# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., | ) ) ) | |
| BLAKE ELLMAN, *and* | ) ) ) | HON. PETER G. SHERIDAN, U.S.D.J. |
| ALEXANDER DEMBOWSKI, | ) ) | |
| *Plaintiffs*, | ) ) | HON. LOIS H. GOODMAN, U.S.M.J. |
| v. | ) ) | |
| GURBIR GREWAL, in his official capacity as Attorney General of New Jersey, | ) ) ) | CIVIL ACTION NO. 18-cv-10507 |
| PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, | ) ) ) ) ) | **CIVIL ACTION** **(ELECTRONICALLY FILED)** |
| THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department, *and* | ) ) ) ) | |
| JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department, | ) ) ) ) | |
| *Defendants*. | ) ) | |

## DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1

## I.    Experience & Training

1.    I am a Professor Emeritus of Criminology and Criminal Justice at Florida State University.  During my years as a professor, I have extensively researched and written about the subject of gun control, and I am a nationally-recognized authority on violence and gun control.  I have conducted numerous studies on the effects of guns on death and injury in crimes, on the impact of gun control laws on rates of violence, and on the frequency and effectiveness of defensive gun use by crime victims, patterns of gun ownership, and why people support gun control.

2.    I have published and presented extensively on the issues of guns, violence, and gun control.  I have studied the effectiveness of defensive gun use ("DGU"), i.e. whether use of guns by crime victims increases or decreases their risk of being injured or losing property in a crime incident.  The research indicated that victims who used guns for self-protection were less likely to suffer injury or property loss than otherwise similar victims who either did not resist or who used other self-protection strategies (Gary Kleck, *Crime Control through the Private Use of Armed Force*, *in* 1 SOCIAL PROBLEMS 1–21 (Feb. 1988); Gary Kleck & Susan Sayles, *Rape and Resistance*, *in* 37 SOCIAL PROBLEMS 149–62 (May 1, 1990); Gary Kleck & Miriam A. DeLone, *Victim Resistance and Offender Weapon Effects in Robbery*, *in*

9 J. QUANTITATIVE CRIMINOLOGY 55–81 (Mar. 1993); Jongyeon Tark & Gary Kleck, *Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes*, *in* 42 CRIMINOLOGY 861–910 (Nov. 2004)).

3.      I have closely examined news media accounts of every large-scale mass shooting (more than six victims killed or injured) committed in the United States from 1987 through July 2013 in which it was known that a large-capacity magazine (LCM) was used, with a focus on whether LCM use by the killers could have affected the number of victims shot.[1] The research showed that in all incidents studied, the shooter possessed either multiple guns or multiple magazines, meaning that the shooter, even if denied LCMs, could have continued firing without any significant interruption, and that the rates of fire were such that any reload would not increase the time between shots.

4.      In 1994, I conducted the National Self-Defense Survey, a nationwide survey designed to estimate the prevalence of DGUs.  My team conducted a random survey sampling of 4,977 adults concerning DGU.   We determined that approximately 1.3% of respondents had experienced a DGU in the preceding twelve months.  Multiplying the U.S. adult population size by 1.3% yielded an estimate that

---

[1] Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, *in* 17 JUSTICE RESEARCH AND POLICY 28–47 (June 1, 2016).

3

in 1993 there were approximately 2.5 million incidents in which victims used guns for self-protection.  As a point of comparison, there were about 0.5 million violent crimes committed that same year by offenders using guns, as estimated by the U.S. Census Bureau's National Crime Victimization Survey. Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, *in* 86 J. CRIM. L. & CRIMINOLOGY 150–87 (1995).  The research further indicated that 46% of DGUs involved women, and additionally that a disproportionate share of DGUs were by African-American or Hispanic individuals.

5.     I have a Ph.D. in Sociology. I am the 1993 winner of the Michael J. Hindelang Award of the American Society of Criminology for my book Point Blank: Guns and Violence in America, which made "the most outstanding contribution to criminology."  I am also an Editorial Consultant for numerous publications including (among others) *Criminology*, *Homicide Studies*, *Violence and Victims*, *Social Problems* and *Journal of Research in Crime and Delinquency*.  The full set of my scholarly publications may be found in the attached Curriculum Vitae.

6.     I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force, and as a

4

member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence.

7.    I have taught doctoral students how to do research and to evaluate the quality of research evidence and have taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology.  My full background can be reviewed in the attached Curriculum Vitae.

8.    I am compensated at a rate of $400.00 per hour for my services.

## II.    The New Jersey Law's Restrictions on Magazine Capacity

9.    The New Jersey law bans standard magazines that are in common use by classifying them as "large capacity ammunition magazines."  A "large capacity ammunition magazine" is defined as a box, drum, tube, or other container which is capable of holding more than 10 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm.

10.   To the extent that New Jersey lawmakers intend for a ban on commonly-used magazines to reduce the number of homicides and violent crimes committed in the state, my research has found no such link, and none can be found in the literature.  In fact, the ban's restriction on magazine capacity is unlikely to have any detectable effect on the number of homicides or violent acts committed

5

with firearms, or the number of persons killed or injured in violent crimes. Further, criminals will be even less likely to be affected by the large-capacity magazine ("LCM") restriction than law-abiding citizens. It is law-abiding citizens who will primarily be impacted by the restriction, being deprived of sufficient ammunition capacity to assure themselves of being able to fend off attackers.

## A. The Law's Ten-Round Restriction Has an Inconsequential Effect on Criminal Behavior But Reduces Law-Abiding Citizens' Ability to Adequately Defend Themselves, Their Families, and Their Property.

11.     The law's limitation of the capacity of magazines allowable for a firearm in the home impairs a crime victim's ability to successfully defend against a criminal attack. My research has indicated that a ten-round restriction leaves victims unable to adequately protect themselves, their families, and their property for the following reasons.

### 1.     Having Only Ten Rounds to Fire in a Situation of Lawful Self-Defense is Insufficient in a Significant Share of Defensive Gun Use Situations.

12.     Limiting magazine loading to ten rounds impairs a crime victim's ability to lawfully defend himself and others because (a) victims often face multiple criminal adversaries; (b) people miss with most of the rounds they fire, especially when firing under duress; (c) some criminal attempts can only be stopped by

shooting the offenders; and (d) criminals will be unaffected by the ban, disproportionately hindering victims.

