# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and ALEXANDER DEMBOWSKI, | Hon. Peter G. Sheridan, U.S.D.J. Hon. Lois H. Goodman, U.S.M.J. |

ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and ALEXANDER DEMBOWSKI,

     Plaintiffs,

  v.

GURBIR GREWAL, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department, and JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department,

     Defendants.

Hon. Peter G. Sheridan, U.S.D.J.
Hon. Lois H. Goodman, U.S.M.J.

Docket No. 3:18-cv-10507-PGS-LHG

## CIVIL ACTION

## (ELECTRONICALLY FILED)

Motion Return Date: July 12, 2018

---

## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION ON BEHALF OF DEFENDANTS GURBIR S. GREWAL AND PATRICK J. CALLAHAN

Joseph C. Fanaroff
Assistant Attorney General
  Of Counsel and On the Brief

Jeremy Feigenbaum
Assistant Attorney General
  Of Counsel and On the Brief

Valeria Dominguez
Deputy Attorney General
  On the Brief

Bryan Edward Lucas
Deputy Attorney General
  On the Brief

GURBIR S. GREWAL
Attorney General OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625
Attorney for Defendants,
Gurbir S. Grewal and Patrick J.
Callahan
973-648-3573
Bryan.Lucas@law.njoag.gov

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................. 1

BACKGROUND .............................................................................. 3

STANDARD FOR PRELIMINARY INJUNCTION ............................... 5

ARGUMENT .................................................................................. 7

I.    Plaintiffs Are Unlikely To Succeed On The Merits Of Their Constitutional
      Claims. ................................................................................. 7

      A.    New Jersey's LCM Law Does Not Violate The Second Amendment. ... 7

            1.    LCM Laws Do Not Implicate the Second Amendment, Which
                  Affords No Protection To Dangerous And Unusual Weapons. ......... 8

            2.    LCM Laws Are Longstanding And Thus Constitutional. ................ 16

            3.    LCM Laws Survive Scrutiny Under the Second Amendment. ......... 18

      B.    New Jersey's LCM Law Does Not Violate The Takings Clause. ........ 27

      C.    New Jersey's LCM Law Does Not Violate The Equal Protection
            Clause. ........................................................................... 32

II.   Plaintiffs Will Not Suffer Irreparable Harm Absent Preliminary Injunctive
      Relief.................................................................................... 37

III.  The Balance Of Equities And The Public Interest Favor Denying Relief. ... 38

CONCLUSION .............................................................................. 40

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*Akins v. United States*, 82 Fed. Cl. 619 (Fed. Cl. 2008) .........................................29

*AmeriSource Corp. v. United States*, 525 F.3d 1149 (Fed. Cir. 2008)...................28

*Andrews v. Holloway*, No. 95-1047, 1995 WL 875883 (D. N.J. 1995) .................37

*Andrus v. Allard*, 444 U.S. 51 (1979) .......................................................................31

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) .........................................37

*Dist. of Colum. v. Heller*, 554 U.S. 570 (2008) ............................ 8, 9, 13, 16, 18, 26

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) .................................. 16, 17, 18, 19, 20

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ...................................29

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979) .......................................29

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)…………………
.................................................................. ……………………8, 12, 13, 19, 23, 26

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)………………………….
................................................... …………………………8, 16, 19, 21, 23, 26, 38

*Guns Save Life v. Village of Deerfield*, No. 18CH498 (Ill. Cir. Ct. June 12,
2018)….................................................................................................................29

*Heller v. Dist. of Colum.*, 670 F.3d 1244 (D.C. Cir. 2011)…………………………
.................................................................. 2, 8, 10, 11, 14, 15, 16, 19, 20, 23, 25

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012)......................................33

*Hodges v. Colo. Springs*, 1992 WL 92767 (10th Cir. May 4, 1992)......................34

*Horne v. Dep't of Ag.*, 135 S. Ct. 2419 (2015)........................................................30

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc)......................................
...............................................2, 3, 8, 9, 10, 11, 12, 14, 19, 20, 22, 23, 35, 36

*Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) ...........................................25

*Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)...............................6

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) ............................... 28, 29, 30

*Maryland v. King*, 567 U.S. 1301 (2012) ...............................................................39

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............................................13

*Mugler v. Kansas*, 123 U.S. 623 (1887) ...................................................... 27, 28, 30

*N.J. Hosp. Ass'n v. Waldman*, 73 F.3d 509 (3d Cir. 1995) ......................................6

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)...........................................................................2, 8, 10, 16, 19, 20, 21, 23

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d 185 (5th Cir. 2012) .....................................................................................................8, 37

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ..................................................................33

*NutraSweet Co. v. Vit-Mar Enterprise, Inc.*, 176 F.3d 151 (3d. Cir. 1999) ..............6

*Punnett v. Carter*, 621 F.2d 578 (3d Cir. 1980)........................................................7

*Rupp v. Becerra*, No. 8:17-cv-00746, 2018 WL 2138452 (C.D. Cal. May 9, 2018) .................................................................................................................29

*S.F. Veteran Police Officers v. City & County of San Francisco*, 18 F. Supp. 3d 997 (N.D. Cal. 2014)............................ ..................................... 10, 14, 15, 39, 40

*Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014) ...........................................34

*Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141 (3d Cir. 2005) ..............................................................................................................33

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008)................................33

*Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847 F.2d 100 (3d Cir. 1998).......................6

*Turner Broad. Sys. v. FCC*, 520 U.S. 180 (1997).......................................21

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)...................................9, 16

*United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011)............................................6

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009)...............................................16

*United States v. Salerno*, 481 U.S. 739 (1987)....................................................6, 20

*United States v. Spectro Foods Corp.*, 533 F. 2d 1175 (3d Cir. 1980).....................6

*Wiese v. Becerra*, 263 F. Supp. 3d 986 (E.D. Cal. 2017) .................... 27, 28, 30, 39

*Wiese v. Becerra,* No. 2:17-903, 2018 WL 746398 (E.D. Cal. Feb. 6, 2018).........
................................................................................................ .........31, 32

*Williams v. Puerto Rico*, 910 F. Supp. 2d 386 (D.P.R. 2012) .................................37

*Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018)............................... 12, 13

## **Statutes**

18 U.S.C. § 926(c) ......................................................................................................35

1927 R.I. Pub. Laws 256, §§ 1, 4................................................................................17

1931 Ill. Laws 452 § 1 .................................................................................................18

1932 La. Acts 336 § 1 ..................................................................................................18

1933 S.D. Sess. Laws 245 § 1 ......................................................................................18

1933 Tex. Gen. Laws 219 § 1 .......................................................................................18

1934 S.C. Acts 1288 § 1 ...............................................................................................18

47 Stat. 650 (1932), ch. 465, §§ 1, 14.........................................................................18

Cal. Penal Code §§ 16740, 32310................................................................................5

Colo. Rev. Stat. §§ 18-12-301 to -303 ........................................................................5

Conn. Gen. Stat. § 53-202w ......................................................................................5

Haw. Rev. Stat. Ann. § 134-8(c) ...............................................................................5

Mass. Gen. Laws ch. 140, §§ 121, 131M ..................................................................5

Md. Code Ann., Crim. Law § 4-305(b) .....................................................................5

N.J. Stat. Ann. § 2C:39-6(l) ......................................................................................5

N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11 ......................................5

## Other Authorities

Bart Jansen, *Weapons gunman used in Orlando shooting are high-capacity, common*, USA TODAY (June 15, 2016)…………………………………………..1

Christopher Ingraham, *It's time to bring back the assault weapons ban, gun violence experts say*, THE WASHINGTON POST (Feb. 14, 2018)............................24

Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, REP. TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE (2004) ...............................24

David B. Kopel, *The History of Firearm and Magazine Prohibitions*, 78 ALB. L. REV. 849 (2015) ....................................................................................................17

