Lawrence S. Lustberg, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

*Attorneys for Amicus Curiae*
*Everytown for Gun Safety*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., et al., <br><br> Plaintiffs, <br><br> - v. - <br><br> GURBIR GREWAL, in his official capacity as Attorney General of New Jersey, et al., <br><br> Defendants. | No. 18-cv-10507 <br><br> **BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF AMICUS CURIAE ................................................................................. 1

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 4

    I.    New Jersey's Prohibition of Large-Capacity Magazines Is Part of a
        Longstanding History of Identical and Analogous Prohibitions ............................... 4

        A.    There Is a Longstanding Tradition of Prohibiting Firearms Capable
            of Quickly Firing Multiple Rounds Without Reloading. ................................ 5

        B.    A2761 Is Consistent with Centuries of Laws Prohibiting
            Weapons Deemed to Be Especially Dangerous. ............................................ 7

    II.    The "Common Use" Test Proposed By Plaintiffs Is Illogical and Should
        Not Be Followed. ................................................................................................... 9

    III.    Use of Large Capacity Magazines Makes Mass Shootings and Other
         Incidents of Gun Violence Deadlier. ..................................................................... 12

        a.    Everytown's Analysis of Mass Shootings Shows that the Use of
            LCMs Results in More Deaths and More Injuries. ...................................... 12

        b.    Social Science Research Shows LCMs Pose a Serious Risk to
            Public Safety. ............................................................................................. 14

        c.    Plaintiffs' Attempts to Dispute this Evidence Are Unconvincing. ............... 17

CONCLUSION .............................................................................................................. 21

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aymette v. State*,
   21 Tenn. 154 (1840)............................................................................................8

*Benjamin* v. *Bailey*,
   No. CV 93-0063723,  (Conn. Super. Ct. June 30, 1994), aff'd, 662 A.2d 1226
   (Conn. 1995) .....................................................................................................18

*Binderup v. Attorney General*,
   836 F.3d 336 (3d Cir. 2016)..................................................................................2

*City of Renton v. Playtime Theatres, Inc.*
   475 U.S. 41 (1986)..............................................................................................11

*Cockrum v. State*,
   24 Tex. 394 (1859)................................................................................................8

*Colo. Outfitters Ass'n v.Hickenlooper*,
   24 F. Supp. 3d 1050, 1071 (D. Colo. 2014), *vacated on standing grounds*, 823
   F.3d 537 (10th Cir. 2016) ...................................................................................19

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)..................................................................................... *passim*

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013)...................................................................................7

*Duncan v. Becerra*,
   265 F. Supp. 3d 1106, 1139 (S.D. Cal. 2017), *appeal docketed*, No. 17-56081
   (9th Cir., oral argument May 14, 2018) .................................................................2

*Duncan v. Becerra*,
   No. 17-56081 (9th Cir. Nov. 22, 2017)...................................................................1

*Duncan v. Becerra*,
   No. 17-cv-1017-BEN-JLB (S.D. Cal. June 5, 2017) ...........................................19

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015)............... *passim*

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) .............................................................................2, 4

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) .......................................................................2, 19

*Jackson v. City & Cty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ................................................................................11

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) (*en banc*), *cert. denied*, 138 S. Ct. 469 (2017).............. *passim*

*Kolbe v. Hogan,*
    No. 14–1945, 2016 WL 1572325 (4th Cir. April 18, 2016) ...............................1, 11

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)...............................................................................................8

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015), *cert. denied sub nom. Shew v. Malloy*, 136 S. Ct.
    2486 (2016) ......................................................................................................2, 11

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
    700 F.3d 185 (5th Cir. 2012) ................................................................................4

*Peruta v. Cty. of San Diego,*
    Nos. 10-56971, 11-16255, 2015 WL 2064206 (9th Cir. Apr. 30, 2015) ..................1

*Reilly v. City of Harrisburg,*
    858 F.3d 173 (3d Cir. 2017)..................................................................................3

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ................................................................................4

*United States v. Marzzarella,*
    614 F.3d 85 (3d. Cir. 2010)...........................................................................2, 4, 5

*United States v. Miller,*
    307 U.S. 174 (1939)..........................................................................................7, 8

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) ................................................................................4

*Wiese v. Becerra,*
    263 F. Supp. 3d 986 (E.D. Cal. 2018)...................................................................3

*Worman v. Healey,*
    2018 U.S. Dist. LEXIS 59357 (D. Mass. 2018) ...............................................9, 11

**Statutes**

New Jersey A2761, tentatively codified at N.J.S.A. 2C:39-1(y) and 39-3(j) ...................... *passim*

1837 Ala. Laws 7, § 1 ........................................................................................8

1881 Ark. Acts § 1909 .......................................................................................8

1917 Cal. Stat. 221, ch. 145, § 1 ........................................................................8

1933 Cal. Stat. 1170, § 3 ..................................................................6

1837 Ga. Laws 90 ..............................................................................8

1931 Ill. Laws 452, § 1 ......................................................................6

1913 Iowa Acts 307, ch. 297, § 2 ......................................................8

1932 La. Acts 337, § 1 ......................................................................6

1926 Mass. Acts 256, ch. 261 ............................................................8

1909 Me. Laws 141 ............................................................................8

1927 Mich. Pub. Acts 887-89, § 3 ....................................................8

1927 Mich. Pub. Acts 887, No. 372, § 3 ..........................................8

1927 Mich. Pub. Acts 887, § 3 ..........................................................5

1913 Minn. Laws 55 ..........................................................................8

1917 Minn. Laws 614, ch. 243, § 1 ..................................................8

1933 Minn. Laws 232, § 1 ................................................................6

1763-1775 N.J. Laws 346 ..................................................................7

1911 N.Y. Laws 442, ch. 195, § 1 ....................................................8

1916 N.Y. Laws 338-39, ch. 137, § 1 ..............................................8

1933 Ohio Laws 189, § 1 ..................................................................6

1927 R.I. Pub. Laws 256, § 1 ............................................................8

1927 R.I. Pub. Laws 256, §§ 1, 4 ......................................................5

1903 S.C. Acts 127, § 1 ....................................................................8

1934 S.C. Acts 1288, § 1 ..................................................................6

47 Stat. 650, ch. 465, §§ 1, 14 (1932) ..............................................6

48 Stat. 1236, 1246 (1934) ................................................................7

1837-1838 Tenn. Pub. Acts 200 ........................................................8

1879 Tenn. Pub. Acts 135, ch. 96, § 1 ..............................................8

1933 Tex. Gen. Laws 219, § 1 ..........................................................6

1912 Vt. Acts & Resolves 310, § 1 ....................................................8

**Other Authorities**

Alan Blinder,
*'I Just Wanted to Live,' Says Man Who Wrested Rifle From Waffle House
Gunman*, N.Y. Times, April 23, 2018, available at https://nyti.ms/2I03Cxs..........................20

Alana Abramson,
*After Newtown, Schools Across the Country Crack Down on Security*, ABC
News (Aug. 21, 2013), http://abcn.ws/1KwN9Ls...................................................................14

Anna Merriman,
*Bystander Killed in Trenton Standoff was Father of 6, Beloved Husband*,
NJ.com (May 11, 2017), *available at* https://bit.ly/2tSKVpL;.................................................17

Bart Jansen,
*Florida shooting suspect bought gun legally, authorities say*, USAToday.com
(Feb. 15, 2018), https://usat.ly/2F9kBfH ...................................................................................14

