## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ASSOCIATION OF NEW JERSEY
RIFLE & PISTOL CLUBS, INC.;
BLAKE ELLMAN; and
ALEXANDER DEMBOWSKI,

               Plaintiffs,

    vs.

GURBIR GREWAL, in his official
capacity as Attorney General of New
Jersey; PATRICK J. CALLAHAN, in
his official capacity as Superintendent
of the New Jersey Division of State
Police; THOMAS WILLIVER, in his
official capacity as Chief of Police of
the Chester Police Department; and
JAMES B. O'CONNOR, in his official
capacity as Chief of Police of the
Lyndhurst Police Department,

               Defendants.

Hon. Peter G. Sheridan, United States
  District Judge
Hon. Lois H. Goodman, United States
  Magistrate Judge

**Civil Action No. 18-cv-10507**

***AMICUS CURIAE* BRIEF OF
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE IN
SUPPORT OF DEFENDANTS'
OPPOSITION TO PRELIMINARY
INJUNCTION MOTION**

HANNAH SHEARER
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 BUSH ST. # 555
SAN FRANCISCO, CA 94104
(415) 433-2062

J. ADAM SKAGGS
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 WEST 38TH ST. # 90
NEW YORK, NY 10018
(917) 680-3473

Of Counsel for *Amicus Curiae* Giffords
Law Center to Prevent Gun Violence

TIMOTHY M. HAGGERTY
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
ONE GATEWAY CENTER, 25TH FLOOR
NEWARK, NJ 07102-5311
(973) 877-6400

Counsel for *Amicus Curiae* Giffords
Law Center to Prevent Gun Violence

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICUS CURIAE* ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT .......................................................................................................... 6

I.   The LCM Possession Ban Strengthens Existing Law in New Jersey by
     Making Mass Shootings Less Likely and Less Lethal.................................... 6

     A.   Gun Violence in New Jersey and Its Prior Magazine Law.................... 6

     B.   The Need for Ten-Round Magazine Limits........................................... 10

II.  The LCM Possession Ban is Constitutional Because It Regulates Activity
     Outside the Second Amendment's Scope ...................................................... 15

     A.   LCMs Are Not Protected "Arms"......................................................... 16

     B.   Even if LCMs Were Arms, They Are Unprotected Because They
          Are "Dangerous and Unusual"............................................................. 18

          1.   LCMs Are Dangerous ................................................................. 18

          2.   LCMs Are "Unusual"................................................................. 19

     C.   LCMs Are Not Protected by the Second Amendment Because They
          Are Most Suitable for Military Use...................................................... 23

     D.   LCM Restrictions are "Longstanding" And Thus Outside the Scope of
          the Second Amendment......................................................................... 24

III. New Jersey's LCM Possession Ban Withstands Intermediate Scrutiny....... 26

CONCLUSION.................................................................................................... 29

# <u>TABLE OF AUTHORITIES</u>

**Page**

## Federal Court Cases

*Avitabile v. Beach*,
  277 F. Supp. 3d 326 (N.D.N.Y. 2017) ............................................................. 22

*City of Los Angeles v. Alameda Books*,
  535 U.S. 425 (2002) ........................................................................................ 28

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................. passim

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) ................................................................ 24, 26, 27

*Duncan v. Becerra*,
  No. 3:17-cv-1017-BEN, 2017 U.S. Dist. LEXIS 101549 (S.D. Cal.
  June 29, 2017) ................................................................................................. 22

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ..................................................................... 16, 20

*Fyock v. City of Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) ...................................................................passim

*Fyock v. City of Sunnyvale*,
  25 F. Supp. 3d 1267 (N.D. Cal. 2014) ............................................................ 22

*Hightower v. City of Boston*,
  693 F.3d 61 (1st Cir. 2012) ............................................................................. 22

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. Feb. 21, 2017) ......................................................passim

*Kolbe v. O'Malley*,
  42 F. Supp. 3d 768 (D. Md. Aug. 12, 2014) .................................................... 22

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ..................................................................................... 1, 20

*Miller v. California*,
  413 U.S. 15 (1973) .......................................................................................... 20

*New York State Rifle & Pistol Association v. Cuomo,*
  804 F.3d 242 (2d Cir. 2015) ...................................................... 21, 22

*Paris Adult Theatre I v. Slaton,*
  413 U.S. 49, 60 (1973)..................................................................... 27

*United States v. Cox,*
  235 F. Supp. 3d 1221 (D. Kan. 2017)............................................... 18

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ....................................................... 21, 26

*United States v. One (1) Palmetto State Armory PA-15 Machinegun
  Receiver/Frame,*
  822 F.3d 136 (3d Cir. 2016) ............................................... 1, 18, 21

*Wiese v. Becerra,*
  263 F. Supp. 3d 986 (E.D. Cal. 2017) .............................................. 28

## Legislative Materials

A.B. 2826, 1998-1999 Leg., 208th Sess. (N.J. 1999) ................................ 7

A.B. 2761, 2018-2019 Leg., 218th Sess. (N.J. 2018) .............................. 10

Assembly Committee for Public Safety, Bill Analysis for SB 396 (Hancock)
  (bill analysis for S.B. 396, 2013-2014 Leg., Reg. Sess. (Cal. 2013))................. 9

159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013)...................................... 2

## Additional Authorities

*2nd Suspect Charged in Trenton Arts Festival Shooting*, ABC NEWS, June 19,
  2018, http://6abc.com/2nd-suspect-charged-in-trenton-arts-festival-
  shooting/3621885/ ..................................................................... 3

*Accessories*, ATLANTIC FIREARMS, www.atlanticfirearms.com/accessories.html
  (visited Jun. 21, 2017) ............................................................... 17

Rob Arthur, *No Matter How You Measure Them, Mass Shooting Deaths Are Up*,
  FIVETHIRTYEIGHT (Nov. 7, 2017), https://fivethirtyeight.com/features/no-
  matter-how-you-measure-them-mass-shooting-deaths-are-up/ .................... 12

Tanya Basu, *This Chart Shows How Mass Public Shootings in the U.S. Have Risen*, TIME, Aug. 4, 2015, http://time.com/3983557/mass-shootings-america-increasing ............................................................................................. 12

Ctrs. for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Fatal Injury Data*, https://www.cdc.gov/injury/wisqars .................................................................. 6, 7

Jen Christensen, *Gunshot Wounds Are Deadlier Than Ever As Guns Become Increasingly Powerful*, CNN, Jun. 14, 2016, https://www.cnn.com/2016/06/14/health/gun-injuries-more-deadly/ ............... 11

