# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., *et al.*, | ) ) ) | Hon. Peter G. Sheridan, U.S.D.J. Hon. Lois H. Goodman, U.S.M.J. |
| *Plaintiffs*, | ) | Civil Action No. 18-cv-10507 |
| v. | ) ) | Oral Argument Requested |
| GURBIR GREWAL, *et al.*, | ) ) | Motion Date: July 12, 2018 |
| *Defendants*. | ) ) | **CIVIL ACTION** |
| | ) ) | **(ELECTRONICALLY FILED)** |
| | ) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
## MOTION FOR PRELIMINARY INJUNCTION

David H. Thompson*
Peter A. Patterson*
Haley N. Proctor*
J. Joel Alicea*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

*Admitted pro hac vice*

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

ARGUMENT ............................................................................................1

I.       Plaintiffs Are Likely To Succeed on Their Second Amendment Claim. ........1

II.      Plaintiffs Are Likely To Succeed on Their Equal Protection Claim.............13

III.     Plaintiffs Are Likely To Succeed on Their Takings Claim............................15

IV.      The Remaining Factors Favor Injunctive Relief ...........................................20

CONCLUSION .......................................................................................20

i

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>                                                                                                                 <u>**Page**</u>

*Akins v. United States*, 82 Fed. Cl. 619 (2008) ......................................................17

*AmeriSource Corp. v. United States*, 525 F.3d 1149 (Fed. Cir. 2008) ....................17

*Andrus v. Allard*, 444 U.S. 51 (1979) ......................................................................18

*Binderup v. Attorney Gen. United States of America*,
    836 F.3d 336 (3d Cir. 2016) ..........................................................................6, 8

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............................13

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ................................................1, 3

*Clark v. Jeter*, 486 U.S. 456 (1988) ...................................................................13, 14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................*passim*

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ...............1, 9, 12, 17, 19

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................2, 19, 20

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. 1979) ......................................................18

*Friedman v. City of Highland Par*k, 136 S. Ct. 447 (2015) ....................................12

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) .....................5, 12

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ..................................................20

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)............................12

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)..............................10

*Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015)...........................17, 19

*Jackson v. City & County of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ...............................................................................1

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013). ...............................................................................20

*Katz v. United States*, 389 U.S. 347 (1967) ...............................................................4

*Kelo v. City of New London*, 545 U.S. 469 (2005) ...................................................18

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ....................................................2, 12

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)................15

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) .............16, 17, 18

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ....................................................13, 14

*Mugler v. Kansas*, 123 U.S. 623 (1887) ............................................................16, 17

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................20

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)............................12

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ....................................20

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) ....................................................5

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ............................................7

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) ..............................................6

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)..................................7, 13

*Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990)............................15, 17, 19

## Statutory Provisions

18 U.S.C. § 926C ....................................................................................................15

A2761

§ 3..........................................................................................................................19

§ 5(a) ......................................................................................................................19

N.J.S.A. 2C:39-3(g) ...............................................................................................19

N.J.A.C.

§ 13:55-4.1 .............................................................................................................15

§ 13:55-4.2 .............................................................................................................15

## Other

James Alan Fox & Monica J. DeLateur, *Mass Shootings in America*,
   18 HOMICIDE STUDIES 125 (2014), *available at* https://goo.gl/bz4Jv7 ..........9, 11

NICHOLAS J. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT:
   REGULATION, RIGHTS, AND POLICY (2018), https://goo.gl/wboJWC ...................5

CHRISTOPHER S. KOPER, ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL
   ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE,
   1994–2003, REP. TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE
   (2004), https://goo.gl/44V3zp...........................................................................11

Nick Wing, *Banning High Capacity Magazines Should Absolutely Be a Winnable
   Issue*, HUFFPOST (Mar. 14, 2018), https://goo.gl/RBiqmW .................................8

The Second Amendment "elevates above *all other interests* the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (emphasis added). The State does not dispute that standard-capacity magazines are "arms," and there is no doubt that its magazine ban forbids "law-abiding, responsible citizens" the right to use an entire category of commonly possessed arms "in defense of hearth and home." *Id.* That is sufficient to hold that Act A2761 violates the Second Amendment. Furthermore, the statute's exception for retired law enforcement officers and indifference towards private property rights violates the Equal Protection Clause and the Takings Clause.

