# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., *et al.*, | ) ) ) ) | |
| *Plaintiffs*, | ) | Hon. Peter G. Sheridan, U.S.D.J. |
| v. | ) ) | Hon. Lois H. Goodman, U.S.M.J. Civil Action No. 18-cv-10507 |
| GURBIR GREWAL, *et al.*, | ) ) | |
| *Defendants*. | ) ) | **CIVIL ACTION** |
| | ) ) ) ) | **(ELECTRONICALLY FILED)** |

## PLAINTIFFS' POST-HEARING PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

David H. Thompson*
Peter A. Patterson*
Haley N. Proctor*
J. Joel Alicea*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

*Admitted pro hac vice*

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... iii

PROPOSED FINDINGS OF FACT ...................................................... 1

I.    Background ............................................................................... 1

II.   Standard-Capacity Magazines Are in Common Use in the United States. ..... 2

      A.    Common Use .................................................................. 2

      B.    The Alleged Concentration of SCMs .................................. 5

      C.    Possessed for Lawful Purposes ........................................ 7

III.  There Is No Historical Tradition of Limiting Magazine Capacity. ........ 7

IV.   New Jersey's Magazine Ban Will Not Reduce Crime. ................... 9

V.    New Jersey's Magazine Ban Will Not Reduce Mass Shootings. .......... 14

VI.   New Jersey's Magazine Ban Inhibits Lawful Self-Defense. ............. 27

VII.  The Testimonies of Allen and Donohue Should be Given No Weight. ..... 31

VIII. Magazine Size Is Irrelevant to Firearm Safety Training. ............... 32

IX.   New Jersey Could Implement a Training Requirement for Civilians
      to Possess and Use Standard-Capacity Magazines. ...................... 33

X.    The Magazine Ban Will Dispossess Citizens of Their Property. ......... 35

PROPOSED CONCLUSIONS OF LAW ............................................. 36

I.    Plaintiffs Are Likely to Succeed on the Merits. ........................ 38

      A.    New Jersey's Magazine Ban Violates the Second Amendment. ...... 38

      1.    Defendants Have Failed to Show That Standard-Capacity
            Magazines Are Outside the Scope of the Second Amendment. ..... 40

i

a.   Standard-Capacity Magazines Are in Common Use. ...............40

b.   There Is No Tradition of Limiting Magazine Capacity. ...........45

2.   Because Standard-Capacity Magazines Are in Common Use, A Ban on Their Use and Possession Is *Per Se* Unconstitutional. .......46

3.   Alternatively, Defendants Have Failed to Show That New Jersey's Magazine Ban Survives Heightened Scrutiny....................................49

a.   The Magazine Ban Will Not Reduce Firearm-Related Crime. ...........................................................................................52

b.   The Magazine Ban Will Not Reduce Mass Shootings. ............54

c.   Defendants Have Offered No Evidence That a 10-Round Limit Is No More Restrictive Than Reasonably Necessary. ....57

B.   New Jersey's Magazine Ban Violates the Equal Protection Clause. ...58

C.   New Jersey's Magazine Ban Violates the Takings Clause. ................63

II.   The Remaining Factors Favor Injunctive Relief. .........................................68

CONCLUSION .........................................................................................................69

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Akins v. United States*, 82 Fed. Cl. 619 (2008)........................................67

*AmeriSource Corp. v. United States*, 525 F.3d 1149 (Fed. Cir. 2008)...................67

*Annex Books, Inc. v. City of Indianapolis*, 740 F.3d 1136 (7th Cir. 2014) ............50

*Binderup v. Attorney Gen. United States of America*,
    836 F.3d 336 (3d Cir. 2016) ................................................46, 49, 51

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ................................58

*Caetano v. Massachusetts*, 136 S. Ct.1027 (2016) ......................................39, 40, 42

*Califano v. Westcott*, 443 U.S. 76 (1979) ................................................63

*City of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002) ................................50

*Clark v. Jeter*, 486 U.S. 456 (1988)........................................................58

*Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120 (3d Cir. 2002) ................59

*Daggett v. Commission on Governmental Ethics & Election Practices*,
    172 F.3d 104 (1st Cir. 1999) ................................................37

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)................... 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 56

*Dunagin v. Oxford*, 718 F.2d 738 (5th Cir. 1983) ....................................37

*Duncan v. Becerra*, 2018 WL 3433828 (9th Cir. July 17, 2018) ..........45, 46, 58, 65

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ................27, 39, 66, 67

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................40, 68, 69

*Fesjian v. Jefferson*, 399 A.2d 861 (D.C. 1979)........................................68

*Friedman v. City of Highland Par*k, 136 S. Ct. 447 (2015) ................................58

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)....................7, 58

*Frontiero v. Richardson*, 411 U.S. 677 (1973)................................................59, 60

*Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014) ......................39

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ............................................68, 69

iii

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)........................50, 56

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...........42, 45, 47, 58

*Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015).........63, 64, 65, 66, 67

*International Paper Co. v. United States*, 282 U.S. 399 (1931).............................64

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)...........38, 39

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013)......69

*Katz v. United States*, 389 U.S. 347 (1967) ...............................................43

*Kelo v. City of New London*, 545 U.S. 469 (2005) ............................................64, 65

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) ..................................................39, 42

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...........................................40, 41, 58

*Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 595 (2013) ................................65

*Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005) ............................................64

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).....64, 65, 66

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ..............66, 67, 68

*Luis v. United States*, 136 S. Ct. 1083 (2016)...........................................39

*Mance v. Sessions*, 896 F.3d 390 (5th Cir. 2018) ............................................47, 50

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) .............................................57, 62

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................41, 47, 51, 59

*Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380 (3d Cir. 2010)..........................60

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................................37

*Mugler v. Kansas*, 123 U.S. 623 (1887) ................................................66, 67

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) .........................................................40, 42

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................69

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018).......................................47

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) .....................................68

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*,
   561 F.2d 1327 (9th Cir. 1977) .................................................................65

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ................................65

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017)............................63

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) ................................63

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002)...............................................................................64

*Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099 (3d Cir. 1997) ..........59

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ..........................51

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) ............................46

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)...........................44

*United States v. Esquivel*, 88 F.3d 722 (9th Cir. 1996) ..........................17

*United States v. Gould*, 536 F.2d 216 (8th Cir. 1976) .......................37, 38

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ..........................40

*United States v. Huet*, 665 F.3d 588 (3d Cir. 2012) ...............................46

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)..............38, 49, 50, 51, 57

*United States v. Steward*, 880 F.3d 983 (8th Cir. 2018) .........................47

*United States v. Virginia*, 518 U.S. 515 (1996) .........................51, 59, 60

*Wiese v. Becerra*, 306 F. Supp. 3d 1190 (E.D. Cal. 2018) .....................65

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .........37, 47

*Yancey v. United States*, 915 F.2d 1534 (Fed. Cir. 1990)........................66

*Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018)....................................47

## **Statutes**

Act A2761

   § 3......................................................................................................68

   § 4(a) .................................................................................................64

   § 4(b) .................................................................................................65

v

§ 4(c) ...............................................................................................64

§ 5.....................................................................................................64

§ 5(a) ..............................................................................................68

N.J.S.A. 2C:39-3(g) ........................................................................68

## **Other**

Advisory Committee Note, Fed. R. Evid. 201....................................38

1 CHRISTOPHER B. MUELLER, ET AL., FEDERAL EVIDENCE (4th ed. 2018)..............38

Gary Kleck, *How Many Large Capacity Magazines (LCMs) Are Possessed By Americans?*, SSRN (2018), https://goo.gl/XFYkpc .............................................3

GUN VIOLENCE, NATIONAL INSTITUTE OF JUSTICE (Mar. 13, 2018), https://goo.gl/73Apha .........................................................................44

Melanie Burney, *Second Man Charged in Trenton Art Festival Shooting*, PHILADELPHIA ENQUIRER (June 19, 2018), https://goo.gl/2Z988e ....................20

# EXHIBITS CITED

PX4     THOMAS J. AVENI, OFFICER-INVOLVED SHOOTINGS: WHAT WE DIDN'T KNOW HAS HURT US (2003)

PX5     MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS (2013)

PX6     Bach Declaration

PX8     PHILIP J. COOK AND JENS LUDWIG, GUNS IN AMERICA (1996)

PX9     T. CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1764)

PX10    Dembowski Declaration

PX18    Ellman Declaration

PX23    James Alan Fox and Monica J. DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUDIES 125 (2014)

PX24    James Alan Fox and Emma E. Fridel, *The Menace of School Shootings in America: Panic and Overresponse*, in THE WILEY HANDBOOK ON VIOLENCE IN EDUCATION 15 (Harvey Shapiro, ed. 2018)

PX25    James Alan Fox and Jack Levin, *Mass Confusion Concerning Mass Murder*, 40 THE CRIMINOLOGIST 8 (2015)

PX27    Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013)

PX28    Robert A. Hahn, et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, AM. J. PREVENTATIVE MED. 40 (2005)

PX29    Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 L. AND CONTEMP. PROBS. 151 (1986)

PX30        Edward W. Hill, *How Many Guns are in the United States: Americans Own between 262 Million and 310 Million Firearms*, URBAN PUBLICATIONS (2013)

PX33        NICHOLAS J. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2018)

PX35        RAYMOND W. KELLY, ANNUAL FIREARMS DISCHARGE REPORT 2011 (2011)

PX36        Gary Kleck, *Did Australia's Ban on Semiauto Firearms Really Reduce Violence?*, SSRN (2018)

PX37        Kleck Supplemental Declaration

PX38        Gary Kleck, *Mass Shootings in Schools: The Worst Possible Case for Gun Control*, 52 AM. BEHAVIORAL SCIENTIST 1447 (2009)

PX39        GARY KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA (1991)

PX40        GARY KLECK, TARGETING GUNS (1997)

PX41        Gary Kleck, *What Do CDC's Surveys Say About the Frequency of Defensive Gun Uses?*, SSRN (2018)

PX42        GARY KLECK AND DON B. KATES, JR., ARMED: NEW PERSPECTIVES ON GUN CONTROL (2001)

PX44        DAVID B. KOPEL WHAT SHOULD AMERICA DO ABOUT GUN VIOLENCE (2013)

PX45        Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, 1994–2004, *in* REDUCING GUN VIOLENCE IN AMERICA 157 (Daniel W. Webster and Jon S. Vernick, ed. 2013)

PX48        GUN DIGEST 2018 (Jerry Lee and Chris Berens, ed. 2017)

PX49        Wang-Sheng Lee and Sandy Suardi, *The Australian Firearms Buybacks and Its Effect on Gun Deaths*, 28 CONTEMP. ECON. POL. 65 (2009)

PX50        ALAN I. LESHNER, ET AL., PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE (2013)

PX53        Michael D. McGonigal, et al., *Urban Firearm Deaths: A Five-Year Perspective*, 35 J. OF TRAUMA 532 (1993)

PX54        Samara McPhedran, *A systematic review of quantitative evidence about the impacts of Australian legislative reform on firearm homicide*, 28 AGGRESSION AND VIOLENT BEHAV. 64 (2016)

PX55        Samara McPhedran and Jeanine Baker, *Mass shootings in Australia and New Zealand: A descriptive study of incidence*, 8 JUSTICE AND POL. J. (2011)

PX56        Carlisle E. Moody, *Large capacity magazines and homicide*, COLLEGE OF WILLIAM AND MARY WORKING PAPER (2015)

PX58        NSSF, MODERN SPORTING RIFLE COMPREHENSIVE CONSUMER REPORT 2013 (2013)

PX63        KIM PARKER, ET AL., AMERICA'S COMPLEX RELATIONSHIP WITH GUNS, PEW RESEARCH CENTER (2017)

PX65        GUN HOMICIDE RATE DOWN 49% SINCE 1993 PEAK; PUBLIC UNAWARE, PEW RESEARCH CENTER (2013)

PX68        D.C. Reedy and C.S. Koper, *Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers*, INJURY PREVENTION 151 (2003)

PX69        Charles Remsberg, *Why one cop carries 145 rounds of ammo on the job*, POLICEONE.COM (Apr. 17, 2013)

PX71        Gus G. Sentementes and Julie Bykowicz, *Documents detail Cross Keys shooting*, BALTIMORE SUN (Mar. 21, 2006)

PX73        Mitch Smith, et al., *Kalamazoo Searches for Motive in Spree That Killed 6*, N.Y. TIMES (Feb. 21, 2016)

PX76        DEPARTMENT OF JUSTICE, CRIMINAL VICTIMIZATION IN THE UNITED STATES (2010)

PX78        CHARLES F. WELLFORD, ET AL., FIREARMS AND VIOLENCE: A CRITICAL REVIEW (2005)

PX80        *Gun shop owner shoots, kills man during attempted robbery*, WISTV (2012)

PX81        JAMES D. WRIGHT AND PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS (2d ed. 2008)

PX83        GALLUP, GUNS (2018)

PX84        James Alan Fox and Emma E. Fridel, *The Tenuous Connections Involving Mass Shootings, Mental Illness, and Gun Laws*, 3 VIOLENCE AND GENDER 14 (2016)

PX85        Herman Wong, *James Shaw Jr. on why he rushed the Waffle House shooter: 'He was going to have to work to kill me*,'' WASH. POST. (Apr. 22)

PX86        Justin Carissimo, *"Hero" customer wrestled rifle away from Waffle House shooter*, CBS NEWS (Apr. 23, 2018)

PX87        Kristine Phillips, *Suspect in Tennessee Waffle House shooting had guns seized after arrest near White House last year*, WASH. POST. (Apr. 23, 2018)

DX3         Allen Declaration

DX8         Deborah Azrael et al., *The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey*, 3 RUSSELL SAGE FOUNDATION J. OF THE SOCIAL SCIENCES 38 (2017)

DX18        Philip J. Cook, et al., *The Gun Debate's New Mythical Number:* How *Many Defensive Uses Per Year?*, 16 J. OF POL. ANALYSIS AND MGMT. 463 (1997)

DX23        Donohue Declaration

DX24        Donohue Deposition Transcript

DX27        EVERYTOWN FOR GUN SAFETY, ANALYSIS OF RECENT MASS SHOOTINGS (2015)

DX36        DEPARTMENT OF JUSTICE, A STUDY OF ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES BETWEEN 2000 AND 2013 (2013)

DX39        Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, THE TRACE (Mar. 28, 2017)

