GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Defendants,
    Gurbir S. Grewal and Patrick J. Callahan

By:   Bryan Edward Lucas (108462015)
      Deputy Attorney General
      (973) 648-3573
      Bryan.Lucas@law.njoag.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and ALEXANDER DEMBOWSKI,<br><br>        Plaintiffs,<br><br>    v.<br><br>GURBIR GREWAL, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department, and JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department,<br><br>        Defendants. | Hon. Peter G. Sheridan, U.S.D.J.<br><br>Hon. Lois H. Goodman, U.S.M.J.<br><br><br>Docket No. 3:18-cv-10507-PGS-LHG<br><br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Defendants Gurbir S. Grewal, Attorney General of New Jersey and Colonel Patrick J. Callahan, Superintendent of the New Jersey State Police (collectively, "Defendants"), respectfully submit these proposed findings of fact and conclusions of law following the hearing conducted on August 13th, 16th, and 17th, 2018 before the Honorable Peter G. Sheridan, U.S.D.J.

## I.      INTRODUCTION

Plaintiffs filed a lawsuit challenging the constitutionality of A2761, a bill signed into law in June 2018 that limits magazine capacity in firearms to ten rounds of ammunition. The Plaintiffs allege that the law violates the Second and Fourteenth Amendments to the U.S. Constitution, represents an unlawful taking of private property, and violates the Equal Protection Clause.

Subsequent to the filing of the lawsuit, Plaintiffs sought a preliminary injunction against enforcement of a provision requiring owners of now non-compliant ammunition magazines to dispossess themselves of those items, or modify their magazine clips to comply with the new law, within 180 days of the law's effective date. The parties took the depositions of some of the declarants who submitted declarations supporting or opposing the preliminary injunction application. A three-day hearing was held before this Court on August 13th, 16th, and 17th, 2018.

For the reasons that will be discussed below, Plaintiffs fail to meet the standards necessary for the issuance of a preliminary injunction. A2761 does not implicate the protections afforded by the Second Amendment and even if this Court found that it did, the law still withstands scrutiny. Also, retired law enforcement officers are not a suspect class and permitting them to utilize magazines with up-to-fifteen-rounds of ammunition meets rational basis scrutiny. Finally, A2761 does not run afoul of the Takings Clause because it is an appropriate exercise of the State's police power. Further, the law does not deprive Plaintiffs of all beneficial use of their property. Thus, for this additional ground, the State is not required to compensate owners of now-prohibited firearm magazines.

## II.     PROPOSED FINDINGS OF FACT

### A. <u>BACKGROUND</u>

#### 1.     <u>A2761</u>

1.      On June 13, 2018, Governor Philip D. Murphy signed into law Assembly Bill 2761 ("A2761").

2.      A2761 generally prohibits possession of firearm magazines capable of holding more than ten rounds of ammunition by revising the definition of "large capacity magazine" ("LCM") that is lawful to possess in New Jersey

from a magazine with the capacity to hold 15 rounds of ammunition to one capable of holding 10 rounds of ammunition. N.J. Stat. Ann. § 2C:39-1(y).

3.      New Jersey law now defines an LCM as "a box, drum, tube or other container which is capable of holding more than 10 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." N.J. Stat. Ann. § 2C:58-1y.

4.      This definition does not apply to "an attached tubular device which is capable of holding only .22 caliber rimfire ammunition." *Ibid.*

5.      A2761 gives owners of now-prohibited magazines 180 days to comply with the law. N.J. Stat. Ann. § 2C:39-19.

6.      Owners have several options: "[t]ransfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine; [r]ender the semi-automatic rifle or magazine inoperable or permanently modify a large capacity magazine to accept 10 rounds or less; or [v]oluntarily surrender the semi-automatic rifle or magazine." *Ibid.*

7.      The law also contains exemptions for firearms "with a fixed magazine capacity [of up to] 15 rounds which is incapable of being modified to accommodate 10 rounds or less" and a "firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable

4

of being modified to accommodate 10 or less rounds." Owners of those weapons have to register them within one year, but do not need to dispossess themselves of those weapons. N.J. Stat. Ann. § 2C:39-20.

8.      A2761 also contains an exemption allowing certain retired law enforcement officers to carry an LCM "capable of holding up to 15 rounds of ammunition." N.J. Stat. Ann. § 2C:39-17.

9.      This exemption only applies to retired law enforcement officers who are authorized under federal and state law to possess and carry a handgun. *Ibid*.

10.     In order to qualify for that exemption, a retired law enforcement officer must "semi-annually qualif[y] in the use of the handgun he is permitted to carry in accordance with the requirements and procedures established by the Attorney General." N.J. Stat. Ann. § 2C:39-6(l).

11.     On the same day A2761 was enacted, the Association of New Jersey Rifle and Pistol Clubs, Inc., Blake Ellman, and Alexander Dembowski (collectively, "Plaintiffs") filed suit, alleging that A2761 violates the Second Amendment, the Takings Clause of the Fifth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. ECF 1.

12.     On June 21, 2018, Plaintiffs filed a motion for a preliminary injunction, asking this Court to prohibit enforcement of A2761, or, in the

alternative, to allow owners of unaltered up-to-15-round magazines to load those magazines with up to 10 rounds of ammunition and to toll the 180-day compliance period. ECF 14.

2.    New Jersey's Matrix of Gun Laws and Regulations

13.    New Jersey law bans fully-automatic firearms (aka "machine guns") and the possession of certain "assault firearms," including the AR-15, which has been described as the "most popular rifle in American history," "AK"-type assault firearms, Uzi semi-automatic firearms, and others, including firearms substantially similar to those banned but marketed under different names. N.J. Stat. Ann. § 2C:39-1(i), (w); N.J. Stat. Ann. § 2C:39-5; *see also*, Joint Exhibit ("JX") 12 at 859.

14.    Possession of these weapons is a crime of the second degree. N.J. Stat. Ann. § 2C:39-5(a), (f).

15.    New Jersey law also restricts lawfully possessed and owned firearms in several ways. N.J. Stat. Ann. § 2C:39-5.

16.    For example, a handgun cannot be carried in public unless the owner obtains a permit to do so. Violation of this law is a crime of the second degree. N.J. Stat. Ann. § 2C:39-5(b).

17.    Public carry permits are only issued upon a firearm owner demonstrating that "he is not subject to any of the disabilities set forth in

[N.J. Stat. Ann. §] 2C:58-3c, that he is thoroughly familiar with the safe handling and use of handguns, and that he has a justifiable need to carry a handgun." N.J. Stat. Ann. §§ 2C:58-4c, d.

18.    Although this law results in few public carry permits being issued, this framework has nevertheless been upheld by the Court of Appeals for the Third Circuit against a Second Amendment challenge. *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013).

19.    Firearm possession is broadly limited to a person's home or place of business "or other land owned or possessed by him." New Jersey law does not permit the transportation of a firearm from one to the other, absent special precautions. N.J. Stat. Ann. § 2C:39-6(e).

20.    When transporting a firearm between a home and a business or between businesses, the firearm "shall be carried unloaded and contained in a closed and fastened case, gunbox, securely tied package, or locked in the trunk of the automobile in which it is being transported . . ." N.J. Stat. Ann. § 2C:39-6(g).

21.    New Jersey permits active duty members of the military (i.e., "Armed Forces of the United States or of the National Guard"), federal, state, and local law enforcement officers, and others, such as correctional officers to

carry firearms as part of their job responsibilities, while on duty. N.J. Stat. Ann. §§ 2C:39-3g, 2C:39-6(a)(1)-(11).

22.     New Jersey also allows members of rifle and pistol clubs to have weapons with them when engaging in such actions as traveling to and from target practice and participating in competitive target, trap, or skeet shooting competitions. N.J. Stat. Ann. §§ 2C:39-3j, 2C:39-6(f).

23.     Purchasing firearms in New Jersey is also closely governed. *See generally* N.J. Stat. Ann. § 2C:58-3.

24.     Before purchasing a firearm in New Jersey, a person must obtain either a permit to purchase a handgun (each permit can be used to buy one handgun) or a Firearms Purchaser Identification Card (FPIC) (one FPIC allows for unlimited rifle and shotgun purchases). *Ibid.*; *see also* N.J. Admin. Code § 13:54-1.9.

25.     As part of the process to obtain a permit or an FPIC, a person must undergo a criminal background check. N.J. Stat. Ann. § 2C:58-3.

26.     *Inter alia*, the applicant must provide his or her "name, residence, place of business, age, date of birth, occupation, sex and physical description, including distinguishing physical characteristics . . . ." N.J. Stat. Ann. § 2C:58-3(e).

8

27.     Applicants are also required to waive confidentiality about any institutional confinement experienced for a mental or psychiatric condition and must provide "the name and location of the doctor, psychiatrist, hospital or institution and the dates of the occurrence . . . ." *Ibid.*

28.     A permit or FPIC is only valid for 90 days. N.J. Stat. Ann. § 2C:58-3(f).

29.     A firearms purchaser in New Jersey is not required to go through any specialized training prior to, or after, he has purchased a firearm.

30.     Owing to New Jersey's strict gun safety measures, the Giffords Law Center to Prevent Gun Violence gave New Jersey an "A-" rating in its most recent evaluation of state-level gun regulation. *See* Defendants' Exhibit ("DX") 45.

31.     New Jersey was one of only six states to receive such a grade and only one state received an "A" rating. *Ibid.*

32.     In its report, the Law Center noted that New Jersey has the sixth lowest rate of death by firearm in the nation. *Ibid.*

**B. <u>SECOND AMENDMENT</u>**

1. <u>LCMs Are "Dangerous and Unusual" Devices Most Useful For Military Purposes</u>

33.     Congress has found that "firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this

9

ability have military purposes and are a crime problem." DX56 at 37, citing H. Rep. No. 103-489 at 18.

