```
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
 2


 3
   _____
 4 ASSOCIATION OF NEW JERSEY
   RIFLE & PISTOL CLUBS, INC.,
 5                  PLAINTIFF

 6    Vs.                              CIVIL NO.
                                       18-10507 (PGS)
 7 GURBIR GREWAL, et al,
                    DEFENDANTS
 8 _____

 9

10
                             AUGUST 13, 2018
11                           CLARKSON S. FISHER COURTHOUSE
                             402 EAST STATE STREET
12                           TRENTON, NEW JERSEY  08608

13

14

15 B E F O R E:        THE HONORABLE PETER G. SHERIDAN
                       U.S. DISTRICT COURT JUDGE
16                     DISTRICT OF NEW JERSEY

17

18

19

20 PRELIMINARY INJUNCTION HEARING - DAY 1

21

22

23                     Certified as true and correct as required
                       by Title 28, U.S.C. Section 753
24                     /S/ Francis J. Gable
                       FRANCIS J. GABLE, C.C.R.
25                     OFFICIAL U.S. REPORTER
                       (856) 889-4761
```

*United States District Court*
*Trenton, New Jersey*

1

2  A P P E A R A N C E S:

3

4      HARTMAN & WINNICKI, PC
        BY:  DANIEL L. SCHMUTTER, ESQUIRE
5      FOR THE PLAINTIFF

6

7      COOPER & KIRK, PLLC
        BY:  DAVID H. THOMPSON, ESQUIRE
8           JOEL ALICEA, ESQUIRE
            HALEY N. PROCTOR, ESQUIRE
9           DAVIS COOPER, ESQUIRE
        FOR THE PLAINTIFF
10

11

        OFFICE OF THE ATTORNEY GENERAL
12      BY:  STUART FEINBLATT, ESQUIRE
            EVAN A. SHOWELL, ESQUIRE
13          BRYAN E. LUCAS, ESQUIRE
            VALERIA DOMINGUEZ, ESQUIRE
14     ASSISTANTS ATTORNEY GENERAL
        FOR THE STATE DEFENDANTS
15

16

17

18

19

20

21

22

23

24

25

1
                        WITNESS INDEX
2
     LUCY PAGE ALLEN                                    9
3    CROSS-EXAMINATION BY MS. ALLEN BY MR. ALICEA      11
     REDIRECT EXAMINATION OF MS. ALLEN BY MR. SHOWELL   64
4    ANDREW STANTON                                     72
     CROSS-EXAMINATION OF ANDREW STANTON BY MS.         72
5    PROCTOR
     REDIRECT EXAMINATION OF ANDREW STANTON BY MR.     103
6    FEINBLATT
     RECROSS-EXAMINATION OF ANDREW STANTON BY MS.      124
7    PROCTOR

8

9

10                         EXHIBITS

11   Plaintiff's Exhibits 1 to 82, Joint Exhibits 1 to   6
     18, and Defendant's Exhibits 1 through 114 were
12   marked into evidence

13

14

15

16

17

18

19

20

21

22

23

24

25


                    *United States District Court*
                    *Trenton, New Jersey*

1          THE COURT:  This is the case of the Association of

2   New Jersey Rifle and Pistol Club versus Attorney General

3   Grewal, et al.  Can we enter appearances?  We'll start with

4   the plaintiffs.

00:00   5          MR. SCHMUTTER:  Good morning, your Honor, Daniel

6   Schmutter from the firm of Hartman and Winnicki for

7   plaintiffs.

8          THE COURT:  Good morning, Mr. Schmutter.

9          MR. THOMPSON:  Good morning, your Honor, David

00:00   10  Thompson of Cooper and Kirk, and I'm joined by my colleagues

11  Joel Alicea, Haley Proctor, and Davis Cooper.

12         THE COURT:  Good morning.

13         For the defendants?

14         MR. SHOWELL:  Your Honor, Evan A. Showell, Deputy

00:00   15  Attorney General, for the defendants, the Attorney General of

16  New Jersey and the Superintendent of State Police, Mr.

17  Callahan; and I'm joined by my colleagues, Deputy Attorney

18  General Bryan Lucas, Assistant Attorney General Stuart

19  Feinblatt, and Deputy Attorney General Valeria Dominguez.

00:01   20         THE COURT:  Good morning.

21         MR. SHOWELL:  Good morning, your Honor.

22         THE COURT:  So, in addition, I know that we had a

23  conference call last week sometime, and George Jones was on

24  the phone from McElroy Deutsch, and he represented one of the

00:01   25  police chiefs, and he indicated at that time he may or may not

1   come.  But I relieved him of his responsibility to appear

2   here, and he indicated that he would probably adopt the

3   arguments of the Attorney General.  His client, a

4   municipality, wished to save money if possible from paying

00:01   5   legal expenses.  No one seemed to be opposed to that idea, so

6   I've just relieved him of showing up for today's and the rest

7   of the week's hearing.

8          I did say though if relief was asked against the

9   police chief, I would entertain that because he had the

00:02   10   opportunity to be here.  And I believe that Mr. Jones

11   understood that.

12          Any other issues?

13          MR. THOMPSON:  Your Honor, David Thompson for the

14   plaintiffs; one preliminary matter relates to exhibits.  So we

00:02   15   have agreed with the defendants for the State on exhibits, and

16   we have 82 for the plaintiffs, and we have 114 for the

17   defendants; we also have 18 joint exhibits.  And all of those

18   are on a thumb drive which we have provided to the Court's law

19   clerk and to the State.

00:02   20          And so we would move jointly I suppose, the

21   admission of Plaintiff's Exhibit 1 to 82, Joint Exhibit 1 to

22   18, and Defendant's 1 through 114.

23          THE COURT:  Any objections?

24          MR. SHOWELL:  The State joins in that joint

00:03   25   application.

1          THE COURT:  Okay.  So all those documents are

2    admitted.

3               (Plaintiff's Exhibits 1 to 82, Joint Exhibits 1 to

4    18, and Defendant's Exhibits 1 through 114 were marked into

00:03    5    evidence.)

6          MR. THOMPSON:  Thank you, your Honor.  And just a

7    couple of points of clarification.  There's one book that we

8    -- is on there, your Honor, which we have ordered and will

9    arrive this week, we will give you that book; it's entitled

00:03    10   Priorities For Research, it's PX-50; and then Mr. Donohue's

11   deposition which is DX-24, we just received the transcript

12   this morning, and we will provide a copy of that this week to

13   the Court.

14         THE COURT:  All right.

00:03    15   MR. THOMPSON:  Thank you.

16         THE COURT:  So I have a number of books here, but

17   they're also included on the thumb drive.

18         MR. THOMPSON:  Your Honor, those are not on the

19   thumb drive and that's why we provided hard copies; we weren't

00:03    20   sure about the copyright implications of making a full copy of

21   that.  So we gave the State a copy, your Honor a copy, but

22   everything other than those books is on the thumb drive, your

23   Honor.

24         THE COURT:  Thank you.  So when we get to these

00:04    25   books, I don't think you expect me to read the whole book.

*United States District Court*
*Trenton, New Jersey*

1          MR. THOMPSON:  No, your Honor, in our post trial

2     briefing we will point you to the precise page that we think

3     is relevant.

4          THE COURT:  Thank you.

00:04     5          MR. SHOWELL:  Your Honor, just if I may, one

6     additional preliminary housekeeping matter I think has to do

7     with naming conventions; and I think there was some degree of

8     confusion during the deposition testimony in this case by

9     witnesses using the term standard capacity magazine versus

00:04    10     large capacity magazine.

11          And it's the State's position that we ought to be

12     using a unique term to describe what is banned by the statute,

13     and in fact the statute is so kind as to define that term for

14     us, and is that large capacity magazine as a magazine capable

00:05    15     of holding in excess of 10 bullets.  And it's the State's view

16     that we ought to have the witnesses and counsel using that

17     term during examination so as to avoid confusion.

18          THE COURT:  All right.  Mr. Thompson?

19          MR. THOMPSON:  Your Honor, we oppose that.  We think

00:05    20     there was not confusion during the depositions, and we do not

21     think the State should be able to have a Norwellian incomplete

22     inaccurate term that they put into a statute, and have that be

23     binding on the plaintiffs.  No more than if in the State of

24     Texas they had an abortion law and they had unborn children,

00:05    25     Planned Parenthood would be required to refer to unborn

1   children in all their pleadings and paper.  So we think that

2   it was not unclear.

3          And to the extent the Court wanted a uniform

4   definition, it would be simple enough to say, magazines that

00:05   5   hold more than 10 bullets, and magazines that hold 10 bullets

6   or less.  That at least would be neutral and not pejorative

7   and prejudge the matter at issue, your Honor.

8          THE COURT:  I'm not going to make a final ruling on

9   that request at the present time, but I think what I'll do is

00:06   10   I'll listen to one of the witnesses, and if it does become

11   confusing, then I might intercede.  But at the present time it

12   seems to me that the appropriate approach is to make certain

13   that the witness understands how you're defining either large

14   or standard or what it is when you ask a question.

00:06   15          MR. THOMPSON:  Very well, your Honor.  Thank you.

16          THE COURT:  All right.  So the way this was

17   established on our conference call was that the Court would

18   accept declarations as the direct testimony of the witness,

19   and then we would start with cross-examination of the witness.

00:07   20   Is that correct?

21          MR. THOMPSON:  Yes, your Honor.

22          MR. SHOWELL:  That is correct, your Honor.

23          THE COURT:  So then it was also agreed that the

24   State was going to present its witness first because of time

00:07   25   constraints.

1          MR. SHOWELL:  That is also correct, your Honor.  So

2   I believe the first witness will be Lucy Allen.

3          THE COURT:  And you don't object to that; right, Mr.

4   Thompson?

00:07   5          MR. THOMPSON:  No, your Honor, we do not.

6          THE COURT:  You may call your first witness, Mr.

7   Showell.

8          MR. SHOWELL:  Your Honor, the State calls Lucy Page

9   (ph) Allen.

00:07   10          THE COURT:  Do I have Ms. Allen's declaration?

11          MR. SHOWELL:  I can provide you with a copy, your

12   Honor.

13          (LUCY PAGE ALLEN), sworn.

14          THE DEPUTY CLERK:  State your name for the record.

00:08   15          THE WITNESS:  Lucy Page Allen.

16          THE COURT:  So, Ms. Allen, once you sit, can you

17   just spell your last name for us?

18          THE WITNESS:  Sure, A-l-l-e-n.

19          THE COURT:  Thank you.

00:08   20          So I have Lucy Page Allen's declaration here; is it

21   marked?

22          MR. SHOWELL:  It's DX-3, your Honor.

23          THE COURT:  All right.

24          MR. SHOWELL:  Judge, just for the witness'

00:08   25   convenience, I'd like to give her a copy of her declaration.

```
 1              THE COURT:  Do you have any objections?

 2              MR. THOMPSON:  We have no objection, your Honor.

 3              THE WITNESS:  I have one.

 4              MR. SHOWELL:  She has a copy, your Honor.

 5              THE WITNESS:  I brought it with me.

 6              MR. THOMPSON:  Thank you, your Honor.  And my

 7  colleague, Mr. Alicea, will be doing the cross-examination.

 8              THE COURT:  All right.

 9              So, Ms. Allen, when you usually come into court,

10  there's the direct testimony of the witness and then you're

11  cross-examined on your direct testimony.  But at the same time

12  the parties agreed to adopt your declaration as your direct

13  testimony, and you're going to be cross-examined by Mr. Alicea

14  at the present time.  Do you understand that?

15              THE WITNESS:  Thank you.

16              THE COURT:  I never went over this with the parties;

17  is redirect?

18              MR. SHOWELL:  I think both parties had contemplated

19  that, your Honor.

20              MR. THOMPSON:  Yes, your Honor.

21              THE COURT:  All right.  Mr. Alicea, you may proceed.

22              Ma:  Good morning, your Honor, Joel Alicea for the

23  plaintiffs.  If it's all right with you, your Honor, I'd like

24  to distribute an exhibit binder with the exhibits I'm going to

25  use in cross-examination, along with a copy of the deposition
```

00:08
00:09
00:09
00:10
00:10

Allen - Cross - Alicea

1    transcript.

2              THE COURT:  You may.

3              (Handing to Court and witness.)

4    (CROSS-EXAMINATION BY MS. ALLEN BY MR. ALICEA:)

00:10    5    Q.   Good morning, Ms. Allen.  Let's start with your

6    educational background, Ms. Allen.  Now, your undergraduate

7    degree was in human biology; is that right?

8    A.   That's correct.

9    Q.   And your graduate studies were in economics and a

00:11    10   Master's in business administration; is that right?

11   A.   That's correct.

12   Q.   Your teaching experience is in econometrics,

13   microeconomics, competitive strategies, probability and gain

14   theory, marketing strategy and economic analysis; is that

00:11    15   correct?

16   A.   That was teaching experience at Yale, that's correct.

17   Q.   Was there any additional teaching experience beyond those

18   categories that I read?

19   A.   Well, something that you reminded me of when you deposed

00:11    20   me the other day you asked if I had any legal education, and I

21   mentioned that I had taught a number of courses that were CLE

22   credits, so I suppose I have additional teaching experience.

23   Q.   Thank you for that clarification.

24   A.   And there's been others, I've done training exercises at

00:12    25   Nera Economic Consulting, I have gone to law firms and done

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1   training on statistics and other sorts of matters, and so yes

2   I've done a fair amount other than the teaching experience at

3   Yale.

4   Q.   And Ms. Allen, am I correct that you are not a

00:12   5   criminologist?

6   A.   I am not a criminologist.

7   Q.   And you have not received any degree in criminology; is

8   that right?

9   A.   I have not received a degree in criminology.

00:12   10   Q.   Nor have you received any degrees in sociology; is that

11   right?

12   A.   That's correct.

13   Q.   Let's turn to Defendant's Exhibit 3 which is a copy of

14   the declaration you submitted in this case, Ms. Allen.

00:12   15   A.   Okay.

16   Q.   And we'll start with pages 4 through 6 of your

17   declaration.  Those pages contain your analysis of the Armed

18   Citizen Database; is that right?

19   A.   That's correct.

00:13   20   Q.   And the Armed Citizen Database is a database of stories

21   maintained by the NRA that according to them highlights

22   accounts of law-abiding gun owners in America using their

23   Second Amendment rights to defend self, home and family; is

24   that correct?

00:13   25   A.   That's correct.

Allen - Cross - Alicea

1   Q.   Now, you performed an analysis of the incidents in the

2   NRA Armed Citizen Database that occurred between January 2011

3   and May 2017; correct?

4   A.   They were -- my analysis didn't occur between those

00:13   5   dates, the incidents occurred between those dates.

6   Q.   Yes, ma'am, thank you.  So the incidents that you

7   analyzed occurred between January 2011 and May 2017; correct?

8   A.   That's correct.

9   Q.   For each incident listed in the NRA's database between

00:13   10   January 2011 and May 2017, you tabulated the city, county,

11   state venue that is whether the incident occurred on the

12   street in the home or elsewhere, and the number of shots

13   fired; correct?

14   A.   Correct.

00:14   15   Q.   And there were 736 incidents in the Armed Citizen

16   Database that occurred between January 2011 and May 2017;

17   right?

18   A.   I believe that's correct, yes.

19   Q.   And based on your tabulation of the incidents in the

00:13   20   Armed Citizen Database you calculated the average number of

21   shots fired by defenders per incident; right?

22   A.   Correct.

23   Q.   You also found that 0.3 percent of all incidents -- that

24   in 0.3 in all incidents the defender was reported to have

00:14   25   fired more than 10 bullets; correct?

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1    A.   Correct.

2    Q.   And in 0.5 percent of incidents in the home the defender

3    was reported to have fired more than 10 bullets; right?

4    A.   That's correct.

00:14    5    Q.   So your analysis shows that there are incidents in which

6    gun owners have fired more than 10 rounds in self-defense;

7    right?

8    A.   There were two incidents out of the 736 incidents in the

9    NRA database, and they were firing more than 10 bullets -- or

00:15    10   the stories report them as firing more than 10 bullets.  And

11   it appears that they were in self-defense.  I mean I would say

12   just one of the things is those particular stories -- so there

13   are two stories, and those stories were --

14   Q.   Well, Ms. Allen, I'm not asking about the specifics of

00:15    15   those stories, my question was simply whether --

16            THE COURT:  All right.  So Ms. Allen, you answered

17   the question; go to the next question.  Your attorney will

18   have the right to redirect afterwards if he thinks there's any

19   need for more explanation.

00:15    20            Go ahead, Mr. Alicea.

21            Ma:  Thank you, your Honor.

22   BY MR. ALICEA:

23   Q.   So again, Ms. Allen, my question was simply whether your

24   analysis shows that there are incidents in which gun owners

00:15    25   have fired more than 10 rounds in self-defense.

Allen - Cross - Alicea

1    A.   And that was the question I was trying to answer.

2         THE COURT:  Well, that's a yes or no --

3         THE WITNESS:  So it's whether it was in self-defense

4    or not, so just the details of those incidents were somewhat

00:16    5    ambiguous, that's the only point I would make.

6    Q.   Well, Ms. Allen, let's just take a look then on page 6 of

7    your declaration, and we'll take --

8         THE COURT:  Mr. Alicea, I'm just trying to get this

9    on the right framework.  You kind of interrupted Ms. Allen at

00:16    10   the end of her answer, you have to let her answer.

11        MR. ALICEA:  Yes, your Honor, thank you.

12        THE WITNESS:  So I coded them as two incidents where

13   more than 10 shots were fired in self-defense; the details of

14   the incidents I would say were somewhat ambiguous about what

00:16    15   was happening.

16   Q.   Okay.  But you coded them as being fired in self-defense.

17   A.   Correct.  That's how I coded them.

18   Q.   Right.  So therefore according to your analysis having

19   coded them as being in self-defense, your analysis shows that

00:16    20   there are incidents in which citizens have fired more than 10

21   rounds in self-defense; correct?  It's a yes or no question.

22   A.   I'm having trouble answering yes or no to that question.

23   I coded them that way and I can describe the methodology that

24   I used.  The details of those incidents are somewhat ambiguous

00:17    25   about whether they were being fired in self-defense or not,

Allen - Cross - Alicea

1  that's all.

2          THE COURT:  Go to the next question.

3          MR. ALICEA:  Thank you, your Honor.

4  Q.  So Ms. Allen, let's turn to JX-17, that's Joint Exhibit

00:17    5  17 in your binder.

6  A.  Okay.

7  Q.  This is a March 12, 2012 article by Claude Werner that

8  was an analysis of an earlier version of five years of the

9  Armed Citizen Database; is that right?

00:17    10  A.  That's right.

11  Q.  You cite this article on page 5 footnote 4 of your

12  declaration; correct?

13  A.  Yes, that's correct.

14          THE COURT:  I'm sorry; I didn't catch what the --

00:17    15          MR. ALICEA:  Yes, your Honor, this is JX-17 in your

16  binder, sir, and you'll see that it says Werner.

17          THE COURT:  Got it.

18  BY MR. ALICEA:

19  Q.  So this article analyzed the Armed Citizen Database for

00:18    20  the period 1997 to 2001; correct?

21  A.  Yes, that's correct.

22  Q.  And you have discussed the methodology that Mr. Warner

23  used with him and have found it to be reasonable; right?

24  A.  I discussed the methodology, I didn't -- I think that's

00:18    25  correct.  I don't believe I actually got his data or was able

United States District Court
Trenton, New Jersey

Allen - Cross - Alicea

1   to replicate it.  I believe I had communications with him, and

2   I think that what he did is similar to what I did which is

3   count up the number of bullets that were used as described in

4   the incidents.

00:18    5   Q.   And you found his methodology to be reasonable; correct?

6   A.   I don't know that I know that much more about his

7   methodology than what I just stated.  So I found his

8   conclusions were consistent with the conclusions that I had

9   found from a later analysis, I'm not sure I know that much

00:19   10   more about his methodology.  For example, when I did this

11   analysis I had people entering the data and another person

12   checking it, so I had a checking process that is standard at

13   Nera; I don't know whether he had that.  I don't have a

14   recollection or understanding that he had that.  So I don't

00:19   15   believe he had the same sort of methodology in terms of

16   thoroughness and checking that I have done, and I don't recall

17   knowing more about it.

18          THE COURT:  Ms. Allen, this is cross-examination;

19   you must answer the question if they call for a yes or no, you

00:19   20   have to answer it in that framework.  Do you understand that?

21          THE WITNESS:  I'm trying to, sir.

22          THE COURT:  Well, you haven't done it yet.  So this

23   are the usual rules on cross-examination, you're just going to

24   need to conform with that.

00:20   25          Mr. Alicea, you may continue.

Allen - Cross - Alicea

1  Q.   Well, Ms. Allen, I think that it is important that we get

2  the wording of this right, so if you wouldn't mind --

3         THE COURT:  There are no speeches, just ask a

4  question.

00:20  5         MR. ALICEA:  Yes, your Honor, if I may ask.

6  Q.   Ms. Allen, will you please turn to page 115 of your

7  deposition transcript?  And I provided you a copy of that.

8         So if we go to page 115, and if we go to line 8, was

9  this the question I asked and was this your answer?

00:20  10        Question:  You don't have one, you don't have a view as

11  to the reliability of Claude Warner's study?

12        Answer:  Well, I think I have just spoken to you a little

13  bit about what comes to my view so one of the reasons that

14  it -- one of the indications that is reliable is that I had

00:21  15  have done a similar study on a later time period and I've

16  gotten very similar results.  I've discussed the methodology

17  with him and have found it to be reasonable.  And it appears

18  to -- so I have done a number of things that could lead me to

19  think the conclusions are reliable.

00:21  20        Was that the question I asked and was that your answer?

21  A.   Yes.

22  Q.   Is that still your testimony today?

23  A.   Yes.

24  Q.   Thank you.  And so you have done a number of things that

00:21  25  would lead you to think that the conclusions Mr. Warner

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

 1  reaches are reliable; right?

 2          THE COURT:  Do you understand that question?

 3          THE WITNESS:  Yes, I believe I do.

 4  A.   Yes.

00:21  5  Q.   Please turn to page 5, the last page of the article.  And

 6  we'll put it up on the screen here for the Court's benefit as

 7  well.

 8          And if you wouldn't mind finding the heading, it says

 9  Multiple Assailants, Ms. Allen.  Just let me know when you're

00:22 10  there.

11  A.   Yes.

12  Q.   Thank you.  Now, this chart in Mr. Werner's study shows

13  that there were multiple assailants in 20 percent of the

14  incidents Mr. Werner analyzed; right?

00:22 15  A.   Yes, I believe so.

16  Q.   And he found that 28 percent of the defensive gun use

17  incidents in the home involved multiple assailants; correct?

18  A.   That's what this says.

19  Q.   So according to an analysis that you find reliable and

00:22 20  using a database that you yourself used, 28 percent of

21  defensive gun use incidents in the home involved multiple

22  assailants; right?

23          (Witness reviewing.)

24  A.   I think I would agree with what you're saying.  I believe

00:23 25  in terms of the methodology it was -- that I am saying -- I

United States District Court
Trenton, New Jersey

Allen - Cross - Alicea

1  thought was reliable that he had done it was in counting up

2  the number of bullets.  I don't have a specific recollection

3  now about asking him about how he counted up -- how he decided

4  about locations or multiple assailants, I just don't have a

00:23   5  recollection of that.

6  Q.  Okay, thank you.  The NRA doesn't have a description of

7  their methodology of collecting the incidents to include the

8  Armed Citizen Database; right?

9  A.  That's correct.

00:23  10  Q.  In fact you don't know their precise method of

11  determining which incidents to include in the database and

12  which ones not to include; right?

13  A.  That's correct.

14  Q.  But whatever might be true about the NRA's methodology

00:23  15  you are sure you don't know the answer to exactly how the

16  particular stories that are on the Armed Citizen Database end

17  up being there; right?

18  A.  That's correct.

19  Q.  And you doesn't believe the Armed Citizen Database was

00:24  20  compiled scientifically; correct?

21  A.  That's correct.

22  Q.  Nor do you believe that the Armed Citizen Database is a

23  comprehensive set of stories that people use in defensive gun

24  use; right?

00:24  25  A.  I'm sorry, I didn't hear that.

Allen - Cross - Alicea

1    Q.   Of course I'll be happy to repeat.  Nor do you believe

2    that the Armed Citizen Database is a comprehensive set of

3    stories of people using defensive gun use; right?

4    A.   That's correct.

00:24    5    Q.   So the Armed Citizen Database is only a subset of all

6    stories of defensive gun use; correct?

7    A.   That's correct.  It may include some that are not

8    actually defensive gun use, but that's correct.

9    Q.   And if you could just again give me a yes or answer to

00:24    10   this question, am I correct in saying that you think that the

11   Armed Citizen Database is not representative of defensive gun

12   use incidents?

13   A.   Not in all ways I think it's not representative.

14   Q.   So Ms. Allen, do you normally rely on non-comprehensive

00:25    15   unrepresentative, unscientific databases whose methodology you

16   don't understand?

17        MR. SHOWELL:  I'm going to object to that; I don't

18   think there was any testimony about her understanding of the

19   methodology.

00:25    20        MR. ALICEA:  Your Honor, she said she didn't know

21   how the methodology worked or how it was even compiled, I

22   think that shows she didn't understand its methodology.

23        THE COURT:  Can you answer the question?  Did you

24   understand the question?

00:25    25        THE WITNESS:  I think I did understand the question,

Allen - Cross - Alicea

1   and yes I would say it is a fairly standard practice to rely

2   on data that is at hand, some sort of sample of convenience in

3   terms of making -- doing analyses.  So it's the sort of things

4   that economists often rely on.

00:25   5            So, you can't always do a randomly controlled

6   scientific experiment, for example -- so the answer is yes, I

7   think it is something that I have often in my work at Nera and

8   other economists rely on data that has been collected by

9   others, and is what's sometimes called a sample of convenience

00:26   10  where you don't know exactly how it was -- it wasn't obtained

11  or maintained in a scientific controlled study.

12  Q.   Okay.  So you routinely rely on non-representative

13  unscientific data that -- whose methodology you're not sure

14  of; that's what you routinely do at Nera?

00:26   15  A.   It often happens.  You can do a scientific analysis of a

16  sample of data that has not been obtained in a scientific

17  study.  And so yes, at Nera we do routinely rely and analyze

18  data that has not been obtained in a scientifically designed

19  study.

00:27   20  Q.   And you think you can extrapolate from unrepresentative

21  data to the larger population?

22  A.   I think you have to be careful about doing that and I

23  think there are -- you want to think about that and you want

24  to try to control for things that may be important.  So data

00:27   25  may be unrepresentative in one way, but that may not be the

Allen - Cross - Alicea

1   particular issue that you're trying to analyze.  So I can give

2   you some examples if you would like.

3   Q.   I think that's sufficient, thank you Ms. Allen.

4        Let's move on to your analysis of the Factiva Database

00:27   5   on pages 6 through 11 of your declaration.

6        THE COURT:  Wait.  Ms. Allen, you said that you

7   sometimes rely upon certain information that you would receive

8   from the sample of the convenience, but you said you would

9   control for it in other ways; when you say control for it,

00:28   10   what do you mean by that?

11        THE WITNESS:  So it depends on what you're looking

12   at.  So if you have -- you know, say you wanted to find out

13   what -- I'm trying to think of an example of something.  You

14   want to find out how long it takes to drive from the train

00:28   15   station to here; you could ask everyone who -- who arrived

16   here from the train station and ask them how long it took.

17   It's not a representative sample, you haven't done any

18   sampling, everyone who's driven from the train station to here

19   is not here today, but you can write down all the times, you

00:28   20   could look at the data, and you can say look, I -- you know, I

21   just -- I found 20 people that came today from the train

22   station and that gives me some idea of how long it takes to

23   arrive at the train station.

24        It's not a random sample.  Your actual methodology of

00:29   25   finding the people might not have been very scientific, it

Allen - Cross - Alicea

1   might be I was standing outside the door here; that's not

2   really a scientific method of finding the people, I'm just

3   picking the people in the room.  So it's a sample of

4   convenience, and yet I could have, you know, a fair amount of

00:29   5   data on how long it took people to drive here, and then

6   someone can say you know what, I don't think that's a

7   reasonable sample because the people in this room are all, you

8   know, the slowest drives in the world or they're all

9   speedsters, so that's something you might want to think about,

00:29   10  is there something different about this sample of convenience

11  here, am I worried that these people are fast drivers or slow

12  drivers.

13       So just because you haven't done a controlled

14  experiment to see how long it takes to drive from the train

00:29   15  station to here doesn't mean you can't look at data and say

16  okay this tells me about something and I can draw some

17  conclusions from this.

18       THE COURT:  Okay.

19       Ma:  Thank you, your Honor.

00:30   20  BY MR. ALICEA:

21  Q.   Let's move on to your analysis of the Factiva Database on

22  pages 6 through 11 of your declaration, Ms. Allen.  Now, the

23  Factiva Database is an online news reporting service and

24  archive owned by Dow Jones, Inc. that aggregates news content

00:30   25  from nearly 33,000 sources; is that right?

Allen - Cross - Alicea

1          THE COURT:  Where are you reading from now?

2          Ma:  I was I think quoting from paragraph 13 of her

3  declaration, your Honor, that's on page 6.  The first sentence

4  of paragraph 13.

00:30      5  Q.   So to repeat the question, Ms. Allen, the Factiva

6  Database is an online news reporting service and archive owned

7  by Dow Jones, Inc. that aggregates news content from nearly

8  33,000 sources; is that right?

9  A.   That's right.

00:31     10  Q.   And the first step in your analysis was a period of trial

11  and error with the database where you were trying to determine

12  what the keywords were going to be by trying out different

13  keywords and then figuring out if these are the ones that

14  would yield a data set that is most relevant; right?

00:31     15  A.   I think that's correct.  I think that's -- yes.

16  Q.   Thank you.  And after going through that process the

17  keywords you ultimately used for your analysis of the Factiva

18  Database are listed on page 7 footnote 5 of your declaration;

19  right?

00:31     20  A.   That's correct.

21  Q.   You also list those keywords in paragraph 13 of your

22  declaration; right?

23  A.   Footnote 5 is more precise what was actually used in the

24  search, paragraph 13 describes it in somewhat more

00:31     25  understandable English rather than the actual search terms

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1   that were used.

2   Q.   Right, thank you.  And I know these keywords included

3   variations and we'll get to that in a moment, but first I want

4   to identify the keywords themselves.  So the first category of

00:32   5   keywords consists of gun, shot, shoot, fire, or arm, each of

6   which was followed by an asterisk; correct?

7   A.   Correct.

8   Q.   And the second category of keywords consists of broke in,

9   break in, broken into, breaking into, burglary with an

00:32   10   asterisk, i-n-t-r-u-d with an asterisk, or inva with an

11   asterisk; correct?

12   A.   Correct.

13   Q.   And the final category of keywords you used consists of

14   home with an asterisk, apartment or property; right?

00:32   15   A.   Correct.

16   Q.   And you also say in your declaration that you included

17   variations on those keywords that we just covered and that's

18   what the asterisk means; right?

19   A.   The asterisk is like a wild card, so it can be any other

00:32   20   letters after that, any number after that.

21   Q.   Right.  And --

22   A.   Or in place of the asterisk.

23   Q.   Thank you.  And just to again just make sure that we have

24   a point on that what the asterisk is, the way the asterisk

00:33   25   works is that it looks for the keyword like gun, and then with

Allen - Cross - Alicea

1   any other letters following it so it just has to start with

2   g-u-n, and then anything could follow it and be a word and

3   that would be a hit; right?

4   A.   Correct.

00:33   5   Q.   But it has to be these exact words, the asterisk would

6   not pick up words other than those that start the letter

7   preceding the asterisk; correct?

8   A.   Correct.

9   Q.   So the third category of keywords wouldn't pick up words

00:33   10   like condominium, townhouse or farm; right?

11   A.   Correct.

12   Q.   And the second category of keywords wouldn't pick up

13   assailant, attacker or perpetrator; right?

14   A.   Correct.

00:33   15   Q.   Your search required that at least one of the keywords

16   from each of the three categories we just discussed be

17   included in the headline or lead paragraph of the news story

18   in order for the story to show up in your results; correct?

19   A.   Correct.

00:33   20   Q.   So if only one or two of the categories of the keywords

21   showed up in the headline or lead paragraph that would not

22   come up in your results; right?

23   A.   Correct.

24   Q.   And with these keywords you're trying to exclude those

00:33   25   stories that are not relevant from your search results; right?

Allen - Cross - Alicea

1    A.   Really what we're trying to do for the keywords is rather

2    than -- there's something like 70 million stories that are in

3    Factiva over this time period, so we're trying to get a random

4    set of potentially relevant stories.  And rather than reading

00:34    5    through 70 million we're doing a search to begin with so that

6    we can read through them to see if they're related to

7    defensive gun use in the home, and then we can code them up.

8    So it's just a way of shortening the search process.

9    Q.   To those results that you think are most likely to be

00:34   10   relevant; right?

11   A.   To ones that will give us a set that we think will be

12   defensive gun use in the home and to which we have no reason

13   to think the number of bullets used is different than

14   something else.  So we're trying to be efficient in -- it's

00:35   15   efficiency.

16   Q.   I understand, Ms. Allen, but -- and I think that this

17   question just straightforwardly that the keywords are intended

18   to return results that you think are more likely to be

19   relevant than the potential results that are not part of your

00:35   20   search process; right?

21   A.   Yes, I say that's correct, to more efficiently find

22   articles that are related, that's correct.

23   Q.   Thank you.  And your third category of keywords -- I just

24   want to close on that for a second.  Your third category of

00:35   25   keywords restricted search results to those incidents

Allen - Cross - Alicea

1  involving the home; correct?

2  A.   Correct.

3  Q.   And your second category of keywords restricted the

4  search results to those incidents in which somebody broken

00:35  5  into or invaded the home; right?

6  A.   Well, I don't know if they exactly do that, they're -- so

7  these words can be used in -- we get a lot of hits that are

8  not what we're actually looking for.

9  Q.   I understand.

00:36  10  A.   So it really doesn't restrict it to that.  The intention

11  was to find a set of keywords that would efficiently help us

12  find stories that are related and that are similar to the

13  kinds of stories that are in the NRA database.

14  Q.   Right.  But your second set of keywords all uses

00:36  15  terminology like break into, broken into, intrude, invade, so

16  your second category of keywords is trying to restrict your

17  search results to incidents in which in the headline or lead

18  paragraph somebody is said to have invaded or intruded into a

19  home; correct?

00:36  20  A.   I think that's correct.

21  Q.   Now, people who live in a house tend not to break into to

22  or invade their own house; right?

23  A.   There are claims of defensive gun use where people are

24  defending themselves against somebody who lives in the house,

00:37  25  but has become violent and they've locked the doors and

Allen - Cross - Alicea

1  things, so sometimes those are people who actually live in the

2  louse intruding into the house.  So I would say -- I wouldn't

3  agree with that, I would say that some of the incidents of

4  defensive gun use are someone trying to protect themselves

00:37   5  from someone who does in fact live in the house who they have,

6  you know, for this period locked them out or whatever.

7  Q.    To be sure, Ms. Allen, there are I'm sure incidents

8  where something like that occurs, but my question was whether

9  people who live in a house tend to break into or intrude or

00:37  10  invade their own house.

11        MR. SHOWELL:  Objection; foundation.

12        THE COURT:  Foundation; can you explain that to me?

13        MR. SHOWELL:  Judge, he's making an assumption in

14  the question, and I think there's no explanation for the

00:38  15  assumption, which is how does Ms. Allen have any idea whether

16  people who live in houses tend to break in or not break into

17  their own home.  I've broken in my own home several times,

18  Judge, I've locked myself out, I haven't been able to find a

19  key, somebody couldn't come help me I've broken in my home

00:38  20  several times.

21        MR. ALICEA:  Your Honor --

22        THE COURT:  I'll allow her to answer the question.

23  But it's a very narrow question I think, because it just says

24  -- I think the question was whether people that own a house

00:38  25  tend to break into their house.

Allen - Cross - Alicea

1          So if you can answer that yes or no --

2          THE WITNESS:  I don't think people tend to

3    particularly do any of the things that I'm searching for here

4    so -- they don't tend to defend themselves by guns either, so

00:38      5    no, I don't think they tend to break into their own house very

6    often.

7          THE COURT:  Next question.

8          MR. ALICEA:  Thank you.

9    BY MR. ALICEA:

00:38      10   Q.  So that would mean that your second category of keywords

11   would generally exclude incidents in which one resident of the

12   house used a firearm in self-defense against another resident

13   in the house; right?  Would tend to, right?

14   A.  These categories don't exclude anything, they only

00:39      15   include things so I don't think they exclude.  Whether those

16   things would be included or not, I think they'd be less likely

17   to be included than some other types.  So I don't think --

18   we're not excluding anything, so if it doesn't say -- but I

19   would agree that they could be less likely to be included.

00:39      20   Q.  Ms. Allen, to put criteria to what is included is

21   necessarily to exclude those things that don't need those

22   criteria; right?

23   A.  No, it's really not, you can do a search where you

24   actually exclude things, so we spent a lot of time doing

00:39      25   searches, these sorts of searches at Nera and you can -- you

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1 can do -- these are the words I'm including and these are the

2 things I'm going to exclude.  We have not done anything to

3 exclude anything, we have only done things to include things.

4 Q.  Okay.

00:40   5 A.  So that is -- that is something you can put in a search

6 criteria you can exclude things.

7 Q.  Okay.  So if I say only people with brown hair can come

8 through this door, I'm not necessarily excluding people

9 without brown hair from coming through the door?

00:40   10 A.  You might be in that sense.

11 Q.  Right.  But, you know, to the extent that you -- I

12 understood your testimony, you're saying it is at least less

13 likely that these incidents of people using self-defense

14 against other residents of the same home is less likely that

00:40   15 those would come up given your second category of search

16 terms; correct?

17 A.  I would think that would be true, I think that would be a

18 testable hypothesis but I would guess that would be true.

19 Q.  Okay.  So that -- assuming that is true then, that would

00:41   20 generally mean that incidents in which one family member used

21 a firearm in self-defense against another family member as

22 residents of the same home, would have less of a likelihood of

23 coming up in your search results; right?

