1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
2


3
    _____
4   ASSOCIATION OF NEW JERSEY
    RIFLE & PISTOL CLUBS, INC.,
5                    PLAINTIFF

6       Vs.                             CIVIL NO.
                                        18-10507 (PGS)
7   GURBIR GREWAL, et al,
                     DEFENDANTS
8   _____

9

10
                             **AUGUST 17, 2018**
11                           CLARKSON S. FISHER COURTHOUSE
                             402 EAST STATE STREET
12                           TRENTON, NEW JERSEY  08608

13

14

15  B E F O R E:        THE HONORABLE PETER G. SHERIDAN
                        U.S. DISTRICT COURT JUDGE
16                      DISTRICT OF NEW JERSEY

17

18

19

20  **PRELIMINARY INJUNCTION HEARING - DAY 3**

21

22

23                      Certified as true and correct as required
                        by Title 28, U.S.C. Section 753
24                      /S/ Francis J. Gable
                        FRANCIS J. GABLE, C.C.R.
25                      OFFICIAL U.S. REPORTER
                        (856) 889-4761


                   *United States District Court*
                   *Trenton, New Jersey*

1

2   A P P E A R A N C E S:

3

4       HARTMAN & WINNICKI, PC
        BY:  DANIEL L. SCHMUTTER, ESQUIRE
5       FOR THE PLAINTIFF

6

7       COOPER & KIRK, PLLC
        BY:  DAVID H. THOMPSON, ESQUIRE
8            JOEL ALICEA, ESQUIRE
             DAVIS COOPER, ESQUIRE
9       FOR THE PLAINTIFF

10

11      OFFICE OF THE ATTORNEY GENERAL
        BY:  EVAN A. SHOWELL, ESQUIRE
12           BRYAN E. LUCAS, ESQUIRE
             VALERIA DOMINGUEZ, ESQUIRE
13      ASSISTANTS ATTORNEY GENERAL
        FOR THE STATE DEFENDANTS
14

15

16

17

18

19

20

21

22

23

24

25

1                          WITNESS

2   GARY KLECK                                          262
    CROSS-EXAMINATION OF GARY KLECK BY MR. SHOWELL      262
3   REDIRECT EXAMINATION OF GARY KLECK BY MR.           345
    THOMPSON
4   RECROSS-EXAMINATION OF GARY KLECK BY MR. SHOWELL    378

5

6

7                          EXHIBITS

8   Plaintiff's Exhibit 50, 83 & 84 were marked into    260
    evidence
9   Defendant's Exhibit 115, 116 & 117 were marked      261
    into evidence
10  Defendants' Exhibit 118 was marked into evidence    327
    Plaintiff's Exhibits 85, 86 & 87 were marked into   385
11  evidence
    Defendants' Exhibit 118 was marked into evidence    385
12  Defendants' Exhibit 119 was marked into evidence    385

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Next witness?

2            MR. THOMPSON:  Your Honor, we have just a couple of

3    quick evidentiary points to put on the record if we may.

4            THE COURT:  You may.

00:00      5            MR. THOMPSON:  We have -- number one, we have now

6    the hard copy of PX-50, and we also have a hard copy stickered

7    of PX-83 and 84 that were admitted into evidence yesterday.

8    So with the Court's permission I will give them to the Court's

9    law clerk.

00:00     10            THE COURT:  Can you just identify what each one was?

11            MR. THOMPSON:  Sure, yes, your Honor.  So PX-50 is

12   Firearm Related Violence; and then PX-83 is the Gallup poll

13   that was the subject of discussion yesterday; and then we've

14   got PX-84, which is a study by Dr. Fox entitled the Tenuous

00:00     15   Connections Involving Mass Shootings, Mental Illness and Gun

16   Laws.

17            THE COURT:  All right.  Mr. Showell, do you object

18   to the admission of those documents?

19            MR. SHOWELL:  I do not.

00:01     20            THE COURT:  All right.  So PX-50, 83 and 84 are

21   admitted.

22            MR. THOMPSON:  Yes, your Honor.

23            (Plaintiff's Exhibit 50, 83 & 84 were marked into

24   evidence.)

00:01     25            MR. THOMPSON:  And then Mr. Showell has some

1   documents, FBI report, the USA Today report, and I'd like to

2   say on the record we have no objection to that coming in

3   because these are legislative facts, and we believe the

4   parties and the Court are permitted to cite to anything at any

5   time.

6           THE COURT:  All right.  Do you wish to place those

7   in evidence, Mr. Showell?

8           MR. SHOWELL:  Thank you, your Honor, yes, I would.

9   The defense offers what's been marked as DX-115, which is a

10  USA Today piece entitled FBI: More Active Shooting Incidents

11  in 2017 Than Any Other Year Recorded; DX-116, which is an

12  article relating to active shooting incidents in the United

13  States in 2014 and '15, and I believe that's an FBI related

14  document; and then DX-117, which is an FBI report as of April,

15  2018, entitled Active Shooter Incidents in the United States

16  in 2016 and 2017.  I'd like to move those into evidence, your

17  Honor.

18          THE COURT:  No objection; right, Mr. Thompson?

19          MR. THOMPSON:  No objection, your Honor.

20          THE COURT:  All right.  So they're admitted, 115,

21  116 and 117.

22          (Defendant's Exhibit 115, 116 & 117 were marked into

23  evidence.)

24          THE COURT:  Next witness?

25          MR. THOMPSON:  Professor Kleck will take the stand,

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1   your Honor.

2              (GARY KLECK), sworn.

3              THE DEPUTY CLERK:  State your name for the record.

4              THE WITNESS:  Gary Kleck.

00:03   5      THE COURT:  You may be seated, Mr. Kleck.  Would you

6   once you are seated just spell your last name for us?

7              THE WITNESS:  K-l-e-c-k.

8              THE COURT:  Thank you.

9              MR. SHOWELL:  Your Honor, just as a housekeeping

00:03   10  matter, I've got some binders I'd like to distribute.

11             THE COURT:  Sure.

12             (Handing to Court and witness.)

13  (CROSS-EXAMINATION OF GARY KLECK BY MR. SHOWELL:)

14  Q.   Good morning, Professor Kleck.

00:05   15  A.   Good morning.

16  Q.   You're familiar with the New Jersey law banning large

17  capacity magazines that is the subject of plaintiff's legal

18  challenge in this case; correct?

19  A.   Yes.

00:05   20  Q.   That law, which I will refer to as A2761, the assembly

21  bill number, does not limit an otherwise qualified

22  individual's ability to own a firearm -- and when I say

23  otherwise qualified individual, I mean someone who isn't a

24  convicted felon for example -- does it?

00:05   25  A.   That's correct.

Kleck - Direct - Showell

1   Q.   So, consistent with your understanding, if I were

2   otherwise legally qualified to own a firearm in New Jersey,

3   before the passage of A2761, there's nothing in that law that

4   prohibits me from owning a firearm after the passage of A2761;

00:06   5   is that right?

6   A.   Yes.

7   Q.   A2761 likewise does not prevent a private citizen in New

8   Jersey from purchasing legal ammunition; isn't that right?

9   A.   Yes.

00:06   10   Q.   And A2761 does not limit the amount of legal ammunition a

11   private individual may purchase; is that right?

12   A.   Yes.

13   Q.   A2761 also does not limit the number of ammunition

14   magazines capable of holding 10 or fewer rounds that a private

00:06   15   individual may own; is that correct?

16   A.   Yes.

17   Q.   Nor does A2761 limit the type of magazine a private

18   individual may own.  And when I say type of magazine, I mean

19   the statute doesn't limit my choice to purchase, for example,

00:06   20   a box-type magazine or a drum-style magazine or a coil-type

21   magazine; is that correct?

22   A.   Yes.

23   Q.   And that's provided that whatever magazine I choose

24   doesn't have a capacity in excess of 10 rounds; isn't that

00:07   25   right?

Kleck - Direct - Showell

1    A.    Yes.

2    Q.    And A2761 likewise does not prohibit private citizens

3    from using a firearm capable of firing as many as 11 rounds

4    without reloading for self-defense in the home; is that

5    correct?

00:07

6    A.    Yes.

7    Q.    And when I say 11 rounds, that's because some firearms

8    may permit the user to chamber one round while still also

9    having 10 rounds in the magazine for a total of 11; is that

10   correct?

00:07

11   A.    Yes.

12   Q.    Nor, does A2761 regulate the type of otherwise lawful

13   firearm an individual may employ in the home for self-defense;

14   is that right?

15   A.    Yes.

00:07

16   Q.    And am I correct that it's your understanding that prior

17   to the passage of A2161, firearms ammunition magazines with a

18   capacity of 15 rounds or fewer were lawful to possess in New

19   Jersey?

20   A.    That is my understanding.

00:08

21   Q.    You were an expert witness for the plaintiffs in the

22   Duncan v. Becerra case in the Federal District in California;

23   isn't that correct?

24   A.    Yes.

25   Q.    I will represent to you that your reply declaration in

00:08

Kleck - Direct - Showell

1   Duncan was submitted to this Court on plaintiff's preliminary

2   injunction application in this case as part of plaintiff's

3   reply papers.  Take a look at tab 2 in the binder that I have

4   placed before you, and I'm just going to ask you, is that your

00:08   5   reply declaration from the Duncan case?

6   A.   Tab 10?

7   Q.   Tab 2.

8   A.   2; sorry.

9        Yes, this looks like my supplementary declaration.

00:09   10   Q.   And if you turn to page 27 of tab 2, bearing your

11   signature line at the bottom right, did you sign that

12   declaration in Duncan on or about June 9th, 2017?

13   A.   I couldn't swear to the date; yeah, if you say about

14   loosely, yeah, it says June 9th, 2017, so I'm assuming that's

00:10   15   when I signed it.

16   Q.   I'm going to direct your attention to page 12 of tab 2 to

17   your reply in Duncan.  And in particular I'm going to be

18   asking you about paragraph 28.  But as with any question I ask

19   you about a particular document, if you feel you need to look

00:10   20   at other paragraphs in the document to put your response to

21   any question in context, please feel free to do that.

22        THE COURT:  So what's the question?

23        MR. SHOWELL:  I'm getting there, Judge.

24   Q.   The general subject matter of that paragraph is mass

00:10   25   shootings incidents involving large capacity magazines; is

Kleck - Direct - Showell

1    that fair to say?

2    A.    In part, yes.

3    Q.    And you state in paragraph 28 that, "the data indicate

4    that there were at least 992 mass shootings (4 or more

00:11    5    victims) in the U.S. in 2014 through 2016 (Shootingtracker.com

6    2017), but only nine mass shootings in which an LCM was known

7    to have been used (Violence Policy Center 2017)."

8         Isn't that correct?

9    A.    That's correct.

00:11    10    Q.    And then you noted in the next sentence of paragraph 28

11    that the nine out of 992 rate of LCM involved mass shootings

12    "implied that only about 8/100ths of 1 percent of mass

13    shootings were known to involve the use of magazines with a

14    capacity exceeding 10 rounds"; but nine out of 992 is not

00:12    15    8/100ths of a percent, it's closer to 1 percent; correct?

16    A.    Okay, I'll concede it's closer to one percent.

17    Q.    Well, that's a pretty significant mathematical error,

18    isn't it?  I mean that's orders of magnitude off.

19    A.    No, it's not orders of magnitude off.  I mean 8/100ths of

00:12    20    1 percent is really really small, and so is one -- so is a

21    little under 1 percent.

22    Q.    Well, actually it's a little bit over 1 percent.

23         THE COURT:  Was that a question?

24    A.    I'll fully concede it's a little under 1 percent.  In

00:12    25    other words, the point that I made that the other side's

Kleck - Direct - Showell

1  expert was way off was absolutely correct.

2  Q.   And you performed the same careful review of your reply

3  declaration in Duncan as you did of your declaration in this

4  case, because you knew a federal judge would rely on that

00:13   5  declaration in deciding an important issue of constitutional

6  dimension; isn't that right?

7  A.   No, it wouldn't be my motivation, my motivation was I

8  always try to be as careful as I can in my research regardless

9  of how the information is going to be used.

00:13   10  Q.   But notwithstanding that care you made a significant

11  mathematical error; isn't that correct?

12  A.   No, I made a trivial mathematical error.

13  Q.   We'll agree to disagree about that.

14  A.   Okay.

00:13   15  Q.   You don't expect this Court to rely on paragraph 28 of

16  your reply declaration in Duncan in this case given the

17  obvious error in it, do you?

18  A.   Yes, I do, because the conclusion is unchallenged.  Even

19  after one takes account of the error the conclusion is

00:13   20  precisely the same and thus can be relied upon by this Court

21  or any other.

22  Q.   Let's take a moment and turn to your declaration in this

23  case which appears at tab 1 in the binder in front of you in

24  particular.  I'd like to direct your attention to paragraph 4

00:14   25  at the bottom of page 3, and it's going to carry over on to 4.

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1   And specifically I'm going to ask you about the text appearing

2   on page 4.

3        Is it fair to say that you've conducted research on

4   defensive gun use?

00:14   5   A.   Yes.

6   Q.   Would it also be fair to say that at least a portion of

7   that research involved estimating the magnitude of annual

8   defensive gun uses in the United States?

9   A.   Estimating the prevalence, yes.

00:14   10   Q.   And you stated in paragraph 4 of your declaration that

11   you estimated that in 1993, "there were approximately 2.5

12   million defensive gun uses in which victims used guns for

13   self-protection."  Is that right?

14   A.   Yes.

00:15   15   Q.   And that estimate was not confined to defensive gun uses

16   in the home, which would be a much smaller subset of that 2.5

17   million number; is that correct?

18   A.   Yes.

19   Q.   And that estimate of 2.5 million annual defensive gun

00:15   20   uses was based on a survey you designed with Professor Mark

21   Gertz, which became the foundation of your article entitled

22   Armed Resistance to Crime - The Prevalence and Nature of

23   Self-Defense With a Gun; is that correct?

24   A.   Yes.

00:15   25   Q.   The 13 or so other surveys that you reviewed in

Kleck - Direct - Showell

1    connection with your 1995 paper suggest that a range in

2    numbers of annual defensive gun uses of between 764,000 and

3    3.6 million; is that correct?

4    A.   Yes.  And I pointed out that they weren't counting the

00:15    5    same thing so you wouldn't expect the numbers to be the same.

6    Q.   And you made your 1993 estimate of defensive gun uses in

7    what was perhaps the peak year for violent crime in America in

8    the throes of the crack cocaine epidemic; is that correct?

9    A.   Yes.

00:16    10   Q.   And when I asked you in your deposition why you didn't

11   bring to the Court's attention your 2015 interview with the

12   journalist Ari Armstrong in which you estimated that then

13   current numbers of annual defensive gun uses were

14   approximately half your original 2.5 million estimate, you

00:16    15   said because the 1.2 million number was a guess for which you

16   didn't have good data; is that correct?

17   A.   It was a guess for which I had no data at all.  That's

18   why it was not an estimate, it was just a guess.  Anybody can

19   guess anything about any topic.

00:16    20   Q.   It's a fact is it not that you testified in the

21   Hickenlooper trial in Colorado that your best guess of annual

22   defensive gun uses at the time of that trial were

23   approximately 1.2 million?

24   A.   Again, stressing that it's a guess I did indeed say that,

00:17    25   yeah.

Kleck - Direct - Showell

1   Q.   So you were comfortable testifying under oath in Colorado

2   that annual defensive gun uses were approximately 1.2 million,

3   but you didn't think it was important for this Court to know

4   that, instead you were relying on 25 year old data in that

5   regard which estimated 2.5 million defensive gun uses in 1993

6   as a basis for your statement in paragraph 4 of your

7   declaration; is that right?

8   A.   I not only didn't think it was appropriate to mention it

9   in accord, I thought it would be positively irresponsible of

10  me to present a guess as if it were real evidence.  That would

11  be deceptive.

12  Q.   But you're presenting estimates in any event; correct?

13  A.   Estimates are evidence based, I mean based on the most

14  rigorous method we have available, which are survey methods;

15  using well-established procedures to get representative

16  samples of the U.S. population, and then using very thoroughly

17  vetted methods of asking people clearly worded questions

18  they'll understand.

19       Whereas a guess isn't based on anything but, you know,

20  just, you know, whatever you want to say at the moment.  And

21  in the Hickenlooper case the -- I'm sorry, in the Ari

22  Armstrong interview, the only reason I said 1.2 million was it

23  was about half as much as 2.5 million which is what my 1993

24  survey had indicated.

25       And the reason I guessed it might be half was I didn't

Kleck - Direct - Showell

1   have any real data from more recent years at that time; I do

2   now but didn't then.  And so the best foundation for a guess

3   would be to take one factor into account that would influence

4   real estimates, which is, you know, how much crime was there;

00:18      5   if there's less crime there's less occasion to use guns for

6   self-protection.

7        There was about half as much crime as that time

8   compared to 1993.  So I took a guess; well if that's the only

9   factor we're taking account of then you'd expect about half as

00:19     10   many defensive gun uses.

11   Q.   Getting back to your paper, the 1995 paper on defensive

12   gun use that was previously marked as Joint Exhibit 10, it's a

13   fact, is it not, that there are academics who have criticized

14   your estimate of 2 and a half million annual defensive gun

00:19     15   uses?

16   A.   Yes.

17   Q.   And among those academics are David Hemingway, professor

18   at Harvard; isn't that right?

19   A.   Yes.

00:19     20   Q.   And Professor Hemingway published a journal article which

21   among other things critically examined your claim of 2.5

22   million annual defensive gun uses; correct?

23   A.   Yes.

24   Q.   And in fact you and Professor Hemingway had a pretty

00:19     25   public back-and-forth in an academic journal regarding his

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1  criticisms of your 1995 paper; is that right?

2  A.  Yes.

3  Q.  And you responded to that in a journal article; correct?

4  A.  Yes, I systematically refuted every single criticism he

5  made.

6  Q.  If you can just answer the questions that I'm asking, I'd

7  appreciate it.  That would require a yes or no answer, you

8  responded --

9        THE COURT:  Mr. Showell, if you need instructions to

10  the jury that's my job.

11        MR. SHOWELL:  My apologies, your Honor.

12        THE COURT:  Next question.

13  BY MR. SHOWELL:

14  Q.  Let me direct your attention to tab 4 of the binder,

15  which is a copy of one of Professor Hemingway's articles

16  criticizing your 1995 paper.  And if you look at page 130,

17  which is the first page of that piece --

18  A.  Are you sure you mean 130?

19  Q.  I'm sorry; 1430.

20  A.  The first page.

21  Q.  Correct.  Can you just read out loud the last two

22  sentences in that first paragraph?

23  A.  The Kleck and Gertz (KG) paper has now been published, it

24  is clear however that the conclusions cannot be accepted as

25  valid.

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1   Q.   Doesn't that say it's clear that its conclusions cannot

2   be accepted as --

3   A.   Yes, that's right, its conclusions cannot be accepted as

4   valid.   What did I say?

00:21   5   Q.   Their conclusion.   You're giving credit to your

6   co-author, I appreciate that.

7        I asked you about some aspects of Professor Hemingway's

8   criticism at your August 2nd deposition; is that right?

9   A.   Could you repeat that please?

00:21   10   Q.   Sure.   I asked you about some of the aspects of Professor

11   Hemingway's criticisms at your August 2nd deposition; is that

12   correct?

13   A.   Yes, you did.

14   Q.   And among the criticisms that Hemingway levels is that

00:22   15   there's some basic methodological problems with your survey

16   techniques; is that correct?

17   A.   That's what he claims, yes.

18   Q.   And if you turn to page 1431 of the Hemingway piece, a

19   couple of paragraphs at the top of the page, and I won't read

00:22   20   both of those paragraphs, I'll try to summarize them.   One of

21   the flaws --

22        THE COURT:   I'm sorry; what page are you on?

23        MR. SHOWELL:   Just turning the next page, your

24   Honor, 1431, tab 1, it's second page of tab 4, first two

00:22   25   paragraphs at the top of the page.

Kleck - Direct - Showell

1  Q.  And in the first paragraph, one of the problems with your

2  1993 survey that Professor Hemingway identifies is something

3  called positive social desirability response; is that right?

4  A.  He does refer to that, yes.

00:22  5  Q.  And then in the next paragraph he talks about something

6  called the haystack problem, I'll call it the haystack

7  problem, and then -- I'll just read from that second

8  paragraph:  However, combined with a second aspect of the

9  survey, the attempt to estimate a very rare event it -- I'm

00:23  10  sorry; I'll withdraw that.

11        I want to start at the top of that paragraph:  Some

12  positive social desirability response bias by itself might not

13  lead to serious overestimation; however, combined with a

14  second aspect of the survey, the attempt to estimate a very

00:23  15  rare event it does.  The search for a "needle in a haystack"

16  has major methodological dangers, especially where researchers

17  try to extrapolate the findings to society as a whole.

18        Do you recall that criticism leveled against your work

19  by Professor Hemingway?

00:24  20  A.  Yes.

21  Q.  And correct me if I'm wrong, but you contend that your

22  1993 survey reflects a nationally representative sample of

23  defensive gun uses in the United States; is that correct?

24  A.  Yeah, I think that's one implication of interviewing a

00:24  25  nationally representative sample of U.S. adults, yeah.

Kleck - Direct - Showell

1    Q.   But in your survey design you intentionally overweighted

2    responses from the south and west of the country; isn't that

3    right?

4    A.   We did, we used standard research survey methods, and

5    that was compensated for by underweighting each of the cases

6    that had been given an extra large chance of being selected

7    into the sample in the first place.

8    Q.   And isn't it true that gun ownership in the United States

9    tends to be more concentrated in the south and western parts

10   of the country?

11   A.   Yes, that's why we deliberately and systematically

12   overrepresented people from those regions, because it would

13   yield a larger absolute number of people who had number one

14   owned guns and conceivably could use a gun for self-protection

15   but in fact did use a gun for self-protection; but as I say it

16   doesn't affect the estimate of frequency because we then

17   underweighted the cases we had over sampled.

18        MR. SHOWELL:  Judge, I've been pretty indulgent but

19   I really think we need to have to witness instructed to answer

20   the questions yes or no.

21        THE COURT:  The problem is your question didn't ask

22   for a yes or no; you have to him is that correct or is that

23   yes or no.  So if you leave it kind of open-ended he's going

24   to speak in paragraphs.  So you're going to have to just

25   rephrase how you're asking the questions.

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1            MR. SHOWELL:  The question ended with isn't that

2      right.

3            THE COURT:  Well, maybe that question, but I've been

4      listening to your questions, so -- but I will.

00:25  5            Professor, you're going to need to answer the

6      questions yes or no if asked in that framework; all right?

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  You may continue, Mr. Showell.

9            MR. SHOWELL:  Thank you, your Honor.

00:26  10     BY MR. SHOWELL:

11     Q.   And you also in your 1993 survey attempted to reach the

12     male head of household; isn't that correct?

13     A.   Yes.

14     Q.   Which I actually find kind of curious, because you said

00:26  15     in your deposition that it was generally your belief that

16     female respondents tended to answer survey questions more

17     honestly; isn't that right?

18     A.   No, that's not exactly what I said.  That's not the

19     reason I offered.

00:27  20     Q.   Take a look at the deposition transcript that I've placed

21     in front of you, which is up on that rail there.  And I'm just

22     going to read --

23            THE COURT:  Tell us where you are.

24            MR. SHOWELL:  We're at 199, and I'm going to pick up

00:27  25     with my question to the witness at line 19.

Kleck - Direct - Showell

1          THE COURT:  Are you there, Professor?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.

4  Q.   And I'm going to carry over on to 200.  And I asked you:

00:27   5       Q.   Okay, so let me just try and break this down then.

6          Are there other aspects of your survey which you don't

7          think produced credible results in your 1993 survey?

8       And your answer:

9          A.   Yeah, as I stated in the original article I think

00:27  10  women are more willing to talk about controversial behaviors

11  in which they've engaged, in fact they're more honest as

12  survey respondents across the board than males are.

13       Do you recall giving that testimony?

14  A.   Yes, but that passage has nothing to do with why we

00:28  15  deliberately overrepresent -- or try to overrepresent males.

16          MR. SHOWELL:  Judge, that can be gotten into on

17  redirect, I really -- that question was asked in a fashion

18  that demanded a yes or no answer and I'm not getting yes or no

19  answers from this witness.

00:28  20          THE COURT:  Go to your next question.  I'm doing my

21  best.  He said no, and then he indicated that the response

22  didn't relate to the prior question you asked.

23  Q.   I'd like to direct your attention again to tab 4,

24  Professor Hemingway's article, this time at page 1434.  One

00:29  25  aspect in which --

Kleck - Direct - Showell

1   A.   Pardon me; which page?

2   Q.   Yeah, it's 1434 at the top, the page number is in the

3   upper left-hand corner.  Just let me know when you're there.

4   A.   I'm there.

5   Q.   One of the aspects in which Professor Hemingway

6   criticized your figures regarding estimated defensive gun uses

7   was because of something he referred to as missed

8   classification; is that correct?

9   A.   Where on the page are you?

10  Q.   I'm looking at the subhead 4 entitled Misclassification

11  in Surveys Generally.

12  A.   Okay, yeah.  My answer is yes.

13  Q.   And in fact at the bottom of that page Professor

14  Hemingway states:  All surveys have problems with accuracy;

15  incorrect classifications come from a wide variety of causes

16  including misunderstanding, miscoding, misremembering,

17  misinterpretation of events, mischief or down right mendacity.

18  Some percentage of answers to virtually all survey questions

19  are incorrect.

20       Do you see that?

21  A.   Yes.

22  Q.   And misclassification can be produced by false positive

23  responses; correct?

24  A.   Yes.

25  Q.   And I don't want to put too fine a point on it, but the

Kleck - Direct - Showell

1    bottom line for Professor Hemingway was that he believed

2    because of the problems with accurately estimating the

3    occurrence of exceedingly rare events, it was possible your

4    estimate of 2.5 million annual defensive gun uses was not a

00:30    5    reasonable estimate; is that correct?

6    A.   Yes, that's what he concluded.

7    Q.   Is it fair to say that also among the critics of your

8    1995 paper on defensive gun use were Philip Cook and Jens

9    Ludwig?

00:31    10    A.   Yes.

11    Q.   And their critical journal article appeared in the

12    Journal of Quantitative Criminology in 1998 with the title

13    Defensive Gun Uses-New Evidence From a National Survey, and

14    that's at tab 3 in your binder.  And Cook and Ludwig mentioned

00:31    15    the National Crime Victimization Survey which is a nationally

16    representative in-person survey of 59,000 households conducted

17    by the Census Bureau for the U.S. Bureau of Justice

18    Statistics.  And that's from page 112 in Cook and Ludwig.

19         And would you agree with that description of the

00:32    20    National Crime Victimization Survey as set forth in Cook and

21    Ludwig at 112?

22    A.   No.

23    Q.   Let me just read you from Cook and Ludwig.  This is

24    starting on the second full paragraph -- I'm sorry.  The

00:32    25    second paragraph at the top of 112:  One data source for

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1  estimating the incidence of civilian DGU, is the National

2  Crime Victimization Survey (NCVS), a nationally representative

3  survey of 59,000 households conducted by the Census Bureau for

4  the U.S. Bureau of Justice Statistics.

00:32  5      Your own 1993 telephone survey had approximately 194

6  positive defensive gun use responses; is that correct?

7  A.   Yes.

8  Q.   And Cook and Ludwig note that the most recent NCVS survey

9  suggested annual defensive gun uses of 108,000; is that

00:33  10  correct?

11  A.   Yes, that's what they say.

12  Q.   Turn if you would to page 128 of the Cook and Ludwig

13  piece.

14      THE COURT:   What page are you turning to?

00:33  15      MR. SHOWELL:   128 at the top left, your Honor.

16  Q.   And in particular I'm going to direct your attention down

17  to the bottom of the page, Section 5.2, Conclusion.  The

18  conclusion of the Cook and Ludwig piece states:  "Survey

19  estimates for the annual number of DGUs have been offered as a

00:34  20  measure of the protective value of private gun ownership and

21  carrying, because several recent estimates from household

22  survey data suggested there are millions of DGUs each year.

23  Some have argued that widespread gun ownership and carrying

24  are effective in reducing injury from criminal victimization.

00:34  25  It is therefore important for public officials to be aware

Kleck - Direct - Showell

1    that estimates of the prevalence of DGU based on data of the

2    sort analyzed here, appear to suffer from a large positive

3    bias and greatly overstate the prevalence of DGU."

4         Did I read that correctly?

00:34    5  A.   You read it correctly.

6    Q.   And you would agree with me, would you not, that Philip

7    Cook is a source you have cited to support various

8    propositions in your own academic work?

9    A.   Not on this one, but yeah, various things, yes.

00:35   10  Q.   And you wouldn't have cited Philip Cook as a source if

11   you thought his scholarship was suspect, would you?

12   A.   Not on any one particular issue, but if I find his

13   scholarship was suspect on a particular issue such as the

14   frequency of defensive gun use, I would not rely on his

00:35   15   evidence.

16   Q.   And I asked you at your deposition whether you would

17   agree with me that there are academics and other professionals

18   who would seriously question your characterization of your

19   1993 survey as being the "best available evidence" of annual

00:35   20   rates of defensive gun use, didn't I?

21   A.   I kind of lost it in the track of the question --

22         THE COURT:  All right, so you have to rephrase.

23         MR. SHOWELL:  I'll boil it down.

24   Q.   We talked about some of the criticisms of your 1993

00:35   25   survey at your deposition; do you remember that general

Kleck - Direct - Showell

1    subject matter area?

2    A.   Yes.

3    Q.   And I suggested to you that there were several academics

4    who might seriously question your characterization of your own

00:36      5    1993 survey as being "the best available evidence" of annual

6    rates of defensive gun use, didn't I?

7    A.   Yes.

8    Q.   And you testified as to being aware of questioning by

9    David Hemenway and Philip Cook especially; isn't that correct?

00:36     10    A.   Yes.

11    Q.   And in fact you testified that, "I would say there are

12    pro-control fanatics like David Hemenway and Philip Cook who

13    would say that, but I would say there aren't any objective

14    scholars, objective and competent scholars who would say."  Do

00:36     15    you recall giving that testimony?

16    A.   I do.

17    Q.   So, just so I'm clear about your testimony, is it your

18    testimony that Philip Cook at Duke is not an objective

19    competent scholar?

00:36     20    A.   Competent when he wants to; objective, no.

21    Q.   And we established that you cited Cook as a source for

22    your 2016 Justice Research and Policy paper marked as Joint

23    Exhibit X at tab 14 in your binder, you cite Cook at page 32.

24         THE COURT:  What tab are you on?

00:37     25         MR. SHOWELL:  14, your Honor.

Kleck - Direct - Showell

1  Q.   And you cite Philip Cook as supporting authority in the

2  middle of the first paragraph -- first complete paragraph at

3  the top of 32; is that correct?

4  A.   Yes.

00:37   5  Q.   So you're willing to cite Cook when he supports your

6  position, but he's an incompetent and biased scholar when he

7  disagrees with you; did I get that right?

8  A.   No you did not.

9  Q.   Okay.  And perhaps he's especially more biased than

00:37   10  incompetent when he disagrees with you in the form of

11  criticizing scholarly work that you actually published in the

12  journal; is that right?

13  A.   No.

14  Q.   And you testified in your deposition that the follow-up

00:38   15  to your 1993 survey was taken away from you by the grants

16  administrator, and the data was handed over to Philip Cook and

17  Jens Ludwig who published the results without your name

18  appearing anywhere on the published work; isn't that right?

19  A.   Yes.

00:38   20  Q.   And you designed the survey instrument for that follow-up

21  and had done roughly 80 percent of the work when the project

22  was taken away from you; isn't that right?

23  A.   Yes.  Actually what I said was --

24          THE COURT:  Wait; you answered the question.

00:38   25          THE WITNESS:  Okay; sorry.

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1          THE COURT:  Next question.

2    Q.   And when I advised you at your deposition that other

3    professionals besides Professors Hemenway and Cook might

4    disagree with your assertion that your 1993 survey represented

00:38   5    the "best available evidence" about the annual rate of

6    defensive gun use and mentioned Ms. Allen, you testified,

7    "she's not a professional at all; in fact I know for a fact

8    she has a different opinion, stress had the word opinion, it's

9    not a professional or expert opinion, it's a personal opinion

00:39   10   based on nothing in the way of professional qualifications to

11   judge survey research."

12        Do you recall giving that testimony?

13   A.   Yes, although it was Lucy Allen, not Liz Allen.

14   Q.   I said Ms.

00:39   15   A.   Ms.?  Then I really misheard it.  But I did say that

16   about Ms. Lucy Allen.

17   Q.   Thank you.  I just want to make sure I understand your

18   objection to Ms. Allen's professional credentials.  Did you

19   review her C.V. in connection with your review of her

00:39   20   declaration in this case?

21   A.   Yes.

22   Q.   And you understood based on your review of that C.V. that

23   she has an MBA from Yale; correct?

24   A.   Yes.

00:39   25   Q.   And you also understood from that review that she has a

Kleck - Direct - Showell

 1  Master's from Yale in economics; isn't that right?

 2  A.   Yes.

 3  Q.   And you understood from your review that she has an

 4  M.Phil Degree from Yale also in economics; isn't that right?

00:40    5  A.   Yes.

 6  Q.   And you also understood from that review that Ms. Allen

 7  served two United States presidents; is that correct?

 8  A.   I don't recall that one way or another.

 9  Q.   I'll represent to you and it's displayed in Ms. Allen's

00:40   10  C.V. that she was a staff economist for George H. W. Bush's

11  Council of Economic Advisors, and I'll further represent to

12  you that she also served as a staff advisor to Bill Clinton's

13  Council of Economic Advisors.  I can show you the C.V. if you

14  would like me to.

00:40   15  A.   It doesn't matter, it's irrelevant, from my standpoint.

16  Q.   And you have no idea, do you, when providing economic

17  advice to two United States presidents whether Ms. Allen had

18  any experience dealing with survey data?

19  A.   I don't know one way or the other.

00:40   20  Q.   And you were also aware, were you not, that Ms. Allen's

21  professional experience includes a "diagnostic survey for auto

22  parts manufacturer on growth obstacles", as well as

23  participating in the president's private security survey on

24  cost control?

00:41   25  A.   Do I know that or remember that?  No, but I'll take your

Kleck - Direct - Showell

1    word for it.

2    Q.   Notwithstanding those qualifications, is it your

3    testimony that Ms. Allen is not -- it is your testimony that

4    Ms. Allen is "not a professional at all"; is that correct?

5    A.   In that context meaning talking about defensive gun use

6    surveys, yeah, that's -- that would be my position, yes.

7         MR. SHOWELL:  Judge, I really would like to get yes

8    or no answers to questions that call for yes or no --

9         THE COURT:  I think he said yes at the end.  I don't

10   understand what your problem is.  I think the professor's

11   doing fine answering the questions.

12   Q.   Professor Kleck, isn't it true that you were recently

13   able to obtain some 1996, '97 and '98 survey data relating to

14   gun usage from the Centers For Disease Control?

15   A.   Yes, defensive gun use.

16   Q.   And you actually produced a paper relating to that data;

17   isn't that right?

18   A.   Yes.

19   Q.   And you released that paper at least in an on-line

20   version; is that correct?

21   A.   Yes, several versions.

22   Q.   And I asked you about whether you had more recent

23   information relating to the numbers of annual defensive gun

24   uses than that reflected in paragraph 4 of your declaration at

25   your deposition; do you recall that?

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    And just to orient you, paragraph 4 of your declaration

2  was based on the 1993 survey research and recounted an annual

3  defensive gun use estimate of 2.5 million.  So if you need the

4  question again I'll give you the question again.

00:42  5  A.  I think the answer was yes.  Maybe I ought to hear it

6  again; I think the answer was yes.

7  Q.  Just so there's no mistake I'll reask the question.

8    THE COURT:  He can look at his declaration; right?

9    So why don't you go to paragraph 4.

00:43  10    MR. SHOWELL:  But the declaration really doesn't go

11  to the nub of the question, Judge.  What I was really focusing

12  on was that he had more recent information when I deposed him

13  than the 1993 data.

14    THE COURT:  Then you better rephrase your question.

00:43  15  BY MR. SHOWELL:

16  Q.  Would you agree with me that when I deposed you on August

17  2nd, 2018, two weeks ago that -- and I asked you whether you

18  had more recent information that I did ask you whether you had

19  more recent information about defensive gun uses than your

00:43  20  1993 survey results; do you recall me asking you that?

21  A.  No, but, you know, I'll take your word for it.  I really

22  don't recall.

23  Q.  Take a look at page 293, line 13 through 294, line 14 in

24  your deposition transcript.

00:44  25  A.  Which pages?

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    Q.   293, starting at line 13 -- actually I'm going to back up

2    to give it some context.  Just to give it appropriate context

3    I was asking you about testimony in Colorado in the

4    Hickenlooper matter where you had testified that your best

00:44    5    estimate of -- or guess I guess would be more accurate; of

6    annual defensive gun uses at that time was about 1.2 million.

7    Just to orient you, do you recall that as part of your

8    Colorado testimony?

9    A.   Yes.

00:44    10    Q.   And then you go on on page 293 and you talk about just

11    making sure that I was aware that it was in fact basically a

12    guess.  So I'm going to read the question that I asked you to

13    and I'll read your answer as well starting at 292 at line 22.

14         Question:  Just so we have a clear record, the question

00:45    15    that was asked of you in Colorado, and this is on page 937 of

16    the fifth day of trial testimony at line 19:  Question "In

17    your opinion guns are used by civilians to defend themselves

18    in America more than one million times every year."

19         Answer:  "Not every year, but I'd guess the average in

00:45    20    recent years would be in the vicinity of 1.2 million."

21         Do you recall that?

22    A.   So this was in the Colorado case?

23    Q.   That was in Colorado.

24    A.   Yes.

00:46    25    Q.   And then I followed that up by saying:  Is there any

Kleck - Direct - Showell

1   reason to believe that your testimony in Colorado was

2   inaccurate.  And you answered in the following respect:  No, I

3   mean as long as you understand it was a guess, it was

4   accurate, I was accurately stating what my best guess would be

00:46   5   based on the information available.  But it wasn't based on

6   the empirical evidence provided by a new survey which

7   obviously would have been preferable.  And now that I have

8   that information I have drawn different conclusions about the

9   number of defensive gun uses, and they were based on actual

00:46   10   national surveys professionally conducted and surveying

11   probability samples of the U.S. population.

12          My next question to you was:  And that information was

13   known to you prior to submitting your declaration in

14   connection with this case, with that case -- and then I said

00:46   15   with this case, isn't that right.  And you said:  No.

16          My next question:  So you learned it between June 21st

17   of 2018 and August 2nd of 2018, you learned in the last six

18   weeks of the existence of those surveys.

19          And your answer was:  It's quite possible it was just

00:47   20   in the last six weeks because I was doing the new review for

21   the purpose of the paper that's still under way that I was

22   still working on, so yeah, the surveys had been done earlier

23   than that, my awareness of the surveys was very recent.

24          Do you recall that testimony?

00:47   25   A.   Yes.

Kleck - Direct - Showell

1    Q.   So when I asked you whether you had gotten that recent

2    survey information prior to June 21, 2018 your answer was no;

3    is that correct?

4    A.   That was my best recollection.

00:47   5    Q.   And then a little bit later in your testimony you amended

6    your answer to state it was possible you had learned that

7    information in the last six weeks because you were still

8    working on the paper; is that right?

9    A.   Yes, working on the CDC paper.

00:48   10   Q.   I'd like to ask you to turn to tab 6 in the binder, which

11   I will represent to you is a blog post from an economics blog

12   that's kind of the equivalent of Law360 for lawyers.  And the

13   blog that this post appeared on is called Marginal Revolution.

14        You will notice at the top of the page the publication

00:48   15   date for that blog post is April 23rd, 2018; is that right?

16   A.   Yes.

17   Q.   And that was approximately two months to the day before

18   you executed your declaration in this case; is that correct?

19   A.   Yes.

00:49   20   Q.   And that blog post mentions a new paper you apparently

21   had made available prior to April 23rd, 2018, which used CDC

22   collected 1996, 1997, and 1998 data to replicate your 1993

23   survey; isn't that right?

24   A.   Yes.

00:49   25   Q.   And if you turn to the bottom of the next page, the blog

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1   post notes that, "since defensive gun use --" actually it's

2   from a bottom of the page.  The bottom of the first page to

3   the top of the next page.  "Since defensive gun use is

4   relatively uncommon under any reasonable scenario, there are

00:49   5   many more opportunities to miscode in a way that inflates

6   defensive gun use than there are ways the miscode in a way

7   that deflates defensive gun use."

8          Is that correct?

9   A.   Absolutely.

00:50   10   Q.   And that's in essence the same misclassification scenario

11   that Hemenway had identified; is that fair to say?

12   A.   No, not exactly.

13   Q.   And the post also notes in the addendum section on page 2

14   that, "the paper --" presumably referring to your recent

00:50   15   paper "-- has since been taken down because in addition to the

16   issue of interpretation that I raised, the survey may not have

17   been national."

18          Isn't that correct?

19   A.   No.  Or partially correct.

00:50   20   Q.   Did I misread that?

21   A.   No, you're not misreading it -- I mean if you're asking

22   if you accurately read it, sure.

23   Q.   I'm asking you whether that's what the blog post states.

24          THE COURT:  You didn't ask that the first time.

00:50   25          So if that's the question, can you answer that?

Kleck - Direct - Showell

1          THE WITNESS:  The question being is this what the

2     blog said?

3  Q.   Yes.

4  A.   Yeah, yes.

00:51  5  Q.   So when you were deposed on August 2nd, two weeks ago,

6     not only did you not tell me that you had received that

7     additional data well before June 21st, 2018 and had not

8     included it in your declaration in this case, you also did not

9     tell me that you had relied on that data and posted a paper

00:51  10     analyzing it at least sometime before April 23rd, 2018; isn't

11     that correct?

12  A.   No, that's completely incorrect.

13  Q.   We can go back to your testimony, but I think we've kind

14     of covered that ground.

00:51  15          THE COURT:  He answered the question, so go to your

16     next question, Mr. Showell.

17  Q.   And it wouldn't have been too easy to forget a paper you

18     recently released which was clearly on your mind since you

19     testified that you were in the midst of revising it; isn't

00:52  20     that right?

21  A.   Yes.

22  Q.   I'd like to spend a little bit of time going back to your

23     declaration in Duncan, which is tab 2 in your binder.  And in

24     particular I'd like to spend a little bit of time examining

00:52  25     some issues about your estimates of defensive gun use from

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    1993 and as discussed in your supplemental declaration in

2    Duncan.

3         Based on the various academic critiques of your

4    estimates of annual defensive gun use in the United States,

00:53    5    defendants aren't willing to concede that your numbers are

6    correct.  But for the sake of attempting to illuminate the

7    issues on this preliminary injunction application, I'd like

8    you to -- I'd like to walk you through some numerical analysis

9    based on your reply declaration in Duncan.

00:53    10        So starting in paragraph 11 of your Duncan reply,

11   that's on page 6 of tab 2, at line 7 you note that, Lucy Allen

12   found two incidents of defensive gun use in which a home

13   defender -- in which a defender fired more than 10 rounds; is

14   that correct?

00:53    15   A.   Yes.

16   Q.   And your reply in Duncan was in response to a declaration

17   that Ms. Allen had submitted in Duncan that's similar to the

18   one that she's offered the Court in this case; is that

19   correct?

00:53    20   A.   Yes.

21   Q.   And based on Ms. Allen's sample of the NRA Armed Citizen

22   Database reports of defensive gun uses, Ms. Allen concluded

23   that the data reflected a rate of 0.3 percent for defensive

24   gun uses in which more than 10 rounds were fired; is that

00:54    25   correct?

Kleck - Direct - Showell

1   A.   Yes.

2   Q.   Are you with me so far?

3   A.   Yes.

4   Q.   So let's fast forward the paragraph 16 of your Duncan

00:54   5   reply.  That's on the next page.  You posit --

6   A.   Which paragraph?

7   Q.   16, line 16 on the following page, page 7.

8   A.   Okay.

9   Q.   You posit at least one million defensive gun uses

00:54   10   annually in that paragraph; isn't that correct?

11   A.   Yes.

12   Q.   And multiplying the estimated one million by Ms. Allen's

13   0.3 figure of defensive gun uses involving the firing of more

14   than 10 rounds, you contend that implies a rate of 3,000

00:55   15   annual defensive gun uses in the United States in which more

16   than 10 shots are fired, and that's in a country of roughly

17   326 million people; is that right?

18   A.   Yes, under the assumptions that Allen's results were

19   valid.

00:55   20   Q.   I understand that.  That translates to a rate of roughly

21   8.2 defensive gun uses daily in the United States involving

22   large capacity magazines; is that right?

23   A.   Yes.  Well, approximately.  I mean I haven't computed it,

24   but again it's in that ballpark.

00:55   25   Q.   And you also note in paragraph 16 of your Duncan reply

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1   that, "no one really knows how many times LCMs are used

2   defensively."  Isn't that right?

3   A.   That's correct.

4   Q.   And if no one really knows how many times LCMs -- and by

5   that I mean large capacity magazines -- are used defensively,

6   we certainty don't know how many times they're used in the

7   home; isn't that right?

8   A.   Yes.

9   Q.   And if we don't really know how many times LCMs are used

10   defensively in the home, we can't establish whether the

11   recently enacted New Jersey Statute A2761, will impose any

12   burden on home defense with firearms in New Jersey; isn't that

13   correct?

14   A.   No.

15   Q.   And why do you posit that that is not correct?

16   A.   Well, beginning with the fact that I had that very

17   contingent acceptance of Lucy Allen results, I said, you know,

18   if they're valid.  The only thing they really demonstrate is

19   that yes, there have been defensive gun uses involving more

20   than 10 rounds fired and thus presumably an LCM used.  Which

21   means yeah, there are some people doing this, we just don't

22   know how many or how many in the home as you've inquired

23   about.  But it's not zero; that's about all I'm confident in

24   saying.

25   Q.   And would it be also fair to say that you have not

Kleck - Direct - Showell

1   conducted any independent research on the topic of the number

2   of defensive gun uses in the home involving an expenditure of

3   more than 10 rounds of ammunition?

4   A.   Yes.

00:57   5   Q.   And would it also be fair to say that the only such

6   instances of defensive gun use in the home involving an

7   expenditure of more than 10 rounds are the two instances that

8   Ms. Allen was able to identify?

9   A.   No.

00:57   10   Q.   What additional instances are you aware of?

11   A.   You asked does that mean there are only two and no, it

12   only means there are at least two that we know of, but again

13   we don't know how many more there might be.

14   Q.   Just so we're clear, you haven't done any research on the

00:57   15   subject; is that fair to say?

16   A.   Correct, it's not research based, it's just a logical

17   point.

18   Q.   You don't know of any such instances other than those

19   specifically identified by Ms. Allen; is that correct?

00:58   20   A.   Yes.

21   Q.   And you yourself have not conducted independent research

22   on the issue; isn't that right?

23   A.   Yes.

24   Q.   Okay.  We're not done with the math just yet.  Your

00:58   25   assumption of a million defensive gun uses in paragraph 16 in

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    your Duncan reply, includes all defensive gun uses; isn't that

2    right?

3    A.   Yes.

4    Q.   It's not limited to the focus of this case, which is

00:58    5    defensive gun uses in the home; correct?

6    A.   Yes.

7    Q.   And the survey results from your 1995 paper suggest that

8    only 37.3 percent of defensive gun uses occur in the home; is

9    that correct?  And if you need to refer to your paper, that's

00:58    10    tab 15, table 3, sub-4, page 185 at the top.

11    A.   Yes.

12    Q.   So it's only about 37.3 percent of defensive gun uses

13    that occur in the home; is that right?

14    A.   Yes.

00:59    15    Q.   And plaintiffs have said in their complaint and in these

16    proceedings in open court that the issues being decided here

17    concern defensive gun uses in the home; does that comport with

18    your understanding?

19    A.   Yes.

00:59    20    Q.   So if we really wanted to attempt to be more accurate

21    with our estimation in a way that's relevant to the Court's

22    analysis of the issues at hand, we would focus on defensive

23    gun uses in the home; correct?

24    A.   You're getting into legal issues, but sounds plausible to

00:59    25    me.

*United States District Court*
*Trenton, New Jersey*

298

Kleck - Direct - Showell

1   Q.   And if we did that, based on your 1993 survey we'd be

2   looking at a figure of 373,000 approximately annual defensive

3   gun uses in the home, against which to multiply -- annual

4   defensive gun uses in the home would be 373,000.  And then if

01:00   5   we were to take Ms. Allen's .3 percent figure to yield annual

6   defensive gun uses in which more than 10 shots were fired, we

7   would get approximately three defensive gun uses a day in a

8   country of 326 million people in which more than 10 shots are

9   fired.  Isn't that right?

01:00   10   A.   You mean starting with that hypothetical assumption that

11   there's a million total defensive gun uses which -- not

12   evidence based it's just an assumption, then the answer is

13   yes.

14   Q.   Right.  And it's an assumption that you made in your

01:00   15   reply declaration in Duncan.

16   A.   Sure, sure.

17   Q.   So that's approximately three defensive gun uses a day in

18   a country of 326 million people in which more than 10 shots

19   are fired; is that right?  With all those underlying --

01:01   20   A.   Under those assumptions, yes.

21   Q.   Now, irrespective of whether we use an estimate of

22   defensive gun uses in which more than 10 shots were fired of

23   3,000, or a 119,000, which is what you get -- I'll represent

24   to you which is what you get when you multiply Ms. Allen's .3

01:01   25   times 373,000, regardless of which measure we use, your

Kleck - Direct - Showell

1    research over a 25 year investigation of defensive gun use

2    hasn't identified a single episode of defensive gun use in

3    which more than 10 rounds were fired in the home; is that

4    correct?

01:01    5    A.    No.

6    Q.    So tell me about all of those instances in the home that

7    your research identified in which more than 10 rounds were

8    fired in a defensive gun use situation.

9    A.    I didn't look into that issue, so therefore I don't have

01:02    10    any evidence to bear on it one way or the other.

11    Q.    So, anything that you said about that issue would not be

12    based on evidence; is that correct?

13    A.    Certainly -- well, the only thing I've actually said

14    about it is that the number of defensive gun uses with over 10

01:02    15    rounds fired is not zero, it's more than zero and that it does

16    occur, and that's literally all I was -- I've actually

17    asserted it is factually true, but you asked me under various

18    hypothetical assumptions like there's only a million defensive

19    gun uses per year what would the numbers be, and I agreed with

01:02    20    what you stated.

21    Q.    I'm going to ask you to take a look at tab 16 in your

22    binder.    And tab 16 is a statistical tables of criminal

23    victimization in the United States for 2008; is that correct?

24    A.    Table 16?

01:03    25    Q.    No, no.   Tab 16.

Kleck - Direct - Showell

1   A.   Oh, tab 16.  And which table?

2   Q.   We haven't gotten there quite yet.

3   A.   Okay.

4   Q.   That appears to be a statistical table for crime

01:03   5   victimization in the United States, 2008; correct?

6   A.   Yes.

7   Q.   And that's a U.S. Department of Justice publication; is

8   that right?

9   A.   Yes.

01:03   10   Q.   And you've cited this same document in your declaration

11   in this case at paragraph 13 and footnote 2; is that right?

12   A.   In my declaration?

13   Q.   Yeah.  We can go to tab 1, paragraph 13, footnote 2.  I

14   think you cite it in the body of the text in paragraph 13 as

01:04   15   well as referencing it in footnote 2.  Page 7 of your

16   declaration, paragraph 13, and I'll just read it to you to

17   save time --

18           THE COURT:  Well, wait; you should wait until he

19   gets there.

01:04   20           THE WITNESS:  I got it.

21           THE COURT:  You may read if you wish, Mr. Showell.

22           MR. SHOWELL:  I don't need to, I just to -- I want

23   him to acknowledge that he's relied on this same document in

24   connection with his declaration in this case.

01:04   25   BY MR. SHOWELL:

Kleck - Direct - Showell

1  Q.   Would it be fair to say that you rely on this document?

2  A.   Yes.

3  Q.   In your declaration?

4  A.   Yes.

01:04  5  Q.   And you considered the crime victimization statistics

6  represented by the document at tab 16 to be generally

7  reliable; is that correct?

8  A.   They represent sort of lower limit estimates.

9  Q.   That wasn't my question.  My question was do you consider

01:04  10  them to be generally reliable?

11  A.   In that case I don't know how to answer the question.

12          THE COURT:  I couldn't hear your answer.

13          THE WITNESS:  I said in that case I don't know how

14  to answer the question.

01:05  15          THE COURT:  You may rephrase.

16  Q.   Reliable or not, you're confident enough in them to rely

17  on them for your own work in presenting issues to this Court;

18  is that fair to say?

19  A.   I rely on them as being good for minimum baseline

01:05  20  estimates, they're at least this much, in other words.  And

21  for that purpose, yes, I do think they're reliable.

22  Q.   And I'll represent to you that the sample size for the

23  data in the crime victimization statistics was 67,090 in 2008

24  based on an entry toward the end of the document.  If you'd

01:05  25  like to confirm that for yourself we can flip to it, but I'll

Kleck - Direct - Showell

1    represent to you that that's what the document says as far as

2    sample size for 2008 is concerned.

3         And I would ordinarily refer you to a specific page,

4    but the problem with that document is it's pretty big and the

01:06    5    pages aren't numbered.

6         THE COURT:  So is that a question?

7  Q.  Does that sound like a reasonable estimate of sample size

8    for this -- let's do this a little differently.  Start at the

9    back of the document.

01:06   10  A.  Maybe I can shortcut it; the samples are very large, yes.

11   I don't know if it's 67,000, but yeah, they're very large.

12  Q.  About 10 pages in from the back there's a table that

13   lists what the sample sizes are and it says number of persons

14   interviewed for 2008; it's very last line at the bottom of the

01:06   15   table, it says 67,090.

16        Have you found that yet, or no?

17  A.  Yes.

18  Q.  So would you agree with me that the sample size for 2008

19   says 67,090?

01:07   20  A.  Yes.

21  Q.  In contrast your 1993 survey, the positive responses on

22   defensive gun use was what, 194 individuals?

23  A.  How many said they had an defensive gun use and that we

24   regarded as legitimate, they really were defensive gun uses?

01:07   25   Yes, 194.  I thought you were asking about the number we

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1 asked, the sample size analogous to what we're talking about

2 here regarding the victimization surveys.

3 Q.  No.  But even so, the sample size there was 4,977; is

4 that right?

01:07   5 A.  Say again, say the number again?

6 Q.  4,977 total sample population.

7 A.  That's correct.

8 Q.  I'm going to ask you to turn to table 70 in the crime

9 victimization statistics.  Again the pages aren't numbered so

01:08   10 it may take you while to get there.  If it helps the

11 orientation of the table is vertical, it looks like this

12 (indicating) as opposed to being set up like that

13 (indicating).

14          THE COURT:  What table are we looking at?

01:08   15          MR. SHOWELL:  We're looking at table 70, seven zero,

16 your Honor.

17          We good to go, Judge?

18          THE COURT:  I've got it.  Do you have it, Professor?

19          THE WITNESS:  Yes, I do.

01:08   20 BY MR. SHOWELL:

21 Q.  So directing your attention to table 70 in the crime

22 victimization statistics, it's labeled at the top Personal

23 Crimes of Violence; do you see that?

24 A.  Yes.

01:09   25 Q.  And that table purports the show percentage figures for

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1  different types of defensive actions taken by victims of

2  personal crimes of violence; is that your understanding?

3  A.   That is.

4  Q.   In the top -- in the top line of that table, one of the

5  options for a defensive action is "attacked offender with a

6  weapon", and that would appear to be just a generic weapon

7  which would include a firearm, but it's not exclusive to a

8  firearm; would you agree with me?

9  A.   Yes.

10  Q.   And that line across the board reflects a percentage rate

11  of weapon use that is not higher than 4.3 percent in any given

12  category; is that right?

13  A.   Which row are you talking about now?

14  Q.   Very top line, attacked offender with a weapon.

15  A.   Okay.

16  Q.   It has crimes of violence 1.3, et cetera, et cetera, and

17  the highest single number is robbery with injury at 4.3

18  percent.  Do you see that?

19  A.   Yes.

20  Q.   And if you just take your finger and you scan it all the

21  way across that one line, that 4.3 percent is the highest

22  number; is that right?

23  A.   Yes.

24  Q.   Notwithstanding the rates there, what I'm really

25  interested is in the asterisk which appears after the rates in

Kleck - Direct - Showell

1   the first category, after all but the first category of

2   numbers, and the asterisk has a code at the bottom of the page

3   stating, "estimate is based on 10 or fewer sample cases".  Is

4   that correct?

01:10   5   A.   Yes.

6   Q.   And even if we assume that every one of those "attacked

7   offender with a weapon" responses involved a firearm, and

8   further that every use of a firearm involved the discharge of

9   excess of 10 rounds of ammunition, this table suggests no more

01:11   10   than 10 or fewer such incidents throughout an entire year in

11   each of the 10 listed categories; isn't that right?

12   A.   In this survey, yes.

13   Q.   And I'll concede that the data in table 7 here for

14   personal crimes of violence and don't reflect property crimes.

01:11   15   We spoke a little while ago about academics working in the gun

16   policy area and discussed your opinion of some researchers

17   working in that area; do you recall that general area of

18   testimony?

19   A.   Yes.

01:11   20   Q.   And one researcher that we didn't speak about was Michael

21   Siegel at Boston University; isn't that right?

22   A.   I don't recall one way or another whether we discussed

23   Mr. Siegel.

24   Q.   I'll simplify things; let's discuss Professor Siegel now.

01:11   25   A.   Okay.

Kleck - Direct - Showell

1    Q.    Professor Siegel did an interview with CNN in which he

2    appeared to discuss some forthcoming research and we spoke

3    about that at your deposition; do you recall that?

4    A.    I think so.  So it was off of a CNN website, that one?

01:12    5    Q.    That's exactly right, very good memory.  And that CNN

6    piece is at tab 13 in your binder.  It's actually -- the

7    reproduction is very small, so I've asked Deputy Attorney

8    General Lucas to blow that up on the screen for anybody who

9    might have trouble following along on the tabbed version.

01:12    10    And if you look at the Siegel piece on the front page,

11    after the first full line following the CNN notification,

12    they're quoting Professor Siegel and he says "whether a state

13    has a large capacity ammunition magazine ban is the single

14    best predictor of the mass shooting rate in that state."  And

01:13    15    he goes on to say:  These states are associated with a 63

16    percent lower rate of mass shootings -- or CNN goes on to

17    state according to Professor Siegel's analysis.

18    Did I read that correctly?

19    A.    You did.

01:13    20    Q.    And in your deposition my recollection is that you were

21    pretty dismissive of Professor Siegel's work if my memory

22    serves; is that correct?

23    A.    Yes, it is.

24    Q.    And in fact it was your opinion that Professor Siegel "in

01:13    25    particular is especially ignorant about the correlates of

Kleck - Direct - Showell

1   crime."  Do you recall testifying to that effect in your

2   deposition?

3   A.   Yes, I do.

4   Q.   Professor Kleck, you own semi-automatic firearms

5   yourself; is that correct?  Or a semi-automatic firearm?

6   A.   Yes, one.

7   Q.   And I believe on deposition you testified that you owned

8   a Gloch semi-automatic handgun; is that right?

9   A.   Yes.

10  Q.   And in fact you've participated in action shooting

11  competition events over the years; is that right?

12  A.   Yes.

13  Q.   And you also testified at your deposition in this case

14  that you fired virtually every type of gun there is; isn't

15  that correct?

16  A.   I think I said like every major type or something like

17  that, meaning broad categories.

18  Q.   You did say every major type, I was about get to that.  I

19  think the exact quote is, "I have fired every major type of

20  firearm there is, semi-automatic pistols, revolvers, rifles,

21  pump shotguns, semi-automatic shotguns."  And that was

22  actually the quote from your deposition testimony in the Kolbe

23  case in Maryland.

24       You also testified at your deposition that you had

25  never fired any of the weapons that you testified about in

Kleck - Direct - Showell

1    self-defense; is that correct?

2    A.    That's correct.

3    Q.    And it's fair to say, is it not, that your testimony was

4    that you had fired those weapons as part of your academic

01:15    5    research.

6    A.    Yes.  Well, let me back up; and also just for fun in some

7    cases, so not strictly research.

8    Q.    Thank you for the clarification.

9    A.    Okay.

01:15    10    Q.    And is it fair to say that when I took your deposition in

11    this case you couldn't really identify the purpose for which

12    you currently owned firearms that you do own; isn't that

13    right?

14    A.    Yes.

01:15    15    Q.    Would it be fair to say that you personally do not

16    currently own a firearm for personal protection?

17    A.    I'd have a hard time answering that yes or no.  I mean

18    it's available, it's conceivable I could use it for that

19    purpose; so in that sense the answer would be yeah, I got it

01:16    20    for self-defense, but I don't -- I don't appreciate that as a

21    realistic possibility for me.

22    Q.    When I asked you at your deposition whether you could

23    identify the purpose for which you currently owned firearms,

24    you told me that you could not; is that correct?

01:16    25    A.    Yes, I did say that.

*309*

Kleck - Direct - Showell

1   Q.   You also testified that you were not personally

2   acquainted with anyone who had ever fired a firearm in his or

3   her home for self-defense; isn't that correct?

4   A.   Yes.

01:16   5   Q.   I think we've established quite thoroughly that during

6   your academic career you've conducted research on defensive

7   gun use; isn't that fair to say?

8   A.   Yes.

9   Q.   And in that research you've defined defensive gun use to

01:17   10   include simply brandishing a weapon; is that correct?

11   A.   If it involves a threat, yes.

12   Q.   And by brandishing you mean simply displaying a firearm

13   but not actually firing it; is that right?

14   A.   If that's all that's involved just brandishing, yes.

01:17   15   Q.   And according to your definition of defensive gun use,

16   that I would successfully defend myself with a firearm if I

17   simply waved it at a home intruder, than turn tail and ran off

18   without me having to fire a single shot; is that correct?

19   A.   Yes.

01:17   20   Q.   And from your 1993 survey research you believed you were

21   able to estimate the frequency of annual defensive gun uses

22   that consisted of brandishing alone; is that correct?

23   A.   Yes, but again, a minimum baseline figure.

24   Q.   And based on the 1993 survey that was the basis for your

01:18   25   1995 article with Professor Gertz, you concluded that 75.7

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1  percent of successful defensive gun uses involved simply

2  brandishing a firearm; isn't that right?

3  A.  I don't recall qualifying it by successful, I think I

4  just said defensive gun use period however they turned out.

01:18   5  Q.  I stand corrected.  75.7 percent of defensive gun uses

6  involved simply brandishing; is that correct?

7  A.  No, not as you phrased it, it's not simply brandishing,

8  it could be brandishing plus other things, or it could be only

9  brandishing.

01:18  10  Q.  Let's take a look at tab 15, table 3.  Tab 15 is your

11  1995 article Armed Resistance to Crime - The Prevalence And

12  Nature of Self-Defense With a Gun, co-authored with the Mark

13  Gertz; is that right?

14  A.  Yes.

01:19  15  Q.  Table 3 is toward the back I believe.  Table 3 is at page

16  185 in the top right corner.  Let me know when --

17  A.  I'm there.

18       MR. SHOWELL:  Your Honor?

19       THE COURT:  I'm there.

01:19  20  Q.  And table 3 is the nature of defensive gun use incidents;

21  is that correct?

22  A.  Yes.

23  Q.  And under sub-A what the defender did with the gun, the

24  first line is brandished or showed gun.  And if you read out

01:19  25  to the column on the right, there's a number there and that's

1   75.7 percent; is that right?

2   A.   That's correct.

3   Q.   And there's no footnote symbol after the brandished or

4   showed gun or after that number 75.7 percent that says

01:20   5   anything other than -- that says anything about explaining

6   it's brandishing plus or brandishing and some other

7   affirmative action; isn't that correct?

8   A.   Yes, because it was explained in the text.

9   Q.   So is it your testimony that according to your 1993

01:20   10   research that three-quarters of defensive gun uses -- in

11   three-quarters of cases of successful defensive gun uses no

12   shots are fired?

13   A.   No.

14   Q.   I'm sorry; withdraw the qualifier successful.  Is it your

01:20   15   testimony that according to table 3 in your 1995 article, that

16   approximately three-quarters of all defensive gun uses involve

17   merely brandishing a weapon?

18   A.   No.

19   Q.   What did I get wrong about that, Professor?

01:21   20   A.   If I understand your term merely to mean only and they

21   didn't do anything else with the gun, so 75.7 percent includes

22   the ones in which they only brandished or showed the gun, plus

23   others where they brandished or showed the gun but they did

24   something additional like threatening -- like pointing the gun

01:21   25   at the offender, like firing at the offender and possibly even

Kleck - Direct - Showell

1  wounding the offender.  So some subset of that involves other

2  stuff.  And as I said that was explained clearly in the text.

3  Q.   Well, did you attempt to determine how many of those

4  instances of defensive gun use subsumed in the brandishing

01:21     5  category did not involve actually firing a gun?  And I think

6  we can deduce that from the table, but -- but I may be wrong.

7  A.   That's right, we can deduce it from the table.

8  Q.   Because of that 75.7 percent of brandishing, further down

9  in the table you have a column, Fired Gun Including Warning

01:22    10  Shots, and that's 23.9 percent.  So doing a little quick math

11  here, we're talking about approximately 50 percent of

12  instances in which a gun was brandished but no shots were

13  fired; is that -- am I correctly deducing that from the table?

14  A.   No.

01:22    15  Q.   Can you tell me if you were able to determine the number

16  of instances of defensive gun use in which no shots were

17  fired?

18  A.   Well, if 23.9 percent of all of the incidents involved a

19  gun being fired including warning shots, and 75 percent

01:23    20  involved --

21  Q.   And 75 -- it's 23 percent of 75 --

22  A.   Yes.

23       THE COURT:  Mr. Showell, how do you interrupt him in

24  the middle of an answer?

01:23    25       MR. SHOWELL:  My apologies because I had a flash of

Kleck - Direct - Showell

1    recognition.

2              THE COURT:  Well, please don't do that again.

3              So you may answer that question again because I lost

4    where you were.

01:23    5              THE WITNESS:  Thank you, your Honor; I'll start

6    again.  If 23.9 percent of all defensive gun uses involve the

7    defender firing the gun including warning shots, and 75.7

8    percent brandished or showed the gun and possibly did other

9    things, then it's about one-third of that 75 percent that

01:23    10   fired the gun.  So one-third also fired the gun and two-thirds

11   did not.

12   BY MR. SHOWELL:

13   Q.   Got it.  So --

14   A.   And you said 50 percent of something like that.

01:23    15   Q.   Right.  So doing a little quick math we're talking about

16   roughly 20 percent of incidents in which -- and I'm rounding

17   the 75 up to 80 and taking the 23 as 25.  So roughly 20

18   percent, quick math, are situations where no shots were fired;

19   is that correct?

01:24    20   A.   No.  It's about one-third.

21   Q.   So 30 percent of the time no shots are fired.

22   A.   Sure, around there, yeah.

23   Q.   So would you agree with me that in those instances where

24   no shots are fired, the restriction of A2761 will have no

01:24    25   effect on an individual's ability to defend themselves with a

Kleck - Direct - Showell

1    firearm?

2    A.   No.

3    Q.   So if I can't use more than 10 bullets in a situation

4    where I don't need to fire a gun, A2761 is having a

01:24   5    detrimental effect on me; is that your testimony?

6    A.   Yes, because some of the effect is deterrence and it's

7    whatever the offender perceives; if he perceives you have the

8    ability to fire large numbers of rounds, that has its own

9    effect apart from the number of rounds you would actually

01:25   10   fire.

11   Q.   But the defender's (sic) perception could be based on

12   unloaded weapons; isn't that correct?

13   A.   Could be.  Yes, could be.

14        THE COURT:  So, Professor, you call it the nature of

01:25   15   defensive gun use; do you have a definition for gun?

16        THE WITNESS:  Oh, no, I don't think I define gun.

17        THE COURT:  So does that include long weapons?

18        THE WITNESS:  Oh, yeah, definitely.

19   BY MR. SHOWELL:

01:25   20   Q.   Based on your 1993 survey results, you indicated that a

21   weapon is involved in defensive gun uses, only about 40

22   percent involve semi-automatic pistols; is that right?

23   A.   Yes.

24   Q.   We're down on the bottom in category H.

01:26   25   A.   Yes.

Kleck - Direct - Showell

1   Q.   And the combined majority of firearms used in your survey

2   were revolvers and shotguns which together aggregate about

3   52.4 percent of firearms used; isn't that correct?

4   A.   Which ones are you adding together?

01:26   5   Q.   I was adding revolvers and shotguns and I think my math

6   takes us to 52.4 percent.

7   A.   Revolvers and shotguns; yes, 52.4 percent.

8   Q.   Are you aware of the existence of any shotgun magazines

9   that contain more than 10 rounds?

01:26   10   A.   I'm not an expert on the technology of firearms, but I

11   think there was something called the Street Sweeper; I don't

12   know if you call it a magazine, it's not -- I don't think it

13   was a detachable magazine but yeah, it had a magazine that

14   held a large number of rounds in a shotgun.

01:27   15   Q.   I'll represent to you that New Jersey Statute A2861

16   specifically references the Street Sweeper and it's a banned

17   weapon.

18   A.   Yeah.

19         THE COURT:  So is that a shotgun?

01:27   20         MR. SHOWELL:  Yes.

21   Q.   So a magazine size limitation of A2761 would have no

22   effect on the majority of weapons that you found were used

23   in self-defense in your 1993 survey; is that correct?

24   A.   No, not exactly, because it wouldn't be the same today.

01:27   25   I mean, you know, after New Jersey has passed a law the

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    distribution of firearms is quite different.

2    Q.   My question was specifically directed to your 1993

3    survey.

4    A.   If nothing had changed since 1993 then my answer would be

5    yes.

6    Q.   You're familiar with Lucy Allen's expert declaration in

7    this case that was submitted by the defendants; is that right?

8    A.   Yes.

9    Q.   And Ms. Allen did an analysis of defensive gun use in the

10   home where shots were actually fired; is that your

11   understanding?  Based on the NRA Armed Citizen Database?

12   A.   I don't recall it being limited to ones in the home, but

13   certainly she did an analysis of defensive gun uses.

14          MR. SHOWELL:  Bear with me for a minute, your Honor

15          I think via the wonders of modern technology, we're

16   going to put Ms. Allen's declaration up on the screen.

17   Q.   And I'd like to direct your attention to the table on

18   page 6 of Ms. Allen's declaration.  And if you look at the top

19   line in that table, underneath the title captioned to the

20   left, it says Average Number of Shots Fired; and there are two

21   columns, the left says Overall, and the right column says

22   Incidents in the Home.

23          Having looked at this, does that refresh your

24   recollection as to whether Ms. Allen did an analysis of the

25   number of shots fired in the home in self-defense?

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1   A.   Yes, she didn't limit herself to that, but she certainly

2   did that among other things.

3   Q.   And that analysis as reflected in the table on page 6 of

4   Ms. Allen's report, which follows paragraph 10, indicated that

01:30   5   the average number of shots fired in the home in self-defense

6   was 2.1 based on her analysis of the NRA Armed Citizen

7   Database; is that correct?

8   A.   Yes.

9   Q.   And Ms. Allen's results of 2.1 shots fired involving

01:31   10   incidents in the home was corroborated by her subsequent

11   analysis of the Dow Jones Factiva Database; is that right?

12   A.   I wouldn't say corroborated because they're basically two

13   entirely different sets of events.  So the one doesn't

14   corroborate anything about the first one.

01:31   15   Q.   Well, would you agree with me that her results from one

16   analysis are consistent with the results from her additional

17   analysis?

18   A.   Yeah, I suppose.  I mean you can put it that way, but

19   really I'd say it's more accurate to say they're more or less

01:31   20   unrelated.

21   Q.   And based on her Factiva data analysis there were an

22   average number of 2.34 shots fired in the home; is that

23   correct?  It's about a third of the way down on the page in

24   the right-hand column.

01:32   25   A.   Yes, according to that source.

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1  Q.   I apologize if we've covered this already, but you

2  haven't performed any studies in connection with this case to

3  determine the number of shots fired in the home in

4  self-defense; is that right?

01:32     5  A.   Yes.

6  Q.   So you have no basis in empirical fact to dispute Ms.

7  Allen's findings about the number of shots fired in home

8  defense situations; is that right?

9  A.   I have no evidence bearing on it one way or the other.

01:33    10  Q.   And if home defenders rarely fire more than three shots

11  in those instances in which shots are actually fired, then the

12  inability to fire an additional seven rounds arising from

13  compliance with A2761's magazine capacity doesn't impose a

14  burden on self-defense in the home; is that correct?

01:33    15  A.   No.

16  Q.   And I know I asked you you haven't done any personal

17  research, but you haven't also identified any studies in

18  connection with this case in which more than three rounds were

19  discharged by an individual defending their home with a

01:34    20  firearm; is that correct?

21  A.   I don't understand the question.

22       (Question read back by the reporter.)

23  A.   I guess I still don't understand the question.  Are you

24  asking --

01:34    25       THE COURT:  All right.  Let him rephrase it.

Kleck - Direct - Showell

1    Q.   Let me break it down for you.  You haven't investigated

2    the number of shots that an individual defending a home might

3    fire when they're using a firearm to defend the home; is that

4    right?

01:35    5    A.   Yes.

6    Q.   And you haven't identified any studies conducted by

7    others that looked at that issue; is that fair to say?

8    A.   Yes.  Other than the Lucy Allen one.

9    Q.   Correct.  In your declaration in this case which I

01:35    10   believe is tab 1 of the binder, you indicate in about four

11   separate spots that the time required for an experienced

12   shooter to change a large capacity magazine in a

13   semi-automatic firearm is two to four seconds; do I have that

14   right?

01:35    15   A.   No.

16   Q.   In what respect do I have that incorrect?

17   A.   I did not limit that two to four second estimate to

18   experienced shooters.

19        (Brief pause.)

01:37    20   Q.   Perhaps you made that qualification in your article.

21   Let's take a look at tab 14.  Are you at your article?

22   A.   Yes.

23   Q.   Tab 14 is your 2016 Justice Research and Policy piece,

24   Large Capacity Magazines and the Casualty Counts in Mass

01:38    25   Shootings - The Plausibility of Linkages.  Is that correct?

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    A.    Yes.

2    Q.    I'm going to direct your attention to page 30 of that

3    publication, and the second to last paragraph at the bottom

4    beginning with the second sentence:  Skilled shooters can

01:38    5    change detachable magazines in two seconds or less, and even

6    relatively unskilled persons can with minimal practice do it

7    so in four seconds.  And then you reference a YouTube video

8    for a demonstration of that fact, which shows a two-second

9    magazine change by an experienced shooter.  Is that correct?

01:38    10    A.    Yes, that's correct.

11            THE COURT:  Can you just point out where on the page

12    you see that?

13            MR. SHOWELL:  Yeah, down at the bottom of 30, it's

14    the second paragraph from the bottom of the page, the

01:39    15    paragraph that starts, it is not however self-evident.

16            THE COURT:  Okay, got it.

17            MR. SHOWELL:  And then we're picking up with the

18    second sentence there.

19            THE COURT:  Got it.

01:39    20            MR. SHOWELL:  Through the YouTube URL, and beyond.

21    BY MR. SHOWELL:

22    Q.    When you cite this two to four-second magazine change

23    figure in your declaration, you do it without any supporting

24    citation; is that correct?

01:39    25    A.    I'm sorry; could you repeat the question?

Kleck - Direct - Showell

1  Q.   Sure.  You cited this two to four-second figure a few

2  times, I think it's four separate instances in your

3  declaration, and I can point out each one if you like.  But as

4  I read your declaration I don't see any reference to any kind

01:39  5  of proof that establishes that two to four-second window in

6  your declaration; is that a fair statement?

7  A.   Yes, that I didn't repeat the same citations four

8  citations again and again with each of those four mentions of

9  the assertion.  As you pointed out that's one of the instances

01:40  10  in which I cited supporting evidence, but I did not repeat the

11  citations between and again.  That's not customary in social

12  science research.

13  Q.   I guess my point is that I don't see the citation

14  appearing anywhere in your declaration.  I'm not talking about

01:40  15  your scholarly article now, I'm talking about your

16  declaration.

17  A.   That's possible, I mean, you know, because I indirectly

18  cite it by citing the academic article, which in turn has the

19  supporting citations.

01:41  20  Q.   And in your Justice Research and Policy article, Joint

21  Exhibit 10 that we just looked at on page 30, when you cite

22  that two to four-second magazine change interval, you don't

23  cite any scholarly research as the basis for that source, do

24  you.

01:41  25  A.   That's correct.

322

Kleck - Direct - Showell

1    Q.   You cite a YouTube demonstration by someone referred to

2    as an experienced shooter; isn't that right?

3    A.   Yes.

4    Q.   But you did not mention, did you, that the experienced

01:41    5    shooter is Doug Koenig.

6    A.   I'm not even sure I was aware of that.

7    Q.   I'm going to ask Deputy Attorney General Lucas to play

8    the YouTube video you cite as supporting authority in Joint

9    Exhibit 10.  That's tab 14 at page 30.

01:41    10         (Https---www.YouTube.com-watch-v=ZRCjY-GtROY)

11   BY MR. SHOWELL:

12   Q.   And I'm going to show you something, Professor Kleck.

13         MR. SHOWELL:  I think it's going to be most

14   effective if I can walk up to the screen and point it out your

01:48    15   Honor.  Without tripping myself.

16   Q.   Professor Kleck, do you see this logo at the bottom of

17   the video screen here (indicating)?

18   A.   Yes.

19   Q.   Do you recognize that logo?

01:48    20   A.   Yes.

21   Q.   Can you see it from there?

22   A.   National Shooting Sports Foundation.

23   Q.   Okay.  And it's my understanding that the National

24   Shooting Sports Foundation sponsored that training video.  Do

01:48    25   you know who the National Shooting Sports Foundation is?

Kleck - Direct - Showell

1  A.   They're an industry group, firearms industry group.

2  Q.   Now, we just saw that video and it appeared to me as

3  though Mr. Koenig was providing his instruction under pretty

4  much clinical range conditions; isn't that correct?

01:48      5  A.   Yes.

6  Q.   And he didn't just describe himself as a skilled shooter,

7  he said in the video that he was a professional shooter; isn't

8  that correct?

9  A.   Yes.

01:49    10  Q.   You would agree with me, would you not, he was alone on

11  the range not surrounded by other people?

12  A.   Yes.

13  Q.   And it was broad daylight; is that correct?

14  A.   Yes.

01:49    15  Q.   And I don't know if you noticed it, Professor Kleck, but

16  he did mention that he had a special belt on for holding his

17  magazines so that they were immediately accessible; isn't that

18  correct?

19  A.   He did.

01:49    20  Q.   Would you agree with me that it would likely have taken

21  Mr. Koenig longer to reload if he had to dig magazines out of

22  a pocket of a pair of jeans?

23  A.   Possibly, depending on how they're positioned; but if it

24  was sticking out and more or less in the same position, but

01:49    25  out of a jeans pocket rather than a holster like that it would

Kleck - Direct - Showell

1    make any difference.

2  Q.   So what if it's jammed down deep in a jeans pocket?

3  A.   Then it would make a difference.

4  Q.   And what if Mr. Koenig had to have retrieved the magazine

01:49    5    from a backpack, for example, would that -- might that have

6    increased his time between shots?

7  A.   Probably.

8  Q.   Even for an experienced shooter like him?

9  A.   Probably.

01:50   10  Q.   And did you notice -- did you mention -- withdraw.

11         Did you happen to hear Mr. Koenig say that it was

12    important to practice because you could fumble a magazine

13    while you're changing or words to that effect?

14  A.   No, I only recall him saying the first part of it, that

01:50   15    you had to practice.

16  Q.   We could we play --

17         THE COURT:  I listened to the video, so I have my

18    recollection of what it said.

19  Q.   And I'd just like to take a minute or two exploring

01:50   20    exactly who Mr. Koenig is.  And I'm going to the ask Deputy

21    Attorney General Lucas to pull up Mr. Koenig's personal

22    website.  And I believe there are items relating to Mr. Koenig

23    at tabs 8 through 11 in the notebook.

24         MR. THOMPSON:  Objection to relevance, your Honor.

01:51   25    We'll stipulate that he's a professional.

Kleck - Direct - Showell

1          MR. SHOWELL:  He's not just a professional, your

2     Honor, he's a world champion shooter and I was going to use

3     this to establish that.  He's an 18 time world champion

4     professional speed shooter according to his website.

01:51    5          THE COURT:  So what's the relevance of that?

6          MR. SHOWELL:  Well, the relevance of that --

7          THE COURT:  Just into the speed in which he changed

8     the magazine?

9          MR. SHOWELL:  The relevance, your Honor, is that

01:51   10     Professor Kleck referring to defensive Doug Koenig as a

11     "skilled shooter", is a little bit like saying Michael Jordan

12     played a little bit of basketball.

13          THE COURT:  So you're impeaching his credibility, is

14     that what you're doing?  I'm trying to figure this out.

01:52   15          MR. SHOWELL:  I think it's somewhat less than

16     forthright to suggest that an average shooter could shoot

17     in -- could change a magazine in two to four seconds.

18          THE COURT:  All right.

19          MR. THOMPSON:  Objection; that mischaracterizes the

01:52   20     testimony, it says a relatively unskilled person can do it in

21     four seconds.

22          THE COURT:  So --

23          MR. SHOWELL:  Your Honor, I think the point --

24          THE COURT:  Do you want to put this document into

01:52   25     evidence?

Kleck - Direct - Showell

1          Mr. Thompson, you don't have any objections?  I can

2    look at --

3          MR. THOMPSON:  I don't have any objection, your

4    Honor.

01:52     5          THE COURT:  All right.  So you can put it into

6    evidence and then I can make my own conclusion as to it.

7          MR. SHOWELL:  Thank you, your Honor.

8          THE COURT:  So how are you going to mark that?

9          MR. SHOWELL:  I think we'll have to get hard copies

01:53    10   to the Court.  There are some in the binder, but I don't think

11   they show everything that we would like.  I think we'll

12   probably have to get -- we'll probably have to get a thumb

13   drive to the Court.

14         THE COURT:  All right.  So what are you going to

01:53    15   mark it as, just so we have a reference to it?

16         MR. SHOWELL:  I think we're at DX-118.  I think we

17   marked 115, 116 and 117 this morning.

18         THE COURT:  So DX-118 will be a thumb drive

19   containing I guess the resume of Mr. Koenig.

01:53    20         MR. SHOWELL:  Well, there are actually a couple

21   things I'd like to include, including his sponsorship by the

22   National Shooting Sports Foundation, he's got a tab on there

23   for sponsorships, and his awards that show he's a professional

24   champion -- world champion speed shooter.

01:54    25         THE COURT:  Well, you'll include whatever's about

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    Koenig then.

2            MR. SHOWELL:  It's actually clicking through some

3    additional tabs that show him with a bazillion trophies and

4    things like that.

01:54    5            THE COURT:  All right.  Let's proceed.  So that will

6    be admitted, but it will be under DX --

7            MR. SHOWELL:  118.

8            THE COURT:  118.

9            MR. SHOWELL:  Thank you, your Honor.

01:54    10           (Defendants' Exhibit 118 was marked into evidence.)

11   BY MR. SHOWELL:

12   Q.   Do you recall me asking you at your deposition where you

13   derived that two to four-second figure for magazine changes

14   that you had cited in your declaration came from?

01:54    15   A.   Yes.

16   Q.   And do you remember testifying that it was based on two

17   things:  Your review of YouTube videos, including but not

18   limited to Mr. Koenig's demonstration; and a practical

19   demonstration that you conducted at a range with your own

01:54    20   personal firearm in St. Augustine, Florida with your friend

21   Jim Stevenson.  Do you recall that?

22   A.   Did you say Joe Stevenson?

23   Q.   I said Jim, but if it should have been Joe then --

24   A.   With that amendment, yes.

01:55    25   Q.   And you noted that you only tested the magazine change a

Kleck - Direct - Showell

1   few times at the shooting range in St. Augustine with your

2   friend Joe Stevenson; isn't that right?

3   A.   I think so.

4   Q.   And you also noted that you personally hadn't tested the

01:55   5   magazine change on more than one gun, your own personal

6   handgun; isn't that right?

7   A.   Yes.

8   Q.   And if you look -- if you think back about Mr. Koenig's

9   demonstration video, Mr. Koenig was only performing those

01:55   10   magazine changes with a single handgun; isn't that right?

11   A.   Yes, I think -- I mean I don't know if he had others in

12   his holster, I wasn't paying attention, but certainly he was

13   only changing mags on one of them.

14   Q.   And at your deposition you testified, did you not, that

01:56   15   you viewed several other magazine change videos on the

16   Internet, but that you hadn't cited to any of those others

17   because you didn't see a need for it; isn't that correct?

18   A.   Yes, they were duplicative.

19   Q.   But at the same time you couldn't provide a single URL

01:56   20   for any of those other Internet videos demonstrating magazine

21   changes, could you?

22   A.   I don't know if I could or could not, but I certainly did

23   not.

24   Q.   So without that information the additional URLs for other

01:56   25   magazine change videos you might have watched, it would be

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    impossible for the Court to verify whether those other

2    identified videos even concern magazine changes for

3    semi-automatic weapons; isn't that right?

4    A.   Yes.

01:56    5    Q.   And I also asked you at your deposition whether you ever

6    made an attempt to systematically evaluate the time necessary

7    to effect a magazine change on weapons that you knew had been

8    identified as weapons used in mass shootings, and you said

9    that you have not; is that correct?

01:57    10    A.   Yes.

11    Q.   I also asked you in the painstaking detail about whether

12    your research into magazine change times such as it was

13    involved any type of firearms magazine other than a box-type

14    magazine; do you recall that line of questioning?

01:57    15    A.   Could you repeat the question?

16    Q.   Sure.   As you may recall, when I was asking you about

17    magazine change times we went through a whole list of

18    different types of magazines, including a box type, a drum, a

19    helical magazine, a coil magazine, a horizontal magazine; do

01:57    20    you remember that line of questioning?

21    A.   Yes.

22    Q.   And if my recollection is correct, you indicated that you

23    had not tested magazine change times on any of those other

24    type of magazines, other than a box-type magazine; is that

01:58    25    correct?

Kleck - Direct - Showell

1   A.   That's correct.

2   Q.   And you also mentioned in your deposition that to the

3   extent there's any academic literature relating to large

4   capacity magazines, it tends to refer to box-type magazines;

01:58   5   isn't that right?

6   A.   I don't recall citing any academic literature on magazine

7   change times.

8   Q.   And that wasn't exactly my question.

9   A.   Then I need to hear it again; sorry.

01:58   10   Q.   My exact question was, and you also mentioned that to the

11   extent there is any academic literature relating to large

12   capacity magazines -- and I didn't limit to it change times --

13   it tends to refer to box-type magazines; isn't that right?

14   A.   Yeah, it sounds like something I said, yeah.  Probably.

01:59   15   Q.   And you also testified that as far as you are aware,

16   academic research accounts of mass shootings tend not to

17   specifically identify the type of magazine involved, but

18   generically refer to large capacity magazines regardless of

19   the type; do you recall that testimony?

01:59   20   A.   Yes.

21   Q.   We also discussed that when you were making your

22   assessment of the two to four-second magazine change in mass

23   shooting situations that you had assumed that shooters were

24   using box-type magazines; isn't that right?

01:59   25   A.   Yes, it appears to be the case.

Kleck - Direct - Showell

1    Q.    And you responded that you assumed that regardless of the

2    type of magazine the shooter was using, a magazine change

3    wouldn't take more than four seconds; is that correct?

4    A.    If it were one of those other types of magazines besides

01:59    5    the box type?

6             THE COURT:  So you didn't understand the question?

7             THE WITNESS:  Yes, I didn't understand the question.

8             THE COURT:  Restate the question.

9             MR. SHOWELL:  Yeah.

02:00   10    Q.    I asked you about magazine change times and you responded

11    that you assumed that regardless of the type of magazine the

12    shooter was using, a magazine change wouldn't take more than

13    four seconds; isn't that right?

14    A.    My recollection is that -- at least what I had in mind

02:00   15    and I don't know if I said it or not, was that I was assuming

16    they were box-type magazines and therefore my information

17    about box-type magazines would apply to mass shooters changing

18    magazines.

19    Q.    Let's take a look at your deposition.  Page 100 --

02:00   20    A.    Which tab?

21    Q.    It's actually up on the rail in front of you.  Page 100,

22    line 17, I asked you the following question.

23             Question:  So with respect to your two to four-second

24    magazine change interval for mass shooters using large

02:01   25    capacity magazines, you're assuming, are you not, that mass

Kleck - Direct - Showell

1    shooters are using box-type magazines.

2         Your answer:  I'm assuming that regardless of what type

3    they're using, that their magazine change times don't exceed

4    four seconds.  And so that's the assumption that's critical

02:01    5    here, but I wasn't really making any assumption one way or the

6    other about what type of magazines the shooters were using.

7         Do you recall that testimony?

8    A.   Yes.

9    Q.   So you identify the use of box-type magazines as a

02:02    10    critical assumption to your two to four-second calculation;

11    isn't that right?

12    A.   I don't -- I don't know if I was saying it was critical

13    or anything, but yeah, I was more or less assuming that mass

14    shooters use box-type magazines, and I think that's correct.

02:02    15    Q.   Just on the critical point, I'm going to read your answer

16    again, page 100, line 22:  I'm assuming that regardless of

17    what type they're using, that their magazine change times

18    don't exceed four seconds, and so that's the assumption that's

19    critical here.

02:02    20         Do you remember that testimony?

21    A.   Yes.

22    Q.   And you admitted that two to four-second magazine change

23    time was just an assumption; isn't that right?

24    A.   No.

02:02    25    Q.   And you also said that you weren't making any assumption

Kleck - Direct - Showell

1  about what type of magazines the shooters were using; isn't

2  that correct?

3  A.   No, I was assuming basically -- I was effectively

4  assuming they were all box-type magazines.

02:03  5  Q.   Your testimony on page 101 at line 3:  But I wasn't

6  really making any assumption one way or another about what

7  type of magazines the shooters were using.

8          THE COURT:  So what's the question?

9          MR. SHOWELL:  He told me that he said that he wasn't

02:03  10  assuming that it was box-type magazines, and I'm refreshing

11  his recollection -- or rather impeaching him with his

12  testimony where he says I'm not assuming any type of magazine.

13          THE COURT:  Oh, so it wasn't a question.

14          MR. SHOWELL:  I was pointing out an inconsistency in

02:03  15  his testimony, your Honor.

16  BY MR. SHOWELL:

17  Q.   And you acknowledged in your deposition testimony, did

18  you not, that all the videos that you watched demonstrating

19  magazine changes were made under ideal -- were made under

02:04  20  range conditions and not in shopping malls, theaters or

21  crowded public gatherings for example; isn't that right?

22  A.   No.

23  Q.   I'm sorry?

24  A.   No.

02:04  25  Q.   I'd like to refer you to page 102 of your deposition

Kleck - Direct - Showell

1   starting at line 15, and my question to you:  Now I'd like to

2   ask you a little bit about the specific conditions portrayed

3   in those video excerpts that you reviewed on magazine changes.

4   Were they -- why don't you describe the conditions under which

02:05   5   those videos were made.

6       Answer:  They were at target ranges and they were for

7   the explicit purpose of demonstrating magazine changes.  They

8   weren't for the purpose -- they weren't sort of incidental or

9   part of the shooting competition or anything, they were just

02:05   10   stand-alone videos concerning magazine changes.

11       Q:  So they weren't performed in for example a crowded

12   shopping mall?

13       A:  No.

14       Q:  Or they weren't performed in a movie theater for

02:05   15   example?

16       A:  No.

17       Q:  Or they weren't performed at an open air public

18   congressional meet-and-greet type event?

19       A:  No.

02:05   20       Q:  So would you agree with me for want of a better

21   term that those were sort of ideal clinical conditions under

22   which magazine changes were demonstrated.

23       Answer:  Yes.

24       THE COURT:  So I don't get this.  You referred to

02:05   25   that testimony and you're not going to ask him a question

Kleck - Direct - Showell

1    about this?  Why are you reading depositions in front of me?

2    I don't need depositions read.

3              MR. SHOWELL:  Judge --

4              THE COURT:  I don't get what you're doing here.

02:06    5              MR. SHOWELL:  I asked him immediately preceding to

6    reading that testimony whether the videos showed magazine

7    changes in crowded shopping malls or theaters or public

8    gatherings and he said no.  He said he didn't have -- I'm

9    sorry; can you read the testimony back?

02:06    10             THE COURT:  No.  I want to know what your -- I think

11   you should ask him a question.

12             MR. SHOWELL:  I did ask him a question, your Honor,

13   and he gave me an answer that was contrary to what he had

14   testified on deposition, and I was pointing out that testimony

02:06    15   was inconsistent with what he had said here in this

16   proceeding.

17             THE COURT:  So, Professor, does the testimony read

18   from pages 102 and 103 by Mr. Showell conflict with your

19   answer?

02:07    20             THE WITNESS:  Absolutely not.

21             THE COURT:  All right, thank you.

22             Now you can go on to the next point.

23   BY MR. SHOWELL:

24   Q.   So the entire basis for your contention stated repeatedly

02:07    25   in your declaration as in this case as an accepted fact, that

Kleck - Direct - Showell

1   a magazine change requires two to four seconds, is one,

2   instructional video by a world champion professional speed

3   shooter performed on a single weapon type, your own unrecorded

4   investigation using your personal Gloch handgun using a single

)2:07    5   type of magazine, and several additional unidentified Internet

6   videos using unspecified weapon types and magazines; is that

7   right?

8   A.   Yes.

9   Q.   And you relied on that information as the basis for

)2:07   10   stating that two to four-second magazine change interval as a

11   matter of accepted fact in an academic journal article on

12   Justice Research and Policy; is that right?

13   A.   A referee journal, yeah, the referees accepted that.

14   Q.   You were deposed in the Massachusetts case, Worman

)2:08   15   against Healey; is that right?

16   A.   Yes.

17   Q.   And you were questioned about your assertion regarding

18   magazine change times in that deposition; is that fair to say?

19   A.   I think so, yes.

)2:08   20   Q.   Would it surprise you if I told you in that case you

21   testified that it could take as many as 10 to 20 seconds to

22   accomplish a magazine change?

23   A.   It would indeed.

24   Q.   It would surprise you?

)2:08   25   A.   It would surprise me.

Kleck - Direct - Showell

1    Q.   Okay.  Let's take a look at tab 12.  Tab 12, starting at

2    page 68, line 4, you were asked the following questions and

3    gave the following series of answers.

4         Question:  Would it take longer in some cases if the

02:09    5    person changing the magazine was under stress?

6         Answer:  It's possible.

7         Question  --

8             THE COURT:  I'm sorry; what line are you starting

9    at?

02:09    10            MR. SHOWELL:  I'm starting on page 68, line 4, in

11   the excerpt from the Worman v. Healey deposition transcript of

12   Professor Kleck.

13            THE COURT:  Okay.

14   Q.   Question:  Would it take longer in some cases if the

02:09    15   person changing the magazine was under stress?

16        Answer:  It's possible.

17        Question:  Is it possible to take any magazine and

18   fumble it in the process of putting it in the gun?

19        Answer:  It's possible?

02:10    20        Question:  If that happened it would take longer than

21   four seconds; right?

22        Answer:  Yes.

23        Question:  It could also take longer if the person

24   hadn't organized themselves to keep their magazines in easy

02:10    25   reach for the purpose of changing them; right?

Kleck - Direct - Showell

1          Answer:  Yes.

2          Question:  Meaning that if the magazine were not in a

3     belt or a pocket that was actually available, it would take

4     longer to change the magazine; right?

02:10     5          Answer:  Under those conditions -- under those

6     circumstances, yes, probably would.

7          Question:  Could take far longer than two to four

8     seconds; right?

9          Answer:  I don't know about far longer, I mean I could

02:10     10    imagine it taking 10 or 20 seconds.

11          Was that your testimony from Worman v. Healey?

12    A.   Yes, in response to a highly hypothetical question which

13    I don't think resembles reality.

14    Q.   And you were under oath when you gave that deposition

02:11     15    testimony; is that correct?

16    A.   Yes, I was under oath.

17    Q.   Does that refresh your recollection as to having

18    previously testified under oath that it could take as many as

19    20 seconds to change a magazine under certain circumstances?

02:11     20    A.   Yes, it refreshes my memory of my response to an

21    extremely hypothetical question that I think doesn't in any

22    way, shape or form resemble the real world.  There is no upper

23    limit on the maximum amount of time it could take to change a

24    magazine; somebody could take hours and take days I mean

02:11     25    theoretical.  There's only a meaningful lower limit, you know,

Kleck - Direct - Showell

1   how fast can it be upon.

2   Q.   Are you finished?

3   A.   Yes.

4   Q.   Would you agree with me that if a shooter wanting to

02:11   5   shoot a hundred bullets and lawfully comply with A2761, wanted

6   to do that, he would have to have at least nine and possibly

7   10 magazines available?

8   A.   Yes.

9   Q.   And would you agree that someone who had a larger

02:12   10   capacity magazine, say a 15 or 20-round capacity magazine,

11   would make fewer magazine changes to accomplish that same

12   hundred shot goal?

13   A.   Yes.

14   Q.   Would you agree with me that every additional magazine

02:12   15   change that would be imposed by New Jersey Statute A2761, is

16   one additional opportunity for a shooter to drop a magazine?

17   A.   You mean intentionally or accidently?

18   Q.   Accidently.

19   A.   Yeah, as long as you emphasize opportunity.

02:12   20   Q.   Right.  Every time you change a magazine it presents an

21   opportunity to drop it; is that correct?

22   A.   Certainly.

23   Q.   Also every time you change a magazine it also presents an

24   opportunity to fumble a magazine; is that correct?

02:13   25   A.   Certainly.

Kleck - Direct - Showell

1    Q.   And every time you have to change a magazine it presents

2    an opportunity that there might be some technical weapon or a

3    magazine malfunction; is that correct?

4    A.   Yes, it's an opportunity.

02:13    5    Q.   And if you were confronted by a mass shooter bent on

6    mayhem you'd prefer to have add many additional 20-second

7    opportunities to save yourself and others that might yet based

8    on a shooter having to change multiple 10-round magazines;

9    isn't that right?

02:13   10    A.   I want as many interruptions of his shooting for whatever

11    reason.

12          MR. SHOWELL:  Your Honor, I'm going to ask Deputy

13    Attorney General Lucas now to cue up and play a video clip

14    from the New York Times website of the recent Las Vegas mass

02:13   15    shooting.

16          MR. THOMPSON:  Objection, your Honor.  We object to

17    the relevance of the Las Vegas shooting.  It was an act that

18    was committed as Professor Donohue on page 31 of yesterday's

19    trial said was committed with magazines that were 30 or more,

02:14   20    which were banned in New Jersey even before this law was put

21    into place.  So whatever mayhem was performed in Nevada with

22    magazines that were banned under a law that isn't challenged,

23    doesn't have any relevance for this proceeding.

24          THE COURT:  So what's the purpose that you're

02:14   25    showing the video for, Mr. Showell?

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

 1          MR. SHOWELL:  Professor Kleck has engaged in an

 2   extensive examination of magazine change times, and you may

 3   recall some testimony from Professor Donohue yesterday that

 4   criticized Professor Kleck's methodology in presenting that

 5   evidence.  And what I'd really like the Court to see is how a

 6   mass shooting actually unfolds.

 7          THE COURT:  So this doesn't show anything about

 8   change times?

 9          MR. SHOWELL:  I think it does implicitly, your

10   Honor.

11          THE COURT:  Implicitly; what does that mean?

12          MR. SHOWELL:  There are lengthy pauses in the

13   shooting, because Mr. Paddock was ensconced in a hotel room

14   and we didn't have surveillance eyes on him, we didn't know

15   what he was doing in those pauses.

16          THE COURT:  So you don't know if he was changing

17   magazines.

18          MR. SHOWELL:  I do not know that as a matter of

19   fact, your Honor.  What I wanted to demonstrate is that every

20   pause in shooting is an opportunity to escape, and I think

21   that video demonstrates it quite significantly.

22          THE COURT:  So what's the point here?  You have to

23   go back over this with me.  He's talking about change times.

24          MR. SHOWELL:  Right.

25          THE COURT:  So you're going to show me a clip that

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    doesn't really show change times, but it shows pauses.

2              MR. SHOWELL:  Right.  And the thesis of an academic

3    piece that Professor Kleck -- or a thesis of an academic piece

4    that Professor Kleck has written is that because magazines can

02:16   5    be changed so quickly, the interval between shots isn't

6    affected by that because shooters have average rates of fire.

7              THE COURT:  Professor Donohue referred to the

8    Virginia Tech incident, not Las Vegas; right?  So how does

9    this --

02:16   10             MR. SHOWELL:  He used an example, I'm using a

11   different example.

12             MR. THOMPSON:  And the criticism that Professor

13   Donohue, too, your Honor, made had nothing to do with change

14   times.  He was saying that the clock had started too early

02:16   15   because Professor Kleck had started the time when the two

16   people were murdered in their apartment, not on the campus.

17   But it had nothing to do with change times and this video

18   which doesn't show anyone changing a magazine certainly

19   doesn't show anything about change times.

02:16   20             THE COURT:  So after you show this video, are you

21   going to ask the professor questions about it?

22             MR. SHOWELL:  I was intending to.

23             THE COURT:  You were.

24             MR. SHOWELL:  I was.

02:16   25             THE COURT:  Okay.  So I'll allow you to show the

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1   video; I'll make a determination of what weight I give it when

2   I render my decision.

3          MR. SHOWELL:  Thank you, your Honor.

4          (Https---www.nytimes.com-video-us-1000000005473328-las-

02:17   5   vegas-shooting-timeline-12-bursts.html)

6   BY MR. SHOWELL:

7   Q.   When you viewed that clip, Professor Kleck, did you

8   notice then the pauses between shooting people were fleeing

9   the venue?

02:28   10   A.   Yes.

11   Q.   And you posit in your paper at tab 15 -- 14, I'm sorry;

12   the paper Large Capacity Magazines and Casualty Counts in Mass

13   Shootings, The Plausibility of Linkages, that it is average

14   rates of fire that matter not -- that it's average rates of

02:28   15   fire that matters; is that fair to say?

16   A.   Yes.

17   Q.   And when you posit in your paper that it's really average

18   rates of fire that matters, aren't you really asking the Court

19   to suspend its common sense based on the video clip of the Las

02:29   20   Vegas shooting that we just watched?

21   A.   No, not at all.

22   Q.   Do you remember me questioning you at your deposition

23   regarding the subject of mass shooting related casualties?

24   A.   Yes.

02:29   25   Q.   And you testified, did you not, that, "the fraction of

*United States District Court*
*Trenton, New Jersey*

Kleck - Direct - Showell

1    people wounded by mass shooters who died is higher than in the

2    general run of assaults with guns."

3    A.   Yes.

4    Q.   And you also testified that the rates of fatal woundings

02:29    5    in mass shootings were "considerably higher" than in other

6    shooting incidents; correct?

7    A.   That sounds like the same point as before, so yes.

8    Q.   You also admitted that mass shooting events involving

9    large capacity magazines correlated with a higher number of

02:30   10    fatalities and non-fatal injuries; isn't that right?

11    A.   Could you -- that was a complicated question; could you

12    ask that one again please?

13    Q.   Sure, I'd be happy to.  You also admitted that mass

14    shooting events involving large capacity magazines, correlated

02:30   15    with a higher number of fatalities and non-fatal injuries;

16    isn't that right?

17    A.   Yes.

18    Q.   Is it your position that the New Jersey legislature has

19    to wait for a Las Vegas style shooting before acting to curb

02:30   20    instrumentalities of mayhem like large capacity magazines?

21    A.   No, of course not.

22         THE COURT:  I have no further questions for this

23    witness, your Honor.

24         THE COURT:  All right.  Redirect, or do you wish to

02:30   25    take a break?

Kleck - Redirect - Thompson

1            MR. THOMPSON:  Could we take a break, your Honor?

2            THE COURT:  You may.

3            So, Professor, you may step down.

4            So we'll be back out in 20 minutes.

02:31    5            MR. THOMPSON:  That would be nice.  Thank you, your

6     Honor.

7                 (Luncheon recess.)

8            THE COURT:  The witness may take the stand.

9            Mr. Thompson, are you ready to go?

03:03   10            MR. THOMPSON:  Yes, your Honor, thank you.

11            THE COURT:  Professor, you are still under oath.

12            THE WITNESS:  Yes, sir.

13            THE COURT:  You may proceed.

14            MR. THOMPSON:  Thank you, your Honor.

03:03   15    (REDIRECT EXAMINATION OF GARY KLECK BY MR. THOMPSON:)

16    Q.   Professor, there were some questions about Ms. Allen's

17    qualifications; I want to just spend a minute on that.  She

18    has her degrees in economics; is that right?

19    A.   Yes.

03:03   20    Q.   What are your degrees in?

21    A.   Sociology.

22    Q.   And what classes have you taught, generally speaking?

23    A.   I've taught everything from introductory criminology to

24    undergraduates, but in last years, last 10 years or so of my

03:04   25    career I was teaching primarily methods classes to doctoral

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1    student; and they would include students -- I'm sorry, classes

2    in statistical analysis, survey research methods, causal

3    inference and research design.

4    Q.   How long have you been publishing in the field of

03:04    5    criminology?

6    A.   Since 1978.

7    Q.   How many peer-reviewed articles approximately have you

8    authored during that time?

9    A.   About 60.

03:04    10    Q.   How many books have you written during that time?

11    A.   Five.

12    Q.   And where did you receive tenure, where were you

13    teaching?

14    A.   Florida State University.

03:04    15    Q.   What is Florida State's reputation for criminology?

16    A.   According to the World University rankings it's the

17    number one program in the world.

18    Q.   What prizes if any have you won in the field of

19    criminology?

03:04    20    A.   I've won the Michael J. Hindelang Award, which is the

21    best book award in criminology for the book Point Blank, which

22    was about guns and violence.

23         MR. SHOWELL:  Judge, we'll stipulate to Professor

24    Kleck's qualifications as an expert.

03:05    25         THE COURT:  Okay.

347

Kleck - Redirect - Thompson

1           MR. THOMPSON:  We're ready to move on.

2    BY MR. THOMPSON:

3    Q.  So, you were asked a question about tab 2 in your binder

4    that Mr. Showell provided you, this was your declaration in

03:05    5    the Duncan case, and it's the -- you were asked about

6    paragraph 28 which showed of 992 mass shootings, in only nine

7    instances were the so-called large capacity magazines utilized

8    for a rate of less than one percent; do you remember that?

9    A.  Yes.

03:05   10    Q.  How does that -- and that number could be calculated

11    differently if you had a different definition of mass

12    shooting; is that right?

13    A.  Yes.

14    Q.  What definition of mass shooting do you use?

03:05   15    A.  The one I use is more than six people shot regardless of

16    whether it was fatal or non-fatal.

17    Q.  And utilizing your definition what is the incidence at

18    which large capacity magazines are utilized in mass shootings?

19    A.  Six percent of mass shootings defined that way are known

03:06   20    to have involved a large capacity magazine.

21    Q.  So 94 percent of the time these large capacity magazines

22    aren't even used in mass shootings; is that right?

23    A.  Yes, as far as we know.

24           MR. SHOWELL:  I have to object to non-foundation

03:06   25    grounds.

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1           THE COURT:  Overruled.

2     BY MR. THOMPSON:

3     Q.   Now, with respect to defensive gun use I'd like to ask

4     you some questions.  You were asked about Professor Hemenway's

03:06    5     critiques of your work, and in particular there was a

6     suggestion that you had oversampled in the south and the west;

7     how did you adjust for that oversampling?

8     A.   Well, when you want to compute a number like the percent

9     of respondents who had a defensive gun use, you have to adjust

03:06   10     for what are called sampling probabilities or the likelihood

11     of a person being selected into the sample.  And it's a common

12     practice in surveys to intentionally overrepresent some groups

13     for the sake of having a larger raw number of cases of

14     interest.

03:07   15           In this case we wanted to include more gun owners who

16     therefore were more likely to be people who had had a

17     defensive gun use experience.  So we intentionally

18     overrepresented males, people from the south and the west, but

19     we adjusted for that in computing the percent of people who

03:07   20     had a defensive gun use, we in effect gave less weight to each

21     male respondent and less weight to each person who resided in

22     the south and west and so on.

23           So the effect was it has no overall effect on the

24     percent we compute of the population who had a defensive gun

03:07   25     use, but it increases the raw number of cases we have to

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1    analyze if we want to know the details about defensive gun

2    use.

3    Q.   Now, Professor Hemenway also criticized some

4    misclassification alleged errors; what is your response to

03:08    5    those criticisms?

6    A.   Could you refresh my memory as to what the

7    misclassification was --

8    Q.   Well, do you recall that he had critiques of your work?

9    A.   Well, he certainly would characterize some of what people

03:08    10   claim are defensive gun uses as offensive uses, that's one

11   kind of misclassification.  Or another kind of

12   misclassification would be there was no threat to begin with

13   and so people were not really defending against something,

14   they were defending against a nonexistent criminal threat,

03:08    15   that sort of thing.

16   Q.   And you wrote a book entitled Armed; do you remember

17   that?

18   A.   Yes.

19        MR. THOMPSON:  And this is PX-42, your Honor.  It's

03:08    20   been admitted into evidence.

21   Q.   And is that where one would look to see your most full

22   and complete answer to these criticisms that Hemenway has made

23   on your calculation of the defensive gun use rate?

24        THE COURT:  What page are you looking at.

03:09    25        MR. THOMPSON:  241 to 271.  If I may approach, I'll

Kleck - Redirect - Thompson

1    just give a copy of the book to the witness.

2            THE COURT:  You may.

3            (Handing to witness.)

4            THE WITNESS:  Yes, I addressed every single

03:09    5    criticism that not only Hemenway had made, but anybody else in

6    the academic world who had made a criticism of that survey in

7    print.  And I went one by one and showed how they were

8    irrelevant, or based on erroneous premises or known to be

9    wrong.  I pointed out how they were speculative in many cases,

03:09    10   and also they were all one-sided.

11           If you're honestly interested in an objective way is

12   this survey generating too high or too low an estimate, you

13   consider both flaws that would lead to too high an estimate

14   and flaws that would lead to too low an estimate.  But the

03:09    15   aforementioned critics Hemenway, Cook and Ludwig and all the

16   others, they were singularly one-sided, they only considered

17   errors that might lead to an overestimation.

18           And they were even wrong about most of those, but even

19   if they had been right it wouldn't imply an overestimate.

03:10    20   Because for all we know there's just as many errors that work

21   in the opposite direction that tend to make the estimate too

22   low.

23           And in fact, everything we know about surveys on

24   other controversial subjects indicates precisely that; in

03:10    25   short, false negatives are far more common than false

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1   positives, meaning wrongly denying you had let's say a

2   defensive gun use, is going to be more common than falsely

3   claiming you did.

4   BY MR. THOMPSON:

03:10    5   Q.   Now, there was a question about the fact that not all

6   defensive gun uses occur in the home; do you recall that?

7   A.   Yes.

8   Q.   And I think Mr. Showell said if there were a million

9   defensive gun uses there'd be 370,000 in the home; do you

03:10    10   recall that?

11   A.   Yes.

12   Q.   And if one were to conclude that the number of overall

13   defensive gun uses was higher, would that same rate of

14   incidence in the home attain?

03:11    15   A.   Well, obviously the estimate would be much higher then.

16   Q.   Now, there was a discussion in the binder, it was -- I

17   don't know that you have to look there, but it was tab 16, it

18   was the criminal victimization in the United States 2008, this

19   was a DOJ document, it was unnumbered; and there was table 70,

03:11    20   that said in the footnote that the estimates were based on 10

21   or fewer sample cases.  Do you recall that?

22   A.   Yes.

23   Q.   So how do you square your estimate of overall defensive

24   gun uses with the findings of this report?

03:11    25   A.   Well, as I pointed out in multiple places, including the

Kleck - Redirect - Thompson

1    book Armed, that survey the National Criminal Victimization

2    Survey never directly asks anyone did they use a gun for

3    self-protection against another person.  They only provide an

4    opportunity for people to sort of volunteer that information.

03:12    5         What they actually ask is during this incident did you do

6    anything to protect yourself, and if the respondent wants to

7    volunteer the very controversial detail that they used a gun

8    to protect themselves they can, but you can't produce a

9    reliable estimate just waiting for people to volunteer that

03:12    10    kind of detail, especially when it's something as sensitive

11    and controversial as pointing a deadly weapon at another human

12    being.

13    Q.   Now, reference was made to a CNN article where a Mr.

14    Siegel had made some remarks about defensive gun use; do you

03:12    15    recall that?

16    A.   Yes.

17    Q.   What is your response to Mr. Siegel's analysis?

18    A.   Well, I didn't really know what his analysis was, it was

19    sort of a secondhand news media account, it's not something

03:13    20    that's been published in a refereed journal.  So the first

21    reaction was I have no idea what his methods were, but he also

22    was clearly saying, assuming it was accurately quoted by CNN,

23    something that's a logical impossibility, that he can know

24    what all of the correlates of crime are, and that the one

03:13    25    that's the highest correlate of mass shootings is the presence

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1    or absence a ban on large capacity magazines.

2         Well, no one can know all of the correlates.  For all

3    we know and for all Michael Siegel knows there are dozens that

4    have a higher correlation with a rate of mass shootings or

03:13    5    homicide in general or violence in general.

6         But I also know from reading Mr. Siegel's other

7    research on guns and violence, is he's unusually ignorant.  He

8    doesn't have any background in criminology, and when he states

9    his models, what other variables did I control for in trying

03:14    10   to assess the impact of availability of guns or of a gun

11   control law, his selection of control variabilities is

12   incomplete, inaccurate; he includes controls that really don't

13   affect violence, he leaves out large numbers of variables that

14   do affect crime rates.

03:14    15        And so I know from prior experience with his research

16   he's unusually inept on that particular subject matter.  He

17   may have other areas of expertise, but his knowledge of the

18   correlates of crime is negligible.

19   Q.   Now, there was a question about the -- that back in 1993

03:14    20   40 percent of defensive gun uses involved semi-automatic

21   pistols; my question is what's happen to the distribution of

22   firearms in the United States since 1993?

23   A.   It's shifted in the direction of a higher percentage of

24   guns being semi-automatic guns.  I mean there was a time when

03:15    25   less than half of the handguns in this country were

Kleck - Redirect - Thompson

1   semi-automatic, now better than 80 percent of them are

2   semi-automatic pistols.  And there have been similar trends

3   for rifles, although we don't have such precise data from the

4   Bureau of Alcohol, Tobacco and Firearms.  In short, a bigger

03:15       5   share of the guns now are the type that you -- that could use

6   large capacity magazines.

7   Q.   Now, a chart was put on the screen from Ms. Allen's

8   declaration showing that most of the time people in their home

9   when they're engaged in defensive gun use don't have to shoot

03:15      10   10 bullets or more; why is there a burden on self-defense even

11   if she's right, implicated by a law like that that's at issue

12   here?

13   A.   Well, first of all I don't think there is anything

14   meaningful as a description of defensive gun use in general in

03:16      15   either of the two studies or sub-studies that she did.  She

16   was dealing with carefully selected subsets of defensive gun

17   uses, unlike my research where I addressed basically any kind

18   as long as they involve either threatening or attacking a

19   criminal using a gun.

03:16      20        So in the one case she's trying to draw conclusions

21   from cases that were selected by news reporters and similar

22   news providers to write a story about, and in another case

23   it's cases selected by NRA staffers to appear in the Armed

24   Citizen column of an NRA magazine.  These are not random

03:16      25   selection of incidents.

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1    I mean, you know, the NRA wanted to make defensive gun

2    use look good, so the only incidents they're going to put in

3    their magazine are the ones that turned out okay, that make

4    gun owners look responsible and prudent, and, you know, they

03:17    5    only react to real threats and the people they oppose were

6    clearly bad guys.  This is not a representative sample of all

7    defensive gun uses.  It's carefully picked out by a sample of

8    defensive gun uses.

9    So, you know, if the NRA thinks they don't want people

03:17    10   to look like they're flinging lead indiscriminately and firing

11   huge numbers of rounds and using excessive force, they're not

12   going to include an incident like that with many rounds fired

13   in the Arm Citizen column.

14   Q.    So which way does that bias cut?

03:17    15   A.    It works in more or less suppressing the representation

16   of cases that do involve over 10 rounds being fired.

17   Q.    But for the instances in which 10 rounds are not fired,

18   and they are certainly some, in fact most in that category,

19   then how is there still a burden on the right of self-defense

03:17    20   implicated by the law that's at issue here?

21   A.    Right.  Well, you know, there's something different about

22   how a ban on large capacity magazines is going to affect New

23   Jersey's potential crime victims and how it will affect

24   offenders.  Offenders are the ones who determine when and

03:18    25   where a criminal attempt will be made.  If they're going to --

Kleck - Redirect - Thompson

1    if they're resolved to shoot a lot of people, they determine

2    that it's going to happen on Tuesday at 2:00 in the afternoon

3    and it's going to be some in such and such shopping mall or

4    whatever.

5         That's not the way it is for New Jersey citizens.  They

6    don't know when crime victimizations are going to occur.  And

7    so they're not going to have the same adaptations available to

8    them of carrying or possessing multiple magazines or multiple

9    guns everywhere they go.  Who in New Jersey is going to have

10   multiple magazines and multiple guns in every room of the

11   house; and for those who can legally care because they have a

12   permit how many are going to tote around huge numbers of

13   magazines.

14        So that's not a practical adaptation for the victims.

15   And so victims are burdened by the fact that they'll be at a

16   tactical disadvantage, they won't have to ability to fire

17   large numbers of rounds if it turns out that they need them.

18   Likewise they won't -- the fact that they clearly don't have

19   that ability will send a message to any criminal aggressors

20   this guy doesn't have the ability to fire large numbers of

21   rounds, so it won't have the same deterrent effect.

22   Q.   Now, you were asked about your guess that you gave to a

23   news reporter that there were 1.2 million defensive gun uses

24   in the United States; do you recall that?

25   A.   Yes.

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1   Q.   What is your view as to the best estimate now based on

2   the most current data as to the number of defensive gun uses

3   in the United States?

4   A.   Well, there have been two national surveys done in 2015

03:19   5   and 2017, one by CNN in 2015, and one by the Pew Research

6   Organization in 2017; so they're far more recent than my 1993

7   survey, so that's good.  But they're not as detailed.  So I

8   can't say anything about the specifics of what happened in the

9   defensive gun uses.

03:20   10          But they asked a nationally representative sample of

11   American adults, have they had a defensive gun use, and

12   they -- they had professional interviewers, they had

13   probability samples, they had all the bells and whistles that

14   a good survey's supposed to have; and those surveys implied

03:20   15   2.3 million defensive gun uses in one survey, and 2.5 million

16   in the other.  So that's an actual database estimate, it's not

17   a guess.  And so if the reporter were to ask me now well,

18   what's the annual number of defensive gun uses in the United

19   States, I would base it on that information.

03:20   20   Q.   And why might the number of defensive gun uses have

21   remained relatively constant from 1993 to the present even if

22   crime rates were lower?

23   A.   It's something of a coincidence.  You have to remember

24   those aren't per capita rates, I mean they hadn't taken

03:21   25   account a population increase, but there's something like 69

Kleck - Redirect - Thompson

1  million more Americans today than there were in 1993.  So

2  based on the sheer number of increased people who could have a

3  gun and use it for self-defense, that would be a factor that

4  would increase other things being equal defensive gun uses.

03:21    5      On the other hand, as I've said before, there's less

6  crime; because when I did my survey it was definitely a peak

7  crime year in 1993.  So you got some forces pushing the

8  estimate -- the raw number of estimated defensive gun uses up,

9  and others pushing it down; just coincidentally they more or

03:21  10  less happen to cancel out and you yield estimates pretty

11  similar to my 1993 estimate.

12  Q.  How many violent crime incidents occur in the United

13  States each year in which the victim faces multiple offenders?

14  A.  On the order of 800,000 a year.

03:22  15  Q.  And how many of these incidents, if any, involve four or

16  more assailants?

17  A.  About 250,000.

18  Q.  And what percentage of defensive gun use incidents

19  involve multiple assailants?

03:22  20  A.  Most of them do.

21      MR. SHOWELL:  Most is not a percentage; objection.

22  A.  About 52 percent.

23  Q.  Thank you, Professor Kleck.  What opinion do you have, if

24  any, as to whether a citizen confronting multiple assailants

03:22  25  would want to have a magazine holding more than 10 bullets?

Kleck - Redirect - Thompson

1   A.   Could you repeat the question?

2   Q.   Sure.   What opinion do you have as to whether a citizen

3   confronting four or more assailants, would want to have a

4   magazine with more than 10 bullets in it?

03:22   5   A.   Well, he -- if he's facing adversaries who can't be

6   stopped unless they're shot, then he would have to shoot four

7   people; but he's not going to hit each individual with every

8   shot.   And even the shots that he does hit with, don't

9   necessarily incapacitate or stop the aggressor.

03:23   10          So even optimistically assuming that every single shot

11   he landed on an offender successfully stopped the individual,

12   we know that at best optimistically maybe one in three shots

13   fired by a defender will hit the offender.   So it takes

14   roughly three shots per offender, and if you've got four

03:23   15   offenders that implies at least 12 rounds.   Of course if you

16   have substantially more than four offenders then the number

17   would go up.

18   Q.   Okay.   And I'd like to direct your attention to some

19   testimony we heard earlier in the week; we're going to put it

03:23   20   up on the board.   It's Mr. Stanton's testimony, starting on

21   page 78, at line 10.   It says:   Do you agree that civilians

22   can also find themselves in situations in which they require a

23   firearm for self-defense; they possibility could.

24          MR. THOMPSON:   We're going to go down through page

03:24   25   82.

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1   Q.   And would you agree that gunfights are also highly

2   stressful situations for law-abiding citizens; yes.

3        Would you expect a civilian involved in a gunfight to

4   have a lower hit rate than a law enforcement officer involved

03:24   5   in a gunfight; I wouldn't know.

6        And then if we continue on, he's asked:  May I direct

7   you to page 116 of the deposition transcript beginning on line

8   3, I asked you would civilians have higher or lower hit rates

9   than police officers all else being equal?  He answered:

03:24   10   Civilians would have lower hit rates.

11        What is your reaction to that testimony?  How if at all

12   does it relate to your opinions in this case?

13   A.   If they have lower hit rates then they'd need to have

14   more rounds per offender to stop them.  And so instead of it

03:25   15   being three rounds per offender it may be four or five or

16   whatever, because their hit rate wouldn't be as high as for

17   police officers.

18   Q.   If there are 2.4, 2.5 million defensive gun use incidents

19   each year, how many would involve a defender firing at or

03:25   20   attempting to hit an assailant?

21   A.   Well, based on the 1993 survey, 15.6 percent.

22   Q.   Okay.  And so we could just do that math.

23        Now, I'd like to ask you some questions about change

24   time.  We saw the video from Mr. Koenig; you also testified

03:25   25   that you yourself had gone to the range and that you were

Kleck - Redirect - Thompson

1    timed using -- what did you say, an audio timer?

2    A.    Yes.

3    Q.    What is an audio timer?

4    A.    It's a device that very precisely measures the interval

03:26    5    between shots.  So it detects a shot being fired, and then

6    there's a clock running, and to at least the nearest 10th of a

7    second or possibly the nearest 100th of a second, it will tell

8    you how much of an interval there was between that shot and

9    the next shot.

03:26    10    So, for example, if I empty one magazine and then

11    reload it with another fresh magazine and then fired out of

12    that fresh magazine, the audio timer would give you a very

13    precise estimate of the span of time between the last shot

14    fired before the magazine change, and the first one fired

03:26    15    after the magazine changed.

16    Q.    And what was your time?

17    A.    My time was about three seconds at best, four seconds

18    more commonly, because I'm kind of a crummy shooter.

19    Q.    Okay, that was what I was going to ask.

03:26    20    And you also said that you would watch some other

21    videos; were the other videos of world champion shooters --

22    A.    No, no.

23    Q.    What were they --

24    A.    There's a real good one currently available on the

03:27    25    Internet where there is one experienced shooter, he obviously

Kleck - Redirect - Thompson

1 knows what he's doing; and then a woman who is clearly not an

2 experienced shooter, you can tell that from numerous mistakes

3 she makes on the range, and she was still -- she was doing

4 better than me, for example, because occasionally she'd get a

03:27   5 two-second magazine change, and I don't think she was ever

6 worse than four seconds.  But she was most commonly two or

7 three seconds per magazine change.

8 Q.   Now, we looked at a study of yours in which you had

9 published the two to four-second number, and you had said it

03:27  10 was a referee journal; do you remember that?

11 A.   Yes.

12 Q.   What does that mean, a referee journal?

13 A.   It means other experts in the field have seen the

14 manuscript, they're asked for their opinion of it, and they're

03:27  15 asked for a recommendation, should it be published or not.  So

16 they -- they can suggest that changes be made and then publish

17 it, they can suggest that it be rejected out of hand; and

18 usually there's anywhere from three to five reviewers or

19 referees.

03:28  20 Q.   Did any of the three to five reviewers push back on your

21 two to four-second calculation?

22 A.   No.

23 Q.   Now, I'd like to direct your attention again to the

24 screen to some testimony we heard earlier in the week from Mr.

03:28  25 Stanton; this is trial transcript page 74.  If we look at

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1     lines 19 to 22, scroll down there:

2         Q.  With training and practical use, would you agree

3     that a person could change a magazine from lock-back position

4     in two to four seconds?

03:28     5         Answer:  Yes I would.

6             What relevance, if any, does that have for your

7     opinions in this case?

8     A.  Well, it has a special relevance in light of the video we

9     just saw, because the video about the Las Vegas shooter while

03:28    10     that is a wildly unusual mass shooting, it's representative at

11     least in one respect, it describes how this guy planned the

12     attack in advance and spent weeks accumulating guns and

13     ammunition and magazines; in other words he's precisely the

14     sort of guy who would practice magazine changes, marksmanship

03:29    15     and everything else related to skill with firearms.

16             So, what a person with training and practical use could

17     accomplish is precisely what's relevant to that kind of

18     shooting.  More broadly that's characteristic of most mass

19     shooters, they for whatever demented reasons they plan their

03:29    20     attacks for weeks and months, and then when they get around to

21     doing it they act in a very -- what to bystanders look like a

22     very deliberate reasonable business-like fashion.  It's what

23     witness after witness says, they're appalled by it, they're

24     astounded by it, but it's what they say.

03:29    25     Q.  Now, you were shown a portion of your Massachusetts

Kleck - Redirect - Thompson

 1   deposition where I think you said something like it's

 2   theoretically possible it can take 10 to 20 seconds, you said

 3   well it could take days even possibly; what is the relevance,

 4   if any, to this case of the fact that some people might fumble

03:30    5   around for 10 or 20 seconds?

 6   A.   Well, my understanding is that the State is arguing that

 7   banning large capacity magazines will reduce the casualty

 8   count in mass shootings.  It's -- their emphasis is entirely

 9   on mass shootings, it's not on ordinary crime where the

03:30   10   criminals either shoot either no rounds at all or just one or

11   two.

12          And the large capacity -- I'm sorry; the mass shootings

13   that use large capacities simply don't correspond with the

14   view of a mass shootings that one would hear from advocates of

03:30   15   large capacity magazines.  They don't involve people being

16   tackled while they're reloading; they -- they don't involve

17   people dropping the magazine and taking 20 seconds to reload.

18   Hypothetically, sure it could take 20 seconds, it could take

19   20 hours if somebody wanted to stretch it out.  But what

03:31   20   matters is what actually happens in real mass shootings that

21   we know about, because it's the best guide to what's going to

22   happen in the future.

23   Q.   Well, how many mass shootings have you looked at?

24   A.   Initially I had looked at hundreds, but mostly I looked

03:31   25   through them to sort them out to identify the ones that

Kleck - Redirect - Thompson

1   involved a large capacity magazine.  Because, you know, it

2   seems painfully obvious but it took me a while to realize the

3   simple point; that the only incidents in which use of a large

4   capacity magazine could have affected the number killed and

03:31   5   injured, is if a large capacity magazine was used.

6        So, I eventually confined my attention to as

7   comprehensible a list of all of the mass shootings that I knew

8   to involve a large capacity magazine, and there were 23 of

9   them?

03:32   10   Q.  And what was the time period of those 23 mass shootings

11   that you looked at?

12   A.  That was from 1994 through 2013, a 20-year period.

13   Q.  And there was discussion about the fact that you had done

14   this two to four seconds focusing largely on box magazines;

03:32   15   why did you focus on box magazines?

16   A.  Officially it was just because I assumed based on all

17   those media accounts that the mass shooters were all using

18   box-type magazines, but I hadn't systematically recorded that

19   the way I recorded things like the gun types they used or the

03:32   20   largest magazine capacity they used and so on.

21        And so it was brought up in the deposition, well, you

22   know, is it possible that the time it takes to change other

23   kinds of magazines would be longer and wouldn't that be

24   relevant.  And so after the deposition I went back and looked

03:32   25   myself.  I looked for the gun type, the specific make and

Kleck - Redirect - Thompson

1     model that was used; if the articles itself that were

2     available to me didn't say what type of magazine was used, I

3     consulted a comprehensive catalog or compilation of catalogs

4     called Gun Digest, 2018 edition of Gun Digest.  I looked up

03:33     5     those makes and models to see what was the magazine capacities

6     and what type of magazine was offered by the manufacturer when

7     you originally purchased the gun.

8          And so what I found was, first of all, of the 23 mass

9     shooters that used a large capacity magazine, every single one

03:33     10    used a box-type magazine, without exception.  None of them

11    used any of the types of other types of magazines with two

12    exceptions; there were two mass shootings in which the shooter

13    was known to have used a drum-type magazine.  And in at least

14    one of those incidents it was inconsequential; this was the

03:34     15    Aurora, Colorado shooting movie theater, the guy fired it and

16    it failed after a few rounds.  In neither of the two incidents

17    could I establish that anybody was actually shot with a

18    drum-type magazine.

19          And no, I don't know how long it takes to change a

03:34     20    drum-type magazine, but, you know, it makes very little

21    difference obviously.  All 23 mass shooters without exception

22    used box-type magazines and only two were known to have used

23    any other type, and they only used one of the other types

24    which is the drum-type magazine.

03:34     25    Q.  According to your analysis, how long do mass shooters

Kleck - Redirect - Thompson

1    take between shots?

2    A.   Almost always more than four seconds.  There are a few

3    where they took a little bit less than that, for example, the

4    Virginia Tech shooting that the professor yesterday brought

03:34    5    up.  He claims that I made an error in calculating the time of

6    the shooting, because I began when the overall shooting began

7    in an off-campus location, and I should have only focused on

8    the beginning of the second round of shooting.  So I went back

9    and explored that.

03:35    10    And I figured out -- I found there were media accounts

11    of the official Virginia report on the Virginia Tech shooting,

12    and they established the number of rounds that were fired, and

13    I think it was 174; and that the shooting even in the period

14    that the professor referred to lasted I think nine minutes.

03:35    15    Which is 540 seconds, and you divide 540 by 174 and it turns

16    out it was even in what the professor characterized as very

17    rapid fire, even if that incident, even in the portion of the

18    incident he talked about, it was over three seconds between

19    each shot.

03:36    20    Which again is completely supportive of my position

21    that changing magazines wouldn't alter -- wouldn't show down

22    the rate of fire, because mass shooters take that amount of

23    time even when they're not changing magazines; that is, they

24    take either three seconds between shots or in many cases far

03:36    25    more than that.

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1    Q.   Now, reference was made to a pause that would allow a

2    bystander to tackle or stop a shooter; how many times has that

3    happened in the mass shootings that you looked at over that

4    20-year period?

03:36    5    A.   Well, you know, it's -- first of all it's clear that

6    there's always pauses in all shootings or some reason or

7    another, even in the Las Vegas shooting very long pauses.  We

8    don't know why he was pausing, could have been magazine

9    changes, could have been a dozen other things.  So there's

03:36    10    always in all mass shootings opportunities for people to

11    escape because of the shooter is pausing.

12        But what's relevant to the effective large capacity

13    magazine ban is whether there's any additional time, because

14    now you forced offenders to make more magazine changes because

03:37    15    now they only have small capacity magazines.  And my research

16    indicates well, if they're not slowing their rate of fire, if

17    their of fire can be exactly the same even if they do take

18    more opportunities to change magazines, it's not going to make

19    a difference.

03:37    20        But I've looked specifically at the issue of well, are

21    these guys, these mass shooters, stopped by some intervenor or

22    they tackled because the guy was reloading, that's why he was

23    pausing in his shooting; and I know there's maybe four cases

24    over the period that I studied where advocates of large

03:37    25    capacity magazine bans had claimed that there was an

Kleck - Redirect - Thompson

1    interruption due to a magazine change and then the guy was

2    tackled and the shooting was stopped.

3         And upon further investigation, not a one of them could

4    be confirmed.  There were other reasons, usually having to do

03:38    5    with a failure of the gun or the magazine while the shooter

6    was pausing.  And the reason that's relevant to what we're

7    discussing today is New Jersey's ban on large capacity

8    magazines isn't going to, you know, affect -- it's not going

9    to improve the jam rate or reduce the jam rate, it's not even

03:38    10   intended to do that; it will only induce would be mass

11   shooters to make more magazine changes.

12        So it's only being tackled while there's a magazine

13   changing go on that can support the case for banning big

14   magazines.  And as far as I know it just -- it hasn't occurred

03:38    15   in a quarter of a century in the entire United States.

16   Q.  Now, you were shown a video about Las Vegas, and one of

17   the justifications that was put forth for its relevance was

18   that if there was lawful compliance, that if New Jersey had a

19   law that said that people couldn't possess a magazine with

03:39    20   more than 10 bullets, that might have some sort of impact on

21   mass murderers.  In your opinion how likely is it, if at all,

22   that mass murderers would be deterred from killing people by

23   New Jersey's ban on magazines that can hold more than 10

24   bullets?

03:39    25   A.  Well, one of the things we know with mass murderers in

Kleck - Redirect - Thompson

1   general or mass shooters in particular is these are unusually

2   powerfully motivated people.  They may have motivations that

3   we don't understand, that don't make sense to a rational mind;

4   they may be based on complete delusions like everybody's out

5   to get me, or racial minorities deserve to be exterminated, or

6   I hate all women and now I want to kill all the women.  But

7   they are very powerfully motivated.

8        And one obvious piece of evidence to indicate that is

9   lots of them are willing to die; they either kill themselves

10  at the end of the incident, they committed it in a way they

11  have no realistic change of escaping, or they provoke the

12  police into doing it.  They know they're not going to get away

13  with it because nobody gets away with it.  The very best they

14  can hope for to is being locked in a cage for the rest of

15  their natural lives.

16       And so these are people who are willing to take not

17  just a high risk, but to undertake an activity that's almost

18  certainly going to result in those -- those results.  So these

19  are powerfully motivated people.  They're also people whose

20  motivation causes them to plan at length and make great

21  efforts and go to expense and extra effort to acquire more

22  guns, more weapons and so on.

23       So the relevance to the New Jersey case is if you're in

24  a state where just across the state boarder in Pennsylvania

25  there's ample availability of the very magazines that are

Kleck - Redirect - Thompson

1   banned in New Jersey, it scarcely takes any effort at all; you

2   need only the weakest motivations to go over and get a

3   substitute magazine that's legally available over there.

4   Q.   Now, Professor Donohue testified yesterday that these

03:41   5   magazines of more than 10 bullets are readily available; what

6   do the Cook and Ludwig data from the late '90s tell us about

7   the ready availability of these magazines of more than 10

8   bullets?

9   A.   That survey was fielded in the 1994, not the '90s but

03:41   10   1994, and the surveyors asked people first of all did they own

11   a gun, and then a gun they owned among those who said yes, it

12   was randomly selected.  They may have owned 12 guns but, you

13   know, the interviewer randomly selected one of the 12 to ask

14   detailed questions about.

03:42   15          And they asked the owner how many rounds does that gun

16   hold when it's fully loaded.  And so you can calculate from

17   those figures the percent that held more than 10 rounds.  And

18   so that's the relevance, that's what --

19   Q.   What is the percent that --

03:42   20   A.   The percent is a bit over 14 percent -- I'm sorry; 18

21   percent of all firearms at that time in 1994, were equipped

22   with magazines holding over 10 rounds.

23   Q.   Well, just to be clear, so it's 10 or more was 18

24   percent?

03:42   25   A.   They originally had 10 or more, but, you know, obviously

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1   what's really relevant to a ban like New Jersey's is you want

2   to know how many held 11 or more rounds.

3   Q.   So what's the answer to that question?

4   A.   Well, I had to go back through the raw data.  The raw

5   data are pubically available, you can get them off an on-line

6   data archive if your university belongs to that archive and

7   analyze the data yourself.

8        And so we had asked the exact number, what is the exact

9   number of rounds that gun can hold when it's fully loaded; so

10   some people would say 11, some people would say 13, they can

11   say any specific number, they didn't give a range.  So I could

12   go back in the data and compute the fraction that held 11 or

13   more rounds.

14   Q.   And what was that?

15   A.   And that was the -- I think the -- oh gosh; that was the

16   14 percent that I initially said I think.

17   Q.   All right.  Now, I want to ask you some questions about

18   causation.  And what is your view about the alleged

19   correlation between states that ban magazines that can hold

20   more than 10 bullets and lower rates of mass shootings?

21   A.   Well, I'd make the same comment about that correlation

22   that I would about any correlation between the presence or

23   absence any kind of gun control law and violence rates of any

24   kind.  The problem in isolating the effect of the law is you

25   have to separate it from the effect of all the other factors

Kleck - Redirect - Thompson

1    that influence violence.  In particular you have to control

2    for the factors that would include influence not just the

3    violence rate, but whether or not people supported gun

4    control.

03:44   5        The problem though is that the same people that have

6    very strongly either you can say pacifists or antiviolence

7    sentiments, those same individuals would be the ones most

8    likely to support a gun control law.  And it's clear there's a

9    difference in that percentage in, you know, a place like

03:44   10   Massachusetts or for that matter New Jersey versus let's say

11   Texas.  They're basically more tolerant of violence in some

12   places than in others.

13       And so if you're very strongly supportive of reducing

14   violence, you'll be strongly supportive of any measures

03:45   15   intended to do that, including gun control laws.  So the

16   electorate in Massachusetts and New Jersey for that matter,

17   it's very supportive of stricter gun laws and they get

18   stricter gun laws.

19       But even if those laws are totally ineffective, you'd

03:45   20   still expect those states to have less violent behavior, less

21   violent crime because people have more strongly held views

22   hostile to violence.  They'll criticize their neighbors who

23   are violent, they'll demand, you know, that something be done

24   about this violence problem; they'll teach their children

03:45   25   especially to avoid violence and resolve disputes verbally

Kleck - Redirect - Thompson

1    rather than through violent behavior.

2         So the long and short of it is antiviolence attitudes

3    will itself have an effect on rate of violent behavior; it

4    will reduce the violent behavior the stronger those views are.

03:45   5    But it will also produce more support for gun control laws.

6    Q.   Are you aware of any research that's been able to show

7    that magazines that hold more than 10 bullets can cause a

8    reduction in mass shootings?

9    A.   No, the only evidence that is support -- that is cited in

03:46   10   support of large capacity magazines are simple correlations;

11   and as any beginning statistic student knows correlation is

12   not causation.  And we have very specific reasons for

13   believing that this particular correlation is a spurious

14   correlation, meaning it's not causal in nature, it's not one

03:46   15   thing causing another; but rather both factors, somebody using

16   a large capacity magazine, and the number that they hurt are

17   both being influenced by the same common antecedent factor,

18   which is a desire to hurt a lot of people.

19   Q.   Yes, and I want to ask you that.  So if there were a

03:46   20   correlation between these magazines with more than 10 bullets

21   and people being injured in mass shootings, what does that

22   tell you about the causal mechanism between the magazine size

23   and the result you see, does it tell you anything?

24   A.   It doesn't tell me anything about the mechanism.

03:47   25   Q.   Why not?

Kleck - Redirect - Thompson

1    A.   It's just a statistical pattern.  In effect you're seeing

2    the result of whatever causal mechanisms are going on, but

3    you're not seeing into the inner mechanisms themselves, you

4    have no idea why that association is coming about.

03:47    5         But an example of what would be an exploration of the

6    mechanisms by which large capacity magazines could affect the

7    number of people hurt in mass shootings, is the research I've

8    done where I took what advocates of large capacity magazines

9    had said how they thought those bans would reduce the number

03:47   10    of people hurt in mass shootings.  I took their arguments as

11    being the best available specifications of how it is having a

12    large capacity magazine would increase the number of people

13    hurt.  And then I tested it by comparing those propositions

14    against the data showing the details of mass shootings

03:48   15    actually occurred.

16         So for example, if you say the mechanism is that the

17    law bans large capacity magazines, if you're fortunate enough

18    that these highly motivated killers nevertheless somehow don't

19    manage to get a substitute illegal large capacity magazine,

03:48   20    and so now they have to use smaller capacity magazines, our

21    argument was okay, now these guys will have to change

22    magazines more often to fire the same number of rounds and

23    hurt the same number of people, and it's during those magazine

24    changes where you would observe the benefit.

03:48   25         The benefit would be now those guys could be tackled,

376

Kleck - Redirect - Thompson

1  because the guy's not shooting, he's concerned with changing

2  his magazines; and then bystanders, potential victims could

3  tackle him and stop the shooting.  And it is a perfectly

4  plausible hypothesis; it's just not something that actually

03:49    5  happens in the real world, not the world we live in.  There

6  might be imaginary worlds you can think up in your head where

7  it fits that advocate's view, but it's not something that's

8  happened even once in the United States in last quarter of a

9  century.

03:49    10  Q.   What role does the intent of the shooter play in the

11  lethality of his actions?

12  A.   Well, the more you want to hurt a lot of people the more

13  likely it is you'll do; I don't think anybody would quibble

14  with that, even the strongest advocates of banning large

03:49    15  capacity magazines don't quibble with that.  Nobody is saying

16  there's a perfect correspondence between your intentions and

17  the result, it's just that there's certainly a positive

18  relationship.  The more you want to hurt a lot of people for

19  whatever demented reasons, the more likely you are to actually

03:50    20  do so.

21  Q.   Now, what is your opinion about whether the number of

22  mass shootings is increasing?

23  A.   The level of mass shootings hasn't changed in decades;

24  probably the last time it was actually an increase would have

03:50    25  been the early '80s.  There really was an increase during the

*United States District Court*
*Trenton, New Jersey*

Kleck - Redirect - Thompson

1  '70s and early '80s, but since then it's simply gone up down,

2  up down, up down and long term there's no trend at all.

3  Q.   Now, what empirical work, if any, has been done on the

4  relative efficacy of a 10-round magazine ban versus a 15-round

03:50   5  magazine ban?

6  A.   I'm not aware of any.

7         MR. THOMPSON:  Your Honor may I have a moment with

8  my colleagues?

9         THE COURT:  You may.

03:51   10        MR. THOMPSON:  Thank you.

11        (Brief pause.)

12        MR. THOMPSON:  Your Honor, we have no further

13  questions for the witness.

14        THE COURT:  Okay, thank you.

03:51   15        Is there any reason to re-cross?

16        MR. SHOWELL:  Yes, I believe there is, your Honor,

17  but it would be exceptionally limited.

18        THE COURT:  Why don't you tell me what the area is

19  and I'll make that decision, and then we'll go from there.

03:51   20        MR. SHOWELL:  Professor Kleck was questioned

21  somewhat extensively about instances of tackling of mass

22  shooters while reloading, and I believe he said there was no

23  instance in which that had happened in the United States in

24  the last quarter century, and he was talking about --

03:52   25        THE COURT:  So you want to go into that area?

*United States District Court*
*Trenton, New Jersey*

1          MR. SHOWELL:  Yeah, I actually do.

2          MR. THOMPSON:  Your Honor, that was not --

3          MR. SHOWELL:  Talking about it was a perfectly

4    plausible hypothesis in an imaginary world and it hasn't

03:52  5    occurred once in the U.S. in the last quarter century was his

6    testimony with bystanders tackling shooters.

7          MR. THOMPSON:  This is not new, your Honor, this was

8    in his declaration, he was asked extensively at his deposition

9    about it, and I think the Court's ruling has been very

03:52  10   Solomonic to date of saying if it's new there can be recross,

11   if not, I don't think it meets that standard.

12          THE COURT:  I'll give you one or two questions.

13          MR. SHOWELL:  I need maybe three, your Honor.

14          THE COURT:  So I'll let those three go.  Because I

03:52  15   was interested in the tackling portion of your testimony.

16   (RECROSS-EXAMINATION OF GARY KLECK BY MR. SHOWELL:)

17   Q.   Professor Kleck, I asked you at your deposition which

18   happened in August of this year a couple weeks ago, whether

19   you were familiar with a shooting that had happened at a

03:53  20   Waffle House Restaurant in Tennessee, and you testified that

21   you were not aware of that shooting, notwithstanding that it

22   was a mass shooting which is in your field of criminology, and

23   it was something that had occurred with in the last six

24   months, I think it might have been April of this year.  Do you

03:53  25   remember me asking you -- and you said you didn't know about

Kleck - Recross- Showell

1   it.

2        Do you remember that area of inquiry at your

3   deposition?

4   A.   Yes.

03:53   5   Q.   Would it surprise you to know that in that incident --

6   and I can have Deputy Attorney General Lucas pull up the news

7   account of that -- that the shooter, Mr. Reinking, was tackled

8   by a bystander when Mr. Reinking stopped to reload his weapon.

9        So contrary to your assertion that that factual

03:54   10   scenario has not occurred in the United States in the last

11   quarter century, not only has it happened in the United States

12   in the last quarter century, it happened this year.

13   A.   Yes, I would be surprised because that's not what

14   happened.  Or at least that's -- that can't be confirmed as

03:54   15   happening.  The very guy who did the intervening said he

16   didn't know one way or another, and when he was interviewed

17   the first possibility he offered was the guy's -- the

18   shooter's gun jammed.  Which is not reloading.

19   Q.   This is a New York Times article on the Waffle House

03:55   20   shooting international.

21        MR. SHOWELL:  I'm just going to read what's on the

22   screen there, Judge:  Officials from detectives to trauma

23   surgeons at Vanderbilt University Medical Center said there

24   would have been greater bloodshed had a 29 year old customer,

03:55   25   James Shaw, Junior, not wrestled the rifle away from Mr.

*380*

Kleck - Recross- Showell

1  Reinking while he was reloading.

2  Q.   Do you have any reason to believe that that New York

3  Times article is inaccurate?

4  A.   Yes.

03:55  5  Q.   And what is the basis for that belief that the New York

6  Times article is inaccurate?

7  A.   The basis is -- I'm sorry; are you finished?

8  Q.   I am now.

9        THE COURT:  Why don't you restate the question.

03:55  10       And can you just hold off on your answer until we

11  have it on the record correctly?

12       THE WITNESS:  Yes.

13  Q.   What's your basis for believing that New York Times

14  report is inaccurate?

03:56  15  A.   Because in both print interviews and video interviews of

16  that very individual, James Shaw, Junior, who purportedly had

17  "wrested the gun away while the shooter was reloading", he

18  himself said I'm not at all sure that's why I did it.  He said

19  in fact I think it was the gun jammed or whatever; and then in

03:56  20  other interviews he said reloading or the gun jammed or

21  whatever.  In other words, he repeatedly said he didn't know

22  it was reloading.  And so it's just sheer guesswork, including

23  guesswork by the New York Times that that's why the guy was --

24  James Shaw, Junior was able to wrest the gun away.

03:56  25  Q.   And you became aware of those interviews between August

*United States District Court*
*Trenton, New Jersey*

Kleck - Recross- Showell

1    2nd of this year and today when I took your deposition?

2    Because when I took your deposition you had no knowledge of

3    this incident whatsoever, notwithstanding that it occurred in

4    your primary field of study.

03:56    5    A.    That's correct.  Because your bringing it up elicited my

6    interest, so I looked into it and found no, it can't be

7    confirmed that the guy was reloading when he was tackled.  So

8    once again confirmed my generalization -- not that one case

9    would have meant anything, I should put this in context, it's

03:57    10   hardly a basis for making policy, but no, not even in that one

11   case do we know that the guy was tackled while he was

12   reloading; in this case it's the New York Times reporter's

13   speculation, not anything based on what Mr. Shaw said.

14           MR. SHOWELL:  Your Honor, I like the Court's

03:57    15   permission to introduce that New York Times article into

16   evidence, which means we will have to get a copy to the Court

17   somehow.

18           MR. THOMPSON:  Your Honor, we would also like to put

19   in the news stories and the video interviews of the actual

03:57    20   person to counter that.

21           THE COURT:  Absolutely.

22           MR. SHOWELL:  We haven't seen those, Judge --

23           MR. THOMPSON:  We haven't seen this either.

24           THE COURT:  I'll admit the New York Times article,

03:58    25   and I'll allow Mr. Thompson to present whatever other articles

1    the professor relied upon.  You can confer with your

2    adversary, and if there's an objection you may send in a

3    letter and I'll make a determination on that.

4              THE WITNESS:  I have copies right here if that's of

03:58    5    any help.

6              THE COURT:  We'll see what happens.  No one sought

7    to admit them yet, Professor.

8              MR. SHOWELL:  Your Honor, I have nothing further at

9    this moment.

03:58    10             THE COURT:  Okay, thank you.

11             So, Mr. Thompson?

12             MR. THOMPSON:  Well, if Professor Kleck has the

13    articles, would the Court prefer that deal off line with our

14    friends at the State --

03:58    15             THE COURT:  I'd just show it to them; that's what

16    happened with you and the New York Times.

17             MR. THOMPSON:  Yeah, we had all of 30 seconds.

18             MR. SHOWELL:  Your Honor, if he's going to show me

19    those articles now I'd like to have the opportunity to examine

03:58    20    him about them.

21             THE COURT:  I don't know if I'm going to allow that,

22    Mr. Showell.  I mean you just brought up this New York Times

23    article; I need to keep the record to be reasonable and fair

24    to both sides.  The doctor says they're not what the other

03:59    25    articles indicate, so I don't see what more you need to go

1  into those with him.  He's just going to present articles that

2  showed this is what he's relying on.

3          MR. SHOWELL:  As you wish, your Honor.

4          THE COURT:  So at any rate, Mr. Thompson, why don't

03:59  5  you obtain the article.

6          MR. THOMPSON:  Do you remember the articles there?

7          THE WITNESS:  They're in my bag.

8          MR. THOMPSON:  With the Court's permission, why

9  don't you come down and get them.

03:59  10          (Witness retrieving bag.)

11          MR. THOMPSON:  Your Honor, there are just few

12  logistical issues; we need to get a printout of the New York

13  Times article, so the State's e-mailing to my colleague, we

14  have a printer here in the court, so we're going to print that

04:00  15  as a courtesy to the State.  And then Professor Kleck's going

16  to bring forward his articles from his bag, your Honor.  I

17  apologize about this.

18          MR. SHOWELL:  And I do appreciate that courtesy; Mr.

19  Thompson has been more than gracious.

04:00  20          THE COURT:  That's great; thanks, Mr. Showell.

21          (Pause in proceedings.)

22          MR. THOMPSON:  So your Honor, this might take a

23  moment or two to print these; I don't know if the Court would

24  prefer that we just agree with the State right now that I'm

04:01  25  not going to object to the New York Times, he's not going to

1   object to mine and then we can just submit them, you know,

2   later this afternoon.

3              THE COURT:  Okay.

4              MR. SHOWELL:  No objection, your Honor.

04:01   5              THE COURT:  No objection; all right.  So, then they

6   are both admitted, but we need numbers on them so we can

7   identify them.  How long is this going to take?  I'll wait --

8              MR. THOMPSON:  That's fine, it might be five minutes

9   or so.

04:01   10             THE COURT:  Okay.  Let me know when you're ready.

11             MR. THOMPSON:  Okay, we will let you know when we're

12  ready, your Honor.  Thank you so much.

13             (Recess.)

14             MR. THOMPSON:  Your Honor, the plaintiffs move to

04:26   15  admission of PX-85, 86, and 87.

16             MR. SHOWELL:  No objection to those, your Honor --

17             THE COURT:  Wait a second.  PX --

18             MR. THOMPSON:  85, your Honor, which will be James

19  Shaw, Junior, on why he rushed the Waffle House shooter; and

04:26   20  then we've got PX-86, which is Hero Customer Wrestled Rifle

21  Away From Waffle House Shooter; and then our final one is

22  PX-87, which is Suspect in Tennessee Waffle House Shooting Had

23  Guns Seized After Arrest Near White House Last Year.

24             THE COURT:  Okay.  So P-85, 86, 87 are admitted.

04:27   25             MR. THOMPSON:  Thank you, your Honor.

*United States District Court*
*Trenton, New Jersey*

1              (Plaintiff's Exhibits 85, 86 & 87 were marked into

2   evidence.)

3              THE COURT:  And then Mr. Showell, what did you have?

4              MR. SHOWELL:  Your Honor we have DX-118, which are

04:27   5   materials from the Doug Koenig website, Doug Koenig World

6   Champion Shooter Hunter and Family Man.

7              THE COURT:  So that's admitted.

8              (Defendants' Exhibit 118 was marked into evidence.)

9              MR. SHOWELL:  That's 118.  And then 119, your Honor,

04:27   10  is a New York Times article, Waffle House Shooting Suspect Is

11  In Custody National Police Say.

12             THE COURT:  Okay.  So you don't have any objections;

13  right?

14             MR. THOMPSON:  No, your Honor, no objection.

04:27   15             THE COURT:  So they're admitted.

16             (Defendants' Exhibit 119 was marked into evidence.)

17             THE COURT:  How about the Las Vegas video; has that

18  been admitted?

19             MR. SHOWELL:  Your Honor, I'd move the Las Vegas

04:27   20  video in evidence if it hasn't already been admitted.

21             MR. THOMPSON:  It's a legislative fact; no

22  objection.

23             THE COURT:  Okay.  So it the Las Vegas video is

24  admitted.  How do I have that, like on a --

04:28   25             MR. SHOWELL:  You have it on thumb drive video file.

1          THE COURT:  It's already on it?

2          MR. LUCAS:  Yes, your Honor.

3          MR. THOMPSON:  So it was already deemed admitted.

4          MR. LUCAS:  Yes.

04:28      5          MR. SHOWELL:  That is true actually.

6          MR. THOMPSON:  So it's already in.

7          THE COURT:  So that's admitted also.

8          MR. THOMPSON:  Yes, your Honor.

9          THE COURT:  Any other --

04:28      10         MR. SHOWELL:  Just to thank the Court for its time

11    and attention to this.

12         THE COURT:  Thank you.

13         MR. THOMPSON:  Likewise.

14         THE COURT:  I thought the parties did a great job

04:28      15    presenting the case.  The idea of relying on the declarations

16    so we didn't have to take the direct testimony was really

17    pretty smart, I thought that was a good idea, so it saved us a

18    lot of time.  So I look forward to getting the briefs and

19    finding of facts and conclusions of law.

04:29      20         Did we deal with the hearing?  It's at 3:00 p.m.,

21    not at noontime or whatever else I had.  Okay, thank you.

22    Have a great weekend.

23         (Counsel say thank you.)

24

25

**'**

**'15** [1] - 261:13
**'70s** [1] - 377:1
**'80s** [2] - 376:25,
377:1
**'90s** [2] - 371:6, 371:9
**'97** [1] - 286:13
**'98** [1] - 286:13

---

**/**

**/S** [1] - 257:24

---

**0**

**0.3** [2] - 293:23,
294:13
**08608** [1] - 257:12

---

**1**

**1** [10] - 266:12, 266:15,
266:20, 266:21,
266:22, 266:24,
267:23, 273:24,
300:13, 319:10
**1.2** [7] - 269:15,
269:23, 270:2,
270:22, 288:6,
288:20, 356:23
**1.3** [1] - 304:16
**10** [54] - 263:14,
263:24, 264:9,
265:6, 266:14,
271:12, 293:13,
293:24, 294:14,
294:16, 295:20,
296:3, 296:7, 298:6,
298:8, 298:18,
298:22, 299:3,
299:7, 299:14,
302:12, 305:3,
305:9, 305:10,
305:11, 314:3,
315:9, 317:4,
321:21, 322:9,
336:21, 338:10,
339:7, 345:24,
351:20, 354:10,
355:16, 355:17,
358:25, 359:4,
359:21, 364:2,
364:5, 369:20,
369:23, 371:5,
371:7, 371:17,
371:22, 371:23,

371:25, 372:20,
374:7, 374:20
**10-round** [2] - 340:8,
377:4
**100** [3] - 331:19,
331:21, 332:16
**100th** [1] - 361:7
**101** [1] - 333:5
**102** [2] - 333:25,
335:18
**103** [1] - 335:18
**108,000** [1] - 280:9
**10th** [1] - 361:6
**11** [8] - 264:3, 264:7,
264:9, 293:10,
324:23, 372:2,
372:10, 372:12
**112** [3] - 279:18,
279:21, 279:25
**115** [4] - 259:9,
261:20, 261:22,
326:17
**116** [5] - 259:9,
261:21, 261:22,
326:17, 360:7
**117** [4] - 259:9,
261:21, 261:22,
326:17
**118** [7] - 259:10,
259:11, 327:7,
327:8, 327:10,
385:8, 385:9
**119** [3] - 259:12,
385:9, 385:16
**119,000** [1] - 298:23
**12** [6] - 265:16, 337:1,
359:15, 371:12,
371:13
**128** [2] - 280:12,
280:15
**13** [9] - 268:25,
287:23, 288:1,
300:11, 300:13,
300:14, 300:16,
306:6, 372:10
**130** [2] - 272:16,
272:18
**14** [9] - 282:23,
282:25, 287:23,
319:21, 319:23,
322:9, 343:11,
371:20, 372:16
**1430** [1] - 272:19
**1431** [2] - 273:18,
273:24
**1434** [2] - 277:24,
278:2
**15** [7] - 264:18,
297:10, 310:10,
334:1, 339:10,

343:11
**15-round** [1] - 377:4
**15.6** [1] - 360:21
**16** [12] - 294:4, 294:7,
294:25, 296:25,
299:21, 299:22,
299:24, 299:25,
300:1, 301:6, 351:17
**17** [2] - 257:10, 331:22
**174** [2] - 367:13,
367:15
**18** [3] - 325:3, 371:20,
371:23
**18-10507** [1] - 257:6
**185** [2] - 297:10,
310:16
**19** [3] - 276:25,
288:16, 363:1
**194** [3] - 280:5,
302:22, 302:25
**1978** [1] - 346:6
**199** [1] - 276:24
**1993** [37] - 268:11,
269:6, 270:5,
270:23, 271:8,
274:2, 274:22,
276:11, 277:7,
280:5, 281:19,
281:24, 282:5,
283:15, 284:4,
287:2, 287:13,
287:20, 290:22,
293:1, 298:1,
302:21, 309:20,
309:24, 311:9,
314:20, 315:23,
316:2, 316:4,
353:19, 353:22,
357:6, 357:21,
358:1, 358:7,
358:11, 360:21
**1994** [4] - 365:12,
371:9, 371:10,
371:21
**1995** [9] - 269:1,
271:11, 272:1,
272:16, 279:8,
297:7, 309:25,
310:11, 311:15
**1996** [2] - 286:13,
290:22
**1997** [1] - 290:22
**1998** [2] - 279:12,
290:22

---

**2**

**2** [13] - 265:3, 265:7,
265:8, 265:10,

265:16, 271:14,
291:13, 292:23,
293:11, 300:11,
300:13, 300:15,
347:3
**2.1** [2] - 317:6, 317:9
**2.3** [1] - 357:15
**2.34** [1] - 317:22
**2.4** [1] - 360:18
**2.5** [11] - 268:11,
268:16, 268:19,
269:14, 270:5,
270:23, 271:21,
279:4, 287:3,
357:15, 360:18
**20** [11] - 313:16,
313:17, 336:21,
338:10, 338:19,
345:4, 364:2, 364:5,
364:17, 364:18,
364:19
**20-round** [1] - 339:10
**20-second** [1] - 340:6
**20-year** [1] - 365:12,
368:4
**200** [1] - 277:4
**2008** [7] - 299:23,
300:5, 301:23,
302:2, 302:14,
302:18, 351:18
**2013** [1] - 365:12
**2014** [2] - 261:13,
266:5
**2015** [3] - 269:11,
357:4, 357:5
**2016** [4] - 261:16,
266:5, 282:22,
319:23
**2017** [7] - 261:11,
261:16, 265:12,
265:14, 266:6,
357:5, 357:6
**2017)** [1] - 266:7
**2018** [11] - 257:10,
261:15, 287:17,
289:17, 290:2,
290:15, 290:21,
292:7, 292:10, 366:4
**21** [1] - 290:2
**21st** [2] - 289:16,
292:7
**22** [3] - 288:13,
332:16, 363:1
**23** [6] - 312:21,
313:17, 365:8,
365:10, 366:8,
366:21
**23.9** [3] - 312:10,
312:18, 313:6
**23rd** [3] - 290:15,

290:21, 292:10
**241** [1] - 349:25
**25** [3] - 270:4, 299:1,
313:17
**250,000** [1] - 358:17
**260** [1] - 259:8
**261** [1] - 259:9
**262** [2] - 259:2, 259:2
**27** [1] - 265:10
**271** [1] - 349:25
**28** [6] - 257:23,
265:18, 266:3,
266:10, 267:15,
347:6
**29** [1] - 379:24
**292** [1] - 288:13
**293** [3] - 287:23,
288:1, 288:10
**294** [1] - 287:23
**2:00** [1] - 356:2
**2nd** [6] - 273:8,
273:11, 287:17,
289:17, 292:5, 381:1

---

**3**

**3** [13] - 257:20, 267:25,
279:14, 297:10,
298:5, 298:24,
310:10, 310:15,
310:20, 311:15,
333:5, 360:8
**3,000** [2] - 294:14,
298:23
**3.6** [1] - 269:3
**30** [7] - 313:21, 320:2,
320:13, 321:21,
322:9, 340:19,
382:17
**31** [1] - 340:18
**32** [2] - 282:23, 283:3
**326** [3] - 294:17,
298:8, 298:18
**327** [1] - 259:10
**345** [1] - 259:3
**37.3** [2] - 297:8,
297:12
**370,000** [1] - 351:9
**373,000** [3] - 298:2,
298:4, 298:25
**378** [1] - 259:4
**385** [3] - 259:10,
259:11, 259:12
**3:00** [1] - 386:20

---

**4**

**4** [15] - 266:4, 267:24,

267:25, 268:2, 268:10, 270:6, 272:14, 273:24, 277:23, 278:10, 286:24, 287:1, 287:9, 337:2, 337:10
**4,977** [2] - 303:3, 303:6
**4.3** [3] - 304:11, 304:17, 304:21
**40** [2] - 314:21, 353:20
**402** [1] - 257:11

## 5

**5.2** [1] - 280:17
**50** [4] - 259:8, 260:23, 312:11, 313:14
**52** [1] - 358:22
**52.4** [3] - 315:3, 315:6, 315:7
**540** [2] - 367:15
**59,000** [2] - 279:16, 280:3

## 6

**6** [4] - 290:10, 293:11, 316:18, 317:3
**60** [1] - 346:9
**63** [1] - 306:15
**67,000** [1] - 302:11
**67,090** [3] - 301:23, 302:15, 302:19
**68** [2] - 337:2, 337:10
**69** [1] - 357:25

## 7

**7** [4] - 293:11, 294:7, 300:15, 305:13
**70** [4] - 303:8, 303:15, 303:21, 351:19
**74** [1] - 362:25
**75** [5] - 312:19, 312:21, 313:9, 313:17
**75.7** [7] - 309:25, 310:5, 311:1, 311:4, 311:21, 312:8, 313:7
**753** [1] - 257:23
**764,000** [1] - 269:2
**78** [1] - 359:21

## 8

**8** [1] - 324:23

**8.2** [1] - 294:21
**8/100ths** [3] - 266:12, 266:15, 266:19
**80** [3] - 283:21, 313:17, 354:1
**800,000** [1] - 358:14
**82** [1] - 359:25
**83** [3] - 259:8, 260:20, 260:23
**84** [4] - 259:8, 260:7, 260:20, 260:23
**85** [3] - 259:10, 384:18, 385:1
**856** [1] - 257:25
**86** [4] - 259:10, 384:15, 384:24, 385:1
**87** [4] - 259:10, 384:15, 384:24, 385:1
**889-4761** [1] - 257:25

## 9

**937** [1] - 288:15
**94** [1] - 347:21
**992** [4] - 266:4, 266:11, 266:14, 347:6
**9th** [2] - 265:12, 265:14

## A

**A2161** [1] - 264:17
**A2761** [15] - 262:20, 263:3, 263:4, 263:7, 263:10, 263:13, 263:17, 264:2, 264:12, 295:11, 313:24, 314:4, 315:21, 339:5, 339:15
**A2761's** [1] - 318:13
**A2861** [1] - 315:15
**abiding** [1] - 360:2
**ability** [6] - 262:22, 313:25, 314:8, 356:16, 356:19, 356:20
**able** [6] - 286:13, 296:8, 309:21, 312:15, 374:6, 380:24
**absence** [2] - 353:1, 372:23
**absolute** [1] - 275:13
**absolutely** [1] - 267:1
**Absolutely** [3] - 291:9,

335:20, 381:21
**academic** [14] - 271:25, 281:8, 293:3, 308:4, 309:6, 321:18, 330:3, 330:6, 330:11, 330:16, 336:11, 342:2, 342:3, 350:6
**academics** [5] - 271:13, 271:17, 281:17, 282:3, 305:15
**acceptance** [1] - 295:17
**accepted** [6] - 272:24, 273:2, 273:3, 335:25, 336:11, 336:13
**accessible** [1] - 323:17
**accidently** [1] - 339:17
**Accidently** [1] - 339:18
**accomplish** [3] - 336:22, 339:11, 363:17
**accord** [1] - 270:9
**According** [2] - 346:16, 366:25
**according** [6] - 306:17, 309:15, 311:9, 311:15, 317:25, 325:4
**account** [6] - 267:19, 271:3, 271:9, 352:19, 357:25, 379:7
**accounts** [3] - 330:16, 365:17, 367:10
**accumulating** [1] - 363:12
**accuracy** [1] - 278:14
**accurate** [4] - 288:5, 289:4, 297:20, 317:19
**accurately** [4] - 279:2, 289:4, 291:22, 352:22
**acknowledge** [1] - 300:23
**acknowledged** [1] - 333:17
**acquainted** [1] - 309:2
**acquire** [1] - 370:21
**act** [2] - 340:17, 363:21
**acting** [1] - 344:19
**action** [3] - 304:5, 307:10, 311:7
**actions** [2] - 304:1,

376:11
**active** [1] - 261:12
**Active** [2] - 261:10, 261:15
**activity** [1] - 370:17
**actual** [3] - 289:9, 357:16, 381:19
**adaptation** [1] - 356:14
**adaptations** [1] - 356:7
**add** [1] - 340:6
**addendum** [1] - 291:13
**adding** [2] - 315:4, 315:5
**addition** [1] - 291:15
**additional** [12] - 292:7, 296:10, 311:24, 317:16, 318:12, 327:3, 328:24, 336:5, 339:14, 339:16, 340:6, 368:13
**addressed** [2] - 350:4, 354:17
**adjust** [2] - 348:7, 348:9
**adjusted** [1] - 348:19
**administrator** [1] - 283:16
**admission** [2] - 260:18, 384:15
**admit** [2] - 381:24, 382:7
**admitted** [17] - 260:7, 260:21, 261:20, 327:6, 332:22, 344:8, 344:13, 349:20, 384:6, 384:24, 385:7, 385:15, 385:18, 385:20, 385:24, 386:3, 386:7
**adults** [2] - 274:25, 357:11
**advance** [1] - 363:12
**adversaries** [1] - 359:5
**adversary** [1] - 382:2
**advice** [1] - 285:17
**advised** [1] - 284:2
**advisor** [1] - 285:12
**Advisors** [2] - 285:11, 285:13
**advocate's** [1] - 376:7
**advocates** [4] - 364:14, 368:24, 375:8, 376:14
**affect** [7] - 275:16,

353:13, 353:14, 355:22, 355:23, 369:8, 375:6
**affected** [2] - 342:6, 365:4
**aforementioned** [1] - 350:15
**afternoon** [2] - 356:2, 384:2
**aggregate** [1] - 315:2
**aggressor** [1] - 359:9
**aggressors** [1] - 356:19
**ago** [4] - 287:17, 292:5, 305:15, 378:18
**agree** [19] - 267:13, 279:19, 281:6, 281:17, 287:16, 302:18, 304:8, 313:23, 317:15, 323:10, 323:20, 334:20, 339:4, 339:9, 339:14, 359:21, 360:1, 363:2, 383:24
**agreed** [1] - 299:19
**air** [1] - 334:17
**al** [1] - 257:7
**Alcohol** [1] - 354:4
**ALICEA** [1] - 258:8
**alleged** [2] - 349:4, 372:18
**Allen** [17] - 284:6, 284:13, 284:16, 285:6, 285:17, 286:3, 286:4, 293:11, 293:17, 293:22, 295:17, 296:8, 296:19, 316:9, 316:24, 319:8
**Allen's** [16] - 284:18, 285:9, 285:20, 293:21, 294:12, 294:18, 298:5, 298:24, 316:6, 316:16, 316:18, 317:4, 317:9, 318:7, 345:16, 354:7
**allow** [4] - 342:25, 368:1, 381:25, 382:21
**almost** [1] - 370:17
**Almost** [1] - 367:2
**alone** [3] - 309:22, 323:10, 334:10
**alter** [1] - 367:21
**amended** [1] - 290:5
**amendment** [1] - 327:24

**America** [2] - 269:7, 288:18
**American** [1] - 357:11
**Americans** [1] - 358:1
**ammunition** [8] - 263:8, 263:10, 263:13, 264:17, 296:3, 305:9, 306:13, 363:13
**amount** [3] - 263:10, 338:23, 367:22
**ample** [1] - 370:25
**analogous** [1] - 303:1
**analysis** [16] - 293:8, 297:22, 306:17, 316:9, 316:13, 316:24, 317:3, 317:6, 317:11, 317:16, 317:17, 317:21, 346:2, 352:17, 352:18, 366:25
**analyze** [2] - 349:1, 372:7
**analyzed** [1] - 281:2
**analyzing** [1] - 292:10
**annual** [24] - 268:7, 268:19, 269:2, 269:13, 269:21, 270:2, 271:14, 271:22, 279:4, 280:9, 280:19, 281:19, 282:5, 284:5, 286:23, 287:2, 288:6, 293:4, 294:15, 298:2, 298:3, 298:5, 309:21, 357:18
**annually** [1] - 294:10
**answer** [30] - 272:6, 272:7, 275:19, 276:5, 276:16, 277:8, 277:18, 278:12, 287:5, 287:6, 288:13, 289:19, 290:2, 290:6, 291:25, 298:12, 301:11, 301:12, 301:14, 308:19, 312:24, 313:3, 316:4, 332:2, 332:15, 335:13, 335:19, 349:22, 372:3, 380:10
**Answer** [11] - 288:19, 334:6, 334:23, 337:6, 337:16, 337:19, 337:22, 338:1, 338:5, 338:9, 363:5

**answered** [4] - 283:24, 289:2, 292:15, 360:9
**answering** [2] - 286:11, 308:17
**answers** [4] - 277:19, 278:18, 286:8, 337:3
**antecedent** [1] - 374:17
**antiviolence** [2] - 373:6, 374:2
**apart** [1] - 314:9
**apartment** [1] - 342:16
**apologies** [2] - 272:11, 312:25
**apologize** [2] - 318:1, 383:17
**appalled** [1] - 363:23
**appear** [3] - 281:2, 304:6, 354:23
**appeared** [4] - 279:11, 290:13, 306:2, 323:2
**appearing** [3] - 268:1, 283:18, 321:14
**application** [2] - 265:2, 293:7
**apply** [1] - 331:17
**appreciate** [4] - 272:7, 273:6, 308:20, 383:18
**approach** [1] - 349:25
**appropriate** [2] - 270:8, 288:2
**April** [5] - 261:14, 290:15, 290:21, 292:10, 378:24
**archive** [2] - 372:6
**area** [7] - 282:1, 305:16, 305:17, 377:18, 377:25, 379:2
**areas** [1] - 353:17
**argued** [1] - 280:23
**arguing** [1] - 364:6
**argument** [1] - 375:21
**arguments** [1] - 375:10
**Ari** [2] - 269:12, 270:21
**arising** [1] - 318:12
**Arm** [1] - 355:13
**Armed** [8] - 268:22, 293:21, 310:11, 316:11, 317:6, 349:16, 352:1, 354:23
**Armstrong** [2] - 269:12, 270:22
**Arrest** [1] - 384:23
**article** [26] - 261:12,

268:21, 271:20, 272:3, 277:9, 277:24, 279:11, 309:25, 310:11, 311:15, 319:20, 319:21, 321:15, 321:18, 321:20, 336:11, 352:13, 379:19, 380:3, 380:6, 381:15, 381:24, 382:23, 383:5, 383:13, 385:10
**articles** [10] - 272:15, 346:7, 366:1, 381:25, 382:13, 382:19, 382:25, 383:1, 383:6, 383:16
**aspect** [3] - 274:8, 274:14, 277:25
**aspects** [4] - 273:7, 273:10, 277:6, 278:5
**assailant** [1] - 360:20
**assailants** [4] - 358:16, 358:19, 358:24, 359:3
**assaults** [1] - 344:2
**assembly** [1] - 262:20
**asserted** [1] - 299:17
**assertion** [4] - 284:4, 321:9, 336:17, 379:9
**assess** [1] - 353:10
**assessment** [1] - 330:22
**ASSISTANTS** [1] - 258:13
**associated** [1] - 306:15
**ASSOCIATION** [1] - 257:4
**association** [1] - 375:4
**assume** [1] - 305:6
**assumed** [4] - 330:23, 331:1, 331:11, 365:16
**assuming** [12] - 265:14, 331:15, 331:25, 332:2, 332:13, 332:16, 333:3, 333:4, 333:10, 333:12, 352:22, 359:10
**assumption** [11] - 296:25, 298:10, 298:12, 298:14, 332:4, 332:5, 332:10, 332:18, 332:23, 332:25, 333:6

**assumptions** [3] - 294:18, 298:20, 299:18
**asterisk** [2] - 304:25, 305:2
**astounded** [1] - 363:24
**attack** [1] - 363:12
**attacked** [3] - 304:5, 304:14, 305:6
**attacking** [1] - 354:18
**attacks** [1] - 363:20
**attain** [1] - 351:14
**attempt** [6] - 274:9, 274:14, 297:20, 312:3, 329:6, 355:25
**attempted** [1] - 276:11
**attempting** [2] - 293:6, 360:20
**attention** [14] - 265:16, 267:24, 269:11, 272:14, 277:23, 280:16, 303:21, 316:17, 320:2, 328:12, 359:18, 362:23, 365:6, 386:11
**attitudes** [1] - 374:2
**ATTORNEY** [2] - 258:11, 258:13
**Attorney** [5] - 306:7, 322:7, 324:21, 340:13, 379:6
**audio** [3] - 361:1, 361:3, 361:12
**August** [7] - 273:8, 273:11, 287:16, 289:17, 292:5, 378:18, 380:25
**AUGUST** [1] - 257:10
**Augustine** [2] - 327:20, 328:1
**Aurora** [1] - 366:15
**author** [1] - 273:6
**authored** [2] - 310:12, 346:8
**authority** [2] - 283:1, 322:8
**auto** [1] - 285:21
**automatic** [12] - 307:4, 307:5, 307:8, 307:20, 307:21, 314:22, 319:13, 329:3, 353:20, 353:24, 354:1, 354:2
**availability** [3] - 353:10, 370:25, 371:7
**available** [16] - 270:14, 281:19,

282:5, 284:5, 289:5, 290:21, 308:18, 338:3, 339:7, 356:7, 361:24, 366:2, 371:3, 371:5, 372:5, 375:11
**average** [8] - 288:19, 317:5, 317:22, 325:16, 342:6, 343:13, 343:14, 343:17
**Average** [1] - 316:20
**avoid** [1] - 373:25
**Award** [1] - 346:20
**award** [1] - 346:21
**awards** [1] - 326:23
**aware** [12] - 280:25, 282:8, 285:20, 288:11, 296:10, 315:8, 322:6, 330:15, 374:6, 377:6, 378:21, 380:25
**awareness** [1] - 289:23

---

**B**

**back-and-forth** [1] - 271:25
**background** [1] - 353:8
**backpack** [1] - 324:5
**bad** [1] - 355:6
**bag** [3] - 383:7, 383:10, 383:16
**ballpark** [1] - 294:24
**ban** [10] - 306:13, 353:1, 355:22, 368:13, 369:7, 369:23, 372:1, 372:19, 377:4, 377:5
**banned** [4] - 315:16, 340:20, 340:22, 371:1
**banning** [4] - 262:16, 364:7, 369:13, 376:14
**bans** [3] - 368:25, 375:9, 375:17
**base** [1] - 357:19
**based** [34] - 268:20, 270:13, 270:19, 281:1, 284:10, 284:22, 287:2, 289:5, 289:9, 293:9, 293:21, 296:16, 298:1, 298:12, 299:12, 301:24,

305:3, 309:24, 314:11, 317:6, 317:21, 327:16, 340:7, 343:19, 350:8, 351:20, 357:1, 358:2, 360:21, 365:16, 370:4, 381:13
**Based** [3] - 293:3, 314:20, 316:11
**baseline** [2] - 301:19, 309:23
**basic** [1] - 273:15
**basis** [10] - 270:6, 309:24, 318:6, 321:23, 335:24, 336:9, 380:5, 380:7, 380:13, 381:10
**basketball** [1] - 325:12
**bazillion** [1] - 327:3
**bear** [1] - 299:10
**Bear** [1] - 316:14
**bearing** [2] - 265:10, 318:9
**became** [2] - 268:21, 380:25
**Becerra** [1] - 264:22
**began** [2] - 367:6
**begin** [1] - 349:12
**beginning** [5] - 295:16, 320:4, 360:7, 367:8, 374:11
**behavior** [4] - 373:20, 374:1, 374:3, 374:4
**behaviors** [1] - 277:10
**belief** [2] - 276:15, 380:5
**bells** [1] - 357:13
**belongs** [1] - 372:6
**belt** [2] - 323:16, 338:3
**benefit** [2] - 375:24, 375:25
**bent** [1] - 340:5
**best** [17] - 269:21, 271:2, 277:21, 281:19, 282:5, 284:5, 288:4, 289:4, 290:4, 306:14, 346:21, 357:1, 359:12, 361:17, 364:21, 370:13, 375:11
**better** [4] - 287:14, 334:20, 354:1, 362:4
**between** [18] - 269:2, 289:16, 321:11, 324:6, 342:5, 343:8, 361:5, 361:8, 361:13, 367:1,

367:18, 367:24, 372:19, 372:22, 374:20, 374:22, 376:16, 380:25
**beyond** [1] - 320:20
**bias** [3] - 274:12, 281:3, 355:14
**biased** [2] - 283:6, 283:9
**big** [2] - 302:4, 369:13
**bigger** [1] - 354:4
**Bill** [1] - 285:12
**bill** [1] - 262:21
**binder** [13] - 265:3, 267:23, 272:14, 279:14, 282:23, 290:10, 292:23, 299:22, 306:6, 319:10, 326:10, 347:3, 351:16
**binders** [1] - 262:10
**bit** [9] - 266:22, 290:5, 292:22, 292:24, 325:11, 325:12, 334:2, 367:3, 371:20
**Blank** [1] - 346:21
**blog** [8] - 290:11, 290:13, 290:15, 290:20, 290:25, 291:23, 292:2
**bloodshed** [1] - 379:24
**blow** [1] - 306:8
**board** [3] - 277:12, 304:10, 359:20
**boarder** [1] - 370:24
**body** [1] - 300:14
**boil** [1] - 281:23
**book** [5] - 346:21, 349:16, 350:1, 352:1
**books** [1] - 346:10
**Boston** [1] - 305:21
**bottom** [15] - 265:11, 267:25, 278:13, 279:1, 280:17, 290:25, 291:2, 302:14, 305:2, 314:24, 320:3, 320:13, 320:14, 322:16
**box** [20] - 263:20, 329:13, 329:18, 329:24, 330:4, 330:13, 330:24, 331:5, 331:16, 331:17, 332:1, 332:9, 332:14, 333:4, 333:10, 365:14, 365:15, 365:18, 366:10, 327:11, 333:16,

366:22
**box-type** [16] - 263:20, 329:13, 329:24, 330:4, 330:13, 330:24, 331:16, 331:17, 332:1, 332:9, 332:14, 333:4, 333:10, 365:18, 366:10, 366:22
**brandished** [6] - 310:24, 311:3, 311:22, 311:23, 312:12, 313:8
**brandishing** [14] - 309:10, 309:12, 309:14, 309:22, 310:2, 310:6, 310:7, 310:8, 310:9, 311:6, 311:17, 312:4, 312:8
**break** [4] - 277:5, 319:1, 344:25, 345:1
**Brief** [2] - 319:19, 377:11
**briefs** [1] - 386:18
**bring** [2] - 269:11, 383:16
**bringing** [1] - 381:5
**broad** [2] - 307:17, 323:13
**broadly** [1] - 363:18
**brought** [3] - 365:21, 367:4, 382:22
**BRYAN** [1] - 258:12
**bullets** [12] - 314:3, 339:5, 354:10, 358:25, 359:4, 369:20, 369:24, 371:5, 371:8, 372:20, 374:7, 374:20
**burden** [4] - 295:12, 318:14, 354:10, 355:19
**burdened** [1] - 356:15
**Bureau** [5] - 279:17, 280:3, 280:4, 354:4
**Bush's** [1] - 285:10
**business** [1] - 363:22
**business-like** [1] - 363:22
**BY** [25] - 258:4, 258:7, 258:11, 259:2, 259:3, 259:4, 262:13, 272:13, 276:10, 287:15, 300:25, 303:20, 313:12, 314:19, 320:21, 322:11, 327:11, 333:16,

335:23, 343:6, 345:15, 347:2, 348:2, 351:4, 378:16
**bystander** [2] - 368:2, 379:8
**bystanders** [3] - 363:21, 376:2, 378:6

───────────

## C

───────────

**C.C.R** [1] - 257:24
**C.V** [4] - 284:19, 284:22, 285:10, 285:13
**cage** [1] - 370:14
**calculate** [1] - 371:16
**calculated** [1] - 347:10
**calculating** [1] - 367:5
**calculation** [3] - 332:10, 349:23, 362:21
**California** [1] - 264:22
**campus** [2] - 342:16, 367:7
**cancel** [1] - 358:10
**cannot** [3] - 272:24, 273:1, 273:3
**capable** [2] - 263:14, 264:3
**capacities** [2] - 364:13, 366:5
**Capacity** [2] - 319:24, 343:12
**capacity** [48] - 262:17, 263:24, 264:18, 265:25, 266:14, 294:22, 295:5, 306:13, 318:13, 319:12, 330:4, 330:12, 330:18, 331:25, 339:10, 344:9, 344:14, 344:20, 347:7, 347:18, 347:20, 347:21, 353:1, 354:6, 355:22, 364:7, 364:12, 364:15, 365:1, 365:4, 365:5, 365:8, 365:20, 366:9, 368:12, 368:15, 368:25, 369:7, 374:10, 374:16, 375:6, 375:8, 375:12, 375:17, 375:19, 375:20, 376:15
**capita** [1] - 357:24

**captioned** [1] - 316:19
**care** [2] - 267:10, 356:11
**career** [2] - 309:6, 345:25
**careful** [2] - 267:2, 267:8
**carefully** [2] - 354:16, 355:7
**carry** [2] - 267:25, 277:4
**carrying** [3] - 280:21, 280:23, 356:8
**case** [45] - 262:18, 264:22, 265:2, 265:5, 267:4, 267:16, 267:23, 270:21, 284:20, 288:22, 289:14, 289:15, 290:18, 292:8, 293:18, 297:4, 300:11, 300:24, 301:11, 301:13, 307:13, 307:23, 308:11, 316:7, 318:2, 318:18, 319:9, 330:25, 335:25, 336:14, 336:20, 347:5, 348:15, 354:20, 354:22, 360:12, 363:7, 364:4, 369:13, 370:23, 381:8, 381:11, 381:12, 386:15
**cases** [15] - 275:5, 275:17, 308:7, 311:11, 337:4, 337:14, 348:13, 348:25, 350:9, 351:21, 354:21, 354:23, 355:16, 367:24, 368:23
**cases"** [1] - 305:3
**casualties** [1] - 343:23
**Casualty** [2] - 319:24, 343:12
**casualty** [1] - 364:7
**catalog** [1] - 366:3
**catalogs** [1] - 366:3
**categories** [2] - 305:11, 307:17
**category** [6] - 304:12, 305:1, 312:5, 314:24, 355:18
**causal** [4] - 346:2, 374:14, 374:22, 375:2
**causation** [2] -

372:18, 374:12
**causes** [2] - 278:15, 370:20
**causing** [1] - 374:15
**CDC** [2] - 290:9, 290:21
**Census** [2] - 279:17, 280:3
**Center** [2] - 266:7, 379:23
**Centers** [1] - 286:14
**century** [6] - 369:15, 376:9, 377:24, 378:5, 379:11, 379:12
**certain** [1] - 338:19
**certainly** [9] - 316:13, 317:1, 328:12, 328:22, 342:18, 349:9, 355:18, 370:18, 376:17
**Certainly** [3] - 299:13, 339:22, 339:25
**certainty** [1] - 295:6
**Certified** [1] - 257:23
**cetera** [2] - 304:16
**challenge** [1] - 262:18
**challenged** [1] - 340:22
**chamber** [1] - 264:8
**champion** [6] - 325:2, 325:3, 326:24, 336:2, 361:21
**Champion** [1] - 385:6
**chance** [1] - 275:6
**change** [54] - 319:12, 320:5, 320:9, 320:22, 321:22, 325:17, 327:25, 328:5, 328:15, 328:25, 329:7, 329:12, 329:17, 329:23, 330:7, 330:12, 330:22, 331:2, 331:10, 331:12, 331:24, 332:3, 332:17, 332:22, 336:1, 336:10, 336:18, 336:22, 338:4, 338:19, 338:23, 339:15, 339:20, 339:23, 340:1, 340:8, 341:2, 341:8, 341:23, 342:1, 342:13, 342:17, 342:19, 360:23, 361:14, 362:5, 362:7, 363:3, 365:22, 366:19,

368:18, 369:1, 370:11, 375:21
**changed** [5] - 316:4, 325:7, 342:5, 361:15, 376:23
**changes** [17] - 327:13, 328:10, 328:21, 329:2, 333:19, 334:3, 334:7, 334:10, 334:22, 335:7, 339:11, 362:16, 363:14, 368:9, 368:14, 369:11, 375:24
**changing** [12] - 324:13, 328:13, 331:17, 337:5, 337:15, 337:25, 341:16, 342:18, 367:21, 367:23, 369:13, 376:1
**characteristic** [1] - 363:18
**characterization** [2] - 281:18, 282:4
**characterize** [1] - 349:9
**characterized** [1] - 367:16
**chart** [1] - 354:7
**children** [1] - 373:24
**choice** [1] - 263:19
**choose** [1] - 263:23
**circumstances** [2] - 338:6, 338:19
**citation** [2] - 320:24, 321:13
**citations** [4] - 321:7, 321:8, 321:11, 321:19
**cite** [11] - 261:4, 282:23, 283:1, 283:5, 300:14, 320:22, 321:18, 321:21, 321:23, 322:1, 322:8
**cited** [9] - 281:7, 281:10, 282:21, 300:10, 321:1, 321:10, 327:14, 328:16, 374:9
**citing** [2] - 321:18, 330:6
**citizen** [3] - 263:7, 358:24, 359:2
**Citizen** [5] - 293:21, 316:11, 317:6, 354:24, 355:13
**citizens** [3] - 264:2, 356:5, 360:2

**CIVIL** [1] - 257:6
**civilian** [2] - 280:1, 360:3
**civilians** [3] - 288:17, 359:21, 360:8
**Civilians** [1] - 360:10
**claim** [2] - 271:21, 349:10
**claimed** [1] - 368:25
**claiming** [1] - 351:3
**claims** [2] - 273:17, 367:5
**clarification** [1] - 308:8
**CLARKSON** [1] - 257:11
**classes** [3] - 345:22, 345:25, 346:1
**classification** [1] - 278:8
**classifications** [1] - 278:15
**clear** [8] - 272:24, 273:1, 282:17, 288:14, 296:14, 368:5, 371:23, 373:8
**clearly** [7] - 270:17, 292:18, 312:2, 352:22, 355:6, 356:18, 362:1
**clerk** [1] - 260:9
**CLERK** [1] - 262:3
**clicking** [1] - 327:2
**clinical** [2] - 323:4, 334:21
**Clinton's** [1] - 285:12
**clip** [4] - 340:13, 341:25, 343:7, 343:19
**clock** [2] - 342:14, 361:6
**closer** [2] - 266:15, 266:16
**CLUBS** [1] - 257:4
**CNN** [8] - 306:1, 306:4, 306:5, 306:11, 306:16, 352:13, 352:22, 357:5
**co** [2] - 273:6, 310:12
**co-author** [1] - 273:6
**co-authored** [1] - 310:12
**cocaine** [1] - 269:8
**code** [1] - 305:2
**coil** [2] - 263:20, 329:19
**coil-type** [1] - 263:20
**coincidence** [1] - 357:23

**coincidentally** [1] - 358:9
**colleague** [1] - 383:13
**colleagues** [1] - 377:8
**collected** [1] - 290:22
**Colorado** [9] - 269:21, 270:1, 288:3, 288:8, 288:15, 288:22, 288:23, 289:1, 366:15
**column** [6] - 310:25, 312:9, 316:21, 317:24, 354:24, 355:13
**columns** [1] - 316:21
**combined** [3] - 274:8, 274:13, 315:1
**comfortable** [1] - 270:1
**coming** [2] - 261:2, 375:4
**comment** [1] - 372:21
**committed** [3] - 340:18, 340:19, 370:10
**common** [5] - 343:19, 348:11, 350:25, 351:2, 374:17
**commonly** [2] - 361:18, 362:6
**compared** [1] - 271:8
**comparing** [1] - 375:13
**compensated** [1] - 275:5
**competent** [2] - 282:14, 282:19
**Competent** [1] - 282:20
**competition** [2] - 307:11, 334:9
**compilation** [1] - 366:3
**complaint** [1] - 297:15
**complete** [3] - 283:2, 349:22, 370:4
**completely** [2] - 292:12, 367:20
**compliance** [2] - 318:13, 369:18
**complicated** [1] - 344:11
**comply** [1] - 339:5
**comport** [1] - 297:17
**comprehensible** [1] - 365:7
**comprehensive** [1] - 366:3
**compute** [3] - 348:8, 348:24, 372:12

**computed** [1] - 294:23
**computing** [1] - 348:19
**concede** [4] - 266:16, 266:24, 293:5, 305:13
**conceivable** [1] - 308:18
**conceivably** [1] - 275:14
**concentrated** [1] - 275:9
**concern** [2] - 297:17, 329:2
**concerned** [2] - 302:2, 376:1
**concerning** [1] - 334:10
**conclude** [1] - 351:12
**concluded** [3] - 279:6, 293:22, 309:25
**Conclusion** [1] - 280:17
**conclusion** [5] - 267:18, 267:19, 273:5, 280:18, 326:6
**conclusions** [6] - 272:24, 273:1, 273:3, 289:8, 354:20, 386:19
**conditions** [6] - 323:4, 333:20, 334:2, 334:4, 334:21, 338:5
**conducted** [9] - 268:3, 279:16, 280:3, 289:10, 296:1, 296:21, 309:6, 319:6, 327:19
**confer** [1] - 382:1
**confident** [2] - 295:23, 301:16
**confined** [2] - 268:15, 365:6
**confirm** [1] - 301:25
**confirmed** [4] - 369:4, 379:14, 381:7, 381:8
**conflict** [1] - 335:18
**confronted** [1] - 340:5
**confronting** [2] - 358:24, 359:3
**congressional** [1] - 334:18
**connection** [6] - 269:1, 284:19, 289:14, 300:24, 318:2, 318:18
**Connections** [1] - 260:15
**consider** [2] - 301:9, 350:13

considerably [1] -
344:5
considered [2] -
301:5, 350:16
consisted [1] - 309:22
consistent [2] - 263:1,
317:16
constant [1] - 357:21
constitutional [1] -
267:5
consulted [1] - 366:3
contain [1] - 315:9
containing [1] -
326:19
contend [2] - 274:21,
294:14
contention [1] -
335:24
context [5] - 265:21,
286:5, 288:2, 381:9
contingent [1] -
295:17
continue [2] - 276:8,
360:6
contrary [2] - 335:13,
379:9
contrast [1] - 302:21
Control [1] - 286:14
control [11] - 282:12,
285:24, 353:9,
353:11, 372:23,
373:1, 373:4, 373:8,
373:15, 374:5
controls [1] - 353:12
controversial [4] -
277:10, 350:24,
352:7, 352:11
convicted [1] - 262:24
Cook [21] - 279:8,
279:14, 279:18,
279:20, 279:23,
280:8, 280:12,
280:18, 281:7,
281:10, 282:9,
282:12, 282:18,
282:21, 282:23,
283:1, 283:5,
283:16, 284:3,
350:15, 371:6
COOPER [2] - 258:7,
258:8
copies [1] - 326:9,
382:4
copy [5] - 260:6,
272:15, 350:1,
381:16
corner [2] - 278:3,
310:16
Correct [3] - 272:21,
296:16, 319:9

correct [109] - 257:23,
262:18, 262:25,
263:15, 263:21,
264:5, 264:10,
264:16, 264:23,
266:8, 266:9,
266:15, 267:1,
267:11, 268:17,
268:23, 269:3,
269:8, 269:16,
270:12, 271:22,
272:3, 273:12,
273:16, 274:21,
274:23, 275:22,
276:12, 278:8,
278:23, 279:5,
280:6, 280:10,
282:9, 283:3,
284:23, 285:7,
286:4, 286:20,
290:3, 290:18,
291:8, 291:18,
291:19, 292:11,
293:6, 293:14,
293:19, 293:25,
294:10, 295:3,
295:13, 295:15,
296:19, 297:5,
297:9, 297:23,
299:4, 299:12,
299:23, 300:5,
301:7, 303:7, 305:4,
306:22, 307:5,
307:15, 308:1,
308:2, 308:24,
309:3, 309:10,
309:18, 309:22,
310:6, 310:21,
311:2, 311:7,
313:19, 314:12,
315:3, 315:23,
317:7, 317:23,
318:14, 318:20,
319:25, 320:9,
320:10, 320:24,
321:25, 323:4,
323:8, 323:13,
323:18, 328:17,
329:9, 329:22,
329:25, 330:1,
331:3, 332:14,
333:2, 338:15,
339:21, 339:24,
340:3, 344:6, 381:5
corrected [1] - 310:5
correctly [5] - 281:4,
281:5, 306:18,
312:13, 380:11
correlate [1] - 352:25
correlated [2] - 344:9,

344:14
correlates [4] -
306:25, 352:24,
353:2, 353:18
correlation [8] -
353:4, 372:19,
372:21, 372:22,
374:11, 374:13,
374:14, 374:20
correlations [1] -
374:10
correspond [1] -
364:13
correspondence [1] -
376:16
corroborate [1] -
317:14
corroborated [2] -
317:10, 317:12
cost [1] - 285:24
Council [2] - 285:11,
285:13
Counsel [1] - 386:23
count [1] - 364:8
counter [1] - 381:20
counting [1] - 269:4
country [6] - 275:2,
275:10, 294:16,
298:8, 298:18,
353:25
Counts [2] - 319:24,
343:12
couple [4] - 260:2,
273:19, 326:20,
378:18
course [2] - 344:21,
359:15
court [2] - 297:16,
383:14
Court [17] - 261:4,
262:12, 265:1,
267:15, 267:20,
270:3, 293:18,
301:17, 326:10,
326:13, 329:1,
341:5, 343:18,
381:16, 382:13,
383:23, 386:10
COURT [129] - 257:1,
257:15, 260:1,
260:4, 260:10,
260:17, 260:20,
261:6, 261:18,
261:20, 261:24,
262:5, 262:8,
262:11, 265:22,
266:23, 272:9,
272:12, 273:22,
275:21, 276:3,
276:8, 276:23,

277:1, 277:3,
277:20, 280:14,
281:22, 282:24,
283:24, 284:1,
286:9, 287:8,
287:14, 291:24,
292:15, 300:18,
300:21, 301:12,
301:15, 302:6,
303:14, 303:18,
310:19, 312:23,
313:2, 314:14,
314:17, 315:19,
318:25, 320:11,
320:16, 320:19,
324:17, 325:5,
325:7, 325:13,
325:18, 325:22,
325:24, 326:5,
326:8, 326:14,
326:18, 326:25,
327:5, 327:8, 331:6,
331:8, 333:8,
333:13, 334:24,
335:4, 335:10,
335:17, 335:21,
337:8, 337:13,
340:24, 341:7,
341:11, 341:16,
341:22, 341:25,
342:7, 342:20,
342:23, 342:25,
344:22, 344:24,
345:2, 345:8,
345:11, 345:13,
346:25, 348:1,
349:24, 350:2,
377:9, 377:14,
377:18, 377:25,
378:12, 378:14,
380:9, 381:21,
381:24, 382:6,
382:10, 382:15,
382:21, 383:4,
383:20, 384:3,
384:5, 384:10,
384:17, 384:24,
385:3, 385:7,
385:12, 385:15,
385:17, 385:23,
386:1, 386:7, 386:9,
386:12, 386:14
Court's [7] - 260:8,
269:11, 297:21,
378:9, 381:14, 383:8
courtesy [2] - 383:15,
383:18
COURTHOUSE [1] -
257:11
covered [2] - 292:14,
318:1

crack [1] - 269:8
credentials [1] -
284:18
credibility [1] - 325:13
credible [1] - 277:7
credit [1] - 273:5
Crime [5] - 268:22,
279:15, 279:20,
280:2, 310:11
crime [21] - 269:7,
271:4, 271:5, 271:7,
300:4, 301:5,
301:23, 303:8,
303:21, 307:1,
352:24, 353:14,
353:18, 355:23,
356:6, 357:22,
358:6, 358:7,
358:12, 364:9,
373:21
crimes [4] - 304:2,
304:16, 305:14
Crimes [1] - 303:23
criminal [7] - 280:24,
299:22, 349:14,
351:18, 354:19,
355:25, 356:19
Criminal [1] - 352:1
criminals [1] - 364:10
criminology [7] -
345:23, 346:5,
346:15, 346:19,
346:21, 353:8,
378:22
Criminology [1] -
279:12
critical [6] - 279:11,
332:4, 332:10,
332:12, 332:15,
332:19
critically [1] - 271:21
criticism [6] - 272:4,
273:8, 274:18,
342:12, 350:5, 350:6
criticisms [6] - 272:1,
273:11, 273:14,
281:24, 349:5,
349:22
criticize [1] - 373:22
criticized [4] - 271:13,
278:6, 341:4, 349:3
criticizing [2] -
272:16, 283:11
critics [2] - 279:7,
350:15
critiques [3] - 293:3,
348:5, 349:8
cross [1] - 377:15
CROSS [2] - 259:2,
262:13

**CROSS-EXAMINATION** [2] - 259:2, 262:13
**crowded** [3] - 333:21, 334:11, 335:7
**crummy** [1] - 361:18
**cue** [1] - 340:13
**curb** [1] - 344:19
**curious** [1] - 276:14
**current** [2] - 269:13, 357:2
**Custody** [1] - 385:11
**customary** [1] - 321:11
**customer** [1] - 379:24
**Customer** [1] - 384:20
**cut** [1] - 355:14

## D

**daily** [1] - 294:21
**dangers** [1] - 274:16
**DANIEL** [1] - 258:4
**data** [29] - 266:3, 269:16, 269:17, 270:4, 271:1, 279:25, 280:22, 281:1, 283:16, 285:18, 286:13, 286:16, 287:13, 290:22, 292:7, 292:9, 293:23, 301:23, 305:13, 317:21, 354:3, 357:2, 371:6, 372:4, 372:5, 372:6, 372:7, 372:12, 375:14
**Database** [4] - 293:22, 316:11, 317:7, 317:11
**database** [1] - 357:16
**date** [3] - 265:13, 290:15, 378:10
**David** [3] - 271:17, 282:9, 282:12
**DAVID** [1] - 258:7
**DAVIS** [1] - 258:8
**DAY** [1] - 257:20
**daylight** [1] - 323:13
**days** [2] - 338:24, 364:3
**deadly** [1] - 352:11
**deal** [2] - 382:13, 386:20
**dealing** [2] - 285:18, 354:16
**decades** [1] - 376:23
**deceptive** [1] - 270:11
**decided** [1] - 297:16

**deciding** [1] - 267:5
**decision** [2] - 343:2, 377:19
**declaration** [44] - 264:25, 265:5, 265:9, 265:12, 267:3, 267:5, 267:16, 267:22, 268:10, 270:7, 284:20, 286:24, 287:1, 287:8, 287:10, 289:13, 290:18, 292:8, 292:23, 293:1, 293:9, 293:16, 298:15, 300:10, 300:12, 300:16, 300:24, 301:3, 316:6, 316:16, 316:18, 319:9, 320:23, 321:3, 321:4, 321:6, 321:14, 321:16, 327:14, 335:25, 347:4, 354:8, 378:8
**declarations** [1] - 386:15
**deduce** [2] - 312:6, 312:7
**deducing** [1] - 312:13
**deemed** [1] - 386:3
**deep** [1] - 324:2
**defend** [4] - 288:17, 309:16, 313:25, 319:3
**Defendant's** [2] - 259:9, 261:22
**DEFENDANTS** [2] - 257:7, 258:13
**defendants** [2] - 293:5, 316:7
**Defendants'** [6] - 259:10, 259:11, 259:12, 327:10, 385:8, 385:16
**defender** [6] - 293:13, 310:23, 313:7, 359:13, 360:19
**defender's** [1] - 314:11
**defenders** [1] - 318:10
**defending** [4] - 318:19, 319:2, 349:13, 349:14
**defense** [17] - 261:9, 264:4, 264:13, 295:12, 308:1, 308:20, 309:3, 315:23, 316:25, 317:5, 318:4, 318:8,

318:14, 354:10, 355:19, 358:3, 359:23
**Defense** [2] - 268:23, 310:12
**Defensive** [1] - 279:13
**defensive** [123] - 268:4, 268:8, 268:12, 268:15, 268:19, 269:2, 269:6, 269:13, 269:22, 270:2, 270:5, 271:10, 271:11, 271:14, 271:22, 274:23, 278:6, 279:4, 279:8, 280:6, 280:9, 281:14, 281:20, 282:6, 284:6, 286:5, 286:15, 286:23, 287:3, 287:19, 288:6, 289:9, 291:1, 291:3, 291:6, 291:7, 292:25, 293:4, 293:12, 293:22, 293:23, 294:9, 294:13, 294:15, 294:21, 295:19, 296:2, 296:6, 296:25, 297:1, 297:5, 297:8, 297:12, 297:17, 297:22, 298:2, 298:4, 298:6, 298:7, 298:11, 298:17, 298:22, 299:1, 299:2, 299:8, 299:14, 299:18, 302:22, 302:23, 302:24, 304:1, 304:5, 309:6, 309:9, 309:15, 309:21, 310:1, 310:4, 310:5, 310:20, 311:10, 311:11, 311:16, 312:4, 312:16, 313:6, 314:15, 314:21, 316:9, 316:13, 325:10, 348:3, 348:9, 348:17, 348:20, 348:24, 349:1, 349:10, 349:23, 351:2, 351:6, 351:9, 351:13, 351:23, 352:14, 353:20, 354:9, 354:14, 354:16, 355:1, 355:7, 355:8, 356:23, 357:2, 357:9, 357:11,

357:15, 357:18, 357:20, 358:4, 358:8, 358:18, 360:18
**defensively** [3] - 295:2, 295:5, 295:10
**define** [1] - 314:16
**defined** [2] - 309:9, 347:19
**definitely** [2] - 314:18, 358:6
**definition** [5] - 309:15, 314:15, 347:11, 347:14, 347:17
**deflates** [1] - 291:7
**Degree** [1] - 285:4
**degrees** [2] - 345:18, 345:20
**deliberate** [1] - 363:22
**deliberately** [2] - 275:11, 277:15
**delusions** [1] - 370:4
**demand** [1] - 373:23
**demanded** [1] - 277:18
**demented** [2] - 363:19, 376:19
**demonstrate** [2] - 295:18, 341:19
**demonstrated** [1] - 334:22
**demonstrates** [1] - 341:21
**demonstrating** [3] - 328:20, 333:18, 334:7
**demonstration** [5] - 320:8, 322:1, 327:18, 327:19, 328:9
**denying** [1] - 351:1
**Department** [1] - 300:7
**deposed** [4] - 287:12, 287:16, 292:5, 336:14
**deposition** [41] - 269:10, 273:8, 273:11, 276:15, 276:20, 281:16, 281:25, 283:14, 284:2, 286:25, 287:24, 306:3, 306:20, 307:2, 307:7, 307:13, 307:22, 307:24, 308:10, 308:22, 327:12, 328:14, 329:5, 330:2, 331:19, 333:17,

333:25, 335:14, 336:18, 337:11, 338:14, 343:22, 360:7, 364:1, 365:21, 365:24, 378:8, 378:17, 379:3, 381:1, 381:2
**depositions** [2] - 335:1, 335:2
**Deputy** [5] - 306:7, 322:7, 324:20, 340:12, 379:6
**DEPUTY** [1] - 262:3
**derived** [1] - 327:13
**describe** [2] - 323:6, 334:4
**describes** [1] - 363:11
**description** [2] - 279:19, 354:14
**deserve** [1] - 370:5
**design** [2] - 275:1, 346:3
**designed** [2] - 268:20, 283:20
**desirability** [2] - 274:3, 274:12
**desire** [1] - 374:18
**detachable** [2] - 315:13, 320:5
**detail** [3] - 329:11, 352:7, 352:10
**detailed** [2] - 357:7, 371:14
**details** [2] - 349:1, 375:14
**detectives** [1] - 379:22
**detects** [1] - 361:5
**determination** [2] - 343:1, 382:3
**determine** [5] - 312:3, 312:15, 318:3, 355:24, 356:1
**deterred** [1] - 369:22
**deterrence** [1] - 314:6
**deterrent** [1] - 356:21
**detrimental** [1] - 314:5
**device** [1] - 361:4
**DGU** [3] - 280:1, 281:1, 281:3
**DGUs** [2] - 280:19, 280:22
**diagnostic** [1] - 285:21
**die** [1] - 370:9
**died** [1] - 344:1
**difference** [5] - 324:1, 324:3, 366:21, 368:19, 373:9
**different** [9] - 284:8, 289:8, 304:1, 316:1,

317:13, 329:18,
342:11, 347:11,
355:21
**differently** [2] - 302:8,
347:11
**dig** [1] - 323:21
**Digest** [2] - 366:4
**dimension** [1] - 267:6
**direct** [11] - 265:16,
267:24, 272:14,
277:23, 280:16,
316:17, 320:2,
359:18, 360:6,
362:23, 386:16
**directed** [1] - 316:2
**directing** [1] - 303:21
**direction** [2] - 350:21,
353:23
**directly** [1] - 352:2
**disadvantage** [1] -
356:16
**disagree** [2] - 267:13,
284:4
**disagrees** [2] - 283:7,
283:10
**discharge** [1] - 305:8
**discharged** [1] -
318:19
**discuss** [2] - 305:24,
306:2
**discussed** [4] - 293:1,
305:16, 305:22,
330:21
**discussing** [1] - 369:7
**discussion** [3] -
260:13, 351:16,
365:13
**Disease** [1] - 286:14
**dismissive** [1] -
306:21
**displayed** [1] - 285:9
**displaying** [1] -
309:12
**dispute** [1] - 318:6
**disputes** [1] - 373:25
**distribute** [1] - 262:10
**distribution** [2] -
316:1, 353:21
**DISTRICT** [4] - 257:1,
257:1, 257:15,
257:16
**District** [1] - 264:22
**divide** [1] - 367:15
**doctor** [1] - 382:24
**doctoral** [1] - 345:25
**document** [13] -
261:14, 265:19,
265:20, 300:10,
300:23, 301:1,
301:6, 301:24,

302:1, 302:4, 302:9,
325:24, 351:19
**documents** [2] -
260:18, 261:1
**DOJ** [1] - 351:19
**DOMINGUEZ** [1] -
258:12
**done** [10] - 283:21,
289:22, 296:14,
296:24, 318:16,
357:4, 365:13,
373:23, 375:8, 377:3
**Donohue** [5] - 340:18,
341:3, 342:7,
342:13, 371:4
**Doug** [4] - 322:5,
325:10, 385:5
**Dow** [1] - 317:11
**down** [20] - 277:5,
278:17, 280:16,
281:23, 291:15,
312:8, 314:24,
317:23, 319:1,
320:13, 324:2,
345:3, 358:9,
359:24, 363:1,
367:21, 377:1,
377:2, 383:9
**dozen** [1] - 368:9
**dozens** [1] - 353:3
**Dr** [1] - 260:14
**draw** [1] - 354:20
**drawn** [1] - 289:8
**drive** [3] - 326:13,
326:18, 385:25
**drop** [2] - 339:16,
339:21
**dropping** [1] - 364:17
**drum** [6] - 263:20,
329:18, 366:13,
366:18, 366:20,
366:24
**drum-style** [1] -
263:20
**drum-type** [4] -
366:13, 366:18,
366:20, 366:24
**due** [1] - 369:1
**Duke** [1] - 282:18
**Duncan** [18] - 264:22,
265:1, 265:5,
265:12, 265:17,
267:3, 267:16,
292:23, 293:2,
293:9, 293:10,
293:16, 293:17,
294:4, 294:25,
297:1, 298:15, 347:5
**duplicative** [1] -
328:18

**during** [6] - 309:5,
346:8, 346:10,
352:5, 375:23,
376:25
**DX** [1] - 327:6
**DX-115** [1] - 261:9
**DX-116** [1] - 261:11
**DX-117** [1] - 261:14
**DX-118** [3] - 326:16,
326:18, 385:4

# E

**e-mailing** [1] - 383:13
**early** [3] - 342:14,
376:25, 377:1
**EAST** [1] - 257:11
**easy** [2] - 292:17,
337:24
**Economic** [2] -
285:11, 285:13
**economic** [1] - 285:16
**economics** [4] -
285:1, 285:4,
290:11, 345:18
**economist** [1] -
285:10
**edition** [1] - 366:4
**effect** [16] - 307:1,
313:25, 314:5,
314:6, 314:9,
315:22, 324:13,
329:7, 348:20,
348:23, 356:21,
372:24, 372:25,
374:3, 375:1
**effective** [3] - 280:24,
322:14, 368:12
**effectively** [1] - 333:3
**efficacy** [1] - 377:4
**effort** [2] - 370:21,
371:1
**efforts** [1] - 370:21
**either** [8] - 354:15,
354:18, 364:10,
367:24, 370:9,
373:6, 381:23
**electorate** [1] - 373:16
**elicited** [1] - 381:5
**emphasis** [1] - 364:8
**emphasize** [1] -
339:19
**empirical** [2] - 289:6,
318:6, 377:3
**employ** [1] - 264:13
**empty** [1] - 361:10
**enacted** [1] - 295:11
**end** [3] - 286:9,
301:24, 370:10

**ended** [2] - 275:23,
276:1
**enforcement** [1] -
360:4
**engaged** [3] - 277:11,
341:1, 354:9
**ensconced** [1] -
341:13
**entire** [3] - 305:10,
335:24, 369:15
**entirely** [2] - 317:13,
364:8
**entitled** [6] - 260:14,
261:10, 261:15,
268:21, 278:10,
349:16
**entry** [1] - 301:24
**epidemic** [1] - 269:8
**episode** [1] - 299:2
**equal** [2] - 358:4,
360:9
**equipped** [1] - 371:21
**equivalent** [1] -
290:12
**erroneous** [1] - 350:8
**error** [6] - 266:17,
267:11, 267:12,
267:17, 267:19,
367:5
**errors** [3] - 349:4,
350:17, 350:20
**escape** [2] - 341:20,
368:11
**escaping** [1] - 370:11
**especially** [6] -
274:16, 282:9,
283:9, 306:25,
352:10, 373:25
**ESQUIRE** [7] - 258:4,
258:7, 258:8, 258:8,
258:11, 258:12,
258:12
**essence** [1] - 291:10
**establish** [3] - 295:10,
325:3, 366:17
**established** [4] -
270:15, 282:21,
309:5, 367:12
**establishes** [1] -
321:5
**estimate** [30] - 268:15,
268:19, 269:6,
269:14, 269:18,
271:14, 274:9,
274:14, 275:16,
279:4, 279:5, 287:3,
288:5, 298:21,
302:7, 305:3,
309:21, 319:17,
350:12, 350:13,

350:14, 350:21,
351:15, 351:23,
352:9, 357:1,
357:16, 358:8,
358:11, 361:13
**estimated** [6] -
268:11, 269:12,
270:5, 278:6,
294:12, 358:8
**estimates** [11] -
270:12, 271:4,
280:19, 280:21,
281:1, 292:25,
293:4, 301:8,
301:20, 351:20,
358:10
**Estimates** [1] - 270:13
**estimating** [3] - 268:7,
279:2, 280:1
**Estimating** [1] - 268:9
**estimation** [1] -
297:21
**et** [3] - 257:7, 304:16
**evaluate** [1] - 329:6
**EVAN** [1] - 258:11
**event** [4] - 270:12,
274:9, 274:15,
334:18
**events** [6] - 278:17,
279:3, 307:11,
317:13, 344:8,
344:14
**eventually** [1] - 365:6
**everywhere** [1] -
356:9
**Evidence** [1] - 279:13
**evidence** [35] - 259:8,
259:9, 259:10,
259:11, 259:11,
259:12, 260:7,
260:24, 261:7,
261:16, 261:23,
270:10, 270:13,
281:15, 281:19,
282:5, 284:5, 289:6,
298:12, 299:10,
299:12, 318:9,
321:10, 325:25,
326:6, 327:10,
341:5, 349:20,
370:8, 374:9,
381:16, 385:2,
385:8, 385:16,
385:20
**evident** [1] - 320:15
**evidentiary** [1] - 260:3
**exact** [4] - 307:19,
330:10, 372:8
**exactly** [7] - 276:18,
291:12, 306:5,

315:24, 324:20,
330:8, 368:17
**examination** [1] -
341:2
**EXAMINATION** [6] -
259:2, 259:3, 259:4,
262:13, 345:15,
378:16
**examine** [1] - 382:19
**examined** [1] - 271:21
**examining** [1] -
292:24
**example** [2] - 262:24,
263:19, 324:5,
333:21, 334:11,
334:15, 342:10,
342:11, 361:10,
362:4, 367:3, 375:5,
375:16
**exceed** [2] - 332:3,
332:18
**exceeding** [1] -
266:14
**exceedingly** [1] -
279:3
**exception** [2] -
366:10, 366:21
**exceptionally** [1] -
377:17
**exceptions** [1] -
366:12
**excerpt** [1] - 337:11
**excerpts** [1] - 334:3
**excess** [2] - 263:24,
305:9
**excessive** [1] - 355:11
**exclusive** [1] - 304:7
**executed** [1] - 290:18
**Exhibit** [14] - 259:8,
259:9, 259:10,
259:11, 259:12,
260:23, 261:22,
271:12, 282:23,
321:21, 322:9,
327:10, 385:8,
385:16
**EXHIBITS** [1] - 259:7
**Exhibits** [2] - 259:10,
385:1
**existence** [2] - 289:18,
315:8
**expect** [5] - 267:15,
269:5, 271:9, 360:3,
373:20
**expenditure** [2] -
296:2, 296:7
**expense** [1] - 370:21
**experience** [4] -
285:18, 285:21,
348:17, 353:15

**experienced** [8] -
319:11, 319:18,
320:9, 322:2, 322:4,
324:8, 361:25, 362:2
**expert** [6] - 264:21,
267:1, 284:9,
315:10, 316:6,
346:24
**expertise** [1] - 353:17
**experts** [1] - 362:13
**explained** [2] - 311:8,
312:2
**explaining** [1] - 311:5
**explicit** [1] - 334:7
**exploration** [1] - 375:5
**explored** [1] - 367:9
**exploring** [1] - 324:19
**extensive** [1] - 341:2
**extensively** [2] -
377:21, 378:8
**extent** [2] - 330:3,
330:11
**exterminated** [1] -
370:5
**extra** [2] - 275:6,
370:21
**extrapolate** [1] -
274:17
**extremely** [1] - 338:21
**eyes** [1] - 341:14

## F

**faces** [1] - 358:13
**facing** [1] - 359:5
**fact** [27] - 269:20,
271:13, 271:24,
275:15, 277:11,
278:13, 282:11,
284:7, 288:11,
295:16, 306:24,
307:10, 318:6,
320:8, 335:25,
336:11, 341:19,
350:23, 351:5,
355:18, 356:15,
356:18, 364:4,
365:13, 380:19,
385:21
**Factiva** [2] - 317:11,
317:21
**factor** [4] - 271:3,
271:9, 358:3, 374:17
**factors** [3] - 372:25,
373:2, 374:15
**facts** [2] - 261:3,
386:19
**factual** [1] - 379:9
**factually** [1] - 299:17

**failed** [1] - 366:16
**failure** [1] - 369:5
**fair** [19] - 266:1, 268:3,
268:6, 279:7,
291:11, 295:25,
296:5, 296:15,
301:1, 301:18,
308:3, 308:10,
308:15, 309:7,
319:7, 321:6,
336:18, 343:15,
382:23
**false** [1] - 278:22,
350:25
**falsely** [1] - 351:2
**familiar** [3] - 262:16,
316:6, 378:19
**Family** [1] - 385:6
**fanatics** [1] - 282:12
**far** [10] - 294:2, 302:1,
330:15, 338:7,
338:9, 347:23,
350:25, 357:6,
367:24, 369:14
**fashion** [2] - 277:17,
363:22
**fast** [2] - 294:4, 339:1
**fatal** [5] - 344:4,
344:10, 344:15,
347:16
**fatalities** [3] - 344:10,
344:15
**FBI** [4] - 261:1,
261:10, 261:13,
261:14
**federal** [1] - 267:4
**Federal** [1] - 264:22
**felon** [1] - 262:24
**female** [1] - 276:16
**few** [5] - 321:1, 328:1,
366:16, 367:2,
383:11
**fewer** [6] - 263:14,
264:18, 305:3,
305:10, 339:11,
351:21
**field** [5] - 346:4,
346:18, 362:13,
378:22, 381:4
**fielded** [1] - 371:9
**fifth** [1] - 288:16
**figure** [8] - 294:13,
298:2, 298:5,
309:23, 320:23,
321:1, 325:14,
327:13
**figured** [1] - 367:10
**figures** [2] - 278:6,
303:25, 371:17
**file** [1] - 385:25

**final** [1] - 384:21
**findings** [3] - 274:17,
318:7, 351:24
**fine** [3] - 278:25,
286:11, 384:8
**finger** [1] - 304:20
**finished** [2] - 339:2,
380:7
**fire** [18] - 309:18,
314:4, 314:8,
314:10, 318:10,
318:12, 319:3,
342:6, 343:14,
343:15, 343:18,
356:16, 356:20,
367:17, 367:22,
368:16, 368:17,
375:22
**Firearm** [1] - 260:12
**firearm** [22] - 262:22,
263:2, 263:4, 264:3,
264:13, 304:7,
304:8, 305:7, 305:8,
307:5, 307:20,
308:16, 309:2,
309:12, 309:16,
310:2, 314:1,
318:20, 319:3,
319:13, 327:20,
359:23
**Firearms** [1] - 354:4
**firearms** [15] - 264:7,
264:17, 295:12,
307:4, 308:12,
308:23, 315:1,
315:3, 315:10,
316:1, 323:1,
329:13, 353:22,
363:15, 371:21
**fired** [43] - 293:13,
293:24, 294:16,
295:20, 298:6,
298:9, 298:19,
298:22, 299:3,
299:8, 299:15,
307:14, 307:19,
307:25, 308:4,
309:2, 311:12,
312:13, 312:17,
312:19, 313:10,
313:18, 313:21,
313:24, 316:10,
316:25, 317:5,
317:9, 317:22,
318:3, 318:7,
318:11, 355:12,
355:16, 355:17,
359:13, 361:5,
361:11, 361:14,
366:15, 367:12

**Fired** [2] - 312:9,
316:20
**firing** [8] - 264:3,
294:13, 309:13,
311:25, 312:5,
313:7, 355:10,
360:19
**first** [23] - 272:17,
272:20, 272:22,
273:24, 274:1,
275:7, 283:2, 291:2,
291:24, 305:1,
306:11, 310:24,
317:14, 324:14,
352:20, 354:13,
361:14, 366:8,
368:5, 371:10,
379:17
**FISHER** [1] - 257:11
**fits** [1] - 376:7
**five** [4] - 360:15,
362:18, 362:20,
384:8
**Five** [1] - 346:11
**flash** [1] - 312:25
**flaws** [3] - 273:21,
350:13, 350:14
**fleeing** [1] - 343:8
**flinging** [1] - 355:10
**flip** [1] - 301:25
**Florida** [3] - 327:20,
346:14, 346:15
**focus** [5] - 297:4,
297:22, 365:15
**focused** [1] - 367:7
**focusing** [2] - 287:11,
365:14
**follow** [2] - 283:14,
283:20
**follow-up** [2] - 283:14,
283:20
**followed** [1] - 288:25
**following** [7] - 289:2,
294:7, 306:9,
306:11, 331:22,
337:2, 337:3
**follows** [1] - 317:4
**footnote** [5] - 300:11,
300:13, 300:15,
311:3, 351:20
**FOR** [3] - 258:5,
258:9, 258:13
**force** [1] - 355:11
**forced** [1] - 368:14
**forces** [1] - 358:7
**forget** [1] - 292:17
**form** [2] - 283:10,
338:22
**forth** [3] - 271:25,
279:20, 369:17

forthcoming [1] - 306:2
forthright [1] - 325:16
fortunate [1] - 375:17
forward [3] - 294:4, 383:16, 386:18
foundation [3] - 268:21, 271:2, 347:24
Foundation [4] - 322:22, 322:24, 322:25, 326:22
four [40] - 319:10, 319:13, 319:17, 320:7, 320:22, 321:1, 321:2, 321:5, 321:7, 321:8, 321:22, 325:17, 325:21, 327:13, 330:22, 331:3, 331:13, 331:23, 332:4, 332:10, 332:18, 332:22, 336:1, 336:10, 337:21, 338:7, 358:15, 359:3, 359:6, 359:14, 359:16, 360:15, 361:17, 362:6, 362:9, 362:21, 363:4, 365:14, 367:2, 368:23
four-second [12] - 320:22, 321:1, 321:5, 321:22, 327:13, 330:22, 331:23, 332:10, 332:22, 336:10, 362:9, 362:21
Fox [1] - 260:14
fraction [2] - 343:25, 372:12
framework [1] - 276:6
Francis [1] - 257:24
FRANCIS [1] - 257:24
free [1] - 265:21
frequency [3] - 275:16, 281:14, 309:21
fresh [2] - 361:11, 361:12
friend [2] - 327:20, 328:2
friends [1] - 382:14
front [5] - 267:23, 276:21, 306:10, 331:21, 335:1
full [3] - 279:24, 306:11, 349:21
fully [3] - 266:24,

371:16, 372:9
fumble [4] - 324:12, 337:18, 339:24, 364:4
fun [1] - 308:6
future [1] - 364:22

## G

Gable [1] - 257:24
GABLE [1] - 257:24
Gallup [1] - 260:12
GARY [8] - 259:2, 259:2, 259:3, 259:4, 262:2, 262:13, 345:15, 378:16
Gary [1] - 262:4
gatherings [2] - 333:21, 335:8
General [5] - 306:8, 322:7, 324:21, 340:13, 379:6
general [8] - 265:24, 281:25, 305:17, 344:2, 353:5, 354:14, 370:1
GENERAL [2] - 258:11, 258:13
generalization [1] - 381:8
generally [4] - 276:15, 301:6, 301:10, 345:22
Generally [1] - 278:11
generating [1] - 350:12
generic [1] - 304:6
generically [1] - 330:18
George [1] - 285:10
Gertz [4] - 268:21, 272:23, 309:25, 310:13
given [3] - 267:16, 275:6, 304:11
Gloch [2] - 307:8, 336:4
goal [1] - 339:12
gosh [1] - 372:15
gracious [1] - 383:19
grants [1] - 283:15
great [4] - 370:20, 383:20, 386:14, 386:22
greater [1] - 379:24
greatly [1] - 281:3
greet [1] - 334:18
GREWAL [1] - 257:7
ground [1] - 292:14

grounds [1] - 347:25
group [2] - 323:1
groups [1] - 348:12
growth [1] - 285:22
GtROY [1] - 322:10
guess [21] - 269:15, 269:17, 269:18, 269:19, 269:21, 269:24, 270:10, 270:19, 271:2, 271:8, 288:5, 288:12, 288:19, 289:3, 289:4, 318:23, 321:13, 326:19, 356:22, 357:17
guessed [1] - 270:25
guesswork [2] - 380:22, 380:23
guide [1] - 364:21
gun [174] - 268:4, 268:8, 268:12, 268:15, 268:19, 269:2, 269:6, 269:13, 269:22, 270:2, 270:5, 271:10, 271:12, 271:14, 271:22, 274:23, 275:8, 275:14, 275:15, 278:6, 279:4, 279:8, 280:6, 280:9, 280:20, 280:23, 281:14, 281:20, 282:6, 284:6, 286:5, 286:14, 286:15, 286:23, 287:3, 287:19, 288:6, 289:9, 291:1, 291:3, 291:6, 291:7, 292:25, 293:4, 293:12, 293:22, 293:24, 294:9, 294:13, 294:15, 294:21, 295:19, 296:2, 296:6, 296:25, 297:1, 297:5, 297:8, 297:12, 297:17, 297:23, 298:3, 298:4, 298:6, 298:7, 298:11, 298:17, 298:22, 299:1, 299:2, 299:8, 299:14, 299:19, 302:22, 302:23, 302:24, 305:15, 307:14, 309:7, 309:9, 309:15, 309:21, 310:1,

310:4, 310:5, 310:20, 310:23, 310:24, 311:4, 311:10, 311:11, 311:16, 311:21, 311:22, 311:23, 311:24, 312:4, 312:5, 312:12, 312:16, 312:19, 313:6, 313:7, 313:8, 313:10, 314:4, 314:15, 314:16, 314:21, 316:9, 316:13, 328:5, 337:18, 348:3, 348:9, 348:15, 348:17, 348:20, 348:24, 349:1, 349:10, 349:23, 351:2, 351:6, 351:9, 351:13, 351:24, 352:2, 352:7, 352:14, 353:10, 353:20, 354:9, 354:14, 354:16, 354:19, 355:1, 355:4, 355:7, 355:8, 356:23, 357:2, 357:9, 357:11, 357:15, 357:18, 357:20, 358:3, 358:4, 358:8, 358:18, 360:18, 365:19, 365:25, 366:7, 369:5, 371:11, 371:15, 372:9, 372:23, 373:3, 373:8, 373:15, 373:17, 373:18, 374:5, 379:18, 380:17, 380:19, 380:20, 380:24
Gun [7] - 260:15, 268:23, 279:13, 310:12, 312:9, 366:4
gunfight [2] - 360:3, 360:5
gunfights [1] - 360:1
guns [16] - 268:12, 271:5, 275:14, 288:17, 344:2, 346:22, 353:7, 353:10, 353:24, 354:5, 356:9, 356:10, 363:12, 370:22, 371:12
Guns [1] - 384:23
GURBIR [1] - 257:7
guy [10] - 356:20,

363:11, 363:14, 366:15, 368:22, 369:1, 379:15, 380:23, 381:7, 381:11
guys [4] - 355:6, 368:21, 375:21, 375:25

## H

half [7] - 269:14, 270:23, 270:25, 271:7, 271:9, 271:14, 353:25
hand [5] - 278:3, 297:22, 317:24, 358:5, 362:17
handed [1] - 283:16
handgun [4] - 307:8, 328:6, 328:10, 336:4
handguns [1] - 353:25
Handing [2] - 262:12, 350:3
happy [1] - 344:13
hard [4] - 260:6, 308:17, 326:9
hardly [1] - 381:10
HARTMAN [1] - 258:4
Harvard [1] - 271:18
hate [1] - 370:6
haystack [3] - 274:6, 274:15
head [2] - 276:12, 376:6
Healey [3] - 336:15, 337:11, 338:11
hear [5] - 287:5, 301:12, 324:11, 330:9, 364:14
heard [2] - 359:19, 362:24
HEARING [1] - 257:20
hearing [1] - 386:20
held [5] - 315:14, 371:17, 372:2, 372:12, 373:21
helical [1] - 329:19
help [1] - 382:5
helps [1] - 303:10
Hemenway [8] - 282:9, 282:12, 284:3, 291:11, 349:3, 349:22, 350:5, 350:15
Hemenway's [1] - 348:4
Hemingway [10] - 271:17, 271:20,

271:24, 273:14,
273:18, 274:2,
274:19, 278:5,
278:14, 279:1
**Hemingway's** [4] -
272:15, 273:7,
273:11, 277:24
**Hero** [1] - 384:20
**herself** [1] - 317:1
**Hickenlooper** [3] -
269:21, 270:21,
288:4
**high** [4] - 350:12,
350:13, 360:16,
370:17
**higher** [10] - 304:11,
344:1, 344:5, 344:9,
344:15, 351:13,
351:15, 353:4,
353:23, 360:8
**highest** [3] - 304:17,
304:21, 352:25
**highly** [3] - 338:12,
360:1, 375:18
**himself** [2] - 323:6,
380:18
**Hindelang** [1] - 346:20
**hit** [9] - 359:7, 359:8,
359:13, 360:4,
360:8, 360:10,
360:13, 360:16,
360:20
**hold** [6] - 369:23,
371:16, 372:9,
372:19, 374:7,
380:10
**holding** [4] - 263:14,
323:16, 358:25,
371:22
**holster** [2] - 323:25,
328:12
**home** [38] - 264:4,
264:13, 268:16,
293:12, 295:7,
295:10, 295:12,
295:22, 296:2,
296:6, 297:5, 297:8,
297:13, 297:17,
297:23, 298:3,
298:4, 299:3, 299:6,
309:3, 309:17,
316:10, 316:12,
316:25, 317:5,
317:10, 317:22,
318:3, 318:7,
318:10, 318:14,
318:19, 319:2,
319:3, 351:6, 351:9,
351:14, 354:8
**Home** [1] - 316:22

**homicide** [1] - 353:5
**honest** [1] - 277:11
**honestly** [2] - 276:17,
350:11
**Honor** [66] - 260:2,
260:11, 260:22,
261:8, 261:17,
261:19, 262:1,
262:9, 272:11,
273:24, 276:7,
276:9, 280:15,
282:25, 303:16,
310:18, 313:5,
316:14, 322:15,
324:24, 325:2,
325:9, 325:23,
326:4, 326:7, 327:9,
333:15, 335:12,
340:12, 340:16,
341:10, 341:19,
342:13, 343:3,
344:23, 345:1,
345:6, 345:10,
345:14, 349:19,
377:7, 377:12,
377:16, 378:2,
378:7, 378:13,
381:14, 381:18,
382:8, 382:18,
383:3, 383:11,
383:16, 383:22,
384:4, 384:12,
384:14, 384:16,
384:18, 384:25,
385:4, 385:9,
385:14, 385:19,
386:2, 386:8
**HONORABLE** [1] -
257:15
**hope** [1] - 370:14
**horizontal** [1] - 329:19
**hostile** [1] - 373:22
**hotel** [1] - 341:13
**hours** [2] - 338:24,
364:19
**House** [7] - 378:20,
379:19, 384:19,
384:21, 384:22,
384:23, 385:10
**house** [1] - 356:11
**household** [2] -
276:12, 280:21
**households** [2] -
279:16, 280:3
**housekeeping** [1] -
262:9
**Https** [2] - 322:10,
343:4
**huge** [2] - 355:11,
356:12

**human** [1] - 352:11
**hundred** [2] - 339:5,
339:12
**hundreds** [1] - 364:24
**Hunter** [1] - 385:6
**hurt** [8] - 374:16,
374:18, 375:7,
375:10, 375:13,
375:23, 376:12,
376:18
**hypothesis** [2] -
376:4, 378:4
**hypothetical** [4] -
298:10, 299:18,
338:12, 338:21
**Hypothetically** [1] -
364:18

---

**I**

---

**idea** [5] - 285:16,
352:21, 375:4,
386:15, 386:17
**ideal** [2] - 333:19,
334:21
**identified** [8] - 291:11,
296:19, 299:2,
299:7, 318:17,
319:6, 329:2, 329:8
**identifies** [1] - 274:2
**identify** [8] - 260:10,
296:8, 308:11,
308:23, 330:17,
332:9, 364:25, 384:7
**ignorant** [2] - 306:25,
353:7
**illegal** [1] - 375:19
**Illness** [1] - 260:15
**illuminate** [1] - 293:6
**imaginary** [2] - 376:6,
378:4
**imagine** [1] - 338:10
**immediately** [2] -
323:17, 335:5
**impact** [2] - 353:10,
369:20
**impeaching** [2] -
325:13, 333:11
**implicated** [2] -
354:11, 355:20
**implication** [1] -
274:24
**implicitly** [1] - 341:9
**Implicitly** [1] - 341:11
**implied** [2] - 266:12,
357:14
**implies** [2] - 294:14,
359:15
**imply** [1] - 350:19

**important** [4] - 267:5,
270:3, 280:25,
324:12
**impose** [2] - 295:11,
318:13
**imposed** [1] - 339:15
**impossibility** [1] -
352:23
**impossible** [1] - 329:1
**improve** [1] - 369:9
**in-person** [1] - 279:16
**inability** [1] - 318:12
**inaccurate** [5] - 289:2,
353:12, 380:3,
380:6, 380:14
**INC** [1] - 257:4
**incapacitate** [1] -
359:9
**incidence** [3] - 280:1,
347:17, 351:14
**incident** [8] - 342:8,
352:5, 355:12,
367:17, 367:18,
370:10, 379:5, 381:3
**incidental** [1] - 334:8
**Incidents** [3] - 261:10,
261:15, 316:22
**incidents** [18] -
261:12, 265:25,
293:12, 305:10,
310:20, 312:18,
313:16, 317:10,
344:6, 354:25,
355:2, 358:12,
358:15, 358:18,
360:18, 365:3,
366:14, 366:16
**include** [9] - 304:7,
309:10, 314:17,
326:21, 326:25,
346:1, 348:15,
355:12, 373:2
**included** [1] - 292:8
**includes** [4] - 285:21,
297:1, 311:21,
353:12
**Including** [1] - 312:9
**including** [9] - 278:16,
312:19, 313:7,
326:21, 327:17,
329:18, 351:25,
373:15, 380:22
**incompetent** [2] -
283:6, 283:10
**incomplete** [1] -
353:12
**inconsequential** [1] -
366:14
**inconsistency** [1] -
333:14

**inconsistent** [1] -
335:15
**incorrect** [4] - 278:15,
278:19, 292:12,
319:16
**increase** [5] - 357:25,
358:4, 375:12,
376:24, 376:25
**increased** [2] - 324:6,
358:2
**increases** [1] - 348:25
**increasing** [1] -
376:22
**indeed** [2] - 269:24,
336:23
**independent** [2] -
296:1, 296:21
**indicate** [4] - 266:3,
319:10, 370:8,
382:25
**indicated** [5] - 270:24,
277:21, 314:20,
317:4, 329:22
**indicates** [2] - 350:24,
368:16
**indicating** [2] -
303:12, 322:17
**indicating)** [1] -
303:13
**indirectly** [1] - 321:17
**indiscriminately** [1] -
355:10
**individual** [10] -
262:23, 263:11,
263:15, 263:18,
264:13, 318:19,
319:2, 359:7,
359:11, 380:16
**individual's** [2] -
262:22, 313:25
**individuals** [2] -
302:22, 373:7
**induce** [1] - 369:10
**indulgent** [1] - 275:18
**industry** [2] - 323:1
**ineffective** [1] -
373:19
**inept** [1] - 353:16
**inference** [1] - 346:3
**inflates** [1] - 291:5
**influence** [3] - 271:3,
373:1, 373:2
**influenced** [1] -
374:17
**information** [15] -
267:9, 286:23,
287:12, 287:18,
287:19, 289:5,
289:8, 289:12,
290:2, 290:7,

328:24, 331:16, 336:9, 352:4, 357:19

**INJUNCTION** [1] - 257:20

**injunction** [2] - 265:2, 293:7

**injured** [2] - 365:5, 374:21

**injuries** [2] - 344:10, 344:15

**injury** [2] - 280:24, 304:17

**inner** [1] - 375:3

**inquired** [1] - 295:22

**inquiry** [1] - 379:2

**instance** [1] - 377:23

**instances** [15] - 296:6, 296:7, 296:10, 296:18, 299:6, 312:4, 312:12, 312:16, 313:23, 318:11, 321:2, 321:9, 347:7, 355:17, 377:21

**instead** [2] - 270:4, 360:14

**instructed** [1] - 275:19

**instruction** [1] - 323:3

**instructional** [1] - 336:2

**instructions** [1] - 272:9

**instrument** [1] - 283:20

**instrumentalities** [1] - 344:20

**intended** [2] - 369:10, 373:15

**intending** [1] - 342:22

**intent** [1] - 376:10

**intentionally** [4] - 275:1, 339:17, 348:12, 348:17

**intentions** [1] - 376:16

**interest** [2] - 348:14, 381:6

**interested** [3] - 304:25, 350:11, 378:15

**international** [1] - 379:20

**Internet** [4] - 328:16, 328:20, 336:5, 361:25

**interpretation** [1] - 291:16

**interrupt** [1] - 312:23

**interruption** [1] - 369:1

**interruptions** [1] -

340:10

**interval** [6] - 321:22, 331:24, 336:10, 342:5, 361:4, 361:8

**intervening** [1] - 379:15

**intervenor** [1] - 368:21

**interview** [3] - 269:11, 270:22, 306:1

**interviewed** [2] - 302:14, 379:16

**interviewer** [1] - 371:13

**interviewers** [1] - 357:12

**interviewing** [1] - 274:24

**interviews** [5] - 380:15, 380:20, 380:25, 381:19

**introduce** [1] - 381:15

**introductory** [1] - 345:23

**intruder** [1] - 309:17

**investigated** [1] - 319:1

**investigation** [3] - 299:1, 336:4, 369:3

**involve** [13] - 266:13, 311:16, 312:5, 313:6, 314:22, 354:18, 355:16, 358:15, 358:19, 360:19, 364:15, 364:16, 365:8

**involved** [17] - 266:11, 268:7, 305:7, 305:8, 309:14, 310:1, 310:6, 312:18, 312:20, 314:21, 329:13, 330:17, 347:20, 353:20, 360:3, 360:4, 365:1

**involves** [2] - 309:11, 312:1

**Involving** [1] - 260:15

**involving** [9] - 265:25, 294:13, 294:21, 295:19, 296:2, 296:6, 317:9, 344:8, 344:14

**irrelevant** [2] - 285:15, 350:8

**irrespective** [1] - 298:21

**irresponsible** [1] - 270:9

**isolating** [1] - 372:24

**issue** [11] - 267:5, 281:12, 281:13,

291:16, 296:22, 299:9, 299:11, 319:7, 354:11, 355:20, 368:20

**issues** [7] - 292:25, 293:7, 297:16, 297:22, 297:24, 301:17, 383:12

**items** [1] - 324:22

**itself** [3] - 274:12, 366:1, 374:3

## J

**jam** [1] - 369:9

**James** [4] - 379:25, 380:16, 380:24, 384:18

**jammed** [4] - 324:2, 379:18, 380:19, 380:20

**jeans** [3] - 323:22, 323:25, 324:2

**Jens** [2] - 279:8, 283:17

**Jersey** [18] - 262:16, 263:2, 263:8, 264:19, 295:11, 295:12, 315:15, 315:25, 339:15, 340:20, 344:18, 356:5, 356:9, 369:18, 370:23, 371:1, 373:10, 373:16

**JERSEY** [4] - 257:1, 257:4, 257:12, 257:16

**Jersey's** [4] - 355:23, 369:7, 369:23, 372:1

**Jim** [2] - 327:21, 327:23

**job** [2] - 272:10, 386:14

**Joe** [3] - 327:22, 327:23, 328:2

**JOEL** [1] - 258:8

**Joint** [4] - 271:12, 282:22, 321:20, 322:8

**Jones** [1] - 317:11

**Jordan** [1] - 325:11

**Journal** [1] - 279:12

**journal** [10] - 271:20, 271:25, 272:3, 279:11, 283:12, 336:11, 336:13, 352:20, 362:10, 362:12

**journalist** [1] - 269:12

**Judge** [10] - 265:23, 275:18, 277:16, 286:7, 287:11, 303:17, 335:3, 346:23, 379:22, 381:22

**JUDGE** [1] - 257:15

**judge** [2] - 267:4, 284:11

**June** [5] - 265:12, 265:14, 289:16, 290:2, 292:7

**Junior** [4] - 379:25, 380:16, 380:24, 384:19

**jury** [1] - 272:10

**Justice** [7] - 279:17, 280:4, 282:22, 300:7, 319:23, 321:20, 336:12

**justifications** [1] - 369:17

## K

**K-l-e-c-k** [1] - 262:7

**keep** [2] - 337:24, 382:23

**KG** [1] - 272:23

**kill** [2] - 370:6, 370:9

**killed** [1] - 365:4

**killers** [1] - 375:18

**killing** [1] - 369:22

**kind** [14] - 275:23, 276:14, 281:21, 290:12, 292:13, 321:4, 349:11, 352:10, 354:17, 361:18, 363:17, 372:23, 372:24

**kinds** [1] - 365:23

**KIRK** [1] - 258:7

**Kleck** [21] - 261:25, 262:4, 262:5, 262:14, 272:23, 286:12, 307:4, 322:12, 322:16, 323:15, 325:10, 337:12, 341:1, 342:3, 342:4, 342:15, 343:7, 358:23, 377:20, 378:17, 382:12

**KLECK** [8] - 259:2, 259:2, 259:3, 259:4, 262:2, 262:13, 345:15, 378:16

**Kleck's** [3] - 341:4,

346:24, 383:15

**knowledge** [2] - 353:17, 381:2

**known** [7] - 266:6, 266:13, 289:13, 347:19, 350:8, 366:13, 366:22

**knows** [5] - 295:1, 295:4, 353:3, 362:1, 374:11

**Koenig** [14] - 322:5, 323:3, 323:21, 324:4, 324:11, 324:20, 324:22, 325:10, 326:19, 327:1, 328:9, 360:24, 385:5

**Koenig's** [3] - 324:21, 327:18, 328:8

**Kolbe** [1] - 307:22

## L

**labeled** [1] - 303:22

**landed** [1] - 359:11

**large** [49] - 262:16, 265:25, 275:6, 281:2, 294:22, 295:5, 302:10, 302:11, 306:13, 314:8, 315:14, 319:12, 330:3, 330:11, 330:18, 331:24, 344:9, 344:14, 344:20, 347:7, 347:18, 347:20, 347:21, 353:1, 353:13, 354:6, 355:22, 356:17, 356:20, 364:7, 364:12, 364:13, 364:15, 365:1, 365:3, 365:5, 365:8, 366:9, 368:12, 368:24, 369:7, 374:10, 374:16, 375:6, 375:8, 375:12, 375:17, 375:19, 376:14

**Large** [2] - 319:24, 343:12

**largely** [1] - 365:14

**larger** [3] - 275:13, 339:9, 348:13

**largest** [1] - 365:20

**Las** [11] - 340:14, 340:17, 342:8, 343:19, 344:19, 363:9, 368:7,

369:16, 385:17,
385:19, 385:23
**last** [17] - 262:6,
272:21, 289:17,
289:20, 290:7,
302:14, 320:3,
345:24, 361:13,
376:8, 376:24,
377:24, 378:5,
378:23, 379:10,
379:12
**Last** [1] - 384:23
**lasted** [1] - 367:14
**late** [1] - 371:6
**law** [18] - 260:9,
262:16, 262:20,
263:3, 315:25,
340:20, 340:22,
353:11, 354:11,
355:20, 360:2,
360:4, 369:19,
372:23, 372:24,
373:8, 375:17,
386:19
**law-abiding** [1] -
360:2
**Law360** [1] - 290:12
**lawful** [3] - 264:12,
264:18, 369:18
**lawfully** [1] - 339:5
**Laws** [1] - 260:16
**laws** [5] - 373:15,
373:17, 373:18,
373:19, 374:5
**lawyers** [1] - 290:12
**LCM** [3] - 266:6,
266:11, 295:20
**LCMs** [3] - 295:1,
295:4, 295:9
**lead** [5] - 274:13,
350:13, 350:14,
350:17, 355:10
**learned** [3] - 289:16,
289:17, 290:6
**least** [14] - 266:4,
268:6, 286:19,
292:10, 294:9,
296:12, 301:20,
331:14, 339:6,
359:15, 361:6,
363:11, 366:13,
379:14
**leave** [1] - 275:23
**leaves** [1] - 353:13
**left** [4] - 278:3, 280:15,
316:20, 316:21
**left-hand** [1] - 278:3
**legal** [4] - 262:17,
263:8, 263:10,
297:24

**legally** [3] - 263:2,
356:11, 371:3
**legislative** [2] - 261:3,
385:21
**legislature** [1] -
344:18
**legitimate** [1] - 302:24
**length** [1] - 370:20
**lengthy** [1] - 341:12
**less** [17] - 271:5,
317:19, 320:5,
323:24, 325:15,
332:13, 347:8,
348:20, 348:21,
353:25, 355:15,
358:5, 358:10,
367:3, 373:20
**lethality** [1] - 376:11
**letter** [1] - 382:3
**level** [1] - 376:23
**leveled** [1] - 274:18
**levels** [1] - 273:14
**light** [1] - 363:8
**likelihood** [1] - 348:10
**likely** [6] - 323:20,
348:16, 369:21,
373:8, 376:13,
376:19
**likewise** [2] - 263:7,
264:2
**Likewise** [2] - 356:18,
386:13
**limit** [11] - 262:21,
263:10, 263:13,
263:17, 263:19,
301:8, 317:1,
319:17, 330:12,
338:23, 338:25
**limitation** [1] - 315:21
**limited** [4] - 297:4,
316:12, 327:18,
377:17
**line** [32] - 265:11,
276:25, 279:1,
286:19, 287:23,
288:1, 288:13,
288:16, 293:11,
294:7, 302:14,
304:4, 304:10,
304:14, 304:21,
306:11, 310:24,
316:19, 329:14,
329:20, 331:22,
332:16, 333:5,
334:1, 337:2, 337:8,
337:10, 359:21,
360:7, 372:5, 382:13
**lines** [1] - 363:1
**Linkages** [2] - 319:25,
343:13

**list** [2] - 329:17, 365:7
**listed** [1] - 305:11
**listened** [1] - 324:17
**listening** [1] - 276:4
**lists** [1] - 302:13
**literally** [1] - 299:16
**literature** [3] - 330:3,
330:6, 330:11
**live** [1] - 376:5
**lives** [1] - 370:15
**Liz** [1] - 284:13
**loaded** [2] - 371:16,
372:9
**location** [1] - 367:7
**lock** [1] - 363:3
**lock-back** [1] - 363:3
**locked** [1] - 370:14
**logical** [2] - 296:16,
352:23
**logistical** [1] - 383:12
**logo** [2] - 322:16,
322:19
**look** [24] - 265:3,
265:19, 272:16,
276:20, 287:8,
287:23, 299:9,
299:21, 306:10,
310:10, 316:18,
319:21, 326:2,
328:8, 331:19,
337:1, 349:21,
351:17, 355:2,
355:4, 355:10,
362:25, 363:21,
386:18
**looked** [14] - 316:23,
319:7, 321:21,
362:8, 364:23,
364:24, 365:11,
365:24, 365:25,
366:4, 368:3,
368:20, 381:6
**looking** [5] - 278:10,
298:2, 303:14,
303:15, 349:24
**looks** [2] - 265:9,
303:11
**loosely** [1] - 265:14
**lost** [2] - 281:21, 313:3
**loud** [1] - 272:21
**low** [3] - 350:12,
350:14, 350:22
**lower** [9] - 301:8,
306:16, 338:25,
357:22, 360:4,
360:8, 360:10,
360:13, 372:20
**LUCAS** [3] - 258:12,
386:2, 386:4
**Lucas** [5] - 306:8,

322:7, 324:21,
340:13, 379:6
**Lucy** [6] - 284:13,
284:16, 293:11,
295:17, 316:6, 319:8
**Ludwig** [1] - 279:9,
279:14, 279:18,
279:21, 279:23,
280:8, 280:12,
280:18, 283:17,
350:15, 371:6
**Luncheon** [1] - 345:7

---

# M

**M.Phil** [1] - 285:4
**magazine** [128] -
263:17, 263:18,
263:20, 263:21,
263:23, 264:9,
306:13, 315:12,
315:13, 315:21,
318:13, 319:12,
320:9, 320:22,
321:22, 324:4,
324:12, 325:8,
325:17, 327:13,
327:25, 328:5,
328:10, 328:15,
328:20, 328:25,
329:2, 329:7,
329:12, 329:13,
329:14, 329:17,
329:19, 329:23,
329:24, 330:6,
330:17, 330:22,
331:2, 331:10,
331:11, 331:12,
331:24, 332:3,
332:17, 332:22,
333:12, 333:19,
334:3, 334:7,
334:10, 334:22,
335:6, 336:1, 336:5,
336:10, 336:18,
336:22, 337:5,
337:15, 337:17,
338:2, 338:4,
338:19, 338:24,
339:10, 339:11,
339:14, 339:16,
339:20, 339:23,
339:24, 340:1,
340:3, 341:2,
342:18, 347:20,
354:24, 355:3,
358:25, 359:4,
361:10, 361:11,
361:12, 361:14,
361:15, 362:5,

362:7, 363:3,
363:14, 364:17,
365:1, 365:4, 365:5,
365:8, 365:20,
366:2, 366:5, 366:6,
366:9, 366:10,
366:13, 366:18,
366:20, 366:24,
368:8, 368:13,
368:14, 368:25,
369:1, 369:5,
369:11, 369:12,
369:19, 371:3,
374:16, 374:22,
375:12, 375:19,
375:23, 377:4, 377:5
**Magazines** [2] -
319:24, 343:12
**magazines** [83] -
262:17, 263:14,
264:17, 265:25,
266:13, 294:22,
295:5, 315:8, 320:5,
323:17, 323:21,
329:18, 329:24,
330:4, 330:12,
330:13, 330:18,
330:24, 331:4,
331:16, 331:17,
331:18, 331:25,
332:1, 332:6, 332:9,
332:14, 333:1,
333:4, 333:7,
333:10, 336:6,
337:24, 339:7,
340:8, 340:19,
340:22, 341:17,
342:4, 344:9,
344:14, 344:20,
347:7, 347:18,
347:21, 353:1,
354:6, 355:22,
356:8, 356:10,
356:13, 363:13,
364:7, 364:15,
365:14, 365:15,
365:18, 365:23,
366:11, 366:22,
367:21, 367:23,
368:15, 368:18,
369:8, 369:14,
369:23, 370:25,
371:5, 371:7,
371:22, 372:19,
374:7, 374:10,
374:20, 375:6,
375:8, 375:17,
375:20, 375:22,
376:2, 376:15
**magnitude** [3] -
266:18, 266:19,

268:7
**mags** [1] - 328:13
**mailing** [1] - 383:13
**major** [4] - 274:16, 307:16, 307:18, 307:19
**majority** [2] - 315:1, 315:22
**male** [2] - 276:12, 348:21
**males** [3] - 277:12, 277:15, 348:18
**malfunction** [1] - 340:3
**mall** [2] - 334:12, 356:3
**malls** [2] - 333:20, 335:7
**Man** [1] - 385:6
**manage** [1] - 375:19
**manufacturer** [2] - 285:22, 366:6
**manuscript** [1] - 362:14
**Marginal** [1] - 290:13
**Mark** [2] - 268:20, 310:12
**mark** [2] - 326:8, 326:15
**marked** [16] - 259:8, 259:9, 259:10, 259:10, 259:11, 259:12, 260:23, 261:9, 261:22, 271:12, 282:22, 326:17, 327:10, 385:1, 385:8, 385:16
**marksmanship** [1] - 363:14
**Maryland** [1] - 307:23
**Mass** [3] - 260:15, 319:24, 343:12
**mass** [64] - 265:24, 266:4, 266:6, 266:11, 266:12, 306:14, 306:16, 329:8, 330:16, 330:22, 331:17, 331:24, 331:25, 332:13, 340:5, 340:14, 341:6, 343:23, 344:1, 344:5, 344:8, 344:13, 347:6, 347:11, 347:14, 347:18, 347:19, 347:22, 352:25, 353:4, 363:10, 363:18, 364:8, 364:9, 364:12,

364:14, 364:20, 364:23, 365:7, 365:10, 365:17, 366:8, 366:12, 366:21, 366:25, 367:22, 368:3, 368:10, 368:21, 369:10, 369:21, 369:22, 369:25, 370:1, 372:20, 374:8, 374:21, 375:7, 375:10, 375:14, 376:22, 376:23, 377:21, 378:22
**Massachusetts** [4] - 336:14, 363:25, 373:10, 373:16
**Master's** [1] - 285:1
**materials** [1] - 385:5
**math** [6] - 296:24, 312:10, 313:15, 313:18, 315:5, 360:22
**mathematical** [3] - 266:17, 267:11, 267:12
**matter** [11] - 262:10, 265:24, 282:1, 285:15, 288:4, 336:11, 341:18, 343:14, 353:16, 373:10, 373:16
**matters** [3] - 343:15, 343:18, 364:20
**maximum** [1] - 338:23
**mayhem** [3] - 340:6, 340:21, 344:20
**MBA** [1] - 284:23
**mean** [28] - 262:23, 263:18, 266:18, 266:19, 270:13, 272:18, 289:3, 291:21, 294:23, 295:5, 296:11, 298:10, 308:17, 309:12, 311:20, 315:25, 317:18, 321:17, 328:11, 338:9, 338:24, 339:17, 341:11, 353:24, 355:1, 357:24, 362:12, 382:22
**meaning** [4] - 286:5, 307:17, 351:1, 374:14
**Meaning** [1] - 338:2
**meaningful** [2] - 338:25, 354:14

**means** [4] - 295:21, 296:12, 362:13, 381:16
**meant** [1] - 381:9
**measure** [2] - 280:20, 298:25
**measures** [1] - 361:4, 373:14
**mechanism** [3] - 374:22, 374:24, 375:16
**mechanisms** [3] - 375:2, 375:3, 375:6
**media** [3] - 352:19, 365:17, 367:10
**Medical** [1] - 379:23
**meet** [1] - 334:18
**meet-and-greet** [1] - 334:18
**meets** [1] - 378:11
**memory** [4] - 306:5, 306:21, 338:20, 349:6
**mendacity** [1] - 278:17
**Mental** [1] - 260:15
**mention** [4] - 270:8, 322:4, 323:16, 324:10
**mentioned** [4] - 279:14, 284:6, 330:2, 330:10
**mentions** [2] - 290:20, 321:8
**merely** [2] - 311:17, 311:20
**message** [1] - 356:19
**method** [1] - 270:14
**methodological** [2] - 273:15, 274:16
**methodology** [1] - 341:4
**methods** [6] - 270:14, 270:17, 275:4, 345:25, 346:2, 352:21
**Michael** [4] - 305:20, 325:11, 346:20, 353:3
**middle** [2] - 283:2, 312:24
**midst** [1] - 292:19
**might** [19] - 270:25, 274:12, 282:4, 284:3, 296:13, 306:9, 319:2, 324:5, 328:25, 340:2, 340:7, 350:17, 357:20, 364:4, 369:20, 376:6,

378:24, 383:22, 384:8
**million** [32] - 268:12, 268:17, 268:19, 269:3, 269:14, 269:15, 269:23, 270:2, 270:5, 270:22, 270:23, 271:14, 271:22, 279:4, 287:3, 288:6, 288:18, 288:20, 294:9, 294:12, 294:17, 296:25, 298:8, 298:11, 298:18, 299:18, 351:8, 356:23, 357:15, 358:1, 360:18
**millions** [1] - 280:22
**mind** [3] - 292:18, 331:14, 370:3
**mine** [1] - 384:1
**minimal** [1] - 320:6
**minimum** [2] - 301:19, 309:23
**minorities** [1] - 370:5
**minute** [3] - 316:14, 324:19, 345:17
**minutes** [3] - 345:4, 367:14, 384:8
**mischaracterizes** [1] - 325:19
**mischief** [1] - 278:17
**Misclassification** [1] - 278:10
**misclassification** [6] - 278:22, 291:10, 349:4, 349:7, 349:11, 349:12
**miscode** [2] - 291:5, 291:6
**miscoding** [1] - 278:16
**misheard** [1] - 284:15
**misinterpretation** [1] - 278:17
**misread** [1] - 291:20
**misreading** [1] - 291:21
**misremembering** [1] - 278:16
**missed** [1] - 278:7
**mistake** [1] - 287:7
**mistakes** [1] - 362:2
**misunderstanding** [1] - 278:16
**model** [1] - 366:1
**models** [2] - 353:9, 366:5
**modern** [1] - 316:15

**moment** [5] - 267:22, 270:20, 377:7, 382:9, 383:23
**months** [3] - 290:17, 363:20, 378:24
**morning** [3] - 262:14, 262:15, 326:17
**Most** [2] - 358:20, 358:21
**most** [11] - 270:13, 280:8, 322:13, 349:21, 350:18, 354:8, 355:18, 357:2, 362:6, 363:18, 373:7
**mostly** [1] - 364:24
**motivated** [4] - 370:2, 370:7, 370:19, 375:18
**motivation** [3] - 267:7, 370:20
**motivations** [2] - 370:2, 371:2
**move** [4] - 261:16, 347:1, 384:14, 385:19
**movie** [2] - 334:14, 366:15
**multiple** [9] - 340:8, 351:25, 356:8, 356:10, 358:13, 358:19, 358:24
**multiply** [2] - 298:3, 298:24
**multiplying** [1] - 294:12
**murdered** [1] - 342:16
**murderers** [3] - 369:21, 369:22, 369:25

---

## N

**name** [3] - 262:3, 262:6, 283:17
**national** [3] - 289:10, 291:17, 357:4
**National** [10] - 279:13, 279:15, 279:20, 280:1, 322:22, 322:23, 322:25, 326:22, 352:1, 385:11
**nationally** [5] - 274:22, 274:25, 279:15, 280:2, 357:10
**natural** [1] - 370:15
**Nature** [2] - 268:22,

310:12
**nature** [3] - 310:20, 314:14, 374:14
**NCVS** [2] - 280:2, 280:8
**Near** [1] - 384:23
**nearest** [2] - 361:6, 361:7
**necessarily** [1] - 359:9
**necessary** [1] - 329:6
**need** [19] - 265:19, 272:9, 275:19, 276:5, 287:3, 297:9, 300:22, 314:4, 328:17, 330:9, 335:2, 356:17, 360:13, 371:2, 378:13, 382:23, 382:25, 383:12, 384:6
**needle** [1] - 274:15
**negatives** [1] - 350:25
**negligible** [1] - 353:18
**neighbors** [1] - 373:22
**Nevada** [1] - 340:21
**never** [2] - 307:25, 352:2
**nevertheless** [1] - 375:18
**New** [37] - 262:16, 263:2, 263:7, 264:18, 279:13, 295:11, 295:12, 315:15, 315:25, 340:20, 344:18, 355:22, 356:5, 356:9, 369:7, 369:18, 369:23, 370:23, 371:1, 372:1, 373:10, 373:16, 379:19, 380:2, 380:5, 380:13, 380:23, 381:12, 381:15, 381:24, 382:16, 382:22, 383:12, 383:25, 385:10
**new** [5] - 289:6, 289:20, 290:20, 378:7, 378:10
**NEW** [4] - 257:1, 257:4, 257:12, 257:16
**news** [6] - 352:19, 354:21, 354:22, 356:23, 379:6, 381:19
**Next** [4] - 260:1, 261:24, 272:12,

284:1
**next** [12] - 266:10, 273:23, 274:5, 277:20, 289:12, 289:16, 290:25, 291:3, 292:16, 294:5, 335:22, 361:9
**nice** [1] - 345:5
**nine** [6] - 266:6, 266:11, 266:14, 339:6, 347:6, 367:14
**NO** [1] - 257:6
**Nobody** [1] - 376:15
**nobody** [1] - 370:13
**non** [4] - 344:10, 344:15, 347:16, 347:24
**non-fatal** [3] - 344:10, 344:15, 347:16
**non-foundation** [1] - 347:24
**None** [1] - 366:10
**nonexistent** [1] - 349:14
**noontime** [1] - 386:21
**note** [3] - 280:8, 293:11, 294:25
**notebook** [1] - 324:23
**noted** [3] - 266:10, 327:25, 328:4
**notes** [2] - 291:1, 291:13
**nothing** [7] - 263:3, 277:14, 284:10, 316:4, 342:13, 342:17, 382:8
**notice** [3] - 290:14, 324:10, 343:8
**noticed** [1] - 323:15
**notification** [1] - 306:11
**Notwithstanding** [2] - 286:2, 304:24
**notwithstanding** [3] - 267:10, 378:21, 381:3
**NRA** [7] - 293:21, 316:11, 317:6, 354:23, 354:24, 355:1, 355:9
**nub** [1] - 287:11
**number** [55] - 260:5, 262:21, 263:13, 268:17, 269:15, 275:13, 278:2, 280:19, 289:9, 296:1, 299:14, 302:13, 302:25, 303:5, 304:17, 304:22, 310:25,

311:4, 312:15, 314:9, 315:14, 316:25, 317:5, 317:22, 318:3, 318:7, 319:2, 344:9, 344:15, 346:17, 347:10, 348:8, 348:13, 348:25, 351:12, 357:2, 357:18, 357:20, 358:2, 358:8, 359:16, 362:9, 365:4, 367:12, 372:8, 372:9, 372:11, 374:16, 375:7, 375:9, 375:12, 375:22, 375:23, 376:21
**Number** [1] - 316:20
**numbered** [2] - 302:5, 303:9
**numbers** [14] - 269:2, 269:5, 269:13, 286:23, 293:5, 299:19, 305:2, 314:8, 353:13, 355:11, 356:12, 356:17, 356:20, 384:6
**numerical** [1] - 293:8
**numerous** [1] - 362:2

# O

**oath** [5] - 270:1, 338:14, 338:16, 338:18, 345:11
**object** [5] - 260:17, 340:16, 347:24, 383:25, 384:1
**Objection** [3] - 324:24, 325:19, 340:16
**objection** [12] - 261:2, 261:18, 261:19, 284:18, 326:3, 358:21, 382:2, 384:4, 384:5, 384:16, 385:14, 385:22
**objections** [2] - 326:1, 385:12
**objective** [5] - 282:13, 282:14, 282:18, 282:20, 350:11
**observe** [1] - 375:24
**obstacles** [1] - 285:22
**obtain** [2] - 286:13, 383:5
**obvious** [3] - 267:17,

365:2, 370:8
**obviously** [5] - 289:7, 351:15, 361:25, 366:21, 371:25
**occasion** [1] - 271:5
**occasionally** [1] - 362:4
**occur** [6] - 297:8, 297:13, 299:16, 351:6, 356:6, 358:12
**occurred** [6] - 369:14, 375:15, 378:5, 378:23, 379:10, 381:3
**occurrence** [1] - 279:3
**OF** [10] - 257:1, 257:4, 257:16, 258:11, 259:2, 259:3, 259:4, 262:13, 345:15, 378:16
**off-campus** [1] - 367:7
**offender** [12] - 304:5, 304:14, 305:7, 311:25, 312:1, 314:7, 359:11, 359:13, 359:14, 360:14, 360:15
**offenders** [5] - 355:24, 358:13, 359:15, 359:16, 368:14
**Offenders** [1] - 355:24
**offensive** [1] - 349:10
**offered** [5] - 276:19, 280:19, 293:18, 366:6, 379:17
**offers** [1] - 261:9
**OFFICE** [1] - 258:11
**officer** [1] - 360:4
**officers** [2] - 360:9, 360:17
**official** [1] - 367:11
**OFFICIAL** [1] - 257:25
**Officially** [1] - 365:16
**Officials** [1] - 379:22
**officials** [1] - 280:25
**often** [1] - 375:22
**old** [2] - 270:4, 379:24
**on-line** [2] - 286:19, 372:5
**once** [4] - 262:6, 376:8, 378:5, 381:8
**one** [86] - 260:5, 260:10, 264:8, 266:16, 266:20, 267:19, 271:3, 272:15, 274:1, 274:24, 275:13, 281:9, 281:12, 285:8, 285:19, 288:18, 293:18,

294:9, 294:12, 295:1, 295:4, 299:10, 304:4, 304:21, 305:6, 305:20, 305:22, 306:4, 307:6, 313:9, 313:10, 313:20, 317:13, 317:14, 317:15, 318:9, 319:8, 321:3, 321:9, 328:5, 328:13, 331:4, 332:5, 333:6, 336:1, 339:16, 344:12, 346:17, 347:8, 347:15, 349:10, 349:21, 350:7, 350:10, 350:16, 351:12, 352:24, 353:2, 354:20, 357:5, 357:15, 359:12, 361:10, 361:14, 361:24, 361:25, 363:11, 364:10, 364:14, 366:9, 366:14, 366:23, 369:3, 369:16, 369:25, 370:8, 371:13, 374:14, 378:12, 379:16, 381:8, 381:10, 382:6, 384:21
**One** [4] - 273:20, 277:24, 278:5, 279:25
**one-sided** [2] - 350:10, 350:16
**one-third** [3] - 313:9, 313:10, 313:20
**ones** [7] - 311:22, 315:4, 316:12, 355:3, 355:24, 364:25, 373:7
**open** [3] - 275:23, 297:16, 334:17
**open-ended** [1] - 275:23
**opinion** [12] - 284:8, 284:9, 288:17, 305:16, 306:24, 358:23, 359:2, 362:14, 369:21, 376:21
**opinions** [2] - 360:12, 363:7
**opportunities** [4] - 291:5, 340:7, 368:10, 368:18
**opportunity** [9] - 339:16, 339:19,

339:21, 339:24,
340:2, 340:4,
341:20, 352:4,
382:19
**oppose** [1] - 355:5
**opposed** [1] - 303:12
**opposite** [1] - 350:21
**optimistically** [2] -
359:10, 359:12
**options** [1] - 304:5
**order** [1] - 358:14
**orders** [2] - 266:18,
266:19
**ordinarily** [1] - 302:3
**ordinary** [1] - 364:9
**Organization** [1] -
357:6
**organized** [1] - 337:24
**orient** [2] - 287:1,
288:7
**orientation** [1] -
303:11
**original** [2] - 269:14,
277:9
**originally** [2] - 366:7,
371:25
**otherwise** [4] -
262:21, 262:23,
263:2, 264:12
**ought** [1] - 287:5
**overall** [4] - 348:23,
351:12, 351:23,
367:6
**Overall** [1] - 316:21
**overestimate** [1] -
350:19
**overestimation** [2] -
274:13, 350:17
**overrepresent** [3] -
277:15, 348:12
**overrepresented** [2] -
275:12, 348:18
**Overruled** [1] - 348:1
**oversampled** [1] -
348:6
**oversampling** [1] -
348:7
**overstate** [1] - 281:3
**overweighted** [1] -
275:1
**own** [17] - 262:22,
263:2, 263:15,
263:18, 280:5,
281:8, 282:4,
301:17, 307:4,
308:12, 308:16,
314:8, 326:6,
327:19, 328:5,
336:3, 371:10
**owned** [6] - 275:14,

307:7, 308:12,
308:23, 371:11,
371:12
**owner** [1] - 371:15
**owners** [2] - 348:15,
355:4
**ownership** [3] - 275:8,
280:20, 280:23
**owning** [1] - 263:4

# P

**P-85** [1] - 384:24
**p.m** [1] - 386:20
**pacifists** [1] - 373:6
**Paddock** [1] - 341:13
**page** [60] - 265:10,
265:16, 267:25,
268:2, 272:16,
272:17, 272:20,
273:18, 273:19,
273:22, 273:23,
273:24, 273:25,
277:24, 278:1,
278:2, 278:9,
278:13, 279:18,
280:12, 280:14,
280:17, 282:23,
287:23, 288:10,
288:15, 290:14,
290:25, 291:2,
291:3, 291:13,
293:11, 294:5,
294:7, 297:10,
302:3, 305:2,
306:10, 310:15,
316:18, 317:3,
317:23, 320:2,
320:11, 320:14,
321:21, 322:9,
332:16, 333:5,
333:25, 337:2,
337:10, 340:18,
349:24, 359:21,
359:24, 360:7,
362:25
**Page** [3] - 300:15,
331:19, 331:21
**pages** [5] - 287:25,
302:5, 302:12,
303:9, 335:18
**painfully** [1] - 365:2
**painstaking** [1] -
329:11
**pair** [1] - 323:22
**paper** [23] - 269:1,
271:11, 272:1,
272:16, 272:23,
279:8, 282:22,
286:16, 286:19,

289:21, 290:8,
290:9, 290:20,
291:14, 291:15,
292:9, 292:17,
297:7, 297:9,
343:11, 343:12,
343:17
**papers** [1] - 265:3
**paragraph** [35] -
265:18, 265:24,
266:3, 266:10,
267:15, 267:24,
268:10, 270:6,
272:22, 274:1,
274:5, 274:8,
274:11, 279:24,
279:25, 283:2,
286:24, 287:1,
287:9, 293:10,
294:4, 294:6,
294:10, 294:25,
296:25, 300:11,
300:13, 300:14,
300:16, 317:4,
320:3, 320:14,
320:15, 347:6
**paragraphs** [5] -
265:20, 273:19,
273:20, 273:25,
275:24
**Pardon** [1] - 278:1
**part** [6] - 265:2, 266:2,
288:7, 308:4,
324:14, 334:9
**partially** [1] - 291:19
**participated** [1] -
307:10
**participating** [1] -
285:23
**particular** [13] -
265:17, 265:19,
267:24, 280:16,
281:12, 281:13,
292:24, 306:25,
348:5, 353:16,
370:1, 373:1, 374:13
**parties** [2] - 261:4,
386:14
**parts** [2] - 275:9,
285:22
**passage** [4] - 263:3,
263:4, 264:17,
277:14
**passed** [1] - 315:25
**pattern** [1] - 375:1
**pause** [4] - 319:19,
341:20, 368:1,
377:11
**Pause** [1] - 383:21
**pauses** [6] - 341:12,

341:15, 342:1,
343:8, 368:6, 368:7
**pausing** [4] - 368:8,
368:11, 368:23,
369:6
**paying** [1] - 328:12
**PC** [1] - 258:4
**peak** [2] - 269:7, 358:6
**peer** [1] - 346:7
**peer-reviewed** [1] -
346:7
**Pennsylvania** [1] -
370:24
**people** [49] - 270:17,
275:12, 275:13,
294:17, 295:21,
298:8, 298:18,
323:11, 342:16,
343:8, 344:1,
347:15, 348:16,
348:18, 348:19,
349:9, 349:13,
352:4, 352:9, 354:8,
355:5, 355:9, 356:1,
358:2, 359:7, 364:4,
364:15, 364:17,
368:10, 369:19,
369:22, 370:2,
370:16, 370:19,
371:10, 372:10,
373:3, 373:5,
373:21, 374:18,
374:21, 375:7,
375:10, 375:12,
375:23, 376:12,
376:18
**per** [6] - 299:19,
357:24, 359:14,
360:14, 360:15,
362:7
**perceives** [2] - 314:7
**percent** [56] - 266:12,
266:15, 266:16,
266:20, 266:21,
266:22, 266:24,
283:21, 293:23,
297:8, 297:12,
298:5, 304:11,
304:18, 304:21,
306:16, 310:1,
310:5, 311:1, 311:4,
311:21, 312:8,
312:10, 312:11,
312:18, 312:19,
312:21, 313:6,
313:8, 313:9,
313:14, 313:16,
313:18, 313:21,
314:22, 315:3,
315:6, 315:7, 347:8,

347:19, 347:21,
348:8, 348:19,
348:24, 353:20,
354:1, 358:22,
360:21, 371:17,
371:19, 371:20,
371:21, 371:24,
372:16
**percentage** [7] -
278:18, 303:25,
304:10, 353:23,
358:18, 358:21,
373:9
**perception** [1] -
314:11
**perfect** [1] - 376:16
**perfectly** [2] - 376:3,
378:3
**performed** [7] - 267:2,
318:2, 334:11,
334:14, 334:17,
336:3, 340:21
**performing** [1] - 328:9
**Perhaps** [1] - 319:20
**perhaps** [2] - 269:7,
283:9
**period** [6] - 310:4,
365:10, 365:12,
367:13, 368:4,
368:24
**permission** [3] -
260:8, 381:15, 383:8
**permit** [2] - 264:8,
356:12
**permitted** [1] - 261:4
**person** [11] - 279:16,
325:20, 337:5,
337:15, 337:23,
348:11, 348:21,
352:3, 363:3,
363:16, 381:20
**personal** [9] - 284:9,
304:2, 305:14,
308:16, 318:16,
324:21, 327:20,
328:5, 336:4
**Personal** [1] - 303:22
**personally** [3] -
308:15, 309:1, 328:4
**persons** [2] - 302:13,
320:6
**PETER** [1] - 257:15
**Pew** [1] - 357:5
**PGS** [1] - 257:6
**Philip** [8] - 279:8,
281:6, 281:10,
282:9, 282:12,
282:18, 283:1,
283:16
**phrased** [1] - 310:7

pick [1] - 276:24
**picked** [1] - 355:7
**picking** [1] - 320:17
**piece** [11] - 261:10,
272:17, 273:18,
280:13, 280:18,
306:6, 306:10,
319:23, 342:3, 370:8
**PISTOL** [1] - 257:4
**pistols** [4] - 307:20,
314:22, 353:21,
354:2
**place** [4] - 261:6,
275:7, 340:21, 373:9
**placed** [2] - 265:4,
276:20
**places** [2] - 351:25,
373:12
**PLAINTIFF** [3] - 257:5,
258:5, 258:9
**plaintiff's** [3] - 262:17,
265:1, 265:2
**Plaintiff's** [4] - 259:8,
259:10, 260:23,
385:1
**plaintiffs** [3] - 264:21,
297:15, 384:14
**plan** [2] - 363:19,
370:20
**planned** [1] - 363:11
**Plausibility** [2] -
319:25, 343:13
**plausible** [3] - 297:24,
376:4, 378:4
**play** [4] - 322:7,
324:16, 340:13,
376:10
**played** [1] - 325:12
**PLLC** [1] - 258:7
**plus** [3] - 310:8, 311:6,
311:22
**pocket** [1] - 323:22,
323:25, 324:2, 338:3
**point** [13] - 266:25,
278:25, 296:17,
320:11, 321:3,
321:13, 322:14,
325:23, 332:15,
335:22, 341:22,
344:7, 365:3
**Point** [1] - 346:21
**pointed** [4] - 269:4,
321:9, 350:9, 351:25
**pointing** [4] - 311:24,
333:14, 335:14,
352:11
**points** [1] - 260:3
**police** [3] - 360:9,
360:17, 370:12
**Police** [1] - 385:11

policy [2] - 305:16,
381:10
**Policy** [5] - 266:7,
282:22, 319:23,
321:20, 336:12
**poll** [1] - 260:12
**population** [5] -
270:16, 289:11,
303:6, 348:24,
357:25
**portion** [4] - 268:6,
363:25, 367:17,
378:15
**portrayed** [1] - 334:2
**posit** [5] - 294:5,
294:9, 295:15,
343:11, 343:17
**position** [6] - 283:6,
286:6, 323:24,
344:18, 363:3,
367:20
**positioned** [1] -
323:23
**positive** [7] - 274:3,
274:12, 278:22,
280:6, 281:2,
302:21, 376:17
**positively** [1] - 270:9
**positives** [1] - 351:1
**possess** [2] - 264:18,
369:19
**possessing** [1] -
356:8
**possibility** [3] -
308:21, 359:23,
379:17
**possible** [10] - 279:3,
289:19, 290:6,
321:17, 337:6,
337:16, 337:17,
337:19, 364:2,
365:22
**Possibly** [1] - 323:23
**possibly** [5] - 311:25,
313:8, 339:6, 361:7,
364:3
**post** [7] - 290:11,
290:13, 290:15,
290:20, 291:1,
291:13, 291:23
**posted** [1] - 292:9
**potential** [2] - 355:23,
376:2
**powerfully** [3] - 370:2,
370:7, 370:19
**practical** [4] - 327:18,
356:14, 363:2,
363:16
**practice** [5] - 320:6,
324:12, 324:15,

348:12, 363:14
**preceding** [1] - 335:5
**precise** [2] - 354:3,
361:13
**precisely** [5] - 267:20,
350:24, 361:4,
363:13, 363:17
**predictor** [1] - 306:14
**prefer** [3] - 340:6,
382:13, 383:24
**preferable** [1] - 289:7
**PRELIMINARY** [1] -
257:20
**preliminary** [2] -
265:1, 293:7
**premises** [1] - 350:8
**presence** [2] - 352:25,
372:22
**present** [4] - 270:10,
357:21, 381:25,
383:1
**presenting** [4] -
270:12, 301:17,
341:4, 386:15
**presents** [3] - 339:20,
339:23, 340:1
**president's** [1] -
285:23
**presidents** [2] - 285:7,
285:17
**presumably** [2] -
291:14, 295:20
**pretty** [8] - 266:17,
271:24, 275:18,
302:4, 306:21,
323:3, 358:10,
386:17
**prevalence** [2] -
268:9, 281:1, 281:3
**Prevalence** [2] -
268:22, 310:11
**prevent** [1] - 263:7
**previously** [2] -
271:12, 338:18
**primarily** [1] - 345:25
**primary** [1] - 381:4
**print** [4] - 350:7,
380:15, 383:14,
383:23
**printer** [1] - 383:14
**printout** [1] - 383:12
**private** [7] - 263:7,
263:11, 263:14,
263:17, 264:2,
280:20, 285:23
**prizes** [1] - 346:18
**pro** [1] - 282:12
**pro-control** [1] -
282:12
**probabilities** [1] -

348:10
**probability** [2] -
289:11, 357:13
**problem** [8] - 274:6,
274:7, 275:21,
286:10, 302:4,
372:24, 373:5,
373:24
**problems** [4] - 273:15,
274:1, 278:14, 279:2
**procedures** [1] -
270:15
**proceed** [2] - 327:5,
345:13
**proceeding** [2] -
335:16, 340:23
**proceedings** [2] -
297:16, 383:21
**process** [1] - 337:18
**produce** [2] - 352:8,
374:5
**produced** [3] - 277:7,
278:22, 286:16
**professional** [13] -
284:7, 284:9,
284:10, 284:18,
285:21, 286:4,
323:7, 324:25,
325:1, 325:4,
326:23, 336:2,
357:12
**professionally** [1] -
289:10
**professionals** [2] -
281:17, 284:3
**professor** [6] - 271:17,
342:21, 367:4,
367:14, 367:16,
382:1
**Professor** [57] -
261:25, 262:14,
268:20, 271:20,
271:24, 272:15,
273:7, 273:10,
274:2, 274:19,
276:5, 277:1,
277:24, 278:5,
278:13, 279:1,
286:12, 303:18,
305:24, 306:1,
306:12, 306:17,
306:21, 306:24,
307:4, 309:25,
311:19, 314:14,
322:12, 322:16,
323:15, 325:10,
335:17, 337:12,
340:18, 341:1,
341:3, 341:4, 342:3,
342:4, 342:7,

342:12, 342:15,
343:7, 345:3,
345:11, 345:16,
346:23, 348:4,
349:3, 358:23,
371:4, 377:20,
378:17, 382:7,
382:12, 383:15
**professor's** [1] -
286:10
**Professors** [1] - 284:3
**program** [1] - 346:17
**prohibit** [1] - 264:2
**prohibits** [1] - 263:4
**project** [1] - 283:21
**proof** [1] - 321:5
**property** [1] - 305:14
**propositions** [2] -
281:8, 375:13
**protect** [2] - 352:6,
352:8
**protection** [6] -
268:13, 271:6,
275:14, 275:15,
308:16, 352:3
**protective** [1] - 280:20
**provide** [2] - 328:19,
352:3
**provided** [3] - 263:23,
289:6, 347:4
**providers** [1] - 354:22
**providing** [2] - 285:16,
323:3
**provoke** [1] - 370:11
**prudent** [1] - 355:4
**pubically** [1] - 372:5
**public** [5] - 271:25,
280:25, 333:21,
334:17, 335:7
**publication** [3] -
290:14, 300:7, 320:3
**publish** [1] - 362:16
**published** [8] -
271:20, 272:23,
283:11, 283:17,
283:18, 352:20,
362:9, 362:15
**publishing** [1] - 346:4
**pull** [2] - 324:21, 379:6
**pump** [1] - 307:21
**purchase** [2] - 263:11,
263:19
**purchased** [1] - 366:7
**purchasing** [1] - 263:8
**purportedly** [1] -
380:16
**purports** [1] - 303:25
**purpose** [9] - 289:21,
301:21, 308:11,
308:19, 308:23,

334:7, 334:8,
337:25, 340:24
**push** [1] - 362:20
**pushing** [2] - 358:7,
358:9
**put** [14] - 260:3,
265:20, 278:25,
316:16, 317:18,
325:24, 326:5,
340:20, 354:7,
355:2, 359:19,
369:17, 381:9,
381:18
**putting** [1] - 337:18
**PX** [1] - 384:17
**PX-42** [1] - 349:19
**PX-50** [2] - 260:6,
260:11, 260:20
**PX-83** [2] - 260:7,
260:12
**PX-84** [1] - 260:14
**PX-85** [1] - 384:15
**PX-86** [1] - 384:20
**PX-87** [1] - 384:22

## Q

**qualification** [1] -
319:20
**qualifications** [4] -
284:10, 286:2,
345:17, 346:24
**qualified** [3] - 262:21,
262:23, 263:2
**qualifier** [1] - 311:14
**qualifying** [1] - 310:3
**Quantitative** [1] -
279:12
**quarter** [6] - 369:15,
376:8, 377:24,
378:5, 379:11,
379:12
**quarters** [3] - 311:10,
311:11, 311:16
**questioned** [2] -
336:17, 377:20
**questioning** [4] -
282:8, 329:14,
329:20, 343:22
**questions** [20] -
270:17, 272:6,
275:20, 275:25,
276:4, 276:6,
276:16, 278:18,
286:8, 286:11,
337:2, 342:21,
344:22, 345:16,
348:4, 360:23,
371:14, 372:17,

377:13, 378:12
**quibble** [2] - 376:13,
376:15
**quick** [4] - 260:3,
312:10, 313:15,
313:18
**quickly** [1] - 342:5
**quite** [5] - 289:19,
300:2, 309:5, 316:1,
341:21
**quote** [2] - 307:19,
307:22
**quoted** [1] - 352:22
**quoting** [1] - 306:12

## R

**racial** [1] - 370:5
**rail** [2] - 276:21,
331:21
**raised** [1] - 291:16
**ran** [1] - 309:17
**random** [1] - 354:24
**randomly** [2] - 371:12,
371:13
**range** [9] - 269:1,
323:4, 323:11,
327:19, 328:1,
333:20, 360:25,
362:3, 372:11
**ranges** [1] - 334:6
**rankings** [1] - 346:16
**rapid** [1] - 367:17
**rare** [3] - 274:9,
274:15, 279:3
**rarely** [1] - 318:10
**rate** [21] - 266:11,
284:5, 293:23,
294:14, 294:20,
304:10, 306:14,
306:16, 347:8,
349:23, 351:13,
353:4, 360:4,
360:16, 367:22,
368:16, 369:9,
373:3, 374:3, 383:4
**rates** [17] - 281:20,
282:6, 304:24,
304:25, 342:6,
343:14, 343:18,
344:4, 353:14,
357:22, 357:24,
360:8, 360:10,
360:13, 372:20,
372:23
**rather** [4] - 323:25,
333:11, 374:1,
374:15
**rational** [1] - 370:3

**raw** [5] - 348:13,
348:25, 358:8, 372:4
**re** [1] - 377:15
**re-cross** [1] - 377:15
**reach** [2] - 276:11,
337:25
**react** [1] - 355:5
**reaction** [2] - 352:21,
360:11
**read** [21] - 272:21,
273:19, 274:7,
276:22, 279:23,
281:4, 281:5,
288:12, 288:13,
291:22, 300:16,
300:21, 306:18,
310:24, 318:22,
321:4, 332:15,
335:2, 335:9,
335:17, 379:21
**readily** [1] - 371:5
**reading** [3] - 335:1,
335:6, 353:6
**ready** [5] - 345:9,
347:1, 371:7,
384:10, 384:12
**real** [8] - 270:10,
271:1, 271:4,
338:22, 355:5,
361:24, 364:20,
376:5
**realistic** [2] - 308:21,
370:11
**reality** [1] - 338:13
**realize** [1] - 365:2
**really** [30] - 266:20,
275:19, 277:17,
284:15, 286:7,
287:10, 287:11,
287:21, 295:1,
295:4, 295:9,
295:18, 297:20,
302:24, 304:24,
308:11, 317:19,
332:5, 333:6, 341:5,
342:1, 343:17,
343:18, 349:13,
352:18, 353:12,
372:1, 376:25,
386:16
**reask** [1] - 287:7
**reason** [9] - 270:22,
270:25, 276:19,
289:1, 340:11,
368:6, 369:6,
377:15, 380:2
**reasonable** [5] -
279:5, 291:4, 302:7,
363:22, 382:23
**reasons** [4] - 363:19,

369:4, 374:12,
376:19
**receive** [1] - 346:12
**received** [1] - 292:6
**recent** [13] - 271:1,
280:8, 280:21,
286:22, 287:12,
287:18, 287:19,
288:20, 289:23,
290:1, 291:14,
340:14, 357:6
**recently** [3] - 286:12,
292:18, 295:11
**Recess** [1] - 384:13
**recess** [1] - 345:7
**recognition** [1] -
313:1
**recognize** [1] - 322:19
**recollection** [8] -
290:4, 306:20,
316:24, 324:18,
329:22, 331:14,
333:11, 338:17
**recommendation** [1] -
362:15
**record** [6] - 260:3,
261:2, 262:3,
288:14, 380:11,
382:23
**recorded** [2] - 365:18,
365:19
**Recorded** [1] - 261:11
**recounted** [1] - 287:2
**RECROSS** [2] - 259:4,
378:16
**recross** [1] - 378:10
**RECROSS-**
**EXAMINATION** [2] -
259:4, 378:16
**Redirect** [1] - 344:24
**REDIRECT** [2] - 259:3,
345:15
**redirect** [1] - 277:17
**reduce** [4] - 364:7,
369:9, 374:4, 375:9
**reducing** [2] - 280:24,
373:13
**reduction** [1] - 374:8
**refer** [8] - 262:20,
274:4, 297:9, 302:3,
330:4, 330:13,
330:18, 333:25
**referee** [3] - 336:13,
362:10, 362:12
**refereed** [1] - 352:20
**referees** [2] - 336:13,
362:19
**reference** [5] - 320:7,
321:4, 326:15,
352:13, 368:1

**references** [1] -
315:16
**referencing** [1] -
300:15
**referred** [5] - 278:7,
322:1, 334:24,
342:7, 367:14
**referring** [2] - 291:14,
325:10
**reflect** [1] - 305:14
**reflected** [3] - 286:24,
293:23, 317:3
**reflects** [2] - 274:22,
304:10
**refresh** [3] - 316:23,
338:17, 349:6
**refreshes** [1] - 338:20
**refreshing** [1] - 333:10
**refuted** [1] - 272:4
**regard** [1] - 270:5
**regarded** [1] - 302:24
**regarding** [5] -
271:25, 278:6,
303:2, 336:17,
343:23
**regardless** [8] - 267:8,
298:25, 330:18,
331:1, 331:11,
332:2, 332:16,
347:15
**regions** [1] - 275:12
**regulate** [1] - 264:12
**Reinking** [3] - 379:7,
379:8, 380:1
**rejected** [1] - 362:17
**relate** [2] - 277:22,
360:12
**Related** [1] - 260:12
**related** [3] - 261:13,
343:23, 363:15
**relating** [7] - 261:12,
286:13, 286:16,
286:23, 324:22,
330:3, 330:11
**relationship** [1] -
376:18
**relative** [1] - 377:4
**relatively** [4] - 291:4,
320:6, 325:20,
357:21
**released** [2] - 286:19,
292:18
**relevance** [12] -
324:24, 325:5,
325:6, 325:9,
340:17, 340:23,
363:6, 363:8, 364:3,
369:17, 370:23,
371:18
**relevant** [6] - 297:21,

363:17, 365:24, 368:12, 369:6, 372:1

**reliable** [4] - 301:7, 301:10, 301:21, 352:9

**Reliable** [1] - 301:16

**relied** [5] - 267:20, 292:9, 300:23, 336:9, 382:1

**reload** [4] - 323:21, 361:11, 364:17, 379:8

**reloading** [11] - 264:4, 364:16, 368:22, 377:22, 379:18, 380:1, 380:17, 380:20, 380:22, 381:7, 381:12

**rely** [6] - 267:4, 267:15, 281:14, 301:1, 301:16, 301:19

**relying** [3] - 270:4, 383:2, 386:15

**remained** [1] - 357:21

**remarks** [1] - 352:14

**remember** [13] - 281:25, 285:25, 327:16, 329:20, 332:20, 343:22, 347:8, 349:16, 357:23, 362:10, 378:25, 379:2, 383:6

**render** [1] - 343:2

**repeat** [6] - 273:9, 320:25, 321:7, 321:10, 329:15, 359:1

**repeatedly** [2] - 335:24, 380:21

**rephrase** [5] - 275:25, 281:22, 287:14, 301:15, 318:25

**replicate** [1] - 290:22

**reply** [13] - 264:25, 265:3, 265:5, 265:17, 267:2, 267:16, 293:9, 293:10, 293:16, 294:5, 294:25, 297:1, 298:15

**report** [7] - 261:1, 261:14, 317:4, 351:24, 367:11, 380:14

**reporter** [3] - 318:22, 356:23, 357:17

**REPORTER** [1] - 257:25

**reporter's** [1] - 381:12

**reporters** [1] - 354:21

**reports** [1] - 293:22

**represent** [9] - 264:25, 285:9, 285:11, 290:11, 298:23, 301:8, 301:22, 302:1, 315:15

**representation** [1] - 355:15

**representative** [8] - 270:15, 274:22, 274:25, 279:16, 280:2, 355:6, 357:10, 363:10

**represented** [2] - 284:4, 301:6

**reproduction** [1] - 306:7

**reputation** [1] - 346:15

**require** [2] - 272:7, 359:22

**required** [2] - 257:23, 319:11

**requires** [1] - 336:1

**research** [32] - 267:8, 268:3, 268:7, 275:4, 284:11, 287:2, 296:1, 296:14, 296:16, 296:21, 299:1, 299:7, 306:2, 308:5, 308:7, 309:6, 309:9, 309:20, 311:10, 318:17, 321:12, 321:23, 329:12, 330:16, 346:2, 346:3, 353:7, 353:15, 354:17, 368:15, 374:6, 375:7

**Research** [5] - 282:22, 319:23, 321:20, 336:12, 357:5

**researcher** [1] - 305:20

**researchers** [2] - 274:16, 305:16

**resemble** [1] - 338:22

**resembles** [1] - 338:13

**resided** [1] - 348:21

**Resistance** [2] - 268:22, 310:11

**resolve** [1] - 373:25

**resolved** [1] - 356:1

**respect** [5] - 289:2, 319:16, 331:23, 348:3, 363:11

**responded** [4] - 272:3, 272:8, 331:1, 331:10

**respondent** [2] -

348:21, 352:6

**respondents** [3] - 276:16, 277:12, 348:9

**response** [9] - 265:20, 274:3, 274:12, 277:21, 293:16, 338:12, 338:20, 349:4, 352:17

**responses** [5] - 275:2, 278:23, 280:6, 302:21, 305:7

**responsible** [1] - 355:4

**rest** [1] - 370:14

**restate** [1] - 380:9

**Restate** [1] - 331:8

**Restaurant** [1] - 378:20

**restriction** [1] - 313:24

**result** [4] - 370:18, 374:23, 375:2, 376:17

**results** [11] - 277:7, 283:17, 287:20, 294:18, 295:17, 297:7, 314:20, 317:9, 317:15, 317:16, 370:10

**resume** [1] - 326:19

**retrieved** [1] - 324:4

**retrieving** [1] - 383:10

**review** [9] - 267:2, 284:19, 284:22, 284:25, 285:3, 285:6, 289:20, 327:17

**reviewed** [4] - 268:25, 334:3, 346:7

**reviewers** [2] - 362:18, 362:20

**revising** [1] - 292:19

**Revolution** [1] - 290:13

**Revolvers** [1] - 315:7

**revolvers** [3] - 307:20, 315:2, 315:5

**rifle** [1] - 379:25

**Rifle** [1] - 384:20

**RIFLE** [1] - 257:4

**rifles** [2] - 307:20, 354:3

**right-hand** [1] - 317:24

**rigorous** [1] - 270:14

**risk** [1] - 370:17

**robbery** [1] - 304:17

**role** [1] - 376:10

**room** [2] - 341:13, 356:10

**roughly** [6] - 283:21, 294:16, 294:20, 313:16, 313:17, 359:14

**round** [2] - 264:8, 367:8

**rounding** [1] - 313:16

**rounds** [42] - 263:14, 263:24, 264:3, 264:7, 264:9, 264:18, 266:14, 293:13, 293:24, 294:14, 295:20, 296:3, 296:7, 299:3, 299:7, 299:15, 305:9, 314:8, 314:9, 315:9, 315:14, 318:12, 318:18, 355:11, 355:12, 355:16, 355:17, 356:17, 356:21, 359:15, 360:14, 360:15, 364:10, 366:16, 367:12, 371:15, 371:17, 371:22, 372:2, 372:9, 372:13, 375:22

**row** [1] - 304:13

**ruling** [1] - 378:9

**run** [1] - 344:2

**running** [1] - 361:6

**rushed** [1] - 384:19

---

# S

**sake** [2] - 293:6, 348:13

**sample** [18] - 274:22, 274:25, 275:7, 293:21, 301:22, 302:2, 302:7, 302:13, 302:18, 303:1, 303:3, 303:6, 305:3, 348:11, 351:21, 355:6, 355:7, 357:10

**sampled** [1] - 275:17

**samples** [4] - 270:16, 289:11, 302:10, 357:13

**sampling** [1] - 348:10

**save** [2] - 300:17, 340:7

**saved** [1] - 386:17

**saw** [3] - 323:2, 360:24, 363:9

**scan** [1] - 304:20

**scarcely** [1] - 371:1

**scenario** [3] - 291:4, 291:10, 379:10

**SCHMUTTER** [1] - 258:4

**scholar** [2] - 282:19, 283:6

**scholarly** [3] - 283:11, 321:15, 321:23

**scholars** [2] - 282:14

**scholarship** [2] - 281:11, 281:13

**science** [1] - 321:12

**screen** [7] - 306:8, 316:16, 322:14, 322:17, 354:7, 362:24, 379:22

**scroll** [1] - 363:1

**search** [1] - 274:15

**seated** [2] - 262:5, 262:6

**second** [29] - 273:24, 274:7, 274:8, 274:14, 279:24, 279:25, 319:17, 320:3, 320:4, 320:8, 320:14, 320:18, 320:22, 321:1, 321:5, 321:22, 327:13, 330:22, 331:23, 332:10, 332:22, 336:10, 361:7, 362:5, 362:9, 362:21, 367:8, 384:17

**secondhand** [1] - 352:19

**seconds** [30] - 319:13, 320:5, 320:7, 325:17, 325:21, 331:3, 331:13, 332:4, 332:18, 336:1, 336:21, 337:21, 338:8, 338:10, 338:19, 361:17, 362:6, 362:7, 363:4, 364:2, 364:5, 364:17, 364:18, 365:14, 367:2, 367:15, 367:18, 367:24, 382:17

**Section** [2] - 257:23, 280:17

**section** [1] - 291:13

**security** [1] - 285:23

**see** [15] - 278:20, 303:23, 304:18, 320:12, 321:4, 321:13, 322:16, 322:21, 328:17,

sentences [1] - 272:22
sentiments [1] - 373:7
separate [3] - 319:11, 321:2, 372:25
series [1] - 337:3
serious [1] - 274:13
seriously [2] - 281:18, 282:4
served [2] - 285:7, 285:12
serves [1] - 306:22
set [2] - 279:20, 303:12
sets [1] - 317:13
seven [2] - 303:15, 318:12
several [5] - 280:21, 282:3, 286:21, 328:15, 336:5
shape [1] - 338:22
share [1] - 354:5
Shaw [5] - 379:25, 380:16, 380:24, 381:13, 384:19
sheer [1] - 358:2, 380:22
SHERIDAN [1] - 257:15
shifted [1] - 353:23
shoot [6] - 325:16, 339:5, 354:9, 356:1, 359:6, 364:10
Shooter [2] - 261:15, 384:21, 385:6
shooter [31] - 319:12, 320:9, 322:2, 322:5, 323:6, 323:7, 324:8, 325:2, 325:4, 325:11, 325:16, 326:24, 331:2, 331:12, 336:3, 339:4, 339:16, 340:5, 340:8, 361:18, 361:25, 362:2, 363:9, 366:12, 368:2, 368:11, 369:5, 376:10, 379:7, 380:17, 384:19
shooter's [1] - 379:18
shooters [24] - 319:18, 320:4, 330:23, 331:17, 331:24, 332:1, 332:6, 332:14, 333:1, 333:7, 342:6, 344:1, 361:21, 363:19, 365:17, 366:9, 366:21, 366:25, 367:22,

sentences [1] - 272:22

341:5, 349:21, 366:5, 374:23, 382:6, 382:25
seeing [2] - 375:1, 375:3
Seized [1] - 384:23
selected [7] - 275:6, 348:11, 354:16, 354:21, 354:23, 371:12, 371:13
selection [2] - 353:11, 354:25
self [20] - 264:4, 264:13, 268:13, 271:6, 275:14, 275:15, 308:1, 308:20, 309:3, 315:23, 316:25, 317:5, 318:4, 318:14, 320:15, 352:3, 354:10, 355:19, 358:3, 359:23
Self [2] - 268:23, 310:12
self-defense [14] - 264:4, 264:13, 308:1, 308:20, 309:3, 315:23, 316:25, 317:5, 318:4, 318:14, 354:10, 355:19, 358:3, 359:23
Self-Defense [2] - 268:23, 310:12
self-evident [1] - 320:15
self-protection [5] - 268:13, 271:6, 275:14, 275:15, 352:3
semi [12] - 307:4, 307:5, 307:8, 307:20, 307:21, 314:22, 319:13, 329:3, 353:20, 353:24, 354:1, 354:2
semi-automatic [12] - 307:4, 307:5, 307:8, 307:20, 307:21, 314:22, 319:13, 329:3, 353:20, 353:24, 354:1, 354:2
send [2] - 356:19, 382:2
sense [3] - 308:19, 343:19, 370:3
sensitive [1] - 352:10
sentence [3] - 266:10, 320:4, 320:18

368:21, 369:11, 370:1, 377:22, 378:6
Shooting [7] - 261:10, 322:22, 322:24, 322:25, 326:22, 384:22, 385:10
shooting [39] - 261:12, 306:14, 307:10, 328:1, 330:23, 334:9, 340:10, 340:15, 340:17, 341:6, 341:13, 341:20, 343:8, 343:20, 343:23, 344:6, 344:8, 344:14, 344:19, 347:12, 347:14, 363:10, 363:18, 366:15, 367:4, 367:6, 367:8, 367:11, 367:13, 368:7, 368:23, 369:2, 376:1, 376:3, 378:19, 378:21, 378:22, 379:20
shootings [35] - 265:25, 266:4, 266:6, 266:11, 266:13, 306:16, 329:8, 330:16, 344:5, 347:6, 347:18, 347:19, 347:22, 352:25, 353:4, 364:8, 364:9, 364:12, 364:14, 364:20, 364:23, 365:7, 365:10, 365:12, 368:3, 368:6, 368:10, 372:20, 374:8, 374:21, 375:7, 375:10, 375:14, 376:22, 376:23
Shootings [3] - 260:15, 319:25, 343:13
Shootingtracker. com [1] - 266:5
shopping [4] - 333:20, 334:12, 335:7, 356:3
short [3] - 350:25, 354:4, 374:2
shortcut [1] - 302:10
shot [12] - 309:18, 339:12, 347:15, 359:6, 359:8, 359:10, 361:5, 361:8, 361:9, 361:13, 366:17, 367:19

shotgun [3] - 315:8, 315:14, 315:19
shotguns [5] - 307:21, 315:2, 315:5, 315:7
shots [31] - 294:16, 298:6, 298:8, 298:18, 298:22, 311:12, 312:12, 312:16, 312:19, 313:7, 313:18, 313:21, 313:24, 316:10, 316:25, 317:5, 317:9, 317:22, 318:3, 318:7, 318:10, 318:11, 319:2, 324:6, 342:5, 359:8, 359:12, 359:14, 361:5, 367:1, 367:24
Shots [2] - 312:10, 316:20
show [17] - 285:13, 303:25, 322:12, 326:11, 326:23, 327:3, 341:7, 341:25, 342:1, 342:18, 342:19, 342:20, 342:25, 367:21, 374:6, 382:15, 382:18
showed [9] - 310:24, 311:4, 311:22, 311:23, 313:8, 335:6, 347:6, 350:7, 383:2
Showell [15] - 260:17, 260:25, 261:7, 272:9, 276:8, 292:16, 300:21, 312:23, 335:18, 340:25, 347:4, 351:8, 382:22, 383:20, 385:3
SHOWELL [97] - 258:11, 259:2, 259:4, 260:19, 261:8, 262:9, 262:13, 265:23, 272:11, 272:13, 273:23, 275:18, 276:1, 276:9, 276:10, 276:24, 277:16, 280:15, 281:23, 282:25, 286:7, 287:10, 287:15, 300:22, 300:25, 303:15, 303:20, 310:18, 312:25, 313:12, 314:19, 315:20,

316:14, 320:13, 320:17, 320:20, 320:21, 322:11, 322:13, 325:1, 325:6, 325:9, 325:15, 325:23, 326:7, 326:9, 326:16, 326:20, 327:2, 327:7, 327:9, 327:11, 331:9, 333:9, 333:14, 333:16, 335:3, 335:5, 335:12, 335:23, 337:10, 340:12, 341:1, 341:9, 341:12, 341:18, 341:24, 342:2, 342:10, 342:22, 342:24, 343:3, 343:6, 346:23, 347:24, 358:21, 377:16, 377:20, 378:1, 378:3, 378:13, 378:16, 379:21, 381:14, 381:22, 382:8, 382:18, 383:3, 383:18, 384:4, 384:16, 385:4, 385:9, 385:19, 385:25, 386:5, 386:10
showing [3] - 340:25, 354:8, 375:14
shown [2] - 363:25, 369:16
shows [2] - 320:8, 342:1
sic [1] - 314:11
side's [1] - 266:25
sided [2] - 350:10, 350:16
sides [1] - 382:24
Siegel [9] - 305:21, 305:23, 305:24, 306:1, 306:10, 306:12, 306:24, 352:14, 353:3
Siegel's [4] - 306:17, 306:21, 352:17, 353:6
sign [1] - 265:11
signature [1] - 265:11
signed [1] - 265:15
significant [2] - 266:17, 267:10
significantly [1] - 341:21
similar [4] - 293:17, 354:2, 354:21,

358:11
**simple** [2] - 365:3, 374:10
**simplify** [1] - 305:24
**simply** [8] - 309:10, 309:12, 309:17, 310:1, 310:6, 310:7, 364:13, 377:1
**single** [12] - 272:4, 299:2, 304:17, 306:13, 309:18, 328:10, 328:19, 336:3, 336:4, 350:4, 359:10, 366:9
**singularly** [1] - 350:16
**situation** [2] - 299:8, 314:3
**situations** [5] - 313:18, 318:8, 330:23, 359:22, 360:2
**six** [5] - 289:17, 289:20, 290:7, 347:15, 378:23
**Six** [1] - 347:19
**size** [8] - 301:22, 302:2, 302:7, 302:18, 303:1, 303:3, 315:21, 374:22
**sizes** [1] - 302:13
**skill** [1] - 363:15
**Skilled** [1] - 320:4
**skilled** [2] - 323:6, 325:11
**slowing** [1] - 368:16
**small** [3] - 266:20, 306:7, 368:15
**smaller** [2] - 268:16, 375:20
**smart** [1] - 386:17
**so-called** [1] - 347:7
**social** [3] - 274:3, 274:12, 321:11
**society** [1] - 274:17
**Sociology** [1] - 345:21
**Solomonic** [1] - 378:10
**someone** [3] - 262:23, 322:1, 339:9
**sometime** [1] - 292:10
**somewhat** [2] - 325:15, 377:21
**sorry** [18] - 265:8, 270:21, 272:19, 273:22, 274:10, 279:24, 283:25, 311:14, 320:25, 330:9, 333:23, 335:9, 337:8,

343:11, 346:1, 364:12, 371:20, 380:7
**sort** [10] - 281:2, 301:8, 334:8, 334:21, 349:15, 352:4, 352:19, 363:14, 364:25, 369:20
**sought** [1] - 382:6
**sound** [1] - 302:7
**sounds** [3] - 297:24, 330:14, 344:7
**source** [6] - 279:25, 281:7, 281:10, 282:21, 317:25, 321:23
**south** [5] - 275:2, 275:9, 348:6, 348:18, 348:22
**span** [1] - 361:13
**speaking** [1] - 345:22
**special** [2] - 323:16, 363:8
**specific** [5] - 302:3, 334:2, 365:25, 372:11, 374:12
**specifically** [6] - 268:1, 296:19, 315:16, 316:2, 330:17, 368:20
**specifications** [1] - 375:11
**specifics** [1] - 357:8
**speculation** [1] - 381:13
**speculative** [1] - 350:9
**speed** [4] - 325:4, 325:7, 326:24, 336:2
**spell** [1] - 262:6
**spend** [3] - 292:22, 292:24, 345:17
**spent** [1] - 363:12
**sponsored** [1] - 322:24
**sponsorship** [1] - 326:21
**sponsorships** [1] - 326:23
**Sports** [4] - 322:22, 322:24, 322:25, 326:22
**spots** [1] - 319:11
**spurious** [1] - 374:13
**square** [1] - 351:23
**St** [2] - 327:20, 328:1
**staff** [2] - 285:10, 285:12
**staffers** [1] - 354:23
**stand** [4] - 261:25,

310:5, 334:10, 345:8
**stand-alone** [1] - 334:10
**standard** [2] - 275:4, 378:11
**standpoint** [1] - 285:15
**Stanton** [1] - 362:25
**Stanton's** [1] - 359:20
**start** [2] - 274:11, 313:5
**Start** [1] - 302:8
**started** [2] - 342:14, 342:15
**starting** [10] - 279:24, 288:1, 288:13, 293:10, 298:10, 334:1, 337:1, 337:8, 337:10, 359:20
**starts** [1] - 320:15
**state** [7] - 266:3, 290:6, 306:12, 306:14, 306:17, 370:24
**State** [6] - 262:3, 346:14, 364:6, 382:14, 383:15, 383:24
**STATE** [2] - 257:11, 258:13
**State's** [2] - 346:15, 383:13
**statement** [2] - 270:6, 321:6
**States** [23] - 261:13, 261:15, 268:8, 274:23, 275:8, 285:7, 285:17, 293:4, 294:15, 294:21, 299:23, 300:5, 351:18, 353:22, 356:24, 357:3, 357:19, 358:13, 369:15, 376:8, 377:23, 379:10, 379:11
**STATES** [1] - 257:1
**states** [7] - 278:14, 280:18, 291:23, 306:15, 353:8, 372:19, 373:20
**stating** [3] - 289:4, 305:3, 336:10
**statistic** [1] - 374:11
**statistical** [4] - 299:22, 300:4, 346:2, 375:1
**Statistics** [2] - 279:18, 280:4
**statistics** [4] - 301:5,

301:23, 303:9, 303:22
**statute** [1] - 263:19
**Statute** [3] - 295:11, 315:15, 339:15
**step** [1] - 345:3
**Stevenson** [3] - 327:21, 327:22, 328:2
**stickered** [1] - 260:6
**sticking** [1] - 323:24
**still** [9] - 264:8, 289:21, 289:22, 290:7, 318:23, 345:11, 355:19, 362:3, 373:20
**stipulate** [2] - 324:25, 346:23
**stop** [4] - 359:9, 360:14, 368:2, 376:3
**stopped** [5] - 359:6, 359:11, 368:21, 369:2, 379:8
**stories** [1] - 381:19
**story** [1] - 354:22
**Street** [2] - 315:11, 315:16
**STREET** [1] - 257:11
**stress** [3] - 284:8, 337:5, 337:15
**stressful** [1] - 360:2
**stressing** [1] - 269:24
**stretch** [1] - 364:19
**stricter** [2] - 373:17, 373:18
**strictly** [1] - 308:7
**stronger** [1] - 374:4
**strongest** [1] - 376:14
**strongly** [4] - 373:6, 373:13, 373:14, 373:21
**student** [2] - 346:1, 374:11
**students** [1] - 346:1
**studied** [1] - 368:24
**studies** [5] - 318:2, 318:17, 319:6, 354:15
**study** [3] - 260:14, 362:8, 381:4
**stuff** [1] - 312:2
**style** [2] - 263:20, 344:19
**sub** [2] - 310:23, 354:15
**sub-4** [1] - 297:10
**sub-A** [1] - 310:23
**sub-studies** [1] - 354:15
**subhead** [1] - 278:10

**subject** [7] - 260:13, 262:17, 265:24, 282:1, 296:15, 343:23, 353:16
**subjects** [1] - 350:24
**submit** [1] - 384:1
**submitted** [3] - 265:1, 293:17, 316:7
**submitting** [1] - 289:13
**subsequent** [1] - 317:10
**subset** [2] - 268:16, 312:1
**subsets** [1] - 354:16
**substantially** [1] - 359:16
**substitute** [2] - 371:3, 375:19
**subsumed** [1] - 312:4
**successful** [4] - 310:1, 310:3, 311:11, 311:14
**successfully** [2] - 309:16, 359:11
**suffer** [1] - 281:2
**suggest** [5] - 269:1, 297:7, 325:16, 362:16, 362:17
**suggested** [3] - 280:9, 280:22, 282:3
**suggestion** [1] - 348:6
**suggests** [1] - 305:9
**summarize** [1] - 273:20
**supplemental** [1] - 293:1
**supplementary** [1] - 265:9
**support** [6] - 281:7, 369:13, 373:8, 374:5, 374:9, 374:10
**supported** [1] - 373:3
**supporting** [5] - 283:1, 320:23, 321:10, 321:19, 322:8
**supportive** [4] - 367:20, 373:13, 373:14, 373:17
**supports** [1] - 283:5
**suppose** [1] - 317:18
**supposed** [1] - 357:14
**suppressing** [1] - 355:15
**surgeons** [1] - 379:23
**surprise** [4] - 336:20, 336:24, 336:25, 379:5
**surprised** [1] - 379:13

surrounded [1] - 323:11

surveillance [1] - 341:14

survey [57] - 268:20, 270:14, 270:24, 273:15, 274:2, 274:9, 274:14, 274:22, 275:1, 275:4, 276:11, 276:16, 277:6, 277:7, 277:12, 278:18, 279:16, 280:3, 280:5, 280:8, 280:22, 281:19, 281:25, 282:5, 283:15, 283:20, 284:4, 284:11, 285:18, 285:21, 285:23, 286:13, 287:2, 287:20, 289:6, 290:2, 290:23, 291:16, 297:7, 298:1, 302:21, 305:12, 309:20, 309:24, 314:20, 315:1, 315:23, 316:3, 346:2, 350:6, 350:12, 352:1, 357:7, 357:15, 358:6, 360:21, 371:9

Survey [6] - 279:13, 279:15, 279:20, 280:2, 280:18, 352:2

survey's [1] - 357:14

surveying [1] - 289:10

surveyors [1] - 371:10

Surveys [1] - 278:11

surveys [12] - 268:25, 278:14, 286:6, 289:10, 289:18, 289:22, 289:23, 303:2, 348:12, 350:23, 357:4, 357:14

Suspect [2] - 384:22, 385:10

suspect [2] - 281:11, 281:13

suspend [1] - 343:19

swear [1] - 265:13

Sweeper [2] - 315:11, 315:16

sworn [1] - 262:2

symbol [1] - 311:3

systematically [4] - 272:4, 275:11, 329:6, 365:18

**T**

tab [31] - 265:3, 265:10, 265:16, 267:23, 272:14, 273:24, 277:23, 279:14, 282:23, 282:24, 290:10, 292:23, 293:11, 297:10, 299:21, 299:22, 300:1, 300:13, 301:6, 306:6, 310:10, 319:10, 319:21, 322:9, 326:22, 331:20, 337:1, 343:11, 347:3, 351:17

Tab [6] - 265:6, 265:7, 299:25, 310:10, 319:23, 337:1

tabbed [1] - 306:9

Table [3] - 299:24, 310:15

table [25] - 297:10, 300:1, 300:4, 302:12, 302:15, 303:8, 303:11, 303:14, 303:15, 303:21, 303:25, 304:4, 305:9, 305:13, 310:10, 310:20, 311:15, 312:6, 312:7, 312:9, 312:13, 316:17, 316:19, 317:3, 351:19

tables [1] - 299:22

tabs [2] - 324:23, 327:3

tackle [2] - 368:2, 376:3

tackled [8] - 364:16, 368:22, 369:2, 369:12, 375:25, 379:7, 381:7, 381:11

tackling [3] - 377:21, 378:6, 378:15

tactical [1] - 356:16

tail [1] - 309:17

talks [1] - 274:5

target [1] - 334:6

taught [2] - 345:22, 345:23

teach [1] - 373:24

teaching [2] - 345:25, 346:13

Tech [3] - 342:8, 367:4, 367:11

technical [1] - 340:2

techniques [1] - 273:16

technology [2] - 315:10, 316:15

telephone [1] - 280:5

tend [2] - 330:16, 350:21

tended [1] - 276:16

tends [3] - 275:9, 330:4, 330:13

Tennessee [2] - 378:20, 384:22

Tenuous [1] - 260:14

tenure [1] - 346:12

term [3] - 311:20, 334:21, 377:2

tested [4] - 327:25, 328:4, 329:23, 375:13

testified [22] - 269:20, 282:8, 282:11, 283:14, 284:6, 288:4, 292:19, 307:7, 307:13, 307:24, 307:25, 309:1, 328:14, 330:15, 335:14, 336:21, 338:18, 343:25, 344:4, 360:24, 371:4, 378:20

testifying [3] - 270:1, 307:1, 327:16

testimony [43] - 277:13, 282:15, 282:17, 282:18, 284:12, 286:3, 288:3, 288:8, 288:16, 289:1, 289:24, 290:5, 292:13, 305:18, 307:22, 308:3, 311:9, 311:15, 314:5, 325:20, 330:19, 332:7, 332:20, 333:5, 333:12, 333:15, 333:17, 334:25, 335:6, 335:9, 335:14, 335:17, 338:11, 338:15, 341:3, 359:19, 359:20, 360:11, 362:24, 378:6, 378:15, 386:16

Texas [1] - 373:11

text [4] - 268:1, 300:14, 311:8, 312:2

theater [2] - 334:14,

366:15

theaters [2] - 333:20, 335:7

themselves [7] - 288:17, 313:25, 337:24, 352:8, 359:22, 370:9, 375:3

theoretical [1] - 338:25

theoretically [1] - 364:2

there'd [1] - 351:9

therefore [4] - 280:25, 299:9, 331:16, 348:16

thesis [2] - 342:2, 342:3

they've [1] - 277:11

thinks [1] - 355:9

third [4] - 313:9, 313:10, 313:20, 317:23

thirds [1] - 313:10

Thompson [7] - 261:18, 326:1, 345:9, 381:25, 382:11, 383:4, 383:19

THOMPSON [50] - 258:7, 259:3, 260:2, 260:5, 260:11, 260:22, 260:25, 261:19, 261:25, 324:24, 325:19, 326:3, 340:16, 342:12, 345:1, 345:5, 345:10, 345:14, 345:15, 347:1, 347:2, 348:2, 349:19, 349:25, 351:4, 359:24, 377:7, 377:10, 377:12, 378:2, 378:7, 381:18, 381:23, 382:12, 382:17, 383:6, 383:8, 383:11, 383:22, 384:8, 384:11, 384:14, 384:18, 384:25, 385:14, 385:21, 386:3, 386:6, 386:8, 386:13

thoroughly [2] - 270:16, 309:5

threat [3] - 309:11, 349:12, 349:14

threatening [2] - 311:24, 354:18

threats [1] - 355:5

three [18] - 298:7, 298:17, 311:10, 311:11, 311:16, 318:10, 318:18, 359:12, 359:14, 360:15, 361:17, 362:7, 362:18, 362:20, 367:18, 367:24, 378:13, 378:14

three-quarters [3] - 311:10, 311:11, 311:16

throes [1] - 269:8

throughout [1] - 305:10

thumb [3] - 326:12, 326:18, 385:25

timed [1] - 361:1

timer [3] - 361:1, 361:3, 361:12

Title [1] - 257:23

title [2] - 279:12, 316:19

Tobacco [1] - 354:4

today [4] - 315:24, 358:1, 369:7, 381:1

Today [2] - 261:1, 261:10

together [2] - 315:2, 315:4

tolerant [1] - 373:11

took [6] - 271:8, 308:10, 365:2, 367:3, 375:8, 375:10, 381:1, 381:2

top [16] - 273:19, 273:25, 274:11, 278:2, 279:25, 280:15, 283:3, 290:14, 291:3, 297:10, 303:22, 304:4, 304:14, 310:16, 316:18

topic [2] - 269:19, 296:1

total [3] - 264:9, 298:11, 303:6

totally [1] - 373:19

tote [1] - 356:12

toward [2] - 301:24, 310:15

track [1] - 281:21

training [3] - 322:24, 363:2, 363:16

transcript [5] - 276:20, 287:24, 337:11, 360:7, 362:25

translates [1] - 294:20

trauma [1] - 379:22

trend [1] - 377:2
trends [1] - 354:2
TRENTON [1] - 257:12
trial [5] - 269:21,
269:22, 288:16,
340:19, 362:25
tripping [1] - 322:15
trivial [1] - 267:12
trophies [1] - 327:3
trouble [1] - 306:9
true [5] - 257:23,
275:8, 286:12,
299:17, 386:5
try [5] - 267:8, 273:20,
274:17, 277:5,
277:15
trying [3] - 325:14,
353:9, 354:20
Tuesday [1] - 356:2
Turn [1] - 280:12
turn [8] - 265:10,
267:22, 273:18,
290:10, 290:25,
303:8, 309:17,
321:18
turned [2] - 310:4,
355:3
turning [2] - 273:23,
280:14
turns [2] - 356:17,
367:15
two [49] - 272:21,
273:24, 285:7,
285:17, 287:17,
290:17, 292:5,
293:12, 296:7,
296:11, 296:12,
313:10, 316:20,
317:12, 319:13,
319:17, 320:5,
320:8, 320:22,
321:1, 321:5,
321:22, 324:19,
325:17, 327:13,
327:16, 330:22,
331:23, 332:10,
332:22, 336:1,
336:10, 338:7,
342:15, 354:15,
357:4, 362:5, 362:6,
362:9, 362:21,
363:4, 364:11,
365:14, 366:11,
366:12, 366:16,
366:22, 378:12,
383:23
two-second [2] -
320:8, 362:5
two-thirds [1] - 313:10
type [50] - 263:17,

263:18, 263:20,
264:12, 307:14,
307:16, 307:18,
307:19, 329:13,
329:18, 329:24,
330:4, 330:13,
330:17, 330:19,
330:24, 331:2,
331:5, 331:11,
331:16, 331:17,
332:1, 332:2, 332:6,
332:9, 332:14,
332:17, 333:1,
333:4, 333:7,
333:10, 333:12,
334:18, 336:3,
336:5, 354:5,
365:18, 365:25,
366:2, 366:6,
366:10, 366:13,
366:18, 366:20,
366:22, 366:23,
366:24
types [8] - 304:1,
329:18, 331:4,
336:6, 365:19,
366:11, 366:23

U

U.S [10] - 257:15,
257:25, 266:5,
270:16, 274:25,
279:17, 280:4,
289:11, 300:7, 378:5
U.S.C [1] - 257:23
unchallenged [1] -
267:18
uncommon [1] - 291:4
Under [2] - 298:20,
338:5
under [23] - 266:21,
266:24, 270:1,
289:21, 291:4,
294:18, 299:17,
310:23, 323:3,
327:6, 333:19,
334:4, 334:21,
337:5, 337:15,
338:5, 338:14,
338:16, 338:18,
338:19, 340:22,
345:11
undergraduates [1] -
345:24
underlying [1] -
298:19
underneath [1] -
316:19
understood [4] -

284:22, 284:25,
285:3, 285:6
undertake [1] - 370:17
underweighted [1] -
275:17
underweighting [1] -
275:5
unfolds [1] - 341:6
unidentified [1] -
336:5
United [23] - 261:12,
261:15, 268:8,
274:23, 275:8,
285:7, 285:17,
293:4, 294:15,
294:21, 299:23,
300:5, 351:18,
353:22, 356:24,
357:3, 357:18,
358:12, 369:15,
376:8, 377:23,
379:10, 379:11
UNITED [1] - 257:1
university [1] - 372:6
University [4] -
305:21, 346:14,
346:16, 379:23
unless [1] - 359:6
unlike [1] - 354:17
unloaded [1] - 314:12
unnumbered [1] -
351:19
unrecorded [1] -
336:3
unrelated [1] - 317:20
unskilled [2] - 320:6,
325:20
unspecified [1] -
336:6
unusual [1] - 363:10
unusually [3] - 353:7,
353:16, 370:1
up [29] - 276:21,
276:24, 283:14,
283:20, 288:1,
288:25, 303:12,
306:8, 308:6,
313:17, 316:16,
320:17, 322:14,
324:21, 331:21,
340:13, 358:8,
359:17, 359:20,
365:21, 366:4,
367:5, 376:6, 377:1,
377:2, 379:6, 381:5,
382:22
upper [2] - 278:3,
338:22
URL [2] - 320:20,
328:19

URLs [1] - 328:24
USA [2] - 261:1,
261:10
usage [1] - 286:14
user [1] - 264:8
uses [73] - 268:8,
268:12, 268:15,
268:20, 269:2,
269:6, 269:13,
269:22, 270:2,
270:5, 271:10,
271:15, 271:22,
274:23, 278:6,
279:4, 280:9,
286:24, 287:19,
288:6, 289:9,
293:22, 293:24,
294:9, 294:13,
294:15, 294:21,
295:19, 296:2,
296:25, 297:1,
297:5, 297:8,
297:12, 297:17,
297:23, 298:3,
298:4, 298:6, 298:7,
298:11, 298:17,
298:22, 299:14,
299:19, 302:24,
309:21, 310:1,
310:5, 311:10,
311:11, 311:16,
313:6, 314:21,
316:13, 349:10,
351:6, 351:9,
351:13, 351:24,
353:20, 354:17,
355:7, 355:8,
356:23, 357:2,
357:9, 357:15,
357:18, 357:20,
358:4, 358:8
Uses [1] - 279:13
Uses-New [1] - 279:13
utilized [2] - 347:7,
347:18
utilizing [1] - 347:17

V

v=ZRCjY [1] - 322:10
VALERIA [1] - 258:12
valid [4] - 272:25,
273:4, 294:19,
295:18
value [1] - 280:20
Vanderbilt [1] -
379:23
variabilities [1] -
353:11
variables [2] - 353:9,

353:13
variety [1] - 278:15
various [4] - 281:7,
281:9, 293:3, 299:17
Vegas [11] - 340:14,
340:17, 342:8,
343:20, 344:19,
363:9, 368:7,
369:16, 385:17,
385:19, 385:23
vegas-shooting-
timeline-12-bursts.
html [1] - 343:5
venue [1] - 343:9
verbally [1] - 373:25
verify [1] - 329:1
version [2] - 286:20,
306:9
versions [1] - 286:21
versus [2] - 373:10,
377:4
vertical [1] - 303:11
vetted [1] - 270:17
via [1] - 316:15
vicinity [1] - 288:20
victim [1] - 358:13
Victimization [4] -
279:15, 279:20,
280:2, 352:1
victimization [9] -
280:24, 299:23,
300:5, 301:5,
301:23, 303:2,
303:9, 303:22,
351:18
victimizations [1] -
356:6
victims [7] - 266:5,
268:12, 304:1,
355:23, 356:14,
356:15, 376:2
video [27] - 320:7,
322:8, 322:17,
322:24, 323:2,
323:7, 324:17,
328:9, 334:3, 336:2,
340:13, 340:25,
341:21, 342:17,
342:20, 343:1,
343:19, 360:24,
363:8, 363:9,
369:16, 380:15,
381:19, 385:17,
385:20, 385:23,
385:25
videos [12] - 327:17,
328:15, 328:20,
328:25, 329:2,
333:18, 334:5,
334:10, 335:6,

336:6, 361:21

**view** [4] - 357:1, 364:14, 372:18, 376:7

**viewed** [2] - 328:15, 343:7

**views** [2] - 373:21, 374:4

**Violence** [3] - 260:12, 266:7, 303:23

**violence** [15] - 304:2, 304:16, 305:14, 346:22, 353:5, 353:7, 353:13, 372:23, 373:1, 373:3, 373:11, 373:14, 373:22, 373:24, 373:25

**violent** [8] - 269:7, 358:12, 373:20, 373:21, 373:23, 374:1, 374:3, 374:4

**Virginia** [4] - 342:8, 367:4, 367:11

**virtually** [2] - 278:18, 307:14

**volunteer** [3] - 352:4, 352:7, 352:9

**Vs** [1] - 257:6

---

**W**

**Waffle** [6] - 378:20, 379:19, 384:19, 384:21, 384:22, 385:10

**Wait** [2] - 283:24, 384:17

**wait** [4] - 300:18, 344:19, 384:7

**waiting** [1] - 352:9

**walk** [2] - 293:8, 322:14

**wants** [2] - 282:20, 352:6

**Warning** [1] - 312:9

**warning** [2] - 312:19, 313:7

**watch** [2] - 322:10, 361:20

**watched** [3] - 328:25, 333:18, 343:20

**waved** [1] - 309:17

**ways** [1] - 291:6

**weakest** [1] - 371:2

**weapon** [14] - 304:6, 304:11, 304:14, 305:7, 309:10, 311:17, 314:21,

315:17, 336:3, 336:6, 340:2, 352:11, 379:8

**weapons** [9] - 307:25, 308:4, 314:12, 314:17, 315:22, 329:3, 329:7, 329:8, 370:22

**website** [5] - 306:4, 324:22, 325:4, 340:14, 385:5

**week** [2] - 359:19, 362:24

**weekend** [1] - 386:22

**weeks** [8] - 287:17, 289:18, 289:20, 290:7, 292:5, 363:12, 363:20, 378:18

**weight** [3] - 343:1, 348:20, 348:21

**well-established** [1] - 270:15

**west** [4] - 275:2, 348:6, 348:18, 348:22

**western** [1] - 275:9

**whatever's** [1] - 326:25

**whatsoever** [1] - 381:3

**Whereas** [1] - 270:19

**whistles** [1] - 357:13

**White** [2] - 384:23

**whole** [2] - 274:17, 329:17

**wide** [1] - 278:15

**widespread** [1] - 280:23

**wildly** [1] - 363:10

**willing** [5] - 277:10, 283:5, 293:5, 370:9, 370:16

**window** [1] - 321:5

**WINNICKI** [1] - 258:4

**wish** [4] - 261:6, 300:21, 344:24, 383:3

**withdraw** [3] - 274:10, 311:14, 324:10

**Witness** [1] - 383:10

**WITNESS** [20] - 259:1, 262:4, 262:7, 276:7, 277:2, 283:25, 292:1, 300:20, 301:13, 303:19, 313:5, 314:16, 314:18, 331:7, 335:20, 345:12, 350:4, 380:12,

382:4, 383:7

**witness** [14] - 260:1, 261:24, 262:12, 264:21, 275:19, 276:25, 277:19, 344:23, 345:8, 350:1, 350:3, 363:23, 377:13

**woman** [1] - 362:1

**women** [3] - 277:10, 370:6

**won** [2] - 346:18, 346:20

**wonders** [1] - 316:15

**word** [3] - 284:8, 286:1, 287:21

**worded** [1] - 270:17

**words** [5] - 266:25, 301:20, 324:13, 363:13, 380:21

**works** [1] - 355:15

**world** [11] - 325:2, 325:3, 326:24, 336:2, 338:22, 346:17, 350:6, 361:21, 376:5, 378:4

**World** [2] - 346:16, 385:5

**worlds** [1] - 376:6

**Worman** [3] - 336:14, 337:11, 338:11

**worse** [1] - 362:6

**wounded** [1] - 344:1

**wounding** [1] - 312:1

**woundings** [1] - 344:4

**wrest** [1] - 380:24

**wrested** [1] - 380:17

**Wrestled** [1] - 384:20

**wrestled** [1] - 379:25

**write** [1] - 354:22

**written** [2] - 342:4, 346:10

**wrongly** [1] - 351:1

**wrote** [1] - 349:16

**www.nytimes.com-video-us-1000000005473328-las** [1] - 343:4

**www.YouTube.com** [1] - 322:10

**www.YouTube.com-watch-v=ZRCjY-GtROY** [1] - 322:10

---

**Y**

**Yale** [3] - 284:23, 285:1, 285:4

**Year** [2] - 261:11,

384:23

**year** [17] - 269:7, 270:4, 280:22, 288:18, 288:19, 299:1, 299:19, 305:10, 358:7, 358:13, 358:14, 360:19, 378:18, 378:24, 379:12, 379:24, 381:1

**years** [5] - 271:1, 288:20, 307:11, 345:24

**yesterday** [5] - 260:7, 260:13, 341:3, 367:4, 371:4

**yesterday's** [1] - 340:18

**yield** [3] - 275:13, 298:5, 358:10

**York** [14] - 340:14, 379:19, 380:2, 380:5, 380:13, 380:23, 381:12, 381:15, 381:24, 382:16, 382:22, 383:12, 383:25, 385:10

**yourself** [7] - 296:21, 301:25, 307:5, 340:7, 352:6, 360:25, 372:7

**YouTube** [4] - 320:7, 320:20, 322:1, 322:8, 327:17

---

**Z**

**zero** [4] - 295:23, 299:15, 303:15