# EXHIBIT A

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ASSOCIATION OF NEW JERSEY RIFLE &
PISTOL CLUBS, INC., *et al.*,

        Plaintiffs,

v.

GURBIR GREWAL, *et al.*,

        Defendants.

Civil Action No.
3:17-cv-10507 (PGS) (LHG)

**MEMORANDUM
AND ORDER**

R E C E I V E D

SEP 2 8 2018

AT 8:30_____M
   WILLIAM T. WALSH
      CLERK

**SHERIDAN, U.S.D.J.**

Presently before the Court is Plaintiffs' Motion for a Preliminary Injunction, (ECF No. 7),

seeking to enjoin the enforcement of a recently enacted New Jersey statute, L. 2018, c. 39 § 1,

which reduces large capacity magazines from fifteen rounds of ammunition to ten. (hereinafter,

"Large Capacity Magazine [LCM]" law).  Specifically, Plaintiffs contend the LCM law is

unconstitutional, under the Second, Fifth, and Fourteenth Amendments.  New Jersey contends that

because large capacity magazines do not fall within the Second Amendment's protections, the

LCM law is lawful, and alternatively that the LCM law nevertheless reasonably fits to accomplish

a significant governmental interest.  The government also contends that the law does not constitute

an unconstitutional taking without compensation.  For the reasons set forth herein, Plaintiffs'

motion is denied.

### BACKGROUND

Our country is facing a significant and widespread problem concerning the prevalence of

mass shootings and it pits the rights of gun owners against the governmental objective of ensuring

public safety. Various state and federal legislatures have proposed solutions, including expanding

mental health services, increasing security in public places, banning certain types of guns and

restricting ammunition, and others; but no one solution itself will ends mass shootings. The

question before this Court concerns the constitutionality of New Jersey's restriction on the legal

capacity of a magazine. New Jersey contends this law will mitigate death tolls during mass

shootings by requiring shooters to reload more often, creating additional opportunities for escape

and for bystanders or law enforcement to stop the shooter. *See* Brief of Defendants in Opposition

to Preliminary Injunction, at 2, 22.

On June 13, 2018, New Jersey strengthened its already robust gun laws by enacting the

LCM law, which makes it unlawful for any person in New Jersey, with certain exceptions,[1] to

possess any firearm magazines that are capable of holding more than ten rounds of ammunition.

In doing so, New Jersey joins California, Connecticut, Hawaii, Maryland, Massachusetts, and New

York, which have all enacted similar statutes restricting the possession and sale of firearm

magazines to ten rounds.[2]

A subsection of the New Jersey Criminal Code, which preexists the law at issue, provides,

with some exceptions, "Any person who knowingly has in his possession a large capacity

ammunition magazine is guilty of a crime of the fourth degree." N.J.S.A. 2C:39-3(j). The new

law defines "[l]arge capacity ammunition magazine" as "a box, drum, tube or other container

which is capable of holding more than 10 rounds of ammunition to be fed continuously and directly

---

[1] The most notable exception applies to retired police officers.

[2] *See* Cal. Penal Code §§ 16740, 32310; Conn. Gen. Stat. § 53-202w; Haw. Rev. Stat. Ann. § 134-8(c); Md. Code Ann., Crim. Law § 4-305(b); Mass. Gen. Laws ch. 140, §§ 121, 131; N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.11.

2

therefrom into a semi-automatic firearm," N.J.S.A. § 2C:39-1(y), a reduction from the 15-round-restriction under the pre-amendment definition, N.J.S.A. § 2C:39-1(y) (1990).[3]

The law also provides a six-month grace period for owners of the now-banned magazines to come into compliance, providing them with one of three options: (1) "[t]ransfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine"; (2) "[r]ender the semi-automatic rifle or magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less"; or (3) "[v]oluntarily surrender the semi-automatic rifle or magazine." *Id.* at § 5. The law exempts firearms "with a fixed magazine capacity holding up to 15 rounds which [are] incapable of being modified to accommodate 10 or less rounds" and firearms "which only accept[] a detachable magazine with a capacity of up to 15 rounds which [are] incapable of being modified to accommodate 10 rounds or less." N.J.S.A. 2C:39-20(a). Owners of such a firearm may lawfully retain the high-capacity magazine if they "register that firearm within one year from the effective date." *Id.* Individuals who fail to timely dispossess or modify the LCM potentially face a maximum sentence of 18 months' imprisonment and a fine of $10,000. *See* N.J.S.A. § 2C:39-3(j); N.J.S.A. § 2C: 43-3(b)(2); N.J.S.A. § 2C:43-6(a)(4).

As noted above, the LCM law also sets forth several statutory exceptions for individuals who may possess a magazine holding more than 10 rounds. First, active and retired law enforcement officers are entitled to possess and carry magazines capable of holding up to fifteen rounds of ammunition. *See* L. 2018, c. 39 §§ 2-3. In addition, actors may possess these magazines as movie or television props, so long as "the large capacity ammunition magazine has been

---

[3] The definition does not apply to "an attached tubular device which is capable of holding only .22 caliber rimfire ammunition." N.J.S.A. § 2C:39-1(y).

3

reconfigured to fire blank ammunition and remains under the control of a federal firearms license holder." *Id.* at § 4. While the law also recognizes exceptions for licensed retail and wholesale firearms dealers, N.J.S.A. 2C:39-3(g)(3), no exceptions exist for active or former servicemen; security guards and armored vehicle employees; or firearms instructors.

Notably, New Jersey's LCM law does not prevent ownership of any type of gun and does not restrict the quantity of ammunition a gun owner may possess. It merely restricts the quantity of bullets a magazine may hold. To illustrate, a citizen who owns a gun, thirty rounds of ammunition, and two fifteen-round magazines prior to the LCM law's enactment will be permitted to retain his gun, ammunition, and three ten-round magazines. The LCM law restricts the amount of ammunition one magazine can hold.

On the same day that New Jersey enacted the LCM law, Plaintiffs filed the present lawsuit, seeking its invalidation. Plaintiff New Jersey Rifle and Pistol Clubs, Inc. ("NJRPC") is an eighty-year old membership organization, representing tens of thousands of members, many of whom possess large capacity magazines for self-defense. (Complaint at ¶¶ 9, 45). Plaintiff Blake Ellman is a law-abiding citizen of New Jersey and member of the NJRPC; however, he is not a retired law enforcement officer and, therefore, does not fall within the LCM law's limited exceptions. (*Id.* at ¶ 36). Ellman is a firearms instructor, range safety officer, armorer, and competitive shooter and currently possesses magazines that would qualify as "large capacity ammunition magazines" under the new law. (*Id.* at ¶¶ 36-37). Plaintiff Alexander Dembowski is also a law-abiding citizen of New Jersey and member of the NJRPC; he is not a retired law enforcement officer, but did serve in the United States Marine Corps for four years, before retiring from service. (*Id.* at ¶¶ 39-40). While in the Marines, Dembowski received annual training on firearms and magazines and served as a Combat Marksmanship Instructor. (*Id.* at ¶ 40). Presently, Dembowski serves as a Chief

4

Range Safety Officer at a gun range in New Jersey, where he routinely trains individuals using a fifteen-round magazine. (*Id.* at ¶ 41). Like Ellman, Dembowski currently possesses "large capacity ammunition magazines" for defense of his home. (*Id.* at ¶ 42). Plaintiffs bring this present action as a facial challenge under 42 U.S.C. § 1983, seeking a declaratory judgment that New Jersey's LCM law violates New Jersey citizens' constitutional right to keep and bear arms under the Second and Fourteenth Amendment and nevertheless constitutes an unlawful taking of property, contrary to the Fifth and Fourteenth Amendments.

