Bradley P. Lehman
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
Phone: 910-713-8804
Email: law.rmd@gmail.com
(Admitted *pro hac vice*)

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 3:18-cv-10507-PGS-LHG |
| MARK CHEESEMAN, et al, <br><br> Plaintiffs, <br><br> v. | Civil Action No. 1:22-cv-04360-PGS-LHG <br><br> **Plaintiffs' Brief in Support of Motion for Summary Judgment** |

MATTHEW J. PLATKIN, in his official
capacity as Acting Attorney General of
New Jersey, et al,

                Defendants.

---

BLAKE ELLMAN et al,

                Plaintiffs,

v.

MATTHEW J. PLATKIN, in his official
capacity as Acting Attorney General of
New Jersey, et al,

                Defendants.

Civil Action No. 3:22-cv-04397-PGS-
LHG

## BRIEF IN SUPPORT OF

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **<u>TABLE OF CONTENTS</u>**

I.     Introduction…………………………………………………………....1

II.    Procedural History………………………………………………………2

III.   Standard of Review……………………………………………………4

IV.    New Jersey's "Assault Firearms" Statutory Scheme……………………6

V.     The Impact of Defendants' Enforcement of the Ban……..……………12

VI.    New Jersey's Ban is Unconstitutional as a Matter of Law……..………18

       A. The So-Called "Assault Firearms" Simply Cannot be Banned……...20

          1. The "*Assault* Firearms" Label is a Pejorative Misnomer….……..21

          2.  However, the State May Attempt to Label Them, the Banned Arms

             are Indisputably in Common Use for Lawful Purposes………….26

       B.  That is the End of the Inquiry and the Ban Must be Struck Down….34

VII.   Conclusion………………………………………………………………36

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…………………………..4, 5

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*
910 F.3d 106 (3d Cir. 2018)…………………………………………….26, 27, 31

*Coal. of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666 (D. N.J. 1999)…9, 11

*Coal. of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602 (D. N.J. 1990)……...11

*Col. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050 (D. Colo. 2014)……..30

*District of Columbia v. Heller*, 554 U.S. 570 (2008)…………………………*passim*

*Downey v. Pa. Dep't of Corr.*, 968 F.3d 299 (3d Cir. 2020)………………………35

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)………………………………..27

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021)…………………………………..27

*Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447 (2015)…………………..27

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)………………………………...26

*Goldstein v. Repossessors Inc.*, 815 F.3d 142 (3d Cir. 2016)………………..4, 5, 36

*Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198 (1st Cir. 2002)…………11

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)………22, 27, 29, 32

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977)……..17

*Jersey Cent. Power & Light Co. v. Lacey Tp.*, 772 F.2d 1103……………………36

*Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993)………………5

<u>**TABLE OF AUTHORITIES (continued)**</u>

**Cases**

*Kendrick v. Bruck*, 586 F. Supp. 3d 300 (D. N.J. 2022)…………………………..15

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)…………………………………….30

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961)……………………………...19

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)………………………………18

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)…………………………………29

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,

804 F.3d 242 (2d Cir. 2015)………………………………………………...27, 30

*Orsatti v. New Jersey State Police*, 71 F.3d 480 (3d Cir. 1995)……………………5

*Penn. Prison Soc. v. Cortes*, 508 F.3d 156 (3d Cir. 2007)………………………...17

*Piszczatoski v. Filko*, 840 F. Supp. 2d 813 (D. N.J. 2012)………………………...17

*Staples v. United States*, 511 U.S. 600 (1994)………………………...22, 23, 29, 34

*Stenberg v. Carhart*, 530 U.S. 914 (2000)………………………………………...21

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,

600 U.S. 181 (2023)………………………………………………………………17

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023)……………………………………….29

*Yurick v. State*, 875 A.2d 898 (N.J. 2005)…………………………………………16

**TABLE OF AUTHORITIES (continued)**

**Statutes**

18 U.S.C. § 922(g)………………………………………………………...12

28 U.S.C. § 1391(b)(1)……………………………………………………18

28 U.S.C. § 1331…………………………………………………………17

28 U.S.C. § 1343…………………………………………………………17

28 U.S.C. § 2201…………………………………………………………17

28 U.S.C. § 2202…………………………………………………………17

42 U.S.C. § 1983…………………………………………………………17

42 U.S.C. § 1988…………………………………………………………17

N.J. Stat. Ann. § 2C:39-1………………………………………………...1

N.J. Stat. Ann. § 2C:39-1………………………………………………...7

N.J. Stat. Ann. § 2C:39-3………………………………………………...8

N.J. Stat. Ann. § 2C:39-5……………………………………………1, 9, 11

N.J. Stat. Ann. § 2C:39-6………………………………………………...1, 9

N.J. Stat. Ann. § 2C:39-9……………………………………………1, 9, 11

N.J. Stat. Ann. § 2C:58-4………………………………………………...9

N.J. Stat. Ann. § 2C:58-12……………………………..………………...1, 9

N.J. Stat. Ann. § 2C:58-13………………………………………………1, 9

N.J. Stat. Ann. § 2C:58-5 ……………………………………….1, 9, 16, 22

**TABLE OF AUTHORITIES (continued)**

**Statutes**

N.J. Stat. Ann. § 43-3……………………………………………………...12

N.J. Stat. Ann. § 43-6(a)…………………………………………………..12


**Other Authorities**

*Assault Weapon Myths*, 43 S. Ill. U. L. J. 193, 232 (2018)…………………5, 25, 34

*Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022)……………………………………………………………….28

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 413 (1994)…………………………………………………22, 25

Dennis Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles* 29-30 (Oct. 5, 2021) (working paper)……………………………...…………...26

*Expanded Homicide Table 8, Crime in the United States* (FBI 2019)……………31

*Firearms Retailer Survey Report*, NSSF (2021)……………….…………...28, 29

Frank Miniter, *The Future of the Gun* at 35 (2014)………………………………24

Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Of Crim. L. & Criminology 150 (1995)………32

Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997)…………..31

*M61A1/M61A2 20mm Automatic Gun*, Military Analysis Network …………...6, 23

**TABLE OF AUTHORITIES (continued)**

**Other Authorities**

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller In Arms-ban Cases—Again* (June 18, 2023)………...36

*Modern Sporting Rifle Comprehensive Consumer Report*, National Shooting Sports Foundation (NSSF)……………………………………………………………24, 33

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 Hastings L.J. 1285, 1296 (2009)…………………………………...28

NRA Shooting Sports USA, *Handgun Operation: Types Of Semi-Automatic Pistol Mechanisms*………………………………………………………………………….25

Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023)……………………………………………………………………………23

*Squad Automatic Weapon (SAW), M249 Light Machine Gun*, Military Analysis Network…………………………………………………………………………..23

*Statement of the New Jersey State Legislature on Assembly Concurrent Resolution No. 106*, 220th Leg. (2022)………………………………………………………..10

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (2022)…………..25

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022)…………………………………28, 32

**<u>TABLE OF AUTHORITIES (continued)</u>**

**Constitutional Provisions**

U.S. Const. amend. II…………………………………………………………..*passim*

U.S. Const. amend. XIV…………..…………………………………………….1, 3, 18

# I.    Introduction

In this consolidated action, three sets of plaintiffs challenge core provisions of New Jersey's firearms regulatory scheme as unconstitutional under the Second and Fourteenth Amendments to the United States Constitution. The instant case (*Cheeseman et al.*) focuses on the State's sweeping prohibitions on so-called "assault firearms," as does one of the other cases (*Ellman et al.*), while the third case (*Association of New Jersey Rifle and Pistol Clubs, Inc., et al.*) focuses on the State's sweeping prohibitions on so-called "large capacity magazines." The common thread tying them together is the righteous claim that, at its core, New Jersey's regulatory scheme blatantly violates the fundamental rights of the State's law-abiding citizens to keep and bear arms in common use for self-defense and other lawful purposes.

All the plaintiffs now move for summary judgment on their respective claims. For their part, the *Cheeseman* plaintiffs demonstrate they are entitled to declaratory and injunctive relief against the core provisions of New Jersey's Ban on the pejoratively mislabeled "assault firearms" ("New Jersey's Ban" or the "Ban").[1] The Ban targets a vast array of arms in common use for lawful purposes through a regulatory scheme that effectively bans all ordinary law-abiding residents from even

---

[1]    Specifically, "New Jersey's Ban" or the "Ban" as used herein refers to N.J. Stat. Ann. §§ 2C:39-1(w)(1)-(3), 2C:39-5(f), 2C:39-6, 2C:39-9(g), 2C:58-5(a)-(b), 2C:58-12, and 2C:58-13, as well as Defendants' regulations, policies, guidelines, practices, and customs interpreting, implementing, and applying the same.

1

possessing these arms, much less purchasing or using them for their lawful purposes. The indisputably ubiquitous use of these otherwise widely available arms means they necessarily are not and could never be shown to be "dangerous *and* unusual," as *must* be the case before a State may subject them to an outright ban. This principle is already firmly settled through binding Supreme Court precedent. It follows that, as a matter of law, New Jersey cannot carry the burden necessary to justify its Ban. Simply put, it must be stricken with summary judgment entered in Plaintiffs' favor.

## II.    Procedural History

The operative complaint in this case was filed on July 14, 2022. Dkt No. 4 (First Amended Complaint or "FAC"). The Plaintiffs are Gloucester County resident Mark Cheeseman, Ocean County resident Timothy Connolly,[2] and Firearms Policy Coalition, Inc., a nonprofit membership organization with New Jersey resident members including Plaintiffs Cheeseman and Connolly (collectively "Plaintiffs"). The Defendants are Matthew J. Platkin in his official capacity as Attorney General for the State of New Jersey ("Defendant Platkin"), Patrick J. Callahan in his official capacity as Superintendent of the New Jersey State Police ("Defendant Callahan"), Christine A. Hoffman in her official capacity as Gloucester County Prosecutor

---

[2]    As originally captioned, Plaintiff Connolly's last name was misspelled as "Connelly."

2

("Defendant Hoffman"), and Bradley D. Billhimer in his official capacity as Ocean County Prosecutor ("Defendant Billhimer").[3]

The FAC focuses on the State's laws and regulations generally prohibiting "assault firearms" (i.e., those comprising the "Ban" as defined above), challenges them as unconstitutional under the Second and Fourteenth Amendments of the United States Constitution, and seeks declaratory and injunctive relief declaring the Ban unconstitutional and enjoining any further enforcement. *See* FAC, Prayer for Relief. State Defendants filed an answer to the FAC on August 26, 2022. Dkt. No. 17 ("Ans."). County Defendants submitted letters stating their position that the claims against each of them should be dismissed on the basis that they are mandated to enforce the laws and regulations at issue, and each requested a pre-motion conference to this end. Dkt. Nos. 33 & 41. Plaintiffs contested this position on the basis that maintenance of the suit against the County Defendants is essential to ensure effective injunctive relief for the individual Plaintiffs. Dkt. Nos. 36 & 42.

However, before any further proceedings occurred on County Defendants' requests for dismissal, State Defendants moved to consolidate this case with two other pending cases in this district, on the basis that all three cases raise similar challenges to core components of the State's statutory scheme "regulating dangerous

---

[3]    Defendants Platkin and Callahan are collectively referred to as "State Defendants," while Defendants Hoffman and Billhimer are collectively referred to as "County Defendants."

