## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al. | ) ) ) ) | Civil Action No. 3:18-cv-10507-PGS-LHG |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| MATTHEW PLATKIN, et al. | ) ) ) | |
| *Defendants*. | ) ) | |
| ———————————— | ) | |
| MARK CHEESEMAN, et al. | ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 3:22-cv-4360-PGS-LHG |
| v. | ) ) | |
| MATTHEW PLATKIN, et al. | ) ) | |
| *Defendants*. | ) ) | |
| ———————————— | ) | |
| BLAKE ELLMAN, et al. | ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| MATTHEW PLATKIN, et al. | ) ) | Civil Action No. 1:22-cv-4397-PGS-LHG |
| *Defendants*. | ) ) | |

## DECLARATION OF DANIEL L. SCHMUTTER

1.      I, Daniel L. Schmutter, am an attorney at the law firm of Hartman & Winnicki, P.C., attorneys of record for Plaintiffs in the 18-cv-10507 and 22-cv-4397 actions captioned above. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is Defendants' expert report of Lucy P. Allen;

3.      Attached hereto as **Exhibit B** is Defendants' expert report of Dennis Barron;

4.      Attached hereto as **Exhibit C** is Defendants' expert report of Saul Cornell;

5.      Attached hereto as **Exhibit D** is Defendants' expert report of Stephen Hargarten;

6.      Attached hereto as **Exhibit E** is Defendants' expert report of Louis Klarevas;

7.      Attached hereto as **Exhibit F** is Defendants' expert report of Randolph Roth;

8.      Attached hereto as **Exhibit G** is Defendants' expert report of Robert J. Spitzer, Ph.D.;

9.      Attached hereto as **Exhibit H** is Defendants' expert report of Daniel W. Webster.

10.      Attached hereto as **Exhibit I** is Defendants' expert report of; James E. Yurgealitis.


I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States.


_____ /s/ Daniel L. Schmutter _____          10/6/2023 _____
Daniel L. Schmutter                              Date

EXHIBIT "A"

EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>　　Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>　　Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>　　Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>　　Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>　　Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>　　Defendants. | Civil Action No. 3:22-cv-04397 |

**Expert Report of Lucy P. Allen**

June 16, 2023

I, Lucy P. Allen, the undersigned, declare as follows:

1.     I am a Senior Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice and Chair of NERA's Product Liability and Mass Torts Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.

2.     In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving economics and statistics. I have been qualified as an expert and testified in court on various economic and statistical issues relating to the flow of guns into the criminal market. I have testified at trials in Federal and State Courts, before the New York City Council Public Safety Committee, the American Arbitration Association, and the Judicial Arbitration Mediation Service, as well as in depositions.

3.     I have an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. My resume with recent publications and testifying experience is included as Exhibit A.

4.     I have been asked by the New Jersey Office of the Attorney General to address the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in self-defense[1] and (b) the outcomes when assault weapons and large-capacity magazines are used in public mass shootings, including the associated number of casualties. NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,150 per hour.  NERA's fees are not in any way contingent upon the outcome of this matter.

---

[1]  I have also been asked to analyze the percent of incidents in which rifles were used in self-defense according to The Heritage Foundation's "Defensive Gun Uses in the U.S." database.

**SUMMARY OF FINDINGS**

5.     Regarding the number of rounds fired by individuals using a gun in self-defense, I analyzed almost 1,000 real-life incidents of self-defense and found that it is extremely rare for a person, when using a firearm in self-defense, to fire more than 10 rounds. In particular, I performed an analysis of 736 incidents in the NRA Armed Citizen database, as well as our own systematic analysis of 200 Factiva news stories from a random sample of approximately 4,800 news stories describing incidents of self-defense with a firearm and found only 2 incidents where more than 10 rounds were used.[2]

6.     Regarding the outcomes when assault weapons and large-capacity magazines are used in public mass shootings, I analyzed almost 200 mass shootings from four different sources between 1982 and 2022 and found that: (1) assault weapons and large-capacity magazines are often used in mass shootings; (2) both injuries and fatalities were higher in mass shootings that involved assault weapons and/or large-capacity magazines than in other mass shootings; (3) it is common for offenders to fire more than 10 rounds when using an assault weapon or a large-capacity magazine in mass shootings; and (4) the majority of guns used in mass shootings were obtained legally. These findings are consistent with other studies that have analyzed mass shootings, including studies based on alternate sets of mass shootings, covering different years and defining mass shootings somewhat differently.

---

[2]   Note that these two incidents with more than 10 bullets fired by the defender were added to the NRA Armed Citizen database after an earlier analysis that I had conducted of the database in another case that was cited and relied upon by the court. See *Kolbe v. O'Malley,. 42 F. Supp. 3d 768 (D. Md. 2014)* ("Allen's use of the NRA database is appropriate and acceptable." The Court also found that "The defendants' expert, Lucy Allen, confirms that it is rare for a self-defender to fire more than ten rounds"). In addition, according to the news stories on these two incidents, the defenders did not appear to need to fire more than 10 shots to defend themselves. See "York County homeowner shoots at intruder," NRA-ILA Armed Citizen, December 12, 2016 and "Homeowner fired at intruders," NRA-ILA Armed Citizen, May 24, 2017.

<div align="center">

**OPINIONS**

</div>

**A.    Use of Guns in Self-Defense**

      **i.    The number of rounds used by individuals in self-defense**

7.    Plaintiffs claim the large-capacity magazines (magazines capable of holding more than ten rounds, "Large Capacity Magazines") and "assault weapons" covered by New Jersey Revised Statutes § 2C:39 and § 2C:58[3] are commonly used for lawful purposes, including for self-defense.[4]

8.    The number of rounds commonly needed by individuals to defend themselves cannot be practically or ethically determined with controlled scientific experiments and there is no source that systematically tracks or maintains data on the number of rounds fired by individuals in self-defense. Due to these limitations, I have analyzed available data sources to estimate the number of rounds fired by individuals to defend themselves. In particular, I have analyzed data from the NRA Institute for Legislative Action, as well as my own study of news reports on incidents of self-defense with a firearm. In all, I have analyzed almost 1,000 incidents of self-defense with a firearm and found that it is extremely rare for a person, when using a firearm in self-defense, to fire more than 10 rounds.

9.    The NRA maintains a database of "Armed Citizen" stories describing private citizens who have successfully defended themselves, or others, using a firearm ("NRA Armed Citizen database"). According to the NRA, the "Armed Citizen" stories "highlight accounts of law-abiding gun owners in America using their Second Amendment rights to defend self, home

---

[3]    Under New Jersey Revised Statutes § 2C:39-1(w), a firearm is classified as an assault weapon if it is one of the firearm types and models listed or is "substantially identical" to any of the listed firearms. Examples of assault weapons include the "Armalite AR-180 type," "Bushmaster Assault Rifle," and "Calico M-900." See, New Jersey Revised Statutes § 2C:39-1(w).

[4]    See, for example, Complaint for Declaratory and Injunctive Relief, filed July 1, 2022, (the "Ellman Complaint") ¶¶1, 24, First Amended Complaint for Declaratory and Injunctive Relief, filed July 14, 2022 (the "Cheeseman Complaint"), ¶¶2-3, and Amended Complaint for Declaratory and Injunctive Relief, filed October 28, 2022 (the "ANJRPC Complaint"), ¶¶1, 29.

<div align="center">

4

</div>

and family."[5] Although the methodology used to compile the NRA Armed Citizen database of stories is not explicitly detailed by the NRA, the NRA Armed Citizen database is a useful data source in this matter for at least three reasons. First, the Armed Citizen database was the largest collection of accounts of citizen self-defense compiled by others that I was able to find.[6] Second, the incidents listed in the Armed Citizen database highlight the very conduct that Plaintiffs claim the New Jersey law impedes (*i.e.*, the use of firearms by law-abiding citizens for self-defense).[7] Third, the Armed Citizen database is compiled by an entity that actively opposes restrictions on magazine capacity and restrictions on the possession and use of firearms in general.[8] In light of the positions taken by the entity compiling the data, I would expect that any selection bias would be in favor of stories that put use of guns in self-defense in the best possible light and might highlight the apparent need of guns and/or multiple rounds in self-defense incidents.

10.     My team and I performed an analysis of incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017.[9] For each incident, the city/county, state, venue (whether the incident occurred on the street, in the home, or elsewhere) and the number of shots fired were tabulated.[10] The information was gathered for each incident from

---

[5]   NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017.

[6]   Note that in 2020, after the time my research was conducted, The Heritage Foundation began an online database of its own sample of defensive gun use incidents (https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us).

[7]   See, for example, Ellman Complaint, ¶¶1, 24, Cheeseman Complaint, ¶¶2-3, and ANJRPC Complaint, ¶¶1, 29.

[8]   See, for example, NRA Civil Rights Defense Fund website, http://www.nradefensefund.org/current-litigation.aspx, accessed October 12, 2018.

[9]   My collection and coding of the NRA Armed Citizen stories was last performed in mid-2017.

[10]  The following incidents were excluded from the analysis: (1) duplicate incidents, (2) wild animal attacks, and (3) one incident where the supposed victim later pleaded guilty to covering up a murder. When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

both the NRA synopsis and, where available, an additional news story. An additional news story was found for over 95% of the incidents in the NRA Armed Citizen database.

9.    According to this analysis of incidents in the NRA Armed Citizen database, it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Out of 736 incidents, there were 2 incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets.[11] Defenders fired 2.2 shots on average.[12] In 18% of incidents the defender did not fire any shots; in 80% of incidents the defender fired 1 to 5 shots; in 2% of incidents the defender fired 6 to 10 shots; and in 0.3% of incidents the defender fired more than 10 shots. [13,14] These incidents highlight the fact that in many instances defenders are able to defend themselves without firing any shots. For example, according to one of the incidents in the NRA Armed Citizen Database:

> "A man entered a Shell station in New Orleans, La. and attempted to rob a cashier, by claiming he was carrying a gun. The cashier responded by retrieving a gun and leveling it at the thief, prompting the criminal to flee. (The Times Picayune, New Orleans, La. 09/02/15)"[15]

10.    The table below summarizes these findings. (Note that we did not perform a New Jersey-specific analysis, as there were only six incidents in the NRA Armed Citizen database that

---

[11] As discussed above, these two incidents with more than 10 shots fired by the defender were added to the NRA Armed Citizen database after an earlier analysis that I had conducted of the database. Further, the defenders in these two incidents did not appear to need to fire more than 10 shots to defend themselves. See footnote 2 above.

[12] Note that the analysis is focused on shots fired when using a gun in self-defense and therefore the average includes instances when no shots are fired. If one calculates the average excluding incidents of self-defense with a gun without firing shots, the average is still low, 2.6 shots when at least one shot is fired.

[13] The number of incidents, as well as the breakdown of incidents by number of shots fired, is similar for incidents inside the home vs. outside the home.

[14] A separate study of incidents in the NRA Armed Citizen database for an earlier period (the five-year period from 1997 through 2001) found similar results. Specifically, this study found that, on average, 2.2 shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. See, Claude Werner, "The Armed Citizen – A Five Year Analysis," https://tacticalprofessor.files.wordpress.com/2014/12/tac-5-year-w-tables.pdf, accessed January 26, 2023.

[15] "Gas station clerk scares off robber," NRA-ILA Armed Citizen, September 9, 2015.

occurred in New Jersey. We found no indication that more than 10 shots were fired in any of these New Jersey incidents.)

| **Breakdown of Incidents in NRA Armed Citizen Database by Number of Shots Fired January 2011 - May 2017** | | |
|---|---|---|
| **# of Shots Fired** | **# of Incidents** | **% of Incidents** |
| 0 | 134 | 18.2% |
| 1-5 | 587 | 79.8% |
| 6-10 | 13 | 1.8% |
| More than 10 | 2 | 0.3% |

*Average Number of Shots Fired: 2.2*

**Notes and Sources:**
Data from NRA Armed Citizen database covering 736 incidents from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

11.     In addition to our analysis of incidents in the NRA Armed Citizen database, we performed a systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, focusing on the same types of incidents as the NRA stories and covering the same time period.[16]

12.     To identify relevant news stories to include in our analysis, we performed a comprehensive search of published news stories using Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates news content from nearly 33,000

---

[16] This analysis was initially conducted to research issues regarding self-defense in the home, which was a focus of federal Second Amendment jurisprudence before the 2022 *New York State Rifle & Pistol Association v. Bruen* Supreme Court decision. The analysis of the NRA Armed Citizen incidents described above indicates that the number of shots fired in self-defense outside the home is similar to those inside the home.

sources.[17] The search was designed to return stories about the types of incidents that are the focus of the NRA Armed Citizen database and that Plaintiffs claim the New Jersey law impedes – in particular, the use of firearms for self-defense.[18] The search identified all stories that contained the following keywords in the headline or lead paragraph: one or more words from "gun," "shot," "shoot," "fire," or "arm" (including variations on these keywords, such as "shooting" or "armed"), plus one or more words from "broke in," "break in," "broken into," "breaking into," "burglar," "intruder," or "invader" (including variations on these keywords) and one or more words from "home," "apartment," or "property" (including variations on these keywords).[19] The search criteria matched approximately 90% of the NRA stories on self-defense with a firearm in the home, and an analysis of the 10% of stories that are not returned by the search shows that the typical number of shots fired in these incidents was no different than in other incidents. The search covered the same period used in our analysis of incidents in the NRA Armed Citizen database (January 2011 to May 2017). The region for the Factiva search was set to "United States." The search returned approximately 35,000 stories for the period January 2011 to May 2017.[20]

---

[17] Factiva is often used for academic research. For example, a search for the term "Factiva" on Google Scholar yields over 28,000 results. As another example, a search on Westlaw yields at least 83 expert reports that conducted news searches using Factiva.

[18] NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-*citizen*/, accessed May 28, 2017. See, also Ellman Complaint, ¶¶1, 24, Cheeseman Complaint, ¶¶2-3, and ANJRPC Complaint, ¶¶1, 29.

[19] The precise search string used was: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"). An asterisk denotes a wildcard, meaning the search includes words which have any letters in place of the asterisk. For example, a search for shoot* would return results including "shoots," "shooter" and "shooting." The search excluded duplicate stories classified as "similar" on Factiva.

[20] The effect of using alternative keywords was considered. For example, removing the second category ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and including incidents in which the assailant was already inside the home and/or was known to the victim was considered. *A priori*, there was no reason to believe that a larger number of shots would be used in these incidents and based on an analysis of the NRA stories we found that the number of shots fired in incidents when defending against someone already in the home was not different than those with an intruder.

13.      Using a random number generator, a random sample of 200 stories was selected

for each calendar year, yielding 1,400 stories in total.[21] These 1,400 stories were reviewed to

identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a

firearm in or near the home. This methodology yielded a random selection of 200 news stories

describing incidents of self-defense with a firearm in the home out of a population of

approximately 4,800 relevant stories.[22] Thus, out of the over 70 million news stories aggregated

by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on

incidents of self-defense with a firearm in the home. We analyzed a random selection of 200 of

these stories.

14.      For each news story, the city/county, state and number of shots fired were

tabulated. When tabulating the number of shots fired, we used the same methodology as we used

to analyze stories in the NRA Armed Citizen database.[23] We then identified other stories

describing the same incident on Factiva based on the date, location and other identifying

information, and recorded the number of times that each incident was covered by Factiva news

stories.

15.      To determine the average number of shots fired per *incident*, we first determined

the average number of shots fired per *story* and then analyzed the number of stories per incident.

According to our study of a random selection from approximately 4,800 relevant stories on

Factiva describing incidents of self-defense with a firearm in the home, the average number of

---

[21]  The random numbers were generated by sampling with replacement.

[22]  The approximately 4,800 relevant news stories were estimated by calculating the proportion of relevant news stories from the 200 randomly selected stories each year and applying that proportion to the number of results returned by the search for each year of the analysis. For example, in 2017, 33 out of 200 (17%) randomly selected news stories involved incidents of self-defense with a firearm in the home. Applying that proportion to the 1,595 results from the Factiva search in 2017 yields 263 relevant news stories in 2017. This process was repeated every year to arrive at a total of 4,841 relevant news stories from 2011-2017.

[23]  When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

shots fired per story was 2.61. This is not a measure of the average shots fired *per incident*, however, because the number of stories covering an incident varies, and the variation is not independent of the number of shots fired. We found that there was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering the incident.[24] We found that on average the more shots fired in a defensive gun use incident, the greater the number of stories covering the incident. For example, as shown in the chart below, we found that incidents in Factiva news stories with zero shots fired were covered on average by 1.8 news stories, while incidents with six or more shots fired were covered on average by 10.4 different news stories.

---

[24] Based on a linear regression of the number of news stories as a function of the number of shots fired, the results were statistically significant at the 1% level (more stringent than the 5% level commonly used by academics and accepted by courts. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980).



16.     After adjusting for this disparity in news coverage, we find that the average number of shots fired per incident covered is 2.34.[25] Note that this adjustment does not take into account the fact that some defensive gun use incidents may not be picked up by *any* news story. Given the observed relationship that there are more news stories when there are more shots fired, one would expect that the incidents that are not written about would on average have fewer shots than those with news stories. Therefore, the expectation is that these results, even after the

---

[25] The adjustment reflects the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home. The formula used for the adjustment is:

$$\frac{\sum_{i=1}^{n}\left(Shots\ Fired_i \times \frac{R_i}{C_i}\right)}{\sum_{i=1}^{n}\left(\frac{R_i}{C_i}\right)}$$

where:

$n$ = random selection of news stories on incidents of self-defense with a firearm in the home
$R_i$ = number of search results on Factiva in the calendar year of incident $i$
$C_i$ = number of news stories covering incident $i$

adjustment, are biased upward (*i.e.*, estimating too high an average number of shots and underestimating the percent of incidents in which no shots were fired).

17.     As shown in the table below, according to the study of Factiva news stories, in 11.6% of incidents the defender did not fire any shots, and simply threatened the offender with a gun. In 97.3% of incidents the defender fired five or fewer shots. There were no incidents where the defender was reported to have fired more than 10 bullets.

**Number of Shots Fired in Self-Defense in the Home
Based on Random Selection of Articles from Factiva
January 2011 - May 2017**

|  | Incidents in the Home |
|---|---|
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with <=5 Shots Fired | 195 |
| Percent of Incidents with <=5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

**Notes and Sources:**

Based on news stories describing defensive gun use in a random selection of Factiva stories 2011 to May 2017 using search string (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property") with region set to United States and excluding duplicate stories classified as "similar."

Calculated using weights reflecting the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home.

18.     In sum, an analysis of incidents in the NRA Armed Citizen database, as well as my own study of a random sample from approximately 4,800 news stories describing incidents of self-defense with a firearm, indicates that it is extremely rare for a person, when using a firearm in self-defense, to fire more than 10 rounds. I have analyzed almost 1,000 incidents of

self-defense (736 incidents from the NRA Armed Citizen database and 200 stories from Factiva) and in only 2 incidents were more than 10 rounds used. [26] Thus, in only 0.2% of reported incidents of self-defense with a firearm were more than 10 rounds used. However, given that this rate excludes incidents with no news coverage, the 0.2% rate is an overestimation of the percent of self-defense incidents in which more than 10 rounds were used because fewer shots means less news coverage.

### ii. Percent of incidents in which rifles were used in self-defense according to the Heritage Defensive Gun Uses Database

19.    I have been asked to analyze The Heritage Foundation's "Defensive Gun Uses in the U.S." database ("Heritage DGU Database"), a database of defensive gun incidents that was first published after my research on the number of rounds used by individuals in self-defense was performed.[27] In particular, I have been asked to analyze the percent of incidents in which rifles were used in self-defense according to the Heritage DGU Database. The analysis of the Heritage DGU Database indicates that it is rare for a rifle to be used in self-defense.

20.    The Heritage Foundation is a think tank focused on "formulat[ing] and promot[ing] public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."[28] According to The Heritage Foundation, "[t]he right of the people to keep and bear arms is a fundamental part of American liberty, serving as an important individual defense against crime and a collective defense against tyranny."[29]

---

[26] As discussed above, these two incidents with more than 10 shots fired by the defender were added to the NRA Armed Citizen database after an earlier analysis that I had conducted of the database. Further, the defenders in these two incidents did not appear to need to fire more than 10 shots to defend themselves. See footnote 2 above.

[27] "Defensive Gun Uses in the U.S.," *The Heritage Foundation,* as of October 7, 2022, https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us.

[28] "About Heritage," *The Heritage Foundation*, https://www.heritage.org/about-heritage/mission.

[29] "Firearms," *The Heritage Foundation*, https://www.heritage.org/firearms.

14

21.     In April 2020, The Heritage Foundation began publishing and periodically updating a database of news stories describing incidents in the U.S. in which individuals purportedly defended themselves using firearms.[30] The Heritage Foundation notes that its database is not comprehensive but meant to "highlight" stories of successful self-defense.[31,32]

22.     As of October 7, 2022, the Heritage DGU Database included 2,714 incidents from January 1, 2019 through October 6, 2022.[33] The Heritage DGU Database codes the following information for each incident:[34]

- Date of the incident;
- Website link to the news story;
- Location (city and state);
- Context (e.g., domestic violence, home invasion, robbery, etc.);
- Whether the defender had a concealed-carry permit;
- Whether there were multiple assailants;
- Whether shots were fired; and
- Firearm type (handgun, shotgun, rifle, pellet rifle, long gun, or unknown).[35]

23.     I performed an analysis of all 2,714 incidents in the Heritage DGU Database as of October 7, 2022, to determine what number and percent of the incidents involved a rifle. I found there were 51 incidents indicating a rifle was involved. These 51 incidents represent 2% of all incidents in the database and 4% of incidents with a known gun type.[36] The table below shows the breakdown of incidents by coded firearm type for the 2,714 incidents.

---

[30] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[31] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[32] Note that a review of the news stories cited in the database indicates that a number of the incidents may not involve individuals defending themselves. For example, in one incident ("Two Burglary Suspects Caught By Victim's Brother And Friend, Held At Gunpoint For Police," *5NewsOnline*, February 11, 2019), a homeowner's brother and friend appear to have found and apprehended burglars on the roadside.

[33] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[34] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[35] A review of the data and linked news stories from the Heritage DGU Database indicates that the firearm type corresponds to the firearm associated with the defender.

[36] This analysis is based on The Heritage Foundation's coding of these incidents. We have not independently verified the coding of these incidents.

**The Heritage Foundation
Defensive Gun Uses Database**

| Firearm Type | Incidents[1] | % of Total | % of Known |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| **Total known:** | **1,241** | | |
| **Total:** | **2,714** | | |

**Source:**
"Defensive Gun Uses in the U.S.," *The Heritage Foundation* .
Data as of October 7, 2022.
[1] Note that three incidents are coded as having more than one
firearm type and thus the sum by firearm type is larger than
the total number of incidents.

24.    I conducted the same analysis of the Heritage DGU Database excluding incidents
that occurred in states that had restrictions on assault weapons in 2022. In particular, I excluded
incidents in California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New
York, as well as Washington D.C.[37] In states without assault weapons restrictions, the Heritage

---

[37]  See, "Assault Weapons," *Giffords Law Center*, https://giffords.org/lawcenter/gun-laws/policy-
areas/hardware-ammunition/assault-weapons/. Delaware is not excluded since restrictions in Delaware
were enacted in June 2022.  See, "Governor Carney Signs Package of Gun Safety Legislation,"
*Delaware.gov,* June 30, 2022, https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-
gun-safety-legislation/.

DGU Database has 48 incidents indicating a rifle was involved. These 48 incidents represent 2% of incidents in these states and 4% of incidents with a known gun type in these states. The table below shows the breakdown of incidents by coded firearm type for states that do not restrict assault weapons.

**The Heritage Foundation**
**Defensive Gun Uses Database**
**States Without Assault Weapon Restrictions**

| Firearm Type | Incidents[1] | % of Total | % of Known |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Handgun | 1,033 | 41% | 90% |
| Shotgun | 63 | 3% | 6% |
| Rifle | 48 | 2% | 4% |
| Long Gun | 0 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,357 | 54% | |
| **Total known:** | **1,142** | | |
| **Total:** | **2,499** | | |

**Source:**

"Defensive Gun Uses in the U.S.," *The Heritage Foundation.* Data as of October 7, 2022. Excludes the following states with assault weapon restrictions: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York as well as Washington D.C. Classification from Giffords Law Center. Incidents in Delaware not excluded as restrictions were enacted in June 2022.

[1] Note that three incidents are coded as having more than one firearm type and thus the sum of the individual firearm types is larger than the total number of incidents.

17

B. **Public Mass Shootings**

25.     We analyzed the use of assault weapons and Large-Capacity Magazines[38] in public mass shootings using four sources for identifying public mass shootings: Mother Jones,[39] the Citizens Crime Commission of New York City,[40] The Washington Post,[41] and The Violence Project.[42, 43] The analysis focused on public mass shootings because it is my understanding that the state of New Jersey is concerned about public mass shootings and enacted the challenged law, in part, to address the problem of public mass shootings.[44]

---

[38]   My analysis is based on the definitions of assault weapons ("Assault Weapons") provided by California law, specifically: California Penal Code sections 30510 and 30515, and California Code of Regulations, title 11, section 5499. California law defines Assault Weapons based on either their "make and model" or on certain "features." See, for example, California Department of Justice: "What is considered an assault weapon under California law?" and "What are AK and AR-15 series weapons?" https://oag.ca.gov/firearms/regagunfaqs, accessed October 25, 2018.

[39]   "US Mass Shootings, 1982-2022: Data From Mother Jones' Investigation," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data.

[40]   "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update. Additional details on the mass shootings were obtained from an earlier source by the Citizens Crime Commission. "Mass Shooting Incidents in America (1984-2012)," Citizens Crime Commission of New York City,  http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[41]   "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[42]   "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[43]   When I began research in 2013 on mass shootings, I found Mother Jones and Citizens Crime Commission to maintain the most comprehensive lists of relevant mass shootings. More recently, two additional sources, The Washington Post and The Violence Project, have compiled lists of public mass shootings. The Violence Project began work on its mass shootings database in September 2017 and its database first went online in November 2019, while The Washington Post first published its mass shootings database on February 14, 2018. There is substantial overlap between the mass shootings in all four sources. For example, the Mother Jones data contains 93% of the mass shootings in the Citizens Crime Commission data for the years covered by both data sources, 1984 to 2016, while The Washington Post contains 94% of the mass shootings in The Violence Project data for the years covered by both data sources, 1966 to 2019.

[44]   See, for example, State of New Jersey Senate Resolution No. 51, February 24, 2020, ("In 1990 New Jersey recognized that assault weapons posed a serious threat…").

26.     The type of incident considered a mass shooting is generally consistent across the four sources: all four sources consider an event a mass shooting if four or more people were killed in a public place in one incident, excluding incidents involving other criminal activity such as a robbery.[45]

---

[45]  Citizens Crime Commission describes a mass shooting as "four or more victims killed" in "a public place" that were "unrelated to another crime (e.g., robbery, domestic violence)." Citizens Crime Commission notes that its sources include "news reports and lists created by government entities and advocacy groups." "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update.

Mother Jones describes mass shootings as "indiscriminate rampages in public places resulting in four or more victims killed by the attacker," excluding "shootings stemming from more conventionally motivated crimes such as armed robbery or gang violence." Although in January 2013 Mother Jones changed its definition of mass shooting to include instances when three or more people were killed, for this report we only analyzed mass shootings where four or more were killed to be consistent with the definition of the other three sources. "A Guide to Mass Shootings in America," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. See also, "What Exactly is a Mass Shooting," Mother Jones, August 24, 2012. http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

The Washington Post describes a mass shooting as "four or more people were killed, usually by a lone shooter" excluding "shootings tied to robberies that went awry" and "domestic shootings that took place exclusively in private homes." The Washington Post notes that its sources include "Grant Duwe, author of 'Mass Murder in the United States: A History,' Mother Jones and Washington Post research," as well as "Violence Policy Center, Gun Violence Archive; FBI 2014 Study of Active Shooter Incidents; published reports." "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

The Violence Project indicates that it uses the Congressional Research Service definition of a mass shooting: "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project notes that its sources include "Primary Sources: Written journals / manifestos / suicide notes etc., Social media and blog posts, Audio and video recordings, Interview transcripts, Personal correspondence with perpetrators" as well as "Secondary Sources (all publicly available): Media (television, newspapers, magazines), Documentary films, Biographies, Monographs, Peer-reviewed journal articles, Court transcripts, Law Enforcement records, Medical records, School records, Autopsy reports." "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/methodology/, accessed January 17, 2020.

27.     Each of the four sources contains data on mass shootings covering different time periods. The Mother Jones data covers 112 mass shootings from 1982 to October 13, 2022,[46] the Citizens Crime Commission data covers 80 mass shootings from 1984 to February 2018,[47] The Washington Post data covers 185 mass shootings from 1966 to May 12, 2021,[48] and The Violence Project data covers 182 mass shootings from 1966 to May 14, 2022.[49, 50]

28.     Note that the two more recently compiled sources of mass shootings, The Washington Post and The Violence Project, include additional mass shootings that were not covered by either Mother Jones or Citizens Crime Commission.  In general, we found that these additional mass shootings were less covered by the media and involved fewer fatalities and/or injuries than the ones previously identified by Mother Jones or Citizens Crime Commission. For example, using the mass shooting data for the period 1982 through 2019, we found that the median number of news stories for a mass shooting included in Mother Jones and/or Citizens

---

[46]  "A Guide to Mass Shootings in America," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. Excludes mass shootings where only three people were killed. Note this analysis of the Mother Jones data may not match other analyses because Mother Jones periodically updates its historical data.

[47]  "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update.

[48]  "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[49]  "Mass Shooter Database," *The Violence Project* https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[50]  Note that I have updated this mass shooting analysis to include more recent incidents, as well as more recently available details. In my 2017 declaration in *Duncan v. Bonta*, I included data on mass shootings through April 2017. In my 2018 declaration in *Rupp v. Becerra*, I updated the analysis to include data on mass shootings through September 2018. The analyses in both of these declarations included mass shootings only from Mother Jones and the Citizens Crime Commission. In my 2020 declaration in *James Miller v. Becerra*, I updated the analysis to include mass shootings through December 2019 and added mass shootings from two more sources, The Washington Post and The Violence Project. The number of mass shootings, as well as some details about the shootings, are not identical across these declarations for three main reasons. First, I have updated the analysis to include more recent incidents as well as more recently available details. Second, starting in 2020, I added two more sources (The Washington Post and The Violence Project), which include additional mass shootings and details not included in the initial sources. Third, even though Mother Jones included instances when three or more people were killed, for my declarations and reports starting in 2020, I only included mass shootings where four or more were killed to be consistent with the definition of the other three sources.

Crime Commission was 317, while the median for the additional mass shootings identified in The Washington Post and/or The Violence Project was 28.[51] In addition, using the mass shooting data through 2019, we found an average of 21 fatalities or injuries for a mass shooting included in Mother Jones and/or Citizens Crime Commission, while only 6 fatalities or injuries for the additional mass shootings identified in The Washington Post and/or The Violence Project.

29.     We combined the data from the four sources for the period 1982 through October 2022, and searched news stories on each mass shooting to obtain additional details on the types of weapons used and data on shots fired where available. We compared the details on the weapons used in each shooting to the list of prohibited firearms and features specified in California law to identify, based on this publicly available information, which mass shootings involved the use of Assault Weapons. In addition, we identified, based on this publicly available information, which mass shootings involved the use of Large-Capacity Magazines. See attached Exhibit B for a summary of the combined data, and Exhibit C for a summary of the weapons used in each public mass shooting based on Mother Jones, Citizens Crime Commission, The Washington Post, The Violence Project, and news reports.[52]

### i.     The use of Assault Weapons in public mass shootings

30.     Based on the 179 mass shootings through October 2022, we found that Assault Weapons are often used in public mass shootings. Whether an Assault Weapon was used in a mass shooting can be determined in 153 out of the 179 incidents (85%) considered in this analysis. Out of these 153 mass shootings, 36 (or 24%) involved Assault Weapons. Even assuming the mass shootings where it is not known whether an Assault Weapon was used *all* did not involve an Assault Weapon, 36 out of 179 mass shootings, or 20%, involved Assault Weapons.

---

[51]  The search was conducted over all published news stories on Factiva. The search was based on the shooter's name and the location of the incident over the period from one week prior to three months following each mass shooting.

[52]  Note that the Citizens Crime Commission data was last updated in February 2018 and The Washington Post was last updated in May 2021.

      **ii.**    **The use of Large-Capacity Magazines in public mass shootings**

31.      Based on the 179 mass shootings through October 2022, we found that Large-Capacity Magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in public mass shootings. Magazine capacity is known in 115 out of the 179 mass shootings (or 64%) considered in this analysis. Out of the 115 mass shootings with known magazine capacity, 73 (or 63%) involved Large-Capacity Magazines. Even assuming the mass shootings with unknown magazine capacity *all* did not involve Large-Capacity Magazines, 73 out of 179 mass shootings or 41% of mass shootings involved Large-Capacity Magazines.

      **iii.**    **Casualties in mass shootings involving Assault Weapons or Large-Capacity Magazines**

32.      Based on our analysis, casualties were higher in the mass shootings that involved Assault Weapons than in other mass shootings. In particular, we found an average number of fatalities or injuries of 36 per mass shooting with an Assault Weapon versus 10 for those without. Focusing on just fatalities, we found an average number of fatalities of 12 per mass shooting with an Assault Weapon versus 6 for those without.

33.      Based on our analysis, casualties were higher in the mass shootings that involved weapons with Large-Capacity Magazines than in other mass shootings. In particular, we found an average number of fatalities or injuries per mass shooting with a Large-Capacity Magazine was 25 versus 9 for mass shootings where a Large-Capacity Magazine was not used. Focusing on just fatalities, we found that the average number of fatalities per mass shooting with a Large-Capacity Magazine was 10 versus 6 for those without.

34.      In addition, we found that casualties were higher in the mass shootings that involved both Assault Weapons *and* Large-Capacity Magazines. In particular, we found an average number of fatalities or injuries of 40 per mass shooting with both an Assault Weapon and a Large-Capacity Magazine versus 8 for those without either. Focusing on just fatalities, we found an average number of fatalities of 13 per mass shooting with both an Assault Weapon and a Large-Capacity Magazine versus 6 for those without either. (See table below.)

## Numbers of Fatalities and Injuries in Public Mass Shootings
## 1982 – October 2022

| Weapon Used | # of Incidents | Average # of | | |
|---|---|---|---|---|
| | | Fatalities | Injuries | Total |
| Assault Weapon | 36 | 12 | 24 | 36 |
| No Assault Weapon | 117 | 6 | 4 | 10 |
| Unknown | 26 | 5 | 3 | 9 |
| Large-Cap. Mag. | 73 | 10 | 16 | 25 |
| No Large-Cap. Mag. | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |
| Assault Weapon & Large-Cap. Mag. | 31 | 13 | 27 | 40 |
| Large-Cap. Mag. Only[1] | 36 | 8 | 7 | 15 |
| No Assault Weapon or Large-Cap. Mag.[2] | 41 | 6 | 3 | 8 |
| Unknown[3] | 71 | 5 | 3 | 8 |

**Notes and Sources:**

Casualty figures exclude the shooter. Assault Weapon and large-capacity magazine classification and casualties updated based on review of stories from Factiva/Google searches.

[1] Shootings involving large-capacity magazine and no Assault Weapon.

[2] Shootings involving neither a large-capacity magazine nor Assault Weapon.

[3] Shootings where it is either unknown whether a large-capacity magazine was involved or unknown whether an Assault Weapon was involved.

35.     Our results are consistent with those of other studies that have analyzed mass shootings. Importantly, although the other studies are based on alternate sets of mass shootings, including covering different years and defining mass shootings somewhat differently, the results are consistent in finding that the number of fatalities and injuries is greater in mass shootings in which large capacity magazines and assault weapons are involved. A 2019 academic article published in the *American Journal of Public Health* by Klarevas et al. found that "[a]ttacks

involving LCMs resulted in a 62% higher mean average death toll."[53] This study found an average number of fatalities of 11.8 per mass shooting with a large-capacity magazine versus 7.3 for those without. The results in this study were based on 69 mass shootings between 1990 and 2017.[54] An analysis of the mass shootings detailed in a 2016 article by Gary Kleck yielded similar results: 21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without.[55] The Kleck study covered 88 mass shooting incidents between 1994 and 2013.[56] In a 2018 study, Koper et al. found that mass shootings involving assault weapons and large-capacity magazines resulted in an average of 13.7 victims versus 5.2 for other cases.[57] The Koper et al. study covered 145 mass shootings between 2009 and 2015.[58] The table below summarizes their results.

---

[53] Louis Klarevas, Andrew Conner, and David Hemenway, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health* (2019).

[54] The Klarevas et al. study defines mass shootings as "intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators" and, unlike my analysis, does not exclude incidents in private places or incidents involving other criminal activity such as robbery.

[55] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[56] The Kleck study defines a mass shooting as "one in which more than six people were shot, either fatally or nonfatally, in a single incident." See, Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[57] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2018).

[58] The Koper et al. study defined mass shootings as "incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed."

**Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings**

| Source | Criteria | | Time Period | # of Incidents | Avg. # of Fatalities + Injuries / Fatalities | |
| | # Victims | Other Criteria | | | With LCM | Without LCM |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2023)[1] | at least 4 killed[3] | Includes shootings "in a public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-October 2022 | 179 | 25 / 10 | 9 / 6 |
| Allen (2020)[2] | | | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[4] | more than 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[5] | at least 6 killed[3] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[6] | at least 4 killed[3] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

**Notes and Sources:**

[1] Exhibit B of this report.

[2] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.,* dated January 23, 2020.

[3] Excluding shooter.

[4] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).

[5] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).

[6] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

### iv. The number of rounds fired in public mass shootings with Assault Weapons or Large-Capacity Magazines

36.     The data on public mass shootings indicates that it is common for offenders to fire more than 10 rounds when using an Assault Weapon. Of the 36 mass shootings we analyzed through October 2022 that are known to have involved an Assault Weapon, there are 24 in which the number of shots fired is known. Shooters fired more than ten rounds in *all* 24 incidents, and the average number of shots fired was 149. In contrast, the average number of shots fired in mass shootings that did not involve an Assault Weapon was 38.

37.     In addition, the data indicates that it is common for offenders to fire more than 10 rounds when using a gun with a Large-Capacity Magazine in mass shootings. Of the 73 mass shootings that are known to have involved a Large-Capacity Magazine, there are 49 in which the number of shots fired is known. Shooters fired more than ten rounds in 46 of the 49 incidents (or 94%), and the average number of shots fired was 99. In contrast, the average number of shots fired in mass shootings that did not involve a Large-Capacity Magazine was 16.

### v.     The percent of mass shooters' guns legally obtained

38.     The data on public mass shootings indicates that the majority of guns used in these mass shootings were obtained legally.[59] Of the 179 mass shootings analyzed through October 2022, there are 112 where it can be determined whether the gun was obtained legally. According to the data, shooters in 79% of mass shootings obtained their guns legally (89 of the 112 mass shootings) and 80% of the guns used in these 112 mass shootings were obtained legally (202 of the 252 guns). (Even if one assumed that the guns were illegally obtained in all of the mass shootings where this question of legality is unknown, then one would find that in 50% of the mass shootings the guns were obtained legally and that 62% of the guns themselves were obtained legally.)

### vi.     Trends in the number of mass shootings

39.     According to the data since 1982, the first year in our analysis, the number of public mass shootings per year has been increasing. The following chart shows the number of mass shootings per year during this period, along with a fitted trendline:

---

[59] The determination of whether guns were obtained legally is based on Mother Jones and The Washington Post reporting.



**Notes and Sources:**
Data from Appendix B. The dotted line is calculated as a linear time series regression of the number of mass shootings from 1982 to 2021.

40. Focusing only on public mass shootings involving Large-Capacity Magazines, the data similarly shows that the number of public mass shootings with Large-Capacity Magazines has been increasing. The following chart shows the number of public mass shootings involving Large-Capacity Magazines per year, along with a fitted trendline:



**Notes and Sources:**
Data from Appendix B. The dotted line is calculated as a linear time series regression of the number of mass shootings involving large-capacity magazines from 1982 to 2021.

41.     Focusing on a broader set of shooting incidents also shows an upward trend over time. In particular, data from the Gun Violence Archive ("GVA") on shootings in which four or more victims were killed *or injured* in either a public place *or a home* shows that the number of shooting incidents within this broader category has also been increasing.[60] GVA maintains a "database of incidents of gun violence and gun crime," based on information from "police, media, data aggregates, government and other sources" and has data starting in 2014.[61] Note that the data indicates there is less news coverage for this broader set of shooting incidents versus public mass shootings and thus less information about the type of magazine used.[62] The

---

[60]   "General Methodology," *Gun Violence Archive Website*, accessed on April 19, 2023.

[61]   "General Methodology," *Gun Violence Archive Website*, accessed on April 19, 2023.

[62]   Analysis of the number of news stories covering shootings indicated that there is more news coverage on public mass shootings than mass shootings in the home. For example, our analysis indicated that the median number of news stories covering public mass shootings is approximately four times larger than for mass shootings in the home. See "Declaration of Lucy P. Allen," dated February 6, 2023, in

following chart shows the number of shootings with four or more fatalities or injuries per year according to the GVA data, along with a fitted trendline:



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Lucy P. Allen

_____

*Oregon Firearms Federation, Inc., et al., v. Tina Kotek, et al.* In addition, the data indicates that when fatalities and/or casualties are higher there is more news coverage. For example, our analysis indicates that there are approximately four times more news stories covering mass shootings with six or more fatalities than those with fewer than six fatalities.



**Lucy P. Allen**
Senior Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

Exhibit A

# LUCY P. ALLEN
# SENIOR MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present    **National Economic Research Associates, Inc.**
Senior Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Managing Director (2016-2023).
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993    **Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988    **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984    Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.

Lucy P. Allen

Diagnostic survey for auto parts manufacturer on growth obstacles. Marketing plan to increase international market share for major accounting firm.

Summer 1985        **WNET/Channel Thirteen, Strategic Planning Department**
                   <u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983          **Arthur Andersen & Company**
                   <u>Consultant</u>.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching
1989- 1992         <u>**Teaching Fellow**</u>**, Yale University**
                   Honors Econometrics
                   Intermediate Microeconomics
                   Competitive Strategies
                   Probability and Game Theory
                   Marketing Strategy
                   Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).


## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2023.

Deposition Testimony before the United States District Court for the Southern District of Texas in *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.,* 2023.

Testimony and Deposition before the United States District Court for the District of Oregon in *Oregon Firearms Federation, Inc. et al. v. Tina Kotek et al.*, 2023.

Testimony and Depositions before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2023.

Deposition Testimony before the United States District Court for the District of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al*., 2022.

Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

4

Lucy P. Allen

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *Miller et al. v. Becerra et al.,* 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.,* 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

5

Lucy P. Allen

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

# Exhibit B
# Public Mass Shootings Data
# 1982 – Oct. 2022

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 1. Raleigh spree shooting Hedingham, NC | 10/13/22 | MJ | - | - | 5 | 2 | 7 | - | - | 2 |
| 2. Highland Park July 4 parade shooting Highland Park, IL | 7/4/22 | MJ | Yes | - | 7 | 48 | 55 | 83 ba | Yes | 1 |
| 3. Tulsa medical center shooting Tulsa, OK | 6/1/22 | MJ | - | - | 4 | 9 bb | 13 bb | 37 bc | Yes | 2 |
| 4. Robb Elementary School massacre Uvalde, TX | 5/24/22 | MJ | Yes | Yes | 21 | 17 | 38 | 164 bd | Yes | 1 be |
| 5. Buffalo supermarket massacre Buffalo, NY | 5/14/22 | MJ/VP | Yes | Yes | 10 | 3 | 13 | 60 bf | Yes | 1 |
| 6. Sacramento County church shooting Sacramento, CA | 2/28/22 | MJ | Yes | - | 4 | 0 | 4 | - | Yes bg | 1 |
| 7. Oxford High School shooting Oxford, MI | 11/30/21 | MJ/VP | Yes | No | 4 | 7 | 11 | 30 bh | Yes bi | 1 |
| 8. San Jose VTA shooting San Jose, CA | 5/26/21 | MJ/VP | Yes | No | 9 | 0 | 9 | 39 bj | Yes bk | 3 |
| 9. Canterbury Mobile Home Park shooting Colorado Springs, CO | 5/9/21 | WaPo | Yes | - | 6 | 0 | 6 | 17 bl | - | 1 |
| 10. FedEx warehouse shooting Indianapolis, IN | 4/15/21 | MJ/VP/WaPo | Yes | Yes | 8 | 7 | 15 | - | Yes | 2 bm |
| 11. Orange office complex shooting Orange, CA | 3/31/21 | MJ/VP/WaPo | - | - | 4 | 1 | 5 | - | - | 1 |
| 12. Essex Royal Farms shooting Baltimore County, MD | 3/28/21 | WaPo | - | - | 4 | 1 | 5 | - | Yes bn | 1 |
| 13. King Soopers supermarket shooting Boulder, CO | 3/22/21 | MJ/VP/WaPo | Yes | Yes | 10 | 0 | 10 | - | Yes | 2 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 14. Atlanta massage parlor shootings  Atlanta, GA | 3/16/21 | MJ/VP/WaPo | Yes | - | 8 | 1 | 9 | - | Yes [bo] | 1 |
| 15. Hyde Park shooting  Chicago, IL | 1/9/21 | WaPo | - | - | 5 | 2 | 7 | - | - | 1 |
| 16. Englewood block party shooting  Chicago, IL | 7/4/20 | WaPo | - | - | 4 | 4 | 8 | - | - | - |
| 17. Springfield convenience store shooting  Springfield, MO | 3/15/20 | MJ/VP/WaPo | - | - | 4 | 2 | 6 | - | Yes [bp] | 2 |
| 18. Molson Coors shooting  Milwaukee, WI | 2/26/20 | MJ/VP/WaPo | - | - | 5 | 0 | 5 | 12 [bq] | - | 2 [br] |
| 19. Jersey City Kosher Supermarket  Jersey City, NJ | 12/10/19 | MJ/VP/WaPo | - | No | 4 | 3 | 7 | - | Yes | 5 |
| 20. Football-watching party  Fresno, CA | 11/17/19 | WaPo | - | No | 4 | 6 | 10 | - | - | 2 |
| 21. Halloween Party  Orinda, CA | 11/1/19 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 22. Tequila KC bar  Kansas City, KS | 10/6/19 | WaPo | - | No | 4 | 5 | 9 | - | No | 2 |
| 23. Midland-Odessa Highways  Odessa, TX | 8/31/19 | MJ/VP/WaPo | - | Yes | 7 | 25 | 32 | - | No | 1 |
| 24. Dayton  Dayton, OH | 8/4/19 | MJ/VP/WaPo | Yes | Yes | 9 | 27 | 36 | 41 [f] | Yes | 1/2 |
| 25. El Paso Walmart  El Paso, TX | 8/3/19 | MJ/VP/WaPo | Yes | Yes | 22 | 26 | 48 | - | Yes | 1 |
| 26. Casa Grande Senior Mobile Estates  Santa Maria, CA | 6/19/19 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 27. Virginia Beach Municipal Center Virginia Beach, VA | 5/31/19 | MJ/VP/WaPo | Yes | No | 12 | 4 | 16 | - | Yes | 2 |
| 28. Henry Pratt Co. Aurora, IL | 2/15/19 | MJ/VP/WaPo | - | No | 5 | 6 | 11 | - | No | 1 |
| 29. SunTrust Bank Sebring, FL | 1/23/19 | MJ/VP/WaPo | - | No | 5 | 0 | 5 | - | Yes | 1 |
| 30. Borderline Bar & Grill Thousand Oaks, CA | 11/7/18 | MJ/VP/WaPo | Yes | No | 12 | 1 | 13 | 50 [g] | Yes | 1 |
| 31. Tree of Life Synagogue Pittsburgh, PA | 10/27/18 | MJ/VP/WaPo | - | Yes | 11 | 6 | 17 | - | Yes | 4 |
| 32. T&T Trucking Bakersfield, CA | 9/12/18 | MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 33. Capital Gazette Annapolis, MD | 6/28/18 | MJ/VP/WaPo | - | No | 5 | 2 | 7 | - | Yes | 1 |
| 34. Santa Fe High School Santa Fe, TX | 5/18/18 | MJ/VP/WaPo | No | No | 10 | 13 | 23 | - | - | 2 |
| 35. Waffle House Nashville, TN | 4/22/18 | MJ/VP/WaPo | - | Yes | 4 | 4 | 8 | - | Yes | 1 |
| 36. Detroit Detroit, MI | 2/26/18 | VP | - | No | 4 | 0 | 4 | - | - | - |
| 37. Stoneman Douglas HS Parkland, FL | 2/14/18 | CC/MJ/VP/WaPo | Yes | No | 17 | 17 | 34 | - | Yes | 1 |
| 38. Pennsylvania Carwash Melcroft, PA | 1/28/18 | MJ/VP/WaPo | - | - | 4 | 1 | 5 | - | - | 3 [h] |
| 39. Rancho Tehama Rancho Tehama, CA | 11/14/17 | MJ/VP/WaPo | Yes | Yes | 4 | 10 | 14 | 30 [i] | No | 2 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 40. Texas First Baptist Church Sutherland Springs, TX | 11/5/17 | CC/MJ/VP/WaPo | Yes | Yes | 26 | 20 | 46 | 450 [j] | Yes | 1 |
| 41. Las Vegas Strip Las Vegas, NV | 10/1/17 | CC/MJ/VP/WaPo | Yes | Yes | 58 | 422 | 480 | 1100 [k] | Yes | 23 |
| 42. Taos and Rio Arriba counties Abiquiu, NM | 6/15/17 | WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 43. Fiamma Workplace Orlando, FL | 6/5/17 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 44. Marathon Savings Bank Rothschild, WI | 3/22/17 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |
| 45. Club 66 Yazoo City, MS | 2/6/17 | VP/WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 46. Fort Lauderdale Airport Fort Lauderdale, FL | 1/6/17 | CC/MJ/VP/WaPo | No | No | 5 | 6 | 11 | 15 [l] | Yes | 1 |
| 47. Cascade Mall Burlington, WA | 9/23/16 | CC/MJ/VP/WaPo | Yes | No | 5 | 0 | 5 | - | - | 1 |
| 48. Dallas Police Dallas, TX | 7/7/16 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 11 | 16 | - | Yes | 3 |
| 49. Walgreens Parking Lot Las Vegas, NV | 6/29/16 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 50. Orlando Nightclub Orlando, FL | 6/12/16 | CC/MJ/VP/WaPo | Yes | Yes | 49 | 53 | 102 | 110 [m] | Yes | 2 |
| 51. Franklin Avenue Cookout Wilkinsburg, PA | 3/9/16 | VP/WaPo | Yes | Yes | 6 | 3 | 9 | 48 [n] | No | 2 |
| 52. Kalamazoo Kalamazoo County, MI | 2/20/16 | MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | - | Yes | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 53. San Bernardino<br>San Bernardino, CA | 12/2/15 | CC/MJ/VP/WaPo | Yes | Yes | 14 | 22 | 36 | 150 [o] | Yes | 4 |
| 54. Tennessee Colony campsite<br>Anderson County, TX | 11/15/15 | VP/WaPo | - | - | 6 | 0 | 6 | - | - | 1 |
| 55. Umpqua Community College<br>Roseburg, OR | 10/1/15 | CC/MJ/VP/WaPo | - | No | 9 | 9 | 18 | - | Yes | 6 |
| 56. Chattanooga Military Center<br>Chattanooga, TN | 7/16/15 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 2 | 7 | - | Yes | 3 |
| 57. Charleston Church<br>Charleston, SC | 6/17/15 | CC/MJ/VP/WaPo | Yes | No | 9 | 3 | 12 | - | Yes | 1 |
| 58. Marysville High School<br>Marysville, WA | 10/24/14 | CC/MJ/VP/WaPo | Yes | No | 4 | 1 | 5 | - | No | 1 |
| 59. Isla Vista<br>Santa Barbara, CA | 5/23/14 | MJ/VP/WaPo | No | No | 6 | 13 | 19 | 50 [p] | Yes | 3 |
| 60. Alturas Tribal<br>Alturas, CA | 2/20/14 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 61. Washington Navy Yard<br>Washington, D.C. | 9/16/13 | CC/MJ/VP/WaPo | No | No | 12 | 8 | 20 | - | Yes | 2 |
| 62. Hialeah<br>Hialeah, FL | 7/26/13 | CC/MJ/VP/WaPo | Yes | No | 6 | 0 | 6 | 10 [q] | Yes | 1 |
| 63. Santa Monica<br>Santa Monica, CA | 6/7/13 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 3 | 8 | 70 [r] | Yes | 2 |
| 64. Federal Way<br>Federal Way, WA | 4/21/13 | MJ/VP/WaPo | - | No | 4 | 0 | 4 | - | Yes | 2 |
| 65. Upstate New York<br>Herkimer County, NY | 3/13/13 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | Yes | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 66. Newtown School, Newtown, CT | 12/14/12 | CC/MJ/VP/WaPo | Yes | Yes | 27 | 2 | 29 | 154 | No | 4/3 |
| 67. Accent Signage Systems, Minneapolis, MN | 9/27/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | 46 | Yes | 1 |
| 68. Sikh Temple, Oak Creek, WI | 8/5/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 4 | 10 | - | Yes | 1 |
| 69. Aurora Movie Theater, Aurora, CO | 7/20/12 | CC/MJ/VP/WaPo | Yes | Yes | 12 | 70 | 82 | 80 | Yes | 4 |
| 70. Seattle Café, Seattle, WA | 5/30/12 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 2 |
| 71. Oikos University, Oakland, CA | 4/2/12 | CC/MJ/VP/WaPo | No | No | 7 | 3 | 10 | - | Yes | 1 |
| 72. Su Jung Health Sauna, Norcross, GA | 2/22/12 | MJ/WaPo | - | No | 4 | 0 | 4 | - | Yes | 1 |
| 73. Seal Beach, Seal Beach, CA | 10/14/11 | CC/MJ/VP/WaPo | No | No | 8 | 1 | 9 | - | Yes | 3 |
| 74. IHOP, Carson City, NV | 9/6/11 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 7 | 11 | - | Yes | 3 |
| 75. Akron, Akron, OH | 8/7/11 | VP | No | No | 7 | 2 | 9 | 21 [s] | - | - |
| 76. Forum Roller World, Grand Prairie, TX | 7/23/11 | WaPo | - | No | 5 | 4 | 9 | - | - | 1 |
| 77. Grand Rapids, Grand Rapids, MI | 7/7/11 | CC | Yes | No | 7 | 2 | 9 | 10 | - | 1 |
| 78. Family law practice, Yuma, AZ | 6/2/11 | WaPo | - | - | 5 | 1 | 6 | - | - | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 79. Tucson<br>Tucson, AZ | 1/8/11 | CC/MJ/VP/WaPo | Yes | No | 6 | 13 | 19 | 33 | Yes | 1 |
| 80. Jackson<br>Jackson, KY | 9/11/10 | VP | No | No | 5 | 0 | 5 | 12 [t] | - | - |
| 81. City Grill<br>Buffalo, NY | 8/14/10 | VP/WaPo | - | No | 4 | 4 | 8 | 10 [u] | - | 1 |
| 82. Hartford Beer Distributor<br>Manchester, CT | 8/3/10 | CC/MJ/VP/WaPo | Yes | No | 8 | 2 | 10 | 11 | Yes | 2 |
| 83. Yoyito Café<br>Hialeah, FL | 6/6/10 | CC/VP/WaPo | No | No | 4 | 3 | 7 | 9 [v] | - | - |
| 84. Hot Spot Café<br>Los Angeles, CA | 4/3/10 | VP/WaPo | - | No | 4 | 2 | 6 | 50 [w] | - | 1 |
| 85. Coffee Shop Police<br>Parkland, WA | 11/29/09 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | No | 2 |
| 86. Fort Hood<br>Fort Hood, TX | 11/5/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 32 | 45 | 214 | Yes | 1 |
| 87. Worth Street<br>Mount Airy, NC | 11/1/09 | VP/WaPo | - | Yes | 4 | 0 | 4 | 16 [x] | No | 1 |
| 88. Binghamton<br>Binghamton, NY | 4/3/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 4 | 17 | 99 | Yes | 2 |
| 89. Carthage Nursing Home<br>Carthage, NC | 3/29/09 | CC/MJ/VP/WaPo | No | No | 8 | 2 | 10 | - | Yes | 2 |
| 90. Skagit County<br>Alger, WA | 9/2/08 | VP/WaPo | - | No | 6 | 4 | 10 | - | No | 2 |
| 91. Atlantis Plastics<br>Henderson, KY | 6/25/08 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 92. Black Road Auto Santa Maria, CA | 3/18/08 | VP/WaPo | - | No | 4 | 0 | 4 | 17 [y] | - | 1 |
| 93. Northern Illinois University DeKalb, IL | 2/14/08 | CC/MJ/VP/WaPo | Yes | No | 5 | 21 | 26 | 54 | Yes | 4 |
| 94. Kirkwood City Council Kirkwood, MO | 2/7/08 | CC/MJ/VP/WaPo | No | No | 6 | 1 | 7 | - | No | 2 |
| 95. Youth With a Mission and New Life Church | 12/9/07 | VP/WaPo | Yes | Yes | 4 | 5 | 9 | 25 [z] | - | 3 |
| 96. Westroads Mall Omaha, NE | 12/5/07 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 5 | 13 | 14 | No | 1 |
| 97. Crandon Crandon, WI | 10/7/07 | CC/MJ/WaPo | Yes | - | 6 | 1 | 7 | 30 [aa] | Yes | 1 |
| 98. Virginia Tech Blacksburg, VA | 4/16/07 | CC/MJ/VP/WaPo | Yes | No | 32 | 17 | 49 | 176 | Yes | 2 |
| 99. Trolley Square Salt Lake City, UT | 2/12/07 | CC/MJ/VP/WaPo | No | No | 5 | 4 | 9 | - | No | 2 |
| 100. Amish School Lancaster County, PA | 10/2/06 | CC/MJ/VP/WaPo | No | No | 5 | 5 | 10 | - | Yes | 3 |
| 101. The Ministry of Jesus Christ Baton Rouge, LA | 5/21/06 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | 1 |
| 102. Capitol Hill Seattle, WA | 3/25/06 | CC/MJ/VP/WaPo | Yes | Yes | 6 | 2 | 8 | - | Yes | 4 |
| 103. Goleta Postal Goleta, CA | 1/30/06 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | - | Yes | 1 |
| 104. Sash Assembly of God Sash, TX | 8/29/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 105. Red Lake, Red Lake, MN | 3/21/05 | CC/MJ/VP/WaPo | No | No | 9 | 7 | 16 | - | No | 3 |
| 106. Living Church of God, Brookfield, WI | 3/12/05 | CC/MJ/VP/WaPo | Yes | No | 7 | 4 | 11 | - | Yes | 1 |
| 107. Fulton County Courthouse, Atlanta, GA | 3/11/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |
| 108. Damageplan Show, Columbus, OH | 12/8/04 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | 15 [ab] | Yes | 1 |
| 109. Hunting Camp, Meteor, WI | 11/21/04 | CC/VP/WaPo | Yes | Yes | 6 | 2 | 8 | 20 | - | 1 |
| 110. ConAgra Foods Plant, Kansas City, KS | 7/3/04 | VP/WaPo | - | No | 6 | 1 | 7 | 10 [ac] | - | 2 |
| 111. Stateline Tavern, Oldtown, ID | 10/24/03 | VP/WaPo | Yes | No | 4 | 0 | 4 | 14 [ad] | - | 1 |
| 112. Windy City Warehouse, Chicago, IL | 8/27/03 | CC/VP/WaPo | No | No | 6 | 0 | 6 | - | - | - |
| 113. Lockheed Martin, Meridian, MS | 7/8/03 | CC/MJ/VP/WaPo | - | No | 6 | 8 | 14 | - | Yes | 5 |
| 114. Labor Ready, Huntsville, AL | 2/25/03 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 115. Bertrand Products, South Bend, IN | 3/22/02 | VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 116. Burns International Security, Sacramento, CA | 9/10/01 | VP/WaPo | Yes | Yes | 5 | 2 | 7 | 200 [ae] | - | 2 |
| 117. Bookcliff RV Park, Rifle, CO | 7/3/01 | VP/WaPo | No | No | 4 | 3 | 7 | 6 [af] | - | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 118. Navistar<br>Melrose Park, IL | 2/5/01 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - | Yes | 4 |
| 119. Houston<br>Houston, TX | 1/9/01 | VP | - | No | 4 | 0 | 4 | - | - | - |
| 120. Wakefield<br>Wakefield, MA | 12/26/00 | CC/MJ/VP/WaPo | Yes | - | 7 | 0 | 7 | 37 | Yes | 3 |
| 121. Mount Lebanon<br>Pittsburgh, PA | 4/28/00 | VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 122. Mi-T-Fine Car Wash<br>Irving, TX | 3/20/00 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | - |
| 123. Hotel<br>Tampa, FL | 12/30/99 | CC/MJ/VP/WaPo | No | No | 5 | 3 | 8 | - | Yes | 2 |
| 124. Xerox<br>Honolulu, HI | 11/2/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | 28 | Yes | 1 |
| 125. Wedgwood Baptist Church<br>Fort Worth, TX | 9/15/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 7 | 14 | 30 | Yes | 2 |
| 126. Atlanta Day Trading<br>Atlanta, GA | 7/29/99 | MJ/VP/WaPo | - | No | 9 | 13 | 22 | - | Yes | 4 |
| 127. Albertson's Supermarket<br>Las Vegas, NV | 6/3/99 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 128. Columbine High School<br>Littleton, CO | 4/20/99 | CC/MJ/VP/WaPo | Yes | Yes | 13 | 23 | 36 | 188 | No | 4 |
| 129. St. John Fellowship Baptist Church<br>Gonzalez, LA | 3/10/99 | VP/WaPo | - | No | 4 | 4 | 8 | - | - | 1 |
| 130. Thurston High School<br>Springfield, OR | 5/21/98 | CC/MJ/VP/WaPo | Yes | No | 4 | 25 | 29 | 50 | No | 3 |

# Exhibit B
## Public Mass Shootings Data
## 1982 – Oct. 2022

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 131. Westside Middle School Jonesboro, AR | 3/24/98 | CC/MJ/VP/WaPo | Yes | No | 5 | 10 | 15 | 26 | No | 9/10 |
| 132. Connecticut Lottery Newington, CT | 3/6/98 | CC/MJ/VP/WaPo | Yes | No | 4 | 0 | 4 | 5 | Yes | 1 |
| 133. Caltrans Maintenance Yard Orange, CA | 12/18/97 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 2 | 6 | 144 | Yes | 1 |
| 134. Erie Manufacturing Bartow, FL | 12/3/97 | VP | - | No | 4 | 0 | 4 | 12 [ag] | - | - |
| 135. R.E. Phelon Company Aiken, SC | 9/15/97 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | - | No | 1 |
| 136. News and Sentinel Colebrook, NH | 8/20/97 | VP/WaPo | - | Yes | 4 | 4 | 8 | - | - | 2 |
| 137. Fire Station Jackson, MS | 4/25/96 | VP/WaPo | - | No | 5 | 3 | 8 | - | - | 3 |
| 138. Fort Lauderdale Fort Lauderdale, FL | 2/9/96 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | 14 [ah] | Yes | 2 |
| 139. Little Chester Shoes New York, NY | 12/19/95 | VP/WaPo | Yes | No | 5 | 3 | 8 | - | - | 1 |
| 140. Piper Technical Center Los Angeles, CA | 7/19/95 | CC/VP/WaPo | Yes | No | 4 | 0 | 4 | - | - | - |
| 141. Walter Rossler Company Corpus Christi, TX | 4/3/95 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | Yes | 2 |
| 142. Puppy creek Hoke County, NC | 12/31/94 | VP | - | - | 5 | 1 | 6 | - | - | - |
| 143. Air Force Base Fairchild Base, WA | 6/20/94 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 23 | 27 | 50 [ai] | Yes | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 144. Chuck E. Cheese Aurora, CO | 12/14/93 | CC/MJ/VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 145. Long Island Railroad Garden City, NY | 12/7/93 | CC/MJ/VP/WaPo | Yes | No | 6 | 19 | 25 | 30 | Yes | 1 |
| 146. Unemployment Office Oxnard, CA | 12/2/93 | VP/WaPo | - | - | 4 | 4 | 8 | - | - | - |
| 147. Family Fitness Club El Cajon, CA | 10/14/93 | VP/WaPo | - | No | 4 | 0 | 4 | - | Yes | 1 |
| 148. Luigi's Restaurant Fayetteville, NC | 8/6/93 | CC/MJ/VP/WaPo | No | No | 4 | 8 | 12 | - | Yes | 3 |
| 149. Washington County Bar Jackson, MS | 7/8/93 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 150. 101 California Street San Francisco, CA | 7/1/93 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 6 | 14 | 75 | No | 3 |
| 151. Card club Paso Robles, CA | 11/8/92 | VP/WaPo | - | No | 6 | 1 | 7 | - | - | 1 |
| 152. Watkins Glen Watkins Glen, NY | 10/15/92 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | Yes | 1 |
| 153. Lindhurst High School Olivehurst, CA | 5/1/92 | CC/MJ/VP/WaPo | No | No | 4 | 10 | 14 | - | Yes | 2 |
| 154. Phoenix Phoenix, AZ | 3/15/92 | VP | - | - | 4 | 0 | 4 | - | - | - |
| 155. Royal Oak Postal Royal Oak, MI | 11/14/91 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - | Yes | 1 |
| 156. Restaurant Harrodsburg, KY | 11/10/91 | VP/WaPo | No | No | 4 | 0 | 4 | 6 [aj] | No | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 157. University of Iowa<br>Iowa City, IA | 11/1/91 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 158. Luby's Cafeteria<br>Killeen, TX | 10/16/91 | CC/MJ/VP/WaPo | Yes | No | 23 | 20 | 43 | 100 | Yes | 2 |
| 159. Post office<br>Ridgewood, NJ | 10/10/91 | VP/WaPo | Yes | Yes | 4 | 0 | 4 | - | - | 2 |
| 160. GMAC<br>Jacksonville, FL | 6/18/90 | CC/MJ/VP/WaPo | Yes | No | 9 | 4 | 13 | 14 | Yes | 2 |
| 161. Standard Gravure Corporation<br>Louisville, KY | 9/14/89 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 12 | 20 | 21 | Yes | 5 |
| 162. Stockton Schoolyard<br>Stockton, CA | 1/17/89 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 29 | 34 | 106 | Yes | 2 |
| 163. Montefiore School<br>Chicago, IL | 9/22/88 | VP/WaPo | No | No | 4 | 2 | 6 | - | - | 1 |
| 164. Old Salisbury Road<br>Winston-Salem, NC | 7/17/88 | VP/WaPo | - | No | 4 | 5 | 9 | - | - | 1 |
| 165. ESL<br>Sunnyvale, CA | 2/16/88 | CC/MJ/VP/WaPo | No | No | 7 | 4 | 11 | - | Yes | 7 |
| 166. Shopping Centers<br>Palm Bay, FL | 4/23/87 | CC/MJ/VP/WaPo | Yes | No | 6 | 14 | 20 | 40 [ak] | Yes | 3 |
| 167. United States Postal Service<br>Edmond, OK | 8/20/86 | CC/MJ/VP/WaPo | No | - | 14 | 6 | 20 | - | Yes | 3 |
| 168. Anchor Glass Container Corporation<br>South Connellsville, PA | 3/16/85 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 169. Other Place Lounge<br>Hot Springs, AR | 7/24/84 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 170. San Ysidro McDonald's San Ysidro, CA | 7/18/84 | CC/MJ/VP/WaPo | Yes | Yes | 21 | 19 | 40 | 257 | Yes | 3 |
| 171. Dallas Nightclub Dallas, TX | 6/29/84 | CC/MJ/VP/WaPo | Yes | No | 6 | 1 | 7 | - | No | 1 |
| 172. Alaska Mining Town Manley Hot Springs, AK | 5/17/84 | VP/WaPo | No | No | 7 | 0 | 7 | - | - | 1 |
| 173. College Station Collge Station, TX | 10/11/83 | VP | - | No | 6 | 0 | 6 | - | - | - |
| 174. Alaska Back-County McCarthy, AK | 3/1/83 | VP/WaPo | - | No | 6 | 2 | 8 | - | - | 2 |
| 175. Upper West Side Hotel New York, NY | 2/3/83 | VP | No | No | 4 | 1 | 5 | - | - | 1 |
| 176. The Investor Noyes Island, AK | 9/6/82 | WaPo | - | No | 8 | 0 | 8 | - | - | 1 |
| 177. Welding Shop Miami, FL | 8/20/82 | MJ/VP/WaPo | No | No | 8 | 3 | 11 | - | Yes | 1 |
| 178. Western Transfer Co. Grand Prairie, TX | 8/9/82 | VP/WaPo | - | No | 6 | 4 | 10 | - | - | 3 |
| 179. Russian Jack Springs Park Anchorage, AK | 5/3/82 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |
| | | | | Total: | 1,272 | 1,417 | 2,689 | | | |

| | | | |
|---|---|---|---|
| Large-Capacity Magazine Average: | 10 | 16 | 25 | 99 |
| Non-Large-Capacity Magazine Average: | 6 | 3 | 9 | 16 |
| Assault Weapon Average: | 12 | 24 | 36 | 149 |
| Non-Assault Weapon Average: | 6 | 4 | 10 | 38 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated October 14, 2022). MJ indicates a mass shooting identified by Mother Jones.

The Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017). CC indicates a mass shooting identified by Citizens Crime Commission of New York City data.

The Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting,", updated May 12, 2021). WaPo indicates a mass shooting identified by The Washington Post.

The Violence Project ("Mass Shooter Database," updated May 14, 2022). VP indicates a mass shooting identified by the Violence Project.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition. Stories from Factiva and Google searches reviewed to determine whether an LCM was involved.

[b] See Exhibit C for details.

[c] Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

[d] Except where noted, all data on shots fired obtained from CC.

[e] The determination of whether guns were obtained legally is based on Mother Jones and The Washington Post reporting.

[ba] "'This is the norm in our country': Highland Park Mayor speaks to Senate committee about gun violence," *CBS Chicago* , July 20, 2022.

[bb] MJ reported "fewer than 10" injuries for this incident.

[bc] "Update: Man among those killed held door to allow others to escape, Tulsa police chief says," *TulsaWorld* , June 2, 2022.

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

bd   "The gunman in Uvalde carried more ammunition into Robb Elementary School than a U.S. soldier carries into combat," *CBS News* , May 27, 2022. Note the number of shots fired has been updated since Allen 2022 in Duncan v. Rob Bonta which listed 315 shots fired based on the number of rounds found at the school.

be   "Uvalde gunman legally bought AR rifles days before shooting, law enforcement says," *The Texas Tribune* , May 25, 2022.

bf   "Buffalo shooting suspect says his motive was to prevent 'eliminating the white race'," *NPR* , June 16, 2022.

bg   "Sacramento Church Mass Shooting Follows Disturbing Trend of Domestic Violence, Mass Shooting Connection; Rise of Ghost Guns," *Everytown* , March 7, 2022.

bh   "Oxford High School shooter fired 30 rounds, had 18 more when arrested, sheriff says," *Fox2Detroit* , December 1, 2021.

bi   "Father of suspected Oxford High School shooter bought gun 4 days before shooting," *Fox 2 Detroit* , December 1, 2021.

bj   "VTA shooter fired 39 rounds during attack; carried 32 high-capacity magazines," *KTVU Fox 2* , May 27, 2021.

bk   "Sam Cassidy legally owned guns used in San Jose VTA shooting: Sheriff," *Kron4* , May 28, 2021.

bl   "Colorado Springs shooter who killed 6 at party had "displayed power and control issues," police say," *The Denver Post* , May 11, 2021.

bm   "Indianapolis FedEx Shooter Who Killed 4 Sikhs Was Not Racially Motivated, Police Say," *NPR* , July 28, 2021.

bn   "Police Investigate Three Separate Fatal Shooting Incidents In Baltimore County," *Baltimore County Government Website* , March 29, 2021.

bo   "Atlanta Shooting Suspect Bought Gun on Day of Rampage," *Courthouse News* , March 26, 2021.

bp   "Search warrant reveals new information in Springfield Kum & Go shooting," *Springfield News-Leader* , April 8, 2020.

bq   "'There was no warning this was going to happen,' Miller shooting witnesses told investigators," *WISN 12 News* , November 24, 2020.

br   "Milwaukee Miller brewery shooting: Six Molson Coors workers, including shooter, dead in rampage," *Milwaukee Journal Sentinel* , February 26, 2020.

f   "The Dayton gunman killed 9 people by firing 41 shots in 30 seconds. A high-capacity rifle helped enable that speed," *CNN* , August 5, 2019.

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

[g] "Authorities Describe 'Confusion And Chaos' At Borderline Bar Shooting In California," *NPR* , November 28, 2018.

[h] "Suspect in quadruple killing at car wash dies," CNN, January 30, 2018.

[i] "California gunman fired 30 rounds at elementary school, left when he couldn't get inside," *ABC News* , November 15, 2017.

[j] "'Be quiet! It's him!' Survivors say shooter walked pew by pew looking for people to shoot," *CNN* , November 9, 2017.

[k] "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal* , November 22, 2017

[l] "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," *Washington Post* , January 9, 2017.

[m] "'We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," *The Telegraph* , June 13, 2016.

[n] "Two men charged with homicide in connection with Wilkinsburg backyard ambush," *Pittsburgh's Action News* , June 24, 2016.

[o] "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," *New York Times* , December 3, 2015.

[p] "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," *Los Angeles Times* , June 4, 2014.

[q] "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," *NBC News* , July 28, 2013.

[r] "Police Call Santa Monica Gunman 'Ready for Battle,'" *New York Times* , June 8, 2013.

[s] "Questions linger in slayings; investigation continues in rampage as community searches for answers on why gunman shot eight people," *The Beacon Journal* ,

August 14, 2011.

[t] "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News* , September 13, 2010.

[u] "Ex-gang member guilty of shooting 5 in deadly 17-second rampage," *NBC* , April 1, 2011.

[v] "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," *Sun-Sentinel* , June 7, 2010.

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

[w] "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press* , March 15, 2016.

[x] "4 Victims In Mount Airy Shooting Related, Police Say," *WXII 12 News* , November 2, 2009.

[y] "Arrested suspect might have warned of Santa Maria shooting", *Associated Press* , March 20, 2008.

[z] "Profile: New information released on Matthew Murray, gunman in church-related shootings in Colorado; Larry Bourbannais, wounded in one of the shootings,

discusses his experience," NBC News, December 11, 2007.

[aa] "Small Town Grieves for 6, and the Killer," *Los Angeles Times* , October 9, 2007.

[ab] "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times* , January 15, 2005.

[ac] "Sixth person dies of injuries from shooting at Kansas meatpacking plant," *Associated Press* , July 3, 2004.

[ad] "Four Killed In Oldtown Shooting," *The Miner* , October 30, 2003.

[ae] "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press* , September 14, 2001.

[af] "Gunman kills 3, wounds 4 in Rifle rampage; mental patient is arrested," *The Denver Post* , April 2, 2015.

[ag] "Unfinished business," *Dateline NBC* , December 21, 2006.

[ah] "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times* , February 10, 1996.

[ai] "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times* , June 21, 1994.

[aj] "Man Killed Estranged Wife, Three Others as They Drove to Dinner," *Associated Press* , November 11, 1991.

[ak] "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune* , April 25, 1987.

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| **Case** | **Location** | **Date** | **Citizens Crime Commission** [a] | **Mother Jones** [b] | **Washington Post** [c] | **Weapon?** [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1. Raleigh spree shooting | Hedingham, NC | 10/13/22 | | shotgun, semiautomatic handgun | | - |
| 2. Highland Park July 4 parade shooting | Highland Park, IL | 7/4/22 | | AR-15 style rifle, possibly modified for rapid fire | | - |
| 3. Tulsa medical center shooting | Tulsa, OK | 6/1/22 | | AR-15 style rifle | | - |
| 4. Robb Elementary School massacre | Uvalde, TX | 5/24/22 | | **semiautomatic rifles** | | Yes [ca] |
| 5. Buffalo supermarket massacre | Buffalo, NY | 5/14/22 | | **Bushmaster XM-15 semiautomatic rifle** | | Yes |
| 6. Sacramento County church shooting | Sacramento, CA | 2/28/22 | | AR-15-style "ghost gun" | | - |
| 7. Oxford High School shooting | Oxford, MI | 11/30/21 | | Sig Sauer 9mm pistol | | No [cb] |
| 8. San Jose VTA shooting | San Jose, CA | 5/26/21 | | semiautomatic handguns | | No [cc] |
| 9. Canterbury Mobile Home Park shooting | Colorado Springs, CO | 5/9/21 | | | Smith & Wesson handgun | - |
| 10. FedEx warehouse shooting | Indianapolis, IN | 4/15/21 | | **semiautomatic rifle** | Ruger AR 556, **HM Defense HM15F Rifle** | Yes [cd] |
| 11. Orange office complex shooting | Orange, CA | 3/31/21 | | semiautomatic handgun | Glock semiautomatic handgun | - |
| 12. Essex Royal Farms shooting | Baltimore County, MD | 3/28/21 | | | - | - |
| 13. King Soopers supermarket shooting | Boulder, CO | 3/22/21 | **Ruger AR-556** | | **Ruger AR 556 pistol**, 9mm pistol | Yes [ce] |
| 14. Atlanta massage parlor shootings | Atlanta, GA | 3/16/21 | | semiautomatic handgun | 9mm handgun | - |
| 15. Hyde Park shooting | Chicago, IL | 1/9/21 | | | .45-caliber pistol | - |
| 16. Englewood block party shooting | Chicago, IL | 7/4/20 | | | - | - |
| 17. Springfield convenience store shooting | Springfield, MO | 3/15/20 | | SKS 7.62-caliber rifle; Glock 9mm | Glock 9mm, SKS 7.62-caliber rifle | - |
| 18. Molson Coors shooting | Milwaukee, WI | 2/26/20 | | semiautomatic handgun | Handgun | - |
| 19. Jersey City Kosher Supermarket | Jersey City, NJ | 12/10/19 | - | - | mossberg 12-gauge; .22-caliber ruger Mark IV; AR-15-style rifle; Ruger 9mm semiautomatic pistol; 9mm glock 17 | No |
| 20. Football-watching party | Fresno, CA | 11/17/19 | - | - | two semiautomatic handguns | No |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| **Case** | **Location** | **Date** | **Citizens Crime Commission** [a] | **Mother Jones** [b] | **Washington Post** [c] | **Weapon?** [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 21.  Halloween Party | Orinda, CA | 11/1/19 | - | - | - | |
| 22.  Tequila KC bar | Kansas City, KS | 10/6/19 | - | - | Handgun | No |
| 23.  Midland-Odessa Highways | Odessa, TX | 8/31/19 | - | **semiautomatic rifle** | **AR-style rifle** | Yes [e] |
| 24.  Dayton | Dayton, OH | 8/4/19 | - | **AR-15-style rifle**, with a **100-round capacity** ammunition drum | 23 caliber anderson AM-15 pistol **modified to function like an AR-15 rifle**, shotgun | Yes [cf] |
| 25.  El Paso Walmart | El Paso, TX | 8/3/19 | - | **AK-47-style rifle**, per authorities | 7.62 caliber **AK-47 style rifle** | Yes |
| 26.  Casa Grande Senior Mobile Estates | Santa Maria, CA | 6/19/19 | - | - | - | - |
| 27.  Virginia Beach Municipal Center | Virginia Beach, VA | 5/31/19 | - | .45-caliber handguns; noise suppressor (silencer); several high-capacity magazines | .45 caliber handgun with noise suppressor, .45 caliber handgun | No |
| 28.  Henry Pratt Co. | Aurora, IL | 2/15/19 | - | Smith & Wesson handgun, with a green sighting laser | .40-caliber Smith & Wesson semiautomatic handgun | No |
| 29.  SunTrust Bank | Sebring, FL | 1/23/19 | - | 9 mm handgun | 9mm semiautomatic handgun | No |
| 30.  Borderline Bar & Grill | Thousand Oaks, CA | 11/7/18 | - | Glock 21, .45 caliber; high-capacity magazine | Glock 21 .45-caliber handgun | No |
| 31.  Tree of Life Synagogue | Pittsburgh, PA | 10/27/18 | - | **AR-15;** Glock .357 | **Colt AR-15 semiautomatic rifle;** three glock .357 pistols | Yes [f] |
| 32.  T&T Trucking | Bakersfield, CA | 9/12/18 | - | - | .50-caliber Smith & Wesson 500 | No [g] |
| 33.  Capital Gazette | Annapolis, MD | 6/28/18 | - | 12-gauge pump-action shotgun | 2 gauge shotgun | No |
| 34.  Santa Fe High School | Santa Fe, TX | 5/18/18 | - | shotgun; .38 revolver | .38 caliber revolver, shotgun | No |
| 35.  Waffle House | Nashville, TN | 4/22/18 | - | **AR-15** | **AR-15-style semiautomatic rifle** | Yes [h] |
| 36.  Detroit | Detroit, MI | 2/26/18 | - | - | - | No |
| 37.  Stoneman Douglas HS | Parkland, FL | 2/14/18 | - | AR-15 | .223 caliber smith & wesson M&P 15 semiautomatic ar 15 rifle | No [i] |
| 38.  Pennsylvania Carwash | Melcroft, PA | 1/28/18 | - | semiautomatic rifle and semiautomatic handgun | AR-15 .223-caliber semiautomatic rifle; 9mm handgun | - [j] |
| 39.  Rancho Tehama | Rancho Tehama, CA | 11/14/17 | - | Two illegally modified rifles | **two semiautomatic rifles;** two handguns | Yes [k] |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| | | | Weapon Description From | | | Assault Weapon? [d] |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 40.  Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 | - | **Ruger AR-556**; Kelley also possessed semiautomatic handguns | 9mm Glock pistol; Ruger .22-caliber; **Ruger AR-556** | Yes [l] |
| 41.  Las Vegas Strip | Las Vegas, NV | 10/1/17 | - | **AR-15-style and AK-47-style rifles** and "a large cache of ammunition"; four **Daniel Defense DDM4 rifles**, three **FN-15s** and **other rifles made by Sig Sauer.** | - | Yes [m] |
| 42.  Taos and Rio Arriba counties | Abiquiu, NM | 6/15/17 | - | - | .38 caliber revolver | No |
| 43.  Fiamma Workplace | Orlando, FL | 6/5/17 | - | semiautomatic handgun | semiautomatic rifle (2); handgun (2) | No |
| 44.  Marathon Savings Bank | Rothschild, WI | 3/22/17 | - | - | Rifle, handgun | No |
| 45.  Club 66 | Yazoo City, MS | 2/6/17 | - | - | - | - |
| 46.  Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | - | Walther 9mm semi-automatic pistol | 9mm semiautomatic handgun | No |
| 47.  Cascade Mall | Burlington, WA | 9/23/16 | - | Ruger .22-caliber | Ruger .22-caliber rifle | No [n] |
| 48.  Dallas Police | Dallas, TX | 7/7/16 | - | **Izhmash-Saiga 5.45mm (AK-style) semiautomatic rifle** with large capacity magazines; Glock 9mm handgun, .25-caliber semiautomatic handgun | **SKS-type semiautomatic rifle** | Yes [o] |
| 49.  Walgreens Parking Lot | Las Vegas, NV | 6/29/16 | - | - | - | - |
| 50.  Orlando Nightclub | Orlando, FL | 6/12/16 | - | **Sig Sauer MCX rifle**, Glock 17 9mm; high-capacity magazines (30 rounds) | **.223-caliber Sig Sauer MCX semiautomatic rifle**; 9mm semiautomatic glock 17 pistol | Yes [p] |
| 51.  Franklin Avenue Cookout | Wilkinsburg, PA | 3/9/16 | - | - | **AK-47-style rifle**, .40-caliber handgun | Yes |
| 52.  Kalamazoo | Kalamazoo County, MI | 2/20/16 | - | 9 mm handgun (ammo used unclear) | Walther P-99 9mm semiautomatic handgun | No |
| 53.  San Bernardino | San Bernardino, CA | 12/2/15 | - | **Two semiautomatic AR-15-style rifles—one a DPMS A-15, the other a Smith & Wesson M&P15**, both with .223 calibre ammunition. Two 9mm semiautomatic handguns. High capacity magazines. | **DPMS AR-15-style rifle; Smith & Wesson M&P AR-15-style rifle**; Llama semiautomatic 9mm pistol; Smith & Wesson semiautomatic 9mm pistol | Yes [q] |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| | | | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 54. Tennessee Colony campsite | Anderson County, TX | 11/15/15 | - | - | - | - |
| 55. Umpqua Community College | Roseburg, OR | 10/1/15 | - | 9 mm Glock pistol, .40 caliber Smith & Wesson, .40 caliber Taurus pistol, .556 caliber Del-Ton; (ammo details unclear) | rifle; five pistols | No [r] |
| 56. Chattanooga Military Center | Chattanooga, TN | 7/16/15 | - | **AK-47**, AR-15, and 30-round magazines; 9mm handgun | AR-15-style semiautomatic rifle; 9mm pistol; **AK-47-type semiautomatic rifle** | Yes [s] |
| 57. Charleston Church | Charleston, SC | 6/17/15 | - | .45-caliber Glock (model 41, with 13-round capacity magazine) | .45-caliber glock 41 pistol | No |
| 58. Marysville High School | Marysville, WA | 10/24/14 | - | Beretta .40-caliber handgun | .40-caliber beretta pistol | No |
| 59. Isla Vista | Santa Barbara, CA | 5/23/14 | - | Two Sig Sauer P226 semiautomatic pistols and Glock 34 pistol, and hundreds of rounds of ammo. A 6- inchand 8-inch "SRK" and "Boar Hunter" hunting knives. | Sig Sauer P226s pistol; Glock 34 pistol; Sig Sauer P226s pistol | No |
| 60. Alturas Tribal | Alturas, CA | 2/20/14 | - | 9mm semi-automatic handgun | Unknown | No |
| 61. Washington Navy Yard | Washington, D.C. | 9/16/13 | - | Remington 870 Express 12-gauge shotgun; Beretta handgun | beretta pistol; Remington 970 Express 12-gauge shotgun | No |
| 62. Hialeah | Hialeah, FL | 7/26/13 | - | Glock 17 | Glock 17 pistol | No |
| 63. Santa Monica | Santa Monica, CA | 6/7/13 | - | **.223-caliber semi-automatic assault rifle**, about 40 high capacity magazines, "black powder" handgun (likely antique) | Black powder .33-caliber handgun; **AR-15 type .223-caliber semiautomatic rifle** | Yes [t] |
| 64. Federal Way | Federal Way, WA | 4/21/13 | - | .40 caliber semi-automatic handgun, pistol grip shotgun | .40 caliber semiautomatic pistol; pistol grip shotgun | No [u] |
| 65. Upstate New York | Herkimer County, NY | 3/13/13 | - | Unknown | Unknown | No [v] |

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon? [d] |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 66. Newtown School | Newtown, CT | 12/14/12 | **An unknown make and model .22-caliber rifle, a Bushmaster XM15 .223-caliber semiautomatic assault rifle** equipped with a 30-round large capacity ammunition magazine, and a GLOCK 10mm handgun were used. According to the Danbury State's Attorney, police also recovered in Lanza's possession a SIG SAUER P226 9mm handgun and three loaded 30-round large capacity ammunition magazines for the Bushmaster. Six additional 30-round large capacity ammunition magazines were recovered at the scene. A loaded unknown make and model 12-gauge shotgun was found in the passenger compartment of the car (later moved to the trunk by police). All of the guns used in the shooting were purchased by Lanza's mother. | 10mm Glock, 9mm SIG Sauer P226 semiautomatic handguns; **.223 Bushmaster XM15-E2S semiautomatic rifle**; Izhmash Saiga-12 12-gauge semiautomatic shotgun | 9mm SIG Sauer P226 pistol ;Savage Mark II bolt-action .22-caliber rifle; **.223 Bushmaster XM15-E2S semiautomatic rifle**; izhmash Saiga 12-gauge semiautomatic shotgun; 10mm Glock pistol | Yes [w] |
| 67. Accent Signage Systems | Minneapolis, MN | 9/27/12 | GLOCK 19 9mm semiautomatic pistol equipped with a 15-round large capacity ammunition magazine. Engeldinger purchased the firearm one year before the shooting at KGS Guns and Ammo in Minneapolis after passing a background check and obtaining a permit to purchase. Police reportedly found packaging for 10,000 rounds of ammunition and another handgun in Engeldinger's home. | 9mm Glock semiautomatic handgun | 9mm glock pistol | No |
| 68. Sikh Temple | Oak Creek, WI | 8/5/12 | Springfield Armory XD(M) 9mm semiautomatic handgun equipped with a 19-round large capacity ammunition magazine. Weeks before the shooting, Wade legally purchased the handgun and three 19-round large capacity ammunition magazines from a federal firearms licensed dealer in nearby West Allis, WI. According to media reports, Wade served in the U.S. Army from 1992 until 1998, when he was given an other-than-honorable discharge or general discharge. In 1994, while stationed at Fort Bliss in Texas, he was arrested by El Paso police, and pled guilty to a misdemeanor charge of criminal mischief. Federal law does not prohibit persons with convictions for misdemeanors other than domestic violence misdemeanors or persons who have been discharged from the military for reasons other than "dishonorably" from purchasing firearms. | 9mm Springfield Armory XDM semiautomatic handgun | 9mm springfield armory XDM pistol | No |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|----------------------------------------|-------------------------|-----------------------|-------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 69. Aurora Movie Theater | Aurora, CO | 7/20/12 | A **Smith & Wesson M&P15 assault rifle** equipped with a 100-round drum large capacity ammunition magazine, a Remington Model 870 12-gauge pump shotgun, and two GLOCK .40 caliber handguns, were recovered at the scene by police. In the months leading to the shooting, Holmes purchased the weapons and 6,000-rounds of ammunition at gun shops and over the Internet. In addition to the weapons used in the shooting, Holmes booby-trapped his apartment, rigging trip wire to detonate 30 plastic shells stuffed with gunpowder, several glass jars filled with gasoline and gunpowder, and 10 gallons of gasoline in canisters. | Two .40-caliber Glock semiautomatic handguns; **.223-caliber Smith & Wesson M&P15 semiautomatic rifle**; 12-gauge Remington 870 pump-action shotgun | .40-caliber glock pistol; 12-gauge pump-action Remington 870 shotgun; **.223-caliber Smith & Wesson M&P15 semiautomatic AR-15-style rifle** | Yes [x] |
| 70. Seattle Café | Seattle, WA | 5/30/12 | - | Two .45-caliber semiautomatic handguns | .45-caliber pistol (2) | No |
| 71. Oikos University | Oakland, CA | 4/2/12 | - | .45-caliber semiautomatic handgun | .45-caliber pistol | No |
| 72. Su Jung Health Sauna | Norcross, GA | 2/22/12 | - | .45-caliber semiautomatic handgun | - | No |
| 73. Seal Beach | Seal Beach, CA | 10/14/11 | - | .45-caliber Heckler & Koch, 9mm Springfield semiautomatic handguns; .44 Magnum Smith & Wesson revolver | - | No |
| 74. IHOP | Carson City, NV | 9/6/11 | **AK-47 type assault rifle** equipped with a 30-round large capacity ammunition magazine. Two additional guns and two more magazines were found in his vehicle. | **AK-47 Norinco Arms variant, AK-47 Romarm Cugir variant rifles**; .38-caliber Colt revolver | **AK-47 variant semiautomatic rifle** | Yes [y] |
| 75. Akron | Akron, OH | 8/7/11 | - | - | - | No [z] |
| 76. Forum Roller World | Grand Prairie, TX | 7/23/11 | - | - | - | No [aa] |
| 77. Grand Rapids | Grand Rapids, MI | 7/7/11 | GLOCK 9mm semiautomatic pistol (unknown model) equipped with a 30-round large capacity ammunition magazine. | - | - | No |
| 78. Family law practice | Yuma, AZ | 6/2/11 | - | - | - | - |
| 79. Tucson | Tucson, AZ | 1/8/11 | GLOCK 19 9mm semiautomatic pistol equipped with a 33-round large capacity ammunition magazine. Loughner was also carrying two 15-round large capacity ammunition magazines, and a knife. The ATF determined Loughner legally purchased the GLOCK pistol with an extended magazine and one box of Winchester ammunition on November 30, 2010, from Sportsman's Warehouse in Tucson. | 9mm Glock 19 semiautomatic handgun | 9mm glock 19 pistol | No |

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 80.  Jackson | Jackson, KY | 9/11/10 | - | - | - | No [ab] |
| 81.  City Grill | Buffalo, NY | 8/14/10 | - | - | 9mm pistol | No |
| 82.  Hartford Beer Distributor | Manchester, CT | 8/3/10 | Two Ruger SR9 9mm semiautomatic pistols equipped with 17-round magazines. Thornton purchased both firearms legally from an East Windsor, CT gun dealer. | Two 9mm Ruger SR9 semiautomatic handguns | 9mm Ruger SR9 pistol (2) | No |
| 83.  Yoyito Café | Hialeah, FL | 6/6/10 | - | - | .45-caliber Glock pistol | No [ac] |
| 84.  Hot Spot Café | Los Angeles, CA | 4/3/10 | - | - | - | No [ad] |
| 85.  Coffee Shop Police | Parkland, WA | 11/29/09 | - | 9mm Glock 17 semiautomatic handgun; .38-caliber Smith & Wesson revolver | .38-caliber Smith & Wesson revolver; 9mm Glock 17 pistol | No |
| 86.  Fort Hood | Fort Hood, TX | 11/5/09 | FN Herstal 5.7 Tactical Pistol equipped with 20-round large capacity ammunition magazine. When Hasan was apprehended, investigators found in his possession 177-rounds in 30-round and 20-round large capacity ammunition magazines, another handgun, a revolver, and two gunsights (for different lighting conditions). Hasan purchased the FN Herstal 5.7 Tactical Pistol legally at Guns Galore, a shop in Killeen, TX | FN Five-seven semiautomatic handgun | FN Five-seven pistol | No |
| 87.  Worth Street | Mount Airy, NC | 11/1/09 | - | - | High-powered **assault-style rifle** | Yes |
| 88.  Binghamton | Binghamton, NY | 4/3/09 | Beretta .45-caliber semiautomatic pistol, Beretta 9mm semiautomatic pistol (models unknown), and two 30-round large capacity ammunition magazines and two 15-round large capacity ammunition magazines. | 9mm Beretta, .45-caliber Springfield semiautomatic handguns | 9mm Beretta pistol; .45-caliber Springfield pistol | No |
| 89.  Carthage Nursing Home | Carthage, NC | 3/29/09 | - | Winchester 1300 pump-action shotgun; .357 Magnum revolver | .357 magnum revolver; Winchester 1300 pump-action shotgun | No |
| 90.  Skagit County | Alger, WA | 9/2/08 | - | - | lever-action winchester rifle, handgun | No |
| 91.  Atlantis Plastics | Henderson, KY | 6/25/08 | - | .45-caliber Hi-Point semiautomatic handgun | .45-caliber Hi-Point pistol | No |
| 92.  Black Road Auto | Santa Maria, CA | 3/18/08 | - | - | semiautomatic handgun | No |

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 93. Northern Illinois University | DeKalb, IL | 2/14/08 | SIG SAUER Kurz 9mm semiautomatic pistol, Hi-Point CF380 .380 caliber semiautomatic pistol, GLOCK 19 9mm semiautomatic pistol, Remington Sportsman 48 12-gauge shotgun, and 33-round and 15-round large capacity ammunition magazines. Kazmierczak purchased all four weapons from Tony's Gun & Ammo in Champaign, IL between August 3, 2007 and February 9, 2008. Kazmierczak also purchased gun accessories from a website operated by TGSCOM, Inc., the same company patronized by the VA Tech shooter. | 9mm Glock 19, Hi-Point CF380, 9mm Kurz SIG Sauer P232 semiautomatic handguns; 12-gauge Remington Sportsman 48 sawed-off shotgun | 12-gauge Remington Sportsman 48 sawed-off shotgun; 9mm glock 19 pistol; 9mm Kurz SIG Sauer P232 pistol; Hi-Point CF380 pistol | No  ae |
| 94. Kirkwood City Council | Kirkwood, MO | 2/7/08 | - | .40-caliber Smith & Wesson semiautomatic handgun; .44 Magnum Smith & Wesson Model 29 revolver | .40-caliber Smith & Wesson pistol; .44 Magnum Smith & Wesson Model 29 revolver | No |
| 95. Youth With a Mission and New Life Church | Colorado Springs, CO | 12/9/07 | - | - | A pistol, **.223-caliber Bushmaster XM16 rifle**, .40-caliber Beretta pistol | Yes |
| 96. Westroads Mall | Omaha, NE | 12/5/07 | **WASR-10 semiautomatic assault rifle** and two 30-round large capacity ammunition magazines. | **WASR-10 Century Arms** semiautomatic rifle | **WASR-10 Century Arms** semiautomatic rifle | Yes  af |
| 97. Crandon | Crandon, WI | 10/7/07 | - | AR-15 SWAT semiautomatic rifle | AR-15-style semiautomatic rifle | -  ag |
| 98. Virginia Tech | Blacksburg, VA | 4/16/07 | GLOCK 19 9mm semiautomatic pistol and Walther P22 .22-caliber semiautomatic pistol. Investigators found a total of 17 empty magazines at the scene of the shooting, a mix of several 15-round, and 10-round magazines loaded with hollow-point rounds (bullets with the tip hollowed out, designed to expand upon impact). He possessed over 400 rounds of ammunition. Cho ordered the Walther P22 from a website operated by TGSCOM, Inc. Kazmierczak patronized the same company before the NIU shooting. On February 9, 2007, Cho picked up the pistol from J-N-D Pawn-brokers, located across the street from the VA Tech campus. In compliance with the state law limiting handgun purchases to one every 30 days, Cho purchased the GLOCK 19 on March 13, 2007. He also purchased five 10-round magazines from eBay in March. Cho's purchase of these firearms was in violation of federal law; he was disqualified from purchasing or possessing a firearm and ammunition, because a special justice of the Montgomery County General District Court had found him to be a danger to himself on December 14, 2005. | 9mm Glock 19, .22-caliber Walther P22 semiautomatic handguns | .22-caliber Walther P22 pistol; 9mm Glock 19 pistol | No |

## Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| | | | Weapon Description From | | | Assault |
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 99. Trolley Square | Salt Lake City, UT | 2/12/07 | - | Mossberg Maverick 88 Field shotgun; .38-caliber Smith & Wesson M36 revolver | .38-caliber Smith & Wesson M36 revolver; Mossberg Maverick 88 Field shotgun | No |
| 100. Amish School | Lancaster County, PA | 10/2/06 | - | Springfield semiautomatic handgun; .30-06 Ruger bolt-action rifle; 12-gauge Browning pump-action shotgun | 12-gauge Browning pump-action shotgun; .30-06 Ruger bolt-action rifle; Springfield 9mm semiautomatic handgun | No [ah] |
| 101. The Ministry of Jesus Christ | Baton Rouge, LA | 5/21/06 | - | - | - | No [ai] |
| 102. Capitol Hill | Seattle, WA | 3/25/06 | - | .40-caliber Ruger, one other semiautomatic handgun; **Bushmaster XM15 E2S semiautomatic rifle**; 12-gauge Winchester Defender pump-action shotgun with extended tube and pistol grip | 12-gauge pump-action Winchester Defender shotgun; .40-caliber Ruger pistol | Yes [aj] |
| 103. Goleta Postal | Goleta, CA | 1/30/06 | Smith & Wesson 915 9mm semiautomatic handgun equipped with a 15-round large capacity ammunition magazine. San Marco purchased the firearm at a pawn shop in New Mexico in August 2005. | 9mm Smith & Wesson 915 semiautomatic handgun | 9mm Smith & Wesson 915 pistol | No |
| 104. Sash Assembly of God | Sash, TX | 8/29/05 | - | - | 9mm semiautomatic pistol, .38-caliber revolver | No |
| 105. Red Lake | Red Lake, MN | 3/21/05 | - | .40-caliber Glock 23, .22-caliber Ruger semiautomatic handguns; 12-gauge Remington 870 shotgun | .22-caliber Ruger pistol (2); 12-gauge Remington 870 shotgun | No |
| 106. Living Church of God | Brookfield, WI | 3/12/05 | - | 9mm Beretta semiautomatic handgun | 9mm beretta pistol | No |
| 107. Fulton County Courthouse | Atlanta, GA | 3/11/05 | - | - | 9mm pistol | No |
| 108. Damageplan Show | Columbus, OH | 12/8/04 | - | 9mm Beretta 92FS semiautomatic handgun | 9mm beretta 92FS pistol | No |
| 109. Hunting Camp | Meteor, WI | 11/21/04 | **SKS 7.62mm semiautomatic assault rifle** equipped with a 20-round large capacity ammunition magazine. | - | **7.62mm SKS semiautomatic rifle** | Yes [ak] |
| 110. ConAgra Foods Plant | Kansas City, KS | 7/3/04 | - | - | 9mm pistol, revolver | No |
| 111. Stateline Tavern | Oldtown, ID | 10/24/03 | - | - | semiautomatic pistol | No |
| 112. Windy City Warehouse | Chicago, IL | 8/27/03 | - | - | .38-caliber Walther pistol | No [al] |

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| | Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|---|
| | | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 113. | Lockheed Martin | Meridian, MS | 7/8/03 | - | .45-caliber Ruger P90 semiautomatic handgun; .22-caliber rifle with scope, .223-caliber Ruger Mini-14 rifle; 12-gauge Winchester 1300 shotgun; .22 Magnum derringer | .223-caliber Ruger Mini-14 rifle; 12-gauge Winchester 1300 shotgun | No [am] |
| 114. | Labor Ready | Huntsville, AL | 2/25/03 | - | - | semiautomatic 9mm pistol | No |
| 115. | Bertrand Products | South Bend, IN | 3/22/02 | - | - | .22-caliber rifle, sawed-off shotgun | No |
| 116. | Burns International Security | Sacramento, CA | 9/10/01 | - | - | **AK-47-type semiautomatic rifle**, 9mm pistol | Yes [an] |
| 117. | Bookcliff RV Park | Rifle, CO | 7/3/01 | - | - | .38 caliber Charter Arms revolver | No |
| 118. | Navistar | Melrose Park, IL | 2/5/01 | - | SKS 1954R, .30-caliber Winchester rifles; 12-gauge Remington pump-action shotgun; .38-caliber revolver | 12-gauge Remington pump-action shotgun; SKS 1954R rifle; .30-caliber Winchester rifle; .38-caliber revolver; | No [ao] |
| 119. | Houston | Houston, TX | 1/9/01 | - | - | - | No [ap] |
| 120. | Wakefield | Wakefield, MA | 12/26/00 | **AK-47-type semiautomatic assault rifle**, unknown make and model 12-gauge shotgun, unknown make and model .32-caliber semiautomatic pistol, and 60-round large capacity ammunition magazine. | .32-caliber Retolaza semiautomatic handgun; **AK-47 variant semiautomatic rifle**; 12-gauge Winchester 1300 pump-action shotgun | .32-caliber Retolaza pistol; AK-47 variant semiautomatic rifle; 12-gauge Winchester 1300 pump-action shotgun | - [aq] |
| 121. | Mount Lebanon | Pittsburgh, PA | 4/28/00 | - | - | .357 Magnum revolver | No |
| 122. | Mi-T-Fine Car Wash | Irving, TX | 3/20/00 | - | - | semiautomatic .9mm pistol | No |
| 123. | Hotel | Tampa, FL | 12/30/99 | - | 9mm Lorcin semiautomatic handgun; .38-caliber Charter Arms revolver | .38-caliber Charter Arms revolver; 9mm Lorcin pistol | No |
| 124. | Xerox | Honolulu, HI | 11/2/99 | GLOCK 17 9mm semiautomatic pistol and three 17-round large capacity ammunition magazines, loaded with hollow point bullets (bullets with the tip hollowed out, designed to expand upon impact). Uyesugi legally purchased the GLOCK in 1989. | 9mm Glock 17 semiautomatic handgun | 9mm Glock 17 pistol | No |
| 125. | Wedgwood Baptist Church | Fort Worth, TX | 9/15/99 | Ruger P85 9mm semiautomatic pistol, unknown make and model .380 caliber semiautomatic pistol, and three 15-round large capacity ammunition magazines. Ashbrook legally acquired both weapons from federally licensed firearms dealers in 1992. | .380-caliber, 9mm Ruger P85 semiautomatic handguns | .380-caliber revolver; 9mm Ruger P85 pistol | No |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| | Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|---|
| | | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 126. | Atlanta Day Trading | Atlanta, GA | 7/29/99 | - | .45-caliber Colt 1911-A1, 9mm Glock 17, .25-caliber Raven Arms MP-25 semiautomatic handguns; .22-caliber Harrington & Richardson revolver | .45-caliber Colt 1911-A1 pistol; .22-caliber Harrington & Richardson revolver; .25-caliber Raven Arms Mp-25 pistol; 9mm Glock 17 pistol | No |
| 127. | Albertson's Supermarket | Las Vegas, NV | 6/3/99 | - | - | 12-gauge pump-action shotgun | No |
| 128. | Columbine High School | Littleton, CO | 4/20/99 | **Savage Springfield 67H 12-gauge pump-action shotgun, Savage Stevens 311D 12-gauge sawedoff shotgun, Hi-Point 995 9mm semiautomatic rifle, INTRATEC TEC-DC9 9mm semiautomatic pistol,** and thirteen 10-round magazines, one 52-, one 32-, one 28-round large capacity ammunition magazines. Harris and Klebold illegally acquired the shotguns and Hi- Point rifle through a "straw purchase" (a transaction in which a legal buyer makes a purchase for someone who cannot legally purchase the firearm). Their friend, Robyn Anderson, purchased the three firearms at the Tanner Gun Show from unlicensed sellers in December of 1998. A pizza shop employee, Mark Manes, illegally sold them the INTRATEC TEC-DC9. | **9mm Intratec DC-9 semiautomatic handgun; 9mm Hi-Point 995 carbine rifle**; 12-gauge sawed-off Savage Stevens 311D, 12-gauge sawed-off Savage Springfield 67H pump-action shotguns | **9mm Hi-Point 995 carbine**; 12-gauge sawed-off Savage Stevens 311D shotgun; 12-gauge sawed-off Savage Springfield 67H pump-action shotgun; **9mm Intratec DC-9 machine pistol** | Yes [ar] |
| 129. | New St. John Fellowship Baptist Church | Gonzalez, LA | 3/10/99 | - | - | semiautomatic pistol | No |
| 130. | Thurston High School | Springfield, OR | 5/21/98 | GLOCK 19 9mm semiautomatic pistol, Ruger (unknown model) .22-caliber semiautomatic pistol, Ruger (unknown model) .22-caliber rifle, and a 50-round large capacity ammunition magazine. The GLOCK and rifle were legally purchased by Kinkel's father. | 9mm Glock, .22-caliber Ruger semiautomatic handguns, .22-caliber Ruger rifle | 9mm Glock pistol; .22-caliber Ruger pistol; .22-caliber Ruger rifle | No [as] |
| 131. | Westside Middle School | Jonesboro, AR | 3/24/98 | Universal M1 Carbine .30-caliber replica, Davis Industries .38-caliber two-shot derringer, Double Deuce Buddie .22-caliber two-shot derringer, Charter Arms .38-caliber revolver, Star .380-caliber pistol, FIE .380-caliber pistol, Ruger Security Six .357-caliber revolver, Ruger .44 magnum rifle, Smith & Wesson .38-caliber revolver, Remington 742 .30-06-caliber rifle, 15-round large capacity ammunition magazines, three 30-round large capacity ammunition magazines, and over 150-rounds of ammunition. | FIE 380, .380-caliber Star semiautomatic handguns; .44 Magnum Ruger, .30-06 Remington 742, .30-caliber Universal M-1 carbine replica rifles; .38-caliber Charter Arms, .357-caliber Ruger Security Six, .38-caliber Smith & Wesson revolvers; .22-caliber Double Deuce Buddie two-shot, .38-caliber Davis Industries two-shot derringers | .22-caliber Double Deuce revolver; .380-caliber Star pistol; .357-caliber Ruger Security six revolver; .44 Magnum Ruger revolver; .30-caliber Universal M-1 carbine; .38-caliber Charter Arms revolver; .38-caliber Smith & Wesson revolver; FIE 380 pistol; .30-06 Remington 742 rifle | No [at] |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|------------------------|--------------------|----------------------|--------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 132.  Connecticut Lottery | Newington, CT | 3/6/98 | GLOCK model unknown 9mm semiautomatic pistol equipped with a 19-round large capacity ammunition magazine. Beck had a permit for the 9mm pistol used in the shooting. | 9mm semiautomatic handgun | 9mm pistol | No |
| 133.  Caltrans Maintenance Yard | Orange, CA | 12/18/97 | **Chinese-made AK-47-type 7.62mm semiautomatic assault rifle** and five 30-round large capacity ammunition magazines. Torres legally purchased the rifle on April 30, 1988, from B&B Gun Sales in Orange County, CA. | **7.62mm AK-47 Chinese variant semiautomatic rifle** | **7.62mm AK-47 Chinese variant semiautomatic rifle** | Yes |
| 134.  Erie Manufacturing | Bartow, FL | 12/3/97 | - | - | - | No [au] |
| 135.  R.E. Phelon Company | Aiken, SC | 9/15/97 | - | 9mm semiautomatic handgun | 9mm pistol | No |
| 136.  News and Sentinel | Colebrook, NH | 8/20/97 | - | - | 9mm pistol, **AR-15-style rifle** | Yes [av] |
| 137.  Fire Station | Jackson, MS | 4/25/96 | - | - | Mac 11 machine pistol, Tec 9 automatic pistol, .45-caliber semiautomatic handgun | No |
| 138.  Fort Lauderdale | Fort Lauderdale, FL | 2/9/96 | - | 9mm Glock semiautomatic handgun; .32-caliber revolver | 9mm Glock pistol; .32-caliber revolver | No |
| 139.  Little Chester Shoes | New York, NY | 12/19/95 | - | - | .9mm semiautomatic pistol | No |
| 140.  Piper Technical Center | Los Angeles, CA | 7/19/95 | - | - | Glock semiautomatic pistol | No [aw] |
| 141.  Walter Rossler Company | Corpus Christi, TX | 4/3/95 | - | 9mm Ruger semiautomatic handgun; .32-caliber revolver | .32-caliber revolver; 9mm Ruger pistol | No |
| 142.  Puppy creek | Hoke County, NC | 12/31/94 | - | - | - | - |
| 143.  Air Force Base | Fairchild Base, WA | 6/20/94 | **Chinese-made Mak-90 semiautomatic assault rifle** equipped with a 75-round drum large capacity ammunition magazine. He purchased the assault rifle on June 15, 1994, five days before the shooting, and the following day purchased 80 rounds of 7.62x39mm ammunition and a 75-round drum large capacity ammunition magazine. | **MAK-90 semiautomatic rifle** | **MAK-90 semiautomatic AK-style rifle** | Yes [ax] |
| 144.  Chuck E. Cheese | Aurora, CO | 12/14/93 | - | .25-caliber semiautomatic handgun | .25-caliber pistol | No |
| 145.  Long Island Railroad | Garden City, NY | 12/7/93 | Ruger P89 9mm semiautomatic pistol and four 15-round large capacity ammunition magazines. Ferguson legally acquired the weapon in California at an outlet of Turner's Outdoorsman. | 9mm Ruger P89 semiautomatic handgun | 9mm Ruger P89 pistol | No |
| 146.  Unemployment Office | Oxnard, CA | 12/2/93 | - | - | Rifle | - |
| 147.  Family Fitness Club | El Cajon, CA | 10/14/93 | - | - | 12-gauge shotgun | No |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|---|---|---------|
| | | | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 148. Luigi's Restaurant | Fayetteville, NC | 8/6/93 | - | .22-caliber rifle; two 12-gauge shotguns | 12-gauge shotgun (2); .22-caliber rifle | No [ay] |
| 149. Washington County Bar | Jackson, MS | 7/8/93 | - | - | - | - |
| 150. 101 California Street | San Francisco, CA | 7/1/93 | **Two INTRATEC TEC-DC9 semiautomatic pistols**, Colt (unknown model) .45-caliber semiautomatic pistol, and 40-round and 50-round large capacity ammunition magazines loaded with a mix of Black Talon and standard ammunition. According to the Las Vegas Metropolitan Police Department, Ferri purchased the pistols from two stores in Las Vegas: Super Pawn and Pacific Tactical Weapons. | **Two Intratec DC-9**, .45-caliber Colt semiautomatic handguns | .45-caliber Colt pistol; **Intratec DC-9 machine pistols** | Yes [az] |
| 151. Card club | Paso Robles, CA | 11/8/92 | - | - | - | No [ba] |
| 152. Watkins Glen | Watkins Glen, NY | 10/15/92 | - | 9mm Llama semiautomatic handgun | 9mm Llama pistol | No |
| 153. Lindhurst High School | Olivehurst, CA | 5/1/92 | - | .22-caliber sawed-off rifle; 12-gauge pump-action shotgun | .22-caliber sawed-off rifle; 12-gauge pump-action shotgun | No [bb] |
| 154. Phoenix | Phoenix, AZ | 3/15/92 | - | - | - | - |
| 155. Royal Oak Postal | Royal Oak, MI | 11/14/91 | - | .22-caliber Ruger sawed-off semiautomatic rifle | .22-caliber Ruger sawed-off semiautomatic rifle | No [bc] |
| 156. Restaurant | Harrodsburg, KY | 11/10/91 | - | - | .357 Magnum | No |
| 157. University of Iowa | Iowa City, IA | 11/1/91 | - | .38-caliber Taurus revolver | .38-caliber Taurus revolver | No |
| 158. Luby's Cafeteria | Killeen, TX | 10/16/91 | GLOCK 17 9mm semiautomatic pistol, Ruger P89 semiautomatic pistol, and 17-round and 15- round large capacity ammunition magazines. Hennard legally purchased the weapons from Mike's Gun Shop in Henderson, NV, in February and March of 1991. | 9mm Glock 17, 9mm Ruger P89 semiautomatic handguns | 9mm Glock 17 pistol; 9mm Ruger P89 pistol | No |
| 159. Post office | Ridgewood, NJ | 10/10/91 | - | - | **9mm Uzi machine pistol**, .22-caliber machine gun | Yes [br] |
| 160. GMAC | Jacksonville, FL | 6/18/90 | Universal M1 .30-caliber semiautomatic assault rifle, unknown make and model .38-caliber revolver, and a 30-round large capacity ammunition magazine. | .30-caliber Universal M1 carbine rifle; .38-caliber revolver | .30-caliber Universal M1 carbine; .38-caliber revolver | No [bd] |
| 161. Standard Gravure Corporation | Louisville, KY | 9/14/89 | **Chinese-made AK-47-type semiautomatic assault rifle**, two INTRATEC MAC-11 semiautomatic assault pistols, SIG SAUER unknown model 9mm semiautomatic pistol, unknown make and model .38-caliber revolver, and 30-round large capacity ammunition magazines. Wesbecker legally purchased the AK-47-type assault rifle from Tilford's Gun Sales in Louisville. | Two Intratec MAC-11, 9mm SIG Sauer semiautomatic handguns; **AK-47 Chinese variant semiautomatic rifle**; .38-caliber revolver | 9mm SIG Sauer pistol; **AK-47 Chinese variant semiautomatic rifle**; Intratec MAC-11 machine pistol; .38-caliber revolver; 9mm SIG Sauer pistol | Yes |

# Exhibit C
## List of Firearms Used in Public Mass Shootings
## 1982 – Oct. 2022

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 162. Stockton Schoolyard | Stockton, CA | 1/17/89 | **Chinese-made AK-47-type semiautomatic assault rifle**, Taurus unknown model 9mm semiautomatic pistol, a 75-round large capacity ammunition drum magazine, a 75-round large capacity ammunition rotary magazine, and four 35-round large capacity ammunition banana magazines. Purdy legally purchased the AK-47-type rifle at Sandy Trading Post, in Sandy, OR on August 3, 1988, and the Taurus 9mm pistol at Hunter Loan and Jewelry Co. in Stockton, CA on December 28, 1988. | 9mm Taurus semiautomatic handgun; **AK-47 Chinese variant semiautomatic rifle** | 9mm Taurus pistol; **AK-47 Chinese variant semiautomatic rifle** | Yes |
| 163. Montefiore School | Chicago, IL | 9/22/88 | - | - | .38-caliber revolver | No |
| 164. Old Salisbury Road | Winston-Salem, NC | 7/17/88 | - | - | .22-caliber rifle | No |
| 165. ESL | Sunnyvale, CA | 2/16/88 | - | .380 ACP Browning, 9mm Smith & Wesson semiautomatic handguns; Ruger M-77 .22-250 bolt-action rifle with scope; Mossberg 12-gauge pump-action, 12-gauge Benelli semiautomatic shotguns; .357 Magnum Smith & Wesson, .22 Sentinel WMR revolvers | .22 Sentinel WMR revolver; 9mm Smith & Wesson pistol; Mossberg 12-gauge pump-action shotgun; Ruger M-77 .22-250 bolt-action rifle with scope; .380 AP Browning pistol; 12-gauge Benelli semiautomatic shotgun; .357 Magnum Smith & Wesson revolver; | No [be] |
| 166. Shopping Centers | Palm Bay, FL | 4/23/87 | Strum, Ruger Mini-14 semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, five 30-round large capacity ammunition magazines, 180 rounds of ammunition, a shotgun (unknown make and model), and a pistol (unknown make and model). Cruse ordered the assault rifle on March 21, 1987. On April 17, 1987, he purchased 100-rounds of ammunition and six 30-round large capacity ammunition magazines. | Sturm, Ruger Mini-14 semiautomatic rifle; 20-gauge Winchester pump-action shotgun; .357 Ruger Blackhawk revolver | .357 Ruger Blackhawk revolver; Ruger Mini-14 semiautomatic rifle; Sturm; 20-gauge Winchester pump-action | No [bf] |
| 167. United States Postal Service | Edmond, OK | 8/20/86 | - | .22-caliber, two .45-caliber Colt Model 1911-A1 semiautomatic handguns | .45-caliber Colt Model 1911-A1 pistol; .45-caliber Colt Model 1911-A1 pistol; .22-caliber pistol | - [bg] |
| 168. Anchor Glass Container Corporation | South Connellsville, PA | 3/16/85 | - | - | .38-caliber snub-nosed revolver | No |
| 169. Other Place Lounge | Hot Springs, AR | 7/24/84 | - | - | .45-caliber semiautomatic pistol | No |

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| | | | Weapon Description From | | | Assault |
| | | | | | | |
| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 170.  San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | - | 9mm Browning P35 Hi-Power semiautomatic handgun; **9mm Israeli Military Industries Uzi Model A carbine semiautomatic rifle**; 12-gauge Winchester 1200 pump-action shotgun | **9mm Israeli Military industries Uzi Model A machine pistol**, 12-gauge Winchester  1200 pump-action shotgun, 9mm Browning P35 Hi-Power pistol | Yes |
| 171.  Dallas Nightclub | Dallas, TX | 6/29/84 | - | 9mm Smith & Wesson 459 semiautomatic handgun | 9mm Smith & Wasson 459 pistol | No  [bh] |
| 172.  Alaska Mining Town | Manley Hot Springs, AK | 5/17/84 | - | - | .30-06-caliber Ruger single-shot rifle | No |
| 173.  College Station | Collge Station, TX | 10/11/83 | - | - | - | No  [bi] |
| 174.  Alaska Back-County | McCarthy, AK | 3/1/83 | - | - | .223-caliber Ruger Mini-14 semiautomatic rifle, .22-caliber pistol | No |
| 175.  Upper West Side Hotel | New York, NY | 2/3/83 | - | - | - | No  [bj] |
| 176.  The Investor | Noyes Island, AK | 9/6/82 | - | - | .22-caliber | No |
| 177.  Welding Shop | Miami, FL | 8/20/82 | - | Mossberg 500 Persuader pump-action shotgun with pistol grip | 12-gauge shotgun | No |
| 178.  Western Transfer Co. | Grand Prairie, TX | 8/9/82 | - | - | .38-caliber revolver, .25-caliber semiautomatic pistol, carbine rifle | No |
| 179.  Russian Jack Springs Park | Anchorage, AK | 5/3/82 | - | - | .38-caliber pistol | No |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated November 23, 2022), the Citizens Crime Commission of New York City ("Mayhem Multiplied:

Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017), Washington Post ("The

Terrible Numbers That Grow With Each Mass Shooting,", updated May 12, 2021) and The Violence Project ("Mass Shooter Database," updated May 14, 2022). Identified Assault Weapons are in bold.

[a]   Description of weapons from "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017,

[b]   Description of weapons from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated November 23, 2022).

[c]   Description of weapons from Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting,", updated May 12, 2021).

[d]   California Penal Code sections 30510 and 30515 and California Code of Regulations, title 11, section 5499.

[ca]  "House Investigative Committee on the Robb Elementary Shooting Texas House of Representatives Interim Report 2022," July 17, 2022; "DDM4 V7", *Daniel Defense,* https://danieldefense.com/ddm4-v7.html, accessed

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|--|--|--------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

January 4, 2023.

cb  "Sheriff: Oxford High School shooter used 9 mm pistol recently purchased by father," *ClickOnDetroit* , December 1, 2021; "SP2022 Nitron Carry," *Sig Sauer* , https://www.sigsauer.com/sp2022-nitron-carry-size.html, accessed January 4, 2023.

cc  "The San Jose gunman appeared to specifically target his victims, sheriff says", *CNN,* May 28, 2021.

cd  "HM DEFENSE HM15F-MB-556 DEFENDER M5 223 REM,5.56X45MM NATO 16" 30+1 BLACK HARD COAT ANODIZED BLACK MIL-SPEC HM STOCK," *Carter's Country* , https://www.carterscountry.com/product/hm-defense-defender-m5-223-rem5.56-nato-16-301-black-hard-coat-anodized-mil-spec-hm-stock, accessed January 5, 2023.

ce  "Instruction Manual for Ruger AR-556 Pistol," https://ruger-docs.s3.amazonaws.com/_manuals/AR-556_Pistol-K94Vg4d.pdf.

e  "From Midland to Odessa, shooter cut a 64-minute path of terror," *Houston Chronicle* , September 8, 2019.

cf  "The Pistol That Looks Like A Rifle: The Dayton Shooter's Gun," *npr* , August 8, 2019.

f  "11 Killed in Synagogue Massacre; Suspect Charged With 29 Counts," *New York Times* , October 27, 2018.

g  "Bakersfield mass shooting 'very calculated,' came after ugly divorce, officials say," *Los Angeles Times* , September 14, 2018; "Model S&W500," Smith & Wesson, https://www.smith-wesson.com/firearms/model-sw500-0, accessed September 25, 2018.

h  "Authorities seized Waffle House shooting suspect's AR-15 after arrest, dad gave them back," *The Mercury News* , April 23, 2018; "Family of murder victim sues Waffle House suspect and his father for $100 million," CBSWJTV, July 11, 2018; "Family of Waffle House victim in Nashville sues accused shooter's father," Reuters, May 15, 2018.

i  "Florida shooting suspect bought gun legally, authorities say," *USA Today* , February 15, 2018; "Florida school shooter's AR-15 may have jammed, saving lives, report says," *Miami Herald* , February 27, 2018.

j  "Suspect in quadruple killing at car wash dies," *CNN* , January 30, 2018.

k  "California mass shooter made his own rifles," *NBC News* , November 16, 2017; "California shooter built his own illegal guns, officials say," *USA Today* , November 15, 2017.

l  "What we know about the rifle used in the Texas church massacre," *CNN* , November 6, 2017; "The Latest: 2 men who pursued gunman attend shooting vigil," *The Associated Press* , November 6, 2017; "Ruger AR-556," Ruger, https://ruger.com/products/ar556/specSheets/8500.html, accessed October 22, 2018.

m  "List: Guns and evidence from Las Vegas shooter Stephen Paddock," *KTNV* , January 19, 2018; "47 guns, loaded high-capacity magazines found in Vegas shooter's hotel suite and Nevada home," *ABC News* , October 4, 2017; "The 'tricked out' guns Las Vegas shooter used in massacre," *New York Post* , October 3, 2017.

n  "Washington shooting victims ranged in age from 16 to 95, coroners say," *CNN* , September 27, 2016; Brown, Jason, "What You Should Know About .22 Rimfire," NRA, August 16, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

o  "Exclusive: Photo of the Saiga AK-74 Rifle Used at Dallas Shooting," *Law Officer* , July 10, 2016.

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|--|--|-------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

[p] "Sig MCX Owners Manual: Handling & Safety Instructions," *Sig Sauer* , https://www.sigsauer.com/wp-content/uploads/2016/07/MCX.pdf, accessed October 23, 2018; Sig Sauer website,

https://www.sigsauer.com/products/firearms/rifles/?state_compliant=1103, accessed October 24, 2018.

[q] "San Bernardino Guns Originally Bought Legally, Later Modified," *The Wall Street Journal* , December 4, 2015.

[r] "Umpqua Community College 2015 shooting report: What we've learned," *The Oregonian* , September 8, 2017.

[s] "Chattanooga Shooting Reignites Gun Control Debate After Mohammad Youssef Abdulazeez Used AK-47 Assault Weapon To Kill Marines," *International Business Times* , July 17, 2015; "Purple Hearts just approved

for Marines and sailor targeted in Chattanooga attack," *The Washington Post* , December 17, 2015.

[t] "John Zawahri, suspected gunman in deadly Santa Monica shooting, left farewell note, police say," *CBS News* , June 14, 2013.

[u] "Names of victims emerge after deadly Federal Way shooting," *Federal Way Mirror* , April 24, 2013.

[v] "Upstate New York Shooting Update: Kurt Myers, suspected gunman, killed by police in shootout," *CBS News* , March 14, 2013.

[w] "Fate of Sandy Hook lawsuit against gun maker could be decided by a slingshot," *NBC News* , November 14, 2017; "Embargo firing a run on Russian-made guns: Added restrictions put arms in short supply,"

*San Antonio Express-News* , August 11, 2014.

[x] "Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol," *New York Times* , July 24, 2012; "M&P15 Centerfire Rifles Safety & Instruction Manual," *Smith & Wesson* ,

https://www.smith-wesson.com/sites/default/files/owners-manuals/M%26P15_CF_Rifle_Manual_10-20-15.pdf, accessed October 25, 2018.

[y] "IHOP gunman used illegally altered AK-47, sheriff says," *Las Vegas Review-Journal* , October 5, 2011.

[z] "The mass killer, the cop and the armed citizen.(THE AYOOB FILES)," *The American Handgunner* , November 1, 2013.

[aa] "6 Killed In Grand Prairie Roller Rink Shooting," *CBS DFW* , July 23, 2011.

[ab] "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News* , September 13, 2010.

[ac] "Hialeah: Only the Latest Mass Shooting by a Concealed Carry Killer," Huffington Post, July 30, 2013;"Hialeah gunman's rage over estranged wife leaves 5 dead," *Sun Sentinel* , June 7, 2010.

[ad] "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press* , March 15, 2016.

[ae] "Instructions for Operation and Care of the Remington Model 11-'48, Sportsman-'48 Autoloading Shotguns," https://www.remington.com/sites/default/files/Model%2011-48.pdf, accessed October 24, 2018.

[af] "Images, suicide note released in mall massacre," *Nation World News* , December 7, 2007; "Romanian Kalashnikov Rifles," guns.net, accessed at http://www.gunsnet.net/Linx310/model.htm on July 28, 2005 via

the Internet Archive WayBack Machine (accessed September 26, 2018).

[ag] "What happened in Crandon on Oct. 7," *Los Angeles Times* , June 8, 2008.

[ah] "Firearms Tutorial: Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| | | | Weapon Description From | | | Assault |
|---|---|---|---|---|---|---|
| **Case** | **Location** | **Date** | **Citizens Crime Commission** [a] | **Mother Jones** [b] | **Washington Post** [c] | **Weapon?** [d] |
| **(1)** | **(2)** | **(3)** | **(4)** | **(5)** | **(6)** | **(7)** |

ai   "5 Dead After Louisiana Church Shooting," *New York Times* , May 21, 2006.

aj   "Police: Seattle shooter said 'plenty for everyone'," *NBC News* , March 27, 2006.

ak   "Both sides cite anger, hostility in killings; Hearings begin with law officers' testimony, grisly images," *Pioneer Press* , September 11, 2005.

al   "Seven die in Chicago warehouse shooting," *CNN* , August 27, 2003.

am   "Man Kills 5 Co-Works at Plant and Himself," *New York Times* , July 9, 2013; "Instruction Manuals & Product History," *Ruger* , https://ruger.com/service/productHistory.html, accessed October 23, 2018; Ruger Mini-14

manuals https://ruger-docs.s3.amazonaws.com/_manuals/mini14-180.pdf, https://ruger-docs.s3.amazonaws.com/_manuals/mini14-181-186.pdf, https://ruger-docs.s3.amazonaws.com/_manuals/mini14-580.pdf, accessed

October 23, 2018; "What You Should Know About .22 Rimfire," *NRA* , August 16, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

an   "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press* , September 14, 2001.

ao   "Workplace Deaths Leave No One Untouched," *Chicago Tribune* , February 7, 2001; "Update 1-Source of guns used in US factory shootings sought," *Associated Press* , February 6, 2011; "SKS Rifle: Simonov Type

56," Department of the Army, October 1969, http://pdf.textfiles.com/manuals/FIREARMS/sks_56.pdf, accessed October 24, 2018; "Why .30-30 Winchester Will Never Die," *NRA* , February 2, 2016; "Firearms Tutorial:

Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

ap   "Houston Rampage Leaves 4 Victims, Gunman Dead," *The Record* , January 10, 2001.

aq   "Man Charged in Killings Evaded Strict Gun Laws," *New York Times* , December 28, 2000.

ar   "How they were equipped that day," *Jefferson County Sheriff* , http://www.cnn.com/SPECIALS/2000/columbine.cd/Pages/EQUIPMENT_TEXT.htm, accessed September 26, 2018.

as   "What You Should Know About .22 Rimfire," *NRA* , August 16, 2017, Kipland Philip Kinkel v. Rob Persson, 13C13698;A155449 (2018); Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

at   "Powerful, semiautomatic rifles in Jonesboro killers' arsenal," *Associated Press* , April 3, 1998; "Post WWII Commercially Manufactured M1 Carbines," *Universal Firearms* ,

http://www.m1carbinesinc.com/carbine_universal.html, accessed September 26, 2018; "77-Series Ruger 77/44," Ruger, https://ruger.com/products/77Series7744/models.html, accessed October 24, 2018; "Model

742," Remington, https://www.remington.com/sites/default/files/Model742.pdf, accessed October 24, 2018.

au   "Unfinished business," *Dateline NBC* , December 21, 2006.

av   "Explosive hoarded by killed of 4," *Chicago Tribune* , August 21, 1997

aw   "High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States," *Violence Policy Center* , accessed September 9, 2018.

ax   "An Airman's Revenge: 5 Minutes of Terror," *The New York Times* , June 22, 1994.

ay   "Soldier from Pasco held in N.C. killings," St. Petersburg Times, August 8, 1993; "What You Should Know About .22 Rimfire," *NRA* , August 16, 2017.

az   "San Francisco massacre prompts families' suits," *The Las Vegas Review-Journal* , May 19, 1994; "Death Over the Counter," *The Washington Post* , July 27, 1993; "TEC-DC9 Manual," Intratec Firearms,

**Exhibit C**
**List of Firearms Used in Public Mass Shootings**
**1982 – Oct. 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|---|---|--------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

http://pdf.textfiles.com/manuals/FIREARMS/intratec_tec_dc9.pdf, accessed October 22, 2018.

ba  "Morro Bay changed forever by killings," *The Fresno Bee* , November 10, 1992

bb  "Gunman may have blamed teacher who flunked him," *Houston Chronicle* , May 3, 1992;  "What You Should Know About .22 Rimfire," *NRA* , August 16, 2017.

bc  "3 Killed, 8 Injured in Shooting Rampage at Post Office Crime," *Los Angeles Times* , November 15, 1991; "A 'Primer' About Rimfire Vs. Centerfire Ammunition," *NRA* , November 21, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

br  "Four Killed in Post Office, Home; Ex-Postal Employee In Custody," *AP News* , October 10, 1991.

bd  "Post WWII Commercially Manufactured M1 Carbines," *Universal Firearms* , http://www.m1carbinesinc.com/carbine_universal.html, accessed September 26, 2018.

be  "Firearms Tutorial: Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

bf  "Sales Of Exotic Weapons Are Mostly Cash And Carry," *Orlando Sentinel* , May 18, 1987; "Instruction Manuals & Product History," *Ruger* , https://ruger.com/service/productHistory.html, accessed October 23, 2018; and Ruger Mini-14 manuals,

bg  https://ruger-docs.s3.amazonaws.com/_manuals/mini14-180.pdf, https://ruger-docs.s3.amazonaws.com/_manuals/mini14-181-186.pdf; https://ruger-docs.s3.amazonaws.com/_manuals/mini14-580.pdf, accessed October 23, 2018."Authorities Piece Together Tragedy Gunman at Edmond Post Office 'Knew Where to Shoot People'," *The Oklahoman* , August 22, 1986.

bh  "6 Die in Dallas Club as Enraged Man Fires Wildly," *New York Times* , June 30, 1984.

bi  "Multiple charges filed in murder, kidnapping spree," *UPI Archives* , October 12, 1983.

bj  "Gunman kills four and wounds a fifth at west side hotel," *The New York Times* , February 4, 1983.

EXHIBIT "B"

EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br>& PISTOL CLUBS, INC., et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br>     Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br>     Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>     Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Expert Report of Dennis Baron**

---

**EXPERT REPORT OF DENNIS BARON**

I, Dennis Baron, the undersigned, declare as follows:

1.      I have been retained by the New Jersey Attorney General's Office to provide expert opinion and testimony regarding Corpus Linguistics research. I am professor of English and linguistics, emeritus, at the University of Illinois at Urbana-Champaign. I have written ten books on various aspects of the English language, with two of them focused on language and law. I am being compensated at a rate of $350 per hour.

2.      For this report I have examined the historical use of the terms *arms* and *accoutrements* in the Founding Era (1760–1820) and during the Civil War and Reconstruction era (1860–1890). It is my opinion that,

   a)  during those periods the words "arms" and "accoutrements" typically signified two distinct lexical or semantic categories.

   b)  during those periods, ammunition containers were typically categorized as "accoutrements," not "arms."

3.      The present case involves firearm magazines. I have found that the term "magazine" was not generally used to describe an ammunition container until well into the nineteenth century, and that use of "magazine" did not become common until the early twentieth century. The detachable ammunition containers from the Founding Era to the later nineteenth century were typically referred to as "cartridge cases," "cartridge boxes," or "cartouch cases" (the words "cartridge" and "cartouch" both derive from the same French word and are synonymous in English during the Founding Era; of this pair, "cartouch" eventually falls out of use and "cartridge" is the term that remains in use today).  Because both the cartridge case and the modern magazine are ammunition containers, it made the most sense to treat the cartridge case as an analogue to the

modern firearms magazine. In the Founding Era and during and after the Civil War, cartridge cases were typically considered accoutrements, not arms.

4.      I have also examined the lexical evidence for repeater air guns, which are sometimes referred to as "wind guns," and the rare terms "magazine wind-gun" and "magazine gun" in the Founding Era. "Air guns" used compressed air instead of gunpowder to propel a ball. Repeater air guns were capable of firing multiple shots before requiring the user to reload the weapon. Although a few artisans did invent air guns capable of firing multiple balls without reloading the ammunition or recharging the air cylinder, such guns were rare in England and America. In addition, although magazine firearms were patented as early as 1860, they remained military weapons during and shortly after the Civil War, with only a few references to them in the corpora before the 1880s.

## BACKGROUND AND QUALIFICATIONS

5.      I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the University for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, in addition to topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship for work on a book on language and law, and, most recently, a Guggenheim Fellowship for work on

my latest book on language and law. I have also published books on language reform, on usage, and on gender in language.

6.      Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, 2023). In addition, I served as lead author on what came to be called "the Linguists' Brief" in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a brief cited both by Justice Scalia in the majority opinion, and by Justice Stevens in his dissent. I was a co-author on another brief by professors of linguistics and corpus linguistics, cited in *New York State Rifle and Pistol Ass'n. v. Bruen*, 142 S. Ct. 2111 (2022), which Justice Breyer cited in his dissent. In that dissent, Justice Breyer also quoted directly from my essay "Corpus Evidence Illuminates the Meaning of 'Bear Arms'" (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical meaning and the Second Amendment at the Federalist Society at the University of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the University of Chicago, at Brigham Young University Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law. I have also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times*. And I have submitted declarations or reports in a number of cases, including *Kenneally v. Raoul, et al.*, No. 3:22-cv-50039 (N.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.); *Harrel v. Raoul*, No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Gates v. Polis*, No. 1:22-cv-1866-GPG-SKC (D. Colo.); *Rocky Mountain Gun Owners, et al. v. Town of Superior*, et al., No. 1:22-cv-02680 (D. Colo.) *Ocean State Tactical, LLC, et al. v. State*

*of Rhode Island*, No. 1:22-cv-00246-JJM-PAS (D.R.I.); *Hanson, et al, v. District of Columbia, et al.*, No. 1:22-cv-02256-RC (D.D.C.); *Delaware State Sportsmen's Association, Inc., et al., v. Delaware Department of Safety and Homeland Security, et al.*, No. 1:22-cv-00951-RGA, (D. Del.); *Capen, et al., v. Campbell, et al.*, No. 22-cv-11431-FDS (D. Mass.); *National Association for Gun Rights, et al., v. Lamont, et al.*, No. 3:22-CV-1118 (D. Conn.); *National Association for Gun Rights, et al., v. Lopez*, No. 1:22-cv-404-DKW-RT (D. Haw.); *Oregon Firearms Federation, et al, v. Kotek, et al.,* (lead case with three additional, consolidated) No. 2:22-cv-01815-IM (D. Or.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Rupp, et al., v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.); *Duncan, et al. v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); and *Fouts, et al., v. Bonta*, No. 3:19-cv-01662-BEN-JLB (S.D. Cal.). I have testified by deposition and at trial in the following case: *Oregon Firearms Federation, et al. v. Kotek,* No. 2:22-cv-01815-IM (D. Or.). In the past twenty years I have also served as an expert in nineteen cases involving document interpretation.

7.      My recent essay, "Look It Up in Your *Funk and Wagnalls*: How Courts Define the Words of the Law," an analysis of how judges incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, appears in *Dictionaries*: *Journal of the Dictionary Society of North America*, vol. 43.2 (2022): 95–144.

8.      This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of one or more large, digitized corpora consisting of many millions of words.

**Theory and Methodology**

9.      Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text. Initial work in corpus linguistics did

not typically involve legal issues. Literary scholars, taking advantage of the ability of computers to search large digitized databases, facilitated their analysis of print materials by developing computerized concordances to the works of Shakespeare, Milton, and other major English writers. They plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt. Soon, in addition to solving literary mysteries, linguists successfully applied computerized textual analysis in a number of criminal cases in the United States and in England involving, for example, the authorship of a ransom note or an email. Lexicographers, who began compiling analog databases of text in the late nineteenth century, began to digitize their data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.

10.    The Oxford English Dictionary (OED) is the standard dictionary of the English language compiled on historical principles. As a graduate student at the University of Michigan in 1970, I coded analog texts from the relevant OED files to help build the computerized database for the Dictionary of Early Modern English, which covers the period from 1500–1800 and is particularly relevant to the language of the Founding Era. Today, major dictionaries like the OED and the Merriam-Webster suite of dictionaries rely on public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The major dictionary makers working on other languages use similar databases in their own work.

11.    Over the past twenty years, legal corpus linguistics (LCL) has developed as a subset of corpus linguistics. LCL involves the analysis of digitized corpora of current and historical

English to establish meaning—often referred to as "original public meaning"—in statutes and in the Constitution. LCL often provides more information about the meaning of words and phrases than can be gleaned from dictionary definitions. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt. In *Muscarello v. United States*, 524 U.S. 125 (1998), we find an early computer search to help determine the meaning of a word in a statute. In *Muscarello,* the Supreme Court considered whether "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or trunk, can be deemed to be within the scope of the statutory phrase 'carries a firearm.'" To answer that question in the affirmative, Justice Breyer searched two computerized newspaper databases (Lexis/Nexis, for the New York Times, and Westlaw, for "US News") to clarify the meaning of the words "carry," "vehicle," and "weapon." In 2012, Judge Richard Posner, of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Judge Posner ran a Google search to confirm that the word "harbor" in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute. *United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012).

12.     More principled, scientific database searches soon followed, and in 2018 Justice Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, summarized the latest research in corpus linguistics and LCL as a way to determine ordinary meaning, and more specifically, original public meaning, with more clarity (Thomas Lee and Stephen Mouritsen, "Judging Ordinary Meaning," *Yale Law Journal* 127(2018): 788–879). Jurists over the past few years have found that in several cases, LCL

proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the Oxford English Dictionary, as well, allowing a more precise interpretation of historical text data.

13.     In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on legal corpus linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, corpus linguistics has drawn increased attention from the courts, including a recent mention in the Sixth Circuit (*Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 440 (6th Cir. 2019) (Thapar, J., concurring)), as well as a comment by Justice Alito in his concurrence in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation.

14.     Several large databases have come online in the past few years that facilitate LCL research. The Center for Law and Corpus Linguistics at Brigham Young University (BYU) hosts the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words and covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), with data from 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth century, the Corpus of Historical American English (COHA), initially developed at BYU but now independent of that institution, currently contains 475 million words of text from 1820–2020. The size of these databases continues to grow as more works are digitized, coded, and added to the corpora. In compiling this report, I reviewed each of these databases. Some of the corpora provided data for some lexical searches, but not for others. The examples cited below specify which corpus they are drawn from.

15.     Critics of LCL have objected that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people" who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora. It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists and professional writers. Although "ordinary people" are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge. A reading-difficulty formula like the commonly used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, Adult Literacy in America (National Center for Education Statistics, U.S. Department of Education, 1993; https://nces.ed.gov/pubs93/93275.pdf), the average American adult tends to have a seventh- or eighth-grade reading level. The National Center for Education Statistics no longer uses "grade level," instead rating literacy levels for Americans between ages 16 and 65 on a scale from 1 to 5; measurements conducted in 2003 showed no significant change from the 1993 NCES report; and the most recent data, from 2014, confirm that most adult Americans still test at or below level 2, with 4.1% testing *below* level 1 (https://nces.ed.gov/pubs2019/2019179/index.asp).

16.     In order to counter any "elite" bias that may be found in databases like COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment. Newspapers of the eighteenth and nineteenth centuries were the principal means of communicating news and information. As such, they embodied much

of the language of the "ordinary people" who read them. These early newspapers also provide researchers with more data for the nineteenth century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.[1] Newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news. Although newspaper subscribers tended to be "elites," newspaper content was widely shared by word of mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

17.     Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans. Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

18.     The newspaper databases that I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (compiled by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this report, both Readex and newspapers.com provide the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later nineteenth century.

---

[1] Because of changes in print technology and the spread of literacy, Founding Era newspapers differed from the newspapers of the post-Civil War era. Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early nineteenth century, when the Industrial Revolution drastically changed printing methods. The first printing press was adapted by Gutenberg from the design of the traditional wine press, and for centuries, printing was a slow and labor-intensive process. As a result, newspapers in the founding era were small by today's standards, averaging four to eight pages. Publication was less frequent as well. Papers tended to appear weekly or semi-weekly, rather than daily.

19.     All the databases contain some duplicates. COFEA and COEME digitize multiple editions of the same work. The newspaper databases duplicate some, though not all, of one another's content; in addition, they contain a number of duplicate stories because, particularly in the period of newspaper growth during the nineteenth century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not. (I therefore exclude duplicate citations from all my corpus searches). The databases often offer more insight into the meaning of words and phrases than simply going to a dictionary. Jurists from Learned Hand[2] and Felix Frankfurter[3] to Frank Easterbrook[4] and Richard Posner[5] have warned their colleagues not to make a fortress of the dictionary. Like dictionaries, corpora are by necessity incomplete. LCL does not replace dictionaries, but it does provide an important supplement to them. Typical LCL analyses are conducted using a keyword and a few words surrounding it, to supply context. Sometimes a limited specific citation is ambiguous. And sometimes, a search of the data set returns only small number of citations, perhaps ten or twenty rather than a few hundred. In such cases, I supplement my use of LCL with a reading of the full context of the citations in order better to determine the keyword's meaning and the relevance of the citation to the search question.

**The meaning of arms and accoutrements in the databases**

20.     There are more than 150,000 citations for the word "arms" alone in the various databases that I consulted, many of them referring not to weapons but to limbs or, in some cases,

---

[2] *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).
[3] *Dennis v. United States*. 341 U.S. 494, 523 (1951) (Frankfurter, J., concurring).
[4] Frank H. Easterbrook, "Text, History, and Structure in Statutory Interpretation," *Harvard Journal of Law and Public Policy* 61, 67 (1994).
[5] *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012).

heraldic symbols (that is, a coat of arms). I selected a random sample of about 500 citations from COFEA and newspapers.com to see what a search for "arms" alone might turn up. I found that the cites where "arms" referred to weapons did not generally specify what constituted an "arm," but I did find that in many of the cites "arms" appears in collocation with "accoutrements," with "ammunition," or with both "accoutrements" and "ammunition."  I then searched for the phrase "arms and accoutrements" in the Founding Era and during the period following the adoption of the Fourteenth Amendment. I also asked whether the term "magazine" as used today falls within the meaning of the term "arms" when used on a standalone basis during those eras, or whether the magazine and its earlier analogues, the cartridge case and cartouch box, are treated as accessories or accoutrements, rather than arms. I look as well at lexical evidence in the Founding Era on the "air rifle," or "air gun," and assess any lexical evidence about the availability and popularity of the repeater air gun and the use of the term "magazine" in association with such guns.

21.    In the eighteenth and nineteenth centuries, "magazine" was a word that meant "storehouse, depot." A magazine was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a magazine was a building designated for storing gunpowder, and because gunpowder was an explosive substance, it was subject to strict regulation: some towns banned or heavily regulated the storage of gunpowder within city limits. The word "magazine" was not typically used to refer to the compartment of a gun containing bullets until late in the nineteenth century. Although the term "magazine" appears in the phrase "magazine wind gun" in 1744, that usage is marked as "rare" by the Oxford English Dictionary, which also marks the phrase "magazine wind gun" as "obsolete." References to "magazine guns," "magazine rifles," or "magazine carbines" appear as early as 1860, when C. M. Spencer received a patent for a "magazine gun" (U.S. Patent No. 27,393, March 6, 1860). B. T. Henry patented a "magazine fire

arm" that same year (U.S. Patent No. 30,446, Oct. 16, 1860). And N. King patented another "magazine fire arm" in 1866 (U.S. Patent 55,012, May 22, 1866).

22.     Although patents for guns with "magazines" capable of holding multiple bullets appear as early as 1860, in its separate, main entry for "magazine," the OED gives the earliest use of "magazine" meaning 'a bullet storage container' as 1868, typically associated with weapons designed for military rather than civilian use. Though repeater guns began to be used by the military during and shortly after the Civil War, the corpus data suggests that use was not common, even in the military, nor were they commonly used by civilians at the time.

23.     The data suggests that "cartridge boxes," which I treated as analogous to today's LCMs, would have been viewed as accoutrements, the ancillary equipment associated with soldiering, or service in the military.

24.     The OED defines "accoutrements" as, "items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments." [OED online, s.v. "accoutrement"; the word typically appears as a plural.]

25.     Thus, the military sense of "accoutrements" generally refers, not to weapons, but to other accessories worn or carried by soldiers. The OED illustrates this second, military, sense, with an example from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here Wellington, widely recognized as a consummate soldier who would be well aware of military terminology, and who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between "arms" and "accoutrements."

26.     The OED definitions are instructive. But in order to determine more specifically whether the term "accoutrements" included "cartridge boxes," the predecessor to modern

magazines, I consulted two digitized historical databases: COFEA and COEME. A COFEA search returns these examples where "cartridge boxes" and "cartouch boxes" are specifically included in the category of accoutrements, not arms

a. 1776 – "The General is surprised to find the Militia applying for Cartouch Boxes and other Accoutrements." (George Washington, General Orders, February 17; here Washington, who certainly knew his military terminology, refers to the fact that militia members often failed to come equipped with their accoutrements, including cartridge or cartouch boxes; see also Carl Bogus, *Madison's Militia,* Oxford Univ. Press, 2023, for a discussion of the militia's general unpreparedness for battle during the Revolutionary War).

b. 1777 – "Many of their Arms are indifferent, and almost the whole [of Washington's troops] are destitute of pouches and Other necessary Accoutrements." (George Washington, Letter to John Hancock, October 10–11; the pouches in question are ammunition holders; another instance where Washington distinguishes between arms and accoutrements).

c. 1777 – "The cartouch boxes and every other species of military accoutrements annexed to the persons of the officers and soldiers of General Burgoyne's army, ought, agreeably to the spirit of the Convention, and the technical interpretation of the word *arms* in similar cases, to have been delivered up…. though the surrender of *arms* only is specified . . . yet the cartouch boxes and other military accoutrements belonging to the noncommissioned officers and privates were without hesitation given up to the commissaries of the American Army." (Journals of the Continental Congress 9, December, 1777, p. 1059).  An interesting example where the first part suggests that *accoutrements* are "arms" to be surrendered, while the second part suggests that, although the terms of surrender required the losing British to give up their "arms only," they also voluntarily gave the Americans their accoutrements. Given that the Americans were eager to acquire as much war equipment as possible, the victors in this case surely wanted to get everything they could from the British soldiers.

d. 1778 – "[T]he board, on the 17th of April, impowered a Capt. Starr of Middleton in Connecticut to receive a quantity of public leather of Colo. Trumbull, and get it made up into shoes and accoutrements, half of each, the cartridge boxes upon the new model; and to send on both to the main army…." (Timothy Pickering, Letter to George Washington, June 9, 1778. At the time, cartridge boxes were made of wood or leather, or a combination of the two).

e. 1783 – "And as to cartridge boxes and other leathern accoutrements, saddles & other furniture for dragoons…." (Timothy Pickering, Letter to George Washington, April 22; the word "other" sweeps "cartridge boxes" into the general

category of accoutrements).

27.     And COEME adds this example, where "cartridge box" appears in a list that includes "accoutrements" but not "arms":

    a.  1788 – "If you could only tell us how to keep papa at home, my drum, spontoon, cartouch box, and accoutrements, should all be yours." (*The Children's Friend, Translated from the French*).

28.     My review of the corpora also confirmed that "accoutrements" are regularly referred to separately from "arms." A COFEA search for the occurrence of "accoutrements" within six words of "arms" returned 873 hits (including a small number of duplicates). A similar search of COEME returned 126 hits, the earliest from 1656. I determined that the two search terms, "arms" and "accoutrements," often appear together as a single phrase, "arms and accoutrements," typically in military contexts having to do with an army or militia unit. "Accoutrements" often occurs in a list alongside, but separate from, ammunition: "arms, accoutrements, (and) ammunition," though when ammunition is not listed separately, the term "accoutrements" will generally include ammunition. The second OED citation for "accoutrements," dated 1902, differentiates "ammunition" from "accoutrements": "When they landed they brought on shore besides a quantity of ammunition and accoutrements…and large stores of flour, sugar and tobacco, &c." (G. S. Whitmore, *Last Maori War* i. 4).

29.     "Arms" as a stand-alone term refers to weapons. "Arms" almost never includes ammunition or ammunition storage containers such as cartridge boxes. These are the three examples that a COHA search returns:

    a.  1780 – "It is necessary to obtain ammunition, arms and accoutrements, and as many horses as you can get" (William Dobein James, "A Sketch of the life of Brig. Gen. Francis Marion and a history of his brigade," 1820—although this account was published in 1820 it quotes from a letter dated 1780).

b. 1909 – "Lyon was ordered to deliver to Governor Yates 10,000 stand of arms with accoutrements and ammunition." (Robert J. Rombauer, "The Union Cause in St. Louis in 1861").

c. 1949 – "It will be necessary that arms, ammunition, accoutrements, tents and camp equipage be deposited there for them the troops." (Francis F. Beirne, "War of 1812").

30.     The "cartridge box" or "cartouch box"—the precursor to today's "magazine"—is typically mentioned in lists of accoutrements, often in connection with other items worn with a soldier's uniform. The "cartridge box" almost never appears to be included among a soldier's weapons. The OED defines "cartridge box" as "a box for storing or carrying cartridges; the case in which a soldier carries his supply of cartridges" (OED online; this definition covers "cartouch box" as well). The OED cites the definition in Smyth and Belcher's *Sailor's Word-Book* (1867) to illustrate its function. Here is the full definition of "cartridge-box" in that dictionary of navy terminology: "a cylindrical wooden box with a lid sliding upon a handle of small rope, just containing one cartridge, and used for its safe conveyance from the magazine to the gun—borne to and fro by the powder-monkeys (boys) of old. The term is loosely applied to the ammunition-pouch" (Admiral W. H. Smyth and Vice-Admiral Sir E. Belcher, *The Sailor's Word-Book: An Alphabetical Digest of Nautical Terms,* London, 1867; see ¶ 58, below, for the authors' definition of "magazine" as a gunpowder storeroom either on land or on a ship). The OED offers an 1892 citation for "magazine" as the equivalent of a cartridge box, calling such usage "obsolete and rare": "W. W. Greener, *Breech-loader* 184 Cartridges are best carried in a magazine of solid leather" (OED online, *s.v.* magazine, IV (d)). By that time, "magazine" was more typically used in the sense we use it today, "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech" (OED online, s.v. magazine, sense IV (b)).

31.     A search of Readex America's Historical Newspapers for "cartridge box," and the synonymous "cartouch-box," for the Founding Era years 1750–1790 returns 176 citations. including multiple duplicates. A Readex search for the period after the adoption of the Fourteenth Amendment, from 1868–1890, returns 1,306 citations, also with many duplicates. The following examples show instances where "cartouch boxes" or "cartridge boxes," are categorically separate from arms or appear in the list of accessories to arms (examples (a), (b), (d), (e), (g), (h), (i)). And examples (f), (j), (k), (l), (n), (o), (p), (q), and (r) clearly show that cartridge boxes are accoutrements, not arms:

a.  1756 – "Every such Male Person . . . provide himself with one well fixed Musket, or Fuzee, with a Worm and Priming Wire, one Cartouch Box, with nine charges of Gun Powder, and Ball suitable therein, and three good Flints … and shall keep such Arms and Ammunition by him, in good Order." *Pennsylvania Gazette,* May 13, 1756. The parallel structure of arms and ammunition suggests that the Musket and Fuzee are arms, the rest, accoutrements.

b.  1774 – "That each man be provided with a good firelock and bayonet fitted thereon, half a pound of powder, two pounds of lead, and a cartouch box, or powder-horn and bag for ball, and be in readiness to act on any emergency." Proceedings of the Continental Congress, *Pennsylvania Journal,* December 21, 1774. Again, the parallel structure suggests that firelock and bayonet are the arms, while powder, lead, and cartouch box are accessories.

c.  1775 – "That each Inhabitant, or Person, as aforesaid, who shall provide Arms for himself, well fixed with a good Bayonet and Cartouch-Box, shall be paid a minimum of 10s." *The Massachusetts Gazette,* May 19, 1775. Here again, arms and cartouch boxes seem separate categories.

d.  1775 – "We hear from Charlestown, South-Carolina, that on the 21st of March, at Night, about eight Hundred Stand of Small Arms, 2 Hundred Cutlasses, and all the Cartouch-Boxes, fit for Service, with several Bundles of Match & some Flints, were taken out of the public Armoury." *New Hampshire Gazette,* June 2, 1775.

e.  1775 – "Deserted from Colonel Woodridge's regiment . . . Martin Nash . . . carried away a long gun of Gen. Pomeroy's make, a cartridge box and good stock of ammunition belonging to the province." *New England Chronicle,* November 9, 1775.

f.  1778 – "List of Necessaries and Accoutrements for each Horseman: 1. A well-tempered sword . . . 2. A carbine, fusee, or short blunderbuss . . . 3. A pair of pistols and holsters. 4. A sword-belt—a belt for the carbine . . . 5. A cartridge-box to buckle round the waist,

16

with twelve tin pipes for the cartridges. 6. A helmet . . . 7. A saddle….” *New-Jersey Gazette* March 25, 1778. The mention of the cartridge box further down this list suggests that it is an accessory.

g.  1785 – “A Neapolitan officer was killed in the same engagement by a cartouch box taking fire while charging the guns.” *South-Carolina Weekly Gazette,* August 4, 1785.

h.  1787 – Abstract from the Militia Law. “That every non-commissioned officer and private soldier of the said militia . . . shall equip himself . . . with a good fire-arm, with a steel or iron ramrod, a spring to retain the same, a worm, priming wire and brush, a bayonet fitted to his fire-arm, and a scabbard and belt for the same, a cartridge box that will hold fifteen cartridges at least, six flints, one pound of powder, forty leaden balls suitable for his fire-arm, a haversack, blanket, and canteen.” *Massachusetts Gazette,* February 2, 1787.

i.  1787 – “All persons liable to do Militia Duty . . . must provide themselves with proper arms and accoutrements, viz. a musket and bayonet, a cartouch box or pouch that will contain twenty-four cartridges.” *State Gazette of South Carolina,* July 16, 1787. Parallel structure here suggests that musket and bayonet are arms, cartouch box, pouch, and cartridges are accoutrements.

j.  1793 – Cartridge boxes appear under the category “military stores” in this multi-page “List of Ordnance, Arms, and Military Stores” in *American State Papers,* Senate, 3rd Congress, First Session, vol. 1, p. 45. Items on this list also include “bullet pouches,” “gun rods,” “worms,” and “fuses.”

k.  On p. 47, “cartouch boxes” and “cartridge boxes” appear under “military stores.” On p. 49, “musket cartridges” themselves are listed as “military stores.” Suggesting that these lists may be regarded as *ad hoc* rather than definitional, on p. 50, “cartouch boxes” are listed under “arms.” But on pp. 52 and 57, “cartouch boxes” appear under “Military Stores.” On p. 60, “cartridge boxes” and “musket cartridges” are listed under “stores.” In sum, “cartridgte boxes” and synonyms are most commonly listed as stores, not arms. https://memory.loc.gov/cgi-bin/ampage?collId=llsp&fileName=016/llsp016.db&recNum=49

l.  1868 – “Government Sale at Watertown Arsenal Mass. . . . Lot of cavalry accoutrements, consisting of Cartridge Boxes, Pistol Holsters, Sabre Belts, Knots, &c.: lot of Infantry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings.” *Evening Star* (Washington, D.C.), January 9, 1868. [Perhaps the clearest and most direct citation specifying cartridge boxes, a term that persists during the Reconstruction Era, as accoutrements.]

m.  1868 – Another government sale lists weapons (carbines, muskets, rifles, and pistols) followed by a list of items that are separate from weapons: “254 carbine cartridge boxes,” carbine slings, cavalry sabre belts, bayonet scabbards, cap pouches, “1,619 cartridge boxes,” “257 cartridge-box Belts,” gun slings, waist belts, “and various other articles.” *Daily Morning Chronicle* (Washington, D.C.), April 22, 1868.

n.  1869 – This account describes the new French "Mitrailleuse," a field weapon which would seem to be analogous to what we call a machine gun today, and the cartridge box would be the equivalent of we call today a detachable magazine. The Mitrailleuse is "a new 'ball syringe' in the shape of a small cannon. . . . It contains thirty-seven common infantry cartridges, arranged like cigars in a bundle. As soon as it is attached to the breech of the cannon, the Mitrailleuse is loaded. A man sitting on the carriage fires it by turning a crank. . . . The crank is turned once more and the cartridge box is removed from the cannon; a man to the right takes it, removes it from the 'cigar box'; the men to the left put a new one in." *Missouri Republican* (St. Louis), September 3, 1869, p.2. It is important to note in this citation that "cartridge box" is used to refer to what today we would call a detachable magazine that both contains ammunition and feeds it. Although the term "magazine" was available at the time to refer to an "ammunition container," it was still not a common term, and the writer uses the apparently more-familiar term "cartridge box" here.

o.  1870 –  In this description of the French National Guard, the writer notes the importance of rapid-fire rifles for defense against the Prussian troops. Several paragraphs later, the cartridge box is listed along with a guard's uniform requirements: "a uniform will be obligatory for all. Each one must be provided with a weather-proof knapsack. . . , a cartridge-box or pouch, and a half-woolen covering of the material of a tent." *New York Tribune,* November 5, 1870.

p.  1871 – Article about a memorial statue in which the cartridge box is identified as part of the soldier's uniform: "a soldier dressed in full uniform (overcoat, cartridge box, belt, etc.,) leaning on his musket." *Boston Journal,* November 12, 1870.

q.  1872 – This list of government ordnance and ordnance stores for sale groups weapons and accoutrements separately, with cartridge boxes clearly identified as accoutrements. The weapons for sale are muskets, rifled muskets, and revolvers, followed by this comment, "Nearly all the Starr's Revolvers and about two-thirds of the other arms are in fair order." After the arms list comes the list of accoutrements, consisting of cap pouches, waist belts, bayonet scabbards, "cartridge box and belt plates," musket and pistol appendages, "and an assortment of other accoutrements and appendages." *Daily Morning Chronicle* (Washington, D.C.), February 3, 1872.

r.  1876 – In this description of a dead body of a soldier found on a beach, the cartridge box is described as an article of the deceased's uniform: "The body was clothed in a blue overcoat and pants, and had on waist-belt, cross-belt and cartridge-box." *Wilmington Morning Star* (North Carolina), February 8, 1876.

s.  1879 – The cartridge box forms part of a new military uniform: "In the rest of the brigade the multiplicity of belts is done away with, and in place is substituted a simple body belt to which the bayonet scabbard and cartridge box is attached. Equipped in such a uniform . . . the brigade will present a solid and soldierly appearance." *New Haven Register,* July 28, 1879.

32.     In sum, in the vast majority of examples, arms referred to weapons. Arms generally did not include ammunition or other weapon accessories, including the cartridge box, the historical analog to magazines. Instead, "cartridge boxes" and "cartouch boxes" were considered "accoutrements," or accessories, like the other military equipment (scabbards, belts, and so forth) that was separate from, and did not include, arms.

33.     But English usage is never simple. As linguists often put it, "all grammars leak"— which is to say, there are always a few counterexamples in the data. The existence of such outliers does not invalidate the data or undercut an interpretation; it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage occurs in all human language. Given the volume of samples, that is not surprising. In addition to the 1777 entry in the Journals of the Continental Congress (above), where "arms" seems to include accoutrements in one part of the sentence and in the next it seems to exclude accoutrements, this example from COFEA shows that "accoutrements" may occasionally encompass arms:

      a.  1789 – A few years since, some boys, equipped in mock military accoutrements, such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston. [*The American jest book*: Part I[-II]; emphasis added; here military accoutrements includes toy swords.]

34.     In these four citations from the Readex newspaper corpus, it is not always clear from the context whether cartridge boxes are arms or accoutrements, or if they are simply not being categorized:

      a.  1753 – "[E]very listed Soldier and other Householder . . . be always provided with a well-fix'd Firelock . . . a Snapsach, Cartouch Box, one Pound of Powder, twenty Bullets fit for his Gun, twelve Flints, a good Sword or Cutlass, a Worm and Priming Wire, on penalty of six Shillings for want of such Arms as is hereby required, and two Shillings for each other Defect." *Boston Post-Boy,* April 30, 1753. Considering citation (c), below, dated 1756, it is likely that the fine for not having a cartouch box in this example would not be the higher fine for a weapons

defect, but rather the lower fine of 2s. levied for "other defects."

    b.   1755 – "whoever provides himself a good Firelock, Sword or Hatchet, Belt and Cartridge-Box, to receive 16s. more . . . . but the Arms to be returned when the Service is over." *Boston Gazette,* April 21, 1755. It is not clear from the context whether the cartridge boxes are part of the arms that must be returned. In other articles, cartridge boxes are treated as personal items. They may bear a variety of decorations, and they are sometimes listed along with other uniform items in a description of a soldier's funeral.

    c.   1756 – "That every Male Person . . . shall . . . provide himself with one well fixed Musket, or Fuzee, with a Worm and Priming Wire, one Cartouch Box with nine Charges of Gun Powder, and Ball suitable therein, and three good Flints . . . and shall keep such Arms and Ammunition by him, in good Order, and fit for Service, at all Times . . . under the Penalty of Twenty Shillings for Want of a well fixed Musket or Fuzee, with a Worm and Priming Wire, and Two Shillings for the Want of every Cartouch Box, and Two Shillings for the Want of nine Charges of Gun Power and Ball, and three Flints, or any of them." *Pennsylvania Gazette,* May 13, 1756. The larger fine for lack of arms, along with lower fines for missing Cartouch Boxes and ammunition, suggest that cartouch boxes and cartridge boxes do not belong to the category "arms" but are instead a form of accessory.

    d.   1785 – "His European weapons consisted of a musket, bayonet and cartouch-box; a fowling piece; two pair of pistols; and two or three swords or cutlasses." *History of Capt. Cook's Voyage, Massachusetts Centinel,* January 15, 1785. Here cartouch box appears among the list of weapons carried by an islander that Cook encountered.

35.    Another cite, from 1777, refers to firearms and other military accoutrements, implying, by the use of the word "other," that arms may be a subcategory of "accoutrements":

"any drafted soldier . . . who is unprovided with a fire-arm, and other military accoutrements prescribed by the militia law." Massachusetts, Acts & Laws, March Session, Colony of Massachusetts Bay, 1777, p. 10 (but see ¶ 37, ex. a).

36.    "Arms" are sometimes included as a subcategory of accoutrements, when "accoutrements" is used in its most general sense, referring to 'the equipment of a soldier,' but that does not mean that "arms" typically includes accessories or other "accoutrements."

37.     Despite a handful of exceptions like those just cited, in literally hundreds of cases, "arms" and "accoutrements" are treated as separate categories of military gear. Here are some typical examples from the Founding Era:

   a.  1776 – "The Sum of ten Shillings … to purchase said Fire Arms and Accoutrements" (Acts and Laws March Session, Colony of Massachusetts Bay). Here arms and accoutrements are separate, unlike the citation from 1777, above in ¶ 35, from the same source, where arms and accoutrements are lumped together).

   b.  1780 – "arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments" (George Washington, General Orders January 22).

   c.  1783 – "Such of the Noncommissioned officers and privates … shall be allowed the fire arms and accoutrements as an extra reward" (George Washington, General Orders, May 1).

   d.  1795 – "you will march …. with arms and accoutrements in good order." (*Incidents of the Insurrection in the Western Part of Pennsylvania, in the year 1774*). This example is from COEME; the other examples in this list are from COFEA.

   e.  1798 – "To hold his powder and his ball, his gun, accoutrements and all …." (French Arrogance, or, "The Cat Let Out of the Bag"). This poetic example shows that the idiomatic phrase arms and accoutrements has become part of the general language available not just to military specialists but also to poets and novelists.

38.     A newspapers.com search for "accoutrements" returns 1,392 hits. There are 692 matches for the exact phrase "arms and accoutrements."

39.     Here is a mid-eighteenth-century British example from the newspapers.com corpus where "arms" and "accoutrements" are separate categories, as is "ammunition": "This Militia shall receive their Arms, Accoutrements, and Ammunition from the Ordnance." *Derby Mercury,* March 19, 1756, p. 3.

40.     Similarly, there is this "ploughshares into swords" example of a Cambridge University library to be converted to military use: "[T]he new Building intended for a publick Library . . . may be converted into a Barrack, and be supplied with Provisions, Arms, and

Accoutrements, at the Expence of the University" *Jackson's Oxford Journal,* March 20, 1756, p. 2.

41.    A search of "arms and accoutrements" in the Readex database of America's Historical Newspapers returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. An early example from the colonial period appeared in the *Boston Evening Post* in 1750. It distinguishes "arms" from uniforms, "accoutrements," and other military equipment: "All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger" (*Boston Evening Post,* September 10, 1750, p. 2).

42.    This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that "arms" and "accoutrements" are distinct categories in the new nation as well: "The militia . . . must be considered as the palladium of our security …. The formation and discipline of the militia of the continent should be absolutely uniform; and that the same species of arms, accoutrements, and military apparatus, should be introduced in every part of the United States" (*Pittsburgh Gazette,* February 14, 1789, p. 1).

43.    The text of a bill in Congress to establish a uniform militia appeared in the *New York Journal* in 1790. It confirms the Founding-Era sense that "arms," "ammunition," and "accoutrements" make up distinct and separate elements of a soldier's kit: "There shall be appointed an adjutant general for each state … whose duty it shall be to … report[] the actual situation of their arms, accoutrements, and ammunition…. Every non-commissioned officer or private … for appearing at such meeting or rendezvous without his arms, ammunition, or accoutrements, as directed by this act, shall pay the sum of twenty-five cents" (*New York Journal,* July 23, 1790).

44.     And this cite from 1868 clearly distinguishes what counts as "arms," and what counts, separately, as "accoutrements": "At Watertown Arsenal, Massachusetts … the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets … ; 261 Carbines … ; 305 Sabres … ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c." *Daily Morning Chronicle* (Washington, D.C.), January 7, 1868, p.4.

45.     The newspaper data parallels that of COFEA: the phrase "arms and accoutrements" is almost always military. The phrase sometimes occurs alongside "ammunition" as a separate list item. *"*Accoutrements," when it appears alone in a military context in these newspapers, is a more general term, used for gear and rarely, for arms as well.

46.     It is clear that "arms and accoutrements" was, during the eighteenth and nineteenth centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like "bacon and eggs" or "salt and pepper." Such pairs take on the characteristics of a formula and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). For example, "eggs and bacon" is rarer than "bacon and eggs." Such ordered pairs are called "irreversible binomials," though there is often nothing but custom to prevent anyone from reversing the order.

47.     The word "accoutrements" typically occurs in a list after "arms" (more rarely, it may occur before "arms" as well), and it is typically a separate category from "arms" (though not always, as the above examples show).

48.     There are over 47,000 citations in newspapers.com for "arms" or "accoutrements" in the period 1868–1900, and 15,799 cites for the exact phrase "arms and accoutrements." Examining a selection of the 15,799 citations of the phrase confirms that both in England and the

United States, "arms" and "accoutrements" are separate categories. Here is one example from Gloucestershire, in England, in 1868: "[A] letter was received from the Home Secretary, pointing out the danger of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot." *Gloucester Chronicle,* January 4, 1868, p. 2.

49.     A similar cite from Iowa in 1868 states, "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property." *Cedar Falls Gazette* (Iowa), January 10, 1868, p. 3.

50.     And this, from Stroudsburg, Pennsylvania, also 1868, states: "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana." *The Jeffersonian* (Stroudsburg, Pennsylvania), January 9, 1868, p. 2.

51.     The circa-1868 data confirmed the Founding Era data that "accoutrements" is primarily a military term, and that when "accoutrements" co-occurs with "arms," the terms refer to separate categories of equipment.

52.     One final note on "accoutrements": the United States Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) references *North Carolina v. Huntley*, 25 N.C. 418 (1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328. In that decision, the North Carolina Supreme Court stated, "A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements—as a part of his dress …"

53.     In the citation above, "accoutrements" does not refer to weaponry, but to the more general category of "everyday attire, or clothing." The court is saying that it may be normal to wear a shirt, or a belt, or shoes, but it is not normal to wear a gun in North Carolina in 1843. It is legal—the court agrees—to carry a gun for any lawful purpose, "either of business or amusement"—but it is not normal or typical to do so. In affirming Huntley's conviction, the court noted that his purpose in carrying a shotgun was not a legal one.

**What does it mean to go "armed"?**

54.     Many Founding Era laws restrict persons from "going armed" in particular circumstances. Searching COFEA for occurrences of "armed" within six words of "ammunition" yields nine citations, of which the following are relevant:

a.   1776 –  If Nine Months ago the Colonies had assumed Governments, they would have been infinitely better armed, trained, furnished with Ammunition, salt Petre, Powder Works—they would have been rid of the Plague of Toryism. (From John Adams to William Heath, 15 April 1776; https://founders.archives.gov/documents/Adams/06-04-02-0042)

b.   1777 – A detachment of 900 men and twelve light horsemen, with proper officers, to furnish themselves with three days provisions, cooked, and parade at 2 o'Clock this afternoon, behind the park of Artillery, completely armed, accoutered and furnished with ammunition, and with their blankets slung. (General Orders, 21 June 1777; https://founders.archives.gov/documents/Washington/03-10-02-0091)

c.   1778 – I desire you to send a party of 150 Men, under a good Officer, well armed and completed with Ammunition to Bartholomews Tavern. (From George Washington to Brigadier General John Lacey, Jr., 2 March 1778; https://founders.archives.gov/documents/Washington/03-14-02-0021)

d.   1779 – The soldiers of such militia, if not well armed and provided with ammunition, shall be furnished with the arms and ammunition of the county, and any deficiency in these may be supplied from the public magazines or if the case admit not that delay, by impressing arms and ammunition of private property; which ammunition, so far as not used, and arms, shall be duly returned, as soon as they may be spared. (6. A Bill Making Provision against Invasions and Insurrections, 18 June 1779; https://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0006)

e.   1785 – same language as above, used in a Virginia militia law. (Collection of All Such Public Acts of the General Assembly and Ordinances of the Conventions of Virginia, Passed since the year 1768. https://heinonline.org/HOL/P?h=hein.sstatutes/pagava0001&i=1)

f.   1790 – The Warriors of the Creeks have been stated at various numbers from four to six thousand, and are said to be generally well armed, and furnished with ammunition. (To George Washington from Henry Knox, 4 January 1790; https://founders.archives.gov/documents/Washington/05-04-02-0353)

g.   1790 – such armed vessel, with her tackle, appurtenances, ammunition . . . . (Annals of the Congress of the United States 1st Congress to 18th Congress, 1st Session (1789-1924); https://heinonline.org/HOL/P?h=hein.congrec/aoc0009&i=1)

55.   For the same dates, searching "arms" and "ammunition" yields more than 973 hits; in all of these, "arms" and "ammunition" are separate categories, as shown in my earlier discussion of these terms. Some of the lists mention accoutrements as well. Here are some samples: arms, accoutrements, and ammunition (1776); arms, ammunition, and clothing (1776); arms, blankets, cloathing, kettles, and ammunition (1776); arms, ammunition, and blankets (1776); arms, ammunition, and stores (1776); arms, ammunition, and warlike stores (1776); arms, ammunition, cannon, and other implements of war (1776); arms, ammunition, money, or other stores (1776); arms, ammunition, money, cloathing, or other articles (1776); arms, ammunition, flints, and lead (1776); arms, gun powder, ammunition, provisions (1777); Cloathing and particularly shoes — Arms, dragoons and Horse Equipments, Ammunition of every kind (1781).

56.   Searching COEME for the dates 1641–1800 for "armed" within six words of "ammunition" yields 23 hits, of which the following are relevant (some duplicates have been removed):

a.   1641 – great ships full of ammunition and armed men (The life of Merlin, sirnamed Ambrosius his prophesies and predictions interpreted; eebo.A43598).

b.   1642 – completely armed and well furnished with ammunition. (September 29. 1642. The persons to whom the militia of the Citie of London is committed, for the safetie of the said Citie, have thought fit, and hereby declare. EEBO eebo.A88439).

c.  1658 – exceeding well armed and furnished with excellent ammunition (A compleat history of the life and raigne of King Charles from his cradle to his grave collected and written by William Sanderson, Esq.; eebo.A62144).

d.  1658 –  The County were not so many, ill trained, dispersed, meanly armed, slender Ammunition, and such Commanders as in like cases are more for reputation, then direction or execution. (A compleat history of the life and raigne of King Charles from his cradle to his grave collected and written by William Sanderson, Esq.)

e.  1662 – Neither excellently armed nor plentifully stored with ammunition (The history of the worthies of England who for parts and learning have been eminent in the several counties : together with an historical narrative of the native commodities and rarities in each county, endeavoured by Thomas Fuller. eebo.A40672).

f.  1680 – well provided both of Victuals and Ammunition, and armed with Ordnance both great and small. (The history of the Turkish empire from the year 1623 to the year 1677 containing the reigns of the three last emperours / by Paul Rycaut, Esq.; eebo.A57996).

g.  1687 – these Powerful Perſons would by no means conceal their triumph over Us, but the next day are guarded from their residence in the City with multitudes of armed Men and Ammunition in a hostile and warlike manner to Westminſser. (Basiliká the works of King Charles the martyr: with a collection of declarations, treaties, and other papers; eebo.A31771).

h.  1688 – the Souldiers raised and armed, and the Victuals and Ammunition provided. (The royal commentaries of Peru, in two parts the first part, treating of the original of their Incas or king; eebo.A42257).

i.  1775 – five private men, all well armed, with plenty of ammunition, two wall-pieces, and three days provision. (Journal of the Resolution's voyage: in 1772, 1773, 1774, and 1775. On discovery to the southern hemisphere; ecco.K111410.000).

57.    COEME and COEFA do not cover the post-Civil War period, and newspaper searches for that period for the "armed" together with "ammunition" are not practical because these databases do not permit collocate searches. From my searches of COFEA and COEME, I conclude being "armed" in the Founding Era typically refers to weapons, while "ammunition," when it is mentioned, is typically listed as a separate category, along with other items like food or accoutrements. In addition, "arms" and "ammunition" are routinely treated as separate categories before and during the Founding Era, both in England and in the U.S. "Ammunition," when it occurs

in lists, often appears in the pair of items "arms and ammunition" or in the three item list, "arms, ammunition, and accoutrements." But "ammunition" does not always appear immediately before or after "arms." In several cases "arms" occurs first, then there are one or more intervening list items, such as food, blankets, or clothing, and then "ammunition."   This further supports my conclusion         that         "arms"         does         not         include         "ammunition."


**Some early use of the words "magazine" and "magazine wind gun," along with instances of repeater or magazine guns in the Founding Era and the years 1860–1880**

58.     Although most uses of the word "magazine" today still refer to printed periodicals, during the nineteenth century, one sense of the term "magazine" narrows, referring more and more to an "ammunition container," a primary sense of the word in reference to firearms today. The OED defines *magazine*, sense IV b, as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868 (OED online). It is noteworthy that as late as 1867, the British naval dictionary *The Sailor's Word-Book* retains the older definition of "magazine" as a gunpowder storage facility on land or at sea: "A place built for the safe-keeping of ammunition; afloat it is confined to a close room, in the fore or after part, or both, of a ship's hold, as low down as possible; it is lighted occasionally by means of candles fixed in the light-room adjoining it, and no person is allowed to enter it with a lamp or candle" (Admiral W. H. Smyth and Vice-Admiral Sir E. Belcher, *The Sailor's Word-Book: An Alphabetical Digest of Nautical Terms,* London, 1867; the authors suggest that the placement of the magazine room "as low down as possible" minimizes the risk of a direct hit by enemy fire, and they note as well that no one is permitted to carry a lighted flame into the ship's magazine room to minimize the risk of an accidental explosion; see ¶ 30, above, for the Smyth and Belcher definition of the term

"cartridge-box" to refer to the box or pouch used for transporting ammunition to a small arm or a large gun). In addition, Smyth and Belcher define "repeating fire-arm" as "One by which a number of charges, previously inserted, may be fired off in rapid succession, or after various pauses. The principle is very old, but the effective working of it is new." Their definition—which does not mention "magazine" in connection with such guns—acknowledges the existence of earlier repeater guns, but judges them to have been ineffective. Only the repeater guns designed and manufactured in quantity during the period just before the dictionary's publication in 1867 are actually judged to be "effective." The earliest example in COHA of "magazine" referring to the ammunition compartment is dated 1882: "Solitary travelers still find it prudent to make a display of a magazine rifle, and to keep a sharp eye on any roving bands" (E. V. Smalley, "The New North-West," *Century,* September, 1882, pp. 769–79). COHA lists only 40 examples of "magazine rifle," occurring a bit later, between 1890 and 1930. "Magazine gun" appears in the COHA data 16 times between 1920–2010. And an 1893 editorial in the *New York Times* refers to the army's "new magazine rifle" ("New Powder for the Army," *New York Times,* December 7, 1893, p. 4). However, as with a very few instances of "accoutrements" including "arms," there are an extremely small number of early counterexamples between 1744 and 1820 where "magazine" refers to the bullet compartment of a gun—not a pistol or rifle using conventional gunpowder and bullets, but an air gun.

59.     The common, single-shot "wind gun" or "air gun" used compressed air rather than ignited gunpowder to propel a ball, and was much quieter than a traditional gun. Although the air gun did not require powder or a match, the user had to re-charge the compressed air cylinder once the air had been expended. The novelist and essayist Oliver Goldsmith found air guns to be useful for experiments in physics, adding, "THIS, however, is but an instrument of curiosity, and

29

sometimes of mischief" (Oliver Goldsmith, *A survey of experimental philosophy, considered in its present state of improvement*, 1776). This newspaper story from the same period reports that the scientist Joseph Priestley was injured by an accidental discharge of an air gun: "We hear from Birmingham, that the celebrated Dr Priestley, in a late trial of some experiments with an air gun, was badly wounded by an accidental discharge of it; the ball with which it was loaded, passing thro' one of his hands, and shattering it to pieces" (*The Leeds Intelligencer and Yorkshire General Advertiser*, June 5, 1781, p. 3).

60.     A number of newspaper references suggest that its relative quietness made the air gun popular with criminals, and many references to air guns refer either to accidental discharges or to criminal assaults (to cite an example of the latter, numerous newspaper accounts in 1785 suggested that the weapon which broke a window in an attack on King George III's carriage was an air gun).

61.     Air guns typically fired a single shot. However, there are references in the corpora to approximately eight inventors between 1744 and 1820 who built air guns capable of firing anywhere from 9 to 50 balls without reloading the ammunition or recharging the compressed-air cylinder. Lexical evidence suggests almost all of these repeater air guns were experimental models rather than guns available for military or civilian use.

62.     The OED dates the term "magazine wind-gun" to 1744 in a reference to an air gun capable of firing more than one shot without reloading. "Magazine wind-gun" is the term used by its inventor, a man named L. Colbe. I have found no other examples of the term "magazine wind gun" in any database, suggesting that the phrase is a *hapax legomenon,* or "oncer," terms that lexicographers use to define a word that merits a definition, but that does not appear anywhere else. Colbe also uses the term "magazine gun" for his device, and that term does occur twice more

in the data, suggesting that it was never a common term. In an entry separate from its entry for "magazine," the OED marks the usage of both "magazine wind gun" and "magazine gun" as "rare" and "obsolete":

> a. †magazine wind-gun *n. Obsolete rare* a type of wind-gun fitted with a magazine of bullets. 1744 J. T. Desaguliers *Course Exper. Philos.* II. 399   An ingenious Workman call'd L. Colbe has very much improv'd it [sc. the old Wind-Gun], by making it a Magazine Wind-Gun; so that 10 Bullets are so lodg'd in a Cavity…that they may be…successively shot. [Oxford English Dictionary Online, s.v. magazine wind-gun.]

63.     The OED citation is from John Theophilus Desaguliers, *A Course of Experimental Philosophy* (London, 1744), vol. II: 399–402. Desaguliers, an assistant to Isaac Newton, was a member of the Royal Society who specialized in mechanics and hydraulics. In his treatise, Desaguliers offers an elaborate description of the common, single-shot wind gun, more typically referred to as an air gun, along with a three-page description of Colbe's so-called "Magazine Wind-Gun," accompanied by a detailed drawing of the mechanism of that gun. I have found no biographical information about L. Colbe, inventor of the gun, and I have found no lexical evidence that Colbe made more than one such gun, or if he did, that it was produced in any significant numbers. Although Desaguliers suggests that this "magazine gun" may be "the best Defence against Highway-men, or Robbers that Travellers are aware of because when they have cause to suspect them, they may make five or six Discharges before a Thief can come within Pistol-Shot" (*Id.* at  402), there is no evidence in any of the corpora that Colbe's invention was ever used either by the military for any purpose, or by civilians for individual self defense. And there is no lexical evidence that the other repeater air guns invented before the mid-nineteenth century were ever more than curiosities until workable models of what we now call machine guns or automatic or semiautomatic weapons, using conventional gunpowder and bullets, not compressed air and balls, were produced during and after the Civil War.

64.     As further confirmation that the magazine wind gun was an anomalous and uncommon term, the OED definition of "magazine," updated most recently in 2022, gives the earliest date of the sense of the word as 'ammunition container' as 1868. The corpus evidence confirms that the magazine wind gun is correctly dated by the OED as 1744, and I have found only two references to "magazine guns" in the 1790s and early 1800s, confirming that this usage of the word remained rare. "Magazine wind-gun" and "magazine gun" do not appear in the COEME or COFEA corpora. I have found no information in the corpora on the availability or popularity of such guns, but the sparse lexical data suggests that they were not in common use.

65.     A small number of references to later repeater wind guns indicate they were made, not by armorers, but by clockmakers and other highly-skilled artists or artisans. There is no indication in the lexical evidence that repeater air guns were ever mass produced or publicly available in the Founding Era. Several of the citations I found treat these guns as curiosities and their owners charged a small fee to anyone interested in looking at them (and in one case, trying the gun out). Like Colbe's wind gun, they seem to be rare inventions or curiosities, not weapons commonly available to the military or to the American or English public. Besides Colbe's gun, there are only two examples from the data that use the word "magazine" in connection with a repeater air gun:

a.  1784 – "An artist of this town [Birmingham, Eng; the artist is also identified as a compass maker] has lately invented a magazine gun, that will discharge 45 bullets separately in two minutes and a half, each bullet would kill an ox at 40 yards distance; it is only charged once, and aim is taken with more certainty than with the fowling piece" (*New York Packet and American Advertiser,* New York, NY, August 5, 1784).

b.  1815 – Advertisement for "one magazine Gun, when once loaded can be discharged ten times in a minute" (*New York Gazette*, Aug. 30, 1815).

66.     The corpora contain just nine other references to repeater air guns, none of them

using the word "magazine":

a.  1783 – "Vienna. A watchmaker has invented an Air Gun, which, without recharging,
    fires 15 times successively. A corps of Hunters are to be armed with these guns."
    (*The Newcastle Weekly Courant* (England), May 10, 1783, p. 3). There is no follow-
    up to indicate whether the corps of Viennese hunters did employ such a weapon.

b.  1792 – A number of American newspapers report on the invention by a man, only
    identified as someone from Rhode Island, of a repeating air gun capable of firing
    twenty times without reloading. Here is one: "A person in Rhode Island has invented
    an Air-gun, which can be discharged, to do execution, 20 times, each time it is
    loaded.—As nothing is cheaper, and easier to be transferred, than the ammunition for
    the above pieces; and as saving much expense, they recommend themselves strongly
    to the Secretary at War, to be used in the approaching campaign against the Indians"
    (*National Intelligencer: National Gazette*, April 26, 1792, p. 3). There is no
    indication that the Secretary of War knew of the invention or acted on this suggestion.
    In fact, the following advertisement suggests that the repeater air gun in question was
    treated as a curiosity to be admired in a museum:

c.  1792 – "An air-gun, made by a young man, a native of Rhode-Island, but now
    resident in this city [New York], and which has been purchased by the subscriber,
    with a view eventually to make it the property of the American museum but wishes to
    reimburse himself in the following manner, viz. He will exhibit it to the examination
    of all persons desirous of viewing it, and of discharging a shot, for which they shall
    pay six-pence. This gun, when properly filled with air, will do execution twenty
    times, without renewing the charge, and for several times will send a ball thro' an
    inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13 Maiden
    Lane, every day in the week, from 10 to 12 in the forenoon, and from 3 to 5 in the
    afternoon, Tuesday and Friday afternoons excepted, at which time it may be seen at
    the Museum. Gardiner Baker, Keeper of the Museum" (*New York Daily Advertiser*,
    February 9, 1792).

d.  1796  – "This carabine, lighter and smaller than the common ones, is composed of
    two barrels, the smallest of which contains 25 balls: and by a slight movement, they
    pass from the one to the other; which ball, by lowering the firelock, goes off with the
    same rapidity and carries further than if fired with powder, without the least noise,
    and that as often as a hundred times alternately, during the space of 8 or 10 minutes;
    after which, the reservoir being exhausted, it requires to pump in fresh air, which
    takes up at most, 16 minutes (*The Independent Gazetteer* (Philadelphia), August 6,
    1796, p. 1). This report adds that the repeater air gun, invented in the reign of
    Emperor Joseph II (reg. 1765–1790), was distributed to German troops, and that a
    sample weapon was given to the Prince of Wales. The writer suggests such guns
    would be useful at sea, since they are not affected by dampness. But there is no
    indication in the corpora that the Royal Navy ever considered such a weapon.

e.  1797 – "An Air GUN has been constructed by Messrs. Darlings and Wilkinson, of Cumberland, Rhode Island, upon a plan entirely new. It can be discharged twelve times with once loading, and will do execution with great exactness, at fifty yards distance" (*Columbian Centinel* (Boston), June 21, 1797).

f.  1801  – Multiple newspapers run the story of a repeater air gun invented by a man known as Girardami, identified as a peasant, artist, and watchmaker, and variously referred to in gun history articles as Girandoni or Girardoni (those spellings do not appear in the corpora that I consulted): "Girardami, a Tyrolese peasant, and self-taught artist, has invented an air-gun, which may be discharged fifty times without pumping again. The first twenty shots penetrate through a door at an uncommon distance. Girardami makes these air-guns himself, and likewise very good wooden watches" (*The Caledonian Mercury* (Edinburgh), March 2, 1801, p. 2). There are indications that Austrian troops used Girardami (or Girardoni) air guns among other weapons at the Battle of Austerlitz in 1805, where Napoleon won an important victory over the Austrian forces. In that battle, the air gun seems not to have been an effective weapon. In any case, there is no indication that it was ever adopted by English or American troops.

g.  1802 – The Newly-Invented Philosophical Air Gun That can be used as Gun or Pistol, and discharge 20 balls with one loading of the globe [that is, the compressed-air cylinder], unless the charge of air is let out at once. To be seen at Mr. Wyant's tavern, Market street, both night and day. Admittance one fourth of a dollar (*Telegraphe and Daily Advertiser* (Baltimore), March 17, 1802). "Philosophical" in this sense is often used to refer to physicists experimenting with air guns to measure air temperature, pressure, and volume, among other things (see, for example, the work of Desaguliers and the experiments of Goldsmith and Priestley mentioned above).

h.  1807 – An ad for an auction includes, among other items, "an air gun in compleat order which, when loaded will discharge twenty five times after being pumped" (*American Citizen* (New York, NY), May 28, 1807).

i.  1814 – One article in the corpora refers to a repeater air gun taken by Lewis and Clark on their expedition to the Pacific some eight years earlier, though the article itself has nothing to do with the expedition. Instead, this letter to the newspaper, criticizing a politician for repeating the same things that he has been saying for years, suggests as well that the Lewis and Clark repeater air gun was used not for hunting or warfare but rather to dazzle the Indians that the explorers encountered with their "great medicine," thereby ensuring a peaceful encounter: "he [the politician in question], forthwith, becomes a "great medicine," as the Shoshones called captain Lewis' air gun"(*National Advocate*, Mar. 23, 1814). This article was written ten years after the start and eight years after the completion of the expedition. I did not find any contemporaneous articles or firsthand accounts in the corpora of such a gun or how it may have been used.

j.  1819 – Finally, there is an ad for a French repeater air gun, for sale at 90 crowns: "which discharges 20 times before the air is expended" (*Salem Gazette* (Massachusetts), February 5, 1819).

67.  To summarize: the corpus data shows that the terms "magazine gun," "magazine wind gun," and "magazine air gun" are extremely rare, occurring a mere three times in the corpora, along with nine instances of repeater air guns that do not include the word "magazine." In contrast, there are approximately 1,200 references to the single-shot "air gun" in the several databases that I consulted. Subtracting an estimated 150 duplicates, that leaves about 1,050 references to a single-shot air gun. Two of the references, ¶ 66 (b) and (d) in the list above, suggest that they would be useful weapons for the military; one, ¶ 66 (a) above, recommends their use to hunters; and one writer, Desaguliers, in 1744 (above, ¶ 63), speculates that the weapon could be useful for self-defense. But for the most part, the references listed above to early repeater guns seem to be treated as curiosities: marvels of engineering constructed by clockmakers or other skilled artisans, items to be seen in a museum or exhibited at a tavern (*see* examples ¶ 66 (c) and (g) above). There is no lexical evidence that they were manufactured in quantity. Their mechanisms were complex, requiring a clockmaker's skill to design, make, and repair. And it took time to re-charge the air cylinder (one source in the list above, ¶ 66 (d), suggests sixteen minutes for one such repeater air gun, which would render them suboptimal in battle situations). A couple of entrepreneurs charged admission to view them (¶ 66 (c) and (g) above), and in one case, in  ¶ 66 (c) above, patrons may pay six pence to try shooting the gun. The writer who cites the Lewis and Clark repeater gun (¶ 66 (i)) suggests that the explorers used the gun to "impress" potentially hostile Native Americans rather than as a weapon against them. It too may have been a one-off. Furthermore, only three of the twelve references to repeater air guns refer to the bullet container as a "magazine," a further indication that this usage of "magazine" is extremely rare before 1820.

68.     With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term "magazine" starts to appear in the sense 'ammunition container' (gradually replacing the earlier terms "cartridge box" or "cartridge case"), not in air guns but in ones using gunpowder and bullets.

69.     COFEA and COEME do not cover the period past 1800. COHA, which does have nineteenth century coverage, turns up only a handful of uses of "magazine" in collocation with bullets, guns, rifles, or weapons in the 1890s, and only three such uses cited above before 1820. Most COHA cites for "magazine" refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses.

70.     Searching the word "magazine" in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. It is not currently possible to tease out the subset of these citations to determine exactly how many refer to weapons rather than print journals. In addition to the patents granted in 1860 (see above), I have found twelve citations in newspapers.com for "magazine carbine" and "magazine rifle" from 1860 to 1880:

a.  1864 – Advertisement for "Henry's Magazine Rifle, 15 shots" along with other firearms. *Chicago Tribune,* January 25, 1864, p. 1.

b.  1864 – The War Department establishes a Board of Officers "for the purpose of examining, testing and recommending for adoption a suitable breech-loader for muskets and carbines, and a repeater or magazine carbine." *New York Times,* Dec. 22, 1864. A few other newspapers carry notices of this commission and later report on its findings.

c.  1865 – "The Meriden Manufacturing Company have a contract for 5,000 breech-loading magazine carbines, Trippett's patent, for the State of Kentucky." *Sunbury* (Pennsylvania) *Gazette,* June 3, 1865, p. 3. No follow-up information in the corpora.

d.  1866 – "The Board would be unwilling to dispense entirely with magazine arms, and as these same can be used ordinarily as single-loaders." The military Board of Officers (see (a), concluded that the repeater gun patented by Spencer had promise, though it was not yet ready for service until improvements could be made to the mechanisms. *Chicago Tribune,* Dec, 19, 1866, p. 4.

e.  1868 – Report of another trial of various weapons under the auspices of the Board of Officers, including "magazine and single breech loaders," (one of them patented by Spencer). *New York Daily Herald,* July 7, 1868, p. 8.

f.  1873 – Marksmanship contest sponsored by the National Rifle Association includes one contestant firing a "magazine carbine" and 36 contestants firing other rifles. *Brooklyn Daily Eagle,* September 1, 1873, p. 4.

g.  1874 – Another NRA-sponsored contest at Creedmoor offers a second prize in one competition for NY State National Guard members, "an elegant Ward-Burton magazine carbine" valued at $50. *New York Times,* September 17, 1874, p. 2.

h.  1877 – A museum in Birmingham, England, displays Russian and Turkish rifles, including one Turkish "Winchester magazine gun." *Birmingham Daily Post,* December 29, 1877, p. 5.

i.  1878 – A display in Sidney, Australia, of a variety of firearms, including "some novelties from America . . . [including] the Evans Magazine carbine." *Sydney Morning Herald,* April 29, 1878, p. 5.

j.  1879 – Under "Military Items," this notice: "An invoice of Hotchkiss Magazine Carbines were received here this week." *Vancouver* (Canada) *Independent,* August 14, 1879, p. 5.

k.  1880 – Under the heading "Maryland Military Affairs," report on the Maryland National Guard. "Each infantry organization is armed with . . . breech-loading magazine carbines." *Baltimore Sun,* January 16, 1880, p. 1.

l.  1880 – Advertisement of F. Lassetter & Co. includes "Evans' Magazine Military Carbines [that] will carry twenty-two rounds." *Otago* (New Zealand) *Witness,* May 15, 1880, p. 1. The advertisement ran on multiple days in multiple newspapers.

71.     A number of these references are optimistic about the future of such weapons, but several note that single-shot weapons will predominate until the repeater mechanisms of these new rifles are improved. Perhaps because the term was largely associated with military weapons, it remained relatively rare until the 1920s. In any case, before mid-nineteenth century, bullets were kept in "cartridge boxes," sometimes called "cartouch boxes," or "cartridge cases" or pouches, and these bullet storage containers were part of the general category of military accoutrements, not arms.

72.      I did try to estimate, indirectly, the frequency of the gun-specific use of "magazine" by running a Google n-gram search. Google's n-gram viewer searches the corpus of digitized Google Books. It can give a rough approximation of a word's frequency in relation to the other words in the Google Books corpus. The results appear as a graph. The n-gram viewer is capable of showing the relative frequency of several words on the same graph. My n-gram search showed that between 1750–1880 the word "magazine" occurs with a frequency of 0.0005121511% in 1789 and a frequency of 0.0007324368 in 1880.[6] A search for "magazine gun" returns no hits for that same period. But a search for "magazine rifle" shows that it does not appear in the database before 1813; there are few instances from 1813 to 1820, with a frequency of 0.0000000185%; and then a sharp rise between 1863 and 1880, when the frequency reaches a high of 0.000000936%, reflecting both the increased use of the revolver and the invention of repeating rifles and machine guns during the Civil War.[7] Still, it remains a rare term. Searching "magazine carbine" from 1860–1880 shows the term to be even rarer than "magazine rifle," with no occurrences in 1860, a peak frequency in 1866 of 0.0000002185%, and a sharp drop thereafter.[8] In contrast, an n-gram search for "carbine" during those years shows that "carbine" occurs about 370 times more frequently than "magazine carbine" in the Google Books corpus.[9] The Google n-gram data shows that the use of "magazine" in the Founding Era was not associated with guns. By 1880, the association with guns had become more common. Comparing the use of "magazine" in 1880 in all contexts with the use of "magazine rifle" that same year, it appears that the gun-related sense of "magazine" represents approximately

---

[6]https://books.google.com/ngrams/graph?content=magazine&year_start=1750&year_end=1880&corpus=en-2019&smoothing=3).

[7](https://books.google.com/ngrams/graph?content=magazine+rifle&year_start=1750&year_end=1880&corpus=en-2019&smoothing=3).

[8]https://books.google.com/ngrams/graph?content=magazine+carbine&year_start=1860&year_end=1880&corpus=en-2019&smoothing=3.

[9]https://books.google.com/ngrams/graph?content=carbine&year_start=1860&year_end=1880&corpus=en-2019&smoothing=3.

0.0012% of the occurrences of the word "magazine." In other words, the association exists in the period surrounding the ratification of the Fourteenth Amendment, but it is still a rare term.

73.     The n-gram estimate, together with the sparse evidence in COHA and the OED, all suggest that "magazine" in the sense of 'device for holding bullets' forms only a very small subset of the 3.3 million occurrences of "magazine" in the newspaper corpora. Although "magazine" in the gun-related sense shows a distinct rise between 1864 and 1880, it took another thirty to forty years for the 'bullet holder' sense of the word "magazine" to become more common. Even then, text references to ammunition magazines often appear, not in general discourse, but in legislation passed early in the twentieth century restricting their size or use.



Fig. 1 Google n-gram showing the frequency of "magazine."



Fig. 2 Google n-gram showing the frequency of "magazine rifle"



Fig. 3 Google n-gram showing the frequency of "magazine carbine."

**Conclusion**

74.     To repeat, there is virtually no lexical data that I have found showing that "arms" includes "accoutrements," "cartridge boxes," "cartouch boxes," "magazines," or any parts of weapons. To the contrary, while "arms" is used as a general term for weapons (typically swords,

knives, rifles, and pistols), it does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category "accoutrements." And there is no evidence from the small number of mentions of the repeater air guns in the databases before the Civil War that such guns were used in the Founding Era by the American or British military, or that they were widely available in that period to civilians for hunting or self-defense.

I declare that the foregoing is true and correct to the best of my knowledge.

_____
Dennis Baron

_____
June 15, 2023
Date

41

# Exhibit A

**DENNIS BARON**

Professor of English, Emeritus
Research professor of English                                               *email:* debaron@illinois.edu
University of Illinois at Urbana-Champaign          Web Page *url:* http://faculty.las.illinois.edu/debaron/
Home: 1801 Foxborough Ct
Champaign IL 61822-8501

## VITA

**Education:**

    Ph.D., University of Michigan (English Language and Literature), 1971.
    M.A., Columbia University (English and Comparative Literature), 1968.
    A.B., Brandeis University (English and American Literature), 1965.

**Positions held:**

    Research Professor of English and linguistics, University of Illinois, 2018–present.
    Professor English, Emeritus, University of Illinois, 2018–present.
    Professor of English and Linguistics, University of Illinois at Urbana-Champaign, 1984–2018.
    Head, Department of English, University of Illinois at Urbana-Champaign, 1998–2003.
    Acting Head, Department of English, Univ. of Illinois at Urbana-Champaign, 1997–98.
    Director of Rhetoric, University of Illinois, 1985–97.
    Director, Writing Outreach Workshop, Univ. of Illinois, 1985–88.
    Professor, Campus Honors Faculty, Univ. of Illinois, 1988–2018.
    Professor, College of Education, UIUC, Summer 1988.
    Associate Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1981–84.
    Assistant Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1975–81.
    Assistant Professor of English, The City College of CUNY, 1973–74.
    Assistant Professor of English, Eastern Illinois University, 1971–73.

**Fellowships and Grants:**

    John Simon Guggenheim Memorial Foundation Fellow, 2016–17.
    Faculty Fellow, Program for the Study of Cultural Values and Ethics, Univ. of Illinois, Spring 1992.
    National Endowment for the Humanities Fellowship, calendar year 1989.
    Newberry Library National Endowment for the Humanities Fellowship, 1988–89 (offered, not held).
    IBM Project Excel Grant C-41, 1986-87: "Computer Analysis of Student Writing."
    Associate, Center for Advanced Study, University of Illinois 1984–85.
    Fulbright Lecturer, University of Poitiers, France, 1978–79.
    Fellow, Center for Advanced Study, University of Illinois, 1978 (offered, not held).
    University of Illinois Research Board grants, multiple years, 1978–2017.

**Books:**

1.   ***You Can't Always Say What You Want: The Paradox of Free Speech.*** Cambridge University Press, 2023. (Available Dec., 2022).

2.  ***What's Your Pronoun? Beyond He and She.*** Liveright, 2020; paperback, 2021. Reviews: *New York Times Book Review, The Times* (London); *The London Review of Books; Harpers; The Atlantic; The Economist; Attitude.*

3.  ***A Better Pencil: Readers, Writers and the Digital Revolution.*** Oxford University Press, 2009, pp. xviii + 259. Paperback edition, 2012. Chinese translation, 2012. Reviews: *Salon; City Journal*; History News Network; *The Scotsman; Library Journal; internet review of books; Montreal Mirror*; Innovation Leadership Network; mantex.com (Manchester, England)*; The Star* (Malaysia); *Times Higher Education; International Journal of Communication; The Guardian; Choice; American Scientist; 3quarksdaily, The New Yorker*; *Arts Journal.*

4.  ***Guide to Home Language Repair*** (questions, answers, and essays on the English language)*.* National Council of Teachers of English (1994), viii + 165. Reviews: *Boston Book Review*; *New York Times Magazine.*

5.  ***The English-Only Question: An Official Language for Americans?*** Yale University Press, 1990; paper ed., 1992. Reviews: *Publishers Weekly; Washington Post Book World; Booklist; Library Journal; Education Week;* Hazel *New York City Tribune; The Bookwatch—Midwest Book Review; Change; Choice; The Jerusalem Post; Times Literary Supplement; American Political Science Review; Book Review Digest; American Journal of Sociology; Publishers Weekly; College English; Modern Language Journal; Language Problems and Language Planning; Language.*

6.  ***Declining Grammar and Other Essays on the English Vocabulary*** National Council of Teachers of English. Reviews: *Newsweek* (Dec. 11, 1989), p. 71; William Safire, *New York Times Magazine; The State Journal-Register* (Springfield, IL); *The Chicago Tribune; The Chicago Sun-Times; The Denver Post*; *Library Materials Guide; Book Report; NATE News; Language; Young Adult Paperback Book Guide.*

7.  ***Grammar and Gender*** Yale University Press, 1986; paper ed., 1987. Reviews: *Kirkus Reviews; Publishers Weekly; Patriot Ledger* (Quincy, MA); *The Washington Times Magazine;* John Simon, *The New Leader; Chronicle of Higher Education; Los Angeles Times; Library Journal; Insight; Champaign-Urbana News-Gazette; Choice; Language Monthly; The Times Literary Supplement; Psychology Today; Virginia Quarterly Review; The Toronto Star; ETC.; Book Review Digest; Chicago Tribune; Akron* (OH) *Beacon Journal; Clearwater* (FL) *Sun; Corpus Christi* (TX) *Caller-Times*; *Wilkes-Barre* (PA) *Times Leader; Troy* (NY) *Record; The Editorial Eye; Studies in the American Renaissance; Lingua; Modern Language Review; Review 9; American Speech; Southern Quarterly Review; Signs; Language; JEGP; Frontiers; Anglia; Journal of English Linguistics* Nominated for the Mina P. Shaughnessy Medal of the Modern Language Association.

8.  ***Grammar and Good Taste: Reforming the American Language*** Yale University Press, 1982; paper ed., 1984. Reviews: *Library Journal; America; The New York Times Book* Review; *The Washington Post Book World; Chronicle of Higher Education; The Times* (London); *The Los Angeles Times Book Review; Journal of American History; Encounter; American Literature; Journal of American Studies; Amerikastudien; Book Review Digest; Journal of English and Germanic Philology; Technical Communication; The Augusta Chronicle, Augusta Herald; American Studies; South Atlantic Quarterly; English Language Notes; World Literature Today; History of Education Quarterly;* Caroline Bokinsky, *Studies in the American* Renaissance; *Etudes Anglaises; Review of English Studies; College Composition and Communication; American Speech; Anglia; Book Review Digest; ESQ; English Journal*. Selected for the "Editor's Choice" section of *The New York Times Book Review*. Selected by the Library of Congress for recording for the blind. Nominated for the 1982 Mina P. Shaughnessy Medal and the 1987 James Russell Lowell award of the Modern Language Association; selected by the Editorial Board of the National Council of Teachers of English for distribution as an affiliate publication of the NCTE.

9.  ***Going Native: The Regeneration of Saxon English.*** Publication of *The American Dialect Society,* No. 69, University of Alabama Press, 1982.

10. ***Case Grammar and Diachronic English Syntax.*** Mouton, 1974. Reviews: *Linguistics; Indogermanische Forschungen; The Year's Work in Old English Studies; Revue Belge de Philologie et d'Histoire.*

**Supreme Court Amicus Briefs:**

Brief for Corpus Linguistics Professors and Experts as Amici Curiae Supporting Respondents. *New York State Rifle and Pistol Assn. v. Bruen,* No. 20-843 (2022). [Cited by J. Breyer in his dissent]

Brief for Professors of Linguistics and English Dennis E. Baron, Ph.D., Richard W. Bailey, Ph.D., and Jeffrey P. Kaplan, Ph.D. in support of petitioners. *District of Columbia, et al., v. Dick Anthony Heller.* 554 U.S. 570 (2008)

**Recent Media:**

"Does the Second Amendment Actually Give You the Right to Own a Gun?" *Think,* with Andrew Miller, NBC News, May 26, 2022. https://www.nbcnews.com/think/video/does-the-2nd-amendment-actually-give-you-the-right-to-own-a-gun-140886597910

"The Plain Language Movement." Part of Stephen Fry's series "English Delight,"  BBC Radio 4, August 2014.

"Latinos in America." PBS Documentary aired in Oct. 2013. In episode 6 of the 6-part series I discuss official English, bilingualism, and minority language rights.

**Book Chapters:**

1.  "Post on Facebook, go directly to jail." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
2.  "Don't make English official, ban it instead." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
3.  "Facebook multiplies genders but offers users the same three tired pronouns." Melissa Goldthwaite, *et al.,* eds. *The Norton Reader,* 14/e New York: W.W. Norton. Forthcoming, January, 2016.
4.  "Facebook multiplies genders but offers users the same three tired pronouns." *The Little Norton Reader.* New York: W.W. Norton. A special edition containing 50 essays from the first 50 years, to celebrate the 50th anniversary of *The Norton Reader.* Forthcoming, 2016.
5.  "Who owns global English?" *The Norton Reader,* ed. Linda H. Peterson and John C. Brereton. New York: Norton.
6.  "Should Everybody Write?" In Andrea Lunsford, *Everyone's an author, with readings.* New York, NY: W. W. Norton, 2012
7.  "The Noun Game: A simple grammar lesson leads to a clash of civilizations." *The Simon and Schuster Short Prose Reader.* Robert Funk, Susan Day, et. al. Boston: Prentice Hall, 2011. Pp. 128-34.
8.  "#Twitter Revolution." *They Say, I Say, with Readings 2e.* New York: W.W. Norton, 2012.
9.  "The More Things Change: Language and Education." In Anne Curzan and Michael Adams, eds., *Contours of English.* Univ. of Michigan Press (2010).
10. "The New Technologies of the Word." In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 136-51.  Rpt. in Lynn Bloom and Louise Smith, *The Arlington Reader,* 2e., New York: Bedford/St. Martin's, 2008; rpt. 2010.

11. "Don't Make English Official—Ban It Instead." [rpt. of 1996 essay]. In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 477-79.

12. "Forget Everything You Learned About Writing." In Chris Anson, ed., *The WAC Casebook: Scenes for Faculty Reflection and Program Development.* New York: Oxford Univ. Press, 2003, pp. 261-65.

13. "Language Legislation and Language Abuse: American Language Policy through the 1990s." In *Language Ideologies: Critical Perspectives on the Official English Movement,* vol. 2: History, Theory and Policy, ed. Roseann D. Gonzalez with Ildiko Melis (Urbana: NCTE, and Lawrence Earlbaum Assoc., 2001), pp. 5-29.

14. "From Pencils to Pixels: The Stages of Literacy Technologies." In *Passions, Pedagogies and 21st-Century Technologies,* ed. Gail Hawisher and Cynthia Selfe (Logan: Utah State Univ. Press and the National Council of Teachers of English, 1999), pp. 15-33. [This is the lead essay in the book.] Rpt. in Ellen Cushman, Eugene R. Kintgen, Barry M. Kroll, and Mike Rose, eds., *Literacy: A Critical Sourcebook*. Boston: Bedford St. Martin's, 2001. Pp. 70-84.

15. "An Official Language."  Rpt. (from *The English Only Question*) in *Writing About Diversity: An Argument Reader and Guide*, ed. Irene L. Clark (Fort Worth: Harcourt Brace, 1994), pp. 284-302.

16. "Language Is the Enemy." Rpt. (from *Declining Grammar*) in *Dimensions of Language*, ed. Boyd Davis.  (New York: Macmillan, 1993), pp. 427-31.

17. "Language, Culture, and Society," in *Introduction to Scholarship in Modern Languages and Literatures*, ed. Joseph Gibaldi.  2nd ed. (New York: Modern Language Association, 1992), pp. 28-52.

18. "Federal English and the Constitution," rpt. in *Language Loyalties*, ed. James Crawford.  Chicago: Univ. of Chicago Press (1992), pp. 36-40.

19. "The Legal Status of English in Illinois: Case Study of a Multilingual State," in *Not Only English: Affirming America's Multilingual Heritage*, ed. Harvey A. Daniels (Urbana: National Council of Teachers of English, 1990), pp. 13-26.

20. "Watching Our Grammar: The English Language for English Teachers," in *On Literacy and Its Teaching: Issues in English Education,* ed. Gail Hawisher and Anna Soter (Albany: State Univ. of New York Press, 1990), pp. 208-23.  [Review: Sharon J. Hamilton, *College English* 55 (1993): 794-800.

21. "Watching Our Grammar" (rpt. from *Grammar and Good Taste*), in *The Story of English: Study Guide and Reader* (Dubuque, IA: Kendall/Hunt, 1986).

22. "Nonstandard English, Composition, and the Academic Establishment," 1975; rpt. in *Readings in Applied English Linguistics,* ed. Harold B. Allen and Michael Linn, 3rd. ed. (New York: Alfred Knopf, 1982), pp. 436-43.

**Recent Articles:**

1. "Look it up in your *Funk & Wagnalls*: How Courts Define the Words of the Law," *Dictionaries* (forthcoming).

2.   "Corpus Evidence Illuminates the Meaning of Bear Arms," *Hastings Constitutional Law Quarterly* 46.3 (2019): 509–22.

3.   "A brief history of singular 'they,' *Oxford English Dictionary Blog,* Sept. 4, 2018. https://public.oed.com/blog/a-brief-history-of-singular-they/#__prclt=9gZeU4Sf

4.   "Antonin Scalia Was Wrong about the Meaning of 'Bear Arms," *Washington Post,* May 21, 2018. https://www.washingtonpost.com/opinions/antonin-scalia-was-wrong-about-the-meaning-of-bear-arms/2018/05/21/9243ac66-5d11-11e8-b2b8-08a538d9dbd6_story.html?utm_term=.9f23ab854a09

5.   "Nowadays, 'Like' Just Means 'Uh-Huh'" *Visual Thesaurus.* August 11, 2014. http://www.visualthesaurus.com/cm/wc/nowadays-like-just-means-uh-huh/' *Vocabulary.com http://www.vocabulary.com/articles/wc/nowadays-like-just-means-uh-huh/*

6.   "America's war on language." *OxfordWords Blog.* Sept. 17. http://blog.oxforddictionaries.com/2014/09/americas-war-language/ Days and Memories Blog. http://hgmsblog.weebly.com/blog/americas-war-on-language  Sept. 3.

7.   "Changing gender in language isn't easy." *New York Times,* "Room for Debate" Oct. 19, 2014. http://nyti.ms/1tDISSa

8.   "Nobody likes a whistleblower, wrayer, snitch, narker, denunciator, quadruplator, or emphanist." *Visual Thesaurus.* Feb. 23, 2014.

9.   "Plain English: It's the law." *Visual Thesaurus.* Feb. 7, 2014. http://www.visualthesaurus.com/cm/wc/plain-english-its-the-law/

10.  "Banning words for the new year." *Vocabulary.com.* January 20, 2914. http://www.vocabulary.com/articles/wc/banning-words-for-the-new-year/"  *Visual Thesaurus.* January 20, 2014. http://www.visualthesaurus.com/cm/wc/banning-words-for-the-new-year/

11.  "Dennis Baron's Word of the Year for 2013: 'marriage'" *Visual Thesaurus.* Dec. 24, 2013. http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2013-marriage/

12.  "The highest dictionary in the land?" *Oxford University Press Blog.* June 23, 2013. http://bit.ly/11UkV54

13.  "The highest dictionary in the land?" *Visual Thesaurus.* June 24, 2013. http://bit.ly/11GYbGK

14.  "Will the real Gettysburg Address please stand up?" *Visual Thesaurus.* Nov. 19, 2013. http://www.visualthesaurus.com/cm/wc/will-the-real-gettysburg-address-please-stand-up/

15.  "Pens and Pencils Down: New York City's 'Banned Words' Controversy." *Visual Thesaurus.* April 4, 2012. http://www.visualthesaurus.com/cm/wc/3212/

16.  "Wikipedia: Write first, ask questions later." Rpt. in James C. McDonald, *The Reader.* New York: Pearson, 2012.

17.  "Learning not to curse in Arizona." *Oxford Univ. Press blog.* May 27, 2012

18.  "Why we misread." *Visual Thesaurus.* July 3, 2012. http://www.visualthesaurus.com/cm/wc/why-we-misread/

19.  "Grammar freaks really *are* strange." *Cultural Weekly.* July 19, 2012. http://www.culturalweekly.com/grammar-freaks-strange.html

20.  "Grammar sticklers may have OCD." *Oxford Univ. Press Blog.* Aug. 18, 2012. http://blog.oup.com/2012/08/grammar-sticklers-may-have-ocd/

21.  "The e-reader over your shoulder." *Visual Thesaurus.* Nov. 12, 2012. http://www.visualthesaurus.com/cm/wc/the-e-reader-over-your-shoulder/

22.  "The e-reader over your shoulder." *Oxford University Press blog,* Nov. 24, 2012. http://blog.oup.com/2012/11/the-e-reader-over-your-shoulder/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+oupblog+%28OUPblog%29

23.  "Apple patents page-turning. What's next, the letter "i"? *Visual Thesaurus.* Nov. 27, 2012. http://www.visualthesaurus.com/cm/wc/apple-patents-page-turning-whats-next-the-letter-i/

24.  "Dennis Baron's Word of the Year for 2012 is #hashtag." *Visual Thesaurus,* Dec. 16, 2012. http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2012-hashtag

25.  "No laptops: Classroom bans on digital devices are spreading." *Visual Thesaurus,* Jan. 14, 2013. http://www.visualthesaurus.com/cm/teachersatwork/no-laptops-classroom-bans-on-digital-devices-are-spreading/

26. "National Grammar Day in Wartime." *Visual Thesaurus.* Mar. 4, 2013. http://www.visualthesaurus.com/cm/wc/national-grammar-day-in-wartime/
27. "The Great Language Change Hoax." *Academe.* (The AAUP blog). April 1, 2013. http://academeblog.org/2013/04/01/the-great-language-change-hoax/
28. "English-only in the exit row." *Oxford Univ. Press Blog.* April 29, 2011. http://blog.oup.com/2011/04/exit-row/
29. "The most human computer?" *Oxford Univ. Press Blog.* May 5, 2011. http://blog.oup.com/2011/05/human-computer/
30. "Teaching commas won't help." *Visual Thesaurus,* May 16, 2011. http://www.visualthesaurus.com/cm/wc/2848
31. "Teaching commas won't help." *Oxford Univ. Press Blog.* June 14, 2011. http://blog.oup.com/2011/06/teaching-commas/
32. "Webster's lays down the law." *Visual Thesaurus Magazine.* June 15, 2011. http://www.visualthesaurus.com/cm/dictionary/2883/
33. "But the dictionary says. . ." *Oxford Univ. Press Blog.* June 27, 2011. http://blog.oup.com/2011/06/dictionary-courtroom/
34. "Content-Free Prose: Death of Writing or Next Big Thing?" *Visual Thesaurus.* June 29, 2011. http://www.visualthesaurus.com/cm/wc/2893?utm_source=rss
35. "Content-Free Prose: Death of Writing or Next Big Thing?" *Oxford Univ. Press Blog.* July 8, 2011. http://blog.oup.com/2011/07/content-free-prose/
36. "Are laws requiring English signs discriminatory?" *Oxford Univ. Press Blog.* July 21, 2011. http://blog.oup.com/2011/07/english-signs/
37. "Computers remember so you don't have to." *Oxford Univ. Press Blog.* July 28, 2011. http://blog.oup.com/2011/07/google-effect/
38. "That ugly Americanism? It could well be British." *Oxford Univ. Press Blog.* Aug. 5, 2011. http://blog.oup.com/2011/08/ugly-americanism/
39. "New words are great for back to school." *Visual Thesaurus.* Aug. 30, 2011. http://www.visualthesaurus.com/cm/dictionary/2956/?utm_source=rss
40. "New words are great for back to school." Oxford Univ. Press Blog, Sep. 1, 2011. http://blog.oup.com/2011/09/school-words/
41. "The linguistic impact of 9/11? '9/11' itself." Visual Thesaurus. Sep. 12, 2011. http://www.visualthesaurus.com/cm/dictionary/2969/
42. "The linguistic impact of 9/11." *Oxford Univ. Press Blog.* Sep. 12, 2011. http://blog.oup.com/2011/09/linguistic-impact/
43. "The only linguistic impact of 9/11 is '9/11' itself." *Cultural Weekly,* Sep. 14, 2011. http://www.culturalweekly.com/only-linguistic-impact-of-911-is-911-itself.html
44. "Are there alternatives to global English?" *Visual Thesaurus.* Sept. 27, 2011. http://www.visualthesaurus.com/cm/wc/2985/
45. "Is resistance futile? Are there alternatives to global English?" *Cultural Weekly.* Sept. 29, 2011. http://www.culturalweekly.com/is-resistance-futil-are-there-alternatives-to-global-english.html
46. "Resistance may be futile: Are there alternatives to global English?" *OUP Blog,* Oct. 11, 2011. http://blog.oup.com/2011/10/global-english/; reposted in the Daily Beast, Oct. 12, 2011. http://andrewsullivan.thedailybeast.com/2011/10/english-has-taken-over.html
47. "Is this the last print dictionary?" *Cultural Weekly.* Oct. 19, 2011. http://www.culturalweekly.com/is-this-the-last-print-dictionary.html
48. "The laws of English punctuation." *Visual Thesaurus.* Oct. 24, 2011. http://www.visualthesaurus.com/cm/wc/3011/
49. "Talk like Shakespeare Day." *Cultural Weekly.* Oct. 27, 2011. http://www.culturalweekly.com/talk-like-shakespeare-day.html
50. "Occupy Wall Street: Can the revolution be trademarked?" *Oxford University Press Blog.* Nov. 28, 2011. http://blog.oup.com/2011/11/occupy-trademark/
51. "Dennis Baron's Word of the Year for 2011: 'Volatility.'" *Visual Thesaurus.* Dec. 2, 2011. http://www.visualthesaurus.com/cm/wc/3052/
52. "How to save an endangered language." *Oxford University Press Blog.* Dec. 4, 2011. http://blog.oup.com/2011/12/endangered-language/

Dennis Baron, *Vita,* 7

53. "The top language stories of 2011." *Visual Thesaurus.* Dec. 20, 2011. http://www.visualthesaurus.com/cm/wc/3072

54. "Dictionary droids write definitions untouched by human hands." *Oxford Univ. Press Blog.* Jan. 24, 2012. http://blog.oup.com/2012/01/dictionary-droids-write-definitions-untouched-by-human-hands/

55. "The Writer's Meme." *Cultural Weekly.* Feb. 22, 2012. http://www.culturalweekly.com/the-writers-meme.html

56. "Alejandrina Cabrera should be on the San Luis City Council ballot." *Oxford Univ. Press Blog.* Feb. 28, 2012. http://blog.oup.com/2012/02/alejandrina-cabrera-san-luis-city-council/

57. "Learning not to curse in Arizona." *Cultural Weekly.* Mar. 15, 2012. http://www.culturalweekly.com/learning-not-to-curse-in-arizona.html

58. "The iPad: What's a Gutenberg moment, anyway?" *Visual Thesaurus,* March 7, 2010, http://www.visualthesaurus.com/cm/wc/2240/

59. "The iPad: What's a Gutenberg moment, anyway?" *Oxford University Press Blog.* March 8, 2010. http://blog.oup.com/2010/04/ipad/

60. "Yes, we want": Who owns global English? *Visual Thesaurus,* May 4, 2010, http://www.visualthesaurus.com/cm/wc/2264/

61. "The New Technologies of the Word." Rpt. in *The Arlington Reader* (New York: Bedford St. Martins, 2010.

62. "Don't read this: What Kindle's Highlights tell us about popular taste." The Visual Thesaurus. July 2, 2010. http://www.visualthesaurus.com/cm/wc/2339/

63. "Revising our freedom: Digital archeology and Jefferson's rough draft of the Declaration of Independence." Oxford University Press blog, July 9, 2010. http://blog.oup.com/2010/07/revising-our-freedom/

64. "Robot teachers!!! Coming soon, to a classroom near you!!!" Oxford University Press blog, July 13, 2010. http://blog.oup.com/2010/07/robot-teachers; repost, io9.com, July 28, 2010. http://io9.com/5599084/robot-teachers-coming-soon-to-a-classroom-near-you

65. "The gender-neutral pronoun: Still an epic(ene) fail." *Visual Thesaurus*. August 9, 2010. http://www.visualthesaurus.com/cm/dictionary/2384/; OUP blog, Aug. 26, 2101, http://blog.oup.com/2010/08/gender-neutral-pronoun/

66. "Technology update: Flying books can be dangerous." Oxford University Press blog, August 13, 2010. http://blog.oup.com/2010/08/ebooks-3/

67. "Is it 'Miss' or 'Ms'?" Oxford University Press blog. Aug. 16, 2010. http://blog.oup.com/2010/08/miss-or-ms/; rpt. as "What's in a Name? For "Ms.," a Long History." on *Ms. Magazine blog*, Aug. 27, 2010, http://msmagazine.com/blog/blog/2010/08/27/whats-in-a-name-for-ms-a-long-history/

68. "Good grammar leads to violence at Starbucks?" *Visual Thesaurus.* August 17, 2010. http://www.visualthesaurus.com/cm/wc/2394/

69. "Good grammar leads to violence at Starbucks?" *Oxford University Press* blog. Aug. 20, 2010. http://blog.oup.com/2010/08/starbucks/

70. "Facebook says, 'All your face are belong to us.'" Oxford University Press blog, Aug. 31, 2010. http://blog.oup.com/2010/08/facebook-trademark/

71. "Facebook says, 'All your face are belong to us.'" *Visual Thesaurus.* Sept. 9, 2010. http://www.visualthesaurus.com/cm/dictionary/2414/

72. "The English Language Unity Act: Big government only a tea partier could love." *Oxford University Press blog,* Sept. 24, 2010. http://blog.oup.com/2010/09/english-language-unity/; rpt *Dallas Morning News,* Sept. 24, 2010. http://topics.dallasnews.com/article/0gsfem7buy0AM; rpt. NPR quotes, Sept. 24, 2010. http://topics.npr.org/quote/0bqS3ST97z0yC; rpt. Latest Law News, Sept. 24, 2010, http://www.tollfree800legal.com/news/latest-law-news.cfm?Next-News-ID=3524647&start=51;

73. "It's alive! New computer learns language like a human, almost." *Oxford University Press blog.* Oct. 11, 2010. http://blog.oup.com/2010/10/computer-learns-language/ Picked up by NPR, the BBC, technorati, and techeye.

74. "Killer app: Seven dirty words you can't say on your iPhone." *Oxford University Press Blog.* Oct. 18, 2010. http://blog.oup.com/2010/10/dirty-words/

Dennis Baron, *Vita,* 8

75. "Killer app: Will the iPhone monitor your language?" *The Visual Thesaurus.* Oct. 19, 2010.
http://www.visualthesaurus.com/cm/wc/2455/
76. "A Literal Paradox." *Visual Thesaurus.* Oct. 26, 2010.
http://www.visualthesaurus.com/cm/dictionary/2465/
77. "A Literal Paradox: *literally* generally means 'figuratively.' *Oxford Univ. Press Blog.* Oct. 29, 2010. http://blog.oup.com/2010/10/literal-paradox/
78. "All hail Goddess English." *Oxford University Press Blog.* Nov. 9, 2010.
http://blog.oup.com/2010/11/all-hail-goddess-english/
*79.* "The tweet police are watching." *The Visual Thesaurus.* Nov. 17, 2010.
http://www.visualthesaurus.com/cm/wc/2506/
*80.* " ☺ when you say that, pardner," – the tweet police are watching." *Oxford University Press Blog,* Nov. 22, 2010. http://blog.oup.com/2010/11/tweet-police/
*81.* "On the internet, nobody knows you can't spell." *Oxford University Press Blog,* Nov. 29, 2010.
http://blog.oup.com/2010/11/you-cant-spell/
*82.* "The Noun Game: A simple grammar lesson leads to a clash of civilizations." Oxford Univ. Press blog. Dec. 10, 2010. http://blog.oup.com/2010/12/noun-game/
*83.* "President has Americans running to the dictionary." *Visual Thesaurus.* Dec. 13, 2011.
http://www.visualthesaurus.com/cm/dictionary/2531/
*84.* "Books by the numbers." *Visual Thesaurus.* Dec. 20, 2010.
http://www.visualthesaurus.com/cm/wc/2546/
*85.* "Books by the numbers." *Oxford Univ. Press Blog.* Jan. 6, 2011.
http://blog.oup.com/2011/01/books-by-the-numbers/
*86.* "Defending the language with bullets." *Oxford Univ. Press Blog.* Jan. 14, 2011.
http://blog.oup.com/2011/01/bullets/
*87.* "The government does not control your grammar." *Oxford Univ. Press Blog,* Jan. 28, 2011.
http://blog.oup.com/2011/01/grammar/
*88.* "The Supreme Court Debates: What does 'personal' mean?" *Visual Thesaurus.* Jan. 24, 2011.
http://www.visualthesaurus.com/cm/dictionary/2582/
*89.* "#twitterrevolution—reforming Egypt 140 characters at a time." *Oxford Univ. Press Blog,* Feb. 17, 2011. http://blog.oup.com/2011/02/twitter-revolution/
*90.* "The government's out-of-date definition of writing." *Visual Thesaurus.* Feb. 18, 2011.
http://www.visualthesaurus.com/cm/dictionary/2628/
*91.* "The government's definition of writing is seriously out of date." *Oxford Univ. Press Blog.* Feb. 28, 2011. http://blog.oup.com/2011/02/dictionary-act/
*92.* "Who cares about National Grammar Day? Or is it *whom?*" *Oxford Univ. Press Blog.* Mar. 4, 2011. http://blog.oup.com/2011/03/grammar-day
*93.* "When news breaks, people look it up in the dictionary." *Visual Thesaurus.* March 10, 2011.
http://www.visualthesaurus.com/cm/dictionary/2655/
*94.* "It's time for English teachers to stop teaching that the world is flat." *Oxford Univ. Press Blog.* Mar. 18, 2011. http://blog.oup.com/2011/03/english-teachers
*95.* "Happy birthday OK: the world's most-popular word turns 172," *Oxford Univ. Press Blog.* Mar. 23, 2011. http://blog.oup.com/2011/03/ok-day/
*96.* "OED Hearts OMG." *Visual Thesaurus*. April 11, 2011.
http://www.visualthesaurus.com/cm/dictionary/2815/
97. "TSA bans reading on international flights." *Indyposted,* Jan. 4, 2010.
http://indyposted.com/8627/tsa-bans-reading-on-international-flights/
98. "Say goodbye to the decade with no name." *Visual Thesaurus,* Dec. 18, 2009.
http://www.visualthesaurus.com/cm/wc/2100/
99. "English teachers council gives Glenn Beck the 'Doublespeak Award'." My statement was reprinted verbatim in a *Washington Post* article about the Doublespeak Award by Valerie Strauss, Nov. 23, 2009, http://voices.washingtonpost.com/answer-sheet/accountability/ncte-award-glenn-beck-the-doub.html
100. "The Noun Game." *The Visual Thesaurus.* Nov. 16, 2009.
http://www.visualthesaurus.com/cm/wc/2067/
101. "Technology reduces the value of old people, MIT computer guru warns." Oxford Univ. Press, OUPBlog, Nov. 11, http://blog.oup.com/2009/11/old-people/

Dennis Baron, *Vita,*  9

102. "Happy belated 40th birthday to the internet." Oxford Univ. Press, OUPBlog, Nov. 3, http://blog.oup.com/2009/11/40th-birthday-internet/

103. "Two thumbs up? Researchers predict that by 2013, we'll all be Tweeting." Oxford Univ. Press, OUPBlog, Oct. 27 http://blog.oup.com/2009/10/universal_authorship/

104. "Blogging for pay." Oxford Univ. Press, OUPBlog, Oct. 8, http://blog.oup.com/2009/10/blogging-for-pay/

105. "Amazon sales rank: I'm being outsold by a book on tattoos." Oxford Univ. Press, OUPBlog, Sept. 25, http://blog.oup.com/2009/09/amazon-rank/

106. "The Spellings Commission, the ACT, and the ETS Just Don't Read America's Literacy Right." *College Composition and Communication* 61.1 (Sept. 2009): W424-35.

107. "The Elements of Style at 50: If You Celebrate, Use the Active Voice." Visual Thesaurus, April 6, 2009, http://www.visualthesaurus.com/cm/dictionary/1805

108. " 'Tis Talk Like Shakespeare Day in Chicago, Methinks." Visual Thesaurus, April 23, 2009. http://www.visualthesaurus.com/cm/dictionary/1827/

109. "Amazon Fail 2.0: Orwell Removed from Kindles." Visual Thesaurus, July 21, 2009. http://www.visualthesaurus.com/cm/wc/1922/

110. "Amazon Fail 2.0: Bookseller's Big Brother removes Orwell's Big Brother from Kindles everywhere." Oxford Univ. Press  OUPblog. July 21, 2009. http://blog.oup.com/2009/07/amazon_fail2/

111. "Digital Text." Letters. *Wilson Quarterly* (winter, 2010), p. 6.

112. "Multitasking: Learning to teach and text at the same time." Oxford Univ. Press Blog, Jan. 25, 2010. http://blog.oup.com/2010/01/teach-and-text/#more-7305

113. "Will the iPad change your life?" Oxford Univ. Press Blog, Jan 28, 2010. http://blog.oup.com/2010/01/will-the-ipad-change-your-life/

114. "Sliced Bread 2.0." Oxford Univ. Press Blog, Feb. 24, 2010. http://blog.oup.com/2010/02/sliced-bread-2-0/

115. "Should everybody write? The destabilizing technologies of communication." Oxford Univ. Press Blog, Mar. 16, 2010. http://blog.oup.com/2010/03/should-everybody-write/   a day later, there were 25 reposts of the essay.

116. "Should everybody write?" *Visual Thesaurus.* Mar. 16, 2010. http://www.visualthesaurus.com/cm/wc/2204/

117. "Multitasking: Learning to Teach and Text at the Same Time" *Quality Teacher* (a quarterly journal of Bato Balani Foundation, the Philippines; forthcoming).

118. "The book, the scroll, and the web." Oxford Univ. Press Blog, April 2, 2010. http://blog.oup.com/2010/04/scroll-book/

119. "March 10: The telephone is 133 years old today. Call me." *Visual Thesaurus.* March 10, 2009. http://www.visualthesaurus.com/cm/dictionary/1768/

120. "Lincoln the writer at 200." *The Visual Thesaurus.* Feb 13, 2009. http://www.visualthesaurus.com/cm/wc/1722/

121. "No Students Left Behind: Why Reports on the Literacy Crisis from the Spellings Commission, the ACT, and the ETS Just Don't Read America's Literacy Right." *College Composition and Communication* 61.1 (Sept. 2009): W424-35.

122. "Noah Webster at 250: A Visionary or a Crackpot?" *The Visual Thesaurus.* Oct. 16, 2008. http://www.visualthesaurus.com/cm/dictionary/1576/

123. "Can commas shoot down gun control?" *Los Angeles Times,* March 22, 2007.  Rpt. *Oxford Magazine* no. 264 (Oxford Univ.), Spring (second week, Trinity term) 2007, pp. 12-13.; also rpt., *The Green Bag,* second series, vol. 10, no. 40 (Quarterly Law review of the George Mason School of Law), Summer 2007.

124. "Don't write off the pencil just yet." *Los Angeles Times,* Jan. 23, 2007, A15.

125. "No academic bill of rights?" *Inside Higher Education,* June 13, 2006. www.ihe.com.

126. "Churchill fallout: It's about academic freedom." *Inside Higher Education,* May 26, 2006. www.ihe.com.

127. "I'm not really a professor, I just play one on TV." *Inside Higher Education,* Oct. 14, 2005.

128. "The College Board's New Essay Reverses Decades of Progress Toward Literacy." *Chronicle of Higher Education.* May 6, 2005. Pp. B14-15; rpt. in *Newsletter of the Northeast Association of Pre-Law Advisors,* Fall 2005.

129. "The New Nativism: Language Policy and Linguistic Ideology in the United States." *Ryukyus Journal of American Studies* (April, 2005): 1-12.

130. "Not Searching for Skeletons." *Chronicle of Higher Education,* Jan. 14, 2005, C1;4.

131. "The Tongue Who Would Be King." *Science and Spirit,* November/December 2004, pp. 28-33.

132. "The President's Reading Lesson." *Education Week*, Sept. 8, 2004, p. 43.

133. "A Diverse Department." *Chronicle of Higher Education,* August 13, 2004, C2-3.

134. "Avoiding the Role of Straight Man." *Chronicle of Higher Education,* June 18, C1;4.

135. "Around the Clock." *Chronicle of Higher Education,* May 21, 2004, C1;4.

136. "It's Just Grammar. Whom Really Cares?" *Los Angeles Times,* May 7, 2004, B17; rpt., *Austin* (Texas) *American-Statesman, Adrian* (Michigan) *Daily Telegram,* May 12, 2004.

137. "What Am I Worth?" *Chronicle of Higher Education.* April 23, 2004, C1;4.

138. "Lessons in Department Budgeting." *Chronicle of Higher Education.* March 26, 2004, C2-3.

139. "Language and society." For PBS Documentary, "Do you speak American?" www.pbs.org/speak/words/sezwho/socialsetting.  [Rpt. in Insightful Writing, ed. David Sabrio and Mitchel Burchfield.  Boston: Houghton, Mifflin, 2008.

140. "No Translation Needed: 'Door Is Closed.'" *Los Angeles Times,* March 14, 2004, M5 [rpt. *Atlanta Journal-Constitution, Kansas City Star; Myrtle Beach* (South Carolina) *Sun-News;* Bryan-College Station (TX) *Eagle;* translated into Finnish for *Helsingin Sanomat* (Helsinki, Finland), March 28, 2004].

141. "New Programs, New Problems." *Chronicle of Higher Education.* Feb. 27, 2004. C1;4.

142. "Intervening in the Classroom." *Chronicle of Higher Education.* Jan. 30, 2004, C1;4

143. "Sharing Inside Information." *Chronicle of Higher Education.* Dec. 19, 2003, C1; 4.

144. "McLanguage Meets the Dictionary." *Chronicle of Higher Education.* Dec. 19, 2003, B14.

145. "Not What I Signed Up For." *Chronicle of Higher Education,* Nov. 21, 2003, C1; C4.

146. "Professors Behaving Badly." *Chronicle of Higher Education,* October 24, 2003, C3-4.

147. "Learning to Be a Department Head." *Chronicle of Higher Education,* Sept. 22, 2003, C5.

148. "Life After Tenure." *Chronicle of Higher Education,* July 21, 2003.

149. "When Tenure Fails." *Chronicle of Higher Education,* June 10, 2003.

150. "Teaching Grammar Doesn't Lead to Better Writing." *Chronicle of Higher Education,* May 16, 2003, B20.

151. "Promoting Late Bloomers." *Chronicle of Higher Education,* April 25, 2003.

152. "The Tenure Files: Getting Through the College." *Chronicle of Higher Education,* Feb. 14, 2003.

153. "External Reviewers." *Chronicle of Higher Education,* January 7, 2003.

154. "A Look at the Record." *Chronicle of Higher Education,* Nov. 7, 2002.

155. "I Teach English—and I Hate Reader's Guides." *Chronicle of Higher Education,* Oct. 4, 2002, p. B5.

156. "Good Grammar and the Career Network." *Chronicle of Higher Education,* July 31, *2002.*

157. "Language Use and Grammar." The September, 2002, module for "Teaching *Composition*," a listserv for the composition teaching community, published by McGraw-Hill. http://www.mhhe.com//socscience/english/tc.

158. "Getting Promoted." *Chronicle of Higher Education,* Sept. 5, 2002.

159. "The Job Search: You're the One." *Chronicle of Higher Education,* April 12, 2002.

160. "The Campus Visit." *Chronicle of Higher Education,* Feb. 24, 2002.

161. "Will Anyone Accept the Good News on Literacy?" *Chronicle of Higher Education,* Feb. 1, 2002, B10.

162. "The Job Interview." *Chronicle of Higher Education,* Jan. 21, 2002.

163. "To Whom It May Concern: Reading Job Applications." *Chronicle of Higher Education,* Dec, 21, 2001.

164. "The Hiring Season." *Chronicle of Higher Education,* Nov. 9, 2001.

165. "America Doesn't Know What the World Is Saying." Op-Ed essay, *The New York Times,* Oct. 27, 2001, A21. Rpt. *Cleveland Plain Dealer,* Oct. 30, 2001, B11.

166. "The End of Linguistics: a response" letter to the editor, *The American Scholar* (Spring, 2001): 155-56.

167. "The Official Secrets Act in Academic Publishing." *Chronicle of Higher Education*, Feb. 16, 2001, B5.

168. "Literacy and technology." In Linda K. Shamoon, R. M. Howard, S. Jamieson, and R. A. Schwegler, eds., *Coming of Age: The Advanced Writing Curriculum.* Portsmouth, NH: Heinemann, Boynton/Cook, 2000 and on CD-rom. Approx. 8 pp.
169. "Ebonics and the Politics of English." *World Englishes* 19 (March, 2000): 5-19.
170. "Technology's Impact on Writing." Letter. *Chronicle of Higher Education*, Jan. 21, 2000, B11.
171. "To Sir, or Ma'am, with Love." *Education Week.* Sept. 8, 1999, 45.

**The Web of Language:** a blog running from 2007 to the present dealing with issues of language and technology: http://bit.ly/1B29f6v Over 1.5 million page views..

**Recent Invited Lectures, Workshops and Conference Presentations:**

1. "Corpus Linguistics and the Original Meaning of the Second Amendment." University of Chicago Law School, 12 January, 2021.
2. Author interviews, "What's Your Pronoun?" New York Public Library, 4 February, 2020; Politics and Prose Books (Washington, DC), 5 February; Cuyahoga County Public Library. 6 February; Kansas City Public Library (MO), 11 February; Town Hall Seattle, 16 February; Powells Books, Portland OR, 17 February; City Lights Books, San Francisco, 18 February.
3. "Guns and Grammar: Big Data and the Meaning of 'bear arms' in the Second Amendment." Conference on Law and Corpus Linguistics, Brigham Young Univ. Law School, Feb. 6-8, 2019.
4. "Corpus evidence and the meaning of 'bear arms.'" Symposium: *District of Columbia v. Heller* 10 years on, Hastings College of Law, San Francisco, CA, Jan. 18, 2019.
5. "What's Your Pronoun?" Language Policy Forum, Sheffield Hallam University, UK, June 1, 2018.
6. "America's War on Language," Invited Lecture, University of Pennsylvania, April 19, 2018.
7. "Guns and Grammar: The Linguistics of the Second Amendment," Neubauer Symposium on Historical Semantics, University of Chicago, April 13, 2018.
8. "Speak the Language of Your Flag: Language and Immigration in the US, 1918-2018," Language and Borders Conference, University of Bristol, UK, March 26, 2018.
9. "Pronoun Showdown," Invited lecture, University of Essex, UK, Nov. 23, 2017.
10. "Going native: Brexit prompts linguistic cleansing." Conference on UK Language Policy after Brexit. Sheffield Hallam University (Sheffield, UK), Sept. 15, 2016.
11. "Pronoun Showdown: Are nonbinary pronouns and singular *they* ruining the language or making English great again?" Univ. of Tennessee (Knoxville), April 11, 2016.
12. "Speak the language of your flag." Present-Day English Discussion Group, Modern Language Association. Jan. 9, 2014.
13. "#twitterrevolution: Destabilizing the world, 140 characters at a time." Univ. of Sussex (Brighton, UK). March 21, 2013.
14. "Speak the language of your flag." In "creative" conversation, with Michael Erard. *Modern Language Association.* Boston, Jan. 3, 2013. Speakers invited by MLA Executive Director Rosemary Feal.
15. "Official English from the school house to the White House." Englishes in Europe Conference. Univ. of Sheffield. April, 2012.
16. "#twitterrevolution: Destabilizing the world, 140 characters at a time." Temple Contemporary, Temple University Art Museum. Oct. 11, 2012.
17. "Guns and grammar: Linguistic authority and legal interpretation in *Washington, D.C., v. Heller"* Stanford University. Nov. 10, 2011.
18. "Should everybody write? The destabilizing technologies of communication." Univ. of Chicago Semiotics Workshop, March 11, 2010.
19. "Guns and grammar: The linguistics of the Second Amendment." Law and Society Annual Conference, Denver, CO, June 30, 2009.
20. "Let's go to the phones." Univ. of Michigan invited lecture. Dec. 5, 2008.
21. "Policing English in America from the White House to the schoolhouse." Conference on prescriptivism in language. Univ. of Paris VII (Sorbonne), Paris, FR. Nov. 15, 2007.

22. "It's All Your Fault: Who's Really to Blame for the Literacy Crisis?" Conference on College Composition and Communication. New York City, March 2007.
23. "No University Student Left Behind: Writing and the Secretary of Education's Commission on Higher Education." Conference on College Composition and Communication. Chicago, March 2006.
24. "The Perils of the new SAT Writing Test." Conference on College Composition and Communication. San Francisco. March 17, 2005.
25. "Spanish, English and the New Nativism." Modern Language Association. Philadelphia. Dec. 30, 2004.
26. "Reading and Writing in the Digital Age." Invited presentation. Illinois Library Association, Chicago, September 30, 2004.
27. "Language Policies and Language Politics in the United States." "English and Minority Languages in the 2000 Census." Invited lectures, Univ. of Ryukyu, Okinawa, Japan, June, 2004.
28. "TeknoFear." Invited lecture, Northeastern Illinois University, April 15, 2004.
29. "Standards: They're Not for Everybody." Conference on College Composition and Communication. San Antonio, TX, March 25, 2004.
30. "The New Technologies of the Word." Plenary lecture. International Association of World Englishes Conference, Univ. of Illinois, October 17, 2002.
31. "Writing Effective Promotion Dossiers," Provost's Seminar, Univ. of Illinois, Sept. 7, 2001.
32. "Promotion and Tenure," a workshop for new executive officers, Association of Departments of English seminar, Monterey, California, June 29, 2001.
33. "From Pencils to Pixels: The New Technologies of Literacy." Invited lecture, UC Davis, March 2, 2001.
34. "The Illinois Professional Learning Partnership." Conference on College Composition and Communication, Denver, CO, March 15, 2001.
35. "Writing Effective Third-Year Faculty Reviews," Provost's Seminar, Univ. of Illinois, Feb. 26, 2001.
36. "Outreach for the Humanities," response to Graham Spanier; Chancellor's Conference, Univ. of Illinois, Jan. 31, 2001.
37. "Other Teachers' Students." Conference on College Composition and Communication, Minneapolis, MN, April 15, 2000.

**Recent Media Interviews**

1. Interviews for *What's Your Pronoun?* 2020-21: CBS Radio (NYC); NPR Weekend All Things Considered; CAP Radio (Sacramento, CA); Wisconsin Public Radio; KPBS San Diego; KWGS, Tulsa, OK; Slate: The Gist; KERA Radio; KATU TV, Portland, OR; KQED, San Francisco Public Radio; KPCC, Los Angeles; Talk the Talk (podcast); The Vocal Fries (podcast); That Word Chat (podcast).
2. "Tapestry," CBC-Radio "The Longing for Belonging," interview on pronouns, June 28, 2018.
3. "Air Talk," Larry Mantle, KPCC-NPR Los Angeles, Pronouns, Mar. 6, 2018.
4. "Do Official English laws work?" interview, KCBS, San Francisco. Aug. 24, 2017.
5. "Latinos in America." PBS documentary, aired October, 2013.
6. Various radio appearances on WILL-AM discussing language issues 1984-present.
7. "Extension 720" with Milt Rosenberg. WGN radio, Oct. 16, 2009. 2-hour interview about *A Better Pencil.*
8. Steve Fast, "The Classroom Connection" Oklahoma Public Radio, interview about *A Better Pencil.* Oct. 1, 2009.
9. Valerie Richardson Show. WPKN, Bridgeport CT, April 21, 2009. Half-hour interview about my work on usage and on technology.
10. Jim Brown, "The Current." CBC-Radio, Canada. July 15, 2008. Interview on Esperanto.
11. "The Peter Laufer Show", Green Radio 960 (San Francisco). 60 min. interview on Broadcast English, Dec. 28, 2008.

12. "Official English in Small Town America," *Eight Forty-Eight,* WBEZ-FM (Chicago public radio), June 13, 2007.  Lead interview for the show, also featured on the WBEZ web site: http://www.wbez.org/Program_848_Segment.aspx?segmentID=11395
13. "The English Language." Focus 580, WILL-AM, multiple appearances each year from 1982-present.
14. "Good English." The Robin and Maynard Show. KQBZ-FM (Seattle), May 3, 2005.
15. "Pronunciation in American English." Interview by Avi Arditti and Roseann Skirble broadcast on "Coast to Coast" by Voice of America (4/24/03); posted on voanews.com/wordmaster.
16. "The English Language," The Joan Rivers Show, WOR-AM, New York, June 25, 2001.
17. "The *New Oxford Dictionary of English,*" "Sandy Rios Live," WYLL-FM, Chicago, Aug. 14, 1998.

**Editorships and Commissions:**

Chair, Committee on Public Policy, Conference on College Composition and Communication, National Council of Teachers of English, 2003-06.
Member, Board of Advisors for the television series "Do You Speak American?" with Robert MacNeil.
Member, *PMLA* Advisory Committee, 1998-2001.
Member, editorial advisory board, *Liverpool Studies in Language and Discourse*, 1993-present.
Member, MLA Delegate Assembly, 1998-2003.
Chair, MLA Division on Language and Society, 2001-02.
Member, Commission on Language, National Council of Teachers of English, 1984-87; 1999-2002.
Editor, *Publication of the American Dialect Society* (monograph series) 1984-93.
Member, Committee on Language and the Schools, Linguistic Society of America, 1992-1997.
Associate Editor, *Publication of the American Dialect Society,* 1982-84.

**Memberships in Professional Organizations:**

American Dialect Society (life member; member, Committee on New Words, 1975-82; member, Committee on Usage, 1982-present; member, Centennial Publications Committee; Centennial Publicity Committee; Centennial Documentaries Committee).
Modern Language Association (member, Delegate Assembly, 1996-99).
National Council of Teachers of English (member, Commission on the English Language, two terms). Chair, Committee on Public Language, 2009-12.
Conference on College Composition and Communication.
Conference of Editors of Learned Journals, 1985-93.
Linguistic Society of America; member, Committee on Language in the Schools, 1992-94.
Illinois Association of Teachers of English (member, program committee, 1987-88).

**Biographical Notices:**

*Who's Who in America*
*Directory of American Scholars*
*Contemporary Authors*
*Who's Where Among Writers*
*International Authors and Writers Who's Who*
*International Linguistic Directory*
*Who's Who in American Education*

Dennis Baron, *Vita,* 14

*Who's Who in the World*
*Who's Who in the Humanities*

**Consulting:**

*Legal consulting and expert witness reports and testimony for a variety of law firms and for the Sate of California Attorney General..*

*Media consulting for television, radio, and newspapers, including ABC's Nightline, Champaign-Urbana News-Gazette, The Chicago Tribune, Cincinnati Enquirer, Los Angeles Times, The McNeil-Lehrer Report, The New York Times, Newsweek, Orlando Sentinel,* Prentice-Hall, *Scripps-Howard Newspapers,* Scott-Foresman, Inc., *Springfield* (IL) *Register, USA Today, U.S. News and World Report*, WICD-TV (Champaign, IL), William Safire.

*Professional consulting for numerous academic and university presses.*

# EXHIBIT "C"

# EXHIBIT "C"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>        Plaintiffs,<br>v.<br><br>PLATKIN, et al.,<br><br>        Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>        Plaintiffs,<br>v.<br><br>PLATKIN, et al.,<br><br>        Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>       Plaintiffs,<br>v.<br><br>PLATKIN, et al.,<br><br>       Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Expert Report of Saul Cornell**

---

## I.       INTRODUCTION

I have been asked by the Office of the Attorney General for the State of New Jersey to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. I have also been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

## II.      BACKGROUND AND QUALIFICATIONS

I received my BA from Amherst College and MA and PhD from the University of Pennsylvania. I currently hold the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American History. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law

School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers v. City of Boulder*, No. 2018-cv-30581 (Colo. D. Ct., Boulder Cty.); *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.); *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226 (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537 (S.D. Cal.); and *Duncan v. Bonta*, No. 3:17-cv-01017 (S.D. Cal.); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal.); *Boland v. Bonta*, No. 8:22-cv-1421 (C.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-746

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

(C.D. Cal.); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718 (S.D. Cal.); *NAGR v. Campbell*, No.1:22-cv-11431 (D. Mass.); *NAGR v. Lamont*, No. 3:22-cv-0118 (D. Conn.); *NAGR v. Lopez*, No. 1:22-cv-404 (D. Haw.); *Rhode Island v. Ortiz*, No. 19-0672AG (R.I. Super.); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn.)

I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports; $1000 per hour for depositions and court appearances. My compensation is not contingent on the results of my analysis or the substance of any testimony.

### III. SUMMARY OF OPINIONS

Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding. It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights.

In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4] Each of the new states, either by statute or judicial decision, adopted multiple

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]

The concept of the peace was central to common law.[6] As one early American justice of the peace manual noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7] Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8] The use of Blackstone as an authority on how early Americans understood their inheritance from England has been reiterated by the Supreme Court.[9] Thus, the dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[10]

---

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).; *District of Columbia v. Heller*, 554 U.S. 570, 626–627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012). The phrase was an example of the archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016). The proper rendering of the term thus becomes "unusually dangerous."

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally*

The most basic right of all at the time of Founding was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[11] The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[12] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."  The term police encompassed more than law enforcement, it also included the right of the people to legislate for the common good.[13]

Thus, any argument that rights must be understood as they were at the time of founding, such as the right to bear arms, must also apply to the scope of the right of the people to regulate their internal police by enacting laws to promote the security and welfare of the people. The history of regulation, including guns, in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point about the scope of legislative authority in this area.

In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the people of the individual states exercised their right to regulate to address longstanding issues and novel problems created by firearms in American

---

JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[11] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[12] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[13] Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government (2005); Gary Gerstle, Liberty and Coercion: The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015).

society. Over the eighteenth and nineteenth century, American regulation increased with the advancement of firearm technology, from the manufacturing, storage, and sale of gunpowder, to regulating where firearms and other dangerous weapons cannot be carried.  The response of states to the emergence of new firearms that threatened the peace was more regulation. When faced with changes in technology and consumer behavior, as well as novel threats to public safety, the individual states enacted laws to address these problems. In every instance apart from a few outlier cases in the Antebellum South, courts upheld such limits on the unfettered exercise of the right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about infringement: whether the law negated the ability to act in self-defense.[14] In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition. Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment. The Founding generation and their successors sought to create a well-regulated society in which ordered liberty, not anarchy prevailed.[15]

### IV.    The Right to Keep and Bear Arms in Historical Context:  Liberty and Regulation in Founding Era Constitutional Thought.

#### A.  The Difficulty of a Historical Inquiry In This Context

The United States Supreme Court's decisions in *Heller*, *McDonald*,[16] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. Legal texts must not be read in a

---

[14] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[15] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[16] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Similarly, a mechanistic strategy of digital searching for historical gun laws would be incapable of answering the historical inquiries required under *Bruen*. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts—how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, responded to societal ills created by those changes.[17]

In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[18] Indeed, such research is still ongoing and new materials continue to emerge; and even since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[19]

Each provision of the Bill of Rights, including the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. *Bruen*, 142 S. Ct. at 2131; *Heller*, 554 U.S. at 635. Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to

---

[17] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[18] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[19] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

regulate arms to promote the goals of preserving a free state. Although rights and regulations are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[20] In Founding-era American English, the word "infringement" meant to "violate" or "destroy." In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the conduct protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying right. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.

John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the

---

[20] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201. This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True freedom, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted ordered liberty. Regulation was the indispensable correlate of rights in Founding era constitutionalism.[21]

Similarly, Nathan Bailey's Dictionarium Britannicum (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[22] And his 1763 New Universal Dictionary repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[23] Samuel Johnson's Dictionary of the English Language (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[24] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[25] And Noah Webster's An American Dictionary of the English Language (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[26] Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The Founding generation was far more nuanced in distinguishing between the differences between these two terms.

For the framers, ratifiers, and other relevant legal actors in the Founding era, robust regulation was not understood to be an "infringement" of the right to bear arms, but rather the

---

[21] *Liberty*, A NEW LAW DICTIONARY (1792) *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[22] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[23] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[24] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[25] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[26] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[27] As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having no government, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property."[28] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[29]

The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text. The inclusion of rights guaranteed in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause

---

[27] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

[28] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[29] *See generally* Quentin Skinner, *Liberty Before Liberalism* (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

and only with consent of the body politic."[30] Thus, rather than limiting rights, regulation was the essential means of preserving rights, including self-defense.[31]

In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[32] The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.[33] Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[34] The plain text of the Second Amendment not only protects the right to keep and bear arms, it acknowledges that this right is

---

[30] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. & CRIMINOLOGY 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[31] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017); SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[32] H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002).

[33] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 CONST. COMMENT. 228–30 (1999).

[34] *Id.*

designed to encourage the security of a free state.  Actions that undermine this security are clearly not protected by the Amendment.

In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and encourage the equally vital goal of promoting public safety. The proper metric for deciding if such laws were constitutional was and remains the same today: whether a regulation infringes on the core right protected by the Second Amendment.[35]

## B.  Arms And Accoutrements: Taking Founding-Era Texts Seriously

The text of the Second Amendment references arms. In Founding Era American English the term arm did not include "ammunition" or any of the other "accoutrements" essential to militia service. Thus, the claim that, as a matter of history and original meaning, modern large capacity magazines (LCMs) are either lineal descendants or analogs to the Founding era arms protected by the Second Amendment is false. As a matter of history, it is my opinion that these items indisputably do not fall under the Second Amendment's protections.  Indeed, the Second Amendment and early American militia laws acknowledge that government had both a compelling interest and ample authority to regulate and proscribe the types of arms, ammunition, and accoutrements that may be purchased in the marketplace. The Founding era term that incorporates all three of these parts of the equipment of a militiaman was "a stand of arms." The Second Amendment references arms, not "a stand of arms."[36]   In his dictionary, Noah Webster

---

[35] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[36]  *See* the relevant entries in Noah Webster,  A DICTIONARY OF THE ENGLISH LANGUAGE (1832) *s.v.*

defined "a stand of arms as follows: "A stand of *arms* consists of a musket, bayonet, cartridge-box and belt, with a sword. But for common soldiers a sword is not necessary."[37]

A search of the phrase "arms and accoutrements" in the Brigham Young University Corpus of Founding Era English, a standard source in any originalist inquiry into constitutional meaning yields close to nine hundred occurrences of these two terms. A computer search of the Founders Online archive, another standard source consulted by originalist scholars also reveals hundreds of uses that underscore the irrefutable fact that arms and accoutrements were two distinct categories of military items.

One need not depend on the methods of corpus linguistics alone to document this basic fact about how "arms," "ammunition," and "accoutrements" were typically used in Founding era English.   William Duane's important military dictionary published during the Founding era made it clear that arms and accoutrements were distinct categories of equipage: "Accoutrements, by contrast, refers to equipage, including 'belts, pouches, and cartridges.'"[38] Similarly, ammunition, which was sometimes combined with accoutrements into a single category, was distinct from arms. The definition of ammunition from the Founding period included "all sorts of powder and ball, shells, bullets cartridges, and grape shot."[39]

Accoutrements were often listed separately from arms and ammunition. This order from General Washington underscores the seriousness with which the Continental Army scrutinized the condition of Arms, ammunition, and accoutrements in the possession of its soldiers:

> Twice a week (Wednesdays and Saturdays) the officers of each company are carefully to inspect the arms, ammunition, and accoutrements of their men, to

---

[37] 1 Encyclopædia Britannica: Or, a Dictionary of Arts, Sciences, and Miscellaneous Literature; Enlarged and Improved (1823) at 673.
[38]  William Duane, MILITARY DICTIONARY (1810) at 2-3.
[39] *Id.*

see that they are in perfect order and that nothing is wanting. At the first inspection they are to take an exact account of every article belonging to each man; and if afterwards any be missing, they are immediately to report the same to the officer commanding their regiment, that the matter may be enquired into, if he judges it proper, by a regimental court martial, and the delinquent punished if deserving it, and charged with the articles lost, to be deducted from his wages.[40]

Further evidence of the importance of the distinction between arms, ammunition, and accoutrements can be gleaned from the range of fines levied for failing to appear at muster adequately armed and accoutered. Persons too indigent to purchase these items were supplied out of the public arms and this included arms, ammunition, and accoutrements.[41]

Fines levied by Massachusetts for Deficient Equipment [42]

| Item | Category | Fine |
| --- | --- | --- |
| Musket | Arms | One dollar |
| Cartridge Box | Ammunition | Thirty Cents |
| Cartridges | Ammunition | Thirty Cents |
| Good Powder | Ammunition | Thirty Cents |
| Flints | Accoutrements | Twenty Cents |
| Wire Brush | Accoutrements | Twenty Cents |

---

[40] General Orders, 11 October 1777," Founders Online, National Archives, https://founders.archives.gov/documents/Washington/03-11-02-0488. [Original source: The Papers of George Washington, Revolutionary War Series, vol. 11, 19 August 1777–25 October 1777, ed. Philander D. Chase and Edward G. Lengel. Charlottesville: University Press of Virginia, 2001, pp. 480–482.]

[41] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[42] Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836 (1836) at 120. See also, Acts and Laws of the State of Connecticut, in America. United States (1784). "Table of Fines, Forfeitures, and Penalties," A Collection of All Such Acts of the General Assembly of Virginia of a Public and Permanent Nature as Have Passed Since the Session of (1808) at 223.

### C.  From Muskets To Pistols: Change And Continuity In Early American Firearms Regulations

Guns have been regulated from the dawn of American history.[43] At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[44] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*.[45]

Anglo-American law venerated the natural right of self-defense but the legal understanding of this doctrine had been shaped by centuries of common law adjudication.  The right of self-defense protected by Anglo-American law was not unlimited; it was shaped by the need to preserve human life and promote the peace.[46] Statutory law, both in England and America functioned to further these inter-related goals.  The use of deadly force was extremely limited.  At the time of the Second Amendment, retreat, not stand your ground was the legal norm.[47] Given these indisputable facts the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[48] To deny such an authority would be to convert the Constitution into a suicide pact and not a charter

---

[43] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[44] *Id.*

[45] Ruben & Miller, *supra* note 18, at 1.

[46] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[47]   The three notable exceptions to this principle were the "castle doctrine," defense against threat when there was no opportunity to escape or seek help, and defense against felonious assault, see  the arguments made by John Adams in his defense of the soldiers in the Boston Massacre trial, "Adams' Argument for the Defense: 3–4 December 1770," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016. [Original source: *The Adams Papers*, Legal Papers of John Adams, vol. 3, *Cases 63 and 64: The Boston Massacre Trials*, ed. L. Kinvin Wroth and Hiller B. Zobel. Cambridge, MA: Harvard University Press, 1965, pp. 242–270

[48] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

of government. In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[49]

*Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[50] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[51]

Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[52]

The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[53] Levels of interpersonal gun violence among those of white

---

[49] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[50] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[51] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[52] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009). Roth's data makes clear that gun violence was not a major problem at the Founding.

[53] It is important to recognize that there were profound regional differences in early America. *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988). These differences also had important consequences for the evolution of American law. *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF

European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the almost constant state of war that existed between the tribal populations of the region and their American neighbors.

Limits in Founding-era firearms technology militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[54] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[55] Simply put, there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[56] The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that these types of firearms were less likely to be used in crimes of passion. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

---

LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

[54] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061 (last visited June 2, 2023).

[55] Sweeney, *supra* note 41.

[56] HAAG, *supra* note 50.

In short, the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America. Rather, they faced a different, but no less serious problem: American reluctance to purchase the type of weapons needed to effectively arm their militias. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[57] Killing pests and hunting were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[58]

Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by the military tactics of the time. A gun had to be able to receive a bayonet and serve as a bludgeon if necessary. The light-weight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin, but were not well suited to eighteenth-century ground wars.  In particular, fowling pieces, loaded with shot, not bullets or musket balls were especially useful in a predominantly agrarian society.[59] When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved. Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[60]

---

[57] Sweeney, *supra* note 41.

[58] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

[59] Sweeney, *supra* note 41.

[60] *Id.*

As a result, the government took an active role in encouraging the manufacturing of arms and had a vested interest in determining what types of weapons would be produced. The American firearms industry in its infancy was thus largely dependent on government contracts and subsidies. The industry was also regulated to prevent sub-standard weapons from being sold and from military weapons being diverted from the militia. [61]

One important form of government regulation of the firearms industry, a practice that began in the era of the Second Amendment and persisted throughout the nineteenth century included inspection of weapons and Government-imposed safety standards on the firearms industry. Indeed, without such interventions it is likely that the industry would never have survived. The danger posed by defective arms, or poorly manufactured ones could be catastrophic. A burst barrel of a musket or fowling piece could turn a firearm into a pipe bomb, maiming or killing an unfortunate user.

In 1805 Massachusetts enacted a law requiring all guns to be inspected before they could be sold in the Commonwealth.[62]  As stated in the law's preamble, the law's purpose was to prevent harm to residents from the sale of unsafe firearms. The law required the appointment of inspectors, up to two per county, who would "prove," i.e. test and inspect, all musket barrels and pistol barrels. The law detailed the manner in which these inspections were to be conducted, which included testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance. If the firearm passed inspection, then the inspector would stamp it with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. Only firearms that passed inspection and were stamped could be sold, and the sale of firearms without a stamp was subject to a fine. The standards that all muskets and pistols had to meet to pass inspection were

---

[61] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[62] 1804 Mass. Acts. 111, ch. 81, "An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth."

updated in 1814.[63]

Maine imposed a similar requirement on firearms in 1821, and continued the practice through the end of the century.[64] Similar to the Massachusetts proving law, the Maine law required the governor to appoint inspectors of firearms who would then ensure that firearms met certain safety standards and stamped prior to their sale. The Maine and Massachusetts laws persisted throughout the nineteenth century.[65]

The federal armory in Springfield, Massachusetts, began producing muskets in 1794. The presence of the armory served as a spur to innovation among local gun smiths. In fact, this confluence of factors helped Western Massachusetts become the leading small arms producer in America on the eve of the War of 1812. The Springfield armory, a federal entity, was governed by federal law (not Massachusetts law) but it nonetheless extensively scrutinized and inspected all arms made at its facilities and any arms produced by local gunsmiths under government contract. The quality of these weapons, literally being stamped with government approval, made these guns particularly valuable in the civilian arms market when government surplus guns were sold to consumers in times of peace.[66] Federal weapons not made in Massachusetts were also stamped to discourage theft. In 1776, George Washington ordered all Continental Army firearms stamped

---

[63] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . .. . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")

[64] "An Act to Provide for the Proof of Fire Arms," 2 Laws State of Maine (1821) at 685-86.

[65] 1 The General Statutes of the Commonwealth of Massachusetts: Enacted December 28, 1859, to Take Effect June 1, 1860 (2d ed., William A. Richardson & George P. Sanger, eds.) 255 (1873).

[66] Lindsay Schakenbach Regele, *Manufacturing Advantage: War, The State, And The Origins Of American Industry*, 1776–1848 (2019) at 63-65.

with an insignia: "U.S.XIII." Government marked weapons in this fashion to make it easier to identify cases where arms were being illegally sold in a secondary market to private individuals or sold to person who were not allowed to own firearms.[67] In 1780, George Washington also ordered that the Continental Army ensure all gun barrels were sufficiently proved to avoid buying poor quality guns.[68]

Stamping and marking firearms aided government efforts to keep track of weapons and enforce manufacturing standards.  These types of policies were understood at the time of the Second Amendment and its various state analogs to be perfectly consistent with the right to keep and bear arms.[69]

The market for firearms in early America shared very few features with the contemporary world of firearms commerce. Today's Americans have a myriad of choices of the type and style of weapon when they wish to acquire a firearm. Gun shows, gun supermarkets, and internet sales are a few of the many ways Americans acquire firearms today. Although estimates vary, it is likely that there are now more guns than people in contemporary America.[70]

Early American firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production.[71] Apart from the wealthiest Americans, most households could not afford to own multiple weapons. Local gun smiths, not big box stores such as Walmart, were responsible for selling most firearms.

---

[67] E. Wayne Carp, *To Starve The Army At Pleasure: Continental Army Administration And American Political Culture, 1775-1783* (1984) at 66-67.

[68] Letter from George Washington to Henry Knox (Nov. 30, 1780), *in* The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, *ed.*) ("I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. ... Lee charges Mr. Deane[']s Agent with purchasing.")

[69] Regele, *supra* note 61.

[70] Terry L. Schell, Samuel Peterson, Brian G. Vegetabile, Adam Scherling, Rosanna Smart, and Andrew R. Morral, State-Level Estimates of Household Firearm Ownership. Santa Monica, CA: RAND Corporation, 2020. https://www.rand.org/pubs/tools/TL354.html.

[71] Merritt Roe Smith, Harpers Ferry Armory and the New Technology: The Challenge of Change (1977).

Fire Arms ownership in New England During the Era of the Second Amendment, 1770-1798[72]

| Years | % Inventories with firearms | % Inventories with muskets | % Inventories with pistols |
|---|---|---|---|
| 1770-1775 | 51 | .9 | 5 |
| 1783-1786 | 46 | .5 | 2.5 |
| 1795-1798 | 32 | 1.5 | 1.5 |

Most sellers and buyers of firearms in early America were members of the same community. Moreover, given the nature of eighteenth-century firearms technology gun owners needed to maintain an on-going relationship with their local gun smith to keep their guns in good working order. The informal ties of kin and community that defined the close-knit communities of early America meant that individuals were effectively vetted and monitored by their neighbors in ways that share little with the largely anonymous world of modern firearms commerce.[73]

The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[74] The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[75] The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints -- common items in many homes -- also transformed American gun culture.[76] These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common. The culmination of this gradual evolution in both firearms and

---

[72] Data adapted from Sweeney, *supra* note 41. Probate data does not perfectly correlate with total number of weapons in circulation so these figures must be used with some caution. In some cases, arms were passed on to family members before probate. These numbers do, however, offer a useful way to capture the relative number of different categories of arms owned by the population.

[73] Scott Paul Gordon, *The Ambitions of William Henry*, 136 PENNSYLVANIA MAGAZINE OF HISTORY AND BIOGRAPHY  253 (2012).  Pennsylvania was one of the main regions of early American gunsmithing. M.L. Brown, *Firearms In Colonial America: The Impact On History And Technology*, 1492-1792 (1980).

[74] Cornell, *supra* note 3, at 745.

[75] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

[76] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY (Eric Foner ed., 1990).

ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican-American War.[77] Economic transformation was accompanied by a host of profound social changes that gave rise to America's first gun violence crisis. As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity. The change in behavior was most noticeable in the case of handguns. [78]

### D.  The Myth of Founding Era Repeaters

Virtually all firearms  in common use in the era of the Second Amendment were single-shot, muzzle-loading black powder weapons.   Guns capable of firing more than a single round, repeaters, could best be described as exceedingly rare and exotic.  Thus, the claim that firearms capable of firing more than ten rounds without reloading "are nothing new"  and the related claim that such weapons were familiar to Americans in the Founding era is deceptive at best. The existence of such weapons did not mean that they were common, nor did it mean that the average American would have understood  that such weapons were generally understood to fall within the protection of the Second Amendment.  There is no evidence to support such a conclusion.

Moreover, the claim that "repeaters" and other rare weapons were widely believed to be protected by the Second Amendment is not consistent with  the originalist framework employed in *Bruen*.  An analysis of  history, text, and tradition  requires a contextually sensitive assessment of what types of weapons were in common use at the time and which weapons were singled out by governments for heighted forms of  legal protection or treated simply as property subject to the normal range of regulation.[79]   Thus, the relevant historical question  is not what firearms

---

[77] William N. Hosley, *Colt: The Making of an American Legend* (1st ed. 1996).

[78] Cornell, *supra* note 3, at 716.

[79] Kevin Sweeney and  Saul Cornell, *All Guns Are Not  Created Equal*, CHRONICLE OF HIGHER  EDUCATION.   January 28, 2013; Priya Satia,  *What Guns Meant in Eighteenth-century Britain* 5  PALGRAVE COMMUN 104 (2019).

technology existed at the time of the Second Amendment. The constitutionally pertinent question is: did the average reader of the Constitution and the first ten amendments understand repeaters to be among those weapons the Second Amendment was intended to protect?[80]

Few if any Americans would have ever encountered these types of weapons and even fewer owned such weapons, an indisputable fact that makes the argument that these types of weapons were encompassed by the Second Amendment highly improbable.[81]

The best way to understand the historical importance (or irrelevance) of these weapons is to analyze the discussion of arms in the print culture of the period, paying close attention to how repeating weapons were discussed in newspapers, books, and to a lesser extent private correspondence.[82]  If one consults the standard sources associated with originalist scholarship and jurisprudence the silence is deafening. These types of weapons were rarely mentioned and when they were discussed they were described as rare and "curious."[83] Founding era newspapers often contained advertisements for the sale of firearms. Although one must approach data gained from this type of digital searching with some historical sophistication and caution, the evidence clearly shows that "repeating" weapons were neither common nor readily available in the period between the American Revolution and enactment of the Second Amendment.  Given this fact it strains credulity to claim that such weapons were originally understood to be encompassed within the protections afforded by the Second Amendment.  During the almost two-decade period between the Declaration of Independence and the adoption of the Second Amendment

---

[80] William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 LAW & HISTORY REVIEW 809-820 (2019).

[81] See discussion below *infra* Section IV.D.

[82] Saul Cornell, *Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning Id.*, 821–45.

[83] See discussion below *infra* Section IV.D.

there were a total of five advertisements for the sale of air rifles in American newspapers.[84] In the same period there were over four thousand advertisements for the sale of guns of various types, most notably muskets of one type or another.   The advertisement reproduced in Figure One below illustrates the exotic nature of these weapons, which were described as "singular" and "curious."[85]

Figure One[86]



To be Sold, at Private Sale,
At No. 60, in Smith-Street, the following curious
   and singular Collection of Fire-Arms :
THREE Air Guns and a Case of Air Pistols,—a
   gun which can be fired twelve times from one
single loading.
   Ditto,   thirty times in a minute, with Pistols, and
many others on the latest and most curious construc-
tion, that is now extant in Europe.
   Twelve small Brass Pattararoes, proper for a Plea-
sure-Boat, or a Gentleman's country-seat.
New-York, Sept. 27, 1783.                   *

These guns were so rare and expensive that a New York Museum from the period decided to showcase an air gun alongside other curiosities such as mammoth bones and a full-size working guillotine.  For an additional fee beyond the price of admission one could purchase an opportunity to fire one these "singular" weapons.[87]

---

[84]  [New York] Royal Gazette October 1, 1783  at 3;  Pennsylvania Packet  July 21, 1789 at 3 ; *id*.  July 28, at 1;  *id*., July 31 at 1; *id*., August 13, at 1.

[85] "To be Sold at Private Sale," [New York] ROYAL GAZETTE October 1, 1783  at 3
[86] *Id.*
[87] Lawrence W. Levine, *Highbrow/Lowbrow* (2009) at 149.

Figure Two [88]



The notion that the Second Amendment was widely understood to protect weapons that were rarely advertised for sale and that generally recognized to be of a "singular" and "curious" nature is not credible; nor is such a claim consistent with Heller and Bruen's originalist methodology which requires that texts be interpreted according to their ordinary public meaning in the eighteenth century.  Weapons described as "singular and curious" are a poor choice for understanding the ordinary meaning of the term "arms" in Founding era English.

Visitors to today's NRA's museum of firearms may be treated to an impressive exhibit featuring the type of Girondoni air rifle that Lewis and Clark carried on their Expedition of Discovery. [89]  Although modern gun rights advocates and antiquarian firearms enthusiasts are well acquainted with this weapon, few Americans in the era of Lewis and Clark could make a comparable claim. Indeed, in the first published account of the Corps of Discovery's mission there are less than a handful of references to the air gun carried by Lewis and Clark.  The

---

[88] "To the Curious," [New York] DAILY ADVERTISER, February 9, 1792.
[89] https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-8-romance-of-the-long-rifle/girardoni-air-rifle-as-used-by-lewis-and-clark.aspx (last visited on 6/1/23).

primary use of the weapon was not for war, hunting, or individual self-defense, but the weapon was a show piece used to impress the different Indian nations the Corps encountered with the superiority of American technology.[90] But, few Americans at the time of the Lewis and Clark exhibition would have had the opportunity to ever see one of these weapons or any other repeating gun up close.

Under ideal conditions priming the Girardoni air gun required 1500 strokes of a pump. The Austrian military, one of the few armed forces in the world to purchase these types of weapons, quickly abandoned them because they were ill suited to battle-field conditions.  In 1789, an Austrian officer complained that the weapons were of little military value because of the difficulty of using them and their tendency to malfunction:

> Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully. In addition, the soldiers using them had to be supervised extremely carefully, as they were unsure about the operation. The guns became inoperable after a very short time—so much so that after a while no more than one-third of them were still in a usable state. We needed the whole winter to repair and replace them.[91]

William Duane's popular military dictionary (1810) devoted a short entry to air guns, noting that the gun's performance was so unreliable, "it has long been out of use among military men."[92]

### E.  The Police Power And Firearms Regulation

The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the

---

[90]  2 History of the Expedition Under the Command of Captains Lewis and Clark...in Two (ed., Paul Allen, 1814) at 136, 28,364. For a discussion of the Corps of Discovery's use of technology to over-awe Indian peoples and impress upon them the superiority of American technology, see James P. Rhonda, LEWIS AND CLARK AMONG THE INDIANS (1984) at 225.

[91]  Frederick J. Chiaventone, *The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon* 14 MILITARY HERITAGE (2015), 19.

[92]  William Duane, A MILITARY DICTIONARY (1810) at 5.

internal police of the same."[93] The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[94] By the early nineteenth century, the term "police" was a fixture in American law.[95] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[96] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[97] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority,

---

[93] PA. CONST. OF 1776, Ch. I, art iii.

[94] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[95] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[96] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[97] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

including the authority to regulate guns and gun powder.[98]

Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible. Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[99] Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[100]

State police power authority was at its pinnacle in matters relating to guns or gun powder.[101] Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the substance's dangerous potential to detonate if exposed to fire or heat. Firearms were also subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons.[102]

Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[103] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

---

[98] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[99] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[100] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[101] Cornell and DeDino, *supra* note 35.

[102] *Id.*

[103] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[104]

New Hampshire enacted a law in 1825 penalizing the sale or offer to sell "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."[105]

Other examples of state laws delegating authority to local governments to regulate the sale of gunpowder for public safety include but are not limited to:

    a. 1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

    b. An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder);

    c. An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8, pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

The purpose of these gunpowder regulations was to promote public safety. Early American governments recognized the danger posed by gun powder and regulated every aspect of its production, sale, and storage. Early American governments also regulated shooting galleries for

---

[104] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, 2 Laws Of The State Of New-York, Comprising The Constitution, And The Acts Of The Legislature, Since The Revolution, From The First To The Fifteenth Session, Inclusive at 191-2 (Thomas Greenleaf, ed., 1792).

[105] 1825 N.H. Laws 74, ch. 61, § 5

similar reasons.[106]

There were also laws that required the inspection of gunpowder. In 1809, Massachusetts established requirements for the quality and composition of gunpowder; authorized the appointment of inspector.  Before  being  placed in any public magazine gunpowder that passed inspection was placed in a cask and marked with the inspector's initials; gunpowder that was marked condemned or that had not yet passed inspection could not be sold.[107] Four other states, including Rhode Island, New Jersey, New Hampshire, and Pennsylvania, adopted similar gunpowder inspection laws in the late eighteenth and early nineteenth centuries.[108]

The regulation of firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland.*[109] This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning

---

[106] John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 80 (1848); Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220 (1854); Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149-150 (1856) ; Rhode Island: 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement, §§ 1-2; Samuel Ames, The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State Page 204-205(1857); William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149 (1863*);* Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council. New Edition Page 257 (1870).

[107] 1808 Mass. Acts 444, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder.

[108] 1776 R.I. Pub. Laws 25 (Oct. Sess.); 1776-77 N.J. Laws 6-7, ch. 6; 1820 N.H. Laws 274, ch. 25; 1794 Pa. Laws 764, ch. 337.

[109] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

with the Marshall Court and continuing with the Taney Court.[110]  Nor was Chief Justice John Marshall unique in highlighting the centrality of this idea to American law.[111] The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety in early America.[112] Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power.

Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[113]

In short, there was unanimous agreement among leading antebellum jurists, at both the

---

[110] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see The Marshall Court, 1801-1835*, SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864**.** See *The Taney Court, 1836-1864*, SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/**.**

[111] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[112] FREUND, *supra* note 95, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996).

[113] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures. Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[114] A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[115]

No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged. This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[116] Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[117] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

---

[114] CORNELL, THE POLICE POWER, *supra* note 31.

[115] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

[116] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[117] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[118]

One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[119] The case is a classic example of antebellum police power jurisprudence. The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[120] In the court's view, the regulation of arms was at the very core of state police power.[121] The judicial determination was straightforward: was the challenged law a legitimate exercise of the police power or not?

Modern-day legislative efforts to ban large-capacity magazines, semi-automatic weapons, and machine guns fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror.  During American's first gun violence crisis in the Jacksonian era, states targeted pistols that were easily concealed, and in the New Deal era, states singled out gangster weapons such as the notorious Thompson sub-machine gun (or "Tommy Gun"), treating these weapons as sufficiently dangerous or unusual to warrant extensive regulation,

---

[118] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[119] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[120] *Id.* at 616.

[121] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms.  For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 95, at 91.

or prohibition.  The same imperatives and constitutional logic guided both regulatory regimes.[122]

### F.  Reconstruction And State Police Power To Regulate Firearms (1863-1877)

Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were textually distinct in the Founding era but were mutually reinforcing in both theory and practice: both were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.[123] This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.[124] As a result, state constitutions no longer included positive affirmations of a police right. Secondly, the constitutional "mischief to be remedied" had changed as well.[125] Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.[126] By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical

---

[122] Spitzer, *supra* note 43.

[123] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[124] See Knapp *supra* note 11.

[125] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[126] Noah. Shusterman, ARMED CITIZENS: THE ROAD FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

Stuart Kings using their standing army to oppress American colonists. In place of these older fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[127]

The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[128] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[129] Texas was not an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[130] Americans living in the newly organized western states and newly reconstructed states of the former Confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[131]

---

[127] On the change in state constitutional arms bearing provisions, *See McDonald*, 561 U.S. at 767–68. For an analysis of the different mischiefs shaping the structure of state arms bearing provisions in these two periods, see Cornell, *supra* note 123.

[128] Cornell, *supra* note 123.

[129] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[130] Cornell, *supra* note 123, at 75–76.

[131] *Id.*

This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies. The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[132]

Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[133]

Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government. The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[134] As long as state and local laws were racially neutral and favored no person over any

---

[132] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[133] Robert J. Kaczorowski*, Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[134] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [135]

It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[136] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[137] The expansion of regulation did not represent a new constitutional principle, but it did embody a new application that represented an adaptation to changed circumstances of post-Civil War America.

Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[138] Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that the "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[139]

In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral

---

[135] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[136] *See* Spitzer, *supra* note 43, at 59–61 tbl. 1.

[137] *Id.*

[138] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[139] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

regulations aimed at public safety. Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[140] The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction. The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[141]

The laws adopted to address these problems underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty and the use of police power to promote public safety.

## V.      CONCLUSION: The Scope Of Permissible Regulation

The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.[142] Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American

---

[140]   Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

[141]   *See* Darrell A. H. Miller*, Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

[142]   Spitzer, *supra* note 43.

law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[143] States and localities have regulated arms and ammunition since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[144] The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture. Weapons have been subject to regulation since before the Founding and this power has been at the core of state police power from time immemorial.[145]

I declare that the foregoing is true and correct to the best of my knowledge.

*Saul Cornell*
_____
Saul Cornell

June 2, 2023
_____
Date

---

[143] *Id.*

[144] GERSTLE, *supra* note 13.

[145] Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum* 34 UCLA L. REV. 1713, 1769 (1986-1987).

**Exhibit 1**

# Saul Cornell

Paul and Diane Guenther Chair in American History

Department of History

Fordham University

441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| **Book Publications** |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
New Histories of American Law, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 Hastings Constitutional  Law Quarterly (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 <u>Fordham Law Review</u>  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 <u>Law and *C*ontemporary Problems</u> (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." <u>Law and History Review</u> 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in <u>Firearms and Freedom: The Second Amendment in the Twenty-First Century</u> <u>Controversies in American Constitutional Law Series</u> (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 <u>Law and Contemporary Problems</u> (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 <u>Northwestern Journal of Criminal Law</u>  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," <u>Wisconsin Law Review Forward</u>  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  <u>American</u> <u>Journal of Legal History</u> 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," <u>Yale Law Journal  Forum</u>  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" <u>Fordham Law Review</u> *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," <u>The Oxford Handbook of the US Constitution</u>,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" <u>Constitutional Commentary</u> 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  <u>Fordham Law Review</u> 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  <u>Fordham Urban Law Journal</u> 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary  Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," <u>Northwestern University Law Review</u> 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u> 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u> 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> <u>History of A merican Law</u> (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" <u>Albany Government Law Review</u> 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u> (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u> (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u> (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u> 47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," <u>Stanford Law and</u> <u>Policy Review</u> (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> <u>History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:  The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**<u>Invited Lectures:</u>**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:  The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's <u>The People Themselves</u>, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"    To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## Federal Courts:

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## **State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, Young v. State of Hawaii N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, Flanagan vs. Becerra, Central District of California Case (2018) [2nd Amendment]

Amicus Brief, Gill v. Whitford (US Supreme Court, 2017) [Partisan Gerrymandering]

Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

## **Law Review Symposia Organized**

### **Second Amendment:**

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

### **New Originalism:**

"The New Originalism" 82 *Fordham L. Rev*. 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev*. 915 (2015).

EXHIBIT "D"

EXHIBIT "D"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br>& PISTOL CLUBS, INC., et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 3:22-cv-04397 |

## Expert Report of Stephen Hargarten

1.      My name is Stephen W. Hargarten, M.D., M.P.H. I am an emergency medicine specialist, having practiced emergency medicine for over 35 years. I have been board certified across four decades. My curriculum vitae, which is attached as **Exhibit A**, documents my clinical, educational, and research experience in detail.

2.      I am being compensated for my services in this case at the rate of $250/hour.

## BACKGROUND AND QUALIFICATIONS

3.      I received my Medical Degree from the Medical College of Wisconsin in 1975, completed my internship at Gorgas Hospital, a U.S. Army hospital in the Canal Zone, Panama in 1976, and received my Master's Degree in Public Health at the Bloomberg School of Public Health at The Johns Hopkins University in 1984.

4.      I was a clinically active emergency medicine physician in the Milwaukee area for over 35 years, most recently serving as an Attending Physician at Froedtert Hospital until 2018. As an emergency medicine physician, I treated patients who sustained gunshot wounds.

5.      In addition to practicing emergency medicine, I continue to  serve as  Professor of Emergency Medicine at the Medical College  of Wisconsin (MCW).  I have served as Chairman of the Department of Emergency Medicine and as the Associate Dean for Global Health at MCW. In 2001, I founded the Injury Research Center, which later was reorganized to become the Comprehensive Injury Center at MCW, where I served as Founding Director and am now the Senior Injury and Policy Advisor.

6.      The Comprehensive Injury Center focuses on the sciences of injury prevention and control, including violence prevention, through a multidisciplinary public health approach. This includes community engagement, research, education, and collaboration with multidisciplinary partners. The Center conducts research in a variety of areas, including interpersonal violence, gun violence, and opioid use.

#96825686v1

7.      I serve on a number of National and International Committees, including as a founding member of the Network to Prevent Gun Violence in the Americas (2020-present), Vice-Chair of the Community Preventive Services Task Force of the U.S. Department of Health and Human Services (CDC, 2018-present), and member of the Executive Committee of the Transportation Research Board of the National Academies of Science, Engineering, and Medicine, (2018-present). I have been a member of the National Academy of Medicine since 2011.

8.      Over the course of my career, I have been awarded more than $20 million in research grants and awards, including awards by the State of Wisconsin Department of Health Services, United States Department of Justice, National Institute of Justice, and the Centers for Disease Control and Prevention. In addition, I have published more than 100 original papers in journals such as *Academic Emergency Medicine*, *The Annals of Emergency Medicine*, and *The New England Journal of Medicine*.

9.      In the past four years, I have served as an expert in the following cases involving firearms regulations: *Viramontes v. The County of Cook*, Case No. 21-cv-04595 (N.D. Ill.), *National Association for Gun Rights v. City of Highland Park, Illinois*, Case No. 22-cv-04774 (N.D. Ill.)., and *Barnett v. Raoul*, Case No. 23-cv-00209 (S.D. Ill.). I have also reviewed medical-legal cases for attorneys representing healthcare providers and patients. In the past four years, I have served as an expert in that capacity in *Liebfried et al. v Caterpillar, Inc.*, Case No. 20-cv-1874 (E.D. Wis.).

10.     I hold my opinions to a reasonable degree of medical and scientific certainty. My opinions are based on my education, training, research, and clinical experience, as well as my knowledge of relevant medical literature and the application of scientific principles to wounding ballistics. Also relevant to the formation of my opinions is my knowledge of accepted standards of medical practice as they apply to emergency medicine.

## OPINIONS

11.     Each year, more than 45,000 people die from gun-related injuries in the United States.[1] Many shooting victims do not make it to the hospital, and those who survive are often left with serious complications, lifelong disabilities, and psychological trauma.[2]

12.     Firearms and the bullets they carry, cause damage to a body by transferring kinetic energy to the target, which ripples through tissues and organs. The bullet penetrates the body, leaving a temporary and permanent cavity in its wake.[3] The amount of energy a bullet transfers into a target is a function of the bullet's velocity and mass. The energy delivered to the target increases geometrically along with increases in mass, and exponentially with increases in velocity. The larger a projectile's surface area, the greater its ability to transfer its energy to the intended target.[4]

13.     Assault weapons[5] present an especially serious public health problem in the United States.  Assault weapons release projectiles at a relatively high velocity and can fire more bullets and thus release more kinetic energy per minute than other kinds of firearms. And due to a variety of factors, including the velocity of the bullet, spin of the bullet, and size of the bullet, bullets fired by assault weapons penetrate tissue to create relatively large temporary cavities and permanent wound channels that are generally more severe than other kinds of weapons. Assault weapon bullets

---

[1] John Gramlich, "What the data says about gun deaths in the U.S.," Pew Research Center (April 26, 2023), available at https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says- about-gun-deaths-in-the-u-s/ (noting that "[i]n 2021, the nost recent year for which complete data is available, 48,830 people died from gun-related injuries in the U.S."),

[2] *See, e.g.*, Arlene Greenspan & Arthur L. Kellerman, "Physical and Psychological Outcomes 8 Months after Serious Gunshot Injury," *The Journal of Trauma* 53(4), at 709–16 (Oct. 2002).

[3] Alex Yablon, "The Simple Physics That Makes Some Bullets Deadlier Than Others," *The Trace* (June 21, 2017), available at https://www.thetrace.org/2017/06/physics-deadly-bullets-assault-rifles/.

[4] Id.

[5] For purposes of this declaration, I use "assault weapons" to refer to firearms like the AR-15, which typically are capable of firing rounds at relatively high velocity and with a high rate of delivery, are lightweight and easy to maneuver, have low recoil, and display a high degree of accuracy at long range. This kind of weapon is encompassed by the definition of "assault weapon" in Superior, Colo. Code § 10-9-20, Boulder, Colo. Rev. Code § 5-8-2, Boulder County, Colo. Ord. No. 2022-5 § 1(a), and Louisville, Colo. Code § 9.80.010.

4

cause extreme damage to the tissue and organs of shooting victims (especially to solid organs such as the liver and spleen), leading to relatively high fatality and complication rates in victims.[6]

**I.      The Energy Release of Bullets Fired by Assault Weapons Typically Results in More Destructive Potential than Other Weapons.**

14.      For the past two years, I have researched the energy release and damage to human tissue of different types of weapons at the Comprehensive Injury Center at MCW, in collaboration with the Department of Biomedical Engineering at MCW and Marquette University. Over the past several years, I, along with a group of collaborators, have sought to perform wound ballistics modeling with state-of-the-art video technology and sensors. Specifically, we designed an experiment to gain a greater understanding of how a bullet "behaves" and transfers energy in simulated human tissue (gelatin). We wanted to quantify the scope and nature of the energy release, as summarized by this equation: Kinetic Energy equals ½ mass times velocity squared.[7] We wanted to measure the size of the permanent and temporary cavities created by the bullet as it travels through the human body model. We sought to measure energy release and cavity size because both are wounding predictors in the human body.

15.      To do so, we partnered with the Wisconsin Crime Lab, Division of Firearms and Toolmark Examiners, in Milwaukee, Wisconsin, where we identified and utilized firearms and bullets from their laboratory. Specifically, we conducted biomechanical testing of the bullets released from several different types of firearms, with the standard ammunition associated with

---

[6] *See, e.g.*, Gina Kolata and C. J. Chivers, "Wounds from Military-Style Rifles? 'A Ghastly Thing to See'," *The New York Times* (Mar. 4, 2018), available at https://www.nytimes.com/2018/03 /04/health/parkland-shooting-victims-ar15.html; Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic* (Feb. 22, 2018), available at https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from- parkland-should-change-the-debate-on-guns/553937/.

[7] Panagiotis K. Stefanopoulos *et al.*, "Wound ballistics of military rifle bullets: An update on controversial issues and associated misconceptions," *Journal of Trauma and Acute Care Surgery* 87(3), at 696 (Sept. 2019).

#96825686v1

those weapons.[8] We used three handguns (all pistols with .25 caliber, .32 caliber, and .40 caliber rounds), a bolt-action Remington hunting rifle (.30-06 caliber), an AR-15 style rifle (5.56 NATO bullets), a Thompson Machine gun rifle (.45 caliber ACP bullet), and a musket model (musket ball). These weapons were chosen to compare the energy output and resulting cavity size from different types of weapons and bullets.

16.     The bullets were shot into gelatin. We chose to use gelatin because it simulates, with a similar projectile depth of penetration and permanent damage, the damage done to human soft tissue. Gelatin blocks allow researchers to measure and visualize the energy transfer, temporary cavity, and permanent wound channels created by a projectile.[9]

17.     When conducting the experiment, science leaders, technicians, and doctoral students from the Bio-Engineering Department of the Medical College of Wisconsin/Marquette University set up the video technology sensors and gelatin, while the Wisconsin Crime Lab personnel set up the stand for the firearms. The distance from the firearm to the gelatin was approximately 10 feet.

18.     We tested several bullets associated with different types of firearms to record and quantify the scope and nature of the permanent and temporary cavities and to quantify the energy release of the bullets with two energy sensors affixed into the gelatin. The system was set up so that when the bullet was released from the firearm, the passage of the bullet thru the gelatin was

---

[8] The size of the bullet can affect wound severity. In general, holding all else equal, larger caliber rounds are more likely to cause more severe injuries because they increase the surface area of affected tissue. *See, e.g.*, Anthony A. Braga & Philip J. Cook, "The Association of Firearm Caliber With Likelihood of Death From Gunshot Injury in Criminal Assaults," *JAMA Network Open* 1(3) (July 27, 2018), available at https://jamanetwork.com/journals/jamanetworkopen/ fullarticle/2688536.

[9] *See, e.g.*, D.J. Carr *et al.*, "The use of gelatine in wound ballistics research," *International Journal of Legal Medicine* 132(6), at 1659–64 (Apr. 25, 2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6208714/. For a helpful video demonstration of a similar gelatin experiment comparing a bullet fired by a 9mm handgun and one from an AR-15, see this *60 Minutes* episode "What makes the AR-15 style rifle the weapon of choice for mass shooters?" (May 29, 2022), available at https://www.cbsnews.com/news/ar-15-mass-shootings-60-minutes-2022-05-29/.

6

recorded by high-speed video technology and the energy release was quantified by the two energy sensors.

19.     The two pressure transducers with range 0 – 50 megapascals (Entran Sensors & Electronics, Fairfield, NJ) were inserted about ten millimeters deep into the gelatin, perpendicular to the bullet path and recorded at 300 kHz. One sensor, the near sensor, was close to the front of the gelatin block; the other sensor, the far sensor, was close to the back of the gelatin block. Data capture was triggered after the bullet was fired using a sound-triggering device (Woods Electronics, Poway, CA). Pressure was filtered at 2.5 kHz using a low-pass Butterworth filter (MATLAB, The MathWorks, Inc., Natick, Massachusetts) and analyzed over time to evaluate peaks for maximum pressure.

20.     The experiment measured a number of metrics; the results of the experiment are summarized in **Exhibit B**.  We are submitting our work for peer review publication.

21.     First, the experiment measured pressure caused by the bullet. Pressure, which was measured by the two different sensors at different points in the gelatin, represents the transferred energy of the bullet as it enters and travels through the gelatin (i.e., the simulated human tissue). The pressure readings show the amount of energy release that is exerted on human tissue.

22.     Second, the experiment measured the temporary cavity and permanent cavity formed by the bullet. A permanent cavity is formed by the mass of the bullet traveling through the gelatin, which causes direct crushing and tearing of the gelatin, similar to what occurs in human tissue and organs. The temporary cavity is formed by the dispersion of the kinetic energy radially from the permanent cavity path, resulting in the stretching and tearing of the gelatin, again similar to what occurs in human tissue and organs..

7

23.     Third, the experiment measured energy lost by the bullet as it transferred through the gelatin. This was measured by calculating the different energies from the first and second transducer, thus resulting in a calculated transfer of energy to the gelatin. This represents the energy that human tissue will absorb as the bullet passes through the body.

24.     Fourth, we measured the percentage of the bullet's energy transferred to the gelatin by the bullet. This was calculated by taking the energy transferred and comparing it to the kinetic energy of the bullet leaving the chamber. Occasionally a bullet will fragment when it enters the gelatin (which also occurs with human tissue). Energy transfer generally increases when a round fragments because energy is released into the fragments and spread over a greater surface area.

25.     We found that the energy release of a 5.56 NATO round fired by an AR-15 style rifle (1,055.05 joules) is significantly greater than that of a round fired by a handgun (54.13 joules for a .25 caliber, 108.73 joules for a .32 caliber, and 265.99 joules for a .40 caliber), a .45 caliber round fired by a Thompson Machine gun (301.81 joules), and a musket ball fired by a musket (111.27 joules). In fact, the energy release is approximately three times greater than a Thompson Machine gun bullet, approximately four to nineteen times greater than the handguns (depending on the caliber), and approximately ten times greater than a musket. The energy release is even larger in a 5.56 NATO round when the bullet fragments, which it did in our second testing of the 5.56 NATO (1,138.13 joules).

26.     Furthermore, the temporary cavity caused by the 5.56 NATO bullet was significantly larger than the cavity sizes caused by the handguns, Thompson Machine gun, and the musket. And again, the temporary cavity of the AR-15 increased, by nearly 2 inches, with fragmentation.

27.     The only bullet that came close to producing temporary cavities comparable to the 5.56 NATO round was the .30-06 round from the Remington hunting rifle, which released more

energy than the 5.56 NATO round (2,126.55 joules) and is often used to hunt large game. However, a shooter firing an AR-15 style weapon is capable of firing substantially more rounds per minute than someone shooting the Remington hunting rifle for a variety of reasons, including because the hunting rifle requires the shooter to pull the bolt back before firing each round (i.e., the hunting rifle requires the shooter to manually cycle the round); the hunting rifle produces a higher recoil, which means the shooter typically must re-aim after each shot; and the hunting rifle has a magazine of only 3-5 rounds, which requires more frequent reloading. Because the shooter firing the AR-15 style weapon is capable of firing substantially more rounds per minute than the shooter firing the hunting rifle, the AR-15, in effect, releases significantly more energy on a per-minute basis than the hunting rifle.

28.     It is my opinion that the AR-15 style bullet's kinetic energy release with its associated greater permanent and temporary cavities is more destructive than those fired by the Thompson Machine gun rifle, handguns, and muskets.

29.     Additionally, when considering the number of rounds per minute that each type of firearm is capable of firing, it is my opinion that an AR-15 style weapon is capable of causing significantly more destruction than a hunting rifle.

30.     Large-capacity magazines increase this destructive potential by increasing the number of rounds someone can fire without having to reload, thereby increasing the number of bullets that can be fired during a given time period.

**II.     AR-15 Style Weapons Produce More Damage to the Human Body Than Other Weapons.**

31.     The significant differences in energy transfer and temporary and permanent cavity sizes associated with rounds fired by AR-15 style weapons as compared to rounds fired by other weapons (including on a per-minute basis) have direct implications for injury and death.

9

32.     AR-15 style weapons are capable of inflicting enormous damage on the human body, especially for children. Specifically, critical solid organs are more at risk, and the relative proximity of vital organs to each other in children increases the likelihood of serious injury or death, from gunshot wounds caused by an AR-15 style weapons than those caused by a lower-velocity weapon. Organs such as the liver and spleen, which are relatively inelastic organs due to their cellular structures (versus lung tissue, which is very elastic due to its need to inflate and constrict) are more severely lacerated due to the greater temporary cavity formation by these bullets, resulting in veins and arteries torn, which increases the risk of catastrophic bleeding. In addition, bullets from AR-15 style rifles are more likely to cause significant damage to bones and skeletal structure due to their higher energy release.

33.     In my opinion, this reality is borne out by the experiences of those who have recently treated victims of mass shootings involving assault rifles. For example, a trauma surgeon who treated a victim of the Parkland shooting "opened a young victim in the operating room, and found only shreds of the organ that had been hit by a bullet from an AR-15. . . .  nothing was left to repair. . . ."[10]

34.     The damage to the human body of bullets fired by assault rifles is amplified when there are multiple bullet wounds and in smaller bodies such as children. In a multiple-gunshot case, there are multiple cavities with energy being transferred to different places inside the body, which means the victim's wounds are typically more complex, carry a higher likelihood of injury requiring

---

[10] Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *supra* note 6; *see also* Leana Wen, "What Bullets Do to Bodies," *The New York Times* (June 15, 2017), available at https://www.nytimes.com/2017/06/15/opinion/virginia-baseball- shooting-gun-shot- wounds.html?_r=1.

surgical intervention, and carry a higher likelihood of death at the scene or on arrival in an emergency department.[11]

35.     In this study of Carr et al, they found that multiple gun shot wounds were associated with higher mortality, more intensive care unit days, and longer hospital length of stay. Multiple bullet wounding patterns seem to have increased morbidity and mortality associated with firearm injuries as postulated by the researchers.

36.     Finally, while the likelihood of serious injury and death from a wound caused by an assault weapon bullet is high for adult victims, the likelihood of serious injury or death for pediatric victims is even greater. Because children have smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves, the energy release and greater temporary and permanent cavities associated with AR-15 style bullets are even more likely to cause serious damage to children as compared to teenagers or adults. Not a single child wounded by an assault weapon bullet at Sandy Hook survived, for example.[12] Those patients who do survive after having been struck by these bullets often face surgical challenges, recurring operative procedures, and long-term recovery and disability.

_____
Dr. Stephen W. Hargarten, M.D., M.P.H.

Dated:  June 7, 2023

_____

[11] Brendan G. Carr *et al.*, "Outcomes related to the number and anatomic placement of gunshot wounds," *Journal of Trauma* 64(1), at 197–202 (Jan. 2008), available at https://pubmed.ncbi.nlm.nih.gov/18188121/.

[12] Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (Nov. 25, 2013) at p. 10, https://portal.ct.gov/-/media/DCJ/SandyHookFinalReportpdf.pdf.

#96825686v1

Exhibit A

# CURRICULUM VITAE (Dec. 2022)
Professor of Emergency Medicine

| | |
|---|---|
| <u>Home Address:</u> | 2411 E. Menlo Boulevard<br>Shorewood, WI  53211 |
| <u>Office Address:</u> | The Hub for Collaborative Medicine<br>8701 W Watertown Plank Rd.<br>Milwaukee, WI  53226<br>Email: hargart@mcw.edu |
| <u>Birth date:</u> | January 5, 1949 |
| <u>Marital Status:</u> | Married, 1987 - Janis<br>Children:  Beth, Jordan, Leah |

<u>Education:</u>

| | |
|---|---|
| 1984 | MPH, Johns Hopkins School of Public Health and Hygiene |
| 1975 | MD, Medical College of Wisconsin |
| 1971 | BA, University of Wisconsin, Milwaukee |

<u>Postgraduate Training:</u>

| | |
|---|---|
| 1975-1976 | Rotating Internship, Gorgas Hospital, Canal Zone, Panama |

<u>Faculty Appointments:</u>

| | |
|---|---|
| 2020-present | Senior Injury and Policy Advisor, Comprehensive Injury Center at the Medical College of Wisconsin |
| 2017-2019 | Co-Director, Global Health Pathway, Medical College of Wisconsin |
| 2014-2016 | Faculty Representative, Board of Trustees, Medical College of Wisconsin |
| 2013-2017 | Director, Global Health Pathway, Medical College of Wisconsin |
| 2013-2017 | Adjunct Faculty, Joseph J. Zilber School of Public Health, University of Wisconsin |
| 2012-present | Graduate Faculty, Graduate School of Biomedical Sciences, Medical College of Wisconsin |
| 2010-2021 | Associate Dean, Global Health, Medical College of Wisconsin |
| 2010-2014 | Institute for Health and Society, Medical College of Wisconsin |
| 2008–present | Adjunct Professor, Department of Population Health Sciences University of Wisconsin School of Medicine and Public Health |
| 2001-2020 | Director, Comprehensive Injury Center at the Medical College of Wisconsin |
| 1998-present | Professor, Department of Emergency Medicine, Medical College of Wisconsin |

- 2 -
Stephen W. Hargarten, MD, MPH

| 1998-2018 | Chairman, Department of Emergency Medicine, Medical College of Wisconsin |
| 1998-2001 | Director, Wisconsin Injury Research Center, Department of Emergency Medicine, Medical College of Wisconsin |
| 1997-2002 | Director, Firearm Injury Center, Department of Emergency Medicine, Medical College of Wisconsin |
| 1994-1997 | Associate Professor, Interim Chairman, Department of Emergency Medicine, Medical College of Wisconsin |
| 1994-1996 | Instructional Academic Staff Preceptor, Physician Assistant Program, Department of Family Medicine & Practice, University of Wisconsin Medical School - Madison, WI |
| 1994-2004 | Health Policy Institute, Medical College of Wisconsin |
| 1989-1994 | Assistant Professor of Emergency Medicine, Medical College of Wisconsin |
| 1985-1988 | Assistant Clinical Professor, Department of Trauma and Emergency Medicine, Medical College of Wisconsin |

Hospital and Administrative Appointments:

| 1995-2018 | Attending Staff, Froedtert Hospital |
| 1992-1997 | Associate Attending Staff, Children's Hospital of Wisconsin |

Hospital Appointments: (past)

| 1989-1995 | Associate Attending Staff, John L. Doyne Hospital, Milwaukee, WI |
| 1985-1988 | Staff Physician, Emergency Department, St. Luke's Hospital |
| 1984-1985 | Staff Physician, Emergency Department, St. Joseph's Hospital |
| 1977-1983 | Staff Physician, Emergency Department, St. Mary's Hospital |
| 1976-1977 | Staff Physician, Emergency Department, St. Joseph's Hospital |

Other Appointments:

| 2014-2020 | President and CEO, Milwaukee Global Health Consortium, Milwaukee, WI |

Specialty Certification:

| 2000 | Board Re-certified, American Board of Emergency Medicine |
| 1991 | Board Re-certified, American Board of Emergency Medicine |
| 1987-2010 | Examiner, American Board of Emergency Medicine |

- 3 -

Stephen W. Hargarten, MD, MPH

| 1987-2003 | Instructor, Advanced Trauma Life Support |
| 1983-2005 | Fellow, American College of Emergency Physicians |
| 1982 | Board Certified, American Board of Emergency Medicine |

Licensure:

National Board of Medical Examiners - July 1976 - #154341
State of Wisconsin - July 1976 - #20218

Awards/Honors

| 2019 | Distinguished Service Award, Medical College of Wisconsin |
| 2018 | Appointment to the Community Preventive Services Task Force (CPSTF) of the U.S. Department of Health and Human Services |
| 2017 | International Institute of Wisconsin's Dorothy Von Briesen World Citizen Award in recognition of dedication to the promotion of international cooperation and understanding between diverse cultural communities |
| 2016 | The Leonard Tow 2016 Humanism in Medicine Award in recognition of exemplary compassion, competence and respect in the delivery of care (presented by The Arnold P. Gold Foundation) |
| 2015 | Distinguished Achievement Award, Milwaukee Academy of Medicine |
| 2012 | Outstanding Pathways Advisor for the 2012 Academic Year Medical College of Wisconsin |
| 2012 | Outstanding Medical Student Teacher for the 2011-2012 Academic Year Medical College of Wisconsin |
| 2011 | Election to the National Academy of Medicine, (Formally the Institute of Medicine) of The National Academy of Sciences |
| 2011 | Selected to be a Johns Hopkins Scholar |
| 2008 | Outstanding Medical Student Teacher for the 2007-2008 Academic Year Medical College of Wisconsin |
| 2000 | Prevention Achievement Award – presented by the Brain Injury Association of Wisconsin |
| 2000 | President's Award, Milwaukee Academy of Medicine |
| 1996 | Contributions to the 1996 Healthy People 2000 Progress Review, and in recognition of leadership in the area of Violence Prevention, on behalf of the National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Washington, DC, November |
| 1995 | Public Citizen of the Year, National Association of Social Workers - Wisconsin Chapter |
| 1994 | Physician of the Year State Medical Society – Wisconsin |

- 4 -

Stephen W. Hargarten, MD, MPH

1990    Rookie of the Year Award (presented by the Emergency Medicine Residents, Medical College of Wisconsin-MCWAH)

Memberships in Professional and Honorary Societies:

Society for Research Excellence
Community Preventive Services Task Force (US Dept of Health & Human Services)
The National Academy of Medicine (fka Institute of Medicine)
Johns Hopkins Society of Scholars
Society for Academic Emergency Medicine
American Public Health Association
Advocates for Highway and Auto Safety
Wisconsin Public Health Association
International Travel Medicine Society
Society for Advancement of Violence and Injury Research

Consultant:

Florida Department of Health
Colorado Department of Health

Journal Reviewer:

Academic Emergency Medicine
Annals of Emergency Medicine
Accident Analysis and Prevention
American Journal of Emergency Medicine
Journal of Global Health
Journal of the American Medical Association
Journal of Injury Prevention
Chinese Journal of Emergency Medicine, Editorial Board

Peer Grant Reviewer

NCIPC - Elimination of Health Disparities through Translation Research (R18), 2008

National Advisory Committees/Boards:

Chair, Network to Prevent Gun Violence in the Americas, 2020-present

Member, Global Violence Prevention Forum of the National Academies of Sciences, Engineering and Medicine, 2019-present

Member, Community Preventive Services Task Force of the U.S. Department of Health and Human Services, 2018-present

Member, Executive Committee, Transportation Research Board of the National Academies of Sciences, Engineering and Medicine, 2018-present

Member, Executive Committee, Transportation Research Board of the National Academies, 2018-present

- 5 -

Stephen W. Hargarten, MD, MPH

Member, Scientific Committee, Consortium of Universities for Global Health, 2013

Special Government Employee, Board of Scientific Counselors, National Center for Injury Prevention and Control, 2013-2017

Member, Institute of Medicine, Global Health Board, 2012-2018

Member, Scientific Advisory Committee, University of Michigan Injury Center, 2011-present

Board Member, Community Advocates, Urban Strategies, 2010-present

Board Member, Great Lakes Transportation Enterprise Institute, 2010-2013

Founding President, Society for Advancement of Violence and Injury Research, 2005-2007

President, Association of Academic Chairs of Emergency Medicine, 2004-2005

President, National Association of Injury Control Research Centers, 2004-2005

Member, Advisory Committee, National Center of Injury Prevention and Control, Acute Care Research Committee, 2004-2005

Board Member, St. Charles Youth and Family Services, 2001-present

Participant, Injury Research Grant Review Committee, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, June 7-8, 1998

Member, Senator Russ Feingold Health Care East Advisory Committee, 1999–2010

Co-Chair, Advocates for Highway & Auto Safety, 1998 – 2002

Public Health Task Force, Society for Academic Emergency Medicine 1998 - 2000

Member, Education Advisory Committee, Association for the Advancement of Automotive Medicine, 1996 – 1997

Board Member, Advocates for Highway & Auto Safety, 1994– present

Member, Public Health and Injury Prevention Committee - American College of Emergency Physicians, 1991-1995

Member, Program Committee, Society for Academic Emergency Medicine, 1993 - 1995

Board Member, Association for Advancement of Automotive Medicine, 1992 - 1995

Member, Public Health Committee - Society for Academic Emergency Medicine, 1990 - 1993

Member, Trauma Subcommittee American College of Emergency Physicians, 1990 – 1991


State/Local Advisory Committee/Boards:

Faculty Member, Board of Trustees, Medical College of Wisconsin, 2014-2016

Member, Committee on Inmate/Youth Death, Department of Corrections, 2005-2007

Stephen W. Hargarten, MD, MPH

Member, Public Health Council, Department of Health and Family Services, 2004-2006

Task Force Member, Governors Task Force on Terrorism, 2001-2003

Chair, State Trauma Advisory Committee, 1999-2003

Chair, State Medical Society Council on Health of the Public, 1999-2000

Eastern Regional Health Care Advisory Committee of Senator Feingold, 1998-2000

Chair, Policies and Practice Work Group, Fighting Back, 1998

Board Member, Fighting Back, 1997-2000

Chair, State Medical Society Injury Control Commission, 1996 - 1999

Chair, Public Health and Education Committee, Milwaukee Academy of Medicine, 1993 – 1999

Tom Dooley Heritage - Board Member (Private, Voluntary Organization), 1981 - 1995

Chairman, Safe Transportation Commission Wisconsin State Medical Society, 1990 - 1994

Board Member, Wisconsin Division American Trauma Society, 1990 - 1993

President, Wisconsin Public Health Association, 1992 - 1993

Co-Chairman, Wisconsin Safety Belt Coalition, Madison, Wisconsin, 1986 - 1991

Milwaukee County Medical Society Public Health Committee, 1989 - 1991

Commissioner, Milwaukee Safety Commission, 1987 - 1990

Medical Director, St. Luke's International Travel Clinic, 1985 - 1988

Board Member/President, Wisconsin Indochina Refugee Relief (WICRR) – Wisconsin, 1980 - 1982

Wisconsin Indochina Refugee Relief (WICRR) (Private, Voluntary non-profit organization), Volunteer Physicians - Tom Dooley Memorial Hospital Thailand, 1980

Co-Founder, Board Member West of the River Community Center, Milwaukee, Wisconsin, 1977 – 1979

Research Grants, Contracts, and Awards:

1. "Remembering the Lost: How Investigation of Military Suicides Can Improve Prevention Resources"
   AWARD FOR FISCAL YEARS 2020-22
   $316,576
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Advancing a Healthier Wisconsin Endowment

2. "Using Hospital Records of Patients Presenting to Froedtert Hospital to Predict Risk of Opioid Use Disorder (OUD), Fatal and Non-fatal Opioid Overdose, and ED Readmission"
   AWARD FOR FISCAL YEARS 2020-2021
   $50,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH

Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: Clinical and Translational Science Institute through Advancing a Healthier Wisconsin Endowment

3. "Project Zero"
   AWARD FOR FISCAL YEARS 2021-2023
   $316,760
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Advancing a Healthier Wisconsin Endowment

4. "Project Aware"
   AWARD FOR FISCAL YEARS 2019-2024
   $300,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: (Sub-contract) State of Wisconsin Department of Health Services

5. "WVDRS and SUDORS Contract"
   AWARD FOR FISCAL YEARS 2019-2020
   $170,440
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: (Sub-contract) State of Wisconsin Department of Health Services

6. FY20 DOC Contract
   AWARD FOR FISCAL YEARS 2019-2020
   $99,874
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Wisconsin Department of Corrections

7. "Destination Zero: Zero Suicide in Fond du Lac County"
   AWARD FOR FISCAL YEARS 2018-2020
   $419,691
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Healthier Wisconsin Partnership Program

8. "MCW Blue Center Research Award"
   INITIAL AWARD FOR FISCAL YEARS: 2017-2020
   $600,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Medical College of Wisconsin, Office of Research

9. "Scudder Travel Scholarship"
   AWARD FOR FISCAL YEARS: 2017-2021
   $15,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Dr. James H. Taylor and Dr. Susan P. Taylor

10. "Dr. Elaine Kohler Summer Academy in Global Health Research and Electives"
    AWARD FOR FISCAL YEARS: 2017-2021
    TOTAL AWARD: $250,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: John Michael Kohler Family Foundation

11. "The Cardiff Model: Strengthening Community Capacity to Reduce Violence:
    AWARD FOR FISCAL YEARS 2016-2018
    $499,693
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH

- 8 -
Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: US Department of Justice

12.  "Developing a Community-Based Approach to Reduce Drug Overdoses in Milwaukee County"
AWARD FOR FISCAL YEAR 2016
TOTAL AWARD $25,000
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Milwaukee County

13.  "Addressing Racial Disparities in the Ascertainment and Identification of Depression,
Suicidal Ideation, and Death by Suicide"
AWARD FOR FISCAL YEARS 2016-2017
TOTAL AWARD $37,347
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Charles E. Kubly Foundation

14.  "Creating a Jackson County that Supports Mental Health"
AWARD FOR FISCAL YEARS 2015-2017
TOTAL AWARD: $374,504
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

15. "Wisconsin Violent Death Reporting System" (WVDRS)
AWARD FOR FISCAL YEAR 2015
AWARD: $69,773
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: (Sub-Contract) State of Wisconsin, Department of Health Services

16.  "Integrating Emergency Data with Law Enforcement, Emergency Medical Service and
Community Data to Reduce Violence"
AWARD FOR FISCAL YEAR 2015
PRINCIPAL INVESTIGATORS: Stephen Hargarten, MD, MPH and Jennifer Hernandez-Meier, MSW
FUNDING AGENCY: National Institute of Justice

17. "Criminal Background Characteristics of Homicide Perpetrators and Victim's and
Suicide Decedents: A Model State Analysis"
AWARD FOR FISCAL YEARS 2014-2016
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: New Venture Fund for a Safer Future

18. "Training Administration Support"
AWARD FOR FISCAL YEARS 2012-present
TOTAL AWARD: $6,200
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Varies

19. "M4 University of the Philippines College of Medicine Global Health Elective"
AWARD FOR FISCAL YEARS: 2012-2013
TOTAL AWARD: $1,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: David E. Engelhardt, MD

20.  "Changing the Culture of Risky Drinking Behavior: Policy Change"
AWARD FOR FISCAL YEARS: 2012-2017
TOTAL AWARD: $748,267
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH

- 9 -
Stephen W. Hargarten, MD, MPH

FUNDING AGENCY:  Healthier Wisconsin Partnership Program

21. "Child Maltreatment and Partner Violence: Bridging the Medical/Social/Science Gap"
AWARD FOR FISCAL YEAR 2011-2012
TOTAL AWARD $7,142
FUNDING AGENCY: NICHHD/Sub-contract from Washington University-St. Louis

22. "M4 Global Health Elective Travel Scholarship"
AWARD FOR FISCAL YEARS: 2011-2017
TOTAL AWARD: $70,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: St. Joseph's Hospital Professional Emergency Services, Inc. (PES) Fund Award

23. "M4 Global Health Elective Travel Scholarship"
AWARD FOR FISCAL YEARS: 2011-2017
TOTAL AWARD: $70,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Ewens WIcare Fund

24. "Dr. Elaine Kohler Summer Academy in Global Health Research and Electives"
AWARD FOR FISCAL YEARS: 2011-2016
TOTAL AWARD: $255,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: John M. Kohler Foundation

25. "Violence Prevention Initiative Research and Evaluation Team"
AWARD FOR FISCAL YEARS: 2010-2015
TOTAL AWARD: $1,241,473
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

26. "Strengthening Emergency Care in Belize"
AWARD FOR FISCAL YEARS: 2010-2012
TOTAL AWARD: $21,360
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wagner Foundation

27. Changing the Culture of Risky Drinking Behavior"
AWARD FOR FISCAL YEARS: 2009-2012
TOTAL AWARD: $300,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

28. "Elaine Kohler Nicaragua Award"
AWARD FOR FISCAL YEARS: 2008-2016
TOTAL AWARD: $5,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Julilly Kohler WI Care

29. "Kenosha County Suicide Prevention Initiative"
AWARD FOR FISCAL YEARS: 2008-2011
TOTAL AWARD: $450,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

- 10 -
Stephen W. Hargarten, MD, MPH

30. "Train the Trainer Alcohol Screening and Intervention"
AWARD FOR PERIOD: June-September 2008
TOTAL AWARD $20,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Transportation

31. "Comprehensive Injury Center at the Medical College of Wisconsin"
AWARD FOR FISCAL YEARS: 2007-2012
TOTAL AWARD: $4,424,025
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

32. "Public Health Injury Surveillance and Program Development"
AWARD FOR FISCAL YEAR: 2007-2008
TOTAL AWARD: $106,034
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

33. "Changing the Culture of Risky Drinking Behavior"
AWARD FOR FISCAL YEARS: 2007-2008
TOTAL AWARD: $49,944
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

34. "Medical Student Training in Aging and Injury Research"
AWARD FPR FOSCA: UEARS: 2007-2012
TOTAL AWARD: $391,068
CO-PROGRAM DIRECTOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: National Institutes of Health/National Institute on Aging

35. "Public Health Injury Surveillance and Program Development"
AWARD FOR FISCAL YEAR: 2006-2007
TOTAL AWARD: $68,870
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

36. "Strengthening Public Health Policymaking for a Healthier Milwaukee"
AWARD FOR FISCAL YEARS: 2006-2008
TOTAL AWARD: $49,816
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Healthier Wisconsin Partnership Program

37. "Youth Suicide Prevention and Early Intervention"
AWARD FOR FISCAL YEARS: 2006-2009
TOTAL AWARD: $100,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Milwaukee Mental Health Association via Substance Abuse and Mental Health Services Administration

38. "Public Health Injury Surveillance and Program Development"
AWARD FOR FISCAL YEAR: 2005-2006
TOTAL AWARD: $93,228
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

- 11 -
Stephen W. Hargarten, MD, MPH

39. "Toward Regional Priorities for Injury Prevention"
AWARD FOR FISCAL YEAR: 2003
TOTAL AWARD: $22,727
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Health and Family Services

40. "Deaths to US Travelers Abroad"
AWARD FOR FISCAL YEAR: 2002
TOTAL AWARD: $50,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Center for Disease Control and Prevention

41. "Annie E. Casey Foundation"
AWARD FOR FISCAL YEAR: 2002
TOTAL AWARD: $68,181
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Annie E. Casey Foundation

42. "Comprehensive Injury Center at the Medical College of Wisconsin"
AWARD FOR FISCAL YEARS:  2001-2007
TOTAL AWARD: $5,180,275
PRIMARY INVESTIGATOR:  Stephen W. Hargarten MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

43. "Grants for Injury Control Research Centers – Small Project 4"
AWARD FOR FISCAL YEARS: 2001-2004
TOTAL AWARD: $ 66,672
CO-INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

44. "Grants for Injury Control Research Centers – Large Project 4"
AWARD FOR FISCAL YEARS: 2001-2006
TOTAL AWARD: $ 204,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

45. "Grants for Injury Control Research Centers – Large Project 3"
AWARD FOR FISCAL YEARS: 2001-2006
TOTAL AWARD: $100,000
CO-INVESTIGATOR (IN KIND): Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

46. "Grants for Injury Control Research Centers – Core A"
AWARD FOR FISCAL YEARS: 2001-2006
TOTAL AWARD:  $ 137,380
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

47. "2nd Annual Emerging Injury Conference: International Travel Related Injury"
AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD:  $ 50,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

48. "NVDRS – Intentional Injuries and Assaults"

- 12 -
Stephen W. Hargarten, MD, MPH

AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD: $ 75,774
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Office of Justice Assistance

49. "Improving Patient Safety: Health Systems Reporting, Analysis, and Safety Improvement Research Demonstrations"
AWARD FOR FISCAL YEARS: 2001-2004
TOTAL AWARD: $1,418,594
CO-PI: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Agency for Healthcare Research and Quality

50. "International Injuries and Assaults"
AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD: $ 68,196
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: State of Wisconsin

51. "Building a National Firearm Injury Reporting System"
AWARDED FOR FISCAL YEARS: 2000 - 2001
TOTAL AWARD: $50,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Funder's Collaborative for Gun Violence Prevention by Harvard School of Public Health National Violent Injury Statistics System (NVISS)

52. "Preventing Firearm Suicides and Unintentional Deaths"
AWARD FOR FISCAL YEARS: 2000-2001
TOTAL AWARD: $60,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Funder's Collaborative for Gun Violence Prevention by Johns Hopkins Center for Gun Policy & Research

53. "A Comprehensive Model for Firearm Injury Reporting, Analysis and Information" – Joyce 5
AWARD FOR FISCAL YEARS: 1999-2002
TOTAL AWARD: $771,924
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

54. "Closing the Gap: Applying Injury Control Science to Patient Safety"
AWARD FOR FISCAL YEARS: 1999-2000
TOTAL AWARD: $24,316 and $30,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Centers for Disease Control and Prevention

55. "In the Wake of a Gunshot"
AWARD FOR FISCAL YEARS: 1999-2000
TOTAL AWARD: $10,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Humanities Council and the National Endowment for the Humanities

56. "Strategic Development of State Firearm Injury Reporting Systems"
AWARD FOR FISCAL YEARS: 1999-2000
TOTAL AWARD: $116,911
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH

Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: Open Society Institute

57. "Wisconsin Firearm Injury Reporting Systems (FIRS) – Joyce 4
AWARD FOR FISCAL YEARS: 1998-1999
TOTAL AWARD: $95,912
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

58. "Wisconsin Drug Abuse Emergency Room Registry"
AWARD FOR FISCAL YEARS: 1998-1999
TOTAL AWARD: $1500
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: State of Wisconsin, Dept. of Health & Family Services

59. "National Firearm Information Center" – Joyce 3
AWARD FOR FISCAL YEARS: 1997-2000
TOTAL AWARD: $391,581
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

60. "Firearm Injury Reporting System" – Joyce II
AWARD FOR FISCAL YEARS: 1996-1998
TOTAL AWARD: $194,538
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

61. "Brief Strategies for Alcohol-Related Non-traffic Injuries"
AWARD FOR FISCAL YEAR: 1996
TOTAL AWARD: $10,904
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: University of Wisconsin – Madison

62. "Firearm Surveillance System - Wisconsin"
AWARD FOR FISCAL YEAR: 1994-1997
TOTAL AWARD:  $150,000
CO-DIRECTOR:   Stephen Hargarten, MD, MPH
FUNDING AGENCY: Division of Health, State of Wisconsin

63. "Firearm Injury Reporting System"
AWARD FOR FISCAL YEAR: 1994-95
TOTAL AWARD: $50,000
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Faye McBeath Foundation

64. "Firearm Injury Reporting System" – Joyce II
AWARD FOR FISCAL YEAR: 1994-95
TOTAL AWARD: $79,997
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

65. "Emergency Room Drug Abuse Data"
AWARD FOR FISCAL YEARS: 1992 - 2000
TOTAL AWARD:  $5,000/yr.
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: State of Wisconsin

- 14 -
Stephen W. Hargarten, MD, MPH

66. "Crash Outcome Data Evaluation (CODES) in Wisconsin"
AWARD FOR FISCAL YEAR: 1992-1993
TOTAL AWARD:  $15,000
CO-INVESTIGATOR:  Stephen Hargarten, MD, MPH
FUNDING AGENCY: National Highway Traffic Safety Administration

67. "Partnerships in Health/EMS Training for Poland"
AWARD FOR FISCAL YEARS: 1992-1994
TOTAL AWARD:  $2.4 million
ASSOCIATE DIRECTOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: United States Agency for International Development

68. "Emergency Medical Services Course for Physicians"
AWARD FOR FISCAL YEAR: 1992
TOTAL AWARD:  $29,789.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Transportation

69. "Motorboat Propeller Injuries in Wisconsin 1987-1989"
AWARD FOR FISCAL YEAR: 1991
TOTAL AWARD:  $2,000.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Institute for Injury Reduction

70. "Electronic Log System for Emergency Department"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD:  $40,356.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Transportation

71. "Cost & Data Analysis of Motor Vehicle Trauma in Milwaukee County"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD: $3,417.00.
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Department of Transportation

72. "Hunting Injuries and Illnesses in Montana 1990"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD:  $2,500.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wilderness Medical Society

73. "Motor Vehicle Crashes - Emergency Physician Costs"
AWARD FOR FISCAL YEAR: 1990
TOTAL AWARD:  $6,000.00
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Safety Belt Coalition


Invited Lectures/Testimony:

1. "Gun Violence as a Biopsychosocial Disease," Midwest Injury Prevention Alliance Virtual Summit, December 9, 2020.

- 15 -

Stephen W. Hargarten, MD, MPH

2. "Global Health from Neighborhoods to Nations", Milwaukee Academy of Medicine, Virtual Webinar, November 17, 2020.

3. "Impact of COVID-19 on the University's Global Health Programming," 7th Annual Midwestern Universities for Global Health, Virtual Webinar, September 30.

4. "Gun Violence in the Americas: Local Solutions to a Hemispheric Challenge," Consortium of Universities for Global Health, Virtual Webinar, July 16, 2020.

5. "Assault Weapons Ban in the Americas," Newtown Action Alliance, Virtual Webinar, July 9, 2020.

6. "Gun Violence in Mexico and Central America," Consortium of Universities for Global Health, Virtual Webinar, April 21, 2020.

7. "The Milwaukee Global Health Landscape Study," Milwaukee Global Health Consortium, Virtual Webinar, April 13, 2020.

8. "Gun Violence in the Americas Focus: Mexico," Consortium of Universities for Global Health, Virtual Webinar, March 24, 2020.

9. "Physician Advocacy," Medical College of Wisconsin Health Policy and Advocacy Course, Milwaukee, WI, March 23, 2020.

10. "Understanding the Biopsychosocial Aspects of Violence Involving Firearms," American Hospital Association Webinar Series on Gun Violence, Virtual Presentation, February 19, 2020.

11. "Gun Violence: A Biopsychosocial Disease," 2020 Comprehensive Injury Center Lecture Series, Medical College of Wisconsin, Milwaukee, WI, January 23, 2020.

12. Assembly Health Committee Public Hearing (Military Civilian Partnership + Cancer Clinical Trials Legislation), Madison, WI, January 7, 2020.

13. "Global Burden of Gun Violence," University of Wisconsin Population Health Seminar Series, University of Wisconsin, Madison, WI, December 2, 2019.

14. "Gun Violence: A Biopsychosocial Disease," Department of Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, September 27, 2019.

15. "Suicide in Wisconsin: Considerations for Prevention," Wisconsin State Legislature's Suicide Prevention Task Force Testimony, Milwaukee, WI, September 9, 2019.

16. "Gun Violence: A Biopsychosocial Disease," Department Conference, Department of Emergency Medicine, Medical College of Wisconsin, Milwaukee, WI, August 8, 2019.

17. "Road Traffic Injury Prevention and Violence Injury Prevention," International Congress on Emergency Medicine Meeting, Seoul, South Korea, June 12, 2019.

18. "Gun Violence Prevention: Dispelling Myths, Understanding Science, Strengthening Prevention, Programs, and Policies," Community Conversations, La Crosse, WI, April 24, 2019.

19. "Gun Violence: A Biopsychosocial Disease," Toward One Wisconsin Inclusivity Conference, Milwaukee, WI, April 11, 2019.

20. "Motor Vehicle Crash Deaths and Injury – Moving to Zero," Wisconsin Medical Society Physician Education Conference, Madison, WI, April 6, 2019.

- 16 -
Stephen W. Hargarten, MD, MPH

21. "Gun Violence: A Biopsychosocial Disease," Wisconsin Medical Society Physician Education Conference, Madison, WI, April 6, 2019.

22. "Injury as a Biopsychosocial Disease," Wisconsin Violence and Injury Prevention Program Summit, Madison, WI, April 4, 2019.

23. "Gun Violence: A Biopsychosocial Disease," Society for the Advancement of Violence and Injury Research Conference, Cincinnati, OH, April 2, 2019.

24. "Gun Violence: A Complex Biopsychosocial Disease," Grand Rounds, University of Wisconsin School of Medicine and Public Health, Madison, WI, February 21, 2019.

25. "Why Do Health Systems Have A Role?" NASEM: Health Systems Interventions to Prevent Firearm Injuries & Death – A Workshop, Washington DC, October 17, 2018

26. "Vision Zero – Emphasis on Public Health" Transportation Research Board Transportation Safety Management Mid-Year Meeting, Washington DC, July 30, 2018

27. "Gun Violence: A Biopsychosocial Disease: Myths, Science & Prevention", 2018 Preventive Medicine Annual Meeting, American College of Preventive Medicine, Chicago, ILL, May 24, 2018

28. "International Challenges and Higher Education", 39th Annual National Conference on Law & Higher Education.  Stetson University College of Law, Clearwater, FL, February 3, 2018

29. "Faculty promotion for global health" 4th Annual Midwest Universities for Global Health Meeting: Capacity Building in Global Health at Washington University Medical School, December 1, 2017.

30. "Gun Violence: A Biopsychosocial Disease: Physician Roles and Responsibilities", Grand Rounds, University of Michigan Emergency Medicine Residency Conference, Ann Arbor, MI, November 8, 2017.

31. "International Partnerships: Global Wisdom, Global Citizens" American Association of Medical Colleges, Boston, MA, November 5, 2017.

32. "Legal Characteristics of Emergency Medicine" Belize Medical and Dental Association XXXVI Congress, Belize City, Belize, October 17, 2017.

33. "Global Health Challenges: The Burden of Injury" University of Norte Dame Eck Institute for Global Health, Norte Dame, IN September 28, 2017.

34. "Gun Violence: Myths, Science, Opportunities", Underground Science Society, The Sugar Maple,
    i.   Milwaukee, WI, September 11, 2017.

35. "Gun Violence as a Biopsychosocial Disease Burden: Our Roles and Responsibilities" for The Violence Epidemic: Justice, Public Health and Ethics, Center for Bioethics and Medical Humanities, Medical College of Wisconsin, Milwaukee, WI, June 13, 2017.

36. "Global Burden of Road Traffic Injury: Opportunities and Strategies for Prevention and Control: Roles of Civil Society" Consortium of Universities for Global Health, Washington DC, April 8, 2017.

37. "Gun Violence: A Biosocial Disease" Keynote for Wisconsin Chapter of American College of Emergency Physician's 2017 Spring Symposium, Madison, WI, March 28, 2017.

38. "Global Burden of Injury" Hainan Medical University, Hainan, China, March 15, 2017.

- 17 -

Stephen W. Hargarten, MD, MPH

39. "MCW's Impact on the World: From Milwaukee, Wisconsin to Around the Globe", MCW/Marquette Medical Alumni Association 51st Clinical Conference, Sonoma, CA, March 7, 2016.

40. "Global Health and Medical Education: The Ethics of Short-term International Electives" Advancing Global Health: Ethical and Logistical Issues, Bronx, NY, December 5, 2016.

41. "Global Emergencies" Belize Medical and Dental Association XXXV Congress, Belize City, Belize, November 17, 2016

42. "Shoot to Kill: Shooting Trends Across the Nation" Panel at Marquette University, Milwaukee, WI,
    i.   October 14, 2016.

43. "Gun Violence: A Biosocial Disease", Sanford Trauma Symposium, South Dakota Department of Health, Sioux Falls, SD, October 11, 2016.

44. "Global Health from a Milwaukee Perspective" Marquette University Global Health Symposium, Milwaukee, September 30, 2016

45. "Study Abroad Student Safety", Wisconsin Association of Independent Colleges and Universities Student Safety Workshop, Milwaukee, September 28, 2016

46. "Global Health Challenges", Notre Dame University, Notre Dame, IN, September 1, 2016

47. "Beyond the Basics of Health, Safety, Security and Risk Management", Keynote Speaker for The Forum on Education Abroad Standards of Good Practice Institute, Northwestern University, Evanston, IL, June 23, 2016.

48. "Global Burden of Injury" University College of Dublin, Dublin, Ireland, June 8, 2016

49. "Global Health: The Ultimate Sustainable Challenge", Sustainability Summit, Milwaukee, May 13, 2016

50. "Medical Student Perspectives on Global Health" MCW Today, Tomorrow, and Beyond Symposium Alumni Weekend, Milwaukee, April 30, 2016

51. "Gun Violence: A Biosocial Disease" for Medical College of Wisconsin Nursing Trauma Conference, Milwaukee, WI, April 23, 2016.

52. "Gun Violence: A Biosocial Disease", Keynote Speaker for Gun Violence: A Public Health Symposium, Washington University – Institute for Public Health, St. Louis, MO, April 5, 2016.

53. "How Violence Impacts Public Health", Panel Participant for University of Wisconsin-Zilber School of Public Health, Milwaukee, WI, February 25, 2016.

54. "Programs and Policy: Addressing a Global Need for Surgery and Emergency Care" and "Global Burden of Injury", Global Health Conference Midwest, Creighton University, Omaha, NE, February 6, 2016.

55. "Inequality and Freedom from Violence: Community violence has identifiable causes and implementable cures" University of Wisconsin-Milwaukee Fireside Forum, Milwaukee, WI, February 2, 2016

56. "Global Health: Managing Health & Safety", 2nd Annual Midwestern Universities for Global Health, Rush University, Chicago, IL, December 2, 2015

57. "Global Burden of Injury" Visiting Professor, Notre Dame, Notre Dame, IN, October 15, 2015

58. "Global Burden of Injury" Visiting Professor, University of Wisconsin, Madison, WI, October 12, 2015

- 18 -

Stephen W. Hargarten, MD, MPH

59. "Challenges and Opportunities in Academic Medicine: Collaborating for Global Health" Visiting Professor, Universidad Católica de Guayaquil, Guayaquil, Ecuador, May 6, 2015

60. "Disaster Preparedness & Response: An All Hazard Approach" Consortium of Universities for Global Health Annual Meeting, Boston, MA, March 26, 2015

61. "Injury Science and Geriatrics: Coming of Age Together", Visiting Professor, Weill Cornell Medical College, Division of Geriatrics & Palliative Medicine Grand Rounds, New York, NY, February 12, 2015

62. "Emergency Medicine and Injury Prevention and Control: A Room with a View", Visiting Professor, Weill Cornell Medical College, Divisions of Emergency Medicine and Geriatrics & Palliative Medicine Grand Rounds, New York, NY, February 11, 201.5

63. "Firearm Injuries", Community Memorial Hospital Medical Staff Education Program, Menomonee Falls, WI, January 16, 2015.

64. "Firearm Injuries", Institute of Medicine Forum on Violence, Washington, DC, December 17, 2014

65. "Global Health Managing Traveler Safety" Midwest Universities for Global Health Inaugural Meeting, University of Illinois at Chicago Center for Global Health, December 3, 2014

66. "Global Health and Medical Education: The Ethics of Short-term International Electives" Advancing Global Health: Education, Building, and Support, Albert Einstein College of Medicine, Bronx, New York, November 10, 2014

67. "Strengthening Emergency Care in Belize" 33rd Belize Medical and Dental Association International Congress, Belize City, Belize, October 31, 2014

68. "Triage Use and Implementation" 33rd Belize Medical and Dental Association International Congress, Belize City, Belize, October 31, 2014

69. "The Science of Injury Prevention and Control" University of Zagreb School of Medicine, Zagreb, Croatia, September 9, 2014

70. "Challenges and Opportunities in Academic Medicine: Collaborating for Global Health", University of Rzeszow Jubilee of Medical Faculty, Rzeszow, Poland, September 5, 2014

71. "Burden of Global Violence/Injury" for the 2014 World Affairs Seminar, Carroll University, Waukesha, Wisconsin, June 23, 2014

72. "Practical advice for implementing useful global health curricula and effective academic programs" USAID The Future of Global Health: Building Better Professionals & Programs, Washington DC, May 9, 2014

73. "Global Health and Partnerships" Shanghai Minhang Central Hospital, Shanghai, China, April 25, 2014

74. "Organizing Injury prevention and control programs" 2014 China- US-Japan Summit Forum of Emergency Medicine, Xinhua Hospital, Shanghai, China, April 25, 2014

75. "Technical Consultation for United Nations Office for Disarmament Affairs", Research and Information Gathering Participant, UN Headquarters, New York, NY, November 19, 2013.

76. "Gun Violence as a Public Health Issue", Tuesday Speaker for Milwaukee Rotary Club, War Memorial, Milwaukee, WI, October 29, 2013

Stephen W. Hargarten, MD, MPH

77. "Transportation Safety and Injury Prevention," Keynote Speaker for Midwest Conference of Institute of Transportation Engineers, Pfister Hotel, Milwaukee, WI, June 27, 2013.

78. "Patient Safety or Injury Control: Two Worlds or One?", Patient Safety Summit, Johns Hopkins, Baltimore, MD, June 21, 2013

79. "Gun-Related Violence", Guest Speaker for Milwaukee Forum, Haggerty Museum, Milwaukee, WI, January 17, 2013.

80. "Gun Policy Summit". Expert Panel Participant, Johns Hopkins University, Baltimore, MD, January 14-15, 2013.

81. "Emergency Medicine: Going Global", Guest Speaker for Klippel Lecture, Washington University School of Medicine, St. Louis, MO, December 4, 2012.

82. "Global Burden of Injury", Introduction to Public Health: Global Health, Carroll University, Waukesha, WI, November 30, 2012, April 20, 2012, November 11, 2011

83. "Gun Violence: The Strengths and Limits of the Disease Model", Guns in America: Conflicting Points of View, University of Wisconsin, Madison, WI, November 1, 2012.

84. "Increasing Utilization of NVDRS Data", National Violent Death Reporting System Reverse Site Visit, Atlanta, GA, September 13, 2011.

85. "Researching Car Crashes and Gun Shot Wounds: Products, Problems, Policies," and "Opportunities in Injury Research: Getting Started and Connecting the Dots", Visiting Lecturer for the University of Alberta, Canada, June, 2011.

86. "Congressional Briefing".  Expert Testimony, Association for Safe International Road Travel and the U.S. Congressional Caucus on Global Road Safety, United Nations Decade of Action for Road Safety 2011-2020 United Nations, Washington, DC, May 11, 2011.

87. "The Team Approach to Caring for Acutely Injured Patients", Jao Tong University, Xinhua Hospital, Shanghai, China, November 9, 2010.

88. "Trauma Evaluation and Management, TEAM" for 29th Belize Medical and Dental Association International Pre-Congress, Belize City, Belize, October 20, 2010.

89. "The Emergency Department and Systems Approach to Emergency Medicine" for 29th Belize Medical and Dental Association International Pre-Congress, Belize City, Belize, October 19, 2010.

90. "The Public Health Approach to Violence Prevention in Health Care Settings" for International Association for Healthcare Security and Safety Conference, Baltimore, MD, June 22, 2009.

91. "Epidemiology of Travel-Related Injury & Death" for 11th Conference of the International Society of Travel Medicine, Budapest, Hungary, May 26, 2009.

92. "Reducing Firearm Injuries and Death: A Public Health Approach" for Trauma Conference, Kent State University, Canton, OH, November 7, 2008.

93. "Guns and Cars: A Tale of Product Design Flaws Linked with Death & Injury" for Trauma Conference Kent State University, Canton, OH, November 7, 2008.

94. "Gun Violence" for Grand Rounds, Mount Sinai Hospital, Milwaukee, WI, October 17, 2008.

- 20 -

Stephen W. Hargarten, MD, MPH

95. "Town Hall Meeting – Status of Impaired Driving in Wisconsin" for MADD, NHTSA, DOT in Middleton, WI, August 14, 2008.

96. "Guns and Cars: Stories for preventing car and gun related deaths" for Grand Rounds, Columbia-St. Mary's, Milwaukee, WI, June 13, 2008.

97. "Panel on Urban Studies Programs" for 2nd Annual Henry W. Maier State of Milwaukee Summit, Milwaukee, WI, April 30, 2008.

98. "The Public Health Approach to Reduce Alcohol Related Injury and Death" Noon Conference for Gundersen Lutheran Trauma & Emergency Center, LaCrosse, WI, November 1, 2007

99. "From the Bedside to the Community and Beyond: The Physician's Role in Injury Prevention and Control", Grand Rounds, Philadelphia, PA, October 23, 2007.

100. "Public Health Approach to Reducing the Burden of Suicide" Grand Rounds for Psychiatry, St. Joseph's Outpatient Conference Center, Milwaukee, WI, June 20, 2007.

101. "Violence is a Disease", 2007 Global Health and Social Justice Conference, University of Wisconsin-Milwaukee College of Nursing, Milwaukee, WI, March 29, 2007.

102. "Burden of Injury in Wisconsin: Spelling It Out", Injury Summit, Holiday Inn, Neenah, WI, October 25, 2006.

103. "Injury Policy Forum", EMSC Policy Forum, Monona Terrace, Madison, WI, March 21, 2006.

104. "To Be or Not to Be: Case Studies in Injury Control and Advocacy", Seminar on Gun Violence, University of Wisconsin, Population Health Institute, Madison, WI, December, 2005.

105. "Emergency Medicine Leadership", Yale University, Section of Emergency Medicine, April 2005

106. "Emergency Medicine Leadership," Brown University, Department of Emergency Medicine, March 2005

107. "Emergency Medicine Leadership", University of Alabama-Birmingham, Department of Emergency Medicine, November 2002

108. "Medical Examiner and Coroner Data for Public Health: A Model Linked System", Institute of Medicine Workshop on the Medicolegal Death Investigation System, Washington, DC, March 23-25, 2003.

109. "The National Violent Death Reporting System: It's About Time We're Connecting-the-Dots for Injury Prevention", University of North Carolina Injury Prevention Research Center Seminar, Chapel Hill, NC, March 17-19, 2003.

110. "Emergency Medicine Leadership in the 21st Century: Guns and Cars, Acute Care, and Injury Prevention", University of North Carolina Injury Prevention Research Center Seminar, Chapel Hill, NC, March 17-19, 2003.

111. "Medical Injury", Grand Rounds at the University of Western Ontario, Ontario, Canada, January 24, 2003.

112. "Planning for a State Violent Death Reporting System", National Violent Death Reporting System Implementation Training, Atlanta, Georgia, January 16-17, 2003.

113. "Advocacy in Emergency Medicine", Grand Rounds at the University of Alabama Birmingham, Birmingham, A., November 20, 2002.

114. "Causes of Gun Crime", American Society of Criminology Conference, Chicago, IL, November 12, 2002.

- 21 -
Stephen W. Hargarten, MD, MPH

115. "Nonfatal Gun Injuries – What We Know, Don't Know and Need to Know", The 7th HELP Network Conference, Chicago, IL, October 27, 2002.

116. "Youths and Guns", Gun Violence Workshop, The National Academies National Research Council Institute of Medicine, Washington, D.C., September 16, 2002.

117. "Injury Prevention: Creating an Agenda for Action", Springfield, Illinois, July 31, 2002.

118. "The Public Health Approach to reducing firearm related deaths", Coalition Against Gun Violence, Cleveland, Ohio, June 6, 2002.

119. "The Physician Scientist as Advocate", The Spivey Lecture, Society for Academic Emergency Medicine Annual Meeting, St. Louis, MO, May 16, 2002.

120. "Firearm suicides: A two-state comparison", 6th World Conference on Injury Prevention and Control, Montreal, Quebec, Canada, May 12-15, 2002.

121. "Travel related injury prevention for students", NAFSA Conference, University of Wisconsin Milwaukee, Milwaukee, WI, April 18, 2002.

122. "Suicide among Wisconsin farmers", American Association of Suicidology, 35th Annual Conference, Bethesda, MD, April 10-13, 2002.

123. "The relationship between health providers and law enforcement: Information sharing and lessons learned in the Firearm Injury Reporting System", 30th Annual Conference on Value Inquiry – Values in Health Care: Past, Present and Future, Milwaukee, WI, April 4-6, 2002.

124. "The Public Health Approach to Reducing Firearm Injuries", 13th Annual Trauma Symposium for Coastal Area Health Education Center, Wilmington, NC, February 9, 2002.

125. "Emergency Medicine and Advocacy", Department of Emergency Medicine Grand Rounds at Johns Hopkins School of Medicine, Baltimore, MD, January 31, 2002.

126. "Gun Violence and Gun Policy Conference", Brookings Institute, Washington, D.C., January 25, 2002.

127. "Emergency Medicine Advocacy:  A Model Discussion", Northwestern University, Department of Emergency Medicine, December 2001.

128. "Emergency Medicine Advocacy", Northwestern University, Chicago, Illinois, December 19, 2001.

129. "Firearm suicide in Wisconsin 1999: Urban/rural and age-related patterns", Mobilizing for a Safe USA, Atlanta, GA, December 3-5, 2001.

130. "Improve Research Information and Data on Firearms", National Academy of Science Committee, 2nd Meeting, Irvine, CA, November 15, 2001.

131. "The Public Health Approach to Reducing Firearm Injuries", AMA Key Stakeholders Meeting, Oak Brook, IL, November, 2001.

132. "Linking the gun with homicides and suicides: A model analysis of the who, when, and where of the gun's first purchase", American Society of Criminology, Atlanta, GA, November 6-10, 2001.

133. "Firearm Injury Data Systems", AMA Science Reporters Conference, San Francisco, California, October 30, 2001.

- 22 -
Stephen W. Hargarten, MD, MPH

134. "Firearm suicide: The Wisconsin experience, 1999", American Public Health Association, 129th Annual Meeting, Atlanta, Georgia, October 20-24, 2001.

135. "Relationship of household gun ownership to firearm suicide rates in Wisconsin communities", American Public Health Association, 129th Annual Meeting, Atlanta, Georgia, October 20-24, 2001.

136. "Firearm Homicide in Milwaukee and the Progress of the Firearm Injury Reporting System", The Milwaukee Fire and Police Commission, Milwaukee, Wisconsin, October 18, 2001.

137. "Identification and Classification of Homicide in Wisconsin 2000: A Comparison of Two Data Systems", Medical College of Wisconsin 2001 Student Research Forum, Milwaukee, Wisconsin, October 4, 2001.

138. "Demonstrating the Linkage of Data Sets from the Firearm Injury Center and the City of Milwaukee Using Geographic Information System Analysis" Medical College of Wisconsin 2001 Student Research Forum, Milwaukee, Wisconsin, October 4, 2001.

139. "The Public Health Challenge and the Model Firearm Injury Reporting System", Plenary Presentation, Aiming for Prevention: International Medical Conference on Small Arms, Helsinki, Finland, September 28-30, 2001.

140. "Highlights of the Firearm Injury Reporting System's first statewide report: Investigating regional differences", 13th Annual Milwaukee County Medical Examiners Office Forensic Science Seminar, Milwaukee, Wisconsin, September, 2001.

141. "What We Don't Know is Killing Us: The Need for Better Data about Firearm Injuries and Deaths", National Academy of Sciences Committee on Law and Justice, Washington, DC, August 30, 2001.

142. "Injury Control of Gun Shot Wounds", Advances in Trauma, American College of Surgeons, Kansas City, Missouri, December 8, 2000.

143. "Trauma Care in the State of Wisconsin", 2000 Annual Meeting of the Wisconsin Chapter of the American College of Surgeons, Waukesha, Wisconsin, December 2, 2000.

144. "Travel Health:  Clinical Issues for Occupational and Environmental Health Providers", American Occupational Health Conference, American College of Occupational and Environmental Medicine, Philadelphia, Pennsylvania, May 18, 2000.

145. "To Be or Not to Be a Physician Scientist Advocate:  That is the Question", Emergency Medicine Spring Research Forum, University of Michigan, Ann Arbor, May 2000.

146. "US Citizen Deaths Abroad:  What we know, don't know, and need to know to prevent them", Occupational Health Conference, Philadelphia, Pennsylvania, May 14, 2000.

147. "Firearms:  The Need for Better Information and Safer Guns", Commission for the Prevention of Youth Violence, American Medical Association, Houston Texas, May 9, 2000.

148. "Understanding State-of-the-Art Treatment & Prevention of Firearm Injuries", National Conference for Health Care Professionals, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, December 10-11, 1999.

149. "Better Data, Safer Guns Equals Fewer Injuries", Gun Violence Forum, Entertainment Industries Council, Los Angeles, California, November 3-4, 1999.

150. "Bridging the Gap between Information and Policy: A Public Health Approach to Reducing Firearm Injuries", Conference of Wisconsin Network for Health Policy Research, University of Wisconsin School of Medicine, Madison, WI, November 4-5, 1999.

- 23 -

Stephen W. Hargarten, MD, MPH

151. "Counting Firearm-related Deaths: A case study for better surveillance and knowledge through data linkage," Emergency Medicine New England Conference, Newport, Rhode Island, August 11-13, 1999.

152. "Guns, Cars & Death: A View from a Room," Department of Emergency Medicine and Division of Traumatology and Surgical Critical Care Grand Rounds, University of Pennsylvania Medical Center, Philadelphia, PA, July 9, 1999.

153. "The Scientist as Policy Advocate: Clarifying the Issues and Framing the Data for Effective Policy Development and Debate," 1999 Society for Academic Emergency Medicine Annual Meeting, Boston, MA, May 23, 1999.

154. "Firearm Injury Surveillance", The 5th Annual Citizens' Conference to Stop Gun Violence, The Educational Fund to End Handgun Violence, Washington DC, November 13-14, 1998.

155. "Public Health Strategies to Address Family Violence", National Advisory Council on Family Violence, Rosemont, IL, April 4, 1998.

156. "Rapid Deceleration Injuries Involving Recreational Vehicles", Flight for Life's Annual Emergency Services Conference: Trends and Issues 1998, Flight for Life, Milwaukee, WI, April 4, 1998.

157. "Rapid Deceleration Injuries Involving Recreational Vehicles", Flight for Life's Annual Emergency Services Conference: Trends and Issues 1998, Flight for Life, Milwaukee, WI, March 31, 1998.

158. "Taking Aim at Cars and Guns", Skills Fair 1998, Shared Governance Development Council, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, March 26, 1998.

159. "Preventing Firearm Injury: Protecting Our Children", Firearm Injury Prevention Training Conference, American Academy of Pediatrics, Chicago, IL, March 14-15, 1998.

160. "Scope and Nature of Firearm Injury Research: Issues and Challenges" Injury Prevention Research Center, The University of Iowa, Iowa City, IO, February 1998.

161. "Mechanism of Injury", Flight for Life's Trauma Nurse Specialist Course, Flight for Life, Milwaukee, WI, February 4, 1998.

162. "Scope and Nature of Firearm Injury Research: Issues and Challenges", University of Iowa Injury Prevention Research Center, Iowa City, IO, February 3, 1998.

163. "Adult Option of the Master's Program in Nursing" Medical College of Wisconsin, Fall Semester, Marquette University College of Nursing, Milwaukee, WI, August 24 - December 6, 1997.

164. National HELP Conference -Tracking the Firearm Epidemic National Conference, Washington DC, April 1997.

165. Lafollette Institute-Public Health Model for Reducing Firearm Injuries and Deaths, Madison, WI, April 1997.

166. "Futures in Emergency Medicine Research Conference, Macy Foundation, Washington D.C., March 1997 (invited as representing the Association of Academic Chairs in Emergency Medicine)

167. "Emergency/Trauma Medicine."  Sheboygan Memorial Medical Center, Knights of Columbus Center, Sheboygan, WI, February 18, 1997.

168. "Firearm Injury Prevention: A Model Strategy."  Medical College of Wisconsin, Winter Refresher Course for Family Physicians, Pfister Hotel, Milwaukee, WI, January 30, 1997.

169. The Johns Hopkins School of Public Health and Hygiene, Gun Policy and Research Center, Baltimore, MD December 3-6, 1996.

- 24 -

Stephen W. Hargarten, MD, MPH

170. "The Nature and Scope of Firearm Injury Research: Issues and Challenges."  Visiting Professor, The Johns Hopkins School of Public Health and Hygiene, Gun Policy and Research Center, Baltimore, MD, December 3-6, 1996.

171. "The Milwaukee County Firearm Injury Reporting System."  Healthy People, National Health Promotion and Disease Prevention Objectives, Violent and Abusive Behavior - 1996 Progress Review, Washington, DC, November 26, 1996.

172. "Violence Prevention."  Tenth Annual Summer Trauma Symposium.  Paper Valley Hotel & Conference Center, Appleton, WI, June 1996.

173. "Teenage Violence."  Tenth Annual Summer Trauma Symposium.  Paper Valley Hotel & Conference Center, Appleton, WI, June 1996.

174. Injury Prevention and Control for Emergency Medicine, Department of Emergency Medicine, University of Pittsburgh Medical Center, Pittsburgh, PA, May 1996.

175. "Firearm Injury Surveillance System."  1996 Attorney General's Law Enforcement Conference, Stevens Point, WI, May 1996.

176. "The Milwaukee County Firearm Injury Reporting System."  Visiting Professor, Department of Emergency Medicine, University of Pittsburgh Medical Center, Pittsburgh, PA, May 1996.

177. "Tracking the Epidemic."  Third Annual HELP Network Conference: Promoting Public Policy for the Public's Health, guest lecturer, Washington, DC, November 1995.

178. "Injury and Violence Prevention: Confronting the Crisis."  69th National School Health Conference of the American School Health Association, Milwaukee, WI, October 1995.

179. "Guns and Violence: The Tragic Cost."  National Violence Prevention Conference, University of Iowa, Des Moines, IA, October 1995.

180. "Monitoring Firearm Injuries."  National Violence Prevention Conference, University of Iowa, Des Moines, IA, October 1995.

181. "Rural Trauma/Rural Violence."  Day of Country Medicine Conference, Howard Young Medical Center, Minocqua, WI, September 1995.

182. "Firearm Violence and Gun Control in America."  Panel participant at the Wisconsin Surgical Society meeting, Lake Geneva, WI, September 1995.

183. "Milwaukee County Firearm Injury Reporting System: A Model for Injury Prevention."  State of Wisconsin, Department of Health and Social Services, Milwaukee Managed Care Forum, Milwaukee, WI, August 1995.

184. "Firearm Injury Prevention for Primary Care Physicians."  Family Practice Grand Rounds, Waukesha Memorial Hospital, August 1995.

185. "Strategies to Reduce Firearm Deaths."  Wisconsin Council of Administrators of Special Services, Ltd., Madison, WI, May 1995.

186. "Violence Prevention."  State Medical Society of Wisconsin Alliance, 66th Annual Convention, Milwaukee, WI, April 1995.

- 25 -

Stephen W. Hargarten, MD, MPH

187. "Emergency Medicine Research: A View from the Riverbank."  Faculty Development Seminar Series, University of Illinois at Chicago, Department of Emergency Medicine, Chicago, IL, March 1995.

188. "Committee on Transportation and Infrastructure Subcommittee on Surface Transportation."  Advocates for Highway and Auto Safety, Washington, DC, March 1995.

189. "Firearm Injuries and Deaths."  Department of Psychiatry, University of Wisconsin - Madison Medical School, Milwaukee Campus, WI, March 1995.

190. "Firearms, Violence and Prevention."  Public Issues Committee, Family Service of Milwaukee, Milwaukee, WI, March 1995.

191. "Injury Control."  Grand rounds, Department of Emergency Medicine, William Beaumont Hospital, Department of Emergency Medicine, Royal Oak, MI, March 1995.

192. "Understanding How to Access Health Care Delivery Systems II Conference."  Milwaukee Regional Medical Complex, Milwaukee, WI, March 1995.

193. "Proposal to Establish a Reporting System for Firearm Injuries."  Public Issues Consortium, 12th Annual Legislative Breakfast, Milwaukee, WI, January 1995.

194. "Firearm Violence: A Public Health Issue."  Marquette University College of Nursing, Milwaukee, WI, January 1995.

195. "Handgun Violence as a Public Health Problem in our Community."  Social Development Commission, November 1994.

196. "Integrated Firearm Injury Reporting System: A Model for Communities."  Second Annual HELP Conference, Chicago, IL, October 1994.

197. "Violence and Firearms: Reshaping the Discussion and Restructuring the Prevention Strategies."  Forum on Youth Violence Conference, Wisconsin AODA Education Network, Stevens Point, WI, October 1994.

198. "Injury Control and Emergency Medicine."  American College of Emergency Physicians Scientific Assembly, Orlando, Florida, September 1994.

199. "Trauma Systems."  American College of Emergency Physicians Scientific Assembly, Orlando, Florida, September 1994.

200. "Firearm Injury and Death Problems in the United States, Wisconsin, and Milwaukee."  Wisconsin Coroners & Medical Examiners Association, Oshkosh, WI, June 1994.

201. "Firearm Injuries and Deaths: Reshaping the Discussion."  Department of Emergency Medicine, University of Missouri-Kansas City School of Medicine, Kansas City, MO, June 1994.

202. "Injury Prevention and Control and Emergency Medicine."  Department of Emergency Medicine, University of Missouri-Kansas City School of Medicine, Kansas City, MO, June 1994.

203. "The Science of Injury Prevention: A Framework for Violence Prevention."  The University of Wisconsin - Milwaukee, School of Nursing, Continuing Education and Outreach Program, Milwaukee, WI, March 1994.

204. "Firearm Injuries and Deaths: Reshaping the Discussion."  Columbia Hospital Grand Rounds, Milwaukee, WI, February 1994.

205. "Injury Patterns of Motor Vehicle Crashes."  Wisconsin EMT Association Annual Conference, Milwaukee, WI, January 1994.

Stephen W. Hargarten, MD, MPH

206. "Firearm Injuries and Deaths: Reshaping the Discussion."  Milwaukee Forum, Milwaukee, WI, November 1993.

207. "Alcohol and Medicine: An Emergency Medicine Perspective."  Association of American Medical Colleges, Washington, DC, November 1993.

208. "Handguns:  Taking Aim at the Problem."  Emergency Nurses Association Annual Meeting, LaCrosse, WI, September 1993.

209. "Violence and the Elderly."  Wisconsin Chapter American College of Emergency Physicians Annual Conference, LaCrosse, WI, September 1993.

210. "Advocacy in Public Health Workshop."  Wisconsin Public Health Association Annual Conference, Appleton, WI, June 1993.

211. "State of the Art Session on Injury Control."  Society for Academic Emergency Medicine, San Francisco, CA, May 1993.

212. "Injury Prevention: A Crucial Aspect of Travel Medicine."  Third Biennial International Travel Medicine Society Meeting.  Paris, France, April 26, 1993.

213. "Firearms Deaths and Injuries."  Emergency Nurses Association - Milwaukee Chapter, Milwaukee, WI, January 1993.

214. "Facial Injuries: Epidemiology, Acute Care, and Prevention."  Wisconsin Emergency Medical Technician Association Annual Meeting, Milwaukee, WI, January 1993.

215. "Boating Injuries and Deaths: Challenges for Emergency Medical Services."  American Trauma Society - Wisconsin Division, Stevens Point, WI, December 1992.

216. "Firearm Injuries: Public Policy Issues, Data Sources for Firearms Injuries."  American Public Health Association, Washington, DC, November 1992.

217. "Data Sources for Firearms Injuries: Problems and Opportunities."  Milwaukee Academy of Medicine, Milwaukee, WI, November 1992.

218. "EMTs and Injury Prevention: It's in our job description."  American Trauma Society - Wisconsin Division, Milwaukee, WI, December 1991.

219. "Firearms and Children."  Wisconsin Nurse Practitioners Conference, Madison, WI, November 1991.

220. "Drownings:  Acute care and prevention."  American Red Cross - Milwaukee Chapter, Milwaukee, WI, January 1991.

221. "Fire-safe cigarettes."  Illinois Public Health Association, Chicago, IL, May 1990.

222. "Travel-related mortality."  Travel Medicine Update Conference, Seattle, WA, May 1990.

223. "Travel-related illness - Where have you been lately?"  Wisconsin Chapter, American College of Emergency Physicians, October 12, 1989.

224. "Travel-related mortality."  Travel Medicine Conference, Seattle, WA, May 1988.

225. "Motor Vehicle Crashes and Seat Belts."  Beloit Memorial Hospital, May 1987.

- 27 -

Stephen W. Hargarten, MD, MPH

Exhibits:

    1.    Producer:  Photograph Exhibit - "Portraits of the Silent Epidemic" - Head Injury in Wisconsin, 1988.

Medical College Committees:

    Chair, Global Health Advisory Council, 2014-2019

    Chair, Milwaukee Regional Medical Center Strategic Planning for Global Health, 2014- 2015

    Chair, Global Health Department Liaisons, 2011- present

    Board Member, Medical College Physicians, 2000- 2017

    MCP Finance Committee, 2005-2007

    Froedtert Credential Committee, 2005-2007

    Chair, Global Health Program Advisory Council, 2010-2011

    Member Department of Medicine Search Committee, Medical College of Wisconsin, 2000

    Froedtert & Medical College Joint Management Cabinet, 1997-2000

    Faculty Career Development Advisory Committee, Medical College of Wisconsin, 1998 - 2003

    Chair, Ad Hoc Committee for M3/M4 Curriculum, 1998

    Intramural Review Committee, Department of Medicine, Medical College of Wisconsin, 1999

    Intramural Review Committee, Department of Family Medicine, Medical College of Wisconsin, 1997

    Clinical Practice Group Committee, Medical College of Wisconsin, 1995 - 2000

    Curriculum and Evaluation Committee, Medical College of Wisconsin, 1998 – 2000

    Executive Committee of the Faculty, Medical College of Wisconsin, 1994 – present

    Nominating Committee - Medical College of Wisconsin, 1992 – 1995

Medical College Teaching:

1.    MCW Faculty's Efforts in Low- and Middle-Income Countries" PhD in Public and Community Health Seminar, January 10, 2018

2.    "MCW's Impact on the World: From Milwaukee, Wisconsin to Around the Globe", Asthma/Allergy, and Clinical Immunology Grand Rounds, Children's Hospital of Wisconsin, September 22, 2017

- 28 -
Stephen W. Hargarten, MD, MPH

3.   "Global Health Electives: What to Consider with International Travel Health and Wellness" Global Health Elective Preparation, September 12, 2017

4.   "MCW's Global Health Efforts and Opportunities for Pharmacy" School of Pharmacy, January 16, 2017

5.   "Global Health Impact" Department of Pediatrics Division of Adolescent Medicine, January 20, 2017

6.   "Local/Global Lens: Exploring the Impact of Medical Training Experiences in Low-Resource Settings" Pediatrics Grand Rounds, December 2, 2016

7.   "The State of MCW Global Health and Opportunities for Neurosurgery" Neurosurgery Grand Rounds, December 2, 2016

8.   "Global and Local Global Health" Neurology Grand Rounds, December 2, 2016

9.   "Developing a Medical Elective in Nicaragua" Orthopedic Grand Rounds, November 30, 2016

10.  "Global Health at MCW" Faculty Council Meeting, October 21, 2015

11.  "Supporting Faculty's Global Health Efforts" Administrators Monthly Meeting, September 3, 2015

12.  "Minimizing GME Global Health Rotation Risk" Graduate Medical Education Committee, April 20, 2015

13.  "Injury Prevention and Management in Resource Limited Settings" Pediatrics Noon Conference, February 18, 2015

14.  "Insight and Direction Global Health Nursing", Froedtert Global Health Nursing Committee, November 26, 2014

15.  "Global Health Definitions, Implications", Physical Medicine and Rehabilitation Grand Rounds, December 5, 2014

16.  "Establishing Partnerships to Promote Global Health" PhD in Public and Community Health Global Health Seminar, September 29, 2014

17.  "Promoting Diversity and Inclusion with Global Health Efforts" Diversity and Inclusion Committee, January 28, 2014

18.  "Growing a campus-wide Global Health Effort" Froedtert Hospital Operations Committee, Milwaukee, Wisconsin, January 22, 2014

19.  "Growing a campus-wide Global Health Effort" Children's Hospital and Health System Leadership, Milwaukee, Wisconsin December 10, 2013

20.  "Global Health Program and Faculty Partnerships" Women's Faculty Council, November 25, 2013

21.  "Growing Global Health Opportunities" Neurology Faculty Meeting, October 10, 2013

22.  "M4 Global Health Electives for MCW Students" Global Health Pathway Core Curriculum, April 25, 2013

23.  "Move toward global health care, what new skills or knowledge will the physicians of the future need to master" Docere Panel, January 8, 2013

24.  "Partnering with Faculty to Grow Global Health" Department of Ophthalmology, November 25, 2012

Stephen W. Hargarten, MD, MPH

25.     "Global Burden of Injury," The Clinical and Translational Science Institute Seminar, September 20, 2012

26.     "Ethical Considerations of Defining Global Health" Bioethics Summer Course Poverty, Justice and Global Health, June 6, 2012

27.     "MCW's Global Health Program: An Exciting New Development" Pediatric Surgery Grand Rounds, May 4, 2012

28.     "Grand Rounds in Injury for the Master Clinician Pathway" M1, M2 & M3 students, Medical College of Wisconsin, March 29, 2012.

29.     "What is the Definition of Global Health" PhD in Public and Community Health Seminar Series, February 14, 2012

30.     "Global Burden of Injury," Global Health Pathway Program, January 5, 2012

31.     "Injury Prevention and Management in Resource Limited Settings" Pediatrics Noon Conference, November 30, 2011

32.     "Growing MCW's Global Health Program and Opportunities to Engage" Medical College of Wisconsin Global Health Organization, Student Interest Group, November 28, 2011

33.     "Faculty's Global Health Efforts" Global Health Pathway Program, May 13, 2019. "Wound Ballistics", Emergency Medicine Grand Rounds, Medical College of Wisconsin and Froedtert Hospital, March 10, 2011.

34.     Health Policy and Physician Advocacy" M4 Selective, Family Medicine, Medical College of Wisconsin, February 8, 2011

35.     "Alcohol and and Youth: Big Problem with a Hospital Based Intervention", Pediatric Trauma Grand Rounds, Children's Hospital and Health System, May 12, 2010

36.     "Reducing the Public Health Burden of Suicide: A View from the Room" for Department of Psychiatry and Behavioral Medicine Grand Rounds, Wheaton Franciscan Healthcare, Wauwatosa, WI, March 18, 2009

37.     "Alcohol Related Illness in the ED", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, December, 2008

38.     "Department Administrator Update", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, October, 2008

39.     "Firearm Related Injury: Myths, Physiology & Epidemiology", Pediatric Trauma Grand Rounds, Children's Hospital of Wisconsin, December 4, 2007

40.     "Gunshot Wounds: An Integrated Approach to a Biosocial Disease", Integrated Grand Rounds, Medical College of Wisconsin, November 2, 2007

41.     "Wound Ballistics", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July, 2008

42.     "Injury Prevention", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July 5, 2007

43.     "Emergency Medicine Update", Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July 13, 2006

- 30 -

Stephen W. Hargarten, MD, MPH

44.     "Firearm suicide: The Wisconsin experience 2000", 10th Annual Emergency Medicine Research Forum, Medical College of Wisconsin, April 16, 2002

45.     "Comprehensive Injury Center at MCW", EPI Seminar Series, Medical College of Wisconsin, October 18, 2001

46.     "Advanced Trauma Life Support", Instructor, Medical College of Wisconsin and Froedtert Hospital, June 21, 2000

47.     "Acute Trauma Care & Prevention", AIM Program, Medical College of Wisconsin, Milwaukee, WI, August, 1996, 1997, 1998, 1999

48.     "Epidemiology of Unintentional and Intentional Injuries", Course Director, Medical Student Lecture, Medical College of Wisconsin Graduate School, Milwaukee, WI, February-April 1998

49.     "Bags, Belts, and Bruises", Emergency Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, February 13, 1997

50.     "Mechanism of Injury", Trauma Nurse Specialist Course, Flight for Life, Milwaukee Regional Medical Center, Milwaukee, WI, January 29, 1997

51.     "Firearm Injuries and Deaths," Department of Epidemiology, medical student lecture, Medical College of Wisconsin, Milwaukee, WI, 1995, 1996, 1997, 1998, 1999

52.     "Firearm Injury Epidemiology," Epidemiology seminar of the Health Policy Institute, Medical College of Wisconsin, Milwaukee, WI, September 1996

53.     "Propeller Injuries," Flight for Life Lecture, Medical College of Wisconsin, Milwaukee, WI, March 1996

54.     "Mechanisms of Injury", Trauma Nurse Specialist Course.  Flight for Life, Milwaukee Regional Medical Center, Milwaukee, WI, February 1996

55.     "Scope and Nature of the Firearm Injury and Death Problem", Fourth Annual Firearms Seminar, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, January 1996

56.     "Violence as a Public Health Issue," First Annual Forum - The Changing Urban Health Care Environment: Ethical Implications, Sponsored by the Center for Ethics Studies, Marquette University, and the Center for the Study of Bioethics at the Medical College of Wisconsin, November 1995

57.     "Issues & Challenges of Gunshot Wound Research",  J. (Deke) Farrington, MD, Trauma Visiting Professorship presented by the Section of Trauma & Emergency Surgery of the Medical College of Wisconsin, the American Trauma Society (Wisconsin Division), ACS Wisconsin Committee on Trauma, and Flight for Life, Milwaukee, WI, November 1995

58.     "Firearm Injuries and Deaths: Epidemiology and Prevention", Pathology lecture to medical students.  Medical College of Wisconsin, Milwaukee, WI, November 1995

59.     "Patterns of Injury and Opportunities for Prevention."  Milwaukee Regional Medical Complex, Flight for Life, Milwaukee, WI, March 1995

60.     "Trauma Systems: Where Does Emergency Medicine Fit In?", Emergency Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, December 1994

61.     "Wound Management."  Medical Student Lecture/Workshop, Medical College of Wisconsin, Milwaukee, WI, December 1994, 1995, 1996, 1997, 1998, 1999

- 31 -
Stephen W. Hargarten, MD, MPH

62.    "Trauma Systems: Who, What, Where?", Surgery Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, November 1994

63.    "Firearm Injury and Death Problems in the United States, Wisconsin, and Milwaukee," Medical College of Wisconsin (Firearms Seminar) January 1994

64.    "Injury Prevention."  Department of Pediatrics Research Seminar Series, Medical College of Wisconsin, Milwaukee, WI, January 1994

65.    POMP Students, 1992 – 1994

66.    Biostatistics & Epidemiology Course, First Year Medical Students at the Medical College of Wisconsin, March 1993

67.    Introduction to Clinical Medicine Lecture, Junior Medical Students, July 1993

68.    Advanced Trauma Life Support Instructor/Shock Lecture, Medical College of Wisconsin, June 1993

69.    Advanced Cardiac Life Support Instructor/Airway Management, Dysrhythmia Recognition, Medical College of Wisconsin, June 1993

70.    Biostatistics Course Lecturer, Freshman Students, March 1993

71.    "Alcohol and Health: Emergency Medicine View from the Bottom of the Bottle."  Medical College of Wisconsin Emergency Medicine Grand Rounds, Milwaukee, WI, December 7, 1993

72.    "The Epidemiology of Firearm Deaths and Injuries."  Surgery Grand Rounds, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, July 1993

73.    "Firearm Deaths and Injuries: Lessons from the 1960s and the Corvair."  Health Policy Institute Seminar, Medical College of Wisconsin Alumni Center, Milwaukee, WI, June 10, 1993

74.    "Mechanisms of Injury", Trauma Nurse Specialist Course: Flight for Life, Milwaukee, WI, March 1993

75.    "Firearms and Children", Children's Hospital of Wisconsin Grand Rounds, Milwaukee, WI, July 1992

76.    Introduction to Advanced Cardiac, Life Support, Junior Students, July 1992

77.    Wound Management Course, Junior Students, 1991 – present

78.    Basic Trauma Life Support Course Director, 1989 1990, 1991, 1991

BIBLIOGRAPHY

Original Papers:

1.    Schneider, R.J., Willman, J., & Hargarten, S. (2023) Linking Police and EMS Records: An Approach to Strengthen Bicyclist Injury Reporting. *Transportation Research Record*, 03611981221151073.

2.    Kohlbeck, S. A., Quinn, K., deRoon-Cassini, T., Hargarten, S., Nelson, D., & Cassidy, L. (2022, December 22). "I've Given Up": Biopsychosocial Factors Preceding Farmer Suicide in Wisconsin. American Journal of Orthopsychiatry. Advance online publication. https://dx.doi.org/10.1037/ort0000662

- 32 -
Stephen W. Hargarten, MD, MPH

3.  Timmer-Murillo, S.C., Schroeder, M.E., Trevino, C., Geier, T.,  Schramm, A.T., Brandolino, A.M., Hargarten, S., Holena, D., deMoya, M., Milia, D., & deRoon-Cassini, T.A. (In Press). Comprehensive Framework of Firearm Violence Survivor Care: A Review. *JAMA Surg.*

4.  Girasek, D.C., Hargarten, S. (2022). Prevention of and Emergency Response to Drowning. *N Engl J Med* 2022;387:1303-8.

5.  Sakran, J.V., Hargarten. S., Rivara, F.P. (2022). Coordinating a National Approach to Violence Prevention. *JAMA*, Sept. 28, 2022 Volume 328, Number 12

6.  Ehrlich, P.F., Pulcini, C.D., De Souza, H.G. Hall, M., Andrews, A., Zima, B.T., Fein, J.A., Chaudhary, S., Hoffmann, J.A., Fleegler, E.W., Jeffires, K.N., Goyal, M.K., Hargarten, S., Alpern, E.R. (2022). Mental Healthcare Following Firearm and Motor Vehicle Related Injuries: Differences Impacting Our Treatment Strategies. *Ann Surg.* 2022 June 28. doi: 10.1097/SLA.0000000000005557. Online ahead of print.PMID: 35762587

7.  Wyler, B.A., Young, H. M., Hargarten, S.W., Cahill, J.D. (2022) Risk of deaths due to injuries in travellers: A systematic review. *J Travel Med* 29.5 (2022): taac074.

8.  Kohlbeck, S., Schramm, A., deRoon-Cassini, T., Hargarten, S., Quinn, K. (2022). Farmer Suicide in Wisconsin: A Qualitative Analysis. *Journal of Rural Health.* Summer 2022. Volume 38, Issue 3: 546-553.

9.  Barron, A., Hargarten, S., & Webb, T. (2021). Gun violence education in medical school: a call to action. *Teaching and learning in medicine* 34.3 (2022): 295-300.

10.  Dunton, Z. R., Kohlbeck, S. A., Lasarev, M. R., Vear, C. R., & Hargarten, S. W. (2021). The association between repealing the 48-hour mandatory waiting period on handgun purchases and suicide rates in Wisconsin. *Archives of suicide research* 26.3 (2022): 1327-1335.

11.  Kohlbeck, S., Levas, M., Hernandez-Meier, J., & Hargarten, S. (2021). Implementing the Cardiff Model for violence prevention: using the diffusion of innovation theory to understand facilitators and barriers to implementation. *Injury Prevention* 28.1 (2022): 49-53.

12.  Dunton, Z., Hargarten, S., Kohlbeck, S., & Osman, F. (2021). Homicide: a leading cause of death for black non-hispanics in Wisconsin. *WMJ (Wisconsin medical journal)*, *120*(S1), S6-S9.

13.  Kohlbeck, S., deRoon-Cassini, T., Levas, M., Hargarten, S., Kostelac, C., Totoratis, M., ... & Smith, J. (2021). Multidisciplinary data-sharing for community violence prevention: shifting power to the community. *Injury prevention* 27.Suppl 3 (2021): A4-A4.

14.  Martin, I. B., & Hargarten, S. (2020). The antiracist, propatient pledge of emergency medicine. *Academic Emergency Medicine*, *27*(9), 932-933.

15.  McDougall, S., Annapureddy, P., Madiraju, P., Fumo, N., & Hargarten, S. (2020, December). Predicting Opioid Overdose Readmission and Opioid Use Disorder with Machine Learning. In *2020 IEEE International Conference on Big Data (Big Data)* (pp. 4892-4901). IEEE.

16.  Hargarten, S. W. (2020). The Bullets He Carried. *Western Journal of Emergency Medicine*, *21*(5), 1036.

17.  Kohlbeck, S, Hargarten, S, Cassidy, L. (2020). Age- and Sex-Specific Risk Factors for Youth Suicide: A Mixed Methods Review. *WMJ* 119.3 (2020): 165-170.

18.  Zosel, A., Kohlbeck, S., Davis, C. S., Meurer, L., & Hargarten, S. (2020). Medical student education for injury prevention: closing the gap. *Injury Prevention* 27.2 (2021): 201-205.

- 33 -

Stephen W. Hargarten, MD, MPH

19. Kohlbeck, S, Fumo, N, Hargarten, S. (2020). Systems Change for Suicide Prevention Among Adolescents: A Rural Wisconsin County Approach. *Injury Prevention* 27.2 (2021): 131-136.

20. Bonk C, Weston B, Davis C, Barron A, McCarty O, Hargarten S. (2019). Saving Lives with Tourniquets: A Review of Penetrating Injury Medical Examiner Cases. *Prehospital Emergency Care:* DOI: 10.1080/10903127.2019.1676344

21. Hernandez-Meier J, Akert B, Zheng C, Guse C, Layde P, Hargarten S. (2019). Status of Legal Firearm Possession and Violent Deaths: Methods and Protocol for a Retrospective Case-Control Study. *Injury Prevention* 25.Suppl 1 (2019): i49-i58.

22. Hargarten SW, Lerner EB, Gorelick M, Brasel K, deRoon-Cassini T, Kohlbeck S.  Gun Violence: A Biopsychosocial Disease. *Western Journal of Emergency Medicine: Integrating Emergency Care with Population Health*, 2018; 19(6), 1024-1027.

23. Levas M, Hernandez-Meier J, Kohlbeck S, Piotrowski N, Hargarten S. Integrating Population Health Data on Violence into the Emergency Department: A Feasibility and Implementation Study.  *Journal of Trauma Nursing*: May/June 2018 – Vol 25 – Issue 3/149-158

24. Rajan S, Branas CC, Hargarten S, Allegrante JP: Funding for Gun Violence Research Is Key to the Health and Safety of the Nation. *American Journal of Public Health*, Am J Public Health. 2018 Feb;108(2):194-195. doi: 10.2105/AJPH.2017.304235.  PMID: 29320291

25. Hargarten, S: Firearm Injury in the United States: Effective Management Must Address Biophysical and Biopsychosocial Factors. *Ann Intern Med*. 2016 Dec 20;165(12):882-883. doi: 10.7326/M16-2244. Epub 2016 Oct 18. PMID: 27750331

26. Bloemen EM, Rosen T, Schiroo JC, Clark S, Mulcare MR, Stern ME, Mysliwie R, Flomenbaum NE, Lachs MS, Hargarten S. Photographing injuries in the acute care setting: Development and evaluation of a standardized protocol for research, forensics, and clinical Practice. *Acad Emerg Med* May 2016; 23(5):653-9. Doi:10.1111/acem.12955. Epub 2016 Apr 13.

27. Rosen T, Hargarten S, Flomenbaum NE, Platts-Mills TF. Identifying elder abuse in the Emergency Department: Toward a multi-disciplinary team-based approach. *Ann Emerg Med*; 63(3):378-82; Sept 2016.

28. Guse CE, Hargarten S. Limitations of travel data for rate computations.  Injury Prevention: Journal of the International Society for Child and Adolescent Injury Prevention. 2015; 21(e1):e153.

29. Vu A, Duber HC, Sasser SM, Hansoti B, Lynch C, Khan A, Johnson T, Modi P, Clattenburg EJ, Hargarten S. Emergency Care Research Funding in the Global Health Context: Trends, Priorities, and Future Directions. *Academic Emergency Medicine* December 2013 20(12):1259-63.

30. Myers SR, Salhi RA, Lerner EB, Gilson R, Mehrotra A, Kraus A, Kelly JJ, Hargarten S, Carr BG:  Pilot Study Describing Access to Emergency Care in 2 States Using a Model Emergency Care Categorization System.  *Academic Emergency Medicine* Volume 20, Issue 9, pages 894–903, September 2013.

31. Hanlin ER, Delgado-Rendón A, Lerner EB, Hargarten S, Farías R: Fall Risk and Prevention Needs Assessment in an Older Adult Latino Population: A Model Community Global Health Partnership.  *Progress in Community Health Partnerships: Research, Education, and Action* 2013; 7(2):191-9.

32. Kowalenko T, Gore R, Sachs CS, Barata IA, Gates D, Hargarten SW, Josephson EB, Kamat S, Kerr HD, McClain A, Cunningham RM.  Workplace Violence in Emergency Medicine: Current Knowledge and Future Directions, *Journal of Emergency Medicine* 43.3 (2012): 523-531.

33. Galvin S, Robertson R, Hargarten S. Injuries Occurring in Medical Students during International Medical Rotations: A Strategy towards Maximizing Safety. *Family Medicine* 2012; Jun 44(6):404-7.

- 34 -
Stephen W. Hargarten, MD, MPH

34. Webb T, Winthrop A, Klingbeil F, Hein L, Czinner M, Christiansen A, Hargarten S, Simpson D. Using an Inter professional Approach to Teach about the Disease of Injury. *Wisconsin Medical Journal*, 2011.

35. Schlotthauer AE, Guse CE, Brixey S, Corden TE, Hargarten SW, Layde PM. Motor Vehicle Crashes Associated with Alcohol: Child Passenger Injury and Restraint Use, *Am J Prev Med*, 2011 Mar 40(3): 320-3.

36. Villaveces A, Christiansen A, Hargarten SW. Developing a Global Research Agenda on Violence and Injury Prevention: A Modest Proposal, *Injury Prevention* 16.3 (2010): 190-193.

37. Pribble JM, Fowler EF, Karmat SV, Wilkerson WM, Goldstein KM, Hargarten SW. Communicating Emerging Infectious Disease Outbreaks to the Public Through Local Television News: Public Health Officials as Potential Spokespeople, *Disaster Medicine and Public Health Preparedness*, 2010; (4) 220-5.

38. Runyan CW, Hargarten S, Hemenway D, Peek-Asa C, Cunningham RM, Costich J, Gielen AC. An Urgent Call to Action in Support of Injury Control Research Centers, *Am J Prev Med*, 2010; 39(1)89-92.

39. Houry D, Cunningham RM, Hankin A, James T, Bernstein E, Hargarten, S. Violence Prevention in the Emergency Department: Future Research Priorities, *Journal of Acad Emerg Med*, November 2009; 16(11),1089-95.

40. Tonellato DJ, Guse CE, Hargarten SW. Injury Deaths of US Citizens Abroad: New Data Source, Old Travel Problem. *J Travel Med* 16.5 (2009): 304-310.

41. Wanta BT, Schlotthauer AE, Guse CE, Hargarten SW. The Burden of Suicide in Wisconsin's Older Population. *Wisconsin Medical Journal* 2009; 108(2), 87-93.

42. Hanrahan R, Layde P, Zhu S, Guse C, Hargarten S. The Association of Driver Age with Traffic Injury Severity in Wisconsin. *Traffic Injury Prevention*, 2009; 10(4), 361-367.

43. Cunningham R, Knox L, Fein J, Harrison S, Frisch K, Walton M, Dicker R, Calhoun D, Becker M, Hargarten SW. Before and After the Trauma Bay: The Prevention of Violent Injury Among Youth. *Ann Emerg Med*. April 2009; 53(4) 490-500.

44. Meisel ZF, Hargarten S, Vernick J. Addressing Prehospital Patient Safety Using the Science of Injury Prevention and Control. *Prehospital Emergency Care*. 2008; 12:4, 411-16.

45. Layde PM, Meurer LN, Guse CE. Yang H, Laud P, Meurer JR, Grube J, Brasel KJ, Hargarten S. Confidential Performance Feedback and Organizational Capacity Building to Improve Hospital Patient Safety: Results of a Randomized Trial. In *Advances in Patient Safety: New Directions and Alternative Approaches*. AHRQ Publication No. 08-0034- 2. August 2008. Vol. 2. Culture and Redesign; pp. 1-12. Agency for Healthcare Research and Quality, Rockville, MD.

46. Pribble JM, Trowbridge MJ, Kamat SV, Fowler EF, Goldstein KM, Hargarten SW: Injury Reporting on Local TV News: A Prime-Time Opportunity for Prevention, May 2008; 34(5), 420-23.

47. Pan S, Hargarten S, Zhu S. School Bus and Traffic Safety. *Chinese Journal of Tramaology*. August 2007.

48. Guse C, Cortés L, Hargarten S, Hennes H. Fatal injuries of US citizens abroad. *J Travel Med*. 2007; 14 (5), 279–287.

49. Phelan MB, Falimirski ME, Simpson, Czinner ML, Hargarten SW. Competency-based strategies for injury control and prevention curricula in undergraduate medical education. *Injury Prevention*. 2007; 13(1):6-9.

50. Heng K, Hargarten SW, Craven A, Layde P, Zhu S.  Motor vehicle crashes and moderate alcohol Intake – Conflict Between Health Advantage and At-Risk Use.  *Alcohol & Alcoholism*. 2006;41:451-54

51. Cortes LM, Hargarten SW, Hennes HM.  Recommendations for water safety and drowning prevention for travelers.  *J Travel Med*. 2006; 13(1): 21-34.

52. Zhu S, Layde P, Guse C, Laud P, Pintar F, Nirula R, Hargarten S.  Obesity and risk for death due to motor vehicle crashes.  *American Journal of Public Health*, April 2006;94(4):#1-6.

53. Allen S, Zhu S, Sauter C, Layde P, Hargarten S.  A Comprehensive Statewide Analysis of Seatbelt Non-Use with Injury and Hospital Admissions: New Data, Old Problem. *Academic Emergency Medicine*. 2006;13:427-34.

54. Glysch RL, Hale, LJ, Nie C, Hargarten SW. Wisconsin's violent death reporting system: Monitoring and responding to Wisconsin's violent deaths.  *WMJ* 2005;104 (1);17-19.

55. Layde PM, Meurer LN, Guse CE, Meurer JR, Yang H, Laud P, Kuhn EM, Brasel KJ, Hargarten SW. Medical injury identification using hospital discharge data. In *Advances in Patient Safety: From Research to Implementation*. AHRQ Publication No. 0500021(1-4) February 2005. Vol 2; pp.119-132. Agency for Healthcare Research and Quality, Rockville, MD.

56. Meurer JR, Meurer LN, Grube J, Brasel KJ, McLaughlin C, Hargarten SW, Layde PM. Combining performance feedback and evidence-based educational resources: A model to promote medical injury prevention. In *Advances in Patient Safety: From Research to Implementation*. AHRQ Publication No. 050021 (1-4). February 2005. Vol 4; pp 237-252. Agency for Healthcare Research and Quality, Rockville, MD.

57. Pan S, Chen E, Zhu S, Layde P, Pirrallo R, Hargarten S.  Epidemiology Characteristics of Road Traffic Injury in China. Chin J Emerg Med. 2005;14(9):709-14.

58. Sauter C, Zhu S, Allen S, Hargarten S, Layde P: Increased Risk of Death or Disability in Unhelmeted Wisconsin Motorcyclists. *WMJ*.  2005; 104 (2): 39-44.

59. Shiffler T, Hargarten SW, Withers RL. The burden of suicide and homicide of Wisconsin's children and youth. *WMJ* 2005;104(1):62-67.

60. Vernick JS, O'Brien M, Hepburn LM, Johnson SB, Webster DW, Hargarten SW. Unintentional and undetermined firearm-related deaths: a preventable death analysis for three safety devices. Injury Prevention 2003;9:307-311.

61. Milne JS, Hargarten SW, Kellerman AL, Wintemute GJ: Effect of current federal regulations on handgun safety features. *Ann Emerg Med* January 2003; 41(1):1-9.

62. Hargarten SW: *The Physician's Role in Preventing Small Arms Injury*. Medicine Conflict and Survival. 18(4): 389-393, Oct.-Dec. 2002.

63. Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ, Hargarten SW.  *Missing the target: A comparison of buyback and fatality-related guns*.  Injury Prevention 8:143-146, 2002.

64. Layde P, Maas L, Teret S, Brasel K, Kuhn E, Mercy J, Hargarten SW. *Patient Safety Efforts Should Focus on Medical Injuries*. JAMA 287(15):1993-7, 2002.

65. Hargarten SW. *Docs and cops: A collaborating or colliding partnership?* Ann Emerg Med 2001; 38:438-440.

- 36 -
Stephen W. Hargarten, MD, MPH

66. Hargarten SW. *Three shots, two dead, five errors, one gun: A recipe for prevention?* Ann Emerg Med 2001; 37:340-341.

67. Cortes L, Hargarten SW. *Preventive care in the emergency department: a systematic literature review on emergency department-based interventions that address smoke detectors in the home.* [Review] [21 refs] Academic Emergency Medicine. 8(9):925-9, 2001.

68. Nie C, Hargarten SW. *Wisconsin needs to support death investigation: Here's why.* Wis Med J 2001;100(2): 60-62.

69. Brasel K, Layde P, Hargarten SW. *Evaluation of Error Medicine: Application of a Public Health Model.* Academic Emergency Medicine November 2000; 7: 1298-1300.

70. Hargarten SW, Kuhn EM, Mercy JA, Withers RL, Nie CL, O'Brien ME. *Suicide guns: why collect the information?* Injury Prevention 2000;6:245-246.

71. Barber C, Hemenway D, Hargarten SW, Kellermann A, Azrael D, Wilt S. *"Call to arms" for a national reporting system on firearm injuries.* Am J Public Health. 2000;90:1191-93.

72. Hootman JM, Annest JL, Mercy JA, Ryan GW, Hargarten SW: *National estimates of non-fatal firearm related injuries other than gunshot wounds.* Jour Inj Prev 6(4):263-267, 2000.

73. Cisler RA, Hargarten SW: *Public health strategies to reduce and prevent alcohol-related illness, injury and death in Wisconsin and Milwaukee County.* WMJ, June 2000, 71-78.

74. Withers RL, Mercy JA, Hargarten SW: *Public health: A successful paradigm applied to firearm injuries.* WMJ 99(1):48-50, 2000.

75. Milne J, Hargarten SW: *Handgun safety features: A review for physicians.* J Trauma: Injury, Infection and Critical Care 47(1):145-150, 1999.

76. Vernick JS, Meisel ZF, Teret SP, Milne JS, Hargarten SW: *"I didn't know the gun was loaded": an examination of two safety devices that can reduce the risk of unintentional firearm injuries.* Journal of Public Health Policy 20(4):427-440, 1999.

77. Milne J, Hargarten SW: *The availability of extrinsic handgun locking devices in a defined metro area.* WMJ 98(7):25-28, 1999.

78. Wolff M, Pirrallo RG, Hargarten SW: *Strengthening emergency medicine in Poland: A training and partnership model.* Acad Emerg Med 5(12):1187-1192, 1998.

79. Freed LH, Vernick JS, Hargarten SW: *Prevention of firearm-related injuries and deaths among youth—a product orientated approach.* Pediatric Clinics of North America 45(2):427-438, 1998.

80. Fox J, Stahlsmith L, Remington P, Tymus T, Hargarten S: *The Wisconsin firearm-related injury surveillance system.* Am J Prev Med 15(3S):101-108, 1998.

81. Teret SP, Defrancesco S, Hargarten SW, Robinson KD: *Making Guns Safer.* Issues in Science and Technology, 14(4): 37-40, 1998.

82. Mannenbach M, Hargarten SW, Phelen MB: *Alcohol use among injured patients aged 12 to 18 years.* Acad Emerg Med 4(1): 40-44, 1997.

Stephen W. Hargarten, MD, MPH

83. Yoganandan N, Pintar FA, Kumaresan S, Maiman DJ, Hargarten SW. *Dynamic Analysis of Penetrating Trauma*. Journal of Trauma-Injury Infection & Critical Care 42(2):266-72, 1997.

84. Hargarten SW, Haskins L, Stehlsmith L, Chatterjee B, Morgan J, Remington P, Nashold R, Peterson P, Karlson T: *Firearm-related deaths and hospitalizations - Wisconsin, 1994*. CDC M&M Wkly Report, Sept 6, 1996: 45(35): 757-759.

85. Pollock G, Brady W, Hargarten S, DeSilvey D, Carner CT: *Hypoglycemia manifested by sinus bradycardia: A report of three cases*. Acad Emerg Med 3(7): 700-707, 1996.

86. Tymus TA, O'Brien ME, Hargarten SW: *Wisconsin firearm injury surveillance system development: A comparison of medical examiner/coroner data*. WMJ 95(5):277-282, 1996.

87. Hargarten SW, Anderson A, Walker J, Barboriak JJ.: *Travel of U.S. citizens after coronary artery bypass surgery*. J Travel Med 1996; 3(1): 7-10.

88. Hargarten SW, Karlson TA, O'Brien ME, Hancock J, Quebbeman E: *Characteristics of firearms involved in fatalities*. JAMA 275(1): 42-45, 1996.

89. Meldon S, Hargarten SW: *Ligamentous injuries of the wrist*. JEM 13(2): 217-225, 1995.

90. Wang-Cheng R, Dillig K, Buthie E, Gilson I, Greaves W, Hargarten S, Nannis P: *Public health strategies: To reduce firearm injuries and deaths in Milwaukee county* - Executive Summary. WI Med J 572-584,1995.

91. Pirrallo RG, Wolff M, Simpson DE, Hargarten SW: *Analysis of an international EMS train-the-trainer program*. Ann Emerg Med 25(5): 656-659, 1995.

92. Hargarten SW, Karlson T: *Motor vehicle crashes and seat belts: A study of emergency physicians' procedures, charges, and documentation*. Ann Emerg Med 24(5): 857-860, 1994.

93. Kellermann A, Conway C, et al: *Access of Medicaid recipients to outpatient care*. New Eng J Med 1994; pp1426-1430.

94. Hargarten SW, O'Brien M: *Trends in motor vehicle and firearm deaths in Wisconsin: An analysis for examining prevention strategies*. WI Med J 93(10): 521-524, 1994.

95. Garrison HG, Runyan CW, Tintinalli JE, Barber CW, Bordley WC, Hargarten SW, Pollock DA, Weiss HB: *Emergency department surveillance: An examination of issues and proposal for a national strategy*. Ann Emerg Med 24(5): 849-856, 1994.

96. Aufderheide T, Apprahamian C, Mateer J, Rudnick E, Manchester EM, Lawrence SW, Olson SW, Hargarten SW: *Emergency airway management in hanging victims*. Ann Emerg Med 24(5): 879-884, 1994.

97. Kefer MP, Hargarten SW, Jentzen J: *Death after discharge from the emergency department*. Ann Emerg Med 24(6): 1102-1107, 1994.

98. Hargarten SW, Karlson T, Vernick JS, Aprahamian C: *Motorboat propeller injuries in Wisconsin: Enumeration and prevention*. J Trauma 37(2): 187-190, 1994.

99. Hargarten SW: *Injury prevention: A crucial aspect of travel medicine*. J Trvl Med 1(1): 48-50, 1994.

100. Meldon S, Hargarten SW: *Airplane vacuum toilets: An uncommon travel hazard*. J of Trvl Med 1(2):104-105, 1994.

- 38 -
Stephen W. Hargarten, MD, MPH

101. Bernstein E, Goldfrank LR, Kellerman AL, Hargarten SW, Jui J, Fish SS, Herbvert BH, Flores C, Caravati ME, Krishel S, et al: *A public health approach to emergency medicine in preparing for the twenty-first century*.  Acad Emerg Med 1(3): 277-286, 1994.

102. Weesner CL, Hargarten SW, Aprahamian C, Nelson DR: *Fatal childhood injury patterns in an urban setting: The case for primary prevention*.  Ann Emerg Med 23(2): 231-236, 1994.

103. Hargarten SW: *Injury control*.  Acad Emerg Med 1(2): 168-171, 1994.

104. Hargarten SW, Bouc GT: *Emergency air medical transport of United States citizen tourists: 1988-1990*.  Air Med J 12(10): 398-402, 1993.

105. Hargarten SW, Karlson T: *Injury control: A crucial aspect of emergency medicine*.  Emerg Med Clin N Amer  11(1):255-262, 1993.

106. Lambrecht CJ, Hargarten SW: *Hunting-related injuries and deaths in Montana: The scope of the problem and a framework for prevention*.  J of Wilderness Med 4: 175-182, 1993.

107. Walker B, Hargarten SW: *Another drug-related death*.  J of Emerg Med 10(5): 649-650, 1992.

108. Hargarten SW, Roberts MJ, Anderson AJ: Cancer Presentation in the Emergency Department: A Failure of Primary Care. Am J Emerg Med, 10(4):290-293, 1992.

109. Hargarten SW: *Availability of safety devices in rental cars: An international survey*.  Trvl Med Interntl 1992; 10(3): 109-110.

110. Hargarten SW, Hanel DP: *Volar metacarpal phalangeal joint dislocation: A rare and often missed injury*.  Ann Emerg Med  21(9): 1157-1159, 1992.

111. Baker T, Hargarten SW, Guptill KS: *Uncounted dead:  Americans dying overseas*.  Public Health Reports  107(2): 155-159, 1992.

112. Grunert BK, Hargarten SW, Matloub HS, Sanger JR, Hanel DP, Yousif NJ: *Predictive value of psychological screening in acute hand injuries*.  J Hand Surg –Am Vol 17(2): 196-199, 1992.

113. Hargarten SW: *International travel and motor vehicle crash deaths: The problem, risks, and prevention*.  Trvl Med Interntl  9(3): 106-110, 1991.

114. Hargarten SW, McKinney WP: *Malaria in Wisconsin 1981-1989:  A review of cases and update on chemoprophylaxis*.  WI Med J 90(5): 215-217, 1991.

115. Hargarten SW: *All terrain vehicle mortality in Wisconsin: A case study in injury control*.  Amer J Emerg Med  9(2): 149-152, 1991.

116. Hargarten SW, Baker TD, Guptill K: *Overseas fatalities of United States citizen travelers, 1975 and 1984: An analysis of deaths related to international travel*.  Ann Emerg Med  20(6): 622-626, 1991.

117. Guptill KS, Hargarten SW, Baker TD: *American travel deaths in Mexico: Causes and prevention strategies*.  West J Med 154:169-171, 1991.

118. Hargarten SW, Baker T, Baker TD: *Injury deaths and American travelers*.  Travel Medicine: Proceedings of the First Conference on International Travel Medicine 1-64, 1988.

- 39 -
Stephen W. Hargarten, MD, MPH

119.<u>Hargarten SW</u>, Baker SP: *Fatalities in the Peace Corps: A retrospective study: 1962-1983*.  JAMA <u>254(10)</u>: 1326-1329, 1985.


<u>BOOKS/CHAPTERS/MONOGRAPHS/NON PEER-REVIEWED ARTICLES:</u>

1. Kohlbeck S., Pederson L., <u>Hargarten S</u>. (2020) Defining Gun Violence Using a Biopsychosocial Framework: A Public Health Approach. In: Geffner R., White J.W., Hamberger L.K., Rosenbaum A., Vaughan-Eden V., Vieth V.I. (eds) Handbook of Interpersonal Violence and Abuse Across the Lifespan. Springer, Cham. https://doi.org/10.1007/978-3-319-62122-7_308-1

2. Keystone, JS, Kozarsky, PE, Freedman, DO, Nothdruft, HD, and Connor, BA, <u>Hargarten S</u>. Chapter 47: "Injuries and Injury Prevention", <u>Travel Medicine</u> 3rd Edition, El Sevier.

3. Yonas MA, Frattaroli S, Liller KD, Christiansen A, Gielen AC, <u>Hargarten S</u>, Olsen LM. Moving Child and Adolescent Injury Prevention and Control Research into Practice: A Framework for Translation. <u>Injury Prevention for Children and Adolescents: Research, Practice, and Advocacy</u> (2nd edition). American Public Health Association, 2012 Print ISSN: 0090-0036 | Electronic ISSN: 1541-0048.

4. <u>Hargarten SW</u>, Lerner EB: Injury Prevention and Control. <u>Rosen's Emergency Medicine</u> 7th Edition 2009;37:286-294

5. <u>Hargarten SW</u>: Injuries and Injury Prevention. In <u>Health Problems While Traveling</u> pp 485-491, 2008.

6. Runge J, <u>Hargarten SW</u>:  Injury Prevention and Control.  In <u>Emergency Medicine: Concepts and Clinical Practice</u>, Marx J, Hockberger S, Walls R., 6th ed, Mosby, Vol 1, pp 940-951, 2006.

7. <u>Hargarten SW</u>, Grenfell R: Travel-related Injuries: Epidemiology and Prevention.  In <u>the Textbook of Travel Medicine and Health</u>, HL DuPont, MD and R Steffen, MD, 2nd Edition, B.C. Decker Inc., 1999.

8. Freed LH, Vernick JS, <u>Hargaten SW</u>:  Prevention of Firearm-related Injuries and Deaths Among Youths:  A Product-Oriented Approach.  In <u>Pediatric Clinics of North America</u>, Saunders, <u>45(2)</u>: 427-438, 1998.

9. Runge J, <u>Hargarten SW</u>:  Injury Control.  In <u>Emergency Medicine: Concepts and Clinical Practice</u>, Rosen, Barkin, 4th ed, Mosby, Vol 1, pp 397-406, 1997.

10. Karlson T, <u>Hargarten SW</u>:  <u>Reducing Injury and Death: A Public Health Sourcebook on Guns</u>. Rutgers University Press, 1997

11. <u>Hargarten SW</u>, Gursu KG: The Travel Related Injuries, Epidemiology, and Prevention.  In <u>Textbook of Travel Medicine and Health</u>, H.L. DuPont, MD and R. Steffen, MD, ed, B.C. Decker Inc., 1997.

12. <u>Hargarten SW</u>, Williams JM:  Injury Prevention and the Role of the EMS Provider.  In <u>Basic Trauma Life Support for Paramedics and Advanced EMS Providers</u>, John Emory Campbell, MD, FACEP (Ed), American College of Emergency Physicians, Brady, Prentice Hall, New Jersey, 1995.

13. Swart GL, <u>Hargarten SW</u>:  Emergency Department Management of Intoxication with Drugs of Abuse. In <u>Pharmacological Therapies in Drug and Alcohol Disorders</u>, N.S. Miller, ed.  Marcel-Dekker, Inc, New York, 1994.

14. Martinez R, Gardner J, et al.:  "Applying an Injury Control Model to the Treatment of Motor Vehicle-Related Injuries.  American College of Emergency Physicians, Dallas, Texas, 1994.

- 40 -

Stephen W. Hargarten, MD, MPH

15. <u>Hargarten SW</u>:   The Epidemiology of Travel-Related Deaths.   In <u>Travel Medicine Advisor</u>.  E. Jong and J. Keystone, eds.  American Health Consultants, Atlanta, Georgia, 1990.

16. Sheridan DP, Winogrond IR, et al: <u>The Preventive Approach to Patient Care</u>.  Elsevier Science Publishing, 1987.


<u>COMMENTARY, EDITORIALS AND LETTERS TO THE EDITOR:</u>

1. <u>Hargarten, Stephen W</u>. Lerner, E. Brooke Gorelick, Marc Brasel, Karen deRoon-Cassini, Terri Kohlbeck, Sara. Commentary - Gun Violence:  A Biopsychosocial Disease.  West J Emerg Med. Sept 10, 2018;19(6)

2. <u>Hargarten S., MCJATLANTA</u> Editorial: Dr. Stephen Hargarten: Gun Violence a 'Public Health Issue' Milwaukee Community Journal, March 5, 2018

3. <u>Hargarten SW</u>.Editorial: Firearm Injury in the US: Effective Management Must Address Biophysical and Biosocial Factors. *Annals of Internal Medicine,* 2016 Dec 21; 24(65).

4. <u>Hargarten S</u>. Reflections on a 37 Years of EM Clinical Practice. *Academic Emergency Medicine*, 2016.

5. <u>Hargarten S</u>. Reflections on a Mass Shooting. *Academic Emergency Medicine*, 2015.

6. <u>Hargarten S</u>. Opinion Editorial: The Global Burden of Gun Violence. Milwaukee Journal-Sentinel, January 30, 2016.

7. <u>Hargarten S</u>. Reflections on Leaving the Bedside. *Academic Emergency Medicine*, December 2015; 23(1):113.

8. <u>Hargarten S</u>, Halverson J. Opinion Editorial: Reducing Gun Violence in Milwaukee. *Milwaukee Journal-Sentinel*, May 9, 2015.

9. Guse C, <u>Hargarten S</u>. Correspondence: Limitations of Travel Data for Rate Computations. *Injury Prevention*, February 21, 2014.

10. <u>Hargarten S</u>, Martin IBK, Hauswald M, Hirshon JM. Executive Summary: Global Health and Emergency Care – What Do We Need to Know to Address the Burden of Illness and Injury? *Academic Emergency Medicine*, December 2013; 20(12):1213-15.

11. <u>Hargarten S</u>. Using Alcohol as an Excuse to Walk Away from the Patient. Milwaukee Journal-Sentinel, March 6, 2010.

12. <u>Hargarten S</u>, Reed J.  First Step in Preventing Violent Deaths: Data.  Milwaukee Journal-Sentinel, Jun 21, 2008.

13. Corden T, <u>Hargarten</u> S, Brixey S, Clementi B, Peterson N. Booster Seats: Inform Parents. Milwaukee Journal-Sentinel, Nov 15, 2007.

14. <u>Hargarten SW</u>. Docs and cops: A collaborating or colliding partnership? Ann Emerg Med October 2001;38:438-440.

15. <u>Hargarten SW</u>, Cortes LM. Landmines: Not Just Another Travel Risk. Journal of Travel Medicine. 8(5):229-231.

- 41 -

Stephen W. Hargarten, MD, MPH

16. Hargarten SW. Three shots, two dead, five errors, one gun: a recipe for prevention? Ann Emerg Med March 2001;37:340-341.

17. Hargarten, SW, Kuhn EM, Mercy JA, Withers RL, Nie CL, Obrien ME:  Suicide guns:  Why collect this information?  Jour Inj Prev 6(4):245-246, 2000.

18. Barber C, Hemenway D, Hargarten S, Kellermann A, Azrael D, Wilt S:  "A Call to Arms" for a National Reporting System on Firearm Injuries.   Editorial.  American Journal of Public Health 90:8:1191-1193, 2000.

19. Withers RL, Mercy JA, Hargarten SW:  Public health: A successful paradigm applied to firearm injuries. WI Med Journal, Jan/Feb 2000.

20. Hargarten SW: Emporiatric Medicine—Growing into the 21st century:  From patient care to population care.  Editorial.  J Travel Med 6(2):59, 1999.

21. Hargarten SW:  Alcohol-related injuries:  Do we really need more proof?  Editorial; comment.  Ann Emerg Med 33(6):699-701,1999.

22. Hargarten SW: Injury control research and wilderness medicine: a babe dangling in the woods. Editorial.   Wilderness & Env Med 10(1):2, 1999.

23. Hargarten SW:  Alcohol-related research and advocacy:  Much to do, many places to do it! Editorial. Ann Emerg Med 31(5): 638-639, 1998

24. Withers R, Hargarten SW.  Real data needed on firearms and firearm safety. Editorial. Wisconsin Lawyer 71(4), 1998.

25. Hargarten SW, Olson L, Sklar D: Emergency Medicine and injury control research:  Past, present, and future.  Editorial.  Acad Emerg Med 4(4): 243-244, 1997.

26. Hargarten SW: So, just do it...  Go upstream.  Acad Emerg Med 3(4): 293-294,1996.

27. Rubens AJ, Hargarten SW, Oleckno WA:  Comparison between emergency department and inpatient E-codes.  Letter.  Acad Emerg Med 3(4): 385-3866,1996.

28. Hargarten SW:  Atlanto-occipital dislocation.  J Emerg Med 11(6):760-761, 1993.

29. Hargarten SW: Travel related diseases:  Injury and infectious disease prevention.  J Wilderness Medicine 4(4): 464-465,1993.

30. Quebbeman EJ, Hargarten SW: The black talon: A new risk for percutaneous injury.  Letter.  J Trauma 35(3): 489, 1993.

31. Jameson SJ, Hargarten SW: Calcium pretreatment to prevent Verapamil induced hypotension in patients with SVT.  Editorial.  Ann Emerg Med 21(1): 68,1992.

32. Schultz CH, Hargarten SW, Babbitt J: Inhalation of a coin and a capsule from metered-dose inhalers. Letter.  New Engl J Med 325(6): 431-432,1991.

33. Hargarten SW:  Injuries in Wisconsin.  Letter.  WI Med J 89(4):158,1990.

34. Hargarten SW:  Injury prevention in emergency medicine.  J Emerg Med 6(3):248, i. 1988

- 42 -

Stephen W. Hargarten, MD, MPH

35. <u>Hargarten SW</u>, Sanders AB:  Injury prevention in medical school curriculums.  Ann Emerg Med <u>15(2)</u>: 226, 1986.

<u>ABSTRACTS:</u>

1.  Rajan S, Branas C, <u>Hargarten S</u>, Allegrante  J: Funding for Gun Violence Research Is Key to the Health and Safety of the Nation. *American Journal of Public Health*, January 10, 2018

2.  Kopatich D, Hernandez-Meier J, <u>Hargarten S</u>: Geographic Fluctuations of Violent Deaths in Children and Youth over Time. 2015 Injury Prevention (21).

3.  Meurer LN, Bernstein R, Brousseau DC, <u>Hargarten S</u>, Treat R: Primary care match is associated with scholarly concentrations focused on underserved local and global communities.  2015 AAMC Medical Education Meeting, Baltimore, MD, November 2015

4.  Oswald J, Kostic M, Gummin D, Kopp B, <u>Hargarten S</u>. *Poison Center Consultation Decreases Hospital Length of Stay and Inpatient Charges*, North American Congress of Clinical Toxicology, Denver, CO, October, 2010

5.  Woods LA, Kuhn EM, Nie CL, <u>Hargarten SW</u>. *Losing Wisconsin dairy farmers to suicide.* American Public Health Association 130th Annual Meeting and Exposition, Philadelphia, Pennsylvania, November 9-13, 2002.

6.  Woods LA, Kuhn EM, Nie CL, Jashinsky LA, <u>Hargarten SW</u>. *Suicide among Wisconsin farmers.* American Association of Suicidology, 35th Annual Conference, Bethesda, MD, April 10-13, 2002.

7.  Kuhn EM, Mercy JA, Nie CL, O'Brien ME, Withers RL, <u>Hargarten SW</u>:  Firearm homicide in relation to location of public housing in the City of Milwaukee.  American Society of Criminology, San Francisco, CA, Nov 15-18, 2000.

8.  O'Brien M, Nie C, Kuhn E, <u>Hargarten S</u>, Withers R: Criminal history and firearm ownership of firearm homicide perpetrators.  American Society of Criminology, San Francisco, Nov 15-18, 2000.

9.  <u>Hargarten SW</u>, Kuhn EM, Nie C, O'Brien, Withers R:  Analysis of firearm type, caliber, and manufacturer associated with homicides and suicides in a defined geographic region. APHA, Boston, Nov 12-16, 2000.

10.  Nie CL, Kuhn EM, Mercy JA, O'Brien ME, <u>Hargarten SW</u>: Characteristics of firearms involved in family and intimate partner homicides: Milwaukee County, 1991-1998.  National Conference on Health Care and Domestic Violence, San Francisco, Oct 13-14, 2000.

11.  Milne JS, Nie CL, O'Brien M, et al: Homicide and Suicide Handguns: Two Unique Populations, Emergency Medicine Forum, Medical College of Wisconsin, Milwaukee, WI, April 18, 2000.

9.  <u>Hargarten SW</u>, Kuhn EM, Nie CL, Withers RL, Wintemute GJ:  Homicide Gun Characteristics Before and After the 1994 Crime Bill. American Public Health Association, 127th Annual Meeting, Chicago, Illinois, Nov 7-11, 1999

10.  O'Brien ME, <u>Hargarten SW</u>, Nie CL, Withers RL, Kuhn EM. *Linking the gun with the death: the who, when, and where of the gun's first purchase.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

- 43 -
Stephen W. Hargarten, MD, MPH

11.   Milne JS, Nie CL, O'Brien ME, Hargarten SW. *Effect of the Bureau of Alcohol, Tobacco, and Firearm (ATF) Factoring Criteria on Homicide and Suicide Handguns.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

12.   Withers RL, Reza A, Hargarten SW. *A Survey of State Reporting Statutes for Gunshot Wounds.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

13.   Hargarten SW, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Homicide gun characteristics before and after the 1994 Crime Bill.* American Society of Criminology Conference, Toronto, Ontario, Nov 17-20, 1999

14.   Milne JS, Nie CL, O'Brien ME, Hargarten SW. *Effect of the Bureau of Alcohol, Tobacco, and Firearm (ATF) Factoring Criteria on Homicide and Suicide Handguns.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

15.   O'Brien ME, Hargarten SW, Nie CL, Withers, RL, Kuhn EM. *Linking the gun with the death: The who, when, and where of the gun's first purchase.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

16.   Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ, Hargarten SW:  A comparison of buyback and fatality-related guns. American Public Health Association, 127th Annual Meeting, Chicago, Illinois, Nov 7-11, 1999 and American Society of Criminology Conference, Toronto, Ontario, Nov 17-20,1999.

17.   Withers RL, Reza A, Hargarten SW. *A survey of state reporting statutes for gunshot wounds.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

18.   Hargarten SW, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Homicide gun characteristics before and after the 1994 Crime Bill.* Second Wisconsin Health Services Research Conference: Health Services Policy Practice and Research: Making Connections, Madison, WI, November 4-5, 1999.

19.   Nie CL, Kuhn EM, O'Brien ME, Withers RL, Hargarten SW. *Firearm homicide-suicide events in Southeastern Wisconsin.* American Association of Suicidology, Houston, Texas, April 15-17, 1999.

20.   Kuhn EM, Nie CL, O'Brien ME, Withers RL, Hargarten SW. *Firearms used in Southeastern Wisconsin suicides.* American Association of Suicidology, Houston, Texas, April 15-17, 1999.

21.   Nie CL, Hargarten SW. *Reducing Firearm Injuries: Health Providers and Survivors Working Together.* The Fifth National HELP Network Conference, San Francisco, California, February 5-6, 1999.

22.   Hargarten SW, O'Brien ME, Quebbeman EJ, Nie CL, Kuhn EM. *Integrated firearm injury reporting system.* Eastern Association for the Surgery of Trauma, 12th Annual Meeting, Orlando, FL, January 13-16, 1999.

23.   Kuhn EM, Nie CL, O'Brien ME, Hargarten SW. *Firearm-related suicides in Southeastern Wisconsin.* American Public Health Association, 126th Annual Meeting, Washington, DC, November 15-19, 1998.

- 44 -

Stephen W. Hargarten, MD, MPH

24.    Nie CL, Kuhn EM, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* American Public Health Association, 126th Annual Meeting, Washington, DC, November 15-19, 1998.

25.    Hargarten SW, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Magazine capacity and number of wounds for Milwaukee County Homicides before and after the 1994 Crime Bill.* American Society of Criminology, 50th Annual Meeting, Washington, DC, November 11-14, 1998.

26.    O'Brien ME, Hargarten SW, Nie CL. *Linking the Gun with the Death: the Who, When, and Where of the Gun's First Purchase.* American Society of Criminology, 50th Annual Meeting, Washington, DC, November 11-14, 1998.

27.    Nie CL, Kuhn EM, O'Brien ME, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* American College of Emergency Physicians Research Forum, San Diego, California, October 11-12, 1998.

28.    Nie CL, Kuhn EM, O'brien ME, Withers RL, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* 12th Annual California Childhood Injury Control Conference, Sacramento, California, September 14-16, 1998.

29.    Kuhn EM, Nie CL, O'Brien ME, Withers RL, Hargarten SW. *Firearm-related suicides in Southeastern Wisconsin.* Violence Data Exchange Team (VDET), First National Conference, Washington, DC, June 24-25, 1998.

30.    Kuhn EM, Nie CL, O'Brien ME, Hargarten SW. *Firearm-related suicides in Southeastern Wisconsin.* Wisconsin Public Health Association, Waukesha, WI, June 4-5, 1998.

31.    Wolff M, Hargarten SW, Pirrallo RG: An Analysis of a US-based Project to Strengthen Prehospital Emergency Medical Services (EMS) in Poland.  Ann Emerg Med 23(4): 925, 1994.

32.    Shepherd D, Hargarten SW: Alcohol Screening in the Emergency Department: Blood Versus Saliva.  Ann Emerg Med 23(2): 612, 1994.

33.    Robertson ME, Hodel D, et al: Minimizing hypothermia: Comparison of the effluent temperature of blood using three delivery methods and cold and pre-warmed starts.  J Emerg Nursing 19(5):  468, 1993.

34.    Orsay EM, Muelleman RL, Peterson TD, et al: Motorcycle helmets and spinal injuries: Dispelling the myth.  Ann Emerg Med 21(5): 655, 1992.

35.    Weesner CL, Apprahamian C, Hargarten SW: Fatal childhood injury patterns in an urban setting: The case for primary prevention.  Ann Emerg Med 21(5): 608, 1992.

36.    Bergstein JM, Robertson ME, Hedell D, et al.: Rapid resuscitation may contribute to hypothermia despite blood warmer use.  Ann Emerg Med, 21(5): 597, 1992.

37.    Hargarten SW, Karlson T, Oldham G:  Alcohol and injuries in the ED: Patients, places, and problems.  Ann Emerg Med 20(4): 477, 1991.

Exhibit B



# Crime Lab Tests

## August 2021





Thompson .45 Auto

Entrance Velocity: 292.6 m/s

Exit Velocity: 212.4 m/s





# Thompson .45 Auto



Bottom view. Bullet travelled right to left.



Lateral view. Bullet travelled right to left.

JOINT DEPARTMENT OF
BIOMEDICAL
ENGINEERING

5.56 NATO

Entrance Velocity: 826.0 m/s

Exit Velocity: 208.8 m/s






# 5.56 NATO



Bottom view. Bullet travelled right to left.



Lateral view. Bullet travelled right to left.

JOINT DEPARTMENT OF
BIOMEDICAL
ENGINEERING



.30-06



Entrance Velocity: 796.0 m/s

Exit Velocity: 358.8 m/s








Bottom view. Bullet travelled right to left.

Lateral view. Bullet travelled right to left.

.30-06





# Summary

| Round Type | Pressure [kPa], Initial Peak, Near Sensor (2500Hz Filter) | Pressure [kPa], Initial Peak, Far Sensor (2500Hz Filter) | Peak Diameter of Temporary Cavity [inches] | Bullet Mass [g] | Energy Lost by Bullet while Passing thru Gel [J] | % Energy Transferred |
|---|---|---|---|---|---|---|
| .25 Caliber | 18.2 | 32.8 | 1.0 | 3.240 | 54.13 | 83.2 |
| .32 Caliber | 138.3 | 251.7 | 1.5 | 4.601 | 108.73 | 58.3 |
| .40 Caliber | *756.9 | 361.2 | *3.3 | 11.664 | 265.99 | 75.3 |
| 5.56 NATO | 712.7 | 774.4 | 5.4 | 3.564 | 1,055.05 | 67.8 |
| Musket Ball | *267.6 | 107.7 | *3.1 | 3.531 | 111.27 | 77.6 |
| Thompson .45 | 205.3 | 206.3 | 2.1 | 14.904 | 301.81 | 47.3 |
| 5.56 NATO | 568.8 | 2360.6 | 7.2 | 3.564 | 1,138.13 | *99.6 |
| .30-06 | *1568.3 | 1387.2 | *8.0 | 8.424 | 2,126.55 | 79.7 |

\* Denotes peak pressures and temporary cavities that were located closer to the near sensor.

\* Peak cavity extended beyond range of camera view. Listed value is from bottom of cavity to top of frame. Estimated cavity is closer to 11.8

\* Bullet fragmented. This likely increased the energy transfer.



# EXHIBIT "E"

# EXHIBIT "E"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

**Expert Report of Louis Klarevas**

1

I, Louis Klarevas, declare:

1.      This report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this report.

## PROFESSIONAL QUALIFICATIONS

2.      I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York.  I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3.      I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  During the course of my nearly 25-year career as an academic, I have served on the faculties of George Washington University, the City University of New York, New York University, and the University of Massachusetts.  I have also served as Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

4.      My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that focuses on reducing intentional shootings at elementary and secondary schools.

5.      In addition to having made over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces.  In 2019, my peer-reviewed article on the effectiveness of restrictions on large-capacity magazines (LCMs) in reducing high-fatality mass shootings that result in six or more victims killed was published in the *American Journal of Public Health*.[2]  This study found that jurisdictions with

---

[1] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed February 11, 2023).

LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans.  Despite being over 3 years old now, this study continues to be one of the highest impact studies in academia.  It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

6.       Since January 1, 2019, I have been deposed, testified in court, or testified by declaration in the following cases (all in federal court), listed alphabetically by state:

**California – Central District**
*Rupp v. Bonta*                                            8:17-cv-00746-JLS-JDE
**California – Eastern District**
*Wiese v. Bonta*                                           2:17-cv-00903-WBS-KJN
**California – Southern District**
*Duncan v. Bonta*                                          17-cv-1017-BEN-JLB
*Jones v. Bonta*                                           19-cv-01226-L-AHG
*Miller v. Bonta*                                          3:19-cv-1537-BEN-JBS
*Nguyen v. Bonta*                                          3:20-cv-02470-WQH-MDD
**Colorado**
*Gates v. Polis*                                           1:22-cv-01866-NYW-SKC
**Connecticut**
*National Association for Gun Rights v. Lamont*            3:22-cv-01118-JBA
**Hawaii**
*National Association for Gun Rights v. Lopez*             1:22-cv-404-DKW-RT
**Illinois – Northern District**
*Viramontes v. Cook County*                               1:21-cv-04595
*National Association for Gun Rights v. Highland Park*     22-cv-04774
*Herrera v. Raoul*                                         1:23-cv-00532
**Illinois – Southern District**
*Harrel v. Raoul*[*]                                       23-cv-141-SPM
*Langley v. Kelly*[*]                                      23-cv-192-SPM
*Barnett v. Raoul*[*]                                      23-cv-209-SPM
*Federal Firearms Licensees of Illinois v. Pritzker*[*]    23-cv-215-SPM
*Kenneally v. Raoul*                                       3:23-cv-50039

---

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed February 11, 2023).  According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies.  Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans.  They helped build the foundation for future studies while overcoming the limitations of previous research." *Ibid.*

3

**Massachusetts**
*National Association for Gun Rights v. Campbell*                    1:22-cv-11431-FDS
**Oregon**
*Oregon Firearms Federation v. Kotek[†]*                    2:22-cv-01815-IM
*Fitz v. Rosenblum[†]*                    3:22-cv-01859-IM
*Eyre v. Rosenblum[†]*                    3:22-cv-01862-IM
*Azzopardi v. Rosenblum[†]*                    3:22-cv-01869-IM
**Washington – Eastern District**
*Brumback v. Ferguson*                    1:22-cv-03093-MKD
*Banta v. Ferguson*                    2:23-cv-00112-MKD
**Washington – Western District**
*Hartford v. Ferguson*                    3:23-cv-05364-RJB

[*]Non-Consolidated Cases on the Same Briefing Schedule / [†]Consolidated Cases

7.      In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20.  I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

8.      I have also submitted declarations in the following state court cases: *People of Colorado v. Sgaggio*, District Court, El Paso County, Colorado, 2022M005894 (Criminal); and *Guardian Arms v. Inslee*, Superior Court, Grant County, Washington, 23-2-00377-13 (Civil).

9.      A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this report.

10.      I am being compensated at a rate of $480/hour for my work on this report, $600/hour for any testimony in connection with this matter, and $120/hour for travel required to provide testimony.

4

## OPINIONS

11.     It is my professional opinion, based upon my analysis of the data reviewed herein, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, often related to the use of assault weapons and LCMs; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs.  Based on these findings, it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of gun massacres.[4]

---

[4] For purposes of this report, mass shootings are defined in a manner consistent with my book *Rampage Nation*, *supra* note 1 (*see* Excerpt Attached as **Exhibit B**).  "Mass shootings" are shootings resulting in four or more victims being shot (fatally or non-fatally), regardless of location or underlying motive.  As a subset of mass shootings, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more victims being shot to death, regardless of location or underlying motive.  The data on high-fatality mass shootings is from a data set that I maintain and continuously update.  This data set is reproduced in **Exhibit C**.  Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in Sections I, II, and VI of this report are drawn from **Exhibit C**.

## I.   MASS SHOOTINGS ARE A GROWING THREAT TO PUBLIC SAFETY

12.   Examining mass-casualty acts of violence in the United States since 1991 points to two disturbing patterns.[5]  First, as demonstrated in Table 1, the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings.  Second, as displayed in Figures 1-2, the problem of high-fatality mass shooting violence is on the rise.  To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%.  However, when the number of people killed in high-fatality mass shootings in the 1990s is compared to the number killed in such incidents in the 2010s, it reflects an increase of 260%.  In other words, the rise in gun massacre violence has far outpaced the rise in national population—by a factor of 13.  The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1.  The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

|   | Deaths | Date | Location | Type of Violence |
|---|--------|------|----------|------------------|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

---

[5] Because the analysis in Section VI of this report necessarily uses data from 1991 through 2022, for purposes of consistency (and to avoid any confusion), the analyses in Sections I and II also use data from 1991 through 2022.

**Figure 1.  Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2.  Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

## II.   THE USE OF ASSAULT WEAPONS AND LCMS ARE MAJOR FACTORS IN THE RISE OF MASS SHOOTING VIOLENCE

13.     In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres.[6]  As shown in Figures 3-4, based on high-fatality mass shootings where details allow a determination on the use of assault weapons and LCMs are available, over half of all incidents in the last four years involved assault weapons and all incidents in the last four years involved LCMs having a capacity greater than 10 bullets.  As shown in Figures 5-6, a similar pattern emerges when examining deaths in high-fatality mass shootings in the last four years, with 62% of deaths resulting from incidents involving assault weapons and 100% of deaths resulting from incidents involving LCMs having a capacity greater than 10 bullets.  These trends demonstrate that, among perpetrators of gun massacres, there is a growing preference for using assault weapons and LCMs to carry out their attacks.[7]

---

[6] Assault weapons are generally semiautomatic firearms that fall into one of the following three categories: assault pistols, assault rifles, and assault shotguns.  For purposes of this report, unless otherwise stated, assault weapons and LCMs are defined and coded in a manner consistent with the definitions used in **Exhibit C**.  As stated in **Exhibit C**: "For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban or (2) the statutes of the state where the shooting occurred.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device with a capacity of more than 10 bullets."

[7] Out of all 93 high-fatality mass shootings in the United States between 1991 and 2022, it cannot be determined whether LCMs were used in 14 of those incidents.  Furthermore, for two of these 14 incidents, it is also not possible to determine whether they involved assault weapons.  Therefore, the tables, figures, and percentages discussed in this section of this report are based on calculations that only use data points from the incidents in which the involvement of assault weapons and/or LCMs could be determined.

8

**Figure 3.  Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Figure 4.  Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

9

**Figure 5.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 5 exclude incidents in which the firearms used are unknown.

**Figure 6.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 6 exclude incidents in which it is unknown if LCMs were used.

10

14.     The growing use of assault weapons to carry out high-fatality mass shootings is an obvious theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another clear theme.  Based on National Sport Shooting Foundation (NSSF) and federal government data, "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform firearms—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly-available data (24.4 million out of an estimated 461.9 million firearms).[8]  And, in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement and security agencies, firearms retailers, and possibly prohibited possessors (e.g., violent criminals) in the United States.[9]  But even using this estimate, if assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 5% of all high-fatality mass shootings would involve assault weapons.  However, as seen in Figure 3 above, civilian ownership rates and mass-shooter use rates are not similar.  Indeed, the

---

[8] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data.  The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available).  NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023).  In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation in the United States.  NSSF, *Firearm Production in the United States with Firearm Import and Export Data*, Industry Intelligence Report, 2020, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023).  According to ATF data, in 2019 and 2020, an additional 28.0 million firearms entered the civilian stock nationwide.  ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (2022), at 181, 188, 193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (last accessed January 3, 2023).  Assuming these figures reported by the NSSF and ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to approximately 461.9 million.  The ownership rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9 million total firearms equals approximately 5.3%.

[9] ATF, 2022, *supra* note 8, at 12; NSSF, 2020, *supra* note 8, at 2-3.

current difference is approximately ten-fold, with the rate at which assault weapons are now used to commit gun massacres far outpacing the rate at which modern sporting rifles circulate amongst civilians in the United States.[10]

15.     Another pattern that stands out when examining the relationship between assault weapons use and gun massacre violence reflects the disproportionately greater lethality associated with the use of assault weapons and LCMs.  For instance, returning to the aforementioned list of the seven deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass shootings, six of the seven incidents (86%) involved assault weapons and LCMs, as shown in Table 2.  When examining all high-fatality mass shootings since 1991, the relationship between assault weapons use, LCM use, and higher death tolls is striking.  In the past 32 years, assault weapons and LCMs with an ammunition capacity greater than 10 rounds have been used, respectively, in 34% and 77% of all high-fatality mass shootings.  However, as the fatality thresholds of such incidents increase, so too do the shares of incidents involving assault weapons and LCMs.  For instance, assault weapons and LCMs were used, respectively, in 75% and 100% of all mass shootings resulting in more than 20 deaths (Figures 7-8).  As the data show, there is an association between mass shooting lethality and the use of assault weapons and LCMs.

---

[10] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar comparison using LCMs instead of modern sporting rifles.

**Table 2.  The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapons | Involved LCMs ( > 10 Rounds ) |
|---|---|---|---|---|
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

**Figure 7.  Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 7 exclude incidents in which the firearms used are unknown.

13

**Figure 8.  Percentage of High-Fatality Mass Shootings Involving LCMs (Ammunition Capacity Greater Than 10 Rounds) by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 8 exclude incidents in which it is unknown if LCMs were used.

16.     Of the 91 high-fatality mass shootings since January 1, 1991, in which the type of firearm used is known, 31 involved assault weapons, resulting in 425 deaths.  The average death toll for these 31 incidents is 13.7 fatalities per shooting.  By contrast, the average death toll for the 60 incidents in which it is known assault weapons were not used (which resulted in 490 fatalities) is 8.2 fatalities per shooting (Table 3).  Furthermore, of the 79 high-fatality mass shootings since January 1, 1991, in which LCM use was determined, 61 involved LCMs with an ammunition capacity greater than 10 rounds, resulting in 704 deaths.  The average death toll for these 61 incidents is 11.5 fatalities per shooting.  The average death toll for the 18 incidents in which it is known LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting (Table 4).  In other words, in the last 32 years, the use of assault weapons and LCMs in gun massacres has resulted, correspondingly, in 67% and 58% increases in average fatalities per incident (Tables 3-4).

17.     Table 5 shows the average death tolls per high-fatality mass shooting incident that are attributable to assault weapons beyond deaths associated with the use of LCMs.  When LCMs with an ammunition capacity greater than 10 rounds are not used, the average death toll is 7.3 fatalities.  When LCMs are used, but not in conjunction with assault weapons, the average death toll is 9.2 fatalities.  When LCMs are used with assault weapons, the average death toll is 14.0 fatalities.  The data show that using LCMs without an assault weapon resulted in a 26% increase in the average death toll.  However, using LCMs with an assault weapon resulted in a 52% increase in the average death toll associated with incidents that involved LCMs without assault weapons and a 92% increase in the average death toll associated with incidents that involved neither LCMs nor assault weapons.

18.     This review of the data suggests that assault weapons and LCMs are force multipliers when used in mass shootings.

**Table 3.  The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
| --- | --- | --- | --- |
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

15

**Table 4.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Table 5.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

III.   **DOUBLE-DIGIT-FATALITY MASS SHOOTINGS ARE A POST-WORLD WAR II PHENOMENON IN AMERICAN HISTORY AND THEY INCREASINGLY INVOLVE ASSAULT WEAPONS**

19.    I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 6 and Figure 9).[11]  In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949.  In other words, for 70% of its 247-year existence as a nation, the United States did not experience a *single* mass shooting resulting in double-digit fatalities.  They are relatively modern phenomena in American history.[12]

20.    After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966.  The third such mass shooting then occurred nine years later, in 1975.  And the fourth such incident occurred seven years after, in 1982.  Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era.  Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 6 and Figure 10).[13]

---

[11] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022).  The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607.  Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[12] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[13] Figures 9-10 are reproduced in larger form as **Exhibit D** of this report.

**Table 6.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**

|  | Date | Location | Deaths | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NJ | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe, TX | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators.  An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 Federal Assault Weapons Ban or (2) the statutes of the state where the gun massacre occurred.  An incident was coded as involving an LCM if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets.

**Figure 9.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**



**Figure 10.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1949-2022**



19

21.    The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years (Table 6 and Figure 10). This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths).  But this cluster of incidents was followed by a 20-year period in which only two double-digit-fatality mass shootings occurred (Figure 10).  This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

22.    It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[14]  Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern.  In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities (a frequency rate of one incident every 5.6 years).  In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings (a frequency rate of one incident every 0.9 years).  In other words, the frequency rate has increased over six-fold since the Federal Assault Weapons Ban expired (Table 6 and Figure 10).  (The 1994 Federal Assault Weapons Ban and its impact on mass shooting violence is discussed in further detail in Section VI of this report.)

---

[14] *See*, for example, Louis Klarevas, *supra* note 1 (Relevant Excerpt Attached as **Exhibit E**); Louis Klarevas, et al., *supra* note 2 (Attached as **Exhibit F**); Charles DiMaggio, et al., "Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data," 86 *Journal of Trauma and Acute Care Surgery* 11 (2019) (Attached as **Exhibit G**); Lori Post, et al., "Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis," 7 *JMIR Public Health and Surveillance* (2021) (Attached as **Exhibit H**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (Attached as **Exhibit I**).

23.     Over three-quarters of the mass shootings resulting in 10 or more deaths involved assault weapons and/or LCMs (Table 6).  As also shown in the analyses of mass shootings in Section II, death tolls in double-digit-fatality mass shootings are related to the use of firearm technologies like assault weapons and LCMs that, in terms of mass shootings, serve as force multipliers.

**IV.    ASSAULT WEAPONS ARE ALMOST NEVER USED BY PRIVATE CITIZENS IN SELF-DEFENSE DURING ACTIVE SHOOTINGS**

24.     An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them?  As shown above in Section II, assault weapons have been used in approximately one-third of high-fatality mass shootings in the past 32 years (Figure 3).  And in the past eight years, the share of high-fatality mass shootings that have involved assault weapons has risen to approximately half (Figure 3).

25.     The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[15]  According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[16]  A simple way to conceptualize active shooter incidents is to think of them as attempted

---

[15] All of the information in this section, including definitions and data, are publicly available from the FBI.  *See* FBI, "Active Shooter Safety Resources," *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed January 2, 2023).

[16] FBI, *Active Shooter Incidents in the United States in 2022*, April 2023, at 1, *available at* https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2022-042623.pdf/view (last accessed May 4, 2023).  The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms.  The *active* aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome."  *Ibid.* (emphasis in original).  In addition to the report on incidents in 2022, the FBI has published seven other reports on active shooter incidents covering the following seven time-periods: 2000-2013, 2014-2015, 2016-2017, 2018, 2019, 2020, and 2021.  All of these reports are available at the FBI's "Active Shooter Safety Resources" website, *supra* note 15.

21

mass shootings.  As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

26.     In the 23 years between January 1, 2000, and December 31, 2022, the FBI has identified 456 active shootings occurring in the United States.  Out of these 456 active shooter incidents, 18 incidents (3.9%) involved defensive gun uses (DGUs) by civilians, excluding law enforcement or armed security.[17]  Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one assault rifle).[18]  In other words, out of the 17 incidents where an armed civilian intervened and it was possible to identify the DGU firearm, only one incident (5.9%) involved an assault weapon.[19]  Within the broader context of all active shooter incidents, only one incident out of 456 in the past 23 years (0.2%) is known to have involved an armed civilian intervening with an assault weapon.[20]

_____

[17] In 17 of the 18 DGU-involved active shooter incidents, there was an exchange of gunfire.  For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased.  FBI, *supra* notes 15 and 16.

[18] All 14 DGU incidents that involved handguns also involved armed civilians who held valid concealed-carry permits or were legally carrying their handguns.  *Ibid*.  In 12 of these 14 incidents, details about the types of handguns used in self-defense were available in news media accounts or in news media photographs from the crime scene.  In two of the 14 incidents, the use of concealed handguns was inferred based on details about the shooting reported in news media accounts.  There is no evidence that either of these two DGU incidents involved an assault pistol.

[19] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident.  *Ibid*.  Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun.  *See* Carla Field, "Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says," WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023).  Adding this incident to the 17 DGU-involved incidents where the type of firearm was identifiable would mean that 5.6% (as opposed to 5.9%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[20] FBI, *supra* notes 15 and 16.  The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas.  In that incident, an armed private citizen

27.     The bottom line is that assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.[21]

## V.     OWNERSHIP RATES OF "MODERN SPORTING RIFLES" AND LCMS IN THE U.S.

28.     As noted above in Para. 14, based on the most recent publicly-available NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform firearms—appear to make up as many as 5.3% of all firearms in circulation in American society (24.4 million out of an estimated 461.9 million firearms), although this is likely an over-estimate due to the apparent inclusion of modern sporting rifles in the possession of law enforcement and security agencies, firearms retailers, and prohibited owners (such as criminals and domestic abusers).  It is also likely that the NSSF's estimate includes firearms that have been illegally trafficked to other countries, especially neighboring Mexico.[22]  Based on NSSF figures, 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles.[23]  In other words, less than 8% of all civilian gun owners

---

used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene. While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him.  *See* Adam Roberts, "Man Who Shot Texas Gunman Shares His Story," KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

[21] Given the limitations of the active shooter incident data reported by the FBI, it is not possible to discern whether any of the civilian DGUs involved an armed civilian using a firearm with an LCM at the time of the intervention.  As such, it is not possible to perform a similar comparison between mass shootings perpetrated with LCM-equipped firearms and mass shootings thwarted with LCM-equipped firearms.

[22] *See*, for example, Liz Mineo, "Stopping Toxic Flow of Guns from U.S. to Mexico," *Harvard Gazette*, February 18, 2022, *available at* https://news.harvard.edu/gazette/story/2022/02/stopping-toxic-flow-of-gun-traffic-from-u-s-to-mexico (last accessed May 31, 2023).

[23] In its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.  NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at*

23

in the United States own modern sporting rifles.[24]  In terms of the total population of the United States, estimated by the Census Bureau to be approximately 333 million people in 2022, less than 2% of all Americans own a modern sporting rifle.[25]

29.     In addition to the NSSF's estimate that there are 24.4 million modern sporting rifles in civilian circulation in the United States as of the end of 2020, the Plaintiffs draw on a survey conducted by William English to support their estimates about the number of AR-15-style rifles in American society.[26]  According to English, "about 24.6 million people" have owned "an AR-15 or similar styled rifle."[27]  In surveying ownership rates, English also found that 0.3% of

---

https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed January 16, 2023).  The estimate that approximately 6.4 million gun owners possess what the NSSF considers to be modern sporting rifles is calculated by dividing the 3.8 average number of such rifles that each modern sporting rifle owner possesses into the 24.4 million such rifles estimated to be in civilian circulation.  This calculation (24.4 million divided by 3.8) equals 6.4 million.  Based on survey data, 81 million American adults are estimated to own guns.  Andy Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight," PolitiFact, The Poynter Institute, August 3, 2022, *available at* https://www.politifact.com/factchecks/2022/aug/03/instagram-posts/proposed-assault-weapons-ban-wont-turn-gun-owners- (last accessed January 16, 2023).

[24] The finding that less than 8% of all gun owners possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 81 million American adults estimated to be gun owners.  Taking 6.4 million and dividing it by 81 million equals 7.9%.

[25] The Census Bureau's total population estimate for 2022 is 333,287,557 persons.  U.S. Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic," December 22, 2022, *available at* https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last accessed January 16, 2023).  The finding that less than 2% of all Americans possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333 million persons in United States.  Taking 6.4 million and dividing it by 333 million equals 1.9%.

[26] Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief, *Cheeseman, et al. v. Platkin, et al.*, 1:22-cv-04360-RMB-AMD (D.N.J.), July 14, 2022, ECF No. 4, at 15, citing William English, "2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned," Unpublished Paper (May 13, 2022; Revised September 22, 2022), *available at* https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=4283305 (last accessed March 7, 2023).

[27] English, *supra* note 26.

24

respondents "indicate owning over 100" AR-15 styled rifles.[28]  Assuming English correctly estimates that 24.6 million people have owned an AR-15 or similarly styled rifle, his survey results indicate that approximately 74,000 people own over 100 such rifles.  Moreover, English also reports that 1.3% of all AR-15 style rifle owners (approximately 320,000 people) own between 11 and 100 such rifles.[29]  Even if, for the sake of argument, these 74,000 people all owned only 101 AR-15s and these additional 320,000 people all owned 11 AR-15s—the lowest possible number in the range that they identified as best capturing the number of AR-15 styled rifles they own—that would mean that, ***at the very least, approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners***.[30]  As a reminder, 11 million AR-15 style rifles is a conservative estimate calculated using the absolute minimum numbers in the reported ranges of 11-to-100 and 101-or-more.[31]

---

[28] *Ibid*.

[29] *Ibid*.

[30] As a reminder, the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.  NSSF, *supra* note 23.  While the NSSF, unlike the English survey, does not report whether respondents in its surveys of modern sporting rifle owners happen to own more than 10, let alone more than 100, modern sporting rifles, NSSF has detected a growing trend toward increased ownership of multiple modern sporting rifles.  For instance, in its 2010 survey, it found that 40% of modern sporting rifle owners owned only 1 modern sporting rifle and 60% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned being 2.6.  In its 2013 survey, it found that 35% of modern sporting rifle owners owned only 1 modern sporting rifle and 65% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing to 3.1.  In its most recent, 2021 survey, the NSSF found that 24% of modern sporting rifle owners owned only 1 modern sporting rifle and 76% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing yet again to 3.8.  This speaks to a growing trend in which modern sporting rifles are being purchased by gun owners who already own a modern sporting rifle, resulting in modern sporting rifles being concentrated, relatively speaking, in the hands of those who already own modern sporting rifles.  *Ibid*.

[31] While the English survey is discussed in an unpublished academic paper that is publicly available online, there are significant concerns with the study, which call into question the findings reported in the paper.  Arguably, the biggest problem with the English survey (as reported in the unpublished paper) is that it appears to be in serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research

30.     In deriving its estimates, the NSSF often relies on United States government data, particularly ATF data.[32]  According to the ATF, from 1986 through 2020 (which reflects the most currently-available data), the civilian stock of firearms in the United States has been made up predominantly of handguns.[33]  As Figure 11 shows, handguns account for 50% of the civilian stock of firearms, rifles account for 33%, and shotguns account for 17%.

31.     According to ATF data, handguns are the most common firearms in civilian circulation; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.[34]

---

(AAPOR).  *See* "AAPOR Code of Professional Ethics and Practices," April 2021 (Attached as **Exhibit J)**.  Among the ways that the English survey seemingly runs afoul of AAPOR canons, it fails to identify the source of sponsorship funding and it fails to fully and openly disclose the measurement tools (Rules III.A.2-3).  The former is vital to assuring that the survey was not designed and conducted to further the political or economic interests of particular people or organizations.  The latter allows independent observers and researchers to assess if, among other factors, question order, question wording, or answer options biased responses.  The latter is also crucial to assuring that select findings were not suppressed because they would, if publicized, undermine the agenda of the survey's sponsor(s).  Without release of the entire questionnaire and the full results to the public, it cannot be confirmed that questions and corresponding responses were not suppressed.

[32] NSSF, 2020, *supra* note 8.

[33] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, *see* ATF, *supra* note 8.  For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the United States: Annual Statistical Update, 2021*, *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 16, 2023).

[34] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles.

**Figure 11.  Share of Firearms in Civilian Circulation in the United States, 1986-2020**



## VI.    RESTRICTIONS ON ASSAULT WEAPONS AND LCMS REDUCE THE INCIDENCE OF GUN MASSACRES, RESULTING IN LIVES SAVED

### VI.A.    THE OPERATIVE MECHANISM OF ASSAULT WEAPONS BANS: SUPPRESSION AND SUBSTITUTION EFFECTS

32.    As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 12).[35]  The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements.  This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[36]

**Figure 12.  The Trinity of Violence**



---

[35] Klarevas, *supra* note 1, at 27-29, 229-238.

[36] *Ibid*.

27

33.     Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[37]  Bans on assault weapons and LCMs generally make it illegal to manufacture, import, transfer, own, or possess certain firearms and certain magazines.  Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial.  With regard to perpetrators, bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior.  In the case of bans on assault weapons and LCMs, they threaten conviction, imprisonment, and/or fines should an individual manufacture, import, transfer, or possess a prohibited assault weapon or LCM.  One mechanism at work here centers around dissuading potential shooters from trying to build or otherwise acquire banned firearm technologies.  But another mechanism focuses on the assault weapon or LCM itself: *deprive potential instruments of violence*.  Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons and LCMs also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who is prohibited from acquiring it.  In essence, the former strategy seeks to dissuade the offender and the latter strategy seeks to deny the instruments of violence.

34.     Ideally, someone intent on committing a mass shooting with an assault weapon and/or LCM would be dissuaded from going on a rampage by the fact that their means of choice are not available.  In such a scenario, the attack would be quashed.  This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely-related desirable outcome.[38]  A real-world

---

[37] Philip J. Cook, "Research in Criminal Deterrence: Laying the Groundwork for the Second Decade," 2 *Crime and Justice* 211 (1980); and Daniel S. Nagin, "Deterrence in the Twenty-First Century," 42 *Crime and Justice* 199 (2013).

[38] Paul Dolan and Mateo M. Galizzi, "Like Ripples on a Pond: Behavioral Spillovers and Their Implications for Research and Policy," 47 *Journal of Economic Psychology* 1 (2015); K. Jane Muir and Jessica Keim-Malpass, "Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research," 9 *Journal of Comparative Effectiveness Research* 755 (2020).

28

example of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun (that did not have an LCM).  At the time of the crime in 2003, the Federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle and LCMs.  In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse."  He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on a rampage and "killed as many people as I possibly could."  As he noted, "because I didn't have an assault weapon, that didn't happen."[39]  In this case, the unavailability of an assault weapon due to the federal ban appears to have suppressed the perpetrator's impulse to commit a mass shooting.

35.     Of course, some potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable.  They will instead replace their desired instruments of violence with available alternatives.  This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[40]  A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California.  In that attack, the gunman appears to have been unable to acquire an assault rifle and LCMs due to California's ban on both.  Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines.  As a result, the gunman quickly ran out of bullets, and while pausing to reload—which appears to have been extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a

---

[39] "Inside the Mind of a Killer," CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023).

[40] Philip J. Cook, "The Effect of Gun Availability on Violent Crime Patterns," 455 *Annals of the American Academy of Political and Social Science* 63 (1981); Anthony A. Braga, et al., "Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?" 4 *Annual Review of Criminology* 147 (2021).

congregant chased him away, preventing him from continuing his attack.[41]  In this incident, which resulted in one death, California's ban on assault weapons and LCMs worked exactly as intended.  It deprived the active shooter of the mechanisms that might have allowed him to kill enough people to surpass the fatality threshold of a mass shooting.  Stated differently, if you examine data sets that identify shootings resulting in mass murder, you will not find the Poway synagogue attack on their lists.

36.     It might seem perverse to think that restrictions on certain instruments of violence operate on the premise that, if an act of violence cannot be averted, then it will proceed with an alternative instrument.  Nevertheless, this is exactly how bans on assault weapons and LCMs work in theory.  They suppress the inclinations of potential mass shooters to go on killing rampages in the first place because their means of choice are unavailable.  And, should deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous, prohibited ones, reducing the casualty tolls of attacks when they do occur.

**VI.B.     THE OPERATIVE MECHANISM OF LCM BANS: FORCING PAUSES IN ACTIVE SHOOTINGS**

37.     Restrictions on assault weapons and LCMs also address the multiple advantages LCMs provide to active shooters.  Offensively, LCMs increase kill potential.  Basically, the more bullets a shooter can fire at a target within a finite amount of time, the more potential wounds they can inflict.  Furthermore, the more bullets that strike a victim, the higher the odds that that person will die.  These two factors—sustained-fire capability and multiple-impact capability— allow LCMs to increase a shooter's kill potential.

38.     When inserted into either a semiautomatic or fully-automatic firearm, an LCM facilitates the ability of an active shooter to fire a large number of rounds at an extremely quick

---

[41] Elliot Spagat and Julie Watson, "Synagogue Shooter Struggled with Gun, Fled with 50 Bullets," Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

rate without pause.  This phenomenon—sustained-fire capability—comes in handy when a target is in a gunman's line of sight for only a few seconds.  For example, sustained-fire capability allows a reasonably competent shooter to fire three rounds per second with a semiautomatic firearm and ten rounds per second with an automatic firearm.  That results in numerous chances to hit a target in a short window of opportunity, especially when ammunition capacity is large.

39.     LCMs also facilitate the ability of a shooter to strike a human target with more than one round.  This phenomenon—multiple-impact capability—increases the chances that the victim, when struck by multiple rounds, will die.  At least two separate studies have found that, when compared to the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than one bullet were over 60 percent higher.[42]  The implication is straightforward: being able to strike human targets with more than one bullet increases a shooter's chances of killing their victims.  In essence, LCMs are force multipliers when it comes to kill potential—and the evidence from gun massacres supports this conclusion (*see* Section II).

40.     In addition to offensive advantages, LCMs also provide the defensive advantage of extended cover.  During an active shooting, a perpetrator is either firing their gun or not firing their gun.  While pulling the trigger, it is difficult for those in harm's way to take successful defensive maneuvers.  But if the shooter runs out of bullets, there is a lull in the shooting.  This precious downtime affords those in the line of fire with a chance to flee, hide, or fight back.

41.     There are several examples of individuals fleeing or taking cover while active shooters paused to reload.  For instance, in 2012, several first-graders at Sandy Hook Elementary School in Newtown, Connecticut, escaped their attacker as he was swapping out magazines,

---

[42] Daniel W. Webster, et al., "Epidemiologic Changes in Gunshot Wounds in Washington, DC, 1983–1990," 127 *Archives of Surgery* 694 (June 1992); Angela Sauaia, et al., "Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000–2013," 315 *JAMA* 2465 (June 14, 2016).

31

allowing them to exit their classroom and dash to safety.[43]  Other well-known examples include the 2007 Virginia Tech and the 2018 Borderline Bar and Grill rampages.[44]  There is also the possibility that someone will rush an active shooter and try to tackle them (or at the very least try to wrestle their weapon away from them) while they pause to reload.[45]  In recent history, there have been numerous instances of gunmen being physically confronted by unarmed civilians while reloading, bringing their gun attacks to an abrupt end.  Prominent examples include the 1993 Long Island Rail Road, the 2011 Tucson shopping center, the 2018 Nashville Waffle House, and the 2022 Laguna Woods church shooting rampages.[46]  When there are pauses in the shooting to reload, opportunities arise for those in the line of fire to take life-saving action.

---

[43] *See* Dave Altimari, et al., "Shooter Paused and Six Escaped," *Hartford Courant*, December 23, 2012 (Attached as **Exhibit K**).

[44] Virginia Tech Review Panel, Mass Shootings at Virginia Tech, April 16, 2007: Report of the Virginia Tech Review Panel Presented to Governor Kaine, Commonwealth of Virginia, Revised with Addendum, November 2009, available at https://scholar.lib.vt.edu/prevail/docs/April16ReportRev20091204.pdf (last accessed February 1, 2023); "California Bar Shooting: Witnesses Describe Escaping as Gunman Reloaded," CBS News, December 7, 2018, available at https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in (last accessed February 1, 2023).

[45] The longer a shooter can fire without interruption, the longer they can keep potential defenders at bay.  The longer potential defenders are kept from physically confronting a shooter, the more opportunity there is for the shooter to inflict damage.

[46] *See*, Rich Schapiro, "LIRR Massacre 20 Years Ago: 'I Was Lucky,' Says Hero Who Stopped Murderer," *New York Daily News*, December 7, 2013, *available at* http://www.nydailynews.com/new-york/nyc-crime/lirr-massacre-20-years-lucky-hero-stopped-murderer-article-1.1540846 (last accessed February 1, 2023); Sam Quinones and Nicole Santa Cruz, "Crowd Members Took Gunman Down," *Los Angeles Times*, January 9, 2011, *available at* https://www.latimes.com/archives/la-xpm-2011-jan-09-la-na-arizona-shooting-heroes-20110110-story.html (last accessed February 1, 2023); Brad Schmitt, "Waffle House Hero: Could You Rush Toward a Gunman Who Just Killed People?" *The Tennessean*, April 24, 2018, *available at* https://www.tennessean.com/story/news/crime/2018/04/24/waffle-house-hero-could-you-rush-toward-gunman-who-just-killed-people/543943002 (last accessed February 1, 2023); "Parishioners Stop Gunman in Deadly California Church Attack," NPR, May 16, 2022, *available at* https://www.npr.org/2022/05/16/1099168335/parishioners-stop-gunman-in-california-church-shooting (last accessed February 1, 2023).

**VI.C.**     **BANS ON ASSAULT WEAPONS AND LCMS IN PRACTICE**

42.     In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons and LCMs in an effort to reduce the occurrence and lethality of such deadly acts of firearm violence.  Prominent among these measures was the 1994 Federal Assault Weapons Ban.  In September 1994, moved to action by high-profile shooting rampages that occurred the previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons and LCMs that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[47]

43.     Like the state bans on assault weapons and LCMs that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[48]  Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand.  As Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004. In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[49]

44.     The legislative intent of the State of New Jersey in enacting the laws being challenged in the present case is similar to that of other legislative bodies that have restricted assault weapons and LCMs: reducing gun violence, especially the frequency and lethality of

---

[47] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[48] Christopher Ingraham, "The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked," *Washington Post*, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

[49] *See* sources cited *supra* note 14.

mass shootings.  Because, on average, the use of assault weapons and LCMs results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons and LCMs is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

45.     Currently, 32% of the U.S. population is subject to a ban on both assault weapons and LCMs.  The following is a list of the 11 state-level jurisdictions that presently restrict both assault weapons and LCMs: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); California (January 1, 2000); New York (November 1, 2000); the District of Columbia (March 31, 2009); Connecticut (April 4, 2013); Delaware (August 29, 2022); Illinois (January 10, 2023); and Washington (April 25, 2023).[50]  As a reminder, from September 13, 1994 through September 12, 2004, the entire country was also subject to federal ban on both assault weapons and LCMs.

46.     In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect.  This measure, known as the incidence rate, allows public health experts to identify discernable differences, while accounting for variations in the population, over a set period of time.  Relevant to the present case, calculating incidence rates across states, in a manner that captures whether or not bans on both assault weapons and LCMs were in effect during the period of observation, allows for the assessment of the effectiveness of such bans.  In addition, fatality rates—the number of deaths, per population, that result from particular events

---

[50] The dates in parentheses mark the effective dates on which the listed states became subject to bans on both assault weapons and LCMs.

across different jurisdictions—also provide insights into the impact bans on assault weapons and LCMs have on mass shooting violence.[51]

47.    Since September 1, 1990, when New Jersey became the first state to ban both assault weapons and LCMs, through December 31, 2022, there have been 93 high-fatality mass shootings in the United States (**Exhibit C**).[52]  Calculating incidence and fatality rates for this time-period, across jurisdictions with and without bans on both assault weapons and LCMs, reveals that states subject to such bans experienced a 56% decrease in high-fatality mass shooting incidence rates.  They also experienced a 66% decrease in high-fatality mass shooting fatality rates, regardless of whether assault weapons or LCMs were used (Table 7).[53]

48.    When calculations go a step further and are limited to mass shootings involving assault weapons or LCMs, the difference between the two jurisdictional categories (non-ban and ban states) is even more pronounced.  In the time-period from January 1, 1991, through December 31, 2022, accounting for population, states with bans on both assault weapons and LCMs experienced a 62% decrease in the rate of high-fatality mass shootings involving the use of assault weapons or LCMs.  Similarly, jurisdictions with such bans in effect experienced a 72%

---

[51] For purposes of this report, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control.  *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).

[52] There were no state bans on both assault weapons and LCMs in effect prior to September 1, 1990.  Therefore, January 1, 1991, is a logical starting point for an analysis of the impact of bans on assault weapons and LCMs.  As there were no high-fatality mass shootings in the last four months of 1990, extending the analysis back to September 1, 1990, would make no difference.

[53] Between September 13, 1994, and September 12, 2004, the Federal Assault Weapons Ban was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that restricted assault weapons and LCMs.  As such, the entire country is coded as being under a ban on both assault weapons and LCMs during the timeframe that the Federal Assault Weapons Ban was in effect.

35

decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs (Table 7).

49.    All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons and LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons or LCMs, where the impact is most striking.

50.    The main purpose of bans on assault weapons and LCMs is to restrict the availability of assault weapons and LCMs.  The rationale is that, if there are fewer assault weapons and LCMs in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost.

51.    Moreover, forcing active shooters to reload creates critical pauses in an attack. These pauses provide opportunities for people in the line of fire to take life-saving measures (such as fleeing the area, taking cover out of the shooter's sight, and fighting back), which in turn can help reduce casualties.

52.    The epidemiological data lend support to the policy choices of New Jersey that seek to enhance public safety through restrictions on civilian access to certain firearms and magazines.  While imposing constraints on assault weapons and LCMs will not prevent every mass shooting, the data suggest that legislative efforts to restrict such instruments of violence should result in lives being saved.

**Table 7.  Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Bans on Assault Weapons and LCMs Were in Effect, 1991-2022**

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| **All High-Fatality Mass Shootings** | | | | | |
| Non-Ban States | 162.0 | 68 | 1.31 | 720 | 13.89 |
| Ban States | 135.8 | 25 | 0.58 | 208 | 4.79 |
| Percentage Decrease in Rate for Ban States | | | 56% | | 66% |
| **High-Fatality Mass Shootings Involving Assault Weapons or LCMs** | | | | | |
| Non-Ban States | 162.0 | 47 | 0.91 | 575 | 11.09 |
| Ban States | 135.8 | 15 | 0.35 | 135 | 3.11 |
| Percentage Decrease in Rate for Ban States | | | 62% | | 72% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

Executed on June 13th, 2023, at Nassau County, New York.

/s/ Louis Klarevas

37

# EXHIBIT A

# Louis J. Klarevas

**Email: ljk2149@tc.columbia.edu**

## Education

Ph.D.   International Relations, 1999
School of International Service
American University
Washington, DC

B.A.   Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania
Philadelphia, PA

## Author

*Rampage Nation: Securing America from Mass Shootings*

## Current Positions

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

## Professional Experience

*Academic Experience (Presented in Academic Years)*

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

| *Graduate* | *Undergraduate* |
|---|---|
| Counter-Terrorism and Homeland Security | American Government and Politics |
| International Political Economy | European-Atlantic Relations |
| International Politics in a Post-Cold War Era | International Political Economy |
| International Security | International Relations |
| Machinery and Politics of American Foreign Policy | Transnational Terrorism |
| Role of the United States in World Affairs | United States Foreign Policy |
| Security Policy | |
| Theories of International Politics | |
| Transnational Security | |
| Transnational Terrorism | |
| United States Foreign Policy | |

**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti,* University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey,*" *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

## Commentaries and Correspondence

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007


**Commentaries Written for _The Huffington Post_ – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)


**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Preventive Medicine*

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Participant, Minnesota Chiefs of Police Association, Survey of Measures to Reduce Gun Violence, 2023

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

16

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Expert Witness Service**

Town of Superior, Colorado, 2023-

City of Boulder, Colorado, 2023-

City of Louisville, Colorado, 2023-

County of Boulder, Colorado, 2023-

State of Connecticut, 2023-

State of Hawaii, 2023-

State of Illinois, 2023-

State of Massachusetts, 2023-

State of New Jersey, 2023-

State of Oregon, 2023-

City of Highland Park, Illinois, 2022-

County of Cook, Illinois, 2022-

State of Washington, 2022-

Government of Canada, 2021-2022

Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019

State of California, 2017-

State of Colorado, 2016-2017, 2022-

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Branas and Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT B




LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS



Prometheus Books

59 John Glenn Drive
Amherst, New York 14228

### Table 2.1. The Concept of a Mass Shooting.

**Definition of a Mass Shooting:**

Any violent attack that results in four or more individuals incurring gunshot wounds.

**Categories of Mass Shooting:**

1. *Nonfatal*
   Mass shootings in which no one dies.

2. *Fatal*
   Mass shootings in which at least one victim dies.

3. *High-Fatality / Gun Massacre*
   Mass shootings in which six or more victims die.



It's easy to dismiss conceptual discussions and debates as exercises in Ivory Tower intellectualism. But how we identify and think about mass shootings impacts which attacks capture national attention and which are disregarded—something which has far-reaching policy consequences. Thus, coming up with the best possible definition and conceptualization is a vital first step toward explaining and preventing rampage violence. As the Socratic adage reminds us, "The beginning of wisdom is the definition of terms."[43]

# EXHIBIT C

**Exhibit C**
**High-Fatality Mass Shootings in the United States, 1991-2022**

|    | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|----|------|------|-------|--------|--------------|---------------|
| 1 | 1/26/1991 | Chimayo | NM | 7 | N | N |
| 2 | 8/9/1991 | Waddell | AZ | 9 | N | N |
| 3 | 10/16/1991 | Killeen | TX | 23 | N | Y |
| 4 | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N | N |
| 5 | 1/8/1993 | Palatine | IL | 7 | N | N |
| 6 | 5/16/1993 | Fresno | CA | 7 | Y | Y |
| 7 | 7/1/1993 | San Francisco | CA | 8 | Y | Y |
| 8 | 12/7/1993 | Garden City | NY | 6 | N | Y |
| 9 | 4/20/1999 | Littleton | CO | 13 | Y | Y |
| 10 | 7/12/1999 | Atlanta | GA | 6 | N | U |
| 11 | 7/29/1999 | Atlanta | GA | 9 | N | Y |
| 12 | 9/15/1999 | Fort Worth | TX | 7 | N | Y |
| 13 | 11/2/1999 | Honolulu | HI | 7 | N | Y |
| 14 | 12/26/2000 | Wakefield | MA | 7 | Y | Y |
| 15 | 12/28/2000 | Philadelphia | PA | 7 | N | Y |
| 16 | 8/26/2002 | Rutledge | AL | 6 | N | N |
| 17 | 1/15/2003 | Edinburg | TX | 6 | Y | U |
| 18 | 7/8/2003 | Meridian | MS | 6 | N | N |
| 19 | 8/27/2003 | Chicago | IL | 6 | N | N |
| 20 | 3/12/2004 | Fresno | CA | 9 | N | N |
| 21 | 11/21/2004 | Birchwood | WI | 6 | Y | Y |
| 22 | 3/12/2005 | Brookfield | WI | 7 | N | Y |
| 23 | 3/21/2005 | Red Lake | MN | 9 | N | Y |
| 24 | 1/30/2006 | Goleta | CA | 7 | N | Y |
| 25 | 3/25/2006 | Seattle | WA | 6 | N | N |
| 26 | 6/1/2006 | Indianapolis | IN | 7 | Y | Y |
| 27 | 12/16/2006 | Kansas City | KS | 6 | N | N |
| 28 | 4/16/2007 | Blacksburg | VA | 32 | N | Y |
| 29 | 10/7/2007 | Crandon | WI | 6 | Y | Y |
| 30 | 12/5/2007 | Omaha | NE | 8 | Y | Y |
| 31 | 12/24/2007 | Carnation | WA | 6 | N | U |
| 32 | 2/7/2008 | Kirkwood | MO | 6 | N | Y |
| 33 | 9/2/2008 | Alger | WA | 6 | N | U |
| 34 | 12/24/2008 | Covina | CA | 8 | N | Y |
| 35 | 1/27/2009 | Los Angeles | CA | 6 | N | N |
| 36 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y | Y |
| 37 | 3/29/2009 | Carthage | NC | 8 | N | N |
| 38 | 4/3/2009 | Binghamton | NY | 13 | N | Y |

C 1

| | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 39 | 11/5/2009 | Fort Hood | TX | 13 | N | Y |
| 40 | 1/19/2010 | Appomattox | VA | 8 | Y | Y |
| 41 | 8/3/2010 | Manchester | CT | 8 | N | Y |
| 42 | 1/8/2011 | Tucson | AZ | 6 | N | Y |
| 43 | 7/7/2011 | Grand Rapids | MI | 7 | N | Y |
| 44 | 8/7/2011 | Copley Township | OH | 7 | N | N |
| 45 | 10/12/2011 | Seal Beach | CA | 8 | N | N |
| 46 | 12/25/2011 | Grapevine | TX | 6 | N | N |
| 47 | 4/2/2012 | Oakland | CA | 7 | N | N |
| 48 | 7/20/2012 | Aurora | CO | 12 | Y | Y |
| 49 | 8/5/2012 | Oak Creek | WI | 6 | N | Y |
| 50 | 9/27/2012 | Minneapolis | MN | 6 | N | Y |
| 51 | 12/14/2012 | Newtown | CT | 27 | Y | Y |
| 52 | 7/26//2013 | Hialeah | FL | 6 | N | Y |
| 53 | 9/16/2013 | Washington | DC | 12 | N | N |
| 54 | 7/9/2014 | Spring | TX | 6 | N | Y |
| 55 | 9/18/2014 | Bell | FL | 7 | N | U |
| 56 | 2/26/2015 | Tyrone | MO | 7 | N | U |
| 57 | 5/17/2015 | Waco | TX | 9 | N | Y |
| 58 | 6/17/2015 | Charleston | SC | 9 | N | Y |
| 59 | 8/8/2015 | Houston | TX | 8 | N | U |
| 60 | 10/1/2015 | Roseburg | OR | 9 | N | Y |
| 61 | 12/2/2015 | San Bernardino | CA | 14 | Y | Y |
| 62 | 2/21/2016 | Kalamazoo | MI | 6 | N | Y |
| 63 | 4/22/2016 | Piketon | OH | 8 | N | U |
| 64 | 6/12/2016 | Orlando | FL | 49 | Y | Y |
| 65 | 5/27/2017 | Brookhaven | MS | 8 | Y | Y |
| 66 | 9/10/2017 | Plano | TX | 8 | Y | Y |
| 67 | 10/1/2017 | Las Vegas | NV | 60 | Y | Y |
| 68 | 11/5/2017 | Sutherland Springs | TX | 25 | Y | Y |
| 69 | 2/14/2018 | Parkland | FL | 17 | Y | Y |
| 70 | 5/18/2018 | Santa Fe | TX | 10 | N | N |
| 71 | 10/27/2018 | Pittsburgh | PA | 11 | Y | Y |
| 72 | 11/7/2018 | Thousand Oaks | CA | 12 | N | Y |
| 73 | 5/31/2019 | Virginia Beach | VA | 12 | N | Y |
| 74 | 8/3/2019 | El Paso | TX | 23 | Y | Y |
| 75 | 8/4/2019 | Dayton | OH | 9 | Y | Y |
| 76 | 8/31/2019 | Midland and Odessa | TX | 7 | Y | Y |
| 77 | 3/15/2020 | Moncure | NC | 6 | U | U |
| 78 | 6/4/2020 | Valhermoso Springs | AL | 7 | Y | Y |
| 79 | 9/7/2020 | Aguanga | CA | 7 | U | U |

|    | Date       | City                | State | Deaths | Involved AWs | Involved LCMs |
|----|------------|---------------------|-------|--------|--------------|---------------|
| 80 | 2/2/2021   | Muskogee            | OK    | 6      | N            | U             |
| 81 | 3/16/2021  | Acworth and Atlanta | GA    | 8      | N            | Y             |
| 82 | 3/22/2021  | Boulder             | CO    | 10     | Y            | Y             |
| 83 | 4/7/2021   | Rock Hill           | SC    | 6      | Y            | Y             |
| 84 | 4/15/2021  | Indianapolis        | IN    | 8      | Y            | Y             |
| 85 | 5/9/2021   | Colorado Springs    | CO    | 6      | N            | Y             |
| 86 | 5/26/2021  | San Jose            | CA    | 9      | N            | Y             |
| 87 | 1/23/2022  | Milwaukee           | WI    | 6      | N            | U             |
| 88 | 4/3/2022   | Sacramento          | CA    | 6      | N            | Y             |
| 89 | 5/14/2022  | Buffalo             | NY    | 10     | Y            | Y             |
| 90 | 5/24/2022  | Uvalde              | TX    | 21     | Y            | Y             |
| 91 | 7/4/2022   | Highland Park       | IL    | 7      | Y            | Y             |
| 92 | 10/27/2022 | Broken Arrow        | OK    | 7      | N            | U             |
| 93 | 11/22/2022 | Chesapeake          | VA    | 6      | N            | U             |

Note: High-fatality mass shootings are mass shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or motive.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban or (2) the statutes of the state where the shooting occurred.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device with a capacity of more than 10 bullets.  Incidents in gray shade are those incidents that occurred at a time when and in a state where legal prohibitions on both assault weapons and large-capacity magazines were in effect statewide or nationwide.

Sources: Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022); and "Gun Violence Archive," *available at* https://www.gunviolencearchive.org (last accessed January 3, 2023).  The Gun Violence Archive was only consulted for identifying high-fatality mass shootings that occurred since January 1, 2018.

# EXHIBIT D



**Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)**



# EXHIBIT E



LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS






Prometheus Books

59 John Glenn Drive
Amherst, New York 14228



in a class all by itself. No other advanced, Western democracy experiences the magnitude of gun violence that presently afflicts American society.[28] This is particularly true when it comes to mass shootings.[29]



* * *

The United States does little to regulate firearms, especially at the federal level.[30] While it goes to great lengths to restrict access to WMDs and IEDs, the same can't be said for its efforts to keep firearms out of the hands of high-risk individuals. Indeed, the American experience with gun control nationwide is so limited that it can actually be chronicled in a few bullet points:

- The National Firearms Act of 1934: Heavily regulated machine guns, short-barrel rifles and shotguns, and silencers.
- The Federal Firearms Act of 1938: Established a federal licensing system to regulate manufacturers, importers, and dealers of firearms.
- The Omnibus Crime Control and Safe Streets Act of 1968: Prohibited anyone under twenty-one years of age from purchasing a handgun.
- The Gun Control Act of 1968: Required that all interstate firearms transfers or sales be made through a federally licensed firearms dealer and prohibited certain categories of people—felons (indicted or convicted), fugitives, drug abusers, mentally ill persons (as determined by adjudication), illegal aliens, dishonorably discharged servicemen, US-citizenship renouncers, and domestic abusers—from possessing firearms.[31]
- The Firearm Owners Protection Act of 1986: Barred the purchase or transfer of automatic weapons without government approval.
- The Undetectable Firearms Act of 1988: Required that all firearms have at least 3.7 oz. of metal that can be detected by a metal detector.
- The Gun-Free School Zones Act of 1990: Criminalized possession or discharge of a firearm in a school zone.
- The Brady Handgun Violence Prevention Act of 1993: Required



**240      PART 3: PRESCRIPTION**

that anyone attempting to purchase a firearm from a federally licensed dealer pass a background check.[32]

- The Federal Assault Weapons Ban of 1994: Banned the sale and possession of semiautomatic assault weapons and extended-capacity magazines not grandfathered prior to the enactment of the law.[33]

Of all of these measures, the National Firearms Act of 1934 and the Assault Weapons Ban of 1994 (AWB) were the only ones instituted primarily in an effort to reduce the carnage of mass shootings. The former was passed in response to a series of bloody gangland executions, including the infamous 1929 St. Valentine's Day massacre in Chicago.[34] While there are still machine guns in circulation, the National Firearm Act, in conjunction with the Firearm Owners Protection Act of 1986, sharply cut the availability of machine guns, which likely explains the complete elimination of massacres perpetrated with such automatic-fire weapons.



Like the National Firearms Act, the AWB was introduced following several high-profile mass shootings in the early 1990s: the Luby's restaurant, 101 California Street office complex, and Long Island Railroad train car massacres.[35] Signed into law by President Bill Clinton, the AWB went into effect on September 13, 1994. At the insistence of the gun-rights lobby, however, the bill contained a ten-year sunset provision. As Congress never renewed the ban, it automatically expired on September 13, 2004.



The decade the law was in effect nonetheless resulted in a unique experiment, allowing us to discern what impact, if any, the ban had on gun violence in general and mass shootings in particular. As to the former, the academic consensus seems to be that the AWB had a minimal impact on reducing violent crime.[36] This hardly comes as a surprise. After all, most crimes don't involve assault weapons. The real test should be: Did it succeed in its intended purpose of reducing rampage violence? The answer is a resounding yes.

Let's take a closer look.

The best way to assess the impact of something is to conduct what, in social science, we commonly refer to as a time-series analysis. Basically, that's a fancy name for a before-and-after test. Figures 7.1



Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.

Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.



Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.



and 7.2 provide a look at the before-and-after pictures. In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death toll of 8.2 fatalities per incident. During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident.[37] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[38] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980).[39] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm. As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance. In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8.9 fatalities per incident.[40] These numbers paint a clear picture: America's experiment, while short-lived, was also extremely successful.[41]




## ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives. But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights.

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders. In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws. A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions.[42] That

# EXHIBIT F

# The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017

*Louis Klarevas, PhD, Andrew Conner, BS, David Hemenway, PhD*

*Objectives.* To evaluate the effect of large-capacity magazine (LCM) bans on the frequency and lethality of high-fatality mass shootings in the United States.

*Methods.* We analyzed state panel data of high-fatality mass shootings from 1990 to 2017. We first assessed the relationship between LCM bans overall, and then federal and state bans separately, on (1) the occurrence of high-fatality mass shootings (logit regression) and (2) the deaths resulting from such incidents (negative binomial analysis). We controlled for 10 independent variables, used state fixed effects with a continuous variable for year, and accounted for clustering.

*Results.* Between 1990 and 2017, there were 69 high-fatality mass shootings. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

*Conclusions.* LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality mass shootings. (*Am J Public Health.* 2019;109:1754–1761. doi: 10.2105/AJPH.2019.305311)

The recent spate of gun massacres in the United States has re-energized the debate over how to prevent such tragedies.[1] A common response to high-profile acts of gun violence is the promotion of tighter gun legislation, and there is some evidence that laws imposing tighter restrictions on access to firearms have been associated with lower levels of mass shootings.[2] One proposal that has received renewed interest involves restricting the possession of large-capacity magazines (LCMs).[3–5] This raises an important question: what has been the impact of LCM bans on high-fatality mass shootings?

In an attempt to arrest an uptick in mass shooting violence in the early 1990s, Congress in 1994 enacted the federal assault weapons ban, which, among other things, restricted ownership of certain ammunition-feeding devices.[6,7] The law, which contained a sunset provision, was allowed to expire a decade later. Pursuant to that ban (18 USC §921(a) [1994]; repealed), it was illegal to possess LCMs—defined as any ammunition-feeding device holding more

than 10 bullets—unless the magazines were manufactured before the enactment of the ban. LCM restrictions are arguably the most important component of assault weapons bans because they also apply to semiautomatic firearms without military-style features.[8,9]

Beginning with New Jersey in 1990, some states implemented their own regulations on LCMs. Today, 9 states and the District of Columbia restrict the possession of LCMs. The bans vary along many dimensions, including maximum bullet capacity of permissible magazines, grandfathering of existing LCMs, and applicable firearms. Moreover, overlaps sometimes exist between assault weapons bans and LCM bans, but not in all states. For example, California instituted a ban

on assault weapons in 1989, but LCMs remained unregulated in the state until 1994, when the federal ban went into effect. In 2000, California's own statewide ban on LCMs took effect as a safeguard in the event the federal ban expired, which happened in 2004.[10,11]

LCMs provide a distinct advantage to active shooters intent on murdering numerous people: they increase the number of rounds that can be fired at potential victims before having to pause to reload or switch weapons. Evidence shows that victims struck by multiple rounds are more likely to die, with 2 studies finding that, when compared with the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than 1 bullet were more than 60% higher.[12,13] Being able to strike human targets with more than 1 bullet increases shooters' chances of killing their victims. Analyses of gunshot wound victims at level I trauma centers have suggested that this multiple-impact capability is often attributable to the use of LCMs.[14,15]

In addition, LCMs provide active shooters with extended cover.[16] During an attack, perpetrators are either firing their guns or not firing their guns. While gunmen are firing, it is extremely difficult for those in the line of fire to take successful defensive maneuvers. But if gunmen run out of bullets, there are lulls in the shootings, as the perpetrators are forced to pause their attacks to reload or change weapons. These pauses provide opportunities for people to intervene and disrupt a shooting. Alternatively, they provide individuals in

## ABOUT THE AUTHORS

*Louis Klarevas is with the Teachers College, Columbia University, New York, NY. Andrew Conner is with the Frank H. Netter, MD, School of Medicine, Quinnipiac University, North Haven, CT. David Hemenway is with the Harvard T. H. Chan School of Public Health, Harvard University, Boston, MA.*

*Correspondence should be sent to Louis Klarevas, Research Professor, Office of the Provost, Teachers College, Columbia University, 525 W 120th St, New York, NY 10027 (e-mail: ljk2149@tc.columbia.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted July 22, 2019.*

*doi: 10.2105/AJPH.2019.305311*

harm's way with a chance to flee or hide. Legislative endeavors that restrict access to LCMs are implemented with the express objective of reducing an active shooter's multiple-impact capability and extended cover.[10]

Although mass shootings have received extensive study, there has been little scholarly analysis of LCM bans.[17–24] The studies undertaken that have broached the subject of ammunition capacity have primarily concentrated on the effect of LCM bans on violent crimes other than mass shootings or on the impact of the assault weapons bans on mass shootings.[25–27]

Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings.[10,20,28] Proponents of LCM bans believe that without LCMs, fewer people will be killed in a mass shooting, other things equal. In turn, fewer shootings will cross the threshold required to be classified as what we call a "high-fatality mass shooting" (≥ 6 victims shot to death). If LCM bans are effective, we should expect to find that high-fatality mass shootings occur at a lower incidence rate when LCM bans are in place, and fewer people are killed in such attacks. But have LCM bans actually saved lives in practice? To our knowledge, the impact of LCM bans has never been systematically assessed. This study fills that void.

## METHODS

Mass shootings have been defined in a variety of ways, with some analyses setting the casualty threshold as low as 2 people wounded or killed and others requiring a minimum of 7 gunshot victims.[18,22,29] We focused on high-fatality mass shootings—the deadliest and most disturbing of such incidents—which are defined as intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators.[20,30,31] After an exhaustive search, we identified 69 such incidents in the United States between 1990 and 2017. We then discerned whether each high-fatality mass shooting involved an LCM—unless otherwise stated, defined consistent with the 1994 federal ban as a detachable ammunition-feeding device capable of holding more than 10 bullets. (See Table 1 for a list of incidents and for additional details on

the search and identification strategy we employed.)

The first state to enact an LCM ban was New Jersey in 1990. Since then, another 8 states and the District of Columbia have enacted LCM bans (Table A, available as a supplement to the online version of this article at http://www.ajph.org).[10] With no LCM bans in effect before 1990, a priori we chose that year to begin our analysis to avoid inflating the impact of the bans. Our data set extends 28 years, from 1990 through 2017. As a secondary analysis, we used a 13-year data set, beginning in 2005, the first full year after the federal assault weapons ban expired.

Our primary outcome measures were the incidence of high-fatality mass shootings and the number of victims killed. We distinguished between high-fatality mass shootings occurring with and without a ban in effect. Because the federal ban was in effect nationwide from September 13, 1994, through September 12, 2004, we coded every state as being under an LCM ban during that 10-year timeframe.

Our interest was in the effect of LCM bans. We ran regression analyses to determine if any relationship between LCM bans and high-fatality mass shootings can be explained by other factors. In our state–year panel multivariate analyses, the outcome variables were (1) whether an LCM-involved high-fatality mass shooting occurred, (2) whether any high-fatality mass shooting occurred, (3) the number of fatalities in an LCM-involved high-fatality mass shooting, and (4) the number of fatalities in any high-fatality mass shooting. Our analyses first combined and then separated federal and state LCM bans.

Consistent with the suggestions and practices of the literature on firearm homicides and mass shootings, our explanatory variables are population density; proportion of population aged 19 to 24 years, aged 25 to 34 years, that is Black, and with a college degree; real per-capita median income; unemployment rate; and per-capita prison population.[2,26,27,32] We also added a variable for percentage of households with a firearm. All regression models controlled for total state population. When the dependent variable reflected occurrences of incidents (ordered choice data), we used logit regression; we ran probit regression as a sensitivity analysis. We had multiple observations for individual

states. To control for this, we utilized cluster-robust standard errors to account for the clustering of observations. When the dependent variable reflected deaths (count data), we used negative binomial regression; Gius used a Poisson regression, and we used that approach as a sensitivity analysis.[26] We included state fixed effects. We used a continuous variable for year because the rate of high-fatality mass shootings has increased over time. For purposes of sensitivity analysis, we also replaced the linear yearly trend with a quadratic function. We performed multivariate statistical analyses by using Stata/IC version 15.1 (StataCorp LP, College Station, TX).

Population data came from the US Census Bureau, unemployment data came from the Bureau of Labor Statistics, and imprisonment data came from the Bureau of Justice Statistics. The percentage of households with a firearm was a validated proxy (the percentage of suicides that are firearm suicides) derived from Centers for Disease Control and Prevention National Vital Statistics Data.[33]

## RESULTS

Between 1990 and 2017, there were 69 high-fatality mass shootings (≥ 6 victims shot to death) in the United States. Of these, 44 (64%) involved LCMs, 16 did not (23%), and for 9 (13%) we could not determine whether LCMs were used (Table 1). The mean number of victims killed in the 44 LCM-involved high-fatality mass shootings was 11.8; including the unknowns resulted in that average falling to 11.0 (not shown). The mean number of victims killed in high-fatality mass shootings in which the perpetrator did not use an LCM was 7.3 (Table B, available as a supplement to the online version of this article at http://www.ajph.org); including the unknowns resulted in that average falling to 7.1 (not shown). When we excluded unknown cases, the data indicated that utilizing LCMs in high-fatality mass shootings resulted in a 62% increase in the mean death toll.

Data sets of mass shooting fatalities by their nature involve truncated data, with the mode generally being the baseline number of fatalities required to be included in the data set (6 fatalities in the current study). Our data

| TABLE 1—High-Fatality Mass Shootings in the United States, 1990–2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
| 1 | Jun 18, 1990 | Jacksonville | FL | Y | 9 | N | N |
| 2 | Jan 26, 1991 | Chimayo | NM | N | 7 | N | N |
| 3 | Aug 9, 1991 | Waddell | AZ | N | 9 | N | N |
| 4 | Oct 16, 1991 | Killeen | TX | Y | 23 | N | N |
| 5 | Nov 7, 1992 | Morro Bay and Paso Robles | CA | N | 6 | N | N |
| 6 | Jan 8, 1993 | Palatine | IL | N | 7 | N | N |
| 7 | May 16, 1993 | Fresno | CA | Y | 7 | N | N |
| 8 | Jul 1, 1993 | San Francisco | CA | Y | 8 | N | N |
| 9 | Dec 7, 1993 | Garden City | NY | Y | 6 | N | N |
| 10 | Apr 20, 1999 | Littleton | CO | Y | 13 | Y | Y |
| 11 | Jul 12, 1999 | Atlanta | GA | U | 6 | Y | Y |
| 12 | Jul 29, 1999 | Atlanta | GA | Y | 9 | Y | Y |
| 13 | Sep 15, 1999 | Fort Worth | TX | Y | 7 | Y | Y |
| 14 | Nov 2, 1999 | Honolulu | HI | Y | 7 | Y | Y |
| 15 | Dec 26, 2000 | Wakefield | MA | Y | 7 | Y | Y |
| 16 | Dec 28, 2000 | Philadelphia | PA | Y | 7 | Y | Y |
| 17 | Aug 26, 2002 | Rutledge | AL | N | 6 | Y | Y |
| 18 | Jan 15, 2003 | Edinburg | TX | U | 6 | Y | Y |
| 19 | Jul 8, 2003 | Meridian | MS | N | 6 | Y | Y |
| 20 | Aug 27, 2003 | Chicago | IL | N | 6 | Y | Y |
| 21 | Mar 12, 2004 | Fresno | CA | N | 9 | Y | Y |
| 22 | Nov 21, 2004 | Birchwood | WI | Y | 6 | N | N |
| 23 | Mar 12, 2005 | Brookfield | WI | Y | 7 | N | N |
| 24 | Mar 21, 2005 | Red Lake | MN | Y | 9 | N | N |
| 25 | Jan 30, 2006 | Goleta | CA | Y | 7 | Y | N |
| 26 | Mar 25, 2006 | Seattle | WA | Y | 6 | N | N |
| 27 | Jun 1, 2006 | Indianapolis | IN | Y | 7 | N | N |
| 28 | Dec 16, 2006 | Kansas City | KS | N | 6 | N | N |
| 29 | Apr 16, 2007 | Blacksburg | VA | Y | 32 | N | N |
| 30 | Oct 7, 2007 | Crandon | WI | Y | 6 | N | N |
| 31 | Dec 5, 2007 | Omaha | NE | Y | 8 | N | N |
| 32 | Dec 24, 2007 | Carnation | WA | U | 6 | N | N |
| 33 | Feb 7, 2008 | Kirkwood | MO | Y | 6 | N | N |
| 34 | Sep 2, 2008 | Alger | WA | U | 6 | N | N |
| 35 | Dec 24, 2008 | Covina | CA | Y | 8 | Y | N |
| 36 | Jan 27, 2009 | Los Angeles | CA | N | 6 | Y | N |
| 37 | Mar 10, 2009 | Kinston, Samson, and Geneva | AL | Y | 10 | N | N |
| 38 | Mar 29, 2009 | Carthage | NC | N | 8 | N | N |
| 39 | Apr 3, 2009 | Binghamton | NY | Y | 13 | Y | N |
| 40 | Nov 5, 2009 | Fort Hood | TX | Y | 13 | N | N |
| 41 | Jan 19, 2010 | Appomattox | VA | Y | 8 | N | N |

*Continued*

**TABLE 1—Continued**

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|----------|------|------|-------|-----|-------------|---------------|------------------------------|
| 42 | Aug 3, 2010 | Manchester | CT | Y | 8 | N | N |
| 43 | Jan 8, 2011 | Tucson | AZ | Y | 6 | N | N |
| 44 | Jul 7, 2011 | Grand Rapids | MI | Y | 7 | N | N |
| 45 | Aug 7, 2011 | Copley Township | OH | N | 7 | N | N |
| 46 | Oct 12, 2011 | Seal Beach | CA | N | 8 | Y | N |
| 47 | Dec 25, 2011 | Grapevine | TX | N | 6 | N | N |
| 48 | Apr 2, 2012 | Oakland | CA | N | 7 | Y | N |
| 49 | Jul 20, 2012 | Aurora | CO | Y | 12 | N | N |
| 50 | Aug 5, 2012 | Oak Creek | WI | Y | 6 | N | N |
| 51 | Sep 27, 2012 | Minneapolis | MN | Y | 6 | N | N |
| 52 | Dec 14, 2012 | Newtown | CT | Y | 27 | N | N |
| 53 | Jul 26, 2013 | Hialeah | FL | Y | 6 | N | N |
| 54 | Sep 16, 2013 | Washington | DC | N | 12 | Y | N |
| 55 | Jul 9, 2014 | Spring | TX | Y | 6 | N | N |
| 56 | Sep 18, 2014 | Bell | FL | U | 7 | N | N |
| 57 | Feb 26, 2015 | Tyrone | MO | U | 7 | N | N |
| 58 | May 17, 2015 | Waco | TX | Y | 9 | N | N |
| 59 | Jun 17, 2015 | Charleston | SC | Y | 9 | N | N |
| 60 | Aug 8, 2015 | Houston | TX | U | 8 | N | N |
| 61 | Oct 1, 2015 | Roseburg | OR | Y | 9 | N | N |
| 62 | Dec 2, 2015 | San Bernardino | CA | Y | 14 | Y | N |
| 63 | Feb 21, 2016 | Kalamazoo | MI | Y | 6 | N | N |
| 64 | Apr 22, 2016 | Piketon | OH | U | 8 | N | N |
| 65 | Jun 12, 2016 | Orlando | FL | Y | 49 | N | N |
| 66 | May 27, 2017 | Brookhaven | MS | U | 8 | N | N |
| 67 | Sep 10, 2017 | Plano | TX | Y | 8 | N | N |
| 68 | Oct 1, 2017 | Las Vegas | NV | Y | 58 | N | N |
| 69 | Nov 5, 2017 | Sutherland Springs | TX | Y | 25 | N | N |

*Note.* LCM = large-capacity magazine; N = no; U = unknown; Y = yes. From September 13, 1994, until and including September 12, 2004, each and every state, including the District of Columbia, was subject to a ban on LCMs pursuant to the federal assault weapons ban. To collect the data in Table 1, we searched the following news media resources for every shooting that resulted in 6 or more fatalities: America's Historical Newspapers, EBSCO, Factiva, Gannett Newsstand, Google News Archive, Lexis-Nexis, Newspaper Archive, Newspaper Source Plus, Newspapers.com, Newswires, ProQuest Historical Newspapers, and ProQuest Newsstand. We also reviewed mass shooting data sets maintained by *Mother Jones*, the *New York Times*, and *USA Today*. In addition to news media sources, we reviewed reports on mass shootings produced by think tank, policy advocacy, and governmental organizations, including the US Federal Bureau of Investigation Supplementary Homicide Reports, the crowdsourced Mass Shooting Tracker, and the open-source databases maintained by the Gun Violence Archive and the Stanford University Geospatial Center. Finally, when it was relevant, we also reviewed court records as well as police, forensic, and autopsy reports. As a general rule, when government sources were available, they were preferred over other sources. Furthermore, when media sources conflicted on the number of casualties or the weaponry involved, the later sources were privileged (as later reporting is often more accurate).

set of high-fatality mass shootings was no exception. As such, the median average number of fatalities for each subset of incidents—those involving and those not involving LCMs—was necessarily lower than the mean average. Nevertheless, like the mean average, the median average was higher when LCMs were employed—a median average of 8 fatalities per incident compared with 7 fatalities per incident for attacks not involving LCMs.

For the 60 incidents in which it was known if an LCM was used, in 44 the perpetrator used an LCM. Of the 44 incidents in which the perpetrators used LCMs, 77% (34/44) were in nonban states. In the 16 incidents in which the perpetrators did not use LCMs, 50% (8/16) were in nonban states (Table B, available as a supplement to the online version of this article at http://www.ajph.org). Stated differently, in nonban states, 81% (34/42) of high-fatality mass shooting perpetrators used LCMs; in LCM-ban states, only 55% (10/18) used LCMs.

The rate of high-fatality mass shootings increased considerably after September 2004 (when the federal assault weapons ban expired). In the 10 years the federal ban was in effect, there were 12 high-fatality mass shootings and 89 deaths (an average of 1.2 incidents and 8.9 deaths per year). Since then, through 2017, there have been 48 high-fatality mass shootings and 527 deaths (an average of 3.6 incidents and 39.6 deaths per year in these 13.3 years).

Of the 69 high-fatality mass shootings from 1990 to 2017, 49 occurred in states without an LCM ban in effect at the time and 20 in states with a ban in effect at the time. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 11.7 per billion population; the annual incidence rate for high-fatality mass shootings in states with an LCM ban was 5.1 per billion population. In that 28-year period, the rate of high-fatality mass shootings per capita was 2.3 times higher in states without an LCM ban (Table 2).

Non–LCM ban states had not only more incidents but also more deaths per incident (10.9 vs 8.2). The average annual number of high-fatality mass shooting deaths per billion population in the non–LCM ban states was 127.4. In the LCM ban states, it was 41.6 (Table 2).

For the time period beginning with the first full calendar year following the expiration of the federal assault weapons ban (January 1, 2005–December 31, 2017), there were 47 high-fatality mass shootings in the United States. Of these, 39 occurred in states where an LCM ban was not in effect, and 8 occurred in LCM ban locations. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 13.2 per billion population; for states with an LCM ban, it was 7.4 per billion population (Table 2). During this period, non–LCM ban states had not only more incidents but also more deaths per incident (11.4 vs 9.4). In terms of high-fatality mass shooting deaths per billion population, the annual number of deaths in the non–LCM ban states was 150.6; in the LCM ban states it was 69.2 (Table 2).

When we limited the analysis solely to high-fatality mass shootings that definitely involved LCMs, the differences between ban and nonban states became larger. For example, for the entire period of 1990 to 2017, of the 44 high-fatality mass shootings that involved LCMs, the annual incidence rate for LCM-involved high-fatality mass shootings in nonban states was 8.1 per billion population; in LCM-ban states it was 2.5 per billion population. The annual rate of high-fatality mass shooting deaths in the non–LCM ban states was 102.1 per billion population; in the LCM ban state it was 23.3. In terms of LCM-involved high-fatality mass shootings, we also found comparable wide differences in incidence and fatality rates between ban and nonban states for the post–federal assault weapons ban period (2005–2017; Table 2).

We found largely similar results in the multivariate analyses (1990–2017). States that did not ban LCMs were significantly more likely to experience LCM-involved high-fatality mass shootings as well as more likely to experience any high-fatality mass shootings (regardless of whether an LCM was involved). States that did not ban LCMs also experienced significantly more deaths from high-fatality mass shootings, operationalized as the absolute number of fatalities (Table 3).

When the LCM bans were separated into federal and state bans, both remained significantly related to the incidence of LCM-involved high-fatality mass shooting events and to the number of LCM-involved high-fatality mass shooting deaths. The associations between federal and state bans and

TABLE 2—High-Fatality Mass Shootings (≥ 6 Victims Shot to Death) by Whether LCM Bans Were in Effect: United States, 1990–2017

|  | Average Annual Population, No. (Millions) | Total Incidents, No. | Annual Incidents per Billion Population, No. | Total Deaths, No. | Annual Deaths per Billion Population, No. | Deaths per Incident, No. |
|---|---|---|---|---|---|---|
| All high-fatality mass shootings, 1990–2017 (28 y) |  |  |  |  |  |  |
| Non–LCM ban states | 149.7 | 49 | 11.7 | 534 | 127.4 | 10.9 |
| LCM ban states | 140.7 | 20 | 5.1 | 164 | 41.6 | 8.2 |
| All high-fatality mass shootings, 2005–2017 (13 y) |  |  |  |  |  |  |
| Non–LCM ban states | 227.8 | 39 | 13.2 | 446 | 150.6 | 11.4 |
| LCM ban states | 83.4 | 8 | 7.4 | 75 | 69.2 | 9.4 |
| LCM-involved high-fatality mass shootings, 1990–2017 (28 y) |  |  |  |  |  |  |
| Non–LCM ban states | 149.7 | 34 | 8.1 | 428 | 102.1 | 12.6 |
| LCM ban states | 140.7 | 10 | 2.5 | 92 | 23.3 | 9.2 |
| LCM-involved high-fatality mass shootings, 2005–2017 (13 y) |  |  |  |  |  |  |
| Non–LCM ban states | 227.8 | 28 | 9.5 | 369 | 124.6 | 13.2 |
| LCM ban states | 83.4 | 4 | 3.7 | 42 | 38.7 | 10.5 |
| Non-LCM high-fatality mass shootings, 1990–2017 (28 y) |  |  |  |  |  |  |
| Non–LCM ban states | 149.7 | 8 | 1.9 | 56 | 13.4 | 7.0 |
| LCM ban states | 140.7 | 8 | 2.0 | 60 | 15.2 | 7.5 |

Note. LCM = large-capacity magazine.

**TABLE 3—Multivariate Results of the Relationship Between LCM Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Combined Federal and State Large Capacity Magazine Bans: United States**

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| All LCM bans (federal and state) | −2.217 (−3.493, −0.940) | −5.912 (−9.261, −2.563) | −1.283 (−2.147, −0.420) | −3.660 (−5.695, −1.624) |
| Population density | −0.011 (−0.052, 0.031) | 0.013 (−0.068, 0.095) | 0.001 (−0.003, 0.006) | 0.011 (−0.005, 0.026) |
|  % aged 19–24 y | −0.480 (−1.689, 0.730) | −2.496 (−5.893, 0.901) | 0.283 (−0.599, 1.164) | −0.585 (−2.666, 1.495) |
|  % aged 25–34 y | −0.801 (−1.512, −0.089) | −2.390 (−4.391, −0.388) | −0.337 (−0.871, 0.197) | −1.114 (−2.463, 0.235) |
|  % Black | −0.227 (−1.062, 0.607) | −0.654 (−2.831, 1.522) | −0.163 (−0.703, 0.377) | −0.261 (−1.391, 0.870) |
|  % with a bachelor's degree or higher | −0.009 (−0.492, 0.474) | −0.469 (−1.590, 0.652) | 0.143 (−0.214, 0.501) | 0.183 (−0.715, 1.081) |
| Percentage of households with a firearm (proxy) | −0.047 (−0.195, 0.101) | −0.147 (−0.546, 0.251) | −0.020 (−0.131, 0.091) | −0.084 (−0.368, 0.200) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.072 (−0.293, 0.149) | −0.476 (−1.081, 0.129) | 0.041 (−0.135, 0.216) | −0.182 (−0.628, 0.263) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.012, 0.001) | −0.007 (−0.017, 0.004) | −0.001 (−0.006, 0.003) | −0.003 (−0.012, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.31 | 0.16 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.49.
[a]Logit regression.
[b]Negative binomial regression.

the overall incidence of all high-fatality mass shootings as well as the total number of victims in these events remained strongly negative but was only sometimes statistically significant (Table 4).

In terms of sensitivity analyses, using probit instead of logit gave us similar results (not shown). When the outcome variable was the number of high-fatality mass shooting deaths, we obtained largely similar results concerning the association between LCM bans and the outcome variables, regardless of whether we used Poisson or negative binomial regression (not shown). Moreover, replacing the linear yearly trend with a quadratic function did not change the major results of the analyses (not shown). Variance inflation factors for all the independent variables never exceeded 10.0, with the variance inflation factor for LCM ban variables always being less than 2.0, indicating that there were no significant multicollinearity issues (Tables 3 and 4).

## DISCUSSION

In the United States, LCMs are disproportionately used in high-fatality mass shootings (incidents in which ≥ 6 victims are shot to death). In at least 64% of the incidents

since 1990, perpetrators used LCMs. (For 23%, we determined that they did not involve LCMs, and a determination could not be made for the remaining 13%.) Previous research has shown that LCM firearms are used in a high share of mass murders (typically defined as ≥ 4 homicides) and murders of police.[9]

We could not find reliable estimates of LCM firearms in the US gun stock. However, it is likely much lower than 64%, given that commonly owned firearms such as revolvers, bolt-action rifles, and shotguns are not typically designed to be LCM-capable. During the decade the federal assault weapons ban was in effect, no firearms were legally manufactured with LCMs for sale in the United States. In the postban era, semiautomatic firearms, especially pistols, are often sold with factory-issue LCMs, but firearms that are not semiautomatic are not sold with such magazines.

Why do we find LCMs so prominent among high-fatality mass shootings? We suspect there are 2 main reasons. The first is that perpetrators probably deliberately select LCMs because they facilitate the ability to fire many rounds without having to stop to reload. The second reason is that the ability of shooters to kill many victims—especially the 6 victims required to be included in our data set—may be reduced if LCMs are not

available. In other words, the first explanation is that shooters perceive LCMs to be more effective at killing many people; the second explanation is that LCMs are indeed more effective at killing many people.

High-fatality mass shootings are not common, even in the United States. Between 1990 and 2017, there has been an average of 2.5 incidents per year, with an average of 25 people killed annually in such attacks. However, the number of incidents and the number of people killed per incident have been increasing since the end of the federal assault weapons ban.

In our study, we found that bans on LCMs were associated with both lower incidence of high-fatality mass shootings and lower fatality tolls per incident. The difference in incidence and overall number of fatalities between states, with and without bans, was even greater for LCM-involved high-fatality mass shootings.

The multivariate results are largely consistent with these bivariate associations. When we controlled for 10 independent variables often associated with overall crime rates, as well as state and year effects, states with LCM bans had lower rates of high-fatality mass shootings and fewer high-fatality mass shooting deaths. When we investigated federal and state bans separately in the multiple

**AJPH** OPEN-THEMED RESEARCH

TABLE 4—Multivariate Results of the Relationship Between Large Caliber Magazine Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Separate Federal and State Large Caliber Magazine Bans: United States

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| Federal LCM ban | −1.434 (−2.622, −0.245) | −3.571 (−7.103, −0.038) | −0.895 (−1.806, 0.016) | −2.570 (−4.902, −0.238) |
| State LCM bans | −2.603 (−4.895, −0.311) | −8.048 (−15.172, −0.925) | −1.277 (−2.977, 0.422) | −3.082 (−7.227, 1.064) |
| Population density | −0.012 (−0.055, 0.030) | −0.001 (−0.085, 0.083) | 0.001 (−0.003, 0.006) | 0.009 (−0.007, 0.024) |
| % aged 19–24 y | −0.311 (−1.499, 0.878) | −2.589 (−6.057, 0.879) | 0.342 (−0.551, 1.236) | −0.531 (−2.759, 1.698) |
| % aged 25–34 y | −0.812 (−1.532, −0.093) | −2.660 (−4.848, −0.471) | −0.323 (−0.864, 0.217) | −0.848 (−2.236, 0.539) |
| % Black | −0.229 (−1.101, 0.643) | −0.770 (−3.232, 1.693) | −0.150 (−0.698, 0.398) | −0.154 (−1.321, 1.013) |
| % with a bachelor's degree or higher | −0.031 (−0.447, 0.509) | −0.479 (−1.577, 0.618) | 0.156 (−0.199, 0.511) | 0.269 (−0.567, 1.106) |
| Percentage of households with a firearm (proxy) | −0.055 (−0.210, 0.101) | −0.227 (−0.651, 0.196) | −0.019 (−0.133, 0.094) | −0.107 (−0.399, 0.186) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.061 (−0.284, 0.162) | −0.420 (−1.041, 0.201) | 0.046 (−0.132, 0.224) | −0.157 (−0.619, 0.305) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.013, 0.000) | −0.012 (−0.026, 0.002) | −0.002 (−0.007, 0.003) | −0.003 (−0.014, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.30 | 0.15 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.45.
[a]Logit regression.
[b]Negative binomial regression.

regressions, both were significantly associated with the incidence of LCM-involved high-fatality mass shootings as well as the number of victims in LCM-involved attacks. The relationship between these bans, considered separately, and all high-fatality mass shooting incidence and deaths is often not statistically significant, although this may be attributable to lack of statistical power (number of observations) to find a statistically significant effect.

Our analysis provides answers to 4 important questions:

1. How often are LCMs used in high-fatality mass shootings? At minimum, 64% of high-fatality mass shootings perpetrated between 1990 and 2017 involved LCMs.
2. Are more people killed when LCMs are used? Yes, and the difference in our data set is substantial and statistically significant (11.8 vs 7.3). We should add that our results likely underestimate the difference because we have a truncated sample (we only examined incidents with at least 6 victim fatalities), compounded by the fact that the number of homicide incidents fell as the number of victims increased.
3. Do states with LCM bans experience high-fatality mass shootings involving LCMs at a lower rate and a lower fatality

count than those states with no such bans in effect? Yes. In fact, the effect is more pronounced for high-fatality mass shootings involving LCMs than for those not involving LCMs.
4. Do states with LCM bans experience high-fatality mass shootings (regardless of whether they involve LCMs) at a lower rate and a lower fatality count than states with no such bans in effect? Yes.

## Limitations

Our study had various limitations. First, although we carefully searched for every high-fatality mass shooting, it is possible that we might have missed some. Nevertheless, we suspect that this is unlikely, because it would mean that others who compiled lists have also missed the same ones, for we checked our list against multiple sources.

Second, our definition of a high-fatality mass shooting is a shooting that results in 6 or more fatal victims. A different threshold criterion (e.g., 6 or more people shot; 5 or more victims killed), might lead to somewhat different results. We expect that as the number of victims in a shooting increases, the likelihood that the perpetrator used an LCM

also increases. Indeed, of the 13 high-fatality mass shootings with 10 or more fatalities in our data set, 12 (92%) involved an LCM.

Third, although many high-fatality mass shootings tend to be highly publicized, in 13% of the incidents we reviewed, we could not determine whether an LCM was used. As a sensitivity analysis, we assessed the assumptions that all of the unknown cases first did, and then did not, involve LCMs. Neither assumption appreciably changed our main results (not shown).

Fourth, as a general rule, clustering standard errors is most appropriate when there is a large number of treated units. Although during the decade of the federal assault weapons bans all 50 states plus the District of Columbia regulated LCMs, during the remaining time periods under examination, only 8 jurisdictions regulated LCMs. As a result, there is the possibility that the standard errors were underestimated in our analyses.[34]

Fifth, there were only 69 events that met our criterion for a "high-fatality mass shooting." Although 69 is a horrific number of incidents, for statistical purposes, it is a relatively small number and limits the power to detect significant associations. For example, we did not have the statistical power (and thus did not even try) to determine whether

different aspects of the various LCM laws might have differential effects on the incidence of high-fatality mass shootings. Moreover, because of suboptimal statistical power, there is also the possibility that the magnitude of the effects detected was overestimated.[35]

## Public Health Implications

LCMs increase the ability to fire large numbers of bullets without having to pause to reload. Any measure that can force a pause in an active shooting—creating opportunities for those in the line of fire to flee, take cover, or physically confront a gunman—offers a possibility of reducing the number of victims in such an attack. To put it in different terms, if the only firearms available were 18th-century muskets, it is doubtful that mass shootings would be the social problem they are today.

The impact of individual state firearm laws is reduced by the fact that guns often move across state lines—occasionally purchased in locales with more permissive laws and taken to states with more restrictive laws. This is partly why efforts aimed at reducing the frequency and lethality of mass shootings must necessarily be multifaceted and multidisciplinary. Legal restrictions on firearms are merely a part of this broader, public health approach. That being said, the theory behind reducing the availability of LCMs to reduce the number of victims in mass shootings makes sense, and our empirical results, consistent with much of the limited literature on mass shootings, suggest that LCM bans have been effective in saving lives. AJPH

## CONTRIBUTORS
L. Klarevas and D. Hemenway designed the study, collected the data, and contributed equally to all parts of the study. A. Conner ran the statistical analyses and helped construct the tables that report the results of the multivariate analyses. All authors approved the final article as submitted.

## ACKNOWLEDGMENTS
The authors would like to thank John Berrigan, research assistant at the Harvard Injury Control Research Center, for his assistance with the undertaking of this study.

## CONFLICTS OF INTEREST
L. Klarevas has, in the past 2 years, served as an expert to the states of Colorado and California in civil litigation that involved the constitutionality of state restrictions on large-capacity magazines. The authors have no additional conflicts of interest to report.

## HUMAN PARTICIPANT PROTECTION
No protocol approval was needed because no human participants were involved in this study.

## REFERENCES
1. Wintemute GJ. How to stop mass shootings. *N Engl J Med*. 2018;379(13):1193–1196.

2. Reeping PM, Cerda M, Kalesan B, Wiebe DJ, Galea S, Branas CC. State gun laws, gun ownership, and mass shootings in the US: cross sectional time series. *BMJ*. 2019; 364(8190):1542–1548.

3. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. October 5, 2017. Available at: https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed June 10, 2019.

4. Kamerow D. Guns don't kill crowds, people with semi-automatics do. *BMJ*. 2011;342(1):d477.

5. Barry CL, Webster DW, Stone E, Crifasi CK, Vernick JS, McGinty EE. Public support for gun violence prevention policies among gun owners and non–gun owners in 2017. *Am J Public Health*. 2018;108(7): 878–881.

6. Lenett MG. Taking a bite out of violent crime. *Univ Dayton Law Rev*. 1995;20(2):573–617.

7. Muchnick JY. The assault weapons ban: saving lives. *Univ Dayton Law Rev*. 1995;20(2):641–651.

8. Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001;17(1):33–74.

9. Koper CS, Johnson WD, Nicholas JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. *J Urban Health*. 2018;95(3):313–321.

10. Giffords Law Center to Prevent Gun Violence. Large capacity magazines. Available at: http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines. Accessed June 10, 2019.

11. Giffords Law Center to Prevent Gun Violence. Assault weapons. Available at: https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons. Accessed June 10, 2019.

12. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. *Arch Surg*. 1992;127(6): 694–698.

13. Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. *J Quant Criminol*. 2001;17(1):81–88.

14. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. *J Trauma Acute Care Surg*. 2014;76(1):2–9.

15. Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. *J Trauma Acute Care Surg*. 2017;84(1):58–65.

16. McCullough J. *The Ultimate Guide to US Army Combat Skills, Tactics and Techniques*. New York, NY: Skyhorse; 2012.

17. Fox JA, DeLateur MJ. Mass shootings in America: moving beyond Newtown. *Homicide Stud*. 2014;18(1): 125–145.

18. Krouse WJ, Richardson DJ. Mass murder with firearms: incidents and victims, 1999–2013. CRS Report R.44126. Washington, DC: Congressional Research Service; 2015.

19. Wilson LC. *The Wiley Handbook of the Psychology of Mass Shootings*. Hoboken, NJ: Wiley; 2016.

20. Klarevas L. *Rampage Nation: Securing America From Mass Shootings*. Amherst, NY: Prometheus; 2016.

21. Schildkraut J, Elsass HJ. *Mass Shootings: Media, Myths, and Realities*. Denver, CO: Praeger; 2016.

22. Schildkraut J. *Mass Shootings in America: Understanding the Debates, Causes, and Responses*. Denver, CO: ABC-CLIO; 2018.

23. Rocque M, Duwe G. Rampage shootings: an historical, empirical, and theoretical overview. *Curr Opin Psychol*. 2018;19(1):28–33.

24. Phaneuf SW. Mass shootings: understanding the complexities. In: Hilinski-Rosick CM, Lee DR, eds. *Contemporary Issues in Victimology: Identifying Patterns and Trends*. New York, NY: Lexington; 2018.

25. Moody CE, Marvell TB. Clustering and standard error bias in fixed effects panel data regressions. *J Quant Crim*; 2018:1–23.

26. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Appl Econ Lett*. 2015;22(4):281–284.

27. Blau BM, Gorry DH, Wade C. Guns, laws and public shootings in the United States. *Appl Econ*. 2016;48(49): 4732–4746.

28. Follman M, Aronsen G, Pan D. A guide to mass shootings in America. *Mother Jones*. May 31, 2019. Available at: https://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed June 10, 2019.

29. Kleck G. Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages. *Justice Res Policy*. 2016;17(1):28–47.

30. Webster DW, Donohue JJ, Klarevas L, et al. Firearms on college campuses: research evidence and policy implications. Report of the Johns Hopkins University Center for Gun Policy and Research. Baltimore, MD: Johns Hopkins Bloomberg School of Public Health; 2016.

31. Kleck G. *Targeting Guns: Firearms and Their Control*. Hawthorne, NY: Aldine de Gruyter; 1997.

32. Hemenway D. *Private Guns, Public Health*. Ann Arbor, MI: University of Michigan Press; 2017.

33. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership: measurement, structure and trends. *J Quant Criminol*. 2004;20(1):43–62.

34. Conley TG, Taber CR. Inference with "difference in differences" with a small number of policy changes. *Rev Econ Stat*. 2011;93(1):113–125.

35. Button KS, Ioannidis JPA, Mokrysz C, et al. Power failure: why small sample size undermines the reliability of neuroscience [erratum *Nat Rev Neurosci*. 2013;14(6):451]. *Nat Rev Neurosci*. 2013;14(5):365–376.

# EXHIBIT G

AAST 2018 PODIUM PAPER

Downloaded from https://journals.lww.com/jtrauma by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSFl4Cf3VC4/OAVpDDa8K8LYe4+2aMrsGRCwJKtFmu0=K2MtVb4jR6oCr+TGrvOkF on 01/07/2019

# Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data

**Charles DiMaggio, PhD, MPH, Jacob Avraham, MD, Cherisse Berry, MD, Marko Bukur, MD, Justin Feldman, ScD, Michael Klein, MD, Noor Shah, MD, Manish Tandon, MD,** *and* **Spiros Frangos, MD, MPH**, *New York, New York*

## AAST Continuing Medical Education Article

### Accreditation Statement

This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education through the joint providership of the American College of Surgeons and the American Association for the Surgery of Trauma. The American College of Surgeons is accredited by the ACCME to provide continuing medical education for physicians.

### *AMA PRA Category 1 Credits™*

The American College of Surgeons designates this journal-based CME activity for a maximum of 1 *AMA PRA Category 1 Credit™*. Physicians should claim only the credit commensurate with the extent of their participation in the activity.

Of the *AMA PRA Category 1 Credit™* listed above, a maximum of 1 credit meets the requirements for self-assessment.

### Credits can only be claimed online



AMERICAN COLLEGE OF SURGEONS
*Inspiring Quality:*
*Highest Standards, Better Outcomes*
100+*years*

### Objectives

After reading the featured articles published in the *Journal of Trauma and Acute Care Surgery*, participants should be able to demonstrate increased understanding of the material specific to the article. Objectives for each article are featured at the beginning of each article and online. Test questions are at the end of the article, with a critique and specific location in the article referencing the question topic.

### Claiming Credit

To claim credit, please visit the AAST website at http://www.aast.org/ and click on the "e-Learning/MOC" tab. You must read the article, successfully complete the post-test and evaluation. Your CME certificate will be available immediately upon receiving a passing score of 75% or higher on the post-test. Post-tests receiving a score of below 75% will require a retake of the test to receive credit.

### System Requirements

The system requirements are as follows: Adobe® Reader 7.0 or above installed; Internet Explorer® 7 and above; Firefox® 3.0 and above, Chrome® 8.0 and above, or Safari™ 4.0 and above.

### Questions

If you have any questions, please contact AAST at 800-789-4006. Paper test and evaluations will not be accepted.

### Disclosure Information

In accordance with the ACCME Accreditation Criteria, the American College of Surgeons, as the accredited provider of this journal activity, must ensure that anyone in a position to control the content of *J Trauma Acute Care Surg* articles selected for CME credit has disclosed all relevant financial relationships with any commercial interest. Disclosure forms are completed by the editorial staff, associate editors, reviewers, and all authors. The ACCME defines a `commercial interest' as "any entity producing, marketing, re-selling, or distributing health care goods or services consumed by, or used on, patients." "Relevant" financial relationships are those (in any amount) that may create a conflict of interest and occur within the 12'months preceding and during the time that the individual is engaged in writing the article. All reported conflicts are thoroughly managed in order to ensure any potential bias within the content is eliminated. However, if you'perceive a bias within the article, please report the circumstances on the evaluation form.

Please note we have advised the authors that it is their responsibility to disclose within the article if they are describing the use of a device, product, or drug that is not FDA approved or the off-label use of an approved device, product, or drug or unapproved usage.

### Disclosures of Significant Relationships with Relevant Commercial Companies/Organizations by the Editorial Staff

Ernest E. Moore, Editor: PI, research support and shared U.S. patents Haemonetics; PI, research support, Instrumentation Laboratory, Inc.; Co-founder, Thrombo Therapeutics. Associate Editors David Hoyt, Ronald V. Maier and Steven Shackford have nothing to disclose. Editorial staff and Angela Sauaia have nothing to disclose.

### Author Disclosures

The authors have nothing to disclose.

### Reviewer Disclosures

The reviewers have nothing to disclose.

### Cost

For AAST members and *Journal of Trauma and Acute Care Surgery* subscribers there is no charge to participate in this activity. For those who are not a member or subscriber, the cost for each credit is $25.

From the Department of Surgery, Division of Trauma and Critical Care Surgery (C.D., J.A., C.B., M.B., J.F., M.K., N.S., M.T., S.F.), New York University School of Medicine, New York, New York.

Address for reprints: Charles DiMaggio, PhD, MPH, Department of Surgery, New York University School of Medicine, 462 First Ave, NBV 15, New York, NY 10016-9196; email: Charles.DiMaggio@nyumc.org.

77th Annual Meeting of AAST and the World Trauma Congress, Sep 26 - 29, 2018, San Diego, California.

DOI: 10.1097/TA.0000000000002060

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

| | |
|---|---|
| **BACKGROUND:** | A federal assault weapons ban has been proposed as a way to reduce mass shootings in the United States. The Federal Assault Weapons Ban of 1994 made the manufacture and civilian use of a defined set of automatic and semiautomatic weapons and large capacity magazines illegal. The ban expired in 2004. The period from 1994 to 2004 serves as a single-arm pre-post observational study to assess the effectiveness of this policy intervention. |
| **METHODS:** | Mass shooting data for 1981 to 2017 were obtained from three well-documented, referenced, and open-source sets of data, based on media reports. We calculated the yearly rates of mass shooting fatalities as a proportion of total firearm homicide deaths and per US population. We compared the 1994 to 2004 federal ban period to non-ban periods, using simple linear regression models for rates and a Poison model for counts with a year variable to control for trend. The relative effects of the ban period were estimated with odds ratios. |
| **RESULTS:** | Assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8–88.9) in 44 mass-shooting incidents. Mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides (coefficient for year, 0.7; $p = 0.0003$), with increment in year alone capturing over a third of the overall variance in the data (adjusted $R^2 = 0.3$). In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides ($p = 0.03$). Mass-shooting fatalities were 70% less likely to occur during the federal ban period (relative rate, 0.30; 95% confidence interval, 0.22–0.39). |
| **CONCLUSION:** | Mass-shooting related homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004. (*J Trauma Acute Care Surg.* 2019;86: 11–19. Copyright © 2018 American Association for the Surgery of Trauma.) |
| **LEVEL OF EVIDENCE:** | Observational, level II/IV. |
| **KEY WORDS:** | Firearms; mass-shootings; assault weapons; epidemiology. |

Increases in firearm-related injuries, particularly mass-shooting related fatalities, in the United States have contributed to a polarizing and sometimes contentious debate over gun ownership and limiting weapons characterized as assault weapons.[1,2] Despite the increasing sense that there is an epidemic of indiscriminate firearm violence in our schools and public spaces, there is a paucity of public health evidence on the topic. Among a number of recommendations, a federal Assault Weapons Ban (AWB) has been proposed as a way to prevent and control mass shootings in the United States. In this article, we assess evidence for the effectiveness of such a ban in preventing or controlling mass-shooting homicides in the United States.

While mass shootings occur in other industrialized nations, the United States is particularly prone to these crimes. In a recent 30-year period, the United States had double the number of mass-shooting incidents than the next 24 industrialized nations combined.[3] Any public perception of recent increases in the number of these events is borne out by analysis of available data.[4] By one measure, there have been more deaths due to mass shootings in the United States in the past 18 years than in the entire 20th century.[5] While there is some debate about the role of mental illness in mass shootings,[6–8] many high-profile recent mass shootings (Aurora, CO; Roseburg, OR; San Bernadino, CA; Newtown, CT; Orlando; Las Vegas; Sutherland Springs, TX) have been characterized by the use of semiautomatic assault rifles,[9] leading some to advocate for restrictions on the manufacture and sale of these weapons.

While survey results indicate that researchers in criminology, law and public health rank an assault weapons ban as one of the most effective measures to prevent mass shootings, and that 67% of the US general population support such a ban,[10] the existing evidence on banning assault weapons is scant and sometimes contradictory. Most evidence is related to the Federal AWB of 1994, which made illegal the manufacture and use by civilians of a defined set of automatic and semiautomatic weapons and large capacity magazines. Formally known as "The Public Safety and Recreational Firearms Use Protection Act", the AWB was part of the broader "Violent Crime Control and Law Enforcement Act of 1994. The ban lasted 10 years, expiring in 2004 when the US Congress declined to renew it.

In a study soon following the implementation of the 1994 ban, researchers reported a 55% decrease in the recovery of assault weapons by the Baltimore City Police in the first 6 months of 1995, indicating a statistically significant 29 fewer firearms in the population.[11] In a 2009 study based on ICD9 external cause of injury codes for patients younger than 18 years in the United States, 11 states with assault and large-capacity magazine bans, as well as other firearm laws, were compared with 33 states without such restrictions. The incidence of firearm injuries per 1,000 total traumatic injuries was significantly lower in states with restrictive laws, 2.2 compared with 5.9.[12] In contrast, a comprehensive 2001 evaluation of the AWB itself concluded that there was "no evidence of reductions in multiple-victim gun homicides or multiple-gunshot wound victimizations". The authors cautioned their results should be "interpreted cautiously" because of the short period since the ban's inception, and that future assessments were warranted.[13] More recent studies, while not primarily addressing the US Federal AWB have found results generally consistent with its effectiveness in preventing mass-shooting fatalities.[14,15]

We believe sufficient time has passed and enough data have accumulated to treat the period from 1994 to 2004 as a naturalistic pre-post observational comparison period for the association of the AWB with changes in mass-shootings in the United States. Because there is no authoritative source or registry, or even a widely agreed upon definition for these incidents, we obtained data from three open source references and restricted our analyses to only those incidents confirmed by all three sources. We assess evidence for the potential effectiveness of such a ban in preventing and controlling mass-shooting homicides in the United States. We hypothesized that the implementation of the Federal AWB contributed to a reduction in mass shooting deaths as measured by the number and rate of mass shooting fatalities before, during, and after the federal AWB.

## METHODS

Mass incident shooting data were obtained from three independent, well-documented and referenced online sources: Mother Jones Magazine, the Los Angeles Times and Stanford

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

University.[16–18] These sources have each been the basis for a number of previous studies.[19–26] Data from the three open-source references were combined. Analyses were restricted to incidents reported by all three sources. Entries were further restricted to those for which four or more fatalities (not including the shooter) were reported, which meets the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Yearly homicide data were obtained from the US Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) an online database of fatal and nonfatal injury.[29] Because 2017 data were not yet available in the WISQARS system, data for firearm-related homicide data for that year were obtained from a separate online source.[30]

A variable was created to indicate the 1994 to 2004 period as the federal ban period. We attempted to identify incidents involving assault weapons. An assault weapon has been defined as semiautomatic rifle that incorporates military-style features such as pistol grips, folding stocks, and high-capacity detachable magazines.[31] In this study, assault weapons were identified using the text search terms "AK," "AR," "MCX," "assault," "assault," or "semiautomatic" in a text field for weapon details. These terms were based on descriptions of the federal assault ban legislative language.[32] The total number of mass shooting fatalities and injuries were aggregated by year and merged with the yearly firearm homicide data.

The rate of mass shooting fatalities per 10,000 firearm homicide deaths was calculated. For the years covered by the data sources, we calculated (1) the total and yearly number of mass-shooting incidents that met the strictest criteria and were confirmed by all three sources, (2) the number of all weapon (assault and nonassault weapons) mass-shooting fatalities, and (3) the case-fatality ratio of all-weapon mass-shooting fatalities per 100 total mass-shooting fatalities and injuries. The yearly case-fatality ratio was plotted with overlying Loess line for trend and standard error limits. We also plotted the yearly rate of mass shooting fatalities per 10,000 firearm-related homicides with an overlying simple linear model with year as the predictor for (1) the total period, and (2) for preban, ban, and postban periods.

We evaluated assumptions of normality and linearity of the data using graphical methods such as density plots and Q-Q normal plots as well as summary statistics. We tested the hypothesis that the federal ban period was associated with a decrease in the number and rate of mass-shooting fatalities in the United States with a multiple linear regression model, with total homicide-based mass-shooting fatality rate as the outcome variable, a dichotomous indicator variable for the federal ban period as the predictor variable, and year as a control variable for trend over time. We calculated the relative risk of mass shooting fatalities during the federal ban period compared to nonban periods by using the "epitab" function of the R "epitools" package. This estimate is based on the ratio of the fatality rate during the ban period divided by the fatality rate during the nonban period. All results are presented with two-sided $p$ values with a significance level of 0.05 and/or 95% confidence intervals (CI). We conducted subgroup analysis with data restricted to incidents in which an assault-type weapon was explicitly noted.

We conducted analyses to test the sensitivity of our results to the choice of denominator with linear regression models controlling for trend with yearly rates based on (1) CDC WISQARS homicide data ending in 2016, (2) extrapolated CDC WISQARS homicide data for 2017, and (3) population denominator-based rates. We tested the robustness of our underlying modeling assumptions with an alternate mixed-effects generalized linear model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion.

The study was determined to be exempt as nonidentifiable data. The study data and analytic code are available for download at http://www.injuryepi.org/styled-2/.

## RESULTS

The three data sources listed incidents ranging in number from 51 (LA Times) to 335 (Stanford) and in dates from 1966 (Stanford) to 2018 (LA Times). There were a total of 51 reported cases of mass shootings confirmed by all three sources. Forty-four of these incidents met the strictest criteria for mass shootings (4 or more killed), totaling 501 all-weapon fatalities. In total 1,460 persons were injured or killed over the 37-year period, for a total case-fatality ratio of 34.3% (95% CI, 31.9–36.8). The overall rate of mass shooting fatalities per 10,000 firearm-related homicides was 10.2 (95% CI, 9.4–11.2). There was an increase in the all-weapon yearly number of mass-shooting fatalities in the United States during the study period, (Fig. 1) and evidence of a decrease in case fatality in the post-2010 period (Fig. 2). Incidents in which weapons were characterized as assault rifles accounted for 430 or 85.8% of mass-shooting fatalities (95% CI, 82.8–88.9). Weapons characterized as assault rifles accounted for *all* mass-shooting fatalities in 15 (62.5%) of the 24 (95% CI, 42.6–78.9) years for which a mass-shooting incident was reported, accounting for a total of 230 fatalities in those years.

Between 1981 and 2017, mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides, with increment in year accounting for nearly 32% of the overall variance in the data. During the years in which the AWB was in effect, this slope decreased, with an increase in the slope of yearly mass-shooting homicides in the postban period



**Figure 1.** Mass shooting deaths. United States 1981–2017.

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.



**Figure 2.** Case fatality per 100 total mass-shooting injuries with loess smoothing line for trend and standard error bounds. United States 1981–2017.

(Fig. 3). A similar pattern was evident in data restricted to those incidents characterized as involving assault weapons (Fig. 4).

In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting–related deaths per 10,000 firearm homicides per year (Table 1). The model indicated that year and federal ban period alone accounted for nearly 40% of all the variation in the data (adjusted $R^2 = 0.37$). A subanalysis



**Figure 4.** Mass-shooting shooting deaths per 10,000 firearm-related homicides restricted to incidents involving assault weapons with linear trends for preban, ban, and postban periods. United States 1981–2017.

restricted to just those incidents characterized by the use of an assault weapon indicated that seven preventable deaths during the ban period were due to assault weapons alone (Table 2).

The risk of mass shooting fatalities during the federal van period was 53 per 140,515 total firearm homicides compared with 448 per 348,528 during the nonban periods, for a risk ratio of 0.30 (95% CI, 0.22–0.39). The calculated risk ratio for the association of the federal ban period with mass-shooting fatalities as a proportion of all firearm-related homicides was 0.29 (95% CI, 0.22–0.29), indicating that mass shooting fatalities were 70% less likely to occur during the federal ban period.

The results of our sensitivity analyses were consistent with our main analyses for total mass shooting fatalities. In a linear regression analysis controlling for yearly trend and restricted to the period ending in 2016 using just CDC WISQARS homicide data as the denominator, the effect of ban period was associated with a statistically significant eight fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.0; $p = 0.05$). In a similar model using extrapolated CDC WISQARS homicide data for 2017 instead of Online Gun Violence Archive data as the denominator, the effect of ban



**Figure 3.** Mass shooting deaths per 10,000 firearm-related homicides with linear trends for preban, ban, and postban periods. United States 1981–2017.

**TABLE 1.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | *t* | *p* |
|---|---|---|---|---|
| (Intercept) | −1409.4 | 333.0 | −4.2 | 0.0002 |
| Year | 0.7 | 0.2 | 4.3 | 0.0001 |
| Ban Period | −8.6 | 3.9 | −2.2 | 0.03 |

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

**TABLE 2.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths Characterized by Use of Assault Weapon per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | *t* | *p* |
|---|---|---|---|---|
| (Intercept) | −1219.7 | 333.9 | −3.7 | 0.0009 |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.6; $p = 0.03$). A model based on the total yearly US population as the denominator, the effect of ban period was associated with a statistically significant 0.4 fewer mass shooting related deaths per 10,000,000 population (coefficient for ban period, 0.4; $p = 0.02$).

The results of a mixed-effects generalized linear Poisson model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion were very similar whether the offset variable was the number of total firearm deaths or the population size. In either case, the assault weapons ban period was associated with an approximately 85% reduction in mass shooting fatalities (Table 3).

## DISCUSSION

Recently, 75% of members of the American College of Surgeons Committee on Trauma endorsed restrictions to "civilian access to assault rifles (magazine fed, semiautomatic, i.e., AR-15),"[33] and 76% of the Board of Governors were in favor of a limit to "… civilian access to ammunition designed for military or law enforcement use (that is, armor piercing, large magazine capacity)."[34] In 2015, the American College of Surgeons joined seven of the largest most prestigious professional health organizations in the United States and the American Bar Association to call for "restricting the manufacture and sale of military-style assault weapons and large-capacity magazines for civilian use."[35] This analysis adds evidence to support these recommendations.

No observational epidemiologic study can answer the question whether the 1994 US federal assault ban was causally related to preventing mass-shooting homicides. However, this study adds to the evidence by narrowly focusing our question on the potential effect of a national assault weapon ban on mass shootings as measured through the lens of case fatality. While the data are amenable to a number of additional analyses, such as stratification by location (e.g. school vs. nonschool) or by characterization of large-capacity magazines versus non large-capacity magazine, we chose to focus only on year of occurrence and total number of fatalities. In this way, we relied on the least subjective aspects of the published reports. We believe our results support the conclusion that the ban period was associated with fewer overall mass-shooting homicides. These results are also consistent with a similar study of the effect of a 1996 ban on assault type weapons in Australia after which mass-shooting fatalities dropped to zero.[36]

While the absolute effects of our regression analyses appears modest (7 to 9 fewer deaths per 10,000 firearm-homicides),

it must be interpreted in the context of the overall number of such fatalities, which ranges from none to 60 in any given year in our data. However, if our linear regression estimate of 9 fewer mass shooting–related deaths per 10,000 homicides is correct, an assault weapons ban would have prevented 314 of the 448 or 70% of the mass shooting deaths during the nonban periods under study. Notably, this estimate is roughly consistent with our odds ratio estimate and Poisson model results.

Our results add to the documentation that mass shooting–related homicides are indeed increasing, most rapidly in the postban period, and that these incidents are frequently associated with weapons characterized as assault rifles by the language of the 1994 AWB. We did not find an increase in the case fatality ratio of mass-shooting deaths to mass-shooting injuries. This might at first seem counterintuitive and paradoxical. The destructive effect of these weapons is unequivocal. They are engineered to cause maximum tissue damage rapidly to the greatest number of targets. However, it may be that the use of these kinds of weapons results in indiscriminate injury with additional rounds more likely to injure more people increasing the denominator in a case-fatality ratio. By contrast, the use of nonassault weapons may result in more precise targeting of victims. It is also possible that improvements in trauma care are driving down case fatality.[37] Also, it is worth noting that in absolute terms, there were many more fatalities outside the ban period and that survivable injury comes with its own physical, emotional, and economic costs, which have been estimated at US $32,237 per hospital admission.[38]

Despite US federal funding restrictions on firearm-related research dating to 1996,[39,40] there is a small but growing number of analyses of mass shooting violence in the United States. Many articles have focused on the mental health aspects of these incidents,[41–43] or on social effects like increased firearm acquisition following mass shootings.[44,45] However, fewer studies have taken a strictly public health or clinical approach. Among these, an autopsy-based study of the incidence and severity of mass-shooting casualties concluded the wound patterns differed sufficiently from combat injuries to require new management strategies, indicating there is much to be learned from a systematic epidemiological perspective.[46] Recently, there have been calls to remove such funding restrictions from both academics and elected officials from across the political spectrum.[47,48]

Our choice of data and analytic approach may reasonably be debated. We chose to base our analyses on the yearly rate of mass shooting fatalities per 10,000 overall firearm homicides. This is not a population-based risk estimate, but is in fact as commonly used in the epidemiologic literature which is essentially a probability statement, that is, the number of events

**TABLE 3.** Exponentiated Coefficients Generalized Linear Poisson Model

| Variable | Homicide Offset | | Population Offset | |
|---|---|---|---|---|
| | Estimate | 95% CI | Estimate | 95% CI |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

Effect of 1994–2004 federal assault weapon ban on mass-shooting death counts. United States, 1981–20017.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

that occurred over the number of times that event could occur. It is the risk of a homicide occurring as a result of a mass shooting. It may be considered a strong assumption to build mass shooting death rates based on the overall firearm homicide rate. The demographics of most homicide victims may differ appreciably from those of mass shooting victims. We selected this approach from among a number of imperfect potential denominators, believing that basing the rates on the number of firearm-homicides partly controls for secular trends in overall homicides and firearm availability. Our sensitivity analyses indicate that our results were robust to most any choice of denominator. We chose linear regression as our primary model because it was straightforward, accessible to most readers, accounted for linear trends in the data, and returned results in the metric in which we were most interested, that is, changes in the rate of fatalities. Our comparative Poisson model results were essentially consistent with the primary model.

These analyses are subject to a number of additional limitations and caveats, primary among which is that there is no authoritative source of data on mass shooting, and any one source may be biased and incomplete. It was for this reason that we chose to combine three independent sources of data, each with its own strengths and weaknesses, and base our analyses only on those numbers that were verified by all three sources. We further restricted our analyses to only the number of fatalities and the year in which the incident occurred, and to the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Even with this approach, the data remain imprecise and subject to differing definitions. We attempted to compensate for this by framing our questions as precisely as possible, following the advice of the scientist and statistician John Tukey to pursue, "… an approximate answer to the right question ...(rather) than the exact answer to the wrong question..."

In this study, we failed to falsify the hypothesis that the AWB was associated with a decrease in mass shooting fatalities in the United States. However, it is important to note that our model did not include important and potentially confounding factors like state-level and local differences in assault weapon laws following the sun downing of the federal AWB. Additional analyses including such variables and using approaches like propensity score matching and regression discontinuity[49] with data further aggregated to state and local levels are necessary to test the strength and consistency of our results.

Federally referenced denominator data were not available for the last year of the study. We chose to use data from the Online Gun Violence Archive to account for firearm homicide in 2017. This resource is a nonpartisan not-for-profit group founded and maintained by a retired computer systems analyst and gun advocate.[50] The alternative would have been to extrapolate from the CDC data, but the 15,593 firearm-related homicides reported by the Online Gun Violence Archive in 2017 was more consistent with the 14,415 reported by CDC in 2016 compared with the 11,599 predicted by an extrapolation and returned more conservative estimates of the increased rate of recent mass shootings. We note there were many years in which the number of mass-shooting fatalities is listed as zero. There were, in fact, fatalities and incidents in those years that could meet a definition of mass shooting, but they were not reported by all three sources, or did not meet the strict criteria we set for this analysis.

An assault weapon ban is not a panacea, nor do our analyses indicate that an assault weapon ban will result in fewer overall firearm-related homicides. It is important to recognize that suicides make up the majority of firearm-related deaths in the United States, accounting for 60.7% of 36,252 deaths from firearms in 2015.[51] However, while this is a critically important issue in its own right, suicides differ fundamentally from mass-shootings, and are unlikely to be affected by an assault weapons ban. Also, compared with the 501 mass-shooting fatalities we counted, there were 489,043 firearm-related homicides in the United States. Public health efforts should be directed at reducing all gun violence and must be multipronged, including targeted initiatives to address mental illness and reducing access to weapons in those with a propensity for violence. However, taken in the context of the increase in mass shootings in the United States, these results support the conclusion that the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States.

## DISCLOSURE

The authors have no conflicts of interest to declare.
There are no federal or nonfederal funding sources associated with this study.

## REFERENCES

1. Wolchover N. Why gun control is so contentious in the US. *LiveScience*. 20 July 2012 https://www.livescience.com/21741-gun-control-second-amendment.html. Accessed 10 August 2018.
2. Bond S. Students take the lead in US gun control debate. *Financial Times*. 23 February 2018. https://www.ft.com/content/9341021e-1818-11e8-9376-4a6390addb44. Accessed 10 August 2018.
3. Lemieux F. 6 things to know about mass shootings in America. *Scientific American*. 13 June 2016. https://www.scientificamerican.com/article/6-things-to-know-about-mass-shootings-in-america/. Accessed 6 June 2018.
4. Webster DW. The true effect of mass shootings on Americans. *Annals of Internal Medicine*. 16 May 2017. The http://annals.org/aim/fullarticle/2624992/true-effect-mass-shootings-americans. Accessed 6 June 2018.
5. Katsiyannis A, Whitford DK, Ennis RB. Historical examination of United States intentional mass school shootings in the 20th and 21st centuries: implications for students, schools, and society. *Child Fam Stud*. (19 April 2018). https://doi.org/10.1007/s10826-018-1096-2.
6. Follman M. Mass shootings: maybe what we need is a better mental-health policy. *Mother Jones*. 9 November 2012. https://www.motherjones.com/politics/2012/11/jared-loughner-mass-shootings-mental-illness/. Accessed 11 August 2018.
7. Carey B. "Are mass murderers insane? Usually not, researchers say". *New York Times*. 8 November 2017. https://www.nytimes.com/2017/11/08/health/mass-murderers-mental-illness.html. Accessed 11 August 2018.
8. Duwe G, Rocque M. Actually, there is a clear link between mass shootings and mental illness. *Los Angeles Times*. 23 February 2018. http://www.latimes.com/opinion/op-ed/la-oe-duwe-rocque-mass-shootings-mental-illness-20180223-story.html. Accessed 11 August 2018.
9. Gillin J, Greenberg J, Jacobson L, Valverde M. The facts on mass shootings in the United States. *Politifact*. 8 November 2017. http://www.politifact.com/truth-o-meter/article/2017/nov/08/facts-mass-shootings-united-states/. Access 6 June 2018.
10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. 5 October 2017. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed 6 June 2018.

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

11. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. *Am J Public Health*. 1997;87(2):297–298.

12. Safavi A, Rhee P, Pandit V, Kulvatunyou N, Tang A, Aziz H, Green D, O'Keeffe T, Vercruysse G, Friese RS, et al. Children are safer in states with strict firearm laws: a national inpatient sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150; discussion 150–1.

13. Koper CS, Roth JA. The impact of the 1994 Federal Assault Weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001; Vol. 17, No. 1.

14. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Applied Economics Letters*. 2015;22(4):281–284.

15. Lemieux F, Bricknell S, Prenzler T. Mass shootings in Australia and the United States, 1981-2013. *Journal of Criminological Research, Policy and Practice*. 1(3):131–142.

16. Follman M, Aronsen G, Pan D, Caldwell M. US mass shootings, 1982-2018: data from mother Jones' investigation. *Mother Jones*. 2012; https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. Accessed 3 June 2018.

17. The Los Angeles times staff. "Deadliest U.S. mass shootings", 1984-2017. *Los Angeles Times*. Oct 1, 2017, timelines latimes.com/deadliest-shooting-rampages/. Accessed 29 August 2018.

18. Stanford mass shootings in America, courtesy of the Stanford Geospatial Center and Stanford libraries. 2016. Available at: https://library.stanford.edu/projects/mass-shootings-america. Accessed 29 August 2018.

19. Fox JA, Levin J, Fridel EE. *Extreme Killing: Understanding Serial and Mass Murder*. Sage Publications; 2018.

20. Dillon L. *Mass Shootings in the U.S.: An Exploratory Study of the Trends from 1982–2012*. PhD thesis; 2014.

21. Lankford A. Public mass shooters and firearms: a cross-national study of 171 countries. *Violence Vict*. 2016;31(2):187.

22. Lowe SR, Galea S. The mental health consequences of mass shootings. *Trauma Violence Abuse*. 2017;18(1):62–82.

23. Fox JA, Fridel EE. The tenuous connections involving mass shootings, mental illness, and gun laws. *Violence Gend*. 2016;3(1):14–19.

24. Luca M, Malhotra DK, Poliquin C. The impact of mass shootings on gun policy. *Harvard Business School NOM Unit Working Paper No.* 2016;1:16–126.

25. Buchholtz LK. Command-directed mental health evaluations and mental health related discharges from the U.S. military: an argument for command authority. *J Health Care Finance*. 2016.

26. Bradley K. Code blue: the expanding field of tactical/battlefield medicine. *J Law Enforcement*. 2017;6(2).

27. Smart R. Mass shootings: definitions and trends. RAND Corporation. https://www.rand.org/research/gun-policy/analysis/supplementary/mass-shootings.html. Accessed 2 June 2018.

28. Krouse WJ, Richardson DJ. *Mass Murder with Firearms: Incidents and Victims, 1999–2013*. Washington, D.C.: Congressional Research Service, R44126 2015.

29. Centers for Disease Control and Prevention. CDC's WISQARS (web-based injury statistics query and reporting system). https://www.cdc.gov/injury/wisqars/fatal.html. Accessed 12 February 2018.

30. The online gun violence archive: past summary ledgers. http://www.gunviolencearchive.org/past-tolls. Accessed 12 February 2018.

31. Studdert DM, Donohue JJ, Mello MM. Testing the immunity of the firearm industry to tort litigation. *JAMA Intern Med*. 2017;177(1):102–105.

32. Public Safety and Recreational Firearms Act. P.L. 103-322, Title XI. 103rd Cong. (1994).

33. Kuhls DA, Campbell BT, Burke PA, Allee L, Hink A, Letton RW, Masiakos PT, Coburn M, Alvi M, Lerer TJ, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury: consensus and opportunities. *J Trauma Acute Care Surg*. 2017;82(5):877–886.

34. Puls M, Kuhls D, Campbell B, Burke P, Michelassi F, Stewart R. Survey of the American College of Surgeons Board of governors on firearm injury prevention: consensus and opportunities. *Bull Am Coll Surg*. 2017; 102(10):30–36.

35. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, Wilkerson D, Benjamin GC, Hubbard WC. Firearm-related injury and death in the U.S.: a call to action from 8 health professional organizations and the American Bar Association. *Ann Intern Med*. 2015;162(7):513–516.

36. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3):291–299.

37. DiMaggio C, Ayoung-Chee P, Shinseki M, Wilson C, Marshall G, Lee DC, Wall S, Maulana S, Leon Pachter H, Frangos S. Traumatic injury in the U.S.: in-patient epidemiology 2000-2011. *Injury*. 2016;47(7):1393–1403.

38. Peek-Asa C, Butcher B, Cavanaugh JE. Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the U.S. *Inj Epidemiol*. 2017; 4(1):20.

39. Wexler L. "gun shy: how a lack of funds translates to inadequate research on gun violence in America". *Hopkins Bloomberg Public Health Fall*. 2017; https://magazine.jhsph.edu/2017/fall/features/cassandra-crifasi-hopkins-moderate-gun-owner-gun-policy-researcher/how-the-dickey-amendment-affects-gun-violence-research.html. Access 5 June 2018.

40. Greenberg J. Spending bill's gun research line: does it nullify dickey amendment? *Politifact*. 27 March 2018. http://www.politifact.com/truth-o-meter/article/2018/mar/27/spending-bills-gun-research-line-does-it-matter/. Accessed 6 June 2018.

41. Pinals DA, Anacker L. Mental illness and firearms: legal context and clinical approaches. *Psychiatr Clin North Am*. 2016;39(4):611–621.

42. Leiner M, De la Vega I, Johansson B. Deadly mass shootings, mental health, and policies and regulations: what we are obligated to do!. *Front Pediatr*. 2018;6:99.

43. Swartz MS, Bhattacharya S, Robertson AG, Swanson JW. Involuntary outpatient commitment and the elusive pursuit of violence prevention. *Can J Psychiatry*. 2017;62(2):102–108.

44. Studdert DM, Zhang Y, Rodden JA, Hyndman RJ, Wintemute GJ. Handgun acquisitions in California after two mass shootings. *Ann Intern Med*. 2017; 166(10):698–706.

45. Stroebe W, Leander NP, Kruglanski AW. The impact of the Orlando mass shooting on fear of victimization and gun-purchasing intentions: not what one might expect. *PLoS One*. 2017;12(8):e0182408.

46. Smith ER, Shapiro G, Sarani B. The profile of wounding in civilian public mass shooting fatalities. *J Trauma Acute Care Surg*. 2016;81(1):86–92.

47. Behrman P, Redding CA, Raja S, Newton T, Beharie N, Printz D. Society of Behavioral Medicine (SBM) position statement: restore CDC funding for firearms and gun violence prevention research. *Transl Behav Med*. 2018.

48. Wong S. "GOP chairman: congress should rethink CDC ban on gun violence research". *The Hill*. 15 February 2018 http://thehill.com/homenews/house/374149-gop-chairman-congress-should-rethink-cdc-ban-on-gun-violence-research. Accessed 5 June 2018.

49. Basu S, Meghani A, Siddiqi A. Evaluating the health impact of large-scale public policy changes: classical and novel approaches. *Annu Rev Public Health*. 2017;38:351–370.

50. Drange M. The Kentucky gun owner who developed his own count of gun violence in the US. *The Guardian*. 23 April 2016. https://www.theguardian.com/world/2016/apr/23/kentucky-gun-owner-gun-violence-archive-mark-bryant. Accessed 5 June 2018.

51. Murphy SL, Xu J, Kochanek KD, Curtin SA, Elizabeth Arias E. *National Vital Statistics Reports*. Volume 66, Number 6 November 27, 2017. Deaths: Final Data for 2015. Centers for Disease Control and Prevention.

## DISCUSSION

**Ernest E. "Gene" Moore, MD** (Denver, Colorado): Thank you, Dr. Rotondo and Dr. Reilly. Can I please have the discussion video. [sounds of a gun shooting] Well, that is the AR15 rifle. Literally, 30 potential lethal shots delivered within 10 seconds. Is this safe to have in our society?

I congratulate Dr. DiMaggio and his colleagues from NYU for their superb presentation on a very timely issue. The AAST has had a long-term interest in reducing gun violence in the United States, and has recently published our 14-point approach. Access to assault rifles is one of them. At a reductionist level, mass shootings are the net result of (1) a deranged person intending to kill random individuals in a populated area, and (2) the use of an assault rifle. Since we seem to be unable to identify

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

the active shooter preemptively, we are left with the alternative solution of eliminating the weapon.

The presentation today provides evidence that a federal assault weapon ban can reduce mass shootings. According to our recent national trauma surgeon surveys, three-fourths of us in the audience, including me, would like to believe the analysis; but I think we need to consider some of the potential limitations.

Many of these issues relate to the fact that research support for gun violence control in the United States remains frustratingly suppressed and fundamentally inadequate. The general lack of information, low quality of data, and need to merge data sets from diverse sources – medical, coroner, police, legal, and behavioral – compounded by scarce funding and public controversy, undermine research to inform policy and enlighten the public. The fact that you had to compare three open-access databases to be certain that the reported mass shootings occurred underscores this deficiency.

Furthermore, there is no definition of a mass shooting, although you employed perhaps the most acceptable at the moment – the FBI's definition. Could you explain for us the rationale for this definition?

You present an analysis of 44 events with four or more deaths, including the shooter, from 1981 to 2017 – a 36-year period; whereas, others suggest a much higher incidence, such as Klaveras, who reported 69 shootings of six or more over the past 27 years.

Identifying all known mass shootings per year during a study period would be useful to appreciate the overall trends, as your data somewhat understates the magnitude of mass shootings in the United States.

You employed the Gun Violence Archive to estimate homicides in 2017. Why did you not use this source for mass shootings? The Archive has reported an alarming 261 mass shootings – defined as six or more shot – thus far in 2018. Nonetheless, in the sample you studied, assault rifles accounted for greater than 85 percent of the fatalities, and this is the key issue.

You have evaluated the impact of the federal assault rifle ban by analyzing the rate of mass shootings per 10,000 firearm homicide deaths per year to adjust for confounders. This would assume that the factors influencing mass shootings are the same as those for homicides, which seems very unlikely. You have idicated that you analyzed mass-shooting fatalities per population per year; perhaps you could elaborate more about this analysis.

Another confounder as acknowledged in the presentation is the impact of individual state limitations on magazine capacity. The first state to enforce these limitations was New Jersey in 1990, and now at least eight states and Washington, D.C., have these restrictions in effect. How can we distinguish the effects of this policy? And could this be a potential bridge to ultimately reestablish a national assault rifle ban?

You have also calculated the case fatality of all weapons in mass shootings per 100 total shootings, finding a decrease since 2010. While you conjecture this may be due to indiscriminate injury from assault rifles or possibly attributed to better trauma care, I am uncertain how this is relevant to the issue of banning assault rifles. The Las Vegas shooting is a cogent example of how these data may be misleading.

Finally, there is the issue of so-called falsification that could be addressed by examining other causes of trauma mortality during this time period.

In sum, this study adds to overwhelming evidence that assault rifles are an essential component in the dramatic escalation of mass shootings in the United States. While the scientific data to support a federal ban on civilian assault rifles is imperfect due to inadequate research support, I submit collectively the existing information argues strongly for enactment of this measure, and compliment the authors for their timely contribution.

**Sheldon H. Teperman, MD** (Bronx, New York): Dr. DiMaggio, your home institution, Bellevue, plays a seminal role in the trauma center safety of our nation.

In fact, right now, your trauma medical director is not present with us, but he is at home on guard for the U.N. General Assembly. But in New York, we don't see long-gun injuries. New York has the Safe Act, and there is an assault weapons ban. So why is it so important to America's trauma center – Bellevue – that we see a national ban on assault rifles?

**Charles E. Lucas, MD** (Detroit, Michigan): Thank you for your nice presentation. How many of these incidents occurred in an inner-city environment, where most of the victims that we treat have received multiple wounds which were purposely inflicted in order to compete competitively for the distribution of heroin and other drugs? Also, how many of the assailants were African-American?

**Martin A. Croce, MD** (Memphis, Tennessee): Thank you. I want to commend the authors for an excellent study, and really, not so much to ask any questions but I rise to put out a plea to the membership that this issue is a public health problem.

This is not a right versus left problem, this is not a Second Amendment problem. This is a public health problem.

And to quote Wayne Meredith at one of the recent Board meetings, "Our primary goal is to reduce the number of bullet holes in people." So I implore the Membership to correct this dearth of research that is going on about gun violence in order to promote a public health approach, so that we can reduce the number of bullet holes in people.

**Deborah A. Kuhls, MD** (Las Vegas, Nevada): And to carry on that thought, I would urge the authors to incorporate the public health data from the CDC when it is available, because part of the methodological issues for this paper is that one data set was used for a certain period of time.

But for the last year, the CDC data was not used because it was not available, so I would urge you to not only do that analysis, but I would also urge the Journal of Trauma to consider an update to that article when that is available. Thank you.

**Charles DiMaggio, MPH, PhD** (New York, New York): Thank you very much for all these comments and questions.

Dr. Moore, so with regard to your observation about the reductionist approach to looking at this particular issue, that puts me in the mind very much of the traditional epidemiologic triad of agent, host, and environment, and if you break one link in that connection, you can break the transmission. In this case, we could call assault weapons one link, whether it's agent or host, we can decide.

With regards to the rationale for the definition, I think it's reflective of the lack of research in this area.

A case definition is an essential and critical first step in any epidemiologic investigation, and you can see that we are barely there. I think the FBI definition makes sense, I think it's the oldest one, I think it's informed by expert consensus.

**18**

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

And I think all the other definitions are based in some form on that, which is why we chose it. And I would urge that if we are going to be doing this research going forward, probably it would be best if we all had the consensus that that be the definition.

Why did we not use the Gun Violence Archive to estimate some of these results, and why are our numbers so much smaller than some of the other numbers? I have to agree, our numbers are very much an under-count.

We restricted our analysis to these three databases. And so the limiting factor was the one database. And I can tell you it was the LA Times – they had the fewest number. And if it wasn't in the LA Times, then the other databases didn't contribute to this data set.

We felt that the important aspect of this particular study was to demonstrate the relative effects, merits or associations with the assault weapon ban as opposed to documenting the absolute numbers.

So the Gun Archive, for example, defines mass shootings as four or more deaths or injuries. That really raises the number of deaths that can be included. We didn't include it, but I think going forward we absolutely should.

With regard to the analysis using population denominators, we agree, actually, that gun homicides are an imperfect denominator. We also felt that population was an imperfect denominator. And again, as we keep on circling around, it has to do with the data in this case.

We did feel that gun homicides captured something about gun availability and criminality in the United States, although homicides themselves differ very much from these mass shooting fatalities.

We do note that our population-based results essentially mirrored the gun homicide results, indicating that, at least for the relative effects and benefits of the assault weapons ban, the results are robust and invariant to the choice of denominator in this case.

Can we distinguish local effects, and could this possibly be a bridge to reestablishing an assault rifle ban? The short answer is yes and yes. We can distinguish local effects.

We took a very broad approach on this particular study as a first pass on the data. But, there are data sources (and even within the data sources we used) where you can tease out local, municipal and state policies.

Also, we can link our data to other sources that have those variables. There are statistical methods available that will not only account for those variables, but also allow us to measure or estimate in some way the contribution of local or regional variation in these policies to the overall effectiveness.

The issue of the case fatality rate is very interesting and challenging. I want to note that there was a paper in JAMA on September 11th – just a couple of weeks ago – looking at mass shooter fatalities, that came essentially to the same conclusion – that there has been this recent decrease.

In our paper, in this write-up, we look at three potential explanations, and one of them is, first of all, it's just a matter of denominator. These are indiscriminate weapons.

You have someone shooting at a large group of people, and there are going to be more injuries and more casualties, and it just inflates the denominator in this case.

The second thing is, the obverse of that, is single-fire weapons, guns, are very personal weapons. They're usually characterized by someone who knows who they want to kill. And finally, we feel that perhaps there may be some improvement by the folks in this room in treating these.

I'm going to close at this point, given the time constraints.

*© 2018 American Association for the Surgery of Trauma.*

**19**

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT H

JMIR PUBLIC HEALTH AND SURVEILLANCE
Post et al

Original Paper

# Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis

Lori Post[1], PhD; Maryann Mason[1], PhD; Lauren Nadya Singh[1], MPH; Nicholas P Wleklinski[2], MD; Charles B Moss[3], PhD; Hassan Mohammad[1]; Tariq Z Issa[2], BA; Adesuwa I Akhetuamhen[2], MD; Cynthia A Brandt[4], MD, MPH; Sarah B Welch[1], MPH; James Francis Oehmke[1], PhD

[1]Buehler Center for Health Policy and Economics, Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[2]Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[3]Institute of Food and Agricultural Sciences, University of Florida, Gainsville, FL, United States
[4]Yale Center for Medical Informatics, Yale School of Medicine, Yale University, New Haven, CT, United States

**Corresponding Author:**
Lori Post, PhD
Buehler Center for Health Policy and Economics
Feinberg School of Medicine
Northwestern University
420 E Superior
Chicago, IL, 60611
United States
Phone: 1 203 980 7107
Email: lori.post@northwestern.edu

## *Abstract*

**Background:** Public mass shootings are a significant public health problem that require ongoing systematic surveillance to test and inform policies that combat gun injuries. Although there is widespread agreement that something needs to be done to stop public mass shootings, opinions on exactly which policies that entails vary, such as the prohibition of assault weapons and large-capacity magazines.

**Objective:** The aim of this study was to determine if the Federal Assault Weapons Ban (FAWB) (1994-2004) reduced the number of public mass shootings while it was in place.

**Methods:** We extracted public mass shooting surveillance data from the Violence Project that matched our inclusion criteria of 4 or more fatalities in a public space during a single event. We performed regression discontinuity analysis, taking advantage of the imposition of the FAWB, which included a prohibition on large-capacity magazines in addition to assault weapons. We estimated a regression model of the 5-year moving average number of public mass shootings per year for the period of 1966 to 2019 controlling for population growth and homicides in general, introduced regression discontinuities in the intercept and a time trend for years coincident with the federal legislation (ie, 1994-2004), and also allowed for a differential effect of the homicide rate during this period. We introduced a second set of trend and intercept discontinuities for post-FAWB years to capture the effects of termination of the policy. We used the regression results to predict what would have happened from 1995 to 2019 had there been no FAWB and also to project what would have happened from 2005 onward had it remained in place.

**Results:** The FAWB resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries. We estimate that the FAWB prevented 11 public mass shootings during the decade the ban was in place. A continuation of the FAWB would have prevented 30 public mass shootings that killed 339 people and injured an additional 1139 people.

**Conclusions:** This study demonstrates the utility of public health surveillance on gun violence. Surveillance informs policy on whether a ban on assault weapons and large-capacity magazines reduces public mass shootings. As society searches for effective policies to prevent the next mass shooting, we must consider the overwhelming evidence that bans on assault weapons and/or large-capacity magazines work.

*(JMIR Public Health Surveill 2021;7(4):e26042)* doi: 10.2196/26042



**KEYWORDS**

firearm surveillance; assault weapons ban; large-capacity magazines; guns control policy; mass shootings; regression lines of discontinuity

## Introduction

### Background

Approximately 44,000 people are killed and an additional 100,000 people are injured by a gun each year in the United States [1,2]. Mass shooting fatalities, as a particular type of gun injury event, account for <1% of all gun deaths [3] and have largely been ignored until recently [4,5]; yet, mass shooting events occur multiple times per year [6]. This information is based on insights from firearm surveillance performed by a variety of researchers, and state and federal agencies on incidence, prevalence, risk factors, injuries, deaths, and precipitating events, similar to the surveillance of infectious diseases such as COVID-19 [7-21]. Teutch and Thacker [22] defined public health surveillance as

> the ongoing systematic collection, analysis, and interpretation of health data, essential to the planning, implementation, and evaluation of public health practice, closely integrated to the dissemination of these data to those who need to know and linked to prevention and control.

Not only do surveillance systems generate hypotheses to test but they also provide the data to test them.

The Federal Assault Weapons Ban (FAWB, also known as the Public Safety and Recreational Firearms Use Protection Act) included a ban on the manufacture for civilian use or sale of certain semiautomatic firearms defined as assault weapons as well as certain large-capacity magazines (LCMs). The Act was in effect for 10 years from 1994 until it sunsetted in 2004. Semiautomatic weapons (rapid fire) and assault weapons (second grip plus other features) are distinct; however, the two are often incorrectly conflated as similar [23-26]. Semiautomatic weapons are defined as weapons that automatically load another cartridge into a chamber, preparing the weapon for firing, but requiring the shooter to manually release and press the trigger for each round [23-26]. By contrast, automatic weapons are similarly self-loading, but allow for a shooter to hold the trigger for continuous fire [27]. Furthermore, the FAWB also prohibited certain ammunition magazines that were defined as "large-capacity" cartridges [28] containing more than 10 bullets [29]. These LCMs can feed ammunition to semiautomatic weapons that do not meet the criteria of being considered assault weapons. Furthermore, LCMs are considered one of the most important features of the FAWB as research has found a relationship between bans on LCMs and casualty counts at the state level [30-34]. The 10-year federal ban was signed into law by President Clinton on September 13, 1994 [28].

Firearm surveillance data have been used to test potential policy responses to prevent mass shootings, including the FAWB [32,34-39], Extreme Risk Protection Orders (also known as red flag laws) [40-45], and federal and state LCM bans [31,32,46]. In particular, it seems likely that the FAWB and LCM bans have potential to affect mass shootings because they regulate weapons and ammunition formats that are designed to enable rapid discharge, which is a key feature in mass shooting incidents [24,47]. Other types of gun deaths may not be responsive to the FAWB or LCM bans. As an example, Extreme Risk Protection Orders or "Red Flag" orders [43,48], which temporarily prohibit at-risk individuals from owning or purchasing firearms, may be effective for preventing firearm suicides or domestic violence homicides [49] but less effective for public mass shooters [50,51]. The prohibition of LCMs may have no impact on firearm suicide because suicide decedents only require one bullet to kill themselves [52].

Several studies during and after the FAWB attempted to determine if gun policy that restricts the production and sale of assault weapons and LCMs decreased gun deaths [53,54]. These initial studies make meaningful contributions to the literature because they describe what constitutes assault weapons, magazine capacity, ballistics, and loopholes in the FAWB legislation [3,53-57]. However, these studies have found little to no evidence that these policies have had any overall effect on firearm homicides, gun lethality, or overall crime [58-61]. Since deaths from public mass shootings comprise less than 1% of all homicides based on our definition, testing whether or not the FAWB/LCM ban has an impact on homicide would wash out the effect. Since the FAWB/LCM ban may be effective at specific types of gun deaths, sampling must be limited to specific types of shooters over overall gun deaths or tests for lethality [62,63]. Finally, the variation in research findings is related to differences in research design, sampling frame, and case definition of a public mass shooting [3,53-56,64,65].

Our study differs from other studies that evaluated the efficacy of the FAWB because we used economic methods and a different outcome variable. Specifically, we focused on whether the FAWB resulted in fewer public mass shooting "events," whereas other studies evaluated the number of gun injuries and deaths that occurred during the course of a mass shooting.

### Objective

The aim of this study was to test whether curbing *access to certain types of guns and magazines* will decrease mass shooting *events*. We sought to empirically answer if there was a relationship between the FAWB and a reduction in mass shooting events.

## Methods

### Data Source

We created a firearm surveillance system based on the National Institute of Justice–funded Violence Project dataset, which culled mass shooting events from 1966 to 2019 [6]. Consistent with earlier studies, we rely on the original Federal Bureau of Investigation (FBI) definition of a massacre, specifically where 4 or more people are killed within a single timeframe. We differentiate our mass shootings from others in that our inclusion criteria require the shootings to have occurred in a public setting.



We adapted this definition to only include massacres that involved gun deaths of 4 or more victims to isolate a particular type of mass shooter [66]. Many firearm surveillance systems that include mass shootings use a lower threshold of persons shot and many do not include deaths. An FBI report on active shooters in mass shooting events identified planning and preparation behaviors that are central to prevention [67]. This more narrow definition isolates premeditation, whereas broader definitions may include shooters that are more reactive [68]. Our case definition does not include family annihilators or felony killers because *familicides are defined by the victim-offender relationship, public massacres are defined by location, and felony killings are distinguished by motive* [69]. This differentiation is consistent with other mass shooting studies [70-72].

We examined the annual number of public mass shootings occurring between 1966 and 2019 that resulted in 4 or more fatalities. The hypothesis was that the FAWB reduced the number of public mass shootings per year during the period of the ban. We used regression discontinuity analysis to test the hypothesis. Regression discontinuity analysis is a standard economist tool used in policy analysis taking advantage of quasi-experimental designs [65,73].

**Analyses**

Regression discontinuity analysis allows for discontinuities or shifts in both the intercept and the slope of the trend line at both the onset and sunset of the FAWB. That is, we introduced intercept shift parameters in 1995 and 2005, and trend shift parameters for the periods 1995-2004 and 2005-2019. A statistically significant shift in a parameter indicates a discontinuity (ie, a finding that the FAWB had a statistically significant effect on the number of public mass shootings). We tested for statistical significance of the intercept and trend shift parameters both independently and jointly. All statistical inference was based on a significance level set at .05. We used the Huber-White robust residuals, which attenuate problems of autocorrelation, heteroscedasticity, and some types of model misspecification [74].

We then used the estimated model for two types of counterfactual analysis. First, we used the model to predict the number of public mass shootings that would have occurred had the FAWB not been in place. The difference between this counterfactual prediction and the modeled number of incidents with the FAWB in place provided an estimate of the number of public mass shootings that the FAWB prevented.

Second, we projected forward the number of public mass shootings that would have occurred had the FAWB been permanent (ie, continued from 2004 through to the end of the sample period). We note that in some sense, this is an "out of sample" exercise because even though the sample extends to 2019, the FAWB ended in 2004; thus, this exercise would not pick up events in the past 15 years that would have augmented or compromised the effects of the FAWB. The difference between the modeled number of public mass shootings and the projected counterfactual number of public mass shootings could provide an estimate of the number of public mass shootings that the FAWB prevented.

We performed a regression of the 5-year moving average of public mass shootings on the US population in millions, the homicide rate, and discontinuity variables to capture both the effects of the FAWB and its discontinuation. We did not introduce a trend line for the entire sample period because it is highly collinear with the population variable. For the period of the FAWB's implementation, we originally introduced an intercept shift, time trend, and shift in the homicide rate; for the post-FAWB period, we introduced an intercept shift and a time trend. Due to collinearity, we retained only the trend shift in the final model for the FAWB period; for the post-FAWB period, we retained both the intercept and the trend shift.

## Results

We identified a total of 170 public mass shooting events, the primary outcome variable, with 4 or more fatalities between 1966 and 2019. The 5-year cumulative number of public mass shootings is shown in Figure 1, providing a visualization of the impacts of the FAWB on the number of shootings. The first mass shooting occurred in 1966; hence, the first data point for the cumulative number of shootings over the previous 5 years occurs in 1970. For 1966 and 1967, the cumulative number of public mass shootings was 3. This number then increased to 12 in 1993 and declined to 3 in 2004. After 2004, the cumulative number of public mass shootings increased to 81 in 2019. The last year of the ban, 2004, experienced the fewest public mass shootings through 2019.

The regression results showed excellent explanatory power ($R^2$=0.94). The coefficient on population was positive and statistically significant (.044, $P$<.001). This coefficient means that for every increase in population of 1 million people, there are an additional .044 public mass shooting events per year. The coefficient on the homicide rate was negative and statistically significant (–.249, $P$=.01). The coefficient on the time trend for the FAWB period captures the effect of the FAWB; this coefficient was negative and statistically significant (–.187, $P$=.001). Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. The intercept discontinuity for 2005-2019 was negative and statistically significant (–2.232, $P$=.001), and the trend coefficient was positive and statistically significant (.081, $P$=.001).



**Figure 1.** Public mass shooting trend line using five year moving averages (1966-2019).



These results are graphed in Figure 2 in which the black stars represent the actual data and the green line represents the predicted numbers of public mass shootings from the regression discontinuity model. A bending of the trend during the FAWB period to become downward sloping at the end of the period is apparent, as is the return of the upward trajectory upon expiration of the FAWB. The red squares represent the projected numbers of public mass shootings during the FAWB period had there been no FAWB. The difference between the red squares and the green lines represents the predicted number of public mass shootings averted by the FAWB. The model predicts that 11 public mass shootings were averted over the period of 1995-2004.

The blue diamonds represent the projected effects of a continuation of the FAWB through 2019 based on the observed trend from 1995 to 2004. This projection indicates that 30 public mass shootings would have been prevented from 2005 to 2019 had the FAWB been left in place.

**Figure 2.** Regression lines from discontinuity analysis of the federal assault weapons ban (1994-2004).





## Discussion

### Principal Findings

In total, 1225 people were killed in a mass shooting over the past 53 years with more than half occurring in the last decade, a function of increases in mass shootings and weapon lethality [62,63,75]. Public mass shooting fatalities and injuries far outpace population growth [75]. Between 1966 and 2019, the US population increased by 67% [76], whereas public mass shooting deaths increased by over 5-fold. The rise in public mass shootings throughout the sample period is in fact partially a function of population growth and homicide rate, along with the effects of the FAWB and its removal. An increase in the US population of 1 million people was associated with an increase of .040 ($P$<.005) public mass shootings per year. During the post-FAWB period, the increase in population from approximately 300 million in 2005 to 330 million in 2019 should be associated with an increase of 1.2 public mass shootings per year, compared to the actual increase of 4 public mass shootings per year in the data (5-year moving average). After controlling for population growth and homicide rate, a positive and statistically significant coefficient (.081, $P$=.001) on the 2005-2018 trend was seen. This further indicates a separate, nonpopulation trend of increasing violence operating during the post-FAWB period. The negative coefficient on the homicide rate invalidates the hypothesis that decreases in the numbers of public mass shootings are simply reflections of an overall decreasing homicide rate. The negative intercept discontinuity is consistent with an effect of the FAWB that persists somewhat beyond the immediate end of the ban. The positive trend coefficient is consistent with the hypothesis that the FAWB was associated with a decrease in the number of public mass shootings, as the expiration of the FAWB was associated with a shift from a downward trend to an upward trend in the number of public mass shootings per year.

The most striking finding from this study is that there was a reduction in the number of public mass shooting events while the FAWB was in place. Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. By projecting what would have happened if the FAWB remained in place, we found that there would have been significantly fewer public mass shootings if the FAWB had remained in place to 2019. Remarkably, although it is intuitive that the removal of assault weapons and magazine clips will reduce the lethality of a mass shooting, we observed an inverse relationship between weapons/ammunition and mass shooting events, meaning that mass shooters may be less likely to perpetrate a mass shooting without rapid fire military-style weapons. This is an independent effect, which indirectly leads to fewer injuries and deaths. DiMaggio et al [64] also found evidence of a decrease in public mass shootings during the ban; however, their study period was shorter and was restricted to 51 public mass shootings. Unlike our study, they implicitly modeled public mass shootings as a random instance of general gun homicides that had a high death count [64]. In contrast, our findings suggest that public mass shootings are a unique type of premeditated gun violence. We found that prior to enactment of the FAWB, the rate of public

mass shootings was increasing. During enactment of the FAWB, there was a downward trend of mass shooting events. After the FAWB was lifted, public mass shootings increased dramatically. Firearm homicides in general follow no such patterns.

This effect was not found in the work of Koper, Roth, and colleagues [53-55]; however, their inclusion of all gun homicides masks the ban's effect on mass shootings. Even though Peterson and Densley's [77] work focused on perpetrator histories and not the FAWB, their findings that ease of gun access is characteristic of public mass shooters further supports our study. We restricted the inclusion criteria to public mass shootings to specifically test the effectiveness of the FAWB on public mass shooting events.

Regardless of the FAWB, bringing a semiautomatic rifle with high magazine capacity to a massacre significantly increases the number of fatalities and injuries. The increase in deaths is a function of rapid fire and increased ballistic energy. The increase in injuries is also a function of rapid fire and high-capacity magazines, enabling the shooter to shoot more people in crowded venues quickly before the crowd can disperse or hide. When controlling for the FAWB, the use of assault rifles decreased by half during implementation of the ban and tripled after the ban was lifted. This is a particularly important finding given that the FAWB had loopholes and that overall violent crime is decreasing [78]. First, all people with an assault weapon prior to the FAWB were allowed to retain their semiautomatic weapons [54,64]. Second, without a buyback program, semiautomatic weapons remained in the community [54,64]. Third, the ban did not target some military assault-like weapons [54,64]. Finally, a major loophole found in gun control legislation is that buyers can bypass background checks by purchasing their weapons and ammunition from gun shows, through illegal purchasing, or legally purchasing their guns and ammunition from another gun owner [57,63,79-87]. Even with these loopholes and issues, there was still a significant reduction in public mass shootings during the FAWB. These loopholes indicate that most people who purchase assault weapons do not become mass shooters; however, mass shooters require assault weapons and LCMs to carry out a mass shooting. Ban effectiveness might have improved if all assault weapons were included in the FAWB.

Some recent studies have specifically analyzed the effects of LCM bans on the incidence of public mass shootings. In a review of state legislation, Webster et al [88] found that bans of LCMs were associated with a significant reduction in the incidence of fatal public mass shootings. This study shows that the FAWB, which included a ban on LCMs, was associated with fewer fatalities and injuries during mass shootings in addition to fewer public mass shooting events. Koper et al [27] previously reported that 19% of public mass shootings resulting in 4 or more fatalities included the use of LCMs, while only 10% involved an assault weapon. Klarevas et al [29] found a similar pattern in shootings of 6 or more people, in which 67% of shooters utilized LCMs, whereas only 26% utilized an assault weapon. Because our study only looked at effects of the FAWB, which included an LCM ban, we were only able to determine the combined effects of limiting assault weapons and LCMs. To be clear, the reduction in the number of public mass



shootings, and resulting fatalities and injuries, may be a function of the ban on assault weapons, assault weapons plus LCMs, or only LCMs. We cannot separate out their independent effects at the national level.

Unlike our study, Webster et al [88] did not evaluate the incidence of assault weapons used in public mass shootings. Rather, they focused on fatalities from public mass shootings vs public mass shooting events. Although Webster et al [88] utilized the FBI Supplemental Homicide Report as their dataset, which is a voluntary reporting measurement system prone to errors in reporting, their findings are applicable to our analysis.

## Limitations

Although we found statistically significant decreases during the FAWB, we cannot isolate aspects of the policy that are attributed to the decline. Most notably, the FAWB also included LCMs during the ban. It may be that the type of gun and/or the type of magazine resulted in a decline. Indeed, assault weapons and LCMs provide the means to carry out a mass shooting; however, there are likely other factors beyond this study that partially explain the radical increase in public mass shootings in the post-FAWB period. For example, the FAWB was in place from 1994 to 2004, which is the same time period that the US population largely adopted the internet, along with associated social communication software and websites. This may have

resulted in better tracking of public mass shootings or increased media coverage. Because our study specifically targeted the federal legislation, we omitted state-level gun policies such as state-level prohibitions on certain types of guns, LCMs, or more lethal types of bullets. It is likely that the internet serves as a contagion and as a guide to potential mass shooters, allowing them to access weapons and multiple stories about other mass shooters [62,67,89,90].

## Conclusions

In summary, public mass shootings are a unique and specific type of homicide by a gun. We found evidence that public mass shootings are qualitatively different from general homicides because after the FAWB expired, mass shooting events increased while general homicides decreased. The increase in public mass shootings was more dramatic in the final 10 years of the study period following the end of the FAWB. We suspect that these outcomes may be improved by removing existing semiautomatic weapons with large bullet capacity by creating a buyback program for all rapid-firing weapons. Moreover, the legislation would be strengthened if it closed loopholes that allow gun buyers to get around the background check legislation and other purchase prohibitions by exempting gun shows and internet or person-to-person purchases, which were exempted from the FAWB and LCM ban [87].

## Acknowledgments

The Violence Project Mass Shooter database generated data for our surveillance. This study was financially supported by the Buehler Endowment at Feinberg School of Medicine.

## Conflicts of Interest

None declared.

## References

1. Web-based Injury Statistics Query and Reporting System. Centers for Disease Control and Prevention, Injury Prevention and Control. 2020 Jul 01. URL: https://www.cdc.gov/injury/wisqars/index.html [accessed 2021-01-15]
2. Christensen AJ, Cunningham R, Delamater A, Hamilton N. Introduction to the special issue on gun violence: addressing a critical public health challenge. J Behav Med 2019 Aug;42(4):581-583. [doi: 10.1007/s10865-019-00075-8] [Medline: 31367923]
3. Drake B. Mass shootings rivet national attention, but are a small share of gun violence. Pew Research Center. 2013 Sep 17. URL: https://www.pewresearch.org/fact-tank/2013/09/17/mass-shootings-rivet-national-attention-but-are-a-small-share-of-gun-violence/ [accessed 2020-12-10]
4. Bowers TG, Holmes ES, Rhom A. The nature of mass murder and autogenic massacre. J Police Crim Psych 2009 Nov 7;25(2):59-66. [doi: 10.1007/s11896-009-9059-6]
5. Delisi M, Scherer AM. Multiple homicide offenders. Crim Justice Behav 2016 Jun 30;33(3):367-391. [doi: 10.1177/0093854806286193]
6. Mass shooter database. The Violence Project. 2020. URL: https://www.theviolenceproject.org/ [accessed 2021-01-14]
7. Shelby D. Association between adult alcohol misuse, adult mental health, and firearm storage practices in households with children: findings from the Behavioral Risk Factor Surveillance System (BRFSS). MPH Thesis. ScholarWorks @ Georgia State University. 2021 Dec 09. URL: https://scholarworks.gsu.edu/iph_theses/725 [accessed 2021-01-08]
8. Loder R, Mishra A, Atoa B, Young A. Spinal injury associated with firearm use. Cureus 2021 Mar 16;13(3):e13918 [FREE Full text] [doi: 10.7759/cureus.13918]
9. Mueller KL, Trolard A, Moran V, Landman JM, Foraker R. Positioning public health surveillance for observational studies and clinical trials: The St. Louis region-wide hospital-based violence intervention program data repository. Contemp Clin Trials Commun 2021 Mar;21:100683 [FREE Full text] [doi: 10.1016/j.conctc.2020.100683] [Medline: 33385095]



10. Horn DL, Butler EK, Stahl JL, Rowhani-Rahbar A, Littman AJ. A multi-state evaluation of the association between mental health and firearm storage practices. Prev Med 2021 Apr;145:106389. [doi: 10.1016/j.ypmed.2020.106389] [Medline: 33385422]

11. Gunn JF, Boxer P. Gun laws and youth gun carrying: results from the youth risk behavior surveillance system, 2005-2017. J Youth Adolesc 2021 Mar;50(3):446-458. [doi: 10.1007/s10964-020-01384-x] [Medline: 33420890]

12. Rozel J, Soliman L, Jain A. The gun talk: how to have effective conversations with patients and families about firearm injury prevention. In: Zun LS, Nordstrom K, Wilson MP, editors. Behavioral Emergencies for Healthcare Providers. Switzerland: Springer; Jan 05, 2021:465-473.

13. Keyes KM, Kandula S, Olfson M, Gould MS, Martínez-Alés G, Rutherford C, et al. Suicide and the agent–host–environment triad: leveraging surveillance sources to inform prevention. Psychol Med 2021 Mar 05;51(4):529-537. [doi: 10.1017/s003329172000536x]

14. Bluestein G, Hallerman T. Future directions for firearm injury intervention, policy, and research. In: Lee LK, Fleeger EW, editors. Pediatric Firearm Injuries and Fatalities: The Clinician's Guide to Policies and Approaches to Firearm Harm Prevention. Switzerland: Springer; Feb 06, 2021:223-234.

15. Oehmke J, Moss C, Singh L, Oehmke T, Post L. Dynamic panel surveillance of COVID-19 transmission in the United States to inform health policy: observational statistical study. J Med Internet Res 2020 Oct 05;22(10):e21955 [FREE Full text] [doi: 10.2196/21955] [Medline: 32924962]

16. Oehmke J, Oehmke T, Singh L, Post L. Dynamic panel estimate-based health surveillance of SARS-CoV-2 infection rates to inform public health policy: model development and validation. J Med Internet Res 2020 Sep 22;22(9):e20924 [FREE Full text] [doi: 10.2196/20924] [Medline: 32915762]

17. Post L, Benishay E, Moss C, Murphy R, Achenbach C, Ison M, et al. Surveillance metrics of SARS-CoV-2 transmission in central Asia: longitudinal trend analysis. J Med Internet Res 2021 Feb 03;23(2):e25799 [FREE Full text] [doi: 10.2196/25799] [Medline: 33475513]

18. Post LA, Issa TZ, Boctor MJ, Moss CB, Murphy RL, Ison MG, et al. Dynamic public health surveillance to track and mitigate the US COVID-19 epidemic: longitudinal trend analysis study. J Med Internet Res 2020 Dec 03;22(12):e24286 [FREE Full text] [doi: 10.2196/24286] [Medline: 33216726]

19. Post LA, Lin JS, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 wave two surveillance in East Asia and the Pacific: longitudinal trend analysis. J Med Internet Res 2021 Feb 01;23(2):e25454 [FREE Full text] [doi: 10.2196/25454] [Medline: 33464207]

20. Post L, Marogi E, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 surveillance in the Middle East and North Africa: longitudinal trend analysis. J Med Internet Res 2021 Jan 15;23(1):e25830 [FREE Full text] [doi: 10.2196/25830] [Medline: 33302252]

21. Post LA, Argaw ST, Jones C, Moss CB, Resnick D, Singh LN, et al. A SARS-CoV-2 surveillance system in Sub-Saharan Africa: modeling study for persistence and transmission to inform policy. J Med Internet Res 2020 Nov 19;22(11):e24248 [FREE Full text] [doi: 10.2196/24248] [Medline: 33211026]

22. Teutsch S, Thacker S. Planning a public health surveillance system. Epidemiol Bull 1995 Mar;16(1):1-6. [Medline: 7794696]

23. Jacobs J, Fuhr Z. The Safe Act: New York's ban on assault weapons and large capacity magazines. Crim Law Bull 2017 Jun 29;53(1):4 [FREE Full text]

24. Wallace EG. Assault weapon myths. South Ill Univ Law J 2018 Nov 18;43:193. [doi: 10.4135/9781452229300.n127]

25. Kopel D, Lowy J, Rostron A. Heller and "Assault Weapons". Campbell Law Rev 2018 Feb 02;40(2):461-480 [FREE Full text]

26. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 28;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

27. Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. J Urban Health 2018 Jun;95(3):313-321 [FREE Full text] [doi: 10.1007/s11524-017-0205-7] [Medline: 28971349]

28. United States Congress House Committee on the Judiciary. Subcommittee on Crime and Criminal Justice. Public Safety and Recreational Firearms Use Protection Act. In: Hearing before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, second session, on H.R. 3527. Washington, DC: US Government; Apr 25, 1994.

29. Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990–2017. Am J Public Health 2019 Dec;109(12):1754-1761. [doi: 10.2105/ajph.2019.305311]

30. Kleck G. Large-capacity magazines and the casualty counts in mass shootings. Justice Res Policy 2016 Jun 01;17(1):28-47. [doi: 10.1177/1525107116674926]

31. Abbasi J. Large-capacity magazine bans linked with fewer mass shootings, deaths. JAMA 2020 Jan 14;323(2):108-109. [doi: 10.1001/jama.2019.20457] [Medline: 31851333]

32. Koper CS. Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high‐capacity semiautomatic firearms. Criminol Public Policy 2020 Jan 10;19(1):147-170. [doi: 10.1111/1745-9133.12485]



Post et al

33. Towers S, Wallace D, Hemenway D. Temporal trends in public mass shootings: high-capacity magazines significantly increase fatality counts, and are becoming more prevalent. medRxiv preprint server. 2019 Dec 15. URL: https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 [accessed 2021-04-17]

34. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

35. Lowy J. Comments on assault weapons, the right to arms, and the right to live. Harv J Law Public Policy 2020;43(2):375-386 [FREE Full text]

36. Kim A. United States gun policy and the effect on mass shootings. California State University Northridge Scholarworks Open Access Repository. Northridge, CA: CSU Northridge University Library; 2020 Aug 25. URL: http://hdl.handle.net/10211.3/217278 [accessed 2020-12-06]

37. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 20;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

38. Balakrishna M, Wilbur KC. How the Massachusetts Assault Weapons Ban Enforcement Notice changed firearm sales. SSRN J 2021 Feb 4:1-51 [FREE Full text] [doi: 10.2139/ssrn.3779510]

39. Soto L, Chheda S, Soto J. Reducing fatalities in mass attacks and the related matter of gun control policy following the El Paso August 2019 shooting. Tex Hisp J Law Policy 2020;26:85.

40. Nagin DS, Koper CS, Lum C. Policy recommendations for countering mass shootings in the United States. Criminol Public Policy 2020 Jan 10;19(1):9-15. [doi: 10.1111/1745-9133.12484]

41. Gay C. 'Red Flag' laws: how law enforcement's controversial new tool to reduce mass shootings fits within current Second Amendment jurisprudence. Boston Coll Law Rev 2020 Apr 30;61(4):1491-1533 [FREE Full text]

42. Nielsen D. Disarming dangerous persons: how Connecticut's Red Flag Law saves lives without jeopardizing constitutional protections. Quinnipiac Health Law J 2020;23(3):253.

43. Blocher J, Charles J. Firearms, extreme risk, and legal design: "Red Flag" laws and due process. Virginia Law Rev 2020 Oct 19;106(6):1285.

44. Kopel DB. Red Flag Laws: proceed with caution. Law Psychol Rev 2020 Jul 16:forthcoming [FREE Full text] [doi: 10.2139/ssrn.3653555]

45. Blodgett S. Dementia, guns, Red Flag laws: Can Indiana's Statute balance elders' constitutional rights and public safety? NAELA J 2020 Sep;16:1-22 [FREE Full text]

46. Kerr S. "What We Need Is Bullet Control": could regulation of bullets reduce mass shootings? In: Crews G, editor. Handbook of Research on Mass Shootings and Multiple Victim Violence. Hershey, PA: IGI Global; Oct 2019:432-446.

47. Moore EE. Another mass shooting: Time to ban the assault rifle. J Trauma Acute Care Surg 2018 Jun;84(6):1036. [doi: 10.1097/TA.0000000000001863] [Medline: 29799817]

48. Delaney GA, Charles JD. A double-filter provision for expanded Red Flag laws: a proposal for balancing rights and risks in preventing gun violence. J Law Med Ethics 2020 Dec;48(4_suppl):126-132. [doi: 10.1177/1073110520979412] [Medline: 33404308]

49. Honberg RS. Mental illness and gun violence: research and policy options. J Law Med Ethics 2020 Dec;48(4_suppl):137-141. [doi: 10.1177/1073110520979414] [Medline: 33404306]

50. Laqueur HS, Wintemute GJ. Identifying high‐risk firearm owners to prevent mass violence. Criminol Public Policy 2019 Dec 16;19(1):109-127. [doi: 10.1111/1745-9133.12477]

51. Pallin R, Schleimer JP, Pear VA, Wintemute GJ. Assessment of extreme risk protection order use in California from 2016 to 2019. JAMA Netw Open 2020 Jun 01;3(6):e207735 [FREE Full text] [doi: 10.1001/jamanetworkopen.2020.7735] [Medline: 32556258]

52. Hurka S, Knill C. Does regulation matter? A cross‐national analysis of the impact of gun policies on homicide and suicide rates. Regul Gov 2018 Dec 21;14(4):787-803. [doi: 10.1111/rego.12235]

53. Koper C, Roth J. The impact of the 1994 Federal Assault Weapon Ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. J Quant Criminol 2001 Mar;17(1):33-74.

54. Koper C, Woods D, Roth J. Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003. Report to the National Institute of Justice, United States Department of Justice. 2004 Jul. URL: https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf [accessed 2020-12-11]

55. Roth J, Koper C, Adams W, Johnson S, Marcotte J, McGready J, et al. Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report. Urban Institute. Washington, DC: The Urban Institute; 1997 Mar 13. URL: https://www.urban.org/research/publication/impact-evaluation-public-safety-and-recreational-firearms-use-protection-act-1994/view/full_report [accessed 2021-02-10]

56. Webster D, Vernick J, McGinty E, Alcorn T. Regulating Gun Sales: An Excerpt from Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press; 2013.

57. Jacobs J. Can Gun Control Work? (Studies in Crime and Public Policy). Oxford: Oxford University Press; Oct 14, 2004.



JMIR PUBLIC HEALTH AND SURVEILLANCE

Post et al

58. Lee LK, Fleegler EW, Farrell C, Avakame E, Srinivasan S, Hemenway D, et al. Firearm laws and firearm homicides: a systematic review. JAMA Intern Med 2017 Jan 01;177(1):106-119. [doi: 10.1001/jamainternmed.2016.7051] [Medline: 27842178]

59. Gius M. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl Econ Lett 2013 Nov 26;21(4):265-267. [doi: 10.1080/13504851.2013.854294]

60. Cook P, Goss K. The Gun Debate: What Everyone Needs to Know. New York: Oxford University Press; May 01, 2014.

61. Cook P, Goss K. The Gun Debate: What Everyone Needs to Know, 2nd Edition. New York: Oxford University Press; Apr 16, 2020.

62. Lankford A, Silver J. Why have public mass shootings become more deadly? Criminol Public Policy 2019 Dec 16;19(1):37-60. [doi: 10.1111/1745-9133.12472]

63. Schiff M. IZA Discussion Paper 12784: Greater US gun ownership, lethality and murder rates: analysis and policy proposals. IZA Institute of Labor Economics. 2019 Nov 27. URL: https://www.iza.org/publications/dp/12784/greater-us-gun-ownership-lethality-and-murder-rates-analysis-and-policy-proposals [accessed 2021-04-17]

64. DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019 Jan;86(1):11-19. [doi: 10.1097/ta.0000000000002060]

65. World Telecommunication/ICT Indicators Database 2020 (24th Edition). International Telecommunications Union. Geneva: International Telecommunications Union; 2021 Jan. URL: https://www.itu.int/en/ITU-D/Statistics/Pages/publications/wtid.aspx [accessed 2021-04-17]

66. Lopez G. America's unique gun violence problem, explained in 17 maps and charts. Vox. 2021 Mar 23. URL: https://www.vox.com/policy-and-politics/2017/10/2/16399418/boulder-colorado-mass-shooting-gun-violence-statistics-charts [accessed 2021-03-29]

67. Silver J, Simons A, Craun S. A study of the pre-attack behaviors of active shooters in the United States between 2000 and 2013. FBI Documents. Washington, DC: US Department of Justice, Federal Bureau of Investigations; 2018. URL: https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view [accessed 2020-10-25]

68. DeFoster R, Swalve N. Guns, culture or mental health? Framing mass shootings as a public health crisis. Health Commun 2018 Oct;33(10):1211-1222. [doi: 10.1080/10410236.2017.1350907] [Medline: 28841045]

69. Fridel EE. A multivariate comparison of family, felony, and public mass murders in the United States. J Interpers Violence 2021 Feb;36(3-4):1092-1118. [doi: 10.1177/0886260517739286] [Medline: 29294976]

70. Duwe G. Mass murder in the United States: a history. Jefferson, NC: McFarland & Company; Jan 07, 2007.

71. Fox J, Levin J. Mass confusion concerning mass murder. Criminologist 2015;40(1):8-11 [FREE Full text] [doi: 10.4135/9781412950619.n277]

72. Fox JA, Levin J. Firing back: the growing threat of workplace homicide. An Am Acad Pol Soc Sci 2016 Sep 08;536(1):16-30. [doi: 10.1177/0002716294536001002]

73. Stevenson AJ, Flores-Vazquez IM, Allgeyer RL, Schenkkan P, Potter JE. Effect of removal of Planned Parenthood from the Texas Women's Health Program. N Engl J Med 2016 Mar 03;374(9):853-860. [doi: 10.1056/nejmsa1511902]

74. Freedman DA. On the so-called "Huber Sandwich Estimator" and "Robust Standard Errors". Am Statistician 2006 Nov;60(4):299-302. [doi: 10.1198/000313006x152207]

75. Duwe G. Mass shootings are getting deadlier, not more frequent. Politico Magazine. 2017 Oct 04. URL: https://www.politico.com/magazine/story/2017/10/04/mass-shootings-more-deadly-frequent-research-215678/ [accessed 2021-01-30]

76. Population Trends. United States Census Bureau. 2019. URL: https://www.census.gov/ [accessed 2019-08-26]

77. Peterson J, Densley J. We have studied every mass shooting since 1966. Here's what we've learned about the shooters. Los Angeles Times. 2019 Aug 04. URL: https://www.latimes.com/opinion/story/2019-08-04/el-paso-dayton-gilroy-mass-shooters-data [accessed 2020-02-01]

78. Klingner DE, Williams E. Topic: Public Safety. Public Integrity 2019 Mar 06;21(2):220-224. [doi: 10.1080/10999922.2019.1565268]

79. Hand C. Gun control and the Second Amendment. Minneapolis, MN: ABDO; Dec 15, 2016.

80. Popovits A. Dominican University of California Political Science & International Studies (Senior Thesis). 2020 May. URL: https://tinyurl.com/se3vrmd6 [accessed 2020-12-01]

81. Miller SV. What Americans think about gun control: evidence from the General Social Survey, 1972-2016. Soc Sci Quart 2018 Nov 18;100(1):272-288. [doi: 10.1111/ssqu.12555]

82. Kellner D. School shootings, societal violence and gun culture. In: Shapiro H, editor. The Wiley Handbook on Violence in Education: Forms, Factors, and Preventions. Medford, MA: John Wiley & Sons, Inc; 2018:53-68.

83. Schildkraut J. Assault weapons, mass shootings, and options for lawmakers. Rockefeller Institute of Government. 2019 Mar 22. URL: https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/ [accessed 2021-02-11]

84. Jacobs J, Fuhr Z. The potential and limitations of universal background checking for gun purchasers. Wake Forest J Law Policy 2017;7(2):537-583.



85. Braga AA, Brunson RK, Cook PJ, Turchan B, Wade B. Underground gun markets and the flow of illegal guns into the Bronx and Brooklyn: a mixed methods analysis. J Urban Health 2020 Sep 04:online ahead of print. [doi: 10.1007/s11524-020-00477-z] [Medline: 32888157]

86. Chai C. Gun control: can we take a shot at it? AMASS 2019;24(2):34-36.

87. Goldberg J. The case for more guns (and more gun control). The Atlantic. 2012 Dec. URL: https://www.theatlantic.com/magazine/archive/2012/12/the-case-for-more-guns-and-more-gun-control/309161/ [accessed 2020-11-20]

88. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

89. Lankford A, Madfis E. Media coverage of mass killers: content, consequences, and solutions. Am Behav Sci 2018 Mar 20;62(2):151-162. [doi: 10.1177/0002764218763476]

90. Kien S, Begay T, Lee A, Stefanidis A. Social media during the school shooting contagion period. Violence Gender 2019 Dec 01;6(4):201-210. [doi: 10.1089/vio.2019.0043]

## Abbreviations

**FAWB:** Federal Assault Weapons Ban
**FBI:** Federal Bureau of Investigation
**LCM:** large-capacity magazine

*Edited by G Eysenbach, T Sanchez; submitted 19.02.21; peer-reviewed by T Alcorn; comments to author 12.03.21; revised version received 24.03.21; accepted 30.03.21; published 22.04.21*

*Please cite as:*
*Post L, Mason M, Singh LN, Wleklinski NP, Moss CB, Mohammad H, Issa TZ, Akhetuamhen AI, Brandt CA, Welch SB, Oehmke JF*
*Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*
*JMIR Public Health Surveill 2021;7(4):e26042*
*URL: https://publichealth.jmir.org/2021/4/e26042*
*doi: 10.2196/26042*
*PMID: 33783360*

©Lori Post, Maryann Mason, Lauren Nadya Singh, Nicholas P Wleklinski, Charles B Moss, Hassan Mohammad, Tariq Z Issa, Adesuwa I Akhetuamhen, Cynthia A Brandt, Sarah B Welch, James Francis Oehmke. Originally published in JMIR Public Health and Surveillance (https://publichealth.jmir.org), 22.04.2021. This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Public Health and Surveillance, is properly cited. The complete bibliographic information, a link to the original publication on https://publichealth.jmir.org, as well as this copyright and license information must be included.



# EXHIBIT I

Opinion



# Regulating Assault Weapons and Large-Capacity Magazines for Ammunition

**Philip J. Cook, PhD**
Duke University,
Durham,
North Carolina.

**John J. Donohue, PhD, JD**
Stanford University,
Stanford, California.



Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201



Supplemental content

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an outsized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

## History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required submachine guns and other firearms capable of fully

> Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semiautomatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions but has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

© 2022 American Medical Association. All rights reserved.

Opinion   Viewpoint

## Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved banned weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

## The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shoot-

ing in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were ultimately relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semiautomatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

## Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

## Conclusions

In 2017, the *New York Times* polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger since then.[10]

---

**ARTICLE INFORMATION**

**Conflict of Interest Disclosures:** Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

**REFERENCES**

**1.** Cook PJ, Goss KA. *The Gun Debate: What Everyone Needs to Know.* 2nd ed. Oxford University Press; 2020.

**2.** Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

**3.** Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

**4.** Smart R, Morral AR, Smucker S, et al. *The Science of Gun Policy.* RAND; 2020.

**5.** Duwe G. Patterns and prevalence of lethal mass violence. *Criminol Public Policy.* 2020;19(1):17-35. doi:10.1111/1745-9133.12478

**6.** Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

**7.** Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://www.theviolenceproject.org/mass-shooter-database/

**8.** Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

**9.** Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA.* 2016;316(3):291-299. doi:10.1001/jama.2016.8752

**10.** Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

jama.com

© 2022 American Medical Association. All rights reserved.

# EXHIBIT J

**The Code of Professional Ethics and Practices**

We—the members of the American Association for Public Opinion Research (AAPOR) and its affiliated chapters—subscribe to the principles expressed in this document, the AAPOR Code of Professional Ethics and Practices ("the Code"). Our goals are to support sound and ethical practice in the conduct of public opinion and survey research and promote the informed and appropriate use of research results.

The Code is based in fundamental ethical principles that apply to the conduct of research regardless of an individual's membership in AAPOR or any other organization. Adherence to the principles and actions set out in the Code is expected of all public opinion and survey researchers.

As AAPOR members, we pledge to maintain the highest standards of scientific competence, integrity, accountability, and transparency in designing, conducting, analyzing, and reporting our work, and in our interactions with participants (sometimes referred to as respondents or subjects), clients, and the users of our research. We pledge to act in accordance with principles of basic human rights in research. We further pledge to reject all tasks or assignments that would require activities inconsistent with the principles of this Code.

The Code sets the standard for the ethical conduct of public opinion and survey research at the time of publication. Recommendations on best practices for research design, conduct, analysis, and reporting are beyond the scope of the Code but may be published separately by AAPOR Executive Council.

**Definitions of Terms Used in the Code**

1. "Public opinion and survey research" refers to the systematic collection and analysis of information from or about individuals, groups, or organizations concerning their behaviors, cognitions, attitudes or other characteristics. It encompasses both quantitative and qualitative research methods, traditional or emerging.
2. "Participants" refers to individuals whose behaviors, cognitions, attitudes, or other characteristics are measured and analyzed. Participants can include individuals representing groups or organizations, and individuals such as minors or those unable to consent directly, for whom a parent, legal guardian, or other proxy makes participation decisions or provides information.
3. "Personally identifiable information" refers to (i) measurements, records, or other data that can be used alone or in combination to distinguish or trace an individual's identity and (ii) any other information that is linkable to an individual (e.g., employment information, medical history, academic records).

**I. Principles of Professional Responsibility in Our Research**

A. Responsibilities to Participants
    1.  We will avoid practices or methods that may harm, endanger, humiliate, or unnecessarily mislead participants and potential participants.

1

2. We will not misrepresent the purpose of our research or conduct other activities (such as sales, fundraising, or political campaigning) under the guise of conducting research.

3. We recognize that participation in our research is voluntary except where specified by regulation or law. Participants may freely decide, without coercion, whether to participate in the research, and whether to answer any question or item presented to them.

4. We will make no false or misleading claims as to a study's sponsorship or purpose and will provide truthful answers to participants' questions about the research. If disclosure of certain information about the research could endanger or cause harm to persons, could bias responses, or does not serve research objectives, it is sufficient to indicate, in response to participants' questions about the research, that some information cannot be revealed.

5. We recognize the critical importance of protecting the rights of minors and other vulnerable individuals when obtaining participation decisions and conducting our research.

6. We will act in accordance with laws, regulations, and the rules of data owners (providers of research or administrative records previously collected for other purposes) governing the collection, use, and disclosure of information obtained from or about individuals, groups, or organizations.

B. Responsibilities When Collecting Personally Identifiable Information

1. We recognize the right of participants to be provided with honest and forthright information about how personally identifiable information that we collect from them will be used.

2. We recognize the importance of preventing unintended disclosure of personally identifiable information. We will act in accordance with all relevant best practices, laws, regulations, and data owner rules governing the handling and storage of such information. We will restrict access to identifiers and destroy them as soon as they are no longer required, in accordance with relevant laws, regulations, and data owner rules.

3. We will not disclose any information that could be used, alone or in combination with other reasonably available information, to identify participants with their data, without participant permission.

4. When disclosing personally identifiable data for purposes other than the current research, we will relay to data users any conditions of their use specified in the participant permission we have obtained.

5. We understand that the use of our research results in a legal proceeding does not relieve us of our ethical obligation to protect participant privacy and keep confidential all personally identifiable data, except where participants have permitted disclosure.

C. Responsibilities to Clients or Sponsors

1. When undertaking work for a client, we will hold confidential all proprietary information obtained about the client and about the conduct and findings of the research undertaken for the client, except when the dissemination of the information is expressly authorized by the client.

2. We will inform those (partners, co-investigators, sponsors, and clients) for whom we conduct publicly released research studies about AAPOR's Standards for Disclosure in Section III of the Code, and provide information on what should be disclosed in their releases.

2

3. We will be mindful of the limitations of our expertise and capacity to conduct various types of research and will accept only those research assignments that we can reasonably expect to accomplish within these limitations.

D. Responsibilities to the Public
1. We will disclose to the public the methods and procedures used to obtain our own publicly disseminated research results in accordance with Section III of the Code.
2. We will correct any errors in our own work that come to our attention which could influence interpretation of the results. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentation or distortions. If such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible to original data dissemination.
3. We will correct factual misrepresentations or distortions of our data or analysis, including those made by our research partners, co-investigators, sponsors, or clients. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentations or distortions, and if such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible. We also recognize that differences of opinion in the interpretation of analysis are not necessarily factual misrepresentations or distortions and will exercise professional judgment in handling disclosure of such differences of opinion.

E. Responsibilities to the Profession
1. We recognize the importance to the science of public opinion and survey research of disseminating as freely as practicable the ideas and findings that emerge from our research.
2. We can point with pride to our membership in AAPOR and adherence to the Code as evidence of our commitment to high standards of ethics in our relations with research participants, our clients or sponsors, the public, and the profession. However, we will not cite our membership in the Association nor adherence to this Code as evidence of professional competence, because the Association does not certify the professional competence of any persons or organizations.

**II. Principles of Professional Practice in the Conduct of Our Work**
A. We will exercise due care in developing research designs, samples, and instruments, and in collecting, processing, and analyzing data, taking all reasonable steps to assure the reliability and validity of results.
1. We will recommend and employ only those tools and methods of analysis that, in our professional judgment, are fit for the purpose of the research questions.
2. We will not knowingly select research tools and methods of analysis that yield misleading conclusions.
3. We will not knowingly make interpretations of research results that are inconsistent with the data available, nor will we tacitly permit such interpretations. We will ensure that any findings we report, either privately or for public release, are a balanced and accurate portrayal of research results.
4. We will not knowingly imply that interpretations are accorded greater confidence than the data warrant. When we generalize from samples to make statements about populations, we will only make claims of precision and applicability to broader populations that are warranted by the sampling frames and other methods employed.

3

5. We will not engage in data fabrication or falsification.
6. We will accurately describe and attribute research from other sources that we cite in our work, including its methodology, content, comparability, and source.

B. We will describe our methods and findings accurately and in appropriate detail in all research reports, adhering to the standards for disclosure specified in Section III of the Code.

**III. Standards for Disclosure**

Broadly defined, research on public opinion can be conducted using a variety of quantitative and qualitative methodologies, depending on the research questions to be addressed and available resources. Accordingly good professional practice imposes the obligation upon all public opinion and survey researchers to disclose sufficient information about how the research was conducted to allow for independent review and verification of research claims, regardless of the methodology used in the research. Full and complete disclosure for items listed in Section A will be made at the time results are released, either publicly or to a research client, as the case may be. As detailed below, the items listed in Section B, if not immediately available, will be released within 30 days of any request for such materials. If the results reported are based on multiple samples or multiple modes, the preceding items (as applicable) will be disclosed for each.

A. Items for Immediate Disclosure

1. **Data Collection Strategy:** Describe the data collection strategies employed (e.g. surveys, focus groups, content analyses).

2. **Who Sponsored the Research and Who Conducted It**. Name the sponsor of the research and the party(ies) who conducted it. If the original source of funding is different than the sponsor, this source will also be disclosed.

3. **Measurement Tools/Instruments.** Measurement tools include questionnaires with survey questions and response options, show cards, vignettes, or scripts used to guide discussions or interviews. The exact wording and presentation of any measurement tool from which results are reported as well as any preceding contextual information that might reasonably be expected to influence responses to the reported results and instructions to respondents or interviewers should be included. Also included are scripts used to guide discussions and semi-structured interviews and any instructions to researchers, interviewers, moderators, and participants in the research. Content analyses and ethnographic research will provide the scheme or guide used to categorize the data; researchers will also disclose if no formal scheme was used.

4. **Population Under Study.** Survey and public opinion research can be conducted with many different populations including, but not limited to, the general public, voters, people working in particular sectors, blog postings, news broadcasts, an elected official's social media feed. Researchers will be specific about the decision rules used to define the population when describing the study population, including location, age, other social or demographic characteristics (e.g., persons who

4

access the internet), time (e.g., immigrants entering the US between 2015 and 2019). Content analyses will also include the unit of analysis (e.g., news article,  social media post) and the source of the data (e.g., Twitter, Lexis-Nexis).

5. **Method Used to Generate and Recruit the Sample.** The description of the methods of sampling includes the sample design and methods used to contact or recruit research participants or collect units of analysis (content analysis).

    a. Explicitly state whether the sample comes from a frame selected using a probability-based methodology (meaning selecting potential participants with a known non-zero probability from a known frame) or if the sample was selected using non-probability methods (potential participants from opt-in, volunteer, or other sources).

    b. Probability-based sample specification should include a description of the sampling frame(s), list(s), or method(s).

        i. If a frame, list, or panel is used, the description should include the name of the supplier of the sample or list and nature of the list (e.g., registered voters in the state of Texas in 2018, pre-recruited panel or pool).

        ii. If a frame, list, or panel is used, the description should include the coverage of the population, including describing any segment of the target population that is not covered by the design.

    c. For surveys, focus groups, or other forms of interviews, provide a clear indication of the method(s) by which participants were contacted, selected, recruited, intercepted, or otherwise contacted or encountered, along with any eligibility requirements and/or oversampling.

    d. Describe any use of quotas.

    e. Include the geographic location of data collection activities for any in-person research.

    f. For content analysis, detail the criteria or decision rules used to include or exclude elements of content and any approaches used to sample content. If a census of the target population of content was used, that will be explicitly stated.

    g. Provide details of any strategies used to help gain cooperation (e.g., advance contact, letters and scripts, compensation or incentives, refusal conversion contacts) whether for participation in a survey, group, panel, or for participation in a particular research project. Describe any compensation/incentives provided to research subjects and the method of delivery (debit card, gift card, cash).

6. **Method(s) and Mode(s) of Data Collection.** Include a description of all mode(s) used to contact participants or collect data or information (e.g., CATI, CAPI, ACASI, IVR, mail, Web for survey; paper and pencil, audio or video recording for qualitative research, etc.) and the language(s) offered or included. For qualitative research such as in-depth interviews and focus groups, also include length of interviews or the focus group session.

7. **Dates of Data Collection.** Disclose the dates of data collection (e.g., data collection from January 15 through March 10 of 2019). If this is a content analysis, include the dates of the content analyzed (e.g., social media posts between January 1 and 10, 2019).

8. **Sample Sizes (by sampling frame if more than one frame was used) and (if applicable) Discussion of the Precision of the Results**.
   a. Provide sample sizes for each mode of data collection (for surveys include sample sizes for each frame, list, or panel used).
   b. For probability sample surveys, report estimates of sampling error (often described as "the margin of error") and discuss whether or not the reported sampling error or statistical analyses have been adjusted for the design effect due to weighting, clustering, or other factors.
   c. Reports of non-probability sample surveys will only provide measures of precision if they are defined and accompanied by a detailed description of how the underlying model was specified, its assumptions validated, and the measure(s) calculated.
   d. If content was analyzed using human coders, report the number of coders, whether inter-coder reliability estimates were calculated for any variables, and the resulting estimates.

9. **How the Data Were Weighted.** Describe how the weights were calculated, including the variables used and the sources of the weighting parameters.

10. **How the Data Were Processed and Procedures to Ensure Data Quality.** Describe validity checks, where applicable, including but not limited to whether the researcher added attention checks, logic checks, or excluded respondents who straight-lined or completed the survey under a certain time constraint, any screening of content for evidence that it originated from bots or fabricated profiles, re-contacts to confirm that the interview occurred or to verify respondent's identity or both, and measures to prevent respondents from completing the survey more than once. Any data imputation or other data exclusions or replacement will also be discussed. Researchers will provide information about whether any coding was done by software or human coders (or both); if automated coding was done, name the software and specify the parameters or decision rules that were used.

11. **A General Statement Acknowledging Limitations of the Design and Data Collection**. All research has limitations and researchers will include a general statement acknowledging the unmeasured error associated with all forms of public opinion research.

B. Additional Items for Disclosure. After results are reported, we will make the following items available within 30 days of any request for such materials:

1. Procedures for managing the membership, participation, and attrition of the panel, if a pool, panel, or access panel was used. This should be disclosed for both probability and non-probability surveys relying on recruited panels of participants.

2. Methods of interviewer or coder training and details of supervision and monitoring of interviewers or human coders. If machine coding was conducted, include description of the machine learning involved in the coding.

3. Details about screening procedures, including any screening for other surveys or data collection that would have made sample or selected members ineligible for the current data collection (e.g., survey, focus group, interview) will be disclosed (e.g., in the case of online surveys if a router was used).

4. Any relevant stimuli, such as visual or sensory exhibits or show cards. In the case of surveys conducted via self-administered computer-assisted interviewing, providing the relevant screen shot(s) is strongly encouraged, though not required.

5. Summaries of the disposition of study-specific sample records so that response rates for probability samples and participation rates for non-probability samples can be computed. If response or cooperation rates are reported, they will be computed according to AAPOR Standard Definitions. If dispositions cannot be provided, explain the reason(s) why they cannot be disclosed, and this will be mentioned as a limitation of the study.

6. The unweighted sample size(s) on which one or more reported subgroup estimates are based.

7. Specifications adequate for replication of indices or statistical modeling included in research reports.

C. Access to Datasets

Reflecting the fundamental goals of transparency and replicability, AAPOR members share the expectation that access to datasets and related documentation will be provided to allow for independent review and verification of research claims upon request. In order to protect the privacy of individual respondents, such datasets will be de-identified to remove variables that can reasonably be expected to identify a respondent. Datasets may be held without release for a period of up to one year after findings are publicly released to allow full opportunity for primary analysis. Those who commission publicly disseminated research have an obligation to disclose the rationale for why eventual public release or access to the datasets is not possible, if that is the case.

D. AAPOR Standards Complaint

If any of our work becomes the subject of a formal investigation of an alleged violation of this Code, undertaken with the approval of the AAPOR Executive Council, we will provide additional information on the research study in such detail that a fellow researcher would be able to conduct a professional evaluation of the study.

.

# EXHIBIT K

Newspapers
by ancestry
https://www.newspapers.com/image/264424206

Hartford Courant (Hartford, Connecticut) · Sun, Dec 23, 2012 · Page A1
Downloaded on Oct 19, 2022



# Hartford Courant

AMERICA'S OLDEST CONTINUOUSLY PUBLISHED NEWSPAPER

FOUNDED IN 1764

VOLUME CLXXVI  NUMBER 358 | COURANT.COM • MOBILE.COURANT.COM | SUNDAY, DECEMBER 23, 2012

STARTING OVER

# NEW SCHOOL, MADE FAMILIAR

### Hundreds Of Volunteers Help Ease Transition For Sandy Hook Kids

**By BRIAN DOWLING**
bdowling@courant.com

Sandy Hook Elementary School students will find that volunteers have painted the walls of their new school green and white, their school colors. The movers set furniture, desks, computers and supplies in the same places as their old classrooms in Newtown. Volunteers pinned the same posters to new classroom walls.

The re-creation of Sandy Hook Elementary at Chalk Hill School in Monroe involved hundreds of people over the past week. Locksmiths, plumbers, electricians, custodians, experts in fire suppression and security systems, as well as residents with paint brushes, all volunteered time to create an around-the-clock renovation team, which peaked at 500 workers.

Thanks to that effort, the surroundings will be

**CHALK HILL, A4**



**THE WELCOME** sign is ready at Chalk Hill School in Monroe, where Sandy Hook students will begin classes Jan. 3.

WFSB | POOL



---

ADAM LANZA

# Shooter Paused, And Six Escaped

**By DAVE ALTIMARI, EDMUND H. MAHONY and JON LENDER**
daltimari@courant.com

As many as a half-dozen first-graders may have survived Adam Lanza's deadly shooting spree at Sandy Hook Elementary School because he stopped firing briefly, perhaps to reload his rifle or because it jammed, according to law enforcement officials familiar with the events.

A source said that the Bushmaster rifle that Lanza used in the shootings is at the state police forensic laboratory undergoing several tests, including tests to determine whether it jammed.

The children escaped from the first-grade classroom of teacher Victoria Soto, one of the six educators Lanza killed in Newtown after shooting his way through a glass door with the .223-caliber semiautomatic rifle on the morning of Dec. 14.

On Friday, detectives obtained and began examining records related to psychiatric care Lanza had received

**RIFLE, A6**

Copyright © 2022 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers.com

Hartford Courant (Hartford, Connecticut) · Sun, Dec 23, 2012 · Page A6

https://www.newspapers.com/image/264424215

Downloaded on Oct 19, 2022

A6  SUNDAY, DECEMBER 23, 2012   THE HARTFORD COURANT

## TRAGEDY IN NEWTOWN

### Rifle

Continued from Page A1



Copyright © 2022 Newspapers.com. All Rights Reserved.

# EXHIBIT "F"

# EXHIBIT "F"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br>     Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br>     Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br>     Defendants. | Civil Action No. 3:22-cv-04397 |

**Expert Report of Randolph Roth**

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1.      I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University. I have personal knowledge of the facts set forth in this report, and if called upon as a witness, I could and would testify competently as to those facts.

2.      I have been retained by the Town of Superior, Colorado; the City of Louisville, Colorado; the City of Boulder, Colorado; and the Board of County Commissioners of Boulder County, Colorado, to render expert opinions in this case. I am being compensated at a rate of $250 per hour.

## BACKGROUND AND QUALIFICATIONS

3.      I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History. I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history. I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this report.

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which is an interregional, internationally comparative study of homicide in the United States from colonial times to the present. The book received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to

research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Book Award from the Social Science History Association for outstanding books in social science history.[2] *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*.

5.      I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline. And in 2022 I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

6.      I am the principal investigator on the National Homicide Data Improvement Project ("NHDIP"), a project funded by the National Science Foundation,[3] and the Harry Frank Guggenheim Foundation to improve the quality of homicide data in the United States from 1959 to the present. I have begun the NHDIP with a pilot project in Ohio, which has drawn on a wide range of sources in its effort to create a comprehensive database on homicides (including narratives of each incident) based on the mortality statistics of the Ohio Department of Health, the confidential compressed mortality files of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports, death certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and Columbus, obituaries, and newspaper accounts.

---

[1] *See* American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2] *See* Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

[3] *See* National Sciences Foundation, Award Abstract 1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406.

(continued…)

7.      I have published numerous essays on the history of violence and the use of firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240;[4] b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708;[5] c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021).[6]

8.      I am also co-founder and co-director of the Historical Violence Database.[7] The historical data on which this report draws are available through the Historical Violence Database.

9.      The Historical Violence Database is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."[8] It is a collaborative project by scholars in the United States, Canada, and

---

[4] Available at https://www.jstor.org/stable/3491655#metadata_info_tab_contents.

[5] Available at https://www.jstor.org/stable/40267796#metadata_info_tab_contents.

[6] Available at https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States.

[7] The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.

[8] *Historical Methods* (2008) 41: 81-98, available at https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present. The only way to obtain reliable historical homicide estimates is to review every scrap of paper on criminal matters in every courthouse (indictments, docket books, case files, and judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article in every issue of a number of local newspapers, every entry in the vital records, and every local history based on lost sources, local tradition, or oral testimony. That is why it takes months to study a single rural county, and years to study a single city.[9]

      10.    My work on data collection and my research for *American Homicide*, together with the research I have conducted for related essays, has helped me gain expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence.

---

98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU.

[9] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides that appear in the surviving records by looking at the degree to which homicides reported in the surviving legal sources overlap with homicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on contested frontiers and during civil wars and revolutions, means a lower percentage and a wider confidence interval. *See* Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates" (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147 (https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M. Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

11.     The insights that my colleagues and I have gained as social science historians into the causes of violence and the history of violence in the United States stem from our commitment to empiricism.  Our goal is to gather accurate data on the character and incidence of violent crimes and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be true proved false. As my colleagues and I are fond of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right.  That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

12.     I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Rupp v. Bonta*, 8:17-cv-00746-JLS-JDE (C.D. Cal.); *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.); *Hanson v. District of Columbia*, No. 1:22-cv-02256-RC (D.D.C.); *State of Vermont v. Max B. Misch*, No. 173-2-19 Bnrc (Vt. Sup. Ct., Criminal Division, Bennington Unit); *National Association for Gun Rights v. Campbell*, No. 22-cv-11431-FDS (D. Mass.); *National Association for Gun Rights v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.); *Oregon Firearms Federation, et al. v. Brown*, No. 2:22-cv-01815-IM (D. Or.); *National Association for Gun Rights v. Lopez*, No. 22-cv-00404-DKW-RT (D. Haw.); *National Association for Gun Rights v. Lamont*, No. 3:22-cv-01118 (D. Conn.); *Harrell v. Raoul*, 23-141-SPM (S.D. Ill.); and *Rocky Mountain Gun Owners v. Town of Superior*, No 22-cv-2680 (D. Colo.).

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

## OPINIONS

### I.   SUMMARY OF OPINIONS

13.     I have been asked by the State of New Jersey to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technological change has played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

14.     For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal society, as it remains today. I have discovered that high homicide rates among unrelated adults—friends, acquaintances, strangers— coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[10] As I have argued in my scholarship, we are still feeling the aftershocks of our failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and

---

[10] *See* Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217, available at https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dkP_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwiRWPEom7M, for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building. My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present. In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

1850s through the Civil War, Reconstruction, and the rise of Jim Crow laws. But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.

15.     My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder. It is my conclusion, based on my analysis of developments in weaponry and related technologies

from before the Revolution to the present, that throughout our nation's history public officials have enacted a variety of restrictions and regulations on firearms use and possession to address and mitigate the risks firearms have posed to public safety.

## II.   GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A.   Homicide and Firearms in the Colonial Era (1688-1763)

16.     In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[11]

17.     But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[12] By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[13] Violence among colonists was not a pressing problem on the eve of the Revolution.

---

[11] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[12] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together. The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[13] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91. By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to

(continued…)

18.     Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread. Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[14] Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[15] In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per million for African Americans for the seventeenth and most of the eighteenth century, and the rate fell to 1 per million for both European and African Americans after the Revolution. The rates in the Chesapeake region were likewise low, at 8 per million per year for European Americans and 4 to 5 per million for African Americans.[16] Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.[17] The homicide rate among unrelated adults was also low,

---

that in the colonial era—was 7 per 100,000 per year. *See* CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[14] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[15] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

[16] Roth, "Why Guns Are and Aren't the Problem," 116.

[17] Ibid., 117-118.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

as was the proportion of nondomestic homicides committed with guns—approximately 10 to 15 percent.[18]

19.     Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[19] They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[20] They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[21] And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[22] It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[23] The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[24] The firing mechanism also had to be readied, often with a

---

[18] Ibid., 116-119.

[19] Ibid., 117.

[20] Ibid.

[21] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

[23] Ibid.

[24] Ibid.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

fresh flint.[25]   And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[26]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[27]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[28]

20.      The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[29]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[30]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[31]

21.      When colonists anticipated violence, or during times of political instability, gun use was more common.  When homicide rates were high among unrelated adults in the early and

---

[25] Ibid.

[26] Ibid.

[27] Ibid.

[28] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[29] Roth, "Why Guns Are and Aren't the Problem," 117.

[30] Ibid.

[31] Ibid.  Contrary to popular belief, dueling was also rare in colonial America.  Roth, *American Homicide*, 45, 158.

(continued…)

mid-seventeenth century, colonists went armed to political or interpersonal disputes,[32] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[33] Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[34] And slave catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were killed in Virginia were shot.[35] Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[36] That is why firearms had a modest impact on homicide rates among colonists.

### B. The Rise in Violence in the South and on Contested Frontiers During the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)

22.    The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[37] The threats that such citizens posed to public safety

---

[32] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[33] Ibid., 116-117.

[34] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[35] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[36] Ibid., 118-119.

[37] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, *see* Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70,

(continued…)

could be checked in most instances by ordinary criminal statutes, drawn largely from British common law. But at times those threats could be checked only by statutes that placed limits on basic rights.[38]

23.    The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[39]   They also recognized

_____

282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[38] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." *See also* Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[A]t the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[39] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia:*

(continued…)

that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England during the Revolutionary period.[40]

24.      But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over. In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century. By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year.[41] And the proportion of domestic and nondomestic homicides committed with firearms was similarly low—between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[42]

_The American Revolution in the Pennsylvania Hinterland_ (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, _Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania_ (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, _All God's Children: The Bosket Family and the American Tradition of Violence_ (New York: Vintage, 1996), 3-18.

[40] Roth, "Why Guns Are and Aren't the Problem," 119-120.

[41] Roth, _American Homicide,_ 180, 183-186; and Eric H. Monkkonen, _Murder in New York City_ (Berkeley: University of California Press, 2001), 15-16.

[42] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf). On weapons use in homicides in the North, see Figures 25 through 46.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

25.     Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[43] And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread. By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[44] African Americans still faced discrimination and limits on their basic rights in most Northern states. But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[45]

26.     Because gun use was generally limited to hunting, controlling vermin, or serving in the militia, there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels. They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed for the nation's democratic polity and the lives of public men: editors, attorneys, military officers, and politicians.[46]

---

[43] Roth, *American Homicide*, 180, 183-186.

[44] Ibid., 180, 183-186.

[45] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[46] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

(continued…)

27.     Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[47] where violence among citizens increased after the Revolution to extremely high levels. Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[48] Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.[49] Prominent whites were subjected to the rough and tumble of partisan politics and their position in society was threatened by people from lower social positions.[50] African Americans despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of African American rebellion.[51] As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[52] The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in the early national period.[53] During the Early National period, the proportion of homicides

---

[47] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[48] Roth, *American Homicide*, 180, 199-203.

[49] Ibid., 182.

[50] Ibid.

[51] Ibid.

[52] Ibid., 182, 199-203.

[53] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[54]

28.     Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming proportion of the era's murders and serious assaults.[55] They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[56]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[57] These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates. Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

---

[54] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[55] Roth, *American Homicide*, 218.

[56] Ibid., 218-219. See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[57] Roth, *American Homicide*, 219.

17

29.     The pistols of the early national period represented a technological advance. Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber. Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[58] The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting. Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[59]

30.     The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838. These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.

31.     Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive. It made it unlawful for merchants

---

[58] Roth, "Why Guns Are and Aren't the Problem," 117.

[59] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

> and any other person or persons whatsoever, to sell, or offer to sell,
> or to keep, or have about their person or elsewhere . . . Bowie, or
> any other kind of knives, manufactured or sold for the purpose of
> wearing, or carrying the same as arms of offence or defence,
> pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers. But the laws in the other five states were also strict: they forbade the carrying of concealable weapons in all circumstances. Indiana made an exemption for travelers.[60]

32. Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[61]

---

[60] *See* Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols; *see also* Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[61] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*,

(continued...)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

C.   **Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)**

33.     By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[62]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.

34.     Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[63]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Rates that had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities.  In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana to 90 per

---

revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[62] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.  These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont.  However, Vermont also had such a law by the early twentieth century.  *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

[63] Roth, *American Homicide*, 297-300.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

100,000, and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. In the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers. And so, the United States became—and remains today—by far the most murderous affluent society in the world.[64]

35.    The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[65] Because the pistols, muskets, fowling pieces, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[66] Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons. But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

36.    Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their

---

[64] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[65] Roth, "Why Guns Are and Aren't the Problem," 116-117.

[66] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

(continued…)

association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[67] They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time. Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever. Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun. But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[68]

37.     Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway. It had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[69]  And it did not require a new percussion cap for each chamber, because the primer

---

[67] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

[68] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[69] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

(continued…)

was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[70]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;
>
> That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[71]

38.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[72]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading. The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[73]

39.     These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns

---

[70] Ibid., 38-57.

[71] Ibid., 39.

[72] Ibid., 38-57.

[73] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

(continued…)

as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[74] Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[75]

40.     As modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.   By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states.[76] In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.   Homicide rates whipsawed, however, in the South.   They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.[77] Ominously, too, firearms invaded families and

---

[74] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*." (emphasis added)).

[75] Ibid., 124-125.

[76] In this analysis, the Prairie states include Iowa, Kansas, Minnesota, Nebraska, North Dakota, South Dakota, and Wisconsin.   The industrial states include Illinois, Indiana, Michigan, New Jersey, New York, Ohio, and Pennsylvania.

[77] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.

(continued…)

intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[78]  That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers— reached today's levels by the 1920s, ranging from a median of 56 percent in New England to over 70 percent in the South and West.[79]  And that is why every state in the Union restricted the right to carrying certain concealable weapons, including restrictions on the modern revolvers that had been invented in the mid- and late-nineteenth century, such as the Smith and Wesson Model 1 revolver and the Colt double-action revolver.[80]

41.      It is important to note that state legislators experimented with various degrees of firearm regulation as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June 1865 to June 1868,[81] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of weapons, including firearms, on social occasions;[82] and it followed in

---

[78] Ibid., 125.

[79] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[80] *See supra* paragraph 33 & note 62.

[81] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192, available at https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents.

[82] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610, available at https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf.  "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be

(continued…)

1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[83]   These laws

---

deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63; *see also* Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019), available at https://repository.tcu.edu/handle/116099117/26778.

[83] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he

(continued…)

were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[84]

42.     Tennessee and Arkansas went further than Texas to stem the tide of post-Civil War interpersonal violence. In 1871, Tennessee flatly prohibited the carrying of pocket pistols and revolvers, openly or concealed, except for the large army and navy pistols commonly carried by members of the military, which could be carried openly, but not concealed.[85] Arkansas

---

shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3." The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces. Also, the deadly weapon law did not apply to all guns or firearms but just pistols. The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'" *See also* Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163, available at https://repository.tcu.edu/handle/116099117/26778.

[84] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620. The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication. *See also* Rivas, "Deadly Weapon Laws of Texas," 164-195.

[85] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

(continued…)

followed suit in 1881.[86]  Tennessee's law withstood a court challenge, and Arkansas's was never challenged.[87]

43.     Both Tennessee and Arkansas also moved to prevent the sale or transfer of pocket pistols or ordinary revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[88]  Arkansas passed a similar prohibition in 1881, but went even further by prohibiting the sale of pistol cartridges as well: "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[89]

---

[86] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[87] *See* Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), available at https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[88] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[89] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

(continued…)

44.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[90] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons. A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[91]

45.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves. And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[92]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances

---

[90] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[91] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851.

[92] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

(continued…)

that they enforced.[93]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[94]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[95]

46.     Other states, like Ohio, tried to have it both ways. The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety. But it directed jurors, in the same law, to acquit persons who carried such weapons

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[96]

The burden of proof remained with the person who carried the concealed weapon.

It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement. The varying policy choices illustrate that as jurisdictions debated the appropriate response to violence in the late nineteenth and early twentieth century, restrictions of particular weapons were some of the policy options available to

---

[93] Ibid., 11.

[94] Ibid., 11-13.

[95] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[96] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

lawmakers, even if they opted not to use them.

## III. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

47.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies which, unlike those of today, did not enable single individuals to commit mass murder.[97]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans, irregular warfare among citizens seeking political power, or public demonstrations that turned deadly, like the Boston Massacre, in which seven soldiers opened fire on a crowd of roughly fifty men and boys, killing five and wounding six.[98]

---

[97] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).  On the Boston Massacre, see Alan Taylor, *American Revolutions: A Continental History, 1750-1804* (New York: W. W. Norton, 2016), 109-110; Eric Hinderaker, *Boston's Massacre* (Cambridge: The Belknap Press of Harvard University Press, 2017); Bernard Bailyn, *The Ordeal of Thomas Hutchinson* (Cambridge: Belknap Press of Harvard University Press, 1974), 156-163; and Alfred F. Young, *The Shoemaker and the Tea Party: Memory and the American Revolution* (Boston: Beacon Press, 1999), 36-41.

[98] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish, as described in Roth, *American Homicide*, 42; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio, as described in Rob Harper, "Looking the

(continued...)

---

31

48.     Examples of mass killings carried out by groups include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871. Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent. Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[99]

---

Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644, available at https://www.jstor.org/stable/25096733#metadata_info_tab_contents.   For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War, as described in Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54, and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham, as described in J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

[99] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

49.     The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments. The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[100] But when federal troops were withdrawn, white supremacist mass killings resumed. In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[101] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes. Rioters and vigilantes remained a threat well into the twentieth century. In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[102]

---

[100] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

[101] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158. *See also* LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[102] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

## IV.  ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT

50.     The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time. These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers, which led public officials to implement a variety of restrictions to aid law enforcement and safeguard the citizenry.

51.     The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

52.     The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare. The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[103]

53.     Criminals and terrorists quickly discovered how accessible and useful these new technologies were. They could be purchased legally by private citizens.

---

[103] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

(continued…)

54.     In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[104]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.  Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), and was favored by labor activists and anarchists.[105]

55.     Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day Massacre and the Kansas City Massacre.[106]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an

---

[104] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022.  The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[105] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  *See* U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012*, available at https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download, accessed October 4, 2022.

[106] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[107]  Dynamite was also used effectively for malicious, private ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[108]

56.    Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[109] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[110]  The Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act,

---

[107] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[108] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[109] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238, https://scholarship.law.duke.edu/lcp/vol83/iss3/13.  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[110] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[111]

57.     Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder. The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder. The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[112] And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks. It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[113]

58.     In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines. These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed

---

[111] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[112] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J). The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007. Accessed August 31, 2022.

[113] See Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, New York Times, December 18, 2018, available at https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html, accessed October 4, 2022.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

for military use during the Cold War, beginning with the Soviet AK-47 assault rifle, which was invented in 1947, adopted by the Soviet Army in 1949, and used in the 1950s by the Soviets or their allies during the Hungarian Revolution, the Vietnam War, and the Laotian Civil War.[114] The signature military firearm of that era—the M-16 rifle with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[115]—was capable of firing 750 to 900 rounds per minute when set on fully automatic.[116] But the M-16 was used more often in combat—and more accurately, effectively, and sustainably as a weapon for inflicting mass casualties—when set on semiautomatic, which was standard military procedure. That is why the U.S. Army defines "rapid fire" as 45 rounds per minute (the rate of fire of an M-16 when set on semiautomatic), not 750 to 900.[117] And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst (but otherwise the same weapon as the M-16)—an alteration that slows the potential rate of fire, conserves ammunition, and improves accuracy.[118] The civilian version of the M-16—the ArmaLite AR-15—has

---

[114] Edward and Ezell, *The AK-47 Story: Evolution of the Kalashnikov Weapons* (Harrisburg, Pennsylvania: Stackpole Books, 1986).

[115] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[116] Edward Ezell, *The Great Rifle Controversy: Search for the Ultimate Infantry Weapon from World War II through Vietnam and Beyond* (Harrisburg, Pennsylvania: Stackpole Books, 1984).

[117] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016), https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf, accessed October 4, 2022.

[118] *See* military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

approximately the same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute.[119]

59.    The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second. But technological advances have increased the speed at which semiautomatic handguns can be fired. An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[120] And they are affordable. A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[121]

60.    It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that arrived on the domestic market in the 1970s and 1980s. These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff, which is why many police and sheriff departments across the United States have purchased semiautomatic rifles and armored vehicles to defend themselves and decrease the likelihood that officers are killed or wounded.[122]

---

[119] Ezell, *The Great Rifle Controversy, 177-192.*

[120] *See* Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

[121] *See* guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

[122] Sam Bieler, "Police Militarization in the USA: The State of the Field," Policing: An International Journal 39 (2016): 586-600, available at https://www.emerald.com/insight/content/doi/10.1108/PIJPSM-03-2016-0042/full/pdf?casa_token=TYUuIouUCc8AAAAA:IWXQRQOtW90KZ2AKwzHNMX2tfRix0zAxRRkjQSy3rA-uUpnylZrnp0Xolhj7UFIf05WGZkr_92L__QGk_OAxnSH-3h26oxKC4e7vM79VCBpFl9_cHg.

(continued…)

61.     Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[123]

62.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[124]

---

[123] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022, available at https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download, accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida.  See James Gangler, *Are Binary Triggers Legal (2023) All You Need to Know*, Lunde Studio, available at https://lundestudio.com/are-binary-triggers-legal/, accessed October 4, 2022; *see also* americanfirearms.org, "A Complete Guide to Binary Triggers," available at https://www.americanfirearms.org/guide-to-binary-triggers/, accessed October 4, 2022.

[124] *See* "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

63.     The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings. The danger these firearms pose is intrinsically different from past weaponry. In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been more deadly than mass shootings with fully automatic weapons.

64.     And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below, for the number of persons killed or wounded).

41

Figure 2

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

65.     Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and semiautomatic handguns 11 percent more than regular firearms. But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns. Semiautomatic handguns cause an average of 184 percent more deaths than regular firearms. In combination, semiautomatic firearms and extended magazines are extraordinarily lethal.

66.     The data in Figures 1 and 2, and in the immediately above paragraph, are from the Violence Project.[125] The Violence Project, which has compiled data on mass shootings from

---

[125] The Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022. The Violence Project database provides information on the weapons used in the shootings. It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons. Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic. I have not participated in Violence Project or in the collection of their data. In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, not yet included in the Violence Project's data, that fit the Violence Project's definition of a mass shooting: the Buffalo, New York, supermarket shooting on May 14; the Robb Elementary School shooting in Uvalde, Texas, on May 24; the Tulsa, Oklahoma medical center shooting on June 1; the concrete company shooting in Smithsburg, Maryland, on June 9; the Highland Park, Illinois, Fourth of July Parade shooting; and the Greenwood, Indiana, Park Mall shooting on July 17. Three were committed with semiautomatic rifles and three with semiautomatic handguns. The table in this report, (continued...)

1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." Other authorities have adopted similar definitions of "mass shootings" and "mass murder." For example, the FBI has defined mass murder as "a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murderers."[126] Federal legislation enacted in 2013 authorized the Attorney General to assist in the investigation of mass killings, defined to mean "3 or more killings in a single incident."[127]

67.    What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two: in 1998 in Jonesboro, Kentucky; in 1999 in Littleton, Colorado; in 2015 in San Bernardino, California; and in 2019 in Jersey City, New Jersey. In the nineteenth and early twentieth centuries, it required scores of individuals to gather together as mobs, rioters, vigilantes, or terrorists to kill or wound dozens of people in a short space of time— generally because of their race, ethnicity, or faith.

---

unlike the tables in the Violence Project, does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded). The Las Vegas shooting is an outlier in the number killed and wounded which would skew the results of the analysis.

[126] FBI, *Serial Murder: Multi-Disciplinary Perspectives for Investigators* at 8 (2005), available at https://www.fbi.gov/stats-services/publications/serial-murder#two, accessed January 3, 2023.

[127] 28 U.S.C. § 530C(b)(1)(M).

68.     Today, because of the availability of extended magazines and certain classes of semiautomatic firearms, it requires only one or two individuals to kill or wound that many people.  And because of these modern technologies, which were developed for warfare, angry, alienated individuals can commit mass murder for reasons that are simply personal.  Mass murderers no longer require collaborators to rally to a cause.  For example, they can kill large numbers of people simply because they feel slighted at school, because they don't get along with their coworkers, because they were rejected romantically, or because they simply want to make a name for themselves.  Since it is impossible in our society—indeed, in any society—to ensure that no one is angry or alienated, public officials have recognized that restricting access to extended magazines and certain classes of semiautomatic firearms mitigates the risk to every American.

69.     For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  Local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene—usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011, was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines.  Every one of those rounds hit an individual, killing six and injuring twelve.[128]

---

[128] "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

## V.   CONCLUSION

70.     From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions. That is why every state restricted the carrying of concealable weapons by the early 20th Century, and the majorly of states prohibited it outright; why the federal government passed the Ku Klux Klan Acts during Reconstruction; and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership and control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit murder. Public officials are not required to pass such laws, of course, but historically, they have always understood their ability to do so, and there is no evidence in the historical record to suggest that policy makers took their decisions lightly when they imposed these restrictions.

71.     In recent decades, public officials have been called on to address not just the longstanding and vexing criminological problems of murder and interpersonal violence in the United States, but also *mass* murder and *mass* interpersonal violence resulting from changes in firearms technology that emerged in the late nineteenth through the late twentieth century. And at the state, local and federal levels, officials have responded to this new threat similar to the way they responded to its antecedents — by exercising their authority to restrict the lethal technologies that underlie the problem and jeopardize the safety of their constituents.

Randolph Roth

6/8/2023          Date

45

# EXHIBIT A

Randolph Roth                                                                Page 1

Curriculum Vitae

RANDOLPH ROTH

Department of History                          6987 Grandee Cliffs Drive
The Ohio State University                      Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                 (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                    2

Education                                                       2
Academic Positions                                              2
Honorary Positions                                              2
Professional Honors and Awards for Scholarship                  2
Professional Honors and Awards for Teaching                     3
Grants                                                          3

**Bibliography and Research**                                   4-17

**Teaching**                                                    18-20

**Service**                                                     21-26

Randolph Roth                                                    Page 2

**Personal**

    Marital Status:              Married         Allison Sweeney
    Children:                  Alexander


**Education**

1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)


**Academic Positions**

1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
1978-1985, Grinnell College: Assistant Professor of History
1978, University of Vermont: Instructor in History
1974-1977, Graduate Teaching Assistant, Yale University


**Honorary Positions**

2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa


**Professional Honors and Awards for Scholarship**

2022, Distinguished Scholar Award, Division of Historical Criminology, American Society of Criminology

2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

2012, Fellow, American Association for the Advancement of Science

2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

2010, Allan Sharlin Memorial Award, Social Science History Association,

Randolph Roth                                                        Page 3

for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village Research Society, for distinguished work in the history of rural society

1982, Theron Rockwell Field Prize, Yale University, for the outstanding dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the outstanding dissertation in American history

1973, James Birdsall Weter Prize, Stanford University, for the outstanding senior thesis in history

**Professional Honors and Awards for Teaching**

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in History at Ohio State University

**Grants**

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science Foundation (SBR-9808050)

Randolph Roth                                                      Page 4

    1992, Fellow, Workshop on the Rhetoric of Social History, University of
    Iowa

    1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

    1987, National Endowment for the Humanities, Summer Stipend

    1983, Research Fellowship for Recent Recipients of the Ph.D., American Council
    of Learned Societies

    1981, Fred Harris Daniels Fellowship, American Antiquarian Society


                          **Bibliography and Research**


**Books**

    *American Homicide* (an interregional study of violent crime and violent death in
    America from colonial times to the present). The Belknap Press of Harvard
    University Press (2009), 655 pp.

    *The Democratic Dilemma:  Religion, Reform, and the Social Order in the
    Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press
    (1987), 399 pp.


**Edited Volumes**

    Co-founder and co-director, Historical Violence Database (on-line database on
    violent crime, violent death, and collective violence).  Web address:
    www.sociology.ohio-state.edu/cjrc/hvd

    American Homicide Supplementary Volume (on-line supplement to *American
    Homicide*, including detailed appendices on methods, supplemental tables, graphs,
    and statistical analyses), approx. 750 pp. Web address:
    http://cjrc.osu.edu/researchprojects/hvd/AHsup.html


**Essays on Historical Subjects**

    "Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with
    Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).

"The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-399.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

 "Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence

Randolph Roth                                                    Page 6

in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

"Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central

Randolph Roth                                                              Page 8

Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods* (1986) 19: 103-117.

## Public History Essays

"Can Faith Change the World?  Religion and Society in Vermont's Age of Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.

## Works in Progress

*Child Murder in America*. An interregional study of murders of and by children from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of Speaking for Nature" (essay in manuscript)

## Editorial Boards

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*

## Invited Lectures

"Trust, Legitimacy, and the Recent Rise in Homicide in the United States," Council on Criminal Justice, Washington, D.C., October 19, 2022.

"The History of Police Involved Homicides in the United States," Mary Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime Historians Symposium, Leeds University, Great Britain, Scheduled for September

Randolph Roth                                                                 Page 9

2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

Randolph Roth                                                                 Page 10

"Quantitative Analysis of the History of Crime and Violence: Achievements and Prospects," Keynote Address, Conference on "Making Sense of Violence," University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

"American Homicide: Its History," Ohio State University at Newark, Nov. 6, 2007

"American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

"The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group,

Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October,

Randolph Roth                                                                              Page 12

1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities.  The presentation was televised in Vermont.  It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999

**Papers Delivered at Professional Meetings (recent)**

"The Social and Geographical Context of Child Homicides in the United States, 1989-2015," Homicide Research Working Group, June 2, 2022, Excelsior Springs, Missouri, and Social Science History Association, November 17, 2022, Chicago.

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

Randolph Roth                                                    Page 13

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

"The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports,"

Randolph Roth                                                                 Page 14

Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005

## Reviews

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918.* (Western Historical Quarterly, 2020).

Randolph Roth                                                      Page 15

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty:  A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic:  Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness:  Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence:  an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love:  Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America:  Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws:  Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation:  Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen:  The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change:  Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power:  The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life:  Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Randolph Roth                                                              Page 17

    Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture*
    (Journal of the Early Republic, 1988).

    William Lynwood Montell, *Killings:  Folk Justice in the Upper South*
    (International Journal of Oral History, 1987).

    David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early
    Industrial New England* (Journal of American History, 1987).

    Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of
    Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

    German
    Spanish
    French (reading)


**Quantitative Skills**

    Probability and Statistics (including econometric techniques of political analysis,
    exploratory data analysis, and log-linear and logit analysis)
    Calculus and Analytical Geometry
    Linear Algebra and Nonlinear Dynamics
    Differential and Series Equations
    Abstract Algebra

Randolph Roth                                                                              Page 18

<div align="center">**Teaching**</div>

### Graduate

| History 7000 | Topics in American History to 1877 |
|---|---|
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| History 2001 | American Civilization, 1607-1877 (and Honors) |
|---|---|
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| | |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

Randolph Roth                                                    Page 19

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Randolph Roth                                                          Page 20

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                                    Page 21

## Service

**Service in Professional Organizations**

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                          Page 22

        1987, Program Committee, Social Science History Association


**Reviews of Manuscripts**

        American Historical Review
        Journal of American History
        William and Mary Quarterly
        Journal of the Early Republic
        Social Science History
        Journal of Interdisciplinary History
        Historical Methods
        Journal of Women's History
        Journal of the Family
        Crime, History, and Societies
        European Journal of Criminology
        American Journal of Sociology
        Sociological Quarterly
        Criminology
        Criminal Justice Review
        Journal of Criminal Law and Criminology
        Law and Social Inquiry
        Homicide Studies
        International Criminal Justice Review
        International Journal of Law, Crime, and Justice
        Law and Society Review
        City and Community
        Eras Review
        Western Historical Quarterly
        Canadian Journal of Sociology
        Journal of the Gilded Age


**Memberships in Professional Organizations (current)**

        American Historical Association
        Organization of American Historians
        Social Science History Association
        European Social Science History Association
        American Society of Criminology
        Homicide Studies Working Group
        American Association for the Advancement of Science


**Service at Ohio State University**

Randolph Roth                                                                 Page 23

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

Randolph Roth                                                    Page 24

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin: advises City Council on all matters concerning utilities, policing, transportation, parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit Badge Counselor / Eagle Scout Association / Philmont Staff Association / Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

Randolph Roth                                                                                   Page 25

   1988-present, President / Vice President / Trustee, East Dublin Civic Association

   1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew
   Leader

**Outreach / Media Appearances**

   Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on
   so-called "Stand Your Ground" laws.

   B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility
   Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

   Testimony to Federalism Committee of the Ohio House of Representatives, June
   12, 2019, on concealed carry laws.

   Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

   Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S.
   with Undergraduate Students, April 10, 2019

   "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

   "How the Erosion of Trust Leads to Murders and Mass Shootings," invited
   editorial, *Washington Post*, October 6, 2017

   "Mass Murder in American History," CSpan-3, April 2, 2017

   All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism,"
   December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the
   United States," March 14, 2017.

   Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-
   2014

   Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-
   span.org/LocalContent/Columbus/)

   Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E
   Home Video)

   "It's No Mystery: Why Homicide Declined in American Cities during the First
   Six Months of 2009," History News Network, November 22, 2009

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 **(http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column)**

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

# EXHIBIT "G"

EXHIBIT "G"

Expert Report: Historical Gun Laws and Weaponry

Prepared for the New Jersey Office of the Attorney General by

Robert J. Spitzer, Ph.D.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br><br>& PISTOL CLUBS, INC., et al.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>　Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>　Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>　Defendants. | Civil Action No. 3:22-cv-04397 |

## I.      INTRODUCTION

I have been asked by the New Jersey State Attorney General's Office to render an opinion on the history of firearms restrictions, including those pertaining to fully automatic and semiautomatic firearms, ammunition feeding devices, the origins of multi-shot firearms, and the historical regulation of other dangerous weapons.

## II.      BACKGROUND AND QUALIFICATIONS

I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland and an Adjunct Professor at the College of William and Mary School of Law. I was also a visiting professor at Cornell University for thirty years. I earned my Ph.D. in Government from Cornell University. I have been studying, teaching, and writing about gun policy for over thirty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The eighth edition of the book was published in 2021 by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For over twenty years, I have been a member of both the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence). I am being compensated at a rate of $500/hour for my work on any written materials, and $750/hour for any testimony in connection with this matter. A copy of my curriculum vitae is attached as Exhibit A.

---

[1] Robert J. Spitzer, "Shooting Down Gun Myths," *America*, June 8, 1985, 468-69.

I have been invited to submit written testimony and serve as an expert witness in the following cases, in addition to this one: *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.).

2

## SUMMARY OF OPINIONS

Gun ownership is as old as America, but so are gun laws. From the 1600s through the early twentieth century, the colonies, states and localities enacted literally thousands of gun laws of every imaginable variety. In this document, I demonstrate that a specific relationship existed between the development of new weapons technologies, their spread into society, and regulation by the government as part of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence. The pattern of criminal violence and concerns for public safety leading to weapons restrictions, as seen in contemporary restrictions on assault weapons and large capacity magazines, is not new; in fact, it can be traced back throughout the Nation's history.

I examine a number of specific examples of weapons that, when they were invented or developed and then made their way into civil society, were subject to governmental restriction. The examples include restrictions on fully automatic (most famously the Tommy gun) and semi-automatic firearms, detachable ammunition feeding devices, both from the early twentieth century; analysis of experimental multi-shot firearms dating back several hundred years, and of multi-shot firearms that proved more successful, including Colt revolvers and Winchester rifles; Bowie and similar long-bladed fighting knives; clubs and other blunt weapons; anti-concealed carry laws; and restrictions on "trap guns."

Firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality.  This historical record is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century.  The historical record summarized

3

here makes clear that contemporary restrictions among the states pertaining to assault weapons and large capacity ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

## I.   INTRODUCTION

1.       The current controversy surrounding legislative efforts to restrict assault weapons and large capacity magazines (LCMs) has roots in earlier generations. The effort to restrict such magazines was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others. The assailant fired a total of 105 rounds in about three minutes from a 75-round magazine and a 30-round magazine, both of which he emptied before killing himself.[2]  Later that year, California enacted the first assault weapons ban in the country. New Jersey enacted an assault weapons and LCM ban in 1990.[3] Five years later, Congress enacted a limited ten year assault weapons ban that also included a restriction on ammunition magazines holding more than 10 rounds.[4]

2.       As of this writing, ten states plus the District of Columbia have enacted assault weapons and LCM bans, as have various localities around the country.[5]  These jurisdictions

---

[2] "A Report to Attorney General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings," October 1989, 7-8, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf

[3] *See Assault Weapons in New Jersey*, GIFFORDS LAW CENTER, https://giffords.org/lawcenter/state-laws/assault-weapons-in-new-jersey/ (last visited May 30, 2023).  *See also* N.J.S.A. 2C:39-1.

[4] Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25-26, 205-11.

[5] Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14–15.  The ten American jurisdictions with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington State.  The Hawaii law applies only to

represent approximately 109 million people, or approximately 32.7% of the U.S. population.[6]

Fourteen states plus the District of Columbia restrict LCMs.[7]  These jurisdictions represent more

than 115 million individuals, or approximately 34.5% of the U.S. population.[8]

      3.      These recent efforts to restrict assault weapons and LCMs are simply the latest

chapter in a centuries-long effort to promote public safety, protect the public from harm, and to

dampen weapons-related criminality.  The pattern of criminal violence and concerns for public

safety leading to weapons restrictions is not new; in fact, it can be traced back to the Nation's

beginnings.  While the particular weapons technologies and public safety threats have changed

---

assault pistols. Illinois enacted its law, including an LCM limit, in early 2023. C. Mandler, "Illinois governor signs ban on assault weapons and high-capacity magazines," *CBS News,* January 10, 2023, https://www.cbsnews.com/news/illinois-governor-signs-ban-on-assault-weapons-and-high-capacity-magazines/. The U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware enacted its assault weapons and LCM restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[6] See U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates).  The total population in these jurisdictions is estimated to be 101,000,000 out of a U.S. total of about 333,000,000.

[7] Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, 30.  The fifteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.  With four exceptions (Colorado, Delaware, Illinois, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. The Illinois and Vermont laws limit magazines for long guns to ten rounds, and handguns to fifteen. Colorado law limits all magazines to fifteen rounds. Delaware law limits all magazines to seventeen rounds.  Litigation challenging most of these assault weapon and LCM restrictions is currently pending.

[8] U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates).  The total population in these jurisdictions is estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

over time, governmental responses to the dangers posed by certain weapons have remained constant.  Current restrictions on assault weapons and detachable ammunition magazines are historically grounded.  They are part of a pattern in America's history of legislative restrictions on particular weapons stretching back centuries.

4.     In order to understand this pattern, this document begins with a detailed and instructive examination of the wide-ranging restrictions that accompanied the introduction of fully automatic and semi-automatic weapons into civilian circulation in the early 1900s. It then reaches back several centuries to examine pre-twentieth century firearms technologies, incorporating a lengthy list of experimental multi-shot failures, leading to the eventually successful Colt-type revolver and Winchester-type rifle. Before leaving the subject of multi-shot weapons, the section concludes with clarifications about the contemporary assault weapons debate. This document next turns to historical restrictions on fighting knives, blunt clubs and similar weapons, pistols, and trap guns. All follow a remarkably similar and consistent regulatory pattern, culminating in recent developments that also punctuate the relationship between weapons development, their spread into society, and subsequent legal restrictions.

## II.   REGULATORY HISTORY OF FULLY AUTOMATIC AND SEMI-AUTOMATIC FIREARMS

5.     A clear example of this historical pattern is provided by early twentieth-century restrictions related to fully automatic and, in some cases, semi-automatic firearms.  While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[9] it and its successors were military weapons designed to be used in

---

[9] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and in the Spanish-

combat and fired from a tripod or similar supporting apparatus, owing to the Gatling gun's size and weight.  Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger.  The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I. These tripod-mounted military guns, like the Maxim, operated to devastating effect on the battlefield. They initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[10]  Because their use and suitability were limited to military settings, there was no need to regulate these weapons among the civilian population.

6.       Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon:  the Thompson submachine gun, widely known as the Tommy gun.  Though it was developed for use in World War I as "purely a military weapon,"[11] it came too late in the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber gun in 1920.[12] The Tommy gun was initially unregulated after World War I and was made available for civilian

---

American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

[10] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How the Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[11] William J. Helmer, *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 75.

[12] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

purchase in order to try to boost anemic sales, typically with either a 20–30 round stick magazine or a 100-round drum magazine (though the Tommy gun could also fire in semi-automatic fashion[13]).  The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[14]  It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[15] though sales in the early 1920s were sluggish.  By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[16]  This pattern of anemic sales typified the gun's commercial trajectory: "Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start."[17] This was especially true for police forces, to whom Thompson and his company marketed the gun aggressively, even when criminals found the gun appealing. "As a criminal's weapon, the Tommy gun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it has never come off the drawing board."[18] For example, after the 1929 St. Valentine's Day massacre, a representative of Auto-Ordnance visited Chicago police captain

---

[13] Helmer, The Gun That Made the Twenties Roar, 137.

[14] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 149–52; Helmer, The Gun That Made the Twenties Roar, 161-64.

[15] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[16] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 203. Helmer confirms the number of 3000 guns sold by 1925. *The Gun That Made the Twenties Roar*, 74. Helmer says that "sales declined steadily" after 1921; see 130.

[17] Helmer, *The Gun That Made the Twenties Roar*, 129.

[18] Helmer, *The Gun That Made the Twenties Roar,* 126. Helmer quotes numerous police officials denouncing the weapon as useless for the police; see 126-28.

John Stege to offer assistance. Captain Stege "practically ran him out of the office. . . .It was Stege's opinion that not even the police should be armed with machine guns," an opinion shared "by many other lawmen in the country."[19] Another police chief explained why: "It is not possible for a police officer to open a machine gun up on a crowded street . . . because you are going to kill possibly ten innocent people to one criminal."[20] Poor military and law enforcement sales forced the company to "peddle the new gun in peacetime" by trying "to think up something else it might be good for." Their conclusion was to market the gun as "good for anything."[21]

7.      After 1926, sales began to rise, primarily because of newfound interest by the American military, which started to use the weapon in foreign military operations especially in Nicaragua, and by the Belgian military.[22] In 1930, the Auto-Ordnance company closed down its sales department because of escalating concerns about its weapons falling into criminal hands, and the attendant bad publicity. All commercial sales were discontinued except to the military and law enforcement.[23] The result was that by 1932, sales had fallen to fewer than ten per month. Through 1938, the company reported total sales of 10,300. The company's revival came thanks to World War II.[24]

---

[19] Helmer, *The Gun That Made the Twenties Roar*, 126.

[20] Helmer, *The Gun That Made the Twenties Roar,* 126. The gun's rare actual use confirmed this fear. In an attack on John Dillinger, for example, FBI agents "mistakenly shot three innocent customers." (128).

[21] Helmer, *The Gun That Made the Twenties Roar*, 75.

[22] Helmer, *The Gun That Made the Twenties Roar*, 130-45.

[23] Helmer, *The Gun That Made the Twenties Roar*, 143-44.

[24] Helmer, *The Gun That Made the Twenties Roar*, 167-79.

8.     Before the early 1920s, these fully automatic weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society.  When they did begin to circulate, however, their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s.  Another automatic weapon developed for World War I was the Browning Automatic Rifle (BAR).  It fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire up to 650 rounds per minute.  The BAR first appeared on the battlefield in 1918.[25]  It was "a heavy machine rifle weighing nearly twenty pounds with bipod and loaded magazine. . . ."[26]  It, too, made its way into civilian life and found favor among criminals and gangsters in the 1920s and early 1930s.[27]  Guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[28]

9.     I conducted a search of Newspapers.com from 1920-1930 using the search terms "Tommy Gun," "Thompson submachine" and "machine gun." The term Tommy Gun turned up essentially no hits until 1928, a clear indication that this particular term did not come in to wide

---

[25] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[26] Helmer, *The Gun That Made the Twenties Roar*, 37.

[27] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[28] Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey Publishing, 2009), 97–98.

use until fairly late in the decade. The search for machine gun turned up more, but many of them referenced the weapons owned or used by the military (including many stories about World War I). The search for Thompson submachine was much more successful, yielding many articles from across the country. Starting in the fall of 1920, a few newspaper articles described regular reports of demonstrations of the gun for police and other government officials and agencies, and reports of local police forces sometimes purchasing a few of the guns. Reports of demonstrations of the gun to police forces and other state and local officials and also of some purchases appeared regularly starting in 1921, and continued throughout the 1920s, as did numerous articles describing the gun's development and capabilities by inventor John Thompson. These articles also reprinted standard accounts of the Tommy gun's weight, size, firing capabilities and possible uses by law enforcement. Despite this degree of coverage, however, relatively few of the guns were actually purchased in the 1920s, as noted earlier.

10.     To cite a few examples of early news coverage, an account in the Western Sentinel[29] from December 3, 1920 reported on a demonstration of the Tommy gun, saying that it weighed about seven pounds, fired .45 caliber rounds, could fire up to 1500 rounds per minute, could receive a box magazine holding 20 rounds, or a drum magazine with either 50 or 100 rounds. It went on to say that the gun was "without equal for riot use and for the police chasing thieves and other lawbreakers who attempt to escape in automobiles, for with this little weapon it is a very easy thing to rip the tires off of an escaping car, and the gun is so light and simple that an inexperienced man can fire with the effect of an expert marksman and moving targets can be hit with the ease that a fireman sprays a hose or on flame." Other articles touted the gun's

---

[29] "New Type of Gun is Demonstrated Here," Winston-Salem, North Carolina; https://www.newspapers.com/image/89498556/?terms=%22Thompson%20submachine%22&match=1

11

usefulness in controlling riots and mobs. An account from the Jamestown Weekly Alert[30] reported that state and county officials were provided with ten of the guns for "hunting down whiskey runners in the northern part of the state."

11.     Starting in roughly late 1921 and early 1922, a handful of small news items reported thefts of Tommy guns from armories or police stations. The one notable crime-related case to receive enormous press attention was a major seizure of about 600 Tommy guns with ammunition and magazines, first reported about June 16, 1921, from a ship docked at the port of Hoboken, N.J. bound for Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won its independence from Britain in 1922).[31]

12.     Newspaper reports of criminal use of Tommy guns were few, small, and spare until 1926, when a few very sensational news reports of their criminal use received widespread and extensive attention in newspapers across the country. Most of these initial stories were reports of Chicago gangster use (notably one "Al Caponi" in an early account) along with stories from the New York City-New Jersey area. For example, an AP story from October 16, 1926 with the dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer police on the mountain stronghold of New Jersey's machine gun mail bandits."[32] According to the account, eight men robbed a truck of over $100,000 and were holed up at the stronghold. The authorities

---

[30] "New Submachine Guns Received," Jamestown, North Dakota, May 12, 1921; https://www.newspapers.com/image/465633429/?terms=%22Thompson%20submachine%22&match=1

[31] Helmer, *The Gun That Made the Twenties Roar*, 53-61.

[32] "Use Expert Riflemen to Hunt Robbers," Ithaca Journal, N.Y., https://www.newspapers.com/image/254505945/?terms=%22Thompson%20submachine%22&match=1

were also armed with weapons that included machine guns, and were contemplating the

expansion of the search party with 2000 militiamen.

      13.     Coinciding with these extensive stories were articles, editorials, and exposés

calling for changes in the law to address this growing gun crime problem. For example, an article

from the Boston Herald[33] began by quoting a magazine story from Collier's Weekly that

observed: "The police authorities are powerless to interfere with the sale and distribution of the

highest powered instrument of destruction that has yet been placed at the convenience of the

criminal element in this country." The Herald sent out a man to see if an average person could

buy a machine gun "without trouble." The buyer's conclusion: "He had no trouble" purchasing

the gun, which the article labeled "a diabolical engine of death." The article detailed that for the

prospective gun purchaser, "Pistols would not be shown unless the customer exhibited a permit,

but machine guns could be had over the counter with no such formalities." The article concluded

this way: "Here is a case where it seems that 'there ought to be a law.' This weapon. . . was

designed for war. . . .a machine gun is the greatest aid to crime that yet has been placed within

the reach of criminals."

      14.     Reports and exposés, juxtaposed with lurid and sensational accounts of Tommy

gun criminality, built pressure on the states to enact anti-machine gun laws, (at least 32 states did

so between 1925 and 1933; see Exhibits B and D) and Congress was also pressured to act. A

long-stalled bill in Congress to restrict the interstate shipment of guns received renewed interest

and support in 1926, eventually leading to congressional enactment of the Mailing of Firearms

Act of 1927, a limited measure that failed to restrict interstate handgun shipment because it did

---

[33] "Machine Guns for All," Kennebec Journal, Augusta, Maine, December 4, 1926,
https://www.newspapers.com/image/857617757/?terms=%22Thompson%20submachine%22&m
atch=1

not affect non-Postal Service shipments.  From 1926 on, news stories were filled with the kind of sensational gangster-related stories that led to the Tommy gun being labeled the weapon that "made the Twenties roar," and that also led to many anti-machine gun laws. For example, an article dated November 27, 1928[34] reported that "Chicago's war on gangsters and racketeers was reopened tonight with the drafting of a law to prohibit the sale of machine guns. 'Tommy guns,' the bullet spitting little Thompson submachine guns which are inseparable from gang fights, bank robberies, assassinations and other major crimes. . .could be purchased as easily and legally in Chicago as a pound of meat. . . .practically every sporting goods establishment in Chicago carried the firearms and sold them readily. State Senator Arthur Huebsch will introduce the bill." (Illinois adopted an anti-machine gun law in 1931.[35])

### A. State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century

15.     In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws (see Exhibits B and D).  These state (and eventually federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law."[36]  (Today, the organization is known as the Uniform Law Commission.)  In 1923, the Commission organized a

---

[34] "Machine Gun Ban Plan of Chicago," The Salt Lake Tribune, https://www.newspapers.com/image/542285510/?terms=%22Thompson%20submachine%22&match=1

[35] Former Ill. Rev. Stat. ch. 38, ¶¶414a to 414g, "An Act to regulate the sale, possession and transportation of machine guns," approved July 2, 1931.

[36] Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms." In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[37] In 1930, it issued a model firearms act focusing on "guns of the pistol type." In 1932, it issued a model act "intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type." The Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun—the Thompson .45 inch caliber submachine gun becoming most popular. . . ."[38]

16.     Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading."[39] The National Rifle Association endorsed D.C.'s ban, stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."[40] In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the

---

[37] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[38] "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[39] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

[40] S. Rep. No. 72-575, at 5–6 (1932).

association I represent is absolutely favorable to reasonable legislation.  We are responsible for the uniform firearms act. . . . in the District of Columbia.  It is on the books now."[41]

17.      In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun.  The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities.  Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[42]  The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute.  A Tommy gun could go through a 100-round drum magazine in four seconds.  Later versions fired 600 to 700 rounds per minute."[43]

18.      In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[44]

---

[41] "Hearings Before the Committee on Ways and Means," 36.

[42] 48 Stat. 1236.

[43] Moss, "From Gangland to the Battlefield."

[44] "Hearings Before the Committee on Ways and Means," 4.  The version of the bill that appears on page 1 of the Hearings had this definition of machine gun:  "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."

19.     As one member of the committee observed, "The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as [John] Dillinger and others."[45]

20.     To address the problem, the original version of the bill proposed regulating both semi-automatic and fully automatic firearms, as it defined restricted machine guns as did the 1932 D.C. law, with its emphasis on outlawing guns that could fire rapidly and repetitively without reloading, whether semi-automatically or fully automatically: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[46]  The final version of the bill limited restrictions to fully automatic firearms.

21.     In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting semi-automatic weapons (see Exhibit B).[47] The reason for restricting semi-automatic firearms is not hard to discern.  These restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology:  an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[48]  During

---

[45] "Hearings Before the Committee on Ways and Means," 42.

[46] Ibid., 52.

[47] *See also* Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 68–71.  The language of the restrictions in Louisiana, Illinois, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[48] Spitzer, *The Gun Dilemma*, 32–33.  In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns." While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a

17

the time that Thompson and his company were developing and marketing the Tommy gun (which could fire in semi- or full-auto modes[49]), they were also developing the Thompson Autorifle, a "strictly semiautomatic rifle" for which the military showed greater interest than it did for the Tommy gun.[50] The Autorifle was also promoted to police and military organizations, though it was overshadowed by the Tommy gun.[51]

22.     As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time, and the related understanding that these weapons had no justifiable civilian use.  By that time, gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices.  Again, the lesson is the same: once these technologies began to spread in civil society and be used for criminal or other dangerous purposes, and because of the belief that it was "unwise for any civilian to possess" such weapons,[52] regulatory efforts ensued. In sections to come I examine the first successful multi-shot revolvers and multi-shot rifles.

**B.  State Regulation of Ammunition Feeding Devices**

23.     Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic

---

semi-automatic weapon fires a single shot with each pull of the trigger.

[49] Helmer, *The Gun That Made the Twenties Roar*, 48-49, 255-56.

[50] Helmer, *The Gun That Made the Twenties Roar*, 37, 50.

[51] Helmer, *The Gun That Made the Twenties Roar*, 161. Ultimately, the military opted for the semiautomatic M1 Garand over the Autorifle.

[52] "Uniform Machine Gun Act."

18

weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired.  As is the case with contemporary state limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio). As discussed elsewhere in this document, removable magazines were not subject to regulation before this time because those that did exist were a rarity in society and had not played any appreciable role in prodding civil disorder in civil society.

24.     Magazine capacity/firing limits were imposed in three categories of state laws (see Table 1 below): ten states plus the District of Columbia regulating semi-automatic and fully automatic weapons (California, District of Columbia, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and Virginia[53]); eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices (Illinois, Louisiana, Minnesota, New Jersey, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Vermont, and Wisconsin[54]); and four states restricted all guns that could receive

---

[53] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.  Two of these states enacted early laws focused on such weapons' use in hunting.  New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading."  1920 N.J. Laws 67, ch. 31, Section 9.  North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

[54] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine

19

any type of ammo feeding mechanism or round feeding device and fire them continuously in a

fully automatic manner (California, Hawaii, Missouri, and Washington State)[55].

---

Guns, §§ 1-2; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[55] 1927 Cal. Stat. 938, ch. 552, §§ 1–2; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

# TABLE 1

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917-1934[56]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Louisiana (8 rounds; 1932)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-South Carolina (8 rounds; 1934)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

See Exhibit D for statutory text.

25. A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of

[56] Including the District of Columbia. Note that California, Minnesota, and New Jersey appear twice in this table. The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934. See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.[57]

The other three states in this category (Hawaii, Missouri, Washington[58]) utilized this same description.  In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).

26.    The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[59]  (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.[60]  The final version of the 1934 bill was limited to fully automatic firearms only and did not include any limitation by number of rounds fired.)  Regulations concerning removable magazines and magazine capacity were thus common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality, as illustrated by the Tommy gun

---

[57] 1927 Cal. Stat. 938.

[58] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[59] "National Firearms Act," Hearings Before the Committee on Ways and Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 52.

[60] Ibid., 45.

narrative and other weapons discussed here—as these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time.[61]

### C. Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices

27.     The lesson from this sequence of events early in the twentieth century is indicative of our nation's history of weapons regulations, whereby changes in gun policy followed a series of steps that respond to developments in firearms technologies and their use in crime, each dependent on the previous step.  *First*, a new gun or gun technology is invented. *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point.  *Third*, it is often developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use.  *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use. *Finally*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.  New gun laws are not enacted when firearm technologies are invented or conceived.  They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

28.     This lesson is significant because some argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis.  For example, David Kopel argues that "[m]agazines of more than ten rounds are older than the

---

[61] U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

United States."[62]  Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[63]  Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[64]  Therefore, by Kopel's reckoning, since these weapons existed early in (or even before) the country's existence, and were not specifically regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[65]  More to the point, Kopel's claim that ammunition magazines holding "more than ten rounds" were "very commonly possessed in the United States since 1862" and were "owned by many millions of law-abiding Americans" dating back to the "mid-nineteenth century"[66] is simply false, as this report demonstrates.

29.     Kopel's and similar arguments[67] fail for two sets of reasons.  First, as explained in the following section, this sort of narrative misrepresents the availability and capabilities of these

---

[62] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 851.

[63] Ibid., 852-54.

[64] Ibid., 849.

[65] Ibid., 871-72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

[66] Ibid., 871. Kopel insists "that [10-round] magazines" have been "'in common use' and 'typically possessed by law-abiding citizens for lawful purposes'" for "a century and a half" (871-72). This claim is both false and unverified by his article.

[67] Declaration of Ashley Hlebinsky in Support Of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, United States District Court For The Southern District Of California, filed September 27, 2019 (Plaintiffs' Trial Exhibit 2).

early weapons.  Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy.  As one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way."[68]  The firearms and firearm feeding devices regulated in the early twentieth century in the previous account represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

### D.  The History of Pre-Twentieth Century Firearms Technologies

30.     Single-shot, muzzle-loaded firearms were the ubiquitous guns from the time of America's initial settlement by Europeans until the latter part of the nineteenth century.[69]  Yet as researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier).  For example, a firearm from the late 1500s that could fire up to sixteen rounds is described in a book titled, *Firearms Curiosa*.  But this book's very title indicates why this narrative is irrelevant to the modern gun debate.  The definition of "curiosa" is something that is rare or unusual.  As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[70]  That is, they were anything but common, ordinary, or found in general

---

[68] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3-4.

[69] "Weapons of War (1600-1800)," The Smithsonian, February 6, 2018, https://learninglab.si.edu/collections/weapons-of-war-1600-1800/HUoHq60eaAj1UKyz

[70] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

circulation.  Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[71] A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[72]  In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited. Roman candle firing was one type of "superposed" or "superimposed" firing. The other type was controlled, where the gun "was charged with one load on top of another, but the operator had control of the interval between shots. It might have one movable lock or several fixed locks. Each shot would be fired by trigger pull, presumably when the operator felt he had the proper aim."[73]  Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[74]

31.     An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the twentieth and twenty-first centuries).  The patent drawing of this weapon shows it sitting on a tripod on the ground.[75]  It was not a hand-held weapon.  In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a

---

[71] Ibid., 168.

[72] Ibid., 166.

[73] Ibid., 166.

[74] Ibid., 166.

[75] Ibid., 220.

DEFENCE."[76]  It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun.  It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated machine guns."  Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[77]  A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[78] although there are claims to the contrary.  A contemporaneous poet, commenting on 'Puckle's Machine Company', wrote 'Fear not, my friends, this terrible machine.  They're only wounded who have shares therein.'"[79]  This weapon "never advanced beyond the prototype stage."[80]

32.     In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense.  As this account confirms, it was likely never even manufactured beyond perhaps a prototype.  It was a failed effort, even though later gun inventors learned from its failure.

33.     Another example is the case of Joseph Belton, an inventor who corresponded with Congress in 1777, claiming that he could produce and provide a flintlock that could fire as many as 16 to 20 consecutive rounds without reloading. After showing preliminary interest on May 3, Congress balked at Belton's proposed "extraordinary allowance" and decided on May 15 that the

---

[76] Ibid., 219.

[77] Ibid., 219-20.

[78] Ellis, *The Social History of the Machine Gun*, 13.

[79] Winant, *Firearms Curiosa*, 219-21.  See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[80] Rasenberger, *Revolver*, 3.

idea "be dismissed"[81] even though Belton offered to provide a demonstration of his invention.

Belton demonstrated the rifle, which by his account fired projectiles a distance of 20 to 30 yards, to several government officials, including General Horatio Gates, Major General Benedict Arnold, and scientist David Rittenhouse.  These individuals, and some others, signed a cautiously worded letter submitted by Belton to Congress on July 10 saying that "Muskets of his Construction with some small alterations, or improvements might be Rendered, of great Service, in the Defense of lives, Redoubts, Ships &c, & even in the Field. . . ."[82]  That same day, however, Congress decided again that "the petition of Thomas [Joseph] Belton be dismissed."[83]

34.    The problems with Belton's scheme were evident. It relied on "superposed loads" as a firing method, a "discredited" and dead-end technology (see discussion above). Despite Belton's offer to demonstrate the gun, not only are there "no known surviving examples of Belton's gun," but "the only evidence" of the gun's existence is "the correspondence between Belton and Congress."[84] From this account, there is no reason to believe that the gun "had been produced, and was possible to produce in quantity. . . ."[85] In all, Belton's claims about his

_____

[81]https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress

[82]https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress#Belton's_fourth_letter_to_Congress,_July_10,_1777

[83]https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress#Belton's_fourth_letter_to_Congress,_July_10,_1777

[84] "Belton Flintlock," https://military-history.fandom.com/wiki/Belton_flintlock. Harold L. Peterson similarly noted that the only evidence of the alleged existence or operation of the Belton gun was his "meager description" of it, from which "it is impossible to determine exactly how the Belton improvement operated." *Arms and Armor in Colonial America, 1526-1783* (Harrisburg, PA: The Stackpole Co., 1956), 218.

[85] David Kopel, "The Founders were well aware of continuing advances in arms technology," *The Volokh Conspiracy,* May 26, 2023, https://reason.com/volokh/2023/05/26/the-founders-were-well-aware-of-continuing-advances-in-arms-technology/

experimental weapon bore no relationship to actual firearms in circulation in America—since Belton's weapon was never proven feasible, much less reproduced, much less distributed—during this time.  For anyone to claim based on the Belton case that "our Founding Fathers . . . knew about repeating rifles" and therefore "the Second Amendment was . . . designed to protect the right to own a repeating rifle"[86] is not only an unsupported claim, but a preposterous claim.


35.     Isaiah Jennings' multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading,[87] is also cited as an early multi-shot gun.  Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[88]  By

---

[86] Logan Metesh, "As a Matter of Fact, the Founding Fathers Did Know About Repeating Rifles," https://www.thetruthaboutguns.com/founding-fathers-knew-repeating-rifles-bill-rights-drafted/, November 24, 2019; https://memory.loc.gov/cgi-bin/query/D?hlaw:4:./temp/~ammem_XxF4:: ; Dave Duringer, "Founding Fathers Knew About Repeating Rifles Before Bill of Rights," LawNews.TV, July 17, 2016, https://lawnews.tv/founding-fathers-knew-about-repeating-rifles-before-bill-of-rights/; Eli D. Camacho, "5 Myths About the 2nd Amendment and the AR-15," Medium.com, April 2, 2018, https://medium.com/@EliDCamacho/5-myths-about-the-2nd-amendment-and-the-ar-15-a080a94e9a2c; Kopel makes the similar, meaningless claim that the country's Founders "were well aware" of these pioneering, experimental, but unproven multishot technologies. The Founders' "awareness" that such experimental weapons existed centered around their hope that the weapon might eventually prove to be feasible and suitable for military use, a prospect that in any case never came to fruition. Kopel also conflates early American leaders' abiding interest in funding, advancing, and reproducing new weapons technologies for the country's military/national defense forces, on the one hand, with the notion that it had anything whatever to do with private citizen gun acquisition and use, on the other. These two, of course, are profoundly different. Kopel, "The Founders were well aware of continuing advances in arms technology."

[87] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 853.

[88] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

one account, "probably not more than 100 rifles of this type [were] manufactured."[89]  Similar

problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century.

According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some

practical use very early in the nineteenth century, but the loose priming powder in the pan of

each cylinder constituted a hazard that was never eliminated."[90]

      36.    Another example often cited is the Girandoni (or Girardoni) air rifle, a military

weapon developed in Europe in the late 1700s for crack shots in the Austrian army that was

capable of firing up to 20 rounds.  One of these made its way to the U.S. where it was taken

along on the Lewis and Clark expedition of 1804-1806.[91]  But these guns were a rarity, as they

were extremely expensive, fragile, and complex, and few were made—no more than about

1,500.[92]  As one writer noted: "The Girandoni air rifle is a might-have been; a footnote to

military history."[93]  In fact, the rifles never caught on as they proved to be impractical on the

battlefield, and even more so for civilian use.  To wit: "Leather gaskets needed to be constantly

maintained and swelled with water to sustain pressure.  Once empty the reservoirs required a

significant effort and 1500 strokes to restore full power.  A supply wagon was subsequently

---

[89] "Isaiah Jennings,"
https://www.littlegun.info/arme%20americaine/artisan%20i%20j%20k%20l/a%20jennings%20g
b.htm

[90] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

[91] David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.

[92] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

[93] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility.  The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon.  The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[94]  First introduced to the Austrian army in the late 1700s, the gun was pulled from military service by 1815.[95]  One American manufacturer, Isaiah Lukens of Pennsylvania, apparently produced perhaps four such weapons.[96]  The rest were made and used in Europe.  And while Lewis and Clark did bring a Girandoni with them, they never intended to use it in combat or battle, but to impress and deter the Native Americans they encountered (which it did).  Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that the Indians were not aware of the extensive pre-fire preparations needed.[97]

37.     To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[98]  The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations.  But the company was "short-lived" and went "defunct" in 1866, even though its partners included

---

[94] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[95] Markowitz, "The Girandoni Air Rifle"; "Girardoni Air Rifle," ForgottenWeapons.com, https://www.forgottenweapons.com/rifles/girardoni-air-rifle/

[96] Nancy McClure, "Treasures from Our West: Lukens air rifle," Buffalo Bill Center of the West, August 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/

[97] Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[98] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6 (Plaintiffs' Trial Exhibit 2).

Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[99]  Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[100] dubbed "radical defects" by Winchester himself.[101]  In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[102]

38.    Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle. . . generally attributed to be the first semi-automatic rifle."[103]  Yet this "development" was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[104]  The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military.[105]

39.    The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together,

---

[99] These are the three men who came together to form what became the Smith & Wesson gun company. Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.

[100] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[101] Quoted in Haag, *The Gunning of America*, 56.

[102] Haag, *The Gunning of America*, 60.

[103] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8 (Plaintiffs' Trial Exhibit 2).

[104] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[105] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32-39.

found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver. The reason: pepperboxes were "heavy, lumpy, and impractical."[106] The addition of more barrels added more weight to the gun. By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[107] Further, "[t]hey also had a nasty habit of discharging all their barrels at once. No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[108] Indeed, the Colt revolver was "the first widely used multishot weapon,"[109] although it took decades for this and similar revolvers to catch on.

40.     Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun repeaters appeared late in the Civil War.[110] Even so, the "standard infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[111] Historian James M. McPherson concurred that, even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war."[112]

41.     As noted, the idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s. Indeed, Colt biographer

---

[106] Rasenberger, *Revolver*, 54.

[107] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[108] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154. By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison." Winant, *Pepperbox Firearms,* 32.

[109] Rasenberger, *Revolver*, 401.

[110] Kopel, "The history of magazines holding 11 or more rounds"; Kennett and Anderson, *The Gun in America*, 112-13.

[111] Snow and Drew, *From Lexington to Desert Storm*, 90.

[112] James M. McPherson, *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.

Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[113]  The Colt revolver was a six-shot weapon, though the company experimented with other shot capabilities.[114] Even then, Colt could not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public.  The government, in fact, dismissed such firearms as mere "novelties."[115]  After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[116]  The government also rejected the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s.  The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[117]  And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a single shot pistol."[118]  It took the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar

---

[113] Rasenberger, *Revolver*, 3-5, 401.

[114] Rasenberger, *Revolver,* 35, 316; Kyle Mizokami, "Meet the Colt Single Action Revolver: The Most Famous Gun of All Time?" *The National Interest,* January 24, 2019, https://nationalinterest.org/blog/buzz/meet-colt-single-action-revolver-most-famous-gun-all-time-42352. Though the six-shot was the standard, gun companies experimented and produced revolvers of varying round capacity. Colt, for example, produced a poor-selling seven-shot revolver in the 1870s. Haag, *The Gunning of America,*173-74.

[115] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

[116] Rasenberger, *Revolver*, 136.

[117] Ibid*.,* 390.

[118] Kennett and Anderson, *The Gun in America*, 91.

firearms into society.[119] As discussed here, the increasing circulation of more and cheaper handguns spurred the enactment of anti-concealed carry laws.

42.     While inventor Benjamin Henry claims credit for developing the first practical, lever action repeating rifle (patented in 1860), his competitor Winchester "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the way for Winchester's dominance.[120]  The Winchester rifle could fire up to fifteen rounds without reloading.  Yet the widely known Winchester 1873, "was designed for sale to the Government as a military arm."[121]  A gun whose legendary status wildly outdistanced its actual production and impact, it was nevertheless an important firearm in the late nineteenth century, although this "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its celebrity biography backdated its diffusion and even its popularity."[122]  In fact, the slogan stating that the Winchester "won the West" was invented by a Winchester executive as a marketing ploy in 1919.[123]  Further, "the notion of the Winchester and the Colt as iconic frontier guns is 'as much a fiction as the sources from which it is drawn.'"[124] An analysis of production runs of Henrys and Winchesters from 1861-1871 concluded that they produced a total of 74,000 guns. Most of them—about 64,000—were sold to foreign militaries, leaving about 9200 for domestic American sales. Of those, 8500 were acquired by Union soldiers, leaving a very small supply of guns for

---

[119] Haag, *The Gunning of America,* 34-37, 46-64.  As Haag said, "the Civil War saved" the gun industrialists (65).

[120] Haag, *The Gunning of America*, 96.

[121] Koller, *The Fireside Book of Guns*, 112.

[122] Haag, *The Gunning of America*, 179.

[123] Haag, *The Gunning of America*, 353.

[124] Haag, The Gunning of America, 175.

domestic civilian acquisition.[125]  By comparison, about 845,000 Springfield "trap-door" single

shot rifles were manufactured during this same time period.[126]  Additionally, the Winchester was

not a semi-automatic firearm; it was a lever-action rifle that required the shooter to manipulate a

lever in a forward-and-back motion before each shot.  And when the gun was emptied, it had to

be manually reloaded, one round at a time.[127]  The Winchester Model 1905, then called a "self-

loading" rifle, was a true semi-automatic firearm.  It could receive a five or ten round box

magazine, although from 1905 to 1920 only about 30,000 of the guns were made.  Even in World

War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per

minute.[128]

43.     With all this, the Winchester was by no means universally embraced by long gun

users.  Indeed, "a good many westerners would have nothing to do with the early Winchesters or

other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating

---

[125]     Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 21, 36–41, 51, 59, 65–66, 71, 73, 75; Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[126] See "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3; some of the data in this report is aggregated and printed at the Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm. According to an account of the Springfield, "The end of the Trapdoor series came in 1892, when the government adopted a bolt-action repeating rifle known as the Krag-Jorgensen." "The Trap Door Rifle," National Park Service, July 22, 2020, https://www.nps.gov/spar/learn/historyculture/trapdoor-rifle.htm

[127] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

[128] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

rifle assert its dominance over the single-shot breechloader."[129]  According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[130]

44.     Following the Civil War, revolvers were heavily marketed to the civilian population. For example, when Smith & Wesson's near-monopoly over the manufacture of cartridge revolvers ended with the expiration of its Rollin White patent in 1870, "dozens of other [gun] makers"[131] entered the market. Soon these other manufacturers were producing abundant cheap revolvers at low cost to the consumer. As Kennett and Anderson noted, Colt's initial revolvers sold for $35, but by 1900 the "'two dollar pistol' was a fixture in American life."[132] Further, as the mail order business boomed from the 1870s on, companies like Montgomery Ward and Sears began selling revolvers through their catalogs—especially small, cheaper, lighter-weight models that cost less to mail. Cheap handguns were advertised not only through catalogs, but also through newspaper and magazine advertisements.[133]

---

[129] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[130] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131. A tang sight is an aperture or "peep" sight mounted on the tang end of a rifle (that is, the portion of the rifle extending behind of the receiver) that is used to more accurately aim the rifle. It normally folds and is made of metal. "Vernier Tang Sight," https://www.hallowellco.com/vernier_tang_sight.htm

[131] Kennett and Anderson, *The Gun in America,* 98.

[132] Kennett and Anderson, *The Gun in America,* 99.

[133] Kennett and Anderson, *The Gun in America,* 99-100. See also Haag, *The Gunning of America*, 251-55.

45.     The rise in the circulation of multi-shot handguns in society—notably the Colt revolver and its many handgun copycats—was accompanied by the rapid spread of concealed carry restrictions (see Exhibits B-E), especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[134]  By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[135]  In addition, in the late 1800s and early 1900s several states effectively barred possession of such weapons outright, regardless of other circumstances.[136]  As discussed earlier, it was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern. While the Winchester rifle circulated some in society by the late 1800s, the actual numbers of Winchesters and similar rifles in circulation has been wildly overstated, as discussed here. Among those in civilian hands, they were largely found in sparsely populated Western and frontier areas.

---

[134] Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 218-19.

[135] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[136] Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1917 Cal. Sess. Law 221-225; 1923 Cal. Stat. 695; 1931 N.Y. Laws 1033, ch. 435, § 1. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

38

46.     As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to understand the connection between gun technology developments and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments.  As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

47.     *First*, a new gun or gun technology must be invented.  *Second*, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination.  As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[137]  And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[138]  *Third*, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications.  Military weaponry is developed without consideration of potential civilian use and the consequences of dissemination in the civilian market.[139]  *Fourth*, some military-designed weapons may then spill over into, or adapted to, civilian markets and use.  *Fifth*, if such weapons then circulate sufficiently to pose a public safety or criminological problem or threat, calls for government regulation or restriction

---

[137] Winant, *Firearms Curiosa*, 36.

[138] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

[139] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs.  These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War.  Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

then may lead to gun policy/law changes.  This general sequence is echoed in works like the *Buyer's Guide to Assault Weapons,* a standard reference work on assault weapons.[140]

48.      Again, to simply assert or assume that past firearms design/development, invention, or patenting equals commonality, viability, or a measurable presence or impact on society, is a leap in logic without historical foundation.  It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy Regulatory Commission because no such regulation was enacted around the time of Benjamin Franklin's experiments with electricity in the mid-eighteenth century.  The fact that inventors worked on new firearm designs and modifications tells us nothing about the consequences of such designs for society and public policy.  And the existence of such designs does not equal technological viability or reliability, much less general availability, much less societal circulation and use of these weapons.  Other weapons subject to government restriction in our history further illustrate these principles.

### E.  Clarifying Terms and Concepts about Assault Weapons and LCMs.

49.      Opponents of assault weapons and LCM laws often assert that "[p]rior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance."[141]

---

[140] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4-7. Peterson's Foreword summarizes a similar relationship between weapons development and subsequent calls for regulation.

[141] *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (quoting Kobayashi & Olson et al., In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons," 8 Stan. L. & Pol'y Rev. 41, 43 (1997)).

50.     Such assertions are incorrect.  The terms "assault weapon" and "assault rifle" were the very terms used by the gun companies that first produced, marketed, and sold such weapons to the public.  Gun industry use of the terms "assault weapons" and "assault rifles" appeared in the early 1980s (and even earlier), before political efforts to regulate them emerged in the late 1980s and early 1990s.[142]

51.     A study of the marketing strategies employed by gun manufacturers and gun publications from the time that such weapons emerged in the American civilian market in a significant way in the early 1980s verifies this by reference to company advertisements and gun magazines.[143]  Examples include: Heckler and Koch selling its "HK 91 Semi-Automatic Assault Rifle"; ads for the "Bushmaster assault rifle"; the AKM "imported assault rifle"; the Beretta M-70 that "resembles many other assault rifles"; the AR10/XM-10 (made by Paragon S&S Inc.) advertised as a "Famous Assault Rifle [that] is Now Available in a Semi Auto Civilian Legal Form!" (see Exhibit J); the "AMT 25/.22 Lightning Carbine" that was advertised as an "assault-type semi-auto"; Intratec extolling its TEC-9 as one that "clearly stands out among high capacity assault-type pistols" (see Exhibit I); and the after-market supplier Assault Systems that appealed to civilian owners of "assault weapons," among many other examples.  The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public.[144]  *Guns & Ammo* magazine described the "success of military assault rifles in

---

[142] Violence Policy Center, *The Militarization of the U.S. Civilian Arms Market*, June 2011, http://www.vpc.org/studies/militarization.pdf#page=33; also Violence Policy Center, *Assault Weapons and Accessories in America*, 1988, http://www.vpc.org/studies/awacont.htm; http://www.vpc.org/studies/thatintr.htm.

[143] Tom Diaz, *Making a Killing* (NY: The New Press, 1999) and Tom Diaz, *The Last Gun* (New York: The New Press, 2013).

[144] Diaz, *Making a Killing*, 124–128, 230–231; Diaz, *The Last Gun*, 142–43; Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 8.

the civilian market" in its July 1982 issue.[145]  In 1984, *Guns & Ammo* advertised a book called *Assault Firearms* that the magazine extolled as "full of the hottest hardware available today."[146]

52.      As a standard buyer's guide on assault weapons noted, the "popularly-held idea that the term 'assault weapon' originated with anti-gun activists, media or politicians is wrong. The term was first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry . . . ."[147]  The more expansive phrase "assault weapon" is generally used over "assault rifle" because "weapon" also includes not only rifles but some shotguns and handguns that were also subject to regulation in the federal 1994 assault weapons ban and subsequent laws.

53.      An article in *Outdoor Life* belied the claim that assault weapons are limited only to firearms that fire fully automatically.  That article urged its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons."  In its account, it correctly noted that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4.  These are selective-fire weapons that can shoot semi-auto, full-auto, or in three-round bursts."[148]

---

[145] "Wooters Chooses the 10 Best Gun Designs," *Guns & Ammo*, July 1982, 58, 68; Diaz, *Making a Killing,* 126.

[146] Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 17, 2013, A1, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html

[147] Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* (Iola, WI: Gun Digest Books, 2008), 11.

[148] John Haughey, "Five Things You Need to Know About 'Assault Weapons'," *Outdoor Life*, March 19, 2013, http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons

54.     The effort to rebrand "assault weapons" as something more benign and severed

from its military origins was seen in the publication struggles of Phillip Peterson, whose book,

titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*,[149] is a well-known

reference work on the subject.  As Peterson explained, the gun industry "moved to shame or

ridicule" those who used the phrase "assault weapons," insisting that the term should now only

apply to fully automatic weapons.  Peterson noted that the origin of the term "assault weapon"

was the industry itself.[150]  He found that the NRA refused to sell his book until he changed the

title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles.*[151]  The very same

pattern played out in Canada, where gun companies also used the term "assault rifle" in the

1970s and 1980s until political pressure began to build to restrict such weapons in the aftermath

of a mass shooting in Montreal in 1989.  By the 1990s, gun companies marketing guns in Canada

and their allies also adopted terms like "modern sporting rifles."[152]

55.     Similar claims are also made about the term "large capacity magazine," again

calling it "politically charged rhetoric," and describing such magazines as "standard capacity."[153]

---

[149] Peterson, *Gun Digest Buyer's Guide to Assault Weapons*.

[150] Goode, "Even Defining 'Assault Rifles' Is Complicated."

[151] Phillip Peterson, *Gun Digest Buyer's Guide to Tactical Rifles* (Iola, WI: Gun Digest Books, 2010).

[152] According to Blake Brown, Canadian newspapers ran ads from gun companies selling weapons like the "AR-15 semi-automatic assault rifle," the "Colt AR-15 Semi Auto Assault Rifle," and the "SKS Assault Rifle" among others, in 1976, 1982, 1983, 1985, and 1986 from dealers and companies including MilArm, Colt, and Ruger. "Gun Advocates' Changing Definition of 'Assault Rifles' is Meant to Sow Confusion," *Toronto Globe and Mail*, May 21, 2020, https://www.theglobeandmail.com/opinion/article-gun-advocates-changing-definition-of-assault-rifles-is-meant-to-sow/

[153] E.g. Complaint ¶ 18, Rocky Mountain Gun Owners, et al. v. Town of Superior, No. 22-cv-2680, filed 10/12/22 (D. Colo.).

Identifying a large capacity magazine as one that holds more than ten rounds is not arbitrary, for at least three reasons.

56.     First, the LCM definition of one holding ten or more rounds dates back to at least 1989,[154] in an early version of the law Congress eventually passed in 1994 that defined "a large capacity magazine or belt as one which holds over ten rounds."[155]  Since that time, fourteen states plus the District of Columbia have adopted the LCM ten round limit (see earlier discussion at note 5).

57.     Second, the definition of LCMs based on a ten round limit has been and is widely accepted and used in the scholarly literature in criminology and other fields examining such devices.[156]

58.     Third, as Table 1 and the accompanying discussion in this document shows, from 1917 to 1934 roughly half of the states in the U.S. enacted laws that restricted various ammunition feeding devices, or guns that could accommodate them, based on a set number of

---

[154] Summary: S.386 — 101st Congress (1989-1990), Introduced in Senate (02/08/1989), https://www.congress.gov/bill/101st-congress/senate-bill/386; Violent Crime Control and Law Enforcement Act of 1994, H.R. REP. 103–489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess. 1994, 36.

[155] Violent Crime Control and Law Enforcement Act of 1994, 6.

[156] For example: Gregg Lee Carter, ed., *Guns in American Society,* 3 vols. (Santa Barbara, CA: ABC-CLIO, 2012), III, 777-78; Jaclyn Schildkraut and Tiffany Cox Hernandez, "Laws That Bit The Bullet: A Review of Legislative Responses to School Shootings," *American Journal of Criminal Justice* 39, 2 (2014): 358-74; Luke Dillon, "Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012," Mason Archival Repository Service, George Mason University, May 22, 2014, http://mars.gmu.edu/xmlui/handle/1920/8694; Jaclyn Schildkraut, "Assault Weapons, Mass Shootings, and Options for Lawmakers," Rockefeller Institute of Government, March 22, 2019, https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/; Christopher Koper, et al., "Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms," *Criminology & Public Policy*, 19 (February 2020): 157; Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2ⁿᵈ ed. (NY: Oxford University Press, 2020), 201.

rounds, though the numerical cap for gun firing without reloading varied at that time from more than a single round up to eighteen.  Thus, the idea of restricting removable magazines by capping the number of rounds dates back at least a century.

## III. HISTORICAL HARDWARE RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS, AND TRAP GUNS

59.     Similar to government regulation of certain types of firearms and ammunition feeding devices in the early twentieth century, which occurred only after the weapons technologies matured, entered the civilian market, and threatened the public through criminal use, government regulation of other weapons typically followed a version of this trajectory during the 1700s and 1800s.  Even though, as discussed earlier, serious crimes became more widespread in the early 1800s, specific crime-related concerns that involved dangerous weapons led to legislative enactments in the late 1700s and early 1800s. For example, from 1780-1809, at least four states (Connecticut, Ohio, New Jersey, Maryland) enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed.[157] At least three states (New York, Ohio, Maryland) enacted laws to punish the discharge of firearms near populated areas.[158] At least four states (Virginia, Massachusetts, North Carolina, Tennessee) criminalized

---

[157] 1783 Conn. Acts 633, An Act For The Punishment of Burglary And Robbery; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4. 1788; Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources. 1799 [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2; The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources, 1809.

[158] James Kent, Laws of the State of New-York Page 41-42, Image 44-45 (Vol. 1, 1802-1812) available at The Making of Modern Law: Primary Sources, 1785; An Act of April 22, 1785, An Act to Prevent the Firing of Guns and Other Fire-Arms within this State, on certain days therein mentioned; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of

45

public arms carrying.[159] Other examples of restrictions of specific types of weapons are discussed in this section.

### A.  Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives

60.    The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[160]

61.    The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms—with or without guards, with differently shaped blades," they eventually

---

Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4. 1788; 1792 Md. Laws 22, A Supplement To An Act Entitled, An Act to Improve and Repair the Streets in Elizabethtown, in Washington County, and For Other Purposes Therein Mentioned, chap. 52, § 4.

[159] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; 1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792); Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801, An Act for the Restraint of Idle and Disorderly Persons § 6.

[160] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

became more standardized as "a large knife with a cross guard and a blade with a clipped point."[161]   The distinctive traits of the Bowie knife are revealed in Robert Abels' book, Bowie Knives, which includes pictures of nearly one hundred such knives made between 1835 and 1890.[162] The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo in 1836), and the knife's distinctive features, encouraged its proliferation,[163] referred to by one historian as "the craze for the knives."[164]   As was true of other knives with long, thin blades,[165] they were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[166]   Indeed, such knives were known as "fighting knives"[167] that were "intended for combat."[168]   In the early nineteenth century "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[169]   In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately

---

[161] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/.

[162] Robert Abels, *Bowie Knives* (NY: Abels, 1979).

[163] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[164] Davis, *Three Roads to the Alamo*, 583.

[165] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[166] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485; Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 35-44.

[167] Roth, *American Homicide*, 218.

[168] Flayderman, *The Bowie Knife*, 59.

[169] Roth, *American Homicide*, 218.

resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[170]

62.      Homicide rates increased in the South in the early nineteenth century, as did laws restricting concealed weapons carrying.  Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[171]  Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[172]  Flayderman concludes that, as early as 1836, "most of the American public was well aware of the Bowie knife."[173]  (Very much like the allure of contemporary assault weapons to some,[174] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[175])  All this contributed to widespread enactment of

---

[170] Quoted in Roth, *American Homicide*, 218–19.

[171] Baugh, *Rendezvous at the Alamo*, 51.

[172] Flayderman, *The Bowie Knife*, 25–64; 495–502.

[173] Ibid., 43.

[174] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[175] Flayderman, *The Bowie Knife*, 46.

48

laws prohibiting dueling in the states.[176]  In 1839, Congress passed a measure barring dueling in the District of Columbia.[177]  Both pistols and knives were prominently used in such affairs.[178]

 63. At least three state court cases dealt in some manner with fighting knives like the Bowie knife. In the 1840 case of *Aymette v. State*[179] the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[180]  In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[181]  The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens. . . ."[182]  Further, the court added that the state law existed "to preserve the public peace, and protect our citizens

---

[176] A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws yields 35 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[177] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[178] Roth, *American Homicide*, 180–83, 210–17.

[179] Cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[180] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

[181] *Aymette v. State*, 156.

[182] *Aymette v. State*, 157.

from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . ."[183]

64.      Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[184] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[185] On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[186] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[187] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or

---

[183] *Aymette v. State*, 157.

[184] *Haynes v. Tennessee*, 24 Tenn. 120 (1844).

[185] *Haynes v. Tennessee*, 122.

[186] *Haynes v. Tennessee*, 122.

[187] *Haynes v. Tennessee*, 123.

any other weapon in form, shape or size, resembling them."[188] Noting the similarity among knives and the possibility of an unjust outcome where, say, a person might be convicted of carrying a mere pocket knife, the court posed this question: "what is to protect against conviction, when the words of the statute cover the charge, and its true spirit and meaning does not?" Their answer: "the judge and jury who try the case."[189] As the author of a book on Bowie knives noted, "the fact that the term 'bowie knife' had never been precisely defined did not help his [Haynes's] case."[190]

65.     A third state court case relevant to the legal status of Bowie knives is *Cockrum v. State* (1859).[191] The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[192] Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be

---

[188] *Haynes v. Tennessee*, 122.

[189] *Haynes v. Tennessee*, 123.

[190] Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques*, 43.

[191] *Cockrum v. State,* 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm. David Kopel says that a fourth case, *Nunn v. State*, 1 Ga. 243 (1846), is a "major state supreme court case[s] involving Bowie knives." "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy,* November 20, 2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/. But *Nunn* involved a man who was prosecuted for carrying a pistol (openly, not concealed), not a knife. A state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State." By contrast, the court upheld the constitutionality of the concealed carry restrictions, and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." 246; italics in original.

[192] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html

deemed murder and punished as such. . . ."[193] The court upheld the added penalty provision of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions. It described Bowie knives as "an exceeding destructive weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common use."[194] Further, the court said: "He who carries such a weapon. . .makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon."[195]

66.     All of these cases underscore the courts' recognition of the dangerous nature and nefarious use of Bowie knives not only by their characterizations of them, but by the fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.[196]

---

[193] *Cockrum v. State*, 394.

[194] *Cockrum v. State*, 403–04. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See Exhibits C and E. Kopel, "Bowie knife statutes 1837-1899."

[195] *Cockrum v. State*, 403.

[196] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan, "Lincoln assassination: The other murder attempt," *CBS News,* May 10, 2015, https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape.

67.     The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[197]  In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[198]  From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives:  a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibits C, E, and H) totaling 49 states plus the District of Columbia.[199]  For example, 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry), while others imposed taxes on the ability for individuals to acquire or possess them. Georgia sought to stamp out Bowie knife circulation (as well as that of other named weapons) in an 1837 law: "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or to offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons . . . Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c."[200] (see Exhibit H).  The desirability and utility of concealed-

---

https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/

[197] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[198]  A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law. See Exhibit H.

[199] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibits C and E.

[200] 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the

carry restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence. Arkansas combined no-carry provisions (whether concealed or openly) applying to Bowie knives, as well as pistols and other weapons, with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person"[201] bowie knives, pistols, or other listed weapons. Even though the law allowed persons to have them on their own premises, it begs the question of how, exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

68.      States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit H).

69.      The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to enact, much less implement, any measure as sweeping as

---

Unwarrantable and too Prevalent use of Deadly Weapons, § 1.

[201] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3. The law also made an allowance for those carrying weapons "upon a journey."

a knife ban, especially since knives are technologically very simple to produce. After all, the front-line administrative entity on which we today relay for law enforcement, the police, barely existed (in the way we think of policing today) in the early nineteenth century (up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes). Modern police forces only came in to being in a handful of large cities before the Civil War.[202] Second, the chief remedy enacted by the states to address the problem of knife fighting was far more focused and feasible: to bar the carrying of knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols.[203] The fact that all three types of weapons were consistently treated together is conclusive evidence that all were considered so dangerous and inimical to public safety that subject to anti-carry laws and bundled together in legislative enactments.

### B. Historical Restrictions on Clubs and Other Blunt Weapons

70.     Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons. (See Exhibits C and E.)  Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession,

---

[202] Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.

[203] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

sale, or use in crime.[204]  As the table in Exhibit C shows, at least six distinct types of clubs and blunt objects were regulated in the United States.  Notably, every state in the nation had laws restricting one or more types of clubs.  According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but now forgotten."[205]  Escobar provides what he calls "a family history" of these blunt weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[206]  They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[207]  Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[208]  These club-type blunt objects compose a family of objects used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[209]

71.     Among the six types of clubs regulated in U.S. laws, 15 states barred bludgeon carrying.  A bludgeon is a short stick with a thickened or weighted end used as a weapon.[210]  The earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and 1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total exceeds the total number of states because some states enacted the same or similar laws in

---

[204] E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

[205] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.

[206] Escobar, *Saps, Blackjacks and Slungshots*, 2.

[207] Escobar, *Saps, Blackjacks and Slungshots,* 2.

[208] Escobar, *Saps, Blackjacks and Slungshots,* 2.

[209] Escobar, *Saps, Blackjacks and Slungshots,* 1.

[210] https://www.merriam-webster.com/dictionary/bludgeon.

multiple centuries).

72.     A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[211] usually made of wood, plastic, or metal,[212] that is traditionally carried by police, often called a nightstick or baton.[213]  Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[214] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in Kansas in 1862,[215] followed by a New York law in 1866.[216]  Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

73.     At least 14 states barred the carrying of "clubs" more generically, without

---

[211] Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[212] https://www.merriam-webster.com/dictionary/billy%20club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[213] Escobar, *Saps, Blackjacks and Slungshots,* 2, 69-70, 105, 113-30.

[214] Escobar, *Saps, Blackjacks and Slungshots*, 105.

[215] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[216] Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

specifying the type.  The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

74.     Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s and 12 in the 1900s.  A slungshot (or slung shot), also referred to as "a type of blackjack,"[217] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[218]).  By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century.  They had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent.  This gave them a dubious reputation, similar to that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions.  The use as a criminal weapon continued at least up until the early 1920s."[219]  Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be merciless in their use."[220]

75.     In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot. In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[221]

---

[217] Escobar, *Saps, Blackjacks and Slungshots*, 228.

[218] See https://www.merriam-webster.com/dictionary/slungshot Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

[219] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[220] Escobar, *Saps, Blackjacks and Slungshots*, 86.

[221] Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon.  Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon.  Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022,

76.     These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements.  These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions.  The earliest anti-Slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

77.     Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.  Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[222] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag.  (Alternately, they could be made heavier by adding water to the sand.)  The first anti-sandbag law was 1866, with 10 states enacting such laws—7 in the 1800s and 7 in the early 1900s. Only 4 states did not have any prohibitions in any of these six categories, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.  One state, New Hampshire, may not have enacted such a law during this time but did at some point.[223]

---

https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

[222] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

[223] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons.  Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife,

### C. Historical Restrictions on Pistol and Gun Carrying

78.    Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."  Massachusetts followed in 1750.  In the late 1700s, North Carolina and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun carrying spread, forty-three states joined the list; three more did so in the early 1900s (see Exhibit B).[224]  The enactment of laws restricting concealed weapons carrying followed the rise of homicides and interpersonal violence described by historian Randolph Roth who noted that restrictions on firearms from the colonial period to the start of the Revolution were few because homicide rates were low. When homicides did occur, guns were seldom used, in large part because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy.  After the Revolutionary period the spread of violence tied to concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed carry weapons laws.[225]  Concealed carry laws normally targeted pistols as well as the types of fighting knives and various types of clubs discussed here (see Exhibit E for text of such laws). In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in

---

slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665).

[224] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[225] Roth, *American Homicide*, 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17; Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[226] As of 1938, "the carrying of concealed pistols is either prohibited absolutely or permitted only with a license in every state but two."[227] Thus, the widespread enactment of concealed carry laws, along with brandishing and display restrictions, were the public policy remedies to the emergent crime problems described here.  In addition, and consonant with a maturing society, at least 30 states broadened their laws to restrict open weapons carrying as well. Most of these laws were enacted in the post-Civil War period (see Exhibit B).

### D.  Historical Restrictions on Trap Guns

79.    Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner need not be present.  Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or wire which then discharged when tripped.[228]  This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[229]

---

[226] Spitzer, *The Gun Dilemma*, 77-80.

[227] Sam B. Warner, "The Uniform Pistol Act," *Journal of Criminal Law and Criminology* 29 (Winter 1938): 530.

[228] See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[229] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

80.      Also sometimes referred to as "infernal machines,"[230] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders.  Unlike the other weapons restrictions examined here, opinion was initially more divided on the relative merits or wisdom of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices had it coming,[231] though the weight of opinion seemed mostly against such devices because of the likelihood that innocent persons could be injured or killed, and also because such devices represented an arbitrary and excessive meting out of private, vigilante-type "justice" that was unjustifiably harsh—to seriously wound or kill a person—for crimes like stealing food or similar commodities.[232]  Those who set gun traps typically did so to defend their places of business, properties, or possessions.  This 1870 newspaper account from an incident in New York City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino."  After the verdict the man continued to be held under $2,000 bail.[233]

---

[230] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.

[231] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window.  A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

[232] This is my observation based on my reading of numerous historic newspaper accounts from the mid-to late 1800s, and from the number of anti-trap gun laws enacted.  As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[233] "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.  See Exhibit G.

81.      Inevitably, however, the traps wound up hurting or killing innocents, even including the person who set the trap.  For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[234]

82.      In all, at least 18 states had anti-trap gun laws (see Exhibits B and F).  The earliest such law encountered was the 1771 New Jersey law (above).  eleven laws were enacted in the 1700s-1800s, and 9 in the early 1900s (counting states that enacted multiple laws across the centuries).

## IV.  RECENT DEVELOPMENTS

83.      A profound change in firepower occurred in the U.S. in the 1980s, when semi-automatic handguns, and a new generation of more expensive and more deadly guns, entered the criminal market.[235]  According to criminologists Alfred Blumstein and Richard Rosenfeld, writing in the 1990s about the period from 1985-1993 and the dramatic rise in gun crime and homicides during that period, "[o]ver the last decade the weapons involved in settling juveniles' disputes have changed dramatically from fists or knives to handguns, with their much greater lethality."[236]  More specifically, Blumstein attributed this deadly crime spike in the 1980s to "the

---

[234] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.  See Exhibit G.

[235] The prevailing crime handguns of the 1970s and early 1980s were so-called "Saturday night specials," cheap, smaller caliber, short-barreled, easily concealable revolvers that accounted for much gun crime. "Hot Guns," *Frontline,* PBS, aired June 3, 1997, https://www.pbs.org/wgbh/pages/frontline/shows/guns/etc/script.html; also Interview with Garen Wintemute, "Hot Guns," PBS, https://www.pbs.org/wgbh/pages/frontline/shows/guns/interviews/wintemute.html

[236] Alfred Blumstein and Richard Rosenfeld, "Explaining Recent Trends in U.S. Homicide

advent of crack cocaine, semiautomatic handguns and gangs" which "sparked the surge in killings by teen-agers."[237]  Blumstein noted that "[b]eginning in 1985, there was steady growth in the use of guns by juveniles in committing murder, leading to a doubling in the number of juvenile murders committed with guns, with no shift in the number of non-gun homicides."[238] These "young people are less likely to exercise the restraint necessary to handle dangerous weapons, particularly rapid-fire assault weapons."[239]

84.     This shift to greater firepower is consistent with the fact that "from 1973 to 1993, the types of handguns most frequently produced" were "pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993."[240]  Pistols "generally contain cartridges in a magazine located in the grip of the gun. When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is ejected, the firing mechanism is cocked, and a new cartridge is chambered"[241] whereas a revolver is defined as a "handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges. . . ."[242]

---

Rates," *Journal of Criminal Law and Criminology* 4 (Summer 1998): 1191, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6976&context=jclc

[237] Fox Butterfield, "Guns Blamed for Rise in Homicides by Youths in 80's," *New York Times,* December 10, 1998, https://www.nytimes.com/1998/12/10/us/guns-blamed-for-rise-in-homicides-by-youths-in-80-s.html

[238] Alfred Blumstein, "Violence by Young People: Why the Deadly Nexus?" *National Institute of Justice Journal,* August 1995, 5, https://www.ojp.gov/pdffiles/nijj_229.pdf

[239] Blumstein, "Violence by Young People," 5.

[240] Marianne W. Zawitz, "Guns Used in Crime," *Bureau of Justice Statistics,* July 1995, 3, https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF

[241] Zawitz, "Guns Used in Crime," 2.

[242] Zawitz, "Guns Used in Crime," 2.

85.     In testimony before Congress on what became the assault weapons ban of 1994, law enforcement representatives discussed the rise in criminal firepower they witnessed in the 1980s.  For example, the executive vice president of the National Association of Police Organizations, Tony Loizzo, offered this testimony:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased. . . dramatically. . . . The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon.[243]

John Pitta, executive vice president of the Federal Law Enforcement Officers Association testified similarly with respect to the 1994 bill: "[t]he TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals.  Cities across the country confiscate more TEC–9s than any other assault pistol."[244]  The ultimate result was congressional enactment of a ten year restriction on assault weapons and also on ammunition magazines capable of holding more than ten rounds.[245]

## V. CONCLUSION

What does the law say, and what should the law be, regarding the regulation of firearms and other harmful or dangerous weapons and accessories? Given the importance of history, the lesson is abundantly clear. Firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society,

---

[243] H.R. REP. 103-489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess. 1994, 1994 WL 168883, 1994 U.S.C.C.A.N. 1820 (Leg.Hist.), Violent Crime Control and Law Enforcement Act Of 1994, 32.

[244] H.R. REP. 103-489, H.R. Rep. No. 489, 32.

[245] Spitzer, *The Politics of Gun Control*, 205-11.

proliferated, and resulted in violence, harm, criminality, or threats to public safety and good order. This historical record from the 1600s through the early twentieth century, as seen in the examples examined here, is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century. The historical record summarized here makes clear that contemporary restrictions of firearms among the states are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

Gun ownership is as old as the country. But so are laws restricting guns and other dangerous weapons, which have adapted to changes in threats to public safety. If this history teaches anything, it is that the state has no less an abiding interest in preserving public safety today by restricting the tools that magnify violence than it did in prior centuries.

I declare that the foregoing is true and correct to the best of my knowledge.

Executed on  *June 7, 2023* , at Williamsburg, Virginia

Robert Spitzer

Exhibit A

October 2022

## Curriculum Vitae

## Robert J. Spitzer

## Distinguished Service Professor, Emeritus
## SUNY Cortland

Address:     5333 Center St.
             Alexandria, VA  23188
             (607) 423-1781
             Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
             https://sites.google.com/site/robertspitzercortland/


Education:   A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
             M.A. Cornell University, 1978.
             Ph.D. Cornell University, 1980.


Positions Held:

        Department Chair, SUNY Cortland, 2008-2020.
        Interim Department Chair, SUNY Cortland, 2004-2005.
        Distinguished Service Professor, SUNY Cortland, 1997-2021.
        Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-
             1990, 1992-2017.
        Professor, SUNY Cortland, 1989 to 1997.
        Continuing Appointment, SUNY Cortland, 1986.
        Associate Professor, SUNY Cortland, 1984 to 1989.
        Department Chair, SUNY Cortland, 1983 to 1989.
        Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985,
             1986, 1988.
        Copy Editor, Administrative Science Quarterly, 1982 to 1983.
        Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
        Assistant Professor, SUNY Cortland, 1979 to 1984.
        Instructor, Cornell University, 1979.
        Instructor, Eisenhower College, 1978-1979.
        Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
        Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

Honors:

        Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

        Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

        Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

        Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

        Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

        Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

        Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

        Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

        SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

        Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

        Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

        Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

        Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

        Who's Who in the World, 1996.

        Dictionary of International Biography, 1995.

        Who's Who in the East, 1995-96; 1997-98

        Ex officio member, Cortland County Bicentennial Committee, 1987-89.

        Chair, SUNY Cortland Bicentennial Committee, 1987-89.

        Phi Eta Sigma, SUNY Cortland, 1994.

        Phi Kappa Phi, SUNY Cortland, 1990.

        Men of Achievement (1986)

        Contemporary Authors, vol. 112 (1985) and subsequent updates.

        International Authors and Writers Who's Who, 1985-present.

        International Who's Who in Education, Winter 1985-86.

        Herbert H. Lehman Graduate Fellowship, 1975-79.

        Who's Who Among Students in American Universities and Colleges, 1974-75.

        Phi Beta Kappa Club, SUNY College at Fredonia, 1975.

2

Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.


Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.


Publications and Papers:

Books:

The Presidency and Public Policy: The Four Arenas of Presidential Power (University, AL: The University of Alabama Press, 1983). A study of the President's relations with Congress in the making of domestic policy. Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987). A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto: Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution: Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial. Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert

3

Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

4

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023, forthcoming). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:
     Daniel Hoffman, Our Elusive Constitution, (1997)
     Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)
     Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)
     Robert Spitzer, ed., Politics and Constitutionalism, (2000)
     Laura Langer, Judicial Review in State Supreme Courts (2002)
     Ian Brodie, Friends of the Court (2002)
     Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)
     Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, Universal Rights and the Constitution (2014).

Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).

Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).

Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).

Peter J. Galie, et al., eds., New York's Broken Constitution (2016).

Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).

Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).

Clyde H. Ray, John Marshall's Constitutionalism (2019).

Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).

Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)


Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.


<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar,

7

closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, <u>American Government: Freedom and Power</u> (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in <u>Encyclopedia of the American Legislative System</u>, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in <u>The Presidency and the Persian Gulf War</u>, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in <u>The Presidency Reconsidered</u>, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in <u>Understanding the Presidency</u>, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the <u>Encyclopedia of the American Presidency</u>, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the <u>Encyclopedia of the United States Congress</u>, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in <u>The Executive Office of the President</u>, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the <u>Oxford Historical Guide to American Government</u> (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

8

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul

Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New

11

York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian

Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Gun Control (Baltimore: Johns Hopkins University Press, 2023, forthcoming).


Articles:

"Jamestown:  Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69.  Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985):

611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

14

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15.  Reprinted in <u>Annual Editions: Criminal Justice</u> (Dushkin/McGraw-Hill, 2000); and in <u>Criminology</u> (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," <u>Congress Monthly</u>, September/October 2000.

"Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u> 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, <u>Silveira v. Lockyer</u> (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, <u>American Literary History</u> 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, <u>Injury Prevention</u> 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," <u>Law and Contemporary Problems</u> 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" <u>Items: Insights from the Social Sciences</u>, Social Science Research Council, October 17, 2018.

16

"Effective Gun Regulation Can Be Compatible with Gun Rights," <u>The Regulatory Review</u>, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," <u>Law and Contemporary Problems</u> 83, 3(2020): 231-55.

Op-Ed Articles

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," <u>Des Moines Register</u>, October 24, 1985.

"Gun Control and Pressure Politics," <u>Syracuse Post-Standard</u>, November 30, 1985.

"Pocket Vetoes and Abuse of Power," <u>Rochester Times Union</u>, January 7, 1987.

"But for One Vote, a Different Nation," <u>Rochester Times Union</u>, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," <u>Rochester Times Union</u>, September 14, 1987.

"The Great Gun Fallacy," <u>Syracuse Post-Standard</u>, March 30, 1989.

"Four Cases on Right to Bear Arms," <u>Syracuse Post-Standard</u>, April 22, 1989.

"Don't Start Line-Item Veto," <u>Syracuse Post-Standard</u>, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" Intellectual Capital, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

18

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

20

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

21

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

22

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

24

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs,*" *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-*

*Standard,* November 4, 2022.

Testimony, Briefs, and Reports:
"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and <u>Sine</u> <u>Die</u> Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA,

27

February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

28

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

29

<u>Papers and Presentations (not including those given on the Cortland campus)</u>:

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington,

D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg,

31

PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute

32

for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

34

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

37

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.


Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

39

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA,

41

Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.


Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

43

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H.

45

Richard Uviller and William G. Merkel, <u>Journal of American History</u>, March 2004.

<u>Power Without Persuasion: The Politics of Direct Presidential Action</u>, by William G. Howell, <u>Perspectives on Politics</u>, June 2004.

<u>The George W. Bush Presidency: An Early Assessment</u>, ed. By Fred Greenstein, <u>Perspectives</u>, Spring 2004.

<u>The Invention of the United States Senate</u>, by Daniel Wirls and Stephen Wirls, <u>Perspectives</u>, Summer 2004.

<u>The Mythic Meanings of the Second Amendment</u>, by David C. Williams, <u>Law and Politics Book Review</u>, April 2004.

<u>Empowering the White House</u>, by Karen M. Hult and Charles E. Walcott, <u>Rhetoric and Public Affairs</u>, Fall 2005.

<u>Defining Americans:  The Presidency and National Identity</u>, by Mary E. Stuckey, <u>Perspectives</u>, Spring 2005.

<u>Presidential Leadership: Rating the Best and Worst in the White House</u>, ed. By James Taranto and Leonard Leo, <u>Rhetoric and Public Affairs</u>, Summer 2006.

<u>A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America</u>, by Saul Cornell, <u>American Journal of Legal History</u>, October 2006.

<u>The Founders' Second Amendment: Origins of the Right to Bear Arms</u>, by Stephen Halbrook, <u>Law and Politics Book Review</u> 18(October 2008).

<u>Out of the Shadow: George H.W. Bush and the End of the Cold War</u>, by Christopher Maynard, <u>Journal of American History</u> (September 2009).

<u>Guns, Democracy, and the Insurrectionist Idea</u>, by Joshua Horwitz, <u>Law and Politics Book Review</u> 19(June 2009).

<u>Talking Together</u>, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

<u>Accidental Presidents</u>, by Philip Abbott, <u>Presidential Studies Quarterly</u>, June 2010.

<u>The Co-Presidency of Bush and Cheney</u>, by Shirley Anne Warshaw, <u>Congress and the Presidency</u>, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post,

47

Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.


Professional Associations:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.


Teaching Areas:

American Government:  courses taught include Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

Teaching-Related Awards:

    Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)


Other Professional Activities

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

Selected Community Service

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010 Project, 1996.

**EXHIBIT B**

EXHIBIT B

FIREARM HARDWARE RESTRICTIONS TABLE
(YEARS OF ENACTMENT)

| STATE | TRAP GUNS[1] | CONCEALED CARRY RESTRICT[2] | OPEN/ ANY CARRY BARRED | AUTOMATIC FIREARMS | SEMI- AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | 1837 | | | |
| Alaska | | 1896 | | | | |
| Arizona | | 1889 | 1867, 1889, 1901 | | | |
| Arkansas | | 1820, 1837 | 1875, 1881 | | | |
| California | | 1850, 1864 | 1861, 1878, 1917 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | | |
| Connecticut | | 1890, 1923 | 1890 | | | |
| Delaware | | 1852 | | 1931 | | |
| District of Columbia | | 1857, 1871 | 1858 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1838, 1868 | 1913[3], 1933 | | |
| Georgia | | 1837 | 1837, 1873 | | | |
| Hawaii | | 1913 | 1852, 1913 | 1933 | | 1933 |

[1] Sometimes trap guns were also referred to as "infernal machines."

[2] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[3] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

| | | | | | | |
|---|---|---|---|---|---|---|
| Idaho | | 1909 | | | | |
| Illinois | | 1881 | | 1931 | 1931[†] | 1931 |
| Indiana | | 1820 | | 1927, 1929 | | |
| Iowa | | 1882, 1887, 1897, 1929 | | 1927 | | |
| Kansas | | 1901 | 1868,1881, 1899 | 1933 | | |
| Kentucky | | 1812, 1813 | | | | |
| Louisiana | | 1813 | 1870 | 1932 | 1932[†] | 1932 |
| Maine | | 1840 | | | | |
| Maryland | 1910 | 1872 | 1874,1886 | 1927 | | 1927 |
| Massachusetts | 1875, 1931 | 1751 | 1891,1903, 1927 | 1927 | 1927 | 1927 |
| Michigan | | 1887 | 1927,1929 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | | 1933 | 1933 | 1933, 1933 |
| Mississippi | | 1878 | 1878 | | | |
| Missouri | 1891[4] | 1873 | 1923 | 1929 | | 1929 |
| Montana | | 1864, 1865 | | | | |
| Nebraska | | 1881 | 1872 | 1929 | | |
| Nevada | | 1881, 1925 | | | | |
| New Hampshire | 1915 | | | | | |
| New Jersey | 1771 | 1686 | 1871,1873 | 1927, 1934 | | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | | |

---

[4] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

| | | | | | | |
|---|---|---|---|---|---|---|
| New York | 1870[5] | 1891 | | 1931, 1933 | | 1917 |
| North Carolina | | 1792 | | | | |
| North Dakota | 1891, 1895 | 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | 1890,1891 | 1933 | | 1933 |
| Oregon | 1925 | 1853 | 1898,1917 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1901 | 1934 | 1934[†] | 1934 |
| South Dakota | 1909 | 1877 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | 1867,1869, 1879,1881, 1893 | | | |
| Texas | | 1870 | 1871,1879, 1879 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | 1877 | | | |
| Vermont | 1884, 1912 | 1892,1895, 1897 | 1895 | 1923 | | 1923 |
| Virginia | | 1794, 1838, 1847,1870, 1877,1884, | | 1934 | 1934 | 1934 |

[5] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

| | | | | | | |
|---|---|---|---|---|---|---|
| Washington State | 1909 | 1887,1908 | | 1933 | | 1933 |
| West Virginia | 1881 | 1870 | 1882,1891, 1925 | 1925 | | |
| Wisconsin | 1872, 1921 | 1858 | | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1893 | 1933 | | |
| NUMBER OF STATES | 16 | 50 (inc. D.C.) | 30 | 32 | 8–11 | 23 |
| NUMBER OF LAWS | 24 | 65 | 55 | 39 | 12 | 26 |

**EXHIBIT C**

1

EXHIBIT C

DANGEROUS WEAPONS RESTRICTIONS
(YEARS OF ENACTMENT)

| STATE[1] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871,1875, 1881 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | | 1797 | | | 1852 | |
| District of Columbia | 1858,1871, 1892 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,[†]1838 ,1847,1868 ,1893[†] | | 1888 | | 1868, 1888 | | 1887 | |

2

[1] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1864†1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | 1882 | | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884† | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836† | 1750 | | | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | 1888 | 1838, 1878 | |
| Missouri | 1871,1897, 1917,1923 | | 1871, 1897, 1923 | 1818, 1923 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |

| | 1873 | 1872 | | | 1881 | | | |
|---|---|---|---|---|---|---|---|---|
| Nevada | | | | | | | 1881, 1925 | |
| New Hampshire | | | | | | | | 1788, 1859, 1880 |
| New Jersey | 1871, 1905† | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852† 1853, 1859, 1864, 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866, 1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840, 1856, 1858, 1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895, 1915† | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859, 1880, 1890 | | | | | | 1859 | |
| Oklahoma | 1890, 1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885† | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893, 1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903† | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838, 1856, 1863, 1867, 1871, 1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856, 1871, 1879, 1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1892,1895† | | | 1895 | | | 1895, 1897 | |
| Virginia | 1838,1887 | | 1792 | 1887 | | | 1794 | |
| Washington | 1854,1859 1869 | | | | 1881 | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1870,1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883,1896 | | | 1883, 1888 | | | 1858 | 1883 |
| Wyoming | 1884,1890 1899,1925 | 1876, 1893 | | 1884, 1890, 1899 | | | 1876 | |
| Total Laws | 136 | 25 | 44 | 17 | 79 | 21 | 66 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

† States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

5

**EXHIBIT D**

EXHIBIT D

MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

**CALIFORNIA:**

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.
§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.
§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
 § 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

1

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

## DELAWARE:

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.
On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

## DISTRICT OF COLUMBIA:

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS

2

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or
blackjack shall be sold to any person other than the persons designated in section

4

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,

machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,

or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

6

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

**FLORIDA:**

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns– known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

7

**HAWAII:**

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 2.
Definitions. "Firearm" as used in this Act means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon and sub-machine guns. The specific mention herein of certain weapons does not exclude from the definition other weapons operated by explosives. "Crime of violence" as used in this Act means any of the following crimes, namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol" or "revolver" as used in this Act, means and includes any firearm of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas. "'Person" as used in this Act includes

8

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

**INDIANA:**

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.

Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

**IOWA:**

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.

§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.

§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

**KANSAS:**

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.

§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other

11

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

12

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

**MASSACHUSETTS:**

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .
§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

13

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

14

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

## MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

15

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.
§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.
§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.
It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

17

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

**NEW YORK:**

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

18

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

## NORTH CAROLINA:

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.
That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

## NORTH DAKOTA:

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

**OHIO:**

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

20

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

## PENNSYLVANIA:

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.
§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol.
. . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

24

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

25

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase own, carry or have in his possession or under his control any firearm.

## SOUTH CAROLINA:

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store,

keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

27

application is received and filed iwth the Secretary of State, and shall expire on
December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty
of a felony, and, on conviction thereof shall be sentenced to pay a fine not
exceeding One Thousand Dollars, and undergo imprisonment by separate or
solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make
Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by
whatever name known, loaded or unloaded from which more than five shots or
bullets may be rapidly or automatically, or semi-automatically discharged from a
magazine, by a single function of the firing device. "Crime of Violence" apples to
and includes any of the following crimes or an attempt to commit any of the same,
namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great
bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny.
"Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted
perpetration of a crime of violence is hereby declared to be a crime punishable by
imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is
hereby declared to be a crime punishable by imprisonment in the state penitentiary
for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or
aggressive purpose; (a) When the machine gun is on premises not owned or rented
for bona fide permanent residence or business occupancy by the person in whose
possession the machine gun may be found; or (b) when in the possession of, or
used by, an unnaturalized foreign born person, who has been convicted of a crime
of violence in any court of record, state or federal of the United States of America,
its territories or insular possessions; or (c) when the machine gun is of the kind
described in §8 and has not been registered as in said section required; or (d) when
empty or loaded pistol shells of 30 or larger caliber which have been or are
susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence
of the possession or use of the machine gun by each person occupying the room,
boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.)
the manufacture for, and sale of, machine guns to the miltary forces or the peace

28

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

**TEXAS:**

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**VIRGINIA:**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

30

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

31

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## WEST VIRGINIA:

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b. It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b. (b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

32

powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or

33

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.
164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.
164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

34

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.
No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## WYOMING:

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.
§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.
§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

**EXHIBIT E**

**EXHIBIT E**

**DANGEROUS WEAPONS LAWS**

<u>**ALABAMA**</u>

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources.  1805

Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,

2

by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.

Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed

3

by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.
Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such

Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.

That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.

That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

6

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other

7

kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).

Race and Slavery Based | Arkansas | 1835

§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and

8

receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

9

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.

That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.

1881 Ark. Acts 191-192, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.

That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.

§ 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person any person [sic] any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.

[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the

10

Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | California | 1853

Compiled Laws of California, § 127.

If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

11

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .


Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

12

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

13

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

14

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. Good Order and Decency § 192.

Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

17

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.
It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons || 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)
CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

18

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

19

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

20

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.

An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

21

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.

Passed 5th February 1838.—Approved 10th Feb. 1838.

https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.

Sentence Enhancement for Use of Weapon | Florida | 1868

Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]

Offences Against Public Peace, § 13.

Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.

Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the

22

public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Georgia | 1816
Offences Against the Public Peace, (1816) § 19.
If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.
§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.
§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum

23

not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or

24

imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more

25

than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources. Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

27

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.
Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody

28

of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach,

29

locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that

30

this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.

## KANSAS

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

31

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.

Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868.

Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); "for cities of the second class":

Sec. 62. The council may prohibit and punish the carrying of firearms, or other deadly weapons, concealed or otherwise, and may arrest and imprison, fine or set at work all vagrants and persons found in said city without visible means of support, or some legitimate business.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities of the Second Class: Also a Complete List of the Officers of Salina During its Organization as a Town and City of the Second and Third Class Page 99, Image 100 (1879) available at The Making of Modern Law: Primary Sources. 1879 Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly Weapons, § 1. That it shall be unlawful for any person to carry on or about his person any pistol, bowie knife, dirk, or other deadly or dangerous weapon, anywhere within the limits of the city of Salina, save and except as hereinafter provided. § 2. This ordinance shall not apply to cases when any person carrying

32

any weapon above mentioned is engaged in the pursuit of any lawful business, calling or employment and the circumstances in which such person is placed at the time aforesaid, are such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family, nor to cases where any person shall carry such weapon openly in his hands, for the purpose of sale, barter, or for repairing the same, or for use in any lawful occupation requiring the use of the same. § 3. Any person violating any of the provisions of this ordinance shall, upon conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles,

33

slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2. Any person who shall in the city of Wichita carry unconcealed, any fire-arms, slungshot, sheath or dirk knife, or any other weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3. Any person who shall, in the city of Wichita, use or carry concealed or unconcealed, any bean snapper or like articles shall upon conviction be fined in any sum not less than one dollar nor more than twenty-five dollars. Carrying Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita, carry concealed about his person any fire-arm, slung shot, sheath or dirk knife, brass knuckles, or any weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred dollars.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813
Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

Louisiana 1855 law 1855 La. L. Chap. 120, Sec. 115, p. 148

Sec. 115, Be it further enacted, &c., That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentnient, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury, specially as to this section.

https://babel.hathitrust.org/cgi/pt?id=osu.32437123281277&view=1up&seq=300&q1=Bowie

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.

Subject(s): Sensitive Places and Times

[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.

Post-Civil War State Constitutions | Louisiana | 1879

A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

36

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, rioutously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.

Prevention of Crimes, § 10.

Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Maryland | 1809 If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.

Carrying Weapons | Maryland | 1872

It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local

Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court

39

of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1886

Concealed Weapons, § 30.

Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

40

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

## MASSACHUSETTS

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such persons, and carry them before a justice of the peace; and if such persons shall be

41

killed or hurt by reason of their resisting . . . officers and their assistants shall be indemnified and held guiltless.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.

All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.

Of Proceedings to Prevent the Commission of Crimes, § 16.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.

Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

42

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances. 1891

The Board of Park Commissioners of the City of Lynn , by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .

3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell, at 58 (1903)

The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .

3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions, to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

43

Carrying Weapons | Massachusetts | 1927
Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1913 Mich. Pub. Acts 452, An Act Defining the Crime of Felonious Assault and Prescribing Punishment Therefor, § 1.
Whoever shall assault another with a gun, revolver, pistol, knife, iron bar, club, brass knuckles or other dangerous weapon, but without intending to commit the crime of murder, and without intending to inflict great bodily harm less than the crime of murder, shall be deemed guilty of a felonious assault, and upon conviction shall be punished by imprisonment in the State Prison for a term not exceeding

44

three years or by imprisonment in the county jail for a term not exceeding one year, in the discretion of the court.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1927
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.
It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city

45

to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor.
Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

46

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, &c, and a Manual for Clerks, Sheriffs and Justices of the Peace Page 676, Image 688 (1840) available at The Making of Modern Law: Primary Sources. 1840 Crimes, Misdemeanors and Criminal Prosecution, § 55. If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper

47

county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.

That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## <u>MISSOURI</u>

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.

Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

48

Carrying Weapons | Missouri | 1871

Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.

§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"

§ 1274.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.

49

Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half

50

inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.
If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.
Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one

51

month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.
If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together

52

with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1890

Ordinances of Omaha, Concealed Weapons, § 10.

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1899

Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.

It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2. Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.
§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## NEW JERSEY

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)
An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by

reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stillettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

55

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New Jersey | 1871

An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New Jersey | 1871

An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk

or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

57

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.

And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
Manufacturing, Inspection and Sale of Gunpowder and Firearms | New Jersey | 1927
No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or

other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

## NEW MEXICO

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.
That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859 N.M. Laws 94, § 1-2.
§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .

## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

60

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1866

An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.

Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1881

Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.

Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a

61

term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any

62

instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pistol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under the age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghshot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

64

## NORTH CAROLINA

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.

Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.

Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

65

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows: If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## NORTH DAKOTA

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be

67

fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec. § 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## OKLAHOMA

1890 Okla. Laws 495, art. 47

Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

69

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

70

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.

It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## **OREGON**

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oregon | 1898

An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.

72

Carrying Weapons | Oregon | 1917

§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law.

Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.

That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one

year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Pennsylvania | 1897

An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.

No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## **RHODE ISLAND**

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.

No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.

Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893

§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

74

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Rhode Island | 1896

Offences Against Public Policy, §§ 23, 24, 26.

§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws

Carrying Weapons | Rhode Island | 1908

§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the

75

blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.
§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises.

1923 S.C. Acts 221

76

If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

**TENNESSEE**

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.
That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall

78

be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.
Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.
It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.
§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.
§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.
Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be

79

fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources. 1869 Elections.
§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.
§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1.
That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.
Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas: Williamson S. Oldham & George W. White, comp., 1859)

Texas, Chapter 3, Act of August 28, 1856
Art. 493. If any person shall assault another with intent to murder, he shall be punished by confinement in the Penitentiary, not less than two years, nor more than seven years. If the assault be made with a bowie-knife, or dagger, the punishment shall be doubled. Page 520

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538&q1=bowie%20knife

Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly. [emphasis in original] Page 534

81

Article 611. A "bowie-knife" or "dagger," as the terms are here and elsewhere used, means any knife intended to be worn on the person, which is capable of inflicting death, and not commonly known as a pocket knife. Page 534
https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552&q1=bowie%20knife

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons.

§ 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; provided, that this section shall not be so contrued as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).

Art. 163.

If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)

Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

83

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

## UTAH

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14.
Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).

§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[1]

## VERMONT

No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892.
Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.
Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.
Approved November 19, 1892.
https://www.google.com/books/edition/Acts_and_Laws_Passed_by_the_Legislatur e/DXFOAQAAIAAJ?hl=en&gbpv=1&dq=Vermont+%22while+a+member+of+an d+in+attendance+upon+any+school,%22++%22any+firearms,+dirk+knife,+bowie +knife,+dagger+or+other+dangerous+or+deadly+weapon%22%C2%A0&pg=PA9 5&printsec=frontcover

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any

---

[1] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

weapon concealed on his person without permission of the mayor or chief of police in writing.[2]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VIRGINIA

1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays.
Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | Virginia | 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.
§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.
§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

87

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.


1847 Va. Laws 127, c. 14, § 16.

If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.


Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.

Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.


The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Virginia | 1887

Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any

88

weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

## WASHINGTON

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956, Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or

90

any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1896
Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.
If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1897
Carrying Concealed Weapons, § 7084.
If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

91

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

92

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

93

## WISCONSIN

1858 Wis. Rev. Stat. 985, Of Proceedings to Prevent the Commission of Crime, ch. 175, § 18.

If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons.

SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.

To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

Charter and Ordinances of the City of Superior; Also Harbor Act, Municipal Court Act, Rules of the Common Council and Board of Education Page 390, Image 481 (1896) available at The Making of Modern Law: Primary Sources. 1896 Ordinances of the City of Superior, Carrying Concealed Weapons, § 18. It shall be unlawful for any person, other than a policeman or other officer authorized to maintain the peace or to serve process, to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger or any other dangerous weapon within the limits of the City of Superior, and any person convicted of a violation of this section shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars.

## **WYOMING**

1876 Wyo. Comp. Laws 352, An Act to Prevent the Carrying of Fire Arms and Other Deadly Weapons, ch. 52, § 1-3.
§ 1. That hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said territory, but a sojourner therein, to bear upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village. § 2. That if any person not a resident of any town, city or village of Wyoming Territory, shall, after being notified of the existence of the last preceding section by a proper peace officer, continue to carry or bear upon his person any fire arm or other deadly weapon, he or she, shall be deemed to be guilty of a violation of the provisions of said section and shall be punished accordingly. § 3. Any person violating any of the provisions of this act shall be deemed guilty of misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five dollars nor more than fifty dollars, and, in the default of the payment of any fine which may be assessed against him, shall be imprisoned in the county jail for not less than five days nor more than twenty days.

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

95

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.

If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Wyoming | 1893

Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.

It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

**EXHIBIT F**

EXHIBIT F

TRAP GUN RESTRICTIONS[1]


**MARYLAND:**

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .


**MICHIGAN:**

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

---

[1] Further research may yield additional laws regulating trap guns.

**MINNESOTA:**

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

**MISSOURI:**

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891:  "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[2]

---

[2] See https://bit.ly/3CtZsfk.

**NEW HAMPSHIRE:**

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

**NEW JERSEY:**

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

**NEW YORK:**

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870: "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . . A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

person, the jury censured Agostino.  He will not be released, however, but will be held under $2,000 bail."[3]

**NORTH DAKOTA:**

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

**OREGON:**

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

---

[3] See https://bit.ly/3yUSGNF.

4

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.


## RHODE ISLAND:

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

## SOUTH CAROLINA:

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

5

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

## SOUTH DAKOTA:

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

## UTAH:

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or

property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.  Dangerous or Unusual Weapons | Utah | 1901
§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.
§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.
§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

**VERMONT:**

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884
A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his

7

personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.


## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

**WISCONSIN:**

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Wisconsin | 1872

Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.


1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1.

Hunting | Wisconsin | 1921

(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

# EXHIBIT G

The Buffalo Commercial (Buffalo, New York) · Tue, Nov 1, 1870 · Page 4

https://www.newspapers.com/image/264632378

Downloaded on Aug 8, 2022



...gentleman will now be brought to a summary conclusion.

# THE MAN TRAP.

### Inquest on the Body of Tweedle, the Burglar, Blown to Pieces by a Gun-Trap.

*From the N. Y. Standard, Oct. 29th.*

Coroner FLYNN and the jury previously impanelled yesterday morning concluded the inquest on the body of GEORGE TWEEDLE, the burglar, who was shot by the trap-gun in the shop of JOSEPH J. AGOSTINO, at No. 301 East Twenty-third street, on Wednesday morning.

AGOSTINO and many of his friends were present, and some few of the intimates of the deceased also looked on with interest. The first and only witness examined was Officer OLIVER WINSHIP, of the Eighteenth Precinct. He testified that early that morning, before seven o'clock, he was informed that the body of a man was lying in the back-yard of AGOSTINO's gun-shop. He went there and found the body as described. The hat, shown to the jury, he identified as the one found lying beside the body, having evidently been worn by the burglar. It was a round black felt hat, and its tattered and riddled appearance showed how terrible must have been the charge in the weapon. It was filled with little holes made by small shot, and the whole top had been blown open. The chisel and piece of stick were also shown. The officer found a hole in one of the shutters of the rear window, which looked as if an attempt had been made to pry it open. A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow.

Nothing further was elicited from this witness, and the case was here rested, there being no more testimony. The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by JOSEPH D. AGOSTINO. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured AGOSTINO. He will not be released, however, but will be held under $2,000 bail.

HOW JUDGE BOWLING CAGES...

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers
by ancestry
https://www.newspapers.com/image/513456592

The South Bend Tribune (South Bend, Indiana) · Wed, Feb 11, 1891 · Page 3

Downloaded on Aug 8, 2022

### Shot by a Trap-Gun.

CHILLICOTHE, Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

Copyright © 2022 Newspapers.com. All Rights Reserved.



EXHIBIT H

## EXHIBIT H: BOWIE KNIFE LAWS BY TYPE#

| STATE | No Concealed Carry | No Carry | Greater Criminal Penalty | Tax/Punish for Sale | Tax Owner-ship | No Sale to Barred Groups* | No brandish |
|---|---|---|---|---|---|---|---|
| Alabama | 1839,1841 1876,1879 | | 1837 | 1837,1897 | 1837,1867 | 1876 | |
| Alaska | | | | | | | |
| Arizona | 1893,1901 | 1889 | | | | | |
| Arkansas | 1875 | 1881 | 1871 | 1881 | | | |
| California | 1896 | | | | | 1896 | 1855,1858 |
| Colorado | 1862,1877 | 1881 | | | | | |
| Connecticut | | | | | | | |
| Delaware | | | | | | | |
| District of Columbia | 1871 | | | | | | |
| Florida | | | | 1838a | | | |
| Georgia | 1837***,1873 | | | 1837*** | | 1860 | |
| Hawaii | | 1852,1913 | | | | | |
| Idaho | 1909 | 1879 | | | | | |
| Illinois | 1876,1881 1883 | | | | | 1881 | |
| Indiana | | 1859 | | | | | |
| Iowa | 1882,1887 1900 | | | | | | |
| Kansas | 1862,1863 1887 | | | | | 1883 | |
| Kentucky | 1855 | | | | | 1859 | |
| Louisiana | | 1870 | | | | | |
| Maine | | | | | | | |
| Maryland | 1872,1884 1886,1890 | | | | | | |
| Massachusetts | | | | | | | |

| State | | | | | | | |
|---|---|---|---|---|---|---|---|
| Michigan | 1891 | | | | | | |
| Minnesota | 1884 | | | | | | |
| Mississippi | 1878,1896^ | | 1837,1838 | | 1841** | | |
| Missouri | 1871,1883 1890,1897 | 1917,1923 | | | | | 1840 |
| Montana | 1864 | | 1879 | | | | |
| Nebraska | 1890,1899 | 1872 | | | | | |
| Nevada | | | 1873 | | | | |
| New Hampshire | | | | | | | |
| New Jersey | | | | | | | |
| New Mexico | 1859,1887 | | | | | | |
| New York | | 1885 | | | | | |
| North Carolina | 1879 | | | | 1856,1858 | 1846b | |
| North Dakota | | | | | | | |
| Ohio | 1859,1880 | | | | | | |
| Oklahoma | 1890,1903 | 1890,1891 | | | | | |
| Oregon | | | | | | | |
| Pennsylvania | 1897 | | | | | | |
| Rhode Island | 1893,1896 1908 | | | | | | |
| South Carolina | | | | | | 1923 | |
| South Dakota | | | | | | | |
| Tennessee | 1838,1863 1867 | 1869,1881 1893 | 1838,1856 | 1838,1867 | | 1856,1867 | |
| Texas | | 1871 | 1856 | | | 1897 | |
| Utah | 1877 | | | | | | |
| Vermont | | | | | | | |
| Virginia | 1838,1867, 1887 | | 1838 | | | | |
| Washington | | | | | | | 1854,1859 1869 |
| West Virginia | 1870 | 1882,1891 | | | | | |

| | | 1925 | |
|---|---|---|---|
| Wisconsin | 1883 | | |
| Wyoming | | | 1884 |

Source: https://firearmslaw.duke.edu/repository/search-the-repository/ unless otherwise noted.

*Barred groups included Native Americans/Indians, African Americans/Enslaved, minors.

#Table excludes laws that punish carry/use of "knives" or "sharp or dangerous weapons" but do not mention Bowie knives by name.

** 1841 Miss. Chap. 1, p. 52. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

^ 1896 Miss. L. chap. 104, pp. 109-10. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

***https://dlg.galileo.usg.edu/georgiabooks/pdfs/gb0439.pdf, pp. 210-211.

a 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838). See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

b 1846 N.C. L. chap. 42. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

**EXHIBIT I**



# Higher TEC.

At two-thirds the weight (and price) of an Uzi, the TEC-9 series clearly stands out among high capacity 9mm assault-type pistols.

Ounce for ounce they deliver more gutsy performance and reliability than any other gun on the market.

TEC-9's are built tough for rugged weather and terrain. And they're built comfortable with an ergonomically designed grip and frame. 36 rounds of firepower make them ideal for self-defense or recreation. Simple, two-step disassembly for easy cleaning makes them convenient.

In Standard or Mini version, blued or stainless steel, the TEC-9's offer rugged, reliable, affordable technology.

Higher TEC.

See the TEC-9 Series at your dealer today.

*". . . (Intratec) makes a gun that doesn't cost an arm and a leg, yet functions with impeccable reliability."*
—Jerry Ahern,
*Petersen's Handguns*



Ask about our hot new TEC-22 Scorpion.



12405 S.W. 130th St.
Miami, Florida 33186

ifunny.co

**EXHIBIT J**

# The XM-10 (AR-10)
## Semi Automatic .308 (7.62 NATO) Rifle

### *This Famous Assault Rifle is Now Available in a Semi Auto. Civilian Legal Form!*

The XM-10 incorporates the excellent design features of the AR-10/AR-15/M16 rifles with the high energy and long effective range of the 7.62 NATO round.

**FEATURES:**

- Gas Operated, Semi-Automatic Brown fiberglass grip, stock, forend.

- Integral grenade launcher Threaded for Blank - Fire attachment 20 Rd. magazine.

- Spring loaded dust cover

- Quickpin, hinged breakdown design

- Length-overall 41″

- Weight w/empty Mag 9½ Pds.

- Barrel length 21 3/8″

- Sight adjustment 100-500 M.

'Straight-Back' recoil design allows for minimal muzzle climb. This means your sights come back on target faster than any other 308 assault rifle, making a faster second shot.

No 'close-tolerance' dirt stoppage problems that have plagued the .223 AR-15 rifle. The XM-10 functions perfectly under adverse conditions.

'Natural Feel' and simple, practical design of the famous AR-15 allows for easy field stripping and cleaning.



The Semi-Auto XM-10 has a new manufacture lower receiver made from Aircraft grade aluminum. Thus weight is kept to a minimum without sacrificing strength, and allows an exact copy of the original. All other parts are original AR-10, made by Artillerie-Inrichtingen in Holland. Condition excellent. All external metal parts are refinished to match the original appearance. We can arrange for a manufacturer to convert an XM-10 to non-restricted full auto for qualified buyers. Supply is very limited - this rifle is destined to become an excellent investment.

**RPLUS AMMUNITION!** We also distribute ll line of military surplus ammunition at reason- e prices. A variety of assault rifles, magazines, accessories are available. Our stock changes dly. Send $3.00 (refundable on purchase) for an rmative assault rifle brochure and complete e list.



**paragon**

SALES & SERVICES INC.
P.O. Box 2022•Joliet, IL 60434•(815) 725-9212

EXHIBIT "H"

EXHIBIT "H"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br>& PISTOL CLUBS, INC., et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Expert Report of Daniel W. Webster**

---

Pursuant to 28 U.S.C. § 1746, I, Daniel W. Webster, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters

contained in this report, and testify based on my personal knowledge and information.

2.      I am Bloomberg Professor of American Health in Violence Prevention in the

Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public

Health.  For 21 years, I served as director or co-director of an academic center focused on

research to inform firearm policy.  I currently serve as Distinguished Scholar for the Johns

Hopkins Center for Gun Violence Solutions.  I previously served as Co-Director of the Johns

Hopkins Center for the Prevention of Youth Violence.

3.      I have been asked by the Attorney General's Office for the state of New Jersey to

provide information about current research on gun violence and its prevention, particularly as it

relates to policies to restrict large capacity magazines and assault weapons.  I have provided my

services at the hourly rate of $600.

## BACKGROUND AND QUALIFICATIONS

4.      I began my career in public safety research in 1985 as a Research Associate at the

University of Michigan's School of Public Health, and I have devoted most of my research since

then to gun-related violence and its prevention.  I have a Master of Public Health degree from the

University of Michigan and a doctorate in Health Policy and Management from the Johns

Hopkins School of Public Health.  This graduate training included many advanced courses in

epidemiology, research methods, and statistical analysis.

5.      Immediately prior to joining the faculty at Johns Hopkins, I directed a program on

violence research at the Washington (D.C.) Hospital Center.  I joined the faculty of the Johns

Hopkins School of Public Health in 1992, and since 2010 have been a tenured Professor of

Health Policy and Management.  I teach graduate courses on violence prevention.  Previously, I taught courses in research and evaluation methods at Johns Hopkins, directed the Ph.D. program in Health and Public Policy, and served on the steering committee of a pre- and post-doctoral training program in violence prevention research funded by the National Institutes of Health.

6.      I have directed numerous studies related to gun violence and its prevention.  I have published 149 scientific articles and nine invited commentaries in academic peer-reviewed journals, the vast majority of these addressed some aspect of violence and/or firearm injuries and their prevention.  I am the lead editor of a book entitled *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* by Johns Hopkins University Press (2013), and I am the lead author for two chapters and co-author on three other chapters in this book.  In addition, I recently served as special editor or co-editor of three special issues on gun violence for top tier public health journals.  A true and correct copy of my curriculum vitae, detailing my qualifications and these publications, is attached as Exhibit A to this report.

## OPINIONS

### I.   LARGE-CAPACITY MAGAZINES AND FEATURES OF ASSAULT WEAPONS INCREASE VICTIMIZATION FROM MASS SHOOTINGS AND FATAL SHOOTINGS OF LAW ENFORCEMENT OFFICERS

7.      There are data that indicate that design and capabilities of firearms can potentially affect the likelihood that an intended target or bystander at a shooting will be wounded as well as the severity of wounds resulting from criminal shootings.  Particularly relevant is the capacity of a firearm's ammunition feeding device.  In comparison to other magazines which feed ammunition to semi-automatic firearms, large capacity magazines (LCMs)—often defined as those that hold more than 10 rounds—increase the number of rounds that can be fired without the shooter having to take the time to reload.

8.      Assault weapons have been defined in laws as semi-automatic firearms capable of accepting LCMs in addition to one or more deemed useful in military or criminal applications, especially mass shootings.  These include pistol grips on rifles, folding rifle stocks (to make rifles more concealable), threaded barrels for attaching silencers, and barrel shrouds on pistols.

9.      There is evidence that the design features of assault weapons make them especially appealing to criminals and to those who commit mass shootings.  When mass shootings occur in public, especially shootings that take place in public places, the shooter often selects an assault weapon or another firearm with an LCM.  Data on 15 public mass shootings in the U.S. from 1984 to 1993 collected by Gary Kleck revealed that six (40%) involved assault weapons or other firearms equipped with LCMs.[1,2]  A collection of data by Mother Jones magazine on 62 mass shootings in public places by lone shooters from 1982 through 2012 found that 33 perpetrators (53.2%) used firearms or LCMs that were or would have been banned by the federal ban of assault weapons and LCMs.[3]

10.     Reviewing data on fatal mass shootings (4 or more victim fatalities) compiled by Everytown for Gun safety for the period 2009-2020, an assault weapon was used in at least 30 of these events resulting in 347 deaths (25% of all victims killed in mass shootings) and 719 individuals with nonfatal gunshot wounds (76% of the total). Fatal mass shootings during this

---

[1] Kleck, Gary. Targeting Guns: Firearms and Their Control. New York: Aldine de Gruyter, pp. 124-126 (1997).

[2] Koper, Christopher S. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*. Philadelphia: University of Pennsylvania. p. 14 (2004).

[3] Mother Jones Magazine, US Mass Shootings, 1982-2012.  Data from Mother Jones' Investigation, available at http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (2014).

time period that were carried out with an assault weapon accounted for 6 times as many people shot as fatal mass shootings committed with other firearms.[4] In these same data, a total of 42 fatal mass shootings were committed with firearms with an LCM, resulting in 422 deaths and an additional 710 with nonfatal gunshot wounds. In comparison with the 34 fatal mass shootings in which there was information indicating that the firearm did not have an LCM, the average number of people shot was 4.4 times higher in shootings with firearms with LCMs (26.6 vs. 6.0).

11.      Similarly, criminologist Christopher Koper's re-analysis of data from Mother Jones magazine's study of public mass murders with firearms from 1982 to 2012 revealed that mass shootings with assault weapons, compared with mass shootings with other firearms, involved more fatalities per incident (a mean of 10.4 vs. 7.4) and more victims with nonfatal gunshot wounds (mean of 13.5 vs. 6.4).[5] Luke Dillon's 2013 research also reported that, compared with assaults carried out with firearms that did not have LCMs, mass shootings in which firearms with LCMs were used had 60% more fatalities on average (a mean of 10.19 vs. 6.35) and more than 3 times as many persons with nonfatal gunshot wounds (12.39 vs. 3.55). These findings are consistent with those from a study of criminal shootings in Jersey City, NJ, which found that, compared to shootings with revolvers, shootings with semi-automatic pistols—

---

[4] Everytown Research & Policy. Mass Shootings in America.
https://everytownresearch.org/maps/mass-shootings-in-america/#mass-shootings-involving-assault-weapons-or-high-capacity-magazines-were-far-deadlier

[5] Dillon, Luke, Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012, Thesis for Master of Arts in Criminology, Law and Society, George Mason University, September 2013; Koper, Christopher S., Supplemental affidavit submitted on January 6, 2014 in *Shew v. Malloy*, Civil Action No. 3:13-CV-00739-AVC (D. Conn).

which tend to hold significantly more bullets than revolvers—had more shots fired and more victims wounded.[6]

      12.     A 2017 study led by Dr. Koper and colleagues gather a variety of kinds of data from law enforcement agencies on the use of LCMs and assault weapons in various types of crime.[7] This study found that firearms with LCMs accounted for 15 to 36% of firearms recovered by law enforcement across ten cities with detailed data on firearm characteristics between 2001 and 2014, 40.6% of firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings involving 4 or more victim deaths for the period 2009-2015.  In this same study, Dr. Koper and his colleagues reported that assault weapons accounted for between 2.6 and 8.5% of firearms recovered by 10 large city police departments between 2001 and 2014, 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally 2009-2015.  In a separate study published in *Criminology & Public Policy* in 2019 that drew upon a wider set of data on fatal mass shootings, Dr. Koper found that about half of all firearms used in fatal mass shootings[8] and two-thirds of the

---

[6] Reedy, Darin C., and Christopher S. Koper, Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers, *Injury Prevention* 9:151-155 (2003).

[7] Koper, Christopher S., William D. Johnson, Jordan L. Nichols, Ambrozine Ayers, and Natalie Mullins. Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources. *Journal of Urban Health* (2017), DOI 10.1007/s11524-017-0205-7

[8] Koper, Christopher S. Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms. *Criminology & Public Policy*. 19(1): 147-170 (2020), https://doi.org/10.1111/1745-9133.12485

most deadly shootings were committed with semiautomatic firearms with LCMs.[9]  When details on the weapons used in fatal mass shootings was available, just over one quarter involved the use of an assault weapon.[10]

13.     As a point of comparison, it is estimated that assault weapons accounted for about 3 percent of all firearms in civilian hands in 2013.  Thus, the research discussed above indicates semiautomatic firearms with LCMs and assault weapons specifically are used in crime, lethal violence against law enforcement officers, and in fatal mass shootings at percentages five to ten times higher than would be by chance or if weapon features played no role in these acts of violence.  A study using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses.[11]  These findings are consistent with the thesis that design features of assault style firearms, including LCMs, are attractive to those who are most likely to use firearms in crime.

---

[9] Klarevas, Louis. *Rampage Nation: Securing America from Mass Shootings*. Amherst, NY: Prometheus Books (2016).

[10] Koper (2019) and Klarevas (2016) in footnotes 8 and 9.

[11] Wintemute, Garen J, Mona A Wright, Carrie A Parham, Christiana M Drake, and James J Beaumont. (1998) Criminal activity and assault-type handguns: A study of young adults. *Annals of Emergency Medicine* 32(1):44-50. doi.org/10.1016/S0196-0644(98)70098-8

## II.   BANS OF LARGE-CAPACITY MAGAZINES AND ASSAULT WEAPONS REDUCE FATAL MASS SHOOTINGS

14.    Available evidence indicates that bans of LCMs and assault weapons reduce the incidence of fatal mass shootings and the number of people shot in such shootings.  In a study that I led that was published in *Criminology & Public Policy* (a journal of the American Society of Criminology) my team analyzed data on fatal mass shootings by state over the period 1984-2017 to assess independent associations between state and federal firearm laws and the incidence of fatal mass shootings.  Using regression analyses to control for other factors in addition to firearm laws, we found that state bans on LCMs were associated with a statistically significant 48 percent lower incidence of fatal mass shootings when contrasted with state-years in which there was no LCM ban.[12]  Our statistical models also indicated that LCM bans were associated with 70% fewer deaths from fatal mass shootings per capita; however, there was a wide confidence interval around that estimate.  Another study, using similar data and methods also published in 2020 likewise found that LCM bans were associated with significantly lower rates of fatal mass shootings.[13]  In 2019, Dr. Louis Klarevas led a study published in the American Journal of Public Health using data from 1990-2017 and reported that the incidence of high-fatality mass shootings (6 or more victim deaths) in non-LCM ban states was more than double the rate than in LCM ban states; the annual number of deaths from these shootings per capita was more than 3 times higher.  Statistical models also found a significant association between LCM

---

[12] Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marisa Doll Booty, and Elizabeth A. Stuart. Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States. *Criminology & Public Policy*, 19:171–212 (2020), doi.org/10.1111/1745-9133.12487.

[13] Siegel M, Goder-Rieser M, Duwe G, Rocque M, Fox JA. The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018. *Law and Human Behavior*. 44(5): 34t-360 (2020), http://dx.doi.org/10.1037/lhb0000378

bans and lower rates of high-fatality mass shootings.[14]  From the available research evidence, I conclude that state bans of LCMs are associated with lower rates of fatal mass shootings and mass shooting deaths.

15.     I have also conducted and synthesized research on the estimated effects of bans of assault weapons on fatal mass shootings.  First, there is evidence that the federal ban of assault weapons and LCMs reduced the incidence of the criminal use of banned guns.  Christopher Koper and colleagues' study of the federal ban that used a variety of data revealed about a one third reduction in the share of crime guns recovered and traced by law enforcement that were assault weapons.[15]

16.     The study that I led on firearm laws and fatal mass shootings estimated the independent association between state assault weapons bans and fatal mass shootings.  Our point estimates suggested that assault weapon bans were associated with a 29 to 36% lower rate of fatal mass shootings after controlling for the effects of LCM bans and other firearm laws. However, there was significant uncertainty surrounding those estimates and they were not statistically significant. The relatively large confidence interval surrounding these estimates for the effect of state bans of assault weapons is likely due to 1) the relatively few (three) state assault weapons bans that were not enacted simultaneously with LCM bans; and 2) the large number of policies whose effects were simultaneously assessed in the statistical models. Another study that was more narrowly focused on the effects of assault weapons bans generated estimates

---

[14] Klarevas, Louis, A Conner, David Hemenway. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *American Journal of Public Health*. 109(12):1754-1761 (2019), doi: 10.2105/AJPH.2019.305311

[15] Christopher S. Koper, Daniel J. Woods, and Jeffrey A. Roth, "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003," National Institute of Justice, US Department of Justice (June 2004).

that were statistically significant.  In a 2015 study of public fatal mass shootings during 1982-2011 and the association with federal and state assault weapon bans, economist Mark Gius found statistically significant negative associations between assault weapon bans and fatalities from public mass shootings.[16]

17.    A recent study used the most comprehensive data collected to date on fatal mass shootings in public places[17] to assess the effects of the federal ban on assault weapons and LCMs and the sunsetting of that law in 2004.  In a 2022 study, prominent firearm policy researchers Philip Cook and John Donohue found that fatalities from shootings with banned weapons decreased during the second half of the ban and then surged after the ban expired.  From 2015 to 2019, five of the top ten deadliest mass public shootings in U.S. history occurred and each was committed with an assault weapon.  The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat (Figure below).[18]

---

[16] Mark Gius. The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings. *Applied Economics Letters* 22(2):281–284 (2015).

[17] Violence Project. Mass shooter database: version 5.0. https://www.theviolenceproject.org/mass-shooter-database/

[18] Cook, Philip J. and John J. Donohue. Regulating Assault Weapons and Large-Capacity Magazines for Ammunition. *JAMA*. 2022;328(12):1191-1192 (2022), doi:10.1001/jama.2022.17120



**eFigure.** Victim counts for mass public shootings in the United States, overall and by Assault Weapons

Data from The Violence Project (7); Mass public shootings are defined as 4 or more fatalities per incident. Data shown in 5-year intervals. Mass shooting periods begin and end in September of the preceding year to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place (For example, 1985 to 1989 covers 9/13/1984 to 9/12/1989).

18.     Researchers Lori Post and colleagues recently published a research article using data on fatal mass shootings (four or more victim deaths) in public places with data from The Violence Project for the years 1966-2019.  The researchers used a regression discontinuity study design and controlled for population growth and homicides, in general, to estimate discontinuities in levels and trends in fatal mass shootings in public places associated with the beginning and the end of the Federal ban on assault weapons and LCMs.[19] The statistical models

---

[19] Post, Lori, Maryann Mason, Lauren Nadya Singh, and colleagues. (2021) Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis. *JMIR Public Health Surveillance*, 22;7(4):e26042. DOI: https://doi.org/10.2196/26042

explained 94% of the variation in the annual number of fatal mass shootings in public places and estimated that the Federal ban of assault weapons and LCMs resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries during the decade the ban was in place.  The statistical models estimated that if the Federal ban had been continued after 2004, there would have been 30 fewer public mass shootings, 339 fewer people murdered in those shootings, and 1,139 fewer people injured in those shootings.

19.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___June 7, 2023_      _Daniel W Webster_

                                    DANIEL W. WEBSTER

# Exhibit A

# CURRICULUM VITAE

## Daniel William Webster, ScD, MPH

**PROFESSIONAL DATA**

| | |
|---|---|
| *Business Address:* | Johns Hopkins Bloomberg School of Public Health |
| | Department of Health Policy & Management |
| | 624 N. Broadway, Room 580, Baltimore, MD  21205 |
| | office: 410.955.0440 |
| *E-mail:* | dwebster@jhu.edu |
| *Twitter:* | @DanielWWebster1 |

**EDUCATION AND TRAINING**

| | |
|---|---|
| *Doctor of Science, 1991* | The Johns Hopkins University School of Hygiene and Public Health |
| | Department of Health Policy and Management |
| *Masters of Public Health, 1985* | The University of Michigan School of Public Health |
| | Department of Health Planning and Administration |
| *Bachelors of Arts, 1982* | The University of Northern Colorado Psychology |

**PROFESSIONAL EXPERIENCE**

***Johns Hopkins University***

*Academic Appointments*

Bloomberg Professor of American Health in Violence Prevention, 2018 – present

Professor, Health Policy & Management, Bloomberg School of Public Health, 2010 – present

Professor, Division of Public Safety Leadership, School of Education, 2010 – present

Associate Professor, Health Policy & Management, Bloomberg School of Public Health, 2001-2010

Assist Professor, Health Policy & Management, Bloomberg School of Public Health, 1995-2001

Instructor, Health Policy & Management, Bloomberg School of Public Health, 1992-1995

*Academic Leadership*

Director, Health & Public Policy PhD Program, Bloomberg School of Public Health, 2013 – 2015

Team Co-Lead, Violence Prevention Workgroup, Bloomberg American Health Initiative, 2016 – 2022

*Research Center Positions*

Co-Director (2022) and Distinguished Scholar (2023- ), Johns Hopkins Center for Gun Violence Solutions.

Webster 2
*May 2023*

Director, Center for Gun Violence Prevention and Policy/Center for Gun Policy and Research, Bloomberg School of Public Health, 2012 – 2022.

Co-Director, Center for Gun Policy and Research, 2001-2012

Core Faculty, Center for Mental Health and Substance Abuse Policy Research, 2016 – present

Deputy Director for Research, Center for the Prevention of Youth Violence, 2005 – 2017

Core Faculty, Center for the Prevention of Youth Violence, 2000 – 2017

Core Faculty, Center for Injury Research and Policy, 1992 – present

Co-Director, Center for Gun Violence Solutions, Bloomberg School of Public Health, 2001 – 2012

*Other Non-JHU Professional Experience*

Director of Violence Research, Washington Hospital Center, Trauma, Surgical Critical Care, and Emergency Medicine Department, Washington, DC., 1990 – 1992

Guest Researcher, National Institute on Aging; Epidemiology, Demography, and Biometry Program, Bethesda, MD, 1988

Injury Control Analyst, American National Red Cross, Washington, DC., 1986 – 1987

Research Associate II, Program for Urban Health Research, Department of Epidemiology, School of Public Health, The University of Michigan, Ann Arbor, 1985 – 1986

Research Associate I, Systems Analysis Division, The University of Michigan Transportation Research Institute, Ann Arbor, 1984 – 1985

Research Assistant I, Department of Health Behavior and Health Education, School of Public Health, The University of Michigan, Ann Arbor, 1983 – 1984

Social Worker, Department for Social Services, Cabinet for Human Resources, Commonwealth of Kentucky, Warsaw, Kentucky, 1982 – 1983

## PROFESSIONAL ACTIVITIES

*Society Membership and Leadership - Participation on Advisory Panels and Boards*

Scientific and Expert Advisory Board, Building Blocks DC and Washington, DC's Office of Gun Violence Prevention., 2021-present.

Member, Council on Criminal Justice, Violent Crime Working Group, 2021- present.

Co-Chair of Policy Workgroup and Executive Session Member, West Creek Community of Practice for a Fair and Just Response to Gun Violence, 2019-present.

John Jay College Research Advisory Group on Preventing and Reducing Community Violence, 2020

Expert Panel on Firearms Data Infrastructure for NORC of the University of Chicago, 2019-2020

Founding member and Co-Chair, advisory board for Safe Streets Baltimore, Baltimore City Health Department and Mayor's Office for Criminal Justice, 2016 - 2020

Director, Johns Hopkins-Baltimore Collaborative for Violence Reduction, 2016 –2019

Director, Baltimore Homicide Review Commission. City of Baltimore, 2014 – 2015

Advisory Committee on Violent Media and Gun Violence to the Directorate of the Social, Behavioral and Economic Sciences Division, National Science Foundation, 2013

Institute of Medicine, Planning Committee for Workshop on Evidentiary Base for Violence Prevention across the Lifespan and Around the World, 2012-2013

Invited participant to the Baltimore City GunStat project to provide technical assistance to law enforcement officials on gun law enforcement strategies, 2007 – present

Expert reviewer, Child Death Review Capacity Building Project, Harborview (University of Washington) Injury Prevention and Research Center, 2006

Advisory Council, California Department of Justice for planning gun violence prevention campaign, 2005 - 2009

Lethality Assessment Committee, advisory group for the Maryland Network Against Domestic Violence to develop a model lethality assessment protocol for police and providers of services to victims of intimate partner violence, 2003 - 2009

Johns Hopkins Univ. President's Council on Urban Health, Violence Working Group, 1998-2000

Baltimore City Task Force on Gunshot Wound Lethality, 1996-1997


## EDITORIAL AND OTHER PEER REVIEW ACTIVITIES

### *Journal Peer Review Activities*

American Journal of Epidemiology

American Journal of Preventive Medicine

American Journal of Public Health

Annals of Emergency Medicine

Annual Reviews of Public Health, Special Symposium Editor, 2014-2015

Archives of Pediatric and Adolescent Medicine Canadian Medical Association Journal

Epidemiologic Reviews, Special Issue Editor 2015-2016

Guide to Clinical and Preventive Services

Health Education and Behavior, Special Issue Editorial Board Member

Health Education Research

Injury Prevention, Editorial Board, 2005-2010

JAMA, Journal of the American Medical Association

Journal of Crime and Delinquency

Journal of Criminal Justice

Journal of General and Internal Medicine

Journal of Health Politics, Policy, and Law

Journal of Interpersonal Violence

Journal of Policy Analysis & Management

Journal of Quantitative Criminology

Journal of Trauma

Journal of Urban Health

Journal of Women's Health

New England Journal of Medicine

Pediatrics

Politics and Policy

Preventive Medicine, Co-editor, special issue on gun violence, 2015; co-editor special issue on gun violence 2022

Social Science & Medicine

Sothern Economic Journal

Western Criminology Review


*Grant Review*

National Center for Injury Control and Prevention, Centers for Disease Control and Prevention, Youth Violence Prevention Through Community-Level Change, April 2004

National Center for Injury Control and Prevention, Centers for Disease Control and Prevention, May 2001

National Institutes of Health, Clinical Sciences Special Emphasis Panel, Small Business Innovation Research Program, March 1999

National Center for Injury Control and Prevention, Centers for Disease Control Review Panel, June 1998

National Institute for Mental Health, Behavioral Science Track Award for Rapid Transition B/START Program, April 1998


## HONORS AND AWARDS

Inaugural (Endowed) Bloomberg Professor of American Health, 2018

Johns Hopkins University Distinguished Alumni Award, 2017

Injury Free Coalition for Kids, Pioneer Award, 2017

Leon Robertson Award for best 2016 article in Injury Epidemiology, co-author, 2017

Baltimore City Health Equity Leadership Award, 2016

David Rall Award for Science-Based Advocacy, American Public Health Association, 2015

Finalist for The Baltimore Sun's award for Marylander of the Year, 2013

Webster 5
*May 2023*

Selected for Institute of Medicine Planning Committee for the Evidentiary Base for Violence Prevention Across the Lifespan and Around the World Workshop, 2012

Delta Omega Honorary Society in Public Health – Alpha Chapter, Johns Hopkins Bloomberg School of Public Health, Faculty induction, 2005

Education Award from the Maryland Network Against Domestic Violence, 2004

Delta Omega Honorary Society - Alpha Chapter Certificate of Merit, 1989

William Haddon Memorial Fellowship, The Johns Hopkins School of Public Health, 1988-1989

Public Health Traineeship, The Johns Hopkins School of Public Health, 1987-1989

## PUBLICATIONS

*Journal Articles, Peer Reviewed*

150.  Examining a hypothesized causal chain for the effects of the 2007 repeal of the permit-to-purchase licensing law in Missouri: homicide guns recovered in state and within a year of purchase. *Journal of Urban Health*, 2023

149.  Ward JA, Uzzi M, Hudson T, **Webster DW**, Crifasi CK. Differences in perceptions of gun-related safety by race and gun ownership in the United States. *Journal of Law, Medicine, and Ethics*, 2023; 51:14-31.

148.  Kagawa R, Charbonneau, McCort C, McCourt A, Vernick J, **Webster D**, Wintemute G. Effects of comprehensive background check policies on firearm fatalities in four states. *American Journal of Epidemiology*, accepted Dec. 22, 2022.

147. **Webster DW**, Richardson J Jr., Meyerson N, St. Vil C, Topazian R. Observations and recommendations based on a review of research on the effects of hospital-based violence intervention programs on risks for future violence. *ANNALS of Political and Social Sciences*, forthcoming in 2023.

146.  Stone EM, Crifasi CK, Ward JA, Vernick JS, **Webster DW**, McGinty EE, Barry CL. National Support for Gun Policies Among U.S. Adults in 2019 and 2021. *Preventive Medicine*, 2022 Sep 7:107242. doi: 10.1016/j.ypmed.2022.107242. Online ahead of print. PMID: 36087625.

145. **Webster DW**, Gostin LO. The Supreme Court Expands Second Amendment Rights as the Nation Experiences Historic Levels of Firearms Violence. *JAMA*, 2022; 328(12):1187-1188. doi: 10.1001/jama.2022.14073. PMID: 36166019

144.  Doucette ML, McCourt AD, Crifasi CK, **Webster DW**. Impact of Changes to Concealed Carry Weapons Laws on Fatal and Non-Fatal Violent Crime, 1980-2019. *American Journal of Epidemiology*, 2022 Sep 14:kwac160. doi: 10.1093/aje/kwac160. Online ahead of print. PMID: 36104849

143.  Ward JA, McGinty EE, Hudson T, Stone EM, Barry CL, **Webster DW**, Crifasi CK. Reimagining public safety: Public opinion on police reform and gun violence prevention by race and gun ownership in the United States. *Preventive Medicine* 2022; 107180, ISSN 0091-7435, https://doi.org/10.1016/j.ypmed.2022.107180

142. Doucette ML, Ward JA, McCourt AD, **Webster D**, Crifasi CK. Officer-involved shootings and concealed carry firearm laws: An analysis of Gun Violence Archive data, 2014-2020. *J Urban Health*. 2022 Jun;99(3):373-384. doi: 10.1007/s11524-022-00627-5. PMID: 35536393 **-Awarded best article of the year in J Urban Health (2022)**

141. Crifasi CK, William RG, Booty MD, Owens-Young JL, **Webster DW**, Buggs SAL. Community Perspectives on Gun Violence and Safety: The Role of Policing in Baltimore City. *Journal of Criminal Justice*. 2022 https://doi.org/10.1016/j.jcrimjus.2022.101964

140. Crifasi CK, Ward JA, McGinty EE, Barry CL, **Webster DW**. Public Opinion on Laws Regulating Public Gun Carrying. *Preventive Medicine*. 2022; vol. 159 https://doi.org/10.1016/j.ypmed.2022.107067.

139. **Webster DW**. Public health approaches to reducing community gun violence. *Daedalus,* Reimagining Justice: The Challenges of Violence & Punitive Excess. (Winter) 2022; 151:38-48. https://doi.org/10.1162/DAED_a_01886

138. Crifasi CK, Ward JA, McGinty EE, **Webster DW**, Barry CL. Gun purchasing behaviours during the initial days of the COVID-19 pandemic, March to mid-July 2020. *International Review of Psychiatry*. 2021 Nov;33(7):593-597. doi: 10.1080/09540261.2021.1901669

137. Crifasi CK, Ward JA, McGinty EE, **Webster DW**, Barry CL. Public Opinion on Gun Policy by Race and Gun Ownership Status. *Preventive Medicine*. 2021; 149:106607. doi: 10.1016/j.ypmed.2021.106607. .PMID: 33984373

136. Zeoli AM, Paruk J, Branas CC, Carter PM, Cunningham R, Heinze J, **Webster DW**. Use of Extreme Risk Protection Orders to Reduce Gun Violence in Oregon. *Criminology & Public Policy* 2021; 20:243-261. https://doi.org/10.1111/1745-9133.12544

135. Crifasi CK, Ward JA, McGinty EE, **Webster DW**, and Barry CL. Gun Purchasing Behaviors during the Initial Phase of the COVID-19 Pandemic, March to mid-July 2020. International Review of Psychiatry, Published online 24 June 2021

https://doi.org/10.1080/09540261.2021.1901669

134. Merrill-Frances M, McGinty EE, Barry CL, **Webster DW**, Crifasi CK. Association between gun owner attitudes and their behavior in private firearm sales. Preventive Medicine 2021 Feb 10;147:106454. doi: 10.1016/j.ypmed.2021.106454. Online ahead of print.PMID: 33581183

133. Buggs SAL, **Webster DW**, Crifasi CK. Using synthetic control methodology to estimate effects of a Cure Violence intervention in Baltimore, Maryland. Injury Prevention Published Online First: 08 February 2021. http://dx.doi.org/10.1136/injuryprev-2020-044056

132. Frattaroli S, Zeoli AM, **Webster DW**. Armed, Prohibited and Violent at Home: Implementation and enforcement of restrictions on gun possession by domestic violence offenders in four U.S. localities. Journal of Family Violence, 2021 https://doi.org/10.1007/s10896-020-00241-6

131. Crifasi CK, Boot MD, Buggs SAL, **Webster DW**, Sherman SG. Worth the risk? Gun carrying and perceived criminal justice responses in Baltimore. Injury Prevention, 2020 injuryprev-2020-043917. doi: 10.1136/injuryprev-2020-043917. Online ahead of print. PMID: 33303560

130. Abelow H, Crifasi C, **Webster DW**. The legal and empirical case for firearm purchaser licensing. The Journal of Law, Medicine & Ethics, 2020; 48(S2):17-24. doi: 10.1177/1073110520979397. PMID: 33404297

129. McCourt AD, Crifasi CK, Stuart ES, Vernick JS, Kagawa RMC, Wintemute GJ, **Webster DW**. Effects of Purchaser Licensing and Point-of-Sale Background Check Laws on Firearm Homicide and Suicide in Four States. American Journal of Public Health 2020;110:1546-1552. doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PMID: 32816544

128. **Webster DW**, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States. Criminology & Public Policy, 2020;19:171–212. doi.org/10.1111/1745-9133.12487

127. Trangenstein P, Eck R, Lu Y, **Webster D**, Jennings JM, Latkin C, Milam AJ, Furr-Holden D, Jernigan DH. The Violence Prevention Potential of Reducing Alcohol Outlet Access in Baltimore, MD. Journal of Studies on Alcohol and Drugs 2020; 81:24-33. doi: 10.15288/jsad.2020.81.24. PMID: 32048598

126. Crifasi CK, Buggs SAL, Booty MD, **Webster DW**, Sherman SG. Baltimore's Underground Gun Market: availability of and access to guns.  Violence and Gender 2020  https://doi.org/10.1089/vio.2019.0054

125. Booty M, O'Dwyer J, **Webster D**, McCourt A, Crifasi C. Describing a "mass shooting": the role of databases in understanding burden. Injury Epidemiology, 2019;6:47. doi:10.1186/s40621-019-0226-7

124. Stone E, Barry CL, Crifasi CK, **Webster DW**, Vernick JS, McGinty EE.  Support for Gun Policies among Young Adults in the U.S., 2017-2019.  Preventive Medicine 2020;135:106094. doi: 10.1016/j.ypmed.2020.106094

123. Castillo-Carniglia A, **Webster DW**, Wintemute GJ. Effect on background checks of newly enacted comprehensive background check policies in Oregon and Washington: a synthetic control approach. Injury Epidemiology. 2019;6:45. Published 2019 Nov 27. doi:10.1186/s40621-019-0225-8

122. Barry CL, Stone E, Crifasi CK, Vernick JS, **Webster DW**, McGinty EE. Trends in Americans' Support for Gun Policies.  Health Affairs 2019; 38:1727-34. doi: 10.1377/hlthaff.2019.00576

121. Crifasi CK, Stone EM, McGinty B, Vernick JS, Barry CL, **Webster DW**. Differences in public support for handgun purchaser licensing. Injury Prevention 2019 Sep 6. pii: injuryprev-2019-043405. doi: 10.1136/injuryprev-2019-043405

120. Crifasi CK, O'Dwyer JK, McGinty EE, **Webster DW**, Barry CL. Desirability of personalized guns among current gun owners.  American Journal of Preventive Medicine. 2019 Jun 7. pii: S0749-3797(19)30155-2. doi: 10.1016/j.amepre.2019.02.024. [Epub ahead of print] PMID: 31196718

119. Hasegawa RB, **Webster DW**, Small DS.  Bracketing in the Comparative Interrupted Time-Series Design to Address Concerns about History Interacting with Group: Evaluating Missouri's Handgun Purchaser Law.  Epidemiology 2019 May;30(3):371-379. doi: 10.1097/EDE.0000000000000989. PMID: 30969945 Paper was runner-up for Rothman Prize for best article in 2019

118. Zeoli AM, **Webster DW**.  Firearm policies that work. JAMA. 2019 Feb 25. doi: 10.1001/jama.2019.0706

117. Decker MR, Wilcox HC, Holliday CN, **Webster DW**.  An integrated public health approach to interpersonal violence and suicide prevention and response.  Public Health Rep. 2018 Nov/Dec;133(1_suppl):65S-79S. doi: 10.1177/0033354918800019.  PMID: 30426878

116. Crifasi CK, McCourt AD, Booty MD, **Webster DW**. Polices to Prevent Illegal Acquisition of Firearms: Impacts on Diversions of Gun for Criminal Use, Violence, and Suicide. Current Epidemiology Reports 2019; 6:238–247

115. Castillo -Carniglia A, **Webster DW**, Cerdá M, Kagawa R, Vernick JS, Wintemute GJ, Crifasi CK. California's comprehensive background check and misdemeanor violence prohibition policies, and firearm mortality.  Annals of Epidemiology 2019; 30:50-56. doi: https://doi.org/10.1016/ j.annepidem.2018.10.001

114. Trangenstein PJ, Curriero FC, **Webster D**, Jennings JM, Latkin C, Eck R, Jernigan DH.  Outlet type, access to alcohol, and violent crime. Alcoholism: Clinical and Experimental Research 2018 Nov;42(11):2234-2245. doi: 10.1111/acer.13880. Epub 2018 Sep 26. PMID: 30256427

113. Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, **Webster DW**. Association between Firearm Laws and Homicide in Large, Urban U.S. Counties, Journal of Urban Health 2018 Jun;95(3):383-390. doi: 10.1007/s11524-018-0273-3.  Correction: Oct 2018; 95 (5):773-776.  10.1007/s11524-018-0306-y

112. Barry CL, **Webster DW**, Stone E, Crifasi CK, Vernick JS, McGinty EE.  Five Years after Newton: Public Support for Gun Violence Prevention Policies among Gun Owners and Non-Gun Owners. American Journal of Public Health. Published online ahead of print May 17, 2018: e1-e4. Doi:10.2105/AJPH.2018.304432)

111. Crifasi CK, McGinty EE, Douchette M, **Webster DW**, Barry CL. Storage practices of U.S. gun owners in 2016. American Journal of Public Health, 2018; 108:532-537. doi: 10.2105/AJPH.2017.304262. Epub 2018 Feb 22.  PMID: 29470124

110. Crifasi CK, Frances M, Vernick JS, **Webster DW**. Changes in the legal environment and enforcement of firearm transfer laws in Pennsylvania and Maryland.  Injury Prevention January 13, 2018 [Epub ahead of print] as 10.1136/injuryprev-2017-042582

109. Zeoli AM, McCourt A, Buggs S, Lilley D, Frattaroli S, **Webster DW**. Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their impact on intimate partner homicide.  American Journal of Epidemiology 2018;187(11):2365–2371. doi: 10.1093/aje/kwy174

108. Kagawa RM, Rudolph KE, Cerda M, Castillo AC, Shev BA, **Webster D**, Vernick JS, Crifasi CK, Wintemute GJ. Repeal of comprehensive background check policies and firearm homicide and suicide. Epidemiology 2018;29:494-502. doi: 10.1097/EDE.0000000000000838. PMID: 29613872

107. Castillo AC, Kagawa RM, **Webster DW**, Vernick JS, Cerda M, Wintemute GJ.  Comprehensive Background Check Policy and Firearm Background Checks in Three States.  Injury Prevention 2017; doi:10.1136/injuryprev-2017-042475

106. **Webster DW**, Buggs SAL.*  Can an Efficacious Strategy for Curtailing Illegal Drug Sales Be Counted on to Reduce Violent Crime?  Criminology & Public Policy 2017;16: 821-825

105. Stuart EA, Crifasi C, McCourt A, Vernick JS, **Webster D**.  Differing perspectives on analyzing data related to firearms and suicide.  American Journal of Public Health. 2017 Aug;107(8):e26. doi: 10.2105/AJPH.2017.303890

104. Crifasi CK, Choksey S, Buggs S,* **Webster DW**.  The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore.  The Russel Sage Foundation Journal for the Social Sciences 2017;3(5):128-140. https://www.jstor.org/stable/10.7758/rsf.2017.3.5.06

103. Crifasi CK, Pollack K, **Webster DW**. Assaults against U.S. law enforcement officers in the line-of-duty: Situational context and predictors of lethality. Injury Epidemiology 2016; 3:29. PMID: 27885587

102. Tung GJ, Vernick JS, Stuart EA, **Webster DW**, Gielen AC. Federal Actions to Incentivize State Adoption of 0.08g/dl Blood Alcohol Concentration Laws. Injury Prevention 2016 Oct 31. doi: 10.1136/injuryprev-2016-042087. PMID: 27799290

101. Milam AJ, Buggs S* Furr-Holden CD, Leaf P, Bradshaw CP, **Webster D**.  Changes in Attitudes towards Guns and Shootings following Implementation of the Baltimore Safe Streets Intervention. *J Urban Health*, 2016 Aug;93(4):609-26. doi: 10.1007/s11524-016-0060-y PMID: 27294969

100. Masho SW, Schoeny M, Sigel E, **Webster D**. Outcomes, data, and indicators of violence at the community level. Journal of Primary Prevention 2016;37:121-39. doi: 10.1007/s10935-016-0429-4

99. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**.  Firearms and the incidence of arrest among respondents to domestic violence restraining orders. Injury Epidemiology, 2015; 2:14. doi: 10.1186/s40621-015-0047-2

98. Riedel LE, Barry CL, McGinty EE, Bandara SN, **Webster DW**, Toone RE, Huskamp HA. Improving Health Care Linkages for Persons: The Cook County Jail Medicaid Enrollment Initiative.  J Correct Health Care. 2016 Jul;22(3):189-99. doi: 10.1177/1078345816653199.  PMID: 27302704

97. Messing JT, O'Sullivan CS, **Webster D**, Campbell J. Are Abused Women's Protective Actions Associated with Reduced Threats, Stalking, and Violence Perpetrated by their Male Intimate Partners? Violence Against Women 2016 Apr 26. pii: 1077801216640381. [Epub ahead of print] PMID: 27118689

96. Parker EM, Gielen AC, Castillo R, **Webster D**, Glass N.  Intimate partner violence and patterns of safety strategy use among women seeking temporary protective orders: a latent class analysis. Violence Against Women 2016 Mar 6. pii: 1077801216631436. [Epub ahead of print] PMID: 26951307

95. Messing JT, Campbell J, **Webster DW**, Brown S, Patchell B, Wilson JS.  The Oklahoma lethality assessment study: A quasi-experimental evaluation of the Lethality Assessment Program.  Social Service Review 2015: 89: 499-530.  DOI: 10.1086/683194

94. **Webster DW**, Cerdá M, Wintemute GJ, Cook PJ.  Epidemiologic evidence to guide the understanding and prevention of gun violence.  Epidemiologic Reviews 2016; 38(1):1-4. doi: 10.1093/epirev/mxv018. Epub 2016 Feb 10. PMID: 26905892

93. Milam AJ, Furr-Holden CD, Leaf P, **Webster D**.  Managing Conflicts in Urban Communities: Youth Attitudes Regarding Gun Violence.  J Interpersonal Violence 2016; Mar 27. pii: 0886260516639584. [Epub ahead of print] PMID: 27021734

92. Bushman BJ, Newman K, Calvert SL, Downey G, Drezde M, Gottfredson M, Jablonski NG, Masten AS, Morrill C, Neil DB, Romer D, **Webster DW**.  Youth violence: what we know and what we need to know. American Psychologist 2016;71:17-39. doi: 10.1037/a0039687

91. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**.  Firearms and the incidence of arrest among respondents to domestic violence restraining orders.  Injury Epidemiol. 2015;2(1):14. Epub 2015 Jun 23. PMID: 27747746

90. Bandara SN, Huskamp HA, Riedel LE, McGinty EE, **Webster D**, Toone RE, Barry CL. Leveraging the Affordable Care Act to enroll justice-involved populations in Medicaid: an inventory of state and local efforts.  Health Affairs 2015;34:2044-51. doi: 10.1377/hlthaff.2015.0668. PMID: 26643624

89. Crifasi CK, Pollack K, **Webster DW**.  The influence of state-level policy changes on the risk environment for law enforcement officers.  Injury Prevention 2016; 22:274-8. doi: 10.1136/injuryprev-2015-041825.  PMID: 26718550

88. Kennedy-Hendricks A, Richey M, McGinty EE, Stuart EA, Barry CL, **Webster DW**. Opioid Overdose Deaths and Florida's Crackdown on Pain Clinics. Am J Public Health 2015 Dec 21:e1-e8. [Epub ahead of print] PMID: 26691121

87. Rutkow L, Chang HY, Daubresse M, **Webster DW**, Stuart EA, Alexander GC.  Effect of Florida's prescription drug monitoring program and pill mill laws on opioid prescribing and use.  JAMA Internal Med 2015; online August 17, 2015. doi:10.1001/jamainternmed.2015.3931

86. Crifasi CK, Meyers JS, Vernick JS, **Webster DW**. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates.  Preventive Med. Jul 23, 2015. pii: S00917435(15)00229-7. doi: 10.1016/j.ypmed.2015.07.013. [Epub ahead of print] PMID: 26212633

85. McGinty EE, Sell TK, Wolfson JA, **Webster DW**.  Political communication about firearm policy in the United States: Competing news media messages about background check proposals in the year following the Newtown shooting. J Health Politics, Policy, and Law, 2015 Nov 13. pii: 3445592. [Epub ahead of print] PMID: 26567381

84. Barry CL, Kennedy Hendricks A, Gollust SE, Niederdeppe J, Bachhuber MA, **Webster D**, McGinty EE. Understanding Americans' Views on Opioid Pain Reliever Abuse.  Addiction. 2015 Jul 25. doi: 10.1111/add.13077. [Epub ahead of print] PMID: 26212522

83. Rudolph KE, Stuart EA, Vernick JS, **Webster DW**.  Association between Connecticut's permit-to-purchase handgun law and homicides. American Journal of Public Health, 2015;105(8):e49-54. doi:10.2105/AJPH.2015.302703

82. Barry C, McGinty EE, Vernick JS, **Webster DW**.  Two Years after Newtown - Public Opinion on Gun Policy Revisited.  Preventive Medicine 2015 May 18. pii: S0091-7435(15)00166-8. doi: 10.1016/j.ypmed.2015.05.007

81. **Webster DW**, Wintemute GJ.  Effects of policies designed to keep firearms from high-risk individuals.  Annual Reviews of Public Health.  2015;36:21-37.  PMID: 25581152

80. McGinty EE, Frattaroli S, Appelbaum P, Bonnie R, Grilley A, Horwitz J, Swanson J, **Webster DW**.  Using research evidence to reframe the policy debate around mental illness and guns: Process and recommendations.  Am J Public Health. 2014;104(11):e22-6. doi: 10.2105/AJPH.2014.302171

79. **Webster DW**, Crifasi CK, Vernick JS.  Effects of the repeal of Missouri's handgun purchaser licensing law on homicides.  J Urban Health 2014;91:293-302. Erratum: J Urban Health 2014; 91:598-601

78. McGinty EE, **Webster DW**, Jarlenski ML, Barry CL News media framing of serious mental illness and gun violence in the United States, 1997-2012 Am J Public Health 2014;104:406-13. doi: 10.2105/AJPH.2013.301557

77. Cavanaugh CE, Messing JT, Amanor-Boadu Y, O'Sullivan CS, **Webster D**, Campbell J.  Intimate partner sexual violence: a comparison of foreign-born versus U.S.-born physically abused Latinas.  J Urban Health 2014;91:122-35. PMID: 23959640

76. McGinty EE, **Webster DW**, Barry CL. Gun policy and serious mental illness: Priorities for future research and policy. Psychiatric Services 2014;65:50-8. doi: 10.1176/appi.ps.201300141

75. Tung GJ, Vernick JS, Stuart EA, **Webster DW**. Political factors affecting the enactment of clean indoor air laws.  Am J Public Health. 2014;104(6):e92-7. doi: 10.2105/AJPH.2013.301689

74. Whitehill JM, **Webster DW**, Frattaroli S, Parker EM. Interrupting violence: How the CeaseFire program prevents imminent gun violence through conflict mediation. J Urban Health 2014;91:84-95. doi: 10.1007/s11524-013-9796-9

73. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**. Identifying armed respondents to domestic violence restraining orders and recovering their firearms: process evaluation of an initiative in California. Amer J Public Health 2014;104:e113-8. doi: 2013.301484. PMID:  24328660

72. Vittes KA, **Webster DW**, Frattaroli S, Claire BE, Wintemute GJ. Removing guns from batterers: Findings from a survey of domestic violence restraining order recipients in California. Violence Against Women 2013; 19:602-16. doi: 10.1177/1077801213490561

71. Milam AJ, Furr-Holden D, Bradshaw CP, **Webster DW**, Leaf PJ.  Alcohol environment, perceived safety, and exposure to alcohol, tobacco, and other drugs in early adolescence.  Journal of Community Psychology 2013;41:867-883

70. McGinty EE, **Webster DW**, Barry CL. Dangerous People or Dangerous Guns? Effects of news media messages about mass shootings on attitudes toward persons with serious mental illness and public support for gun control policies. American Journal of Psychiatry 2013;170:494-501

69. Barry CL, McGinty EE, Vernick JS, **Webster DW**.  After Newtown – public opinion on gun policy and mental illness.  New England Journal of Medicine 2013;368:1077-1081. doi: 10.1056

68. Vittes KA, Vernick JS, **Webster DW**.  Common sense gun policy reforms for the United States. British Medical Journal 2012; 345:e8672. doi: 10.1136 /bmj.e8672

67. Alexander GC, **Webster DW**, Kruszewski SP.  Rethinking opioid prescribing to protect patient ]safety and public health.  JAMA 2012;308:1865-6. doi: 10.1001 /jama.2012.14282

66. Whitehill JM, **Webster DW**, Vernick JS. Street conflict mediation to prevent youth violence: conflict characteristics and outcomes.  Injury Prev 2013; 19:204-9. doi: 10.1136 /injuryprev-2012-040429

65. Vittes KA, Vernick JS, **Webster DW**. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership.  Injury Prevention 2013;19:26-31. doi: 10.1136/injuryprev-2011-040290

64. Kercher C, Swedler DI, Pollak KM, **Webster DW**.  Homicides of law enforcement officers responding to domestic disturbance calls.  Injury Prevention 2013; 19:331-5

63. **Webster DW**, Whitehill JM, Vernick JS, Curriero FC. Effects of Baltimore's Safe Streets Program on gun violence: a replication of Chicago's CeaseFire program. J Urban Health 2013;90:27-40. doi: 10.1007/s11524-012-9731-5

62. **Webster DW**, Vernick JS, Bulzacchelli MT, Vittes KA.  Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee.  J Urban Health 2012;89:87-97

61. Yang C, German D, **Webster DW**, Latkin C. Experiencing violence as a predictor of drug use relapse among former drug users in Baltimore, Maryland. J Urban Health 2011;88:1044-51

60. Vernick JS, Rutkow L, **Webster DW**, Teret SP. Changing the constitutional landscape for firearms: the Supreme Court's recent second amendment decisions.  Amer. J Public Health 2011;101;2021-6

59. Franklin FA II, Pan WK, **Webster DW**, LaVeist TA.  Alcohol outlets and violent crime in the nation's capital. Western Journal of Emergency Medicine 2010;11:283-290

58. Wintemute GJ, Hemenway D, **Webster DW**, Pierce G, Braga AA.  Gun shows and gun violence: fatally flawed study yields misleading results. American Journal of Public Health 2010;100:1856-60

57. Wright MA, Wintemute GJ, **Webster DW**.  Factors affecting a recently-purchased handgun's risk for use in crime under circumstances that suggest gun trafficking.  J Urban Health 2010; 87:352-364

56. Zeoli AM, **Webster DW**.  Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large U.S. cities.  Injury Prevention 2010;16:90-95

55. **Webster DW**, Frattaroli S, Vernick JS, O'Sullivan C, Roehl J, Campbell JC. Women with protective orders report failure to remove firearms from their abusive partners: Results from an exploratory study.  Journal of Women's Health 2010;19:93-98

54. **Webster DW**, Vernick JS. Keeping firearms from drug and alcohol abusers. Injury Prevention 2009;15:425-7

53. **Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of state-level firearm seller accountability policies on firearms trafficking.  Journal of Urban Health 2009;86:525-537. doi: 10.1007/s11524-009-9351-x. Epub 2009 May 29.PMID: 19479382

52. Snider C, **Webster D**, O'Sullivan CS, Campbell JC.  Intimate partner violence: Development of a Brief Risk Assessment for the Emergency Department.  Academic Emergency Medicine 2009;16:1-8

51. Rutkow L, Vernick JS, **Webster DW**, Lennig DJ.  Violence against women and the Supreme Court:  recent challenges and opportunities for advocates and practitioners. Violence Against Women 2009; 15:1248-1258

50. Campbell JC, **Webster DW**, Glass N.  The Danger Assessment:  Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide.  J Interpersonal Violence 2009;24:653-674

49. Hu G, **Webster DW**, Baker SP.  Hidden homicide trends in the U.S., 1999-2004.  J Urban Health 2008;85:597-606

48. Bulzacchelli MT, Vernick JS, Sorock GS, **Webster DW**, Lees PS. Circumstances of Fatal Lockout/Tagout- Related Injuries in Manufacturing. Amer J Industrial Medicine 2008;51:728-734

47. Outwater A, Campbell JC, **Webster DW**, Mgaya E. Homicide death in Sub-Saharan Africa: A review 1970-2004. African Safety Promotion 2008;5:31-44

46. Vernick JS, Hodge J , **Webster DW**.  The ethics of restrictive licensing for handguns: Comparing the United States and Canadian approaches to handgun regulation.  Journal of Law, Medicine, and Ethics 2007;35:668-678

45. Bulzacchelli MT, Vernick JS, **Webster DW**, Lees PS. Effects of OSHA's Control of Hazardous Energy (Lockout/Tagout) Standard on Rates of Machinery- Related Fatal Occupational Injury. Injury Prevention 2007;13:334-338

44. Vernick JS, **Webster DW**. Policies to prevent firearms trafficking. Injury Prevention 2007;13:78-79

43. Weiner J, Wiebe DJ, Richmond TS, and other including **Webster D**. Reducing firearm violence: a research agenda. Injury Prevention 2007;13:80-84

42. Vernick JS, **Webster DW**, Bulzacchelli MT.  Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement.  J Law Med and Ethics 2006;34:765-775

41. Vernick JS, Teret SP, Smith GA, **Webster DW**.  Counseling About Firearms: Proposed Legislation is a Threat to Physicians and Their Patients.  Pediatrics 2006; 118:2168-72

40. Manganello J, **Webster DW**, Campbell JC.  Intimate partner violence and health provider training and screening in the news.  Journal of Women's Health 2006; 43:21-40

39. **Webster DW**, Zeoli AM, Bulzacchelli MT, Vernick JS.  Effects of police stings of gun dealers on the supply of new guns to criminals.  Injury Prevention 2006;12:225-230

38. **Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of a gun dealer's change in sales practices on the supply of guns to criminals.  Journal of Urban Health 2006; 83:778-787.

37. Koziol-McLain J, **Webster DW**, MacFarlane J, Block CR, Glass N, Campbell JC. Risk factors for femicide-suicide in abusive relationships: results from a multi-site case control study. Violence & Victims 2006;21:3-21

36. Vernick JS, Johnson SB, **Webster DW**.  Firearm suicide in Maryland: characteristics of older versus younger suicide victims.  Maryland Medicine, 2005; 6(3):24-2

35. Lewin NL, Vernick JS, Beilenson PL, Mair JS, Lindamood LM, Teret SP, **Webster DW**.  Using local public health powers as a tool for gun violence prevention: the Baltimore youth ammunition initiative. American Journal of Public Health 2005; 95:762-765

34. **Webster DW**, Vernick JS, Zeoli AM, Manganello JA.  Effects of youth-focused firearm laws on youth suicides. JAMA 2004; 292:594-601

33. Vernick JS, O'Brien M, Hepburn LM, Johnson SB, **Webster DW**, Hargarten SW.  Unintentional and undetermined firearm deaths: a preventable death analysis of 3 safety devices. Injury Prev 2003; 9:307-11

32. Vernick JS, Pierce MW, **Webster DW**, Johnson SB, Frattaroli S.  Technology to detect concealed weapons: 4th Amendment limits on a public health and law enforce tool.  J Law, Med. and Ethics 2003; 31:567-579

31. Campbell JC, **Webster DW**, Koziol-McLain J, et al.  Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study.  Am J Public Health 2003; 93:1089-97.

30. Campbell JC, **Webster DW**, Koziol-McLain J, et al.  Assessing risk factors for intimate partner homicide.  NIJ Journal 2003;250:14-19

29. Roche KM, **Webster DW**, Alexander CS, Ensminger ME.  Neighborhood variations in the salience of parental support to boys' fighting.  Adolescent and Family Health 2003;3:55-63

28. Solomon BS, Duggan AK, **Webster DW**, Serwint JR.  Pediatric resident firearm safety counseling during adolescent health maintenance visits. Arch Pediatric and Adolescent Med 2002;156:769-775

27. **Webster DW**, Vernick JS, Hepburn LM.  Effects of Maryland's law banning Saturday night special handguns on homicides.  American Journal of Epidemiology 2002;155:406-412

26. **Webster DW**, Freed LH, Frattaroli S, Wilson MH.  How delinquent youth acquire guns: Initial versus most recent gun acquisitions. Journal of Urban Health 2002;79:60-69

25. Frattaroli S, **Webster DW**, Teret SP.  Unintentional gun injuries, firearm design, and prevention: A perspective on urban health.  Journal of Urban Health 2002;79:49-59

24. Sachs CJ, Kosiol-McLain J, Glass N, **Webster DW**, Campbell JC.  A population-based survey assessing support for mandatory domestic violence reporting by healthcare personnel.  Women and Health 2002;35:121-133

23. **Webster DW**, Vernick JS, Hepburn LM.  The relationship between licensing, registration and other state gun sales laws and the source state of crime guns.  Injury Prevention 2001;7:184-189

22. Sharps PW, Campbell JC, Campbell D, Gary F, **Webster D**.  The role of alcohol use in intimate partner femicide.  American Journal on Addictions, 2001;10:122-135

21. Freed LH, **Webster DW**, Longwell JJ, Carrese J, Wilson MH.  Deterrents to gun acquisition and carrying among incarcerated adolescent males.  Arch Pediatric and Adoles Med 2001;155:335-341

20. **Webster DW**, Starnes M.  Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children, Pediatrics, 2000;106:1466-1469

19. Vernick JS, **Webster DW**, Hepburn LM.  Maryland's law banning Saturday night special handguns:  Effects on crime guns.  Injury Prevention 1999; 5:259-263

18. Howard KA, **Webster DW**, Vernick JS.  Beliefs about the risks of firearms in the home: Analysis of a national survey (U.S.A.).  Injury Prevention 1999;5:284-289

17. Teret SP, **Webster DW**.  Reducing gun deaths in the United States: Personalized guns would help – and would be achievable.  British Medical Journal 1999:318:1160-1161

16. Teret SP, **Webster DW**, Vernick JS, et al.  Public support for innovative gun policies: The results of two national surveys.  New England Journal of Medicine 1998;339:813-818

15. **Webster DW**, Vernick JS, Ludwig J.  No proof that right-to-carry laws reduce violence, American Journal of Public Health, 1998;88:982-983

14. **Webster DW**, Vernick JS, Ludwig J, Lester KJ.  Flawed gun policy research could endanger public safety.  American Journal of Public Health 1997;87:918-921

13. Vernick JS, Teret SP, **Webster DW**.  Regulating firearm advertising promising home protection: The legal basis for a public health intervention.  JAMA 1997;277:1391-1397

12. **Webster DW**, Wilson MEH.  Gun violence among youth and the pediatrician's role in primary prevention.  Pediatrics 1994;94:617-622

11. **Webster DW**.  The unconvincing case for school-based conflict resolution programs for adolescents.  Health Affairs 1993;12(4):126-141

10. **Webster DW**, Gainer PS, Champion HR.  Weapon carrying among inner-city junior high school students:  Defensive behavior vs aggressive delinquency.  Amer J Public Health 1993; 83:1604-1608

9. Gainer PS, **Webster DW**, Champion HR.  A youth violence prevention program description and preliminary evaluation.  Archives of Surgery 1993;128:303-308

8. **Webster DW**, Champion HR, Gainer PS, Sykes L.  Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990.  Archives of Surgery 1992;127:694-698

7. Oschner MG, Hoffman AP, DiPasquale D, Cole FJ, **Webster DW**, Champion HR.  Associated aortic rupture-pelvic fracture: an alert for orthopedic and general surgeons. J Trauma, 1992;33:429-34

6. **Webster DW**, Wilson MEH, Duggan AK, Pakula LC.  Parents' beliefs about preventing gun injuries to children.  Pediatrics 1992;89:908-914

5. **Webster DW**, Wilson MEH, Duggan AK, Pakula LC.  Firearm injury prevention counseling:  a study of pediatricians' beliefs and practices.  Pediatrics 1992;89:902-907

4. Harburg E, DiFrancesco W, **Webster DW**, Gleiberman L, Schork MA:  Familial transmission of alcohol use: II. Imitation of and aversion to parent drinking (1960) by adult offspring (1977); Tecumseh, Michigan.  Journal of Studies on Alcohol 1990;51:245-256

3. **Webster DW**, Harburg E, Gleiberman L, Schork MA, DiFrancesco W:  Familial transmission of alcohol use:  I. Parent and adult offspring alcohol use over 17 years, Tecumseh, Michigan.  Journal of Studies on Alcohol 1989;50:557-566

2. Wagenaar AC, **Webster DW**, Maybee RG:  Effects of child restraint laws on traffic fatalities in eleven states.  Journal of Trauma 1987;27:726-732

1.Wagenaar AC, **Webster DW**:  Preventing injuries to children through compulsory automobile safety seat use. Pediatrics 1986;78:662-*672*


*Invited Commentaries in Scientific Journals*

10. South EC, Hemenway D, **Webster DW**. Gun violence research is surging to inform solutions to a devastating public health crisis. *Preventive Medicine* 2022 Oct 27:107325. doi: 10.1016/j.ypmed.2022.107325.


9. Zeoli AM, **Webster DW**.  Firearm policies that work. JAMA 2019 Feb 25. doi: 10.1001/jama.2019.0706. [Epub ahead of print]

8. **Webster DW**, Buggs SAL.  Can an efficacious strategy for curtailing illegal drug sales be counted on to reduce violent crime? Criminology & Public Policy 2017; 16:821-825. DOI: 10.1111/17459133.12326

7. **Webster DW**.  The true impact of mass shootings on Americans.  Annals of Internal Medicine. 2017; Annals of Internal Medicine. 2017 May 2. doi: 10.7326/M17-0943. PMID: 28462426

6. McGinty EE, **Webster DW**. The role of alcohol and drugs in firearm violence. JAMA Internal Med. 2017 Jan 3. doi: 10.1001/jamainternmed.2016.8192. [Epub ahead of print] PMID: 28055044

5. **Webster DW**.  Lessons from Australia's National Firearms Agreement.  JAMA. 2016;316:279-81. doi: 10.1001/jama.2016.8819. PMID: 27332736

4. Hemenway D, **Webster DW**.  Increasing knowledge for the prevention of firearm violence

3. Preventive Medicine, Jun 8, 2015. pii: S0091-7435(15)00198-X. doi: 10.1016/j.ypmed.2015.06.001

2. **Webster DW**. Commentary: Evidence to guide gun violence prevention in America.  Annual Reviews of Public Health. 2015;36:1-4. PMID: 25581156

1. Frattaroli S, Wintemute GJ, **Webster DW**. Implementing a public health approach to gun violence prevention: The importance of physician engagement.  Ann Internal Medicine, 2013; 159:306-7


*Journal Articles Not Peer-Reviewed*

2. **Webster DW**, Chaulk CP, Teret SP, Wintemute GJ.  Reducing firearm injuries.  Issues in Science & Technology 1991; 7 (Spring): 73-79

1. **Webster DW**. Suicide in the subway:  case consultation:  suicide and mass transit: commentary.  Journal of Suicide and Life-Threatening Behavior 1991;21:209-212

*Books and Book Chapters*

12. McGinty EE, **Webster DW**. "Defining the problem: the relationship between mental illness and gun violence," in Gold LH, Simon RI., eds. Gun Violence and Mental Illness. Arlington, VA: American Psychiatric Press, 2015.

11. **Webster DW**, Vernick JS, Eds.  Updated Evidence and Policy Developments on Reducing Gun Violence in America. Baltimore, MD: Johns Hopkins University Press, 2014.

10. **Webster DW**, Vernick JS, Eds. Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press, 2013.

9. Chapters contributed to in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press, 2013:

8. Vittes KA, **Webster DW**, Vernick JS.  "Reconsidering the Adequacy of Current Conditions on Legal Firearm Ownership," pp. 65-76.

7. **Webster DW**, Vernick JS, McGinty EE, Alcorn T. "Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws," pp. 109-122.

6. **Webster DW**, Vernick JS. "Spurring Responsible Firearms Sales Practices through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking," p. 123-32.

5. Vernick JS, **Webster DW**.  "Curtailing Dangerous Practices by Licensed Firearm Dealers: Legal Opportunities and Obstacles." pp. 133-142.

4. McGinty EE, **Webster DW**, Vernick JS, Barry CL.  "Public Opinion on Proposals to Strengthen U.S. Gun Laws: Findings from a 2013 Survey," pp. 239-257.

3. Vernick JS, **Webster DW**, Vittes KA.  "Law and Policy Approaches to Keeping Guns from High-Risk People" in Culhane J. ed. Reconsidering Law and Policy Debates: A Public Health Perspective. New York: Cambridge University Press, 2011.

2. Vernick JS, **Webster DW**.  Amicus Brief to U.S. Supreme Court regarding District of Columbia vs. Heller for the petitioner. Written on behalf of American Public Health Assoc., American College of Preventive Medicine, American Trauma Society, and the American Assoc. of Suicidology, Jan. 2008

1. **Webster DW**. Child Access Prevention (CAP) Laws.  In Gregg Lee Carter (Ed.) Entry in Encyclopedia of Guns in American Society.  Santa Barbara, CA:  ABC-CLIO, 2003

*Reports*

27. John Jay College Research Advisory Group on Preventing and Reducing Community Violence, **Webster DW** – member. Reducing Violence Without Police: A Review of Research Evidence. New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York, November 2020. https://johnjayrec.nyc/2020/11/09/av2020/

26. Expert Panel on Firearms Data Infrastructure, **Webster DW** – member, and John Roman. A Blueprint for Firearms Data Infrastructure: Recommendations from NORC's Expert Panel on Firearms Data Infrastructure. NORC at the University of Chicago, October 2020

25. **Webster DW**, Crifasi CK, Williams RG, Booty MD, Buggs SAL.  Reducing Violence and Building Trust: Data to Guide Gun Law Enforcement in Baltimore. Johns Hopkins Center for Gun Policy and Research, June 2020.

24. Expert Panel on Firearms Data Infrastructure, **Webster DW** – member. The State of Firearms Data in 2019, NORC at the University of Chicago, January 2020

23. Crifasi CK, McCourt AD, **Webster DW**.  Impact of Handgun Purchaser Licensing on Gun Violence. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 2019

22. Crifasi CK, McCourt A, **Webster DW**.  Policies to Reduce Gun Violence in Illinois: Research, Policy Analysis and Recommendations. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, February 2019

21. **Webster DW**, Buggs SAL, Crifasi CK.  Estimating the Effects of Law Enforcement and Public Health Interventions to Reduce Gun Violence in Baltimore.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, January 2018.

20. **Webster DW**, Crifasi CK, Vernick JS, McCourt A.  Concealed Carry of Firearms: Facts vs. Fiction.  Johns Hopkins Center for Gun Policy and Research, November 2017

19. **Webster DW**, Donohue JJ III, Klarevas L, Crifasi CK, Vernick JS, Jernigan D, Wilcox HC, Johnson SB, Greenberg S, McGinty EE.  Firearms on College Campuses:  Research Evidence and Policy Implications.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins University, October 15, 2016

18. Braga AA, **Webster DW**, White MD, Saizow H.  Gun Violence: Smart Policing Initiative Spotlight on Evidence-Based Strategies and Impacts. Alexandria, VA: CNA Analysis & Solutions, Mar. 2014

17. Bushman B, Newman K, Calvert S, Downey G, Dredze M, Gottfredson M, Jablonski NG, Masten A, Morrill C, Neil DB, Romber D, **Webster D**.  Predictors of Youth Violence.  Report prepared at the request of the National Sciences Foundation, December 2013

16. American Psychological Association Panel of Experts Report – Cornell D, Evans AC Jr., Guerra NG, Kinscherff R, Mankowski E, Randazzo MR, Scrivner E, Sorenson SB, Tynan WD, **Webster DW**.  Gun Violence: Prediction, Prevention and Policy.  American Psychological Association, Washington, DC, December 2013

15. Consortium for Risk-Based Firearm Policy, **DW Webster** contributing member. Guns, Public Health, and Mental Illness: An Evidence-Based Approach to State Policy.  December 2013

14. Consortium for Risk-Based Firearm Policy, **DW Webster** contributing member. Guns, Public Health, and Mental Illness: An Evidence-Based Approach to Federal Policy.  December 2013

13. **Webster DW**.  Evaluation of Baltimore's Strategies for Reducing Gun Violence. Report prepared for the Baltimore Police Department, Smart Policing Initiative grant, U.S. Bureau of Justice Assistance, Aug. 2013

12. **Webster DW**, Vernick JS, Vittes KA, McGinty EE, Teret SP, Frattaroli S.  The Case for Gun Policy Reforms in America.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, October 2012

11. **Webster DW**. Whitehill JM, Vernick JS, Parker E.  Evaluation of Baltimore's Safe Streets Program: Effects on Attitudes, Participants' Experiences, and Gun Violence. Johns Hopkins Center for the Prevention of Youth Violence, January 2012

10. **Webster DW**, Illangasekare SL.  Best Practices for the Prevention Youth Homicide and Serious Violence.  Johns Hopkins Urban Health Institute, October 2010

9. **Webster DW**, Vernick JS, Mendel J.  Interim Evaluation of Baltimore's Safe Streets Program. Johns Hopkins Center for the Prevention of Youth Violence, Jan. 2009

8. **Webster DW**, Vittes KA. Using GunStat Data to Assess Progress on the Prosecution of Gun Cases in Baltimore City. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, December 2009

7. **Webster DW**, Mendel J.  Effects of Baltimore's Operation Safe Kids on Re-Arrest.  Johns Hopkins Center for the Prevention of Youth Violence, June 2008

6. **Webster DW**.  Interventions to reduce deaths and injuries associated with youth violence. White paper commissioned by the Robert Wood Johnson Foundation.  May 2006

5. **Webster DW**.  Preventing intimate partner violence.  White paper commissioned by the Robert Wood Johnson Foundation.  June 2006

4. **Webster DW**, Vernick JS, Teret SP.  How Cities Can Reduce Illegal Guns and Gun Violence.  Johns Hopkins Center for Gun Policy and Research, April 2006. Updated January 2008

3. Campbell JC, **Webster DW**, O'Sullivan C, Roehl J, Mahoney P, White M, Guertin K.  Intimate Violence Risk Assessment Validation Study. Report submitted to the National Institute of Justice, September 2004. 2000WTVX0011

2. **Webster DW**, Kim A.  Evaluation of the Maryland Gun Violence Act of 1996: Effects on the Illicit Gun Market.  Prepared for the U.S. Bureau of Alcohol, Tobacco, and Firearms, September 2003

1. **Webster DW**, Vernick JS, Kaljee L, Cameron DD, Frattaroli S, Johnson S.  Public attitudes About New Law Enforcement Technologies and Related to Strategies to Reduce Gun Violence.  Report by the Johns Hopkins Center for Gun Policy and Research to the National Institute of Justice, 2002


***Consultations or Collaborations with Policymakers, Community Groups, and Other Stakeholders***

13. Firearm Data Infrastructure Working Group. Safe States Alliance, 2022- present.

12. Center for Research and Evaluation of the John Jay College for Criminal Justice, Research Advisory Group on Preventing and Reducing Community Violence, 2020.

11. National Opinion Research Center, University of Chicago, 2019-2020.  Expert advisor on project to develop recommendations for building a data infrastructure for gun violence research. Funded by the National Collaborative for Gun Violence Research.

10. Consultant and Participant, Square One Justice Project to Reimagine Criminal Justice, Columbia University, 2019-2020.

9. Violence Prevention Research Program, University of California, Davis, 2014–2018.  Identify state background check policies for firearm purchasers and develop plans for evaluating the laws' effects on violence and injuries

8. John Jay School of Criminal Justice, 2017 –2019. Advise team evaluating Cure Violence public health interventions in New York to reduce shootings and other serious violence

7. Police Executive Research Forum, 2012-2014.  Advise PERF and law enforcement officials in four cities on strategies to combat gun violence as part of a USDOJ Bureau of Justice Assistance project

6. California Dept. of Justice, Firearms Division, 2005-2006.  Provide advice about how the state should use funds from its litigation against Wal-Mart to advance gun violence prevention

5. The Robert Wood Johnson Foundation, 2005-2006.  Prepare advice and white papers on the prevention of youth violence and the prevention of intimate partner violence

4. National Association for the Advancement of Colored People, 1999-2000.  Assistance with gun violence victimization survey of NAACP members for use in lawsuit against the gun industry

3. Duke University and Georgetown University, 1998-1999.  Consultation on project to estimate the economic costs associated with firearm injuries

2. Consortium of Virginia Urban Municipalities on strategies to reduce violence, 1992

1. Center to Prevent Handgun Violence, Washington, DC, 1991-1993.  Conducted survey of pediatricians on materials being developed for education families about firearm injury prevention


***Media Dissemination***

Frequently interviewed and quoted by major news media outlets including *CNN, MSNBC, CBS, PBS News Hour, National Public Radio, The New York Times, The Washington Post, USA Today, US News and World Report, TIME, Newsweek, The Guardian, Newsweek, Vox, Newsy.*

## PART II

**TEACHING**

*Academic Advisees,* **Johns Hopkins University**

       Erin Boguski, MPH (parttime), 2021 – present

       Jennifer Styles, MPH (parttime), 2021 – present

       Yaniris Gomez, MPH (parttime), 2021 – present

       Simimidele Badero, MPH (parttime), 2021 - present

       Rev. Wendy Calderon-Payne, MPH (parttime), 2021 – present

       Kristina Singleton, MPH (parttime) 2021 - present

       Lyndsey O'Rourke, MPH (parttime), 2021 – Present

       Carly Pysher, MPH (parttime), 2021 - Present

       Caroline Palmer (parttime), MPH, 2021 – Present

       Nargus Narounzadeh (parttime), MPH, 2021 - Present

       Cailin Crocket, MPH (parttime), 2020 – Present

       Nicholas Meyerson, PhD, 2020 – Present

       Don Hedrick, DrPH, 2020 – Present

       Eric Cumberbach, MPH, 2020 – Present

       Kelly Burke, MPH (parttime), 2019 – Present

       Josh Peterson, MPH (parttime), 2018 – 2022

       Amanda Capitummino, MPH 2018-2019

       Alexander McCourt, PhD, 2014-2018

       Christine McKenna, MPH, 2013-2014

       Shani Buggs, PhD, 2013 – 2018

       Cassandra Kercher, PhD, 2011–2014

       Dara Johnson, MPH, 2011 – 2012

       Janis Sethness, MPH, 2011 – 2012

       Donald Chalfin, MPH, 2010 – 2014

       Jeane Garcia Davis, MPH, 2008-2011

       Summer Venable, MPH, 2008-2010

       Jillian Fry, PhD, 2007 – 2012

       Gayle Nelson, MPH, 2007-2009

       James Saltzman, MPH, 2007-2008

Jennifer Mendel Whitehill, PhD, 2006 – 2011

Elizabeth Saylor, PhD candidate, 2003 - 2007

April Zeoli, PhD, 2002 – 2007

Allegra Kim, PhD 2001 – 2006

Jennifer Manganello, PhD, 1999-2003

Kim Ammann Howard, PhD, 1997

*Co-Advisees,* **Johns Hopkins University**

Julia Ward, PhD, 2019 – 2023

Emma (Beth) McGinty, PhD, 2010 – 2013

Rachel Garfield (MHS Health Policy), 1998 –

Leonardo Goe (MHS Health Policy), 1997-98

*Thesis Committees,* **Johns Hopkins University**

Sara Solomon, DrPH, 2023
John Thorn, PhD, 2020
Pamela Trangenstein, PhD, 2019
Joceyln Kelly, 2015
Erin Person, PhD, 2015
Lian-Yu Chen, PhD, 2014
Nicole Lunardi, MSPH, 2014
Elizabeth Parker, PhD, 2013
Michael Kim, PhD, 2013
Gregory Tung, PhD, 2012
Lareina La Flair, PhD, 2012
Mahua Mandel, PhD, 2012
Susan Ganbarpour, DrPH, 2011
Vanessa Kuhn, PhD in HPM, 2010
Donna Ansara, PhD in PFHS, 2008
Anne Outwater, PhD in Nursing, 2007
April Zeoli, PhD in HPM, 2007
Maria Bulzacchelli, PhD in HPM, 2006
Swapnil P. Maniar, PhD in PFHS, 2005
Lisa Hepburn, PhD in HPM, 2001
Marsha Rosenberg, PhD in Mental Hygiene,2001
Li-Hui Chen, PhD in HPM, 1999
Shannon Frattaroli, PhD in HPM, 1998
Kathleen Roche, PhD in MCH, 1998

*Preliminary Oral Exam Committees,* **Johns Hopkins University**

Webster 21
*May 2023*

Shannon Frattaroli, Marguerite Roe, Li-Hui Chen, Mary Beth Skupien, Monique Shepard, Beth Hooten, Farfifteh Duffy, Mary Garza, Lisa Hepburn, Marc Starnes, Jennifer Manganello, Allegra Kim, Christina Pallitto, Swapnil Maniar, Christine Koth, Maria Bulzacchelli, Margaret Haynes, Frank Franklin, Donna Ansara, Vanessa Kuhn, Susan Ghanbarpour, Greg Tung, Adam, Milam, Michael Kim, Beth McGinty, Erin Pearson

### *Post-Doctoral Mentoring,* **Johns Hopkins University**

Lareina LaFlair, NIDA Drug Dependency Epidemiology, 2012-2013

Erica Sutton, MD, NIMH Violence Research Fellow, 2003-2005

Barry Solomon, MD, Pediatric Fellow, 1999-2002

Shannon Frattaroli, Kellogg Community Health Scholar, 1999-2000

Lorraine Freed, MD, MPH, RWJ Clinical Scholar 1996-98

### *Online Instruction,* **Johns Hopkins University**

Lead Instructor; Reducing Gun Violence in America: Evidence for Change, Coursera, 2019 – Present

### *Classroom Instruction,* **Johns Hopkins University**

Instructor; Understanding and Preventing Violence, 1993 – Present

Instructor; Crafting Effective Solutions to Gun Violence: Problem Solving Seminar, 2021 – Present

Instructor; Graduate Seminar in Injury Research and Policy, 2005 – 2018

Instructor; Graduate Seminar in Health and Public Policy, 2012 – 2014

Co-Instructor; Research and Evaluation Methods for Health Policy, 2008 – 2010

Lead Instructor; Research and Evaluation Methods for Health Policy, 2011-2015

### *Lecturer,* **Johns Hopkins University**

Epidemiology and Evidence-Based Policy Public Health Policy

Health Policy I: Social & Economic Determinants of Health

Proposal Writing (Health Policy & Management)

Introduction to Urban Health

Suicide as a Public Health Problem

Adolescence and Adolescent Health

Issues in Injury and Violence Prevention

Methodological Issues in Injury and Violence

Applications in Program Monitoring and Evaluation

Alcohol, Society, and Health

Baltimore and "The Wire": A Focus on Major Urban Issues

Community Health Practicum

***Program Management & Training Program Involvement,* Johns Hopkins University**

Core Faculty, Drug Dependency Epidemiology Program (pre- and post-doctoral training program funded by NIDA), 2011 – Present

Program Head, PhD program in Health and Public Policy, 2006–2007; 2012 -2014

Executive Committee and Core Faculty, Interdisciplinary Research Training Program on Violence Research, pre- and post-doctoral training program funded by NICHD, 2008-2015

Faculty Director, Certificate Program in Injury Control, 1999- 2012

Executive Committee and Core Faculty, Interdisciplinary Research Training Program on Violence (pre- and post-doctoral training program funded by NIMH), 1999-2008

Resource Faculty, Alcohol, Injury and Violence Training Program (pre-doctoral training program funded by NIAAA), 2001-2007

## RESEARCH GRANT PARTICIPATON

**Research and Training to Advance Equitable Solutions to Reduce Gun Violence that are Supported by Impacted Communities**

| | |
|---|---|
| Dates: | 11/15/22 – 11/14/27 |
| Sponsoring Agency: | Robert Wood Johnson Foundation |
| Amount: | $5,000,000 |
| Principal Investigator: | Co-PIs: Daniel Webster, Cassandra Crifasi |
| Effort: | 10% year 1, 15% year 2, 20% years 3-5 |
| Main Objectives: | Increase diversity, equity, and inclusion in gun violence prevention research. Complete several research projects at the intersection of gun violence prevention and equity. |

**Evaluating and Enhancing Community Violence Intervention Effectiveness in the Nation's Capital City**

| | |
|---|---|
| Dates: | 1/1/2023 – 12/31/2027 |
| Sponsoring Agency: | Arnold Ventures |
| Amount: | $1,841,961 |
| Principal Investigator: | CoPIs: Daniel Webster, Joseph Richardson, Jr. |
| Effort: | 25% year 1, 30% years 2-4 |
| Main Objectives: | Describe community violence intervention implementation, assess CVI workers' and program participants' experiences, and estimate program effects on gun violence. |

Webster 23
*May 2023*

**Estimating the Effects of Handgun Purchaser Licensing and Right to Carry Laws on Arrests, Incarceration, and Racial Disparities**

Dates:                        1/1/22 – 12/31/23

Sponsoring Agency:   The Joyce Foundation

Role:                         PI

Effort:                       15%

Main Objectives:       Derive valid estimates of the association between permit-to-purchase handgun laws and right to carry laws on arrests for weapons and violent offenses, incarceration, and racial disparities in these outcomes.

**The Role of Permit-to-Purchase in the Primary Prevention of Multiple Forms of Violence**

Dates:                        09/30/2021 – 09/29/2024

Sponsoring Agency:   Centers for Disease Control and Prevention (CDC) - 1U01CE003368-01

Amount:                    $1,049,998

Role:                         Co-Investigator (Cassandra Crifasi, PI)

Main Objective:         To assess the impact of Permit-to-Purchase laws on youth violence victimization and perpetration, youth suicide, intimate partner homicide, and familicide.

**Forecasting the impacts of permit-to-purchase handgun laws on firearm-related mortality in Oregon for Effective Gun Violence Prevention Advocacy**

Dates:                        7/1/22 – 6/30/24

Sponsoring Agency:   Bloomberg American Health Initiative

Amount:                    $382.070

Principal Investigator:  Co-PI: Daniel Webster and Joshua Horwitz

Effort:                       $25% in year 1

Main Objective:         Generate data on estimated effects of handgun purchaser licensing law in Oregon based on effects of PTP in Connecticut and provide evidence-based advocacy for effective policies to prevent gun violence in Oregon.

**Review of Research Relevant to the Effectiveness of Hospital-based Violence Intervention Programs with Recommendations for Future Research and Policy**

Dates:                        1/1/21 – 12/31/21

Sponsoring Agency:    Arnold Ventures

Principal Investigator: Daniel W. Webster

Amount:                    $83,167

Role/Effort:              PI / 15%

Webster 24
*May 2023*

Main Objectives:        Evaluate the scientific rigor of studies to evaluate the impacts of hospital-

based violence intervention programs, synthesize findings from those studies,

and develop recommendations for enhancing the programs and research.

**Expanding and Improving Data on Nonfatal Gun Crime Incidents for Research on Gun Violence and Its Prevention**

Dates:                 9/1/2020 – 6/30/2023

Principal Investigator: Daniel W. Webster

Sponsoring Agency:  National Collaborative for Gun Violence Research

Amount:                $255,247

Effort:                20%

Main Objectives:       Expand data on nonfatal criminal shootings, estimate biases in the FBI's UCR

data on nonfatal gun crime, estimate gun law effects on nonfatal gun violence.

**Estimating the Effects of Community Violence Intervention on Gun Violence in Baltimore City**

Dates:                 10/1/21 – 9/30/22

Sponsoring Agency:     Baltimore City Mayor's Office for Neighborhood Safety and Engagement

Amount:                $126,429

**Impact of Criminal Justice and Community-Based Interventions on Gun Violence Reduction**

Dates:                 12/01/2020 – 5/31/2023

Principal Investigator: Daniel W. Webster (for subaward from Urban Institute)

Sponsoring Agency:   New York City's Mayor's Office for Criminal Justice

Amount:                $255,247

Effort:                25%

Main Objectives:       Estimate the impact of community prevention programs and law enforcement initiatives to reduce
                       gun violence.

**Comprehensive Background Check Policies and Firearm Violence: Identifying Effective Design, Implementation, and Enforcement Strategies - subaward**

Dates:                 7/1/2019 – 6/30/2022

Principal Investigator: Daniel W. Webster (of subaward)

Sponsoring Agency:   University of California, Davis - the National Collaborative for Gun Violence Research

Amount:                $122,612

Effort:                         5%

Main Objectives:        Identify aspects of systems for background checks that affect efforts to prevent high-risk

individuals from acquiring firearms.


**Evaluating the Effects of Legal Standards for Civilian Concealed Gun Carrying**

Dates:                        4/11/2018 – 8/31/2021

Principal Investigator:  Daniel W. Webster

Sponsoring Agency:     The Joyce Foundation

Amount                      $407,000

Effort:                        20%

Main Objectives:         Estimate the impacts of various type of state laws governing civilian gun carrying in relations to legal qualifications and standards of legal carriers.


**Effects of Permitless Concealed Carry-On Violent Crime**

Dates:                        10/1/2019 - 3/31/2021

Principal Investigator:  Cassandra Crifasi

Sponsoring Agency:     New Venture Fund – Fund for Safer Future

Amount:                     $250,000

Effort:                        5%

Main Objective:          To assess the impacts of deregulating civilian gun carrying on violent crime.


**Development and Testing of a Virtual Reality Experience for Civilian Carriers of Concealed Firearms**

Dates:                        1/1/2020 – 12/31/2021

Principal Investigator:  Cassandra Crifasi

Sponsoring Agency:      The Davide and Lucille Packard Foundation

Amount:                     $500,000

Effort:                        5%

Main Objective:          Develop and test a system for evaluating the performance of civilian gun carriers under realistic situations.


**Core Support for Johns Hopkins Center for Gun Policy and Research and Youth Education on Evidence-Based Gun Violence Prevention**

Dates:                        7/1/2018 – 6/30/2020

| Principal Investigator: | Daniel W. Webster |
|---|---|
| Sponsoring Agency: | David and Lucille Packard Foundation |
| Amount: | $750,000 |
| Effort: | 25% |
| Main Objectives: | Conduct and translate research to inform gun violence prevention. Develop Open Online Course and Summer Youth Institute on gun violence prevention. |

**Johns Hopkins-Baltimore Collaborative for Violence Reduction**

| Dates: | 1/1/16 – 9/30/19 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Abell Foundation and The Annie E. Casey Foundation |
| Funding Level: | $875,000 |
| Effort: | 30% |
| Main Objectives: | Assess police efforts to reduce violent crime and enhance training to promote more effective policing. |

**Study of Baltimore's Underground Gun Market**

| Dates: | 7/1//15 –6/30/17 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Everytown for Gun Safety |
| Funding Level: | $240,245 |
| Effort: | 15% |
| Main Objectives: | Collect and analyze data from surveys of offenders, crime gun trace data, and gun-related arrests to describe Baltimore's underground gun market and assess evidence that 2013 state gun laws affected the diversion of guns to criminals. |

**Effects of Universal Background Check Laws for Handgun Sales in Maryland and Pennsylvania**

| Dates: | 8/1//15 – 7/31/18 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $357,000 |
| Effort: | 18% |
| Main Objectives: | Describe the implementation and enforcement of universal background check laws for handgun purchases in Maryland and Pennsylvania and estimate the effects of the laws and enforcement practices on gun violence. |

**Estimating Effects of Gun Policies on Intimate Partner Homicides**

Dates:                              8/1/15 – 6/30/17

Principal Investigator:   Daniel W. Webster, subcontract to Michigan State University

Sponsoring Agency:        The Joyce Foundation

Funding Level:                 $267,276

Effort:                              10%

Main Objectives:           To estimate the impact of firearm sales laws on intimate partner homicides and examine factors relevant to successful enforcement of those laws.


**Promoting Evidence-based Policies to Reduce Domestic Violence Involving Guns**

Dates:                              7/1/15 – 6/30/16

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:        Norman Raab Foundation

Funding Level:                 $25,000

Effort:                              2%


**Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and their Impact on Intimate Partner Homicide**

Dates:                              8/1/15 – 1/31/18

Principal Investigator:    Daniel W. Webster

Sponsoring Agency:        The Joyce Foundation

Funding Level:                 $176,389

Effort:                              10%

Main Objectives:           Describe the implementation and enforcement of domestic violence related firearm laws and their impact on intimate partner homicides.


**Baltimore Homicide Review Commission**

Dates:                              9/1/14 – 12/31/15

Principal Investigator:   Daniel W. Webster

Sponsoring Agency:        Baltimore City Mayor's Office

Funding Level:                 $135,000

Effort:                              15%

Webster 28
*May 2023*

Main Objectives:       Conduct in-depth reviews of homicides in three police districts in Baltimore to identify
                       determinants of lethal violence and develop recommendations for policies, procedures, and
                       programs to prevent homicides.

## Study of Baltimore's Underground Gun Market

Dates:                 7/1//14 – 6/30/15

Principal Investigator: Daniel W. Webster

Sponsoring Agency:     The Norman Raab Foundation

Funding Level:         $50,000

Effort:                5%

Main Objectives:       Gather data about how criminals access firearms, how they connect with suppliers, what barriers
                       they face, and their perceptions of gun laws.

## Effects of Drug and Gun Law Enforcement on Violence in Baltimore

Dates:                 1/1/14 – 12/31/15

Principal Investigator: Daniel W. Webster

Sponsoring Agency:     The Abell Foundation

Funding Level:         $144,918

Effort:                15%

Main Objectives:       Estimate the effects of law enforcement activities directed at drug and gun law violations on
                       violent crime in Baltimore from 1986 through 2012.

## Gun Owners Perspectives on Safe Gun Ownership and Sales Practices

Dates:                 10/01/2013 – 03/31/16

Principal Investigator: Daniel W. Webster

Sponsoring Agency:     Harold B. Simmons Foundation

Funding Level:         $411,421

Effort:                20%

Main Objectives:       Study gun owners' attitudes relevant to safe firearm sales and storage.

## Johns Hopkins Center for the Prevention of Youth Violence

Dates:                 9/15/11 – 9/14/16

Principal Investigator: Philip Leaf

| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $6 million |
| Effort: | 20% to 25% |
| Main Objectives: | Develop, implement, and evaluate a comprehensive community intervention to prevent youth violence in the Park Heights neighborhood of Baltimore. |

**Prescription Opioid Addiction Research Study**

| Dates: | 9/01/2012 – 8/31/2014 |
| Principal Investigator: | Colleen L. Barry |
| Sponsoring Agency: | AIG |
| Funding Level: | $430,655 |
| Effort: | 10% |
| Main Objectives: | To assess of the growing problem of prescription opioid addiction, and to identify promising policy and clinical approaches to address the problem. |

**National Gun Violence Research Center - subcontract**

| Dates: | 5/01/13 – 5/31/14 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Police Executive Research Forum |
| Funding Level: | $41,762 |
| Effort: | 20% |
| Main Objectives: | Assist PERF with designing and conducting studies of innovative policing strategies to combat gun violence. |

**Evaluation of the Effects of Permit to Purchase Handgun Laws**

| Dates: | 9/1/12 - 8/31/14 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $222,242 |
| Effort: | 25% |
| Main Objectives: | To evaluate the effects of changes in permit to purchase handgun laws in Connecticut and Missouri on homicides and the diversion of guns to criminals. |

Webster 30
*May 2023*

**Gun Violence Reduction Program**

| | |
|---|---|
| Dates: | 1/01/11 – 12/31/13 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Bloomberg Philanthropies |
| Funding Level: | $500,000 |
| Effort: | 5% to 40% |
| Main Objectives: | Conduct research, policy analysis, and technical assistance to inform efforts to reduce the availability of illegal guns and gun violence. |

**Evaluation of Baltimore Policing Strategies to Reduce Gun Violence**

| | |
|---|---|
| Dates: | 10/1/2010 – 3/31/2012. |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | U.S. Dept. of Justice, Bureau of Justice Assistance |
| Funding Level: | $60,000 |
| Effort: | 15% |
| Main Objectives: | Develop unbiased estimates of the impact of 3 strategies being implemented by Baltimore police to reduce violence. |

**Impact of Safe Streets' Outreach Workers on the Lives of Their Clients**

| | |
|---|---|
| Dates: | 12/1/09 – 6/30/10 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Baltimore City Health Department |
| Funding Level: $ | 72,000 |
| Effort: | 25% |
| Main Objectives: | Measure the impact of the Safe Streets program on program participants and analyze of the relationships between program activities and gun violence. |

**Effects of the Lethality Assessment Program on Intimate Partner Violence**

| | |
|---|---|
| Dates: | 3/15/10 – 3/14/12 |
| Principal Investigator: | Daniel Webster |
| Sponsoring Agency: | Centers for Disease Control and Prevention (through Center grant to JHU) |
| Funding Level: | $388,282 |
| Effort: | 20% |

| | |
|---|---|
| Main Objectives: | Estimate the effects of the Maryland Lethality Assessment program on intimate partner homicide and repeat intimate partner violence. |

**Gun Violence Reduction Program**

| | |
|---|---|
| Dates: | 1/01/08 – 12/31/10 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Anonymous donor |
| Funding Level: | $500,000 |
| Effort: | 25% |
| Main Objectives: | Conduct research, policy analysis, and technical assistance to inform efforts to reduce the availability of illegal guns and gun violence. |

**Analyzing and Developing Policies to Limit Firearm Access by High-Risk People**

| | |
|---|---|
| Dates: | 5/1/09 – 4/30/11 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $179,971 |
| Main Objectives: | Research and describe state laws pertaining the potential public safety gains for expanding current prohibition categories for firearm purchase and possession. |

**Data for Combating Illegal Guns**

| | |
|---|---|
| Dates: | 1/01/08 – 12/31/08 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Maryland Governor's Office for Crime Control and Prevention |
| Funding Level: | $75,419 |
| Main Objectives: | Assist Baltimore and Maryland State Police to collect and analyze data on crime guns and illegal gun trafficking. |

**Analyzing & Assisting Innovative City-Level Efforts to Prevent Gun Violence**

| | |
|---|---|
| Dates: | 5/1/07 – 4/30/09 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $175,000 |

| | |
|---|---|
| Main Objectives: | Analyze data on illegal gun trafficking and provide consultation to enhance data to inform efforts to stem gun trafficking in Milwaukee. Case study of Chicago Police Department's efforts to thwart gun trafficking. |

**Evaluation of the California Firearms Domestic Violence Intervention Project**

| | |
|---|---|
| Dates: | 1/15/07 – 1/14/10 |
| Principal Investigator: | Garen Wintemute (UC Davis) and Shannon Frattaroli (JHBSPH) |
| Sponsoring Agency: | California Department of Justice |
| Funding Level: | $31,481 subcontract from UC Davis for first year |
| Effort: | 10% |
| Main Objectives: | Evaluate a program in 2 California counties to enhance implementation of state laws prohibiting certain domestic violence offenders from possessing firearms. |

**Baseline Data for Evaluating a Community Initiative to Reduce Youth Homicides**

| | |
|---|---|
| Dates: | 3/01/07 – 2/28/09 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Baltimore City Health Department |
| Funding Level: | $75,122 |
| Effort: | 6% |
| Main Objectives: | Collect and analyze baseline data on violent crime and youths' attitudes relevant to gun violence in intervention and comparison neighborhoods. |

**Evaluation of a community gun violence prevention initiative in Baltimore.**

| | |
|---|---|
| Dates: | 9/1/05 – 8/31/10 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $745,352 |
| Effort: | 25%-30% |
| Main Objectives: | Estimate the impact of the initiative on youth gun violence victimization and perpetration and attitudes and behaviors of high-risk youth. |

**Effects of a Formal Danger Assessment and Risk Communication Intervention on Actions Taken to Reduce Risks of Intimate Partner Violence**

| | |
|---|---|
| Dates: | 9/1/04 – 8/31/09 |

| | |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $485,000 |
| Effort: | 20%-25% |
| Main Objectives: | Determine whether a formal, quantitative assessment of danger, and a standard protocol for communicating the assessed risk of future partner violence and scientific support for protection strategies is more effective than current procedures in motivating protective actions and lowers risk for future violence. |

**Reducing Illegal Gun Trafficking Through Research and Technical Assistance**

| | |
|---|---|
| Dates: | 5/1/05 – 4/30/08 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $181,117 |
| Effort: | 25%-30% |
| Main Objective: | Disseminate research findings to law enforcement agencies, advocates, and the media on policies shown to reduce illegal gun trafficking. |

**Effects of Police Stings of Gun Dealers on the Illegal Gun Market**

| | |
|---|---|
| Dates: | 11/1/03 - 10/31/04 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Overbrook Foundation |
| Funding Level: | $37,000 |
| Effort: | 20% |
| Main Objectives: | Assess the impact of police stings of 12 gun dealers suspected of making illegal gun sales in Chicago on the flow of new guns into the illicit gun market. |

**Evaluating and Developing Policies to Regulate Licensed Gun Dealers**

| | |
|---|---|
| Dates: | 4/1/02 - 3/31/04 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The John D. and Catherine T. MacArthur Foundation |
| Funding Level: | $260,000 |
| Effort: | 35% |
| Main Objectives: | 1) Document state policies and practices for regulation and oversight of licensed gun dealers; 2) Assess effects of those measures on gun trafficking; and 3) Recommend strategies for deterring diversions of guns to criminals. |

**Working with Health Commissioners to Reduce Gun Violence**

Dates:                                    7/01/03 - 6/30/04

Principal Investigator:   Jon S. Vernick

Sponsoring Agency:      Richard and Rhoda Goldman Fund

Funding Level:              $100,000

Effort:                          15%

Main Objective:            Identify and provide technical assistance to city or county health commissioners in order to use public health powers to shut down corrupt gun dealers who endanger the public's health.


**Separating Kids from Guns Program**

Dates:                                    10/01/01 - 9/30/03

Principal Investigator:   Shannon Frattaroli

Co-PI:                           Daniel W. Webster

Sponsoring Agency: The David and Lucille Packard Foundation

Funding Level:              $300,000

Effort:                          25%

Main Objective:            Conduct research, perform policy analysis, disseminate information relevant to protecting children and adolescents from unsupervised access to guns.


**Johns Hopkins Center for Gun Policy and Research**

Dates:                                    01/01/99 - 4/30/04

Sponsoring Agency:      The Joyce Foundation

Principal Investigator:   Stephen P. Teret (1995-2001), Jon S. Vernick (2001-present)

Co-Prin. Invest.:          Daniel W. Webster (2001-present)

Funding Level:              2001-2003: $600,000

Effort:                          15% (05/01/03 - 4/30/04)

                                     35% (05/01/01 - 4/30/03)

                                     25% (01/01/00 - 4/30/01)

                                     35% (01/01/96 - 12/31/99)

                                     20% (01/01/95 - 12/31/96)

Main Objective:            Develop and analyze policies to reduce firearm injuries.

| Responsibilities: | Co-direct Center, initiate and conduct research and analysis relevant to gun policy; develop and analyze gun policy surveys; assist groups working to reduce gun violence; serve as resource to media and policymakers. |

**Effects of Minimum Age Restrictions on Handgun Purchase and Possession – Center for the Prevention of Youth Violence**

| | |
| --- | --- |
| Dates: | 10/01/00 - 9/30/05 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $306,695 |
| Main Objective: | Estimate the effects of minimum age restrictions on handgun purchases and possession on youth homicide offending and suicides |

**Evaluation of Instruments to Assess Risk for Intimate Partner Violence**

| | |
| --- | --- |
| Dates: | 8/01/00 - 3/31/04 |
| Principal Investigator: | Jacquelyn C. Campbell |
| Sponsoring Agency: | National Institute of Justice |
| Funding Level: | $619,792 |
| Effort: | 20% |
| Main Objective: | Determine the sensitivity, specificity, and predictive value of four instruments designed to assess future risk for violent victimization by an intimate partner. |

**The Center for Injury Research and Policy:**

| | |
| --- | --- |
| Dates: | 1987-2005 |
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Principal Investigator: | Ellen MacKenzie |
| Funding Level: | 1999-2003: $750,000 per year |
| Effort: | 10% (09/03/03 - 8/31/04) |
| | 10% (09/01/00 - 8/31/01) |
| | 20% (09/01/99 - 8/31/00) |
| | 10% (09/01/98 - 08/31/99) |
| | 25% (09/01/94 - 08/31/98) |
| | 20% (04/01/94 - 08/31/94) |
| | 50% (07/01/92 - 03/31/94) |

Webster 36
*May 2023*

100% (04/01/92 - 06/30/93)

Main Objective:          One of the eight regional injury control research centers.

Responsibilities:        Evaluate state-level gun policies, direct study of risk factors for serious injuries from intimate partner assaults, develop research proposals, serve as resource to students, media, practitioners, and policy makers.


**Developing and Analyzing Data for Effective Gun Law Enforcement**

Dates:                   3/01/01 - 2/28/02

Principal Investigator:  Daniel W. Webster

Sponsoring Agency:       Governor's Office of Crime Control and Prevention

Funding Level:           $102,911

Effort:                  35%

Main Objective:          Develop databases for information about the sources of crime guns and the prosecution of gun crimes


**Developing a Dataset of State Gun Laws**

Dates:                   12/01/00 - 11/30/01

Principal Investigator:  Jon S. Vernick

Sponsoring Agency:       Annie E. Casey Foundation

Funding Level:           $45,000

Effort:                  10%

Main Objective:          Determine the presence and effective dates of specific types of gun laws in each of the 50 U.S. states and the DC and share with interested researchers.

Webster 37
*May 2023*

**Effects of Personalized Guns in Maryland**

Dates:                        9/1/99 - 8/31/00

Sponsoring Agency:   The Abell Foundation

Funding Level:            $40,533

Principal Investigator: Stephen Teret

Effort:                        10%

Main Objective:         Assess likely effects of a law to require personalized guns in Maryland


**Risk Factors for Homicide in Violent Intimate Relationships**

Dates:                        9/01/96 - 2/28/00

Sponsoring Agency:   NIDA, NIMH, CDC, NIJ, NIA

Principal Investigator:  Jacquelyn Campbell

Funding Level:            $1,267,744

Effort:                        10% (09/01/99 - 02/28/00)

                              25% (09/01/98 - 08/31/99)

                              10% (09/01/97 - 08/31/98)

                              15% (09/01/96 - 08/31/97)

Main Objective:         Determine risk factors for homicide or attempted homicide among women involved in violent intimate relationships and develop predictive screening devices for clinicians, shelter workers, and the courts.


**Preventing Firearm Suicide and Unintentional Deaths Through Safer Gun Design**

Dates:                        1/01/00 - 12/31/00

Principal Investigator: Jon S. Vernick

Sponsoring Agency:   Funders' Collaborative for Gun Violence Prevention

Funding Level:            $176,755

Effort:                        10%

Main Objective:         Evaluate potential benefits of safer gun designs


**Public Attitudes About New Law Enforcement Technologies**

Dates:                        06/01/97 – 05/31/99

Sponsoring Agency:   National Institute of Justice

Principal Investigator: Daniel W. Webster

Funding Level:          $266,625

Main Objectives:        Assess public attitudes relevant to law enforcement strategies to detect concealed weapons in high-crime areas including the use of new technology, concerns about safety, privacy, and fairness in the way that law enforcement officials apply new technology. Qualitative study of residents of a high-crime neighborhood in Baltimore and a national phone survey of urban residents.

### Evaluation of the California Violence Prevention Initiative

Dates:                  7/01/93 - 4/15/96

Sponsoring Agency:      The California Wellness Foundation

Principal Investigator: Stephen P. Teret

Co-Prin. Investigator:  Daniel W. Webster Funding

Level:                  $3.1 million

Effort:                 50%

Main Objectives:        Conduct process and outcome evaluation of a statewide violence prevention initiative.

### Evaluation of Violence Prevention Public Education Campaign

Dates:                  4/01/94 - 3/31/95

Sponsoring Agency:      The California Wellness Foundation

Principal Investigator: Daniel W. Webster

Funding Level:          $40,000

Effort:                 20%

Main Objectives:        The describe all facets of the campaign and the political and social context in which the campaign is conducted and evaluate the effects of the campaign on public opinion, opinion leaders, the media, and policy makers.

### Planning "The Consortium on Gun Policy and Information"

Dates:                  4/01/94 - 10/31/94

Sponsoring Agency:      The Joyce Foundation

Principal Investigator: Stephen P. Teret

Funding Level:          $40,000

Effort:                 10%

Main Objectives:        To assess the need for a "Consortium on Gun Policy and Information" that would provide factual information on firearms and the public's health to various consumers.

**ACADEMIC SERVICE**

**Johns Hopkins University**

Finance Committee, Health Policy and Management, 2020 – Present

Appointments and Promotions Committee, School of Public Health, 2012 – 2015

Conflict of Interest Committee, School of Public Health, 2011 – 2012

Academic Policy and Admissions Committee, Health Policy and Management, 2006 – 2007, 2012 – 2014

Faculty Development Committee, Health Policy and Management, 2010 – Present

Qualifying Exam Committee, Health Policy and Management, 1998- 1999, 2001 – 2008

Qualifying Exam Committee, Health Policy and Management, Chair 2004 – 2008

Health Policy and Management, Doctoral Admissions Committee, 2006 – 2007

Affirmative Action Committee, School, 2005 – 2010

9 Ad Hoc Committees for Appointments and Promotions, 2006 – Present

Search Committee, Leon Robertson Chair in Injury Control, 2005 – 2006

Academic Policy and Admissions Committee, Health Policy and Management, 1997- 1999

Ad-Hoc Committee on Statistics Training, Health Policy and Management, 1997-1998

Research Policy Committee, Health Policy and Management, 1995-97

**PRESENTATIONS**
*Scientific Meetings*

**Webster DW.**  Evidence-Based Public Health Approaches to Reducing Violence with Less Reliance on Police and Prisons. Presentation before the Workshop on Addressing the Drivers of Criminal Justice Involvement to Advance Racial Equity for the Committee on Reducing Racial Inequalities in the Criminal Justice System, National Academy of Science, Engineering, and Medicine, March 2021.

**Webster DW**. The Role of Firearms and Firearm Policy in Fatal Shootings by Police. Annual FACTS (Firearm Safety Among Children and Teens) Symposium, the University of Michigan, 2020.

**Webster DW**.  Strengthening the science of firearm policy evaluations. Research Symposium: Preventing Firearm Injuries among Children and Teens: The State of the Science. University of Michigan, October 2019.

**Webster DW.**  Public Health Approaches to Preventing Gun Violence. Plenary session presentation at the Annual meeting of the American Society of Criminology, Atlanta, GA, November 2018.

**Webster DW.**  Research and public safety collaborations focused on reducing gun violence in Baltimore.  Presented at the Annual meeting of the American Society of Criminology, New Orleans, November 2016.

**Webster DW.**  What have we learned about the impact of states' gun policies. Plenary session presentation at the annual meeting of the American Public Health Association, Denver, Nov. 2016.

**Webster DW,** Crifasi CK, Meyers JS, Vernick JS.  Effects of changes in permit-to-purchase handgun laws on suicide rates.  Presented at the Annual Meeting of the American College of Epidemiology, Atlanta, GA, September 29, 2015.

**Webster DW**, Meyers JS, Buggs S.  Access to firearms among youth in the United States: Patterns, consequences, and prevention strategies. Presented at the Institute of Medicine's Forum on Global Violence Prevention, Workshop on Lethal Means of Violence, Washington, DC, December 18, 2014.

**Webster DW**.  State of the science and need for additional research to prevent gun violence in America.  Presentation at the Martha May Elliott Forum at the American Public Health Association Annual Meetings, New Orleans, November 2014.

**Webster DW**.  Community Involvement in the Evaluation of Baltimore's Safe Streets Program to Reduce Youth Violence.  Presented at the annual meetings of the Society for Prevention Research, Washington, DC May 29, 2014.

**Webster DW**.  Mental health and means of violence.  Presented at Workshop on Violence and Mental Health: Opportunities for Prevention and Early Intervention, Institute of Medicine's Forum on Global Violence Prevention, February 26, 2014.

**Webster DW**.  Effects of Missouri's permit to purchase handgun licensing law on the diversion of firearms to criminals and homicides.  Presented at the annual meetings of the American Public Health Association, Boston, November 2013.

Vittes KA, **Webster DW**, Vernick JS.  Associations between state gun sales laws and the source of criminals' handguns they used to commit crime. Presented at the annual meetings of the American Public Health Association, Boston, November 2013.

**Webster DW**.  Effects of Baltimore's Safe Streets Program on Gun Violence and Youth Attitudes toward Resolving Conflicts with Guns.  Presented at the World Health Summit, Berlin, Germany, October 2013.

**Webster DW**.  Safe Streets Baltimore – program effects on gun violence, youth attitudes, and the lives of program participants.  Presented at the meetings of the Society for the Advancement of Violence and Injury Research, Baltimore, June 2013.

Parker EM, Gielen AC, Castillo R, **Webster DW**. Intimate Partner Violence and Patterns of Safety Strategy Use among Women Seeking Temporary Protective Orders: A Latent Class Analysis. Presented at the meetings of the Society for the Advancement of Violence and Injury Research, Baltimore, June 2013.

**Webster DW**.  Priorities for public health efforts to reduce gun violence.  Presentation to the Institute of Medicine's Workshop on Priorities for Public Health Research Agenda to Reduce Firearm-Related Violence, Washington, DC, April 2, 2013

**Webster DW**.  State gun laws' effects on the intra- and interstate diversion of guns used by criminals.  Presented at the annual meetings of the American Society of Criminology, Washington, DC, November 2011.

**Webster DW**.  Effects of state gun sales laws on the exportation of guns used by criminals.  Presented at the annual meetings of the American Public Health Association Meetings, Washington, DC, November 2011.

**Webster DW**, Mendel JS, Vernick. Evaluating Baltimore's Safe Streets Program's effects on violence.  Presented at the annual meetings of the Amer. Public Health Assoc., Denver, Nov. 2010.

**Webster DW**, Vernick JS, Mendel JS.  Interim evaluation of Baltimore's Safe Streets initiative: Effects on gun violence.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**.  Impact of danger assessment screening and safety education on abused women's perceived risk of serious re-abuse.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Mendel JS, **Webster DW**, Vernick JS.  Street outreach to prevent gun violence in Baltimore: An analysis of high-risk conflict mediation.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Vernick JS, **Webster DW**.  An environmental approach to preventing firearm violence: targeting illegal gun trafficking.  Annual Meetings of Amer. Public Health Assoc., Philadelphia, Nov. 2009.

Vittes KA, **Webster DW**.  Potential effects of expanding firearm prohibitions in the U.S.: analysis of data from a national survey of prisoners.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of Policies to Promote Firearm Dealer and Owner Accountability on Firearm Trafficking.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**. Firearm violence roundtable: Data collection, data quality, and data access.  Roundtable discussion led at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Vernick JS.  Implementation of a Community Gun Violence Prevention Program: A Focus on Outreach Workers' Efforts.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S, Stockman J.  Factors associated with seeking a long term protective order and staying away among women seeking temporary protective orders against a male partner.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S.  Communicating empirically-based information about risks and protection strategies to survivors of intimate partner violence. Presented at the Annual Meeting of the American Public Health Association, Washington, DC, Nov. 2007.

**Webster DW**, Vernick JS, Bulzacchelli MT.  Association Between Regulations and Oversight of Firearm Dealers and Gun Trafficking.  Presented at the Annual Meeting of the American Society of Criminology, Atlanta, November 2007.

Campbell JC, O'Sullivan C, Roehl J, **Webster DW**, Mahoney P, White M, Eliacin J, Guertin K. What battered women know and do to protect themselves from abuse:  results and methodological challenges from the domestic violence risk assessment validation experiment. Paper presented at the 9th International Family Violence Research Conference, Portsmouth, NH, July 2005.

**Webster DW**, Vernick JS, Manganello JA, Zeoli AM.  Effects of youth-focused firearm laws on youth suicides. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Vernick JS, **Webster DW**, Pierce MW, Johnson SB, Frattaroli S. Judging the constitutionality of injury interventions using empirical data: The case of concealed weapons detectors. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Vernick JS, Lewin NL, Beilenson PL, Mair JS, Lindamood MM, Teret SP, **Webster DW**.  Using local public health powers as a tool for gun violence prevention: The Baltimore Youth Ammunition Initiative. Paper to be presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

**Webster DW**.  Cracking down on corrupt gun dealers in Chicago: Effects on the illicit gun market. Paper presented at the annual meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Mahoney P, Rhoel J, O'Sullivan C. Domestic violence risk assessment and history of injury. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Kim A, **Webster DW**.  Effects of a one-gun-a-month purchase limit on illicit gun trafficking and availability. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Chouaf K, et al. "If I can't have you, no one can": Further exploration of estrangement increasing risk of intimate partner femicide. Presented at the Annual Meetings of the American Society of Criminology, Chicago, November 2002.

Kim A, **Webster DW**.  The effects of the 1996 Maryland Gun Violence Prevention Act on Illicit Gun Markets. Presented at the Annual Meeting of Amer. Public Health Assoc., Philadelphia, Nov. 2002.

**Webster DW**, Vernick JS, Hepburn L.  The association between licensing, registration, and other gun sales laws and the state-of-origin of crime guns.  Presented at the National Association for Injury Control Research Centers meeting, Pittsburgh, May 2001.

**Webster DW**, Vernick JS, Hepburn L.  The association between licensing, registration, and other complementary gun sales laws and the state-of-origin of crime guns.  Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

Campbell JC, **Webster DW**, et al.  Risk factors for intimate partner femicide among women in physically abusive relationships.  Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

**Webster DW**, Vernick JS, Hepburn L.  Can comprehensive gun control and enforcement keep guns from being used in crime?  Presented at the annual meetings of the American Society of Criminology, Toronto, Ont., November 1999.

Roche K, **Webster DW**, Alexander C, Ensminger M.  Neighborhood effects on the association between parenting and youth fighting.  Presented at the American Sociological Association Annual Meetings, 1999.

**Webster DW**.  Assessing sources of data on risk factors for intimate partner homicide: Proxy respondent surveys versus police records.  Femicide Research Working Meeting, Chapel Hill NC, February 1999.

**Webster DW**, Campbell JC, Curry MA.  Issues of using proxy informants in femicide research. Annual meetings of the American Society of Criminology, Washington DC,  November 1998.

McFarlane J, **Webster DW**, Campbell JC, Block CR, Ulrich Y.  Femicide with and without suicide by an intimate partner: A comparative analysis.  Annual meetings of the American Society of Criminology, Washington DC, November 1998.

**Webster DW**, Vernick JS, Huang K.  The effects of Maryland's law banning Saturday Night Specials on homicides. American Public Health Assoc. Annual Meeting, Washington DC, Nov. 1998. Vernick JS, Webster DW, Huang K. Maryland's 1988 law banning Saturday Night Special handguns:  Effects on intermediate outcomes.  American Public Health Association Annual Meeting, Washington DC, November 1998.

**Webster DW**.  Investigating a sudden increase in the lethality of shootings in Baltimore: A case study.  American Public Health Association Annual Meeting, Indianapolis IN, November 1997.

Freed LH, Wilson MHS, Longwell JJ, Carrese J, **Webster DW**.  Deterrent to gun carrying among incarcerated adolescent males.  Presented at the Annual Meeting of the Robert Wood Johnson Clinical Scholars Meeting, November 1998.

**Webster DW**, Kaljee L, Vernick JS, Cameron DD.  Attitudes about new law enforcement technologies and strategies for detecting concealed weapons in a high-crime urban community.  Presented at the National Institute of Justice Annual Research and Evaluation Meetings, Washington DC, July 1998.

**Webster DW**, Campbell JC.  Issues in using case-control methods in homicide research.  Annual Meetings of the American Society of Criminology, San Diego CA, November 1997.

**Webster DW**.  Methodological challenges to evaluating the Brady Law.  Annual Meetings of the Homicide Research Working Group, Shepherdstown, WV, June 9 1997.

**Webster DW**.  Modifying guns tor reduce child and adolescent mortality: A Risk Analysis. American Public Health Association Annual Meeting, New York, November 1996.

**Webster DW**.  School-based efforts to reduce adolescent violence.  Presented at Children Harmed and Harmful:  Risks and Risk-Taking Among 10-15 Year-Olds, Working Conference.  Chicago, September 1994.

**Webster DW**.  Tackling the problem of gun carrying among youth:  Behavior change vs. environmental change.  Paper presented at the National Conference on Risk-Taking Behaviors Among Children and Adolescents.  Arlington, VA, June 1994.

**Webster DW**.  Individual vs. community perspective on the study and prevention of youth weapon carrying.  Public Health Service Annual Professional Meetings, Baltimore, MD, April 1994.

**Webster DW**, Wilson MEH.  The role of primary care pediatricians in preventing firearm injuries to children and youth.  Johnson & Johnson Pediatric Institute Conference on the Pediatrician's Role in Violence Prevention, Dulles, VA, March 1994.

**Webster DW**, Gainer PS, Champion, HR.  Determinants of weapon carrying within a sample of inner city junior high school students.  Paper to be presented at the American Public Health Association Annual Meetings, Washington, DC, November 1992.

**Webster DW**.  Short-term effects of a primary prevention program for youth violence.  American Psychiatric Association Annual Meetings, Washington, DC, May 1992.

**Webster DW**, Sykes L, Champion HR, Gainer PS.  The effects of Washington D.C.'s epidemic of gun violence on trauma center admissions and wound profiles.  American Public Health Association Annual Meetings, Atlanta, GA, November 1991.

Champion HR, Oschner MG, **Webster DW**.  A retrospective review of over 300 abdominal gunshot wounds at an urban Level I trauma center.  International Society of Surgery Conference, Stockholm, Sweden, August 1991.

Wilson MEH, **Webster DW**, Duggan AK, Pakula LC.  Firearm injury prevention counseling:  are pediatricians and parents ready?  American College of Physicians Annual Meetings, April 1991.

**Webster DW**, Wilson MEH, Duggan AK.  Parental beliefs and practices concerning firearm injury prevention.  American Public Health Association Annual Meetings, New York, October 1990.

**Webster DW**, Wilson MH, Duggan AK. Determinants of pediatrician firearm injury prevention counseling practices.  American Public Health Assoc. Annual Meetings, New York, October 1990.

**Webster DW**, Wilson MH, Duggan AK. Pediatrician attitudes and practices concerning firearm injury prevention counseling. Amer. Pediatric Soc./Soc. Pediatric Research Meetings, Chicago, 1990.

Waller AE, **Webster DW**, Baker SP.  Homicide and suicide among children, United States, 19801985.  American Public Health Association Annual Meeting, Chicago, October 1989.
Keyl PM, **Webster DW**, Smith GS, Baker SP.  The effect of Maryland's seat belt law on fatality risks.  SAE Conference on the Evaluation of Trends in Auto Safety, National Highway Traffic Safety Administration, Washington, DC, May 1989.

***Invited Presentations, Seminars & Webinars***

**Public Health Models and Evidence to Guide the Prevention of Gun Violence.**  2nd Annual Sarah and Erin Braner Endowed Lecture for the Department of Pediatrics at Oregon Health and Science University's (OHSU) Doernbecher Children's Hospital, Portland. November 2019.

**A Roadmap for Reducing Gun Violence in America**. 28th Annual Herbert Lourie Memorial Lecture on Health Policy, Maxwell School of Citizenship and Public Affairs, Syracuse University, Oct. 2016.

**Gun Violence in America: How Culture and Politics Shape Our Response.  Public Health Models for Reducing Gun Violence.** 22nd Annual Rosemary Flanigan Lecture, Center for Practical Bioethics, KU School of Medicine, The University of Kansas, August 2016.

**Lessons from Baltimore's Safe Streets Program on Community Efforts to Reduce Gun Violence.**  National Academies of Science, Engineering, and Medicine Workshop on Community Violence Prevention.  Brooklyn, NY, June 16, 2016.

**Effects of Extending Background Check Requirements to Firearm Sales by Private Gun Owners**.  White House meeting for state and local officials on strategies to reduce gun violence.  Washington, DC, May 24, 2016.

**Priorities for Advancing Research on Gun Violence.** American Association for the Advancement of Science Forum on Science and Technology Policy, Washington, DC, April 2016.

**Evidence to Guide Public Health Efforts to Reduce Gun Violence.**  Keynote presentation, Gun Violence: A Public Health Crisis Symposium, Washington University of St. Louis, April 5, 2016.

**Effects of Drug Law Enforcement Practices on Gun Violence**, Baltimore, 2003-2015.

**Presentation,** 2016 National High-Intensity Drug Trafficking Areas Conference, Washington, DC, Feb. 18, 2016.

**Public Health Approaches to Reducing Gun Violence in America Presentation,** Moving from Crisis to Action: A Public Health Approach to Reducing Gun Violence, Mother Emanuel A.M.E. Church, Charleston, SC, Dec. 4, 2015.

**Evidence on Policies to Keep Guns from High-Risk Individuals**, The Brady Center for Gun Violence Prevention and the American Public Health Association's Summit. Washington, DC, Oct. 27, 2015.

**Charting a Course Toward Fewer Gun Deaths in America**, National Public Health Week Grand Rounds Lecture, Drexel University, School of Public Health, Philadelphia, April 8, 2015.

**Evidence to Guide Gun Violence Prevention in America**, National Public Health Week Grand Rounds, University of Delaware, Newark, DE, April 6, 2015

**Research on Policies to Keep Firearms from Dangerous People Forum on Gun Violence Prevention**, American Public Health Association and Brady Campaign to Prevent Gun Violence.  Washington, DC, March 2, 2015.

**Why Collective Efficacy Makes us Safer than "Good Guys with Guns."** Q Commons Baltimore. Baltimore. February 26, 2015.

**Evidence that State Gun Policies Can Reduce Gun Availability to Criminals and Gun Violence.** Gun Violence Prevention Summit for State Legislators, Arlington, VA, December 9, 2014.

**Opportunities and Challenges for Prosecutors Combatting Gun Violence in America.** Keynote presentation to the first meeting of Prosecutors Against Gun Violence, Atlanta, Oct. 21, 2014.

**Evidence-Based Strategies to Reduce Gun Violence in America.** Presentation as part of the Distinguished Guest Faculty Seminars, University of Michigan Injury Research Center, Ann Arbor, Oct. 21, 2014.

**Evidence-Based Strategies for Reducing Gun-Related Violence and Injuries Among Youth.** Grand Rounds Presentation, Department of Pediatrics and Adolescent Medicine, Johns Hopkins University, School of Medicine. Sept. 24, 2014.

**America's Path to Fewer Gun Deaths.** Presented at TEDMED Conference, Washington, DC, Sept. 10, 2014.

**Evidence-Based Policies to Reduce Gun Violence in America.** George Mason University, Center for Evidence-Based Crime Policy's 2014 Symposium, June 23, 2014.

**Using Research Evidence to Strengthen Maryland's Gun Laws.** Mid-Atlantic Public Health Grand Rounds, Johns Hopkins Bloomberg School of Public Health, June 18, 2014.

**Evidence to Support Efforts to Reform America's Gun Laws.** The Brady Campaign Summit. Washington, DC, November 2013.

**A Way Forward for Policies to Reduce Gun Violence in America**. Invited to be a William J. Clinton Distinguished Lecturer for the Clinton School of Public Service, University of Arkansas, Little Rock, Sept. 10, 2013.

**Public Health Approaches to Reducing Gun Violence.** The Group Dynamics Seminar Series, Institute for Social Research, University of Michigan, Ann Arbor, MI, October 7, 2013.

**Preventing Intimate Partner Homicides by Keeping Firearms from Perpetrators of Domestic Violence.** Summit on Civil Protection Orders, National Council of Juvenile and Family Court Judges, Washington, DC, June 2013.

**Data and Informatics needs for gun violence prevention research.** Webinar for the Public Health Informatics Working Group for the American Medical Informatics Association. June 2013.

**Gun Violence: The Healthcare Providers Role in Prevention, National Healthcare Collaborative on Violence and Abuse**. Webinar, June 2013.

**Firearm Policy and Gun Violence Prevention.** Webinar for California Public Health Grand Rounds, May 2013.

**Public Health Interventions to Reduce Gun Violence to Youth.** Keynote session, Pediatric Academic Societies Annual Meeting, May 2013.

**Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence: Workshop.** Institute of Medicine, Washington, DC, April 2013.

**Preventing Violence with Policies to Keep Guns from High-Risk People.** George Washington University, School of Public Health, Forum – From Dialogue to Action: Preventing Gun Violence, April 5, 2013.

**Research to Inform Policies to Keep Guns from High Risk People.**  The United States General Accountability Office, April 3, 2013.

**Policy Priorities for Reducing Youth Gun Violence: A Way Forward.**  Semi-annual meeting of the Maternal and Child Health Section of the American Public Health Association, February 2013.

**Importance of Assessing Threats to Study Validity: Cautions About Applying Questionable Evidence to Policies and Programs to Reduce Violence**. Evidence for Violence Prevention Across the Lifespan and Around the World: A Workshop of the Forum on Global Violence Prevention, Institute of Medicine, Washington, DC, January 23-24, 2013.

**Preventing Gun Violence to Youth**.  Keynote presentation, King Holiday Celebration, Martin Luther King, Jr. Center for Non-Violence, New York, NY, January 2013.

**Changing the Code of the Street in Baltimore's Most Violent Neighborhoods: Evaluation of a CeaseFire-like Intervention.**  Patricia F. Waller Lecture. University of North Carolina, October 2012.

**Reducing Risk for Re-assault of Victims of Intimate Partner Violence**. Network for Public Health Law's Eastern Region Symposium.  University of Maryland Law School, Baltimore, June 26, 2012.

**Firearm Seller Accountability Measures and the Diversion of Guns to Criminals**.  Congressional briefing organized by George Mason University's Center for Evidence Based Crime Policy, Washington, DC, February 2012.

**Research with Victims of Intimate Partner Violence:  Risks, Benefits, and Safety Strategies**.  Plenary session, Advancement of Ethical Research Conference, National Harbor, MD, December 2011.

**Evaluating Baltimore's Replication of Chicago's CeaseFire Program:  Effects on Youth Attitudes and Gun Violence.**  Centers for Disease Control and Prevention, Atlanta, January 7, 2010.

**Public Health Approaches to Gun Violence Prevention**.  Conference on Promoting Community Safety and Preventing Violence: Integrating Lessons from Research and Practice.  Ohio State University, Columbus, OH, June 2009.

**Keys to States Keeping Guns from Criminals and Reducing Gun Violence**.  Meeting of State Legislators Against Gun Violence, Gracie Mansion, New York, May 8, 2009.

**Effects of Baltimore's Safe Streets Program: A Public Health Approach to Reducing Gun Violence**. Trauma Seminar Series, Johns Hopkins Hospital, March 2009.

**Effective Strategies for Combating Illegal Guns and Gun Violence**. Roundtable on Gun Violence Prevention, International Association of Chiefs of Police, Chicago, IL, November 2008.

**Research Supporting the Lethality Assessment Program**. Maryland Judicial Conference, Linthicum Heights, MD, June 20, 2008.

**Evidence-Based Strategies for Reducing Illegal Guns and Gun Violence**. Seminar for the Baltimore Police Department Command Staff Training, Baltimore, May 22, 2008.

**Preventing Gun Violence**. Invited seminar for the Baltimore City Circuit Court Judges, April 2008.

**How Cities Can Reduce Gun Violence**. Mid-Atlantic Regional Meeting, Mayors Against Illegal Guns, March 2007.Strategies to Reduce Illegal Gun Trafficking.  Harvard Injury Control Research Center, January 2007.

**Expert Panel, Midwest meeting of Mayors Against Illegal Guns**, Chicago, October 2006.

**Expert Panel for Mayors Against Illegal Guns Summit**, New York, April 2006.

**Promising Approaches for Violence Prevention**.  Association of Baltimore Area Grantmakers, Baltimore, March 2006.

**Evidence of the Effectiveness of Gun Policies**.  Graduate Seminar in Injury Research and Policy, Johns Hopkins Bloomberg School of Public Health, February 2004.

**Recent Research on Gun Violence Prevention**.  Seminar at the 2003 Child Advocacy Leadership Institute, Advocates for Children and Youth, Washington, DC, November 2003.

**Gun Policy: Understanding the Research and Defending the Data**.  Seminar at 2002 Child Advocacy Leadership Institute, National Association of Child Advocates, Washington, DC, November 2002.

**Preventing Gun Violence Among Youth**. Seminar for the University of Maryland Journalism Fellowship in Child and Family Policy, Washington, DC, November 2002.

**Opportunities for Preventing Gun Violence**, the U.S.  Robert W. Leraas Lecture, St. Olaf College, Northfield MN, October 2002.

**The Impact of Gun Safe Storage Laws on Firearm Mortality Risks among Youth**. National Academy of Sciences, Institute of Medicine Meeting on Youth and Gun Violence. Washington, DC, Sept 2002.

**Recent Research on the Effectiveness of Gun Policies**. Citizens' Conference to Stop Gun Violence.  Arlington, VA, February 2002.

**How Criminally-Involved Youth Obtain Their Guns**. Citizens' Conference to Stop Gun Violence.  Arlington, VA, February 2002.

**The Role of Alcohol in Interpersonal Violence**. Johns Hopkins University, Center for Injury Research and Policy Seminar, October 2001.

**Risk Factors for Near Fatal Intimate Partner Assaults**. Johns Hopkins University, Department of Mental Hygiene's Seminar Series on Violence Research, September 2001.

**Effects of Child Access Prevention Gun Laws on Unintentional Gun Deaths to Children**. Presented at the annual meeting of the Handgun Epidemic Lowering Plan (HELP) Network, Atlanta, April 2001.

**Public Health Models for Reducing Gun Violence**. Grand rounds presentation at George Washington University School of Medicine, Washington, DC, April 2000.

**Methodological Challenges to Studying Risk Factors for Intimate Partner Homicide**. Seminar for the Center for Injury Research and Policy, Johns Hopkins School of Public Health, March 1999.

**School-Based Interventions to Reduce Youth Violence: Do Our Programs Fit the Problem?**  Annual conference of Maryland State School Health Council, Ocean City MD, April 1998.

**The Role of Health Professionals in the Prevention of Youth Violence**. Continuing medical education seminar at Bethesda Memorial Hospital, Boynton Beach, FL, February 1998.

**Determinants of Youth Violence and Scientific Support for Interventions**. Best Practices in Adolescent Health Conference, Annapolis MD, May 1996.

**Media Advocacy and Public Health: A Case Study of a Campaign to Increase Support for Handgun Restrictions**. Johns Hopkins University School of Public Health Seminar, April 1995.

**The Evaluation of the Policy Program of the California Wellness Foundation's Violence Prevention Initiative**, MPH Seminar, November 1995.

**The Limitations of Skill-Focused Conflict Resolution Curricula for Reducing Youth Violence**.  Handgun Epidemic Lowering Plan (HELP) Network Annual Meeting.  Chicago, September 1994.

**Promising Public Health Approaches to Violence Prevention**. Presentation to the Board of Directors, Physicians for Social Responsibility, Bethesda, MD, March 1994.

**The Ability of Gun Laws to Reduce Deaths and Injuries**. Presentation to the Maryland State Office of Strategic Drug Enforcement Coordination, Columbia, MD, January 1994.

**The Limitations of Conflict Resolution Curricula for Adolescents**. National Symposium on Violence, Safety, and Health in Urban Schools.  Sponsored by the Council of Great City Schools, Washington, DC, December 1993.

**The Role of Public Health in Violence Prevention**. JHU Seminar sponsored by the Department of Mental Hygiene and The Injury Prevention Center, December 1993.

**Research on Strategies to Prevent Youth Violence. Creative Solutions to Problem of Urban Violence**. Symposium sponsored by the Baltimore Urban League and the YMCA. Baltimore, April 6, 1993.

**Public Health Professionals' Role in Reducing Injuries from Violence.  Preventive Medicine in Minority Communities:  First or Last Resort?** Symposium sponsored by the Student National Medical Association of The Johns Hopkins School of Medicine.  Baltimore, MD, April 3, 1993.

Webster 50
*May 2023*

**Health Professionals' Role in Limiting Children's Access to Firearms**. Surgeon General's Invitational Workshop. Keeping Kids Safe: Strategies for Preventing Violence and Injury, Columbia, MD, November 19, 1992.

**A Legislative Agenda for Violence Reduction**. Consortium of Virginia Urban Municipalities, Williamsburg, VA, July 10, 1992.

**The Epidemiology of Violence and Public Health Approaches to the Problem**. Keynote Address, 13th Annual Institute of the Virginia Organization of Health Care Social Workers, Richmond, June 1992.

## ADDITIONAL INFORMATION

*Personal Statement*

that synthesizes your research, policy, and practice goals, objectives and impact  [This section allows you to "tell your story" and "connect the dots" – very important, particularly for faculty doing a wide range of tasks that are not captured through traditional "academic metrics". Keep it concise (no more than half a page)]

*Keywords*

violence, violence prevention, firearm injuries, gun policy, domestic violence, substance abuse

*Research Objectives*

To study the causes and prevention of interpersonal and self-inflicted violence and associated injuries; to study the effectiveness interventions intended to reduce severe forms of violence; to develop and assess instruments designed to assess the risk for future violence.

*Community Involvement*

Coach, Bethesda-Chevy Chase Baseball Youth League 2001- 2010

Served as Co-Chair of Social Justice Committee and as a member of the Board of Trustees at Temple Emanuel, Kensington, MD, 2004- 2007

# Exhibit B

## Cases on which Dr. Daniel W. Webster produced reports 2018-2023.

---

**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF WASHINGTON.**
NATIONAL SHOOTING SPORTS FOUNDATION, INC., Plaintiff, v. ROBERT W.
FERGUSON, Attorney General of the State of Washington, Defendant. Case No. 2:23-cv-00113-
MKD.

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA.**
ANDREW HANSON, *et al.*, Plaintiffs v. DISTRICT OF COLUMBIA, *et al.*, Defendants. Case
No. 1:22-cv-02256-RC.

**CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT SANGAMON COUNTY,
ILLINOIS – CHANCERY DIVISION.** GUNS SAVE LIFE, INC., Plaintiff, v. KWAME
RAOUL (Attorney General for Illinois) and BRENDAN KELLY (Acting Director of the Illinois
State Police) Defendants. Case No. 2019 CH 180.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO.**
DOE BRANDEIS, et al., Plaintiffs, **v.** ROB BONTA (Attorney General of California),
Defendant. Case No. 37-2019-00038820-CU-TT-CTL.

**UNITED STATES DISTRICT COURT FOR the WESTERN DISTRICT OF TEXAS, San
Antonio Division.** Holcombe et al. vs. the United States of America. Case No. 5:18-CV-
00555-XR (consolidated cases).

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND.**
MARYLAND SHALL ISSUE, INC., *et al.*, Plaintiffs v. LAWRENCE HOGAN, *et al.,
Defendants.* Case No. 16-cv-3311-ELH.

# EXHIBIT "I"

# EXHIBIT "I"

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>      Defendants. | Civil Action No. 3:22-cv-04397 |

### Expert Report of James E. Yurgealitis

I, James E. Yurgealitis, declare as follows:

1.      I am currently Self Employed as a Legal and Forensic Consultant providing firearms related technical and public policy consulting, forensic case reviews and testing and training services to corporations, legal counsel, and the public sector. During my previous 26-year career as a Federal Law Enforcement Officer, I have been recognized, and testified as, an expert witness in numerous local, state and federal courts. I have toured numerous firearms and ammunition manufacturer's facilities both in the United States and overseas. I maintain a personal library of firearms and ammunition related books and periodicals and maintain contact with other recognized experts in the field. My final assignment in government service was as Senior Special Agent / Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, a position I held for nine years. During that time, I was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

2.      My credentials, training, background and experience are stated in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. My credentials, training, background and experience as an expert witness are detailed on my Statement of Qualifications, a true and correct copy of which is attached as Exhibit B.

3.      I have been retained by the Office of the Attorney General of the State of New Jersey to provide expert testimony in litigation challenging various aspects of New Jersey Statute 2C, Section 39-1 (the "Statute"). As of the date of this declaration, the scope of my engagement includes providing expert testimony in the following cases: *Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al.*, Docket No. 3:18-cv-10507; *Cheeseman et al. v. Platkin et al.*, Docket No. 1:22-cv-04360; *Ellman et al. v. Platkin et al.*, Docket No. 3:22-cv-04397. I have

reviewed the provisions of the Statute being challenged in these cases. I am being compensated at a rate of $400 per hour for my work in these cases, and $1600 per travel + work day.

## OPINIONS

4.      As discussed in this report, many of the firearms covered by the Statute can directly trace their origins to weapons developed for use in combat. As such, they were never initially intended for general distribution / sale to the public.

5.      As tragically demonstrated by recent mass shootings such as the Pulse Nightclub in Orlando Florida in 2016 (49 fatalities, 50+ wounded), the 2017 Las Vegas shooting (60 fatalities, 400+ wounded), the 2022 Uvalde Texas School shooting (21 fatalities, 17 wounded) and the July 4th 2022 shooting in Highland Park (7 fatalities, 48 wounded), the "assault firearms" as defined under the Statute (also commonly referred to as assault weapons) are capable of inflicting significant carnage upon civilians in a short period of time, especially in conjunction with large capacity magazines.

6.      Additionally, assault weapons as prohibited under the Statute pose a significant risk to law enforcement officers. It has been my experience that soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" National Institute of Justice (NIJ) protection rating. These two ratings are suitable for protection against most handgun bullets as those projectiles range up to a 1200FPS (+ or -) velocity. Rifle caliber assault weapons (AR & AK type) can, as stated in more detail below in this report, achieve muzzle velocities of 3200FPS (+ or -) which can readily penetrate Level II & IIIA Body Armor (as well as some Level III hard body armor which is not universal standard issue amongst law enforcement agencies nationwide). Not only do the firearms banned under the Statute pose a threat to overall public safety, but they also increase the likelihood that first responders charged with stopping such a threat may be injured or killed in the performance of their duty.

## DISCUSSION

I.       **Firearms Terminology, Types, And Operation.**

        **A.  Handguns And Long Guns.**

    7.       Modern firearms as currently manufactured for civilian ownership fall into two general types: handguns and long guns (or shoulder weapons).

        **i.  Handguns.**

    8.       **Handguns.** Handguns are generally defined as a firearm having a short stock (grip), and are designed to be held, and fired, with one hand. The term "handgun" defines two distinct types of modern firearms: the revolver and the semi-automatic pistol.

    9.       **Revolver.** A revolver is a handgun designed and manufactured with a revolving cylinder to contain, chamber, and feed multiple rounds of ammunition. In a modern double action revolver, pulling the trigger rotates the cylinder bringing an unfired cartridge of ammunition in line with the barrel and firing pin. Pulling the trigger also cocks the hammer and then releases it either directly (or indirectly via a firing pin) to strike the primer of the cartridge initiating the firing sequence as stated previously. In this type of revolver, the trigger must again be pulled to rotate the cylinder in order to fire another cartridge. When all cartridges have been fired, the cylinder is unlocked from the frame and swings out to facilitate removal of expended cartridge casings and insertion of unfired cartridges. The cylinder is then closed and relocked within the frame and the handgun is again ready to fire when the trigger is pulled.

    10.       **Semi-automatic pistol.** A semi-automatic pistol is a handgun designed and manufactured with the firing chamber as an integral part of the barrel and utilizes a "box" magazine to contain and feed multiple rounds of ammunition. In this type of handgun, generally, the box magazine is inserted into the firearm, the slide or bolt is pulled back and released which springs forward and a loads a cartridge into the chamber. When the trigger is pulled, a firing pin

or striker is released which impacts the primer of the cartridge and initiates the firing sequence of the ammunition. In most pistols, a portion of the recoil or gas pressure generated by firing the cartridge is utilized to move the slide rearward, extracts and ejects the expended cartridge case and chambers another round from the magazine. This sequence can be repeated by pulling the trigger once for each shot. The pistol can then be reloaded by removing the empty magazine and inserting a loaded magazine.

### ii.   Long Guns.

11.   In terms of modern firearms manufacture, long guns are generally of two distinct types: rifles and shotguns.

12.   **Rifle.** A rifle is a firearm which is designed and intended to be fired from the shoulder.  It fires a single shot through a rifled bore for each pull of the trigger.

13.   **Shotgun.**  A shotgun is a firearm that is also designed and intended to be fired from the shoulder. It fires either a number of ball shot (commonly termed "buckshot" or "birdshot") or a single projectile (commonly termed a "slug") through a smooth (non rifled) bore for each pull of the trigger.

14.   In terms of "types" of rifle there are numerous variations. All of these variations, generally speaking, are defined and distinguished by the way they are loaded and reloaded.

15.   **Single-shot rifle.**  For example, single-shot rifles fire one shot for each pull of the trigger. They have no internal or external magazine capacity and must be reloaded with a new unfired cartridge by hand for each consecutive shot. Many of these have a hinged or "break open" receiver to facilitate loading and unloading.

16.   **Pump Action rifle.**  A pump action rifle requires the operator to manually manipulate a forearm piece which is traditionally found underneath the barrel. After firing, the forearm is pulled backward which unlocks the bolt, extracts and ejects the fired cartridge case.

5

Pushing the slide forward feeds an unfired cartridge from the magazine, cocks the firearm

mechanism and locks the bolt for a successive shot. Pump action rifles have been manufactured

with both tubular and detachable box magazines.

17.     **Bolt Action rifle.**  Bolt action rifles require the operator to manually manipulate the

bolt of the rifle.  After firing, the bolt is first unlocked from the chamber and then moved

rearward. This action also extracts and ejects the expended cartridge case. The bolt is then moved

forward which feeds an unfired cartridge from the magazine into the chamber. Once the bolt is

then again locked by the operator, it is ready to fire. Bolt action rifles usually have an internal

fixed magazine or tubular magazine which will facilitate reloading via manipulation of the bolt

until that capacity is exhausted. Bolt action rifles were generally the choice among hunters and

military forces through the end of World War II.

18.     **Lever Action rifle.**  A lever action rifle is similar to the bolt action rifle in that the

operator is required to manipulate the mechanism of the firearm. A lever at the bottom of the

receiver of the rifle is manipulated in and up and down motion in order to unlock the bolt and

move it rearward, extract and eject the expended cartridge case, feed an unfired cartridge into the

chamber and lock it. This action is required by the operator for each shot fired through the rifle.

Generally speaking lever action rifles have historically been manufactured with tubular magazines

which will vary in capacity depending on the caliber of the firearm.

19.     **Semi-automatic rifle.**  A semi-automatic rifle utilizes the energy generated by the

firing of the cartridge to power the cycle of fire. This is accomplished by siphoning off a portion

of the gases generated by firing to operate the mechanism or by utilizing the recoil generated by

firing much as in a semi-automatic pistol as described previously. Once loaded, the operation of

this cycle of fire is not dependent on the operator to effect any portion of the process other than to

pull the trigger. Semi-automatic rifles are, and have been previously, manufactured with both

fixed internal magazines and a capacity to accept detachable external magazines. As such this type of rifle is capable of firing with each pull of the trigger until the supply of ammunition is exhausted. As stated previously, the majority of military firearms through World War II were bolt action. The exception to this rule was the United States entering the war with the semi-automatic M1 (Garand) .30-06 caliber rifle as standard issue. The Garand had a fixed internal magazine with an eight round capacity.

20.    Modern shotguns, as stated previously in regard to rifles, are generally classified by their operating system, (i.e. the manner in which they function, are loaded and are reloaded). Additionally, in the case of shotguns with multiple barrels they are defined by placement or orientation of same.

21.    **Single-shot shotguns**.  Single-shot shotguns function similarly to the single-shot rifle. They may have a hinged receiver which allows the operator to open the action at chamber area to facilitate loading and unloading of the firearm. There are also single shot models that are loaded and unloaded through a bolt action mechanism and have no additional magazine capacity.

22.    **Bolt action shotguns.** Bolt action shotguns are manufactured, as stated above for rifles, as single shot, or with internal or detachable magazines to facilitate easier and faster reloading. They function in the same way as a bolt action rifle and require manual manipulation of the bolt by the operator to unload and reload.

23.    **Level action shotguns.** Level action shotguns again function in the same fashion as a similarly designed rifle. Manual manipulation of the lever is required for successive shots.

24.    **Pump action shotguns.** Pump action shotguns have the same general operating system as a similarly designed rifle. The "action" of the shotgun must be worked forward and back by the operator to unlock the bolt, extract and eject the expended shotgun shell, reload and relock the bolt for firing.

7

25.   **Semi-automatic shotguns.** Semi-automatic shotguns, as with their rifle caliber counterparts, utilize energy (either recoil or gas pressure) generated by firing ammunition to "power" the operating system of the firearm. These are manufactured with a number of different magazines, both internal and fixed, as well as external and detachable. They are capable of firing a single shot with each pull of the trigger until the supply of ammunition in the magazine is exhausted.

26.   **Break open, double barrel, and "tip up" shotguns.**  Break open, double barrel, and "tip up" shotguns have a hinged receiver which facilitates access to the rear of the chamber for unloading and reloading. They are manufactured in single shot and double barrel variations. Double barrel variations are further delineated by the placement of their barrels. Side-by-side shotguns have two barrels situated next to one another in a horizontal arrangement. Over-and-under shotguns have two barrels superimposed upon one another in a vertical plane. The mechanisms in each of these allow staggered firing of each of the two barrels with a separate pull of the trigger. When the hinged action is opened, the expended shotgun shell hulls can be manually extracted by the operator although more complex designs with auto ejectors perform that function when "opened."

### B.  General Firearms Definitions.

27.   In discussing modern firearms, it is important to understand how they are defined under statute, how they function and the differences between types commonly found and available to the public.

28.   Additional terms often used when discussing modern firearms are semi-automatic, full-automatic, select fire, rifling, caliber and gauge.  I define these terms as follows:

29.   **Semi-Automatic.** Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot.

30.   **Full-automatic.** Full-automatic refers to a firearm that will continuously fire successive shots when the trigger is pulled and will only stop when the trigger is released or the supply of ammunition is exhausted. Commonly referred to, and defined and classified as a machine gun, under N.J.S.A. 2C:39-1(i).

31.   **Select Fire.** A select fire firearm is capable of switching between and functioning in either full- or semi-automatic fire mode.

32.   **Rifling**. Rifling refers to a series of grooves cut or impressed inside the barrel in a spiral pattern. The "high" portions of these patterns are called "lands." The "lower" portion of this pattern are called "grooves." When a projectile (or bullet) is fired in a "rifled" firearm, it comes into contact with the lands as it leaves the chamber and begins to travel down the barrel. Because the lands are oriented in a spiral pattern, the rifling imparts a spin to the projectile which improves stability and accuracy.

33.   **Caliber**. Caliber is a dimensional measurement of the inside (or bore) of a rifled barrel. In the United States, caliber is traditionally expressed in fractions of an inch. For example, a .22 caliber firearm is designed to chamber and fire a projectile which measures .22 inches (or slightly less than a quarter of an inch). A .50 caliber firearm chambers and fires a projectile which is approximately a half inch in diameter.[1]

---

[1] In Europe, and. the majority of other countries utilizing the metric system, caliber has historically been expressed in millimeters (mm). Therefore a 9mm firearm is designed to chamber and fire a projectile with a diameter of 9mm. European caliber designations may also include measurement of the length of the cartridge case (9x19mm, 7.62x39mm etc.). A number of firearm calibers widely manufactured have two separate caliber designations, one in inch measurements and one in metric, which are equivalent and interchangeable. For example .380 ACP caliber ammunition in the US is referred to as 9x17mm caliber in Europe.

9

34.    It is important to note for the purposes of this report that the caliber designation of any given ammunition cartridge usually refers only to the diameter of the projectile (bullet) and not the relative "power" of the cartridge itself (in terms of muzzle energy, effective range and muzzle velocity). For example, there is an important distinction between cartridges commonly referred to as .22 caliber and cartridges commonly referred to as .223 caliber.

35.    .22 caliber ammunition is a popular and relatively low power cartridge developed in the 1880's. It is also known as ".22 rimfire" as the primer mixture in the cartridge is seated in the rim of the cartridge and not contained in a separate primer cup in the cartridge base. It is commonly used for target shooting as well as hunting small game and can be fired from both handguns and rifles chambered in that caliber. Bullet weights for .22 caliber projectiles / bullets are typically between 30-60 grains (0.08 to 0.13 ounces). Muzzle velocities are usually in the 1100-1300 feet per second (fps) range.

36.    .223 caliber ammunition by comparison is a high velocity cartridge developed in the 1950's in part for use in the original AR-15 and M-16 assault rifles. It is a "centerfire cartridge." Although the diameter of the projectile / bullet is only slightly greater (approximately the width of a human hair) than the .22 caliber cartridge mentioned previously, it is a vastly more powerful cartridge in terms of muzzle velocity and range. This caliber ammunition is also somewhat interchangeable with 5.56mm ammunition. Here is a side-by-side comparison of .223 (left) and .22 caliber cartridges (right) with a quarter for size reference:



37.    Common bullet weights for .223 / 5.56mm caliber projectiles are 50 to 62 grains + or- (0.11 to 0.14 ounces)—heavier than .22 caliber projectiles.  Common muzzle velocities are approximately 3,200 to 3,500 feet per second—about three times as fast as .22 caliber projectiles. A heavier bullet and increased velocity equate to more of the cartridge's energy being transferred to the target. The National Rifle Association (NRA) American Rifleman Magazine tested the U.S. Army's new .223 caliber cartridge (M855Al) in 2014 and the results are published here:

https://www.americanrifleman.org/content/testing-the-army-s-m855a1-standard-ball-cartridge/.

38.    **Gauge.** Gauge is a dimensional measurement which is traditionally used to denote the bore of a non-rifled or "smoothbore" firearm (i.e. a shotgun). Shotguns were initially designed to fire a mass of round shot as opposed to one solid projectile, and therefore a caliber designation is not readily applicable. Gauge refers to the number of lead spheres which will fit inside the bore and equal one pound. For example, in a 12 gauge shotgun, you can fit 12 spheres of lead, which are approximately 18.52mm or .73 inches in diameter, the total weight of which will equal one pound. If the diameter of the spheres are increased, it will require less of them to equal one pound.

11

Therefore the smaller the "gauge" the larger the dimension of the bore. The exception to this measurement system is the .410 gauge shotgun which is actually a caliber designation.

II.    **Recent Development And Evolution Of Firearms With Features Designed for Military Purposes.**

39.    In recent years, there has been an increase in the popularity and availability of semi-automatic rifles, pistols, and shotguns with features initially designed (or patterned after those designed) for a military purpose. It is important to discuss the history of the development and evolution of firearms with these features. In regard to the design and manufacture of military small arms it is important to note that 'form follows function' and the design and inclusion of features are intended to increase the effectiveness of the individual combatant in battle.

**A.  Assault Rifle Development and Evolution.**

40.    The first "assault rifle" or "assault weapon" was the German StG 44 (Sturmgewehr Model 1944), which appeared in production form late in World War II. Earlier pre-production variants included the MP 42 and MP 43 (Machinenpistol 1942 and 1943 respectively). The Germans termed the rifle "Sturmgewehr," literally "Storm Rifle," and a number of the features included utilization of a portion of the gas generated by the burning cartridge propellant to operate the rifle, extensive use of steel stampings in its construction, a detachable magazine, a separate pistol style grip (not integrated with the shoulder stock), a bayonet mounting jug and a threaded barrel to facilitate the attachment of a grenade launcher. It fired a cartridge that was smaller dimensionally and less "powerful" (in terms of muzzle velocity and foot pounds of energy) than the standard 8mm Mauser cartridge in use by the German Army in their issued bolt action Mauser K-98 rifles.



`                                                                                                    2

41.   It is important to note that the features designed into the German StG 44 were intended to increase the effectiveness of the individual soldier in combat and allow for simplified manufacture:

42.   **Gas-powered semiautomatic fire**. Gas-powered semiautomatic fire enabled more rapid fire than was possible using standard-issue bolt action rifles.

43.   **Steel stampings.** Steel stampings made for a lighter weapon increasing the amount of ammunition an individual combatant could carry and / or increasing mobility. Additionally they were easier and less expensive to manufacture than machined steel forgings.

44.   **Detachable magazine.** Detachable magazines allow more rapid re-loading than previous standard issue bolt action firearms.

45.   **Separate pistol style grip.**  A separate pistol style grip enhanced the ability of combat soldiers to quickly maneuver their firearms into firing position and retain stability for subsequent shots.

---

[2] Image source –Peter Suciu, "Sturmgewehr, the First Assault Rifle," Recoil: The Ultimate Firearms Destination for the Gun Lifestyle, June 19, 2016, available at https://www.recoilweb.com/sturmgewehr-the-first-assault-rifle-100907.html

13

46. **Barrel shroud.** A barrel shroud encircles and protects the end of the barrel, keeping the barrel safe from damage caused by collision with objects and giving the soldier using the firearm an auxiliary grip on the barrel without burning his hand.

47. **Bayonet mounting lug.** This feature provided combat soldiers with an additional weapon for use in close combat.

48. **Threaded Barrel.** A threaded barrel allowed for the attachment of grenade launcher (on this particular rifle), providing combat soldiers with an additional weapon, albeit for use at a greater distance.

49. Following the end of the war, captured StG 44's were analyzed by the Allies and although there was reluctance to move to a smaller caliber cartridge, a number of the features of the StG 44 found favor in the design of successive European, American, and Eastern Bloc military rifles. Noted firearm expert and historian Jim Supica wrote in his forward to the book "Guns":

> Most military establishments hesitated to "downsize" the range and power of their primary rifles in the early Cold War years. The semi-auto detachable magazine concept was an obvious success and there was something to be said for full auto capability.[3]

He further writes:

> However the assault rifle concept wouldn't go away. The Soviet Union accepted the lower power round idea in its fixed magazine semi-auto chambered for an intermediate power 7.62 x 39 mm round in 1945, the SKS, which saw wide distribution and production in Soviet client states.[4]

50. Two years later in 1947, the USSR followed the SKS with what Supica terms "the quintessential assault rifle - the Kalashnikov designed AK-47."[5]

---

[3] Supica, Guns (TAJ Books 2006). PP. 26-28
[4] *Id.*
[5] *Id.*

14

51.    The design of the AK-47 carried forward a number of the features introduced on the German StG 44. These features include a gas powered operating system, use of steel stampings in its construction, a separate pistol grip, separate shoulder stock, a detachable magazine, a bayonet lug and provision for attachment of a grenade launcher. Due to the separate stock and pistol grip the AK, much like the StG 44, also utilized a barrel shroud / or foregrip on the forward third of the rifle. Some variations of the early AK-47s (AKM) also featured a "compensator" at the muzzle that deflected gas upward and to the right to compensate for the rifle's tendency to kick up and to the right with every shot.

52.    In the 1950's, many countries sought to replace World War I and World War II vintage bolt action and semi-automatic rifles with these newer and more effective designs. With the birth of the North Atlantic Treaty Organization (NATO) however, utilization of Soviet Bloc AK or SKS assault rifles was not possible. Accordingly, a number of firearms manufacturers outside the Soviet sphere of influence developed military rifles that carried forward these same features to one extent or another. Fabrique Nationale (FN) of Herstal, Belgium and Heckler Koch (HK) of Oberndorf, Germany are two noteworthy examples.

53.    FN developed the FN-FAL (Fusil Automatique Leger) and HK the G3 which found a ready market amongst nations that did not favor the Soviet AK type designs. Both incorporated features which like the AK, were derived directly from the StG 44. Their designs featured some parts made from metal stampings as opposed to heavier and more expensive machined steel pieces. A separate pistol grip, shoulder stock, detachable magazine, and barrel shroud followed the basic design of the StG 44. A flash hider and / or muzzle brake have appeared in production variations of both rifles. These rifles were destined from inception to become widely exported as the domestic market in both countries was relatively limited. The FN-FAL and G3 have been in

15

production since the 1950's and both FN and HK have licensed production to numerous countries in South America, Africa, and the Middle East.

54.    In the United States, progress in this arena moved at a significantly slower pace.  The prevailing wisdom in the United States was to stay away from lighter, smaller rifle calibers and cartridges as the .30-06 cartridge used in the M-1 Garand Rifle during World War II had proven to be more than successful. Their initial answer to the burgeoning move towards assault rifles was a variation of the basic M-1 Garand operating system, the T44, or M-14. Outwardly, the M-14 retained a full length wood stock as did the Garand; however, it featured a detachable magazine, select fire (both semi-automatic and full automatic) capability, and a flash hider. It competed directly against the FN-FAL (designated T88) in U.S. Army trials and was selected in 1957.

55.    In the mid 1950's, Eugene Stoner, the chief Engineer of the American company ArmaLite Corporation, developed a number of lightweight assault rifle designs which resulted in the AR-10 in .308 caliber. Its design closely followed what was now becoming standard assault rifle design, i.e., light weight (aluminum forged receivers as opposed to machined steel), separate pistol grip and shoulder stock, foregrip / barrel shroud, detachable magazine, and numerous flash hider / muzzle brake variations. ArmaLite continued to refine the basic design of the AR-10 which resulted in the AR-15. The AR-15 was designed to chamber and fire the 5.56 x 45mm cartridge (somewhat interchangeable with .223 Remington caliber).

56.    In 1961, the Department of Defense purchased a quantity of AR-15 rifles from Colt for evaluation. A number of these were subsequently shipped to US Army advisors in Vietnam to test their suitability for issue to South Vietnamese Army forces. Following the field evaluation the Department of Defense Advanced Research Projects Agency prepared a report (AD-343778, dated August 20, 1962) summarizing the results. Amongst the data compiled via surveys of the US Army Advisors are a number of comments regarding actual use in the field and the results.

16

These comments describe various catastrophic injuries to Viet Cong Combatants who were shot by AR-15, including severing of limbs and decapitation.[6]

57.    This rifle was adopted as standard issue by the U.S. Army in the mid 1960's. The production of the rifle had been licensed to Colt, and initially the model designation was, as produced, AR-15. Later, after a series of engineering changes, the standard U.S. military designation was changed to M-16. When first deployed as a standard issue rifle for US Military Forces, the AR-15 / M-16 platform was maligned as unreliable and prone to jamming. This was due, in part, to inadequate maintenance by the operators themselves. Once the problems were addressed and rectified, the rifle proved to be as reliable and accurate as the AK type rifles deployed by the North Vietnamese and Viet Cong.

58.    The 5.56mm cartridge has a muzzle velocity of approximately 3200 feet per second (fps) (for reference a 9mm pistol cartridge has a muzzle velocity of approximately 1100 fps). 5.56mm bullets, upon contacting tissue will "yaw" (begin to rotate on its axis) which contributes to the creation of both temporary and permanent large wound cavities. Handgun bullets, because they are heavier and travelling at a lower velocity, do not typically yaw upon contact with tissue and do not create as large of a wound cavity nor commensurate destruction of tissue. The yaw movement of a 5.56mm / .223 caliber bullet can also cause it to fragment upon striking bone which contributes to additional tissue damage not immediately adjacent to the cavity itself.

---

[6] Advanced Research Projects Agency, Office of the Secretary of Defense, Field Test Report, AR-15 Armalite Rifle, at 24 (July 31, 1962), available at https://apps.dtic.mil/sti/pdfs/AD0343778.pdf.

59.   Noted Wound Ballistics expert Vincent DiMaio in "Gunshot Wounds" writes:

> As the bullet enters, the body, there is 'tail splash' or backward hurling of injured tissue.  This material may be ejected from the entrance.  The bullet passes through the target, creating a large temporary cavity whose maximum diameter is up to 11-12.5 times the diameter of the projectile.  The maximum diameter of the cavity occurs at the point at which the maximum rate of loss of kinetic energy occurs. This occurs at the point where the bullet is at maximum yaw, i.e., turned sideways (at a 90-degree angle to the path) and / or when it fragments.  If fragmentation does not occur and the path is long enough, the yawing continues until the bullet rotates 180 degrees and ends up in a base-forward position.  The bullet will continue traveling base first with little or no yaw as this position puts the center of mass forward.[7]

> The temporary cavity will undulate for 5-10 msec before coming to rest as a permanent track.  Positive and negative pressures alternate in the wound track, with resultant sucking of foreign material and bacteria into the track from both entrance and exit.  In high-velocity centerfire rifle wounds, the expanding walls of the temporary cavity are capable of doing severe damage.   There is compression, stretching and shearing of the displaced tissue.  Injuries to blood vessels, nerves, or organs not struck by the bullet, and a distance from the path, can occur as can fractures of bones, though, in the case of fractures, this is relatively rare.  In the author's experience, fractures usually occur when the bullet perforates an intercostal space fracturing ribs above and below the bullet path.[8]

60.   Demaio further states,

> Projectile fragmentation can amplify the effects of the temporary cavity increasing the severity of a wound.  This is the reason for the effectiveness of the 5.56 x 45-mm cartridge and the M-16 rifle.[9]

61.   This video graphically illustrates the temporary wound cavity as described by

DeMaio: https://www.youtube.com/watch?v=8HM96wpPVoQ.

---

[7] DiMaio, Gunshot Wounds, 2d (CRC Press LLC, 1999).  P. 54
[8] *Id.*, P.55
[9] *Id.,* P.56

62.    Because of the propensity of the 5.56mm/.223 caliber round to create significant damage upon impacting living tissue, it is not generally considered nor favored as a hunting cartridge.

### B.  Pistol Caliber Firearms Evolution And Development.

63.    It is important in terms of this particular case also to address the evolution and development of firearms that chamber and fire pistol caliber ammunition, including those known as submachine guns. Submachineguns are defined as machineguns that fire "sub caliber" (i.e. pistol caliber) ammunition. A number of the handguns that are banned under the Statute are direct evolutionary descendants of submachine guns initially designed and produced for military use.

64.    Many of the construction and design features attributed to assault weapons, and the StG 44, were first utilized in the design and manufacture of mid-20[th] century submachine guns. Nazi Germany entered World War II with the Innovative Maschinenpistole 38 (MP38). It was chambered in 9mm and later, after a number of engineering changes, re-designated as the MP40. It has design features commonly found in later assault weapons including an adjustable stock, separate pistol grip, a detachable magazine and use of steel stampings in its construction.



10

65.    While the United States initially entered World War II with a military variant of the Thompson .45 caliber sub machinegun, it was heavy and expensive to manufacture because a number of the major components were machined from solid steel. Before the end of the war, the Thompson had been supplemented by the M3 "Greasegun" initially produced by General Motors. The receiver was a stamped and welded sheet metal assembly with an adjustable sliding shoulder stock. Like the MP38 / MP40, it had a separate pistol grip, a sliding / adjustable shoulder stock and a detachable box magazine with a 30 round capacity. In a utilitarian sense it was as effective as the Thompson and, at approximately $20, it was less than half as expensive.

66.    The United Kingdom produced over one million Sten submachine guns during World War II. A rugged and reliable firearm made largely from welded steel stampings, it was utility, reliability and ease of manufacture both combined and perfected. Features shared with the M3 and MP38/MP40 included an adjustable shoulder stock, separate detachable box magazine and, on  some variations, a barrel shroud allowing the operator to utilize the area surrounding the barrel as an auxiliary grip point without touching a heated barrel.

67.    Prior to and during World War II, a number of other nations developed submachine guns which followed the same design and construction philosophy. Notable examples include the Soviet PPSH41, the Italian Beretta Model 38/42, and the Swedish Carl Gustav Model 45.

68.    Following World War II, most new submachine gun designs continued the design philosophy which combined utility, ease of manufacture and the features of wartime firearms. In the early 1960's, HK introduced the MP5 which became an immensely popular choice for military and law enforcement agencies worldwide due to its inherent reliability and accuracy. It was produced in multiple iterations to include a semi-automatic civilian version as well as a pistol variant without a provision for a shoulder stock (HK SP89).

20



11

69.   Israeli Military Industries also successfully marketed their UZI sub machinegun for export in select fire, and in civilian semi-automatic variants.



12

70.   Additionally, a number of submachine gun designs proved unsuccessful in terms of military and government sales but nonetheless found a ready market when re-engineered as a

---

11 Image source: https://www.gunsinternational.com/guns-for-sale-online/pistols/9mm-pistols/excellent-condition-factory-german-hk-sp89-9mm-pistol.cfm?gun_id=101037518

12 Image source: https://www.military-today.com/firearms/uzi_pistol.htm

semiautomatic pistol. Notable examples include the Cobray MAC-10 (and successive variants) and the Intratec TEC-9, which began life as a Swedish designed submachine gun, the Interdynamic MP-9.



13



14

---

[13] Image source: https://www.armslist.com/posts/11522946/st-louis-missouri-handguns-for-sale--vulcan-mac-10

[14] Image source: https://www.egunner.com/intratec-tec-dc9-9mmpara,name,11952922,auction_id,auction_details

### C.  Proliferation of the AR & AK Platforms for the civilian market

71.     Since the late 1950's through the late 1960's the move towards adoption of semiautomatic and select fire rifles by military forces became a global phenomenon. Soviet Bloc nations rearmed with AK type rifles (and their variants) while NATO Nations adopted a number of designs from Colt, HK and FN, as stated previously, around a standardized caliber rifle cartridge.

72.     Several companies adapted these weapons, without changing their basic construction or design features, for civilian use. For example, in the early 1960's, Colt sought to capitalize on the military acceptance of the AR-15 /M-16 andbegan to produce rifles, incorporating the same construction techniques and configuration as the AR-15 for sale on the civilian market. The only difference between the Colt-produced military and civilian versions was removal of select fire capability and relocation of assembly/ disassembly pins in the lower receiver as stated previously.

73.     These civilian versions, including the Colt·AR-15, retained the performance capacities of the military weapons they were based on, including the effective range, muzzle velocity and semiautomatic rate of fire. In addition, the weapons retained the capability to accommodate large capacity magazines (more than ten rounds) as originally issued for military use. Again however, the basic configuration, appearance, construction and operation of the internal gas operating system (as designed) has remained unchanged since its initial design and introduction as a military weapon.

74.     The expiration of Colt's patents in the late 1970's naturally spawned competition in the marketplace. Throughout the design's lifespan many of the internal fire control components have remained unchanged and their specifications standardized industry wide. There are multiple internal parts that are completely interchangeable between military M16's manufactured in the 1960's by Colt and an AR-15 type rifle produced today by any one of hundreds of U.S.

manufacturers that produce either receivers or internal operating parts. For example, a Bolt Carrier manufactured in 1967 by Colt will fit, and function as designed, in an AR copy manufactured in 2023. Additionally, the overall configuration of "copycat" AR rifles remains essentially identical to the original production design of the early 1960's. The overall design configuration (two piece hinged receiver (shown below), shoulder stock in line with the chamber and barrel, placement of the magazine, external switches and other features) are identical or nearly so.

75.    While employed at the ATF NLC I was a custodian of the Laboratory's Firearms Reference Collection. The firearms in the collection were regularly used by students in the National Firearms Examiner Academy and often required repair. I have personally replaced internal parts in older Colt AR type rifles and Eastern Bloc manufactured AK rifles with recently manufactured parts from aftermarket vendors. The parts fit without issue and the firearms functioned as designed after the repair.

76.    Due to their modular construction AR type rifles are easily constructed / configured with parts made by other manufacturers to suit the owner's personal preference. The rifle receiver itself is designed as a two-piece unit and the "upper receiver" and "lower receiver" can be swapped out for other interchangeable pieces made by the same or another manufacturer with ease. The design also facilitates replacement of internal fire control components and assemblies.

77.    Individual component pieces can be purchased allowing the individual to build a custom AR type rifle from the "ground up" as opposed to purchasing a complete firearm due to the standardization and interchangeability of parts and subassemblies (under Federal Law the lower receiver of the AR platform is considered the "firearm" and requires a serial number). A good illustration of this ease of customization, and the plethora of interchangeable parts and accessories, is the fact that Brownell's Inc., an established gun supply retailer in Iowa, currently devotes the

24

first 107 pages of their "Big Book" (74th edition) catalog of parts and accessories to AR type rifles alone. [15]

78.    The same holds true for AK type rifles and, more recently, pistols available in the civilian market. Although the design (and variants) of the AK-47 are more numerous than the AR type rifle (as far as military production and use is concerned), it lags behind the AR in regard to domestic civilian popularity. Nonetheless whether the AK Type rifle is of Russian, Chinese or other former Eastern Bloc manufacture, there is a robust secondary market in the United States for accessories, parts, sub- assemblies etc. Although not as easily modified as an AR style rifle due to its less "modular" design there are customization options available including a variety of shoulder stocks, sighting and illumination, etc.

79.    Additionally, much as with AR type rifles, there are numerous vendors selling all the necessary component parts needed for an individual to build an AK style rifle from "the ground up" as opposed to purchasing a complete rifle and subsequently modifying the firearm. In actuality, the receiver of many AK rifles is simply a stamped metal "flat" which is available from numerous vendors online for as little as $14.99.



16

---

[15] Links to view the catalog are available at this website:  https://www.brownells.com/order-a-catalog/

[16] Image source: https://www.buymilsurp.com/ak-receiver-flat-and-rails-p-3028.html

80.     The AK 'flat' is bent into the correct configuration using a jig which can also be found from numerous vendors.



<sup>17</sup>

81.     As with the AR, the general configuration and specifications of internal AK operating parts and assemblies have remained consistent. Regardless of the place of manufacture there are numerous internal fire control, feeding and gas operating system components that are interchangeable between AK rifles produced by manufacturers over the past 40-plus years. Again, as with AR type rifles, the overall configuration of the AK rifle receiver, internal operating systems and their parts, and performance (in terms of semiautomatic rate of fire, muzzle velocity, range etc.) are comparable to the military versions from which they evolved.

82.     As stated previously, the expiration of Colt's AR patent in the late 1970's spawned numerous "copycat" rifles from other vendors. A similar situation occurred with respect to AK type rifles on an international scale. These foreign manufacturers, Norinco (China), Romarm (Romania) and Valmet (Finland), were or still are state owned enterprises and tens of thousands of complete AK copies were imported into the U.S. by a number of foreign manufacturers before

<hr />

[17] Image source: https://ak-builder.com/images/detailed/1/ak_builder_flat_bending_die_set.jpg

additional Federal regulation, Title 18, Section 922(r), required that a certain percentage of the rifle's parts be manufactured domestically.

83.     Regulation of imports however has not slowed the demand for AK "copycat rifles" and numerous domestic manufacturers are producing rifles in the U.S. based on the original design and operating system.

84.     In my opinion, the performance characteristics of Assault Firearms in regard to semi automatic rate of fire, muzzle velocity, effective range have not changed since their initial incarnation as military weapons.

### D.  Marketing of Assault Weapons

85.     Contrary to claims of political contrivance, the term "assault weapon" had already entered common use in the firearms community as early as 1986 when the "Gun Digest Book of Assault Weapons" was first published. Edited by Jack Lewis the front cover states that it contains: "A detailed analysis of Assault Type Weapons: Test Reports – Firing the latest in full and Semi Autos, centerfires, rimfires and shotguns."



86.     On Pages 88-93 Lewis reviews and test fires the Springfield SAR-48 which is a reproduction of the Fabrique Nationale (FN) FAL Rifle mentioned above. In the article on page 89 he refers to it as "a weapon of war."

87.   On Page103, Lewis states:  "Whatever a shooter's reasons may be for wanting one, he'll be able to find one of these civilian-legal semi-auto assault weapons on dealer's shelves. A number of them are detailed on the following pages."

88.   The firearms industry has also promoted the similarities between semi automatic versions of their full / select fire battle rifles for marketing purposes.



---

[18] Image source: https://gearsofguns.com/old-ar-15-ads/



19

89.     Essentially Assault Weapons can be simply defined (under numerous State and local statutes) as semi automatic copies of fully automatic (or select fire) firearms designed and intended for use by the military. They retain features and performance characteristics (in terms of muzzle velocity, range etc.) originally designed and intended for use on the battlefield.

90.     Following the passage of the Federal and numerous State and local Assault Weapon Bans in the 1990's, the firearm industry via the National Shooting Sports Foundation (NSSF, a firearm industry trade and lobbying organization) reversed course and coined the moniker "Modern Sporting Rifle" to describe semi automatic variants of the fully automatic / select fire M-16.

### E.  Military origins of Large Capacity Magazines

91.     Large capacity magazines were not initially designed or intended for the civilian marketplace. The lineage and refinement of large capacity detachable magazines and belt feeding mechanisms can be traced directly to a military heritage. Various belt & clip fed medium machine gun designs by Hiram Maxim (1885) and John Browning (1890) debuted before the end of the 19th Century;[20] however, it wasn't until the advent of WWI that development and refinement of large capacity feeding devices for machineguns gained increased importance.

92.     In regard to standard issue rifles, the U.S. and other combatant nations entered, deployed, and exited WWI with bolt action rifles as standard issue to the individual soldier.

93.     By contrast, magazine fed semi-automatic pistols first appeared in the early 1890s. Numerous models designed and manufactured by Salvator Dormus, Hugo Borchardt and Paul Mauser featured both internal fixed and detachable box magazines of varying capacities although only Mauser's C96 (1896) design proved commercially viable and was manufactured until the late

---

[20] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 83-99

30

1930's. Initially designed with a 10 round internal fixed magazine later variants included the ability to accept detachable magazines.[21]

94.   In addition to use of the Mauser C98 in WWI, Germany also issued the P08 (1908) "Luger" pistol with an 8 round detachable magazine. Similarly U.S. Forces fielded the Colt Model 1911 with a 7 round detachable magazine. One exception to the "under 10" magazine capacity was the introduction of the Belgian FN "Hi-Power" (1935) 9mm pistol which featured a detachable magazine holding 13 rounds.[22]

95.   In the interwar years, a number of advancements in arms technology & design facilitated practical semi-automatic rifles for standard issue. Accordingly, the U.S. Forces in WWII were issued the Springfield Armory M-1 "Garand' rifle with an 8 round internal magazine. The U.S. also deployed the M-1 carbine in .30 caliber which featured a 15 round detachable box magazine; however, this was intended for issue to support personnel behind the front lines. It was not until the M-14 was adopted in the late 1950s that a rifle with a detachable magazine was adopted for standard issue to front line troops. The M-14 was issued with a 20 round magazine.[23]

96.   When the AR-15 (later designated M-16) was first purchased and issued to U.S. Forces in the early 1960s it was intended to be utilized, and was issued, with 20 round detachable magazines.[24]

97.   However, when the first semi-automatic variants of the M-16, the Colt AR-15 SP1 Sporter, became available for sale to the public in 1964 it came supplied with two five round magazines, not the military issue 20 round magazines.

---

[21] Zhuk, A.B., The Illustrated Encyclopedia of Handguns, (Greenhill Books, 1995), PP. 207-211

[22] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 115-122

[23] Hogg, Ian V. & Weeks, John S., Military Small Arms of the 20th Century, 7th Ed., (Krause Publications, 2000), P. 291

[24] Stevens, R. Blake & Ezell, Edward C., The Black Rifle (Collector Grade Publications, 2004), P. 108

31



**COLT AR-15 SPORTER SEMI-AUTOMATIC RIFLE .223 CALIBER**

Colt's answer to the demand for a semi-automatic version of the AR-15 automatic rifle purchased by The United States Armed Forces. Painstaking engineering redesign efforts have resulted in a Government-approved conversion of the Colt AR-15 automatic rifle without sacrificing any performance or weight characteristics. The semi-automatic AR-15 Sporter weighs only 6.3 pounds. Its recoil is light and barrel rise minimal.

MODEL R-6000

RETAIL PRICE*
$189.50

Lightweight ● Extremely accurate ● Easy to handle ● Straight line construction — barrel, bolt, recoil buffer unit and stock assembled in a straight line ● Rapid semi-automatic fire is more controllable than with rifles of commercial design ● Simple to maintain.

| CALIBER | BARREL LENGTH | OVERALL LENGTH | CAPACITY | SIGHTS | SAFETY | WEIGHT |
|---------|---------------|----------------|----------|--------|--------|--------|
| .223 | 21" | 39" | 5 rounds | Double tang rear peep sight adjustable for windage. Post type front sight adjustable for elevation. | Rotary safety—selector lever | Approx. 6¼ lbs. |

*The suggested retail price of the Sporter is $189.50 and includes two magazines (each blocked for five rounds), sling, flash suppressor, rubber recoil pad, cleaning rod assembly, cleaning brush, and the Colt AR-15 Sporter Operation and Maintenance manual.

25

98.   As stated by Christopher R. Bartocci in his book The Black Rifle II:

Initially, Colt simply added a five round limitation spacer to the 20-round magazine which could be installed or removed at will by simply removing the floor plate of the magazine. This was primarily intended for hunters, in compliance with the laws in most states which limit magazines in the field to a five-round capacity for hunting. With the introduction of the Colt Sporter series, the configuration of this magazine was altered by the addition of a permanent rivet in the floorplate to prevent the removal of the spacer, thus making this a magazine of dedicated five-round capacity for hunting applications. [26]

---

[25] Source: https://thecoltar15resource.com/1964-catalog/

[26] Bartocci, Christopher R., The Black Rifle II (Collector Grade Publications, 2004), P. 263

| MODEL NO. | MODEL | CALIBER | BBL LENGTH (inches) | FINISH | APPROX. WEIGHT (lbs.) | O/A LENGTH (inches) | SIGHT RADIUS (inches) | ROUNDS MAG. |
|---|---|---|---|---|---|---|---|---|
| R6600DH | AR-15A2 DELTA H-BAR w/scope and acces. | 223 Rem (5.56mm) | 20 | M | 10 | 39 | 19.75 | 5 |
| R6600 | AR-15A2 H-BAR | 223 Rem (5.56mm) | 20 | M | 8.0 | 39 | 19.75 | 5 |
| R6500 | AR-15A2 SPORTER II | 223 Rem (5.56mm) | 20 | M | 7.5 | 39 | 19.75 | 5 |
| R6420 | AR-15A2 CARBINE | 223 Rem (5.56mm) | 16 | M | 5.8 | 35 extended 32 closed | 14.5 | 5 |

Rifles

© 1986 Colt Industries Inc
Printed in U.S.A.

15

99.    As shown in the image above, Colt continued to provide five round magazines with their AR-15 rifles as late as 1987.[27]

100.   Postwar development of semi-automatic pistols continued after WWII; however, magazine capacities generally remained under 10 rounds. Notable examples include the Beretta Model 1951 (8 rounds), Sig Sauer P220 (1975, 7-10 rounds depending on caliber), Heckler Koch P7 (1978, 8 rounds).

101.   It was not until the early 1980s the U.S. Military sought to replace the Colt 1911, a .45 ACP caliber pistol with a seven round magazine, and standardize the sidearms (handguns) issued to U.S. Forces in a caliber common to all NATO member nations. The resultant winner of numerous competitions was the Beretta Model 92SB, a 9mm caliber pistol with a 15 round magazine. Following a few minor functional changes, the Beretta was accepted and designated the M-9.[28]

102.   During the latter half of the 1980s, numerous manufacturers, both domestic and foreign, began developing and offering numerous semi-automatic models with magazine capacities equaling, or exceeding, that of the Beretta M-9.

---

[27] Colt Firearms 1987 Catalog, (Colt Industries Inc., 1986), P.15

[28] Wilson, R.L., The World of Beretta, An International Legend, (Random House, 2000), PP. 227-253

33

103.  In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act, (which included provisions also known as the Federal Assault Weapons Ban or "AWB"), which limited the maximum capacity of a detachable magazine to ten rounds.[29] As a result, numerous firearm manufacturers, as well as aftermarket magazine manufacturers, initiated production of what were colloquially termed "post ban" magazines to conform to the new legislation. Magazines with a capacity of over ten rounds were termed "Large Capacity Magazines."[30] The post ban magazines were modified, or retooled, versions of existing large capacity magazines in order to keep their dimensions identical and ensure that the 10-round magazines functioned identically to existing magazines of 11 rounds or more in their firearms. For example, pictured below is a 'pre ban' 10-round magazine for a Browning 9mm caliber "Hi Power" semi-automatic pistol:



[31]

---

[29] https://www.congress.gov/bill/103rd-congress/house-bill/3355/text

[30] The definition of "Large Capacity Magazine" under the Federal AWB included any magazine with a capacity of over 10 rounds where under Colorado Law it defines a magazine with a capacity of over 15 rounds.

[31] Image source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-high-capacity

104.  And shown below is a 'post ban' magazine for the same pistol. You will note the 10-round magazine differs as a portion of the metal magazine body is replaced with a molded polymer plug. This modification effectively limits the interior volume and capacity of the magazine to 10 rounds. Manufacturers have also utilized various other methods to restrict magazine capacity, including dimpling the lower quadrant of the magazine body inwards, placing rivets in the magazine body, or thickening the walls of polymer bodied magazines to reduce capacity.



32

105.  Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation, which also contained magazine capacity limitations. As a result, many manufacturers of popular semi-automatic handguns and rifles during the Federal

---

32 Image Source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-10-round-browning-high-power

35

Assault Weapons Ban continued to offer "state compliant" versions to customers in states so affected. Manufacturers such as Glock, Sig Sauer (SIG), FN USA, Beretta, and Smith & Wesson, among numerous others, offer handguns and rifles compliant with individual state regulations. Most major firearm manufacturers offer models that come "standard" with 10-round magazines.

106.  Shown here is a page from the online catalog of FN USA (the U.S. based subsidiary of Belgian arms manufacturer Fabrique Nationale) showing the "California Compliant" version of their "Five-seveN" pistol.



107.  This is a page from Smith & Wesson's online catalog showing their AR-15 type rifle which is marketed as a "compliant" model and is sold with a 10-round capacity magazine:

---

[33] Image Source: https://fnamerica.com/catalog-and-wallpapers/



34

108.  And a "California Compliant" Glock Model 19 9mm pistol available from

Sportsman's Warehouse:



35

---

34 Image Source: https://www.smith-wesson.com/product/m-p-15-sport-ii-compliant

35 Image Source: https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/glock-19-9mm-luger-402in-black-nitrite-pistol-101-rounds-california-compliant/p/1155366

109.  Additionally, there are numerous well respected aftermarket manufacturers who offer 10-round magazines specifically for use in handguns that come with LCMs. Mec-Gar and ProMag are two of many:



---

[36] Image Source: https://mec-gar.com/shop/magazines/sig-sauer/sig-sauer-p229-1-9mm-10-round/

[37] Image Source: https://promagindustries.com/fits-the-glock-model-17-19-26-9mm-10-rd-black-polymer/

110.  In my opinion, the ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat or the military would not have incorporated this feature. Less time required to reload can equate to more time spent acquiring targets or shooting. As stated previously form follows function in regard to equipment designed and intended for military use.

### III.   Features of Assault Rifles/Assault Weapons Under the Statute.

111.  Based on my experience and my training and research regarding the conception, design, history, and purpose of assault weapons, the assault weapons as described in the Statute are ill-suited for civilian self-defense.

112.  Many of the assault weapons available for purchase by the public and prohibited by the Statute, are near identical copies of military firearms, save for the lack of select fire capability. As such, they retain a number of features originally designed to maximize their effectiveness in battle. Other firearms available to the public and prohibited by the Statute, which were not initially intended for sale to government or military customers, incorporate features which mimic those found on military firearms. Moreover, there are countless accessories available to add to firearms traditionally considered "sporting firearms" (i.e. those initially designed and manufactured for target shooting or hunting), which brings their functionality more towards the military side of the spectrum and away from the sporting side.

### A.  Prohibited Firearms And Features Under the Statute.

#### i.  Prohibited Firearms

113.  The Statute, enumerates 36 specific types of weapons that are considered "assault firearms," including AR-15 style and AK type rifles. N.J. Stat. Ann. § 2C:39-1(w)(1).

114.  The types of firearms classified as assault firearms under the Statute, including AR and AK type rifles, are direct developmental descendants of Military weapons designed for use in

39

combat. The 'civilian' AR-15 type rifles in .223 / 5.56mm retain the same performance characteristics (in terms of muzzle velocity, range, etc.) as does the military M-16 and its variants (M-16A2, M-4 etc.). For example, according to the US Army Manual 3-22.9 "Rifle Marksmanship M-16A1, M-16A2/3, M-16A4, and M4 Carbine, April 2003," the maximum range of these rifles is 2650-3000 meters. They were not designed, nor are they suitable, for home defense in short range close quarter situations.

FM 3-22.9(FM 23-9)

## CHAPTER 2
## CHARACTERISTICS, AMMUNITION, AND ACCESSORIES

*This chapter describes the general components, characteristics, ammunition, and accessories for the M16 and M4-series weapons to include a brief explanation of how to mount the various accessories.*

### 2-1.   CHARACTERISTICS

The M16-/M4-series weapons are 5.56-mm, magazine-fed, gas-operated, air-cooled, shoulder-fired weapons. This section describes the general characteristics (Table 2-1) and the components of the M16-/M4-series weapons. Table 2-2 (page 2-2) shows the characteristics of various accessories.

| CHARACTERISTIC | M16A1 | M16A2/A3 | M16A4 | M4 |
|---|---|---|---|---|
| **WEIGHT (pounds):** | | | | |
| Without magazine and sling | 6.35 | 7.78 | 9.08 | 6.49 |
| With sling and loaded: | | | | |
| 20-round magazine | 6.75 | 8.48 | 9.78 | 7.19 |
| 30-round magazine | 7.06 | 8.79 | 10.09 | 7.50 |
| Bayonet knife, M9 | 1.50 | 1.50 | 1.50 | 1.50 |
| Scabbard | 0.30 | 0.30 | 0.30 | 0.30 |
| Sling, M1 | 0.40 | 0.40 | 0.40 | 0.40 |
| **LENGTH (inches):** | | | | |
| Rifle w/bayonet knife | 44.25 | 44.88 | 44.88 | N/A |
| Overall rifle length | 30.00 | 39.63 | 39.63 | N/A |
| Buttstock closed | N/A | N/A | N/A | 29.75 |
| Buttstock open | N/A | N/A | N/A | 33.0 |
| **OPERATIONAL CHARACTERISTICS:** | | | | |
| Barrel rifling-right hand 1 twist (inches) | 12 | 7 | 7 | 7 |
| Muzzle velocity (feet per second) | 3,250 | 3,100 | 3,100 | 2,970 |
| Cyclic rate of fire (rounds per minute) | 700-800 | 700-900 | 800 | 700-900 |
| **MAXIMUM EFFECTIVE RATE OF FIRE:** | | | | |
| Semiautomatic (rounds per minute) | 45-65 | 45 | 45 | 45 |
| Burst (3-round bursts) (rounds per minute) | N/A | 90 | 90 | 90 |
| Automatic (rounds per minute) | 150-200 | 150-200 A3 | N/A | N/A |
| Sustained (rounds per minute) | 12-15 | 12-15 | 12-15 | 12-15 |
| **RANGE (meters):** | | | | |
| Maximum range | 2,653 | 3,600 | 3,600 | 3,600 |
| Maximum effective range | | | | |
| Point target | 460 | 550 | 550 | 500 |
| Area target | N/A | 800 | 600 | 600 |

**Table 2-1. Characteristics of the M16-/M4-series weapons.**

**NOTE:**   For further technical information, refer to TM 9-1005-319-10 and TM 9-1005-249-10.

2-1

115.  The Statute also bans certain weapons based on magazine capacity. I discuss magazine capacity below.

116.  Finally, the Statute restricts shotguns with revolving cylinders. Such shotguns are known as "street sweeper" shotguns, and are of a design that has not been accepted or adopted for military or law enforcement use by any nation or agency that I am aware of.  In terms of legitimate sporting use for either hunting or target shooting or self-defense, I cannot conceive of it having

any utility. Shotguns of this type have been classified as a "Destructive Device" by ATF and are subject to additional restrictions under the National Firearms Act of 1935.

### ii.   Prohibited Features

117.  Included in the Statute's definition of "Assault firearm," at N.J.S.A. 2C:39-1(w)(2) to (5), are a number of features which, when added to certain firearms, bring those firearms under the statutory definition of Assault weapons. The Statute, at under N.J.S.A. 2C:39-1(w)(2) states that a weapon is an assault firearm if it is "substantially identical" to any of the 36 types of weapons listed in N.J. Stat. Ann. § 2C:39-1(w)(1).

118.  In 1996, the New Jersey Attorney General issued Guidelines "to provide guidance to the prosecutors" about when a semi-automatic firearm should be considered to be "substantially identical" to a named assault weapon in N.J.S.A. 2C:39-1(w)(1).

https://www.state.nj.us/lps/dcj/agguide/assltf.htm

119.  The Guidelines mirror the definition of "semiautomatic assault weapons" in the 1994 federal "Public Safety and Recreational Firearms Act" which was part of a larger omnibus crime reduction act. Commonly known as the Federal "Assault Weapons Ban" (AWB) the act banned the possession, transfer or importation of "semiautomatic assault weapons."

120.  Specifically, the Guidelines state that when two or more of certain listed features are present in a weapon, it should be considered "substantially identical" to an assault firearm under N.J.S.A. 2C:39-1(w)(1) and (2).

121.  As I explain below, each of the features listed in the Statute and Guidelines, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a combat scenario.

41

122.  **A pistol grip or thumbhole stock** (for rifles and shotguns).  A semiautomatic rifle or shotgun that includes a pistol grip (or does not include a shoulder stock) somewhat increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator).

123.  **Forward handgrip** (rifles, shotguns, pistols). Forward handgrips allow increased stability of the firearm by the operator. This allows the operator to better control recoil and muzzle climb thus increasing the hit probability of successive shots. A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK based rifles; however, it was not until the advent of the Rail Attachment Systems (RAS) and acceptance by the US Military of  same that foregrips for semi-automatic rifles became more widespread. A foregrip on a pistol is considered "any other weapon" under the National Firearms Act and subject to more restrictive controls to include registration in a national database.

124.  **Folding/telescoping stocks** (rifles and shotguns). Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder.  U.S. Military origins for this type of stock can be found on the M1 carbine in World War II when modified for paratrooper use.

125.  **Flash suppressors**. A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low light conditions and also helps to conceal the flash from view.  This allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position.

126.  **Grenade launchers**. Without question a grenade launcher has neither a sporting lineage nor a practical application on a civilian firearm. Obviously a grenade is an offensive military weapon which could result in mass casualties if deployed during a civilian event or public space.

127.  **Barrel shroud**. Military semi-automatic and select fire rifles have featured a shroud or hand guard that encircles the barrel since before the onset of World War II. The M1 "Garand" Rifle utilized by the US Military during that conflict incorporated a traditional wooden stock similar to most hunting and sporting rifles of the period. However, it also featured a wooden handguard which covered the top 2/3rds of the barrel. Therefore this design feature is not a recent development. Enclosing the barrel in a shroud serves multiple purposes. In a modern gas operated semi-automatic military rifle, it serves to protect the gas tube / piston mechanism from inadvertent damage. It also provides additional grip space for the operator to steady and control the rifle during rapid, repeat firing without getting burned by the hot barrel.

128.  **Threaded barrel**. A threaded barrel allows for attachment of a suppressor (commonly referred to as a silencer) which allows the operator to better conceal themselves from their target by reducing the report of their firearm. It also allows the attachment of some flash suppressors with the resultant effect mentioned previously.

129.  **Buffer tube, arm brace, or the like**. Attachment of a brace, when affixed to a rifle caliber pistol effectively mimics the characteristics of a short-barreled rifle (a type of weapon restricted under the National Firearms Act) as it can allow the operator to fire it from the shoulder increasing stability while maintaining concealability.

130.  "**Bump stocks**." A bump stock is a device which replaces the shoulder stock on a firearm and utilizes the recoil generated by firing to rapidly 'bump' the trigger against the operators finger. The resultant effect is a dramatic increase in the cyclic rate (number of rounds

fired per minute) above that which would be normally be achieved by the unmodified firearm. For example, a semi-automatic AR type rifle equipped with a bump stock can fire between 600-700 rounds per minute, a cyclic rate which is roughly equivalent to that of a full-automatic M-16.

### B.  Prohibited "Large Capacity Magazines" Under The Statute.

131.  The Statute further defines an "assault firearm" as "[a] semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds." N.J. Stat. Ann. § 2C:39-1(w)(4). And the Statute separately prohibits possession of large-capacity magazines, which are ammunition magazines capable of holding more than 10 rounds of ammunition. *Id.* § 2C: 39-1(y).

132.  Generally speaking, modern semi-automatic rifles that are designed, manufactured and marketed as "hunting rifles" traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example, the Browning BAR in .30-06 caliber as currently manufactured has an internal magazine capacity of four (4) rounds. The Remington Model 1100, a semi-automatic shotgun, has an internal magazine capacity of 5 rounds.

133.  Semi-automatic pistols from numerous manufacturers are sold with magazines that would be permitted under the Statute.  For example, 9mm caliber pistols are available with standard magazines with a capacity of 15, 10, or as few as 7 rounds. https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/handguns/c/cat-9mm-luger-pistols

134.  Detachable magazines are available with varying capacities from 5-100 rounds. Generally speaking any firearm designed for a detachable magazine with a capacity exceeding 10 rounds will function as designed with a magazine with a smaller maximum capacity.

IV.    **Rifle Caliber Assault Firearms and Self / Home Defense.**

135.  At numerous points throughout their complaint the Plaintiffs allege that self-defense is one of the primary reasons for the purchase of a firearm regulated by the Statute. It is my opinion that an AR, AK, or other banned assault weapon is a poor choice for this task.

136.  I have been asked on numerous occasions over the past 35 years what firearm I would recommend for home or self-defense. My recommendation is based upon my inquiry in return regarding the individual's (and their family members') personal experience and comfort level with firearms. In over 25-plus years, I have never recommended an AR, AK or other rifle as a home defense weapon.

137.  Home defense and / or self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Assault firearms banned under the Statute were designed to be effective at battlefield ranges of up to 500 yards. The typical muzzle velocity of a .223 caliber bullet is 3,200 feet per second (+ or -). Projectiles travelling at velocities found in banned weapons pose a serious risk of over-penetration in most home construction materials such as gypsum board / sheet rock, and typical 2x4 lumber. When this cartridge was designed for the AR-16 / M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards not dozens of feet.

138.  In August 2014 the National Rifle Association's "American Rifleman" published an article by Stanton Wormley: "The AR-15 for Home Defense: Penetration Tests."[38] Wormley conducted penetration tests on nine different types of .223 / 5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board / sheet rock and wooden 2x4 studs. When fired at a 90-degree angle to the walls all nine (including "frangible" rounds designed to

---

[38] https://www.americanrifleman.org/content/the-ar-15-for-home-defense-penetration-tests/

45

disintegrate when hitting a hard surface) easily penetrated the wall section as well as water jugs placed three feet behind:

> But just how much energy did the penetrating projectiles carry? All the loads, including the Glaser, exploded one-gallon water jugs placed 3 feet behind the wall sections.[39]

139.  The tests conducted by Wormley also included firing longitudinally through the wall sections resulting in the penetration of three successive 2" thick 2x4 studs by a number of the projectiles. These tests vividly highlight the inherent dangers of utilizing assault weapons with high velocity ammunition in a home defense scenario.

140.  In reference to the NRA American Rifleman article mentioned earlier in this report, current U.S. Army issue .223 caliber ammunition is capable of penetrating 3/8" hardened steel at 350 yards. Potential over-penetration in a confined environment is problematic in terms of risk to bystanders or family members outside the target location. Most jacketed commercially available .223 / 5.56mm ammunition has impressive penetration capabilities in this regard. Additionally, the (former) NATO issue M855 SS109 5.56mm is readily available for purchase by civilians. This ammunition was designed to penetrate up to 3mm of "soft," (non-hardened) steel. This capability is certainly unnecessary and poses substantial risks to individuals in adjoining rooms, neighboring apartments or other attached dwelling units.

141.  In my opinion, assault firearms, as defined under the Statute, are a poor choice for home defense or personal protection. Many enumerated in the Statute require two hands to effectively aim and shoot. In a home defense situation, an individual may be required to use one hand to call 911 while attempting to operate a "two handed" firearm with one hand. Such a situation would also preclude the homeowner from utilizing their "non-gun hand" to pick up or guide a small child, elderly, or vulnerable adult during such an event. During a stressful situation

---

[39] *Id.*

such as a home invasion or break-in, there may be multiple steps required by the operator to bring the weapon from a "safe" condition to a firing condition. Manipulation of a charging handle, safety switch, or inserting a magazine may be difficult to accomplish under stress, particularly if the operator has not adequately trained or practiced with their firearm. Other family members may not be familiar with bringing the weapon to a firing condition or fail to complete adequate steps to do so under duress.

142.  Unloaded, an AR-platform rifle weighs approximately 6.5 to 7 pounds. It also requires two hands to aim and fire. In a home-defense scenario, a homeowner would likely be attempting to call 911 while addressing the intruder, which is difficult if not impossible while wielding their AR-15 effectively and safely. Additionally, it would hamper, if not prevent, leading a vulnerable adult away from danger or guiding/carrying a small child. By comparison, common handgun weights are between 2 and 3 pounds and require only one hand to operate.

143.  While employed as a Special Agent with ATF, the agency transitioned to an AR type rifle in the early 2000's. Each Agent was required to attend, and successfully complete, a one week / 40 plus hour transition training class in order to familiarize themselves, and qualify, with the firearm. The training included repetitive live fire drills under stressful conditions. Additionally, we were required to requalify with these firearms quarterly and repeat the same drills as during the initial transition training. Nonetheless, I witnessed Agents make errors that resulted in a failure of the weapon to fire during those drills, even though those Agents had performed the drills repeatedly under stress. It is worth noting here that the M4 carbines issued to ATF Field Offices were select fire rifles (i.e. machineguns capable of full automatic fire) that were converted to semi-automatic fire only.

144.  Additionally, I am not of the opinion that an abundance of ammunition is a substitute for weapons familiarization and shot placement. Repeated practice and shooting with your chosen

firearm will make you a more effective deterrent than the capability to fire more rounds, should deadly force be required. The operation (or cycle of fire) of any firearm designed and manufactured to accept a detachable magazine will function regardless of the maximum capacity of the magazine itself.

145. For example, firearms such as the Glock Model 17 semi-automatic pistol and AR-15 type semi-automatic rifle will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity. Generally speaking, any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity legal under the statute. This includes the vast majority of handguns and shoulder-fired firearms designed and manufactured to utilize detachable magazines. Magazine capacity is not a determinant of firearm operability.

146. Home defense and / or street / commercial robbery situations between citizens and criminals are rarely lengthy protracted shootouts with extensive exchanges of gunfire. The National Rifle Association Institute for Legislative Action (NRA ILA) regularly publishes newsclips on their "Armed Citizen" webpage highlighting examples of defensive use of firearms by citizens.[40]

147. Claude Werner, a firearm instructor and writer, conducted a detailed statistical analysis of 482 incidents provided by the NRA ILA on their website from 1997 to 2001. He determined, from the information provided, that the average number of shots fired by an armed citizen in a defensive scenario was 2.2.[41]

---

[40] https://www.nraila.org/gun-laws/armed-citizen/

[41] https://www.defensivecarry.com/attachments/tac-5-year-w-tables-pdf.107045

148.  Lucy Allen conducted a similar statistical analysis of the "Armed Citizen" newsclips for the period January 2011 – May 2017. Her analysis revealed that the average number of shots fired in a self-defense scenario was identical to that determined by Werner: 2.2 shots.

149.  I am of the opinion that an overabundance of ammunition and a "spray and pray" mentality is a poor substitute for training and competent marksmanship with your chosen self-defense firearm. In fact accurate shot placement will prove a more effective deterrent than the number of rounds in your magazine should deadly force be required.

150.  If the individual preferred shoulder weapons, I have recommended, depending on what is legal in the appropriate jurisdiction, a pump action 12 or 20-gauge shotgun (Remington 870, Mossberg 500 etc.) loaded with 00 Buckshot and stored with the "hammer dropped" on an empty chamber, safety off. The only action required to bring the shotgun from a safe unloaded condition to a firing condition is to work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power, low probability of over penetration (as compared to rifle caliber and velocity projectiles) and zero manipulation of safety mechanisms required in high stress situations. The loading / chambering process itself is an audible deterrent. Training and familiarization with this type of a firearm is simple and straightforward.

151.  For a handgun, my first inclination is to recommend an eight shot revolver in .38 +P caliber / .357 Magnum (Similar to S&W Model 627, Taurus Model 608, etc.) loaded with hollow point bullets, depending on what is legal in each jurisdiction. As with my rationale for recommending a pump action shotgun there are no complicated safety mechanisms to manipulate in a high stress situation, low probability of over penetration and ease of reloading with a speed loader should more than eight shots be required. Revolvers are also easier and less complicated for other family members to learn to operate especially if they have less familiarity with firearms.

49

152.  In terms of a carry handgun, I value concealability over ammunition capacity. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario, I believe the best course of action is to quickly extricate yourself from the "kill zone" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF, we were issued a Sig Sauer P229 in .40 S&W caliber as a primary duty weapon. We were also given the choice of a Sig Sauer P239 in .40 S&W or a five shot Smith and Wesson Model 640 in .357 Magnum as a backup firearm. When off duty, I carried the S&W 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that ten (10) rounds was an adequate amount of ammunition to enable me, or myself and my wife, or child, to extricate myself from a street or retail location robbery should I encounter one. Consequently, I have most often recommended either a lightweight small revolver (S&W Bodyguard, Ruger LCR, Smith and Wesson Model 36, 640 or variant) carried with a speed loader or a low profile small semiautomatic pistol (Sig Sauer P236, Ruger LCP, Colt Pocketlite etc.) with a spare magazine.

153.  In my opinion, based upon my training, knowledge, experience and research, assault firearms were not designed for traditional hunting purposes. Pistol caliber firearms (.380, 9mm, .45) are not a popular hunting caliber. Neither was the .223/ 5.56 caliber cartridge developed for civilian hunting applications. Due to .223 caliber / 5.56 mm bullets proven record of causing considerable tissue damage (when fired from an AR type rifle or pistol) it is a counterintuitive choice.

**V.      Assault Weapons As A General Threat To Public Safety**

154.  As mentioned previously in this report, many of the firearms prohibited by statute directly trace their origins to those developed for use in combat. As such they were never initially intended for general distribution / sale to the public.

155.  As tragically demonstrated by recent mass shootings such as the Pulse Nightclub in Orlando Florida in 2016 (49 fatalities, 50+ wounded), the 2017 Las Vegas shooting (60 fatalities, 400+ wounded), the 2022 Uvalde Texas School shooting (21 fatalities + 17 wounded) and the July 4th 2022 shooting in Highland Park (7 fatalities + 48 wounded), the assault weapons (in conjunction with high capacity magazines) as defined under the Statute are capable of inflicting significant carnage upon civilians in a short period of time.

156.  Rifle caliber Assault Firearms as regulated under the Statute pose a significant risk to Law Enforcement Officers. It has been my experience that soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" National Institute of Justice (NIJ) protection rating. These two ratings are suitable for protection against most handgun bullets as those projectiles range up to a 1200FPS (+ or -) velocity. Rifle caliber Assault Weapons (AR & AK type) can, as stated previously in this report, achieve muzzle velocities of 3200FPS (+ or -) which can readily penetrate Level II & IIIA Body Armor (as well as some Level III hard body armor which is not universal standard issue amongst Law Enforcement Agencies nationwide). Not only do the firearms subject to the Statute pose a threat to overall public safety they increase the likelihood that first responders charged with stopping such a threat, or attending to wounded citizens, may be injured or killed in the performance of their duty.

157.  This online video illustrates the capability of commonly available .223 / 5.56mm caliber ammunition to penetrate Level III body armor. The author / narrator states that this test was performed at a distance of "about seven yards."

https://www.youtube.com/watch?v=oMYkEMhPsO8

158.  The argument that commercially available AR type rifles are somehow less dangerous or lethal simply because they fire only in semi-automatic mode is misleading. They retain the identical performance capabilities and characteristics (save full-automatic capability) as

51

initially intended for use in combat. With even minimal training an operator can fire 40-50 shots per minute in semi-automatic mode. According to the US Army Manual referenced earlier in this report the most effective use of the M-16 at ranges beyond 25 yards is rapid semi-automatic fire. Not full- automatic fire.

**7-8.    RAPID SEMIAUTOMATIC FIRE**

The most important firing technique during modern, fast moving combat is rapid semiautomatic fire. Rapid-fire techniques are the key to hitting the short exposure, multiple, or moving targets described previously. If properly applied, rapid semiautomatic fire delivers a large volume of effective fire into a target area. The soldier intentionally fires a quick series of shots into the target area to assure a high probability of a hit. (Figure 7-10, page 7-8 shows the current training program for rapid semiautomatic fire.)

**Figure 7-10. Rapid semiautomatic fire training program.**

a.    **Effectiveness of Rapid Fire.** When a soldier uses rapid semiautomatic fire properly, he sacrifices some accuracy to deliver a greater volume of effective fire to hit more targets. It is surprising how devastatingly accurate rapid fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures (shots per target, trigger pulls per hit, and even time to hit). The decrease in accuracy when firing faster is reduced with proper training and repeated practice.

159.   In my opinion, such capability combined with the performance characteristics of .223 / 5.56 ammunition originally intended for combat can, and have, resulted in catastrophic civilian mass casualty events.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ~~JUNE 15, 2023~~ at Manchester, Maryland.

James E. Yurgealitis

Exhibit A

# James E. Yurgealitis

5004 Roller Rd., Manchester, Maryland 21102
24 Hour Mobile: (443) 452-7248
Email: jyurgealitis@gmail.com

SUMMARY:

Self employed as a Legal and Public Policy Consultant providing Technical Firearms and Forensic Consulting, Testing and Policy Research / Training Services to Corporations, Legal Counsel and the Public Sector

EDUCATION:

B.A., Political Science and Psychology, St. John Fisher University, Rochester, New York – May 1985

PROFESSIONAL EXPERIENCE:

December 2012 to Present: Independent Legal and Policy Consultant / Subject Matter Expert

Currently provide independent consulting services to Corporations, Legal Counsel and Governmental entities in regard to Public Policy and Technical matters relating to Firearms, Firearms Policy, Forensics and Law Enforcement. Current and former clients include the Office of the District Attorney for Cook County Illinois, The City of Sunnyvale, California, The City of Highland Park, Illinois, The Office of the Attorney General for the Commonwealth of Massachusetts and the Center for American Progress, Washington D.C. I have provided sound policy and technical assistance for my clients to include expert testimony which successfully endured the opposition's legal appeals to the U.S. Circuit Court of Appeals and the U.S. Supreme Court.

December 2003 to December 2012: Senior Special Agent / Program Manager for Forensic Services ATF National Laboratory Center (NLC), Beltsville, Maryland. U. S Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

Directed the administration and management of ATF's Forensic Training Programs to include the National Firearms Examiner Academy (NFEA) a 12-month training program for State and Local Forensic Firearm Examiner Trainees. Also managed two additional forensic training programs. Administered a $1M + budget in accordance with strict ATF and National Institute of Justice (NIJ) guidelines and reporting requirements. Responsible for oversight of all Forensic Firearms related research at the NLC. Supervised a full and part time cadre of fifty-two (52) instructors and administrative personnel. Maintained liaison with commercial firearms and ammunition manufacturers and subject matter experts and ensure that lesson plans and curriculum reflected the latest technical developments in firearms manufacture, forensics and their application to federal and state law. Applied for, received and managed in excess of $2M in external grants to facilitate uninterrupted delivery of training during internal budget shortfalls. Detailed to the Department of Homeland Security Command Center in 2005 with overall responsibility to coordinate and direct Federal, State and Local Law Enforcement assets during and following Hurricanes "Irene" and "Katrina" and again in 2010 for "Andrew" and "Danielle".

June 1997 - December 2003:  Special Agent / Violent Crime Coordinator, ATF Baltimore Field Division, Baltimore, Maryland

Responsible for management of ATF's "Project Disarm", a joint law enforcement initiative between ATF, The United States Attorney's office for the District of Maryland (USAO), the Baltimore City Police Department, the Baltimore City States Attorney's Office and the Maryland State Police. Duties included reviewing over 400 state and local firearms related arrests annually for subsequent referral to the USAO and Federal Prosecution. Managed a caseload of 75 – 100 criminal cases annually. Responsible for selection, referral, follow - up investigation and subsequent indictment and prosecution of armed career criminals. Testified in front of Federal Grand Juries in excess of 75 times annually. Was recognized, and testified, as an expert witness in the Identification, Operability and origin of Firearms and Ammunition in three Federal Judicial Districts. Toured over 25 firearms and ammunition manufacturing facilities in Europe and the United States. Temporarily assigned in 2001 for three months to the 9-11 Task Force investigation in conjunction with FBI Assets. Temporarily assigned to the D.C. Sniper Task Force Intelligence Group in 2002 for two months.

June 1990 – June 1997:
Special Agent, ATF Baltimore Field Division, Baltimore, Maryland

Served in various capacities as a street-level Special Agent.  Acted as Group Supervisor and Assistant Special Agent in Charge on numerous occasions. Served on the Washington – Baltimore High Intensity Drug Trafficking Area (HIDTA) task force from 1995 – 1999.  Investigated armed narcotics trafficking organizations, seized assets, authored and executed Federal and state search and arrest warrants, conducted surveillance, interviews / interrogations, testified in Federal and state courts as a fact witness, purchased firearms, explosives and narcotics while in an undercover capacity, investigated fatal bombings and arsons, firearms trafficking, alcohol and tobacco trafficking, homicide, fraud and gun store burglaries. Also while detailed for 8 months as the Public Information Officer authored press releases, provided interviews to local and national print and television media outlets and made presentations to local and national public and special interest groups and associations.

April 1989 – June 1990 and July 1986 – March 1987: Special Agent, United States Department of State, Diplomatic Security Service (DSS), Washington Field Office, Rossyln, VA

Conducted investigations of violations of Federal Law under the department's purview to include Passport and Visa Fraud, Illegal trafficking of restricted firearms and war materials to prohibited countries, human trafficking, seized assets, authored and executed State, local and Federal Arrest and Search Warrants,  testified in Federal Court as a fact witness, detailed on an as needed basis to the Dignitary Protection Division as Agent in Charge of  multiple protective details for visiting and resident foreign dignitaries, temporarily assigned to support Physical and Personal Protective Security in various U.S. Embassies overseas on an as needed basis, detailed to the Secretary of State Protective Division on an as needed basis to supervise agents assigned to augment the permanent protective detail.

March 1987-February 1989: Special Agent, DSS, Secretary of State Protective Division, Washington, DC

Served in various capacities as Acting Agent in Charge, Acting Shift Leader, Lead Advance Agent and Shift Agent. Responsibilities included close personal protection of the Secretary of State both domestically and overseas, extensive foreign travel to facilitate and prepare security arrangements for overseas visits to include Presidential Summit meetings, liaison with foreign host government officials to plan and solicit assistance with security arrangements, supervision of agents temporarily assigned to augment the detail, liaison with U.S Government Intelligence Agencies and other Federal, State and Local Law Enforcement Agencies to identify and protect against potential threats to the Secretary of State.

<u>CLEARANCES:</u>  Top Secret March 1986 valid through February 2015. Numerous prior SCI Clearances.

<u>TEACHING EXPERIENCE:</u>

- Instructed at the Federal Law Enforcement Training Center (FLETC), for ATF and other Federal Law Enforcement Agencies
- Instructed at the International Law Enforcement Academy (ILEA) in Budapest, Hungary
- Instructed for numerous State, local and / or regional law enforcement agencies both in the United States, Canada and Central America

<u>LINKEDIN PROFILE AND ENDORSEMENTS:</u>

https://www.linkedin.com/in/james-jim-yurgealitis-68618464?trk=nav_responsive_tab_profile_pic

<u>REFERENCES:</u>

Available upon request

Exhibit B

**Professional Qualifications of James E. Yurgealitis**
**Independent Legal, Public Policy and Forensic Consultant**

I, James E. Yurgealitis, being duly sworn, depose and state:

1.) That I was previously employed as a Senior Special Agent / Program Manager with the Bureau of Alcohol, Tobacco Firearms & Explosives, (ATF) United States Department of Justice, and had been so employed since 1990. Prior to 1990 I was employed as a Special Agent with the Bureau of Diplomatic Security, (DSS) United States Department of State and had been so employed since 1986.

2.) I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher College, Rochester, New York.

3.) I am a graduate of the Federal Law Enforcement Training Center, Glynco, Georgia, the Criminal Investigator Training Program, Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program.

4.) I have completed the Firearms Interstate Nexus Training Program conducted by the Firearms Technology Branch, ATF Headquarters, Washington, D.C.

5.) I have completed both Advanced Interstate and European Nexus Training conducted by ATF in conjunction with several domestic and European firearm manufacturers.

6.) I have testified in excess of 200 times before Federal Grand Juries regarding the classification, operability, and commerce of firearms and / or ammunition.

7.) I have previously qualified as an expert witness regarding the origin, operability / classification and interstate movement of firearms and ammunition in U.S. District Court for the District of Maryland, U.S. District Court for the District of Delaware and the Circuit Court For Baltimore City, Maryland.

8.) I have conducted regular training for local, state and federal law enforcement agencies both domestically and overseas regarding firearms classification, operability and firearms statutes.

9.) I maintain a personal library of books, printed material and documents that relate to the field of firearms, ammunition, and firearms classification, attend local and national trade shows and professional association meetings, and regularly review periodicals relating to firearms and ammunition.

10.) I attend trade shows, maintain contact with, and regularly consult with other persons, to include  published authors and recognized experts in the origin, identification and  classification of firearms and ammunition.

11.) I have, during my tenure with ATF, personally examined in excess of five thousand

Qualifications Of  James E. Yurgealitis contd.

firearms to determine their origin and classification and operability, and to facilitate
the tracing of  those firearms.

I have toured production facilities for numerous firearms and ammunition manufacturers. The
tours were conducted by corporate historians, corporate officers, or production engineering
personnel.

Domestic Firearm Manufacturers:
Bushmaster Firearms, Ilion, NY, USA
Colt, New Haven CT, USA (4x)
H&R 1871 Inc., Chicopee, MA, USA (2x)
Marlin, North Haven CT, USA (4x)
O.F. Mossberg & Sons, North Haven, CT, USA (4x)
Remington Firearms, Ilion, NY, USA
Savage Arms Inc., Westfield, MA, USA (4x)
Sig-Sauer / SIGARMS Inc., Exeter, NH, USA (3x)
Smith and Wesson, Springfield, MA, USA (4x)
Sturm Ruger, Newport, NH, USA (4x)
Yankee Hill Machining, Florence, MA, USA

Foreign Firearm Manufacturers:
Carl Walther GmbH, Ulm, Germany
Ceska Zbrojovka (CZ), Uhersky Brod, Czech Republic
Fegarmy (FEG), Budapest, Hungary
F.N Herstal S.A., Herstal, Belgium
Glock GmbH, Deutsch-Wagram, Austria
Heckler & Koch GmbH, Oberndorf au Neckar, Germany
J.P. Sauer & Sohn GmbH, Eckernforde, Germany

Domestic Ammunition Manufacturers:
Fiocchi Ammunition, Ozark, MO, USA
PMC, Boulder City, NV, USA
Remington, Lonoke, AR, USA (4x)
Sierra, Sedalia, MO, USA
Starline Brass, Sedalia, MO, USA

European Proof Houses
Beschussamt Ulm, (Ulm Proofhouse) Ulm, Germany
Beschusstelle Eckernforde, (Eckernforde Proofhouse) Eckernforde, Germany
Czech Republic Proofhouse, Uhersky Brod, Czech Republic
Liege Proofhouse, Liege, Belgium

<u>Qualifications Of   James E. Yurgealitis contd.</u>

<u>I have been allowed regular access to the following reference collections:</u>
Bureau of Alcohol, Tobacco Firearms and Explosives Reference Collection, Martinsburg, West Virginia, USA consisting of 5,000+ firearms

Liege Proofhouse, Liege, Belgium consisting of 1,000+ ammunition cartridges

Springfield Armory National Historic Site Firearms Collection, Springfield, MA, USA consisting of 10,000+ Firearms

Smithsonian Institution (Museum of American History) Firearms Reference Collection Washington, DC, USA, consisting of 4000+ firearms

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany consisting of 10,000+ Firearms

<u>I have toured the following museums:</u>
Heeresgeschichtliches Museum, (Museum of Military History), Vienna, Austria
Hungarian Military Museum, Budapest, Hungary
Springfield Armory National Historic Site, Springfield, MA, USA
United States Air Force Museum, Dayton, OH, USA
United States Army Ordnance Museum, Aberdeen Proving Ground, Aberdeen, MD, USA
United States Military Academy Museum, West Point, NY, USA
United States Naval Academy Museum, Annapolis, MD, USA
Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany

<u>Membership in Professional Organizations:</u>

Member, International Ammunition Association (IAA)
Technical Advisor (pending approval), Association of Firearm and Toolmark Examiners (AFTE)
Member, Federal Law Enforcement Officers Association (FLEOA)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>     Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>     Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>     Defendants. | Civil Action No. 3:22-cv-04397 |

**Expert Report of James E. Yurgealitis**

I, James E. Yurgealitis, declare as follows:

1.      I am currently Self Employed as a Legal and Forensic Consultant providing firearms related technical and public policy consulting, forensic case reviews and testing and training services to corporations, legal counsel, and the public sector. During my previous 26-year career as a Federal Law Enforcement Officer, I have been recognized, and testified as, an expert witness in numerous local, state and federal courts. I have toured numerous firearms and ammunition manufacturer's facilities both in the United States and overseas. I maintain a personal library of firearms and ammunition related books and periodicals and maintain contact with other recognized experts in the field. My final assignment in government service was as Senior Special Agent / Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, a position I held for nine years. During that time, I was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

2.      My credentials, training, background and experience are stated in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. My credentials, training, background and experience as an expert witness are detailed on my Statement of Qualifications, a true and correct copy of which is attached as Exhibit B.

3.      I have been retained by the Office of the Attorney General of the State of New Jersey to provide expert testimony in litigation challenging various aspects of New Jersey Statute 2C, Section 39-1 (the "Statute"). As of the date of this declaration, the scope of my engagement includes providing expert testimony in the following cases: *Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al.*, Docket No. 3:18-cv-10507; *Cheeseman et al. v. Platkin et al.*, Docket No. 1:22-cv-04360; *Ellman et al. v. Platkin et al.*, Docket No. 3:22-cv-04397. I have

reviewed the provisions of the Statute being challenged in these cases. I am being compensated at a rate of $400 per hour for my work in these cases, and $1600 per travel + work day.

## OPINIONS

4.      As discussed in this report, many of the firearms covered by the Statute can directly trace their origins to weapons developed for use in combat. As such, they were never initially intended for general distribution / sale to the public.

5.      As tragically demonstrated by recent mass shootings such as the Pulse Nightclub in Orlando Florida in 2016 (49 fatalities, 50+ wounded), the 2017 Las Vegas shooting (60 fatalities, 400+ wounded), the 2022 Uvalde Texas School shooting (21 fatalities, 17 wounded) and the July 4th 2022 shooting in Highland Park (7 fatalities, 48 wounded), the "assault firearms" as defined under the Statute (also commonly referred to as assault weapons) are capable of inflicting significant carnage upon civilians in a short period of time, especially in conjunction with large capacity magazines.

6.      Additionally, assault weapons as prohibited under the Statute pose a significant risk to law enforcement officers. It has been my experience that soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" National Institute of Justice (NIJ) protection rating. These two ratings are suitable for protection against most handgun bullets as those projectiles range up to a 1200FPS (+ or -) velocity. Rifle caliber assault weapons (AR & AK type) can, as stated in more detail below in this report, achieve muzzle velocities of 3200FPS (+ or -) which can readily penetrate Level II & IIIA Body Armor (as well as some Level III hard body armor which is not universal standard issue amongst law enforcement agencies nationwide). Not only do the firearms banned under the Statute pose a threat to overall public safety, but they also increase the likelihood that first responders charged with stopping such a threat may be injured or killed in the performance of their duty.

## DISCUSSION

I.      **Firearms Terminology, Types, And Operation.**

      **A.  Handguns And Long Guns.**

7.      Modern firearms as currently manufactured for civilian ownership fall into two general types: handguns and long guns (or shoulder weapons).

      **i.  Handguns.**

8.      **Handguns.** Handguns are generally defined as a firearm having a short stock (grip), and are designed to be held, and fired, with one hand. The term "handgun" defines two distinct types of modern firearms: the revolver and the semi-automatic pistol.

9.      **Revolver.** A revolver is a handgun designed and manufactured with a revolving cylinder to contain, chamber, and feed multiple rounds of ammunition. In a modern double action revolver, pulling the trigger rotates the cylinder bringing an unfired cartridge of ammunition in line with the barrel and firing pin. Pulling the trigger also cocks the hammer and then releases it either directly (or indirectly via a firing pin) to strike the primer of the cartridge initiating the firing sequence as stated previously. In this type of revolver, the trigger must again be pulled to rotate the cylinder in order to fire another cartridge. When all cartridges have been fired, the cylinder is unlocked from the frame and swings out to facilitate removal of expended cartridge casings and insertion of unfired cartridges. The cylinder is then closed and relocked within the frame and the handgun is again ready to fire when the trigger is pulled.

10.      **Semi-automatic pistol.** A semi-automatic pistol is a handgun designed and manufactured with the firing chamber as an integral part of the barrel and utilizes a "box" magazine to contain and feed multiple rounds of ammunition. In this type of handgun, generally, the box magazine is inserted into the firearm, the slide or bolt is pulled back and released which springs forward and a loads a cartridge into the chamber. When the trigger is pulled, a firing pin

or striker is released which impacts the primer of the cartridge and initiates the firing sequence of the ammunition. In most pistols, a portion of the recoil or gas pressure generated by firing the cartridge is utilized to move the slide rearward, extracts and ejects the expended cartridge case and chambers another round from the magazine. This sequence can be repeated by pulling the trigger once for each shot. The pistol can then be reloaded by removing the empty magazine and inserting a loaded magazine.

### ii. Long Guns.

11.    In terms of modern firearms manufacture, long guns are generally of two distinct types: rifles and shotguns.

12.    **Rifle.** A rifle is a firearm which is designed and intended to be fired from the shoulder.  It fires a single shot through a rifled bore for each pull of the trigger.

13.    **Shotgun.**  A shotgun is a firearm that is also designed and intended to be fired from the shoulder. It fires either a number of ball shot (commonly termed "buckshot" or "birdshot") or a single projectile (commonly termed a "slug") through a smooth (non rifled) bore for each pull of the trigger.

14.    In terms of "types" of rifle there are numerous variations. All of these variations, generally speaking, are defined and distinguished by the way they are loaded and reloaded.

15.    **Single-shot rifle.**  For example, single-shot rifles fire one shot for each pull of the trigger. They have no internal or external magazine capacity and must be reloaded with a new unfired cartridge by hand for each consecutive shot. Many of these have a hinged or "break open" receiver to facilitate loading and unloading.

16.    **Pump Action rifle.**  A pump action rifle requires the operator to manually manipulate a forearm piece which is traditionally found underneath the barrel. After firing, the forearm is pulled backward which unlocks the bolt, extracts and ejects the fired cartridge case.

Pushing the slide forward feeds an unfired cartridge from the magazine, cocks the firearm mechanism and locks the bolt for a successive shot. Pump action rifles have been manufactured with both tubular and detachable box magazines.

17.   **Bolt Action rifle.**  Bolt action rifles require the operator to manually manipulate the bolt of the rifle.  After firing, the bolt is first unlocked from the chamber and then moved rearward. This action also extracts and ejects the expended cartridge case. The bolt is then moved forward which feeds an unfired cartridge from the magazine into the chamber. Once the bolt is then again locked by the operator, it is ready to fire. Bolt action rifles usually have an internal fixed magazine or tubular magazine which will facilitate reloading via manipulation of the bolt until that capacity is exhausted. Bolt action rifles were generally the choice among hunters and military forces through the end of World War II.

18.   **Lever Action rifle.**  A lever action rifle is similar to the bolt action rifle in that the operator is required to manipulate the mechanism of the firearm. A lever at the bottom of the receiver of the rifle is manipulated in and up and down motion in order to unlock the bolt and move it rearward, extract and eject the expended cartridge case, feed an unfired cartridge into the chamber and lock it. This action is required by the operator for each shot fired through the rifle. Generally speaking lever action rifles have historically been manufactured with tubular magazines which will vary in capacity depending on the caliber of the firearm.

19.   **Semi-automatic rifle.**  A semi-automatic rifle utilizes the energy generated by the firing of the cartridge to power the cycle of fire. This is accomplished by siphoning off a portion of the gases generated by firing to operate the mechanism or by utilizing the recoil generated by firing much as in a semi-automatic pistol as described previously. Once loaded, the operation of this cycle of fire is not dependent on the operator to effect any portion of the process other than to pull the trigger. Semi-automatic rifles are, and have been previously, manufactured with both

fixed internal magazines and a capacity to accept detachable external magazines. As such this type of rifle is capable of firing with each pull of the trigger until the supply of ammunition is exhausted. As stated previously, the majority of military firearms through World War II were bolt action. The exception to this rule was the United States entering the war with the semi-automatic M1 (Garand) .30-06 caliber rifle as standard issue. The Garand had a fixed internal magazine with an eight round capacity.

20.    Modern shotguns, as stated previously in regard to rifles, are generally classified by their operating system, (i.e. the manner in which they function, are loaded and are reloaded). Additionally, in the case of shotguns with multiple barrels they are defined by placement or orientation of same.

21.    **Single-shot shotguns.**  Single-shot shotguns function similarly to the single-shot rifle. They may have a hinged receiver which allows the operator to open the action at chamber area to facilitate loading and unloading of the firearm. There are also single shot models that are loaded and unloaded through a bolt action mechanism and have no additional magazine capacity.

22.    **Bolt action shotguns.** Bolt action shotguns are manufactured, as stated above for rifles, as single shot, or with internal or detachable magazines to facilitate easier and faster reloading. They function in the same way as a bolt action rifle and require manual manipulation of the bolt by the operator to unload and reload.

23.    **Level action shotguns.** Level action shotguns again function in the same fashion as a similarly designed rifle. Manual manipulation of the lever is required for successive shots.

24.    **Pump action shotguns.** Pump action shotguns have the same general operating system as a similarly designed rifle. The "action" of the shotgun must be worked forward and back by the operator to unlock the bolt, extract and eject the expended shotgun shell, reload and relock the bolt for firing.

7

25. **Semi-automatic shotguns.** Semi-automatic shotguns, as with their rifle caliber counterparts, utilize energy (either recoil or gas pressure) generated by firing ammunition to "power" the operating system of the firearm. These are manufactured with a number of different magazines, both internal and fixed, as well as external and detachable. They are capable of firing a single shot with each pull of the trigger until the supply of ammunition in the magazine is exhausted.

26. **Break open, double barrel, and "tip up" shotguns.**  Break open, double barrel, and "tip up" shotguns have a hinged receiver which facilitates access to the rear of the chamber for unloading and reloading. They are manufactured in single shot and double barrel variations. Double barrel variations are further delineated by the placement of their barrels. Side-by-side shotguns have two barrels situated next to one another in a horizontal arrangement. Over-and-under shotguns have two barrels superimposed upon one another in a vertical plane. The mechanisms in each of these allow staggered firing of each of the two barrels with a separate pull of the trigger. When the hinged action is opened, the expended shotgun shell hulls can be manually extracted by the operator although more complex designs with auto ejectors perform that function when "opened."

## B.  General Firearms Definitions.

27.  In discussing modern firearms, it is important to understand how they are defined under statute, how they function and the differences between types commonly found and available to the public.

28.  Additional terms often used when discussing modern firearms are semi-automatic, full-automatic, select fire, rifling, caliber and gauge.  I define these terms as follows:

29.   **Semi-Automatic.** Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot.

30.   **Full-automatic.** Full-automatic refers to a firearm that will continuously fire successive shots when the trigger is pulled and will only stop when the trigger is released or the supply of ammunition is exhausted. Commonly referred to, and defined and classified as a machine gun, under N.J.S.A. 2C:39-1(i).

31.   **Select Fire.** A select fire firearm is capable of switching between and functioning in either full- or semi-automatic fire mode.

32.   **Rifling**. Rifling refers to a series of grooves cut or impressed inside the barrel in a spiral pattern. The "high" portions of these patterns are called "lands." The "lower" portion of this pattern are called "grooves." When a projectile (or bullet) is fired in a "rifled" firearm, it comes into contact with the lands as it leaves the chamber and begins to travel down the barrel. Because the lands are oriented in a spiral pattern, the rifling imparts a spin to the projectile which improves stability and accuracy.

33.   **Caliber**. Caliber is a dimensional measurement of the inside (or bore) of a rifled barrel. In the United States, caliber is traditionally expressed in fractions of an inch. For example, a .22 caliber firearm is designed to chamber and fire a projectile which measures .22 inches (or slightly less than a quarter of an inch). A .50 caliber firearm chambers and fires a projectile which is approximately a half inch in diameter.[1]

---

[1] In Europe, and. the majority of other countries utilizing the metric system, caliber has historically been expressed in millimeters (mm). Therefore a 9mm firearm is designed to chamber and fire a projectile with a diameter of 9mm. European caliber designations may also include measurement of the length of the cartridge case (9x19mm, 7.62x39mm etc.). A number of firearm calibers widely manufactured have two separate caliber designations, one in inch measurements and one in metric, which are equivalent and interchangeable. For example .380 ACP caliber ammunition in the US is referred to as 9x17mm caliber in Europe.

9

34.    It is important to note for the purposes of this report that the caliber designation of any given ammunition cartridge usually refers only to the diameter of the projectile (bullet) and not the relative "power" of the cartridge itself (in terms of muzzle energy, effective range and muzzle velocity). For example, there is an important distinction between cartridges commonly referred to as .22 caliber and cartridges commonly referred to as .223 caliber.

35.    .22 caliber ammunition is a popular and relatively low power cartridge developed in the 1880's. It is also known as ".22 rimfire" as the primer mixture in the cartridge is seated in the rim of the cartridge and not contained in a separate primer cup in the cartridge base. It is commonly used for target shooting as well as hunting small game and can be fired from both handguns and rifles chambered in that caliber. Bullet weights for .22 caliber projectiles / bullets are typically between 30-60 grains (0.08 to 0.13 ounces). Muzzle velocities are usually in the 1100-1300 feet per second (fps) range.

36.    .223 caliber ammunition by comparison is a high velocity cartridge developed in the 1950's in part for use in the original AR-15 and M-16 assault rifles. It is a "centerfire cartridge." Although the diameter of the projectile / bullet is only slightly greater (approximately the width of a human hair) than the .22 caliber cartridge mentioned previously, it is a vastly more powerful cartridge in terms of muzzle velocity and range. This caliber ammunition is also somewhat interchangeable with 5.56mm ammunition. Here is a side-by-side comparison of .223 (left) and .22 caliber cartridges (right) with a quarter for size reference:



37.   Common bullet weights for .223 / 5.56mm caliber projectiles are 50 to 62 grains + or- (0.11 to 0.14 ounces)—heavier than .22 caliber projectiles.  Common muzzle velocities are approximately 3,200 to 3,500 feet per second—about three times as fast as .22 caliber projectiles. A heavier bullet and increased velocity equate to more of the cartridge's energy being transferred to the target. The National Rifle Association (NRA) American Rifleman Magazine tested the U.S. Army's new .223 caliber cartridge (M855Al) in 2014 and the results are published here:

https://www.americanrifleman.org/content/testing-the-army-s-m855a1-standard-ball-cartridge/.

38.   **Gauge.** Gauge is a dimensional measurement which is traditionally used to denote the bore of a non-rifled or "smoothbore" firearm (i.e. a shotgun). Shotguns were initially designed to fire a mass of round shot as opposed to one solid projectile, and therefore a caliber designation is not readily applicable. Gauge refers to the number of lead spheres which will fit inside the bore and equal one pound. For example, in a 12 gauge shotgun, you can fit 12 spheres of lead, which are approximately 18.52mm or .73 inches in diameter, the total weight of which will equal one pound. If the diameter of the spheres are increased, it will require less of them to equal one pound.

11

Therefore the smaller the "gauge" the larger the dimension of the bore. The exception to this measurement system is the .410 gauge shotgun which is actually a caliber designation.

II.    **Recent Development And Evolution Of Firearms With Features Designed for Military Purposes.**

39.    In recent years, there has been an increase in the popularity and availability of semi-automatic rifles, pistols, and shotguns with features initially designed (or patterned after those designed) for a military purpose. It is important to discuss the history of the development and evolution of firearms with these features. In regard to the design and manufacture of military small arms it is important to note that 'form follows function' and the design and inclusion of features are intended to increase the effectiveness of the individual combatant in battle.

A.  **Assault Rifle Development and Evolution.**

40.    The first "assault rifle" or "assault weapon" was the German StG 44 (Sturmgewehr Model 1944), which appeared in production form late in World War II. Earlier pre-production variants included the MP 42 and MP 43 (Machinenpistol 1942 and 1943 respectively). The Germans termed the rifle "Sturmgewehr," literally "Storm Rifle," and a number of the features included utilization of a portion of the gas generated by the burning cartridge propellant to operate the rifle, extensive use of steel stampings in its construction, a detachable magazine, a separate pistol style grip (not integrated with the shoulder stock), a bayonet mounting jug and a threaded barrel to facilitate the attachment of a grenade launcher. It fired a cartridge that was smaller dimensionally and less "powerful" (in terms of muzzle velocity and foot pounds of energy) than the standard 8mm Mauser cartridge in use by the German Army in their issued bolt action Mauser K-98 rifles.



`                                                                                          2

41.   It is important to note that the features designed into the German StG 44 were intended to increase the effectiveness of the individual soldier in combat and allow for simplified manufacture:

42.   **Gas-powered semiautomatic fire**. Gas-powered semiautomatic fire enabled more rapid fire than was possible using standard-issue bolt action rifles.

43.   **Steel stampings.** Steel stampings made for a lighter weapon increasing the amount of ammunition an individual combatant could carry and / or increasing mobility. Additionally they were easier and less expensive to manufacture than machined steel forgings.

44.   **Detachable magazine.** Detachable magazines allow more rapid re-loading than previous standard issue bolt action firearms.

45.   **Separate pistol style grip.**  A separate pistol style grip enhanced the ability of combat soldiers to quickly maneuver their firearms into firing position and retain stability for subsequent shots.

---

[2] Image source –Peter Suciu, "Sturmgewehr, the First Assault Rifle," Recoil: The Ultimate Firearms Destination for the Gun Lifestyle, June 19, 2016, available at https://www.recoilweb.com/sturmgewehr-the-first-assault-rifle-100907.html

46.   **Barrel shroud.**  A barrel shroud encircles and protects the end of the barrel, keeping the barrel safe from damage caused by collision with objects and giving the soldier using the firearm an auxiliary grip on the barrel without burning his hand.

47.   **Bayonet mounting lug.** This feature provided combat soldiers with an additional weapon for use in close combat.

48.   **Threaded Barrel.**  A threaded barrel allowed for the attachment of grenade launcher (on this particular rifle), providing combat soldiers with an additional weapon, albeit for use at a greater distance.

49.   Following the end of the war, captured StG 44's were analyzed by the Allies and although there was reluctance to move to a smaller caliber cartridge, a number of the features of the StG 44 found favor in the design of successive European, American, and Eastern Bloc military rifles. Noted firearm expert and historian Jim Supica wrote in his forward to the book "Guns":

> Most military establishments hesitated to "downsize" the range and power of their primary rifles in the early Cold War years. The semi-auto detachable magazine concept was an obvious success and there was something to be said for full auto capability.[3]

He further writes:

> However the assault rifle concept wouldn't go away. The Soviet Union accepted the lower power round idea in its fixed magazine semi-auto chambered for an intermediate power 7.62 x 39 mm round in 1945, the SKS, which saw wide distribution and production in Soviet client states.[4]

50.   Two years later in 1947, the USSR followed the SKS with what Supica terms "the quintessential assault rifle - the Kalashnikov designed AK-47."[5]

---

[3] Supica, Guns (TAJ Books 2006). PP. 26-28
[4] *Id.*
[5] *Id.*

51.    The design of the AK-47 carried forward a number of the features introduced on the German StG 44. These features include a gas powered operating system, use of steel stampings in its construction, a separate pistol grip, separate shoulder stock, a detachable magazine, a bayonet lug and provision for attachment of a grenade launcher. Due to the separate stock and pistol grip the AK, much like the StG 44, also utilized a barrel shroud / or foregrip on the forward third of the rifle. Some variations of the early AK-47s (AKM) also featured a "compensator" at the muzzle that deflected gas upward and to the right to compensate for the rifle's tendency to kick up and to the right with every shot.

52.    In the 1950's, many countries sought to replace World War I and World War II vintage bolt action and semi-automatic rifles with these newer and more effective designs. With the birth of the North Atlantic Treaty Organization (NATO) however, utilization of Soviet Bloc AK or SKS assault rifles was not possible. Accordingly, a number of firearms manufacturers outside the Soviet sphere of influence developed military rifles that carried forward these same features to one extent or another. Fabrique Nationale (FN) of Herstal, Belgium and Heckler Koch (HK) of Oberndorf, Germany are two noteworthy examples.

53.    FN developed the FN-FAL (Fusil Automatique Leger) and HK the G3 which found a ready market amongst nations that did not favor the Soviet AK type designs. Both incorporated features which like the AK, were derived directly from the StG 44. Their designs featured some parts made from metal stampings as opposed to heavier and more expensive machined steel pieces. A separate pistol grip, shoulder stock, detachable magazine, and barrel shroud followed the basic design of the StG 44. A flash hider and / or muzzle brake have appeared in production variations of both rifles. These rifles were destined from inception to become widely exported as the domestic market in both countries was relatively limited. The FN-FAL and G3 have been in

15

production since the 1950's and both FN and HK have licensed production to numerous countries in South America, Africa, and the Middle East.

54.    In the United States, progress in this arena moved at a significantly slower pace.  The prevailing wisdom in the United States was to stay away from lighter, smaller rifle calibers and cartridges as the .30-06 cartridge used in the M-1 Garand Rifle during World War II had proven to be more than successful. Their initial answer to the burgeoning move towards assault rifles was a variation of the basic M-1 Garand operating system, the T44, or M-14. Outwardly, the M-14 retained a full length wood stock as did the Garand; however, it featured a detachable magazine, select fire (both semi-automatic and full automatic) capability, and a flash hider. It competed directly against the FN-FAL (designated T88) in U.S. Army trials and was selected in 1957.

55.    In the mid 1950's, Eugene Stoner, the chief Engineer of the American company ArmaLite Corporation, developed a number of lightweight assault rifle designs which resulted in the AR-10 in .308 caliber. Its design closely followed what was now becoming standard assault rifle design, i.e., light weight (aluminum forged receivers as opposed to machined steel), separate pistol grip and shoulder stock, foregrip / barrel shroud, detachable magazine, and numerous flash hider / muzzle brake variations. ArmaLite continued to refine the basic design of the AR-10 which resulted in the AR-15. The AR-15 was designed to chamber and fire the 5.56 x 45mm cartridge (somewhat interchangeable with .223 Remington caliber).

56.    In 1961, the Department of Defense purchased a quantity of AR-15 rifles from Colt for evaluation. A number of these were subsequently shipped to US Army advisors in Vietnam to test their suitability for issue to South Vietnamese Army forces. Following the field evaluation the Department of Defense Advanced Research Projects Agency prepared a report (AD-343778, dated August 20, 1962) summarizing the results. Amongst the data compiled via surveys of the US Army Advisors are a number of comments regarding actual use in the field and the results.

16

These comments describe various catastrophic injuries to Viet Cong Combatants who were shot by AR-15, including severing of limbs and decapitation.[6]

57.    This rifle was adopted as standard issue by the U.S. Army in the mid 1960's. The production of the rifle had been licensed to Colt, and initially the model designation was, as produced, AR-15. Later, after a series of engineering changes, the standard U.S. military designation was changed to M-16. When first deployed as a standard issue rifle for US Military Forces, the AR-15 / M-16 platform was maligned as unreliable and prone to jamming. This was due, in part, to inadequate maintenance by the operators themselves. Once the problems were addressed and rectified, the rifle proved to be as reliable and accurate as the AK type rifles deployed by the North Vietnamese and Viet Cong.

58.    The 5.56mm cartridge has a muzzle velocity of approximately 3200 feet per second (fps) (for reference a 9mm pistol cartridge has a muzzle velocity of approximately 1100 fps). 5.56mm bullets, upon contacting tissue will "yaw" (begin to rotate on its axis) which contributes to the creation of both temporary and permanent large wound cavities. Handgun bullets, because they are heavier and travelling at a lower velocity, do not typically yaw upon contact with tissue and do not create as large of a wound cavity nor commensurate destruction of tissue. The yaw movement of a 5.56mm / .223 caliber bullet can also cause it to fragment upon striking bone which contributes to additional tissue damage not immediately adjacent to the cavity itself.

---

[6] Advanced Research Projects Agency, Office of the Secretary of Defense, Field Test Report, AR-15 Armalite Rifle, at 24 (July 31, 1962), available at https://apps.dtic.mil/sti/pdfs/AD0343778.pdf.

59.     Noted Wound Ballistics expert Vincent DiMaio in "Gunshot Wounds" writes:

> As the bullet enters, the body, there is 'tail splash' or backward hurling of injured tissue.  This material may be ejected from the entrance.  The bullet passes through the target, creating a large temporary cavity whose maximum diameter is up to 11-12.5 times the diameter of the projectile.  The maximum diameter of the cavity occurs at the point at which the maximum rate of loss of kinetic energy occurs. This occurs at the point where the bullet is at maximum yaw, i.e., turned sideways (at a 90-degree angle to the path) and / or when it fragments.  If fragmentation does not occur and the path is long enough, the yawing continues until the bullet rotates 180 degrees and ends up in a base-forward position.  The bullet will continue traveling base first with little or no yaw as this position puts the center of mass forward.[7]

> The temporary cavity will undulate for 5-10 msec before coming to rest as a permanent track.  Positive and negative pressures alternate in the wound track, with resultant sucking of foreign material and bacteria into the track from both entrance and exit.  In high-velocity centerfire rifle wounds, the expanding walls of the temporary cavity are capable of doing severe damage.  There is compression, stretching and shearing of the displaced tissue.  Injuries to blood vessels, nerves, or organs not struck by the bullet, and a distance from the path, can occur as can fractures of bones, though, in the case of fractures, this is relatively rare.  In the author's experience, fractures usually occur when the bullet perforates an intercostal space fracturing ribs above and below the bullet path.[8]

60.     Demaio further states,

> Projectile fragmentation can amplify the effects of the temporary cavity increasing the severity of a wound.  This is the reason for the effectiveness of the 5.56 x 45-mm cartridge and the M-16 rifle.[9]

61.     This video graphically illustrates the temporary wound cavity as described by

DeMaio: https://www.youtube.com/watch?v=8HM96wpPVoQ.

---

[7] DiMaio, Gunshot Wounds, 2d (CRC Press LLC, 1999).  P. 54
[8] Id., P.55
[9] Id., P.56

18

62.   Because of the propensity of the 5.56mm/.223 caliber round to create significant damage upon impacting living tissue, it is not generally considered nor favored as a hunting cartridge.

### B.  Pistol Caliber Firearms Evolution And Development.

63.   It is important in terms of this particular case also to address the evolution and development of firearms that chamber and fire pistol caliber ammunition, including those known as submachine guns. Submachineguns are defined as machineguns that fire "sub caliber" (i.e. pistol caliber) ammunition. A number of the handguns that are banned under the Statute are direct evolutionary descendants of submachine guns initially designed and produced for military use.

64.   Many of the construction and design features attributed to assault weapons, and the StG 44, were first utilized in the design and manufacture of mid-20th century submachine guns. Nazi Germany entered World War II with the Innovative Maschinenpistole 38 (MP38). It was chambered in 9mm and later, after a number of engineering changes, re-designated as the MP40. It has design features commonly found in later assault weapons including an adjustable stock, separate pistol grip, a detachable magazine and use of steel stampings in its construction.



10

---

[10] Image source: http://firearmshistory.blogspot.com/2015/09/the-mp40-submachine-gun.html

65.    While the United States initially entered World War II with a military variant of the Thompson .45 caliber sub machinegun, it was heavy and expensive to manufacture because a number of the major components were machined from solid steel. Before the end of the war, the Thompson had been supplemented by the M3 "Greasegun" initially produced by General Motors. The receiver was a stamped and welded sheet metal assembly with an adjustable sliding shoulder stock. Like the MP38 / MP40, it had a separate pistol grip, a sliding / adjustable shoulder stock and a detachable box magazine with a 30 round capacity. In a utilitarian sense it was as effective as the Thompson and, at approximately $20, it was less than half as expensive.

66.    The United Kingdom produced over one million Sten submachine guns during World War II. A rugged and reliable firearm made largely from welded steel stampings, it was utility, reliability and ease of manufacture both combined and perfected. Features shared with the M3 and MP38/MP40 included an adjustable shoulder stock, separate detachable box magazine and, on  some variations, a barrel shroud allowing the operator to utilize the area surrounding the barrel as an auxiliary grip point without touching a heated barrel.

67.    Prior to and during World War II, a number of other nations developed submachine guns which followed the same design and construction philosophy. Notable examples include the Soviet PPSH41, the Italian Beretta Model 38/42, and the Swedish Carl Gustav Model 45.

68.    Following World War II, most new submachine gun designs continued the design philosophy which combined utility, ease of manufacture and the features of wartime firearms. In the early 1960's, HK introduced the MP5 which became an immensely popular choice for military and law enforcement agencies worldwide due to its inherent reliability and accuracy. It was produced in multiple iterations to include a semi-automatic civilian version as well as a pistol variant without a provision for a shoulder stock (HK SP89).

20



11

69.    Israeli Military Industries also successfully marketed their UZI sub machinegun for export in select fire, and in civilian semi-automatic variants.



Military-Today.com 12

70.    Additionally, a number of submachine gun designs proved unsuccessful in terms of military and government sales but nonetheless found a ready market when re-engineered as a

---

[11] Image source: https://www.gunsinternational.com/guns-for-sale-online/pistols/9mm-pistols/excellent-condition-factory-german-hk-sp89-9mm-pistol.cfm?gun_id=101037518

[12] Image source: https://www.military-today.com/firearms/uzi_pistol.htm

semiautomatic pistol. Notable examples include the Cobray MAC-10 (and successive variants) and the Intratec TEC-9, which began life as a Swedish designed submachine gun, the Interdynamic MP-9.



13



14

---

[13] Image source: https://www.armslist.com/posts/11522946/st-louis-missouri-handguns-for-sale--vulcan-mac-10

[14] Image source: https://www.egunner.com/intratec-tec-dc9-9mmpara,name,11952922,auction_id,auction_details

### C.  Proliferation of the AR & AK Platforms for the civilian market

71.    Since the late 1950's through the late 1960's the move towards adoption of semiautomatic and select fire rifles by military forces became a global phenomenon. Soviet Bloc nations rearmed with AK type rifles (and their variants) while NATO Nations adopted a number of designs from Colt, HK and FN, as stated previously, around a standardized caliber rifle cartridge.

72.    Several companies adapted these weapons, without changing their basic construction or design features, for civilian use. For example, in the early 1960's, Colt sought to capitalize on the military acceptance of the AR-15 /M-16 andbegan to produce rifles, incorporating the same construction techniques and configuration as the AR-15 for sale on the civilian market. The only difference between the Colt-produced military and civilian versions was removal of select fire capability and relocation of assembly/ disassembly pins in the lower receiver as stated previously.

73.    These civilian versions, including the Colt·AR-15, retained the performance capacities of the military weapons they were based on, including the effective range, muzzle velocity and semiautomatic rate of fire. In addition, the weapons retained the capability to accommodate large capacity magazines (more than ten rounds) as originally issued for military use. Again however, the basic configuration, appearance, construction and operation of the internal gas operating system (as designed) has remained unchanged since its initial design and introduction as a military weapon.

74.    The expiration of Colt's patents in the late 1970's naturally spawned competition in the marketplace. Throughout the design's lifespan many of the internal fire control components have remained unchanged and their specifications standardized industry wide. There are multiple internal parts that are completely interchangeable between military M16's manufactured in the 1960's by Colt and an AR-15 type rifle produced today by any one of hundreds of U.S.

manufacturers that produce either receivers or internal operating parts. For example, a Bolt Carrier manufactured in 1967 by Colt will fit, and function as designed, in an AR copy manufactured in 2023. Additionally, the overall configuration of "copycat" AR rifles remains essentially identical to the original production design of the early 1960's. The overall design configuration (two piece hinged receiver (shown below), shoulder stock in line with the chamber and barrel, placement of the magazine, external switches and other features) are identical or nearly so.

75.    While employed at the ATF NLC I was a custodian of the Laboratory's Firearms Reference Collection. The firearms in the collection were regularly used by students in the National Firearms Examiner Academy and often required repair. I have personally replaced internal parts in older Colt AR type rifles and Eastern Bloc manufactured AK rifles with recently manufactured parts from aftermarket vendors. The parts fit without issue and the firearms functioned as designed after the repair.

76.    Due to their modular construction AR type rifles are easily constructed / configured with parts made by other manufacturers to suit the owner's personal preference. The rifle receiver itself is designed as a two-piece unit and the "upper receiver" and "lower receiver" can be swapped out for other interchangeable pieces made by the same or another manufacturer with ease. The design also facilitates replacement of internal fire control components and assemblies.

77.    Individual component pieces can be purchased allowing the individual to build a custom AR type rifle from the "ground up" as opposed to purchasing a complete firearm due to the standardization and interchangeability of parts and subassemblies (under Federal Law the lower receiver of the AR platform is considered the "firearm" and requires a serial number). A good illustration of this ease of customization, and the plethora of interchangeable parts and accessories, is the fact that Brownell's Inc., an established gun supply retailer in Iowa, currently devotes the

24

first 107 pages of their "Big Book" (74th edition) catalog of parts and accessories to AR type rifles alone. [15]

78.   The same holds true for AK type rifles and, more recently, pistols available in the civilian market. Although the design (and variants) of the AK-47 are more numerous than the AR type rifle (as far as military production and use is concerned), it lags behind the AR in regard to domestic civilian popularity. Nonetheless whether the AK Type rifle is of Russian, Chinese or other former Eastern Bloc manufacture, there is a robust secondary market in the United States for accessories, parts, sub- assemblies etc. Although not as easily modified as an AR style rifle due to its less "modular" design there are customization options available including a variety of shoulder stocks, sighting and illumination, etc.

79.   Additionally, much as with AR type rifles, there are numerous vendors selling all the necessary component parts needed for an individual to build an AK style rifle from "the ground up" as opposed to purchasing a complete rifle and subsequently modifying the firearm. In actuality, the receiver of many AK rifles is simply a stamped metal "flat" which is available from numerous vendors online for as little as $14.99.



16

---

[15] Links to view the catalog are available at this website:  https://www.brownells.com/order-a-catalog/

[16] Image source: https://www.buymilsurp.com/ak-receiver-flat-and-rails-p-3028.html

25

80.   The AK 'flat' is bent into the correct configuration using a jig which can also be found from numerous vendors.



17

81.   As with the AR, the general configuration and specifications of internal AK operating parts and assemblies have remained consistent. Regardless of the place of manufacture there are numerous internal fire control, feeding and gas operating system components that are interchangeable between AK rifles produced by manufacturers over the past 40-plus years. Again, as with AR type rifles, the overall configuration of the AK rifle receiver, internal operating systems and their parts, and performance (in terms of semiautomatic rate of fire, muzzle velocity, range etc.) are comparable to the military versions from which they evolved.

82.   As stated previously, the expiration of Colt's AR patent in the late 1970's spawned numerous "copycat" rifles from other vendors. A similar situation occurred with respect to AK type rifles on an international scale. These foreign manufacturers, Norinco (China), Romarm (Romania) and Valmet (Finland), were or still are state owned enterprises and tens of thousands of complete AK copies were imported into the U.S. by a number of foreign manufacturers before

---

17 Image source: https://ak-builder.com/images/detailed/1/ak_builder_flat_bending_die_set.jpg

additional Federal regulation, Title 18, Section 922(r), required that a certain percentage of the rifle's parts be manufactured domestically.

83.    Regulation of imports however has not slowed the demand for AK "copycat rifles" and numerous domestic manufacturers are producing rifles in the U.S. based on the original design and operating system.

84.    In my opinion, the performance characteristics of Assault Firearms in regard to semi automatic rate of fire, muzzle velocity, effective range have not changed since their initial incarnation as military weapons.

### D.  Marketing of Assault Weapons

85.    Contrary to claims of political contrivance, the term "assault weapon" had already entered common use in the firearms community as early as 1986 when the "Gun Digest Book of Assault Weapons" was first published. Edited by Jack Lewis the front cover states that it contains: "A detailed analysis of Assault Type Weapons: Test Reports – Firing the latest in full and Semi Autos, centerfires, rimfires and shotguns."



86.    On Pages 88-93 Lewis reviews and test fires the Springfield SAR-48 which is a reproduction of the Fabrique Nationale (FN) FAL Rifle mentioned above. In the article on page 89 he refers to it as "a weapon of war."

87.    On Page103, Lewis states:  "Whatever a shooter's reasons may be for wanting one, he'll be able to find one of these civilian-legal semi-auto assault weapons on dealer's shelves. A number of them are detailed on the following pages."

88.    The firearms industry has also promoted the similarities between semi automatic versions of their full / select fire battle rifles for marketing purposes.



---

[18] Image source: https://gearsofguns.com/old-ar-15-ads/



---

[19] Image source: "The Black Rifle," P.98.

89.     Essentially Assault Weapons can be simply defined (under numerous State and local statutes) as semi automatic copies of fully automatic (or select fire) firearms designed and intended for use by the military. They retain features and performance characteristics (in terms of muzzle velocity, range etc.) originally designed and intended for use on the battlefield.

90.     Following the passage of the Federal and numerous State and local Assault Weapon Bans in the 1990's, the firearm industry via the National Shooting Sports Foundation (NSSF, a firearm industry trade and lobbying organization) reversed course and coined the moniker "Modern Sporting Rifle" to describe semi automatic variants of the fully automatic / select fire M-16.

### E.  Military origins of Large Capacity Magazines

91.     Large capacity magazines were not initially designed or intended for the civilian marketplace. The lineage and refinement of large capacity detachable magazines and belt feeding mechanisms can be traced directly to a military heritage. Various belt & clip fed medium machine gun designs by Hiram Maxim (1885) and John Browning (1890) debuted before the end of the 19th Century;[20] however, it wasn't until the advent of WWI that development and refinement of large capacity feeding devices for machineguns gained increased importance.

92.     In regard to standard issue rifles, the U.S. and other combatant nations entered, deployed, and exited WWI with bolt action rifles as standard issue to the individual soldier.

93.     By contrast, magazine fed semi-automatic pistols first appeared in the early 1890s. Numerous models designed and manufactured by Salvator Dormus, Hugo Borchardt and Paul Mauser featured both internal fixed and detachable box magazines of varying capacities although only Mauser's C96 (1896) design proved commercially viable and was manufactured until the late

---

[20] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 83-99

1930's. Initially designed with a 10 round internal fixed magazine later variants included the ability to accept detachable magazines.[21]

94.    In addition to use of the Mauser C98 in WWI, Germany also issued the P08 (1908) "Luger" pistol with an 8 round detachable magazine. Similarly U.S. Forces fielded the Colt Model 1911 with a 7 round detachable magazine. One exception to the "under 10" magazine capacity was the introduction of the Belgian FN "Hi-Power" (1935) 9mm pistol which featured a detachable magazine holding 13 rounds.[22]

95.    In the interwar years, a number of advancements in arms technology & design facilitated practical semi-automatic rifles for standard issue. Accordingly, the U.S. Forces in WWII were issued the Springfield Armory M-1 "Garand' rifle with an 8 round internal magazine. The U.S. also deployed the M-1 carbine in .30 caliber which featured a 15 round detachable box magazine; however, this was intended for issue to support personnel behind the front lines. It was not until the M-14 was adopted in the late 1950s that a rifle with a detachable magazine was adopted for standard issue to front line troops. The M-14 was issued with a 20 round magazine.[23]

96.    When the AR-15 (later designated M-16) was first purchased and issued to U.S. Forces in the early 1960s it was intended to be utilized, and was issued, with 20 round detachable magazines.[24]

97.    However, when the first semi-automatic variants of the M-16, the Colt AR-15 SP1 Sporter, became available for sale to the public in 1964 it came supplied with two five round magazines, not the military issue 20 round magazines.

---

[21] Zhuk, A.B., The Illustrated Encyclopedia of Handguns, (Greenhill Books, 1995), PP. 207-211

[22] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 115-122

[23] Hogg, Ian V. & Weeks, John S., Military Small Arms of the 20th Century, 7th Ed., (Krause Publications, 2000), P. 291

[24] Stevens, R. Blake & Ezell, Edward C., The Black Rifle (Collector Grade Publications, 2004), P. 108



**COLT AR-15 SPORTER SEMI-AUTOMATIC RIFLE**
**.223 CALIBER**

Colt's answer to the demand for a semi-automatic version of the AR-15 automatic rifle purchased by The United States Armed Forces. Painstaking engineering redesign efforts have resulted in a Government-approved conversion of the Colt AR-15 automatic rifle without sacrificing any performance or weight characteristics. The semi-automatic AR-15 Sporter weighs only 6.3 pounds. Its recoil is light and barrel rise minimal.

MODEL R-6000

RETAIL PRICE*
$189.50

Lightweight ● Extremely accurate ● Easy to handle ● Straight line construction — barrel, bolt, recoil buffer unit and stock assembled in a straight line ● Rapid semi-automatic fire is more controllable than with rifles of commercial design ● Simple to maintain.

| CALIBER | BARREL LENGTH | OVERALL LENGTH | CAPACITY | SIGHTS | SAFETY | WEIGHT |
|---|---|---|---|---|---|---|
| .223 | 21" | 39" | 5 rounds | Double tang rear peep sight adjustable for windage. Post type front sight adjustable for elevation. | Rotary safety— selector lever | Approx. 6½ lbs. |

*The suggested retail price of the Sporter is $189.50 and includes two magazines (each blocked for five rounds), sling, flash suppressor, rubber recoil pad, cleaning rod assembly, cleaning brush, and the Colt AR-15 Sporter Operation and Maintenance manual.

25

98.   As stated by Christopher R. Bartocci in his book The Black Rifle II:

Initially, Colt simply added a five round limitation spacer to the 20-round magazine which could be installed or removed at will by simply removing the floor plate of the magazine. This was primarily intended for hunters, in compliance with the laws in most states which limit magazines in the field to a five-round capacity for hunting. With the introduction of the Colt Sporter series, the configuration of this magazine was altered by the addition of a permanent rivet in the floorplate to prevent the removal of the spacer, thus making this a magazine of dedicated five-round capacity for hunting applications. [26]

---

[25] Source: https://thecoltar15resource.com/1964-catalog/

[26] Bartocci, Christopher R., The Black Rifle II (Collector Grade Publications, 2004), P. 263

| MODEL NO. | MODEL | CALIBER | BBL LENGTH (inches) | FINISH | APPROX. WEIGHT (lbs.) | O/A LENGTH (inches) | SIGHT RADIUS (inches) | ROUNDS MAG. |
|---|---|---|---|---|---|---|---|---|
| R6600DH | AR-15A2 DELTA H-BAR w/scope and acces. | 223 Rem (5.56mm) | 20 | M | 10 | 39 | 19.75 | 5 |
| R6600 | AR-15A2 H-BAR | 223 Rem (5.56mm) | 20 | M | 8.0 | 39 | 19.75 | 5 |
| R6500 | AR-15A2 SPORTER II | 223 Rem (5.56mm) | 20 | M | 7.5 | 39 | 19.75 | 5 |
| R6420 | AR-15A2 CARBINE | 223 Rem (5.56mm) | 16 | M | 5.8 | 35 extended 32 closed | 14.5 | 5 |

Rifles

© 1986 Colt Industries Inc
Printed in U.S.A.

15

99.   As shown in the image above, Colt continued to provide five round magazines with their AR-15 rifles as late as 1987.[27]

100.  Postwar development of semi-automatic pistols continued after WWII; however, magazine capacities generally remained under 10 rounds. Notable examples include the Beretta Model 1951 (8 rounds), Sig Sauer P220 (1975, 7-10 rounds depending on caliber), Heckler Koch P7 (1978, 8 rounds).

101.  It was not until the early 1980s the U.S. Military sought to replace the Colt 1911, a .45 ACP caliber pistol with a seven round magazine, and standardize the sidearms (handguns) issued to U.S. Forces in a caliber common to all NATO member nations. The resultant winner of numerous competitions was the Beretta Model 92SB, a 9mm caliber pistol with a 15 round magazine. Following a few minor functional changes, the Beretta was accepted and designated the M-9.[28]

102.  During the latter half of the 1980s, numerous manufacturers, both domestic and foreign, began developing and offering numerous semi-automatic models with magazine capacities equaling, or exceeding, that of the Beretta M-9.

---

[27] Colt Firearms 1987 Catalog, (Colt Industries Inc., 1986), P.15

[28] Wilson, R.L., The World of Beretta, An International Legend, (Random House, 2000), PP. 227-253

33

103.  In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act, (which included provisions also known as the Federal Assault Weapons Ban or "AWB"), which limited the maximum capacity of a detachable magazine to ten rounds.[29] As a result, numerous firearm manufacturers, as well as aftermarket magazine manufacturers, initiated production of what were colloquially termed "post ban" magazines to conform to the new legislation. Magazines with a capacity of over ten rounds were termed "Large Capacity Magazines."[30] The post ban magazines were modified, or retooled, versions of existing large capacity magazines in order to keep their dimensions identical and ensure that the 10-round magazines functioned identically to existing magazines of 11 rounds or more in their firearms. For example, pictured below is a 'pre ban' 10-round magazine for a Browning 9mm caliber "Hi Power" semi-automatic pistol:



[31]

---

[29] https://www.congress.gov/bill/103rd-congress/house-bill/3355/text

[30] The definition of "Large Capacity Magazine" under the Federal AWB included any magazine with a capacity of over 10 rounds where under Colorado Law it defines a magazine with a capacity of over 15 rounds.

[31] Image source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-high-capacity

104.  And shown below is a 'post ban' magazine for the same pistol. You will note the 10-round magazine differs as a portion of the metal magazine body is replaced with a molded polymer plug. This modification effectively limits the interior volume and capacity of the magazine to 10 rounds. Manufacturers have also utilized various other methods to restrict magazine capacity, including dimpling the lower quadrant of the magazine body inwards, placing rivets in the magazine body, or thickening the walls of polymer bodied magazines to reduce capacity.



<sup>32</sup>

105.  Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation, which also contained magazine capacity limitations. As a result, many manufacturers of popular semi-automatic handguns and rifles during the Federal

---

<sup>32</sup> Image Source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-10-round-browning-high-power

35

Assault Weapons Ban continued to offer "state compliant" versions to customers in states so affected. Manufacturers such as Glock, Sig Sauer (SIG), FN USA, Beretta, and Smith & Wesson, among numerous others, offer handguns and rifles compliant with individual state regulations. Most major firearm manufacturers offer models that come "standard" with 10-round magazines.

106.  Shown here is a page from the online catalog of FN USA (the U.S. based subsidiary of Belgian arms manufacturer Fabrique Nationale) showing the "California Compliant" version of their "Five-seveN" pistol.



107.  This is a page from Smith & Wesson's online catalog showing their AR-15 type rifle which is marketed as a "compliant" model and is sold with a 10-round capacity magazine:

---

[33] Image Source: https://fnamerica.com/catalog-and-wallpapers/



34

108.  And a "California Compliant" Glock Model 19 9mm pistol available from

Sportsman's Warehouse:



35

34 Image Source: https://www.smith-wesson.com/product/m-p-15-sport-ii-compliant

35 Image Source: https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/glock-19-9mm-luger-402in-black-nitrite-pistol-101-rounds-california-compliant/p/1155366

109.  Additionally, there are numerous well respected aftermarket manufacturers who offer 10-round magazines specifically for use in handguns that come with LCMs. Mec-Gar and ProMag are two of many:



---

110.  In my opinion, the ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat or the military would not have incorporated this feature. Less time required to reload can equate to more time spent acquiring targets or shooting. As stated previously form follows function in regard to equipment designed and intended for military use.

### III.   Features of Assault Rifles/Assault Weapons Under the Statute.

111.  Based on my experience and my training and research regarding the conception, design, history, and purpose of assault weapons, the assault weapons as described in the Statute are ill-suited for civilian self-defense.

112.  Many of the assault weapons available for purchase by the public and prohibited by the Statute, are near identical copies of military firearms, save for the lack of select fire capability. As such, they retain a number of features originally designed to maximize their effectiveness in battle. Other firearms available to the public and prohibited by the Statute, which were not initially intended for sale to government or military customers, incorporate features which mimic those found on military firearms. Moreover, there are countless accessories available to add to firearms traditionally considered "sporting firearms" (i.e. those initially designed and manufactured for target shooting or hunting), which brings their functionality more towards the military side of the spectrum and away from the sporting side.

### A.  Prohibited Firearms And Features Under the Statute.

#### i.  Prohibited Firearms

113.  The Statute, enumerates 36 specific types of weapons that are considered "assault firearms," including AR-15 style and AK type rifles. N.J. Stat. Ann. § 2C:39-1(w)(1).

114.  The types of firearms classified as assault firearms under the Statute, including AR and AK type rifles, are direct developmental descendants of Military weapons designed for use in

39

combat. The 'civilian' AR-15 type rifles in .223 / 5.56mm retain the same performance characteristics (in terms of muzzle velocity, range, etc.) as does the military M-16 and its variants (M-16A2, M-4 etc.). For example, according to the US Army Manual 3-22.9 "Rifle Marksmanship M-16A1, M-16A2/3, M-16A4, and M4 Carbine, April 2003," the maximum range of these rifles is 2650-3000 meters. They were not designed, nor are they suitable, for home defense in short range close quarter situations.

FM 3-22.9(FM 23-9)

CHAPTER 2

**CHARACTERISTICS, AMMUNITION, AND ACCESSORIES**

*This chapter describes the general components, characteristics, ammunition, and accessories for the M16 and M4-series weapons to include a brief explanation of how to mount the various accessories.*

**2-1.   CHARACTERISTICS**
The M16-/M4-series weapons are 5.56-mm, magazine-fed, gas-operated, air-cooled, shoulder-fired weapons. This section describes the general characteristics (Table 2-1) and the components of the M16-/M4-series weapons. Table 2-2 (page 2-2) shows the characteristics of various accessories.

| CHARACTERISTIC | M16A1 | M16A2/A3 | M16A4 | M4 |
|---|---|---|---|---|
| **WEIGHT (pounds):** | | | | |
| Without magazine and sling | 6.35 | 7.78 | 9.08 | 6.49 |
| With sling and loaded: | | | | |
| 20-round magazine | 6.75 | 8.48 | 9.78 | 7.19 |
| 30-round magazine | 7.06 | 8.79 | 10.09 | 7.50 |
| | | | | |
| Bayonet knife, M9 | 1.50 | 1.50 | 1.50 | 1.50 |
| Scabbard | 0.30 | 0.30 | 0.30 | 0.30 |
| Sling, M1 | 0.40 | 0.40 | 0.40 | 0.40 |
| **LENGTH (inches):** | | | | |
| Rifle w/bayonet knife | 44.25 | 44.88 | 44.88 | N/A |
| Overall rifle length | 30.00 | 39.63 | 39.63 | N/A |
| Buttstock closed | N/A | N/A | N/A | 29.75 |
| Buttstock open | N/A | N/A | N/A | 33.0 |
| **OPERATIONAL CHARACTERISTICS:** | | | | |
| Barrel rifling-right hand 1 twist (inches) | 12 | 7 | 7 | 7 |
| Muzzle velocity (feet per second) | 3,250 | 3,100 | 3,100 | 2,970 |
| Cyclic rate of fire (rounds per minute) | 700-800 | 700-900 | 800 | 700-900 |
| **MAXIMUM EFFECTIVE RATE OF FIRE:** | | | | |
| Semiautomatic (rounds per minute) | 45-65 | 45 | 45 | 45 |
| Burst (3-round bursts) (rounds per minute) | N/A | 90 | 90 | 90 |
| Automatic (rounds per minute) | 150-200 | 150-200 A3 | N/A | N/A |
| Sustained (rounds per minute) | 12-15 | 12-15 | 12-15 | 12-15 |
| **RANGE (meters):** | | | | |
| Maximum range | 2,653 | 3,600 | 3,600 | 3,600 |
| Maximum effective range | | | | |
| Point target | 460 | 550 | 550 | 500 |
| Area target | N/A | 800 | 600 | 600 |

**Table 2-1. Characteristics of the M16-/M4-series weapons.**

**NOTE:**   For further technical information, refer to TM 9-1005-319-10 and TM 9-1005-249-10.

2-1

115.  The Statute also bans certain weapons based on magazine capacity. I discuss magazine capacity below.

116.  Finally, the Statute restricts shotguns with revolving cylinders. Such shotguns are known as "street sweeper" shotguns, and are of a design that has not been accepted or adopted for military or law enforcement use by any nation or agency that I am aware of.  In terms of legitimate sporting use for either hunting or target shooting or self-defense, I cannot conceive of it having

any utility. Shotguns of this type have been classified as a "Destructive Device" by ATF and are subject to additional restrictions under the National Firearms Act of 1935.

### ii. Prohibited Features

117.  Included in the Statute's definition of "Assault firearm," at N.J.S.A. 2C:39-1(w)(2) to (5), are a number of features which, when added to certain firearms, bring those firearms under the statutory definition of Assault weapons. The Statute, at under N.J.S.A. 2C:39-1(w)(2) states that a weapon is an assault firearm if it is "substantially identical" to any of the 36 types of weapons listed in N.J. Stat. Ann. § 2C:39-1(w)(1).

118.  In 1996, the New Jersey Attorney General issued Guidelines "to provide guidance to the prosecutors" about when a semi-automatic firearm should be considered to be "substantially identical" to a named assault weapon in N.J.S.A. 2C:39-1(w)(1).

https://www.state.nj.us/lps/dcj/agguide/assltf.htm

119.  The Guidelines mirror the definition of "semiautomatic assault weapons" in the 1994 federal "Public Safety and Recreational Firearms Act" which was part of a larger omnibus crime reduction act. Commonly known as the Federal "Assault Weapons Ban" (AWB) the act banned the possession, transfer or importation of "semiautomatic assault weapons."

120.  Specifically, the Guidelines state that when two or more of certain listed features are present in a weapon, it should be considered "substantially identical" to an assault firearm under N.J.S.A. 2C:39-1(w)(1) and (2).

121.  As I explain below, each of the features listed in the Statute and Guidelines, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a combat scenario.

41

122. **A pistol grip or thumbhole stock** (for rifles and shotguns).  A semiautomatic rifle or shotgun that includes a pistol grip (or does not include a shoulder stock) somewhat increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator).

123. **Forward handgrip** (rifles, shotguns, pistols). Forward handgrips allow increased stability of the firearm by the operator. This allows the operator to better control recoil and muzzle climb thus increasing the hit probability of successive shots. A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK based rifles; however, it was not until the advent of the Rail Attachment Systems (RAS) and acceptance by the US Military of  same that foregrips for semi-automatic rifles became more widespread. A foregrip on a pistol is considered "any other weapon" under the National Firearms Act and subject to more restrictive controls to include registration in a national database.

124. **Folding/telescoping stocks** (rifles and shotguns). Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder.  U.S. Military origins for this type of stock can be found on the M1 carbine in World War II when modified for paratrooper use.

125. **Flash suppressors**. A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low light conditions and also helps to conceal the flash from view.  This allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position.

126. **Grenade launchers**. Without question a grenade launcher has neither a sporting lineage nor a practical application on a civilian firearm. Obviously a grenade is an offensive military weapon which could result in mass casualties if deployed during a civilian event or public space.

127. **Barrel shroud**. Military semi-automatic and select fire rifles have featured a shroud or hand guard that encircles the barrel since before the onset of World War II. The M1 "Garand" Rifle utilized by the US Military during that conflict incorporated a traditional wooden stock similar to most hunting and sporting rifles of the period. However, it also featured a wooden handguard which covered the top 2/3rds of the barrel. Therefore this design feature is not a recent development. Enclosing the barrel in a shroud serves multiple purposes. In a modern gas operated semi-automatic military rifle, it serves to protect the gas tube / piston mechanism from inadvertent damage.  It also provides additional grip space for the operator to steady and control the rifle during rapid, repeat firing without getting burned by the hot barrel.

128. **Threaded barrel**. A threaded barrel allows for attachment of a suppressor (commonly referred to as a silencer) which allows the operator to better conceal themselves from their target by reducing the report of their firearm. It also allows the attachment of some flash suppressors with the resultant effect mentioned previously.

129. **Buffer tube, arm brace, or the like**. Attachment of a brace, when affixed to a rifle caliber pistol effectively mimics the characteristics of a short-barreled rifle (a type of weapon restricted under the National Firearms Act) as it can allow the operator to fire it from the shoulder increasing stability while maintaining concealability.

130.  "**Bump stocks**." A bump stock is a device which replaces the shoulder stock on a firearm and utilizes the recoil generated by firing to rapidly 'bump' the trigger against the operators finger. The resultant effect is a dramatic increase in the cyclic rate (number of rounds

43

fired per minute) above that which would be normally be achieved by the unmodified firearm. For example, a semi-automatic AR type rifle equipped with a bump stock can fire between 600-700 rounds per minute, a cyclic rate which is roughly equivalent to that of a full-automatic M-16.

### B.  Prohibited "Large Capacity Magazines" Under The Statute.

131.  The Statute further defines an "assault firearm" as "[a] semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds." N.J. Stat. Ann. § 2C:39-1(w)(4). And the Statute separately prohibits possession of large-capacity magazines, which are ammunition magazines capable of holding more than 10 rounds of ammunition. *Id*. § 2C: 39-1(y).

132.  Generally speaking, modern semi-automatic rifles that are designed, manufactured and marketed as "hunting rifles" traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example, the Browning BAR in .30-06 caliber as currently manufactured has an internal magazine capacity of four (4) rounds. The Remington Model 1100, a semi-automatic shotgun, has an internal magazine capacity of 5 rounds.

133.  Semi-automatic pistols from numerous manufacturers are sold with magazines that would be permitted under the Statute.  For example, 9mm caliber pistols are available with standard magazines with a capacity of 15, 10, or as few as 7 rounds. https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/handguns/c/cat-9mm-luger-pistols

134.  Detachable magazines are available with varying capacities from 5-100 rounds. Generally speaking any firearm designed for a detachable magazine with a capacity exceeding 10 rounds will function as designed with a magazine with a smaller maximum capacity.

**IV.      Rifle Caliber Assault Firearms and Self / Home Defense.**

135.  At numerous points throughout their complaint the Plaintiffs allege that self-defense is one of the primary reasons for the purchase of a firearm regulated by the Statute. It is my opinion that an AR, AK, or other banned assault weapon is a poor choice for this task.

136.  I have been asked on numerous occasions over the past 35 years what firearm I would recommend for home or self-defense. My recommendation is based upon my inquiry in return regarding the individual's (and their family members') personal experience and comfort level with firearms. In over 25-plus years, I have never recommended an AR, AK or other rifle as a home defense weapon.

137.  Home defense and / or self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Assault firearms banned under the Statute were designed to be effective at battlefield ranges of up to 500 yards. The typical muzzle velocity of a .223 caliber bullet is 3,200 feet per second (+ or -). Projectiles travelling at velocities found in banned weapons pose a serious risk of over-penetration in most home construction materials such as gypsum board / sheet rock, and typical 2x4 lumber. When this cartridge was designed for the AR-16 / M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards not dozens of feet.

138.  In August 2014 the National Rifle Association's "American Rifleman" published an article by Stanton Wormley: "The AR-15 for Home Defense: Penetration Tests."[38] Wormley conducted penetration tests on nine different types of .223 / 5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board / sheet rock and wooden 2x4 studs. When fired at a 90-degree angle to the walls all nine (including "frangible" rounds designed to

---

[38] https://www.americanrifleman.org/content/the-ar-15-for-home-defense-penetration-tests/

45

disintegrate when hitting a hard surface) easily penetrated the wall section as well as water jugs placed three feet behind:

> But just how much energy did the penetrating projectiles carry? All the loads, including the Glaser, exploded one-gallon water jugs placed 3 feet behind the wall sections.[39]

139.  The tests conducted by Wormley also included firing longitudinally through the wall sections resulting in the penetration of three successive 2" thick 2x4 studs by a number of the projectiles. These tests vividly highlight the inherent dangers of utilizing assault weapons with high velocity ammunition in a home defense scenario.

140.  In reference to the NRA American Rifleman article mentioned earlier in this report, current U.S. Army issue .223 caliber ammunition is capable of penetrating 3/8" hardened steel at 350 yards. Potential over-penetration in a confined environment is problematic in terms of risk to bystanders or family members outside the target location. Most jacketed commercially available .223 / 5.56mm ammunition has impressive penetration capabilities in this regard. Additionally, the (former) NATO issue M855 SS109 5.56mm is readily available for purchase by civilians. This ammunition was designed to penetrate up to 3mm of "soft," (non-hardened) steel. This capability is certainly unnecessary and poses substantial risks to individuals in adjoining rooms, neighboring apartments or other attached dwelling units.

141.  In my opinion, assault firearms, as defined under the Statute, are a poor choice for home defense or personal protection. Many enumerated in the Statute require two hands to effectively aim and shoot. In a home defense situation, an individual may be required to use one hand to call 911 while attempting to operate a "two handed" firearm with one hand. Such a situation would also preclude the homeowner from utilizing their "non-gun hand" to pick up or guide a small child, elderly, or vulnerable adult during such an event. During a stressful situation

---

[39] *Id.*

such as a home invasion or break-in, there may be multiple steps required by the operator to bring the weapon from a "safe" condition to a firing condition. Manipulation of a charging handle, safety switch, or inserting a magazine may be difficult to accomplish under stress, particularly if the operator has not adequately trained or practiced with their firearm. Other family members may not be familiar with bringing the weapon to a firing condition or fail to complete adequate steps to do so under duress.

142.  Unloaded, an AR-platform rifle weighs approximately 6.5 to 7 pounds. It also requires two hands to aim and fire. In a home-defense scenario, a homeowner would likely be attempting to call 911 while addressing the intruder, which is difficult if not impossible while wielding their AR-15 effectively and safely. Additionally, it would hamper, if not prevent, leading a vulnerable adult away from danger or guiding/carrying a small child. By comparison, common handgun weights are between 2 and 3 pounds and require only one hand to operate.

143.  While employed as a Special Agent with ATF, the agency transitioned to an AR type rifle in the early 2000's. Each Agent was required to attend, and successfully complete, a one week / 40 plus hour transition training class in order to familiarize themselves, and qualify, with the firearm. The training included repetitive live fire drills under stressful conditions. Additionally, we were required to requalify with these firearms quarterly and repeat the same drills as during the initial transition training. Nonetheless, I witnessed Agents make errors that resulted in a failure of the weapon to fire during those drills, even though those Agents had performed the drills repeatedly under stress. It is worth noting here that the M4 carbines issued to ATF Field Offices were select fire rifles (i.e. machineguns capable of full automatic fire) that were converted to semi-automatic fire only.

144.  Additionally, I am not of the opinion that an abundance of ammunition is a substitute for weapons familiarization and shot placement. Repeated practice and shooting with your chosen

47

firearm will make you a more effective deterrent than the capability to fire more rounds, should deadly force be required. The operation (or cycle of fire) of any firearm designed and manufactured to accept a detachable magazine will function regardless of the maximum capacity of the magazine itself.

145.  For example, firearms such as the Glock Model 17 semi-automatic pistol and AR-15 type semi-automatic rifle will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity. Generally speaking, any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity legal under the statute. This includes the vast majority of handguns and shoulder-fired firearms designed and manufactured to utilize detachable magazines. Magazine capacity is not a determinant of firearm operability.

146.  Home defense and / or street / commercial robbery situations between citizens and criminals are rarely lengthy protracted shootouts with extensive exchanges of gunfire. The National Rifle Association Institute for Legislative Action (NRA ILA) regularly publishes newsclips on their "Armed Citizen" webpage highlighting examples of defensive use of firearms by citizens.[40]

147.  Claude Werner, a firearm instructor and writer, conducted a detailed statistical analysis of 482 incidents provided by the NRA ILA on their website from 1997 to 2001. He determined, from the information provided, that the average number of shots fired by an armed citizen in a defensive scenario was 2.2.[41]

---

[40]  https://www.nraila.org/gun-laws/armed-citizen/

[41]  https://www.defensivecarry.com/attachments/tac-5-year-w-tables-pdf.107045

148.  Lucy Allen conducted a similar statistical analysis of the "Armed Citizen" newsclips for the period January 2011 – May 2017. Her analysis revealed that the average number of shots fired in a self-defense scenario was identical to that determined by Werner: 2.2 shots.

149.  I am of the opinion that an overabundance of ammunition and a "spray and pray" mentality is a poor substitute for training and competent marksmanship with your chosen self-defense firearm. In fact accurate shot placement will prove a more effective deterrent than the number of rounds in your magazine should deadly force be required.

150.  If the individual preferred shoulder weapons, I have recommended, depending on what is legal in the appropriate jurisdiction, a pump action 12 or 20-gauge shotgun (Remington 870, Mossberg 500 etc.) loaded with 00 Buckshot and stored with the "hammer dropped" on an empty chamber, safety off. The only action required to bring the shotgun from a safe unloaded condition to a firing condition is to work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power, low probability of over penetration (as compared to rifle caliber and velocity projectiles) and zero manipulation of safety mechanisms required in high stress situations. The loading / chambering process itself is an audible deterrent. Training and familiarization with this type of a firearm is simple and straightforward.

151.  For a handgun, my first inclination is to recommend an eight shot revolver in .38 +P caliber / .357 Magnum (Similar to S&W Model 627, Taurus Model 608, etc.) loaded with hollow point bullets, depending on what is legal in each jurisdiction. As with my rationale for recommending a pump action shotgun there are no complicated safety mechanisms to manipulate in a high stress situation, low probability of over penetration and ease of reloading with a speed loader should more than eight shots be required. Revolvers are also easier and less complicated for other family members to learn to operate especially if they have less familiarity with firearms.

49

152.  In terms of a carry handgun, I value concealability over ammunition capacity. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario, I believe the best course of action is to quickly extricate yourself from the "kill zone" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF, we were issued a Sig Sauer P229 in .40 S&W caliber as a primary duty weapon. We were also given the choice of a Sig Sauer P239 in .40 S&W or a five shot Smith and Wesson Model 640 in .357 Magnum as a backup firearm. When off duty, I carried the S&W 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that ten (10) rounds was an adequate amount of ammunition to enable me, or myself and my wife, or child, to extricate myself from a street or retail location robbery should I encounter one. Consequently, I have most often recommended either a lightweight small revolver (S&W Bodyguard, Ruger LCR, Smith and Wesson Model 36, 640 or variant) carried with a speed loader or a low profile small semiautomatic pistol (Sig Sauer P236, Ruger LCP, Colt Pocketlite etc.) with a spare magazine.

153.  In my opinion, based upon my training, knowledge, experience and research, assault firearms were not designed for traditional hunting purposes. Pistol caliber firearms (.380, 9mm, .45) are not a popular hunting caliber. Neither was the .223/ 5.56 caliber cartridge developed for civilian hunting applications. Due to .223 caliber / 5.56 mm bullets proven record of causing considerable tissue damage (when fired from an AR type rifle or pistol) it is a counterintuitive choice.

## V.    Assault Weapons As A General Threat To Public Safety

154.  As mentioned previously in this report, many of the firearms prohibited by statute directly trace their origins to those developed for use in combat. As such they were never initially intended for general distribution / sale to the public.

155.  As tragically demonstrated by recent mass shootings such as the Pulse Nightclub in Orlando Florida in 2016 (49 fatalities, 50+ wounded), the 2017 Las Vegas shooting (60 fatalities, 400+ wounded), the 2022 Uvalde Texas School shooting (21 fatalities + 17 wounded) and the July 4th 2022 shooting in Highland Park (7 fatalities + 48 wounded), the assault weapons (in conjunction with high capacity magazines) as defined under the Statute are capable of inflicting significant carnage upon civilians in a short period of time.

156.  Rifle caliber Assault Firearms as regulated under the Statute pose a significant risk to Law Enforcement Officers. It has been my experience that soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" National Institute of Justice (NIJ) protection rating. These two ratings are suitable for protection against most handgun bullets as those projectiles range up to a 1200FPS (+ or -) velocity. Rifle caliber Assault Weapons (AR & AK type) can, as stated previously in this report, achieve muzzle velocities of 3200FPS (+ or -) which can readily penetrate Level II & IIIA Body Armor (as well as some Level III hard body armor which is not universal standard issue amongst Law Enforcement Agencies nationwide). Not only do the firearms subject to the Statute pose a threat to overall public safety they increase the likelihood that first responders charged with stopping such a threat, or attending to wounded citizens, may be injured or killed in the performance of their duty.

157.  This online video illustrates the capability of commonly available .223 / 5.56mm caliber ammunition to penetrate Level III body armor. The author / narrator states that this test was performed at a distance of "about seven yards."

https://www.youtube.com/watch?v=oMYkEMhPsO8

158.  The argument that commercially available AR type rifles are somehow less dangerous or lethal simply because they fire only in semi-automatic mode is misleading. They retain the identical performance capabilities and characteristics (save full-automatic capability) as

51

initially intended for use in combat. With even minimal training an operator can fire 40-50 shots per minute in semi-automatic mode. According to the US Army Manual referenced earlier in this report the most effective use of the M-16 at ranges beyond 25 yards is rapid semi-automatic fire. Not full- automatic fire.

**7-8.   RAPID SEMIAUTOMATIC FIRE**

The most important firing technique during modern, fast moving combat is rapid semiautomatic fire. Rapid-fire techniques are the key to hitting the short exposure, multiple, or moving targets described previously. If properly applied, rapid semiautomatic fire delivers a large volume of effective fire into a target area. The soldier intentionally fires a quick series of shots into the target area to assure a high probability of a hit. (Figure 7-10, page 7-8 shows the current training program for rapid semiautomatic fire.)

**Figure 7-10. Rapid semiautomatic fire training program.**

a.   **Effectiveness of Rapid Fire.** When a soldier uses rapid semiautomatic fire properly, he sacrifices some accuracy to deliver a greater volume of effective fire to hit more targets. It is surprising how devastatingly accurate rapid fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures (shots per target, trigger pulls per hit, and even time to hit). The decrease in accuracy when firing faster is reduced with proper training and repeated practice.

159.   In my opinion, such capability combined with the performance characteristics of .223 / 5.56 ammunition originally intended for combat can, and have, resulted in catastrophic civilian mass casualty events.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _JUNE 15, 2023_ at Manchester, Maryland.

James E. Yurgealitis

52

Exhibit A

# James E. Yurgealitis

5004 Roller Rd., Manchester, Maryland 21102
24 Hour Mobile: (443) 452-7248
Email: jyurgealitis@gmail.com

_____

SUMMARY:

Self employed as a Legal and Public Policy Consultant providing Technical Firearms and Forensic Consulting, Testing and Policy Research / Training Services to Corporations, Legal Counsel and the Public Sector

EDUCATION:

B.A., Political Science and Psychology, St. John Fisher University, Rochester, New York – May 1985

PROFESSIONAL EXPERIENCE:

December 2012 to Present: Independent Legal and Policy Consultant / Subject Matter Expert

Currently provide independent consulting services to Corporations, Legal Counsel and Governmental entities in regard to Public Policy and Technical matters relating to Firearms, Firearms Policy, Forensics and Law Enforcement. Current and former clients include the Office of the District Attorney for Cook County Illinois, The City of Sunnyvale, California, The City of Highland Park, Illinois, The Office of the Attorney General for the Commonwealth of Massachusetts and the Center for American Progress, Washington D.C. I have provided sound policy and technical assistance for my clients to include expert testimony which successfully endured the opposition's legal appeals to the U.S. Circuit Court of Appeals and the U.S. Supreme Court.

December 2003 to December 2012: Senior Special Agent / Program Manager for Forensic Services ATF National Laboratory Center (NLC), Beltsville, Maryland. U. S Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

Directed the administration and management of ATF's Forensic Training Programs to include the National Firearms Examiner Academy (NFEA) a 12-month training program for State and Local Forensic Firearm Examiner Trainees. Also managed two additional forensic training programs. Administered a $1M + budget in accordance with strict ATF and National Institute of Justice (NIJ) guidelines and reporting requirements. Responsible for oversight of all Forensic Firearms related research at the NLC. Supervised a full and part time cadre of fifty-two (52) instructors and administrative personnel. Maintained liaison with commercial firearms and ammunition manufacturers and subject matter experts and ensure that lesson plans and curriculum reflected the latest technical developments in firearms manufacture, forensics and their application to federal and state law. Applied for, received and managed in excess of $2M in external grants to facilitate uninterrupted delivery of training during internal budget shortfalls. Detailed to the Department of Homeland Security Command Center in 2005 with overall responsibility to coordinate and direct Federal, State and Local Law Enforcement assets during and following Hurricanes "Irene" and "Katrina" and again in 2010 for "Andrew" and "Danielle".

June 1997 - December 2003:  Special Agent / Violent Crime Coordinator, ATF Baltimore Field Division, Baltimore, Maryland

Responsible for management of ATF's "Project Disarm", a joint law enforcement initiative between ATF, The United States Attorney's office for the District of Maryland (USAO), the Baltimore City Police Department, the Baltimore City States Attorney's Office and the Maryland State Police. Duties included reviewing over 400 state and local firearms related arrests annually for subsequent referral to the USAO and Federal Prosecution. Managed a caseload of 75 – 100 criminal cases annually. Responsible for selection, referral, follow - up investigation and subsequent indictment and prosecution of armed career criminals. Testified in front of Federal Grand Juries in excess of 75 times annually. Was recognized, and testified, as an expert witness in the Identification, Operability and origin of Firearms and Ammunition in three Federal Judicial Districts. Toured over 25 firearms and ammunition manufacturing facilities in Europe and the United States. Temporarily assigned in 2001 for three months to the 9-11 Task Force investigation in conjunction with FBI Assets. Temporarily assigned to the D.C. Sniper Task Force Intelligence Group in 2002 for two months.

June 1990 – June 1997:
Special Agent, ATF Baltimore Field Division, Baltimore, Maryland

Served in various capacities as a street-level Special Agent.  Acted as Group Supervisor and Assistant Special Agent in Charge on numerous occasions. Served on the Washington – Baltimore High Intensity Drug Trafficking Area (HIDTA) task force from 1995 – 1999.  Investigated armed narcotics trafficking organizations, seized assets, authored and executed Federal and state search and arrest warrants, conducted surveillance, interviews / interrogations, testified in Federal and state courts as a fact witness, purchased firearms, explosives and narcotics while in an undercover capacity, investigated fatal bombings and arsons, firearms trafficking, alcohol and tobacco trafficking, homicide, fraud and gun store burglaries. Also while detailed for 8 months as the Public Information Officer authored press releases, provided interviews to local and national print and television media outlets and made presentations to local and national public and special interest groups and associations.

April 1989 – June 1990 and July 1986 – March 1987: Special Agent, United States Department of State, Diplomatic Security Service (DSS), Washington Field Office, Rossyln, VA

Conducted investigations of violations of Federal Law under the department's purview to include Passport and Visa Fraud, Illegal trafficking of restricted firearms and war materials to prohibited countries, human trafficking, seized assets, authored and executed State, local and Federal Arrest and Search Warrants,  testified in Federal Court as a fact witness, detailed on an as needed basis to the Dignitary Protection Division as Agent in Charge of  multiple protective details for visiting and resident foreign dignitaries, temporarily assigned to support Physical and Personal Protective Security in various U.S. Embassies overseas on an as needed basis, detailed to the Secretary of State Protective Division on an as needed basis to supervise agents assigned to augment the permanent protective detail.

March 1987-February 1989: Special Agent, DSS, Secretary of State Protective Division, Washington, DC

Served in various capacities as Acting Agent in Charge, Acting Shift Leader, Lead Advance Agent and Shift Agent. Responsibilities included close personal protection of the Secretary of State both domestically and overseas, extensive foreign travel to facilitate and prepare security arrangements for overseas visits to include Presidential Summit meetings, liaison with foreign host government officials to plan and solicit assistance with security arrangements, supervision of agents temporarily assigned to augment the detail, liaison with U.S Government Intelligence Agencies and other Federal, State and Local Law Enforcement Agencies to identify and protect against potential threats to the Secretary of State.

<u>CLEARANCES:</u>  Top Secret March 1986 valid through February 2015. Numerous prior SCI Clearances.

<u>TEACHING EXPERIENCE:</u>

- Instructed at the Federal Law Enforcement Training Center (FLETC), for ATF and other Federal Law Enforcement Agencies
- Instructed at the International Law Enforcement Academy (ILEA) in Budapest, Hungary
- Instructed for numerous State, local and / or regional law enforcement agencies both in the United States, Canada and Central America

<u>LINKEDIN PROFILE AND ENDORSEMENTS:</u>

https://www.linkedin.com/in/james-jim-yurgealitis-68618464?trk=nav_responsive_tab_profile_pic

<u>REFERENCES:</u>

Available upon request

Exhibit B

**Professional Qualifications of James E. Yurgealitis**
**Independent Legal, Public Policy and Forensic Consultant**

I, James E. Yurgealitis, being duly sworn, depose and state:

1.) That I was previously employed as a Senior Special Agent / Program Manager with the Bureau of Alcohol, Tobacco Firearms & Explosives, (ATF) United States Department of Justice, and had been so employed since 1990. Prior to 1990 I was employed as a Special Agent with the Bureau of Diplomatic Security, (DSS) United States Department of State and had been so employed since 1986.

2.) I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher College, Rochester, New York.

3.) I am a graduate of the Federal Law Enforcement Training Center, Glynco, Georgia, the Criminal Investigator Training Program, Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program.

4.) I have completed the Firearms Interstate Nexus Training Program conducted by the Firearms Technology Branch, ATF Headquarters, Washington, D.C.

5.) I have completed both Advanced Interstate and European Nexus Training conducted by ATF in conjunction with several domestic and European firearm manufacturers.

6.) I have testified in excess of 200 times before Federal Grand Juries regarding the classification, operability, and commerce of firearms and / or ammunition.

7.) I have previously qualified as an expert witness regarding the origin, operability / classification and interstate movement of firearms and ammunition in U.S. District Court for the District of Maryland, U.S. District Court for the District of Delaware and the Circuit Court For Baltimore City, Maryland.

8.) I have conducted regular training for local, state and federal law enforcement agencies both domestically and overseas regarding firearms classification, operability and firearms statutes.

9.) I maintain a personal library of books, printed material and documents that relate to the field of firearms, ammunition, and firearms classification, attend local and national trade shows and professional association meetings, and regularly review periodicals relating to firearms and ammunition.

10.) I attend trade shows, maintain contact with, and regularly consult with other persons, to include  published authors and recognized experts in the origin, identification and  classification of firearms and ammunition.

11.) I have, during my tenure with ATF, personally examined in excess of five thousand

 Qualifications Of  James E. Yurgealitis contd.

firearms to determine their origin and classification and operability, and to facilitate
the tracing of  those firearms.

I have toured production facilities for numerous firearms and ammunition manufacturers. The
tours were conducted by corporate historians, corporate officers, or production engineering
personnel.

Domestic Firearm Manufacturers:
Bushmaster Firearms, Ilion, NY, USA
Colt, New Haven CT, USA (4x)
H&R 1871 Inc., Chicopee, MA, USA (2x)
Marlin, North Haven CT, USA (4x)
O.F. Mossberg & Sons, North Haven, CT, USA (4x)
Remington Firearms, Ilion, NY, USA
Savage Arms Inc., Westfield, MA, USA (4x)
Sig-Sauer / SIGARMS Inc., Exeter, NH, USA (3x)
Smith and Wesson, Springfield, MA, USA (4x)
Sturm Ruger, Newport, NH, USA (4x)
Yankee Hill Machining, Florence, MA, USA

Foreign Firearm Manufacturers:
Carl Walther GmbH, Ulm, Germany
Ceska Zbrojovka (CZ), Uhersky Brod, Czech Republic
Fegarmy (FEG), Budapest, Hungary
F.N Herstal S.A., Herstal, Belgium
Glock GmbH, Deutsch-Wagram, Austria
Heckler & Koch GmbH, Oberndorf au Neckar, Germany
J.P. Sauer & Sohn GmbH, Eckernforde, Germany

Domestic Ammunition Manufacturers:
Fiocchi Ammunition, Ozark, MO, USA
PMC, Boulder City, NV, USA
Remington, Lonoke, AR, USA (4x)
Sierra, Sedalia, MO, USA
Starline Brass, Sedalia, MO, USA

European Proof Houses
Beschussamt Ulm, (Ulm Proofhouse) Ulm, Germany
Beschusstelle Eckernforde, (Eckernforde Proofhouse) Eckernforde, Germany
Czech Republic Proofhouse, Uhersky Brod, Czech Republic
Liege Proofhouse, Liege, Belgium

<u>Qualifications Of   James E. Yurgealitis contd.</u>

<u>I have been allowed regular access to the following reference collections:</u>
Bureau of Alcohol, Tobacco Firearms and Explosives Reference Collection, Martinsburg, West Virginia, USA consisting of 5,000+ firearms

Liege Proofhouse, Liege, Belgium consisting of 1,000+ ammunition cartridges

Springfield Armory National Historic Site Firearms Collection, Springfield, MA, USA consisting of 10,000+ Firearms

Smithsonian Institution (Museum of American History) Firearms Reference Collection Washington, DC, USA, consisting of 4000+ firearms

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany consisting of 10,000+ Firearms

<u>I have toured the following museums:</u>
Heeresgeschichtliches Museum, (Museum of Military History), Vienna, Austria
Hungarian Military Museum, Budapest, Hungary
Springfield Armory National Historic Site, Springfield, MA, USA
United States Air Force Museum, Dayton, OH, USA
United States Army Ordnance Museum, Aberdeen Proving Ground, Aberdeen, MD, USA
United States Military Academy Museum, West Point, NY, USA
United States Naval Academy Museum, Annapolis, MD, USA
Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany

<u>Membership in Professional Organizations:</u>

Member, International Ammunition Association (IAA)
Technical Advisor (pending approval), Association of Firearm and Toolmark Examiners (AFTE)
Member, Federal Law Enforcement Officers Association (FLEOA)