## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
|     Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
|     Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
|     Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

     Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

     Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

     Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

---

**BRIEF IN OPPOSITION TO *ANJRPC/ELLMAN* PLAINTIFFS'
MOTION TO EXCLUDE EXPERT TESTIMONY**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
(609) 376-3202
Daniel.Vannella@law.njoag.gov
*Attorney for State Defendants*

Angela Cai, *Deputy Solicitor General*
Daniel Vannella, *Assistant Attorney General*
Christopher Ioannou, *Deputy Attorney General*

Of Counsel And On The Brief

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT .................................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ............4

LEGAL STANDARD...............................................................................11

ARGUMENT .........................................................................................12

   I.    THE STATE'S HISTORICAL EXPERTS—CORNELL, SPITZER, AND ROTH—PROVIDE RELEVANT HISTORICAL EVIDENCE. .........................13

      A.   Historian Expert Testimony Is Relevant To *Bruen*'s Historical Inquiry..............................................................................................13

      B.   Professors Cornell, Spitzer, And Roth Offer Proper And Reliable Historical Expert Testimony. ...........................................................19

   II.    THE STATE'S NON-HISTORIAN EXPERTS EACH OFFER TESTIMONY RELEVANT TO *BRUEN*'S TWO-STEP ANALYSIS...............26

      A.   The State's Non-Historian Experts Provide Relevant Evidence About Whether Assault Weapons and Large-Capacity Magazines Are Commonly Used For Self Defense. .......................................................................27

      B.   The State's Non-Historian Experts Provide Testimony Relevant To *Bruen*'s Second Step. .......................................................................31

   III.  PROFESSOR BARON'S EXPERT TESTIMONY HAS PROPER FOUNDATION...................................................................................34

CONCLUSION .....................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Aloe Coal Co. v. Clark Equip. Corp.*,
  816 F.2d 110 (3d Cir. 1987)................................................................12

*Antonyuk v. Hochul*,
  639 F. Supp. 3d 232 (N.D.N.Y. 2022)..................................................18

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
  910 F.3d 106 (3d Cir. 2018)................................................................35

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006)......................................................... 19, 20

*Breidor v. Sears, Roebuck & Co.*,
  722 F.2d 1134 (3d Cir. 1983)..............................................................36

*Burton v. Am. Cyanamid*,
  No. 07-303, 2018 WL 3954858 E.D. Wis. Aug. 16, 2018).................15

*Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*,
  932 F.3d 91 (3d Cir. 2019)..................................................................35

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ..................................................................... passim

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  No. 22-951, --- F. Supp. 3d ---, 2023 WL 2655150
  (D. Del. Mar. 27, 2023),......................................................... 31, 32, 33

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012)................................................................25

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...................................................................... 27, 28

*Duncan v. Becerra*,
  366 F. Supp. 3d 1131(S.D. Cal. 2019)) ..............................................33

*Duncan v. Bonta,*
No. 17-1017, 2023 WL 6180472, (S.D. Cal. Sept. 22, 2023),
*stay granted*, No. 23-55805, --- F.4th ---, 2023 WL 6588362
(9th Cir. Oct. 10, 2023). ....................................................................33

*Hanson v. District of Columbia,*
No. 22-2256, --- F. Supp. 3d ---, 2023 WL 3019777
(D.D.C. Apr. 20, 2023) ......................................................... 25, 28, 29

*Hartford v. Ferguson,*
No. 23-05364, --- F. Supp. 3d ---, 2023 WL 3836230
(W.D. Wash. June 6, 2023).................................................................25

*Hunter v. Underwood,*
471 U.S. 222 (1985) ..................................................................... 14, 15

I*n re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999).............................................................36

*Langbord v. U.S. Dep't of Treasury,*
832 F.3d 170 (3d Cir. 2016).............................................................15

*Leonard v. Stemtech Int'l Inc.*,
834 F.3d 376 (3d Cir. 2016).............................................................38

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013).............................................................14

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)..........................................................................17

*Miller v. Smith*,
No. 22-1482, 2023 WL 334788 (7th Cir. Jan. 20, 2023)...................17

*Nat'l Ass'n for Gun Rights v. Lamont*,
No. 22-1118, --- F. Supp. 3d ---, 2023 WL 4975979
(D. Conn. Aug. 3, 2023)............................................................ passim

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) .............................................................. passim

*Ocean State Tactical, LLC v. Rhode Island*,
646 F. Supp. 3d 368 (D.R.I. 2022)...................................................25

*Or. Firearms Fed'n v. Kotek*
   No. 22-1815, 2023 WL 4698752
   (D. Or. May 31, 2023) ................................................................................. passim

*Or. Firearms Fed'n v. Kotek*
   No. 22-1815, --- F. Supp. 3d ---, 2023 WL 4541027
   (D. Or. July 14, 2023) ................................................................................. passim

*Reed v. Lieurance,*
   863 F.3d 1196 (9th Cir. 2017) ...........................................................................25

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,*
   949 F.3d 825 (3d Cir. 2020) ..............................................................................11

*United States v. Bullock,*
   No. 18-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023), ....................... 17, 18

*United States v. Kantengwa,*
   781 F.3d 545 (1st Cir. 2015) ..............................................................................15

*United States v. Leo,*
   941 F.2d 181 (3d Cir. 1991) ..............................................................................21

*United States v. Tartaglione,*
   815 F. Appx. 648 (3d. Cir. 2020) ................................................................ 21, 24

*Walden v. City of Chicago,*
   755 F. Supp. 2d 942, 951 (N.D. Ill. 2010) .........................................................16

## Other Authorities

Thomas R. Lee & Stephen C. Mouritsen, Judging Ordinary Meaning,
   127 Yale L.J. 788 (2018) ...................................................................................35

## Rules

Federal Rule of Evidence 702 ............................................................................ passim

## PRELIMINARY STATEMENT

Realizing too late that their evidence on summary judgment is thin, Plaintiffs ask this Court to wipe away all of the State's affirmative expert evidence. Though they claim that *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) requires this result, the decision does no such thing. The State's experts are well qualified, use sound methodology, and give relevant testimony under *Bruen*. Rather than exclude nine State experts' testimony in its entirety, this Court should reject Plaintiffs' motion in its entirety.

Plaintiffs in two of the three consolidated matters, *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Platkin* and *Ellman v. Platkin* ("*ANJRPC* Plaintiffs"), moved to exclude all nine of the State's affirmative experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). But the motion primarily does not raise any arguments under those standards, since Plaintiffs for the most part do not challenge the experts' qualifications or expertise, the sufficiency of their evidence, the reliability of their methodology, or the reliable application of those methods to this case. *See* Fed. R. Evid. 702(a)-(d). Rather, they assert a sweeping philosophical objection that none of the proposed testimonies is or can ever be relevant in a Second Amendment challenge.

That position is plainly incorrect. It is axiomatic that expert witnesses can offer relevant, admissible testimony in a diverse cross-section of cases. This is true

for historical experts, who can provide additional key context for other historical laws and other historical factors related to the court's review of the law being challenged. It is also true for experts in other fields such as statistics and data analysis, linguistics, weapons hardware and technology, forensics and ballistics, epidemiology, and biomechanics. It is no less true for cases challenging laws under the Second Amendment.

