# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
|     Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
|     Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
|     Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

**BRIEF IN SUPPORT OF STATE DEFENDANTS'
MOTION TO EXCLUDE THE EXPERT TESTIMONIES OF
EMANUEL KAPELSOHN AND CLAYTON CRAMER**

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
(609) 376-3202
Daniel.Vannella@law.njoag.gov
*Attorney for State Defendants*

Angela Cai, *Deputy Solicitor General*
Daniel Vannella, *Assistant Attorney General*

Nicholas Kant
Justine Longa
Jonathan Mangel
  *Deputy Attorneys General*

Of Counsel And On The Brief

**TABLE OF CONTENTS**

TABLE OF CONTENTS........................................................................... i

TABLE OF AUTHORITIES .................................................................. iii

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............4

LEGAL STANDARD...........................................................................8

    A.    Exclusion of Inadmissible Expert Testimony. ...........................8

    B.    Striking Improper Discovery Submissions. .............................10

ARGUMENT .....................................................................................12

I.    EMANUEL KAPELSOHN'S EXPERT TESTIMONY SHOULD BE EXCLUDED. .................................................................................12

    A.    Mr. Kapelsohn Is Not Qualified To Present Most Of The Opinions He Offers. ................................................................................12

    B.    Mr. Kapelsohn's Offered Opinions Are Based On Unreliable Methodology. ..........................................................................15

    C.    In The Alternative, Mr. Kapelsohn's Ballistics Test Results Produced On August 31, 2023, And Portions Of His Deposition Errata Sheet, Should Be Struck...........................................................................25

        1.    August 31, 2023 Supplemental Materials. ..............................25

        2.    Portions of Rule 30(e) Deposition Errata................................29

II.    CLAYTON CRAMER'S EXPERT TESTIMONY SHOULD BE EXCLUDED. .................................................................................33

    A.    Mr. Cramer Is Not Qualified To Offer His Proposed Rebuttal Expert Opinions. ..................................................................................33

    B.    Mr. Cramer's Opinions Are Not The Product Of Reliable Methodology, And Are Imbued With Result-Driven Personal Biases......................................35

i

C.    In The Alternative, Mr. Cramer's August 31, 2023 Supplemental Report Should Be Struck.................................................................................42

CONCLUSION .....................................................................................44

# TABLE OF AUTHORITIES

**Pages**

## Cases

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999)........................................................................16

*Aloe Coal Co. v. Clark Equip. Co.*,
   816 F.2d 110 (3d Cir. 1987)........................................................................8, 34

*Am. Tech. Res. v. United States*,
   893 F.2d 651 (3d Cir. 1990)...........................................................................12

*Claar v. Burlington No. R. Co.*,
   29 F.3d 499 (9th Cir. 1994)........................................................................ 35, 39

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D.N.J. 2004) ...................................................................8

*Dandy v. Ethicon Women's Health & Urology*,
   579 F. Supp. 3d 625 (D.N.J. 2022) ......................................................... passim

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ................................................................................ passim

*DeLuca v. Merrell Dow Pharmaceuticals, Inc.*,
   791 F. Supp. 1042 (D.N.J. 1992) ....................................................................35

*Diaz v. Johnson Matthey, Inc.*,
   893 F. Supp. 358 (D.N.J. 1995) ....................................................................9, 25

*Durrell v. Lower Merion Sch. Dist.*,
   729 F.3d 248 (3d Cir. 2013)..............................................................................8

*EBC, Inc. v. Clark Bldg. Sys., Inc.*,
   618 F.3d 253 (3d Cir. 2010).............................................................. 11, 31, 32

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000)........................................................................ 12, 38

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*,
   No. 15-5477, 2019 WL 581544 (D.N.J. Feb. 13, 2019) ................... 10, 26, 27, 42

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................................9

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods.
   Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020)....................................................... 38, 39

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999)..............................................................................8, 10

*In re TMI Litig.*,
   911 F. Supp. 775 (M.D. Pa. 1996) .........................................................................9

*Intervet, Inc. v. Mileutis Ltd.*,
   No. 15-1371, 2023 WL 2266411 (D.N.J. Feb. 28, 2023) ............................. 11, 32

*Siring v. Or. State Bd. of Higher Educ.*,
   927 F. Supp. 2d 1069 (D. Or. 2013) ............................................................. 15, 16

*Karlo v. Pittsburgh Glass Works, LLC*,
   849 F.3d 61 (3d Cir. 2017).....................................................................................8

*Konstantopoulos v. Westvaco Corp.*,
   112 F.3d 710 (3d Cir. 1997)..................................................................................11

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ....................................................................................... 12, 15

*Luke v. Family Care & Urgent Med. Clinics*,
   323 Fed. App'x 496 (9th Cir. 2009) ............................................................. 26, 42

*Muzzey v. Kerr-McGee Chem. Corp.*,
   921 F. Supp. 511 (N.D. Ill. 1996) ................................................................. 10, 16

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) .............................................................................. 1, 4, 5, 6

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
   676 F.3d 521 (6th Cir. 2012)................................................................................16

*Nicholas v. Pa. State Univ.*,
  227 F.3d 133 (3d Cir. 2000)..............................................................11

*Or. Firearms Fed'n v. Kotek*,
  No. 22-1815, 2023 WL 4698752 (D. Or. May 31, 2023)......................................35

*Patroni v. Harrah's Atl. City Operating Co.*,
  No. 18-15637, 2022 WL 2375721 (D.N.J. June 30, 2022)........................... 12, 32

*Ramos v. Banner Health*,
  1 F.4th 769 (10th Cir. 2021) ..............................................................16

*Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003)........................................................... 12, 33

*Snodgrass v. Ford Motor Co.*,
  No. 96-1814, 2002 WL 485688 (D.N.J. Mar. 28, 2002) ......................................39

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
  949 F.3d 825 (3d Cir. 2020)...............................................................8

*Wade-Greaux v. Whitehall Labs., Inc.*,
  874 F. Supp. 1441 (D.V.I. 1994) ...................................................... 10, 25

*Waldorf v. Shuta*,
  142 F.3d 601 (3d Cir. 1998)........................................................... 12, 34

*Wood v. Showers*,
  822 Fed. App'x 122 (3d Cir. 2020).........................................................9

## Rules

Fed. R. Civ. P. 26(e)(1)(A) ............................................................. passim

Fed. R. Civ. P. 30(e)................................................................... passim

Fed. R. Evid. 702 ...................................................................... passim

## PRELIMINARY STATEMENT

Plaintiffs with one hand ask the Court to wipe away all of the State's affirmative expert evidence—incorrectly claiming that *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) requires this result—but with the other hand proffer affirmative and rebuttal experts of their own. But in stark contrast to the State's experts, all of whom have devoted their academic and professional careers to studying the specific subject matter on which they offer expertise, and who have meticulously supported their opinions with methodology that is well-accepted in their respective fields, the same cannot be said of two of Plaintiffs' experts, Emanuel Kapelsohn and Clayton Cramer.[1]

Although experts can offer relevant and important testimony in a diverse cross-section of cases, expert opinion evidence must satisfy quality checks dictated by Rule of Evidence 702. As the Supreme Court laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), a witness must be "qualified" to render expert-level opinions—possessing skill or knowledge beyond the average layman—in the pertinent subject matter. And even then, their proposed testimony must be sufficiently "reliable"—grounded in clear methodology that the Court, as gatekeeper, can independently review and evaluate for soundness. Because Mr.

---

[1] Only Plaintiffs in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Platkin* and *Ellman v. Platkin* proffered experts; Plaintiffs in *Cheeseman v. Platkin* did not.

Kapelsohn and Mr. Cramer are neither qualified nor employ reliable methodology, this Court should exclude their proffered testimonies.

Mr. Kapelsohn, a commercial attorney and firearms instructor, is not qualified to render expert opinions on subjects like linguistics, biomechanics and medicine, history, and statistics. Yet he proffers opinions on how people in the Founding era used language, how many joules of energy would be released by weapons under certain conditions, and the proper way to read statistical data, despite having no academic or professional training on any of those subjects. And while he undisputedly possesses knowledge of firearm use and features, his opinions relating to those matters are without foundation and sound methodology. Mr. Kapelsohn frequently resorts to anecdote or vague assertions of experience; at other times, his opinions are expressions of personal disagreement with New Jersey's laws, not expert opinions. *Daubert*) demands far more.

