# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | |
| v. | Civil Action No. 3:18-cv-10507 |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-cv-4360 |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

     Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

     Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

     Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

---

# COMBINED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
(609) 376-3202
Daniel.Vannella@law.njoag.gov
*Attorney for State Defendants*

Jeremy M. Feigenbaum, *Solicitor General*
Angela Cai, *Deputy Solicitor General*
Daniel Vannella, *Assistant Attorney General*

Christopher Ioannou
Nicholas Kant
Justine Longa
Jonathan Mangel
Rachel Manning
Tim Sheehan
  *Deputy Attorneys General*

Of Counsel And On The Brief

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT ............................................................... 1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ............ 5

    A.    New Jersey's Assault Weapons and Magazine Capacity Restrictions. ..... 5

    B.    Procedural History. ................................................................. 9

STANDARD OF REVIEW ................................................................... 13

ARGUMENT .................................................................................... 14

I.       THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIMS. ............................................... 14

    A.    Plaintiffs Cannot Show That Possessing LCMs Or Assault Weapons Is Protected By The Second Amendment. .............................................. 15

        1.    Large-Capacity Magazines Are Not "Arms." ..................................... 16

        2.    Neither LCMs Nor Assault Weapons Are In Common Use For Self Defense. ................................................................................ 22

            a.  LCMs And Assault Weapons Are Rarely Used For Self-Defense. .... 22

            b.  Assault Weapons And LCMs Were Designed For Military Combat, And Are Disproportionately Used By Criminals To Perpetrate Mass Shootings. ............................................................................. 28

            c.  The Relevant Test Is Common Use, Not Common Ownership. ......... 35

    B.    The Challenged Laws Are Consistent With The Nation's Tradition Of Restricting Firearms That Were Particularly Dangerous Or Susceptible To Disproportionate Criminal Misuse. ................................................. 41

        1.    Bruen Requires Engaging In Nuanced Analogical Reasoning. .......... 41

        2.    There Is A Longstanding National Tradition Of Restricting Instruments That Were Particularly Dangerous Or Susceptible To

i

Disproportionate Criminal Misuse. ................................................................55

II.      THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON
ANJRPC'S TAKINGS CLAIM................................................................................76

CONCLUSION ..........................................................................................................80

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................13

*Andrews v. State,*
   50 Tenn. 165 (1871) ........................................................................................64

*Andrus v. Allard,*
   444 U.S. 51 (1979) ........................................................................................80

*ANJRPC v. Att'y Gen. N.J.,*
   974 F.3d 237 (3d Cir. 2020) ................................................................ 11, 76, 77

*ANJRPC v. Attorney Gen. N.J.,*
   910 F.3d 106 (3d Cir. 2018) ............................................................... passim

*ANJRPC v. Bruck,*
   142 S. Ct. 2894 (2022) ....................................................................................12

*ANJRPC v. Grewal,*
   2018 WL 4688345 (D.N.J. Sept. 28, 2018) ............................................ 10, 24, 41

*ANJRPC v. Grewal,*
   2019 WL 3430101 (D.N.J. July 29, 2019) ...........................................................11

*Aymette v. State,*
   21 Tenn. 154 (1840) ...................................................................... 62, 69

*Bevis v. City of Naperville,*
   No. 23-1353, Dkt. No. 170 (7th Cir. Nov. 3, 2023) ...............................................4

*Bevis v. City of Naperville,*
  No. 22-cv-4775, ___ F.Supp.3d ____, 2023 WL 2077392
  (N.D. Ill. Feb. 17, 2023) ..............................................................................4

*Blackburn v. United Parcel Serv., Inc.,*
  179 F.3d 81 (3d Cir. 1999) ..........................................................................47

*Brown v. Maryland,*
  25 U.S. 419 (1827) ......................................................................................60

*Brumback v. Ferguson,*
  No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) .............4

*Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund,*
  932 F.3d 91 (3d Cir. 2019) ..........................................................................16

*Cheeseman v. Platkin,*
  No. 22-cv-4360 (D.N.J.) ..............................................................................12

*Chicago B. & Q. Railroad Co. v. Illinois,*
  200 U.S. 561 (1906) ....................................................................................79

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.,*
  No. 22-cv-951, ___ F.Supp.3d ____, 2023 WL 2655150
  (D. Del. Mar. 27, 2023) .......................................................................... 4, 38

*Dist. of Colum. v. Heller,*
  554 U.S. 570 (2008) ......................................................................... passim

*Drummond v. Robinson Twp.,*
  9 F.4th 217 (3d Cir. 2021) ...........................................................................73

*Duncan v. Becerra,*
  265 F. Supp. 3d 1106 (S.D. Cal. 2017) ......................................................79

*Duncan v. Bonta*,
 19 F.4th 1087 (9th Cir. 2021) ...............................................................30

*Fife v. State*,
 31 Ark. 455 (1876)................................................................... 64, 69

*Friedman v. City of Highland Park*,
 784 F.3d 406 (7th Cir. 2015) ................................................. 37, 54, 70

*Hanson v. Dist. of Colum.*,
 No. 22-cv-2256, ___ F.Supp.3d ____, 2023 WL 3019777
 (D.D.C. Apr. 20, 2023) .................................................................. passim

*Hartford v. Ferguson*,
 No. 23-5364, 2023 WL 3836230 (W.D. Wash. June 6, 2023) ..............................4

*Heller v. District of Columbia*,
 670 F.3d 1244 (U.S. App. D.C. 2011) ..................................................70

*Herrera v. Raoul*,
 No. 23-cv-532, ___ F.Supp.3d ____, 2023 WL 3074799
 (N.D. Ill. Apr. 25, 2023) .................................................................4

*Horne v. Dep't of Ag.*,
 576 U.S. 350 (2013)................................................................78

*In re Continental Airlines*,
 134 F.3d 536 (3d Cir. 1998)................................................................77

*In re Engers v. AT&T*,
 No. 98-cv-3660, 2005 WL 6460846 (D.N.J. Sept. 9, 2005)..................................39

*Kaucher v. Cty. of Bucks*,
 455 F.3d 418 (3d Cir. 2006)................................................................13

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) .................................................................37

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ...............................................................................80

*Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992) ..............................................................................80

*Luis v. United States*,
  578 U.S. 5 (2016) ....................................................................................19

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ................................................................................74

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ................................................................................22

*Mugler v. Kansas*,
  123 U.S. 623 (1887) ................................................................................79

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) ..................................................................... passim

*Nat'l Ass'n of Gun Rights v. Lamont*,
  No. 22-cv-1118, ___ F.Supp.3d ____, 2023 WL 4975979
  (D. Conn. Aug. 3, 2023) .................................................................. passim

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ................................................................................68

*O'Neill v. State*,
  16 Ala. 65 (1849) ....................................................................................56

*Ocean State Tactical LLC v. Rhode Island*,
 646 F. Supp.3d 368 (D.R.I. 2022) ................................................................. passim

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*,
 514 U.S. 175 (1995) ....................................................................................60

*Or. Firearms Fed'n v. Kotek*,
 No. 22-cv-01815, ___ F.Supp.3d ____, 2023 WL 4541027
 (D. Or. July 14, 2023) ................................................................................ passim

*Or. Firearms Fed'n, Inc. v. Brown*,
 644 F. Supp.3d 782 (D. Or. 2022) ............................................................... 4, 78

*People v. Brown*,
 235 N.W. 245 (Mich. 1931) ........................................................................ 66, 69

*Range v. Att'y Gen.*,
 69 F.4th 96 (3d Cir. 2023) (en banc) .......................................................... 21, 74

*Staples v. United States*,
 511 U.S. 600 (1994) ....................................................................................40

*State v. Huntly*,
 25 N.C. 418 (1843) .....................................................................................72

*State v. Reid*,
 1 Ala. 612 (1840) ....................................................................................... 62, 69

*State v. Wilburn*,
 66 Tenn. 57 (1872) ..................................................................................... 64, 69

*United States ex rel. Doe v. Heart Solution, PC*,
 923 F.3d 308 (3d Cir. 2019) .......................................................................39

*United States v. Marzzarella*,
 614 F.3d 85 (3d Cir. 2010) .........................................................................10

*United States v. Stevens*,
  70 F.4th 653 (3d Cir. 2023) ...................................................................21

*United States v. White*,
  401 U.S. 745 (1971)...............................................................................36

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981)...............................................................................41

*Wiese v. Becerra*,
  306 F. Supp. 3d 1190 (E.D. Cal. 2018) .................................................10

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019)....................................................................37

## **Historical Laws**

20 Rich. 2 c. 1 (1396)...............................................................................57

33 Hen. 8, c. 6, § 2 (1541–1542) .............................................................57

7 Rich. 2 c. 13 (1383)...............................................................................57

1686 N.J. Laws 289-90, ch. 9 ...................................................................57

1783 Mass. Acts 37....................................................................................60

1784 Laws of N.Y. 627, ch. 28 .................................................................59

1821 Me. Laws 98, ch, 25 .........................................................................60

1837 Ala. Laws 7 .......................................................................................61

1837 Ga. Acts 90 (1838)............................................................................61

1837-1838 Tenn. Pub. Acts 200-01, ch. 137 ...........................................61

1850 Mass. Gen. Law, ch. 194...................................................................62

Laws & Ordinances Governing the City of Chicago 239
  (Myers & Chandler 1866)......................................................................60

1870 Tex. Gen. Laws 63 ....................................................................64

1871 Tenn. Pub. Acts 81 ch. 90, § 1 ..............................................64

1881 Ark. Acts 191, ch. XCVI .................................................. 61, 64

Illinois Act of Apr. 16, 1881 ...........................................................62

1888 Gen. Minn. Law §§ 333, 334 ..................................................62

1890 Okla. Sess. Laws 475, § 18 ....................................................62

1927 Mass. Acts 413, ch. 326 ..........................................................66

1927 Mich. Pub. Acts 888-89 ..........................................................66

1927 R.I. Pub. Laws 256, ..................................................................66

Pub. L. No. 72-275, 47 Stat. 650 (1932)........................................66

1933 Minn. Laws 231, ch. 190 ........................................................66

1933 Ohio Laws 189 ..........................................................................66

1934 Va. Acts 137-39 ch. 96 ............................................................66

Pub. L. No. 75-474, 48 Stat. 1236 (1934)......................................66

Pub. L. No. 75-785, 52 Stat. 1250 (1938)......................................66

Pub. L. No. 103-322, 108 Stat. 1796 (1994)....................................8

## **Statutes**

2023 Wash. Sess. Laws, ch. 162, § 1 ................................................9

720 Ill. Comp. Stat. 5/24-1.10...........................................................9

720 Ill. Comp. Stat. 5/24-1.9.............................................................9

720 Md. Code Ann., Crim. Law § 4-305 ..........................................9

Cal. Penal Code § 16740....................................................................9

Cal. Penal Code § 30500-30515 ........................................................9

Cal. Penal Code § 30600 ........................................................................................9

Cal. Penal Code § 30605 ........................................................................................9

Colo. Rev. Stat. § 18-12-301 .................................................................................9

Conn. Gen. Stat. § 53-202 .....................................................................................9

D.C. Code § 7-2506.01 ..........................................................................................9

D.C. Code § 7-2501.01 ..........................................................................................9

D.C. Code § 7-2502.01 ..........................................................................................9

D.C. Code § 7-2502.02 ..........................................................................................9

Del. Code Ann. tit. 11, § 1468 ..............................................................................9

Del. Code Ann. tit. 11, §§ 1465-1466 ...................................................................9

Haw. Rev. Stat. Ann. § 134-8 ...............................................................................9

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a) .................................................9

Mass. Gen. Laws ch. 140, § 121 ...........................................................................9

Mass. Gen. Laws ch. 140 § 131 ............................................................................9

Md. Code Ann., Crim. Law § 4-301 ......................................................................9

Md. Code Ann., Crim. Law § 4-303 ......................................................................9

N.J. Stat. Ann. § 2C:39-1 ...........................................................................5, 6, 7

N.J. Stat. Ann. § 2C:39-19 ...........................................................................8, 78, 79

N.J. Stat. Ann. § 2C:39-20 ...........................................................................8, 78, 79

N.J. Stat. Ann. § 2C:39-3 .....................................................................................7

N.J. Stat. Ann. § 2C:58-3 .....................................................................................6

N.Y. Penal Law § 265.00 ......................................................................................9

N.Y. Penal Law § 265.02 ......................................................................................9

x

N.Y. Penal Law § 265.37 ..................................................................................9

Or. Laws 2023, c. 1, § 11 ...............................................................................9

P.L. 1990, ch. 32 ........................................................................................5, 6

P.L. 2017, ch. 323 ........................................................................................6

P.L. 2018, ch. 39 .........................................................................................7

R.I. Gen. Laws § 11-47.1-2 ..........................................................................9

Vt. Stat. Ann. Tit. 13, § 4021 ......................................................................9

Wash. Rev. Code § 9.41.010 .........................................................................9

Wash. Rev. Code § 9.41.240 .........................................................................9

Wash. Rev. Code § 9.41.390 .........................................................................9

## **Rules**

Fed. R. Civ. P. 56 .........................................................................................13

## **Other Authorities**

1 W. & M., ch. 2, § 7 ..................................................................................57

H.R. Rep. No. 103-489 (1994) .......................................................................8

N.J. Div. of Criminal Justice, Guidelines Regarding the "Substantially Identical"
    Provision in the State's Assault Firearms Laws (1996),
    https://nj.gov/lps/dcj/agguide/assltf.htm ...............................................7

William Blackstone, 4 Commentaries on the Laws of England 55 (1769) ............56

William English, "2021 National Firearms Survey: Updated Analysis Including
    Types of Firearms Owned" (May 13, 2022) .........................................39

## PRELIMINARY STATEMENT

The development and the widespread dissemination of assault weapons and large-capacity magazines (LCMs) in the 20th and 21st Centuries led to an unprecedented, devastating societal problem in modern America: mass shootings. In contrast to the single-shot muskets and other firearms that were prevalent at the Founding, technological changes in the last 100 years have provided everyday Americans access to weapons of far greater lethality. The AR-15 enables civilians to fire 45 rounds per minute, a significantly greater firepower than that enjoyed by soldiers during the Civil War. LCMs allow them to fire 11 or more bullets without even pausing to reload another magazine. And the bullets they fire cause damage of unprecedented scope, especially when they strike children. The consequences that follow are grave: because civilians now maintain access to weapons of unprecedented lethality, the Nation has for years been in the throes of a mass shooting epidemic that would have been unimaginable to the Founders. Five of the top ten deadliest mass shootings in American history occurred since 2010, all involving assault weapons. And assault weapons and LCMs have become a common feature of school shootings—allowing a lone shooter to kill 21 people (mostly children) and to wound 17 others in Uvalde just last year.

Yet even as the devastation inflicted with assault weapons and/or LCMs is of unprecedented scope, laws restricting these weapons find extensive support both in

our Constitution's text and in the Nation's historical tradition. In 2022, the Supreme Court reiterated that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense," and held that it allows citizens to carry the same in public. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022). But at the same time, *Bruen* took care to confirm that this right was not "a regulatory straightjacket," *id.*—that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring) (quoting *Dist. of Colum. v. Heller*, 554 U.S. 570, 626 (2008)). Indeed, that much had been clear long before even the Founding of this Nation: "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the [self-defense] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (majority op.) (quoting *Heller*, 554 U.S. at 626); *see id.* at 2162 (Kavanaugh, J., concurring) (quoting same passage). As *Bruen* explained, that promise remains true today.

