# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

      Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

      Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

      Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

---

## STATE DEFENDANTS' RESPONSE TO *CHEESEMAN* PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rules of Civil Procedure 56 and D.N.J. Local Rule 56.1, State Defendants submit the following Response to Cheeseman Plaintiffs' Statement of Material Facts Not in Dispute.

1.    Former New Jersey Attorney General Peter Verniero issued "Guidelines Regarding the 'Substantially Identical' Provision in the State's Assault Firearms Laws" dated August 19, 1996, https://www.nj.gov/lps/dcj/agguide/assltf.htm ("Guidelines"), which the current Attorney General (Defendant Platkin) and Superintendent of the New Jersey State Police (Defendant Callahan) continue to enforce.

Supporting Citations: Ans. to FAC ¶¶ 15, 18 (Admitted that Defendant Platkin "continues to publish the Guidelines").

**RESPONSE:**        **Undisputed.**

2.    The Guidelines direct that they "should be followed by all county prosecutors and all law enforcement officers in this State so that the State's assault firearms laws will be uniformly enforced throughout the State."

Supporting Citations: *Guidelines* at 3; Ans. to FAC ¶ 17 (Admitted).

**RESPONSE:**        **Undisputed that the Guidelines include this quoted statement.**

3.    The exceptions are largely limited to exemptions for: (1) those in the military or law enforcement, § 2C:39-6(a), (j); (2) rifles that the Attorney General designates as "legitimate" target-shooting firearms (which can only qualify for such designation if registered and owned by an individual who has been a member of a rifle or pistol club since at least 1990), § 2C:58-12; (3) "assault firearms" rendered "inoperable" (or else voluntarily surrendered or transferred to an exempt person or entity), § 2C:58-13; and (4) those who satisfy the statutory criteria for a license to purchase, possess, and carry an assault firearm, § 2C:58-5(a)-(b).

Supporting Citations: Ans. to FAC ¶ 19 (State Defendants do not deny the exemptions are limited as stated).

**RESPONSE:**        **Undisputed that the statute contains limited exemptions.**

1

4.    To lawfully purchase, possess, or carry any operable firearm falling within the classification of an "assault firearm" under this scheme—other than an "assault firearm" deemed "legitimate" by the Attorney General for target-shooting purposes—an ordinary, law-abiding person must demonstrate to the satisfaction of a judge that such a license is required in the interest of public safety and welfare.

Supporting Citations: Ans. to FAC ¶ 19 (State Defendants do not deny this interpretation of the law).

**RESPONSE:    Undisputed    that    the    statute    contains    limited exemptions.**

5.    The New Jersey Legislature has recognized that this statutory scheme operates as a general "ban" on the so-called "assault firearms."

Supporting Citations: *Statement of the New Jersey State Legislature on Assembly Concurrent Resolution No. 106*, 220th Leg. (2022), https://www.njleg.state.nj.us/bill-search/2022/ACR106/bill-text?f=ACR&n=106_I1 ("in 1990 New Jersey enacted legislation *banning* assault weapons and certain large capacity ammunition feeding devices") (italics added).

**RESPONSE:    Undisputed that the 2022 statement reads, in part, that "in 1990 New Jersey enacted legislation banning assault weapons and certain large capacity ammunition feeding devices."**

6.    The Attorney General's Office itself characterizes the regulatory scheme in this way on its public website.

Supporting Citations: State of New Jersey, Department of Law & Public Safety, Office of the Attorney General, https://nj.gov/njsp/firearms/firearms-faqs.shtml (FAQ No. 15: "What type of firearms are considered assault weapons in New Jersey? [¶] "A complete list of *banned* firearms can be found in N.J.S. 2C:39-1.w as well as N.J.A.C. 13:54-1.2.") (italics added); Readington Township Police Department,    New    Jersey,    Frequently    Asked    Questions, https://www.readingtontwpnj.gov/firearms/firearms-faq    (FAQ    No.    17: characterizing the scheme in the same way).

**RESPONSE:    Undisputed only that the cited web pages include the statements quoted in the "Supporting Citations." Disputed that the website for**

the Readington Township Police Department is "The Attorney General's Office itself," or speaks on behalf of it.

