# Exhibit 21

**From:** Daniel Vannella
**Sent:** Tuesday, August 8, 2023 8:33 PM
**To:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>; blehman@gsbblaw.com
<BLehman@gsbblaw.com>; law.rmd@gmail.com <law.rmd@gmail.com>
**Cc:** Nicholas Kant <Nicholas.Kant@law.njoag.gov>
**Subject:** ANJRPC/Ellman/Cheeseman v. Platkin - 8/8/23 letter requesting records

Dan:

Attached please find State Defendants' letter re-asserting certain records requests made on the
record during the 8/4/23 deposition of Mr. Kapelsohn.

**Daniel M. Vannella**
Assistant Attorney General
Litigation Practice Group
Division of Law
25 Market St. | P.O. Box 112
Trenton, N.J. 08625
t: 609-376-2776
daniel.vannella@law.njoag.gov



PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO Box 112
TRENTON, NJ 08625-0112

MATTHEW J. PLATKIN
*Attorney General*

MICHAEL T.G. LONG
*Director*

August 8, 2023

**VIA EMAIL**
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Attorney for *ANJRPC* and *Ellman* Plaintiffs

> Re:  *Association Of New Jersey Rifle & Pistol Clubs,*
> *Inc. et al. v. Platkin et al. ("ANJRPC")*
> Docket No. 3:18-cv-10507
> *Cheeseman et al. v. Platkin et al.*
> Docket No. 1:22-cv-04360
> *Ellman et al. v. Platkin et al.*
> Docket No. 3:22-cv-04397

Dear Mr. Schmutter,

As you know, this office represents State Defendants in the above-referenced actions. Pursuant to Federal Rules of Civil Procedure 26(a)(2)(B)(ii) and 26(e)(2), this letter confirms and reiterates the following records requests State Defendants made during the August 4, 2023 deposition of Emanuel Kapelsohn. State Defendants request receipt of all records responsive to the below requests, or (if appropriate) confirmation that none responsive to a particular request(s) exists, by August 11, 2023.

Please note that, whereas State Defendants made additional requests for records on the record during the deposition, in a show of good faith they are now limiting their requests to just those enumerated below. Please also note that, with regard to certain of the below requests, and as an additional show of good faith, State



August 8, 2023
Page 2

Defendants limit the scope of their request more narrowly than what they had put on the record during the deposition.  In short, please respond to the requests below, and limited to the scope of the requests as set forth below.

1. Copies of any tests, reports, data, videos and any other materials related tests or experiments by Mr. Kapelsohn related to bullets passing through walls or other objects. (*See* 8/4/23 Deposition Transcript, T:46-5 to -9; T:46-17 to 47-2).[1]

2. Any National Shooting Sports Foundation (NSSF) documents that Mr. Kapelsohn relied upon for his report regarding the number of AR-15 rifles in civilian hands in the United States. (*See id*., T:77-4 to 78-6).

3. Any "FBI uniform crime report" or other specific "studies" Mr. Kapelsohn was referring to in response to the questions about Exhibit 14 of his June 15, 2023 report (Kapelsohn-1).  (*See id*., T:162-13 to 163-12).

4. The name and address of any individuals with whom Mr. Kapelsohn has spoken about Revolutionary War era arms and accoutrements, but specifically and limited to any such individuals with whom he spoke in preparation for any of his expert reports and/or his August 4, 2023 deposition testimony in these matters.  (*See id.*, T:178:21 to 179-5).

5. The names and addresses of any "reenactors" of "Revolutionary [and/or] Civil War battles" with whom Mr. Kapelsohn has spoken, but specifically and limited to any such individuals with whom he spoke in preparation for any of his expert reports and/or his August 4, 2023 deposition testimony in these matters.   (*See id.*, T:183-6 to 184-16).

6. The results of any "ballistic testing" performed by Mr. Kapelsohn for "the past 45 years." (*See id.*, T:184-21 to 186-1).

7. The names and addresses of any "firearms expert[s]" with whom Mr. Kapelsohn spoke—***but specifically and limited to*** any such individuals with whom he spoke in preparation for any of his expert reports and/or his August 4, 2023 deposition testimony in these matters—who consider the .25 auto and

---

[1] A courtesy copy of the August 4, 2023 deposition testimony is attached hereto.

August 8, 2023
Page 3

the .32 auto (the .25 or also called .25 ACP, the ACP standing for Automatic Colt Pistol, and .32 auto or .32 ACP) to be inadequate for self-defense use. (*See id.*, T:195-3 to 196-4).

Sincerely yours,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY


By:   /s/ Daniel M. Vannella_____
      Daniel M. Vannella
      Assistant Attorney General

Encl.

cc: All counsel of record

# Exhibit 22

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Thursday, August 31, 2023 8:44 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** Bradley P. Lehman <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] ANJRPC v. Platkin; Ellman v. Platkin; Cheeseman v. Platkin

Dan –

Attached please find my letter of today's date describing today's supplemental production. The production can be found at the following link:

https://app.box.com/s/z2kbhjbelg23d8wrslciancosylex463

Please let me know if you have any difficulty accessing the documents.

Thanks.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:   (201) 967-8040
Fax:   (201) 967-0590
www.hartmanwinnicki.com

# Exhibit 23

LAW OFFICES

# HARTMAN & WINNICKI, P.C.

Dariusz M. Winnicki *°
Richard L. Ravin *°□
Daniel L. Schmutter*
Andrew T. Wolfe*

_____

* New York and New Jersey Bars
* Florida Bar
□ Washington, D.C. Bar
◊ New Jersey Bar

74 PASSAIC STREET
RIDGEWOOD, NEW JERSEY 07450

* * *

WEBSITE
www.hartmanwinnicki.com

Phone: (201) 967-8040
Fax:    (201) 967-0590

_____

Porter E. Hartman (1920-2009)
Charles R. Buhrman (1938-1994)
William T. Marsden (1943-1993)
Cyrus D. Samuelson (1911-1998)

August 31, 2023

**VIA EMAIL**

Daniel M. Vannella Esq.
Assistant Attorney General
25 Market St., P.O. Box 112
Trenton, NJ 08625

> Re:   **Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC") v. Platkin,
> et al. - 3:18-cv-10507-PGS-LHG
> Ellman v. Platkin - 3:22-cv-04397-PGS-LHG
> Cheeseman v. Platkin - 1:22-cv-04360-PGS-LHG**

Dear Dan:

ANJRPC Plaintiffs and Ellman Plaintiffs hereby amend their discovery responses including but not limited to their answers to interrogatories and document requests and their expert disclosures to produce the following contained in the "The Box" cloud server link provided in the accompanying email:

1)     Errata Sheet from the deposition of Emanuel Kapelsohn pursuant to Fed. Civ. P. 30(e);

2)     Deposition signature page for Emanuel Kapelsohn;

3)     ANJRPC Plaintiffs', Ellman Plaintiffs', and Emanuel Kapelsohn's responses to the Letter of Daniel M. Vannella dated August 8, 2023 ("Kapelsohn Response");

4)     All attachments identified in the Kapelsohn Response with the exception of the NSSF "News", July 20, 2022, "Commonly Owned: NSSF Announces Over 24 Million MSRS In Circulation," NSSF, Newtown, CT which can be found at the following link:

https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/

P0176337

August 31, 2023
Page 2

5)     Corrected CV of Clayton Cramer.

                                     Very truly yours,

                                     /s/ Daniel L. Schmutter
                                     DANIEL L. SCHMUTTER

DLS/lks
Cc:    Bradley Lehman

# Exhibit 24



# The Peregrine Corporation

Specialists in Defense Dynamics

August 29, 2023

Daniel L. Schmutter, Esq.
Hartman & Winnicki PC
74 Passaic Street
Ridgewood, NJ 07450

                    Re:     __Association of New Jersey Rifle & Pistol Club Cases__

Dear Attorney Schmutter:

Following are my responses to the questions posed by Attorney Vannella in his letter of August 8, 2023.  My responses are numbered in keeping with the numbering of his questions.

1.  Provided are (1) a video of my testing of ballistic film for use on glass doors and windows by firing through it with 9mm pistol and AR-15 rifle; (2) data from ballistic testing of micro-9 pistols with various types of ammunition, including chronographing, accuracy testing, and firing bullets into ballistic gelatin; (3) a page of rough notes from my ballistic testing (chronographing and firing at ballistic gelatin blocks) of two brands of paint marking cartridges used for law enforcement simulation training; (4) a video I made for this case, showing penetration of sheetrock walls by several types of projectiles fired from handgun, shotgun and AR-15 rifle; and (5) a typed page detailing the specifics of the ammunition used for (4) above, and the chronographed velocities of the projectiles. I do not typically keep ballistic testing results after cases or projects I am working on are concluded.  Also, I have many times done ballistic demonstrations for classes of officers or instructors, such as firing at, into or through sheetrock wall sections, automobile glass or autobodies, other glass, ballistic gelatin, etc., without recording or otherwise documenting the results of the tests, which are done for the purpose of demonstration and education, not research or publication.

2.  NSSF "News", July 20, 2022, "Commonly Owned:  NSSF Announces Over 24 Million MSRS In Circulation," NSSF, Newtown, CT.  Also, NSSF's "Modern Sporting Rifle Comprehensive Consumer Report."  Copies of both are enclosed.

3.  For studies and statistics to the effect that most violent crime occurs during the hours of darkness, see, e.g., New York City Police Department, "Analysis of Police Combat Situations", 1981 (available on the internet); and "Police Officer's Guide to Operating and Surviving in Low-Light and No-Light Conditions," ("The majority of crimes and officer shootings occur at night in diminished light or no-light settings.  The Federal

Bureau of Investigation reports that during a 9-year period (1985-1994), almost 63 percent of police officer deaths occurred between 6:00 p.m. and 6:00 a.m.").  Also see, e.g., "Officer-Involved Shootings: What We Didn't Know Has Hurt Us," Tom Aveni, Police Policy Studies Council.

4.  Richard C. Metzger, 217 Raymond St., Reading, PA.
    Mike Jessberger, Warminster, PA.
    Dixon's Muzzleloading Shop, Inc., 9952 Kunkels Mill Rd., Kempton, PA 19529
    Lyman Products Corp., 475 Smith St., Middletown, CT 06457 (Technical Services Dept.)
    Harold Coleman, National Muzzle Loading Rifle Association, P.O. Box 67, Friendship, IN 47021
    Tony Vance, Rush Creek Round Balls, P.O. Box 327, Rushlyvania, OH 43347
    Curator at Washington Crossing Historic Park, 1112 River Road, Washington Crossing, PA 18977 Washington Crossing, PA 18977
    Several Revolutionary War re-enactors (names unknown), spoken with and photographed in their uniforms at Washington Crossing Historic Park, 1112 River Road, Washington Crossing, PA 18977
    Jennifer Bolton, Park Ranger, Acting Lead Historic Weapons Supervisor, Valley Forge National Historical Park, (U.S. National Park Serive), 100 North Outer Line Drive, King of Prussia, PA 19406
    "Luke" (Lucien) Haag, P.O. Box 5347 Carefree, Arizona 85377

5.  Richard C. Metzger (see above)
    Mike Jessberger (see above)

6.  See #1 above.  I do not typically keep results of ballistic testing on cases that are closed, and I often do not document, video-record, or otherwise memorialize ballistic demonstrations I perform for classes of officers, police instructors, or others.  However, another example of "results" of ballistic testing I did within the past few years was as follows:  I worked for Pacific Power & Light Company ("PP&L") as an expert in a civil case in which a Yakima, Washington, Police Department SWAT Team sniper fired a .30 caliber rifle bullet in training at the shooting range (specifically, a .308 Winchester, I think a Federal Cartridge Co., product number 308M, 168 grain Sierra boat-tail hollowpoint bullet, if I remember correctly).  The bullet the police sniper fired missed the range backstop, and broke a high-voltage electric transmission line several hundred yards away.  The falling, sparking transmission line resulted in a wildfire that burned for three days, took numerous ground crews and firefighting helicopters to contain and extinguish, and damaged the properties of seven property owners, who sued the police and PP&L. An issue in the case was whether the rifle bullet in question could, in fact, break the power line at the distance involved.  To prove this, I obtained a quantity of the uninsulated, 3-strand copper electrical cable from PP&L.  I strung this cable between two utility poles at the Muhlenberg Township (PA) Shooting Range.  I had one end of the cable run over a large steel pulley, and I suspended hundreds of pounds of weight from the end of the cable passing over the pulley, to produce the appropriate amount of strain (tension) on the cable that would be created by the weight of the cable in the span between the two involved transmission line towers, the amount of current passing

through the cable (which creates heat) and the ambient temperature at the time of the incident.  I determined the amount of tension by working with a PP&L transmission line engineer.  Then I used equivalent .308 Winchester match-grade sniper ammunition, downloaded and chronographed so that, at the shorter distance on the shooting range, it would impact the copper cable at approximately the same velocity as the police bullet that had traveled several hundred yards by the time it impacted the actual cable in Yakima.  All of this required careful ballistic calculation, and trial and error in downloading and chronographing the ammunition below the velocity of a standard .308 loading.  Having done the foregoing, I was able to break the cable with a bullet fired at the shooting range.  The ballistic damage to the copper strands of the cable in my testing was comparable in appearance to the ballistic damage to the actual cable that started the wildfire, which had been photographed and preserved as evidence by the Washington Department of Environmental Protection, the agency that managed the firefighting effort and investigated the fire.

7.  I did not speak with other firearms experts **"specifically and limited to any such individuals with whom he spoke in preparation"** for my expert reports, opinions, or deposition to the effect that the .25 ACP and .32 ACP are widely considered by experts and other knowledgeable individuals to be generally inadequate calibers for self-defense use.  My opinions, reports, and/or deposition testimony to that effect are based on my lifetime of study of these matters, my many decades of reviewing the professional literature about wound ballistics and the effectiveness or ineffectiveness of various firearms calibers for self-defense use, my previous work, communication and experience (prior to my involvement in this case) with other firearms experts and instructors, my attendance at numerous training programs and conferences, and my review of numerous shooting incidents, all performed over more than four decades of work in this field.\\

Very truly yours,

Emanuel Kapelsohn, President

# Exhibit 25

A-30-21

5/8-21

Body For F —

427
437
464

Glock 17T
T 14 126

435
331
321
314

LOT
2AE172-b22

+ bounces off Clear Ballistics w/ only tiny dimple—

UTM
346
352
328

SIG P228
U426 19#

01-0976 RED
UMK20 G167-010    07658

314
340

+ bounces off Clear Ballistics —

SIMUNITIONS — FX
GLOCK 17T
RED LOT FABY2

402
397
379
404
412

| | | End | | Muzzle Velocity | |
|---|---|---|---|---|---|
| Glock 19 | Federal HST | 14 | 1181 | | |
| | Hornady CD | 13.75 | 1132 | | |
| | Speer GoldDot +P | 15.75 | 1284 | 1212.5 | |
| | Speer Short Barrel | 15.4 | 1253 | | |
| Sig P365 | Remington UD Full | 15.5 | 1011 | | |
| | Remington UD Compact | 14 | 1039 | | |
| | Federal HST | 15 | 1072 | | |
| | Federal HST Micro | 16 | 853 | 1014 | |
| | Federal HST Micro | 17.25 | 873 | | |
| | Hornady CD | 13.75 | 1073 | | |
| | Speer GoldDot +P | 16 | 1177 | | 1089.75 |
| Kahr PM9 | Speer Short Barrel | 16 | 1161 | | |
| | Speer Short Barrel | 15.25 | 1174 | | |
| | Speer Short Barrel | 13.75 | ERR | 1165.5 | |
| | Speer Short Barrel | 14.15 | 1168 | | |
| | Speer Short Barrel | 14.875 | 1159 | | |



| | Remington UD Full | Remington UD Compact | Federal HST |
|---|---|---|---|
| Glock 19 | - | - | 1181 |
| Sig P365 | 1011 | 1039 | 1072 |
| Kahr PM9 | - | - | - |

|  |  | Remington UD | | |
|---|---|---|---|---|
|  |  | 1 | 2 | 3 |
| Glock 19 | 5' | 1104 | 1149 | 1128 |
|  | 7' | 1089 | 1133 | 1114 |
| Glock 43 | 5' |  |  |  |
|  | 7' |  |  |  |
| Kahr PM9 | 5' |  |  |  |
|  | 7' |  |  |  |



# Ballistic Gelatin Penetration Testing

| Federal HST Micro | Hornady CD | Speer GoldDot +P | Speer Short Barrel |
|---|---|---|---|
| - | 1132 | 1284 | 1253 |
| 863 | 1073 | 1177 | - |
| - | - | - | 1165.5 |

Speer Short Barrel

| Full | | Remington UD Compact | | | | | Federal HST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 5 | 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 5 |
| 1105 | 1097 | | | | | | | | | | |
| 1090 | 1085 | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| Federal HST Micro | | | | | Hornady CD | | | | | Spe | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 5 | 1 | 2 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| er GoldDot +P | | | Speer Short Barrel | | | | |
|---|---|---|---|---|---|---|---|
| 3 | 4 | 5 | 1 | 2 | 3 | 4 | 5 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### Mike

|  | FMJ | FMJ | FMJ | HST | HST | HST | Speer GD | Speer GD | Speer GD | AVG FMJ |
|---|---|---|---|---|---|---|---|---|---|---|
| Glock 43 | 1.32 | 2.52 | 2.78 | 3.37 | 2.16 | 2.16 | 3.85 | 2.04 | 2.28 | 2.206667 |
| Sig P365 | 6.37 | 3.01 | 2.3 | 2.8 | 2.66 | 2.6 | 2.26 | 3.18 | 3.91 | 3.893333 |
| MP Shield | 1.89 | 1.6 | 3.25 | 1.97 | 3.23 | 3.98 | 3.27 | 2.5 | 2.35 | 2.246667 |
| Kahr #1 | 4.72 | 4.83 | 4.12 | 5.68 | 6.29 | 6.06 | 3.75 | 6.5 | 5.23 | 4.556667 |
| Kahr #2 | 3.13 | 2.7 | 2.51 | 5.77 | 3.19 | 5.23 | 3.51 | 3.49 | 2.6 | 2.78 |
| Ruger LC9 | 3.73 | 3.5 | 2.89 | 6.45 | 5.52 | 2.54 | 4.77 | 3.61 | 2.68 | 3.373333 |
| SCCY CPX-2 | 2.75 | 3.78 | 4.23 | 2.73 | 2.08 | 3.22 | 3.45 | 5.94 | 3.62 | 3.586667 |

### Dad

|  | FMJ | FMJ | FMJ | HST | HST | HST | Speer GD | Speer GD | Speer GD | AVG FMJ |
|---|---|---|---|---|---|---|---|---|---|---|
| Glock 43 | 2.75 | 2.75 | 2.85 | 2.42 | 3.18 | 2.98 | 2.09 | 5.14 | 4.3 | 2.783333 |
| Sig P365 | 3.6 | 1.83 | 2.26 | 2.13 | 1.71 | 2.02 | 2 | 3.68 | 4.14 | 2.563333 |
| MP Shield | 3.59 | 3.68 | 2.54 | 2.06 | 2.91 | 3.72 | 2.2 | 3.2 | 4.05 | 3.27 |
| Kahr #1 | 6.56 | 5.62 | 6.42 | 5.5 | 7.25 | 7 | 7.61 | 7.06 | 6.52 | 6.2 |
| Kahr #2 | 3.32 | 3.47 | 3.47 | 8.07 | 5.11 | 5.49 | 4.39 | 3.27 | 4.21 | 3.42 |
| Ruger LC9 | 5.1 | 2.99 | 4.72 | 2.94 | 6.35 | 3.28 | 4.58 | 3.75 | 4.39 | 4.27 |
| SCCY CPX-2 | 3.61 | 7.76 | 5.74 | 5.51 | 5.08 | 3.4 | 6.875 | 5.94 | 2.12 | 5.703333 |

### AVERAGE

| | | | |
|---|---|---|---|
| Glock 43 | 2.83 | 0.904434 | |
| MP Shield | 2.888333 | 0.769433 | |
| Sig P365 | 2.914444 | 1.133938 | |
| Kahr #1 | 5.928889 | 4.990278 | 1.566126 |
| Kahr #2 | 4.051667 | | |
| Ruger LC9 | 4.099444 | 1.207157 | |
| SCCY CPX-2 | 4.324167 | 1.655257 | |

Glock 43

| Sig P365 |
| MP Shield |
| Kahr #1 |
| Kahr #2 |
| Ruger LC9 |
| SCCY CPX- |

| AVG HST | AVG Speer GD | Overall Average |
|---|---|---|
| 2.563333 | 2.723333 | 2.497778 |
| 2.686667 | 3.116667 | 3.232222 |
| 3.06 | 2.706667 | 2.671111 |
| 6.01 | 5.16 | 5.242222 |
| 4.73 | 3.2 | 3.57 |
| 4.836667 | 3.686667 | 3.965556 |
| 2.676667 | 4.336667 | 3.533333 |

| AVG HST | /G Speer GD | Overall Average |
|---|---|---|
| 2.86 | 3.843333 | 3.162222 |
| 1.953333 | 3.273333 | 2.596667 |
| 2.896667 | 3.15 | 3.105556 |
| 6.583333 | 7.063333 | 6.615556 |
| 6.223333 | 3.956667 | 4.533333 |
| 4.19 | 4.24 | 4.233333 |
| 4.663333 | 4.978333 | 5.115 |

| AVG FMJ | AVG HST | AVG Spec | Overall Averag |
|---|---|---|---|
| 2.50 | 2.71 | 3.28 | 2.83 |





| | | | |
|---|---|---|---|
| 3.23 | 2.32 | 3.20 | 2.91 |
| 2.76 | 2.98 | 2.93 | 2.89 |
| 5.38 | 6.30 | 6.11 | 5.93 |
| 3.10 | 5.48 | 3.58 | 4.05 |
| 3.82 | 4.51 | 3.96 | 4.10 |
| 4.65 | 3.67 | 4.66 | 4.32 |



| | Glock 43 | Sig P365 | MP Shield | Kahr #1 | K |
|---|---|---|---|---|---|
| AVG FMJ | 2.50 | 3.23 | 2.76 | 5.38 | |
| AVG HST | 2.71 | 2.32 | 2.98 | 6.30 | |
| AVG Speer GD | 3.28 | 3.20 | 2.93 | 6.11 | |
| Overall Average | 2.83 | 2.91 | 2.89 | 5.93 | |

MICRO PISTOL MODELS







| | Kahr #2 | Ruger LC9 | SCCY CPX-2 |
|---|---|---|---|
| | 3.10 | 3.82 | 4.65 |
| | 5.48 | 4.51 | 3.67 |
| | 3.58 | 3.96 | 4.66 |
| | 4.05 | 4.10 | 4.32 |

**Association of New Jersey Rifle & Pistol Club Cases – ANJRPC v Platkin; Ellman v. Platkin**

**Details on Firearms and Ammunition Used in Ballistic Testing (Sheetrock Wall Penetration) on 8/26/23 at Topton Fish & Game Association Range, Topton, PA.**

**Chronographing done 8 feet from muzzle using Caldwell Ballistic Precision chronograph, between 5:00 p.m. and 6:00 p.m., approximate ambient air temperature 80 degrees F.**

**Handgun:**  Smith & Wesson Model 586 .357 Magnum revolver, 4" barrel, ser. #AAL8096.

> Federal .357 Magnum Hi-Shok 125 gr. jacketed hollow point ammunition,
> Product No. 357B, Lot No. 1215553693.
> Average velocity 1,263.8 fps. (range 1,154 to 1,380 fps.).

> Speer .38 Special +P, 125 gr. Gold Dot hollow point ammunition,
> Part No. 53720, Lot No. C20A203. Average velocity 1,002.5 fps.,
> (range 989 to 1,023 fps.).

**Shotgun:**  Remington 870 Wingmaster, 12 ga. pump-action shotgun, 20" barrel, ser. #67498V.

> Federal 12 ga. 2-3/4" 9-pellet 00 buckshot, Power-Shok, Product No. F127 00,
> Lot No. 153Z107.  Average velocity 1,298.3 fps. (range 1,295 to 1,302 fps.).

**Rifle:** Bushmaster Model XM15-E2S, cal. .223-5.56mm, 20" barrel, ser. #L105981.

> Hornady "Superformance Varmint" 35 gr. NTX, Product #83266, Lot #3214339.
> Average velocity 3,719,4 fps. (range 3,672 to 3,786 fps.).

# Exhibit 26




SHEETROCK WALL
PENETRATION TESTING
8/26/2023



Shooting Glass Video 1 of 2



Shooting Glass Video 2 of 2

# Exhibit 27



*NSSF® Report*

# MODERN SPORTING RIFLE
## COMPREHENSIVE
## CONSUMER REPORT

**Ownership, Usage and Attitudes Toward
AR- and AK-Platform Modern Sporting Rifles**

NSSF®
The Firearm Industry
Trade Association

**Copyright:** ©2022 National Shooting Sports Foundation
For all client unique research, copyright is assigned to said client. All report findings contained within are the property of the client (NSSF), who is free to use this information as desired. However, it is recommended that the client contact *Sports Marketing Surveys*, prior to reproduction or transmission for clarification of findings, analysis, or recommendations.

**Disclaimer:**
While proper due care and diligence has been taken in the preparation of this document, *Sports Marketing Surveys* cannot guarantee the accuracy of the information contained and does not  accept any liability for any loss or damage caused as a result of using information or recommendations contained within this document.

Sports Marketing Surveys USA
6650 West Indiantown Road, Suite 220,
Jupiter,
Florida 33458, USA

www.sportsmarketingsurveys.com

+1 561 427 0647
c. 772 341 6711

# Table of Contents

Executive Summary……………………………………………………………………………    3

Methodology…………………………………………………………………………    9

1. Experience with MSRs……………………………………………………………    10

2. Most Recently Acquired MSR……………………………………………………    18

3. MSR Usage and Activities………………………………………………………    39

4. MSR User Profiles…………………………………………………………………    51

5. Clusters/Segmentation……………………………………………………………    61

6. Sample Profile……………………………………………………………………    71

NSSF MSR Consumer Study – Report of Findings

# Executive Summary

**EXPERIENCE WITH MSRs**

- <u>Ownership & Platform</u>: The median MSR user owns nearly 4 MSRs, with 97% of owners saying they own an AR-platform MSR. 38% own another MSR platform and 27% own an AK platform MSR.

- <u>When MSR was first owned</u>: Over 40% obtained their first MSR since 2009, with 11% obtaining their first MSR within the last 2 years.  while 20% of MSR owners obtained their first MSR prior to 1999.

- <u>Other Firearms Owned First</u>: 99% of MSR owners used or obtained another firearm before an MSR; the most popular firearm owned is a handgun, which 88% of MSR owners held before obtaining a MSR.

- <u>Introduction to MSRs</u>: One-third of MSR owners became interested through their own personal accord. About 21% first gained interest through military or their job, and another 20% through family & friends.

- <u>Range membership</u>: 52% of MSR owners are current members of a shooting range. 28% have never been a member, with the final 20% being former members.

- <u>Reasons for ownership</u>: Recreational target shooting was rated as the most important reasons for owning an MSR.  Big game hunting and professional/job-related use were rated as least important.

**MOST RECENTLY ACQUIRED MSR**

- <u>When Acquired:</u> 48% of MSR owners said they obtained their most recently acquired MSR within the last two years (2021 or 2021), with 31% saying they obtained a MSR in 2021.

- <u>Platform:</u> Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

NSSF MSR Consumer Study – Report of Findings

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- <u>New/Used MSR</u>: 83% of MSR owners said they bought their most recent MSR by purchasing it new.

- <u>Place of purchase</u>: 30% of owners bought their most recent MSR from a independent (mom & pop) retail store. 22% assembled their MSR using purchases of different parts, and 19% used the internet/website.  The most popular retailers & online sites used were Palmetto State Armory, Gunbroker.com, Cabela's, and Sportsman's Warehouse.

- <u>Price</u>: The average price for a new MSR paid by owners was $1,071; half of MSR owners paid between $500 and $1000 for their most recently acquired MSR.

- <u>Brand:</u> Survey data indicates the MSR market is highly fragmented.  11% of MSR owners said Palmetto was the brand of their most recently acquired MSR.

- <u>Caliber</u> – 60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm.

- <u>Reasons for buying</u>– MSR owners said reliability, accuracy, and fun were the most important reasons for purchasing their most recently acquired MSR. The least important reasons were recommendations from a retailer and MSRs owned by family/friends.

- <u>Accessories:</u> 86% of MSR owners have their most recently acquired MSR customized to some extent, with 70% having 1–3 accessories. 75% of those with accessories added them to their MSR within 12 months after purchase. The average spent for accessories by owners on their most recently acquired MSR is $618.

- <u>Optics used:</u> 61% of MSR owners have a scope equipped as a primary optics, while 55% utilize a red dot.

NSSF MSR Consumer Study – Report of Findings

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- <u>Scope</u>: the most common scopes used by MSR owners are the 3-9x power scope and the 1-4x power scope.

- <u>Magazine capacity</u>: Over half (52%) of MSR owners stated the magazine capacity of their MSR is 30 rounds. When asked why they chose their respective capacity, most frequent responses were related to popularity/standard and being readily available.

- <u>Stock</u>: Approximately two-thirds of MSR owners have a collapsible/folding stock on their MSR.

- <u>Receiver</u>: 81% of owners have a flat top upper receiver.

- <u>Handguard</u>: The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

- <u>Finish color</u>: 3 out of 4 owners have a black finish color on their MSR.

- <u>Barrel</u>: 67% have a threaded barrel on their MSR.

- <u>Barrel accessories</u>: Most used barrel accessories are flash hider (39% of MSR owners) and muzzle brake/compensator (37%).

- <u>Barrel length</u>: 75% have a MSR with a barrel length of 16" to 20".

- <u>Operating system</u>: The most recently acquired MSR for 59% of owners operates by direct gas impingement.

NSSF MSR Consumer Study – Report of Findings

# Executive Summary

### MOST RECENTLY ACQUIRED MSR (cont.)

- <u>Storage</u>: 67% store their MSR unloaded and secured in a safe, lock box, or with a trigger lock. An additional 19% store their MSR <u>loaded</u> and secured in a safe, lock box, or with a trigger lock.

- <u>Likelihood to buy</u>: On a scale from 1 to 10, where 1 is "not at all likely" and 10 is "very likely", the average likelihood rating given by MSR owners that they'll buy a MSR in the next 12 months is 6.2, slightly more to the 'likely' end of the scale.

- <u>Accessories owned</u>: The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and a soft carrying case. The accessory MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer. About 70% of MSR owners do not own and do not plan on buying a laser designator or night vision/thermal scope in the next 12 months.

### USAGE AND ACTIVITIES

- <u>Use:</u> 88% of MSR owners used/shot their MSR(s) in the last 12 months. The average number of times used was 14, just over once a month. Compared to the 12 months before that, 41% said their MSR use was "about the same" while 38% said it was less.

- <u>Desired usage</u>: 75% of MSR owners said they did not use their MSR as much as they would like over the past 12 months. The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

- <u>Activities</u>: The most popular activity by MSR owners is target shooting — 54% said they did target shooting at a private range, while 49% said they did target shooting at a public range.

- <u>Ammo used</u>: Roughly 70% of MSR owners used budget factory and premium factory loads in the last 12 months. The ammo breakdown for an average MSR user is made up of 42% budget factory loads, 32% premium factory loads, 17% handloads/reloads, and 9% import ammo. The average number of rounds used by MSR owners in the last 12 months is 907 rounds. In the next 12 months, MSR owners project they'll fire 984 rounds.

NSSF MSR Consumer Study – Report of Findings

# Executive Summary

## USAGE AND ACTIVITIES (cont.)

- <u>Ammo purchases</u>: The average number of ammo rounds typically purchased by MSR owners is 637.

- <u>Ammo on hand</u>: Nearly half (45%) of MSR owners own/keep more than 1,000 rounds on hand.

- <u>Ammo reloads</u>: 6 out of 10 MSR owners do not reload their own ammunition. Of the 40% who do, the average percentage of ammunition they reload is 53%.

- <u>Activities – Distance</u>: The most frequent distance that MSR owners hunt/target shoot is at 100–300 yards.

- <u>Target shooting alone vs with others</u>: 43% of MSR owners who go target shooting typically go with 1 other person. 27% go alone.

- <u>Favorite part about owning MSR</u>: MSR owners said their favorite part about owning a MSR was: fun/enjoyment of shooting, exercising freedom/2A rights, ease of use, and reliability.

## RESPONDENT PROFILE

- Organizations: 61% of MSR owners are members of or recently donated to the NRA, the most frequently chosen organization. 21% of MSR owners are not members of or recently donated to any firearm organizations. 12% are members or recently donated to the NSSF.

- Military/Law-Enforcement: 38% of MSR owners are active/retired member of law enforcement or the military.

- Age/Gender/Race: 96% of MSR owners are Male. The average age of MSR owners is 55 years old. 88% are White/Caucasian.

- Marital status: 74% of MSR owners are married. Of these MSR owners, over half say their spouse accompanies them for target shooting. 24% say their spouse has no interest in target shooting or firearms.

# Executive Summary

**RESPONDENT PROFILE (cont.)**

- Education: 45% of MSR owners have attained at least a bachelors degree. One-quarter have attended some college, but did not graduate.

- Income: The average yearly household income for MSR owners is $110,934. More than half are in households with an annual income of greater than $85,000.

- <u>Children in Household</u>: 62% of MSR owners do not have any children living with them.

- State: The states with the most respondents were Texas (9%), California (5%), and Florida (5%).

## Methodology

In 2020, the National Shooting Sports Foundation (NSSF) contracted Sports Marketing Surveys for an online consumer survey on modern sporting rifles (MSRs) that was last carried out in 2013. Due to the COVID pandemic and personnel changes at NSSF, this survey was not able to be administered until December 2021. The aim is to provide the NSSF and manufacturers insights on current consumer needs and uses of MSRs as well as educate those influencing public policy in the effort to preserve our constitutional rights.

The online survey covered various aspects of MSR ownership, behavior, and attitudes. The NSSF promoted the survey via a partner email distribution list.  A random drawing to win one of four $250 Mastercard prepaid gift cards was included to incentivize participation. The term "Modern Sporting Rifle" was clearly defined as AR- or AK-platform rifles such as AR-15, AR-10, AK-47, AK-74 and did not include non-rifle firearms such as AR pistols, etc. Photographs of both AR- and AK-platform MSRs were shown on the survey landing page. All responses from those under 18 years old or said they did not own at least 1 MSR were removed from the analysis.

The survey was live from December 9, 2021 to January 2, 2022.
- **Completed Surveys: 2,421**
- **Usable responses for analysis: 2,185**

NSSF MSR Consumer Study – Report of Findings



Section 1: Experience with Modern Sporting Rifles

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 48 of 240 PageID: 7639

# Modern Sporting Rifle Ownership: Platforms

### MSR Platforms Owned



**Average number of MSRs owned: 3.8**
- AR – 2.6
- Other – 0.8
- AK – 0.4

Median of all MSRs owned: 3

**(may own zero of one or more platform, but must at least own one MSR)**

### Number of MSRs owned



| Platform | Average Number of MSRs owned (must own at least one of specified platform) |
|---|---|
| AR platform | 2.7 |
| Other platform | 2.3 |
| AK platform | 1.5 |

**Trend – Average Number of MSRs owned**
2010: 2.6
2013: 3.1
2021: 3.8

Case 3:18-cv-10507-PCP-JBD   Document 184-8   Filed 11/03/23   Page 49 of 240 PageID: 7640

# Modern Sporting Rifle Ownership: Experience



**When did you obtain your FIRST MSR?**

| Year | % |
|---|---|
| 2021 | 5% |
| 2020 | 6% |
| 2019 | 6% |
| 2018 | 5% |
| 2017 | 5% |
| 2016 | 6% |
| 2015 | 6% |
| 2014 | 5% |
| 2013 | 4% |
| 2012 | 5% |
| 2011 | 3% |
| 2010 | 5% |
| 2005 – 2009 | 14% |
| 2000 – 2004 | 7% |
| Prior to 1999 | 20% |

| | By Number of MSRs Owned | | | | |
|---|---|---|---|---|---|
| | 1 MSR | 2 | 3 | 4 | 5+ |
| 2021 | 14% | 3% | 3% | 1% | 1% |
| 2020 | 13% | 7% | 3% | 1% | 2% |
| 2019 | 9% | 7% | 5% | 4% | 2% |
| 2018 | 9% | 7% | 5% | 5% | 2% |
| 2017 | 8% | 5% | 5% | 4% | 3% |
| 2016 | 7% | 8% | 8% | 6% | 3% |
| 2015 | 7% | 8% | 6% | 3% | 5% |
| 2014 | 5% | 7% | 3% | 4% | 3% |
| 2013 | 3% | 5% | 6% | 4% | 4% |
| 2012 | 4% | 4% | 4% | 7% | 5% |
| 2011 | 2% | 4% | 4% | 4% | 4% |
| 2010 | 2% | 4% | 4% | 4% | 6% |
| 2005 – 2009 | 8% | 13% | 15% | 15% | 19% |
| 2000 – 2004 | 3% | 4% | 7% | 9% | 11% |
| Prior to 1999 | 7% | 13% | 20% | 28% | 30% |

- **20% of MSR owners obtained their first MSR before 1999.  Over 40% have owned theirs since 2009.**

- **11% obtained their first MSR within the last two years.**

- **26% of those who own 1 MSR obtained it in 2020 or 2021.**

# Modern Sporting Rifle Ownership: Experience

**Firearms Used/Owned BEFORE obtaining a MSR**



- Handguns are the most popular firearm used/owned before obtaining an MSR, with 88% of MSR owners selecting.

- Traditional rifles were also first used/owned by 82% of MSR owners.

- Younger MSR owners show less ownership of other firearm types before a MSR compared to other age groups.



**NSSF MSR Consumer Study – Report of Findings**

# Modern Sporting Rifle Ownership: Experience

**Introduction to MSRs: where did you first gain interest?**



**Introduction to MSRs (Grouped)**



- One-third of MSR owners became interested through their own personal accord.

- About 21% first gained interest through the military or their job, and another 20% through family/friends.

NSSF MSR Consumer Study – Report of Findings

# Modern Sporting Rifle Ownership: Experience





- One-third of MSR owners became interested through their own personal accord.

- About 21% first gained interest through the military or their job, and another 20% through family/friends.

# Modern Sporting Rifle Ownership: Shooting Ranges

**Do you currently have a membership at a shooting range?**



- About half of MSR owners are current members of a shooting range.

- 28% have never been a member of a shooting range.

Case 3:18-cv-10507-PBS-JBD   Document 184-8   Filed 11/03/22   Page 54 of 240 PageID: 7645

# Modern Sporting Rifle Ownership: Reasons for Ownership

Respondents were asked to rate how important each of the following reasons are to owning an MSR. They rated each reason on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."



**Rating: How important are these reasons to owning an MSR?**

Recreational target shooting — 8.7
Home/self-defense — 8.3
Collecting — 6.3
Varmint Hunting — 5.8
Competition shooting (i.e. 3. Gun) — 5.6
Big Game Hunting — 4.9
Professional use / Job-related — 3.4

*Scale:*
*1=Not at all important,   10= very important*

- Recreational target shooting was rated as the most important reason for owning an MSR.

- Big game hunting and professional/job-related use were given the lowest importance ratings.

| | MSR Owned | | | | | Age | | | Usage Frequency | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | 3 times or less | 4 to 11 times | 12 to 23 times | 24+ times |
| Recreational target shooting | 8.4 | 8.7 | 8.8 | 8.6 | 9 | 8.4 | 8.8 | 8.9 | 8.5 | 8.8 | 9 | 9.1 |
| Home/self-defense | 7.9 | 8.2 | 8.2 | 8.3 | 8.7 | 8.4 | 8.3 | 8.2 | 8 | 8.3 | 8.5 | 8.7 |
| Collecting | 5.2 | 5.8 | 6.6 | 6.7 | 7.1 | 6.9 | 6.5 | 5.8 | 5.9 | 6.2 | 6.4 | 7 |
| Varmint Hunting | 5.2 | 5.5 | 5.8 | 5.9 | 6.3 | 5.7 | 5.8 | 5.8 | 5.2 | 5.7 | 6.2 | 7 |
| Competition shooting (i.e. 3. Gun) | 4.6 | 5.3 | 5.6 | 6 | 6.4 | 6 | 5.8 | 5.2 | 4.9 | 5.4 | 6.3 | 7 |
| Big Game Hunting | 4.3 | 4.4 | 4.9 | 5.4 | 5.5 | 5.2 | 4.9 | 4.7 | 4.4 | 4.9 | 5.2 | 6 |
| Professional use / Job-related | 2.8 | 3 | 3.7 | 3.5 | 3.9 | 4 | 3.4 | 3 | 3 | 3.2 | 3.6 | 4.5 |

NSSF MSR Consumer Study – Report of Findings



Section 2: Most Recently Acquired Modern Sporting Rifle

# Most Recently Acquired MSR: Platform, When Acquired

**Platform - Most Recent MSR Obtained**



**Year of Most Recently Acquired MSR**



- Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

- Nearly one–third of MSR owners said they acquired their most recent one in 2021, nearly 50% within the last two years (2021 or 2020).

# Most Recently Acquired MSR: How? Where?



**How did you obtain your most recently acquired MSR?**

- I purchased it NEW — 83%
- I purchased it USED — 11%
- I received it NEW as a gift — 3%
- I received it USED as a gift — 2%
- I inherited it — 1%



**Place of Purchase**

- Independent (Mom & Pop) Retail Store — 30%
- Purchases of different parts — 22%
- Internet/Website — 19%
- Other — 10%
- Chain or Big Box Retail Store — 9%
- Purchased as a kit — 6%
- Gun Show — 4%

- 83% of MSR owners acquired their most recent MSR by purchasing it new.

- For those purchasing a new or used MSR, the most common place of purchase was an independent retail store.

- Popular retailers & online sites used: Palmetto State Armory, Gunbroker.com, Cabela's, Sportsman's Warehouse,

# Most Recently Acquired MSR: Place of Purchase

| | Total | Number of MSRs Owned | | | | | Age | | | Range Membership | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | Member | Non-member |
| Independent (Mom & Pop) Retail Store | 30.3% | 31.9% | 30.5% | 31.1% | 29.8% | 28.9% | 26.6% | 35.1% | 30.1% | 33.9% | 26.5% |
| Purchases of different parts | 22.2% | 12.0% | 18.8% | 24.8% | 29.3% | 28.6% | 25.4% | 25.8% | 19.0% | 21.3% | 23.2% |
| Internet/Website | 19.3% | 18.6% | 21.1% | 16.2% | 19.1% | 20.2% | 24.3% | 14.1% | 19.1% | 18.1% | 20.7% |
| Other | 9.5% | 11.4% | 11.2% | 9.6% | 8.0% | 7.3% | 6.1% | 7.8% | 11.9% | 8.9% | 10.1% |
| Chain or Big Box Retail Store | 9.2% | 16.2% | 10.1% | 7.6% | 5.3% | 5.2% | 7.9% | 8.8% | 9.9% | 7.9% | 10.5% |
| Purchased as a kit | 5.8% | 5.6% | 4.6% | 6.3% | 5.8% | 6.4% | 7.0% | 4.6% | 5.6% | 5.9% | 5.6% |
| Gun Show | 3.7% | 4.2% | 3.7% | 4.3% | 2.7% | 3.5% | 2.7% | 3.8% | 4.2% | 4.0% | 3.4% |

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Price

**Price of most recently acquired NEW MSR**



- Half of MSR owners paid between $500 and $1000 for their most recently purchased MSR, both those who bought a new MSR and those who bought a used MSR.

- Average price for last MSR: $1,071.

**Price of most recently acquired USED MSR**



| | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Overall average** | **$1,083** | **$1,058** | **$1,071** |
| AR–platform (new) | | $1,112 | $1,057 |
| AR platform (used) | | | $992 |
| AK platform (new) | | $711 | $1,086 |
| AK platform (used) | | | $1,218 |

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Brand

**Brand of Most Recently Acquired AR**



- Survey data indicates the MSR market is highly fragmented. 11% of MSR owners said Palmetto was the brand of their most recently acquired MSR —— the highest among the options available.

Commonly mentioned brands included in "Other":
- ATI
- Battle Arms Development
- MBX
- Sharp Bros
- Tavor
- WBP

*50+ other brands were selected by less than 1 % of respondents; full list available upon request*

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/22  Page 61 of 240 PageID: 7652

# Most Recently Acquired MSR: Caliber



**Caliber of Most Recently Acquired MSR**

| Caliber | % |
|---|---|
| .223 / 5.56mm | 60% |
| .308 Winchester (7.62 x 51) | 9% |
| 7.62x39mm | 6% |
| .300 Blackout | 6% |
| Other | 5% |
| 9mm Luger | 4% |
| .22 Long Rifle | 2% |
| 6.5 Creedmoor | 2% |
| .350 Legend | 1% |
| 5.7 x 28mm | 1% |
| 6mm ARC | 1% |
| 6.8 SPC | 1% |
| 5.45 x 39mm | 1% |

*7 other calibers were selected by less than 1 % of respondents*

- 60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm

- Of the 5% selecting "other," the most frequently mentioned calibers included:
  - 6.5 Grendel
  - .458 SOCOM
  - .224 Valkyrie

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Reasons for Buying

For the 94% of respondents that purchased their MSR new or used, they were asked to rate how important each of the following reasons are for selecting their most recently acquired MSR on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."

**Rating: Most Important Reasons for Buying Most Recently Purchased MSR**



- MSR owners rated reliability, accuracy, and fun as the most important reasons for purchasing their most recently acquired MSR.

- The least important reasons as rated by MSR owners include recommendations from a retailer and MSRs owned by family/friends.

*Scale:*
*1=Not at all important,  10= very important*

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/22  Page 63 of 240 PageID: 7654

# Most Recently Acquired MSR: Accessories

**MSR – Use of Accessories**



**When have you added accessories to your MSR?**



- 86% of have their most recently acquired MSR customized to some extent, 70% having 1–3 accessories.

- For those with accessories on their most recently acquired MSR, 75% added accessories within 12 months after purchase. Nearly a quarter added accessories at the time of purchase.

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/03/22 Page 64 of 240 PageID: 7655

# Most Recently Acquired MSR: Accessories - Spend

**Spend on After-Market Customization to Most Recently Acquired MSR**



|  | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Average spent** | **$436** | **$381** | **$618** |

- Of the MSR owners who have added accessories to their most recently acquired MSR, nearly half, or 48%, have spent between $201 and $600 on after–market customization.

- The average spent for accessories by owners on their most recently acquired MSR by owners is $618.

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/03/23 Page 65 of 240 PageID: 7656

# Most Recently Acquired MSR: Optics



**Optics Used on Most Recently Acquired MSR**

- Primary Optics
- Secondary sighting/aiming device
- Not applicable

- 61% of MSR owners have a scope equipped as a primary optic on their most recently acquired MSR.

- Iron sights are the most common secondary aiming device, equipped on two-thirds of respondents' MSRs.

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/03/22 Page 66 of 240 PageID: 7657

# Most Recently Acquired MSR: Scope



**Type of Scope on MSR**

- The most common scopes used by MSR owners are the 3–9x power scope (21%) and the 1–4x power scope (20%).

- Of the 10% who selected "Other," the most frequently mentioned scopes were:
  - 1-8x variable power scope
  - 1-10x variable power scope

# Most Recently Acquired MSR: Magazine Capacity



**Magazine Capacity on MSR**

- Half (52%) of MSR owners stated the magazine capacity of their most recently acquired MSR is 30 rounds.

- When asked why they chose their respective magazine capacity, the most frequent responses were:
  - Common/standard
  - Readily available

NSSF MSR Consumer Study – Report of Findings

# Most Recently Acquired MSR: Type of Stock



**Type of Stock on MSR**

- **65%, or approximately two-thirds, of MSR owners have a collapsible/folding stock on their most recently purchased MSR.**

NSSF MSR Consumer Study – Report of Findings

# Most Recently Acquired MSR: Type of Upper Receiver

**Type of Upper Receiver on MSR**



- 81% have a flat top upper receiver on their most recently acquired MSR.

Case 3:18-cv-10507-PBS-JBD   Document 184-8   Filed 11/03/22   Page 70 of 240 PageID: 7661

# Most Recently Acquired MSR: Type of Handguard

**Type of Handguard on MSR**



- The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

Case 3:18-cv-10507-PBS-JBD   Document 184-8   Filed 11/03/22   Page 71 of 240 PageID: 7662

# Most Recently Acquired MSR: Finish Color

**Finish Color on MSR**



- 3 out of 4 MSR owners have a black finish color.

# Most Recently Acquired MSR: Barrels – Type, Accessories, Length

### Type of Barrel on MSR



### Barrel Accessories on MSR



### Barrel Length on MSR



- Two-thirds of MSR owners have a threaded barrel.

- Most common accessories: flash hider (39%), muzzle brake/compensator (37%)

- 75% have a barrel length of 16-20%

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Operating System, Storage



**Operating System on MSR**

- 59% of MSR owners indicated their most recently acquired MSR is operated by direct gas impingement.

- 67%, or two-thirds, of MSR owners store their MSR secured and unloaded.

**MSR Storage**

**NSSF MSR Consumer Study – Report of Findings**

# Most Recently Acquired MSR: Likelihood to Buy a MSR in Next 12 Months



Likelihood to Buy a MSR in Next 12 Months

Avg: **6.2**

Scale: 1= Very Unlikely 10=Very Likely

- Average likelihood to buy an MSR in the next 12 months is a 6.2 out of 10, slightly more to the "likely" end of the scale.

- 25%, or one–fourth of respondents, said they are "very likely" to buy an MSR in the next 12 months.

# Most Recently Acquired MSR: Accessories Owned

| | Owned | Plan to buy in next 12 months | Don't own, don't plan to buy |
|---|---|---|---|
| Gun Cleaning Kit | 94% | 9% | 3% |
| Extra Magazines | 87% | 23% | 6% |
| Targets | 84% | 26% | 5% |
| Soft Carrying Case | 84% | 9% | 12% |
| Rifle Sling | 81% | 21% | 8% |
| Gun Safe | 78% | 14% | 13% |
| Rifle Scope | 76% | 23% | 14% |
| Hard Carrying Case | 69% | 12% | 25% |
| Gun Lock | 64% | 4% | 32% |
| Backup sights | 55% | 20% | 31% |
| Bipod | 55% | 21% | 34% |
| Railed Handguard | 54% | 13% | 36% |
| Spotting Scope | 52% | 19% | 31% |
| Mounted Flashlight | 46% | 27% | 36% |
| Trigger Upgrade | 45% | 26% | 39% |
| Range Finder | 43% | 25% | 37% |
| Vertical Fore-grip | 41% | 14% | 49% |
| Stock Upgrade | 37% | 17% | 49% |
| Suppressor/silencer | 19% | 37% | 53% |
| Laser Designator | 17% | 12% | 72% |
| Night Vision/Thermal | 13% | 26% | 67% |
| Other | 6% | 4% | 43% |

- The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and soft carrying case.

- The accessory that MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer.

- Roughly 70% of MSR owners do not own and do not plan to buy a laser designator or night vision/thermal scope in the next 12 months.

NSSF MSR Consumer Study – Report of Findings



Section 3: Modern Sporting Rifle Usage & Activities

NSSF MSR Consumer Study – Report of Findings

# MSR Usage and Activities

**Used Your MSR(s) in the last 12 months?**



**MSR Use in Last 12 Months Compared to Previous 12 Months**



**MSR Usage: Number of Times in Last 12 Months**



Avg: **14 occasions**

- 88% of MSR owners used/shot their MSR(s) in the last 12 months. Compared to the 12 months before that, 41% said their MSR use was "about the same." 38% said it was less.

- Of those who used their MSR, the average number of times respondents used it in the last 12 months is 14.

# MSR Usage and Activities: Factors Preventing Usage

**Used MSR As Much As You Would Like in Last 12 Months?**



**Rating: How important are the following in preventing you from using your MSR as much as you'd like?**



- 3 out of 4 MSR owners said they did not use their MSR as much as they would like over the past 12 months.

- The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

*Scale:*
*1=Not at all important,  10= very important*

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/22   Page 79 of 240 PageID: 7670

## MSR Usage and Activities



**MSR Activities in Last 12 Months**

| Activity | Percentage |
|---|---|
| Target shoot at a private range | 54% |
| Target shoot at a public range | 49% |
| Target shoot on my/family land | 32% |
| Target shoot on friends land | 25% |
| While hunting on private land | 24% |
| Competition Shooting (i.e. 3 Gun) | 15% |
| While hunting on public land | 11% |
| At paid course/training academy | 10% |
| While at work (i.e. Law Enforcement, Private Security) | 5% |
| Other | 4% |

- **The most popular activity by MSR owners is target shooting; 54% said they did at a private range, while 49% said they did at a public range.**

**NSSF MSR Consumer Study – Report of Findings**

# MSR Usage and Activities: Ammunition Used - Type

**Ammo Used (% of MSR Owners Using)**



**Ammo Profile - Average % Breakdown Per MSR Owner**



- Across all MSR owners, roughly 70% of used budget factory loads and premium factory loads in the last 12 months.

- The ammo breakdown per MSR owner shows that 42% of ammo they used in the past 12 months are factory loads/bulk packs.

NSSF MSR Consumer Study – Report of Findings

# MSR Usage and Activities: Ammunition Used - Amount

**Rounds of Ammo Fired Through MSR In Last 12 Months**



**Rounds of Ammo Fired (Grouped)**



- The average number of rounds used by MSR owners in the last 12 months is 907.

- Approximately half of MSR owners fired between 1 and 400 shots in the last 12 months, the other half shooting more than 400 rounds.

# MSR Usage and Activities: Ammunition Used – Projected Amount

**Projected Rounds of Ammo Fired Through MSR In Next 12 Months**



**Projected Rounds of Ammo Fired (Grouped)**



- The average number of rounds that MSR owners project they will fire in the next 12 months is 984.

- Over one-third of MSR owners anticipate firing more than 800 rounds of ammunition in the next 12 months.

**NSSF MSR Consumer Study – Report of Findings**

# MSR Usage and Activities: Ammunition Quantity Purchased, Kept On Hand

**Quantity of MSR Ammo Typically Purchased**



**Number of MSR Rounds Owned/Kept on Hand**



- When purchasing ammunition, the average number of ammo rounds typically purchased by MSR owners is 637.

- 36% of MSR owners typically purchase between 500–1,999 rounds.

- Nearly half of MSR owners own/keep more than 1,000 rounds on hand.

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/03/22 Page 84 of 240 PageID: 7675

# MSR Usage and Activities: Ammunition Reloads

**Do you reload your own ammunition?**



**Percentage of Ammo Reloaded**



- 6 out of 10 MSR owners do not reload their own ammunition.

- Of the 40% who do, the average percentage of their ammunition they reload is 53%.

**NSSF MSR Consumer Study – Report of Findings**

# MSR Usage and Activities: Firearms Used



**Firearms Used - Activities**

- **95% of respondents used their MSR to rifle target shoot.**

# MSR Usage and Activities: Target Shooting/Hunting



**Typical Distance When Using MSR for Hunting/Target Shooting**

- Under 100 yards — 30%
- 100 - 300 yards — 59%
- 301 - 500 yards — 7%
- 501 - 1,000 yards — 3%
- More than 1,000 yards — 0%
- I don't know — 1%



**Target Shooting - Do you generally go alone or with others?**

- With 1 other person — 43%
- Alone — 27%
- With 2 - 4 other people — 26%
- With 5+ other people — 4%

---

- The most frequent distance that MSR owners hunt/target shoot at is 100–300 yards.

- 43% generally go target shooting with one other person. 27% go alone.

NSSF MSR Consumer Study – Report of Findings

# Respondent Profile: Favorite Part About Owning MSR

Respondents were asked in an open-ended question to explain their favorite part of owning an MSR. Common themes in answers include:

**FUN/ENJOYMENT OF SHOOTING**
- General enjoyment of shooting; relaxing
- Challenge of target shooting, hunting; improving
- Camaraderie with others, quality time with loved ones
- Ability to customize/building from parts

**EXERCISING FREEDOM/2A RIGHTS**
- Represents freedom and America
- Tradition and history

**EASE OF USE**
- Lightweight
- Low-recoil
- Accurate, versatile
- Instills confidence

**RELIABLE**
- Craftsmanship and engineering
- Peace of mind — excellent for home defense



Section 4: MSR Owner Profiles

**NSSF MSR Consumer Study – Report of Findings**

# Profile: Single MSR Owners vs Multi-MSR Owners



Multiple–MSR owners are relatively more likely to be:

• Ages 55+

• Non–range members

• Those who used MSR 11 or less times in the last 12 months

• Not from a military/law enforcement background

• Those with an income under $65k, though there is fairly even distribution across ranges

• Users of MSR for target shooting

• Those with no kids at home

• Owners of a MSR(s) for home defense purposes

• Those who plan to buy MSR accessories in the next 12 months

# Profile: Range vs Non-Range Member



MSR owners who are shooting range members are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- Occasional users of MSRs – 4 to 11 times times in the last 12 months

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who plan to buy MSR accessories in the next 12 months

NSSF MSR Consumer Study – Report of Findings

# Profile: Infrequent vs Avid MSR Users



Avid MSR owners are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- A member of a shooting range

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting and hunting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who recently bought a MSR in 2020 or 2021, plan to buy accessories or a new MSR in the next 12 months

**NSSF MSR Consumer Study – Report of Findings**

# Profile: Target Shooters vs Hunters



Target shooters and hunters have similar profiles. Hunters are slightly more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- A frequent or avid user of MSRs

- Those without a bachelors degree

- Users of MSR for target shooting and hunting

- Those with kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who are likely to buy a new MSR in the next 12 months

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/03/23 Page 93 of 240 PageID: 7684

# Profile: Owners Who Haven't Used MSR In Last 12 Months

Non-MSR users are relatively more likely to be:

- Owners of multiple MSRs
- Ages 55 & older
- Not a member of a shooting range
- Those with a household income of less than $110k
- Those with no kids at home
- Owners of a MSR(s) for home defense, some hunting
- Those who plan to buy accessories for their MSR in the next 12 months

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 94 of 240 PageID: 7685

# Profile: Premium Buyers (>$1500 spent on MSR) vs Non-Premium Buyers



Premium MSR buyers are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55 & older

- A member of a shooting range

- Regular users of MSRs, using 4 to 11 times a year

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Recent buyers (purchased MSR in 2021 or 2020), high–spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

**NSSF MSR Consumer Study – Report of Findings**

# Profile: Heavily Accessorized (4+ accessories) MSR Owners



Owners of heavily accessorized MSRs are relatively more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- A member of a shooting range

- Frequent/avid users of MSRs

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Premium MSR buyers (>$1500 spent on last MSR), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

**NSSF MSR Consumer Study – Report of Findings**

# Profile: Likely MSR buyers



Likely MSR buyers are relatively more likely to be:

- Owners of multiple MSRs

- Under 45 years old

- Frequent/avid users of MSRs

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Premium MSR buyers (>$1500 spent on last MSR), high–spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

# Profile: Military/Law Enforcement vs Non-Military/Law Enforcement



MSR owners with a military/law-enforcement background are relatively more likely to be:

- Owners of multiple MSRs

- 55 years old or older

- Frequent/avid users of MSRs

- Those with a household income of $65–$110k

- Those without a bachelors degree or more

- Using MSR for competition shooting or work

- Owners of a MSR(s) for home defense or professional/job-related purpose



Section 5: Clusters/Segmentation

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/22   Page 99 of 240 PageID: 7690

# Clusters Analysis/Market Segmentation Explained

A Cluster Analysis is method used in market segmentation to help marketers identify specific consumer groups based on a specific set and sub-set of demographic and specific product usage patterns. Market segmentation means dividing the market into distinct groups of individual segments or clusters with similar wants or needs and behaviors.

A market segment or cluster is a sub-set of a people, in this case, MSR owners with one or more characteristics that cause them to demand similar product and/or services based on qualities of those products — such as usage activity and demographics. A true market segment meets all of the following criteria: it is distinct from other segments (different segments have different needs), it is homogeneous within the segment (exhibits common needs), and responds similarly to market stimulus and media.

In the MSR Study, we used the following variables to establish clusters:
- Age
- Reasons for owning an MSR
- Annual Household Income
- Number of MSRs Owned
- Military/Law-Enforcement Affiliation

# MSR Clusters Summary

| | 1. Law Enforcement & Competition | 2. Casual Hunter | 3. Affluent Gun Enthusiast | 4. Low-Use Home Defense | 5. Hunting Aficionado |
|---|---|---|---|---|---|
| % of owners | 18% | 17% | 23% | 21% | 21% |
| % of MSRs | 24% | 13% | 27% | 11% | 25% |
| Number of MSRs Owned | 3+ | 1 | 3+ | 1 | 3+ |
| Age | Under 45 | Under 45 | 45 to 54 | 55+ | 55+ |
| Reasons for Owning a MSR | Professional use/job-related, competition | Hunting | Competition shooting | Home defense | Hunting |
| Annual Household Income | $65 to $110k | <$65k | >$110k | <$65k | >$110k |
| Military/Law-Enforcement Affiliation | Military/L.E. | Non-Military/L.E. | Non-Military/L.E. | Slightly more Military/L.E. | Slightly more non-Military/L.E. |
| MSR usage frequency (last 12 months) | More than 24 times | 3 times or less | 12 to 23 times | 3 times or less | 4 to 11 times |
| Range Member | Slightly more likely to be a range member | Non-member | Range Member | Non-member | Non-member |
| Education | Slightly more likely to not have a bachelors | No bachelors | Bachelors+ | Both bachelors+/no bachelors | Bachelors+ |
| Introduction to MSRs | Military/job, Other | Family/friends, personal interest | Shooting Range | Media/internet, military/job | Family/friends, personal interest |
| MSR Activities In Last Year | Use MSR for work, competition shooting | Hunting, long-range shooting | Competition shooting | Not Used MSR | Hunting |
| MSR Purchase Behavior | Very likely to buy MSR in next year, premium MSR buyer (>$1500 for MSR), High-spend accessories, heavily accessorized, recent buyer | Very likely to buy MSR in next 12 months, plans on buying accessories | Premium MSR buyer (>$1500), heavily accessorized MSR, high-spend on accessories, recent buyer | Slightly less likely to plan to buy accessories in next year | Recent buyer (obtained MSR in 2020 or 2021) |
| Place of Purchase | Mom & Pop Retail Store | Gun Show | Gun show, custom built | Chain/Big-Box Retail | Bought as kit/custom-built |

**NSSF MSR Consumer Study – Report of Findings**

# MSR Clusters Summary

**Clusters: Makeup of MSR Owners & Total MSRs Owned**



|  | % of owners | % of MSRs |
|---|---|---|
| Law Enforcement & Competition | 18% | 24% |
| Younger Casual Hunter | 17% | 13% |
| Affluent Gun Enthusiast | 23% | 27% |
| Low-Use | 21% | 11% |
| Hunting Aficionado | 21% | 25% |

# How to Read Cluster Graphs

In the cluster graphs, the overall MSR sample profile is represented by a value of 0. The index is calculated by dividing the profile of the cluster (percentage of that cluster for a category) by the profile of the total MSR population. An index of 20 means the cluster is 20% more likely to exhibit that behavior or be a part of that group. For examples, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45 —this means a MSR owner in this cluster is 37% relatively more likely to be under 45 years old compared to the overall MSR user population.

We describe this as a relative measure since it does not account for the percentage of the MSR owner population. Using our previous example, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45; this does not mean MSR owners under 45 form the majority of Cluster 1, only that they're over–represented compared to the overall MSR owner population.

NSSF MSR Consumer Study – Report of Findings

# Cluster 1: Law Enforcement & Competition

*Index (All MSR Owners = 0)*



The **Law Enforcement & Competition** Cluster accounts for 18% of MSR owners. They tend to be:

- Owners of 3+ MSRs

- Under 45 years old

- Avid users of MSR

- From a military/law enforcement background

- Those with income of $65k to $110k

- Users of MSR for work/law, competition shooting

- Those with kids at home

- Very likely to buy new MSR in next 12 months, a premium buyer of MSRS (spending more than $1500 most recently acquired MSR), high–spenders on accessories

# Cluster 2: Casual Hunter

*Index (All MSR Owners = 0)*



The **Casual Hunter** Cluster accounts for 17% of MSR owners. They tend to be:

• Owners of 1 MSR

• Under 45 years old

• Not members of a shooting range

• Casual users, using their MSR 3 times or less in the past 12 months

• Not from a military or law enforcement background

• Those with income less than $65k

• Those without a bachelors degree

• Users of MSRs for hunting and long-range shooting

• Those without kids at home

• Very likely to buy new MSR in next 12 months and plan to buy accessories.

• Owners of MSRs for hunting and self-defense

# Cluster 3: Affluent Gun Enthusiast

*Index (All MSR Owners = 0)*



The **Affluent Gun Enthusiast** Cluster accounts for 23% of MSR owners. They tend to be:

- Owners of 3+ MSR

- 45 to 54 years old

- Members of a shooting range

- Frequent users, using their MSR 12 to 23 times in the last 12 months

- Not from a military or law enforcement background

- Those with income greater than $110k

- Those with a bachelors degree

- Users of MSRs for competition shooting

- Premium MSR Buyers (>$1500 on most recent MSR, heavily accessorized and high spender on accessories

- Owners of MSRs for competition shooting

NSSF MSR Consumer Study – Report of Findings

# Cluster 4: Low-Use Self Defense

*Index (All MSR Owners = 0)*





The **Low-Use Self Defense** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 1 MSR

- 55 years old or older

- Not members of a shooting range

- Infrequent users, using their MSR 3 times or less in the last 12 months

- Slightly more likely to be from a military or law enforcement background

- Those with income less than $65k

- Those who did not use their MSR in the last 12 months

- Those with no kids at home

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for home defense

NSSF MSR Consumer Study – Report of Findings

# Cluster 5: Hunting Aficionado

*Index (All MSR Owners = 0)*



The **Hunting Aficionado** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 3+ MSRs

- 55 years old or older

- Not members of a shooting range

- Occasional MSR users, using their MSR 4 to 11 times in the last 12 months

- Slightly more likely to not be from a military or law enforcement background

- Those with income of greater than $110k

- Those with a bachelors degree

- Those used their MSR for hunting in the last 12 months

- Recent buyers of a MSR (in 2020 or 2021)

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for hunting

NSSF MSR Consumer Study – Report of Findings



Section 6: Sample Profile

# Respondent Profile: Organizations

**Current Membership or Recent Donation to Organizations**



- When asked what organizations they are a member of or recently donated to, the most-selected organization was the NRA (61%), chosen more than twice as much as any other organization.

- 21% of MSR owners are not members of or recently donated to any organizations listed.

- 12% are members or recently donated to the NSSF.

- Of the 19% who selected "Other" organizations, the most common mentions were:
  - Firearms Policy Coalition
  - Liberal Gun Club/Liberal Gun Owners
  - Second Amendment Foundation
  - National Skeet Shooting Foundation
  - National Sporting Clays Association

**NSSF MSR Consumer Study – Report of Findings**

# Respondent Profile: Military/Law-Enforcement

**Military/Law Enforcement Affiliation**

**Active or Veteran/Retired Member of Law Enforcement/Military**





| Military/law–enforcement (grouped) | % of those |
|---|---|
| Veteran military | 82% |
| Veteran law enforcement | 26% |
| Active law enforcement | 11% |
| Active military | 9% |

| | |
|---|---|
| 34% | Army (veteran) |
| 19% | Air Force (veteran) |
| 17% | Local Law Enforcement (veteran) |
| 17% | Navy (veteran) |
| 13% | Marines (veteran) |
| 11% | National Guard (veteran) |
| 9% | Reserves (veteran) |
| 7% | Local Law Enforcement (active) |
| 6% | Other Law Enforcement (veteran) |
| 6% | State Law Enforcement (veteran) |
| 5% | Federal Law Enforcement (veteran) |
| 5% | Army (active) |
| 3% | State Law Enforcement (active) |
| 3% | Federal Law Enforcement (active) |
| 3% | National Guard (active) |
| 2% | Other Law Enforcement (active) |
| 2% | Air Force (active) |
| 2% | Coast Guard (veteran) |
| 2% | Reserves (active) |
| 2% | Navy (active) |
| 2% | Marines (active) |
| 2% | Coast Guard (active) |
| 2% | Space Force (active) |
| 1% | Space Force (veteran) |

40% 35% 30% 25% 20% 15% 10% 5% 0%

NSSF MSR Consumer Study – Report of Findings

# Respondent Profile: Age, Gender

**Gender**



- 96% of respondents are Male.

- The average age of respondents is 55 years old. Only 27% are under the age of 45.

- 88% of respondents are White/Caucasian.

**Age**



Avg: **55 years**

| Age | % |
|---|---|
| 18 to 24 | 2% |
| 25 to 34 | 9% |
| 35 to 44 | 17% |
| 45 to 54 | 22% |
| 55 to 64 | 27% |
| 65+ | 24% |

**Race/Ethnicity**



| | |
|---|---|
| 88% | White / Caucasian |
| 3% | Multi-racial |
| 3% | Hispanic / Latino |
| 2% | Other |
| 2% | Asian / Pacific Islander |
| 2% | Black / African-American |
| 1% | American Indian / Alaska Native |

# Respondent Profile: Martial Status, Shooting Activities with Spouse



- **74% of respondents are married.**

- **Of these MSR owners, over half (57%) say their spouse accompanies them for target shooting. Nearly a quarter, 24%, say their spouse has no interest in target shooting or firearms.**

# Respondent Profile: Education



**Highest Level of Education Completed**

| Education Level | Percentage |
|---|---|
| Bachelors degree | 29% |
| Some college but did not graduate | 26% |
| Post-graduate degree | 16% |
| Associate degree | 14% |
| High school graduate or GED equivalent | 10% |
| Other professional degree | 4% |
| Some high school or less | 1% |

- 45% of respondents have attained at least a bachelors degree (29% have bachelors, 16% post-graduate).

- One-quarter of MSR owners have attended some college but did not graduate.

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/23/22 Page 114 of 240 PageID: 7184

# Respondent Profile: Income



**Estimated Yearly Household Income**

Avg: **$110,934**

$85k or less: 37%
More than $85k: 52%

- The average yearly household income for respondents is $110,934.

- More than half of MSR owners are in households with an annual income of greater than $85,000.

**NSSF MSR Consumer Study – Report of Findings**

# Respondent Profile: State, Household Children

**Do you have any children living with you?**



- Nearly two–thirds of respondents do not have any children living with them.

- The states with the most respondents are Texas (9%), California (5%), and Florida (5%).



NSSF MSR Consumer Study – Report of Findings

# Respondent Profile: State, Household Children





© 2022 National Shooting Sports Foundation, Inc. All Rights Reserved

# Exhibit 28

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al. | ) ) ) ) |
| *Plaintiffs*, | Civil Action No. 3:18-cv-10507-PGS-LHG |
| v. | |
| MATTHEW PLATKIN, et al. | |
| *Defendants*. | |
| MARK CHEESEMAN, et al. | |
| *Plaintiffs*, | Civil Action No. 3:22-cv-4360-PGS-LHG |
| v. | |
| MATTHEW PLATKIN, et al. | |
| *Defendants*. | |
| BLAKE ELLMAN, et al. | |
| *Plaintiffs*, | Civil Action No. 1:22-cv-4397-PGS-LHG |
| v. | |
| MATTHEW PLATKIN, et al. | |
| *Defendants*. | |

## ERRATA SHEET FOR DEPOSITION OF EMANUEL KAPELSOHN PURSUANT TO FED. R. CIV. P. 30(e)

**TO:**     Daniel M. Vannella Esq.
            Assistant Attorney General
            25 Market St., P.O. Box 112
            Trenton, NJ 08625

ANJRPC Plaintiffs and Ellman Plaintiffs hereby produce the following errata sheet for the deposition of Emanuel Kapilson pursuant to the Federal Rules of Civil Procedure 30(e):

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|------|------|
| 5 | 12 | Emmanuel | Emanuel | Misspelled |
| 17 | 21 | Emmanuel | Emanuel | Misspelled |
| 24 | 17 | manufactures | manufacturers | Mistranscribed |
| 29 | 25 | reserved | reserve | Mistranscribed |
| 31 | 25 | firearms related to | firearms-related | Incorrect |
| 33 | 2 | HR | HB | Mistranscribed |
| 36 | 5 | son | son-in-law | I misspoke |
| 36 | 8 | son | son-in-law | I misspoke |
| 36 | 9 | son | son-in-law | I misspoke |
| 37 | 6 | you're | here | Mistranscribed |
| 46 | 5 | any report | my report | Mistranscribed |
| 46 | 15 | I made it | I make it | Mistranscribed |
| 60 | 25 | bear | bare | Misspelled |
| 62 | 24 | that | that's | Error |
| 64 | 16 | a | an | Error |
| 70 | 9 | have to | have | mistranscribed |
| 71 | 20-25 | Oh, I would have to go back and look, … (and ff) | Semiautomatic rifles invented before 1900 included Hiram Maxim's recoil-operated rifle in 1883; Ferdinand Mannlicher's rifle models 85, 91, 93 and 95, and Horace Updegraff's 1885 rifle. Also the Remington Model 8 (FN Model 1900), a John M. Browning | Refreshed my recollection |

| | | | design, patented in 1900 and thus likely invented before 1900.<br><br>Semiautomatic shotguns invented before 1900 include the extremely popular Browning A-5, ("Auto 5") designed by John M. Browning in 1898, and manufactured in large quantities from about 1902 to 1998. Semiautomatic pistols invented before 1900 include, among others, the FN Browning M1900 (invented by John Moses Browning about 1896), the Mauser Model 1896 ("Broomhandle Mauser"), the Borchardt C-93, the Schwarzlose Model 1898, and I believe others. | |
|---|---|---|---|---|
| 72 | 5 | investors | inventors | Mistranscribed |
| 72 | 19 | I can't tell you that from memory, no | In addition to the rifles mentioned above, the Winchester Model 1903 (rimfire) and Model 1905 (centerfire) were widely sold to the civilian market in the United States. | Refreshed my recollection |
| 76 | 16 | What evidence are you relying on? | Among other things, the widespread and widely-documented sale of the Browning A-5 shotgun from about 1902 to 1998. | Supplied the requested information |

|  |  |  | This is evidenced, among other things, in many books in my firearms library, and on the internet.  See, as just one of dozens of sources, "Browning A5: A History", by Will Poston, Split Reed, for Browning Firearms. |  |
|---|---|---|---|---|
| 78 | 15 | moderate | modern | Mistranscribed |
| 79 | 24 | moderate | modern | Mistranscribed |
| 85 | 21 | AK-46s | AK-47s | Mistranscribed |
| 96 | 1 | Sometime in the 1970s…But I need to look to be exact. But that's the approximate range of years. | Sometime in the 1960s.  Specifically, it was offered to the civilian market by Colt Firearms Division in the fall of 1964.  I have in my library a copy of the American Rifleman magazine from, I believe, October 1964 that advertises this rifle for sale to the public, with 20-round magazines shown in the ad, and an emphasis on use of the rifle for hunting. | Corrected my approximation of the time period – supplied additional information |
| 96 | 20 | but I think that very soon after that, if that's the case, larger magazines were available | My own recollection, upon further thought, is that the early magazines sent out by Colt with the AR15's sold to the public had bent sheet metal "spacers" in their 20-round magazines, that reduced magazine capacity to 5 rounds for | Remembered correct information |

| | | | hunting in those states that limited capacity to 5 rounds for hunting.  The spacers were easily removed in the same manner as one would disassemble the magazine for routine cleaning, to restore the magazine to its 20-round capacity.  I have heard that some magazines were sent out by Colt with the sheet metal spacers riveted in place, perhaps for states whose game laws required this, but I never saw any magazines of that type at the time. | |
|---|---|---|---|---|
| 98 | 4 | feild | field | Misspelled |
| 102 | 5 | manufactures | manufacturers | Misstrascribed |
| 111 | 5 | manufactures | manufacturers | Mistranscribed |
| 113 | 11 | their | there | Misspelled |
| 113 | 24 | .9 millimeter | 9 millimeter | Mistranscribed |
| 121 | 17 | protected | prohibited | Mistranscribed |
| 126 | 19 | control | patrol | Mistranscribed |
| 139 | 19 | feet, small | violent crimes committed with rifles are a small number in comparison | Phrase omitted |
| 140 | 25 | criminal firearms every year | criminal firearms uses every year | Words omitted bad audio transmission? |
| 143 | 11 | recommends as | recommends, as | Needs punctuation for clarity |
| 145 | 8 | .44 caliber | .45 caliber | Mistranscribed |
| 147 | 6 | .9 millimeter | 9 millimeter | Mistranscribed |
| 149 | 11 | we've about | we've been | Mistranscribed |
| 154 | 24 | Gun Sight | Gunsite | misspelled |
| 159 | 25 | rifle use | rifle bayonet use | Word omitted |
| 161 | 7 | type of | typo | Wrong transcription |
| 166 | 13 | protected | prohibited | Mistranscribed – bad transcription |

| 167 | 6 | positive | larger | Mistranscribed – bad transcription |
|-----|-----|-----|-----|-----|
| 167 | 11 | firearms | firearm's | Mistranscribed – bad transcription |
| 167 | 12 | reglued | reblued | Mistranscribed – bad transcription |
| 183 | 23 | 10 | 100 | Mistranscribed – bad transcription |
| 190 | 14 | building and trees | building entries | Mistranscribed – bad transcription |
| 216 | 8 | But it's | That's it | Mistranscribed – bad transcription |
| 233 | 15 | are are | are there | Incorrect word |
| 241 | 7 | switch | switched | Correction to the transcript- minor typos |
| 242 | 24 | perpetrator | perpetrators | Correction to the transcript- minor typos |

Page 248

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4       I, ENANUEL KAPELSOHN   do hereby certify that

5       I have read the foregoing pages ___1___ to __244__ and

6       that the same is a correct transcription of the

7       answers given by me to the questions therein

8       propounded, except for the corrections or changes

9       in form or substance, if any, noted in the

10      attached Errata Sheet.

11      8-29-2023

12      DATE            SIGNATURE

13

14

15      _____

16      Subscribed and sworn to before me this

17

18      29th day of August        of 2023.

19      My commission expires:   September 21, 2023

20

21

22      _____

        Notary Public

        ┌─────────────────────────────────────────────┐
        │ Commonwealth of Pennsylvania - Notary Seal   │
        │ Edward H. Butz, Notary Public                │
        │ Lehigh County                                │
23      │ My commission expires September 21, 2023     │
        │ Commission number 1021379                    │
24      │ Member, Pennsylvania Association of Notaries │
        └─────────────────────────────────────────────┘
25

# Exhibit 29

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Thursday, August 31, 2023 11:59 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** Bradley P. Lehman <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] RE: ANJRPC v. Platkin; Ellman v. Platkin; Cheeseman v. Platkin

Dan –

Attached is the Supplemental Rebuttal Expert Report of Clayton Cramer.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:  (201) 967-8040
Fax:  (201) 967-0590
www.hartmanwinnicki.com

**From:** Daniel L. Schmutter
**Sent:** Thursday, August 31, 2023 8:44 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** Bradley P. Lehman <BLehman@gsbblaw.com>
**Subject:** ANJRPC v. Platkin; Ellman v. Platkin; Cheeseman v. Platkin

Dan –

Attached please find my letter of today's date describing today's supplemental production. The production can be found at the following link:

https://app.box.com/s/z2kbhjbelg23d8wrslciancosylex463

Please let me know if you have any difficulty accessing the documents.

Thanks.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:  (201) 967-8040
Fax:  (201) 967-0590

www.hartmanwinnicki.com

# Exhibit 30

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF CLAYTON CRAMER**

Dear Dan:

I decided to re-run Klarevas' data with my own pre-1991 high fatality mass shootings incidents. While paragraph 12 of his declaration acknowledges population growth and even then understates it by comparing population from 1990s to 2010s, not 1991 to 2022 when it rose 32%: "To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%." Klarevas' Figure 1 is a count only of deaths per year:



Picking 1991 as his starting point is cherry-picking his data. I took his data and filled in high-fatality (six or more dead) mass shooting incidents from 1902 through 1990. All of these are mass murders in which the murderer only used firearms (excluding incidents where multiple weapons types were used) and there was only a single mass murderer.

Another problem with Klarevas' data is that Klarevas' Figure 1 makes no allowance for U.S. population growth from 1991 to 2022. The 1991 population was 251,000,000;[1] in 2022, it was 332,403,650.[2] The U.S. had 32% more people in 2022 than in 1991.

Adding the earlier mass fatality mass shooting deaths per million population[3] shows a much flatter trend line. And not necessarily all that recent.

---

[1] U.S. Census, *National Intercensal Tables: 1990-2000*, 1991.
[2] U.S. Census, *U.S. Population Estimated at 332,403,650 on Jan. 1, 2022*.
[3] US Census Bureau, *1900-1989: Historical National Population Estimates, 1990-1999: Intercensal Estimates, 2000-2009: Intercensal Resident Population Estimates, 2010-2020: Monthly Population Estimates*



The rate per million population does indeed show an increase but much of it caused by population growth.  This graph only goes through 2017, an outlier year because of the Las Vegas mass shooting.  Last minute technical issues preventing fixing this last minute analysis.  Note also the high fatality mass shooting events early in the 20th century.

## High-Fatality Mass Shootings 1900-1990

**Jefferson Co., Miss. (1902)**

Before 6/19/1902: While father was at church, mother shot to death her six children with a rifle, then attempted suicide as a search party approached her the next day.  She claimed no memory of what had happened.  "Those who know her and her family believe that she committed the crime while mentally deranged."

Category: family
Suicide: no
Cause: postpartum?
Weapon: rifle[4]

**Winfield, Kan. (1903)**

8/13/1903: "[A] crazy man" with a double-barrelled shotgun opened fire on a crowd at an outdoor concert killing six, with recovery of five others "doubtful."  He wounded another 28 before committing suicide.

Category: public
Suicide: yes
Cause: mental illness

---

[4] "Killed Her Six Children," [Sumter, S.C.] *Watchman And Southron*, Jun. 25, 1902, 1.

Weapon: shotgun[5]


**Blackfeet Reservation, Mont. (1903)**

Before 10/21/1903: Murderer confessed in court to "the murder of seven Indians and the wounding another two." He blamed his actions on alcohol.
Category: residential
Suicide: no
Cause: intoxication
Weapon: rifle[6]


**Farmersville, Cal. (1907)**

5/7/1907: Carpenter living in a boarding house "in a fit of insanity" shot to death six other residents with a double-barreled shotgun. He dropped his gun when confronted by a 17-year-old girl who looked like his own daughter. Police eventually distracted him long enough in conversation to sneak up behind him and restrain him.
Category: residential
Suicide: no
Cause: mental illness
Weapon: shotgun[7]


**Brunswick, Ga. (1915)**

3/6/1915: "[A] local real estate and timber dealer, 'ran amuck'" with a "[semiautomatic] shotgun," murdering at least six, with two expected to die, and 30 others wounded. Murderer was former mayor of Brunswick, apparently because of "financial reverses." Lawyer Eustis C. Butts shot him dead while he was firing on others. While described as insane, no evidence presented of previous mental illness.
Category: public
Suicide: no
Cause: unknown
Weapon: shotgun[8]


**Willseyville, N.Y. (1918)**

08/17/1918: Someone burned down a house. Seven died. Because authorities found only one intact skull in the remains near a shotgun, that of the mother, they concluded that the mother "while temporarily insane" had blown the heads off the rest of her family before dying in the flames.
Category: family
Suicide: yes
Cause: mental illness

---

[5] "Shoots into Crowd Murdering Three," Butte [Mont.] Inter Mountain, Aug. 14, 1903, 1; "Twigg's Seventh Victim," *Macon* [Miss.] *Beacon*, 1.
[6] "Indian Murderer Confesses," [Fort Benton, Mont.] *River Press*, .Oct. 21, 1903, 1.
[7] "Maniac Amuck with Gun Murders Six," [Newport News, Va.] *Daily Press*, May 8, 1907, 1.
[8] "Georgian, Crazed, Kills 5, Injures 32," [Washington] *Evening Star*, Mar. 7, 1915, 11.

Weapon: shotgun[9]

**Gilcrest, Colo. (1919)**
12/21/1919: Former farmhand shot to death Adam Schank, his wife, and four children.
Category: family non-resident
Suicide: no
Cause: quarrel
Weapon: revolver[10]

**Mayfield, Ky. (1921)**
06/25/1921: Farmer murdered his wife, three children, his brother-in-law, his wife, their three children, and the brother-in-law's brother.  Police were at first uncertain of the weapon used to commit the murders because the farmer burned down the house around them.  Neighbors reported hearing multiple gunshots before the fire.  The farmer's behavior after a beating by a police officer years before suggested mental illness.
Category: family
Suicide: yes
Cause: mental illness
Weapon: firearm[11]

**Ormsby, Minn. (1921)**
09/05/1921: The father chloroformed his wife and their five children and shot them.  He then committed suicide.  There were no obvious rational reasons for this murder-suicide.  He had quit his job as a bank cashier six weeks before; he gave the bank no explanation for his resignation.  His accounts were in order according to the bank.  The day before the murders, he went around town paying all outstanding debts in cash.  The article: "Temporary insanity is the only explanation friends make."
Category: family
Suicide: yes
Cause: mental illness
Weapon: pistol[12]

**Drew, Miss. (1923)**
12/15/1923: During a quarrel between a tenant farmer and the landlord, the tenant shot his landlord through the heart then engaged in a drawn-out gun battle with the several hundred man posse sent out to arrest him.  He shot to death six men of the posse, wounding three others.  Because of his skill with a shotgun and pistol, the posse only ended the standoff with a machine gun.
Category: public

---

[9] "Six Believed Murdered Before House Burned," *Richmond Times-Dispatch,* Aug. 19, 1918, 1.

[10] "Colorado Family Is Butchered By Unknown Fiend," *Albuquerque Morning Journal,* Dec. 22, 1919, 1.

[11] "Working On Theory," [Mt. Vernon, Ohio] *Democratic Banner,* Jun. 28, 1921, 1; "Mysterious Fire Burns 11 To Death," *Omaha Daily Bee,* Jun. 27, 1921, 1.

[12] "Entire Family Found Murdered; Wife And Five Children Victims Of Father; Woman Finds Bodies," [Great Falls, Mont.] *Great Falls Tribune,* Sep. 06, 1921, 1.

Suicide: no
Cause: quarrel
Weapon: pistol, shotgun[13]

**Stockton, Cal. (1926)**

03/18/1926: Wife seeks divorce; husband murders her, her sister, her lawyer's wife, a man who had testified against him in a horse stealing case, the attorney's wife, and their daughter.  He drove off the road while fleeing a posse, then shot himself in the head.  While the newspaper account mentioned "possible insanity" but cited no other evidence of mental illness.
Category: family non-resident
Suicide: yes
Cause: divorce
Weapon: firearm[14]

**Youngstown, Ohio (1927)**

09/03/1927: Unemployed steel worker quarreled with wife, then shot and killed her, her son's wife, and six children of the two families.  When the police arrived, he wounded two officers.
Category: family
Suicide: no
Cause: quarrel
Weapon: pistol[15]

**El Dorado, Kan. (1928)**

04/20/1928: The 17-year-old son argued with his father about use of the family car.  After police had cleared him of suspicion, he confessed to shooting his entire family (father, mother, and five siblings) with a rifle, "then set fire to the farmhouse to destroy evidence of the deed."
Category: family
Suicide: no
Cause: quarrel
Weapon: rifle[16]

**Columbus, Ohio (1930)**

05/05/1930: The woman's second husband had just gone to penitentiary, and she took two jobs (perhaps full-time) to care for her twelve children.  She decided this was more of a burden than she could bear, so she shot seven to death with a .22 caliber rifle, then attempted suicide.
Category: family
Suicide: no
Cause: financial
Weapon: rifle[17]

---

[13] "Machine Gun Used In The Capture Of A Murderer," *New Britain Herald,* Dec. 15, 1923, 1.
[14] "Man Takes His Life After Shooting Six," *Bismarck Tribune,* Mar. 19, 1926, 1.
[15] "Seven Are Killed By Man Out Of Job," [Washington, D.C.] *Evening Star,* Sep. 04, 1927, 1.
[16] "Slew Own Family, Boy Says," *Brownsville Herald,* May 05, 1928, 1.
[17] "Mother Kills 7 Oh Her 12 Children, Then Shoots Self*," Indianapolis Times,* May 07, 1930,  1.

**Wagener, S.C. (1931)**

10/26/1931: A farmer was apparently angry about his wife's recent separation, provoked it appears by his shooting her.  After threatening his mother-in-law, he attended a gathering of his family, where he shot and killed two of his uncles, an aunt, and three cousins.  The murderer had quarreled with and shot one of the uncles ten years earlier.

Category: family
Suicide: no
Cause: divorce?  Mentally ill?
Weapon: pistol, shotgun[18]


**Mount Vernon, Ky. (1935)**

01/08/1935: News reports blamed "[a] family quarrel over land." The murderer killed his wife and four of her family, two other persons, and wounded an eighth before committing suicide.

Category: family
Suicide: yes
Cause: quarrel
Weapon: firearm[19]


**Center, Tex. (1938)**

03/17/1938: The mother was ill and "unable to provide for her family" so she kissed six of her nine children as they slept and shot them to death.  "I did not kill the oldest one… because he is big enough to work for himself."

Category: family
Suicide: no
Cause: financial
Weapon: firearm[20]


**Plum City, Wisc. (1942)**

01/15/1942: Farmer murdered wife and their five children with a rifle then shot himself.

Category: family
Suicide: yes
Cause: unknown
Weapon: rifle[21]


**Albertville, Ala. (1943)**

05/18/1943: Apparently estranged from his wife, the murderer went to her parents' house and shot to death his wife, and their five children with a pistol.  He attempted suicide.

Category: family
Suicide: yes
Cause: divorce

---

[18] "Farmer Kills Six In Sudden Frenzy," [Washington, D.C.] Evening Star, Oct. 26, 1931, 2.
[19] "Slayer Of Seven Takes Own Life," [Washington, D.C.] *Evening Star,* Jan. 09, 1935, 1.
[20] "Mother Slays Six Children," [Pauls Valle, Okla.] *Pauls Valley Democrat,* Mar. 17, 1938, 1.
[21] "Man Kills Wife, 5 Children, Self," *Chattanooga Daily Times,* Jan. 17, 1942, 10.

Weapon: pistol[22]


**Camden, N.J. (1949)**

09/05/1949: Howard Unruh murdered 13 people at random in his neighborhood.  He "never went to trial for his deadly crimes."  Later determined to be schizophrenic, he was committed.
Category: public
Suicide: no
Cause: mental illness
Weapon: pistol[23]


**Malaga, N.J. (1950)**

11/18/1950: Angered about a restraining order that prohibited him from seeing his kids, the father, "armed with four guns," shot his estranged wife, then went on to other homes where he murdered his wife's mother, father, grandmother, uncle, and aunt.  He also wounded his wife's brother and sister-in-law and a cousin.  After arrest, police held him for a psychiatric evaluation.
Category: family
Suicide: no
Cause: divorce
Weapon: pistols[24]


**Lenoir, N.C. (1951)**

05/02/1951: An impending divorce may have precipitated the mass murder.  Neighbors reported the father had "been acting peculiar lately."  He beat the eight children into unconsciousness, shot the children to death, lit the house on fire, then killed himself with a shotgun.
Category: family
Suicide: yes
Cause: divorce, mental illness
Weapon: shotgun[25]


**Parsippany, N.J. (1954)**

06/08/1954: Police believed that the father, 44, murdered his wife and their sons before committing suicide.  A daughter who did not live at home called police and requested a welfare check after a serious argument.
Category: family
Suicide: yes
Cause: quarrel
Weapon: pistol[26]

---

[22] "Alabaman Goes Berserk: Kills Wife, 5 Children," [Havre, Montana] *Havre Daily News,* May 18, 1943, 1.

[23] Flowers and Flowers, *Murders in the United States*, 28; "The Story of the First Mass Murder in U.S. History," *Smithsonian*, Oct. 14, 2015, https://www.smithsonianmag.com/history/story-first-mass-murder-us-history-180956927/, last accessed August 9, 2022.

[24] "Crazy Gunman Murders 5 In New Jersey," *Salt Lake Telegram,* Nov. 18, 1950, 3.

[25] "Man Shoots Eight Children And Self," [Rocky Mount, North Carolina] *Rocky Mount Telegram,* May. 03, 1951, 1.

[26] "Four Of Family Found Shot To Death In Home," [Moberly, Missouri] *Moberly Monitor-Index,* Jun. 08, 1954, 10.

**Austin, Tex. (1966)**

8/1/1966: Sniper opens fire from a tower at the University of Texas, killing 14, and wounding another 33, after having killed his wife and mother.

Category: public

Suicide: no

Cause: likely mental illness, caused by brain tumor; murderer requested autopsy to look for evidence

Weapon: rifle[27]


**Amityville, N.Y. (1974)**

11/13/1974: Ronald DeFeo "possessed by Satan" murdered six members of his family.

Category: family

Suicide: no

Cause: mental illness

Weapon: rifle[28]


**Hamilton, Ohio (1975)**

3/30/1975: James Ruppert murdered eleven family murders.

Category: family

Suicide: no

Cause: unknown

Weapon: firearm[29]


**Fullerton, Cal. (1976)**

07/12/1976: California State University, Fullerton custodian shot and killed seven people, wounding two.

Category: school

Suicide: no

Cause: mental illness

Weapon: rifle[30]


**Midland Co., Mich. (1982)**

02/16/1982: A man unhappy about his pending divorce murdered his wife, "her sister and parents, three nieces and a nephew."  DNA evidence many years later proved he raped and murdered a young woman some years before.

Category: family

Suicide: no

---

[27] Kirk Heilbrun, Joel Dvoskin, and Anna Heilbrun, "Toward Preventing Future Tragedies: Mass Killings on College Campuses, Public Health, and Threat/Risk Assessment," *Journal of Psychological Injury and Law* 2:94 (2009); J.M. Prutting, "Symposium On Medical Progress and the Postmortem," *Bulletin of the New York Academy of Medicine*, July, 1968, 794.

[28] Flowers and Flowers, Murders in the United States, 75.

[29] Flowers and Flowers, Murders in the United States, 76.

[30] Maria Bovsun, "Mass Murderer Who Killed 7 At Cal State Fullerton Begs to be Freed From Psychiatric Hospital," New York Daily News, Jun. 11, 2016.

Cause: divorce
Weapon: shotgun[31]

**Miami, Fla. (1982)**
8/20/1982: Man angry about repair work on a lawnmower murders eight employees and bystanders with a shotgun, rides away on a bicycle, and dies when he threatens pursuers with the shotgun, who hit him with the car.
Category: public
Suicide: no
Cause: revenge
Weapon: shotgun[32]

**Manley Hot Springs, Alaska (1984)**
5/20/1984: Recent arrival from Illinois was wanted for a murder in Fairbanks.  He murdered nine people.
Category: public
Suicide: no
Cause: unknown
Weapon: firearm[33]

**San Ysidro, Cal. (1984)**
7/18/1984: After an argument with his wife, the murderer went to a McDonald's, murdering 20 with a pistol, Uzi rifle, and a shotgun, and wounding 16 others, before dying from a police sniper's shot.  He had called a mental health clinic earlier in the day seeking help.
Category: public
Suicide: no
Cause: mental illness
Weapon: pistol, shotgun, rifle[34]

**Edmond, Okla. (1986)**
8/21/1986: Postman known as "Crazy Pat" to his neighbors went to his employer, the U.S. Postal Service, and murdered 14 co-workers and wounded six others.
Category: workplace
Suicide: yes
Cause: unknown
Weapon: pistols[35]

---

[31]"Michigan Man is Guilty of Killing 7 in Family," *New York Times,* Oct. 9, 1982; Gus Burns, "Police say infamous Farwell killer, Robert Lee Haggart, strangled and raped Midland woman in 1977," *Saginaw News,* Jul. 24, 2009.
[32] George Volsky, "Gunman in Miami Kills 8 in Rampage," *New York Times,* Aug. 21, 1982.
[33] "Memories of Springtime Murders Chill Small Alaskan Town," *New York Times,* Nov. 11, 1984.
[34] "Coast Man Kills 20 in Rampage at a Restaurant." *New York Times,* Jul. 19, 1984; "Police Defended in Macdonald's Case," *New York Times,* Aug. 3, 1984.,"
[35] "Massacre at a Post Office," *New York Times,* Aug. 24. 1986.,"

**Palm Bay, Fla. (1987)**

4/23/1987: Retired librarian described by neighbors as having "a bad temper and a sick wife… and maybe a little crazy" murdered six and wounded 14.  He used a shotgun, pistol, and rifle.  He had a history of shooting at neighborhood kids who walked across his lawn.[36]  In spite of being convicted, he was later determined to be mentally incompetent.   A bystander distracted the murderer by returning fire, "which allowed people to escape" from a grocery store where the shooting was taking place.[37]

    Category: public
    Suicide: no
    Cause: mental illness
    Weapon: shotgun, pistol, rifle[38]

**Algona, Ia. (1987)**

Before 12/31/1987: A 40-year-old murdered his parents, sister, "and her three children."
    Category: family
    Suicide: yes
    Cause: unknown
    Weapon: firearm[39]

**Sunnyvale, Cal. (1988)**

2/16/1988: Murderer upset that his stalking had been spurned shot his way into her place of employment, killing seven and wounding four.
    Category: workplace
    Suicide: no
    Cause: stalker
    Weapon: shotgun[40]

**Louisville, Ky. (1989)**

9/15/1989: Employee of Standard Gravure printing plant had a grudge against his employer, in his opinion, because of his mental illness, bipolar disorder.  (He had voluntarily sought mental health treatment in the past.)  He murdered seven people and wounded many others.  He left in his home a copy of *Time* open to an article about the Stockton mass murderer.
    Category: workplace
    Suicide: yes
    Cause: mental illness

---

[36] Barry Bearak, "6 Dead and 14 Hurt in Rampage: Florida Shooting Suspect 'Meanest Man on Block'," LOS ANGELES TIMES, Apr. 25, 1987, http://articles.latimes.com/1987-04-25/news/mn-990_1_palm-bay-police, last accessed November 24, 2018.,"

[37] John A. Torres, "Palm Bay Killer Far From Execution 20 Years Later." [Lakeland, Fla.] *Ledger,* Apr. 30, 2007, https://www.theledger.com/news/20070430/palm-bay-killer-far-from-execution-20-years-later, last accessed November 24, 2018.

[38] Barry Bearak, "6 Dead and 14 Hurt in Rampage: Florida Shooting Suspect 'Meanest Man on Block'," LOS ANGELES TIMES, Apr. 25, 1987, http://articles.latimes.com/1987-04-25/news/mn-990_1_palm-bay-police, last accessed November 24, 2018.,"

[39] Associated Press, "Son Kills 6 in Family, Then Self, Iowa Police Believe," *Los Angeles Times,* Dec. 31, 1987, http://articles.latimes.com/1987-12-31/news/mn-7942_1_shooting-spree. Last accessed November 24, 2018.

[40] Dan Morain and Mark A. Stein, "Unwanted Suitor's Fixation on Woman Led to Carnage," *Los Angeles Times,* Feb. 18, 1988.

Weapon: rifle, pistol[41]

**Jacksonville, Fla. (1990)**

6/18/1990: Murderer (a convicted felon) was perhaps upset about repossession of his car six months earlier, so after murdering two other people the previous day, he went into a General Motors Acceptance Corp. offices and murdered nine more and wounding five others.

Category: public
Suicide: yes
Cause: unknown
Weapon: rifle, pistol[42]

*[signature: Clayton C. Crow]*

August 31, 2023

---

[41] Ronald Smothers, "Disturbed Past of Killer of 7 is Unraveled," *New York Times*, Sep. 16, 1989, https://www.nytimes.com/1989/09/16/us/disturbed-past-of-killer-of-7-is-unraveled.html, last accessed November 24, 2018.
[42] Ronald Smothers, "Florida Gunman Kills 8 And Wounds 6 in Office," *New York Times*, Jun. 19, 1990; "10th Death in Office Shooting," *New York Times*, Jun. 28, 1990.

# Exhibit 31

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Wednesday, September 20, 2023 8:02 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** BLehman@gsbblaw.com <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] ANJRPC v. Platkin/Ellman v. Platkin

Dan –

Attached please find:

Errata sheet of Ashley Hlebinsky
Deposition signature page of Ashley Hlebinsky
Armax Article requested at deposition of Ashley Hlebinsky.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:   (201) 967-8040
Fax:   (201) 967-0590
www.hartmanwinnicki.com

# Exhibit 32

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ASSOCIATION OF NEW JERSEY RIFFLE & PISTOL CLUBS, INC., et al. | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 3:18-cv-10507-PGS-LHG |

ASSOCIATION OF NEW JERSEY
RIFLE & PISTOL CLUBS, INC., et
al.

          *Plaintiffs*,

    v.

MATTHEW PLATKIN, et al.

          *Defendants*.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:18-cv-10507-PGS-LHG

_____

MARK CHEESEMAN, et al.

          *Plaintiffs*,

    v.

MATTHEW PLATKIN, et al.

          *Defendants*.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:22-cv-4360-PGS-LHG

_____

BLAKE ELLMAN, et al.

          *Plaintiffs*,

    v.

MATTHEW PLATKIN, et al.

          *Defendants*.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:22-cv-4397-PGS-LHG

## ERRATA SHEET FOR DEPOSITION OF ASHLEY LYNN HLEBINSKY PURSUANT TO FED. R. CIV. P. 30(e)

**TO:**    Daniel M. Vannella Esq.
          Assistant Attorney General
          25 Market St., P.O. Box 112
          Trenton, NJ 08625

ANJRPC Plaintiffs and Ellman Plaintiffs hereby produce the following errata sheet for the deposition of Ashley Hlebinsky pursuant to the Federal Rules of Civil Procedure 30(e):

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|----|--------|
| 10 | 3 | I've | I have | Transcription Error |
| 13 | 10-22 | A: I'm not sure of the exact date. If I recall correctly, the submission was June 15th. So it would have been – I think that was the correct date for the submission, so it would have been sometime that week. Q. Okay. So not – not prior to the week of June 15, 2023, at least? A. What do you mean by "not prior to the week"? Q. So sometime in the week of June 15, 2023 is when you completed this report? A. If that was the submission date for the report, then, yerh, it was that week | June 15, 2023 | Refreshed my memory |
| 14 | 1-4 | Mr. Schmutter: And Dan, I'll just suggest if you need an exact date, just let us know and we'll get you one. Mr. Vannella: All right, thank you | Delete | Corrected above so this is not necessary |
| 15 | 11 | For the preparatory | For the preparation | Corrected word |
| 16 | 12 | Collectors | Collectors' | Punctuation error |

| 23 | 8-10 | And I don't know the exact percentage breakdown, but typically, the bulk of my work has focused on museums | In 2022, about 50% of my work involved museums, 25% involved historical consultation for auction houses, 16% expert witness testimony – all completed after the June 2022 Bruen decision, and 10% writing, guest speaking and television. | Reviewed my tax statements |
|---|---|---|---|---|
| 23 | 13 | Typically, they've been spread out, few and far between, throughout my career. | Prior to the Bruen decision, I had only worked on two 2nd Amendment related cases, the rest dealt with historical firearms and ammunition, but not challenges to the 2nd Amendment | More complete information |
| 24 | 20 | On my own time | Volunteer-based | Clarity |
| 25 | 11 | In my fashion | career | Wrong word |
| 25 | 13 | That gun community | The gun collector community | Clarity |
| 27 | 4 | A so gray area | Such a gray area | Transcription error |
| 27 | 13 | is | has | Transcription error |
| 27 | 17-18 | You typically see Ph.Ds, in my world | You typically only see Ph.Ds, in my field | Clarity |
| 29 | 17-18 | I probably have a copy of it in a journal in my house somewhere | I do | Request; Article Attached |
| 30 | 19 | Part of a kind of | Part of a | Clarity |
| 32 | 1 | definitional | definition | Transcription error |
| 32 | 14 | of | from | Transcription error |
| 33 | 20 | All goes all | Goes all | Transcription error |
| 34 | 12 | Things | Thing | Transcription error |
| 35 | 4 | 23 | 20,000 | Transcription error; clarity |
| 43 | 15 | contents | content | Transcription error |
| 47 | 15 | in | and | Transcription error |
| 51 | 11-18 | I'm trying to think of a specific | One example of a sensitive topic in | Refreshed my memory |

| | | example…what the example was | which we worked with experts as well as parties affected by that history was of our Native American histories. We discussed and drafted content that was respectful of those communities who have suffered at point in history. | |
|---|---|---|---|---|
| 55 | 10 | Veterans Affairs | Cheyenne Veterans Affairs | Clarifying |
| 55 | 19 | Classes, with firearms | Education classes with firearms | Punctuation error |
| 57 | 9 | Holder is in that | Holder in that | Transcription error |
| 58 | 10 | FFL storage | Firearm storage | Clarifying |
| 58 | 17-19 | Alexander – I'm spacing on his last name. I'm not a paid employee, so – I can remember his last name but Alexander is also | Alexander Adams. He is also | Clarity |
| 66 | 20-21 | Out here | To Phoenix | clarity |
| 76 | 24 | Speaking about | Speaking about that | clarity |
| 78 | 16 | Work with at | Work at | Transcription error |
| 79 | 3 | I first studying guns | I first started studying guns | Clarity |
| 82 | 6 | More ESPN | ESPN | Transcription error |
| 91 | 14 | also | always | Transcription error |
| 93 | 9 | firearms | firearm | Transcription error |
| 93 | 22 | quotes | Air quotes | clarity |
| 94 | 20 | are | is | clarity |
| 99 | 8 | Have either | follow | clarity |
| 100 | 6 | Absent of | Separate from | clarity |
| 112 | 16 | piece | magazine | clarity |
| 112-113 | 21-3 | And so it …you're doing it | The Belton firearms had different variations, but the initial design was a superimposed repeater with one lockplate that would slide as you fired it. You had to move the lockplate for | Refreshed memory and clarity |

| | | | each shot. However, the improved Beltons had a rapid-fire mode of function utilizing portfire, in which the user ignores the trigger and pulls the lockplate back as fast as they can to fire the gun similar to that of a semi-automatic or double action. There are other variations, such as the Chambers musket that only needed one trigger pull to fire all stacked rounds in succession. | |
|-----|-------|--------------------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------|--------------------------------|
| 114 | 23 | Consistent production scheduling | Standardized production capabilities | Clarity |
| 115 | 5-10 | But the Lorenzoni…firing process | The Lorenzoni has a magazine that houses the projectiles and another that houses the powder. A lever is worked to seat each powder and projectile into the chamber of the gun. | Clarity |
| 118 | 1-6 | It follows…recall on that | It follows the Lorenzoni style of design, so yes. | Refreshed my memory |
| 115 | 17-19 | I don't think so…but I could be wrong | The lever was used to chamber the ammunition each time. | Correction |
| 119 | 16 | And putting it in there yourself | And manually chambering it | clarity |
| 119 | 18 | Moving it | Moving the cartridge | clarity |
| 121 | 9 | was | had | clarity |
| 122 | 15 | has | had | typo |
| 125 | 4-8 | Firearms-wise…had access to | Firearm-wise that the military would have developed that the civilian market would have had access to | Correction. Civilians do own tanks |

| 126 | 15 | stopped | Stopped making the plug bayonet | Clarity |
| 129 | 23 | Breach loaders | Breech-loaders | Transcription error |
| 136 | 10 | Breach-loading | Breech-loading | Transcription error |
| 139 | 20 | Breach-loading | Breech-loading | Transcription error |

September 20, 2023

Page 149

1  Blake Ellman, Et Al. v. Matthew Platkin, Et Al.

2  Ashley Hlebinsky (#6040712)

3                    ACKNOWLEDGEMENT OF DEPONENT

4      I, Ashley Hlebinsky, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11                                          09|20|2023

12  Ashley Hlebinsky                    Date

13  *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20___.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

# Exhibit 33

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Wednesday, September 20, 2023 8:02 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** BLehman@gsbblaw.com <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] ANJRPC v. Platkin/Ellman v. Platkin

Dan –

Attached please find:

Errata sheet of Ashley Hlebinsky
Deposition signature page of Ashley Hlebinsky
Armax Article requested at deposition of Ashley Hlebinsky.

Dan

_____

Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:  (201) 967-8040
Fax:  (201) 967-0590
www.hartmanwinnicki.com

# Exhibit 34

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

ASSOCIATION OF NEW JERSEY
RIFLE & PISTOL CLUBS, INC., et
al.

    *Plaintiffs*,

   v.

MATTHEW PLATKIN, et al.


    *Defendants*.

_____

MARK CHEESEMAN, et al.

    *Plaintiffs*,

   v.

MATTHEW PLATKIN, et al.


    *Defendants*.

_____

BLAKE ELLMAN, et al.

    *Plaintiffs*,

   v.

MATTHEW PLATKIN, et al.


    *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:18-cv-10507-PGS-LHG

Civil Action No. 3:22-cv-4360-PGS-LHG

Civil Action No. 1:22-cv-4397-PGS-LHG

# ERRATA SHEET FOR DEPOSITION OF CLAYTON CRAMER PURSUANT TO FED. R. CIV. P. 30(e)

**TO:**     Daniel M. Vannella Esq.
             Assistant Attorney General
             25 Market St., P.O. Box 112
             Trenton, NJ 08625

ANJRPC Plaintiffs and Ellman Plaintiffs hereby produce the following errata sheet for the deposition of Clayton Cramer pursuant to the Federal Rules of Civil Procedure 30(e):

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|------|--------|
| 23 | 2 | Uniform Handgun – let's Handgun Act | Unsafe Handgun Act | Mistranscribed |
| 25 | 16 | The children shall | Roth argued the children should | Mistranscribed |
| 28 | 17 | The issue | The question | I misspoke |
| 31 | 12 | But | | I misspoke |
| 33 | 8 | , it | | Incorrect |
| 33 | 17 | I did not do | I did | Mistranscribed |
| 45 | 4 | In deed | Indeed | Mistranscribed |
| 50 | 12 | Breach | increased | Mistranscribed |
| 52 | 4 | Projections | Protections | Mistranscribed |
| 57 | 24 | Courts | courts | Mistranscribed |
| 58 | 8 | 479.1 | In 1791 | Mistranscribed |
| 58 | 20 | Say | Say that | Mistranscribed |
| 58 | 25 | Disqualifies | Disqualifiers of | Mistranscribed |
| 60 | 5 | Others, when | Others.  When | Mistranscribed |
| 61 | 5 | Commonly | Commonly owned | error |
| 62 | 7 | A | | mistranscribed |
| 63 | 4 | There's | | I misspoke |
| 63 | 10 | Seek | Sneak | Mistranscribed |
| 64 | 21 | Work | Worked | Mistranscribed |
| 69 | 24 | From | For | Mistranscribed |
| 84 | 25 | Staring | starting | Mistranscribed |
| 85 | 25 | Text | | Mistranscribed |
| 88 | 11 | Shooters | Shooter | Mistranscribed |
| 88 | 22 | Spotty record | Spotty record of outpatient treatment | I misspoke |
| 88 | 25 | They wanted | They went on | Mistranscribed |
| 90 | 2 | Stayed in the United | Stayed in that state | Mistranscribed |

| 90 | 14 | Nipples | Nickels | Mistranscribed |
|---|---|---|---|---|
| 96 | 19 | I've everything | Everything | Mistranscribed |
| 103 | 1 | Is what | As to what | Mistranscribed |
| 105 | 7 | Pretty fundamental | Pretty fundamental errors | I misspoke |
| 108 | 14 | Statures | Statutes | Mistranscribed |
| 109 | 22 | Compile | Compiler | Mistranscribed |
| 113 | 4 | Supreme Court | State Constitution | I misspoke |
| 113 | 5 | It's | Its | Mistranscribed |
| 117 | 24 | Automatic | semiautomatic | Mistranscribed |
| 121 | 9 | Opposed | Created | I misspoke |
| 124 | 1 | Expressive | Persuasive | Mistranscribed |
| 127 | 21 | Instills | Commits | I misspoke |
| 127 | 16 | Step | Set | Mistranscribed |
| 134 | 11 | But she's | But she has not | I missoke |
| 137 | 25 | Credibly detailed valuation | Incredibly detailed evaluation | Mistranscribed |
| 138 | 25 | Range data | Data | Mistranscribed |
| 144 | 14 | Algorithm | n-gram | Mistranscribed |
| 145 | 20 | Somebody | some number | Mistranscribed |
| 149 | 24 | Malice and forethought | Malice aforethought | Mistranscribed |
| 159 | 24 | | I have since acquired his data and recharted his graphs with early mass fatality incidents before 1991 in a more complete answer dated August 31, 2023. | More complete answer |
| 164 | 20 | Right | They did not involve assault weapons or LCMs | I misspoke |
| 174 | 19 | Not fragmentary strong | Fragmentary and not strong | Mistranscribed |
| 183 | 6 | Him | It | Mistranscribed |
| 185 | 4 | That | | Mistranscribed |
| 190 | 11 | Stopped | Started | I misspoke |
| 242 | 24 | perpetrator | perpetrators | Correction to the transcript- minor typos |

# Exhibit 35

Page 201

1    Daniel L. Schmutter, Esq.

2    dschmutter@hartmanwinnicki.com

3                       August 22, 2023.

4    RE: Blake Ellman, Et Al. v. Matthew Platkin, Et Al.

5       8/21/2023, Clayton E. Cramer (#6058311)

6       The above-referenced transcript is available for

7    review.

8       Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                Yours,

23                Veritext Legal Solutions

24

25

Page 202

1    Blake Ellman, Et Al. v. Matthew Platkin, Et Al.

2    Clayton E. Cramer (#6058311)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____         _____

24   Clayton E. Cramer                 Date

25

Page 203

```
 1   Blake Ellman, Et Al. v. Matthew Platkin, Et Al.
 2   Clayton E. Cramer (#6058311)
 3              ACKNOWLEDGEMENT OF DEPONENT
 4       I, Clayton E. Cramer, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____        9/22/23
12   Clayton E. Cramer                  Date
13   *If notary is required
14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18                   _____
19                   NOTARY PUBLIC
20
21
22
23
24
25
```

# Exhibit 36

force & Vrue en toutz pointz; et outre ceo est auxint assentuz q̃ si aucun alien eit purchacez ou desore purchace aucun benefice de Seinte Esglise Dignite ou autre & en ppre psone Pigne possession dicelle ou loccupie de fait, deinz mesme le Roialme, soit il a son oeps ppre, ou al oeps dautri sanz especiale congie du Roi, soit il compris en mesme lestatut, & outre ceo encourge en toutz pointz tielx peines & forfaiture come sont ordeignez p un autre estatut fait en lan xxv° del regne luy noble Roi E. uiel n̄re f le Roi qore est, contre ceux qi purchacent prisions dabbeies ou Priories; et enoutre au fyn q̃ tielx licences ne se facent desore enavant, le Roi voet & comande a toutz ses lieges & autres qils lour abstiegnent de cy enavant de luy prier dascuna tiels licences doner; et si voet auxi le Roi luy mesmes abstiegner de doner ascune tiele licence, durantes les guerres horspris au Cardinal de Naples ou a autre especiale psone a qi le Roi soit p especiale cause tenuz.

xiij. Item est ordeignez & assentuz & le Roi defende q̃ desoremes nuŀ hõme chivache deinz le Roialme armez, encontre la forme de lestatut de Norhamptoñ sur ce fait, ne ovesq̃ lancegay deinz mesme le Roialme, les queux lancegayes soient de tout oustez deinz le dit Roialme come chose defendue p n̄re f le Roi, sur peine de forfaiture dicelx lancegaies armures & auŀs herneys quelconqes et mayns & possession de celluy qi les portŝa desore deinz mesme le Roialme contre cesta estatut & ordinances sanz especiale congie de Roi n̄re f.

xiiij. Item es briefs de p̃munire faĉ est assentuz & accordez q̃ ceux q̃a queux tielx briefs sont portez, & qi sont de p̃sent lors de Roialme & sont de bone fame & aient faitz lo' ge̅ñalx atto'nes devant lo' depŝir, q̃ le Chaunceller [Denglet̃re'] pur le tempz esteant, p ladvis des Justices purra g̃nt̃er q̃ mesmes les psones purront apparoir & respondre & faire & resceivre ce q̃ la ley demande, p lo' ge̅ñalx atto'nes avantdiz siavant come es autres cas & quereles; et ceux psones qi decy enavant passeront p̃sions n̄re f le Roi & soient auxint de bone fame, q̃ a lo' requeste le dit Chaunceller p ladvis des Justices lour purra g̃nt̃er desaire lo' ge̅ñalx atto'nes en la Chauncellerie p patent du Roi devant lo' passer, [a respondre'] sibn es ditz briefs de p̃munire faĉ, come en auŝa quereles en quel cas toutes voies soit exp̃sse mencion [faite'] des briefs & quereles de p̃munire faĉ; et celle patente ensi faite, purront des lors les ditz atto'nes en absence de lo' Meistres, respondre p eux & auŝs atto'nes desouz eux, devant quelconq̃, juge du Roialme & faire & resceivre el dit cas, siavant come en nuŀ autre cas nientcontresteant ascun estatut fait a contŝie avant ces heures.

Item sur la grevouse pleinte qest faite des meyntenʒ des quereles & chaumpto's; est ordeignez & assentuz q̃ lestatutz est faitz en les ans du regne le Roi Edward uiel n̄re dit f le Roi primer & quart, et auxint en lan de n̄re f le Roi qore est primer, soient tenuz & gardez & duement executz en toutz pointz.

Item est assentuz & le Roi defende estroitement q̃ decy enavant nulle psone aliene ou denazein de quelconq, estat ou condicion qil soit amesne ou envoie ou face amesner ou envoier p l̃re ou p meer hors du Roialme Denglet̃re as aucunes pties Descoce en prive ne en appt aucune maille darmure de blee de bree ne dautre vitaille ou dautre refreuhchement quelconq, sur peine de forfaiture de mesmes les vitailles armures & des autres choses avantdites ensemble avec les niefs vesseulx charettes & chivalx qi les portent ou amesnent, ou de la Vroie value dicelles, si ensi ne soit q̃ le

⁽ᵃ⁾ Interlined on the Roll.

Force and Effect in all Points; and moreover *it is* assented, That if any Alien have purchased, or from henceforth shall purchase any Benefice of Holy Church, Dignity, or other Thing, and in his proper Person take Possession of the same, or occupy it himself within the Realm, whether it be to his own proper Use, or to the Use of another, without especial Licence of the King, he shall be comprised within the same Statute; and moreover shall incur all Pains and Forfeitures in all Points as is before ordained by another Statute made the Five and twentieth Year of the noble King Edward the Third, Grandfather to our Lord the King that now is, against them that purchase Provisions of Abbeys or Priories; and to the Intent that such Licences shall not be from henceforth made, the King willeth and commandeth to all his Subjects and other, that they shall abstain them from henceforth to pray him for any such Licence to be given; and also the King himself will refrain to give any such Licence during the Wars, except to the Cardinal of Naples, or to some other special Person to whom the King is beholden for a special Cause.

(margin) who shall also be liable to the Penalties of 25 Ed.III. st. 5. c. 22.

(margin) The King's Licence to the contrary shall not be asked for.

ITEM, It is ordained and assented, and also the King doth prohibit, That from henceforth no Man shall ride in Harness within the Realm, contrary to the Form of the Statute of Northampton thereupon made, neither with Launcegay within the Realm, the which Launcegayes be clearly put out within the said Realm, as a Thing prohibited by our Lord the King, upon Pain of Forfeiture of the said Launcegays, Armours, and other Harness, in whose Hands or Possession they be found that bear them within the Realm, contrary to the Statutes and Ordinances aforesaid, without the King's special Licence.

(margin) XIII. No Man shall ride armed, contrary to the Statute 2 Edw. III. chapter 3.

ITEM, In Writs of Præmunire facias, It is assented and agreed, That they against whom such Writs be sued, and who at this Time be out of the Realm, and be of good Fame, and have made their general Attornies before their departing, that the Chancellor of England for the Time being, by the Advice of the Justices, may grant, that the same Persons may appear to answer, to do, and to receive that Thing which the Law demandeth, by their general Attornies aforesaid, as well as in other Causes and Quarrels; and those Persons which from henceforth shall pass by the King's Licence, and be of good Fame, that at their Request the Chancellor, by the Advice of the Justices, may grant to them to make their general Attornies in the Chancery by the King's Patent, before their Passage, to answer as well in the said Writs of Præmunire facias, as in other Writs and Plaints; in which Case express Mention shall be made at all Times of the Writs and Plaints of Præmunire facias; and this Patent so made, the said Attornies from henceforth, in Absence of their Masters, may answer [for them, and make'] other Attornies under them, before any Judge of the Realm, [to'] do and receive in the said Case as much as in any other Case or Matter, notwithstanding any Statute made to the contrary heretofore.

(margin) XIV. For enabling Parties out of the Realm to appoint Attornies in Writs of Premunire.

ITEM, For the grievous Complaint that is made of Maintainers of Quarrels, and Champertors; It is ordained and assented, That the Statutes thereof made in the First and Fourth Years of King Edward, Grandfather to our Lord the King that now is, and also in the First Year of our Lord the King that now is, shall be holden and kept, and duly executed in all Points.

(margin) XV. Statutes 1 Edw. III. stat. 2. c. 14; 4 E III c 11; 1 Ric.II. c 4; against Maintenance, &c. confirmed.

ITEM, It is assented, and the King straitly defendeth, That from henceforth no Person, Alien nor Denizen, of whatsoever Estate or Condition that he be, shall carry nor send, nor do to be carried nor sent, by Land nor by Sea, out of the Realm of England, to any Parts of Scotland, privily nor apertly, any Manner of Armour, Corn, Malt, or other Victuals, or any other refreshing, upon Pain of Forfeiture of the same Victuals, Armours, and other Things aforesaid, together with the Ships, Vessels, Carts, and Horses which shall bring or carry the same, or of the very Value of the same, except so it be

(margin) XVI. No Armour or Victual shall be sent into Scotland without Licence of the King; on Pain of Forfeiture thereof.

⁽ᵃ⁾ by themselves and     ⁽ᵇ⁾ and

# Exhibit 37

# 20 Ric. 2, 93, ch. 1 (1396)

|

First, whereas in a Statute made the Seventh Year of the Reign of the King that now is, it is ordained and assented, That no Man shall ride armed within the Realm, against the form of the Statute of Northampton thereupon made, nor with Launcegays within the same Realm, and that the said Launcegays shall by utterly put out within the said Realm, as a Thing prohibited by the King, upon Pain of Forfeiture of the same Launcegays, Armours, or any other Harness, in the Hands and Possession of them that bear them, form henceforth within the same Realm against the same Statutes and Ordinances without the King's special License. Our Lord the King, considering the great clamour made to him in this present Parliament, because that the said Statute is not holden, hath ordained and established in the said Parliament, That the said Statutes shall be fully holden and kept, and duly executed; and that the said Launcegayes shall be clear put out upon the Pain contained in the said Statute of Northampton, and also to make Fine and Ransom to the King. And moreover, that no Lord, Knight nor other, little nor great, shall go nor ride by Night nor by Day armed, nor bear [Sallet] nor Skull of Iron, nor [of] other Armour, upon the pain aforesaid; save and except the King's Officers and Ministers in doing their Office. And Moreover, the King will and hath ordained, that the statute made the First Year of his Reign, of Liveries of Hats, shall be holden and kept upon the pain contined in the same Statute, and upon Pain to be imprisoned, and make Fine and Ransom of the King.

# Exhibit 38

832                    33° HEN. VIII. c. 5, 6.                    A.D.1541-2.

VI.
Proviso as to
Persons whose
Wives wear
Velvets, &c.
[Sw § I.]

AND be it pryded and enacted by auctie aforesaid, that if the Wif of any pson or psons were any velvet in the lynyng or other part of her gowne other then in the cuffes or purfels of suche gownes, or elle were any velvet in her kyrtell or were any peticote of silke, that then the husbande of eủy suche Wiff shall fynde one stoned horse of the stature above in this acte resyted, or shall incurre the abovemsaide penaltie and forfaiture of tenne poundes to be levyed and receủed as is afore declared : Provyded also that this Acte or any thing therin conteyned shall not extende to charge any pson or psons whose Wif or Wiffes shall were any of the apparell or thinge above rehersed during the tyme such Wif or Wyffes shalbe devorsyd from her or ther husbonde or husbondes, or shall willingly absent her self from her said husbound and duringe suche absence shall were any of the apparell or other thynge afore resyted : Provyded alwaies that heires w'in age being wardes whose landes tenuế and hereditamente amount to the yerely value of CC li. shall not be compelled by auctie of this acte till they cũme to ther full age to kepe any horses, althoughe the wiffes of suche heires w'in age were any gowne of Sylke or any Frenche hood or Bonet of Velvet w' any habilyment past or egge of Gold Perle or Stone or any chayne of gold about ther nekke or in ther plette or in any apparell of ther bodie; Any thing in this Acte to the contrary notw'stonding.

VII.
Proviso for
replacing Horses
killed in War, &c.

PROVYDED also that if all or any the horses kept by vertue of this acte shall happen to be kyllyd maymyd or lost in the êvice of the Kinge warres, That then in eủy suche case the owners of suche horse or horses so kyllyd mayned pisshed or lost in the warres shall have libtie, by the space of twoo yeres next after suche chaunce of kylling maymyng pisshing or losing ther horses, to pvide other horses in the stede and place of the horses so kylled maymed pisshed or lost in the Warres, w'out any daunger losse or penaltie of this acte; Any thing in this acte to the contrary therof notw'stonding.

VIII.
Cart-Horses and
Sumpter-Horses.

PROVYDED also that cart horses or sumpter horses shall not be takyn reputed or reckned for any suche horses whiche any pson is or shalbe bounden to kepe by vertu of this acte.

## CHAPTER VI.

### AN ACTE concerning Crosbowes and Handguns.

Recital of Stat.
25 H.VIII. c. 17.
against shooting
with Cross-bows
and Hand-guns :

Violation thereof ;

WHERE in the Parliament holden at Westm the fyftenthe daye of Januarie in the twenty fyve Yere of the Kinges most gracious Raigne, and there contynued and kepte untill the thirtieth daye of Marche then next ensuynge, amonge diủse and sondrie holsome and lawdable Acte Statute and ordyn'ncế one Statute and Ordyn'nce was made and ordeyned for the avoydinge and eschewinge of shotinge in Crosbowes and Handguns; synce the makinge of whiche Acte diủse malicious and evill disposed psons not only pủumynge wilfullye and obstynatlye the violaũon and breach of the saide Acte, but also of their malicious and evill disposed myndes and purposes have wilfully and shamefully cõmytted pptrated and done diủse detestable and shamefull murthers roberies felonyes ryotế and routế with Crosbowes little shorte handguns and little hagbuttế, to the great pill and contynuall feare and daunger of the Kingế most lovinge subjectế, and also diủse Kepers of Forestế Chases and Parkế aswell of our saide Soveraigne Lorde as other his Nobles and Cõmons and diủse Gentlemen Yomen and Servingmen nowe of late have layde aparte the good and laudable êxcise of the longe bowe, whiche alwaye heretofore hathe bene the suertie savegarde and contynuall defence of this Realme of Englande, and an inestimable dread and terror to the Enemyes of the same, and nowe of late the saide evill disposed psons have used and yet don daylie use to ryde and goe in the Kingế highe Wayes and elswhere, havinge with them Crosbowes and little handguns, ready furnished with Quarrellế Gunpowder fyer & touche to the great pill and feare of the Kingế most lovinge Subjectế : FOR REFORMAũON wherof be it enacted ordeyned and established by the Kinge our Soveraigne Lorde the Lordes sủuall and temporall and the Cõmons in this pủsent Parliament assembled and by thauctoritie of the same, in maner and fourme followinge That ye to saye ; that noe pson or psons of what estate or degree he or they be, excepte he or they in their owne right or in the right of his or their Wyeffế to his or their owne use or any other to the use of any suche pson or psons, have landes tenế fees annuyties or Officế to the yerely value of one hundred poundế, from or after the laste daye of June next cõmynge, shall shote in any Crosbowe handgun hagbutt or demy hake, or use or kepe in his or their houses or elswhere any Crosbowe handgun hagbut or demy hake, otherwise or in any other manner then ys hereafter in this pủsent Acte declared, uppon payne to forfeyt for everie tyme that he or they so offendinge cont'rie to this Acte tenne poundes.

Penalty on Persons,
having less than
£100. per Annum,
keeping or using
Cross-bows, &c.
£10.

II.
Length of
Hand-guns, &c.
to be kept.

AND furthermore be it enacted by thauctoritie aforesaide that no pson or psons, of what estate or degree socver he or they be, from or after the saide laste daye of June shall shote in carye kepe use or have in his house or els where any handgunn other then suche as shalbe in the stock and gonne of the lenghe of one hole Yarde, or any hagbutt or demyhake other then suche as shalbe in the stock and gune of the lenghe of thre quarters of one Yarde, uppon payne to forfeyt for everie tyme that he or they shall carie use or have anye suche Gun being not of the lenghe of one whole Yarde or hagbutt or demyhake beinge not of the lenghe of thre quarters of a Yarde, Tenne poundế sterlinge.

Those of less
Length may be
seized and
destroyed by
Persons having
£100. a Year.

And that it shalbe laufull to everie pson and psons, w'h have landes tenế fees annuyties or officế to the yerelye value of one hundred poundế as ys aforesaide, to seise and take everie suche Crosbowe, and also everie handgun beinge in stock and gune shorter in lenghe then one whole Yarde and everie hagbutt and demyhake beinge shorter in lenghe then thre quarters of a Yarde, or any of them; from the Kepinge or possession of everie suche Offendor cont'rie to the forme of this Acte, and the same Crosbowe or Crosbowes to kepe and reteyne to his or their owne

me, and also the same handguns hagbutt̃ and demyhak̃ so seised and taken within twenty dayes next after the same seisure or takinge to breake and distroye, upon peyne of fourtye Shilling̃ for everie Gune so seised and not broken and destroyed, and the same so broken and destroyed to kepe & reteyne to his or their owne use.

And be it further enacted by thauctoritie aforesaide, that noe p̃son or p̃sons, other then suche as have land̃ teñt̃ rent̃ fees annuyties or Offic̃ to the yerely value of one hundred Pound̃ as ys aforesaide, from or after the saide laste daye of June, shall carrie or have, in his or their Jorney goinge or ridinge in the King̃ highe waye or elswhere, any Crosbowe bent or Gune charged or furnished withe Powder fier or touche for the same, Except it be in tyme and Service of Warre, upon payne to forfeyt for everie suche Offence tenne pound̃; this P̃sent Acte or any thinge therin conteyned to the contr̃ie notwithstandinge.

III.
Penalty upon unqualified Persons riding, &c. with Guns charged, &c.

And be it further enacted by thauctoritie aforesaide, that no p̃son or p̃sons from the saide laste daye of June shall in anywise shote in or withe anye handgune demyhake or hagbutt at any thinge at lardge, within any Cittie Boroughe or Markett Towne or within one quarter of a myle of anny Cittie Boroughe or Markett Towne, excepte it be at a Butt or Banck of earth in place convenient, or for the defence of his p̃son or house, upon payne to forfeyte for everie suche Shott tenne poundes; this P̃sent Acte or anny thinge therin conteyned to the contrarie notwithstandinge.

IV.
None shall shoot at large in Cities, &c.

And be it further enacted by thauctoritie aforesaide, that noe p̃son or p̃sons of what estate or degre soever he or they be, shall from or after the saide laste daye of June cõmaunde any of his or their servaunt̃ to shote in any Crosbowe handgune hagbutt or demyhake of his or their saide Masters or of any other p̃sons, at any deare fowle or other thinge excepte it be only at a butt or bank of Earth or in the tyme of Warre as ys abovesaide, upon payne to forfeyt for everie suche offence tenne pound̃ : The one moytie of all w̃th forfeytures and penalties in this P̃sent Acte above specified shalbe to the Kinge our Soveraigne Lorde his heires and Successors, and thother moytie thereof to the partie that will sue for the same by bill playnt acc̃õn of Debte or Informac̃õn in anny of the King̃ Court̃ of Recorde in whiche auyte noe Essoyne p̃tec̃õn nor Wager of lawe shalbe allowed.

V.
None shall order their Servants to shoot at Deer, &c. with Hand-guns.

Application of Penalties.

Provided alwaye and be it enacted by thauctoritie aforesaide, that it shalbe laufull from henceforthe to all Gentlemen Yeomen and Servingemen of everie Lorde or Lord̃ s̃uall or temporall and of all Knight̃ Esquiers and Gentlemen, and to all the Inhabitaunt̃ of Citties Boroughes and Markett Townes of this Realme of Englande, to shote withe any handgune Demyhake or hagbutt at anye butt or bank of Earth onlye in place convenient for the same, so that everie suche handgune Demyhake or hagbutt be of the seṽall lenghes aforesaide and not under ; and that it shalbe laufull to everie of the saide Lorde and Lord̃ Knight̃ Esquiers and Gentlemen, and the Inhabitaunt̃ of everie Cittie Boroughe and Markett Towne, to have and kepe in everie of their houses any suche handgune or handgunes of the lenghe of one whole Yarde, or any hagbutt or Demyhake of the lenghe of thre quarters of a Yarde as ys aforesaide and not under, to thintent to use and shote in the same at a butt or banke of Earthe onlye, as ys abovesaid, wherbye they and everie of them by thẽcise thereof in forme abovessaid may the better syde and assist to the defence of this Realme when nede shall requyre; this P̃sent Acte or any thinge therein conteyned to the contr̃ie notwithstandinge.

VI.
Shooting at Butts with Hand-guns allowed.

And be it further enacted by thauctoritie aforesaide, that it shalbe laufull to everie p̃son and p̃sons whiche dwelleth and inhabiteth in anye house standinge and being sett distant twoo furlong̃ from any Cittie Boroughe or Towne, to kepe and have in his saide house for the onelye defence of the same handgunes hagbutt̃ and demyhakes beinge of the severall lenghes aforesaide and not under, & to use and exc̃ise to shote in the same at any butt or bancke of earthe nere to his house and not otherwise; Any thinge conteyned in this Acte to the contr̃ie notwithstandinge.

VII.
Hand-guns allowed out of Cities for Defence of Houses, &c.

And furthermore the King̃ most lovinge Subject̃ the Lordes s̃uall and temporall and the Cõmons in this P̃sent Parliament assembled, most humblye doe beseche the King̃ Majestie that it be further enacted by thauctoritie aforesaide, that all tres patent̃ Fraternyties, and also all other placard̃ lycences and bill̃ assigned heretofore had made or signed by his Highnes or by any other authorised by his Highnes tres patent̃ under his Great Seale to give licence and placarde to shote in Crosbowes & handgunes or any of them, shalbe from and after the saide laste daye of June frustrate voyde and of none effecte.

VIII.
Patents, &c. to shoot in Crossbows, &c. declared void.
[*But see* § XIV.]

And also that it may be further enacted by thauctoritie aforesaide that the saide Statute made in the saide xxṽa Yere of the King̃ most gracious Raigne, and all other Statut̃ heretofore made and p̃vided for thavoydinge and restreynt in shotinge of Crosbowes and handguns or for any of them, or for the usinge and kepinge of the same, be from henceforth utterlie voyde and of none effecte : Provided alwayes that everie p̃cesse suyte or Informac̃õn conceaved cõmenced and nowe dependinge for any Offence done contr̃ie to the forme of the saide Statute made in the said xxṽth Yere of the King̃ moste noble Raigne, or of any other Statute made (*) p̃vyded for and concerninge the shotinge in Crosbowes and handguns, not repealed, and for the kepinge of the same, shalbe as good and effectuall to the parties that have comenced the (*) and shall stande and be in suche forme effecte and condic̃õn as if this Acte had never bene made.

IX.
25 H.VIII. c. 17, &c. repealed ;

Except as to Suits depending.

Provided also that this Acte or any thinge therin conteyned be not in any wise hurtfull or p̃judiciall to any p̃son or p̃sons nowe beinge or that hereafter shalbe appoynted by the King̃ Highnes, to kepe receyve or take any Crosbowes or Handguns that shalbe forfeyted or taken within the precinc̃te or libtye of the King̃ forrest̃ park̃ or chaces, but that he or they may laufully kepe and reteyne the same Crosbowes or Handguns from tyme to tyme untill suche tyme

X.
Proviso for Persons keeping Crossbows, &c. seized in Forests :

---

<sup>1</sup> or *O.*       * same *O,*

**for Makers of Crosbows, &c.**

as the further pleasure of the Kingꝰ Highnes in that behalfe be to eꝰy suche pson shewed & declared: Provided also that this Acte extende not to the makers of Crosbowes or Handguns, but that they may laufully kepe Crosbowes and Handguns Hagbuttꝰ and Demyhakes in their houses, and shott in the same onlye for provinge & assayinge of them at a butt or bank of earthe in the place convenient and not otherwise, so that the saide Handguns Hagbuttꝰ & Demyhakꝰ

**and Merchants dealing therein.**

be of the seꝰall lenghes in Stock and Gune as ys above lymitted: Provided also that this Acte nor any thinge therin conteyned extende not or be ꝓjudiciall to any Marchauntꝰ whiche have or shall have any Crosbowes Handguns Hagbuttꝰ and Demyhakꝰ or any of them to sell within this Realme and to none other use, so that the same Handguns Hagbuttꝰ and Demyhakꝰ be of the seꝰall lenghes in Gune and Stocke as ys above lymitted and not under.

**XI.**
**Proclamation of the Act in each County.**

PROVIDED also that noe manner of parson rune in any daunger or take hurte by reason of any penaltye or forfeiture conteyned in this Acte untill suche tyme as ꝓclamaꝛꝺn be made of the same Acte, within the Countye where the partie that shall or maye offende contꝛrie to this Acte dwelleth, by the space of twentye dayes nexte after the makinge of the saide ꝓclamaꝛꝺn.

**XII.**
**Householdkeepers not liable to Penalty for their Lodgers keeping Crossbows, &c.**

PROVIDED also that yf any manner of pson bringe or cause to be brought withe him into his lodginge or in or to any other mans house any Crosbowe or Handgune, that then the penaltye and forfeyture, yf any suche be or hereafter shalbe forfeited by reason of this Acte, to rune and be onely upon the bringer of the saide Crosbowe and Handgune and not to the owner of the same lodginge or house, yf the saide [howner ¹] of the said lodging or house cause thes aide bringer thereof to take & carrie awaye the saide Crosbowe or Handgune agayne withe him at his departinge; anye thinge in this Acꝛe made to the contꝛrie notwithstandinge.

**XIII.**
**Offenders may be arrested by any Persons.**

AND be it also enacted by thauctoritie of this ꝓsent parliament that if any pson or psons, from or after the laste daye of June next comynge, see or fynde any pson or psons offendinge or doinge contꝛrie to the forme and effecte of this Acte, that then it shalbe laufull to everie suche pson or psons pceyvinge fyndinge or seinge anye suche pson or psons so offendinge contꝛrie to the fourme of this acte, to arrest and attache eꝰy suche offendor or offendors and to bringe or convey the same to the next Justice of Peace of the same Countye where the said offendor or offendors shalbe founde soe offendinge; And that the same Justice of Peace upon a due exiaꝛꝺn and proeff thereof before him had or made by his discreꝛꝺn shall have full power and aucthoritie to sende or cõmytt the same offendor or offendors to the next Gaole, there to remayne till suche tyme as the saide penaltye or forfeyture shalbe trulye contented and paide by the saide offendor; the one moytie of the same penaltye to be paide to the Kingꝰ Highnes and thother moytie thereof to the first bringer or conveyer of the saide offendor to the same Justice of Peace.

**XIV.**
**Licences, if given, (for § VIII.) shall specify at what Beasts, &c. the Party licensed may shoot, and he shall give Security to obey such Regulations.**

AND be it further enacted by thauctoritie aforesaide, that yf any pson or psons doe at any tyme hereafter obteyne gett or purchase, of the Kingꝰ Majestie his heires or successors, any placarde licence or bill assigned to shote in any Crosbowe Handgun Hagbutt or Demyhake contꝛrie to the tenor purporte and effecte of this ꝓsent acte, that then there shalbe conteyned in everie suche placarde licence and bill assigned, at what beastꝰ fowles or other thinges the saide pson or psons so obteyninge any suche placarde licence or bill assigned shall shote, withe any Crosbowe Handgune Hagbutt or Demyhake, or els that everie suche placarde licence and bill assigned hereafter to be obteyned gotten or purchased shalbe clerely voyde fruxtrate and of none effecte: And also that everie suche pson or psons so obteyninge any suche placarde licence or bill assigned, before they shote in any suche Crosbowe Handgun Hagbutt or Demyhake, in any suche manner or forme as shalbe mencioned in any suche placarde licence or bill assigned, shalbe bounden in the Kingꝰ Courte of Chaunꝛerie by recognizaunce in the some of twenty poundꝰ to the Kingꝰ use withe and upon condiꝛꝺn that he so obteyninge or havinge the saide licence placarde or bill assigned, shall not shote in any Crosbowe Handgune Hagbutt or Demyhake at any other beastꝰ or fowles then in any suche placarde licence or bill assigned shalbe conteyned and specified, and els all suche placardes licencꝰ and billꝰ assigned so hereafter to be made to any pson or psons not beinge so bounden by recognizaunce in the Courte of Chaunꝛerie as is aforesaide, to be utterlie voide and of none effecte.

**XV.**
**Recovery and Application of Penalties.**

AND be it further enacted by thauctoritie aforesaide, that it shalbe laufull to all Justicꝰ of Peace in their sessions and to all Stewardes and Baylieffꝰ in their seꝰall leetꝰ and lawe dayes to enquyre heare and determyne eꝰy suche offence after the saide laste daye of June to be cõmytted and done contꝛrie to the tenor of this ꝓsent Acte; So that alwayes noe lesse fyne then tenne poundes be assessed upon everie suche ꝓsentment and conviꝛꝺn made accordinge to the due course of the lawe; the same fyne so by the same Justicꝰ of Peace upon everie suche ꝓsentment and conviꝛꝺn made before them in their Sessions, to be payde and levyed onely to the Kingꝰ use; and the one moytie of everie fyne to be assessed by the Stewardꝰ or Baylyffꝰ of any leete or lawe daye, upon everie ꝓsentment and conviꝛꝺn before them, to be payde and levyed to the use of the Kinge our Soveraigne Lorde, and (¹) the other moytie the one halfe to the owner of the saide leete or lawe daye by distresse or acꝛꝺn of debte, and thother halfe of the same seconde moytie of the same fyne, to be to the partie that will pursue for the same in any of the Kingꝰ Courtꝰ by bill playnte informaꝛꝺn or acꝛꝺn of debte, in the whiche none Essoyne precꝛꝺn nor wager of lawe shalbe allowed.

**XVI.**
**Penalty on Jurors charged to enquire into Offences, who shall conceal the same, 20s.**

AND be it further enacted, that yf any Jurie beinge sworne and charged to enquyre for the Kinge our Soꝰaigne Lorde before anye Justicꝰ of the Peace or Stewardꝰ of leetꝰ or lawdayes, of any offencꝰ cõmytted or done contꝛrie to this ꝓsent Acte, doe wilfullie conceale any of the same offencꝰ, that then the saide Justicꝰ Stewardꝰ or Bayliffꝰ before whom any concealment shalbe had and done, shall have auctoritie by vertue of this ꝓsent Acte from tyme to tyme to chardge and sweare an other Jurie of twelve or mo good and substantiall honest psons to enquire of everie suche concealment, and if any suche concealment be founde and presented by the saide Jurie so chardged to enquyre of the same, that

¹ owner O.                                       ² of O.

*A.D.*1541-2.          33° Hen. VIII. c. 6.          835

then everie one of the saide fyrste Jurie that so did conceale the same, shall leese and forfeyt for everie suche concealement of eữy suche offence twenty shillingℓ; All whiche forfeytures and penaltyes of twentye shillingℓ for everie such concealment of everie suche offence so found and p̃sented before the same Justicℓ of Peace shall holye be levyed and payde to the Kingℓ use, and the moytie of all the same forfeytures and penaltyes of twenty shillingℓ, so founde and p̃sented before the Stewardℓ or Bayliffℓ of any leete or lawdaye, shalbe levied and paide to the use of the owner of the saide leete or lawdaye by distresse or acc̃on of debte, and thother moytie thereof to be to the partie or parties that will sue for the same by acc̃on informac̃on bill or playnte in any of the Kingℓ Courtℓ, in the whiche acc̃ons informac̃ons billℓ or playntℓ no wager of lawe essoyne nor ptecc̃on shalbe allowed.

PROVIDED alwaies and be it enacted by thauctoritie aforesaide, that yf any p̃son or p̃sons hereafter in any parte do offende or do contr̃ie to the purrewe and remedy of this Acte, whereupon cause of Acc̃on for the same offence shalbe geven to the Kinge his heires or successors or to any other p̃son or p̃sons that will sue by vertue of this Acte for the punyshment of the saide offence or forfeytures, that yf the Kinge our Soveraigne Lorde his heires or successors within one yere next and ymediatlye after suche offencℓ and forfeytures had and made do not pursue their acc̃on or acc̃ons so given by this Acte or cause exãlac̃on upon suche defaultℓ and offencℓ to be had and made before their counsaile, or other p̃sentmentℓ thereof to be had accordinge to the meanynge of the same Acte, and everie other p̃son whiche hereafter by vertue of this Acte maye have acc̃on or acc̃ons suyte or informac̃on upon this Statute within halfe a yere next and ymediatlye after suche offencℓ or forfeitures had and made do not comence their suytℓ informac̃on acc̃ons or p̃sentmentℓ of and upon the said forfeytℓ by acc̃on or otherwise as in this p̃sent Acte ys lymited and declared, that then aswell the Kinge our Sov̾aigne Lorde his heires and successors, after one yere next after suche offencℓ and forfeytℓ had and made yf no suyte in his or their name be taken by acc̃on or otherwise as ys before exp̃ised before the same yere ended & det̃myned, as everie other p̃son after halfe yere next after like Offencℓ had and done in the fourme aforesaide yf noe suyte thereupon be taken by none of them in fourme above declared, be utterly excluded and debarred of their saide suytℓ acc̃ons Informac̃ons and exãiac̃ons to them gyven by vertue of the saide Acte, and the partyes and eữy of them so offendinge shalbe of all suche Offencℓ and forfeytℓ clerely dischardged and quytt; Any thinge in this Acte comprised to the contr̃ie notwithstandinge.

PROVIDED alwayes and be it enacted by thauctoritie aforesaide that this p̃sent Acte ne any thinge therin conteyned shall in anywise extende or be p̃judiciall unto the Kingℓ Subjectℓ resident or inhabitinge nere unto the Coastℓ of the Sea in any parte of this Realme, their houses beinge not above fyve myles distant from the same Costℓ, nor also to any of the saide Subjectℓ inhabitinge within twelve myles of the borders of Scotlande, nor to any the Kingℓ Subjectℓ Inhabitauntℓ of the Towne and Marches of Callice, nor to any of the Inhabit̾untℓ of the Isles of Jersey Gernesey Anglesey and the Isles of Weight and Man, but that it shalbe laufull for everie of the saide Inhabitauntℓ at all tymes hereafter to have excise and use their handguns hagbuttℓ and demyhakes of the lenghes abovesaide within the lymyttℓ and Isles abovesaide, so that it be at noe manner of Dere heron Shoveler fesant partriche Wild Swanne or Wilde Elke or any of them; this p̃sent Acte or any thinge therin conteyned to the contr̃ie notwithstandinge.

PROVIDED also that this Acte ne any thinge therin conteyned be in anywise hurtfull or p̃judiciall to any S̾v̾nte or p̃son that hereafter, from the saide laste daye of June, shall bend beare carrie charge use or assaye anye Crosbowe or any handgun demyhake or hagbutt of the lenghes abovesaide, by the cõmaundment of his Lorde [and *] Master so that the saide S̾v̾nte or p̃son doe not shote at any fowle Dere or other Game of what Kynd or nature soever they be; nor also to any suche S̾v̾nte p̃son or p̃sons that shall after the saide last daye of June beare or convey any Crosbowe handgun hagbutt or Demyhake of the lenghes aforesaide to any place or places, by the comaundment of his lorde or master that maye shote by auctoritie of this Acte, to be amended repayred delyvered or assayed; so that the saide Servaunte or other p̃son so bringinge or conveyinge the saide Crosbowe handgun hagbutt or demyhake have redye to shewe to eữy p̃son requiring the sight thereof one licence in Writinge sealed or subscribed by his saide Lorde or Master to carrie and convey the same Crosbowe handgun hagbutt or demyhake to thintent to be amended repayred assayed or delivered as ys aforesaide.

PROVIDED alwaies that this Acte or any thinge conteyned therein shall not extende to any Owner of any Shippe, for having or kepinge of any handgun hagbutt or demyhake of the sev̾all lenghes in this Acte exp̃ised or under, only to be had and occupied within their Shippe or other Vessell, or for the carriage and recarriage of them or any of them on lande, or kepinge of them for the onlye excise and occupyinge of them within their saide Shippe or Vessell; Anye thinge in this Acte to the contr̃ie in any wise notwithstandinge.

<div style="text-align:right">

XVII.
Limitation of Prosecutions; One Year to the King, and Half a Year to others.

XVIII.
Proviso for Inhabitants near the Sea Coasts, Scotland, Calais, Jersey, &c.

XIX.
Proviso for Servants under Orders of their Masters.

XX.
Proviso for Owners of Ships, &c.

</div>

* or *O*.

# Exhibit 39



DATE DOWNLOADED: Wed May 10 12:07:29 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1784 627 .

ALWD 7th ed.
, , 1784 627 .

Chicago 17th ed.
"," New York - 7th Legislative Session : 627-629


AGLC 4th ed.
" New York - 7th Legislative Session 627

OSCOLA 4th ed.
" 1784 627          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# LAWS

OF THE

# STATE OF NEW-YORK,

PASSED AT THE

FIRST MEETING OF THE SEVENTH SESSION OF THE LEGISLATURE
OF SAID STATE.

## CHAP. 1.

AN ACT to lay a duty of tonnage on vessels for defraying the
expence of the lighthouse at Sandy Hook.

PASSED the 12th of February, 1784.

I. *Be it enacted by the People of the State of New York represented in* Duty
*Senate and Assembly and it is hereby enacted by the authority of the same,* levied.
That a duty of four pence per ton shall be levied and collected on all
vessels which shall arrive from sea into the port of New York excepting
vessels the property of citizens of this State while actually employed on
whaling or coasting voyages, and all vessels the entire property of citi-
zens of any of the United States, which shall not exceed the burthen of
sixty tons carpenters tonnage.

That for the orderly collection of the said duty it shall be lawful for Clerk to be
the master and wardens of the port of New York, who are or shall be appointed
appointed by the council of appointment, to appoint a clerk to execute to collect
the duties enjoined upon him by this act.

That every master or commander of a vessel claiming an exemption Masters
from the said duty shall if required make oath before the said clerk or claiming
in his absence before any of the said wardens who are hereby respect- exemption
ively empowered to administer the same. That according to the best oath.
of his knowledge and belief such vessel is a whaling or a coasting vessel for failure
entitled to exemption from the said duty, according to the true intent to report
meaning of this act; and in case of refusal to take the said oath such arrival.
master or commander shall be liable not only to the duty of tonnage
the penalties in such cases to be imposed by this act.   That every mas-
ter of a vessel subject to the said duty who shall not within twenty-four

74

*And bè it further enacted by the authority aforesaid* That whenever any Warrant person shall refuse to appear and make affidavit in pursuance of such to issue summons, a warrant shall issue from such judge or magistrate to com- witnesses pel his appearance, and if on his appearance he shall refuse to make to appear. affidavit, or affirmation if a Quaker, of the fact which may be within his knowledge touching the matters in question, he shall be committed to the common gaol of the county, there to remain without bail or mainprise for the term of six callender months.

# CHAP. 27.

AN ACT to repeal an act entitled An act to revive and amend an act entitled an act more effectually to prevent robberies within this State.

PASSED the 10th of April, 1784.

*Be it enacted by the People of the State of New York, represented in* Act named *Senate and Assembly, and it is hereby enacted by the authority of the same,* repealed. That the act entitled "An act to revive and amend an act entitled an act more effectually to prevent robberies within this State," passed the first day of July, one thousand seven hundred and eighty, shall be, and the same is hereby repealed.

# CHAP. 28.

AN ACT to prevent the danger arising from the pernicious practice of lodging gun powder in dwelling houses, stores, or other places within certain parts of the city of New York, or on board of vessels within the harbour thereof.

PASSED the 13th of April, 1784.

WHEREAS the storing of gun powder within the city of New York is Preamble. dangerous to the safety thereof.

*Be it therefore enacted by the People of the State of New York, repre-* Unlawful *sented in Senate and Assembly, and it is hereby enacted by the authority of* gunpow-*the same,* That from and after the passing of this act, it shall not be der in lawfull for any merchant, shopkeeper, or retailer, or any other person, or exceeding persons whatsoever, to have or keep any quantity of gun powder exceed- eight ing twenty-eight pounds weight, in any one place, less than one mile to pounds the northward of the city hall of the said city, except in the public mag- public azine at the Fresh-water, and the said quantity of twenty-eight pounds magazine, weight, which shall be lawfull for any person to have and keep at any place within this city, shall be seperated into four stone jugs or tin cannisters, which shall not contain more than seven pounds each, on pain of forfeiting all such gun powder, and the sum of fifty pounds for every hundred weight, and in that proportion for a greater or lesser quantity, Penalty. and upon pain of forfeiting such quantity which any person may lawfully keep as aforesaid, and which shall not be seperated as above directed, with full costs of suit to any person, or persons, who will inform and sue for the same, by any action, bill, or information, in any of the courts of record, in this city, who are hereby impowered, and required, to give special judgment in such action bills or informations, to be brought

LAWS OF NEW YORK.

by virtue of this act, as well for the recovery of the value of such gun powder in specie, as for the penalty aforesaid, besides costs, and to award, effectual execution thereon, provided always that all suits, actions, or prosecutions to be brought, commenced, or prosecuted, against any person or persons, for any thing done in pursuance of this act, shall be commenced and prosecuted without willful delay, within two callender months next after the fact was committed, and not otherwise.

*And whereas* vessels arriving from sea, and having onboard as part of their cargo a quantity of gun powder.

Gunpow-der on vessels to be landed before vessel hauls alongside of wharf, etc.

*Be it enacted by the authority aforesaid,* That the commander, or owner or owners, of all such ships or vessels, having gun powder onboard, shall, within twenty-four hours after her arrival in the harbour, and before they hawl along side of any wharf, pier or key within the city, land the said gun powder, by means of their boat or boats, or any other craft, at any place along the ship yards on the East river, or at any place to the northward of the air furnace on the North river, which may be most contigious to the magazine at Fresh water, and shall cause the same o be stored there, or in any other proper magazine, which now is or ereafter may be built for that purpose, at any place to the northward thereof, on pain of forfeiting all such gun powder, to any person or persons, who will inform and sue for the same, in like manner, as is herein before directed, with respect to the having and storing of gun powder within the city as aforesaid. And in order to prevent any fatal consequences which may arise, from the carriage of gun powder, in and through the streets of the city of New York, by carts, carriages, or by hand, or otherways, it shall be in tight cask, well headed and hooped, and shall be put into bags or leather-cases, and intirely covered there-with, so as that none be spilt or scattered in the passage thereof, on pain of forfeiting all such gun powder, as shall be conveyed through any of the streets aforesaid in any other manner than is herein directed, and it shall and may be lawfull for any person or persons, to scize the same to his or their own use and benefit — provided the person or persons so offending, be thereof lawfully convicted, before the mayor, recorder, or any two justices of the city aforesaid. And that it shall and may be lawfull, for the mayor recorder, or any two justices of the peace of the city and county of New York, upon demand made by any inhabitant or inhabitants of the said city, who assigning a reasonable cause of sus-picion on oath, of the sufficiency of which the said mayor or recorder, or justices, is and are to judge, to issue his or their warrant or war-rants, under his or their hands and seals, for searching in the day time for gun powder in any building or place whatsoever, within the limits aforesaid, or any ship or vessel within forty eight hours after her arrival in the harbour, or at any time after any such ship or vessel shall and may have hawled alongside of any wharf pier or key within the limits afore-said, and that upon any such search, it shall be lawfull for the searchers or persons finding the same, immidiatly to seize, and at any time within twelve hours after such seizure, to cause the same to be removed to the magazine at Fresh water, or to any other proper magazine, which now is or hereafter may be at any place north of Fresh water aforesaid, and the same being so removed, it shall be lawfull to detain and keep the same untill it shall be determined by the mayor, recorder or any two of the justices of the peace of the city and county aforesaid, whether the same shall be forfeited by virtue of this act, and the person or persons so detaining the same, shall not be subject or liable to any action or suit, for the detention thereof, provided always that nothing in the act con-

How gun-powder to be trans-ported through streets of city.

Warrant to search in day time for gun pow-der unlaw-fully stored may be issued, etc.

tained, shall be construed to authorize any person, having such warrant to take advantage of the same, for serving any civil process of any kind whatsoever.

*And be further enacted by the authority aforesaid,* That if any gun powder, exceeding the quantity which any person by this act may law- fully keep in his custody, shall be found during any fire, or alarm of fire, in the said city, by any of the firemen of the said city, it shall be law- full for him to seize the same, without warrant from a majestrate, and to hold and have the same to his own use, any thing in this act to the con- trary notwithstanding.    This act to be and continue in force from the passing thereof, untill the twenty-eight day of February in the year of our Lord one thousand, seven hundred and eighty six.

*If found during any fire any gun may be seized without warrant.*

# CHAP. 29.

AN ACT to lengthen the terms of the inferior courts of com-
mon pleas and general sessions of the peace, in the counties of
Westchester, Queens and Richmond; and for other purposes
therein mentioned.

### PASSED the 13th of April, 1784.

WHEREAS the duration of the terms of the inferior courts of common pleas and general sessions of the peace, in the counties of Westchester, Queens and Richmond; which, in the county of Westchester, continue from the fourth Tuesday in May until the Friday following, and from the first Tuesday in November until the Friday following, in every year; in Queens county, from the third Tuesday in May until the Friday fol- lowing, and from third Tuesday in September until the Friday following, in every year; and in Richmond county, from the first Tuesday in May until the Friday following, and from the last Tuesday in September un- til the Friday following, in every year, are found from experience, to be too short for the discharge of the necessary business in the said respec- tive courts.

*Preamble.*

*Be it therefore enacted by the People of the State of New York repre- sented in Senate and Assembly, and it is hereby enacted by the authority of the same,* That the terms of the inferior courts of common pleas and general sessions of the peace in the county of Westchester, shall here- after commence on the fourth Monday in May and first Monday in November, in every year, and shall continue until the several Saturdays next following, inclusive; that the terms of the inferior courts of com- mon pleas and general sessions of the peace in Queens county, shall commence on the third Mondays in May and September, in every year, and shall continue until the several Saturdays next following, inclusive; and that the inferior courts of common pleas and general sessions of the peace in the county of Richmond, shall commence on the first Mon- day in May and last Monday in September, in every year, and shall con- tinue until the several Saturdays next following, inclusive.    That all process issued out of the said respective courts, and made returnable on the usual return days, and all recognizances by which any person or persons shall be bound to appear on the said usual return days, shall be deemed good and valid on such days, although such days of return and appearance, are by this act, respectively altered.

*Terms of the courts, when to commence and when to close.*

*Process issued re- turnable on usual return days valid.*

# Exhibit 40

# ACTS AND RESOLVES

OF

# MASSACHUSETTS.

## 1782-83.

[REPRINTED UNDER CHAPTER 104 OF THE RESOLVES OF 1889.]

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 178 of 240 PageID: 7769

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the Authority of the same,* That a Sum not exceeding *Two Thousand Pounds* be raised by a Lottery or Lotteries, for and to the Purpose of re-building the said Mills; and that *John Pitts* and *John White,* Esquires, and Mr. *William Paine,* or any two of them, shall be Managers of the said Lottery or Lotteries, who shall be sworn to the faithful Performance of their Trust; which said Managers shall make and publish in such News Papers as they shall judge proper, a Scheme for the said Lottery or Lotteries, as soon as may be; and they shall also publish therewith all necessary Rules and Regulations for the Management thereof. And all Prizes which may be drawn in the said Lottery or Lotteries, shall be paid without any Deduction, provided they are demanded within Six Months after the Drawing of the said Lottery or Lotteries, otherwise the Money arising from such Prizes, shall be appropriated to the Purpose aforesaid.

*£2000 to be raised by Lottery.*

*Names of the Managers.*

*And be it further enacted,* That if any Person shall forge, counterfeit, or alter any Lottery Ticket issued by Virtue of this Act, or shall pass or utter any such forged, counterfeited or altered Ticket, knowing the same to be false, forged, counterfeited or altered, or shall advise or assist in forging, altering, or counterfeiting the same, every Person so offending, and being thereof convicted before the Supreme Judicial Court of this Commonwealth, shall be punished by being set on the Gallows for the Space of one Hour, with a Rope round his Neck, or shall pay a Fine not exceeding *One Hundred Pounds,* to the Use of this Commonwealth, or suffer not more than Twelve Months Imprisonment, nor less than Two, or be publicly whipped, not exceeding Thirty-nine Stripes, at the Discretion of the said Supreme Judicial Court, according to the Nature and Circumstances of the Offence.

*Persons guilty of Forgery.*

*Penalty.*

*February 26, 1783.*

---

### 1782. — Chapter 46.

[January Session, ch. 13.]

AN ACT IN ADDITION TO THE SEVERAL ACTS ALREADY MADE FOR THE PRUDENT STORAGE OF GUN POWDER WITHIN THE TOWN OF *BOSTON.*

*Chap.* 46

*Whereas the depositing of loaded Arms in the Houses of the Town of* Boston, *is dangerous to the Lives of those who*

*Preamble.*

120 ·           1782. — CHAPTER 46.

are disposed to exert themselves when a Fire happens to break out in the said Town:

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the Authority of the same, That if any Person shall take into any Dwelling House, Stable, Barn, Out House, Ware House, Store, Shop, or other Building within the Town of Boston, any Cannon, Swivel, Mortar, Howitzer, Cohorn, or Fire Arm, loaded with, or having Gun Powder in the same, or shall receive into any Dwelling House, Stable, Barn, Out House, Store, Ware House, Shop, or other Building, within the said Town, any Bomb, Grenade, or other Iron Shell, charged with, or having Gun Powder in the same, such Person shall forfeit and pay the Sum of Ten Pounds, to be recovered at the Suit of the Firewards of the said Town, in an Action of Debt, before any Court proper to try the same; one Moiety thereof to the Use of the said Firewards, and the other Moiety to the Support of the Poor of the Town of Boston.

*Persons prohibited taking into their Dwellings, &c. any piece of Ordnance loaded with Gun Powder.*

*Penalty.*

And be it further enacted by the Authority aforesaid, That all Cannon, Swivels, Mortars, Howitzers, Cohorns, Fire Arms, Bombs, Granades, and Iron Shells of any Kind, that shall be found in any Dwelling House, Out House, Stable, Barn, Store, Ware House, Shop, or other Building, charged with, or having in them any Gun Powder, shall be liable to be seized by either of the Firewards of the said Town: And upon Complaint made by the said Firewards to the Court of Common Pleas, of such Cannon, Swivels, Mortars, or Howitzer, being so found, the Court shall proceed to try the Merits of such Complaint by a Jury; and if the Jury shall find such Complaint supported, such Cannon, Swivel, Mortar, or Howitzer, shall be adjudged forfeit, and be sold at public Auction; and one Half of the Proceeds thereof shall be disposed of to the Firewards, and the other Half to the Use of the Poor of the Town of Boston. And when any Fire Arms, or any Bomb, Granade, or other Shell, shall be found in any House, Out House, Barn, Stable, Store, Warehouse, Shop, or other Building, so charged, or having Gun Powder in the same, the same shall be liable to be seized in Manner aforesaid; and on Complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of as is above provided for Cannon.

*Pieces of Ordnance charged with Gun Powder found in any Dwelling-House, &c. liable to be seized.*

*How disposed of in Cases of Forfeiture.*

Be it further enacted, That Appeals shall be allowed in Prosecutions upon this Act as is usual in other Cases.

*Appeals allowed.*

March 1, 1783.

# Exhibit 41





DATE DOWNLOADED: Fri Jan 27 13:50:59 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Laws of the State of Maine (1830).

ALWD 7th ed.
. Ls of the State of Maine (1830).

APA 7th ed.
(1830). Laws of the State of Maine. Hallowell, Glazier, Master & Co.

Chicago 17th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co.

McGill Guide 9th ed.
Ls of the State of Maine (Hallowell: Glazier, Master & Co., 1830)


AGLC 4th ed.
Laws of the State of Maine (Glazier, Master & Co., 1830

MLA 9th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co. HeinOnline.

OSCOLA 4th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

cial Court, to parties and witnesses, as are allowed in the
regular Courts of law ; and that the said two Justices, *quo-
rum unus*, shall have the same fees, and be allowed the same
sums for the trial aforesaid, as are allowed to Justices in the
process of forcible entry and detainer.

[*Approved March* 8, 1821.]

## CHAPTER XXV.

### An Act for the prevention of damage by Fire, and the safe keeping of Gunpowder.

Sec. 1. **B**E *it enacted by the Senate and House of Represent-*
*atives, in Legislature assembled,* That the Selectmen of each
town within this State, containing not less than fifteen hundred
inhabitants, be, and they hereby are, authorized and empow-
ered to make rules and regulations, from time to time, in con-
formity with which, all gunpowder which is or may be with-
in such town, shall be kept, had or possessed therein ; and no
person or persons shall have, keep or possess within such
town, any gunpowder, in any quantity, manner, form or
mode, other than may be prescribed by the rules and regu-
lations aforesaid.

*Selectmen to make regula- tions as to the keeping of gun- powder in cer- tain towns.*

Sec. 2. *Be it further enacted,* That any person or per-
sons who shall keep, have or possess any gunpowder, within
any town, contrary to the rules and regulations which shall
be established by the Selectmen of such town, according to
the provisions of this Act, shall forfeit and pay a fine of not
less than twenty dollars, and not exceeding one hundred dol-
lars, for each and every offence, to be recovered by action of
debt in any Court proper to try the same.

*Penalty for vio- lating such reg- ulations.*

*Mode of re- covery.*

Sec. 3. *Be it further enacted,* That all gunpowder which
shall be had, kept or possessed, within any town, contrary to
the rules and regulations which shall be established by the
Selectmen of such town, according to the provisions of this
Act, may be seized by any one or more of the Selectmen of
such town, and shall within twenty days next after the seizure
thereof, be libelled, by filing with any Justice of the Peace
in such town, a libel, stating the time, place and cause of seiz-
ure, and the time and place when and where trial shall be had
before said Justice, and a copy of said libel shall be served
by the Sheriff, or his deputy, on the person or persons, in
whose possession the said gunpowder shall have been seized
by delivering a copy thereof to each such person, or leaving
such copy at his or her usual place of abode, seven days at
least, before the time which shall be specified in said libel,
for the trial thereof, that such person may appear, and show
cause why the gunpowder, so seized or taken, should not be
adjudged forfeit ; and if any person shall appear to show
cause why the same should not be adjudged forfeit, such ap-

*Powder kept contrary to reg- ulations may be seized and li- belled.*

*Proceedings on such libel.*

pearance shall be entered on record, by said Justice; and if the gunpowder, seized as aforesaid, shall be adjudged forfeit, the person or persons, whose appearance shall have been recorded as aforesaid, shall pay all costs of prosecution, and execution shall issue therefor: *Provided however,* That the person or persons, whose appearance shall have been recorded, may appeal from the judgment rendered by said Justice *Appeal from Justice's judgment,* of the Peace, to the next Court of Common Pleas to be holden for the County where such town is situated: and the party so appealing, before such appeal shall be allowed, shall recognize, with sufficient surety or sureties to the libellant, to prosecute his said appeal and to pay all such costs as may arise after said appeal; and no further proceedings shall be had upon the judgment appealed from; and in case the party appealing shall neglect to enter his appeal, the Court *after proceedings.* appealed to, may, upon complaint, proceed to affirm the judgment of the Justice, with additional costs.

SEC. 4. *Be it further enacted,* That any person who shall *Persons damaged by explosion of powder illegally kept, may obtain redress.* suffer injury by the explosion of any gunpowder, had or possessed, or being within any town, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, may have an action of the case in any Court proper to try the same, against the owner or owners of such gun powder, or against any other person or persons, who may have had the possession or custody of such gunpowder, at the time of the explosion thereof, to recover reasonable damages for the injury sustained.

SEC. 5. *Be it further enacted,* That it shall, and may be *Selectmen may enter buildings to search for powder.* lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gunpowder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

SEC. 6. *Be it further enacted,* That when any stove, chim- *Penalty for suffering stoves, chimnies or stove pipes to be defective, &c.* ney or stove pipe, within any town containing not less than fifteen hundred inhabitants, shall be defective, or out of repair, or so constructed or placed, that any building, or other property shall be in danger of fire therefrom, the Selectmen of said town shall give notice in writing, to the possessor or possessors of such stove, chimney or stove pipe, to remove or repair the same; and if such possessor shall for the term of six days after the giving of such notice, unnecessarily neglect to remove, or effectually repair such stove, chimney or stove pipe, such possessor shall, for each and every such neglect, forfeit and pay a fine of not less than ten dollars, nor more than fifty dollars, to be recovered by action of the *Action of case.* case, in any Court proper to try the same.

SEC. 7. *Be it further enacted,* That the fines, forfeitures

**Appropriation of fines, &c.** and penalties, which shall arise under this Act, shall accrue, one moiety thereof to the use of the town within which the offence shall be committed, and the other moiety to the use of the person who shall prosecute or sue for the same.

**Above regulations not to be in force till published by Selectmen, &c.** SEC. 8. *Be it further enacted,* That the rules and regulations, which shall be established in any town, according to the provisions of this Act, shall be of no force or effect, until such rules and regulations, together with this Act, shall have been published by the Selectmen of such town, three weeks successively, by printing in some newspaper printed within the County, or by posting up attested copies in three several public places in said town.

[*Approved March* 19, 1821.]

## CHAPTER XXVI.

### An Act to prevent damage from firing Crackers, Squibs, Serpents and Rockets, within this State.

BE it enacted by the Senate and House of Representatives, *in Legislature assembled,* That if any person shall offer **Crackers, squibs, &c. not to be fired without license.** for sale, set fire to, or throw any lighted cracker, squib, rocket or serpent within this State, without the license of the Selectmen of the several towns, respectively, first obtained **Punishment.** therefor, he shall forfeit, for every such offence, the sum of five dollars ; one moiety to the use of the poor of that town, in which the offence shall be committed, and the other moiety to the use of the prosecutor ; to be recovered by action of debt, or by information before any Justice of the Peace of the County, in which the offence shall be committed, with the costs of suit.

[*Approved February* 20, 1821.]

## CHAPTER XXVII.

### An Act more effectually to secure Fire Engines from being injured.

BE it enacted by the Senate and House of Representatives, *in Legislature assembled,* That if any person shall wantonly or **Persons wantonly injuring fire engines,** maliciously, spoil, break, injure, damage or render useless, any engine, or any of the apparatus thereto belonging, prepared by any town, society, person or persons, for the extinguishment of fire, and shall be convicted thereof, **punished on conviction in S. J. Court.** before the Supreme Judicial Court, he shall be punished by a fine not exceeding five hundred dollars, or by imprisonment, not exceeding two years, at the discretion of the Court; and be further ordered to recognize, with sufficient surety or sureties, for his good behaviour for such term as the Court shall order.

[*Approved March* 2, 1821.]

# Exhibit 42

# OFFICE OF THE GOVERNOR
## NEWS RELEASE

CN-001
Contact:

Emma Byrne
609/292-8956

**TRENTON, N.J. 08625**
**Release:**

Wednesday
May 30, 1990

## FLORIO SIGNS NATION'S TOUGHEST ASSAULT WEAPON LAW

PATERSON -- Keeping a promise made during the campaign, Governor Jim Florio today signed a bill banning the sale and sharply restricting current possession of assault weapons in New Jersey, making it the toughest law in the nation.

Florio signed the bill during a ceremony in Paterson, the home of the late state Senator Frank Graves, the bill's original sponsor.

"One of our most basic rights is to be safe. But when the police are outgunned and innocent people can be gunned down in vast numbers, all of our other rights become meaningless," Governor Florio said. "I promised that I would ban assault weapons in New Jersey and I am proud to sign this bill into law today. It's the toughest law in the nation. It's right. It's fair, and it will make New Jersey a better place."

Under the law, no person will be able to legally purchase an assault weapon in the state. Unlike a California assault weapon ban, which exempts all current owners, the New Jersey law severely restricts possession of any assault weapon not used for legitimate collecting or target-shooting purposes.

"This is a common sense bill -- one that recognized that hunters don't need Uzis to shred their prey, and law abiding citizens don't need 'street-sweepers'," Florio said. "The ban on military-style assault weapons was Frank Graves' last fight. He believed, as I do, that guns capable of wholesale destruction are a direct threat to our police, our citizens and especially our children."

Current owners have one year to either sell their weapon or render it inoperable by certifying that the parts necessary to fire the weapon have been removed from his immediate possession, making it purely a collector's piece. Owners also have seven months to join a chartered rifle/pistol club, but may do so only if their firearm was purchased as of May 1, 1990, and is included on a list

currently being drawn up by the Attorney General based on those weapons used in U.S. Army-sanctioned competitions.

"This bill says that no one can walk off the street and purchase a gun that is designed to wipe out the greatest number of people in the shortest possible time," Florio said.  "I call that common sense.  So do the majority of people in New Jersey and so does the State Legislature."

# # #

# Exhibit 43

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 189 of 240 PageID: 7780

# LAWS AND ORDINANCES

GOVERNING THE

## CITY OF CHICAGO,

**JANUARY 1, 1866,**

WITH AN

### APPENDIX,

CONTAINING THE

## FORMER LEGISLATION

RELATING TO THE CITY,

AND NOTES OF

## DECISIONS OF THE SUPREME COURT OF ILLINOIS,

RELATING TO CORPORATIONS.

PRINTED AND PUBLISHED BY AUTHORITY OF THE COMMON COUNCIL OF THE CITY.

COMPILED AND ARRANGED BY

JOSEPH E. GARY,

ONE OF THE JUDGES OF THE SUPERIOR COURT OF CHICAGO.

E. B. MYERS AND CHANDLER,

LAW BOOKSELLERS AND PUBLISHERS,

No. 111 Lake Street.

1866.

Generated on 2023-05-19 03:58 GMT / https://hdl.handle.net/2027/uiug.30112108865186
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

# CHAPTER XI.

## GUNPOWDER AND GUN-COTTON.

SECTION
1. Dealers in gunpowder and gun-cotton to have permits; proviso.
2. Application for permit; register; quantity and how kept; sale at night; sign; penalty.
3. Carrying through streets; penalty.
4. Vessels laden with, not to land or discharge within certain limits; penalty.

SECTION
5. Mayor may cause removal of vessel; penalty.
6. When permits expire; persons to whom not granted; charge for.
7. Officers to report violations.
8. Appropriation of penalties.

SECTION 1. No person shall keep, sell or give away gun- Permit required. powder or gun-cotton, in any quantity, without permission in writing, signed by the mayor and clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: *Provided,* Any person may keep for his own Proviso. use not exceeding one pound of gunpowder or gun-cotton at one and the same time.

SEC. 2. All applications for permits shall be made to Application for permit. the mayor. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot by the common council. When issued, the clerk shall make an entry Register. thereof in a register to be provided for the purpose, which entry shall state the name and place of business, and date of permit. Persons to whom permits may be issued shall Quantity. not have or keep at their place of business, or elsewhere within the city, a greater quantity of gunpowder or gun- How kept. cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor shall any person sell Sale at night. or weigh any gunpowder or gun-cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given, to keep a sign at the front door of his place of Sign. business, with the words " gunpowder " painted or printed thereon in large letters. A violation of any clause of this

Generated on 2023-05-19 03:57 GMT / https://hdl.handle.net/2027/uiug.30112168865186
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by **Google**

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

# Exhibit 44

# IN  THE  UNITED  STATES  DISTRICT  COURT
# FOR  THE  EASTERN  DISTRICT  OF  CALIFORNIA

WILLIAM WIESE, et al.,  )
                                             )
            Plaintiffs,  )
                                             )
       vs.  ) **CASE NO.**
                                           )   2:17-cv-00903-WBS-KJN
ROB BONTA, et al.,  )
                                           )
          Defendants.  )
_____  )

## DEPOSITION OF
JAMES CURCURUTO

**DATE:**          Thursday, August 3, 2023

**REPORTER:**     Althea L Miller, CSR No. 33553/RPR/CCRR

## VIA REMOTE VIDEO TECHNOLOGY



## HINES REPORTERS
**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**

**866.432.4300; 213.688.7887**

**WWW.HINESREPORTERS.COM**

IN THE UNITED STATES DISTRICT COURT


FOR THE EASTERN DISTRICT OF CALIFORNIA


SACRAMENTO DIVISION


WILLIAM WIESE, et al.,          )
                                )
            Plaintiffs,         )
                                )
v.                              )   No. 2:17-cv-00903-WBS-KJN
                                )
ROB BONTA, et al.,              )
                                )
            Defendants.         )
_____  )



DEPOSITION OF:   JAMES CURCURUTO

TAKEN ON:        August 3, 2023

APPEARING REMOTELY FROM MIDDLEBURY, CONNECTICUT




STENOGRAPHICALLY REPORTED BY:
ALTHEA L. MILLER
CSR No. 3353, RPR, CCRR No. 149
File No. 107482
APPEARING REMOTELY FROM LOS ANGELES COUNTY,
CALIFORNIA

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 194 of 240 PageID: 7785

Wiese, et al. vs. Bonta, et al.                                           Deposition of James Curcuruto

1    REMOTE DEPOSITION OF JAMES CURCURUTO,
2    taken on behalf of the Defendants, with
3    all parties, by agreement, attending the
4    deposition remotely in Los Angeles
5    and San Francisco counties, California, on
6    Thursday, August 3, 2023, at 9:33 A.M., before
7    Althea L. Miller, CSR No. 3353, RPR,
8    CCRR No. 149.
9
10   APPEARANCES:
11       For the Plaintiffs:
12       SEILER EPSTEIN LLP
         BY: GEORGE M. LEE, ESQ.
13       Four Embarcadero Center
         14th Floor
14       San Francisco, California 94111
         (415) 979-0500
15       gml@seilerepstein.com
16
17       For the Defendants:
18       OFFICE OF THE ATTORNEY GENERAL
         OF THE STATE OF CALIFORNIA
19       BY: ROBERT L. MEYERHOFF,
            Deputy Attorney General
20          JOHN D. ECHEVERRIA,
            Deputy Attorney General
21       300 South Spring Street
         Suite 1702
22       Los Angeles, California 90013-1230
         (213) 269-6177
23       Robert.Meyerhoff@doj.ca.gov
         John.Echeverria@doj.ca.gov
24
25   ///

                                                Page 2

                    I N D E X
WITNESS                              PAGE

     JAMES CURCURUTO

        BY MR. MEYERHOFF        5, 180

        BY MR. LEE              172

            E X H I B I T S
DEPOSITION                           PAGE
EXHIBIT 1  Copy of the "Notice of        11
           Deposition of James Curcuruto,"
           three pages
EXHIBIT 2  Copy of "Plaintiffs'          21
           Objections to Defendants'
           Notice of Deposition of
           James Curcuruto, three pages
EXHIBIT 3  Copy of "Declaration of James  26
           Curcuruto in Support of Plaintiffs'
           Motion for Temporary Restraining
           Order and Issuance of
           Preliminary Injunction,"
           six pages
EXHIBIT 4  17-page document titled on    74
           page 1 "Outdoor Stewards of
           Conservation Foundation"
EXHIBIT 5  Two-page document titled     103
           Southwick Associates
           Honored for Groundbreaking
           Research
EXHIBIT 6  Copy of the deposition of    115
           James Curcuruto, taken on
           January 11, 2018, 174 pages
25   ///

                                                Page 3

                E X H I B I T S
DEPOSITION                           PAGE
EXHIBIT 7  Copy of the deposition of     141
           James Curcuruto, taken on
           January 24, 2014, 250 pages
EXHIBIT 8  14-page document titled       155
           "Ethical Guidelines for
           Statistical Practice"
EXHIBIT 9  Copy of a two-page declaration 164
           of James Curcuruto in the
           Rocky Mountain Gun Owners
           versus The Town of Superior

        I N F O R M A T I O N   R E Q U E S T E D
                    (None.)

        Q U E S T I O N S   M A R K E D
                    (None.)

24   ///
25   ///

                                                Page 4

1    REPORTED REMOTELY FROM LOS ANGELES COUNTY,
2        CALIFORNIA
3        August 3, 2023
4        9:33 A.M.
5
6        -oOo-
7
8        JAMES CURCURUTO,
9    having declared under penalty
10   of perjury to tell the truth, was
11   examined and testified as follows:
12
13   THE WITNESS:  I do.
14   THE REPORTER:  Thank you.
15   THE WITNESS:  You're welcome.
16
17       EXAMINATION
18   BY MR. MEYERHOFF:
19   Q  Good morning.
20       My name is Rob Meyerhoff.  I'm a Deputy
21   Attorney General with the Department of Justice.  I
22   represent the defendants in this case.
23       Why don't we just start with some ground
24   rules relating to the deposition.
25       You understand you're testifying under oath

                                                Page 5

1  today, Mr. Curcuruto?
2      A  I do.
3      Q  And you understand that even though we're
4  in the informal setting on the Zoom call, the oath
5  that you just took has the same sanctity as if we
6  were in a court of law?
7      A  Yes.
8      Q  And do you understand the same penalties
9  for giving untrue testimony apply?
10     A  Yes.
11     Q  Even though the deposition is proceeding
12  over Zoom, the court reporter won't be able to take
13  down nonverbal responses like head nods or shakes.
14  You'll need to give verbal answers to each question.
15      Do you understand that?
16     A  Yes.
17     Q  If you don't understand a question, please
18  just ask me to clarify and I can try to restate the
19  question.
20      If you answer a question I ask, people
21  reading the transcript later will assume you
22  understood the question.
23      Does that make sense?
24     A  Yes.
25     Q  Also, from time to time, Mr. Lee may make

Page 6

1  objections.
2      Do you understand that?
3      A  Yes.
4      Q  If you need to take a break, please let me
5  know.  We can take a break whenever you want or
6  whenever Mr. Lee or the court reporter needs one.
7      However, I'll ask if there's a question
8  pending -- I've asked a question -- I just ask that
9  you answer the question before taking a break.
10      Does that make sense?
11     A  Yes.
12     Q  Do you have any questions about the
13  procedures we're going to be following today?
14     A  Not now, no.
15     Q  Is there any reason you feel like you can't
16  give your best testimony today?
17     A  No.
18     Q  Are you suffering from any medical problems
19  that would prevent you from doing so?
20     A  No.
21     Q  Are you under the influence of any
22  prescription medications that would prevent you from
23  doing so?
24     A  I am not.
25     Q  Are you under the influence of drugs or

Page 7

1  alcohol at this time?
2      A  I am not.
3      Q  You've been deposed before; correct?
4      A  Correct.
5      Q  And you are -- was your first deposition
6  the Wilson versus Cook County case?
7      A  I don't recall the order of them.  I've
8  been deposed maybe a half dozen times, but I don't
9  recall the order.
10     Q  But you recall being deposed in that case;
11  correct?
12     A  Which one was that?
13     Q  Wilson versus Cook County in 2013.
14     A  Sounds familiar, yes, sir.
15     Q  Do you recall the subject matter of that
16  case?
17     A  Not specifically, but for the most part,
18  all the cases I've been deposed in had to do with
19  either the high-capacity magazines or the AR-15
20  model firearm.
21     Q  Do you recall being deposed in the Kolbe
22  versus O'Malley case?
23     A  Yes.  I was deposed in that one.
24     Q  And Friedman v City of Highland Park as
25  well?

Page 8

1      A  Correct.  Yes.
2      Q  You were also deposed in the Worman case;
3  is that correct?
4      A  Was that Worman --
5      Q  V Healey.
6      A  -- v Healey?
7      Okay.  Massachusetts, I think, yeah.
8      Q  You were also deposed in two California
9  cases; correct?
10     A  I know I've -- Duncan v Becerra was one of
11  them, and I'm not sure if there's another Becerra
12  one, but --
13     Q  Would it refresh your recollection if I
14  told you you were deposed in a case called Miller?
15     A  Okay.
16     Q  Can you recall any other depositions that
17  you had taken?
18     A  Let's see.
19      We covered Worman, Kolbe, Duncan, and you
20  said -- was there a Highland Park one too or did you
21  cover that?
22     Q  The Friedman versus the City of
23  Highland Park?
24     A  I think that's about it.  Six or seven of
25  them.

Page 9

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 196 of 240 PageID: 7787

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

**Page 10**

1  Q  And in each of those cases, you testified
2  on behalf of plaintiffs; is that correct?
3  A  Correct.
4  Q  And in each of those cases, plaintiffs were
5  seeking to invalidate a firearms restriction;
6  correct?
7  A  The cases were, I think, to show the
8  commonality of either the AR platform modern
9  sporting rifle or the high-capacity magazine, I
10 think defined as holding 11-plus rounds.
11 Q  But to the best of your recollection, in
12 each of those cases, plaintiffs were seeking to
13 invalidate some kind of firearms restriction;
14 correct?
15 A  Yeah.
16    I think they wanted to be able to possess
17 one or two of those -- either the firearm or the
18 magazine.
19 Q  And to the best -- I'm sorry.
20 A  I'm sorry.  Legally possess, yeah.
21 Q  And in each of those cases, there was a
22 local, state, or federal restriction preventing them
23 from doing so; correct?
24 A  I believe so, yes.
25 Q  I'm going to pull up a document that I'd

**Page 11**

1  like to mark as Exhibit 1.
2      (The document referred to was marked as
3      Deposition Exhibit 1 by the Reporter.)
4  BY MR. MEYERHOFF:
5  Q  And throughout the deposition,
6  Mr. Curcuruto, I'm going to pull up exhibits.  The
7  way to work over Zoom is I'll screen-share them.
8  You are unable to control the scrolling function.
9  I'll show you the document and you let me know when
10 you want me to scroll down.
11 A  Sounds good.
12 Q  Can you see the document up on the screen?
13 The first words at the top are on 1 "Rob Bonta,
14 Attorney General of California"?
15 A  Yes.
16 Q  And you see in the middle of the page,
17 "Notice of Deposition of James Curcuruto"?
18 A  Correct; yeah.
19 Q  I'm pronouncing your name correct; is that
20 correct?
21 A  Very good.
22 Q  Thank you.
23    I'm going to have you review -- this is
24 just a three-page document.
25    I'll have you review the whole thing.  I'll

**Page 12**

1  ask you some questions about it.
2      Please just review it and let me know when
3  you want me to scroll down.
4  A  Okay.  Wiese versus Bonta.  He's the
5  Attorney General, I believe; right?
6      You can scroll down.  That's good.
7  I'm at line 14.  If you can scroll up or
8  down.
9      Okay.  You can go to the next page up.
10     Okay.
11 Q  So that's the end of the document.  I'll
12 scroll back up to the first page.
13     So this document is entitled
14 "Notice of Deposition of James Curcuruto."
15     Mr. Curcuruto, have you seen this document
16 before?
17 A  I have.
18 Q  When did you see it?
19 A  I don't know.  Mr. Lee had sent it to me
20 recently.  I don't know the exact date.
21 Q  Would you say within the past week?
22 A  Past week or two probably.  Yeah.  Within
23 the past week or two.
24 Q  Have you reviewed this document in full
25 prior to today?

**Page 13**

1  A  I have read it, yes, sir.
2  Q  Did you discuss it with Mr. Lee?
3  A  I did.
4  Q  What was the substance of your discussion
5  with Mr. Lee about this document?
6  A  Just to make sure I had received it and
7  read it and also the request for documents.
8      You know, I -- I do not have access to any
9  past documents after a job change.
10 Q  And what, if anything else, did Mr. Lee say
11 about this document?
12 A  Not much.  Not much in the document.
13 Q  Did he ask you if you had access to any of
14 the documents mentioned in the requests?
15 A  He did.  He asked me to look to see what I
16 could find.
17 Q  Let's scroll down to that on page 3.
18     Do you see where it says "Individual
19 Requests" 1:
20     "All non-privileged documents,
21     data, or information in electronic
22     form that you received, reviewed, or
23     relied upon in forming your opinions
24     in this litigation"?
25     Do you see that?

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 197 of 240 PageID: 7788

Wiese, et al. vs. Bonta, et al.                                        Deposition of James Curcuruto

1  A  Yes.
2  Q  So -- do any documents exist that are
3  responsive to that request?
4  A  I believe the original deposition I had
5  done in 2017 concerning this case.  I had -- Mr. Lee
6  had sent that to me as well and I had reviewed that
7  and that had, I believe, one exhibit which was the
8  Magazine Chart I had helped create back in 2017 or
9  '16.
10      I think it was when I was with the
11  National Shooting Sports Foundation.
12  Q  Are there any documents that exist that are
13  responsive to this request?
14  A  They exist but not in my possession.
15  Q  And what are those documents that exist
16  that are not in your possession?
17  A  Just one -- Request No. 1?  Is that the one
18  we're looking at?
19  Q  That's correct.
20  A  Opinions of this litigation.
21      So materials I had used to create that
22  one-page document, I'm sure there are records of
23  those somewhere but not in my possession.
24  Q  What were those materials that you had used
25  to create the one-page document?

Page 14

1  A  I believe, according to that original
2  declaration or deposition in 2017, to help create
3  that one-page NSSF Magazine Chart, I use sources
4  such as the U.S. ITC, the International
5  Trade Commission's import/export data and the ATF's
6  AFMER reports, which, I believe are --
7      THE REPORTER:  I'm sorry.  What is that?
8      THE WITNESS:  AFMER, A-F-M-E-R.  Annual
9  Firearms Manufacturing Export Reports.
10      So those are -- you know, there's documents
11  of those, I'm sure available somewhere that I used
12  as a basis to create that one pager.
13      I just don't have them anymore.
14  BY MR. MEYERHOFF:
15  Q  And are there any other documents that
16  exist that you received, reviewed, or relied upon in
17  creating the Magazine Chart?
18  A  Not that I'm aware of.
19      I -- I don't have any in my possession.
20  Q  But do any -- do any other documents, other
21  than the U.S. ITC documents, the ATF AFMER
22  documents, exist in your possession or not that you
23  relied upon in creating the Magazine Chart?
24  A  Not that I'm aware of.  You know, it was
25  created whenever it was -- 2016, 2017.

Page 15

1      And I had left the NSSF in 2021; so I
2  assume any documents, you know, that were in my
3  office at the time are probably long gone, but I
4  don't have knowledge if they are there or -- or
5  gone.
6  Q  But to the best of your knowledge in
7  creating the Magazine Chart, you only relied on
8  physical documents from the U.S. ITC and ATF AFMER;
9  correct?
10  A  Correct.
11      For the most part, those documents form the
12  basis and then I created a draft report and
13  discussed that with some coworkers to -- that had
14  expertise in the industry to make sure I was on the
15  right track and wasn't going to put anything out
16  that wasn't as correct as it can be.
17  Q  Looking at Request No. 2:
18      "All opinions, reports, and
19      similar documents that you have
20      provided in other lawsuits,
21      arbitrations, or administrative
22      proceedings, or any other judicial or
23      quasi-judicial proceedings, that
24      involve issues or topics similar to
25      those on which you have provided

Page 16

1      opinions in this case."
2      Do you have any such documents?
3  A  I do not.
4  Q  But other such documents exist; correct?
5  A  Same answer as before.  There may or may
6  not be documents that NSSF -- actually, the building
7  that, you know, I had an office in was sold and I --
8  I have a feeling that they have -- you know, they
9  don't have a lot of documents.
10      But I'm 100 percent unaware of what exists
11  or doesn't exist that NSSF -- or aware, if they do
12  exist, where they might be.
13  Q  But to be clear, you filed declarations in
14  other cases; correct?
15  A  I have, yes.
16  Q  And it's fair to say, based on your
17  previous answer, that you haven't retained copies of
18  any of those declarations; correct?
19  A  I have not.
20  Q  Going to Request No. 3:
21      "All non-privileged information
22      and documents received or acquired by
23      you from any source concerning this
24      litigation."
25      Do you have any such documents in your

Page 17

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1 possession?
2    A   The only other document Mr. Lee had sent me
3 was, I think, a memo or memorandum of this case,
4 about a 40-page document.
5    Q   And do you know was this a memo that
6 Mr. Lee prepared?
7    A   I am not sure who prepared it.  It's just
8 kind of a review of the case.
9    Q   Any other documents received from anyone
10 else?
11   A   No.
12   Q   What did you do to prepare for this
13 deposition?
14   A   I did read the three documents we
15 discussed, the original deposition from 2017, the
16 three-page declaration, and then I reviewed the
17 40-page -- I think it was a memo of points, and I
18 had a phone call with Mr. Lee earlier in the week.
19   Q   What did you discuss on that phone call
20 with Mr. Lee?
21   A   Sort of a refresher of, you know, how the
22 day would go.  Again, it'd be an online Zoom meeting
23 and go through the points of the documents received.
24   Q   Did Mr. Lee tell you any questions you
25 should expect?

                                                Page 18

1    A   We discussed -- yeah.  We discussed that,
2 yes.
3    Q   And what questions did Mr. Lee tell you to
4 expect?
5    A   State your name, your background, what your
6 current position is, and knowledge, then, of the
7 Magazine Chart.
8    Q   Did you discuss the substance of your
9 opinions with Mr. Lee on that phone call?
10   A   Not in depth.
11   Q   But generally?
12   A   Yeah.
13       In regards to the -- the one exhibit, the
14 Magazine Chart.
15   Q   And what did you tell Mr. Lee about the
16 Magazine Chart?
17   A   It was something I had created when I was
18 with the National Shooting Sports Foundation, and we
19 discussed it; it had been updated and if I had any
20 records of that to which I replied I'd look, and I
21 was unable to find any updated documents.
22   Q   And you only had that one phone call with
23 Mr. Lee with regard to this deposition; correct?
24   A   With regard to the deposition -- we had one
25 previously when he asked if I would be interested in

                                                Page 19

1 helping out.
2    Q   When did that phone call when he asked if
3 you would be interested in helping out occur?
4    A   I'm not sure.  Maybe a month ago.
5    Q   What did you tell Mr. Lee when he asked if
6 you would be willing to help out?
7    A   I said "Sure."  So I'm here.
8    Q   Did you speak with anyone else about this
9 deposition?
10   A   I have not.
11   Q   You haven't spoken to any friends about
12 this deposition?
13       MR. LEE:  Asked and answered.
14       You may answer.
15       THE WITNESS:  Oh.  Not really.  I mean,
16 just -- you know, my -- my main job is keeping me
17 busy and that's my main focus with the company that
18 I'm with now.
19       This is just something that seemingly was
20 going to be a quick request and -- to corroborate
21 what had happened in 2017 with that one exhibit;
22 so --
23 BY MR. MEYERHOFF:
24   Q   You said "Not really."  I just want to be
25 absolutely clear.

                                                Page 20

1       Have you mentioned this deposition to
2 anyone else other than Mr. Lee?
3    A   I -- about a half hour ago, before -- my
4 17-year-old son woke up and I said "Don't come
5 downstairs."  He asked why I was all dressed up.  I
6 said "I'm going to go do a deposition" but didn't
7 get into any of the details.
8    Q   And I'll take it that that was the only
9 person that you've mentioned it to?
10   A   Correct.
11       MR. MEYERHOFF:  I want to pull up a
12 document that I'll mark as Exhibit 2.
13       (The document referred to was marked as
14       Deposition Exhibit 2 by the Reporter.)
15 BY MR. MEYERHOFF:
16   Q   Do you see this document?  The first line
17 is -- says Number 1 and then it says "George M. Lee"
18 at the top?
19   A   Yes.
20   Q   I will -- it's a three-page document.  I'll
21 just give you a chance to review the whole thing; so
22 if you want to review it and then when you want me
23 to scroll down, just let me know.
24   A   Okay.  You can scroll down a little bit.
25       Okay.

                                                Page 21

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 199 of 240 PageID: 7790

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1     Okay.
2    Q I'm only going to ask you questions about
3 the first two pages.
4    A Okay.
5    Q So scroll back up to page 2.
6     Do you see the second sentence on page 2?
7 It says:
8      "Plaintiffs have not yet retained
9     or disclosed Mr. Curcuruto as an
10     expert witness, but reserve the right
11     to so designate and disclose as such
12     within the time provided by
13     Federal Rule of Civil Procedure
14     26(a)(2)(D)(i)."
15     Do you see that?
16    A I do.
17    Q Is it an accurate statement that the
18 plaintiffs have not yet retained you as an expert
19 witness?
20    A Correct.
21    Q So you have no written agreement with
22 plaintiffs; correct?
23    A No.
24    Q And are you being compensated by plaintiffs
25 for your time here today?

Page 22

1    A I am not.
2    Q Are you being compensated by anyone for
3 your time here today?
4    A I am not.
5    Q So you have not been retained as an expert
6 witness.
7     Is it your understanding that you are
8 giving expert testimony here today?
9    A I think I'm just providing my opinion and
10 corroborating or -- what had taken place back in --
11 when I submitted that original document and kind of
12 tell you -- answer any questions about how that
13 original document came about.
14     MR. LEE: And let me just interpose an
15 objection. Lacks foundation. Calls for
16 speculation.
17 BY MR. MEYERHOFF:
18    Q Have you reviewed the original Complaint
19 filed by plaintiffs in this case?
20    A Unless it was one of those three documents,
21 no.
22    Q And just to be -- I'm sorry. I
23 interrupted.
24    A Just the three documents I mentioned
25 earlier, just to clarify.

Page 23

1    Q Just to be clear, the memo, the points and
2 authorities that Mr. Lee provided you, and what were
3 the other two documents? Sorry.
4    A The original deposition; I think about a
5 six-page document; and then the declaration, the
6 three-page document about today's declaration [as
7 spoken].
8    Q To be clear, when you say "the original
9 deposition," do you actually mean the original
10 declaration that you filed in this case in 2017?
11    A It was a six-page document and it had the
12 one attached exhibit, with the Magazine Chart. I'm
13 not sure if it was -- getting confused on
14 "declaration" versus "deposition."
15     MR. LEE: And objection -- I object to the
16 question. Assumes facts. He didn't file anything.
17 BY MR. MEYERHOFF:
18    Q And then the other document you're
19 referring to, is that the Notice of Deposition that
20 we looked at earlier as Exhibit 1?
21    A The three-page document?
22    Q Yeah. That's correct.
23    A Yes.
24    Q Do you recall when you first became
25 involved in this case?

Page 24

1    A Going back to the 2017 filing or --
2    Q Was the 2017 filing the first time you were
3 involved in this case?
4    A I'm not sure. You know, this case is, I
5 think, different than the original 2017 one. We
6 were talking about that one exhibit.
7     I'm a little confused on, you know, this
8 case versus other cases.
9    Q To the best of your recollection, has
10 Mr. Lee ever been the plaintiffs' attorney in
11 another case that you participated in?
12    A Yes. I believe so.
13    Q Okay. Do you recall when the first time --
14 let me rephrase.
15     When was the first time you've heard about
16 this specific case?
17    A If you want to name this case for me? This
18 is the Wiese/Bonta one? Was it known as something
19 previously?
20    Q When was the first time you heard about the
21 Wiese case, previously known as Wiese v Becerra, now
22 known as Wiese versus Bonta?
23    A I'm not sure.
24     I know I got refreshed on it with Mr. Lee
25 recently, but I'm not sure if I had dealt with it

Page 25

1 previously.
2    Q   Do you know how you first became aware of
3 this case, the Wiese case?
4    A   I'm not sure specifically how I became
5 aware of this case.
6    Q   Do you recall who you first spoke with
7 about this case?
8    A   I do not.
9       MR. MEYERHOFF:  I want to go ahead and pull
10 up what I'm going to mark as Exhibit 3.
11      (The document referred to was marked as
12      Deposition Exhibit 3 by the Reporter.)
13 BY MR. MEYERHOFF:
14    Q   It's a six-page document entitled
15 "Declaration of James Curcuruto in Support of
16 Plaintiffs' Motion for Temporary Restraining Order
17 and Issuance of a Preliminary Injunction."
18       Do you see that towards the middle of the
19 page?
20    A   I do.
21    Q   Is this the six-page document you were
22 referring to previously?
23    A   If you could just -- I think the one that I
24 had seen had an exhibit at page 6 and dated 2017; so
25 if you could just kind of scroll down so I could see

Page 26

1 the rest of it?
2    Q   Sure.
3    A   They all look the same.
4       Okay.  You can keep going.
5       Okay.  You can keep going.
6       Okay.  Yeah.  2017.
7       So it was just a different defendant, I
8 suppose, at the time; is that correct?  Same
9 plaintiff?
10    A   Yeah.  It's -- Becerra was the
11 Attorney General.
12    A   Okay.  So this, I believe, was the first
13 time I had heard of this and I'm not sure, you know,
14 if -- the process at NSSF, when I was there, if
15 someone needed help, usually -- you know, Mr. Lee
16 probably would have probably went through our
17 government relations team and then they would have
18 contacted me.
19       That was the standard practice back then.
20    Q   So looking at this document on the middle
21 of page 4 of the pdf, it says:
22       "I declare under penalty of
23       perjury that the foregoing is true
24       and correct.  Executed within the
25       United States on June 9, 2017."

Page 27

1       Do you see that?
2    A   Correct.  Yes.
3    Q   And do you see below that, there's a
4 signature?
5    A   That's me, yeah.
6    Q   And that's your signature; correct?
7    A   It is.
8    Q   And do you recall signing this document?
9    A   I do.
10    Q   Did you write this document?
11    A   I believe so.
12    Q   And did plaintiffs' counsel provide you
13 with any edits to this document?
14    A   I do not recall.
15    Q   Do you recall reviewing this document with
16 plaintiffs' counsel before signing it?
17    A   I do not recall, but it, most likely, would
18 have been reviewed by the plaintiffs' side before
19 getting submitted -- being submitted.
20    Q   You submitted declarations in other cases;
21 correct?
22    A   Correct.
23    Q   And is that a similar -- let me rephrase.
24       Is that the general practice with the
25 declarations you have submitted?

Page 28

1    A   There was a very similar process, you know,
2 of requests would come in, again, normally filtered
3 through our government relations team, and then they
4 would reach out to me and ask if, you know, the --
5 we had materials that were available and time
6 available to support any effort.
7       And then I would be in contact with the
8 plaintiffs' attorney and submit a declaration and
9 then go on from there.
10    Q   Did you discuss this declaration with
11 anyone at NSSF?
12    A   Oh, I'm sure, yeah.
13    Q   Who do you think you would have discussed
14 it with?
15    A   We had two associate general counsels
16 during my time at NSSF.  The first one I worked with
17 was Jeff Yue, I think Y-u-e, and then I'm not sure
18 when he left.  Maybe -- might have been before or
19 after this one.
20       And then Benjamin -- can't remember his
21 last name -- was the second associate general
22 counsel that I worked with on declarations like
23 these.
24       Ben -- hmm.  Sorry.  I can't remember his
25 last name.

Page 29

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 201 of 240 PageID: 7792

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  Q  Would you have discussed it with anyone
2  other than the associate general counsels at NSSF?
3  A  I'm sure I informed my direct superior, you
4  know, just on -- update on what type of work I
5  was -- had on my plate.
6  Q  And who was your direct superior at the
7  time you wrote this declaration?
8  A  Most likely, Randy Clark.  If not
9  Randy Clark, maybe Chris Dolmack, D-o-l-m-a-c-k.
10     I can't think of Ben's last name, but it
11  will come to me.
12  Q  So is it fair to say that you drafted this
13  declaration within the scope of your employment at
14  NSSF?
15  A  Yes.
16  Q  You drafted it on company time; correct?
17  A  Correct.
18  Q  Were you paid any additional money beyond
19  your salary to draft this declaration?
20  A  I was not.
21  Q  I want to shift gears and ask you --
22  actually, let me ask you another question.
23     You wrote this declaration in 2017;
24  correct?
25  A  Correct.

Page 30

1  Q  And were you aware that this declaration
2  was subsequently filed by the plaintiffs in the
3  Wiese case?
4  A  I believe -- yeah.  That was the process at
5  the time.  I believe that had taken place.
6  Q  So you testified previously that you spoke
7  with Mr. Lee approximately a month ago and he asked
8  about your willingness to -- to be deposed in this
9  case; correct?
10  A  Yes.
11  Q  When, previous to that time a month ago,
12  was the last time you had spoken with Mr. Lee about
13  this case?
14  A  May have been back in '17.
15  Q  But it hadn't been the past year; correct?
16  A  I don't believe so.
17  Q  Looking at this document, the top of the
18  page, page 4, do you see the purple writing at the
19  top of the page?
20  A  The share has gone away from my computer.
21     MR. MEYERHOFF:  I'm sorry.  Let me share
22  that again.
23     THE WITNESS:  Good old modern technology.
24     I do see that -- it's back on.  I do see it
25  but it's almost doubled up here.  I can't read that

Page 31

1  blue at the top of the page.  It's got two lines on
2  top of each other.
3  BY MR. MEYERHOFF:
4  Q  Do you have any understanding of what those
5  blue lines represent?
6  A  I believe they are just -- show the -- I
7  can't even read it.
8     But -- maybe just an overview of what the
9  document is.
10  Q  Do you know why there is two lines
11  superimposed over each other?
12  A  I do not.
13     MR. LEE:  Objection.  Calls for
14  speculation.
15     Well, never mind.
16  BY MR. MEYERHOFF:
17  Q  Are you aware that this declaration was
18  filed a second time?
19  A  I don't recall.
20  Q  In your conversations with Mr. Lee -- I
21  believe there's been two conversations within
22  approximately the last month with Mr. Lee; correct?
23  A  Correct.
24  Q  And have you spoken with Mr. Ray DiGuiseppe
25  about this case?

Page 32

1  A  I do not believe so.
2  Q  In either of your conversations with
3  Mr. Lee over the past month, did he tell you that
4  your declaration had been refiled this year?
5  A  I do not recall.
6  Q  So to be clear, at no point within the past
7  year did Mr. Lee contact you and ask you whether the
8  opinions included in this declaration filed in 2017
9  were still your opinions today; correct?
10  A  Did he ask me if they were still my
11  opinions?
12  Q  Yes.  That's correct.
13  A  On the Magazine Chart or this declaration?
14  Q  Yes.
15  A  Yeah.  We discussed that.
16  Q  All right.  You discussed that a month ago;
17  correct?
18  A  Correct.
19  Q  Prior to that, did Mr. Lee ask that
20  question?
21  A  Not to my knowledge.
22  Q  You graduated from college; correct,
23  Mr. Curcuruto?
24  A  I did.
25  Q  You graduated from UNC Wilmington; correct?

Page 33

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1   A   Correct.
2   Q   What degree did you obtain there?
3   A   A Bachelor's in business administration.
4   Q   And did you attend graduate school?
5   A   I did not.
6   Q   At UNC Wilmington, did you take any
7   statistics classes?
8   A   Just the one to help meet the requirements
9   of -- the course requirements for that degree.
10  Q   So it's your testimony today that you took
11  a statistics class at UNC Wilmington?
12  A   I believe so.  It was 1991.  I think it was
13  part of the curriculum.
14  Q   And do you recall specifically what was
15  taught in that class?
16  A   No.  Just general.
17  Q   Okay.  Let me talk a little bit about your
18  employment history.
19      You served as a marketing manager at the
20  Other List Company; correct?
21  A   Correct.
22  Q   And that was from 1996 to 2005; correct?
23  A   It's about -- sounds about right.
24  Q   What did you do as a marketing manager at
25  the Other List Company?

Page 34

1   A   I was responsible -- there was some new
2   client acquisition and transactions between clients.
3   Q   What does "new client acquisition" mean?
4   A   You know, we would try to sign on new
5   clients to add to our -- our existing clients.
6   Q   What did the Other List Company do?
7   A   They were a direct marketing firm focused
8   on direct mail campaigns.
9   Q   Were you successful in your new client
10  acquisition?
11  A   Yes.
12  Q   And then you next were at Scholastic, Inc.;
13  correct?
14  A   Correct.
15  Q   And you were a marketing manager there as
16  well?
17  A   Correct.
18  Q   And you were there from approximately 2005
19  to 2006; correct?
20  A   Yes.
21  Q   And what did you do in your role as
22  marketing manager at Scholastic, Inc.?
23  A   Did some analysis of the programs they had
24  there and worked with their marketing team to test
25  some of the campaigns to see which performed better.

Page 35

1   Q   And is it fair to say that the goal at
2   Scholastic, Inc., was new client acquisition?
3   A   No.  Not from my position.
4   Q   What was the goal of your position?
5   A   Just trying to determine the most
6   cost-effective campaigns.
7   Q   And who were your clients at Scholastic,
8   Inc.?
9   A   I just worked for the company, Scholastic.
10  They were a book publisher.  Like "Harry Potter" was
11  their big book at the time, but I worked in their
12  continuity program division.
13  Q   What does -- what does the continuity
14  division do?
15  A   You may recall offers where, you know, you
16  buy one book for one dollar and then you sign up and
17  you get six free but then you've got to buy, you
18  know, five more at $5.00, and they were children's
19  book titles, "Dr. Seuss," Disney.
20      Golden books were the ones I really worked
21  with.
22  Q   I remember the Scholastic book fair.
23  A   Right.
24  Q   And -- and so the clients of Scholastic,
25  Inc., are end users; right?  Consumers; correct?

Page 36

1   A   Correct.
2   Q   Just going back up a second.
3       Why did you leave the Other List Company?
4   A   Just was looking to increase my revenue
5   and, you know, try something different.
6   Q   You were not terminated from the
7   Other List Company; correct?
8   A   Correct.
9   Q   And then why did you leave Scholastic,
10  Inc.?
11  A   They were going through a transition period
12  and had to reduce payroll.  It was probably the
13  start of people not reading books anymore.  Not a
14  good business decision.
15  Q   So it's fair to say you were laid off;
16  correct?
17  A   Correct.
18  Q   To the best of your knowledge, did that
19  layoff have to do with any performance-related
20  issues on your part?
21  A   I don't believe so.
22  Q   After Scholastic, Inc., you served as
23  executive director at Marketing Memories, LLC;
24  correct?
25  A   Correct.

Page 37

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  Q  And you did that from approximately 2006 to
2  2009; correct?
3  A  Correct.
4  Q  And you were also the owner of this
5  company; correct?
6  A  I was.
7  Q  Were you the sole owner of the company?
8  A  Yes.
9  Q  And how many employees did you have at
10 Marketing Memories?
11 A  Just me.
12 Q  And is it fair so say that the -- the
13 business of Marketing Memories was about selling
14 personalized engraved products?
15 A  Yes.
16 Q  So you were sort of -- I imagine you were a
17 jack-of-all-trades at the -- at the company;
18 correct?
19 A  Correct.
20 Q  Did you have any other jobs before you
21 joined NSSF that we haven't previously mentioned?
22 A  Oh, yeah.  I had plenty of jobs growing up
23 and previous to, I think, the first one you
24 mentioned was -- was the Other List Company.
25 Q  Were those jobs in the service industry?

Page 38

1  A  Sure.  Everything from a paper route to
2  landscaping to working at retail stores.
3  Q  Did any of those retail stores sell
4  firearms?
5  A  Yes.
6  Q  Which one or ones?
7  A  The Sports Authority.
8     And Track -- I worked at companies that no
9  longer exist.
10 Q  This deposition is a trip down memory lane.
11 Sports Authority, Scholastic.
12    Were you -- at the Sports Authority, were
13 you involved in the sale of firearms?
14 A  I was not.  I had worked there part-time at
15 nights for a couple years.  They brought the
16 firearms toward the end.  They were not there in my
17 store for very long.
18 Q  When you say they brought them in at the
19 end, you mean at the beginning of your employment,
20 they did not sell firearms and then towards the end
21 of your employment, they did; correct?
22 A  Correct.
23 Q  Do you recall what year this was or years
24 when you were employed at the Sports Authority?
25 A  1995-ish.

Page 39

1  Q  Do you have an understanding of why the
2  Sports Authority decided to start selling firearms
3  around 1995?
4     MR. LEE:  Objection.  Lacks foundation.
5  Calls for speculation.
6  BY MR. MEYERHOFF:
7  Q  You can answer.
8  A  Okay.  Then no, I did not.
9  Q  Do you recall what type of firearms the
10 Sports Authority sold while you worked there?
11 A  I believe they had long guns, which -- you
12 know, shotguns and rifles.
13 Q  Do you recall if they sold magazines while
14 you worked there?
15 A  I do not.
16 Q  So before your employment at NSSF, is it
17 fair to say that your primary professional focus was
18 marketing?
19 A  Yes.  Marketing, sales.
20 Q  Prior to your time at NSSF, have you had
21 any experience with companies in the firearms
22 industry?
23 A  A few of our clients at the
24 Other List Company were in the outdoor space and
25 then also, obviously, the Sports Authority which we

Page 40

1  already discussed.
2  Q  When you say "the outdoor space," what do
3  you mean?
4  A  Hunting, fishing, camping, shooting.
5  Q  So in 2009, you started your employment at
6  NSSF; correct?
7  A  Correct.
8  Q  What does "NSSF" stand for?
9  A  The National Shooting Sports Foundation.
10 Q  And how did you first become aware of the
11 role you were eventually hired for at NSSF?
12 A  I believe I saw the ad in a -- in a local
13 newspaper or potentially an online website job
14 board.
15 Q  And why did you decide to apply for this
16 role?
17 A  Couple reasons:  One, the company that I
18 had owned was, you know -- wasn't as successful as I
19 was hoping it would be.
20    Second, I had grown up hunting, fishing,
21 camping, and the NSSF was in that space.
22    So those were the two primary reasons.
23 Q  And can you describe briefly what the
24 interview and hiring process was like for NSSF for
25 that role?

Page 41

1 A  Sure.
2    Best of my recollection, submitted paper
3 interview; mailed it in.
4    Resume.  Cover letter.  Mailed it in.
5    I was contacted by -- I think they had used
6 a third party to kind of sort through all the
7 applicants and I made it past that initial review
8 and then had interviews, several interviews, with
9 staff at NSSF.
10   Q  And you were initially hired as the
11 director of industry research and analysis; correct?
12   A  Correct.
13   Q  And you had testified previously that your
14 main area of professional focus, prior to joining
15 NSSF, was in marketing; correct?
16   A  Correct.
17   Q  To the best of your knowledge, why do you
18 think NSSF hired you for this
19 industry-research-and-analysis role?
20   MR. LEE:  Objection.  Calls for
21 speculation.  Lacks foundation.
22    You can answer.
23    THE WITNESS:  I believe, you know, my
24 knowledge of the industry, my just personal
25 experiences with the industry, my background in

Page 42

1 formed, the Marketing Memories, framed that
2 movement.  And I had to research which particular
3 market I thought would be best for the personalized
4 products, that sort of stuff.
5    Q  And what sources of information did you
6 look at in making that determination?
7    A  Let me think back.  Just a lot of, I guess,
8 internet searches and looking up -- I remember --
9 you know, the markets we were looking at were birth
10 rate, death rate, number of anniversaries, number of
11 weddings.
12    When you were making -- when we were making
13 personalized products, we wanted to know why people
14 would buy those and they were mainly for birthdays,
15 anniversaries, births, deaths.
16    We kind of analyzed how many people were
17 born a year, how many people died a year.
18 Obviously, birthdays are easy to figure out.  That
19 type of stuff.
20    Q  When you worked at the Other List and at
21 Scholastic, were there research directors at either
22 company?
23    A  I don't recall.
24    Q  Do you recall receiving any research
25 training at either job?

Page 44

1 marketing.
2    Also encompassed when I worked at
3 Scholastic, the analysis part of it.
4 BY MR. MEYERHOFF:
5    Q  The Scholastic you mentioned was the -- you
6 had testified previously about the analysis of
7 programs was something you did at Scholastic?
8    A  Correct.
9    Q  What do you mean by analysis of programs?
10   A  Again, with those continuity programs, we
11 would do some AB testing with different titles and
12 different offers, and I was the person that would
13 then say "Okay.  Offer A outperformed Offer B.
14 Let's now test Offer B versus Offer C."
15   Q  So it was an analysis -- let me just -- so
16 at Scholastic, the analysis of programs was mainly
17 geared towards sales?  Is that a fair statement?
18   A  Yes.  Which offers outperformed others.
19 Looking at numbers and developing a few formulas and
20 projecting overall sales for a campaign and then
21 determining which one was more cost effective than
22 another.
23   Q  And have you done any research in
24 professional roles prior to joining NSSF?
25   A  You know, with my -- the organization I

Page 43

1    A  Just standard job training.  Somebody
2 taught me a little bit about getting me up to speed
3 on the spreadsheets at Scholastic, and I was on my
4 own at Marketing Memories.
5    Q  But nothing specific about these are the
6 best practices to engage in in research; correct?
7    A  Correct.
8    Q  And did you work with any statisticians at
9 the Other List Company or Scholastic?
10   A  At Scholastic there were statisticians or
11 at least they had some other analysis staff.
12   Q  And did you receive training from those
13 statisticians?
14   A  I did learn from them.
15   Q  Do you recall what you learned?
16   A  Just, again, some of the formulas -- the
17 Excel formulas to do forecasting so we could make
18 decisions quicker.
19    We didn't have to wait for a program to --
20 to end all the way out.  We would just forecast the
21 ones we thought would make the most money so then we
22 could move on to the next offer.
23   Q  Is it fair to say that that training was
24 mostly related to formulas in Excel?
25   A  Yes.

Page 45

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 205 of 240 PageID: 7796

Wiese, et al. vs. Bonta, et al.                                        Deposition of James Curcuruto

Page 46

1   Q  And when you ran Marketing Memories, did
2  you employ any -- I guess you testified previously
3  there were no other employees.
4       Did you ever contract with any
5  statisticians with Marketing Memories, LLC?
6    A  I did not.
7    Q  Did you ever contract with any outside
8  research organizations while you were with
9  Marketing Memories, LLC?
10   A  No.
11   Q  So returning to NSSF, when you served as
12 director of administrative research and analysis,
13 you reported to the director of business
14 development; correct?
15   A  Correct.
16   Q  And --
17   A  It might have been the manager of business
18 development.  I'm not sure of the title.
19   Q  And that was Randy Clark; correct?
20   A  Correct.
21   Q  And can you describe what the business
22 development department did at NSSF?
23   A  They had a couple of divisions -- I don't
24 know divisions but parts to it.
25       There were member services.  So NSSF is a

Page 47

1  member-based organization; so they had staff that
2  supported member needs; they had some programs --
3  programs division where they would help try to
4  increase participation in hunting, target shooting;
5  and then the research division was myself and my
6  associate researcher.
7    Q  Do you recall receiving annual reviews for
8  performance at NSSF?
9    A  I do, yes.
10   Q  And those reviews were given by Mr. Clark;
11 correct?
12   A  Correct.
13   Q  And do you recall what the rubrics were for
14 those reviews?
15   A  Just standard forms with, you know, the --
16 maybe ten -- ten questions on poor to excellent.
17   Q  If you recall, generally, what those
18 categories were.
19   A  I do not recall specifically, but generally
20 they would have been, like, you know, works well
21 with coworkers, met goals, that type of stuff.
22       MR. MEYERHOFF:  I see we're past an hour.
23 Mr. Curcuruto, Ms. Miller, Mr. Lee, would you like a
24 break?
25       THE WITNESS:  I'm okay.

Page 48

1       THE REPORTER:  I would like one.
2       MR. MEYERHOFF:  How long?
3       THE REPORTER:  Five minutes is great.
4       (A brief recess was taken.)
5  BY MR. MEYERHOFF:
6    Q  So when we broke, we were discussing your
7  role as director of industry research and analysis
8  at NSSF.
9       Can you briefly describe what that role
10 entailed?
11   A  Sure.
12       I was responsible for most -- conducting
13 most of the research for NSSF, and NSSF is a
14 business-to-business trade association for the
15 firearms industry; so what we tried to do is provide
16 research to our members that would help them make
17 better business decisions.
18   Q  And then in 2016, you became director of
19 research and market development; is that correct?
20   A  Correct.
21   Q  Would that be considered a promotion?
22   A  And some added responsibilities.
23   Q  And added compensation?
24   A  I think it was just a title change.
25   Q  What were the added responsibilities that

Page 49

1  came with becoming the director of research and
2  market development?
3    A  I took over what we call R3, which is
4  recruit new people, retain the ones we have, and
5  reactivate lapsed participants.
6       And that R3 dealt with overall
7  participation in hunting and target shooting; so we
8  tried to increase participation, and that kind of
9  then fell under my responsibilities.
10   Q  Did you -- did you lose any of the
11 responsibilities that you previously had when you
12 took on this new role?
13   A  I -- the only thing that I had taken off my
14 plate was I had ran an executive management seminar
15 at our -- one of our conferences; so somebody else
16 took that responsibility over.
17   Q  What was the -- was it a seminar?
18   A  Correct.  Yeah.
19       I brought in paid speakers that -- NSSF
20 owned and operated a large business-to-business
21 show, which was called the Shot Show, and at that
22 show, we would provide our attendees education; so
23 the education that -- that program that I developed
24 was for executives just to help them, you know,
25 improve their skill set.

Q   And these are executives of firearms companies?

A   Correct.

The attendees of Shot Show were primarily firearm manufacturers, ammunition manufacturers, and any businesses that had to do with that market. Retailers, ranges, parts manufacturers.

Q   Who did you report to in your role as director of research and market development?

A   At the time I believe it was still Randy Clark and I'm not sure of the time.

He had left the organization and then I had reported to Chris Dolmack, and I'm not sure how -- how long I had reported to Randy in my new role and then transferred over reporting to somebody else.

Q   Is it fair to say that the whole time you were at NSSF, you were within the business development division?

A   Correct.

Q   When was your last day of employment at NSSF?

A   Early January 2021.  I don't recall the specific date.

Q   Why did you leave NSSF?

A   They had staff reductions due to losing --

Page 50

during COVID, the -- the show that they held, the Shot Show, was canceled and that was a big chunk of their revenue; so they had to have some staff reductions and budget reductions.

So I got caught up in that.

Q   Is that the reason they told you you were being let go?

A   Correct.

Q   Did they mention any other reasons that they told you you were being let go?

A   They did not.

Q   Who took over your responsibilities, to the best of your knowledge, after you were let go?

A   I had a research assistant that, I assume, most of the responsibilities went to and then I think they had divvied up a lot of other responsibilities among the remaining staff there.

Q   Who was that research assistant?

A   Dianne, with two n's, Vrablic, V-r-a-b-l-i-c.

Q   Do you know why you were let go and Miss Vrablic was not?

MR. LEE:  Objection.  Calls for speculation.

THE WITNESS:  Most likely financially.  I

Page 51

had a larger salary and -- and controlled a few budgets that she did not.

BY MR. MEYERHOFF:

Q   Do you know that -- do you know if NSSF ever hired another director of research and market development?

A   I do not believe they have.

Q   Are you familiar with an individual named Salam Fatohi?

A   He was a coworker at the time.  I'm not sure.  Maybe we were there for two years together.

He had worked, I believe, in the government relations division, but at the time we were all home officed to -- due to COVID; so I didn't really have many in-person interactions with Salam.

Q   Have you had any interactions with him, in person or otherwise, since you've left NSSF?

A   I have not.

Q   Do you know what Mr. Fatohi's role was in the government relations division?

A   I believe he was an assistant researcher on the government side of things, politics.

But I didn't really delve too much into that.  I was busy with my own responsibilities to learn what his were.

Page 52

Q   What -- so I take it that NSSF has a government relations division?

A   Correct.

Q   And what does that division do?

A   They -- they mostly focus on the political side of things.

Q   When you say "focus on the political side of things," what do you mean?

A   I know that they had started a government relations office in Washington, D.C., to try to help the industry side of politics and, again, I didn't get too involved in that.

Q   Did you ever discuss -- did you ever discuss the declaration that you submitted in this case with anyone in the government relations division?

A   The original declaration from 2017?

Q   That's correct.

A   Sure.

That's where I would have worked with that associate general counsel who was part of the government relations team.  Ben Erwin.  Ben Erwin.

THE REPORTER:  What was -- I'm sorry.  What is it?

THE WITNESS:  E-r-w-i-n.

Page 53

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 54

1    He was the associate general counsel that I
2  worked with on some of the declarations after the
3  original one left.
4    Sorry.
5  BY MR. MEYERHOFF:
6    Q  And when you say you worked with the
7  associate general counsels on these declarations,
8  what do you mean?
9    A  They would, you know, help walk through the
10 process with me and, you know, I would -- I had all
11 the research and filled out the declarations and
12 they would be, you know, kind of the liaison between
13 folks like Mr. Lee.
14   Q  Did the associate general counsels at NSSF
15 ever provide comments on these declarations?
16   A  I know we discussed them and they probably
17 provided some comments, general comments, on
18 grammar, that type of stuff.
19   Q  To the best of your recollection, did NSSF
20 oppose California's restrictions on large-capacity
21 magazines while you were there?
22   A  To the best of my knowledge, I know NSSF
23 overall would be opposed to anything seen as, you
24 know, I guess anti-gun or anti-industry; so things
25 like the high-capacity magazine bans or bans on what

Page 55

1  they called modern sporting rifles, which was the AR
2  platform, they would have been opposed to.
3    I don't know, again, if they -- how -- how
4  in depth or what they did to oppose them, but I know
5  that was discussed.
6    Q  Do you recall if they ever told you why
7  NSSF opposed restrictions on large-capacity
8  magazines?
9    MR. LEE:  Objection.  Vague.  Vague as to
10 the term "they."
11   You may answer.
12   THE WITNESS:  Okay.  Yeah.  I think there
13 were discussions.
14   From what I recall, I had discussions on,
15 you know, getting rid of a product that our members
16 sold was bad for our members and we are a
17 member-based trade association; so we would do what
18 is best for our members and that would be the --
19 keep allowing them to sell -- make the products that
20 they were selling.
21   MR. MEYERHOFF:  Can you read back that last
22 answer for me, Ms. Miller?
23   (The record was read.)
24 BY MR. MEYERHOFF:
25   Q  To the best of your recollection, were you

Page 56

1  provided with any other rationales as to why NSSF
2  opposed the restrictions on large-capacity
3  magazines?
4    A  No.  That was the premise of it, you know,
5  helping our members stay in business.
6    Q  So after you left NSSF in 2021, you formed
7  a company called Outdoor Insights, LLC; is that
8  correct?
9    A  Correct.  Yeah.  Just kind of did some
10 consulting.  Just -- and then decided to try to
11 figure out what I want to do.
12   Q  What you want to do when you grow up.
13   A  Exactly.
14   Q  And what kind of companies did you consult
15 for?
16   A  A few companies within the firearms
17 industry.
18   I did some -- wrote some articles.  Some
19 folks paid me to write some articles.  The U.S. Fish
20 and Wildlife Service was a company that asked me to
21 write articles, you know, focused on the outdoors
22 and conservation.
23   Q  Did any of the firearms companies that you
24 consulted with -- do any of them sell large-capacity
25 magazines?

Page 57

1    A  I do not believe so, no.
2    Q  Did any of the articles you've written
3  while at Outdoor Insights, LLC, concern
4  large-capacity magazines?
5    A  I don't believe so.
6    Q  You're also the executive director of
7  Outdoor Stewards of Conservation Foundation; is that
8  right?
9    A  Correct.
10   Q  And you -- is it fair to say that you
11 formed that organization?
12   A  I did.
13   Q  And you formed it in 2021 as well?
14   A  Correct.
15   Q  What does that organization do?
16   A  We are a 501(c)(3) nonprofit organization,
17 and our mission is to help recruit the next
18 generation of what we call HATS, which are hunters,
19 anglers, trappers, and shooters, and promote the
20 fact that HATS are primary funders and stewards of
21 land, fish, and wildlife conservation in America.
22   Is that too long?
23   Q  No.  That's -- thank you.
24   Does Outdoor Stewards of Conservation
25 Foundation have a position on legality of

1 large-capacity-magazine restrictions?
2    A  We do not.
3       We're conservation focused and we've got
4 some programs that we're -- which is our primary
5 focus.
6    Q  And I'm sorry.  You told me this already,
7 but what is the -- what is the mission of
8 Outdoor Stewards of Conservation Foundation?
9    A  That's to use the research-based
10 communication and engagement programs to help
11 recruit the next generation of hunters, anglers,
12 trappers, and shooters and promote the fact that
13 they are the primary funders of land, fish, wildlife
14 conservation in America.
15    Q  Do you think that restrictions on
16 large-capacity magazines interfere with recruiting
17 the next generation of hunters and anglers?
18    A  I have not thought too much about that,
19 but, you know, the less options you have to do
20 anything, I suppose would -- would hurt recruitment
21 efforts.
22    Q  But it's not something you spent time
23 thinking about; correct?
24    A  I have not.
25    Q  Prior to your time at NSSF, you had never

Page 58

1 conducted any research on firearm magazines;
2 correct?
3    A  Correct.
4    Q  And -- and in your prior employment we
5 mentioned prior to NSSF, you hadn't designed or
6 conducted studies as part of those positions, had
7 you?
8    A  I had not.
9    Q  And you mentioned briefly -- and if you
10 could just refresh my recollection.  In your
11 positions prior to NSSF, what had been your
12 professional involvement with firearms'
13 manufacturers?
14    A  No direct contact with the manufacturers.
15    Q  Other than your salary from NSSF, in the
16 past five years, have you received any payments or
17 funds or income from the firearms industry?
18    A  A few of my clients with the consulting
19 business, I had -- I had received some compensation
20 for work I had done after NSSF.
21    Q  And anything beyond that?
22    A  Directly from the firearm manufacturers?
23    Q  That's correct.
24    A  With Outdoor Stewards of Conservation
25 Foundation, one of our programs is called "Fill a

Page 59

1 bag while filling your tag," and we provide
2 biodegradable bags to people that hunt, fish, and
3 shoot so when they are outdoors they can take trash
4 out of the woods and waters, and we sell those bags
5 to state wildlife agencies, outdoor organizations.
6       Some of the folks that have bought those
7 bags are firearm manufacturers.
8    Q  Do you own any shares or stocks in any
9 firearms manufacturing companies?
10    A  I have a retirement account that has, you
11 know, the different funds, and I have -- I don't
12 know if any of them have shares in that.
13       You know, my -- my son has an account to
14 kind of -- I teach him to play with and in that
15 account, he owns shares of Smith & Wesson, yes.  I
16 think. I'm not sure of the symbol.
17    Q  But you personally don't own any shares of
18 Smith & Wesson or any other firearms manufacturer,
19 independent of what may be in your retirement fund?
20    A  Correct.
21    Q  Do you personally own any large-capacity
22 magazines?
23    A  So is that -- that's 11-plus?  Is that --
24 just to define it?
25    Q  A magazine capable of holding more than

Page 60

1 10 rounds.
2    A  Okay.  I do.
3    Q  Approximately how many do you own?
4    A  I believe three.
5    Q  Do you own any standard-capacity magazines
6 or magazines capable of holding 10 rounds or less?
7    A  I do.
8       MR. LEE:  Well, hang on a second.
9       THE WITNESS:  Oh, sorry.
10       MR. LEE:  Counsel, which is it?
11 Standard-capacity magazine or magazines capable of
12 holding 10 or fewer rounds?
13       MR. MEYERHOFF:  I mean, I'm calling it a
14 standard-capacity magazine.  I think the witness
15 knows what I mean.
16       MR. LEE:  Standard -- you said do you own
17 any standard-capacity magazines or magazines capable
18 of holding 10 rounds or less.
19       Did you not apply that 10 -- that
20 standard-capacity magazines are magazines that hold
21 10 or fewer rounds?
22       So the question is vague and ambiguous.
23       MR. MEYERHOFF:  That's your objection?
24       MR. LEE:  Yes.
25 ///

Page 61

1  BY MR. MEYERHOFF:
2      Q  Mr. Curcuruto, do you own any magazines
3  capable of holding no more than 10 rounds?
4      A  I do.
5          Thanks for the clarification.
6      Q  You do know for purposes of this
7  deposition, when I say "standard-capacity magazine,"
8  I mean a magazine capable of holding 10 rounds or
9  less?
10     A  And I do understand that.
11         MR. LEE:  I object to the question --
12         THE WITNESS:  Oh, sorry.
13         MR. LEE:  That -- that's not a term that I
14 recognize, and the term that has been used in this
15 litigation, standard-capacity magazine, by others
16 including plaintiffs, including General Youngman,
17 including just about anyone else that you would talk
18 to in the country -- a standard-capacity magazine is
19 a magazine that typically holds more than 10 rounds.
20         So to the extent you're trying to mislead
21 this witness by getting him to adopt the idea that a
22 standard-capacity magazine as that term has been
23 used in this litigation means a California legal
24 magazine, I'm going to have to object to that.
25         MR. MEYERHOFF:  Ms. Miller, can you read

Page 62

1  back the last question and answer.
2          (The record was read.)
3  BY MR. MEYERHOFF:
4      Q  How many magazines, approximately, do you
5  own that are capable of holding no more than
6  10 rounds?
7      A  Approximately 10.
8      Q  For the large-capacity magazines that you
9  own, what is the maximum number of rounds that those
10 are capable of holding?
11     A  15.
12     Q  And are all 3 of those magazines capable of
13 holding 15?
14     A  Yes.
15     Q  What state do you live in, Mr. Curcuruto?
16     A  Connecticut.
17     Q  Do you know if Connecticut has any
18 restrictions on large-capacity magazines?
19     A  They do.
20     Q  Do you know what -- do you know what that
21 restriction is?
22     A  I believe no more than 10.
23     Q  Do you know if there is some kind of
24 grandfather provision that makes your possession of
25 those magazines legal?

Page 63

1      A  There is.
2          I believe back in early 2022, '23, I had to
3  sign some sort of paperwork that said how many do
4  you own?
5      Q  Is it your understanding that under
6  Connecticut law, you cannot acquire more capacity
7  magazines?
8      A  I believe that's correct.
9          It's hard to keep up with the laws in
10 Connecticut.
11         MR. LEE:  Object to the question as calls
12 for a legal opinion, legal conclusion.
13 BY MR. MEYERHOFF:
14     Q  If Connecticut's law were invalidated,
15 would you go purchase more large-capacity magazines?
16         MR. LEE:  Objection.  Lacks foundation.
17 Calls for speculation.
18         You may answer.
19         THE WITNESS:  So I would -- if I had the
20 legal ability to buy a magazine that held more than
21 11 -- 11-or-more rounds, I, most likely, would.
22 BY MR. MEYERHOFF:
23     Q  Why would you buy another magazine capable
24 of holding more than 10 rounds?
25     A  A lot of firearm manufacturers, when you

Page 64

1  buy a gun, they come with that.
2          In other states, I believe, they come with
3  11-plus and if I were to go buy a new gun and it
4  came with that magazine, I would be purchasing it, I
5  guess.
6      Q  Any other reasons?
7      A  You know, I -- hopefully, when I have some
8  free time, I'll do some target shooting.  Right now,
9  I'm just focusing on getting the business up and
10 running, and it's just -- when you do do target
11 shooting, it's easier to load one magazine, you
12 know, with 15 rounds than 3 magazines with 10, you
13 know -- 2 15-round magazines versus 3 10-round
14 magazines.  Just makes it easier, more enjoyable
15 when you're at the target-shooting range.
16     Q  I take it you do a -- you like to target
17 shoot; correct?
18     A  I do.
19     Q  Are there any other reasons, other than the
20 fact that if you purchased another firearm, it may
21 come with a large-capacity magazine and the fact
22 that large-capacity magazines make target shooting
23 easier, that you would want to purchase a
24 large-capacity magazine?
25     A  Again, just to clarify the "large capacity"

Page 65

1 being an 11-plus, you know, I do have a conceal
2 carry license, and right now the maximum in
3 Connecticut is that under-10 capacity; so if I
4 were -- if the law allowed it and I was legally
5 allowed to do it and carry a firearm concealed, I
6 would carry one with 11 or more rounds, most likely.
7     Q   There are 30-round magazines commercially
8 available for sale in other states.
9         Do you know if that's true?
10    A   I believe so, yes, sir.
11    Q   And would you want to purchase a 30-round
12 magazine?
13    A   I don't -- I -- I haven't really thought
14 about it, but I would if they weren't illegal.
15    Q   How many firearms do you own?
16    A   Approximately 20.
17    Q   Do you own any revolvers?
18    A   I do.
19    Q   And why do you own revolvers?
20    A   I just -- I just like all different types
21 of guns.
22    Q   But no specific reason that you -- that you
23 own revolvers?
24    A   Just collecting, target shooting, personal
25 protection.

Page 66

1         Those are some of the reasons I own all
2 types of guns.
3     Q   So it's fair to say that you own revolvers
4 for, among other reasons, personal protection;
5 correct?
6     A   Correct.
7     Q   And when you say "personal protection," is
8 it fair to say you mean that if someone were to
9 confront you and you had a revolver, you would
10 potentially use that for self-defense; correct?
11    A   Correct.
12    Q   Do you own any guns that are -- that are
13 fixed-magazine systems?
14    A   So not attachable?  Just to clarify.
15    Q   Yeah.
16        Not -- that have a magazine that is not
17 detachable.
18    A   I do not.
19    Q   Do you have any firearms that are capable
20 of accepting magazines capable of holding more than
21 15 rounds?
22    A   More than 15?
23    Q   For example, are -- do you possess any
24 firearms that are capable of holding magazines which
25 can accept 30 rounds?

Page 67

1     A   I believe so, yes.
2     Q   What is one of those firearms?
3     A   Well, like, you know, a Ruger 10/22, which
4 is a rifle, has a little box magazine which most of
5 them are -- are 10 rounds but they have other
6 magazines that would hold more -- 11-plus.
7         I'm not sure up to 30, but certainly 15.
8     Q   Do you know if any -- do you know if the
9 Ruger 10/22 you could purchase a magazine capable of
10 holding more than 15 rounds?
11    A   I'm not familiar with that.
12        I would -- if I had to venture a guess, I
13 would say yes.
14    Q   Do you own any firearms which are referred
15 to alternatively as assault weapons or modern
16 sporting rifles?
17    A   I have one AR platform rifle that we used
18 to call, at NSSF, a modern sporting rifle.
19 Connecticut-compliant edition.
20    Q   And when did you purchase that AR platform
21 rifle?
22    A   I'm not sure of the exact date but several
23 years ago.
24    Q   Did you purchase that rifle, to the best of
25 your knowledge, before Connecticut's restrictions on

Page 68

1 large-capacity magazines went into effect?
2     A   I believe after because I -- I do -- I
3 couldn't -- I don't have any magazines that hold
4 more than 10 rounds for that firearm; so I would
5 assume at the time, if I could have bought more than
6 10 rounds, I would have or it would have come with
7 it.
8     Q   You testified previously, I believe, that
9 the Ruger 10/22 firearm is capable of accepting a
10 magazine holding more than 10 rounds; correct?
11    A   Correct.
12    Q   Do you own any other -- do you own any
13 detachable magazine firearms for which you only have
14 a magazine capable of holding more -- no more than
15 10 rounds?
16    A   Yes.
17        I own several firearms with magazines that
18 are 10 or less.
19    Q   What do you use those firearms for?
20    A   Mostly target shooting, collecting,
21 personal home defense.
22        I don't think any of them are -- they are
23 not hunting related.  Those aren't my hunting
24 firearms.
25    Q   So is it fair to say that you believe that

Page 69

Wiese, et al. vs. Bonta, et al.                              Deposition of James Curcuruto

---

1  those firearms are appropriate for home defense?
2      MR. LEE: Objection. Misstates testimony.
3      You may answer.
4      THE WITNESS: They -- they can be used for
5  home defense.
6  BY MR. MEYERHOFF:
7      Q  I believe -- and correct me if I'm wrong --
8  but I believe one of the reasons you possess one of
9  the revolvers you have is for home defense; correct?
10     A  Correct.
11     Q  And did you also say for personal
12 protection?
13     A  For the revolvers, home defense, personal
14 protection, yes.
15     Q  For the revolvers you have, what is the
16 maximum number of rounds you can fire before you
17 need to reload?
18     A  The maximum in the revolvers I own, there
19 are 6.
20     Q  Do you know what I mean firearms for
21 which -- start again.
22     Do you own any firearms that you can only
23 shoot 5 or fewer rounds before you need to reload?
24     A  Well, I do have some -- for -- for when you
25 water fowl hunt and you duck hunt in Connecticut and

Page 70

---

1  I think most places, the most you are allowed to
2  have is 3 bullets in the gun; so you have to -- if
3  the gun would -- is capable of holding more, you
4  have to include what they call a plug; so, you know,
5  you have to just take the gun apart to be able to
6  put more than 3 bullets in it.
7      So I have some water fowl guns right now
8  with plugs in them; so the maximum amount of shells
9  I can put in them are 3.
10     Q  Do you know, to the best of your knowledge,
11 why Connecticut has that restriction?
12     MR. LEE: Objection. Lacks foundation.
13 Lacks foundation. Calls for speculation. And calls
14 for a legal opinion.
15     You may answer.
16     THE WITNESS: It's just a federal
17 regulation for duck hunting, the maximum is 3. For
18 most types of duck hunting, there is a lot of
19 different regulations. Snow geese, you can have a
20 lot more than 3 and -- but they go down a rabbit
21 hole.
22 BY MR. MEYERHOFF:
23     Q  Do you think that restriction on the number
24 of rounds you can fire without reloading while
25 duck/fowl hunting interferes with hunting?

Page 71

---

1      MR. LEE: Objection. Calls for an opinion.
2      You may answer.
3      THE WITNESS: You know, it's always been
4  that way since I've been hunting. I'm sure there's
5  times if I had a fourth bullet, I would have been
6  able to get more dinner, but, you know, it's -- it's
7  just the way it is and I follow the regulations.
8  BY MR. MEYERHOFF:
9      Q  It sounds like -- and obviously correct me
10 if I'm wrong -- you've discharged a firearm before;
11 correct?
12     A  Correct.
13     Q  Why have you discharged firearms in the
14 past?
15     A  For target shooting and hunting.
16     Q  Have you ever discharged a firearm for any
17 other reason?
18     A  Not that I can recall.
19     Q  Have you ever discharged a firearm at
20 another person?
21     A  I have not.
22     Q  We discussed previously depositions you had
23 given in other cases; correct?
24     A  Yes.
25     Q  Have you ever testified at trial in any

Page 72

---

1  case?
2      A  I did -- I believe it was a California
3  case, and it was during COVID; so it was virtual.
4      I took the virtual stand.
5      Q  Have you ever testified at trial in any
6  non-firearms cases?
7      A  I have not.
8      Q  Have you ever been deposed in any
9  non-firearms cases?
10     A  The magazines, I -- I would assume, would
11 fall under that, but nothing other than firearms and
12 magazines.
13     Q  What is your definition of a sportsman?
14     A  A sportsman.
15     Let's see. I don't really have a
16 definition handy, but I assume someone that enjoys
17 going outdoors hunting, fishing, trapping, shooting.
18     Q  Would you consider yourself a sportsman?
19     A  I would under that definition.
20     Q  Do you consider California's restriction on
21 large-capacity magazines to be anti-sportsman?
22     MR. LEE: Objection. Calls for an opinion.
23     You may answer.
24     THE WITNESS: You know, since I live in a
25 state that has similar restrictions on the amount of

Page 73

---

1 capacity in a firearm in a magazine, you know, I
2 would assume it's -- if I had to define if it's
3 pro-sportsman or anti-sportsman, I guess it would be
4 anti-sportsman just because you couldn't -- you
5 know, it just restricts what you can do as a
6 sportsman.
7      MR. MEYERHOFF:
8      Q   And any restriction on what you can do as a
9 sportsman is anti-sportsman?
10     A   I'm sure -- maybe it restricts, you know,
11 our ability to do the things that we should be able
12 to do or may want to do; so --
13     Q   Please.  I interrupted you.
14     A   No.  Go ahead.  I'm sorry.  Just getting my
15 water.
16         MR. MEYERHOFF:  I'm going to pull up
17 another doc- -- document I'll mark as Exhibit 4.
18         And let me figure out how to screen share.
19         (The document referred to was marked as
20         Deposition Exhibit 4 by the Reporter.)
21     BY MR. MEYERHOFF:
22     Q   Can you see the document that I have on my
23 screen now?  The icon in the upper left-hand corner
24 has the LinkedIn logo?
25     A   Correct.  Yeah.

Page 74

1      Q   And the document is 17 pages.
2          So I'll just start with -- I'll just have
3 you look at page 1 and if you -- well, I'll ask
4 specific questions and obviously if at any time you
5 want to review the whole thing, just let me know.
6          Does that work?
7      A   Sure.
8      Q   So do you recognize the first page of this
9 document?
10     A   I do.
11     Q   What do you recognize it to be?
12     A   It appears to be a screenshot of my
13 LinkedIn profile.
14     Q   And do you maintain your LinkedIn profile?
15     A   I do.
16     Q   I'm going to scroll down.
17         Do you see where I've scrolled to?  It says
18 "President Outdoor Insights, LLC."
19     A   Correct.
20     Q   And do you see maybe ten lines down, there
21 is a carat?  It says "Available as Expert
22 Witness..."?
23     A   Correct.
24     Q   And it says "Available as Expert Witness
25 for the firearms industry"; correct?

Page 75

1      A   Yes.
2      Q   And I believe we discussed this earlier,
3 but correct me if I'm wrong, it's fair to say that
4 you have -- in firearms cases that you've been a
5 part of, you've only submitted declarations or been
6 deposed on behalf of the plaintiffs; correct?
7      A   Correct.
8      Q   And reading this statement from your
9 LinkedIn page, is it fair to say that you would not
10 be available as an expert witness for defendants in
11 cases where firearms restrictions are being
12 challenged?
13         MR. LEE:  Objection.  Calls for
14 speculation.
15         THE WITNESS:  No.
16         I don't -- I would -- I don't think that's
17 true.
18         I could be an expert witness, I think, on
19 either side, depending on the -- the content.
20     BY MR. MEYERHOFF:
21     Q   But here you're advertising your services
22 as an expert witness specifically for the firearms
23 industry; correct?
24     A   Correct.
25     Q   And do you see here where it says in the

Page 76

1 middle of the page, "National Shooting Sports
2 Foundation"?
3      A   I do.
4      Q   And do you see the -- the third carat down
5 in there?  It says:
6          "Serve as an expert witness in
7          depositions representing industry
8          against anti-sportsman legislation"?
9      A   Yes.
10     Q   So is it fair so say that you believe that
11 restrictions on magazines capable of holding more
12 than 10 rounds are anti-sportsman?
13     A   Well, as we discussed before, it kind of
14 limits what you can do; so that would be
15 anti-sportsman.
16     Q   Is it your opinion that a restriction on
17 magazines capable of holding more than 30 rounds
18 would be anti-sportsman?
19         MR. LEE:  Objection.  Calls for an opinion.
20         THE WITNESS:  I have -- yeah.  I don't have
21 any experience with magazines holding more than 30;
22 so I haven't really -- I don't really have a
23 personal opinion on using them or others using them.
24     BY MR. MEYERHOFF:
25     Q   So you don't have a strong opinion that

Page 77

1  those should be unrestricted?
2      A  I do not have a strong opinion on that.
3      Q  Do you have a strong opinion on whether --
4  I'll just rephrase.
5        Do you have any opinion on whether
6  magazines capable of holding more than 100 rounds
7  should be restricted?
8      A  Again, I haven't really had any experience
9  with that, no personal or professional experience
10  firing or using that product or much knowledge of
11  that at all; so I don't have much of an opinion on
12  magazines holding more than 100 rounds.
13      Q  Do you have any opinion on them?
14      A  I -- I -- from the limited experience I
15  have with them, I -- I don't really -- I don't
16  really have an opinion at this time on those.
17      Q  In your opinion, would it be fair to
18  describe magazines as a firearm accessory?
19      A  Yes.
20      Q  Are you familiar with what are called
21  silencers?
22      A  Suppressor, silencer, I believe that just
23  gets connected to the top of the barrel for noise
24  abatement.  If so -- if that's your definition of
25  what you're talking about, yes, I do have knowledge

Page 78

1  of those.
2      Q  Do you own any silencers?
3      A  I do not.
4      Q  Why not?
5      A  It is just a complicated process to
6  purchase and own them here in Connecticut, and I
7  just haven't taken the time to go through that.
8      Q  Do you think restrictions on silencers
9  would be anti-sportsman?
10      A  I think so.
11        When you're hunting, you know, and use ear
12  protection without a silencer, you know, is a smart
13  move; but, you know, in other countries, it's kind
14  of -- they want you to use silencers for -- for the
15  noise, not disturb, you know, anybody close by
16  and -- and to protect your hearing.
17        So not allowing silencers is kind of
18  anti-sportsman.
19      Q  You've been deposed in a number of cases;
20  correct?
21      A  Yes.
22      MR. LEE:  Asked and answered.
23  BY MR. MEYERHOFF:
24      Q  Do you know if you've ever been found
25  qualified as an expert by any court?

Page 79

1      A  I don't -- I'm not sure I understand that.
2        I haven't heard that I'm qualified or
3  unqualified, I believe, by any court.
4      Q  Have you personally ever been a party to a
5  lawsuit?
6      A  I have not.
7      Q  Have any of the entities that you've
8  controlled been a party to a lawsuit?
9      A  Can you just specify which entities?
10      Q  I believe previously we discussed --
11  have -- so I believe that you exercise control over
12  Outdoor Stewards of Conservation Foundation and
13  Outdoor Insights; correct?
14      A  Correct.
15      Q  And I believe previously you testified that
16  you were the owner of Marketing Memories, LLC;
17  correct?
18      A  Yes, sir.  Yes.
19      Q  Have you ever owned any other businesses?
20      A  No.
21      Q  Have you ever run any other nonprofits?
22      A  I have not.
23      Q  So have any of those three entities either
24  been -- have any of those three entities ever been a
25  party to a lawsuit?

Page 80

1      A  They have not.
2      Q  One more question on Exhibit 4.
3        Do you see where it says "Executive
4  Director, Marketing Memories, LLC" in bold?
5      A  Yes, sir.
6      Q  And then the dates it lists October 2006 to
7  November 2012; correct?
8      A  Correct.
9      Q  So is it fair to say that your employment
10  with NSSF overlapped with your role as executive
11  director at Marketing Memories, LLC?
12      A  It did.
13      Q  And so how did you manage both roles at the
14  same time?
15      A  The Marketing Memories was the business I
16  had started after Scholastic and prior to NSSF, it
17  was my full-time job.
18        When I started at NSSF, that was my
19  full-time job and -- and Marketing Memories was just
20  kind of residual.  If an order came in, I would fill
21  it, but not a lot -- unfortunately, not a lot of
22  business came in during the time it overlapped with
23  NSSF.
24      Q  Have you ever been charged with a crime?
25      A  I have not.

Page 81

1  Q  Have you ever been the victim of a crime?
2  A  Not that I know of.
3  Q  I'm going to return to what's been marked
4  as Exhibit 3, which is your declaration.
5        Do you see in paragraph 2, you write that
6  the NSSF's:
7        "... mission is to promote,
8        protect and preserve hunting and the
9        shooting sports"?
10  A  Correct.
11  Q  How does NSSF do that?
12  A  When I was with NSSF, and I'm not sure if
13  their mission has changed -- but to promote,
14  protect, preserve hunting and the shooting sports,
15  they -- you know, I think one of the best things
16  they did was provide research to learn how to
17  increase participation in the activities of hunting
18  and shooting sports.
19        And as a trade association, if we could
20  grow new customers that are members, which were
21  business based, you know, it would increase their
22  sales and -- and customer bases as well.
23  Q  So was the ultimate goal to increase sales?
24  A  Well, the goal for the NSSF for at least,
25  you know, what I thought was there, was to provide

Page 82

1  them, you know, with better -- our members with
2  better information so they could make better
3  decisions and for them to increase, you know, their
4  businesses, grow their businesses.
5  Q  And when you say "grow their businesses,"
6  you mean increase revenue; correct?
7  A  It means -- you know, it could be increase,
8  you know, the amount of employees that they have to,
9  you know, pay some new people; bring some new people
10  into hunting and shooting sports, new customers; and
11  then also, you know, sell -- sell more products,
12  sell to more customers.
13  Q  And in your declaration, you write at the
14  time:
15        "... NSSF has a membership of
16        12,000 manufacturers, distributors,
17        firearms retailers, shooting ranges,
18        sportsmen's organizations and
19        publishers."
20        Do you know the approximate breakdown in
21  terms of number of members within those different
22  categories?
23  A  I do not.
24        I think the -- the biggest portion of the
25  membership at the time that I was there was the

Page 83

1  retailers and the ranges; but I don't have any
2  specifics.
3        I wasn't in the membership.  It wasn't part
4  of my responsibilities to determine the numbers of
5  members or the individual types of memberships.
6  Just knowledge of the overall numbers of members we
7  had.
8  Q  Do you know how NSSF funded its operations?
9        MR. LEE:  Objection.  Lacks foundation.
10  Calls for speculation.
11        You can answer.
12        THE WITNESS:  To the best of my knowledge,
13  NSSF funded their operations primarily by the
14  ownership of the Shot Show that was a
15  business-to-business consumer trade show.  That
16  brought in a lot of revenue for them.
17        They also were able to bring in revenue via
18  memberships.  Since it was a, you know,
19  business-to-business-based organization, they had
20  members as outlined here.
21        Manufacturers would pay a membership fee as
22  well as retailers, ranges.
23        Also, NSSF made a little bit of money
24  selling some research products but it wasn't a huge
25  chunk of their overall budgets.

Page 84

1  BY MR. MEYERHOFF:
2  Q  How did NSSF make money with the Shot Show?
3  A  Again, I wasn't on the Shot Show team, but
4  it's my understanding that exhibitors, and they had
5  a couple thousand exhibitors, would pay to exhibit
6  at the Shot Show and then attendees would pay to
7  attend the Shot Show.  That's how they made money
8  during the trade show.
9        THE REPORTER:  May I take a little break?
10  My doorbell rang and there is nobody else here and I
11  need to check.
12        THE WITNESS:  I'll take a chance to go to
13  the restroom.
14        MR. MEYERHOFF:  Why don't we take a
15  five-minute break.
16        (A brief recess was taken.)
17  BY MR. MEYERHOFF:
18  Q  Mr. Curcuruto, are you ready to proceed?
19  A  Yes, sir.  I am.
20  Q  I believe you testified previously that
21  members of NSSF paid membership dues; is that
22  correct?
23  A  Yes.
24  Q  And do you -- to the best of your
25  understanding, did all 12,000 members pay the exact

Page 85

1 same amount in dues?
2       MR. LEE:  Objection.  Lacks foundation.
3       THE WITNESS:  No.  I was not in membership,
4 but I know there were different levels of
5 membership; different pricing tiers.  I don't know
6 the specifics of them, though.
7       Sorry.
8 BY MR. MEYERHOFF:
9    Q   Would it be fair to say that, to the best
10 of your knowledge, the larger firearms manufacturers
11 paid more than the other members?
12    A   I believe that was the case.
13    Q   And to the best of your knowledge,
14 manufacturers, distributors, and firearm retailers
15 all have the primary goal of selling more firearms
16 and firearms-related accessories; correct?
17    A   I -- you know, I did not work for a retail
18 or range or manufacturers, so I'm not sure what
19 their goals were, but I assume any business that
20 wants to stay in business would like to sell -- sell
21 to their customers and have more customers.
22    Q   And do you think it's fair to say that
23 shooting ranges, sportsmen's organizations, and
24 publishers all benefit from more firearm and
25 firearm-accessory sales?

Page 86

1    A   Well, I'm not sure.
2       Again, on an individual level, sportsman
3 organizations -- sometimes those are, you know,
4 private clubs that don't want more.  They like to
5 have their own amount or even less sometimes.
6       So I don't know if that statement is true
7 for all -- everybody.
8    Q   Do you think it's fair to say that the main
9 purpose of NSSF was to promote the sale of firearms
10 and firearm accessories?
11    A   No.
12       You know, in my opinion, when I was there,
13 our main goal was just to, you know, grow overall --
14 the overall market which includes participation and
15 the amount of people purchasing anything from the
16 firearm to, you know, targets and ear protection and
17 all the accessories that go with it, all the hunting
18 decoys and stuff.
19       We just wanted to grow the overall market.
20    Q   So would it be fair to say that the goals
21 of NSSF, in your opinion, were to increase the sale
22 of firearms and firearm accessories, increase
23 participation, and increase the purchasing of
24 firearm accessories such as targets, et cetera?
25       MR. LEE:  Objection to the form of the

Page 87

1 question.  It's compound many times over.
2       You may answer.
3       THE WITNESS:  Yeah.
4       Just what we wanted to do, at least my
5 division, we wanted to grow our own ranks which
6 was -- or membership; right?  We wanted to have more
7 members as a trade organization which, I think, is
8 standard for any trade organization.
9       And of course we want our members to be
10 successful; so, you know, I assume if they went out
11 of business, they would no longer be members of the
12 NSSF.
13 BY MR. MEYERHOFF:
14    Q   Did you know -- during the time you were at
15 NSSF, did you know who any members of the board of
16 directors were?
17    A   I did.
18    Q   At the time you were at NSSF, was the chair
19 of the board of directors Robert L. Scott?
20    A   I believe so.
21    Q   And did you know -- do you know if
22 Mr. Scott is also the chairman of Smith & Wesson?
23    A   At the time that I was with NSSF and
24 Mr. Scott was on our board, I believe he worked in
25 some capacity with Smith & Wesson, but I do not know

Page 88

1 what capacity.
2    Q   Do you know if Smith & Wesson manufactures
3 large-capacity magazines?
4    A   If Smith & Wesson manufactures
5 large-capacity magazines?
6       I'm not sure.  I don't believe they do.  I
7 think they are a firearm manufacturer, but I'm
8 unaware if they do or do not manufacture magazines
9 that would go in firearms that they make.
10    Q   Smith & Wesson -- would you just consider
11 Smith & Wesson to be a large firearms manufacturer?
12    A   Yes.
13    Q   Is it your testimony that you're not sure
14 whether Smith & Wesson manufactures magazines that
15 go along with the firearms themselves?
16    A   Right.
17       I'm not sure if they manufacture them or if
18 they bought them from another manufacturer to
19 include them, you know, with a firearms they sold.
20    Q   But it's your understanding that
21 Smith & Wesson typically sells firearms -- typically
22 sells magazines along with the individual firearm
23 they sell?
24    A   I believe when you purchase a firearm from
25 Smith & Wesson or, you know, any other manufacturer

Page 89

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 216 of 240 PageID: 7807

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  that makes a firearm that needs a detachable
2  magazine, that manufacturer is going to not just
3  sell the firearm but the firearm will come with
4  either one or two detachable magazines, whether it's
5  Smith & Wesson or another manufacturer.
6      Q   At the time you were at NSSF, was the
7  co-vice chairman of the board Stephen Hornady?
8      A   So Stephen Hornady was on NSSF's board
9  while I was working at NSSF.  I'm not sure what
10 capacity he was there.
11     Q   And are you aware if he is the president of
12 Hornady Manufacturing Co.?
13     A   When I was with NSSF, and, to my knowledge,
14 Steve Hornady was working with Hornady
15 Manufacturing.  I don't know what his capacity was
16 there.
17         I believe he was an owner.  His name is on
18 it; so --
19     Q   Do you know what that company manufactures?
20     A   Primarily ammunition.
21     Q   At the time you were at NSSF, was the other
22 co-vice chairman of the board Jeff Reh, R-e-h?
23     A   Mr. Reh.  Or Reh, R-e-h.  He was on NSSF's
24 board.  I'm not sure what his title was.
25         I did not have a lot of direct contact

Page 90

1  with firearms manufacturers?
2      A   You know, the one that just popped into my
3  head was a retail owner or worked at a retail shop,
4  but I don't want to use my memory to try to recall
5  who else was on the board.
6          If you had a list there, I might be able to
7  remember them, but I know the board was primarily
8  made up of larger organizations from firearms and
9  ammunition and accessory and I think publishing
10 companies.
11     Q   Would it be fair to say, based on your
12 recollection of the board's composition today, that
13 the NSSF board was controlled by firearms
14 manufacturers?
15         MR. LEE:  Objection.  Argumentative.  Lacks
16 foundation.  Calls for speculation.
17         THE WITNESS:  I believe they had a mix of
18 representatives from firearms, ammunition, retail.
19         I think maybe -- shooting ranges and, at
20 one point, media.  I'm not sure how their make-up is
21 today.
22 BY MR. MEYERHOFF:
23     Q   Would it be fair to say that, at NSSF, your
24 role is to support the member organizations in
25 generating revenue?

Page 92

1  with, you know, board meetings or anything like
2  that.
3      Q   And are you aware if Mr. Reh is affiliated
4  in any way with Beretta USA, Corp.?
5      A   I believe, you know, during the time I was
6  with NSSF, Mr. Reh was with Beretta.
7      Q   What does Beretta do?
8      A   They are a manufacturer of firearms.
9      Q   And at the time you were at NSSF, were you
10 aware that Josh Dorsey was on the board?
11     A   Yes.
12         When I was with NSSF, I believe Mr. Dorsey
13 was on NSSF's board.
14     Q   And are you aware that Mr. Dorsey at the
15 time was affiliated with GLOCK?
16     A   Yes.  When I was NSSF, Mr. Dorsey was on
17 our board and, to my knowledge, he was working for
18 the company GLOCK at the time.
19     Q   And what does GLOCK do?
20     A   They are a firearm manufacturer.
21     Q   Sitting here today, do you recall any other
22 members of the NSSF board of directors at the time
23 you worked there?
24     A   I do.
25     Q   Were any of those individuals affiliated

Page 91

1      A   My primary thought process was to, you
2  know, provide our members with as much quality
3  information as possible so they could make the best
4  business decisions.
5          MR. MEYERHOFF:  I'm going to go ahead and
6  share my screen.
7  BY MR. MEYERHOFF:
8      Q   Can you see what's on my screen now,
9  Mr. Curcuruto?  It appears to be a YouTube page and
10 below the video it says "NSSF research -
11 Jim Curcuruto 2016 Shot Show TV Studio"?
12     A   I do see it, yeah.
13     Q   And did a Shot Show convention take place
14 in 2016?
15     A   Yeah.
16         The Shot Show is -- the trade show is every
17 year, usually January, once a year.
18     Q   And what would the Shot Show TV studio be?
19     A   That was run by the NSSF media department
20 and they would do kind of on-site interviews of
21 people attending the show.
22     Q   And do you recall ever participating in the
23 TV studio?
24     A   I did, yes.
25         I did several interviews over the years.

Page 93

Wiese, et al. vs. Bonta, et al.                                        Deposition of James Curcuruto

1    Q  I'm going to play this video and then ask
2  you a few questions about it or I'm going to play a
3  segment of the video.
4        "MS. KOPCZYK:  Welcome back to Shot Show
5        TV.  I'm your host, Rachel Kopczyk,
6        coming to you live from the Shot Show TV
7        studio, and I'm joined now by Jim
8        Curcuruto.  He is the director of
9        industry research for NSSF.
10       MR. CURCURUTO:  Thank you for having me.
11       MS. KOPCZYK:  It's great to have you
12       here and speak about this.  So your
13       research and analysis and sometimes our
14       eyes kind of glaze but you guys are
15       actually doing really important work.
16       MR. CURCURUTO:  Thank you.
17       MS. KOPCZYK:  And it's actually very
18       important for business success.
19       MR. CURCURUTO:  Right.
20       MS. KOPCZYK:  So what's your most
21       popular research elements that you have?
22       Publications?
23       MR. CURCURUTO:  We have a ton of
24       research every year.  And now some of
25       the big more popular ones are our

Page 94

1  industry reference guide.  We actually
2        call it our Bible.  It's 200 pages worth
3        of source material that will give you a
4        real good idea of what's happening in
5        the industry from the background check
6        data that the FBI puts out on a monthly
7        basis, to firearm production every year,
8        how many hunting licenses are sold
9        and -- and, of course, the all-important
10       economic data on the -- you know, the
11       size of the industry.
12       MS. KOPCZYK:  All right.  Give us a --
13       give us some stats.  Give us some info.
14       MR. CURCURUTO:  Sure.  Well, we've had a
15       good run here the last couple years as
16       the 60,000 goers here will tell you and
17       we finished the year strong.  The FBI
18       background checks; had a good November
19       and December and that is up 8.8% over
20       the year.  We were expecting about a 5%
21       increase, but that -- that strong finish
22       really helped push us over the edge."
23  BY MR. MEYERHOFF:
24    Q  That was you in the video that we just
25  played; correct?

Page 95

1    A  I believe, yes.
2        That suit I would not fit in anymore.
3    Q  And do you recall giving this interview?
4    A  I do.
5    Q  And this was at the 2016 Shot Show;
6  correct?
7    A  Correct.
8    Q  And you were representing NSSF at that
9  Shot Show; correct?
10   A  Yes.
11   Q  When you say in the video -- a moment ago
12  you said "we finished the year strong."
13       What did you mean by that?
14   A  It was -- you know, one of the indicators
15  that we rely on is firearm sales and participation;
16  so those two -- I believe 2016 was a good year for
17  both increasing participation and hunting in the
18  shooting sports and overall sales increases.
19   Q  How would you have measured increased
20  participation?
21   A  Each year, we conducted several studies on
22  participation.
23       We also reviewed data from sources like --
24  I'm speaking slow now.  I heard myself speaking
25  slow.  U.S. Fish and Wildlife Service had certified

Page 96

1  hunting license sales.
2        We had done a couple of studies on target
3  shooting participation.
4        We purchased data from other sources like
5  the National Sporting Goods Association.
6        They had an annual report on a bunch of
7  different activities, including hunting and
8  target-shooting participation; so we tried to
9  monitor, the best we could, how participation rates
10 were and used other sources to monitor, the best we
11 could, sales data as well.
12   Q  And then later in the video, you said we
13 "had a good November and December."
14       What did you mean by that?
15   A  Probably focusing on, from my
16 recollection -- and what I know -- the best -- one
17 of the best indicators we had or more current was
18 every month the FBI would release their unadjusted
19 background check data on firearm sales; so we would
20 look at that, and each month, we would keep a tally
21 and measure it versus, you know, year-over-year and
22 keep historical records of that.
23       And 2016 had a strong, I guess, holiday
24 season -- October, November, December end-of-year
25 season for the background check data.

Page 97

Wiese, et al. vs. Bonta, et al.                    Deposition of James Curcuruto

1    Q  And when you say there was "a strong finish
2  really helped push us over the edge," is that
3  firearm sales as well?
4    A  Oh, I don't really know what I was
5  referring to, "push us over the edge."
6       Most likely, what I was referring to was
7  the firearms sales because that, you know --
8  January, 2020 -- or 2016, we would have had just
9  received the December data; so we would have had the
10 full year and be able to say that 2016 was stronger
11 than 2015 in -- in looking at the background check
12 data.
13   Q  When you were saying "we," did you mean
14 NSSF?
15   A  I'm sure I -- "we" -- I -- I might have
16 spoken for NSSF as saying "we," yeah.  Or -- or the
17 industry.
18      I think I had referenced the 60,000 people
19 there; so maybe I was all-encompassing.
20   Q  I'm going to return to your declaration
21 now.
22      In paragraph 3 of your declaration, you
23 write that you directed:
24      "... the activities of an
25      internal research coordinator...."

Page 98

1       Do you see that?
2    A  Yes.
3    Q  Who was that internal research coordinator?
4    A  That was Dianne Vrablic who we referenced
5  earlier.
6    Q  And did Miss Vrablic ever assist you with
7  research on firearm magazines?
8    A  Most likely, I handled the bulk of that and
9  then, you know, the -- the analysis or the data
10 collection on firearm magazines, and she would help
11 create the charts and promote that type of stuff,
12 but I think I did most of the data-crunching on
13 that.
14   Q  Do you know if Miss Vrablic created the
15 Magazine Chart that was attached as an exhibit to
16 your declaration in this Wiese case?
17   A  She may have created it in, you know, Excel
18 or PowerPoint but the data to create it was under my
19 responsibilities.
20   Q  And to the best of your knowledge, is
21 Miss Vrablic still with NSSF?
22   A  I believe she is.
23      It's been a while since we've spoken, but
24 the last time we spoke, within the last six months,
25 she was still there.

Page 99

1    Q  And in your discussions with her, did you
2  discuss large-capacity magazines?
3    A  We did not.
4    Q  In paragraph 3, you also state that you
5  directed:
6       "... outside companies retained
7       to conduct research and gather market
8       and consumer information useful to
9       NSSF members."
10      Which outside companies did you retain to
11 do that?
12   A  Well, we worked with several companies.
13 Southwick Associates, Responsive Management,
14 Sports Marketing Surveys, InfoManiacs were some of
15 the top organizations that we would contract to help
16 us conduct market research.
17      MR. MEYERHOFF:  Miss Miller, can you just
18 read back his answer for me.
19      (The record was read.)
20      MR. MEYERHOFF:  Thank you.
21 BY MR. MEYERHOFF:
22   Q  Did Southwick Associates ever assist you
23 with research on firearm magazines?
24   A  They did.  I believe so, yes.
25      Not on this chart that's in -- that's in

Page 100

1  the exhibit on this, but --
2    Q  How did they assist you?
3    A  I believe we contracted them to do a quick
4  survey or a study on consumers' ownership of -- of
5  magazines.
6       They also ran an internal survey of
7  consumers, and they tracked a lot of different
8  purchases from people that purchased firearms,
9  ammunition, magazines.
10      I believe magazines may have been one of
11 the things they tracked, but I'm not sure at the
12 time if -- if that was one that we had, you know,
13 purchased from them or not.
14   Q  Did you ever contract with Responsive --
15 did -- did Responsive Management ever assist you
16 with research on firearm magazines?
17   A  Responsive Management we hired several
18 times to do participation studies and -- and several
19 other studies -- we would contract them a few times
20 a year.
21      I don't recall anything specific to
22 magazine ownership, but there may have been a
23 question in -- in some of the surveys that we had
24 contracted them out that had to do with magazine
25 ownership or purchasing or usage.

Page 101

1  Q  What about Sports Marketing Surveys?
2  A  Sports Marketing Surveys -- I believe we
3  contracted to do a study on the modern sporting
4  rifle consumer, and in that study, there was
5  questions on purchases of firearms and accessories
6  and, I believe, some of the accessories were
7  magazines; so I believe they were involved in that.
8  Q  And what about InfoManiacs?
9  A  We used them quite often on specific
10 projects -- first-time gun buyers, women gun owners.
11 But I don't think we ever got too deep
12 involved in specifics on any of their projects, but
13 we had done so many things over 10, 11 years, I
14 don't want to say we did not, but I don't believe we
15 used InfoManiacs to do anything specific to magazine
16 ownership.
17 Q  Can you describe what kind of -- can you
18 describe what Southwick Associates does as a
19 company?
20 A  They are a market research organization; so
21 they -- their services -- they would get contracted
22 out by folks or companies, like NSSF, to do specific
23 market research products, for the most part, and
24 they had internal data as well that you could
25 purchase from them.

Page 102

1  Q  Would it be fair to say that you have a
2  high opinion of Southwick Associates?
3  A  Yeah.
4  We -- we wouldn't work with companies that
5  we didn't have a good opinion on; so all -- all four
6  of those companies I mentioned, I had a high opinion
7  on.
8  Certainly would not have hired them if I
9  didn't.
10 MR. MEYERHOFF:  I'm going to pull up what I
11 want to mark as Exhibit 5.
12 (The document referred to was marked as
13 Deposition Exhibit 5 by the Reporter.)
14 BY MR. MEYERHOFF:
15 Q  It's just a two-page document.  I'll give
16 you a moment to review it.  You can tell me when to
17 scroll down.
18 A  2011?
19 You can scroll down.  Hmm.
20 Scroll up a little bit, please.
21 Q  Up or down?  I'm sorry.
22 A  Oh, down.  Yeah.  Okay.  That's good.
23 All right.  Let's see what Rob said here.
24 Helping --
25 Report.  Yeah.  They did a lot.

Page 103

1  Q  Have you ever seen this press release
2  before, Mr. Curcuruto?
3  A  I recall giving them the award and I know
4  that we had some media ad on it.
5  This looks like it came directly from
6  Southwick.
7  I normally just tracked NSSF releases on
8  it; so I'm aware of the award, but I may not have
9  seen this particular release 12 years ago.
10 Q  And you're quoted as saying:
11 "'The awards are well deserved.
12 NSSF's research would not be where it
13 is today without them.'"
14 Do you recall saying that?
15 A  Yes.
16 Q  And is that statement true?
17 A  It is.
18 Q  Why did you not hire Southwick Associates
19 to create the Magazine Chart attached to your
20 declaration as Exhibit 1?
21 A  That was something that, you know, I could
22 do internally; so there were certain things that we,
23 you know -- with two people on staff, we could only
24 do a certain amount internally; so we would hire
25 those organizations to do -- help us with other

Page 104

1  things.
2  When we could do things in-house, we did
3  them in-house and the Magazine Chart is one we did
4  in-house.
5  Q  To be clear, you testified earlier that
6  Southwick tracked the purchases of accessories
7  including magazines; correct?
8  A  Again, I believe I said -- I was pretty
9  sure they tracked magazines, but I wasn't sure, but
10 they tracked a lot of consumer purchases in the
11 firearms industry.  Not -- not sure if magazines was
12 part of them, but I think they were.
13 Q  Did -- at the time you were there, did NSSF
14 track magazine purchases?
15 A  Not internally.  We would use outside
16 sources for, like -- if Southwick had that data, we
17 would use them or contract them to see if we could
18 learn a little bit more about a particular product.
19 Q  I'm going to go back to your declaration.
20 In paragraph 4 you state that the purpose
21 of the research you conducted at NSSF was for NSSF
22 members "use in their business decisions"; correct?
23 A  For use in their business decisions, yes.
24 Q  How would the members use the data you
25 provided to them in their business decisions?

Page 105

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 220 of 240 PageID: 7811

Wiese, et al. vs. Bonta, et al.                                                    Deposition of James Curcuruto

1    MR. LEE: Objection. Lacks foundation.
2    THE WITNESS: Well, so overall, you know,
3 when I first started in 2009, there wasn't a lot of
4 data for -- for the outdoor industry for hunting and
5 target shooting; so we tried to, you know, figure
6 out what holes needed to be filled and, you know,
7 participation data was a big one; so if we could
8 have trend data that showed our members, "Well,
9 hunting is increasing" or "target shooting is
10 increasing" or "hunting is decreasing," those are
11 the types of things we felt would help them make
12 better business decisions.
13    You know, if sales of firearms were going
14 up or sales of firearms were going down, we wanted
15 to try to provide that information as quickly and
16 accurately as we could to our members, thinking that
17 they would be able to use that data to make better
18 decisions, you know, contracted out some of those
19 companies we talked about.
20    We would get the consumer opinions and, you
21 know, the more you know about your consumer, we felt
22 our customers could then -- or NSSF members could
23 make better decisions when they understood their
24 customers a little bit more.
25 ///

Page 106

1 BY MR. MEYERHOFF:
2    Q   Do you know if NSSF members used the
3 Magazine Chart in their decisions?
4    A   I do not know specifically or don't recall.
5    I do remember thinking that people should
6 use our data. Our members should use our data more
7 than they did because I would get questions from
8 some members, "Hey. Do we have any information on
9 this?" and something that we had done previously,
10 like, "Yes. We have it. We haven't used it
11 before," but that -- just personally, I thought
12 that, you know, we should have our research being
13 used more than it was.
14    But going back to your original question
15 there, I'm not -- I would hope that the research we
16 provided them on magazines was used by some of our
17 members, but I don't recall specifically any of them
18 stating that their -- their use of it.
19    Q   How would an NSSF member use the
20 Magazine Chart in their business decisions?
21    MR. LEE: Objection. Lacks foundation.
22 Calls for speculation.
23    You can answer.
24    THE WITNESS: The way I tried to look at it
25 is what would I like to know? And I would want to

Page 107

1 know as much as possible if I was, you know --
2 whether somebody that was writing articles on, you
3 know, the outdoor industry or somebody owned a
4 shooting range or somebody that owned a retail shop,
5 to better understand, you know, what kind of
6 products I should carry.
7    And if they can see in the trends are one
8 way for a certain product, whether that's magazines,
9 and maybe they would know better what to carry in
10 their stores.
11    If they see that, you know, magazines under
12 10 rounds were more popular than magazines over
13 10 rounds, you know, they would -- they would make
14 decisions like that.
15    I never made those decisions because I
16 wasn't working at those companies, but I tried to
17 think like them and provide them with as much
18 information as I could.
19 BY MR. MEYERHOFF:
20    Q   The Magazine Chart was submitted as an
21 exhibit to your declaration. Is that -- would it be
22 fair to say that?
23    A   Correct.
24    Q   And would it be fair to say that your
25 declaration was submitted in this case as part of an

Page 108

1 effort to invalidate California's restrictions on
2 magazines capable of holding more than 10 rounds?
3    Would it be fair to say that?
4    A   I think, you know, the primary reason that
5 I conducted research for NSSF was, you know, for our
6 members and then when lawsuits started to happen and
7 people realized do we have any information on
8 magazines or -- or modern sporting rifles, then
9 that's when they, you know, became used for -- as
10 exhibits for these cases to, you know, show the
11 other side or -- or try to prove whatever NSSF's
12 were -- or the plaintiffs were trying to prove.
13    Q   Is it your testimony, sitting here today,
14 that the Magazine Chart was created prior to any
15 litigation regarding large-capacity magazines?
16    A   I'm not sure. When you say "any
17 litigation," I really don't know when it started but
18 I know the purpose of all the research that NSSF or
19 at least under -- when I was there, the primary
20 reason was not for legislation issues or lawsuits
21 but to provide our members with information so they
22 could just make their best business decision.
23    Q   I want to focus specifically on the
24 Magazine Chart.
25    A   Okay.

Page 109

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/03/23 Page 221 of 240 PageID: 7812

Wiese, et al. vs. Bonta, et al.                          Deposition of James Curcuruto

1  Q  So sitting here today, what is your best
2  recollection of why the one-page Magazine Chart
3  attached to your declaration was created?
4  A  Probably -- again, going off my memory of
5  what I think at the time, we had done a couple of
6  studies on the modern sporting rifle consumer and I
7  want to say maybe we had done them in 2013, but
8  maybe the first one, and in that -- whenever you do
9  one bit of research, there is always, you know,
10 questions about "Hey. Did you learn anything about
11 X, Y, or Z?" and then my assumption was somebody --
12 one of our members said "Hey. Do you have any more
13 information on magazines that," you know, "go into
14 the firearms?"
15    So that's -- that would have been why we
16 created it in the first place.
17 Q  Do you recall any specific member asking
18 you to create this chart?
19 A  I do not.
20    We had created so many things for so many
21 reasons that, unfortunately, I don't know the exact
22 reason why we created all this stuff again.
23 Q  Do you have -- to the best of your
24 knowledge, has this chart been disseminated to
25 members of NSSF?

Page 110

1  we would pay them to do those reports.
2    So sometimes we would charge our members
3  for certain reports.
4    And then, again, I mentioned there were
5  different levels of membership; so some -- the
6  highest levels of membership got a lot of free
7  research, and different levels had to pay different
8  amounts for some of the research we provided.
9  Q  Do you know when -- do you know when the
10 Magazine Chart was first included in NSSF's year-end
11 report?
12 A  I would -- if it was included, it probably
13 would have been around 2016 or 2017.
14    We tried to update that report as much as
15 possible on an annual basis, but there were years we
16 skipped it just because, you know, two people,
17 200-page report, there was a lot in there and we
18 couldn't -- just couldn't manage everything to
19 update every single page.
20    A lot of times we would just update what we
21 had available to us.
22    So earliest it would have been in there
23 would have been 2017, if it was in there.
24 Q  But sitting here today, you can't be
25 positive of whether or not it was in there?

Page 112

1  A  Yeah.
2    I believe -- you know, when you played that
3  video and I referenced our industry reference guide
4  which was 200 pages, that was kind of our catch-all.
5    We would put as much stuff as we could into
6  that one document -- you know, the background check
7  data, the participation data, economic impact of
8  hunting and target shooting, and then we would have
9  put things like this Magazine Chart in there.
10    You mentioned silencers earlier. We
11 tracked 4 and 4 -- I think they were 4 and 4's --
12 for, you know, the amount of suppressors.
13    We had a lot of things that we tracked so
14 that we, again, just tried to provide as much
15 information to our members as possible.
16 Q  So is it fair to say you may -- NSSF may
17 have included this chart in some kind of year-end
18 report to -- to members?
19 A  Correct.
20    I would assume -- it wasn't given to them.
21 It was a product that was sold and it was kind of
22 behind a firewall.
23    We would put out dozens of pieces of
24 information a year from full reports from those
25 outside agencies, like the Southwick Associates, and

Page 111

1  A  I cannot.
2  Q  And NSSF distributed this year-end report
3  prior to 2016; correct?
4  A  Yeah.
5    We -- I guess we called it the industry
6  reference guide and we tried to update it every --
7  at the end of every year; so I guess you could call
8  it a year-end report.
9    But, yeah, it was on an annual basis as
10 best as we could.
11 Q  And do you have any understanding of why,
12 prior to 2016, this Magazine Chart, or a version of
13 it, was not included in that industry reference
14 guide year-end report?
15 A  Just from my recollection, you know, doing
16 that modern sporting rifle consumer study, if that
17 was in '13 and people had questions and -- we might
18 have just done it for the first time in '15.
19    I'm not sure. I don't recall, you know,
20 the first time I ever created that chart, but it was
21 probably in the vicinity of 2015.
22 Q  To be clear, are you aware of any other use
23 of this Magazine Chart outside of litigation
24 involving large-capacity magazines?
25 A  Well, I'm not aware, but I would hope its

Page 113

Wiese, et al. vs. Bonta, et al.                                                    Deposition of James Curcuruto

1  intended purpose of helping some of our 10- or
2  12,000 members at the time -- hopefully some of them
3  used it.
4      Q  Going to paragraph 4, the last sentence
5  says:
6          "Research conducted by the NSSF
7       and under my direction demonstrates
8       that detachable ammunition magazines
9       are very popular and are commonly
10      owned by millions of persons in the
11      United States for a variety of lawful
12      purposes, including, but not limited
13      to, recreational and competitive
14      target shooting, home defense,
15      collecting and hunting."
16      Do you see that?
17     A  Yes.
18     Q  Do you have a breakdown of the number of
19  persons in the United States who -- who commonly own
20  large -- who commonly own detachable ammunition
21  magazines for each of those purposes?
22     A  I do not.
23     MR. MEYERHOFF:  I'm going to pull up what
24  I'll mark as Exhibit 6.
25  ///

Page 114

1      Q  Line 8, where it says:
2          "Q  Have you conducted any
3       study...."
4      A  Okay.
5      Q  Through the end of the page, please.
6      A  All right.  Wait one second here.  I'm
7  losing track of it.
8          Okay.
9      Q  So is it fair to say in paragraph 4, when
10  you talk about common ownership for "lawful
11  purposes," that's an extrapolation from the total
12  number of magazines in your Magazine Chart?
13  Correct?
14     A  You know, obviously, you're not using a
15  magazine by itself.  You're using it within the
16  firearm, and I know we had some discussion on, you
17  know -- there's -- we had done a study on consumers
18  on modern sporting rifles which told us, I think,
19  within that study that they used magazines with the
20  firearm; so I don't want to say that it was only
21  from that Magazine Chart that we were saying they
22  were popular, the magazines that can hold 11 more
23  rounds, but there was, you know -- pretty clear-cut
24  that there are millions of them owned out there and
25  being used for a lot of legal, lawful purposes or

Page 116

1          (The document referred to was marked as
2       Deposition Exhibit 6 by the Reporter.)
3      MR. MEYERHOFF:  And I'm going to screen
4  share it.
5  BY MR. MEYERHOFF:
6      Q  Do you see the document that we marked as
7  Exhibit 6?  At the very top it says
8  "James Curcuruto, January 11, 2018."
9          Do you see that?
10     A  I do.
11     Q  Do you recall giving a deposition in
12  White Plains, New York, on January 11, 2018?
13     A  I'm sure I did, but I don't recall for some
14  reason.  White Plains which isn't too far from where
15  I was.  I'm trying to think of where that was.
16         I'm sure I did.  I just don't recall being
17  in White Plains in January of 2018.
18     Q  I'm going to scroll down to what in the
19  document itself is page 117.
20         And I'll start at line -- could you read
21  from line 8 to line 25 of that page.
22     A  Is there any way you could make it a little
23  bigger?  Get rid of that stuff on the left.  My
24  eyes -- ah.  Much better.
25         Where am I starting?

Page 115

1  several legal, lawful purposes.
2      MR. LEE:  Counsel, may I ask you to
3  represent whether that Exhibit 006 -- I'm sorry --
4  may I ask you to represent whether defense Exhibit 6
5  constitutes the entire transcript of the deposition?
6      MR. MEYERHOFF:  Yeah.  Looks like it.
7      MR. LEE:  In other words, it wasn't
8  excerpted?
9      MR. MEYERHOFF:  Yeah.  It's the whole
10  thing.
11  BY MR. MEYERHOFF:
12     Q  So, I mean, is it fair to say that your
13  conclusion that millions of Americans use detachable
14  ammunition magazines for a variety of lawful
15  purposes is based on the fact that -- never mind.
16  I'll -- I'll strike that.
17         In paragraph 6, you state that you are:
18         "... not aware of any singular
19      public source providing reliable
20      figures identifying exactly how many
21      ammunition magazines are manufactured
22      or imported for sale within the
23      United States each year."
24      Is that -- is that true?
25     A  Yeah.

Page 117

**H I N E S   R E P O R T E R S**                                    30 (114 - 117)

1   MR. LEE:  Sorry.  Are you asking the
2   witness whether that was true then or true now?
3   BY MR. MEYERHOFF:
4   Q   Was that true at the time that you made the
5   statement?
6   A   Yes.
7   Q   And since that time, have you become aware
8   of any singular public source providing such
9   reliable figures?
10   A   I have not.
11   Q   Are there any singular public sources
12   providing unreliable figures?
13   A   No.  Not that I'm aware of.
14   Q   Are there any private public sources that
15   would provide those reliable figures?
16   A   Not that I'm aware of then or now.
17       That's why I created the Magazine Chart and
18   did some of the studies on usage, just to get that
19   information since we didn't have a reliable source
20   for it.
21   Q   I believe you testified earlier that
22   Southwick Associates tracked the sale of accessories
23   and including, to the best of your knowledge,
24   magazines.
25   A   I believe they -- I believe they did.

Page 118

1   Perhaps not at the time when we were collecting all
2   of this.  You know, Southwick Associates had the
3   ability to add, you know, products that they were
4   tracking at the request of their clients.  It made
5   sense for them because if they had the information
6   and somebody wanted it, they could then sell it.
7       So I would assume that Southwick Associates
8   added products and categories to their consumer
9   questionnaire as they were going so they could, you
10   know, reach whatever demand they were wanting.
11       And I don't recall, unfortunately, if they
12   did track it.  It would have made my life easier if
13   I had a reliable source for it so I wouldn't have to
14   create it myself.
15       I assume they did not have it; therefore, I
16   had to create one myself.
17   Q   Are you aware of any obstacle they would
18   have faced if NSSF had paid them to gather that
19   information?
20   MR. LEE:  Objection.  Lacks foundation.
21   Calls for speculation.
22   THE WITNESS:  No.  I'm not aware of any
23   obstacle.
24   BY MR. MEYERHOFF:
25   Q   Was the reason NSSF did not ask

Page 119

1   Southwick Associates to gather this information
2   because of cost?
3   A   No.
4       I -- I like to do things like this when I
5   have -- I'm familiar with the data sources
6   available, and I have the means and the time to do
7   it.
8       I just kind of like to dig in and figure
9   out things like this; so just at the time I must
10   have had the time and the -- the sources -- enough
11   sources where I felt I could create something
12   reliable.
13   Q   And I don't want to misstate your
14   testimony, but to -- correct me if I'm wrong -- but
15   I believe what you testified previously was that you
16   synthesized the information contained in the
17   Magazine Chart and then Mrs. Vrablic
18   [pronunciation] --
19   A   Vrablic.
20   Q   -- Vrablic created the actual document
21   itself; is that right?
22   A   I'm not sure.  I think I stated I wasn't
23   sure if she created the document or I did or we both
24   did.
25       I mean at the time, you know, I was the

Page 120

1   primary one that conducted how to come up with the
2   Magazine Chart and get all the data and look at the
3   sources and come up with the reliable estimates and
4   then I would have supplied that either to her to
5   make a chart or myself to make the chart, but one of
6   the two of us would have made the -- the chart that
7   you see that you have here as an exhibit.
8   Q   Who else, if anyone, helped you develop
9   this chart?
10   A   Well, I did -- I was responsible for the
11   bulk of the concept in creating it and digging
12   through all the sources that we had and then when I
13   came up with what I thought was a good plan and had
14   to do it or came up with a number, one of my go-to
15   sources to check with things was the president of
16   NSSF, Steve Sanetti.  He has, you know, a wealth of
17   knowledge on the industry; one of the smartest or
18   most well-informed folks I've known in my 14 years
19   in the industry.
20       So I might have created the initial chart
21   but before releasing it to anybody, I wanted to run
22   it by him and give him my methodology and
23   corroborate and see if it needed any tweaks, but he
24   was somebody I relied on to help with it.
25   Q   Did you rely on anyone else to help with

Page 121

Case 3:18-cv-10507-PGS-JBD  Document 184-8  Filed 11/03/23  Page 224 of 240 PageID: 7815

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  it?
2      A  No.
3      You know, nobody that I can remember having
4  detailed conversations, but, you know, I'm -- you
5  know, part of my process was to double-check and
6  triple-check and have, you know, reliance on people
7  that I -- I don't recall if I had done so with this
8  Magazine Chart, but it's -- there is a possibility I
9  might have ran it by a few others, say "Hey. Here's
10  what I did. Here's how I do it. Here's what I got.
11  What do you think?"
12     But not as in depth as with Mr. Sanetti.
13     Q  And what was Mr. Sanetti's role at NSSF?
14     A  He was the president of NSSF when I was
15  there.
16     Q  Is he still the president, to the best of
17  your knowledge?
18     A  I believe he retired four years ago.
19  Three, four years ago.
20     THE REPORTER:  Do you have the spelling on
21  his name, please?
22     THE WITNESS:  S-a-n-e-t-t-i.
23     THE REPORTER:  Thank you.
24     THE WITNESS:  You're welcome.
25  ///

Page 122

BY MR. MEYERHOFF:
2      Q  Did Mr. Sanetti ever express his opinion to
3  you, if any, on laws restricting large-capacity
4  magazines?
5      A  I don't recall any discussions, but it's
6  possible that we did have some.
7      Q  Sitting here today, are you aware of
8  Mr. Sanetti's position, if any, on restrictions on
9  large-capacity magazines?
10     A  I cannot speak for him, unfortunately. I'm
11  not a mind reader, but -- and I know he was -- owned
12  firearms and, worked for fire- -- in the industry
13  for a long time, but I don't want to guess at what
14  his positions are.
15     Q  In paragraph 8, you state that:
16        "The NSSF Magazine Chart
17        estimates that 230 million pistol and
18        rifle magazines were in the
19        possession of United States consumers
20        between 1990 and 2015."
21        Was that statement accurate, to the best of
22  your knowledge, when you made it in 2017?
23     A  It was.
24     Q  And then you also -- do you see where it
25  says in 8:

Page 123

"... the Chart further shows
2      magazines capable of holding more
3      than 10 rounds of ammunition
4      accounted for approximately
5      115 million or approximately half of
6      all magazines owned"?
7      Do you see that?
8      A  I do.
9      Q  And then in paragraph 9, you mention the
10  sources of information you used to reach that
11  conclusion; correct?
12     (The record was read.)
13     THE WITNESS:  Yes. That is correct.
14  BY MR. MEYERHOFF:
15     Q  And the three sources of information you
16  used for this data are, 1, the ATF's AMFER report;
17  2, documents from the International Trade
18  Commission; and, 3, the opinions of firearm industry
19  professionals.  Correct?
20     A  Not documents from the ITC, but they had
21  a -- a data web that was -- so you could query the
22  system; so they weren't documents. They were a
23  query system.
24     Q  Okay. So the three sources of information
25  you relied on were the ATF AFMER report, information

Page 124

from the U.S. ITC, and opinions of firearm industry
2  professionals; correct?
3      A  Correct.
4      Q  And in paragraph 10, you state:
5        "The ATF AFMER" report "data
6        provide historical figures for
7        pistols by caliber (i.e., the
8        specific ammunition cartridge for
9        which a firearm is chambered) and
10        rifles produced in the United States
11        for consumer purchase."
12        Do you see that?
13     A  Yes.
14     Q  So is it fair to say that AFMER data
15  includes the number of firearms by category that are
16  manufactured in a given year?
17     A  They do provide different categories.
18        U.S. manufacturers are required to report
19  their production to the ATF, and I believe the
20  categories are pistols, revolvers, shotguns, rifles,
21  miscellaneous. I think those are the primary
22  categories within the AFMER reports.
23     Q  And the AFMER report deals specifically
24  with manufacture; correct?
25     A  U.S. manufacture; correct.

Page 125

1  Q  And so it doesn't tell you how many
2  firearms were actually purchased in a given year;
3  correct?
4  A  Correct.
5  Q  And it doesn't tell you how many firearms
6  were actually purchased by private individuals, does
7  it?
8  A  It does not.
9  Q  So firearms that are manufactured in a
10  given year and cataloged in AFMER could come into
11  the possession of law enforcement agencies; correct?
12  A  I believe the AFMER report does not
13  include, like, military, but it would include some
14  law enforcement, but I'm a little -- I don't recall
15  if there was a threshold now, if they included all
16  firearms that could be purchased by law
17  enforcement -- certainly by an individual law
18  enforcement person -- but I'm not sure if it
19  included firearms produced for law enforcement
20  offices.
21  Q  So is it fair to say that firearms
22  manufactured in a given year and cataloged in AFMER
23  could come into the possession of some law
24  enforcement agencies; correct?
25  A  I believe so, yes.

Page 126

1  Q  And firearms that are manufactured in a
2  given year and cataloged in AFMER could come into
3  the possession of private security organizations;
4  correct?
5  A  Yes.
6  Q  And firearms that are manufactured in a
7  given year and cataloged in AFMER could come into
8  the possession of firearms wholesalers; correct?
9  A  Correct.
10  Q  And firearms that are manufactured in a
11  given year and cataloged into AFMER could come into
12  the possession of firearms retailers; correct?
13  A  Correct.
14  Q  AFMER data does not track how many firearms
15  are -- are illegally trafficked from the
16  United States into other countries, does it?
17  A  I'm sorry.  Can you repeat that one?  I
18  want to make sure --
19  Q  AFMER data does not track how many
20  firearms, if any, are illegally trafficked from the
21  United States to another country; correct?
22  A  Correct.
23  Q  AFMER data does not track numbers of
24  magazines at all; correct?
25  A  Correct.

Page 127

1  Q  The ITC data that you relied on -- it
2  doesn't tell you how many firearms were actually
3  purchased by private citizens in a given year;
4  correct?
5  A  Correct.
6  Q  And it doesn't tell you how many firearms,
7  if any, were imported in a given year, cataloged by
8  ITC and then came into the possession of some law
9  enforcement agencies; correct?
10  A  Correct.
11  Q  And firearms that are imported in a given
12  year and cataloged by ITC could come into the
13  possession of private security organizations;
14  correct?
15  A  Correct.
16  Q  Firearms that were imported in a given year
17  and cataloged by the ITC could come into the
18  possession of firearm wholesalers; correct?
19  A  Correct.
20  Q  Firearms that are imported in a given year
21  and cataloged by ITC could come into the possession
22  of firearms retailers; correct?
23  A  Correct.
24  Q  And the ITC does not track how many
25  firearms, if any, are illegally trafficked from the

Page 128

1  United States into another country; correct?
2  A  To the best of my knowledge, they do not.
3  Q  Does AFMER data track firearm attrition
4  rates, meaning the rate of firearms that cease to be
5  functional due to loss, destruction, or
6  deterioration?
7  A  It does not.
8  Q  Does ITC data track that?
9  A  It does not.
10  Q  And ITC doesn't track magazines, does it?
11  A  I don't believe so.  They have hundreds and
12  hundreds of codes and, you know, for the purpose of
13  this one, we were just looking at the firearms
14  imported minus exported, and, you know, I don't
15  recall that they -- the ITC tracks magazines or, at
16  least at the time, we didn't identify a code that
17  did.
18  Q  Are you aware of anyone in the firearms
19  industry who tracks how many people actually own
20  LCMs?
21  A  Just to confirm, LCM, large capacity
22  magazine, referring to 11-plus?
23  No.  I'm not aware of anybody.  That
24  doesn't mean that somebody doesn't.
25  Q  So in paragraph 11, you state:

Page 129

**Wiese, et al. vs. Bonta, et al.**                                        **Deposition of James Curcuruto**

1      "The ATF AFMER and ITC data
2      provided estimates of approximately
3      67.7 million pistols and 42.6 million
4      rifles capable of holding a magazine
5      were available to United States
6      consumers between 1990 and 2015."
7      Do you see that?
8  A   Correct.  Yeah.
9  Q   What do you mean when you say "were
10  available to United States consumers"?
11  A   That are available for purchase.
12  Q   These numbers of 67.7 million pistols and
13  42.6 million rifles -- does that account for
14  firearms that may have been purchased by law
15  enforcement agencies?
16  A   It may -- does it account for them?  Are
17  they included in it?  Or could they be included?
18    If you could rephrase that.
19  Q   Sure.
20    So the number of "approximately
21  67.7 million pistols and 42.6 million rifles capable
22  of holding a magazine were available to
23  United States consumers between 1990 and 2015" -- do
24  you think it's likely that some of the firearms
25  imported into the United States were purchased by

Page 130

1  law enforcement agencies?
2  A   I believe it's possible.  I'm not sure
3  likely, but possible, yeah.
4  Q   And do these figures for pistols and rifles
5  account for any magazine -- excuse me -- any
6  firearms that were purchased by law enforcement
7  agencies and thus would not be available to
8  United States consumers?
9  A   I guess I just want to confirm.  Like, you
10  know, an off-duty law enforcement that purchased a
11  firearm, that's a consumer.
12    But other than that, you know, there is a
13  possibility that -- you know, that that service
14  weapon is only used, you know, by that law
15  enforcement professional for work purposes, I
16  suppose.
17  Q   Let me ask the question a different way.
18    So previously when I asked you about the
19  AFMER data and ITC data, I asked you about firearms
20  that could have come into the possession of some law
21  enforcement agencies, private security
22  organizations, firearm wholesalers, firearm
23  retailers, and firearms that were illegally
24  trafficked from the United States.
25    Do you recall me asking those questions?

Page 131

1  A   I do.
2  Q   And so the figures in paragraph 11, the
3  67.7 million pistols and 42.6 million rifles, do
4  those numbers account for any of those
5  possibilities?
6  A   Well, these numbers, you know, came from
7  the AFMER and ITC; so they could have had law
8  enforcement purchase some of these firearms.
9    Obviously the wholesalers and the retailers
10  would.
11  Q   To be clear, the 67.7 million pistols and
12  the 42.6 million rifles is -- the data you
13  obtained -- is the data you obtained based on your
14  analysis of the AFMER and ITC data; correct?
15  A   Right.
16    For the -- yeah.  Adding up the U.S.
17  production from ATF AFMER and International Trade
18  Commission data, that's how we came up with the 67
19  million pistols and the 42 million rifles capable of
20  holding a magazine available to the U.S. consumer
21  market between those -- 1990 and 2015, yeah.
22  Q   And you didn't make any adjustments to
23  that?
24  A   No.
25    Those were the hard numbers coming from the

Page 132

1  AFMER and the ITC on the firearm production and
2  imports.
3  Q   Thank you.
4    And then in the second sentence of
5  paragraph 11, you write:
6      "Firearm industry professionals
7      with knowledge of the pistol and
8      rifle magazine market then allocated
9      magazines to the totals to complete
10      the data provided in the NSSF
11      Magazine Chart."
12    Who were the firearm industry professionals
13  you're mentioning there?
14  A   Myself and Steve Sanetti were the two that
15  I can recall.
16    There may or may not have been some others
17  that I asked to take a quick look at the data.
18    Again, we're not going to put out anything
19  to our members that we don't think is going to be as
20  accurate as possible.
21    And as referenced earlier, without a direct
22  source for this, we had to merge the ATF and the ITC
23  data and then discuss, you know -- apply how many
24  magazines for pistols and how many for firearms that
25  we think would be the best estimate to create the

Page 133

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 227 of 240 PageID: 7818

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Magazine Chart.

Q   I'm sorry.  Just to clarify.

Why do you believe that Southwick Associates did not have that accurate source?

A   They were just not somebody that I needed to use at the time.  I felt confident that using the ATF data and the ITC data -- we could get some hard numbers and, you know, applying a percentage between Steve and myself, and if any others were involved, I felt we didn't need to go outside and -- and hire anybody to do it.  It was one of the things we could do inside.

Q   At the time you consulted with Mr. Sanetti, he was your boss; correct?

A   He was the president.  I didn't directly report to him.  I was a couple levels below him, but he was very open and willing to assist, you know, any time I needed help.

Q   What, if anything, do you recall Mr. Sanetti saying about the Magazine Chart you created?

A   You know, he was -- you know, I told him the purpose was, you know, to get us outdoor members and make sure they had a reliable source, and I

Page 134

didn't want to put anything out that, you know, I didn't think was inaccurate or he didn't think was inaccurate; so he was fine with the conclusions that we came up with.

Again, the last thing we want to do is give incorrect data to the people that are paying us to be our members, and if they make the wrong decision based on that data, they wouldn't be happy with us, you know.

Q   Did Mr. Sanetti tell you what specific sources of data he relied on in allocating magazines for the Magazine Chart?

A   I think it was just his personal knowledge.

He had worked for one of the larger manufacturers.  I think he was the president of Sturm, Ruger, which is a large firearm manufacturer, for many years and just had a very good knowledge of firearms and components and parts that go in and around the firearm, including magazines.

Someone I had a high trust in.

Q   Do you know if Sturm, Ruger produces large capacity magazines?

A   Again, similar to Smith & Wesson, you know, they produce firearms that would be capable of holding all different types of detachable magazines,

Page 135

but I don't know if they manufactured them themselves or if -- if they purchased them from an outside manufacturer to include with the sale of their firearms.

Q   I'm going to draw your attention to Exhibit A of your declaration.

Is this the Magazine Chart that you created with Mr. Sanetti's input?

A   It is.

Q   Did you list Mr. Sanetti anywhere on this Magazine Chart?

A   I did not.  I always like to try to put a source line and it looks like the source line says "ATF AFMER, International Trade Commission figures combined with NSSF and fire industry estimates."

So he would be part of that last portion of it but not specifically naming him, no.

Q   Do you recall why you didn't specifically name him?

A   I just -- I don't know if people would have known who -- who he was if I put him on there.

I never put an individual person as a source.  I would always use that kind of tag line.

If it was Southwick Associates or whoever helped me conduct the study, I always liked to put

Page 136

some sort of information on there, but I don't think I've ever put an individual's name specifically on a source.

Q   But would it be fair to say, when on the sources you list firearm industry estimates, you really mean Mr. Sanetti's estimates, don't you?

A   Myself, his, and, like I said, it's very possible I had to ask others but just not in the capacity that I had asked Mr. Sanetti.

Q   So to be clear on the process, you essentially told Mr. Sanetti "There is X number of pistols out there.  How many do you think come with a magazine holding more than 10 rounds?"

Is that a fair assessment?

A   Yeah.

The conversation I recall "Here is what I had done so far.  Used the AFMER and the ITC data.  Here's the numbers I came up with for the amount of pistols that will hold the magazine."  Doesn't matter what, you know quantity, and "Here is the number of rifles."

And then we -- we tried to break that down.

The AFMER does give some information on caliber and -- and obviously, you know, long guns, we -- we didn't include shotguns or lever-action

Page 137

1  guns or pump-action guns.
2      You know, we just counted the guns that
3  could hold the magazine and then Mr. Sanetti and I
4  went out and figured out, "Okay. How many of
5  those," you know, "magazines that are in that type
6  of firearm would be under 10," you know, "10 or
7  over," and then for the -- there's only really the
8  two categories for pistols.
9      For the rifles, we decided to do 10 and
10  under, 11 to 29, and then that 30-plus.
11      You know, I'm just recalling, you know,
12  when I would put stuff out, sometimes I would get
13  called on it and somebody would say "That doesn't
14  look right," but when we put this out, I don't
15  recall anybody ever saying to take another look at
16  it.
17      So, you know, including those industry
18  estimates are -- whoever had seen that -- right? --
19  they would have said "Give me a call.  That doesn't
20  look right, Jim.  How the heck did you come up with
21  that number?"
22      If that had ever happened, I would have
23  went back and revised it with their input, but we
24  did not receive any such feedback on this one.
25      So pretty confident that this was a good

Page 138

1  estimate that our members could use to make a decent
2  business decision.
3      Q  Would it be fair to say that the expertise
4  employed in creating this chart was really with the
5  allocation of magazines to a particular firearm?
6  Correct?
7      A  I would like to think that not too many
8  people could do what I've done with the ATF and the
9  ITC data unless it would have been done and saved me
10  all the trouble; so I think that's my expertise.
11      And then being able to, you know, know the
12  right people to run it by and, you know, takes a
13  certain amount of expertise.
14      And certainly Mr. Sanetti's -- I considered
15  him very knowledgeable about that, but it wasn't --
16  wasn't easy to do any -- any of the three parts of
17  it or -- you know, from start to finish, it was
18  something that was a challenge and I -- I like
19  digging into those type of things and looking at
20  numbers probably more than I should.
21      Q  Would it be fair to say that the
22  allocations of magazines to the firearms identified
23  in the AFMER and ITC reports was based on
24  Mr. Sanetti's expertise?
25      A  Yeah.

Page 139

1      A combination of his and mine.  We were on
2  the same page, from what I recall.
3      Like, I wasn't thinking it's, you know, two
4  per firearm and he was thinking 10 per firearm.  I
5  think we were on the same page, ballpark, when we
6  did discuss this.
7      Q  But would it ultimately be fair to say that
8  you deferred to Mr. Sanetti in allocating the number
9  of magazines for the firearms reflected in the AFMER
10  and ITC data?
11      A  I don't recall deferring because, like I
12  said, we were on the same page.
13      Now, if we were way off, I would have taken
14  his opinion over mine, but on this one, I think we
15  were in pretty good agreement.
16      MR. MEYERHOFF:  I want to mark --
17      THE WITNESS:  Maybe after this line of
18  questioning, we can take a break.  I just need to
19  hit the restroom.  Are we near the end?
20      MR. MEYERHOFF:  We're just a couple minutes
21  away if that's --
22      THE WITNESS:  Okay.  Keep going if that's
23  okay with everybody else.
24      MR. MEYERHOFF:  So I want to go ahead
25  and -- let's see -- mark as Exhibit 7 the following

Page 140

1  document.
2      (The document referred to was marked as
3      Deposition Exhibit 7 by the Reporter.)
4  BY MR. MEYERHOFF:
5      Q  Can you see this document on your screen?
6  It's entitled "Transcript of James Curcuruto," Date:
7  January 24, 2014.  Case Kolbe, et al., versus
8  O'Malley, et al."
9      Do you see that?
10      A  I do.
11      Q  Do you recall giving a deposition in this
12  case?
13      A  I do, yes.
14      Q  Okay.  I'm going to scroll down.
15      MR. MEYERHOFF:  And I will represent to
16  plaintiffs' counsel that this is the entire -- the
17  entire deposition transcript.
18  BY MR. MEYERHOFF:
19      Q  So we can start at paragraph -- excuse me.
20  We can start at page 40, line 10.
21      Do you see that, Mr. Curcuruto?
22      A  I do.
23      I mean, if you can, make the screen bigger.
24  I don't know if you can.  I can see it pretty good.
25      Q  Yeah.  Let me see.

Page 141

1  Can you see it now?
2  A  It just cut it off.  I don't know if you
3  can get rid of that arrow on the left or get rid of
4  that part of it.
5  Q  Yes.  I wish I was more tech savvy.
6  Let's see.
7  Okay.  How about that?
8  A  That may be just -- if you can make the
9  font bigger now, we should be good.
10  Oops.  Wrong way.
11  Q  Can you see it now?
12  A  Perfect.
13  Starting at line 10, is that where you
14  want?
15  Q  Yes.
16  A  Okay.  Okay.  Yeah.
17  Q  And I'll just stop at line 6 where it says:
18  "Well, it's something of a
19  hypothetical because, again, I relied
20  on Mr. Sanetti's so I didn't question
21  his."
22  A  Yes.  I see the line above that.  I would
23  consider myself an expert, not as much as
24  Mr. Sanetti, which is true.
25  Q  Okay.  So do you see at line 3 where it

Page 142

1  says:
2  "Q  So, with respect to your
3  expertise, then, how would you go
4  about estimating how many pistol
5  magazines there will be?  We'll start
6  there."
7  "A  Well, it's somewhat
8  hypothetical because, again, I relied
9  on Mr. Sanetti/s so I didn't question
10  his."
11  Do you see that?
12  A  Yes.
13  Q  Was that testimony accurate when you gave
14  it in 2014?
15  A  Yeah.
16  Everything that I just read that included
17  I'd consider myself an expert but not as much as an
18  expert as Mr. Sanetti's; correct.
19  Q  But in this case -- excuse me, not in this
20  case.
21  With regard to the Magazine Chart, you
22  relied on Mr. Sanetti's expertise as to allocating
23  the number of magazines per firearm; correct?
24  A  Along with my own, yes.  I relied on his,
25  and luckily we came to the same conclusion.

Page 143

1  Q  I'm just a little confused because when you
2  were deposed in 2014 and you were asked how did you
3  go about estimating how many pistol magazines there
4  would be, you said "Well, it's somewhat hypothetical
5  because I relied on Mr. Sanetti's so I didn't
6  question his."
7  MR. LEE:  Objection.  Misstates testimony.
8  THE WITNESS:  Again, you're correct.
9  As we read before, I consider myself an
10  expert but not as much as Mr. Sanetti and it even
11  said before that, I was part of a process that got
12  it going.
13  So it does seem like you're just trying to
14  cherrypick over and over which, you know, I don't
15  think that's, you know, the right thing to do in
16  this instance, but I think you know that too.
17  BY MR. MEYERHOFF:
18  Q  Well, I guess I'm wondering what you mean
19  by "it's somewhat hypothetical."
20  A  In 2014, I have no idea what I meant by
21  that at this point.  Probably answering the same
22  question four times and got a little tired, maybe.
23  MR. LEE:  I'll also state for the record
24  that that answer also seemed like it was cut off.
25  ///

Page 144

1  BY MR. MEYERHOFF:
2  Q  We can go down further.  The question says:
3  "Q  Let me make sure I
4  understand.  You're saying that you
5  never considered yourself what you
6  would estimate that breakdown to be;
7  is that right?"
8  And then you say:
9  "A  I did, I'm sure at the time,
10  but, again, I referred it to
11  Mr. Sanetti because I knew his
12  opinion on this or estimation on it
13  would be more accurate than mine.
14  But I can't recall, you know, what I
15  thought, if I looked at the
16  100 million and said, well, let me
17  ask him first, and then there's
18  really no need for me to supercede
19  his estimate."
20  Do you see that there?
21  A  I do.
22  Q  And was that testimony accurate in 2014?
23  A  It looks to be again we met.  I had given
24  him what I had so far.  He probably had a little
25  tweak to it and I'm going to take his ideas over

Page 145

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 146

1 mine.
2      But from what I recall, we were on the same
3 page. We were not way off or anything near there.
4      Q  And I think that portion of the deposition
5 transcript that we just looked at was referring to
6 pistol magazines.
7      Did you engage in the same process for
8 rifle magazines that you did for pistol magazines?
9      A  Correct. At the same time.
10      MR. MEYERHOFF: We can take a break now. I
11 don't want to hold you longer.
12      THE WITNESS: All right. I only need a
13 couple minutes.
14      (A brief recess was taken.)
15 BY MR. MEYERHOFF:
16      Q  I'm going to put your declaration back up
17 on the screen, Mr. Curcuruto.
18      And so in paragraph 11, you provide the
19 number of "67.7 million pistols and 42.6 million
20 rifles capable of holding a magazine" that "were
21 available to United States consumers between 1990
22 and 2015."
23      Do you see that?
24      A  I do.
25      Q  And the total number of magazines that you

Page 147

1 estimated were in possession of United States
2 consumers during that period were 230 million
3 magazines; correct?
4      A  Correct.
5      Q  So would you agree with me that
6 67.7 million pistols and 42.6 million rifles would
7 total 110.3 million firearms?  Correct?
8      A  Sounds right.
9      Q  So would you agree that to get to
10 approximately 230 million magazines based on that
11 data, you would need to allocate 2.085 magazines per
12 rifle and pistol?
13      A  Correct.
14      Q  So was there a specific formula you used
15 when creating the chart to -- let me step back.
16      So the numbers you provided in your
17 declaration, there was approximately 120 million
18 more magazines available to American consumers
19 during that time period than firearms; correct?
20      A  Correct.
21      Q  So how did you allocate that approximately
22 additional 120 million magazines to, you know, the
23 110 million firearms?
24      A  To the best of my recollection, Mr. Sanetti
25 and I determined that it would be about 2 magazines

Page 148

1 per firearm that's capable of holding a magazine and
2 whether that's, you know -- that comes with the
3 purchase or bought after market where the firearm --
4 most firearms would come with either 1 or 2 and then
5 there's the option for the consumer to purchase
6 additional magazines from firearm retailers and
7 other sources.
8      Q  Do you recall why you didn't just say
9 2 magazines per firearm and reach a total of
10 approximately 220 million magazines?
11      A  I do not recall.
12      Q  Do you recall, was there a specific formula
13 you used to reach the 230 million magazine number?
14      A  If you go to that chart again, I think we
15 had certain -- we didn't just say 2 per firearm. We
16 looked at -- I believe there's 5 categories on
17 pistols. We had 2 categories, 10 and under,
18 11-plus, and then on the rifles, we had the 3
19 categories. I believe it's 10 and under, 11 to 29,
20 and 30-plus.
21      So we looked at those 5 different breakouts
22 and tried to apply what number we thought was best
23 and, you know, came up with that total of
24 230 million that we put out to our members, again,
25 without wanting to provide them with anything that

Page 149

1 we didn't think accurate, and we did not receive any
2 feedback from any of our members that may or may not
3 have seen this and said that they didn't think that
4 it looked correct to them [as spoken].
5      Q  Do you recall receiving any type of
6 feedback from your members with regard to this
7 Magazine Chart?
8      A  I do not recall any specific feedback on
9 this.
10      Q  Is that -- was that unusual with -- with
11 information you put out to your members?
12      A  We put out dozens, if not hundreds, of
13 pieces of information on an annual basis; so if one
14 did not receive any feedback, it was not unusual.
15      We did receive a lot of feedback on reports
16 and data that we put out thanking us for it putting
17 it out, because, you know, we requested that our
18 members not just solely rely on what we put out, but
19 they also use it with their internal sources.
20      You know, there are professionals that work
21 with each one of our member organizations and they
22 would take the data that they had and the data we
23 had and any outside information to help them make
24 those best-informed business decisions.
25      Q  So looking at the chart for pistol

Wiese, et al. vs. Bonta, et al.                                      Deposition of James Curcuruto

1  magazines, there's two bars.  One is for pistol
2  magazines, 10 rounds or less, and another is for
3  pistol magazines, 11-plus rounds.
4      Do you see that?
5      A  Yes.
6      Q  And would it be fair to say the total
7  numbers, 81,240,000 and 54,160,000 -- those numbers
8  combined are essentially the number of pistols
9  available to consumers between 1990 and 2015 as you
10 ascertained from AFMER data and ITC data multiplied
11 by 2?
12     A  Can you make the chart bigger?  I can't
13 read the numbers there.
14     So you were referencing the pistol
15 magazines, 10 or less, 81.2 million, and the pistol
16 magazines, 11-plus, 54.1 million?
17     Q  That's right.
18     A  And then what was the question after that?
19     Q  The question is I have that total being
20 135,400,000.
21     Is it fair to say that overall number was
22 obtained simply by multiplying the number of pistols
23 that you determined were available to American
24 consumers during the time period by 2?
25     A  I do not recall specifically if that's how

Page 150

1  accurate data to our membership.
2      Q  Do the numbers contained in this
3  Magazine Chart reflect attrition in the number of
4  magazines due to loss, destruction, or deterioration
5  that may have occurred?
6      A  Not to my knowledge, it does not.
7      Q  This Magazine Chart doesn't contain any
8  information on why someone would purchase an LCM,
9  does it?
10     A  On why somebody would purchase?
11     No, it does not.
12     Q  And would it be fair to say that this chart
13 tracks sales of magazines, not possession of them?
14     A  It -- let's see.  The chart is labeled
15 "Consumer Possession 1990 - 2015."
16     So the chart makes the assumption that
17 these are in consumer possession during that time
18 period.
19     Q  And the data that you relied on to
20 determine the overall number of magazines in
21 possession was the AFMER and ITC data; correct?
22     A  Correct.
23     Which is the firearm production in the U.S.
24 and the import data from the ITC, assuming that, you
25 know, companies aren't going to manufacture

Page 152

1  I had done that at the time.
2      Q  And do you recall specifically how you
3  allocated, among that 135,400,000 pistol magazines
4  you estimated -- how you allocated how many were
5  10 rounds or less and how many were more than --
6  11 rounds or over?
7      A  That was with a conversation I had with
8  Mr. Sanetti and these were the numbers that we came
9  up with and put out in good faith to our members to
10 help them make better business decisions.
11     Q  And moving over to the right, there's three
12 columns for rifle magazines.
13     Do you know how you came up with the total
14 number of rifle magazines in U.S. consumer
15 possession 1990 to 2015?
16     A  That would have been with the conversation
17 with Mr. Sanetti and anybody else that I may have
18 spoken with on the topic.
19     Q  And do you have any formula for how you
20 allocated the total number of rifle magazines within
21 these three categories, 10 rounds or less, 11 to 29
22 rounds, and 30-plus rounds?
23     A  I don't recall specifically, but I know
24 Mr. Sanetti and I came up with the allocation that
25 we thought would be best to be able to put out

Page 151

1  something each year without selling it.
2      Q  Does this chart account for magazines that
3  may have been exported from the United States?
4      A  It does not include any export of
5  magazines.
6      Q  If you had to do the chart over again,
7  would you include an analysis of how many -- or what
8  an analysis of magazines that had fallen into disuse
9  or been exported be a part of that analysis?
10     A  This chart is seven years old.  There would
11 be -- I would probably look at any new source data
12 that's out there.
13     I know whenever we put out things that are
14 estimates and it does say "Estimated" on the chart,
15 that we erred on the side of caution and put out a
16 lower number than what, quite possibly, could be --
17 could be more.
18     This is the minimum amount that we felt
19 comfortable with.  We didn't want to overstate
20 anything, but it's possible that there are more than
21 230 million.  Just to be cautious, we didn't want to
22 overshoot anything.
23     Q  Would it be fair to describe the NSS- --
24 NSSF Magazine Chart -- would it -- sorry.  I'll
25 rephrase.

Page 153

1  Would it be fair to describe your work on
2 this chart, in part, as involving statistical
3 analysis?
4  A  Not complex statistical analysis but
5 certainly math involved.
6  Q  Would it be fair to say it's simple
7 statistical analysis?
8  A  I don't, as I referenced before.
9  Maybe not everybody could have understood
10 the process and the resources available or the
11 sources available to come up with it, but it is
12 certainly not complex.
13  Q  Would you describe the number of total
14 magazines in consumer possession from 1990 to 2015
15 as a statistic?
16  A  The 230 million total magazines available
17 for consumer possession between 1990 and 2015 could
18 be considered a statistic, sure.
19  Q  And the same thing with the subcategories
20 of rifle magazines and pistol magazines; correct?
21  A  As referenced in the chart?
22  Q  Sure.
23  A  Correct.
24  Q  Are you familiar with an organization
25 called the American Statistical Association?

Page 154

1  A  I am not.
2  MR. MEYERHOFF:  I'm going to mark as
3 Exhibit 7, I believe --
4  THE REPORTER:  No.  8 is next.
5  MR. LEE:  8.
6  (The document referred to was marked as
7  Deposition Exhibit 8 by the Reporter.)
8 BY MR. MEYERHOFF:
9  Q  Do you see a document on a screen called
10 "Ethical Guidelines for Statistical Practice"?
11  A  Is it dated February 2022?
12  Q  Yes.  That's correct.
13  A  I do see it, yes.
14  Q  And you just testified a moment ago that
15 you're not familiar with this organization; correct?
16  A  Correct.
17  Q  So it would be fair to say you're not a
18 member; correct?
19  A  Not to my knowledge.  Unless they offer
20 free membership for everybody.
21  Q  So would it be fair to say you've never
22 seen this document, "Ethical Guidelines for
23 Statistical Practice" prepared by the Committee on
24 Professional Ethics of the American Statistical
25 Association?

Page 155

1  A  Correct.
2  Q  I'm going to direct your attention to
3 page 4 [as spoken]," and I'll zoom in at
4 paragraph 2.
5  Do you see where it says "The ethical
6 statistical practitioner"?
7  A  Yes.
8  Q  And do you see Number 2 where it says:
9  "Uses methodology and data that
10  are valid, relevant, and appropriate
11  without favoritism or prejudice, and
12  in a manner intended to produce valid
13  interpretable, and reproducible
14  results"?
15  Do you see that?
16  A  I do.
17  Q  Do you agree with the position taken by
18 this document, namely, that an ethical statistical
19 practitioner should use "methodology and data that
20 are valid, relevant, and appropriate without
21 favoritism or prejudice, and in a manner, intended
22 to produce valid, interpretable, and reproducible
23 results"?
24  MR. LEE:  I will object to the question.
25 It lacks foundation.

Page 156

1  This witness has indicated he's never seen
2 this document.  There is -- so he can't authenticate
3 this document and without foundation, you're asking
4 him to agree or disagree with something that he's
5 never seen before.
6  So I'm going to object on the grounds that
7 it lacks foundation.
8 BY MR. MEYERHOFF:
9  Q  You can answer the question.
10  A  I'm going to have to review the document in
11 more detail.
12  Q  Let me ask a question not about the
13 document.
14  Do you believe that an ethical statistical
15 practitioner should use methodology and data that
16 are valid, relevant, and appropriate without
17 favoritism or prejudice and in a manner intended to
18 produce valid and interpretable and reproducible
19 results?
20  MR. LEE:  Objection.  Lacks foundation.
21 And it's compound many times over.
22  THE WITNESS:  I believe, you know,
23 statisticians should put out accurate and timely
24 data that's going to help support their members'
25 needs and that's what I did at NSSF whenever we put

Page 157

1 out any report, whether internal or external.
2     We're not going to give it out to our
3 members. The last thing we're going to do is give
4 our members bad data. If we put out data that said
5 230 million magazines, why would we give them
6 information that we don't believe is valid? That
7 would be very hurtful to our members and they
8 wouldn't be members and we wouldn't have an
9 organization anymore.
10     So doesn't make much sense what you're --
11 what you're trying to get at, I don't think.
12 BY MR. MEYERHOFF:
13     Q  Would it be possible for another individual
14 to reproduce the statistical analysis that you did
15 in the magazine chart?
16     A  Not in the same exact way that I had done.
17     Q  NSSF is a membership-based organization
18 that includes manufacturers of magazines; correct?
19     A  They most likely do.
20        I don't know the -- every -- the make-up of
21 every member of -- out of the 12,000 when I was with
22 the organization.
23        I don't know all of them, but there is a
24 good possibility that manufacturers of magazines
25 were members of NSSF.

1     Q  Are you aware if any were at the time?
2     A  I am not.
3     Q  Do you think it's in the business interests
4 of NSSF members to have California's restrictions on
5 large-capacity magazines invalidated?
6        MR. LEE: Objection. It calls for an
7 opinion well beyond the scope of what he was asked
8 to do.
9        You may answer.
10        THE WITNESS: I haven't really thought that
11 through. I don't have much of an opinion on that
12 right now.
13 BY MR. MEYERHOFF:
14     Q  Would you agree with the statement that an
15 ethical statistical practitioner discloses conflicts
16 of interest, financial or otherwise, and manages or
17 resolves them according to established policies,
18 regulations, and laws?
19        MR. LEE: Objection. Lacks foundation.
20        Object to the form of the question.
21        You can answer.
22        THE WITNESS: What was the question?
23 BY MR. MEYERHOFF:
24     Q  Do you believe that an ethical -- I'll
25 simplify the question.

1     Do you believe that an ethical statistical
2 practitioner discloses conflicts of interest?
3        MR. LEE: Still calls for an opinion.
4        THE WITNESS: My opinion is everybody
5 should be -- should be ethical, not just
6 statisticians.
7 BY MR. MEYERHOFF:
8     Q  Do you believe --
9     A  Lawyers included.
10     Q  I'm sorry. I interrupted you.
11     A  I said lawyers included.
12     Q  Do you believe there were any conflicts of
13 interest involved in creating the Magazine Chart?
14     A  I do not.
15     Q  Your position at NSSF was funded, in part,
16 by firearms manufacturers. Would it be fair to say
17 that?
18     A  I suppose it would.
19        They were dues-paying members and that's
20 how we got -- NSSF had received revenue; so that's
21 how they paid their staff.
22     Q  Would it be fair to say that at least some
23 of NSSF's members would benefit financially from the
24 ability to sell large-capacity magazines into states
25 such as in California?

1        MR. LEE: Objection. Calls for
2 speculation.
3        THE WITNESS: I would assume that if a
4 manufacturer of magazines that holds more rounds,
5 had more customers that they could legally sell to,
6 then it would benefit and if they were members of
7 NSSF, that would, then, benefit NSSF members.
8 BY MR. MEYERHOFF:
9     Q  So why is that not a conflict of interest?
10        MR. LEE: Objection. Lacks foundation.
11 Calls for speculation.
12        THE WITNESS: I think we talked about
13 ethics; about the last thing that I'm going to do is
14 put out misinformation.
15        If that number was wrong and a member made
16 a decision and went out of business, that doesn't
17 help NSSF at all; so -- probably helps you guys if
18 it ever went out of business, but we weren't in the
19 business of providing misinformation to our member
20 base.
21        MR. LEE: Also object to the question on
22 the grounds that it lacks foundation.
23        I mean ethical -- conflict of interest
24 presumes or assumes that -- implies that there is a
25 duty of some type. Duty to whom? Some type of

1  legal duty?
2       So I'm going to object to the question that
3  it calls for a legal opinion as to conflict of
4  interest.
5       I'm not aware that you've identified a
6  duty, specific duty, that he has, and, if so, to
7  whom.
8       So I don't think the question makes sense.
9       MR. MEYERHOFF:  Can you read back the
10 answer, Ms. Miller.
11      (The record was read.)
12 BY MR. MEYERHOFF:
13   Q  So based on that answer -- and correct me
14 if I'm wrong -- that only -- that conflicts of
15 interest should only be disclosed when the person
16 releasing the information believes that it may be
17 incorrect?
18      MR. LEE:  Objection.  Misstates testimony.
19      THE WITNESS:  I mean, I -- can you -- I'll
20 pass on that question.
21      Your conflict of interest, you know, goes a
22 lot of ways for a lot of different things.
23 Different -- you'll have to clarify that question.
24 BY MR. MEYERHOFF:
25   Q  So you believe there is no conflict of

Page 162

1  interest request NSSF putting out a chart -- let me
2  rephrase.
3       So you believe there were no conflicts of
4  interest implicated by NSSF's release of this chart;
5  correct?
6    A  We put out that chart to help our members
7  make better business decisions.  That was our
8  primary goal of all the research we put out there.
9    Q  I'm going to return to your declaration.
10      In paragraph 13, you state:
11      "While the figure of 115 million
12      magazines with a capacity greater
13      than 10 rounds in circulation is an
14      estimation based on extrapolation
15      from indirect sources and cannot be
16      confirmed as unequivocally accurate,
17      it is safe to say that whatever the
18      actual number of such magazines in
19      United States consumers' hands, it is
20      in the ten of millions, even under
21      the most conservative estimates."
22      Do you see that?
23   A  I do.
24   Q  The first part of that sentence:
25      "While the figure of 115 million

Page 163

1  magazines with a capacity greater
2  than 10 rounds in circulation is an
3  estimation based on extrapolation
4  from indirect sources and cannot be
5  confirmed as unequivocally
6  accurate" --
7       Do you recall why you included that phrase
8  in your declaration?
9    A  Just to clarify that, again, this was not
10 an absolute number that came from one source that
11 was indisputable, but I wanted to clarify that, you
12 know, it was an estimate and we're not saying that
13 it's an exact figure at all, just an estimate, and
14 we came up with it in the best way we could, using
15 the best sources, and put it out to our members so
16 they could make informed decisions.
17      MR. MEYERHOFF:  I'm going to go ahead and
18 pull up something that I'll mark as --
19      THE REPORTER:  Exhibit 9.
20      MR. MEYERHOFF:  -- Exhibit 9.  Thank you.
21 Thank you.
22      (The document referred to was marked as
23      Deposition Exhibit 9 by the Reporter.)
24 BY MR. MEYERHOFF:
25   Q  Do you see the top of the document?  It

Page 164

1  says "In the United States District Court for the
2  District of Colorado"?
3    A  I do, yeah.
4    Q  And I'll just give you a moment to review
5  this document.  You can let me know when to scroll
6  down.
7    A  Can you just make the font bigger, please?
8    Q  Sure.
9    A  Scroll down a little bit.
10      Okay.
11      Okay.
12    Q  In this declaration, you did not include
13 the line "While the figure of X million magazines
14 with a capacity greater than 10 rounds in
15 circulation is an estimation based on an
16 extrapolation from indirect sources and cannot be
17 confirmed as unequivocally accurate"; correct?
18    A  I did not see it.
19    Q  Did you use the same process for making
20 this determination that you did in the Wiese case?
21    A  Can you repeat that?
22    Q  I'll just ask a simpler question.
23      Why did you not include that -- that line
24 in this declaration?
25    A  I don't recall.

Page 165

Q The -- the Magazine Chart attached as Exhibit -- as an exhibit to your declaration in the Wiese case reflects consumer possession of magazines between 1990 and 2015; is that correct?

A Correct.

Q So it doesn't reflect any data from 2016 to the present; correct?

A Not to my knowledge.

Q And you were not asked in this case to submit a -- an updated version of this chart, were you?

A I was asked to look to see what was available and I did not find anything.

Q You mentioned previously that you hunt; is that correct?

A Yes.

Q And how long have you hunted for?

A Probably 40 years.

Q And -- so would it be fair to say that you began hunting in approximately 1980?

A '82.

Q And when you first started hunting, do you recall what kind of rifle you used? Or did you use a rifle or a pistol or a shotgun?

A Rifle and shotgun.

Page 166

Q Did those rifles that you used have detachable magazines?

A I don't recall. Possible.

Q When was the first time you recall hunting with a detachable magazine firearm?

A Probably squirrel hunting with, like, a Ruger 10/22, which had a detachable magazine, and I'm not sure when that would have been. '80s or '90s.

Q Do you recall what capacity magazine you hunted with that Ruger firearm?

A I believe it was 10.

Q To the best of your recollection, do you recall why you didn't use a larger capacity magazine?

A I do not recall.

Q Do you recall when you first purchased a large-capacity magazine?

A When I purchased -- first purchased a large-capacity magazine?

I don't recall if I've ever purchased one.

Q I believe you previously testified that you possess 3 large-capacity magazines; is that right?

A It is correct.

Q How did you acquire those?

Page 167

A My grandfather had served in World War II. He was provided with a service rifle, a 30 Carbine, and that held 15 rounds of 30 caliber Carbine, and he had -- when he got back, I think he either purchased a service rifle or my father ended up getting that, and then I ended up getting that for some time and then I think it's at my cousin's house.

Just a family heirloom that's been passed around with those 15-round magazine capacity.

So I didn't purchase them. And I don't recall if I've purchased any other magazine with more than 10-round capacity.

Q So all three of those magazines were initially issued to the original owner by the military. Is that fair to say?

A I don't know the full story where my grandfather -- if he bought them after he returned home, to have a similar firearm and magazines that he carried, you know, during the war.

I don't know the full story, but I know it's kind of a family heirloom. It's made its way down three generations and soon to be four.

Q But all three large-capacity magazines you possess are all family heirlooms; correct?

Page 168

A There are four that -- the 30 Carbine firearm that my grandfather had carried or been -- similar firearm to what he carried in World War II.

Q I think you had previously testified that Connecticut had some restrictions on magazine capacity; correct?

A I believe the max is 10 and I think that was about 2013 when that came into effect and then we had to sign some sort of paperwork that said "if you own any."

Q And do you -- why did you not purchase any large-capacity magazines prior to 2013?

A I didn't have the need for them.

I'm not saying that I didn't because, you know, some firearms that I had purchased may have come with 10-plus or 11-plus, but I don't recall any that did.

Q When you say you "didn't have the need for them," what do you mean?

A I have, you know, plenty of a collection of firearms and magazines and accessories for all the things that I am currently doing now.

Q Correct me if I'm wrong, but that is mainly hunting and target shooting; correct?

Page 169

Wiese, et al. vs. Bonta, et al.                                           Deposition of James Curcuruto

1  A  Correct.

2  Q  So from the period you first started
3  shooting in 1982 until large-capacity magazines
4  became restricted in Connecticut in 2013, you've
5  never felt the need to purchase a large-capacity
6  magazine; is that correct?

7  A  Again, not to my knowledge.  Some of the
8  handguns may have come with 11-plus capacity, but,
9  you know, they are not in my possession anymore.

10       It wasn't something that was a big deal or
11  tracked.  If you had it, you had it, but it
12  wasn't -- I mean, it wasn't as big of a deal as it
13  is nowadays.

14  Q  So it sounds like -- it sounds like you
15  may, prior to 2013, have come into possession of
16  large-capacity magazines simply by virtue of buying
17  a firearm that came with one; correct?

18  A  Correct.

19  Q  And is that -- do you think that's a common
20  occurrence, that someone purchases a firearm and it
21  happens to come with a large-capacity magazine?

22  A  It's possible and there's aftermarket, as
23  well, where people can pick up additional magazines
24  to go with their firearm.

25  Q  You're educating me, but I'm asking the

Page 170

1  sell what they were asking for, and if that customer
2  was asking for, you know 2 -- 2 magazines with each
3  purchase or 1 magazine with each purchase or 11-plus
4  magazine, I think just like any -- any business
5  sector, they listen to their customers and try to
6  provide the product that that customer wants.

7  Q  Just to be clear, the Magazine Chart
8  attached to your declaration at Exhibit A does not
9  indicate how many Americans own large-capacity
10  magazines; correct?

11  A  Correct.

12  Q  And it doesn't contain any information on
13  why Americans may own large-capacity magazines;
14  correct?

15  A  Correct.

16       MR. MEYERHOFF:  I've got nothing further at
17  this time.

18       MR. LEE:  I have a few questions.

19

20       EXAMINATION

21  BY MR. LEE:

22  Q  Mr. Curcuruto, when we approached you way
23  back in 2017 and we asked you to do something in
24  connection with this case, what was it that we asked
25  you to do?

Page 172

1  question do you think your experience is a common
2  one that individuals purchase a firearm and come
3  into possession of a large-capacity magazine simply
4  by virtue of it being included with the firearm?

5  A  I think that happens in several instances,
6  you know, where legal, and I know it's a lot more
7  complicated for retailers and manufacturers to sell
8  in different states.  They have got to make sure
9  they are in compliance so they are not going to get
10  into trouble themselves or their customers in
11  trouble.

12  Q  You have 40 years of experience with
13  firearms; correct?

14  A  Correct.

15  Q  Is it fair to say that large-capacity
16  magazines have become more prevalent over the past
17  40 years?

18  A  I would think so, yes.

19  Q  And is part of the reason they have become
20  more prevalent because, as in your case, they were
21  included with the firearm that was sold?

22  A  I think on the pistol side, in my opinion,
23  manufacturers -- different -- depending on the
24  consumer demand, the manufacturers would then, you
25  know, listen to their customer and -- and make and

Page 171

1       In other words, what was the scope of what
2  we were asking you to do?

3  A  Look at NSSF data and see if we had
4  anything available to help with your case.

5  Q  And -- and in terms of data, that is to
6  look at the numbers and try to extrapolate the
7  numbers of magazines in Americans' hands as of that
8  time?

9  A  I think, yeah, in regard to the -- what we
10  call large-capacity magazines, which is the 11-plus,
11  to provide any data we may have on that topic.

12  Q  Did we ask you to provide any other
13  opinions in connection with this case?

14  A  I don't believe so.

15  Q  Did we ask you to provide any opinions with
16  regard to the -- the effectiveness -- effectiveness
17  of California's laws?

18  A  I don't recall.  I don't believe so.

19  Q  Did we ask you to provide any opinion with
20  regard to the utility of large-capacity magazines
21  for purposes such as self-defense?

22  A  I don't believe so.

23  Q  Did we ask you to provide any opinions as
24  to the constitutionality of California's
25  large-capacity magazine laws?

Page 173

Case 3:18-cv-10507-PGS-JBD Document 184-8 Filed 11/03/23 Page 237 of 240 PageID: 7828

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1    A   I don't believe so.
2    Q   Is it fair to say that the only opinions
3  that we asked you to provide in this case are
4  summarized in paragraph 8 of your declaration which
5  is that 230 million magazines are in American hands,
6  of which one half of those are approximated to be
7  large-capacity magazines?
8    A   Correct.
9    Q   And that was your opinion in 2017?
10   A   It was.
11   Q   And from 2017 to 2023, has anything
12 occurred in the industry that would change your
13 opinion with regard to the millions of magazines in
14 Americans' hands?
15   A   Nothing has happened that would change my
16 opinion on the chart that we originally put out,
17 but, obviously, in six years, there has been
18 additional firearms and accessories, including
19 magazines of all types that have been manufactured
20 and purchased.
21   Q   And -- and as part of your work in the
22 firearms industry for NSSF, it was your job to keep
23 track of trends in the industry overall in terms of
24 consumer trends?  Is that true?
25   A   It is correct.

Page 174

1    Q   And so did you keep track of trends in
2  general in the firearm industry, consumer trends?
3    A   We did.
4    Q   In general, from 2017 to the present, did
5  firearm sales increase, decrease, or remain the same
6  since you first gave that opinion?
7    A   From 2017 to 2023, where we are now,
8  without looking at, you know, all the -- all
9  the data I had available to me over time, I believe
10 that firearm-accessory sales have increased over the
11 past six, seven years.
12   Q   And what is NICS, N-I-C-S.
13   A   The FBI, the Federal Bureau of
14 Investigation, has NICS, which is National Instant
15 Criminal Background Check System, and they put out
16 data on a monthly basis that records the amount of
17 checks to that system and a check would be when a
18 firearm retailer or a state agency, such as a state
19 police, would log into the FBI NICS system and do a
20 background check or somebody that is looking to
21 purchase or transfer a firearm, whether that's at a
22 retail -- traditional brick-and-mortar retail
23 establishment, and now I think there's, you know,
24 other ways that system is being used as well.
25       When you pawn a gun or redeem a gun at a

Page 175

1  pawnshop, the system catches those as well.
2    Q   You said the FBI puts out NICS data every
3  month?
4    A   Correct.
5        Usually within the first week; so, for
6  example, you know, we're at August 3rd.  July data
7  would be out about now.  July -- you know, the month
8  before, within a week.
9    Q   And NICS data records the number of
10 background checks.  Is that fair?
11   A   Correct.
12   Q   Is NICS data used to extrapolate the number
13 of firearms purchases in any given period of time,
14 such as a month or a year?
15   A   It has been used by several organizations
16 and maybe outlets.
17       You know, at NSSF, we adjusted that FBI
18 data to take out things that we didn't think had to
19 do with the sale or transfer of the firearm to get a
20 little bit more accurate picture, but we used that
21 as an indicator of sales, and since we had been
22 going on for 20-plus years on a monthly basis, it
23 provided pretty good trend data to our members.
24   Q   And so if I wanted to look at the firearm
25 trend in general in terms of firearm purchases from

Page 176

1  2017 to the present, I could look at NICS data as
2  one indicator?
3    A   Correct.
4        And we always tried to caution to just
5  don't look at one thing -- the NICS data, all the
6  other indicators that we provided and their own
7  industry knowledge.
8    Q   Is there anything in -- within the -- your
9  knowledge of the firearm trends in general, since
10 2017, or the NICS data -- is there anything in there
11 that would change your opinion as to the millions of
12 firearms that are held in American hands presently?
13   A   Nothing that changed my opinion on -- on
14 what we had submitted for this case.
15       I would assume there's just -- that number
16 has grown probably substantially over the past seven
17 years.
18   Q   Do you know what percentage of firearm
19 sales from 2017 through the present are
20 semiautomatic firearms?
21   A   I do not know that.  I don't have that
22 offhand.
23   Q   Do you -- did you -- do you have an
24 estimate as to the number -- the breakdown between
25 semiautomatics and other types of firearms?

Page 177

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 238 of 240 PageID: 7829

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1    MR. MEYERHOFF:  Objection.  Asked and
2  answered.
3    THE WITNESS:  I do not have a -- I wouldn't
4  want to provide an incorrect statement there.  I was
5  talking for a couple hours how I always like to put
6  out accurate data; so I don't want to put out
7  anything incorrect right now.
8    Sorry about that.
9  BY MR. LEE:
10    Q  No worries.
11    Now, the NSSF was a trade organization for
12  the firearms industry; correct?
13    A  Correct.
14    Q  And there is no secret that it's a trade
15  industry for the firearm association; right?
16    A  Correct.
17    Q  And we never -- I don't think, to our
18  knowledge, we have ever tried to hide the fact that
19  it's associated with the firearms industry.
20    Have you ever heard anyone try to hide that
21  fact from anybody?
22    A  On the contrary, they like to tout that
23  they are the trade association for the firearm
24  industry.  I think that is their latest tag line.
25    Q  And you were a member of the firearms

Page 178

1  industry for 14 years as a member -- as an employee
2  of NSSF; is that correct?
3    A  11 years.  From '09 to '21, yeah.
4    Q  And you are still part of the firearm
5  industry.  Is that fair?
6    A  Yeah.
7    We're focused on conservation, but
8  obviously when we're dealing with hunters and target
9  shooters, firearms are involved.
10    Q  Because Mr. Meyerhoff, I don't know, spent
11  maybe two hours asking you to verify, I think, that
12  which is not disputed which is that you are
13  affiliated with the firearms industry.
14    Is that fair?
15    A  It is, yes.
16    Q  Are you aware of any other source that the
17  firearms industry relies upon to measure the number
18  of magazines in circulation besides the NSSF data?
19    A  I am not aware.  I would hope that it's out
20  there; that we have evolved a little or somebody
21  else has done it, but I'm not aware of any.
22    MR. LEE:  Thank you very much.  That is all
23  the questions I have.
24    MR. MEYERHOFF:  I'll just ask a few
25  questions on redirect.

Page 179

1    FURTHER EXAMINATION
2  BY MR. MEYERHOFF:
3    Q  Mr. Lee asked you if your opinions that you
4  were asked for in this case were only those
5  contained in your declaration you filed; correct?
6    A  Correct.
7    The original one from '17; correct.
8    Q  And then he asked you a number of questions
9  about your opinions unrelated to your declaration;
10  correct?
11    A  Correct.
12    Q  He asked about firearm sales; correct?
13    A  Correct.
14    Q  He asked about magazine sales?
15    A  I think we discussed magazines, but I'd
16  have to go back and look at the document to see
17  specifically what he asked.
18    Q  You left NSSF in 2021; correct?
19    A  Yes.
20    Q  And I believe you testified at the
21  beginning of this deposition that after you left --
22  left NSSF, you lacked access to the documents and
23  information that you -- that you used while you were
24  at NSSF; correct?
25    A  Correct.

Page 180

1    Q  You -- Mr. Lee mentioned the NICS database;
2  correct?
3    A  He did.
4    Q  But you mentioned when you worked at NSSF
5  that you adjusted the numbers in that database;
6  correct?
7    A  We did.
8    Q  And you cautioned not just to look at the
9  NIS- -- NICS data; correct?
10    A  Standard practice for our members that we
11  would say "There's not just one thing to look at."
12  We want them to, you know, try to get as much
13  information as they could and then make their
14  decisions, which is just helpful -- trying to be
15  helpful if you say "Don't just look at one thing,"
16  but I think most people know that that is not a good
17  business move.
18    Q  Sure.  Sure.
19    And so to do right by your members, you
20  would look at other sources of data other than the
21  NICS; correct?
22    A  Correct.
23    Q  And what other sources of information would
24  you look at?
25    A  Well, that we had referenced a few.  The

Page 181

1 ATF AFMER data, the International Trade Commission,
2 import/export.
3      ATF also put out a report on the number of
4 FFLs or firearm -- federal firearm retail -- or
5 licenses out there.
6      There was government source data on
7 silencers or suppressors that we talked about.
8      I mean, dozens and dozens of different
9 sources out there in the participation data on
10 hunting and target shooting, economic impact and
11 jobs and all that sort of stuff; so we tried to
12 provide as much as we could but certainly not just
13 one thing.
14    Q   And would it be fair to say that to provide
15 the most accurate data, the most accurate trend
16 lines, that you would want to look at those dozens
17 and dozens of sources?  Correct?
18    A   That's what we would recommend to our --
19 our members, to say, you know, "Here is everything
20 that we have," you know, whatever topic that you're
21 looking at.  "Make sure you utilize all the
22 resources that we have" because, again, we were
23 trying to put out stuff that was timely and accurate
24 for them to make good business decisions.
25      Last thing we wanted to do was put out

Page 182

1 something that we thought was wrong or didn't think
2 that, you know, was going to help our membership.
3    Q   Would you submit a declaration in this case
4 saying that "Based on NICS data alone, I believe
5 that the number of magazine sales in the
6 United States have increased over the last six
7 years"?
8      MR. LEE:  Objection.  Calls for
9 speculation.
10      THE WITNESS:  You know, the NICS data is --
11 helps people understand the trends in sales of
12 firearms and pistols and long guns.
13      It doesn't really break down too much more
14 into those categories; so it would not just be the
15 sole source to rely on, I don't believe.
16      I would -- if I was doing it, I would use a
17 few other sources as we discussed.
18 BY MR. MEYERHOFF:
19    Q   I just want to be clear on one thing.  Were
20 you aware that your 2017 declaration was refiled in
21 support of Plaintiffs' Motion for Summary Judgment
22 in this case --
23      MR. LEE:  Objection.
24 BY MR. MEYERHOFF:
25    Q   -- in 2023?

Page 183

1      MR. LEE:  Objection.  Asked and answered.
2 Beyond the scope.
3 BY MR. MEYERHOFF:
4    Q   But you can answer.
5    A   If it was asked and answered, I would have
6 to go back and ask -- to review my answer.
7    Q   I'm just asking, sitting here in this
8 moment, do you recall if you were aware that
9 plaintiffs' refiled your declaration in March of
10 this year?
11      MR. LEE:  Same objections.
12      THE WITNESS:  Same answer.
13 BY MR. MEYERHOFF:
14    Q   So you don't recall.
15    A   I guess we could ask the court reporter to
16 go back and find that question and -- and read the
17 response for you.
18      MR. LEE:  Do you want a stipulation,
19 Counsel?
20      MR. MEYERHOFF:  No.  I just want to know if
21 the witness was aware that his declaration was
22 refiled --
23      MR. LEE:  You asked him.
24      MR. MEYERHOFF:  -- in March of 2023, this
25 year.

Page 184

1      MR. LEE:  Right.
2      I'll stipulate to that fact.  But if you're
3 trying to establish it for something, you did ask
4 that question already.
5      MR. MEYERHOFF:  Okay.
6      Sorry, Ms. Miller.  Can you go back through
7 the transcript and see if you can find the word
8 refile?
9      (The following question and answer was
10 read:
11      "Q   In either of your
12 conversations with Mr. Lee over the
13 past month, did he tell you that your
14 declaration had been refiled this
15 year?
16      "A   I do not recall.")
17      MR. MEYERHOFF:  I don't have any other
18 questions at this time.
19      MR. LEE:  Thank you.
20      THE REPORTER:  Mr. Lee, are you purchasing
21 a certified copy of the transcript?
22      MR. LEE:  Yes.
23
24      (The deposition concluded at 2:28 P.M.)
25 ///

Page 185

Case 3:18-cv-10507-PGS-JBD   Document 184-8   Filed 11/03/23   Page 240 of 240 PageID: 7831

Wiese, et al. vs. Bonta, et al.                           Deposition of James Curcuruto

1
2       I, JAMES CURCURUTO, declare under
3   penalty of perjury that the foregoing
4   is true and correct, to the best of
5   my ability.
6
7
8
9       Dated this ___ day of
10  _____, 2023, at
11  _____,
12  Connecticut.
13
14
15
16  _____
17      JAMES CURCURUTO
18
19
20
21
22
23
24
25
                                              Page 186

1       I, ALTHEA L. MILLER, CSR NO. 3353, RPR,
2   CCRR NO. 149 certify:  That the foregoing proceedings
3   were taken before me at the time and place herein set
4   forth; at which time the witness, JAMES CURCURUTO, was
5   duly sworn; and that the transcript is a true record of
6   the testimony so given.
7       Witness review, correction, and signature
8   was
9   ( ) by Code.          ( ) requested.
10  ( ) waived.          (X) not requested.
11
12      The dismantling, unsealing, or unbinding of
13  the original transcript will render the Reporter's
14  Certificate null and void.
15      I further certify that I am not financially
16  interested in the action, and I am not a relative or
17  employee of any attorney of the parties, nor of any
18  of the parties.
19
20      Dated this 13th day of August, 2023.
21
22  _____
23  ALTHEA L. MILLER, CSR NO. 3353, RPR, CCRR NO. 149
24
25  ///
                                              Page 187