Paul J. Fishman
ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center, Suite 1025
Newark, NJ 07102
(973) 776-1901
paul.fishman@arnoldporter.com

Aaron R. Marcu*
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022
(212) 277-4000
aaron.marcu@freshfields.com

Jennifer Loeb*
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

*Attorneys for Proposed Amici Curiae*
Giffords Law Center to Prevent Gun Violence,
Brady Center to Prevent Gun Violence, and March for Our Lives

*Pro hac vice* pending

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, *in his official capacity as Acting Attorney General of New Jersey*, et al., <br><br> Defendants. | HON. PETER G. SHERIDAN <br><br> Civil Action No. 3:18-cv-10507 |

| | |
|---|---|
| MARK CHEESEMAN, et al., | HON. RENEE M. BUMB |
| Plaintiffs, | |
| v. | Civil Action No. |
| | 1:22-cv-04360 |
| MATTHEW J. PLATKIN, *in his official capacity as Acting Attorney General of New Jersey*, et al., | |
| Defendants. | |
| BLAKE ELLMAN et al., | |
| Plaintiffs, | HON. PETER G. SHERIDAN |
| v. | Civil Action No. |
| | 3:22-cv-04397 |
| MATTHEW J. PLATKIN, *in his official capacity as Acting Attorney General of New Jersey*, et al., | |
| Defendants. | |

**[PROPOSED] BRIEF OF *AMICI CURIAE*
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE,
BRADY CENTER TO PREVENT GUN VIOLENCE, AND
MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I.   INTEREST OF *AMICI CURIAE* ...................................................................1

II.  INTRODUCTION.........................................................................................2

III. ARGUMENT ...............................................................................................4

   A.  Bruen's Second Amendment Test Requires the Consideration of Empirical Research.........................................................................................................4

   B.  Because the Challenged Laws Address Unprecedented Social and Technological Conditions, Bruen Requires a Nuanced Approach........................5

      1.  The Frequency, Lethality, and Geographic Concentration of Premeditated Public Mass Shootings Are Novel Societal Concerns. ........................................5

      2.  The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined...........................7

      3.  Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings. ................................................10

      4.  Bruen Requires Nuance in Analyzing Historical Analogues....................12

   C.  Plaintiffs' Formulation of "Common Use" Is Inherently Flawed Because Neither Challenged Law Is a Categorical Ban, and Therefore the Common Use Standard Does Not Apply...............................................................................14

   D.  Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment..................................18

      1.  Pistol Grips ...........................................................................................23

      2.  Forward Grips .......................................................................................24

      3.  Detachable Magazines............................................................................24

   E.  Regulation of LCMs Likewise Does Not Burden the Individual Right to Self-Defense. ..................................................................................................25

IV. CONCLUSION ..........................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*,
No. 3:18-cv-10507-PGS-LHG, 2018 WL5724371 (D.N.J. Sept. 4,
2018) ...........................................................................................................27, 28

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. AG N.J.*,
910 F.3d 106 (3d Cir. 2018) ...................................................................2

*Bevis v. City of Naperville, Illinois*,
No. 23-1353, 2023 WL 7273709 (7th Cir. Nov. 3, 2023)................15, 20, 22, 25

*D.C. v. Heller*,
554 U.S. 570 (2008).......................................................................*passim*

*Duncan v. Bonta*,
19 F.4th 1087 (9th Cir. 2021) .............................................................26

*Firearms Fed'n v. Kotek Or. All. for Gun Safety*,
2023 WL 4541027 (D. Or. July 14, 2023).........................................27

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) .......................................................23, 25

*Kolbe v. O'Malley*,
42 F. Supp. 3d 768 (D. Md. 2014).....................................................27

*Libertarian Party of Erie Cnty. v. Cuomo*,
970 F.3d 106 (2d Cir. 2020) ................................................................2

*Md. Shall Issue v. Hogan*,
353 F. Supp. 3d 400 (D. Md. 2018).....................................................2

*McDonald v. City of Chicago, Ill.*,
561 U.S. 742 (2010)............................................................................2

*Nat'l Ass'n for Gun Rts. v. Lamont*,
No. 22-CV-1118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023).........................2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)...................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  990 F. Supp. 2d 349 (W.D.N.Y. 2013)...............................................23

*Or. Firearms Fed'n, Inc. v. Brown*,
  644 F. Supp. 3d 782 (D. Or. 2022) .....................................................27

*Peruta v. Cnty. of San Diego*,
  824 F.3d 919 (9th Cir. 2016) ................................................................2

*Richmond Boro Gun Club, Inc. v. City of New York*,
  97 F.3d 681 (2d Cir. 1996) .................................................................23

*Rocky Mountain Gun Owners v. Polis*,
  467 P.3d 314 (Colo. 2020)..................................................................27

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019) ..................................................2

*S.F. Veteran Pol'y Officers Ass'n v. City & Cnty. of San Francisco*,
  18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014)........................................17

*State v. Misch*,
  214 Vt. 309 (Vt. 2021).......................................................................27

*Stimmel v. Sessions*,
  879 F.3d 198 (6th Cir. 2018) ................................................................2

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019).................................................................27

**Statutes**

N.J. Stat. Ann. §§ 2C:39-1 ................................................................*passim*

N.J. Stat. Ann. §§ 2C:39-3 .......................................................................2

N.J. Stat. Ann. §§ 2C:39-5 .......................................................................2

N.J. Stat. Ann. §§ 2C:39-9 .......................................................................2

N.J. Stat. Ann. §§ 2C:39-20(a) ...............................................................15

N.J. Stat. Ann. §§ 2C:58-5 ...................................................................2

**Other Authorities**

Adam Lankford, *Confirmation That the United States Has Six Times Its Global Share of Public Mass Shooters, Courtesy of Lott and Moody's Data*, 16 Econ. J. Watch 1, 73-77 (2019), https://tinyurl.com/5c8xpuv9 ...................................................7

AR15.com, "What is your Par time for an AR-15 emergency reload?" (Nov. 22, 2010) https://tinyurl.com/3csjs7kd ....................................11

