Bradley P. Lehman (NJ #129762014)
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
Phone: 910-713-8804
Email: law.rmd@gmail.com
(Admitted *pro hac vice*)

*Attorneys for Cheeseman Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 3:18-cv-10507-PGS-LHG |

| | |
|---|---|
| MARK CHEESEMAN, et al, | Civil Action No. 1:22-cv-04360-PGS-LHG |
| Plaintiffs, | |
| v. | **Plaintiffs' Combined Brief in Opposition to State Defendants' Cross-Motion for Summary Judgment and Reply to State Defendants' Opposition to Cheeseman Plaintiffs' Motion for Summary Judgment** |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, | |
| Defendants. | |
| BLAKE ELLMAN et al, | Civil Action No. 3:22-cv-04397-PGS-LHG |
| Plaintiffs, | |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, | |
| Defendants. | |

## COMBINED BRIEF IN OPPOSITION TO STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO STATE DEFENDANTS' OPPOSITION TO CHEESEMAN PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

I.     **Introduction**……………………………………………………………1

II.    **As the State Implicitly Concedes, the Second Amendment Plainly Covers the Possession and Use of the So-Called "Assault Firearms."**……………………………………………………………….2

III.   **The *Proper* "Common Use" Test Dispositively Resolves the Motions for Summary Judgment in Favor of Plaintiffs and Against the State.** ……………………………………………………………6

    A. **Common Possession for Lawful Purposes is the Correct Focus, Not How Often or How Many Rounds People Happen to Use in Self-Defense…**……………………………………………………6

       1. **"In Common Use" Means Common *Possession*.** ……………….7

       2. **The State's Criticisms of This Test Are Irrelevant and Unfounded.** …………………………………………………...12

    B. **The State's Claims About Increased Risks of "Lethality" Are Overblown, and *Heller* and *Bruen* Have Already Taken Account of All Relevant Risks.** ……………………………………………14

    C. **Because These Arms Are in Common Use, They Are Necessarily *Not* Dangerous and Unusual and Cannot be Subjected to the State's Ban.** …………………………………………………………19

       1. **The Banned Arms Are Ubiquitously Owned and Possessed for Lawful Purposes, Including for Self-Defense.** ……………...20

       2. **Any Ban of These Commonly Used Arms is Untenable.** ………27

IV.    **Any Additional Historical Analysis Can Only Further Cement the Fate of the Challenged Law as an Unconstitutional Arms Ban.** ……..30

i

**A. The State is Not Entitled to Any Leniency Under the *Bruen* Standards, Whether Under "a More Nuances Approach" or Otherwise.** ……………………………………………………….31

**1. No "Dramatic Technological Changes" Are in Play Here.** ……34

**2. No "Unprecedented Societal Concerns" Are in Play Either.** ….38

**B. In All Events, The State Cannot Carry Its Burden Under *Bruen*.**..43

**V.     Summary Judgment Must Be Entered Against *All* Defendants.** …….48

**VI.    Conclusion** …………………………………………………………..49

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anchorage Assocs. V. Virgin Islands Bd. Of Tax Rev.*, 922 F.2d 168 (3d Cir. 1990)…………………………………………………………………………48

*Arroyo v. Pleasant Garden Apartments*, 14 F. Supp. 2d 696 (D. N.J. 1998)………..48

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen.*, 974 F.3d 237……………........38

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018)………………………………………………………………….2, 12

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345 (D.N.J. Sept. 28, 2018)……………………………….11

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)……………………………..8, 22, 28

*Delaware State Sportsmen's Association, Inc. v. Delaware Dept. of Safety and Homeland Security*, ___ F. Supp. 3d ___, 2023 WL 2655150 (3d Cir. 2023)…………12

*District of Columbia v. Heller*, 554 U.S. 570……………………………………*passim*

*Duncan v. Becerra,* 19 F.4th 1087 (9th Cir. 2021)……………………………………37

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017)………………………..11

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)……………………………………37

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)……………………………………...2

*Gamble v. United States*, 139 S. Ct. 1960 (2019)……………………………………45

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)………...9, 13, 19, 45

*Ind. H. B. R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174 (7th Cir. 1990)…………..21

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)……………………………………..13, 14

*Konigsberg v. State Bar of Cal.,* 366 U.S. 36 (1961)……………………….....1, 45

*Lockhart v. McCree*, 476 U.S. 162 (1986)……………………………………………20

*McDonald v. Chicago*, 561 U.S. 742 (2010)……………………………….17, 31, 45

*Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021)……………………………11

*Muscarello v. United States*, 524 U.S. 125 (1998)……………………………………7

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)…...8

*New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1 (2022)….*passim*

*Ocean State Tactical LLC v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022)……3

*Staples v. United States*, 511 U.S. 600 (1994)………………………………….19, 28

*State v. Huntly*, 25 N.C. 418 (1843)…………………………………………………9

*Stenberg v. Carhart*, 530 U.S. 914 (2000)…………………………………………...2

*Wiesmueller v. Kosobucki*, 547 F.3d 740 (7th Cir. 2008)…………………………...20

**Statutes**

18 U.S.C. § 922………………………………………………………………………48

**Rules**

Fed. R. Evid. 201…………………………………………………………………..20

## Other Authorities

Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008*, Bureau of Just. Stats. NCJ 236018 (Nov. 2011)……………………………………23

Anna Codutti, *Tulsa Race Massacre graves search: 'Major scientific breakthrough' made in DNA investigation*, Tulsa World (Apr. 12, 2023)…………………………39

Amy Swearer, *If You Can't Beat 'Em, Lie About 'Em: How Gun Control Advocates Twist Heritage's Defensive Gun Use Database in the "Large-Capacity" Magazine Debate*, The Heritage Foundation (May 17, 2023)………………………………...23

*Assault Rifle Legality by State 2023*, World Population Review…………………...22

*Crime Data Explorer*, FBI, U.S. Dep't. of Just. (2020)……………………………18

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381 (1994)……………………………………………………………...25

David B. Kopel, *The Costs and Consequences of Gun Control*, CATO Institute (Dec. 1, 2015)……………………………………………………………………………26

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015)………………………………………………………..37, 38

David E. Petzal, *The 8 Best Lever Action Rifles Ever Made*, Field & Stream (Nov. 3, 2022)……………………………………………………………………………36

Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171 (2020)…………………………………………………………………...41

Dictionary.com…………………………………………………………………..7

E. Gregory Wallace, *Assault Weapon Myths*, 43 S. Ill. U. L. J. 193 (2018)…………………………………………………………………………...25

*Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, Rand Corp. (Jan. 10, 2023)……………………………………………………..40

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018*, *Crime in the United States*, FBI, U.S. Dep't of Just. (2018)………………………………41

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. Dep't. of Just. (2019)………………………………...18

*Firearms Retailer Survey Report*, NSSF (2021)……………….………………..21

Frank Miniter, *The Future of the Gun* at 35 (2014)………………………………24

Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 J. Res. & Pol'y 28 (2016)………………………...40

Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997)……………18

Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Of Crim. L. & Criminology 150 (1995)……………23

James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 Homicide Studies 125 (2013)…………………………………………41

John B. Deans, *The Penn's Creek Massacre, Union County Sesquicentennial: The Story of a County, 1813–1963* (1963)………………………………………………...39

Joshua J. Mark, *Indian Massacre of 1622*, World History Encyclopedia (Mar. 2, 2021)……………………………………………………………………………39

Joseph G. Bilby, *A Revolution in Arms* 44 (2015)…………………………………36

Joseph von Benedikt, *Winchester Model 1873 Rifle Review*, Shooting Times (June 18, 2013)………………………………………………………………………..36

Katharina Bucholz, *Where Military-Style Weapons Are Banned in the United States*, Statista (Jan. 11, 2023)…………………………………………………….22

Kenneth Culp Davis, *Facts in Lawmaking*, 80 Colum. L. Rev. 931 (1980)……….20

Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894* (1985)…………………………………………………………………..37

*M61A1/M61A2 20mm Automatic Gun*, Military Analysis Network ……………….7

Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates,* 2016 at 5 tbl. 3, U.S. Dept. of Just., Off. Of Just. Progs., Bureau of Just. Stats. (Jan. 2019)………………………………………………19

*Mass Shooting Incidents in America (1984–2012)*, Citizens Crime Commission of New York City (2017)………………………………………………………………40

