Bradley P. Lehman (NJ #129762014)
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
Phone: 910-713-8804
Email: law.rmd@gmail.com
(Admitted *pro hac vice*)

*Attorneys for Cheeseman Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |

Defendants.

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, CHRISTINE A. HOFFMAN, in her official capacity as Acting Gloucester County Prosecutor, and BRADLEY D. BILLHIMER, in his official capacity as Ocean County Prosecutor, | |
| Defendants. | |

| | |
|---|---|
| BLAKE ELLMAN, THOMAS R. ROGERS, and ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:22-cv-04397 |
| v. | |
| MATTHEW J. PLATKIN, in his | |

official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

        Defendants.

# CHEESEMAN PLAINTIFFS' RESPONSE TO STATE DEFENDANTS'
## COUNTER-STATEMENT OF
## MATERIAL FACTS NOT IN DISPUTE

Pursuant to Federal Rule of Civil Procedure 56 and D.N.J. Local Rule 56.1, the Cheeseman Plaintiffs (hereinafter, "Plaintiffs") submit the following response to State Defendants' Counter-Statement of Material Facts Not in Dispute.

Plaintiffs note at the outset every one of the facts asserted by the State in this document, is a "legislative fact" and not an "adjudicative fact." *See* Fed. R. Evid. 201, 1972 Advisory Committee Note. In other words, they are not facts specific to the parties, that need to be established for purposes of resolving this dispute, but rather general facts about the world that "have relevance to legal reasoning . . . in the formulation of a legal principle or ruling by a judge or court." *Id.* They are not, therefore, the types of facts that are found at a trial, and they are facts that may be equally well discussed in a "statement of facts" like this one, or within the argument section of a brief. *See Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (discussing Seventh Circuit Rule 28). For those facts below that are relevant to the legal inquiry under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) (many of them are not relevant to any legal issue before the court), the Supreme Court has stated clearly that such facts are truly a part of the *legal* analysis this Court must do. *See id.* at 2130 n.6. While Plaintiffs will respond to each of the facts asserted by the State below, it will deal more fully with the relevance and importance of the asserted facts in its legal brief.

1. New Jersey enacted its assault firearms prohibition in 1990. P.L. 1990, Ch. 32.

**Plaintiffs' Response to No. 1:** This is not a "fact" but rather a statement of the law. The State's laws speak for themselves.

2. That law was enacted after a mass shooting in Stockton, California when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others at an elementary school. Decl. of Daniel Vannella, Ex. 4 ("Vannella Decl."); Rpt. of Professor Robert Spitzer ¶ 1.

**Plaintiffs' Response to No. 2:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time.

3. New Jersey Governor Jim Florio's bill signing statement for Public Law 1990 discussed the capacity of the prohibited firearms to cause mass destruction and pose a threat to police, citizens, and children. Vannella Decl., Ex. 42.

**Plaintiffs' Response to No. 3:** Admitted insofar as it correctly describes Governor Florio's statement, but Plaintiffs dispute the accuracy of the claims therein as discussed in detail below.

4. In 2018, New Jersey enacted P.L. 2018, Chapter 39, which revised the definition of an unlawful "large capacity ammunition magazine" from 15 to 10 rounds of capacity.

**Plaintiffs' Response to No. 4:** This is not a "fact" but rather a statement of the law. The State's laws speak for themselves.

5. N.J. Stat. Ann. § 2C:39-1(w) regulates only a specific subset of handguns, rifles, and shotguns. Vannella Decl., Ex. 11, Rpt. of James Yurgealitis ¶¶ 8–26.

**Plaintiffs' Response to No. 5:** This is not a "fact" but rather a statement of the law. The State's laws speak for themselves.

6. N.J. Stat. Ann. § 2C:39-1(y) does not limit how many magazines an individual may possess.

**Plaintiffs' Response to No. 6:** This is not a "fact" but rather a statement of the law. The State's laws speak for themselves.

7. Fourteen states plus the District of Columbia restrict large-capacity magazines, representing more than 115 million people, or approximately 34.5% of the U.S. population. Spitzer Rpt. ¶¶ 2, 56.

**Plaintiffs' Response to No. 7:** The content of laws is not a fact but rather a statement of the law. The laws speak for themselves. Plaintiffs admit that the fourteen states identified plus the District of Columbia contain approximately 34.5% of the U.S. population.

8. Ten states plus the District of Columbia have enacted assault weapons and large-capacity magazine bans, as have various localities around the country, representing approximately 109 million people, or 32.7% of the U.S. population. Spitzer Rept. ¶ 2.

**Plaintiffs' Response to No. 8:** The content of laws is not a fact but rather a statement of the law. The laws speak for themselves. Plaintiffs admit that the ten states identified, the District of Columbia, and the identified localities contain approximately 32.7% of the U.S. population.

9. Semi-automatic rifles and pistols which are designed to function with detachable magazines will still function as intended regardless of the capacity of the magazine a user inserts into the firearm. Numerous manufacturers sell semi-automatic pistols packaged with detachable magazines ranging in size from 7 rounds to 15 rounds. Yurgealitis Rept. ¶¶ 131–34.

**Plaintiffs' Response to No. 9:** Disputed. The "intended" functionality of a firearm is irrelevant to the Second Amendment analysis in this case. Regulations that affect magazine size affect the functionality of a firearm and therefore infringe the Second Amendment rights of Plaintiffs. By banning standard-capacity magazines, the State bans an entire class of firearms, specifically those that are capable of firing more than ten rounds without reloading. A firearm that comes standard with a 15 round magazine will not function as intended with a ten round magazine because an individual will be required to reload more frequently than if she were able to use a standard capacity magazine.

10. "[A]ny firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity" of less than 10 rounds. Yurgealitis Rept. ¶ 145. Thus, an AR-15 style rifle "will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity." *Id.*

**Plaintiffs' Response to No. 10:** Dispute. *See* Resp. to Statement 9.

11. Each of the features listed in N.J. Stat. Ann. 2C:39-1(w)(2) and the 1996 Attorney General Guidelines, whether incorporated into the firearm by the

3

manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a combat scenario:

    i. A pistol grip or thumbhole stock (for rifles and shotguns);
    ii. Forward handgrip (rifles, shotguns, and pistols);
    iii. Folding/telescoping stocks (rifles and shotguns);
    iv. Flash suppressors;
    v. Grenade launchers;
    vi. Barrel shroud;
    vii. Threaded barrel;
    viii. Buffer tube, arm brace, or the like;
    ix. "Bump stocks"

Yurgealitis Rpt. ¶¶ 117–30.

**Plaintiffs' Response to No. 11:** Disputed. The State is wrong to suggest that these features are only or primarily useful in combat scenarios. In fact, many of these features make the firearms that have them particularly well suited for self-defense. A pistol grip helps to stabilize a firearm and permits its operator to maintain accuracy. *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 392–93 (1994) (Exhibit 1). "Recoil can be painful, and muzzle movement interferes with accuracy. A telescoping stock…'allows the user to adjust the length of the stock,' which, 'like finding the right size shoe, simply allows the shooter to rest the weapon on his or her shoulder properly and comfortably.'" Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* 313 (2022) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 368 (2013)) (Exhibit 2). A flash suppressor "reduces noise and potentially increases accuracy," while "there is no law enforcement concern for pistol grips or thumbhole stocks, which simply assist a shooter in absorbing recoil." *Id*. at 332 (quoting *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 WL 5508998, at *19 (D.N. Mariana Islands Sept. 28, 2016)). "[S]uch features…do not render the AR-15 more deadly by making it fire faster . . . or impact with far more power. They mostly serve the same ergonomic functions as similar features on non-banned firearms, making the AR-15 easier and safer to use." E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev. 1, 13–14 (2020) (Exhibit 3).

As Wallace explains in detail, "When a rifle fires, recoil from the bullet and propellant gases exiting the muzzle of the barrel moves the rifle back along the centerline of the barrel. With many hunting rifles and shotguns, the centerline of

the barrel is higher than the shooter's shoulder because the buttstock of the rifle is angled lower than the barrel. Recoil thus causes the barrel of the rifle to move back and up." E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U. L.J. 193, 228–29 (2018) (Exhibit 4). To mitigate the inaccuracy due to recoil, "M16 rifles were designed to reduce muzzle rise by moving the buttstock in line with the barrel so that the rifle's recoil will push straight back against the shooter's shoulder." *Id.* at 229. This straight-line alignment, which the semiautomatic AR-15 also has, "*requires* a pistol grip separate from the buttstock because it is too awkward to pull the trigger while gripping the raised buttstock when firing the rifle from the shoulder, whether standing, kneeling, or prone." *Id.* (emphasis added) A pistol grip "thus allows for accurate firing from the shoulder, which is how the rifle was designed to shoot." *Id*. Indeed, this is how the Department of Defense's Defense Advanced Research Projects Agency (DARPA) explained the purpose of pistol grips for AR-15s: "a plastic stock with a rubber butt, assembled in line with the bore" that "in conjunction with its high line of sight and separate hand grip, is designed to minimize rotation about the shoulder during firing." U.S. Dep't of Def.: Advanced Rsch. Projects Agency, *Rep. of Task No. 13A: Test of Armalite Rifle, AR-15 (U)* at 2 (Aug. 20, 1962) (Exhibit 5). The pistol grip is positioned "in such a manner as to provide a more natural, comfortable, and effective grasp of the rifle. It is this purpose, and no other, for which the modern pistol grip is intended." *See* Dennis P. Chapman, *The AR-15 Controversy: Semiautomatic Rifles and the Second Amendment* 38 (2d ed. 2022) (Exhibit 6).

Often referred to as the "handguard," a barrel shroud "is the metal or plastic enclosure that covers typically all but a few inches of the barrel" and, on an AR-15, "has multiple functions: (1) it provides the shooter with a forward grip on the rifle using the non-trigger hand; (2) it protects the shooter's hand from a hot barrel; (3) it protects the barrel and gas tube or piston from damage; (4) it helps ventilate and cool the barrel; and (5) it provides a base for attaching accessories to the rifle such as sights, slings, flashlights, forward vertical grips, and bipods. None of these functions make the AR-15 exceptionally lethal, especially when compared to non-banned rifles." *See* Wallace, *Myths, supra* at 231. Rifles also "have been equipped with 'barrel shroud' handguards for more than 100 years," with bolt-actions being "the first rifles so equipped." *See*, *supra* at 65. Because burned hands pose "a critically important safety concern" for the millions of Americans who own these rifles, these handguards "exist to protect shooters from injury by contact with hot rifle barrels during ordinary, routine shooting activities." *Id.* at 66–67.

The State also isolates folding, telescoping, or thumbhole stocks as banned features. These features are "ergonomic improvements over earlier fixed-stock rifle

configurations" that are "designed to allow adjustments in the rifle's length of pull, making the firearm more comfortable to shoot in both military and civilian applications." *See* Wallace, *Myths*, *supra* at 232. "A telescoping stock makes a rifle easier to shoulder properly for different users, or for one user when shooting from different positions or wearing different thicknesses of clothing." *Id*. A thumbhole stock is simply a hole in the stock through which the user can place his or her thumb to allow a more secure grip on the firearm. Adjustable stocks serve a perfectly sensible function, one in fact rooted in American tradition: "Most people cannot afford to have a rifle custom-stocked to fit their precise size and shape and certainly cannot afford to have custom stocks made for each member of their family. Collapsible or adjustable stocks provide a standard, off-the-shelf solution that allows each shooter to adjust the rifle to their own body and thus optimize their shooting experience; adjustable buttstocks enable multiple members of a family to practice shooting with the same rifle, optimizing the shooting experience for each. In this respect, adjustable buttstocks reflect the American shooting tradition, wherein hunting, target shooting, and arms for self-defense have always been the province of ordinary working people of modest means, as opposed to the European tradition wherein the shooting sports were the domain of the wealthy and privileged classes who could afford to indulge in fine handcrafted and extremely expensive custom sporting arms." Chapman, *supra* at 83–84. The bottom line is that these "assault" features identified by the State are not at all nefarious. Rather, they improve the functions of a rifle, render its operation simpler and more accurate, and account for some of the reasons these firearms are favored for defense of self and home.

To be sure, they are heavily favored for that purpose. Millions of Americans have chosen the banned firearms for that reason. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 33–34, Geo. Univ. (May 13, 2022) (Exhibit 7) (finding that 24.6 million Americans, or 30.2% of gun owners, have owned an AR-15 or similar style rifle, and that the most common reasons for owning them were target shooting (66% of owners), home defense (61.9% of owners) and hunting (50.5% of owners)); *see also Poll of current gun owners* at 1, Wash. Post-Ipsos (Mar. 27, 2023), https://bit.ly/46CqzRa (Exhibit 8) (finding 20% of gun owners currently own an AR-15 or similar style rifle, 60% of respondents citing target shooting as a "major reason" for owning them and 30% citing that as a "minor reason," and protection of self, family, and property rating as even *more* important, with 65% as a major reason and 26% reporting it as a minor reason). As the ATF itself has said, the AR-15 type rifle is "one of the most popular firearms in the United States." *Definition of "Frame or Receiver" & Identification of Firearms*, 2022 WL 1159420, at *2 (ATF Apr. 10, 2022).

A recent survey of over 2,000 owners of such firearms reached the same result as the National Firearms Survey and the Washington Post, showing again that home-defense and recreational target shooting are the two most important reason for owning these firearms. *See Modern Sporting Rifle: Comprehensive Consumer Report* at 5, Nat'l Shooting Sports Found., Inc. (July 14, 2022) (Exhibit 9); *see also Sport Shooting Participation in the U.S. in 2020* at iii, Nat'l Shooting Sports Found., Inc. (2021), https://bit.ly/3sPuEQl (Exhibit 10) (noting that in 2020, 20 million American participated in sport or target shooting with firearms like those banned by the State). "AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." Frank Miniter, *The Future of the Gun* 46–47 (2014) (Exhibit 11). This popularity among a diverse demographic of Americans is, in part, because an AR-15 "firing .223 or 5.56mm ammunition produces *zero* felt recoil—that is, nearly all the recoil produced by firing is absorbed by the buffer assembly, transmitting almost none to the shooter's shoulder." Chapman, *supra* at 127.

But not only are semiautomatic rifles useful in self-defense generally, they are particularly useful when one is confronted by multiple assailants. Indeed, 51.2% of all self-defense incidents annually involve two or more attackers, while 20.4% of such incidents involve three or more attackers. *See* English, *supra* at 15. In 2019, a Houston homeowner repelled five-armed home invaders with his semiautomatic AK-47. Stefania Okolie*, 5 Shot and 3 Killed After Homeowner Opens Fire on Suspects in East Houston*, ABC13 (Jan. 20, 2019), https://abc13.co/46V92DX (Exhibit 12). An eight-months-pregnant mother in Florida used an AR-15 to defend herself and her family when two masked men forcibly entered her home, pistol-whipped her husband, and grabbed her daughter. She fatally shot one of the attackers, while the other ran away. Joe Tacopino, *Pregnant Florida mom uses AR-15 to kill home intruder*, N.Y. POST (Nov. 4, 2019), https://bit.ly/4a5SBax (Exhibit 13). When the owner of a Santa Monica liquor store, and his friends, stood in front of his store armed with AR-15s, the looters who had plundered and razed neighboring stores simply passed them by without incident. *Santa Monica Owner Protects His Store With Guns Amid Looting*, CBS L.A. (June 1, 2020), https://cbsn.ws/47BxwDk (Exhibit 14). A homeowner in Florida used his AR-15 to fight off four home invaders in Summerfield, Fla. Two died from their injuries, two were arrested near the house, and the homeowner was injured. Austin L. Miller, *MCSO: 2 of 4 intruders dead, homeowner injured in home invasion*, Ocala

StarBanner (July 10, 2019), https://bit.ly/3R49MAN (Exhibit 15). When firearms instructor Dave Thomas ran into his apartment hallway with his AR-15 because he heard women screaming, he found blood in the hallway and a man stabbing another. The stabber ran away when Thomas threatened to shoot him. Hannah Leone, *Gun instructor uses AR-15 to stop attacker in Oswego: "He was half a breath away from getting his head blown off,"* CHI. TRIB. (Mar. 1, 2018), https://bit.ly/46IwOTt (Exhibit 16). The 19-year-old son of a homeowner in Oklahoma used and AR-15 to shoot and kill two of three home invaders who had entered the house through the back door with the goal of burglarizing it. *Homeowner's son shoots, kills three would-be burglars*, FOX NEWS (Mar. 27, 2017), https://fxn.ws/47DrNgv (Exhibit 17).

**History Of Firearms Technology**

12. Single-shot, muzzle-loading firearms were the ubiquitous guns from the time of America's initial settlement by Europeans until the latter part of the 19th Century. Spitzer Rpt. ¶¶ 30, 40; Vannella Decl. Ex. 12, Rpt. of Professor Brian DeLay ¶ 34; Rpt. of Professor Saul Cornell at 24. These were slow-loading guns that had to be loaded with gunpowder and ball before every shot, and could not be kept loaded without corroding the iron barrels. DeLay Rpt. ¶ 37; Cornell Rpt. at 24. Moreover, the black powder used in these weapons was both corrosive and attracted moisture like a sponge. Cornell Rpt. at 18. These weapons were thus limited as practical tools for self-defense. *Id.*

**Plaintiffs' Response to No. 12:** Disputed that these firearms were not effective tools for self-defense and were not employed that way. As the Supreme Court has stressed repeatedly, the Second Amendment right to keep firearms was understood then, as now, as crucial to furthering the right to self-defense, and Americans chose, then as now, the common, "ubiquitous" firearms of the time to use for self-defense. *See District of Columbia v. Heller*, 554 U.S. 570, 624 (2008) ("The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."). Plaintiffs also dispute that these firearms remained "the ubiquitous guns" until "the latter part of the 19th century." As discussed in more detail below, lever-action rifles and revolvers were in production well before "the latter part of the 19th century."

13. Repeat fire was difficult to achieve with colonial-era muzzle loading firearms, and they were known to be inaccurate at range. DeLay Rpt. ¶¶ 37, 61.

**Plaintiffs' Response to No. 13:** Admitted, noting that while repeat fire was difficult to achieve with muzzle loading firearms, breech loading firearms, which were "very

8

numerous and of greatly diversified mechanism" in the 17th and 18th centuries (and were used by the British in the American War of Independence), could achieve relatively rapid fire. A user could hit a 200-yard target with six shots per minute. David Kopel, *Fast Reloading of Guns in the 19th Century,* Reason (Jun. 5, 2023), https://bit.ly/3R67jpw (Exhibit 18).

14. Muzzle loading firearms could not be loaded while lying prone, such that soldiers became an easier target during combat when they rose to reload. DeLay Rpt. ¶ 61.

**Plaintiffs' Response to No. 14:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time.

15. The average 18th Century soldier fired two or three shots a minute from a smoothbore musket. DeLay Rpt. ¶ 16.

**Plaintiffs' Response to No. 15:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time.

16. Multi-shot firearms were not common, ordinary, or found in general circulation during the Colonial and Founding eras. Spitzer Rpt. ¶ 30. Repeating firearms did not pose a threat to public safety in 1791. DeLay Rpt. ¶ 49.

**Plaintiffs' Response to No. 16:** Disputed. The first firearm that could fire more than ten rounds without reloading was invented around 1580. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 852 (2015) (Exhibit 19). 11-shot repeaters were sold in the United States as early as the 1720s. Samuel Niles, *A Summary Historical Narrative of the Wars in New England* 347 (1837), https://bit.ly/3tflRev. The 1820s saw the invention of a repeater whose "number of charges may be extended to fifteen or even twenty" and which was marketed for "private use." *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen.*, 974 F.3d 237, 255 (Matey, C.J., dissenting) (citation omitted)). The leading air rifle of the mid-1800s could shoot upwards of 20 rounds via a gravity-fed, tubular magazine. Kopel, *The History of Firearm Magazines*, *supra* at 854–56.

17. Repeating arms were experimental, flawed curiosities at the times of the Founding and ratification of the Fourteenth Amendment, and were rare in the United States during those eras. DeLay Rpt. ¶¶ 5, 8, 13, 51. No repeating firearm achieved military or commercial significance before the 19th Century. DeLay Rpt. ¶¶ 8, 14.