13.     The 2008 National Crime Victimization Survey of the U. S. Bureau of Justice Statistics found that 797,139 violent crime incidents occurred in the U. S. in which the victims faced multiple offenders, and in 247,388 of these violent crimes the victim faced *four or more* offenders.[2]

14.     A reasonable upper limit on the marksmanship of lawful defenders using guns can be inferred from a review of the many detailed studies that have been done of shootings by police officers in which the officers were trying to shoot criminal adversaries.  In many of these shootings, the officers fired large numbers of rounds. Yet, in 63% of the incidents, the officers failed to hit even a single offender with even a single round.[3]  Given the experience and training police officers have in handling stressful, dangerous situations, it is reasonable to assume that marksmanship among civilians will be no better than that of police during an attack. Therefore, it is reasonable to suppose that at most 37% of attempts by civilian crime

---

[2]   U.S. BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 37 (Mar. 2010), https://goo.gl/6vSpRA.

[3]   WILLIAM A. GELLER & MICHAEL S. SCOTT, DEADLY FORCE: WHAT WE KNOW: A PRACTITIONER'S DESK REFERENCE ON POLICE-INVOLVED SHOOTINGS (1993).

victims to shoot their criminal adversaries will result in any of the offenders being shot.

15.     Even if one optimistically assumed that the average civilian crime victim could hit an offender with one out of every three shots fired, this means it would take at least 12 rounds to shoot four offenders, still more to shoot even larger numbers of offenders.  A law that banned magazines holding more than 10 rounds would therefore have made it impossible for the 247,388 crime victims who faced four or more offenders in 2008 to shoot all of the criminals menacing them.  In any subset of those crimes in which offenders could only be stopped by actually shooting them, victims who obeyed a New Jersey-style LCM ban and possessed only a single magazine holding 10 or fewer rounds would have been unable to stop all of the offenders.

16.     Some law-abiding citizens, along with many criminals, will very likely substitute multiple ten-round magazines, or even multiple guns, in the absence of LCMs—a development which would obviously defeat the purpose of the magazine capacity limit to a considerable degree.  The potential for substituting a large number of smaller-capacity magazines for banned large-capacity magazines, however, is not the same for offenders and victims.  A criminal who planned to commit a violent crime such as a mass shooting could also plan to bring a large number of 10-round

magazines, enabling him to fire many rounds with only 2–4 second delays for magazine changes. He would not need to routinely carry this huge number of magazines on a daily basis—he would only need to do so on the occasion of the shooting.

17.    In contrast, crime victims do not plan their victimizations and cannot know when or where they will be victimized. They could only be assured of possessing large numbers of magazines at the time of a violent victimization if they routinely carried them on a daily basis, which is obviously not feasible. As a result, criminals will be able to easily evade the intent of the LCM ban by carrying multiple loaded magazines, while victims will not.

18.    Further, many crime victims will not be able to make effective use of additional magazines. Under the intense emotional stress of a crime victimization, when taken by surprise, the victim's hands are shaking, making it impossible for some victims to eject the expended magazine and insert a new one quickly enough to make effective use of the second magazine even if it is nearby and readily available. Elderly or physically handicapped persons may find it physically impossible for them to quickly change magazines.

19.    It is virtually a tautology that criminals will disobey the legal ban on LCMs at a higher rate than noncriminals, so law-abiding citizens who desire a LCM

will be less likely to illegally acquire one than criminals.  Consequently, the additional defensive value conferred by LCMs will be denied to law-abiding citizens at a higher rate than any possible crime-reducing effects of LCMs denied to criminals.

### 2.    The Restrictions on LCMs Will Have An Inconsequential Impact on Reducing Homicides and Violent Crimes.

20.    Criminals rarely fire more than ten rounds in gun crimes.  Indeed, they usually do not fire any at all—the gun is used only to threaten the victim, not to attack him or her.[4]  And when criminals do fire their weapons, they usually fire only a very few rounds.  For example, a study from Jersey City, New Jersey found that offenders did not fire a single shot in over two-thirds of crimes in which the offender was armed with a handgun.[5]  And of all violent crimes in which handguns *were* fired, only 2.5–3.0% involved more than 10 rounds being fired by the offender.  The average number of rounds fired was 3.23–3.68 in incidents involving semi-automatic firearms, and 2.30–2.58 in incidents involving revolvers.  In a sample of Philadelphia

---

[4]   Gary Kleck & Karen McElrath, *The Effects of Weaponry on Human Violence*, *in* 69 SOCIAL FORCES 669–92 (Mar. 1, 1991).

[5]   D. C. Reedy & C. S. Koper, *Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers*, *in* 9 INJURY PREVENTION 151–55 (2009).

gun homicides, the average number of rounds fired was 2.7 for attacks committed with semiautomatic pistols and 2.1 for those with revolvers (McGonigal et al. 1993). For the vast majority of gun crimes, the unavailability of LCMs would therefore be inconsequential in reducing criminal behavior.

21.     Among the very small share of offenders who anticipated firing more than ten rounds, a criminal could simply substitute one of the many illegal LCMs that will continue to circulate among criminals even after being prohibited.[6]

### 3. The Restrictions on LCMs Will Not Have A Significant Effect On The Number of Victims Killed or Injured in Mass Shootings.

22.     A ban on LCMs will have an inconsequential effect on reducing the number of killed or injured victims in mass shootings.  Mass murderers are not going to balk at violating laws banning LCMs and can easily obtain LCMs out of state and illegally bring them back to New Jersey.   Among would-be mass murderers unwilling or unable to simply acquire an unlawful LCM, the absence of an LCM would, as far as available evidence indicates, still make no difference to the number of people hurt.  Some have assumed that lives would be saved if an offender lacked an LCM because he would be forced to reload sooner or more often, thereby giving

---

[6]  GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997).

bystanders the opportunity to tackle the shooter and stop his attacks.  Unfortunately, the window of opportunity for such heroic intervention closes rapidly: it takes two to four seconds for shooters to eject an expended magazine from a semi-automatic gun, insert a loaded magazine, and make the gun ready to fire.  Thus, it is not surprising that victims and bystanders in mass shootings have virtually never tackled the shooters while they were reloading.  My research found that in the 20-year period from 1994–2013, there was at most one mass shooting in which bystanders tackled a shooter while he was reloading a semiautomatic firearm.