Margot Sanger-Katz, *How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws*, N.Y. TIMES (Oct. 15, 2017). ....................................................................23

Mary Ellen Clark & Noreen O'Donnell, *Newtown School Gunman Fired 154 Rounds in Less than 5 Minutes*, REUTERS (Mar. 28, 2013)……………………..1

Patricia Mazzei, *Parkland Gunman Carried Out Rampage Without Entering a Single Classroom*, N.Y. TIMES (Apr. 24, 2018)…………………..…..…..1

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMPORARY PROBS. 55 (2017)..........................................17

Sam Petulla, *Here Is One Correlation Between State Gun Laws & Mass Shootings*, CNN (Oct. 5, 2017)..............................................................................................23

Sam Quinones & Nicole Santa Cruz, *Crowd Members Took Gunman Down*, L.A. TIMES (Jan. 9, 2011)………………………………………………………...……...1

*Semi-Annual Firearms Qualification & Requalification Standards for N.J. Law Enforcement* (June 2003) ....................................................................................34

## INTRODUCTION

Less than five months ago, a 19-year-old walked into the Marjory Stoneman Douglas High School in Parkland, Florida, armed with an AR-15 assault rifle and over 300 rounds of ammunition, and opened fire—killing 17 students and staff and wounding 17 others. In 2016, a man in Orlando, Florida, carrying both a rifle with a 30-round magazine and a pistol with a 17-round magazine, killed 49 people at a nightclub. In 2012, a shooter in Newtown, Connecticut, killed 20 children and 6 adults at Sandy Hook Elementary School, using 30-round magazines that enabled him to fire 154 rounds in under 5 minutes. In 2011, a gunman in Tucson, Arizona, killed 6 people and wounded 13 others, including Representative Gabby Giffords, using a handgun with a 33-round magazine—an attack that ended only when that shooter paused to reload and a bystander tackled him. These are just some of the tragic mass shootings this Nation has suffered in recent years.[1]

Seeking to prevent the spread of mass shootings, New Jersey prohibited one of the devices that made them all too possible—large-capacity magazines (LCMs). LCMs enable shooters to fire an unusually high number of rounds of ammunition,

---

[1] Information on each can be found at: Patricia Mazzei, *Parkland Gunman Carried Out Rampage Without Entering a Single Classroom*, N.Y. TIMES (Apr. 24, 2018); Mary Ellen Clark & Noreen O'Donnell, *Newtown School Gunman Fired 154 Rounds in Less than 5 Minutes*, REUTERS (Mar. 28, 2013); Bart Jansen, *Weapons gunman used in Orlando shooting are high-capacity, common*, USA TODAY (June 15, 2016); and Sam Quinones & Nicole Santa Cruz, *Crowd Members Took Gunman Down*, L.A. TIMES (Jan. 9, 2011).

without ever having to pause to reload. For that reason, attacks with LCMs "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'" *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015) (*NYSRPA*) (quoting *Heller v. Dist. of Colum.*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) (*Heller II*)). Simply put, LCMs allow "shooters to inflict mass casualties while depriving victims and law enforcement officers of opportunities to escape or overwhelm the shooters while they reload their weapons." *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc). It follows (and experts have found) that limits on LCMs have the "potential to prevent and limit shootings in the state over the long-run," *NYSRPA*, 804 F.3d at 264, so New Jersey enacted a law reducing the maximum capacity of ammunition magazines within its borders to 10 rounds.

Now Plaintiffs are asking this Court to enjoin the new statute from going into effect—to strip New Jersey's government of the power to protect its residents from the serious dangers that LCMs pose. But the Second Amendment, on which Plaintiffs rely, provides no basis for doing so. Deciding how best to protect New Jersey residents from especially lethal weapons that have become common to mass shootings is a question better suited to legislatures than to courts. Simply put, it is not possible "to draw from the profound ambiguities of the Second Amendment an invitation to courts to preempt this most volatile of political subjects and arrogate to themselves decisions that have been historically assigned to other, more

democratic, actors." *Kolbe*, 849 F.3d at 150 (Wilkinson, J., concurring). After all, "[d]isenfranchising the American people on this life and death subject would be the gravest and most serious of steps." *Id.* That concern has never mattered more than it does today: "[t]o say in the wake of so many mass shootings in so many localities across this country that the people themselves are now to be rendered newly powerless, that all they can do is stand by and watch as federal courts design their destiny—this would deliver a body blow to democracy as we have known it since the very founding." *Id.*

Not every state, and not every court, has the same ideas about the best ways to combat the scourge of mass shootings in this country. But every single appellate court to consider the question *has* agreed that states are free to enact restrictions on LCMs like this one—to let the democratic process run its course. So even as other plaintiffs have been urging courts across the country to invalidate nearly identical restrictions, their demands have been rebuffed time and again. Given the respect owed to legislatures as they seek to limit the spread of these dangerous weapons— and to protect their residents from mass shootings—this unanimous respect is well founded. This Court should reach the same result in this case.

## **BACKGROUND**

On June 13, 2018, New Jersey enacted Assembly Bill 2761 ("A2761") into law. A2761 bans firearm magazines capable of holding more than ten rounds of

ammunition, by revising the definition of "large capacity magazine" to reduce the allowable rounds in the State from 15 to 10. A2761 § 1(y).

For those owners who already had weapons that violate the new law, A2761 gives them 180 days to comply, and lays out the methods by which they can do so. A2761 § 5. Such owners can "[t]ransfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine; [r]ender the semi-automatic rifle or magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less; or [v]oluntarily surrender the semi-automatic rifle or magazine." *Id.* But the State also understood that modifications are not always possible—so if someone already owned firearms "with a fixed magazine capacity holding up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds; or a firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds," that owner would simply have to register the weapon within one year. A2761 § 7.

The Legislature also recognized that some individuals are more likely to use LCMs safely, so it provided a tailored exemption to certain classes, including (as relevant) retired law enforcement officers authorized under federal and state law to possess and carry a handgun. A2761 § 2. Such retired law enforcement officers may carry an LCM "capable of holding up to 15 rounds of ammunition." *Id.* But

the exception only applies to a retired officer who "semi-annually qualifies in the use of the handgun he is permitted to carry in accordance with the requirements and procedures established by the Attorney General." N.J. Stat. Ann. § 2C:39-6(l).

New Jersey was not alone in taking action to address the issue of LCMs—seven other states restrict the possession or sale of ammunition magazines on the basis of their capacity, and all but one of them applies the same 10-round limit that A2761 adopts. *See* Cal. Penal Code §§ 16740, 32310; Colo. Rev. Stat. §§ 18-12-301 to -303; Conn. Gen. Stat. § 53-202w; Haw. Rev. Stat. Ann. § 134-8(c); Md. Code Ann., Crim. Law § 4-305(b); Mass. Gen. Laws ch. 140, §§ 121, 131M; N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11.[2]

The same day that New Jersey enacted A2761, Plaintiffs filed suit, alleging that A2761 violates the Second Amendment, Takings Clause, and Equal Protection Clause, and seeking the statute's invalidation. ECF 1. Eight days later, Plaintiffs filed this motion for a preliminary injunction. ECF 7.

## STANDARD FOR PRELIMINARY INJUNCTION

"[T]he grant of injunctive relief," courts have explained, "is an extraordinary remedy which should be granted only in limited circumstances." *Truck Ctr., Inc. v.*

---

[2] For ten years, the Federal Government did the same. The 1994 Violent Crime Control and Law Enforcement Act, H.R. 3355, Pub. L. 103-322, made it unlawful to possess or transfer LCMs—again defined by the capacity to accept more than 10 rounds. *See* Pub. L. 103-322, Sept. 13, 1994, 108 Stat. 1796, 1998-2000. That law sunset (and was not renewed) in 2004. In addition, a number of municipalities have banned LCMs within their borders.