Brian Freskos,
*Baltimore Police Are Recovering More Guns Loaded With High-Capacity
Magazines, Despite Ban on Sales*, The Trace (March 27, 2017),
http://bit.ly/2o1UQrr ..................................................................................................................15

Christopher Koper, Daniel Woods & Jeffrey Roth,
*An Updated Assessment of the Federal Assault Weapons Ban: Impacts on
Gun Markets and Gun Violence, 1994-2003*, National Institute of Justice
(2004), http://bit.ly/2vBTGTX ...........................................................................................15, 16

Christopher S. Koper et al.,
*Criminal Use of Assault Weapons and High-Capacity Semiautomatic
Firearms: an Updated Examination of Local and National Sources*, 95 J. Urb.
Health 313 (Oct. 2017), *available at* https://bit.ly/2MRVqkd..........................................15, 17

Cody J. Jacobs,
*End the Popularity Contest: A Proposal for Second Amendment "Type of
Weapon" Analysis*, 83 Tenn. L. Rev. 231 (2015)...................................................................10

*Congresswoman's Responses after Arizona Shooting Called Encouraging*,
CNN.com, Jan. 9, 2011, available at https://cnn.it/2NrEiD0...................................................20

Dan Ivers,
*Car Wash Employee Killed by Stray Bullet in Newark; Two Others Injured*,
NJ.com (Oct. 12, 2014), *available at* https://bit.ly/2KJFoeP;.................................................17

Daniel W. Webster et al.,
*Epidemiologic changes in gunshot wounds in Washington, D.C. 1983-1990*,
127 Archives of Surgery 694 (1992) ........................................................................................16

David Fallis,
*Data Indicate Drop in High Capacity Magazines During Federal Gun Ban*,
Washington Post, (Jan. 10, 2013), http://wapo.st/2wV9EMX.................................................15

David Hemenway,
   *Private Guns, Public Health* 66-68 (2004) ..................................................................18

Everytown for Gun Safety,
   *Mass Shootings in the United States: 2009-2016* (March 2017) available at
   https://every.tw/2BvFkXr ...............................................................................12, 13

Frank Iannamico,
   *Design and Development of the U.S. Carbine Thirty Round Magazine*, Small
   Arms Review (May 13, 2013) ..........................................................................14

Garen J. Wintemute, *et al.,*
   *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, 32
   Annals Emer. Med. 44 (1998), available at http://bit.ly/2ymFodM .......................................17

Jackie Valley,  *et al.,*
   *No Clear Motive in Las Vegas Strip Shooting That Killed 59, Injured 527*,
   Nevada Independent (Oct. 2, 2017), http://bit.ly/2x4m4is .....................................................13

Jason Hanna & Holly Yan,
   *Sutherland Springs church shooting: What we know*, CNN.com (Nov. 7,
   2017) ..............................................................................................................14

Jeffrey Roth & Christopher Koper,
   *Impact Evaluation of the Public Safety and Recreational Firearms Use
   Protection Act of 1994*: Final Report, Urban Institute, (1997), *available at*
   http://urbn.is/2wQKkrA ....................................................................................16

Joseph Blocher & Darrell A.H. Miller,
   *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis.
   279, 288 (2016)..................................................................................................9

Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in
   America*, Baltimore Sun (Sept. 30, 2016) ..............................................................16

Kelsey Mallahan,
   *Timeline: Seattle Pacific University Shooting*, K5 News, June 24, 2016,
   available at https://kng5.tv/2m22501 ...................................................................20

Mike McIntire,
   *Weapons in San Bernardino Shootings Were Legally Obtained*, New York
   Times (Dec. 3, 2015), https://nyti.ms/2JPLR4F ......................................................16

Kristina Davis,
   *Las Vegas Mass Shooting Revives Debate on High-Capacity Magazines*, San
   Diego Tribune (Oct. 7, 2017) available at https://bit.ly/2KshdlQ ............................................2

Lia Eustachewich & Danika Fears,
   *Las Vegas Shooter Had Cache of Weapons in Hotel Room*, New York Post
   (October 2, 2017) ............................................................................................13

Lois Beckett,
    *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*,
    The Trace (Sept. 20, 2016), available at http://bit.ly/2d89dGH ...............................10

Louis Klarevas,
    *Rampage Nation: Securing America from Mass Shootings* 221 (2016) ................................13

Mayors Against Illegal Guns,
    *Analysis of Recent Mass Shootings* (Sept. 2013). *available at*
    https://bit.ly/R5K9zi...............................................................................13

Myles Ma & Erin O'Neill,
    *Toddler was Bouncing on Parent's Bed When Killed by Stray Bullet Fired in
    Shootout*, NJ.com (Oct 13, 2014), *available at* https://bit.ly/2KMc9Iw................................17

National Rifle Association (@NRA),
    Twitter (June 28, 2018, 10:07 AM), https://bit.ly/2tZzBr9 ....................................18

Nicholas Nehamas & David Smiley,
    *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report
    Says*, Miami Herald (Feb. 27, 2018), https://hrld.us/2KQskUU.............................14

O. Ricardo Pimentel,
    *Nearly 50 Years Ago, Bravery at UT tower* (June 19, 2016), MySA.com,
    https://bit.ly/2JAqu7s;.............................................................................14

Paula McMahon,
    *Nikolas Cruz left 180 rounds of ammunition – with swastikas – at Parkland
    school, sources say*, Sun Sentinel (Mar. 2, 2018), https://bit.ly/2lVjY09 ...........................14

Philip Cook, Jens Ludwig & David Hemenway,
    *The Gun Debate's New Mythical Number: How Many Self-Defense Uses Per
    Year?*, 16 J. Pol'y Analysis & Mgmt. 43 (2007) ....................................................18

Rachael Rettner,
    *Gunshot Wounds Are Getting Deadlier, One Hospital Finds*,
    LiveScience.com, June 14, 2016, https://bit.ly/2HBnMO9 ....................................16

Robert J. Spitzer,
    *Gun Law History in the United States and Second Amendment Rights*, 80 Law
    & Contemp. Probs. 55 (2017) ......................................................................5

Robert Johnson & Geoffrey Ingersoll,
    *It's Incredible How Much Guns Have Advanced Since the Second
    Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), *available
    at* http://read.bi/2x12PpU..........................................................................5

S. Rep. No. 72-575 (1932) ................................................................................6

Sam Petulla,
*Here is 1 Correlation Between State Gun Laws and Mass Shootings,*
CNN.com (Oct. 5, 2017), https://cnn.it/2J4sWCC ....................................................15

United States Census Bureau, 2010 Census: Population Density Data, *available at*
https://bit.ly/2z5jPRx ............................................................................17

Violence Policy Center,
*Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* (June
2015) ............................................................................................18

Violence Policy Center,
*High Capacity Ammunition Magazines are the Common Thread Running
Through Most Mass Shootings in the United States*, https://bit.ly/2HnPC0k........................14

Violence Policy Center,
*Firearm Justifiable Homicide and Non-Fatal Self-Defense Gun Use: An
Analysis of Federal Bureau of Investigation and National Crime Victimization
Survey Data* (May 2017), *available at* https://bit.ly/2KAB0Qa ............................................18

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with millions of supporters spread across all fifty states, including tens of thousands of New Jersey residents.  It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Currently, the mayors of 100 New Jersey cities are members of Mayors Against Illegal Guns.  Everytown also includes a large network of gun violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown's mission includes defending gun laws through the filing of *amicus* briefs that provide historical context and doctrinal analysis which might otherwise be overlooked. Everytown has filed such briefs in several recent cases, including in cases, like this one, involving challenges to laws regulating large-capacity ammunition magazines.  *See, e.g.*, *Kolbe v. Hogan, No.* 14–1945, 2016 WL 1572325 (4th Cir. April 18, 2016); *Peruta v. Cty. of San Diego*, Nos. 10-56971, 11-16255, 2015 WL 2064206 (9th Cir. Apr. 30, 2015); *Duncan v. Becerra*, No. 17-56081 (9th Cir. Nov. 22, 2017).