Citizens Crime Commission of New York City, *NYC & LA City Councils Introduce Rezo for Federal Ban on Large Capacity Magazines* (Mar. 2, 2011) ..................................................................................................... 9

CNN/ORC Poll, *December 17-18 – Gun Rights* 3 (Dec. 2012), http://i2.cdn.turner.com/cnn/2012/images/12/19/cnnpoll.december19.4p.pdf ................................................................... 22

Decl. of John Donohue III in California's Opp. To Plaintiffs' Motion for Prelim. Inj., *Duncan v. Becerra*, No. 3:17-cv-1017-BEN, 2017 U.S. Dist. LEXIS 101549 (S.D. Cal. June 29, 2017), ECF No. 12 .................................. 22

*Deer Creek Middle School Shooting*, HUFFINGTON POST, Apr. 25, 2010, http://www.huffingtonpost.com/2010/02/23/deer-creek-middle-school_n_473943.html ............................................................................. 4

Shaila Dewan, *Hatred Said to Motivate Tenn. Shooter*, N.Y. TIMES, Jul. 28, 2008, http://www.nytimes.com/2008/07/28/us/28shooting.html ....................... 4

Everytown Research, *Analysis of Recent Mass Shootings*, at 4 (Aug. 2015), https://everytownresearch.org/documents/2015/09/analysis-mass-shootings.pdf ............................................................................................... 11

Luis Ferré-Sadurní and Mihir Zaveri, *Mass Shooting at New Jersey Arts Festival Leaves 22 Injured and 1 Dead*, N.Y. TIMES, June 17, 2018, https://www.nytimes.com/2018/06/17/nyregion/trenton-mass-shooting.html .... 3

Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, TRACE, Mar. 27, 2017, https://www.thetrace.org/2017/03/high-capacity-magazine-ban-baltimore-police/ ........................................................ 10, 14, 19

Giffords Law Ctr. to Prevent Gun Violence, *Annual Gun Law Scorecard*, http://lawcenter.giffords.org/scorecard/ (visited Jun. 30, 2018) ......................... 6

Giffords Law Ctr. to Prevent Gun Violence, *The Economic Cost of Gun Violence In New Jersey* (Feb. 2018), http://lawcenter.giffords.org/wp-content/uploads/2018/04/Cost-of-Gun-Violence-in-New-Jersey_Full-Report_4.20.18.pdf (visited Jun. 30, 2018) ........................................ 7

Giffords Law Ctr. to Prevent Gun Violence, *Large-Capacity Magazines: Summary of State Law*, http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/#state (visited Jun. 30, 2018) ........................................................ 4

Laura Herzog, *Growing Up In High Crime: How N.J. Kids Cope With Homicides*, NJ.COM, May 10, 2016, https://www.nj.com/hudson/index.ssf/2016/05/jersey_city_school_neighborhood_violence.html.................. 7

Christopher Ingraham, *Just Three Percent of Adults Own Half of America's Guns*, WASH. POST, Sept. 19, 2016 .................................................... 21

Rick Jervis, *Gun Control Advocates Target High-Capacity Magazines*, USA TODAY (Jul. 31, 2012)................................................................ 15

Louis Klarevas, RAMPAGE NATION: SECURING AMERICA FROM MASS SHOOTINGS (2016) ................................................................ ..passim

Christopher Koper et al., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994—2003 ................................................................ 13

Christopher Koper et al., *Criminal Use of Assault Weapons & High-Capacity Semiautomatic Firearms: Updated Examination of Local & National Sources*, 95 J. Urban Health 313 (2017)...................................... passim

Christopher Koper et al., *Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers*, 9 Inj. Prev. 151 (2003) ...................................................... 8

New Jersey Department of Health, New Jersey Discharge Data Collection System, www.state.nj.us/doh-shad/query/selection/ub/UBSelection.html.......... 7

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/gun-laws-magazines-las-vegas/index.html ........................................ 11

Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Cont. Probs. 55 (2017), http://lcp.law.duke.edu/article/gun-law-history-in-the-united-states-and-second-amendment-rights-spitzer-vol80-iss2/..................................... passim

Violence Policy Center, *Backgrounder on Glock 19 Pistol and Ammunition Magazines Used in Attack on Representative Gabrielle Giffords And Others* (Jan. 2011), http://www.vpc.org/fact_sht/AZbackgrounder.pdf. ........................ 8

Eugene Volokh, *Are Laws Limiting Magazine Capacity to 10 Rounds Constitutional?*, Volokh Conspiracy (Mar. 6, 2014), https://washingtonpost.com/news/volokh-conspiracy/wp/2014/03/06/ are-laws-limiting-magazine-capacity-to-10-rounds-constitutional/ ................... 8

John Wilkens, *Construction Workers Felt They 'Had To Do Something*, San Diego Union-Tribune, Oct. 11, 2010, http://www.sandiegouniontribune.com/sdut-hailed-as-heroes-construction-workers-who-stopped-2010oct11-htmlstory.html ......................... 4

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Giffords Law Center to Prevent Gun Violence states that it has no parent corporations.  It has no stock, and therefore no publicly held company owns 10% or more of its stock.

## INTEREST OF THE *AMICUS CURIAE*

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence. The organization was founded 25 years ago following a gun massacre at a San Francisco law firm that was perpetrated by a shooter armed with semiautomatic pistols and large-capacity magazines. The group was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords. Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to improve the safety of their communities. The organization has provided informed analysis as an *amicus* in numerous important firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), and *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136 (3d Cir. 2016).

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

On January 8, 2011, a man walked into a Tucson parking lot where Congresswoman Gabrielle Giffords was hosting a constituent meeting. Using a semiautomatic pistol equipped with a 33-round magazine, the man opened fire on Congresswoman Giffords, her staff, and members of the public lined up to meet her. In 15 seconds, he fired 33 rounds and hit 19 victims, killing six, including a young girl named Christina-Taylor Green. Congresswoman Giffords's husband, retired Navy Captain Mark Kelly, later testified that a law prohibiting ammunition magazines holding more than 10 rounds could have saved the girl's life:

> The shooter in Tucson . . . unloaded the contents of [his 33-round] magazine in 15 seconds. Very quickly. It all happened very, very fast. The first bullet went into Gabby's head. Bullet number 13 went into a nine-year-old girl named Christina-Taylor Green, who was very interested in democracy and our Government and really deserved a full life committed to advancing those ideas. …. When [the shooter] tried to reload one 33-round magazine with another 33-round magazine, he dropped it. And a woman named Patricia Maisch grabbed it, and it gave bystanders a time to tackle him. I contend if that same thing happened when he was trying to reload one 10-round magazine with another 10-round magazine, meaning he did not have access to a high-capacity magazine, and the same thing happened, Christina-Taylor Green would be alive today.