## ARGUMENT

### I.   Plaintiffs Are Likely To Succeed on Their Second Amendment Claim.

"[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027 (2016) (per curiam). The State does not dispute that standard-capacity magazines are "Arms" within the meaning of the Second Amendment.[1] The

---

[1] The Giffords Law Center contends that standard-capacity magazines are "accessories" rather than "Arms" because their function is to "enhance[ ] ammunition capacity far beyond what is needed." Giffords Br. 16–18. But ammunition is necessary to the exercise of the Second Amendment, *see Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1116 (S.D. Cal. 2017), and limiting magazine capacity limits the amount of ammunition that can be used. If New Jersey had a law

magazines are therefore presumptively within the Second Amendment's protection, and the burden shifts to the State to prove that an exception to the Second Amendment applies. *See Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011). The State offers two possible exceptions: the exception for dangerous and unusual weapons and the exception for longstanding regulations supported by historical tradition. Neither argument succeeds.

First, the State contends that *Heller* establishes an "exception [to the Second Amendment] for 'dangerous weapons,' " State Br. 9, and it invokes the Fourth Circuit's opinion in *Kolbe v. Hogan* for the notion that the "dispositive" test is whether an arm is "most useful in military service," 849 F.3d 114, 137 (4th Cir. 2017). But this free-floating "dangerousness" test is "clearly at odds with the Supreme Court's approach in *Heller*." *Id.* at 155 (Traxler, J., dissenting). *Heller* did not leave the scope of the Second Amendment up to judicial determinations of whether an arm is too "dangerous" to warrant constitutional protection. *See* 554 U.S. at 634 (Judges do not have "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." (emphasis in original)). Thus, even though handguns were "the overwhelmingly favorite weapon of armed criminals," and even though crimes committed with handguns were "7 times more likely to be lethal than

---

limiting the number of books its citizens could read, that would infringe the First Amendment, even if the State thought its citizens wanted to read books "beyond what [the State thought was] needed." *Id.*

2

a crime committed with any other weapon," *id.* at 682, 695 (Breyer, J., dissenting), *Heller* nonetheless held that handguns were protected by the Second Amendment and invalidated the D.C. handgun ban, *id.* at 636.

Indeed, *Heller* was clear about the test for determining whether arms are within the Second Amendment's scope: "the sorts of weapons protected" are those "in common use." *Id.* at 627; *see also id.* at 624–25. The Court acknowledged the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " but it did so *in contrast with* those arms in common use. *Id.* In other words, if an arm is in "common use," by definition it cannot be dangerous *and unusual*. *See Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring). Therefore, so long as standard-capacity magazines are in common use, the "dangerous and unusual" exception does not apply. Because the State does not (and could not plausibly) dispute that standard-capacity magazines *are* in common use,[2] the State's assertions regarding the "dangerousness" of such magazines are irrelevant, *see* State Br. 9–12, and the magazines receive full constitutional protection.

The State and Everytown for Gun Safety respond that the common-use test is "circular" and "illogical," *id.* at 12–13; Everytown Br. 9–12, but the Supreme Court

---

[2] The Giffords Law Center suggests that the relevant standard is whether standard-capacity magazines are in common use *in New Jersey*, but *Heller* looked nationwide to determine common use. *See* 554 U.S. at 628. In any event, standard-capacity magazines are in common use in New Jersey. *See* Bach Decl. ¶ 13.

rejected those arguments when Justice Breyer raised them in his *Heller* dissent, *see Heller*, 554 U.S. at 721–22 (Breyer, J., dissenting). In any event, the common-use test is not circular. Just as the scope of the Fourth Amendment is tied to the People's "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), the Second Amendment relies on the People's exercise of sound judgment as to which arms to use for lawful purposes.