DX63        LOUIS KLAREVAS, RAMPAGE NATION: SECURING AMERICA FROM MASS SHOOTINGS (2016)

DX66        Christopher S. Koper and Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapons Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 J. OF QUANTITATIVE CRIMINOLOGY 33 (2001)

DX70        William J. Krouse and Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, CONGRESSIONAL RESEARCH SERVICE (2015)

DX72        Frederick Lemieux, *Effect of Gun Culture and Firearm Laws on Gun Violence and Mass Shootings in the United States: A Multi-Level Quantitative Analysis*, 9 INT'L J. OF CRIM. JUSTICE SCIENCES 74 (2014)

DX89        Sam Petulla, *Here is 1 correlation between state gun laws and mass shootings*, CNN (Oct. 5, 2017)

DX90        *Section 3: Gun Ownership Trends and Demographics*, PEW RESEARCH CENTER (Mar. 12, 2013)

DX99        Stanton Supplemental Declaration

DX107       Eugene Volokh, *Are laws limiting magazine capacity to 10 rounds constitutional*, VOLOKH CONSPIRACY (Mar. 6, 2014)

DX115       Christal Hayes, *FBI: More active shooting incidents in 2017 than any other year recorded*, USA TODAY (May 4, 2018)

DX116       DEPARTMENT OF JUSTICE, ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES IN 2014 AND 2015 (2016)

DX117       DEPARTMENT OF JUSTICE, ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES IN 2016 AND 2017 (2018)

JX3         MASS SHOOTING INCIDENTS IN AMERICA (1984–2012), CITIZENS CRIME COMMISSION (2017)

JX5         Mark Follman, *What Exactly Is a Mass Shooting?*, MOTHER JONES (Aug. 24, 2012)

JX6         Mark Follman, *Yes, Mass Shootings Are Occurring More Often*, MOTHER JONES (Oct. 21, 2014)

JX7         Mark Follman, et al., *A Guide to Mass Shootings in America*, MOTHER JONES (Oct. 2, 2017)

JX8         GIFFORDS LAW CENTER, SUMMARY OF STATE LAW (2018)

JX9         Kleck Declaration

JX10        Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 JUSTICE RESEARCH AND POL. 28 (2016)

JX11        Gary Kleck and Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, J. OF CRIM. L. & CRIMINOLOGY 150 (1995)

JX12        David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849 (2015)

JX13        JEFFREY A. ROTH AND CHRISTOPHER S. KOPER, IMPACT EVALUATION OF THE PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT OF 1994 (1997)

JX14        CHRISTOPHER S. KOPER, AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN (2004)

Pursuant to this Court's August 8, 2018 Order, Doc. 54, Plaintiffs respectfully submit these proposed findings of fact and conclusions of law in support of their Motion for a Preliminary Injunction, Docs. 7, 14.

## PROPOSED FINDINGS OF FACT

### I.      Background

1.      The Association of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC) is a not-for-profit membership corporation, incorporated in New Jersey, which represents the interests of law-abiding firearm owners. PX6, Bach Decl. ¶¶ 2–3.

2.      ANJRPC has many members who own or desire to purchase standard-capacity magazines (i.e., magazines capable of holding more than 10 rounds of ammunition) for lawful purposes and that are subject to Act A2761's ban. They would purchase additional standard-capacity magazines (SCMs) but refrain from doing so because of Act A2761. PX6, Bach Decl. ¶¶ 3–8.

3.      Plaintiffs Blake Ellman and Alexander Dembowski are members of ANJRPC. PX18, Ellman Decl. ¶ 5; PX10, Dembowski Decl. ¶ 7.

4.      Mr. Ellman and Mr. Dembowski are both law-abiding citizens of New Jersey who do not qualify for any of the exceptions to the magazine ban. PX18, Ellman Decl. ¶¶ 2–3, 10; PX10, Dembowski Decl. ¶¶ 2–3, 12.

5.      Mr. Ellman is a firearms instructor, range safety officer, armorer, and competitive shooter. PX18, Ellman Decl. ¶ 4.

1

6.      Mr. Dembowski served in the Marine Corps for 4 years. He spent a year as a Combat Marksmanship Instructor, which required an additional month of firearms training. He used 30-round magazines with his M-16 rifle and 15-round magazines with his Beretta 92 FS pistol. Now, Mr. Dembowski serves as Chief Range Safety Officer for a range in New Jersey, where he has routinely trained customers using 15-round magazines. PX10, Dembowski Decl. ¶¶ 4–6.

7.      Both Mr. Ellman and Mr. Dembowski own and desire to purchase standard-capacity magazines capable of holding as many as 15 rounds of ammunition. PX18, Ellman Decl. ¶¶ 6, 9; PX10, Dembowski Decl. ¶¶ 8, 11.

8.      Mr. Ellman and Mr. Dembowski use these magazines for lawful purposes like home defense. PX18, Ellman Decl. ¶ 7; PX10, Dembowski Decl. ¶ 9.

9.      Because of Act A2761, Mr. Ellman and Mr. Dembowski will refrain from purchasing additional SCMs and, absent preliminary injunctive relief, will be forced to transfer, render inoperable, permanently modify, or surrender to the police the standard-capacity magazines they currently own at the end of the 180-day grace period. PX18, Ellman Decl. ¶¶ 8–9; PX10, Dembowski Decl. ¶¶ 10–11.

## II.      Standard-Capacity Magazines Are in Common Use in the United States.

### A.      Common Use

10.     Based on 1994 and 2009 data, there are at least 43,400,000 civilian-owned standard-capacity magazines in the United States. As of 1994, approximately

2

14% of all civilian-owned firearms in the United States used standard-capacity magazines as their primary magazine. Tr. 372:14–16 (Kleck); PX8, PHILIP J. COOK AND JENS LUDWIG, GUNS IN AMERICA 17 (1996). In 2009, there were an estimated 310 million civilian-owned firearms in the United States. PX30, Edward W. Hill, *How Many Guns are in the United States: Americans Own between 262 Million and 310 Million Firearms*, URBAN PUBLICATIONS 3–4 (2013). However, it is very likely that the number of civilian-owned SCMs in the United States is significantly higher than 43 million because of three assumptions built in to this estimate.[1]

    a.    This estimate assumes that the percentage of firearms using SCMs has remained constant since 1994, but, as Professor Kleck testified, "a bigger share of the guns now are the type that . . . could use large capacity magazines." Tr. 354:4–6; *see also* PX30, Hill, at 3.

    b.    This estimate also assumes that the number of firearms has not increased since 2009, but "the number of guns owned by Americans increased at an average rate of 4.1 percent a year from 1994 to 2009." PX30, Hill, at 4.

    c.    Finally, this estimate assumes that gun owners only own one SCM for each firearm that primarily uses an SCM, but gun owners often own multiple magazines. PX8, COOK AND LUDWIG, at 17.

---

[1] Professor Kleck has recently estimated that the minimum number of SCMs is 58.9 million. Gary Kleck, *How Many Large Capacity Magazines (LCMs) Are Possessed By Americans?*, SSRN (2018), https://goo.gl/XFYkpc.

11.     A 2004 study found that there were 25 million SCMs available in 1995, and "nearly 4.8 million [SCMs] were imported for commercial sale (as opposed to law enforcement uses) from 1994 through 2000." JX14, CHRISTOPHER S. KOPER, AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN 65 (2004). An additional 42 million SCMs had been approved for importation between 1994 and 2000. *Id.* Thus, even assuming that the SCM stock in the U.S. remained at roughly the same level after the year 2000, the number of SCMs in the United States is in the tens of millions. Tr. 76:2–7 (Stanton) (magazines can last for decades).

12.     SCMs have been "easily available" and are more prevalent today than they were in 1994. Tr. 183:20–23; 152:1–6 (Donohue).

13.     There are at least hundreds of thousands of SCMs in New Jersey. PX6, Bach Decl. ¶ 13.

14.     SCMs are standard-issue on popular handguns and rifles:

a.     The most popular and commonly owned semiautomatic handguns come standard with SCMs. PX48, GUN DIGEST 2018 386–88 (Jerry Lee and Chris Berens, ed. 2017) (Glocks); *id.* at 374 (Beretta); *id.* at 375 (Bersa); *id.* at 418 (Dan Wesson); *id.* at 386 (Fabrique Nationale); *id.* at 408 (Smith & Wesson); *id.* at 402 (Ruger); *id.* at 380–81, 417–18 (CZ); *id.* at 384 (European American Armory); *id.* at 408 (Sig Sauer); *id.* at 414 (Taurus). Glock pistols, which are "hugely popular for . . . home and personal defense," typically come standard with SCMs.

4

PX5, Massad Ayoob, The Complete Book of Handguns 90, 87 (2013); *see also* DX39, Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, The Trace 3–4 (Mar. 28, 2017).

      b.    About two-thirds of the distinct models of semiautomatic centerfire rifles listed in the 2018 *Gun Digest* are normally sold with standard magazines that hold more than 10 rounds of ammunition. PX48, Gun Digest 2018, at 441–49, 497–99. 83% of modern sport rifles owners use SCMs as their standard magazine. PX58, NSSF, Modern Sporting Rifle Comprehensive Consumer Report 2013 28 (2013). And the AR-15, which accounts for 60% of all civilian rifle sales and about 25% of all firearm sales, comes standard with a magazine exceeding 10 rounds. PX27, Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant 2 (Mar. 9, 2013); JX12, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015).

      15.    Magazines capable of carrying more than 10 rounds are legal under the laws of 42 States. JX8, Giffords Law Center, Summary of State Law (2018) (entries for New Jersey and Vermont not yet updated); Tr. 180:24–181:1 (Donohue).

      16.    Defendants have offered no evidence as to the number or availability of SCMs in the United States or in New Jersey.

    **B.**    **The Alleged Concentration of SCMs**

      17.    Professor Donohue asserted that SCM ownership is increasingly

5

concentrated among a small percentage of Americans. DX23 ¶¶ 13–22. This is false.

      a.     Gallup data shows that the percentage of individuals who have a gun in their home has remained relatively stable since the late 1990s and currently stands at 42%. PX83, GALLUP, GUNS 1, 11–12 (2018); Tr. 158:10–16 (Donohue); PX50, ALAN I. LESHNER, ET AL., PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 15 (2013).

      b.     The Pew Research Center likewise found that 42% of households own a gun. PX63, KIM PARKER, ET AL., AMERICA'S COMPLEX RELATIONSHIP WITH GUNS, PEW RESEARCH CENTER 18 (2017); Tr. 161:24–162:4 (Donohue).

      c.     The General Social Survey (GSS), on which Professor Donohue relies, is less likely to elicit honest responses to the gun-ownership question than Gallup or Pew because, unlike those two polls, the GSS is a live, in-person interview, and gun ownership is a controversial subject that those being interviewed may be uncomfortable disclosing. Tr. 157:6–9 (Donohue); JX11, Gary Kleck and Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, J. OF CRIM. L. & CRIMINOLOGY 150, 154–55 (1995).

      d.     Gun ownership data tends to be *underreported* by survey respondents for various reasons, so ownership is likely more widespread than even Gallup and Pew suggest. PX40, GARY KLECK, TARGETING GUNS 66–68 (1997).

      e.     A source upon which Professor Donohue relies for his opinion

that gun ownership is concentrated finds that the median gun owner reported owning approximately two guns. DX8, Deborah Azrael et al., *The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey*, 3 RUSSELL SAGE FOUNDATION J. OF THE SOCIAL SCIENCES 38, 43 (2017).

      f.      Professor Donohue conceded that he is "not aware of any current social science research providing an estimate for the number of American households that own" SCMs. DX23 ¶ 21.

### C.    Possessed for Lawful Purposes

18.    The volume of SCMs proves that they are typically possessed for lawful purposes. It is implausible to say that there are tens of millions of SCMs in the U.S. possessed for *unlawful* purposes. *Friedman v. City of Highland Park*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting); JX12, Kopel, at 871.

19.    Self-defense and recreational shooting or hunting are the most common reasons given by survey respondents for having a firearm, which also proves that SCMs are typically possessed and used for lawful purposes. Tr. 163:22–165:17 (Donohue); DX8, Azrael et al., at 44; PX8, COOK AND LUDWIG, at 36–38; PX63, PARKER, at 20; PX58, NSSF, at 28, 34; PX40, KLECK, 74–75, 85–86; PX39, GARY KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA 25–26, 41–45 (1991).

### III.    There Is No Historical Tradition of Limiting Magazine Capacity.

20.    Firearms capable of firing more than 10 rounds have existed since 1580,

and magazines capable of holding more than 10 rounds are older than the Second Amendment. JX12, Kopel, at 852–53.

21.     Firearms that came standard with magazines capable of holding more than 10 rounds were in common use by the time the Fourteenth Amendment was ratified. JX12, Kopel, at 869.

22.     The first laws limiting magazine capacity were enacted by Rhode Island and Michigan in 1927. Both were repealed by the 1970s. Neither prohibited mere possession of SCMs or limited magazines to 10 rounds. JX12, Kopel, at 864–65.

23.     California and Virginia likewise enacted magazine limitations during the Prohibition Era, though California allowed possession with a permit and Virginia only prohibited possession for offensive or aggressive purposes. Both sets of laws were repealed by the 1970s. PX33, NICHOLAS J. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 529 (2018).

24.     In 1933, Ohio began requiring a special permit for the possession or sale of a semiautomatic firearm with an ammunition capacity of greater than eighteen rounds, but this law was not interpreted as a ban on the sale of any particular magazine or gun. Ohio's law was repealed in 2014. JX12, Kopel, at 865.

25.     Illinois, Louisiana, South Carolina, South Dakota, and Texas enacted laws prohibiting certain types of *automatic* firearms, but these were not broadly applicable laws restricting the magazine capacity of semiautomatic firearms.

8

Everytown Br. 6 n.11.

26.     New Jersey did not enact a law limiting magazine capacity until 1990. JX12, Kopel, at 867.

27.     The only magazine ban originating in the Prohibition Era that remains in place in some form today is the District of Columbia's. JX12, Kopel, at 866.

## IV.   New Jersey's Magazine Ban Will Not Reduce Crime.

28.     Defendants have offered no evidence demonstrating that a 10-round magazine limit will be more effective at reducing crime than a 15-round magazine limit. No such evidence exists. Tr. 377:3–6 (Kleck); Donohue Dep. Tr. 23:15–18.