34.    The same report noted that "the ability to accept a large capacity magazine 'serve[s] specific, combat-functional ends.'" *Ibid.*

35.    The report went on to state that LCM-compatible weapons "pla[y] a role in increasing a firearm's 'capability for lethality,' creating 'more wounds, more serious, in more victims.'" *Ibid.* citing H. Rep. No. 103-489 at 19.

36.    Finally, the report observed that LCM-equipped semiautomatic assault weapons are the "'weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged people bent on mass murder.'" *Ibid.* citing H. Rep. No. 103-489 at 13.

37.    LCMs are among those accessories referred to as "military features" designed for use with assault weapons whose principal purpose is to "kill[] or disabl[e] the enemy on the battlefield." *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2014)(en banc).

38.    Federal appellate courts have described LCMs as "particularly designed and most suitable for military and law enforcement purposes." *Ibid.*

39.     LCMs "are 'designed to enhance' a shooter's 'capacity to shoot multiple human targets very rapidly.'" *Ibid.* (internal citation omitted).

40.     LCMs are also "meant to 'provide[] soldiers with a large ammunition supply and the ability to reload rapidly.'" *Id.* at 137 (internal citation omitted).

41.     LCMs "enable a shooter to hit 'multiple human targets very rapidly; contribute to the unique function of any assault weapon to deliver extraordinary firepower; and are a uniquely military feature' of both the banned assault weapons and other firearms to which they may be attached." *Ibid.*

2.  <u>There Is No Evidence In The Record That LCMs Are In Common Use For Self-Defense In The Home</u>

42.     At the outset of this case, Plaintiffs offered a declaration by Mr. James Curcuruto regarding the number of LCMs estimated to be in circulation in the United States. Plaintiffs' subsequently withdrew Mr. Curcuruto's declaration. Consequently, there is nothing in the record to show how many LCMs are lawfully owned in the United States.

43.     In addition, there is nothing in the record to show that LCMs are owned by a large number of people for the lawful purpose at issue in this case – i.e., self-defense in the home – or well-suited for that purpose. *See* DX23 at ¶ 13. *See also Heller v. District of Columbia*, ("*Heller II*"), 670

F.3d 1244, 1262 (D.C. Cir. 2011)("[H]ardly any evidence [exists] that [LCMs] are well-suited or preferred for the purpose of self-defense or sport."); *Kolbe*, 849 F.3d at 138 ("there is scant evidence . . . [that LCMs] are possessed, or even suitable, for self-protection."); *S.F. Veteran Police Officers v. City & County of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D.Cal. 2014)("the number of instances in which more than ten rounds have been fired in self-defense (in our entire country) by civilians is exceedingly rare."); *see also* Section II.B(6) *infra*.

3. <u>Guns Equipped With LCMs Are Often Used In Mass Shootings and the Rate of Such Use is Increasing</u>

44.    Prior to the federal ban on LCMs, semiautomatic pistols and semiautomatic rifles equipped with LCMs were used to perpetrate notorious mass shootings. To take just a few examples, on July 18, 1984, James Huberty killed 21 people and wounded 19 others at a McDonalds restaurant in San Ysidro, California. On September 14, 1989, Joseph Wesbecker killed seven people and wounded 15 others in Louisville, Kentucky. DX83.

45.    Prior to the federal LCM ban, LCM-equipped semiautomatic pistols were used in several tragic mass shootings. These included a mass shooting in Killgren, Texas on October 19, 1991 where George Hennard killed 22 people and wounded 23 others and a mass shooting on a Long Island

Railroad train on December 7, 1993, where Colin Ferguson killed five people and wounded 17 more. *Ibid. See also* JX14 at 14.

46.      Between 1984 and 1993, LCM-equipped semiautomatic weapons were used in 40 percent of mass shootings where six or more people were killed or a total of 12 or more people were wounded. JX14 at 14.

47.      In 1994, the year the federal LCM ban went into effect, LCM-equipped guns were estimated to have been used in between 31 percent and 41 percent of gun murders of police. *Id*. at 18.

48.      The LCM restriction contained in the federal assault weapons ban has been described as "the most important feature" of that law. DX68 at 168.

49.      A study of mass shootings in which at least six people were killed found that in the ten years (1994-2004) when the federal LCM ban was in place, there were only 12 such incidents and an overall total of 89 deaths; however, in the ten years after the federal LCM ban lapsed, there were 34 mass shootings resulting in six or more deaths and a total of 302 deaths. DX23 at ¶ 38.

50.      These incidents included:

- Brookfield, Wisconsin on March 13, 2005 (eight people (including shooter) killed with Beretta 9mm semiautomatic pistol equipped with 13-round magazine);

13

- Goleta, California on January 30, 2006 (seven people killed with a Smith & Wesson 9mm semiautomatic pistol equipped with 15-round magazines);

- Blacksburg, Virginia on April 16, 2007 (33 people (including shooter) killed and 17 wounded with a Glock G17 semiautomatic pistol and a Walther P22 pistol equipped with 15-round magazines);

- Charleston, South Carolina at the Emanuel African Methodist Episcopal Church on June 17, 2015 (9 killed with a Glock Model 41 semiautomatic pistol equipped with a 13-round magazine); and

- Newtown, Connecticut on December 14, 2012 (26 people, including 20 children aged five or six, killed with assault rifle and semiautomatic pistol equipped with LCMs), and in Kalamazoo, Michigan on February 20, 2016 (6 people killed and 2 people injured with a Glock 19 semiautomatic pistol and Walther P99 semiautomatic pistol equipped with "extended" magazines). DX83.

51.     Nidal Hasan, who used LCM-equipped semiautomatic pistols to kill 13 people and wound 32 others in Fort Hood, Texas in 2011, was reported to have specifically requested pistols with the highest possible magazine capacity when he purchased the firearms used in that mass shooting. DX28.

52.     Other mass shootings resulted in the death or grievous injury to elected or appointed government officials and law enforcement. For example, on January 8, 2011, 6 people were killed, including U.S. District Court Judge John Roll, and 13 wounded, including U.S. Representative Gabrielle Giffords, by a gunman equipped with a Glock G19 semiautomatic pistol and two 31-round magazines and two 15-round magazines. DX83.

53.     At that mass shooting, a nine-year-old girl, Christina-Taylor Green, was killed by the 13th shot from the assailant's 31-round LCM. DX23 at ¶ 50.

54.     The shooter was subdued when he was trying to reload his handgun. *Ibid.*

55.     That mass shooting may have had fewer fatalities had the shooter been forced to reload after firing 10 rounds instead of 31. *Ibid.*

56.     In other incidents, mass shooters used a combination of assault rifles and LCM-equipped semiautomatic pistols to kill multiple members of law enforcement. For example, on July 7, 2016, 5 law enforcement officers were killed and 9 were wounded in Dallas, Texas by a gunman using an assault rifle and two LCM-equipped semiautomatic pistols. Just ten days later, in Baton Rouge, Louisiana, 3 law enforcement officers were killed and 3 were

wounded by a gunman using two assault rifles and a semiautomatic pistol equipped with LCMs. DX106.

57.    A study of mass shootings in the United States between 1982 and 2012, comparing cases where an LCM was known to have been used (or possessed by the shooter) against cases where no LCM was used or known to have been used, revealed far greater numbers of fatalities and non-fatal injuries in the former. In mass shootings involving guns equipped with LCMs, there were an average of 10.19 fatalities and 12.39 non-fatal injuries. In mass shootings involving guns where LCMs were not used, there were 6.35 fatalities and 3.55 non-fatal injuries. DX22 at p. 66.

58.    A separate study of similar data showed that of 96 mass shootings (defined as a shooting where four or more people were killed) in the United States since 1982, in 83 of those incidents, magazine capacity of the guns used by the shooters was known. Fifty-four of those incidents, or 65 percent, involved LCM-equipped weapons. DX3 at ¶ 22.

59.    Even assuming the 13 incidents where magazine capacity was unknown did not involve LCMs, the number of mass shooting incidents where LCMs were used would still be 56 percent of the total. *Ibid*.

60.     Of the 96 mass shooting incidents reviewed above, 37 involved the use of LCMs where the number of rounds of ammunition expended was also known. In those cases, an average of 99 bullets were fired. *Id*. at ¶ 23.

61.     In the 50 years between 1966 and 2016, there were 111 mass shooting incidents where six or more people were killed (not including the perpetrator). In those 111 incidents, 904 people were killed. DX63 at 71.

62.     Thirty-nine out of 111 of those incidents, or roughly 35 percent of the mass shootings in the past 50 years, occurred in the decade between 2006 and 2016. *Ibid*.

63.     In the previous ten years, there were only 15 mass shootings. *Ibid*.

64.     There was a 160 percent increase in the number of mass shootings between 1996-2005 (15) and 2006-2015 (39). *Ibid.*

65.     Three hundred forty-nine people were killed in mass shootings between 2006 and 2015, or nearly 40 percent of all those killed in such incidents in the past 50 years. *Ibid*.

66.     The use of LCMs in gun massacres of this sort increased nearly nine-fold between 1966-1975 (3) and 2006-2015 (26). *Id.* at p. 219, Table 6.3.

67.     LCMs have been used in two-thirds of all gun massacres during this most recent time period. *Ibid.*

68.     In gun massacres where an LCM is used, the number of fatalities increases 17 percent as compared to those gun massacres in which no LCM is used. *Id*. at p. 221.

69.     Plaintiffs' expert, Dr. Gary Kleck, acknowledged that "the fraction of people wounded by mass shooters who died is higher than in the general run of assaults with guns," that the rates of fatal woundings in mass shootings were "considerably higher" than in other shooting incidents, that mass shootings involving LCMs correlated with a higher number of fatalities and non-fatal injuries, and that the New Jersey Legislature need not wait for a Las Vegas-style mass shooting before acting to mitigate the threat posed by LCM-equipped firearms. Hearing Transcript ("Tr."), 343:1-22, 344:1-7, 344:12-21.