24 A.  That might be the case.

00:41   25 Q.  But is it the case?

Allen - Cross - Alicea

1  A.   I have not tested whether that is the case.

2  Q.   Okay.  But I thought we just established that it was less

3  likely that residents of the same home using defensive gun use

4  against each other would come up in your search results, and

00:41    5  I'm just asking as a subset of that if those two residents of

6  the same home or family members is that less likely to come up

7  in your search results.  Seems to follow from what you said.

8  A.   I think it might be less likely, I have not tested

9  whether that is -- I've not done a test to see whether that is

00:41   10  the case or not.

11  Q.   Okay.  Do you know how many defensive gun use incidents

12  each year involve one family member using a firearm in

13  self-defense against another family member in the same home?

14  A.   I don't know that.

00:42   15  Q.   What about how many defensive gun use incidents each year

16  involve one family member using a firearm in self-defense

17  against another family member generally?

18  A.   I don't know that.

19  Q.   Do you at least know the percentage of gun use incidents

00:42   20  each year that involve one family member using firearms in

21  self-defense against another family member?

22  A.   I would say anything about what is the number or the

23  percentage of defensive gun use is -- there's controversy and

24  not -- so I don't have a definitive answer to that no and I'm

00:42   25  not aware of one.

Allen - Cross - Alicea

1    Q.    So for all you know your second category of search terms
2    could be restricting your search results in a way that doesn't
3    allow or rather would tend to suppress a rather large category
4    of incidents of defensive gun use; right?  For all you know.
00:43    5    A.    Well, I have -- I have looked into that, and I have
6    looked to see whether I think that would affect the results,
7    so that is something I thought about as something I have
8    looked to see whether it would have an effect.
9    Q.    How would you know if it had an effect if you don't know
00:43    10    how many defensive gun use incidents involve people in the
11    same residence?
12    A.    Because I'm not interested in how many incidents there
13    are, I'm interested in how many bullets were used to defend
14    yourself, and what proportion of the time was it more than 10
00:43    15    bullets.  So what I am interested in is are the stories that
16    I'm looking at, are they systematically more bullets being
17    used or fewer bullets being used, and is there a reason to
18    think that if you're defending yourself against a spouse or
19    someone who lives in the home would you need to use more
00:44    20    bullets to defend yourself than you would against someone else
21    who's intruded.
22         I don't from a logical or from anything that I've read
23    have an understanding that you would need more bullets to
24    defend yourself against someone that is in the home with you,
00:44    25    and I have looked at the NRA stories and have seen that that's

Allen - Cross - Alicea

1    not the case, that the NRA stories the people who are

2    defending themselves against someone who is already in the

3    home on average used fewer bullets, so it wasn't the case that

4    they used more bullets.

00:44    5          So this is -- I'm not interested in seeing how many

6    stories there are of one type, I'm looking only at how many

7    bullets are being used, it doesn't matter to me the number.

8    The same way it doesn't matter to me the number of people that

9    were driving from the train station here in my hypothetical

00:44    10   that I discussed, I'm interested in the time that it takes.

11   Q.   Right.  And so your -- you mentioned in that answer that

12   you didn't see anything in the NRA Armed Citizen Database that

13   would lead you to think that your results for Factiva would be

14   any different on this point, that was the NRA database that

00:45    15   you don't believe is representative or scientifically

16   compiled; right?

17   A.   I don't think it's scientifically compiled, I think it

18   might be representative in terms of the number of bullets.  So

19   it's -- again, I don't know that if there is a bias in it I

00:45    20   think it's that it's overstating the number of bullets that

21   are used.  So the thing that I'm trying to measure, which is

22   the number of bullets, is something that I'm spending a lot of

23   time trying to think about is there any bias or is it

24   representative in terms of that, I don't think it's

00:45    25   necessarily representative in other ways.

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1    Q.   How would you know whether it's representative in one way

2    or another if you said you don't know how it was even

3    compiled?

4    A.   There are a number of ways that you can do that.  So you

00:46    5    can look and see does it represent -- one of the things I did

6    is -- that's one of the reasons that I did this Factiva search

7    is to say am I getting different results when I do a

8    scientific study of news stories, am I finding something

9    different in terms of the numbers of bullets.  So I know I'm

00:46    10    finding something different in terms of how positive the

11    outcomes are; I know that the NRA stories tend to have much

12    more positive outcomes, things go well for the person who's

13    defending themselves with a gun, whereas they don't always go

14    well for the person defending them with a gun when I do a

00:46    15    search of new stories.

16         So I think there is some bias and the bias is that

17    these stories have positive outcomes.  But what I've been

18    asked to look at is how many bullets are they using when

19    they're defending themselves.  And so you can look at these

00:46    20    stories and you can say okay is it representative across the

21    country, like do I -- you know, does it seem like more of the

22    stories come in one location than the others and does that

23    make sense; are there -- is there more gun ownership, is there

24    more crime, there's lots of way to look at something and cut

00:47    25    data that you have and say do I think that this is

Allen - Cross - Alicea

1    representative or does this tell me something about the things

2    that I'm interested in.

3         It may not be a representative sample, I mean these

4    stories may not tell you about something else all together,

00:47   5    but the thing that I'm interested in and that I was asked to

6    analyze is how many bullets are being used, and that's

7    something that I spent a lot of time thinking about, and

8    whether this data tells me something about that.

9    Q.   Let's just continue with the methodology of the Factiva

00:47   10   Database then.  So your keyword search as I understand it

11   returned 35,000 stories for the period of January 2011 through

12   May 2017; is that right?

13   A.   Yes, that's right.

14   Q.   So that's the universe of search results you obtained.

00:47   15   And then you used a random number generator to identify 200

16   stories for each of the seven years you were analyzing leading

17   to a sample of 1,400 stories; correct?

18   A.   Correct.

19   Q.   You then examined each of the 1,400 stories individually

00:48   20   to see whether they were relevant to the analysis, i.e.,

21   incidents of self-defense with a firearm in or near the home,

22   and that yielded 200 news stories; right?

23   A.   Correct.

24   Q.   The time period that you covered for your Factiva

00:48   25   analysis was the same time period you covered for the Armed

Allen - Cross - Alicea

1 Citizen Database analysis; correct?

2 A.   Correct.

3 Q.   And as you testified earlier 0.5 percent of incidents

4 that took place in the home in the Armed Citizen Database

00:48  5 involved the defender firing more than 10 shots; right?

6 A.   That's correct, the two incidents.

7 Q.   And the incidents of more than 10 shots being fired that

8 are listed in the NRA database are covered in the Factiva

9 Database; right?

00:48 10 A.   Can you repeat that?

11 Q.   Of course.  So the incidents of more than 10 shots being

12 fired that are listed in the NRA's database, are also covered

13 in the Factiva Database; correct?

14 A.   One of them was in the Factiva Database, the other one

00:48 15 was a television story, so it was not a news -- not a written

16 news story, was a write-up of the television story, so it was

17 not one of the sources.  Factiva has I think as you said

18 earlier 33,000 or something like that sources; this was, I

19 don't know, KZATV or something and it was not one of the

00:49 20 sources that Factiva covers.

21      So one story was within the Factiva Database, the other

22 one was not because it was not a source that Factiva -- it was

23 not one of the 33,000 sources that Factiva covers.

24 Q.   Okay.  Ms. Allen, let's just turn very quickly to page

00:49 25 165 of your deposition transcript.

Allen - Cross - Alicea

1    A.   165?

2    Q.   Yes, ma'am.

3    A.   Okay.

4    Q.   And going down to line 17 was this the question I asked

00:49    5    and was this your answer?

6         Question:  But did you check to see in the Factiva

7    Database whether the two incidents of more than 10 shots being

8    fired that are listed in the NRA's database are covered in

9    Factiva's millions of news stories?

00:50    10        Answer:  Yes I believe they are.

11        Was that the question I asked and was that your answer?

12   A.   It appears to be.

13   Q.   Is that still your testimony today?

14   A.   Well, if you look at the prior answer...

00:50    15   Q.   Well Ms. Allen, I'm just asking if this was -- is this

16   still your testimony today.

17   A.   I did check whether they were in it and I think -- I

18   think that only one of them was in it is my recollection.  So

19   I think that -- I think that's not correct what I'm saying

00:50    20   here.  It might be correct that I did it at that point believe

21   they were both there but I think only one of them is there.

22   Q.   Was that based on analysis or research that you did after

23   our deposition?

24   A.   I think I looked back again after you asked me the

00:51    25   question.

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1   Q.   Okay.  So if I'm understanding your testimony today

2   correctly, and just tell me if this is fair, you are now

3   changing your testimony to say that in light of new reviewing

4   that you did, there's only one of these two NRA database

00:51   5   incidents that is covered in the Factiva Database.

6   A.   Yeah, I think -- just to be clear, what the prior

7   question that I was answering is that the types of stories

8   that -- that story would show up in the criteria, meaning the

9   words would fall into it, it didn't -- it wasn't in there

00:51   10   because the source wasn't in there.  So there are sort of

11   two -- two parts to this and I may not have answered it

12   correctly in deposition.  And I may just have forgotten

13   whether one of them was there.

14        But one question is whether would the search criteria

00:52   15   pull up this story and the other is is it a source that's

16   actually in Factiva, and my recollection is that the search

17   criteria would pull up both of these stories, but only one of

18   them was actually in the Factiva Database.  And I do think I

19   looked at that more closely after you asked me about it at

00:52   20   deposition.

21   Q.   Okay.  But just so we're back on the same page again,

22   even though as you testified earlier 0.5 percent of the

23   incidents that took place in the home in the Armed Citizen

24   Database, involved the defender firing more than 10 shots;

00:52   25   your analysis of the Factiva Database resulted in no incidents

Allen - Cross - Alicea

1   where the defender was reported to have fired more than 10

2   bullets.  Right?

3   A.   That's correct.

4   Q.   Thank you.  Let's turn now to your analysis of mass

00:53      5   shootings, and this is on pages 11 through 13 and Appendix B

6   of your declaration.  Now you analyzed two sources detailing

7   historical mass shootings, a database complied by Mother Jones

8   and a couple of larger overlapping databases compiled by the

9   Citizen Crime Commission; correct?

00:53      10          THE COURT:  Mr. Alicea, I didn't catch the page

11   you're on.

12          MR. ALICEA:  That's pages 11 through 13, your Honor,

13   as well as Appendix B of the declaration.

14          THE COURT:  Thank you.

00:53      15   Q.   So to repeat the question, Ms. Allen, you analyzed two

16   sources detailing historical mass shootings, a database

17   compiled by Mother Jones, and a couple of largely overlapping

18   databases compiled by the Citizens Crime Commission; correct?

19   A.   That's correct.

00:53      20   Q.   So the incidents that you are analyzing came from those

21   two sources, Mother Jones, and the Citizens Crime Commission;

22   right?

23   A.   That's correct.

24   Q.   You describe Mother Judge's definition of a mass shooting

00:53      25   in paragraph 21 of your declaration; right?

Allen - Cross - Alicea

1  A.   Yes.

2  Q.   You also describe the Citizens Crime Commission's

3  definition of mass shooting in that same paragraph; right?

4  A.   Yes.

00:54  5  Q.   Now you don't have your own definition of a mass

6  shooting; correct?

7  A.   Correct.

8  Q.   But you agree that once you have a definition of a mass

9  shooting you should be mindful if you are changing the

00:54  10  definition and it seems particularly unhelpful if you just

11  change the definition kind of willy-nilly from event to event;

12  right?

13  A.   Well, that's true, yes.

14  Q.   Now one of the reasons that you selected Mother Judge and

00:54  15  the Citizens Crime Commission as your sources for your data,

16  was that they were the most between them comprehensive set of

17  mass shootings data; right?

18  A.   Yes, I believe that's correct.

19  Q.   Please turn to JX-7, this is Joint Exhibit 7, in your

00:54  20  binder.  This is an October 2nd 2017 article from Mother Jones

21  titled A Guide to Mass Shootings In America.  You cite this

22  article in footnotes 14 and 15 of your declaration; correct?

23  A.   Yes.

24  Q.   Please turn to page 4 of the exhibit.

00:55  25  A.   Okay.

Allen - Cross - Alicea

1    Q.   Now, right above the bullet point on that page, and we've

2    put it up here on the screen for the benefit of the Court, the

3    article says:  Our focus is on public mass shootings in which

4    the motive appeared to be incriminate killing; we used the

00:55    5    following criteria to identify cases."

6         Did I read that correctly, Ms. Allen?

7    A.   Yes.

8    Q.   Now, the first bullet point says:  "The perpetrator took

9    the lives of at least four people."

00:55    10        Did I read that correctly?

11   A.   Yes.

12   Q.   So according to this article that you cite one of the

13   criteria that Mother Jones used to identify mass shootings was

14   that the perpetrator took the lives of at least four people;

00:56    15   right?

16   A.   Yes.  I meant that they also changed their criteria

17   later, but --

18   Q.   You anticipated my next question I was about to say now,

19   starting in January 2013 Mother Judge changed its definition

00:56    20   of a mass shooting to include incidents when a shooter killed

21   three or more people; right?

22   A.   Right, consistent with the change in the federal

23   definition of mass shooting.

24   Q.   And we'll come back to that, but first I want to go to

00:56    25   the second bullet point and the second bullet point in the

*United States District Court*
*Trenton, New Jersev*

Allen - Cross - Alicea

1    Mother Judge article you have in front of you says:  "The

2    killings were carried out by a lone shooter."  Did I read that

3    correctly?

4    A.   Yes.

00:56    5    Q.   So a second criterion that Mother Judge used to identify

6    mass shootings was that the killings were carried out by a

7    lone shooter; right?

8    A.   I don't know if that's correct because I -- they say that

9    but then they say except in certain cases, so it's not clear

00:56    10    to me that that is what they're criteria is.

11    Q.   To be sure Ms. Allen they list exceptions, but they say

12    right there, you can see it on the screen, we use the

13    following criteria to identify cases, and the second bullet

14    point says that killings were carried out by a lone shooter,

00:57    15    and then they mention there are exceptions to that criterion.

16    But the criterion is the killings were carried out by a lone

17    shooter; right?

18    A.   That's what they say there.  I don't think that -- it's

19    not clear to me that that was their criteria.  I think if you

00:57    20    have a criteria and then you say except in these instances

21    it's not clear to me what that criteria is, so I don't think

22    this particular description is that illuminating and that's

23    not how I have described it in my declaration.

24        I think that's a confusing thing to say that their

00:57    25    criteria is it's carried out by a lone shooter but then it's

Allen - Cross - Alicea

1   not in these instances.  So I don't understand that, I don't

2   find those words clear to me.

3   Q.   Well Ms. Allen would you please turn to page 203 of your

4   deposition transcript.

00:58    5   A.   Okay.

6   Q.   And I will represent to you, Ms. Allen, that what I'm

7   about to read from is referencing that to this -- to the

8   article, A Guide To Mass Shootings In America.  So if we go

9   down to line 14 --

00:58    10           THE COURT:  What page?

11           MR. ALICEA:  This is page 203 line 14 of the

12   deposition transcript, your Honor.

13           THE COURT:  Hold on.  Okay.

14   Q.   Did I ask this question and was this your answer, Ms.

00:58    15   Allen?

16       Question:  According to this document from Mother Jones

17   one of the criteria that they used in defining what

18   constitutes a mass shooting was that the killings were carried

19   out by a lone shooter; correct?

00:58    20       Answer:  Yes, I mean I think that's correct.

21       Was that the question I asked was that your answer?

22   A.   Yes.

23   Q.   Is that your testimony today?

24   A.   According to this document it does look like that is

00:59    25   their criteria.  I think I testified later that it's not clear

Allen - Cross - Alicea

1    to me that that really was their criteria and the same thing

2    that I've testified today which it doesn't make sense to me to

3    say that your criteria is that it is a lone shooter except I'm

4    not going to make it a lone shooter in these incidents.

00:59   5        I think what I was asking -- answering in the

6    deposition is according to this document one of the criteria

7    is that, and according to the document you showed me that does

8    appear to be what they say and the document is not -- it's

9    not -- I don't -- having reviewed the Mother Judge data and

00:59  10   the Citizens Crime Commission data I think they describe their

11   criteria, each of them describe their criteria as somewhat

12   differently in different documents and they describe them

13   somewhat differently from each other and I think there are

14   some differences between their criteria, which are not

00:59  15   entirely clear to me, but overall I think they have

16   essentially a similar grouping and a category for what they're

17   calling a mass shooting.  I think that the document you showed

18   me in that particular criteria is -- it doesn't make a whole

19   lot of sense to me.

01:00  20   Q.   So this document that we have up on the screen -- we will

21   have back up on the screen, JX-7, that document which is from

22   Mother Judge and is purporting to describe the criteria they

23   used to identify their cases, you think that their explanation

24   doesn't make whole lot of sense; is that right?

01:00  25   A.   I think the particular part that you've asked me about,

Allen - Cross - Alicea

1  that killings were carried out by a lone shooter, I think that

2  doesn't make whole lot of sense to me.  It doesn't make sense

3  to say that and then include mass shootings that don't do

4  that, so I'm not sure why they've done that.  There are a

01:00  5  couple other things about that document --

6         THE COURT:  Can you go on the next question?  We've

7  been through this a number of times.

8         Ma:  Thank you, your Honor, I'm move on.

9  Q.   Now, Ms. Allen, there might be other criteria that Mother

01:01  10  Judge used but let's just focus on the two that we've laid

11  out.  We discussed earlier that Mother Jones lowered the

12  minimum number of fatalities required for a mass shooting from

13  four to three in January 2013; right?

14  A.   I believe that's correct, although I'm not -- the

01:01  15  document that you just showed me that we talked about is dated

16  October 2nd, and doesn't appear to mention this difference in

17  the criteria.  So that's another aspect that's somewhat

18  confusing.  So the document that you're showing me that has

19  these criteria is dated after it appears that they've changed

01:01  20  the criteria.  So -- and I don't have an explanation why

21  they've written it exactly that way.

22  Q.   Are you saying Ms. Allen -- tell me if this is fair; are

23  you saying that you don't think Mother Judge given the date of

24  this document has accurately represented its own criteria?

01:02  25  A.   I think it's confusingly worded.

*United States District Court*
*Trenton, New Jersey*

*48*

Allen - Cross - Alicea

1   Q.   Okay.

2   A.   And I don't -- I'd have to look back at this document to

3   see at what point are they saying this is our criteria -- I

4   don't know if they're talking about their criteria as of

01:02   5   October 2017 or they're talking about their criteria as of

6   some other time, so I don't recall exactly what that document

7   is refers to.

8   Q.   Well Ms. Allen, as we said -- we went over earlier you

9   cited and relied upon this document in your declaration;

01:02   10   correct?

11   A.   I didn't rely upon the part that you've just asked me

12   about.

13   Q.   Okay.  But you cited it; right?

14   A.   I did cite it, yes.

01:03   15   Q.   So this document from Mother Judge that explains its

16   methodology that you cited in your declaration you're saying

17   you don't understand how -- you don't understand their

18   explanation for their own criteria; is that fair?

19   A.   I think the way this is written is a little bit

01:03   20   confusing, it's my understanding they changed their criteria

21   as I say in my declaration that they started in January and

22   they changed it consistent with the change in the federal

23   definition of a mass shooting.  So I don't quite understand --

24   and then the part that you're highlighting and you're asking

01:03   25   about the lone shooter I think is confusing, I don't -- I

Allen - Cross - Alicea

1    don't fully understand why they're saying that.

2    Q.   Okay.  Well let's leave that aside for the moment.  Just

3    focusing on your declaration then, let's just look at

4    paragraph 21 of your declaration.  And in paragraph 21 of your

01:03    5    declaration, you say:  "Starting in January 2013 Mother Judge

6    changed its definition of mass shooting to include instances

7    when a shooter killed three or more people consistent with a

8    change in the federal definition of a mass shooting."

9         Did I read that correctly?

01:04    10    A.   Yes.

11    Q.   So just -- again just to get the facts on the table,

12    Mother Judge required four or more fatalities for something

13    that qualifies as a mass shooting until January 2013 at which

14    point they changed to three or more fatalities; right?

01:04    15    A.   That's my understanding, yes.

16    Q.   Thank you.  And if we look at Appendix B to your

17    declaration in this case, you'll see that prior to 2013 there

18    are no mass shootings listed for which the fatalities are

19    exactly three; correct?

01:04    20    A.   Yes, I believe that's correct.

21    Q.   So after it changed its criteria to lower the minimum

22    number of fatalities from four to three, Mother Jones did not

23    go back into its database and add in incidents with exactly

24    three fatalities for the time period before January 2013;

01:05    25    right?

Allen - Cross - Alicea

1   A.   I think that's right.

2   Q.   So depending which year of data you're looking at in the

3   Mother Judge database sometimes three fatalities will be

4   required for an incident to qualify as a mass shooting and

01:05   5   sometimes four fatalities will be required; right?

6   A.   Yeah, my understanding is it's a one-time switch.

7   Q.   Right.  But depending which year --

8   A.   Consistent with the change in the federal statute.

9   Q.   Correct.  But again depending on which year you're

01:05   10   looking at in the Mother Judge database, sometimes three

11   fatalities will be required for an incident to qualify,

12   sometimes four will be required; is that correct?

13   A.   Correct.

14   Q.   So the Mother Judge database is inconsistent in regard to

01:05   15   how many fatalities are required for an incident to qualify as

16   a mass shooting; right?

17   A.   They've made a change, there's a change in one point,

18   that's correct.

19   Q.   Please turn to Defendant's Exhibit 82 in your binder,

01:06   20   which is the raw Mother Judge data, and is titled U.S. Mass

21   Shootings 1982 to 2017 Data from Mother Judge's Investigation.

22   A.   Okay.  It's very small font, so it's hard for me to read

23   this.

24   Q.   I understand that.  You cite this exhibit in footnote 11

01:06   25   of your declaration; right?

*United States District Court*
*Trenton, New Jersey*

*51*

Allen - Cross - Alicea

1    A.   Yes, I believe so.

2    Q.   Okay.  Please turn to Joint Exhibit 5 in your binder

3    which should be two tabs over.  And this is a Mother Judge

4    article from August 24th, 2012 titled What Exactly Is A Mass

01:07    5    Shooting, and you cite this exhibit in footnote 14 of your

6    declaration; correct?

7         (Witness reviewing.)

8    A.   Yes, I believe so.

9    Q.   Now, Defendant's Exhibit 82 and Joint Exhibits 5 and 7

01:07   10    are the only three Mother Jones sources you cite in your

11    declaration; right?

12        (Witness reviewing.)

13   A.   I think that's correct.  I have on my Materials

14   Considered section, I have like a little O which seems to list

01:08   15    Mother Judge sites; and there seem to be four of them.

16   Q.   Well, let's just take a quick look at that, Ms. Allen.  I

17   see three U.S. mass shootings 1982 to 2017 Data From Mother

18   Judge Investigation, A Guide To Mass Shootings In America, and

19   What Exactly Is A Mass Shooting.  Those are the three Mother

01:09   20    Judge sources you cite on page 3 of your declaration, right,

21   as sources considered?

22   A.   Well, it looks like I have three URL sites, plus it seems

23   like I have something else that I'm not sure I've given the

24   URL site, or the formatting here is not so helpful.  Oh, I

01:09   25    guess it's because it's too big a thing; yeah, I think you're

Allen - Cross - Alicea

1   right.  I think it's just -- I think that URL site itself

2   didn't fit on the line, so there's a strange spacing.

3   Q.  I understand, okay.  But then just for clarity of the

4   record, the three exhibits that we just went over, these are

01:10   5   Defendant's Exhibit 82, Joint Exhibits 5 and 7, those are the

6   only three Mother Judge sources you cite in your declaration;

7   right?

8   A.  I believe that's correct, yeah.

9   Q.  Thank you.  Do any of those three exhibits explain why

01:10   10  Mother Judge did not go back through its database and add in

11  the three fatality incidents that occurred prior to January

12  2013?

13  A.  Oh, do they explain that?  I don't know, I don't have a

14  recollection of whether they do or not.

01:10   15  Q.  Now, with regard to the criterion that the killings be

16  carried out by a single shooter, you acknowledge in footnote

17  15 of your declaration that the Mother Judge data includes

18  three incidents involving two shooters, Columbine High School,

19  San Bernardino and Westside Middle School; right?

01:10   20  A.  I think that's right, I don't really -- yeah, that sounds

21  right.

22  Q.  Do any the three Mother Judge sources you cite in your

23  declaration explain why Mother Jones included the Columbine,

24  San Bernardino and Westside Middle School shootings despite

01:11   25  the fact that the they involved more than one shooter?

Allen - Cross - Alicea

1    A.   I don't have a recollection whether they do, I think -- I

2    don't recall.

3    Q.   Did you ever look into that?

4         (Brief pause.)

01:11    5    A.   When -- so this analysis of -- yes, probably.  So I've

6    done an analysis of mass shootings a few times and updated it

7    a few times.  So the first time that I did it, we spend some

8    time trying to understand what were their definitions, and,

9    you know, what are the differences for the Mother Judge.  And

01:11    10    we may have contacted them, we probably looked through

11    everything we could find, I just don't have a recollection of

12    that.

13         You asked me about this in my deposition, and nobody

14    had asked me about that before, and the lone shooter thing

01:12    15    seems a bit confusing.  So I did go back after the deposition

16    and try to look a little bit and I don't have a recollection

17    of finding really an explanation of why there -- why they make

18    a distinction about a lone shooter and then have incidents

19    that they then claim are exceptions to that.

01:12    20    Q.   So as far as you know Mother Jones' decision to include

21    those three incidents, Columbine, San Bernardino and Westside

22    Middle School, was completely arbitrary; right?

23    A.   No, I wouldn't say that.

24    Q.   Well, as far as you know; right?

01:12    25    A.   No, because I have read some things about what they're

*54*

Allen - Cross - Alicea

1   trying to do in their definition of mass shooting, and I think

2   what is a mass shooting is not -- and I think something that

3   we -- something that you just put up here had an explanation

4   of what they're trying to get at in a mass shooting.

01:13   5            And so no I don't think it's arbitrary, I think they

6   have done a thoughtful analysis in how they have done this.

7   My understanding is that they're quite a thoughtful and well

8   respected organization and they have won some awards, and I

9   don't have an exact recollection -- I have no understanding of

01:13   10  the lone shooter issue and what they're doing and I did look

11  at that a little bit right after my deposition was last week.

12           But it's not my understanding that they've just done

13  things arbitrarily, that doesn't appear to me how they have

14  done things, they appear to be quite systemic in how they do

01:13   15  things and don't do thing arbitrarily.

16  Q.   Okay, Ms. Allen.  Now as you testified earlier one of the

17  reasons why you selected Mother Judge and the Citizens Crime

18  Commission as your sources for your data, was that they were

19  the most between them comprehensive set of mass shooting data;

01:14   20  correct?

21  A.   I don't know if I said the most or one of the most; yes.

22  Q.   Please turn to the document with the tab marked Duwe in

23  your binder.

24  A.   Duwe?  Okay.

01:14   25  Q.   Now this is an article by Professor Grant Duwe entitled

Allen - Cross - Alicea

1   The Truth About Mass Public Shootings, that was published by

2   Reason.com on October 28th, 2014.  Have you seen this article

3   before?

4        (Witness reviewing.)

01:14   5   A.   Possibly.  I don't think -- I don't believe I've seen it

6   recently or looked at it recently, but I might have.

7   Q.   Okay.  Please look at the last paragraph on the first

8   page, and please read aloud if you wouldn't mind for the

9   benefit of the Court, the first two sentences of that final

01:15   10   paragraph, Ms. Allen.

11   A.   I'm sorry; what am I reading?

12   Q.   If you go down to the last paragraph which begins the

13   first problem --

14   A.   Okay.

01:15   15   Q.   And just read the two first two sentences all the way to

16   the beginning of that parenthetical in the middle of the

17   paragraph.

18   A.   The first problem with the Mother Judge list which

19   contains 67 cases, is that it significantly underreports the

01:15   20   incidents occurring between 1982 and 2013 that meet its

21   definitional requirements; the data I've collected show there

22   are 114 mass public shootings which means the Mother Judge

23   list missed more than 40 percent of the cases that took place

24   in the U.S. during this 32 year period.

01:15   25   Q.   Thank you, Ms. Allen.  Do you have any basis for

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1    disputing Professor Duwe's assertion that the Mother Judge

2    database missed 40 percent of the incidents that qualify as

3    mass shootings under its own criteria?

4    A.   I probably do have a basis in the office and I probably

01:16    5    have looked at this.  So I have looked to see whether there

6    are mass shootings that are missed within Mother Judge and

7    Citizens Crime Commission, so I did spend quite a bit of time

8    looking at -- I don't have a recollection of this criticism,

9    but I do believe that this is something I would have a basis

01:16    10   to dispute.

11   Q.   You just don't recall it sitting here.

12   A.   No I don't recall it sitting here.  I do recall that we

13   had spent quite a bit of time looking to see if there are

14   other mass shootings that meet the -- that meet the criteria

01:16    15   that have or not been included and are they included in other

16   sources, so that is something that we spent time doing.

17   Q.   Now if Professor Duwe were correct, that would be a

18   pretty significant problem for the Mother Jones database,

19   wouldn't it?

01:16    20   A.   I don't know.

21   Q.   If Mother Judge's database missed 40 percent of the

22   incidents that qualified under its own criteria, would you

23   still think it's a reliable database?

24   A.   Well, it depends on what you're using it for.  It doesn't

01:17    25   sound -- it doesn't sound reliable if it's not meeting its own

Allen - Cross - Alicea

1    criteria, and it misses 40 percent; no, I would say that

2    doesn't -- that sounds in itself like it's not very reliable.

3    Q.   So given what we've just covered, would you agree Ms.

4    Allen that Mother Judge changed its definition of a mass

01:17    5    shooting willy-nilly from event to event?

6    A.   No, it appears to me they changed their definition once,

7    and they say in some documents that they have a criteria of a

8    lone shooter that I don't quite understand.  But I don't think

9    they've changed their definition willy-nilly from event to

01:17    10    event, my understanding is they've changed their definition

11    once.

12    Q.   Thank you, Ms. Allen.  Let's go to paragraph 25 of your

13    declaration.  In that paragraph you provide a percentage of

14    guns used in mass shootings that were obtained legally, and as

01:18    15    I understand it according to footnote 20 of your declaration

16    you are relying on Mother Judge's reporting as to whether the

17    guns were obtained legally; right?

18    A.   That's correct.

19    Q.   Is it fair to say as far as -- is it fair to say that as

01:18    20    far as you know mainly Mother Jones's legal determination was

21    whether the guns were purchased as opposed to stolen.

22    A.   I think that may be correct, yes.

23    Q.   So as far as you know Mother Judge hasn't for example

24    examined whether the firearms were purchased through a straw

01:18    25    purchaser; right?

Allen - Cross - Alicea

1    A.   I was asked this a while ago a number of years ago and

2    I -- I don't recall.  So I have done a bunch of work on straw

3    purchasers and things like that correct.  It's very hard to

4    know if it was a straw purchaser, I don't know if there was

01:19      5    evidence that it was a straw purchaser, I think Mother Judge

6    would code it as being illegal is my recollection but I'm not

7    sure.  But I am aware that it's not easy to know if there's a

8    straw purchaser.

9    Q.   Well, Ms. Allen, if you would turn to page 279 of your

01:19     10    deposition transcript.

11    A.   Okay.

12    Q.   Actually let's start on page 278, just to get the first

13    full question in.  If you go down to line 19, Ms. Allen --

14         MR. ALICEA:  Your Honor, so this is page 278, line

01:19     15    19.

16    Q.   Were these the questions I asked and were these your

17    answers as they pertain to what we're just discussing?

18         Question:  Do you have any basis for assuming that

19    Mother Judge's legal conclusions are sound?

01:20     20         Answer:  Their legal conclusions are sound about

21    whether I -- I think they're considered a reliable source of

22    data --

23         And we skip down to page 279 line 10.  And I ask a

24    question:  You have not researched whether they -- and then

01:20     25    you cut in with an answer.  And if we go down to line 24:  So

Allen - Cross - Alicea

1   for example I don't think that they made a determination

2   whether the guns were purchased, you know, perhaps by a strong

3   purchaser for example which might not have been a legal

4   purchase; I don't see how they could have made that

01:20   5   determination, but beyond that I don't know much else about

6   how they made that determination.

7       Were those the questions asked and were those -- did I

8   accurately read the parts of your answer?

9   A.   Well, you jumped around so I think it's kind of confusing

01:20   10   what you're saying.

11   Q.   Well Ms. Allen, as we said earlier to the extent your

12   counsel on redirect wants to fill in more --

13       THE COURT:   I'll give the instructions to the

14   witness, Mr. Alicea.   Just ask your questions please.

01:21   15       MR. ALICEA:   Thank you, your Honor.

16   Q.   But my question stands, Ms. Allen; did I accurately read

17   the questions and did I accurately read the parts of your

18   answer that I was highlighting for you?

19   A.   I think that's correct.

01:21   20   Q.   And is that still your testimony today?

21   A.   I would have to look through the questions and the

22   answers to see if that's my testimony, because the jumping

23   around it's not clear to me what I'm saying.   It appears that

24   I am saying just what I am saying here; that's my

01:21   25   recollection, I said the same thing in the deposition that I

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1    have just said.  To the extent you're saying that it sounds

2    different then I think I would have to look at this to see --

3    I think it's --

4              THE COURT:  We understand.

5              Next question.

01:21

6    Q.  Let's go to paragraph 22 of your declaration, Ms. Allen.

7    A.  Paragraph 22?

8    Q.  Yes, ma'am.  Now, here you report the percentage of mass

9    shootings involving magazines capable of holding more than 10

10   rounds; correct?

01:22

11   A.  Can you repeat that?

12   Q.  Sure.  Paragraph 22, which is what we're looking at right

13   now, here you report the percentage of mass shootings

14   involving magazines capable of holding more than 10 rounds;

15   correct?

01:22

16   A.  Correct.

17   Q.  Paragraph 22 does not purport to show that magazines

18   capable of holding more than 10 rounds cause mass shootings;

19   right?

20   A.  Correct.

01:22

21   Q.  Now, paragraph 23, moving on to paragraph 23 of your

22   declaration, reports the average number of shots fired in

23   incidents involving magazines capable of holding more than 10

24   rounds; correct?

25   A.  Correct.

01:23

Allen - Cross - Alicea

1  Q.  And again this paragraph does not purport to analyze

2  causation; right?

3  A.  Correct.

4  Q.  So paragraph 23 does not purport to prove that the

01:23  5  shooters would not have fired as many rounds had they used a

6  different magazine; correct?

7  A.  Correct.

8  Q.  Please turn to Joint Exhibit 9 in your binder --

9          THE COURT:  Wait, before you go any farther.

01:23  10          Ms. Allen, in paragraph 23 you use the term large

11  capacity magazine; what do you mean by large capacity?

12          THE WITNESS:  Holding more than 10.

13          THE COURT:  All right, thank you.

14          MR. ALICEA:  May I proceed, your Honor?

01:23  15          THE COURT:  You may.

16          MR. ALICEA:  Thank you.

17  BY MR. ALICEA:

18  Q.  Please turn to Joint Exhibit 9 in your -- in your binder,

19  Ms. Allen.  This is the declaration of Professor Gary Kleck

01:23  20  submitted in support of plaintiff's motion for preliminary

21  injunction in this case.  Just let me know when you get there.

22  A.  Okay.

23          THE COURT:  I'm sorry; where are you?

24          MR. ALICEA:  I am at -- I'm in the last tab of the

01:24  25  binder, your Honor.

*United States District Court*
*Trenton, New Jersey*

Allen - Cross - Alicea

1        THE COURT:  Okay.

2        MR. ALICEA:  Thins JX-9, it says Kleck, and this is

3    the declaration that Professor Gary Kleck has submitted in

4    support of plaintiff's motion for preliminary injunction in

01:24    5    this case.

6    Q.  Ms. Allen, please turn to paragraph 25 of the declaration

7    which is on page 13.  If you could do me the favor of just

8    reading paragraph 25 on page 13 over to page 14 for the

9    benefit of the Court.

01:24    10   A.  My research of these 23 LCM involved mass shootings known

11   to have occurred from 1994 through July 2013 found that in all

12   of the incidents the shooters (a) had multiple guns, (b) had

13   multiple magazines, and/or (c) reloaded their guns without

14   interference from others; thus the shooters did not need LCMs

01:25    15   to fire large number of rounds and kill or injure as many

16   victims as they did; of the 23 incidents shooters had multiple

17   guns in 17, 74 percent of the incidents; among the six

18   incidents in which shooters possessed only a single gun the

19   shooter was known to also possess multiple magazines in all

01:25    20   six incidents; thus all these mass shooters would have been

21   able to fire large numbers of rounds without significant

22   interruption and wound large numbers of victims even if they

23   had not possessed LCMs, they could have simply switched guns

24   or changed magazines in two to four seconds to continue

01:25    25   firing.

63

Allen - Cross - Alicea

1   Q.   Thank you, Ms. Allen.  Paragraph 23 of your declaration

2   does not purport to address Dr. Kleck's analysis in the

3   paragraph I just had you read; correct?

4   A.   I think it doesn't purport to do that, no, that's

01:25   5   correct.

6   Q.   Paragraph 24 of your declaration -- well, actually let me

7   just ask you.  Paragraph 23 you said does not analyze

8   causation -- actually, withdrawn.  Let me just move on to

9   paragraph 24.

01:26   10        Paragraph 24 of your declaration states that there are

11   more fatalities and injuries in incidents involving magazines

12   capable of holding more than 10 rounds, than in incidents

13   involving magazines holding 10 or fewer rounds; correct?

14   A.   Correct.

01:26   15   Q.   Again that paragraph does not purport to analyze whether

16   the use of magazines capable of holding more than 10 rounds is

17   causally related to the numbers of injuries or deaths in those

18   mass shooting incidents; correct?

19   A.   It doesn't prove causation, it's consistent with

01:26   20   causation.

21   Q.   But it does not itself prove that they are causally

22   related.