## Mass Shootings in the United States

There is anecdotal evidence that some mass shootings reveal clear examples in which lives may have been saved because a shooter needed to reload. Between 1984 and 1993, LCM-equipped semiautomatic weapons were used in 40 percent of mass shootings where six or more people were killed or a total of 12 or more people were wounded. (Joint Exhibit 14, at 14). In 1994, the year the federal LCM ban[4] went into effect, LCM-equipped guns were estimated to have been used in between 31 percent and 41 percent of gun murders of police officers. (*Id.* at 18).

During a January 8, 2011 mass shooting, a gunman wielding a Glock G19 semiautomatic pistol, two thirty-one-round magazines, and two fifteen-round magazines shot and killed six individuals, including United States District Judge John Roll, and wounded thirteen individuals, including United States Representative Gabrielle Giffords. (Defendants' Exhibit 83, at 3; Defendants' Proposed Findings of Fact, at ¶ 52). The thirteenth shot fired from one of the gunman's thirty-one-round magazines killed Christina-Taylor Green, a nine-year-old girl. (Defendants' Exhibit 23, Donohue Declaration, at ¶ 50). When the shooter paused to reload, several bystanders subdued him. (*Id.*).

---

[4] *See infra*, p. 8

In 2011, an individual purchased various firearms in Texas, which does not limit magazine capacity, and specifically requested the highest capacity magazines available. Defendants' Exhibit 23, Donohue Declaration, at ¶ 37). That year, in Fort Hood, he used LCM-equipped semiautomatic pistols to kill thirteen people and wound thirty-two in a mass shooting. *Id.*

Also, during a September 16, 2013 mass shooting at the District of Columbia's Navy Yard, a shooter used a seven-round shotgun to kill twelve people and injure several more. (Defendants' Exhibit 83, at 2). Although that shooter did not use a high-capacity magazine, there is evidence that he spotted a woman hiding next to a filing cabinet, approached her, and pulled the trigger. (Defendants' Exhibit 63 at 7). The gun – out of ammunition – did not fire and the shooter retreated, permitting the woman to escape. *Id.*

The Court also notes that a declaration provided by Baltimore County Police Chief Jim Johnson claimed that during the mass shooting at Sandy Hook Elementary School in Connecticut in 2012, multiple potential victims escaped harm while the shooter paused to reload. (Defendants' Exhibit 59, Jim Johnson Declaration, at ¶ 55).

New Jersey was also the site of a recent mass shooting at a June 10, 2018 art festival in Trenton. The shooting – suspected to be gang-related – caused seventeen gunshot injuries and one death. Sophie Nieto-Munoz & Paige Gross, *Trenton Shooting: Suspected Gunman Killed at Art All Night was Gang Member with Violent Past*, NJ.com, June 17, 2018, www.nj.com/index.ssf/2018/06/art_all_night_trenton_shooting.html. According to news stories, law enforcement seized multiple weapons from the scene including a handgun with a high capacity magazine. Luis Ferre-Sadurni & Mihir Zaveri, *Mass Shooting at New Jersey Arts Festival Leaves 22 Injured and 1 Dead*, The New York Times, June 17, 2018, www.njtimes.com/2018/06/17/nyregion/trenton-mass-shooting.html; Kristine Phillips, *Gang*

6

*Fistfight Escalated into a Mass Shooting at New Jersey Arts Festival, Prosecutor Says*, The Washington Post, June 18, 2018, www.washingtonpost.com/news/post-nation/wp/2018/06/17/suspect-killed-at-least-20-injured-in-shooting-at-new-jersey-arts-festival.

**History and Tradition of LCM Restrictions**

Much of the legal history and tradition of LCM restrictions in the United States is relatively recent and evolving. The first rifle to achieve mass-market success in the United States was in 1866. (Joint Exhibit 12, at 1-2). The popularity of such firearms expanded in the twentieth century, and the first handgun to achieve mass-market success did so in 1935. (*Id.* at 9). State-law restrictions on the possession, use, sale, and purchase of weapons based on the number of rounds they could fire without needing to reload corresponded with the increased use. *See* 1927 R.I. Pub. Laws 256 §§ 1, 4 (banning firearms "which shoot[] more than twelve shots semi-automatically without reloading); 1933 Cal. Stat. 1170, § 3 (banning "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity of greater than ten cartridges"); 1927 Mich. Pub. Acts 887, § 3 (prohibiting possession of "any machine gun or firearm which can be fired sixteen times without reloading"); 47 Stat. 650, ch. 465, §§ 1, 14 (1932) (prohibiting weapons capable of firing twelve or more times without reloading (including semiautomatic firearms) from the District of Columbia); 1933 S.D. Sess. Laws 245 § 1 (banning machine guns that could fire more than five rounds without reloading); 1933 Tex. Gen. Laws 219 § 1 (same); 1931 Ill. Laws 452 § 1 (banning machine guns that could fire more than eight rounds without reloading); 1932 La. Acts 336 § 1 (same); 1934 S.C. Acts 1288 § 1 (same).

For the majority of the twentieth century, the handgun most commonly owned by Americans was the revolver, which can hold six rounds of ammunition. (Defendant's Exhibit

103).  Between 1980 and 1991, semiautomatic pistols became the dominant handgun.  Defendants'

(Exhibit 69).  Two states – New Jersey and Hawaii – responded to this trend by restricting

magazine capacity to fifteen and ten rounds respectively.  *See* L. 1990, c. 32; Haw. Rev. Stat. Ann.

§ 134-(8).  In 1994, the federal government enacted a ban on the possession of certain assault

weapons and, in doing so, prohibited the possession or transfer of LCMs capable of holding more

than ten rounds of ammunition.  Pub. L. 103-322, § 110103 (Sep. 13, 1994).  The law however did

not apply to "the possession or transfer of any large capacity ammunition feeding device otherwise

lawfully possessed on or before the date of the enactment of" the federal ban.  P.L. 103-322, §

110103(a).  In 2004, in accordance with the statute's sunset provision, the law expired after

Congress declined to reauthorize it.

   Additionally, nine states have enacted restrictions on magazine capacity; seven of those

restricting magazines to ten rounds or less.  *See* Cal. Penal Code §§ 16740 (ten rounds); Conn.