3

weapons." Dkt. No. 37-1. The other cases are *Ellman, et al. v. Platkin, et al.*, No. 22-cv-4397, which also focuses on the "assault firearms" components of the State's regulatory scheme, and *Association of New Jersey Rifle and Pistol Clubs, Inc., et al. v. Attorney General New Jersey, et al.*, No. 18-cv-10507, which generally challenges the State's regulation of "large capacity magazines." Further proceedings in this case were administratively terminated on December 29, 2022, pending resolution of this consolidation motion. Dkt No. 44 (Text Order). That motion was eventually granted on February 3, 2023, and the case was reactivated for purposes of coordinating discovery among the cases. Dkt. No. 49. A joint discovery plan was established, Dkt. No. 56, as well as a briefing schedule allowing the parties in each case to bring dispositive motions seeking judgment in their favor. Dkt. No. 64. On September 12, 2023, after the close of discovery, the consolidation of the cases was extended through the resolution of the parties' dispositive motions. Dkt. No. 65 (Text Order).

### III.   Standard of Review

"In a motion for summary judgment, it is initially the moving party's burden to 'demonstrate the absence of a genuine [dispute] of material fact.' " *Goldstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (citation omitted). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986)). Therefore, "[i]n deciding a motion for summary judgment, the judge's function is not to weigh the evidence and determine the truth of the matter, but rather to determine if there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (citing *Anderson*, 477 U.S. at 249). That is, the judge's function at this stage is "only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995). It follows from these standards that " 'where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.' " *Goldstein*, 815 F.3d at 146 (citation omitted).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* "That is, while the materiality determination

rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

## IV.   New Jersey's "Assault Firearms" Statutory Scheme

As a general matter, ordinary law-abiding residents of New Jersey must be eligible for and obtain a license issued by the State (either a Firearms Purchaser Identification Card or a Handgun Purchase Permit) as a condition to lawfully acquiring or possessing any handgun, rifle, or shotgun within the State. N.J. Stat. Ann. §§ 2C:39-1(f), 2C:39-5(b) & (c). Additionally, and of particular concern here, the State has established a separate regulatory classification for so-called "assault firearms." The regulatory scheme broadly defines the term "assault firearm" to include an array of handguns, rifles, and shotguns, by specific make or model (e.g., "Beretta AR-70 and BM59 semi-automatic firearms"), by "type" (e.g., "Algimec AGM1 type"), and by purported category based on particular configurations or features (e.g., "Any shotgun with a revolving cylinder such as the 'Street Sweeper' or 'Striker'"). § 2C:39-1(w)(1). The definition of "assault firearm" extends further to include "[a]ny firearm manufactured under any designation which is substantially identical to any of the firearms listed above" in subsection (1). § 2C:39-1(w)(2). It

6

also extends to any semiautomatic shotgun "with a fixed magazine capacity exceeding six rounds, a pistol grip, or a folding stock." § 2C:39-1(w)(3).[4]

Beyond this, former New Jersey Attorney General Peter Verniero issued "Guidelines Regarding the 'Substantially Identical' Provision in the State's Assault Firearms Laws" dated August 19, 1996, https://www.nj.gov/lps/dcj/agguide/assltf.htm ("*Guidelines*"), which the current Attorney General (Defendant Platkin) and Superintendent of the New Jersey State Police (Defendant Callahan) continue to enforce. SOUMF No. 1.[5] The Guidelines declare that semiautomatic handguns, rifles, and shotguns shall be deemed "substantially identical" to "assault firearms" within the meaning of the statutory scheme whenever they possess certain characteristics and/or capabilities.

Any semiautomatic rifle falls within this expanded definition so long as it has "the ability to accept a detachable magazine" and at least two of the following attributes: folding or telescoping stock, pistol grip "that protrudes conspicuously beneath the action of the weapon," bayonet mount, flash suppressor or threaded

---

[4]     It goes on to include any semiautomatic rifle with a fixed magazine capacity exceeding 10 rounds, precursor parts from which an "assault firearm" "may be readily assembled," and any firearm "with a bump stock attached." §§ 2C:39-1(w)(4)-(6). However, those prohibitions related to magazine capacity limitations, manufacturing, and bump stock attachments are beyond the scope of this lawsuit.

[5]     "SOUMF" refers to the Statement of Undisputed Material Facts that Plaintiffs have contemporaneously filed with this motion.

barrel designed to accommodate a flash suppressor, and/or a grenade launcher.[6] *Guidelines* at 2.

Any semiautomatic pistol with "the ability to accept a detachable magazine" also falls within this general classification whenever it has at least two of the following attributes: "an ammunition magazine that attaches to the pistol outside of the pistol grip," "a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer," "a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned," the pistol has a "manufactured weight of 50 ounces or more when the pistol is unloaded," and/or it is "a semi-automatic version of an automatic firearm." *Id.* at 2-3. And a semi-automatic shotgun is treated as an "assault firearm" so long as it has at least two of the following: a folding or telescoping stock, "a pistol grip that protrudes conspicuously beneath the action of the weapon," "a fixed magazine capacity in excess of 5 rounds," and/or an ability to accept a detachable magazine. *Id.* at 3.

The Guidelines direct that they "should be followed by all county prosecutors and all law enforcement officers in this State so that the State's assault firearms laws will be uniformly enforced throughout the State." *Id.* at 3; SOUMF No. 2.

---

[6]     Plaintiffs do not challenge New Jersey's separate ban on grenades under its "destructive device" regulations. *See* N.J. Stat. Ann. § 2C:39-3(a).

8

The effect of "assault firearm" classification is significant: subject to limited exceptions, the possession, transport, shipment, sale, or disposal of any such arm is generally outlawed. N.J. Stat. Ann. §§ 2C:39-5(f), 2C:39-9(g); *see also Coal. of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 670 (D. N.J. 1999) (explaining how these arms are generally prohibited "unless certain very narrow exceptions apply"). These exceptions are largely limited to exemptions for: (1) those in the military or law enforcement, § 2C:39-6(a), (j); (2) rifles that the Attorney General designates as "legitimate" target-shooting firearms (which can only qualify for such designation if registered and owned by an individual who has been a member of a rifle or pistol club since at least 1990), § 2C:58-12; (3) "assault firearms" rendered "inoperable" (or else voluntarily surrendered or transferred to an exempt person or entity), § 2C:58-13; and (4) those who satisfy the statutory criteria for a license to purchase, possess, and carry an assault firearm, § 2C:58-13(a)-(b). SOUMF No. 3.