And as a growing chorus of courts confirm, it remains true for Second Amendment cases. *Bruen* is clear that Second Amendment cases, like other cases, "follow the principle of party presentation," and "Courts are thus entitled to decide a case based on the historical record compiled by the parties." 142 S. Ct. at 2111 n.6. Contrary to *ANJRPC* Plaintiffs' assertion, the State's experts in this case proffer testimony directly relevant to both *Bruen*'s threshold inquiry and the historical analysis that follows.

As to the threshold inquiry, the State provides linguistic evidence about whether large-capacity magazines fall under the purview of the Second Amendment at all, which only protects "arms" as historically understood, and empirical evidence that assault weapons and large capacity magazines are not commonly used for self-defense, but rather designed for military use and commonly used to perpetrate mass shootings. As to the latter, historical inquiry, the State provides both historical and statistical expert evidence showing that mass shootings, and those perpetrated with

assault weapons and large-capacity magazines, are a new social problem. The State's experts also demonstrate that these instruments present dramatic technological change that requires nuanced analysis. Finally, the State's historical experts provide testimony as to the development of historical firearms technologies and their use by Americans, the contextual background behind historical firearms regulations, and the evolution and emergence of social problems over time. *ANJRPC* Plaintiffs' insistence that the State's historical experts be jettisoned entirely is also belied by their conduct in proffering purported historical experts in this very matter.

*ANJRPC* Plaintiffs' only specific challenge is to linguistics expert Professor Dennis Baron, whom they claim offered faulty methodology to draw his conclusions regarding linguistic use of the term "arms" to exclude "accessories" and "accoutrements," which would have encompassed large-capacity magazines. Indeed, it is Plaintiffs who fail to understand Professor Baron's methodology, which is laid out in great detail in his report. Indeed, the historical linguistic evidence he cites directly contradicts *ANJRPC* Plaintiffs' specific—and unfounded—objection. Plaintiffs simply fail to launch any valid challenge to the reliability of Professor Baron's opinions under Rule 702 and *Daubert*.

This Court should deny *ANJRPC* Plaintiffs' motion in full.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY[1]

Following the Third Circuit's remand of *Association of New Jersey Rifle & Pistol Clubs* ("*ANJRPC*"), No. 18-10507, to this Court "for decision in the first instance under the standard announced in *Bruen*," this Court reopened the matter on August 25, 2022. ECF 109-110. Plaintiffs filed an amended complaint on October 28, 2022, which the State answered on November 17, 2022. ECF 122, 126. On February 6, 2023, the Court granted the State's motion to consolidate *Cheeseman v. Platkin*, No. 22-4360, as well as *Ellman v. Platkin*, No. 22-4397, into the older *ANJRPC* matter for coordination of discovery. ECF 148.[2] The Court found consolidation appropriate, among other reasons, to accomplish the "main goal" of "develop[ing] the historical evidence and discovery." *Id.* at 7.

Following the Rule 16 initial conference, on March 16, 2023 the Court entered its discovery scheduling order. ECF 154. That order required fact discovery to close by May 31, 2023, and set an interim deadline of May 15, 2023 for all parties to "identify any affirmative experts by name and subject area." *Id.* at 2. It then required all parties to serve any affirmative expert reports by June 16, 2023; all parties to

---

[1] Because they are closely intertwined, combined for the Court's convenience. All references "ECF __" refer to the *ANJRPC* docket, No. 18-10507.

[2] The Court, with the consent of all parties, would later extend the consolidation of these three matters through the resolution of the post-discovery *Daubert* motions and dispositive motion. ECF 168.

serve any rebuttal expert reports by July 17, 2023; and all expert discovery (and thus discovery in full) to be completed by August 31, 2023. *Id.* The parties met all of these deadlines.

On May 15, 2023, the State and *ANJRPC* Plaintiffs each disclosed affirmative experts and their subject areas. Declaration of Daniel Vannella, Exs. 1-2.[3] The *ANJRPC* Plaintiffs identified two affirmative experts: Emanuel Kapelsohn ("[g]eneral firearms knowledge, use, and nature"),[4] and Ashley Hlebinsky ("[h]istory, including, but not limited to, historical development, nature, and use of firearms"). Ex. 2. They would later produce affirmative expert reports from each of these witnesses on the June 16, 2023 deadline to do so. Ex. 13, Rpt. of Emanuel Kapelsohn; Ex. 17, Rpt. of Ashley Hlebinsky. *Cheeseman* Plaintiffs have submitted and are relying on no expert testimony.

---

[3] Subsequent references to "Ex. __" refer to exhibits to the Vannella Declaration, unless otherwise specified.

[4] During his deposition, Mr. Kapelsohn hinted that he is also offering affirmative expert testimony on the history of firearms. Ex. 16, Kapelsohn Dep. Tr. at T47:10-51:11. He possesses only "a general education in U.S. history from public school," he "may have taken one or more courses in history at Yale University," and he has read about history "pretty much all my life." *Id.* at T51:12-20. On the history of firearms specifically, he suggests he is a qualified expert because he has visited museums and spoken with war reenactors. *Id.* at T179:22-181:2; 183:6-184:13. Asked if he has ever been admitted as an expert on the history of firearms, he responded, "[t]hat I couldn't tell you." *Id.* at T52:5-8.

The State identified nine affirmative experts on May 15, 2023, and produced reports from each of them on June 16, 2023. They are as follows:

- Lucy Allen is currently a Senior Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice, and Chair of NERA's Product Liability and Mass Torts Practice. Ex. 7, Rpt. of Lucy Allen ¶ 1). She holds an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in economics, also from Yale University. *Id.* ¶ 3. Prior to engaging as an economic consultant with NERA for over twenty-five years, Ms. Allen served as an economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. *Id.* ¶¶ 2-3;

- Dennis Baron is Professor Emeritus and Research Professor at the University of Illinois, where he has served as a member of both the Department of English and the Department of Linguistics since 1975. Ex. 6, Rpt. of Professor Dennis Baron ¶ 5). Professor Baron earned his Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English. *Id.* Professor Baron is a recipient of Fulbright, Guggenheim, and National Endowment for the Humanities

fellowships. *Id*. He continues to publish widely on matters of historical language use, in addition to topics related to language and law. *Id*.;

- Saul Cornell currently holds the Paul and Diane Guenther Chair in American History at Fordham University. Ex. 3, Rpt. of Professor Saul Cornell 2. He earned an M.A. and a Ph.D. in History from the University of Pennsylvania. *Id.* In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, he also teaches constitutional law at Fordham Law School. *Id.* Professor Cornell has been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. *Id.*;