Mr. Cramer, a retired computer programmer and avid blogger, faces similar deficiencies with his testimony. Despite having no expertise in statistics and public health, he nonetheless proffers rebuttal testimony to the State's statistics and data analysis experts, including the results of a recent statistical study published in the peer-reviewed journal *American Journal of Public Health*. And were his lack of expertise not enough, Mr. Cramer openly acknowledged in his deposition that he did not review all of the evidence cited by the State's experts whose opinions he

challenges and prejudged their reports before even having received them. And Mr. Cramer admitted that he has selectively cherrypicked the evidence he himself relies on to offer his own opinions. The unreliability of his methodology is evident from the fact that in another lawsuit, Mr. Cramer's report contained erroneous information. In this case, his assertions also suffer substantive blunders.

In the alternative, even if the Court is inclined to consider some testimony from Mr. Kapelsohn and Mr. Cramer, it should exclude strike certain belated submissions. Even when expert evidence is otherwise admissible, the parties offering it still must always comply with Rule 26(e)(1)(A). Here, weeks after the expert disclosure deadlines and after depositions revealed fatal deficiencies in their experts' opinions, Plaintiffs attempted a series of unpermitted efforts at rehabilitation, all between 8:44 p.m. and midnight on the final day of discovery. First, they attempted to substantively revised portions of the experts' deposition testimony, striking the actual answers given with paragraphs of new information that stand in stark contrast to what the experts previously stated under oath. Second, they proffered a new supplemental report by Mr. Cramer, consisting of additional "statistics"—analysis he could have, but had not, conducted prior to submitting his prior report or his deposition. Third, they submitted "evidence" of ballistics testing conducted by Mr. Kapelsohn, consisting of illegible notes and home videos.

The Court should strike these supplemental submissions as untimely and prejudicial, and more generally exclude Mr. Kapelsohn and Mr. Cramer's proffered opinions that fail to satisfy Rule 702.

## **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Following the Third Circuit's remand of *Association of New Jersey Rifle & Pistol Clubs* ("*ANJRPC*") No. 18-10507, back to this Court "for decision in the first instance under the standard announced in *Bruen*," this Court reopened the matter on August 25, 2022. ECF 109-110. Plaintiffs filed an amended complaint on October 28, 2022, which the State answered on November 17, 2022. ECF 122, 126. On February 6, 2023, the Court granted the State's motion to consolidate *Cheeseman v. Platkin*, No. 22-4360, as well as *Ellman v. Platkin*, No. 22-4397, into the older *Association* matter for coordination of discovery. ECF 148.[2] The Court found consolidation appropriate, among other reasons, to accomplish the "main goal" of "develop[ing] the historical evidence and discovery." *Id.* at 7.

Following the Rule 16 initial conference, on March 16, 2023 the Court entered its a discovery scheduling order. ECF 154. Under the order, fact discovery was to conclude May 31, 2023. *Id.* at 2. All parties must "identify any affirmative experts

---

[2] The Court, with the consent of all parties, would later extend the consolidation of these three matters through the resolution of the post-discovery *Daubert* motions and dispositive motion. ECF 168. All references "ECF __" refer to the *ANJRPC* docket, No. 18-10507.

4

by name and subject area" by May 15, 2023, and must serve any affirmative expert reports by June 16, 2023. *Id.* The deadline to serve any rebuttal expert reports was July 17, 2023; and all discovery was to be completed by August 31, 2023. *Id.*

On May 15, 2023, the State and *ANJRPC* Plaintiffs each disclosed affirmative experts and their subject areas. Declaration of Daniel Vannella, Exs. 1-2.[3] The *ANJRPC* Plaintiffs identified two affirmative experts, one of whom was Emanuel Kapelsohn, a lawyer and firearms instructor. They later produced Mr. Kapelsohn's affirmative expert report from Mr. Kapelsohn on June 16, 2023. *ANJRPC* Plaintiffs produced a second report from Mr. Kapelsohn, this one serving as rebuttal to State's experts, on July 17. That rebuttal report attempted to respond to eight of the State's nine affirmative experts, whose expertise ranged from emergency medicine to linguistics to history to statistics. Vannella Decl. Ex. 14, Rebuttal Rpt. of Emanuel Kapelsohn. The same day, they also produced a rebuttal expert report from Clayton Cramer, a retired software engineer with a master's degree in history.[4] Vannella Decl. Ex. 19, Rebuttal Rpt. of Clayton Cramer. That report attempted to respond to

---

[3] Subsequent references to "Ex. __" refer to exhibits to the Vannella Declaration, unless otherwise specified.

[4] Mr. Cramer now works as an adjunct faculty member at a community college in Idaho, teaching one class "most semesters" on an "as-needed" basis. Vannella Decl. Ex. 20, Cramer Dep. Tr. T30:14-18, T31:4-6, T31:10.

three of the State's affirmative experts, including two historical experts and one statistics and data analysis expert.

Mr. Kapelsohn was deposed on August 4, 2023. Vannella Decl., Ex. 16, Kapelsohn Dep. Tr. During his deposition, the State requested production of certain documents or other records on which Mr. Kapelsohn testified he was relying in support of his expert opinions, but which did not produce or even identify with detail in his reports or during his deposition testimony. Among other things, this included prior ballistics testing that he claims to have performed. *Id.* at T46:5-9, T46:17-47:2. When *ANJRPC* Plaintiffs' counsel responded that they needed to follow up with this request in writing, the State did just that on August 8, 2023. Vannella Decl. ¶¶ 25-27; Vannella Decl. Ex. 21, State Defs. 8/8/2023 Ltr. With the end of discovery approaching, they asked that this request be answered by August 11, 2023. State Defs. 8/8/2023 Ltr. It was not.

At 8:44 p.m. on the very the last day of discovery, August 31, 2023, *ANJRPC* Plaintiffs e-mailed to State Defendants supplemental production from Mr. Kapelsohn. Vannella Decl.  ¶¶ 30-34; Vannella Decl. Ex. 22, ANJRPC 8/31/2023 8:44 p.m. e-mail). The supplemental production included, among other things, 1) a .pdf entitled "Rough Notes from Ballistic Testing"; (2) a spreadsheet file entitled "Penetration and Accuracy Test"; and (3) a .pdf entitled "ANJRPC Ballistic Testing – Sheetrock Wall Penetration (004)." Vannella Decl. Ex. 25, ANJRPC 8/31/2023

Ballistics Test Notes. Also included were three .mp4 video files, entitled "Sheetrock Wall Penetration Testing," "Shooting Glass Video 1 of 2," and "Shooting Glass Video 2 of 2." Vannella Decl. Ex. 26, ANJRPC 8/31/2023 Ballistic Test Videos. In the same e-mail, ANJRPC Plaintiffs also attached an errata sheet for Mr. Kapelsohn's August 4, 2023 deposition testimony. Vannella Decl. Ex. 28, Kapelsohn Errata Sheet.

Just before midnight the same night, *ANJRPC* Plaintiffs sent State Defendants a "Supplemental Rebuttal Expert Report of Clayton Cramer." Vannella Decl. ¶¶ 36-37; Vannella Decl. Ex. 29, ANJRPC 8/31/2023 11:59 p.m. e-mail; Vannella Decl. Ex. 30, Supp. Rpt. of Clayton Cramer. Mr. Cramer was deposed on August 21, 2023. Cramer Dep. Tr.

The State voiced to *ANJRPC* Plaintiffs their objections to the late service of Mr. Kapelsohn's ballistics testing, certain portions of Mr. Kapelsohn's errata sheet, and Mr. Cramer's "Supplemental Rebuttal Expert Report." Vannella Decl. ¶ 38. Following *ANJRPC* Plaintiffs' refusal to withdraw those submissions, State Defendants raised their objections to the Court via letter filed September 20, 2023. ECF 169. Following a September 27, 2023 conference, the Court entered a September 28, 2023 text order directing that State Defendants "may [] incorporate any objections to the materials at issue, and any requests that the Court strike or

disregard them, into their forthcoming Daubert and summary judgment briefing." ECF 171.