*Bruen* provided two different ways to show that modern laws are consistent with the self-defense right, and the challenged assault weapons and LCM restrictions satisfy both. First, *Bruen* explained that firearms restrictions withstand muster if they do not fall within the scope of the Second Amendment's protection in the first place. That matters here in two respects. For one, the Second Amendment applies only to

2

"arms," but as the historical record and linguistic experts confirm, LCMs are not arms at all—they are simply ammunition containers. For another, the Second Amendment applies only to arms that are "'in common use' for self-defense today," *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627), in contrast to those— like M-16 rifles—most useful in military service. But as this record reveals, LCMs and assault weapons are not commonly used for self-defense, and instead bear many of the features of the M-16. Since these weapons fall outside the self-defense right itself, "the analysis can stop there." *Id.* at 2126.

Second, these laws also find support in an extensive historical tradition. *Bruen* establishes that even where a law falls within the scope of the Second Amendment, that law will still pass constitutional scrutiny when it is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. That does not mean the State has to identify *identical* historical laws—after all, States confront new technologies and modern challenges "beyond those the Founders specifically anticipated." *Id.* at 2132. Instead, States are free to justify their laws through "analogical reasoning"— that is, by identifying analogous laws that "impose a comparable burden on the right of armed self-defense" and were "comparably justified." *Id.* at 2132-33. And as the historical record and experts in this case confirm, that is what New Jersey has done. From the Founding through Reconstruction through the 20th Century, governments have long regulated guns that are particularly dangerous or susceptible to

disproportionate criminal misuse, while leaving the quintessential self-defense weapons available for civilian use. New Jersey law, like the laws of multiple other States, is no different: it limits only a narrow subset of particularly dangerous weapons that are especially susceptible to causing mass death and damage, and that are of little or no self-defense use.

Since *Bruen*, the vast majority of federal courts to confront these challenges have upheld assault weapons and/or LCM laws. *See Bevis v. City of Napierville*, No. 23-1353, Dkt. No. 170 (7th Cir. Nov. 3, 2023) (slip op.), *Brumback v. Ferguson*, No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023); *Nat'l Ass'n of Gun Rights v. Lamont*, No. 22-cv-1118, ___ F.Supp.3d ____, 2023 WL 4975979 (D. Conn. Aug. 3, 2023); *Or. Firearms Fed'n v. Kotek*, No. 22-cv-01815, ___ F.Supp.3d ____, 2023 WL 4541027 (D. Or. July 14, 2023); *Hartford v. Ferguson*, No. 23-5364, 2023 WL 3836230 (W.D. Wash. June 6, 2023), *Herrera v. Raoul*, No. 23-cv-532, ___ F.Supp.3d ____, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023); *Hanson v. Dist. of Colum.*, No. 22-cv-2256, ___ F.Supp.3d ____, 2023 WL 3019777 (D.D.C. Apr. 20, 2023); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 22-cv-951, ___ F.Supp.3d ____, 2023 WL 2655150 (D. Del. Mar. 27, 2023); *Bevis v. City of Naperville*, No. 22-cv-4775, ___ F.Supp.3d ____, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023); *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp.3d 782 (D. Or. 2022); *Ocean State Tactical LLC v. Rhode Island*, 646 F.

Supp.3d 368 (D.R.I. 2022). In reaching these results, courts have endorsed the State's arguments at both steps of *Bruen*'s inquiry: that LCMs and assault weapons are not commonly used for self-defense and that LCMs are not arms, and that assault weapons and LCM laws fit within a long tradition of regulating arms that are particularly dangerous or susceptible to disproportionate criminal misuse. There is no basis for this Court to break from that near-consensus; rather, this Court should deny Plaintiffs' motion and grant summary judgment to the State.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   New Jersey's Assault Weapons and Magazine Capacity Restrictions.

In 1990, in the wake of a mass shooting at a California school where the shooter killed five children and wounded thirty-three others using an AK-47 and a handgun, New Jersey enacted a law prohibiting the possession of assault weapons. P.L. 1990, ch. 32 *see* N.J. Stat. Ann. §§ 2C:39-1(w)(1); *see* Declaration of Daniel Vannella Ex. 4, Rpt. of Professor Robert J. Spitzer ¶ 1.[1] In signing the bill, Governor Jim Florio recognized the "wholesale destruction" these weapons can inflict, making them a "direct threat to our police, our citizens and especially our children." Vannella Decl. Ex. 42, News Release, Office of the Governor, Florio Signs Nation's Toughest Assault Weapon Law (May 30, 1990). He explained that this measure targets only

---

[1] Unless otherwise noted, cited exhibits refer to exhibits attached to the Vannella Declaration.

those weapons "designed to wipe out the greatest number of people in the shortest possible time." *Id.* As the Governor put it, "hunters don't need Uzis to shred their prey, and law abiding citizens don't need 'street-sweepers'" for self-defense. *Id.*

The 1990 Act's prohibition on "assault firearms" did not apply at all to most handguns and rifles, which remain generally available in New Jersey subject to generally-applicable permitting and background check requirements. *See* N.J. Stat. Ann. § 2C:58-3. The Act listed the specific firearms prohibited under the defined term "assault firearm," P.L. 1990, ch. 32 § 1 (w), and captured any copycat designs, by including "[a]ny firearm manufactured under any designation which is substantially identical to any of the firearms listed" in subsection (w)(1). *Id.* § 1(w)(2). And the law also clarified the specific features that otherwise characterized impermissible assault firearms: namely, "A semiautomatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock;" "A semiautomatic rifle with a fixed magazine capacity exceeding 15 rounds;" and "A part or combination of parts designed or intended to convert a firearm into an assault firearm," or "from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person." *Id.* § 1(w). In 2017, the definition was amended to include "A firearm with a bump stock attached." P.L. 2017, ch. 323 § 1(w)(6). In August 1996, Attorney General Peter Verniero issued guidelines on the criteria that renders a firearm

6

"substantially identical," N.J. Stat. Ann. § 2C:39-1(w)(2), to the listed weapons defined as "assault firearms" under N.J. Stat. Ann. § 2C:39-1(w)(1).[2] In short, "assault firearm" is thus simply the statutory umbrella for the enumerated list and series of functional definitions that identify the features which make a firearm illegal to possess—similar to how the defined terms "destructive device" and "machine gun" in the same statute operate. *See id.* § 2C:39-1(c), (i).

New Jersey law also governs the permissible capacity for a magazine. In 1990, the Act defined an impermissible "large capacity ammunition magazine" to mean "a box, drum, tube, or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." P.L. 1990, ch. 32 § 1(y). But in 2018—as the threat of mass shootings, often with LCMs, proliferated—New Jersey enacted P.L. 2018, Chapter 39 (A2761), which revised the definition of an unlawful "large capacity ammunition magazine" from 15 to 10 rounds of capacity. *See* N.J. Stat. Ann. § 2C:39-1(y); *see id.* § 2C:39-3 (j). Although the law restricts the capacity of each individual magazine, it imposes no limitation on the number of firearms or magazines, or the amount of ammunition, that a person can lawfully purchase or own.

---

[2] N.J. Div. of Criminal Justice, Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws (1996), https://nj.gov/lps/dcj/agguide/assltf.htm.

Chapter 39 gave owners of prohibited magazines 180 days to comply with the revised limit. *Id.* § 2C:39-19. Owners could comply in several ways: "[t]ransfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine; [r]ender the semi-automatic rifle or magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less; or [v]oluntarily surrender the semi-automatic rifle or magazine." *Id.* Chapter 39 also created exemptions for firearms "with a fixed magazine capacity [of up to] 15 rounds which is incapable of being modified to accommodate 10 or less rounds" and a "firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds." *Id.* § 2C:39-20(a). Owners of those weapons simply had to register them within one year of the law's effective date. Both the 1990 Act and Chapter 39 contain certain exemptions, including for law enforcement, that are not applicable here.

This change to New Jersey's LCM regulations brought it in line with the capacity limits of a number of other states, and with the prior federal limits that governed under Congress's 1994 assault-weapons ban until it sunset in 2004. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, §§ 110101–06, 108 Stat. 1796, 1996-2010 (1994); H.R. Rep. No. 103-489, at 19 (1994) (explaining LCMs "make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent," such that "a single

8

person with a single assault weapon can easily fire literally hundreds of rounds within minutes"). Indeed, fourteen states and the District of Columbia maintain some restriction on the capacity of magazines used with semiautomatic weapons—and eleven states also choose 10-rounds (or less) as the limit.[3] New Jersey is likewise one of ten jurisdictions that currently prohibits the possession or sale of semiautomatic assault weapons.[4]

## B.  Procedural History.

On the same day Chapter 39 was signed into law, the *ANJRPC* Plaintiffs filed the instant suit, alleging that New Jersey's LCM restriction violates the Second Amendment, the Takings Clause of the Fifth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. This Court denied Plaintiffs' motion for a preliminary injunction, *ANJRPC v. Grewal*, 2018 WL 4688345 (D.N.J. Sept. 28,

---

[3] *See* Cal. Penal Code § 16740 (ten rounds); Conn. Gen. Stat. § 53-202a(1) (same); D.C. Code § 7-2506.01(b); Haw. Rev. Stat. Ann. § 134-8(c); 720 Md. Code Ann., Crim. Law § 4-305(b); Mass. Gen. Laws ch. 140, § 121; Or. Laws 2023, c. 1, § 11; R.I. Gen. Laws § 11-47.1-2; Wash. Rev. Code § 9.41.010(25); *see* N.Y. Penal Law §§ 265.02(8), 265.37 (seven); *see also* Colo. Rev. Stat. § 18-12-301 (fifteen); Del. Code Ann. tit. 11, § 1468 (seventeen); 720 Ill. Comp. Stat. 5/24-1.10 (10 for "long guns;" 15 for "handguns"); Vt. Stat. Ann. Tit. 13, § 4021 (same).

[4] *See* Cal. Penal Code §§ 30500-30515, 30600, 30605; Conn. Gen. Stat. §§ 53-202a-202c; Del. Code Ann. tit. 11, §§ 1465-1466(a); D.C. Code §§ 7-2501.01(3A), 7-2502.01, 7-2502.02(a)(6); Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a); 720 Ill. Comp. Stat. 5/24-1.9; Md. Code Ann., Crim. Law §§ 4-301, 4-303; Mass. Gen. Laws ch. 140, §§ 121, 131M; N.Y. Penal Law §§ 265.00(22), 265.02(7); Wash. Rev. Code §§ 9.41.390, 9.41.010(2), 9.41.240 (2023 Wash. Sess. Laws, ch. 162, § 1).

2018), and the Third Circuit affirmed, finding Chapter 39 constitutional, *ANJRPC v. Attorney Gen. N.J. ("ANJRPC I")*, 910 F.3d 106 (3d Cir. 2018).

Although this was at the preliminary-injunction stage, the panel made clear it was resolving all the legal challenges on the merits and upholding the law. The panel concluded that the LCM restriction does not "violate[] the Second Amendment." *Id.* at 110. Applying the Circuit's then-governing "two-step framework," *id.* at 116 (citing *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)), the panel held that "laws restricting magazine capacity to ten rounds of ammunition do not violate the Second Amendment," *id.* at 122. The panel also rejected the Takings Clause challenge. *Id.* at 110. It reasoned that the LCM restriction does not effect a taking, because owners of proscribed magazines can "transfer or sell" them to third parties who may lawfully possess them, "modify their LCMs to accept fewer than ten rounds," or "register those LCMs that cannot be modified," but are not required to surrender them to the State. *Id.* at 124. And "because it does not deprive the gun owners of all economically beneficial or productive uses of their magazines," the statute does not work a regulatory taking. *Id.* After all, "modifying the magazine to hold fewer rounds of ammunition than before does not 'destroy the functionality of the magazine.'" *Id.* at 124-25 (quoting *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018)). And notably, even for magazines incapable of being modified to accommodate 10 or less rounds, owners can "keep their unmodifiable LCMs and

modified versions" and use them "in the same way expected: to hold multiple rounds of ammunition in a single magazine." *Id.* at 125.

The State subsequently prevailed at summary judgment. This Court granted summary judgment to the State, finding the Third Circuit's "precedential decision" in *ANJRPC I* resolved all legal issues in the case. *ANJRPC v. Grewal*, 2019 WL 3430101, at *3 (D.N.J. July 29, 2019). The Third Circuit affirmed, holding that its prior opinion was the law of the case as to these claims. *ANJRPC v. Att'y Gen. N.J. ("ANJRPC II")*, 974 F.3d 237, 240 (3d Cir. 2020).

While Plaintiffs' petition for certiorari from the Third Circuit's 2020 opinion was pending, the U.S. Supreme Court in June 2022 decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). The majority in *Bruen* rejected the use of means-end scrutiny in assessing the constitutionality of laws under the Second Amendment, *id.* at 2129-30, abrogating the approach the Third Circuit had applied in this case. In its place, *Bruen* mandated a historically-informed inquiry. It required courts to first assess if the Second Amendment's "plain text covers an individual's conduct," focusing on the "'normal and ordinary' meaning" of the text, and whether the weapons at issue are "'in common use' today for self-defense." *Id.* at 2126–27, 2134. *Bruen* then instructed that "when the Second Amendment's plain text covers an individual's conduct," courts proceed to a second part of the inquiry: to determine

11

whether "the regulation is consistent with this Nation's historical tradition of firearm regulation" using "analogical reasoning." *Id.* at 2126, 2132.

The following week, the Supreme Court granted the *ANJRPC* Plaintiffs' petition, vacated the judgment of the Third Circuit, and "remanded ... for further consideration in light of [*Bruen*]." *ANJRPC v. Bruck*, 142 S. Ct. 2894 (2022) (mem.). The Third Circuit, in turn, remanded to this Court "for decision in the first instance under the standard announced in *Bruen*." No. 19-3142, Dkt. 147-1 (3d Cir.), ECF 109[5] at 1; *see id.* n.1 (adding remand would afford opportunity "for further record development, targeted at the legal and historical analysis required under *Bruen*").

Meanwhile, two other groups of plaintiffs commenced new suits in the days following the *Bruen* decision. *See Cheeseman v. Platkin*, No. 22-cv-4360 (D.N.J.); *Ellman v. Platkin*, No. 22-cv-4397 (D.N.J.). And the *ANJRPC* Plaintiffs, following the Third Circuit's remand, filed an Amended Complaint, which dropped the Equal Protection claim they had initially pled. Am. Compl., ECF 122. As the *Cheeseman* and *Ellman* complaints both challenge the validity of New Jersey's assault-firearms prohibition on Second Amendment grounds—a central claim also being litigated in *ANJRPC*—this Court on February 6, 2023, granted the State's motion to consolidate and consolidated all three matters for coordination of discovery. ECF 148. The parties then engaged in extensive consolidated discovery, including both exchanging

---

[5] All citations to "ECF __" refer to the *ANJRPC* docket, No. 18-cv-10507 (D.N.J.).

expert reports and conducting depositions.[6] After the close of discovery, this Court extended consolidation "through the resolution of *Daubert* motions and dispositive motions." ECF 168. On September 6, 2023, this Court entered the parties' joint proposed briefing schedule for *Daubert* and dispositive motions. ECF 166-67. On October 6, each set of Plaintiffs filed a motion for summary judgment. ECF 174-75. The State now cross-moves for summary judgment.[7]

## STANDARD OF REVIEW

Summary judgment is appropriate where the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" "only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and is "material" only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). "Factual disputes that are irrelevant or unnecessary" thus do not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[6] The *Cheeseman* Plaintiffs proffered no experts. No Plaintiffs deposed any of the State's expert witnesses.

[7] The *ANJRPC/Ellman* Plaintiffs filed motions seeking to exclude the testimony of the State's affirmative experts, and the State is contemporaneously moving to exclude the testimony of two Plaintiffs' experts.