7.    Courts in New Jersey and elsewhere have also recognized this scheme as a general "ban."

Supporting Citations: *See e.g.*, *Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D.N.J. 1990) ("the prohibition is de facto, for that person [seeking to purchase an 'assault firearm'] must go through the extremely rigorous qualification process required for receiving a license[,]" and, "[t]his regulatory scheme vests unbridled discretion over the licensing process with the State"); *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 207 (1st Cir. 2002) ("The New Jersey law examined in *Coalition* [of *New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 673 n. 10] was effectively a ban on assault weapons.").

**RESPONSE:**    **Undisputed that the cases contain the language cited.**

8.    Anyone who "manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm" in violation of the scheme "is guilty of a crime of the third degree." N.J. Stat. Ann. § 2C:39-9(g).

Supporting Citations: Ans. to FAC ¶ 24 (admitted).

**RESPONSE:**    **Undisputed that the statute includes the language quoted.**

9.    One who knowingly possesses such an arm illegally "is guilty of a crime of the second degree." N.J. Stat. Ann. §§ 2C:39-5(f).

Supporting Citations: Ans. to FAC ¶ 25 (admitted).

**RESPONSE:**    **The State objects that this paragraph calls for a legal conclusion, and/or mischaracterizes and/or offers argument and/or improper opinion concerning the meaning of laws, and mischaracterizes the State Defendants' answer to the complaint.  In any event, the pertinent laws speak for themselves.**

10.    A crime in the second degree generally carries a term of imprisonment of five to ten years and a fine of up to $150,000, and a crime in the

third degree generally carries a term of imprisonment of three to five years and a fine of up to $15,000. §§ 43-3(a)-(b), 43-6(a).

Supporting Citations: Ans. to FAC ¶ 26 (not denied).

**RESPONSE:** **Undisputed that N.J. Stat. Ann. § 2C:43-3 and -6 contain the maximum fines and sentence ranges for second and third degree crimes in the State of New Jersey**

11.   Moreover, a conviction would result in a lifetime ban on the possession of firearms and ammunition under federal and state law. *See* 18 U.S.C. § 922(g).

Supporting Citations: Ans. to FAC ¶ 27 (not denied).

**RESPONSE:** **This paragraph calls for legal conclusion and is not a proper statement of material fact.**

12.   Plaintiff Cheeseman is a law-abiding resident of Gloucester County, New Jersey.

Supporting Citations: Decl. of Mark Cheeseman (Ex. 1) ¶ 1.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion that Plaintiff Cheeseman is "law-abiding." Subject to those objections, undisputed.**

13.   Plaintiff Connolly is a law-abiding resident of Ocean County, New Jersey.

Supporting Citations: Decl. of Connolly (Ex. 2) ¶ 1.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion that Plaintiff Connolly is "law-abiding." Subject to those objections, undisputed.**

14.   Plaintiff Cheeseman is not disqualified from possessing and acquiring firearms under federal and state law.

Supporting Citations: Decl. of Mark Cheeseman (Ex. 1) ¶ 1.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion.**

15.    Plaintiff Connolly is not disqualified from possessing and acquiring firearms under federal and state law.

Supporting Citations: Decl. of Connolly (Ex. 2) ¶ 1.

**RESPONSE:**        **The State objects that this paragraph calls for a legal conclusion.**

16.    Plaintiff Cheeseman is a member of Plaintiff FPC.

Supporting Citations: Ex. 1 ¶ 2.

**RESPONSE:**        **Undisputed.**

17.    Plaintiff Connolly is a member of Plaintiff FPC.

Supporting Citations: Ex. 2 ¶ 2.

**RESPONSE:**        **Undisputed.**

18.    Plaintiff Cheeseman intends and desires to exercise his rights to keep and bear firearms classified as "assault firearms" under New Jersey's Ban, including but not limited to an AR-15 style rifle, for lawful purposes, especially for home defense, target shooting, and proficiency training.

Supporting Citations: Ex. 1 ¶ 3.

**RESPONSE:**        **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion, including as to "New Jersey's Ban" and the scope of the "rights to keep and bear firearms."**

19.    Plaintiff Connolly intends and desires to exercise his rights to keep and bear firearms classified as "assault firearms" under New Jersey's Ban, including but not limited to an AR-15 style rifle, for lawful purposes, especially for home defense, target shooting, and proficiency training.

Supporting Citations: Ex. 2 ¶ 3.

**RESPONSE:**        **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion, including as to "New Jersey's Ban" and the scope of the "rights to keep and bear firearms."**

20.    But for the Ban, Plaintiff Cheeseman would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns.

Supporting Citations: Ex. 1 ¶ 4.