August 19, 1996 Attorney General Guidelines ...............................2, 23, 24

Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4 ...................................................6

Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994–2004 Federal Assault Weapons Ban: Analysis of Open–source Data*, 86 J. Trauma & Acute Care Surgery 11, 12 (2019) .........................................................26

Chris Baker, *How Much Ammo Capacity Is Enough?*, Lucky Gunner (Sep. 2, 2016), https://tinyurl.com/47kz2tsh ......................................28

Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Wash. Post (Feb. 15, 2018), https://wapo.st/2TARTva .............................................................26

Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64 ...............................................10, 11

Christopher S. Koper, *Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms*. 19 Criminology and Public Policy 147 (2020) .......................................16

Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM ......................28

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.......................11

Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC News (May 29, 2022), https://tinyurl.com/27hr2p2w ......................................................................21

Dep't of the Army, *Rifle Marksmanship M16A1, M16A2/3, M16A4, and Carbine*, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px........................19

Dep't of the Army, *TC 3-22.9 Rifle and Carbine Manual*, §§ 8-19–20 (May 2016), https://tinyurl.com/2p963dxd........................................................22

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, House Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed ...............................................................16

Educ. Fund to Stop Gun Violence, *Assault Weapons and Large Capacity Magazines*, https://tinyurl.com/yjmaba4k ...........................................24

Erin Grinshteyn and David Hemenway, *Violent death rates in the US compared to those of the other high-income countries, 2015*, 130 Nursing and Health Professions Fac. Rsch. and Publ'ns 1 (2019), https://tinyurl.com/zb7phedb ...................................................................7

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t........................................................................12

Fla. Dep't of L. Enf't, *Marjory Stoneman Douglas High School Public Safety Commission Report* (Jan. 2, 2019), https://tinyurl.com/mvs34fky...............................................................26

*Gun Accessories for Sale*, Impact Guns, https://www.impactguns.com/high-capacity-magazines/?in_stock=1 ......................................................................16

Gun Violence Archive 2023, Gun Violence Archive (Aug. 22, 2023), https://tinyurl.com/5t4rrt56..........................................................................6

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe .......................................................................21

Homes Lybrand, *Two arrested on gun charges after crashing into barricade near the US Capitol, authorities say*, CNN (Nov. 6, 2023) https://tinyurl.com/mssjae43 ...................................................22

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.......................9

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye...............................................................11

Joshua Horwitz, *Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence (Sept. 2003)................................23

Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9 ..........................................28

Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754, 1755 (2019)................25

Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn........................................6

Mark Berman and Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023),  https://tinyurl.com/dkzjskxs ..................................................12

MICHAEL JENSEN ET AL., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc ..................................................8

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b ..................................................20

NECKBONE ARMORY, *Are Ar-15 Magazines Interchangeable? Which Ones Are*, https://tinyurl.com/hppuzpb2.........................................11

NEWCASTLE UNIVERSITY NATIONAL CIVIL WAR CENTRE, *Meet a Musketeer*, https://tinyurl.com/heehyjnk .........................................11

Off. of the N.Y. State Att'y Gen., *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022)..........................................8

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, CAMBRIDGE UNIV. PRESS (Aug. 24, 2020), https://tinyurl.com/bdds6wf9 ...............................................................................8

*Past Summary Ledgers*, GUN VIOLENCE ARCHIVE, https://tinyurl.com/y5s7ax23 .............................................................................6

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths,* 80 J. of Trauma and Acute Care Surgery 6, 856 (2016) ......................................................................................................11

POP CULTURE: 1800, U.S. CENSUS BUREAU (Dec. 9, 2022), https://tinyurl.com/78cxvafx...................................................................................9

Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars Journal (July 12, 2017), https://tinyurl.com/2jwemryz ......................................19

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27 ........................26

Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture,* POYNTER (June 29, 2022), https://tinyurl.com/5bffkafr...............................................................................19

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt....................................................21

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?,* 49 Hastings Const. L.Q. 145, 168-69 (2022), https://tinyurl.com/zx2dvsmc ...............................................................................13

Scott Pelley, *What makes the AR-15 style rifle the weapon of choice for mass shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33................................................................................11

TC 3-22.9 Rifle and Carbine Manual, DEPARTMENT OF THE ARMY, §§ 8-19–20 (May 2016), https://tinyurl.com/2p963dxd ............................................9

Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*, NPR (Apr. 20, 2023) https://tinyurl.com/3ak32wvp .........................................20

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa....................................................................19

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack,* Reuters  (May 15, 2022), https://tinyurl.com/bdzbf8us ........................................................................9

UBERTI USA, 1866 Yellowboy Rifle History, https://tinyurl.com/3x2wjth3...............................................................12

Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk...................10

*What we know so far about the mass shooting in Maine, AP (Oct. 28, 2023),* https://tinyurl.com/5mcr4n6c .................................................6

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494 (May 13, 2022), https://tinyurl.com/yc3fer46 .......................................................14, 15

Winchester Gun Store, *Winchester Model 1866 Short 38 Special Lever Action Rifle*, https://tinyurl.com/yc3cv2zc .......................................11

## I.   INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), Brady Center to Prevent Gun Violence ("Brady"), and March for Our Lives ("MFOL") (together, "*Amici*") respectfully submit this Brief in Support of Defendants' Opposition, ECF No. 181 ("New Jersey Brief"), to Plaintiffs' Motions for Summary Judgment, ECF Nos 174 (Motion for Summary Judgment by Plaintiffs Cheeseman, et al. ("Cheeseman Brief")), 175 (Motion for Summary Judgment by Association of New Jersey Rifle & Pistol Clubs, Inc. et. al ("ANJRPC Brief")) (together "Plaintiffs' Briefs").

Giffords Law Center is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. Brady is the Nation's longest-standing non-partisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. MFOL is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives.

---

[1] All parties have consented to this filing.

Through partnerships with researchers, public health experts, and community organizations, *Amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence.