Matthew Larosiere, *Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions* (July 17, 2018)……………………………………………………..26

Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022)…………………………………21, 22

Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (2013)……21

Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (April 6, 2021)………………………………………………………………………21

Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022)………………………………………………21

Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*………………………………………………………………………..21

Nicholas J. Johnson, *et al.*, *Firearms Law and the Second Amendment* 1148 (2d ed. 2018)………………………………………………………………………37

Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, Rand Corp. (Apr. 15, 2021)………………………………………………………………….40

Samuel Niles, *A Summary Historical Narrative of the Wars in New England* 347 (1837)……………………………………………………………………...38

Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, The Trace (Jan. 6, 2016)……………………………………………………………..41

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (Google Books ed. 2022)…………………………………………………………………………35

*The Herrin Massacre*, Southern Illinois University (2009)………………………..39

U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats., *Victimization During Household Burglary*…………………………………………………………………….23

Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* 196 (2nd ed. 1999)…………………………………..35

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022)……………………………………………….20

**Constitutional Provisions**

U.S. Const. amend. II…………………………………………………………*passim*

U.S. Const. amend. XIV……………….…………………………………………..44

# I.    Introduction

As emphasized in the *Cheeseman* Plaintiffs' initial briefing, the first question to ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 17 (2022). If it does, that conduct is "presumptively protect[ed]" by the Second Amendment. *Id*. Then, it becomes the burden of the State to demonstrate that the restrictions imposed on the exercise of that conduct are consistent with "this Nation's historical tradition of firearm regulation" so as to fall outside of the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 17 (citing *Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 50 n.10 (1961)). The analysis in this case is very simple: binding Supreme Court precedent has already established the relevant contours of the historical tradition that a court must examine when the Court declared that arms in common use for lawful purposes cannot be banned because, by definition, they cannot be both dangerous *and* unusual. The challenged law at issue here does just that, banning scores of arms in common use for lawful purposes around the country, and thus it must fall as necessarily *in*consistent with the Nation's historical tradition of firearms regulation.

The State's opposition and cross-motion for summary judgment ("D-MSJ") and related Statement of Undisputed Material Facts ("D-SOUMF") only cement this

conclusion by starkly illustrating how even an in-depth analysis of the entire relevant historical period compels the same result of summary judgment for Plaintiffs.

## II.   As the State Implicitly Concedes, the Second Amendment Plainly Covers the Possession and Use of the So-Called "Assault Firearms."

While the State unpersuasively claims that the banned "large-capacity" magazines (LCMs) are not "arms" under the Second Amendment,[1] D-MSJ at 15-21, it makes no *textual* argument at all about the numerous firearms it bans under the pejorative label of "assault firearms" or "assault weapons."[2] In fact, the State finds itself forced to concede this point in arguing for an interpretation of the Second Amendment's text that excludes LCMs. *See e.g.*, D-MSJ at 16 ("the word 'arms' was understood in the 18th and 19th centuries to encompass weapons like firearms . . .");

---

[1]    Although the LCM ban is beyond the scope of this particular suit, the law of this circuit is already settled against the State. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("Because ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[C]aselaw supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable.").

[2]    Although New Jersey's statutory label for these weapons is "assault firearms," the State borrows from the gun control lexicon to use the more popular label of "assault weapons" in arguing its case for upholding its bans against the prohibited firearms and LCMs. This "is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of an undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation omitted).

*id.* at 18–19 (quoting *Ocean State Tactical LLC v. Rhode Island*, 646 F. Supp. 3d 368, 387–88 (D.R.I. 2022) (" 'The word 'Arms' was a general term for weapons such as swords, knives, rifles, and pistols . . .' "). This concession punctuates the obvious: the Second Amendment's plain text covers Plaintiffs' proposed course of conduct—simply being able to acquire and possess such arms for lawful purposes without being subject to criminal prosecution—as one can neither "keep [nor] bear Arms," U.S. CONST. amend. II, if one cannot acquire the arms in the first place. As the *Heller* Court explained, "[t]he 18th-century meaning is no different from the meaning today …. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *District of Columbia v. Heller*, 554 U.S. 570, 581 (quoting 1 A New and Complete Law Dictionary). There cannot be—and has not been—any dispute that the banned "assault firearms" fall within the broad category of "bearable arms" protected by the text of the Second Amendment. *Id.* at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

Rather, the State's theory that Plaintiffs' proposed course of conduct "falls outside the scope of the right" to keep and bear arms is that it's Plaintiffs' burden to show—as an additional "predicate" to *textual* protection under the Second Amendment—that the banned firearms are "in common use for self-defense today."

3

D-MSJ at 15. Setting aside for the moment the State's fundamental distortion of the "common use" test itself—twisting it into one where Plaintiffs must supposedly prove that "law-abiding citizens *commonly* employ assault weapons or fire more than 10 bullets in acts of self-defense," D-MSJ at 22-23—the common use test is not an element of the textual analysis. This prong of the analysis focuses solely on the "plain text" of the Second Amendment, as *Bruen* made clear: "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17; *id.* at 24. Indeed, nothing in *Heller* or *Bruen* suggests that commonality is even relevant, much less a "predicate" to an arm's textual protection.

Instead, the question of commonality is relevant to the *historical* prong, and thus it's a matter on which the *government* carries the burden of proof. Following the methodology later made explicit in *Bruen*, *Heller* began by analyzing the scope of the text of the Second Amendment. *See Heller*, 554 U.S. at 576–600. It construed the term "arms" to embrace "all instruments that constitute bearable arms," without regard to commonality. *Id.* at 582. *Heller* then analyzed the history of firearm regulation to assess potential limits on the right and held that *history* disclosed an "important limitation on the right to keep and carry arms," namely, that "*the historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons' " showed that "the sorts of weapons protected were those 'in common use.' " *Id.* at

4

627 (emphasis added). Thus, this was a rule developed from "*the historical understanding* of the scope of the right." *Id.* at 625 (emphasis added). The handguns that were the subject of the District of Columbia's challenged ban were not "dangerous and unusual weapons," but rather "the most popular weapon chosen by Americans for self-defense in the home," thus they could not be banned. *Id.* at 629. Moreover, in *Bruen*, as the Supreme Court set out to clarify the methodology exemplified in *Heller*, it stated plainly that *Heller*'s conclusion that firearms "in common use" are protected by the Second Amendment was "[d]raw[n] from . . . *historical tradition*" and comported with the enactments of colonial legislatures that *Bruen* analyzed in its own historical review. 597 U.S. at 47 (emphasis added).

It is the job of the State, and the State alone, to demonstrate that the challenged regulation comports with the Nation's tradition of firearms regulation. *Bruen*, 597 U.S. at 24 ("When the Second Amendment's plain text covers an individual's conduct," "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). At the textual level, where the focus is solely on the plain text of the Second Amendment, Plaintiffs' proposed course of conduct of acquiring and possessing the banned "assault firearms" for lawful purposes is unquestionably protected and, on that point, the State does not claim otherwise. Therefore, the textual analysis is complete and "the Constitution presumptively protects that conduct." *Id.* at 17.

5

III.    The *Proper* "Common Use" Test Dispositively Resolves the Motions for Summary Judgment in Favor of Plaintiffs and Against the State.

Under *Bruen*, courts must analyze history, but in this case—which involves an arms ban just as *Heller* did—the Supreme Court has already done the historical work and has provided the rule of decision for this case: only "dangerous and unusual" arms could be banned historically, so that means that arms "in common use" today cannot be banned. The arms at issue are indisputably "in common use." This alone dismantles the challenged laws, compelling judgment for Plaintiffs.

A.    Common Possession for Lawful Purposes is the Correct Focus, Not How Often or How Many Rounds People Happen to Use in Self-Defense.