**Plaintiffs' Response to No. 17**: Disputed. *See* Resp. to Statement 16. Repeating arms were by no means "curiosities": for example, magazine-fed repeaters invented and improved by members of the Kalthoff family, which were lever-actuated and could fire up to thirty rounds without reloading, were widely produced across Europe by at least 19 different manufacturers. Arne Hoff, *Dutch Firearms* 229-31 (1978), https://bit.ly/46RuwSb. A Danish flintlock based on the Kalthoff system was produced in significant quantities as early as 1646. Kopel, *Firearms technology and the original meaning of the Second Amendment*, Wash. Post (Apr. 3, 2017), https://wapo.st/48kj5Un (Exhibit 20). A couple of companies in the Danish military were armed with these firearms. Hoff, Dutch Firearms 240. They stayed in service for twenty years, *id.,* and were used in the siege of Copenhagen in 1658 and 1659, and in the Scanian War of 1675-1679. Harold L. Peterson, *The Treasury of the Gun* 230 (1962), https://bit.ly/41dZouV. These guns were "undoubtedly the first magazine repeaters ever to be adopted for military purposes." *Id*. Additionally, a type of repeating flintlock became very popular in England in the 17th century and was manufactured in Massachusetts in the 18th century. *Id.*

It is true, however, that repeating firearms became hugely commercially successful in the 19th century. The introduction of the Spencer lever action repeating rifle in 1860, eight years prior to the enactment of the Fourteenth Amendment, was a great military and commercial success. Kopel, *Fast Reloading of Guns in the 19th Century*, *supra* Resp. to Statement 13. Indeed, the Spencer Repeating Rifle Company of Boston made 144,500 rifles and carbines and sold 107,372 to the U.S. government. The rest were presumably sold privately. The Spencer held 7 rounds in a tubular magazine in the buttstock. After firing 7 rounds, using the Blakeslee speedloader the user could pour in 7 new rounds. The Blakeslee cartridge box kit could hold up to 13 tubes, with 7 rounds each. The Henry model of 1860 was also commercially successful, with 14,000 rifles produced. Kopel, *Fast Reloading of Guns in the 19th Century*, *supra*; Patrick Roberts, *The History of Henry,* Gun Digest (Aug. 26, 2022), https://bit.ly/47T7qf2 (Exhibit 21).

18. 18th Century repeaters were unreliable and prone to misfiring. DeLay Rpt. ¶ 14.

**Plaintiffs' Response to No. 18:** Disputed. The reliability of repeaters depended on the level of expertise involved in crafting the weapon. The way the internal components of the firearm fit together contributed to whether to firearm operated properly, making craftsmanship a primary factor in reliability. Kopel, *Firearms technology and the original meaning of the Second Amendment*, *supra,* Resp. to Statement 17.

19. Early repeaters that used the superposed firing method were slow to load and could explode in the user's hands if the sequencing between rounds was off. They also produced clouds of white smoke from the gunpowder when fired. DeLay Rpt. ¶ 15.

**Plaintiffs' Response to No. 19:** Admitted. All black powder firearms produce white smoke when fired.

20. The Puckle gun, an 18th Century repeater, was a military weapon, was not a self-loading or hand-held firearm, and was not manufactured for commercial sale. Spitzer Rpt. ¶¶ 31–32; DeLay Rpt. ¶ 16.

**Plaintiffs' Response to No. 20:** Admitted.

21. The 18th Century Belton repeater was neither proven feasible nor produced for distribution. It used the superposed firing method. Spitzer Rpt. ¶¶ 33–34; DeLay Rpt. ¶ 24.

**Plaintiffs' Response to No. 21**: Disputed. The Belton repeater was well-known to the Founders: in 1777, the Continental Congress ordered 100 of the rifles. *Letter from Joseph Belton to the Continental Congress* (Apr. 11, 1777) (Exhibit 22). The State offers no support for the notion that the Belton repeater was not "feasible."

In 1792, Joseph Chambers attempted to sell his superposed musket that could shoot twenty times a minute to the U.S. War Department. Ian McCollum, *Chambers Flintlock Machine Gun from the 1700s*, Forgotten Weapons (Nov. 8, 2019), https://bit.ly/4abG59 (Exhibit 23). During the War of 1812 the U.S. Navy contracted for 200 of his repeating muskets and 100 repeating pistols. Andrew Fagal, *The Promise of American Repeating Weapons, 1791-1821*, Age of Revolutions (Oct. 20, 2016), https://bit.ly/4825Rve (Exhibit 24).

22. Only a few hundred of the 19th Century Jennings multi-shot rifle were manufactured. This gun used the superposed firing method. Spitzer Rpt. ¶ 35; DeLay Rpt. ¶ 53.

**Plaintiffs' Response to No. 22:** Disputed. This description leaves out important context. While they may not have been mass produced, they were of public importance. The *New York Evening Post* in 1821 praised Jennings' repeater as "important[t] for both public and private use," whose "number of charges may be extended to fifteen or even twenty." *Newly Invented Muskets*, N.Y. Evening Post, Apr. 10, 1822, *in* 59 Alexander Tilloch, *The Phil. Mag. And J. Comprehending The*

11

*Various Branches Of Science, The Liberal And Fine Arts, Geology, Agric., Mfrs, And Com.* 467–68 (1822) (Exhibit 25).

23. The 18th Century Girandoni air rifle required 1500 strokes to restore power after its reservoirs were empty, making it impractical for civilian use. These air guns were complex and expensive to make and repair, and therefore were rare in 18th and early 19th Century America. Spitzer Rpt. ¶ 36; DeLay Rpt. ¶¶ 28–29, 32; Cornell Rpt. at 28. Indeed, the Austrian military, one of the few armed forces to purchase this weapon, quickly abandoned it. Cornell Rpt. at 28.

**Plaintiffs' Response to No. 23:** Disputed. The Girandoni air rifle was used for decades by the Austrian military and was used effectively in the Austro-Turkish War, 1787-1791. Frederick J. Chiaventone, *The Girandoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon,* Warfare Hist. Network (Jan. 2013), https://bit.ly/47GQw3s (Exhibit 26).

While it was primarily used by the military, it would "set a high standard that would eventually become attainable by firearms made for ordinary consumers." Kopel, *Fast Reloading of Guns in the 19th Century, supra* Resp. to Statement 13. Meriwether Lewis carried a Girandoni rifle on his expedition with William Clark in 1803. James B. Garry, *Weapons of the Lewis and Clark Expedition* 100–01 (2012) (Exhibit 27).

24. The repeating pistols produced by the Volcanic Repeating Arms Company in the 19th Century were few, flawed, and experimental. Spitzer Rpt. ¶ 37.

**Plaintiffs' Response to No. 24:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time.

25. The guns advertised by Samuel Miller and James Pim in the early 1700s were not offered for sale, used for self-defense, or employed in combat. DeLay Rpt. ¶ 20.

**Plaintiffs' Response to No. 25:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time.

26. The gun advertised by John Cookson in the early 1700s was for a single weapon. There is no evidence that Cookson continued to make or sell that firearm. DeLay Rpt. ¶ 21.

**Plaintiffs' Response to No. 26:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time**.**

27. The Continental Congress cancelled its order for 100 of Joseph Belton's gun in the 1770s. There is no evidence that Belton ever produced that gun in quantity. DeLay Rpt. ¶ 23-24; Spitzer Rpt. ¶ 33–34.

**Plaintiffs' Response to No. 27:** Admitted. *See* Resp. to Statement 21. This shows that Founders were both aware of and attracted to new firearm technology.

28. The U.S. Navy purchased several hundred Chambers repeaters, which utilized the superposed load technology, but there is no evidence that the guns were put to use or produced for commercial sale. DeLay Rpt. ¶ 52.

**Plaintiffs' Response to No. 28:** Disputed. The Chambers repeater was used during the War of 1812. Andrew Fagal, *The Promise of American Repeating Weapons, 1791-1821*, *supra*.

29. The market for firearms in early America shared very few features with the contemporary world of firearms commerce. Cornell Rpt. at 22.

**Plaintiffs' Response to No. 29:** Disputed. Plaintiffs object that this statement is too vague to permit a response: the market for any modern product could be said to share few features with its corresponding market in early America. Further, the market for firearms is in no way relevant to the *Bruen* analysis.

30. In the early 1800s, the government took an active role in encouraging the manufacture of arms, and it had a vested interest in what types of weapons would be produced. The American firearms industry, then in its infancy, was thus largely dependent on government contracts and subsidies. Cornell Rpt. at 20.

**Plaintiffs' Response to No. 30:** Disputed. The firearms industry began to be subsidized by the federal government as a result of the procurement problems created by the War of 1812. David Kopel, *The Founders were well aware of continuing advances in arms technology*, Reason (May 26, 2023), https://bit.ly/4a6AUYI (Exhibit 28). The government ultimately sought to enhance technological innovation and create more effective firearms. *Id.* Additionally, the AR-15—the archetypal weapon targeted by "assault weapon" bans—was itself developed under a government contract. Christopher Bartocci, *AR-15/M16: The Rifle That Was Never Supposed to Be*, Gun Digest (July 16, 2012), https://bit.ly/4822apf (Exhibit 29). But the firearms industry was not "largely dependent on government contracts and subsidies," and Cornell cites nothing to support that broad claim. Cornell Rpt. at 20.

31. Early American firearms production in the era of the Second Amendment was dominated by artisan production, while local gun smiths—not big box stores like Walmart—sold most firearms. Most households, apart from the wealthiest ones, could not afford to own multiple weapons. Cornell Rpt. at 22.

**Plaintiffs' Response to No. 31:** Disputed. The history of the production of firearms is irrelevant under the *Bruen* analysis, and there were not "big box stores" selling firearms in early America because there simply were not big box stores. Many households would have been required by law to have multiple weapons. The First Militia Act of 1792 required every male 18-45 years of age to own a musket: if a household had two males in that age range, then, it was required to have more than one musket. The Militia Act of 1792, Act of May 8, 1792, ch. 33, 1 Stat. 271 § 1 (Exhibit 30). As Professor Cornell says about his own figures, "[p]robate data does not perfectly correlate with total number of weapons in circulation so these figures must be used with some caution." Cornell Rpt. at 23 n.72. Firearms were also mass produced during the Founding era: the 1795 Springfield Model, based on the popular Charleville musket, saw 85,000 muskets manufactured at the Springfield Armory between 1795 and 1816. *U.S. Springfield Model 1795 Flintlock Musket Type I*, NRA Museums (Exhibit 31).

32. The vast majority of the repeating pistols that entered the market in the 1830s (i.e., pepperbox pistols and revolvers) held seven or fewer rounds. Only three 19th Century revolvers had greater than ten-round capacity, and only a few hundred of those were produced. DeLay Rpt. ¶ 58.

**Plaintiffs' Response to No. 32:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time.

33. Mid-19th Century repeating pistols had to be manually reloaded when empty. It could take at least one minute to complete the reloading process. DeLay Rpt. ¶ 59. This limited the damage a single shooter could inflict on a group of people. DeLay Rpt. ¶ 69.

**Plaintiffs' Response to No. 33:** Disputed. Once the Colt revolver discharged all shots, the user could remove a wedge holding the cylinder in place, replace that cylinder with another loaded cylinder, reinsert the wedge, and fire. However, the Remington-Beals revolver, introduced in 1858, had a cylinder that could be removed instantly without removing any other part, replaced with another loaded cylinder, and fired in seconds. Dennis Adler, *The Interesting History of Remington Revolvers From the 1850s-1870s*, Athlon Outdoors (Jan. 29, 2022), https://bit.ly/3GAdywU (Exhibit 32).

34. The Colt revolver was designed as a six-shot weapon and did not circulate widely in society until after the Civil War. Spitzer Rpt. ¶ 41.

**Plaintiffs' Response to No. 34:** Disputed. The Colt revolver was patented in 1836. It was designed as a five-shot revolver, not a six-shot as stated. Robert L. Wilson, *An American Legend: the Official History of Winchester Firearms and Ammunition from 1849 to the Present* 16 (1985), https://bit.ly/3uQzmlj. Capacities on later guns extended to six rounds. Colt revolver factories emerged in the 1850s and almost 500,000 revolvers had been manufactured by 1862:

> "In 1855, in Hartford along the Connecticut River, he completed a new factory and incorporated his business as the Colt's Patent Fire Arms Manufacturing Company (today Colt's Manufacturing Company LLC) and began regular production. By the time of Colt's death on January 10, 1862, a succession of ten improved revolver models had been introduced, and some 468,000 units manufactured. Before the Civil War the most popular of these in Texas was the .36 caliber 1851 Navy model, about which traveler Frederick Law Olmsted observed, 'Of the Colt's [Navy] we cannot speak in too high terms. . . . There are probably in Texas about as many revolvers as male adults, and I doubt if there are one hundred in the state of any other make.'"

Richard C. Rattenbury, *Colt Revolvers*, TSHA (Oct. 2, 2019), https://bit.ly/3t3Yd4x (Exhibit 33).

35. The Henry and Winchester repeating firearms were the only reliable firearms that could fire more than ten rounds in the years surrounding the ratification of the Fourteenth Amendment. DeLay Rpt. ¶ 64. Most of those weapons produced between 1861 and 1871 were purchased by the military or exported abroad. DeLay Rpt. ¶ 65; Spitzer Rpt. ¶ 42. Overall, large-capacity firearms constituted less than 0.02% of all firearms in the United States as late as 1872. Vannella Decl. Ex. 12, Correction to Rebuttal Report of Professor Brian DeLay ¶¶ 1-2.

**Plaintiffs' Response to No. 35:** Disputed. Multi-shot arms were not novelties; they were ubiquitous among civilians by the end of the Civil War. "[O]ver 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the Model 73 and Model 92, sold more than ten times that amount in the ensuing decades. Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 306–11 (9th ed. 2007) (Exhibit 34). And Winchester rifles, while certainly the most popular, were by no means unique. *See, e.g.*, Harold F. Williamson, *Winchester: The Gun That Won The West* 28–31 (1952) (Exhibit 35)

(discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Flayderman, *supra* at 305 (noting that 14,000 Henry rifles were sold between 1860 and 1866).

Other repeating rifles holding more than 10 rounds also were available commercially during this time period. The Evans lever action rifle, introduced in 1873, and had "the greatest capacity of any repeating rifle ever mass produced and marketed in the United States." *Id.* at 694. The "Old Model" could fire 34 cartridges of .44 caliber ammunition without reloading; the "New Model," which fired a longer cartridge, held 28 rounds. *Id.* The Colt Lightning slide action rifle, in production between 1884 and 1902, also held 15 rounds, and 89,777 of the medium-frame version alone were made. Jim Supica, *2022 Standard Catalog of Firearms* 286–87 (2021), https://bit.ly/3Rh9BSS.

36. The Winchester firearms in the last third of the 19th Century were fixed magazine, lever-action rifles that required the shooter to manipulate a lever in a forward-and-back motion before each shot in order to eject a spent casing and chamber a new round. When the magazine was empty, it had to be manually reloaded round by round. Spitzer Rpt. ¶ 42; DeLay Rpt. ¶¶ 69, 75.

**Plaintiffs' Response to No. 36:** Admitted, noting that most magazines today need to be manually reloaded round by round.

37. Both automatic and semi-automatic weapons use energy released by the first round fired to load the next round into the firing chamber. Both are capable of firing numerous rounds without reloading, potentially with the use of detachable ammunition magazines or similar feeding devices. Spitzer Rpt. ¶¶ 21, 23; DeLay Rpt. ¶ 75. Automatic arms continue to fire as long as the trigger is depressed, while semiautomatic arms require the shooter to squeeze the trigger for each round fired. DeLay Rpt. ¶ 76.

**Plaintiffs' Response to No. 37:** Admitted.

38. Detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century. These drastically accelerated the process to load and reload a firearm by making it possible to load an entire magazine at once, rather than bullet-by-bullet. DeLay Rpt. ¶ 79.

**Plaintiffs' Response to No. 38:** Disputed. "The principle of the detachable magazine had been put into use long before" the Civil War. Kopel, *Fast Reloading of Guns in the 19th Century, supra* Resp. to Statement 13. "After the American Revolution, American inventor Joseph Belton moved to England, where starting in

1786 he created 7-shot breechloading repeaters with detachable metal magazines for the British East India Company." *Id.* The M1885 Remington-Lee, with a detachable box magazine, first appeared in 1879. *Gun Timeline*, PBS, https://to.pbs.org/3NzoajJ (last visited Nov. 30, 2023) (Exhibit 36). As noted above, speed loaders permitted rapid reloading without detachable magazines.

39. Semi- and fully automatic firearm technology was developed in the 1880s and did not become reliable or widely available until the beginning of the 20th Century. The primary market was the military. Spitzer Rpt. ¶ 38; DeLay Rpt. ¶¶ 6; 76. When this dramatic technological change provoked unprecedented social concern, it led to a wave of regulatory legislation across the country. DeLay Rpt. ¶ 6.

**Plaintiffs' Response to No. 39:** Disputed. This statement, which makes broad claims about the history of firearm regulation in the country, casting certain regulatory restrictions as responsive to both "technological change" and "unprecedented social concern" states legal conclusions relevant to the *Bruen* analysis. The analysis of regulatory history surrounding firearms is not a factual inquiry, but a *legal* one. *See Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis. Plaintiffs will respond to the substance of the statements in this section where appropriate, but when the issue relates to the *legal* analysis prescribed by *Bruen*, Plaintiffs will engage with their substance in their legal briefing.

Semiautomatic rifles became in wide use by civilians in the early 20th century. Then-Judge Brett Kavanaugh wrote in *Heller v. District of Columbia,* 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting):

> The first commercially available semi-automatic rifles, the Winchester Models 1903 and 1905 and the Remington Model 8, entered the market between 1903 and 1906. *See* JOHN HENWOOD, THE 8 AND THE 81: A HISTORY OF REMINGTON'S PIONEER AUTOLOADING RIFLES 5 (1993); *see also* JOHN HENWOOD, THE FORGOTTEN WINCHESTERS: A HISTORY OF THE MODELS, 1905, 1907, AND 1910 SELF LOADING RIFLES 2, 6 (1995). The first semi-automatic shotgun, designed by John Browning and manufactured by Remington, hit the market in 1905 and was a

runaway commercial success. *See* HENWOOD, 8 AND THE 81, *supra* at 4. Other arms manufacturers, including Standard Arms and Browning Arms, quickly brought their own semi-automatic rifles to market. *See id*. at 64–69. Five-shot magazines were standard, but as early as 1907, Winchester was offering the general public ten-shot magazines for use with its .351 caliber semi-automatic rifles. *See* HENWOOD, THE FORGOTTEN WINCHESTERS, *supra* at 22–23. Many of the early semi-automatic rifles were available with pistol grips. *See id.* at 117–24. These semi-automatic rifles were designed and marketed primarily for use as hunting rifles, with a small ancillary market among law enforcement officers. *See* HENWOOD, 8 AND THE 81, *supra* at 115–21.

In any event, semiautomatic firearms were not federally regulated until 1994, a century after their introduction. While a few states enacted laws restricting firing capacity of semiautomatic weapons in the 1920s and 1930s, each was either repealed outright or replaced with a law that restricted only fully automatic weapons, *i.e.*, machine guns—which, unlike *semi*automatics, were not widely adopted by law-abiding citizens for lawful purposes. *See* 1959 Mich. Pub. Acts 249–50 (Exhibit 37); 1959 R.I. Acts & Resolves 260–63 (Exhibit 38); 1963 Minn. Sess. L. ch. 753,1229 (Exhibit 39); 1965 Cal. Stat., ch. 33, at 913; 1972 Ohio Laws 1866, 1963; 1975 Va. Acts, ch. 14, at 67 (Exhibit 40).

40. The firearms and firearm feeding devices regulated in the early 20th Century, unlike those from previous centuries, were capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices. Spitzer Rpt. ¶ 29.

**Plaintiffs' Response to No. 40:** Disputed. At least by the time the lever-action rifle was developed, firearms were capable of reliable, rapid fire: "[a]n 1859 advertisement bragged that the guns could be loaded and fire thirty shots in less than a minute." Kopel, *The History of Firearm Magazines*, *supra* at 855, Resp. to Statement 16.

41. Early precursors to modern semi-automatic and automatic firearms were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus due to their large size and weight, such as the Gatling gun. Because their use and suitability were limited to military settings, there was no need to regulate these weapons among the civilian population. Spitzer Rpt. ¶ 5.

**Plaintiffs' Response to No. 41:** Disputed. The Gatling gun operated neither automatically nor semi-automatically but was rather, as Spitzer acknowledges "a manually operated, hand-cranked machine gun" and it is, in no way, a "precursor"

18

to the firearms banned by the State. Spitzer Rpt. ¶ 5. Modern semiautomatic firearms have always been light and hand-held, unlike the Gatling gun which was mounted on wheels. Furthermore, while Spitzer claims that "their use and suitability were limited to military settings [so] there was no need to regulate these weapons among the civilian population," *id.*, the fact is that even Gatling guns were privately owned. In one notable incident, the editor of *The New York Times* averted rioters who were attacking the newspaper's headquarters by use of Gatling guns. Robert C. Kennedy, *How to Escape the Draft*, N.Y. Times: Archive (Aug. 1, 1863), https://nyti.ms/3v2nFrC (Exhibit 41).

42. Fully automatic machine guns, capable of firing all of their rounds from a single barrel and with a single trigger pull, were developed during World War I. These weapons, such as the Thompson submachine gun ("Tommy gun") and Browning Automatic Rifle ("BAR"), were developed as military weapons but were made available to civilians after the war. It was not until the early 1920s that these hand-held, fully automatic weapons operated reliably, were available to civilians, and began to circulate in society. Spitzer Rpt. ¶¶ 5, 6, 8; DeLay Rpt. ¶ 81.