23.    An absence of LCMs would not, except in the most extraordinarily rare situations, reduce the numbers of persons killed or injured even in a mass shooting, in which large numbers of rounds are fired.  This is because mass shooters either bring multiple guns to the crime or use multiple, smaller capacity magazines and, even in the presence of bystanders willing and able to intervene, simply reload their weapons or substitute another one.  Indeed, evidence on mass shootings indicates that these are precisely the adaptations adopted by virtually all mass shooters.[7]

---

[7]  Gary Kleck, *The Worst Possible Case For Gun Control: Mass Shootings in Schools*, *in* 52 AMERICAN BEHAVIORAL SCIENTIST 1447–64 (Mar. 4, 2009); Kleck, *supra* note 1.

24.     I recently conducted a study where I identified, as comprehensively as possible, all mass shootings (those with more than six killed or injured victims) that occurred in the United States in the 20-year period from 1994 through 2013 inclusive and that were known to have involved an LCM, defined as it is by New Jersey law to be a magazine holding more than 10 rounds of ammunition.  For the period 1994–2013 inclusive, I identified 23 mass shootings in which LCMs were known to have been used.[8]  Thus, mass shootings known to involve LCMs occurred, on average, only about once per year in the United States over this 20-year period.  None of these incidents occurred in New Jersey.

25.     My research of these 23 LCM-involved mass shootings known to have occurred from 1994 through July 2013 found that in all of the incidents the shooters (a) had multiple guns, (b) had multiple magazines, and/or (c) reloaded their guns without interference from others.  Thus, the shooters did not need LCMs to fire large numbers of rounds and kill or injure as many victims as they did.  Of the 23 incidents, shooters had multiple guns in 17 (74%) of the incidents.  Among the 6 incidents in which shooters possessed only a single gun, the shooter was known to also possess multiple magazines in all six incidents. Thus, all these mass shooters would have

_____

[8] Kleck, *supra* note 1.

been able to fire large numbers of rounds without significant interruption, and wound large numbers of victims, even if they had not possessed LCMs. They could have simply switched guns or changed magazines in 2–4 seconds to continue firing.

26.     For the period 1994–2013 inclusive, we identified three mass shooting incidents in which it was claimed that interveners disrupted the shooting by tackling the shooter while he was trying to reload.  In only one of the three cases, however, did interveners actually tackle the shooter while he *may* have been reloading a semiautomatic firearm.  In one of the other two incidents, the weapon in question was a shotgun that had to be reloaded by inserting one shotshell at a time into the weapon and so the incident is irrelevant to the effects of detachable LCMs.[9]  In another incident, occurring in Springfield, Oregon on May, 21, 1998, the shooter, Kip Kinkel, was using a semiautomatic gun, and he was tackled by bystanders, but not while he was reloading.  After exhausting the ammunition in one gun, the shooter started firing another loaded gun, one of the three firearms he had with him.  The first intervener was shot in the hand in the course of wresting this still-loaded gun away from the shooter.

---

[9] *Take down of Alleged Shooter Recounted*, KNOXVILLE NEWS SENTINEL (July 29, 2008).

27.    The final case occurred in Tucson, Arizona on January 8, 2011.  This is the shooting in which a man named Jared Loughner attempted to assassinate Representative Gabrielle Giffords.  The shooter was using a semiautomatic firearm and was tackled by bystanders, purportedly while trying to reload a detachable magazine.  Even in this case, however, there are important uncertainties.  According to one news account, one bystander "grabbed a full magazine" that the shooter dropped, and two others helped subdue him.  It is not, however, clear whether this bystander intervention was facilitated because the shooter was reloading or because the shooter stopped firing when his gun or magazine failed to function properly.  Eyewitness testimony, including that of the intervenors, was inconsistent as to exactly why or how the intervention transpired in the Giffords shooting.  One intervener insisted that he was sure the shooter had exhausted the ammunition in the first magazine because he saw the gun's slide locked back—a condition he believed could only occur with this particular firearm after the last round is fired.  In fact, this can also happen when the gun jams, that is, fails to chamber the new round.[10]  The *New York Times* reported that the spring on the second magazine was broken,

_____

[10] Transcript of Trial, Colorado Outfitters Ass'n, et al. v. Hickenlooper, No. 13-cv-1300 (D. Colo. Apr. 8, 2014) (Statement of Colorado Assistant Attorney General Leann Morrill and Roger Salzgeber).

presumably rendering it incapable of functioning.[11]  If the *New York Times* account was accurate, the shooter would not have been able to continue shooting with that magazine even if no one had stopped him from loading it into his gun.  Detachable magazines of *any* size can malfunction, which would at least temporarily stop a prospective mass shooter from firing.  The bystander intervention in the Tucson case could have occurred regardless of what size magazines the shooter possessed, since a shooter struggling with a defective small-capacity magazine would be just as vulnerable to disruption as one struggling with a defective LCM.

28.    The bystander intervention in the Giffords shooting was in any case unique and occurred only because there were extraordinarily courageous and quick-thinking bystanders willing and able to tackle the shooter.  Over a 20-year period in the United States, the Tucson incident appears to be the only known instance of a mass shooter using a semiautomatic firearm and detachable magazines in which the shooter was stopped by bystanders while the shooter *may* have been trying to reload such a magazine.

29.    In earlier research, I studied news media accounts of 15 widely-reported mass shootings that occurred in the U.S. between 1984 and 1993.  Likewise, among

---

[11] Adam Nagourney, *A Single, Terrifying Moment: Shots Fired, a Scuffle, and Some Luck*, N.Y. TIMES (Jan. 10, 2011).

the incidents covered in my earlier study, bystander intervention stopped the shooting in only one case, that of Colin Ferguson shooting people on a Long Island commuter train.  Bystander intervention, however, may only have occurred in that incident because of the unique location of the shooting.  Since passengers could not exit the moving train car, they were forced to remain relatively close to the shooter, allowing them to quickly close the short distance between them and the shooter when he tried to reload.  My study of mass shootings in 1984 through 1993 found that the killers in 13 of the 15 incidents possessed multiple guns—the Ferguson shooting being one of the two exceptions.[12] Thus, the shooters could continue firing without interruption after exhausting the ammunition in one gun simply by switching to another loaded gun.