*Gen'l Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1998). To qualify for preliminary injunctive relief, the moving party must demonstrate:

> (1) A likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). And this is no small burden to meet: the plaintiff must produce "evidence sufficient to convince the district court that all four factors favor preliminary relief." *N.J. Hosp. Ass'n v. Waldman*, 73 F.3d 509, 512 (3d Cir. 1995) (citations omitted). A plaintiff's failure to satisfy any of the four factors renders a preliminary injunction inappropriate. *See NutraSweet Co. v. Vit-Mar Enterprise, Inc.*, 176 F.3d 151, 153 (3d. Cir. 1999).

Here, the burden is even greater because this is a facial challenge in which Plaintiffs are asking this Court to enjoin an entire state statute—a request "granted sparingly by the courts." *United States v. Spectro Foods Corp.*, 533 F. 2d 1175, 1181 (3d Cir. 1980). Not only are facial challenges "disfavored" outside the First Amendment realm, *United States v. Mitchell*, 652 F.3d 387, 406 (3d Cir. 2011) (en banc), but they are "the most difficult challenge[s] to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987). Said simply,

Plaintiffs' burden is "particularly heavy"; their right to relief must be "indisputably clear." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980).

**ARGUMENT**

I.    **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.**

This Court must deny Plaintiffs' request for a preliminary injunction because they have no likelihood of success on the merits. Plaintiffs advance three theories for why this Court should strike down New Jersey's democratically-adopted LCM law, arguing that the statute violates the Second Amendment, the Takings Clause, and the Equal Protection Clause. But none of their claims hold water. The Second Amendment does not apply to such dangerous and unusual weapons as LCMs, and even if it did, the law would withstand constitutional scrutiny. There is no taking if a state is simply regulating dangerous personal property—or else states could not ban a host of deadly objects without paying out compensation. And New Jersey's decision to exempt retired law enforcement officers is entirely defensible, and does not offend equal protection principles, given the officers' background and training. That is why efforts to invalidate LCM laws have been rejected by every court of appeals to consider them. This Court should follow that consensus view.

**A. New Jersey's LCM Law Does Not Violate The Second Amendment.**

This case can be resolved by one simple point: "When the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation

7

was woven into the tapestry of the guarantee." *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d 185, 200 (5th Cir. 2012). So every single federal court of appeals to consider similar LCM restrictions has reached the same conclusion—that such laws do not violate the Second Amendment. *See Kolbe*, 849 F.3d 114; *NYSRPA*, 804 F.3d 242; *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015); *Heller II*, 670 F.3d 1244. Three independent bases bolster that consensus: first, the Second Amendment does not protect dangerous and unusual weapons; second, the laws are longstanding and thus presumptively valid under the Second Amendment; and third, such laws promote public safety and withstand scrutiny. Each reason is enough to uphold New Jersey's law; together, they are overwhelming.

1. LCM Laws Do Not Implicate the Second Amendment, Which Affords No Protection To Dangerous And Unusual Weapons.

"Like most rights," the U.S. Supreme Court began, "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008). That right was *not* "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. To the contrary, an "important limitation on the right to keep and carry arms" is that it "extends only to certain types of weapons." *Id.* at 623, 627. In particular, there is a long "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627 (citing 4 Blackstone 148-49 (1769)). So "the *Heller* Court specified that 'weapons

8

that are most useful in military service—M-16 rifles and the like—may be banned'
without infringement upon the Second Amendment right." *Kolbe*, 849 F.3d at 131
(quoting *Heller*, 554 U.S. at 627); *United States v. Marzzarella*, 614 F.3d 85, 92
(3d Cir. 2010) (noting that the Second Amendment only "protects the right of law-
abiding citizens to possess non-dangerous weapons for self-defense in the home").
The Second Amendment, the Court went on, protects arms "in common use at the
time," but the Constitution "does not protect those weapons not typically possessed
by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25, 627.[3] So
that is the threshold question before this Court: are LCMs "dangerous and unusual"
weapons "most useful in military service"? The answer to that inquiry is obviously
yes. And given their nature, it is clear that LCMs are not—as Plaintiffs contend—
commonly or typically possessed for lawful purposes.

Start with *Heller* and *Marzzarella*'s exception for "dangerous weapons"—a
moniker that plainly applies to LCMs. As other courts have repeatedly recognized,
LCMs are disproportionately used in mass shootings, and they result in increased
wounds and fatalities for the public and for police. "One study of sixty-two mass
shootings between 1982 and 2012, for example, found that the perpetrators were
armed with … [LCMs] in 50% or more" of the tragic attacks, and another showed

---

[3] Plaintiffs' claim that the Second Amendment "presumptively" applies to LCMs
because it "extends, *prima facie*, to all instruments that constitute bearable arms,"
Br. 9-10, thus makes little sense. *Heller* was explicit: the Second Amendment does
not protect dangerous and unusual weapons most useful in military service.

LCMs "were used in 31% to 41% of" murders of on-duty law enforcement. *Kolbe*, 849 F.3d at 126-27; *see also S.F. Veteran Police Officers v. City & County of San Francisco*, 18 F. Supp. 3d 997, 1005 (N.D. Cal. 2014) (noting that during "the last thirty years, 86 percent of mass shootings involved at least one" LCM); Allen Decl., ¶22 (adding that "out of 83 mass shootings with known magazine capacity [since 1982], 54 involved large-capacity magazines or 65% of mass shootings with known magazine capacity"). It is beyond dispute that a "very high correlation" exists "between mass shootings and the use of" LCMs. *S.F. Veteran Police*, 18 F. Supp. 3d at 1003-04; *see also, e.g., Heller II*, 670 F.3d at 1264 (noting that LCMs "tend to pose a danger to innocent people and particularly to police").[4]

Because LCMs allow shooters to release more firepower in a rapid manner without having to reload, LCMs "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'" *NYSRPA*, 804 F.3d at 264 (citation omitted); *see also, e.g., Heller II*, 670 F.3d at 1264 ("By permitting a shooter to fire more than ten rounds without reloading, [LCMs] greatly increase the firepower of mass shooters."). They are dangerous even when used defensively, as "'the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passerby, and bystanders.'" *Heller II*,

---

[4] Plaintiffs reply that they "are not aware of any Parkland-type mass shootings in New Jersey" since it adopted its 15-round limit. Br. 20. But New Jersey is free to take preventive actions—it need not wait for a tragic shooting within its borders.

670 F.3d at 1263-64; *see also, e.g., Kolbe*, 849 F.3d at 127 (finding that "when inadequately trained civilians fire weapons equipped with [LCMs], they tend to fire more rounds than necessary and thus endanger more bystanders."). And this Court need not take the word of other jurists—the evidence in this case bears out the deadly nature of LCMs. *See* Donohue Decl., ¶29 (finding "the use of [LCMs] leads to more bullet wounds for victims (thereby substantially increasing the death toll of those who are shot), results in more shots fired (thus increasing the number of individuals who are shot), and reduces the capacity of potential victims to flee to safety or take effective defensive action"); Allen Decl., ¶23 (adding that "in mass shootings that involved use of [LCMs], the average number of shots fired was 99"); Noble Decl., ¶15 (LCMs "increase a shooter's ability to injure individuals in mass shootings").  The dangers that LCMs pose could not be clearer.

The Fourth Circuit's decision in *Kolbe* is instructive, showing why LCMs are not protected under the Second Amendment. As that court found, the answer to *Heller*'s "dispositive" test is that LCMs, like M-16s, are "unquestionably most useful in military service." *Kolbe*, 849 F.3d at 137. LCMs will "enable a shooter to hit multiple human targets very rapidly; contribute to the unique function of any assault weapon to deliver extraordinary firepower; and are a uniquely military feature." *Id.* (citation omitted). By "provid[ing] soldiers with a large ammunition supply and the ability to reload rapidly," they "are particularly designed and most

suitable for military and law enforcement applications." *Id.* (citation omitted); *see also Worman v. Healey*, 293 F. Supp. 3d 251, 266 (D. Mass. 2018) (agreeing that "LCMs are most useful in military service, [and] beyond the scope of the Second Amendment"); Noble Decl., ¶16 (LCMs "are most appropriate in law enforcement and military settings"). Limits on LCMs do not violate the Second Amendment.