**INTRODUCTION**

This case concerns New Jersey residents' right to be free from gun violence and their power to enact laws to protect that right.  In light of the increasing toll of mass shootings, and in response to recent gun massacres in Aurora, Colorado; Newtown, Connecticut; San Bernardino, California; Las Vegas, Nevada; Sutherland Springs, Texas, and Parkland, Florida, among other places, the people of New Jersey sought legislation that would limit their risk of dying in one of these horrific crimes.  Their efforts resulted in Assembly Bill No. A2761 (hereinafter, "A2761"), which amends the New Jersey criminal code to prohibit the sale or possession of large-capacity magazines ("LCMs") capable of holding more than ten rounds of ammunition, of the type used

in these and other recent mass shootings.[1]  Every federal court of appeals that has considered this issue has found that such prohibitions on LCMs are permissible under the Second Amendment.[2]  But Plaintiffs barely mention this overwhelming precedent in their motion papers, instead arguing that their Second Amendment claims are likely to succeed because, they assert, laws regulating ammunition capacity are not longstanding, LCMs are widely owned, and social science does not support the restrictions at issue.  As both the State's brief and this *amicus* brief show, Plaintiffs' arguments are without merit.  This Court should thus reach the same conclusion as the Second, Fourth, Seventh, Ninth, and D.C. Circuits and reject them—and accordingly deny Plaintiffs' Motion for a Preliminary Injunction.[3]

Courts in this Circuit analyze Second Amendment challenges through a "two-pronged approach": first, by assessing "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," and then, if it does, by "evaluat[ing] the law under some form of means-ends scrutiny," generally intermediate scrutiny.  *Binderup v. Attorney General*, 836 F.3d 336, 346, 397 (3d Cir. 2016) (*en banc*) (quoting *United States v.*

---

[1] *See e.g.* Kristina Davis, *Las Vegas Mass Shooting Revives Debate on High-Capacity Magazines*, San Diego Tribune (Oct. 7, 2017) available at https://bit.ly/2KshdlQ; Mike McIntire, *Weapons in San Bernardino Shootings Were Illegally Obtained*, New York Times (Dec. 3, 2015), https://nyti.ms/2JPLR4F; A2761 is tentatively codified at N.J.S.A. 2C:39-1(y) and 39-3(j).

[2] *See Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017) (*en banc*) (affirming the finding that Maryland's ban on LCMs over ten rounds was constitutional and holding that such magazines were not protected by the Second Amendment), *cert. denied*, 138 S. Ct. 469 (2017); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 247 (2d Cir. 2015) (hereinafter, "*NYSRPA*") (holding that New York and Connecticut prohibitions on possessing LCMs holding over ten rounds did not violate the Second Amendment), *cert. denied sub nom. Shew v. Malloy*, 136 S. Ct. 2486 (2016); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (holding that local ordinance banning LCMs did not violate the Second Amendment), *cert. denied*, 136 S. Ct. 447 (2015); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 1001 (9th Cir. 2015) (upholding denial of preliminary injunction of local ordinance restricting the possession of LCMs accepting more than ten rounds); *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011) (upholding D.C. prohibition on LCMs over ten rounds).  *But see Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1139 (S.D. Cal. 2017) (granting preliminary injunction against California's ban on LCMs over ten rounds), *appeal docketed*, No. 17-56081 (9th Cir., oral argument May 14, 2018).

[3] This *amicus* brief addresses only Plaintiffs' Second Amendment claims, and in particular Plaintiffs' failure to demonstrate their likelihood of success on those claims.  Plaintiffs' motion for a preliminary injunction with respect to their Equal Protection and Takings Clause claims should also be denied, for the reasons set forth by the State.

*Marzzarella*, 614 F.3d 85, 89 (3d. Cir. 2010) (internal quotation marks omitted).[4]   A2761 passes muster at both steps of this analysis, clearly showing that, as the State argues, (Def.'s Br. at *18-27), Plaintiffs are highly unlikely to succeed on the merits of their claims.[5]

As an initial matter, A2761 is part of a long tradition of regulating or prohibiting weapons that legislatures have determined to be unacceptably dangerous—including a century of restrictions on firearms capable of firing a large number of rounds without reloading.  This historical tradition alone is sufficient for this Court to find A2761 constitutional under *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) (noting "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'' and that "nothing in its opinion should be taken to cast doubt on longstanding prohibitions").

The Court should also reject Plaintiffs' argument that the national prevalence of a firearm feature, like the LCMs at issue here, somehow gives that feature Second Amendment protection. Such an approach cannot, for the reasons set forth herein, be reconciled with the Second Amendment exceptions articulated by the Supreme Court in *Heller* and by those circuits that have addressed this issue.  *See, e.g.*, *id.* at 626-627 (recognizing that the Second Amendment is "not a right to keep and carry any weapon whatsoever" and  "M-16 rifles and the like—may be banned"); *Kolbe*, 849 F.3d at 121 (holding that LCMs "are among those arms . . . the *Heller* Court singled out as being beyond the Second Amendment's reach"); *Friedman*, 784 F.3d at 408 (noting that under *Heller*, the Second Amendment does not protect "military-grade weapons . . . and weapons especially attractive to criminals").  Moreover, the "common use" test would transform the constitutional analysis into a consumer referendum and render existing firearms and firearm features like LCMs effectively immune from regulation.

---

[4] Every court that has confronted a Second Amendment challenge to LCM regulations has applied such intermediate scrutiny. *See Wiese v. Becerra*, 263 F. Supp. 3d 986, 992 (E.D. Cal. 2018) ("[V]irtually every other court to examine large capacity magazine bans has found that intermediate scrutiny is appropriate").

[5] To obtain a preliminary injunction Plaintiffs must show (1) a reasonable probability of success in the litigation, and (2) irreparable injury if relief is not granted.  *E.g., Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).  The court should also take into account the possibility of harm to other interested persons, and the public interest.  *Id.*  This brief focuses on Plaintiffs' likelihood of success on the merits but as discussed below and in the State's brief, these additional factors also weigh heavily in favor of denying Plaintiffs' motion.

To the extent that the Court engages in the second step of the Second Amendment analysis, applying intermediate scrutiny, it also strongly supports the constitutionality of A2761. As discussed below, social science research conducted by Everytown, as well as other relevant social science, demonstrates that LCMs make mass shootings more deadly and supports the reasonable fit of A2761 to addressing New Jersey residents' public safety concerns.