159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy) (quoting Judiciary Committee testimony of Captain Mark Kelly).

Unfortunately, preventable tragedies like the one Captain Kelly describes have become commonplace. Large-capacity magazines ("LCMs") holding more

than 10 rounds of ammunition allow shooters to inflict mass casualties by firing more shots without pausing to reload. LCMs are the thread linking nearly every notorious high-fatality gun massacre, including the 2012 Sandy Hook shooting, where a gunman fired 154 rounds, killing 26 children and teachers; the 2015 San Bernardino shooting, where assailants shot 36 people and killed 14; the 2016 Orlando shooting, where a gunman shot over 100 people and killed 49; the 2017 Las Vegas shooting, where a killer gunned down 58 people and injured hundreds more; the 2017 Sutherland Springs shooting, where a gunman murdered 26 adults and children at a Texas church; and the 2018 Parkland school shooting, where a former student killed 17 at a Florida high school. Recently in Trenton, New Jersey, large-capacity magazines were apprehended at the scene and in a suspect's possession after mass shooters injured 22 people at an arts festival.[1]

These horrific events underscore the extraordinary lethality of LCMs—how they enable even untrained shooters to take down dozens of people, and how they eliminate the possibility of interruption while shooters reload. It is the latter point, in particular, that makes LCMs so dangerous. In many mass shootings, the pause to

---

[1] Luis Ferré-Sadurní and Mihir Zaveri, *Mass Shooting at New Jersey Arts Festival Leaves 22 Injured and 1 Dead*, N.Y. TIMES, June 17, 2018, https://www.nytimes.com/2018/06/17/nyregion/trenton-mass-shooting.html; *2nd Suspect Charged in Trenton Arts Festival Shooting*, ABC NEWS, June 19, 2018, http://6abc.com/2nd-suspect-charged-in-trenton-arts-festival-shooting/3621885/.

reload is when lives are saved. Other incidents in which magazines holding 10 or

fewer rounds were used—or in which rampages were cut short while shooters

reloaded—stand in stark contrast to the examples above.[2]

To help prevent the occurrence of high-fatality gun massacres, and to reduce

the bloodshed when these tragedies occur, last month, New Jersey joined seven

other states and the District of Columbia by generally prohibiting possession of

magazines holding more than 10 rounds of ammunition.[3] Assembly Bill 2761 (the

"LCM possession ban") strengthens New Jersey's existing magazine law, which

---

[2] During the 2013 massacre at Washington Navy Yard, a man with a seven-shell shotgun killed twelve people, but while he reloaded, a victim he had cornered was able to crawl to safety. In 2014, a gunman at Seattle Pacific University was tackled while reloading. Other examples abound. John Wilkens, *Construction Workers Felt They 'Had To Do Something,'* SAN DIEGO UNION-TRIBUNE, Oct. 11, 2010, http://www.sandiegouniontribune.com/sdut-hailed-as-heroes-construction-workers-who-stopped-2010oct11-htmlstory.html (workers stopped gunman "as he stopped to reload"); *Deer Creek Middle School Shooting*, HUFFINGTON POST, Apr. 25, 2010, http://www.huffingtonpost.com/2010/02/23/deer-creek-middle-school_n_473943.html (math teacher "tackled the suspect as he was trying to reload"); Sheila Dewan, *Hatred Said to Motivate Tenn. Shooter*, THE NEW YORK TIMES, Jul. 28, 2008, http://www.nytimes.com/2008/07/28/us/28shooting.html ("It was when the man paused to reload that several congregants ran to stop him.").

[3] The states with 10-round restrictions for all firearm magazines are California, Connecticut, Hawaii, Maryland, Massachusetts, and New York, in addition to Washington, D.C. *See* Giffords Law Ctr. to Prevent Gun Violence, *Large-Capacity Magazines: Summary of State Law*, http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/#state (visited Jun. 30, 2018) (citing state statutes). Vermont is the seventh state: its recently-enacted law applies to rifle magazines holding more than 10 rounds. S.B. 55, 2017-2018 Leg., Reg. Sess. (Vt. 2018).

allowed possession of magazines holding up to 15 rounds. The LCM possession ban was adopted alongside other gun safety bills introduced after February's horrifying massacre of students and educators in Parkland, Florida.

New Jersey need not wait for its own Parkland before curtailing access to LCMs in the Garden State. Its new LCM possession ban is an evidence-based measure that is consistent with the protections guaranteed by the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that law-abiding citizens have a right to keep a handgun in the home for self-defense, but said that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. *Heller* approved banning "dangerous and unusual weapons," and confirmed that other "longstanding" regulations are constitutional. *Id.* at 626-27 & n.26.

New Jersey's LCM possession ban is quite unlike the handgun ban *Heller* invalidated: it leaves most avenues for lawful self-defense untouched. To suggest otherwise—as Plaintiffs do in their preliminary injunction brief by equating an LCM ban to a handgun ban—ignores *Heller*'s recognition that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." 554 U.S. at 623. Accordingly, Plaintiffs have failed to establish a likelihood of success on their Second Amendment claim because the law they challenge simply

5

does not burden Second Amendment-protected activity. LCMs are an accessory, not a protected "arm," but either way, their possession may be banned because doing so leaves open ample avenues for self-defense and because LCMs are dangerous, unusual devices best suited for military purposes that have historically been restricted. Even if LCMs were constitutionally protected, the State's evidence amply shows that the ban survives intermediate scrutiny, and Plaintiffs cite only outdated evidence in their brief to the contrary. Because Plaintiffs' Second Amendment claim cannot succeed, the Court should deny the motion for a preliminary injunction.[4]

## **ARGUMENT**

### I.    The LCM Possession Ban Strengthens Existing Law in New Jersey by Making Mass Shootings Less Likely and Less Lethal

#### A.    Gun Violence in New Jersey and Its Prior Magazine Law

New Jersey's firearm laws are stronger than those of many other states, and unsurprisingly, New Jersey sees fewer gun deaths per capita than states with weaker laws.[5] Nonetheless, the state still experiences unacceptable levels of

---

[4] *Amicus* Giffords Law Center joins the State's arguments on Plaintiffs' Takings Clause and Equal Protection Clause claims, which also cannot prevail.