The State falls back to asserting that, even if standard-capacity magazines are in common use, there is no evidence that they are "typically possessed by law-abiding citizens for lawful purposes." State Br. 13–14 (quoting *Heller*, 554 U.S. at 625). But it would be implausible to claim that the approximately *133 million* standard-capacity magazines in the United States—approximately half the magazines in circulation—are *typically* possessed for *unlawful* purposes. One would have to believe that America was overrun by armed criminals. Undaunted, the State demands that Plaintiffs show "how many households" possess, or "what type of person" has, standard-capacity magazines. *Id.* at 14. Yet the Supreme Court in *Heller* provided no such information in holding that handguns were in common use and typically possessed for lawful purposes. Nor did it matter to the Court that "gun ownership . . . is concentrated." *Id.* And the Court spent *no* time examining how often handguns were actually used in self-defense.[3] *See id.* at 14–15. Rather, the fact

---

[3] The relevant question is whether arms are *possessed* for lawful purposes, *see*

that handguns were an extremely popular firearm was sufficient for the Court to conclude that they were typically possessed for lawful purposes. *See Heller*, 554 U.S. at 628–29. The same is true here. *See Friedman v. City of Highland Park*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting).

Next, the State and its amici assert that New Jersey's standard-capacity magazine ban is a longstanding regulatory measure that is "presumptively lawful." State Br. 16–18; Everytown Br. 4–9; *see also* Giffords Br. 24–26. In addition to the states noted in Plaintiffs' opening brief, New Jersey and its amici have identified two jurisdictions (California and Virginia) that enacted laws restricting magazine capacity during the Prohibition Era.[4] But both states—like Rhode Island and Michigan—had repealed those laws by the 1970s. *See* NICHOLAS J. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 529 (2018), https://goo.gl/wboJWC. It remains undisputed that the few laws

---

*Heller*, 554 U.S. at 625, not how often citizens are forced to *use* them for lawful purposes, *see Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting) ("The Second Amendment is a doomsday provision . . . ."). And the fact that the State exempts retired police officers (who are civilians) shows that it believes it will often-enough be necessary for civilians to lawfully use standard-capacity magazines. *Compare* Kleck *Duncan* Decl. ¶¶ 9–18 (Exhibit A to Schmutter Decl.) *with* Allen Decl. ¶¶ 7–19.

[4] The State also cites laws from Illinois, Louisiana, South Carolina, South Dakota, and Texas, but as Everytown for Gun Safety correctly points out, these laws only prohibited certain types of automatic firearms. *See* Everytown Br. 6 n.11. They were not broadly applicable laws restricting magazine capacity.

regulating magazine capacity were recent and short-lived.

Even if the type of magazine ban at issue in this case *were* longstanding and were not a minority position, that would only establish a *presumption* in favor of its constitutionality, and "the presumption may be rebutted." *United States v. Barton*, 633 F.3d 168, 173 (3d Cir. 2011); *see also Binderup v. Attorney Gen. United States of America*, 836 F.3d 336, 347 (3d Cir. 2016) (en banc) (Ambro, J.); *id.* at 358 (Hardiman, J., concurring in part and concurring in the judgments). *Heller* made clear that any such presumption must be based on "historical justifications," 554 U.S. at 635, and it likewise made clear that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id.* at 634–35. For those reasons, the Third Circuit looks to "our founding era" for any "historical justifications" that support a presumption of constitutionality. *See Binderup*, 836 F.3d at 348–49 (Ambro, J.); *id.* at 367–74 (Hardiman, J.). And *Heller* establishes what founding-era justification exists for banning a certain type of weapon: that it is dangerous ***and*** unusual. Standard-capacity magazines are neither. There is, therefore, no historical justification for New Jersey's magazine ban, and any presumption of its lawfulness is rebutted based on uncontested evidence.

Alternatively, the State argues that its standard-capacity magazine ban survives applicable scrutiny. It argues that Act A2761 is not a ban and does not severely burden the Second Amendment because the law allows citizens to possess

6

*other* types of magazines. State Br. 19, 26. But the handgun ban invalidated in *Heller* permitted D.C. residents to own other types of firearms, yet the Supreme Court nonetheless held that this was "no answer" to the reality that handguns were banned despite being in common use. 554 U.S. at 629. In the same way, the fact that other types of magazines are permitted is "no answer" to banning a class of magazines in common use. Under *Heller*, that suffices to invalidate the State's ban without resorting to a tiers-of-scrutiny analysis. *See* Pls.' Br. 15–18.