29.     <u>The Federal Ban</u>: Between 1994 and 2004, the United States generally banned magazines capable of holding more than 10 rounds of ammunition (though exempting SCMs purchased before the ban's effective date). JX14, KOPER, at 6. The final, government-commissioned study on the effect of the federal SCM ban concluded: "[W]e cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence . . . ." *Id.* at 96; *see also id.* at 92 ("the percentage of gun crimes resulting in death" went up while the ban was in place). While noting that the grandfathering provision might have inhibited the ban's effectiveness in the short term, the study pointed out that, even with more time, "the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable

measurement." *Id.* at 97. These findings were consistent with those of earlier studies, DX66, Christopher S. Koper and Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapons Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 J. OF QUANTITATIVE CRIMINOLOGY 33, 69 (2001); JX13, JEFFREY A. ROTH AND CHRISTOPHER S. KOPER, IMPACT EVALUATION OF THE PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT OF 1994 6 (1997), and of recent scholarship, PX56, Carlisle E. Moody, *Large capacity magazines and homicide*, COLLEGE OF WILLIAM AND MARY WORKING PAPER 7 (2015); PX45, Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, 1994–2004, *in* REDUCING GUN VIOLENCE IN AMERICA 157, 158, 165–66 (Daniel W. Webster and Jon S. Vernick, ed. 2013).

30.   <u>Defendants' Expert</u>: Professor Donohue agreed with the 2004 government-commissioned report that "we cannot clearly credit the [federal SCM] ban with any of the nation's recent drop in gun violence." Tr. 171:16–172:1. He also agreed that "magazine capacity limits have a small impact on overall violent crime rates." Tr. 169:19–170:25. Thus, when studying the effect of right-to-carry laws, he "did not control for" magazine limits despite attempting to "control for factors that could explain any change in violent crime." Tr. 170:7–171:2.

31.   <u>The Australian Experience</u>: Australia's nationwide ban on semi-automatic rifles and shotguns has had no effect on firearm-related homicides. PX36,

Gary Kleck, *Did Australia's Ban on Semiauto Firearms Really Reduce Violence?*, SSRN, 1, 5–6 (2018); PX54, Samara McPhedran, *A systematic review of quantitative evidence about the impacts of Australian legislative reform on firearm homicide*, 28 AGGRESSION AND VIOLENT BEHAV. 64, 70–71 (2016); PX49, Wang-Sheng Lee and Sandy Suardi, *The Australian Firearms Buybacks and Its Effect on Gun Deaths*, 28 CONTEMP. ECON. POL. 65, 76 (2009).

32.   <u>State-Level Bans</u>: A state-level ban on SCMs is even less likely to reduce firearm-related crime than a nationwide ban.

a.    *Failure of Past Bans*: The 2004 government-commissioned study of the federal ban observed that "studies suggest that state-level [assault weapon] bans have not reduced crime." JX14, KOPER, at 81 n.95. Other reviews of the literature have come to similar conclusions. PX78, CHARLES F. WELLFORD, ET AL., FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97–101 (2005); PX28, Robert A. Hahn, et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, AM. J. PREVENTATIVE MED. 40, 47–49 (2005); JX40, KLECK, at 360–67.

b.    *Circumvention of State Bans*: State-level bans are ineffective at reducing the use of SCMs by criminals because they are easily circumvented. *See* JX14, KOPER, at 81 n.95. Maryland's SCM ban "has done little to stamp out the use of big magazines by criminals" and has been "hobbled by inflows of weapons from other states, few of which limit magazine size." DX39, Freskos, at 1, 5. SCMs

11

remain legal in 42 states, including Delaware and Pennsylvania. JX8, GIFFORDS LAW CENTER, at 2. As Defendants' expert, Detective Glenn Stanton, acknowledged, "there are lots of stores in Pennsylvania that sell magazines," and "anyone in New Jersey can drive across state lines to purchase one of these magazines." Tr. 82:6–13. Detective Stanton also testified that "a very small percentage of armed criminals possess their arms lawfully," Tr. 82:20–22, which is consistent with studies showing that criminals acquire firearms through informal and often-illegal means, PX81, JAMES D. WRIGHT AND PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 207 (2d ed. 2008); PX78, WELLFORD, at 73–89, 99–101. Criminals (especially mass murders, *see infra* PFOF 40) are also, by definition, less likely than law-abiding citizens to obey a law banning SCMs. JX9, Kleck Decl. ¶ 19. Therefore, as Detective Stanton testified, "somebody who is about to . . . break the law" is "[p]robably not" "going to limit himself or herself to firearms or magazines that are legal under state law." Tr. 81:13–19; PX29, Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms*," 49 L. AND CONTEMP. PROBS. 151, 154 (1986). In 2005, the National Research Council (NRC) accordingly concluded that arguments for laws, like New Jersey's, that attempt to make it more difficult for criminals to obtain firearms "are now largely based on speculation, not on evidence from research." PX78, WELLFORD, at 8. The NRC in 2013 similarly concluded that restrictions on particular types of firearms remain controversial and require

12

additional research. PX50, Leshner, et al., at 48; *see also* PX28, Hahn, at 49.

33.   <u>Criminal Use of Less Than 10 Rounds</u>: Even assuming—contrary to all the foregoing evidence—that a state-level ban on SCMs would actually be effective at preventing criminals from using SCMs, there would be no effect on firearm-related crime because "studies on shots fired show that assailants fire less than four shots on average." JX14, Koper, at 90; *see also id.* at 19, 91; PX40, Kleck, at 123–24. As summarized by Professor Kleck, a study from Jersey City, New Jersey found that "of all violent crimes in which handguns *were* fired, only 2.5–3.0% involved more than 10 rounds being fired by the offender," with the average number of rounds fired by semi-automatic firearms being 3.23–3.68. JX9, Kleck Decl. ¶ 20; PX68, D.C. Reedy and C.S. Koper, *Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers*, Injury Prevention 151, 152, 154 (2003). The average number of rounds fired in Philadelphia gun homicides was 2.7 for attacks committed with semiautomatic pistols and 2.1 for those committed with revolvers. JX9, Kleck Decl. ¶ 20; PX53, Michael D. McGonigal, et al., *Urban Firearm Deaths: A Five-Year Perspective*, 35 J. of Trauma 532, 534 (1993).

34.   <u>Criminal Use of Multiple Firearms or Magazines</u>: Even assuming that the SCM ban would prevent criminals from accessing SCMs, and even assuming a very rare occasion when a criminal would want to fire more than 10 rounds, a

criminal could simply come prepared with multiple firearms or multiple 10-round magazines. As Detective Stanton testified, "one comparative advantage criminals enjoy over their victims and law enforcement is that they are better able to anticipate a confrontation" because "they're initiating the aggression," Tr. 80:15–18, which means criminals can prepare for their attack by acquiring their preferred weaponry in advance, Tr. 355:17–356:21 (Kleck); JX9, Kleck Decl. ¶¶ 16–17; PX44, DAVID B. KOPEL WHAT SHOULD AMERICA DO ABOUT GUN VIOLENCE 17 (2013). This is the uniform practice among mass shooters. *See infra* PFOF 41.

35.     <u>SCMs and Police Shootings</u>: SCMs are rarely used to kill law enforcement officers. PX37, Kleck Supp. Decl. ¶¶ 62–65.

## V.     New Jersey's Magazine Ban Will Not Reduce Mass Shootings.

36.     Defendants have offered no evidence demonstrating that a 10-round magazine limit will be more effective at reducing the frequency or lethality of mass shootings than a 15-round magazine limit. No such evidence exists. Tr. 377:3–6 (Kleck); Donohue Dep. Tr. 23:15–18. At the time it enacted the new ban, New Jersey had not had a public mass shooting since it adopted its 15-round limit in 1990. Tr. 173:3–5 (Donohue). Furthermore, the National Research Council has found that there is no conclusive information about which policies or enforcement and prevention strategies might be effective regarding interventions for public mass shootings. PX50, LESHNER, ET AL., at 47.

37.     "Mass shootings represent a small share of total U.S. firearm homicides. Less than one percent of gun murder victims recorded by the FBI in 2012 were killed in incidents with four or more victims." DX27, EVERYTOWN FOR GUN SAFETY, ANALYSIS OF RECENT MASS SHOOTINGS 2 (2015); *see also* PX65, GUN HOMICIDE RATE DOWN 49% SINCE 1993 PEAK; PUBLIC UNAWARE, PEW RESEARCH CENTER 4 (2013) ("According to a Bureau of Justice Statistics review, homicides that claimed at least three lives accounted for less than 1% of all homicide deaths from 1980 to 2008."); PX50, LESHNER, ET AL., at 31; JX14, KOPER, at 16.

38.     The Federal Ban and the Number of Mass Shootings: The federal ban on SCMs had no effect on the number of mass shootings in the United States, which has remained relatively constant for decades.

a.     *Number and Lethality of Mass Shootings in General*: As Professor James Alan Fox, whom Defendants' expert Professor Donohue called a "respected" researcher, Tr. 188:11–21, has concluded: "Despite the good intentions behind the [federal SCM] ban, its impact on mass killings was negligible . . . . [T]he frequency of incidents was virtually unchanged during the decade when the ban was in effect." PX84, James Alan Fox and Emma E. Fridel, *The Tenuous Connections Involving Mass Shootings, Mental Illness, and Gun Laws*, 3 VIOLENCE AND GENDER 14, 16–17 & Fig. 2 (2016); *see also* PX45, Koper, at 166. Indeed, as Professor Fox has stated in his peer-reviewed scholarship, the idea that mass shootings are on the

rise is a "myth": "Mass shootings have not increased in number or in overall death toll, at least not over the past several decades." PX23, James Alan Fox and Monica J. DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUDIES 125, 128 (2014); *see also id.* at 129 Fig. 1, 136–37.; PX25, James Alan Fox and Jack Levin, *Mass Confusion Concerning Mass Murder*, 40 THE CRIMINOLOGIST 8, 9–10 (2015). Professor Kleck has likewise testified that the number of mass shootings has not increased in decades. Tr. 376:21–377:2.

b.    *Number and Lethality of School Shootings*: School shootings have decreased in both number and lethality since the 1990s. PX24, James Alan Fox and Emma E. Fridel, *The Menace of School Shootings in America: Panic and Overresponse*, in THE WILEY HANDBOOK ON VIOLENCE IN EDUCATION 15, 18–19 (Harvey Shapiro, ed. 2018). "[S]chools are not only safe relative to other settings in which children typically spend their time, but are growing safer," and "the rate of victimization [in schools] is remarkably low." *Id.*; *see generally* PX38, Gary Kleck, *Mass Shootings in Schools: The Worst Possible Case for Gun Control*, 52 AM. BEHAVIORAL SCIENTIST 1447 (2009).

c.    *Professor Donohue's Assertions*: Professor Donohue states that "[t]he problem of mass shootings in the U.S. is getting worse" and claims that the federal SCM ban decreased mass shootings. DX23, Donohue Decl. ¶¶ 23–26, 38. His claims do not withstand scrutiny.

i.      Professor Donohue cites a report by the Congressional Research Service (CRS). DX23, Donohue Decl. ¶ 23 n.9. As Professor Donohue conceded during cross-examination (but did not disclose in his declaration), that report shows an increase in the average number of mass shootings per year from 2.7 in the 1980s to 4.0 in the 1990s, with an increase of only 0.5 between the 1990s and the period from 2010–2013. Tr. 197:4–198:20; DX70, William J. Krouse and Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, CONGRESSIONAL RESEARCH SERVICE 14–15 (2015). That is broadly consistent with Professor Kleck's testimony that the number of mass shootings went up in the 1980s but has remained relatively stable since then. Tr. 376:21–377:2. And Professor Donohue agreed that an "apples to apples" comparison would "compare the rate per capita," Tr. 198:21–25, which the CRS study did not do, DX70, Krouse, at 14–15. When the CRS figures are considered on a per capita basis, they indicate that the average number of mass shootings has declined since the 1990s. Tr. 199:1–11.[2]

---

[2] Plaintiffs renew their request that the exhibit used in the cited portion of Professor Donohue's cross-examination be admitted into evidence. That exhibit relied on two sources: DX90 (already in evidence) and U.S. Census Bureau data that is clearly reliable and subject to judicial notice, *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996), especially in a preliminary injunction posture in which legislative facts are at issue. The exhibit divided the average number of mass shooting incidents per year for each decade (calculated in DX90) by the average U.S. population for each decade (1990–1999, 2000–2009, and 2010–2013), and then multiplied by 100 million to get average annual rates of mass shootings per 100 million people. These rates were 1.512 for 1990–1999, 1.392 for 2000–2009, and 1.438 for 2010–2013.

ii.     Professor Donohue relies on the work of Louis Klarevas for his assertion that the federal ban reduced mass shootings. Tr. 191:22–25; DX23, Donohue Decl. ¶ 38. The data on which Professor Donohue relies "is based on an analysis of incidents where six or more people were killed," Tr. 192:20–22, yet Klarevas himself defines a mass shooting to be an incident in which at least four people were shot (fatally or not), Tr. 193:3–9; DX63, LOUIS KLAREVAS, RAMPAGE NATION: SECURING AMERICA FROM MASS SHOOTINGS 46 (2016), which is a broader category of shootings. Thus, under Klarevas's own definition, his work (as relied upon by Professor Donohue) does not purport to show a trend in mass shootings, and it does not do so because he had inadequate funding to analyze the data under his definition of a mass shooting. Tr. 193:10–194:4 (Donohue).

iii.     Professor Donohue cites an article from *Mother Jones*. As discussed below, *see infra* PFOF 46, that source is not credible. In any event, *Mother Jones* objects to Professor Fox's conclusion that mass shootings are not increasing, PFOF 38(a), based on its view that public mass shootings should be treated differently than mass shootings that occur in the home. JX6, Mark Follman, *Yes, Mass Shootings Are Occurring More Often*, MOTHER JONES at 4–5 (Oct. 21, 2014). But even when public mass shootings are viewed in isolation, they have not increased since the year 2000. PX84, Fox and Fridel, at 14–15 & Fig. 1.

d.     *The FBI Active Shooter Reports*: Defendants also cite reports

18

from the FBI purporting to show an increase in "active shooter" incidents over time. DX36; DX115–17. As those reports acknowledge, they are "not [studies] of mass killings or mass shootings." Tr. 231:14–24 (Donohue). Indeed, "the majority of the 160 active shooter events described in the [2014] FBI report were not mass shootings," and "[t]he interchangeable use of the terms 'active shooting' and 'mass shooting' by news coverage has created a good deal of public anxiety and confusion." PX25, Fox and Levin, at 9. Even on its own terms, "evidence suggesting an increase in active shooters is suspect, at best." *Id.*

39. <u>The Australian Experience</u>: Australia's nationwide ban on semi-automatic rifles and shotguns has had no effect on mass shootings. PX36, Kleck, at 13–21; PX55, Samara McPhedran and Jeanine Baker, *Mass shootings in Australia and New Zealand: A descriptive study of incidence*, 8 JUSTICE AND POL. J. 1, 14–18 (2011). Professor Donohue's declaration cites no scholarship to the contrary, and his testimony is inconsistent as to how many mass shootings have occurred in Australia. *Compare* DX23, Donohue Decl. ¶ 51 (13 mass shootings between 1979–1996) *with* Tr. 208:23–209:1 (7 mass shootings).