#### 4. Law Enforcement Does Not Support Civilian Use Of LCMs and Highlights the Dangers Associated with LCMs

70.     Restricting access to LCMs also serves an important law enforcement function. DX98 at ¶¶ 26-27, DX87 at ¶¶ 15-16.

71.     When engaging with a criminal, LCMs give law enforcement an edge as they reduce the need to reload firearms. DX98 at ¶ 25.

72.     Conversely, use of LCM-equipped guns by criminals is "particularly harmful" because it reduces their need to reload. *Id*. at ¶ 26.

73.     The International Association of Chiefs of Police, the National Law Enforcement Partnership to Prevent Gun Violence, and the Major Cities Chiefs Association, all support laws restricting civilian access to LCMs. DX59 at ¶¶ 8, 10, 12.

74.     In a mass shooting situation, if an active shooter did not have access to LCMs of 30, 50 or 100 rounds, but instead only had 10-round magazines, that shooter would have to swap magazines nine times to shoot 100 bullets and "would thus offer nine . . . more chances for bystanders or law enforcement to intervene during a pause in firing, nine more chances for something to go wrong with a magazine during a change, nine . . . more chances for the shooter to have problems quickly changing a magazine under intense pressure, and nine . . . more chances for potential victims to find safety during a pause in firing." DX10 at ¶ 49.

75.     LCM-equipped firearms were used in the murder of 30 percent of all law enforcement officers between 2003 and 2007; that number rose to 40 percent between 2009 and 2013. DX68 at 317, Table 3.

76.     Law enforcement professionals have also testified about the danger posed by LCM-equipped weapons. DX 23 at ¶¶ 49-50.

77.     Clark County (Nevada) Sheriff Joe Lombardo noted "there's no need to have a high-capacity magazine for any practical reason." *Id.* at ¶ 49.

19

78.     Sheriff Lombardo added that when a shooter needs to reload, it gives "potential victims an opportunity to escape and law enforcement officials an opportunity to safely fire back." *Ibid.*

79.     Sheriff Lombardo's statement is supported by Baltimore County Police Chief Jim Johnson, who noted that during the mass murder of kindergarteners at Sandy Hook Elementary School in 2012, "additional potential victims were able to escape harm" when the killer paused to reload. Had the killer "been required to reload after ten rounds, instead of 30, many more children's lives may have been saved." DX59 at ¶ 55.

80.     Chief Johnson went on to note that under the high stress of an active shooting environment, "criminals, including mass shooters, are often unable to quickly reload, allowing more and sooner opportunities for intervention or for potential victims to seek cover or escape." *Id.* at ¶ 56.

81.     The Plaintiffs' expert, Dr. Kleck, acknowledged that it could take a shooter as long as 20 seconds to change an LCM under certain circumstances. Tr., 338:17-20.

82.     Indeed, video taken during a mass shooting in Las Vegas, Nevada in 2017 shows that "concert attendees would use the pauses in firing when the shooter's high-capacity magazines were spent to flee the deadly venue before more shots were fired." DX23 at ¶ 41; DX14.

83.     The same is true of a mass shooting that took place at the Washington, D.C. Navy Yard on September 16, 2013. There, the shooter in question used a seven-round shotgun to kill 12 people and injure several others before the police shot and killed him. During his shooting spree, the killer spotted a woman hiding next to a filing cabinet. He walked up to her, aimed his weapon at her and pulled the trigger; however, he had run out of ammunition. He retreated to reload and the woman escaped. DX63 at 134.

84.     John Walsh, the United States Attorney for the District of Colorado, explained in testimony before the U.S. Senate Judiciary Committee on February 27, 2013 that "shutting off the flow of military-style assault weapons and high-capacity magazines is a *top public safety priority*." DX23 at ¶ 50 (emphasis added).

85.     Walsh went on to document incidents where shooters with LCMs had inflicted mass murder, including the 2007 mass shooting at Virginia Tech and other shootings in Tucson, Arizona, Oak Creek, Wisconsin, and Fort Hood, Texas. *Ibid.*

86.     These mass murders, Walsh testified, were the result of an LCM turning "any weapon into a tool of mass violence." *Ibid.*

87.     Walsh stated that restricting LCMs could reduce the potential death toll from mass shootings in two ways: first, "by affording a chance for law

enforcement or bystanders to intervene . . . ," and second, "by giving bystanders and potential victims an opportunity to seek cover or escape when there in an interruption in the firing." *Ibid.*

88.     At least one contemporary scholar has indicated that whether a state has enacted an LCM restriction is the single best predictor of the mass shooting rate in that state and that LCM restrictions correlate with a 63 percent reduction in mass shooting rates in the states that have adopted them. DX89.

5. <u>Guns Equipped With LCMs Make Violent Crime Outcomes Worse and Their Use in Violent Crime is Becoming More Prevalent</u>

89.     A study of gun homicide victims conducted in Milwaukee, Wisconsin between 1992 and 1995 showed that victims killed by guns equipped with LCMs had 55 percent more wounds than victims killed by guns not equipped with LCMs.  JX14 at 86.

90.     A study of crime guns seized in Baltimore, Maryland found that in incidents where a victim was shot, LCM-equipped firearms were 17 to 26 percent more likely to have been used than in incidents where no victims were wounded. That same study also found that guns linked to murders were 8 to 17 percent more likely to have been committed with an LCM-equipped gun than guns not equipped with an LCM. JX14 at 69-70, 87.

91.     A study of crime in Baltimore, Maryland showed that 16.5 percent of all "crime guns" (guns used in the commission of a crime) seized between 2012 and 2014 were equipped with an LCM, but 21.5 percent of those guns were connected with the commission of a violent crime. DX68 at 315.

92.     A similar study in Richmond, Virginia found that 22 percent of crime guns seized between 2008 and 2009 were equipped with LCMs. *Ibid*.

93.     Similar studies of other cities, including Hartford, Connecticut, Kansas City, Missouri, and Seattle, Washington, confirmed that LCM-equipped firearms were seized as crime guns in between 22 percent (Hartford) and 36 percent (Kansas City and Seattle) of all cases reported between 2012 and 2014. *Ibid.*

94.     The same research revealed that a clear trend has developed – crime guns equipped with LCMs are becoming more prevalent. *Id.* at 317, Table 3.

95.     For example, in Richmond, Virginia, LCM-equipped firearms accounted for 10 percent of all crime guns between 2003 and 2004; however, that number jumped to 22 percent between 2008 and 2009, an increase of 111 percent. *Ibid.*

96.     Similarly, in Baltimore, Maryland, LCM-equipped firearms accounted for 11 percent of all crime guns between 2004 and 2006; however, that

number increased to 16.5 percent between 2012 and 2014, an increase of 48 percent. *Ibid.*

97.     In Minneapolis, Minnesota, LCM-compatible firearms were recovered in nearly half of all violent crime investigations between 2012 and 2014. *Ibid*.

98.     Research shows that more than one-third of crime guns are manufactured and sold with LCMs. DX28.

99.     Research also suggests that "increased use of [LCMs] has also contributed to an increase in non-fatal gunshot injuries." *Ibid.*

6.   Defensive Gun Use Is Not Common in the United States

100.     Data from the National Crime Victimization Survey ("NCVS") indicates that of the estimated 6 million violent crimes that were committed in the United States between 2007 and 2011, a gun was either brandished or fired in self-defense less than 1 percent of the time, for a total of approximately 60,000 defensive gun uses ("DGUs") over a four-year period. DX23 at ¶ 43.

101.     By comparison, Plaintiffs' expert, Dr. Kleck, has asserted, based on a telephone survey conducted 25 years ago, that in and around 1993, 2.5 million annual DGUs (including mere brandishing of a firearm) occur each year. Dr. Kleck's research has been criticized by other scholars in the field.

*See* DX18 at 465 (Professor Philip Cook of Duke Law School noted that because DGUs are a "rare event", a small false-positive result will lead to a relatively large overestimate), DX49 at 1431 (Professor David Hemenway of Harvard University noted that Dr. Kleck's survey had a "huge overestimation bias" and did little to "reduce the bias or validate [the study's] external findings"), DX50 at 6 (separate Hemenway study noted that "all attempts at external validation" of Dr. Kleck's estimate indicated it was an "enormous overestimate.").

102.     Dr. Kleck also testified under oath last year that his current estimate of annual DGUs was roughly half that of his 1993 estimate; however, that information was not included in his declaration in this case. DX113 at 506:5.

103.     In 2018, the NRA estimated that the total number of annual DGUs in the United States did not exceed 760,000, a figure more than three times *lower* than Dr. Kleck's 1993 estimate. ECF 34-2 at 27 (emphasis added).

7.  <u>LCMs Are Not Needed For Self-Defense</u>

104.     The National Rifle Association ("NRA") maintains a database of "armed citizen" stories in which individuals claim to have successfully defended themselves or others using a firearm, including incidents when the firearm was brandished, but not fired. DX3 at ¶ 8.

105.    An analysis of the 736 incidents in the database that occurred between January 2011 and May 2017, found that defenders fired an average of 2.2 shots in self-defense. *Id*. at ¶ 10.

106.    The analysis also found that in just two of the 736 incidents (three-tenths of one percent) did the defender self-report firing more than 10 bullets. *Ibid*.

107.    The study also focused on the subset of reported incidents that occurred in the home. There, defenders fired an average of 2.1 bullets. *Ibid.*

108.    An analysis of this database examining only those incidents that occurred in New Jersey was consistent with the nationwide findings. Defenders in New Jersey reported shooting an average of 2.2 bullets in the six incidents reported to the NRA. In none of the cases were more than 10 bullets fired. *Id*. at ¶ 11.