23   A.   It doesn't itself prove it.

24   Q.   Indeed your declaration does not do an analysis of

01:26   25   causation; right?

*United States District Court*
*Trenton, New Jersey*

Allen - Redirect - Showell

1   A.   It does not prove causation.

2   Q.   In fact you haven't offered an opinion in this particular

3   declaration on why people do anything; right?

4   A.   That's correct.

01:27   5            MR. ALICEA:  May I have a minute to confer with my

6   colleagues, your Honor?

7            THE COURT:  You may.

8            (Brief pause.)

9            MR. ALICEA:  No further questions, your Honor.

01:27   10           THE COURT:  All right.  Redirect?

11           Do you need a break, Ms. Allen?

12           THE WITNESS:  I'm fine, thank you.

13           MR. SHOWELL:  Judge, can I have five minutes.

14           THE COURT:  You're going to get a break anyway.

01:27   15           You may.  So we will break for five minutes.  You

16   may step down.

17           (Recess.)

18           THE COURT:  Ready to go?

19           MR. SHOWELL:  I am, your Honor.  Thank you.

01:40   20           THE COURT:  You may proceed, Mr. Showell.

21   (REDIRECT EXAMINATION OF MS. ALLEN BY MR. SHOWELL:)

22   Q.   Ms. Allen, do you recall being asked by Mr. Alicea

23   earlier this morning about the two instances that you

24   cataloged of shots -- in excess of 10 shots being fired in

01:40   25   defensive gun use episodes?

Allen - Redirect - Showell

1   A.   Yes.

2   Q.   Could you just briefly review the facts of those two

3   separate incidents?

4   A.   Sure.  Do you mean when I found them or just what

01:40   5   actually happened in those incidents?

6   Q.   Let me back up for a second.  When you did your initial

7   -- or one of your earlier analyses for the Duncan case in

8   California, did you examine instances where -- self-defensive

9   shootings in which more than 10 bullets were used?

01:41   10   A.   Yes.

11   Q.   And what did that analysis reveal as far as of the number

12   of those instances?

13   A.   I think it might have been the same as this.  Prior to

14   the Duncan case I had done an analysis, I had done this

01:41   15   analysis a few times, and I believe the analysis in the Duncan

16   case was the same as this is my recollection, but I might be

17   wrong.

18   Q.    And in the prior case was there a difference in your

19   analysis?

01:41   20   A.   Well, I did the same analysis.  So I had done this

21   analysis a few times, I was asked by first the State of New

22   York to look at the number of bullets that were used in

23   self-defense, and I did this analysis for them and then I was

24   asked by a number of other states and municipalities to do an

01:42   25   analysis, so I kept updating the analysis.  And there were

*United States District Court*
*Trenton, New Jersey*

Allen - Redirect - Showell

1   some decisions in some of these cases that cited this analysis

2   favorably or credited the analysis.

3        After the time of that -- and there were no instances

4   in the NRA database that I had coded that had used more than

01:42   5   10 bullets.  After I had done the analysis a few times and it

6   had been cited by courts in these sorts of cases, then the

7   next time that I did it there were two instances in the NRA

8   database.

9        So I do think there's a potential for bias of certain

01:42   10  types in the database certainly to show stories using guns in

11  their best light.  And the two instances that were there, one

12  was a television story that's not covered by Factiva and it

13  was -- I forgot now -- one was 14 bullets and one was 16

14  bullets and one was a person -- finding a person -- seeing

01:43   15  what the story said was a black plan in the living room, and

16  then going out -- and the person went outside and then the

17  person -- the homeowner seemed to fire a number of bullets, it

18  wasn't clear that they did anything with the bullets, it

19  wasn't clear that they hit the person it sounded like they

01:43   20  were already running away, that was one instance.

21        The other one the person was I believe in the shower,

22  heard someone downstairs and their phone was dead, so they got

23  their gun and they -- it appears to have shot their way out of

24  the bathroom window to get out of the house.  So those are the

01:43   25  two instances.  The only two instances I had found of someone

*United States District Court*
*Trenton, New Jersey*

Allen - Redirect - Showell

1    using more than 14 -- more than 10 bullets defending

2    themselves.

3    Q.   Are you aware in this case whether Professor Kleck

4    utilized the Mother Judge database in his analysis?

01:44    5    A.   He discussed the Mother Judge database.

6    Q.   Now, you have done similar analyses for several court

7    cases involving large capacity magazine restrictions; is that

8    right?

9    A.   That is correct.

01:44    10    Q.   And did you rely on the Mother Judge database in each of

11    those cases?

12    A.   Yes.

13    Q.   And with respect to those cases, was the Mother Judge

14    database accepted as a reliable source by the court?

01:44    15    A.   It's my understanding it was.

16    Q.   And can you tell me those court cases specifically?

17    A.   No.  I can look in my C.V. here and read them out, I

18    don't have a -- I don't recall their names.  One was the State

19    of New York; I can tell you states, but I don't recall their

01:45    20    specific names.

21    Q.   Why don't you take a minute to turn to your C.V. within

22    your declaration, and just refresh your recollection with

23    reference to that.

24         (Witness reviewing.)

01:45    25    A.   San Francisco Veteran Police Officers Association, et al

Allen - Redirect - Showell

1    versus the City and County of San Francisco.

2  Q.   Was that in Federal District Court in California?

3  A.   Northern District of California, yes, I believe that's

4    Federal District Court.

01:46    5  Q.   And the court accepted your reliance on the Mother Judge

6    database in that case; is that true?

7  A.   I believe so.

8  Q.   And there are three additional cases?

9  A.   Kolbe, et al versus O'Malley, et al, which is in

01:46   10    Maryland.

11  Q.   And that's also in the Federal District Court?

12  A.   Yes.

13  Q.   And the two remaining cases?

14  A.   Fyock, et al versus the City of Sunnyvale, et al.

01:46   15  Q.   And that's also in Federal District Court?

16  A.   Yes.

17  Q.   And there's -- is there an additional case, one more?

18       (Witness reviewing.)

19  Q.   I'm sorry, maybe we've covered them all.  We have New

01:47   20    York -- had you mentioned the New York Cuomo?

21  A.   Oh, I think that maybe was old enough that it wasn't in

22    the last four years, so it's not on this -- so it wasn't on my

23    C.V. here because it's more than four years old, so I think

24    that would -- that would be the other one.

01:47   25  Q.   Did you rely on the Mother Judge database in the New York

Allen - Redirect - Showell

1   State Cuomo matter?

2   A.   Yes.

3   Q.   And did the court accept your analysis of that database

4   in that case?

01:47    5   A.   Yes, I believe so.

6   Q.   When you did your initial analysis in this case, was the

7   gun violence archive maintained on ShootingTracker.com

8   available to you?

9   A.   I don't believe so, no.

01:47   10   Q.   And is that -- is there a reason -- you couldn't have

11   used that database if it wasn't available; fair to say?

12   A.   I couldn't have used it if I wasn't available, that's

13   correct.

14   Q.   You were asked about an article by Grant Duwe, a

01:48   15   professor, that was marked?

16   A.   Yes.

17        THE COURT:  It's marked as Duwe I think.

18        MR. SHOWELL:  Your Honor, I think it's

19   cross-examination material that wasn't submitted as an exhibit

01:48   20   to the Court.  And I just want to reference that for a second.

21   Q.   Do you have a copy of that?

22   A.   Yes, I do.

23   Q.   If you look at the bottom third paragraph that appears on

24   the first page of that, does Professor Duwe acknowledge using

01:49   25   a definition of mass shootings that's identical to that used

Allen - Redirect - Showell

1   by Mother Judge?

2        (Witness reviewing.)

3   A.   I don't believe so, no.

4   Q.   And does Professor Duwe make any mention of a criteria

01:49   5   that he required these mass shootings to involve a lone

6   shooter?

7   A.   I don't know.  I mean I -- not that I see, no.

8   Q.   Would you expect Professor Duwe to get a different result

9   in terms of the absolute number of mass shooting events that

01:50   10   he identifies if he uses a different definition from Mother

11   Judge?

12   A.   Yes, I think if you use a very different definition you

13   can get a very different set of mass shootings, and if you use

14   a somewhat different you can also get a different set.

01:50   15        (Brief pause.)

16        THE COURT:  Next question.

17   Q.   You were asked extensively about intrafamilial; violence

18   do you recall testifying generally in that area, gun violence?

19   A.   Yes.

01:50   20   Q.   I think you said, and I don't want to put words in your

21   mouth, that it wouldn't make a difference to you who the

22   perpetrators were, you were interested in counting number of

23   bullets; is that correct?

24   A.   For the purposes of my analysis here, I don't want to say

01:51   25   it doesn't make a difference to me who's attacking someone.

Allen - Redirect - Showell

1   For my purposes here what I was asked to do is analysis of how

2   common is it to use more than 10 bullets to defend yourself.

3   Q.   Ms. Allen, I don't believe I have anything further to

4   you.  Thank you for your time.

01:51   5        THE COURT:  All right.  You may step down.  Thank

6   you.

7            MR. ALICEA:  Your Honor, would it be permissible to

8   have one question on recross?

9            THE COURT:  Well, I don't usually have recross, so I

01:51   10  don't see why I should change the rule now.

11           Thank you for coming in today.

12           (Witness excused.)

13           THE COURT:  Next witness?

14           MR. THOMPSON:  Your Honor, it's Mr. Stanton, who

01:52   15  will be the next witness.  And Mr. Feinblatt needs to have one

16  minute if that would be permissible.

17           THE COURT:  All right.  So, we will break a half

18  hour for lunch, we'll be back out like 1:15.

19           MR. THOMPSON:  Very well, your Honor.

01:52   20           MR. FEINBLATT:  Thank you, your Honor.

21           (Luncheon recess.)

22           THE COURT: Next witness?

23           MR. THOMPSON:  Good afternoon, your Honor.  Mr.

24  Stanton will be the next witness.

02:36   25           THE COURT:  Mr. Stanton may take the stand.

Stanton - Cross - Proctor

1          MR. THOMPSON:  With the Court's permission, my

2    colleague, Ms. Proctor, will conduct the cross-examination.

3          THE COURT:  Okay.

4          (ANDREW STANTON), sworn.

02:36  5          THE COURT:  Once you're seated, Mr. Stanton, can you

6    spell your last name?

7          THE WITNESS:  Yes, S-t-a-n-t-o-n.

8          THE COURT:  You may proceed, Ms. Proctor.

9          MS. PROCTOR:  Your Honor, Haley Proctor for the

02:37  10   plaintiff and with your Honor's permission I will distribute

11   some binders for reference during the cross-examination?

12         THE COURT:  You may.

13         (Handing to Court and witness.)

14   (CROSS-EXAMINATION OF ANDREW STANTON BY MS. PROCTOR:)

02:37  15   Q.  Detective Stanton, based on your decades of experience

16   training individuals to store, handle and use firearms safely,

17   is it your opinion that a citizen who can safely possess a

18   weapon capable of holding 10 or fewer rounds can also safely

19   possess a firearm capable of holding 11 to 15 rounds?

02:38  20   A.  I think when we spoke at the deposition we were talking

21   about the magazine itself, and I think I stated that a private

22   citizen could safely possess a high capacity magazine.  You

23   just said would they possess a weapon with a high capacity --

24   I would differ in that in the sense that yes, they could

02:38  25   safely possess the magazine because it's just an implement

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1    that goes into the firearm to allow a certain number of rounds

2    to be fired.  Safely possessing the high capacity magazine,

3    they can safely possess it, but with that higher capacity

4    magazine bad things could possibly happen if they had it.

02:38    5    Q.   And Detective Stanton if I could direct your attention to

6    page 106 of the deposition transcript which is the spiral

7    bound document --

8    A.   Okay.

9    Q.   -- you were provided.  Starting on line 3.  I asked --

02:39    10   THE COURT:  Hold on; let's wait until he gets there.

11   MS. PROCTOR:  I apologize.

12   THE COURT:   Are you there, Mr. Stanton?

13   THE WITNESS:  Yes I am, thank you.

14   BY MS. PROCTOR:

02:39    15   Q.   I asked:  In your opinion a citizen who would safely

16   possess a weapon capable of holding 10 or fewer rounds can

17   also safely possess a firearm capable of holding 11 to 15

18   rounds.  And you answered:  They could safely possess it.

19   Is that correct?

02:39    20   A.   Yes, it is.

21   Q.   In fact, it is your opinion that the capacity of the

22   magazine does not have anything to do with safety; is that

23   correct?

24   A.   It's not with safety, it's with use.

02:39    25   Q.   And you recall that during your deposition I used the

Stanton - Cross - Proctor

1   term standard capacity magazine to refer to a magazine capable

2   of holding more than 10 rounds.

3   A.   That's correct.

4   Q.   I'm going to use that same term today in the same sense;

02:40   5   does that make sense?

6   A.   Yes.

7   Q.   In paragraph 8 of your supplemental declaration which is

8   the second tab in the binder that we provided --

9        MS. PROCTOR:  And it's Defendant Exhibit 99, your

02:40   10   Honor.

11   Q.   You state that it can take anywhere from eight to 10

12   seconds for an inexperienced shooter to change a magazine;

13   correct?

14   A.   Yes.

02:40   15   Q.   By little to no experience, do you mean no former

16   training -- no formal training?

17   A.   Yes, very little use of the weapon -- practical use of

18   the weapon.

19   Q.   With training and practical use would you agree that a

02:41   20   person could change a magazine from lock-back position in two

21   to four seconds?

22   A.   Yes, I would.

23   Q.   In all of the firearms training you have offered or taken

24   had the training ever varied based on the size of the magazine

02:41   25   of the weapon on which the training was conducted?

Stanton - Cross - Proctor

1    A.   You mean regarding the fundamentals of magazine exchange?

2    Q.   Regarding the firearms training in general.

3    A.   You mean the fundamentals of the magazine exchanges;

4    there are differences between using a lower capacity

02:41    5    magazine --

6              THE COURT:  Mr. Stanton, I'm sorry to interrupt; if

7    you don't understand the question, that's all you have to tell

8    us?

9              THE WITNESS:  Okay.

02:41    10   A.   Could you repeat the question?

11   Q.   Yes.  In all of the firearms training you have either

12   offered or taken, has the training ever varied based on the

13   size of the magazine of the weapon on which the training is

14   conducted?

02:42    15   A.   No.

16   Q.   When you teach someone to change a magazine, do you teach

17   them to keep their trigger finger off of the trigger?

18   A.   Yes.

19   Q.   And that is because a person who keeps his or her finger

02:42    20   on the trigger might accidently discharge the weapon during

21   the reloading process; is that correct?

22   A.   Yes.

23   Q.   In your experience is it a mistake that someone who is

24   inexperienced with a firearm is likely to make, keeping the

02:42    25   finger on the trigger?

Stanton - Cross - Proctor

1    A.    Yes.

2    Q.    In your experience a magazine that is well maintained can

3    last in excess of 15 years; is that correct?

4    A.    Yes.

02:42          5    Q.    In fact, you have owned some of your magazines for nearly

6    30 years or since 1991; is that correct?

7    A.    Yes.

8    Q.    Is it the case that you always load your magazines to

9    capacity?

02:43          10   A.    Yes, when I'm going to use them.

11   Q.    And you regularly carry a firearm with a 15-round

12   magazine; is that correct?

13   A.    When I'm on duty.

14   Q.    And you load your magazines to capacity because if you

02:43          15   were to need to use your firearm you would want every

16   advantage you could ascertain; is that right?

17   A.    Yes, it is.

18   Q.    The standard issue weapon for law enforcement officers in

19   New Jersey is a Gloch 19; is that correct?

02:43          20   A.    It's one of the standard issues; there's many departments

21   in the state, the State of New Jersey -- the Division of

22   Criminal Justice who I represent, yes, that is our weapon, but

23   there's many other weapons in the state.

24   Q.    And the Gloch 19 has a 15 round magazine; is that

02:43          25   correct?

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1   A.   Yes, it does.

2   Q.   Is it customary for law enforcement officers to carry

3   their weapons with their magazines loaded to capacity?

4   A.   Yes, it is.

02:44   5   Q.   And they do so in order to protect themselves; is that

6   correct?

7   A.   Themselves and others.

8   Q.   You have opined that -- in paragraph 25 of your

9   declaration, which is the first tab in the binder, Defendant

02:44   10   Exhibit 98 --

11           THE COURT:   What paragraph?

12           MS. PROCTOR:   Paragraph 25.

13           THE COURT:   Thank you.

14   Q.   And in that paragraph you opine that gunfights are highly

02:44   15   stressful situations for law enforcement officers; is that

16   correct?

17   A.   Yes.

18   Q.   And by gunfight you mean an encounter where shots are

19   fired; is that correct?

02:44   20   A.   That is correct.

21   Q.   In your experience do police officers involved in

22   gunfights go through rounds quickly?

23   A.   Yes, they do.

24   Q.   And for that reason would you agree that a standard

02:45   25   capacity magazine is advantageous and necessary for law

Stanton - Cross - Proctor

**1**  enforcement officers, because it reduces their need to reload?

**2**  A.   It's advantageous because it does reduce their need for

**3**  reloading.

**4**  Q.   And may I direct your attention to paragraph 25 again of

02:45  **5**  your declaration.  The final sentence you state:  Large

**6**  capacity magazines are advantageous and necessary for law

**7**  enforcement officers because it reduces their need to reload.

**8**  Is that correct?

**9**  A.   Yes.

02:45  **10**  Q.   Do you agree that civilians can also find themselves in

**11**  situations in which they require a firearm for self-defense?

**12**  A.   They could possibly.

**13**  Q.   And would you agree that gunfights are also highly

**14**  stressful situation for law-abiding citizens?

02:46  **15**  A.   Yes.

**16**  Q.   Would you expect a civilian involved in a gunfight to

**17**  have a lower hit rate than an law enforcement officer involved

**18**  in a gunfight?

**19**  A.   I wouldn't know.

02:46  **20**  Q.   Okay.  May I direct you to page 116 of the deposition

**21**  transcript.  Beginning on line 3, I asked you:  Would

**22**  civilians have higher or lower hit rates than police officers,

**23**  all else being equal.  And you answered:  Civilians would have

**24**  lower hit rates.

02:46  **25**      Is that correct?

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1  A.   Yes, that's what I stated.

2  Q.   All else being equal, would you therefore expect a

3  civilian to go through more rounds to incapacitate an

4  assailant than a law enforcement officer would?

02:47   5  A.   All else being equal, yes.

6  Q.   And would you expect a civilian to take longer to change

7  a magazine than a law enforcement officer would?

8  A.   All else being equal and assuming they had no training,

9  yes.

02:47   10  Q.   Would you expect a civilian to be less likely than a law

11  enforcement officer to have a spare magazine available?

12  A.   Yes.

13  Q.   Would you therefore agree that it is preferable for

14  law-abiding civilians who find themselves in gunfights not to

02:47   15  have to reload?

16  A.   All else being equal if you're in a gunfight, yes.

17  Q.   Would you agree then that standard capacity magazines are

18  also advantageous and necessary for law-abiding citizens in a

19  gunfight?

02:48   20  A.   They would be advantageous.  And I guess they would be

21  necessary if they possessed one legally.

22  Q.   In fact you believe that hypothetically a standard

23  capacity magazine would afford law enforcement officer and

24  law-abiding citizen alike the same advantage in a gunfight; is

02:48   25  that right?

Stanton - Cross - Proctor

1    A.    A large capacity magazine would afford anyone an
2    advantage, the police officer, armed citizen or the bad guy.
3    The bigger the magazine in the gunfight the more the
4    advantage.
02:48    5    Q.    And speaking of advantages, during -- in paragraph 27 of
6    your declaration you speak about the need for law enforcement
7    officers to secure every advantage they can get in a gunfight.
8         THE COURT:   Let's gets to the declaration.
9         THE WITNESS:   I have it, your Honor.
02:49    10   A.    I'm sorry; can you repeat that again?
11   Q.    You speak in this paragraph about the need to secure
12   comparative advantage for law enforcement in their
13   confrontations with criminals; is that correct?
14   A.    Yes.
02:49    15   Q.    Would you agree that one comparative advantage criminals
16   enjoy over their victims and law enforcement is that they are
17   better able to anticipate a confrontation?
18   A.    Yes, they're initiating the aggression.
19   Q.    And might a criminal initiating or anticipating an armed
02:49    20   confrontation arm himself with multiple firearms?
21   A.    They may.
22   Q.    How about multiple magazines?
23   A.    Again, they may.  In my experience I've seen many
24   criminals come very ill-prepared, their weapons a lot of times
02:50    25   are not of the best quality; it isn't always the case.

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1   Q.   Might a criminal anticipating an armed confrontation

2   train on his or her firearms, and yes or no, might a criminal

3   do so?

4   A.   They own the gun, they could I guess, yes.

02:50   5   Q.   And might a criminal anticipating an armed confrontation

6   in which many rounds will be fired train on reloading the

7   magazine; yes or no?

8   A.   Yes, they could.

9   Q.   And would you -- you would not expect someone that is

02:50   10   about the break the law to limit himself to firearms or

11   magazines that are legal under state law, would you?

12   A.   That wouldn't be their main concern.

13   Q.   May I direct your attention to page 112 of the deposition

14   transcript.  Beginning on line 20 I asked you:  Do you think

02:51   15   somebody who is about to break a law -- break the law and

16   initiate a confrontation with the police, is going to limit

17   himself or herself to firearms or magazines that are legal

18   under state law.  And you answered:  Probably not.

19   A.   That's correct.

02:51   20   Q.   I will represent to you that standard capacity magazines

21   are legal in the Commonwealth of Pennsylvania.  Someone in say

22   Trenton who wanted to acquire a standard capacity magazine

23   would only have to ride across the bridge to get into

24   Pennsylvania to get it; is that correct?

02:51   25   A.   They could do that; they would break the law when they

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1    brought it back here.

2    Q.   In fact, are you aware that less than two miles from

3    where you sit right now there is a gun store in Pennsylvania

4    that sells these standard capacity magazines?

02:52    5    A.   I'm not aware of it, but...

6    Q.   But you are aware that there are lots of stores in

7    Pennsylvania that sell magazines.

8    A.   Yes.

9    Q.   And you also know that anyone in New Jersey can drive

02:52    10   across state lines to purchase one of these magazines; is that

11   correct?

12   A.   Yes, they can.  But again they'll break the law when they

13   bring it back into the state.

14   Q.   You have also opined that a person who is about the break

02:52    15   the law by engaging in an arm confrontation is not likely to

16   limit himself to --

17   A.   That's correct.  You just said anyone can, so I'm just

18   saying, yeah a criminal could or a law-abiding citizen, either

19   one if they bring it back in they'll break the law.

02:52    20   Q.   And in your experience a very small percentage of armed

21   criminals possess their arms lawfully; is that correct?

22   A.   Yes.

23   Q.   Does New Jersey's ban on standard capacity magazines

24   apply only to criminals or does it also apply to law-abiding

02:53    25   citizens who are not in law enforcement?

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1    A.    It applies to everyone that's not in law enforcement.

2    Q.    And all else being equal, do you agree that standard

3    capacity magazines can be beneficial for self-defense by

4    law-abiding citizens?

02:53    5    A.    All else being equal they can be beneficial in that

6    they'll have greater capacity.

7    Q.    When someone asks your advice about what type of firearm

8    they should keep in their home for self-defense purposes,

9    would it be accurate to say that you usually advise them to

02:53    10   choose a weapon with which they are familiar and which they

11   are able to shoot well?

12   A.    Yes.

13   Q.    So if someone is most comfortable with handling say a

14   Beretta 92, would you say that that is an effective weapon for

02:53    15   home defense?

16   A.    If they were comfortable in handling it, yes.

17   Q.    What is the typical magazine capacity of a Beretta 92?

18   A.    It's a double stacked magazine, I'm not sure of the exact

19   capacity; between 15 and 17 rounds.

02:54    20   Q.    Would you say that one advantage of a Beretta 92 is

21   magazine capacity?  In self-defense.

22   A.    In self-defense, it would be an advantage, however, the

23   double capacity -- or the double stacked magazine that you are

24   referring to in a Beretta 92, if you're asking me if I'm

02:54    25   counseling someone on buying a weapon, I'd really have to look

Stanton - Cross - Proctor

1    at their actual -- the actual size of their hands.  Because

2    weapons -- handguns are like shoes to the sense that really

3    once size doesn't always fit all.

4         A lot of times if I'm counseling say a female and their

02:54    5    hands are relatively small, I would counsel them to go a

6    single stack magazine, because it's more important that the

7    gun fit their hand properly than the amount of rounds that are

8    in the gun.

9    Q.   Someone who is familiar with a Beretta 92 and able to

02:54   10    fire it well, you would counsel that the size of the magazine

11    is an advantage in self-defense.

12    A.   Well, the size of the magazine would be an advantage, but

13    again even if they were familiar with a 92, if I was

14    evaluating them I'd really have to look at other things just

02:55   15    other than the fact that they're familiar with that weapon;

16    how the weapon fit them specifically.

17    Q.   Now, you are being offered here as an expert on firearms

18    training; is that correct?

19    A.   Yes.

02:55   20    Q.   And is one basis for your expertise that you are a state

21    range master for the State of New Jersey?

22    A.   Yes.

23    Q.   And as a state range master you are employed by the New

24    Jersey, Office of the Attorney General, Division of Criminal

02:55   25    Justice; is that correct?

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1    A.    Yes.

2    Q.    Is the attorney general, a defendant in this case, the

3    head of the Office of the Attorney General?

4    A.    Yes.

02:55    5    Q.    Did Ms. Valeria Dominguez, Deputy Attorney General and

6    Counsel for the State defendants, draft your declaration for

7    you?

8    A.    She -- I did the declaration and she typed it for me, if

9    that's what you mean.

02:56    10   Q.    And did she draft your supplemental declaration for you?

11   A.    I dictated it and she typed it, yes.

12   Q.    In paragraph 10 of your supplemental declaration, you

13   offer the opinion that it would be cost prohibitive and not

14   feasible to have all interested New Jersey citizens train on

02:56    15   standard capacity magazines in a manner consistent with law

16   enforcement officers; is that correct?

17   A.    Yes.

18   Q.    In preparing to offer this opinion did you make a study

19   of the practical requirements of providing training for

02:56    20   civilians who wish to possess standard capacity magazines?

21   A.    No, I did not.

22   Q.    Would it be accurate to say that your opinion is based on

23   your sense that there are not enough ranges in New Jersey to

24   accommodate all interested citizens?

02:57    25   A.    It would be a myriad of things, yes.

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1   Q.   Doesn't insufficient capacity relate more to the wait

2   time that interested citizens would face to receive training

3   rather than it does to the cost of that training?

4   A.   I'm sorry; repeat that again?

02:57  5   Q.   Your concerns about insufficient capacity of the ranges,

6   wouldn't that relate more to the wait time that interested

7   citizens would face to receive training, than it does to the

8   cost of providing such training?

9   A.   When you say cost of providing such training, I'm not

02:57  10  sure if you mean -- do you mean the state would have to pay

11  for that training or would that be individuals paying for that

12  training out of their own pocket?

13       THE COURT:  So you should rephrase.  He doesn't

14  understand the question.

02:57  15  Q.   You -- backing up one step.  You had said, am I correct,

16  that your opinion about the feasibility of providing training

17  to civilians is based on your belief that there are not enough

18  ranges in New Jersey to accommodate all interested citizens.

19  A.   Yes, among other things.

02:58  20  Q.   And with that concern in particular, insufficient ranges,

21  create an additional cost for the state, or does it simply

22  mean that citizen would have to wait longer to obtain

23  training?

24  A.   This state doesn't really have much of a program for

02:58  25  civilian training.  Our ability to carry personally owned

Stanton - Cross - Proctor

1    weapons for concealed carry in the state is very very minimal

2    other than law enforcement or retired law enforcement.  The

3    number of private citizens that carry is very very small;

4    therefore, there's not much training to go around to prepare

02:58    5    people for concealed carry either in ranges, curriculums,

6    instructors, there's nothing in place right now, this state

7    doesn't really deal with that much.

8    Q.   And you seem to be assuming that there would be a fairly

9    large number of interested citizens; is that because standard

02:59    10   capacity magazines are commonly owned in New Jersey?

11   A.   No, not at all.  I think that there would be a lot of

12   people, honest law-abiding people that would want to carry

13   simply to defend themselves.  I don't think the fact that --

14   the large capacity magazine has nothing to do with whether

02:59    15   they can carry or not.  You know, whether they have a less

16   than 15-round or less than 10-round magazine or a greater than

17   10-round magazine I don't think that would affect the private

18   citizen on his desire to carry.  I don't think that they'd

19   have a greater desire to carry because they can carry a high

02:59    20   cap magazine as opposed to the sub 10-round magazine.

21   Q.   And Detective Stanton, the opinion that you offer in

22   paragraph 10 of your supplemental declaration, does it refer

23   to the feasibility of training civilians in order to be able

24   to carry arms, or in order to be able to possess standard

03:00    25   capacity magazines?

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1        (Brief pause.)

2    A.   It would be -- it would be cost prohibitive and not

3    feasible to train everyone in the totality of everything to do

4    concealed carry.

03:00   5    Q.   To do concealed carry.

6    A.   Right.

7    Q.   But you are not offering an opinion on the feasibility of

8    training to possess standard capacity magazines.

9    A.   There's no training to possess a high capacity -- it's

03:00   10   the same -- the magazine almost looks identical, it just holds

11   more rounds.  There's not additional training needed to insert

12   that magazine into the weapon.

13   Q.   So in your opinion no special training is required for a

14   citizen to possess a standard capacity magazine as

03:01   15   distinguished from a magazine holding 10 or fewer rounds?

16   A.   No, to possess a magazine as I said it's just an

17   implement that goes into the weapon to increase the capacity

18   of the weapon itself.

19   Q.   Before the magazine passed for this year, did New Jersey

03:01   20   require its residents to receive training in order to possess

21   magazines capable of holding between 11 and 15 rounds?

22   A.   No.

23   Q.   Are you aware of any incidents in New Jersey's history in

24   which a person was injured or killed because a citizen had not

03:01   25   received proper training to handle magazines capable of

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1  holding between 11 and 15 rounds?

2  A.   No.

3  Q.   Are you aware of any mass shooting incident in New

4  Jersey's history involving magazines capable of holding

03:02      5  between 11 and 15 rounds?

6  A.   I don't know.

7  Q.   Under the new law does New Jersey require its residents

8  to receive training to possess magazines with capacities of up

9  to 10 rounds?

03:02      10  A.   No.

11  Q.   Does that concern you?

12  A.   No.

13  Q.   Based on your experience, again, is there any difference

14  in the amount of training required for a person to possess an

03:02      15  11-round magazine?

16  A.   No, there's no difference in the training to possess the

17  magazine.  Like I said it's more what you can do with the

18  magazine with a higher capacity than a lower capacity.

19  Q.   In preparing to offer this opinion on training, did you

03:02      20  seek to ascertain how many New Jersey citizens would be

21  interested in receiving training on standard capacity

22  magazines?

23  A.   No, I did not.

24  Q.   In fact, you had no idea how many people in New Jersey

03:03      25  would seek out such training if it were available and

Stanton - Cross - Proctor

1    required.

2    A.   Not at all.

3    Q.   In preparing to offer this opinion concerning the

4    feasibility of training, did you determine how many ranges

03:03    5    there are in the State of New Jersey?

6    A.   No, I did not.

7    Q.   In fact, you do not know how many gun ranges there are in

8    the state; is that correct?

9    A.   That's correct.

03:03    10   Q.   In preparing to offer this opinion about the feasibility

11   of training, did you determine the cost and feasibility of

12   building additional ranges if any were needed?

13   A.   No.

14   Q.   And in formulating this opinion you did assume that the

03:03    15   cost of providing training would fall on the state; is that

16   correct?

17   A.   If the state were to mandate it and provide training, the

18   cost would fall on them.  They'd have to do some type of

19   regulation, they'd either have to let private people train and

03:04    20   offer some type of certification or do it themselves, I don't

21   know how they would do it.

22   Q.   In paragraph 10 of your declaration, you state:   I

23   believe it would not be feasible and cost prohibitive to

24   attempt to have all New Jersey citizens train on LCMs in a

03:04    25   manner consistent with law enforcement officers.

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1        Is that correct?

2  A.   Yes.

3  Q.   And when you say cost prohibitive you meant cost

4  prohibitive for the State of New Jersey; is that correct?

03:04   5  A.   I -- yes.  If they had -- if they had to provide the

6  training, because it would be at least 40 hours worth of

7  training.

8  Q.   So if the State of New Jersey were not to provide that

9  training, would you believe that it would not be cost

03:04   10  prohibitive for the state?

11  A.   I don't know.

12  Q.   Isn't it true that there are no practical barriers to New

13  Jersey shifting the cost of that training to interested

14  citizens?

03:05   15  A.   They could do whatever they want I guess.

16  Q.   Are you familiar with the procedure for a civilian to

17  obtain a permit to carry a weapon in New Jersey?

18  A.   Somewhat.

19  Q.   Does that procedure involve the training requirement?

03:05   20  A.   Well, they have to pass a qualification course, so they

21  would need obviously some type of training.

22  Q.   And is that qualification course similar to what law

23  enforcement officers in the state pass, plus all the ancillary

24  training that goes along with it?

03:05   25  A.   Yes.

Stanton - Cross - Proctor

1   Q.   Would you agree that the training a civilian must undergo

2   to carry a weapon in New Jersey is provided by private

3   individuals?

4   A.   It could be.

03:05   5   Q.   In formulating your opinion about the cost and

6   feasibility of training civilians, in your supplemental

7   declaration did you make any study of the cost or practical

8   limitations the state has or has not faced in administering

9   the training program as part of its carry permitting regime?

03:06   10   A.   No, I have not.

11   Q.   If there were more interested citizens than the currently

12   available ranges could accommodate, isn't it possible that new

13   ranges would open to meet the increased demand?

14   A.   In this state it's tough; it's possible, but I mean with

03:06   15   all the restrictions on -- on the construction of the range,

16   the environmental considerations, things like that, ranges

17   are -- they're hard to get up and going I think in this state

18   as opposed to other states.  So I don't know how -- how many

19   areas would be -- would be able to accommodate ranges.

03:06   20   Q.   But you do not know how many -- the practical limitations

21   on constructing --

22   A.   No, I don't know that.

23   Q.   Okay.  Have you made a study of state mandated civilian

24   training programs in other states?

03:07   25   A.   No, I have not.

United States District Court
Trenton, New Jersey

Stanton - Cross - Proctor

1   Q.   Please turn to the application instructions tab of your

2   binder, which is Plaintiff's Exhibit 19.  These are the

3   application instructions issued by the Florida Department of

4   Agriculture and Consumer Services --

03:07   5   A.   Hold on.

6   Q.   Um-hmm.

7   A.   Okay, got it.

8   Q.   For a Florida concealed weapon or firearm license.

9   A.   Okay.

03:07   10   Q.   Have you reviewed this document before?

11   A.   I saw it during the deposition.

12   Q.   Can you please turn to page 2 of the document?

13   A.   Okay.

14   Q.   The section titled Minimum Eligibility Requirements.

03:07   15   A.   Okay.

16   Q.   The third bullet reads:  You must be able to provide a

17   certificate of completion from a firearms training class or

18   other acceptable training document that evidences your

19   competency with a firearm; see the instructions for Question 6

03:08   20   in Section 2 below for further details.

21         Do you agree?

22   A.   Agree with what?

23   Q.   That that's what it says?

24   A.   Oh yeah, yeah.

03:08   25   Q.   If you could please turn to question 6.

Stanton - Cross - Proctor

1   A.   Okay.

2   Q.   Have you reviewed the instructions for question 6 before?

3   A.   I saw this at the deposition.

4   Q.   Based on your review, would you agree that Florida relies

03:08   5   on training by private individuals certified to offer

6   instruction in firearms?

7        (Witness reviewing.)

8   A.   Yes.  Private is in there.

9   Q.   Please turn to the next tab in your binder, which is

03:09   10   Plaintiff's Exhibit 21.  This is a report issued by the

11   Division of Licensing of Florida's Department of Agriculture

12   and Consumer Services, dated as of July 31st, 2018; and it

13   lists the number of licenses by type that have been issued by

14   the division.

03:09   15        Can you please read the number of concealed weapon or

16   firearm licenses that have been issued by the State of

17   Florida?

18   A.   The total number is 2,108,229.

19   Q.   I'm sorry.  The line -- four lines up from that says

03:09   20   concealed weapon requirement or firearm, could you please --

21   A.   I'm sorry, yes; 1,919,227.  Sorry.

22   Q.   If you could please turn to the next tab in your binder,

23   which is Plaintiff's Exhibit 20.  This is a report that was

24   also issued by the division of licensing and it details

03:10   25   statistics about concealed firearm license applications in the

United States District Court
Trenton, New Jersey

Stanton - Cross - Proctor

1   state between July 1st, 2017 and June 30th, 2018.  If you

2   could please turn to the end of the report.  The bottom line

3   gives the statewide total, and it states that new applications

4   received in this state for that reporting period was 219,486;

03:10   5   would you agree?

6   A.   Yes.

7   Q.   Is it accurate to say that you do not know whether it is

8   feasible for New Jersey to put a similar system in place to

9   train individuals on standard capacity magazines?

03:11   10   A.   This isn't -- this is concealed carry.

11   Q.   Correct.

12   A.   Right?  So we're talking -- we're talking concealed carry

13   -- what did you say again?

14   Q.   The question is whether you are aware of any reason that

03:11   15   New Jersey could not put in place a system that requires

16   private training for citizens to possess standard capacity

17   magazines.

18   A.   Well, to possess standard capacity magazines is not the

19   issue, it's really could we put this into training for

03:11   20   concealed carry, because that's what we're talking about here.

21   Q.   Well, my question for you is for purposes of possessing

22   standard capacity magazines.

23   A.   If you -- if you did concealed weapons training, like I

24   said, the standard capacity magazine as opposed to the

03:12   25   10-round or less magazine, the training type of thing would be

Stanton - Cross - Proctor

1    the same.

2    Q.   And so the question yes or no is are you aware of any

3    reason that New Jersey could not put in place a training

4    system along the lines of what Florida has done?