Gen. Stat. § 53-202w (ten rounds); D.C. Code Ann. § 7-2506.01(b) (ten rounds); Haw. Rev. Stat.

Ann. § 134-8(c) (ten rounds); Md. Code Ann., Crim. Law § 4-305(b) (ten rounds); Mass. Gen.

Laws ch. 140 §§ 121; 131M (ten rounds); N.J. Stat. Ann. § 2C:39-1(y) (ten rounds); N.Y. Penal

Law §§ 265.00(23) (ten rounds); 13 Vt. Stat. Ann. § 4021(e)(1)(A), (B) (ten rounds for a "long

gun" and fifteen rounds for a "hand gun"); Colo. Rev. Stat. § 18-12-301(2)(a)(I) (fifteen rounds).

And, several localities across the country have enacted restrictions on magazine capacity.  San

Francisco (Cal.) Ord. § 249-13 (ten rounds); Sunnyvale (Cal.) Municipal Code § 9.44.030-60 (ten

rounds); Highland Park (Ill.) Municipal Code § 136.001 (ten rounds); Oak Park (Ill.) Village Code

Ch. 27 § 1 (ten rounds).

**Expert Evidence**

8

To better assess the credibility of the evidence presented by the parties, the Court held a three-day hearing on August 13, 16, and 17, 2018. Defendants presented Lucy Allen, Glenn Stanton, and John Donohue as expert witnesses; Plaintiffs presented Gary Kleck.[5] Thereafter, the parties submitted findings of facts and conclusions of law on September 4, 2018; closing arguments were made on September 6, 2018.

**a. Lucy P. Allen**

Lucy Allen is an economist and the Managing Director of NERQA Economic Consulting, Inc., which provides economic advice for complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. (Defendants' Exhibit 3, "Allen Declaration" at ¶ 2). Allen holds an A.B. from Stanford University, and an M.B.A., M.A., and M. Phil. Degrees in Economics from Yale University. (*Id.* at ¶ 4). Allen has provided expert reports in several other cases involving the reduction of large capacity magazines.

In her declaration, Allen stated that it is rare for an individual, in self-defense, to fire more than ten rounds. (*Id.* at ¶ 10). Relying on data from the NRA Armed Citizen database, from January 2011 to May 2017, Allen concluded that "[self-]defenders fired 2.2 shots on average." (*Id.*). Notably, out of the 736 reported incidents – 411 of which occurred in the home – there were only two incidents where the self-defender was reported to have fired more than 10 bullets. (*Id.*). In another study, Allen used Factiva, an online news reporting service that aggregates news content from nearly 33,000 sources, to compare her findings from the NRA Armed Citizen database. (*Id.* at ¶ 13). Using specific string searches, Allen searched the database for stories that reported the

---

[5] It should be noted that the parties stipulated that the experts' respective declarations were deemed admitted as direct examination testimony; as such, only cross- and re-direct examinations were conducted at the hearing.

number of rounds fired by self-defenders. (*Id.*).[6]   Consistent with the NRA Armed Citizen database, Allen's Factiva analysis reported that "the average number of shots fired per incident covered is 2.34." (*Id.* at ¶ 17).  In addition, "[i]n 97.3% of incidents the defender fired 5 or fewer shots.  There were no incidents where the defender was reported to have fired more than 10 bullets." (*Id.* at ¶ 18).

Lastly, Allen performed an analysis on the use of LCMs in mass shootings, relying on data from a Mother Jones investigation, which covered mass shootings from 1982 to 2017, and a study by the Citizens Crime Commission of New York City, which covered mass shootings from 1984 to 2012. (*Id.* at ¶ 20).  Based on the combined data from these two sources, Allen concluded that LCMs, which she defined as magazines capable of holding more than ten rounds, were known to have been used in 54 out of 83 mass shootings, where the magazine capacity was reported. (*Id.* at ¶ 22).  In addition, when comparing the number of casualties involved in mass shootings where LCMs are used with those without, the number of casualties was significantly higher in shootings where LCMs were used. (*Id.* at ¶ 24).  Specifically, the average number of fatalities or injuries per mass shooting involving an LCM was 31, as compared to 9 without LCMs. (*Id.*).

On cross-examination, Plaintiffs focused primarily on the reliability, or lack thereof, of the data Allen used in preparing this declaration.  Allen conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of overall statistics on the use of arms in self-defense. (P.I. Hearing at 1T20:19 to 21).  She also conceded that her analysis of Factiva data could have excluded defensive gun use incidents among residents of the same home and that her search criteria omitted some important terms. (*Id.* at 32:19 to 33:10).  She admitted there were

---

[6] The precise string searches used were: "(gun* or shot* or shoot* or fire* or arm*) and ('broke in' or 'break in' or 'broken into' or 'breaking into' or burglar* or intrud* or inva*) and (home* or 'apartment' or 'property')." (*Id.* at ¶ 13 n.5).

problems with the Mother Jones study relating to the definition of mass shooting. For example, the study claimed to rely on only mass shootings involving a lone gunman but included various mass shootings that involved multiple shooters, including Columbine High School, San Bernardino, and Westside Middle School. (*Id.* at 1T43:24 to 46:19; 52:15 to 53:19). Plaintiff's counsel showed Allen an exhibit showing that the Mother Jones study omitted over 40% of mass shooting cases. (*Id.* at 1T54:25 to 55:24). Finally, Allen admitted that none of the studies she relied upon set forth any evidence that LCMs caused mass shootings or that mass shootings would not have occurred if smaller magazines were required. (*Id.* at 1T60:17 to 20).

**b. Glenn L. Stanton**

Glenn Stanton is an expert in the use of firearms and is currently a State Range Master for the New Jersey Office of the Attorney General, Division of Criminal Justice. (Defendants' Exhibit 98, "Stanton Declaration" at ¶ 3). Prior to working for the State, Stanton was the Principal Firearms Instructor for the Federal Bureau of Investigations' New York Office, from 1992 until 2011. (*Id.* at ¶ 6). From 1978 to 1982, Stanton was a police officer for the Princeton, New Jersey Police Department. (*Id.* at ¶ 7).

Stanton's declaration provides a police officer's perspective on the use of LCMs. According to Stanton, both active and retired police officers are required to pass the Handgun Qualification Course and the Night Handgun Qualification Course bi-annually. (*Id.* at ¶¶ 17-18). In performing these tests, officers use their standard issued weapon, which is a 9-millimeter Glock 19, equipped with a 15-round magazine. (*Id.* at ¶ 19). According to Stanton, the firearms training required in New Jersey is enforced upon all individuals; as such, "[i]ndividuals with military backgrounds are not exempted from the firearms training . . . because the firearms training military recruits receive is vastly different than what is required of recruits in the police academy." (*Id.* at

11

¶ 22). In fact, unlike military recruits, who receive little, if any, handgun training, law enforcement officers are required to undergo extensive handgun training. (*Id.* at ¶ 23). Moreover, Stanton discussed the advantages of law enforcement using LCMs: "gunfights are highly stressful situations. Accordingly, officers go through rounds quickly. [LCMs] are advantageous and necessary for law enforcement officers because it reduces their need to reload." (*Id.* at ¶ 25). These advantages are lost, however, when these same LCMs are possessed by individuals that are committing crimes. (*Id.* at ¶ 26). In addition, given that gunfights are unpredictable, and at the discretion of the aggressor, Stanton stressed that "law enforcement officers need every advantage they can get." (*Id.* at ¶ 27).