To obtain a license for an assault firearm, a person must "qualify for a permit to carry a handgun under section 2C:58-4" *and* a judge of the Superior Court must "find[] that the public safety and welfare so require." § 2C:58-5(b). Thus, to lawfully purchase, possess, or carry any *operable* firearm falling within the classification of an "assault firearm" under this scheme—other than an "assault firearm" deemed "legitimate" by the Attorney General for target-shooting purposes—an ordinary,

law-abiding person must demonstrate to the satisfaction of a judge that such a license is *required* in the interest of public safety and welfare. SOUMF No. 4.

The New Jersey Legislature has recognized that this statutory scheme operates as a general "ban" on the so-called "assault firearms." *Statement of the New Jersey State Legislature on Assembly Concurrent Resolution No. 106*, 220th Leg. (2022), https://www.njleg.state.nj.us/bill-search/2022/ACR106/bill-text?f=ACR&n=106_I1 ("in 1990 New Jersey enacted legislation *banning* assault weapons and certain large capacity ammunition feeding devices") (italics added); SOUMF No. 5. The Attorney General's Office itself characterizes the regulatory scheme in this way on its own website. State of New Jersey, Department of Law & Public Safety, Office of the Attorney General, https://nj.gov/njsp/firearms/firearms-faqs.shtml (FAQ No. 15: "What type of firearms are considered assault weapons in New Jersey? [¶] "A complete list of *banned* firearms can be found in N.J.S. 2C:39-1.w as well as N.J.A.C. 13:54-1.2.") (italics added) (last accessed Oct. 3, 2023);[7] *see also* Readington Township Police Department, New Jersey, Frequently Asked Questions, https://www.readingtontwpnj.gov/firearms/firearms-faq (FAQ No. 17: characterizing the scheme in the same way); SOUMF No. 6.

---

[7] This contradicts the Attorney General's denials of Plaintiffs' allegations in the FAC that the regulatory scheme creates a de facto ban. Ans. to FAC ¶¶ 3, 20.

Courts in New Jersey and elsewhere have also recognized this scheme as a general "ban." *See e.g.*, *Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D. N.J. 1990) ("the prohibition is de facto, for that person [seeking to purchase an 'assault firearm'] must go through the extremely rigorous qualification process required for receiving a license[,]" and, "[t]his regulatory scheme vests unbridled discretion over the licensing process with the State"); *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 207 (1st Cir. 2002) ("The New Jersey law examined in *Coalition* [*of New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 673 n.10] was effectively a ban on assault weapons."); SOUMF No. 7.

A conviction of violating the prohibitions under the "assault firearms" regulatory scheme carries significant criminal sanctions. Anyone who "manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm" in violation of the scheme "is guilty of a crime of the third degree." N.J. Stat. Ann. § 2C:39-9(g). SOUMF No. 8. One who knowingly possesses such an arm illegally "is guilty of a crime of the second degree." N.J. Stat. Ann. §§ 2C:39-5(f). SOUMF No. 9. A crime in the second degree generally carries a term of imprisonment of five to ten years and a fine of up to $150,000, and a crime in the third degree generally carries a term of imprisonment of three to five years and a fine of up to $15,000. §§ 43-3(a)-(b), 43-6(a). SOUMF No. 10. Moreover, a

conviction would result in a lifetime ban on the possession of firearms and ammunition under federal and state law. *See* 18 U.S.C. § 922(g). SOUMF No. 11.

## V.   The Impact of Defendants' Enforcement of the Ban

Plaintiffs Cheeseman and Connolly are law-abiding residents of New Jersey—Cheeseman in Gloucester County and Connolly in Ocean County— neither of whom is disqualified from possessing and acquiring firearms under federal or state law. Decl. of Mark Cheeseman (Ex. 1) ¶ 1; Decl. of Connolly (Ex. 2) ¶ 1; SOUMF Nos. 12-15. They are both members of Plaintiff FPC. Ex. 1 ¶ 2; Ex. 2 ¶ 2; SOUMF Nos. 16-17. Plaintiffs Cheeseman and Connolly intend and desire to exercise their rights to keep and bear firearms classified as "assault firearms" under New Jersey's Ban, including but not limited to an AR-15 style rifle, for lawful purposes, especially for home defense, target shooting, and proficiency training. Ex. 1 ¶ 3; Ex. 2 ¶ 3; SOUMF Nos. 18-19. But for the Ban, they would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns. Ex. 1 ¶ 4; Ex. 2 ¶ 4; SOUMF Nos. 20-21. The Ban nonetheless renders it illegal for them to do so. Ex. 1 ¶¶ 3-4; Ex. 2 ¶¶ 3-4; SOUMF No. 22. In light of the State's enforcement of this Ban, Plaintiffs Cheeseman and Connolly both continue to refrain from acquiring, possessing, and using for self-defense and other lawful purposes any AR-15 rifle, any other firearm prohibited

under the Ban, or any "substantially identical" firearm as defined under the Guidelines, based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Ban. *Id.*; SOUMF Nos. 23-24.

Plaintiff FPC is a nonprofit membership organization, the purposes of which include defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom. Decl. of Brandon Combs (Ex. 3) ¶ 2; SOUMF No. 25. Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. *Id.*; SOUMF No. 26. Plaintiff FPC brings this action on behalf its New Jersey resident members, including Plaintiffs Cheeseman and Connolly, who seek to exercise their right to keep and bear common semi-automatic arms for lawful purposes in New Jersey but who are prohibited from doing so under the Ban. Ex. 3 ¶ 3; SOUMF No. 27. Law-abiding New Jersey resident members of Plaintiff FPC intend and desire to, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of various semiautomatic rifles, shotguns, and handguns labeled by the State as "assault firearms," but they are subject to, adversely affected by, and prevented from doing so under the prohibitions of the Ban against "assault firearms." Ex. 3 ¶ 4; SOUMF No. 28.