- Stephen Hargarten has practiced emergency medicine for over thirty-five years, and is a Professor of Emergency Medicine at the Medical College of Wisconsin ("MCW"). Ex. 8, Rpt. of Dr. Stephen Hargarten ¶¶ 3-5. He received his M.D. from MCW in 1975 and his M.P.H. from the Bloomberg School of Public Health at The Johns Hopkins University in 1984. *Id.* ¶ 3. He has served as Chairman of the Department of Emergency Medicine and as the Associate Dean for Global Health at MCW. *Id.* ¶ 5. Dr. Hargarten has also served on a number of National and International Committees,

including as Vice-Chair of the Community Preventive Services Task Force of the U.S. Department of Health and Human Services. *Id.* ¶ 7;

- Louis Klarevas is a security policy analyst and Research Professor at Teachers College, Columbia University. Ex. 9, Rpt. of Professor Louis Klarevas ¶ 2). He holds a B.A. from the University of Pennsylvania and a Ph.D. from American University. *Id.* ¶ 3. During the course of his twenty-five-year career as an academic, he has served on the faculties of George Washington University, the City University of New York, New York University, and the University of Massachusetts. *Id.* And, he is the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States. *Id.* ¶ 2;

- Randolph Roth is an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University. Ex. 5, Rpt. of Professor Randolph Roth ¶ 1. He obtained a B.A. in History with Honors and Distinction in 1973 from Stanford University, where he received the James Birdsall Weter Prize for the outstanding honors thesis in History. *Id.* ¶ 3. He obtained a Ph.D. in History in 1981 from Yale University, where he received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history. *Id.* He has taught courses in

8

history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime. *Id.* He is the author of *American Homicide*, an interregional, internationally comparative study of homicide in the United States from colonial times to the present. *Id.* ¶ 4;

- Robert Spitzer is a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland and an Adjunct Professor at the College of William and Mary School of Law. Ex. 4, Rpt. of Professor Robert Spitzer 1). He earned his Ph.D. in Government from Cornell University. *Id.* Professor Spitzer has been studying, teaching, and writing about gun policy for more than thirty years. *Id.* His expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. *Id.*;

- Daniel Webster is a Bloomberg Professor of American Health in Violence Prevention in the Department Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Ex. 10, Rpt. of Professor Daniel Webster ¶ 2. He currently serves as Distinguished Scholar for the Johns Hopkins Center for Gun Violence Solutions and previously served as Co-Director of the Johns Hopkins Center for the Prevention of Youth Violence. *Id.* Professor Webster holds a M.P.H. from the University of Michigan and a doctorate in Health Policy and Management from the

Johns Hopkins School of Public Health. *Id.* ¶ 4. He has directed numerous studies related to gun violence and its prevention and has published 149 scientific articles and 9 invited commentaries in academic peer-reviewed journals, the vast majority of which addressed some aspect of violence and/or firearm injuries and their prevention. *Id.* ¶ 6;

- James Yurgealitis is a Legal and Forensic Consultant with twenty-six years of prior experience as a Federal Law Enforcement Officer. Ex. 11, Rpt. of James Yurgealitis ¶ 1. For nine years, he served as a Senior Special Agent/Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for the United States Department of Justice, during which time he was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Maryland. *Id.*.

Plaintiffs chose not to depose any of the State's experts.

On the July 17, 2023 deadline to produce rebuttal expert reports, *ANJRPC* Plaintiffs produced a second, rebuttal expert report from Mr. Kapelsohn; as well as one from Clayton Cramer.[5] Ex. 14, Rebuttal Rpt. of Emanuel Kapelsohn; Ex. 19,

---

[5] The State also produced its own rebuttal expert report from Professor Brian DeLay, Ph.D., the Preston Hotchkis Chair in the History of the United States at University of California at Berkeley. Vannella Decl. Ex. 12, Rpt. of Professor Brian DeLay ¶ 1. *ANJRPC* Plaintiffs do not challenge Professor DeLay or his proposed testimony in their *Daubert* motion.

Rebuttal Rpt. of Clayton Cramer. Each of these rebuttal reports purports to challenge the opinions rendered by several of the State's affirmative experts. *Id.* Each of them challenges, among others, the opinions of the State's three affirmative historical experts, Professors Cornell, Spitzer, and Roth. *Id.*

On September 6, 2023, following the close of discovery, the Court entered a text order adopting the parties' jointly proposed briefing schedule for summary judgment and *Daubert* motions. ECF 167. Pertinent here, any Plaintiffs' *Daubert* motions challenging the State's experts were to be filed by October 6, 2023. ECF 166, at 2. The *ANJRPC* Plaintiffs filed their motion on that date. The State's response, which is to be filed by November 3, 2023, *id.* at 3, follows.

## LEGAL STANDARD

Rule 702 permits expert testimony or evidence, provided (1) "the witness is a qualified expert"; (2) the proposed testimony or evidence "is reliable and relates to matters requiring scientific, technical, or specialized knowledge"; and (3) it "is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). A "qualified" expert "possess[es] skill or knowledge greater than the average layman" in the subject-matter of their expertise. *Aloe Coal Co. v. Clark Equip. Corp.*, 816 F.2d 110, 114 (3d Cir. 1987). In assessing the reliability of

the expert's testimony or evidence, *Daubert* describes four nonexclusive considerations that courts should weigh: (1) an ability (or not) to test the expert's methodology or reasoning; (2) whether the expert's theory has been subjected to peer review and publication; (3) its potential rate of error; and (4) its general acceptance in the relevant scientific community. 509 U.S. at 592-94.

## **ARGUMENT**

*ANJRPC* Plaintiffs do not contest that all nine of the State's affirmative experts are each qualified in their respective fields of expertise.[6] Their only argument against the State's historian experts—that courts may not consider historical expert information when evaluating *Bruen*'s historical test—is foreclosed by both precedent and logic. *See* Point I, *infra*. Their argument that the State's empirical experts offer impermissible "interest balancing" testimony is belied by the record, which shows these experts instead offer expert testimony relevant to both the threshold question of whether assault weapons and large-capacity magazines are in common use for self-defense and whether such instruments present new technological and social change—both inquiries required under *Bruen*. *See* Point II, *infra*. And *ANJRPC* Plaintiffs' specific challenge against the methodology of linguist Denis Baron, Ph.D., is based on their misunderstanding of his report, which

---

[6] Plaintiffs raise no challenge whatsoever to the State's historical rebuttal expert, Professor Brian DeLay, who responds to the report of their expert Ashley Hlebinsky. DeLay Rpt.

12

presents evidence directly contradicting *ANJRPC* Plaintiffs' unfounded assertions. *See* Point III, *infra*.

# I.   THE STATE'S HISTORICAL EXPERTS—CORNELL, SPITZER, AND ROTH—PROVIDE RELEVANT HISTORICAL EVIDENCE.

This Court should reject *ANJRPC* Plaintiffs' efforts to discard wholesale the reports of three expert historians, who proffer expertise as to background historical facts that will aid the finder of fact in understanding historical firearms technologies and their use, the contextual background behind historical firearms regulations, and the evolution and emergence of social problems—all issues relevant for this Court's evaluation of the constitutionality of the challenged laws under the Second Amendment. There is no dispute that Professors Cornell, Roth, and Spitzer are eminently qualified as experts. There is also no dispute about the reliability of their methodology or the reliability of their application of that methodology in this case. Because their proffered testimonies are proper expert opinion and relevant to factual determinations before this Court, they are admissible. *See Daubert*, 509 U.S. at 591.