## LEGAL STANDARD

### A. Exclusion of Inadmissible Expert Testimony.

Rule 702 permits expert testimony or evidence, provided (1) the witness is a qualified expert; (2) the proposed testimony or evidence is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) it is "sufficiently tied to the facts of the case," so that it "fits" the dispute and will assist the trier of fact. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert*, 509 U.S. at 591). Pertinent here, the court must "ensure that plaintiffs' [expert] evidence is reliable under *Daubert* and provides more than the 'mere scintilla of evidence' needed to survive summary judgment." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 78 (3d Cir. 2017) (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d Cir. 2013)). The party offering the expert testimony holds the burden of demonstrating that it meets the *Daubert* requirements and is admissible. *In re TMI Litig.*, 193 F.3d 613, 662-66, 705 (3d Cir. 1999); *Crowley v. Chait*, 322 F. Supp. 2d 530, 537 (D.N.J. 2004).

A "qualified" expert must "possess skill or knowledge greater than the average layman" in the subject-matter of their expertise. *Aloe Coal Co. v. Clark*

*Equip. Co.*, 816 F.2d 110, 114-15 (3d Cir. 1987). In next assessing the reliability of the expert's testimony or evidence, the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. *Daubert* describes four nonexclusive considerations that courts should weigh: (1) an ability (or not) to test the expert's methodology or reasoning; (2) whether the expert's theory has been subjected to peer review and publication; (3) its potential rate of error; and (4) its general acceptance in the relevant community. *Id*. at 592-94. It follows that an expert's failure to define or apply a reliable principle or method can create an "analytical gap" that renders their evidence unreliable and thus inadmissible. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Wood v. Showers*, 822 Fed. App'x 122, 124 (3d Cir. 2020) ("The reliability of an expert's conclusions and opinions hinges on the reliability of the expert's methodology."); *In re TMI Litig.*, 911 F. Supp. 775, 803 (M.D. Pa. 1996) (rejecting expert methodology that was not "generally accepted").

An obvious prerequisite to sound methodology is the expert's review of all relevant materials before forming an opinion. Failing to do so indicates that they reached a conclusion in advance of performing all necessary research, which the court should consider in determining whether to deem it admissible. *See, e.g.*, *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 373 (D.N.J. 1995) (potential expert excluded as he lacked experience in area and had "at best a limited familiarity with

the small amount of literature in the field"); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1476 (D.V.I. 1994) (potential expert excluded because their only knowledge or experience on subject-matter came from "review, for purposes of testifying in litigation, of selected literature"). Similarly, anecdotal experience is not a reliable methodology on which to base expert testimony or evidence, and so it should not rely. *See, e.g., In re TMI Litig.*, 193 F.3d at 673-74; *Muzzey v. Kerr-McGee Chem. Corp.*, 921 F. Supp. 511, 519 (N.D. Ill. 1996) ("Anecdotal reports ... are not reliable bases to form a scientific opinion about a causal link. [They] may be an incentive for more careful investigation but may also reflect rumor and speculation rather than fact.").

### B. Striking Improper Discovery Submissions.

Experts may supplement their disclosures in a "timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]" Fed. R. Civ. P. 26(e)(1)(A). Even when timely, however, supplementation is "proper only for the narrow purpose of correcting inaccuracies or adding information that was *not available at the time of the initial report*." *Dandy v. Ethicon Women's Health & Urology*, 579 F. Supp. 3d 625, 629 (D.N.J. 2022) (quoting *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, No. 15-5477, 2019 WL 581544, *3 (D.N.J. Feb. 13,

2019)) (emphasis added). Belated supplementation is not an "an avenue to correct failures of omission because the expert did an inadequate or incomplete preparation, add new opinions, or deepen or strengthen existing opinions." *Id*. (quoting *Ezaki*, 2019 WL 581544, *3).

In addition, any late-produced expert disclosures must be subject to a multi-factor balancing test, which involves weighing (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the Court's Order; and (5) the importance of the testimony sought to be excluded. *See id.* (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000); *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)).

In determining whether to strike deposition testimony added in a Rule 30(e) errata sheet, courts must undertake a fact-sensitive inquiry to assess if "sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 270 (3d Cir. 2010). They cannot "materially contradict prior deposition testimony," including adding new facts and explanations that should have offered before but were not, without "sufficient justification." *Intervet, Inc. v. Mileutis Ltd.*, No. 15-

1371, 2023 WL 2266411, *5 (D.N.J. Feb. 28, 2023); *see also Patroni v. Harrah's Atl. City Operating Co.*, No. 18-15637, 2022 WL 2375721, *3 (D.N.J. June 30, 2022) (granting a motion to strike portions of a Rule 30(e) errata sheet when new testimony clearly contradicted the original testimony).

## ARGUMENT

I.    **EMANUEL KAPELSOHN'S EXPERT TESTIMONY SHOULD BE EXCLUDED.**

### A. Mr. Kapelsohn Is Not Qualified To Present Most Of The Opinions He Offers.

A witness is qualified to provide expert testimony only if the witness has "specialized expertise" with "a broad range of knowledge, skills, and training" in the testimony's subject matter. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *supra* at 8-9. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990)). Experts who lack formal education or training in a particular area must rely upon practical experience to demonstrate that they possess "the minimum qualifications necessary to testify as an expert." *Elcock v. Kmart Corp.*, 233 F.3d 734, 743 (3d Cir. 2000). A witness may be qualified to serve as an expert in one discipline, but not in another. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

Mr. Kapelsohn is an attorney by education and trade. Kapelsohn Dep. Tr. at T21:19-21. He lacks any formal education, training, or experience in most of the subject areas of the experts whom he intends to rebut: linguistics, biomechanics and medicine, public health statistics, and history, *see* Kapelsohn Rebuttal Rpt. (claiming to rebut the expert opinions of Professors Cornell, Roth, Spitzer, Baron, Webster, and Klarevas, Ms. Allen, and Dr. Hargarten). Whenever pressed for his qualifications in those areas, Mr. Kapelsohn's insists that his general experience with firearms and/or police practices qualifies him to opine on virtually any subject matter in this case. But that is not the standard under Rule 702, which requires that the expert possess "scientific, technical, or other *specialized* knowledge." *Daubert*, 509 U.S. at 589. That is not the case for Mr. Kapelsohn.

As to history, for example, Mr. Kapelsohn proffers rebuttal testimony to the report of Professor Robert Spitzer. Kapelsohn Rebuttal Rpt. 2. But Mr. Kapelsohn possesses only "a general education in U.S. history from public school," and "may have taken one or more courses in history at Yale University." Kapelsohn Dep. Tr. at T51:12-18. On the "history of firearms" specifically, he suggests he is a qualified expert because he has visited museums and spoken with war reenactors. *Id.* at T179:11-181:2, T183:6-184:13. Mr. Kapelsohn conceded he has never been admitted as an expert on the history of firearms. *Id.* at T52:5-8.

Incredibly, Mr. Kapelsohn even purports to have sufficient expertise to proffer medical and biomechanics testimony. Asked how he is qualified to rebut Dr. Stephen Hargarten, "a medical doctor," he responded: "Years of work in the firearms fields, including in defensive shootings, including reviewing data on shootings with various calibers of guns, ballistic testing of others and of me, et cetera." *Id.* at T197:1-18. Pressed further how he is qualified to rebut Dr. Hargarten's opinions concerning "the scientific or medical process of how firearms and bullets they carry cause damage to the human body," he responded: "Well, I've studied it in many, many classes, including classes taught by M.D.s, including ones much more illustrious than Dr. Hargarten. Whether a court thinks that [] qualifies me to testify about it or not is for a court to decide." *Id.* at T198:23-199:9.

Similarly, Mr. Kapelsohn obviously lacks any education or experience in linguistics (Professor Baron's field)—and instead attempts to compare it to his prior court testimony on "owner's manuals and warnings for firearms." *Id.* at T52:9-54:3. And by his own admission, he is "not an expert on statistics or data analysis," *id.* at T54:4-6—yet, his rebuttal report promises testimony against the State's experts in those fields (Ms. Allen and Professor Klarevas), if permitted. Kapelsohn Rebuttal Rpt. 10-12.