**ARGUMENT**

**I.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIMS.**

Courts assessing Second Amendment claims after *Bruen* conduct a two-step inquiry. First, courts ask whether the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct," focusing on the "'normal and ordinary' meaning" of the text, and whether the weapons at issue are "'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2126–27, 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 576, 624 (2008)). If the Amendment does not cover the conduct, "the analysis can stop there; the regulated activity is categorically unprotected." *Id.* at 2126. Second, if the conduct is protected, courts must ask if the regulation still accords with "the Nation's historical tradition of firearm regulation." *Id.* at 2130. States can satisfy that burden by identifying "historical analogue[s]," *id.* at 2133, for their laws—even if an identical measure did not exist historically. And that analysis is particularly "nuanced" when the modern law "implicat[es] unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. In assessing whether an analogue is "relevantly similar" to the modern law, courts ask whether the two laws "impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Id.* at 2132-33; *see id.* at 2133 (calling these the "how and why" of the laws). Laws can be sufficiently analogous even if the modern law "is not a dead ringer for historical precursors";

that is, the State need not point to a "historical *twin*." *Id.* at 2133. *Bruen*'s analogical test thus offers neither "a regulatory straightjacket nor a regulatory blank check." *Id.*

Under either step, New Jersey's laws are valid. Plaintiffs cannot meet their threshold burden of showing that their proposed conduct—to possess and carry assault weapons and magazines capable of holding more than 10 bullets—is protected by the Second Amendment, for two independent reasons. First, neither LCMs nor assault weapons enjoy Second Amendment protection because LCMs are not "arms" and because neither are commonly used for self-defense. Moreover, even if the Second Amendment right is implicated, the challenged laws are relevantly similar to historical restrictions on firearms that were particularly dangerous or susceptible to disproportionate criminal misuse, especially considering the dramatic technological and social changes that bear on the historical inquiry.

## A. Plaintiffs Cannot Show That Possessing LCMs Or Assault Weapons Is Protected By The Second Amendment.

The Second Amendment protects "only" "arms" that are "'in common use' for self-defense today." *Bruen*, 142 S. Ct. at 2132, 2143. Plaintiffs cannot show their desired conduct is protected by the Second Amendment: they can neither show that LCMs are "arms" at all under the Amendment's plain text, nor that LCMs or assault weapons are in common use for self-defense, both predicates for Second Amendment protection. Because the regulated conduct falls outside the scope of the right, the analysis "stop[s] there." *Id.* at 2126.

15

1.   *Large-Capacity Magazines Are Not "Arms."*

To determine whether "the Second Amendment's plain text covers an individual's conduct," courts must "focus on the 'normal and ordinary' meaning of the Second Amendment's language" in its historical context. *Id.* at 2126-27 (quoting *Heller*, 554 U.S. at 576-77). Although technology has changed, "the Second Amendment's definition of 'arms' is fixed according to its historical understanding." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582). The undisputed record evidence establishes the word "arms" was not historically understood to include ammunition containers like LCMs. Plaintiffs' contrary arguments fail.

The unrebutted expert testimony of linguist Dennis Baron, Ph.D., is that the word "arms" was understood in the 18th and 19th Centuries to encompass weapons like firearms but *not* to encompass accessories like ammunition containers. Professor Baron analyzed both historical dictionaries and databases containing historical texts during the Founding through the Reconstruction eras to glean the "original public meaning" of terms like "arm," "accoutrement," and "magazine." *See* Ex. 6, Rpt. of Professor Dennis Baron ¶¶ 2, 9-20 (describing methodology); *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91, 95 & n.1 (3d Cir. 2019) (approving of this method, known as corpus linguistics, to interpret legal texts). And his analysis of the historical textual evidence demonstrates that in both the Founding and Reconstruction eras, the terms "arms" and "accoutrements"

16

described "separate categories of military gear" or equipment. Baron Rpt. ¶ 37; *id.* ¶¶ 2(a), 28, 32, 51. "'Arms' as a stand-alone term refers to weapons," *id.* ¶ 29, while "'accoutrements' generally refers not to weapons, but to other accessories worn or carried by soldiers." *Id.* ¶ 25. In particular, "cartridge boxes" and other "ammunition containers" were "typically categorized as 'accoutrements,' not 'arms.'" *Id.* ¶ 2(b); *id.* ¶¶ 26-27, 30-32, 71. That makes sense: up until the mid-1800s, "bullets were kept in 'cartridge boxes,'" variously called "cartouch boxes," "cartridge cases," or "pouches," *id.* ¶ 71, which were among the "items worn with a soldier's uniform." *Id.* ¶ 30.

The evidence shows not only that "arms" excluded accoutrements like cartridge boxes, but also that cartridge boxes are "the historical analog to magazines." *Id.* ¶¶ 30, 32. Contemporaneous newspaper articles show that the term cartridge box referred to "ammunition containers," whether worn on the person or used to feed ammunition into a weapon. *Id.* ¶¶ 3, 31. The term "magazine" emerged as a term similarly referring to "a bullet storage container" as early as the 1860s. *Id.* ¶ 22. Indeed, "magazine" began "replacing the earlier terms 'cartridge box' [and] 'cartridge case'" in everyday usage at around that time. *Id.* ¶ 68. By contrast, "there is virtually no lexical data" showing "that 'arms' includes ... 'magazines.'" *Id.* ¶ 74.

As such, LCMs fall outside the textual ambit of the Second Amendment, which only protects the right to bear "arms," not "accoutrements."[8]

Other courts have already recognized the import of this linguistic, historical analysis. As multiple courts have explained after examining substantially the same historical evidence, Plaintiffs "failed to meet their burden of establishing that LCMs are 'Arms' within the textual meaning of the Second Amendment." *Ocean State Tactical*, 646 F. Supp. 3d at 388, *appeal pending*, No. 23-1072 (1st Cir.); *Kotek*, 2023 WL 4541027, at *26, *appeal pending*, No. 23-35479 (9th Cir.). To the contrary, as they rightly reasoned, "The word 'Arms' was a general term for weapons such as

---

[8] Tellingly, Plaintiffs fail to even cite their own proffered experts, who have no linguistics training but attempt to rebut Professor Baron's linguistic testimony. *See* Ex. 14, Rebuttal Rpt. of Emanuel Kapelsohn at 3-7; Ex. 19, Rebuttal Rpt. of Clayton Cramer at 12-13. Their proffered lay opinions betray a lack of expert understanding, and create no genuine issue of material fact, even if they were admissible. While Kapelsohn argues that "the modern magazine is *not* the 'analog' of the Revolutionary War soldier's cartridge box," because such "cartridge box[es] did not feed cartridges into the chamber of his musket or rifle," Kapelsohn Rebuttal Rpt. at 4, he simply overlooks Professor Baron's specific analysis of evidence from 1869 that "cartridge box" *was* used to refer to "what today we would call a detachable magazine that both contains ammunition and feeds it." Baron Rpt. at 17-18. More importantly, Kapelsohn's quip is not germane to the corpus linguistics inquiry at all. Plaintiffs' arguments relate to the *functional* equivalency of cartridge boxes and magazines, not those items' *linguistic* equivalency. After all, no record evidence disputes that the term "cartridge box[es]" referred to containers that "store[d] ammunition." Cramer Rebuttal Rpt. at 13. Nor does any record evidence dispute Professor Baron's testimony that the term "magazine" was referred to as a "bullet storage container" as early as 1868. Baron Rpt. ¶ 22 (quoting the Oxford English Dictionary). There is thus no genuine dispute that cartridge boxes share the same *linguistic* meaning as magazines: "device[s] that hold[] cartridges or ammunition." *ANJRPC I*, 910 F.3d at 116 (citing "Magazine," Merriam-Webster Dictionary).

swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or 'parts' of weapons such as the trigger, or a cartridge box. [By contrast,] in the 18th Century, bullets were kept in cartridge boxes or cases, called 'accoutrements,' and the word 'magazine,' which was used at that time to mean 'storehouse' did not come to mean a compartment holding ammunition until the late 19th Century." *Ocean State Tactical*, 646 F. Supp. 3d at 387-88. This Court need not break any new ground; it should simply hold the same.

Plaintiffs present no contrary evidence as to the original public meaning of "arms," and instead wrongly assert that magazines are "integral to the functionality" of semiautomatic firearms, and thus presumptively protected. ANJRPC Br. 21. The central problem is that Plaintiffs are conflating *bullets* with magazines. All agree that because they are necessary for the operation of firearms (the subject of the Second Amendment's guarantee), bullets fall within the ambit of the Second Amendment. *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) (stating that the scope of the right to keep and bear arms implicitly protects "those closely related acts necessary to [its] exercise," including "obtain[ing] the bullets necessary to use them"). Yet there is no record evidence similarly suggesting that any particular form of bullet container—an LCM—is somehow necessary for a firearm to operate.

Rather, the undisputed expert evidence establishes that, generally speaking, "any firearm designed to accept a detachable magazine holding more than 10 rounds

19

will also accept a magazine with a maximum capacity" of fewer than 10 rounds. Ex. 11, Rpt. of James E. Yurgealitis ¶ 145. Thus, an AR-15 type rifle "will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity." *Id.*; *see also id.* ¶¶ 103-09 (noting mass market in firearms that come standard with 10-round magazine). In other words, a magazine's *capacity* "is not a determinant of firearm operability." *Id.* ¶ 145. As another court put it in rejecting this functionality argument, "[w]ithout *bullets*, a firearm would be useless. But a firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful." *Ocean State Tactical*, 646 F. Supp. 3d at 386. That *bullets* are necessary for a firearm to function thus says nothing about whether *LCMs* are "arms."

The Third Circuit's pre-*Bruen* opinion does not compel a different conclusion. *See ANJRPC I*, 910 F.3d at 116. Because the parties in that 2018 appeal did not litigate whether LCMs are "arms" as historically understood, the Third Circuit said only that "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Id.* Given the law as it stood then, *ANJRPC I* did not conduct the historically-driven textual analysis of "arms" the Supreme Court now requires, *Bruen*, 142 S. Ct. at 2127, or consider any of the historical evidence the State has compiled on that score. *Supra* at 16-18. *ANJRPC I*'s rationale regarding

"arms" was thus abrogated by *Bruen*. *See United States v. Stevens*, 70 F.4th 653, 657-60 (3d Cir. 2023) (explaining panel's "analysis and holding" is "abrogated by intervening" Supreme Court precedent that "undermined" the panel's "rationale"); *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) (confirming "*Bruen* abrogated [the Circuit's] Second Amendment jurisprudence"). Indeed, the Third Circuit's 2020 opinion holding that it was bound by *ANJRPC I* on this very Second Amendment challenge was itself "vacated" and remanded by the Supreme Court for reconsideration in light of *Bruen*, 142 S. Ct. 2894, underscoring that *ANJRPC I* is no longer good law on issues relating to the Second Amendment's scope.

In any event, *ANJRPC I*'s rationale does not support Plaintiffs' functionality point. The opinion stated that "*ammunition* is necessary for such a gun to function as intended." 910 F.3d at 116 (emphasis added). "Magazines," meanwhile, merely "feed ammunition into certain guns." *Id.* And as laid out above, there is no genuine dispute that even for firearms designed to use detachable magazines, a magazine *holding more than 10 rounds* is not "necessary" for the gun to function as intended—such weapons would function perfectly well with a smaller magazine. *Supra* at 19-20; Yurgealitis Rpt. ¶ 145. That magazines *generally* "feed ammunition into certain guns" is thus nonresponsive to the State's specific, uncontroverted evidence showing that *LCMs* are unnecessary to a firearm's operability. That helps explain why bullets generally fall within the Second Amendment's ambit, but LCMs do not.

2.   *Neither LCMs Nor Assault Weapons Are In Common Use For Self Defense.*

Even if this Court considers LCMs "Arms," Plaintiffs' claims still fail at the threshold step because the Second Amendment only protects "Arms" that are "'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627). That makes sense: *Bruen* explained that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128. To the contrary, because "individual self-defense" is "'the *central component*' of the Second Amendment right," *id.* at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)), the sole "Arms" protected by the Second Amendment right are those "that facilitate armed self-defense," *id.* at 2132. Certain firearms are thus excluded; as *Heller* stated expressly, "weapons that are most useful in military service—M-16 rifles and the like—may be banned." 554 U.S. at 627; *id.* at 624-25 (same). And here, the record is undisputed that the LCMs and assault weapons at issue are not commonly used for self-defense. This Court should join a host of others rejecting Plaintiffs' claims on this basis. *See, e.g.*, *Kotek*, 2023 WL 4541027, at *26-33; *Hanson*, 2023 WL 3019777, at *7-12; *Ocean State Tactical*, 646 F. Supp. 3d at 388–90; *Lamont*, 2023 WL 4975979, at *19-26.

a.   LCMs And Assault Weapons Are Rarely Used For Self-Defense.

Abundant record evidence shows that LCMs and assault weapons are rarely used for self-defense. That evidence—results of statistical analysis of data from

22

multiple sources—is entirely undisputed by Plaintiffs, who present no competent evidence that law-abiding citizens *commonly* employ assault weapons or fire more than 10 bullets in acts of self-defense.

The undisputed record evidence shows that civilians acting in self-defense rarely use more than 10 shots, much less from one magazine. The State's statistical expert Lucy Allen, an economist, analyzed real-life armed self-defense incidents in two independent analyses, whose results were markedly similar. The first analysis was based on incidents recorded in the NRA Armed Citizen database. Of the 736 incidents of self-defense from January 2011 to May 2017 recorded in the database, there are *two* cases (or 0.3%) in which a person using a gun in self-defense fired more than 10 bullets. Ex. 7, Rpt. of Lucy P. Allen ¶¶ 9, 10. And the underlying reporting of those two incidents did not indicate the defenders needed to fire more than 10 shots to defend themselves. *Id.* ¶ 6, n.2. Indeed, in the vast majority of incidents—587 (or 79.8%)—the defender fired 1 to 5 bullets; and in 134 (or 18.2%), the defender fired no shots at all. *Id.* ¶¶ 9-10. Overall, defenders fired an average of 2.2 shots. *Id.*

Her two other database analyses found the same. The second database analysis was also performed on a sample of published news stories in a large aggregative archive, evaluating instances of persons using a gun in self-defense and how many rounds they fired. *See id.* ¶ 5. Of the 200 randomly sampled news stories "describing

23

incidents of self-defense with a firearm in the home" from the same period of January 2011 to May 2017, *id.* ¶ 13, there "were *no incidents* where the defender was reported to have fired more than 10 bullets." *Id.* ¶ 17 (emphasis added). The results showed that "[i]n 97.3% of incidents the defender fired five or fewer shots," and in 11.6% of incidents fired no shots at all. *Id.* Thus, in the "almost 1,000 incidents of self-defense" culled from both datasets, "in only 0.2% of reported incidents of self-defense with a firearm were more than 10 rounds used." *Id.* ¶ 18.[9] And the third analysis—a study of the NRA database from 1997 to 2001—also yielded a 2.2-shot average. *Id.* ¶ 9, n.14; Yurgealitis Rpt. ¶ 147. And there is a good reason why: self-defense scenarios "are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire." Yurgealitis Rpt. ¶ 137.

---

[9] In its 2018 preliminary-injunction decision, this Court observed that both Allen and Plaintiffs' expert Gary Kleck were credible, but "failed to clearly convey the effect this law will have on reducing mass shootings in New Jersey or the extent to which the law will impede gun owners from defending themselves." *ANJRPC I*, 2018 WL 4688345, at *5, 8. While those determinations—made before *Bruen* abrogated the two-step means-end approach previously employed by courts—are no longer binding, Allen's instant expert report is different in several respects. First, Allen has updated her analysis, including analysis to confirm the reliability of her methodology as to the NRA Armed Citizen and Factiva study approaches. Allen Rpt. ¶¶ 9, 12 (finding Factiva search terms yielded 90% overlap of results as NRA database and finding no difference in results in remaining 10%, and addressing selection bias). Second, Allen conducted additional analyses on new databases for defensive gun use with handguns versus rifles and for mass shooting data. *Id.* ¶¶ 19-28. Notably, her findings on the latter are consistent with other published studies. *Id.* ¶ 35. Importantly, these findings are undisputed by Plaintiffs.