**RESPONSE:    Undisputed to the extent Plaintiff Cheeseman attests interest in acquiring and using "assault firearms."**

21.    But for the Ban, Plaintiff Connolly would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns.

Supporting Citations: Ex. 2 ¶ 4.

**RESPONSE:    Undisputed to the extent Plaintiff Connolly attests interest in acquiring and using "assault firearms."**

22.    The Ban nonetheless renders it illegal for either of them to do so.

Supporting Citations: Ex. 1 ¶¶ 3-4; Ex. 2 ¶¶ 3-4.

**RESPONSE:    Undisputed that New Jersey law prohibits non-exempt individuals from acquiring and using "assault firearms."**

23.    In light of the State's enforcement of this Ban, Plaintiff Cheeseman continues to refrain from acquiring, possessing, and using for self-defense and other lawful purposes any AR-15 rifle, any other firearm prohibited under the Ban, or any "substantially identical" firearm as defined under the Guidelines, based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Ban.

Supporting Citations: Ex. 1 ¶ 5.

**RESPONSE:    The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Undisputed as to Plaintiff Cheeseman's attested reasons for not acquiring an "assault firearm."**

24.    In light of the State's enforcement of this Ban, Plaintiff Connolly continues to refrain from acquiring, possessing, and using for self-defense and other

lawful purposes any AR-15 rifle, any other firearm prohibited under the Ban, or any "substantially identical" firearm as defined under the Guidelines, based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Ban.

Supporting Citations: Ex. 2 ¶ 5.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Undisputed as to Plaintiff Connolly's attested reasons for not acquiring an "assault firearm."**

25. Plaintiff FPC is a nonprofit membership organization, the purposes of which include defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom.

Supporting Citations: Decl. of Brandon Combs (Ex. 3) ¶ 2.

**RESPONSE:** **Undisputed that FPC is a nonprofit membership organization whose self-described purposes are as stated.**

26. Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

Supporting Citations: Ex. 3 ¶ 2.

**RESPONSE:** **Undisputed that FPC's self-described mission is as stated.**

27. Plaintiff FPC brings this action on behalf its New Jersey resident members, including Plaintiffs Cheeseman and Connolly, who seek to exercise their right to keep and bear common semi-automatic arms for lawful purposes in New Jersey but who are prohibited from doing so under the Ban.

Supporting Citations: Ex. 3 ¶ 3.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms.**

**Disputed as to the remainder of the paragraph. Plaintiff FPC has produced no evidence that, aside from the individually named Plaintiffs Cheeseman and Connolly, any of their other members would possess semi-automatic firearms in their homes, whether or not New Jersey law permitted it. Further, when asked in interrogatories if any of its members has applied for a license to possess an assault firearm in New Jersey, Plaintiff ANJRPC responded on May 4, 2023, "[u]nknown at this time." Cheeseman Interrogatory Response #9.**

28.    Law-abiding New Jersey resident members of Plaintiff FPC intend and desire to, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of various semiautomatic rifles, shotguns, and handguns labeled by the State as "assault firearms," but they are subject to, adversely affected by, and prevented from doing so under the prohibitions of the Ban against "assault firearms."

Supporting Citations: Ex. 3 ¶ 4.

**RESPONSE:**    **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

29. But for the enactment and enforcement of the Ban, these FPC members would forthwith, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of such rifles, shotguns, and handguns targeted under the Ban.

Supporting Citations: Ex. 3 ¶ 5.

**RESPONSE:**    **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

30.     However, they cannot and do not do so because the weapons are labeled "assault firearms," such that they reasonably fear and face a threat of arrest, confiscation, prosecution, fine, and imprisonment in light of the Ban's prohibitions.
Supporting Citations: Ex. 3 ¶ 5.

**RESPONSE:     The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing certain  semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

31.     But for the enactment and enforcement of this Ban, and the criminal penalties (including a life-long ban on the individuals' exercise of their Second Amendment protected rights) associated with violations of the Ban, these members of Plaintiff FPC would exercise their right to keep and bear the banned firearms for lawful purposes, including self-defense, without the fear or risk of arrest and prosecution for engaging in otherwise protected, lawful conduct.
Supporting Citations: Ex. 3 ¶ 6.

**RESPONSE:     The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing certain semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

32.     The injuries suffered by these members are germane to the core purposes of Plaintiff FPC.
Supporting Citations: Ex. 3 ¶ 7.