Giffords Law Center, Brady, and MFOL have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations,[2] and judges have regularly cited the organizations' research and expertise.[3]

## II.    INTRODUCTION

The New Jersey laws regulating possession of large capacity ammunition magazines, N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), N.J. Stat. Ann. § 2C:39-20(a) and laws regulating possession of assault firearms, N.J. Stat. Ann. §§ 2C:39-1(w),[4] N.J.S. 2C:39-5(f), N.J.S. 2C:39-9(g), N.J.S. 2C:58-5 (together the "Challenged Laws"), are constitutional under the test announced in *New York State Rifle & Pistol*

---

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont,* No. 22-CV-1118, 2023 WL 4975979, at *12 (D. Conn. Aug. 3, 2023); *Rupp v. Becerra,* 401 F. Supp. 3d 978, 990 (C.D. Cal. 2019); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. AG N.J.,* 910 F.3d 106, 121-22 (3d Cir. 2018); *Md. Shall Issue v. Hogan,* 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel v. Sessions,* 879 F.3d 198, 208 (6th Cir. 2018); *Peruta v. Cnty. of San Diego,* 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring). Giffords Law Center filed the latter two briefs under its former name Law Center to Prevent Gun Violence.

[4] A firearm is regulated under N.J. Stat. Ann. § 2C:39-1(w)(2) for being "substantially identical" to a listed firearm if it has the features set forth in the August 19, 1996 Attorney General Guidelines ("Attorney General Guidelines").

*Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* instructs that, when a law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if the "regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. When considering the unprecedented social and technological conditions addressed by the Challenged Laws, *Bruen* requires a "nuanced approach" to the analogical inquiry to avoid creating a "regulatory straightjacket." 142 S. Ct. at 2132–33. The Challenged Laws are constitutional under this test because they are relevantly similar to historical regulations that were designed to address pressing public safety concerns of the time.

However, the Court need not even get to the historical regulation question as the weapons and weapon features governed by the Challenged Laws are also uniquely dangerous, not quintessential self-defense weapons, and, therefore, not covered by the plain text of the Second Amendment. These weapons are designed to kill large numbers of people quickly, making them significantly more lethal than any firearms in the 1700s or 1800s.

Finally, Plaintiffs' version of the common use test is inherently flawed and should be rejected.

## III.   ARGUMENT

### A.   Bruen's Second Amendment Test Requires the Consideration of Empirical Research.

In *Bruen*, the Supreme Court articulated a new standard for determining whether a regulation is constitutional under the Second Amendment. The party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. The burden then shifts to the relevant governmental body to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. *Bruen*, 142 S. Ct. at 2135 (2022). The Court explained that a modern regulation need not be the "twin" of a historical regulation. *Id.* at 2132. Indeed, the Court recognized that while it is "relatively simple" to analogize modern regulations to "historical" ones in some cases, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* The Court also identified two important—but non-exclusive—considerations for lower courts to use: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in modern and historical American society. Such

empirical research helps courts contextualize modern and historical laws and the prevailing social backdrop against which those laws were passed, as *Bruen* requires.

*Bruen*'s analysis of historical analogues thus demands that gun-safety regulations be viewed in light of relevant prevailing societal conditions, and empirical research provides indispensable evidence of these conditions.

### B.   Because the Challenged Laws Address Unprecedented Social and Technological Conditions, Bruen Requires a Nuanced Approach.

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the Challenged Laws, which, like many regulations spanning our Nation's history, were designed to protect the public.[5]

### 1.   The Frequency, Lethality, and Geographic Concentration of Premeditated Public Mass Shootings Are Novel Societal Concerns.

The United States has experienced a recent, exponential increase in the frequency of public mass shootings. *Amici* could find only two instances of private mass shootings in America throughout all of the 18th and 19th centuries,[6] both of

---

[5] *See* New Jersey Br. 5–6 (explaining motivations).

[6] As used here, a "mass shooting" is a shooting in which four or more people (other than the perpetrator(s)) are injured and/or killed, where victims are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance. Defendants use a definition that focuses on the

which occurred in 1891 and neither of which involved fatalities (likely given the limitations of gun technology at the time).[7] One scholar estimates that 25 mass shootings occurred between 1900 and 1965.[8] By contrast, sources report over 600 mass shootings *per year* in each of the last three years (610 in 2020, 690 in 2021, and 646 in 2022).[9] As of this drafting,[10] 580 mass shootings have occurred in the United States in 2023,[11] an average of nearly two per day.

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in the United States relative to the rest of the world. At least one comprehensive study has found that between 1998 and 2012, the United States experienced 29.7% of all mass shootings globally, but accounted for just 4.5% of the

---

number of deaths caused by a mass shooter. *See* New Jersey State Defendants' Counter-Statement of Material Facts Not in Dispute ECF 183 at 25 § 151. Both definitions yield the same conclusion: mass shootings have skyrocketed in this country.

[7] *See* Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn.

[8] *See* Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, WASH. POST (May 9, 2021), https://tinyurl.com/537ww9z4.

[9] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.

[10] And this number is likely to grow. Just weeks ago, a man killed 18 people in Maine. *See What we know so far about the mass shooting in Maine*, AP (Oct. 28, 2023), https://tinyurl.com/5mcr4n6c.

[11] *See Gun Violence Archive 2023,* Gun Violence Archive, https://tinyurl.com/5t4rrt56.

world's population.[12] This disparity is even starker when measured by gun-related fatalities: in 2015, "[t]he overall firearm death rate was 11.4 times higher in the US than in other high-income countries," and "83.7% of all firearm deaths, 91.6% of women killed by guns, and 96.7% of all children aged 0-4 years killed by guns were from the US."[13]

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any other time in history or in any other comparable place in the world.

### 2.   The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined.

Several modern social phenomena coincided with a surge in mass shootings over the 21st century, making gun violence prevention especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

---

[12] *See* Adam Lankford, *Confirmation That the United States Has Six Times Its Global Share of Public Mass Shooters, Courtesy of Lott and Moody's Data*, 16 Econ J. Watch 1, 73–77 (Mar. 2019), https://tinyurl.com/5c8xpuv9.