As noted, the State defines the "common use" test as a determination of whether "law-abiding citizens *commonly* employ assault weapons or fire more than 10 bullets in acts of self-defense," D-MSJ at 22–23, such that the focus is on actual "*use* for self-defense, not common *ownership* or possession," *id.* at 35. This is wrong. For all the State's own surmising about "hopelessly circular" and "absurd" results of focusing on common ownership or possession, *id.* at 36–38, the *legal doctrine* it cites in support of this construct directly undermines this position: the State points to *Bruen* for the principle that, "[i]t is weapons that actually 'facilitate armed self-defense' that fall within the protection of the 'central component of the Second Amendment right,' " *id.* at 35 (quoting *Bruen*, 597 U.S. at 28). More specifically, what the Supreme Court said was that the "general definition [of 'arms']

6

covers modern instruments that facilitate armed self-defense." 597 U.S. at 28. The plain meaning of "facilitate" is simply "to make easier or less difficult; help forward (an action, a process, etc.)." Dictionary.com, https://www.dictionary.com/browse/facilitate. Clearly, ownership or possession of an arm *facilitates* armed self-defense, by enabling the owner or possessor to use the weapon for such purposes if and when the need for such action arises—i.e., as a matter of *preparedness* in maintaining one's personal security against threats which *may* call for armed defensive actions. At any rate, *Bruen* did not purport to *limit* the definition of "arms" to those that facilitate self-defense; rather, it was simply necessary for the Court to clarify that arms that "facilitate armed self-defense" are protected because, under the New York law at issue, carrying a handgun for "self-defense" purposes alone was insufficient "cause" to obtain a carry license. *See Bruen*, 597 U.S. at 15-16 (Plaintiff Nash's application for an unrestricted license was denied because he "did not claim any unique danger to his personal safety," and instead "simply wanted to carry a handgun for self-defense").

1.    **"In Common Use" Means Common *Possession*.**

As *Heller* explained, the word "bear" in the phrase "keep and bear Arms" means " 'being armed and *ready for* offensive or defensive action in a case of conflict with another person.' " *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (emphasis added). And, as

*Bruen* explained in reaffirming *Heller*, the Second Amendment " 'guarantee[s] the individual right to possess and carry weapons *in case of* confrontation' that does not depend on service in the militia." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592) (emphasis added). Otherwise, absurdly, the protections of the Second Amendment would not kick in until the moment a person is compelled to fire upon another person as a means of repelling force. So, it is clear that, under the proper test for "common use," *possession* is what the Supreme Court meant. *Bruen*, 597 U.S. at 27 (quoting *Heller*, 554 U.S. at 627 ("[T]he Second Amendment protects *the possession and use* of weapons that are " 'in common use at the time.' ") (emphasis added); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (the "*relevant statistic* is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears *may lawfully possess* them in 45 states") (emphasis added); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (focusing solely on the fact that "Americans *own* millions of the firearms that the challenged legislation prohibits" to find that "the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*") (emphasis added).

The Court in *Heller* specifically recognized that the Second Amendment protects those firearms "typically *possessed* by law-abiding citizens for *lawful purposes*." 554 U.S. at 625 (emphasis added). Not only does this cement the

conclusion that the common use test focuses on possession, but it also highlights that the Second Amendment secures more than armed *self-defense*, contrary to the State's suggestion. While the scope of the protection *includes* self-defense, the right also extends to other "lawful purposes." *See Bruen*, 597 U.S. at 48 & n.15 (approvingly citing *State v. Huntly*, 25 N.C. 418, 422–23 (1843), where the North Carolina Supreme Court stated that " 'the citizen is at perfect liberty to carry his gun' '[f]or any lawful purpose,' of which 'business' and 'amusement' were then mentioned" and "contrasted these 'lawful purpose[s]' with the 'wicked purpose . . . to terrify and alarm' "); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("*Heller II*") ("Of course, the Court also said the Second Amendment protects the right to keep and bear arms for other 'lawful purposes,' such as hunting . . .") (citing *Heller*, 554 U.S. at 630). Further, consider all the collectible antique firearms, hunting or competition target shooting rifles, and even handguns that are virtually useless or at least relatively impractical for use as self-defense weapons. Their protection under the Second Amendment certainly is not in question. The Supreme Court plainly did not envision that lower courts in the wake of *Heller* and *Bruen* would decide on a case-by-case basis whether individual firearms, in their views, were "legitimate" or "ideal" self-defense weapons. Instead, bearable arms are protected and cannot be banned if they are in common use for any lawful purpose.

Just the same, the Supreme Court did not envision that states would be deciding when and how a particular firearm otherwise lawfully owned or possessed is *necessary* for self-defense, nor how many shots must be fired or how often before the arm is entitled to protection against a ban. The State's position is not only absurd, but it also effectively attempts to elevate its policy judgments—and the paid judgments of its experts—over "the balance struck by the founding generation." *Bruen*, 597 U.S. at 29 n.7. That is, the State is purportedly legislating the *necessity* of this fundamental right, by deciding for itself whether or to what extent "the right is *really worth* insisting upon." *Contra Heller*, 554 U.S. at 634. That is forbidden. The Supreme Court's opinion in *Bruen* was designed to eliminate any further use of such means-end, interest balancing that focuses on whether a firearm regulation burdens the Second Amendment right " 'in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 634). *Heller* left no doubt that the People choose what is useful for self-defense and that *whatever* reason they have for it is good enough:

> It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those

without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Heller*, 554 U.S. at 629.

Thus, the evidence the State has developed through another of its paid experts, Lucy Allen, that individuals on average fire 2.2 bullets when using handguns in self-defense, Def. Ex. 7 (Dkt No. 184-1) at ¶¶ 9-10, is simply irrelevant. Moreover, Allen's analysis, based on an NRA magazine report self-titled "NRA Armed Citizens database," is not supported with statistical reliability. First, she admits that the data in this report has not been updated since 2017. *Id.* ¶ 9, n.5. Second, the purported "NRA Armed Citizens database" is just a collection of magazine articles, and Allen has admitted in multiple other cases that this study was not compiled scientifically. *See Duncan v. Becerra*, 265 F.  Supp. 3d 1106, 1129 (S.D. Cal. 2017); *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1044-45 (S.D. Cal. 2021) ("As she acknowledged in her declaration submitted in *Duncan v. Becerra*, the NRA-ILA Armed Citizen Database is not compiled scientifically."), vacated and remanded, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *id.* at 1042-45 ("Allen's opinion about the number of shots fired in self-defense is entitled to little weight and fails the scientific method."); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345 ("*ANJRPC*"), at *5 (D.N.J. Sept. 28, 2018) ("Allen

11

conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of overall statistics on the use of arms in self-defense."), aff'd sub nom. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018); *id.* at *12 (finding that Allen had not "provided a clear analysis" based on the various studies).

### 2.   The State's Criticisms of This Test Are Irrelevant and Unfounded.

The State certainly cannot expect to upend this settled law based on its complaints about supposedly untenable consequences of adhering to the true test. These complaints are meritless anyway. The State harps that "under Plaintiffs' ownership tally test, machine guns would be entitled to Second Amendment protection, since there are roughly '176,000 legal civilian owned machine guns in the United States.'" D-MSJ at 38 (quoting *Delaware State Sportsmen's Association, Inc. v. Delaware Dept. of Safety and Homeland Security*, __ F. Supp. 3d __, 2023 WL 2655150, at *5, appeal pending, No. 23-1633 (3d Cir. 2023)). But even looking solely at the numbers, it is far from clear that an arm over 10 percent less common than the 200,000 stun guns in circulation—which may well represent the lower bar of constitutional protection—qualifies as "in common use." Moreover, according to the Supreme Court, fully automatic machine guns are not "widely accepted as lawful possessions," *Staples v. United States*, 511 U.S. 600, 612 (1994), even if roughly 176,000 are in civilian circulation, *see* 18 U.S.C. § 922(o)(2)(b).

Of course, the numbers of both Tasers and machine guns owned by law-abiding Americans are dwarfed by the number of firearms that the State dubs "assault firearms," which are owned by *millions* of Americans, as demonstrated in Plaintiffs' opening brief and in further detail below; *see also* Pltf. Resp. to D-SOUMF Nos. 39, 42, 44, 49, 57 (further distinguishing machine guns as a distinct class of arms). So, even if the floor for common use is above 200,000, this case raises no thorny concerns about the limits of the scope of the right. *See, e.g.*, *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR–15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.").