**Plaintiffs' Response to No. 42:** Admitted that this generally describes the development of submachine guns, but dispute that they "circulate[d] in society even in the 1920s. The Thompson submachine gun, like machine guns generally, has *never* been in common use. When it appeared on the market in 1921, though "virtually anyone with the cash could buy one across the counter," "[s]ales trickled in." Dave Campbell, *A Look Back at the Thompson Submachine Gun*, NRA (Apr. 17, 2019), https://bit.ly/3ZlZL5y (Exhibit 42).

43. After 1930, commercial sales of the Tommy gun were discontinued except to the military and law enforcement due to concerns about criminal use of the firearm. Spitzer Rpt. ¶ 7.

**Plaintiffs' Response to No. 43:** Admitted that commercial sales of the Tommy gun were discontinued except to the military and law enforcement after 1930.

## History and Development of Assault Rifles and LCMs

44. Rapid-fire semiautomatic weapons that accept magazines capable of holding more than 10 rounds, such as the AR-15, are derived from technologies developed for military use. Roth Rpt. ¶¶ 58–59. Many of the assault weapons available for purchase by the public are near identical copies of military firearms, save for the lack of select fire capability. Yurgealitis Rpt. ¶ 112. The only difference between the Colt-produced military and civilian versions of the AR-

15 / M-16 was removal of select fire capability and relocation of assembly/ disassembly pins in the lower receiver as stated previously. Yurgealitis Rpt. ¶ 72.

**Plaintiffs' Response to No. 44**: Disputed. Many of the features of semiautomatic weapons, such as magazines that can accept more than 10 rounds, were commercially successful from their inception. *See* Kopel, *Fast Reloading of Guns in the 19th Century, supra* Resp. to Statement 13. Semiautomatic weapons were not developed with only the military in mind. The Mauser C96 pistol of 1896 and Luger of 1899, for example, achieved great *commercial* success. *Id.* That should come as no surprise: Far from treating technological advancements aimed at improving the accuracy, firing capacity, and functionality of firearms as nefarious developments that made firearms "too dangerous," history establishes time after time that those are precisely the kinds of things people have consistently looked for when determining how best to protect self, others, and home.

The semiautomatic Colt AR-15 was first marketed to the public the same year the first deliveries of the automatic M16 were made to the armed forces. In 1963, the predecessor agency of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) examined an "AR-15 Sports Version Rifle" and an "AR-15 automatic rifle" (later renamed the M16). It found that modifications to the automatic version that made it into the sports version "have changed the weapon in basic design to the extent that it is not a 'firearm' in the machine gun category" as defined in the National Firearms Act. Halbrook, *America's Rifle*, at 148 (citing Director, Alcohol & Tobacco Tax Division, Internal Revenue Service, to Colt's Patent Firearms Manufacturing Co., Dec. 10, 1963). The Sports Version was then introduced to the public as the AR-15 Sporter in 1964, the same year the first M16s were delivered to the air force. *Id.* (cleaned up).

While the AR-15 was originally developed for use in the military (and then redesigned for civilian use), its *only* exclusively military attribute was selective fire capability. The AR-15, the most popular rifle in the country, is a semi-automatic version of the M16, a military rifle with select-fire capability (meaning it can fire in semiautomatic mode like an AR-15, where one round is discharged each time the trigger is pulled, or in automatic mode, where one pull of the trigger discharges more than one bullet), *see* NSSF Fast Facts, *Background Information On So-Called "Assault Weapons,"* NSSF (May 2022) https://bit.ly/418TYRJ (Exhibit 43). The firearms are not "identical" in any meaningful sense. This is because the M16, as an automatic weapon, has a much higher rate of fire than an AR-15, *see Rifle Marksmanship: M16-/M4-Series Weapons*, Dep't of the Army, at tbl. 2-1 (Aug. 2008), https://bit.ly/3pvS3SW (Exhibit 44). Indeed, having thoroughly reviewed industry and military manuals, former Army officer and infantryman Dennis

Chapman concludes, "Semiautomatic rifles such as the AR-15 cannot even approximate—much less replicate—the effective rates of fire of machineguns or selective-fire weapons, and they cannot even remotely approach the extreme capabilities that some poorly informed commentators attribute to them." Chapman, *supra* at 34, Resp. to Statement 11. And "[n]o aspect of the semiautomatic AR-15's capabilities or features render it any more a military arm or "weapon of war"—or any "deadlier"—than any other semiautomatic rifle." *Id.* at 100. The Supreme Court has itself observed that, unlike machineguns, semiautomatic rifles like AR-15s "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 611–12 (1994). As the Court noted at the very outset of its opinion, the only categorical distinction between a machinegun and a semiautomatic firearm is that the former "fires repeatedly with a single pull of the trigger," while the latter "fires only one shot with each pull of the trigger." *Id.* at 602 n.1. This distinction is supported by the very history of firearms development: "At the end of the 19th Century and the beginning of the 20th, a new technology emerged that would set out a clear line of demarcation between firearms adapted solely to military applications and those useful in other shooting applications—technology that would, for the first time, set apart "weapons of war" from other firearms. That technology was automatic fire: the ability to fire more than one round, whether in a continuous stream or in a burst, with each pull of the trigger." Chapman, *supra* at 110–11. Thus, the automatic-semiautomatic distinction is central to the nature and function of a firearm—not a peripheral point to be shrugged off.

45. The first "assault rifle" or "assault weapon," which arose during World War II, was the German StG 44. The features of the German StG 44 were intended, in part, to increase the effectiveness of the individual soldier by enabling more rapid fire, increasing the amount of ammunition an individual combatant could carry, and allowing more rapid re-loading. Yurgealitis Rpt. ¶¶ 40–44. These features were also utilized in the German MP40, and by the United States's M3 "Greasegun" in in World War II. Yurgealitis Rpt. ¶¶ 64–65. Many of these features were also utilized in the design and manufacture of mid-20th Century submachine guns. Yurgealitis Rpt. ¶ 64.

**Plaintiffs' Response to No. 45:** Disputed. This is misleading to the extent it suggests "assault weapons" and "assault rifles" are the same things. The term "assault rifle" is a military term used to describe a selective-fire rifle, such as the AK-47, that fires both fully automatically and semiautomatically. *Sturmgewehr*, the German equivalent of the term assault rifle, was first used in Nazi Germany. Peter R. Senich, *The German Assault Rifle 1935-1945* 79 (1987), https://bit.ly/3tdqo14. Describing the AK-47, the U.S. Defense Intelligence Agency provides this definition: "Assault

rifles are short, compact, selective fire weapons that fire a cartridge intermediate in power between submachinegun and rifle cartridges. Assault rifles…are capable of delivering effective full automatic fire….” Harold E. Johnson, *Small Arms Identification & Operation Guide – Eurasian Communist Countries* 105 (1980), https://bit.ly/3taKWXV. “In other words, assault rifles are battlefield rifles which can fire automatically.” *See* Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition, supra* at 392–3 (quotation marks omitted). As defined by the State, “assault weapons” are not capable of automatic fire. Indeed, as the ATF has said, “it is somewhat of a misnomer to refer to these weapons [semiautomatic rifles] as “assault rifles,” because true assault rifles are selective fire weapons that will fire in a fully automatic mode.” Bureau of Alcohol, Tobacco, and Firearms, *"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles"* at 5 (Jul. 6, 1989) (Exhibit 45).

46. In 1947, after the end of World War II, the USSR developed what one firearm expert and historian termed “the quintessential assault rifle – the Kalashnikov designed AK-47.” The AK-47 adopted several features from the German StG 44. Yurgealitis Rpt. ¶¶ 50–51.

**Plaintiffs' Response to No. 46:** Admitted, though as noted above, an “assault rifle” is not equivalent to the State's “assault weapon.” *See* Resp. to Statement 45.

47. Other countries followed suit and developed military rifles that incorporated these same features to some extent. Yurgealitis Rpt. ¶ 52. In the United States, for instance, Eugene Stoner developed a number of lightweight assault rifle designs that resulted in the AR-10 (.308 caliber) with features that are now commonplace in the standard assault rifle design: light weight, separate pistol grip and shoulder stock, foregrip/barrel shroud, detachable magazine, and numerous lash hider/muzzle brake variations. Yurgealitis Rpt. ¶ 55.

**Plaintiffs' Response to No. 47:** Admitted, although the State failed to mention the defining feature of the AR-10 as an assault rifle—the ability to fire in fully automatic mode. *See* Resp. to Statement 45.

48. In 1961, the United States Department of Defense purchased a quantity of AR-15 rifles, which followed the original AR-10. The Department tested those AR-15 rifles in Vietnam and issued a report summarizing their field evaluation. Comments in that report describe “catastrophic injuries” to combatants shot by AR-15 rifles, including “severing of limbs and decapitation.” Yurgealitis Rpt ¶ 56.

**Plaintiffs' Response to No. 48:** Disputed. "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Christopher S. Koper, *Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms*, 19 Crim'y & Pub. Pol'y 147, 149 (2020) (Exhibit 46). Indeed, according to a renowned forensic pathologist, former medical examiner, and former member of the Justice Department's National Commission on Forensic Science, "[o]ne of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to ordinary centerfire rifles. In fact, the wounds are less severe than those produced by virtually all hunting rifles even the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895)." Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* (2d ed. 1999) (Exhibit 47). The outlandish claims of the devastating effectiveness of the AR-15 in Vietnam were investigated by the Army's Wound Ballistics Laboratory, but "[n]o matter what they did . . . they were unable to reproduce the effects that the participants [in the Vietnam tests] claimed to have seen." Kopel, *How powerful are AR rifles?*, Reason (Feb. 27, 2023)*,* https://bit.ly/3t4Vh7g (internal quotations omitted) (Exhibit 48).

Furthermore, the bullets typically fired by an AR-style rifle are far smaller than those used since before the Founding: "Muskets, which were being transitioned from matchlocks to flintlocks, were typically .75 caliber. That was a powerful, deadly weapon that could create a three-quarters-of-an-inch wound. By comparison, today's AR-15 rifle typically fires a .223 caliber bullet, which is less than a quarter of an inch in diameter. In other words, the seventeenth-century musket fired a bullet three times larger in diameter than the bullet usually fired by the AR-15." Halbrook, *America's Rifle*, at 77. Indeed, over the decades of its use by the military, the far more common complaint has been that AR-15 ammunition is underpowered for military purposes. *See* Anthony F. Milavic, *It's the Cartridge, Stupid—Not the Rifle* (Aug. 2002), https://bit.ly/4agrZDP (Exhibit 49).

The ammunition for the AR-15 existed first in a civilian form and then developed into the military round. Specifically, "the .222 Remington round evolved into what became known as .223 Remington, later standardized by NATO as 5.56x45 mm." *The AR-10 Story*, NRA-ILA (Oct. 2, 2018), https://bit.ly/46UIaUG (Exhibit 50). The .222 and .223 caliber rounds are suitable for some small and medium game, such as varmints and wild boar, but not moose or other large game, which require more powerful rounds like the .308. The 5.56 mm is used by the military and by competitors in shooting matches. *See* Halbrook, *America's Rifle*, at 148.

49. In the 1950's and 1960's, assault rifles proliferated and civilian version of these weapons were developed. These civilian versions, including the Colt AR-15, retained the performance capacities of the military weapons off which they were based, including the effective range, muzzle velocity, and semiautomatic range of fire. Their "basic configuration, appearance, construction and operation" remained "unchanged." Yurgealitis Rpt. ¶¶ 71-73.

**Plaintiffs' Response to No. 49:** Disputed. Unlike the military M-16, the civilian AR-15 does not include "both semiautomatic (i.e., autoloading) and fully automatic fire-control options" and so lacks the physical components, like fire selectors, of the military M-16. *See M16 rifle*, Encyclopedia Britannica (last updated Nov. 16, 2023), https://bit.ly/40tupc7 (Exhibit 51). Contrary to the State's characterization, the automatic-semiautomatic distinction is central to the nature and function of the firearm. *See* Resp. to Statement 44.

50. These civilian versions also retained the capability to accommodate large-capacity magazines of more than ten rounds. Yurgealitis Rpt. ¶ 73.

**Plaintiffs' Response to No. 50:** Admitted.

51. Over time, these weapons have remained largely consistent. For instance, there are multiple internal parts that are completely interchangeable between military weapons that Colt manufactured in the 1960's and an AR-15 today. Yurgealitis Rpt. ¶ 74. The same goes for internal AK operating parts and assemblies. Yurgealitis Rpt. ¶ 81.

**Plaintiffs' Response to No. 51:** Admitted. There are also internal operating parts, such as the M16 automatic sear, that are not interchangeable with the semiautomatic AR-15. Only M16 frames or receivers are drilled and milled to accept such parts.

52. The term "assault weapon" entered common use in the firearms community as early as 1986, as the below "Gun Digest Book of Assault Weapons," published that year, demonstrates:



Yurgealitis Rpt. ¶ 85.

**Plaintiffs' Response to No. 52:** Plaintiffs object that the marketing of firearms is irrelevant to any part of the analysis under *Bruen*, and this fact is not in any way "material" to this case. Subject to that objection, Plaintiffs dispute this paragraph. While "assault rifle" has a technical meaning (different from the meaning used here), "assault weapon" does not. *See* Resp. to Statement 45. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of an undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (quoting Kobayashi & Olson, et al., *In Re 101 California Street: A Legal and Economic Analysis of Strict Liability For The Manufacture And Sale Of "Assault Weapons*, 8 Stan. L. & Pol'y Rev. 41, 43 (1997)).

The phrase was manufactured in the 1980s by gun control advocates: "In 1984, a group called Handgun Control, Inc. first used the term 'assault weapon' in reference to a rifle in a newspaper advertisement. A few years later, in 1988, the term rose in prominence after Josh Sugarmann, a gun control advocacy group's communications director, stated in a Violence Policy Center paper: "The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons - anything that looks like a machine gun is assumed to be a machine gun - can only increase the chance of public support for restrictions on these weapons." *The Truth About So-Called "Assault Weapons,"* NRA-ILA (last visited Dec. 6, 2023), https://bitly.ws/34GQv (Exhibit 52) (cleaned up).

53. The terms "assault weapon" and "assault rifle" originated in the firearms industry marketing in the 1980s. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public. Spitzer Rpt. ¶¶ 50–51.

**Plaintiffs' Response to No. 53:** Disputed. *See* Resp. to Statement 52.

54. The firearms industry has also promoted the similarities between semi-automatic versions of their full/select battle rifles for marketing purposes, as well as conversion capabilities with features like grenade launchers, as the below advertisement demonstrates:





Yurgealitis Rpt. ¶ 88.

**Plaintiffs' Response to No. 54:** Plaintiffs object that the marketing of the semiautomatic AR-15 is irrelevant. Subject to that objection, these advertisements speak for themselves. To the extent the Statement is broader than these advertisements or seeks to make a more general claim about comparisons between semiautomatic and automatic rifles, Plaintiffs dispute this paragraph. *See* Resp. to Statement 52.

55. In 1990, following the passage of Federal and numerous State local Assault Weapon Bans, the firearm industry began to use the moniker "Modern Sporting Rifle" to describe semi-automatic variants of the fully automatic/select fire M-16. Yurgealitis Rpt. ¶ 90.

**Plaintiffs' Response to No. 55:** Disputed. 1990 predates the federal ban and almost all state bans on so-called "assault weapons." As Yurgealitis notes in his report, the phrase was coined by the National Shooting Sports Foundation: however, this

27

occurred in 2010, 16 years after the enactment of the federal ban and six years after its expiration, hardly an immediate response to the ban. *Modern Sporting Rifle Owners Are Most Active Shooters, Says NSSF/Responsive Management Survey*, Nat'l Shooting Sports Found., Inc. (Apr. 19, 2010) https://bitly.ws/34GUW (Exhibit 53).

56. The lineage and refinement of large capacity detachable magazines and belt feeding mechanisms can be traced directly to a military heritage. Development and refinement of large capacity feeding devices for machine guns gained increased importance with the advent of World War I. Yurgealitis Rpt. ¶ 91.

**Plaintiffs' Response to No. 56:** Disputed. So-called "large capacity" magazines have origins long before World War I, as the State's expert recognizes. *See* Yurgealitis Rpt. ¶ 91. Furthermore, the importance of belt-feeding mechanisms or detachable magazines for machine guns is irrelevant to this case, which involves a ban on semiautomatic, not automatic, firearms.

57. The ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat, which is a feature of design intended for military use. Yurgealitis Rpt. ¶ 110.

**Plaintiffs' Response to No. 57:** Disputed. The only truly "military" feature of a firearm is automatic fire. *See* Resp. Statement to 44. So-called large capacity magazines permit individuals to have a firearm equipped with sufficient ammunition to effectively defend themselves in many situations without reloading, which can be a fatal pause in self-defense situations. Indeed, the "pause" that Yurgealitis refers to here might be more aptly called a "lethal pause," since, from the perspective of a shooter, who has planned his attack, a pause (if any) is likely to be too short to matter. *See* Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 J. Res. & Pol'y 28, 41 (2016) (Exhibit 54) ("[I]n cases where the shooter has more than one loaded gun, he can continue firing, without significant pause, even without LCMs, simply by switching to a loaded gun. Alternatively, if he has multiple small magazines rather than LCMs, the shooter can continue firing many rounds with only a 2- to 4-s pause between shots for switching magazines."). For a victim, who is unlikely to be carrying a spare magazine on their person, who may also be trying to call for help or hide, and who is scared, the pause is likely to be much longer (and may in fact merely be a cessation of the ability to defend herself).

58. After World War I, a number of advancements in arms technology and design facilitated practical semi-automatic rifles for standard issue. In World War II, U.S. Forces where issued a rifle with eight-round internal magazine (the Springfield Armory M-1 "Garand" rifle). The United States also deployed a .30 caliber M-1 with a fifteen-round detachable box magazine that was issued to support personnel behind the front lines. Yurgealitis Rpt. ¶ 95.

**Plaintiffs' Response to No. 58:** Admitted. These M1 carbines have been widely owned by U.S. civilians for decades. In the early 1960s, the federal government's Director of Civilian Marksmanship sold about 300,000 M1 Carbines to ordinary citizens for $15.00 each plus a $2.50 shipping fee. Craig Riesch, *U.S. M1 Carbines, Wartime Production* 8–9 (8th ed. 2019) (Exhibit 55). Commercial outlets also sold surplus M1 Carbines to the public. *Id.* at 9. As recently as 2016, the Civilian Marksmanship Program has offered surplus M1 Carbines for sale to the public. *CMP gets M1 Carbines (that you can order, right now)*, TFB (Feb. 1, 2016), https://bit.ly/46Ste9 (Exhibit 56). About forty companies have produced new commercially manufactured M1 Carbines for the civilian market since 1960, most of them in the M1 Carbine .30 caliber cartridge. *Post WWII Commercially Manufactured M1 Carbines*, M1 Carbines Incorporated, https://bit.ly/3v0dSSY (Exhibit 57) .

59. When the AR-15 (later the M-16) was issued to U.S. Forces in the 1960's, it was issued with twenty-round detachable magazines. Yurgealitis Rpt. ¶ 96.

**Plaintiffs' Response to No. 59:** Admitted.

60. When the first semi-automatic variant became available for sale to the public in 1964, it only came with two five-round magazines. Yurgealitis Rpt. ¶ 97. This remained the case as late as 1987. Yurgealitis Rpt. ¶ 99.

**Plaintiffs' Response to No. 60:** Disputed. The State's expert cites for this proposition just two catalog listings. While it may have been available with two five-round magazines, it was also sold with larger magazines as standard. "The AR-15 was brought to the market in 1963, with a then-standard magazine of twenty; the thirty-round standard magazine was developed a few years later." Kopel*, The History of Firearm Magazines and Magazine Prohibitions, supra* at 859–60, Resp. to Statement 16.

Indeed, as the State's expert admits, the magazines he references were in fact 20-round magazines with a "five round limitation spacer" that "could be installed or removed at will." Yurgealitis Rpt. ¶ 98.

61. Even as development of semi-automatic pistols continued after World War II, magazine capacities generally remained under ten rounds. Yurgealitis Rpt. ¶ 100.

**Plaintiffs' Response to No. 61:** Disputed. "Citizen firearms with detachable magazines holding more than ten rounds were not limited to rifles." Kopel, *The History of Firearm Magazines, supra* Resp. to Statement 16, at 861. In his article, Kopel collects examples of handguns holding more than ten rounds going back to 1935. *Id.* One of the most popular was the Browning High Power pistol with a thirteen-round magazine. Michael, *Browning Hi-Power*, Lynx Defense (last updated Oct. 28, 2023). https://bit.ly/3TmBw6m(Exhibit 58).

62. By the late 1980's, numerous domestic and foreign manufacturers began developing and offering numerous semi-automatic models with magazine capacities equaling or exceeding fifteen rounds. Yurgealitis Rpt. ¶ 101–02.

**Plaintiffs' Response to No. 62:** Admitted that there were numerous semi-automatic handguns available with magazine capacities at or exceeding 15 rounds. Plaintiffs dispute the implication that such firearms only began to appear in the 1980s. In pistols alone, for instance, the Beretta model 92, which had a sixteen-round magazine, was "[a] tremendous commercial success" when it entered the market in 1976. Kopel, *The History of Firearm Magazines, supra* at 861, Resp. to Statement 16.