30.    It might be argued that banning LCMs could reduce the casualty count in mass shootings by allowing prospective victims to escape or take evasive actions during the time when the shooter changed magazines.  Shooters deprived of LCMs who substituted lower capacity magazines would have to change magazines sooner or more often, arguably extending the time available to prospective victims to take such actions.  This argument, however, assumes that magazine changes do in fact

---

[12]  KLECK, TARGETING GUNS, *supra* note 6.

extend the time the killer was not shooting.  Evidence on actual mass shootings, however, indicates that the killers typically do not fire at high rates, instead firing deliberately, at rates far below the fastest rates that can be maintained with semi-automatic weapons.  It only takes two to four seconds to drop an expended box-type magazine, insert a new, fully loaded magazine, and make the weapon ready to fire. The average interval between shots in mass shootings, however, is nearly always more than two to four seconds, which means that magazine changes do not even slow the shooter's rate of fire.

31.     Table 1 summarizes data on 17 of the 23 LCM-involved mass shootings, plus another 8 mass shootings for which rate of fire information was available but it was unknown whether LCMs were involved.  These were shooting incidents for which news media accounts provided information on both the number of shots fired and the time span in which shots were fired, thereby allowing computation of rates of fire.  Only 3 shooters of the 25 total took less than 2 seconds per shot fired, and only 6 took under 4 seconds.  Even with this handful of incidents with unusually rapid fire, however, the difference between the 1.4 seconds per shot and 1.6 seconds per shot observed in two incidents, and the 2–4 seconds that it takes to change a box-type magazine is not likely to even be perceptible to prospective victims.  That is, they would be unlikely to even be aware of the very slight slowing

18

of the killer's rate of fire necessitated by his changing of magazines.  In sum, even if LCM bans forced some mass shooters to use smaller capacity magazines and therefore change magazines earlier and/or more often, it would not perceptibly reduce those offenders' rate of fire and thereby allow victims to take any additional evasive or defensive actions that they otherwise would not have been able to take.

## III.   Conclusion

32.    The New Jersey legal restrictions on LCMs will have little or no impact on the number of homicides and violent acts committed with firearms. Law-abiding citizens will be less safe in their homes because of the restriction on LCMs.  The LCMs restriction will not prevent violent behavior or reduce its harms. Criminals rarely need large numbers of rounds to commit their crimes and, on the rare occasions when they do, will accomplish the same goal as using an LCM by bringing multiple firearms to the crime, using multiple, smaller-capacity magazines, or, given the absence of bystanders willing to intervene, simply reloading their weapons.  The ten-round restriction does, however, leave crime victims less able to adequately protect themselves, their families, and their property.  Such a law will reduce possession of LCMs more among law-abiding citizens than among criminals, and thus more among non-criminal victims and prospective victims than among criminal offenders.  A law limiting magazine capacity to no more than ten rounds will do

19

more harm than good because it will reduce the harm-preventing effects of victim DGU more than it will reduce the extremely rare harm-causing effects of offender use of LCMs.

33.    In sum, the best available evidence indicates that New Jersey' ban on LCMs is more likely, on net, to harm the safety of its citizens than to improve it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed within the United States.

_____          _____

Gary Kleck                                June 19, 2018

                                          Date

**Table 1.  Rates of Fire in Mass Shootings (over 6 casualties), 1994-2013**

| Date of Incident | Shots Fired[a] | Time of Firing (minutes) | Shots per minute | Seconds per Shot |
|---|---|---|---|---|
| 6-20-94 | >50 | c. 5 | >10 | <6.0 |
| 2-28-97 | 1,101 | 44 | 25 | 2.4 |
| 4-20-99 | 188 | 49 | 3.8 | 15.6 |
| 9-15-99 | >100 | 10 | >10.0 | <6.0 |
| 9-2-99 | 10 | <30 | >0.3 | <180.0 |
| 5-24-00 | c. 7 | <90 | >0.06 | <1080.0 |
| 9-22-00 | 9+ | <10 | >0.9 | <66.7 |
| 12-26-00 | 37 | 5-8 (6.5) | 5.7 | 10.5 |
| 2-5-01 | 25-30 (27.5) | 8-15 (11.5) | 2.4 | 25.1 |
| 3-5-01 | c. 24 | 6 | c. 4.0 | c. 15.0 |
| 3-12-05 | 22 | <1 | >22.0 | <2.7 |
| 3-21-05 | 45 | 9 | 5.0 | 12.0 |
| 3-25-06 | 8+ | c. 5 | >1.6 | <37.5 |
| 10-2-06 | 17-18 (17.5) | c. 2 | c. 8.75 | c. 6.9 |
| 4-16-07 | c. 174 | 156 | c. 1.11 | c. 53.8 |
| 10-7-07 | 30 | c. 1 | c. 30.0 | c. 2.0 |
| 12-5-07 | >30 | c. 6 | > 5.0 | <12.0 |
| 2-14-08 | 56 | 5 | 11.1 | 5.4 |
| 1-7-10 | 115 | 30 | 3.8 | 15.7 |
| 8-3-10 | 19 | 3 | 6.3 | 9.5 |

| 1-8-11 | 31 | 0.25 | 125 | 0.48 |
| 9-6-11 | 60+ | 1.42 | 42.3+ | 1.4 |
| 7-20-12 | 76 | c. 6 | 12.7 | 4.74 |
| 9-27-12 | 46+ | 14 | >3.3 | <18.3 |
| 12-14-12 | 154+ | 4 | 38.5+ | 1.6 |

Note:

a.  Where a range was provided in news media accounts, the midpoint of the range (shown in parentheses) was used in rate-of-fire computations.