Plaintiffs respond that the LCMs at issue cannot be banned no matter what dangers they may pose because they are in fact in "common use." LCMs must be in common use, Plaintiffs say, because LCMs "are legal under federal law and the laws of 43 States." Br. 10. As importantly, "there are approximately 133 million magazines capable of holding more than ten rounds owned throughout the country, constituting about *half* of all the nation's magazines." *Id.* (emphasis in original). LCMs must thus be "common" and protected under the Second Amendment. *Id.* at 11. But no matter how simple that analysis sounds at first, the approach suffers from two fundamental flaws—it is altogether circular, and Plaintiffs' evidence says nothing about who is buying LCMs and for what purposes.

First, "relying on how common a weapon is at the time of litigation would be circular." *Friedman*, 784 F.3d at 409. As Judge Easterbrook noted, "[m]achine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with [LCMs] are owned more commonly because, until recently (in some jurisdictions), they have been legal." *Id.* It would, however, "be

absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Id.* A "law's existence can't be the source of its own constitutional validity." *Id.* And counting up laws—Plaintiffs' other suggestion—makes even less sense, because *Heller* "contemplated that the weapons properly in private hands for militia use might change through legal regulation." *Id.*; *see also McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) ("State and local experimentation with reasonable firearms regulations will continue under the Second Amendment…"). Both approaches would also mean that "firearm safety decisions made in some states would render the laws of other states 'more or less open to challenge under the Second Amendment.'" *Friedman*, 784 F.3d at 412. Because that has no basis in either law or logic, this Court should reject Plaintiffs' two "popularity" tests. *See, e.g., Worman*, 293 F. Supp. 3d at 266 ("[P]resent day popularity is not constitutionally material.").

Second, Plaintiffs cannot offer critical information—information that speaks to whether the purportedly common LCMs are "typically possessed by law-abiding citizens for lawful purposes." Plaintiffs base their analysis on the sheer volume of LCMs sold—asserting that this "*ipso facto*" demonstrates the weapons must be for lawful purposes. Br. 12. But Plaintiffs' record "does not actually show that such magazines are common or prevalent among law-abiding citizens (as opposed to criminals and law enforcement). The record shows only that a large number of

such magazines have been made and sold, but does not break down how they are possessed." *S.F. Veteran Police*, 18 F. Supp. 3d at 1003. This gap is most glaring because gun ownership—and ownership of LCMs—is concentrated, so the volume of LCMs says little about how many households or what type of person have them, and how they are used. Donohue Decl., ¶ 13 (noting "the highly concentrated rate of ownership with 20 percent of gunowners now owning 60 percent of the nation's firearms"). In contrast to all the evidence that LCMs are used in mass shootings, Plaintiffs supply no data showing LCMs are crucial or common in lawful activities like self-defense. *See Heller II*, 670 F.3d at 1262 ("[H]ardly any evidence [exists] that [LCMs] are well-suited to or preferred for the purpose of self-defense or sport."); *Kolbe*, 849 F.3d at 138 (adding "there is scant evidence ... [that LCMs] are possessed, or even suitable, for self-protection").

In fact, just the opposite is true—LCMs are not typically necessary for such self-defense purposes, but instead are perfectly suited for *illicit* use. The evidence is clear: "the average number of shots fired in self-defense is 2.2 rounds," and "the number of instances in which more than ten rounds have been fired in self-defense (in our entire country) by civilians is exceedingly rare." *S.F. Veteran Police*, 18 F. Supp. 3d at 1003. An analysis of the NRA's reports of firearm use in self-defense for January 2011 to May 2017, included in the record, confirms that individuals fired on average only 2.2 bullets when using a firearm in self-defense. Allen Decl.,

14

¶10; *see also id.* (noting there were only "two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets").[5] That is also true of New Jersey: during this period, there were *zero* instances in which a New Jersey self-defender reported to have fired more than 10 bullets. Allen Decl., ¶11. And even gun rights proponents have testified that 98 percent of the instances that firearms are used defensively, it is only necessary to "brandish" or "point" a gun, but not fire it. Donohue Decl., ¶¶ 44-47 (collecting examples); *see also* ECF 1 ¶33 (noting one plaintiff scared away attackers when he "drew" his gun). That makes sense, because (as detailed above) LCMs are *dangerous* in a defensive situation. *See, e.g., Heller II*, 670 F.3d at 1263-63 (noting the "grave risks to others in the household, passersby, and bystanders."). But while a "civilian defender rarely will exhaust the up-to-ten magazine, … the mass murderer has every intention of firing every round possible and will exhaust the largest magazine available to him." *S.F. Veteran Police*, 18 F. Supp. 3d at 1003. The role of LCMs could not be clearer, and New Jersey was free to place careful limits on their ownership.[6]

---

[5] Reviewing news reports yield similar results—"the average number of shots fired per story" was 2.34 (adjusting for the fact that stories involving multiple shots are more salient and garner greater news coverage). Allen Decl., ¶¶16, 17. Of course, since "some defensive gun use incidents may not be picked up by *any* news story," even this number is likely still "biased upward." *Id.*

[6] Plaintiffs rely on two last points. First, Plaintiffs argue the "typically possessed" prong is irrelevant so long as LCMs are in common use. Br. 12-13. Second, they offer a few anecdotes to make LCMs appear crucial for self-defense. But neither

## 2.  LCM Laws Are Longstanding And Thus Constitutional.

Under *Heller*, the longstanding nature of a law can be a sufficient (but not necessary) reason to find that it withstands Second Amendment scrutiny. *Heller*, after all, held "that the rights guaranteed by the Second Amendment were 'not unlimited'"; instead, there were "limits deriving from various historical restrictions on possessing and carrying weapons." *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (quoting *Heller*, 554 U.S. at 626). It follows, the Third Circuit has held, that "'longstanding' restrictions" are "'presumptively lawful.'" *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (quoting *Heller*, 554 U.S. at 626, 627 n.26); *see also Rene E.*, 583 F.3d at 12 (noting restrictions "rooted in history, were left intact by the Second Amendment and by *Heller*"); *Fyock*, 779 F.3d at 996; *Heller II*, 670 F.3d at 1253. Nor can that historical analysis stop at the Founding, because *Heller* had surveyed "nineteenth-century state laws as evidence of 'longstanding' firearms restrictions." *Rene E.*, 583 F.3d at 12; *see also Marzzarella*, 614 F.3d at 92 (noting "pre-ratification presence" cannot be "the only avenue to a categorical exception"). The Third Circuit's decision in *Drake* is illustrative. Faced with a law regulating

---

carries weight. *Heller* is clear—and commonsense dictates—that firearms should get protection if typically possessed for *lawful* purposes. *NYSRPA*, 804 F.3d at 256 (noting *Heller* "requires [courts] to look into both broad patterns of use and the subjective motives of gun owners"). And Plaintiffs' anecdotes—which actually show instances in which individuals defended themselves *without* using an LCM, *see, e.g.,* ECF 1 ¶33—cannot overcome the statistical proof that LCMs are rarely (if ever) used in this way. At a minimum, the legislature was free to base its safety decisions on these statistics over anecdotes.

16

the ability to carry firearms in public, the panel upheld the regime as longstanding and lawful because public carry laws existed (in, *inter alia*, New York and New Jersey) "in some form for nearly 90 years." *Drake*, 724 F.3d at 432. That early Twentieth Century history bolstered the constitutionality of the law.