## ARGUMENT

I.  **New Jersey's Prohibition of Large-Capacity Magazines Is Part of a Longstanding History of Identical and Analogous Prohibitions.**

As both the Supreme Court and the Third Circuit have emphasized, "longstanding limitations are exceptions to the right to bear arms." *Marzzarella*, 614 F.3d at 91; *see Heller*, 554 U.S. at 626-27, 635 (noting that such "longstanding" regulations are treated as tradition-based "exceptions" by virtue of their "historical justifications").[6]  That said, such longstanding prohibitions need not "mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*).  Instead, courts have found that even "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Fyock*, 779 F.3d at 997 (citing *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012)).[7]

A2761 is part of a long tradition of regulating or prohibiting weapons that lawmakers have determined to be unacceptably dangerous—including a century of restrictions enacted shortly after semi-automatic weapons capable of firing a large number of rounds without

---

[6] *See also Fyock*, 779 F.3d at 997 (noting that "longstanding prohibitions" are "traditionally understood to be outside the scope of the Second Amendment"); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (noting that a law does not violate the Second Amendment if it does not infringe upon "conduct that was within the scope of the Second Amendment as historically understood").

[7] *See also Friedman*, 784 F.3d at 408 (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934); *Skoien*, 614 F.3d at 639-41 (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by *all* felons was not enacted until 1961").

4

reloading became widely commercially available.  *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68-69 (2017) (explaining that "[firearm] laws were enacted not when these weapons were invented, but when they began to circulate widely in society").  Many of these laws were passed at about the same time as the prohibitions on sales to felons and the mentally ill and restrictions on commercial sale of arms which the Supreme Court in *Heller* identified as longstanding.  *See id*. at 82 (discussing the passage of prohibitions on possession of firearms by felons and the mentally ill in the early 20th century and on the possession of semi-automatic weapons with LCMs in the 1920s and 1930s).  This historical tradition alone is sufficient for the Court to find A2761 constitutional under *Heller*.  *See Heller*, 554 U.S. at 626-27; *Marzzarella*, 614 F.3d at 91-92.

### A.	There Is a Longstanding Tradition of Prohibiting Firearms Capable of Quickly Firing Multiple Rounds Without Reloading.

Even more specifically, states have regulated the ammunition capacity of semi-automatic firearms since they first became widely commercially available at the turn of the twentieth century.  *See* Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), *available at* http://read.bi/2x12PpU (explaining that semi-automatic weapons became commercially available in the early 1900s).  Such laws often categorized large-capacity, semi-automatic firearms, along with fully automatic weapons, as "machine guns," and imposed restrictions that effectively prohibited them entirely. *See, e.g.*, 1927 R.I. Pub. Laws 256, §§ 1, 4 (prohibiting the "manufacture, s[ale], purchase or possess[ion]" of a "machine gun," which it defined as "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub. Acts 887, § 3 (prohibiting possession of "any machine gun or firearm which can be fired more than sixteen times without reloading").

In 1928, the National Conference on Uniform State Laws (now the Uniform Law Commission) adopted a model law prohibiting possession of "any firearm which shoots more than twelve shots semi-automatically without reloading," setting the national standard for laws prohibiting possession of semi-automatic firearms with large magazine capacities.  *See* Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State

5

Laws and Proceedings of the Annual Meeting 422-23 (1928).[8]  Shortly thereafter, the federal government enacted a similar prohibition for the District of Columbia.  *See* 47 Stat. 650, ch. 465, §§ 1, 14 (1932) (making it a crime to "possess any machine gun," which it defined as "any firearm which shoots . . . semiautomatically more than twelve shots without loading"). Ironically, the National Rifle Association, the parent organization of the plaintiffs in this case, endorsed passage of the D.C. law, saying, "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."  S. Rep. No. 72-575, at 5-6 (1932).

Many states followed the federal government's lead, prohibiting or regulating firearms based on magazine capacity.  California, for example, prohibited the sale or possession of not only "all firearms . . . capable of discharging automatically," but also "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device *having a capacity of greater than ten cartridges*."  1933 Cal. Stat. 1170, § 3 (emphasis added).[9]  Several other states, including Minnesota, Ohio, and Virginia, also prohibited or regulated firearms based on magazine capacity.[10]  Still other states passed laws limiting possession of automatic weapons based on the number of rounds that a firearm could discharge without reloading.[11]

---

[8] This standard originated with a model law promulgated by the National Crime Commission in 1927.  *Report of Firearms Committee*, at 422-23.

[9] These statutes were at least as restrictive as A2761, and indeed appear more restrictive: the 1933 law prohibited *firearms* capable of receiving LCMs, rather than only the LCMs at issue here.  *See id.*

[10] *See* 1933 Minn. Laws 232, § 1 (banning "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously" if the weapon was modified to allow for a larger magazine capacity); 1933 Ohio Laws 189, § 1 (banning "any firearm which shoots more than eighteen shots semi-automatically without reloading"); 1934 Va. Acts 137, § 1 (effectively prohibiting possession or use of "weapons . . . from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading").

[11] These limitations were more stringent than New Jersey's current magazine prohibition of ten rounds.  *See* 1933 S.D. Sess. Laws 245, § 1 (five rounds); 1933 Tex. Gen. Laws 219, § 1 (five rounds); 1934 Va. Acts 137, § 1 (seven rounds for automatics, 16 for semi-automatics); 1931 Ill. Laws 452, § 1 (eight rounds); 1932 La. Acts 337, § 1 (eight rounds); 1934 S.C. Acts 1288, § 1 (eight rounds).

The federal government embraced such regulations in 1934 when Congress enacted the National Firearms Act. *See* 48 Stat. 1236, 1246 (1934) (requiring registration of automatic weapons, short-barreled rifles and shotguns, and a variety of concealable and disguised firearms, and imposing a significant transfer tax on these weapons). And the Supreme Court unanimously upheld the National Firearms Act in one of its few pre-*Heller* Second Amendment decisions. *See United States v. Miller*, 307 U.S. 174, 178 (1939) (affirming that the Second Amendment does not guarantee the right to keep and bear short-barreled shotguns).

As this historical record shows, A2761 is thus properly viewed as the continuation of nearly a century of valid restrictions based on the ability to shoot large numbers of rounds in a short time without reloading. As such, the statute is a longstanding restriction, which accordingly falls outside the scope of the Second Amendment. *See Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (finding that concealed-carry licensing standard which had been in effect "in some form for nearly 90 years," "qualifies as a longstanding, presumptively lawful regulation" (internal quotation marks omitted)).

### B. A2761 Is Consistent with Centuries of Laws Prohibiting Weapons Deemed to Be Especially Dangerous.

A2761 is also part of a long history of government prohibition of weapons that pose heightened threats to public safety, either because the weapons themselves are particularly lethal or because they are especially suitable for criminal use. In particular, prohibitions on weapons deemed to be especially dangerous date back to early English legal history, beginning with the 1383 prohibition of launcegays (a particularly lethal type of spear) and the 1541 prohibition of crossbows and firearms less than a yard long. *See* 7 Ric. 2, 35, ch. 13 (1383); 33 Hen. 8, ch. 6, § 1 (1541). The regulation of unusually dangerous weapons continued as the American colonies and first states, including New Jersey, adopted the English tradition. *See generally* 1763-1775 N.J. Laws 346 (prohibiting set or trap guns); The Laws of Plymouth Colony (1671) (same); Records of the Colony of New Plymouth in New England 230 (Boston 1861) (same).