[5] *See* Giffords Law Ctr. to Prevent Gun Violence, *Annual Gun Law Scorecard*, http://lawcenter.giffords.org/scorecard/ (visited June 30, 2018) (based on data from Ctrs. for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Fatal Injury Data*, https://www.cdc.gov/injury/wisqars).

firearm violence. In recent years, New Jersey has experienced an annual average of 280 gun-related homicides, 184 gun-related suicides, 764 non-fatal interpersonal shootings, and 599 unintentional shootings.[6] The ripple effect of each gunshot leaves many more people grieving and in fear for their safety.[7] These frequent incidents not only harm communities and leave survivors traumatized, they also impose enormous economic consequences, costing New Jersey taxpayers an estimated $273 million per year.[8]

Among New Jersey's lifesaving polices is its new law designed to stem the proliferation of military-grade ammunition magazines. New Jersey first restricted access to larger magazines in 1999 by prohibiting the manufacture, transportation, shipment, sale, or disposal of magazines capable of holding more than 15 rounds, effective January 2000. *See* A.B. 2826, 1998-1999 Leg., 208th Sess. (N.J. 1999).

---

[6] Fatal firearm injury data is from the Centers for Disease Control and Prevention's WISQARS Fatal Injury Reports (www.cdc.gov/injury/wisqars/fatal.html). Non-fatal firearm injury data is from the New Jersey Department of Health's New Jersey Discharge Data Collection System (www.state.nj.us/doh-shad/query/selection/ub/UBSelection.html).

[7] *See, e.g.*, Laura Herzog, *Growing Up In High Crime: How N.J. Kids Cope With Homicides*, NJ.COM, May 10, 2016, https://www.nj.com/hudson/index.ssf/2016/05/jersey_city_school_neighborhood_violence.html.

[8] Giffords Law Ctr. to Prevent Gun Violence, *The Economic Cost of Gun Violence in New Jersey* (Feb. 20, 2018), http://lawcenter.giffords.org/wp-content/uploads/2018/04/Cost-of-Gun-Violence-in-New-Jersey_Full-Report_4.20.18.pdf.

The state also prohibited possession of such magazines, with an exception if possessors registered assault firearms and used the magazine for competitive shooting matches. *Id.* New Jersey's 1999 law responded to gun industry efforts to package LCMs with increasing numbers of newer semiautomatic firearm models. Before the 1980s, the handgun most Americans owned was a revolver, usually holding six rounds of ammunition.[9] Police also used six-round revolvers, which were "seen as adequate for officers' defensive needs."[10] But starting in the 1980s, the gun industry developed and aggressively promoted pistols that can be equipped with larger magazines. *See* Christopher Koper et al., *Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers*, 9 Inj. Prev. 151, 151 (2003) ("Production of pistols with magazines holding more than 10 rounds grew during the 1980s and early 1990s"). In response to the shifting handgun market, more states recognized that access to the LCMs sold with these guns endangered the public, and responded by adopting modern magazine restrictions.

---

[9] *See, e.g.*, Violence Policy Center, *Backgrounder on Glock 19 Pistol and Ammunition Magazines Used in Attack on Representative Gabrielle Giffords And Others* 1 (Jan. 2011), http://www.vpc.org/fact_sht/AZbackgrounder.pdf.

[10] Eugene Volokh, *Are Laws Limiting Magazine Capacity to 10 Rounds Constitutional?*, VOLOKH CONSPIRACY (Mar. 6, 2014), https://washingtonpost.com/news/volokh-conspiracy/wp/2014/03/06/are-laws-limiting-magazine-capacity-to-10-rounds-constitutional/.

New Jersey's 1999 law addressed this dangerous proliferation of larger magazines, but it was not actually an LCM ban, since LCMs are "typically defined as ammunition feeding devices holding more than ten rounds of ammunition." Christopher Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. Urban Health 313, 314 (2017) (hereafter "Koper, *Criminal Use*"). Because New Jersey's law capped magazines at 15 rounds, the law could not have prevented deaths like Christina-Taylor Green's, who was struck by bullet 13 (her shooter was later stopped while he reloaded). On the other hand, New Jersey's law did generally prohibit *possession* of 15-round magazines, making it stronger in this respect than the laws of other states that included broad "grandfathering" provisions for people who owned prohibited magazines when those states' law took effect. Grandfathering exceptions are dangerous: they make LCM restrictions impossible to enforce because LCMs lack identifying marks to indicate when they were manufactured or sold.[11] Reflecting the sheer difficulty of enforcement with

---

[11] *See, e.g.*, ASSEMBLY COMMITTEE FOR PUBLIC SAFETY, BILL ANALYSIS FOR SB 396 (HANCOCK) (bill analysis for S.B. 396, 2013-2014 Leg., Reg. Sess. (Cal. 2013)), 7 (quoting law enforcement testimony that California's LCM "law is difficult to enforce since the date of acquisition is nearly impossible to prove," and magazines "acquired before the ban, or illegally purchased in other states since the ban, are usually indistinguishable. A ban on the *possession* of high capacity magazines will help address this issue") (emphasis added).

grandfathering in place, police in California and Maryland started to recover *more* crime guns loaded with LCMs after their restrictions initially took effect.[12]

With its recent legislation, New Jersey strengthened its magazine restrictions by limiting capacity to ten rounds (and thus prohibiting LCMs as experts define them, *see* Koper, *Criminal Use* at 314). While New Jersey's legislation continues to generally prohibit possession of LCMs—because that is essential for avoiding the enforcement pitfalls experienced in California and Maryland—the law contains exceptions to ease the burdens for existing owners. For instance, individuals are permitted to modify larger magazines so that they hold ten or fewer rounds. *See* A.B. 2761, 2018-2019 Leg., 218th Sess. (N.J. 2018).

### B.    The Need for Ten-Round Magazine Limits

New Jersey's LCM possession ban was adopted to protect its residents from the devastating use of LCMs in mass shootings and everyday crimes, and to make shootings that do occur less lethal. Its new legislation is well-tailored to reduce the likelihood of mass shootings; indeed, a recent analysis by Professor Michael Siegel of Boston University found that the states that have restricted access to LCMs—

---

[12] Press Release, Citizens Crime Commission of New York City, *NYC & LA City Councils Introduce Rezo for Federal Ban on Large Capacity Magazines* (Mar. 2, 2011), http://www.nycrimecommission.org/pdfs/CrimeCmsnNYCLACouncils.pdf; Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, THE TRACE, Mar. 27, 2017, https://www.thetrace.org/2017/03/high-capacity-magazine-ban-baltimore-police/.

usually defined with a 10 round-limit—experience 63% fewer mass shootings. Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/gun-laws-magazines-las-vegas/index.html (discussing empirical analysis for CNN by Dr. Siegel).