As the State acknowledges, "if a law burdens the core of the right conferred upon individuals by the Second Amendment, strict scrutiny is required." State Br. 19 (quotation marks omitted). The State mischaracterizes the "core" of the right as limited to handguns, *id.*, but because Act A2761 is a ban on possession of standard-capacity magazines *even in the home*, it "implicates [citizens'] interest in the defense of hearth and home," which indisputably is part of "the core protection of the Second Amendment," *Marzzarella*, 614 F.3d at 94; *see also* Pls.' Br. 19–20.

But even if intermediate scrutiny applies, the magazine ban must fall. The State downplays its burden under intermediate scrutiny by cherry-picking quotes from various cases, *see* State Br. 20–21, but the State "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will *in fact* alleviate these harms in a direct and material way," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (emphasis added). Notwithstanding the deference owed to

legislatures, the State must "present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Binderup*, 836 F.3d at 354 (Ambro, J.) (alteration omitted); *id.* at 378–79 (Hardiman, J.).

Here, the State's burden is especially onerous because the question is *not* whether *any* limitation on magazine capacity passes scrutiny; the question is whether *changing* the State's limitation from 15 rounds to 10 rounds passes scrutiny. This is a critical point that the State overlooks in its brief. The State offers *no evidence at all* that its interest in public safety will be advanced by lowering the magazine limit from 15 rounds to 10. The State does not claim, let alone *prove*, that any of the mass shootings surveyed by its experts would have been prevented or made less deadly by a 10-round limit rather than a 15-round limit. Indeed, the opening paragraph of the State's brief undercuts any such assertion, since all of the mass shootings it cites either involved magazines exceeding New Jersey's *previous* 15-round limit or compliant with the new 10-round ban.[5] This failure of proof is decisive.

The State and its amici make several assertions in favor of the ban's constitutionality, but none of them holds up. First, they claim that there is a correlation between standard-capacity magazines and mass shootings. *See* State Br. 9–10, 23; Everytown Br. 13–15; Giffords Br. 3–4, 10–11. There are serious issues

---

[5] It is unclear whether the Parkland shooter used 10- or 30-round magazines. *See* Nick Wing, *Banning High Capacity Magazines Should Absolutely Be a Winnable Issue*, HUFFPOST (Mar. 14, 2018), https://goo.gl/RBiqmW.

with this claim, but it is irrelevant in any event. *Heller* struck down D.C.'s handgun ban even though handguns were the "overwhelmingly favorite weapon of armed criminals," 554 U.S. at 682 (Breyer, J., dissenting), so a correlation between a particular arm and criminal behavior cannot save the State's ban.

Of course, correlation does not prove causation, and there are significant problems with the State's evidence. For example, Lucy Allen's correlation relies on a *Mother Jones* database, Allen Decl. ¶¶ 20–22, whose methodology has been described by scholars as "hard to defend," *see* James Alan Fox & Monica J. DeLateur, *Mass Shootings in America*, 18 HOMICIDE STUDIES 125, 129 (2014), *available at* https://goo.gl/bz4Jv7; *see also Duncan*, 265 F. Supp. 3d at 1122; Kleck *Duncan* Decl. ¶¶ 25–27. A sounder analysis showed no correlation between mass shootings and the use of standard-capacity magazines. *See id.* ¶¶ 28–29.