40. <u>Mass Shooters and Circumvention</u>: The evidence described in PFOF 32(b) shows that mass shooters can and will circumvent New Jersey's SCM ban and acquire SCMs in neighboring states. Indeed, the evidence is overwhelming that mass shooters, in particular, will not be deterred by an SCM ban. As Professor Donohue

conceded, mass shooters have to violate multiple New Jersey laws in order to carry out their crimes, including committing murder on a mass scale. Tr. 182:3–193:6. Mass shooters are "very powerfully motivated" criminals who often expect to die in the process of committing their crimes, and they "plan at length and make great efforts and go to expense and extra effort to acquire more guns, more weapons and so on." Tr. 370:7, 20–22 (Kleck); *see also* Tr. 363:8–13 (Kleck); PX84, Fox and Fridel, at 15 (describing "detailed planning involved in large-scale mass shootings"); PX38, Kleck, at 1451 (Columbine murderers planned their attack for over a year). Professor Donohue testified that mass shooters "will use whatever they have available" to commit their crimes, Tr. 184:14–20, and given the ample availability of SCMs in neighboring states, mass shooters will continue to use SCMs to the extent they desire to do so, *see* Tr. 370:23–371:3 (Kleck); JX9, Kleck Decl. ¶ 22. Indeed, in an attempted mass shooting in Trenton in June 2018 the shooter used a 30-round magazine. *See* Melanie Burney, *Second Man Charged in Trenton Art Festival Shooting*, PHILADELPHIA ENQUIRER (June 19, 2018), https://goo.gl/2Z988e.

41.  <u>Mass Shooters' Use of Multiple Firearms or Magazines</u>: Based on the same evidence described in PFOF 34, even if New Jersey's SCM ban actually prevented mass shooters from acquiring SCMs (which it would not), mass shooters would simply use multiple firearms or multiple magazines in their attacks. Moreover, in *every mass shooting* involving an SCM between 1994 and 2013, the

20

murderer used multiple firearms and/or multiple magazines, JX9, Kleck Decl. ¶¶ 22–25; JX10, Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 JUSTICE RESEARCH AND POL. 28, 31–32, 40–42 (2016); PX40, KLECK, at 125; PX84, Fox and Fridel, at 17, including 10-round magazines, JX3, MASS SHOOTING INCIDENTS IN AMERICA (1984–2012), CITIZENS CRIME COMMISSION 6, 8 (2017) (Columbine and Virginia Tech).

42.     The Lethality of Mass Shootings Involving More Magazine Changes: Even if Act A2761 prevented mass shooters from acquiring SCMs (which it would not), and even if mass shooters had to change magazines more often during their attacks, this would not slow their rate of fire or lead to more bystander interventions to stop ongoing attacks. The lethality of mass shootings would remain the same.

a.     As Professor Kleck testified, based on his peer-reviewed study, it takes only 2–4 seconds for a person to change a magazine. Tr. 360:23–366:24; JX9, Kleck Decl. ¶ 22; PX37, Kleck Supp. Decl. ¶ 39; JX10, Kleck, at 30; *see also* PX44, KOPEL, at 16 (magazine change takes "a second or two"); DX107, Eugene Volokh, *Are laws limiting magazine capacity to 10 rounds constitutional*, VOLOKH CONSPIRACY 1 (Mar. 6, 2014). Although Defendants' firearms expert, Detective Stanton, testified that a person with "little to no experience" and who had "very little use of the weapon" could take 8–10 seconds to change a magazine, Tr. 74:11–18, he agreed that a person with "training and practical use" "could change a magazine

21

from lock-back position in two to four seconds," Tr. 74:19–22, and Professor Kleck testified that "what a person with training and practical use could accomplish is precisely what's relevant to [a mass] shooting. More broadly that's characteristic of most mass shooters," who are "precisely the sort of [people] who would practice magazine changes, marksmanship and everything else related to skill with firearms" given their highly motivated and deliberate approach to their attacks. Tr. 363:2–24.

b.     Defendants note that Professor Kleck's estimate of 2–4 seconds applies only to box-type magazines, but of the mass shootings that involved an SCM between 1994 and 2013, every single one involved box-type magazines. Tr. 365:13–366:24 (Kleck). Non-box-type magazines were used only twice (both being drum-type magazines), and it is unclear that they played any role in the killings. *Id.* Drum-type magazines "are very prone to malfunction," PX44, KOPEL, at 18, which might explain why mass shooters almost never use them. The evidence therefore supports Professor Kleck's estimate that mass shooters can change magazines in 2–4 seconds.

c.     As Professor Kleck testified, based on his peer-reviewed study, mass shooters "[a]lmost always" take more than four seconds between shots. Tr. 366:25–367:2; JX9, Kleck Decl. ¶¶ 30–31; JX10, Kleck, at 42–44.

d.     Professor Donohue claimed that Professor Kleck's rate-of-fire analysis used a flawed method of measuring the amount of time the Virginia Tech shooter took to complete his attack, Tr. 222:4–15, but as Professor Kleck explained,

even using Professor Donohue's preferred method of measuring time, the result of Professor Kleck's study would remain the same, Tr. 367:2–25.

      e.    Defendants have offered no affirmative evidence that it usually takes longer than 2–4 seconds for a mass shooter to change a magazine or that mass shooters maintain a faster rate of fire than that found by Professor Kleck's study.

      f.    Because it will only take mass shooters 2–4 seconds to change a magazine, and because mass shooters almost always take longer than 4 seconds between shots, forcing mass shooters to change magazines more often will not disrupt their rate of fire and, therefore, will not provide more opportunities for escape or intervention than would otherwise exist absent an SCM ban.

43.  <u>Bystander Intervention</u>: The evidence shows that bystander intervention to stop a mass shooting during a magazine change is extremely rare.

      a.    Between 1994 and 2013, for all mass shootings known to involve an SCM (and mass shootings involving SCMs are very rare, *see infra* PFOF 44), there was not a single confirmed case of a bystander intervening while the murderer was changing magazines. Tr. 368:1–369:15 (Kleck); JX9, Kleck Decl. ¶¶ 26–28; PX37, Kleck Supp. Decl. ¶¶ 30–34; JX10, Kleck, at 39–40. Similarly, between 1984 and 1993, there was only one confirmed intervention by a bystander while the mass shooter was reloading. JX9, Kleck Decl. ¶ 29; PX37, Kleck Supp. Decl. ¶¶ 30–34; PX40, KLECK, 124–26. Thus, over the course of almost 30 years, there was only one

confirmed intervention during a mass shooting involving an SCM in which the bystander stopped an attack during a magazine change.

b. Defendants have offered no evidence that contradicts Professor Kleck's analysis. In the only instance of intervention offered by Defendants at the hearing—the 2018 Waffle House shooting in Tennessee—it is unclear whether the shooter was reloading or the firearm jammed. Tr. 379:19–381:13; PX85, Herman Wong, *James Shaw Jr. on why he rushed the Waffle House shooter: 'He was going to have to work to kill me*," WASH. POST. 1 (Apr. 22) (shooter "was either reloading the gun or the firearm had jammed"); *see also* PX86–87 (same).

c. Indeed, one of Defendants' exhibits *confirms* Professor Kleck's analysis. DX72, Frederick Lemieux, *Effect of Gun Culture and Firearm Laws on Gun Violence and Mass Shootings in the United States: A Multi-Level Quantitative Analysis*, 9 INT'L J. OF CRIM. JUSTICE SCIENCES 74, 91 (2014) (of 73 mass shootings between 1983 and 2013, "[o]nly one case involved an unarmed bystander who intervened and tackled a shooter while he was reloading his weapons").

44. <u>The Alleged Association Between SCMs and Mass Shootings</u>: Lucy Allen asserts that most mass shootings involve SCMs. DX3, Allen Decl. ¶ 22. But using Klarevas's definition of a mass shooting (4 or more victims shot, fatally or non-fatally), less than 1% of the attacks from 2014–2016 involved an SCM. PX37, Kleck Supp. Decl. ¶¶ 26–29; DX63, KLAREVAS, 46. Using Professor Kleck's

definition of a mass shooting, only 6% of mass shootings involve SCMs. Tr. 347:14–23; JX10, Kleck, at 38. Even Everytown for Gun Safety, an amicus supporting Defendants, estimates that only about 11% of mass shootings involve SCMs. DX27, EVERYTOWN, at 4. As Allen conceded, even if most mass shootings involved SCMs, that would not prove that SCMs *cause* mass shootings. Tr. 60:16–20. Similarly, Allen conceded that the alleged association between SCMs and the number of fatalities and injuries in mass shootings does not prove that the use of SCMs *caused* more fatalities and injuries, and she conceded that her testimony does not address Professor Kleck's analysis showing that SCMs do *not* affect the number of people killed or injured in a mass shooting. Tr. 60:21–63:5. Such associations would be explained if mass shooters wanted to maximize casualties and used SCMs because they *believed* that SCMs enabled them to harm more people, even though SCMs are not necessary to enable them to do so. Tr. 374:9–375:4 (Kleck); PX37, Kleck Supp. Decl. ¶¶ 35–36; JX10, Kleck, at 31–32; JX13, ROTH AND KOPER, at A-1.

45.    The Alleged Association Between SCM Bans and Fewer Mass Shootings: Defendants also rely on an alleged association between state-level SCM bans and fewer mass shootings. The study asserting that this association exists has never been published; the study makes a claim that is a logical impossibility; and the study's author has a well-documented history of methodological errors. Tr. 352:17–353:18 (Kleck). In any event, even if such an association existed, it would not prove

that SCM bans prevent mass shootings. Such an association would be explained by the fact that the citizens of some states have a stronger aversion to violence than the citizens of other states, and that aversion will likely lead those citizens to both commit fewer mass shootings *and* support SCM bans. Tr. 372:17–374:5 (Kleck). Furthermore, the study reportedly included New Jersey among the states with a magazine ban due to its prior 15-round limit, and therefore it provides no support for New Jersey lowering that limit to 10 rounds. *See* DX89, Sam Petulla, *Here is 1 correlation between state gun laws and mass shootings*, CNN (Oct. 5, 2017).

46.    Allen's Analysis of Mass Shootings Should Be Rejected as Not Credible: The *Mother Jones* database covers 91 out of the 96 mass shooting incidents that Allen analyzes. DX3, Allen Decl. ¶¶ 21–22. That database is not credible, and Allen's mass shooting analysis, *see id.* ¶¶ 20–25, should be rejected.

a.    Professor Grant Duwe has stated that the *Mother Jones* database misses more than 40% of the mass shootings "that meet its definitional requirements." Tr. 55:18–24 (Allen). Allen offered no basis for disputing that statement, and none is in evidence. Tr. 55:25–56:16. Allen admitted that, if the statement were true, the database would not be reliable. Tr. 56:21–57:2.

b.    Allen admitted that the *Mother Jones* database "is inconsistent in regard to how many fatalities are required for an incident to qualify as a mass shooting" "depending on which year you're looking at." Tr. 50:9–18.

26

c.     *Mother Jones* requires that an incident involve a lone shooter, Tr.
45:14–25, yet it makes three exceptions for incidents involving more than one
shooter, 52:15–21. Allen repeatedly testified that *Mother Jones*'s lone-shooter
criterion is "confusing" and "doesn't make sense." Tr. 44:9–10, 44:21, 44:24–45:2,
46:2–4, 46:18–19, 47:1–4, 48:25–49:1, 54:9–11; *see also* DX63, KLAREVAS, at 44.

d.     *Mother Jones* requires that a mass shooting take place in a single
"incident," yet makes an exception (without explanation) for several "spree" killings
involving multiple locations spread out over several hours. JX7, Mark Follman, et
al., *A Guide to Mass Shootings in America*, MOTHER JONES 5 (Oct. 2, 2017); JX5,
Mark Follman, *What Exactly Is a Mass Shooting?*, MOTHER JONES 2 (Aug. 24,
2012); DX63, KLAREVAS, at 43–44; *see, e.g.*, PX73.

e.     Klarevas, upon whom Professor Donohue relies, has said that
*Mother Jones* "capriciously appl[ies] the criteria of [its] own established definitions"
and "bend[s] its own rules." DX63, KLAREVAS, at 43–44. Its criteria are indeed "hard
to defend" and are not applied consistently. PX23, Fox and DeLateur, at 128–29; *see
also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1121–22 (S.D. Cal. 2017).

## VI.   New Jersey's Magazine Ban Inhibits Lawful Self-Defense.

47.     There are approximately 2.5 million defensive gun uses (DGUs) each
year. PX42, GARY KLECK AND DON B. KATES, JR., ARMED: NEW PERSPECTIVES ON
GUN CONTROL 221–25 (2001); JX11, Kleck and Gertz, at 164. This estimate is based

on a survey "conducted according to current standards" and "reproduced in several subsequent surveys." DX18, Philip J. Cook, et al., *The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?*, 16 J. OF POL. ANALYSIS AND MGMT. 463, 464 (1997). It is consistent with the results of at least nineteen other surveys, PX41, Gary Kleck, *What Do CDC's Surveys Say About the Frequency of Defensive Gun Uses?*, SSRN 3, 13, Appendix 3–6 (Tbl. 4) (2018), as independent literature reviews have confirmed, PX50, LESHNER, ET AL., at 15; PX78, WELLFORD, at 103.