109.    A comprehensive, randomized search of nationwide news stories involving the use of guns in self-defense yielded similar results. *Id*. at ¶ 16.

110.    In that study, which surveyed 33,000 news sources and covered the same time period of January 2011 through May 2017, approximately 4,800 stories were found regarding the use of a firearm in self-defense. *Id*. at ¶ 14.

111.    Adjusting for the fact that incidents receive more public attention when more shots are fired in self-defense than incidents where no, or few,

shots are fired in self-defense, the study yielded an average number of 2.34 shots fired per incident. *Id*. at ¶ 17.

112.    The study also showed that in 97.3 percent of the incidents, the self-defender fired five or fewer shots. *Id*. at ¶ 18.

113.    The study showed that in 11.6 percent of the incidents, the self-defender brandished a gun, but fired no shots. *Ibid*.

114.    There were no incidents where the self-defender reportedly fired more than 10 rounds. *Ibid.*

115.    These findings track with a separate data set maintained by the NRA of 482 incidents that occurred between 1997 and 2001. In that data set of self-reported incidents, an average of 2.2 shots were fired by defenders and in 28 percent of the incidents, no shots at all were fired. *Id*. at ¶ 10 n.4.

116.    Similarly, the total number of times a defender was reported to have fired more than 10 bullets was two, or one-half of one-percent of all incidents. *Id*. at ¶ 10 Table 1.

117.    These conclusions are echoed by John Lott, Jr., the author of several books related to gun ownership, including *More Guns, Less Crime* and *The Bias Against Guns*. Mr. Lott is quoted as saying that 98 percent of defensive gun use only requires brandishing the weapon without firing a single bullet. DX23 at ¶ 44.

118.     Dr. Kleck, has also observed that it is "more common[]" for a self-defender or an assailant to merely brandish a gun "to accomplish the[ir] ends." *Id.* at ¶ 45.

119.     Dr. Kleck has also been quoted as saying that when citizens use a gun to defend themselves, "the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers." *Id*. at ¶ 46.

120.     Dr. Kleck could not identify a single incident over a more than 25-year career studying DGUs in which an individual fired more than ten rounds defending against a home invader other than the incidents identified by Defendants' expert, Lucy Allen. Tr., 295:1, 25, 296:1, 4, 11, 18-23, 299:4, 299:9-10.

121.     Dr. Kleck further testified that he does not know how many times LCMs are used in self-defense of the home. *Id.* at 294:25-295:8.

122.     Dr. Kleck stated that he thought it was "logical" that other DGUs involving more than 10 rounds had occurred, but could not identify any. *Id.* at 296:10-20.

123.     The idea that a self-defender would need to fire more than 10 rounds in self-defense, as speculated by Plaintiffs, has been described as not "realistic" by Baltimore City Police Chief Anthony Batts, a law enforcement professional with more than 30 years of experience. DX10 at ¶ 37.

124.     Chief Batts stated that he "recommended .38 caliber snub nose revolvers [holding six bullets] for self-defense when asked by members of my family for a recommendation." *Id.* at ¶ 34.

125.     Glenn Stanton, a firearms instructor and range master for the New Jersey Division of Criminal Justice, testified that he recommends a 20-gauge shotgun for personal protection. Such a weapon cannot accept an LCM. Tr., 112:23.

126.     Mr. Stanton also testified that while he owns three firearms for self-defense, none has a magazine capacity of more than ten rounds. *Id.* at 111:25-112:13.

127.     Mr. Stanton further testified, based on his more than 30 years of experience in law enforcement, that it would be unwise for an untrained civilian to use a firearm with an LCM in self-defense because of the risk to innocent bystanders, family members, and others, who might be struck by a wayward bullet. *Id.* at 116:2-11; *see also* DX23 at ¶ 50.

128.     Untrained civilians are not likely to be good shots, therefore, most of their bullets will miss their intended target. DX10 at ¶ 42.

129.      While the intended target may not be hit, another person or object may be hit, resulting in a greater risk to public safety. *Id.* at ¶ 43.

130.    Baltimore County Police Chief Johnson, who has 35 years of law enforcement experience, stated in a case challenging Maryland's LCM-restriction law, that "a large-capacity magazine is not appropriate or necessary for self-defense." DX59 at ¶ 37.

131.    Chief Johnson also noted that in "the vast majority of self-defense cases involving a firearm, knowledge that the victim has a firearm is all that is necessary to send the assailant away. In other cases, one or only a few shots fired are sufficient to end the encounter." *Ibid.*

132.    The Complaint identifies two instances of home invasion in New Jersey. In one case, the homeowner lacked a firearm and scared off the invaders by yelling loudly. In the other, the homeowner merely brandished his gun and did not fire a single shot. ECF 1  ¶¶ 32-33.

133.    Although the Complaint indicates that the weapon brandished in the above example, the Glock 19, utilized a then-legal 15-round magazine, it can also be operated with a 10-round magazine.  Tr., 120:12-24.

134.    None of the Plaintiffs, or their expert, identified a single semiautomatic pistol that could not be adapted to accept a 10-round ammunition clip.

135.    None of the Plaintiffs, or their expert, identified in his declaration, deposition or hearing testimony a single instance in the state of New Jersey

when a civilian fired more than 10 rounds in self-defense. *See supra* at ¶ 105, Tr., 296:11, 18-23 (Dr. Kleck noting the only instances he was aware of nationally were based on incidents identified by Lucy Allen); *see also* ECF 1 ¶¶ 32-33 (only examples of self-defense in the home involved yelling at intruders and brandishing (but not firing) a gun).

136.    A2761 does not restrict the number of 10-round magazines a person can purchase. Tr., 263:11, 13-16.

### 8. A2761 Limits Criminals' Access to LCMs

137.    One of the most popular sources of firearms for criminals is the theft of firearms from law-abiding citizens. DX23 at ¶ 61.

138.    Current estimates place the number of guns stolen or lost in the United States each year at anywhere from 237,000 to 380,000. *Id.* at ¶ 61 n. 40.

139.    The greater the number of LCMs in circulation, the more opportunity there is for criminals to steal them. *Ibid.*; *see also*, Tr., 116:17-19, 117:13-18

140.    By decreasing the number of LCMs in circulation, the chances a law-abiding citizen will be confronted by an assailant using a firearm equipped with an LCM will decrease. DX23 at ¶ 60.

### 9. Firearm Ammunition Capacity Regulations Are Longstanding

141.    LCMs as an ammunition delivery device for firearms did not become commercially available until the early twentieth century. DX60.

142.    Laws enacted in the 1920s and 1930s prohibited the possession, use, sale, and/or purchase of certain weapons based on the number of rounds that could be fired without the need to reload. *See, e.g.*, 1927 R.I. Pub. Laws 256 §§ 1, 4 (banning firearms "which shoot[] more than twelve shots semi-automatically without reloading); 1933 Cal. Stat. 1170, § 3 (banning "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity of greater than ten cartridges"); 1927 Mich. Pub. Acts 887, §3 (prohibiting possession of "any machine gun or firearm which can be fired sixteen times without reloading"); 47 Stat. 650, ch. 465, §§ 1, 14 (1932)(prohibiting weapons capable of firing 12 or more times without reloading (including semiautomatic firearms) from the District of Columbia); 1933 S.D. Sess. Laws 245 § 1 (banning machine guns that could fire more than five rounds without reloading); 1933 Tex. Gen. Laws 219 § 1 (same); 1931 Ill. Laws 452 § 1 (banning machine guns that could fire more than eight rounds without reloading); 1932 La. Acts 336 § 1 (same); 1934 S.C. Acts 1288 § 1 (same).

143.    Certain of these laws did not merely prohibit magazines based on their capacity, as A2761 does, but the firearm itself. *See*, *e.g.*, 47 Stat. 650,

ch. 465, §§ 1, 14 (1932); 1927 R.I. Pub. Laws 256 §§ 1, 4; 1933 Cal. Stat. 1170, § 3; 1927 Mich. Pub. Acts 887, § 3.

144.    The laws did not just restrict firearms based on the number of bullets that could be fired with one pull of the trigger, but the number of bullets that could be fired without *reloading* – i.e., magazine capacity.

145.    In 1932, Congress prohibited the possession of weapons in the District of Columbia capable of firing 12 or more times without reloading. *See* 47 Stat. 650, ch. 465, §§1, 14 (1932).

146.    In fact, the NRA "urged" passage of the 1932 D.C. law and expressed its hope "it can then be used as a guide throughout the States of the Union, some seven or eight of which have already enacted similar legislation." S. Rep. No. 575 at 4-6 (1932).

147.    Two years later, Congress passed a federal law that essentially banned the possession of fully automatic machine guns. *See* 48 Stat. 1236 (1934); s*ee also U.S. v. Miller*, 307 U.S. 174 (1937).

148.    Before the 1980s, the handgun most Americans owned was a revolver which typically held six rounds of ammunition. DX103.

149.    Beginning in the 1980s and 1990s, "production of pistols with magazines holding more than 10 rounds grew . . . ." DX69.

150.     In response to the changes in the marketplace, both the federal government and state governments began enacting laws restricting the number of rounds of ammunition that gun magazines could hold.

151.     In 1990, New Jersey enacted a law generally restricting magazine capacity to 15 rounds of ammunition. *See* P.L. 1990, c. 32.

152.     In 1992, Hawaii enacted a law generally restricting magazine capacity to 10 rounds of ammunition and gave those in possession of magazines of up-to-twenty rounds two years to dispossess themselves of those LCMs. Haw. Rev. Stat. Ann. § 134-(8).