03:12    5    A.   No.

6    Q.   Based on your decades of experience training individuals

7    to store, handle and use firearms safely, would you agree that

8    a properly trained law-abiding citizen can safely possess

9    standard capacity magazines in their home without presenting a

03:12   10    threat to public safety?

11    A.   Yes, they could possess it.

12    Q.   Moving to your -- paragraphs 22 through 24 of your

13    declaration.

14    A.   Okay.

03:13   15    Q.   Would you agree that these paragraphs include your

16    observations about how military training and law enforcement

17    training differ?

18         (Witness reviewing.)

19    A.   Yes.

03:13   20    Q.   Is it accurate to say that the bases of your opinions

21    concerning U.S. military training are first, your interactions

22    with the individual units detailed in your supplemental

23    declaration, and second, your observations of and

24    conversations with individuals wit a military background?

03:13   25    A.   Yes.

Stanton - Cross - Proctor

1  Q.   Looking at your supplemental declaration, paragraphs 5

2  and 6, you list several units of the U.S. military with whom

3  you've trained or for whom you've offered training.

4  A.   Yes.

03:14  5  Q.   Would you agree that every military unit you listed there

6  trained with handguns with a standard capacity magazine?

7  A.   Yes, they did.

8  Q.   And is it your opinion that these elite units have very

9  good training on par with law enforcement training?

03:14  10  A.   Those units do.

11  Q.   So your opinion that members of the military in general

12  receive very little if any handgun training is based primarily

13  on your anecdotal observations and conversations rather than

14  the specific training interactions detailed in your

03:14  15  supplemental declaration; is that correct?

16  A.   Well, I specifically trained people, like I said I

17  don't -- in paragraph 7, I conducted a pistol and shotgun

18  course in 2003 for the United States Army Military Police, so

19  I specifically trained other people; and I would say that, you

03:15  20  know, other than the elite units their handgun training is not

21  commensurate with law enforcement.  And furthermore, you know,

22  for every combat personnel there is there -- when we say law

23  enforcement we're talking about sworn officers that are

24  involved in arresting and enforcement of the laws, when we

03:15  25  talk about the military we're talking about a huge number of

Stanton - Cross - Proctor

1   people.  Very few are what I would actually call people that

2   are engaged in combat or what the military calls trigger

3   pullers.

4        So for every trigger puller there's usually five or six

03:15   5   support personnel supplying that person to fight, so when

6   you're talking about the army you're talking about -- or the

7   military in general you're talking about a very broad group,

8   which other than maybe the little bit of training they get at

9   the basic level then they go into a specialty and they're not

03:15   10   really dealing with weapons that much.

11   Q.   But you do not know what their training and qualification

12   requirements --

13   A.   Well, I've seen their qualification requirements, I guess

14   I've seen the army's qualification requirement, and I see

03:16   15   these people shoot quite often at Fort Dix.

16   Q.   But as you have just stated that the military is a large

17   group with diverse requirements and you do not have specific

18   knowledge of what those requirements are; is that correct?

19   A.   That's correct.

03:16   20   Q.   And even with respect to the army pistol qualification

21   requirements that you have seen in the past, you do not know

22   what those requirements are today, do you?

23   A.   You mean with the passing scores on the combat pistol

24   course?

03:16   25   Q.   What the combat pistol course requires today.

Stanton - Cross - Proctor

1    A.    From what I've seen at the army level, again, it's shot

2    on a pop-up target system, and you have to get 18 out of 30

3    hits to pass the course.

4    Q.    You do not know if that is still what is required for the

03:16   5    army; is that correct?

6    A.    As of this minute no, I do not.

7    Q.    Do you know who must receive handgun training in the

8    army?

9    A.    People that would be carrying handguns.

03:17   10   Q.    Do you know that as a matter of fact or is that your

11   belief --

12   A.    Just logic.  They wouldn't train people if they didn't

13   carry them.

14   Q.    Do you know how often handgun training is required?

03:17   15   A.    Usually for the military it's once a year --

16   qualification course is usually once a year that I know of.

17   Q.    But you don't know that specifically as a matter of

18   policy --

19   A.    No, I do not.

03:17   20   Q.    And you do not know what percentage of the army for

21   example is issued a pistol; is that correct?

22   A.    That's correct.

23   Q.    Is it your opinion that members of the military receive

24   training on long arms with standard capacity magazines that is

03:17   25   comparable to if not better than the training that New Jersey

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1   law enforcement officers received on long arms with standard

2   capacity magazines?

3   A.   They -- they receive training with standard capacity

4   magazines.  They're shooting an M4 or M16 and it usually has a

03:17   5   20 or 30-round magazine so they receive training with that.

6   Is it comparable or exceeds?  I'd say it may be comparable.  I

7   think that when law enforcement -- when they're carrying a

8   rifle or long arm I think their training is every bit as good

9   as what the military's going to get.

03:18   10   Q.   But not every member of law enforcement in New Jersey

11   receives training on the long arm.

12   A.   That's correct, and if they don't receive training on it

13   they don't carry it.

14   Q.   And would you agree that the differences you believe

03:18   15   exist between law enforcement and military training have

16   nothing to do with the magazine size of the firearm an officer

17   or a veteran is able to handle?

18   A.   I'm sorry; repeat that one more time.

19   Q.   Would you agree that the differences that you believe

03:18   20   exist between law enforcement and military training have

21   nothing to do with the magazine size of the firearm an officer

22   or a veteran is able to handle?

23   A.   It doesn't have to do with the magazine capacity, it has

24   to do with the tactics and the laws and everything else.  I

03:19   25   mean the magazine capacity is a very small part of, you know,

*United States District Court*
*Trenton, New Jersey*

Stanton - Cross - Proctor

1   the overall carrying that law enforcement is required to use.

2   Q.   In fact it is your opinion that members of the military

3   and retired members of the military can safely possess

4   standard capacity magazines without presenting a threat to

03:19   5   public safety.

6   A.   Again, possessing the magazine is not inherently a threat

7   to anything; it's the use of the weapon which is more

8   important.

9   Q.   In paragraph 24 of your declaration you talk about

03:19   10   differences between the environments in which law enforcement

11   officers and member of the military operate, and how the rules

12   of engagement differ in those environments; is that correct?

13   A.   Yes.

14   Q.   But you agree that members of the military are trained to

03:19   15   avoid indiscriminate destruction; is that correct?

16        (Witness reviewing.)

17   A.   I just said that the environments were different, I don't

18   see where I said anything about indiscriminate destruction of

19   property by the military.

03:20   20   Q.   My question for you is this, in your opinion do you

21   believe military members are trained to avoid indiscriminate

22   destruction?

23   A.   To some degree, yes.

24   Q.   Can I please direct your attention to page 91 of the

03:20   25   deposition transcript.  There starting at line 1 I ask:  Is it

Stanton - Cross - Proctor

1   your belief that in hostile environments members of the

2   military are not instructed to avoid indiscriminate

3   destruction of property.  And you responded:  No, it is not.

4       Is that correct?

03:21   5  A.   Let me just read that again.

6       Okay.  Go ahead, ask your question, I'm sorry.

7  Q.   I'm asking you if I accurately read -- my question and

8   your answer.

9  Q.     It's a bad question?

03:21  10  A.   Yeah, I mean -- when I look at that question now that I

11  look at it, you're asking me is it my belief in a hostile

12  environment members of the military are not instructed to

13  avoid indiscriminate destruction of property, and I said no it

14  is not.  They're going to try to avoid indiscriminate

03:22  15  destruction of property also.

16  Q.   Thank you.  Would you agree that the differences to which

17  you refer between military and law enforcement training have

18  no bearing on their ability to handle standard capacity

19  magazines without presenting a threat to public safety?

03:22  20  A.   Again, possessing the magazine is just a small part, it's

21  the -- the use of the weapon in total.  The magazine

22  possessing, it would not -- it would not be -- they can

23  possess it -- they can possess it safely; what happens

24  afterwards is a different story.

03:22  25  Q.   Would you agree then that handling a magazine holding 10

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1  rounds versus handling a magazines versus 11 rounds that

2  there's no difference in their ability to do that?

3  A.   Again, yeah, they can possess either magazine.  What the

4  magazine possession allows them to do is either put more

03:22  5  rounds into the weapon or less, and the consequences of what

6  happened once the weapon is fired is what is the germane

7  issue.

8         MS. PROCTOR:  Your Honor, may I have a few moments

9  to confer?

03:23  10         THE COURT:  You may.

11         (Brief pause.)

12         MS. PROCTOR:  No further questions.

13         THE COURT:  Thank you.  Redirect?

14  (REDIRECT EXAMINATION OF ANDREW STANTON BY MR. FEINBLATT:)

03:24  15  Q.   Good afternoon, Mr. Stanton.

16         MR. FEINBLATT:  Just for the record, my name is

17  Stuart M. Feinblatt from the Attorney General's Office.

18  Q.   Mr. Stanton, you were asked a number of questions about

19  safe possession of LCMs; do you remember that?

03:24  20  A.   Yes.

21  Q.   And I think you said there's a distinction between safe

22  possession and safe use of LCMs; is that right?

23  A.   Yes.

24  Q.   And why is there a distinction between those two

03:24  25  concepts?

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1    A.   Safe possession, the way I understand that, would be to

2    physically possess it; again, it's a -- it's not going to do

3    anything in of it itself.  When a large capacity or any

4    magazine is placed into a weapon and the weapon is charged,

03:24    5    the large capacity magazine would allow more rounds to be

6    fired.  That's what I was referring to there.

7    Q.   And do you believe that training in the use of the

8    firearm itself as opposed to the magazine affects the safe use

9    of the -- of the bullets in that gun?

03:25    10   A.   Yes.

11   Q.   Why is that?

12   A.   Well, it's all about the training.  You know, proper

13   training with the weapon, fundamentals of safety, regarding

14   law enforcement the proper tactics that are used, all these

03:25    15   things work to create a safer environment for the law

16   enforcement officer.

17   Q.   That kind of training -- I'm going to ask you a few

18   questions to elaborate on that.  Is that type of training

19   required by regular citizens in New Jersey?

03:25    20   A.   No.

21   Q.   Why don't you just -- because I know in your declaration

22   the original one you tried to describe the training provided

23   to law enforcement in New Jersey.  Could you just briefly

24   describe what training is required by all law enforcement who

03:26    25   are going to shoot guns?

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1    A.   In the State of New Jersey for -- to be a police officer

2    in the State of New Jersey they have to attend a certified --

3    a police training certified police academy; that requires a

4    certain amount of handgun training, it's 40 hours of handgun

)3:26    5    training, actual range time, with another -- another usually

6    about 16 hours in the classroom just going over all the

7    different procedures, all the functions; and then it's also

8    incorporated with the defensive tactics training, they kind of

9    go hand in hand, and during defensive tactics training all the

)3:26    10    candidates that are in the academies, they'll wear a holster

11    with a simulated weapon, and they're usually made of plastic

12    of the same make and model of the gun that they actually are

13    going to use in training; and they'll also use that in

14    defensive tactics circumstances, both on drawing, holstering,

)3:27    15    protecting the weapon, there's many things they do with that.

16    So they get quite a bit of training either with the

17    red-handled guns or the actual firearms themselves.

18    Q.   Are they required to be tested on a periodic basis once

19    they qualify to use guns to show that they're continuing a

)3:27    20    capability with those guns?

21    A.   Yes, once they graduate from the police academy they are

22    required in this state to qualify twice a year.

23    Q.   And what do those qualifications entail?

24    A.   The qualification right now entails a 60-round course

)3:27    25    that runs from 1 yard the 25 yards, and that's the day

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1  qualification; then they must also do a night qualification

2  which consists of another additional 40 rounds which runs from

3  1 yard to the 15 yard line, requires the use of a flashlight

4  or some type of lighting system.

03:27   5  Q.   Are there any shooting proficiency requirements?

6  A.   Yes.

7  Q.   And what are those?

8  A.   80 percent on both.

9  Q.   So if they do less than 80 percent what happens?

03:28   10  A.   If they do less than 80 percent they have to re-qualify;

11  if they fail to re-qualify it is up to their head of

12  department as to what action to take against them.

13  Q.   Is there any training in the safe storage of firearms?

14  A.   Yes, in the academy we teach the weapon should be

03:28   15  inoperable and inaccessible.

16  Q.   And can you just elaborate on that a little bit?  How is

17  that done?

18  A.   Okay.  Inoperable is -- what we do there is we have them

19  remove the magazine, either insert a cable lock through the

03:28   20  slide-down through the magazine well and locking it, therefore

21  the gun can't function; or to put a trigger lock on the weapon

22  itself so that the trigger cannot be reached.  And that's the

23  inoperable.  And then the inaccessible is -- is stored in a

24  safe location, preferably locked in a lockbox.

03:28   25  Q.   As far as you know are citizens in the State of New

Stanton - Redirect - Feinblatt

1   Jersey who have firearms at home required to undergo that

2   training?

3   A.   They're not required to undergo the training, no.

4   Q.   Now, can local police departments require any more

03:29     5   training for their police when they come to your academy?

6   A.   Yes.

7   Q.   Does that happen on occasion?

8   A.   Yes, yes.

9   Q.   Now, I think you indicated in your testimony and

03:29     10   certainly in your declaration that when military people who

11   have been in military come to the police academy, that they

12   receive the same training as the police; is that right?

13   A.   Exact same.

14   Q.   And why is that required?

03:29     15   A.   Well, the training is standard, we don't -- when they

16   come to the academy you don't take -- you don't take anything

17   for granted, you don't take into account what their former

18   training was.  We have to have everyone on the same sheet of

19   music so to speak so everyone gets the same amount -- the

03:29     20   exact same training whether they're prior military, or even if

21   they were a law enforcement officer from a different state

22   that was coming to this state to become a police officer here,

23   they would still have to require the same training.

24   Q.   Now, I think you've indicated that over the years you

03:30     25   trained a number of individuals who have previously been in

Stanton - Redirect - Feinblatt

1   the military; is that right?

2   A.   Yes.

3   Q.   Can you give an estimate of how many?

4   A.   300 maybe.

03:30   5   Q.   And when you've trained these individuals have you

6   learned from them the nature of the training in firearms that

7   they had received in the military?

8   A.   Yes.

9   Q.   And these individuals that you trained, have some of them

03:30   10   been in the military for a significant number of years or are

11   they all raw recruits?

12   A.   No, I mean they had done time in the military, so if they

13   were ex-military they probably had at least four years of

14   military service.

03:30   15   Q.   And these individuals based on your talking with them --

16   and we'll talk about other bases of knowledge -- what's your

17   understanding of the nature of handgun training that they

18   typically receive in the military?

19   A.   Unless they're in specific units that require the use of

03:31   20   a handgun, most of them receive very little if no handgun

21   training.

22   Q.   You say specific units; what do you mean by that?

23   A.   Like military police or a security type force where they

24   use a handgun, because that's not their primary weapon in the

03:31   25   military, their primary weapon is the long gun.

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1   Q.   Are you aware -- I think that you said that you've

2   observed training at Fort Dix; is that right?

3   A.   Yes.

4   Q.   Now, what is Fort Dix, what branch of the military?

03:31   5   A.   Well, right now Fort Dix -- it's an army base, but it's a

6   joint military base, it's -- it's a super base, it's the first

7   of its kind; it's Navy, Air Force and Army.

8   Q.   But have you actually observed the training that they've

9   undergone there?

03:31   10   A.   Yes.

11   Q.   And how if any -- in any way does it differ from the

12   training that's provided to the police in the State of New

13   Jersey?

14   A.   Their qualification that I usually observe is -- they

03:32   15   usually come into sighting their rifles, to re-sight their

16   rifles; I hardly ever observe handgun training with them, it's

17   usually rifle training.

18   Q.   You were asked some questions about the military

19   operating I think in a different environment; do you remember

03:32   20   that?

21   A.   Yes.

22   Q.   Do you think that the military do operate in a different

23   environment than law enforcement officers?

24   A.   When they're in a combat zone, yes.

03:32   25   Q.   And why is that?

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1  A.   We're -- you know, we operate in a peacetime situation

2  here, I mean if they're in a combat zone it's basically a

3  wartime situation.  Different things happen in a war zone than

4  what -- I mean there's bombings, there's invasions, there's

03:33  5  cover fire being laid down, there's a lot of different things

6  that occur in battle that don't normally occur in -- that

7  don't occur during a peacetime environment.

8  Q.   And are the roles of the military, their purpose,

9  different than what the police who are engaging in law

03:33  10  enforcement in New Jersey are performing?

11  A.   Yes.

12  Q.   In what ways as far as you know?

13  A.   I mean in combat they're basically trying to subdue an

14  enemy that, you know, we're currently at war with; in

03:33  15  peacetime we're seeking criminals, you know, we're -- we're

16  interacting with criminal activity.  So, you know, it's --

17  there's a lot -- you know, you just can't indiscriminately do

18  things, there's a lot of rules that we have to follow as far

19  as effecting arrests and the amount of force that we can use

03:33  20  for the arrests that's commensurate with it, what the safety

21  concerns are in regards to the public.

22  Q.   Okay.  I think you indicated the -- I think it was the

23  Gloch 19 is the standard issue for on-duty police, at least

24  for you.

03:34  25  A.   Yes.

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1  Q.   And can you describe that gun?

2  A.   Yes, it's a recoil operated semi-automatic weapon, it's

3  got a steel slide, a polymer frame; you know, it's -- it's a

4  straper (ph) firing semi-automatic weapon.

03:34  5  Q.   And the capacity for the on-duty weapon is what in terms

6  of the magazine?

7  A.   15 rounds.

8  Q.   Now, do you carry a weapon off duty?

9  A.   Yes, I do.

03:34  10  Q.   And what allows you to carry a weapon off duty?

11  A.   The fact that I'm a police officer.

12  Q.   Is that considered private carry or what -- how would you

13  describe that?

14  A.   No, as a police officer you're a police officer 24 hours

03:34  15  a day; you have a duty if you see a crime, you know, grievous

16  bodily harm you're supposed to intervene, you have a duty to

17  intervene.  And by statute we are allowed to carry off duty.

18  Q.   Now, what kind of gun do you carry off duty?

19  A.   I carry several different weapons off duty.

03:35  20  Q.   And do any of them involve magazines with greater than 10

21  rounds?

22  A.   No.

23  Q.   Is there any reason for that?

24  A.   Concealability.

03:35  25  Q.   I think you were asked at your deposition what kind of

Stanton - Redirect - Feinblatt

1    gun do you use at home for self-defense; what kind of gun do

2    you use?

3    A.   I use a -- just a couple different handguns; I use a -- I

4    have a five-shot Smith & Wesson J Frame, I have a Springfield

03:35    5    XDS, which is a 5-plus-1 .45 semi-automatic --

6    Q.   What does 5-plus-1 mean?

7    A.   Five in the magazine, one in the chamber, so six rounds

8    total in the weapon.  I also have a Sig P220, which has a

9    nine-round magazine, and I put one in the chamber would make

03:36    10    it 10.  They're the three guns I basically use.

11    Q.   So none that you use for self-defense have more than 10

12    rounds in the magazine; is that right?

13    A.   That's correct.

14    Q.   Now, you were asked about citizens using guns for

03:36    15    self-defense; do you recall that?

16    A.   Yes.

17    Q.   I believe at your deposition you were asked what would

18    you recommend that a citizen use at home for self-defense as a

19    weapon; do you remember that?

03:36    20    A.   Yes.

21    Q.   Could you tell the Court what you advised at the

22    deposition?

23    A.   I think I said a .20 gauge shotgun.

24    Q.   And how many -- does that have a large capacity magazine?

03:36    25    A.   No.

Stanton - Redirect - Feinblatt

1   Q.   How many bullets would be in that?

2   A.   Depending, the max number I think would be seven, seven

3   would be the max.

4   Q.   And you were also asked questions about what would be the

03:37   5   most important feature of the gun that would be used by an

6   individual for self-defense; do you remember that?

7   A.   Yes.

8   Q.   And what was that?

9   A.   I said the fit of the weapon with the individual,

03:37   10   specifically their hand size.

11   Q.   And would the fit of the weapon be affected in any cases

12   by the size of the magazine?

13   A.   Yes.

14   Q.   And if you have a larger magazine would that require a

03:37   15   larger handgun, could it?

16   A.   The larger magazine creates a greater grip circumference,

17   and depending on your hand size it would -- it could adversely

18   affect how you hold the weapon to properly fire.

19   Q.   And I think you said that particularly with females who

03:37   20   potentially have smaller hands, a large magazine size would be

21   inadvisable; is that what you testified to?

22   A.   Often it is.

23   Q.   You were asked some questions regarding gunfights

24   involving citizens; do you remember that?

03:38   25   A.   Yes.

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1   Q.   Now, when we talk about citizens in New Jersey, are

2   citizens in New Jersey allowed -- let's assume the gunfight is

3   outside of the house, or outside the property; are citizens in

4   New Jersey allowed to carry loaded weapons outside of the

03:38   5   home?

6   A.   No.

7   Q.   Unless they --

8   A.   Unless they have a concealed carry permit.

9   Q.   And in New Jersey the number of individuals, private

03:38   10   citizen who have concealed carry permits, do you know -- do

11   you have any estimate what that number is?

12   A.   I couldn't tell you, I couldn't tell you, it's small, I

13   don't know.  But I don't know hardly anybody that I know

14   that's a civilian other than one person that has a concealed

03:38   15   carry permit.

16   Q.   So is it fair to say that the number of concealed carry

17   permits for civilians in New Jersey is very different than the

18   number in Florida?

19   A.   Very different.

03:39   20   Q.   It's like night and day; is that fair to say?

21   A.   Yes.

22   Q.   I know that you said at your deposition -- and this

23   actually came up earlier in the case -- that you do read

24   American Citizen Column; is that right?

03:39   25   A.   You mean The American Rifleman?

Stanton - Redirect - Feinblatt

 1   Q.   Right, and there's a column in there about --

 2   A.   Called The Armed Citizen.

 3   Q.   I'm sorry, I got that wrong.  You read that on a regular

 4   basis?

03:39    5   A.   Yes.

 6   Q.   And I know there was some discussion earlier based at

 7   least on your own personal reviews of that do you recall any

 8   cases where individual citizens were using more than 10

 9   bullets to defend themselves?

03:39   10   A.   I've been reading that publication for 50 years, and I

11   don't recall -- I mean there may have been, I don't recall

12   any.

13   Q.   And you've been a police officer, correct, at the

14   Princeton Police Department; correct?

03:39   15   A.   Yes.

16   Q.   And you worked for the FBI for several years; correct?

17   A.   27 years, yes.

18   Q.   How long have you been with the Division of Criminal

19   Justice?

03:40   20   A.   Five years October.

21   Q.   And you keep up I guess on gun incidents, do you try to

22   keep up as best you can?

23   A.   Yes, I do.

24   Q.   Are you familiar with any incidents in New Jersey

03:40   25   involving the discharge of more than 10 rounds by a civilian?

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1   A.   There's none that I'm aware of.

2   Q.   Are you concerned at all about whether civilians can

3   safely use a magazine in a gun with more than 10 rounds?

4   A.   It's -- it's the propensity if they're not trained and

03:40   5   they're using a high capacity magazine and they're not hitting

6   what they're aiming at and they're putting more bullets down

7   range, there could be a danger there.

8   Q.   And could that danger be to innocent bystanders?

9   A.   Yes.

03:40   10   Q.   Could it be to other family members?

11   A.   Yes.

12   Q.   Are you also concerned at all about whether criminals or

13   others might misuse a weapon that has a large capacity

14   magazine?

03:41   15   A.   Yes.

16   Q.   And why is that?

17   A.   Well, if they -- if they burglarize a house and they

18   steal the weapon with a high cap magazine, the high cap

19   magazine is in their hands.

03:41   20   Q.   Now, you were asked questions about the State of

21   Pennsylvania having a different law -- laws than New Jersey on

22   guns; is that right?

23   A.   Yes.

24   Q.   You're aware of the New Jersey law, correct, the law

03:41   25   that's being challenged today in this lawsuit; correct?

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1   A.   Yes.

2   Q.   I think you testified that at least it would be -- it

3   would be a violation of state law for somebody to bring in a

4   large capacity magazine into New Jersey; is that right?

03:41   5   A.   That's correct.

6   Q.   And they could be prosecuted if found out; correct?

7   A.   Yes.

8   Q.   And I think you indicated that criminals may not follow

9   gun laws; is that right?

03:42   10   A.   Yes.

11   Q.   And they may steal guns; correct?

12   A.   Yes.

13   Q.   Am I correct if New Jersey has a law limiting -- or

14   prohibiting LCMs then those LCMs at least won't be in New

03:42   15   Jersey; is that right?

16   A.   If they're not in their house they won't be stolen.

17   Q.   So it's a matter of logic; correct?

18   A.   Yes.

19   Q.   You were asked a lot of questions about the idea of

03:42   20   training all citizens in New Jersey the use of LCMs; do you

21   remember that?

22   A.   Yes.

23   Q.   And I guess it's fair to say that you -- that your

24   analysis, you were trying to present some practical guidance

03:42   25   on that issue; correct?

Stanton - Redirect - Feinblatt

1   A.   That's correct.

2   Q.   You didn't do a systemic study of every state; correct?

3   A.   Not at all.

4   Q.   But I think you did assume that if someone is going to --

03:42   5   that if a citizen's going to have the ability to use an LCM

6   that there would be training; correct?

7   A.   Yes, there should be --

8   Q.   And the training you're really talking about is not on

9   the magazine itself but on the use of the gun that goes with

03:43   10   the magazine; is that right?

11   A.   That's correct.

12   Q.   And why do you think that would be reasonable?

13   A.   Why should it be done?

14   Q.   Yeah.

03:43   15   A.   Well, you have a responsibility any time you pick up

16   something that, you know, is potentially dangerous there

17   should be a responsibility on behalf of that person to be

18   trained properly with it.  At least, you know, from safety

19   aspects.

03:43   20   Q.   Okay.  And you were asked a number of questions about the

21   number of ranges in New Jersey, and let's say New Jersey were

22   to go to something like Florida where there's almost two

23   million people, do you agree that that would be a drastic

24   change in the gun infrastructure in New Jersey in terms of

03:43   25   ranges, trainers, et cetera?

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

```
    1  A.   Yes.
    2  Q.   I think you said over and over that training for use of a
    3  magazine is the same regardless of the size; right?
    4  A.   Yes.
03:44  5  Q.   Why did you say that again?
    6  A.   Well, whether it's a 10-round magazine or a 15-round
    7  magazine, it goes in the weapon the same way, the weapon
    8  operates the same way; the only difference is there's a
    9  greater capacity in that magazine and what could be done with
03:44 10  it.
   11  Q.   Right.  So you're focused on the training of the gun, use
   12  of the gun; correct?
   13  A.   Yes.
   14  Q.   You made some reference to military using M4 and M16
03:45 15  rifles; correct?
   16  A.   Yes.
   17  Q.   Are those rifles allowed to be used by citizens in the
   18  State of New Jersey?
   19  A.   Yes.
03:45 20  Q.   Under what circumstances?
   21  A.   They have to be so-called New Jersey compliant.
   22  Q.   And what does that mean?
   23  A.   It means that there's so many things on the weapon --
   24  they have to meet certain standards as far as what the muzzle
03:45 25  break is on the weapon, there can't be a vertical forward grip
```

Stanton - Redirect - Feinblatt

1   on the weapon; just a lot of small things that have to be

2   modified to make the weapon legal in New Jersey.  They can't

3   have a bayonet on the weapon.

4   Q.   And once it's modified what kind of use can be made of

03:46   5   those weapons?

6   A.   This can be used for target shooting.

7   Q.   Anything else?

8   A.   They can have them for defense in their house.

9   Q.   As you know the New Jersey law that's being challenged

03:46   10   limits the size of the magazine; right?

11   A.   Yes.

12   Q.   You're aware of that.  With regard to handguns, are they

13   available with magazines with 10 rounds or less?

14   A.   Now they are.

03:46   15   Q.   Are you aware of any particular brands that are not

16   available with that size magazine?

17   A.   Of current production?

18   Q.   Current production.

19   A.   I'm not -- I'm not aware of any that aren't going to

03:46   20   modify the 10-round magazine to sell the magazine here in the

21   state.

22   Q.   So is it fair to say that gun manufacturers could adopt

23   their products to meet local legal requirements?

24   A.   Yes, they've already done that in New York State also.

03:47   25   Q.   And am I correct that in New Jersey, the law that's being

*United States District Court*
*Trenton, New Jersey*

Stanton - Redirect - Feinblatt

1   challenged does not ban any particular class of gun; correct?

2   A.   No.

3   Q.   It just deals with the size of the magazine; correct?

4   A.   That's correct.

03:47   5   Q.   Do you know how much a new magazine would cost, let's say

6   one that's 10 rounds or less?

7   A.   Between --

8        MS. PROCTOR:  Objection.

9        THE COURT:  What's the objection?

03:47   10       MS. PROCTOR:  The question is beyond the scope of

11  the cross-examination.

12       THE COURT:  Well, was it in his declarations?

13       MR. FEINBLATT:  No, it wasn't.

14       THE COURT:  So you want to open up a new area?

03:48   15       MR. FEINBLATT:  I just thought -- I can withdraw the

16  question.

17       THE COURT:  Overruled.  You can answer that

18  question?

19       THE WITNESS:  I would say between 20 and $40.

03:48   20  BY MR. FEINBLATT:

21  Q.   Okay.  There were some questions asked about gunfights

22  and I think you did make some reference to law enforcement

23  engaged in gunfights; do you remember that?  Do you remember

24  those questions?

03:48   25  A.   Yes.

Stanton - Redirect - Feinblatt

1    Q.   And I believe at your deposition you were asked about

2    average use of rounds by law enforcement in gunfights; could

3    you share what -- do you remember what you discussed at the --

4    I think you talked about New York City data.  What did you

03:48    5    learn from New York City?

6    A.   This was back in the early 2000s; New York City, when I

7    spoke to their officers at Rodman's Neck, they averaged 8.8

8    rounds per officer per gunfight.

9    Q.   And how frequently did they engage in gunfights, do you

03:48    10   know?

11   A.   There's a lot of gunfights in New York; I don't know how

12   many.

13   Q.   And what about the FBI in terms of the amount of rounds

14   discharged in gunfights by the FBI?

03:49    15   A.   Same -- same timeframe, it was about right around three

16   rounds per agent per gunfight.

17   Q.   Three rounds, thank you.  And there was some reference to

18   a Beretta 92 that maybe a civilian would want to use that for

19   self-defense; do you remember that?

03:49    20   A.   Yes.

21   Q.   Do you know whether they're available with magazines of

22   10 rounds or less?

23   A.   I would assume they are.  If they're going to sell them

24   in the State of New Jersey they'll have a 10-round magazine

03:49    25   for them.

*United States District Court*
*Trenton, New Jersey*

1      MR. FEINBLATT:  I have no further questions.  Thank

2  you.

3      THE COURT:  All right.  So are there any matters

4  that weren't part of the cross and they were dealing with

03:50      5  information that was not in the declaration?

6      MS. PROCTOR:  Your Honor, just the question about

7  the cost of the --

8      THE COURT:  That's the only one?  How about with

9  regard to 40 hours of handgun training, 16 hours in the

03:50      10  classroom, defensive tactic training; do you have other

11  questions on that?  Because I didn't see that in the

12  declaration?

13      MR. FEINBLATT:  He didn't go into the detail --

14      THE COURT:  Wait, I'm asking --

03:50      15      MR. FEINBLATT:  I'm sorry.

16      THE COURT:  You have to wait your turn.

17      MS. PROCTOR:  Your Honor, you're correct that those

18  details were not in Detective Stanton's --

19      THE COURT:  So do you wish to be heard on that?

03:50      20      MS. PROCTOR:  Your Honor, we would move to strike

21  Detective Stanton's answers on those questions.

22      THE COURT:  Do you wish to be heard on that, Mr.

23  Feinblatt?

24      MR. FEINBLATT:  That's what I was -- well, I will

03:51      25  acknowledge that the declaration didn't go into minute detail

1    but it did go into his discussion of training the police

2    actually in four categories of courses; and so that's

3    discussed starting at paragraph 12 -- actually 11 of his

4    initial declaration.

03:51    5         THE COURT:  All right.  So this is a matter on a

6    preliminary injunction, I mean there has been some discovery,

7    but it hasn't really been complete; the parties haven't had

8    really significant time to review all of that information.  So

9    to strike the testimony at this stage of the litigation I

03:52   10    believe it's kind of premature in a way.  I think mean things

11    just come out in preliminary injunctions when we have

12    witnesses, so I'll allow the testimony.

13         But I am offering Ms. Proctor the ability to

14    cross-examine that area if you wish.

03:52   15    (RECROSS-EXAMINATION OF ANDREW STANTON BY MS. PROCTOR:)

16    Q.  Detective Stanton, when we were speaking earlier about

17    the different units with whom you participated on handgun

18    training, you opined that these elite units in the military

19    have training that's on par with law enforcement officers in

03:52   20    New Jersey.  Are you aware of -- to what extent the

21    requirements in these military units match the requirements

22    that you've described for law enforcement officers?

23    A.  No.

24    Q.  So you are not aware of the full handgun training that's

03:53   25    required for members of the military; is that correct?

*United States District Court*
*Trenton, New Jersey*

1    A.    From the elite units?

2    Q.    From the elite units.

3    A.    No, I just see the results of their shooting abilities,

4    that's all.

03:53    5    Q.    Okay.

6              MS. PROCTOR:  No further questions.

7              THE COURT:  All right, thank you.

8              So I have one question.

9              THE WITNESS:  Yes.

03:53    10             THE COURT:  But it's not on anything that you

11   discussed.  But you do own several, maybe even more than

12   several, magazines that might have a capacity of 15 or more

13   rounds, do you?

14             THE WITNESS:  Yes, I do.

03:53    15             THE COURT:  So what are the problems when this law

16   goes into effect and people have to return or change their

17   magazine, do you know?

18             THE WITNESS:  Well, basically any magazine right now

19   that is of 15-round magazine capacity would basically become

03:54    20   illegal; they would have a certain amount of time to get those

21   magazines out of the state.  And then after that they would

22   be -- but I think there's a grace period on when they have to

23   get rid of the magazines by a certain date, and replace them

24   with a 10-round magazine.

03:54    25             THE COURT:  So do persons that possess these

1    15-round magazines or more, would that cause them harm or

2    damage?

3              THE WITNESS:  Cause them a little monetary damage

4    maybe to get rid of one and buy another, but it would be no

03:54    5    harm.

6              THE COURT:  No harm?  Okay, thank you.

7              You may step down.  Thank you for coming today.

8              THE WITNESS:  Thank you.

9              (Witness excused.)

03:54   10            THE COURT:  Next witness?

11            MR. THOMPSON:  Your Honor, there are no further

12   witnesses for today.  The next witness will be Mr. Donohue on

13   Thursday, and then Mr. Kleck on Friday.

14            THE COURT:  All right.  And how about for the State?

03:55   15            MR. SHOWELL:  No, your Honor.  None today.

16            THE COURT:  Do you have other witnesses?

17            MR. SHOWELL:  We have Mr. Donohue who lives in

18   California, then he will be flying in for Thursday.

19            THE COURT:  All right.  So I'll see you Thursday.

03:55   20            MR. THOMPSON:  Thank you, your Honor.

21            MR. SHOWELL:  Thank you, your Honor.

22            (Proceedings concluded for the day.)