Stanton testified on cross-examination that a civilian is less likely than a law enforcement officer to possess more than one magazine and that civilians have "lower hit rates," which suggests that law abiding citizens would benefit from large capacity magazines. (P.I. Hearing, at 2T78:16 to 79:5; 83:2 to 6). He nonetheless maintained that he was unaware of a situation in which someone used greater than ten rounds of ammunition in self-defense.

Stanton also testified that military servicepersons do not receive handgun training, likely because the military serves a different role than law enforcement. However, he admitted he was unfamiliar with current statistics regarding military training and that there is no difference in training based on magazine size. (*Id.* at 75:11 to 15).

### c. John J. Donohue

Professor Donohue is an expert in empirical research and currently teaches courses on empirical law and economics at Stanford Law School. (Defendants' Exhibit 23, "Donohue Declaration" at ¶ 3). Professor Donohue received his J.D. from Harvard Law School and holds a Ph.D. in economics from Yale University. (*Id.*). In addition to teaching at Stanford, Professor

12

Donohue is a member of the Committee on Law and Justice of the National Research Council, which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an intellectual resource for federal agencies and private groups." (*Id.* at ¶ 6). Like Allen, Professor Donohue has provided expert declarations in several cases involving Second Amendment challenges to laws restricting the possession of LCMs.

According to Professor Donohue, LCM bans have little to no effect on an individual's ability to possess weapons for self-defense purposes but would "have a restraining impact on the effectiveness of those who have the criminal intent to kill as many individuals as possible." (*Id.* at ¶ 12). Moreover, having reviewed mass shootings involving LCMs, Professor Donohue concluded, "bans on [LCMs] can help save lives by forcing mass shooters to pause and reload ammunition." (*Id.* at ¶ 30). In fact, since 1991, at least twenty shooting attempts were stopped, or the harm was curtailed, when bystanders were able to subdue the perpetrator while he reloaded his weapon. (*Id.*). For instance, during the tragic Newtown shooting, nine children were able to escape gunfire, while the assailant reloaded his gun. (*Id.* at ¶¶ 30, 50). More recently, in April 2018, in Nashville, Tennessee, a man opened fire into a Waffle House, killing four and wounding another seven. (*Id.* at ¶ 31). However, the shooting was cut short when a customer apprehended the assailant while he tried to reload his weapon. (*Id.*).[7] As such, Professor Donohue reasoned, "[w]hen shooters stop to reload, they are overtaken by citizens, shot by police, or provide opportunities for escape, all of which government policy should seek to facilitate. The lower the size of the magazine, the more reloading must take place in mass shooting situations." (*Id.*).

---

[7] It should be noted that the parties dispute whether the shooter was apprehended while reloading his gun or, as Plaintiffs contend, the shooter's gun jammed. In any event, the point – as the Court sees it – is that the LCM law invites more opportunities to hinder mass shooting events.

Professor Donohue also noted that the use of LCMs for self-defense purposes is "extremely rare." (*Id.* at ¶ 43). According to Donohue, "the vast majority of the time that an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense." (*Id.*). Specifically, based on data collected from the National Crime Victimization Survey, from 2007 through 2011 – when approximately 6 million violent crimes were committed each year – 99.2% of victims were unable to defend themselves with a gun. (*Id.*). Even when guns are used for self-defense purposes, the defender rarely fires any rounds. (*Id.* at ¶ 44). In fact, in 98% of defensive gun use cases, people simply brandish the weapon to stop the attack. (*Id.*).

On cross-examination, Donohue conceded that there is no empirical data scrutinizing the efficacy of LCM bans and that none of the studies upon which he relied considered magazine restrictions. P.I. Hearing, at 2T167:25 to 168:20. He stated he could "not clearly credit the [federal LCM] ban with any of the nation's recent drop in gun violence." (*Id.* at 2T171:16 to 172:1). He also admitted that the LCM ban will not stop mass shootings. (*Id.* at 2T181:17 to 22).

On redirect, Plaintiffs' counsel showed Donohue a study, which claimed that during an average mass shooting "the time it takes to reload a detachable magazine is no greater than the average time between shots that the shooter takes anyway when not reloading." *Id.* at 2T220:23 to 221:1 (quoting Joint Exhibit 10, at 17 (A study conducted by Gary Kleck)). Donohue dismissed this claim as "terribly flawed," and noted there are several examples that undermined the claim. (*Id.* at 2T221:9 to 224:3).

**d. Gary Kleck**

Professor Kleck is an expert on violence and gun control and teaches criminology and criminal justice at Florida State University. (Joint Exhibit 9, "Kleck Declaration" at ¶ 9). He holds three degrees from the University of Illinois and frequently writes about gun control, gun violence,

14

and mass shootings. (*Id.* at ¶ 2). Kleck's has written six books on the subject and published several articles, book chapters, book reviews, and letters. (*Id.* at p.28 to 37). Like Allen and Professor Donohue, Kleck has provided expert testimony in other cases involving LCM bans.

In his declaration, Kleck concluded that New Jersey's LCM law "is unlikely to have any detectable effect on the number of homicides or violent acts committed with firearms, or the number of persons killed or injured in violent crimes," (*Id.* at ¶ 10); but it will significantly impair "a crime victim's ability to successfully defend against a criminal attack." (*Id.* at ¶ 11). Citing the 2008 National Crime Victimization Survey, Kleck noted that almost 800,000 violent crime incidents involved multiple offenders (about 25% of all violent crime incidents). (*Id.* at ¶ 13). As such, given the risk of facing multiple offenders, as well as the fact that defenders tend to miss more shots while firing under duress, Kleck contended that the LCM law places law abiding citizens at a distinct disadvantage in defending themselves. (*Id.* at ¶¶ 12-13).

Kleck claimed that the LCM law would have an "inconsequential effect," since "[m]ass murderers are not going to balk at violating laws banning LCMs and can easily obtain LCMs out of state and illegally bring them back to New Jersey." (*Id.* at ¶ 22). However, "one of the most important sources of arming criminals in the United States is 'law-abiding citizens' whose guns are lost and stolen each year"; on an annual basis, "roughly 400,000 guns move into the hands of criminals." (Donahue Declaration at ¶ 61). As such, it follows that "[t]he more large-capacity magazines in the hands of law-abiding citizens means the more large-capacity magazines in the hands of criminals." (*Id.*). More significantly, the majority of shootings that have taken place in America were perpetuated by previously law-abiding citizens. (*Id.*).