13

But for the enactment and enforcement of the Ban, these FPC members would forthwith, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of such rifles, shotguns, and handguns targeted under the Ban. Ex. 3 ¶ 5; SOUMF No. 29. However, they cannot and do not do so because the weapons are labeled "assault firearms," such that they reasonably fear and face a threat of arrest, confiscation, prosecution, fine, and imprisonment in light of the Ban's prohibitions. *Id.*; SOUMF No. 30. But for the enactment and enforcement of this Ban, and the criminal penalties (including a life-long ban on the individuals' exercise of their Second Amendment protected rights) associated with violations of the Ban, these members of Plaintiff FPC would exercise their right to keep and bear the banned firearms for lawful purposes, including self-defense, without the fear or risk of arrest and prosecution for engaging in otherwise protected, lawful conduct. Ex. 3 ¶ 6; SOUMF No. 31. The injuries suffered by these members are germane to the core purposes of Plaintiff FPC. Ex. 3 ¶ 7; SOUMF No. 32.

As Attorney General of New Jersey, Defendant Platkin is the head of the State's Office of the Attorney General and Department of Law and Public Safety, which includes the New Jersey State Police, and this Office holds statewide criminal jurisdiction to investigate and prosecute any indictable offense. *See* State of New Jersey, Department of Law & Public Safety website, https://www.njoag.gov/about/ ("the Attorney General oversees the New Jersey State Police (NJSP), the state's

largest law enforcement agency, and the Division of Criminal Justice (DCJ), which has statewide authority to investigate and prosecute criminal offenses"); SOUMF No 33. In this official capacity, Defendant Platkin is thus responsible for executing, delegating, and/or supervising the laws and regulations governing the possession of firearms and magazines and impose criminal sanctions for violations of the same, including the "assault firearms" regulatory scheme at issue in this case. *Id.* ("the Attorney General oversees the state's 21 County Prosecutors, and may assume responsibility for, or 'supersede,' investigations or prosecutions handled by a County Prosecutor's Office"); *see also Kendrick v. Bruck*, 586 F. Supp. 3d 300, 307 (D. N.J. 2022) (the Attorney General oversees the Division of State Police, "which is responsible for executing and enforcing New Jersey's laws and regulations governing the possession of firearms"); SOUMF No. 34.

Defendant Callahan is the Superintendent of the New Jersey Division of State Police, which is responsible for executing and enforcement of all criminal laws in the State, including those regulating the possession of firearms and magazines. *See* State of New Jersey, Department of Law & Public Safety, State Police website, https://www.nj.gov/njsp/about/core-functions.shtml (the New Jersey Division of State Police performs "all functions associated with the statewide enforcement of laws, the prevention of crime, the pursuit and apprehension of offenders, and the gathering of legal evidence to ensure conviction of such offenders"); *Kendrick*, 586

15

F. Supp. 3d at 307; SOUMF No. 35. Defendant Callahan's division acts under the general oversight and supervision of the Attorney General. SOUMF No. 36.

Defendant Hoffman is the County Prosecutor of Gloucester County, https://www.gloucestercountynj.gov/Directory.aspx?did=69, where Plaintiff Cheeseman resides, Ex. 1 ¶ 1, while Defendant Billhimer serves as the County Prosecutor for Ocean County, https://ocponj.gov/staff/bradley-d-billhimer/, where Plaintiff Connolly resides, Ex. 2 ¶ 1. SOUMF Nos. 37-38. As the County Prosecutors for their respective counties, Defendants Hoffman and Billhimer are "responsible for the prosecution of crimes committed in the county" and have "authority to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." *Yurick v. State*, 875 A.2d 898, 903 (N.J. 2005) (quotations omitted); SOUMF No. 39. In addition, they would be responsible for preparing the necessary investigation and recommendation to law enforcement as to any individual in their respective counties who applies through the Superior Court for a license to purchase, possess, and carry any of otherwise prohibited "assault firearms." N.J. Stat. Ann. § 2C:58-5(a); SOUMF No. 40.

Accordingly, Defendants Hoffman and Billhimer would be responsible for prosecuting Plaintiff Cheeseman and Plaintiff Connolly, respectively, for any violation of the Ban that they may be accused of committing in their respective counties of residence. SOUMF No. 41. Similarly, Defendants Hoffman and

Billhimer would be responsible for the investigation and recommendation as to Plaintiffs Cheeseman and Connolly, respectively, concerning any application for a license to purchase, possess, and carry any "assault firearm." SOUMF No. 42.

Therefore, Plaintiffs have standing to pursue these claims, which are actionable against the named Defendants as the responsible parties in seeking the requested relief. *See Piszczatoski v. Filko*, 840 F. Supp. 2d 813, 818 & n.1 (D. N.J. 2012) (it was "not disputed that the individual plaintiffs ha[d] standing" where "Defendants [were] state and local officials sued in their official capacities based on their responsibility for approving applications for permits to carry handguns or otherwise executing and administering New Jersey handgun laws and regulations"); *Penn. Prison Soc. v. Cortes*, 508 F.3d 156, 163 (3d Cir. 2007) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342 (1977) (emphasis omitted) (an association may assert claims on behalf of its members where "the organization's individual members themselves have standing to bring those claims"); *accord Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 199 (2023).

Further, the Court has jurisdiction over this case and controversy, with the full power to adjudicate all claims for relief in the FAC, pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, and venue properly lies in

this district for purposes of adjudicating these claims, pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). *See* Ans. to FAC ¶¶ 4-5 (Admitted); SOUMF No. 43.