## A. Historian Expert Testimony Is Relevant To *Bruen*'s Historical Inquiry.

In asking this Court to discard the entirety of the three historians' affirmative expert reports, the gravamen of *ANJRPC* Plaintiffs' argument is that the State's historical experts' testimonies play *no* role in assisting a trier of fact for Second Amendment challenges. *See* ANJRPC Daubert Br. 6-8. But this is squarely contrary

to precedent. Within and beyond the Second Amendment context, historical expert testimony provides important factual inputs for a court's adjudication of historical facts. The value of this testimony is no less important even if the parties can, and indeed often do, present historical documents to the trier of fact. "[A] historian's 'specialized knowledge' could potentially aid a trier of fact" by "help[ing] to identify, gaug[ing] the reliability of, and interpret[ing] evidence that would otherwise elude, mislead, or remain opaque to a layperson." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013).[7]

*Hunter v. Underwood*, 471 U.S. 222 (1985), underscores the value that historical experts provide in contextualizing the enactment of historical laws. There, the Supreme Court affirmed the appellate court's holding that racial animus motivated the enactment of a provision of the Alabama Constitution. *Id.* at 230. Central to the lower court's decision was "[t]he evidence of legislative intent," which "consisted of the proceedings of the [constitutional] convention, several historical

---

[7] To wit, Plaintiffs themselves are proffering three witnesses who each hold themselves out as "historical" experts of sorts. Perhaps in a preemptive defense of their actions, they claim the State's retention of experts "compel[led]" them to "offer responsive testimony." ANJRPC Daubert Br. 13. That is weak tea. Plaintiffs did not retain those experts merely to rebut the States' experts, but rather rely on them affirmatively. Tellingly, Plaintiffs now lean heavily on those experts' testimonies in their summary judgment motion. *See, e.g.*, ANJRPC SJ Br. 24, 27, 28, 34 (summary judgment brief); ANJRPC SUMF ¶¶ 23-112. To be clear, one of those individuals has no expertise in history, and the other's testimony is wholly irrelevant to the historical inquiry under *Bruen*. State Defs. Daubert Br. 15; State Defs. Responses to ANJRPC SUMF ¶¶ 68-112.

studies, and *the testimony of two expert historians*." *Id.* at 229 (emphasis added). The historians' testimony helped "show[] that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks." *Id.* at 228-29. (citation omitted). In upholding the lower court's decision, the Supreme Court declined to "repeat[] th[e] factual analysis," including historical expert testimony, on which the lower court relied. *Id.* at 229-30.

Historical experts also provide value beyond discussing historical laws, which explains why courts have permitted their testimony in diverse scenarios. *See, e.g.*, *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 195 (3d Cir. 2016) (en banc) (accepting the testimony of an expert witness, under Rule 702, who "help[ed] the jury understand the historical background of the 1933 Double Eagles [gold pieces] ... by 'surveying a daunting amount of historical sources, evaluating their reliability and providing a basis for a reliable narrative about the past'" (quoting *United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015))); *Burton v. Am. Cyanamid*, No. 07-303, 2018 WL 3954858, *4, *7 (E.D. Wis. Aug. 16, 2018) (permitting the inclusion of expert testimony from historians in a products liability case given that "a trained historian can contribute tremendously to the accuracy and completeness of the juror's understanding by situating the documents in its historical context—a context with social, economic, technological, linguistic, and medical dimensions, to

name but a few"); *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 951 (N.D. Ill. 2010) (holding that a historian was qualified to testify as an expert in a § 1983 action because his "research utilized his experience and education as an academic historian and could not have been completed by 'anyone,'" given that "historical research … require[s] training and education"). These decisions evince the important role historical experts play in shedding light on historical documents, laws, and trends—a role this Court should permit the State's witnesses to fulfill here.

The need for historical expertise is amplified by the type of inquiry required of courts under *Bruen*, which sets out a two-part test, the latter of which is a fact-intensive historical inquiry. After determining whether the Second Amendment right is implicated, courts must ask if the regulation nevertheless accords with "the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. That includes determining, *inter alia*, whether there existed historical regulations on firearms "address[ing] a general societal problem that has persisted since the 18th century" and whether "unprecedented societal concerns or dramatic technological changes" have taken place in the interim. *Id.* at 2132. And those broad questions may involve a panoply of historical facts, such as what kinds of firearms existed, how they were used by the public, how they were perceived by governments, and what kind of historical actions were taken, to name a few. It is no surprise, then, that *Bruen* made clear that "[i]n our adversarial system of adjudication, we follow the

principle of party presentation," and that "Courts are thus entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2111 n.6 (bracket in original). After all, as the Court acknowledged, "[h]istorical analysis can be difficult." *Id.* at 2130 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 803 (2010) (Scalia, J., concurring)). This is especially the case where, as here, "unprecedented societal concerns or dramatic technological changes" abound, "requir[ing] a more nuanced approach." *Id.* at 2132. The role of historical expert testimony is thus critical to help courts "identify a well-established and representative historical *analogue*," *id.* at 2133, considering that they—the courts— are not themselves "obliged to sift the historical materials for evidence to sustain [a] statute," *id.* at 2150.

It is thus unsurprising that following *Bruen*, numerous lower courts have permitted the use of historical expert testimony in Second Amendment cases. In *Miller v. Smith*, No. 22-1482, 2023 WL 334788 (7th Cir. Jan. 20, 2023), the Seventh Circuit remanded the case and instructed the district court to "allow the parties to engage in further discovery, including seeking additional expert reports." *Id.* at *1. Additional experts, the court determined, were necessary to enable the district court to "apply[] the 'text, history, and tradition' test of *Bruen*." *Id.* In *United States v. Bullock*, No. 18-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023), the court found the lack of historical expert testimony to be a glaring omission in the government's

case. *See id.* at *15 ("The most disappointing failure is that the party with the burden to prove history and tradition—the United States—did not designate a historian to testify on the analogues, if any, to modern felon-in-possession laws."). Experts were necessary, the court noted, because "[j]udges draw not upon their own subject-matter expertise, but upon a record produced by the parties' own presentations." *Id.* at *16.

In another case, *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022), the district court underscored the importance of historical testimony. *See id.* at 297 n.72 ("What would be more helpful to this Court [in interpreting historical laws] is the testimony of opposing historians with expertise in the time periods and regions that produced the laws."). And in yet another case, *Oregon Firearms Federation v. Kotek*, which upheld an Oregon law restricting large-capacity magazines, the court relied on the State's historical experts after hearing testimony from both sides' experts at trial. No. 22-1815, --- F. Supp. 3d ---, 2023 WL 4541027, *16 (D. Or. July 14, 2023) ("This Court finds the testimony of Defendants' neutral historical experts to be significantly more credible—and entitled to more weight—than that of [the plaintiffs' witness]."), *appeal pending*, No. 23-35479 (9th Cir.). Though they are not themselves binding on this Court, these decisions nevertheless underscore the importance of admitting and referring to historical expert testimony in the Second Amendment context.