In short, Mr. Kapelsohn is plainly unqualified to offer opinions in subjects that he has no specialized knowledge or expertise. Plaintiffs have failed to meet

that threshold burden under Rule 702, and this Court can exclude those opinions on that basis alone.

### B. Mr. Kapelsohn's Offered Opinions Are Based On Unreliable Methodology.

This Court should exclude all of Mr. Kapelsohn's testimony for an independent reason—failure to support his proffered opinions with reliable and accepted methodology. While the State does not presently challenge Mr. Kapelsohn's qualifications on general firearms knowledge and police practices, the entirety of his expert testimony should be excluded because his stated opinions in this case are not supported by accepted methodological standards of research and analysis and, therefore, are not sufficiently reliable to be admitted as expert opinion under Rule 702 and *Daubert*.

Mr. Kapelsohn's purported expertise is his personal experience. But when a prospective expert is relying on "personal experience," they nonetheless must bring "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152; *see also Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1074 (D. Or. 2013) ("If an expert is relying solely or primarily on experience, then the expert 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"). An expert cannot merely "invoke vague allusions to his 'experience'" to lay a proper foundation for

their opinions. *Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021). Amorphous "knowledge" from prior experience does not establish proper expert testimony. *See Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999); *Muzzey*, 921 F. Supp. at 519. Instead, an expert must still explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Ramos*, 1 F.4th at 780; *Siring*, 927 F. Supp. 2d at 1074.

Mr. Kapelsohn does none of these things. His reports are lacking in evidence or other authorities to support his asserted opinions, or even an explanation of how he reached each conclusion. His standard response is to simply cite back to the amorphous "years of experience" he claims in using firearms and/or in police practices to support any and all of them. And in the few instances where he does offer evidence—and has actually identified that evidence with specificity—it is almost entirely anecdotal in nature. That is an insufficient basis for the Court to admit as an expert opinion. *Supra* at 9-10.

***Affirmative Report***. Much of Mr. Kapelsohn's report is entirely devoid of any source citation or basis for his claims, and when pressed to provide sources for his proffered opinions, he could not.

By way of illustration, Mr. Kapelsohn opines that semiautomatic rifles, shotguns, and handguns each "were in common use in the early 1900's." Vannella Decl. Ex. 13, Rpt. of Emanuel Kapelsohn 10. Other than a statement that "[o]ur military first adopted a semiautomatic pistol (the Colt .45 caliber Model 1911) in the year 1911," *id.*, his report provides no support for these opinions. Asked to provide his methodology for this opinion at his deposition, Mr. Kapelsohn had trouble explaining what he meant when *he* used the term "common use" in his report, other than "[i]t means widespread": and as an "example" of this, a "semi-automatic pistol was issued to an entire army" during World War I. Kapelsohn Dep. Tr. at T74:8-76:7. When pressed on what "evidence" he was "relying on that semi-automatic rifles were in common use by private civilians"—*i.e.*, those who were *not* out fighting a war—in the early 1900s, he admitted he has none to offer: "I didn't come here with evidence." *Id.* at T76:2-7. He similarly had no evidence to support his opinions that either semi-automatic shotguns, or semi-automatic pistols, "were in common use by private civilians in the United States in the early 1900s." *Id.* at T76:11-77:3.

Similarly, in his affirmative report he opines that "[t]he most common magazine size for the AR-15, and the size of the great majority of magazines manufactured and sold for the AR-15, is 30 rounds"; "[t]he next most commonly seen magazine size is 20 rounds"; and "[m]agazines of 5, 10 and 40 rounds are also

available, as well as other sizes, but are relatively rare." Kapelsohn Rpt. 12. Again, he provides no evidence in his report, *id.*, and provided none at his deposition, Kapelsohn Dep. Tr. at T100:17-102:1, to support any of these claims. He further opines in his affirmative report that he finds "quite credible" "estimates that there are currently 100 million or more 30-round AR-15 magazines in circulation." Kapelsohn Rpt. 12. Once again, he has provided no evidence in support, either in his report, *id.*, or at his deposition, Kapelsohn Dep. Tr. at T105:15-106:13.

Mr. Kapelsohn also could not support his assertion that "[c]urrent estimates of AR-15 and AK-type semiautomatic firearms in civilian hands in the United States are in the range of 25 million or more." Kapelsohn Rpt. 11. Asked for the source of this information at his deposition, he replied only he had seen the number in "various" and "several" sources, but "can't point to one source." Kapelsohn Dep. Tr. at T83:23-86:1. And although he pointed to a National Shooting Sports Foundation (NSSF) report estimating that about five years ago there were "between 5 and 10 million AR-15 rifles in civilian hands in the United States," Kapelsohn Rpt. 11, he could not explain what survey methods the NSSF used. Kapelsohn Dep. Tr. at T77:21-78:3. He could not even confirm definitively that it was referring to AR-15s only: "I would expect it does. But I don't know for sure." *Id.* at T78:11-79:11.[5]

---

[5] The NSSF Survey is deeply unreliable. James Curcuruto, a former director of research and market development at NSSF, testified in another case that he and Steve

Turning to a different topic in his affirmative report, Mr. Kapelsohn asserts that "pistol grips," "telescoping stocks," "flash suppressors," and "threaded muzzles" have practical "advantages." Kapelsohn Rpt. 18-26. When pressed on the basis of his opinions, Mr. Kapelsohn identified one article supporting his opinion "of the importance of flash suppressors," specifically, "on rifles," but professed a lack of knowledge about the data contained in the article, or where or how it was obtained. Kapelsohn Dep. Tr. at T162:3-164:2. He again alluded generally to "FBI data," but, once again, could not specify further. *Id.*

Moreover, some of Mr. Kapelsohn's opinions appeared to be based solely on cherrypicked and unverified anecdotal stories. For example, Mr. Kapelsohn opined that New Jersey's regulation of magazines that attach to the pistol outside of the pistol grip points at a feature that "has nothing to do with the pistol's safety," asserting "this is a common firearm feature." Kapelsohn Rpt. 23. He provided no citation for his claim that "this is a common firearm feature." *Id.* Asked at his deposition for any data regarding how common it is, he had none, but offered more anecdotal evidence ("I see them with some regularity elsewhere other than in New Jersey."). Kapelsohn Dep. Tr. at T173:5-174:9.

---

Sanetti, the president of NSSF, essentially made estimates between themselves, and that Mr. Sanetti's personal knowledge was the "sources of data" relied upon when they published statistics related to the number of firearm magazines in circulation Vannella Decl. Ex. 44, Curcuruto Dep. Tr. at T133:4-140:15.

Similarly, in opining that AR-15 rifles have proven to be effective in self-defense situations involving private individuals, Mr. Kapelsohn's provided seven news articles. Kapelsohn Rpt. 14-16. At his deposition, Mr. Kapelsohn explained they are "[j]ust [] a handful of examples where people have apparently used AR-15 rifles for defending themselves and others." Kapelsohn Dep. Tr. at T133:11-16. But Mr. Kapelsohn never verified the information in the news reports, and suggested that they may have been provided to him by an unnamed source.[6] *Id.* at T132:21-133:4.

Indeed, much of Mr. Kapelsohn's proffered expert opinions are not expert opinions at all. Rather, as he acknowledged, they are his "personal opinions" that certain laws are "not correct." *Id.* at T171:9-172:8. For example, he opines that "Limiting New Jersey gun owners to 10-round magazines for their semiautomatic rifles and pistols imposes an unreasonable and arbitrary disadvantage," Kapelsohn Rpt. 25, that "It appears that this legislation is … ill-informed," *id.*, and that the term

---

[6] *ANJRPC* Plaintiffs' motion for summary judgment claims that these articles support Mr. Kapelsohn's opinion, and the conclusion, that magazines holding more than 10 rounds are "regularly" used in self-defense. *See* ANJRPC SJ Br. 27; ECF 175-5 (Kapelsohn Decl.) ¶¶ 39-45. Putting aside the purely anecdotal nature of a selection of only seven articles, even these articles fail to support that claim. Only one article, ECF 175-5 (Kapelsohn Decl. ¶ 40, Ex. 3), states that more than 10 rounds were fired, and even then does not indicate whether the person used one large magazine or re-loaded magazines holding 10 or fewer rounds, or whether more than 10 rounds were actually necessary to neutralize the threat. None of the other articles even indicate that more than 10 rounds were filed. Indeed, one article states that only a *single round* was fired. *Id.* ¶ 44, Ex. 7. Another one states that *no* shots were filed *Id.* ¶ 41, Ex. 4.