There is no genuine dispute that individuals acting in self-defense rarely use more than 10 shots, and in fact tend to use between 2 and 3. Plaintiffs' sole response does not create genuine disputes of material fact. They do not dispute the reliability of the data used, the methodology used, or the accuracy of the findings—nor can they, given that such findings were replicated across multiple independent analyses. *See, e.g*, Ex. 16, Kapelsohn Dep. Tr. T114:15-17 (agreeing on inability to opine on Allen's statistical results). Instead, Plaintiffs' purported expert Emanuel Kapelsohn only observes that averages are averages, and "there are some instances where the number is smaller" than the average, and "some where the number is larger." Kapelsohn Rebuttal Rpt. at 11. That truism is entirely unresponsive to the data results. As to his other argument that it is theoretically possible that newspaper accounts are inaccurate, Kapelsohn does not suggest any reasons that the hypothetical inaccuracy would tend to skew downward in reporting the number of shots fired. *Id.* at 12.

The undisputed record evidence also shows assault weapons are rarely used for self-defense.[10] Of the 2,714 defensive gun incidents from January 2019 to October 2022 recorded in the Heritage Foundation's *Defensive Gun Uses in the United States* database—a representative set of "stories of successful self-defense,"

---

[10] Plaintiffs proffer no record evidence disputing facts relating to Allen's statistical analysis of rifle use in self-defense and of assault weapon and LCM use in mass shootings and resulting differentials in fatalities and injuries.

not intended as a comprehensive dataset, Allen Rpt. ¶¶ 21, 22—a "rifle" was used in 51 incidents. *Id.* ¶ 23. That represents 2% of all recorded incidents, and 4% of incidents in which the firearm type was known. *Id.*; *id.* ¶ 24 (findings substantially the same when excluding incidents in "states that had restrictions on assault weapons in 2022"). And because "rifle" includes more than just assault weapons, this most likely reflects overcounts of instances of use of *assault weapons* for self-defense. *See id.* ¶ 22.

These data also confirm the obvious: that handguns are far and away the most commonly used firearm for self-defense, accounting for 41% of all reported cases of defensive gun use, and 90% of cases in which the firearm type was known. *Id.* ¶ 23; *accord Bruen*, 142 S. Ct. at 2143 (agreeing handguns are "the quintessential self-defense weapon." (quoting *Heller*, 554 U.S. at 629)). Indeed, a separate analysis of the FBI's active-shooter database between January 1, 2000 and December 31, 2022, by Professor Louis Klarevas—a political scientist who has published acclaimed research on gun violence epidemiology—finds similar results for self-defense incidents in response to attacks by armed perpetrators "in a populated area." Ex. 9, Rpt. of Professor Louis Klarevas ¶ 25. That revealed 17 active-shooter incidents where the firearms used by a civilian defender was known: 14 involved handguns, 1 involved a shotgun, 1 involved a bolt-action rifle, and 1 involved an assault rifle. *Id.* ¶ 26. Thus, only 5.9% (1 of 17) cases where a firearm was used for self-defense in

26

an active-shooter scenario involved the use of an assault weapon. *Id.* Overall, only 1 out of 456 active-shooter scenarios in the last 23 years involved a civilian intervening with an assault weapon. *Id.*

Against these statistical analyses, Plaintiffs present only 7 anecdotal examples of defensive arm uses with an assault firearm. *See* ANJRPC Br. 27; Kapelsohn SJ Decl. ¶¶ 29-47, ECF 175-5; Ex. 13, Rpt. of Emanual Kapelsohn at 14-16. The State has moved to exclude Kapelsohn's testimony on Rule 702 and *Daubert* grounds; in any event, Mr. Kapelsohn himself admitted he had no recollection of how the examples were provided to him and that he did not "take any actions to verify" their accuracy. Kapelsohn Dep. Tr. 132:21-133:8. But even if these anecdotal examples were admissible, they do not present a genuine issue of material fact. After all, Kapelsohn was only able to identify 7 anecdotes, but presents no evidence of the denominator. As such, Plaintiffs offer no evidence on how *commonly* assault weapons are used for self-defense, as what Kapelsohn offers is not a statistical analysis at all. *See id.* at 132:21-133:4 (acknowledging no information on how many cases or incidents in a particular time period involved the use of a semi-automatic rifle in self-defense).

Moreover, these very articles do nothing to dispute the State's evidence that LCMs are not commonly used for self-defense. Indeed, only one of the seven articles indicates that more than 10 rounds were fired, but even that article fails to indicate

whether the individual used an LCM or reloaded magazines of lower capacity—or even whether more than 10 rounds were necessary. *See* Kapelsohn Decl. ¶ 40, ECF 175-5, Ex. 3. Several of the other articles indicate that no shots were fired, *id.* ¶ 41, Ex. 4, or a single round was fired, *id.* ¶ 44, Ex. 7. Plucking individual examples from an unknown dataset provides no admissible evidence regarding how commonly assault weapons and large-capacity magazines are used in self-defense scenarios.

At bottom, the undisputed data demonstrates that instances of actual use of assault weapons or LCMs in self-defense scenarios are vanishingly rare—and such instruments are not in "common use" for self-defense. *See Kotek*, 2023 WL 4541027, at *33 (holding, based on similar expert and historical record, that challengers "have not shown that LCMs are commonly employed for self-defense"); *Hanson*, 2023 WL 3019777, at *12 (agreeing that LCMs "are not in fact commonly used for self-defense"); *Ocean State Tactical*, 646 F. Supp. 3d at 390 (same).

> b. <u>Assault Weapons And LCMs Were Designed For Military Combat, And Are Disproportionately Used By Criminals To Perpetrate Mass Shootings.</u>

By contrast, the undisputed record evidence shows that assault weapons and LCMs are designed for military purposes. The very characteristics that are central to their use for military combat also make them the preferred instruments for perpetrating mass murders, not lawful self-defense.

The undisputed record evidence demonstrates that assault weapons and LCMs were designed for military use, not civilian self-defense. The assault weapons in circulation today derive from, and "are near identical copies" of, weapons developed for use by military forces in the post-World War II era. Ex. _, Rpt. of James Yurgealitis ¶ 112; *id.* ¶¶ 52-58, 64-65, 158 (tracing lineage of AR-type and other commercially available assault weapons to arms developed in conjunction with U.S. military). The AR-15 specifically was originally designed and developed in the 1950s to meet U.S. Army specifications. *Id.* ¶¶ 54-56. After U.S. Army testing in South Vietnam demonstrated its "suitability" for use against Viet Cong combatants—who suffered "catastrophic injuries ... including severing of limbs and decapitation" when shot, *id.* ¶ 56—the AR-15 "was adopted as standard issue by the U.S. Army in the mid 1960's" and was subsequently renamed the M-16. *Id.* ¶ 57.

Indeed, modern AR-15s are functionally identical to the M-16, except lacking a pre-set automatic-fire option. *Id.* ¶¶ 72-74. They have the same "effective range, muzzle velocity and semiautomatic rate of fire." *Id.* ¶ 73. Their "basic configuration, appearance, construction and operation" remained "unchanged." *Id.* They "retained the capability to accommodate" LCMs. *Id.* And modern AR-15's internal components are "completely interchangeable" with the 1960s-era M-16s. *Id.* ¶ 74; *id.* ¶¶ 75-77. In other words, today's AR-15 type rifles are in essence functionally "identical" to the "M-16 rifles and the like" that *Heller* confirms "may be banned"

consistent with the Second Amendment. 554 U.S. at 627; *see also Lamont*, 2023 WL 4975979, at *24–26 (relying on this relationship between AR-15s and M-16s in finding that assault weapons "are more suitable for military use than civilian self-defense," and thus rejecting similar constitutional claims).

LCMs bear the same "military heritage." Yurgealitis Rpt. ¶ 91. The earliest LCMs with magazine capacity beyond 10 rounds were designed specifically for use by soldiers during World War II. *Id.* ¶¶ 73, 95-96. LCMs' basic function—conferring "the ability to fire an increased quantity of cartridges without reloading"—results in increased "lethality and effectiveness" that was "intended for military use." *Id.* ¶ 110; *see Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021) ("Evidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to a soldier[.]"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Indeed, manufacturers long marketed both LCMs and assault weapons as military weaponry intended for offensive use—the very terms "assault weapon" and "assault rifle" originated in firearm industry marketing in the 1980s. Rpt. of Robert J. Spitzer ¶ 50; *id.* ¶¶ 51 ("The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public."), 52-58; Yurgealitis Rpt. ¶¶ 85-88 (providing copies of contemporaneous advertisements depicting such firearms as semiautomatic versions of military weapons).

30

Unsurprisingly, the military pedigree of assault weapons and LCMs reflects their exceptional lethality. Assault weapons are designed to inflict catastrophic injuries by firing high-velocity bullets "at battlefield ranges of up to 500 yards." Yurgealitis Rpt. ¶ 137. Given its ability to rapidly fire uninterrupted, an assault weapon is "capable of inflicting significant carnage upon civilians in a short period of time, especially in conjunction with large capacity magazines." *Id.* ¶ 5; *see also* Ex. \_, Rpt. of Professor Brian DeLay ¶¶ 6, 82. Similarly, LCMs offer "the ability to fire an increased quantity of cartridges without reloading," which "increases the lethality and effectiveness of small arms in combat." Yurgealitis Rpt. ¶ 110. These features allow a single shooter to "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." Ex. \_, Rpt. of Professor Randolph Roth ¶ 60; Yurgealitis Rpt. ¶ 156 (noting assault weapons can penetrate law enforcement standard-issue body armor).

As biomechanical modeling shows, bullets fired by AR-15 style rifles produce "significantly larger" cavities in human tissue than even the Thompson machine gun. Ex. \_, Rpt. of Dr. Stephen W. Hargarten ¶ 26; *see id.* ¶ 28.[11] That expert, an

---

[11] Plaintiffs' purported expert only questions the comparison of experiment results from the AR-15 rifle versus the musket, but does not dispute the remaining results or Dr. Hargarten's medical opinions. *See* Kapelsohn Rebuttal Rpt. at 7-9. In any event, Kapelsohn's assertion that a larger "Brown Bess" musket was used on the *battlefield* during the American Revolution, in no way contradicts the use of a smaller musket ball in Dr. Hargarten's biomedical study, since there Kapelsohn provides no evidence that civilians would have been using the "Brown Bess" musket

emergency room physician, also testified that bullets from assault weapons "are capable of inflicting enormous damage on the human body" by causing "extreme damage to the tissue and organs of shooting victims … leading to relatively high fatality" rates compared to lower-powered guns. *Id.* ¶¶ 13, 32; *see also id.* ¶ 34 (citing observation of trauma surgeon who treated Parkland victim that "only shreds of the organ that had been hit by a bullet from an AR-15" remained, and "nothing was left to repair"). The risks are "amplified when there are multiple bullet wounds," including a higher risk of death. *Id.* ¶ 34. Using an LCM in combination with an assault weapon thus exacerbates the risks, as it "increase[s] this destructive potential by increasing ... the number of bullets that can be fired during a given time period." *Id.* ¶ 30.

The very characteristics that are central to these instruments' use for military combat helps to explain why they are preferred instruments for perpetrating mass murders. Not only is the prevalence of mass shootings increasing overall; perpetrators of particularly deadly mass shootings are also increasingly choosing LCMs and assault weapons to inflict carnage. *See* Allen Rpt. ¶¶ 39, 40 (increasing trendline in public mass shootings and public mass shootings with LCMs from 1982

---

ball to defend themselves in the 18th and 19th Centuries. Moreover, as the State explains in its concurrent motion to exclude expert testimony, Mr. Kapelsohn is in no way qualified to render expert opinions about the kinetic energy release of an experiment he did not even conduct.

to 2001); Klarevas Rpt. ¶¶ 12-13 (increased incidence of mass shootings and increased percentage of high-fatality mass shootings with assault weapons or LCMs from 1991 to 2022); Ex. _, Rpt. of Professor Daniel Webster ¶ 12 (citing 2017 study finding that LCMs constituted up to 57% of firearms used in mass shootings and 41% of firearms used to murder police). From 1982 to 2022, LCMs were used to perpetrate 63% of mass shootings with 4 or more victim fatalities; assault weapons were used to perpetrate 24%. Allen Rpt. ¶¶ 30-31. And for high-fatality mass shootings especially (6 or more victim fatalities), between 1991 and 2022, the percentage involving assault weapons is 34%, but rose to 53% for the past 4 years. Klarevas Rpt. ¶ 13. The percentage involving LCMs is 77%, but rose to 100% for the past 4 years. *Id.*

Moreover, several studies confirm that the average number of casualties in mass shootings is higher when the perpetrator uses LCMs or assault weapons. Allen Rpt. ¶ 35; Klarevas Rpt. ¶¶ 15-16; Webster Rpt. ¶¶ 9, 11. The results are even starker when both instruments are used. Klarevas Rpt. ¶ 17 (finding use of LCMs with assault weapons in high-fatality mass shootings resulted in a 92% increase in the average death toll compared to high-fatality mass shootings involving neither); Allen Rpt. ¶¶ 32-34 (finding average number of injuries or fatalities was 40 per mass shooting with both assault weapons and LCMs versus 8 for those with neither); *see also* Webster Rpt. ¶¶ 9-13 (other studies showing assault weapons and LCMs

disproportionately account for recent mass shootings and cause a comparatively higher number of fatalities and injuries).

The undisputed record evidence shows that they are *not* in common use for self-defense, but *are* in common use for crime—in particular, mass murder. LCMs and assault weapons are far more often used in mass shootings (conservatively, 63% and 24% of mass shootings) than for armed self-defense (conservatively, 0.2% and 2% of self-defense). *See supra* at 23-26, 32-33; Klarevas Rpt. ¶ 27 ("assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings."); *see also Lamont*, 2023 WL 4975979, at *23-24 (agreeing, based on evidence, that "the use of [assault weapons and LCMs] in mass shootings demonstrates that the weapons are commonly used for reasons other than lawful self-defense."); Webster Rpt. ¶ 9 (citing the "evidence that the design features of assault weapons make them especially appealing to criminals and to those who commit mass shootings"). Because the undisputed evidence shows assault weapons and LCMs are not designed for and do not "facilitate" self-defense, they are not protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2132.[12]

---

[12] While Plaintiffs' proffered expert disputes the State's expert evidence that assault weapons can actually hamper self-defense, *compare* Yurgealitis Rpt. ¶¶ 137-42 (noting ways in which such weapons can hamper self-defense capabilities and harm bystanders and loved ones), *with* Kapelsohn Rebuttal Rpt. at 13-15 (commenting on specific firearm recommendations without support but acknowledging opinion "is not that the Court should accept my opinions rather than those of Yurgealitis"), that does not create a genuine issue of material fact. The relevant question is not whether

c.  <u>The Relevant Test Is Common Use, Not Common Ownership</u>.

Against this overwhelming record, Plaintiffs adduce no credible evidence that LCMs and assault weapons are commonly used for self-defense; instead, Plaintiffs erroneously contend that "typical[] possess[ion]" is the dispositive inquiry. ANJRPC Br. 22; Cheeseman Br. 27 (same). But their simple circulation tally, even if Plaintiffs could bear their evidentiary burden, is simply not the law.