**RESPONSE:     The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

33.     As Attorney General of New Jersey, Defendant Platkin is the head of the State's Office of the Attorney General and Department of Law and Public Safety, which includes the New Jersey State Police, and this Office holds statewide criminal jurisdiction to investigate and prosecute any indictable offense.

Supporting Citations: *See* State of New Jersey, Department of Law & Public Safety website, https://www.njoag.gov/about/ ("the Attorney General oversees the New Jersey State Police (NJSP), the state's largest law enforcement agency, and the Division of Criminal Justice (DCJ), which has statewide authority to investigate and prosecute criminal offenses").

**RESPONSE:        Undisputed.**

34.     In this official capacity, Defendant Platkin is thus responsible for executing, delegating, and/or supervising the laws and regulations governing the possession of firearms and magazines and impose criminal sanctions for violations of the same, including the "assault firearms" regulatory scheme at issue in this case.

Supporting Citations: *See* State of New Jersey, Department of Law & Public Safety website, https://www.njoag.gov/about/ ("the Attorney General oversees the state's 21 County Prosecutors, and may assume responsibility for, or 'supersede,' investigations or prosecutions handled by a County Prosecutor's Office"); *Kendrick v. Bruck*, 586 F. Supp. 3d 300, 307 (D.N.J. 2022) (the Attorney General oversees the Division of State Police, "which is responsible for executing and enforcing New Jersey's laws and regulations governing the possession of firearms"); Ans. to FAC ¶ 9 (admitting that "Defendant Platkin is the Acting Attorney General of New Jersey, and serves as the head of the New Jersey Office of the Attorney General and Department of Law and Public Safety, which includes the New Jersey State Police").

**RESPONSE:        Undisputed that the Attorney General of New Jersey is the chief law enforcement officer of the State.**

35.     Defendant Callahan is the Superintendent of the New Jersey Division of State Police, which is responsible for executing and enforcement of all criminal laws in the State, including those regulating the possession of firearms and magazines.

Supporting Citations: *See* State of New Jersey, Department of Law & Public Safety, State Police website, https://www.nj.gov/njsp/about/core-functions.shtml (the New Jersey Division of State Police performs "all functions associated with the

statewide enforcement of laws, the prevention of crime, the pursuit and apprehension of offenders, and the gathering of legal evidence to ensure conviction of such offenders"); *Kendrick*, 586 F. Supp. 3d at 307; Ans. to FAC ¶ 10 (admitting that "Defendant Patrick J. Callahan is the Superintendent of the New Jersey State Police").

**RESPONSE:**      **Undisputed.**

36.     Defendant Callahan's division acts under the general oversight and supervision of the Attorney General.

Supporting Citations: Plaintiffs incorporate the citations in support of SOUMF No. 35 as equally applicable and supportive here.

**RESPONSE:**      **Undisputed.**

37.     Defendant Hoffman is the County Prosecutor of Gloucester County, where Plaintiff Cheeseman resides.

Supporting Citations:
https://www.gloucestercountynj.gov/Directory.aspx?did=69; Ex. 1 ¶ 1.

**RESPONSE:**      **Undisputed that Christine A. Hoffman is the Acting County Prosecutor of Gloucester County.**

38.     Defendant Billhimer serves as the County Prosecutor for Ocean County, where Plaintiff Connolly resides.

Supporting Citations: https://ocponj.gov/staff/bradley-d-billhimer/; Ex. 2 ¶ 1.

**RESPONSE:**      **Undisputed that Bradley D. Billhimer is the County Prosecutor of Ocean County.**

39.     As the County Prosecutors for their respective counties, Defendants Hoffman and Billhimer are "responsible for the prosecution of crimes committed in the county" and have "authority to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws."

Supporting Citations: *Yurick v. State*, 875 A.2d 898, 903 (N.J. 2005) (quotations omitted).

11

**RESPONSE:** **Undisputed that county prosecutors generally are responsible for the prosecution of crimes committed in their respective county.**

40.     In addition, they would be responsible for preparing the necessary investigation and recommendation to law enforcement as to any individual in their respective counties who applies through the Superior Court for a license to purchase, possess, and carry any of otherwise prohibited "assault firearms."

Supporting Citations: N.J. Stat. Ann. §§ 2C:58-5(a).