[13] *See* Erin Grinshteyn and David Hemenway, *Violent death rates in the US compared to those of the other high-income countries, 2015*, 130 Nursing and Health Professions Faculty Research and Publications 1, 2 (2019), https://tinyurl.com/zb7phedb.

a.   *Social Media*

Social media platforms create a means of communication that is exponentially faster, farther-reaching, and more difficult to regulate than anything the Founders could possibly have imagined. Numerous studies correlate social media with increases in anti-social behavior; mental health disorders; political, religious, and social extremism; and ultimately, mass shootings. Social media plays an important role in the radicalization of American extremists,[14] as a mounting body of evidence shows that content-ranking algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[15]

Amid such violent and frenetic discourse, many perpetrators of mass shootings have been inspired by what they read online. One example (of far too many) is the May 2022 Tops Buffalo shooting, in which the 18-year-old gunman published a racist manifesto online before broadcasting the shooting live on social media.[16] The New York Attorney General reported that the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social

---

[14] *See, e.g.* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

[15] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[16] *See* Off. of the N.Y. State Att'y Gen., *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022).

media] website a brief clip of a [previous] mass shooting."[17] The shooter also posted

material on a different social media platform, Discord, "with the explicit goal of

provoking future mass shootings."[18] A *Reuters* article observed that the shooting

"appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass

shootings inspired by previous attackers."[19] Even more recently, on May 7, 2023,

another mass shooter killed 8 people in Allen, Texas, after seemingly being

influenced by content he saw on social media.[20]

        b.   *Urbanization*

Urbanization has also radically transformed society since the Founders' era.

In 1800, the United States averaged 6.1 people per square mile.[21] By 2020, the

population had increased by a staggering 1500% to an average of 93 per square

mile.[22]

This explosion in population density has profoundly changed how people

---

[17] *Id.* at 3.

[18] *Id.* at 15.

[19] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.

[20] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.

[21] Pop Culture: 1800, U.S. Census Bureau (Dec. 9, 2022), https://tinyurl.com/78cxvafx.

[22] Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers drastically understate the impact of population density in *urban* areas, where most mass shootings occur.

associate. People gather in large groups more frequently than could have been possible before urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, crowded night clubs, sports arenas and stadiums, concerts, movie theaters, malls, and parades. These gatherings create "sitting duck" situations in which mass shooters can efficiently injure or kill large numbers of people in a single event. The Route 91 Music Festival shooting in Las Vegas lasted only 11 minutes but killed 58 concertgoers and injured nearly 1,000 others.[23]

### 3. Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings.

Against the backdrop of these and other societal changes, advances in gun technology allow even an inexperienced shooter to kill vastly more people more quickly than ever before.

Modern firearms far surpass their Founding-era counterparts in lethality. The typical Revolutionary-era musket (i) could hold just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[24]

---

[23] Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk.

[24] Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, WASH. POST (June 13, 2016), https://tinyurl.com/mu5ety64. "Muzzle velocity" is the speed of a projectile when leaving the muzzle of a gun, and is a

By contrast, a typical AR-15 rifle (i) can hold 30 rounds[25] (30 times more); (ii) can shoot accurately from around 400 yards[26] (7 times as far); (iii) attains a muzzle velocity of around 3,251 feet per second[27] (over three times faster); and (iv) can be reloaded with full magazines in as little as three seconds.[28] Thus, a shooter wielding an AR-15 is massively more lethal than one with a Revolutionary-era musket.[29]

Even the most advanced firearms of the Civil War era were a far cry from modern weapons such as an AR-15 rifle. For example, the 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[30] a maximum effective range of approximately 100 yards (one-fourth of an AR-15 rifle) and a muzzle velocity of 1,100 feet per second (one-third of an AR-15 rifle),[31] and could fire only ten shots

---

general measure of the power and lethality of a firearm. Newcastle University National Civil War Centre, *Meet a Musketeer*, https://tinyurl.com/heehyjnk.

[25] AR-15 rifles use the same magazines as M16 rifles, which come in a standard size of 30 rounds. *See* NECKBONE ARMORY, *Are Ar-15 Magazines Interchangeable? Which Ones Are*, https://tinyurl.com/hppuzpb2. *See also*, Ingraham, *supra* note 26.

[26] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, MINUTEMAN REVIEW (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

[27] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma and Acute Care Surgery 6, 856 (2016).

[28] AR15.com, "What is your Par time for an AR-15 emergency reload?" (Nov. 22, 2010) https://tinyurl.com/3csjs7kd.

[29] Scott Pelley, *What makes the AR-15 style rifle the weapon of choice for mass shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33.

[30] Winchester Gun Store, *Winchester Model 1866 Short 38 Special Lever Action Rifle*, https://tinyurl.com/yc3cv2zc; Dan Alex*, Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

[31] *Id.*

per minute.[32] Using a semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds.[33] This meets the U.S. Army definition for "rapid semiautomatic fire."[34]

Increased firepower, coupled with advanced ballistics,[35] have made modern firearms far more deadly and fundamentally different from their historical predecessors. Current events too frequently illustrate how, with modern technology, a lone individual can commit mass murder in seconds. The ratifiers of the Second Amendment could not have imagined such rapid, indiscriminate carnage.

### 4.    Bruen Requires Nuance in Analyzing Historical Analogues.

In passing the Challenged Laws, the New Jersey legislature contended with realities that legislatures of the past did not. Mass shootings that even in 1990[36] were occurring in greater frequencies than ever before, shifts in our society, and advances in gun technology. These drastic societal and technological changes require this Court, under *Bruen,* to employ a nuanced analysis when comparing the "hows" and

---

[32] UBERTI USA, 1866 Yellowboy Rifle History, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer.").

[33] *See* Mark Berman and Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, WASH. POST (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.

[34] Dep't of the Army, *TC 3-22.9 Rifle and Carbine Manual*, §§ 8-19–20, (May 2016), https://tinyurl.com/2p963dxd.

[35] *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, FORBES (Feb. 15, 2017), https://tinyurl.com/2hudma2t.

[36] *See* New Jersey Br. 5–6 (explaining motivation of Challenged Laws being mass shooting in California where an AK-47 assault weapon was used).