The State also charges that this test is circular or creates a race between regulators and manufacturers, because it "would permit prohibiting a weapon simply because the State banned the weapon before it ever became commercially available" and would allow "regulated parties" to "game" the system because "manufacturers would only need to 'flood[] . . . the market' before any restrictions could be enacted to forever insulate a weapon from restrictions." D-MSJ at 36-37 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017)). But Justice Breyer made this very argument in *Heller*, contending in his dissenting opinion that applying a test focused

on common possession would mean, "if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so." 554 U.S. at 720–21. And "the *Heller* majority was obviously unmoved by it." *Kolbe*, 849 F.3d at 153 (Traxler, J., dissenting). Similarly, it's not true that a state's regulation would be *per se* valid any time it outlaws a firearm before the firearm comes into common use. To be banned, a firearm must be "dangerous *and* unusual," as discussed further in the opening brief and below here. A firearm may be infrequently owned (therefore unusual numerically) yet no more dangerous than arms that are in common use (therefore not dangerous). "Common use" is a sufficient but not necessary condition to prohibit the State from banning its possession.

**B.      The State's Claims About Increased Risks of "Lethality" Are Overblown, and *Heller* and *Bruen* Have Already Taken Account of All Relevant Risks.**

The State's attempt to paint the banned firearms as weapons of war "disproportionately used by criminals to perpetrate mass shootings," D-MSJ at 28-34, is another red herring. The State's main focus here is the AR-style rifle—in particular the AR-15—and its potential for causing lethal injuries in the hands of criminals. Of course, *all* firearms possess such potential—as they must in order to serve their core purpose of facilitating *armed* self-defense—and *Heller's* primary analysis of the Second Amendment already took account for the main concerns about

14

the misuse of firearms in society. *See* 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution."). In fact, Justice Breyer spilled considerable ink writing about these potentialities in much the same light as the State does here. *See id.* at 682 (Breyer, J., dissenting) (defending the District of Columbia's handgun ban on the basis that handguns "are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals"); *id.* at 694–95 (pressing the District of Columbia's statistics that "guns were 'responsible for 69 deaths in this country each day,' for a total of '[a]pproximately 25,000 gun-deaths . . . each year,' along with an additional 200,000 gun-related injuries," and " '[a] crime committed with a pistol,' the [House] Committee [on the District of Columbia] reported, 'is 7 times more likely to be lethal than a crime committed with any other weapon' "). A central idea behind the District of Columbia's handgun ban, stressed in Justice Breyer's dissent, was in fact " 'to reduce the potentiality for gun-related violence.' " *Id.* at 695.

In the face of this, the *Heller* majority noted that "[u]ndoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem." 554 U.S. at 636. Yet, the majority was unshaken in its adherence to "the true meaning of the right to keep and bear arms,"

*id.* at 624, and in its resolve that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table," including "the absolute prohibition of handguns held and used for self-defense in the home," *id.* at 636. Thus, the *Heller* majority considered the essential concerns that the State presses here in lamenting the potential "to inflict carnage" when AR-style rifles are in the wrong hands. D-MSJ at 32-34. But the Court found them irrelevant to whether the arms at issue were protected, because that does not turn on whether arms are misused by criminals; it turns on, *inter alia*, whether law-abiding citizens commonly own and use them for lawful purposes, and it was enough in *Heller* to secure constitutional protection that handguns are *typically* possessed for lawful purposes. 544 U.S. at 624–25.

The extent to which any of the arms at issue might be used for harmful purposes in the hands of criminals or wrongdoers cannot justify the restrictions being imposed against those who indisputably wish to use such arms for the *lawful* purposes secured for law-abiding citizens under the Second Amendment. Criminals misusing firearms will always have a tactical advantage bestowed by their planning and forethought. It is those reacting to an aggressor who are limited by what they can carry in the course of their everyday lives. The actions of criminals do not affect the rights of those who wish to avail themselves of the advantages that common firearms offer for defense of self, others, and home. Just as the State could not justify

16

a general ban against the use of popular fora for free speech (like Facebook and Instagram) based on the risk that *some* may misuse those fora to perpetrate or facilitate criminal conduct, it cannot justify a general ban against "assault firearms" just because some use them to commit criminal acts.

Likewise, attempting to justify the general ban against the targeted "assault firearms" based on the State's interest in combating such risks runs afoul of *Bruen's* clear mandate that courts must abandon any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 634.) *Bruen* also took account for such risks and expressly set them aside: The Court noted "the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms." *Id.* at 17 n.3. Much like the State does here, "[t]he dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use." *Id.* "But, as Members of the Court have already explained, '[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications.' " *Id.* (quoting *McDonald v. Chicago*, 561 U.S. 742, 783 (2010)). Therefore, the State is not only misguided in its heavy emphasis on the potential dangers of firearms falling into the wrong hands,

but these assertions of fact about such risks are irrelevant and immaterial to the issues in dispute.

Moreover, to the extent the State's claim that AR-style firearms are "disproportionately used by criminals to perpetrate mass shootings" is intended to suggest such weapons are *commonly* used in crime, D-MSJ at 32-34, this is not just irrelevant, it is wrong: "assault" rifles are used extremely rarely in crime, underscoring that AR-15s and other banned rifles are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of guns used in crime] are 'assault rifles.' " Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997). From 2015 through 2020, only 2.4% of murders were committed with *any* type of rifle. *See Crime Data Explorer*, FBI, U.S. Dep't. of Just. (2020), https://bit.ly/3AA8Qwj; *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. Dep't. of Just. (2019), https://bit.ly/31WmQ1V (72,781 total murders; 1,573 with rifles). Murder by "hands, fists, feet, etc." was more than twice as common, at 3,346 occurrences, over the same time period—and murder by handgun, at over 30,000 occurrences, was approximately *20 times* as common. *Id.* Even if a different semiautomatic rifle had been used in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million of them in circulation in the United States during that time period—around .01 percent—would have been used for that

18

unlawful purpose. More broadly, as of 2016, only 0.8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates,* 2016 at 5 tbl. 3, U.S. Dept. of Just., Off. Of Just. Progs., Bureau of Just. Stats. (Jan. 2019), https://bit.ly/31VjRa9. And, as for the exceedingly rare instances of "mass shootings" perpetrated with "assault weapons" that the State cites in justification for the challenged bans, again, this is nothing but fodder for improper interest balancing and an appeal to emotions instead of legal reasoning.

## C.   Because These Arms Are in Common Use, They Are Necessarily *Not* Dangerous and Unusual and Cannot be Subjected to the State's Ban.

Semiautomatic firearms of the very kind that the State bans as "assault firearms" "*traditionally have been widely accepted as lawful possessions*." *See Staples*, 511 U.S. at 612 (so categorizing an AR-15 semiautomatic rifle) (emphasis added), and "[t]here is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles" for these purposes, *Heller II*, 670 F.3d at 1269–70. While some exterior physical attributes may differ— wood versus metal stocks and furniture, the number and/or location of grips, bare muzzles versus muzzle devices, different barrel lengths, etc.—they are, in all relevant respects, the same. They are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are

functionally semiautomatic in nature. They are all common firearms that have the same cyclical rate of fire: one round fired per pull of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions. They are all common under the same jurisdictional analysis. Further, they are all subject to the same constitutionally relevant history.

### 1.    The Banned Arms Are Ubiquitously Owned and Possessed for Lawful Purposes, Including for Self-Defense.

A recent survey of gun owners indicates that about 24.6 million Americans have owned up to 44 million AR-15 or similar rifles. *See* William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw ("English Survey").[3] And according to

---

[3]    The State's evidentiary objections to the English Survey as inadmissible and unauthenticated and "double-hearsay," D-MSJ at 39, are unfounded. The Survey contains statements of "legislative fact" or facts "which have relevance to the legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court in the enactment of a legislative body." Fed. R. Evid. 201, 1972 Advisory Committee Note. The rules of evidence do not apply to legislative facts. *See, e.g.*, *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (Posner, J., in chambers). Thus, it is irrelevant that the Survey is offered for the truth of the matter asserted—after all, sources of legislative facts will *frequently* be hearsay. "[E]ven though nothing in the Rules provides that they are limited to adjudicative facts," "[t]he hearsay provisions of the Federal Rules of Evidence clearly should not apply (Rule 803(8), for instance)" to legislative facts. Kenneth Culp Davis, *Facts in Lawmaking*, 80 Colum. L. Rev. 931, 941 (1980); *see* Fed. R. Evid. 201, 1972 Advisory Committee Note (relying on Professor Davis's framework of legislative facts and adjudicative facts to explain why a judge may rely on legislative facts without taking judicial notice of them, as they are not the type of facts to which the Rules apply); *see also* *Lockhart v. McCree*, 476 U.S. 162, 168 n.3 (1986). Because the Rules of Evidence do not apply, legislative

industry sources, even ten years ago more than one out of every five firearms sold was a rifle of the type banned by New Jersey. Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (2013) at 11, https://www.nssf.org/articles/nssf-updates-firearms-retailer-survey-results/; *see also* Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in_circulation/; Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf; Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (April 6, 2021), https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf; Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*, https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf.[4]

---

facts can be and frequently are found in "books and other documents not prepared specially for litigation or refined in its fires." *Ind. H. B. R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990). The Survey is one such proper source.