63. In 1994 Congress adopted the Federal Assault Weapons Ban, which limited the maximum capacity of a detachable magazine to ten rounds. Numerous firearm and aftermarket magazine manufacturers, in turn, initiated production of "post ban" magazines to confirm to the new legislation. Magazines with a capacity of over ten rounds were termed "Large Capacity Magazines." Yurgealitis Rpt. ¶ 103.

**Plaintiffs' Response to No. 63:** Admitted, except that the law did not limit capacity of magazines lawfully possessed on the date of enactment, and also except as to the claim regarding the origin of the term "large capacity magazines." By law, such magazines were called "large capacity ammunition feeding devices." 18 U.S.C. 921(a)(31) (expired). In fact, magazines capable of holding more than ten rounds are the standard for many semiautomatic firearms today as they were before the Federal Assault Weapons Ban. *See* Resps. to Statements 60–62.

64. "Post ban" magazines were modified versions of existing large-capacity magazines to keep their dimensions identical and ensure that ten-round magazines functioned identically to "large capacity magazines." Yurgealitis Rpt. ¶ 103.

**Plaintiffs' Response to No. 64:** Disputed. Ten-round magazines do not function identically to larger magazines. *See* Resp. to Statement 9.

65. Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation that also contained magazine-capacity limitations. In turn, many semi-automatic handgun manufacturers and rifles continued to offer "state compliant" versions to customers in affected states. Yurgealitis Rpt. ¶ 105.

**Plaintiffs' Response to No. 65:** Admitted that a small minority of states and localities enacted legislation limiting the size of ammunition magazines following the expiration of the Federal Assault Weapons ban.

66. Many aftermarket manufacturers, including Mec-Gar and ProMag, offer ten-round magazines specifically for use in handguns that come with large-capacity magazines. Yurgealitis Rpt. ¶ 109.

**Plaintiffs' Response to No. 66:** Admitted as to some handguns, but not as to all.

<u>**Assault Weapons and LCMs' Lethality**</u>

67. Assault firearms are not designed for traditional hunting purposes. Rather, the .223 caliber / 5.56 mm bullets fired from AR type rifles and pistols cause considerable tissue damage to their targets and are therefore counterintuitive choices for hunting. Yurgealitis Rpt. ¶ 153.

**Plaintiffs' Response to No. 67:** Disputed. The 5.56mm/.223 caliber round is a "varmint" round used for small game hunting and target shooting (as well as self-defense) but generally not favored—and even prohibited by some state game departments—for larger animal hunting because it is *insufficiently* damaging upon impact. Indeed, "the M4 rifle, which is equivalent to a .223 caliber rifle [like the AR-15] … is relatively light in both force and velocity compared to many other shoulder-fired weapons used for hunting and recreation." Joseph W. Galvin et al., *Rate and time to return to shooting following arthroscopic and open shoulder surgery*, 6 JSES Int'l 963, 968 (2022) (Exhibit 59). So much so, in fact, that "[w]hen compared to many hunting rifles, the M4 often produces 3 to 4 times less recoil energy and typically about half of the recoil velocity." *Id*.

Additionally, the .223 caliber round was not a wholly new military round when it was created. It is based on a pre-existing rifle round (another "varmint" round) of similar size—the .222 Remington. *See* Richard A. Mann, *The .223 Family Tree,* Gun Digest (June 3, 2022)*,* https://bit.ly/43HXvYp (Exhibit 60). *See* Milavic, *supra* Resp. to Statement 48.

68. Assault firearms banned under New Jersey law were designed for military use, effective at battlefield ranges of up to 500 yards, and the design purpose of the .223 caliber bullet used in the AR-16 / M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet. Yurgealitis Rpt. ¶ 137.

**Plaintiffs' Response to No. 68:** Disputed. *See* Resps. to Statements 11, 44, 48. Being effective at a range of 500 yards is certainly not unprecedented: at the time of the Founding, examples abounded of marksmen who could hit a target at up to 900 yards. In Boston, one rifleman, "seeing some British on a scow at a distance of fully half a mile, found a good resting place on a hill and bombarded them until he potted the lot." Charles Winthrop Sawyer, *Firearms In American History* 81(1910) (Exhibit 61). The Pennsylvania Gazette reported on August 21, 1775, that "some rifleman … killed three men on board a ship at Charlestown ferry, at the distance of full half a mile." John G.W. Dillin, *The Kentucky Rifle* 85 (1992), https://bit.ly/3uS7Vrt. When an English soldier on the New Jersey side of the Delaware River "mocked" Jacobus Scout, who was on the Pennsylvania side, the Pennsylvanian "shot [the] English soldier at 900 yards and killed him." *History Of Bucks County, Pennsylvania* 220 (1887) (Exhibit 62); *Tales from the 1769 Vansant/Craven Burying Ground*, 19 The Craven Hall Newsletter (Craven Hall Historical Society, Warminster, Pa.), Mar. 2021, at 7 (Exhibit 63).

69. The AR-15 has approximately the same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute. Delay Rpt. ¶ 58.

**Plaintiffs' Response to No. 69:** Admitted.

70. More than 45,000 individuals die each year from gun-related injuries in the United States. Rpt. of Dr. Stephen Hargarten ¶ 11. Those who survive suffer from serious complications, lifelong disabilities, and psychological trauma. Hargarten Rpt. ¶¶ 11, 36.

**Plaintiffs' Response to No. 70:** Disputed. Not everyone who survives a gun-related injury suffers from one of these long-term effects. Studies of firearm injury survivors

show that after six months over half reported they no longer have a functional limitation in daily living. *See* Juan Paublo Herrera-Escobar et al., *Patient-reported Outcomes at 6 to 12 Months Among Survivors of Firearm Injury in the United States*, 274 Annals of Surgery (2021), https://bit.ly/4a3zb6b (Exhibit 64). Additionally, the number of individuals killed by rifles in 2018 was 364, which constituted approximately 3.5% of the homicides committed with a firearm. *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. Dep't of Just. (2019), https://bit.ly/3NrqV6n (Exhibit 65).

71. The AR-15 was designed to chamber and fire a 5.56 x 45 mm cartridge. Yurgealitis Rpt. ¶ 55. This cartridge has a muzzle velocity of approximately 3200 feet per second, which is almost three times greater than the muzzle velocity of a 9mm pistol. *Id.* ¶ 58. This velocity is sufficient to penetrate the soft body armor (Level II or Level IIIA) that most officers are issued. *Id.* Yurgealitis Rpt. ¶ 6.

**Plaintiffs' Response to No. 71:** Admitted that the specifications of the AR-15 listed here are accurate, but Plaintiffs dispute that comparison to a 9mm handgun is material or even relevant. Other centerfire rifles not targeted by "assault weapon" bans are equal to or more powerful than the AR-15 in these respects. *See* Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, Reason (Oct. 31, 2018), https://bit.ly/46IZbB7 (Exhibit 66). Further, "virtually *all* rifle ammunition will pierce soft body armor, which is why federal law defines 'armor piercing ammunition' as a projectile for use in *a handgun* with certain metallic properties." *See* Halbrook, *supra* at 326, Resp. to Statement 48 (quoting 18 U.S.C. § 921(a)(17)(B)) (emphasis in original).

An "AR-15 rifle is no better at piercing soft body armor than any other rifle of the same caliber." *Id*. Indeed, "the M4 rifle, which is equivalent to a .223 caliber rifle [like the AR-15] … is relatively light in both force and velocity compared to many other shoulder-fired weapons used for hunting and recreation." Galvin, *Rate and time to return to shooting following arthroscopic and open shoulder surgery*, *supra* at 968. So much so, in fact, that "[w]hen compared to many hunting rifles, the M4 often produces 3 to 4 times less recoil energy and typically about half of the recoil velocity." *Id*.

72. Once a 5.56mm bullet connects with tissue, it will "yaw"—rotate on its axis—creating temporary and permanent large wound cavities. Handgun bullets, by contrast, because they are heavier and travel at a lower velocity, do not typically "yaw" and do not create as large a wound cavity. Yurgealitis Rpt. ¶ 58. In part because of the significant damage that 5.56mm bullets create upon impact with

living tissue, they are generally not favored as a hunting cartridge. Yurgealitis Rpt. ¶ 62.

**Plaintiffs' Response to No. 72:** Disputed. Not all ammunition "yaws," and while yawing is a feature of some, primarily military, 5.56mm full-metal jacket rounds, the more common .223 caliber rounds used by civilians typically do not yaw (though the bullets, in many other ways, perform similarly). *See* Kopel, *How powerful are AR rifles?*, *supra* Resp. to Statement 48. There is no categorical difference between the yawing of a bullet fired from an "assault weapon" and one fired from any other semiautomatic firearm. "The yaw of a bullet is defined as the deviation of the long axis of the bullet from its line of flight. When a bullet is fired down a rifled barrel, the rifling imparts a gyroscopic spin to the bullet. The purpose of the spin is to stabilize the bullet's flight through the air. Thus, as the bullet leaves the barrel, it is spinning on its long axis, which in turn corresponds to the line of flight. As soon as the bullet leaves the barrel, however, it begins to wobble or yaw. The amount or degree of yaw of a bullet depends on the physical characteristics of the bullet (its length, diameter, cross-sectional density), the rate of twist of the barrel, and the density of the air." *See* DiMaio, *supra* Resp. to Statement 48.

73. A bullet damages a body by transferring kinetic energy to the target. Increases in the mass, velocity, and surface area of a bullet each increase the energy delivered to a target. Hargarten Rpt. ¶ 12.

**Plaintiffs' Response to No. 73:** Disputed. There are many other factors which determine the damage of a firearm in particular circumstances: "How bullets injure and kill has less to do with velocity and kinetic energy than with the location of impact, the bullet's physical characteristics (mass, shape, and construction), and the type of tissues disrupted along the bullet's path." *See* Wallace, *"Lethality", supra* at 45 Resp. to Statement 11 (summarizing research from Martin L. Fackler, *Civilian Gunshot Wounds and Ballistics: Dispelling the Myths*, 16 Emergency Med. Clinics 17, 19 (1998) and Martin L. Fackler, *Gunshot Wound Review*, 28 Annals Emergency Med. 194, 202 (1996).

74. A study by Hargarten 2022 showed that assault weapons can release more kinetic energy per minute than other kinds of firearms. Hargarten Rpt. ¶ 13. For instance, assault weapons release approximately three times more energy than a Thompson Machine Gun bullet, between four to nineteen times more energy than handguns, depending on the caliber, and ten times more energy than a musket. And the energy release can increase if the bullet fragments upon impact. Hargarten Rpt. ¶ 25; *see also id*. at Ex. B.

34

**Plaintiffs' Response to No. 74:** Disputed. *See* Resps. to Statements 44, 67. The comparison to a Tommy gun, handgun, or musket is neither material nor relevant. Other centerfire rifles not targeted by "assault weapon" bans are equal to or more powerful than the AR-15 in these respects. *See* Sullum, *supra* Resp. to Statement 71. Comparing the AR-15 to these firearms with respect to "energy release" to paint the picture of the AR-15 as releasing a uniquely high amount of kinetic energy is like comparing the acceleration of a Corvette to a Honda Civic and finding that the Corvette is *uniquely* fast. It is faster than a Civic, but the proper comparison is against other sports cars. *See, e.g.* Edmunds Cars, *U Drag Race: Corvette Z06 vs. McLaren*, YouTube (Feb. 16, 2023), https://bit.ly/41f7OSN.

75. In the Hargarten 2022 study, the size of the temporary cavity that assault-weapon bullets cause was significantly larger than what the Thompson Machine gun, handguns, and muskets cause. Hargarten Rpt. ¶¶ 13, 26; *see also id*. at Ex. B. The AR-15 style bullet, with its kinetic energy release and its greater permanent and temporary cavities is more destructive than those fired by the Thompson Machine gun rifle and handguns. Hargarten Rpt. ¶ 28.

**Plaintiffs' Response to No. 75:** Disputed. As explained, the proper comparisons for so-called assault-weapon bullets are the bullets of other semiautomatic rifles, not Tommy guns (which shoot pistol caliber cartridges), handguns, and muskets. *See* Resps. to Statements 44, 74. On that score, "the AR-15's smaller .223/5.56 bullets strike with only one-fourth to one-half of the energy of most other centerfire rifle bullets despite having higher velocities." *See* Wallace, *"Lethality"*, *supra* at 53, Resp. to Statement 11. The most lethal feature of bullets fired from a machine gun is not their individual ballistic qualities but the fact that they are fired from a gun capable of automatic fire. Simply describing individual wounds and comparing them for lethality creates a false impression of how the firearms that shot them compare.

76. Assault weapons can cause extreme damage to the tissue and organs of shooting victims, leading to high fatality and complication rates in victims. Hargarten Rpt. ¶¶ 13, 32.

**Plaintiffs' Response to No. 76:** Disputed. *See* Resp. to Statement 73. *All* firearms can cause extreme damage to tissue and organs of shooting victims. The amount of harm inflicted by a firearm of any type is primarily dependent upon *where* an individual is injured by a bullet or bullets, not what sort of firearm fired the bullet. According to Navy combat surgeon and president of the International Wound Ballistics Association, Colonel Martin L. Fackler, "widespread misinformation persists" regarding the wounding power of rifles like the AR-15, and "[t]he damage caused by the military rifle bullet [5.56mm] cannot be differentiated from that

35

caused by a handgun bullet even by the most expert." Martin L. Fackler, 28 *Gunshot Wound Review*, Annals of Emergency Med. 194, 202 (Aug. 1996) (Exhibit 67). And this 5.56 mm cartridge is the very one the AR-15 is designed to accept—in fact, as a key feature: "Notwithstanding its distinctive appearance and unique aluminum, fiberglass, and plastic construction, the AR-15's most groundbreaking feature was, arguably, its ammunition–the intermediate .223 Remington and 5.56mm NATO rounds." Dennis P. Chapman, *Firearms Chimera: The Counter Productive Campaign to Ban the AR-15 Rifle*, 8 Belmont L. Rev. 191, 203 (2020) (Exhibit 68). This smaller and lighter ammunition made it possible for soldiers to carry more ammunition than they could before.

77. Assault weapons are also more likely to cause significant damage to bones, the skeletal structure, and critical solid organs like the liver and spleen. Damage to these organs, in turn, increases the risk of catastrophic bleeding. Hargarten Rpt. ¶ 32.

**Plaintiffs' Response to No. 77:** Disputed. *See* Resps. to Statements 74–76.

78. Assault weapons cause added damage when there are multiple bullet wounds. In this case, a victim's wounds are more complex, carry a higher likelihood of injury requiring surgical intervention, and increase the likelihood of death at the scene or upon arrival at an emergency department. Hargarten Rpt. ¶ 34.

**Plaintiffs' Response to No. 78:** Disputed. *See* Resps. to Statements 74–76.

79. Large capacity magazines increase this destructive potential by increasing the number of rounds someone can fire without having to reload, thereby increasing the number of bullets that can be fired during a given time period. Hargarten Rpt. ¶ 30.

**Plaintiffs' Response to No. 79:** Disputed. As discussed above the limited "pause" caused by a shooter reloading is more likely to be a "lethal pause" for a victim trying to defend herself with a small magazine. *See* Resp. to Statement 57. Indeed, the need to reload more often will almost always operate asymmetrically against someone trying to defend themselves, who will be forced to use only what they were carrying for the purpose, as opposed to their attacker, who chose the time and place of the attack and could come prepared with many magazines.

80. Assault weapons are even more likely to cause serious injury or death for children due to children's smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves. Hargarten Rpt. ¶ 36.

**Plaintiffs' Response to No. 80:** Disputed. *See* Resps. to Statements 74–76.

81. In the Sandy Hook Elementary School shooting, not one child wounded by an assault-weapon bullet ultimately survived. Hargarten Rpt. ¶ 36.

**Plaintiffs' Response to No. 81:** Disputed, as there is no such bullet as an "assault weapon" bullet.

**History of Firearms Regulations**

82. Weapons regulations in the United States have historically followed the same series of steps: First, a new gun or gun technology is invented. Second, it may then be patented. Third, it is often developed with a focus on military applications and needs, not directly for civilian acquisition or use. Fourth, some military-designed weapons may spread to, or be adapted to, civilian markets and use. Finally, if such weapons circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, the government may implement gun policy/law changes. Spitzer Rpt. ¶¶ 27, 47.

**Plaintiffs' Response to No. 82:** Disputed. This statement, like many of the others in this section, relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 597 U.S. at 2130 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis.

As a legal claim, this assertion is foreclosed by the Supreme Court's decisions in *Heller* and *Bruen*, which both make clear that firearms that "circulate sufficiently in society," *i.e.*, those that are "in common use at the time," are *protected* and cannot be banned consistent with the Second Amendment. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. 1 at 2128.

83. The general progression of firearms regulation follow a general pattern. New gun regulations are not enacted at the time that firearm technologies are invented or conceived. Rather, they are enacted when those technologies circulate sufficiently in society to present a public safety concern. Spitzer Rpt. ¶ 27.

**Plaintiffs' Response to No. 83:** Disputed. *See* Resp. to Statement 82.

84. There were few restrictions on firearms from the colonial period to the start of the Revolution because homicide rates were low. When homicides did occur, guns were seldom used, largely due to the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. Spitzer Rpt. ¶ 78; Roth Rpt. ¶¶ 16–17.

**Plaintiffs' Response to No. 84:** Admitted that there were few restrictions on firearms from the colonial period to the start of the Revolution. Plaintiffs dispute that homicides, with or without firearms, were rare in the colonial period. As the State's own expert explained in his book on this topic, "[t]hrough 1675, 38 percent of homicides among unrelated colonists in New England and New Netherlands were committed with guns; the figure was probably 40 percent in Maryland." Randolph Roth, *American Homicide* at 56 (2012) (Exhibit 69). Homicides greatly increased in "the revolutionary crisis of the 1760s and 1770s," and "[t]he extremely high homicide rates persisted until the end of the War of 1812 ...." *Id*. at 61, 147; *See also* Resp. to Statement 82.

85. In the 1800s, states and cities enacted regulations on every aspect of the manufacture, sale, and storage of gunpowder due to the substance's dangerous potential to detonate if exposed to fire or heat. Cornell Rpt. at 30. Indeed, early American governments recognized the danger posed by gunpowder and multiple states passed laws delegating authority to local governments to regulate the sale of gunpowder for public safety. Cornell Rpt. at 31.

**Plaintiffs' Response to No. 85:** Admitted that gunpowder, in particular the storage of gunpowder, was regulated in the 1800s. Plaintiffs dispute that this characterization of those laws, which speak for themselves, is accurate. Furthermore, the regulation of gunpowder—which did not amount to a ban on possession of it— is not relevant to this case. *See also* Resp. to Statement 82.

86. Specific crime-related concerns that involved dangerous weapons led to legislative enactments in the late 1700s and early 1800s. Between 1780 and 1809, at least four states enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed, at least three states enacted laws to punish the discharge of firearms near populated areas, and at least four states criminalized public arms carrying. Spitzer Rpt. ¶ 59.

**Plaintiffs' Response to No. 86:** Admitted that laws increasing penalties for crimes committed by armed individuals existed at the Founding, as they do now. Plaintiffs dispute that the characterization of the laws cited here, which speak for themselves, is accurate. Particularly, Spitzer claims that four states "criminalized public arms

38

carrying." Spitzer Rpt. ¶ 59. The laws in question did no such thing. No state criminalized public arms carrying. One 1786 Virginia law forbade people to "go nor ride armed by night nor by day . . . in terror of the Country," a version of the famous Statute of Northampton which the Supreme Court held in *Bruen* did not prohibit carrying of weapons, unless the carrying was done in such a way as to seek to terrify the people or for other "wicked purpose[s]." *See Bruen*, 597 U.S. 1 at 2145 (quoting *State v. Huntly*, 25 N.C. 418, 422–23 (1843)). A 1792 North Carolina law and an 1801 Tennessee law were the same. *See* Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60–61 (Newbern 1792); Judge Edward Scott, *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820*, pg. 710, Image 714 (Vol. 1, 1821) (Exhibit 70); *The Making of Modern Law: Primary Sources, 1801, An Act for the Restraint of Idle and Disorderly Persons* § 6. Spitzer also cites a Maine law that forbade groups of 12 or more from assembling together "armed with clubs or other weapons," *An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof*, reprinted in Cumberland Gazette (Portland, MA.), Nov. 17, 1786, at 1; *See also* Resp. to Statement 82.

To make matters worse, the North Carolina law Spitzer referenced is not just inapposite, it is likely entirely fictional. Noted Second Amendment scholar Stephen Halbrook has explained that it is found only in "a 1792 book by a lawyer who thought he was compiling the English statutes in force in North Carolina. Later compilers wrote that the work 'was utterly unworthy' as 'omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force.'" *See* Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms*: *Young v. Hawaii (9th Cir. 2021)* (Exhibit 71) (quoting *Preface of the Commissioners of 1838*, Revised Code of North Carolina, xiii (1855)).