<u>Source</u>:  Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, *in* 17 JUSTICE RESEARCH AND POLICY 28–47 (June 1, 2016)

23

# REFERENCES

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997)

Gary Kleck & Michael Hogan, *National case-control study of homicide offending and gun ownership*, *in* 46 SOCIAL PROBLEMS 275–93 (May 1999).

Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, *in* 17 JUSTICE RESEARCH AND POLICY 28–47 (June 1, 2016)

Christopher S. Koper & Jeffery A. Roth, *The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, *in* 17 J. QUANTITATIVE CRIMINOLOGY 33–74 (Mar. 2001)

Christopher S. Koper & Jeffery A. Roth, *The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Short-Term Primary and Secondary Market Effects*, *in* 18 J. QUANTITATIVE CRIMINOLOGY 239–66 (Sept. 2002)

Michael D. McGonigal, et al., *Urban Firearm Deaths: A Five-Year Perspective*, *in* 35 J. TRAUMA 532–36 (Oct. 1993)

Rick Ruddell & G. Larry Mays, *Examining the Arsenal of Juvenile Gunslingers: Trends and Policy Implications*, in 49 CRIME & DELINQUENCY 231–52 (Apr. 1, 2003)

CURRICULUM VITAE

GARY KLECK

(Updated June 10, 2018)

PERSONAL

Place of Birth:              Lombard, Illinois

Date of Birth:              March 2, 1951

Address:                    College of Criminology and Criminal Justice
                            The Florida State University
                            314B Eppes Hall
                            112 S. Copeland Street
                            Tallahassee, FL 32306-1273

                            Tallahassee, Florida 32306-1127

Telephone Number:           Home: (850) 894-1628

e-mail Address:             gkleck@fsu.edu


CURRENT POSITION

    David J. Bordua Emeritus Professor of Criminology, Florida State University

COURTESY APPOINTMENT

    Courtesy Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

    American Society of Criminology

    Academy of Criminal Justice Sciences

EDUCATION

    A.B.        1973 - University of Illinois, with High Honors and with Distinction in
                Sociology

A.M.            1975 - University of Illinois at Urbana, in Sociology

Ph.D.           1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in
Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of
Criminology, for the book that made "the most outstanding contribution to
criminology"   (for Point Blank: Guns and Violence in America).

Awarded Named Professorship, Florida State University, 2012.

Nominated for University Teaching Award, Florida State University, 2014.

Paper of the Year awarded by Criminal Justice Review for "Does Gun Control Reduce
Crime?," Volume 4, pp. 488-513 (2016).

TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to May 2016 | Professor, College of Criminology and Criminal Justice, Florida State University |
| Fall, 1984 to Spring, 1991 | Associate Professor, School of Criminology, Florida State University. |
| Fall, 1979 to Spring, 1984 | Assistant Professor, School of  Criminology, Florida State University. |
| Fall, 1978 to Spring, 1979 | Instructor, School of Criminology, Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law
Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory
Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and
Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S.
Homicide Trends from 1947 to 1976.  Department of Sociology, University of
Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991,  Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de
2005   Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American
       Society of Criminology.  Republished in 2005 in paperback by Transaction
       Publishers.

              Reviewed in Contemporary Sociology, American Journal of Sociology,
              Social Forces, Journal of Criminal Law and Criminology, The
              Criminologist, The Public Interest, Criminal Law Forum, Social
              Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and
              Law Enforcement, Newsletter of Public Policy Currents, Commonweal,
              Choice, and others.

1997   Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997   The Great American Gun Debate: Essays on Firearms and Violence (with Don B.
       Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001   (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.:
       Prometheus Books.

       Selected to Choice: Current Reviews for Academic Libraries' 39th annual
       "Outstanding Academic Title List," awarded for "excellence in scholarship and
       presentation, the significance of their contribution to their field, and their value as
       an important treatment of their topic."  Awarded to less than one percent of
       books.

2017   (with Brion Sever) Punishment and Crime: The Limits of Punitive Crime Control.
       NY: Routledge.

RESEARCH MONOGRAPH

1979   Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms
       Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforce-
       ment Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979    "Capital punishment, gun ownership, and homicide." <u>American Journal of Sociology</u> 84(4):882-910.

1981    "Racial discrimination in criminal sentencing: A critical evaluation of the evidence with additional evidence on the death penalty." <u>American Sociological Review</u> 46(6):783-804.

1982    "On the use of self-report data to determine the class distribution of criminal behavior." <u>American Sociological Review</u> 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun control." <u>Law and Policy Quarterly</u> 5(3):271-298.

1985     "Life support for ailing hypotheses:  modes of summarizing the evidence on racial discrimination in criminal sentencing." <u>Law and Human Behavior</u> 9(3):271-285.

1986     "Evidence that 'Saturday Night Specials' not very important for crime." <u>Sociology and Social Research</u> 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence." <u>Sociological Inquiry</u> 57(3):237-250.

1988    "Crime control through the private use of armed force." <u>Social Problems</u> 35(1):1-21.

1988    "Miscounting suicides." <u>Suicide and Life-Threatening Behavior</u> 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance." <u>Social Problems</u> 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence." <u>Social Forces</u> 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery." <u>Journal of Quantitative Criminology</u> 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on violence rates." <u>Journal of Quantitative Criminology</u> 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control." <u>Violence and Victims</u> 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field." <u>Social Pathology</u> 1(1):12-47.

1995    "Using speculation to meet evidence." <u>Journal of Quantitative Criminology</u>

11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun." Journal of Criminal Law & Criminology 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys." American Behavioral Scientist 39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." Law & Society Review 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down." Journal of Criminal Law and Criminology 87(4):1446-1461.

1997    (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." Journal of Criminal Justice 26(3):251-258.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998    "What are the risks and benefits of keeping a gun in the home?" Journal of the American Medical Association 280(5):473-475.

1998    (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders." Criminology 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Social Problems 46(2):275-293.

1999    "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals." St. Louis University Public Law Review 18(1):23-45.

2001    "Can owning a gun really triple the owner's chances of being murdered?" Homicide Studies 5:64-77.

2002    (with Theodore Chiricos) "Unemployment and property crime: a target-specific assessment of opportunity and motivation as mediating factors." Criminology 40(3):649-680.