Under *Drake*'s analysis, LCM laws are longstanding and should be upheld. LCMs themselves are of more recent vintage: "The first time a rifle with more than ten rounds of ammunition [achieved widespread success] was in 1866, and the first time a handgun did so was in 1935." David B. Kopel, *The History of Firearm and Magazine Prohibitions*, 78 ALB. L. REV. 849, 850 (2015). And ever since their rise in popularity, states have been regulating them—as well as any other weapons with similar features. *See id.* (noting "during prohibition, Michigan, Rhode Island, and the District of Columbia banned some arms that could hold more than a certain number of rounds"). In 1927, Rhode Island banned firearms "which shoot[] more than twelve shots semi-automatically without reloading."[7] 1927 R.I. Pub. Laws 256, §§ 1, 4. In 1932, Congress prohibited weapons capable of firing 12 or more times without reloading from the District of Columbia, and passed a federal ban on machine guns two years later. 47 Stat. 650 (1932), ch. 465, §§ 1, 14, 48 Stat. 1236

---

[7] At least five other states passed laws between 1927 and 1933 restricting, in one form or another, semi-automatic weapons based on the number of shots that could be fired without reloading, including Michigan (16), Ohio (18), South Dakota (5), and Virginia (16). Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMPORARY PROBS. 55, 70 (2017).

(1934). Two states banned any machine guns that could fire more than 5 rounds without reloading, *see* 1933 S.D. Sess. Laws 245 § 1, 1933 Tex. Gen. Laws 219 § 1, while three had an 8-round limit, *see*, 1931 Ill. Laws 452 § 1, 1932 La. Acts 336 § 1, and 1934 S.C. Acts 1288 § 1. Finally, as LCMs became more prevalent for use with pistols in the early 1980s, laws regulating their capacity were not far behind. New Jersey passed a 15-round LCM law in 1990, Hawaii passed a 10-round LCM law in 1992, and the Federal Government passed its own 10-round LCM law in 1994. *See supra*, at 5. Just as Twentieth Century history supported modern public carry laws in *Drake*, so too does the history of LCM laws support A2761.

### 3. LCM Laws Survive Scrutiny Under the Second Amendment.

But this Court need not decide whether New Jersey's LCM law falls within the scope of the Second Amendment's protections (based on the dangerousness of the devices or the longstanding nature of the laws), since this law passes muster in any event. Because the statute does not burden the core Second Amendment right in *Heller*, this Court must subject it only to intermediate scrutiny. And whatever the standard, the LCM law survives review: the statute advances state interests in public safety and preventing mass shootings, fits that interest hand-in-glove, and does not burden more conduct than is reasonably necessary.

As a threshold matter, this Court must subject the law only to intermediate scrutiny. As for the First Amendment, "the Second Amendment can trigger more

than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue." *Drake*, 724 F.3d at 436. The test is straightforward: if a law burdens "the core of the right conferred upon individuals by the Second Amendment," strict scrutiny is required, and if it does not, intermediate scrutiny is called for instead. *Id.* The Third Circuit also articulated the core of that right: "to possess usable handguns in the home for self-defense." *Id.* As every court of appeals to consider the question has held, LCM statutes do not severely burden that core right, since they leave open to individuals myriad other firearms for use in self-defense. *See, e.g., NYSRPA*, 804 F.3d at 260 (an LCM law "does not effectively disarm individuals or substantially affect their ability to defend themselves" since they "can purchase any number of magazines with a capacity of ten or fewer rounds"); *Heller II*, 670 F.3d at 1263 (adding LCM laws "do not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun"). Intermediate scrutiny is thus proper. *See Kolbe*, 849 F.3d at 138 (holding "intermediate scrutiny is the appropriate standard because the [LCM statute] does not severely burden the core protection of the Second Amendment"); *Friedman*, 784 F.3d at 419 (same); *Fyock*, 779 F.3d at 1000; *NYSRPA*, 804 F.3d at 260; *Heller II*, 670 F.3d at 1258.[8] New Jersey's law thus only has to promote a

---

[8] Plaintiffs' strained reading of Third Circuit precedent to imply strict scrutiny is appropriate lacks support. When the D.C. Circuit reviewed a similar LCM law, it

"substantial, or important" interest, be a reasonable means of achieving it, and not burden more conduct than necessary. *Drake*, 724 F.3d at 436.

This law easily survives under that analysis—and, for that matter, withstands any level of review. That New Jersey has a "substantial interest" in the safety of its people is beyond dispute. *Drake*, 724 F.3d at 437 ("New Jersey, has, undoubtedly, a significant, substantial and important interest in protecting its citizens' safety."); *see also, e.g., Salerno*, 481 U.S. at 755 (noting the "primary concern of every government" is the "concern for the safety and indeed the lives of its citizens"); *NYSRPA*, 804 F.3d at 261 ("It is beyond cavil that both states … have substantial, indeed compelling, governmental interests in public safety and crime prevention.") (citation omitted). That is why courts examining similar statutes have unanimously found that LCM laws advance an interest in safety. *See Heller II*, 670 F.3d at 1263-64; *NYSRPA*, 804 F.3d at 264; *Kolbe*, 849 F.3d at 138.

The only remaining questions are whether the LCM law is a "reasonable" fit to achieve those important interests, and whether the law burdens more conduct than reasonably necessary. In answering those questions, of course, courts have to accord "substantial deference to the predictive judgments of the legislature," and to "remain mindful that, in the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments

---

explicitly relied on the Third Circuit's *Marzarrella* decision to find intermediate scrutiny most appropriate. *See Heller II*, 670 F.3d at 1262.

(within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *NYSRPA*, 804 F.3d at 261 (citing, *inter alia*, *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195 (1997)) (quotation marks omitted). All that courts may do is "assure [them]selves that, in formulating their respective laws, [the states] have drawn reasonable inferences based on substantial evidence." *Id.* at 261-62. The state has done enough whenever its interest "would be achieved less effectively absent the regulation." *Fyock*, 779 F.3d at 1000.

New Jersey has met that burden here: its limits on LCMs, part of its effort to prevent mass shootings, advances public safety. The record is plain, with experts stating "[i]t is a sound, evidence-based, and longstanding harm-reducing strategy virtually uniformly embraced throughout the developed world for governments to place constraints on the harm that weapons can inflict." Donohue Decl., ¶11. Given how dangerous LCMs are, *see supra*, it is sensible to ban them. First, bans reduce criminal access to LCMs. While Plaintiffs say criminals will violate the LCM laws, Br. 24, they ignore that "one of the most important sources of arming criminals in the United States are 'law-abiding citizens' whose guns are lost and stolen each year"—to the tune of about 400,000 each year. Donohue Decl., ¶61; *see also id.* (adding that "it is orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire more than 10 bullets in lawful self-defense"); Allen Decl., ¶25 (finding that "shooters in at least 71% of

mass shootings in the past 35 years obtained their guns legally … and at least 76% of the guns used in these 96 mass shootings were obtained legally"). And "many of the most horrific mass shootings in America were perpetrated by previously law-abiding citizens." Donohue Decl., ¶61.

Second, by reducing the LCMs available to criminals, these laws "help save lives by forcing mass shooters to pause and reload ammunition." Donohue Decl., ¶30. Experience shows "[c]itizens have frequently taken advantage of a perpetrator stopping to reload his weapon to tackle him or otherwise subdue him." *Id.* While Plaintiffs scoff at the notion that a 2-3 second pause to reload matters, noting that shooters can switch guns quickly, Br. 23, law enforcement across the country has found that seconds might mean the difference between "life or death." *Kolbe*, 849 F.3d at 128. Recent mass shootings bear that out. In Newtown, "nine children were able to run from a targeted classroom while the gunman paused to change out a large-capacity thirty-round magazine," while in Tucson, "the shooter was finally tackled and restrained by bystanders while reloading his firearm." *Id.*; Donohue Decl., ¶¶30, 50. The truth of the matter is, "reducing the number of rounds that can be fired without reloading increases the odds that lives will be spared in a mass shooting." *Kolbe*, 849 F.3d at 128. New Jersey's law enforcement agrees. Stanton Decl., ¶26 (noting "the use and possession of [LCMs] by individuals committing crimes is particularly harmful as it also reduces their need to reload.").