States continued to pass prohibitions or regulations on unreasonably dangerous weapons after ratification of the Second Amendment. For example, several states banned or placed

prohibitively high taxes on Bowie knives,[12] the assault weapon of their time, which were determined to be "instrument[s] of almost certain death."  *See Cockrum v. State*, 24 Tex. 394, 402 (1859).  In addition, a number of states prohibited certain types of small and easily concealable handguns, which were determined to be ideal for criminal use.[13]

Throughout the early twentieth century, many states passed laws prohibiting unusually dangerous weapons or weapon features, such as silencers, as the technology of firearms and other dangerous weapons evolved.[14]  At least 28 states, as well as the federal government, passed prohibitions or severe restrictions on automatic weapons in the 1920s and 1930s, along with the restrictions on large capacity semi-automatic weapons discussed above.  *See supra* Part I.A.[15]

Within this historical context, New Jersey's prohibition on LCMs can be understood as merely the latest part of a longstanding tradition of government prohibition or regulation of

---

[12] *See* 1837 Ala. Laws 7, § 1 (prohibitively taxing Bowie knives); 1837 Ga. Laws 90 (banning Bowie knives); 1837-1838 Tenn. Pub. Acts 200 (prohibiting the sale of Bowie knives); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (justifying a prohibition on Bowie knives on the basis that they are "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin").

[13] *See* 1881 Ark. Acts § 1909 (pocket pistols and "any kind of cartridge[] for any pistol"); 1879 Tenn. Pub. Acts 135, ch. 96, § 1 ("belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol"); 1907 Ala. Law 80, § 1 (similar); 1903 S.C. Acts 127, § 1 (similar).

[14] *See, e.g.*, 1909 Me. Laws 141 (prohibiting silencers); 1912 Vt. Acts & Resolves 310, § 1 (same); 1913 Minn. Laws 55 (same); 1916 N.Y. Laws 338-39, ch. 137, § 1 (same); 1926 Mass. Acts 256, ch. 261 (same); 1927 Mich. Pub. Acts 887-89, § 3 (same); 1927 R.I. Pub. Laws 256, § 1 (same).  States also banned a wide variety of unusually dangerous weapons, including blackjacks and billy clubs, sling-shots (a metal or stone weight tied to a string), brass knuckles, various kinds of knives, and explosives.  *See, e.g.*, 1917 Cal. Stat. 221, ch. 145, § 1 (blackjacks and billy clubs); 1911 N.Y. Laws 442, ch. 195, § 1 (sling-shots); 1917 Minn. Laws 614, ch. 243, § 1 (brass knuckles); 1913 Iowa Acts 307, ch. 297, § 2 (daggers and similar-length knives); 1927 Mich. Pub. Acts 887, No. 372, § 3 (explosives).

[15] Plaintiffs point to the failure of the founding generation to pass laws prohibiting experimental, and highly unusual weapons of the era with ammunition capacities of greater than ten rounds. (Pls.' Mem. at 13.)  This argument is foreclosed by the series of Supreme Court decisions, culminating in *Heller*, expressly allowing the regulation and prohibition of automatic weapons and short-barreled shotguns, which had existed, in a much less unusual manner, for decades. *Heller*, 554 U.S. at 627 (allowing for the prohibition of "dangerous and unusual weapons" including "M-16 rifles and the like"); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (noting that the Second Amendment is "not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'"); *United States v. Miller*, 307 U.S. 174 (1939) (upholding prohibitive registration requirement for short-barreled shotguns, a weapon that existed at the founding without regulation).

unusually dangerous weapons.  This long history of analogous regulation further supports the conclusion that A2761 does not burden a "right secured by the Second Amendment."  *Heller*, 554 U.S. at 626-27.

## II.    The "Common Use" Test Proposed By Plaintiffs Is Illogical and Should Not Be Followed.

In analyzing this Second Amendment challenge, the Court should reject Plaintiffs' argument that it should apply a test that focuses on whether the law bans weapons that are "in common use."  (*See* Pls.' Mem. at 10.)  Such test is not well grounded in Second Amendment jurisprudence and does not fully account for important principles of federalism.  These flaws exist whether the test is applied categorically or as a threshold question at step one of the prevailing Second Amendment analysis. (*Id.* at 18.)

The argument that LCMs must be afforded Second Amendment protection because they are widely available misconstrues the Supreme Court's decision in *Heller* to suggest that a product's significant presence in the national market triggers Second Amendment protection. The Court in *Heller* held that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  554 U.S. at 625.  But it does not logically follow, and courts have not found, that the Second Amendment somehow protects all weapons that have achieved a degree of commercial success.  *See Kolbe*, 849 F.3d at 142 ("The *Heller* majority said nothing to confirm that it was sponsoring the popularity test."); *Worman v. Healey*, 2018 U.S. Dist. LEXIS 59357, *30 (D. Mass. 2018) ("[P]resent day popularity is not constitutionally material.").

In addition to lacking firm jurisprudential foundation, the "common use" test ultimately proves hopelessly circular.  Following this approach would allow the constitutionality of weapons prohibitions to be decided not by how dangerous a weapon is, but rather by "how widely it is circulated to law-abiding citizens by the time a bar on its private possession has been enacted and challenged."  *Kolbe*, 849 F.3d at 141.  Just as "[i]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned," *Friedman*, 784 F.3d at 409, it would be similarly absurd to allow the fact that a law previously did not exist to stand as a constitutional bar to its enactment.  *See* Joseph

Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288 (2016) (discussing the "central circularity" that plagues the "common use" test: "what is common depends largely on what is, and has been, subject to regulation"). Yet this is what application of the "common use" test, advocated by Plaintiffs, would dictate, here and elsewhere.

This approach also fails to provide workable standards, or indeed, any guidance, as to whether a court should determine "common use" by considering the number of LCMs produced or sold or the number of law-abiding owners of the same. *See Kolbe*, 849 F.3d at 135-36. This distinction is critical because firearm ownership is extremely concentrated, with 3% of American adults possessing 50% of the country's guns. *See* Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The Trace (Sept. 20, 2016), available at http://bit.ly/2d89dGH. If production or sales numbers form the basis of the common use analysis, this small group of gun owners would be essentially placed in control of the meaning of the Second Amendment. But this tyranny by a tiny minority was obviously not what the *Heller* Court intended.

Indeed, a constitutional analysis driven by the prevalence of the prohibited firearm in the market would create perverse incentives for the firearms industry, giving it the unilateral ability to provide highly dangerous firearms, and firearm features with Second Amendment protection "simply by manufacturing and heavily marketing them" before the Government has had the chance to assess their danger, determine whether to regulate them and build the political momentum to actually do so. Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231, 265 (2015). But the choices, including the irresponsible choices, of the gun industry cannot and should not define the meaning of the Second Amendment. *See Kolbe*, 849 F.3d at 141-42 (rejecting such a Second Amendment test).

Such an approach also raises federalism concerns, as states that fail to immediately regulate new and potentially dangerous firearms or firearm features would risk losing the ability

to do so if such firearms or features are quickly adopted by consumers in other states.[16]  Thus, firearm safety decisions made in some states would render the laws of other states "more or less open to challenge under the Second Amendment," and "would imply that no jurisdiction other than the United States as a whole can regulate firearms."  *Friedman*, 784 F.3d at 412.  But *Heller* "does not foreclose all possibility of experimentation" by state and local governments.  *Id.* Directly to the contrary, it permits states and localities to do what they have long done in the realm of firearm legislation: "experiment with solutions to admittedly serious problems." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (quoting *City of Renton v. Playtime Theatres, Inc.* 475 U.S. 41, 52 (1986)).