Evidence also shows that New Jersey's law is likely to reduce fatalities during a mass shooting should one occur. When LCMs are used in shootings, the outcome is far more lethal, because more shots are fired and bystanders have limited opportunities to intervene. On average, mass shooters who use such magazines or assault weapons shoot over twice as many victims than in comparable shootings. Everytown Research, *Analysis of Recent Mass Shootings*, at 4 (Aug. 2015), https://everytownresearch.org/documents/2015/09/analysis-mass-shootings.pdf. Use of LCMs or assault weapons correlates with 47% more victims killed, *id.*, and medical research corroborates the unsurprising fact that shootings involving LCMs are deadlier because firing more shots rapidly causes more severe tissue damage. *See* Jen Christensen, *Gunshot Wounds Are Deadlier Than Ever As Guns Become Increasingly Powerful*, CNN, Jun. 14, 2016, http://www.cnn.com/2016/06/14/health/gun-injuries-more-deadly/.

Certainly, many LCMs will not be used in mass shootings, but this does not diminish the importance of efforts to stem injuries and community trauma resulting

from such shootings, especially in light of their increasing frequency and lethality. In fact, mass shootings are not rare, and are becoming much more common. Dr. Louis Klarevas recently surveyed high-fatality mass shootings (defined for the purposes of his study as shootings with at least six fatalities) between 1966 and 2015, and found that they have risen in incidence and lethality to "unprecedented levels in the past ten years."  Louis Klarevas, RAMPAGE NATION: SECURING AMERICA FROM MASS SHOOTINGS 215, 76-79 (2016) (hereafter "RAMPAGE NATION"). Because many researchers define "mass shooting" to include incidents where four or more are killed, Dr. Klarevas also analyzed the universe of such incidents, and found that they too are increasing. *Id.* at 80-86; *see also, e.g.*, Tanya Basu, *This Chart Shows How Mass Public Shootings in the U.S. Have Risen*, TIME, Aug. 4, 2015, http://time.com/3983557/mass-shootings-america-increasing (citing analysis by the Congressional Research Service); Rob Arthur, *No Matter How You Measure Them, Mass Shooting Deaths Are Up*, FIVETHIRTYEIGHT, Nov. 7, 2017, https://fivethirtyeight.com/features/no-matter-how-you-measure-them-mass-shooting-deaths-are-up/.

Dr. Klarevas found that the sharpest increase in fatalities during mass shootings is driven by access to LCMs that allow shooters to hit more targets without interruption. Analyzing data over nearly five decades, he found that use of magazines holding more than ten rounds is "the factor most associated with high

death tolls in gun massacres. . . If such magazines were completely removed from circulation, the bloodshed would be drastically reduced." RAMPAGE NATION at 257; *see also id.* at 215-25. In fact, Dr. Klarevas found, reduced bloodshed is exactly what occurred between 1994 and 2004, when federal law restricted sale and possession of LCMs. The federal ban on assault weapons and LCMs achieved dramatic reductions in fatalities resulting from mass shootings—fulfilling one of the law's main purposes. *Id.* at 240-43 (explaining that the ban was "extremely successful" in reducing rampage violence). Specifically, Dr. Klarevas observed:

> During the ten-year period that the [federal ban] was in effect, the numbers [of fatalities per mass shooting] declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident. What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.

*Id.* at 243. When the federal ban expired in 2004, fatality rates connected to large-scale shootings spiked, "further evidenc[ing] the [ban's] effectiveness." *Id.* Plaintiffs' contention that the federal ban had no impact is incorrect: they base their argument entirely on one finding from an older paper that did not focus on the federal ban's impact on high-fatality mass shootings, as Dr. Klarevas's 2017 research did. *See* Prelim. Inj. Br. at 21. Even the paper Plaintiffs cite does not support their argument: it explained that the federal ban's effectiveness was hindered by its grandfathering provisions, and detailed adverse consequences likely to result from lifting the ban. *See* CHRISTOPHER KOPER ET AL., AN UPDATED

13

ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN
MARKETS AND GUN VIOLENCE, 1994—2003 96, 101, https://goo.gl/44V3zp
(addressing grandfathering provisions and noting that it is "possible, and perhaps
probable that AWs [assault weapons] and LCMs" reintroduced to the market after
the federal ban expires will "be used to commit mass murder").

     Just as laws restricting access to LCMs reduce citizen death tolls in mass
shootings, such laws also reduce the lethality of day-to-day shootings. Recent
research by Professor Koper (an expert cited by the Plaintiffs) comprehensively
analyzed four data sources pertaining to crime guns, police shootings, and mass
shootings, and concluded that "high-capacity semiautomatics have grown from 33
to 112% as a share of crime guns since the expiration of the federal ban—a trend
that has coincided with recent growth in shootings nationwide." Koper, *Criminal
Use* at 313. In Maryland, where LCM restrictions are hard to enforce because the
state has a grandfathering clause, police officers observed that "larger magazines
have surged in popularity among criminals." Freskos, *supra* note 12. A Baltimore
Sun investigation found that in the past ten years, the number of corpses at the state
medical examiner's office with 10 or more bullet wounds doubled. *Id.* This
suggests that LCMs are selected for many gun crimes (not just high-profile mass
shootings) for their lethal propensities.

     Finally, LCM restrictions help protect the police officers who are most likely

to confront heavily armed criminals and killers. Professor Koper's recent analysis of criminal use of LCMs, discussed above, found that on average LCM-compatible firearms constituted a staggering 40.6% of weapons used to murder police officers (excluding cases where officers were killed with their own firearms), in some years reaching 48% of police murder weapons. Koper, *Criminal Use* at 214. Opining on increasing use of LCMs against police, one commissioner of police has said: "something needs to happen" because "[w]e're outgunned."[13]

In sum, New Jersey's recent LCM legislation is an evidence-based measure aimed at reducing the rising death toll from mass shootings and mitigating documented risks that the proliferation of LCMs poses for citizens and law enforcement officers. The above evidence shows that prohibiting possession of LCMs can be expected to reduce the incidence and lethality of gun massacres, police shootings, and other criminal attacks.