Second, the State and its amici assert that forcing mass shooters to use lower-capacity magazines will result in fewer shots fired and create reloading "pauses" that will allow victims to escape or subdue their attackers.[6] *See* State Br. 10–11, 22; Everytown Br. 13–16; Giffords Br. 2–4, 11. But the State never explains why 10 rounds, versus some other number, is the proper limit. And this argument proves too

---

[6] The State also asserts that it is dangerous to entrust average citizens with standard-capacity magazines because they could shoot indiscriminately and hurt someone. State Br. 10–11. There is no evidence that this is a real risk—as demonstrated by the State's own assertions about the average number of rounds fired by citizens in self-defense. *See* Kleck *Duncan* Decl. ¶¶ 19–22; State Br. 14.

much. If the State's ban could be justified by its assertion that reductions in magazine capacity lead to fewer deaths, there is no logical reason why the State could not ban magazines *altogether*, yet that plainly would be unconstitutional. *See Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015). Moreover, the State never addresses Dr. Kleck's analysis demonstrating that reloading generally will not slow a mass-shooter's rate of fire or provide "pauses" that enable victims to escape.[7] Kleck Decl. ¶¶ 23–25, 30–31; *see also* Kleck *Duncan* Decl. ¶¶ 30–44. Nor has the State disproven Dr. Kleck's conclusion that between 1984 and 2013 there was only one known instance of a victim subduing a mass shooter who used a standard-capacity magazine. Kleck Decl. ¶¶ 24–29. Instead, the State and its amici rely on misleading calculations[8] and contestable[9] or irrelevant[10] anecdotes.

---

[7] Everytown for Gun Safety asserts that Dr. Kleck's analysis has been refuted by an expert in *Duncan*, *see* Everytown Br. 19, but the District Court in that case did not question Dr. Kleck's conclusions. Rather, the court questioned the credibility of the expert that Everytown relies upon. *See Duncan*, 265 F. Supp. 3d at 1128–29. As for the alleged debunking of Dr. Kleck's defensive-gun-use statistics, *see* Everytown Br. 18, Kleck has debunked the debunkers, *see* Kleck *Duncan* Decl. ¶¶ 1–8.

[8] *See, e.g.*, Allen Decl. ¶ 23 (using *Mother Jones* database); *compare* Everytown Br. 13 (alleging correlation between standard-capacity magazine use and number of deaths), *with* Kleck *Duncan* Decl. ¶¶ 35–44 (finding no causation).

[9] *Compare* Donahue Decl. ¶ 30 (asserting that children escaped during a reloading pause at the Newtown massacre and that a bystander tackled the Tucson shooter when he was reloading), *with* Kleck *Duncan* Decl. ¶ 32 (unclear if children escaped during a reloading pause), *and* Kleck Decl. ¶ 27 (unclear if Tucson shooter tackled during a reloading pause).

[10] *See, e.g.*, Giffords Br. 4 n.2 (citing the reloading pause of the Washington

10

Third, the State and the Giffords Law Center assert that the number of mass shootings has increased over time, especially since the lapse of the federal ban on standard-capacity magazines.[11] *See* State Br. 24; Giffords Br. 12–14. That is simply false, *see* Fox & DeLateur, *supra*, at 128–30, and even if it were true, it would not prove that standard-capacity magazines cause mass shootings.[12]

Fourth, the State contends that Act A2761 will reduce criminals' access to standard-capacity magazines. State Br. 21–22. But even if that were true, the State does not dispute that criminals almost never fire more than 10 rounds in a gun crime, *see* Kleck Decl. ¶ 20, and because the mass shooters who do would generally be unaffected by the need to reload, *see supra* pp. 9–10, the magazine ban would do little for the State's interest in public safety even if it succeeded in depriving criminals of access. Of course, the reality is that the ban will *not* deprive them of

---

Navy Yard shooter, even though a shotgun would be unaffected by a magazine ban).

[11] The State notes that Christopher Koper, who authored the official report concluding that the federal ban could not be credited with any of the drop in gun violence, also said that the "effects of the law would occur only gradually." State Br. 24. But Koper went on to say that, even with the benefit of more time, "the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement." CHRISTOPHER S. KOPER, ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994–2003, REP. TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE 97 (2004), https://goo.gl/44V3zp.