48.    Defendants' criticisms of Professor Kleck's estimate have all been addressed and refuted in his previous scholarship. Tr. 348:3–351:3 (Kleck); PX42, KLECK AND KATES, at 241–71; *see also* PX37, Kleck Supp. Decl. ¶¶ 1–8.

49.    The most commonly cited contrary estimate, by the National Crime Victimization Survey (NCVS), suffers from numerous methodological flaws, including the fact that the NCVS "never directly asks anyone did they use a gun for self-protection against another person." Tr. 351:23–352:12; PX41, Kleck, at 3–4; PX37, Kleck Supp. Decl. ¶¶ 7–8. "No other surveys have found numbers consistent with the NCVS." PX78, WELLFORD, at 103.

50.    Recent surveys by CNN and Pew found that there are 2.4 and 2.6 million annual DGUs, respectively, and confirm Professor Kleck's estimate of 2.5 million annual DGUs. Tr. 357:1–19 (Kleck); PX41, Kleck, 21–22, Appendix 5 (Tbl. 4). There are many reasons that would explain why the number of DGUs has

remained the same since 1993 despite a drop in crime. Tr. 357:20–358:11 (Kleck).

51.     Because 37.3% of DGUs occur in the home, Tr. 297:7–14 (Kleck); JX11, Kleck and Gertz, at 185, an estimated 932,500 DGUs occur in the home each year (37.3% x 2.5 million). Defendants' expert, Lucy Allen, found that 0.5% of DGUs in the home involve the defender firing more than 10 rounds. Tr. 14:2–4; DX3, Allen Decl. at 6. Thus, according to Professor Allen's data, approximately 4,663 DGUs in the home each year involve the defender firing more than 10 rounds (0.5% x 932,500). This estimate likely understates the number of DGUs in the home involving more than 10 rounds because Allen's analysis is biased against DGUs involving more than 10 rounds. Tr. 354:7–355:16 (Kleck).

52.     There are reported cases of DGUs in which the defender fired more than 10 rounds. *See, e.g.*, PX80; PX71; Tr. 14:5–13 (Allen).

53.     It is not surprising that many citizens each year fire more than 10 rounds in self-defense. In 2008, for example, there were 797,139 violent crime incidents in which the victim faced multiple attackers, and in 247,388 of these, there were four or more assailants. JX9, Kleck Decl. ¶ 13; Tr. 358:12–17 (Kleck); PX76, DEPARTMENT OF JUSTICE, CRIMINAL VICTIMIZATION IN THE UNITED STATES Tbl. 37 (2010). In 15.6% of DGUs, the defender fires attempting to hit the assailant. Tr. 360:18–21 (Kleck); JX11, Kleck and Gertz, at 185. A majority of DGUs involve multiple attackers. Tr. 358:18–22 (Kleck); JX11, Kleck and Gertz, at 186.

29

54.     Because police hit about 37% of their targets, it is reasonable to assume that average citizens will require *at least* 12 rounds to shoot four attackers. Tr. 359:2–360:17 (Kleck); Tr. 78:16–79:5, 83:2–6 (Stanton); JX9, Kleck Decl. ¶¶ 14–15; PX37, Kleck Supp. Decl. ¶ 17; JX14, Koper, at 83; PX4, Thomas J. Aveni, Officer-Involved Shootings: What We Didn't Know Has Hurt Us 4, 5, 9 (2003). At the same time, errant DGU fire does not present a meaningful threat to public safety. PX37, Kleck Supp. Decl. ¶¶ 19–22; PX40, Kleck, at 309–10.

55.     While criminals choose the time and place of their attacks and can come ready with their preferred weaponry, PFOF 34, it is unrealistic to expect victims to have access to multiple firearms or multiple magazines in every room of their houses in the event of an attack. Act A2761 therefore disadvantages victims relative to their attackers. Tr. 355:17–356:21 (Kleck); Tr. 80:15–21, 79:10–80:4 (Stanton); JX9, Kleck Decl. ¶¶ 16–17; PX44, Kopel, at 16.

56.     New York police shoot more than 10 rounds in 29% of incidents, PX35, Raymond W. Kelly, Annual Firearms Discharge Report 2011 23 & Fig. A.10 (2011); *see also* PX4, Aveni, at 4; PX69, and the standard-issue firearms for police departments across the country (including New Jersey law enforcement) carry more than 10 rounds, Tr. 76:18–77:1 (Stanton); PX5, Ayoob, at 87, 88–90.

57.     As Detective Stanton testified, all else being equal, SCMs are equally advantageous to law-enforcement officers and civilians during a gunfight, and it is

30

preferable for civilians to have such magazines in a gunfight. Tr. 78:4–80:4. He always loads his 15-round, standard-issue Glock to capacity because he "want[s] every advantage [he] could ascertain." Tr. 76:8–17.

58.     Allen's analysis of the Factiva database, *see* DX3, Allen Decl. ¶¶ 12–19, is not credible. Allen admitted that her analysis found no DGUs involving more than 10 rounds even though her analysis of the Armed Citizen database proved that such incidents exist, Tr. 40:21–41:3; she tended to exclude incidents of self-defense among residents of the same home despite not knowing how large a portion of DGUs they constituted, Tr. 29:14–20, 32:11–18, 33:2–8, 11–25; and she left out obvious synonyms from her search terms, Tr. 27:9–14. The Factiva database is not representative of DGUs generally and cannot be relied upon. Tr. 354:13–25 (Kleck).

**VII.   The Testimonies of Allen and Donohue Should be Given No Weight.**

59.     Lucy Allen's testimony, although establishing a minimum estimate of DGUs involving more than 10 rounds in the home, *see* Tr. 354:7–355:16 (Kleck), is otherwise not credible, *see* PFOF 46, 58. Moreover, Allen admitted that she "normally rel[ies] on non-comprehensive, unrepresentative, unscientific databases whose methodology [she] do[esn't] understand," Tr. 21:14–22:11; *see also* Tr. 22:12–15 (admitting "[i]t often happens" that she relies on "non-representative unscientific data . . . whose methodology [she's] not sure of"), and she admitted that she had "no understanding of" a basic feature of the *Mother Jones* database on which

she relied, Tr. 54:9–11. Her testimony should be given no weight.

60.     Professor Donohue's testimony is also not credible. He has conducted no original empirical research into the effect of SCM laws on crime or the trends in the prevalence of mass shootings, Tr. 167:17–168:20; DX24, Donohue Dep. 18:17–24, 19:16–20:11; his declaration routinely fails to acknowledge facts and scholarship contrary to his own conclusions, Tr. 158:10–16, 161:8–162:1, 201:16–202:20; and he repeatedly withheld relevant information from the Court, Tr. 194:13–195:19, 198:11–20, 203:13–205:6, 209:2–19. All of this is explained by his manifest bias against the view of the Second Amendment adopted by the Supreme Court, Tr. 149:4–11, which he describes as "fanatical," Tr. 149:22–150:4. Indeed, Professor Donohue has never publicly opposed a gun control measure and would vote to ban all handguns. Tr. 150:8–151:13. His testimony should be given no weight.

## VIII.  Magazine Size Is Irrelevant to Firearm Safety Training.

61.     As Detective Stanton testified, "no special training is required for a citizen to possess a standard capacity magazine as distinguished from a magazine holding 10 or fewer rounds." Tr. 88:13–16; *see also* Tr. 89:13–17, 95:23–96:1.

62.     Indeed, "[i]n all of the firearms training [Detective Stanton] ha[s] either offered or taken," "the training [has] [n]ever varied based on the size of the magazine of the weapon on which the training [was] conducted[.]" Tr. 75:11–15 (Stanton).

63.     Detective Stanton agreed that "the differences that [he] believe[s] exist

between law enforcement and military training have nothing to do with the magazine size of the firearm an officer or a veteran is able to handle." Tr. 100:19–23.

64.     Therefore, as Detective Stanton conceded, "a citizen who would safely possess a weapon capable of holding 10 or fewer rounds can also safely possess a firearm capable of holding 11 to 15 rounds." Tr. 73:15–20; *see also* Tr. 96:6–11.

65.     In the same way, "members of the military and retired members of the military can safely possess standard capacity magazines without presenting a threat to public safety." Tr. 101:2–8 (Stanton); *see also* Tr. 102:16–24 (Stanton).

66.     Detective Stanton agreed that "the military is a large group with diverse [training] requirements and [he] do[es] not have specific knowledge of what those requirements are." Tr. 98:16–19. But "every military unit" with which Detective Stanton has trained and that is listed in Paragraphs 5 and 6 of his supplemental declaration "train[s] with handguns with a standard capacity magazine" and has "very good training on par with law enforcement training." Tr. 97:1–10 (Stanton).

67.     As Detective Stanton testified, "members of the military" are "going to try to avoid indiscriminate destruction of property." Tr. 102:10–15. Detective Stanton's rejects the view that "in a hostile environment[,] members of the military are not instructed to avoid indiscriminate destruction of property." Tr. 102:10–14.

## IX.   New Jersey Could Implement a Training Requirement for Civilians to Possess and Use Standard-Capacity Magazines.

68.     At trial, Detective Stanton clarified that Paragraph 10 of his

33

supplemental declaration refers to the feasibility and cost of training "everyone in the totality of everything to do [with] concealed carry," not to the feasibility and cost of training people "to possess standard capacity magazines." Tr. 87:21–88:16.

69.     To the extent (if any) that Detective Stanton has offered an opinion on the feasibility and cost of training interested New Jersey citizens on SCMs (as opposed to concealed carry), his testimony is not credible and should be rejected.

a.     Detective Stanton admitted that he did not "make a study of the practical requirements of providing training for civilians who wish to possess standard capacity magazines," Tr. 85:18–21, and he has not "made a study of state mandated civilian training programs in other states," Tr. 92:23–25.

b.     He also admitted that he did not "seek to ascertain how many New Jersey citizens would be interested in receiving training on standard capacity magazines" and that he has "no idea how many people in New Jersey would seek out such training if it were available and required." Tr. 89:19–90:2.

c.     He also admitted that he did not "determine how many [gun] ranges there are in the State of New Jersey," "do[es] not know how many gun ranges there are in the state," and did not "determine the cost and feasibility of building additional ranges if any were needed," Tr. 90:3–13, even though his "opinion about the feasibility of providing training to civilians is based," among other things, "on [his] belief that there are not enough ranges in New Jersey," Tr. 86:15–19.

34

d.      Stanton does not know if it would be cost prohibitive for New Jersey to have all interested citizens train on SCMs "if the State of New Jersey were not to provide that training" itself, and he knew of "no practical barriers to New Jersey shifting the cost of that training to interested citizens." Tr. 91:8–15.

e.      He also admitted that he has not "ma[de] any study of the cost or practical limitations the state has or has not faced in administering the training program as part of its carry permitting regime." Tr. 92:5–10.

f.      He also admitted that Florida's concealed carry program "relies on training by private individuals certified to offer instruction in firearms," Tr. 94:4–8; Florida has issued 1,919,227 concealed-carry licenses, Tr. 94:9–21; Florida has received 219,486 new conceal-carry applications between July 1, 2017 and June 30, 2018, Tr. 94:22–95:6, and he is not "aware of any reason that New Jersey could not put in place a training system along the lines of what Florida has done," Tr. 96:2–5.

## X.   The Magazine Ban Will Dispossess Citizens of Their Property.

70.    If Act A2761 goes into effect, standard-capacity magazines would "basically become illegal" and New Jersey citizens would "have to get rid of the magazines by a certain date." Tr. 125:18–23 (Stanton).

71.    If Act A2761 goes into effect, it will cause New Jersey citizens "monetary damage" because they will be forced to "get rid of one [SCM] and buy another [magazine]," Tr. 126:3–4 (Stanton), or pay to have their magazines altered.

## PROPOSED CONCLUSIONS OF LAW

In less than 100 days, absent a preliminary injunction from this Court, hundreds of thousands of law-abiding citizens of New Jersey will become criminals if they continue to possess standard-capacity ammunition magazines capable of holding more than 10 rounds (SCMs). New Jersey's magazine ban violates the Second Amendment for three independent, legal reasons that do not require this Court to wade into evidentiary disputes about the likely effects of the ban. First, SCMs are in common use within the United States and typically possessed for lawful purposes. Under Supreme Court precedent, SCMs simply cannot be prohibited.

Second, under well-established principles of heightened scrutiny, it is impermissible to suppress the lawful exercise of a constitutional right to regulate the secondary effects of that right. That is exactly what New Jersey has done by banning the lawful exercise of the right to keep and bear arms with the goal of preventing criminal misuse of standard-capacity magazines.

Third, under heightened scrutiny, New Jersey must show that it does not burden more conduct than is reasonably necessary, yet Defendants have introduced *no evidence* that a 15-round magazine limit or other alternative means of achieving its goals are insufficient or not possible. Thus, it violates the Second Amendment.

Of course, the magazine ban must fall for a fourth reason—Defendants have failed to show that the ban will reduce firearm-related crime and mass shootings.

36

Although the burden of proving these claims lies entirely with Defendants, the testimony of their own experts shows that the magazine ban will not reduce firearm-related crime or the incidence or lethality of mass shootings. However, the evidence shows that the magazine ban *will* have one consequence: it will give murderers and other assailants a crucial advantage over the law-abiding citizens of New Jersey.

The Equal Protection Clause likewise condemns New Jersey's magazine ban. Act A2761 exempts retired law-enforcement officers from the ban, and the testimony of Defendants' own firearms expert shows that there is no basis for that exception. The proper remedy is to extend the right to possess standard-capacity magazines to all law-abiding citizens and hold that the ban is null and void.

Finally, even if the magazine ban were otherwise within New Jersey's power, the Takings Clause requires payment of Just Compensation to New Jersey's citizens, who will be dispossessed of private property by the ban. The failure of Act A2761 to provide for such compensation renders the ban unconstitutional.