153.     In 1994, the federal government banned the possession or transfer of LCMs capable of holding more than ten rounds of ammunition as part of a broader prohibition on the possession of certain assault weapons. Pub. L. 103-222, Sept. 13, 1994.

154.     The federal law included a "grandfather" provision permitting the possession, ownership and transfer of LCMs purchased prior to the effective date of the law. *Ibid.*

155.     The federal law also contained a ten-year "sunset" provision and the law lapsed in 2004 when Congress failed to reauthorize it.

156.     In all, nine states, California, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Vermont, and the

District of Columbia, restrict magazine capacity. *See* Cal. Penal Code §§ 16350, 16740, 16890, 32310-32450; Colo. Rev. Stat. §§ 18-12-201, 18-12, 303; Conn. Gen. Stat. §§ 53-202w, 52-202q; D.C. Code Ann. § 7-2506.01(b); Haw. Rev. Stat. Ann. § 134-8(c); Md. Code Ann., Crim Law § 4-305; Mass. Gen. Laws ch. 140 §§ 121; 131M; N.J. Stat. Ann. § 2C:39-1(y), -3(j), -9(h); N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11, 265.20(7-f), 265.36, 265.37; Vt. Stat. Ann. § 4201. *See also* JX16.

157.    Each of those states, except Colorado and Vermont, restricts magazine capacity to 10 rounds. Colorado restricts capacity to 15 rounds and Vermont restricts capacity to 10 rounds for long guns and 15 rounds for handguns. *Ibid.*

158.    A number of counties and municipalities have also restricted magazine capacity. *See, e.g.,* San Francisco (California) Ordinance § 249-13; Sunnyvale (California) Municipal Code § 9.44.030-60; Highland Park (Illinois) Municipal Code § 136.055; Oak Park (Illinois) Village Code Ch. 27 § 1.

## C. <u>EQUAL PROTECTION</u>

  1. <u>Retired Law Enforcement Officers Are Not Similarly Situated To the General Public or Members of the Military</u>

159. Active duty and retired New Jersey law enforcement officers are required to meet biannual certification requirements in order to carry a firearm. N.J. Stat. Ann. § 2C:39-6(1).

160. In order to carry a firearm, they are required to pass the Handgun Qualification Course and Night Handgun Qualification Course twice a year. DX98, ¶ 17.

161. To show proficiency, an officer must score at least 80 percent on both tests. *Ibid.*, Tr., 106:8.

162. The same proficiency requirement (bi-annual certification and an 80 percent score on the HQC and NHQC) is also required for retired law enforcement officers who wish to carry a personal firearm. DX98 at ¶ 18.

163. Law enforcement officers are also trained extensively in the safe handling and storage of firearms. Tr., 106:13-24.

164. Unlike law enforcement officers who receive extensive training in the safe use of handguns, most military personnel receive little or no handgun training. DX98 at ¶ 23, Tr., 108:15-109:17.

165. Furthermore, the military works in a vastly different environment than law enforcement (combat vs. peacetime) and their roles are very different

36

(military action is focused on subduing the enemy while law enforcement is focused on addressing crime and apprehending criminals). DX98 at ¶ 24, Tr., 109:22-110:21.

166.    Notwithstanding whatever firearms training a person may receive in the military, if that person enters law enforcement in New Jersey, he or she must still undergo the same training and certification regimen as all other officers are required to do. DX98 at ¶ 21, Tr., 107:13.

167.     New Jersey law delimits the ability of civilians to carry firearms. N.J. Stat. Ann.  § 2C:58-4; *see also supra* at ¶¶ 16-17.

168.    While New Jersey places a number of requirements on individuals before they may purchase a firearm in the state, applicants for a permit to purchase a handgun or FPIC do not need to show proficiency with a firearm or take any training courses related to the safe storage of firearms. *See supra* at ¶ 29; Tr., 106:25-107:3.

**D. <u>TAKINGS CLAIM</u>**

   1. <u>A2761 Provides Options For Disposing of Now-Banned LCMs</u>

169.    A2761 does not deprive LCM owners of all economically beneficial use of their property. Plaintiffs concede that the law permits them to receive some compensation via transfer or sale of their LCM. ECF 14 at 36.

170.      A2761 provides alternatives for LCM owners to sell, modify, or otherwise dispose of their magazines within six months of the law's passage. N.J. Stat. Ann. § 2C:39-20.

171.      A2761 also exempts firearms using a fixed capacity magazine of 15 rounds or using detachable 15-round magazines that cannot be modified to accept the 10-round magazine. *See supra* at ¶ 7.

## III.   PROPOSED CONCLUSIONS OF LAW

## A. <u>STANDARD FOR GRANTING A PRELIMINARY INJUNCTION</u>

172.      The grant of preliminary injunctive relief "is an extraordinary remedy which should be granted only in limited circumstances." *Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1998).

173.      To obtain a preliminary injunction, the movant must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief. *Kos Pharms Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004).

174.      The moving party seeking injunctive relief must produce "evidence sufficient to convince the district court that all four factors favor preliminary

relief." *N.J. Hosp. Ass'n v. Waldman*, 73 F.3d 509, 512 (3d Cir. 1995)(citations omitted).

175.    Failure to meet any one of the four factors renders preliminary injunction inappropriate. *NutraSweet Co. v. Vit-Mar Enterprise, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).

176.    The instant case presents a facial challenge to a duly-enacted law of the State of New Jersey. Statutes "are entitled to the presumption of constitutionality." *Davies Warehouse Co., v. Bowles*, 321 U.S. 144, 153 (1944).

177.    Not only are facial challenges "disfavored" outside the First Amendment realm, *U.S. v. Mitchell*, 652 F.3d 387, 406 (3d Cir. 2011)(en banc), but they are the most difficult to prove because the movant must show that "no set of circumstances exists under which the [law] would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987).

178.    Such requests are "granted sparingly by the courts." *U.S. v. Spectro Foods Corp.*, 533 F.2d 1175, 1181 (3d Cir. 1980).

179.    Accordingly, Plaintiffs' burden is "particularly heavy," and their right to relief must be "indisputably clear." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980).

B. **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CLAIM**

The overwhelming majority of federal courts ruling on either a request for a preliminary injunction or on the merits of a challenge to an LCM ban have found these laws constitutional. *See Kolbe*, 849 F.3d 114; *NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015); *Heller II*, 670 F.3d 1244. *See also Wiese v. Becerra*, 306 F. Supp. 3d 1190 ("*Wiese II*"), *Worman v. Healey*, 293 F. Supp. 3d 251, 266 (D. Mass. 2018); *S.F. Veteran Police Officers*, 18 F. Supp. 3d 997; *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014); *Fyock v. City of Sunnyvale*, 25 F. Supp. 1267 (N.D.Cal. 2014); *but see Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017), *aff'd*, 2018 U.S. App. LEXIS 19690 (9th Cir. Cal., July 17, 2018).

1. LCMs Are Dangerous and Unusual Devices Most Useful for Military Purposes

180.    The Second Amendment "protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home." *U.S. v. Marzzarella*, 614 F.3d 85, 92 (3d Cir. 2010).

181.    That right is not unlimited. The Second Amendment does not grant individuals the right "to keep and carry any weapon whatsoever in any

manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 624, 626 (2008).

182.    The right "extends only to certain types of weapons." *Id.* at 623, 627.

183.    There is, for example, a long "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627.

184.    As such, "weapons that are most useful in military service – M16 rifles and the like – may be banned without infringement upon the Second Amendment right." *Ibid.*

185.    Further, the Constitution "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 624-25, 627.

186.    LCMs are defined by their ability to "enable a shooter to hit multiple human targets very rapidly; contribute to the unique function of any assault weapon to deliver extraordinary firepower; and are a uniquely military feature." *Kolbe*, 849 F.3d at 137.

187.    LCMs provide "soldiers with a large ammunition supply and the ability to reload rapidly," and "are particularly designed and most suitable for military and law enforcement applications." *Ibid.; see also Worman*, 293 F. Supp. 3d at 266, (agreeing that "LCMs are most useful in military service, [and] beyond the scope of the Second Amendment.")

188.     The evidence is unmistakable that LCMs are disproportionately used in mass shooting events. That is true no matter whether that term is defined, as the FBI now does, as incidents where three or more people are killed, or as Plaintiffs' expert, Gary Kleck defines it, as incidents when six or more people are wounded. *See supra* at ¶¶ 49, 57-68.

189.     Other courts examining LCM restrictions have reached a similar conclusion. *See, e.g.*, *Kolbe*, 849 F.3d at 126-27 ("One study of sixty-two mass shootings between 1982 and 2012, for example, found that the perpetrators were armed with . . . [LCMs] in 50% or more" of the attacks and another study found that LCMs "were used in 31% to 41% of" murders of on-duty police officers); *NYSRPA*, 804 F.3d at 264 (finding that guns equipped with LCMs "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'")(citation omitted); *Heller II*, 670 F.3d at 1264 ("By permitting a shooter to fire more than ten rounds without reloading, [LCMs] greatly increase the firepower of mass shooters."); *S.F. Veteran Police Officers*, 18 F. Supp. 3d at 1005 (noting that during "the last thirty years, 86 percent of mass shootings involved at least one" LCM).

190.     It is beyond dispute that a "very high correlation" exists "between mass shootings and the use of" LCMs. *S.F. Veteran Police Officers*, 18 F.

Supp. 3d at 1003-04; *see also Heller II*, 670 F.3d at 1264 (noting that LCMs

"tend to pose a danger to innocent people and particularly to police.").

2. <u>The Record Does Not Show LCMs Are in Common Use For Self-Defense in the Home</u>

191.    The Second Amendment is implicated only if a firearm is "typically

possessed for a lawful purpose." *Heller*, 554 U.S. at 625.