23

24

25

*United States District Court*
*Trenton, New Jersey*

## $

**$40** [1] - 121:19

## /

**/S** [1] - 1:24

## 0

**0.3** [2] - 13:23, 13:24
**0.5** [3] - 14:2, 38:3, 40:22
**08608** [1] - 1:12

## 1

**1** [13] - 1:20, 3:11, 3:11, 5:21, 5:22, 6:3, 6:4, 101:25, 105:25, 106:3
**1,400** [2] - 37:17, 37:19
**1,919,227** [1] - 94:21
**10** [51] - 7:15, 8:5, 13:25, 14:3, 14:6, 14:9, 14:10, 14:25, 15:13, 15:20, 34:14, 38:5, 38:7, 38:11, 39:7, 40:24, 41:1, 58:23, 60:9, 60:14, 60:18, 60:23, 61:12, 63:12, 63:13, 63:16, 64:24, 65:9, 66:5, 67:1, 71:2, 72:18, 73:16, 74:2, 74:11, 85:12, 87:22, 88:15, 89:9, 90:22, 102:25, 111:20, 112:10, 112:11, 115:8, 115:25, 116:3, 120:13, 121:6, 122:22
**10-round** [8] - 87:16, 87:17, 87:20, 95:25, 119:6, 120:20, 122:24, 125:24
**103** [1] - 3:5
**106** [1] - 73:6
**11** [13] - 3:3, 23:5, 24:22, 41:5, 41:12, 50:24, 72:19, 73:17, 88:21, 89:1, 89:5, 103:1, 124:3
**11-round** [1] - 89:15
**112** [1] - 81:13
**114** [5] - 3:11, 5:16,

5:22, 6:4, 55:22
**115** [2] - 18:6, 18:8
**116** [1] - 78:20
**12** [2] - 16:7, 124:3
**124** [1] - 3:6
**13** [9] - 1:10, 25:2, 25:4, 25:21, 25:24, 41:5, 41:12, 62:7, 62:8
**14** [7] - 42:22, 45:9, 45:11, 51:5, 62:8, 66:13, 67:1
**15** [13] - 42:22, 52:17, 72:19, 73:17, 76:3, 76:24, 83:19, 88:21, 89:1, 89:5, 106:3, 111:7, 125:12
**15-round** [5] - 76:11, 87:16, 119:6, 125:19, 126:1
**16** [3] - 66:13, 105:6, 123:9
**165** [2] - 38:25, 39:1
**17** [4] - 16:5, 39:4, 62:17, 83:19
**18** [5] - 3:11, 5:17, 5:22, 6:4, 99:2
**18-10507** [1] - 1:6
**19** [6] - 58:13, 58:15, 76:19, 76:24, 93:2, 110:23
**1982** [3] - 50:21, 51:17, 55:20
**1991** [1] - 76:6
**1994** [1] - 62:11
**1997** [1] - 16:20
**1:15** [1] - 71:18
**1st** [1] - 95:1

## 2

**2** [2] - 93:12, 93:20
**2,108,229** [1] - 94:18
**20** [8] - 19:13, 23:21, 57:15, 81:14, 94:23, 100:5, 112:23, 121:19
**200** [2] - 37:15, 37:22
**2000s** [1] - 122:6
**2001** [1] - 16:20
**2003** [1] - 97:18
**2011** [5] - 13:2, 13:7, 13:10, 13:16, 37:11
**2012** [2] - 16:7, 51:4
**2013** [9] - 43:19, 47:13, 49:5, 49:13, 49:17, 49:24, 52:12, 55:20, 62:11
**2014** [1] - 55:2

**2017** [10] - 13:3, 13:7, 13:10, 13:16, 37:12, 42:20, 48:5, 50:21, 51:17, 95:1
**2018** [3] - 1:10, 94:12, 95:1
**203** [2] - 45:3, 45:11
**21** [4] - 41:25, 49:4, 94:10
**219,486** [1] - 95:4
**22** [5] - 60:6, 60:7, 60:12, 60:17, 96:12
**23** [8] - 60:21, 61:4, 61:10, 62:10, 62:16, 63:1, 63:7
**24** [7] - 58:25, 63:6, 63:9, 63:10, 96:12, 101:9, 111:14
**24th** [1] - 51:4
**25** [7] - 57:12, 62:6, 62:8, 77:8, 77:12, 78:4, 105:25
**27** [2] - 80:5, 115:17
**278** [2] - 58:12, 58:14
**279** [2] - 58:9, 58:23
**28** [3] - 1:23, 19:16, 19:20
**28th** [1] - 55:2
**2nd** [2] - 42:20, 47:16

## 3

**3** [4] - 12:13, 51:20, 73:9, 78:21
**30** [2] - 76:6, 99:2
**30-round** [1] - 100:5
**300** [1] - 108:4
**30th** [1] - 95:1
**31st** [1] - 94:12
**32** [1] - 55:24
**33,000** [4] - 24:25, 25:8, 38:18, 38:23
**35,000** [1] - 37:11

## 4

**4** [3] - 12:16, 16:11, 42:24
**40** [8] - 55:23, 56:2, 56:21, 57:1, 91:6, 105:4, 106:2, 123:9
**402** [1] - 1:11
**45** [1] - 112:5

## 5

**5** [8] - 16:11, 19:5, 25:18, 25:23, 51:2,

51:9, 52:5, 97:1
**5-plus-1** [2] - 112:5, 112:6
**50** [1] - 115:10

## 6

**6** [10] - 3:11, 12:16, 15:6, 23:5, 24:22, 25:3, 93:19, 93:25, 94:2, 97:2
**60-round** [1] - 105:24
**64** [1] - 3:3
**67** [1] - 55:19

## 7

**7** [5] - 25:18, 42:19, 51:9, 52:5, 97:17
**70** [2] - 28:2, 28:5
**72** [2] - 3:4, 3:4
**736** [2] - 13:15, 14:8
**74** [1] - 62:17
**753** [1] - 1:23

## 8

**8** [2] - 18:8, 74:7
**8.8** [1] - 122:7
**80** [3] - 106:8, 106:9, 106:10
**82** [7] - 3:11, 5:16, 5:21, 6:3, 50:19, 51:9, 52:5
**856** [1] - 1:25
**889-4761** [1] - 1:25

## 9

**9** [3] - 3:2, 61:8, 61:18
**91** [1] - 101:24
**92** [7] - 83:14, 83:17, 83:20, 83:24, 84:9, 84:13, 122:18
**98** [1] - 77:10
**99** [1] - 74:9

## A

**A-l-l-e-n** [1] - 9:18
**abiding** [10] - 12:22, 78:14, 79:14, 79:18, 79:24, 82:18, 82:24, 83:4, 87:12, 96:8
**abilities** [1] - 125:3
**ability** [5] - 86:25, 102:18, 103:2,

118:5, 124:13
**able** [13] - 7:21, 16:25, 30:18, 62:21, 80:17, 83:11, 84:9, 87:23, 87:24, 92:19, 93:16, 100:17, 100:22
**abortion** [1] - 7:24
**absolute** [1] - 70:9
**academies** [1] - 105:10
**academy** [6] - 105:3, 105:21, 106:14, 107:5, 107:11, 107:16
**accept** [2] - 8:18, 69:3
**acceptable** [1] - 93:18
**accepted** [2] - 67:14, 68:5
**accidently** [1] - 75:20
**accommodate** [4] - 85:24, 86:18, 92:12, 92:19
**According** [2] - 45:16, 45:24
**according** [7] - 12:21, 15:18, 19:19, 43:12, 46:6, 46:7, 57:15
**account** [1] - 107:17
**accounts** [1] - 12:22
**accurate** [4] - 83:9, 85:22, 95:7, 96:20
**accurately** [5] - 47:24, 59:8, 59:16, 59:17, 102:7
**acknowledge** [3] - 52:16, 69:24, 123:25
**acquire** [1] - 81:22
**action** [1] - 106:12
**activity** [1] - 110:16
**actual** [6] - 23:24, 25:25, 84:1, 105:5, 105:17
**add** [2] - 49:23, 52:10
**addition** [1] - 4:22
**additional** [9] - 7:6, 11:17, 11:22, 68:8, 68:17, 86:21, 88:11, 90:12, 106:2
**address** [1] - 63:2
**administering** [1] - 92:8
**administration** [1] - 11:10
**admission** [1] - 5:21
**admitted** [1] - 6:2
**adopt** [3] - 5:2, 10:12, 120:22
**advantage** [1] - 76:16, 79:24, 80:2, 80:4, 80:7, 80:12,

80:15, 83:20, 83:22, 84:11, 84:12

**advantageous** [5] - 77:25, 78:2, 78:6, 79:18, 79:20

**advantages** [1] - 80:5

**adversely** [1] - 113:17

**advice** [1] - 83:7

**advise** [1] - 83:9

**advised** [1] - 112:21

**affect** [3] - 34:6, 87:17, 113:18

**affected** [1] - 113:11

**affects** [1] - 104:8

**afford** [2] - 79:23, 80:1

**afternoon** [2] - 71:23, 103:15

**afterwards** [2] - 14:18, 102:24

**agent** [1] - 122:16

**aggregates** [2] - 24:24, 25:7

**aggression** [1] - 80:18

**ago** [2] - 58:1

**agree** [26] - 19:24, 30:3, 31:19, 42:8, 57:3, 74:19, 77:24, 78:10, 78:13, 79:13, 79:17, 80:15, 83:2, 92:1, 93:21, 94:4, 95:5, 96:7, 96:15, 97:5, 100:14, 100:19, 101:14, 102:16, 102:25, 118:23

**Agree** [1] - 93:22

**agreed** [3] - 5:15, 8:23, 10:12

**Agriculture** [2] - 93:4, 94:11

**ahead** [2] - 14:20, 102:6

**aiming** [1] - 116:6

**Air** [1] - 109:7

**al** [7] - 1:7, 4:3, 67:25, 68:9, 68:14

**Alicea** [11] - 4:11, 10:7, 10:13, 10:21, 10:22, 14:20, 15:8, 17:25, 41:10, 59:14, 64:22

**ALICEA** [26] - 2:8, 3:3, 11:4, 14:22, 15:11, 16:3, 16:15, 16:18, 18:5, 21:20, 24:20, 30:21, 31:8, 31:9, 41:12, 45:11, 58:14, 59:15, 61:14, 61:16, 61:17, 61:24, 62:2, 64:5, 64:9, 71:7

**alike** [1] - 79:24

**Allen** [57] - 9:2, 9:9, 9:15, 9:16, 10:9, 11:15, 11:6, 12:4, 12:14, 14:14, 14:16, 14:23, 15:6, 15:9, 16:4, 17:18, 18:1, 18:6, 19:9, 21:14, 23:3, 23:6, 24:22, 25:5, 28:16, 30:7, 30:15, 31:20, 38:24, 39:15, 41:15, 43:6, 44:11, 45:3, 45:6, 45:15, 47:9, 47:22, 48:8, 51:16, 54:16, 55:10, 55:25, 57:4, 57:12, 58:9, 58:13, 59:11, 59:16, 60:6, 61:10, 61:19, 62:6, 63:1, 64:11, 64:22, 71:3

**ALLEN** [6] - 3:2, 3:3, 3:3, 9:13, 11:4, 64:21

**Allen's** [2] - 9:10, 9:20

**allow** [5] - 30:22, 34:3, 73:1, 104:5, 124:12

**allowed** [4] - 111:17, 114:2, 114:4, 119:17

**allows** [2] - 103:4, 111:10

**almost** [2] - 88:10, 118:22

**aloud** [1] - 55:8

**ambiguous** [3] - 15:5, 15:14, 15:24

**Amendment** [1] - 12:23

**America** [4] - 12:22, 42:21, 45:8, 51:18

**American** [2] - 114:24, 114:25

**amount** [9] - 12:2, 24:4, 84:7, 89:14, 105:4, 107:19, 110:19, 122:13, 125:20

**analyses** [3] - 22:3, 65:7, 67:6

**analysis** [47] - 11:14, 12:17, 13:1, 13:4, 14:5, 14:24, 15:18, 15:19, 16:8, 17:9, 17:11, 19:19, 22:15, 23:4, 24:21, 25:10, 25:17, 37:20, 37:25, 38:1, 39:22, 40:25, 41:4, 53:5, 53:6, 54:6, 63:2, 63:24, 65:11, 65:14, 65:15,

65:19, 65:20, 65:21, 65:23, 65:25, 66:1, 66:2, 66:5, 67:4, 69:3, 69:6, 70:24, 71:1, 117:24

**analyze** [2] - 22:17, 23:1, 37:6, 61:1, 63:7, 63:15

**analyzed** [5] - 13:7, 16:19, 19:14, 41:6, 41:15

**analyzing** [2] - 37:16, 41:20

**ancillary** [1] - 91:23

**ANDREW** [8] - 3:4, 3:4, 3:5, 3:6, 72:4, 72:14, 103:14, 124:15

**anecdotal** [1] - 97:13

**answer** [24] - 15:1, 15:10, 17:19, 17:20, 18:9, 18:20, 20:15, 21:9, 21:23, 22:6, 30:22, 31:1, 33:24, 35:11, 39:5, 39:11, 45:14, 45:21, 58:25, 59:8, 59:18, 102:8, 121:17

**Answer** [4] - 18:12, 39:10, 45:20, 58:20

**answer..** [1] - 39:14

**answered** [5] - 14:16, 40:11, 73:18, 78:23, 81:18

**answering** [3] - 15:22, 40:7, 46:5

**answers** [3] - 58:17, 59:22, 123:17

**anticipate** [1] - 80:17

**anticipated** [1] - 43:18

**anticipating** [3] - 80:19, 81:1, 81:5

**anyway** [1] - 64:14

**apartment** [1] - 26:14

**apologize** [1] - 73:11

**appear** [5] - 5:1, 46:8, 47:16, 54:13, 54:14

**appearances** [1] - 4:3

**appeared** [1] - 43:4

**Appendix** [3] - 41:5, 41:13, 49:16

**application** [3] - 5:25, 93:1, 93:3

**applications** [2] - 94:25, 95:3

**applies** [1] - 83:1

**apply** [2] - 82:24

**approach** [1] - 8:12

**appropriate** [1] - 8:12

**arbitrarily** [2] - 54:13,

54:15

**arbitrary** [2] - 53:22, 54:5

**archive** [3] - 24:24, 25:6, 69:7

**area** [3] - 70:18, 121:14, 124:14

**areas** [1] - 92:19

**arguments** [1] - 5:3

**arm** [5] - 26:5, 80:20, 82:15, 100:8, 100:11

**Armed** [19] - 12:17, 12:20, 13:2, 13:15, 13:20, 16:9, 16:19, 20:8, 20:16, 20:19, 20:22, 21:2, 21:5, 21:11, 35:12, 37:25, 38:4, 40:23, 115:2

**armed** [5] - 80:2, 80:19, 81:1, 81:5, 82:20

**arms** [4] - 82:21, 87:24, 99:24, 100:1

**Army** [2] - 97:18, 109:7

**army** [7] - 98:6, 98:20, 99:1, 99:5, 99:8, 99:20, 109:5

**army's** [1] - 98:14

**arresting** [1] - 97:24

**arrests** [2] - 110:19, 110:20

**arrive** [2] - 6:9, 23:23

**arrived** [1] - 23:15

**article** [14] - 16:7, 16:11, 16:19, 19:5, 42:20, 42:22, 43:3, 43:12, 44:1, 45:8, 51:4, 54:25, 55:2, 69:14

**articles** [1] - 28:22

**ascertain** [2] - 76:16, 89:20

**aside** [1] - 49:2

**aspect** [1] - 47:17

**aspects** [1] - 118:19

**assailant** [2] - 27:13, 79:4

**Assailants** [1] - 19:9

**assailants** [4] - 19:13, 19:17, 19:22, 20:4

**assertion** [1] - 56:1

**Assistant** [1] - 4:18

**ASSISTANTS** [1] - 2:14

**ASSOCIATION** [1] - 1:4

**Association** [2] - 4:1, 67:25

**assume** [4] - 90:14,

114:2, 118:4, 122:23

**assuming** [4] - 32:19, 58:18, 79:8, 87:8

**assumption** [2] - 30:13, 30:15

**asterisk** [12] - 26:6, 26:10, 26:11, 26:14, 26:18, 26:19, 26:22, 26:24, 27:5, 27:7

**attacker** [1] - 27:13

**attacking** [1] - 70:25

**attempt** [1] - 90:24

**attend** [1] - 105:2

**attention** [4] - 73:5, 78:4, 81:13, 101:24

**ATTORNEY** [2] - 2:11, 2:14

**attorney** [2] - 14:17, 85:2

**Attorney** [11] - 4:2, 4:15, 4:17, 4:18, 4:19, 5:3, 84:24, 85:3, 85:5, 103:17

**AUGUST** [1] - 1:10

**August** [1] - 51:4

**automatic** [3] - 111:2, 111:4, 112:5

**available** [9] - 69:8, 69:11, 69:12, 79:11, 89:25, 92:12, 120:13, 120:16, 122:21

**average** [4] - 13:20, 35:3, 60:22, 122:2

**averaged** [1] - 122:7

**avoid** [6] - 7:17, 101:15, 101:21, 102:2, 102:13, 102:14

**awards** [1] - 54:8

**aware** [18] - 33:25, 58:7, 67:3, 82:2, 82:5, 82:6, 88:23, 89:3, 95:14, 96:2, 109:1, 116:1, 116:24, 120:12, 120:15, 120:19, 124:20, 124:24

---

**B**

**background** [2] - 11:6, 96:24

**backing** [1] - 86:15

**bad** [3] - 73:4, 80:2, 102:9

**ban** [2] - 82:23, 121:1

**banned** [1] - 7:12

**barriers** [1] - 91:12

**base** [3] - 109:5, 109:6
**Based** [2] - 89:13, 94:4, 96:6
**based** [10] - 13:19, 39:22, 72:15, 74:24, 75:12, 85:22, 86:17, 97:12, 108:15, 115:6
**bases** [2] - 96:20, 108:16
**basic** [1] - 98:9
**basis** [7] - 55:25, 56:4, 56:9, 58:18, 84:20, 105:18, 115:4
**bathroom** [1] - 66:24
**battle** [1] - 110:6
**bayonet** [1] - 120:3
**bearing** [1] - 102:18
**become** [4] - 8:10, 29:25, 107:22, 125:19
**begin** [1] - 28:5
**Beginning** [2] - 78:21, 81:14
**beginning** [1] - 55:16
**begins** [1] - 55:12
**behalf** [1] - 118:17
**belief** [4] - 86:17, 99:11, 102:1, 102:11
**below** [1] - 93:20
**beneficial** [2] - 83:3, 83:5
**benefit** [4] - 19:6, 43:2, 55:9, 62:9
**Beretta** [6] - 83:14, 83:17, 83:20, 83:24, 84:9, 122:18
**Bernardino** [3] - 52:19, 52:24, 53:21
**best** [3] - 66:11, 80:25, 115:22
**better** [2] - 80:17, 99:25
**between** [23] - 13:2, 13:4, 13:5, 13:7, 13:9, 13:16, 42:16, 46:14, 54:19, 55:20, 75:4, 83:19, 88:21, 89:1, 89:5, 95:1, 100:15, 100:20, 101:10, 102:17, 103:21, 103:24, 121:19
**Between** [1] - 121:7
**beyond** [3] - 11:17, 59:5, 121:10
**bias** [5] - 35:19, 35:23, 36:16, 66:9
**big** [1] - 51:25
**bigger** [1] - 80:3
**binder** [15] - 10:24,

16:5, 16:16, 42:20, 50:19, 51:2, 54:23, 61:8, 61:18, 61:25, 74:8, 77:9, 93:2, 94:9, 94:22
**binders** [1] - 72:11
**binding** [1] - 7:23
**biology** [1] - 11:7
**bit** [11] - 18:13, 48:19, 53:15, 53:16, 54:11, 56:7, 56:13, 98:8, 100:8, 105:16, 106:16
**black** [1] - 66:15
**bodily** [1] - 111:16
**bombings** [1] - 110:4
**book** [3] - 6:7, 6:9, 6:25
**books** [3] - 6:16, 6:22, 6:25
**bottom** [2] - 69:23, 95:2
**bound** [1] - 73:7
**branch** [1] - 109:4
**brands** [1] - 120:15
**break** [20] - 26:9, 29:15, 29:21, 30:9, 30:16, 30:25, 31:5, 64:11, 64:14, 64:15, 71:17, 81:10, 81:15, 81:25, 82:12, 82:14, 82:19, 119:25
**breaking** [1] - 26:9
**bridge** [1] - 81:23
**Brief** [5] - 53:4, 64:8, 70:15, 88:1, 103:11
**briefing** [1] - 7:2
**briefly** [2] - 65:2, 104:23
**bring** [3] - 82:13, 82:19, 117:3
**broad** [1] - 98:7
**broke** [1] - 26:8
**broken** [5] - 26:9, 29:4, 29:15, 30:17, 30:19
**brought** [2] - 10:5, 82:1
**brown** [2] - 32:7, 32:9
**Bryan** [1] - 4:18
**BRYAN** [1] - 2:13
**building** [1] - 90:12
**bullet** [6] - 43:1, 43:8, 43:25, 44:13, 93:16
**bullets** [40] - 7:15, 8:5, 13:25, 14:3, 14:9, 14:10, 17:3, 20:2, 28:13, 34:13, 34:15, 34:16, 34:17, 34:20, 34:23, 35:3, 35:4,

35:7, 35:18, 35:20, 35:22, 36:9, 36:18, 37:6, 41:2, 65:9, 65:22, 66:5, 66:13, 66:14, 66:17, 66:18, 67:1, 70:23, 71:2, 104:9, 113:1, 115:9, 116:6
**bunch** [1] - 58:2
**burglarize** [1] - 116:17
**burglary** [1] - 26:9
**business** [1] - 11:10
**but..** [1] - 82:5
**buy** [1] - 126:4
**buying** [1] - 83:25
**BY** [22] - 2:4, 2:7, 2:12, 3:3, 3:3, 3:4, 3:5, 3:6, 11:4, 14:22, 16:18, 24:20, 31:9, 61:17, 64:21, 72:14, 73:14, 103:14, 121:20, 124:15
**bystanders** [1] - 116:8

## C

**C.C.R** [1] - 1:24
**C.V** [3] - 67:17, 67:21, 68:23
**cable** [1] - 106:19
**calculated** [1] - 13:20
**California** [4] - 65:8, 68:2, 68:3, 126:18
**Callahan** [1] - 4:17
**candidates** [1] - 105:10
**cannot** [1] - 106:22
**cap** [3] - 87:20, 116:18
**capability** [1] - 105:20
**capable** [15] - 7:14, 60:9, 60:14, 60:18, 60:23, 63:12, 63:16, 72:18, 72:19, 73:16, 73:17, 74:1, 88:21, 88:25, 89:4
**capacities** [1] - 89:8
**capacity** [69] - 7:9, 7:10, 7:14, 61:11, 67:7, 72:22, 72:23, 73:2, 73:3, 73:21, 74:1, 75:4, 76:9, 76:14, 77:3, 77:25, 78:6, 79:17, 79:23, 80:1, 81:20, 81:22, 82:4, 82:23, 83:3, 83:6, 83:17, 83:19, 83:21, 83:23, 85:15, 85:20, 86:1, 86:5, 87:10, 87:14, 87:25,

88:8, 88:9, 88:14, 88:17, 89:18, 89:21, 95:9, 95:16, 95:18, 95:22, 95:24, 96:9, 97:6, 99:24, 100:2, 100:3, 100:23, 100:25, 101:4, 102:18, 104:3, 104:5, 111:5, 112:24, 116:5, 116:13, 117:4, 119:9, 125:12, 125:23
**card** [1] - 26:19
**careful** [1] - 22:22
**carried** [8] - 44:2, 44:6, 44:14, 44:16, 44:25, 45:18, 47:1, 52:16
**carry** [33] - 76:11, 77:2, 86:25, 87:1, 87:3, 87:5, 87:12, 87:15, 87:18, 87:19, 87:24, 88:4, 88:5, 91:17, 92:2, 92:9, 95:10, 95:12, 95:20, 99:13, 100:13, 111:8, 111:10, 111:12, 111:17, 111:18, 111:19, 114:4, 114:8, 114:10, 114:15, 114:16
**carrying** [1] - 99:9, 100:7, 101:1
**case** [25] - 4:1, 7:8, 12:14, 32:24, 32:25, 33:1, 33:10, 35:1, 35:3, 49:17, 61:21, 62:5, 65:7, 65:14, 65:16, 65:18, 67:3, 68:6, 68:17, 69:4, 69:6, 76:8, 80:25, 85:2, 114:23
**cases** [16] - 43:5, 44:9, 44:13, 46:23, 55:19, 55:23, 66:1, 66:6, 67:7, 67:11, 67:13, 67:16, 68:8, 68:13, 113:11, 115:8
**cataloged** [1] - 64:24
**catch** [2] - 16:14, 41:10
**categories** [5] - 11:18, 27:16, 27:20, 31:14, 124:2
**category** [14] - 26:4, 26:8, 26:13, 27:9, 27:12, 28:23, 28:24, 29:3, 29:16, 31:10,

88:8, 88:9, 88:14, 88:17, 89:18, 89:21, 95:9, 95:16, 95:18, 95:22, 95:24, 96:9, 97:6, 99:24, 100:2, 100:3, 100:23, 100:25, 101:4, 102:18, 104:3, 104:5, 111:5, 112:24, 116:5, 116:13, 117:4, 119:9, 125:12, 125:23

**32:15, 34:1, 34:3, 46:16**
**causally** [2] - 63:17, 63:21
**causation** [6] - 61:2, 63:8, 63:19, 63:20, 63:25, 64:1
**certain** [9] - 8:12, 23:7, 44:9, 66:9, 73:1, 105:4, 119:24, 125:20, 125:23
**certainly** [2] - 66:10, 107:10
**certificate** [1] - 93:17
**certification** [1] - 90:20
**Certified** [1] - 1:23
**certified** [3] - 94:5, 105:2, 105:3
**cetera** [1] - 118:25
**challenged** [3] - 116:25, 120:9, 121:1
**chamber** [2] - 112:7, 112:9
**change** [14] - 42:11, 43:22, 48:22, 49:8, 50:8, 50:17, 71:10, 74:12, 74:20, 75:16, 79:6, 118:24, 125:16
**changed** [13] - 43:16, 43:19, 47:19, 48:20, 48:22, 49:6, 49:14, 49:21, 57:4, 57:6, 57:9, 57:10, 62:24
**changing** [2] - 40:3, 42:9
**charged** [1] - 104:4
**chart** [1] - 19:12
**check** [2] - 39:6, 39:17
**checking** [3] - 17:12, 17:16
**chief** [1] - 5:9
**chiefs** [1] - 4:25
**children** [2] - 7:24, 8:1
**choose** [1] - 83:10
**circumference** [1] - 113:16
**circumstances** [2] - 105:14, 119:20
**cite** [10] - 16:11, 42:21, 43:12, 48:14, 50:24, 51:5, 51:10, 51:20, 52:6, 52:22
**cited** [5] - 48:9, 48:13, 48:16, 66:1, 66:6
**citizen** [13] - 72:17, 72:22, 73:15, 79:24, 80:2, 82:18, 86:22, 87:18, 88:14, 88:24, 96:8, 112:18, 114:10

Citizen [21] - 12:18,
12:20, 13:2, 13:15,
13:20, 16:9, 16:19,
20:8, 20:16, 20:19,
20:22, 21:2, 21:5,
21:11, 35:12, 38:1,
38:4, 40:23, 41:9,
114:24, 115:2
citizen's [1] - 118:5
Citizens [7] - 41:18,
41:21, 42:2, 42:15,
46:10, 54:17, 56:7
citizens [27] - 15:20,
78:14, 79:18, 82:25,
83:4, 85:14, 85:24,
86:2, 86:7, 86:18,
87:3, 87:9, 89:20,
90:24, 91:14, 92:11,
95:16, 104:19,
106:25, 112:14,
113:24, 114:1,
114:2, 114:3, 115:8,
117:20, 119:17
City [5] - 68:1, 68:14,
122:4, 122:5, 122:6
city [1] - 13:10
CIVIL [1] - 1:6
civilian [11] - 78:16,
79:3, 79:6, 79:10,
86:25, 91:16, 92:1,
92:23, 114:14,
115:25, 122:18
civilians [9] - 78:10,
78:22, 79:14, 85:20,
86:17, 87:23, 92:6,
114:17, 116:2
Civilians [1] - 78:23
claim [1] - 53:19
claims [1] - 29:23
clarification [2] - 6:7,
11:23
clarity [1] - 52:3
CLARKSON [1] - 1:11
class [2] - 93:17,
121:1
classroom [2] - 105:6,
123:10
Claude [2] - 16:7,
18:11
CLE [1] - 11:21
clear [10] - 40:6, 44:9,
44:19, 44:21, 45:2,
45:25, 46:15, 59:23,
66:18, 66:19
clerk [1] - 5:19
CLERK [1] - 9:14
client [1] - 5:3
close [1] - 28:24
closely [1] - 40:19
Club [1] - 4:2

CLUBS [1] - 1:4
code [2] - 28:7, 58:6
coded [6] - 15:12,
15:16, 15:17, 15:19,
15:23, 66:4
colleague [2] - 10:7,
72:2
colleagues [3] - 4:10,
4:17, 64:6
collected [2] - 22:8,
55:21
collecting [1] - 20:7
Columbine [3] -
52:18, 52:23, 53:21
Column [1] - 114:24
column [1] - 115:1
combat [7] - 97:22,
98:2, 98:23, 98:25,
109:24, 110:2,
110:13
comfortable [2] -
83:13, 83:16
coming [2] - 32:9,
32:23, 71:11,
107:22, 126:7
commensurate [2] -
97:21, 110:20
Commission [7] -
41:9, 41:18, 41:21,
42:15, 46:10, 54:18,
56:7
Commission's [1] -
42:2
common [1] - 71:2
commonly [1] - 87:10
Commonwealth [1] -
81:21
communications [1] -
17:1
comparable [3] -
99:25, 100:6
comparative [2] -
80:12, 80:15
competency [1] -
93:19
competitive [1] -
11:13
compiled [8] - 20:20,
21:21, 35:16, 35:17,
36:3, 41:8, 41:17,
41:18
complete [1] - 124:7
completely [1] - 53:22
completion [1] - 93:17
compliant [1] - 119:21
complied [1] - 41:7
comprehensive [5] -
20:23, 21:2, 21:14,
42:16, 54:19
Concealability [1] -

111:24
concealed [16] - 87:1,
87:5, 88:4, 88:5,
93:8, 94:15, 94:20,
94:25, 95:10, 95:12,
95:20, 95:23, 114:8,
114:10, 114:14,
114:16
concepts [1] - 103:25
concern [3] - 81:12,
86:20, 89:11
concerned [2] - 116:2,
116:12
concerning [2] - 90:3,
96:21
concerns [2] - 86:5,
110:21
concluded [1] -
126:22
conclusions [7] -
17:8, 18:19, 18:25,
24:17, 58:19, 58:20
condominium [1] -
27:10
conduct [1] - 72:2
conducted [3] - 74:25,
75:14, 97:17
confer [2] - 64:5,
103:9
conference [2] - 4:23,
8:17
conform [1] - 17:24
confrontation [6] -
80:17, 80:20, 81:1,
81:5, 81:16, 82:15
confrontations [1] -
80:13
confusing [7] - 8:11,
44:24, 47:18, 48:20,
48:25, 53:15, 59:9
confusingly [1] -
47:25
confusion [3] - 7:8,
7:17, 7:20
consequences [1] -
103:5
considerations [1] -
92:16
Considered [1] -
51:14
considered [3] -
51:21, 58:21, 111:12
consistent [7] - 17:8,
43:22, 48:22, 49:7,
63:19, 85:15, 90:25
Consistent [1] - 50:8
consists [4] - 26:5,
26:8, 26:13, 106:2
constitutes [1] - 45:18
constraints [1] - 8:25

constructing [1] -
92:21
construction [1] -
92:15
Consulting [1] - 11:25
Consumer [2] - 93:4,
94:12
contacted [1] - 53:10
contain [1] - 12:17
contains [1] - 55:19
contemplated [1] -
10:18
content [2] - 24:24,
25:7
continue [1] - 17:25,
37:9, 62:24
continuing [1] -
105:19
control [3] - 22:24,
23:9
controlled [3] - 22:5,
22:11, 24:13
controversy [1] -
33:23
convenience [6] -
9:25, 22:2, 22:9,
23:8, 24:4, 24:10
conventions [1] - 7:7
conversations [2] -
96:24, 97:13
Cooper [2] - 4:10,
4:11
COOPER [2] - 2:7, 2:9
copies [1] - 6:19
copy [11] - 6:12, 6:20,
6:21, 9:11, 9:25,
10:4, 10:25, 12:13,
18:7, 69:21
copyright [1] - 6:20
correct [159] - 1:23,
8:20, 8:22, 9:1, 11:8,
11:11, 11:15, 11:16,
12:4, 12:12, 12:19,
12:24, 12:25, 13:3,
13:7, 13:8, 13:13,
13:18, 13:25, 14:4,
15:21, 16:12, 16:13,
16:20, 16:21, 16:25,
17:5, 19:17, 20:9,
20:13, 20:18, 20:20,
20:21, 21:4, 21:6,
21:7, 21:8, 21:10,
25:15, 25:20, 26:6,
26:11, 27:7, 27:18,
28:21, 28:22, 29:1,
29:19, 29:20, 32:16,
37:17, 38:1, 38:6,
38:13, 39:19, 39:20,
41:3, 41:9, 41:18,
41:19, 41:23, 42:6,

42:18, 42:22, 44:8,
45:19, 45:20, 47:14,
48:10, 49:19, 49:20,
50:12, 50:18, 51:6,
51:13, 52:8, 54:20,
56:17, 57:18, 57:22,
58:3, 59:19, 60:10,
60:15, 60:24, 61:6,
63:3, 63:5, 63:13,
63:18, 64:4, 67:9,
69:13, 70:23, 73:19,
73:23, 74:3, 74:13,
75:21, 76:3, 76:6,
76:12, 76:19, 76:25,
77:6, 77:16, 77:19,
77:20, 78:8, 78:25,
80:13, 81:19, 81:24,
82:11, 82:17, 82:21,
84:18, 84:25, 85:16,
86:15, 90:8, 90:9,
90:16, 91:1, 91:4,
97:15, 98:18, 98:19,
99:5, 99:21, 99:22,
100:12, 101:12,
101:15, 102:4,
112:13, 115:13,
115:14, 115:16,
116:24, 116:25,
117:5, 117:6,
117:11, 117:13,
117:17, 117:25,
118:1, 118:2, 118:6,
118:11, 119:12,
119:15, 120:25,
121:1, 121:3, 121:4,
123:17, 124:25
Correct [27] - 13:14,
13:22, 14:1, 15:17,
26:7, 26:12, 26:15,
27:4, 27:8, 27:11,
27:14, 27:19, 27:23,
29:2, 37:18, 37:23,
38:2, 42:7, 50:9,
50:13, 60:16, 60:20,
60:25, 61:3, 61:7,
63:14, 95:11
correctly [6] - 40:2,
40:12, 43:6, 43:10,
44:3, 49:9
cost [18] - 85:13, 86:3,
86:8, 86:9, 86:21,
88:2, 90:11, 90:15,
90:18, 90:23, 91:3,
91:9, 91:13, 92:5,
92:7, 121:5, 123:7
counsel [4] - 7:16,
59:12, 84:5, 84:10
Counsel [1] - 85:6
counseling [2] -
83:25, 84:4

count [1] - 17:3
counted [1] - 20:3
counting [2] - 20:1,
70:22
country [1] - 36:21
County [1] - 68:1
county [1] - 13:10
couple [5] - 6:7, 41:8,
41:17, 47:5, 112:3
course [10] - 21:1,
38:11, 91:20, 91:22,
97:18, 98:24, 98:25,
99:3, 99:16, 105:24
courses [2] - 11:21,
124:2
COURT [103] - 1:1,
1:15, 4:1, 4:8, 4:12,
4:20, 4:22, 5:23, 6:1,
6:14, 6:16, 6:24, 7:4,
7:18, 8:8, 8:16, 8:23,
9:3, 9:6, 9:10, 9:16,
9:19, 9:23, 10:1,
10:8, 10:16, 10:21,
11:2, 14:16, 15:2,
15:8, 16:2, 16:14,
16:17, 17:18, 17:22,
18:3, 19:2, 21:23,
23:6, 24:18, 25:1,
30:12, 30:22, 31:7,
41:10, 41:14, 45:10,
45:13, 47:6, 59:13,
60:4, 61:9, 61:13,
61:15, 61:23, 62:1,
64:7, 64:10, 64:14,
64:18, 64:20, 69:17,
70:16, 71:5, 71:9,
71:13, 71:17, 71:22,
71:25, 72:3, 72:5,
72:8, 72:12, 73:10,
73:12, 75:6, 77:11,
77:13, 80:8, 86:13,
103:10, 103:13,
121:9, 121:12,
121:14, 121:17,
123:3, 123:8,
123:14, 123:16,
123:19, 123:22,
124:5, 125:7,
125:10, 125:15,
125:25, 126:6,
126:10, 126:14,
126:16, 126:19
Court [14] - 6:13, 8:3,
8:17, 11:3, 43:2,
55:9, 62:9, 68:2,
68:4, 68:11, 68:15,
69:20, 72:13, 112:21
court [6] - 10:9, 67:6,
67:14, 67:16, 68:5,
69:3

Court's [3] - 5:18,
19:6, 72:1
COURTHOUSE [1] -
1:11
courts [1] - 66:6
cover [1] - 110:5
covered [10] - 26:17,
37:24, 37:25, 38:8,
38:12, 39:8, 40:5,
57:3, 66:12, 68:19
covers [2] - 38:20,
38:23
create [2] - 86:21,
104:15
creates [1] - 113:16
credited [1] - 66:2
credits [1] - 11:22
Crime [8] - 41:9,
41:18, 41:21, 42:2,
42:15, 46:10, 54:17,
56:7
crime [2] - 36:24,
111:15
Criminal [3] - 76:22,
84:24, 115:18
criminal [6] - 80:19,
81:1, 81:2, 81:5,
82:18, 110:16
criminals [8] - 80:13,
80:15, 80:24, 82:21,
82:24, 110:15,
116:12, 117:8
criminologist [2] -
12:5, 12:6
criminology [2] - 12:7,
12:9
criteria [42] - 31:20,
31:22, 32:6, 40:8,
40:14, 40:17, 43:5,
43:13, 43:16, 44:10,
44:13, 44:19, 44:20,
44:21, 44:25, 45:17,
45:25, 46:1, 46:3,
46:6, 46:11, 46:14,
46:18, 46:22, 47:9,
47:17, 47:19, 47:20,
47:24, 48:3, 48:4,
48:5, 48:18, 48:20,
49:21, 56:3, 56:14,
56:22, 57:1, 57:7,
70:4
criterion [4] - 44:5,
44:15, 44:16, 52:15
criticism [1] - 56:8
CROSS [4] - 3:3, 3:4,
11:4, 72:14
cross [13] - 8:19, 10:7,
10:11, 10:13, 10:25,
17:18, 17:23, 69:19,
72:2, 72:11, 121:11,

123:4, 124:14
CROSS-
EXAMINATION [4] -
3:3, 3:4, 11:4, 72:14
cross-examination [9]
- 8:19, 10:7, 10:25,
17:18, 17:23, 69:19,
72:2, 72:11, 121:11
cross-examine [1] -
124:14
cross-examined [2] -
10:11, 10:13
Cuomo [2] - 68:20,
69:1
current [1] - 120:17
Current [1] - 120:18
curriculums [1] - 87:5
customary [1] - 77:2
cut [2] - 36:24, 58:25

## D

damage [2] - 126:2,
126:3
danger [2] - 116:7,
116:8
dangerous [1] -
118:16
Daniel [1] - 4:5
DANIEL [1] - 2:4
Data [2] - 50:21, 51:17
data [27] - 16:25,
17:11, 22:2, 22:8,
22:13, 22:16, 22:18,
22:21, 22:24, 23:20,
24:5, 24:15, 25:14,
36:25, 37:8, 42:15,
42:17, 46:9, 46:10,
50:2, 50:20, 52:17,
54:18, 54:19, 55:21,
58:22, 122:4
Database [32] - 12:18,
12:20, 13:2, 13:16,
13:20, 16:9, 16:19,
20:8, 20:16, 20:19,
20:22, 21:2, 21:5,
21:11, 23:4, 24:21,
24:23, 25:6, 25:18,
35:12, 37:10, 38:1,
38:4, 38:9, 38:13,
38:14, 38:21, 39:7,
40:5, 40:18, 40:24,
40:25
database [34] - 12:20,
13:9, 14:9, 19:20,
20:11, 25:11, 29:13,
35:14, 38:8, 38:12,
39:8, 40:4, 41:7,
41:16, 49:23, 50:3,