Kleck also dismissed the possibility of a mass shooting assailant being apprehended while reloading, since "the window of opportunity for such heroic intervention closes rapidly: it takes

15

two to four seconds for shooters" to reload. (Kleck Declaration at ¶ 22). However, on cross-examination, Kleck conceded that he based this assertion on his review of several Youtube videos and a practical demonstration he personally conducted. (P.I. Hearing at 3T327:16-24). Specifically, Kleck relied on demonstrations prepared by Doug Koenig, an eighteen-time world champion professional speed shooter. (*Id.* at 3T325:1-4). In this video, Koenig performs his magazine reloads in clinical conditions: alone, perfect weather, and no distractions. National Shooting Sports Foundation, *Speed Reload: Handgun Technique – Competitive Shooting Tips with Doug Koenig* (2011), https://www.youtube.com/watch?v=ZRCjY-GtROY (last visited Aug. 28, 2018). In addition, Koenig is seen wearing a speed shooting gun holster, substantially easing his ability to reload his gun. (*Id.*) In no way does Koenig's video accurately depict the type of conditions that are common during a mass shooting, where there is chaos, moving targets, and panic. In fact, Kleck acknowledged that it could take a shooter as long as twenty seconds to change an LCM under certain circumstances. (P.I. Hearing at 3T338:17 to 20).

Kleck estimated that around 1993, 2.5 million annual defensive gun-use incidents occur each year. (*Id.* at 3T268:10 to 14). Kleck himself, however, admitted that his current estimate of annual defensive gun use events was approximately half of that 1993 estimate but characterized it as a "guess for which I had no data at all." (*Id.* at 269:10 to 25). Kleck was unable to explain this inconsistency. He estimated that approximately thirty percent of defensive gun use incidents involve only brandishing the firearm. (*Id.* at 309:9 to 313:22).

**Findings**

The Court finds the expert testimony is of little help in its analysis. Both Allen and Kleck relied upon questionable data and conflicting studies. For example, they relied on different definitions of "mass shooting"; Allen considered a mass shooting to be an incident in which four

16

or more people were shot, fatally or non-fatally, while Kleck's definition included those with more than six killed or injured victims. *See* Kleck Decl., at ¶ 24. Although the Court finds these witnesses credible, their testimony failed to clearly convey the effect this law will have on reducing mass shootings in New Jersey or the extent to which the law will impede gun owners from defending themselves.

**LEGAL STANDARD**

"A preliminary injunction 'is an extraordinary remedy . . . which should be granted only in limited circumstances.'" *Holland v. Rosen*, 277 F. Supp. 3d 707, 724 (D.N.J. 2017) (quoting *Am. Tel. & Tel Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). In order to obtain preliminary injunctive relief, the moving party must demonstrate: (1) a reasonable probability of success on the merits; (2) irreparable injury if the requested relief is not granted; (3) the granting of preliminary injunction will not result in greater harm to nonmoving party; and (4) the public interest weighs in favor of granting the injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). The Third Circuit recently clarified the standard for preliminary injunction, "a movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 179. If the moving party satisfies the first two factors, "a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

**DISCUSSION**

## I. Likelihood of Success on the Merits

17

Plaintiffs present three separate theories to support their contention that New Jersey's LCM law is unconstitutional. First, Plaintiffs contend that the LCM law violates the Second Amendment, since it unlawfully infringes on their constitutional right to keep and bear arms. Second, Plaintiffs argue the law violates the Equal Protection Clause of the Fourteenth Amendment, since it treats similarly situated people differently. Finally, Plaintiffs aver that the LCM law constitutes an Unconstitutional Taking, contrary to the Fifth and Fourteenth Amendments. The Court shall address each theory in turn.

*1. Second Amendment*

The Second Amendment of the United States Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008), the Supreme Court recognized that the Second Amendment's "core protection" is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." By virtue of the Fourteenth Amendment, this fundamental right is incorporated against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The *Heller* Court also noted that Second Amendment protections are not absolute and extend only to the sorts of weapons that are in "common use at the time." *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Put differently, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. In addition, these rights are to be tempered with the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (quoting 4 Blackstone 148-49 (1769)).

In assessing Second Amendment challenges, the Third Circuit has set forth a two-pronged approach. *See United States v. Marzzarella*, 614 F.3d 85, 89 (2010). First, the Court must

18

consider whether "the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* Second, if the law falls within the scope of the Second Amendment, the Court must "evaluate the law under some form of means-end scrutiny." *Id.* The Court considers each prong in turn.

<u>Prong One: Whether Magazines Are Protected Under the Second Amendment</u>

Here, the threshold inquiry is whether New Jersey's LCM law affects conduct that falls within the scope of the Second Amendment; that is, whether the magazines are entitled to Second Amendment protection. Plaintiffs contend that because magazines constitute "arms," any laws regulating the size or capacity of ammunition, including magazines, would, by necessity, trigger Second Amendment protections. The government responds, arguing that because magazines having a capacity of more than ten bullets constitute "dangerous and unusual weapons," they are afforded no protection under the Second Amendment.

As explained in *Heller*, the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. These protections extend to the "sorts of weapons" that are "in common use at the time for lawful purposes like self-defense." *Id.* at 624 (internal quotation marks omitted). As such, the *Heller* Court explained that "dangerous and unusual weapons," as well as "weapons not typically possessed by law-abiding citizens for lawful purposes" find no protection under the Second Amendment. *Id.* at 624-25. Determining the scope of the Second Amendment requires a "textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.'" *Ezell v. City of Chicago (Ezell II)*, 846 F.3d

19

888, 892 (7th Cir. 2017) (quoting *Ezell v. City of Chicago (Ezell I)*, 651 F.3d 684, 703 (7th Cir. 2011)).

At the outset, the Court notes that "[t]he Second Amendment protects firearms and the ammunition and magazines that enable arms to fire." *Duncan v. Becerra (Duncan I)*, 265 F. Supp. 3d 1106, 1116-17 (S.D. Cal. 2017), *aff'd, Duncan v. Becerra (Duncan II)*, 2018 WL 3433828 (9th Cir. July 17, 2018); *see also Fyock v. City of Sunnyvale (Fyock II)*, 779 F.3d 991, 997-98 (9th Cir. 2015); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1264 (D.C. Cir. 2014). "[W]ithout bullets, the right to bear arms would be meaningless," and a "regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). As such, since magazines are considered "integral components to the vast categories of guns," they ought to be treated as "arms" for purposes of Second Amendment protection. *Fyock v. City of Sunnyvale (Fyock I)*, 25 F. Supp. 3d 1267, 1277 (N.D. Cal. 2014) (citing *Heller*, 554 U.S. at 581), *aff'd*, 779 F.3d 991 (9th Cir. 2015).

The government next contends that large capacity magazines are nevertheless beyond protection by the Second Amendment since: (1) they are considered dangerous and unusual weapons and (2) New Jersey has a longstanding history of regulating such weapons.