## VI.    New Jersey's Ban is Unconstitutional as a Matter of Law.

The Second Amendment declares, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Incorporated against and fully applicable to the States via the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id*. at 805 (Thomas, J., concurring), the Second Amendment guarantees "an individual right to keep and bear arms," as "a fundamental constitutional right guaranteed to the people," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Indeed, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. at 2111, 2126 (2022). To be sure, the Second Amendment's "reference to

18

'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. (citations omitted). It is similarly settled that "the Second Amendment protects the possession and use of weapons that are " 'in common use at the time.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). And for a *ban* of a type of arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is both "dangerous and unusual." *Id*. at 2143; *Heller*, 554 U.S. at 625 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."). It follows that those types of arms in "common use today" simply cannot be banned. *Id.* at 2143.

Thus, the question for this Court is whether the firearms possessing the features and configurations that subject them to New Jersey's Ban are "arms" "in common use" for lawful purposes; for if so, they are protected by the Second Amendment's " 'unqualified command.' " *Id.* at 2126, 2128 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961) ("Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the

individual's conduct falls outside the Second Amendment's 'unqualified command.' "). These principles decide this case. Once it is determined that the law bans arms in common use, it follows that the law is unconstitutional—period.

A.      **The So-Called "Assault Firearms" Simply Cannot be Banned.**

The plain text of the Second Amendment covers the course of conduct in which Plaintiffs seek to engage—to "keep and bear arms" for self-defense and other lawful purposes—as well as the arms that they seek to keep and bear but are prohibited under New Jersey's Ban, i.e., the numerous rifles, handguns, and shotguns labeled "assault firearms." Again, simply but crucially, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Bruen*, 142 S. Ct. at 2132, and that indisputably includes the banned "assault firearms."

The other crucial element—whether these firearms are in "common use" for lawful purposes—is also not subject to reasonable dispute. *Heller* and *Bruen* precisely determine the limits of the State's authority to enact "a 'complete prohibition' " on a type of firearm "*consistent with* the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2128, 2130 (italics added). It can enact and enforce such a ban, those decisions hold, *only* if the banned arms are not "the sorts of weapons . . . in common use at the time," so that the regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual

weapons.' " *Heller*, 554 U.S. at 627 (cleaned up). Because *Bruen* squarely places the burden on *the Government* to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—it *falls to the State* to show that the arms it has banned are "unusual," and thus *not* "in common use at the time." Nevertheless, to assist the Court in properly resolving this crucial, and dispositive, component of the analysis, Plaintiffs will outline the reasons why this is not so.

### 1.   The "*Assault* Firearm" Label is a Pejorative Misnomer.

At the outset, the "assault" label that the State has attached to these weapons under its "assault firearms" regulatory scheme should be dispelled as a misnomer improperly casting a sinister shroud across the arms targeted under New Jersey's Ban. The term "assault firearm" (or "assault weapon," as used in other states that have enacted similar weapons bans) is a pejorative term that does not refer to any identifiable class of firearms. SOUMF No. 44. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted). But while "assault weapons" or "assault firearms" are not a recognized category of firearms, "semiautomatic"

firearms are. And it is semiautomatic firearms that the State bans and that Plaintiffs seek to acquire. SOUMF No. 45.

In fostering the sinister characterization of "*assault* firearms," the State lumps these arms in with the distinct category of fully automatic "machine guns," N.J. Stat. Ann. § 2C:58-5(a) ("Any person who desires to purchase, possess and carry a machine gun or assault firearm in this State may apply for a license to do so …"). However, unlike an automatic firearm, a semiautomatic firearm will not fire continuously with one pull of its trigger. Instead, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994); SOUMF No. 46. In contrast to fully automatic firearms, semiautomatic firearms have "traditionally have been widely accepted as lawful possessions." *Id.*; SOUMF No. 47. Indeed, semiautomatic firearms have been commercially available for over a century. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994), https://davekopel.org/2A/LawRev/rational.htm; SOUMF No. 48. Yet apart from the now-expired ten-year federal "assault weapons" ban, the federal government has not banned them. Associated Press, *Congress lets assault weapons ban expire*, Sept. 8, 2004, https://www.nbcnews.com/id/wbna5946127; SOUMF No. 49.

And currently, the vast majority of States do not ban semiautomatic "assault weapons." (In addition to New Jersey, the only states that have enacted bans on "assault weapons" (with varying definitions of that term) are California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Delaware, New York, and Washington.) *See* Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02; SOUMF No. 50.

Indeed, the Supreme Court has identified the line between semiautomatic and automatic as key in determining whether a firearm is of a type traditionally "accepted as lawful." *See Staples*, 511 U.S. at 612. A comparison to firearms used by the military demonstrates just how disingenuous the "assault weapon" moniker is. While an AR-15 can only fire as often as a person can pull its trigger, an M249 light machine gun, commonly used by the U.S. military, can fire 750 to 1,000 rounds per minute, *see Squad Automatic Weapon (SAW), M249 Light Machine Gun*, Military Analysis Network, https://bit.ly/3tsQGtd, SOUMF No. 51, and "heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute), *see M61A1/M61A2 20mm Automatic Gun*, Military Analysis Network, https://bit.ly/3ttnemV, SOUMF No. 52.

Central among the common purposes and uses of the semiautomatic firearms banned under New Jersey's regime is defense of self in the home. For example, most AR-style firearms are chambered for 5.56 x 45mm NATO (similar to .223

Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. SOUMF No. 53; *see Modern Sporting Rifle Comprehensive Consumer Report*, National Shooting Sports Foundation (NSSF) ("*Comprehensive Consumer Report*"), https://bit.ly/3GLmErS (noting that self/home-defense is the second most important reason that Americans reported for owning AR-style firearms, second only to recreational target shooting); FRANK MINITER, *The Future of the Gun* at 35 (2014) (Ex. 4) ("ARs are popular with civilians and law enforcement around the world because they're accurate, light, portable and modular. . . . It's also easy to shoot and has little recoil, making it popular with women.").