## B. Professors Cornell, Spitzer, And Roth Offer Proper And Reliable Historical Expert Testimony.

This Court should also reject *ANJRPC* Plaintiffs straw-man argument that Professors Cornell, Spitzer, and Roth's testimonies are "impermissible legal interpretation." ANJRPC Daubert Br. 6. Even a cursory glance through their reports makes clear that *ANJRPC* Plaintiffs' characterization is patently false. Rather than offering "legal conclusions" about the constitutionality of New Jersey's assault weapons and large-capacity magazine restrictions, these historians "address the history of firearms regulations"—a fact Plaintiffs elsewhere admit. *Id*. at 6.

*ANJRPC* Plaintiffs begin with a vague assertion that the State's historical experts give "pages upon pages of statutory interpretation," urging this Court to exclude the testimony "in its entirety." ANJRPC Daubert Br. 6, 8. But that is simply incorrect. Professors Cornell, Spitzer, and Roth are *not* "testify[ing] as to the governing law of the case." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Here, the "governing law," set forth by *Bruen*, is whether "the Second Amendment's plain text covers an individual's conduct," and whether a regulation burdening that conduct "is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. And a current regulation's consistency with its historical predecessors turns on the regulations' "relevant[] similar[ity]." *Id*. No question; it is this Court, not experts, who is responsible for resolving those legal questions. *See Or. Firearms Fed'n v. Kotek*, No. 22-1815, 2023 WL 4698752, *3

19

(D. Or. May 31, 2023) (addressing the parties' *Daubert* motions in a post-*Bruen* Second Amendment challenge).

But the testimony offered by the State's historical experts do not aim to answer that ultimate legal question. Professors Cornell, Spitzer, and Roth do "not testify as to the governing law of the case," *Berckeley*, 455 F.3d at 217, namely whether historical gun regulations are "relevantly similar" to those at issue in this case, *Bruen*, 142 S. Ct. at 2132. Instead, they provide background historical facts that provide the evidence that the Court would use to resolve the legal questions, "offer[ing] opinions as to what kinds of firearm regulations existed during the relevant historical time periods, how and why those regulations came into existence, and what burdens those regulations imposed at the time." *Kotek*, 2023 WL 4698752, *2; *see also id.* at *3 (rejecting plaintiffs' *Daubert* motion "to exclude … Robert Spitzer's testimony in its entirety … on the basis that [he] offer[s] impermissible legal-interpretation or legal-conclusion testimony").

As in all cases involving application of law to facts, historical evidence—such as what motivated the passage of historical statutes or how they applied to individuals subject to them—can be relevant to the resolution of legal issues. And as the Third Circuit has observed, historical *legal* facts also constitute evidence: "sometimes an understanding of non-governing law may 'help the trier of fact to understand the evidence.'" *United States v. Tartaglione*, 815 F. Appx. 648, 650 (3d.

Cir. 2020) (quoting Fed. R. Evid. 702(a)). For example, the Third Circuit "has allowed expert testimony concerning business customs and practices" in a variety of cases, because that testimony was not testimony about the "applicable law" in the case at hand. *United States v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991). So, "qualified experts may testify" about the "context[]" behind non-governing laws: here, the historical firearms regulations themselves. *Tartaglione*, 815 F. Appx. at 650-51.

The State's historical experts do just that. To the extent they discuss past regulations at all, they simply "contextualize" those laws. *Id.* Indeed, as Professor Cornell rightly explains, "[l]egal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past." Cornell Rpt. 7-8. The "relevant historical contexts" include "how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, responded to societal ills created by those changes." *Id.* at 8.

Professors Cornell, Spitzer, and Roth appropriately shed light on those contexts behind historical gun laws. For example:

- In describing early nineteenth century laws requiring gun inspections, Professor Cornell explains that while an infant American firearms industry ironed out some kinks, "[t]he danger posed by defective arms, or poorly

manufactured ones could be catastrophic. A burst barrel of a musket or fowling piece could turn a firearm into a pipe bomb, maiming or killing an unfortunate user." *Id.* at 20. Inspection laws were thus devised "to prevent harm to residents from the sale of unsafe firearms." *Id.* at 20-21.

- Professor Cornell also identifies early stamping and marking standards imposed on the firearms industry, which "aided government efforts to keep track of weapons and enforce manufacturing standards," noting that the government "marked weapons in this fashion to make it easier to identify cases where arms were being illegally sold in a secondary market to private individuals or sold to person who were not allowed to own firearms." *Id.* at 21-22.

- Similarly, Professor Spitzer points to "[t]he rise in the circulation of multi-shot handguns in society" to explain "the rapid spread of concealed carry restrictions[,] … precisely because of [those guns'] contribution to escalating interpersonal violence." Spitzer Rpt. ¶ 45.

- As Professor Spitzer notes, several states effectively barred possession of multi-shot handguns "outright" in the late 1800s and early 1900s, and by the end of the nineteenth century, "virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying." *Id.*

- And in pointing to the technological "spread" of automatic and semi-automatic weapons in civil society that were "used for criminal or other dangerous purposes," Professor Spitzer explains that "regulatory efforts ensued." *Id.* ¶ 22.

- Professor Roth considers several "historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders." Roth Rpt. ¶ 13.

- Indeed, Professor Roth observes, laws restricting the use of firearms appeared "in the early national period in a number of slave states, where violence among citizens increased after the Revolution to extremely high levels" and concealable weapons "were used in an alarming proportion of the era's murders and serious assaults." *Id.* ¶¶ 27-28. As Professor Roth notes, "these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime." *Id.* ¶ 28.

- Professor Roth also identifies early prohibitions against carrying certain concealable weapons which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838, which "applied

broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct." *Id.* ¶ 30.

- And "[b]y the early twentieth century," Professor Roth explains, "every state either banned concealed firearms or placed severe restrictions on their possession," due to a "nationwide surge in homicide rates … and the invention of new firearms, … which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse." *Id.* ¶ 33.