"assault weapon" is "a pejorative term," *id.* at 17. These, of course, are not expert opinions that will assist the trier of fact.

**Rebuttal Report**. Mr. Kapelsohn's methodological shortfalls become even starker in his rebuttal report.

As indicated above, though unqualified to do so, Mr. Kapelsohn attempts to rebut the testimonies of the State's experts in statistics and data analysis, Lucy Allen and Louis Klarevas. Kapelsohn Rebuttal Rpt. 10-12; *supra* at 14. Notably, he does not contest the accuracy of Ms. Allen's conclusions regarding the average number of shots fired in self-defense. Kapelsohn Rebuttal Rpt. 10. He does not challenge her methodology, other than to comment that newspaper articles may not be reliable sources. *Id.* at 11-12. This overlooks (1) that he himself is relying on newspaper articles, *supra* at 20; (2) unlike his reliance on a selected few, anecdotal articles, Ms. Allen's study was based on a random sampling of 200 articles from a source of approximately 4,800, which were in turn systematically culled from a large database, Vannella Decl. Ex. 7, Rpt. of Lucy Allen ¶ 5; and (3) her study did not rely solely on newspaper articles but also on incidents reported "in the NRA Armed Citizen database," *id.* Mr. Kapelsohn ultimately offers his personal view that it is always possible that in a self-defense situation a person could need more bullets than the average, Kapelsohn Rebuttal Rpt. 11. As any elementary school student should

know, an "average" indicates that some numbers indeed would be larger than the average, just as some would be smaller.[7]

Similarly, Mr. Kapelsohn offers no explanation as to how Professor Klarevas's methodology is unreliable or his conclusions incorrect. *Id.* at 12. He attempts to throw cold water on Professor Klarevas's conclusions by referring to a "FBI statistics" source that, once again, he does not specify (and thus cannot be verified); and a quote from a Pew Research Center article. *Id.* But at the end, he begrudgingly admits that Professor Klarevas's statements were not wrong. *Id.*

Mr. Kapelsohn objects to the biomechanics testing that the State's expert, Dr. Hargarten, performed. Those tests revealed that bullets fired by AR-15 style rifles produce "significantly larger" cavities in human tissue than handguns, the Thompson Machine gun, and muskets. Vannella Decl. Ex. 8, Rpt. of Stephen Hargarten ¶ 26. Mr. Kapelsohn does not dispute the accuracy of the tests or their results, but insists that he knows—without doing any testing of his own—that a different type of ammunition used on the battlefield during the Revolutionary War would have yielded similar kinetic energy release as the AR-15 performed in Mr.

---

[7] At one point in his deposition, Mr. Kapelsohn, referring to Ms. Allen's report and concerning the average number of rounds of ammunition fired in self-defense situations (just over 2 rounds on average per situation), testified "I don't know what that means," and countered that he was familiar with *one* specific incident where "the fella that defended himself … fire[d] 18 rounds, … and hit with 14 of them." Kapelsohn Dep. Tr. at T114:15-115:6. Ultimately, he was unable to state that Ms. Allen's studies were *not* "credible or accurate." *Id.* at T114:15-17.

Hargarten's experiment. Kapelsohn Rebuttal Rpt. 8; Kapelsohn Dep. Tr. at T181:10-21, T199:14-18. In claiming that tests with the larger musket ball *would have* revealed that "Revolutionary War muskets" had similar "wounding efficiency" compared to "modern firearms," Mr. Kapelsohn piles speculation on speculation under the guise of back-of-the-napkin extrapolations of unverified assertions. Kapelsohn Rebuttal Rpt. 8; Kapelsohn Dep. Tr. at T181:10-21, T199:14-18. When pressed, he acknowledged that such guesstimates did not account for a number of other factors besides a bullet's mass that determines its kinetic energy when entering the human body. Kapelsohn Dep. Tr. at T200:23-201:1 (acknowledging that velocity "matters more in the calculation" of kinetic energy than does mass).

Mr. Kapelsohn's attempts to rebut Professor Baron, an expert on linguistics, gets no further. Kapelsohn Rebuttal Rpt. 3-7. Lacking any qualifications in the field of linguistics, *supra* at 14, Mr. Kapelsohn either fails to understand even the basic "point," much less the specific opinions, actually being offered by Professor Baron. Addressing whether the *word* "Arms" would have been understood to include ammunition containers such as magazines *at the time* of the Founding and Reconstruction eras, Professor Baron, researching source materials and other appropriate authorities, concluded that it would not. *See generally* Vannella Decl. Ex. 6, Rpt. of Dennis Baron. Mr. Kapelsohn's response to this consists of lengthy descriptions of how different magazines work, and a citation to two present-day

sources that describe what the term "magazine" means today. The latter says nothing about how words would have been understood in centuries prior, The former has nothing to do with how words would be understood at all.

Finally, in his rebuttal report Mr. Kapelsohn challenges the report of James Yurgealitis, a former ATF agent who is an expert on weapons technology and forensics. Kapelsohn Rebuttal Rpt. 9-16. Mr. Yurgealitis details his opinions regarding the objective effectiveness of using large (two hands needed) and overly powerful semi-automatic weapons in home self-defense situations, as well as the objective risks of collateral damage—and supports them in his report with a plethora of ballistics testing, hard data, articles, and other authorities. Vannella Decl. Ex. 11, Rpt. of James Yurgealitis. Mr. Kapelsohn's rebuts without any of his own data, articles or other authorities, or even his own oft-promised prior "ballistic testing."[8] Kapelsohn Rebuttal Rpt. 9-16. For example, regarding Mr. Yurgealitis's testing of .223 caliber ammunition, commonly used by AR-15 style rifles, on sheetrock, Mr. Kapelsohn asserted that .223 caliber ammunition is "safer for home defense," but

---

[8] As for the belated materials relating to alleged ballistic testing, which should be stricken for failure to comport with Rule 26(e)(1)(A), *see infra* at 25-28, much of it also lack even the most basic indicia of reliability and verifiability. The two "shooting glass video" depict Mr. Kapelsohn shooting at two pieces of glass reinforced with safety film with first a handgun and then an AR-15, sequentially. The videos do not depict any recording of data or even efforts to measure a uniform distance. The documentary materials—handwritten notes and a spreadsheet without explanation, are even harder to decipher.

relied only on "an internet source called Prepared Gun Owners." Kapelsohn Dep.
Tr. at T155:20-156:5; Kapelsohn Rpt., Ex. 11. That, of course, is insufficiently
rigorous for expert opinion. *See Diaz*, 893 F. Supp. at 373; *Wade-Greaux*, 874 F.
Supp. at 1476.

In sum, Mr. Kapelsohn's proffered opinions are unsound in methodology and
must be excluded.

### C. In The Alternative, Mr. Kapelsohn's Ballistics Test Results Produced On August 31, 2023, And Portions Of His Deposition Errata Sheet, Should Be Struck

1. August 31, 2023 Supplemental Materials.

As set forth above, *ANJRPC* Plaintiffs waited until about 3 hours before
midnight on the final day of discovery—and months after the deadline to serve
affirmative expert reports, weeks after the deadline to serve rebuttal expert reports,
and 27 days after Mr. Kapelsohn's deposition—to produce supplemental expert
materials. These include ballistics testing results, one of which expressly was
conducted only five days earlier. At his deposition, Mr. Kapelsohn has maintained
that he conducted numerous ballistics testing over the years, and was relying on
those alleged results in generating some of his opinions. Since he did not produce or
even provide any details about them in his reports, State Defendants requested on
the record at his deposition that that these "past" test results be produced. *Supra* at
6. Told that they needed to follow up in writing, State Defendants did just that. *Id.*

25

They asked that *ANJRPC* Plaintiffs provide these "past" results, and that they do so by August 11, 2023.