As an initial matter, the test for whether a specific weapon falls within the Second Amendment right turns on whether it is in common *use* for self-defense, not common *ownership* or possession. As *Bruen* explains, the Second Amendment protects "commonly *used* firearms for self-defense." 142 S. Ct. at 2138 (emphasis added); *see id.* at 2156 (describing "right to bear commonly *used* arms in public" (emphasis added)). It is weapons that actually "facilitate armed self-defense" that fall within the protection of the "central component of the Second Amendment right." *Id.* at 2132-33. Indeed, that was central to *Heller*'s reasoning why a ban on handgun possession violated the Second Amendment. The Court emphasized that the handgun is "the quintessential self-defense weapon." 554 U.S. at 629. And since the "right of self-defense" is "central to the Second Amendment right," the Court assessed the scope of the right by looking to "arms 'in common use at the time' for

_____

such instruments *could* be used by a civilian in self-defense scenarios, but rather whether they are in fact in common use for that purpose.

lawful purposes like self-defense." *Id.* at 624-25, 629. It strains credulity to find, as Plaintiffs suggest in a footnote, that when *Bruen* referred to "use" (relying on cases that did the same) it silently meant "possession." ANJRPC Br. 3 n.1.

Nothing in *Heller*, *McDonald*, or *Bruen* suggests an individual's subjective motivation for purchasing a firearm is the fulcrum of constitutional protection. Otherwise, it would be enough for Americans to *believe* that grenade launchers or automatic weapons could be helpful for self-defense, even when they are not in fact so used. *See* Yurgealitis Rpt. at 29 ¶ 88 (Colt brochure advertising AR-15, including depiction of "grenade launcher" and touting interchangeability). But subjective expectations alone do not dictate the parameters of constitutional rights. *See Kotek*, 2023 WL 4541027, at *30 (owners' "subjective intent" does not establish common use for self-defense); *Lamont*, 2023 WL 4975979, at *14 (same). After all, "[o]ur expectations … are in large part reflections of laws that translate into rules the customs and values of the past and present." *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting). *Bruen* instead rightly requires that courts analyze the actual use of the weapon for self-defense.

Moreover, relying on mere ownership figures at the time of the litigation is hopelessly circular. Indeed, that would mean the Second Amendment would permit prohibiting a weapon simply because the State banned the weapon before it ever became commercially available. But it "would be absurd to say that the reason why

a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (similar). This could be easily gamed by regulated parties as well: manufacturers would only need to "flood[] ... the market" before any restrictions could be enacted to forever insulate a weapon from restrictions. *Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. But just as any given "law's existence can't be the source of its own constitutional validity," the converse is also true: that governments did not uniformly prohibit a weapon for the initial years of commercial production cannot be the reason why it is presumptively protected by the Constitution. *Id.* n.15. And as *Kotek* observed, "the commonality of LCMs is at least partially due to choices made by firearms manufacturers and dealers rather than firearms purchasers," making the ownership figures not "reflective of an affirmative choice by consumers." 2023 WL 4541027 at *28; *see* Yurgealitis Rpt. ¶¶ 96-97, 99-100, 102-103 (describing sellers' choices to offer firearms with certain standard magazine capacities).

Indeed, Plaintiffs' proposed ownership tally test is inconsistent with *Heller,* which held that the Second Amendment does not protect machine guns because they are "not typically possessed by law-abiding citizens for lawful purposes," and found "startling" the suggestion that these are entitled to constitutional protection. 554 U.S.

at 624-25. But under Plaintiffs' ownership tally test, machine guns would be entitled to Second Amendment protection, since there are roughly "176,000 legal civilian-owned machine guns in the United States." *DSSA*, 2023 WL 2655150, at *5, *appeal pending*, No. 23-1633 (3d Cir.); *see* Vannella Decl. Ex. _ (February 2016 ATF document indicating 175,977 machine guns acquired before 1986 are registered in the National Firearms Registration Transfer Record System). That, of course, defies *Heller*'s command, and confirms that Plaintiffs' test is not the Court's.

Plaintiffs appear to recognize the problem with their argument, *see* ANJRPC Br. at 24 (acknowledging that a common-ownership test would mean "New Jersey could simply ban any brand new firearm merely because no one owns it yet"), but their attempt to circumvent it gets them no further. Plaintiffs argue that because New Jersey bans particularized *features* of firearms that make them assault weapons (and likewise regulates the magazine-capacity feature), so long as a feature is in common possession, that is enough to come under the Second Amendment's protection. But that runs into the same problems: if firearms with a certain feature—*e.g.*, automatic fire—were immediately prohibited when introduced, then under Plaintiffs' view, they would also fall outside the scope of the Second Amendment. Conversely, if automatic-fire is not banned as a feature all-but immediately, and weapons with that characteristic circulated in society in sufficient quantities, under Plaintiffs' logic,

38

governments could never ban automatic weapons. *See also, e.g.*, Yurgealitis Rpt. ¶¶ 85-88 (early advertisements for grenade launcher capability for AR-15).

But even if this Court adopts Plaintiffs' common-ownership test—despite the contrary precedent—Plaintiffs cannot point to any competent record evidence that assault weapons (or their features) and LCMs *are* commonly owned by civilians for self-defense.  Plaintiffs rely almost exclusively on outside-the-record unpublished survey data not authenticated by any sworn declarant. *See* ANJRPC Br. 22, 25-26; Cheeseman Br. 28 (citing William English, "2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned" (May 13, 2022)). That is inadmissible double hearsay, which may not be considered. *See Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999); *In re Engers v. AT&T*, No. 98-cv-3660, 2005 WL 6460846, at *2 (D.N.J. Sept. 9, 2005) (survey results inadmissible hearsay). Since no declarant swore to its accuracy, it "is incompetent summary judgment evidence." *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 316 (3d Cir. 2019). It is also inadmissible for its unreliability, as expert witnesses on *both sides* have criticized its methodology. Klarevas Rpt. ¶ 29 n.31 (noting violation of Code of Professional Ethics and Practices of the American Association for Public Opinion Research); Dep. of Gary D. Kleck, *Kotek*, No. 22-cv-1815 (D. Or.), ECF 175-7 at 12-13 (plaintiff expert stating he "would not rely" on it "for any purpose").

Admissibility aside, Plaintiffs' evidence does not even support their theory. Bare aggregate sales and circulation figures do not show anything about how many of the weapons are specifically owned *for self-defense* (as opposed to those sold to law enforcement or to straw buyers, or owned for hunting, target practice, and/or as collector's items). *E.g.*, ANJRPC Br. 22-23, 26; Cheeseman Br. 28. Indeed, the NSSF "Commonly Owned" and "Firearm Production" reports, ANJRPC Br. 22, 26, are not civilian common-ownership figures, as they appear to include sales to law enforcement, firearm retailers, "and possibly prohibited possessors" as well as straw buyers. *See* Klarevas Rpt. ¶ 14. Similarly, assault-weapons sales totals alone do nothing to prove they are commonly owned (as opposed to being "concentrated in the hands of" a relative few, Klarevas Rpt. ¶ 29)—let alone that they are commonly used for self-defense, *see* Allen Rpt. ¶¶ 21-24 (assault weapons accounted for 2% of instances of a firearm being used in self-defense). In other words, even accepting Plaintiffs' premise, they have adduced no record evidence that assault weapons and LCMs are commonly owned for self-defense purposes.[13] That means the State is

---

[13] Plaintiffs' citation to *Staples v. United States*, 511 U.S. 600, 632 (1994), is inapposite, as *Staples* says nothing about whether assault weapons are indeed in common use for self-defense. The *Staples* Court answered the very narrow criminal law question of the requisite level of *mens rea* required for conviction under the federal prohibition on ownership of a machine gun, and "emphasize[d] that our holding is a narrow one." At best, it observes that AR-15s are legally available in some states, an obvious fact that does not bear on whether they are commonly used for self-defense without running into the problem of circularity described above.

entitled to summary judgment; but at a minimum, Plaintiffs are not entitled to summary judgment, as any evidence they present on this score is disputed.[14]

### B. The Challenged Laws Are Consistent With The Nation's Tradition Of Restricting Firearms That Were Particularly Dangerous Or Susceptible To Disproportionate Criminal Misuse.

Even if this Court believes that New Jersey's assault weapons and LCM laws trigger further Second Amendment scrutiny under the first *Bruen* step, it should still enter judgment for the State under *Bruen*'s second step because the challenged laws are relevantly similar to historic firearm regulations. *See Bruen*, 142 S. Ct. at 2129-30 (holding that even if "the Second Amendment's plain text covers an individual's conduct," a challenged statute remains constitutional where it is "consistent with the Nation's historical tradition of firearm regulation").

### 1. Bruen *Requires Engaging In Nuanced Analogical Reasoning.*

The initial question this Court must confront is how to determine whether the modern laws at issue are "consistent with the Nation's historical tradition of firearm

---

[14] This Court's common-use analysis at the preliminary injunction stage, 2018 WL 4688345, at *10, should not be treated as law of the case. First, decisions on preliminary injunction motions about the *likelihood* of success are not law-of-the-case. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Second, *Bruen* has since clarified that the proper inquiry is whether the arm is in "common use today for self-defense," 142 S. Ct. at 2134, binding guidance this Court did not have in 2018. Moreover, the analysis this Court previously engaged in was a feature of the means-end scrutiny *Bruen* abrogated, and thus it should assess common-use anew under the proper inquiry as articulated by *Bruen*, on the record compiled by the parties.

regulation." *Id. Bruen* provides the answer: "analogical reasoning." *Id.* at 2131-33. In other words, even if the modern statute itself was unfamiliar to the Founding and Reconstruction generations, the State may show that a statute aligns with this Nation's history by "identify[ing] a well-established and representative historical *analogue*" – rather than a "historical *twin*" – supporting the restriction. *Id.* at 2133; *see id.* (confirming that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster"). In reviewing the historical and expert record, courts will consider "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by evaluating "whether the two regulations are relevantly similar." *Id.* at 2132 (citation omitted). And while *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it provided "at least two metrics" for courts to use: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Said another way, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (citation omitted).

   *Bruen* also made clear that certain cases would require especially "nuanced" analogical reasoning. *Id.* at 2132. As *Bruen* noted, the "regulatory challenges posed

by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and therefore courts should apply the historical understanding of the Second and Fourteenth Amendments "to circumstances beyond those the Founders specifically anticipated." *Id.* To that end, *Bruen* emphasized that if modern laws "implicat[e] unprecedented societal concerns or dramatic technological changes," courts may need to apply "a more nuanced approach" when evaluating historic analogues. *Id.* And, notably, the Court identified the development of new firearms as appropriate for this nuanced, analogical analysis. *See id.* (explaining that the Court has "already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century'") (quoting *Heller*, 554 U.S. at 582). In other words, even if a particular firearm—and thus a particular firearm restriction—did not exist at the time the States ratified the Second and Fourteenth Amendments, that is not dispositive in either direction. *Id.* at 2133 (agreeing that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check"). To the contrary, this Court must consider what restrictions on arms *did* exist historically, and then ask whether the principles that underlie them are relevantly similar to the modern law. *See generally id.* at 2162 (Kavanaugh, J., concurring)

(emphasizing that, under analogical reasoning, "the Second Amendment allows a 'variety' of gun regulations") (quoting *Heller*, 554 U.S. at 636).

This is precisely the sort of modern suit that calls for "nuanced" "analogical" reasoning for two reasons: it implicates both "dramatic technological changes" and "unprecedented societal concerns." This brief addresses each in turn.

*First*, this action implicates "dramatic technological changes." *See id.* at 2132 (citing development of new arms as classic modern change). The most commonly-owned firearms during the colonial era—such as "single-shot" muskets and fowling pieces—"had significant limitations" that prevented widespread use in "murder" or mass shooting events. Rpt. of Randolph Roth ¶¶ 18-19; *see also* Spitzer Rpt. ¶¶ 30, 40; Delay Rpt. ¶¶ 34, 37; Ex. 3, Rpt. of Professor Saul Cornell at 24. Among other things, these single-shot weapons "had to be reloaded manually" after every single shot—a "time-consuming process" ("at least half a minute") that "required skill and experience." Roth Rpt. ¶ 19. This significantly reduced the risk that these firearms could harm or kill multiple persons in a single episode, and also increased opportunities for officers or bystanders to stop any would-be murderer. *See* Rpt. of Brian DeLay ¶ 61 (adding that the process of re-loading colonial-era firearms necessitated rising up from a prone position, "ma[king] one an easier target during combat"). Nor was this the only technological defect: in addition to manual reloading after each shot, these arms "were liable to misfire," Roth Rpt. ¶ 19;

44

notoriously "inaccurate at range," DeLay Rpt. ¶ 37; and sometimes even carried a risk of explosion, *id.* ¶¶ 14-15; *see also, e.g.*, Roth Rpt. ¶ 19 (explaining that once muzzle-loading guns "were fired (or misfired)," these firearms "lost their advantage: they could only be used as clubs in hand-to-hand combat"). For all these reasons, "repeat-fire was difficult to achieve." DeLay Rpt. ¶ 61. The limits on the technology thus limited the lethality an individual could achieve with a gun.

That state of affairs held true throughout the antebellum period. Indeed, as the historical record establishes, "single shot guns were the ubiquitous firearm until after the Civil War." Spitzer Rpt. ¶ 40; *see* DeLay Rpt. ¶ 51 (same). That is, repeating (i.e., "multi-shot") firearms were a rarity until the late 1800s. *See, e.g.*, Spitzer Rpt. ¶ 30; DeLay Rpt. ¶¶ 8, 14, 33-34. And when such firearms did become available, they shared many of the same limitations as the colonial-era guns. *See, e.g.*, Spitzer Rpt. ¶ 30; DeLay Rpt. ¶¶ 8, 14, 33-34. Early repeater weapons were slow to reload, unreliable, prone to misfiring, and dangerous to the user. *See* DeLay Rpt. ¶¶ 14-16, 59; Spitzer Rpt. ¶ 30. Guns that relied on superposed loading "were painfully slow to load" and liable to "explode like a tubular grenade in the shooter's hands." DeLay Rpt. ¶ 15. Given those limitations, it is not surprising that no repeating firearm achieved military or commercial significance before the nineteenth Century. DeLay Rpt. ¶¶ 8, 14. Indeed, of the repeating firearms found in eighteenth- to mid-nineteenth-Century America discussed in the report of Plaintiffs' expert Ashley

Hlebinsky, none were produced for commercial sale. *See* Spitzer Rpt. ¶¶ 31-37; DeLay Rpt. ¶¶ 16, 20-24, 52-53 (describing repeaters designed and/or advertised by Puckle, Belton, Jennings, Miller, Pim, Chambers, Cookson, and the Volcanic Repeating Arms Company). By and large, they were rare, experimental and flawed curiosities. DeLay Rpt. ¶¶ 5, 8, 13, 51. Air guns had their own "major drawbacks"— the Girandoni air rifle called for *1,500 hand strokes* to prime, and thus "proved to be impractical … for civilian use." Spitzer Rpt. ¶ 36; *see* DeLay Rpt. ¶¶ 31-32.

The "*vast* majority" of nineteenth-century revolvers and pepperboxes also had limited capacity (seven or fewer rounds) and were slow to load (at least one minute). DeLay Rpt. ¶¶ 58-60; *see* Spitzer Rpt. ¶¶ 37-39. The Colt revolver did not proliferate until after the Civil War, and was designed as only a six-shot weapon. *See* Spitzer Rpt. ¶¶ 39-41, 44. And the few firearms that had larger capacities were almost entirely fixed-magazine, lever-action rifles (*i.e.*, the shooter had to work a lever forward and back between shots to eject each spent casing and chamber a new round) which required manual reloading once the magazine was spent. *See* Spitzer Rpt. ¶¶ 41-42; DeLay Rpt. ¶¶ 63, 69, 75.Those larger capacity rifles were mostly purchased by the military or exported abroad during the years surrounding the adoption of the Fourteenth Amendment, making up less than 0.02% of all firearms in the United States by 1872. DeLay Rpt. ¶ 65; Correction to Rebuttal Expert Rpt. of Brian DeLay ¶¶ 1-2. In short, while a number of experimental multi-shot guns existed in the 1800s

and may have been sampled by military forces, few were "common, ordinary, or found in general circulation." Spitzer Rpt. ¶ 30.