**RESPONSE:** **This paragraph contains improper legal argument. The text of N.J. Stat. Ann. §§ 2C:58-5(a) provides: "Any person who desires to purchase, possess and carry a machine gun or assault firearm in this State may apply for a license to do so by filing in the Superior Court in the county in which he resides, or conducts his business if a nonresident, a written application setting forth in detail his reasons for desiring such a license. The Superior Court shall refer the application to the county prosecutor for investigation and recommendation. A copy of the prosecutor's report, together with a copy of the notice of the hearing on the application, shall be served upon the superintendent and the chief police officer of every municipality in which the applicant intends to carry the machine gun or assault firearm, unless, for good cause shown, the court orders notice to be given wholly or in part by publication."**

41.     Accordingly, Defendants Hoffman and Billhimer would be responsible for prosecuting Plaintiff Cheeseman and Plaintiff Connolly, respectively, for any violation of the Ban that they may be accused of committing in their respective counties of residence.

Supporting Citations: Plaintiffs incorporate the citations in support of SOUMF Nos. 37-40 as equally applicable and supportive here.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion.**

42. Similarly, Defendants Hoffman and Billhimer would be responsible for the investigation and recommendation as to Plaintiff Cheeseman and Connolly, respectively, concerning any application for a license to purchase, possess, and carry any "assault firearm."

Supporting Citations: Plaintiffs incorporate the citations in support of SOUMF Nos. 37-40 as equally applicable and supportive here.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. The complete text of N.J. Stat. Ann. §§ 2C:58-5(a) is above at paragraph 40.**

43.    The Court has jurisdiction over this case and controversy, with the full power to adjudicate all claims for relief in the FAC, pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, and venue properly lies in this district for purposes of adjudicating these claims, pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

Supporting Citations: Ans. to FAC ¶¶ 4-5 (not disputing jurisdiction or venue).

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion. To the extent the paragraph contains any alleged facts, they are undisputed.**

44.    The term "assault firearm" (or "assault weapon," as used in other states that have enacted similar weapons bans) is a pejorative term that does not refer to any identifiable class of firearms.

Supporting Citations: "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted).

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Disputed that the term "assault weapon" or "assault firearm" does not refer to "any identifiable class of firearms." See Decl. of Daniel Vannella, Ex. 11, Rpt. of James Yurgealitis ¶ 85 (documenting firearms industry use of "assault weapons" as early as the 1980s); *id.* ¶ 89; id. ¶¶ 113-130 (describing defined features).**

45.    It is semiautomatic firearms that the State bans and that Plaintiffs seek to acquire.

Supporting Citations: Ex. 1 ¶¶ 3-4; Ex. 2 ¶¶ 3-4; Ex. 3 ¶¶ 3-6.

**RESPONSE:      Undisputed that Plaintiffs allege they seek to acquire prohibited firearms.**

46.    Unlike an automatic firearm, a semiautomatic firearm will not fire continuously with one pull of its trigger. Instead, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round.

Supporting Citations: *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

**RESPONSE:      Undisputed, except to the extent that a semiautomatic firearm outfitted with certain additional features prohibited under New Jersey law may  simulate automatic fire.**

47.    Semiautomatic firearms have "traditionally have been widely accepted as lawful possessions."

Supporting Citations: *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

**RESPONSE:      Undisputed that the quoted case states that possession of semiautomatic firearms in general has been lawful.**

48.    Indeed, semiautomatic firearms have been commercially available for over a century.

Supporting Citations: *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. 381, 413 (1994), https://davekopel.org/2A/LawRev/rational.htm.

**RESPONSE:      Undisputed that semiautomatic firearms became commercially available in the beginning of the 20th Century. See Decl. of Daniel Vannella, Ex. 4, Rpt. of Professor Robert Spitzer ¶ 38; Decl. of Daniel Vannella, Ex. 12, Rpt. of Professor Brian DeLay ¶¶ 6; 76. The State objects to Plaintiffs' use of inadmissible hearsay.**

49.    Apart from the now-expired ten-year federal "assault weapons" ban, the federal government has not banned semiautomatic firearms.

14

Supporting Citations: Associated Press, *Congress lets assault weapons ban expire*, Sept. 8, 2004, https://www.nbcnews.com/id/wbna5946127.

**RESPONSE:** **Undisputed that the Public Safety and Recreational Firearms Use Protection Act expired on September 13, 2004, and that law is not currently in effect.**

50.     The only states that have enacted bans on "assault weapons" (with varying definitions of that term) are California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Delaware, New York, and Washington.

Supporting Citations: *See* Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02.