"whys" of the Challenged Laws with those of historical laws.

The motivation behind the Challenged Laws—their ("why")—is, fundamentally, to promote public safety.[37] Many (if not all) gun regulations at the Founding and throughout our history had the same motivation: to protect the public from deadly harm.[38] Thus, there is a strong and easily discernible link between the past and present "whys."

To analogize present and past "hows," the Court must determine whether the Challenged Laws impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 142 S. Ct. at 2133. The New Jersey legislature—like prior lawmakers—chose to restrict the use and sale of specific especially dangerous firearms and accessories to protect public safety, and it has done so without preventing citizens from possessing the modern-day quintessential self-defense weapon: handguns. Employing *Bruen*'s nuanced approach, *id*. at 2132, the Court should conclude that the Challenged Laws are

---

[37] *See* New Jersey Br. 5 ("In signing the bill, Governor Jim Florio recognized the "wholesale destruction" these weapons can inflict, making them a "direct threat to our police, our citizens and especially our children.").

[38] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc; *see also* New Jersey Br. 55–67.

relevantly similar to many historical weapons regulations, and thus are consistent with our Nation's tradition of firearm regulation.[39]

### C. Plaintiffs' Formulation of "Common Use" Is Inherently Flawed Because Neither Challenged Law Is a Categorical Ban, and Therefore the Common Use Standard Does Not Apply.

Plaintiffs argue that the Challenged Laws constitute an "outright ban" on "commonly owned arms" and thus "New Jersey's laws cannot be reconciled with *Bruen* (or reality)." ANJRPC Br. 4.[40]

Preliminarily, Plaintiffs are incorrect that the arms and magazines covered by the Challenged Laws are in common use such that they are presumptively entitled to Second Amendment protection. Plaintiffs assert they are in common use because millions of individuals "possess the semiautomatic firearms" and "the standard-issue magazines New Jersey has banned." *Id.* at 3. For support, however, Plaintiffs rely heavily on an unpublished, non-peer-reviewed summary of an online survey. *Id.* (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2 (May 13, 2022) ("English Survey"),

---

[39] *See* New Jersey Br. 55–75.

[40] *See* Cheeseman Br. 34 (Because assault weapons "are all common under the same jurisdictional analysis," New Jersey's restrictions on such weapons is "categorically unconstitutional.").

https://tinyurl.com/yc3fer46).[41] And even this summary acknowledges that actual ownership numbers are likely lower than stated because the survey asked whether respondents had "ever owned" such a rifle or magazine, *English Survey* at 22, 33, and its estimate thus does not account for destruction of these weapons or transfer of ownership, such as resale, *id.* at 33. This highlights just one fallacy in Plaintiffs' use of historical ownership statistics to define "common use:"[42] the argument necessarily assumes that every individual who has ever owned these guns still owns them, actively uses them, and uses them only for lawful purposes. Using ownership statistics spanning many decades to define "common use" also ignores the additional, immensely important requirement that such weapons must be in common use for *lawful self-defense*. *See Bruen*, 142 S. Ct. at 2132 (amendment protects only "instruments that facilitate armed self-defense"); *Bevis v. City of Naperville, Illinois*, No. 23-1353, 2023 WL 7273709, at *11 (7th Cir. Nov. 3, 2023) ("the definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose. That lawful purpose . . . is at its core the right to individual self-defense").

Nor do Plaintiffs compare the Challenged Laws with the regulation at issue in *Heller* or provide any other support to justify their claim that the Challenged Laws constitute an absolute, categorical ban. They could not do so. N.J. Stat. Ann. § 2C:39-

---

[41] *See* New Jersey Br. 39 (raising use of *English Survey* as "inadmissible double hearsay.").

[42] *See* ANJRPC Br. 22–23; Cheeseman Br. 27–28.

1(w) does not ban possession of all "rifles" or "semi-automatic rifles." The statute regulates an enumerated, tailored list of semiautomatic rifles and semiautomatic pistols and an enumerated, narrowly tailored list of firearm features that pose a specific threat to society. Plaintiffs themselves confirm this point, describing the Challenged Laws restriction as a "prohibition of the enumerated 66 long guns and 'substantially identical' firearms."[43]

N.J. Stat. Ann. § 2C:39-1(y) likewise does not constitute a categorical ban. Even if the Court assumes that magazines are "arms", the Challenged Laws do not ban magazines generally, just those "capable of holding more than 10 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." N.J. Stat. Ann. § 2C:39-1(y). Rather, LCMs, as defined by the statute at issue, are non-essential firearm accessories.[44] The Challenged Laws, which simply require an individual to reload their weapon after discharging 10 rounds of ammunition,[45] are a far cry from a "prohibition of an entire class of 'arms.'" *Heller*,

---

[43] ANJRPC Br. 11.

[44] Gun retailers also make this distinction. *See, e.g.*, *Gun Accessories for Sale*, Impact Guns, https://www.impactguns.com/high-capacity-magazines/?in_stock=1 ("In addition to being one of the largest online providers of firearms and ammunition, Impact Guns has a massive selection of gun accessories online as well. [...] From gun cleaning materials to extended and high-capacity magazines, the products we carry will enhance your shooting and hunting experience in one way or another.").

[45] *See* Christopher S. Koper, *Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms*. 19 Criminology and Public Policy 147 (2020)

554 U.S. at 628;[46] *see also, e.g.*, *S.F. Veteran Pol'y Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014) (LCM ban was not "a total ban on all magazines" but instead "a total ban only on magazines holding more than ten rounds," allowing citizens "to carry or keep . . . more magazines" as "a backup"). N.J. Stat. Ann. § 2C:39-20(a) further exempts "firearms "with a fixed magazine capacity [of up to] 15 rounds which is incapable of being modified to accommodate 10 or less rounds" and a "firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds."[47] The Challenged Laws thus restrict only a specified type of magazine for specific groups of people, rather than imposing a blanket ban on an entire class of arms.[48]

By limiting only a narrow category of firearms, the Challenged Laws accord with *Heller*'s recognition that the Second Amendment right "is not unlimited" and

---

("LCM restrictions do not ban all firearms capable of accepting LCMs, but they do limit the capacity of the ammunition magazines that can be sold for these weapons . . . Although offenders blocked from access to AWs and LCMs can commit crimes with other guns and smaller magazines, the logic underlying [LCM] laws is that forcing this substitution should limit the number of shots fired in gun attacks.").