[4]     Notably, the State's own expert evidence relies on this NSSF data along with data from ATF in distilling the actual ownership statistics. *See e.g.*, Expert Report of Luis Klarevas, Def. Ex. 9 (Dkt No. 184-1) at ¶ 14 ("The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available)."); *id.* ("Assuming these figures reported by the NSSF and ATF are accurate. . ."). In so doing, the State neutralizes its own claim that the NSSF data are unreliable, D-MSJ

Further, it is also indisputable that these firearms are in common use for lawful purposes, including for self-defense. The fact that these devices are perfectly lawful in the vast majority of states speaks volumes alone. *See Assault Rifle Legality by State 2023*, World Population Review (last accessed Dec. 13, 2023), https://worldpopulationreview.com/state-rankings/assault-rifle-legality-by-state ("[T]he overwhelming majority of states allow assault rifles to be purchased within their borders."); Katharina Bucholz, *Where Military-Style Weapons Are Banned in the United States*, Statista (Jan. 11, 2023), https://www.statista.com/chart/18924/states-without-a-ban-on-assault-rifles-and-large-capacity-magazines/ ("The vast majority of U.S. states do not restrict the sale of assault weapons or high-capacity magazines[.]"). In addition to lawful uses such as hunting and target shooting, studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck,

---

39-40, and it also neutralizes its objections to the English Survey as unreliable and inadmissible since the Survey is independently corroborated by the NSSF's data. Even accepting the speculation that the NSSF reports "*appear to* include sales to law enforcement, firearm retailers, and 'possibly prohibited possessors' as well as straw buyers," D-MSJ at 40 (emphasis added), the State fails to show how any inclusion of these categories materially alters the analysis: Even just one million of the more than 24 million firearms documented as being in circulation is quintuple the number that Justice Alito deemed sufficient to be "common" in *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (finding stun guns common because civilians own 200,000 of them).

Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. of Crim. L. & Criminology 150, 164 (1995); *see also* English Survey, *supra* at 5 (finding 31.1% of firearms owners, or about 25.3 million adult Americans, have used a firearm in self-defense, and 1.67 million defensive firearm uses a year).

Encounters with criminal intruders in the home are not uncommon. According to a report by the U.S. Department of Justice, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats., *Victimization During Household Burglary*, at 1 (Sept. 2010), https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf. Indeed, 51.2 percent of all self-defense incidents annually involve two or more attackers, while 20.4 percent of such incidents involve three or more attackers. English Survey at 15. "[M]ultiple-offender homicides in particular are becoming increasingly common: In 2008, roughly one of every five homicides involved multiple offenders." Amy Swearer, *If You Can't Beat 'Em, Lie About 'Em: How Gun Control Advocates Twist Heritage's Defensive Gun Use Database in the "Large-Capacity" Magazine Debate*, The Heritage Foundation, at 7 (May 17, 2023), https://www.heritage.org/firearms/report/if-you-cant-beat-em-lie-about-em-how-gun-control-advocates-twist-heritages (citing Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008*, Bureau of Just.

Stats. NCJ 236018, at 24 (Nov. 2011)); *see also* Pltf. Resp. to D-SOUMF Nos. 11, 189 (further detailing how these firearms are particularly useful in such confrontations).

The firearms that the State bans undoubtedly *facilitate* these lawful purposes for which law-abiding citizens own and possess them around the country, including self-defense, in particular *because* of the common utilitarian features that the State uses to label them as prohibited "assault firearms." For example, most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. *See Modern Sporting Rifle Comprehensive Consumer Report*, *supra*, at 18 (noting self/home-defense is the second most important reason Americans reported for owning AR-style firearms, second only to recreational target shooting); Frank Miniter, *The Future of the Gun*, at 35 (2014) (the caliber of the AR-15 "makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls"). "ARs are popular with civilians and law enforcement around the world because they're accurate, light, portable and modular. . . . It's also easy to shoot and has little recoil, making it popular with

women." *Id.* In fact, "[t]he AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." *Id.* Thus, despite the pejorative labels, an AR-15 rifle chambered for 5.56x45mm NATO ammunition is an optimal firearm for self-defense encounters.

The same is true for the specific utilitarian features and combination of features that the State targets through its arms ban. A flash suppressor, for example, not only reduces the chances that an attacker will mark his victim's position, but it also helps protect an individual against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 397 (1994). Similarly, folding and telescoping stocks increase maneuverability in tight home quarters, *id.* at 398–99, as well as enabling safe storage of defense instruments in accessible spaces. A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively. *Id.* Thus, they increase the likelihood of successful home defense by making the rifle maneuverable in confined spaces as well as permitting safe storage of defense instruments in accessible spaces. *Id.* Additionally, pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id.* at 396; E. Gregory Wallace, *Assault Weapon Myths*, 43 S. Ill. U. L. J. 193, 228–34 (2018). A thumbhole stock is

nothing more than an ordinary stock with a hole drilled through the grip area. It promotes accuracy by improving comfort and stability in handling a firearm. *Id.*

Further, most all common semiautomatic firearms, including those banned under New Jersey law, accept a detachable magazine. David B. Kopel, *The Costs and Consequences of Gun Control*, CATO Institute (Dec. 1, 2015), https://www.cato.org/policy-analysis/costs-consequences-gun-control#high-capacity-magazines ("This is the norm for shotguns. For many rifles, and almost all handguns that use magazines, the magazine is detachable."). Detachable magazines not only help law-abiding shooters to reload their weapon in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to remedy malfunctions safely and quickly. *See* Matthew Larosiere, *Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions* (July 17, 2018), https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions#a-magazine-is-not-just-a-nbsp-box ("[M]agazine malfunctions are the primary source of breakdowns in self-loading weapons."). Detachable magazines have the same benefits in hunting and sport shooting as they do in home defense—improved reloading and remedying of malfunctions. Similarly, these features, which the State claims are attractive to users likely to engage in crime, are neither nefarious nor unique to "assault firearms," as they also facilitate the lawful activities of hunting and sport shooting: folding and telescoping stocks, for

26

example, allow for safe transportation, including in a hiking pack, an ATV, or a boat; both telescoping stocks and protruding grips open hunting and sport shooting to those for whom recoil represents a high barrier to entry; and flash suppressors certainly promote accuracy in target shooting and hunting (especially at dawn). Pltf. Resp. to D-SOUMF Nos. 11, 179 (further detailing how these features make these firearms particularly well suited for self-defense).

### 2.   Any Ban of These Commonly Used Arms is Untenable.

Again, it is clear—and dispositive in this case—that for a *ban* of a type of arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is both "dangerous and unusual." *Bruen*, 597 U.S. at 47; *Heller*, 554 U.S. at 625. In other words, New Jersey can enact and enforce such a ban *only* if the targeted arms are *not* "the sorts of weapons . . . in common use at the time," so that the regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 627 (cleaned up). Significantly, the State does not argue otherwise. Instead, it attempts to evade the issue by supplanting its own standard—in a footnote no less—which transmogrifies the well-established dangerous *and* unusual test into a *disjunctive* "unusually dangerous" test. D-MSJ at 55–56 n.16.

There is no historical tradition of banning dangerous arms—just a historical basis for banning "*dangerous and unusual*" arms. *See Bruen*, 597 U.S. at 21

(emphasis added). Indeed, all arms are dangerous or else they would not be arms; a weapon that poses no danger is useless. Further, "that an item is 'dangerous,' in some general sense, does not necessarily suggest, as the State seems to assume, that it is not also entirely innocent." *Staples*, 511 U.S. at 611. In 2016, Justice Alito wrote in *Caetano*: "As the per *curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual. Because the Court rejects the lower court's conclusion that stun guns are unusual, it does not need to consider the lower court's conclusion that they are also dangerous." 577 U.S. at 417 (Alito, J., concurring) (emphasis in original). If the Supreme Court had ever intended lower courts to consider whether various arms were dangerous *or* unusual and to uphold bans based solely on one or the other, it would have said so. It has not.