87. As early as 1771, New Jersey and other states banned or heavily regulated trap guns, which were often used to defend the user's property but posed a public safety problem because they sometimes killed or hurt innocent people. At least 18 states enacted anti-trap gun laws between the 1700s and early 1900s. Spitzer Rpt. ¶¶ 79–82 & Exs. B, F.

**Plaintiffs' Response to No. 87:** Admitted that laws regulating trap guns existed at the Founding. Plaintiffs dispute that this characterization of those laws, which speak for themselves, is accurate. Furthermore, these laws were not actually restrictions on *owning* any sort of firearm. Rather, they forbade, for example, misusing a firearm by "set[ting] [it] in such Manner as [the arm] shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance," and are therefore

irrelevant to this case. 1763–1775 N.J. Laws 346, ch. 539 § 10 (1771) (Exhibit 72); *See also* Resp. to Statement 82.

88. In the 18th and 19th Centuries, every state in the nation had laws restricting dangerous weapons such as clubs, knives, slungshots, bludgeons, sandbags, and pistols, which were widely used for criminal purposes. Spitzer Rpt. ¶¶ 70–74, 76-77 & Ex. C.

**Plaintiffs' Response to No. 88:** Disputed. These laws speak for themselves, and the State's expert's descriptions are far too general to satisfy the careful review which *Bruen* requires. More importantly, his descriptions are quite often simply wrong.

Take, for example, the laws "restricting" Bowie knives. Spitzer claims in his report that "15 states banned all carrying of Bowie knives (by banning both concealed and open carry)." Spitzer Rpt. ¶ 67. That is false. Of the fifteen states to which Spitzer pointed for support, *see* Spitzer Rpt. Ex. H, three merely banned *concealed* carry or open carry *with intent* to use the knife in a crime. 1859 Ind. Acts. 129 (Exhibit 73); George R. Donnan, *Ann. Code of Crim. P. & Penal Code of the State of N.Y. as Amended 1882-5*, at 172, § 410 (4th ed. 1885), two others applied only to certain discrete locations or on days of elections, 1870 La. Acts 159–60; Nashville, Tenn., Ordinances, Elections, §§ 2–3, *in* James H. Shankland, *Public Statutes of the State of Tennessee, since the Year 1858, Being in the Nature of a Supplement to the Code* 108 (1869), and six others did not apply statewide but were limited to certain localities (and even in those localities, some of these were still not broad bans on all forms of carry), Joplin Code of 1917, art. 67, § 1201 (Joplin, Missouri, also only applied to certain discrete places); Nashville, Tenn., Ordinances, pt. 3, tit. 12, ch. 108, §§ 1–6, *in* William King McAlister Jr., *Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City* 340–41 (1881) (Nashville) (Exhibit 74); Nashville, Tenn., Ordinance, § 738, *in* Claude Waller, *Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City* 364–65 (1893) (Nashville) (Exhibit 75); Otoe County, Neb., Ordinance No. 7, § 1, *in* Gilbert B. Colfield, *Laws, Ordinances, and Rules of Nebraska City, Otoe County* 36 (1872) (Nebraska City, also notably prohibited all carriage even of rifles, muskets, and pistols, plainly unconstitutional under *Bruen*); *Charter and Revised Ordinances of Boise City, Idaho* 119–20 (1894) (Boise, permitted carrying while traveling); *Revised Ordinances of Provo City, Containing All The Ordinances In Force* 105, 106–107 (1877) (Provo) (Exhibit 76). One cited law only applied to those who were engaged in the illegal transport of alcohol. 1923 Mo. Laws 24–142. Several others were mere "territorial restrictions," which *Bruen* discounted because they were frequently short lived, rarely tested in court, and irrelevant to most of the country at

the time they were in force, *Bruen*, 597 U.S. at 2154–55; *see* 1889 Ariz. Sess. Laws 16 (Exhibit 77); 1890 Okla. Laws 495 (Exhibit 78); 1913 Haw. Rev. Laws, ch. 209 (also contained exception for those "authorized by law"); and one Hawaiian law predates Hawaii even having territory status, 1852 Haw. Sess. Laws 19. In the end, far from the fifteen the State claims, there is evidence of just *three* states that actually prohibited all forms of carry of Bowie knives—Arkansas, Texas, and West Virginia.

The other laws Spitzer cites, he similarly misconstrues. He collects a set of general restrictions on a wide variety of "dangerous weapons," including bludgeons, billy clubs, "clubs" more generally, and slung shots. *See* Spitzer Ex. C. But these laws, like the Bowie knife restrictions, were nowhere near as restrictive as the State's ban on standard-capacity magazines and so-called "assault weapons." Few barred possession at all and many did not even entirely forbid carry, but rather regulated its *method*. *See, e.g.*, 1872 Md. Laws 57 (Exhibit 79) (billy club *concealed* carriage prohibited, but only in Annapolis); 1873 Ala. Offenses Against Public Justice § 4110 (prohibiting *concealed* carriage of brass knuckles and slung-shots). Again, the general way in which Spitzer discusses these laws does not comport with *Bruen*, and a close examination demonstrates that they are not "relevantly similar" to the State's bans. *Bruen*, 597 U.S. at 2132; *see also* Resp. to Statement 82.

89. In the 1800s, the government started to regulate the firearms industry to prevent sub-standard weapons from being sold, as well as from military weapons being diverted from the militia. Cornell Rpt. at 20.

**Plaintiffs' Response to No. 89:** Disputed. *See* Resps. to Statements 82, 84. The firearms industry began to be subsidized by the federal government as a result of the procurement problems created by the War of 1812. The government ultimately sought to enhance technological innovation and create more effective firearms. *See* Kopel, *The Founders were well aware of continuing advances in arms technology*, *supra*. The federal government did not otherwise regulate the firearms industry. With the exception of proving laws enacted by two states, the states did not regulate the firearms industry. See "An Act to Provide for the Proof of Fire arms Manufactured Within this Commonwealth,"1804 Mass. Acts. 111, ch. 81, § 1; An Act to provide for the Proof of Fire Arms, 2 Laws of the State of Maine 685 (1821), ch. 162.

90. Starting in the 1830s, most, if not all, states in the country enacted laws that barred or restricted the carrying or possession of Bowie knives, which were intended for combat and became associated with criminal use and dueling. Spitzer Rpt. ¶¶ 61, 67; *see also id.* Ex. H.

**Plaintiffs' Response to No. 90:** Disputed. *See* Resps. to Statements 82, 88.

91. Forty-three states enacted anti-slungshot laws in the 19th Century. Overall, 71 anti-slungshot laws were enacted in the 19th Century and 12 were enacted in the 20th Century. Spitzer Rpt. ¶¶ 74, 76; *see also id.* Ex. C.

**Plaintiffs' Response to No. 91:** Disputed. As noted above the laws speak for themselves and the broad characterization of these laws as "anti-slungshot" obscures, rather than reveals, whether they are possibly relevant to the analysis of the State's bans under *Bruen*. *See* Resp. to Statement 88. Furthermore, to the extent that Spitzer and the State purport to rely on 20th century laws, they can be disregarded entirely. *See Bruen*, 597 U.S. at 2154 n.28. In any event, as explained above, many of these laws are merely restrictions on the method of carrying, not on possession. *See, e.g.*, 1896 Ak. Sess. Laws 1270, c. 6 § 117 ("it shall be unlawful for any person to carry concealed about his person . . . [a] slung shot").

92. In the late 1800s and early 1900s several states effectively barred possession of certain weapons outright. Spitzer Rpt. ¶ 45. For example, an 1837 Georgia law made it a crime to sell, offer to sell, keep, or have Bowie knives. Spitzer Rpt. ¶ 67 & Ex. E; Roth Rpt. ¶ 31. And as early as 1850, Massachusetts banned the manufacture and sale of slung shots. Spitzer Rpt. Ex. E.

**Plaintiffs' Response to No. 92:** Disputed. The Georgia law the State relies upon here was declared unconstitutional under the Second Amendment in *Nunn v. State*, 1 Ga. 243 (1846), in an opinion that *Heller* said, "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause, in continuity with the English right," 554 U.S. at 612; *See* Kopel, *The legal history of bans on firearms and Bowie knives before 1900*, Reason (Nov. 20, 2022), https://bit.ly/3T5Uu17 (Exhibit 80). The 1860 law that Spitzer also collects, which replaced the 1837 act, applied only against sales to "any slave or free person of color." *See* 1860 Ga. Laws 56 § 1 (Exhibit 81). Such laws, which were "born of bigotry and arose at a time of pervasive hostility" to African Americans have a "shameful pedigree" and "hardly evince a tradition that should inform our understanding" of the Bill of Rights. *Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2259 (2020) (cleaned up).

The Massachusetts law referenced did ban manufacture and sale of slung shots, but an isolated law, dating so long after the founding, is similarly weak evidence of an historic tradition. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is*

*when the Second Amendment was Ratified in 1791, and not 1868*, Harv. J. of L. & Pub. Pol'y Per Curiam (Oct. 1, 2022), https://bit.ly/3CMSKjw (Exhibit 82).

93. States also targeted easily concealed pistols during America's gun violence crisis in the Jacksonian era for regulation, reflecting concerns that these firearms were dangerous or capable of provoking terror. Cornell Rpt. at 35.

**Plaintiffs' Response to No. 93:** Disputed. *See* Resp. to Statement 82. As with the other "factual" claims in this section, this is a legal claim, and it construes laws which speak for themselves and are not "relevantly similar" to the State's bans. More problematically, Cornell cites nothing to support this claim, and he is not a reliable source on the history of firearm regulation in this country. He has derided *Bruen* as "bonkers" for applying "Fiction, Fantasy, and Mythology" as an interpretive model. Saul Cornell, *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, SCOTUS Blog (June 27, 2022), https://bit.ly/3Jp4EDa (Exhibit 83).

94. In the post-Civil War period, the rise in the circulation of multi-shot handguns in society, such as the Colt revolver, contributed to escalating interpersonal violence and was accompanied by the rapid spread of concealed carry restrictions. By the end of the 19th century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying. Spitzer Rpt. ¶ 45; DeLay Rpt. ¶ 70.

**Plaintiffs' Response to No. 94:** Disputed. *See* Resps. to Statements 88, 93. Again, the laws that the State is characterizing here speak for themselves. While it is true that, "[i]n the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons," *Bruen*, 597 U.S. at 2146, such laws are not "relevantly similar" to the State's bans because, far from showing that handguns, even concealable handguns, could be banned, they "reveal[] a consensus that States could *not* ban public carry altogether," *id.*

95. During Reconstruction, Republican-dominated legislatures in the South enacted a range of racially-neutral gun regulations in response to violence directed against African Americans including by white supremacist groups. Cornell Rpt. at 39–40.

**Plaintiffs' Response to No. 95:** Disputed. *See* Resps. to Statements 84, 88. What matters under *Bruen* are specific examples of real regulations that are "relevantly similar" to the laws at issue in this lawsuit. Cornell's gloss on that history is not historical evidence this Court should consider. Furthermore, Cornell's support for

this historical claim is two law review articles specifically focused on the firearms laws of Texas. *See* Cornell Rpt. at 40 n.140. One of the articles, Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 Tex. A&M L. Rev. 95, 113–17 (2016) (Exhibit 84), at the cited portion, focuses on the Texas Supreme Court's decision in *English v. State*, 35 Tex. 473 (Tex. 1871), a case which the Supreme Court recognized in *Bruen* weighed against the Supreme Court's eventual holding and was an "outlier[]" that "provide[s] little insight into how postbellum courts viewed the right to carry." *Bruen*, 597 U.S. at 65.

96. The slow-load lever-action firearms of the 19th Century did not attract regulatory attention at that time and would not be banned under the challenged New Jersey laws today. DeLay Rpt. ¶¶ 73–74.

**Plaintiffs' Response to No. 96:** Admitted that New Jersey does not ban lever-action firearms. *See* Resp. to Statement 82.

97. Before the early 1920s, automatic weapons were unregulated because they did not exist or were not circulating widely in society. Spitzer Rpt. ¶ 8.

**Plaintiffs' Response to No. 97:** Admitted. *See* Resp. to Statement 82. Additionally, the history of firearm regulation in the 20th century is entirely irrelevant under *Bruen*. 597 U.S. at 66 n.28.

98. Criminals and terrorists began adopting machine guns and submachine guns starting in the 1920s. Roth Rpt. ¶¶ 53–54.

**Plaintiffs' Response to No. 98:** Admitted that such firearms were adopted by some high-profile criminals. *See* Resp. to Statement 82. Additionally, the history of firearm regulation in the 20th century is entirely irrelevant under *Bruen*. 597 U.S. at 66 n.28.

99. In the early 20th Century, legislatures responded to the risks that fully automatic and semiautomatic firearms posed to public safety by restricting their sale, possession, and manufacture. Roth Rpt. ¶ 56. Once they circulated appreciably in society and became associated with criminal activity, states began to restrict their sale, manufacturing, and possession. DeLay Rpt. ¶ 82; Spitzer Rpt. ¶¶ 6, 11–15, 45; Cornell Rpt. at 35–36. Some jurisdictions also prohibited large-capacity semi-automatic weapons. Spitzer Rpt. Ex. D.

**Plaintiffs' Response to No. 99:** Disputed. *See* Resp. to Statement 82. Laws from this period are irrelevant under *Bruen*. 597 U.S. at 66 n.28. In any event, what matters under *Bruen* are specific examples of real regulations that are "relevantly similar" to

the laws at issue in this lawsuit. The State's experts' gloss on this history is not the sort of evidence this Court can consider under *Bruen*. And, as before, the State's experts badly misconstrue this history. For instance, Spitzer purports to identify "ten states plus the District of Columbia" that restricted magazine capacity for "semi-automatic and fully automatic weapons" and four states that he claims restricted magazine capacity in "all firearms." Spitzer Rpt. ¶ 26 & tbl. 1. As to the latter groups, Spitzer clarifies that he means all firearms "that could receive any type of ammo feeding mechanism or round feeding device and fire them continuously in a fully automatic manner," or, in other words, not "all firearms" but only machine guns. *Id.* at ¶ 26; *see* 1927 Cal. Stat. 938 (Exhibit 85) (pertaining to "machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously"); *see also* 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170 (Exhibit 86); 1933 Wash. Sess. Laws 335 (Exhibit 87). Laws regulating machine guns are irrelevant to the State bans which regulate semiautomatic firearms.

That leaves the other eleven, and again, Spitzer's description of them is inaccurate. One cited law did not ban semiautomatics, it just required a permit, *see* 1933 Ohio Laws 189–90; two laws permitted ordinary possession but banned possession for an "offensive or aggressive purpose," 1933 S.D. Sess. Laws 245–47 (Exhibit 88); 1934 Va. Acts 137–39 (Exhibit 89); two laws only applied to machine guns capable of automatic fire, 1927 Mass. Acts 416 (Exhibit 90); 1933 Cal. Stat. 1169 (Exhibit 91); and two laws were limited to ammunition capacity of firearms used in hunting, 1920 N.J. Laws 67, ch. 31, § 9 (Exhibit 92); 1917 N.C. Sess. Laws 390, ch. 209, § 1 (Exhibit 93). Another law reached semiautomatics only if they were "changed, altered or modified" from their original design to increase their capacity. 1933 Minn. Laws ch. 190 (Exhibit 94). Only three jurisdictions banned semiautomatic firearms based on capacity, each of which set the limit above what the State has done here. *See* 1932, Public-No. 275-72D (District of Columbia) (12 rounds without reloading) (Exhibit 95); 1927 Mich. Pub. Acts 888–89 (16 rounds) (Exhibit 96); 1927 R.I. Pub Laws 256 (12 rounds) (Exhibit 97). Of these laws, only the D.C. law was not repealed. *See* 1959 Mich. Pub. Acts 249–50; 1959 R.I. Acts & Resolves 260, 263. Such laws do not show an enduring tradition of lawful restriction on the right to own a commonly possessed firearm.

100.   Beginning in the 20th Century, ten states plus the District of Columbia regulated semi-automatic and fully automatic weapons; eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices; and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire

them continuously in a fully automatic manner. Spitzer Rpt. ¶ 24. In total, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity between 1917 and 1934. Spitzer Rpt. ¶¶ 24–25. *See also* DeLay Rpt. ¶ 84 (describing 20th Century restrictions on semi-automatic firearms and magazine capacity).

**Plaintiffs' Response to No. 100:** Disputed. *See* Resp. to Statement 99.

101.   Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots automatically or semi-automatically more than twelve shots without reloading." The National Rifle Association endorsed the law and encouraged it to be used as a guide for other states. Spitzer Rpt. ¶ 16.

**Plaintiffs' Response to No. 101:** Disputed. *See* Resp. to Statement 100. The automatic-semiautomatic distinction, contrary to a single law enacted 150 years after the Founding, is central to the nature of firearms. *See id*. at 44, 99.

102.   In 1934, Congress enacted the National Firearms Act, which strictly regulated fully automatic weapons. Spitzer Rpt. ¶ 17. During the same time period, at least seven states plus the District of Columbia enacted laws restricting semi-automatic weapons. Spitzer Rpt.¶ 21.

**Plaintiffs' Response to No. 102:** Disputed. Spitzer claims that there were *ten* states, plus the District of Columbia, not seven. In any event, this claim is not accurate. *See* Resp. to Statement 99.

103.   Congress passed the National Firearms Acts of 1934 and 1938 in response to the use of machine guns and submachine guns in notorious killings. Roth Rpt. ¶¶ 53–56.

**Plaintiffs' Response to No. 103:** Admitted as to the National Firearms Act of 1934. The Federal Firearms Act of 1938 was not a response to such killings and did not specifically regulate machine guns. *See* Resp. to Statement 82; 52 Stat. 1250 (1938) (Exhibit 98).

104.   In passing the National Firearms Acts of 1934 and 1938, Congress placed restrictions on the ownership of machine guns and submachine guns based on their ability to fire rapidly from magazines capable of holding more than 10 rounds. Roth Rpt. ¶¶ 55–56.

**Plaintiffs' Response to No. 104:** Disputed. When Congress enacted the National Firearms Act, it chose not to impose any restrictions on magazines despite imposing stringent regulations on machine guns. *See* National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934) (Exhibit 99); Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 866 (2015) (Exhibit 100); *see also* 52 Stat. 1250 (1938).

105.  None of the federal laws regulating machine guns, automatic weapons, silencers, certain ammunition and large-caliber weapons, or destructive devices such as grenades and artillery have ever applied to the U.S. military. DeLay Rpt. ¶ 94. *See also* Spitzer Rpt. ¶ 17.

**Plaintiffs' Response to No. 105:** Admitted.

106.  Removable magazines were not subject to regulation before the early 20th Century because those that did exist were rare and had not played any appreciable role in creating civil disorder. Spitzer Rpt. ¶ 23.

**Plaintiffs' Response to No. 106:** Admitted that removable magazines were not subject to regulation before the early 20th century. Plaintiffs dispute the claim that the lack of regulation was merely because they were not used illegally. Statements like this, which purport to explain the reason for a *lack* of historical regulation are not the sort of evidence *Bruen* considered. *See* Resp. to Statement 82.

## History of Firearms-Related Homicides

107.  Levels of interpersonal gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. Cornell Rpt. at 17–18.

**Plaintiffs' Response to No. 107:** Disputed. Interpersonal gun violence was hardly an unprecedented problem for the Founders: for example, "[t]hrough 1675, 38 percent of homicides among unrelated colonists in New England and New Netherlands were committed with guns; the figure was probably 40 percent in Maryland." Roth, *American Homicide* at 56, *supra* Resp. to Statement 84. During the Revolutionary War era, over 50% of homicides in New England were committed with firearms. *Id.* at 155. Homicides greatly increased in "the revolutionary crisis of the 1760s and 1770s[,]" and "the extremely high homicide rates persisted until the end of the War of 1812 …." *Id.* at 61, 147.

108.  In the colonial era leading up to the Revolutionary War, homicides among colonists were rare. Roth Rpt. ¶¶ 17–18.

**Plaintiffs' Response to No. 108:** Disputed. This statement is contradicted by Roth's own work. In the colonial era, homicides were in some places quite high. To say that homicides among colonists were rare prior to the Revolution is a gross generalization. For example, in Pennsylvania, from the 1710s to the 1730s, the homicide rate rose to 9 or more per 100,000 adults per year. Roth, *American Homicide* at 92, *supra* Resp. to Statement 84. Homicide rates also rose in Pennsylvania, North Carolina, and South Carolina in the 1760s. *Id.* at 148. "From the Georgia Piedmont to the Ohio River Valley, homicide rates were extremely high from the mid-1760s through the War of 1812. Rates of 25 to 30 per 100,000 per year were common for white adults in areas where county governments had been established." *Id.* at 162. In "the backcountry" at this same time, they were astronomical, "probably reach[ing] 200 or more per 100,000." *Id.* To compare, the homicide rate in America in 2019 was 5 per 100,000. *Crime in the United States by Volume and Rate per 100,000 Inhabitants, 2000–2019 Table 1*, FBI, U.S. Dep't of Just. (2019), https://bitly.ws/34Hck (Exhibit 101). In the colonial era, the proportion of homicides committed with firearms was no greater than 15 percent. Roth Rpt. ¶¶ 18, 20.