2004    "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general deterrence research." Criminology 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently used in research in criminology and criminal justice?" Journal of Criminal Justice 34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?" Psychological Reports 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2000-2005." Journal of Criminal Justice Education 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime victimization and divorce." International Review of Victimology 15(1):1-17.

2009    "The worst possible case for gun control: mass shootings in schools." American Behavioral Scientist 52(10):1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking and the overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009    (with Tomislav Kovandzic) "City-level characteristics and individual handgun ownership: effects of collective security and homicide." Journal of Contemporary Criminal Justice 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton) "Why do people support gun control?" Journal of Criminal Justice 37(5):496-504.

2011    (with James C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009." Journal of Criminal Justice Education 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser). "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." Journal of Criminal Justice 39(4):312-319.

2013    (with Will Hauser) "Guns and fear: a one-way street?" Crime and Delinquency 59:271-291.

2013   "Gun control after Heller and McDonald: what cannot be done and what ought to be done." Fordham Urban Law Journal 39(5):1383-1420.

2013   (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?" Crime and Delinquency 59(7):1006-1035.

2013   (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach." Journal of Quantitative Criminology 28(4):477-541.

2014   (with Jongyeon Tark) "Resisting rape: the effects of victim self-protection on rape completion and injury." Violence Against Women 23(3): 270-292.

2014   (with J. C. Barnes) "Do more police generate more crime deterrence?" Crime and Delinquency 60(5):716-738.

2015   "The impact of gun ownership rates on crime rates: a methodological review of the evidence." Journal of  Criminal Justice 43(1):40-48.

2016   (with Tom Kovandzic and Jon Bellows)  "Does gun control reduce violent crime? Criminal Justice Review 41:488-513.

2016   "Objective risks and individual perceptions of those risks." Criminology & Public Policy 15:767-775.

2016   (with Dylan Jackson)  "What kind of joblessness affects crime?  A national case-control study of serious property crime." Journal of Quantitative Criminology 32:489-513.

2016   "Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages." Justice Research and Policy 17:28-47.

2017   (with Will Hauser)  "The impact of police strength and arrest productivity on fear of crime and subjective assessments of the police" American Journal of Criminal Justice 42:86-111.

2017   (with Dylan Jackson)  "Does crime cause punitiveness?" Crime & Delinquency. 63(12):1572-1599.

2017   (with Bethany Mims)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014." Journal of Criminal Justice Education 28(4):467-487.

2018   (with Moonki Hong) "The short-term deterrent effect of executions: an analysis of daily homicide counts." Crime & Delinquency 64(7):939-970.

2018    "Response errors in survey estimates of defensive gun use." Published online in Crime & Delinquency, 3-26-18.  Due in print c. Feb. 2019.

2018    "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence."  Social Science Quarterly, in press.

## OTHER PUBLISHED ARTICLES

1985    "Policy lessons from recent gun control research." Law and Contemporary Problems 49(1):35-62.

1992    "Assault weapons aren't the problem."  New York Times September 1, 1992, p. A15.  Invited Op-Ed page article.

1993    "The incidence of violence among young people." The Public Perspective 4:3-6. Invited article.

1994    "Guns and self-protection."  Journal of the Medical Association of Georgia 83:42. Invited editorial.

1998    "Using speculation to meet evidence: reply to Alba and Messner."  Journal on Firearms and Public Policy 9:13-49.

1998    "Has the gun deterrence hypothesis been discredited?"  Journal on Firearms and Public Policy 10:65-75.

1999    "There are no lessons to be learned from Littleton."  Criminal Justice Ethics 18(1):2, 61-63.  Invited commentary.

1999    "Risks and benefits of gun ownership - reply."  Journal of the American Medical Association 282(2):136-136.

1999    "The misfire that wounded Colt's."  New York Times October 23, 1999.  Invited Op-Ed page article.

1999    "Degrading scientific standards to get the defensive gun use estimate down." Journal on Firearms and Public Policy 11:77-137.

2000    "Guns aren't ready to be smart."  New York Times March 11, 2000.  Invited Op-Ed page article.

2000    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: using interrupted time series designs to evaluate social policy impact."  Journal on Firearms and Public Policy 12:197-247.

2001   "School lesson: armed self-defense works." Wall Street Journal March 27, 2001. Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth." Journal of Quantitative Criminology 17:75-80.

2001   "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement." Journal on Firearms and Public Policy 13:1-43.

2002   "Research agenda on guns, violence, and gun control." Journal on Firearms and Public Policy 14:51-72.

2006   "Off target." New York Sun January 5, 2006.  Invited opinion article.

2009   "How not to study the effect of gun levels on violence rates." Journal on Firearms and Public Policy 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes." Wall Street Journal January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking." Wall Street Journal May 21, 2011. Invited opinion article.

2015   "Defensive gun ownership is not a myth: why my critics still have it wrong." Politico Magazine, February 17, 2015.  Online at Politico.Com.


BOOK CHAPTERS

1984   (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge, Mass.: Ballinger.

       (Also appeared in Federal Regulation of Firearms, report prepared by the Congressional Research Service, Library of Congress, for the Committee on the Judiciary, United States Senate, 1982).

1984   "The relationship between gun ownership levels and rates of violence in the U.S." Pp. 99-135 in Kates, above.

1984   "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in Kates, above.

1996   "Racial discrimination in criminal sentencing."  Pp. 339-344 in Crime and Society, Volume III – Readings: Criminal Justice, edited by George Bridges,

Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs, edited by Martha R. Plotkin.  Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the Encyclopedia of Criminology and Deviant Behavior, edited by Clifton D. Bryant.  Philadelphia: Taylor & Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in What is Crime?: Controversy over the Nature of Crime and What to Do About It, edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in Punishment and Social Control: Enlarged Second Edition, edited by Thomas G. Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in The Criminal Justice System: Politics and Policies, 9th edition, edited by George F. Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008    "Gun control." Article in The Encyclopedia of Social Problems, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009    "Guns and crime." Invited chapter.  Pp. 85-92 in 21st Century Criminology: A Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias."  Chapter 6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA: Sage.

2012    (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?"  Pp. 415-439 in Handbook of Survey Methodology, edited by Lior Gideon.  NY: Springer.