That is why the State's experts have concluded that "no single gun control measure is likely to be as effective in addressing the problem of mass shootings as the limitation on the size of the ammunition magazine." Donohue Decl., ¶28. After all, "[w]hether a state has [an LCM] ban is the single best predictor of the mass shooting rate in that state." Sam Petulla, *Here Is One Correlation Between State Gun Laws & Mass Shootings*, CNN (Oct. 5, 2017). And a survey of other experts found that they viewed LCMs laws as one of the most "effective" ways to "prevent mass shootings." Margot Sanger-Katz, *How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws*, N.Y. TIMES (Oct. 15, 2017).

This also explains why every appellate court (and all but one district court) reached the same conclusion. To take one example, the D.C. Circuit canvassed the evidence and found that because LCMs "tend to pose a danger to innocent people and particularly to police officers," a state met "its burden of showing a substantial relationship between the prohibition of [LCMs] and the objectives of protecting police officers and controlling crime." *Heller II*, 670 F.3d at 1264. And the Second Circuit found the same, adding that because LCM laws have "the greatest potential to prevent and limit shootings in the state over the long-run," they plainly "survive intermediate scrutiny." *NYSRPA*, 804 F.3d at 264. The decisions from the Fourth, Seventh, and Ninth Circuits that upheld similar LCM laws are all in accord. *See Kolbe*, 849 F.3d at 138; *Friedman*, 784 F.3d at 419; *Fyock*, 779 F.3d at 1001.

Plaintiffs respond to all this by baldly asserting that the state's LCM law will not work, and thus does not fit the interest New Jersey is trying to achieve. First, they contend, the federal LCM limits were ineffective. Br. 21-24. Plaintiffs rely almost exclusively on a 2004 report that could not "credit the ban with any of the nation's recent drop in gun violence." Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, REP. TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE (2004). But that report also admitted that the "exemption of millions of pre-ban" LCMs "ensured the effects of the law would occur only gradually," *id.*, and a more recent analysis indicates the number of shootings with 6 or more deaths fell by 37 percent while the ban was in place, and that the number of deaths from such shootings dropped by 43 percent. *See* Christopher Ingraham, *It's time to bring back the assault weapons ban, gun violence experts say*, THE WASHINGTON POST (Feb. 14, 2018). In the decade after the ban lapsed, deaths from "gun massacres" spiked by 239 percent. *Id.* Indeed, another analysis of "the ten year period when the federal assault weapons ban was in effect … indicates that limiting the size of ammunition magazines to ten bullets saved lives and reduced the mayhem from mass shootings." Donohue Decl., ¶ 28. And Plaintiffs leave out that Professor Koper himself found the federal LCM ban did not go far enough—and that state LCM bans promote public safety. *See, e.g., Kolbe v. O'Malley*, 42 F. Supp. 3d 768,

778-79 (D. Md. 2014). States are plainly within their authority to reach different predictive judgments regarding these laws than Plaintiffs do.[9]

None of Plaintiffs' other arguments pass muster. Insofar as Plaintiffs repeat that LCM bans will not effectively target criminal use because shooters often carry multiple magazines or guns, Br. 23, they are missing the point entirely—a "2 or 3 second pause during which a criminal reloads his firearm can be of critical benefit to law enforcement." *Heller II*, 670 F.3d at 1264 (citation omitted). But Plaintiffs further insist that the fact that most crimes do not involve LCMs somehow renders this point moot. Br. 22. Yet states can tackle the mass shooting epidemic (where LCMs play a major role) even if they cannot solve all aspects of gun crime in one fell swoop. Plaintiffs' final point—that individuals facing multiple attackers will be disadvantaged if they cannot use LCMs, *see* Br. 17, 24—also falls short. Plaintiffs failed to put into the record any more than anecdotes, while the evidence detailed above shows LCMs are not needed for self-defense. *See, e.g.,* Donohue Decl., ¶12 (confirming a "ban on LCMs would be expected to have little or no effect on the ability of individuals to possess weapons for self-defense in the home").

---

[9] Plaintiffs also suggest that a state ban is less likely to be effective than the federal ban, but the evidence shows the opposite is true—and legislators were free to find otherwise. Unlike the Federal ban, the State's law is more comprehensive in that it does not exempt magazines based on their manufacture date. A2761 § 1(y). Some neighboring states also banned LCMs, thus limiting the concern regarding porous borders. *See, NYSRPA*, 804 F.3d at 263-64; *Kolbe*, 849 F.3d at 144. And a reasonable fit only requires that the government interest "would be achieved less effectively absent the regulation." *Fyock*, 799 F.3d at 1000.

Finally, this Court must address whether the law burdens more conduct than necessary to achieve the State's interest in safety. It does not. Although Plaintiffs argue that A2761 creates a total ban on handgun ownership akin to that at issue in *Heller*, Br. 15, they fundamentally misunderstand LCM laws. The statute "restricts possession of only a subset of magazines that are over a certain capacity. It does not restrict the possession of magazines in general … nor does it restrict the number of magazines that an individual may possess." *Fyock*, 779 F.3d at 998. The statute also exempts firearms "with a fixed magazine capacity holding up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds." A2761 § 7. This law does not come close to the blanket ban struck down in *Heller*, and it does not burden more conduct than necessary to achieve the State's interest.

Not every legislature (and not every citizen) has the same idea of what the right LCM regulation will be. But "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process." *Friedman*, 784 F.3d at 412. As Judge Easterbrook explained, "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity." *Id.* New Jersey's decision that it can limit the number and impact of mass shootings by banning the very military

weapons that make such tragedies possible deserves great respect, and nothing in the Second Amendment compels otherwise.

### B. New Jersey's LCM Law Does Not Violate The Takings Clause.

Plaintiffs are no more likely to succeed on the merits of their Takings Clause claim for two independent reasons: A2761 falls within the State's police power to protect the public from dangerous items, and Plaintiffs have not been deprived of all economically beneficial use of their property. Either disposes of their claim.

First, and most importantly, the Takings Clause has never been understood as a restriction on the State's power to protect its residents. To the contrary, an unbroken line of decisions since the Nineteenth Century establishes that the Clause presents no barrier to state laws prohibiting the possession of dangerous products. *See, e.g., Wiese v. Becerra*, 263 F. Supp. 3d 986, 995 (E.D. Cal. 2017) (*Wiese I*) (noting that a "long line of federal cases has authorized the taking or destruction of private property in the exercise of the state's police power"). Starting with *Mugler v. Kansas*, 123 U.S. 623 (1887), the Supreme Court put it bluntly: any "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking." *Id.* at 668. Indeed, "[t]he exercise of the police power by the destruction of property which is itself a public nuisance ... is very different from taking property for public use." *Id.* at 669. "The power which the states have

of prohibiting such use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public," the *Mugler* court continued, "is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate" the owners. *Id.*

And courts have, unsurprisingly, applied that exception through the present day. *See, e.g., AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause."); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1022-23 (1992) (*Mugler* "was the Court's early attempt to describe … why government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power."). That is as it should be, or else states could not restrict individuals from possessing such dangerous items as chemicals, bombs, drugs, or wild animals without paying owners along the way. That is not, and has never been, the law.

It is thus no surprise that almost every court to consider the issue has held in no uncertain terms that restrictions on deadly firearms and accessories—including LCM laws like A2761—do not run afoul of the Takings Clause. *See, e.g., Wiese I*, 263 F. Supp. 3d at 995 (denying request for preliminary injunction of state LCM ban); *Rupp v. Becerra*, No. 8:17-cv-00746, 2018 WL 2138452, at *7-9 (C.D. Cal.