This Court should be guided by the Fourth Circuit's *en banc* opinion in *Kolbe*, as well as the historical tradition discussed above, and consider whether the firearm, or firearm component, at issue is appropriate for self-defense or instead is a weapon designed to produce mass casualties.  *See* 849 F.3d at 121.  The *Kolbe* court found that "large-capacity magazines . . . [that] allow a shooter to fire more than ten rounds without having to pause to reload . . . 'are particularly designed and most suitable for military and law enforcement applications' [as they] enhance a shooter's capacity to shoot multiple human targets very rapidly."  *Id.* at 125 (internal citations omitted); *see id.* at 137 (noting that LCMs "are a 'uniquely military feature[]'"). "Because . . . large-capacity magazines are clearly most useful in military service," the *Kolbe* court held that it was "compelled by *Heller* to recognize that those . . . magazines are not constitutionally protected."  *Id.* at 137.  The same reasoning should apply here.  *See Worman*, 2018 U.S. Dist. at *29 (following *Kolbe*, and holding that "LCMs are most useful in military service [and therefore] . . . beyond the scope of the Second Amendment"); *see also NYSRPA*, 804 F.3d at 256 (noting that *Heller* permitted the prohibition of military-grade weapons "without implicating the Second Amendment," before applying intermediate scrutiny to uphold assault weapon and LCM prohibitions); *Friedman*, 784 F.3d at 408 (noting that, under *Heller*, the Second Amendment does not protect "military-grade weapons" or "weapons especially attractive

---

[16] A counterfactual further demonstrates why the "common use" test is inappropriate: if Congress had renewed the federal prohibition on LCMs rather than permitting it to lapse in 2004, the weapons prohibited by A2761would not be in widespread use today and would therefore not be subject to Second Amendment protection under Plaintiffs' "common use" theory.

to criminals," before applying intermediate scrutiny to uphold assault weapons and LCM prohibitions). Accordingly, the Court should find that Plaintiffs are not likely to (and, indeed, cannot) prevail on their Second Amendment challenge to A2671—and that their preliminary injunction motion should thus be denied.

### III.    Use of Large Capacity Magazines Makes Mass Shootings and Other Incidents of Gun Violence Deadlier.

The use of LCMs, whether in mass shootings or in everyday gun violence, results in more people being shot, more injuries per victim, and more deaths. Both Everytown's analysis and the relevant social science research indicate that the use of LCMs makes shootings more dangerous and more deadly. The people of New Jersey thus have a strong public interest in reducing the risk of harm to their citizens by prohibiting the possession and use of LCMs throughout the State. And A2761 is a reasonably tailored attempt to address this serious public safety concern, and is thus constitutional, for this reason as well.

#### a.    Everytown's Analysis of Mass Shootings Shows that the Use of LCMs Results in More Deaths and More Injuries.

Everytown, like its predecessor organization Mayor's Against Illegal Guns, has been tracking and documenting mass shootings since 2013 and has released several reports summarizing this data.[17] As part of this work, Everytown has attempted to document the weapons used in mass shootings. Everytown's researchers have largely relied on press coverage and FBI data for details regarding individual mass shootings. *See generally* Everytown for Gun Safety, *Mass Shootings in the United States: 2009-2016* (March 2017) available at https://every.tw/2BvFkXr. But while Everytown's research cannot present a comprehensive dataset of the magazines used in every mass shootings—the reality of gun violence and mass shootings in the United States is that this kind of information is not available in every instance—the available data indicate that LCMs make shootings significantly more deadly.

---

[17] Everytown's most recent mass shooting report, *Mass Shootings in the United States: 2009-2016* (Mar. 2017), is available at https://every.tw/2BvFkXr.

For example, a report on mass shootings issued by Everytown in 2013 shows that, on average, shooters who use LCMs, or assault weapons (which are typically equipped with LCMs), shoot more than twice as many victims (151% more) and kill 63% more victims as compared to other mass shooters.  Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (Sept. 2013). *available at* https://bit.ly/R5K9zi.  Data from Everytown's continued tracking of mass shootings also shows that where assault-style weapons—which, except for in jurisdictions where they are prohibited, nearly universally come standard with LCMs—are used, an average of twice as many people are killed (10.1 per shooting vs. 4.9) and more than ten times as many are shot and injured (11.4 per shooting vs. 1.1) than in shootings in which assault-style weapons are not used.[18]  *See* Everytown for Gun Safety, Appendix to *Mass Shootings in the United States: 2009-2016* (Apr. 11 2017), https://every.tw/2JPBIVz;[19] *see also* Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 221 (2016) (finding the use of LCMs in high casualty mass shootings increased the death toll by 17%).

Everytown's continued tracking of mass shootings also shows that LCMs are almost always used in the most deadly events.  These include the shooting in San Bernardino, California, that resulted in fourteen deaths and twenty-two injuries; the massacre of forty-nine people and wounding of fifty-three more in a nightclub in Orlando, Florida; the attack in Las Vegas, Nevada in which the shooter used dozens of LCMs to fire hundreds of rounds into a concert crowd resulting in the death of fifty-nine people and the injury of over 500 more; and the attack on a church in Sutherland Springs, Texas that resulted in twenty-six deaths and twenty injuries.[20] Contrary to Plaintiffs' claims, (Pls.' Mem. at *22-23), this record shows that mass

---

[18] Because they are generally used together, assault weapons, serve as a reasonable, though underinclusive, proxy for LCMs.  Everytown suspended comprehensively tracking magazine capacity after the 2013 report due to the difficulty of obtaining such data.

[19] An unpublished Everytown analysis of shootings since the 2017 report shows that, after including these shootings, the injury disparity jumps to nearly 50:1.

[20] *See* Everytown for Gun Safety, Appendix to *Mass Shootings*, at 3, 6; *see* Jackie Valley,  *et al.*, *No Clear Motive in Las Vegas Strip Shooting That Killed 59, Injured 527*, Nevada Independent (Oct. 2, 2017), http://bit.ly/2x4m4is; Lia Eustachewich & Danika Fears, *Las Vegas Shooter Had*

shooters clearly do not view carrying dozens of weapons with ten round magazines as a viable alternative to LCMs. Indeed, at least nine of the ten deadliest mass shootings in modern American history involved the use of a gun with an LCM.[21]

Mass shootings involving LCMs have a unique impact that the Court should consider when weighing the significant harm caused by LCMs.  Indeed, mass shootings like those that occurred in Aurora, Sandy Hook, Tucson, Orlando, Las Vegas, and Sutherland Springs sear themselves into the national consciousness and affect the way people live their everyday lives. *See* Alana Abramson, *After Newtown, Schools Across the Country Crack Down on Security*, ABC News (Aug. 21, 2013), http://abcn.ws/1KwN9Ls (comparing the impact of the Sandy Hook shooting on school security to that of 9/11 on airport security and noting school districts have spent tens of millions of dollars on security improvements); *see also Friedman*, 784 F.3d at 412 (noting that mass shootings "are highly salient").  While mass shootings on the scale of these tragedies remain statistically rare compared to the plague of everyday gun violence, their enormous impact reinforces the compelling justifications for New Jersey's law.

  **b.**  **Social Science Research Shows LCMs Pose a Serious Risk to Public Safety.**

---

*Cache of Weapons in Hotel Room*, New York Post (October 2, 2017), https://nyp.st/2qCjqzj; Jason Hanna & Holly Yan, *Sutherland Springs church shooting: What we know*, CNN.com (Nov. 7, 2017), https://cnn.it/2HlsfV6.