## II.    The LCM Possession Ban is Constitutional Because It Regulates Activity Outside the Second Amendment's Scope

Plaintiffs fail to show a likelihood of success on their Second Amendment claim because New Jersey's LCM possession ban is constitutional as a matter of law: it prohibits only one class of uniquely dangerous accessories that are unprotected by the Second Amendment. As other courts have ruled, the

---

[13] Rick Jervis, *Gun Control Advocates Target High-Capacity Magazines*, USA TODAY (Jul. 31, 2012) (quoting Philadelphia police commissioner).

Constitution does not guarantee the right to possess the magazines often selected by mass shooters to quickly kill and injure many people. *See, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 135 (4th Cir. 2017) (en banc) ("the Second Amendment does not shield" LCMs); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (upholding LCM ban and observing "at least some categorical limits on the kinds of weapons that can be possessed are proper").

New research on LCMs confirms the correctness of these rulings that large-capacity magazines are unprotected by the Second Amendment. The new research includes Dr. Klarevas's survey of high-fatality mass shootings (discussed *supra* pp. 12-13), Professor Koper's updated analysis of LCM use in gun crimes (discussed *supra* pp. 14-15), and a historical analysis showing the ubiquity of laws analogous to LCM bans (discussed *infra* pp. 25-26). This recent scholarship suggests this Court need not reach the question of whether New Jersey's LCM prohibition survives intermediate scrutiny, because the Second Amendment does not protect LCM possession in the first instance. There are four independent reasons why this is true.

### A.  LCMs Are Not Protected "Arms"

First, the right protected under the Second Amendment applies only to "arms." *Heller*, 554 U.S. at 581. The *Heller* Court relied on a 1773 dictionary defining "arms" as "weapons of offence, or armour of defence." 554 U.S. at 581

(citing 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). An LCM is not a "weapon of offence" or "armour of defence." Rather, an LCM is an ammunition storage device that enhances a gun's ability to fire without reloading, but is in no way an essential functional part of lawful firearms. Certainly, LCMs may be used with arms and may even come as the "factory-issued" magazine. But such firearms will also function with a magazine holding 10 or fewer rounds, meaning an LCM is an *option*, not a critical component of a protected arm. Because they are optional devices, LCMs are better categorized as an accessory than as offensive or defensive weaponry.[14]

That is not to say that *ammunition*, or magazines necessary to render a firearm operational, should not be considered protected by the Second Amendment. A magazine necessary to provide a constitutionally-protected firearm with bullets that facilitate its intended use may be essential to the arm's core function, but New Jersey's law critically leaves access to such magazines undisturbed—while prohibiting more dangerous LCMs. *See, e.g.*, *Fyock v. City of*

---

[14] Historical sources support the conclusion that accessories like LCMs are not "arms." A founding-era militia law distinguished "arms" and "ammunition" from a third category, "accoutrements"—analogous to accessories that enhance an already-functional firearm. *Heller*, 554 U.S. at 650 (Stevens, J., dissenting) (quoting Act for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § 3, p. 2). The gun industry draws this distinction today, selling magazines as "accessories," not firearms or ammunition. *E.g.*, *Accessories*, ATLANTIC FIREARMS, www.atlanticfirearms.com/accessories.html (visited Jun. 21, 2017).

*Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing corollary "but not unfettered" Second Amendment right to ammunition "necessary to render firearms operable"). But the argument that *ammunition* is integral to a gun's function is inapplicable to a *magazine* that enhances ammunition capacity far beyond what is needed to make a gun operable for lawful purposes, such as self-defense, when ample magazines containing 10 or fewer rounds remain available.

Simply put, LCMs are not protected "arms" because they optionally enhance ammunition storage beyond what is constitutionally required. Like scopes or silencers, LCMs are not arms or ammunition, but non-essential accessories. *E.g.*, *United States v. Cox*, 235 F. Supp. 3d 1221, 1221 (D. Kan. 2017) (silencers "outside the scope of Second Amendment protection").

## B. Even if LCMs Were Arms, They Are Unprotected Because They Are "Dangerous and Unusual"

LCMs are also unprotected by the Second Amendment because they are "dangerous and unusual." *Heller*, 554 U.S. at 627.

### 1. LCMs Are Dangerous

The Third Circuit recognizes that "mere possession of certain weapons may be prohibited" and that "dangerous and unusual" weapons fall outside the scope of the Second Amendment's protections. *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 143 (3d Cir. 2016). LCMs are unquestionably dangerous because they substantially boost the lethality

of the firearms using them. As discussed above, LCMs are catastrophic when employed in a confined area packed with people, because the best, or only, opportunity to stop such shooters is when they reload. Moreover, recent research (*see supra* at pp. 12-13) shows that more lives are being lost during major mass shootings because of LCMs. Such magazines are also being used more in day-to-day crimes on city streets, where they "increase [criminals'] odds of a kill." Freskos, *supra* note 12. As the firearm accessory most responsible for driving up murder rates during mass shootings, LCMs are uniquely dangerous.

### 2.    LCMs Are "Unusual"

LCMs are unusual because there is no evidence that they are typically possessed, either nationally or in New Jersey, for use in lawful self-defense. *Heller*, 554 U.S. at 625 ("the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes").

As an initial matter, this Court should consider using a localized standard, not a national standard, in assessing whether possession of LCMs is common or unusual. Other rights are reviewed on a local basis to account for interstate diversity. Whether material is obscene under the First Amendment, for example, depends on standards of the relevant community, because "[i]t is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las

19

Vegas, or New York City." *Miller v. California*, 413 U.S. 15, 32-33 (1973). The question whether a weapon is protected under the Second Amendment should also be evaluated locally because gun policies should be tailored to the safety needs of individual states and communities. *E.g.*, *Kolbe*, 849 F.3d at 150 (Wilkinson, J., concurring) ("Leaving the question of assault weapons bans to legislative competence preserves the latitude that representative governments enjoy in responding to changes in facts on the ground."); *Friedman*, 784 F.3d at 412. *Heller* did not dictate that a weapon's commonality must be assessed nationally, and *McDonald* confirmed that the Second Amendment permits continued "state and local experimentation with reasonable firearm regulations. 561 U.S. at 785. Plaintiffs fail to present New Jersey-specific statistics on LCM use.