[12] The State also asserts, without any evidence, that a state-level ban is more likely to be effective than the federal ban. *See* State Br. 25 n.9. That is implausible, since a state ban can be circumvented by criminals purchasing magazines legally in other states. *See* KOPER, *supra*, at 81 n.95.

access, since standard-capacity magazines remain legal in 43 States and, in any event, criminals have no problem breaking the law to obtain their arms of choice.[13]

The State's last rationale is that every federal appellate court to address the issue has upheld a standard-capacity magazine ban. *See* State Br. 23–24. This argument-from-authority is thin. *Kolbe*, *Friedman*, and *Heller II* were contrary to Supreme Court precedent and elicited forceful dissents, *see Kolbe*, 849 F.3d at 155–57 (Traxler, J., joined by three other judges, dissenting); *Friedman*, 784 F.3d at 413–14 (Manion, J., dissenting); *Heller v. District of Columbia*, 670 F.3d 1244, 1271–82 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and *Friedman* earned a dissent from the denial of certiorari, *see Friedman v. City of Highland Par*k, 136 S. Ct. 447 (2015) (Thomas, J., dissenting from the denial of certiorari). The courts of appeals do not have a great track record in this area. *See Parker v. District of Columbia*, 478 F.3d 370, 380 n.4 (D.C. Cir. 2007) (listing nine courts of appeals that had rejected the individual-right interpretation of the Second Amendment vindicated by *Heller*). Moreover, a California district court has issued a preliminary injunction against a standard-capacity magazine ban, so this Court would not be the first. *See Duncan*, 265 F. Supp. 3d at 1139–40.

---

[13] Puzzlingly, the State responds by pointing to the allegedly widespread theft of law-abiding citizens' firearms as a source for criminals, but even if true, this fact actually *proves* that criminals are willing to break laws like the magazine ban to obtain the arms that they want. *See* State Br. 21.

Finally, the State's ban can only be upheld under intermediate scrutiny if it burdens no more conduct than is reasonably necessary. *Marzzarella*, 614 F.3d at 98. The State has offered no explanation for why its ban extends to possession of standard-capacity magazines in the home—the core of the Second Amendment right—given that the alleged harm that it seeks to remedy (mass shootings) typically occurs outside the home. That alone suffices to invalidate the ban under intermediate scrutiny. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2537 (2014). The unduly broad reach of the State's ban is further demonstrated by additional alternatives the State could have pursued but did not, including a licensing requirement, a training requirement, and requiring magazines to be stored in a secure way when not in use.[14]

## II. Plaintiffs Are Likely To Succeed on Their Equal Protection Claim.

The State has failed to provide a justification for the retired law enforcement officer exception that can survive heightened scrutiny. The State asserts that, if Plaintiffs' Second Amendment challenge fails, Act A2761 is subject to rational-basis review. That is incorrect. So long as standard-capacity magazines are in common use (as they undoubtedly are), they are protected by the right to keep and bear arms, and even if the ban does not *violate* that right, it certainly *affects and limits* that right, which is all that is required for strict scrutiny to apply. *See Clark v. Jeter*, 486 U.S.

---

[14] Plaintiffs do not take a position on the constitutionality of these alternatives, but this Court can nonetheless take the State's failure to pursue them into account. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781–82 (2014).

456, 461 (1988). The State's sole basis for distinguishing between retired police officers and average, law-abiding citizens is that the retired officers are better trained, but even assuming that 15-round magazines require specialized training that 10-round magazines do not (an implicit premise of the State's argument that it never acknowledges or defends), it is radically disproportionate to address that problem by *banning* standard-capacity magazines. An obvious—and far less burdensome— solution could have been to require citizens to undertake mandatory training in order to possess such magazines, yet the State gives no hint that it even *considered* that solution. *See McCullen*, 134 S. Ct. at 2537.

The State's training rationale fares even worse as applied to retired members of the armed forces. The State claims that the "firearms training" of its law enforcement officers is "vastly different" than the equivalent training in the armed forces and that military officers receive "little, if any, handgun training." Stanton Decl. ¶¶ 22–23. But Act A2761 bans the use of *standard-capacity magazines*, not handguns in particular or firearms in general, so any specialized *handgun* training is irrelevant. The only potentially relevant distinction the State offers is that its officers "are accountable for every round fired and are instructed to avoid the indiscriminate destruction of property." *Id.* ¶ 24. But does the State truly believe that members of the armed forces are *not* trained to "avoid the indiscriminate destruction of

14

property"? The suggestion is as astonishing as it is implausible.[15] The import of "civilian" training is further undermined by the failure to exempt security guards, who are required to undertake ongoing training. *See* N.J.A.C. §§ 13:55-4.1, -4.2.