This Court should grant Plaintiffs' Motion for a Preliminary Injunction.[3]

---

[3] If the Court agrees with any of Plaintiffs' legal arguments, Plaintiffs request that the Court enter a permanent injunction, since there would be no factual questions to resolve in subsequent proceedings. *See Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). In any event, courts are not confined to the record developed at an evidentiary hearing in adjudicating legislative facts. *See Daggett v. Commission on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999); *Dunagin v. Oxford*, 718 F.2d 738, 748 n.8 (5th Cir. 1983); *United States v. Gould*, 536 F.2d 216, 219–20 (8th

## I.     Plaintiffs Are Likely to Succeed on the Merits.

### A.     New Jersey's Magazine Ban Violates the Second Amendment.

The Second Amendment to the U.S. Constitution, as incorporated against the States via the Fourteenth Amendment, provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "protect[s] an individual right to use arms for self-defense." 554 U.S. 570, 616 (2008). Subsequently, the Third Circuit established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they] evaluate the law under some form of means-end scrutiny." *Id.* Proper application of *Heller* and *Marzzarella* requires holding that New Jersey's magazine ban violates the Second Amendment.

Standard-capacity magazines are "Arms" within the meaning of the Second Amendment. "[W]ithout bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City & Cty. of*

---

Cir. 1976); 1 Christopher B. Mueller, et al., Federal Evidence § 2:12 (4th ed. 2018); Advisory Committee Note, Fed. R. Evid. 201.

*San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *see also Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring); *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1116–17 (S.D. Cal. 2017); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014). That commonsense conclusion "finds strong historical support" in Founding-era dictionary definitions of "Arms," *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), which an "important 1771 legal dictionary" broadly defined to include "any thing that a man wears for his defence, or takes into his hands, or useth . . . to cast at or strike another," *Heller*, 554 U.S. at 581; *see also* PX9, T. CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1764). "[M]agazines and the rounds they contain are used to strike at another and inflict damage." *Kolbe*, 813 F.3d at 175. Thus, ammunition magazines are "Arms" as that term is used in the Second Amendment.[4]

Since SCMs are "Arms," they are presumptively protected by the Second Amendment because "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582; *Caetano v.*

---

[4] The Giffords Law Center contends that standard-capacity magazines are "accessories" rather than "Arms" because their function is to "enhance[ ] ammunition capacity far beyond what is needed." Giffords Br. 16–18. But ammunition is necessary to the exercise of the Second Amendment, and limiting magazine capacity limits the amount of ammunition that can be used. If New Jersey had a law limiting the number of books its citizens could read at any given time, that would infringe the First Amendment, even if the State thought its citizens wanted to read books "beyond what [the State thought was] needed." *Id.*

*Massachusetts*, 136 S. Ct.1027, 1027 (2016). The burden is therefore on *Defendants* to show that standard-capacity magazines are *not* protected by the Second Amendment. *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011). Defendants assert two possible limits on the Second Amendment's scope: the exception for dangerous and unusual weapons and the presumptive constitutionality of certain longstanding regulations. The evidence overwhelmingly shows that neither limit applies.

### 1. Defendants Have Failed to Show That Standard-Capacity Magazines Are Outside the Scope of the Second Amendment.

#### a. Standard-Capacity Magazines Are in Common Use.

*Heller* was clear about the test for determining whether arms are within the Second Amendment's scope: "the sorts of weapons protected" are those "in common use." 554 U.S. at 627; *see also id.* at 624–25. The Court acknowledged the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " but it did so *in contrast with* those arms in common use. *Id.* In other words, if a type of arm (such as SCMs) is in "common use," it cannot be dangerous *and unusual*, *see Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring).

Defendants are therefore wrong to contend that *Heller* established an "exception [to the Second Amendment] for 'dangerous weapons.' " Resp. Br. 9. Any free-floating "dangerousness" test is "clearly at odds with the Supreme Court's

40

approach in *Heller*." *Kolbe v. Hogan*, 849 F.3d 114, 155 (4th Cir. 2017) (en banc) (Traxler, J., dissenting). *Heller* did not leave the scope of the Second Amendment up to judicial determinations of whether an arm is too "dangerous" to warrant constitutional protection. Rather, by asking whether an arm is dangerous *and unusual*, *Heller* made clear that the relevant judgment is that made by the People.

Defendants' "dangerousness" test tracks the interest-balancing test proposed by Justice Breyer *in dissent* in *Heller*. Justice Breyer would have upheld the D.C. ban based on the danger handguns posed, because handguns are "the overwhelmingly favorite weapon of armed criminals" and crimes committed with handguns are "7 times more likely to be lethal than a crime committed with any other weapon." 554 U.S. at 682, 695 (Breyer, J., dissenting). Notwithstanding that argument, *Heller* held that handguns were protected by the Second Amendment and invalidated the D.C. handgun ban. *Id.* at 636. In doing so, the Court rejected the idea that judges have "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634 (emphasis in original); *see also McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (plurality opinion). Defendants' arbitrary test is therefore foreclosed by binding Supreme Court precedent.

Critically, although it is *Defendants'* burden to show that SCMs are not in common use, they have offered *no evidence* as to the number or availability of standard-capacity magazines in the United States. PFOF 16. That is sufficient to hold

41

that SCMs *are* in common use and protected by the Second Amendment.

But this Court need not rely on burdens of proof to find that SCMs are in common use; the evidence in the record uniformly supports such a finding. The evidence shows that there are *at least* 43,400,000 civilian-owned standard-capacity magazines in the United States, and it is very likely that the true number is significantly greater. PFOF 10. In fact, based solely on SCM stocks from the year 1995, there are, at a minimum, tens of millions of SCMs in the country. PFOF 11. Magazines capable of holding more than 10 rounds come standard on some of the most popular handguns and rifles, including *the* most popular rifle in America. PFOF 14. SCMs are legal under the laws of 42 states, PFOF 15; *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring), and even Defendants' expert, Professor Donohue, admitted that SCMs have been "easily available" and are more prevalent today than they were in 1994, PFOF 12. As the Second Circuit has held, "[SCMs] are 'in common use' as that term was used in *Heller*." *New York State Rifle & Pistol Ass'n, Inc.*, 804 F.3d at 255. The D.C. Circuit and the original *Kolbe* panel reached the same conclusion, *see Kolbe*, 813 F.3d at 174; *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (*Heller II*), and so should this Court.[5]

_____

[5] The Giffords Law Center suggests that the relevant standard is whether standard-capacity magazines are in common use *in New Jersey*, but *Heller* looked nationwide to determine common use. *See* 554 U.S. at 628. In any event, there are hundreds of thousands of standard-capacity magazines in New Jersey, PFOF 13,

Defendants and Everytown for Gun Safety respond that the common-use test is "circular" and "illogical," Resp. Br. 12–13; Everytown Br. 9–12, but the Supreme Court rejected the same arguments when Justice Breyer raised them in his *Heller* dissent, *see Heller*, 554 U.S. at 721–22 (Breyer, J., dissenting). In any event, the common-use test is not circular. Just as the scope of the Fourth Amendment is tied to the People's "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), the Second Amendment relies on the People's exercise of sound judgment as to which arms to use for lawful purposes.

Unable to dispute the enormous number of SCMs in the country, Defendants and their amici assert that these numbers do not matter because firearms are increasingly concentrated among fewer Americans. Resp. Br. 13–14; Everytown Br. 10; Giffords Br. 20–21. But the evidence introduced at the preliminary injunction hearing has proven that claim false. The percentage of individuals who have a gun in their home has remained relatively constant since the late 1990s and currently stands at 42%, hardly a small slice of America. PFOF 17. In any event, even if firearms were becoming increasingly concentrated, that fact would be irrelevant to determining common use; *Heller* held that handguns were in common use without even *discussing* their distribution within the American population. It was enough to

---

which is enough to show common use, *see Caetano*, 136 S. Ct. at 1032–33 (Alito, J., concurring) (200,000 stun guns *nationwide* sufficed to show common use).

say that handguns were extremely popular in the United States to establish that they were in common use, 554 U.S. at 628–29, and the same is true here.

Finally, Defendants argue that even if SCMs are in common use, that does not show that they are possessed for lawful purposes or how they are used. Resp. Br. 13–14. But *Heller* conducted no empirical analysis of how handguns were typically *used*; the relevant question was whether they were typically *possessed* for lawful purposes. 554 U.S. at 625. And on that score, the sheer volume of handguns proved that they *were* typically possessed for lawful purposes. *Id.* at 628–29. The same reasoning applies here, since it would be implausible to claim that over 43 million standard-capacity magazines in the United States are *typically* possessed for *unlawful* purposes. PFOF 18. Nonetheless, empirical evidence *does* show that Americans typically possess firearms for lawful purposes, such as self-defense, and the same is therefore true of the SCMs used in those firearms. PFOF 19. Indeed, there were 414,562 non-fatal gun crimes in the United States in 2011,[6] and even if *all* those crimes involved SCMs (which is obviously untrue, *see* JX14, Koper, at 18 (SCMs used in only 14–26% of most gun crimes)), *less than 1%* of SCMs were involved in a gun crime. Clearly, SCMs are typically possessed for lawful purposes.

---

[6] GUN VIOLENCE, NATIONAL INSTITUTE OF JUSTICE (Mar. 13, 2018), https://goo.gl/73Apha. *See United States v. Chester*, 628 F.3d 673, 692 (4th Cir. 2010) (Davis, J., concurring in the judgment) (taking judicial notice of National Institute of Justice data).

### b.      There Is No Tradition of Limiting Magazine Capacity.

Defendants and their amici assert that laws limiting the size of ammunition magazines are the sort of "longstanding" measures that are "presumptively lawful." *Heller*, 554 U.S. 626, 627 n.26; Resp. Br. 16–18; Everytown Br. 4–9; *see also* Giffords Br. 24–26. The evidence shows that there is no basis for that assertion.

Standard-capacity magazines predate the Second Amendment, and firearms that came standard with SCMs were in common use by the time the Fourteenth Amendment was ratified. PFOF 20–21. The first laws limiting magazine capacity were enacted by Rhode Island and Michigan in 1927, which were later joined by California and Virginia (although these latter two did not flatly ban any magazines). PFOF 22–23. These Prohibition-Era laws were repealed by the 1970s. *Id.* Other laws were either not interpreted as a ban on particular magazines or firearms, PFOF 24, or did not restrict the magazine capacity of semiautomatic firearms, PFOF 25. New Jersey did not enact a law limiting magazine capacity until 1990. PFOF 26. The only state or federal law limiting magazine capacity that originated in the Prohibition Era and remains in place in some form today is the District of Columbia's. PFOF 27.

Laws limiting magazine capacity are not, therefore, longstanding regulatory measures. In fact, quite the opposite: they were almost unknown in American history before the 1990s. Thus, New Jersey's magazine ban does not enjoy a presumption of lawfulness under *Heller*, *see Heller II*, 670 F.3d at 1260; *see also Duncan v.*

*Becerra*, 2018 WL 3433828, at *2 (9th Cir. July 17, 2018), especially given the Third Circuit's warning that courts "tread carefully" and "cautio[usly]" in applying such a presumption, *see United States v. Huet*, 665 F.3d 588, 602 (3d Cir. 2012).

But even if magazine bans were longstanding, they would only be entitled to a *presumption* of lawfulness, and "the presumption may be rebutted." *United States v. Barton*, 633 F.3d 168, 173 (3d Cir. 2011); *see also Binderup v. Attorney Gen. United States of America*, 836 F.3d 336, 347 (3d Cir. 2016) (en banc) (Ambro, J.); *id.* at 358 (Hardiman, J., concurring in part and concurring in the judgments). Any such presumption must be based on "historical justifications," and "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. Thus, the Third Circuit looks to "our founding era" for any "historical justifications" that support a presumption of lawfulness, *see Binderup*, 836 F.3d at 348–49 (Ambro, J.); *id.* at 367–74 (Hardiman, J.), and no such historical justifications from the founding era can be found for magazine bans. Indeed, the only plausible justification is the limitation on dangerous and unusual weapons, and as demonstrated above, that limitation does not apply here. Any presumption of lawfulness therefore is rebutted by the evidence.

###    2.    Because Standard-Capacity Magazines Are in Common Use, A Ban on Their Use and Possession Is *Per Se* Unconstitutional.

Under *Heller*, the Court's analysis of Plaintiffs' Second Amendment claim should end here. *Heller* struck down the D.C. handgun law because handguns were

in common use and, as a result, "a complete prohibition of their use is invalid." 554 U.S. at 629. The Massachusetts Supreme Judicial Court used the same approach to strike down the state's stun gun ban after being rebuked by the Supreme Court for using a contrary analysis. *See Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). That logic requires invalidation of New Jersey's ban on SCMs. And that logic is consistent with *Marzzarella* because, at the second step of the analysis, a flat ban on protected arms "would fail constitutional muster" under any of the potentially applicable "standards of scrutiny." *Heller*, 554 U.S. 628–29; *see also Young v. Hawaii*, 896 F.3d 1044, 1070–71 (9th Cir. 2018); *Wrenn*, 864 F.3d at 665.[7]

Once *Heller* established that handguns were protected by the Second Amendment because they were in common use, 554 U.S. at 626–28, it followed that banning them was unconstitutional, *see id.* at 628–29; *see also McDonald*, 561 U.S. at 767–68 (*Heller* "found that [the Second Amendment] right applies to handguns" and therefore "concluded [that] citizens must be permitted to use handguns for the core lawful purpose of self-defense" (cleaned up)).[8] The D.C. handgun ban

---

[7] Plaintiffs reserve the right to argue that a tiers-of-scrutiny analysis is *always* inappropriate in Second Amendment cases. *See Heller II*, 670 F.3d at 1271–85 (Kavanaugh, J., dissenting); *see also Mance v. Sessions*, 896 F.3d 390, 394–95 (5th Cir. 2018) (Elrod, J., joined by six other judges, dissenting).

[8] " 'Cleaned up' " is a new parenthetical used to eliminate unnecessary explanation of non-substantive prior alterations." *United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018).

"amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense]," *Heller*, 554 U.S. at 628; the same is true of New Jersey's magazine ban. The D.C. handgun ban "extend[ed], moreover, to the home, where the need for defense of self, family, and property is most acute," *id.*; the same is true of New Jersey's magazine ban. And "[f]ew laws in the history of our Nation have come close to the severe restriction of [the D.C. handgun ban]," *id.* at 629; the same is true of New Jersey's magazine ban. Like the D.C. handgun ban, the New Jersey magazine ban is flatly unconstitutional.