192.    This "requires [courts] to look into both broad patterns of use and the

subjective motives of gun owners." *NYSRPA*, 804 F.3d at 256.

193.    There is no indication that LCM-equipped guns are "typically

possessed by law-abiding citizens" for the lawful purpose recognized in

*Heller* – the right to self-defense of the home with a handgun. *Heller*, 554

U.S. at 623. *See Heller II*, 670 F.3d at 1261 ("[w]e cannot be certain whether

these weapons [semi-automatic rifles and LCMs] are commonly used or are

useful specifically for self-defense or hunting and therefore whether the

prohibitions [on] holding more than ten rounds meaningfully affect the right

to keep and bear arms."); 670 F.3d at 1262 ("[H]ardly any evidence [exists]

that [LCMs] are well-suited to or preferred for the purpose of self-defense or

sport."); *Kolbe* 849 F.3d at 138 ("there is scant evidence . . . [that LCMs] are

possessed, or even suitable, for self-protection.").

194.    Plaintiffs' record "does not actually show that such magazines are common or prevalent among law-abiding citizens (as opposed to criminals and law enforcement)." *S.F. Veteran Police Officers*, 18 F. Supp. 3d at 1003.

195.    This is important because gun ownership, and ownership of LCMs, is concentrated, so the number of LCMs in circulation does not necessarily reflect their usage. DX23 at ¶ 13.

196.    Plaintiffs' assertion that LCMs cannot be restricted because they are in "common use" has been rejected by other courts reviewing this argument.

197.    First, "relying on how common a weapon is at the time of litigation would be circular . . . [m]achine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with [LCMs] are owned more commonly because, until recently (in some jurisdictions) they have been legal." *Friedman*, 784 F.3d at 409.

198.    Put another way, it would "be absurd to say that the reason a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Ibid.*

199.    The converse is also true. That a certain number of LCMs have been sold does not, and cannot, shield them from regulation. *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010)("State and local experimentation with reasonable firearms regulations will continue under the Second Amendment

. . . .”); *see also Friedman*, 784 F.3d at 412 (noting that adoption of a "common use" test would mean that "firearm safety decisions made in some states would render the laws of other states 'more or less open to challenge under the Second Amendment.'").

200.    In short, "[P]resent day popularity is not constitutionally material." *Worman*, 293 F. Supp. 3d at 266.

201.    The evidence available indicates that the average number of bullets fired in self-defense is less than three and, in many cases, when confronted by an attacker, individuals who do possess firearms fire no shots at all. *See supra* at ¶¶ at 105-108, 111-116.

202.    The distinction matters because while a "civilian defender rarely will exhaust the up-to-ten magazine . . . the mass murderer has every intention of firing every round possible and will exhaust the largest magazine available to him." *S.F. Veteran Police Officers*, 18 F. Supp. 3d at 1003.

203.    In other instances, there is a risk that a person without proper training will fire more bullets than necessary in self-defense. *See Kolbe*, 849 F.3d at 127 (finding that "when inadequately trained civilians fire weapons equipped with [LCMs], they tend to fire more rounds than necessary and thus endanger more bystanders."); *see also* DX13 at ¶ 29, DX3 at ¶ 23.

204.     On the record before the Court, Plaintiffs have failed to show that LCMs are crucial or common for the constitutionally-protected right to self-defense recognized in *Heller*. *See Heller II*, 670 F.3d at 1262 ("[H]ardly any evidence [exists] that [LCMs] are well-suited to or preferred for the purpose of self-defense or sport."); *Kolbe*, 849 F.3d at 138 (observing that "there is scant evidence . . . [that LCMs] are possessed, or even suitable, for self-protection."); *see also supra* at ¶ 120 (Plaintiffs' expert unable to independently identify a single instance of defensive gun use anywhere in the United States requiring more than ten bullets in 25 years of research).

205.     The Court should also credit the studies in evidence indicating that self-defense with a firearm is incredibly rare, and when it does occur, most commonly involves merely brandishing that weapon. In those situations when a firearm is shot, the record shows it requires, on average, firing fewer than three bullets. *See supra* at ¶¶ 105-108, 111-116; *see also S.F. Veteran Police* Officers, 18 F. Supp. 3d at 1003 ("[T]he record shows the average number of shots fired in self-defense is 2.2 rounds . . .."); Plaintiffs' Exhibit ("PX") 76, Table 70.

206.     On the other hand, there is substantial evidence to indicate that LCM-equipped guns are commonly used for the unlawful purposes of mass murder, murder of police officers, and general violent crime. *See supra* at ¶¶

46

49, 57-68, 75, 93-99; *see also Heller II*, 670 F.3d at 1264 (finding that LCMs "tend to pose a danger to innocent people and particularly to police officers" and thus, the government met "its burden of showing a substantial relationship between the prohibition of [LCMs] and the objectives of protecting police officers and controlling crime.").

207. There is substantial evidence to indicate that LCMs are most useful in military service. *See supra* at ¶¶ 33-41; *see also Kolbe*, 849 F.3d at 137; *Worman*, 293 F. Supp. 3d at 266.

208. For the reasons discussed above, this Court should find that the Plaintiffs are unlikely to succeed on the merits of their preliminary injunction claim because LCMs are not "typically possessed for a lawful purpose," i.e., self-defense in the home. Rather, LCMs are dangerous and unusual devices and are therefore outside the ambit of Second Amendment protection.

3.  Restrictions on LCMs Are Longstanding and Therefore Constitutional

209. A separate and additional ground for denying Plaintiffs' request for a preliminary injunction rests in the longstanding nature of LCM restrictions. *Heller II*, 670 F.3d at 1253 ("longstanding regulations are 'presumptively lawful,'" and are "presumed not to burden conduct within the scope of the Second Amendment.")(internal citation omitted).

210.     Regulations need not date to the founding of the Republic in order to be considered longstanding. *See, e.g.*, *Marzzarella*, 614 F.3d at 92 (noting "pre-ratification presence" cannot be "the only avenue to a categorical exception."); *Silvester v. Harris*, 843 F.3d 816, 820 (9th Cir. 2016)(finding that a 10-day waiting period for the purchase of a firearm was constitutional even though the regulation "cannot boast a precise founding-era analogue.").

211.     Other gun safety laws have also been upheld as longstanding even though they were not enacted until well into the 20th century. *See Drake*, 734 F.3d at 434, n.11(noting that the first federal statute barring felons from possessing firearms was passed in 1938 and non-violent felons were not prohibited from possessing firearms until 1961); *see also National Rifle Association of America v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 196-97 (5th Cir. 2012) (noting that the prohibition on transferring firearms from federal licensees to persons under 21 was passed in 1968); *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010)(noting that the federal law prohibiting persons adjudicated as mentally ill from possessing firearms was passed in 1968).

212.     As recently as 1994, Congress broadly expanded the categories of individuals who are prohibited from possessing firearms, to include any

person who "is a fugitive from justice," or has "been convicted in any court of a misdemeanor crime of domestic violence." *See* 18 U.S.C. §922(g).[1]

213.     LCMs did not become available in rifles until after the Civil War and in handguns until the 1930s; however, prohibitions of one sort or another based on the number of bullets or shots that could be fired using semiautomatic and automatic weapons have historical antecedents that date back nearly a century. *See S.F. Veteran Police Officers*, 18 F. Supp. 3d at 1003 ("The bottom line on history is that there is no proof that multi-bullet magazines for firearms were in use at the time of the ratification of the Second Amendment.").

214.     The Depression-Era laws restricting gun ownership based on the number of shots fired without reloading were more restrictive than A2761 because those laws restricted ownership of the weapon itself, not merely limiting the magazine option available to the owner. *See supra* at ¶¶ 143-145.

215.     The disqualifying feature of these weapons was the number of rounds of ammunition that could be fired semi-automatically (or automatically) without reloading. *Ibid.*

---

[1] This prohibition has been upheld against a Second Amendment challenge as well. *See U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).

216.     LCM-equipped handguns did not become prevalent until the early 1980s. *See supra* at ¶ 150.

217.     Laws restricting magazine capacity were enacted at the federal and state levels within a short period of time after LCMs became a more common option of firearms. *See supra* at ¶ 152-154.

218.     In more recent years, additional states and localities have also passed LCM restrictions. *See supra* at ¶¶ 157, 159.

219.     All but two LCM laws limit handgun magazine capacity to 10 rounds. *See supra* at ¶ 158.

220.     In the modern context and here, activity at both the federal and state level shows that regulating firearms based on the number of bullets that could be fired without reloading has been longstanding and that regulating LCMs has also been longstanding in relation to their availability in the marketplace.

221.     For the reasons described above, the Court should find that the Plaintiffs are unlikely to succeed on the merits of their preliminary injunction claim because LCM restrictions are longstanding and are therefore outside the ambit of Second Amendment protection.

### 4.  Intermediate Scrutiny of A2761 Is The Proper Standard

222.    Even if this Court finds that A2761 falls within the scope of the Second Amendment, Plaintiffs would still be unlikely to succeed on the merits of their claim because A2761 withstands intermediate scrutiny.

223.    Like the First Amendment, "the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue." *Drake*, 724 F.3d at 436.

224.    In instances where a challenged law burdens "the core of the right conferred upon individuals by the Second Amendment," strict scrutiny is required, and if it does not, intermediate scrutiny is the standard. *Ibid.*

225.    The Court should concur with the holdings of the federal appellate courts that have examined substantially similar LCM laws and found that they do not "prohibit the possession of the 'quintessential self-defense weapon,' to wit, the handgun." *Heller II*, 670 F.3d at 1263; *see also NYSPRA*, 804 F.3d at 260 (explaining that an LCM law "does not effectively disarm individuals or substantially affect their ability to defend themselves" because those individuals "can purchase any number of magazines with a capacity of ten or fewer rounds.").