50:10, 50:14, 52:10,
56:2, 56:18, 56:21,
56:23, 66:4, 66:8,
66:10, 67:4, 67:5,
67:10, 67:14, 68:6,
68:25, 69:3, 69:11
databases [3] - 21:15,
41:8, 41:18
date [2] - 47:23,
125:23
dated [3] - 47:15,
47:19, 94:12
dates [2] - 13:5
DAVID [1] - 2:7
David [2] - 4:9, 5:13
DAVIS [1] - 2:9
Davis [1] - 4:11
DAY [1] - 1:20
dead [1] - 66:22
deal [1] - 87:7
dealing [2] - 98:10,
123:4
deals [1] - 121:3
deaths [1] - 63:17
decades [2] - 72:15,
96:6
decided [1] - 20:3
decision [1] - 53:20
decisions [1] - 66:1
declaration [69] -
9:10, 9:20, 9:25,
10:12, 12:14, 12:17,
15:7, 16:12, 23:5,
24:22, 25:3, 25:18,
25:22, 26:16, 41:6,
41:13, 41:25, 42:22,
44:23, 48:9, 48:16,
48:21, 49:3, 49:4,
49:5, 49:17, 50:25,
51:6, 51:11, 51:20,
52:6, 52:17, 52:23,
57:13, 57:15, 60:6,
60:22, 61:19, 62:3,
62:6, 63:1, 63:6,
63:10, 63:24, 64:3,
67:22, 74:7, 77:9,
78:5, 80:6, 80:8,
85:6, 85:8, 85:10,
85:12, 87:22, 90:22,
92:7, 96:13, 96:23,
97:1, 97:15, 101:9,
104:21, 107:10,
123:5, 123:12,
123:25, 124:4
declarations [2] -
8:18, 121:12
defend [6] - 12:23,
31:4, 34:13, 34:20,
34:24, 71:2, 87:13,
115:9

defendant [1] - 85:2
Defendant [2] - 74:9,
77:9
Defendant's [7] - 3:11,
5:22, 6:4, 12:13,
50:19, 51:9, 52:5
DEFENDANTS [2] -
1:7, 2:14
defendants [5] - 4:13,
4:15, 5:15, 5:17,
85:6
defender [5] - 13:24,
14:2, 38:5, 40:24,
41:1
defenders [1] - 13:21
defending [7] - 29:24,
34:18, 35:2, 36:13,
36:14, 36:19, 67:1
defense [31] - 14:6,
14:11, 14:25, 15:3,
15:13, 15:16, 15:19,
15:21, 15:25, 31:12,
32:13, 32:21, 33:13,
33:16, 33:21, 37:21,
65:23, 78:11, 83:3,
83:8, 83:15, 83:21,
83:22, 84:11, 112:1,
112:11, 112:15,
112:18, 113:6,
120:8, 122:19
defensive [23] - 19:16,
19:21, 20:23, 21:3,
21:6, 21:8, 21:11,
28:7, 28:12, 29:23,
30:4, 33:3, 33:11,
33:15, 33:23, 34:4,
34:10, 64:25, 65:8,
105:8, 105:9,
105:14, 123:10
define [1] - 7:13
defining [2] - 8:13,
45:17
definition [20] - 8:4,
41:24, 42:3, 42:5,
42:8, 42:10, 42:11,
43:19, 43:23, 48:23,
49:6, 49:8, 54:1,
57:4, 57:6, 57:9,
57:10, 69:25, 70:10,
70:12
definitional [1] - 55:21
definitions [1] - 53:8
definitive [1] - 33:24
degree [5] - 7:7, 11:7,
12:7, 12:9, 101:23
degrees [1] - 12:10
demand [1] - 92:13
department [1] -
106:12
Department [3] - 93:3,

94:11, 115:14
**departments** [2] - 76:20, 107:4
**deposed** [1] - 11:19
**deposition** [29] - 6:11, 7:8, 10:25, 18:7, 38:25, 39:23, 40:12, 40:20, 45:4, 45:12, 46:6, 53:13, 53:15, 54:11, 58:10, 59:25, 72:20, 73:6, 73:25, 78:20, 81:13, 93:11, 94:3, 101:25, 111:25, 112:17, 112:22, 114:22, 122:1
**depositions** [1] - 7:20
**DEPUTY** [1] - 9:14
**Deputy** [4] - 4:14, 4:17, 4:19, 85:5
**describe** [12] - 7:12, 15:23, 41:24, 42:2, 46:10, 46:11, 46:12, 46:22, 104:22, 104:24, 111:1, 111:13
**described** [3] - 17:3, 44:23, 124:22
**describes** [1] - 25:24
**description** [2] - 20:6, 44:22
**designed** [1] - 22:18
**desire** [2] - 87:18, 87:19
**despite** [1] - 52:24
**destruction** [6] - 101:15, 101:18, 101:22, 102:3, 102:13, 102:15
**detail** [2] - 123:13, 123:25
**detailed** [2] - 96:22, 97:14
**detailing** [2] - 41:6, 41:16
**details** [6] - 15:4, 15:13, 15:24, 93:20, 94:24, 123:18
**Detective** [6] - 72:15, 73:5, 87:21, 123:18, 123:21, 124:16
**determination** [4] - 57:20, 59:1, 59:5, 59:6
**determine** [3] - 25:11, 90:4, 90:11
**determining** [1] - 20:11
**Deutsch** [1] - 4:24
**dictated** [1] - 85:11
**differ** [4] - 72:24, 96:17, 101:12, 109:11
**difference** [8] - 47:16, 65:18, 70:21, 70:25, 89:13, 89:16, 103:2, 119:8
**differences** [7] - 46:14, 53:9, 75:4, 100:14, 100:19, 101:10, 102:16
**Different** [1] - 110:3
**different** [30] - 24:10, 25:12, 28:13, 35:14, 36:7, 36:9, 36:10, 46:12, 60:2, 61:6, 70:8, 70:10, 70:12, 70:13, 70:14, 101:17, 102:24, 105:7, 107:21, 109:19, 109:22, 110:5, 110:9, 111:19, 112:3, 114:17, 114:19, 116:21, 124:17
**differently** [2] - 46:12, 46:13
**direct** [9] - 8:18, 10:10, 10:11, 10:12, 73:5, 78:4, 78:20, 81:13, 101:24
**discharge** [2] - 75:20, 115:25
**discharged** [1] - 122:14
**discovery** [1] - 124:6
**discussed** [10] - 16:22, 16:24, 18:16, 27:16, 35:10, 47:11, 67:5, 122:3, 124:3, 125:11
**discussing** [1] - 58:17
**discussion** [2] - 115:6, 124:1
**dispute** [1] - 56:10
**disputing** [1] - 56:1
**distinction** [3] - 53:18, 103:21, 103:24
**distinguished** [1] - 88:15
**distribute** [2] - 10:24, 72:10
**District** [5] - 68:2, 68:3, 68:4, 68:11, 68:15
**DISTRICT** [4] - 1:1, 1:1, 1:15, 1:16
**diverse** [1] - 98:17
**division** [2] - 94:14, 94:24
**Division** [4] - 76:21, 84:24, 94:11, 115:18
**Dix** [4] - 98:15, 109:2, 109:4, 109:5
**document** [21] - 45:16, 45:24, 46:6, 46:7, 46:8, 46:17, 46:20, 46:21, 47:5, 47:15, 47:18, 47:24, 48:2, 48:6, 48:9, 48:15, 54:22, 73:7, 93:10, 93:12, 93:18
**documents** [3] - 6:1, 46:12, 57:7
**DOMINGUEZ** [1] - 2:13
**Dominguez** [2] - 4:19, 85:5
**done** [32] - 11:24, 11:25, 12:2, 17:16, 17:22, 18:15, 18:18, 18:24, 20:1, 23:17, 24:13, 32:2, 32:3, 33:9, 47:4, 53:6, 54:6, 54:12, 54:14, 58:2, 65:14, 65:20, 66:5, 67:6, 96:4, 106:17, 108:12, 118:13, 119:9, 120:24
**Donohue** [2] - 126:12, 126:17
**Donohue's** [1] - 6:10
**door** [3] - 24:1, 32:8, 32:9
**doors** [1] - 29:25
**double** [3] - 83:18, 83:23
**Dow** [2] - 24:24, 25:7
**down** [13] - 23:19, 39:4, 45:9, 55:12, 58:13, 58:23, 58:25, 64:16, 71:5, 106:20, 110:5, 116:6, 126:7
**downstairs** [1] - 66:22
**Dr** [1] - 63:2
**draft** [2] - 85:6, 85:10
**drastic** [1] - 118:23
**draw** [1] - 24:16
**drawing** [1] - 105:14
**drive** [8] - 5:18, 6:17, 6:19, 6:22, 23:14, 24:5, 24:14, 82:9
**driven** [1] - 23:18
**drivers** [2] - 24:11, 24:12
**drives** [1] - 24:8
**driving** [1] - 35:9
**Duncan** [3] - 65:7, 65:14, 65:15
**during** [11] - 7:8, 7:17, 7:20, 55:24, 72:11, 73:25, 75:20, 80:5, 93:11, 105:9, 110:7
**duty** [10] - 76:13, 110:23, 111:5, 111:8, 111:10, 111:15, 111:16, 111:17, 111:18, 111:19
**Duwe** [9] - 54:22, 54:24, 54:25, 56:17, 69:14, 69:17, 69:24, 70:4, 70:8
**Duwe's** [1] - 56:1
**DX-24** [1] - 6:11
**DX-3** [1] - 9:22

## E

**early** [1] - 122:6
**EAST** [1] - 1:11
**easy** [1] - 58:7
**econometrics** [1] - 11:12
**economic** [1] - 11:14
**Economic** [1] - 11:25
**economics** [1] - 11:9
**economists** [2] - 22:4, 22:8
**education** [1] - 11:20
**educational** [1] - 11:6
**effect** [3] - 34:8, 34:9, 125:16
**effecting** [1] - 110:19
**effective** [1] - 83:14
**efficiency** [1] - 28:15
**efficient** [1] - 28:14
**efficiently** [2] - 28:21, 29:11
**eight** [1] - 74:11
**either** [10] - 8:13, 31:4, 75:11, 82:18, 87:5, 90:19, 103:3, 103:4, 105:16, 106:19
**elaborate** [2] - 104:18, 106:16
**Eligibility** [1] - 93:14
**elite** [5] - 97:8, 97:20, 124:18, 125:1, 125:2
**elsewhere** [1] - 13:12
**employed** [1] - 84:23
**encounter** [1] - 77:18
**end** [3] - 15:10, 20:16, 95:2
**enemy** [1] - 110:14
**enforcement** [44] - 76:18, 77:2, 77:15, 78:1, 78:7, 78:17, 79:4, 79:7, 79:11, 79:23, 80:6, 80:12, 80:16, 82:25, 83:1, 85:16, 87:2, 90:25, 91:23, 96:16, 97:9, 97:21, 97:23, 97:24, 100:1, 100:7, 100:10, 100:15, 100:20, 101:1, 101:10, 102:17, 104:14, 104:16, 104:23, 104:24, 107:21, 109:23, 110:10, 121:22, 122:2, 124:19, 124:22
**engage** [1] - 122:9
**engaged** [2] - 98:2, 121:23
**engagement** [1] - 101:12
**engaging** [2] - 82:15, 110:9
**English** [1] - 25:25
**enjoy** [1] - 80:16
**entail** [1] - 105:23
**entails** [1] - 105:24
**enter** [1] - 4:3
**entering** [1] - 17:11
**entertain** [1] - 5:9
**entirely** [1] - 46:15
**entitled** [2] - 6:9, 54:25
**environment** [5] - 102:12, 104:15, 109:19, 109:23, 110:7
**environmental** [1] - 92:16
**environments** [4] - 101:10, 101:12, 101:17, 102:1
**episodes** [1] - 64:25
**equal** [7] - 78:23, 79:2, 79:5, 79:8, 79:16, 83:2, 83:5
**error** [1] - 25:11
**ESQUIRE** [9] - 2:4, 2:7, 2:8, 2:8, 2:9, 2:12, 2:12, 2:13, 2:13
**essentially** [1] - 46:16
**established** [2] - 8:17, 33:2
**estimate** [2] - 108:3, 114:11
**et** [8] - 1:7, 4:3, 67:25, 68:9, 68:14, 118:25
**evaluating** [1] - 84:14
**Evan** [1] - 4:14

EVAN [1] - 2:12
event [6] - 42:11, 57:5, 57:9, 57:10
events [1] - 70:9
evidence [3] - 3:12, 6:5, 58:5
evidences [1] - 93:18
ex [1] - 108:13
ex-military [1] - 108:13
exact [4] - 27:5, 54:9, 83:18, 107:20
Exact [1] - 107:13
exactly [7] - 20:15, 22:10, 29:6, 47:21, 48:6, 49:19, 49:23
Exactly [2] - 51:4, 51:19
examination [10] - 7:17, 8:19, 10:7, 10:25, 17:18, 17:23, 69:19, 72:2, 72:11, 121:11
EXAMINATION [10] - 3:3, 3:3, 3:4, 3:5, 3:6, 11:4, 64:21, 72:14, 103:14, 124:15
examine [2] - 65:8, 124:14
examined [4] - 10:11, 10:13, 37:19, 57:24
example [7] - 17:10, 22:6, 23:13, 57:23, 59:1, 59:3, 99:21
examples [1] - 23:2
exceeds [1] - 100:6
except [3] - 44:9, 44:20, 46:3
exceptions [3] - 44:11, 44:15, 53:19
excess [3] - 7:15, 64:24, 76:3
exchange [1] - 75:1
exchanges [1] - 75:3
exclude [9] - 27:24, 31:11, 31:14, 31:15, 31:21, 31:24, 32:2, 32:3, 32:6
excluding [2] - 31:18, 32:8
excused [2] - 71:12, 126:9
exercises [1] - 11:24
Exhibit [16] - 5:21, 12:13, 16:4, 42:19, 50:19, 51:2, 51:9, 52:5, 61:8, 61:18, 74:9, 77:10, 93:2, 94:10, 94:23

exhibit [5] - 10:24, 42:24, 50:24, 51:5, 69:19
exhibits [6] - 5:14, 5:15, 5:17, 10:24, 52:4, 52:9
EXHIBITS [1] - 3:10
Exhibits [8] - 3:11, 3:11, 6:3, 6:4, 51:9, 52:5
exist [2] - 100:15, 100:20
expect [7] - 6:25, 70:8, 78:16, 79:2, 79:6, 79:10, 81:9
expenses [1] - 5:5
experience [14] - 11:12, 11:16, 11:17, 11:22, 12:2, 72:15, 74:15, 75:23, 76:2, 77:21, 80:23, 82:20, 89:13, 96:6
experiment [2] - 22:6, 24:14
expert [1] - 84:17
expertise [1] - 84:20
explain [4] - 30:12, 52:9, 52:13, 52:23
explains [1] - 48:15
explanation [7] - 14:19, 30:14, 46:23, 47:20, 48:18, 53:17, 54:3
extensively [1] - 70:17
extent [5] - 8:3, 32:11, 59:11, 60:1, 124:20
extrapolate [1] - 22:20

## F

face [2] - 86:2, 86:7
faced [1] - 92:8
fact [16] - 7:13, 20:10, 30:5, 52:25, 64:2, 73:21, 76:5, 79:22, 82:2, 84:15, 87:13, 89:24, 90:7, 99:10, 101:2, 111:11
Factiva [24] - 23:4, 24:21, 24:23, 25:5, 25:17, 28:3, 35:13, 36:6, 37:9, 37:24, 38:8, 38:13, 38:14, 38:17, 38:20, 38:21, 38:22, 38:23, 39:6, 40:5, 40:16, 40:18, 40:25, 66:12
Factiva's [1] - 39:9
facts [2] - 49:11, 65:2

fail [1] - 106:11
fair [12] - 12:2, 24:4, 40:2, 47:22, 48:18, 57:19, 69:11, 114:16, 114:20, 117:23, 120:22
fairly [2] - 22:1, 87:8
fall [3] - 40:9, 90:15, 90:18
familiar [6] - 83:10, 84:9, 84:13, 84:15, 91:16, 115:24
family [11] - 12:23, 32:20, 32:21, 33:6, 33:12, 33:13, 33:16, 33:17, 33:20, 33:21, 116:10
far [10] - 53:20, 53:24, 57:19, 57:20, 57:23, 65:11, 106:25, 110:12, 110:18, 119:24
farm [1] - 27:10
fast [1] - 24:11
fatalities [11] - 47:12, 49:12, 49:14, 49:18, 49:22, 49:24, 50:3, 50:5, 50:11, 50:15, 63:11
fatality [1] - 52:11
favor [1] - 62:7
favorably [1] - 66:2
FBI [3] - 115:16, 122:13, 122:14
feasibility [7] - 86:16, 87:23, 88:7, 90:4, 90:10, 90:11, 92:6
feasible [4] - 85:14, 88:3, 90:23, 95:8
feature [1] - 113:5
federal [4] - 43:22, 48:22, 49:8, 50:8
Federal [4] - 68:2, 68:4, 68:11, 68:15
Feinblatt [4] - 4:19, 71:15, 103:17, 123:23
FEINBLATT [12] - 2:12, 3:6, 71:20, 103:14, 103:16, 121:13, 121:15, 121:20, 123:1, 123:13, 123:15, 123:24
female [1] - 84:4
females [1] - 113:19
few [8] - 53:6, 53:7, 65:15, 65:21, 66:5, 98:1, 103:8, 104:17
fewer [6] - 34:17, 35:3,

63:13, 72:18, 73:16, 88:15
fight [1] - 98:5
figuring [1] - 25:13
fill [1] - 59:12
final [4] - 8:8, 26:13, 55:9, 78:5
fine [1] - 64:12
finger [3] - 75:17, 75:19, 75:25
fire [7] - 26:5, 62:15, 62:21, 66:17, 84:10, 110:5, 113:18
firearm [21] - 31:12, 32:21, 33:12, 33:16, 37:21, 72:19, 73:1, 73:17, 75:24, 76:11, 76:15, 78:11, 83:7, 93:8, 93:19, 94:16, 94:20, 94:25, 100:16, 100:21, 104:8
firearms [18] - 33:20, 57:24, 72:16, 74:23, 75:2, 75:11, 80:20, 81:2, 81:10, 81:17, 84:17, 93:17, 94:6, 96:7, 105:17, 106:13, 107:1, 108:6
fired [22] - 13:13, 13:21, 13:25, 14:3, 14:6, 14:25, 15:13, 15:16, 15:20, 15:25, 38:7, 38:12, 39:8, 41:1, 60:22, 61:5, 64:24, 73:2, 77:19, 81:6, 103:6, 104:6
firing [6] - 14:9, 14:10, 38:5, 40:24, 62:25, 111:4
firm [1] - 4:6
firms [1] - 11:25
first [21] - 8:24, 9:2, 9:6, 25:3, 25:10, 26:3, 26:4, 43:8, 43:24, 53:7, 55:7, 55:9, 55:13, 55:15, 55:18, 58:12, 65:21, 69:24, 77:9, 96:21, 109:6
FISHER [1] - 1:11
fit [6] - 52:2, 84:3, 84:7, 84:16, 113:9, 113:11
Five [2] - 112:7, 115:20
five [5] - 16:8, 64:13, 64:15, 98:4, 112:4
five-shot [1] - 112:4
flashlight [1] - 106:3

Florida [7] - 93:3, 93:8, 94:4, 94:17, 96:4, 114:18, 118:22
Florida's [1] - 94:11
flying [1] - 126:18
focus [2] - 43:3, 47:10
focused [1] - 119:11
focusing [1] - 49:3
follow [4] - 27:2, 33:7, 110:18, 117:8
followed [1] - 26:6
following [3] - 27:1, 43:5, 44:13
font [1] - 50:22
footnote [6] - 16:11, 25:18, 50:24, 51:5, 52:16, 57:15
Footnote [1] - 25:23
footnotes [1] - 42:22
FOR [3] - 2:5, 2:9, 2:14
force [2] - 108:23, 110:19
Force [1] - 109:7
forgot [1] - 66:13
forgotten [1] - 40:12
formal [1] - 74:16
formatting [1] - 51:24
former [2] - 74:15, 107:17
formulating [2] - 90:14, 92:5
Fort [4] - 98:15, 109:2, 109:4, 109:5
forward [1] - 119:25
foundation [1] - 30:11
Foundation [1] - 30:12
four [15] - 43:9, 43:14, 47:13, 49:12, 49:22, 50:5, 50:12, 51:15, 62:24, 68:22, 68:23, 74:21, 94:19, 108:13, 124:2
frame [1] - 111:3
Frame [1] - 112:4
framework [2] - 15:9, 17:20
Francis [1] - 1:24
FRANCIS [1] - 1:24
Francisco [2] - 67:25, 68:1
frequently [1] - 122:9
Friday [1] - 126:13
front [1] - 44:1
full [3] - 6:20, 58:13, 124:24
fully [1] - 49:1
function [1] - 106:21
functions [1] - 105:7

**fundamentals** [3] - 75:1, 75:3, 104:13
**furthermore** [1] - 97:21
**Fyock** [1] - 68:14

## G

**Gable** [1] - 1:24
**GABLE** [1] - 1:24
**gain** [1] - 11:13
**Gary** [2] - 61:19, 62:3
**gauge** [1] - 112:23
**General** [10] - 4:2, 4:15, 4:18, 4:19, 5:3, 84:24, 85:3, 85:5
**GENERAL** [2] - 2:11, 2:14
**general** [4] - 75:2, 85:2, 97:11, 98:7
**General's** [1] - 103:17
**generally** [4] - 31:11, 32:20, 33:17, 70:18
**generator** [1] - 37:15
**George** [1] - 4:23
**germane** [1] - 103:6
**given** [4] - 32:15, 47:23, 51:23, 57:3
**Gloch** [3] - 76:19, 76:24, 110:23
**grace** [1] - 125:22
**graduate** [2] - 11:9, 105:21
**Grant** [2] - 54:25, 69:14
**granted** [1] - 107:17
**greater** [6] - 83:6, 87:16, 87:19, 111:20, 113:16, 119:9
**GREWAL** [1] - 1:7
**Grewal** [1] - 4:3
**grievous** [1] - 111:15
**grip** [2] - 113:16, 119:25
**group** [2] - 98:7, 98:17
**grouping** [1] - 46:16
**guess** [8] - 32:18, 51:25, 79:20, 81:4, 91:15, 98:13, 115:21, 117:23
**guidance** [1] - 117:24
**Guide** [3] - 42:21, 45:8, 51:18
**gun** [54] - 12:22, 14:6, 14:24, 19:16, 19:21, 20:23, 21:3, 21:6, 21:8, 21:11, 26:5, 26:25, 28:7, 28:12,

29:23, 30:4, 33:3, 33:11, 33:15, 33:19, 33:23, 34:4, 34:10, 36:13, 36:14, 36:23, 62:18, 64:25, 66:23, 69:7, 70:18, 81:4, 82:3, 84:7, 84:8, 90:7, 104:9, 105:12, 106:21, 108:25, 111:1, 111:18, 112:1, 113:5, 115:21, 116:3, 117:9, 118:9, 118:24, 119:11, 119:12, 120:22, 121:1
**GUN** [1] - 27:2
**gunfight** [11] - 77:18, 78:16, 78:18, 79:16, 79:19, 79:24, 80:3, 80:7, 114:2, 122:8, 122:16
**gunfights** [11] - 77:14, 77:22, 78:13, 79:14, 113:23, 121:21, 121:23, 122:2, 122:9, 122:11, 122:14
**guns** [18] - 31:4, 57:14, 57:17, 57:21, 59:2, 62:12, 62:13, 62:17, 62:23, 66:10, 104:25, 105:17, 105:19, 105:20, 112:10, 112:14, 116:22, 117:11
**GURBIR** [1] - 1:7
**guy** [1] - 80:2

## H

**hair** [2] - 32:7, 32:9
**Haley** [2] - 4:11, 72:9
**HALEY** [1] - 2:8
**half** [1] - 71:17
**hand** [6] - 22:2, 84:7, 105:9, 113:10, 113:17
**handgun** [15] - 97:12, 97:20, 99:7, 99:14, 105:4, 108:17, 108:20, 108:24, 109:16, 113:15, 123:9, 124:17, 124:24
**handguns** [5] - 84:2, 97:6, 99:9, 112:3, 120:12
**Handing** [2] - 11:3, 72:13

**handle** [6] - 72:16, 88:25, 96:7, 100:17, 100:22, 102:18
**handled** [1] - 105:17
**handling** [4] - 83:13, 83:16, 102:25, 103:1
**hands** [4] - 84:1, 84:5, 113:20, 116:19
**happy** [1] - 21:1
**hard** [4] - 6:19, 50:22, 58:3, 92:17
**hardly** [2] - 109:16, 114:13
**harm** [4] - 111:16, 126:1, 126:5, 126:6
**HARTMAN** [1] - 2:4
**Hartman** [1] - 4:6
**head** [2] - 85:3, 106:11
**heading** [1] - 19:8
**headline** [3] - 27:17, 27:21, 29:17
**hear** [1] - 20:25
**heard** [3] - 66:22, 123:19, 123:22
**HEARING** [1] - 1:20
**hearing** [1] - 5:7
**help** [2] - 29:11, 30:19
**helpful** [1] - 51:24
**herself** [1] - 81:17
**High** [1] - 52:18
**high** [8] - 72:22, 72:23, 73:2, 87:19, 88:9, 116:5, 116:18
**higher** [3] - 73:3, 78:22, 89:18
**highlighting** [1] - 48:24, 59:18
**highlights** [1] - 12:21
**highly** [2] - 77:14, 78:13
**himself** [4] - 80:20, 81:10, 81:17, 82:16
**historical** [2] - 41:7, 41:16
**history** [2] - 88:23, 89:4
**hit** [5] - 27:3, 66:19, 78:17, 78:22, 78:24
**hits** [2] - 29:7, 99:3
**hitting** [1] - 116:5
**hmm** [1] - 93:6
**hold** [3] - 8:5, 113:18
**Hold** [3] - 45:13, 73:10, 93:5
**holding** [18] - 7:15, 60:9, 60:14, 60:18, 60:23, 63:12, 63:13, 63:16, 72:18, 72:19, 73:16, 73:17, 74:2, 88:15, 88:21, 89:1,

89:4, 102:25
**Holding** [1] - 61:12
**holds** [1] - 88:10
**holster** [1] - 105:10
**holstering** [1] - 105:14
**home** [32] - 12:23, 13:12, 14:2, 19:17, 19:21, 26:14, 28:7, 28:12, 29:1, 29:5, 29:19, 30:17, 30:19, 32:14, 32:22, 33:3, 33:6, 33:13, 34:19, 34:24, 35:3, 37:21, 38:4, 40:23, 83:8, 83:15, 96:9, 107:1, 112:1, 112:18, 114:5
**homeowner** [1] - 66:17
**honest** [1] - 87:12
**Honor** [65] - 4:5, 4:9, 4:14, 4:21, 5:13, 6:6, 6:8, 6:18, 6:21, 6:23, 7:1, 7:5, 7:19, 8:7, 8:15, 8:21, 8:22, 9:1, 9:5, 9:8, 9:12, 9:22, 10:2, 10:4, 10:6, 10:19, 10:20, 10:22, 10:23, 14:21, 15:11, 16:3, 16:15, 18:5, 21:20, 24:19, 25:3, 30:21, 41:12, 45:12, 47:8, 58:14, 59:15, 61:14, 61:25, 64:6, 64:9, 64:19, 69:18, 71:7, 71:14, 71:19, 71:20, 71:23, 72:9, 74:10, 80:9, 103:8, 123:6, 123:17, 123:20, 126:11, 126:15, 126:20, 126:21
**Honor's** [1] - 72:10
**HONORABLE** [1] - 1:15
**hostile** [2] - 102:1, 102:11
**hour** [1] - 71:18
**hours** [6] - 91:6, 105:4, 105:6, 111:14, 123:9
**house** [17] - 29:21, 29:22, 29:24, 30:2, 30:5, 30:9, 30:10, 30:24, 30:25, 31:5, 31:12, 31:13, 66:24, 114:3, 116:17, 117:16, 120:8
**housekeeping** [1] - 7:6
**houses** [1] - 30:16

**huge** [1] - 97:25
**human** [1] - 11:7
**hypothesis** [1] - 32:18
**hypothetical** [1] - 35:9
**hypothetically** [1] - 79:22

## I

**i.e** [1] - 37:20
**idea** [5] - 5:5, 23:22, 30:15, 89:24, 117:19
**identical** [2] - 69:25, 88:10
**identifies** [1] - 70:10
**identify** [7] - 26:4, 37:15, 43:5, 43:13, 44:5, 44:13, 46:23
**ill** [1] - 80:24
**ill-prepared** [1] - 80:24
**illegal** [2] - 58:6, 125:20
**illuminating** [1] - 44:22
**implement** [2] - 72:25, 88:17
**implications** [1] - 6:20
**important** [5] - 18:1, 22:24, 84:6, 101:8, 113:5
**inaccessible** [1] - 106:15, 106:23
**inaccurate** [1] - 7:22
**inadvisable** [1] - 113:21
**INC** [1] - 1:4
**Inc** [2] - 24:24, 25:7
**incapacitate** [1] - 79:3
**incident** [7] - 13:9, 13:11, 13:21, 50:4, 50:11, 50:15, 89:3
**incidents** [72] - 13:1, 13:5, 13:6, 13:15, 13:19, 13:23, 13:24, 14:2, 14:5, 14:8, 14:24, 15:4, 15:12, 15:14, 15:20, 15:24, 17:4, 19:14, 19:17, 19:21, 20:7, 20:11, 21:12, 28:25, 29:4, 29:17, 30:3, 30:7, 31:11, 32:13, 32:20, 33:11, 33:15, 33:19, 34:4, 34:10, 34:12, 37:21, 38:3, 38:6, 38:7, 38:11, 39:7, 40:5, 40:23, 40:25, 41:20, 43:20, 46:4,

49:23, 52:11, 52:18, 53:18, 53:21, 55:20, 56:2, 56:22, 60:23, 62:12, 62:16, 62:17, 62:18, 62:20, 63:11, 63:12, 63:18, 65:3, 65:5, 88:23, 115:21, 115:24
**include** [11] - 20:7, 20:11, 20:12, 21:7, 31:15, 32:3, 43:20, 47:3, 49:6, 53:20, 96:15
**included** [11] - 6:17, 26:2, 26:16, 27:17, 31:16, 31:17, 31:19, 31:20, 52:23, 56:15
**includes** [1] - 52:17
**including** [1] - 32:1
**incomplete** [1] - 7:21
**inconsistent** [1] - 50:14
**incorporated** [1] - 105:8
**increase** [1] - 88:17
**increased** [1] - 92:13
**incriminate** [1] - 43:4
**Indeed** [1] - 63:24
**INDEX** [1] - 3:1
**indicated** [6] - 4:25, 5:2, 107:9, 107:24, 110:22, 117:8
**indications** [1] - 18:14
**indiscriminate** [6] - 101:15, 101:18, 101:21, 102:2, 102:13, 102:14
**indiscriminately** [1] - 110:17
**individual** [4] - 96:22, 113:6, 113:9, 115:8
**individually** [1] - 37:19
**individuals** [12] - 72:16, 86:11, 92:3, 94:5, 95:9, 96:6, 96:24, 107:25, 108:5, 108:9, 108:15, 114:9
**inexperienced** [2] - 74:12, 75:24
**information** [3] - 23:7, 123:5, 124:8
**infrastructure** [1] - 118:24
**inherently** [1] - 101:6
**initial** [3] - 65:6, 69:6, 124:4
**initiate** [1] - 81:16
**initiating** [2] - 80:18,

80:19
**INJUNCTION** [1] - 1:20
**injunction** [3] - 61:21, 62:4, 124:6
**injunctions** [1] - 124:11
**injure** [1] - 62:15
**injured** [1] - 88:24
**injuries** [2] - 63:11, 63:17
**innocent** [1] - 116:8
**inoperable** [2] - 106:15, 106:23
**Inoperable** [1] - 106:18
**insert** [2] - 88:11, 106:19
**instance** [1] - 66:20
**instances** [11] - 44:20, 45:1, 49:6, 64:23, 65:8, 65:12, 66:3, 66:7, 66:11, 66:25
**instructed** [2] - 102:2, 102:12
**instruction** [1] - 94:6
**instructions** [5] - 59:13, 93:1, 93:3, 93:19, 94:2
**instructors** [1] - 87:6
**insufficient** [3] - 86:1, 86:5, 86:20
**intended** [1] - 28:17
**intention** [1] - 29:10
**interacting** [1] - 110:16
**interactions** [2] - 96:21, 97:14
**intercede** [1] - 8:11
**interested** [17] - 34:12, 34:13, 34:15, 35:5, 35:10, 37:2, 37:5, 70:22, 85:14, 85:24, 86:2, 86:6, 86:18, 87:9, 89:21, 91:13, 92:11
**interference** [1] - 62:14
**interrupt** [1] - 75:6
**interrupted** [1] - 15:9
**interruption** [1] - 62:22
**intervene** [2] - 111:16, 111:17
**intrafamilial** [1] - 70:17
**INTRUD** [1] - 26:10
**intrude** [2] - 29:15, 30:9
**intruded** [2] - 29:18,

34:21
**intruding** [1] - 30:2
**inva** [1] - 26:10
**invade** [3] - 29:15, 29:22, 30:10
**invaded** [2] - 29:5, 29:18
**invasions** [1] - 110:4
**Investigation** [2] - 50:21, 51:18
**involve** [7] - 33:12, 33:16, 33:20, 34:10, 70:5, 91:19, 111:20
**involved** [10] - 19:17, 19:21, 38:5, 40:24, 52:25, 62:10, 77:21, 78:16, 78:17, 97:24
**involving** [11] - 29:1, 52:18, 60:9, 60:14, 60:23, 63:11, 63:13, 67:7, 89:4, 113:24, 115:25
**issue** [8] - 8:7, 23:1, 54:10, 76:18, 95:19, 103:7, 110:23, 117:25
**issued** [6] - 93:3, 94:10, 94:13, 94:16, 94:24, 99:21
**issues** [2] - 5:12, 76:20
**itself** [10] - 52:1, 57:2, 63:21, 63:23, 72:21, 88:18, 104:3, 104:8, 106:22, 118:9

**J**

**January** [12] - 13:2, 13:7, 13:10, 13:16, 37:11, 43:19, 47:13, 48:21, 49:5, 49:13, 49:24, 52:11
**JERSEY** [4] - 1:1, 1:4, 1:12, 1:16
**Jersey** [56] - 4:2, 4:16, 76:19, 76:21, 82:9, 84:21, 84:24, 85:14, 85:23, 86:18, 87:10, 88:19, 89:7, 89:20, 89:24, 90:5, 90:24, 91:4, 91:8, 91:13, 91:17, 92:2, 95:8, 95:15, 96:3, 99:25, 100:10, 104:19, 104:23, 105:1, 105:2, 107:1, 109:13, 110:10, 114:1, 114:2, 114:4, 114:9, 114:17,

115:24, 116:21, 116:24, 117:4, 117:13, 117:15, 117:20, 118:21, 118:24, 119:18, 119:21, 120:2, 120:9, 120:25, 122:24, 124:20
**Jersey's** [3] - 82:23, 88:23, 89:4
**JOEL** [1] - 2:8
**Joel** [2] - 4:11, 10:22
**joined** [2] - 4:10, 4:17
**joins** [1] - 5:24
**Joint** [10] - 3:11, 5:21, 6:3, 16:4, 42:19, 51:2, 51:9, 52:5, 61:8, 61:18
**joint** [3] - 5:17, 5:24, 109:6
**jointly** [1] - 5:20
**Jones** [15] - 4:23, 5:10, 24:24, 25:7, 41:7, 41:17, 41:21, 42:20, 43:13, 45:16, 47:11, 49:22, 51:10, 52:23, 56:18
**Jones'** [1] - 53:20
**Jones's** [1] - 57:20
**Judge** [44] - 9:24, 30:13, 30:18, 42:14, 43:19, 44:1, 44:5, 46:9, 46:22, 47:10, 47:23, 48:15, 49:5, 49:12, 50:3, 50:10, 50:14, 50:20, 51:3, 51:15, 51:18, 51:20, 52:6, 52:10, 52:17, 52:22, 53:9, 54:17, 55:18, 55:22, 56:1, 56:6, 57:4, 57:23, 58:5, 64:13, 67:4, 67:5, 67:10, 67:13, 68:5, 68:25, 70:1, 70:11
**JUDGE** [1] - 1:15
**Judge's** [5] - 41:24, 50:21, 56:21, 57:16, 58:19
**July** [3] - 62:11, 94:12, 95:1
**jumped** [1] - 59:9
**jumping** [1] - 59:22
**June** [1] - 95:1
**Justice** [3] - 76:22, 84:25, 115:19
**JX-17** [2] - 16:4, 16:15
**JX-7** [2] - 42:19, 46:21
**JX-9** [1] - 62:2

**K**

**keep** [4] - 75:17, 83:8, 115:21, 115:22
**keeping** [1] - 75:24
**keeps** [1] - 75:19
**kept** [1] - 65:25
**key** [1] - 30:19
**keyword** [2] - 26:25, 37:10
**keywords** [24] - 25:12, 25:13, 25:17, 25:21, 26:2, 26:4, 26:5, 26:8, 26:13, 26:17, 27:9, 27:12, 27:15, 27:20, 27:24, 28:1, 28:17, 28:23, 28:25, 29:3, 29:11, 29:14, 29:16, 31:10
**kill** [1] - 62:15
**killed** [3] - 43:20, 49:7, 88:24
**killing** [1] - 43:4
**killings** [7] - 44:2, 44:6, 44:14, 44:16, 45:18, 47:1, 52:15
**kind** [12] - 7:13, 15:9, 42:11, 59:9, 104:17, 105:8, 109:7, 111:18, 111:25, 112:1, 120:4, 124:10
**kinds** [1] - 29:13
**Kirk** [1] - 4:10
**KIRK** [1] - 2:7
**Kleck** [5] - 61:19, 62:2, 62:3, 67:3, 126:13
**Kleck's** [1] - 63:2
**knowing** [1] - 17:17
**knowledge** [2] - 98:18, 108:16
**known** [2] - 62:10, 62:19
**Kolbe** [1] - 68:9
**KZATV** [1] - 38:19