"To measure whether a weapon is dangerous and unusual, the court looks at whether it is 'in common use,' or whether such weapons are 'typically possessed by law-abiding citizens for lawful purposes.'" *Fyock*, 25 F. Supp. 3d at 1275 (quoting *Miller*, 307 U.S. at 179; *Heller*, 554 U.S. at 625). Here, Plaintiffs contend that magazines holding more than ten rounds are commonly possessed for self-defense and lawful purposes and, as such, the prohibition of the same would impose a substantial burden. In support of their contention, Plaintiffs note that such magazines

20

are lawful in 43 States and that there are approximately 133 million such magazines owned throughout the United States, representing almost half of all magazines. Plaintiffs also note that two-thirds of semiautomatic rifles currently listed in Gun Digest, a popular gun magazine, hold more than ten rounds of ammunition. Plaintiff's Ex. 48.

The government, in response, argues that because these large-capacity magazines are both "dangerous and unusual" they are not entitled to Second Amendment protection. The government cites statistics which represent that the vast majority of mass shootings involve the use of large capacity magazines and semi-automatic weapons. (ECF No. 31-2, "Allen Declaration" at ¶ 22). In addition, the government relies principally on the Fourth Circuit's decision in *Kolbe v. Hogan*, 849 F.3d 114, 135 (4th Cir. 2017), which deviates from the Second, Ninth, and District of Columbia Circuits, by holding that large capacity magazines are "among the arms that the Second Amendment does not shield." In doing so, the Fourth Circuit disregarded the "common use" test set forth in *Heller* and its progeny and created a new test: "Are the banned assault weapons and large-capacity magazines 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?" *Id.* at 136 (quoting *Heller*, at 554 U.S. at 627). Framing the inquiry this way, the Fourth Circuit concluded, "[b]ecause the banned assault weapons and large-capacity magazines are clearly most useful in military service, we are compelled by *Heller* to recognize that those weapons and magazines are not constitutionally protected." *Id.* at 137.

Contrary to the government's assertion, the Court finds *Kolbe*'s inquiry to be at odds with *Heller*'s "common use" test, which explained that if a weapon is "typically possessed by law-abiding citizens for lawful purposes," it cannot be a "dangerous or unusual weapon." *Heller*, 554 U.S. at 625, 627. In fact, other circuits that have addressed this issue employ the "common use"

21

test and conclude that large-capacity magazines are protected by the Second Amendment. *See, e.g.*, *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255-56 (2d Cir. 2015); *Fyock II*, 779 F.3d at 998; *Heller II*, 670 F.3d at 1260-61. Guided by these decisions, the Court sees no reason to deviate from employing the "common use" standard. In addition, under this standard, the Court is satisfied, based on the record presented, that magazines holding more than ten rounds are in common use and, therefore, entitled to Second Amendment protection. *See Heller II*, 670 F.3d at 1261; *Duncan*, 265 F. Supp. 3d at 1116-17; *Fyock I*, 25 F. Supp. 3d at 1276.

The government contends that there is no evidence suggesting that large capacity magazines are possessed by law abiding citizens for lawful purposes. However, this argument fails for several reasons. First, courts are reluctant to engage in a "typical use" analysis, since "empirical evidence of lawful possession for lawful purposes [is] 'elusive." *New York State Rifle & Pistol Ass'n*, 804 F.3d at 257 (citation omitted); *see also Heller II*, 670 F.3d at 1260-61. Instead, these circuits deem it more appropriate to assume common use and proceed to the second step of the analysis, level of scrutiny. *See New York State Rifle & Pistol Ass'n*, 804 F.3d at 257; *Heller II*, 670 F.3d at 1260-61. Second, the government fails to acknowledge that it bears the burden of demonstrating that the banned magazines are not in common use; noting the absence of evidence does not suffice. *See Fyock I*, 25 F. Supp. 3d at 1276.

The LCM law is also consistent with this country's history and tradition of "imposing conditions and qualifications on the commercial sale of arms." *Heller I*, 554 U.S. at 626-27. Several states began to impose restrictions on the capacity of magazines shortly after they became commercially available in the early part of the century.[8] Further, until the 1980s and 1990s the

---

[8] Although Plaintiffs correctly note that some of these early 20th century laws regulated automatic weapons, rather than semiautomatic weapons, those statutes nonetheless inform the

most commonly owned handgun in the United States was the revolver, which generally held six rounds of ammunition. (Defendants' Exhibit 103). Once production – and ownership – of handguns with magazines holding more than ten rounds increased, two states and the federal government soon responded.

The prohibition-era limitations on the number of rounds a gun could fire without reloading ranged from five to sixteen; five state laws restricted that number to ten rounds or fewer. Of the states that currently regulate magazine capacity, the majority of restrictions limit capacity to ten rounds. *See Heller II,* 670 F.3d at 1296 n.20 (Kavanaugh, J., dissenting) (noting that he would remand to the District Court for analysis of "whether magazines with more than 10 rounds have traditionally been banned and are not in common use").

In sum, based on the record presented, New Jersey's ban on magazines capable of holding more than ten rounds implicates Second Amendment protections. As such, the Court proceeds to step two, as outlined in *Marzarrella*, and considers whether the LCM law passes constitutional muster.

<u>Prong Two: Constitutional Scrutiny</u>

Having concluded that magazines fall within the purview of Second Amendment protections, the Court next assesses the LCM law under the appropriate standard of constitutional scrutiny. *Marzzarella,* 614 F.3d at 95. Neither *Heller* nor *McDonald* explicitly prescribed the appropriate standard of scrutiny to review Second Amendment challenges. As such, the parties predictably offer conflicting standards of scrutiny upon which to review the present matter. The government contends that intermediate scrutiny is appropriate since the law does not severely

---

Court's analysis in that they focused on the number of bullets that could be fired *without reloading*, not the number of times the shooter needed to pull the trigger.

burden the core right to bear arms. Plaintiffs, on the other hand, contend that strict scrutiny must be applied, since the right to bear arms is a fundamental constitutional right. Likening New Jersey's LCM law to the District of Columbia handgun ban in *Heller*, Plaintiffs argue that strict scrutiny should apply, since they contend that the law would prohibit an entire class of arms.

In *Marzzarella*, the Third Circuit faced a similar challenge in determining the appropriate level of scrutiny to use, in reviewing the constitutionality of a statute that generally prohibits possession of a firearm with an obliterated serial number. 614 F.3d at 96-97. Like the First Amendment right to free speech, the Third Circuit explained that Second Amendment challenges are susceptible to varying levels of scrutiny, depending on the severity of the burden the law places on the Second Amendment right. *Id.* at 97. Where the law in question severely limits the possession of firearms, as was the case in *Heller*, strict scrutiny should apply. *Id.* Ultimately, the *Marzzarella* court concluded that because the statute nevertheless "le[ft] a person free to possess any otherwise lawful firearm he chooses – so long as it bears its original serial number," intermediate scrutiny was appropriate. *Id.* at 97.