Nor can the State legitimately segregate these arms from the class and subject them to a ban on the basis that they possess attributes, features, or configurations like a folding / telescoping stock, pistol grip, flash suppressor, or detachable magazine, which do not impact the actual function of these firearms. Indeed, a telescoping or folding stock is merely an adjustable shoulder stock, which allows one to change the length of his gun to fit his stature, in the same way that he can change the height of an adjustable chair; some people have shorter arms than others,

24

so it promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position. *See* E. Gregory Wallace, *Assault Weapon Myths*, 43 S. Ill. U. L. J. 193, 232 (2018), https://scholarship.law.campbell.edu/cgi/viewcontent.cgi?article=1265&context=fa c_sw; Stephen P. Halbrook, America's Rifle: The Case for the AR-15 at 8 (2022) (Ex. 5); SOUMF No. 54. Similarly, a pistol grip makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and thus also promotes accuracy and reduces the risk of stray shots. *See* Wallace, *Assault Weapon Myths* at 228; Kopel, *Rational Basis*, *supra*, 20 J. Contemp. L. 381, 396 (1994); SOUMF No. 55. A flash suppressor is merely a device that reduces the flash of light from firing a round, "prevent[ing] the night-time home defender from being blinded by her own muzzle flash." *Miller*, 542 F. Supp. 3d at 1035; *see also* Wallace, *Assault Weapon Myths* at 233–34; SOUMF No. 56.

As for detachable magazines, most all common semiautomatic firearms, including those banned under the State's law, can accept a detachable magazine. NRA Shooting Sports USA, *Handgun Operation: Types Of Semi-Automatic Pistol Mechanisms*, https://www.ssusa.org/content/handgun-operation-types-of-semi-automatic-pistol-mechanisms/ ("Most semi-automatic firearms use detachable box magazines, which afford one of the main advantages of such arms"). SOUMF No. 57. Detachable magazines not only help law-abiding shooters to reload their weapon

in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to remedy malfunctions safely and quickly. *See* Dennis Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles* 29-30 (Oct. 5, 2021) (working paper) (last accessed October 4, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3436512 (explaining the propensity of self-loading weapons to overheat and malfunction); SOUMF No. 58. More fundamentally, it is well settled, including in the Third Circuit, that detachable magazines are integral components of the firearms to which they are attached, and so much so that they themselves are protected "arms" under the Second Amendment: "Because ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("ANJRPC"); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("caselaw supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable").

### 2.  However the State May Attempt to Label Them, the Banned Arms are Indisputably in Common Use for Lawful Purposes.

Even if the banned firearms *were* considered a separate category of arms rather than simply examples of semiautomatic firearms, they still easily satisfy the

common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in that category. Commonality in this case "is determined largely by statistics." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *rev'd sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc), *granted, vacated, and remanded in light of Bruen*, 142 S. Ct. 2895 (2022); *see also Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "roughly five million Americans own" them and "the overwhelming majority . . . do so for lawful purposes"); *ANJRPC*, 910 F.3d at 116 (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), abrogated by *Bruen* ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' ").

This is demonstrated by the AR-15 and other modern semiautomatic rifles, which epitomize the firearms that the State bans. The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), SOUMF No. 59, and in recent years it has been "the best-selling rifle

27

type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1494634, SOUMF No. 60. Today, the number of AR-rifles and other similar "modern sporting rifles" in circulation in the United States exceeds *twenty-four million*. *Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv; *see also* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1–2 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles). SOUMF No. 61. In recent years they have been the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *See 2021 Firearms Retailer Survey Report* at 9, NSSF (2021), https://bit.ly/3gWhI8E. SOUMF No. 62. And the English survey is not limited to the semiautomatic firearms that the State enumerates by name, but rather extends to the "AR-15 *or similarly styled rifle[s]*,"—like New Jersey does in sweeping into its regulatory scheme all "substantially identical" firearms. *National Firearms Survey*, *supra*, at 33. SOUMF No. 63.

While most of these statistics concern semiautomatic rifles, there is no basis for reaching a different conclusion with respect to the banned semiautomatic handguns. Indeed, "[t]here is no meaningful or persuasive constitutional distinction

between semi-automatic handguns and semi-automatic rifles." *Heller II*, 670 F.3d 1269-70 (Kavanaugh, J., dissenting). Just like the rifles, they are semiautomatic firearms, and semiautomatic firearms are indisputably common. *See, e.g.*, *Firearms Retailer Survey Report*, *supra*, at 9, NSSF; SOUMF No. 64. After all, both *Bruen* and *Heller* unequivocally stated that pistols, including revolvers, are protected arms under the Second Amendment and "history reveals a consensus that States could *not* ban public carry [of them] altogether," let alone ban their possession. *Bruen*, 142 S. Ct. at 2146.

Based on the indisputable evidence of this nature, courts have repeatedly made judicial findings to the same effect, not just as to semi-automatic rifles in common use for lawful purposes but as to all such semiautomatic firearms, creating a clear record of legislative facts.[8] *See e.g.*, *Staples v. United States*, 511 U.S. at 612 ("guns falling outside [the] categories" of machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation" "traditionally have been widely

---

[8]     "Legislative facts" are "facts that bear on the justification for legislation, as distinct from" adjudicative facts, which are facts "concerning the conduct of parties in a particular case." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). "Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the [challenged] gun law." *Id*. As the Ninth Circuit recently observed, "the historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.'" *Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023) (quoting Fed. R. Evid. 201, advis. comm. note (1972 proposed rules)).

accepted as lawful possessions"); *Heller*, 670 F.3d at 1261 ("Approximately 1.6 million AR–15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market."); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017) (Traxler, J., dissenting) ("Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States. … In fact, in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150."); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("This much is clear: Americans own millions of the firearms that the challenged legislation prohibits. . . . Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014) (concluding that statute "affects the use of firearms that are both widespread and commonly used for self-defense," because "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions"), *vacated in part on other grounds*, 823 F.3d 537 (10th Cir. 2016).