Because these experts merely "contextualize" "non-governing law"—*i.e.*, the historical regulations themselves—in a way that "help[s] the trier of fact to understand the evidence," the State's historical experts' testimony is admissible. *Tartaglione*, 815 F. Appx. at 650-51. Indeed, another district court rejected a similar motion on identical grounds, concluding that "Defendants' experts may offer opinions as to what kinds of firearm regulations existed during the relevant historical time periods, how and why those regulations came into existence, and what burdens those regulations imposed at the time." *Kotek*, 2023 WL 4698752, *3. And a number of courts, reviewing post-*Bruen* Second Amendment challenges, have relied on the very same historical experts that New Jersey offers here. *See, e.g.*, *Kotek*, 2023 WL 4541027, *15-16 (crediting the testimony of the defendants' historical experts, including Professor Spitzer, with substantial weight); *Hanson v. District of*

*Columbia*, No. 22-2256, --- F. Supp. 3d ---, 2023 WL 3019777, *9, *14-15 (D.D.C. Apr. 20, 2023) (similarly crediting Professors Spitzer's and Roth's historical testimony), *appeal pending*, No. 23-7061 (D.C. Cir.); *Nat'l Ass'n for Gun Rights v. Lamont*, No. 22-1118, --- F. Supp. 3d ---, 2023 WL 4975979, *24-25, *27-28, *31-33 (D. Conn. Aug. 3, 2023) (crediting both Professors Cornell's and Roth's testimony), *appeal pending*, No. 23-1162 (2d Cir.); *Hartford v. Ferguson*, No. 23-05364, --- F. Supp. 3d ---, 2023 WL 3836230, *4-6 (W.D. Wash. June 6, 2023) (crediting Professor Spitzer's testimony); *see also Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 381, 390 (D.R.I. 2022) (acknowledging that the state's historical experts, including Professor Roth, were more credible than the plaintiffs,' including Ashley Hlebinsky), *appeal pending*, No. 23-1072 (1st Cir.).This Court should do the same.

Finally, even if portions of an expert report contained inadmissible testimony (which is not the case here), that is no basis for full exclusion, since "*Daubert* is not an all-or-nothing test." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 n.18 (3d Cir. 2012); *see Reed v. Lieurance*, 863 F.3d 1196, 1208-09 (9th Cir. 2017) (explaining that a district court abuses its discretion in excluding expert testimony entirely when only "portions of the expert report" may be excludable). Thus, there is no basis for granting Plaintiffs' motion in full.

## II.   THE STATE'S NON-HISTORIAN EXPERTS EACH OFFER TESTIMONY RELEVANT TO *BRUEN*'S TWO-STEP ANALYSIS.

*ANJRPC* Plaintiffs' argument regarding five other State experts is yet another straw-man. These experts—whose qualifications and methodology are again, unchallenged—*do not* proffer opinions as to "interest balancing," *contra* Plaintiffs' assertion. ANJRPC Daubert Br. 2; *see also id.* at 9-14. These experts do not opine that New Jersey's restrictions on assault weapons and large-capacity magazines are justified by some social interest. Rather, they provide factual information directly relevant to *Bruen*'s inquiry: whether a certain item is in common use for self-defense so as to be protected by the Second Amendment's plain text and whether modern society faces unprecedented technological change or new social problems. These experts' proffered testimonies include facts relevant to those questions. They include information such as statistical evidence on 1) how frequently assault weapons are used in self-defense scenarios, 2) how many rounds of ammunition are used in such scenarios, 3) the design of assault weapons and large-capacity magazines and their suitability for military use, 4) the rise of mass shootings over time, and 5) the use of assault weapons and large capacity magazines in such shootings. They also provide other relevant scientific facts such as experimental data on the differences in body-tissue damage caused by modern assault weapons versus historical weapons.

**A. The State's Non-Historian Experts Provide Relevant Evidence About Whether Assault Weapons and Large-Capacity Magazines Are Commonly Used For Self Defense.**

As mentioned, the first step under *Bruen*'s analysis is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. To answer that question, courts must determine on whether the arms at issue are "'in common use' today for self-defense." *Id.* at 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). Although weapons commonly used for self-defense are presumptively protected, those not so used, namely because they "are most useful in military service[,] … may be banned." *Heller*, 554 U.S. at 627.

Several of the State's experts' proffered testimonies relate to the common-use question. Consider, for example, the testimony of Ms. Allen, a Yale-trained economist who performed statistical analyses of how frequently assault weapons were used by individuals in self-defense scenarios and the number of shots an average person uses in such scenarios. *ANJRPC* Plaintiffs puzzlingly criticize Ms. Allen's testimony for "speak[ing] only of mass shootings and the number of rounds the average person uses in self-defense"—when they use the firearms and magazines being challenged in these cases. ANJRPC Daubert Br. 12. But "the number of rounds the average person uses in self-defense" is relevant to the core inquiry of whether the challenged magazines and firearms are "in common use for self-defense." And other courts agree. *See, e.g.*, *Kotek*, 2023 WL 4698752, *1, *3 (rejecting a challenge

to exclude Ms. Allen's same testimony, because "understanding whether LCMs are actually used in self-defense situations is relevant to determining whether LCMs are in common use for lawful purposes such as self-defense"); *Hanson*, 2023 WL 3019777, *10-12 (relying in part on Ms. Allen's testimony). And Professor Klarevas, a political scientist whose expertise includes statistical studies on firearms violence, similarly concluded based on FBI data that use of assault weapons in defensive gun uses by civilians is very rare. Klarevas Rpt. ¶ 26. By contrast, the vast majority of such defensive gun uses involved civilian use of a handgun. *Id.*[8]

Moreover, several of the State's experts proffer testimony "relevant to determining whether LCMs [and assault weapons] are weapons that are 'most useful in military service,' which are not necessarily protected by the Second Amendment." *Kotek*, 2023 WL 4698752, *1 (quoting *Heller*, 554 U.S. at 627). For example, Mr. Yurgealitis, a former ATF agent who has deep knowledge and expertise of firearms, opined that assault weapons and LCMs were "initially designed … for a military purpose." Yurgealitis Rpt. ¶¶ 39-110. That expert opinion similarly tends to show that such instruments are not commonly used for self-defense. *See Hanson*, 2023

---

[8] And even as to Plaintiffs' theory—that ownership is the sole determinant of common use, *see* ANJRPC SJ Br. 2-3, 23-24, 29; State Defs. Cross-SJ Br., Professor Klarevas provides relevant testimony. After analyzing a study cited by *Plaintiffs*, he pointed out that even that study supports the conclusion that less than 2% of Americans own a modern sporting rifle, and that nearly half of the AR-15s owned by civilians are concentrated in just 1.6% of all AR-15 owners. Klarevas Rpt. ¶¶ 28-29.

WL 3019777, at *8-9 (finding "support for this [common-use argument] in history" because the "historical evidence … shows that LCMs' lethality was popular in military settings, and indeed many of them were designed specifically for military (and law enforcement) use").