Not only did *ANJRPC* Plaintiffs fail to meet this deadline, they did not indicate any date certain that these they could provide these requested records. Weeks later, after close of business on the very last day of discovery, Plaintiffs produced a home video of ballistics test results that appears to have been conducted on August 26, 2023. They also produced other purported ballistics test results—much of which is impossible to decipher, and some of which is undated.

*ANJRPC* Plaintiffs are attempting to use Rule 26(e)(1)(A) for a clearly improper purpose: as a "loophole through which … [plaintiffs] wish[] to revise [their] disclosures in light of [their] opponent's challenges to the analysis and conclusions therein." *Ezaki*, 2019 WL 581544, *3 (quoting *Luke v. Family Care & Urgent Med. Clinics*, 323 Fed. App'x 496, 500 (9th Cir. 2009)). They cannot now "add [analysis and conclusions]"—especially Mr. Kapelsohn's August 26, 2023 testing materials—"to [their] advantage after the court's deadline for doing so has passed." *See id*.; *supra* at 10-12.

Experts may supplement their disclosures under Rule 26(e)(1)(A) only if timely, and "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Dandy*, 579 F. Supp. 3d at 629. It is not an "an avenue to correct failures of omission because the

expert did an inadequate or incomplete preparation, add new opinions, or deepen or strengthen existing opinions." *Id*. (quoting *Ezaki*, 2019 WL 581544, *3). Here, all of the materials could have been served in a timely manner. Most importantly, *ANJRPC* Plaintiffs have never attempted to justify their actions.

The *Dandy* factors all weigh in favor of striking these materials. The first, second, and third factors (surprise/prejudice, ability of moving party to cure prejudice, and disruption of trial) are met because *ANJRPC* Plaintiffs could have and should have produced these materials in a timely fashion, but deliberately chose to sandbag the State in the last 3 hours of the months-long discovery process. This deprived the State of the ability to potentially challenge or even review these materials while discovery remained open, in a consolidated litigation of significance and in which the parties and the Court had just reached an agreement on a rigid dispositive motion schedule that could not easily be delayed. The State is now left with the limited option of addressing these materials simultaneously responding to *ANJRPC* Plaintiffs' motion for summary judgment.

The fourth factor (bad faith or willfulness in failing to comply with the Court's Order) should be afforded particular weight in State Defendants' favor. Not only did *ANJRPC* Plaintiffs delay in failing to identify or produce these materials by the June 16, 2023 deadline to serve Mr. Kapelsohn's affirmative expert report, or even the July 17, 2023 deadline to serve his rebuttal expert report, or even at his August 4,

27

2023 deposition,[9] or even immediately thereafter, they waited weeks more. In the interim, while not producing anything, they instead prioritized creating new materials to backfill the lack of support for Mr. Kapelsohn's opinions, and even withheld those results for days after.[10]

For these reasons, the ballistics testing results, Vannella Decl. Exs. 25-26, and the portions of Mr. Kapelsohn's August 29, 2023 letter, Vannella Decl. Ex. 24, describing them, should be struck.

---

[9] On July 30, 2023, following the deadlines for service of affirmative and rebuttal expert reports, *ANJRPC* Plaintiffs, without prior notice, served a "supplemental letter" from Mr. Kapelsohn. Vannella Decl. ¶ 18; Vannella Decl. Ex. 15, 7/31/2023 Kapelsohn Ltr. Though untimely and arguably also in violation of Rule 26(e)(1)(A), the State did not and is not objecting to this letter's consideration, as it was at least provided in advance of Mr. Kapelsohn's deposition.

[10] The fifth *Dandy* factor also weighs in favor of striking all ballistics testing results. The methodology employed is entirely unclear, and the details concerning both of these tests are scant at best. Their relative importance are thus unclear.

2. Portions of Rule 30(e) Deposition Errata.

Mr. Kapelsohn's errata sheet, also submitted on at 8:44 p.m. on August 31, 2023, Vannella Decl. Ex. 28, included multiple entries offering substantive changes to his original deposition testimony. For the Court's convenience, the table below recreates the portions of the errata sheet which State Defendants are moving to strike from the record:

| Page | Line | From | To | Reason |
|------|------|------|-----|--------|
| **71** | 20-25 | Oh, I would have to go back and look,… (and ff) | Semiautomatic rifles invented before 1900 included Hiram Maxim's recoil-operated rifle in 1883, Ferdinand Mannlicher's rifle models 85, 91, 93 and 95, and Horace Updegraff's 1885 rifle. Also the Remington Model 8 (FN Model 1900), a John M. Browning design, patented in 1900 and thus likely invented before 1900.<br><br>Semiautomatic shotguns invented before 1900 include the extremely popular Browning A-5, ("Auto 5") designed by John M. Browning in 1898, and manufactured in large quantities from about 1902 to 1998. Semiautomatic pistols invented before 1900 include, among others, the FN Browning M1900 | Refreshed my recollection. |

| | | | (invented by John Moses Browning about 1896), the Mauser Model 1896 ("Broomhandle Mauser"), the Borchardt C-93, the Schwarzlose Model 1898, and I believe others. | |
|---|---|---|---|---|
| **72** | 19 | I can't tell you that from memory, no. | In addition to the rifles mentioned above, the Winchester Model 1903 (rimfire) and Model 1905 (centerfire) were widely sold to the civilian market in the United States. | Refreshed my recollection. |
| **76** | 16 | What evidence are you relying on? | Among other things, the widespread and widely-documented sale of the Browning A-5 shotgun from about 1902 to 1998. This is evidenced, among other things, in many books in my firearms library, and on the internet. See, as just one of dozens of sources, "Browning A5: A History" by Will Poston, Split Reed, for Browning Firearms. | |
| **96** | 1 | Sometime in the 1970s… But I need to look to be exact. But that's the approximate | Sometime in the 1960s. Specifically, it was offered to the civilian market by Colt Firearms Division in the fall of 1964. I have a copy of the American Rifleman magazine from, I believe, October 1964 that advertises this rifle for sale to the | Corrected my approximation of the time period – supplied additional information |

30

| | | range of years. | public, with a 20-round magazine shown in the ad, and an emphasis on use of the rifle for hunting. | |
|---|---|---|---|---|
| 96 | 20 | but I think that very soon after that, if that's the case, larger magazines were available | My own recollection upon further thought, is that the early magazines sent out by Colt with the AR15's sold to the public had bent sheet metal "spacers" in their 20 round magazines that reduced magazine capacity to 5 rounds for hunting. The spacers were easily removed in the same manner as one would disassemble the magazine for routine cleaning to restore the magazine to its 20-round capacity. I have heard that some magazines sent out by Colt with the sheet metal spacers rivered in place, perhaps for state whose game laws required this, but I never saw any magazines of that type at the time. | Remembered correct information |

Again, on a motion to strike deposition testimony added in a Rule 30(e) errata sheet, courts must undertake a fact-sensitive inquiry to assess if "sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted." *EBC*, 618 F.3d at 270; *supra* at 11-12. Although there is no one-size-fits all rule for whether the Court should strike testimony in Rule

31

30(e) errata sheets, "contradictory amendments cannot establish a genuine issue of material fact where the original testimony did not." *EBC*, 618 F.3d at 271. Mr. Kapelsohn's Rule 30(e) errata sheet seeks to do just that by replacing short answers, unhelpful to *ANJRPC* Plaintiffs' claims, with long responses that contradict and inappropriately expand on his original answers. In five entries on his Rule 30(e) errata sheet, Mr. Kapelsohn seeks to completely change his testimony given, offering only for justification that he "refreshed [his] recollection" or "remembered correct information" after his deposition. Kapelsohn Errata Sheet 2-5. These are not sufficient reasons to construct new deposition answers to create a genuine issue of material fact "from whole cloth." *See Patroni*, 2022 WL 2375721, *2 (quoting *EBC*, 618 F.3d at 267-68).

The substantive changes in Mr. Kapelsohn's errata sheet "materially contradict prior deposition testimony," adding new facts and explanations that he could have offered at his deposition, but did not. *Intervet*, 2023 WL 2266411, *5. For these reasons, the above portions of Mr. Kapelsohn's errata sheet should be stricken.