Even the briefest of analyses of modern firearms demonstrates the "dramatic technological change" that has transpired since. *Hanson*, 2023 WL 3019777, at *13 (finding that although "[h]igh-capacity firearms became more common in military settings in the second half of the 19th century," such weapons remained "rare" and "did not resemble the semiautomatic weapons of today"). In contrast to weapons from the 18th and 19th Centuries, automatic and semiautomatic weapons available today allow one person to inflict substantially greater lethality. *See*, *e.g.*, Roth Rpt. ¶ 58 (explaining assault rifles operate "more accurately, effectively, and sustainably as a weapon for inflicting mass casualties," especially if set on "semiautomatic"); *id.* ¶ 63 (the danger posed "is intrinsically different from past weaponry"); Spitzer Rpt. ¶ 29 (agreeing that modern guns are "a dramatically different type of firearm").

There are a number of reasons for this change. For one, these weapons afford shooters the "ability to fire rapidly"—that is, firing substantially more bullets over a short period of time. Roth Rpt. ¶ 56. Multiple modern features enable this increased rapidity. A single high-capacity magazine allows individuals to fire multiple shots without pausing to reload. Moreover, even when a shooter has to reload, the use of detachable magazines "dramatically accelerated loading"—detachable magazines allow shooters to simply "eject[] the spent magazine, insert[] a full magazine, and

resume[] firing," meaning that shooters can now "load and reload" a whole magazine "all at once, rather than round by round." DeLay Rpt. ¶¶ 79, 82. Further, historical guns required "human muscle" to position a new round in the chamber, but modern assault weapons "capture the recoil energy of a fired round in order to chamber the next round." *Id.* ¶¶ 75-76. These features and others thus give users the "ability to fire rapidly from large-capacity magazines" Roth Rpt. ¶ 56. An AR-15, for instance, can fire 45 rounds per minute, *id.* ¶ 58, and an expert can "fire an entire 30-round clip" from a semiautomatic Glock 17 handgun "in five seconds," *id.* ¶ 59; *compare* DeLay Rpt. ¶¶ 16 (noting, "an average soldier fired two or three shots a minute from a smoothbore musket"). In short, in either the 18th or mid-19th Centuries, Americans—including would-be criminals—could "hardly have conceived of" the firepower of modern handguns available on the civilian market today. *Id.* ¶ 60. *See also Or. Firearms Fed'n*, 2023 WL 4541027, at *38 (concluding that "modern-day LCMs represent a dramatic technological change from the Founding and Reconstruction-era firearms based on at least two key metrics: the time and effort involved in reloading and the time involved in shooting the firearm's rounds").

Not only do these dramatic technological changes allow more bullets to be fired in rapid succession, but each individual shot can create unprecedented physical damage as well. Bullets fired by AR-15 style rifles produce "significantly larger" cavities in human tissue than muskets or even the early 20th Century Thompson

Machine gun. *See supra* at 31-32; Hargarten Rpt. ¶¶ 26-28. Their uniquely lethal nature—obliterating organs and body parts—make them far more lethal than their predecessors. *Id.* ¶¶ 32-34. Using an LCM only exacerbates those risks. *Id.* ¶ 30. And the likelihood of catastrophic injury or death is particularly high for children. *Id.* ¶ 36.

*Second*, as a result of these dramatic technological changes, the country now grapples with "unprecedented societal concerns": the spate of mass shooting events that would have been "unimaginable" to the Founders. *Bruen*, 142 S. Ct. at 2132. As explained above, the limits on early firearms technology imposed a "ceiling on the damage a single shooter could inflict on a group of people." DeLay Rpt. ¶ 69; *see also*, *e.g.*, Roth Rpt. ¶ 47 (adding that, during these periods, the "only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own"); DeLay Rpt. ¶ 90 (agreeing that in 1791 and 1868, if a single person's "purpose was murdering a large number of strangers in a school or a church or at a public event, nothing would have sufficed. There was no functioning firearm then in existence that would enable someone to do that."). By contrast, given the ability to rapidly fire uninterrupted with brief pauses to reload, a single individual armed with an assault weapon is "capable of inflicting significant carnage upon

civilians in a short period of time, especially in conjunction with large capacity magazines." Yurgealitis Rpt. ¶ 5; *see* Delay Rpt. ¶ 6.[15] It thus allows a single individual to both "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." Roth Rpt. ¶ 60.  And, given that rifle-caliber assault weapons can "readily penetrate" body armor issued to most law enforcement officers, these weapons pose an even greater threat to public safety by "increas[ing] the likelihood that first responders charged with stopping such a threat may be injured or killed in the performance of their duty."  Yurgealitis Rpt. ¶¶ 6, 156.

As multiple courts have held, these changes have produced "the contemporary problem of mass shootings in America today." *Hanson*, 2023 WL 3019777, at *14; *Lamont*, 2023 WL 4975979, at *29 ("[M]ass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem; the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers."); *Kotek,* 2023 WL 4541027, at *36 ("[M]ass shootings using LCMs are an unprecedented societal concern rather than a general societal problem

---

[15] The fact that a single individual has such firepower changes the very "character" of mass murder: since they need not rally a group to a common cause, lone shooters "can kill large numbers of people simply because they feel slighted at school," or for any number of purely personal reasons. Roth Rpt. ¶¶ 14, 68.

that has persisted since the eighteenth century"); *Hanson*, 2023 WL 3019777, at *14 ("LCMs implicate 'unprecedented societal concerns.'"). Consider the historical baseline: Mass murder by a lone shooter was virtually non-existent before the twentieth Century. *See* Klarevas Rpt. ¶ 19. Even group shootings pale in comparison to contemporary tragedies: in the 1770 Boston Massacre, for example, "seven soldiers opened fire on a crowd of" roughly 50 people, but managed to kill only five people and wound six. Roth Rpt. ¶ 47. Mass killings of this type were "rare" in our early history. *Id.* The proportion of both domestic (family, household, or intimate partner) and nondomestic homicides committed with guns was likewise low, at "10 to 15 percent." *Id.* ¶ 18; DeLay Rpt. ¶¶ 37 (same), 74 (noting even proliferation of slow-load large-capacity rifles in latter half of nineteenth Century "did not represent a fundamental change in how a single armed individual could threaten public safety."). Indeed, "the United States did not experience a *single* mass shooting resulting in double-digit fatalities" until 1949—over 150 years after the Founding. Klarevas Rpt. ¶ 19; *see Kotek,* 2023 WL 4541027, at *36 (recognizing that "the shooting of multiple victims by a single assailant using a firearm is a recent phenomenon in American history").

Contrast that with mass shootings in the modern era. Experts have established in painstaking detail the extraordinary increase in the number of mass shootings per year, Allen Rpt. ¶¶ 39-41, including a 260% increase in number of fatalities in mass

shootings from 1991-2022 alone, Klarevas Rpt. ¶ 12, and ultimately producing "five of the top ten deadliest mass public shootings in U.S. history" in the 2010s alone, Webster Rpt. ¶ 17. *See supra* at 32-33. And the role of modern firearms is clear. All five of the recent deadliest mass shootings were "committed with an assault weapon," Webster Rpt. ¶ 17, and assault weapons and LCMs were used, respectively, in 34% and 77% of the 91 high-fatality mass shootings since 1991, *see* Klarevas Rpt. ¶ 15. *See also* Klarevas Rpt. ¶¶ 12-13; Allen Rpt. ¶¶ 30-31. In the Virginia Tech massacre in 2007, using a Glock 19 and Walther P22 equipped with multiple LCMs of up to 15-rounds, the shooter "fired 174 shots in 9 minutes, killing 33 people and wounding 17 others before taking his own life." DeLay Rpt. ¶ 60. In the 2017 Mandala Bay Hotel shooting in Las Vegas, the shooter killed 60 people and wounded more than 400 using an AR-15 and LCMs. *See* Klarevas Rpt., Ex. C at C2; Yurgealitis Rpt. ¶ 155. So too the shooter in Orlando, Florida in 2016, who killed 49 people and wounded more than 50; and Uvalde, Texas in 2022, where 21 mostly schoolchildren were killed and 17 people wounded. *Id.* And the harms such weapons can inflict help to explain why "[n]ot a single child wounded by an assault weapon bullet at Sandy Hook survived." Hargarten Rpt. ¶ 36. The unprecedented death toll tied to single shooters—using assault weapons and LCMs—has no historical precursor.

Plaintiffs' smorgasbord of responses are unavailing. Initially, Plaintiffs resist the need for analogical reasoning at all because *some* multi-shot weapons existed by the Founding. *See* ANRPC Br. 30-31. But as explained above, the historical record establishes that even if a few multi-shot weapons *existed*, they were not widespread; not for civilian use; and most importantly, faced serious technological limitations that limited the lethality any one person could cause. *See supra* at 44-47; *Hanson*, 2023 WL 3019777, *13 (rejecting identical argument on basis that multi-shot weapons were "experimental curiosities" and "exotic curios"); *Friedman*, 784 F.3d at 410 (observing assault weapons and LCMs "are more recent developments"); Dep. of Ashley Lynn Hlebinsky 104:6-105:1 (Ex. 18) (admitting to look only at existence of models, rather than prevalence—even more than a single curio—on the basis that it was allegedly "not necessarily relevant to the conclusions that [she is] making"). Nor do Plaintiffs identify a single weapon that could fire 45 rounds per minute—or a 30-round clip in five seconds—in these periods. *See* Roth Rpt. ¶ 59; *compare* DeLay Rpt. ¶ 16 (noting that "an average soldier fired two or three shots a minute from a smoothbore musket").

Plaintiffs do not get any further by arguing that modern weapons are allegedly "linear descendants" of Founding-era guns, or that the Founders knew that weapons technology would one day develop further. ANJRPC Br. 33. For one, this argument makes little sense. That the Founders knew weapons technology could develop (and

develop iteratively, building on technology already in existence) hardly proves they understood the degree of lethality such weapons could achieve, let alone shows any belief that such weapons could never be regulated no matter how lethal. For another, the Supreme Court has repeatedly recognized that the "weapons that are most useful in military service—M-16 rifles and the like," can be regulated, no matter that their technology, too, may descend "linearly" from Founding-era arms. *Heller*, 554 U.S. at 627. And Plaintiffs themselves acknowledge that states can at least ban arms not in common use (though, as explained above, they misunderstand this test), which itself recognizes that modern conditions can inform the analysis.

Finally, Plaintiffs err in resisting analogical reasoning by denying that mass shootings represent an unprecedented societal concern. Plaintiffs callously suggest that *Bruen*'s analysis need not be nuanced here because "mass murder has been a fact of life in the United States for a very long time." ANJRPC Br. 34. But as laid out above, as this record demonstrates, and as federal courts have long recognized, "[a]ctive shooting and mass shooting incidents have dramatically increased during recent years." *ANJRPC*, 910 F.3d at 110 & n.1; *see also Hanson*, 2023 WL 3019777, at *14. The famous Boston Massacre was itself significantly less lethal—even though it involved seven soldiers opening fire—than *multiple* mass shootings this decade alone, all perpetrated by individual lone shooters armed with assault weapons and/or LCMs. Roth Rpt. ¶ 47. That represents a significant and unprecedented

societal concern that allows the States to respond—consistent with our Nation's traditions.

2. *There Is A Longstanding National Tradition Of Restricting Instruments That Were Particularly Dangerous Or Susceptible To Disproportionate Criminal Misuse.*

New Jersey's laws are part of a long historical tradition, from pre-Founding English history through the Prohibition era, that restricted dangerous weapons and accessories once they spread in society and posed a public safety threat through characteristics that made them particularly dangerous or particularly susceptible to disproportionate criminal misuse.

1. Laws that restrict assault weapons and magazine capacity are just the latest chapter within a long tradition of regulating specific weapons and accessories that pose a heightened public safety threat, while leaving open other avenues of self-defense. The historical record bears out that the Second Amendment never protected "any weapon whatsoever," and instead has always been understood to fit within "a historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626-27 (quoting William Blackstone, 4 Commentaries on the Laws of England 55, 148–149 (1769)).[16]

---

[16] Notably, the term "dangerous and unusual" employs an "archaic grammatical and rhetorical form" of hendiadys, which combine to form a single concept of "unusually dangerous," much like other legal terms like "cruel and unusual." Cornell Rpt. at 5, n.9. *Heller* itself refers to the term both disjunctively and conjunctively. *See* 554 U.S. at 623 ("dangerous or unusual weapons"); *id.* at 627 ("dangerous and unusual

English and colonial governments identified particular weapons for restriction while leaving room for other tools of self-defense. *See, e.g.*, *Bruen*, 142 S. Ct. at 2140 (noting English prohibitions on "wearing of armor" and "such weapons as the 'launcegay,' a 10- to 12-foot-long lightweight lance," which "were generally worn or carried only when one intended to engage in lawful combat or … to breach the peace" (citing 7 Rich. 2 c. 13 (1383) (Ex. 36); 20 Rich. 2 c. 1 (1396) (Ex. 37)); *id.* (noting prohibitions on "Handguns and Crossbows," "Steelets, Pocket Daggers, Pocket Dagges and Pistols"); *id.* at 2143 (citing 1686 East New Jersey law prohibiting concealed carry of "pocket pistol[s],"); 1686 N.J. Laws 289-90, ch. 9 (prohibiting "pocket pistols, skeins, stilettoes, daggers, or dirks, or other unusual or unlawful weapons") (Spitzer Rpt. at Ex. E, 54–55); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–31 (9th Cir. 2016) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (noting English prohibitions on "owning or carrying concealable (not merely concealed) weapons, such as 'little shorte handguns and little hagbutts,' and guns 'not of the lengthe of one whole Yarde or hagbutt or demyhake beinge not of the lenghe of thre quarters of a Yarde'" (citing 33 Hen. 8, c. 6, § 2 (1541–1542) (Ex. 38)). Indeed, the English Bill of Rights, "the predecessor to our Second Amendment," protected the right of the people to "'have Arms for

_____

weapons"). And state high courts in the 19th century likewise understood the terms to be disjunctive. *See, e.g.*, *O'Neill v. State*, 16 Ala. 65, 67 (1849); *State v. Lanier*, 71 N.C. 288, 289 (1874); *English v. State*, 35 Tex. 473, 476 (1872).

their Defence *suitable to their Conditions*, and *as allowed by Law*.'" *Heller*, 554 U.S. at 593 (quoting 1 W. & M., ch. 2, § 7). In other words, the foundations of the Second Amendment reflected a period in which governments regulated the types of arms that are "suitable" for self-defense, and disallowed those that are not.

That tradition continued in America, where a range of governments enacted laws regulating specific weapons and accessories that posed threats to public safety because of certain dangerous features from the Founding era into the 20th Century. As the State's experts explain, this spanned a wide range of weapons and accessories with features that made them particularly dangerous or particularly susceptible to disproportionate criminal misuse. *See* Roth Rpt. ¶¶ 28, 30, 32 (States "restricted the use or ownership of certain types of weapons after it became obvious" that they "were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates," problems acute in southern and frontier states in the 1800s); Spitzer Rpt. ¶ 78 (such restrictions were "public policy remedies to the emergent crime problems"); Cornell Rpt. at 7 ("states singled out weapons that posed a particular danger for regulation").

The evidence spans our Nation's history:

***Trap Guns***. A number of states identified the trap gun as a threat to public safety. Trap guns were "devices or contraptions … [that] could be set to fire remotely … by rigging the firearm to be fired with a string or wire which then discharged

when tripped," and often used by individuals "to defend their places of business, properties, or possessions." Spitzer Rpt. ¶¶ 79-80. However, they sometimes "wound up hurting or killing innocents." *Id.* ¶ 80-81. Thus, as trap guns proliferated, more than a dozen states had anti-trap gun statutes in the 18th and early 20th Centuries. *Id.* ¶ 82 & Exs. B, F (listing evidence of such restrictions).