**RESPONSE:** **Disputed that the laws of each of these states "bans" assault firearms. The State objects to Plaintiffs' use of inadmissible hearsay and mischaracterization of the statutes of the states listed.**

51.     An AR-15 can only fire as often as a person can pull its trigger, while an M249 light machine gun, commonly used by the U.S. military, can fire 750 to 1,000 rounds per minute.

Supporting Citations: *See Squad Automatic Weapon (SAW), M249 Light Machine Gun*, Military Analysis Network, https://bit.ly/3tsQGtd.

**RESPONSE:** **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record.**

52.     "Heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute).

Supporting Citations: *See M61A1/M61A2 20mm Automatic Gun, Military Analysis Network*, https://bit.ly/3ttnemV.

**RESPONSE:** **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record.**

53.     Most AR-style firearms are chambered for 5.56 x 45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has

sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target.

Supporting Citations: *See Modern Sporting Rifle Comprehensive Consumer Report*, National Shooting Sports Foundation (NSSF) ("*Comprehensive Consumer Report*"), https://bit.ly/3GLmErS (noting that self/home-defense is the second most important reason that Americans reported for owning AR- style firearms, second only to recreational target shooting);  FRANK MINITER, *The Future of the Gun* at 35 (2014) (Ex. 4) ("ARs are popular with civilians and law enforcement around the world because they're accurate, light, portable and modular   It's also easy to shoot and has little recoil, making it popular with women.").

**RESPONSE:**    **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record. The State objects to the reliability of the methodology employed in the cited documents.**

54.    A telescoping or folding stock is merely an adjustable shoulder stock, which allows one to change the length of his gun to fit his stature, in the same way that he can change the height of an adjustable chair; some people have shorter arms than others, so it promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position.

Supporting Citations: *See* E. Gregory Wallace, *Assault Weapon Myths*, 43 S. ILL.      U.      L.      J.      193,      232      (2018), https://scholarship.law.campbell.edu/cgi/viewcontent.cgi?article=1265&context=fa c_sw; STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 at 8 (2022) (Ex. 5)

**RESPONSE:**    **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder. U.S. Military origins for this type of stock can be found on the M1 carbine in World War II when modified for paratrooper use." Yurgealitis Rpt. ¶ 124.**

55.   Similarly, a pistol grip makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and thus also promotes accuracy and reduces the risk of stray shots.

Supporting Citations: *See* Wallace, *Assault Weapon Myths* at 228; Kopel, *Rational Basis*, *supra*, 20 J. CONTEMP. L. 381, 396 (1994).

**RESPONSE**:   **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that a "semiautomatic rifle or shotgun that includes a pistol grip (or does not include a shoulder stock) somewhat increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator)." Yurgealitis Rpt. ¶ 122.**

56.   A flash suppressor is merely a device that reduces the flash of light from firing a round, "prevent[ing] the night-time home defender from being blinded by her own muzzle flash."

Supporting Citations: *Miller*, 542 F. Supp. 3d at 1035; *See also* Wallace, *Assault Weapon Myths* at 233-34.

**RESPONSE**:   **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low light conditions and also helps to conceal the flash from view. This allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position." Yurgealitis Rpt. ¶ 125.**

57.   Most common semiautomatic firearms, including those banned under the State's law, can accept a detachable magazine.

Supporting Citations: NRA Shooting Sports USA, *Handgun Operation: Types Of Semi- Automatic Pistol Mechanisms*, https://www.ssusa.org/content/handgun-operation-types-of-semi-automatic-pistol-mechanisms/ ("Most semi-automatic firearms use detachable box magazines, which afford one of the main advantages of such arms").

**RESPONSE:**   The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that most firearms regulated by the statutes at issue can accept a detachable magazine. Yurgealitis Rpt. ¶¶ 131-34.

58.   Detachable magazines not only help law-abiding shooters to reload their weapon in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to remedy malfunctions safely and quickly.
Supporting Citations: *See* Dennis Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles* 29-30 (Oct. 5, 2021) (working paper), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3436512 (explaining the propensity of self-loading weapons to overheat and malfunction).

**RESPONSE:**   The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation.

59.   The AR-15 is America's "most popular semi-automatic rifle."
Supporting Citations: *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting)

**RESPONSE:**   Undisputed that then-Judge Kavanaugh's dissent in *Heller II* contains the quoted statement.

60.   In recent years, the AR-15 has been "the best-selling rifle type in the United States."
Supporting Citations: Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1494634.