[46] *See* New Jersey Br. 69–70.

[47] *See* New Jersey Br. 8; *see also* N.J. Stat. Ann. § 2C:39-1(y) (exempting from LCM definition any "attached tubular device which is capable of holding only .22 caliber rimfire ammunition.").

[48] *See* New Jersey Br. 7 ("Although the [Challenged Laws] restricts the capacity of each individual magazine, it imposes no limitation on the number of firearms or magazines, or the amount of ammunition, that a person can lawfully purchase or own.")

had never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. The Challenged Laws thus stand in contrast to the one the Court invalidated in *Heller*—a total ban on handgun possession in the home that "amount[ed] to a prohibition of an entire class of 'arms.'" *Id.* at 628.

All told, the Challenged Laws regulate specific, enumerated especially dangerous firearms, features, and accessories posing a threat to society. They do not constitute a complete ban on an entire class of weapons.[49]

### D. Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.

The Supreme Court has held that the Second Amendment right to bear "arms" protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—inside and outside the home for self-defense. *Heller*, 554 U.S. at 629; *Bruen*, 142 S. Ct. at 2119. The Court cautioned, however, that the Second Amendment should not be understood to bestow a right to keep and carry any weapon, in any manner, for any purpose. Instead, it endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual

---

[49] *See* New Jersey Br. 70 ("[I]ndividuals remain free to possess any number of different types of handguns, rifles, and shotguns. And an individual remains free to own as many bullets and magazines as he wishes.")

weapons.'" *Heller*, 554 U.S. at 626–27.[50]

The Challenged Laws fit neatly within this historical tradition of prohibiting "dangerous and unusual weapons." They regulate only a narrow subset of assault rifles with features that turn them into dangerous military-style firearms best suited to offensive use in wartime. The AR-15, for example, traces its origins to a military-grade rifle designed in the late 1950s.[51] It is the AR-15's "phenomenal lethality" that has made versions of it the U.S. military's standard-issue assault rifle since the Vietnam War.[52] Besides lacking automatic-fire capability,[53] the AR-15 is functionally the same as the M16, an automatic weapon designed for military combat. *See Bevis*, 2023 WL 7273709, at *12 (finding weapons such as the AR-15 do not "enjoy Second Amendment protection" because "the AR-15 is almost the same gun as the M16 machinegun. . . . Both weapons share the same core design,

---

[50] *Bruen* makes clear that many regulations implicating Second Amendment rights will survive scrutiny. *See Bruen*, 142 S. Ct. at 2133–34.

[51] *See* Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars J. (July 12, 2017), https://tinyurl.com/2jwemryz; Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

[52] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

[53] Just because the AR-15 does not fire automatically does not make it appropriate for civilian use. The U.S. Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be." Dep't of the Army, *Rifle Marksmanship M16A1, M16A2/3, M16A4, and Carbine* §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.

and both rely on the same patented operating system").[54] The AR-15's and M16's gas-impingement system specifically appealed to the military—an innovation that redirects some of the energy from a fired bullet to reload the next bullet in order to reduce recoil and make it easier for a gunman to maintain aim, increasing accuracy.[55] Indeed, virtually all of the world's armies use assault rifles that are variants of the AR-15.[56] *See Bevis*, 2023 WL 7273709, at \*12 (concluding that the Second Amendment does not protect the weapons and feeding devices covered by the challenged legislation "because these assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense").

Assault weapons are exponentially more lethal than any firearms available during the ratification of the Second or Fourteenth Amendments or throughout most of our Nation's history. When traveling through the body, bullets fired from semiautomatic rifles cause "cavitation," whereby a swath of tissue several inches from the bullet's path ripples away from the bullet and then settles back, creating a

---

[54] *See also* Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*, NPR (Apr. 20, 2023) https://tinyurl.com/3ak32wvp.
[55] *Id.*
[56] Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b

large cavity.[57] Bullets need not hit an artery to cause catastrophic bleeding.[58] Exit wounds can be the size of oranges.[59] Underscoring the carnage that assault-rifle fire wreaks, Peter Rhee, a trauma surgeon at the University of Arizona, has explained that wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there," whereas wounds inflicted by a 9mm handgun "look[] like a bad knife cut."[60]

The effects of assault weapons are particularly devastating in mass shootings involving child victims. Roy Guerrero, a pediatrician in Uvalde, Texas, recalled victims with "[o]pen chest wounds," "war wounds," wounds akin to "decapitation," "as if things exploded once the bullets hit the bodies."[61] In his congressional testimony, Dr. Guerrero recalled seeing children "whose bodies had been so pulverized, decapitated by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood-

---

[57] *See* Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, THE ATLANTIC (Feb. 22, 2018), https://tinyurl.com/2uc4bepe (explaining the difference between injuries inflicted by semiautomatic rifles versus handguns).

[58] *Id.*

[59] *Id.*

[60] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt; *see also* Dickinson, *supra* note 48 (quoting the Navy trauma surgeon who operated on Congresswoman Gabrielle Giffords as saying that while handgun wounds are comparable to "stabbing with a bullet," shooting someone with an AR-15 is "as if you shot somebody with a Coke can").

[61] Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC NEWS (May 29, 2022), https://tinyurl.com/27hr2p2w.

spattered cartoon clothes still clinging to them."[62]

Attempting to distinguish the assault weapons regulated by the Challenged Laws from those they presume to be indisputably unprotected by the Second Amendment, Plaintiffs note that the regulated weapons "are not machine guns," ANJRPC Br. at 8 (quotations omitted). Plaintiffs go on to assert that the Second Amendment plainly protects firearms "no matter what kind of grip, stock, ammunition feeding device, or other features they may have." *Id*. at 19-20. However, the specific features regulated by the Challenged Laws—including (1) pistol grips, (2) forward grips, and (3) detachable magazines—make them more like machine guns[63] and thus increase their lethality, placing them far outside the category of "quintessential self-defense weapons" at issue in *Heller*. "The very features that qualify [these] firearm[s] as . . . banned assault weapon[s] . . . 'serve specific,

---

[62] *Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, House Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed.