The State nevertheless asserts that the targeted arms may be banned under this "unusually dangerous" label, extrapolating this "disjunctive" concept to mean weapons that are "particularly dangerous or susceptible to disproportionate criminal misuse," which it then uses as the foundation for its claim that the ban is part of "a longstanding national tradition of restricting" such weapons. D-MSJ at 55. First, this assertion seeks subtly to prod the Court back into the forbidden territory of interest balancing. The fact that a legislature may be particularly concerned with the potential dangerousness of arms is immaterial and entitled to no deference when the arms are in common use for lawful purposes, as these targeted arms are here. *Caetano*, 577

U.S. at 418 (Alito, J. concurring) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). Second, any supposed "tradition" of restricting arms *solely* based on their dangerousness would carry no weight because the test is in fact *conjunctive*— i.e., whether New Jersey will admit it or not, states may ban only those arms "highly unusual in society at large" *in addition to* being dangerous. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). Third, whatever the State means by weapons that are "unusually dangerous"—or "particularly dangerous or susceptible to disproportionate criminal misuse"—weapons in common use for *lawful purposes* necessarily cannot reasonably be seen as fitting such a mold. Substantially more people are killed each year in this country with bare hands, knives, or blunt objects (individually, not collectively) than by rifles of *any* kind. *See* FBI (2019), *Expanded Homicide Data Table 8, Murder Victims by Weapon, 2015-2019*, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls (last accessed December 8, 2023). Notably, these arms are exactly as "dangerous" as the semiautomatic arms that are not banned by the State since they function in the same way and can fire the same cartridges.

"Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Bruen*, 597 U.S. at 70. They have confined

themselves to prohibiting only those arms that are "*not* typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). Thus, the reality is, it makes no difference whether these or similar arms would have been understood as "dangerous and unusual" in olden days, as *Bruen* made clear:

> [E]ven if … colonial laws prohibited the carrying of [certain types of arms] because they were considered 'dangerous and unusual weapons' [*then*], they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 597 U.S. at 47 (emphasis added) (quoting *Heller*, 554 U.S. at 627).

Ultimately, *Heller's* distinction, reiterated by *Bruen*, between protected weapons "in common use at the time" and those that are "dangerous and unusual" loses all meaning if a state can ban a weapon in common use merely because the legislature concludes the weapon is potentially more dangerous relative to some other weapon. The dangerous *and* unusual test controls. Because the State cannot show that the so-called "assault firearms" are "dangerous and *unusual* weapons," as is necessary to enact "a 'complete prohibition'" on a type of firearm "*consistent with* the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24 (emphasis added), that is the end of the analysis and the end of road for this law.

## IV.   Any Additional Historical Analysis Can Only Further Cement the Fate of The Challenged Law as an Unconstitutional Arms Ban.

"[T]he traditions of the American people . . . demand[] our unqualified deference," *Bruen*, 597 U.S. at 26, and the tradition here is that law-abiding citizens

may keep and bear arms that are commonly possessed for lawful purposes. That *is* the historical test—i.e., the key inquiry under *Bruen*—and it forecloses the State's effort to ban these commonly possessed arms. Summary judgment can and should issue on this basis alone. However, should the Court go further, the State's historical arguments can only underscore why the ban must be stricken.

## A.   The State is Not Entitled to Any Leniency Under the *Bruen* Standards, Whether Under "a More Nuanced Approach" or Otherwise.

In order to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, the State must identify, through "analogical reasoning," "a well-established and representative historical analogue" to the challenge regulation, *id.* at 30. This requires the State to show a historical tradition "relevantly similar" to the challenged regulation in both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767).

The States strives for leniency here in claiming this Court should apply " 'a more nuanced approach' when evaluating historical analogues here," because the challenged law " 'implicat[es] unprecedented societal concerns or dramatic technological changes,' " D-MSJ at 41 (quoting *Bruen*, 597 U.S. at 27), without

venturing to explain how or in what way the analysis should be altered. In all events though, the Supreme Court's discussion of "a more nuanced approach" does not create any sort of analytical offramp from the "analogical inquiry" mandated in *Bruen*, and this case does not even involve "unprecedented societal concerns or dramatic technological changes" that would require a "nuanced approach" anyway.

At the outset, a "more nuanced approach" makes no difference when the analogy has *already been drawn* by the Supreme Court and, in any event, the specific rule the Supreme Court has derived for cases like this one—that arms "in common use" today are protected against bans—inherently accounts for technological and social changes on which the State places so much emphasis. Indeed, in explaining why "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," the court cited its recognition in *Heller* that "the Second Amendment's historically fixed meaning applies to new circumstances" and specifically that, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. In other words, the Court's own illustration of this "more nuanced approach" was applied to further explain the holding in *Heller* that " 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' " *Id.* (quoting *Heller*, 554 U.S. at 582). So,

32

the concept was discussed in explaining the *expansive* reach of the Second Amendment's protection, not to *shrink* its protective scope as the State suggests.

At no point did the Supreme Court suggest that the existence of any "unprecedented societal concerns or dramatic technological changes" would somehow untether the analysis from the required analogical inquiry. To the contrary, when the court went on to discuss in this very context the process of "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," it reaffirmed that doing so "requires a determination of whether the two regulations are 'relevantly similar,' " just the same as any other regulation. *Bruen*, 597 U.S. at 28-29. Nevertheless, the State distorts *Bruen's* discussion of "a more nuanced approach" into the foundation for its lengthy exposition about the supposedly dramatic technological advancements leading to the development of the arms at issue, which, in turn, it claims, have left "the country now grappl[ing] with" the "unprecedented societal concerns" of "mass shootings." D-MSJ 41-55. The clear driving force behind this exposition is an effort to demonstrate the importance of the challenged laws in advancing the State's firearms policies. But under *Bruen*, interest-balancing arguments are out of bounds, and this Court must guard against giving credence to such arguments, however presented. *See Bruen*, 597 U.S. at 29.

### 1.   No "Dramatic Technological Changes" Are in Play Here.

Moreover, any argument based on the notion of dramatic-technological-changes-resulting-in-unprecedented-societal-concerns is a non-starter. First, as the above principles make clear, the Supreme Court's Second Amendment doctrine *embraces* relevant technological change to *ensure the protection* of modern arms in common use even if they may differ considerably from arms of old. *Heller*, 554 U.S. at 582 ("Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). *Bruen* eliminated any doubt about that when it explicitly held that handguns could not be banned even if they *were* considered "dangerous and unusual" at the founding, because what matters is whether they are "in common use *today*." *Bruen*, 597 U.S. at 47 (emphasis added). Thus, any argument that begins with a comparison to commonality at the founding never gets off the ground.

Second, the essential premise behind the State's "dramatic technological changes" argument is that modern semiautomatic firearms, and in particular AR-15 rifles, enable a person "to inflict substantially greater lethality" than one could inflict with firearms of the colonial age, which is not only fundamentally misleading from a factual perspective but also seriously distorts the legal issues before the Court by

focusing on the conduct of mass murderers and other violent criminals. D-MSJ at 44-48. According to a renowned forensic pathologist, former medical examiner, and former member of the Justice Department's National Commission on Forensic Science, "[o]ne of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895)." *See* Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* 196 (2nd ed. 1999). Further, the bullets fired by an AR-style rifle are far smaller than those used since before the founding: "Muskets, which were being transitioned from matchlocks to flintlocks, were typically .75 caliber. That was a powerful, deadly weapon that could create a three-quarters-of-an-inch wound." Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* 104 (Google Books ed. 2022). "By comparison, today's AR-15 rifle typically fires a .223 caliber bullet, which is less than a quarter of an inch in diameter. In other words, the seventeenth-century musket fired a bullet three times larger in diameter than the bullet usually fired by the AR-15." *Id.* All semiautomatic firearms have exactly the same inherent rate of fire since the number of bullets that exit the muzzle in a unit of time depends entirely on how fast its operator pulls the trigger: "Once one pulls the trigger and fires a round, another round loads itself and

may be fired by another pull of the trigger." *Id.* at 206; *see also* Pltf. Resp. to D-SOUMF Nos. 44, 48, 67, 71–73, 75–76, 180–81 (further detailing how the core functionality of AR-style rifles is the same as any other semiautomatic firearm).