109.   In the colonial era, the proportion of homicides committed with firearms was no greater than 15 percent. Roth Rpt. ¶¶ 18, 20.

**Plaintiffs' Response to No. 109:** Disputed. *See* Resp. to Statement 107.

110.   The vast majority of muzzle-loading firearms available in the colonial era, such as muskets and fowling pieces, needed to be reloaded manually after every shot. Roth Rpt. ¶ 19.

**Plaintiffs' Response to No. 110:** Admitted.

111.   Reloading one of the muzzle-loading firearms available in the colonial era took at least half a minute to complete. Roth Rpt. ¶ 19.

**Plaintiffs' Response to No. 111:** Admitted.

112.   The muzzle-loading firearms of the colonial era, such as muskets and fowling pieces, were liable to misfire. Roth Rpt. ¶ 19.

**Plaintiffs' Response to No. 112:** Plaintiffs lack knowledge and, on that basis, do not dispute at this time.

113.   In the colonial era, most owners of muzzle-loaded firearms stored their guns empty and loaded them anew before every use. Roth Rpt. ¶ 19; Cornell Rpt. At 18. Due to the preference for storing these weapons unloaded, they posed fewer dangers to children from accidental discharges. Cornell Rpt. At 18.

**Plaintiffs' Response to No. 113:** Admitted that firearms were ordinarily stored unloaded at the Founding. Plaintiffs dispute the unfounded claim that accidental discharges are a greater threat now than they were then.

114.   The rates of homicides of European Americans in the colonies by unrelated adults rose during the Revolutionary War period. Roth Rpt. ¶¶ 23–24.

**Plaintiffs' Response to No. 114:** Admitted.

115.   Following the end of the Revolutionary War, homicide rates fell across New England, the Mid-Atlantic states, and the settled Midwest. Roth Rpt. ¶¶ 23–24.

**Plaintiffs' Response to No. 115:** Admitted.

116.   Following the end of the Revolutionary War, the proportion of homicides committed with firearms was between 0 and 10 percent. Roth Rpt. ¶ 24.

**Plaintiffs' Response to No. 116:** Disputed. Roth's data can be found in Figures 25 through 46 of his supplement, Randolph Roth, *American Homicide Supplemental Volume: Weapons* (Oct. 2009), https://bit.ly/3GtHACv (Exhibit 102). While, in general, the percentage of homicides committed with firearms was lower in the period immediately following the Revolutionary War than it would be through the other periods of the 19th century, that was not true everywhere, and in many places the percentage of homicides committed with firearms was above the 0–10% range cited by Roth. *See, e.g.*, *id.* at Fig. W 32 (13% of homicides in New York City from 1797–1815 were committed with a firearm); *id.* at Fig. W 27 (40% of homicides in New Hampshire and Vermont from 1775–1815 were committed with firearms).

117.   In the colonial era, firearm use was generally limited to hunting, controlling vermin, or serving in the militia. Roth Rpt. ¶¶ 18, 26.

**Plaintiffs' Response to No. 117:** Disputed. As the Supreme Court explained in *Heller*, even at the Founding, the right to armed-self-defense was the "*central component*" of the Second Amendment right. 554 U.S. at 599. And, in fact, firearms were frequently used for self-defense. Consistent with this fact, "[m]any colonial statutes required individual arms bearing for public-safety reasons." *Heller*, 554 U.S. at 601. People were also avid trainers during the colonial era:

> [A]rms proficiency was required for survival. Guns were needed for food, self-defense, community defense, and conquest. Poor shooting, therefore, had deadly consequences. It could result in starvation, invasion, insurrection, or defeat in battle. Great emphasis was placed on proficiency from the earliest colonial days. "Nowhere else was the cult of accuracy so rigorously worshipped as in colonial America." The colonists practiced shooting regularly, and since they depended on one another for security, they passed laws to ensure that the community as a whole was competent with arms.

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill Rts. J. 93, 107 (2022), https://bit.ly/48c1j5p (Exhibit 103).

118.   In the Founding era, there was little interest among public officials in northern states in restricting the use of firearms, with the exception of placing restrictions on dueling. Roth Rpt. ¶ 26.

**Plaintiffs' Response to No. 118:** Admitted.

119.   In the slave states during the Founding era, the proportion of homicides committed with firearms increased to between one-third and two-fifths. Roth Rpt. ¶ 27.

**Plaintiffs' Response to No. 119:** Admitted.

120.   Pistols that started to become commercially available in the early 1800s could be kept loaded and carried for longer amounts of time without risk of corrosion than the firearms that were prevalent in the colonial era. Roth Rpt. ¶ 29.

**Plaintiffs' Response to No. 120:** Admitted.

121.   Pistols and revolvers contributed to a sharp increase in the proportion of homicides committed with firearms at the end of the 19th Century. Roth Rpt. ¶¶ 30–40.

**Plaintiffs' Response to No. 121:** Disputed. As the State's expert notes, a number of causes led to increased homicide rates: in the 1840s and 1850s, the causes included "[i]mmigration, economic hardship, and the conquest of areas populated by Hispanic and Native peoples," and that "ultimately the increase in homicide in the United States occurred because Americans could not coalesce into a nation." Roth, *American Homicide* at 300, *supra* Resp. to Statement 84. Moreover, homicide rates

declined in the North at the end of the nineteenth century. *Id.* at 388. The degree to which pistols and revolvers contributed is unclear.

122.   States that imposed restrictions on carrying certain concealed weapons in the 19th Century were responding to concealable weapons contributing to rising crime rates. Roth Rpt. ¶¶ 30–33.

**Plaintiffs' Response to No. 122:** Disputed. *See* Resps. to Statements 82, 93, 121. In addition to being a fundamentally legal argument, this claim about the reason why certain firearms regulations were enacted is speculative.

123.   States that imposed restrictions on carrying certain concealed weapons in the 19th Century were responding to technological advances that enabled firearms to fire multiple rounds in succession without reloading. Roth Rpt. ¶ 33.

**Plaintiffs' Response to No. 123:** Disputed. *See* Resp. to Statements 82, 93. In addition to being a fundamentally legal argument, this claim about the reason why certain firearms regulations were enacted is speculative.

124.   In the mid-1800s, homicide rates rose across the United States. Roth Rpt. ¶¶ 34–35.

**Plaintiffs' Response to No. 124:** Admitted.

125.   Economic transformation was accompanied by profound social changes that gave rise to America's first gun violence crisis. As cheaper, more dependable, and easily concealable handguns proliferated, Americans, particularly southerners, began sporting them regularly. Cornell Rpt. At 24.

**Plaintiffs' Response to No. 125:** Disputed. *See* Resp. to Statement 82.

In addition to being a fundamentally legal argument, this claim about the reason why certain firearms regulations were enacted is speculative. Furthermore, as discussed above, Americans carried firearms far earlier than the advent of concealable handguns. *See* Resp. to Statement 117.

126.   From the Mexican War through Reconstruction, the proportion of homicides committed with firearms increased. Roth Rpt. ¶ 35.

**Plaintiffs' Response to No. 126:** Admitted.

127.   Once pistols and revolvers became commercially available in the mid-19th Century, they began to displace the single-shot guns prevalent in the early 1800s. Roth Rpt. ¶¶ 33–40.

**Plaintiffs' Response to No. 127:** Admitted.

128.   The pistols and revolvers that became commercially available in the mid-19th Century could be fired multiple times before having to reload. Roth Rpt. ¶¶ 37–38.

**Plaintiffs' Response to No. 128:** Admitted.

129.   Once single-shot guns began to be displaced by breech-loading firearms in the mid-19th Century, the proportion of homicides committed with firearms increased even in periods when overall homicide rates temporarily fell. Roth Rpt. ¶ 40.

**Plaintiffs' Response to No. 129:** Admitted.

130.   By the 1920s, the proportion of homicides committed with firearms reached a median of 56% in New England and over 70% in the South and West. Roth Rpt. ¶ 40.

**Plaintiffs' Response to No. 130:** Admitted.

131.   In the Reconstruction era, state legislators understood that placing restrictions on the carrying and/or possession of certain weapons was within states' constitutional authority. Roth Rpt. ¶¶ 40–46.

**Plaintiffs' Response to No. 131:** Disputed. *See* Resp. to Statement 82. In addition to being a fundamentally legal argument, this statement misunderstands the importance of laws regulating the method of carrying. As *Bruen* has bindingly interpreted them, rather than showing that states had broad authority to regulate carrying (much less possession), such laws show that states *had to* permit some method of carrying these firearms in public. *Bruen*, 597 U.S. at 52–54.

132.   In response to Reconstruction-era violence directed against African Americans, Republican-dominated legislatures in the Reconstruction South passed a range of racially neutral gun regulations to protect individuals from gun violence. Cornell Rpt. 39–40.

**Plaintiffs' Response to No. 132:** Disputed. This statement is identical to Statement 95. *See* Resp. to Statement 95.

133.   Incidents in which a single person killed four or more persons using firearms were rare, if not non-existent, in the colonial, Founding or Reconstruction eras. Roth Rpt. ¶¶ 47–48;Vannella Decl. Ex. 9, Rpt. Of Professor Louis Klarevas ¶ 19.

**Plaintiffs' Response to No. 133:** Disputed. Unfortunately, mass violence is nothing new. *See* Roth, *American Homicide* at 348, *supra* Resp. to Statement 84 (discussing notable incidents of mass murder in the Reconstruction South).

134.   Firearms were used in approximately two fifths of homicides between unrelated white people before the Civil War era, and in approximately four fifths of all homicides in 2021. DeLay Rpt. ¶ 37.

**Plaintiffs' Response to No. 134:** Plaintiffs presently lack knowledge regarding the data cited by the State's expert. However, Plaintiffs dispute the inappropriate comparison between homicides among *unrelated white people* before the Civil War and *all* homicides in 2021.

135.   In the 1980s, the introduction of semi-automatic handguns into the criminal market led to a dramatic increase in criminal firepower. This resulted in more gun crimes and homicides with no corresponding increase in non-gun homicides. Spitzer Rpt. ¶ 83.

**Plaintiffs' Response to No. 135:** Admitted there was an increase in gun crimes and homicides in the 1980s. Plaintiffs dispute that this was caused by the introduction of semi-automatic handguns or that they constituted a "dramatic increase in criminal firepower." In addition to dealing with history that comes far too late to be relevant, it must be noted that despite the fact that handguns are overwhelmingly the firearm of choice by criminals, the Supreme Court has held that they nevertheless are protected. That is because, although the State focuses on the *misuse* of firearms by criminals, *Heller* shows that the focus must be on their lawful use by law-abiding citizens. *See, e.g.*, 554 U.S. at 628 (noting that handguns are "overwhelmingly chosen by American society" for self-defense).

## Mass Shootings – General

136.   From the colonial era through the end of the 19th Century, mass killings were predominantly committed by a group of people. Roth Rpt. ¶¶ 47–50.

**Plaintiffs' Response to No. 136:** Admitted.

137.   There is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and

1948. The first known mass shooting resulting in 10 or more deaths occurred in 1949. For 70% of its 247-year existence as a nation, the United States did not experience a single mass shooting resulting in double-digit fatalities. Klarevas Rpt. ¶ 19.

**Plaintiffs' Response to No. 137:** Plaintiffs presently lack knowledge and, on that basis, do not dispute. Additionally, it should be noted how arbitrary and cherry-picked the 1948 cutoff is.

138.   After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966. The third such mass shooting then occurred nine years later, in 1975. And the fourth such incident occurred seven years after, in 1982. Klarevas Rpt. ¶ 20.



**Plaintiffs' Response to No. 138:** Disputed. Not only is there "no standard definition of what constitutes a mass shooting," with "different data sources—such as media outlets, academic researchers, and law enforcement agencies—frequently us[ing] different definitions when discussing and analyzing mass shootings," the soundness of Defendants' observation dispositively turns on what they choose to define as a "mass shooting." Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, RAND Corp. (Apr. 15, 2021), https://bit.ly/3L9kzH4 (Exhibit 104).

These challenges to define a "mass shooting" occur, in part, because:

(1) there are many different definitions for mass shootings, each of which may be useful for a somewhat different purpose; (2) we have incomplete data sources that do not track these events in a consistent

54

> manner over time, likely include a biased sample of incidents, and lack the full range of individual and incident characteristics researchers are interested in; and (3) there are statistical limitations inherent in trying to draw inferences from rare and idiosyncratic events.

*Id*. As a result, there is little agreement even among researchers regarding "how often mass shooting events occur, how the rate has changed over time, and incident characteristics." *Id.* And the differences in views are massive. "Depending on which data source is referenced, there were somewhere between six and 503 mass shootings and between 60 and 628 mass shooting fatalities in 2019." *Id.*

Importantly, the RAND analysis found only inconclusive evidence for the effect of assault weapons bans on mass shootings and specifically identified a study by one of the State's experts, Klarevas, which purported to show that standard capacity magazines were associated with higher fatality rates in mass shootings, had "improbably large" effect sizes, likely the result of the sparsity of the data on which it was based. *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, Rand Corp. (Jan. 10, 2023), https://bit.ly/3RDN3xe (Exhibit 105). One study suggests that "assault weapons" were used only in 10–36% of mass shootings. *See* Koper, *Assessing the potential to reduce deaths and injuries for mass shootings* at 151, *supra* Resp. to Statement 48. Another study found that "assault weapons use is not associated with more victims or fatalities" in public shootings. Benjamin M. Blau et al., *Guns, laws and public shootings in the United States* at 2, Applied Econ. (2016) (Exhibit 106). Yet another study found that "bans on assault weapons had no clear effects on either the incidence of mass shootings or on the incidence of victim fatalities from mass shootings." Daniel W. Webster et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 Criminology & Pub. Pol'y 171, 188 (2020) (Exhibit 107).

139.   The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years. Klarevas Rpt. ¶ 21.

**Plaintiffs' Response to No. 139:** Disputed. *See* Resp. to Statement 138.

140.   This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984

San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). Klarevas Rpt. ¶ 21.

**Plaintiffs' Response to No. 140:** Admitted. Plaintiffs note that these took place decades after the AR-15 and other semiautomatic weapons had arrived on the market; additionally, the firearms and incidents in question predate the State's tendentious phrase "assault weapons."

141.   In the 20-year period between 1987–2007, only two double-digit-fatality mass shootings occurred. Klarevas Rpt. ¶ 21.

**Plaintiffs' Response to No. 141:** Admitted.

142.   Between 1987 and 2007, three federal measures were in effect: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban. Klarevas Rpt. ¶ 21.

**Plaintiffs' Response to No. 142:** Admitted.

143.   A broader dataset of shooting incidents from the Gun Violence Archive shows that shooting events with four or more injuries or fatalities has been increasing from 2014 to 2021. Vannella Decl. Ex. 7, Rpt. Of Lucy Allen ¶ 41.



**Plaintiffs' Response to No. 143:** Disputed. *See* Resp. to Statement 138.

144.   The 7 deadliest acts of intentional criminal violence in the U.S. since September 11, 2011 have all been mass shootings. Klarevas Rpt. ¶ 12. Perpetrators in all 7 employed LCMs, and 6 of the 7 used assault weapons. *Id*. at ¶ 15.

| | | | Involved Assault Weapons | Involved LCMs ( > 10 Rounds ) |
|---|---|---|---|---|
| **Deaths** | **Date** | **Location** | | |
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

Table 2.  The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11

**Plaintiffs' Response to No. 144:** Disputed. *See* Resp. to Statement 138. It is very difficult to make generalizations about mass shooting violence; Professor Klarevas does not distinguish between "assault weapons" and "large capacity magazines." Without distinguishing these features, Professor Klarevas's numbers cannot say anything informative about "assault weapons" alone. Furthermore, this is missing important context which overstates the significance of these events. Mass shootings, despite their prevalence in the media, are a very rare form of crime. In 2018, for instance, "mass public shootings . . . represent[ed] fewer than one of every 200 homicides." Smart & Schell, *Mass Shootings in the United States*, *supra* Resp. to Statement 138.

145.   Assault firearms with large-capacity magazines inflicted significant damage in recent mass shootings at the Pulse Nightclub in 2016 (49 fatalities, 50+ wounded), Las Vegas in 2017 (60 fatalities, 400+ wounded), the Uvalde, Texas school shooting in 2022 (21 fatalities, 17 wounded), and the July 4th Highland Park shooting in 2022 (7 fatalities, 48 wounded). Yurgealitis Rpt. ¶ 5. Assault firearms are capable of inflicting significant carnage upon civilians in a short period of time, especially in conjunction with large capacity magazines. Yurgealitis Rpt. ¶ 5.

**Plaintiffs' Response to No. 145:** Disputed. *See* Resps. to Statements 76–79, 144.

146.   All but four mass shootings that have occurred in the United States since 1965 involved a single shooter. Roth Rpt. ¶ 67.

**Plaintiffs' Response to No. 146:** Disputed. *See* Resp. to Statement 138.

147.   The four mass shootings in the United States since 1965 that involved more than one shooter were each committed by two assailants. Roth Rpt. ¶ 67.

**Plaintiffs' Response to No. 147:** Disputed. *See* Resp. to Statement 138.

148.   The availability of semiautomatic weapons and magazines that hold more than 10 rounds has made it possible for one or two individuals to kill or wound a large number of people in a short amount of time. Roth Rpt. ¶¶ 50, 67–68.

**Plaintiffs' Response to No. 148:** Disputed. *See* Resps. to Statements 76–79, 138. The AR-15 has been commercially available for decades and popular for at least the last 40 years. The supposed increase in mass shootings occurred long after the availability and popularity of the AR-15 was already well-established.

149.   The availability of semiautomatic weapons and magazines that hold more than 10 rounds has made it possible for a single shooter to commit mass murder without rallying collaborators around a common cause. Roth Rpt. ¶¶ 47, 68.

**Plaintiffs' Response to No. 149:** Disputed. *See* Resp. to Statement 148.

150.   In the 2011 mass shooting in which U.S. House Representative Gabby Giffords was wounded, the shooter fired 31 rounds with a Glock 19 semiautomatic handgun before he was disarmed by bystanders while changing magazines; each of the 31 rounds fired struck an individual. Roth Rpt. ¶ 69.

**Plaintiffs' Response to No. 150:** Admitted.

151.   Lucy Allen performed a 2023 study of public mass shootings was conducted using data from four sources: Mother Jones, the Citizens Crime Commission of New York City, the Washington Post, and the Violence Project (the latter two of which began publishing data in 2018–2019). Each source defines mass shooting as one where four or more people were killed in a public place in one incident, excluding incidents related to other crimes such as robberies and domestic violence). The combined data spanned 1982 to October 2022, which yielded 179 mass shooting events. Allen Rpt. ¶¶ 25–29.

**Plaintiffs' Response to No. 151:** Admitted that this accurately describes the findings of Allen's study. Plaintiffs dispute that this study accurately reflects the

reality of mass shooting violence in the United States. *See* Resp. to Statement 138. Additionally, Allen's methodology has been criticized by courts:

> Her results cannot be tested because she does not identify the specific incidents or how she scored the gun-type variables attributed to each incident. Consequently, there is no way to check her analysis or her math. Her study cannot be reproduced. Unfortunately, this means her opinion lacks classic indicia of reliability.

*See* Decision at 66, *Miller v. Becerra*, No. 3:19-cv-01537 (S.D. Cal. Oct. 19, 2022), ECF No. 175.

"The whole statistical exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police investigatory reports. There are no police reports or eyewitness declarations collected for Allen's study. A limited collection of news articles lacks the usual indicia of accuracy and reliability of admissible evidence." *Id*. at 68.

152.   The Allen 2023 study shows the number of mass shooting events has been increasing, from 1982 to 2022. Allen Rpt. ¶ 39.



**Plaintiffs' Response to No. 152:** Disputed. *See* Resps. to Statements 138, 151. As this graph demonstrates, the change in mass shootings over time is not linear, and the "trendline" identified only loosely fits the data.

153.   The Allen 2023 study shows the number of mass shooting events with large-capacity magazines has been increasing, from 1982 to 2022. Allen Rpt. ¶ 40.



**Plaintiffs' Response to No. 153:** Disputed. *See* Resps. to Statements 138, 144, 151. As this graph demonstrates, the change in mass shootings over time is not linear, and the "trendline" identified only loosely fits the data.

154.   From 1991 to 2022, both the number of high-fatality mass shooting incidents and number of mass shooting fatalities have grown significantly. Klarevas Rpt. ¶ 12.



Figure 1. Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022



Figure 2. Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022

**Plaintiffs' Response to No. 154:** Disputed. *See* Resps. to Statements 138, 151. As this graph demonstrates, the change in mass shootings over time is not linear, and the "trendline" identified only loosely fits the data.