2013    "An overview of gun control policy in the United States."  Pp. 562-579 in The Criminal Justice System, 10th edition, Edited by George F. Cole and Marc G. Gertz. Wadsworth.

2014    "Deterrence: actual vs. perceived risk of punishment.  Article in Encyclopedia of Criminology and Criminal Justice. Berlin: Springer Verlag.

2018   "Gun control."  Chapter in <u>The Handbook of Social Control</u>.  New York: Springer.  Forthcoming.

2018   "Guns and suicide."  In <u>Handbook on Gun Studies</u>, edited by Jennifer Carlson, Kristin Goss, and Harel Shapira.  NY: Routledge.  Forthcoming.

## BOOK REVIEWS

1978   Review of <u>Murder in Space City: A Cultural Analysis of Houston Homicide Patterns,</u> by Henry Lundsgaarde.  <u>Contemporary Sociology</u> 7:291-293.

1984   Review of <u>Under the Gun</u>, by James Wright et al. <u>Contemporary Sociology</u> 13:294-296.

1984   Review of <u>Social Control</u>, ed. by Jack Gibbs.  <u>Social Forces</u> 63: 579-581.

1985    Review of <u>Armed and Considered Dangerous</u>, by James Wright and Peter Rossi, <u>Social Forces</u> 66:1139-1140.

1988   Review of <u>The Citizen's Guide to Gun Control</u>, by Franklin Zimring and Gordon Hawkins, <u>Contemporary Sociology</u> 17:363-364.

1989   Review of <u>Sociological Justice</u>, by Donald Black, <u>Contemporary Sociology</u> 19:261-3.

1991   Review of <u>Equal Justice and the Death Penalty</u>, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  <u>Contemporary Sociology</u> 20:598-9.

1999    Review of <u>Crime is Not the Problem</u>, by Franklin E. Zimring and Gordon Hawkins.  <u>American Journal of Sociology</u> 104(5):1543-1544.

2001   Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig.  <u>Criminal Law Bulletin</u> 37(5):544-547.

2010   Review of  <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.

## LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987   "Accidental firearm fatalities."  <u>American Journal of Public Health</u> 77:513.

1992   "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993    "Gun ownership and crime." <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999    "Risks and benefits of gun ownership." <u>Journal of the American Medical Association</u> 282:136.

2000    (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates." <u>Journal of the American Medical Association</u> 284:2718-2719.

2001    "Violence, drugs, guns (and Switzerland)." <u>Scientific American</u> 284(2):12.

2002    "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u> /8/3/252.

2005    "Firearms, violence, and self-protection." <u>Science</u> 309:1674. September 9, 2005.

## UNPUBLISHED REPORT

1987    <u>Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare</u>. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

## RESEARCH FUNDING

1994    "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997    "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between actual and perceived punishment levels.

## PRESENTED PAPERS

1976    "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979    "The assumptions of gun control."  Presented at the Annual Meetings of the American Sociological Association, New York City.

1980    "Handgun-only gun control:  A policy disaster in the making."  Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1981   "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial
discrimination."  Presented at the Annual Meetings of the American Society of
Criminology, Toronto.

1984   "Policy lessons from recent gun control research."  Presented at the Duke
University Law School Conference on Gun Control.

1985   "Policy lessons from recent gun control research." Presented at the Annual
Meetings of the American Society of Criminology, San Diego.

1986   "Miscounting suicides."  Presented at the Annual Meetings of the American
Sociological Association, Chicago.

1987   (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment
and crime: a comparison of motivation and opportunity effects."  Annual
meetings of the American Society of Criminology, Montreal.

1988   "Suicide, guns and gun control."  Presented at the Annual Meetings of the Popular
Culture Association, New Orleans.

1988   (with Susan Sayles)  "Rape and resistance."  Presented at the Annual Meetings of
the American Society of Criminology, Chicago, Ill.

1989   (with Karen McElrath)  "The impact of weaponry on human violence."
Presented at the Annual Meetings of the American Sociological Association, San
Francisco.

1989   (with Britt Patterson)  "The impact of gun control and gun ownership levels on
city violence rates."  Presented at the Annual Meetings of the American Society
of Criminology, Reno.

1990   "Guns and violence: a summary of the field."  Presented at the Annual Meetings
of the American Political Science Association, Washington, D.C.

1992   "Interrupted time series designs: time for a re-evaluation."  Presented at the
Annual Meetings of the American Society of Criminology, New Orleans.

1993   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using
interrupted time series designs to evaluate social policy impact." Presented at the
Annual Meetings of the American Society of Criminology, Phoenix.

1993   "Crime, culture conflict and support for gun laws: a multi-level application of the
General Social Surveys."  Presented at the Annual Meetings of the
American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."   Presented at the Annual Meetings of the American Society of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data." Presented at the annual meetings of the Homicide Research Working Group, Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the General Social Surveys."  Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of deterrence-based crime control policy."  Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Presented at the Annual Meetings of the American Society of Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime rates."  Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2002    "The effects of gun ownership levels and gun control laws on urban crime rates." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

2003   (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends on who has them." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2003   (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2004   (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?" Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004   (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004   (with Jongyeon Tark) "The impact of self-protection on rape completion and injury." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004   (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2005   (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2005   (with Jongyeon Tark and Laura Bedard) "Crime and marriage." Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2006   (with Shun-Yang Kevin Wang) "Organized gun trafficking, 'crime guns,' and crime rates." Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2006   "Are police officers more likely to kill black suspects?" Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2007   (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking." Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2007   (with Marc Gertz and Jason Bratton) "Why do people support gun control?" Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2008   (with J.C. Barnes) "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?" Presented at the Annual Meetings of the

American Society of Criminology,  St. Louis.

2009    "The myth of big-time gun trafficking."  Presented at <u>UCLA Law Review</u> Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the Annual Meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the Annual Meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011    (with Shun-young Wang) "The impact of job quality and career commitment on delinquency: conditional or universal?"  Presented at the annual Meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Moonki Hong) "The short-term deterrent effect of executions on homicides in the United States, 1984-1998."  Presented at the annual Meetings of the American Society of Criminology, November 16, 2011, Washington, D.C.