May 9, 2018) (finding a ban on assault weapons represented an exercise of police power, not a taking); *Guns Save Life v. Village of Deerfield*, No. 18CH498, slip op. at 17-19 (Ill. Cir. Ct. June 12, 2018) (same under state constitution); *Akins v. United States*, 82 Fed. Cl. 619, 622-23 (Fed. Cl. 2008) (rejecting takings claim regarding an order that the plaintiff register or surrender a machine gun); *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. Ct. App. 1979) (finding no compensation due after town banned machine guns as an exercise of the police power). A2761 is legal, the logic of these decisions goes, because it "does not compel conveyance of the guns for public use, but regulates possession of an object the legislature has found to be dangerous." *Rupp*, 2018 WL 2138452, at *9.[10] A2761 is a legitimate exercise of New Jersey's power to protect its citizens and its law enforcement from dangerous devices, so no compensation is necessary.

   *Lucas*—on which Plaintiffs rely—only bolsters this conclusion. *Lucas*, to be sure, held that "[w]here the State seeks to sustain regulation that deprives land of all economically beneficial use, … it may resist compensation only if the logically

---

[10] The only court to agree with Plaintiffs on the takings argument—in a decision on appeal—missed these points. *See Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1137 (S.D. Cal. 2017). *Duncan* is also the only decision erroneously adopting Plaintiffs' Second Amendment argument, and its error in approving of the takings claim was based on that threshold mistake. Because the court wrongly believed plaintiffs had a right to LCMs—despite their safety implications—it deemed the designation of LCMs as a nuisance "dubious." *Id.* If the court had found (as it should have) that LCMs may be regulated under the Second Amendment, then *Mugler*'s exception for statutes protecting the public safety obviously would have applied.

antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1027. If interests in *land*—that most quintessential property right—were involved, the majority held, it strained credulity that the owner would assume that "the State may subsequently eliminate all economically valuable use." *Id.* at 1028. But the majority was quick to distinguish other kinds of property: "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless." *Id.* at 1027-28. So the fact that Plaintiffs' owned their LCMs before this law is of no moment. *See, e.g., Mugler*, 123 U.S. at 669 (noting that while the property had previously been lawful, "the state did not thereby give any assurance … that its legislation upon that subject would remain unchanged"). Just as "no compensation was due where a federal agency ordered, pursuant to federal law, an inventor to surrender a device later classified … as a machine gun," *Wiese I,* 263 F. Supp. 3d at 995, none is due here.[11]

---

[11] Nothing in *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), is to the contrary. When it comes to regulatory takings, that case wholeheartedly embraced the distinction *Lucas* drew between the reasonable expectations regarding real and personal property. *Id.* at 2427. The *Horne* majority simply concluded that the case was different when it came to "government acquisitions of property," as when the state requires that title to certain property (there, raisins) be "transferred from the growers to the Government." *Id.* at 2427-28. These facts could not be any more different; if Plaintiffs were right that this qualified as a physical taking, every ban

Second, the takings claim fails because Plaintiffs have not been deprived of all economically beneficial use of their property. *Wiese v. Becerra,* No. 2:17-903, 2018 WL 746398 (E.D. Cal. Feb. 6, 2018) (*Wiese II*), is on point. There, as here, a state passed a similar LCM ban, and there, as here, the state provided for a period of time in which to sell, modify, or dispose of any illegal magazines. That was not a physical taking under the Takings Clause, the court held, because "[t]he ban does not require that owners turn over their magazines to law enforcement—they may alternatively sell the magazines to licensed gun dealers, remove them from the state, or permanently modify the magazines so that they no longer accept more than 10 rounds." *Id.* at *5. Nor was it a "regulatory taking, for similar reasons"— *i.e.,* owners could retain some economic value by selling the weapons or modifying them permanently to accept fewer than 11 rounds. *Id.* That followed clearly from *Andrus v. Allard*, 444 U.S. 51 (1979). In *Andrus*, the Supreme Court found that a prohibition on commercial transactions of eagle feathers did not violate the Fifth Amendment even as it "prevent[ed] the[ir] most profitable use," reasoning that the plaintiffs had not been deprived of *all* economic benefit. *Id.* at 66-67. That is why the court held in *Wiese* that the plaintiffs fell short when they could not show the California LCM statute "completely deprive[d] them of all economically beneficial use of their property." *Wiese II*, 2018 WL 746398, at *5.

---

on possession of a dangerous item (be it an M16, or a pill the Federal Government now classifies as an illegal drug) would qualify and require compensation.

So too here. Like the law in *Wiese II*, A2761 allows owners to permanently modify a prohibited LCM to accept ten or fewer rounds. A2761 § 5(b). Plaintiffs do not allege that they are unable to use modified magazines or weapons—nor can they say that the modification "destroys the functionality" of the device. *See Wiese II*, 2018 WL 746398, at *5. The LCM would have a lower capacity than an owner may wish, but that is not the test. Like the law in *Wiese II*, A2761 allows owners to transfer their semi-automatic rifle or magazine to any person lawfully entitled to own or possess that LCM, A2761 § 5(a), and Plaintiffs concede owners choosing to transfer LCMs still have the ability to obtain "*some* compensation," Br. 36. There is thus no doubt regarding the economic value of the property. While there may be burdens involved, "[t]he impracticality of any particular option, such as the alleged lack of a market for these magazines [or] the burden in removing these magazines from the state … does not transform the regulation into a physical taking" or leave any personal property without value. *Wiese II*, 2018 WL 746398, at *5. Plaintiffs cannot succeed on their takings claim.

### C. New Jersey's LCM Law Does Not Violate The Equal Protection Clause.

Plaintiffs' equal protection arguments also lack merit. Plaintiffs contend that A2761 violates their rights to equal protection because the statute's exemption for retired law enforcement officers favors such officers over other residents. ECF 1 ¶¶61-65. But Plaintiffs fundamentally misunderstand the Equal Protection Clause,

which requires only that similarly situated individuals be treated similarly, and even then allows the state to treat them differently when it has a rational basis for doing so. Here, retired law enforcement officers are not similarly situated to other residents, even military veterans, and the State has a rational basis for exempting retired law enforcement officers from A2761's reach.[12]

Plaintiffs' claim fails because retired law enforcement officers are, on their face, not similarly situated to other state residents, and it makes good sense to treat them differently when it comes to public safety laws. To state a claim under Equal Protection Clause, Plaintiffs "must demonstrate [they] received different treatment from that received by other individuals similarly situated." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citation omitted). That is a demanding standard, because "[p]ersons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Notwithstanding Plaintiffs' puzzling assertions to the contrary,

---

[12] Plaintiffs assert that strict scrutiny applies because, in their view, the distinction between retired law enforcement and the public with respect to LCMs implicates a fundamental right to bear arms. But as discussed above, this law does not violate the Second Amendment. Because the premise is wrong, the conclusion falls too. *See, e.g., Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012) ("Given that the Second Amendment challenge fails, the equal protection claim is subject to rational basis review.").

retired law enforcement officers are not like other state residents "in all relevant aspects" when it comes to the possession of lethal weapons.