[21]Las Vegas, Nev. (58 Fatalities); Orlando, Fla. (49); Blacksburg, Va. (32); Newtown, Conn. (26); Sutherland Springs, Tex. (26); Killeen, Tex. (23); San Ysidro, Cal. (21); Austin, Tex. (18); San Bernardino, Cal. (14).  *See* Violence Policy Center, *High Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States*, https://bit.ly/2HnPC0k.  Information on the magazines used in the Texas Tower shooting in Austin, Tex. is unavailable, but the M1 Carbine used comes standard with a either a 15 or 30 round box magazine.  *See.* O. Ricardo Pimentel, *Nearly 50 Years Ago, Bravery at UT tower*, MySA.com (June 19, 2016), https://bit.ly/2JAqu7s; Frank Iannamico, *Design and Development of the U.S. Carbine Thirty Round Magazine*, Small Arms Review (May 13, 2013).  The attack on Marjory Stoneman Douglas High School in Parkland Florida, which killed seventeen and injured at least fifteen people, involved the use of a Smith and Wesson M&P 15, which comes standard with a thirty-round magazine.  Bart Jansen, *Florida shooting suspect bought gun legally, authorities say*, USAToday.com (Feb. 15, 2018), https://usat.ly/2F9kBfH.  It has been reported that the shooter "abandoned at least six magazines that each contained 30 bullets at the scene of the shooting."  Paula McMahon, *Nikolas Cruz left 180 rounds of ammunition – with swastikas – at Parkland school, sources say*, Sun Sentinel (Mar. 2, 2018), https://bit.ly/2lVjY09.  However, other sources reported that the shooter "went in with only 10-round magazines because larger clips would not fit in his duffel bag." Nicholas Nehamas & David Smiley, *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report Says*, Miami Herald (Feb. 27, 2018), https://hrld.us/2KQskUU.

Additional research supports the conclusion reached by the New Jersey Legislature that LCMs pose a significant danger to public safety.  State prohibitions on LCMs are correlated with a 63% lower rate of shootings with three or more injuries or deaths.  *See* Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN.com (Oct. 5, 2017), https://cnn.it/2J4sWCC (noting Boston University Professor Michael Siegel's conclusion that "[w]hether a state has a [LCM] ban is the single best predictor of the mass shooting rate in that state").

Likewise, several studies indicate that criminals are increasingly using LCMs in everyday violent crimes, as evidenced by the number of LCMs recovered by police.  *See*, *e.g.*, Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, The Trace (March 27, 2017), http://bit.ly/2o1UQrr (noting a more than 5% increase in the percentage of guns recovered with LCMs by Baltimore police from 2010 to 2016, despite Maryland's 2013 law prohibiting the sale or manufacture, but not the possession, of LCMs).  Indeed, a recent study found that assault weapons and LCM-compatible firearms "appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence."  Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources*, 95 J. Urb. Health 313 (Oct. 2017), *available at* https://bit.ly/2MRVqkd.  The rise in LCM use runs counter to the trend that existed during the federal LCM prohibition between 1994-2004 which researchers found was effective in reducing the use of LCMs by criminals. David Fallis, *Data Indicate Drop in High Capacity Magazines During Federal Gun Ban*, Washington Post, (Jan. 10, 2013), http://wapo.st/2wV9EMX (noting that the percentage of LCM-equipped guns recovered by Virginia police decreased during the federal LCM  ban, but has more than doubled since its expiration in 2004).

Furthermore, when criminals use LCMs in violent crimes and shootings, they generally fire more shots and cause more injuries.[22]  For example, a study of Milwaukee homicides found

---

[22] Christopher Koper, Daniel Woods & Jeffrey Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, National Institute

that those killed with guns containing LCMs had on average one additional gunshot injury than when a gun without an LCM is used, and the Maryland medical examiner's office reported that the number of cadavers with ten or more bullets more than doubled between 2006 and 2016. *See, e.g.*, Jeffrey Roth & Christopher Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*: Final Report, Urban Institute, (1997), *available at* http://urbn.is/2wQKkrA; Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in America*, Baltimore Sun (Sept. 30, 2016), https://bsun.md/2da4nci.  And shootings with more injuries invariably lead to more deaths.  One study found that gunshot victims shot twice are 60% more likely to die than those shot once.  *See* Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, *supra* note 23, at 87; s*ee also* Daniel W. Webster et al., *Epidemiologic changes in gunshot wounds in Washington, D.C. 1983-1990*, 127 Archives of Surgery 694 (1992) (finding that the fatality rate for multiple chest wounds is 61% higher than the fatality rate for a single chest wound).  This finding is supported by the correlation between the prevalence of LCMs and increases in lethal shootings reported in several American cities.  *See* Rachael Rettner, *Gunshot Wounds Are Getting Deadlier, One Hospital Finds*, LiveScience.com, June 14, 2016, https://bit.ly/2HBnMO9 (asserting that increases in gunshot death rates could be connected to the use of LCMs).[23]

As Plaintiffs' own expert makes clear, LCMs also create the opportunity for a dramatic increase in the number of errant shots. (Kleck Decl. ¶ 12 ("people miss with most of the rounds they fire, especially under duress").) One recent study tracking stray-bullet shooting events found that during a one-year period there were 284 stray-bullet shooting events during which 317 people were injured of which sixty-five died. Garen Wintemute, et. Al., *Epidemiology and Clinical Aspects of Stray Bullet Shootings in the United States, 73 J. of Trauma and Acute Care Surgery 215 (2012)*. This is not a small concern in New Jersey, the most densely populated state

---

of Justice (2004), http://bit.ly/2vBTGTX (finding that handguns associated with gunshot injuries are up to 50% more likely to have LCMs than handguns used in other crimes and that guns used in shootings resulting in injuries are nearly 26% more likely to have LCMs).

[23]*See also* George, *Shoot to Kill, supra* p. 16 (attributing increased shooting lethality, in part, to increasingly lethal tactics enabled by LCMs).

in the country, where the victims of shootings are often not the intended targets. *See, e.g.,* Anna

Merriman, *Bystander Killed in Trenton Standoff was Father of 6, Beloved Husband*, NJ.com

(May 11, 2017), *available at* https://bit.ly/2tSKVpL; Myles Ma & Erin O'Neill, *Toddler was*

*Bouncing on Parent's Bed When Killed by Stray Bullet Fired in Shootout*, NJ.com (Oct 13,

2014), *available at* https://bit.ly/2KMc9Iw.; Dan Ivers, *Car Wash Employee Killed by Stray*

*Bullet in Newark; Two Others Injured*, NJ.com (Oct. 12, 2014), *available at*

https://bit.ly/2KJFoeP;  *See generally* United States Census Bureau, 2010 Census: Population

Density Data, *available at* https://bit.ly/2z5jPRx (indicating that New Jersey is the most densely

populated state in the country).

      Another study, conducted in California, indicates that assault pistols equipped with

LCMs are more likely to be purchased by individuals with a criminal background.  *See* Garen J.

Wintemute, *et al.*, *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, 32

Annals Emer. Med. 44 (1998), available at http://bit.ly/2ymFodM (finding assault pistols were

selected by 2% of purchasers with no criminal record, 6.6% of purchasers with a prior gun

charge, and 10.2% of purchasers with two or more previous violent felonies). And LCMs also

pose a threat to New Jersey's law enforcement community; a recent analysis found that "LCM

weapons overall account for 41% of the guns used to kill officers."  *See* Koper, *Criminal Use of*

*Assault Weapons and High-Capacity Semiautomatic Firearms*, *supra* p. 16, at 7.