Though the Court can and should take a localized approach, LCM possession is also "unusual" nationwide. Plaintiffs appear to rest their case to the contrary on a rough national ownership estimate (133 million LCMs) that is based on undisclosed extrapolations their expert made from *sales* data. *See* Curcuruto Decl. ¶¶ 15-20. But such data does not establish that "large-capacity magazines are in fact commonly possessed by law-abiding citizens for lawful purposes," *Fyock*, 779 F.3d at 998. Particularly in light of research documenting extraordinary

concentration of firearm ownership among a small number of gun owners,[15] Plaintiffs' sales data may simply reflect the fact that gunmakers are marketing more firearms with factory-issued LCMs.[16] The Third Circuit confirmed in *One (1) Palmetto State Armory* that the "typical possession" or "common use" inquiry should consider the purpose weapons are *actually used for*. 822 F.3d at 142-43 (holding that machine guns are "not in common use for lawful purposes," citing evidence that they are used "principally by persons engaged in unlawful activities" and have no appropriate "use for personal protection"); *see also N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254-56 (2d Cir. 2015) (treating "common use" and "typical possession" as separate inquiries, and noting that "[w]hile 'common use' is an objective and largely statistical inquiry, 'typical[ ] possess[ion]' requires us to look into both broad patterns of use and the subjective motives of gun owners").

Sales data or even possession estimates like that provided by Plaintiffs in fact say nothing about the purposes for which LCMs are possessed or used. *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) ("[I]t cannot be the case that possession of a firearm in the home for self-defense is a protected form of

---

[15] Christopher Ingraham, *Just Three Percent of Adults Own Half of America's Guns*, WASH. POST, Sept. 19, 2016 (citing research from Harvard and Northeastern University).

[16] *See supra* p.8 & notes 9-10.

possession under all circumstances."); *N.Y. Rifle & Pistol Ass'n*, 804 F.3d at 256 (agreeing that "reliable empirical evidence of lawful possession for lawful purposes was 'elusive,' beyond ownership statistics"). By focusing on how many LCMs have been sold, and providing only anecdotal information suggesting that LCMs are used in self-defense, Plaintiffs fail to meet their burden under the preliminary injunction standard. *See Avitabile v. Beach*, 277 F. Supp. 3d 326, 335-36 (N.D.N.Y. 2017) (declining to enjoin stun gun ban based on affidavit setting forth "personal experience" that did not "clearly establish" common use).

Undercutting Plaintiffs' case further is the fact that numerous experts have testified that it is extremely rare to fire more than ten rounds in self-defense,[17] which makes Plaintiffs' argument (Prelim. Inj. Br. at 17) that people regularly fend off multiple criminal attackers irrelevant—since they do not require LCMs to do so. Experts have also opined that ownership of LCMs is concentrated among a small subset of gun owners. *E.g.*, Decl. of John Donohue III in California's Opp. To Plaintiffs' Motion for Prelim. Inj. at ¶ 11, *Duncan v. Becerra*, No. 3:17-cv-1017-BEN, 2017 U.S. Dist. LEXIS 101549 (S.D. Cal. June 29, 2017), ECF No. 12.

---

[17] *See, e.g.*, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 787 (D. Md. 2014) (expert found "it is rare for a self-defender to fire more than ten rounds"; on average, 2.1 bullets were fired), *aff'd*, 849 F.3d 114 (4th Cir. 2017) (en banc); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1281 (N.D. Cal. 2014) (the fact that "Plaintiffs only present anecdotal examples rather than quantitative studies" suggests it is very rare "to possess a larger magazine in self-defense"); *accord Hightower v. City of Boston*, 693 F.3d 61, 71 (1st Cir. 2012) ("large capacity weapons" are not "the type characteristically used to protect the home").

The rarity of LCM use for self-defense is confirmed by national polling showing that 62% of Americans support banning LCM possession, suggesting that a sizable majority—nearly two-thirds—of Americans do not own an LCM and never plan to own or use one. CNN/ORC Poll, *December 17-18 – Gun Rights* 3 (Dec. 2012), at http://i2.cdn.turner.com/cnn/2012/images/12/19/cnnpoll.december19.4p.pdf.

Regardless of how many LCMs may have been sold, the constitutional right to self-defense by responsible Americans does not depend on continuously firing tens to hundreds of bullets. LCMs are "dangerous and unusual" accessories and are neither necessary nor well-suited for ordinary self-defense. As such, they are unprotected by the Second Amendment.

### C.   LCMs Are Not Protected by the Second Amendment Because They Are Most Suitable for Military Use

LCMs are unprotected for the further reason that they are best suited for military use, not civilian self-defense. *Heller* recognized that "weapons that are most useful in military service—M-16 rifles and the like—may be banned" without violating the Second Amendment. 554 U.S. at 627. In *Kolbe v. Hogan*, the *en banc* Fourth Circuit held that LCMs are "like" the M-16, and therefore may be prohibited even if commonly owned by Americans—because *Heller*'s statement had no caveat that such items may be banned only if they are uncommon. 849 F.3d at 136-37.

The Fourth Circuit correctly found that LCMs were "particularly designed

and most suitable for military and law enforcement applications." *Id.* at 125. As the

*en banc* court held, LCMs' lethality suits them to military use, but that is exactly

what makes them poorly-adapted for civilian defense. *See id.* at 127 ("in the hands

of law-abiding citizens, large-capacity magazines are particularly dangerous";

"inadequately trained civilians… fire more rounds than necessary and thus

endanger more bystanders"). Even setting aside the grave risks to bystanders, and

assuming LCMs have theoretical utility for self-defense, this utility pales in

comparison to the overwhelming evidence that LCMs give criminals military-level

firepower, enabling the shooting of "multiple human targets very rapidly." *Id.* at

137. Because LCMs are most suitable for military purposes—and killers seeking to

emulate military firepower and inflict maximum carnage—they are unprotected.

### D.   LCM Restrictions are "Longstanding" And Thus Outside the Scope of the Second Amendment

In addition to approving prohibitions on military-grade weapons, *Heller*

recognized that historically-rooted gun regulations remain permissible under the

Second Amendment. Such "longstanding regulations are 'exceptions' to the right

to keep and bear arms, such that the conduct they regulate is not within the scope

of the Second Amendment." *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013)

(internal citation omitted). Because *Heller* recognized that some 20th century laws

are in this category, a law need not exist "at the time of the adoption of the Bill of

Rights" to be constitutional under the Second Amendment. *Id.* at 433-34 & n.11.