## III.   Plaintiffs Are Likely To Succeed on Their Takings Claim.

By dispossessing owners of their lawfully-acquired property without compensation, Act A2761 violates the Takings Clause.

Supreme Court precedent forecloses the State's primary response: that the State may confiscate property without compensation if it acts pursuant to its police power. State Br. 27–28. In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Court held that a law requiring physical occupation of private property was both "within the State's police power" *and* an unconstitutional taking, *id.* at 425. The Court expressly stated that whether a law effects a taking is a "separate question" from whether the State has the police power to enact it, for an uncompensated taking is unconstitutional "without regard to the public interests that it may serve." *Id.* at 425–26. "The Government's proper exercise of regulatory authority does not automatically preclude a finding that such action is a compensable taking." *Yancey v. United States*, 915 F.2d 1534, 1540 (Fed. Cir. 1990).

The State nevertheless insists that there is an exception to this rule for "state

---

[15] The State suggests that Plaintiffs' argument would require invalidation of 18 U.S.C. § 926C, but concealed carry laws raise a distinct set of justifications and equal-protection questions. *See Heller*, 554 U.S. at 626–27.

laws prohibiting the possession of dangerous products." State Br. 27. In support, the State cites a line of cases beginning with *Mugler v. Kansas*, 123 U.S. 623 (1887), upholding regulations on the use of property. State Br. 27. As an initial matter, the Supreme Court squarely rejected the argument that *Mugler* carved out a "noxious use" exception to the Takings Clause in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). There, the Council argued unsuccessfully that its uncompensated per se taking was permissible because it "involved an exercise of South Carolina's 'police powers' to mitigate the harm to the public interest that petitioner's use of his land might occasion." 505 U.S. at 1020–21. Cabining *Mugler* and its progeny as "early formulation[s] of the police power justification necessary to sustain . . . *any* regulatory diminution in value," the Court found it "self-evident that noxious-use logic cannot serve as a touchstone to distinguish" takings that require compensation "from regulatory deprivations that do not." *Id.* at 1026.

The Takings Clause would afford little protection to property rights if the government could evade its compensation requirement by claiming it is taking property not to provide for "public use" but instead to protect the public from some danger. Because "the distinction between 'harm-preventing' and 'benefit-conferring' regulation is often in the eye of the beholder," a wide range of confiscations could be justified under this rubric. *Id.* at 1024. Critically, the *Lucas* Court pointed out that it had *never* "employed the logic of 'harmful use' prevention

to sustain" an uncompensated *per se* taking. *Id.* at 1026. Neither should this Court.[16]

In any event, unlike the laws at issue in *Mugler* and its progeny, A2761 does not simply regulate the use of Plaintiffs' property. Instead, it prohibits Plaintiffs from continuing to possess their lawfully-acquired property, thereby working a physical taking of that property. *See Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2429 (2015). Apart from recent decisions analyzing takings challenges to arms bans in a preliminary injunction posture,[17] the State's cited decisions do not involve bans on the continued possession of lawfully acquired property. *See Mugler*, 123 U.S. at 669 (restriction on the use of property for particular purposes); *Akins v. United States*, 82 Fed. Cl. 619, 622–23 (2008) (registration requirement); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) (confiscation of

---

[16] The State seeks to limit *Lucas* to real property. State Br. 29–30. True, *Lucas* allowed that uncompensated restrictions on the *sale* of personal property were more likely to be upheld under the Court's regulatory takings analysis in light of "the State's traditionally high degree of control over commercial dealings," *Lucas*, 505 U.S. at 1027, but it never suggested that the Takings Clause does not require compensation for State regulation of personal property under the police power. To the contrary, "[n]othing in the text or history of the Takings Clause . . . suggests that the rule is any different when it comes to appropriation of personal property." *Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2426 (2015); *Yancey*, 915 F.2d at 1541 (regulatory takings).