"It is no answer to say, as [Defendants] do, that it is permissible to ban the possession of [standard-capacity magazines] so long as the possession of other [magazines] (*i.e.,* [those carrying fewer than 11 rounds]) is allowed." *Id.* at 630. "There are many reasons that a citizen may prefer a [standard-capacity magazine] for home defense." *Id.* There are approximately 2.5 million defensive gun uses (DGUs) each year, PFOF 47, almost 1 million of which occur in the home, PFOF 51, and the majority of DGUs involve fighting off multiple attackers, PFOF 53. Indeed, in 2008 there were 797,139 violent crime incidents in which the victim faced multiple attackers, and in 247,388 of these, there were four or more assailants. *Id.* Because police hit about 37% of their targets, it is reasonable to assume that average citizens will require *at least* 12 rounds to shoot four attackers. PFOF 54. It is not surprising, therefore, that annually at least 4,663 DGUs in the home involve the

48

defender firing more than 10 rounds. PFOF 51. And while criminals choose the time and place of their attacks and come ready with their preferred weaponry, it is unrealistic to expect victims to have access to multiple firearms or magazines in every room of their houses. PFOF 55. Act A2761 therefore disadvantages victims relative to their attackers. *Id.* As Defendants' expert, Detective Stanton, testified, it would be preferable for civilians to have SCMs during a gunfight. PFOF 57.

But "[w]hatever the reason, [standard-capacity magazines] are [among] the most popular weapon[s] chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. New Jersey's attempt to ban a class of commonly used ammunition magazines is an option that the Second Amendment simply takes "off the table." *Heller*, 554 U.S. at 636; *Binderup*, 836 F.3d at 363–64 (Hardiman, J.).

### 3. Alternatively, Defendants Have Failed to Show That New Jersey's Magazine Ban Survives Heightened Scrutiny.

Because New Jersey's magazine ban is *per se* unconstitutional under *Heller*, there is no need to conduct a tiers-of-scrutiny analysis, but even under such an analysis, the ban must fall. *Heller* made clear that the rational-basis test does not apply to Second Amendment challenges, 554 U.S. at 628 n.27, and *Marzzarella* makes clear that strict scrutiny is the appropriate test here. By banning the possession of SCMs *anywhere* in the State, New Jersey's law "implicates [the] interest in the defense of hearth and home—the core protection of the Second Amendment,"

49

*Marzzarella*, 614 F.3d at 94, and as Defendants concede, "if a law burdens the core of the right conferred upon individuals by the Second Amendment, strict scrutiny is required," Resp. Br. 19 (cleaned up). Moreover, whereas intermediate scrutiny might be appropriate where a law "was neither designed to nor ha[d] the effect of prohibiting the possession of any class of firearms," *Marzzarella*, 614 F.3d at 97, New Jersey's law has precisely that design and effect, so strict scrutiny applies. And under strict scrutiny, a ban on an entire class of conduct (i.e., possession of an SCM) designed to prevent a much narrower class of misconduct (i.e., gun-related crimes) cannot survive. *See Mance*, 896 F.3d at 400–01 (Ho, J., dissenting) (collecting authorities stating that prophylactic measures fail strict scrutiny). Indeed, even under intermediate scrutiny, the government "may not regulate the secondary effects of [protected conduct] by suppressing the [protected conduct] itself." *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 445 (2002) (controlling opinion of Kennedy, J.); *see also Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015) (*Heller III*); *Annex Books, Inc. v. City of Indianapolis*, 740 F.3d 1136, 1138 (7th Cir. 2014). That is precisely what New Jersey seeks to do here: regulate the criminal use of SCMs by suppressing the lawful use of SCMs. That is impermissible.

But if this Court nonetheless proceeds further with an intermediate-scrutiny analysis, the result is the same: the SCM ban is invalid. Defendants must show that the ban advances a substantial governmental interest, and the statute "may not

burden more [of the right to keep and bear arms] than is reasonably necessary." *Marzzarella*, 614 F.3d at 98. Defendants downplay their burden under intermediate scrutiny by cherry-picking quotes from various cases, *see* Resp. Br. 20–21, but they "must demonstrate that the recited harms are *real*, not merely conjectural, and that the regulation will *in fact* alleviate these harms in a direct and material way," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (emphases added). Notwithstanding the deference owed to legislatures, the State must "present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Binderup*, 836 F.3d at 354 (Ambro, J.) (cleaned up); *id.* at 378–79 (Hardiman, J.). The Supreme Court has held that it is "plain[ ] err[or]" to use "a deferential analysis" when evaluating sex-discrimination claims under intermediate scrutiny, *United States v. Virginia*, 518 U.S. 515, 555–56 (1996), and the same is true for Second Amendment claims. To do otherwise is to impermissibly "treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other [fundamental rights] guarantees." *McDonald*, 561 U.S. at 780.

Defendants put forward two rationales for the magazine ban: (1) the reduction of firearm-related crime in general, and (2) the reduction of the incidence and lethality of mass shootings in particular. "The burden of justification is demanding and it rests entirely on the State." *Virginia*, 518 U.S. at 533. The evidence in the record shows that Defendants have failed to carry that burden.

### a.    The Magazine Ban Will Not Reduce Firearm-Related Crime.

Although Defendants point to the crime-reduction rationale, they do not seriously attempt to advance it. And that makes sense, since there is no basis in evidence for believing that the SCM ban will reduce firearm-related crime.

There are multiple assumptions built in to the assertion that an SCM ban will reduce firearm-related crime, and each one of them is false. First, the assertion assumes that a ban will deter criminals from using SCMs, but because SCMs remain legal in 42 States (including Delaware and Pennsylvania), "anyone in New Jersey can drive across state lines to purchase one of these [standard-capacity] magazines." Tr. 82:6–13 (Stanton). That same dynamic explains why Maryland's SCM ban "has done little to stamp out the use of big magazines by criminals" and has been "hobbled by inflows of weapons from other states, few of which limit magazine size." DX39, Freskos, at 1, 5. As Defendants' own expert testified, "somebody who is about to . . . break the law" is "[p]robably not" "going to limit himself or herself to firearms or magazines that are legal under state law." Tr. 81:13–19 (Stanton). New Jersey's SCM ban will be easily circumvented. PFOF 32(b).

Second, the crime-reduction rationale assumes that a significant amount of gun crime involves firing more than 10 rounds of ammunition, but criminals fire fewer than 10 rounds about 97% of the time, which means a law limiting magazine capacity to 10 rounds will have almost no effect on firearm-related crime—even

assuming criminals obey the law. PFOF 33.

Third, the crime-reduction rationale assumes that, in some hypothetical world where a criminal wants to fire more than 10 rounds but for some reason cannot access an SCM from another state, the criminal will only bring a single firearm or magazine to the scene of the crime, but the truth is that criminals "are better able to anticipate a confrontation" because "they're initiating the aggression." Tr. 80:15–18 (Stanton). That means criminals (unlike their victims) can prepare for their attack by acquiring their preferred weaponry in advance. Tr. 355:17–356:21 (Kleck). Ordinary criminals will simply bring multiple firearms or magazines in the rare event that they think more than 10 rounds will be required. PFOF 34.

For these reasons, it is no surprise that the official, government-commissioned study on the 1994 federal SCM ban could not "clearly credit the ban with any of the nation's recent drop in gun violence," JX14, KOPER, at 96, a finding supported by the overwhelming weight of evidence and the testimony of *Defendants' own expert*, *see* PFOF 29–30. It is also no surprise that state and local bans have likewise failed to reduce firearm-related crime, PFOF 32, and that Australia's experiment with a nationwide ban on certain semiautomatic firearms (which Professor Donohue cites in support of New Jersey's ban) has not reduced firearm-related homicides, PFOF 31. The crime-reduction rationale for the magazine ban is baseless.

53

### b.     The Magazine Ban Will Not Reduce Mass Shootings.

Defendants' primary rationale for the SCM ban is the reduction of the incidence and lethality of mass shootings. While mass shootings represented less than 1% of all gun homicides in 2012, PFOF 37, reducing them is unquestionably a laudable public policy objective that everyone should support, but the evidence decisively shows that New Jersey's ban will have no effect on mass shootings.

The mass-shooting rationale is premised on similar false assumptions as the crime-reduction rationale. First, it assumes that mass murderers—who violate multiple laws to commit their heinous crimes (including, obviously, laws against murder)—will dutifully obey a law prohibiting them from using SCMs, rather than purchasing SCMs in neighboring states. PFOF 40. That assumption—implausible in the context of ordinary criminals—is particularly nonsensical in the context of mass murderers, given the uncontradicted evidence that mass shooters are highly motivated and engage in extensive planning. *Id.* As Defendants' expert conceded, mass shooters "will use whatever they have available" to commit their crimes, Tr. 184:14–20 (Donohue), and given the availability of SCMs in neighboring states, mass shooters will continue using SCMs to the extent they desire to do so, PFOF 40.

Second, the mass-shooting rationale assumes that a significant percentage of mass shootings involve SCMs, but anywhere between 89% and 99% of mass shootings do *not* involve SCMs. PFOF 44. And even in those instances in which

magazines above ten rounds *are* used, there is no evidence that they typically are magazines holding 11–15 rounds; rather, the evidence shows that the magazines generally would have *already been banned* by New Jersey's previous 15-round limit. *See, e.g.*, Tr. 178:23–179:5 (Donohue describing Las Vegas shooting); JX3 at 1 (Sandy Hook), 2 (Aurora). Even if New Jersey's ban prevents mass shooters from using SCMs (which it will not), that would affect only a small number of shootings.

Third, the mass-shooting rationale assumes that mass murderers bring only a single firearm or magazine to the scene of their massacres. Not only is that assumption counterintuitive, it is contradicted by the fact that *every single mass shooter* known to have an SCM between 1994 and 2013 used multiple firearms, multiple magazines, or both. PFOF 41.

Alternatively, the mass-shooting rationale assumes that if a mass murderer has multiple magazines, the need to change magazines more often will create additional time for victims to escape or intervene to stop the shooting. But mass shooters almost always take longer between shots than the time it would take to change a magazine, which means more magazine changes will have no effect on their rate of fire. PFOF 42. Moreover, bystanders almost never intervene to stop mass shootings involving SCMs while the murderer is reloading; that is known to have occurred only once since 1984. PFOF 43. And even if these reloading pauses did provide opportunities for escape or intervention that would not otherwise exist, Defendants' argument

55

proves too much: if banning SCMs is constitutional because it leads to fewer deaths, there is no reason why the State could not ban magazines *altogether*, yet that plainly would be unconstitutional. *See Heller III*, 801 F.3d at 280.

Finally, Defendants trot out a series of erroneous statistical associations. They claim that mass shootings have been increasing since the expiration of the federal SCM ban, but in fact the number has remained relatively stable for decades. PFOF 38. Defendants claim that Australia's ban on certain semiautomatic firearms has decreased mass shootings, but there is no empirical evidence that it has had any such effect. PFOF 39. And Defendants claim that most mass shootings involve SCMs, but in fact SCMs are involved in a very small fraction of mass shootings. PFOF 44.

Moreover, these alleged statistical associations, even if true, are irrelevant. *Heller* struck down D.C.'s handgun ban even though handguns were the "overwhelmingly favorite weapon of armed criminals," 554 U.S. at 682 (Breyer, J., dissenting), so even a proven association between a particular arm and criminal behavior cannot justify a ban on that arm. What is more, according to Defendants' own expert, the alleged associations between SCMs and mass shootings do not prove causation. PFOF 44. Nor is there any causal connection between the state-level SCM bans and the number of mass shootings in those states. PFOF 45. All of these associations are readily explained by causes that have nothing to do with SCMs themselves. PFOF 44–45. Defendants have no reliable evidence that SCMs cause or

56

exacerbate mass shootings or that a ban on SCMs will reduce such tragedies.

### c. Defendants Have Offered No Evidence That a 10-Round Limit Is No More Restrictive Than Reasonably Necessary.

Even assuming—contrary to the evidence in the record—that a magazine limit would reduce firearm-related crime or reduce the incidence and lethality of mass shootings, Defendants would still have to show that a 10-round limit does not "burden more [conduct] than is reasonably necessary." *Marzzarella*, 614 F.3d at 98. If, for example, New Jersey's previous limit of 15 rounds would achieve Defendants' objectives equally as well as a 10-round limit, the 10-round limit would *ipso facto* burden the right to keep and bear arms more than is *reasonably* necessary. Yet, Defendants offer *no evidence* comparing the relative efficacy of a 10-round limit and a 15-round limit, and both Plaintiffs' and Defendants' experts agree that no such evidence exists. PFOF 28, 36. This complete failure of proof—wholly apart from the foregoing arguments—renders New Jersey's 10-round limit unconstitutional. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2537 (2014).

Indeed, Defendants have offered no evidence regarding *any* of the following alternative means of achieving their interests: limiting the magazine ban to outside the home; imposing a licensing requirement for SCMs; or requiring SCMs to be stored in a secure way when not in use. Plaintiffs raised these alternatives before the evidentiary hearing, and Defendants had the opportunity to address them by putting in exhibits and supplementing their expert testimony. They did neither. The

magazine ban is therefore unconstitutional under heightened scrutiny.[9]

Defendants argue that most Courts of Appeals have upheld magazine bans, but this argument is even less persuasive now than it was when Defendants first made it, since the Ninth Circuit has, in the intervening period, affirmed the grant of a preliminary injunction against California's magazine ban. *Duncan*, 2018 WL 3433828, at *1–2. *Kolbe*, *Friedman*, and *Heller II* were contrary to Supreme Court precedent and elicited forceful dissents, *see Kolbe*, 849 F.3d at 155–57 (Traxler, J., joined by three other judges, dissenting); *Friedman*, 784 F.3d at 413–14 (Manion, J., dissenting); *Heller II*, 670 F.3d at 1271–82 (Kavanaugh, J., dissenting), and *Friedman* earned a dissent from the denial of certiorari, *see Friedman v. City of Highland Par*k, 136 S. Ct. 447 (2015) (Thomas, J., dissenting from the denial of certiorari). This Court should not join them in flouting Supreme Court precedent.

**B.    New Jersey's Magazine Ban Violates the Equal Protection Clause.**

The Equal Protection Clause of the Fourteenth Amendment states: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (cleaned up). As demonstrated above,

---

[9] Plaintiffs do not take a position on the constitutionality of any alternative (including the firearm training requirement discussed below), but this Court can nonetheless take Defendants' failure to pursue them into account. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781–82 (2014).