226.     Intermediate scrutiny is thus proper. *See Kolbe*, 849 F.3d at 138 (holding "intermediate scrutiny is the appropriate standard because the [LCM statute] does not severely burden the core protection of the Second Amendment"); *Fyock*, 779 F.3d at 999 ("there was no abuse of discretion in finding that the impact [of an LCM ordinance on the Second Amendment right] was not severe and that intermediate scrutiny is warranted."); *NYSRPA*, 804 F.3d at 260 (in reviewing New York's LCM ban, "we conclude that intermediate, not strict, scrutiny is appropriate."); *Heller II*, 670 F.3d at 1262 (determining that intermediate scrutiny was appropriate because D.C.'s LCM ban "does not effectively disarm individuals or substantially affect their ability to defend themselves.").

5.  A2761 Passes Intermediate Scrutiny

227.     In order to withstand intermediate scrutiny, A2761 must promote a "substantial or important" governmental interest, the law must be a reasonable means of achieving it, and not burden more conduct than necessary. *Drake*, 724 F.3d at 436.

a.    New Jersey Has A Substantial Interest In Public Safety

228.     There is no dispute that the state has a "substantial interest" in the safety of its people. *Drake*, 724 F.3d at 437 ("New Jersey, has, undoubtedly, a significant, substantial and important interest in protecting its citizens'

52

safety."); *see also NYSRPA*, 804 F.3d at 261 ("It is beyond cavil that both states . . . have substantial, indeed compelling, governmental interests in public safety and crime prevention.")(citation omitted).

229.    Courts examining similar statutes have reached the same conclusion. *See Heller II*, 670 F.3d at 1263-64; *Kolbe*, 849 F.3d at 138.

      b.    <u>A2761 Is A Reasonable Fit To Address New Jersey's Substantial Interest in Public Safety</u>

230.    With regard to whether A2761 is a "reasonable fit" to achieve this substantial public interest, this Court must accord "substantial deference to the predictive judgments of the legislature," and "remain mindful that, in the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *NYSRPA*, 804 F.3d at 261 (citing, *inter alia*, *Turner Broad Sys. v. FCC*, 520 U.S. 180, 195 (1997))(quotation marks omitted); *see also Friedman*, 784 F.3d at 412 ("[t]he central role of representative democracy is no less part of the Constitution than the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process."); *Kolbe*, 849 F.3d at 140 (""[i]t is the Legislature's job, not ours, to weigh conflicting evidence and make policy judgments."")(internal citation omitted).

231.    Provided there is "evidence that fairly supports [the Legislature's] rationale, the law will pass constitutional muster." *NYSRPA*, 804 F.3d at 261 (internal citation omitted).

232.    All that courts may do is "assure [them]selves that, in formulating their respective laws, [the states] have drawn reasonable inferences based on substantial evidence." *Id.* at 261-62.

233.    Provided the State has shown that its interest "would be achieved less effectively absent the regulation," this Court must uphold the statute. *Fyock*, 779 F.3d at 1000.

234.    The Court should find that A2761 is a reasonable fit in achieving three separate but interrelated public safety interests – to reduce mass shootings, to reduce the number of fatalities and injuries that occur when guns are used in other crimes, and to reduce the risk of death or injury to law enforcement.

235.    The Court should find that there is substantial evidence demonstrating that guns equipped with LCMs are disproportionately used in mass shootings. *See supra* at ¶¶ 49, 57-68; *see also Fyock*, 779 F.3d at 1000 (noting that "large capacity magazines are disproportionately used in mass shootings as well as crimes against law enforcement . . . ."); *Kolbe*, 849 F.3d at 127 (finding that LCMs are used disproportionately in mass shootings and killings of law enforcement officers); *NYSRPA*, 804 F.3d at 263 (holding

54

that the record suggests LCMs are "disproportionately used in mass shootings . . . ."); *S.F. Veteran Police Officers*, 18 F. Supp. 3d at 1003 (finding a "very high correlation between mass shootings and the use of magazines with the capacity to accept more than ten rounds.").

236.     The evidence in the record also demonstrates clearly that when LCM-equipped guns are used in the commission of crimes – even other than mass murder - more bullets are fired, more people are wounded, and more people are killed than when criminals use guns without LCMs. *See supra* at ¶¶ 93-99; *see also Fyock*, 779 F.3d at 1000, *NYSRPA*, 804 F.3d at 263-64 (noting that the use of LCMs "result in more shots fired, persons wounded, and wounds per victim that do other gun attacks.").

237.     LCM-equipped firearms are used disproportionately in the murder of law enforcement officers. *See supra* at ¶ 75; *see also Heller II*, 670 F.3d at 1264 (finding that LCMs "tend to pose a danger to innocent people and particularly to police officers" and thus, the District of Columbia had met "its burden of showing a substantial relationship between the prohibition of [LCMs] and the objectives of protecting police officers and controlling crime."); *Kolbe*, 849 F.3d at 127 (finding that LCMs are used disproportionately in mass shootings and killings of law enforcement officers).

238.    When confronting criminals, law enforcement is disadvantaged if the criminal is armed with an LCM-equipped gun. *See supra* at ¶¶ 70-72; *see also S.F. Veteran Police Officers*, 18 F. Supp. 3d at 1006 (noting "the danger that police officers face when targeted with magazines with the capacity to accept more than ten rounds" and that LCM bans are justified on that basis); *Heller II*, 670 F.3d at 1263 (citing to a study by the U.S. Bureau of Alcohol, Tobacco, and Firearms that law enforcement officers are placed at "particular risk" when facing criminals using LCM-equipped firearms).

239.    Guns equipped with smaller-capacity magazines require a shooter to reload more often. These precious seconds can mean the difference between "life and death." *Kolbe*, 849 F.3d at 128 (also noting that in the Sandy Hook Elementary School mass murder, "nine children were able to run from a targeted classroom while the gunman paused to change out a large-capacity thirty-round magazine" and that in Tucson, Arizona, where U.S. District Court Judge Roll and others were murdered, the killer "was finally tackled and restrained by bystanders while reloading his firearm.").

240.    In other words, "reducing the number of rounds that can be fired without reloading increases the odds that lives will be spared in a mass shooting." *Kolbe*, 849 F.3d at 128; *see also Heller II*, 670 F.3d at 1264

(crediting testimony by the D.C. Chief of Police that a 2 to 3 second pause to reload "can be of critical benefit to law enforcement.").

241.     In sum, this Court should find that there is a reasonable fit between A2761 and New Jersey's substantial interest in public safety because evidence shows that fewer people are shot in mass shootings and in the commission of other crimes when LCM-equipped magazines are not used, requiring a shooter to reload more often results in additional opportunities for escape and engagement with the shooter by law enforcement or bystanders, reducing the supply of LCMs will reduce criminals' ability to steal them from law-abiding citizens, and that LCM-equipped firearms pose a specific threat to law enforcement.

        c.     <u>A2761 Does Not Burden More Conduct Than Necessary to Achieve its Objectives</u>

242.     The Court should also find that A2761 does not burden more conduct than is necessary to achieve New Jersey's substantial interest in public safety.

243.     Unlike the law at issue in *Heller*, A2761 does not prohibit an entire class of firearms.

244.     Firearms that are typically sold with a larger-than-ten-round magazine can also be operated with a compliant, ten-round magazine. Tr., 120:12-24.

245.      In this way, A2761 "restricts possession of only a subset of magazines that are over a certain capacity. It does not restrict the possession of magazines in general . . . nor does it restrict the number of magazines that an individual may possess." *Fyock*, 779 F.3d at 998; *see also* Tr., 263:1-264:15 (New Jersey has no limit on the amount of ammunition a person can purchase, no limit on the number of compliant magazines a person can purchase, and no limit on the type of otherwise lawful firearms a person can use in the home for self-defense).

246.      A2761 also provides an exemption for firearms equipped "with a fixed magazine capacity holding up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds." N.J. Stat. Ann. § 2C:39-20.

247.      A2761 also exempts a "firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds." *Ibid.*

248.      Owners of those weapons simply have to register them within one year, but do not need to dispossess themselves of those weapons. *Ibid.*

249.      Defendants are not obligated to show that passage of A2761 will eradicate all violent crime, all incidents of mass shootings, or all incidents of gun-related attacks on law enforcement. Rather, their burden is to show that these public safety interests "would be achieved less effectively absent the

regulation." *Fyock*, *supra*; *see also Friedman*, 784 F.3d at 412 (finding that reducing the public's fear of a mass shooting by restricting semi-automatic weapons and LCMs is itself a "substantial benefit.").

250.    Further, because firing more than ten bullets in home self-defense is an incredibly rare occurrence, and because New Jersey law does not restrict the number of compliant firearms, magazines, or ammunition a person can own, A2761 does not restrict more conduct than necessary to achieve the substantial governmental interest in public safety. *See Fyock*, 779 F.3d at 998 (noting that a similar ordinance in Sunnyvale, California "restricts possession of only a subset of magazines that are over a certain capacity. It does not restrict the possession of magazines in general . . . nor does it restrict the number of magazines that an individual may possess."), 779 F.3d at 1000 (noting that "most defensive gun use incidents involved fewer than ten rounds of ammunition."); *see also NYSPRA*, 804 F.3d at 260 (explaining that an LCM law "does not effectively disarm individuals or substantially affect their ability to defend themselves" because those individuals "can purchase any number of magazines with a capacity of ten or fewer rounds.").

251.    On the record before the Court, Plaintiffs have not shown a substantial likelihood of success on the merits of their claim that A2761 violates the

Second Amendment rights of individuals as applied to the states through the Fourteenth Amendment.

## C. **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM**

252.    The record before the Court indicates that the State of New Jersey appropriately treats its law enforcement officers differently than non-law enforcement officers.