**L**

**laid** [2] - 47:10, 110:5
**Large** [1] - 78:5
**large** [20] - 7:10, 7:14, 8:13, 34:3, 61:10, 61:11, 62:15, 62:21, 62:22, 67:7, 80:1, 87:9, 87:14, 98:16, 104:3, 104:5, 112:24, 113:20, 116:13, 117:4

**largely** [1] - 41:17
**larger** [5] - 22:21, 41:8, 113:14, 113:15, 113:16
**last** [10] - 4:23, 9:17, 19:5, 54:11, 55:7, 55:12, 61:24, 68:22, 72:6, 76:3
**law** [74] - 5:18, 7:24, 11:25, 12:22, 76:18, 77:2, 77:15, 77:25, 78:6, 78:14, 78:17, 79:4, 79:7, 79:10, 79:14, 79:18, 79:23, 79:24, 80:6, 80:12, 80:16, 81:10, 81:11, 81:15, 81:18, 81:25, 82:12, 82:15, 82:18, 82:19, 82:24, 82:25, 83:1, 83:4, 85:15, 87:2, 87:12, 89:7, 90:25, 91:22, 96:8, 96:16, 97:9, 97:21, 97:22, 100:1, 100:7, 100:10, 100:15, 100:20, 101:1, 101:10, 102:17, 104:14, 104:15, 104:23, 104:24, 107:21, 109:23, 110:9, 116:21, 116:24, 117:3, 117:13, 120:9, 120:25, 121:22, 122:2, 124:19, 124:22, 125:15
**law-abiding** [10] - 12:22, 78:14, 79:14, 79:18, 79:24, 82:18, 82:24, 83:4, 87:12, 96:8
**lawfully** [1] - 82:21
**laws** [4] - 97:24, 100:24, 116:21, 117:9
**lawsuit** [1] - 116:25
**LCM** [2] - 62:10, 118:5
**LCMs** [8] - 62:14, 62:23, 90:24, 103:19, 103:22, 117:14, 117:20
**lead** [6] - 18:18, 18:25, 27:17, 27:21, 29:17, 35:13
**leading** [1] - 37:16
**learn** [1] - 122:5
**learned** [1] - 108:6
**least** [13] - 8:6, 27:15, 32:12, 33:19, 43:9, 43:14, 91:6, 108:13,

110:23, 115:7, 117:2, 117:14, 118:18
**leave** [1] - 49:2
**legal** [11] - 5:5, 11:20, 57:20, 58:19, 58:20, 59:3, 81:11, 81:17, 81:21, 120:2, 120:23
**legally** [3] - 57:14, 57:17, 79:21
**less** [20] - 8:6, 31:16, 31:19, 32:12, 32:14, 32:22, 33:2, 33:6, 33:8, 79:10, 82:2, 87:15, 87:16, 95:25, 103:5, 106:9, 106:10, 120:13, 121:6, 122:22
**letter** [1] - 27:6
**letters** [2] - 26:20, 27:1
**level** [2] - 98:9, 99:1
**license** [2] - 93:8, 94:25
**licenses** [2] - 94:13, 94:16
**Licensing** [1] - 94:11
**licensing** [1] - 94:24
**light** [2] - 40:3, 66:11
**lighting** [1] - 106:4
**likelihood** [1] - 32:22
**likely** [12] - 28:9, 28:18, 31:16, 31:19, 32:13, 32:14, 33:3, 33:6, 33:8, 75:24, 79:10, 82:15
**limit** [3] - 81:10, 81:16, 82:16
**limitations** [2] - 92:8, 92:20
**limiting** [1] - 117:13
**limits** [1] - 120:10
**line** [16] - 18:8, 39:4, 45:9, 45:11, 52:2, 58:13, 58:14, 58:23, 58:25, 73:9, 78:21, 81:14, 94:19, 95:2, 101:25, 106:3
**lines** [3] - 82:10, 94:19, 96:4
**list** [6] - 25:21, 44:11, 51:14, 55:18, 55:23, 97:2
**listed** [7] - 13:9, 25:18, 38:8, 38:12, 39:8, 49:18, 97:5
**listen** [1] - 8:10
**lists** [1] - 94:13
**litigation** [1] - 124:9
**live** [5] - 29:21, 30:1,

30:5, 30:9, 30:16
**lives** [5] - 29:24, 34:19, 43:9, 43:14, 126:17
**living** [1] - 66:15
**load** [2] - 76:8, 76:14
**loaded** [2] - 77:3, 114:4
**local** [2] - 107:4, 120:23
**location** [2] - 36:22, 106:24
**locations** [1] - 20:4
**lock** [3] - 74:20, 106:19, 106:21
**lock-back** [1] - 74:20
**lockbox** [1] - 106:24
**locked** [4] - 29:25, 30:6, 30:18, 106:24
**locking** [1] - 106:20
**logic** [2] - 99:12, 117:17
**logical** [1] - 34:22
**lone** [15] - 44:2, 44:7, 44:14, 44:16, 44:25, 45:19, 46:3, 46:4, 47:1, 48:25, 53:14, 53:18, 54:10, 57:8, 70:5
**look** [27] - 15:6, 23:20, 24:15, 36:5, 36:18, 36:19, 36:24, 39:14, 45:24, 48:2, 49:3, 49:16, 51:16, 53:3, 53:16, 54:10, 55:7, 59:21, 60:2, 65:22, 67:17, 69:23, 83:25, 84:14, 102:10, 102:11
**looked** [10] - 34:5, 34:6, 34:8, 34:25, 39:24, 40:19, 53:10, 55:6, 56:5
**looking** [9] - 23:11, 29:8, 34:16, 35:6, 50:2, 50:10, 56:8, 56:13, 60:12
**Looking** [1] - 97:1
**looks** [3] - 26:25, 51:22, 88:10
**louse** [1] - 30:2
**lower** [6] - 49:21, 75:4, 78:17, 78:22, 78:24, 89:18
**lowered** [1] - 47:11
**LUCAS** [1] - 2:13
**Lucas** [1] - 4:18
**Lucy** [4] - 9:2, 9:8, 9:15, 9:20
**LUCY** [2] - 3:2, 9:13

**lunch** [1] - 71:18
**Luncheon** [1] - 71:21

---

**M**

**M16** [2] - 100:4, 119:14
**M4** [2] - 100:4, 119:14
**ma'am** [3] - 13:6, 39:2, 60:8
**magazine** [106] - 7:9, 7:10, 7:14, 61:6, 61:11, 67:7, 72:21, 72:22, 72:25, 73:2, 73:4, 73:22, 74:1, 74:12, 74:20, 74:24, 75:1, 75:3, 75:5, 75:13, 75:16, 76:2, 76:12, 76:24, 77:25, 79:7, 79:11, 79:23, 80:1, 80:3, 81:7, 81:22, 83:17, 83:18, 83:21, 83:23, 84:6, 84:10, 84:12, 87:14, 87:16, 87:17, 87:20, 88:10, 88:12, 88:14, 88:15, 88:16, 88:19, 89:15, 89:17, 89:18, 95:24, 95:25, 97:6, 100:5, 100:16, 100:21, 100:23, 100:25, 101:6, 102:20, 102:21, 102:25, 103:3, 103:4, 104:4, 104:5, 104:8, 106:19, 106:20, 111:6, 112:7, 112:9, 112:12, 112:24, 113:12, 113:14, 113:16, 113:20, 116:3, 116:5, 116:14, 116:18, 116:19, 117:4, 118:9, 118:10, 119:3, 119:6, 119:7, 119:9, 120:10, 120:16, 120:20, 121:3, 121:5, 122:24, 125:17, 125:18, 125:19, 125:24
**magazines** [55] - 8:4, 8:5, 60:9, 60:14, 60:17, 60:23, 62:13, 62:19, 62:24, 63:11, 63:13, 63:16, 76:5, 76:8, 76:14, 77:3, 78:6, 79:17, 80:22, 81:11, 81:17, 81:20,

82:4, 82:7, 82:10, 82:23, 83:3, 85:15, 85:20, 87:10, 87:25, 88:8, 88:21, 88:25, 89:4, 89:8, 89:22, 95:9, 95:17, 95:18, 95:22, 96:9, 99:24, 100:2, 100:4, 101:4, 102:19, 103:1, 111:20, 120:13, 122:21, 125:12, 125:21, 125:23, 126:1
**main** [1] - 81:12
**maintained** [4] - 12:21, 22:11, 69:7, 76:2
**mandate** [1] - 90:17
**mandated** [1] - 92:23
**manner** [2] - 85:15, 90:25
**manufacturers** [1] - 120:22
**March** [1] - 16:7
**marked** [6] - 3:12, 6:4, 9:21, 54:22, 69:15, 69:17
**marketing** [1] - 11:14
**Maryland** [1] - 68:10
**mass** [47] - 41:4, 41:7, 41:16, 41:24, 42:3, 42:5, 42:8, 42:17, 43:3, 43:13, 43:20, 43:23, 44:6, 45:18, 46:17, 47:3, 47:12, 48:23, 49:6, 49:8, 49:13, 49:18, 50:4, 50:16, 51:17, 53:6, 54:1, 54:2, 54:4, 54:19, 55:22, 56:3, 56:6, 56:14, 57:4, 57:14, 60:8, 60:13, 60:18, 62:10, 62:20, 63:18, 69:25, 70:5, 70:9, 70:13, 89:3
**Mass** [7] - 42:21, 45:8, 50:20, 51:4, 51:18, 51:19, 55:1
**master** [2] - 84:21, 84:23
**Master's** [1] - 11:10
**match** [1] - 124:21
**material** [1] - 69:19
**Materials** [1] - 51:13
**matter** [10] - 5:14, 7:6, 8:7, 35:7, 35:8, 69:1, 99:10, 99:17, 117:17, 124:5
**matters** [2] - 12:1, 123:3

**max** [2] - 113:2, 113:3
**McElroy** [1] - 4:24
**mean** [33] - 14:11, 23:10, 24:15, 31:10, 32:20, 37:3, 45:20, 61:11, 65:4, 70:7, 74:15, 75:1, 75:3, 77:18, 85:9, 86:10, 86:22, 92:14, 98:23, 100:25, 102:10, 108:12, 108:22, 110:2, 110:4, 110:13, 112:6, 114:25, 115:11, 119:22, 124:6, 124:10
**meaning** [1] - 40:8
**means** [3] - 26:18, 55:22, 119:23
**meant** [2] - 43:16, 91:3
**measure** [1] - 35:21
**meet** [6] - 55:20, 56:14, 92:13, 119:24, 120:23
**meeting** [1] - 56:25
**member** [10] - 32:20, 32:21, 33:12, 33:13, 33:16, 33:17, 33:20, 33:21, 100:10, 101:11
**members** [11] - 33:6, 97:11, 99:23, 101:2, 101:3, 101:14, 101:21, 102:1, 102:12, 116:10, 124:25
**mention** [3] - 44:15, 47:16, 70:4
**mentioned** [3] - 11:21, 35:11, 68:20
**method** [2] - 20:10, 24:2
**methodology** [19] - 15:23, 16:22, 16:24, 17:5, 17:7, 17:10, 17:15, 18:16, 19:25, 20:7, 20:14, 21:15, 21:19, 21:21, 21:22, 22:13, 23:24, 37:9, 48:16
**microeconomics** [1] - 11:13
**Middle** [3] - 52:19, 52:24, 53:22
**middle** [1] - 55:16
**Might** [1] - 81:1
**might** [21] - 8:11, 20:14, 23:25, 24:1, 24:9, 32:10, 32:24,

33:8, 35:18, 39:20, 47:9, 55:6, 59:3, 65:13, 65:16, 75:20, 80:19, 81:2, 81:5, 116:13, 125:12
**miles** [1] - 82:2
**Military** [1] - 97:18
**military** [44] - 96:16, 96:21, 96:24, 97:2, 97:5, 97:11, 97:25, 98:2, 98:7, 98:16, 99:15, 99:23, 100:15, 100:20, 101:2, 101:3, 101:11, 101:14, 101:19, 101:21, 102:2, 102:12, 102:17, 107:10, 107:11, 107:20, 108:1, 108:7, 108:10, 108:12, 108:13, 108:14, 108:18, 108:23, 108:25, 109:4, 109:6, 109:18, 109:22, 110:8, 119:14, 124:18, 124:21, 124:25
**military's** [1] - 100:9
**million** [3] - 28:2, 28:5, 118:23
**millions** [1] - 39:9
**mind** [3] - 18:2, 19:8, 55:8
**mindful** [1] - 42:9
**minimal** [1] - 87:1
**Minimum** [1] - 93:14
**minimum** [2] - 47:12, 49:21
**minute** [5] - 64:5, 67:21, 71:16, 99:6, 123:25
**minutes** [2] - 64:13, 64:15
**missed** [4] - 55:23, 56:2, 56:6, 56:21
**misses** [1] - 57:1
**mistake** [1] - 75:23
**misuse** [1] - 116:13
**model** [1] - 105:12
**modified** [2] - 120:2, 120:4
**modify** [1] - 120:20
**moment** [2] - 26:3, 49:2
**moments** [1] - 103:8
**monetary** [1] - 126:3
**money** [1] - 5:4
**morning** [10] - 4:5, 4:8, 4:9, 4:12, 4:20,

4:21, 6:12, 10:22, 11:5, 64:23
**most** [9] - 25:14, 28:9, 42:16, 54:19, 54:21, 83:13, 108:20, 113:5
**Mother** [58] - 41:7, 41:17, 41:21, 41:24, 42:14, 42:20, 43:13, 43:19, 44:1, 44:5, 45:16, 46:9, 46:22, 47:9, 47:11, 47:23, 48:15, 49:5, 49:12, 49:22, 50:3, 50:10, 50:14, 50:20, 50:21, 51:3, 51:10, 51:15, 51:17, 51:19, 52:6, 52:10, 52:17, 52:22, 52:23, 53:9, 53:20, 54:17, 55:18, 55:22, 56:1, 56:6, 56:18, 56:21, 57:4, 57:16, 57:20, 57:23, 58:5, 58:19, 67:4, 67:5, 67:10, 67:13, 68:5, 68:25, 70:1, 70:10
**motion** [2] - 61:20, 62:4
**motive** [1] - 43:4
**mouth** [1] - 70:21
**move** [6] - 5:20, 23:4, 24:21, 47:8, 63:8, 123:20
**moving** [1] - 60:21
**Moving** [1] - 96:12
**MS** [21] - 3:3, 3:3, 3:4, 3:6, 11:4, 64:21, 72:9, 72:14, 73:11, 73:14, 74:9, 77:12, 103:8, 103:12, 121:8, 121:10, 123:6, 123:17, 123:20, 124:15, 125:6
**Multiple** [1] - 19:9
**multiple** [10] - 19:13, 19:17, 19:21, 20:4, 62:12, 62:13, 62:16, 62:19, 80:20, 80:22
**municipalities** [1] - 65:24
**municipality** [1] - 5:4
**music** [1] - 107:19
**must** [5] - 17:19, 92:1, 93:16, 99:7, 106:1
**muzzle** [1] - 119:24
**myriad** [1] - 85:25

**N**

**name** [4] - 9:14, 9:17, 72:6, 103:16
**names** [2] - 67:18, 67:20
**naming** [1] - 7:7
**narrow** [1] - 30:23
**nature** [2] - 108:6, 108:17
**Navy** [1] - 109:7
**near** [1] - 37:21
**nearly** [3] - 24:25, 25:7, 76:5
**necessarily** [3] - 31:21, 32:8, 35:25
**necessary** [4] - 77:25, 78:6, 79:18, 79:21
**Neck** [1] - 122:7
**need** [14] - 14:19, 17:24, 31:21, 34:19, 34:23, 62:14, 64:11, 76:15, 78:1, 78:2, 78:7, 80:6, 80:11, 91:21
**needed** [2] - 88:11, 90:12
**needs** [1] - 71:15
**Nera** [6] - 11:25, 17:13, 22:7, 22:14, 22:17, 31:25
**neutral** [1] - 8:6
**never** [1] - 10:16
**NEW** [4] - 1:1, 1:4, 1:12, 1:16
**New** [69] - 4:2, 4:16, 65:21, 67:19, 68:19, 68:20, 68:25, 76:19, 76:21, 82:9, 82:23, 84:21, 84:23, 85:14, 85:23, 86:18, 87:10, 88:19, 88:23, 89:3, 89:7, 89:20, 89:24, 90:5, 90:24, 91:4, 91:8, 91:12, 91:17, 92:2, 95:8, 95:15, 96:3, 99:25, 100:10, 104:19, 104:23, 105:1, 105:2, 106:25, 109:12, 110:10, 114:1, 114:2, 114:4, 114:9, 114:17, 115:24, 116:21, 116:24, 117:4, 117:13, 117:14, 117:20, 118:21, 118:24, 119:18, 119:21, 120:2, 120:9,

120:24, 120:25, 122:4, 122:5, 122:6, 122:11, 122:24, 124:20
**new** [7] - 36:15, 40:3, 89:7, 92:12, 95:3, 121:5, 121:14
**news** [10] - 24:23, 24:24, 25:6, 25:7, 27:17, 36:8, 37:22, 38:15, 38:16, 39:9
**next** [10] - 14:17, 16:2, 43:18, 47:6, 66:7, 71:15, 71:24, 94:9, 94:22, 126:12
**Next** [6] - 31:7, 60:5, 70:16, 71:13, 71:22, 126:10
**night** [2] - 106:1, 114:20
**nilly** [3] - 42:11, 57:5, 57:9
**nine** [1] - 112:9
**nine-round** [1] - 112:9
**NO** [1] - 1:6
**nobody** [1] - 53:13
**non** [2] - 21:14, 22:12
**non-comprehensive** [1] - 21:14
**non-representative** [1] - 22:12
**none** [2] - 112:11, 116:1
**None** [1] - 126:15
**normally** [2] - 21:14, 110:6
**Northern** [1] - 68:3
**Norwellian** [1] - 7:21
**nothing** [4] - 87:6, 87:14, 100:16, 100:21
**NRA** [14] - 12:21, 13:2, 14:9, 20:6, 29:13, 34:25, 35:1, 35:12, 35:14, 36:11, 38:8, 40:4, 66:4, 66:7
**NRA's** [4] - 13:9, 20:14, 38:12, 39:8
**number** [47] - 6:16, 11:21, 13:12, 13:20, 17:3, 18:18, 18:24, 20:2, 26:20, 28:13, 33:22, 35:7, 35:8, 35:18, 35:20, 35:22, 36:4, 37:15, 47:7, 47:12, 49:22, 58:1, 60:22, 62:15, 65:11, 65:22, 65:24, 66:17, 70:9, 70:22, 73:1, 87:3, 87:9, 94:13,

94:15, 94:18, 97:25,
103:18, 107:25,
108:10, 113:2,
114:9, 114:11,
114:16, 114:18,
118:20, 118:21
**numbers** [4] - 36:9,
62:21, 62:22, 63:17

## O

**O'Malley** [1] - 68:9
**object** [2] - 9:3, 21:17
**Objection** [2] - 30:11,
121:8
**objection** [2] - 10:2,
121:9
**objections** [2] - 5:23,
10:1
**observations** [3] -
96:16, 96:23, 97:13
**observe** [2] - 109:14,
109:16
**observed** [2] - 109:2,
109:8
**obtain** [2] - 86:22,
91:17
**obtained** [6] - 22:10,
22:16, 22:18, 37:14,
57:14, 57:17
**obviously** [1] - 91:21
**occasion** [1] - 107:7
**occur** [4] - 13:4,
110:6, 110:7
**occurred** [7] - 13:2,
13:5, 13:7, 13:11,
13:16, 52:11, 62:11
**occurring** [1] - 55:20
**occurs** [1] - 30:8
**October** [5] - 42:20,
47:16, 48:5, 55:2,
115:20
**OF** [12] - 1:1, 1:4,
1:16, 2:11, 3:3, 3:4,
3:5, 3:6, 64:21,
72:14, 103:14,
124:15
**offer** [8] - 85:13,
85:18, 87:21, 89:19,
90:3, 90:10, 90:20,
94:5
**offered** [5] - 64:2,
74:23, 75:12, 84:17,
97:3
**offering** [2] - 88:7,
124:13
**OFFICE** [1] - 2:11
**office** [1] - 56:4
**Office** [3] - 84:24,

85:3, 103:17
**officer** [17] - 78:17,
79:4, 79:7, 79:11,
79:23, 80:2, 100:16,
100:21, 104:16,
105:1, 107:21,
107:22, 111:11,
111:14, 115:13,
122:8
**Officers** [1] - 67:25
**officers** [18] - 76:18,
77:2, 77:15, 77:21,
78:1, 78:7, 78:22,
80:7, 85:16, 90:25,
91:23, 97:23, 100:1,
101:11, 109:23,
122:7, 124:19,
124:22
**OFFICIAL** [1] - 1:25
**often** [6] - 22:4, 22:7,
22:15, 31:6, 98:15,
99:14
**Often** [1] - 113:22
**old** [2] - 68:21, 68:23
**on-duty** [2] - 110:23,
111:5
**once** [11] - 9:16, 42:8,
57:6, 57:11, 84:3,
99:15, 99:16, 103:6,
105:18, 105:21,
120:4
**Once** [1] - 72:5
**one** [74] - 4:24, 5:5,
5:14, 6:7, 7:5, 8:10,
10:3, 14:12, 18:10,
18:13, 18:14, 22:25,
27:15, 27:20, 31:11,
32:20, 33:12, 33:16,
33:20, 33:25, 35:6,
36:1, 36:5, 36:6,
36:22, 38:14, 38:17,
38:19, 38:21, 38:22,
38:23, 39:18, 39:21,
40:4, 40:13, 40:14,
40:17, 42:14, 43:12,
45:17, 46:6, 50:6,
50:17, 52:25, 54:16,
54:21, 65:7, 66:11,
66:13, 66:14, 66:20,
66:21, 68:17, 68:24,
71:8, 71:15, 76:20,
79:21, 80:15, 82:10,
82:19, 83:20, 84:20,
86:15, 100:18,
104:22, 112:7,
112:9, 114:14,
121:6, 123:8, 125:8,
126:4
**One** [2] - 38:14, 67:18
**one-time** [1] - 50:6

**ones** [3] - 20:12,
25:13, 28:11
**online** [2] - 24:23,
25:6
**open** [2] - 92:13,
121:14
**operate** [3] - 101:11,
109:22, 110:1
**operated** [1] - 111:2
**operates** [1] - 119:8
**operating** [1] - 109:19
**opine** [1] - 77:14
**opined** [3] - 77:8,
82:14, 124:18
**opinion** [21] - 64:2,
72:17, 73:15, 73:21,
85:13, 85:18, 85:22,
86:16, 87:21, 88:7,
88:13, 89:19, 90:3,
90:10, 90:14, 92:5,
97:8, 97:11, 99:23,
101:2, 101:20
**opinions** [1] - 96:20
**opportunity** [1] - 5:10
**oppose** [1] - 7:19
**opposed** [6] - 5:5,
57:21, 87:20, 92:18,
95:24, 104:8
**order** [5] - 27:18, 77:5,
87:23, 87:24, 88:20
**ordered** [1] - 6:8
**organization** [1] - 54:8
**original** [1] - 104:22
**ought** [2] - 7:11, 7:16
**outcomes** [3] - 36:11,
36:12, 36:17
**outside** [5] - 24:1,
66:16, 114:3, 114:4
**overall** [2] - 46:15,
101:1
**overlapping** [2] - 41:8,
41:17
**Overruled** [1] - 121:17
**overstating** [1] - 35:20
**own** [16] - 29:22,
30:10, 30:17, 30:24,
31:5, 42:5, 47:24,
48:18, 56:3, 56:22,
56:25, 81:4, 86:12,
115:7, 125:11
**owned** [5] - 24:24,
25:6, 76:5, 86:25,
87:10
**owners** [3] - 12:22,
14:6, 14:24
**ownership** [1] - 36:23

## P

**P220** [1] - 112:8
**Page** [3] - 9:8, 9:15,
9:20
**page** [32] - 7:2, 15:6,
16:11, 18:6, 18:8,
19:5, 25:3, 25:18,
38:24, 40:21, 41:10,
42:24, 43:1, 45:3,
45:10, 45:11, 51:20,
55:8, 58:9, 58:12,
58:14, 58:23, 62:7,
62:8, 69:24, 73:6,
78:20, 81:13, 93:12,
101:24
**PAGE** [2] - 3:2, 9:13
**pages** [6] - 12:16,
12:17, 23:5, 24:22,
41:5, 41:12
**paper** [1] - 8:1
**par** [2] - 97:9, 124:19
**paragraph** [42] - 25:2,
25:4, 25:21, 25:24,
27:17, 27:21, 29:18,
41:25, 42:3, 49:4,
55:7, 55:10, 55:12,
55:17, 57:12, 57:13,
60:6, 60:21, 61:1,
61:4, 61:10, 62:6,
62:8, 63:3, 63:9,
63:15, 69:23, 74:7,
77:8, 77:11, 77:14,
78:4, 80:5, 80:11,
85:12, 87:22, 90:22,
97:17, 101:9, 124:3
**Paragraph** [8] - 60:7,
60:12, 60:17, 63:1,
63:6, 63:7, 63:10,
77:12
**paragraphs** [3] -
96:12, 96:15, 97:1
**parenthetical** [1] -
55:16
**Parenthood** [1] - 7:25
**part** [8] - 28:19, 46:25,
48:11, 48:24, 92:9,
100:25, 102:20,
123:4
**participated** [1] -
124:17
**particular** [10] - 14:12,
20:16, 23:1, 44:22,
46:18, 46:25, 64:2,
86:20, 120:15, 121:1
**particularly** [3] - 31:3,
42:10, 113:19
**parties** [4] - 10:12,
10:16, 10:18, 124:7

**parts** [3] - 40:11, 59:8,
59:17
**pass** [3] - 91:20,
91:23, 99:3
**passed** [1] - 88:19
**passing** [1] - 98:23
**past** [1] - 98:21
**pause** [5] - 53:4, 64:8,
70:15, 88:1, 103:11
**pay** [1] - 86:10
**paying** [2] - 5:4, 86:11
**PC** [1] - 2:4
**peacetime** [3] - 110:1,
110:7, 110:15
**pejorative** [1] - 8:6
**Pennsylvania** [5] -
81:21, 81:24, 82:3,
82:7, 116:21
**People** [1] - 99:9
**people** [42] - 17:11,
20:23, 21:3, 23:21,
23:25, 24:2, 24:3,
24:5, 24:7, 24:11,
29:21, 29:23, 30:1,
30:9, 30:16, 30:24,
31:2, 32:7, 32:8,
32:13, 34:10, 35:1,
35:8, 43:9, 43:14,
43:21, 49:7, 64:3,
87:5, 87:12, 89:24,
90:19, 97:16, 97:19,
98:1, 98:15, 99:12,
107:10, 118:23,
125:16
**per** [5] - 13:21, 122:8,
122:16
**percent** [15] - 13:23,
14:2, 19:13, 19:16,
19:20, 38:3, 40:22,
55:23, 56:2, 56:21,
57:1, 62:17, 106:8,
106:9, 106:10
**percentage** [7] -
33:19, 33:23, 57:13,
60:8, 60:13, 82:20,
99:20
**performed** [1] - 13:1
**performing** [1] -
110:10
**perhaps** [1] - 59:2
**period** [12] - 16:20,
18:15, 25:10, 28:3,
30:6, 37:11, 37:24,
37:25, 49:24, 55:24,
95:4, 125:22
**periodic** [1] - 105:18
**permissible** [2] - 71:7,
71:16
**permission** [2] - 72:1,
72:10

**permit** [3] - 91:17, 114:8, 114:15
**permits** [2] - 114:10, 114:17
**permitting** [1] - 92:9
**perpetrator** [3] - 27:13, 43:8, 43:14
**perpetrators** [1] - 70:22
**person** [17] - 17:11, 36:12, 36:14, 66:14, 66:16, 66:17, 66:19, 66:21, 74:20, 75:19, 82:14, 88:24, 89:14, 98:5, 114:14, 118:17
**personal** [1] - 115:7
**personally** [1] - 86:25
**personnel** [2] - 97:22, 98:5
**persons** [1] - 125:25
**pertain** [1] - 58:17
**PETER** [1] - 1:15
**PGS** [1] - 1:6
**ph** [2] - 9:9, 111:4
**phone** [2] - 4:24, 66:22
**physically** [1] - 104:2
**pick** [4] - 27:6, 27:9, 27:12, 118:15
**picking** [1] - 24:3
**PISTOL** [1] - 1:4
**Pistol** [1] - 4:2
**pistol** [5] - 97:17, 98:20, 98:23, 98:25, 99:21
**place** [8] - 26:22, 38:4, 40:23, 55:23, 87:6, 95:8, 95:15, 96:3
**placed** [1] - 104:4
**PLAINTIFF** [3] - 1:5, 2:5, 2:9
**plaintiff** [1] - 72:10
**plaintiff's** [2] - 61:20, 62:4
**Plaintiff's** [6] - 3:11, 5:21, 6:3, 93:2, 94:10, 94:23
**plaintiffs** [6] - 4:4, 4:7, 5:14, 5:16, 7:23, 10:23
**plan** [1] - 66:15
**Planned** [1] - 7:25
**plastic** [1] - 105:11
**pleadings** [1] - 8:1
**PLLC** [1] - 2:7
**plus** [2] - 51:22, 91:23
**pocket** [1] - 86:12
**point** [13] - 7:2, 15:5, 26:24, 35:14, 39:20, 43:1, 43:8, 43:25,

44:14, 48:3, 49:14, 50:17
**points** [1] - 6:7
**Police** [4] - 4:16, 67:25, 97:18, 115:14
**police** [24] - 4:25, 5:9, 77:21, 78:22, 80:2, 81:16, 105:1, 105:3, 105:21, 107:4, 107:5, 107:11, 107:12, 107:22, 108:23, 109:12, 110:9, 110:23, 111:11, 111:14, 115:13, 124:1
**policy** [1] - 99:18
**polymer** [1] - 111:3
**pop** [1] - 99:2
**pop-up** [1] - 99:2
**population** [1] - 22:21
**position** [2] - 7:11, 74:20
**positive** [3] - 36:10, 36:12, 36:17
**possess** [31] - 62:19, 72:17, 72:19, 72:22, 72:23, 72:25, 73:3, 73:16, 73:17, 73:18, 82:21, 85:20, 87:24, 88:8, 88:9, 88:14, 88:16, 88:20, 89:8, 89:14, 89:16, 95:16, 95:18, 96:8, 96:11, 101:3, 102:23, 103:3, 104:2, 125:25
**possessed** [3] - 62:18, 62:23, 79:21
**possessing** [5] - 73:2, 95:21, 101:6, 102:20, 102:22
**possession** [4] - 103:4, 103:19, 103:22, 104:1
**possible** [3] - 5:4, 92:12, 92:14
**possibly** [2] - 73:4, 78:12
**Possibly** [1] - 55:5
**post** [1] - 7:1
**potential** [2] - 28:19, 66:9
**potentially** [3] - 28:4, 113:20, 118:16
**practical** [7] - 74:17, 74:19, 85:19, 91:12, 92:7, 92:20, 117:24
**practice** [1] - 22:1
**preceding** [1] - 27:7
**precise** [3] - 7:2, 20:10, 25:23

**preferable** [1] - 79:13
**preferably** [1] - 106:24
**prejudge** [1] - 8:7
**preliminary** [5] - 5:14, 7:6, 61:20, 62:4, 124:6, 124:11
**PRELIMINARY** [1] - 1:20
**premature** [1] - 124:10
**prepare** [1] - 87:4
**prepared** [1] - 80:24
**preparing** [4] - 85:18, 89:19, 90:3, 90:10
**present** [5] - 8:9, 8:11, 8:24, 10:14, 117:24
**presenting** [2] - 96:9, 101:4, 102:19
**pretty** [1] - 56:18
**previously** [1] - 107:25
**primarily** [1] - 97:12
**primary** [2] - 108:24, 108:25
**Princeton** [1] - 115:14
**Priorities** [1] - 6:10
**private** [9] - 72:21, 87:3, 87:17, 90:19, 92:2, 94:5, 95:16, 111:12, 114:9
**Private** [1] - 94:8
**probability** [1] - 11:13
**problem** [3] - 55:13, 55:18, 56:18
**problems** [1] - 125:15
**procedure** [2] - 91:16, 91:19
**procedures** [1] - 105:7
**proceed** [4] - 10:21, 61:14, 64:20, 72:8
**Proceedings** [1] - 126:22
**process** [5] - 17:12, 25:16, 28:8, 28:20, 75:21
**Proctor** [5] - 4:11, 72:2, 72:8, 72:9, 124:13
**PROCTOR** [18] - 2:8, 3:5, 3:7, 72:9, 72:14, 73:11, 73:14, 74:9, 77:12, 103:8, 103:12, 121:8, 121:10, 123:6, 123:17, 123:20, 124:15, 125:6
**production** [2] - 120:17, 120:18
**products** [1] - 120:23
**professor** [1] - 69:15
**Professor** [9] - 54:25,

56:1, 56:17, 61:19, 62:3, 67:3, 69:24, 70:4, 70:8
**proficiency** [1] - 106:5
**program** [2] - 86:24, 92:9
**programs** [1] - 92:24
**prohibiting** [1] - 117:14
**prohibitive** [6] - 85:13, 88:2, 90:23, 91:3, 91:4, 91:10
**propensity** [1] - 116:4
**proper** [3] - 88:25, 104:12, 104:14
**properly** [4] - 84:7, 96:8, 113:18, 118:18
**property** [6] - 26:14, 101:19, 102:3, 102:13, 102:15, 114:3
**proportion** [1] - 34:14
**prosecuted** [1] - 117:6
**protect** [2] - 30:4, 77:5
**protecting** [1] - 105:15
**prove** [5] - 61:4, 63:19, 63:21, 63:23, 64:1
**provide** [7] - 6:12, 9:11, 57:13, 90:17, 91:5, 91:8, 93:16
**provided** [8] - 5:18, 6:19, 18:7, 73:9, 74:8, 92:2, 104:22, 109:12
**providing** [5] - 85:19, 86:8, 86:9, 86:16, 90:15
**public** [6] - 43:3, 55:22, 96:10, 101:5, 102:19, 110:21
**Public** [1] - 55:1
**publication** [1] - 115:10
**published** [1] - 55:1
**pull** [2] - 40:15, 40:17
**puller** [1] - 98:4
**pullers** [1] - 98:3
**purchase** [2] - 59:4, 82:10
**purchased** [3] - 57:21, 57:24, 59:2
**purchaser** [2] - 57:25, 58:4, 58:5, 58:8, 59:3
**purchasers** [1] - 58:3
**purport** [6] - 60:17, 61:1, 61:4, 63:2, 63:4, 63:15

**purporting** [1] - 46:22
**purpose** [1] - 110:8
**purposes** [4] - 70:24, 71:1, 83:8, 95:21
**put** [14] - 7:22, 19:6, 31:20, 32:5, 43:2, 54:3, 70:20, 95:8, 95:15, 95:19, 96:3, 103:4, 106:21, 112:9
**putting** [1] - 116:6
**PX-50** [1] - 6:10

**Q**

**qualification** [11] - 91:20, 91:22, 98:11, 98:13, 98:14, 98:20, 99:16, 105:24, 106:1, 109:14
**qualifications** [1] - 105:23
**qualified** [1] - 56:22
**qualifies** [1] - 49:13
**qualify** [8] - 50:4, 50:11, 50:15, 56:2, 105:19, 105:22, 106:10, 106:11
**quality** [1] - 80:25
**questions** [21] - 58:16, 59:7, 59:14, 59:17, 59:21, 64:9, 103:12, 103:18, 104:18, 109:18, 113:4, 113:23, 116:20, 117:19, 118:20, 121:21, 121:24, 123:1, 123:11, 123:21, 125:6
**quick** [1] - 51:16
**quickly** [2] - 38:24, 77:22
**quite** [8] - 48:23, 54:7, 54:14, 56:7, 56:13, 57:8, 98:15, 105:16
**quoting** [1] - 25:2

**R**

**random** [3] - 23:24, 28:3, 37:15
**randomly** [1] - 22:5
**range** [5] - 84:21, 84:23, 92:15, 105:5, 116:7
**ranges** [14] - 85:23, 86:5, 86:18, 86:20, 87:5, 90:4, 90:7, 90:12, 92:12, 92:13, 92:16, 92:19,

118:21, 118:25
**rate** [1] - 78:17
**rates** [2] - 78:22, 78:24
**rather** [7] - 25:25, 28:1, 28:4, 34:3, 86:3, 97:13
**raw** [2] - 50:20, 108:11
**re** [3] - 106:10, 106:11, 109:15
**re-qualify** [2] - 106:10, 106:11
**re-sight** [1] - 109:15
**reached** [1] - 106:22
**reaches** [1] - 19:1
**read** [23] - 6:25, 11:18, 28:6, 34:22, 43:6, 43:10, 44:2, 45:7, 49:9, 50:22, 53:25, 55:8, 55:15, 59:8, 59:16, 59:17, 63:3, 67:17, 94:15, 102:5, 102:7, 114:23, 115:3
**reading** [5] - 25:1, 28:4, 55:11, 62:8, 115:10
**reads** [1] - 93:16
**Ready** [1] - 64:18
**really** [16] - 24:2, 29:10, 31:23, 46:1, 52:20, 53:17, 83:25, 84:2, 84:14, 86:24, 87:7, 95:19, 98:10, 118:8, 124:7, 124:8
**Really** [1] - 28:1
**reason** [7] - 28:12, 34:17, 69:10, 77:24, 95:14, 96:3, 111:23
**Reason.com** [1] - 55:2
**reasonable** [5] - 16:23, 17:5, 18:17, 24:7, 118:12
**reasons** [4] - 18:13, 36:6, 42:14, 54:17
**receive** [14] - 23:7, 86:2, 86:7, 88:20, 89:8, 97:12, 99:7, 99:23, 100:3, 100:5, 100:12, 107:12, 108:18, 108:20
**received** [8] - 6:11, 12:7, 12:9, 12:10, 88:25, 95:4, 100:1, 108:7
**receives** [1] - 100:11
**receiving** [1] - 89:21
**recently** [2] - 55:6
**Recess** [1] - 64:17
**recess** [1] - 71:21
**recoil** [1] - 111:2
**recollection** [15] -