Here, the Court sees no reason to stray from *Marzzarella*'s reasoning. Contrary to Plaintiffs' assertion, New Jersey's LCM law does not prohibit the possession of "the quintessential self-defense weapon," the handgun, as was the case in *Heller*. 554 U.S. at 629. Nor does the prohibition of large capacity magazines "effectively disarm individuals or substantially affect their ability to defend themselves." *Heller II*, 670 F.3d at 1262. As such, since the LCM law nevertheless leaves law abiding citizens free to possess lawful firearms, albeit with five less rounds per magazine, intermediate scrutiny is appropriate. *See Marzzarella*, 614 F.3d at 97. This is also consistent with the majority of Circuit Courts that have considered similar restrictions on magazine capacities and have, likewise, utilized intermediate scrutiny. *See New York State Rifle & Pistol*

24

*Ass'n*, 804 F.3d at 260-61; *Fyock II*, 779 F.3d at 998-99; *Heller II*, 670 F.3d at 1261-62; *see also Kolbe*, 849 F.3d at 138 (assuming that large capacity magazines were protected by the Second Amendment, the Fourth Circuit would apply intermediate scrutiny).

To survive intermediate scrutiny, the government must demonstrate: (1) "a significant, substantial, or important interest;" and (2) "a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." *Drake v. Filko*, 724 F.3d 426, 436 (3d Cir. 2013) (citing *Marzzarella*, 614 F.3d at 98). Put differently, "a regulation that burdens a plaintiff's Second Amendment rights 'passes constitutional muster if it is substantially related to the achievement of an important governmental interest.'" *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) (quoting *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012)). "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the [legislature's] predictive judgments.'" *Drake*, 724 F.3d at 436-37 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)).

It is well-established that "[t]he State of New Jersey has, undoubtedly, a significant, substantial and important interest in protecting its citizens' safety." *Id.* at 437 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Here, the parties dispute whether New Jersey's LCM law reasonably fits within this interest in safety. The government defends the constitutionality of the LCM law, contending it seeks to prevent mass shootings, which is likely to advance public safety interests. Plaintiffs respond, contending that the proposed law would not be fruitful and, in enforcing the law, would place law abiding citizens at a greater risk of danger.

The Court finds neither Allen nor Kleck provided a clear analysis based on the various studies. Allen's analysis, based on an NRA report, does not support with statistical reliability her claim that individuals only use an average of 2.2 or 2.3 bullets when using handguns in self-

25

defense. Similarly, the report relied on by Kleck used a poor sample, and he failed to explain why the defensive gun use events in his report were cut in half one year later. However, the expert testimony established that there is some delay associated with reloading, which may provide an opportunity for potential victims to escape or for a bystander to intercede and somehow stop a shooter.

The LCM law places a minimal burden on lawful gun owners. The new law imposes no new restrictions on the quantity of firearms, magazines or bullets an individual may possess. It merely limits the lawful capacity of a single magazine. A gun owner preparing to fire more than ten bullets in self-defense can legally purchase multiple magazines and fill them with ten bullets each. The Court therefore finds the new law imposes no significant burden, if any, on Plaintiffs' second amendment right.

The Court also notes that New Jersey, a densely populated urban state, has a particularly strong local interest in regulating firearms. New Jersey, like other states with densely populated areas (Massachusetts, New York, California, Connecticut, the District of Columbia), has concluded that this restriction on magazine capacity is necessary for public safety and this Court will defer to that legislative finding. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (recognizing that "the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems"); *Heller I*, 554 U.S. at 705 (Breyer, J., dissenting) (noting that "deference to legislative judgment seems particularly appropriate [with regard to firearm legislation], where the judgment has been made by a local legislature with particular knowledge of local problems and insight into appropriate local solutions").

Conclusion

In sum, the Court finds that the government has enacted the LCM law in response to a growing concern over mass shootings and the law, based on the evidence presented, is reasonably tailored to accomplish that objective. Plaintiffs challenge the ban since it will have "an inconsequential effect on reducing the number of killed or injured victims in mass shootings." (Kleck Declaration at ¶ 22). However, this contention fails to recognize that, under intermediate scrutiny, a regulation need not be perfect, but fit within the government's purpose. *See Woollard v. Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2013); *see also Kachalsky*, 701 F.3d at 100. As such, simply because the challenged ban does not completely solve a problem, here being mass shooting, does not render it unconstitutional. *See id.* Because the Court is satisfied that the state has presented sufficient evidence that demonstrates that the LCM law is reasonably tailored to achieve their goal of reducing the number of casualties and fatalities in a mass shooting, and that it leaves several options open for current LCM owners to retain their magazines and for purchasers to buy large amounts of ammunition, it passes constitutional muster. Therefore, Plaintiffs have failed to prove that they are likely to succeed on the merits on their Second Amendment claim. This is consistent with nearly every Circuit Court to examine laws that reduce large magazine capacity to hold no more than ten rounds, all of which have found these laws constitutional. *See Kolbe*, 849 F.3d at 140-41; *Friedman v. City of Highland Park*, 784 F.3d 406, 411-12 (7th Cir. 2015); *New York State Rifle & Pistol Ass'n*, 804 F.3d at 264; *Fyock II*, 779 F.3d at 1000-01; *Heller II*, 670 F.3d at 1262-64. *But see Duncan II*, 2018 WL 3433828.

*2. Equal Protection*

Plaintiffs next argue that the LCM law violates the Equal Protection Clause of the Fourteenth Amendment, since it treats active and retired law enforcement officers differently than other individuals. The Equal Protection Clause guarantees that "[n]o State shall . . . deny to any

27

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440.[9]

Here, Plaintiffs challenge the validity of New Jersey's LCM law and bring this equal protection claim on a "class of one" theory. Under a "class of one" claim, the plaintiff must demonstrate that: "1) it 'has been intentionally treated differently from others similarly situated,' and 2) 'there is no rational basis for the difference in treatment.'" *Highway Materials, Inc. v. Whitemarsh Twp.*, 386 F. App'x 251, 259 (3d Cir. 2010) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). As such, the Court first considers whether the Plaintiffs have been treated differently from similarly situated individuals and, if so, whether there is a rational basis for the differential treatment.

Turning to the first issue, the Court finds that Plaintiffs have not be not been treated differently from others similarly situated. "[R]etired police officers possess a unique combination of training and experience related to firearms[,]" not commonly possessed by the general public. *Kolbe*, 813 F.3d at 185 (citing *Shew v. Malloy*, 994 F. Supp. 2d 234, 252 (D. Conn. 2014); *Pineiro v. Gemme*, 937 F. Supp. 2d 161, 176 (D. Mass. 2013)). In New Jersey, the Attorney General has

---

[9] It should be noted that Plaintiffs argue that the Court should apply a heightened level of scrutiny, since the LCM law implicates fundamental rights protected under the Second Amendment. However, because the Court has already determined that the Plaintiffs' Second Amendment claim fails, their equal protection claim is subject to rational basis review. *See Kwong v. Bloomberg*, 723 F.3d 160, 169-70 (2d Cir. 2013); *Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012) ("Given that the Second Amendment challenge fails, the equal protection claim is subject to rational basis review").