The legislative facts documenting the ubiquity of detachable magazines associated with these firearms further illustrate the commonality of the banned arms. *See e.g., ANJRPC*, 910 F.3d at 116 (finding that magazines capable of holding more than ten rounds are owned by the "millions, . . . often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense"); *National Firearms Survey*, *supra*, at 23–25 (documenting that approximately 39 million Americans have owned at least one magazine capable of owning more than 10 rounds and that Americans have owned as many as 542 million such magazines). SOUMF No. 65.

And it is clear that these arms are overwhelmingly used for lawful purposes. SOUMF No. 66. *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997), https://archive.org/details/targetinggunsfir00klec/mode/2up (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' "). Indeed, according to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects. *See Expanded Homicide Table 8, Crime in the United States* (FBI 2019), https://bit.ly/3HdolNd; SOUMF No 67.

Encounters with criminal intruders in the home are not uncommon. According to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household

members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf; SOUMF No 68. Studies on the frequency of defensive gun uses in the United States have determined that up to 2.5 million instances occur each year in which civilians use firearms to defend themselves or their property. Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6853&context=jclc; *see also* English, *National Firearms Survey*, *supra* at 5 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year); SOUMF No 69.

Other common, lawful uses of the banned firearms are hunting and sport. *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (*citing Heller*, 554 U.S. at 630) ("Of course, the [U.S. Supreme] Court also said the Second Amendment protects the right to keep and bear arms for other lawful purposes, such as hunting, but self-defense is the core lawful purpose protected."). At least a third of all gun owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense,

for owning semiautomatic firearms like those banned by the State. *See Modern Sporting Rifle Comprehensive Consumer Report* and *Sport Shooting Participation in the U.S. in 2020*, *supra*; SOUMF No. 70. Here again, the banned features of firearms mischaracterized as "assault weapons" serve lawful purposes: folding and telescoping stocks allow for safe transportation, including in a hiking pack, an ATV, or a boat; both telescoping stocks and protruding grips open hunting and sport shooting to those for whom recoil represents a high barrier to entry; detachable magazines have the same benefits in hunting and sport shooting as they do in home defense—improved reloading and remedying of malfunctions; and flash suppressors promote accuracy in target shooting and hunting (especially at dawn), as well as mitigate against temporary blindness when using a firearm in self-defense.

What these facts show is that the arms that New Jersey bans as "assault firearms" are common in all relevant respects: (1) they are common categorically, as they are all functionally semiautomatic in their operation; (2) they are common characteristically, as they are all popular configurations of arms (e.g., rifles, shotguns, handguns) with varying barrel lengths and common characteristics like pistol grips and the like; and (3) they are common jurisdictionally, lawful to possess and use in the vast majority of states now and throughout relevant history for a wide variety of lawful purposes including self-defense, proficiency training, competition, recreation, hunting, and collecting. There is no constitutionally relevant difference

33

between a semiautomatic handgun, a shotgun, and a rifle. While some exterior physical attributes may differ—e.g., wood instead of metal stocks and furniture, the number and/or location of grips, having a bare muzzle or having muzzle devices, different barrel lengths, etc.—the arms are, in all relevant respects, the same.

Indeed, all semiautomatic firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature share the same cyclical rate of fire: one round fired per pull of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions. *Staples*, 511 U.S. at 602 n.1 ("We use the term 'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.") Wallace, *Assault Weapon Myths* at 216 ("Because a semiautomatic firearm fires only one round with each pull of the trigger, it can fire only as fast as the individual shooter can pull the trigger."); SOUMF No. 71. They are all common under the same jurisdictional analysis. And, they are all subject to the same relevant history under which the Ban is categorically unconstitutional.

**B.     That is the End of the Inquiry and the Ban Must be Struck Down.**

The Second Amendment's plain text covers "all instruments that constitute bearable arms" and the State cannot show the so-called "assault weapons" are

"dangerous and *unusual* weapons," as is necessary to enact "a 'complete prohibition' " on a type of firearm "*consistent with* the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2128, 2130 (italics added). That is the end of the analysis.

Concluding the analysis here, in the context of a flat ban on protected arms, does not improperly bypass *Bruen's* historical analysis. *Bruen* did not concern a flat ban on possessing firearms; it dealt with restrictions on carrying firearms outside the home—a different type of regulation that required the Court to assess the government's proffered historical evidence afresh. In some contexts, like an absolute ban on certain firearms, the application of that standard has already been decided by the Supreme Court and is thus settled. *Heller* and *Bruen* speak with one voice, and they speak clearly here: when the government enacts a prohibition on arms, the *only* way it can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are in common use at the time." *Bruen*, 142 S. Ct. at 2126, 2128 (cleaned up). If the government cannot make that showing because the firearms at issue are in common use, any further examination of history and tradition is not necessary or appropriate, because the Supreme Court has already done the historical analysis, and its conclusions are binding. *See Downey v. Pa. Dep't of Corr.*, 968 F.3d

299, 308 n.8 (3d Cir. 2020). Because the State cannot make that showing here, the Ban is unconstitutional, period. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller In Arms-ban Cases— Again* (June 18, 2023), https://bit.ly/3PTEiP1.

Where that leaves us at the end of the day is that Plaintiffs are entitled to judgment on their claims as a matter of law. *See Jersey Cent. Power & Light Co. v. Lacey Tp.*, 772 F.2d 1103, 1109 (finding "no genuine issues of material fact in dispute" where the challenged ordinances were unconstitutional "as a matter of law" because they violated the Supremacy Clause).

## VI.   Conclusion

Because New Jersey necessarily cannot carry its fundamental burden to establish that the arms targeted under the Ban are *not* in common use for lawful purposes, it will necessarily "fail[] sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial," meaning "there is not a genuine dispute with respect to a material fact and thus [Plaintiffs] [are] entitled to judgment as a matter of law." *Goldstein*, 815 F.3d 142 at 146.

Respectfully submitted,

Dated: October 6, 2023                          s/ *Bradley P. Lehman*
                                                Bradley P. Lehman
                                                Gellert Scali Busenkell & Brown, LLC
                                                1201 N. Orange Street, Suite 300

Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com