Other State's experts provide testimony relevant to the use of assault weapons and large capacity magazines for purposes other than self-defense, namely, perpetrating mass shootings. "Evidence regarding the prevalence and nature of mass shootings that involved the use of LCMs [and assault weapons] is … relevant to considering the typical use of LCMs in order to determine whether they are arms protected by the Second Amendment." *Kotek*, 2023 WL 4698752, *2; *see also Lamont*, 2023 WL 4975979, *22-26 (finding the weight of the evidence to show that the use of assault weapons and LCMs "in mass shootings [and other crimes] demonstrates that the weapons are commonly used for reasons other than lawful self-defense"). For example, Professor Webster, an epidemiologist at Johns Hopkins University who specializes on violence, presents expert evidence "that the design features of assault weapons make them especially appealing to criminals and to those who commit mass shootings." Webster Rpt. ¶ 9; *see also id.* ¶¶ 10-11 (similar evidence about LCMs). And Professor Klarevas provides testimony based on statistical data showing that assault weapons and LCMs are used more frequently to

perpetrate mass shootings than to stop them. Klarevas Rpt. ¶¶ 13-27.[9] *See Kotek*, 2023 WL 4541027, *34 (considering Professor Klarevas's testimony in finding "that LCMs enhance the lethality of shooting events," and thus holding that they "are not commonly used for self-defense"); *Lamont*, 2023 WL 4975979, *23-24 (similar). And Dr. Hargarten, an emergency-room physician and epidemiologist, provided empirical scientific data to demonstrate that the "particular[] sever[ity]" of injuries caused by assault weapons and LCMs make those instruments "are more suitable for military use than civilian self-defense." *Lamont*, 2023 WL 4975979, *24-26. Dr. Hargarten reached that conclusion after partnering with the Wisconsin Crime Lab to conduct biomechanical testing of bullets released from various weapons, including an AR-15-style rifle, a bolt-action Remington hunting rifle, three handguns, a Thompson Machine gun rifle, and a musket model; the results demonstrated that "bullets fired by assault weapons penetrate tissue to create relatively large temporary cavities and permanent wound channels that are generally more severe than other kinds of weapons." Hargarten Rpt. ¶¶ 13-36. That is directly relevant to the question of whether such instruments, designed for military use, are useful for self-defense, or whether they are useful for inflicting enormous damage to the human body and

---

[9] *ANJRPC* Plaintiffs cherry-pick a quotation to suggest that Professor Klarevas "was retained to opine that 'restrictions on assault weapons and LCMs have the potential to save lives.'" ANJRPC Daubert Br. 12 (quoting Klarevas Rpt. ¶ 11). But as a reading of the entirety of his report makes clear, Professor Klarevas was not retained to opine on the effectiveness of assault weapon and LCM bans.

are thus preferred by perpetrators of mass shootings. *See also infra* at 32 (relevance of Hargarten study results on *Bruen* step 2 inquiry).

Because each of these experts' testimony is relevant to *Bruen*'s threshold inquiry of whether the instruments at issue are protected by the Second Amendment, this Court should deny *ANJRPC* Plaintiffs' motion to exclude their testimony.

### B. The State's Non-Historian Experts Provide Testimony Relevant To *Bruen*'s Second Step.

For arms that *are* presumptively protected by the Second Amendment, *Bruen* requires courts to evaluate whether the challenged regulations are "consistent with this Nation's historical tradition." 142 S. Ct. at 2126. It directed courts to ask whether the regulation at issue "addresses a general societal problem that has persisted since the 18th century," or whether they address "unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. In latter cases, the court's examination of the government's proffered historical analogues is more "nuanced." *Id.* at 2133. Thus, assessing whether a case involves "unprecedented societal concerns or dramatic technological changes" affects the government's burden.

As other courts have found, assault weapon and LCM bans "implicate unprecedented societal concerns and dramatic technological changes." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.* ("*DSSA*"), No. 22-951, --- F. Supp. 3d ---, 2023 WL 2655150, *10 (D. Del. Mar. 27, 2023), *appeal pending*, No. 23-1633 (3d Cir.); *see, e.g.*, *Lamont*, 2023 WL 4975979, *26-29;

*Kotek*, 2023 WL 4541027, *13-15, *36-39. The State's proffered expert evidence addresses both inquiries.

First, several experts present evidence "show[ing] that assault long guns and LCMs represent recent advances in technology." *DSSA*, 2023 WL 2655150, *10. For example, Mr. Yurgealitis's testimony discusses the evolution of assault weapons and LCMs. Yurgealitis Rpt. ¶¶ 39-110. And Dr. Hargarten's biomechanical testing shows that the types of injuries caused by LCMs and assault weapons, are catastrophic in nature compared to weapons available historically, such as the Thompson machine gun and the musket ball. Hargarten Rpt. ¶¶ 25, 26, 28; *see DSSA*, 2023 WL 2655150, *10-11 (recounting at length the "catastrophic" wounds suffered by victims of assault weapons, including the much larger tissue cavity those weapons create compared to handguns, and concluding that assault weapons and LCMs "implicate … unprecedented societal concerns for public safety"); *Kotek*, 2023 WL 4698752, at *1, *3 (concluding evidence regarding "the types of injuries caused by LCMs, is relevant to the extent that this Court needs to determine whether LCMs constitute a 'dramatic technological change[]' and whether [the Oregon law] seeks to address an 'unprecedented societal concern[]'" (quoting *Bruen*, 142 S. Ct. at 2132) (brackets in original)).

Second, the State's experts provide relevant evidence "show[ing] that assault weapons and LCMs implicate unprecedented societal concerns"—namely, the

increased frequency and devastation of mass shootings (especially those committed with assault weapons and LCMs). *DSSA*, 2023 WL 2655150, *9-10 (citing *Bruen*, 142 S. Ct. at 2132). As mentioned, Dr. Webster and Professor Klarevas's testimonies address the new, growing problem of mass shootings, and assault weapons' and LCMs' prevalent role in them. *See, e.g.*, Klarevas Rpt. ¶¶ 19-23 (examining "the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776"); Webster Rpt. ¶¶ 7-18 (analyzing the usage of assault weapons and LCMs in mass shootings). Indeed, the District of Oregon rejected an identical challenge to the use of Professor Klarevas's testimony precisely for this reason.[10] *Kotek*, 2023 WL 4698752, *3. This Court should do the same.

In sum, the expert testimonies of Dr. Hargarten, Professor Webster, Mr. Yurgealitis, and Mr. Klarevas, and Ms. Allen are directly relevant to factual inquires required under *Bruen*. This Court thus should deny *ANJRPC* Plaintiffs' motion to exclude them.

---

[10] *ANJRPC* Plaintiffs throw in a footnote the suggestion that another district judge has "rejected" Professor Klarevas as an expert. ANJRPC Daubert Br. 13 n.4 (quoting *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1173 (S.D. Cal. 2019)). They misread that judge's summary judgment opinion, which disagreed with one aspect of Professor Klarevas's declaration offered in that motion but certainly did not find he was unqualified to render expert testimony. Moreover, the same judge relied on his declaration submitted in a subsequent summary judgment motion in the same matter. *Duncan v. Bonta*, No. 17-1017, 2023 WL 6180472, *4 & n.28 (S.D. Cal. Sept. 22, 2023), *stay granted*, No. 23-55805, --- F.4th ---, 2023 WL 6588362 (9th Cir. Oct. 10, 2023).