## II. CLAYTON CRAMER'S EXPERT TESTIMONY SHOULD BE EXCLUDED.

### A. Mr. Cramer Is Not Qualified To Offer His Proposed Rebuttal Expert Opinions.

*ANJRPC* Plaintiffs offer Mr. Cramer as a rebuttal expert to challenge the opinions offered by three of the State's nine experts: (1) Saul Cornell, an expert on the history of firearms regulation in the Anglo-American legal tradition; (2) Randolph Roth, an expert on the history of homicides and mass murders in the United States; and (3) Louis Klarevas, an expert on statistics and data analysis. Cramer Rebuttal Rpt.; Cramer Dep. Tr. at T93:8-94:16.[11] At a minimum, Mr. Cramer's should be excluded from offering testimony in rebuttal to Professor Klarevas's report, since he lacks the qualifications to do so.

As discussed, *supra* at 8-9, a witness is qualified to provide expert testimony only if the witness has "specialized expertise" with "a broad range of knowledge, skills, and training" in the testimony's subject matter. *Schneider*, 320 F.3d at 404. And although the expert's specialized knowledge can be based on either academic

---

[11] While Mr. Cramer's July 17, 2023 rebuttal report included a footnote that referenced Professor Baron, the State's linguistics expert, Cramer Reb. Rpt. 12 n.19, Mr. Cramer clarified at his deposition that he was *not* "offering any rebuttal to Dennis Baron." Cramer Dep. Tr. at T94:15-18, T119:2-20. In any event, Mr. Cramer acknowledges he has no training or credentials in linguistics. *Id.* at T120:3-7. He would not be qualified to offer any responsive opinion.

training and credentials or practical experience, *Waldorf*, 142 F.3d at 625, it *does* have to be one or the other.

Mr. Cramer is not qualified to rebut the statistics/data analysis expert testimony of Professor Klarevas. To begin, Mr. Cramer openly admits that he has no education, training, or credentials in statistics or data analysis. Cramer Dep. Tr. at T136:22-137:11. While Mr. Cramer publishes in law reviews and popular press, he has not published a peer-reviewed article on any topic in the last twenty years, and has never published a peer-reviewed article on statistics. *See id.* at T37:19-38:1, T39:4-9, T41:4-12.When pressed further at his deposition what if anything would qualify him to assess and criticize analyses offered by Professor Klarevas, which is based on data and results that were published in the peer-reviewed *American Journal of Public Health*, Mr. Cramer pointed only to his general knowledge of math and having taken a biology class in high school. *Id.* at T138:13-139:2. He does not "possess skill or knowledge greater than the average layman" in this subject matter. *Aloe Coal Co.*, 816 F.2d at 114.

He nevertheless challenges the State's expert in those fields, just as he attempted to do in at least one prior litigation before another court, *Oregon Firearms Federation v. Brown*. Cramer Dep. Tr. at T17:17-19:17. In that prior litigation, his report was revealed to be "erroneous" and plagued with data discrepancies; and, in an attempt to resuscitate it, he consulted with an "expert on database development."

*Id.*[12] (Tellingly, Mr. Cramer made no attempts to even do that here. *Id.* at T140:6-141:11). The Court should exclude Mr. Cramer's rebuttal opinions to Professor Klarevas. Cramer Rebuttal Rpt. 27-41.

### B. Mr. Cramer's Opinions Are Not The Product Of Reliable Methodology, And Are Imbued With Result-Driven Personal Biases.

Mr. Cramer's proffered expert testimony should be wholly excluded because his stated opinions are not based on reliable methodology accepted in the fields of expertise. Rather, Mr. Cramer proffered his rebuttal opinions *before* he even read the expert reports he was purportedly responding to, did not review them thoroughly after receiving them, and refused to review the sources cited in those reports. These deficiencies are exacerbated by a results-driven bias. Unsurprisingly, his report betrays a resulting lack of reliability.

Expert testimony based upon unreliable methodology is not helpful to a trier of fact and may be excluded. *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 791 F. Supp. 1042, 1055 (D.N.J. 1992). And as with any expert, the court should consider whether they reviewed all relevant materials before forming their opinion(s). *See Claar v. Burlington No. R. Co*, 29 F.3d 499, 502-03 (9th Cir. 1994) (observing that

---

[12] Oregon's *Daubert* motion against Mr. Cramer in the *Brown* case (later consolidated with others into *Oregon Firearms Federation v. Kotek*), was mooted before the Court rendered its decision, because plaintiffs responded that they were withdrawing him as a proposed witness. No. 22-1815, 2023 WL 4698752, *2 (D. Or. May 31, 2023). Mr. Cramer confirmed at his deposition that he had not testified at any hearing before the judge in that case. Cramer Dep. Tr. at T19:14-17.

an expert should not "com[e] to a firm conclusion first and then do[] research to support it"). That is especially true for a rebuttal expert, whose role is to evaluate and respond to the opinions of other experts based on sound methods. But Mr. Cramer did not do that here.

Mr. Cramer's deposition testimony revealed that he reached his purported rebuttal conclusions about State Defendants' experts' opinions *before* even receiving and reading the reports they submitted in this case. Cramer Dep. Tr. at T76:7-78:24. And even *after* Mr. Cramer received the reports, he did not form his responsive opinions based on reliable, well-accepted historical or statistical methodology. Rather, he admitted that he did not closely examine the States' experts reports at all. For example, Mr. Cramer admitted at his deposition that he failed to perform a "credibly detailed valuation" of Professor Klarevas's report, which contains numerous and detailed statistical analyses of data. *Id.* at T137:12-25. And Mr. Cramer could not specifically recall whether he actually read Professor Baron's report in this case, asserting that he "know[s] he read it in other cases." *Id.* at 118:14-119:1. At other times, Mr. Cramer openly admitted to prejudging Professor Cornell's report, stating he already arrived at opinions of Professor Cornell's report before he actually reviewed it. *Id.* at T105:23-106:22.

Moreover, Mr. Cramer did not even review the New Jersey laws being challenged in these matters before rendering his report and sitting for a deposition

36

int his matter. *Id.* at T34:11-16. He also professed a lack of knowledge the basic terms of the laws being challenged in the present case. *Id.* at T34:21-35:9. He admitted that he does not know what the threshold ammunition capacity of a large-capacity magazine is under New Jersey law, and at one point during his deposition asked the State's counsel to tell him what it was. *Id.* at T35:7-9, T47:14-18.

Mr. Cramer also failed to review all relevant authorities and sources, including those specifically relied upon by the State's experts. He refused to review "secondary sources" (*e.g.*, articles and books) relied upon by the State's experts, claiming that such materials can be flawed, and at one point in his report lectured Professor Cornell for not relying solely on "primary sources, as historians try to do." Cramer Rebuttal Rpt. 25; Cramer Dep. Tr. at T28:19-29:7, T97:10-98:5, T99:11-101:7, T172:4-19. Mr. Cramer acknowledged he did not review any of the secondary sources cited in Professor Cornell's report, and does not remember if he reviewed the secondary sources cited in Professor Roth's report. *Id.* at T172:7-19. Despite this, Mr. Cramer acknowledged that he himself relies on secondary sources, but only when *he* is convinced the source is sufficient. *Id.* at T100:14-101:7, T190:22-192:6.

In short, Mr. Cramer has openly announced that he formed his opinions in this case before reading the expert reports he was responding to, without knowing the basic contents of the statutes at the center of this case, and while refusing to even review the sources that support the opinions he had already rejected out of hand.

These serious failures to adhere to the baseline of methodological rigor are individually disqualifying.

Moreover, Mr. Cramer has exhibited a "result-driven bias" against nearly any firearm regulation, adding to his methodological shortcomings. *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 141 (D.N.J. 2020). For example, he considers defenders of "restrictive" firearms laws to be members of an "enemy camp." Cramer Dep. Tr. at T56:6-13; *see also, e.g., id.* at T56:1-5 & Ex. 3 (blog post recruiting "six to ten activists" to assist with a "research project" relating to firearms).[13] While issues of credibility, standing alone, typically do not justify exclusion of an expert's testimony, when an expert's credibility seriously undermines the reliability of the methodology he employed, exclusion is permissible under Rule 702. *See Elcock*, 233 F.3d at 750-51, 751 n.8. And where, as here, an expert "signed affidavits setting forth their conclusions before reading the relevant literature" or "there was clear evidence that the expert manipulated data to achieve a specific result," the court may reject the expert.