New Jersey was one of those states, enacting a law in 1771 that noted "a most dangerous Method of setting Guns has too much prevailed in this Province," and prohibiting "set[ting] any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance." *Id.* Ex. F at 3 (1763-1775 N.J. Laws 346, ch. 539, § 10); *see also, e.g., id.* Ex. F at 2 (1866 Minnesota law prohibiting "setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon"); 6 (1865 Utah law prohibiting "set[ting] any gun"); 7-8 (1884 Vermont law prohibiting "set[ting] a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap"); 9 (1871 Wisconsin law prohibiting "set[ting] any gun, pistol or revolver, or any other firearms").

***Gunpowder Aggregation And Storage***. 18th and 19th Century governments heavily regulated gunpowder, including its storage and aggregation in the home. Although gunpowder was essential to the operation of firearms at the time, States

heavily regulated its possession, storage, and transfer because of the risk that it posed to public safety in the event of fire or explosion. Cornell Rpt. at 30-32.

Among those regulations were storage restrictions that limited the amount of gunpowder that could be aggregated. For example, New York City in 1784 made it unlawful "to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place," and required that allotment "shall be separated into four stone jugs or tin canisters, which shall not contain more than seven pounds each." Ex. 39, 1784 Laws of N.Y. 627, ch. 28; Cornell Rpt. at 30-31. In the same period, Massachusetts prohibited anyone from "tak[ing] into any Dwelling-House, Stable, Barn, Out-house, Warehouse, Store, Shop, or other Building, within the Town of Boston, any … Fire-Arm, loaded with, or having gun-powder." Ex. 40, Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37; Cornell Rpt. at 30; *see also* Ex. 43, Laws & Ordinances Governing the City of Chicago 239 (Myers & Chandler 1866) (allowing "one pound of gunpowder or gun-cotton at one and the same time" per person and prohibiting the transfer of "gunpowder or gun-cotton, in any quantity," without prior permission from a city official).

Several states also delegated plenary authority to local governments to regulate the storage and acquisition of gunpowder. *See* Cornell Rpt. at 31 (listing laws); Ex. 41, 1821 Me. Laws 98, ch, 25, § 2. Others also enacted gunpowder inspection laws. Cornell Rpt. at 32. The regulation of particularly dangerous

59

instruments like gunpowder was not only commonplace, but also understood to be a valid exercise of State police power. *See Brown v. Maryland*, 25 U.S. 419, 443 (1827) (affirming States' prerogative to "direct the removal of gunpowder"), *abrogated on other grounds by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).

*Bowie Knives*. In the 1830s, the "Bowie knife," a "long-bladed and usually single-edged knife with a hand guard," became widespread in the United States. Spitzer Rpt. ¶ 61. Its distinctive features were "intended for combat" and led to the knives' proliferation. *Id*. ¶¶ 61-63. Unfortunately, the knives were "widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate." *Id.* ¶ 61.

In response, nearly every state eventually restricted Bowie (or similar long-bladed) knives in some manner, whether by prohibiting or restricting carry or sale, enhancing criminal penalties, or taxing their ownership. Spitzer Rpt. ¶¶ 61, 67-68; *see also id.* Ex. H (listing bowie knife restrictions by manner, state, and year). That included Georgia in 1837, which made it a crime to "sell, or offer to sell, or to keep, or to have about their person or elsewhere," "Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c." 1837 Ga. Acts 90 (1838); Spitzer Rpt. ¶ 67; Roth Rpt. ¶ 31. And it included Alabama, which in 1837

60

aimed to "suppress" Bowie knives by enacting a prohibitive financial burden, requiring that "for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars." Spitzer Rpt. Ex. E at 2-3 (Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7). Other States, such as Tennessee and Arkansas, prohibited the carry and sale of bowie knives. *See* Spitzer Rpt. Ex. E at 78 (1837-1838 Tenn. Pub. Acts 200-01, ch. 137, §§ 1, 2); Spitzer Rpt. ¶ 67 (1881 Ark. Acts 191, ch. XCVI (96) §§1-3). These restrictions were approved by contemporaneous decisions. One court, in upholding Tennessee's law, noted Bowie knives were singled out because they "are usually employed in private broils" and "are efficient only in the hands of the robber and the assassin," thus distinguishing them from protected arms. *Aymette v. State*, 21 Tenn. 154, 158 (1840); *see also State v. Reid*, 1 Ala. 612, 617 (1840) (noting law was intended "to promote personal security, and to put down lawless aggression and violence").

***Slungshots and Clubs***. Dozens of states enacted anti-slungshot laws in the 19th Century. A slungshot "is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s." Spitzer Rpt. ¶ 74. Slungshots were "widely used" in the 19th Century for criminal purposes; they were "easy to make, silent, and very effective." *Id.* That led many States to prohibit or otherwise restrict them. *Id.* ¶ 76; *see also id.*

Ex. E at 28 (Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, ch. 38 (1885) 88, § 1) (prohibiting possession, sale, or transfer of "any slung shot or metallic knuckles, or other deadl[y] weapon of like character")); 42-43 (1850 Mass. Gen. Law, ch. 194, §§ 1, 2 (prohibiting manufacture or sale)); 46 (1888 Gen. Minn. Law §§ 333, 334 (prohibiting manufacture, sale, or possession with intent to use)); 70 (1890 Okla. Sess. Laws 475, § 18 (prohibiting manufacture, sale, or carrying)). Similarly, States heavily regulated clubs and blunt objects, both understood in the 19th and early 20th Centuries to be embroiled in crime. *See* Spitzer Rpt. ¶¶ 70-71; *id.* Ex. C.

**Pistols.** In the lead-up to the Civil War, the single-shot guns prevalent in the early 1800s were displaced by pistols and revolvers. Roth Rpt. ¶¶ 33-40. These guns "contribute[d] to the later stages" of a spike in the ratio of homicides committed with firearms toward the end of the nineteenth Century, *id.* ¶¶ 39-40, due to their "lethality and the new ways in which they could be used." *Id.* ¶ 35. An unprecedented rise in "interpersonal assaults" using such firearms exacerbated the problem. *Id.* ¶ 39.[17]

That led States to respond by restricting the carry of "certain concealable weapons" at the root of the problem—in particular "the modern revolvers that had been invented in the mid- and late-nineteenth century[.]" *Id.* ¶ 40; *see* DeLay Rpt. ¶

---

[17] That knives, clubs and pistols were often treated together in one statute underscores that the animating concern was the same: these were "dangerous and inimical to public safety." Spitzer Rpt. ¶ 69 (same).

70 (similar); *see also* Spitzer Rpt. Ex. C (listing dangerous weapons restrictions by type, state, and year). States of course did not prohibit all handguns; instead, they focused on specific varieties that presented a heightened threat.

To take a few illustrative examples, Texas prohibited the "carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense" except on one's own premises or with "reasonable grounds for fearing an ["immediate and pressing"] unlawful attack on his person." Spitzer Ex. E, at 82 (1871 Tex. Laws 25, § 1); *see also* Roth Rpt. ¶ 41 & n.82 (1870 Tex. Gen. Laws 63 (prohibiting in certain places carrying of "a six-shooter, gun or pistol of any kind")); Roth Rpt. ¶ 41 & n.82. Tennessee and Arkansas also passed weapon-specific restrictions. Tennessee in 1871 banned carrying a "belt or pocket pistol, or revolver" in public, with a carve-out for certain pistols typically carried by members of the military. Roth Rpt. ¶ 42 & n.85 (1871 Tenn. Pub. Acts 81 ch. 90, § 1); *Andrews v. State*, 50 Tenn. 165, 186 (1871). That law was upheld. *See State v. Wilburn*, 66 Tenn. 57, 59-62 (1872). Arkansas likewise prohibited carry of pocket pistols, *Fife v. State*, 31 Ark. 455, 456, 462 (1876), and later legislative enactments exempted army or navy pistols, *see* Spitzer Rpt., Ex. E at 10 (1881 Ark. Acts 191, ch. XCVI (96) §§1-3). That prohibition was not challenged again. Roth Rpt. ¶ 42.

*Semiautomatic Weapons*. The early twentieth Century saw a revolutionary change: the emergence and spread of automatic and semiautomatic weapons on the commercial market. *See id.* ¶¶ 50-53; DeLay Rpt. ¶¶ 76-78, 79 (noting detachable magazines "first emerged in the 1880s" and began to be integrated into firearms "by the end of the century"). Indeed, weapons like submachine guns enabled "a single individual" to carry a "weapon[] of war" capable of firing 20-, 50- or 100-round clips or magazines "at a rate of 600 of 725 rounds per minute." Roth Rpt. ¶ 52. This meant "individuals or small groups of people" now had "the power to kill large numbers of people in a short amount of time." *Id.* ¶ 50; *see* DeLay Rpt. ¶ 82 (same). That included criminals and terrorists, who adopted these new weapons starting in the 1920s. *See* Spitzer Rpt. ¶¶ 6-15 (detailing popularity of Thompson submachine gun (Tommy gun) and Browning Automatic Rifle (BAR)); *see also* Roth Rpt. ¶¶ 53-54; DeLay Rpt. ¶ 81; Cornell Rpt. at 35.

Once these large-capacity firearms began to circulate and became associated with criminal activity, legislatures responded to "the threats these new technologies posed for public safety" by restricting their sale, possession, and manufacture.[18] Roth Rpt. ¶ 56; *see* DeLay Rpt. ¶ 82 (noting lawmakers legislated against these automatic firearms "as they had with the advent of multi-fire pistols in the nineteenth century");

_____

[18] "Before the early 1920s, these fully automatic weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society." Spitzer Rpt. ¶ 8.

Spitzer Rpt. ¶¶ 8, 23 (explaining those threats were first presented in early twentieth Century). These restrictions often revealed a "widened … regulatory focus" beyond carry restrictions. Roth Rpt. ¶ 56.

Many States regulated not only automatic weapons, but also semiautomatic weapons and magazine capacity. Spitzer Rpt. ¶¶ 23-24; Roth Rpt. ¶ 56. For example, Rhode Island in 1927 prohibited the manufacture, sale, or possession of "any weapon which shoots automatically and any weapon which shoots more than twelve shots semiautomatically." Spitzer Rpt. Ex. D, at 23 (1927 R.I. Pub. Laws 256, § 1); *see also id.* ¶ 24. The District of Columbia broadly prohibited "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading." Spitzer Rpt. Ex. D at 2-3, 6 (Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 14, 47 Stat. 650, 654 (1932)). Michigan in 1927 prohibited the manufacture, sale, or possession of "any machine gun or firearm which can be fired more than sixteen times without reloading." *Id.* at 14 (1927 Mich. Pub. Acts 888-89 §3); *see People v. Brown*, 235 N.W. 245, 247 (Mich. 1931). Virginia in 1934 defined the prohibited machine gun as any "weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise

discharged without reloading." Spitzer Rpt. Ex. D at 30-31 (1934 Va. Acts 137-39 ch. 96 §§ 1-7).[19]

These provisions were widespread. The National Rifle Association endorsed the District of Columbia's law during Congressional testimony, noting its desire that such a prohibition "can then be used as a guide throughout the states of the Union." Spitzer Rpt. ¶ 16. And Congress itself passed the National Firearms Acts of 1934 and 1938, *see* Pub. L. No. 75-474, 48 Stat. 1236 (1934); Pub. L. No. 75-785, 52 Stat. 1250 (1938), which imposed a tax on the making, sale and transfer of certain automatic weapons (including machine guns), and required such weapons to be registered with the Treasury Department and for their owners to be fingerprinted and subject to background checks. Spitzer Rpt. ¶ 17. All in all, at least 23 states in the early twentieth Century enacted restrictions on magazines and ammunition capacity, *id.* ¶¶ 24-26; DeLay Rpt. ¶ 84, confirming the examples given here are "representative" analogues. *Bruen*, 142 S. Ct. at 2133.

States recognized that part of what made these automatic and semiautomatic weapons "so dangerous" was the ability to fire numerous shots without reloading. DeLay Rpt. ¶ 83; Spitzer Rpt. ¶ 22. Thus, in all, "nearly half of all states" adopted some form of "[r]egulations concerning removable magazines and magazine

---

[19] *See also, e.g.*, Spitzer Rpt. Ex. D at 13, 14-15, 20 (1927 Mass. Acts 413, 413-15, ch. 326, §§ 1-2; 1933 Minn. Laws 231, 232-33, ch. 190 §§ 1, 3; 1933 Ohio Laws 189, 189-90).

capacity" in the 20th Century. Spitzer Rpt. ¶¶ 24-26 & Ex. D. That included California, which prohibited "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges." Spitzer Rpt. Ex. D, at 1-2 (1933 Cal. Stat. 1169, 1170); *see also id.* Ex. D, at 12 (1932 La. Acts 336, 337 (prohibiting firearms "capable of automatically discharging more than eight cartridges successively without reloading")); *id.* Ex. D, at 9 (1931 Ill. Laws 452-53 §§ 1-2) (same); *id.* Ex. D, at 30 (1923 Vt. Acts and Resolves 127 § 1) (prohibiting the use in hunting of any "automatic rifle of military type with a magazine capacity of over six cartridges").

2. All told, the measures from before the Founding and continuing through the twentieth Century, and their subsequent judicial approval, reveal an established tradition of restricting weapons and accessories that were particularly dangerous or particularly susceptible to disproportionate criminal misuse. As any given weapon or accessory became widespread in society and posed a specific, heightened threat to public safety—such as bowie knives, slungshots, certain concealable pistols, and automatic and semiautomatic weapons—governments in turn regulated the features that made them so unusually dangerous. And the historical record similarly shows that when a particular weapon was configured to create a specific danger, such as the setting of trap guns, governments prohibited those, too. *See, e.g.*, *Lamont*, 2023

WL 4975979, at *33 (finding "rationale" underlying modern assault-weapons and LCM laws and historical precursors is "the same").

The evidence also shows that States retained significant leeway to choose the manner of regulation for the dangerous instrument at issue, and that variation is the natural product of federalism. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) ("In a functioning democracy, policy choices … belong to the people and their elected representatives."). Some chose to expressly prohibit the entire instrument at issue, *see supra* at 60-62 (possession bans on bowie knives and slungshots); *supra* at 63-66 (possession bans of semiautomatic weapons with expanded magazine capacity), while other States chose to prohibit only certain forms of public carry. Still others enacted restrictions, including prohibitions on sale or transfer and taxation and registration requirements, that effectively made the dangerous weapons extremely difficult to acquire. *See supra* at 61-62 (transfer prohibition and taxation regulations on bowie knives and slungshots); *supra* at 66 (taxation and registration requirements for machine guns). And some States enacted laws that target especially dangerous features of the instrument at issue, such as prohibitions on configuring firearms to operate as trap-guns, *see supra* at 58-59, setting limits on aggregate storage of gunpowder, *see supra* at 59-60, prohibiting concealed-carry of certain pistols and other weapons whose concealability made

them especially dangerous, *see supra* at 63-64, and prohibiting certain ammunition feeding devices that allow shots to be fired without reloading, *see supra* at 65-67.