**RESPONSE:**   The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation.

61.   Today, the number of AR-rifles and other similar "modern sporting rifles" in circulation in the United States exceeds *twenty-four million*.
Supporting Citations: *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv; *See also* William English, *2021 National Firearms Survey: Updated Analysis Including*

*Types of Firearms Owned* at 1-2 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles).

**RESPONSE:** The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State objects to the reliability of the methodology employed in the cited documents.

As to the NSSF Survey, the State specifically objects to the reliability of its methodology. James Curcuruto, a former director of research and market development at NSSF, testified in another case that he and Steve Sanetti, the president of NSSF, essentially made estimates between themselves, and that Mr. Sanetti's personal knowledge was the "sources of data" relied upon when they published statistics related to the number of firearm magazines in circulation. Vannella Decl. Ex. 44, Dep. of James Curcuruto, *Wiese v. Bonta*, 2:17-cv-00903-WBS-KJN (E.D. Ca.). at T:133:4-140:15.

Even if the NSSF survey is admissible, the State disputes any conclusion that it shows the weapons in question are commonly owned. The NSSF figures also do not represent civilian ownership, as the figures appear to include law enforcement and security agencies, firearms retailers, and possibly prohibited possessors (e.g. violent criminals). See Decl. of Daniel Vannella, Ex. 9, Rpt. of Professor Louis Klarevas ¶ 14. The surveys and reports by the NSSF also don't necessarily account for AR-15s being amassed in the hands of a relative few. Klarevas Rpt. ¶ 29. Based on the NSSF's own data and Census Bureau statistics, less than 2% of all Americans own a modern sporting rifle. Klarevas Rpt. ¶ 38.

As to the English survey, the State specifically objects to the reliability of its methodology. Klarevas Rpt. ¶ 29, n.31 (noting serious violation of Code of Professional Ethics and Practices of the American Association for Public Opinion Research); Dep. of Gary D. Kleck, *Oregon Firearms Fed'n v. Kotek*, No. 22-cv-1815 (D. Or.), ECF 175-7 at 12-13 (plaintiff-side expert stating he "would not rely" on it "for any purpose").

19

**Even if the English survey is admissible, the State disputes any conclusion that it shows the weapons in question are commonly owned. The study results indicate that approximately 74,000 people own over 100 such rifles. A conservative calculation of the English study results show that approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners. Klarevas Rpt. ¶ 29.**

62.   In recent years they have been the second- most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns.

Supporting Citations: *See 2021 Firearms Retailer Survey Report* at 9, NSSF (2021), https://bit.ly/3gWhI8E.

**RESPONSE:        The State repeats its objection in Paragraph 61.**

63.   And the English survey is not limited to the semiautomatic firearms that the State enumerates by name, but rather extends to the "AR-15 or *similarly styled rifle[s]*."

Supporting Citations: *National Firearms Survey*, *supra*, at 33.

**RESPONSE:        The State repeats its objection in Paragraph 61.**

64.   Just like the rifles, handguns are semiautomatic firearms and semiautomatic firearms are indisputably common.

Supporting Citations: *See*, *e.g.*, *Firearms Retailer Survey Report*, *supra*, at 9, NSSF.

**RESPONSE:        The State repeats its objection in Paragraph 61.**

65. The legislative facts documenting the ubiquity of detachable magazines associated with these firearms further illustrate the commonality of the banned arms.

Supporting Citations: *See*, *e.g.*, *ANJRPC*, 910 F.3d at 116 (finding that magazines capable of holding more than ten rounds are owned by the "millions, . . . often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense"); *National Firearms Survey*, *supra*, at 23-25 (documenting that approximately 39 million Americans have owned at least one magazine capable of

owning more than 10 rounds and that Americans have owned as many as 542 million of such magazines).

**RESPONSE:**      **The State repeats its objection in Paragraph 61.**

66.    It is clear that these arms (detachable magazines) are overwhelmingly used for lawful purposes.

Supporting Citations: *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (Ex. 6) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'").