[63] The Challenged Laws also regulate bump stocks, defined as a device that "facilitates repeated activation of the trigger." N.J. Stat. Ann. §§ 2C:39-1(w)(6), (ee). As explained by the Seventh Circuit, "[t]he similarity between the AR-15 and the M16 only increases when we take into account how easy it is to modify the AR-15 by adding a 'bump stock' (as the shooter in the 2017 Las Vegas event had done) . . . thereby making it, in essence, a fully automatic weapon." *Bevis*, 2023 WL 7273709, at *13. *See, e.g.,* Homes Lybrand, *Two arrested on gun charges after crashing into barricade near the US Capitol, authorities say*, CNN (Nov. 6, 2023) https://tinyurl.com/mssjae43 ("[O]fficers . . . found two pistols, one of which had a device attached known as a 'Giggle Switch' . . . The device converts a semi-automatic Glock pistol into an illegal machine-gun pistol capable of firing multiple rounds with one pull of the trigger.")

combat-functional ends'" that citizens would not require for ordinary self-defense. *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017).

### 1.    Pistol Grips[64]

Contrary to Plaintiffs' assertion that pistol grips "do not impact the actual function of [a] firearm," Cheeseman Br. 24, pistol grips alter the way a weapon functions in practice and increases its lethality, especially during prolonged episodes of rapid fire. By allowing the shooter to place the shooting hand beneath the gun, the shooter can exert leverage on the gun with both hands and maintain greater control and aim during rapid, prolonged firing.[65] Pistol grips do not merely make it "easier to hold . . . a rifle or shotgun when fired from the shoulder," as Plaintiffs contend, Cheeseman Br. 25, they also enable a shooter to shoot from the hip instead of the shoulder, something that is useless for hunting or lawful self-defense because there is hardly any accuracy when shooting from the hip, but which allows a shooter to indiscriminately spray fire into a crowd. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685 (2d Cir. 1996) ("[P]istol grips are designed to make [] spray firing from the hip particularly easy."); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 370 (W.D.N.Y. 2013), ("New York points to evidence that [pistol grips] aid shooters when 'spray firing' from the hip."), *aff'd in*

---

[64] N.J. Stat. Ann. §§ 2C:39-1(w)(3); Attorney General Guidelines II(A)(2), II(C)(2).
[65] *See* Joshua Horwitz, Educ. Fund to Stop Gun Violence, *Killing Machines: The Case for Banning Assault Weapons* 9 (2003).

*part, rev'd in part*, 804 F.3d 242 (2d Cir. 2015).

### 2. Forward Grips[66]

Forward pistol grips (such as those found on AR-15 rifles) are located in front of the trigger and are meant to be used by the shooter's non-shooting hand. Forward grips give shooters "enhanced control" by allowing a shooter to place the non-shooting hand underneath the barrel of the gun, which grants more leverage and control during episodes of rapid firing.[67]  The enhanced control and aim increase the weapon's lethality, especially during prolonged episodes of rapid fire.[68]

### 3. Detachable Magazines[69]

Detachable magazines equip firearms with a drastically higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[70] Detachable magazines can hold as many as one hundred rounds without having to reload.[71] They also allow shooters to replace an empty magazine with a pre-loaded, full magazine in a few seconds, with little practice.[72] When combined with other features regulated by the Challenged Laws,[73] detachable

---

[66] Attorney General Guidelines II(B)(2).

[67] *See* Horwitz, *supra* note 69.

[68] *Id.*

[69] Attorney General Guidelines II(A), II(B), II(C)(4).

[70] *See* EDUC. FUND TO STOP GUN VIOLENCE, *Assault Weapons and Large Capacity Magazines*, https://tinyurl.com/yjmaba4k (last accessed May 9, 2023).

[71] *Id.*

[72] *See id*.

[73] *See* N.J. Stat. Ann. §§ 2C:39-1(w)(3); Attorney General Guidelines II.

magazines thus render weapons uniquely dangerous. They are especially lethal when used in combination with firearms that have "features that allow [for] enhanced control while firing multiple rounds."[74]

* * *

The regulated assault rifles and weapons with the regulated features are uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Second Amendment protects.

### E. Regulation of LCMs Likewise Does Not Burden the Individual Right to Self-Defense.

"Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings."[75] Indeed, LCMs are designed to perpetrate devastation on a massive scale by enhancing an already especially dangerous firearm's ability to fire more than ten rounds in rapid succession *without the need to reload.*[76] LCMs thus increase the lethality of attacks by eliminating the

---

[74] *Id.*

[75] Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 1990-2017, 109 AJPH 1754, 1755 (2019). LCMs are also considered especially useful in military applications, allowing gunmen "to hit multiple human targets very rapidly," *Kolbe*, 849 F.3d at 137 (4th Cir. 2017).

[76] The Challenged Laws merely regulate this need to reload, not, as Plaintiffs assert, the ammunition an individual may lawfully possess. *See Bevis*, 2023 WL 7273709, at *14 ("Anyone who wants greater firepower is free under these [LCM] laws to purchase several magazines of the permitted size. Thus, the person who might have preferred buying a magazine that loads 30 rounds can buy three 10-round magazines instead.")

critical pause during which the gunman would have to reload and the gunman's targets could escape or attempt to disarm him.[77] For this reason, states that have restricted access to LCMs—usually defined with a 10-round limit—experience 63% fewer mass shootings than states that do not.[78] This is evidenced by the fact that, at the national level, mass-shooting fatalities were 70% less likely to occur during the ten years that federal law banned assault weapons and LCMs than in other years.[79] After Congress allowed the ban to lapse, high-fatality mass shootings increased by 183%; deaths from such shootings increased by 239%.[80]

Numerous federal and state courts have found no evidence that firing more than ten bullets without the need to reload is necessary or even beneficial for self-defense. *See, e.g.*, *Duncan v. Bonta,* 19 F.4th 1087, 1105 (9th Cir. 2021) (observing that "as in other cases," the record offered no indication that "the added benefit of a[n] [LCM]—being able to fire more than 10 bullets in rapid succession—

---

[77] During the 2018 shooting in Parkland, Florida, the shooter's 13-second pause to reload a new magazine enabled a teacher and ten students to flee. Fla. Dep't of Law Enforcement, *Marjory Stoneman Douglas High School Public Safety Commission Report* at 34 (2019), tinyurl.com/mvs34fky.