Semiautomatic firearms were invented in the 1880s, with modern box magazines following in the 1890s. Joseph G. Bilby, *A Revolution in Arms* 44 (2015). As recounted by one of the State's own experts, "[b]y the early 1890s, then, gunmakers had at their disposal a trio of potent new design features that would become characteristic of most modern automatic and semiautomatic firearms—self-loading mechanisms, smokeless powder ammunition, and detachable magazines." Def. Ex. 12 (Report of Brian DeLay) at ¶ 80. "These culminated with the M1911, a handgun with a 7-round detachable magazine. The most copied and influential of all modern handguns, several million M1911s have been sold in the past century." *Id.* The "first really successful centerfire repeating rifle," the Winchester Model 1873, "was an accurate, ergonomic, reliable rifle chambered for revolver-compatible cartridges so that shooters could carry one type of ammo for both their long gun and their sidearm." Joseph von Benedikt, *Winchester Model 1873 Rifle Review*, Shooting Times (June 18, 2013), https://www.shootingtimes.com/editorial/winchester-model-1873-rifle-review/99446. Other popular repeaters, despite being from over a century ago, "are still the best lever action rifles ever produced." David E. Petzal, *The 8 Best*

*Lever Action Rifles Ever Made*, Field & Stream (Nov. 3, 2022), https://www.fieldandstream.com/guns/best-lever-action-rifles/.

These were not novelty firearms even then. "Cartridge-fed," "repeating" firearms in particular came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, which was a full-size lever-action rifle capable of carrying 17 rounds," which "could fire 18 rounds in half as many seconds." *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020) reh'g en banc granted, opinion vacated, 19 F.4th 1087 (9th Cir. 2021); *see* Nicholas J. Johnson, *et al.*, *Firearms Law and the Second Amendment* 1148 (2d ed. 2018); Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894* 128 (1985); David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854-55 (2015). In short, the semiautomatic firearms and ammunition feeding devices of the sort targeted by New Jersey's ban do not represent "dramatic technological changes," as the State claims, but rather have been part of the fabric of American life for more than 150 years *without* any tradition of prohibiting law-abiding citizens like Plaintiffs from possessing them. *See also* Resp. to D-MSJ Nos. 16-18, 21-23, 28, 34-35 (further detailing the centuries-long history of detachable magazines, multi-shot arms, and repeaters in American life). The first firearm that could fire more than ten rounds without reloading was

invented around 1580. Kopel, 78 Alb. L. Rev. at 85.  11-shot repeaters were sold in the United States as early as the 1720s. Samuel Niles, *A Summary Historical Narrative of the Wars in New England* 347 (1837), https://bit.ly/3tflRev. The 1820s saw the invention of a repeater whose "number of charges may be extended to fifteen or even twenty" and which was marketed for "private use." *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen.*, 974 F.3d 237, 255 (Matey, C.J., dissenting) (citation omitted)). In fact, the leading air rifle of the mid-1800s could shoot upwards of 20 rounds via a gravity-fed, tubular magazine. Kopel, *The History of Firearm Magazines*, *supra* at 854–56. Repeating arms, capable of firing as many and even more rounds than the arms banned by the State are nothing new.

### 2.    No "Unprecedented Societal Concerns" Are in Play Either.

To the extent the State seeks to excuse the relative novelty of banning such commonplace arms by pointing to the "unprecedented societal concerns" of "the spate of mass shooting events," *see Bruen*, 597 U.S. at 27, that argument fails too. Even accepting the dubious proposition of a causal link between the arms the State has banned and the horrific acts on which its briefing has focused,[5] the unfortunate reality is that mass killings are not novel phenomena. For example, on March 22,

---

[5]    *See* Pltf. Resp. to D-SOUMF Nos. 138, 144, 148, 151–54, 164–75, 177–78 (further explaining the inherent unreliability of the State's evidence intended to draw a link between "mass shootings" and the banned "assault firearms" and LCMs, either in terms of a causal connection or the frequency of their involvement in such crimes).

1622, Native Americans killed 347 English settlers, wiping out over a quarter of the Jamestown population. Joshua J. Mark, *Indian Massacre of 1622*, World History Encyclopedia (Mar. 2, 2021), https://www.worldhistory.org/Indian_Massacre_of_1622/. A Lenape raid in October 1755 claimed fourteen lives along Penn's Creek, Pennsylvania. John B. Deans, *The Penn's Creek Massacre, Union County Sesquicentennial: The Story of a County, 1813–1963* (1963), https://archive.org/details/unioncountysesqu00dean. Many were killed by firearms and other media in the infamous Tulsa Race Massacre of 1921. *See* Anna Codutti, *Tulsa Race Massacre graves search: 'Major scientific breakthrough' made in DNA investigation*, Tulsa World (Apr. 12, 2023), https://tulsaworld.com/news/local/racemassacre/tulsa-race-massacre-graves-search-major-scientific-breakthrough-made-in-dna-investigation/article_2ed50126-d93e-11ed-abd1-b7cb157513c8.html. The Herrin Massacre of 1922 resulted in the killings of 21 people, in what President Warren Harding called "a shocking crime, barbarity, butchery, rot and madness." *The Herrin Massacre*, Southern Illinois University (2009), https://www.cs.siu.edu/csday/2009_1/herrin_massacre.htm.

Further, whether "mass shootings" before and after the assault weapon ban "increased dramatically," D-MSJ at 54, is a matter of opinion, not fact. Even more fundamentally, it's unclear what the State even means by "mass shootings." Not only is there "no standard definition of what constitutes a mass shooting," with "different

data sources—such as media outlets, academic researchers, and law enforcement agencies—frequently us[ing] different definitions when discussing and analyzing mass shootings," the soundness of the State's statistical observation dispositively turns on what they choose to define as a "mass shooting." Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, Rand Corp. (Apr. 15, 2021), https://bit.ly/3L9kzH4. A Rand Corporation study found that "[e]vidence that high-capacity magazine bans may decrease mass shootings is limited." *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, Rand Corp. (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/ban-assault-weapons/mass-shootings.html. But, even if mass shootings could be definitively defined, they involve so many factors that their lethality cannot be broadly traced to the capacity of a particular magazine. For example, *every single mass shooter*, as defined by a 2017 study, who used a so-called large capacity magazine between 1994 and 2013 also brought to the scene of the shooting multiple firearms and magazines—an average of 5.78 magazines in each instance. Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 J. Res. & Pol'y 28, 31–32, 40–42 (2016); *see also Mass Shooting Incidents in America (1984–2012)*, Citizens Crime Commission of New York City at 6, 8 (2017), http://www.nycrimecommission.org/mass-shooting-incidents-

america.php. By contrast, citizens plainly do not and cannot go about the demands of everyday life with multiple firearms and six magazines on their person.

The reality is, handguns, and not "assault firearms," regardless of magazine capacity, are the most common firearm used in mass shootings, *see* James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 Homicide Studies 125, 136 (2013); *accord* Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171, 188 (2020), consistent with their being overwhelmingly the weapons of choice for criminals generally, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018*, *Crime in the United States*, FBI, U.S. Dep't of Just.  (2018), https://bit.ly/2p0bw4D (64% of murders in 2018 committed with handguns); *see also, e.g.,* Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, The Trace (Jan. 6, 2016), https://bit.ly/41tIDv7 (showing that, of the top 20 firearms seized by Chicago Police in 2014, *all 20* were handguns); Pltf. Resp. to D-SOUMF No. 155, 156 (citing additional statistics on the comparatively low percentage of mass shootings that have been perpetrated with semiautomatic of "assault"-style rifles as opposed to handguns, as well as the infinitesimally small percentage of such incidents involving them when compared to the number of such rifles in circulation for lawful purposes).

More generally, the abuse of firearms and firearm violence, including those that use magazines, is neither new nor unprecedented. *Bruen*, 597 U.S. at 27 (firearm violence is "a general societal problem that has persisted since the 18th century"). In fact, for most of the 17th century, the "peacetime murder rate for adult colonists . . . ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States" in 2009. Randolph Roth, *American Homicide* 27, 219 (2009),          https://www.hoplofobia.info/wp-content/uploads/2020/07/2009-Randolph_Roth-American_Homicide.pdf; *see also* Pltf. Resp. to D-SOUMF Nos. 107, 108, 116, 133, 135 (detailing statistics of homicides and mass violence, including with firearms, during the colonial era).

Despite the reality that criminal misuse of firearms, including mass killings, has been a persisting phenomenon, before the 1990s there were almost no efforts to restrict semiautomatic arms. Nor, more importantly, has there ever been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they *could* inflict in the hands of someone bent on misusing them. To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm. *See Bruen*, 597 U.S. at 27-28; *Heller*, 554 U.S. at 627. In fact, a central tenet of the Supreme Court's decision in *Heller* is that handguns are protected from bans like the one New Jersey has imposed against "assault firearms"

*even though* handguns are overwhelmingly the firearm of choice by criminals. *Heller*, 554 U.S. at 628. The State's arms ban flies in the face of this longstanding tradition.

**B.     In All Events, the State Cannot Carry Its Burden Under *Bruen*.**

Again, regardless of whether the challenged regulation is purportedly designed to address "unprecedented societal concerns or dramatic technological changes," the State must still survive the analogical inquiry under *Bruen* requiring it to demonstrate a proper historical analogue for the challenged regulation. By the same token, the State cannot expect to survive this scrutiny by claiming a "tradition" of governments being granted "significant leeway to choose the manner of regulation for the dangerous instrument at issue." D-MSJ at 68. As the Supreme Court has made clear, "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* This the State cannot do.

The weapons restrictions that the State proffers as purported historical analogues fall far short of the mark. At the outset, all the restrictions from yesteryear concerning trap guns, bowie knives, slungshots and clubs, pistols, and various other bearable instruments as "dangerous" weapons at various times in various localities, D-MSJ at 57–58, 60–63, are not controlling because—once again—the weapons at

43

issue here are in common use for lawful purposes *today* and thus are not dangerous and unusual so as to be subject to a ban. *Bruen*, 597 U.S. at 32 (emphasis added) (quoting *Heller*, 554 U.S. at 627) (any colonial laws that prohibited the carrying of certain weapons as "dangerous and unusual" at the time can "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today").

Not only are these weapons restrictions all misfits when we are dealing with the right of *law-abiding* citizens to possess and use weapons in common use for *lawful* purposes, which New Jersey has *banned*, but many come too late in time as they were not enacted until the mid to late nineteenth century. D-MSJ at 57-63. The Supreme Court was clear that "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. Foremost, " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " *Id.* at 34 (quoting *Heller*, 554 U.S. at 634–35). While "[s]trictly speaking," the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, "we have generally assumed that the scope of the protection applicable to the federal government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* And while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the

Court's repeated holdings that 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019), and that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765.

For this reason, regulations hailing from later periods—like the mid-to-late 19th and 20th century periods that the State seeks to harness—are not part of the tapestry establishing "this Nation's historical tradition of firearm regulation" to the extent they are " '*inconsistent* with the original meaning of the constitutional text,' " *Bruen*, 597 U.S. at 36 (quoting *Heller II*, 670 F.3d at 1274 n.6) (Kavanaugh, J., dissenting)), or otherwise "contradict[] earlier evidence" of the meaning of the Second Amendment at the time it was adopted, *id.* at 2153. This "original meaning" forms the Amendment's " 'unqualified command,' " *id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. at 50 n.10), which ultimately "demands our unqualified deference," *id.* at 2131; *see also id.* at 2040 n.11 (while the 1686 *Sir John Knight's Case* may "only 'arguably' support[]" the view that the proper-cause requirement was inconsistent with the Nation's tradition, "[t]o the extent there are multiple plausible interpretations of *Sir John Knight's Case*, we will favor the one that is more consistent with the Second Amendment's command").

It follows that, despite the State's claims about the "uniquely probative" value that "Twentieth-Century history" regulations can supposedly provide, D-MSJ at 75, the various cited twentieth-century regulations on semiautomatic firearms, *id.* at 64–66, carry no real weight, particularly because they are *inconsistent* with the Nation's tradition of firearm regulation which has otherwise permitted the possession and use of such arms by law-abiding citizens for lawful purposes, including self-defense.[6]

And, anyway, they all fail to compare on the two relevant metrics of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Indeed, we are not dealing with restrictions on the manner or place of carrying or using a weapon at all, but rather a ban on mere *possession*. *See* Pltf. Resp. to D-SOUMF Nos. 86, 87, 88, 91, 92, 93, 94, 99 (further distinguishing the "how" and "why" of these regulations and pointing out the inaccuracies about and mischaracterizations of them in the reports of the State's experts). Far from showing that firearms, even concealable handguns, could be banned as the State has banned "assault firearms," these regulations "reveal[] a consensus that States could *not* ban public carry altogether," *Bruen*, 597 U.S. at 53, *despite* the existence of policies in certain localities that sought to reduce their prevalence over concerns about their potential for misuse when in the wrong hands.

---

[6]     It must be noted as well that the majority of the regulations the State cites in this context concern *automatic* firearms, not semiautomatic firearms of the type at issue. D-MSJ at 64-66. Automatic firearms are of a different class, as detailed above.

Lastly, as for the gunpowder regulations that the State cites, D-MSJ at 58–59, once again, its own description of these regulations eliminates any serious claim to relevant similarity, as it explains that states regulated the possession, storage, and transfer of gunpower "because of the risk that it posed to public safety in the event of fire or explosion." *Id.* Neither the "how" nor the "why" of the burdens these regulations imposed on a law-abiding citizen's right to armed self-defense— regulations on the *storage* of gunpowder to reduce the incidence of fires and explosions from unmonitored stockpiles housed in towns built almost entirely from wood—could demonstrate that a broad prohibition against the firearms and LCMs otherwise in common use for lawful purposes, i.e., for purposes that do *not* inflict any societal harm, is "part of an enduring American tradition of state regulation." *Bruen*, 597 U.S. at 69. In fact, examples of these gunpowder regulations show that they did not *blanketly* prohibit or compel forfeitures of offending stockpiles, but rather provided an opportunity for a hearing, at which the owner was allowed "to appear, and show cause why the gun powder, so seized or taken, should not be adjudged forfeit," before the supply would be deemed forfeited or the owner would be penalized. *See e.g.*, 1821 Me. L. chap. 25, p. 98-100; 1832 Conn. L. chap. 25, p. 391-2. Notably, the State makes no attempt to actually argue that these regulations imposed a "comparable burden" or were "comparably justified" in this context, as it

47

must to establish "a *well-established and representative* historical analogue." *Bruen*, 597 U.S. 30 (emphasis altered).

## V.   Summary Judgment Must Be Entered Against *All* Defendants

Plaintiffs brought and served their motion for summary judgment against *all* Defendants, specifically setting forth the basis for their claims against the County Defendants, Christine A. Hoffman in her official capacity as Gloucester County Prosecutor ("Defendant Hoffman"), and Bradley D. Billhimer in his official capacity as Ocean County Prosecutor ("Defendant Billhimer"). Dkt. No. 174. *State* Defendants filed a combined brief in opposition to this motion along with a cross-motion for summary judgment in their favor. State Defendants made clear in their briefing that they were acting solely on behalf of themselves and not on behalf of County Defendants. Dkt. Nos. 183 & 183-1. County Defendants have not opposed Plaintiffs' motion in any fashion; nor have they even joined in the State's opposition to Plaintiffs' motion. They have taken no action within the timeframes specified in the Court's scheduling order for the briefing on the cross-motions. "If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court 'will accept as true all material facts set forth by the moving party with appropriate record support.' " *Arroyo v. Pleasant Garden Apartments*, 14 F. Supp. 2d 696, 699 (D. N.J. 1998) (quoting *Anchorage Assocs. V. Virgin Islands Bd. Of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990)).

As detailed above, those facts compel judgment in Plaintiffs' favor. Therefore, judgment should be entered against all Defendants.

## VI.   Conclusion

Given that the Second Amendment presumptively protects the conduct Plaintiffs wish to engage in, and that the State cannot carry the burden necessary to sustain this law, summary judgment must be granted in favor of Plaintiffs and against the State.

Respectfully submitted,

Dated: December 15, 2023

*/s/ Bradley P. Lehman*
Bradley P. Lehman
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com

*Attorneys for Cheeseman Plaintiffs*

49