## Use of Assault Weapons and LCMs in Mass Shootings

155.   There is evidence that the design features of assault weapons and LCMs make them especially appealing to criminals and to those who commit mass shootings. Data on 15 mass shootings from 1984 to 1993 compiled by Gary Kleck (1997) revealed six (40%) involved assault weapons or other firearms equipped with LCMs. Vannella Decl. Ex. 10, Rpt. Of Professor Daniel Webster ¶ 9.

**Plaintiffs' Response to No. 155:** Disputed. *See* Resp. to Statement 144.

Handguns, and not assault weapons, regardless of magazine capacity, are the most common firearm used in mass shootings, *see* James Alan Fox & Monica

DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 Homicide Studies 125, 136 (2014) (Exhibit 108); *accord* Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States* at 188, *supra* Resp. to Statement 138, and are overwhelmingly the weapons of choice for criminals generally, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018, Crime in the United States*, FBI, U.S. Dep't of Just. (2018), https://bit.ly/2p0bw4D (Exhibit 109) (64% of murders in 2018 committed with handguns); *see also, e.g.*, Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, The Trace (Jan. 6, 2016), https://bit.ly/41tIDv7 (Exhibit 110) (showing that, of the top 20 firearms seized by Chicago Police in 2014, *all 20* were handguns).

156.   The rate at which assault weapons are used to commit gun massacres far outpaces the rate at which they are owned in the United States. Klarevas Rpt. ¶ 14.

**Plaintiffs' Response to No. 156:** Disputed. *See* Resp. to Statement 138, 155. Congressional Research report concluded that "offenders used firearms that could be characterized as 'assault weapons' in . . . (9.78%) [of mass shootings]." William J. Krouse et al., Cong. Rsch. Serv., R44126, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, at 29 (2015) (Exhibit 111). In addition, "handguns are the firearm most commonly involved in active shootings and mass shootings; semiautomatic rifles or 'assault-style' weapons are used in an estimated 10 to 36 percent of active shootings and mass shootings." *See* Smart & Schell, *Mass Shootings in the United States*, *supra* Resp. to Statement 138.

Tens of millions of Americans own so-called assault weapons throughout the United States and among owners, the majority state that they keep them for lawful purposes like self-defense, target shooting, and hunting. *See* Resp. to Statement 11. Indeed, Klarevas himself accepts that over 24 million Americans own these firearms. Klarevas Rpt. ¶ 14 & n.8. And they are extremely rarely used in crime. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' " Gary Kleck, *Targeting Guns: Firearms and their Control* 112 (1997) (Exhibit 112). From 2015 through 2020, only 2.2% of murders were committed with *any* type of rifle. *See Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019, supra* Resp. to Statement 70 (90,594 total murders; 2,028 with rifles). Murder by "hands, fists, feet, etc." was almost twice as common, at 4,008, over the same time period—and murder by handgun, at over 40,000, was over *20 times* as common. *Id.* Even in the counterfactual event that a different modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 24 million modern sporting rifles in circulation in the United

States during that time period—around .01%—would have been used for that unlawful purpose. More broadly, as of 2016, only 0.8% of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats. (Jan. 2019), at 5 tbl. 3, https://bit.ly/31VjRa9 (Exhibit 113).

And of course, Klarevas's claim is specific to a particularly rare type of crime: "gun massacres." If around .01% of these firearms are used in crime *at all*, then even fewer of them are used in gun massacres.

157.   **Percentage of mass shootings perpetrated with AWs or LCMs.** Within the Allen 2023 dataset discussed above, there were 153 mass shooting events for which it was known if an assault weapon was used. Of those 153 mass shootings, an assault weapon was used in 36 of them (24%). In the same dataset, there were 115 mass shooting events for which magazine capacity was known. Out of those 115 events, there were 73 where the perpetrator used large-capacity magazines (63%). Allen Rpt. ¶¶ 30–31.

**Plaintiffs' Response to No. 157:** Admitted that this accurately reflects the Allen 2023 dataset. Plaintiffs dispute that the Allen 2023 dataset accurately reflects the realities of mass shooting violence in the United States. *See* Resps. to Statements 138, 155.

158.   Of the 179 mass shooting incidents examined in the Allen 2023 Study, whether the guns used were obtained legally was known in 112 of them. In those 112 mass shootings, shooters in 89 (79%) of them obtained their guns legally. Even if one assumed the guns were illegally obtained in the 67 incidents for which legal purchase status of the gun used was not known, 50% of the mass shootings were still done with guns obtained legally (89 out of 179). Allen Rpt. ¶ 38.

**Plaintiffs' Response to No. 158:** Admitted that this accurately reflects the Allen 2023 dataset. Plaintiffs dispute that the Allen 2023 dataset accurately reflects the realities of mass shooting violence in the United States. *See* Resps. to Statements 138, 155.

159.   In the Allen 2023 Study, 80% of the guns used in mass shooting events for which it was known whether the guns were legally obtained (202 out of 252 guns) were obtained legally. Allen Rpt. ¶ 38.

**Plaintiffs' Response to No. 159:** Admitted that this accurately reflects the Allen 2023 dataset. Plaintiffs dispute that the Allen 2023 dataset accurately reflects the realities of mass shooting violence in the United States. *See* Resps. to Statements 138, 155.

160. **Average number of shots by perpetrator (AWs).** Of the 36 events involving assault weapons in the Allen 2023 study data, there are 24 in which the number of shots fired is known. Shooters fired more than 10 rounds in each of the 24 incidents. The average number of shots fired was 149. By contrast, the average number of shots fired in mass shootings without an assault weapon was 38. Allen Rpt. ¶ 36.

**Plaintiffs' Response to No. 160:** Admitted that this accurately reflects the Allen 2023 dataset. Plaintiffs dispute that the Allen 2023 dataset accurately reflects the realities of mass shooting violence in the United States. *See* Resps. to Statements 138, 155.

161. **Average number of shots by perpetrator (LCMs).** Of the 73 incidents known to have involved a large-capacity magazine in the Allen 2023 study data, there are 49 in which the number of shots fired is known. Shooters fired more than 10 rounds in 46 of the 49 incidents. The average number of shots fired was 99. In contrast, the average number of shots fired in mass shootings without large-capacity magazines was 16. Allen Rpt. ¶ 37.

**Plaintiffs' Response to No. 161:** Admitted that this accurately reflects the Allen 2023 dataset. Plaintiffs dispute that the Allen 2023 dataset accurately reflects the realities of mass shooting violence in the United States. *See* Resps. to Statements 138, 151, 155.

162. **Comparative casualties.** Within the Allen 2023 dataset, the average number of fatalities was 12 per mass shooting with an assault weapon versus 6 for those without an assault weapon. The average number of fatalities was 10 per mass shooting with large-capacity magazines versus 6 for those without large-capacity magazines. The average number of fatalities was 13 per mass shooting with both assault weapons and large-capacity magazines versus 6 for those with neither. Allen Rpt. ¶¶ 32–34.

**Plaintiffs' Response to No. 162:** Admitted that this accurately reflects the Allen 2023 dataset. Plaintiffs dispute that the Allen 2023 dataset accurately reflects the realities of mass shooting violence in the United States. *See* Resps. to Statements 138, 155. In its analysis of this issue, RAND found that there was an uncertain or

65

inconsistent relationship between so-called assault weapons and mass shootings. *See Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, *supra.*

163.  Within the Allen 2023 dataset, the average number of injuries or fatalities was 36 per mass shooting with an assault weapon versus 10 for those without an assault weapon. The average number of injuries or fatalities was 25 per mass shooting with large-capacity magazines versus 9 for those without large-capacity magazines. The average number of injuries or fatalities was 40 per mass shooting with both assault weapons and large-capacity magazines versus 8 for those with neither. Allen Rpt. ¶¶ 32–34.

**Numbers of Fatalities and Injuries in Public Mass Shootings**
**1982 - October 2022**

| Weapon Used | # of Incidents | Average # of Fatalities | Injuries | Total |
|---|---|---|---|---|
| Assault Weapon | 36 | 12 | 24 | 36 |
| No Assault Weapon | 117 | 6 | 4 | 10 |
| Unknown | 26 | 5 | 3 | 9 |
| Large-Cap. Mag. | 73 | 10 | 16 | 25 |
| No Large-Cap. Mag. | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |
| Assault Weapon & Large-Cap. Mag. | 31 | 13 | 27 | 40 |
| Large-Cap. Mag. Only[1] | 36 | 8 | 7 | 15 |
| No Assault Weapon or Large-Cap. Mag.[2] | 41 | 6 | 3 | 8 |
| Unknown[3] | 71 | 5 | 3 | 8 |

Notes and Sources:

Casualty figures exclude the shooter. Assault Weapon and large-capacity magazine classification and casualties updated based on review of stories from Factiva/Google searches.

[1] Shootings involving large-capacity magazine and no Assault Weapon.

[2] Shootings involving neither a large-capacity magazine nor Assault Weapon.

[3] Shootings where it is either unknown whether a large-capacity magazine was involved or unknown whether an Assault Weapon was involved.

**Plaintiffs' Response to No. 163:** Admitted that this accurately reflects the Allen 2023 dataset. Plaintiffs dispute that the Allen 2023 dataset accurately reflects the realities of mass shooting violence in the United States. *See* Resps. to Statements 138, 155.

164.   A study by Christopher Koper in 2014 showed that between 1982 and 2012, mass shootings (defined as shootings with four or more victim fatalities) committed with assault weapons caused more fatalities per incident than mass shootings committed with other firearms (a mean of 10.4 fatalities with assault weapons vs. 7.4 fatalities with other firearms) and caused non-fatal gunshot wounds to more people (a mean of 13.5 people with non-fatal gunshot wounds in mass shootings with assault weapons vs. 6.4 without). Webster Rpt. ¶¶ 9, 11.

**Plaintiffs' Response to No. 164:** Disputed. *See* Resps. to Statements 138, 155.

165.   A study by Luke Dillon in 2013 showed that mass shootings (defined as shootings with four or more victim fatalities) committed with firearms with LCMs had 60% more fatalities on average than those committed with firearms without LCMs (a mean of 10.19 fatalities vs. 6.35) and had more than 3 times as many victims with non-fatal gunshot wounds (a mean of 12.39 people with non-fatal gunshot wounds in mass shootings with LCMs vs. 3.55 without LCMs). Webster Rpt. ¶ 11.

**Plaintiffs' Response to No. 165:** Disputed. *See* Resps. to Statements 138, 155.

166.   The Allen 2023 study results are consistent with those of other studies that have analyzed mass shootings, each of which show that the average number of casualties (whether defined as injuries and fatalities or fatalities alone) were higher in mass shooting events where the perpetrator used large-capacity magazines. Allen Rpt. ¶ 35; Roth Rpt. ¶¶ 64–66.

| Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings | | | | | | |
|---|---|---|---|---|---|---|
| | Criteria | | Time | # of | Avg. # of Fatalities + Injuries / Fatalities | |
| Source | # Victims | Other Criteria | Period | Incidents | With LCM | Without LCM |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2023)[1] | at least 4 | Includes shootings "in a | 1982-October 2022 | 179 | 25 / 10 | 9 / 6 |
| Allen (2020)[2] | killed[3] | public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[4] | more than 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[5] | at least 6 killed[3] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[6] | at least 4 killed[3] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

Notes and Sources:
[1] Exhibit B of this report.
[2] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.*, dated January 23, 2020.
[3] Excluding shooter.
[4] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).
[5] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).
[6] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

**Plaintiffs' Response to No. 166:** Disputed. *See* Resps. to Statements 138, 155.

167. **High Fatality Mass Shootings – AWs.** Focusing on high-fatality mass shootings in particular (defined as events resulting in 6 or more victims being shot to death), an analysis of such events by Prof. Klarevas (based on a dataset that Prof. Klarevas maintains and continuously updates, which is reproduced at Exhibit C to his report) between 1991 and 2022, where the weapon used was known, showed that the percentage of such shootings where the perpetrator employed an assault weapon has increased over time. The overall rate of use of assault weapons in such high fatality mass shootings is 34%, but rose to 53% over the past 4 years. Klarevas Rpt. ¶ 13.



**Figure 3. Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**

Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Plaintiffs' Response to No. 167:** Disputed. This is an updated version of the study that was discounted by the RAND analysis. *See* Resp. to Statement 138. Klarevas's use of the phrase "high fatality mass shooting" is idiosyncratic and does not give a definitive picture of the role of "assault weapons" in shootings.

168. **High Fatality Mass Shootings – LCMs.** Of the high fatality mass shootings between 1991 and 2022 where magazine capacity used was known, the percentage of such shootings where the perpetrator employed a large-capacity magazine (with greater than 10 rounds of capacity) has increased. The overall rate of use of LCMs in such high fatality mass shootings is 77%, but rose to 100% over the past 4 years. Klarevas Rpt. ¶ 13.



Figure 4. Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022

Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

**Plaintiffs' Response to No. 168:** Disputed. *See* Resps. to Statements 138, 155, 167.

169. **High Fatality Mass Shootings – Lethality.** There is a positive association between the lethality of mass shootings and the use of assault weapons and LCMs. The average death toll for high-fatality mass shootings involving assault weapons was 13.7 fatalities per shooting. By contrast, the average death toll for high-fatality mass shootings without assault weapons was 8.2 fatalities per shooting. The average death toll for high-fatality mass shootings involving LCMs was 11.5 fatalities per shooting. By contrast, the average death toll for high-fatality mass shootings without LCMs was 7.3 fatalities per shooting. Klarevas Rpt. ¶¶ 15, 16.

**Table 3. The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

**Table 4.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Plaintiffs' Response to No. 169:** Disputed. *See* Resps. to Statements 138, 144, 155, 166.

170.   Use of LCMs with assault weapons in high-fatality mass shootings resulted in a 92% increase in the average death toll compared to high-fatality mass shootings involving neither instrument. Klarevas Rpt. ¶ 17.

**Table 5.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

**Plaintiffs' Response to No. 170:** Disputed. *See* Resps. to Statements 138, 144, 155, 166.

171.   A 2020 study in *Criminology & Public Policy* by Webster et al found that for the period of 1984 to 2017, state bans on LCMs were associated with a 48 percent lower incidence of fatal mass shootings within those states, when compared to years in those states in which there was no LCM ban and with 70% fewer deaths from fatal mass shootings per capita. Webster Rpt. ¶ 14.

**Plaintiffs' Response to No. 171:** Disputed. *See* Resp. to Statement 138. In an analysis of two studies (including the State's expert's) on the effect of state bans on LCMs, RAND corporation found only "*limited evidence that high-capacity magazine bans reduce mass shootings.*" *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, *supra* Resp. to Statement 162.

172.   A 2020 study in *Law and Human Behavior* by Siegel et al found that LCM bans were also associated with significantly lower rates of fatal mass shootings. Webster Rpt. ¶ 14.

**Plaintiffs' Response to No. 172:** Disputed. *See* Resps. to Statements 138, 171.

173.   A 2019 study by Klarevas et al. in the *American Journal of Public Health* found that between 1990 and 2017, the incidence of fatal mass shootings (those with 6 or more victim deaths) in states without LCM bans was more than double the rate than in states with LCM bans. The annual number of deaths in non-LCM ban states was also 3 times higher. Webster Rpt. ¶ 14.

**Plaintiffs' Response to No. 173:** Disputed. *See* Resp. to Statement 138.

174.   A 2015 study by Gius et al in *Applied Economics Letters* found statistically significant negative associations between assault weapon bans and fatalities from public mass shootings. Webster Rpt. ¶ 16.

**Plaintiffs' Response to No. 174:** Disputed. *See* Resp. to Statement 138.

175.   A 2022 study by Cook et al. in *JAMA* found that, during the federal assault weapons ban from 1994 to 2004, fatalities from shootings with banned weapons decreased during the second half of the ban and then surged after the ban expired. Webster Rpt. ¶ 17. A 2004 study by Koper et al. for the National Institute of Justice found a one-third reduction in the share of crime guns recovered and traced by law enforcement that were assault weapons. *Id*. at ¶ 15.

**Plaintiffs' Response to No. 175:** Disputed. *See* Resp. to Statement 138. Additionally, this is misleading. While fatalities with banned weapons decreased during the ban, the State does not even claim that the ban resulted in an overall decrease in fatalities from shootings. Indeed, there was no such drop associated with the federal ban. *See* Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, U.S. Dep't of Just. (June 2004), at 2, https://bit.ly/3hZiy5v (Exhibit 114). And this should not be surprising given that handguns, not rifles of any kind (so-called "assault weapons" or not), are overwhelmingly the weapon of choice of criminals.

*See* Resp. to Statement 155. Furthermore, even focusing on fatalities from shootings with the banned weapons only, that should not be attributed to the ban either, since the ban did not apply to any firearm lawfully possessed on the law's enactment date (and so it did not reduce the stock of "assault weapons" at all.

176.   From 2015 to 2019, five of the top ten deadliest mass shootings in U.S. history occurred and each was committed with an assault weapon. Webster Rpt. ¶ 17.

**Plaintiffs' Response to No. 176:** Disputed. The State's expert fails to add that based on his source, the period from 2015 to 2019 was an outlier for deaths caused by "assault weapons."

177.   A 2021 study in *JMIR Public Health Surveillance* by Post et al. showed that during the years the federal assault weapons ban was in place, statistical models estimated that the federal ban on assault weapons and LCMs resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries during the decade the ban was in place. Those statistical models estimated that if the federal ban had continued after 2004, there would have been 30 fewer public mass shootings, 339 fewer people murdered in those shootings, and 1,139 fewer people injured in those shootings. Webster Rpt. ¶ 18.

**Plaintiffs' Response to No. 177:** Disputed. *See* Resps. to Statements 138, 144, 155, 175. "[A] comparison of the incidence of mass shootings during the 10-year window when the assault weapon ban was in force against the time periods before implementation and after expiration shows that the legislation had virtually no effect." Fox & DeLateur, *Mass Shootings in America* at 136, *supra* Resp. to Statement 155.

178.   The number of fatalities from mass public shootings committed with non-assault weapons has remained relatively flat. Webster Rpt. ¶ 17.



**Plaintiffs' Response to No. 178:** Disputed. *See* Resps. to Statements 138, 155.

## Use of Assault Weapons/ LCMs and Crime

179.   The features of assault style firearms, including LCMs, are attractive to users who are most likely to use firearms in crime. Webster Rpt. ¶ 13.

**Plaintiffs' Response to No. 179:** Disputed. The features of "assault weapons" which defendants claim are attractive to users likely to engage in crime are neither nefarious nor unique to so-called "assault weapons." An "assault weapon" fires no faster, and is no more dangerous, than any other semiautomatic firearm. In fact, the features of the banned firearms make them particularly attractive to individuals seeking to defend themselves. *See* Resp. to Statement 11. Both experience and studies have found that what criminals look for in a firearm is a weapon that is concealable, and a firearm that has the banned features is not concealable. *See id*. at 155; *see also* Marianne W. Zawitz, *Guns Used in Crime*, U.S. Dep't of Just., Bureau of Just. Stat. (July 1995), at 1, https://bit.ly/3GtqQeE (Exhibit 115) ("Surveys of inmates show that they prefer concealable, large caliber guns.").

74

180. After rapid-fire semiautomatic handguns and rifles with large capacity magazines arrived on the domestic market in the 1970s and 1980s, they were picked up by criminals, terrorists, and lone gunmen. These firearms inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff. Roth Rpt. ¶ 60.

**Plaintiffs' Response to No. 180:** Disputed. *See* Resps. to Statements 138, 144, 155. "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Koper, *Assessing the potential to reduce deaths and injuries for mass shootings* at, *supra* Resp. to Statement 48.

181. Uniformed police officers are generally outfitted with soft body armor of a "Level II" or "Level IIIA" protection rating for the National Institute of Justice. Those ratings of body armor are suitable protection against most handgun bullets (which reach a muzzle velocity of 1200FPS (+ or -), but not against rifle caliber AR & AK type assault rifles (which reach a muzzle velocity of 3200FPS (+ or -). Yurgealitis Rpt. ¶ 156.

**Plaintiffs' Response to No. 181:** Disputed. *See* Resp. to Statement 11. "Assault rifles" function no differently from any other semiautomatic firearm, and "virtually *all* rifle ammunition will pierce soft body armor, which is why federal law defines 'armor piercing ammunition' as a projectile for use in *a handgun* with certain metallic properties." *See* Halbrook, *America's Rifle* at 326, *supra* Resp. to Statement 48 (quoting 18 U.S.C. § 921(a)(17)(B)) (emphasis in original). Indeed, an "AR-15 rifle is no better at piercing soft body armor than any other rifle of the same caliber." *Id*. Furthermore, the actions of criminals do not affect the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

182. The firearms prohibited by N.J. Stat. Ann. § 39-1(w) pose a threat to overall public safety and increase the likelihood that first responders charged with stopping a threat, or attending to wounded citizens, may be injured or killed in performance of their duty. Yurgealitis Rpt. ¶ 156.

**Plaintiffs' Response to No. 182:** Disputed. *See* Resp. to Statement 11.

183. A study by Christopher Koper et al. in 2017 showed that across ten different cities in the United States, firearms with LCMs accounted for between 15 and 36% of firearms recovered by law enforcement between 2001 and 2014. Webster Rpt. ¶ 12.

**Plaintiffs' Response to No. 183:** Admitted.

184.   Firearms with LCMs accounted for 40.6% of the firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings with 4 or more fatalities for the period of 2009 to 2015. Webster Rpt. ¶ 12 (citing Koper).

**Plaintiffs' Response to No. 184:** Disputed. This statement is misleading to the extent it suggests that LCMs are overrepresented among firearms used to commit these crimes. In fact, their presence in these situations merely reflects that they are extremely popular nationally and, as other data more clearly shows, they are overwhelmingly used for lawful purposes. *See* Resps. to Statements 11, 156.

185.   Assault weapons accounted for between 2.6 and 8.5% of firearms recovered by law-enforcement officers in the same ten cities between 2001 and 2014. Webster Rpt. ¶ 12 (citing Koper).

**Plaintiffs' Response to No. 185:** Admitted. *See* Resp. to Statement 184.

186.   Assault weapons also accounted for 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally between 2009 and 2015. Webster Rpt. ¶ 12. (citing Koper).

**Plaintiffs' Response to No. 186:** Disputed. *See* Resp. to Statement 184.

187.   Assuming that assault weapons account for 3 percent of the population of firearms in civilian hands, the data discussed above indicates assault firearms and firearms with LCMs are specifically used in crime, in lethal violence against law enforcement officers, and in fatal mass shootings at percentages five to ten times higher than they would be expected to if those weapons' features played no role in whether they were used in crimes. Webster Rpt. ¶ 13.

**Plaintiffs' Response to No. 187:** Disputed. *See* Resps. to Statements 11, 156. The State also understates the popularity of what it calls "assault weapons": modern sport rifles are the second most common type of firearm sold, behind only semiautomatic handguns. Sales of modern sport rifles account for approximately 20% of nationwide firearm sales. *See 2021 Firearms Retailer Survey Report*, Nat'l Shooting Sports Found., Inc. (2021), at 9, https://bit.ly/3gWhI8E (Exhibit 116).

188.   A study by Wintemute et al. (1998) in *Annals of Emergency Medicine*, using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the

share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses. Webster Rpt. ¶ 13.

**Plaintiffs' Response to No. 188:** Admitted that this accurately summarizes the results of the Wintermute study. Plaintiffs dispute the implication that such firearms are favored by criminals. Even accepting the accuracy of the results of the study, 9 out of 10 individuals with two or more serious gun charges preferred a type of handgun that is not regulated by the State. Finally, one serious flaw with this method of studying gun acquisition trends by criminals is that it is solely focused on handgun purchasing. Very few criminals (around 10% only) purchase their firearms at retail stores. *See* Alper & Glaze, *Sources and Use of Firearms Involved in Crimes* at 7 tbl. 5, *supra* Resp. to Statement 156. A much greater share either get them from a friend or family member or acquire them through theft. *Id.*

## Self-Defense Data

189.   Home defense and self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Yurgealitis Rpt. ¶ 137.

**Plaintiffs' Response to No. 189:** Disputed. "Rarely" is far too subjective an adverb to factually describe the occurrence of self-defense events, particularly those involving life and death. As detailed in Response to Statement 11, shootouts with assailants occur, and a majority of defensive firearm uses occur against multiple assailants. *See* English, *2021 National Firearms Survey* at 15, *supra* Resp. to Statement 11. The benefits of AR-style firearms, also detailed in Resp. to Statement 11, are particularly pronounced in those contexts. In fact, "lengthy shootouts with extensive exchanges of gunfire" are often avoided precisely *because* of the unique defensive advantages AR-style firearms offer a means to end violent encounters speedily and effectively, as the features and incidents recounted in Response to Statement 11 demonstrate. Also, it is an independent analytical error to presume, as the State does, that firearms and the Second Amendment are meant only for those situations it considers normal, frequent, or routine. Rather, in many ways,

> [t]he Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed-where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these

contingencies may seem today, facing them unprepared is a mistake a free people get to make only once..."

*Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc).

190.   Based on incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017, it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Allen Rpt. ¶¶ 9–11.

**Plaintiffs' Response to No. 190:** Disputed. Strictly speaking, how often a magazine is fired to its full capacity, or how often more than ten rounds are actually fired in a self-defense scenario is irrelevant to whether such magazines are constitutionally protected. The NRA does not maintain a "database" of defensive gun uses, rather, Allen reviewed stories published by the NRA as part of their "Armed Citizen" series highlighting defensive gun uses. *See* Allen Rpt. ¶ 10. The NRA's database is neither comprehensive nor representative and is not intended to be. Indeed, Allen has admitted that the "database" is "not compiled scientifically" and not representative. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1044–45 (S.D. Cal. 2021), *vacated and remanded*, No. 21-55608, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *see also Miller v. Becerra, supra* Resp. to Statement 151; *Ass'n of N.J. Rifle & Pistol Clubs v. Grewal*, No. 3:17-cv-10507, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018), *aff'd sub nom.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) ("Allen conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of overall statistics on the use of arms in self-defense."). Further, it is undeniable that incidents occur in which 10 or more rounds are necessary to defend oneself. *See* Resp. to Statement 11; *see also* Amy E. Swearer, *If You Can't Beat 'Em, Lie About 'Em: How Gun Control Advocates Twist Heritage's Defensive Gun Use Database in the "Large-Capacity" Magazine Debate*, Heritage Found. (May 17, 2023), at app'x tbl. 1, https://herit.ag/419dXA3 (Exhibit 117) (collecting 22 examples from January 2019 to March 2023). Allen's data, by contrast, cuts off in 2017. There are also a large number of anecdotal accounts of situations in which individuals expressed a *desire* to have had access to more than ten rounds of ammunition reproduced in the *National Firearms Survey*. *See* English, *2021 National Firearms Survey* at 28–32, *supra* Resp. to Statement 11.

191.   **Average number of shots fired for self-defense – NRA Data.** Out of 736 incidents in the NRA Armed Citizen database between January 2011 and May

2017, the average number of shots fired by a person using firearms in self-defense was 2.2. Allen Rpt. ¶ 10.[1]

**Plaintiffs' Response to No. 191:** Disputed. *See* Resp. to Statement 190.

192. Indeed, in the vast majority of incidents—587 (or 79.8%)—the defender fired 1 to 5 bullets; and in 134 (or 18.2%), the defender fired no shots at all. Allen Rpt. ¶¶ 9–10.

**Plaintiffs' Response to No. 192:** Disputed. *See* Resp. to Statement 190.

193. Within that same dataset, only 2 incidents (0.3% of all incidents) were reported where the defender fired more than 10 bullets. In 18.2% of incidents, the defender fired zero shots. In 80% of incidents, the defender fired 1 to 5 shots. In 2% of incidents, the defender fired 6 to 10 shots. Allen Rpt. ¶ 10.

**Breakdown of Incidents in NRA Armed Citizen Database**
**by Number of Shots Fired**
**January 2011 - May 2017**

| # of Shots Fired | # of Incidents | % of Incidents |
|---|---|---|
| 0 | 134 | 18.2% |
| 1-5 | 587 | 79.8% |
| 6-10 | 13 | 1.8% |
| More than 10 | 2 | 0.3% |

*Average Number of Shots Fired: 2.2*

Notes and Sources:
Data from NRA Armed Citizen database covering 736 incidents from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

**Plaintiffs' Response to No. 193:** Disputed. *See* Resp. to Statement 190.

194. These 2 incidents were reported in the database after Allen's initial findings were published (at which time there were zero incidents involving more than 10 shots fired). Underlying reporting of those two incidents did not indicate the defenders needed to fire more than 10 shots to defend themselves. Allen Rpt. ¶ 5 n.2.

**Plaintiffs' Response to No. 194:** Disputed. *See* Resp. to Statement 190.

---

[1] Paragraph 11 is mislabeled as Paragraph 9. *See* Allen Rpt. at 6.

195.   The NRA database is not limited to cases of self-defense in the home, and the number of shots fired was found to be similar in incidents both inside and outside the home. Allen Rpt. ¶¶ 9, 11 n.16.

**Plaintiffs' Response to No. 195:** Disputed. *See* Resp. to Statement 190.

196.   A separate study of the NRA database for an earlier time period, 1997 to 2001, found similar results. Specifically, that study also found that, on average, 2.2-shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. Allen Rpt. ¶ 9 n.14; Yurgealitis Rpt. ¶ 147.

**Plaintiffs' Response to No. 196:** Disputed. *See* Resp. to Statement 190.

197.   An additional study of news reports using the Factiva archive of aggregated news content from nearly 33,000 sources using keyword search criteria resulted in 35,000 stories from January 2011 to May 2017 in the United States. The search criteria matched approximately 90% of the NRA Armed Citizen database reports, and the remaining 10% showed the typical number of shots fired was no different. Allen Rpt. ¶ 12.

**Plaintiffs' Response to No. 197:** Disputed. *See* Resp. to Statement 190.

198.   **Average number of shots fired for self-defense - Factiva.** Separately, a random number generator was used to sample the 35,000 news stories aggregated on Factiva between January 2011 to May 2017 that matched relevant search terms, yielding 4,800 news stories on incidents of self-defense of a firearm in the home. A random selection of 200 such stories were analyzed. In that analysis the average number of shots fired per *story* was 2.61. Allen Rpt. ¶¶ 12–15.

**Plaintiffs' Response to No. 198:** Disputed. *See* Resp. to Statement 190.

199.   There was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering the incident (i.e., the more shots fired, the more news stories covered the incident). A statistical calculation was performed to adjust for this effect, yielding the average number of shots fired per incident as 2.34. In 11.6% of incidents, the defender fired no shots; in 97.3% of incidents, the defender fired 5 or fewer shots. In no incidents was the defender reported to have fired more than 10 bullets. Allen Rpt. ¶¶ 15–17.

**Number of Shots Fired in Self-Defense in the Home
Based on Random Selection of Articles from Factiva**
**January 2011 - May 2017**

|  | Incidents in the Home |
|---|---|
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with <=5 Shots Fired | 195 |
| Percent of Incidents with <=5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

Notes and Sources:
Based on news stories describing defensive gun use in a random selection of Factiva
stories 2011 to May 2017 using search string (gun* or shot* or shoot* or fire* or
arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar*
or intrud* or inva*) and (home* or "apartment" or "property") with region set to
United States and excluding duplicate stories classified as "similar."
Calculated using weights reflecting the probability that a news story on a particular
incident would be selected at random from the total population of news stories on
incidents of self-defense with a firearm in the home.

**Plaintiffs' Response to No. 199:** Disputed. *See* Resp. to Statement 190.

200.  Out of almost 1,000 incidents of self-defense analyzed (736 from the NRA
Armed Citizen database and 200 randomly sampled from Factiva), only 2
involved reports of more than 10 shots fired in a self-defense scenario in the home
(0.2%). Because the analysis excludes incidents without news reportage, and
because the fewer shots fired, the less news coverage there is, the 0.2% figure
likely overestimates the overall percentage of self-defense incidents in which
more than 10 rounds were used. Allen Rpt. ¶18.

**Plaintiffs' Response to No. 200:** Disputed. *See* Resp. to Statement 190.

201.   **Percentage of rifle use for self-defense.** The Heritage Foundation maintains a "Defensive Gun Uses In the U.S." database (DGU), with data beginning in January 1, 2019. An analysis of the 2,714 incidents in the database spanning January 1, 2019 through October 6, 2022 showed 51 incidents where a rifle was used. This represents 2% of all incidents in the database and 4% of all incidents in the database with a known gun type. After conducting the same analysis again, but excluding incidents in states that had restrictions on assault weapons, the results were 48 incidents, representing 2% and 4% of the total number of incidents, 2,499. Allen Rpt. ¶¶ 19–24.

**Plaintiffs' Response to No. 201:** Disputed. *See* Resp. to Statement 190. Just as the NRA "database" is not compiled scientifically, the Heritage database, which is of very recent vintage and only covers the period between January 2019 and the present, is again not a scientific or statistically representative sample of defensive gun uses but rather a compilation of media-verified defensive gun uses. *See* Swearer, *If You Can't Beat 'Em, Lie About 'Em*, *supra* Resp. to Statement 190. Indeed, it collects a tiny fraction of overall defensive gun uses. While the database Allen analyzed had 2,714 incidents for a period of almost three years, "[s]tudies consistently conclude that in any given year, Americans use their guns defensively between 500,000 and several million times, with the best available evidence indicating that the real average is probably somewhere between 1 million and 2 million times a year." *Id*.

202.   **Percentage of handgun use for self-defense.** Within the same dataset, there were 1,113 incidents where a handgun was used. This represents 41% of all incidents in the database and 90% of all reported incidents with a known gun type. Allen Rpt. ¶ 23.

| The Heritage Foundation Defensive Gun Uses Database | | | |
|---|---|---|---|
| Firearm Type | Incidents[1] | % of Total | % of Known |
| (1) | (2) | (3) | (4) |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| Total known: | 1,241 | | |
| Total: | 2,714 | | |

Source:
"Defensive Gun Uses in the U.S.," *The Heritage Foundation*.
Data as of October 7, 2022.
[1] Note that three incidents are coded as having more than one
firearm type and thus the sum by firearm type is larger than
the total number of incidents.

**Plaintiffs' Response to No. 202:** Disputed. *See* Resp. to Statement 201.

203. **Assault Weapons Self-Defense Use in Active Shootings.** An analysis of FBI data of active shootings between January 1, 2000 and December 31, 2022 in the United States revealed 456 active shooter incidents, of which 18 incidents involved defensive gun use by civilians, excluding law enforcement or armed security. For this dataset, active shooter incident refers to attacks by perpetrators "in a populated area." In 17 of the 18 incidents, the firearm used by an armed private citizen was identifiable. 14 involved handguns, 1 involved a shotgun, 1 involved a bolt-action rifle, and 1 involved an assault rifle. Thus, only 5.9% (1 of 17) cases where a firearm was used for self-defense in an active-shooter scenario involved the use of an assault weapon. Overall, only 1 out of 456 active-shooter scenarios in the last 23 years (0.2%) involved an armed civilian intervening with an assault weapon. Klarevas Rpt. ¶¶ 25–26.

**Plaintiffs' Response to No. 203:** Disputed. *See* Resp. to Statement 201. Rifles are used in 13.1% of defensive incidents. English, *2021 National Firearms Survey*, *supra* Resp. to Statement 11.

## Historical Linguistics

204. An appropriate way to glean the original public meaning of constitutional text is to consider historical dictionaries and databases comprising real-world

examples of how Americans used words between Founding and Reconstruction. Vannella Decl. Ex. 6, Rpt. of Professor Dennis Baron ¶¶ 2, 9–20.

**Plaintiffs' Response to No. 204:** Disputed. The "corpus linguistics" approach advocated by Baron relies on computerized searches of databases of historical documents and analyzing how certain words or phrases were used in those documents. This approach was unequivocally rejected by the Supreme Court in *Heller*, which derided the ways in which the "data" used by the proponents of the approach led them to a nonsensical interpretation of the phrase "bear arms" that was "worthy of the Mad Hatter." 554 U.S. at 589. For a more complete critique of the method in this context, *see generally* Mark W. Smith & Dan M. Peterson*, Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation*, 70 Drake L. Rev. 387 (2022) (Exhibit 118).

205.   Between Founding and Reconstruction, the word "arms" referred to weapons. Baron Rpt. ¶¶ 20, 29, 31(q), 32, 74.

**Plaintiffs' Response to No. 205:** Disputed. "Arms" within the context of the Second Amendment has been definitively and bindingly interpreted by the Supreme Court to be broader than this and includes, for instance " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *Heller*, 554 U.S. at 581 (quoting *Arms*, *1 A New and Complete Law Dictionary*); *see also id.* at 580–82. That Baron's method would lead him to define the term in a way that conflicts with binding Supreme Court precedent well demonstrates why his method should not be accepted.

206.   During that same period, the word "arms" was used separately from the word "accoutrements," which referred to accessories such as belts, scabbards, and cartridge boxes. Baron Rpt. ¶¶ 2(a), 23–28, 31(f), 31(*l*), 32, 37, 39, 42–44, 47–48, 51, 55.

**Plaintiffs' Response to No. 206:** Disputed. Belts, scabbards, and cartridge boxes all qualify as "arms" within the meaning of that term as used in *Heller*. *See* 554 U.S. at 580–82. Whether they also could have been referred to as "accoutrements" is irrelevant.

In another demonstration of the limitations of Baron's methods, although he makes much of the fact that he consulted several founding era sources to conclude that these items were referenced as "accoutrements," he omits any discussion of the most important sources. The Constitution gives Congress the authority to "provide for organizing, *arming*, and disciplining, the Militia," U.S. Const. art. I, § 8, cl. 16

84

(emphasis added), and, in the first exercise of that authority in 1792 (one year after the ratification of the Second Amendment), Congress required militiamen to acquire firearms as well as "a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges[.]" The Militia Act of 1792, *supra*. Congress therefore understood "arming" the militia to include outfitting the militia with containers for ammunition. *See Abbott v. Biden*, 70 F.4th 817, 830 (5th Cir. 2023).

207.   "Cartridge boxes," "cartridge cases," and "cartouch cases" were phrases used during this period to describe ammunition containers. Baron Rpt. ¶¶ 3, 30, 31(i), 71.

**Plaintiffs' Response to No. 207:** Admitted. "Cartridge boxes" were, as the name suggests, simply boxes used to store extra ammunition. They were carried by soldiers but not part of a firearm. *See* Don Troiani, *Don Troiani's Soldiers of the American Revolution* 4 (1st ed. 2007) (Exhibit 119).

208.   The word "magazine" is currently used to describe ammunition containers, but it began to be so used only during the latter half of the 19th Century. Baron Rpt. ¶¶ 3, 21–22, 30, 31(n), 58, 67–68. For instance, the Oxford English Dictionary notes the earliest use of magazine meaning "a bullet storage container" as 1868. Baron Rpt. ¶¶ 3, 22, 58, 64. From that point, the word "magazine" gradually replaced the phrase "cartridge box" and the like. Baron Rpt. ¶ 68.

**Plaintiffs' Response to No. 208:** Disputed. The State's attempt to reduce "magazines" to mere "ammunition containers" (as step one of an argument that fails at *every* step, including this one, which proceeds by then analogizing magazines them to "cartridge boxes" and arguing that such items were not "arms" but "accoutrements"), is baseless. Semiautomatic magazines are integral components of semiautomatic firearms which both hold *and feed* ammunition into the chamber to be fired, *see* Nicholas Johnson et al., *Firearms Law and The Second Amendment: Regulation, Rights, and Policy* 1978 (3d ed. 2021), https://bit.ly/3RmvShU. Indeed, most semiautomatic firearms *cannot function semiautomatically* if they are not equipped with a magazine (since without the magazine, they cannot automatically load the next round into the chamber).

209.   Modern magazines often feed ammunition into firearms. Baron Rpt. ¶¶ 30, 31(n), 58.

**Plaintiffs' Response to No. 209:** Admitted. This is a key point differentiating them from a cartridge box.

210.   Historically, cartridge boxes also fed ammunition into firearms. For example, to operate the "Mitrailleuse," a French field weapon analogous to today's machine guns, a person "fire[d] it by turning a crank" and then "removed" "the cartridge box … from the canon" and "put a new one in." Baron Rpt. ¶ 31(n).

**Plaintiffs' Response to No. 210:** Disputed. The ammunition was placed in a single box before being placed into the breech which had 37 firing pins, where *all* of the barrels were loaded simultaneously: as such this "cartridge box" was not analogous to a magazine. Ian McCollum, *Forgotten Weapons: The Mitrailleuse*, Popular Mechs. (Dec. 9, 2015), https://bit.ly/4a4NDeg (Exhibit 120). Furthermore, this "cartridge box" was significantly larger than those that existed at the Founding and that were carried by militia members to use with their muskets or rifles. *See* Resp. to Statement 207. The Mitrailleuse was very similar to the Gatling gun, and it was invented in 1851 in Belgium. *See* Paul Wahl & Donald R. Toppel, *The Gatling Gun* 43 (1965) (Exhibit 121). The reference to the firearm that Baron points to comes from a Missouri newspaper in 1869. There is absolutely no evidence of any type of "cartridge box" from the time the Second Amendment was written that operated integrally with a firearm the way a magazine does today. And the fact that Baron reaches for such an obscure example from so late demonstrates what an outlier this particular usage was. In fact, Baron's other examples from this late period still reference cartridge boxes as items worn on a soldier's clothing, not attached to his firearm. *See, e.g.*, Baron Rpt. ¶ 31(s).

211.   Ammunition containers—whether cartridge boxes or magazines—were not historically understood to be "arms." Baron Rpt. ¶¶ 2(b), 3, 22–23, 29–32, 44, 58, 64, 68, 71, 74.

**Plaintiffs' Response to No. 211:** Disputed. *See* Resp. to Statement 206.

Dated:  December 15, 2023

Respectfully submitted,

/s/ *Bradley P. Lehman*

Bradley P. Lehman
GELLERT SCALI BUSENKELL & BROWN, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com