2011    (with Kelly Roberts)  "Which survey modes are most effective in getting people to admit illegal behaviors?"  Presented at the annual Meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size influence victim selection?" Presented at the annual Meetings

of the American Society of Criminology, November 18, 2011, Washington, D.C.

2011    (with Tomislav Kovandzic) "Is the macro-level crime/punishment association spurious?"  Presented at the annual Meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2012     (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual Meetings of the American Society of Criminology, November 15, 2012, Chicago, IL.

2013    (with Will Hauser) "Confidence in the Police and Fear of Crime: Do Police Force Size and Productivity Matter?"  Presented at the annual Meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2013.   (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual Meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2014    (with Dylan Jackson) "Does Crime Cause Punitiveness?"  Presented at the annual Meetings of the American Society of Criminology, November 20, 2014, San Francisco, CA.

2015    "The effect of large capacity magazines on the casualty counts in mass shootings."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2015, Washington, D.C.

2015    (with Bethany Mims) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Presented at the annual Meetings of the American Society of Criminology, November 20, 2015, Washington, D.C.

2016    "Firearms and the Lethality of Suicide Methods."  Presented at the annual Meetings of the American Society of Criminology, November 16, 2016, New Orleans, L.A.

2017    "Macro-level Research on the Effect of Firearms Prevalence on Suicide Rates: A Systematic Review and New Evidence."  Presented at the annual Meetings of the American Society of Criminology, November 15, 2017.

CHAIR

1983    Chair, session on Race and Crime.  Annual meetings of the American Society of Criminology, Denver.

1989    Co-chair (with Merry Morash), roundtable session on problems in analyzing the

National Crime Surveys.  Annual meetings of the American Society of Criminology, Reno.

1994    Chair, session on Interrupted Time Series Designs. Annual meetings of the American Society of Criminology, New Orleans.

1993    Chair, session on Guns, Gun Control, and Violence. Annual meetings of the American Society of Criminology, Phoenix.

1995    Chair, session on International Drug Enforcement. Annual meetings of the American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime.  Annual meetings of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use.  Annual Meetings of the American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. Annual meetings of the American Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim.  Annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981    Session on Gun Control Legislation, Annual Meetings of the American Society of Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, Annual Meetings of the American Society of Criminology, Cincinnati.

1986    Session on Sentencing, Annual Meetings of the American Society of Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, Annual Meetings of the Popular Culture Association, Montreal.

1991    Session on Gun Control, Annual Meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, Annual Meetings of the American Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, Annual Meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson.  Annual meetings of the American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On The Economics of Crime, March 26-28, 2009.

2012    Panel discussion of news media coverage of high profile crimes Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

Editorial consultant -
    American Sociological Review
    American Journal of Sociology
    Social Forces
    Social Problems
    Law and Society Review
    Journal of Research in Crime and Delinquency
    Social Science Research
    Criminology
    Journal of Quantitative Criminology
    Justice Quarterly
    Journal of Criminal Justice
    Violence and Victims
    Violence Against Women
    Journal of the American Medical Association
    New England Journal of Medicine
    American Journal of Public Health
    Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene Carte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of  Criminology, annual meetings in Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

Outside reviewer of Dr. J. Pete Blair for promotion to Full Professor in the School of Criminal Justice at Texas State University, San Marcos, 2014.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology,  Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-present.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-present.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to present.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2011.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

Served as major professor on Area Paper by Christopher Rosbough, completed in 2012.

Served as member of dissertation committee of Kristen Lavin, dissertation completed in 2012.

Served as member of dissertation committee of Elizabeth Stupi, dissertation completed in 2013.

Served as outside member on two dissertation committees in 2014-2015: Brian Meehan in the Department of Economics and Adam Weinstein in the English Department.  Both dissertations were completed.

Served as major professor on Area Paper on legalization of marijuana for Pedro Juan Matos Silva, Spring 2015.  Paper completed.

Currently serving as major professor for two doctoral students, Moonki Hong and Sergio Garduno.  Hong is scheduled to finish his dissertation by December 2015, and Garduno will be starting his dissertation in Spring 2016.


PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include <u>Newsweek</u>, <u>Time</u>, <u>U.S. News and World Report</u>,

New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,     Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 16-17, 2002, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"   New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment," sponsored by the <u>Tallahassee Democrat</u>.

Invited address at University of West Florida, Department of Justice Studies, titled "Guns, Self-Defense, and the Public Interest," April 12, 2013.

Member, National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence, May 2013.

Invited address at Davidson College, Davidson, NC, April 18, 2014.  Invited by the Department of Philosophy.

OTHER ITEMS
>Listed in:
>>Marquis Who's Who
>>Marquis Who's Who in the South and Southwest
>>Who's Who of Emerging Leaders in America
>>Contemporary Authors
>>Directory of American Scholars
>>Writer's Directory

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed through National Public Radio.  Further details are available at
http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in <u>Florida State University Research in Review</u>, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Named one of "25 Top Criminal Justice Professors" in the U.S. by Forensics Colleges website (http://www.forensicscolleges.com/), 2014.


EXPERT TESTIMONY IN PAST FIVE YEARS

Heller et al. v. District of Columbia. U.S. District Court for the District of Columbia (remand of *Heller II*). Deposed 7-2-13.

Wilson v. Cook County. Circuit of Cook County, Illinois County Department, Chancery Division. Deposed 9-16-13.

Kolbe v. O'Malley. U.S. District Court for the District of Maryland. Deposed 1-2-14.

Barbra Schlifer Commemorative Clinic v. HMQ Canada. "Cross-examined" (Canadian term for deposed) 2-24-14.

Dr. Arie S. Friedman and the Illinois State Rifle Association v. City of Highland Park. Deposed May or June 2014.

Wrenn v. District of Columbia. U.S. District Court for the District of Columbia. Deposed 12-8-16.

Tracy Rifle and Pistol v. Kamala D. Harris. U.S. District Court for the Eastern District of California. Deposed 11-2-16.

Flanagan v. Becerra, U.S. District Court for the Central District of California. Deposed 7-25-17.

Duncan v. Becerra. U.S. District Court for the Southern District of California. Deposed 1-3-18.