Simply put, retired law enforcement officers are unique given their extensive training in the use of firearms and force and given their experience in protecting the public's safety. *See, e.g., Hodges v. Colo. Springs*, 1992 WL 92767, *2-3 (10th Cir. Colo. May 4, 1992) ("The differences between the duties of police officers and civilian employees demonstrate that the two groups are not similarly situated for equal protection analysis."); *Shew v. Malloy*, 994 F. Supp. 2d 234, 252 (D. Conn. 2014) (distinguishing law enforcement officers from the public by "the charge of protecting the public, and the training that accompanies that charge"); Donohue Decl. ¶56 (noting Plaintiffs' expert has previously opined "[t]he average citizen is not trained like law enforcement personnel"). In New Jersey, the Attorney General has issued standards requiring all law enforcement pass semi-annual requalification tests to ensure that they maintain proficiency with all firearms they may use in the line of duty, including assault weapons. *See Semi-Annual Firearms Qualification & Requalification Standards for N.J. Law Enforcement* (June 2003), *available at* http://www.state.nj.us/lps/dcj/pdfs/dcj-firearms.pdf. These guidelines provide that officers receive semi-annual training on the laws and policies regarding use of force. *Id.* at 9-12. Indeed, as the New Jersey Range Master (the firearms instructor) put it, law enforcement officers must "show proficiency in the use of firearms by

successfully qualifying on [two courses] bi-annually." Stanton Decl., ¶17; *see also* Stanton Decl., ¶18 (noting "[t]he same bi-annual qualification requirement applies to retired police officers"). So all "officers who retire from [law enforcement] have been properly trained on the handling and use of such [LCMs]." *Kolbe*, 849 F.3d at 147. That is not true of the public—no matter how knowledgeable one individual might be, the training regimen the State imposes on law enforcement officers in the context of a duty to protect the public differentiates them altogether.[13]

In light of these differences, the Fourth Circuit had little difficulty disposing of a similar equal protection claim to Maryland's LCM law. Relying on the same "extensive training that Maryland requires of its law enforcement officers, and in light of their experience in public safety," the court held that "retired Maryland law enforcement officers are not similarly situated to the general public with respect to the assault weapons and [LCMs]." *Kolbe*, 849 F.3d at 147. That makes sense, for "retired officers are better equipped to safely handle and store those weapons and magazines and to prevent them from falling into the wrong hands." *Id.* The result could not change simply because *some* members of the general public may have as

---

[13] By Plaintiffs' reasoning, the federal "Law Enforcement Officers Safety Act," 18 U.S.C. § 926 (c), is similarly infirm. That provision authorizes qualified retired law enforcement officers to carry concealed weapons, but does not similarly authorize members of the public or the military to do so. Most strikingly, Plaintiffs' remedy for such laws—and any other firearm safety laws that exempt retired officers from their reach—would be their wholesale invalidation.

much training as a law enforcement officer—the equal protection analysis must be done based on a comparison of the "broader class." *Id.* at 148 n.18.

The same is true of the military veterans that live in New Jersey—and who distinguished themselves by service and sacrifice. While many such veterans were trained in the use of assault weapons, the context for their training and use—on a battlefield—differs markedly from the civilian context in which they would own LCMs in New Jersey. *See* Stanton Decl., ¶22 (noting "the firearms training military recruits receive is vastly different than what is required of recruits in the police academy"). While law enforcement gets training in how to "safely handle and store those weapons and magazines" in the civilian context and how "to prevent them from falling into the wrong hands," that is not necessarily part of military training. *Kolbe*, 849 F.3d at 147; *see also* Stanton Decl., ¶23 (adding that "military recruits generally receive very little, if any, handgun training"). Look no further than the veterans who go on to serve this state in law enforcement; notwithstanding their military backgrounds, none are exempt from training by virtue of their experience. *See* Stanton Decl., ¶21 (noting that "individuals with military backgrounds undergo the same training that all law enforcement officers are required to undergo" and do not receive exemptions). Because the training and experience is not identical, even veterans are not like law enforcement officers in all relevant aspects.

New Jersey plainly has a rational basis for the alleged differential treatment law enforcement officers receive. When considering challenges to state laws under the Equal Protection Clause, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Indeed, courts have applied rational basis review and upheld firearm safety laws that distinguish between groups so long as the distinction was not based on suspect classifications. *See, e.g., Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 398-399 (D.P.R. 2012) (upholding law with different permitting procedures for government officials than for other citizens); *Nat'l Rifle Ass'n*, 700 F.3d at 211-12 (upholding federal ban on gun sales to individuals under 21 under rational basis review). Retired officers are not a suspect class, and the state had a rational basis for treating them differently under this public safety law.

## II.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs carry a "heavy burden" when claiming they will suffer irreparable harm absent preliminary injunctive relief. *Andrews v. Holloway*, No. 95-1047, 1995 WL 875883, *11 (D. N.J. 1995). Plaintiffs cannot merely show the "risk" of irreparable harm; rather, plaintiffs must make "an affirmative showing indicating that [they] will be irreparably harmed should relief be denied." *Id.* Even leaving

aside that Plaintiffs will not be harmed where their underlying theories lack merit, *see Fyock*, 25 F. Supp. 3d at 1282, Plaintiffs cannot meet that burden here.

Simply put, this Court need not grant a preliminary injunction because there is no imminent risk to Plaintiffs, who have 180 days from the law's effective date (June 13, 2018) to transfer LCMs "to any person or firm lawfully entitled to own or possess that ... magazine, render the ... magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less, or voluntarily surrender" that weapon. A2761 § 5(b).[14] Indeed, Plaintiffs repeatedly assert they have "less than six months" before losing their rights. Br. 1, 3. But that leaves ample time for this Court to adjudicate their underlying complaint without granting preliminary relief. And during that time, Plaintiffs can still purchase and use firearms that hold up to 10 rounds of ammunition—meaning the law will not impair their right to use myriad firearms in self-defense. There is simply no need for this Court to grant preliminary relief enjoining a state statute from taking effect when Plaintiffs can litigate their claims, unharmed, in the normal course.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR DENYING RELIEF.

That remaining factors only confirm that preliminary relief is not warranted. While Plaintiffs will not suffer irreparable harm absent an injunction, the *grant* of

---

[14] Notably, any firearms owners in possession of weapons with a "fixed magazine capacity" of up to 15 rounds (meaning that they cannot be modified to accept a 10 round magazine) have *one year* to register such arms. *See* A2761 § 7.

an injunction would impose a significant burden on the State and undermine the public interest. Indeed, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J. in chambers) (citation omitted). All the more so whenever "there is, in addition, an ongoing and concrete harm to [the state's] law enforcement and public safety interests." *Id.* In this case in particular, New Jersey—and the public—have a "demonstrated need to remove magazines from circulation that are capable of accepting more than ten rounds." *S.F. Veteran Police*, 18 F. Supp. 3d at 997; *see also Wiese I*, 263 F. Supp. 3d at 994 ("The public interest is also furthered by preventing and minimizing the harm of gun violence…."). And all the safety implications laid out in Part I, *supra*, merit against an injunction. *See, e.g., S.F. Veteran Police*, 18 F. Supp. 3d at 1005. Such preliminary relief would undo the state's efforts to protect the public.

At bottom, the problem with Plaintiffs' request is that the putative harms they will face are far outweighed by the risks to New Jersey and the public interest. As another district court put the point when rejecting an identical request, the "rare occasions" someone needs an LCM for self-defense

> must be weighed against the more frequent and documented occasions when a mass murderer with a gun holding eleven or more rounds empties the magazine and slaughters innocents. *One critical difference is that whereas the civilian defender rarely will exhaust the up-to-ten magazine, the mass murderer has every intention of firing every round possible and will exhaust the largest magazine available*

39

> *to him*. On balance, more innocent lives will be saved by limiting the capacity of magazines than by allowing the previous regime of no limitation to continue.

*Id.* (emphasis in original); *compare also* Allen Decl., ¶¶8, 19 (noting that "it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds"), *with* Allen Decl., ¶23 (but adding that "it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings"). Because granting preliminary injunction would do grave harm to the State and the public, this Court should reject Plaintiffs' request.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Plaintiffs' Motion.


Dated: July 5, 2018      Respectfully Submitted,
            GURBIR S. GREWAL
            ATTORNEY GENERAL OF NEW JERSEY

            By:  /s/ Bryan E. Lucas

            Joseph Fanaroff
            Jeremy Feigenbaum
            Assistant Attorneys General
             Of Counsel and On the Brief

            Valeria Dominguez
            Bryan E. Lucas
            Deputy Attorneys General
             On the Brief