      In sum, Everytown's research makes clear that mass shootings involving LCMs are

substantially more dangerous than those in which LCMs are not involved.  This is further

supported by research showing that LCMs increase the harms resulting from gun crime, even

outside of the particularly tragic context of mass shootings.

      **c.**    **Plaintiffs' Attempts to Dispute this Evidence Are Unconvincing.**

      The declaration submitted by Plaintiffs' expert, Professor Gary Kleck (hereinafter,

"Kleck Decl.")—which is undermined by contradictions, clear methodological errors, and

impossibilities—fails to rebut these social-science findings.  It should not be relied upon by this Court.[24]

Kleck, for example, asserts in his declaration that "in 1993 there were approximately 2.5 million incidents in which guns were used for self-protection."  (Kleck Decl. ¶ 4.)  But this figure, and the methodology used to derive it, have been repeatedly debunked.[25]  As Dr. David Hemenway, Professor of Health Policy at the Harvard School of Public Health and director of the Harvard Injury Control Research Center has noted, Kleck's "estimate is not plausible and has been nominated as the 'most outrageous number mentioned in a policy discussion.'"  Hemenway, *supra*, at 66-68 ("It is clear that the claim of 2.5 million annual self-defense gun uses is a vast overestimate."). In fact, the NRA – the parent organization of Kleck's client – does not even credit his estimate, instead  using a number more than  three-times lower in its own advocacy materials. National Rifle Association (@NRA), Twitter (June 28, 2018, 10:07 AM), https://bit.ly/2tZzBr9 (claiming 760,000 annual defensive gun uses).[26]

---

[24] Professor Kleck's testimony was previously rejected by a Connecticut court, in a case involving a challenge to an assault weapons statute, because, the court found, he was "biased," was "focused on the public debate," and "did not help the inquiry of the court with respect to the legal claims." *Benjamin* v. *Bailey*, No. CV 93-0063723, at 12-13 (Conn. Super. Ct. June 30, 1994).  The trial court's decision was ultimately affirmed by the Connecticut Supreme Court. 662 A.2d 1226 (Conn. 1995).

[25] *See, e.g.*, Philip Cook, Jens Ludwig & David Hemenway, *The Gun Debate's New Mythical Number: How Many Self-Defense Uses Per Year?*, 16 J. Pol'y Analysis & Mgmt. 43, 463-69 (2007); David Hemenway, *Private Guns, Public Health* 66-68, 238-43 (2004); Violence Policy Center, *Firearm Justifiable Homicide and Non-Fatal Self-Defense Gun Use: An Analysis of Federal Bureau of Investigation and National Crime Victimization Survey Data*, at 4 (May 2017), *available at* https://bit.ly/2KAB0Qa.

[26] Kleck also overestimates the frequency with which an armed victim is faced with multiple attackers, drawing his numbers largely from statistically insignificant samples and providing no analysis of the appropriateness of deadly force in those situations.  (Kleck Decl. ¶ 18.)  Thus, at least one study based on the FBI's 2012 Supplemental Homicide Report found that in 2012, 98.5% of the 259 justifiable homicides that were committed involved killing only one attacker and not a single incident involved killing more than three. Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* (June 2015) (In 2012 there were 255 justifiable homicides with one killed, 4 with two killed and 2 with three killed).  This statistic demonstrates the false premise underlying Plaintiffs' contention that LCMs can be justified by the need to be able to defend oneself by gunning down numerous assailants.

The methodology underlying one of the central arguments of Kleck's declaration, focusing on the average time per shot, is similarly unsound.  Kleck takes the reported total length of each mass shooting, divides it by the number of rounds fired, and uses that average to argue that mass shootings are not impacted by the use of LCMs because on average a shooter could have reloaded between each shot.  (Kleck Decl. ¶ 18.)  This argument erroneously assumes, with no evidence, that mass shooters fire their gun at a completely consistent rates throughout the shooting rather than in bursts, interspersed between periods of movement or inactivity.  As has been conclusively demonstrated elsewhere, this assumption cannot plausibly be credited.  (*See* Declaration of Professor Daniel W. Webster, *Duncan v. Becerra*, No. 17-cv-1017-BEN-JLB, at ¶ 14 (S.D. Cal. June 5, 2017) (ECF Docket No. 15).)

Kleck also contradicts himself on the ease of changing magazines. According to Kleck, for armed victims changing magazines is virtually impossible because "[u]nder the intense emotional stress of a crime victimization, when taken by surprise, the victim's hands are shaking, making it impossible for some victims to eject the expended magazine and insert a new one quickly."  (Kleck Decl. ¶ 18.)  For criminals, however, Kleck asserts that being forced to reload, even in the chaotic atmosphere of a mass shooting, poses essentially no burden.  (*Id.* at ¶ 22 ("it takes two to four seconds for shooters to eject an expended magazine from a semi-automatic gun, insert a loaded magazine, and make the gun ready to fire").

In reality, however, the pause after a mass shooter expends his ammunition and has to either reload or change weapons is critical for ending or escaping from attacks.[27]  *See Kolbe*, 849 F.3d at 128 ("[R]educing the number of rounds that can be fired without reloading increases the odds that lives will be spared in a mass shooting."); *Heller II*, 670 F.3d at 1264 (noting evidence that "the '2 or 3 second pause' during which a criminal reloads his firearm 'can be of critical

---

[27] And, despite Plaintiffs' contentions, there is no evidence that "the pause to reload adversely affects one's success in self-defense."  *Colo. Outfitters Ass'n v.Hickenlooper*, 24 F. Supp. 3d 1050, 1071 (D. Colo. 2014), *vacated on standing grounds*, 823 F.3d 537 (10th Cir. 2016).

benefit to law enforcement'"). During April's mass shooting at a Waffle House in Tennessee, for example, a bystander intervened during a pause in firing by grabbing the attackers AR-15 and ending the shooting. Alan Blinder, *'I Just Wanted to Live,' Says Man Who Wrested Rifle From Waffle House Gunman*, N.Y. Times, April 23, 2018, available at https://nyti.ms/2I03Cxs. At Seattle Pacific University in 2014, students tackled a gunman while he was reloading, thus ending the shooting. Kelsey Mallahan, *Timeline: Seattle Pacific University Shooting*, K5 News, June 24, 2016, available at https://kng5.tv/2m22501. In 2011, bystanders were able to disarm the shooter at a constituent event in Tucson, Arizona when the shooter was forced to pause and reload. *Congresswoman's Responses after Arizona Shooting Called Encouraging*, CNN.com, Jan. 9, 2011, available at https://cnn.it/2NrEiD0. And during the mass shooting at an elementary school in Newtown, Connecticut, "nine children were able to run from a targeted classroom while the gunman paused to change out a large-capacity thirty-round magazine." *Kolbe*, 849 F.3d at 128. These examples make clear that "limiting a shooter to a ten-round magazine could 'mean the difference between life and death for many people.'" *Id.*

In short, Everytown's research, along with the other support that the Defendant has introduced into the record, supports the State's position that A2761 is important legislation that is, as a matter of law, appropriately tailored to address the significant public safety threat presented by LCMs and that it is therefore constitutional. Nothing in Kleck's declaration undermines that legal reality.

## **CONCLUSION**

For the foregoing reasons, Everytown respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated:  July 6, 2018                                          Respectfully submitted,

By:  /s/ Lawrence S. Lustberg

Lawrence S. Lustberg, Esq.
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

*Attorneys for Amicus Curiae*
*Everytown for Gun Safety*