24

Naturally, no Founding-era law prohibited LCMs, because it was not until the 1980s that firearms accepting such magazines attained any significant market share; one cannot have expected the Founding generation to regulate technology that did not yet exist. But LCM bans are a modern iteration of widespread early 20th century laws that prohibited highly dangerous firearms, like semiautomatic weapons (restricted in as many as 10 states in the 1920s and 1930s), and machine guns (restricted in at least 28 states during this period). *See* Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Cont. Probs. 55, 67-69 (2017) (describing "concerted national push to regulate … gangster-type weapons" that arose as the new technology "spread in the civilian population in the mid-to-late 1920s"). LCM bans also have direct antecedents in three early state laws restricting weapons based on ammunition capacity. In 1932, Congress prohibited weapons that can fire 12 or more times without reloading in the District of Columbia. Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652. In 1927, Michigan and Rhode Island had enacted bans with 16- and 12-round caps. Spitzer, *Gun Law History*, at 68.

One court has held that twentieth century laws can be "longstanding" "if their historical prevalence and significance is properly developed in the record." *Fyock*, 779 F.3d at 997. The above laws are prevalent, having been enacted by more than half of states by the 1930s. Spitzer, *Gun Law History*, at 67-71 (LCM

25

bans enacted in three jurisdictions, machine gun bans in 28, and semiautomatic weapon restrictions in at least seven); *accord Drake*, 724 F.3d at 434 ("our analysis of the constitutionality of a federal firearm restriction included consideration of the fact that at least *seven state legislatures* 'had adopted bans on the carrying of concealed weapons by violent offenders' prior to 1923'") (citing *United States v. Barton*, 633 F.3d 168, 173 (3d Cir. 2011)) (emphasis added). And these laws are significant, reflecting a "national push" to restrict the preferred tools of gangsters. Spitzer, *Gun Law History*, at 67. Accordingly, New Jersey's LCM possession ban is constitutional because it reflects the continuation of a prevalent, significant, and longstanding tradition of prohibiting dangerous weaponry that has come to be misused.

## III.   New Jersey's LCM Possession Ban Withstands Intermediate Scrutiny

### A.   Intermediate Scrutiny Is Appropriate

Even were the Court to decide that LCM possession is constitutionally protected, New Jersey's ban at most slightly burdens Second Amendment-protected conduct. It regulates the capacity of firearms and magazines, so operates like a "time, place, and manner" restriction of *how* firearms may be used, rather than a severe limitation on gun possession itself. *See United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010); *accord Fyock*, 779 F.3d at 999 (affirming ruling that ban on "only a subset of magazines" holding more than 10 rounds is not a

severe restriction). Though Plaintiffs strenuously argue that the law limits the magazines they would *like* to possess, those preferences do not determine the standard of review when Plaintiffs remain free to exercise the right to self-defense with firearms that can fire up to ten times without reloading. New Jersey has prohibited only those ammunition magazines that have become mass shooters' favored tool and which result in unnecessary defensive rounds being fired, "endanger[ing] more bystanders." *Kolbe*, 849 F.3d at 127. Because New Jersey's LCM ban therefore does not infringe on the core *Heller* right, intermediate scrutiny is appropriate.

### B.  New Jersey's Evidence Readily Satisfies Intermediate Scrutiny

Under intermediate scrutiny, New Jersey must show that the LCM possession ban reasonably furthers substantial public safety interests. *Drake*, 724 F.3d at 436. "'[T]he fit' between the asserted interest and the challenged law need not be 'perfect,'" *id.*, and the Court should "accord substantial deference to the [legislature's] predictive judgments." *Id.* at 436-37 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). Deference to legislative judgment is an established principle of jurisprudence not limited to the Second Amendment.[18]

---

[18] For example, the application of heightened means-end scrutiny in constitutional challenges does not mean legislatures must empirically prove the effectiveness of laws. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 60 (1973) ("We do not demand of legislatures 'scientifically certain criteria of legislation.'" (internal citation and

As one court recently determined, "[r]easonable minds will always differ"
on how to "reduce the incidence and harm of mass shootings, or whether that can
even be accomplished at all." *Wiese v. Becerra*, 263 F. Supp. 3d 986, 993 (E.D.
Cal. 2017). Plaintiffs plainly disagree with New Jersey's assessments that a 10-
round magazine limit will reduce mass shootings, deter criminal use of LCMs, and
reduce the lethality of gun massacres. But under the standards articulated by the
Third Circuit and the Supreme Court, the evidence catalogued above and presented
by the State is more than enough to satisfy intermediate scrutiny. This record
amply supports the inference that LCMs are employed to devastating effect by
mass shooters and are not needed for or safe to use in self-defense. *See, e.g.*, *supra*
pp. 12-13, 22-23 & n.17. The record also supports the inference that use of a
magazine holding no more than 10 rounds would have saved lives in past
shootings. *Supra* p. 2 (Christina-Taylor Green was struck by the thirteenth bullet).
The record shows that state LCM restrictions are associated with reductions in
mass shootings, suggesting laws can prevent criminal behavior—a reasonable
assumption for the legislature to make in any event. *Supra* pp. 10-11. And the
record supports the inference that a "grandfathering" provision that allows for
continued possession of previously owned LCMs would dangerously undermine

---

quotation omitted)); *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 439
(2002) (crediting city's informed judgment even absent specific "empirical data"
that "its ordinance will successfully lower crime").

enforcement. *See supra* pp. 9-10 & notes 11-12.

To prevail under intermediate scrutiny, the State need not disprove each of Plaintiffs' assertions that LCM bans are ineffectual, that criminals will not obey them, or that LCMs might be desirable for self-defense. Rather, the State must show that it drew reasonable inferences from competent evidence that prohibiting LCMs holding more than ten rounds will save lives from mass shootings and criminal attacks, while leaving citizens free to use other magazines and firearms in lawful self-defense. It has discharged that burden.

## **CONCLUSION**

Because Plaintiffs fail to show that they are likely to prevail on their Second Amendment claim, the Court should deny the preliminary injunction motion.

Dated:  Newark, New Jersey
      July 6, 2018

                              Respectfully Submitted,

                              FRIEDMAN KAPLAN SEILER &
                               ADELMAN LLP

                              s/ Timothy M. Haggerty
                              Timothy M. Haggerty
                              One Gateway Center, 25th Floor
                              Newark, NJ 07102-5311
                              (973) 877-6400
                              thaggerty@fklaw.com

                              *Attorney for Amicus Curiae Giffords Law*
                              *Center to Prevent Gun Violence*

Of Counsel:

Hannah Shearer
Giffords Law Center to Prevent Gun Violence
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062
hshearer@giffords.org

J. Adam Skaggs
Giffords Law Center to Prevent Gun Violence
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473
askaggs@giffords.org