[17] Courts have divided on the status of confiscatory magazine bans under the Takings Clause. Contrary to the State's contention, however, the district court in *Duncan* squarely confronted and rejected a police-power exception to takings, and its analysis did not rely on its separate conclusion that magazines are protected by the Second Amendment. 265 F. Supp. 3d at 1136–37.

property in connection with criminal proceeding). The sole exception—a forty-year-old D.C. Court of Appeals decision that predated *Loretto*, *Lucas*, and *Horne*—summarily rejected a takings challenge based on the now-discredited assumption that exercises of the police power are categorically exempt from the Takings Clause. *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979).[18]

Next, the State also argues that A2761 does not effect a taking because Plaintiffs may choose to be dispossessed of their property by means other than a direct appropriation. State Br. 31. For the reasons set out in Plaintiffs' opening brief—none of which the State addresses—these options do not render the law anything other than a taking. Forcing Plaintiffs to transfer their property to a third party is no less a taking than if the State seized it. The gravamen of a physical taking is the dispossession of property. Whether the government edict forces the owner to hand the property over to the government or to a third party, there is still a taking. *See Kelo v. City of New London*, 545 U.S. 469, 473–75 (2005). Affording Plaintiffs the opportunity to alter or destroy their property does not save the law, either. It is

---

[18] The power to abate nuisances is not a justification for the ban. Governments may act to abate nuisances without paying compensation only to the extent consistent with preexisting, background principles of nuisance law "inhere in the title itself." *Lucas*, 505 U.S. at 1029–30. The State makes no argument that A2761 "expressly prohibit[s]" that which was "*always* unlawful," *id.* at 1030–31, and a duty to compensate arises when the State criminalizes continued possession of *lawfully*-owned property. This is likely why governments often exempt existing owners from possession bans. *See, e.g.*, *Andrus v. Allard*, 444 U.S. 51, 56 (1979).

often the case that parties can evade a confiscatory regulation by altering their property, but the Supreme Court has admonished that "property rights cannot be so easily manipulated." *Horne*, 135 S. Ct. at 2430 (quotation marks omitted).

A2761 fares no better when analyzed as a regulatory taking. The State insists that it does not deprive Plaintiffs of all economically beneficial use of their property. But even if it does not result in a complete loss in value, regulatory action may constitute a taking if it interferes with a property owner's reasonable, investment-backed expectations. Whatever else property owners may expect, they "do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 135 S. Ct. at 2427; *see also Duncan*, 265 F. Supp. 3d at 1138. Nor do they expect to be forced to sell, destroy, or alter property. *See Yancey*, 915 F.2d at 1540.

Finally, even if Plaintiffs may obtain *some* compensation for their property by selling it, A2761 does not secure Just Compensation, which is what the Constitution requires. To the contrary, A2761 virtually guarantees that any sale would return less than just compensation by providing for an influx of magazines into a limited market of those "entitled to own or possess" them. A2761 § 5(a). That is a narrow class, consisting primarily of retired and active police officers and active military personnel and dealers who sell to them. N.J.S.A. 2C:39-3(g); A2761 § 3. [19]

---

[19] To the extent an out-of-State sale is possible, New Jersey cannot justify its ban by the less restrictive laws of other jurisdictions. *See Ezell*, 651 F.3d at 697.

## IV.    The Remaining Factors Favor Injunctive Relief.

While Plaintiffs need only show that irreparable harm is "more likely than not," *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), here it is certain for "a prospective violation of a constitutional right constitutes irreparable injury. *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Ezell*, 651 F.3d at 699. The remaining two factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 455 (2009), and they favor Plaintiffs because "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013).

## CONCLUSION

Plaintiffs respectfully request that the Court enter a preliminary injunction.

Dated: July 9, 2018

David H. Thompson*
Peter A. Patterson*
Haley N. Proctor*
J. Joel Alicea*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

* Admitted *pro hac vice*

Respectfully submitted,

/s/Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com