58

standard-capacity magazines are fully protected by the Second Amendment, and the Second Amendment is a fundamental right, *McDonald*, 561 U.S. at 778. Thus, even if this Court were to conclude that New Jersey's magazine ban does not violate the Second Amendment, the ban's exception for retired law-enforcement officers nonetheless creates a classification "affecting fundamental rights" and triggers strict scrutiny. *See Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099, 1114 (3d Cir. 1997).

Even under intermediate-scrutiny, the magazine ban violates equal protection. Defendants must show "at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (cleaned up). "The burden of justification is demanding and it rests entirely on the State." *Id.* Its justification must be "exceedingly persuasive." *Id.*

There are two steps to the equal-protection analysis. First, courts ask whether the groups are "similarly situated." *See Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 136–38 (3d Cir. 2002). Second, courts examine whether the justification offered for the distinction drawn between the groups is justifiable under the appropriate form of scrutiny. *Id.* Under the first step, courts determine whether the law would treat the two classes the same *absent the challenged statutory distinction*. Men and women were similarly situated in *Frontiero v. Richardson* because "[t]he sole basis of the classification established in the challenged statutes

59

[was] the sex of the individuals involved." 411 U.S. 677, 688 (1973); *see also Virginia*, 518 U.S. at 530. Thus, if the statute under review would treat two groups the same way *except for* the distinction being challenged, the groups are similarly situated. *See Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 394 (3d Cir. 2010).

Here, Act A2761 bans SCMs for all civilians except retired law-enforcement officers. Absent that exception, retired law-enforcement officers, veterans of the armed forces, and ordinary, law-abiding citizens would all be prohibited from possessing SCMs. Therefore, retired law-enforcement officers are similarly situated to (1) veterans of the armed forces and (2) ordinary, law-abiding citizens.[10]

Defendants have offered no evidence that would justify distinguishing between retired law-enforcement officers on the one hand and ordinary citizens or military veterans on the other. Their *sole* justification is that retired law-enforcement officers have specialized training in the use of firearms that ordinary citizens and military veterans do not. That justification fails for three independent reasons.

First, the testimony of Defendants' own expert proves that firearms training is irrelevant to a citizens' ability to safely possess SCMs. As Detective Stanton testified, "no special training is required for a citizen to possess a standard capacity

---

[10] Defendants contend that the groups are not similarly situated because retired law-enforcement officers have specialized firearms training that military veterans and ordinary citizens do not. But that alleged difference goes to the *justification* for the statute's classification, which is the *second* step of the equal-protection analysis.

magazine as distinguished from a magazine holding 10 or fewer rounds." PFOF 61. Therefore, "a citizen who would safely possess a weapon capable of holding 10 or fewer rounds can also safely possess a firearm capable of holding 11 to 15 rounds." PFOF 64. He also conceded that "members of the military and retired members of the military can safely possess standard capacity magazines without presenting a threat to public safety." PFOF 65. The specialized-training justification is irrelevant to the distinction drawn by the statute.

Defendants contend that, although training might not be relevant to the *possession* of SCMs, it is relevant to the *use* of SCMs because the more rounds a firearm has, the more risk posed by an untrained person. But that argument proves too much: if it is safer to only allow an untrained person to use 10 rounds of ammunition instead of 15, it would also be safer to only allow an untrained person to use 9 rounds. The logical conclusion would be that firearms should be banned for all those lacking specialized training (so that they fire *no* rounds without training), yet Act A2761 does no such thing; it instead arbitrarily allows untrained individuals to use 10 rounds but not 11. In any event, Defendants' argument is belied by the evidence that it is almost unheard-of for a bystander to be shot during a defensive gun use, PFOF 54, and it ignores the safety concerns posed by forcing untrained citizens to change magazines more often, Tr. 75:16–76:1 (Stanton). At bottom, Defendants' arguments are incoherent: they argue that citizens virtually never fire

more than 10 rounds in self-defense *and* that allowing citizens to have more than 10 rounds endangers a significant number of bystanders. Both cannot be true.

The second problem with Defendants' training argument is that, even if training were important to ensuring the safe use of an SCM, the obvious logical response would be to *require training*, not to *ban all SCMs*. Defendants have offered no evidence that this alternative was considered by the New Jersey legislature or that there is any reason it could not be implemented. Although Detective Stanton asserted that a training program would be cost-prohibitive and infeasible, DX99 ¶ 10, that opinion was offered without any basis and is entitled to no weight, PFOF 69. In fact, Detective Stanton conceded that he was not "aware of any reason that New Jersey could not put in place a training system along the lines of what Florida has done," Tr. 96:2–5, which has allowed Florida to grant almost 1 million concealed-carry licenses with the cost borne by private parties, PFOF 69(f). There is no credible evidence upon which Defendants could rely to carry their burden of showing that a training program is infeasible or ineffective. *McCullen*, 134 S. Ct. at 2537.

Third, the foregoing assumes that there *is* a relevant distinction in training between retired law-enforcement officers and ordinary citizens or military veterans. But it is undisputed that Plaintiffs Ellman and Dembowski have significant experience and training with firearms using standard-capacity magazines, PFOF 5–6, and Detective Stanton conceded that "the military is a large group with diverse

62

[training] requirements and [he] do[es] not have specific knowledge of what those requirements are," Tr. 98:16–19. There is no evidence to show that the individual Plaintiffs in this case in particular or military veterans in general lack the requisite training required to safely use standard-capacity magazines.

"[T]he retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." *Silveira v. Lockyer*, 312 F.3d 1052, 1091 (9th Cir. 2002). The proper remedy is to "extend the coverage of the statute to include those who are aggrieved by the exclusion." *Califano v. Westcott*, 443 U.S. 76, 89 (1979). "Ordinarily, . . . extension [of an exception], rather than nullification, is the proper course." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1699 (2017) (cleaned up). Under these well-established remedial principles, the magazine ban must be invalidated both on its face and as applied to military veterans such as Mr. Dembowski.

## C.     New Jersey's Magazine Ban Violates the Takings Clause.

The Takings Clause of the Fifth Amendment, as incorporated against the States by the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." Defendants do not and cannot dispute that standard-capacity magazines are "private property" under the Takings Clause. *See Horne v. Department of Agric.*, 135 S. Ct. 2419, 2425–26 (2015). Once that is accepted, it becomes clear that Act A2761 effects an uncompensated taking.

Property can be "taken" within the meaning of the Fifth Amendment in one of two ways: A "physical taking" occurs when the government appropriates or otherwise physically dispossesses the owner of property. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005). A "regulatory taking" occurs when the government regulates the use of that property in a manner that "is tantamount to a direct appropriation or ouster." *Id.*; *see also Horne*, 135 S. Ct. at 2427.

Act A2761 effects a physical taking because it dispossesses New Jersey citizens of their property. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002); PFOF 70. Under the statute, citizens have three options. First, they may surrender their SCMs to the government, Act A2761 §§ 4(c), 5, which is a "direct government appropriation . . . of private property" and a "paradigmatic taking requiring just compensation." *Lingle*, 544 U.S. at 537; *see also Horne*, 135 S. Ct. at 2428.

Second, they may transfer their SCMs to "any person or firm lawfully entitled to own or possess that firearm or magazine." Act A2761 § 4(a). A taking occurs when the government provides for a third party instead of itself to dispossess a property owner. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982); *International Paper Co. v. United States*, 282 U.S. 399, 408 (1931). A taking occurred in *Kelo v. City of New London*, for example, even though owners of the condemned parcels had the option of selling to a private entity. 545 U.S. 469,

475 (2005); *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004–05 (1984).[11]

Third, New Jersey citizens may "[r]ender the . . . magazine inoperable" or permanently alter it to accept 10 rounds or less. Act A2761 § 4(b). But the government cannot escape its obligations under the Fifth Amendment by affording owners such alternatives. In *Horne*, for example, the raisin growers could have "plant[ed] different crops," or "[sold] their raisin-variety grapes as table grapes or for use in juice or wine." 135 S. Ct. at 2430. Likewise, in *Loretto*, the owner could have converted her building into something other than an apartment complex. *See* 458 U.S. at 439 n.17. The Supreme Court nonetheless held that these were takings. *See Horne*, 135 S. Ct. at 2430 (quoting *Loretto*, 458 U.S. at 439 n.17); *see also Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1329 (9th Cir. 1977). If nothing else, threatening uncompensated confiscation to force property owners to alter their property is an unconstitutional condition. *See Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 595, 606–07 (2013).

Act A2761 fares no better when analyzed as a regulatory taking. Defendants assert that the statute does not deprive Plaintiffs of all economically beneficial use of their property. But even if that were true, regulatory action may constitute a taking

---

[11] *Wiese v. Becerra* cited *no authority* for its analysis and completely ignored the foregoing cases. 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018). By contrast, *Duncan* "outlined the correct legal principles" in holding that a taking had likely occurred and was affirmed by the Ninth Circuit. 2018 WL 3433828, at *3.

if it interferes with a property owner's reasonable, investment-backed expectations. Property owners "do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 135 S. Ct. at 2427; *see also Duncan*, 265 F. Supp. 3d at 1138. Nor do they expect to be forced to sell, destroy, or alter property. *Yancey v. United States*, 915 F.2d 1534, 1540 (Fed. Cir. 1990).

The State may not escape its compensation obligation by acting pursuant to its police power. Supreme Court precedent forecloses that argument. In *Loretto*, the Court held that a law requiring physical occupation of private property was both "within the State's police power" *and* an unconstitutional taking. 458 U.S. at 425. Whether a law effects a taking is a "separate question" from whether the State has the police power to enact it, for an uncompensated taking is unconstitutional "without regard to the public interests that it may serve." *Id.* at 425–26.

Defendants insist that there is an exception for "state laws prohibiting the possession of dangerous products." Resp. Br. 27. In support, Defendants cite a line of cases beginning with *Mugler v. Kansas*, 123 U.S. 623 (1887). Resp. Br. 27. But the Supreme Court squarely rejected the argument that *Mugler* carved out a "noxious use" exception to the Takings Clause in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). The Court found it "self-evident that noxious-use logic cannot serve as a touchstone to distinguish" takings that require compensation "from regulatory deprivations that do not." *Id.* at 1026. Critically, the *Lucas* Court pointed

66

out that it had *never* "employed the logic of 'harmful use' prevention to sustain" an uncompensated *per se* taking. *Id.* at 1026. Neither should this Court.[12]

In any event, unlike the laws at issue in *Mugler* and its progeny, A2761 does not simply regulate the use of Plaintiffs' property. Instead, it prohibits Plaintiffs from continuing to possess their property. *See Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2429 (2015). Apart from recent decisions analyzing takings challenges to arms bans in a preliminary injunction posture,[13] Defendants' cited decisions do not involve bans on the continued possession of lawfully acquired property. *See Mugler*, 123 U.S. at 669 (restriction on the use of property); *Akins v. United States*, 82 Fed. Cl. 619, 622–23 (2008) (registration requirement); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) (confiscation of property in connection with criminal proceeding). The sole

---

[12] Defendants seek to limit *Lucas* to real property. Resp. Br. 29–30. *Lucas* allowed that uncompensated restrictions on the *sale* of personal property were more likely to be upheld under a regulatory takings analysis in light of "the State's traditionally high degree of control over commercial dealings," *Lucas*, 505 U.S. at 1027, but it never suggested that the Takings Clause does not require compensation for State regulation of personal property under the police power. "Nothing in the text or history of the Takings Clause . . . suggests that the rule is any different when it comes to appropriation of personal property." *Horne*, 135 S. Ct. at 2426.

[13] Courts have divided on the status of confiscatory magazine bans under the Takings Clause. Contrary to Defendants' contention, however, the district court in *Duncan*—affirmed by the Ninth Circuit—squarely rejected a police-power exception to takings, and its analysis did not rely on its separate conclusion that magazines are protected by the Second Amendment. 265 F. Supp. 3d at 1136–37.

exception—a forty-year-old D.C. Court of Appeals decision that predated *Loretto*, *Lucas*, and *Horne*—summarily rejected a takings challenge based on the now-discredited assumption that exercises of the police power are categorically exempt from the Takings Clause. *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979).[14]

Finally, Defendants' own expert conceded that citizens will suffer economic loss from the taking of their property, PFOF 71, and even if Plaintiffs obtain *some* compensation, Act A2761 does not secure *just* compensation. To the contrary, Act A2761 virtually guarantees that any sale would return less than just compensation by providing for an influx of magazines into a limited market of those "entitled to own or possess" them. A2761 § 5(a). That is a narrow class, consisting primarily of retired and active police officers and active military personnel and dealers who sell to them. N.J.S.A. 2C:39-3(g); A2761 § 3.[15]

## II.   The Remaining Factors Favor Injunctive Relief.

Irreparable harm is "more likely than not," *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), because "a prospective violation of a constitutional

---

[14] The power to abate nuisances is not a justification for the ban. Governments may act to abate nuisances without paying compensation only to the extent consistent with preexisting, background principles of nuisance law. *See Lucas*, 505 U.S. at 1029–30. Defendants make no argument that A2761 "expressly prohibit[s]" that which was "*always*" unlawful," *id.* at 1030–31, and a duty to compensate arises when the State criminalizes continued possession of *lawfully* owned property.

[15] To the extent an out-of-state sale is possible, New Jersey cannot justify its ban by the less restrictive laws of other jurisdictions. *See Ezell*, 651 F.3d at 697.

right constitutes irreparable injury," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir.

2013); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir.

2013); *Ezell*, 651 F.3d at 699. The remaining two factors "merge," *Nken v. Holder*,

556 U.S. 418, 455 (2009), and favor Plaintiffs because "the enforcement of an

unconstitutional law vindicates no public interest," *Ayers*, 710 F.3d at 114.

## CONCLUSION

Plaintiffs' respectfully request that the Court enter a preliminary injunction.

Dated: September 4, 2018                    Respectfully submitted,

David H. Thompson*                          /s/Daniel L. Schmutter
Peter A. Patterson*                         Daniel L. Schmutter
Haley N. Proctor*                           Hartman & Winnicki, P.C.
J. Joel Alicea*                             74 Passaic Street
COOPER & KIRK, PLLC                         Ridgewood, New Jersey 07450
1523 New Hampshire Avenue, N.W.             (201) 967-8040
Washington, D.C. 20036                      (201) 967-0590 (fax)
(202) 220-9600                              dschmutter@hartmanwinnicki.com
(202) 220-9601 (fax)
dthompson@cooperkirk.com

* Admitted *pro hac vice*