253.    In the realm of firearms possession, retired law enforcement officers are not like other state residents "in all relevant aspects." *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008)(quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

254.    Unlike law enforcement officers, members of the public are not required to pass proficiency exams before or after they purchase a firearm. *See supra* at ¶ 29.

255.    In considering a similar challenge, the Fourth Circuit rejected an equal protection claim because of the "extensive training that Maryland requires of its law enforcement officers, and in light of their experience in public safety," the court held that "retired Maryland law enforcement officers are not similarly situated to the general public with respect to the assault weapons and [LCMs]." *Kolbe*, 849 F.3d at 147.

256.    The training requirement placed upon members of law enforcement, including retired officers, make them "better equipped to safely handle and store those weapons and magazines and to prevent them from falling into the wrong hands." *Ibid.*

257.    Civilian purchasers of firearms in New Jersey are not required to meet firearms proficiency standards or take any course on the proper handling and storage of firearms prior to purchasing firearms. *See supra* at ¶¶ 29, 169.

258.    By the same token, the training provided to members of the military is also different than that given to law enforcement officers. *See supra* at ¶¶ 165-167.

259.    While law enforcement officers receive training in how to "safely handle and store those weapons and magazines" in the civilian context and how "to prevent them from falling into the wrong hands," that is not necessarily true of military training. *Kolbe*, 849 F.3d at 147; *see also* DX98 at ¶ 23 (adding that "military recruits generally receive very little, if any, handgun training.").

260.    For the purposes of equal protection analysis, the Court should not find retired law enforcement officers are members of a suspect class. Accordingly, A2761 need only pass rational basis scrutiny. *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985).

261.     Firearm safety laws that distinguish between groups so long as the distinction is not based on a suspect classification have previously been upheld. *See, e.g.*, *Kolbe*, *supra*; *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 398-99 (D.P.R. 2012)(upholding law with different permitting rules for government officials than other citizens); *Nat'l Rifle Assn. v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d 185, 211-12 (5th Cir. 2012)(upholding federal ban on gun sales to individuals under the age of 21).

262.     Based on the training required of members of law enforcement and the regular re-certification needed to carry firearms (something the general public is largely restricted from), and the differences in firearms training between law enforcement and the military, Plaintiffs do not have a likelihood of success on the merits of their Equal Protection claim.

## D. PLAINTIFFS ARE UNLIKELY TO SUCEED ON THEIR TAKINGS CLAIM

263.     It is indisputable that the State may protect the public from dangerous items without having to provide compensation. *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887)(any "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit.")

264.     Courts considering challenges to laws involving firearms or their accessories have held that no compensation is due in situations like this because the actions taken by the state are a proper exercise of its police power. *See Roberts v. Bondi*, 2018 U.S. Dist. LEXIS 141261 at *7-10 (M.D. Fla. Aug. 21, 2018)(dismissing takings claim challenge to Florida's recently-enacted ban on "bump stocks" and finding the law to be an appropriate exercise of the state's police power); *Wiese v. Becerra*, 263 F. Supp. 3d 986, 995 (E.D. Cal. 2017) (in denying request for preliminary injunction of state LCM ban, court rejected takings claim); *Rupp v. Becerra*, 2018 WL 2138452 at 7-9 (C.D. Cal. 2018)(finding a ban on assault weapons represented a proper exercise of the state's police power and no compensation due); *Akins v. U.S.*, 82 Fed. Cl. 619, 622-23 (Fed. Cl. 2008)(rejecting takings claim regarding an order that the plaintiff register or surrender a machine gun); *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979)(rejecting takings claim challenge to D.C. law that required the disposal of unregisterable guns capable of firing more than twelve rounds without reloading).

265.     For those who possess previously-legal LCMs, such ownership came contingent on the understanding that "by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be

aware of the possibility that new regulation might even render his property economically worthless." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992); *see also Mugler*, 123 U.S. at 669 (noting that while the property in question had previously been lawful to own, "the state did not thereby give any assurance . . . that its legislation upon that subject would remain unchanged.").

266.    Plaintiffs' takings claim is also unlikely to succeed on the merits because they have not been deprived of all economically beneficial use of their property.

267.    As was recently noted in a challenge to a similar LCM restriction law in California, "[t]he ban does not require that owners turn over their magazines to law enforcement – they may alternatively sell the magazines to licensed gun dealers, remove them from the state, or permanently modify the magazines so that they no longer accept more than ten rounds." *Wiese II*, 306 F. Supp. 3d at 1198.

268.    For similar reasons, A2761 does not act as a regulatory taking – the law provides alternative means for owners to receive some compensation for their LCMs, to modify them to comply with the law, or retain ownership of them as-is, but transport them out of state. *Ibid.*

269.     Provided Plaintiffs have not been deprived of all economic benefit, even if their property has been deprived of its most profitable use, A2761 must be upheld. *Andrus v. Allard*, 444 U.S. 51, 66-67 (1979).

270.     Plaintiffs do not argue that a modified magazine is unusable or that an unmodified magazine cannot be sold or transported out of state. Plaintiffs concede that they have the ability to receive "some compensation" under the law. ECF 14 at p. 36.

271.     While A2761 may impose some burden on owners of LCMs with a greater-than-ten-round capacity, "[t]he impracticality of any particular option, such as the alleged lack of a market for these magazines [or] the burden in removing these magazines from the state . . . does not transform the regulation into a physical taking" or leave the LCM without any value. *Wiese II*, 390 F. Supp. 3d at 1198.

272.     For these reasons, Plaintiffs cannot sustain a claim that "the ban operates as government appropriation of private property for government or public use" and accordingly, cannot succeed on the merits of their takings claim. *Id.* at 1199.

### E. **PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IF THEIR REQUEST FOR A PRELIMINARY INJUNCTION IS DENIED**

273.     Plaintiffs must also show that they will be irreparably harmed if preliminary injunctive relief is not granted. *See supra* at ¶ 173.

274.     As discussed *supra*, Plaintiffs have no likelihood of success on the merits of their claims; therefore, they will suffer no irreparable harm if this Court denies their request. *See Fyock*, 25 F. Supp. 3d at 1282 (holding that Plaintiffs who premise their irreparable harm argument on the expectation they will succeed on the merits cannot show irreparable harm where the court finds they have no likelihood of success on the merits).

275.     In addition, the provisions of the law requiring dispossession or transport out-of-state of now-banned LCMs does not become effective until December 13, 2018. Thus, there is no imminent harm. N.J. Stat. Ann. § 2C:39-19.

276.     A2761 does not in any way limit Plaintiffs' access to, or use of, as many LCM-compliant firearms (and magazines) that they wish to purchase. There is no impairment to ownership of the "quintessential self-defense weapon," i.e., the handgun. *Heller*, 554 U.S. at 629; *see also NYSPRA*, 804 F.3d at 260 (explaining that an LCM law "does not effectively disarm individuals or substantially affect their ability to defend themselves" because

those individuals "can purchase any number of magazines with a capacity of ten or fewer rounds.").

277.    For these reasons, this Court should find that Plaintiffs will not suffer irreparable harm if their request for a preliminary injunction is denied.

## F. GRANTING A PRELIMINARY INJUNCTION WOULD RESULT IN HARM TO THE DEFENDANTS

278.    The Defendants have articulated a substantial and important governmental interest in protecting public safety that would be furthered by the provisions of A2761. *See Wiese I*, 263 F. Supp. 3d at 994 ("The public interest is also furthered by preventing and minimizing harm of gun violence . . . .")

279.    The grant of an injunction would impose a significant burden on the Defendants and undermine public interest by frustrating the intent of the people as expressed through the actions of their elected officials. *Maryland v. King*, 567 U.S. 1301 (2012)(Roberts, C.J., in chambers)("[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")(citation omitted).

280.    This is even more pertinent whenever "there is, in addition, an ongoing and concrete harm to [the state's] law enforcement and public safety interests." *Ibid.*

281.    On the record before the Court, it should find that granting a preliminary injunction would result in greater harm to Defendants than denying one would to the Plaintiffs.

## G. THE PUBLIC INTEREST FAVORS DENIAL OF PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION

282.    A2761 expresses the will of the people of New Jersey as reflected by the actions of their elected officials.

283.    Not only is the public interest served by denying a preliminary injunction, but the public safety of the residents of New Jersey will be similarly served.

284.    Whatever speculative harm might befall Plaintiffs is far outweighed by the concrete evidence that LCM-equipped firearms pose a significant threat to public safety – in mass shootings, in shootings of law enforcement, and in the commission of violent crime. *See supra* at ¶¶ 49, 57-68, 75, 93-99.

285.    The vanishingly rare or hypothetical instance when an individual may expend more than ten bullets in self-defense is far outweighed by the litany of examples where LCM-equipped firearms have been used to perpetrate acts of mass murder, the killing of police officers, and other violent crime. "On balance, more innocent lives will be saved by limiting the capacity of

magazines than by allowing the previous regime . . . to continue." *S.F. Veteran Police Officers*, 18 F. Supp. 3d at 997.

286.    Not every state has the same view of whether LCMs should be restricted at all, much less at a defined number of rounds of ammunition; however, "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process." *Friedman*, 784 F.3d at 412.

287.    Accordingly, this Court should DENY Plaintiffs' motion for a preliminary injunction.


Dated: September 4, 2018               Respectfully Submitted,
                                       GURBIR S. GREWAL
                                       ATTORNEY GENERAL OF NEW JERSEY

                                       By:  /s/ Bryan Edward Lucas

                                       Joseph Fanaroff
                                       Jeremy Feigenbaum
                                       Stuart M. Feinblatt
                                       Assistant Attorneys General

                                       Evan A. Showell
                                       Valeria Dominguez
                                       Bryan E. Lucas
                                       Deputy Attorneys General