17:14, 20:2, 20:5, 39:18, 40:16, 52:14, 53:1, 53:11, 53:16, 54:9, 56:8, 58:6, 59:25, 65:16, 67:22
**recommend** [1] - 112:18
**record** [3] - 9:14, 52:4, 103:16
**RECROSS** [2] - 3:6, 124:15
**recross** [2] - 71:8, 71:9
**RECROSS-EXAMINATION** [2] - 3:6, 124:15
**recruits** [1] - 108:11
**red** [1] - 105:17
**red-handled** [1] - 105:17
**redirect** [3] - 10:17, 14:18, 59:12
**Redirect** [2] - 64:10, 103:13
**REDIRECT** [4] - 3:3, 3:5, 64:21, 103:14
**reduce** [1] - 78:2
**reduces** [2] - 78:1, 78:7
**refer** [4] - 7:25, 74:1, 87:22, 102:17
**reference** [6] - 67:23, 69:20, 72:11, 119:14, 121:22, 122:17
**referencing** [1] - 45:7
**referring** [2] - 83:24, 104:6
**refers** [1] - 48:7
**refresh** [1] - 67:22
**regard** [4] - 50:14, 52:15, 120:12, 123:9
**regarding** [3] - 75:1, 104:13, 113:23
**Regarding** [1] - 75:2
**regardless** [1] - 119:3
**regards** [1] - 110:21
**regime** [1] - 92:9
**regular** [2] - 104:19, 115:3
**regularly** [1] - 76:11
**regulation** [1] - 90:19
**relate** [2] - 86:1, 86:6
**related** [5] - 28:6, 28:22, 29:12, 63:17, 63:22
**relates** [1] - 5:14
**relatively** [1] - 84:5
**relevant** [7] - 7:3, 25:14, 27:25, 28:4,

28:10, 28:19, 37:20
**reliability** [1] - 18:11
**reliable** [10] - 18:14, 18:19, 19:1, 19:19, 20:1, 56:23, 56:25, 57:2, 58:21, 67:14
**reliance** [1] - 68:5
**relied** [1] - 48:9
**relief** [1] - 5:8
**relies** [1] - 94:4
**relieved** [2] - 5:1, 5:6
**reload** [3] - 78:1, 78:7, 79:15
**reloaded** [1] - 62:13
**reloading** [3] - 75:21, 78:3, 81:6
**rely** [10] - 21:14, 22:1, 22:4, 22:8, 22:12, 22:17, 23:7, 48:11, 67:10, 68:25
**relying** [1] - 57:16
**remaining** [1] - 68:13
**remember** [10] - 103:19, 109:19, 112:19, 113:6, 113:24, 117:21, 121:23, 122:3, 122:19
**reminded** [1] - 11:19
**remove** [1] - 106:19
**repeat** [9] - 21:1, 25:5, 38:10, 41:15, 60:11, 75:10, 80:10, 86:4, 100:18
**rephrase** [1] - 86:13
**replace** [1] - 125:23
**replicate** [1] - 17:1
**report** [6] - 14:10, 60:8, 60:13, 94:10, 94:23, 95:2
**reported** [3] - 13:24, 14:3, 41:1
**REPORTER** [1] - 1:25
**reporting** [4] - 24:23, 25:6, 57:16, 95:4
**reports** [1] - 60:22
**represent** [4] - 36:5, 45:6, 76:22, 81:20
**representative** [12] - 21:11, 21:13, 22:12, 23:17, 35:15, 35:18, 35:24, 35:25, 36:1, 36:20, 37:1, 37:3
**represented** [2] - 4:24, 47:24
**request** [1] - 8:9
**require** [7] - 78:11, 88:20, 89:7, 107:4, 107:23, 108:19, 113:14

**required** [25] - 1:23, 7:25, 27:15, 47:12, 49:12, 50:4, 50:5, 50:11, 50:12, 50:15, 70:5, 88:13, 89:14, 90:1, 99:4, 99:14, 101:1, 104:19, 104:24, 105:18, 105:22, 107:1, 107:3, 107:14, 124:25
**requirement** [3] - 91:19, 94:20, 98:14
**Requirements** [1] - 93:14
**requirements** [12] - 55:21, 85:19, 98:12, 98:13, 98:17, 98:18, 98:21, 98:22, 106:5, 120:23, 124:21
**requires** [4] - 95:15, 98:25, 105:3, 106:3
**research** [2] - 39:22, 62:10
**Research** [1] - 6:10
**researched** [1] - 58:24
**residence** [1] - 34:11
**resident** [2] - 31:11, 31:12
**residents** [6] - 32:14, 32:22, 33:3, 33:5, 88:20, 89:7
**respect** [2] - 67:13, 98:20
**respected** [1] - 54:8
**responded** [1] - 102:3
**responsibility** [3] - 5:1, 118:15, 118:17
**rest** [1] - 5:6
**restrict** [2] - 29:10, 29:16
**restricted** [2] - 28:25, 29:3
**restricting** [1] - 34:2
**restrictions** [2] - 67:7, 92:15
**result** [1] - 70:8
**resulted** [1] - 40:25
**results** [19] - 18:16, 27:18, 27:22, 27:25, 28:9, 28:18, 28:19, 28:25, 29:4, 29:17, 32:23, 33:4, 33:7, 34:2, 34:6, 35:13, 36:7, 37:14, 125:3
**retired** [2] - 87:2, 101:3
**return** [2] - 28:18, 125:16
**returned** [1] - 37:11

**reveal** [1] - 65:11
**review** [3] - 65:2, 94:4, 124:8
**reviewed** [3] - 46:9, 93:10, 94:2
**reviewing** [11] - 19:23, 40:3, 51:7, 51:12, 55:4, 67:24, 68:18, 70:2, 94:7, 96:18, 101:16
**reviews** [1] - 115:7
**rid** [2] - 125:23, 126:4
**ride** [1] - 81:23
**RIFLE** [1] - 1:4
**rifle** [2] - 100:8, 109:17
**Rifle** [1] - 4:2
**Rifleman** [1] - 114:25
**rifles** [4] - 109:15, 109:16, 119:15, 119:17
**rights** [1] - 12:23
**Rodman's** [1] - 122:7
**roles** [1] - 110:8
**room** [3] - 24:3, 24:7, 66:15
**round** [2] - 76:24, 112:9
**rounds** [50] - 14:6, 14:25, 15:21, 60:10, 60:14, 60:18, 60:24, 61:5, 62:15, 62:21, 63:12, 63:13, 63:16, 72:18, 72:19, 73:1, 73:16, 73:18, 74:2, 77:22, 79:3, 81:6, 83:19, 84:7, 88:11, 88:15, 88:21, 89:1, 89:5, 89:9, 103:1, 103:5, 104:5, 106:2, 111:7, 111:21, 112:7, 112:12, 115:25, 116:3, 120:13, 121:6, 122:2, 122:8, 122:13, 122:16, 122:17, 122:22, 125:13
**routinely** [3] - 22:12, 22:14, 22:17
**rule** [1] - 71:10
**rules** [3] - 17:23, 101:11, 110:18
**ruling** [1] - 8:8
**running** [1] - 66:20
**runs** [2] - 105:25, 106:2

## S

S-t-a-n-t-o-n [1] - 72:7
**safe** [6] - 103:19, 103:21, 103:22, 104:8, 106:13, 106:24
**Safe** [1] - 104:1
**safely** [14] - 72:16, 72:17, 72:18, 72:22, 72:25, 73:3, 73:15, 73:17, 73:18, 96:7, 96:8, 101:3, 102:23, 116:3
**Safely** [1] - 73:2
**safer** [1] - 104:15
**safety** [8] - 73:22, 73:24, 96:10, 101:5, 102:19, 104:13, 110:20, 118:18
**sample** [11] - 22:2, 22:9, 22:16, 23:8, 23:17, 23:24, 24:3, 24:7, 24:10, 37:3, 37:17
**sampling** [1] - 23:18
**San** [5] - 52:19, 52:24, 53:21, 67:25, 68:1
**save** [1] - 5:4
**saw** [2] - 93:11, 94:3
**Schmutter** [2] - 4:6, 4:8
**SCHMUTTER** [2] - 2:4, 4:5
**School** [4] - 52:18, 52:19, 52:24, 53:22
**scientific** [7] - 22:6, 22:11, 22:15, 22:16, 23:25, 24:2, 36:8
**scientifically** [4] - 20:20, 22:18, 35:15, 35:17
**scope** [1] - 121:10
**scores** [1] - 98:23
**screen** [5] - 19:6, 43:2, 44:12, 46:20, 46:21
**search** [24] - 25:24, 25:25, 27:15, 27:25, 28:5, 28:8, 28:20, 28:25, 29:4, 29:17, 31:23, 32:5, 32:15, 32:23, 33:4, 33:7, 34:1, 34:2, 36:6, 36:15, 37:10, 37:14, 40:14, 40:16
**searches** [2] - 31:25
**searching** [1] - 31:3
**seated** [1] - 72:5

**Second** [1] - 12:23
**second** [17] - 26:8, 27:12, 28:24, 29:3, 29:14, 29:16, 31:10, 32:15, 34:1, 43:25, 44:5, 44:13, 65:6, 69:20, 74:8, 96:23
**seconds** [3] - 62:24, 74:12, 74:21
**Section** [2] - 1:23, 93:20
**section** [2] - 51:14, 93:14
**secure** [2] - 80:7, 80:11
**security** [1] - 108:23
**see** [28] - 16:16, 24:14, 28:6, 33:9, 34:6, 34:8, 35:12, 36:5, 37:20, 39:6, 44:12, 48:3, 49:17, 51:17, 56:5, 56:13, 59:4, 59:22, 60:2, 70:7, 71:10, 93:19, 98:14, 101:18, 111:15, 123:11, 125:3, 126:19
**seeing** [2] - 35:5, 66:14
**seek** [2] - 89:20, 89:25
**seeking** [1] - 110:15
**seem** [3] - 36:21, 51:15, 87:8
**selected** [2] - 42:14, 54:17
**self** [31] - 12:23, 14:6, 14:11, 14:25, 15:3, 15:13, 15:16, 15:19, 15:21, 15:25, 31:12, 32:13, 32:21, 33:13, 33:16, 33:21, 37:21, 65:8, 65:23, 78:11, 83:3, 83:8, 83:21, 83:22, 84:11, 112:1, 112:11, 112:15, 112:18, 113:6, 122:19
**self-defense** [29] - 14:6, 14:11, 14:25, 15:3, 15:13, 15:16, 15:19, 15:21, 15:25, 31:12, 32:13, 32:21, 33:13, 33:16, 33:21, 37:21, 65:23, 78:11, 83:3, 83:8, 83:21, 83:22, 84:11, 112:1, 112:11, 112:15, 112:18, 113:6, 122:19
**self-defensive** [1] -

65:8
**sell** [3] - 82:7, 120:20, 122:23
**sells** [1] - 82:4
**semi** [3] - 111:2, 111:4, 112:5
**semi-automatic** [3] - 111:2, 111:4, 112:5
**sense** [12] - 32:10, 36:23, 46:2, 46:19, 46:24, 47:2, 72:24, 74:4, 74:5, 84:2, 85:23
**sentence** [2] - 25:3, 78:5
**sentences** [2] - 55:9, 55:15
**separate** [1] - 65:3
**service** [3] - 24:23, 25:6, 108:14
**Services** [2] - 93:4, 94:12
**set** [11] - 20:23, 21:2, 25:14, 28:4, 28:11, 29:11, 29:14, 42:16, 54:19, 70:13, 70:14
**seven** [3] - 37:16, 113:2
**several** [8] - 30:17, 30:20, 67:6, 97:2, 111:19, 115:16, 125:11, 125:12
**share** [1] - 122:3
**sheet** [1] - 107:18
**SHERIDAN** [1] - 1:15
**shifting** [1] - 91:13
**shoes** [1] - 84:2
**shoot** [4] - 26:5, 83:11, 98:15, 104:25
**shooter** [21] - 43:20, 44:2, 44:7, 44:14, 44:17, 44:25, 45:19, 46:3, 46:4, 47:1, 48:25, 49:7, 52:16, 52:25, 53:14, 53:18, 54:10, 57:8, 62:19, 70:6, 74:12
**shooters** [7] - 52:18, 61:5, 62:12, 62:14, 62:16, 62:18, 62:20
**shooting** [27] - 41:24, 42:3, 42:6, 42:9, 43:20, 43:23, 45:18, 46:17, 47:12, 48:23, 49:6, 49:8, 49:13, 50:4, 50:16, 54:1, 54:2, 54:4, 54:19, 57:5, 63:18, 70:9, 89:3, 100:4, 106:5, 120:6, 125:3

**Shooting** [2] - 51:5, 51:19
**shootings** [25] - 41:5, 41:7, 41:16, 42:17, 43:3, 43:13, 44:6, 47:3, 49:18, 51:17, 52:24, 53:6, 55:22, 56:3, 56:6, 56:14, 57:14, 60:9, 60:13, 60:18, 62:10, 65:9, 69:25, 70:5, 70:13
**Shootings** [5] - 42:21, 45:8, 50:21, 51:18, 55:1
**ShootingTracker. com** [1] - 69:7
**shortening** [1] - 28:8
**shot** [4] - 26:5, 66:23, 99:1, 112:4
**shotgun** [2] - 97:17, 112:23
**shots** [12] - 13:12, 13:21, 15:13, 38:5, 38:7, 38:11, 39:7, 40:24, 60:22, 64:24, 77:18
**show** [6] - 27:18, 40:8, 55:21, 60:17, 66:10, 105:19
**showed** [4] - 27:21, 46:7, 46:17, 47:15
**Showell** [3] - 4:14, 9:7, 64:20
**SHOWELL** [24] - 2:12, 3:3, 4:14, 4:21, 5:24, 7:5, 8:22, 9:1, 9:8, 9:11, 9:22, 9:24, 10:4, 10:18, 21:17, 30:11, 30:13, 64:13, 64:19, 64:21, 69:18, 126:15, 126:17, 126:21
**shower** [1] - 66:21
**showing** [2] - 5:6, 47:18
**shows** [5] - 14:5, 14:24, 15:19, 19:12, 21:22
**Sig** [1] - 112:8
**sight** [1] - 109:15
**sighting** [1] - 109:15
**significant** [4] - 56:18, 62:21, 108:10, 124:8
**significantly** [1] - 55:19
**similar** [8] - 17:2, 18:15, 18:16, 29:12, 46:16, 67:6, 91:22, 95:8
**simple** [1] - 8:4

**simply** [5] - 14:15, 14:23, 62:23, 86:21, 87:13
**simulated** [1] - 105:11
**single** [3] - 52:16, 62:18, 84:6
**sit** [2] - 9:16, 82:3
**site** [2] - 51:24, 52:1
**sites** [2] - 51:15, 51:22
**sitting** [2] - 56:11, 56:12
**situation** [3] - 78:14, 110:1, 110:3
**situations** [2] - 77:15, 78:11
**six** [4] - 62:17, 62:20, 98:4, 112:7
**size** [16] - 74:24, 75:13, 84:1, 84:3, 84:10, 84:12, 100:16, 100:21, 113:10, 113:12, 113:17, 113:20, 119:3, 120:10, 120:16, 121:3
**skip** [1] - 58:23
**slide** [2] - 106:20, 111:3
**slide-down** [1] - 106:20
**slow** [1] - 24:11
**slowest** [1] - 24:8
**small** [8] - 50:22, 82:20, 84:5, 87:3, 100:25, 102:20, 114:12, 120:1
**smaller** [1] - 113:20
**Smith** [1] - 112:4
**so-called** [1] - 119:21
**sociology** [1] - 12:10
**someone** [17] - 24:6, 30:4, 30:5, 34:19, 34:20, 34:24, 35:2, 66:22, 66:25, 70:25, 75:16, 75:23, 81:9, 83:7, 83:13, 83:25, 118:4
**Someone** [2] - 81:21, 84:9
**sometime** [1] - 4:23
**sometimes** [7] - 22:9, 23:7, 30:1, 50:3, 50:5, 50:10, 50:12
**Somewhat** [1] - 91:18
**somewhat** [8] - 15:4, 15:14, 15:24, 25:24, 46:11, 46:13, 47:17, 70:14
**Sorry** [1] - 94:21
**sorry** [14] - 16:14,

20:25, 55:11, 61:23, 68:19, 75:6, 80:10, 86:4, 94:19, 94:21, 100:18, 102:6, 115:3, 123:15

**sort** [4] - 17:15, 22:2, 22:3, 40:10

**sorts** [3] - 12:1, 31:25, 66:6

**sound** [4] - 56:25, 58:19, 58:20

**sounded** [1] - 66:19

**sounds** [3] - 52:20, 57:2, 60:1

**source** [5] - 38:22, 40:10, 40:15, 58:21, 67:14

**sources** [17] - 24:25, 25:8, 38:17, 38:18, 38:20, 38:23, 41:6, 41:16, 41:21, 42:15, 51:10, 51:20, 51:21, 52:6, 52:22, 54:18, 56:16

**spacing** [1] - 52:2

**spare** [1] - 79:11

**speaking** [2] - 80:5, 124:16

**special** [1] - 88:13

**specialty** [1] - 98:9

**specific** [6] - 20:2, 67:20, 97:14, 98:17, 108:19, 108:22

**specifically** [6] - 67:16, 84:16, 97:16, 97:19, 99:17, 113:10

**specifics** [1] - 14:14

**speeches** [1] - 18:3

**speedsters** [1] - 24:9

**spell** [2] - 9:17, 72:6

**spend** [2] - 53:7, 56:7

**spending** [1] - 35:22

**spent** [4] - 31:24, 37:7, 56:13, 56:16

**spiral** [1] - 73:6

**spoken** [1] - 18:12

**spouse** [1] - 34:18

**Springfield** [1] - 112:4

**stack** [1] - 84:6

**stacked** [2] - 83:18, 83:23

**stage** [1] - 124:9

**stand** [1] - 71:25

**standard** [36] - 7:9, 8:14, 17:12, 22:1, 74:1, 76:18, 76:20, 77:24, 79:17, 79:22, 81:20, 81:22, 82:4, 82:23, 83:2, 85:15, 85:20, 87:9, 87:24,

88:8, 88:14, 89:21, 95:9, 95:16, 95:18, 95:22, 95:24, 96:9, 97:6, 99:24, 100:1, 100:3, 101:4, 102:18, 107:15, 110:23

**standards** [1] - 119:24

**standing** [1] - 24:1

**stands** [1] - 59:16

**Stanton** [12] - 71:14, 71:24, 71:25, 72:5, 72:15, 73:5, 73:12, 75:6, 87:21, 103:15, 103:18, 124:16

**STANTON** [8] - 3:4, 3:4, 3:5, 3:6, 72:4, 72:14, 103:14, 124:15

**Stanton's** [2] - 123:18, 123:21

**start** [7] - 4:3, 8:19, 11:5, 12:16, 27:1, 27:6, 58:12

**started** [1] - 48:21

**starting** [3] - 43:19, 101:25, 124:3

**Starting** [2] - 49:5, 73:9

**STATE** [2] - 1:11, 2:14

**State** [29] - 4:16, 5:15, 5:19, 5:24, 6:21, 7:21, 7:23, 8:24, 9:8, 9:14, 65:21, 67:18, 69:1, 76:21, 84:21, 85:6, 90:5, 91:4, 91:8, 94:16, 105:1, 105:2, 106:25, 109:12, 116:20, 119:18, 120:24, 122:24, 126:14

**state** [35] - 13:11, 74:11, 76:21, 76:23, 78:5, 81:11, 81:18, 82:10, 82:13, 84:20, 84:23, 86:10, 86:21, 86:24, 87:1, 87:6, 90:8, 90:15, 90:17, 90:22, 91:10, 91:23, 92:8, 92:14, 92:17, 92:23, 95:1, 95:4, 105:22, 107:21, 107:22, 117:3, 118:2, 120:21, 125:21

**State's** [2] - 7:11, 7:15

**states** [6] - 63:10, 65:24, 67:19, 92:18, 92:24, 95:3

**STATES** [1] - 1:1

**States** [1] - 97:18

**statewide** [1] - 95:3

**station** [7] - 23:15, 23:16, 23:18, 23:22, 23:23, 24:15, 35:9

**statistics** [2] - 12:1, 94:25

**statute** [5] - 7:12, 7:13, 7:22, 50:8, 111:17

**steal** [2] - 116:18, 117:11

**steel** [1] - 111:3

**step** [5] - 25:10, 64:16, 71:5, 86:15, 126:7

**still** [7] - 18:22, 39:13, 39:16, 56:23, 59:20, 99:4, 107:23

**stolen** [2] - 57:21, 117:16

**storage** [1] - 106:13

**store** [3] - 72:16, 82:3, 96:7

**stored** [1] - 106:23

**stores** [1] - 82:6

**stories** [35] - 12:20, 14:10, 14:12, 14:13, 14:15, 20:16, 20:23, 21:3, 21:6, 27:25, 28:2, 28:4, 29:12, 29:13, 34:15, 34:25, 35:1, 35:6, 36:8, 36:11, 36:15, 36:17, 36:20, 36:22, 37:4, 37:11, 37:16, 37:17, 37:19, 37:22, 39:9, 40:7, 40:17, 66:10

**story** [11] - 27:17, 27:18, 38:15, 38:16, 38:21, 40:8, 40:15, 66:12, 66:15, 102:24

**straightforwardly** [1] - 28:17

**strange** [1] - 52:2

**straper** [1] - 111:4

**strategies** [1] - 11:13

**strategy** [1] - 11:14

**straw** [5] - 57:24, 58:2, 58:4, 58:5, 58:8

**street** [1] - 13:12

**STREET** [1] - 1:11

**stressful** [2] - 77:15, 78:14

**strike** [2] - 123:20, 124:9

**strong** [1] - 59:2

**STUART** [1] - 2:12

**Stuart** [2] - 4:18, 103:17

**studies** [1] - 11:9

**study** [11] - 18:11, 18:15, 19:12, 22:11, 22:17, 22:19, 36:8, 85:18, 92:7, 92:23, 118:2

**sub** [1] - 87:20

**subdue** [1] - 110:13

**submitted** [4] - 12:14, 61:20, 62:3, 69:19

**subset** [2] - 21:5, 33:5

**sufficient** [1] - 23:3

**Sunnyvale** [1] - 68:14

**super** [1] - 109:6

**Superintendent** [1] - 4:16

**supplemental** [8] - 74:7, 85:10, 85:12, 87:22, 92:6, 96:22, 97:1, 97:15

**supplying** [1] - 98:5

**support** [3] - 61:20, 62:4, 98:5

**suppose** [2] - 5:20, 11:22

**supposed** [1] - 111:16

**suppress** [1] - 34:3

**switch** [1] - 50:6

**switched** [1] - 62:23

**sworn** [3] - 9:13, 72:4, 97:23

**system** [5] - 95:8, 95:15, 96:4, 99:2, 106:4

**systematically** [1] - 34:16

**systemic** [2] - 54:14, 118:2

## T

**tab** [7] - 54:22, 61:24, 74:8, 77:9, 93:1, 94:9, 94:22

**table** [1] - 49:11

**tabs** [1] - 51:3

**tabulated** [1] - 13:10

**tabulation** [1] - 13:19

**tactic** [1] - 123:10

**tactics** [5] - 100:24, 104:14, 105:8, 105:9, 105:14

**target** [2] - 99:2, 120:6

**taught** [1] - 11:21

**teach** [3] - 75:16, 106:14

**teaching** [5] - 11:12, 11:16, 11:17, 11:22, 12:2

**television** [3] - 38:15,

38:16, 66:12

**tend** [10] - 29:21, 30:9, 30:16, 30:25, 31:2, 31:4, 31:5, 31:13, 34:3, 36:11

**term** [8] - 7:9, 7:12, 7:13, 7:17, 7:22, 61:10, 74:1, 74:4

**terminology** [1] - 29:15

**terms** [14] - 17:15, 19:25, 22:3, 25:25, 32:16, 34:1, 35:18, 35:24, 36:9, 36:10, 70:9, 111:5, 118:24, 122:13

**test** [1] - 33:9

**testable** [1] - 32:18

**tested** [3] - 33:1, 33:8, 105:18

**testified** [7] - 38:3, 40:22, 45:25, 46:2, 54:16, 113:21, 117:2

**testifying** [1] - 70:18

**testimony** [18] - 7:8, 8:18, 10:10, 10:11, 10:13, 18:22, 21:18, 32:12, 39:13, 39:16, 40:1, 40:3, 45:23, 59:20, 59:22, 107:9, 124:9, 124:12

**Texas** [1] - 7:24

**themselves** [11] - 26:4, 29:24, 30:4, 31:4, 35:2, 36:13, 36:19, 67:2, 77:5, 78:10, 79:14, 87:13, 90:20, 105:17, 115:9

**Themselves** [1] - 77:7

**theory** [1] - 11:14

**therefore** [5] - 15:18, 79:2, 79:13, 87:4, 106:20

**they've** [9] - 29:25, 47:4, 47:19, 47:21, 54:12, 57:9, 57:10, 109:8, 120:24

**They've** [1] - 50:17

**thinking** [1] - 37:7

**thinks** [1] - 14:18

**Thins** [1] - 62:2

**third** [5] - 27:9, 28:23, 28:24, 69:23, 93:16

**THOMPSON** [20] - 2:7, 4:9, 5:13, 6:6, 6:15, 6:18, 7:1, 7:19, 8:15, 8:21, 9:5, 10:2, 10:6, 10:20, 71:14, 71:19, 71:23, 72:1, 126:11, 126:20

**Thompson** [4] - 4:10, 5:13, 7:18, 9:4
**thoroughness** [1] - 17:16
**thoughtful** [2] - 54:6, 54:7
**threat** [4] - 96:10, 101:4, 101:6, 102:19
**Three** [1] - 122:17
**three** [24] - 27:16, 43:21, 47:13, 49:7, 49:14, 49:19, 49:22, 49:24, 50:3, 50:10, 51:10, 51:17, 51:19, 51:22, 52:4, 52:6, 52:9, 52:11, 52:18, 52:22, 53:21, 68:8, 112:10, 122:15
**thumb** [4] - 5:18, 6:17, 6:19, 6:22
**Thursday** [3] - 126:13, 126:18, 126:19
**timeframe** [1] - 122:15
**Title** [1] - 1:23
**titled** [4] - 42:21, 50:20, 51:4, 93:14
**today** [17] - 18:22, 23:19, 23:21, 39:13, 39:16, 40:1, 45:23, 46:2, 59:20, 71:11, 74:4, 98:22, 98:25, 116:25, 126:7, 126:12, 126:15
**today's** [1] - 5:6
**together** [1] - 37:4
**took** [7] - 23:16, 24:5, 38:4, 40:23, 43:8, 43:14, 55:23
**total** [4] - 94:18, 95:3, 102:21, 112:8
**totality** [1] - 88:3
**tough** [1] - 92:14
**townhouse** [1] - 27:10
**train** [15] - 23:14, 23:16, 23:18, 23:21, 23:23, 24:14, 35:9, 81:2, 81:6, 85:14, 88:3, 90:19, 90:24, 95:9, 99:12
**trained** [12] - 96:8, 97:3, 97:6, 97:16, 97:19, 101:14, 101:21, 107:25, 108:5, 108:9, 116:4, 118:18
**trainers** [1] - 118:25
**training** [129] - 11:24, 12:1, 72:16, 74:16, 74:19, 74:23, 74:24, 74:25, 75:2, 75:11,

75:12, 75:13, 79:8, 84:18, 85:19, 86:2, 86:3, 86:7, 86:8, 86:9, 86:11, 86:12, 86:16, 86:23, 86:25, 87:4, 87:23, 88:8, 88:9, 88:11, 88:13, 88:20, 88:25, 89:8, 89:14, 89:16, 89:19, 89:21, 89:25, 90:4, 90:11, 90:15, 90:17, 91:6, 91:7, 91:9, 91:13, 91:19, 91:21, 91:24, 92:1, 92:6, 92:9, 92:24, 93:17, 93:18, 94:5, 95:16, 95:19, 95:23, 95:25, 96:3, 96:6, 96:16, 96:17, 96:21, 97:3, 97:9, 97:12, 97:14, 97:20, 98:8, 98:11, 99:7, 99:14, 99:24, 99:25, 100:3, 100:5, 100:8, 100:11, 100:12, 100:15, 100:20, 102:17, 104:7, 104:12, 104:13, 104:17, 104:18, 104:22, 104:24, 105:3, 105:4, 105:5, 105:8, 105:9, 105:13, 105:16, 106:13, 107:2, 107:3, 107:5, 107:12, 107:15, 107:18, 107:20, 107:23, 108:6, 108:17, 108:21, 109:2, 109:8, 109:12, 109:16, 109:17, 117:20, 118:6, 118:8, 119:2, 119:11, 123:9, 123:10, 124:1, 124:18, 124:19, 124:24
**transcript** [11] - 6:11, 11:1, 18:7, 38:25, 45:4, 45:12, 58:10, 73:6, 78:21, 81:14, 101:25
**Trenton** [1] - 81:22
**TRENTON** [1] - 1:12
**trial** [2] - 7:1, 25:10
**tried** [1] - 104:22
**trigger** [8] - 75:17, 75:20, 75:25, 98:2, 98:4, 106:21, 106:22
**trouble** [1] - 15:22
**true** [8] - 1:23, 20:14,

32:17, 32:18, 32:19, 42:13, 68:6, 91:12
**Truth** [1] - 55:1
**try** [4] - 22:24, 53:16, 102:14, 115:21
**trying** [20] - 15:1, 15:8, 17:21, 23:1, 23:13, 25:11, 25:12, 27:24, 28:1, 28:3, 28:14, 29:16, 30:4, 35:21, 35:23, 53:8, 54:1, 54:4, 110:13, 117:24
**turn** [24] - 12:13, 16:4, 18:6, 19:5, 38:24, 41:4, 42:19, 42:24, 45:3, 50:19, 51:2, 54:22, 58:9, 61:8, 61:18, 62:6, 67:21, 93:1, 93:12, 93:25, 94:9, 94:22, 95:2, 123:16
**twice** [1] - 105:22
**two** [31] - 14:8, 14:13, 15:12, 27:20, 33:5, 38:6, 39:7, 40:4, 40:11, 41:6, 41:15, 41:21, 47:10, 51:3, 52:18, 55:9, 55:15, 62:24, 64:23, 65:2, 66:7, 66:11, 66:25, 68:13, 74:20, 82:2, 103:24, 118:22
**type** [10] - 35:6, 83:7, 90:18, 90:20, 91:21, 94:13, 95:25, 104:18, 106:4, 108:23
**typed** [2] - 85:8, 85:11
**types** [3] - 31:17, 40:7, 66:10
**typical** [1] - 83:17
**typically** [1] - 108:18

**U**

**U.S** [7] - 1:15, 1:25, 50:20, 51:17, 55:24, 96:21, 97:2
**U.S.C** [1] - 1:23
**ultimately** [1] - 25:17
**Um-hmm** [1] - 93:6
**unborn** [2] - 7:24, 7:25
**unclear** [1] - 8:2
**Under** [2] - 89:7, 119:20
**under** [4] - 56:3, 56:22, 81:11, 81:18
**undergo** [3] - 92:1, 107:1, 107:3

**undergone** [1] - 109:9
**undergraduate** [1] - 11:6
**underreports** [1] - 55:19
**understandable** [1] - 25:25
**understood** [2] - 5:11, 32:12
**unhelpful** [1] - 42:10
**uniform** [1] - 8:3
**unique** [1] - 7:12
**unit** [1] - 97:5
**UNITED** [1] - 1:1
**United** [1] - 97:18
**units** [12] - 96:22, 97:2, 97:8, 97:10, 97:20, 108:19, 108:22, 124:17, 124:18, 124:21, 125:1, 125:2
**universe** [1] - 37:14
**Unless** [3] - 108:19, 114:7, 114:8
**unrepresentative** [3] - 21:15, 22:20, 22:25
**unscientific** [2] - 21:15, 22:13
**up** [37] - 5:6, 17:3, 19:6, 20:1, 20:3, 20:17, 27:6, 27:9, 27:12, 27:18, 27:21, 27:22, 28:7, 32:15, 32:23, 33:4, 33:6, 38:16, 40:8, 40:15, 40:17, 43:2, 46:20, 46:21, 54:3, 65:6, 86:15, 89:8, 92:17, 94:19, 99:2, 106:11, 114:23, 115:21, 115:22, 118:15, 121:14
**updated** [1] - 53:6
**updating** [1] - 65:25
**URL** [3] - 51:22, 51:24, 52:1
**uses** [2] - 29:14, 70:10
**usual** [1] - 17:23
**utilized** [1] - 67:4

**V**

**Valeria** [2] - 4:19, 85:5
**VALERIA** [1] - 2:13
**variations** [2] - 26:3, 26:17
**varied** [2] - 74:24, 75:12
**venue** [1] - 13:11

**version** [1] - 16:8
**versus** [7] - 4:2, 7:9, 68:1, 68:9, 68:14, 103:1
**vertical** [1] - 119:25
**veteran** [2] - 100:17, 100:22
**Veteran** [1] - 67:25
**victims** [3] - 62:16, 62:22, 80:16
**view** [3] - 7:15, 18:10, 18:13
**violation** [1] - 117:3
**violence** [3] - 69:7, 70:17, 70:18
**violent** [1] - 29:25
**Vs** [1] - 1:6

**W**

**Wait** [3] - 23:6, 61:9, 123:14
**wait** [5] - 73:10, 86:1, 86:6, 86:22, 123:16
**wants** [1] - 59:12
**war** [2] - 110:3, 110:14
**Warner** [2] - 16:22, 18:25
**Warner's** [1] - 18:11
**wartime** [1] - 110:3
**ways** [5] - 21:13, 23:9, 35:25, 36:4, 110:12
**weapon** [55] - 72:18, 72:23, 73:16, 74:17, 74:18, 74:25, 75:13, 75:20, 76:18, 76:22, 83:10, 83:14, 83:25, 84:15, 84:16, 88:12, 88:17, 88:18, 91:17, 92:2, 93:8, 94:15, 94:20, 101:7, 102:21, 103:5, 103:6, 104:4, 104:13, 105:11, 105:15, 106:14, 106:21, 108:24, 108:25, 111:2, 111:4, 111:5, 111:8, 111:10, 112:8, 112:19, 113:9, 113:11, 113:18, 116:13, 116:18, 119:7, 119:23, 119:25, 120:1, 120:2, 120:3
**weapons** [10] - 76:23, 77:3, 80:24, 84:2, 87:1, 95:23, 98:10, 111:19, 114:4, 120:5

**wear** [1] - 105:10
**week** [4] - 4:23, 6:9,
6:12, 54:11
**week's** [1] - 5:7
**Werner** [3] - 16:7,
16:16, 19:14
**Werner's** [1] - 19:12
**Wesson** [1] - 112:4
**Westside** [3] - 52:19,
52:24, 53:21
**whereas** [1] - 36:13
**whole** [4] - 6:25,
46:18, 46:24, 47:2
**wild** [1] - 26:19
**willy** [3] - 42:11, 57:5,
57:9
**willy-nilly** [3] - 42:11,
57:5, 57:9
**window** [1] - 66:24
**Winnicki** [1] - 4:6
**WINNICKI** [1] - 2:4
**wish** [4] - 85:20,
123:19, 123:22,
124:14
**wished** [1] - 5:4
**wit** [1] - 96:24
**withdraw** [1] - 121:15
**withdrawn** [1] - 63:8
**witness** [16] - 8:13,
8:18, 8:19, 8:24, 9:2,
9:6, 10:10, 11:3,
59:14, 71:13, 71:15,
71:22, 71:24, 72:13,
126:10, 126:12
**WITNESS** [25] - 3:1,
9:15, 9:18, 10:3,
10:5, 10:15, 15:3,
15:12, 17:21, 19:3,
21:25, 23:11, 31:2,
61:12, 64:12, 72:7,
73:13, 75:9, 80:9,
121:19, 125:9,
125:14, 125:18,
126:3, 126:8
**Witness** [12] - 19:23,
51:7, 51:12, 55:4,
67:24, 68:18, 70:2,
71:12, 94:7, 96:18,
101:16, 126:9
**witness'** [1] - 9:24
**witnesses** [6] - 7:9,
7:16, 8:10, 124:12,
126:12, 126:16
**won** [1] - 54:8
**word** [1] - 27:2
**worded** [1] - 47:25
**wording** [1] - 18:2
**words** [8] - 27:5, 27:6,
27:9, 29:7, 32:1,
40:9, 45:2, 70:20

**works** [1] - 26:25
**world** [1] - 24:8
**worried** [1] - 24:11
**worth** [1] - 91:6
**wound** [1] - 62:22
**write** [2] - 23:19, 38:16
**write-up** [1] - 38:16
**written** [3] - 38:15,
47:21, 48:19

## X

**XDS** [1] - 112:5

## Y

**Yale** [2] - 11:16, 12:3
**yard** [3] - 105:25,
106:3
**yards** [1] - 105:25
**year** [11] - 33:12,
33:15, 33:20, 50:2,
50:7, 50:9, 55:24,
88:19, 99:15, 99:16,
105:22
**years** [14] - 16:8,
37:16, 58:1, 68:22,
68:23, 76:3, 76:6,
107:24, 108:10,
108:13, 115:10,
115:16, 115:17,
115:20
**yield** [1] - 25:14
**yielded** [1] - 37:22
**York** [10] - 65:22,
67:19, 68:20, 68:25,
120:24, 122:4,
122:5, 122:6, 122:11
**yourself** [6] - 19:20,
34:14, 34:18, 34:20,
34:24, 71:2

## Z

**zone** [3] - 109:24,
110:2, 110:3