28

issued guidelines dictating the semi-annual firearms requalification standards for state law enforcement officers, "to ensure the safety of law enforcement officers as well as promote the public safety and ensure a high level of public confidence in the competence and integrity of our law enforcement personnel in the performance of their official functions." *Semi-Annual Firearms Qualification and Requalification Standards for N.J. Law Enforcement* (June 2003), *available at* http://www.state.nj.us/lps/dcj/pdfs/dcj-firearms.pdf. These qualifications apply to both active and retired law enforcement officers. *Id.*; *see also* Stanton Declaration at ¶¶ 17-18. However, no similar requirements are imposed on regular law abiding individuals. Second, as the *Kolbe* court recognized, "police officers are instilled with what might be called an unusual ethos of public service," and are expected to act in the public's interest, which does not apply to the public at large. 813 F.3d at 186-87. Finally, "retired police officers face special threats that private citizens do not," such as from past criminals that they have arrested." *Id.* at 187 (citing H.R. Rep. 108-560, at 4 (2004)). In addition, to the extent Plaintiffs complain of the disparate treatment between retired officers and military veterans, there is no evidence to suggest that military veterans receive equivalent training. In fact, the government notes that "the firearms training military recruits receive is vastly different than what is required of recruits in the police academy" and "military recruits generally receive very little, if any handgun training." (Stanton Declaration at ¶¶ 22-23).

In sum, given the extensive and stringent training that law enforcement officers receive, in addition to the unique circumstances that come with being a police officer, they are not similarly situated to other New Jersey citizens. As such, Plaintiffs' equal protection claim fails. *See Plyler v. Doe*, 457 U.S. 202, 216 (1982) ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection."). Therefore, since Plaintiffs' fail to establish a prima facie Fourteenth Amendment claim, they are unlikely to succeed on the merits of this claim.

*3. Unconstitutional Taking*

Finally, Plaintiffs challenge the LCM law on the basis that it constitutes a unconstitutional governmental taking, under the Fifth and Fourteenth Amendments, since they are required to dispossess themselves of these magazines or modify them to accept no more than ten rounds. In either case, Plaintiffs claim the LCM law deprives them of the beneficial use of their fifteen round magazines, without receiving just compensation.

The Takings Clause, as incorporated against the states by the Fourteenth Amendment, guarantees that no "private property shall be taken for public use, without just compensation." U.S. Const. amend. V. A physical taking occurs "[w]hen the government physically takes possession of an interest in property for some public purpose." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). Where no physical dispossession of property occurs, a regulation may nevertheless be deemed a "regulatory taking" if considered overly burdensome. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

"[T]wo guidelines" inform the Supreme Court's regulatory takings jurisprudence." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). "First, 'with certain qualifications . . . a regulation which "denies all economically beneficial or productive use of land" will require compensation under the Takings Clause.'" *Id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). Additionally, where a regulation does not deprive the owner of all economically beneficial use, courts assess "'complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extend to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Id.* at 1943 (quoting *Palazzolo*, 533 U.S. at 617).

30

Under the police power doctrine, the government may pass regulations to "protect the general health, safety and welfare of its citizens[,]" without having to recompense the aggrieved. *Akins v. United States*, 82 Fed. Cl. 619, 622 (2008) (quoting *Amerisource Corp. v. United States*, 75 Fed. Cl. 743, 747 (2007)). This is because,

> A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests

*Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887). A state's power to legislate that which is injurious to the health, morals, or safety of the community, however, "cannot serve as a touchstone to distinguish regulatory 'takings' – which require compensation – from regulatory deprivations that do not require compensation." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1026 (1992).

The Court notes a recent case from the Southern District of California, which declined to apply the police power doctrine to a similar regulation, finding the state's classification of LCMs as a nuisance to be "dubious" because "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.'" *Duncan I*, 265 F. Supp. 3d at 1137 (quoting *Staples v. United States*, 511 U.S. 600, 610 (1994)). That decision held "the Takings Clause prevents [California] from compelling the physical *dispossession* of . . . lawfully acquired private property [(magazines over 10 rounds)] without just compensation." *Id.* at 1138.

There are clear distinctions between the statute considered in *Duncan* and the one at issue here. As the court recognized,

> Section 32310(d) provides three options for dispossession. First, a person may "remove the large-capacity magazine from the State" §

31

> 32310(d)(1).   Second, a person may "sell the large-capacity
> magazine to a licensed firearm dealer."   § 32310(d)(2).   Third, a
> person may "surrender the large-capacity magazine to  a law
> enforcement agency for destruction.

*Id.* at 1110. This the court found deprived gun owners "not just of the use of their property, but of *possession*, one of the most essential sticks in the bundle of property rights."

Two provisions of the New Jersey law at issue here remedy the *Duncan* court's concern. First, section five permits gun owners to permanently modify their magazines "to accept 10 rounds or less." L. 2018, ch. 39, § 5. Second, section seven – which applies to magazines that cannot be modified and to guns which do not accept the smaller magazines – permits gun owners to register their firearms. L. 2018, c. 39, § 7. These avenues, unlike the California statute, ensure that gun owners who wish to keep their magazines may do so, provided they bring them into compliance with the new law. As such, New Jersey is not imposing a regulation that goes "too far," nor is it permanently depriving anyone of their property. The Court finds Plaintiffs' Taking Clause fails because the statute provides property owners with an avenue to comply with the law without forfeiting their property.

For the reasons discussed above, Plaintiffs have failed to demonstrate a likelihood of success regarding their takings claim.

## II. Irreparable Injury, Balance of Hardships, Public Interest

Having concluded that New Jersey's restriction on magazine capacity is not unconstitutional and thus that Plaintiffs have failed to demonstrate a likelihood of success on the merits, the Court concludes that Plaintiffs cannot establish the other three requirements for a preliminary injunction: (1) that they will suffer irreparable harm absent injunction;[10] (2) that

---

[10] Although there is no need to address the irreparable harm prong, it is noteworthy that the Court does not find same, the gun owners still possess the right to own a weapon without any numerical

32

granting preliminary relief will not result in even greater harm to the non-moving party; and (3)
that the public interest favors injunctive relief.

**ORDER**

Having carefully reviewed and taken into consideration the submissions of the parties, as
well as the arguments and exhibits therein presented, and the testimony adduced; for good cause
shown, and for all of the foregoing reasons,

IT IS on this __2 8__ day of September, 2018,

ORDERED that Plaintiffs' Motion for Preliminary Injunction be and hereby is DENIED.


PETER G. SHERIDAN, U.S.D.J.

---

limit on the quantity of bullets and magazines one can own. There is no evidence this regulation
on the capacity of the magazine places any burden on Plaintiffs' Second Amendment right.