## III.   PROFESSOR BARON'S EXPERT TESTIMONY HAS PROPER FOUNDATION.

*ANJRPC* Plaintiffs attempt one final attack, specific to Professor Baron, an English linguistics scholar at the University of Illinois at Urbana-Champaign and the recipient of Guggenheim and National Endowment for the Humanities fellowships. ANJRPC Daubert Br. 14-16. "Though [they] do not challenge [Professor] Baron's qualifications as a linguist," and offer no arguments contesting the relevance of his testimony on *Bruen*'s textual inquiry, Plaintiffs claim "his entire analysis turns out to rest on an improper foundation." *Id.* at 14-15. But upon closer examination, *ANJRPC* Plaintiffs' argument sounds in their own failure to understand and unfounded disagreement with Professor Baron's expert opinion, not a proper *Daubert* challenge. Specifically, they question his opinion that the term "cartridge box" is "an appropriate 18th century linguistic analogue for 'magazine.'" *Id.* Plaintiffs argue—without any support—that Professor Baron's opinion on the linguistic meaning of the term is wrong. But *ANJRPC* Plaintiffs' argument is belied by the very foundation provided in Professor Baron's report, both as to his overall methodology and as to the specific evidence he offered that refutes *ANJRPC* Plaintiffs' unfounded assertions.

First, Plaintiffs fundamentally misunderstand Dr. Baron's methodology and its direct relevance to *Bruen*'s direction to perform a textual inquiry of how the terms in the Second Amendment—in this case, "arms"—were historically understood. 142

S. Ct. at 2127-28, 2132. Dr. Baron analyzed databases containing historical texts to glean the "original public meaning" of terms like "arm," "accoutrement," and "magazine." *See* Baron Rpt. ¶¶ 9-19; *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91, 95 & n.1 (3d Cir. 2019) (approving of this method, known as corpus linguistics, to interpret legal texts). Based on that contemporaneous linguistic data, Professor Baron found that "'Arms' as a stand-alone term refer[red] to weapons." Baron Rpt. ¶ 29. Those examples, in turn, showed that "Arms" (and thus weapons) were contrasted with "accoutrements." *Id.* ¶¶ 20-28. So the ultimate legal question turns on whether, *linguistically*, magazines were described by early Americans as arms or accoutrements. *See* Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788, 826 (2018) (explaining that "the original public meaning of a word … in the [c]onstitutional text" depends on "how that word was most commonly used by the public at large in similar contexts").

The problem, Professor Baron explains, is that "the term 'magazine' was not generally used … until well into the nineteenth century," Baron Rpt. ¶ 3, in the sense that it now is: "a device that holds cartridges or ammunition[,]" *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018). So he needed to find the early American linguistic equivalent of "a device … hold[ing] cartridges or ammunition." He found that "from the Founding Era to the later

nineteenth century," Americans used the term "cartridge box" (and its contemporary synonyms) to describe "ammunition containers"—just like the term magazine is used today. Baron Rpt. ¶¶ 20-73. So in determining whether today's magazines would historically be understood as "Arms," it makes complete sense to ask whether yesterday's magazines—cartridge boxes—were so understood as a matter of language. As Professor Baron found, they were not. *See, e.g., id.* ¶ 3 ("In the Founding Era and during and after the Civil War, cartridge [boxes] were typically considered accoutrements, not arms.").

Far from lacking foundation, Professor Baron's opinions are explained clearly and with detail. *See id.* ¶¶ 9-73. His opinions are "sufficiently grounded in sound methodology[] and reasoning" to be admissible. *In re TMI Litig.*, 193 F.3d 613, 677 (3d Cir. 1999); *see also Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.").

Second, Dr. Baron presented historical linguistic evidence that *directly* refutes *ANJRPC* Plaintiffs' unfounded assertion that cartridge boxes historically did not refer to instruments "attached to the firearm" that "feeds" ammunition into the weapon. ANJRPC Daubert Br. 15 (claiming cartridge boxes were mere "box[es] in which ammunition was stored," whereas modern magazines supposedly "play[] a

critical role in the *functionality* of a firearm"). As an initial matter, whether modern magazines happen to feed ammunition into guns is irrelevant to whether the modern linguistic use of the word "magazine" is the same as the historic use of the phrase "cartridge box." The State has persuasively explained that those linguistic usages are the same: both magazines and cartridge boxes refer to ammunition containers. *See supra* at 35-36; State Defs. Cross-SJ Br. But even on their own terms, Plaintiffs are simply wrong. They overlook the fact that Dr. Baron cites an 1869 document that uses the term "cartridge box" to refer to precisely an instrument "attached" to the firearm that "feeds" ammunition into it. Baron Rpt. ¶ 31(n). Dr. Baron explains that in an 1869 account describing the "Mitrailleuse," that weapon is described as "contain[ing] thirty-seven common infantry cartridges, arranged like cigars in a bundle" and is fired by "turning a crank … The crank is turned once more and the cartridge box is removed from the cannon." *Id.* As Dr. Baron explains, "'cartridge box' is used to refer to what we today would call a detachable magazine that both contains ammunition and feeds it." *Id.* And while the word "magazine" was beginning to be used in its now-common sense, "it was still not a common term, and the writer use[d] the apparently more-familiar term 'cartridge box' here." *Id.* The Mitrailleuse example thus shows that, in addition to being linguistic equivalents, cartridge boxes and magazines might well have been *functional* equivalents, too.

Third, Plaintiffs ineffectual pot-shot arguments do nothing to affect Dr. Baron's expert testimony. For one, they fault Professor Baron for not "claim[ing] any knowledge of how firearms or magazines worked, or how or when they have evolved." ANJRPC Daubert Br. 15. But Professor Baron is not opining on how firearms or magazines work, or on how they have "evolved." As a linguist, Professor Baron only offers testimony as to how *words* were understood historically. For another, Plaintiffs criticize Professor Baron for not "consult[ing] … other experts or written sources on firearms in choosing 'cartridge boxes' as the analogue to 'magazines.'" ANJRPC Daubert Br. 15. But as a linguist examining *historical* uses of the terms at issue, Professor Baron need not consult firearms experts. He need only consult sources on how relevant words were used historically, which is precisely what he did. In analogizing between cartridge boxes and magazines, he relied on primary sources employing those terms, as well as the Oxford English Dictionary, which gave "the earliest use of 'magazine' meaning a 'bullet storage container' [in] 1868." Baron Rpt. ¶¶ 3, 10, 21-23.

Ultimately, *ANJRPC* Plaintiffs' mere "disagreement with the [linguistic] methodology and the underlying assumptions [Professor Baron] made," would, at most, "go[] to the weight given to his testimony, rather than admissibility." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016). Because they "can challenge the alleged methodological deficiencies on cross-examination[,]" this Court should

thus deny their motion to exclude Professor Baron's entire testimony. *See Kotek*, 2023 WL 4698752, *4 (denying a motion "to exclude Dennis Baron['s] … testimony in its entirety … on the basis that [it] lack[s] foundation," because "Plaintiffs' arguments go to the weight rather than the admissibility of the testimony").

## **CONCLUSION**

For the foregoing reasons, *ANJRPC* Plaintiffs' motion should be denied in its

entirety.

Dated:  November 3, 2023                    Respectfully submitted,

                                            MATHEW J. PLATKIN
                                            ATTORNEY GENERAL OF NEW JERSEY


                                    By:    /s/ Daniel M. Vannella
                                           Daniel M. Vannella
                                           Assistant Attorney General