---

[13] That bias is also evidenced by Mr. Cramer's unprofessional levels of animosity towards other witnesses and courts. He repeatedly called Professor Cornell's report "crap," *id.* at T106:8, T106:20). And most egregiously, Mr. Cramer openly celebrated the death of a federal circuit court judge—who in Mr. Cramer's view had written "unpleasant" decisions in Second Amendment matters—remarking the judge had "recently been demoted to hell." *Id.* at T52:7-54:3 & Ex. 2. *See also id.* at T98:6-24 (calling Duke Law School's Repository of Historical Firearms Laws the "Duke trash repository").

*Johnson & Johnson*, 509 F. Supp. 3d at 141 (citing *Claar*, 29 F.3d at 502-03; *Snodgrass v. Ford Motor Co.*, No. 96-1814, 2002 WL 485688, *12 (D.N.J. Mar. 28, 2002)).

That is sufficient to render all of Mr. Cramer's proffered opinions suspect, but his report evinces numerous *substantive* methodological failings as well. For example, he accuses Professor Cornell of attributing the carryover of English law in 1776 to only three sources—sources that he believed Professor Cornell fails to understand. Cramer Rebuttal Rpt. 4. But Mr. Cramer offered that criticism without reviewing any of the *other* scholarly literature Professor Cornell also cited to in evidentiary support of that particular opinion. Cramer Dep. Tr. at T112:5-9. And while Professor Cornell cited to colonial historian Kevin Sweeney's article, "Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America," in support of his opinion that over 90 percent of the weapons owned by Americans were long guns, and not pistols, at the time that the Second Amendment passed, Mr. Cramer admits that he did not bother to read that article. *Id.* at T116:18-23.

Next, Mr. Cramer's attempts to rebut Professor Klarevas's statistical studies lacks even the minimum indicia of reliability. Cramer Rebuttal Rpt. 27-41. Most of Mr. Cramer's offered opinions are based on his review of reports about "mass murder" in newspapers. Far from a systematic search or random sampling, Mr.

Cramer seems to have selected his data haphazardly. For example, to identify incidents of mass murder, Mr. Cramer searched the commercial site Newspapers.com and the Library of Congress' Chronicling America collection of 1789-1963 newspapers for the terms "murders," "murdered," "killed," "slain," and "dead," accompanied by numbers. *Id.* at 78-80; Cramer Dep. Tr. at T145:25-146:12. Aside from relying on so few source databases, his chosen search terms were few if not outright arbitrary—indeed, Mr. Cramer even acknowledged that it is "possible [he] missed a few." Cramer Dep. Tr. at T146:13-25.

Even within this limited universe of newspaper articles that resulted in "hits," Mr. Cramer's filtering of those hits to identify only those reporting incidents of "mass murder," is itself arbitrary and subjective. In selecting qualifying incidents, he considers the moral or legal culpability of the victims or perpetrators as he gleaned from the articles, and excludes some otherwise qualifying incidents from his review. For example, he chooses to exclude what he considers to be "justifiable" or "excusable" killings when identifying instances of mass murder, such as when he—lacking even a background in law or criminal justice—believed that the perpetrator acted in self-defense. Cramer Rebuttal Rpt. 75; Cramer Dep. Tr. at T149:1-12. Nor does he classify incidents as "mass murder" if he perceives the incident to be gang-related, because, in his view, "determining if they were defensive in nature or not requires confidence in the integrity of the participants," and gang

40

members "often have reason to lie." Cramer Rebuttal Rpt. 75. He does not explain what generally accepted standards support any of these filtering methods that he chose, or how he can consistently apply those methods to actual examples—because no such standards exist.[14]

Moreover, Mr. Cramer's rush to conclusion has led to obvious errors. For example, Mr. Cramer asserted that the perpetrator of the Parkland, Florida mass shooting that killed 17 at Marjorie Stoneman Douglas High School was one where the perpetrator used a 10-round magazine. Cramer Dep. Tr. at T132:11-12 ("And as I think also in the Parkland shooting was done by someone using ten-round magazines."); *id.* at T133:6-25; Cramer Rebuttal Rpt. 36 (questioning Professor Klarevas's report listing the shooting as one perpetrated with an LCM). But that is wrong. As a publicly-available law enforcement report states, "Eight 30- and 40-round capacity magazines were recovered from the scene."[15]

In short, every step of Mr. Cramer's methodology—from identifying relevant data, to his review of the sources, to rendering his opinion—is rife with

---

[14] As discussed below, Mr. Cramer's August 31, 2023 Supplemental Report must be stricken for failure to comply with Rule 26(e)(1)(A). But it is also a of the same deficient methodology that Mr. Cramer relied upon in drafting his July 17, 2023 rebuttal report.

[15] Florida Dep't of Law Enf't, Marjory Stoneman Douglas High School Public Safety Commission Initial Report, at 262 (Jan. 2, 2019), https://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf.

methodological deficiency, sounding either in arbitrariness or wholly results-driven bias. Because his report does not meet minimum standards of reliability under Rule 702 and *Daubert*, it should be excluded.

### C. In The Alternative, Mr. Cramer's August 31, 2023 Supplemental Report Should Be Struck.

Besides constituting inadmissible expert testimony, *supra* Point II.A-B, *ANJRPC* Plaintiffs' August 31, 2023 "Supplemental Expert Report of Clayton Cramer," Vannella Decl. Ex. 30, must also be stricken for failure to comply with Rule 26(e)(1)(A). This late-in-time submission does not aim to correct any inaccuracies in the initial report, nor does it provide data or analysis previously unavailable at the time of his original report. On the contrary, as Mr. Cramer openly admits, he decided to "re-run" and add data—data which was available to him at the time he issued his original report—after perceived weaknesses in his analysis were exposed at deposition. Cramer Supp. Rpt.

The Supplemental Report seeks to use Rule 26(e)(1)(A) for a clearly improper purpose: as a "loophole through which … [Plaintiffs] wish[] to revise [their] disclosures in light of [their] opponent's challenges to the analysis and conclusions therein." *Ezaki*, 2019 WL 581544, *3 (quoting *Luke*, 323 Fed. App'x at 500). As with their last-minute dump of materials pertaining to Mr. Kapelsohn, *supra* at 25-28, *ANJRPC* Plaintiffs cannot now "add [analysis and conclusions] to [their] advantage after the court's deadline for doing so has passed." *See id.*; *supra* at 10-

42

12. If anything their production of a brand-new, unannounced, unrequested, and unpermitted supplemental expert report in the literal last minute of discovery is even more egregious.

The *Dandy* factors all weigh in favor of striking the Supplemental Report. The Supplemental Report was served on the State at the literal last minute before discovery closed—and forty-five days after the July 17, 2023 deadline for service of rebuttal expert reports, and ten days following Mr. Cramer's deposition. *ANJRPC* Plaintiffs provided no prior notice that any supplemental report even might be forthcoming—even as the parties' counsel, at the Court's direction, communicated with each other on an amended scheduling order that confirmed discovery would end on August 31, 2023 and set deadlines for *Daubert* and summary-judgment briefing. ECF 164. The State was prejudiced by the surprise nature of the Supplemental Report and the lack of any meaningful opportunity to respond or examine Mr. Cramer on the substance of his untimely disclosures. Based on the foregoing, the first four *Dandy* factors clearly weigh in favor of striking the Supplemental Report. The fifth *Dandy* factor also weighs in favor of striking the Supplemental Report: the methodology of the report is entirely unclear, and so its relative importance is difficult to ascertain.

## <u>CONCLUSION</u>

For the foregoing reasons, State Defendants' *Daubert* motion, and their motion to strike certain discovery, should be granted.

Dated:  November 3, 2023       Respectfully submitted,

                                            MATHEW J. PLATKIN
                                            ATTORNEY GENERAL OF NEW JERSEY

                              By:   /s/ Daniel M. Vannella
                                       Daniel M. Vannella
                                       Assistant Attorney General

44