The State is not aware of any contemporaneous doubt as to "the lawfulness of such prohibitions," *Bruen*, 142 S. Ct. 2133, regardless of the particular regulatory option the historical government chose. To the contrary, state high courts frequently passed on them with approval. *See, e.g.*, *Brown*, 235 N.W. at 247; *Fife*, 31 Ark. at 456; *Wilburn*, 66 Tenn. at 61; *Aymette*, 21 Tenn. at 158; *Reid*, 1 Ala. at 617. And *Bruen* nowhere suggests that historical analogues must be precisely the same type of regulation, especially if the modern problem itself did not exist in the 18th or 19th Century. *See Bruen*, 142 S. Ct at 2132 (requiring "only that the government identify a well-established and representative historical analogue, not a historical twin" and emphasizing that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach"); *supra* at 14-15.  In fact, *Heller* itself recognized that a "historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'" can "fairly support[]" restrictions "on the right to *keep* and carry arms." 554 U.S. at 626-27 (emphases added).

Instead, *Bruen* asks whether the analogues work a comparably "substantial burden" on the right to self-defense—and these do. 142 S. Ct. at 2145. The theme of the historical tradition is clear: Governments could pass restrictions that targeted specific weapons and accessories that pose particular risk, but they have to leave

other arms available for self-defense. The modern approach is the same: New Jersey's laws are not flat bans on rifles or pistols, and do not functionally prevent individuals from carrying firearms for self-defense. Indeed, individuals remain free to possess any number of different types of handguns, rifles, and shotguns. *See* Yurgealitis Rpt. ¶¶ 8-26. And an individual remains free to own as many bullets and magazines as he wishes. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1262 (U.S. App. D.C. 2011) (noting LCM prohibition "does not effectively disarm individuals or substantially affect their ability to defend themselves"); *Friedman*, 784 F.3d at 411 (same). That is in contrast to *Bruen* and *Heller*, which eliminated access to an entire class of quintessential self-defense arms: handguns. *See Bruen*, 142 S. Ct. at 2156; *Heller*, 554 U.S at 574-75.

Indeed, New Jersey's law is particularly tailored—to specific weapons and accessories that pose particular risk and that are not actually used for self-defense, *see supra* at 6-7. Given that limited scope, prohibiting their use in particular does little to burden the right to self-defense, just like the historical tradition that comes before it. *See Lamont*, 2023 WL 4975979, at *33 (relying on comparable "available sufficient avenues of carrying firearms for self-defense" in finding laws relevantly similar); *Hanson*, 2023 WL 3019777, at *15 (same analogical analysis). Applying the "nuanced approach" required by *Bruen* makes clear that these historical laws are apt analogues for New Jersey's modern and targeted restrictions on assault weapons

and magazine capacity. In short, New Jersey's laws and its historical predecessors share relevant similarities in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. 2133.

3. Plaintiffs resist the weight of historical tradition, but their efforts sound in a misapprehension of precedent and blindness to historical evidence.

***First***, Plaintiffs ask this Court to disregard historical evidence of relevantly similar regulations of weapons—notwithstanding *Bruen*'s detailed instructions on this score—by incorrectly insisting that "[t]he Supreme Court has already decided" that so long as a weapon or accessory is commonly owned, "the state may not ban them, full stop." ANJRPC Br. at 21-22; Cheeseman Br. at 20, 35 (claiming issue "has already been decided by the Supreme Court"). As an initial matter, assault weapons and large-capacity magazines are *not* commonly used for self-defense, and common ownership, even if proven, is not the test. *See supra* at 22-39. But beyond that threshold error, Plaintiffs' argument is also wrong both as a matter of precedent and history.

As to precedent, Plaintiffs' position flies in the face of the Supreme Court's plain language: although some guns are undoubtedly in common use for self-defense and are thus "presumptively protect[ed]," that is not the end of the inquiry. *Bruen*, 142 S. Ct. at 2130. Instead, a second step of historical inquiry ensues, where the government may "justify its regulation" of the weapon "by demonstrating that it is

71

consistent with the Nation's historical tradition of firearm regulation." *Id.* If *Bruen* had meant to say that this analysis need not be conducted for any weapons in common use, the majority would presumably have said so clearly.

And as to history, Plaintiffs' position simply has no grounding. There is no evidence that States historically believed they could only regulate firearms that were not commonly possessed. To the contrary, States believed the opposite. *State v. Huntly*, 25 N.C. 418 (1843)—a decision cited favorably by *Bruen* and *Heller*—forecloses the very argument advanced by Plaintiffs today, as it rejected the notion that "a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort." *Huntly*, 25 N.C. at 422.

Moreover, the record is replete with examples of restrictions, including flat prohibitions or effective prohibitions, on particularly dangerous weapons that *were* in common use. *See supra* at 58-65 (citing evidence that trap guns, bowie knives, slungshots, clubs, pocket pistols, and Tommy guns were in wide circulation when governments enacted restrictions). Indeed, that even included weapons often used by law-abiding citizens, such as trap guns, *see* Spitzer Rpt. ¶ 80, and pepperbox pistols, *see* Delay Rpt. ¶ 92. In fact, Plaintiffs get it backwards: the history shows that governments enact laws to address the violence and harm that results from the *proliferation* of dangerous weapons. *See supra* at 58 (noting such weapons "were

being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates" (quoting Roth Rpt. ¶ 32)); Spitzer Rpt. ¶ 78 (similar). Adopting Plaintiffs' approach would be to jettison *Bruen*'s command to look to history to understand the proper scope of the Second Amendment, and to adopt a view of the Second Amendment "that our ancestors would never have accepted." *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021).

*Second*, Plaintiffs insist that the lack of ammunition-capacity restrictions at the Founding means New Jersey cannot enact its large-capacity magazine restriction today, and that the laws that were enacted in the early 20th Century come too late. ANJRPC Br. 31-33. But *Bruen* and *Heller* nowhere stand for that proposition; instead, they direct courts to consider the totality of this Nation's history in evaluating the constitutionality of a state law. While twentieth-Century history that "'contradicts earlier evidence'" is not probative, *Range v. Att'y Gen.*, 69 F.4th 96, 104 n.8 (3d Cir. 2023) (en banc) (quoting *Bruen*, 142 S. Ct. at 2154 n.28), there is only a consistent tradition of historical regulation here.

Initially, and most obviously, there was no reason for Founding-era States to regulate ammunition capacity, since commonly-owned firearms at that time had *single-shot* capacity. *See supra* at 44-46; Roth Rpt. ¶¶ 18-19; Spitzer Rpt. ¶ 40; DeLay Rpt. ¶ 51. Indeed, revolvers with six-shot capacity did not proliferate until after the Civil War. *See supra* at 45-46; Spitzer Rpt. ¶¶ 39-41, 44. Other repeating-

action firearms were either experimental and not commonly possessed by civilians, or required manual action that made them substantially different from the firearms regulated in New Jersey today. *See supra* at 46-47; DeLay Rpt. ¶¶ 13, 47, 73-74. The absence of eighteenth- and nineteenth-Century legislative enactments addressing these weapons thus cannot disprove a historical tradition of comparable regulation, as there would have been scant reason for States to regulate those specific weapons during those eras. *See, e.g.*, Roth Rpt. ¶¶ 18-20; *id.* ¶ 26; DeLay Rpt. ¶¶ 46-49. Just as the "First Amendment does not require States to regulate for problems that do not exist," nor does the Second Amendment impose on States such a burden. *McCullen v. Coakley*, 573 U.S. 464, 481 (2014). The Constitution allows States the flexibility to "adopt laws to address the problems that confront them," consistent with the overall limits provided by the Nation's historical tradition. *Id.*

Moreover, Plaintiffs ignore the myriad evidence of weapons and ammunition-capacity restrictions enacted soon after semiautomatic weapons with ammunition-feeding magazines became widely available. *See* ANJRPC Br. at 31 (acknowledging semiautomatic pistols with detachable magazines only began retail sales in 1890s). Plaintiffs do not dispute that automatic and semiautomatic weapons technology was a major innovation, which meant "individuals or small groups of people" now had "the power to kill large numbers of people in a short amount of time." Roth Rpt. ¶ 50; *see* DeLay Rpt. ¶ 82 (same); *see supra* at 47-49. And when that precise problem

74

began to emerge in the early 20th Century, *see supra* at 64-65, states moved to ban these weapons and limit ammunition capacity soon thereafter.

Twentieth-Century history can be uniquely probative in cases—like here—involving emergent weapons that only came into existence at that time. *Heller* itself noted that early 20th Century restrictions on possession of machine guns—often enacted alongside the restrictions here—were presumptively constitutional. 554 U.S. at 624. And a majority of the Court in *Bruen* reaffirmed the constitutionality of those measures. *See* 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring). For good reason: the twentieth-Century history is especially probative because it "confirm[s]" the historical tradition, stretching back to the Founding, of singling out for regulation the particular features of new weapons technologies that render such weapons unusually dangerous. *Kotek*, 2023 WL 4541027, at *45; *see also Hanson*, 2023 WL 3019777, at *16 (similar).

New Jersey's restrictions on assault weapons and large-capacity magazines follow the footsteps of States confronting 18th, 19th, and early 20th-Century threats to public safety posed by weapons that were particularly dangerous or particularly susceptible to disproportionate criminal misuse. In addressing a profound problem today—spades of mass shootings by lone shooters yielding catastrophic losses of life, perpetrated by weapons designed for war—New Jersey's choice is consistent with a long tradition of relevantly similar historical regulations.

## II.    THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON ANJRPC'S TAKINGS CLAIM.

This Court should also reject the *ANJRPC* Plaintiffs' argument that the LCM restriction violates the Takings Clause, *see* Br. 35, for two independent reasons: the suit is foreclosed by binding circuit precedent and lacks merit in any event.

Initially, this claim is flatly inconsistent with binding Third Circuit precedent. In this very case, the Third Circuit considered and rejected the Takings Clause claim on the merits, *ANJRPC I*, 910 F.3d at 124-25, a holding that the Third Circuit already recognized to be law of the case, *ANJRPC II*, 974 F.3d at 245-46. As the panel held, "the compliance measures in the Act do not result in either an actual or regulatory taking." *Id.* at 124. "There is no actual taking," the panel reasoned, "because owners have the option to transfer or sell their LCMs to an individual or entity who can lawfully possess LCMs, modify their LCMs to accept fewer than ten rounds, or register those LCMs that cannot be modified." *Id.* And "[t]he Act also does not result in a regulatory taking because it does not deprive the gun owners of all economically beneficial or productive uses of their magazines": among other things, it allows them to "modify[] the magazine to hold fewer rounds of ammunition," an act that leaves the item with significant "functionality." *Id.* at 124-25.

Nothing in *Bruen*'s subsequent decision remotely undermined that holding as to the Takings Clause. *Bruen* abrogated *ANJRPC I*'s Second Amendment holding, by replacing the Third Circuit's prior Second Amendment analysis with an analysis

76

grounded in text, history, and analogical reasoning. But *Bruen* never considered any Takings Clause claim at all, and thus it did not disturb any part of the Third Circuit's takings analysis. *See, e.g.*, *In re Continental Airlines*, 134 F.3d 536, 539-40, 542 (3d Cir. 1998) (circuit precedent overruled in part by Supreme Court remains binding as to other issues not decided by Supreme Court). So while the State has consistently acknowledged that *Bruen* is the type of "intervening change in the law" that requires reconsideration of the Second Amendment question, *ANJRPC II*, 974 F.3d at 246, it did not change the law *ANJRPC I* applied in deciding this takings challenge. That is why other district courts have consistently continued to follow pre-*Bruen* decisions reviewing a *takings* challenge to similar restrictions on magazine capacity. *See, e.g.*, *Oregon Firearms Fed'n*, 644 F. Supp. 3d at 808 n.28 (*Bruen* left Ninth Circuit's takings holding "undisturbed"); *Ocean State Tactical*, 646 F. Supp. 3d at 398 n.42 (*Bruen* "cast no doubt" on these holdings). That is dispositive here.

Even if this Court considers the Takings Clause issue anew, New Jersey's law regulating maximum magazine capacity does not present a taking. As explained in more detail above, the challenged Act gave owners of affected magazines multiple avenues to comply: owners could just "modify a large capacity magazine to accept 10 rounds or less"; transfer or sell the magazine to anyone who can lawfully possess it (whether in or outside of New Jersey); or, only if the owner preferred, voluntarily surrender it. *See* N.J. Stat. Ann. § 2C:39-19. Moreover, the owners of firearms with

magazine capacities of more than ten rounds that were "incapable of being modified to accommodate 10 or less rounds" simply had to register them within a year, and did not need to make modifications to the items. *See id.* § 2C:39-20(a).

Although Plaintiffs primarily argue that this law is a physical taking, ANJRPC Br. 36-37, the entire paradigm of a physical taking is inapplicable: physical takings involve "direct appropriations" of property for public use, not the regulation of use or possession by the property owner. *See Horne v. Dep't of Ag.*, 576 U.S. 350, 361 (2013). Whereas cases like *Horne* involve laws that set aside certain property "for the government" to use (including to sell or transfer to another party), New Jersey's law by contrast "does not involve a taking for government use in any way." *ANJRPC I*, 910 F.3d at 124 n.32. Instead, turning an LCM over to the government is but one *voluntary* form of compliance; an owner can continue possessing a magazine with modifications, transfer or sell their LCM to someone who can lawfully possess it, or register LCMs that cannot be modified. *See* N.J. Stat. Ann. §§ 2C:39-19, -20. As the Third Circuit rightly held, those "alternatives" mean the statute "does not require" surrendering an LCM to the government. *ANJRPC I*, 910 F.3d at 124.[20]

---

[20] *Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017), is thus distinct, because the only alternatives that LCM owners had to "surrender[ing]" the magazine to law enforcement under that law were to sell an LCM to a firearms dealer or "remove" the LCM "from the state." *Id.* at 1138. Owners, in other words, lacked the options to keep their LCM (in-state) by modifying it or registering an unmodifiable arm that New Jersey offers. *Duncan*'s finding that California's law "compel[s] the physical *dispossession* of" magazines thus does not compel the same conclusion here. *Id.*

Were that not enough, there is an independent problem too: over a century of consistent cases confirm that "[a] compensable taking does not occur when the state prohibits the use of property as an exercise of its police powers rather than for public use." *Id.* at 124 n.32. As the Supreme Court explained in *Mugler v. Kansas*, 123 U.S. 623 (1887), any "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking." *Id.* at 668-69; *see also Chicago B. & Q. Railroad Co. v. Illinois*, 200 U.S. 561, 594 (1906) ("It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property and though no compensation is given."). Plaintiffs' position would "effectively compel the government to regulate by purchase," an unsupportable rule that would extend beyond the firearm context to drug regulations and more. *Andrus v. Allard*, 444 U.S. 51, 65 (1979) (noting that "[g]overnment could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law").

Nor is the law a regulatory taking. While the Takings Clause can be implicated by "regulations that compel the property owner to suffer a physical 'invasion' of his property," *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992), the restriction on LCMs is not such a law. The archetype for this type of taking—and the case on which ANJRPC primary relies, *see* Br. 37-38, is *Loretto v. Teleprompter Manhattan*

*CATV Corp.*, 458 U.S. 419 (1982), but that case is inapposite. In *Loretto*, a state law mandated owners of apartment buildings to allow cable companies to permanently attach equipment to their buildings. *Id.* at 421-22. That is distinct, as New Jersey is not "physical[ly] inva[ding]" LCM owners' property or placing them "into some form of public service." *Lucas*, 505 U.S. at 1018. Rather, New Jersey is allowing owners to "keep" their magazines and "use[]" them "in the same way" as before, with only the slight modifications needed to reduce the risk that they can be used in a mass shooting event. *ANJRPC I*, 910 F.3d at 125. That is not a taking.

## CONCLUSION

This Court should enter summary judgment for the State and deny Plaintiffs' motions (ECF 174 & 175).


Dated:  November 3, 2023                Respectfully submitted,

                                        MATHEW J. PLATKIN
                                        ATTORNEY GENERAL OF NEW JERSEY

                          By:    */s/ Daniel M. Vannella*
                                        Daniel M. Vannella
                                        Assistant Attorney General