**RESPONSE:**      **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper legal argument. The State's undisputed *fact* evidence regarding the prevalence of LCMs in crime are as follows:**

a. **A study by Christopher Koper in 2017 *Journal of Urban Health* showed that across ten different cities in the United States, firearms with LCMs accounted for between 15 and 36% of firearms recovered by law enforcement between 2001 and 2014.  Vannella Decl. Ex. 10, Rpt. of Daniel Webster ¶ 12.**

b. **Firearms with LCMs accounted for 40.6% of the firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings with 4 or more fatalities for the period of 2009 to 2015.  Webster Rpt. ¶ 12.**

c. **Assault weapons accounted for between 2.6 and 8.5% of firearms recovered by law enforcement officers from crime scenes in the same ten cities between 2001 and 2014. Webster Rpt. ¶ 12.**

d. **Assault weapons also accounted for 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally between 2009 and 2015.  Webster Rpt. ¶ 12.**

e. **A study by Wintermute et al. (1998) in *Annals of Emergency Medicine*, using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault**

pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses.  Webster Rpt. ¶ 13.

f.  **A study of mass shooting events from 1982 to October 2022 showed that there were 115 mass shooting events for which magazine capacity was known. Out of those 115 events, there were 73 where the perpetrator used large-capacity magazines (63%). Mass shooting was defined as one where four or more people were killed in a public place in one incident, excluding incidents related to other crimes such as robberies and domestic violence. Decl. of Daniel Vannella, Ex. 7, Rpt. of Lucy Allen ¶¶ 30-31.**

g.  **A study of high-fatality mass shootings (defined as events resulting in 6 or more victims being shot to death) between 1991 and 2022 where magazine capacity used was known showed the percentage of such shootings where the perpetrator employed a large-capacity magazine (with greater than 10 rounds of capacity) has increased. The overall rate of use of LCMs in such high fatality mass shootings is 77%, but rose to 100% over the past 4 years. Klarevas Rpt. ¶ 13.**

h.  **Several statistical studies of defensive gun use showed that it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Allen Rpt. ¶¶ 9-15 & n.4; Yurgealitis Rpt. ¶ 147.**

67.    According to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects.

Supporting Citations: *See Expanded Homicide Table 8, Crime in the United States* (FBI 2019), https://bit.ly/3HdolNd.

**RESPONSE:**    **Disputed that the FBI UCR report cited to in the "Supporting Citations" concerns "homicides" (which include, but are not limited to, murders), because on its face it is addressing only "Murder Victims." It is also unclear what this report defines as "Other guns" (45 known murders in 2019); or "Firearms, type not stated" (3,281 known murders in 2019). Otherwise, undisputed that this report provides the statistics highlighted in this**

22

**paragraph. To the extent this paragraph contains any other alleged facts, they are disputed; and *Cheeseman* Plaintiffs have identified no non-hearsay and otherwise admissible evidence in support.**

68.    According to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases.

Supporting Citations: https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf.

**RESPONSE:    Undisputed only that the September 2010 Special Report by the Bureau of Justice Statistics listed in the "Supporting Citations" states that from the time period of 2003 to 2007, a household member was present for a household burglary approximately 27.6% of the time; and "[o]n average, household members became victims of violent crimes in about 266,560 burglaries annually" (or, approximately 7.2% of the time).**

69.    Studies on the frequency of defensive gun uses in the United States have determined that up to 2.5 million instances occur each year in which civilians use firearms to defend themselves or their property.

Supporting Citations: Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6853 &context=jclc; *See also* English, *National Firearms Survey*, *supra* at 5 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

**RESPONSE:    The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper legal argument. The State repeats its objections contained in paragraph 61.**

70.    At least a third of all gun owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning semiautomatic firearms like those banned by the State.

Supporting Citations: *See* Modern Sporting Rifle Comprehensive Consumer Report and Sport Shooting Participation in the U.S. in 2020, *supra*.

**RESPONSE:**      **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper legal argument. The State repeats its objections contained in paragraph 61.**

71.    All semiautomatic firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature the (sic) same cyclical rate of fire: one round fired per pull of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions.

Supporting Citations: *Staples*, 511 U.S. at 602 n.1 ("We use the term 'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired."); Wallace, *Assault Weapon Myths* at 216 ("Because a semiautomatic firearm fires only one round with each pull of the trigger, it can fire only as fast as the individual shooter can pull the trigger.")

**RESPONSE:**      **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot." Yurgealitis Rpt. ¶ 29.**

Dated:  November 3, 2023              Respectfully submitted,

                                      MATHEW J. PLATKIN
                                      ATTORNEY GENERAL OF NEW JERSEY

                              By:    /s/ Daniel M. Vannella
                                     Daniel M. Vannella
                                     Assistant Attorney General

24