[78] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27.

[79] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994–2004 Federal Assault Weapons Ban: Analysis of Open–source Data*, 86 J. Trauma & Acute Care Surgery 86, 11, 12 (2019).

[80] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, WASH. POST (Feb. 15, 2018), https://wapo.st/2TARTva (citing Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016)).

has *ever* been realized in self-defense in the home"); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired."); *Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, 2023 WL 4541027, at *12 (D. Or. July 14, 2023) ("[I]t is exceedingly rare (far less than 1 percent) for an individual to fire more than ten shots in self-defense.");  *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 787 (D. Md. 2014) *aff'd,* 849 F.3d 114 (4th Cir. 2017); *State v. Misch*, 214 Vt. 309, 356 (Vt. 2021) ("[I]t appears from the available data that . . . the large-capacity magazine [] is almost never used for self-defense."); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc.*, No. 3:18-cv-10507-PGS-LHG*, 2018 WL5724371, at *127-28 (D.N.J. Sept. 4, 2018) (Defendant's Proposed Findings of Fact and Conclusions of Law) (noting testimony by a veteran firearms instructor "that it would be unwise for an untrained civilian to use a firearm with an LCM in self-defense because . . . [u]ntrained civilians are not likely to be good shots").

Empirical research further demonstrates that the ability to fire more than ten rounds without reloading (*e.g.*, through use of an LCM) does not aid in self-defense. For example, the National Rifle Association's Armed Citizen database shows that, in more than 700 self-defense incidents, *less than one half of one percent* (0.5%) involved more than ten rounds of ammunition. *See Or. Firearms Fed'n, Inc. v.*

*Brown*, 644 F. Supp. 3d 782, 799-800 (D. Or. 2022). Other sources confirm that the average number of shots fired by civilians in self-defense is only about 2.[81] That figure aligns with FBI statistics, which suggest that "the average gunfight includes 3 rounds fired."[82] Lucky Gunner, an online retailer providing (self-proclaimed) "reliable shooting advice for regular people" has reported that "[i]n the overwhelming majority of the incidents where an armed civilian fires a shot in self-defense, probably 70 to 90% of them are able to resolve the situation within 3 or 4 rounds, and usually closer to one or two rounds," with only occasional instances of "5 to 8 rounds."[83]

As these authorities and statistics show, the Challenged Laws do not impose a burden on an individual's right to possess a firearm for lawful self-defense. LCMs are not used or useful in self-defense. And nothing exemplifies the ill-necessity and destructive capability of LCMs more poignantly than the words of Mark Kelly,

---

[81] *See* Claude Werner, *The Armed Citizen - A Five Year Analysis*, GUNS SAVE LIVES (Mar. 12, 2012), tinyurl.com/bdemd7ya (average of 2.2 defensive shots fired per incident from 1997–2001); Decl. of Lucy P. Allen ¶ 17, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*, Civil Action No. 3:17-cv-10507 (PGS)(LHG), 2018 WL 4688345 (D.N.J. Sept. 28, 2018) (average of 2.34 shots fired per incident in 2011-2017).

[82] Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9.

[83] Further, Lucky Gunner states that "a small, five-shot revolver should be more than enough to take care of the problem in all but the most extreme cases." Chris Baker, *How Much Ammo Capacity Is Enough?*, Lucky Gunner (Sep. 2, 2016), https://tinyurl.com/47kz2tsh.

United States Senator, retired astronaut, and husband of Giffords Law Center founder and mass shooting survivor Gabby Giffords. Testifying before Congress on the shooting that nearly took his wife's life, Senator Kelly said: "The first bullet went into Gabby's head. Bullet number 13 went into a nine-year-old girl named Christina-Taylor Green . . . . When [the shooter] tried to reload one 33-round magazine with another 33-round magazine, he dropped it [and was subdued]. I contend if [the shooter] . . . did not have access to a high-capacity magazine . . . Christina-Taylor Green would be alive today."[84]

## IV.    CONCLUSION

For the reasons set forth above and those set forth in the New Jersey Brief, the Challenged Laws are constitutional, and the Court should deny Plaintiffs' Motions for Summary Judgment.

---

[84] 159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy) (quoting Judiciary Committee testimony of Captain Mark Kelly).

Dated: November 10, 2023   Respectfully submitted,

      /s/ *Paul J. Fishman*
      Paul J. Fishman
      ARNOLD & PORTER KAYE SCHOLER LLP
      One Gateway Center, Suite 1025
      Newark, NJ 07102
      (973) 776-1901
      paul.fishman@arnoldporter.com

      Aaron R. Marcu*
      FRESHFIELDS BRUCKHAUS DERINGER US LLP
      601 Lexington Ave., 31st Floor
      New York, NY 10022
      (212) 277-4000
      aaron.marcu@freshfields.com

      Jennifer Loeb*
      FRESHFIELDS BRUCKHAUS DERINGER US LLP
      700 13th Street NW, 10th Floor
      Washington, DC 20005
      (202) 777-4500
      jennifer.loeb@freshfields.com

      *Attorneys for Proposed Amici Curiae*
      Giffords Law Center to Prevent Gun Violence,
      Brady Center to Prevent Gun Violence, and
      March for Our Lives

*\*Pro hac vice* pending

## CERTIFICATE OF SERVICE

I certify that, on November 10, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court for the District of New Jersey via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: November 10, 2023

/s/   *Paul J. Fishman*__
Paul J. Fishman

*Attorney for Proposed Amici Curiae*
Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives