# EXHIBIT 29

# AR-15/M16: The Rifle That Was Never Supposed to Be

**gundigest.com**/gun-reviews/the-ar-16m16-the-rifle-that-was-never-supposed-to-be

Christopher R. Bartocci                                          July 16, 2012



- AR-15
- Classic Guns
- Gun Reviews
- Military Firearms
- Rifles



The M16-series rifles have served the U.S. military, law enforcement and sportsman with distinction for nearly 40 years. They have become the world's standard for comparison. Here is the latest, the M16A2 assault rifle.



The M16-series rifles have served the U.S. military, law enforcement and sportsman with distinction for nearly 40 years. They have become the world's standard for comparison. Here is the latest, the M16A2 assault rifle.

IN MARCH OF 1965, the first U.S. troops landed in Vietnam. They were carrying the M14 rifle, chambered for the 7.62×51mm NATO (M80 Ball) cartridge, which had a detachable 20-round magazine and was capable of semi- and full-automatic fire. The military soon learned the M14 on full auto was extremely difficult to control; most burst fire was ineffective.

As a result, many M14 rifles were issued with the selector levers removed, making the rifle effectively, an M1 Garand with a 20-round magazine. The M14 was accurate but heavy, weighing nearly nine pounds, empty. As U.S. involvement in the Vietnam War escalated, our troops encountered North Vietnamese as well as the Vietcong carrying the Soviet-designed AK47 (Avtomat Kalashnikova model 47), chambered for the 7.62×39mm Soviet cartridge, and had a 30-round magazine. The AK's light recoil permitted controllable, accurate full-auto bursts and American troops began to feel outgunned. The United States needed it's own assault rifle — and needed it fast.

During the early 1950s, ArmaLite, a division of Fairchild Engine and Airplane Corporation of Hollywood, California, was working on a new assault rifle. The chief engineer was Eugene M. Stoner (1922–1997), described by many as the most gifted firearms designer since John Browning. His first attempt to create a new assault rifle was designated the AR10 (ArmaLite Rifle model 10).

The AR-10 was the first weapon to incorporate Gene Stoner's patented (U.S. Patent No. 2,951,424) gas system. This system uses a port in the barrel to bleed gas from the fired cartridge into a tube that runs under the hand-guard, from the front sight assembly to the upper receiver and into the carrier key on the bolt carrier.

The pressure gives a hammer-like blow to the bolt carrier, pushing it rearward while simultaneously unlocking the eight-lug bolt from the barrel extension. The bolt and bolt carrier, continuing to move rearward, extract and eject the spent cartridge case and the buffer and recoil/buffer spring return the bolt assembly forward, stripping a cartridge off the magazine, chambering it and locking the bolt into the barrel extension. Using expertise gained in the aircraft industry, Stoner designed the upper and lower receivers of the AR-10 to be made of lightweight aircraft aluminum.

The first AR-10 prototype, chambered for the 7.62×5 1mm NATO cartridge carried in a 20-round magazine, was completed in 1955. The rifle proved extremely accurate for a gas-operated weapon. In December 1955, the first AR10 was presented to the Infantry Board and School at Fort Benning, Georgia, by Gene Stoner and George Sullivan, an ArmaLite executive. Stoner demonstrated his new weapon concept to General William Wyman at Fort Benning on May 6th, just five days after the announcement of the adoption of the M14.

Subsequently, the Board recommended further investigation into the AR-10. In 1957 General Wyman, impressed by the merits and performance of the AR-10, went to the ArmaLite Company and asked Gene Stoner to join a weapons program, offering ArmaLite financial

support for future development of ArmaLite rifles in exchange for proprietary rights to the final product. Subsequently, ArmaLite introduced a totally new concept for the modern battlefield, a 22-caliber battle rifle. As a result, the 30-caliber AR-10 was to have a short history with the U.S. military.

The AR-10, scaled down to fire the popular 222 Remington cartridge, had little recoil in semi-auto mode and was amazingly controllable on full-auto. There was heavy resistance to the radical new design from the Ordnance Corps, especially from Dr. Frederick Carten. Doctor Carten was adamantly opposed to weapons developed by commercial companies outside the Ordnance Corps and Springfield Armory, as well as guns made of aluminum and plastic.

General Wyman ordered 10 of these new rifles, along m with 100,000 rounds of ammunition, for Infantry M Board trials. ArmaLite's W focus was thus changed to the 22-caliber rifle and the AR-15 M (ArmaLite Rifle model 15) was born. In 1958, General Wyman ordered the Army to conduct the first tests on the new AR-15.



The original AR15; the weapon configuration that Colt bought from ArmaLite. Notice the three-prong suppressor, the fibrite stock/ pistol/grip/firearm grips, the absent forward assist and the smooth bolt carrier without forward-assist grooves. This was the model used in the Department of Defense testing which launched the weapon's reputation for durability, reliability and accuracy.

Among the changes from the AR-10 to the AR-15 were revised sights to accommodate the flatter-shooting 22-caliber cartridge; elevation to be adjusted via a threaded front post sight rather than within the rear sight, where a less expensive L-shaped peep sight was

substituted. The resulting rifle was 37½ inches long and weighed an incredible 6 pounds empty; 6.12 pounds with a loaded 25-round magazine.

The AR-15 made use of high-impact fibrite stocks, pistol grips and handguards. A selector lever on the left side of the rifle could be manipulated with the shooter's right thumb without removing the hand from the pistol grip. The magazine release, on the right side of the receiver, could be operated with the trigger finger; when pressed, the magazine would drop free.

A fresh magazine, requiring no camming — or 'rocking' — could be inserted straight into the magazine well. This attribute contributed significantly to speedy reloading in combat situations compared to its closest rival, the AK47/AKM. These are two of the main reasons why the AR-15/M16-series rifles are considered the finest human-engineered assault rifles in the world.

A bolt catch mechanism is located on the left side of the rifle. When the last round was fired, the magazine follower would elevate the bolt catch and lock the bolt to the rear. After inserting a full magazine, the rifleman would push in on the upper portion of the bolt catch to release the bolt and load the rifle. The receivers, produced from 7075 T6 aircraft aluminum, which helps keep the rifle lightweight and dissipates heat better than conventional metals, are hard-anodized with a non-reflective matte gray weather-resistant finish.

Stoner went to Aberdeen Proving Ground for ammunition assistance. He enlisted the expertise of Robert Hutton, known as the father of the 5.56×45mm round. The pressures involved were more than the 222 Remington case could handle, so the 222 Special was developed.

Sierra Bullet Co. made the 55-grain full metal jacket boat-tail bullet and the first "222 Special" ammunition was loaded by Remington Arms. This cartridge, with a muzzle velocity of 3250 fps and a maximum effective range of 460 meters, became the 5.56×45mm Ball M193/223 Remington.

Tests by the Infantry Board and School at Fort Benning went very well for the AR-15. Stoner personally delivered the weapons and conducted training and familiarization classes for all involved in the testing. In March of 1958, the Board found some "bugs" in the AR-15 system. Some of the resultant changes incorporated in the first rifles were reduction of the trigger pull to seven pounds; replacement of the one-piece handguard with a two-piece triangular handguard; magazine capacity reduced from 25 to 20 rounds and the switching of the selector lever settings.

The Board found the AR-15 to be nearly three times more reliable than the M14 in the development stages. Despite the positive conclusion of the test, Dr. Carten's report stated the AR-15 had not demonstrated sufficient technical merit and should not be developed by the Army. Accordingly, the Ordnance Corps lost interest in the AR-15.

When Bill Davis, at the time Chief of the Small Arms Branch at Aberdeen Proving Ground, first encountered the AR-15, he was quite impressed and found it had no shortcomings that would not be worked out in the normal course of development. Davis thought Carten's decision to drop the AR-15 rifle was a bad one and that the weapon held great promise.



The Army/Marine version adopted towards the middle of the Vietnam War to serve the U.S. Marines (until 1983) and the Army (until 1986). Note the forward assist, magazine release fence "Boss" and the "bird cage" flash suppressor. Note the 25-meter zeroing target.

On February 19, 1959, Colt's Patent Firearms Manufacturing Company of Hartford, Connecticut purchased the rights to the AR-15 and AR-10 from Fairchild Stratos (ArmaLite) for a lump sum of $75,000 plus a royalty of four and a half percent on all further production of the AR-15 and AR-10. Colt also paid Cooper & Macdonald (a sales group who did a lot of work in Southeast Asia) $250,000 and a one percent royalty on all production of AR-15 and AR-10 rifles.

In July of 1960, Air Force General Curtis LeMay attended a Fourth of July celebration where a Colt salesman placed three watermelons on a firing range at distances of 50, 100 and 150 yards — then gave General LeMay an AR-15 and loaded magazines. Following this hands-on range evaluation, General LeMay ordered 80,000 rifles on the spot. However, Congress put the General's order on hold.

Concurrently, Colt had requested a re-trial from the Ordnance Corps to demonstrate improvements to the rifle. Initially the request was denied, the Ordnance Corps saying the military had no use for such a weapon. However, a request arrived at the Pentagon from Lackland Air Force Base requesting the AR-15 be qualified as a candidate to replace M2 carbines. This turn of events caused Congress to investigate why the Ordnance Corps had boycotted the AR-15. Subsequently, the Ordnance Corps set up the test without delay.

The test was concluded in November 1960. Three rifles were subjected to a light machine-gun test and two to accuracy tests. There were a total of 24,443 rounds fired. One rifle in the accuracy test delivered an amazing 10-round group at 100 yards that measured only 1.5

inches; any group under six inches at 100 yards being acceptable for an assault rifle. The rifle also performed admirably in the unlubricated, dust, extreme cold and rain tests. The final results indicated the AR-15 was superior to all competitors, including the M14. The rifle was then approved for Air Force trial.

It took General LeMay three tries before his request was approved. In the summer of 1961, the Deputy Defense Secretary approved 8,500 AR-15 rifles for the Air Force, pending congressional approval … which Congress withheld. General LeMay then brought the issue to President Kennedy, without success. Finally, in May of 1962, the purchase was approved. With things warming up in Southeast Asia, the AR-15 was about to meet the Army.

Many of the U.S. advisors in Vietnam were equipped with the new AR-15 rifle. Rifles began to surface throughout Vietnam, totally outside the normal small arms procurement process. The first troops using the AR-15 under combat conditions were very enthusiastic, preferring it to all other weapons. The South Vietnamese were impressed with the rifle, as well. In December 1961, Secretary of Defense Robert McNamara authorized a purchase of 1,000 AR-15s.

There was further testing (Project AGILE) to explore the compatibility of the AR-15 rifle to the smaller Vietnamese. The results indicated the AR-15 was more suitable for the South Vietnamese military than the M2 carbine. In actual combat, the new 5.56×45mm cartridge was found to be more lethal than its 30-caliber counterparts. while Project AGILE testing was being conducted, the Army completed the Hitch Report, which was a comparison of the AR-15, AK47, M14 and Ml Garand. The report concluded that the AR-15 was superior to the weapons to which it was compared.

Testing of the AR-15 weapon system had met with contempt from the Ordnance Corps. In one test in the Arctic, weapons were malfunctioning at alarming rates. As soon as Gene Stoner heard, he was on the next plane to Fort Greeley, Alaska. He found parts misaligned, front sights removed (front sights held in with taper pins have no reason to ever be removed) and replaced with pieces of welding rod.

With missing and damaged parts, there was no way the weapons would function properly and, with welding rod replacing the front sight, accuracy suffered. The arctic test was, in fact, rigged to make the AR-15 look inadequate. Gene Stoner repaired all the weapons; the test resumed and the weapons performed admirably.

Fortunately, Defense Secretary McNamara was fond of the AR-15, knew the Ordnance Corps was dragging its feet on the weapon and on January 23, 1963, halted all procurements of the M14. Finally, in 1964, Defense Secretary McNamara ordered the Ordnance Corps to work with all branches of the armed forces to get the AR-15 ready for issue to all military personnel…one rifle for all branches. The Army purchased 100,000 rifles for issue to the Air Assault, Airborne, Ranger and Special Forces units.



The firing sequence of Gene Stoner's design. After the hammer strikes the primer and fires the round, the bullet travels down the barrel and reaches the gas port where gas is bled into the gas tube and back into the bolt carrier assembly. The diverted gas delivers a hammer-like blow and moves the carrier to the rear, unlocking the bolt, extracting and ejecting the fired cartridge. The buffer spring returns the bolt carrier forward, chambering a fresh round and locking the bolt into the barrel extension — the rifle is now ready to fire again. Printed with permission of Colt Firearms.

After the AR15 — now, the M16 rifle — went into circulation, more was learned about how to improve the rifle. The rifling twist was changed from 1:14 inches to 1:12 inches. The Army wanted a manual bolt closure device added so, if the bolt failed to lock, it could be manually closed — and the forward assist assembly was born. The firing pin was lightened to prevent slam-fires (caused by the inertia of the firing pin when the bolt closed on a round). The buffer was changed from the original hollow version to one with weights in it to prevent the bolt from bouncing back when it slammed into the barrel extension.

On November 4, 1963, Colt was awarded a contract worth $13.5 million dollars for the procurement of 104,000 rifles … the legendary "One Time Buy." Of those rifles, 19,000 were M16s for the Air Force and 85,000 were the XM16E1 (with the bolt closure device/forward assist assembly) for the Army and Marines. The XM16E1 was adopted as the M16A1 rifle. Steps were taken to procure ammunition.

Procurement of the ammunition is one of the main factors in the rifle's performance early in the Vietnam War. The initial ammunition used by DOD was made to Armalite/Colt specifications that called for IMR 4475 propellant.

The weapon's reputation for durability and reliability was based on this ammo/extruded propellant combination. However, the military wanted to standardize propellants and the propellant used in the established 7.62×51mm NATO cartridge was Ball powder

manufactured by Olin Corporation. So, when ammunition was ordered, Olin's Ball powder was used for the new 5.56×45mm M193 Ball cartridge. Both powders created the desired 50,750 psi.

Ball (spherical) powder reaches its peak pressure significantly faster than extruded IMR powder. Ball powder generates larger amounts of carbon residue that clogs the gas tube and barrel port, causing the firearm to malfunction. The most serious malfunctions, during the early use of Ball powder, involved extraction problems and a significant increase in the cyclic rate of fire. Despite having this information, the Department Of Defense still approved use of Ball powder.

Gene Stoner was approached by Frank Vee of the OSD Comptrollers office after the package was approved and asked what he (Gene Stoner) thought of the use of Ball powder. Stoner asked, "Why are you asking me now?" Vee said, "I would have felt better if you would have approved the package." Stoner replied, "Well, now we both don't feel so good."

The "one-time buy" was now a thing of the past. The original $13.5 million contract turned into a $17,994,694.23 contract. There were an additional 33,500 rifles that went to the Air Force, 240 to the Navy and 82 to the Coast Guard. Over $517,000 worth of spare parts was ordered.

The first field performance reports, from the 5th Special Forces in Vietnam, were excellent. The rifle had been well received and was very popular, although instruction manuals were in "short supply." During the investigation by the Ichord Subcommittee of the M16 Rifle Program, Honorable Richard Ichord said — regarding the rifle's reputation with the North Vietnamese Army and Vietcong — "I understand that they refer to this rifle as 'black rifle,'…I have heard their motto is 'Beware of the units with the black rifles'… they have been possessed with deadly fear."



Tlution of the M16 to the M16A1 is very evident when the rifles are compared side by side. The M16 (top) and the M16A1 (bottom). Note the addition of the forward bolt assist, magazine fence guard "BOSS" and the "birdcage" flash suppressor on the M16A1.

In September 1965, General Westmoreland ordered an additional 100,000 rifles and requested all U.S. ground forces in Vietnam be equipped with the new M16A1 rifles. Colt now signed an additional contract to deliver 25,000 rifles a month by December 1966. In 1968, GM Hydramatic Division and Harrington & Richardson were awarded second-source contracts from the Department of Defense.

Letters from the field began reporting the rifles were malfunctioning at an alarming rate, with U.S. troops found dead next to jammed M16 rifles. Spent cartridge cases were becoming lodged in the chamber and the only way to remove them was to knock them out with a cleaning rod. Requests were made for Colt to send a representative to the field to solve this problem. This turn of events was highly publicized by the media.

A representative from Colt, Mr. Kanemitsu Ito, went to Vietnam and claimed to be shocked, having never seen equipment in such poor shape. He claimed to have looked down the barrel of one rifle and not seen 'daylight' due to severe rusting and pitting. Many of the troops he spoke to said they were never trained to maintain their rifle, that the rifle was "self-cleaning" and that they had not handled an M16/M16A1 rifle until they arrived "in-country." Subsequently, Mr. Ito gave classes on maintenance all over South Vietnam.



The combat 5.56×45mm. The M193 Ball Cartridge (left), 55-grain full metal jacket boattall bullet. The M855/SS109 Ball Cartridge (right), 62-grain full metal Jacket boattall with a hardened steel penetrator core. Identified by the green tip.

Seeking an independent, unbiased report of the true field performance situation, the Ichord Congressional Subcommittee selected a retired officer, Colonel Crossman, as their representative and sent him to Vietnam. In the course of his investigation, he interviewed 250 soldiers and Marines throughout South Vietnam, fully 50 percent of whom reported malfunctions with their M16/M16A1 rifles.

Of these malfunctions, 90 percent were failures to extract. Colonel Crossman found 22-caliber cleaning kits in short supply and concluded many of the problems were due to lack of maintenance and cleaning. He also felt there was room for improvement in the rifle. He concluded, "It was not possible to correlate ammunition make or type with malfunctions." His findings report, dated June 16, 1967, included the statement that the rifle needed a complete overhaul in design and manufacture.

According to Gene Stoner, there were hardly any 22-caliber cleaning kits in Vietnam — and no instruction manuals. The "cleanup" began: The military developed bore and chamber cleaning brushes and began to distribute 22-caliber cleaning kits, firearm maintenance cards and instruction manuals, for the M16/M16A1 rifles.

From May 15th through August 22nd, 1967, the much-publicized Ichord Congressional Subcommittee (Honorable Richard Ichord, Chairman) investigated the history, development, testing, procurement and foreign sales of the M16 rifle. During the investigation, the

subcommittee visited U.S. military training installations of all branches where the committee members interviewed hundreds of Vietnam returnees on their experiences with the M16/M16A1 rifle.

They also visited South Vietnam to interview troops in combat zones. Several people were called to testify before the subcommittee. Two topics, not identified until after the subcommittee returned from Vietnam, were the propellant and high cyclic rate issues. The subcommittee would focus most of their attention on these two aspects.



The M16A1 field-stripped. The ease and simplicity of disassembly made cleaning easy. All AR-15/M16-series weapons disassemble in the same manner.

Reports from Vietnam of failures to extract in the field caused the subcommittee great concern. They investigated, finding the major contributor to malfunctions was ammunition assembled using Ball powder. The change from IMR extruded powder to Ball powder in 1964 for the 5.56mm ammunition was neither justified nor supported by test data, they found. The subcommittee also found the Ball propellant sole-source position enjoyed by Olin Mathieson for many years — and their close relationship with the Army — may have influenced Army Materiel Command.

They felt the AR-15/M16 rifle, as initially developed, was an excellent and reliable weapon. Further, certain modifications made to the rifle at the insistence of the Army — also unsupported by test data — were unnecessary. For example, both the Air Force and the Marine Corps found no evidence to support the expense and possible problems of the manual bolt closure (forward assist) device.

Gene Stoner was called to testify at the congressional hearings to explain the extraction problem; he explained the failure to extract was due to the use of Ball powder.

Gene Stoner [To Mr. Bray]: "Well, the cartridge tends to stick under high residual pressure in the barrel, and of course with this too-soon action you also have a higher bolt velocity. In other words, your bolt is trying to open at higher speeds, so you have an aggravated condition where the cartridge is tending to stick in there a little longer or a little harder, and you are also giving it a harder jerk by driving the bolt faster."



The battle cartridges of the 20th Century ( left to right ): 7.62×63mm (30-06 Springfield); 8mm Mauser; 7.62×54mm Russian; 7.92×33mm Kurtz; 30 US Carbine; 7.62×51 mm NATO (308 Winchester); 7.62×39mm Soviet; 5.56×45mm NATO (223 Remington) and the 5.45×39mm Soviet.

Mr. Bray [To Gene Stoner]: "Then a faster rate of fire could cause that situation (failure to extract)?"

Gene Stoner [To Mr. Bray]: "This is probably one of the worst conditions you can get, by increasing the cyclic rate."

Basically, Ball propellant causes the bolt to open prematurely, before the spent cartridge case has had sufficient time to contract. The result is the extractor shears off the rim of the spent cartridge case — which sticks in the chamber. Ball and IMR powders create the same peak pressure but the Ball powder reaches its peak much faster than IMR powder, causing a significant increase in the cyclic rate of fire.

Ball powder leaves significantly more fouling in the chamber and bolt assembly. Gene Stoner also pointed out the rifle had gone through more than 22 changes from his original design and neither Colt nor the Department of Defense consulted him on how some changes would impact his design.

The forward assist was one of the changes on which he was not consulted and Mr. Ichord asked Gene Stoner his opinion of the device.

Gene Stoner [To Mr. Ichord]: "I wasn't in on that, except I was told the Army insisted on it. There were reasons for it.

One reason was that they felt that due to the fact that the M1, and the M14 rifle, and the carbine had always had something for a soldier to push on; that maybe this would be a comforting feeling to him, or something. I could never quite get it through my mind that it was necessary. I did not really advise it. I thought it was a mistake, myself. But I made my thought known to the people."



Which is the better assault rifle? The M16A1 (top) or the AKM/AK47 (bottom)? Both are the most prolific military rifles of the last half of the 20th century; the most tested and most produced all over the world. Author feels hands-down winner is the M16 series.

He explained the last thing you want to do is force a round into a dirty chamber, which quickly leads to function failures. The chamber fouling tends to embed in the soft brass cartridge case and lock it in, causing a fired cartridge case to be — literally — locked into the chamber at the moment of extraction.

Gene Stoner was able to prove the rifle and ammunition combination he furnished to Armalite/Colt was a totally reliable weapon system and the change the military made, without his consent, caused the malfunctions. He told the committee he expressed these concerns to the OSD Comptrollers office and was ignored. The subcommittee accepted this as the reason for the condition.

M16 rifle project manager, Col. Yout, was of particular interest to the subcommittee. Throughout the hearing he was accused of making irresponsible decisions as to the direction of the program.

Mr. Ichord [to Col. Yout]: "We have evidence and are advised by our experts … that Ball propellant, which you apparently speak so highly of, does have an adverse affect upon the operation of the M16 rifle. It speeded up the cyclic rate. It is dirtier burning … . When we are also advised that the Army was cautioned against making this change from IMR to Ball propellant … Naturally, we would be quite concerned. Apparently you aren't so concerned. I don't understand your explanation. I just haven't been able to understand you — but perhaps you haven't offered the information in words I can understand. Would you care to say something?" He never replied to the question.

The Army made a statement on July 27, 1967: "From the vantage point of retrospect, it has sometimes been suggested that the particular behavior of Ball propellant should have been predicted … Had the Army anticipated these developments, it is most unlikely that the course chosen in January, 1964, would have been the same. A decision to reduce the velocity requirement, and continue loading IMR4475 propellant would probably have been made instead, and development of alternate propellants could have been pursued more deliberately."

This is the closest to an admission of negligence by the Army for the decision to use Ball powder. Gene Stoner warned them long before it got to this point; who would know more about the rifle's performance and design intent than the man who designed it? In the end, the rifle was not the problem; instead, this was an ammunition-driven problem that altered the design intent of the rifle.

In August 1967, the hearings ended, and in October 1967, the subcommittee concluded, "Grave mismanagement, errors of judgment and lack of responsibility had characterized the Army's handling of the entire M16 program." They stated the officials in the Department of the Army were aware of the adverse affect of Ball propellant on the cyclic rate of the M16 rifle as early as March 1964, yet continued to accept delivery of additional thousands of rifles that were not subjected to acceptance or endurance tests using Ball propellant.

All Colt endurance testing was done using IMR 4475. The subcommittee also concluded, "The failure on the part of officials with authority in the Army to cause action to be taken to correct the deficiencies of the 5.56mm ammunition borders on criminal negligence."

The cyclic rate of the rifle was increased 10 to 15 percent (approximately 200 rounds per minute), resulting in higher stress on certain components caused by the higher velocity of the bolt carrier assembly. As a result, there were parts driven beyond their working parameters – as well as the bolt opening prematurely.

Many parts were changed to more stringent specifications to help deal with the higher pressure curve and harder impact. To solve the chamber corrosion and failure-to-extract issues, all future production rifle barrels would be chrome-lined. Even though chrome-lining

barrels is a military specification, Ordinance failed to require this basic requirement on the AR-15/M16 rifle system.



The CAR15 (Colt Automatic Rifle 15) gained major popularity with the development of the new M4 and M4A1 carbine. Note the telescoping stock and the shorter barrel. Most CAR15 rifles were issued with a 14.5-inch barrel.

Chrome-lining the barrels gave three major improvements to the standard barrel. First, the chrome-lined barrel was corrosion resistant. Second, chrome is slippery in nature and assists in extraction and ejection. When chromed, the walls of the chamber are harder; sand and mud don't "iron" into them. Thirdly, chrome is 2 to 3 times harder than standard barrel steel so the barrel lasts significantly longer.

The new, improved M16/M16A1 barrel assemblies would have stamped on the barrel, in front of the front sight assembly: "C" (Chrome Chamber Only), "C MP B" (Chrome Chamber, Barrel & Magnetic Resonance Tested) or "C MP Chrome Bore"(Chrome Chamber, Barrel & Magnetic Resonance Tested). Many experts, including Bill Davis, felt the failure to chrome the chamber was responsible for many of the early malfunctions in Vietnam.

The flash hider was changed from the early three-prong to the new "bird cage" style. The three-prong suppressor was superior to the new design, but was snagprone in the field. With these modifications in place, the M16/M16A1 rifle was "perfected" and performing to the Department of Defense acceptance standards.

## The AR15/M16 Carbines

Soon there was a demand for a smaller, more compact, version of the rifle. Early in 1966, the Army expressed interest for a carbine for its special operation units, placing an order totaling some 2,050 carbines. Lieutenant Col. Yout later ordered an additional 765 Colt "Commandos" — and a new name was coined for the carbine project. The first carbines were known as CAR15 (Colt Automatic Rifle). These first designs incorporated a 10-inch barrel and a sliding butt stock. Later the barrel was changed to 11.4 inches to permit the weapon to launch grenades. The Army signed a contract for 2,815 "Commando model" submachine guns on June 28, 1966.

As expected, the CAR15 — now the XM177E2 — successfully passed all testing phases at Aberdeen Proving Ground. However, a new problem appeared: the deafening noise and large fireball from the muzzle, thanks to the CAR15's higher cyclic rate of 700 to 1,000 rounds per minute. As a remedy, many of these rifles were equipped with 14.5-inch barrels, a practice that carried over to the M4 project of the early 1980s.

Product Improvement (PIP)

On October 28, 1980, there was a new 5.56×45mm cartridge on the block. NATO (Northern Atlantic Treaty Organization) had adopted the Belgian-made SS109. This new bullet had two major differences from the GI 5.56×45mm M193 Ball cartridge. First, the bullet weighed 62 grains instead of 55 grains. Second, this new bullet had a hardened steel penetrator core, giving this new 5.56×45mm round better penetration at all distances than the 7.62×51mm NATO (M80 Ball) round.This new SS109 round penetrated three 3.5mm mild steel plates at 640 meters and a U.S. issue helmet at 1,300 meters.

The new 5.56×45mmNATO round revolutionized military small arms ammunition all over the world. In 1974, the Soviet Union switched from the 7.62×39mm (AK47/AKM) to the 5.45×39mm Soviet round of the new AK74 rifle. This new round was a .221-inch diameter 52-grain full metal jacket boat-tail armor-piercing bullet with a velocity of 3000fps.

The new SS109 round was more lethal than the original M193 Ball round due to the faster "spin" and fragmentation upon impact with soft tissue.



The SR25, perhaps the most accurate autoloader on the face of the earth. Gene Stoner revives
his original AR10 design, with some added features of the M16A2, to build this semi-automatic
7.62×51 mm sniper rifle.

Military surgeons all over the world have asked the United Nations to ban small caliber high-
velocity rounds in combat — including the 5.56×45mm and the 5.45×39mm cartridges —
which they believe cause unnecessary pain and suffering.

Switzerland re-designed the M855/SS109 round with a thicker jacket to stop fragmentation
upon impact.

This new cartridge, however, was significantly more accurate at longer ranges than the M193
Ball cartridge, boosting the maximum effective range to 800 meters. To accommodate this
new cartridge, a new barrel twist — from 1:12 inches to 1:7 inches — was required to
stabilize the heavier 62-grain bullet.

There was a catch: the SS109 ammunition could not be fired accurately in an M16/M16A1
rifle due to its slower rifling twist. The bullet would not stabilize and would "keyhole" in flight.
This new cartridge was about to be adopted as the M855 Ball cartridge of the U.S. military
and the new PIP project would redesign the M16A1 rifle around this cartridge.

The United States Marine Corps began negotiations with Colt in January of 1980, asking for three modified rifles that would make use of the new FN SS109/XM855 cartridge and would incorporate four Marine-designated changes:

1. The sights must be adjustable to 800 meters.
2. The bullet must be accurate to 800 meters and possess the capability to penetrate all known steel helmets and body armor at 800 meters.
3. The strength of the plastic stock, pistol grip and handguards  — as well as the strength of the exposed portion of the barrel — must be improved.
4. The rifle must have the full-auto capability replaced with a 3-shot burst mode.

## The Joint Services Small  Arms Program (JSSAP) PIP

The first rifles arrived from Colt in November of 1981. The USMC Firepower Division at Quantico, Virginia, would lead the PIP project. On November 11th, 20 Marines and 10 soldiers from the 197th Infantry Brigade at Fort Benning, Georgia, would take 30 M16A1 rifles and 30 M16A1E1 (PIP rifles) and test them for a month.

The test report was issued on December 11th and the conclusions were as follows:
• The sights were easily adjusted in the field by hand rather than with a bullet tip.
• Increased the effectiveness at long range, more so than the M16A1.
• More durable plastic furniture on the M16A1E1, for hand-to-hand combat.
• Sights were better for low-light conditions thanks to a larger-diameter (5mm) close-range aperture in the rear sight.
• Increased ammunition conservation and more effective fire with the 3-round burst than with full-auto fire.
• Utilized the XM855 NATO (SS109) ammunition, which improves the accuracy and penetration at all ranges. The product-improvement (PIP) "M16A1E1" was classified as the M16A2 in September of 1982 and was adopted by the United States Marine Corps in November of 1983. The Marines ordered 76,000 M16A2 rifles from Colt. The Army did not adopt the M16A2 until 1986.



The M16A2 is mechanically identical to the M16 and the M16A1. The only difference is the 3-round burst selector setting in lieu of full-auto. All the changes were improvements to accuracy, more durable stock and grips as well as some structural reinforcements.

## The M16A2 Rifle

There were twelve major changes from the M16A1 to the M16A2 and, although the rifles seem similar at first glance, they are two totally different weapons. Many improvements were necessary to accommodate the new M855 Ball and M856 tracer rounds. The twelve major variances between the AI and A2 are as follows:

1. The flash suppresser of the M16A1 is now a muzzle brake/ compensator on the M16A2. Instead of having vents all around the flash suppresser, the bottom has been left solid, which reduces muzzle climb and prevents dust from flying when firing from the prone position.

2. The barrel, from the front sight assembly to the flash suppressor/compensator, is heavier. The M16A1 rifles barrels were known to bend when paratroopers landed and the barrels hit the ground. When the AI barrels would heat up, sling tension could bend them. The new M16A2 barrels had a rifling twist of 1:7 inches to accommodate the SS109/M855 cartridge.

3. The front sight post on the M16A2 is square, contrasted to the round post of the M16A1.

4. The M16A2 handguard was redesigned to have an interchangeable, upper and lower, round ribbed handguard.

5. The slip-ring "delta ring" was redesigned and is now canted for easier removal of the hand-guards.

6. A spent shell deflector was added to the upper receiver behind the ejection port of the M16A2 to accommodate left-hand shooters and, as well, the pivot pin area of the upper receiver has been strengthened. The area around the buffer tube extension (takedown pin area) was strengthened to prevent cracking during hand-to-hand combat or from impact on the butt of the weapon while cushioning one's fall.

7. The rear sight was redesigned. The 1.75mm and 5mm apertures made adjustable for windage as well as elevation. The maximum elevation setting is 800 meters. There is still an "L-shaped" sight aperture, and there is a 5mm aperture battle sight effective to 200 meters.

8. The forward assist assembly was changed from the "tear drop" style of the M16A1 to the new round "button" style forward assist assembly of the M16A2.

9. The pistol grip is now made of a stronger plastic (™Zytel), and incorporates a "swell" below the middle finger position.

10. The three-shot Burst selector lever setting of the M16A2 replaced the Auto setting of the M16A1.

11. The⅝-inch longer M16A2 stock is made from foam-filled nylon, said to be ten to twelve times stronger than the fibrite stocks of the M16 /M16A1.

12. The buttplate has been made stronger (™Zytel), and the entire buttplate is checkered. The trapdoor can be opened by hand rather requiring the tip of a cartridge.

## Critics Attack the M16A2

There were critics who still found problems with the M16A2. One of the greatest criticisms was the substitution of the Burst mode for the Automatic mode selector option. The critics reasoned the M16 rifle was adopted because U.S. troops felt outgunned by the North Vietnamese Army/Viet Cong who were equipped with full-auto AK47s.

While, theoretically, the 3-round burst was more effective than full-auto fire, there was no substitute for a well-trained automatic rifleman. More recently, infantry units have noticed it takes more time to clear rooms and buildings in the MOUT (Military Operations in Urban Terrain) environment with the 3-round burst versus the full-auto mode and feel the full-auto option is desirable in those circumstances.

Not only was the conceptual validity of the three-round Burst under scrutiny, but the mechanical design as well. The burst mechanism does not recycle. If only two rounds were fired — because the trigger was not held long enough or the weapon ran out of ammunition — the next time the trigger was pulled only one round would fire.

Further, some critics found the sighting system too complex. The Canadian military addressed many of the issues brought up by American military critics. When Canada replaced their aging FN FAL 7.62mmNATO rifles, they modeled the new rifle after the M16A2. Their Diemaco-manufactured C7 was, virtually, an M16A2 that retained the rear sight and the full-auto setting of the M16A1.

Some critics did not like the fact that the new M855 cartridge could not be fired in the current issue M16 /M16A1 rifles without raising concerns that the fast I:7-inch rifling twist would more quickly burn out barrels during extended rapid fire.



The forward assist bolt closure mechanism. The M16A1 (shown) had the "tear drop" style while the new M16A2 has a round button style.

## The "Shorty" Program Revisited: The M4 Carbine

In 1994, the Army adopted the second carbine of the 20th century and the first general issue carbine since 1941, the M4, perhaps the finest carbine ever developed. They were, at first, to be used by special operation units, but then were selected for use in many other units. Deliveries began in August of 1994, from Colt's Manufacturing, for 24,000 M4 carbines contracted at $11 million; another contract followed in 1995 for 16,217 M4A1 carbines.

The M4 is basically an M16A2 with a telescoping butt stock and a 14.5-inch barrel. The barrel has the heavy profile of the M16A2 barrel with a modified groove to accommodate the M203 grenade launcher. With its 14.5-inch barrel, the M4 fires the M855 Ball round at 2900 fps.

The M4 incorporates the M16A2 fully adjustable rear sight. Colt's Manufacturing claims there is little, if any, difference in accuracy at ranges up to 500-600 meters. M4 carbines can be found with either full-auto or burst settings. The M4 duplicates the reliability and accuracy of the full-size rifle and weighs only 5.65 pounds.

The M4 has two variants, the standard M4 and the M4A1. The M4A1 is identical to the M4 with the exception of its removable carrying handle, which is attached to a Picatinny Weaver rail system. This arrangement enables easy attachment of optical sighting systems or, by

reattaching the carrying handle, use of the iron sights.

## Rebirth of the AR-10, Further Developments by Gene Stoner

The legacy of the ArmaLite rifles is far from over. The great weapons designer, Eugene Stoner, never stopped working on his AR-10 design. He, along with C. Reed Knight of Knight's Manufacturing, perfected the AR-10 and added many design features of the M16A2, to build the SR25 (Stoner Rifle Model 25). The model number comes from adding the 10 from the AR-10 and the 15 from the AR-15.

Basically the SR25 looks like an M16 on steroids, beefed up to accommodate the 30-caliber round. The SR25 Match rifle is a 7.62×51mm NATO sniper rifle. Knight's Manufacturing is one of the only manufacturers that guarantee their rifle will shoot one minute of angle at 100 yards using factory 168-grain Match 7.62×51mm NATO/308 Winchester ammunition. This rifles incorporates the 5R rifling sniper barrel manufactured by Remington Arms for the M24 sniper rifle.

Knight's Manufacturing is the only company to which Remington has ever sold these precision barrel blanks. The 5R rifling is designed to optimize the use of 168-grain Match 7.62×51mm NATO/308 Winchester ammunition. Many firearms experts claim the SR25 is the most accurate semi-automatic rifle in the world.

In May of 2000, the U.S. Navy SEALS adopted the SR25 — now classified as the Mk 11 Mod 0 — as a full weapons system: rifle, Leupold scope, back-up pop-up iron sights and a sound suppressor. This is a modified SR25 Match rifle, which has a 20-inch barrel instead of 24-inch barrel. Following this sale, the U.S. Army Rangers also purchased SR25 rifles.

## Production Sources of Civilian/ Military Versions of the AR-15/M16

The AR-15 rifle has been copied all over the world, in military and sporting configurations. The Canadian military adopted the C7 as its main battle rifle. The C7, literally a modified M16A2 rifle, is manufactured by Diemaco of Ontario, Canada, an unknown company to most of the world but a large player in this weapons system.



The latest in the M16 family, the M16A2. The standard by which all assault rifles are judged.
Note major changes: fully adjustable rear sight, round handguards, longer stock, finger swell
on pistol grip and cartridge case deflector. Note the 25-meter zeroing target.

Diemaco has supplied their C7 and C8 weapons systems to Denmark, Norway, New Zealand and the Netherlands. They also equip the legendary British SAS and SBS with their SFW (Special Forces Weapon), designated the British L119A1 Assault Rifle. There have also been other military copies of the M16-series rifle made by Elisco Tool Company of the Philippines and Chartered Industries of Singapore.

Currently manufacturing the M16A2 and M4 carbines for the U.S. military are Colt's Manufacturing Inc, Hartford, Connecticut, and FN Manufacturing of Columbia, South Carolina. Quality Parts/Bushmaster Firearms of Windham, Maine, have manufactured approximately 400 complete M4 carbines for the United States Department of Defense as well as an additional (approximately) 400 complete M4 upper receivers assemblies.

The semi-automatic Colt AR-15/ Sporter-series rifles have become very popular in the world of competitive shooters. Colt's Manufacturing Company, Inc., manufactures more civilian versions of the rifle than any other manufacturer, even though there are many other semi-auto clones produced. One of the finest is the XM15E2S, made by Quality Parts-Bushmaster Firearms. Some other manufacturers are Olympic Arms of Olympia, Washington, and ArmaLite, Inc., a division of Eagle Arms of Coal Valley, Illinois.

The AR-15/M16 rifle has come a long way, surviving political opposition and its troubles in Vietnam to become one of the finest military rifles ever produced, with more than 9 million M16-series rifles in service throughout the world, equipping the troops of more than 20 nations. The U.S. military has always been a military of marksmen, and the M16A2 complements this philosophy, setting a standard of accuracy very few assault rifles can match while enjoying the reputation of being the finest human-engineered assault rifle in the world.

The M16-series rifle continues to be the rifle of choice of SWAT teams and police departments all over the country, and it will be the main battle rifle of the United States well into the new millennium.



## Next Step: Get your FREE Printable Target Pack

Enhance your shooting precision with our 62 MOA Targets, perfect for rifles and handguns. Crafted in collaboration with Storm Tactical for accuracy and versatility.

**Subscribe to the Gun Digest email newsletter** and get your downloadable target pack sent straight to your inbox. Stay updated with the latest firearms info in the industry.

# EXHIBIT 30

SECOND CONGRESS. Sess. I. Ch. 37. 1792. 279

any district court of the United States, in which it shall appear that the judge of such court is, any ways, concerned in interest, or has been of counsel for either party, it shall be the duty of such judge on application of either party, to cause the fact to be entered on the minutes of the court, and also to order an authenticated copy thereof, with all the proceedings in such suit or action, to be forthwith certified to the next circuit court of the district, which circuit court shall, thereupon, take cognizance thereof, in the like manner, as if it had been originally commenced in that court, and shall proceed to hear and determine the same accordingly.

<span style="float:right">Where judges act as counsel for a party,<br>their duty in such case.</span>

SEC. 12. *And be it further enacted,* That all the records and proceedings of the court of appeals heretofore appointed, previous to the adoption of the present constitution, shall be deposited in the office of the clerk of the supreme court of the United States, who is hereby authorized and directed to give copies of all such records and proceedings, to any person requiring and paying for the same, in like manner as copies of the records and other proceedings of the said court are by law directed to be given: which copies shall have like faith and credit as all other proceedings of the said court.

<span style="float:right">Records of court of appeals to be deposited with clerk of supreme court.</span>

APPROVED, May 8, 1792.

---

<span style="float:right">STATUTE I.</span>

CHAP. XXXVII.—*An Act making alterations in the Treasury and War Departments.(a)*

<span style="float:right">May 8, 1792.</span>

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there

---

(a) The acts for the establishment and regulation of the Treasury department. have been: An act to establish the Treasury department, September 2, 1789, chap. 12; an act supplemental to the act "establishing the Treasury department," and for further compensation to certain officers, March 3, 1791, chap. 18; an act making alterations in the Treasury and War departments, May 8, 1792, chap. 37; an act to amend the act entitled, "An act making alterations in the Treasury and War departments," February 13, 1795, chap. 21; an act for the more effectual recovery of debts due from individuals to the United States, March 3, 1795, chap. 48; an act to alter and amend the several acts for the establishment and regulation of the Treasury, War, and Navy departments, July 16, 1798, chap. 85; an act supplementary to the act entitled, "An act to establish the Treasury department," May 10, 1800, chap. 58; an act further to amend the several acts for the establishment and regulation of the Treasury, War, and Navy departments, March 3, 1809, chap. 28; an act authorizing the Secretary of the Treasury to appoint a clerk in the office of the commissioner of revenue, with power to sign licenses, November 22, 1814, chap. 7; an act supplementary to an act making alterations in the Treasury and War departments, passed 8th day of May, 1792, April 29, 1816, chap. 140; an act to provide for the prompt settlement of public accounts, March 3, 1817, chap. 45; an act making appropriation for the payment of arrearages which have been incurred for the support of the military establishment previous to the first of January, one thousand eight hundred and seventeen, February 16, 1818, chap. 10; an act supplementary to the act entitled, "An act to provide for the prompt settlement of public accounts," February 24, 1819, chap. 43; an act to provide for obtaining accurate statements of the foreign commerce of the United States, February 10, 1820, chap. 11; an act in addition to the several acts for the establishment and regulation of the Treasury, War, and Naval departments, May 1, 1820, chap. 52; an act to provide for the better organizing the Treasury department, May 15, 1820, chap. 107. (See The United States v. Maurice et al., 2 Brockenb. C. C. R. 96.) An act further to amend the several acts relative to the Treasury, War, and Naval departments, May 7, 1822, chap. 90; an act to organize the general land office, July 4, 1836, chap. 352, sec. 12; an act to authorize the proper officers of the Treasury department to credit the account of the Treasurer of the United States, with the amount of unavailable funds standing to his debit on the books of the Treasury, to transfer the amount of the debit of banks and individuals indebted for the same, and to authorize the Secretary of the Treasury to compromise and settle the same, March 3, 1837, chap. 35.

Department of War. The acts establishing and regulating the department of War, are: An act to establish an executive department to be denominated the Department of War, August 7, 1789, chap. 7; an act making alterations in the Treasury and War departments, May 8, 1792, chap. 37; an act to amend the act entitled, "An act making alterations in the Treasury and War departments," February 13, 1795, chap. 21; an act to alter and amend the several acts for the establishment and regulation of the Treasury, War, and Naval departments, July 16, 1798, chap. 85; an act concerning public contracts, April 21, 1808, chap. 48, sec. 5; an act further to amend the several acts for the establishment and regulation of the Treasury, War, and Naval departments, March 3, 1809, chap. 28; an act concerning the annual sum appropriated for arming and equipping the militia, April 29, 1816, chap. 136; an act supplementary to "an act making alterations in the Treasury and War departments," passed 8th May, 1792, April 29, 1816, chap. 140; an act to provide for the prompt settlement of public accounts, March 3, 1817, chap. 45; an act in addition to the several acts for the establishment and regulation of the Treasury, War, and Navy departments, May 1, 1820, chap. 52; an act to amend the several acts relative to the Treasury, War, and Navy departments, May 7, 1822, chap. 90.

280                    SECOND CONGRESS. Sess. I. Ch. 37. 1792.

Accountant in the war department, his duty.
be an accountant to the department of war, who shall be charged with the settlement of all accounts relative to the pay of the army, the subsistence of officers, bounties to soldiers, the expenses of the recruiting service, the incidental and contingent expenses of the department; and who shall report from time to time, all such settlements as shall have been made by him, for the inspection and revision of the accounting officers of the treasury; and the said accountant shall also be charged with the settlement of all claims for personal service authorized by the act of this Congress of the twenty-seventh of March last, and of all military claims lodged in the late office of the paymaster general and commissioner of army accounts, which are not foreclosed by the acts of limitation of the late Congress, and he shall report from time to time, all such settlements as have been made by him, for the inspection and revision of the Comptroller of the Treasury. The compensation of the said accountant shall be a yearly salary of one thousand two hundred dollars.

*Salary.*

*Duty of the Treasurer of the U. S. herein.*

*1822, ch. 90.*

Sec. 2. *And be it further enacted,* That the treasurer of the United States shall disburse all such monies as shall have been previously ordered for the use of the department of war by warrants from the treasury, which disbursements shall be made pursuant to warrants from the Secretary at War, countersigned by the accountant.

*Paymaster of the troops, his duty.*

Sec. 3. *And be it further enacted,* That there be a paymaster to reside near the head-quarters of the troops of the United States. That it shall be the duty of the said paymaster, to receive from the treasurer all the monies which shall be entrusted to him for the purpose of paying the pay, the arrears of pay, subsistence or forage, due to the troops of the United States. That he shall receive the pay abstracts of the paymasters of the several regiments or corps, and compare the same with the returns or muster rolls which shall accompany the said pay abstracts. That he shall certify accurately to the commanding officer, the sums due to the respective corps, which shall have been examined as aforesaid, who shall thereon issue his warrant on the said deputy paymaster, for the payment accordingly. That copies of all reports to the commanding officer, and the warrants thereon, shall be duly transmitted to the office of the accountant of the war department, in order to be there examined and finally adjusted at the treasury. That the said paymaster shall give bond in the sum of twenty thousand dollars, with two sufficient sureties, for the faithful discharge of his duty, and he shall take an oath faithfully to execute the duties of his office. That the compensation to the said paymaster shall be sixty dollars monthly, with the same rations and forage as a major.

*To give bond.*

*His salary.*

*Assignment of pay by a soldier after 1st June next not valid.*

Sec. 4. *And be it further enacted,* That no assignment of pay made after the first day of June next, by a non-commissioned officer or private, shall be valid.

*Contracts for supplying the army to be made under the Secretary of the Treasury.*

Sec. 5. *And be it further enacted,* That all purchases and contracts for supplying the army with provisions, clothing, supplies in the quartermaster's department, military stores, Indian goods, and all other supplies or articles for the use of the department of war, be made by or under the direction of the treasury department.

*To direct the collection of duties, &c.*

*Assistant Secretary abolished, and Commissioner of the Revenue substituted, his duty.*

Sec. 6. *And be it further enacted,* That the Secretary of the Treasury shall direct the superintendence of the collection of the duties on impost and tonnage as he shall judge best. That the present office of assistant to the Secretary of the Treasury, be abolished, and that instead thereof there be an officer in the department of the treasury, to be denominated Commissioner of the Revenue, who shall be charged with superintending, under the direction of the head of the department, the collection of the other revenues of the United States, and shall execute such other services, being conformable to the constitution of the department, as shall be directed by the Secretary of the Treasury. That the

3:18-cv-10507-PGS-JBD   Document 196-3   Filed 12/15/23   Page 30 of 167 PageID:

SECOND CONGRESS. Sess. I. Ch. 38. 1792.    281

compensation of the said commissioner shall be a salary of one thousand nine hundred dollars per annum.

*Salary.*

Sec. 7. *And be it further enacted,* That in every case of an account or claim not finally adjusted, upon which the present comptroller of the treasury, as auditor, may have decided, it shall be the duty of the commissioner of the revenue, and of the auditor of the treasury, finally to adjust the same, and in case of disagreement between the said commissioner and auditor, the decision of the attorney general shall be final.

*And powers, with the Auditor and Attorney-General.*

Sec. 8. *And be it further enacted,* That in case of the death, absence from the seat of government, or sickness of the Secretary of State, Secretary of the Treasury, or of the Secretary of the War department, or of any officer of either of the said departments whose appointment is not in the head thereof, whereby they cannot perform the duties of their said respective offices, it shall be lawful for the President of the United States, in case he shall think it necessary, to authorize any person or persons at his discretion to perform the duties of the said respective offices until a successor be appointed, or until such absence or inability by sickness shall cease.

*Power of the President on death, &c. of the heads of the three departments.*

*1795, ch. 21.*

Sec. 9. *And be it further enacted,* That the forms of keeping and rendering all public accounts whatsoever, shall be prescribed by the department of the Treasury.

*Treasury department to prescribe forms for keeping accounts.*

*1789, ch. 13.*

Sec. 10. *And be it further enacted,* That in addition to the compensations allowed to the comptroller, auditor, treasurer, and register of the treasury, by the " act for establishing the salaries of the executive officers of government, their assistants and clerks," and to the attorney general by the " act for allowing certain compensations to the judges of the supreme and other courts, and to the attorney general of the United States," the said officers respectively shall be allowed the following yearly sums, viz : the comptroller four hundred dollars ; the auditor four hundred dollars ; the treasurer four hundred dollars ; the register five hundred dollars ; the attorney general four hundred dollars.

*Yearly allowance to certain officers of the Treasury and Attorney General.*

*1789, ch. 13.*

Sec. 11. *And be it further enacted,* That the Secretary of the Treasury be authorized to have two principal clerks, each of whom to have a salary of eight hundred dollars per annum ; and that the salary of the chief clerk of the department of war, be at the rate of eight hundred dollars per year.

*Secretary of the Treasury allowed two principal clerks.*

Sec. 12. *And be it further enacted,* That the restriction on the clerks of the department of the treasury so far as respects the carrying on of any trade or business, other than in the funds or debts of the United States or of any state, or in any kind of public property, be abolished, and that such restriction, so far as respects the funds or debts of the United States, or of any state, or any public property of either, be extended to the commissioner of the revenue, to the several commissioners of loans, and to all persons employed in their respective offices, and to all officers of the United States concerned in the collection or disbursement of the revenues thereof, under the penalties prescribed in the eighth section of the act, intitled " An act to establish the treasury department," and the provisions relative to the officers in the treasury department, contained in the " Act to establish the post-office and post roads," shall be and hereby are extended and applied to the commissioner of the revenue.

*Restriction on his clerks as to carrying on trade abolished ; and that as to the funds extended to all revenue officers, &c.*

*1799, ch. 22, § 87.*

*1789, ch. 12.*

*1792, ch. 7.*

*Privilege of franking extended to Commissioner of the Revenue.*

Approved, May 8, 1792.

STATUTE I.

May 8, 1792.

Chap. XXXVIII.—*An Act supplementary to the act making provision for the Debt of the United States.*

Section 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the term

*[Obsolete.] 1790, ch. 34.*

# EXHIBIT 31

      

Guns   Museums   FAQs   Gun Info & Research   Image Requests   End of Trail Museums

Search:

The Galleries

Robert E. Petersen Collection

Ancient Firearms - 1350 to 1700

Road to American Liberty - 1700 to 1780

A Prospering New Republic - 1780 to 1860

   Case 7

   Case 8

   Case 9

   Case 10

   Case 11

A Nation Asunder - 1861 to 1865

The American West - 1850 to 1900

Innovation, Oddities and Competition

Theodore Roosevelt and Elegant Arms - 1880s to 1920s

World War I and Firearms Innovation

WWII, Korea, Vietnam and Beyond - 1940 to Present

For the Fun of It

Modern Firearms - 1950 to Present

Hollywood Guns

## U.S. Springfield Model 1795 Flintlock Musket Type I



The Model 1795, patterned after the French Charleville musket, was the first U.S. martial arm to be produced at Springfield Armory. There are three basic types of Model 1795 musket that may be identified, and some features are common to all three. Type I muskets, including this example, were manufactured between 1799 and 1806.

Due to the hand workmanship of these longarms and the lack of clear definition in inspection and acceptance regulations on the part of the U.S. War Department, variations exist in configuration and markings. Approximately 85,000 Model 1795 muskets were manufactured at Springfield Armory between 1795 amd 1816.

The town of Springfield, Massachusetts, located on the banks of the Connecticut River, was settled in 1636 by emigrants from Roxbury. The town was nearly destroyed during King Philip's War in 1675, but it was quickly rebuilt. As early as 1776, Continental Army colonel and future Secretary of War Henry Knox recommended the establishment of public laboratories, magazines, arsenals and foundries in secure locations for the production and repair of arms, ammunition, and other ordnance stores. Both George Washington and the Continental Congress concurred with this recommendation, under which an ordnance depot was established at Springfield in 1777. The town's access to raw materials, sources of water power, and transportation, as well as its inland location which provided security against seaborne attack, made Springfield an ideal location. Over the following year, buildings were rented or erected for use as barracks and storehouses. In addition to ordnance stores, the depot at Springfield also handled other aspects of army supply, including equipment, uniforms, tents, food, and fuel. The end of the War for Independence also brought a decline in military activities at Springfield. In 1794, an Act of Congress directed that national armories be established for the

fabrication of small arms. President Washington selected Springfield and Harpers Ferry, which was then located in Virginia, as the sites for these facilities. In addition to the advantages that contributed to the presence of a Revolutionary War depot in the town, many skilled armory workers were still living nearby. The government acquired nearly 300 acres and constructed a dam to furnish power to the armory complex, as well as shops, offices, and storehouses. The first permanent structure to be constructed on the site was a brick powder magazine, which was torn down in 1842. Additional buildings have been constructed as necessary over the years since. Production of arms at Springfield began in 1795, with 245 muskets manufactured during that year, and approximately 80,000 were turned out before production was discontinued in 1814. The Model 1795 muskets were the first standardized U.S. martial arms to be produced and were patterned after the French Model 1763 Charleville musket. Harpers Ferry Armory also produced a Model 1795 musket, but these were distinctly different from those manufactured at Springfield. The first known Springfield Armory-marked specimens were manufactured in 1799, and feature dated lockplates which bear an eagle stamp and the word "Springfield." The Model 1816 was first standardized U.S. martial arm to be manufactured at both Springfield and Harpers Ferry. These arms enjoyed the longest production run in U.S. history, lasting until 1844, with nearly 700,000 muskets turned out during this period. Both armories also produced the Model 1842 percussion musket and Model 1855 percussion rifle-musket. These arms are significant in that the Model 1842 was the last U.S. regulation .69 caliber smoothbore, as well as the first to be made at both armories with completely interchangeable parts, while the Model 1855 rifle-musket was the first rifle-musket to be produced by the United States, the first to be produced in the new regulation .58 caliber, and the last arm to be produced at both government armories. In addition to commonly produced arms, each armory was the sole producer of certain other designs, such as the Model 1855 percussion pistol-carbine and various musketoons and cadet muskets that were produced solely at Springfield, or the Model 1803 flintlock rifle, and the Model 1841 percussion, or "Mississippi" rifles, both of which were produced only at Harpers Ferry. Model 1861 and 1863 rifle-muskets, which were based on a modification of the earlier Model 1855, were produced in great quantities throughout the Civil War. These were the last muzzle loading, paper cartridge percussion arms to be produced by the U.S. Erskine S. Allin, Springfield's Master Armorer, designed a method for converting many of these into metallic cartridge breech loaders. This conversion consisted of a modification to the breech to permit the installation of a "trap door" breechblock with a self-contained firing pin. The famous .45-70 government caliber "trap door" Springfield rifles and carbines of the Plains Indian Wars were based on Allin's work, and these accounted for much of the Armory's production during the 1870s and 1880s. Springfield Armory was also involved in improving the state of the art in military rifle design, and toward this end, limited-production long arms including the Ward-Burton, Lee Vertical Action, Hotchkiss, and Chaffee-Reese rifles were manufactured there. These efforts culminated in the 1890s with the Army's adoption of the smokeless powder Krag-Jorgensen bolt-action repeating rifle as its standard longarm. These rifles, as well as carbine versions, were manufactured at the Armory through the turn of the century. The Spanish-American War proved the superiority of the German-designed Mauser, and the .30-'06 caliber U.S. Model 1903 bolt-action rifle, which was built at Springfield Armory and Rock Island Arsenal under a license from Mauser, replaced the Krag-Jorgensen as the Army's new standard rifle. Over one million were manufactured before production was discontinued in 1941, and many of these, as well as rebuilt or contract model Ö03s, saw action in both World Wars. Prior to the First World War, Springfield also manufactured the M1911 .45 caliber semi-automatic pistol under license from Colt, and throughout this period, Armory workers continued to experiment with, produce, test, and maintain various other ordnance materiel including rifles, pistols, machine guns, and related equipment. During the interwar years, John Garand, a Canadian-born design engineer and Springfield Armory employee, worked on a design for a new gas-operated semi-automatic rifle. After overcoming several problems, both with his designs and with Army brass, the U.S. Rifle .30 caliber M1 was adopted by the Army in 1936. The Marine Corps followed suit, and during the Second World War, over three and one-half million M1s were produced at Springfield. An additional 500,000 were manufactured by Winchester Repeating Arms Co. This rifle, which General George S. Patton called, "the greatest battle implement ever devised," gave American troops a significant edge over their German and Japanese enemies, most of whom were still equipped with bolt-action arms. After the war, Springfield ceased manufacture of the M1 and turned its efforts to the overhaul and long-term storage of these rifles. The outbreak of war in Korea in 1950 brought a resumption in production at the Armory, as well as by International Harvester and Harrington & Richardson. The return of peace brought a second and final discontinuation of M1 production. Springfield Armory's continuing efforts at advancing military rifle designs yielded a series of improvements to the M1, culminating in production of the 7.62mm NATO caliber selective-fire M14 rifle, which replaced the Garand in the Army's inventory. In 1968, the Ordnance Department ceased operations at Springfield Armory. The Armory grounds, buildings, and museum, with its extensive arms and accouterments collection, have become Springfield Armory National Historic Site and are now maintained by the National Park Service.

About Us    |    Contact Us    |    Join/Renew    |    Corporate Ethics    |    Privacy Policy

© NRA National Firearms Museum
www.nra.org

# EXHIBIT 32

   

GUNS ⌄   PARTS ⌄   ACCESSORIES ⌄   AMMO ⌄   GEAR ⌄   LIFESTYLE ⌄   NEWS ⌄   VIDEOS

 

ENTER TO WIN: Smith & Wesson's Free Gun Friday Package ft. Caldwell, Volcon, and Black Hills     ✕

# The Interesting History of Remington Revolvers From the 1850s-1870s



by **Dennis Adler**                                                           January 29, 2018

f  Share on Facebook          🐦 Share on Twitter



  

 

It began with a patent, an unbreakable patent belonging to Samuel Colt since 1835 that kept E. Remington & Sons at arm's length from the late 1840s until the day Colt's seven-year patent extension expired in 1857.

As an American arms manufacturer, Remington was much older than Colt, founded in 1816 by Eliphalet Remington II. Originally, Remington only manufactured barrels but did so quite successfully. In 1828, the company moved from Litchfield to larger facilities in Ilion, New York, along the Erie Canal, a major trade route in the 19th century. While Samuel Colt was busy rebuilding his fortunes in 1847 with the .44-caliber Walker and Whitneyville Dragoons, Remington was busy purchasing the Ames Company of Chicopee, Massachusetts, in 1848. He used Ames tooling to manufacture his first complete gun, a breech-loading percussion carbine built under contract to the U.S.

Navy. It was followed by a contract for 5,000 U.S. Model 1841 percussion "Mississippi" rifles. As for manufacturing revolvers, Remington (and every other U.S. arms-maker) was effectively blocked by the Colt patent. Nearly a decade would pass before Remington introduced its first model, the Remington-Beals revolver.

It was designed by Fordyce Beals, who shared not only the name but the June 24, 1856, and May 26, 1857, patents. Introduced on the heels of Colt's patent expiration in 1857, the relationship with E. Remington & Sons and Fordyce Beals would continue for years, leading to many of the company's most successful models.

## Roaring Big Guns

In 1858, Remington and Beals raised the bar for .44-caliber handgun designs with the introduction of the Remington-Beals Army model, an immediate and successful rival to the Colt Dragoons and their comparatively outdated (in Beals' opinion) construction. The .44-caliber Remington Army was followed by a .36-caliber Navy Model.

Over the years, Samuel Colt had continued to rely upon his original patent designs using a separate frame and barrel, which were joined with the cylinder on the arbor and secured in place with a wedge passing through the barrel lug and arbor. This was the traditional open-top design that everyone in the U.S. was trying (unsuccessfully) to copy and produce. Colt brought swift litigation against all copies. Beals and Remington were not interested in copying Colt, but rather building a different type of revolver that would, by design, be stronger and use a one-piece frame with a topstrap. And it would be far easier to reload.

One had two options when reloading a Colt: Pour a measure of powder into each cylinder chamber, load a lead ball, turn the gun over and place a percussion cap on the nipple of each chamber. The second method was to disassemble the gun by removing the barrel and swapping out the empty cylinder for a loaded one. This was faster so long as you didn't lose the barrel wedge.

With the Remington and Beals revolver design, traditional loading was the same as the Colt, but a cylinder change took only seconds and required virtually no disassembly. One placed the hammer at half-cock, lowered the loading lever and pulled the cylinder pin forward, rolled the empty cylinder out of the frame, put in a loaded one, pushed the cylinder pin back into place and then raised the loading lever. (You may recall seeing Clint Eastwood do this in the middle of a gunfight in *Pale Rider* and Anson Mount in the AMC television series *Hell on Wheels*.) It really was a better idea.

With the start of the Civil War, Remington did not rest on its laurels. The Army and Navy models were fast becoming the Union's second most carried sidearms. During the course of the war, Remington continued to make improvements to its original .36- and .44-caliber models, introducing the improved Army in 1861 and New Model Army and Navy in 1863. By the end of the Civil War, Remington had produced the second largest quantity of handguns used by the Union, a total of nearly 130,000 revolvers, of which more than 115,000 were .44-caliber models. Remington was also the benefactor of Colt's misfortune—the factory fire of February 4, 1864—which destroyed the original structures erected by Samuel Colt in 1855. The fire destroyed the buildings where revolvers were manufactured and finished. So, the 1864 fire certainly played a role in the Ordnance Department's increased orders from Remington before the end of the Civil War.

While Remington touted its superior designs, the Army and Navy models were not perfect. Remington's revolvers were more prone to jamming than Colts and required more meticulous care. But there was much to be said for the ease of reloading, especially in the midst of a battle.

## The Second Blockade

Remington had the misfortune of weathering one unbreakable patent to end up facing another by the end of the Civil War. This time even Colt was being held at bay—both companies were prevented from manufacturing breech-loading cartridge revolvers by Smith & Wesson and the Rollin White patent, which S&W had wisely purchased in 1855. With the White patent, Smith & Wesson had blocked any advances in American handgun design for a decade with the exclusive rights to manufacture breech-loading revolvers in the U.S. until 1869. And like Colt before them, S&W pursued litigation against all violations.

This had proven unfortunate during the war, as metallic cartridges and cartridge-loading handguns were becoming the most advanced form of personal armament. With self-contained metallic cartridges, it was possible to reload more quickly and shoot with greater reliability. Thus, Remington bit the bullet, so to speak, and in 1868 and 1869 paid a hefty $1 royalty to S&W for every cartridge conversion revolver they built. They also agreed to stamp the Rollin White patent dates on each cylinder. Colt would have none of it, and for the first time since 1857, Remington had the edge over its biggest competitor in the handgun market-place.

Remington signed the agreement with S&W in February of 1868 and a total of 4,574 Remington New Model Army percussion models were converted to fire .46-caliber rimfire metallic cartridges. The majority of the guns were actually sold by S&W to Benjamin Kittredge, a wholesale and retail firearms dealer in Cincinnati, Ohio, who had initiated the request for the cartridge conversion models through S&W a year earlier. During this period S&W was only building .22 and .32 caliber breech-loading pocket pistols, and would not introduce a large-caliber model until 1870.

The Remington conversions required the manufacture of a new cylinder since the .46-caliber rounds wound not fit within the diameter of the original six-shot .44 percussion cylinder, thereby ruling out the possibility of cutting off the back and boring the chambers through. The .46-caliber Remington conversions only chambered five rounds, but they were five big ones.

The back of the frame, where the cylinder butted up against the recoil shield, was dovetailed to accept a new recoil plate, which was fastened with a small screw. The right side of the recoil shield and frame were deeply channeled to allow the loading and extracting of cartridges; however, there was no loading gate, and the majority of early .46-caliber conversions were not fitted with cartridge ejectors.

The same basic design was used for later models chambered to the new .44-caliber Martin centerfire and Colt .45- caliber centerfire cartridges. These later designs, introduced in the summer of 1869, were six-shot revolvers and offered a manual cartridge ejector assembly mounted on the left side of the frame.

Remington's New Model Navy was the next percussion revolver to get the conversion treatment beginning in 1873, chambered for either .38 rimfire or .38 centerfire cartridges. The Navy was also the first model to come standard with both a loading gate and cartridge ejector.

Just as Colt was doing in the early 1870s, Remington produced both new conversions to use up Civil-War-era percussion frames and barrels, as well as modifying older percussion models sent to the factory by the military or civilian owners. In 1875, the U.S. Navy contracted to have 1,000 Navy percussion revolvers used during the Civil War returned to Remington for conversion to .38 centerfire. The cost of converting the Navy models was $4.25 each, including new grips and refinishing.

Following the war, Remington also introduced several new percussion models, among them the New Police revolver and New Pocket revolver in .36 and .31 caliber, respectively. Along with the Remington Rider, all of the new pistols were available with factory cartridge conversions.

The New Police was chambered for the .38 rimfire while the New Pocket revolvers (designed by Fordyce Beals) was in .32 rimfire. Unlike the earlier Remington cartridge designs, both could easily be converted back to percussion pistols by changing cylinders, thus providing greater versatility than Colt models, which, once converted, could not be used with a percussion cylinder.

## Two-Part Solution

Remington's new approach to the conversion of its percussion revolvers was considerably more diverse than Colt, which had taken only one course of action with the C.B. Richards and William Mason designs. Remington's new conversions utilized several different methods, one of which followed three influential British designs—the C. C. Tevis patent (1856), the J. Adams patent (1861) and the W. Tranter patent (1865)—all of which made use of a two-piece cylinder. This required cutting off the back portion of the cylinder below the percussion nipples, drilling the chambers completely through and counter-boring the back of the cylinder to accommodate the cartridge rims. A cylinder cap, with ratchets to engage the hand and openings to allow the hammer to strike the cartridge rim, completed the conversion.

Fortunately, the design of the Remington hammer required only slight modification in order to work with the two-piece cylinders, and it would still work with the percussion cylinder. By simply replacing the old cylinder, the gun could be used as a conventional cap-and-ball revolver, which proved fairly handy on the frontier where a box of cartridges couldn't always be found.

Approximately 18,000 New Model Police Remington revolvers were built between 1865 and 1873, with many of them converted to metallic cartridges. Remington offered the Police model with a choice of four barrel lengths: 3½, 4½, 5½ and 6½ inches. Prices ranged from $10 to $11, and options included a nickel-plated frame for an extra $0.75 and a full nickel finish for $1.50. Ivory stocks were $5 extra; pearl, a whopping $9, and engraving added another $5. A fancy New Model Police with a 6½-inch barrel would have set its owner back a total of $26.50 in 1873. A box of 100 .38-caliber rimfire cartridges cost $1.70, and a case of 1,000 rounds was $17.

The same conversion principle used for the New Police applied to the smaller, five-shot New Pocket model, which become one of the most prolific of all cartridge conversions. The Pocket Remington revolvers had been manufactured as percussion revolvers from 1865 to 1873. Thus, there was nearly a decade of production before the conversion to .32 rimfire was introduced in 1873. The pistols were available with 3-, 3½-, 4-and 4½-inch barrels, though the latter two lengths were actually quite rare. More than 25,000 Pocket models were produced, with the majority either converted to or produced as .32-caliber cartridge pistols. The Remington revolvers were available with both cylinders, again making the Remington a more versatile model than a comparable Colt pocket pistol.

Among the rarest of Remington conversions are the Belt Model Remington revolvers, which were smaller than the New Model Army and Navy but larger than the .38-caliber New Police, and carried six rounds. It is estimated that no more than 3,000 Belt Models were produced and only a fraction of those were converted from .36-caliber percussion to .38-caliber rimfire. Even rarer is the Remington-Rider Double Action New Model Belt Revolver, which was identical in all respects to the single action except for the trigger mechanism. Both SA and DA models utilized six-shot, two-piece cylinders and 6½-inch octagonal barrels.

The .36-caliber Remington Navy was also an excellent candidate for conversion, having the same basic design as the .44-caliber Army. The earliest designs were based on the Remington-Beals Navy models, but the majority of conversions were performed on the New Model Navy revolvers circa 1863 to 1878. The Navy models were fitted with hinged and latched loading gates, and nearly all came with ejector assemblies. The factory conversions sold for $9 and were chambered for .38 rimfire cartridges. Later models (circa 1874) were available in .38-caliber centerfire.

## End of Remington Revolvers

By 1875, Remington had converted or built thousands of cartridge revolvers in a variety of calibers and models. The New Model Army conversion went out of production in 1875 with the debut of Remington's first all-new large-caliber cartridge model, the 1875 Single Action Army. The .38-caliber 1863 New Model Navy conversion, however, remained in production for another three years, and conversions of the New Model Police were done as late as 1888. The Belt Model was discontinued in 1873, as were the Remington-Rider Double Action versions. For E. Remington & Sons, the era of the cartridge conversion was nearing an end.

E. Remington & Sons, which was headed in later years by Eliphalet Remington's eldest son, Philo, prospered well into the post-Civil War era and during America's Western Expansion but suffered a severe reversal of fortune in the late 1880s and was forced into receivership in 1886. The company was reorganized two years later as the Remington Arms Company under the control of Marcellus Hartley and the New York sporting goods firm of Hartley & Graham (previously Schuyler, Hartley & Graham), which had played a significant role during the Civil War supplying the Union with arms and ammunition. Remington later merged with Hartley & Graham and the Union Metallic Cartridge Company (founded by Hartley after the Civil War), becoming Remington-UMC in 1912. Today, the Remington Arms Co. still operates out of Ilion, N.Y.

**Didn't find what you were looking for?** <span></span> Search here! <span></span> SEARCH

KEEP READING

BROWSE BY BRAND

















**SPOTLIGHT**



**SPONSORED CONTENT**

## DEAD AIR SUPPRESSOR 101: BEGINNER

**BY DEAD AIR SILENCERS** — Lightweight. Versatile. Modular. The Nomad-30 exists for the everyday user. Designed to go everywhere you go,...

**RELATED POSTS**

### Savage Arms Introduces High-Performance Polymer Bipods

...

### REVIEW: 360 Buckhammer Core-Lokt Ammo, Henry Levers & the BFR

...



### Stag Arms Pursuit Bolt Action Available Now

**BY STAG ARMS**

SPONSORED CONTENT

LOAD MORE

**TRENDING**

### The Civilian-Legal FN M249S Para Is as Close as It Gets to the Real Thing

The M249S Para is its latest addition to FN's Military Collector series, which includes two AR-15s as close as you...

### WINCHESTER's SXP 'Defender' Pump Shotgun

Tactical-Life.com brings you the newest products live from the NASGW '08 show!

## 10 Pocket Pistols Perfect for Christmas [2023]

Santa Claus is coming to town...to deliver these 10 pocket pistols from Remington, Ruger, Glock and many more!

## Vote & Win: 2023 Ballistic's Best Readers' Choice for Best Guns

One of our most anticipated magazines each year, the 2023 edition of Ballistic's Best, hits the press soon. But first,...

**MOST POPULAR**

## 12 Best Micro-Compact Handguns for Concealed Carry [2022]

A thick veil of fog stood forever in front of me as I cruised down the highway at 6:30 in...

## Police Sidearms: Handguns of America's 10 Largest Departments

Law enforcement in the United States is in constant evolution and that includes various police sidearms. These days, law enforcement...

## Vote & Win: 2023 Ballistic's Best Readers' Choice for Best Guns

One of our most anticipated magazines each year, the 2023 edition of Ballistic's Best, hits the press soon. But first,...

### 21 Best New Handguns [2023]

The NSSF SHOT Show is the premier event to get your hands on new gear. It gives us a first...

**VIDEO SERIES: AT THE READY | SEASON 2**



Now Playing
At The Ready | ...

UP NEXT
At The Ready | ...

At The Ready | ...

At The Ready | ...

At The Re...

MORE VIDEOS

**The Citadel Taipan X SCSA Pump Action Rifle in .223 Wylde**

**SIG M17X & M18X: Upgraded XSeries Pistols are Here!**

HANDGUNS

**Ruger 75th Anniversary Commemorative Firearms Celebrate Icon**

**The Faxon FX-19-LT Line Provides Budget-Friendly FX-19 Options**

**REVIEW: 360 Buckhammer Core-Lokt Ammo, Henry Levers & the BFR**

RIFLES - click to see all



SPONSORED CONTENT

**Ruger 75th Anniversary Commemorative Firearms Celebrate Icon**

**DIY Series™ Sights & Tool Bundle**

BY XS SIGHTS

**The Citadel Taipan X SCSA Pump Action Rifle in .223 Wylde**

**MDT ACC Elite Chassis System Adds More Model Compatibility**

AMMO - click to see all

**REVIEW: 360 Buckhammer Core-Lokt Ammo, Henry Levers & the BFR**

**Magtech Steel Case 9mm Brings Affordable Pistol, PCC Ammo**

**Freedom Munitions X-DEF Line Adds .357 Sig Self-Defense Ammo**



EXHIBIT 33

# Colt Revolvers

⭐ **tshaonline.org**/handbook/entries/colt-revolvers





Portrait, Samuel Colt, 1859. Colt invented and patented the revolver. Image couresy of the Connecticut State Library. Image available on the Internet and included in accordance with Title 17 U.S.C. Section 107.



Photograph, a five-shot Paterson Colt revolver was the first design of the Colt revolver. Texas was a place in which the revolver was able to help control the frontier. Image courtesy of the Texas Rangers Hall of Fame and Museum. Image available on the Internet and included in accordance with Title 17 U.S.C. Section 107.

**COLT REVOLVERS.**  The first practical revolving-cylinder handgun was invented in 1831 by Samuel Colt of Hartford, Connecticut, and patented on February 25, 1836, the year of the Texas Revolution. Texas became a proving ground and nearly the only market for Colt's revolutionary product. Colt provided the struggling republic and frontier state with the increased firepower necessary to defend and advance itself. Colt revolvers were manufactured first in 1837 at Paterson, New Jersey, by the Patent Arms Manufacturing Company. Three principal variations of these five-shot Paterson Colt handguns were produced: the .28 caliber Pocket model, the .31 caliber Belt model, and the .36 caliber Holster model. The Republic of Texas ordered 180 of the .36 caliber Holster model revolvers for its navy in August 1839. Numbers of these rather delicate arms were issued to various Texas warships and served well in engagements against Mexico over the next four years. Colt was so pleased by the Texas purchase and with the performance of his product that he engraved the scene of the victorious naval battle fought off Campeche on May 16, 1843, by the Texas Navy on the cylinders of the 1851 Navy, 1860 Army, and 1861 Navy model Colts (in all, nearly 500,000 revolvers).

Many of the Paterson Colts purchased for the Texas Navy were ultimately used by the Texas army and in various quasimilitary expeditions. They are known to have been involved in the Council House Fight at San Antonio, as well as in the Texan–Santa Fe and Mier expeditions. Most significant, however, were those revolvers reissued to units of the Texas Rangers. Among these border horsemen the Colt revolver first won its reputation as a weapon ideally suited to mounted combat. Using Paterson Colts purchased in 1843, Col. John Coffee Hays commanded a Ranger contingent in several uneven battles against depredating Comanches. Most notable was the contest in which Hays and fourteen rangers charged and routed nearly

eighty Comanche warriors in the battle of Walker's Creek in 1844. Other victories against considerable odds at Nueces Canyon and Enchanted Rock reinforced the report of the Colt revolver's firepower. All of the forthcoming Walker and Dragoon model Colts (some 21,000 revolvers) carried a cylinder scene commemorating the so-called "Hays Big Fight" on the Pedernales. Colt himself came to call the Paterson Holster model revolver the Texas Arm, and present-day collectors generally refer to it as the Texas Model or Texas Paterson.

Although Colt's Paterson enterprise failed in 1842 because of inadequate sales, his early revolvers had won the devotion of frontier Texans, particularly those of the ranger force. Appropriately, it was a former Texas Ranger, Samuel H. Walker, who in conjunction with the demands of the Mexican War, put Colt back in business to stay. In November 1846 Captain Walker, then of the United States Mounted Riflemen, opened negotiations with Colt for the production of 1,000 improved revolvers. Familiar with the shortcomings of the Paterson arm, Walker specified a substantial new design incorporating a fixed trigger with guard and a loading lever beneath the nine-inch barrel. The massive revolver mounted a six-shot cylinder chambered for a .44 caliber conical bullet; the revolver weighed an unprecedented four pounds, nine ounces. Texas Ranger John S. (Rip) Ford claimed the new Walker Colt pistol was as powerful as the United States Model 1841 "Mississippi" rifle.



Portrait, Captain Samuel Hamilton Walker, ca. 1846. Captain
Walker recommended improvements for the Paterson Colt
revolver. Image courtesy of Library of Congress. Image available
on the Internet and included in accordance with Title 17 U.S.C.
Section 107.

The Walker Colt inaugurated the era of perfected revolver design and manufacture. Colt
produced his newly-designed revolvers in Connecticut at the factory of Eli Whitney, Jr., son of
the cotton gin inventor. In 1855, in Hartford along the Connecticut River, he completed a new
factory and incorporated his business as the Colt's Patent Fire Arms Manufacturing
Company (today Colt's Manufacturing Company LLC) and began regular production. By the
time of Colt's death on January 10, 1862, a succession of ten improved revolver models had
been introduced, and some 468,000 units manufactured. Before the Civil War the most
popular of these in Texas was the .36 caliber 1851 Navy model, about which traveler
Frederick Law Olmsted observed, "Of the Colt's [Navy] we cannot speak in too high terms. . .
. There are probably in Texas about as many revolvers as male adults, and I doubt if there
are one hundred in the state of any other make." During the war the few Texas arms
manufacturers producing revolvers—Dance Brothers , for instance—patterned their limited
output on the Colt Dragoon and Navy models.

The Colt revolver remained preeminent among such arms in Texas and throughout the West for the remainder of the nineteenth century. The 1873 Single Action Army model, known as the Peacemaker or simply six-shooter, became the standard sidearm of the postwar military, the Texas Rangers, and the majority of cowboys across the plains. Though restrictions against carrying handguns were applied in Texas during the 1880s, widespread possession declined only slowly.

Windmills, barbed wire fences, and Colt revolvers have been credited with settlement of the Great Plains. The Colt revolver and Texas remain inextricably associated in history, symbolism, and romance. Colt collectors abound in the state.

## Is history important to you?

We need your support because we are a non-profit that relies upon contributions from our community in order to record and preserve the history of our state. Every dollar helps.

Colt, "History: The Colt Legend" (http://www.coltsmfg.com/history.aspx), accessed November 3, 2009. T. R. Fehrenbach, *Lone Star: A History of Texas and the Texans* (New York: Macmillan, 1968). John S. Ford, *Rip Ford's Texas*, ed. Stephen B. Oates (Austin: University of Texas Press, 1963). J. Evetts Haley, *The XIT Ranch of Texas and the Early Days of the Llano Estacado* (Chicago: Lakeside, 1929; rpts., Norman: University of Oklahoma Press, 1953, 1967). Charles Tower Haven and Frank A. Belden, *A History of the Colt Revolver* (New York: Morrow, 1940). Carroll C. Holloway, *Texas Gun Lore* (San Antonio: Naylor, 1951). Philip D. Jordan, "The Pistol Packin' Cowboy: From Bullet to Burial," *Red River Valley Historical Review* 11 (Spring 1975). Noel M. Loomis, *Texan-Santa Fe Pioneers* (Norman: University of Oklahoma Press, 1958). Watson Parker, "Armed and Ready: Guns on the Western Frontier," in *The American West: Essays in Honor of W. Eugene Hollon*, ed. Ronald Lora (University of Toledo, 1980). John E. Parsons, *The Peacemaker and Its Rivals: An Account of the Single Action Colt* (New York: Morrow, 1950). Ernest Lisle Reedstrom, *Bugles, Banners and War Bonnets* (Caldwell, Idaho, 1977). James E. Serven, *Colt Firearms* (Santa Ana, California: Serven, 1954). James E. Serven, *Conquering the Frontiers* (La Habra, California: Foundation, 1974). Walter Prescott Webb, *The Great Plains* (Boston: Ginn, 1931). Walter Prescott Webb, *The Texas Rangers* (Boston: Houghton Mifflin, 1935; rpt., Austin: University of Texas Press, 1982). R. L. Wilson, *Colt: An American Legend* (New York: Abbeville Press, 1985). R. L. Wilson, *Colt Heritage: The Official History of Colt Firearms* (New York: Simon and Schuster, 1950).

# EXHIBIT 34

# FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS
## ...and their values

**9th EDITION**



**Norm Flayderman**

• 4,000 Individually Priced Firearms • 1,800 Photos for Quick Reference • Coverage From Early-1700s to Early-1900s



SK-022
Iron Frame Henry

SK-023
Early Brass Frame Henry

the magazine. A distinctive identifying feature of the Henry is the lack of a forend, and the absence of a loading gate on either side of the frame. Made in relatively limited quantities, and a revolutionary weapon in Civil War service, the Henry is one of the major collector's items in the entire Winchester field. The model is difficult to obtain in fine condition and commands premium prices in all its variations. Quite a few company-size Union outfits, especially those from Kentucky, Illinois, Indiana and Missouri purchased at their own expense, and carried, Henry rifles. Much significant information on the development and history of this important rifle, its production, sale and usage by the military during the Civil War is found in *The Historic Henry Rifle* by W. Sword (q.v.).

**Iron Frame Model.** The most desirable Henry variation, featuring the frame of iron, rather than the standard brass. Rounded type iron buttplate at its heel, no lever latch, sporting style adjustable leaf rear sights. Quantity estimated 275. Serial number range 1 to 400:

SK-022  Values—Good $30,000  Fine $100,000

**Early Brass Frame Model.** As above, but the frame and buttplate of brass. With or without lever latch. Serial numbers overlap iron frames. Total made about 1,500:

SK-023  Values—Good $11,500  Fine $35,000

**Late Brass Frame Model.** As above, but the heel of the brass buttplate (adopted approx. serial range no. 4,000) has a pointed profile. Lever latch standard. Serial range primarily above about 2500 (overlap with early M1866 brass frame rifles):

SK-024  Values—Good $10,000  Fine $30,000

**U.S. Government Purchased and Issued Henry Rifles.** Total quantity 1,731 acquired between 1862 and 1865. Most in serial range 3000 to 4200. Known issued to 1st Maine and 1st District of Columbia Cavalry Regiments, (more than 200 were captured Sept. 1864 from the 1st D.C. Regiment and issued to the 7th, 11th and 35th Virginia (Confederate) Cavalry); small quantity trial issues to other units. Believed brass frames only. Inspector

## Winchester Model 1866 Rifle

**Model 1866 Rifle.** Manufactured c. 1866-98; total produced approximately 170,101.

44 rimfire caliber. Tubular magazine located beneath the barrel. Distinctive brass frame.

Oil stained walnut stocks. Metal parts finished as follows: Lever and hammer casehardened; barrel browned or blued, magazine tube blued, the brass furniture left a natural finish.

Serial numbering overlaps that of the Henry Rifle, and began at about 12476. Until about the 20000 serial range the number was marked beneath the buttstock on the left side of the upper tang. Thereafter the number could be found on the lower tang and was visible without removing the buttstock.

These arms are not marked "Model 1866," and are easily distinguished by their brass frames with loading gates, and the

markings C.G.C. at breech of barrel and stock. Extremely important information about government purchases and serial number ranges of same will be found in *The Historic Henry Rifle* (by W. Sword, q.v.) some of which may add significantly to historic significance and premium values.

SK-025  Values—Good $20,000  Fine $70,000

**Cleaning or wiping rods issued with all Henry rifles.** Earliest types were jointed, four-piece hickory wood rods with small iron fittings for assembly. The four sections were stowed in the butt-stock through a hinged brass door in buttplate. Later rods were four pieces of steel with brass tip stowed in butt in same manner. However, the aperture and the loading port was narrower in diameter, hence the earlier wooden rod will not fit into that later style. Reported that some earlier wooden rods may bear "CGC" inspector markings to accompany government contract rifles.



SK-025.5

**Briggs Patent Henry Rifle.** Although the King's Patent (May 22, 1866) hinged loading gate adapted to a Henry rifle became the device used to facilitate loading cartridges from the receiver in the M.1866, other methods were experimented with. Best known and most practical is the Briggs Patent of Oct. 16, 1866 which allowed for loading the magazine tube immediately in front of the receiver. Made only experimentally, there are a handful of known examples that have come on the market. One method, made without a forearm, had the entire magazine tube slide forward; the other (illus. here) is fitted with a uniquely designed brass forend which slides forward to expose the bottom end of the magazine tube for ease in loading. Few recorded sales; values minimum in low five figures; upward considerably dependant on condition.

SK-025.5

presence of forestocks. Winchester Museum serial records are only partially complete on the 1866 production. Popularly known on the frontier as the "Yellow Boy", the Indian also called it "many shots" along with "heap firing" guns. The '66 is the repeating rifle most deserving of the name "The Gun That Won The West."

*Rifle:* Standard with 24" barrel, octagonal through about the serial range 100000, at which time round barrels became common. Brass frame, buttplate, and forend cap (steel cap became standard after serial range 135000). The buttplate of the crescent type.

*Carbine:* Standard with 20" round barrel and two barrel bands. Brass frame and buttplate, the latter of the distinctive curved profile. Saddle ring mounted on the left side of the frame.

*Musket:* Standard with 27" round barrel, 24" magazine, and



5K-028
M. 1866 Rifle

5K-029
M. 1866 Carbine

5K-032
M. 1866 Musket

17˝ forend. Three barrel bands present, and the buttplate of carbine style.

Major variations are:

**First Model 1866 (a.k.a. "Flatside")**, tang serial number concealed by the buttstock, "Henry drop" in profile of frame at the hammer area, frame does not flare out to meet forend, upper tang has two screws, flat loading gate cover, Henry and King's patent barrel marking; serial range 12476 to about 15500 (with some overlap with Henry Rifle).

Rifle version of the First Model (not fitted with forend cap):
| 5K-026 | Values—Good $14,000 | Fine $45,000 |
|---|---|---|

Carbine version of the First Model:
| 5K-027 | Values—Good $7,000 | Fine $22,500 |
|---|---|---|

Musket version of the First Model: (None produced)

**Second Model 1866**, concealed "inside" serial marking on the tang (early production through about 19000 serial range), flared frame to meet the forend, the "Henry drop" frame profile has turned to a graceful curved shape in the hammer area, Henry and King's patent barrel marking for most of production; serial range about 15500 to 23000+.

**Mexican military purchase:** Late in 1866 President Benito Juárez purchased 1,000 Model 1866 rifles (most likely 5K-029; possibly 5K-030; not to be confused with muskets or carbines). They were soon delivered to Monterrey in the State of Nuevo Leon. Only marking thus far recorded is a small circular stamp at top of receiver with a crudely outlined eagle, wings downward and letters "N.L." (Nuevo Leon) on left of circle; an issue or serial number above circle. Whether that marking indicated solely a Nuevo Leon state issue or was marked on all

the contract is unknown. Authenticated specimens worthy of premium values.

Rifle:
| 5K-028 | Values—Good $4,500 | Fine $12,500 |
|---|---|---|

Carbine:
| 5K-029 | Values—Good $4,000 | Fine $11,500 |
|---|---|---|

Musket: None known to be produced.

**Third Model 1866**, serial marked in block numerals behind the trigger (and thus visible without removing stock), flared frame to meet forend, and the curved frame profile in hammer area not as pronounced as the First and Second Models; Winchester, New Haven and King's Patent barrel marking; serial range about 23169 (lowest recorded number to date) to 149000.

Rifle:
| 5K-030 | Values—Good $4,000 | Fine $11,000 |
|---|---|---|

Carbine:
| 5K-031 | Values—Good $3,750 | Fine $9,500 |
|---|---|---|

Musket:
| 5K-032 | Values—Good $2,500 | Fine $6,500 |
|---|---|---|

**Fourth Model 1866**, the serial number marked in script on the lower tang near lever latch, flared frame to meet forend, the curved frame profile in hammer area even less pronounced than the Third Model; barrel marking same as the Third Model, serial range about 149000 to 170101. Late production iron mountings.

Rifle:
| 5K-033 | Values—Good $3,250 | Fine $9,000 |
|---|---|---|

Carbine:
| 5K-034 | Values—Good $2,750 | Fine $8,500 |
|---|---|---|

Musket:
| 5K-035 | Values—Good $2,500 | Fine $6,500 |
|---|---|---|

(Note: A premium placed on round barrels on rifles, as these are less frequently encountered than octagon.)

## Winchester Model 1873 Rifle

**Model 1873 Rifle.** Made c. 1873-1919; total produced approximately 720,610 (figure includes 19,552 made in 22 rimfire) 32-20, 38-40, and 44-40 calibers. Tubular magazine located beneath barrel. The frames of iron with sideplates, and noticeably different from the Model 1866 predecessor.

Oil stained or (less common) varnished walnut stocks. Blued finish, with hammers, levers and buttplates casehardened; frames also not uncommon casehardened.

Serial numbering in individual series from 1 on up; located

on the lower tang. MODEL 1873 and Winchester markings appear on the upper tang; caliber markings usually are present on bottom of the brass elevator block (see bottom of frames) and on the barrel at breech. Winchester name and address marking on the barrel, with King's Improvement patent dates.

To the good fortune of collectors, Winchester Museum factory records are virtually complete for the Model 1873 production. This is a model in which the collector can specialize exclusively, and perhaps never run out of variations to acquire. Considerable

variety is apparent in the Model 1873, in sights, magazines, finishes, markings, barrel lengths and weights, stocks, and even in screws, varying contours of wood and metal, knurlings, and *ad infinitum*. Export sales were considerable, and many of these arms experienced rough handling and those that survived are often in poor condition. Domestic sales have survived in a generally better state of condition, but the majority do show use, and often to a great degree. Perhaps the most famous of all Winchesters, the '73 was featured in the James Stewart film "Winchester '73." The Model boasts a production record covering more years (about 50) and more guns (over 720,000) than most of the company's other lever action models. Those under No. 525900 (approx.) made prior to December 31, 1898.

*Rifle:* Standard with 24" barrel, round or octagon. Buttplate of the crescent type. Cap on front of forend; the magazine tube attached to barrel with small band. Adjustable, open style sporting rear sight.

*Carbine:* Standard with 20" round barrel, and two barrel bands. Buttplate of distinctive curved profile. Saddle ring mounted on the left side of the frame. The rear sights of adjustable carbine type (compare with Rifle).

*Muskets:* Standard with 30" round barrel, 27" magazine. Three barrel bands usually present, the buttplate of carbine style, and the sights of adjustable musket type.

Major variations are:

**Early First Model 1873,** the dust cover with guide grooves is mortised in forward section of the frame, checkered oval thumbrest is separately affixed (very earliest is round thumbrest and worth premium). Note two screws on frame above trigger, lever latch fits into lower tang with threads, upper lever profile curves away from trigger; serial range from 1 to about 1600 (serials under 100 worth 30 percent to 50 percent premium).

Rifle:
5K-036    Values—Good $2,250        Fine $8,500
Carbine:
5K-037    Values—Good $3,500        Fine $10,000

Musket: None known to be produced.
(Note: On many, serial numbered 1 through approximately 600, Model 1873 markings are hand engraved and found on the lower tang with the serial number. This feature worth a premium in value.)

**Late First Model 1873,** the dust cover mortised as above (oval thumbrest is checkered on the cover itself and variations of that oval panel occur and fetch premiums), trigger pin appears below the two frame screws above trigger. Improved type lever latch (the threads not visible) became standard as did the trigger block safety and the added profile to the lever behind trigger (to engage newly added safety pin), serial range about 1600 to 31000 (serials under 100 worth 30 percent to 50 percent premium).

Rifle:
5K-038    Values—Good $1,750        Fine $6,500
Carbine:
5K-039    Values—Good $2,250        Fine $9,500
Musket
5K-040    Values—Good $2,250        Fine $9,000

**Second Model 1873,** same as above but dust cover slides on center rail on rear section of top of the frame, the rail secured by screws; serial range about 31000 to 90000. On later Second Models, serrations on rear edges (for finger hold) replaced the checkered oval panel on the dust cover.

Rifle:
5K-041    Values—Good $1,250        Fine $3,750
Carbine:
5K-042    Values—Good $1,500        Fine $5,000
Musket:
5K-043    Values—Good $1,250        Fine $4,000

**Third Model 1873,** same as above but the dust cover rail is a machined integral part of the frame, no longer present are the two frame screws and pin formerly located above the trigger, and screws on lower tang are located much more rearward than previously; serial range about 90000 to end of production. Serrated rear edges on dust cover.

Rifles:
5K-044    Values—Good $875          Fine $3,000
Carbine:
5K-045    Values—Good $1,250        Fine $4,500
Musket:
5K-046    Values—Good $1,100        Fine $2,750



5K-042 / 5K-045
Carbine

5K-041 / 5K-044
Rifle

5K-043 / 5K-046
Musket

18-cv-10507-PGS-JBD   Document 196-3   Filed 12/15/23   Page 57 of 167 PageID



5K-047
Model 1873 Caliber 22 RF

**Model 1873 22 Rimfire Rifle**, easily identified by the 22 caliber markings and the lack of a loading gate in the right sideplate. Chambered for 22 short and long rimfire cartridges, and loaded through the front end of the magazine tube. 24" or 26" barrels standard. Made c. 1884-1904 in a total quantity of 19,552, this was the first repeating rifle manufactured in America chambered for the 22 rimfire ammunition (although Winchester's initial advertising of this rifle in their 1885 catalog offered it in 22 W.C.F. (centerfire) it is believed that was a clerical error as none are known, or recorded made in that caliber). Made in rifle size only.

It appears that only this variant chambered for 22 rimfire was offered with a takedown feature (in the early Winchester advertisements). The barrel, magazine and forearm fastened together as a single unit and were attached to the frame by a single tapered iron cross-pin. Merely removing (knocking out) that pin separated the frame from the barrel unit, "thus making the gun more easily packed in trunk or case" as their catalog stated. The system was found unsatisfactory and few were actually produced and sold. It is noted that some other receivers had been drilled to accept that taper pin, but were fitted with the barrel unit and that pin is in a permanently fixed position. Actual takedown models and others with merely frames showing the

permanent pin have been observed in the serial ranges 155,000 to 180,000. Authenticated takedown models worth substantial increased value.

**5K-047**   Values—Good $1,150           Fine $3,750

1 of 1000 and 1 of 100 rifles, are among the ultimate rarities in Winchester collecting. In the Model 1873 only 136 "1 of 1000" rifles were made, and 8 "1 of 100". These are distinguished by the special marking found on the top of the breech. Confirmation of the series can be made through Winchester Museum records, in which the original arms are documented. The desirability of 1 of 100/1000 rifles has made them attractive for faking, and caution is suggested in making a purchase. Although the "1 of 100" is the scarcer rifle it seems that the "1 of 1000" is more eagerly sought after, hence values are apparently the same for these two great rarities, ranging from:

1 of 100:
**5K-048**   Values—Good $40,000           Fine $90,000
             Exc. $225,000

1 of 1000:
**5K-049**   Values—Good $37,500           Fine $85,000
             Exc. $200,000

## Winchester Model 1876 Rifle

**Model 1876 Rifle.** Manufactured c. 1876-97; total production of 63,871.

40-60, 45-60, 45-75, and 50-95 calibers. Tubular magazine located beneath barrel. The frames similar in appearance to the Model 1873, but are noticeably larger.

Oil-stained or (less common) varnished walnut stocks. Blued finish, with hammers and levers, casehardened; frames and butt plates also not uncommon casehardened.

Serial numbering in individual series from 1 on up; located on the lower tang. MODEL 1876 stamped on the upper tang. Winchester name and address marking on the barrel, with King's Improvement patent dates. Caliber markings usually are present on bottom of the brass elevator block and on the barrel at breech.

Often known as the "Centennial Model" due to its introduction in 1876, the '76 was designed to offer the shooter a large caliber lever action for big game. It is sometimes confused with the Model 1873, until comparing their frames and calibers. The limited production total and years of manufacture recommend the '76 as among the less common Winchester lever actions. Shooters who enthusiastically endorsed the model include one of the most revered of all American hunters— Theodore Roosevelt. An important recent study *The Winchester Model 1876 Centennial Rifle* by H.G. Houze (q.v.) includes much fresh information about the Model 76 and discusses misconceptions about its origin and evolution.

*Rifles:* Standard with 26" or 28" round or octagon barrel. The buttplate of crescent type. Like the 1873, the forend has a metal cap, and the magazine tube is attached to the barrel with a small band. Adjustable, open style sporting rear sight. Stocks usually straight; pistol grip types are not common.

*Carbines:* The standard having 22" round barrel, 19" forend with a distinctive forend cap set back to allow for bayonet attachment; one barrel band (with band spring), carbine type buttplate. Saddle ring mounted on the left side of the frame. The rear sights of adjustable carbine type.

*Muskets:* Standard with 32" round barrel, the magazine tube concealed beneath the forend and the forend tip identical to that on the carbine. One barrel band, with band spring. Carbine type buttplate. Sights vary but are generally of military type. Muskets in the Model 1876 are scarce.

Major variations are:

**First Model 1876,** was made without a frame dust cover, and is in the serial range 1 to about 3000.

| Rifle: | | |
|---|---|---|
| 5K-050 | Values—Good $1,750 | Fine $6,500 |
| Carbine: | | |
| 5K-051 | Values—Good $2,250 | Fine $7,500 |
| Musket: | | |
| 5K-052 | Values—Good $5,500 | Fine $10,000 |

**Early Second Model 1876,** has a dust cover on the frame, with the thumbpiece of a die-struck oval, the dust cover guide rail screwed to top of frame; serial range about 3000 to 7000.

| Rifle: | | |
|---|---|---|
| 5K-053 | Values—Good $1,250 | Fine $5,000 |
| Carbine: | | |
| 5K-054 | Values—Good $1,750 | Fine $7,000 |
| Musket: | | |
| 5K-055 | Values—Good $5,000 | Fine $9,500 |



5K-053 / 056 / 059
Rifle

SK-054 / 057 / 060
Carbine

**Late Second Model 1876**, lacks the oval thumbpiece on the dust cover, but has knurling at the finger grip section at rear, the guide rail as on Early Second Model: serial range of about 7000 to 30000.

Rifle:
5K-056   Values—Good $1,100   Fine $4,000

Carbine:
5K-057   Values—Good $1,750   Fine $6,000

Musket:
5K-058   Values—Good $4,500   Fine $9,000

**Third Model 1876**, same as Late Second Model, but the guide rail machined integral with the frame; aerial range of about 30000 to end of production.

Rifle:
5K-059   Values—Good $1,100   Fine $4,000

Carbine:
5K-060   Values—Good $1,750   Fine $6,000

Musket:
5K-061   Values—Good $4,500   Fine $9,000

**Northwest Mounted Police Carbines**, form especially prized variations of the 1876 Carbine. Though appearing in various serial ranges from as low as about 8000, the two major types are in the serial range of about 23801 – 24100 and the range 43900 – 44400. Mounted Police 76 Carbines bear an NWMP stamp on the buttstock, and are in 45-75 caliber; barrel lengths of the conventional 22".

5K-062   Values—Good $3,250   Fine $8,750

1 of 1000 and 1 of 100 Rifles, are of even greater rarity in the '76 than in the '73 Model. Only 8 "1 of 100s" and 54 "1 of 1000s" were made in the 1876 series, all fortunately recorded in the Winchester shipping records. The identifying marking appears on top of the breech end of the barrel. Again, caution is recommended for purchasing one of these ultra-rarities, due to the possibility of spurious markings. As with the Model 1873, the "1 of 100" is the scarcer rifle, but values in the collectors marketplace are about the same for these two great prizes:

1 of 100:
5K-063   Values—Good $50,000   Fine $95,000
    Exc. $250,000

1 of 1000:
5K-064   Values—Good $50,000   Fine $90,000
    Exc. $225,000

## Winchester Model 1886 Rifle

**Model 1886 Rifle.** Manufactured c. 1886–1935; total produced 159,994. (Those under No. 119193 (approx.) made prior to December 31, 1898).

Made in a variety of calibers from as small as 33 W.C.F. to as large as 50-110 Express; total of about 10 chamberings; 45-70 and 45-90 are worth 25 percent premium; caliber 50 is worth 100 percent premium. Tubular magazine beneath the barrel. The frame distinctively different from previous lever action Winchesters, and featured vertical locking bolts, visible when viewing the gun from top or bottom.

Prior to 1900 and serial 120,000 (approx.) the M.1886 was standard with case hardened frame, hammer, forend cap and buttplates. Hence, such information is not included in factory letters. Following that date/serial all major parts were blued and case hardening had to be custom ordered and was so mentioned in factory ledgers. Takedown models almost always blued and not so mentioned. Straight grain, oil stained walnut stock standard. Although various grades of wood were extra, records merely mention "fancy"; pistol grip stocks usually fitted with better grades.

Serial numbering was in an individual series from 1 on up; marked on the lower tang. MODEL 1886 on the upper tang of most of the production; variations exist primarily in the late production due to adding of Winchester name and trademark data. Barrel marking of Winchester name and address; and, in late series arms, 1884 and 1885 patent dates were also used. Calibers marked on breech of the barrels.

The Model 1886, dramatically different from predecessor lever actions, was the first repeating rifle of John M. and Matthew S. Browning design to be adopted by Winchester. Improvements on their creation were made by Winchester's own William Mason, and the result was a vast improvement



5K-065
1886 Rifle



5K-066
1886 Light Weight Rifle

5K-069
1886 Carbine

5K-071
1886 Musket

over the Model 1876. Chamberings were in the big game calibers, and a featured part of the '86 was its shorter and quite streamlined frame. Immediately received with great enthusiasm by shooters (even several African hunters), the new model could count among its converts Theodore Roosevelt.

Major variations are:

**Rifle;** 26" round or octagon barrel, crescent style buttplate. Steel forend cap; the magazine tube attached to the barrel by a small band. Adjustable Buckhorn style rear sights. Straight buttstock.
**5K-065**   Values—Very Good **$1,500**   Exc. **$4,750**
**Extra Light Weight Rifle;** 22" round "rapid taper" barrel; half magazine, rubber shotgun buttplate; 45-70 and 33 calibers only:

33 caliber:
**5K-066**   Values—Very Good **$1,200**   Exc. **$3,750**

45-70 caliber:
**5K-067**   Values-Very Good **$3,000**   Exc. **$6,000**

## Winchester Model 71 Rifle

**Model 71 Rifle.** (Not illus.; about identical in contours to the Model 1886.) Manufactured 1935-1957; total quantity of about 47,254.

348 Winchester caliber. Tubular 3/4-length magazine beneath the barrel. The frame used was an improved version of that employed for many years on the Model 1886. (Note: Early specimens [approx. first 15,000] have long 3-7/8" tangs and will bring a premium value. Standard tang is 2-7/8".)

Plain walnut pistol grip stocks, the forend of semi-beavertail type. Blued finish.

Serial numbered in an individual series, from 1 to 47254; marking was on the bottom curve of the forward end of the frame. Two basic types of barrel markings were used, both identifying the model, and giving caliber, company name and address, and etc. Winchester developed the Model 71 as a

**Takedown Model Rifles:** which come apart at forward end of the breech.
**5K-068**   Values—Add 10 percent to 15 percent premium depending on model and overall condition.
**Carbine;** 22" round barrel, saddle ring on left side of the frame. Adjustable carbine style rear sights. Carbine style buttplate. Calibers 45-70 and 50 Express worth premium:
**5K-069**   Values—Good **$3,000**   Fine **$7,500**
**Full Stock Carbine;** as above but with forearm extending nearly to the muzzle (as on the Model 1876 Carbine); one barrel band.
**5K-070**   Values—Good **$4,000**   Fine **$11,500**
**Musket;** 30" round barrel, 26" forend (the tip of the Model 1876 Musket style), one barrel band. Military windgauge rear sights. Production quite limited, only about 350 produced; the '86 Musket is the greatest rarity of all Winchester lever action muskets:
**5K-071**   Values—Good **$5,000**   Fine **$17,500**

continuation of the Model 1886, with improvements to handle the 348 cartridge. Though a relatively modern rifle, the 71 has proven a quite popular item with collectors.

**Standard model;** plain walnut stocks, without pistol grip cap, or sling, or sling swivels. 24" barrel length:
**5K-072**   Values—Very Good **$600**   Exc. **$1,000**
**Deluxe Model;** checkered pistol grip stock and quick detachable sling swivels:
**5K-072.5**   Values—Very Good **$750**   Exc. **$1,250**
As above, but in 20" barrels:
**5K-073**   Values—Very Good **$850**   Exc. **$1,750**
**Deluxe Model;** checkered pistol grip stock, detachable swivels; 20" barrel:
**5K-073.5**   Values—Very Good **$950**   Exc. **$1,850**

## Winchester Model 1892 Rifle

**Model 1892 Rifle.** Made c. 1892-1941; total production approximately 1,004,067. (Those under No. 165,432 (approx.) made prior to December 31,1898.)

32-20, 38-40, and 44-40 were the major calibers; 25-20 added

in 1895, quite scarce in 218 Bee. Tubular magazine beneath the barrel. The frame a smaller version of the Model 1886.

Oil stained or (less common) varnished walnut stocks. Blued finish, with casehardening a special order detail.

## XIII: Lever Action and Other Repeating Rifles

"Folding Gun." 12 gauge shotgun. 19-1/2" barrel. Hinged on underside of receiver with lift lever to open on top. Folds in half for concealment. Advertised in company literature as "...especially adapted for police service, express messengers, U.S. marshals, prison and bank guards." Company sold a unique "quick draw" waist holster to go with it:

**13-006**    Values—Very Good $1,750    Exc. $4,500

Rifles. Reported in calibers 30/30 and 45/70. Round barrels. The longer forend conceals the full length of the magazine tube. Very scarce.

**13-007**    Values—Very Good $2,000    Exc. $4,500

---

### Burgess Lever Action Rifle   *See Chapter V: Whitney Firearms (V-J) or Colt Firearms (V-B).*

### Colt Lever and Pump Action Rifles   *See Colt Firearms, Chapter V-B.*

---

### Evans Lever Action Rifles



13-008
Old Model

13-013
Transition Model Carbine

13-016
New Model Military Musket

**Evans Repeating Rifle Company, Mechanic Falls, Maine, Lever Action Repeating Rifles.** Made c. 1873 to 1879. Total quantity estimated at approximately 12,200.

Caliber 44 Evans centerfire all models (1" shell on "Old Model" and "Transition Model" with longer 1-1/2" shell on "New Model").

Blued finish on barrel and frame standard. Walnut stocks. Nickeled buttplates and cocking levers occasionally seen and correct, but not worth premium.

Markings as noted below. "Old Model" and "Transition Model" serial numbered from 1 to approximately 2185. New Models are not serial numbered (the numbers that appear on them are assembly numbers and not serials).

The Evans was one of the more novel repeating rifles of the 19th century. It enjoys the distinction of being the only mass produced firearm ever attempted in the state of Maine and also holds the greatest capacity of any repeating rifle ever mass produced and marketed in the United States. The magazine was of a revolving type with the full complement of cartridges loaded through the butt. In place of the usual top hammer on most lever action rifles, the Evans hammer was mounted on the underside of the frame, just ahead of the breech lever and could also be manually cocked. Earliest specimens (extreme rarities with no examples known) held 38 rounds while the standard manufactured types had capacities of 34 and 28 rounds respectively.

As with other arms companies of their era, Evans made a practice of presenting for promotional purposes, special elaborately embellished models of their rifles to notables of the time. They included famous shooters, personalities and governmental officials instrumental in passing judgment on the acceptability of weapons for possible quantity contracts. Such

arms are rare and eagerly sought after; some are exemplary for their ornateness and superb quality reflecting the highest degrees of the engraver's art. Such rifles are one-of-a-kind and are evaluated similarly to those of other makes on the basis of their quality, elaborateness of workmanship, historical significance and, of course, condition. They have been recorded in all models of Evans with known examples presented to famous Westerners, Presidents of various Central and South American Republics and a number of Russian officers whom Evans was actively courting, seeking military contracts.

The best reference for information about Evans may be found in *Maine Made Guns And Their Makers* by Dwight B. Demeritt, Jr. (Maine State Museum, Hallowell, Maine, 1973).

**Old Model.** Made c. 1874 to 1876. Quantity estimated at approximately 500. Serial numbered 1 to approximately 500. 34-shot capacity. Fitted with upper buttstock only with the iron magazine entirely exposed on underside; buttplate has an inverted appearance with the heel on the underside. Flat top of frame; wooden forend fits into cut-out sides of forward section of frame. Earliest production made without the small lever retaining stud; later production (approximately serial numbers 100 to 500) with small locking stud. Exposed loading aperture on right frame without cover. Barrel marked EVANS REPEATING RIFLE/PAT.DEC 8, 1868 & SEPT 16, 1871.

**Sporting Rifle.** Estimated quantity made 300. 26", 28", and 30" octagon barrels:

**13-008**    Values—Very Good $850    Exc. $2,250

**Military Musket.** Estimated quantity less than 50. 30" barrel fitted for either socket type or saber bayonet. Full forend fastened by two barrel bands:

**13-009**    Values—Very Good $2,500    Exc. $4,000

**Carbine.** Estimated quantity made 150. 22" barrel. Short carbine forend with single barrel band and sling swivel:

**13-010**    Values—Very Good $1,450    Exc. $2,750

# EXHIBIT 35



# WINCHESTER

## THE GUN
## THAT WON THE WEST

*By* HAROLD F. WILLIAMSON

*A Sportsman's Press Book Published by the*

**COMBAT FORCES PRESS**

*Washington, D.C.*

(The Winchester trade mark is used with permission of the Winchester Repeating Arms Company)

**FIRST EDITION**

*Copyright 1952 by Association of the U.S. Army*

All rights reserved

No portion of this book may be reproduced in any form without permission.

For information address

The Sportsman's Press, 1529 18th Street NW, Washington 6, D.C.

MANUFACTURED IN THE UNITED STATES OF AMERICA

*Library of Congress Catalog No. 52-11409*

head. After the fulminate was in place, a wad was inserted in the head of the cartridge and the case filled with gunpowder. A ball of an "elongated conical form" grooved at the rear was in turn put into the mouth of the case and pressed into place. The final step was to put a light pressure on the head to bring the metal into close contact with the fulminate.

Wesson, it may be noted, made no claim to have invented the rimfire metallic cartridge, but he did claim priority in making it in this form and manner described. Actually, he made the first cartridges of this type in January 1858, and they were used in the caliber .22 revolver that his company had introduced the year before.

**The Henry Rimfire Cartridge**

In testimony given some years later, B. Tyler Henry stated that he began experimenting with metallic ammunition in the fall of 1858.[16] By the end of the year he could produce flanged rimfire cartridges almost identical with those of Wesson's except that they were larger in size. It is possible that he developed this type of ammunition independently, but it seems more likely that he had seen some of Wesson's products and realized their applicability to the problem of the Volcanic firearms. The fact that Henry did not take out a patent on ammunition might be taken as evidence that he recognized Smith & Wesson's prior claim. It appears much more probable that he and Winchester did not believe such a cartridge was patentable, for on April 20, 1863, the latter wrote Smith & Wesson:



*44 Flat Rimfire Cartridge*

*Gentlemen:*

After I saw you on Friday last, I saw Mr. Leete and, in course of the conversation, he asked me if you had said anything to me about your patent on cartridges. I replied that you had not, that I was not aware that you had one, and if you had I presumed you would not say anything to me about it for the reason that by virtue of certain agreements with the Volcanic Arms Company to which I fell heir, you would doubtless consider me entitled to make them. On this subject, however, it is best we should have a fair understanding, to this end please give me the facts and your views.

Yours Respectfully,
O. F. WINCHESTER

In any event, at the time the letter to Smith & Wesson was written, the New Haven Arms Company had been turning out caliber .44 rimfire cartridges in some quantity for well over a year and a half. Stamped on the head with the letter H, in honor of Henry, these cartridges carried a pointed, conical, spherical bullet weighing 216 grains and a powder charge of about 26 grains. About a year later the Company brought out a cartridge with a flat-nosed bullet, designed to lessen the danger of explosion in the magazine. These cartridges became known as the Henry .44 Flat. Some measure of their superiority over the Volcanic ammunition is indicated by the fact that they developed a muzzle velocity of about 1,200 feet per second compared with the maximum of 500 feet per second for the former.

**The Henry Rifle**

As soon as he had produced a satisfactory cartridge, Henry turned his attention to adapting the Volcanic repeating mechanism to the use of the new ammunition. Specifically, his improvements consisted in adapting the bolt and firing pin to loading, firing, and extracting the rimfire cartridge. A special feature was the design of the firing pin, which was divided at the fore end so that it indented both sides of the rim of the cartridge head and reduced the possibility of misfires. There was no question as to the patentability of these improvements, and in Octo-

28

ber 1860 Henry was granted US Patent 3446, which he assigned to the New Haven Arms Company.

These changes were incorporated in a new model rifle, bearing Henry's name, which in external appearance showed its relationship to the Volcanic. The magazine was the same, consisting of a slotted metal tube under the barrel, parallel with it, and holding fifteen cartridges. A section of the magazine, near the muzzle, which swung to one side to permit loading, contained a spiral spring that forced the ammunition to the rear against the carrier block. The barrel was twenty-four inches long with a bore of caliber .44. Complete, the gun weighed about ten pounds.

The choice of the caliber .44 bore for the new rifle raises an interesting question. While not an uncommon size, this bore was smaller than the standard military arms which were all above caliber .50. At the same time, it was larger than the Volcanic caliber .36 rifle and, therefore, its manufacture required the use of new equipment. It seems most probable that the Company adopted the larger bore in an attempt to tap the military market, but could not go beyond the caliber .44 without redesigning the repeating action to handle the longer ammunition. Even if this had been possible or practicable in 1861, it would have made the arm heavier and would have cut down on the amount of ammunition that could be carried in the magazine.[17]

**Importance of Henry's Contribution**

Some evidence of the significance of Henry's contributions to the New Haven Arms Company is contained in a brief submitted for an extension of his patent to the Patent Office in September 1874. According to this document

In 1860 the Volcanic arm as fully shown by all the witnesses for applicant, had become a failure, and the company insolvent, which state of affairs led applicant to make the improvements in the arm.

That the invention was of great value and importance is clearly shown by each and all of the witnesses on the part of the applicant.

It is impossible to estimate the real value of the invention made by the applicant. The Mechanism of the arm remains the same as the original arm, the patents for that mechanism are the foundation of all subsequent improvements, and to those patents, in this arm, applicant's patent was and still is subservient. The arm was a failure till the applicant's improvements, but it would be folly to say that the value of the arm made successful by such improvements is the real value or ascertained value of the invention of the applicant.

The witness, Winchester, fully explains the difficulties of estimating the real value of the invention . . . and fixes one dollar per gun as the money value of an improvement of that kind, and he stated that one hundred forty thousand arms have been made and sold to 1874, hence one hundred and forty thousand dollars is a reasonable estimate of the real value of the invention to the manufacturer, some portion of which should properly be credited to the inventor.

The Winchester Repeating Arms Company have agreed to pay the applicant for the patent for the extended term, the sum of twelve thousand five hundred dollars.[18]

The same document gives the details of the way in which Henry was compensated for his improvements:

Applicant's salary as superintendent was fifteen hundred dollars per year, and as in all manufactures, his ingenuity and talent were expected to be exercised for the good of

29

his employer without special agreement to that effect, leaving the question of the right of any patentable invention that he may make open, to be settled between the inventor and Company that employed him as they can agree.

Rather than pay Henry a cash settlement or royalty, Winchester, on behalf of the New Haven Arms Company, gave him a contract to manufacture five thousand arms "but in this contract no extra price was allowed applicant, above what other parties would have received from the same." (This is an example of the inside contract system, which will be discussed in some detail in Chapters Seven and Twelve. In brief, under this arrangement Henry was to produce the guns in the New Haven Company's factory, using the fixed plant and equipment and raw materials supplied by the Company. He was to employ, supervise and pay the workers himself. The difference between his costs and the contract price to the New Haven Arms Company was his income.) Furthermore, under this contract, although Henry continued to act as superintendent, his pay was discontinued. The arrangement ran for five years during which time Henry made some $15,000, or more by $7,500 than he would have received from his salary as superintendent.

In view of the importance attached to Henry's improvements, that amount does not appear to be overly generous. As the brief relates, if a deduction is made from Henry's income of a reasonable allowance for his attention and services under the contract, little or nothing remains as compensation for his invention which made a complete success of the arm and which, but for his improvement, was a failure.

This statement was made in an attempt to get a renewal of the patent and after the new gun had proved itself. In 1861, when the future of the rifle was still uncertain, Winchester's unwillingness to make a cash payment to Henry is understandable. Evidence is lacking as to whether the question of a royalty payment was raised, but it is significant to note that Winchester and his successors in general followed a rule of never granting royalties on inventions they acquired.

"Gentlemen's Agreement"

With the introduction of the Henry improvements, the New Haven Arms Company dropped the production of pistols and concentrated on the manufacture of rifles. The fact that the New Haven Arms Company and its successor, the Winchester Repeating Arms Company, never again manufactured pistols or revolvers, has given rise to an interesting speculation about an agreement between Winchester and Smith & Wesson. Chinn and Hardin, in their book on American hand arms, state, without documentation, that when Winchester and Smith & Wesson came to terms about the patents, they entered a gentlemen's agreement

. . . that was verbal, but has never been violated by either company in their many years of active existence. Oliver Winchester pledged that his company would never compete in the revolver business by manufacturing them; likewise the Smith and Wesson Company agreed never to produce rifles. And this agreement has been recognized by each succeeding generation having proved more binding than lots of contracts that were legally perfect and elaborately drawn.[18]

Such an agreement may have been entered into, and, being a "gentlemen's agreement," might not have been made a matter of record. There is, however, no mention of such an arrangement in the existing documents of either Smith & Wes-

son or the Winchester Repeating Arms Company, although the latter company did have a similar agreement with another concern.

Furthermore, the timing of the alleged agreement is wrong, because the patents were transferred to the Volcanic Company in 1855 and that company continued to produce pistols until almost 1860, several years after Smith & Wesson had started operations. In any case, the decision to specialize after 1860 can be accounted for largely on other grounds. If Smith & Wesson had wished to produce repeating rifles, it would have been necessary for them to develop an action not covered by the patents turned over to the Volcanic Repeating Arms Company and now held by Winchester. Moreover, any such invention would have reverted to Winchester under the covenant signed by the two at the same time. The Rollin White patent acquired by Smith & Wesson did not fall within the covenant although Winchester seems to have had his lawyers explore the possibility.

Of course, Winchester could have continued the manufacture of pistols using the toggle-link action. But at this time the revolving action popularized by Colt was well known and liked by shooters. This was largely because the revolver was easier to manipulate than the finger-lever action of the Volcanic which required both hands. As the Rollin White patent covered the revolving mechanism with the chambers bored through, in which metallic ammunition could be used, it would have been extremely difficult for the New Haven Arms Company to develop a patentable revolving action during the life of the Rollin White patents.

Whatever may have been Winchester's inclination toward the production of pistols, there is no doubt that by the middle of 1862 the prospects for the future of the New Haven Arms Company looked promising. The improvements in the rifle had been completed and the organization was tooled up and ready for production. The Civil War had begun the year before, and the tremendous demand for military supplies of all kinds offered the prospect of a substantial market for the New Haven Arms Company's new rifle.



*Henry Rifle*

EXHIBIT 36

# Gun Timeline | History Detectives

🌐 **pbs.org**/opb/historydetectives/technique/gun-timeline



## Gun Timeline

**Historical timeline of the development of modern weapons starting at 1364 with the first recorded use of a firearm and ending in 1892 with the introduction of automatic handguns.**



**1364 - First recorded use of a firearm.**
**1380 - Hand guns are known across Europe.**
**1400s - The matchlock gun appears.**

Before the matchlock, guns were fired by holding a burning wick to a "touch hole" in the barrel igniting the powder inside. A shooter uses one hand for firing, and a prop to steady the gun.The first device, or "lock," for mechanically firing a gun is the matchlock. Powder is held in a "flash pan," and ignited by a wick, or match, in a movable clamp. Both hands remain on the gun, vastly improving aim. Early matchlock guns are extremely rare. The matchlock shown here was made around 1640, and is typical of the muskets used by militia in Colonial America.



**1498 - Rifling principle is discovered.**
**1509 - Invention of wheel lock (rose lock).**

The next major advance, the wheel lock, generates a spark mechanically. With no wick to keep lit, the wheel lock is easier to use, and more reliable than the matchlock. However, wheel locks are expensive to produce. Matchlocks, at half the cost, remain in common use. This is an early (ca. 1540) multi-shot, wheel-lock pistol, made for Emperor Charles V. In this weapon, two locks are combined in one mechanism, to give each barrel separate ignition.



**1540 - Rifling appears in firearms.**
**1607 - Settlers arrive in Jamestown, Virginia.**
**1630 - The first true flintlock.**

The flintlock solved a longstanding problem. Some time in the late 1500s, a lid was added to the flash pan design. To expose or protect the powder, the lid had to be moved manually. The flintlock mechanism was designed to push back the lid and spark a flint at the same time. The flintlock ignition system reigned for two centuries, with virtually no alteration. The flintlock pictured here is a typical British "Brown Bess" musket. Marks on the gun indicate that it was used by German mercenaries during the American Revolution.



**1637 - First use of firearms proof-marks.**
**1750-1850 - Dueling pistols come into fashion**.

Around 1750, men stop carrying rapiers, and guns became the weapon of choice for a duel. Various guns were used, until a true dueling pistol was officially standardized in 1777, as "a 9 or 10 inch barreled, smooth bore flintlock of 1 inch bore, carrying a ball of 48 to the pound." Often lavishly decorated, the pistols are made until dueling falls out of favor in the mid-1800s. This pair of 1786 flintlock pistols was made with ivory stocks and unusually elaborate decorative details.



**1776 - American Revolution.**
**1807 - Percussion-detonating principle patented.**
**1825 ca. - Percussion-cap guns are in general use.**
**1830 - The back action lock appears.**
**1835 - The first Colt revolver.**

Samuel Colt developed the first mass-produced, multi-shot, revolving firearms. Various revolving designs had been around for centuries, but precision parts couldn't be made with available technologies. Colt was the first to apply Industrial Age machining tools to the idea. Mass production made the guns affordable. Reliability and accuracy made the Colt a favorite of soldiers and frontiersmen. The Colt depicted is a Third Model Dragoon percussion revolver (ca. 1853). A Colt with such lavish decoration and gold inlay is extremely rare.



**1840 - Guns begin to use pin-fire cartridges.**
**1847 - The telegraph is invented.**
**1850 - True shotguns in common use**.

In the second half of the 18th century, musket design branched out. This period produced a number of single-purpose firearms. The forerunner of modern shotguns was the fowling piece, developed specifically for hunting birds. Among the upper classes, fowling was a

leisure sport. Fowling pieces for the very affluent were often lovely works of art, but impractical for hunting.



**1854-56 - The Crimean War.** The last war to use only muzzle-loaded guns.
**1859 - The first full rim-fire cartridge.**
**1860 - Spencer repeating carbine patented**.

Introduced at the start of the Civil War, Spencer repeating guns were technically advanced, used cartridges (a recent development), and could fire 7 shots in 15 seconds. But the Army didn't want a repeating gun, fearing that soldiers would fire more often, constantly need fresh ammunition, and overtax the supply system. But in 1863, President Lincoln test-fired a Spencer. His approval led to the purchase of 107,372 Spencer repeating carbines and rifles (of 144,500 made), and the Spencer became the principal repeating gun of the Civil War.



**1861 - Breech loaded guns in common use.**
**1861-1865 - American Civil War.** Both breech and muzzle loaded guns used.
**1862 - The Gatling Gun is invented.**
**1869 - Center-fire cartridge introduced.**
**1870-1871- The Franco-German War**. Breach-loaded guns are dominant.
**1871 - First cartridge revolver.**
**1873 - Winchester rifle introduced.**

Winchester rifles were affordable, and produced in such great numbers, that the Winchester became the generic rifle. The Winchester had such a powerful hold in some regions that it actually became known as "the gun that won the West." In 1887, Winchester came out with their first repeating shotguns. The next major milestone for Winchester came in 1903, when the company introduced the first automatic rifle that would become widely used.



**1876 - Custer defeated at Little Big Horn.**
**1877 - First effective double-action revolver.**
**1879 - Lee box magazine patented.**
**1892- Advent of automatic handguns.**

The first automatic pistol was created by Joseph Laumann in 1892. But the Borchardt pistol of 1893 was the first automatic with a separate magazine in the grip, and this remains the defining feature of the breed. More automatics came in rapid succession, including Browning, Luger, Mauser, and Colt models. By the turn of the century, just 8 years after Laumann, automatics were firmly established.

**1900 - Historical firearms period concludes.** Contemporary period begins.

## Related Content

- 

  Ballistics

- 

  Weapon Dating

  **Detective Techniques Home**

# EXHIBIT 37

# PUBLIC AND LOCAL ACTS

OF

# THE LEGISLATURE

OF THE

## State of Michigan

PASSED AT THE

### REGULAR SESSION OF 1959

CONTAINING JOINT RESOLUTIONS, AMENDMENTS TO
CONSTITUTION AND ABSTRACTS OF PROCEEDINGS
RELATIVE TO CHANGE OF BOUNDARIES OF TOWN-
SHIPS AND INCORPORATION, ETC., OF CITIES AND
VILLAGES.



COMPILED BY

## JAMES M. HARE

SECRETARY OF STATE

AND THE

### LEGISLATIVE SERVICE BUREAU

SPEAKER-HINES AND THOMAS, INC., LANSING, MICH.—1960



of election commissioners of the county shall cause to be printed ballot labels or slips containing the names of candidates for all offices to be voted for or questions to be voted upon, except when the city, village or township officials only are to be elected, at which time the city, village or township clerk shall provide such ballot labels for use upon such voting machines, and shall forward the same to the board of election commissioners of each city, village or township within the county where such voting machines are used at least 5 secular days before the day of election: Provided, That whenever local officers are to be elected at any such general election, it shall be the duty of the city, township or village clerk, respectively, to file with the board of election commissioners of the county, the titles of offices, the names of all candidates to be voted for, and all questions or propositions to be voted upon within such city, township or village, at that election: Provided further, That in counties now or hereafter having a population of 500,000 or more, according to the latest or each succeeding federal decennial census, whenever local officers are to be elected at any such general election, the last day upon which the respective clerks may receive nominating petitions for such local offices shall be the same as fixed by law for the receiving of nominating petitions for state or county offices.

Approved July 16, 1959.

---

## [No. 174.]

AN ACT to amend section 9 of chapter 84 of the Revised Statutes of 1846, entitled "Of divorce," as last amended by Act No. 227 of the Public Acts of 1958, being section 552.9 of the Compiled Laws of 1948.

*The People of the State of Michigan enact:*

**Section amended.**

Section 1. Section 9 of chapter 84 of the Revised Statutes of 1846, as last amended by Act No. 227 of the Public Acts of 1958, being section 552.9 of the Compiled Laws of 1948, is hereby amended to read as follows:

**552.9 Divorce; residence, place of marriage. [M.S.A. 25.89]**

Sec. 9. No decree of divorce shall be granted by any court in this state in any case unless:

(1) The party applying therefor shall have resided in this state for 1 year immediately preceding the time of filing the bill of complaint therefor; or

(2) The marriage which it is sought to dissolve was solemnized in this state, and the party applying for such divorce shall have resided in this state from the time of such marriage until the time of bringing such suit for divorce; and

(3) The complainant or defendant, or both of them, shall have resided in the county in which the bill of complaint is filed for 10 days immediately preceding the filing of the bill of complaint therefor.

Approved July 16, 1959.

---

## [No. 175.]

AN ACT to amend section 224 of Act No. 328 of the Public Acts of 1931, entitled "An act to revise, consolidate, codify and add to the statutes relating to crimes; to define crimes and prescribe the penalties therefor; to provide for the competency of evidence at the trial of persons accused of crime; to provide immunity from prosecution for certain witnesses appearing at such trials; and to repeal certain acts and parts of acts inconsistent with or contravening any of the provisions of this act," being section 750.224 of the Compiled Laws of 1948.

*The People of the State of Michigan enact:*

**Section amended.**

Section 1.   Section 224 of Act No. 328 of the Public Acts of 1931, being section 750.224 of the Compiled Laws of 1948, is hereby amended to read as follows:

**750.224   Machine gun, silencer, bomb, blackjack, slung shot, billy, metallic knuckles, sand club, bludgeon, gas container, manufacture or sale.   [M.S.A. 28.421]**

Sec. 224.   Any person who shall manufacture, sell, offer for sale or possess any machine gun or firearm which shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact, shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 5 years or by a fine of not more than $2,500.00.

**Persons to whom section applies.**

The provisions of this section shall not apply to any person manufacturing firearms, explosives or munitions of war by virtue of any contracts with any department of the government of the United States, or with any foreign government, state, municipality or any subdivision thereof, or to any person duly licensed to manufacture, sell or possess any machine gun or gas ejecting device, weapon, cartridge, container or contrivance above mentioned.

Approved July 16, 1959.

———————

**[No. 176.]**

AN ACT to amend section 3 of Act No. 289 of the Public Acts of 1925, entitled as amended "An act to create a bureau of criminal identification, records and statistics within the department of public safety; to provide for a director thereof; to prescribe his duties; to require peace officers, persons in charge of certain institutions and others, to make reports respecting crimes and criminals to such bureau and to provide a penalty for violation of the provisions thereof," as last amended by Act No. 92 of the Public Acts of 1958, being section 28.243 of the Compiled Laws of 1948.

*The People of the State of Michigan enact:*

**Section amended.**

Section 1.   Section 3 of Act No. 289 of the Public Acts of 1925, as last amended by Act No. 92 of the Public Acts of 1958, being section 28.243 of the Compiled Laws of 1948, is hereby amended to read as follows:

**28.243   Fingerprints and description of persons arrested; return upon release or acquittal.   [M.S.A. 4.463]**

Sec. 3.   It is hereby made the duty of the sheriffs of the several counties of this state, chiefs of police of the cities, and village marshals, immediately upon the arrest of any person for a felony or of a misdemeanor not cognizable by a justice of the peace, to take his fingerprints, in duplicate, 1 set of fingerprints, according to the fingerprint system of identification established by the director of said bureau and on forms furnished by him, and 1 set of fingerprints according to the fingerprint system of identification established by the director of the federal bureau of investigation at Washington, D. C., on forms furnished by him, and forward the same, together with such other descriptions and information as

# EXHIBIT 38

# ACTS AND RESOLVES

PASSED AT THE

# GENERAL ASSEMBLY

OF THE

## STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

AT THE

## Special October Session, A. D. 1958

AND

## JANUARY SESSION, A. D. 1959



DEPARTMENT OF STATE

OFFICE OF THE SECRETARY OF STATE

PROVIDENCE
THE OXFORD PRESS
1959

## "TITLE 11.

## "CRIMINAL OFFENSES

"\* \* \*

## "CHAPTER 47

## "WEAPONS

Firearms
act.

**"11-47-1.   Short title.**—Sections 11-47-1 to 11-47-56, inclusive, may be cited as the firearms act.

Definitions:

**"11-47-2.   Definition of terms.**—When used in sections 11-47-1 to 11-47-56, inclusive, the following words and phrases shall be construed as follows:

'Pistol'.

'Pistol' shall include any pistol or revolver, and any shotgun, rifle or similar weapon with overall length less than twenty-six (26) inches, but shall not include any pistol or revolver designed for the use of blank cartridges only.

'Machine
gun'.

'Machine gun' shall include any weapon which shoots automatically and any weapon other than twenty-two (22) caliber rim fire which shoots more than fourteen (14) shots semi-automatically without reloading.

'Firearm'.

'Firearm' shall include any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' so-called, or other instrument from which steel or metal projectiles are propelled, except such instruments propelling such projectiles which instruments are designed or normally used for a primary purpose other than as a weapon.

'Person'.

'Person' shall include individual, partnership, firm, association or corporation.

JANUARY SESSION, 1959—CHAPTER 75.     261

'Licensing authorities' shall mean the board of police commissioners of a city or town where such board has been instituted, the chief of police or superintendent of police of other cities and towns having a regular organized police force, and in towns where there is no chief of police or superintendent of police it shall mean the town clerk who may issue licenses upon the recommendation of the town sergeant, and it shall also mean any other person or body duly authorized by the city or town charter or by state law. 'Licensing authorities'.

'Crime of violence' shall mean and include any of the following crimes or an attempt to commit any of the same, viz.; murder, manslaughter, rape, mayhem, robbery, burglary, breaking and entering, assault with a dangerous weapon, assault or battery involving grave bodily injury, and/or assault with intent to commit any offense punishable as a felony. 'Crime of violence'.

'Fugitive from justice' shall mean any person who has fled from any state, territory, the District of Columbia, or possession of the United States to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal proceeding. 'Fugitive from justice'.

'Sell' shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. 'Sell'. "'purchase''. "'purchasing''.

"11-47-3.  **Carrying arms when committing crime of violence.**—If any person shall commit or attempt to commit a crime of violence when armed or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished by imprisonment for not more than five (5) years. Carrying arms when committing crime of violence.

262      JANUARY SESSION, 1959—CHAPTER 75.

The judge shall have the power to sentence any person who may be convicted for a second or third offense under this section, to double and triple the penalty imposed thereby, and for a fourth offense the person so convicted may be sentenced to perpetual imprisonment.

Being armed prima facie evidence of intent.

"11-47-4.  **Being armed prima facie evidence of intention.**—In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol or revolver without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence.

Possession of arms by person convicted of crime of violence or who is a fugitive from justice.

"11-47-5.  **Possession of arms by person convicted of crime of violence or who is a fugitive from justice.**— No person who has been convicted in this state or elsewhere of a crime of violence or who is a fugitive from justice shall purchase, own, carry, transport or have in his possession or under his control any firearm.

Possession of arms by mental incompetents, drug addicts, and persons adjudicated habitual drunkards.

"11-47-6.  **Possession of arms by mental incompetents, drug addicts, and persons adjudicated an habitual drunkard.**—No person who is under guardianship or treatment or confinement by virtue of being a mental incompetent, or who has been adjudicated or is under treatment or confinement as a drug addict, or who has been adjudicated or is under treatment or confinement as an habitual drunkard shall purchase, own, carry, transport or have in his possession or under his control any firearm. Any person affected by the provisions of this section, other than a person who has been pronounced criminally insane by competent

medical authority, after the lapse of a period of five (5) years from the date of being pronounced cured by competent medical authority, may, upon presentation of an affidavit issued by competent medical authority to the effect that he is a mentally stable person and a proper person to possess firearms, make application for the purchase of said firearm(s). If said person has no other disqualifying record he will be allowed to purchase and possess firearms.

"**11-47-7.   Possession of pistol or revolver by alien.**— No unnaturalized foreign born person who has resided in the United States for less than 10 years shall purchase, own, carry, transport or have in his possession or under his control any pistol or revolver. The provisions of this section shall be waived in the case of an unnaturalized foreign born person arriving in or passing through this state for the purpose of competing in a match organized under the auspices of a national shooting organization.

*Possession of arms by aliens.*

"**11-47-8.   License required for carrying pistol— Possession of machine gun.**—No person shall, without a license therefor, issued as provided in sections 11-47-11 and 11-47-12, carry a pistol or revolver in any vehicle or conveyance or on or about his person whether visible or concealed, except in his dwelling house or place of business or on land possessed by him or as provided in sections 11-47-9 and 11-47-10, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this chapter. Every person violating the provisions of this section shall, upon conviction, be punished by imprisonment for not more than one (1) year and one (1) day.

*License required for carrying pistol or revolver.*

*Possession of machine gun.*

EXHIBIT 39

### CHAPTER 753—H. F No. 449

*Relating to crimes and punishment; creating the criminal code of 1963 and conforming and harmonizing certain provisions of Minnesota Statutes with the provisions thereof; amending Minnesota Statutes 1961, Sections 169.11; 243.05; 243.18; 340.461, Subdivision 5; 359.08; 566.01; 610.08; 610.35; 614.054; 614.15; 615.13; 617.05; 618.21, Subdivision 2; 619.36; and 621.37; repealing Minnesota Statutes 1961, Sections 168.47; 168.48; 168.49; 241.24; 243.01; 243.11; 243.60; 243.70; 243.76; 243.77; 340.69; 360.075, Subdivision 3; 361.06; 437.03; 561.05; 561.06; 610.01 to 610.07; 610.09; 610.11 to 610.34; 610.36 to 610.39; 610.41 to 610.47; 610.50; 610.51; 611.09; 611.10; 612.01 to 612.12; 613.01 to 613.12; 613.16 to 613.21; 613.251 to 613.27; 613.29 to 613.43; 613.45 to 613.51; 613.56 to 613.58; 613.61 to 613.66; 613.68; 613.70 to 613.76; 613.79; 614.01 to 614.05; 614.06 to 614.08; 614.11; 614.13; 614.14; 614.16; 614.17; 614.18, Subdivision 1; 614.22; 614.24; 614.32 to 614.34; 614.36 to 614.40; 614.51 to 614.575; 614.60; 614.62 to 614.65; 614.67; 614.71 to 614.75; 615.01 to 615.12; 615.14 to 615.17; 616.01 to 616.05; 616.15 to 616.163; 616.18; 616.19; 616.21; 616.24; 616.25; 616.26; 616.28; 616.30; 616.41 to 616.43; 616.44 to 616.46; 617.04; 617.05; 617.11 to 617.13; 617.15; 617.31; 617.55 to 617.68; 617.72 to 617.75; 619.01 to 619.05; 619.07 to 619.35; 619.37 to 619.55; 619.57 to 619.63; 620.01 to 620.24; 620.25 to 620.273; 620.34; 620.41; 620.44 to 620.51; 620.59 to 620.72; 620.74; 620.76; 621.01 to 621.15; 621.17 to 621.35; 621.40 to 621.49; 621.51 to 621.57; 622.01 to 622.19; 622.21; 622.22; 622.28; 623.20 to 623.23; 623.25; 623.26; 631.42; 631.47; 631.49; 634.05; 636.02; 641.19; and 643.18.*

Be it enacted by the Legislature of the State of Minnesota:

### ARTICLE I
### GENERAL PRINCIPLES

Section 609.01.   **Name and construction.**   *Subdivision 1.* **Purposes.**   *This article may be cited as the Criminal Code of 1963. Its provisions shall be construed according to the fair import of its terms, to promote justice, and to effect its purposes which are declared to be:*

*(1)   To protect the public safety and welfare by preventing the commission of crime through the deterring effect of the sentences authorized, the rehabilitation of those convicted, and their confinement when the public safety and interest requires; and*

*(2)   To protect the individual against the misuse of the*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*criminal law by fairly defining the acts and omissions prohibited, authorizing sentences reasonably related to the conduct and character of the convicted person, and prescribing fair and reasonable post-conviction procedures.*

*Subd. 2.* **Numbering.** *This article is arranged and numbered, subject, however, to the provisions of Minnesota Statutes 1961, Section 648.34, so that the enacted article may be compiled in the next edition of Minnesota Statutes without any changes in numbering.*

Sec. 609.015. **Scope and effect.** *Subdivision 1. Common law crimes are abolished and no act or omission is a crime unless made so by this article or by other applicable statute, but this does not prevent the use of common law rules in the construction or interpretation of the provisions of this article or other statute. Crimes committed prior to the effective date of this article are not affected thereby.*

*Subd. 2. Unless expressly stated otherwise, or the context otherwise requires, the provisions of this article also apply to crimes created by statute other than in this article.*

Sec. 609.02 **Definitions.** *Subdivision 1.* **Crime.** *"Crime" means conduct which is prohibited by statute and for which the actor may be sentenced to imprisonment or fine or both.*

*Subd. 2.* **Felony.** *"Felony" means a crime for which a sentence of imprisonment for more than one year may be imposed.*

*Subd. 3.* **Misdemeanor.** *"Misdemeanor" means a crime for which a sentence of not more than 90 days or a fine of not more than $100 may be imposed.*

*Subd. 4.* **Gross misdemeanor.** *"Gross misdemeanor" means any crime which is not a felony or misdemeanor.*

*Subd. 5.* **Conviction.** *"Conviction" means any of the following accepted and recorded by the court:*

*(1) A plea of guilty; or*

*(2) A verdict of guilty by a jury or a finding of guilty by the court.*

*Subd. 6.* **Dangerous weapon.** *"Dangerous weapon" means any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or great bodily harm, or any other device or instrumentality which, in the manner it is*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

8-cv-10507-PGS-JBD  Document 196-3  Filed 12/15/23  Page 86 of 167  Page

_used or intended to be used, is calculated or likely to produce death or great bodily harm._

_Subd. 7._ **Bodily harm.** _"Bodily- harm" means physical pain or injury, illness, or any impairment of physical condition._

_Subd. 8._ **Great bodily harm.** _"Great bodily harm" means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm._

_Subd. 9._ **Mental state.** _(1) When criminal intent is an element of a crime in this article, such intent is indicated by the term "intentionally," the phrase "with intent to," the phrase "with intent that," or some form of the verbs "know" or "believe."_

_(2) "Know" requires only that the actor believes that the specified fact exists._

_(3) "Intentionally" means that the actor either has a purpose to do the thing or cause the result specified or believes that his act, if successful, will cause that result. In addition, except as provided in clause (6), the actor must have knowledge of those facts which are necessary to make his conduct criminal and which are set forth after the word "intentionally."_

_(4) "With intent to" or "with intent that" means that the actor either has a purpose to do the thing or cause the result specified or believes that his act, if successful, will cause that result._

_(5) Criminal intent does not require proof of knowledge of the existence or constitutionality of the statute under which he is prosecuted or the scope or meaning of the terms used in that statute._

_(6) Criminal intent does not require proof of knowledge of the age of a minor even though age is a material element in the crime in question._

Sec. 609.025. **Jurisdiction of state.** _A person may be convicted and sentenced under the law of this state if:_

_(1) He commits a crime in whole or in part within this state; or_

_(2) Being without the state, he causes, aids or abets another to commit a crime within the state; or_

_(3) Being without the state, he intentionally causes a result within the state prohibited by the criminal laws of this state._

**Changes or additions indicated by** _italics,_ **deletions by** ~~strikeout~~.

*It is not a defense that the defendant's conduct is also a criminal offense under the laws of another state or of the United States or of another country.*

Sec. 609.03.    **Punishment when not otherwise fixed.** *If a person is convicted of a crime for which no punishment is otherwise provided he may be sentenced as follows:*

*(1)    If the crime is a felony, to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both; or*

*(2)    If the crime is a gross misdemeanor, to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both; or*

*(3)    If the crime is a misdemeanor, to imprisonment for not more than 90 days or to payment of a fine of not more than $100; or*

*(4)    If the crime is other than a misdemeanor and a fine is imposed but the amount is not specified, to payment of a fine of not more than $500, or to imprisonment for a specified term of not more than six months if the fine is not paid.*

Sec. 609.035.    **Crime punishable under different provisions.** *Except as provided in section 609.585, if a person's conduct constitutes more than one offense under the laws of this state he may be punished for only one of such offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them. All such offenses may be included in one prosecution which shall be stated in separate counts.*

Sec. 609.04.    **Conviction of lesser offense.**    *Subdivision 1. Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:*

*(1)    A lesser degree of the same crime; or*

*(2)    An attempt to commit the crime charged; or*

*(3)    An attempt to commit a lesser degree of the same crime; or*

*(4)    A crime necessarily proved if the crime charged were proved.*

*Subd. 2.    A conviction or acquittal of a crime is a bar to further prosecution of any included crime, or other degree of the same crime.*

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

Sec. 609.045.   **Foreign conviction or acquittal.**   *If an act or omission constitutes a crime under both the laws of this state and the laws of another jurisdiction, a conviction or acquittal of such crime in the other jurisdiction bars prosecution for the crime in this state.*

Sec. 609.05.   **Liability for crimes of another.**   *Subdivision 1.   A person is criminally liable for a crime committed by another if he intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.*

*Subd. 2.   A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by him as a probable consequence of committing or attempting to commit the crime intended.*

*Subd. 3.   A person who intentionally aids, advises, hires, counsels, or conspires with or otherwise procures another to commit a crime and thereafter abandons his purpose and makes a reasonable effort to prevent the commission of the crime prior to its commission is not liable if the crime is thereafter committed.*

*Subd. 4.   A person liable under this section may be charged with and convicted of the crime although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.*

Sec. 609.055.   **Liability of children.**   *Children under the age of 14 years are incapable of committing crime. Children of the age of 14 years or over but under 18 years may be prosecuted for a criminal offense if the alleged violation is duly referred to the appropriate prosecuting authority in accordance with the provisions of Minnesota Statutes, Chapter 260.*

Sec. 609.06.   **Authorized use of force.**   *Reasonable force may be used upon or toward the person of another without his consent when the following circumstances exist or the actor reasonably believes them to exist:*

*(1)   When used by a public officer or one assisting him under his direction:*

*(a)   In effecting a lawful arrest; or*

*(b)   In the execution of legal process; or*

*(c)   In enforcing an order of the court; or*

*(d)   In executing any other duty imposed upon him by law; or*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*(2)    When used by a person not a public officer in arresting another in the cases and in the manner provided by law and delivering him to an officer competent to receive him into custody; or*

*(3)    When used by any person in resisting or aiding another to resist an offense against the person; or*

*(4)    When used by any person in lawful possession of real or personal property, or by another assisting him, in resisting a trespass upon or other unlawful interference with such property; or*

*(5)    When used by any person to prevent the escape, or to retake following the escape, of a person lawfully held on a charge or conviction of a crime; or*

*(6)    When used by a parent, guardian, teacher or other lawful custodian of a child or pupil, in the exercise of lawful authority, to restrain or correct such child or pupil; or*

*(7)    When used by a common carrier in expelling a passenger who refuses to obey a lawful requirement for the conduct of passengers and reasonable care is exercised with regard to his personal safety; or*

*(8)    When used to restrain a mentally ill or mentally defective person from injuring himself or another or when used by one with authority to do so to compel compliance with reasonable requirements for his control, conduct or treatment; or*

*(9)    When used by a public or private institution providing custody or treatment against one lawfully committed to it to compel compliance with reasonable requirements for his control, conduct or treatment.*

Sec. 609.065.    **Justifiable taking of life.**    *The intentional taking of the life of another is not authorized by section 609.06, except when necessary in the following cases:*

*(1)    In resisting or preventing an offense which the actor reasonably believes exposes him or another to great bodily harm or death, or preventing the commission of a felony in his place of abode; or*

*(2)    By a public officer, or person assisting him, to overcome resistance to the execution of legal process or order of a court when he reasonably believes that such resistance exposes him or another to great bodily harm or death; or*

*(3)    By a public officer, or person assisting him, in effecting*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*a lawful arrest for a felony or in preventing an escape of a person held therefor.*

Sec. 609.075.   **Intoxication as defense.**   *An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.*

Sec. 609.08.   **Duress.**   *Except as provided in section 609.20, clause (3), when any crime is committed or participated in by two or more persons, any one of whom participates only under compulsion by another engaged therein, who by threats creates a reasonable apprehension in the mind of such participator that in case of refusal he is liable to instant death, such threats and apprehension constitute duress which will excuse such participator from criminal liability.*

Sec. 609.085.   **Sending written communication.**   *Subdivision 1.   When the sending of a letter or other written communication is made an offense, the offense is complete upon deposit of the letter or communication in any official depository of mail or given to another for the purpose of delivery to the receiver.*

*Subd. 2.   The offense is committed in both the county in which the letter is so deposited or given and the county in which it is received by the person for whom it is intended.*

Sec. 609.09.   **Compelling testimony; immunity from prosecution.**   *Subdivision 1.   In any criminal proceeding, in which a violation of a provision of this article is charged, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the prosecuting attorney, in writing, requests a judge of the district court to order that person to answer the question or produce the evidence, the judge, after notice to the witness and hearing, shall so order if he finds that to do so would not be contrary to the public interest and would not expose the witness to prosecution in another state or in the federal courts, and that person shall comply with the order.*

*After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, he shall not be prosecuted or subjected to penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order, he gave, answered, or produced evidence, but he may be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*committed in answering, or in failing to answer, or in producing, or failing to produce, evidence in accordance with the order.*

*Subd. 2. In every case not provided for in subdivision 1 and in which it is provided by law that a witness shall not be excused from giving testimony tending to criminate himself, no person shall be excused from testifying or producing any papers or documents on the ground that his testimony may tend to criminate him or subject him to a penalty or forfeiture, but he shall not be prosecuted or subjected to a penalty or forfeiture for or on account of any action, matter, or thing concerning which he shall so testify, except for perjury committed in such testimony.*

## SENTENCES

Sec. 609.095. **Limits of sentences.** *No other or different sentence or punishment shall be imposed for the commission of a crime than is authorized by this article or other applicable law.*

Sec. 609.10. **Sentences available.** *Upon conviction of a felony and compliance with the other provisions of this article the court, if it imposes sentence, may sentence the defendant to the extent authorized by law as follows:*

*(1) To life imprisonment; or*

*(2) To imprisonment for a maximum term of years fixed by the court; or*

*(3) To an indeterminate term of imprisonment which shall be deemed to be for the maximum term authorized by law; or*

*(4) To both imprisonment and payment of a fine; or*

*(5) To payment of a fine without imprisonment or to imprisonment if the fine is not paid.*

Sec. 609.105. **Sentence of imprisonment.** *Subdivision 1. A sentence to imprisonment for more than one year shall commit the defendant to the custody of the commissioner of corrections.*

*Subd. 2. The commissioner of corrections shall determine the place of confinement in a prison, reformatory, or other facility of the department of corrections established by law for the confinement of convicted persons and prescribe reasonable conditions, rules, and regulations for their employment, conduct, instruction, and discipline within or without the facility.*

*Subd. 3. A sentence to imprisonment for a period of one year or any lesser period shall be to a workhouse, work farm, county jail, or other place authorized by law.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

Sec. 609.11.    **Minimum terms of imprisonment.**    *All commitments to the commissioner of corrections for imprisonment of the the defendant are without minimum terms except when sentence is to life imprisonment as required by law.*

Sec. 609.115.    **Presentence investigation.**    *Subdivision 1. When a defendant has been convicted of a felony, and a sentence of life imprisonment is not required by law, the court may, before sentence is imposed, cause a presentence investigation and written report to be made to the court concerning the defendant's individual characteristics, circumstances, needs, potentialities, criminal record and social history, the circumstances of the offense and the harm caused thereby to others and to the community. If the court so directs, the report shall include an estimate of the prospects of the defendant's rehabilitation and recommendations as to the sentence which should be imposed.*

*The investigation shall be made by a probation officer of the court, if there is one, otherwise by the commissioner of corrections.*

*Pending the presentence investigation and report, the court with the consent of the commissioner may commit the defendant to the custody of the commissioner of corrections who shall return the defendant to the court when the court so orders.*

*Subd. 2.    If the defendant has been convicted of a crime for which a mandatory sentence of life imprisonment is provided by law, the probation officer of the court, if there is one, otherwise the commissioner of corrections, shall forthwith make a post-sentence investigation and make a written report as provided by subdivision 1.*

*Subd. 3.    All law enforcement agencies shall make available to the probation officer or the commissioner of corrections the criminal record and other relevant information relating to the defendant which they may have, when requested for the purposes of subdivisions 1 and 2.*

*Subd. 4.    Any report made pursuant to subdivision 1 of this section shall be open to inspection by the prosecuting attorney and the defendant's attorney prior to sentence and on the request of either of them a summary hearing in chambers shall be held on any matter brought in issue, but confidential sources of information shall not be disclosed unless the court otherwise directs.*

*Subd. 5.    If the defendant is sentenced to the commissioner of corrections, a copy of any report made pursuant to this section and not made by the commissioner shall accompany the commitment.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*Subd. 6.    Except as provided in subdivisions 4 and 5 or as otherwise directed by the court any report made pursuant to this section shall not be disclosed.*

*Subd. 7.    If imposition of sentence is stayed by reason of an appeal taken or to be taken, the presentence investigation provided for in this section shall not be made until such stay has expired or has otherwise been terminated.*

Sec. 609.12.    **Parole or discharge.**    *Subdivision 1.    A person sentenced to the commissioner of corrections for imprisonment for a period less than life may be paroled or discharged at any time without regard to length of the term of imprisonment which the sentence imposes when in the judgment of the adult corrections commission, and under the conditions it imposes, the granting of parole or discharge would be most conducive to his rehabilitation and would be in the public interest.*

*Subd. 2.    If a sentence of more than five years has been imposed on a defendant for a crime authorizing a sentence of not more than ten years, the adult corrections commission shall grant him parole no later than the expiration of five years if imprisonment, less time granted for good behavior, unless the commission determines with or without hearing that his parole would not be conducive to his rehabilitation or would not be in the public interest.*

*Subd. 3.    All sentences to the commissioner of corrections for the imprisonment of the defendant are subject to the laws relating to parole and the powers of the adult corrections commission and the commissioner of corrections, except as modified in subdivisions 1 and 2, and to all other laws relating to persons in said institutions and their imprisonment.*

Sec. 609.125.    **Sentence for misdemeanor or gross misdemeanor.**    *Upon conviction of a misdemeanor or gross misdemeanor the court, if sentence is imposed, may, to the extent authorized by law, sentence the defendant:*

*(1)    To imprisonment for a definite term; or*

*(2)    To payment of a fine, or to imprisonment for a specified term if the fine is not paid; or*

*(3)    In the case of a conviction of a gross misdemeanor, to both imprisonment for a definite term and payment of a fine.*

Sec. 609.13.    **Convictions of felony; when deemed misdemeanor or gross misdemeanor.**    *Notwithstanding a conviction is for a felony:*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*(1)    The conviction is deemed to be for a misdemeanor or a gross misdemeanor if the sentence imposed is within the limits provided by law for a misdemeanor or gross misdemeanor as defined in section 609.02; or*

*(2)    The conviction is deemed to be for a misdemeanor if the imposition of the sentence is stayed, the defendant is placed on probation, and he is thereafter discharged without sentence.*

Sec. 609.135.    **Stay of imposition or execution of sentence.** *Subdivision 1.    Except when a sentence of life imprisonment is required by law, any court, including a justice of the peace to the extent otherwise authorized by law, may stay imposition or execution of sentence and place the defendant on probation with or without supervision and on such terms as the court may prescribe. The court may order the supervision to be under the probation officer of the court, or, if there is none and the conviction is for a felony, by the commissioner of corrections, or in any case by some other suitable and consenting person.*

*Subd. 2.    (1)    In case the conviction is for a felony such stay shall be for not more than the maximum period for which the sentence of imprisonment might have been imposed.*

*(2)    In case the conviction is for a misdemeanor the stay shall not be for more than one year.*

*(3)    In case the conviction is for a gross misdemeanor the stay shall not be for more than two years.*

*(4)    At the expiration of such stay, unless the stay has been revoked or the defendant discharged prior thereto, the defendant shall be discharged.*

Sec. 609.14.    **Revocation of stay.**   *Subdivision 1.    When it appears that the defendant has violated any of the conditions of his probation or has otherwise been guilty of misconduct which warrants the imposing or execution of sentence, the court may without notice revoke the stay thereof and probation and direct that the defendant be taken into immediate custody.*

*Subd. 2.    The defendant shall thereupon be notified in writing and in such manner as the court directs of the grounds alleged to exist for revocation of the stay of imposition or execution of sentence. If such grounds are brought in issue by the defendant, a summary hearing shall be held thereon at which he is entitled to be heard and to be represented by counsel.*

*Subd. 3.    If any of such grounds are found to exist the court may:*

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

*(1) If imposition of sentence was previously stayed, again stay sentence or impose sentence and stay the execution thereof, and in either event place the defendant on probation pursuant to section 609.135, or impose sentence and order execution thereof; or*

*(2) If sentence was previously imposed and execution thereof stayed, continue such stay and place the defendant on probation in accordance with the provisions of section 609.135, or order execution of the sentence previously imposed.*

*Subd. 4. If none of such grounds are found to exist, the defendant shall be restored to his liberty under the previous order of the court.*

Sec. 609.145. **Credit for prior imprisonment.** *Subdivision 1. When a person has been imprisoned pursuant to a conviction which is set aside and is thereafter convicted of a crime growing out of the same act or omission, the maximum period of imprisonment to which he may be sentenced is reduced by the period of the prior imprisonment and the time earned thereby in diminution of sentence. If sentence is for less than this maximum, the prior imprisonment and time earned in diminution of sentence shall be credited toward the sentence unless the court otherwise directs.*

*Subd. 2. A sentence of imprisonment upon conviction of a felony is reduced by the period of confinement of the defendant following his conviction and before his commitment to the commissioner of corrections for execution of sentence unless the court otherwise directs.*

Sec. 609.15. **Multiple sentences.** *Subdivision 1. When separate sentences of imprisonment are imposed on a defendant for two or more crimes, whether charged in a single indictment or information or separately, or when a person who is under sentence of imprisonment in this state is being sentenced to imprisonment for another crime committed prior to or while subject to such former sentence, the court in the later sentences shall specify whether the sentences shall run concurrently or consecutively. If the court does not so specify, the sentences shall run concurrently.*

*Subd. 2. If the court specifies that the sentence shall run consecutively, the total of the terms of imprisonment imposed, other than a term of imprisonment for life, shall not exceed 40 years. If all of the sentences are for misdemeanors the total of the terms of imprisonment shall not exceed one year; if for gross misdemeanors the total of such terms shall not exceed three years.*

Sec. 609.155. **Extended term for dangerous offenders.**

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

*Subdivision 1.* **Definition.** *"Extended term of imprisonment" means a term of imprisonment the maximum of which may be for the maximum term authorized by law for the crime for which the defendant is being sentenced multiplied by the number of his prior felony convictions, but not to exceed 40 years.*

*Subd. 2.* **When applicable.** *Whoever, having previously been convicted of one or more felonies, commits another felony other than murder in the first degree may upon conviction thereof be sentenced to an extended term of imprisonment if;*

*(1)   A presentence investigation and report has been made pursuant to section 609.115; and*

*(2)   Findings are made by the court as required by section 609.16.*

*Subd. 3.   For purpose of this section a felony shall be that as defined in Section 609.02, Subdivision 2, notwithstanding the provisions of Section 609.13.*

*Subd. 4.* **Limitations.** *Subdivision 2 does not apply unless:*

*(1)   The prior convictions occurred within ten years prior to the commission of the crime of which the defendant presently stands convicted; and*

*(2)   The prior convictions occurred:*

*(a)   In this state; or*

*(b)   In another state and were for crimes which would have been felonies if they had been committed in this state; or*

*(c)   In a federal court.*

Sec. 609.16.   **Extended term for dangerous offenders; hearing.**   *A sentence to an extended term of imprisonment under section 609.155 shall not be imposed unless:*

*(1)   At the instance of the prosecuting attorney or by order of the court on its own motion, written notice is served by the prosecuting attorney on the defendant or his attorney personally setting forth the prior convictions and advising the defendant that the court may sentence him to an extended term of imprisonment for the crime of which he has been convicted and that he is entitled to be heard thereon if he denies such prior convictions or brings in issue any matter in the presentence report, and fixing a time not less than five days after service of such notice for such hearing and sentence.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*(2)    A summary hearing is thereafter held pursuant to such notice at which evidence for and against the imposition of a sentence for an extended term may be received and at which the defendant is entitled to be heard on the issues raised and to be represented by counsel.*

*(3)    The court finds on the basis of such hearings, the defendant's admissions, the evidence at the trial and the presentence report:*

*(a)    That the defendant was previously convicted of one or more of the crimes specified in section 609.155; and*

*(b)    That the defendant is disposed to the commission of criminal acts of violence and that an extended term of imprisonment is required for his rehabilitation or for the public safety.*

Sec. 609.165.    **Restoration of civil rights.**    *Subdivision 1. When a person has been deprived of his civil rights by reason of conviction of a crime and is thereafter discharged, such discharge shall restore him to all his civil rights and to full citizenship, with full right to vote and hold office, the same as if such conviction had not taken place, and the order of discharge shall so provide.*

*Subd. 2.    The discharge may be:*

*(1)    By order of the court following stay of sentence or stay of execution of sentence; or*

*(2)    By order of the adult corrections commission or youth conservation commission prior to expiration of sentence; or*

*(3)    Upon expiration of sentence.*

*Subd. 3.    This section does not apply to a forfeiture of and disqualification for public office as provided in section 609.42, subdivision 2.*

### ANTICIPATORY CRIMES

Sec. 609.17.    **Attempts.**    *Subdivision 1.    Whoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime, and may be punished as provided in subdivision 4.*

*Subd. 2.    An act may be an attempt notwithstanding the circumstances under which it was performed or the means employed to commit the crime intended or the act itself were such that the commission of the crime was not possible, unless such*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*impossibility would have been clearly evident to a person of normal understanding.*

*Subd. 3.    It is a defense to a charge of attempt that the crime was not committed because the accused desisted voluntarily and in good faith and abandoned his intention to commit the crime.*

*Subd. 4.    Whoever attempts to commit a crime may be sentenced as follows:*

*(1)    If the maximum sentence provided for the crime is life imprisonment, to not more than 20 years; or*

*(2)    For any other attempt, to not more than one half of the maximum imprisonment or fine or both provided for the crime attempted, but such maximum in any case shall not be less than imprisonment for 90 days or a fine of $100.*

Sec. 609.175.    **Conspiracy.**    *Subdivision 1.*    **To cause arrest or prosecution.**    *Whoever conspires with another to cause a third person to be arrested or prosecuted on a criminal charge knowing the charge to be false may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

*Subd. 2.*    **To commit crime.**    *Whoever conspires with another to commit a crime and in furtherance of the conspiracy one or more of the parties does some overt act in furtherance of such conspiracy may be sentenced as follows:*

*(1)    If the crime intended is a misdemeanor, by a sentence to imprisonment for not more than 90 days or to payment of a fine of not more than $100; or*

*(2)    If the crime intended is murder in the first degree or treason, to imprisonment for not more than 20 years; or*

*(3)    If the crime intended is any other felony or a gross misdemeanor, to imprisonment or to payment of a fine of not more than one half the imprisonment or fine provided for that felony or gross misdemeanor or both.*

*Subd. 3.*    **Application of section.**    *This section applies if:*

*(1)    The defendant in this state conspires with another outside of this state; or*

*(2)    The defendant outside of this state conspires with another in this state; or*

*(3)    The defendant outside of this state conspires with*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

*another outside of this state and an overt act in furtherance of the conspiracy is committed within this state by either of them.*

## HOMICIDE AND SUICIDE

Sec. 609.18.    **Definition.**    *For the purposes of sections 609.185 and 609.19, "premeditation" means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission.*

Sec. 609.185.    **Murder in the first degree.**    *Whoever does either of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:*

*(1)    Causes the death of a human being with premeditation and with intent to effect the death of such person or of another; or*

*(2)    Causes the death of a human being while committing or attempting to commit rape or sodomy with force or violence, either upon or affecting such person or another.*

Sec. 609.19.    **Murder in the second degree.**    *Whoever causes the death of a human being with intent to effect the death of such person or another, but without premediatation, is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years.*

Sec. 609.195.    **Murder in the third degree.**    *Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree and may be sentenced to imprisonment for not more than 25 years:*

*(1)    Perpetrates an act eminently dangerous to others and evincing a depraved mind, regardless of human life; or*

*(2)    Commits or attempts to commit a felony upon or affecting the person whose death was caused or another, except rape or sodomy with force or violence within the meaning of section 609.185.*

Sec. 609.20.    **Manslaughter in the first degree.**    *Whoever does any of the following is guilty of manslaughter in the first degree and may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $15,000, or both:*

*(1)    Intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances; or*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*(2)    Causes the death of another in committing or attempting to commit a crime with such force and violence that death of or great bodily harm to any person was reasonably foreseeable, and murder in the first or second degree was not committed thereby; or*

*(3)    Intentionally causes the death of another person because the actor is coerced by threats made by someone other than his co-conspirator and which cause him reasonably to believe that his act is the only means of preventing imminent death to himself or another.*

Sec. 609.205.    **Manslaughter in the second degree.**    *Whoever causes the death of another by any of the following means is guilty of manslaughter in the second degree and may be sentenced to imprisonment for not more than seven years or to payment of a fine of not more than $7,000, or both:*

*(1)    By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another; or*

*(2)    By shooting another with a firearm or other dangerous weapon as a result of negligently believing him to be a deer or other animal; or*

*(3)    By setting a spring gun, pit fall, deadfall, snare, or other like dangerous weapon or device; or*

*(4)    By negligently or intentionally permitting any animal, known by him to have vicious propensities, to go at large, or negligently failing to keep it properly confined, and the victim was not at fault.*

Sec. 609.21.    **Criminal negligence resulting in death.**    Whoever *operates a vehicle as defined in Minnesota Statutes, Section 169.01, Subdivision 2, or an aircraft or watercraft, in a grossly negligent manner and thereby causes the death of a human being not constituting murder or manslaughter is guilty of criminal negligence in the operation of a vehicle resulting in death and may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both.*

Sec. 609.215.    **Suicide.**    *Subdivision 1.*    **Aiding suicide.**    *Whoever intentionally advises, encourages, or assists another in taking his own life may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $15,000, or both.*

*Subd. 2.*    **Aiding attempted suicide.**    *Whoever intention-*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

## 1202                           SESSION LAWS                          [Chap.

*ally advises, encourages, or assists another who attempts but fails
to take his own life may be sentenced to imprisonment for not more
than seven years or to payment of a fine of not more than $7,000,
or both.*

## CRIMES AGAINST THE PERSON

Sec. 609.22.   **Assault.**   *Whoever does any of the follow-
ing commits an assault and may be sentenced to imprisonment for
not more than 90 days or to payment of a fine of not more than
$100:*

*(1)   Does an act with intent to cause fear in another of im-
mediate bodily harm or death; or*

*(2)   Intentionally inflicts or attempts to inflict bodily harm
upon another.*

Sec. 609.225.   **Aggravated assault.**   *Subdivision 1. -- Who-
ever intentionally inflicts great bodily harm upon another may be
sentenced to imprisonment for not more than ten years or to pay-
ment of a fine of not more than $10,000, or both.*

*Subd. 2.   Whoever assaults another with a dangerous weap-
on but without intent to inflict great bodily harm may be sentenced
to imprisonment for not more than five years or to payment of a
fine of not more than $5,000, or both.*

Sec. 609.23.   **Mistreatment of persons confined.**   *Whoever,
being in charge of or employed in any institution, whether public
or private, intentionally abuses or ill-treats any person confined
therein who is mentally or physically disabled or who is involun-
tarily confined therein by order of court or other duly constituted
authority may be sentenced to imprisonment for not more than one
year or to payment of a fine of not more than $1,000, or both.*

Sec. 609.235.   **Use of drugs to injure or facilitate crime.**
*Whoever administers to another or causes another to take any poi-
sonous, stupefying, overpowering, narcotic or anaesthetic substance
with intent thereby to injure or to facilitate the commission of a
crime may be sentenced to imprisonment for not more than five
years or to payment of a fine of not more than $5,000, or both.*

Sec. 609.24.   **Simple robbery.**   *Whoever, knowing he is
not entitled thereto, takes personal property from the person or
in the presence of another and uses or threatens the imminent use
of force against any person to overcome his resistance or powers
of resistance to, or to compel acquiescense in, the taking or carrying
away of the property is guilty of robbery and may be sentenced to*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both.*

Sec. 609.245.    **Aggravated robbery.**    *Whoever, while committing a robbery, is armed with a dangerous weapon or inflicts bodily harm upon another is guilty of aggravated robbery and may be sentenced to imprisonment for not more than 20 years or to payment of a fine of not more than $20,000, or both.*

Sec. 609.25.    **Kidnapping.**    *Subdivision 1.*    **Acts constituting.**    *Whoever, for any of the following purposes, confines or removes from one place to another, any person without his consent or, if he is under the age of 16 years, without the consent of his parents or other legal custodian, is guilty of kidnapping and may be sentenced as provided in subdivision 2:*

*(1)    To hold for ransom or reward for release, or as shield or hostage; or*

*(2)    To facilitate commission of any felony or flight thereafter; or*

*(3)    To commit great bodily harm or to terrorize the victim or another; or*

*(4)    To hold in involuntary servitude.*

*Subd. 2.*    **Sentence.**    *Whoever violates subdivision 1 may be sentenced as follows:*

*(1)    If the victim is released in a safe place without great bodily harm, to imprisonment for not more than 20 years or to payment of a fine of not more than $20,000, or both; or*

*(2)    Otherwise to imprisonment for not more than 40 years or to payment of a fine of not more than $40,000, or both.*

Sec. 609.255    **False imprisonment.**    *Whoever, knowing he has no lawful authority to do so, intentionally confines or restrains a child not his own under the age of 18 years without his parent's or legal custodian's consent, or any other person without his consent, is guilty of false imprisonment and may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

Sec. 609.26.    **Confining own child.**    *Whoever intentionally takes, confines or restrains his own child under the age of 18 years with intent to prevent another from obtaining or retaining his custody pursuant to an existing court order may be sentenced to*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

1204            SESSION LAWS              [Chap.

*imprisonment for not more than two years or to payment of a fine of not more than $2,000, or both.*

Sec. 609.265.   **Abduction.**   *Whoever, for the purpose of marriage, takes a person under the age of 18 years, without the consent of the parents, guardian or other person having legal custody of such person is guilty of abduction and may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

## CRIMES OF COMPULSION

Sec. 609.27.   **Coercion.**   *Subdivision 1.*   **Acts constituting.**   *Whoever orally or in writing makes any of the following threats and thereby causes another against his will to do any act or forebear doing a lawful act is guilty of coercion and may be sentenced as provided in subdivision 2:*

*(1)    A threat to unlawfully inflict bodily harm upon, or hold in confinement, the person threatened or another, when robbery or attempt to rob is not committed thereby; or*

*(2)    A threat to unlawfully inflict damage to the property of the person threatened or another; or*

*(3)    A threat to unlawfully injure a trade, business, profession or calling; or*

*(4)    A threat to expose a secret or deformity, publish a defamatory statement or otherwise to expose any person to disgrace or ridicule; or*

*(5)    A threat to make or cause to be made a criminal charge, whether true or false; provided, that a warning of the consequences of a future violation of law given in good faith by a magistrate, peace officer, or prosecuting attorney to any person shall not be deemed a threat for the purposes of this section.*

*Subd. 2.*   **Sentence.**   *Whoever violates subdivision 1 may be sentenced as follows:*

*(1)    To imprisonment for not more than 90 days or to payment of a fine of not more than $100 if neither the pecuniary gain received by the violator nor the loss suffered by the person threatened or another as a result of the threat exceeds $100, or the benefits received or harm sustained are not susceptible of pecuniary measurement; or*

*(2)    To imprisonment for not more than five years or to*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*payment of a fine of not more than $5,000, or both, if such pecuniary gain or loss is more than $100 but less than $2,500; or*

*(3)    To imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both, if such pecuniary gain or loss is $2,500, or more.*

Sec. 609.275    **Attempt to coerce.**    *Whoever makes a threat within the meaning of section 609.27, subdivision 1, clauses (1) to (5), but fails to cause the intended act or forebearance, commits an attempt to coerce and may be punished as provided in section 609.17.*

Sec. 609.28.    **Interfering with religious observance.**    *Whoever, by threats or violence, intentionally prevents another person from performing any lawful act enjoined upon or recommended to him by the religion which he professes may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

## CRIMES AGAINST THE FAMILY

Sec. 609.355.    **Bigamy.**    *Subdivision 1.*    **Definition.**    *In this section "cohabit" means to live together under the representation or appearance of being married.*

Subd. 2.    **Acts constituting.**    *Whoever does any of the following is guilty of bigamy and may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both:*

*(1)    Contracts a marriage in this state with knowledge that his prior marriage is not dissolved; or*

*(2)    Contracts a marriage in this state with knowledge that the prior marriage of the person he marries is not dissolved; or*

*(3)    Cohabits in this state with a person whom he married outside this state with knowledge that his own prior marriage has not been dissolved or with knowledge that the prior marriage of the person he married had not been dissolved.*

Sec. 609.36.    **Adultery.**    *Subdivision 1.*    **Acts constituting.**    *When a married woman has sexual intercourse with a man other than her husband, whether married or not, both are guilty of adultery and may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

*Subd. 2.*    **Limitations.**    *No prosecution shall be commenced under this section except on complaint of the husband or the wife,*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

*except when such husband or wife is insane, nor after one year from the commission of the offense.*

*Subd. 3.* **Defense.** *It is a defense to violation of this section if the marital status of the woman was not known to the defendant at the time of the act of adultery.*

Sec. 609.365. **Incest.** *Whoever has sexual intercourse with another nearer of kin to him than first cousin, computed by rules of the civil law, whether of the half or the whole blood, with knowledge of the relationship, is guilty of incest and may be sentenced to imprisonment for not more than ten years.*

Sec. 609.37. **Definition.** *As used in sections 609.375 and 609.38, "child" means a child under the age of 16 years who is in necessitous circumstances and includes such child born out of wedlock whose paternity has been duly established.*

Sec. 609.375. *Subdivision 1. Whoever is legally obligated and able to provide care and support to his wife who is in necessitous circumstances, or his child, whether or not its custody has been granted to another, and intentionally fails to do so is guilty of non-support of said wife or child, as the case may be, and upon conviction thereof may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100; if failure to provide care and support to a minor child or a pregnant wife continues for a period in excess of 120 days such person is guilty of a felony and may be sentenced to imprisonment for not more than five years.*

*Subd. 2. Upon conviction, the court may provide by order for the care and support of such child or wife for a period not to exceed five years, require bond or other security to the state to secure performance thereof, and suspend sentence or execution thereof, conditioned upon compliance with such order.*

*Subd. 3. If, upon order to show cause duly made, the court finds that an order made pursuant to subdivision 2 has been violated, the suspension may be revoked and sentence imposed or executed, and the obligors of such bond or security shall become liable pursuant to the terms thereof, and, with leave of the court, the wife, or child, or any public agency which furnished care or support to such wife or child while such order for care and support was in force, may recover thereon.*

## CRIMES AGAINST THE GOVERNMENT

Sec. 609.385. **Treason.** *Subdivision 1.* **Definition.** *"Levying war" includes an act of war or an insurrection of several*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

3:18-cv-10507-PGS-JBD  Document 196-3  Filed 12/15/23  Page 106 of 167  P:
8904

*persons with intent to prevent, by force and intimidation, the execution of a statute of the state, or to force its repeal. It does not include either a conspiracy to commit an act of war or a single instance of resistance for a private purpose to the execution of a law.*

*Subd. 2.*     **Acts constituting.**     *Any person owing allegiance to this state who does either of the following is guilty of treason against this state and shall be sentenced to life imprisonment:*

*(1)     Levies war against this state; or*

*(2)     Adheres to the enemies of this state, giving them aid and comfort.*

*Subd. 3.*     **Testimony required.**     *No person shall be convicted of treason except on the testimony of two witnesses to the same overt act, or on his confession in open court.*

Sec. 609.39.     **Misprision of treason.**     *Whoever, owing allegiance to this state and having knowledge of the commission of treason against this state, does not, as soon as may be, disclose and make known the same to the governor or a judge of the supreme court or of the district court, is guilty of misprision of treason against this state and may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both.*

Sec. 609.395.     **State military forces; interfering with, obstructing, or other.**     *Whoever, when the United States is at war, does either of the following may be sentenced to imprisonment for not more than 20 years or to payment of a fine of not more than $20,000, or both:*

*(1)     Intentionally makes or conveys false reports or statements with intent to interfere with the operation ·or success of the military or naval forces of this state; or*

*(2)     Intentionally causes or incites insubordination, disloyalty, mutiny, or refusal of duty in the military or naval forces of this state, or obstructs the recruiting or enlistment service of this· state.*

Sec. 609.40.     **Flags.**     *Subdivision 1.*     **Definition.**     *In this section "flag" means anything which is or purports to be the Stars and Stripes, the United States shield, the United States coat of arms, the Minnesota state flag, or a copy, picture, or representation of any of them.*

*Subd. 2.*     **Acts prohibited.**     *Whoever does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

1208                    SESSION LAWS                    [Chap.

*(1)    Intentionally and publicly mutilates, defiles, or casts contempt upon the flag; or*

*(2)    Places on or attaches to the flag any word, mark, design, or advertisement not properly a part of such flag or exposes to public view a flag so altered; or*

*(3)    Manufactures or exposes to public view an article of merchandise or a wrapper or receptacle for merchandise upon which the flag is depicted; or*

*(4)    Uses the flag for commercial advertising purposes.*

*Subd. 3.*    **Exceptions.**    *This section does not apply to flags depicted on written or printed documents or periodicals or on stationery, ornaments, pictures, or jewelry, provided there are not unauthorized words or designs on such flags and provided the flag is not connected with any advertisement.*

Sec. 609.405.    **Criminal syndicalism.**    *Subdivision 1.*    **Definition.**    *"Criminal syndicalism" is the doctrine which advocates crime, malicious damage or injury to the property of an employer, violence, or other unlawful methods of terrorism as a means of accomplishing industrial or political ends.*

*Subd. 2.*    **Acts prohibited.**    *Whoever does any of the following may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both:*

*(1)    Orally or by means of writing advocates or promotes the doctrine of criminal syndicalism; or*

*(2)    Intentionally organizes or becomes a member of any assembly, group, or organization which he knows is advocating or promoting the doctrine of criminal syndicalism; or*

*(3)    For or on behalf of another person, distributes, sells, publishes, or publicly displays any writing, which is intended by that person to be used to, and which does, advocate or promote the doctrine of criminal syndicalism.*

*Subd. 3.*    **Permitting assemblage for.**    *Whoever, being the owner or in possession or control of any premises intentionally permits any assemblage of persons to use such premises for the purpose of advocating or promoting the doctrine of criminal syndicalism may be sentenced to imprisonment for not more than one year, or to payment of a fine of not more than $1,000, or both.*

Sec. 609.41.    **False tax statement.**    *Whoever, in making any statement, oral or written, which is required or authorized by*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*law to be made as a basis of imposing, reducing, or abating any tax or assessment, intentionally makes any statement as to any material matter which he knows is false may be sentenced, unless otherwise provided by law, to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

## CRIMES AFFECTING PUBLIC OFFICER OR EMPLOYEE

Sec. 609.415.     **Definitions.**     *Subdivision 1.     As used in sections 609.415 to 609.465, and 609.515,*

*(1)     "Public officer" means:*

*(a)     An executive or administrative officer of the state or of a county, municipality or other subdivision or agency of the state.*

*(b)     A member of the legislature or of a governing board of a county, municipality, or other subdivision of the state, or other governmental instrumentality within the state.*

*(c)     A judicial officer.*

*(d)     A hearing officer.*

*(e)     A law enforcement officer.*

*(f)     Any other person exercising the functions of a public officer.*

*(2)     A "public employee" is a person employed by or acting for the state or by or for a county, municipality, or other subdivision or governmental instrumentality of the state for the purpose of exercising their respective powers and performing their respective duties, and who is not a "public officer."*

*(3)     A "judicial officer" includes a judge, justice of the peace or other magistrate, juror, court commissioner, referee, or any other person appointed by a judge or court to hear or determine a cause or controversy.*

*(4)     A "hearing officer" includes any person authorized by law or private agreement to hear or determine a cause or controversy and who is not a judicial officer.*

*Subd. 2.     A person who has been elected, appointed, or otherwise designated as a public officer or public employee is deemed such officer or employee although he has not yet qualified therefor or entered upon the duties thereof.*

Sec. 609.42.     **Bribery.**     *Subdivision 1.*     **Acts constituting.** *Whoever does any of the following is guilty of bribery and may*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both:*

*(1)    Offers, gives, or promises to give, directly or indirectly, to any public officer or employee any benefit, reward or consideration to which he is not legally entitled with intent thereby to influence such officer or employee with respect to the performance of his powers or duties as such officer or employee; or*

*(2)    Being a public officer or employee, requests, receives or agrees to receive, directly or indirectly, any such benefit, reward or consideration upon the understanding that he will be so influenced; or*

*(3)    Offers, gives, or promises to give, directly or indirectly any such benefit, reward, or consideration to a witness or one who is about to become a witness in a proceeding before a judicial or hearing officer, with intent that his testimony be influenced thereby, or that he will absent himself from the proceeding; or*

*(4)    By any other means induces a witness or one who is about to become a witness to withhold his true testimony or to absent himself from the proceeding; or*

*(5)    Is, or is about to become such witness and requests, receives, or agrees to receive, directly or indirectly, any such benefit, reward, or consideration upon the understanding that his testimony will be so influenced, or that he will absent himself from the proceeding; or*

*(6)    Accepts directly or indirectly a benefit, reward or consideration upon an agreement or understanding, express or implied, that he will refrain from giving information that may lead to the prosecution of a crime or purported crime or that he will abstain from, discontinue, or delay prosecution therefor, except in a case where a compromise is allowed by law.*

*Subd. 2.* **Forfeiture of office.** *Any public officer who is convicted of violating or attempting to violate subdivision 1 of this section shall forfeit his office and be forever disqualified from holding public office under the state.*

Sec. 609.425.    **Corruptly influencing legislator.** *Whoever by menace, deception, concealment of facts, or other corrupt means, attempts to influence the vote or other performance of duty of any member of the legislature or person elected thereto may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

Sec. 609.43.    **Misconduct of public officer or employee.**    *A public officer or employee who does any of the following, for which no other sentence is specifically provided by law, may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both:*

*(1)    Intentionally fails or refuses to perform a known mandatory, nondiscretionary, ministerial duty of his office or employment within the time or in the manner required by law; or*

*(2)    In his capacity as such officer or employee, does an act which he knows is in excess of his lawful authority or which he knows he is forbidden by law to do in his official capacity; or*

*(3)    Under pretense or color of official authority intentionally and unlawfully injures another in his person, property, or rights; or*

*(4)    In his capacity as such officer or employee, makes a return, certificate, official report, or other like document which to his knowledge is false in any material respect.*

Sec. 609.435.    **Officer not filing security.**    *Whoever intentionally performs the functions of a public officer without having executed and duly filed the required security may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec. 609.44.    **Public office; illegally assuming; non-surrender.** *Whoever intentionally and without lawful right thereto, exercises a function of a public office or, having held such office and his right thereto having ceased, refuses to surrender the office or its seal, books, papers, or other incidents to his successor or other authority entitled thereto may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

Sec. 609.445.    **Failure to pay over state funds.**    *Whoever receives money on behalf of or for the account of the state or any of its agencies or subdivisions and intentionally refuses or omits to pay the same to the state or its agency or subdivision entitled thereto, or to an officer or agent authorized to receive the same, may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

Sec.  609.45.    **Public officer; unauthorized compensation.** *Whoever is a public officer or public employee and under color of his office or employment intentionally asks, receives or agrees to receive a fee or other compensation in excess of that allowed by law or where no such fee or compensation is allowed, may be sentenced*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

:18-cv-10507-PGS-JBD   Document 196-3   Filed 12/15/23   Page 111 of 167 P
8909

*to imprisonment for not more than 90 days or to payment of a fine
of not more than $100.*

Sec. 609.455.    **Permitting false claims against government.**
*A public officer or employe who audits, allows, or pays any claim or
demand made upon the state or subdivision thereof or other govern-
mental instrumentality within the state which he knows is false or
fraudulent in whole or in part, may be sentenced to imprisonment
for not more than five years or to payment of a fine of not more than
$5,000, or both.*

Sec. 609.46.    **Justice of the peace or constable buying claim
or inducing suit.**    *Every justice of the peace or constable who shall,
directly or indirectly, buy, or be interested in buying, any thing in
action, for the purpose of commencing a suit thereon before a justice,
or who shall give or promise any valuable consideration to any per-
son as an inducement to bring, or in consideration of having brought,
a suit thereon before a justice, may be sentenced to imprisonment
for not more than 90 days or to payment of a fine of not more than
$100.*

Sec. 609.465.    **Presenting false claims to public officer or
body.**    *Whoever, with intent to defraud, presents a claim or de-
mand, which to his knowledge is false in whole or in part, for audit,
allowance or payment to a public officer or body authorized to make
such audit, allowance or payment is guilty of an attempt to commit
theft of public funds and may be sentenced accordingly.*

Sec. 609.47.    **Interference with property in official custody.**
*Whoever intentionally takes, damages, or destroys any personal
property held in custody by an officer or other person under process
of law may be sentenced to imprisonment for not more than one year
or to payment of a fine of not more than $1,000, or both.*

Sec. 609.475.    **Impersonating officer.**    *Whoever falsely im-
personates a police or military officer or public official with intent to
mislead another into believing that he is actually such officer or offi-
cial may be sentenced to imprisonment for not more than 90 days or
to payment of a fine of not more than $100.*

## CRIMES AGAINST THE ADMINISTRATION OF JUSTICE

Sec. 609.48.    **Perjury.**    *Subdivision 1.*    **Acts constituting.**
*Whoever makes a false material statement which he does not believe
to be true in any of the following cases is guilty of perjury and may
be sentenced as provided in subdivision 4:*

(1)    *In or for an action, hearing or proceeding of any kind in*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*which the statement is required or authorized by law to be made under oath or affirmation; or*

*(2)    In any writing which is required or authorized by law to be under oath or affirmation; or*

*(3)    In any other case in which the penalties for perjury are imposed by law and no specific sentence is otherwise provided.*

*Subd. 2.*    **Defenses not available.**    *It is not a defense to a violation of this section that:*

*(1)    The oath or affirmation was taken or administered in an irregular manner; or*

*(2)    The declarant was not competent to give the statement; or*

*(3)    The declarant did not know that his statement was material or believed it to be immaterial; or*

*(4)    The statement was not used or, if used, did not affect the proceeding for which it was made; or*

*(5)    The statement was inadmissible under the law of evidence.*

*Subd. 3.*    **Inconsistent statements.**    *When the declarant has made two inconsistent statements under such circumstances that one or the other must be false and not believed by him when made, it shall be sufficient for conviction under this section to charge and the jury to find that, without determining which, one or the other of such statements was false and not believed by the declarant. The period of limitations for prosecution under this subdivision runs from the first such statement.*

*Subd. 4.*    **Sentence.**    *Whoever violates this section may be sentenced as follows:*

*(1)    If the false statement was made upon the trial of a felony charge, to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both; or*

*(2)    In all other cases, to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

Sec.  609.485.    **Escape from custody.**    *Subdivision   1.*
**Definition.**    *"Escape" includes departure without lawful authority and failure to return to custody following temporary leave granted for a specific purpose or limited period.*

*Subd. 2.*    **Acts prohibited.**    *Whoever does any of the following may be sentenced as provided in subdivison 4:*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

1214                     SESSION  LAWS                    [Chap.

*(1)    Escapes while held in lawful custody on a charge or conviction of a crime; or*

*(2)    Transfers to another, who is in lawful custody on a charge or conviction of a crime, or introduces into an institution in which the latter is confined, anything useable in making such escape, with intent that it shall be so used; or*

*(3)    Having another in his lawful custody on a charge or conviction of a crime, intentionally permits him to escape.*

*Subd. 3.*    **Exceptions.**    *This section does not apply to a person who is free on bail or who is on parole or probation, or subject to a stayed sentence or stayed execution of sentence, unless he has been taken into actual custody upon revocation of the parole, probation, or stay of the sentence or execution of sentence.*

*Subd. 4.*    **Sentence.**    *Whoever violates this section may be sentenced as follows:*

*(1)    If the person who escapes is in lawful custody on a charge or conviction of a felony, to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both.*

*(2)    If such charge or conviction is for a gross misdemeanor, to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

*(3)    If such charge or conviction is for a misdemeanor, to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

*(4)    If the escape was effected by violence or threat of violence against a person, the sentence may be increased to not more than twice those permitted in clauses (1), (2), and (3).*

*(5)    A sentence under this section shall be in addition to any sentence previously imposed or which may be imposed for any crime or offense for which the person was in custody when he escaped.*

Sec. 609.49.    **Release, failure to appear.**    *Whoever, being charged with or convicted of a felony and held in lawful custody therefor, is released from custody, with or without bail or recognizance, on condition that he personally appear when required with respect to such charge or conviction, and intentionally fails, without lawful excuse, to so appear when required or surrender himself within three days thereafter, may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

Sec. 609.495.     **Aiding an offender to avoid arrest.**     *Subdivision 1.     Whoever harbors, conceals or aids another known by him to have committed a felony under the laws of this or another state or of the United States with intent that such offender shall avoid or escape from arrest, trial, conviction, or punishment, may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

*Subd. 2.     This section does not apply if the actor at the time of harboring, concealing, or aiding is related to the offender as husband, wife, parent, or child.*

Sec. 609.50.     **Obstructing legal process or arrest.**     *Whoever intentionally obstructs, hinders or prevents the lawful execution of any legal process, civil or criminal, or apprehension of another on a charge or conviction of a criminal offense may be sentenced as follows:*

*1)     If the act was accompanied by force or violence or the threat thereof, to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both; or*

*(2)     In other cases to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec. 609.505.     **Falsely reporting crime.**     *Whoever informs a law enforcement officer that a crime has been committed, knowing that it is false and intending that the officer shall act in reliance upon it, may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec. 609.51.     **Simulating legal process.**     *Subdivision 1.* **Acts prohibited.**     *Whoever does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)     Sends or delivers to another any document which simulates a summons, complaint, or court process with intent thereby to induce payment of a claim; or*

*(2)     Prints, distributes, or offers for sale any such document knowing or intending that it shall be so used.*

*Subd. 2.* **Exceptions.**     *This section does not prohibit the printing, distribution or sale of blank forms of legal documents for use in judicial proceedings.*

Sec. 609.515.     **Misconduct of judicial or hearing officer.** *Whoever does any of the following, when the act is not in violation of*

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

1216                    SESSION LAWS                    [Chap.

*section 609.42, may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)     Being a judicial or hearing officer, does either of the following:*

*(a)     Agrees with or promises another to determine a cause or controversy or issue pending or to be brought before him for or against any party; or*

*(b)     Intentionally obtains or receives and uses information relating thereto contrary to the regular course of the proceeding.*

*(2)     Induces a judicial or hearing officer to act contrary to the provisions of this section.*

## THEFT AND RELATED CRIMES

Sec.   609.52.   **Theft.**   *Subdivision 1.*   **Definitions.**   *In this section:*

*(1)     "Property" means all forms of tangible property, whether real or personal, without limitation including documents of value, electricity, gas, water, corpses, domestic animals, dogs, pets, fowl, and heat supplied by pipe or conduit by municipalities or public utility companies.*

*(2)     "Movable property" is property whose physical location can be changed, including without limitation things growing on, affixed to or found in land.*

*(3)     "Value" means the market value at the time of the theft, or if the market value cannot be ascertained, the cost of replacement of the property within a reasonable time after the theft. For a theft committed within the meaning of subdivision 2, clause (5), (a) and (b), if the property has been restored to the owner, "value" means the value of the use of the property or the damage which it sustained, whichever is greater, while the owner was deprived of its possession, but not exceeding the value otherwise provided herein.*

*(4)     "Property of another" includes property in which the actor is co-owner or has a lien, pledge, bailment, or lease or other subordinate interest, and property of a partnership of which the actor is a member, unless the actor and the victim are husband and wife. It does not include property in which the actor asserts in good faith a claim as a collection fee or commission out of property or funds recovered, or by virtue of a lien, set-off, or counterclaim.*

*Subd. 2.*   **Acts constituting theft.**   *Whoever does any of the*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*following commits theft and may be sentenced as provided in sub-division 3:*

*(1)     Intentionally and without claim of right takes, uses, transfers, conceals or retains possession of movable property of an-other without his consent and with intent to deprive the owner permanently of possession of the property; or*

*(2)     Having a legal interest in movable property, intentionally and without consent, takes such property out of the possession of a pledgee or other person having a superior right of possession, with intent thereby to deprive the pledgee or other person permanently of the possession of the property; or*

*(3)     Obtains for himself or another the possession, custody, or title to property of a third person by intentionally deceiving him with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes without limitation:*

*(a)     The issuance of a check, draft, or order for the payment of money or the delivery of property knowing that he is not entitled to draw upon the drawee therefor or to order the payment or delivery thereof; or*

*(b)     A promise made with intent not to perform. Failure to perform is not evidence of intent not to perform unless corroborated by other substantial evidence; or*

*(c)     The unauthorized use of a credit card, credit plate, charge plate, or other identification device issued by an organization to a person for use in purchasing goods on credit; or*

*(4)     By swindling, whether by artifice, trick, device, or any other means, obtains property from another person; or*

*(5)     Intentionally commits any of the acts listed in this sub-division but with intent to exercise temporary control only and:*

*(a)     The control exercised manifests an indifference to the rights of the owner or the restoration of the property to him; or*

*(b)     He pledges or otherwise attempts to subject the property to an adverse claim; or*

*(c)     He intends to restore the property only on condition that the owner pay a reward or buy back or make other compensation; or*

*(6)     Finds lost property and, knowing or having reasonable means of ascertaining the true owner, appropriates it to his own use or to that of another not entitled thereto without first having made*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

3:18-cv-10507-PGS-JBD   Document 196-3   Filed 12/15/23   Page 117 of 167   P

*reasonable effort to find the owner and offer and surrender the property to him; or*

(7)     *Intentionally obtains property or services, offered upon the deposit of a sum of money or tokens in a coin or token operated machine or other receptacle, without making the required deposit or otherwise obtaining the consent of the owner.*

*Subd. 3.*   **Sentence.**   *Whoever commits theft may be sentenced as follows:*

(1)     *To imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both, if the value of the property or services stolen exceeds $2,500; or*

(2)     *To imprisonmen for not more than five years or to payment of a fine of not more than $5,000, or both, if the value of the property or services is more than $100 but not more than $2,500; or*

(3)     *To imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both, notwithstanding the value of the property or services is not more than $100, if any of the following circumstances exist:*

(a)     *The property is taken from the person of another or from a corpse, or grave or coffin containing a corpse; or*

(b)     *The property taken is a record of a court or officer, or a writing, instrument or record kept, filed or deposited according to law with or in the keeping of any public officer or office; or*

(c)     *The property is taken from a burning building or upon its removal therefrom, or from an area of destruction caused by civil disaster, riot, bombing, or the proximity of battle; or*

(d)     *The property taken consists of public funds belonging to the state or to any political subdivision or agency thereof; or*

(4)     *In all other cases where the value of the property or services is $100 or less, to imprisonment for not more than 90 days or to payment of a fine of not more than $100, provided, however, in any prosecution under clause (3) (a) of subdivision 2 hereunder the value of the money or property received by the defendant in violation thereof within any six month period may be aggregated and the defendant charged accordingly in applying the provisions of this subdivision.*

Sec. 609.525.   **Bringing stolen goods into state.**   *Subdivision 1.*   *Whoever brings property into the state which he has stolen*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*outside the state, or received outside of the state knowing it to have been stolen, may be sentenced in accordance with the provisions of section 609.52, subdivision 3. He may be charged, indicted, and tried in any county, but not more than one county, into or through which he has brought such property.*

*Subd. 2.    Property is stolen within the meaning of this section if the act by which the owner was deprived of his property was a criminal offense under the laws of the state in which the act was committed and would constitute a theft under this article if the act had been committed in this state.*

Sec. 609.53.    **Receiving stolen property.**    *Whoever intentionally receives or conceals stolen property may be sentenced in accordance with the provisions of section 609.52, subdivision 3.*

Sec. 609.535.    **Issuance of worthless check.**    *Subdivision 1.* **Definition.**    *"Credit" means an arrangement or understanding with the drawee for the payment of the check or other order for the payment of money to which this section applies.*

*Subd. 2.    **Acts constituting.**    Whoever issues any check or other order for the payment of money which, at the time of issuance, he intends shall not be paid may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

*Subd. 3.    **Proof of intent.**    Any of the following is evidence sufficient to sustain a finding that the person at the time he issued the check or other order for the payment of money, intended it should not be paid:*

*(1)    Proof that, at the time of issuance, he did not have an account with the drawee; or*

*(2)    Proof that, at the time of issuance, he did not have sufficient funds or credit with the drawee and that he failed within five days after receiving notive of nonpayment or dishonor to pay the check or other order; or*

*(3) ·  Proof that, when presentment was made within a reasonable time, the issuer did not have sufficient funds or credit with the drawee and that he failed within five days after receiving notice of nonpayment or dishonor to pay the check or other order.*

*Subd. 4.    **Proof of lack of funds or credit.**    If the check or other order for the payment of money has been protested, the notice of protest thereof is admissible as proof of presentation, nonpayment, and protest, and is evidence sufficient to sustain a finding that there was a lack of funds or credit with the drawee.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*Subd. 5.* **Exceptions.**   *This section does not apply to a postdated check or to a check given for a past consideration, except a payroll check.*

Sec. 609.54.   **Embezzlement of public funds.**   *Whoever does an act which constitutes embezzlement under the provisions of Minnesota Constitution, Article IX, Section 12 may be sentenced as follows:*

*(1)   If the value of the funds so embezzled is $2,500, or less, to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both; or*

*(2)   If such value is more than $2,500, to imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both.*

Sec. 609.545.   **Misusing credit card to secure services.**   *Whoever obtains the services of another by the intentional unauthorized use of a credit card issued or purporting to be issued by an organization for use as identification in purchasing services may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec. 609.55.   **Unauthorized use of motor vehicle.**   *Subdivision 1.*   **Definition.**   *For the purposes of this section, "motor vehicle" means any self-propelled device for moving persons or property or pulling implements from one place to another, whether such device is operated on land, rails, water, or in the air.*

*Subd. 2.*   **Acts constituting.**   *Whoever intentionally takes and drives a motor vehicle without the consent of the owner or his authorized agent may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

### DAMAGE OR TRESPASS TO PROPERTY

Sec. 609.555.   **Definition.**   *"Property of another" as used in sections 609.56 and 609.565 means property in which a person other than the actor has an interest which the actor has no right to defeat or impair.*

Sec. 609.56.   **Aggravated arson.**   *Whoever, by means of fire or explosives, intentionally destroys or damages a dwelling house or other property, real or personal, whether his own or that of another, and thereby creates an imminent danger to life or risk of great bodily harm commits aggravated arson and may be sentenced to imprisonment for not more than 15 years or to payment of a fine of*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

*not more than $15,000, or both, if the danger or risk was known to the actor; or to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both, if the danger or risk was not known but was reasonably foreseeable.*

Sec. 609.565.    **Simple arson.**    *Whoever, by means of fire or explosives, intentionally damages or destroys any property of another without his consent is guilty of simple arson, if the act does not constitute aggravated arson, and may be sentenced as follows:*

*(1)    To imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both, if:*

*(a)    The property intended by the actor to be damaged or destroyed had a value of $100 or more; or*

*(b)    Property of the value of $100 or more was unintentionally damaged or destroyed but such damage or destruction could reasonably have been foreseen; or*

*(c)    The property specified in clauses (a) and (b) in the aggregate had a value of $100 or more; or*

*(2)    To imprisonment for not more than 90 days or to payment of a fine of not more than $100 in all other cases.*

Sec. 609.57.    **Attempted arson.**    *Whoever places any combustible or explosive or other destructive material or device in or near any property with intent to set fire to or blow up or otherwise damage such property so that, if such fire or destruction had occurred, he would have been guilty of violating sections 609.56, 609.565, or 609.61, is guilty of an attempt to violate such sections.*

Sec. 609.575.    **Negligent fires.**    *Whoever is culpably negligent in causing a fire to burn or get out of control and thereby creates an unreasonable risk and high degree of probability of damage or injury to another, and the property or person of another is damaged or injured or endangered thereby, may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec.    609.58.    **Burglary.**    *Subdivision    1.*    **Definitions.** *For the purposes of this section:*

*(1)    Whoever enters a building while open to the general public does so with consent except when, prior thereto, consent was expressly withdrawn.*

*(2)    "Building" includes a dwelling or other structure suitable for affording shelter for human beings or appurtenant to or connected*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

with a structure so adapted, and includes portions of such structure as are separately occupied.

 *Subd. 2.* **Acts constituting.**   *Whoever enters a building without the consent of the person in lawful possession, with intent to commit a crime therein, commits burglary and may be sentenced as follows:*

 *(1)   To imprisonment for not more than 20 years or to payment of a fine of not more than $20,000, or both, if:*

 *(a)   When entering or while in the building, he possesses an explosive or tool to gain access to money or property; or*

 *(b)   The building entered is a dwelling and he possesses a dangerous weapon when entering or while in the building or he commits an assault upon a person present therein; or*

 *(c)   The portion of the building entered contains a banking business or other business of receiving securities or other valuable papers for deposit or safe-keeping, the entry is with force or threat of force, the intent is to steal or commit a felony therein.*

 *(2)   To imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both, if the building entered is a dwelling and another person not an accomplice is present therein.*

 *(3)   In any other case, to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both, if the intent is to steal or commit a felony or gross misdemeanor or to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both, if the intent is to commit a misdemeanor.*

 Sec. 609.585.   **Double jeopardy.**   *A prosecution for or conviction of the cime of burglary is not a bar to conviction of any other crime committed on entering or while in the building entered.*

 Sec. 609.59.   **Possession of burglary tools.**   *Whoever has in his possession any device, explosive, or other instrumentality with intent to use or permit the use of the same to commit burglary may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

 Sec. 609.595.   **Damage to property.**   *Subdivision 1.*   **Aggravated criminal damage to property.**   *Whoever intentionally causes damage to physical property of another without the latter's consent may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both, if:*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

:18-cv-10507-PGS-JBD   Document 196-3   Filed 12/15/23   Page 122 of 167 P
8920

753]                   OF MINNESOTA FOR 1963              1223

*(1)     The damage to the property caused a reasonably foresee-
able risk of bodily harm; or*

*(2)     The property damaged belongs to a public utility or a
common carrier and the damage impairs the service to the public
rendered by them; or*

*(3)     The damage reduces the value of the property by more
than $100 measured by the cost of repair or replacement, whichever
is less.*

*Subd. 2.*     **Criminal damage to property.**     *Whoever inten-
tionally so causes such damage under any other circumstances may
be sentenced to imprisonment for not more than 90 days or to pay-
ment of a fine of not more than $100.*

Sec. 609.60.     **Dangerous trespasses and other acts.**     *Who-
ever intentionally does any of the following may be sentenced to im-
prisonment for not more than 90 days or to payment of a fine of not
more than $100; except, if to his knowledge a risk of death or bodily
harm or serious property damage is thereby created, he may be sen-
tenced to imprisonment for not more than five years or to payment
of a fine of not more than $5,000, or both:*

*(1)     Smokes in the presence of explosives or inflammable
materials; or*

*(2)     Interferes with or obstructs the prevention or extinguish-
ing of any fire or disobeys the lawful orders of a law enforcement
officer or fireman present at the fire; or*

*(3)     Shows a false light or signal or interferes with any light,
signal, or sign controlling or guiding traffic upon a highway, railway
track, navigable waters, or in the air; or*

*(4)     Places an obstruction upon a railroad track; or*

*(5)     Exposes another or his property to an obnoxious or
harmful gas, fluid or substance, with intent to injure, molest, or
coerce.*

Sec. 609.605.     **Trespasses and other acts.**     *Whoever inten-
tionally does any of the following may be sentenced to imprisonment
for not more than 90 days or to payment of a fine of not more than
$100:*

*(1)     Smokes in a building, area, or common carrier in which
"no smoking" notices have been prominently posted, or when re-
quested not to by the operator of the common carrier; or*

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

*(2)    Trespasses or permits animals under his control to trespass upon a railroad track; or*

*(3)    Permits domestic animals or fowls under his control to go upon the lands of another within a city or village; or*

*(4)    Interferes unlawfully with any mounment, sign, or pointer erected or marked to designate a point of a boundary, line or a political subdivision, or of a tract of land; or*

*(5)    Trespasses upon the premises of another and, without claim of right, refuses to depart therefrom on demand of the lawful possessor thereof; or*

*(6)    Enters the premises of another with intent to take or injure any fruit, fruit trees, or vegetables growing thereon without the permission of the owner or occupant; or*

*(7)    Refuses the request of the operator of a public conveyance to either pay the required fare or leave the conveyance; or*

*(8)    Takes any animal on a public conveyance without the consent of the operator; or*

*(9)    Without the permission of the owner, tampers with or gets into or upon a motor vehicle as defined in section 609.55, subdivision 1, or rides in or upon such motor vehicle knowing it was taken and is being driven by another without the permission of the owner.*

Sec.  609.61.    **Defrauding insurer.**  *Whoever burns, destroys, or otherwise damages any property with intent to defraud an insurer of that property, when aggravated arson is not committed thereby, may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

Sec.  609.615.    **Defeating security on realty.**  *Whoever removes or damages real property which is subject to a mortgage, mechanic's lien, or contract for deed, with intent to impair the value of the security, without the consent of the security holder, may be sentenced as follows:*

*(1)    If the value of the property is impaired by $100 or less, to imprisonment for not more than 90 days or to payment of a fine of not more than $100; or*

*(2)    If the value of the property is impaired by more than $100, to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both.*

Sec.  609.62.    **Defeating security on personalty.**  *Subdivi-*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*sion 1.*   **Definition.**   *In this section "security interest" means an interest in property which secures payment or other performance of an obligation.*

*Subd. 2.*   **Acts constituting.**   *Whoever, with intent to defraud, does any of the following may be sentenced to imprisonment for not more than two years or to payment of a fine of not more than $2,000, or both:*

*(1)   Conceals, removes, or transfers any personal property in which he knows that another has a security interest; or*

*(2)   Being an obligor and knowing the location of the property refuses to disclose the same to an obligee entitled to possession thereof.*

## FORGERY AND RELATED CRIMES

Sec. 609.625.   **Aggravated forgery.**   *Subdivision 1.*   **Making or altering writing or object.**   *Whoever, with intent to defraud, falsely makes or alters a writing or object of any of the following kinds so that it purports to have been made by another or by himself under an assumed or fictitious name, or at another time, or with different provisions, or by authority of one who did not give such authority, is guilty of aggravated forgery and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both:*

*(1)   A writing or object whereby, when genuine, legal rights, privileges, or obligations are created, terminated, transferred, or evidenced, or any writing normally relied upon as evidence of debt or property rights; or*

*(2)   An official seal or the seal of a corporation; or*

*(3)   A public record or an official authentication or certification of a copy thereof; or*

*(4)   An official return or certificate entitled to be received as evidence of its contents; or*

*(5)   A court order, judgment, decree, or process; or*

*(6)   The records or accounts of a public body, office, or officer; or*

*(7)   The records or accounts of a bank or person, with whom funds of the state or any of its agencies or subdivisions are deposited or entrusted, relating to such funds.*

*Subd. 2.*   **Means for false reproduction.**   *Whoever, with*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

1226                    SESSION LAWS                    [Chap.

*intent to defraud, makes, engraves, possesses or transfers a plate or instrument for the false reproduction of a writing or object mentioned in subdivision 1 may be sentenced as provided in subdivision 1.*

*Subd. 3.* **Uttering or possessing.** *Whoever, with intent to defraud, utters or possesses with intent to utter any forged writing or object mentioned in subdivision 1, knowing it to have been so forged, may be sentenced as provided in subdivision 1.*

Sec. 609.63.    **Forgery.**    *Subdivision 1.    Whoever, with intent to injure or defraud, does any of the following is guilty of forgery and may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both:*

*(1)    Uses a false writing, knowing it to be false, for the purpose of identification or recommendation; or*

*(2)    Without consent, places, or possesses with intent to place, upon any merchandise an identifying label or stamp which is or purports to be that of another craftsman, tradesman, packer, or manufacturer, or disposes or possesses with intent to dispose of any merchandise so labeled or stamped; or*

*(3)    Falsely makes or alters a membership card purporting to be that of a fraternal, business, professional, or other association, or of any labor union, or possesses any such card knowing it to have been thus falsely made or altered; or*

*(4)    Falsely makes or alters a writing, or possesses a falsely made or altered writing, evidencing a right to transportation on a common carrier; or*

*(5)    Destroys, mutilates, or by alteration, false entry or omission, falsifies any record, account, or other document relating to a private business; or*

*(6)    Without authority of law, destroys, mutilates, or by alteration, false entry, or omission, falsifies any record, account, or other document relating to a person, corporation, or business, or filed in the office of, or deposited with, any public office or officer; or*

*(7)    Destroys a writing or object to prevent it from being produced at a trial, hearing, or other proceeding authorized by law.*

*Subd. 2.    Whoever, with knowledge that it is forged, offers in evidence in any trial, hearing or other proceedings authorized by law, as genuine, any forged writing or object may be sentenced as follows:*

*(1)    If the writing or object is offered in evidence in the trial*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*of a felony charge, to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both; or*

*(2)    In all other cases, to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

Sec. 609.635.    **Obtaining signature by false pretense.**    *Whoever, by false pretense, obtains the signature of another to a writing which is a subject of forgery under section 609.625, subdivision 1, may be punished as therein provided.*

Sec. 609.64.    **Recording, filing of forged instrument.**    *Whoever intentionally presents for filing, registering, or recording, or files, registers, or records a false or forged instrument relating to or affecting real or personal property in a public office entitled to file, register, or record such instrument when genuine may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both.*

Sec. 609.645.    **Fraudulent statements.**    *Whoever, with intent to injure or defraud, does any of the following may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both:*

*(1)    Circulates or publishes a false statement, oral or written, relating to a corporation, association, or individual, intending thereby to give a false apparent value to securities issued or to be issued by, or to the property of, such corporation, association, or individual; or*

*(2)    Makes a false ship's or airplane's manifest, invoice, register, or protest.*

Sec. 609.65.    **False certification by notary public.**    *Whoever, when acting or purporting to act as a notary public or other public officer, certifies falsely that an instrument has been acknowledged or that any other act was performed by a party appearing before him or that as such notary public or other public officer he performed any other official act may be sentenced as follows:*

*(1)    If he so certifies with intent to injure or defraud, to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both; or*

*(2)    In any other case, to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec. 609.655.    **Alteration or removal of identification number.**    *Whoever, with intent to prevent the identification of property involved, alters or removes any manufacturer's identification number on personal property or possesses any personal property with knowl-*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*edge that the manufacturer's identification number has been removed
or altered may be sentenced to imprisonment for not more than 90
days or to payment of a fine of not more than $100.*

## CRIMES AGAINST PUBLIC SAFETY AND HEALTH

Sec. 609.66.   **Dangerous weapons.**   *Subdivision 1.*   **Acts
prohibited.**   *Whoever does any of the following may be sentenced
to imprisonment for not more than 90 days or to payment of a fine
of not more than $100:*

*(1)    Recklessly handles or uses a gun or other dangerous
weapon or explosive so as to endanger the safety of another; or*

*(2)    Intentionally points a gun of any kind, capable of injuring
or killing a human being and whether loaded or unloaded, at or to-
ward another; or*

*(3)    Manufactures or sells for any unlawful purpose any
weapon known as a slung-shot or sand club; or*

*(4)    Manufactures, transfers, or possesses metal knuckles
or a switch blade knife opening automatically; or*

*(5)    Possesses any other dangerous article or substance for
the purpose of being used unlawfully as a weapon against another; or*

*(6)    Sells or has in his possession any device designed to
silence or muffle the discharge of a firearm; or*

*(7)    Without the parent's or guardian's consent, furnishes
a child under 14 years of age, or as a parent or guardian permits
such child to handle or use, outside of the parent's or guardian's
presence, a firearm or airgun of any kind, or any ammunition or
explosive; or*

*(8)    In any municipality of this state, furnishes a minor under
18 years of age with a firearm, airgun, ammunition, or explosive
without the written consent of his parent or guardian or of the
police department or magistrate of such municipality.*

*Subd. 2.*   **Exceptions.**   *Nothing in this section prohibits the
possession of the articles mentioned by museums or collectors of art
or for other lawful purposes of public exhibition.*

Sec. 609.655.   **Spring guns.**   *Whoever sets a spring gun,
pit fall, deadfall, snare, or other like dangerous weapon or device,
may be sentenced to imprisonment for not more than six month
or to payment of a fine of not more than $500, or both.*

Sec. 609.67.   **Machine guns.**   *Subdivision 1.*   **Definition.**

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~**.**

:18-cv-10507-PGS-JBD   Document 196-3   Filed 12/15/23   Page 128 of 167 P
8926

*"Machine gun" means any firearm designed to discharge, or capable of discharging automatically more than once by a single function of the trigger.*

*Subd. 2.* **Acts prohibited.** *Except as otherwise provided herein, whoever owns, possesses, or operates a machine gun may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both.*

*Subd. 3.* **Uses permitted.** *The following persons may own or possess a machine gun provided the provisions of subdivision 4 are compiled with:*

*(1)     Law enforcement officers for use in the course of their duties;*

*(2)     Wardens of penal institutions and other personnel thereof authorized by them and persons in charge of other institutions for the retention of persons convicted or accused of crime, for use in the course of their duties; and*

*(3)     Persons possessing machine guns as war relics, museum pieces, or as objects of curiosity, ornament, or keepsake, and not useable as a weapon.*

*Subd. 4.* **Report required.** *A person owning or possessing a machine gun as authorized by subdivision 3 shall, within ten days after acquiring such ownership or possession, file a written report with the bureau of criminal apprehension, showing his name and address; his official title and position, if any; a description of the machine gun sufficient to enable identification thereof; the purpose for which it is owned or possessed; and the manner in which rendered unuseable, if the right to possess the machine gun is claimed under clause (3) of subdivision 3 of this section; and such further information as the bureau may reasonably require.*

*Subd. 5.* **Exceptions.** *This section does not apply to members of the armed services of either the United States or the state of Minnesota for use in the course of their duties.*

Sec. 609.675.     **Exposure of unused refrigerator or container to children.** *Whoever, being the owner or in possession or control, permits an unused refrigerator or other container, sufficiently large to retain any child and with doors which fasten automatically when closed, to be exposed and accessible to children, without removing the doors, lids, hinges, or latches may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

Sec. 609.68.    **Unlawful deposit of garbage, litter, or like.**
*Whoever unlawfully deposits garbage, rubbish, offal, or the body
of a dead animal, or other litter in or upon any public highway,
public waters or the ice thereon, public lands, or, without the*
*consent of the owner, private lands or water or ice thereon, may
be sentenced to imprisonment for not more than 90 days or to
payment of a fine of not more than $100.*

Sec. 609.685.    **Use of tobacco by children.**    *Whoever does
any of the following may be sentenced to imprisonment for not more
than 30 days or to payment of a fine of not more than $50:*

*(1)    Being under the age of 18 years, uses tobacco in any
form; or*

*(2)    Furnishes tobacco in any form to one not entitled thereto
under clause (1).*

### PUBLIC MISCONDUCT OR NUISANCE

Sec. 609.705.    **Unlawful assembly.**    *When three or more
persons assemble, each participant is guilty of unlawful assembly
and may be sentenced to imprisonment for not more than 90
days or to payment of a fine of not more than $100 if the assembly*
*is:*

*(1)    With intent to commit any unlawful act by force; or*

*(2)    With intent to carry out any purpose in such manner
as will disturb or threaten the public peace; or*

*(3)    Without unlawful purpose, but the participants so con-
duct themselves in a disorderly manner as to disturb or threaten
the public peace.*

Sec. 609.71.    **Riot.**    *When three or more persons assembled
disturb the public peace by an intentional act or threat of unlawful
force or violence to person or property, each participant therein
is guilty of riot and may be sentenced to imprisonment for not more
than one year or to payment of a fine of not more than $1,000,
or both, or, if the offender, or tō his knowledge any other participant,
is armed with a dangerous weapon or is disguised, to imprisonment
for not more than five years or to payment of a fine of not more than
$5,000, or both.*

Sec. 609.715.    **Presence at unlawful assembly.**    *Whoever
without lawful purpose is present at the place of an unlawful assembly
and refuses to leave when so directed by a law enforcement officer
may be sentenced to imprisonment for not more than 90 days or
to payment of a fine of not more than $100.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

Sec. 609.72.    **Disorderly conduct.**    *Whoever does any of the following in a public or private place, knowing, or having reasonable grounds to know, that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct and may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)    Engages in brawling or fighting; or*

*(2)    Disturbs an assembly or meeting, not unlawful in its character; or*

*(3)    Engages in offensive, obscene, or abusive language or in boisterous and noisy conduct tending reasonably to arouse alarm, anger or resentment in others.*

Sec. 609.725.    **Vagrancy.**    *Any of the following are vagrants and may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)    A person, with ability to work, who is without lawful means of support, does not seek employment, and is not under 18 years of age; or*

*(2)    A person found in or loitering near any structure, vehicle, or private grounds who is there without the consent of the owner and is unable to account for his presence; or*

*(3)    A prostitute who loiters on the streets or in a public place or in a place open to the public with intent to solicit for immoral purposes; or*

*(4)    A person who derives his support in whole or in part from begging or as a fortune teller or similar imposter.*

Sec. 609.735.    **Concealing identity.**    *Whoever conceals his identity in a public place by means of a robe, mask, or other disguise, unless incidental to amusement or entertainment, may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec. 609.74.    **Public nuisance.**    *Whoever by his act or failure to perform a legal duty intentionally does any of the following is guilty of maintaining a public nuisance and may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)    Maintains or permits a condition which unreasonably annoys, injuries or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public; or*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

1232                              SESSION LAWS                              [Chap.

*(2)     Interferes with, obstructs, or renders dangerous for passage, any public highway or right-of-way, or waters used by the public; or*

*(3)     Is guilty of any other act or omission declared by law to be a public nuisance and for which no sentence is specifically provided.*

Sec. 609.745.     **Permitting public nuisance.**     *Whoever permits real property under his control to be used to maintain a public nuisance or lets the same knowing it will be so used may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

## GAMBLING

Sec. 609.75.     **Gambling; definitions.**     *Subdivision 1.*     **Lottery.**     *A lottery is a plan for the distribution of money, property or other reward or benefit to persons selected by chance from among participants some or all of whom have given a consideration for the chance of being selected. Acts in this state in furtherance of a lottery conducted outside of this state are included notwithstanding its validity where conducted.*

*Subd. 2.*     **Bet.**     *A bet is a bargain whereby the parties mutually agree to a gain or loss by one to the other of specified money, property or benefit dependent upon chance although the chance is accompanied by some element of skill.*

*Subd. 3.*     **What are not bets.**     *The following are not bets:*

*(1)     A contract to insure, indemnify, guarantee or otherwise compensate another for a harm or loss sustained, even though the loss depends upon chance.*

*(2)     A contract for the purchase or sale at a future date of securities or other commodities.*

*(3)     Offers of purses, prizes or premiums to the actual contestants in any bona fide contest for the determination of skill, speed, strength, endurance, or quality or to the bona fide owners of animals or other property entered in such a contest.*

*(4)     The game of bingo as provided in Minnesota Statutes, Sections 614.053 and 614.054.*

*(5)     A private social bet not part of or incidental to organized, commercialized, or systematic gambling.*

*Subd. 4.*     **Gambling device.**     *A gambling device is a con-*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*trivance which for a consideration affords the player an opportunity to obtain something of value, other than free plays, automatically from the machine or otherwise, the award of which is determined principally by chance.*

*Subd. 5.* **Gambling place.** *A gambling place is a location or structure, stationary or movable, or any part thereof, wherein, as one of its uses, betting is permitted or promoted, a lottery is conducted or assisted or a gambling device is operated.*

*Subd. 6.* **Bucket shop.** *A bucket shop is a place wherein the operator is engaged in making bets in the form of purchases or sales on public exchanges of securities, commodities or other personal property for future delivery to be settled at prices dependent on the chance of those prevailing at the public exchanges without a bona fide purchase or sale being in fact made on a board of trade or exchange.*

Sec. 609.755. **Acts of or relating to gambling.** *Whoever does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)    Makes a bet; or*

*(2)    Sells or transfers a chance to participate in a lottery; or*

*(3)    Disseminates information about a lottery with intent to encourage participation therein; or*

*(4)    Permits a structure or location owned or occupied by him or under his control to be used as a gambling place.*

Sec. 609.76. **Other acts relating to gambling.** *Whoever does any of the following may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both:*

*(1)    Maintains or operates a gambling place or operates a bucket shop; or*

*(2)    Intentionally participates in the income of a gambling place or bucket shop; or*

*(3)    Conducts, a lottery, or, with intent to conduct a lottery, possesses facilities for doing so; or*

*(4)    Sets up for use for the purpose of gambling, or collects the proceeds of, any gambling device or bucket shop; or*

*(5)    With intent that it shall be so used, manufactures, sells or offers for sale, in whole or any part thereof, any gambling device*

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

SESSION LAWS [Chap.

*including those defined in Minnesota Statutes, Section 325.53, Subdivision 2, and any facility for conducting a lottery; or*

*(6)    Receives, records, or forwards bets or offers to bet or, with intent to receive, record, or forward bets or offers to bet, possesses facilities to do so.*

## CRIMES AGAINST REPUTATION

Sec. 609.765.    **Criminal defamation.**    *Subdivision 1.*    **Definition.**    *Defamatory matter is anything which exposes a person or a group, class or association to hatred, contempt, ridicule, degradation or disgrace in society, or injury to his or its business or occupation.*

*Subd. 2.*    **Acts constituting.**    *Whoever with knowledge of its defamatory character orally, in writing or by any other means, communicates any defamatory matter to a third person without the consent of the person defamed is guilty of criminal defamation and may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

*Subd. 3.*    **Justification.**    *Violation of subdivision 2 is justified if:*

*(1)    The defamatory matter is true and is communicated with good motives and for justifiable ends; or*

*(2)    The communication is absolutely privileged; or*

*(3)    The communication consists of fair comment. made in good faith with respect to persons participating in matters of public concern; or*

*(4)    The communication consists of a fair and true report or a fair summary of any judicial, legislative or other public or official proceedings; or*

*(5)    The communication is between persons each having an interest or duty with respect to the subject matter of the communication and is made with intent to further such interest or duty.*

*Subd. 4.*    **Testimony required.**    *No person shall be convicted on the basis of an oral communication of defamatory matter except upon the testimony of at least two other persons that they heard and understood the oral statement as defamatory or upon a plea of guilty.    .*

Sec. 609.77.    **False information to news media.**    *Whoever, with intent that it be published or disseminated and that it defame*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

*another person, communicates to any newspaper, magazine or other news media, any statement, knowing it to be false, may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

## CRIMES RELATING TO COMMUNICATIONS

Sec. 609.775.   **Divulging telephone or telegraph message; non-delivery.**   *Whoever does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)     Being entrusted as an employee of a telephone or telegraph company with the transmission or delivery of a telephonic or telegraphic message, intentionally or through culpable negligence discloses the contents or meaning thereof to a person other than the intended receiver; or*

*(2)     Knowing he is not the intended receiver, obtains such disclosure from such employee; or*

*(3)     Being such employee, intentionally or negligently fails duly to deliver such message.*

Sec. 609.78.   **Emergency telephone calls.**   *Whoever does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)     Refuses to relinquish immediately a telephone line consisting of two or more stations when informed that the line is needed at another station to make an emergency call for medical or ambulance service or for assistance from a police or fire department or for other service needed in an emergency to avoid serious harm to person or property, and an emergency therefor in fact exists; or*

*(2)     Secures a relinquishment of such telephone line by falsely stating that the line is needed for an emergency; or*

*(3)     Publishes telephone directories to be used for such lines which do not contain a copy of this section.*

Sec. 609.785.   **Fraudulent long distance telephone calls.**   *Whoever obtains long distance telephone service by intentionally requesting of the operator that the cost thereof be charged to a false or non-existent telephone number or to the telephone number of another without his authority may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

Sec. 609.79.   **Making anonymous telephone call.**   *Subdivi-*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

*sion 1.      Whoever, without disclosing his identity and with intent to alarm or annoy another, makes a telephone call, whether or not conversation ensues, may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

*Subd. 2.      The offense may be prosecuted either at the place where the call is made or where it is received.*

Sec. 609.795.      **Opening sealed letter, telegram, or package.** *Whoever does either of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)      Knowing that he does not have the consent of either the sender or the addressee, intentionally opens any sealed letter, telegram, or package addressed to another; or*

*(2)      Knowing that a sealed letter, telegram, or package has been opened without the consent of either the sender or addressee, intentionally publishes any of the contents thereof.*

### CRIMES RELATING TO A BUSINESS

Sec. 609.805.      **Ticket scalping.** *Subdivision 1.* **Definition.** *"Event" means a theater performance or show, circus, athletic contest or other entertainment or amusement to which the general public is admitted.*

*Subd. 2.* **Acts constituting.** *Whoever intentionally does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)      Issues or sells tickets to an event without printing thereon in a conspicuous place the price of the ticket and the seat number, if any; or*

*(2)      Charges for admission to an event a price greater than that advertised or stated on tickets issued for the event; or*

*(3)      Sells or offers to sell a ticket to an event at a price greater that that charged at the place of admission or printed on the ticket; or*

*(4)      Having received a ticket to an event under conditions restricting its transfer, sells it in violation of such conditions; or*

*(5)      Being in control of premises on or in which an event is conducted, permits the sale or exhibition for sale on or in such premises of a ticket to the event at a price greater than printed thereon.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

Sec. 609.81.    **Misconduct of pawnbrokers.**    *Whoever in his business as a pawnbroker does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)    Lends money on a pledge at a rate of interest above that allowed by law; or*

*(2)    Has stolen goods in his possession and refuses to permit a law enforcement officer to examine them during usual business hours; or*

*(3)    Sells pledged goods before the time to redeem has expired; or*

*(4)    Having sold pledged goods, refuses to disclose to the pledgor the name of the purchaser or the price for which sold; or*

*(5)    Makes a loan on a pledge to a person under lawful age, without the written consent of his parent or guardian.*

Sec. 609.815.    **Misconduct of junk or second-hand dealer.** *Whoever is a junk dealer or second-hand dealer and does any of the following may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100:*

*(1)    Has stolen goods in his possession and refuses to permit a law enforcement officer to examine them during usual business hours; or*

*(2)    Purchases property from a person under lawful age, without the written consent of his parent or guardian.*

Sec. 609.82.    **Fraud in obtaining credit.**    *Whoever, with intent to defraud, obtains credit for himself or another from a bank, trust company, savings or building and loan association, or credit union, by means of a present or past false representation as to his or another's financial ability may be sentenced as follows:*

*(1)    If no money or property is obtained by the defendant by means of such credit, to imprisonment for not more than 90 days or to payment of a fine of not more than $100; or*

*(2)    If money or property is so obtained, the value thereof shall be determined as provided in section 609.52, subdivision 1, clause (3) and he may be sentenced as provided in section 609.52, subdivision 3.*

## MISCELLANEOUS CRIMES

Sec. 609.825    **Bribery of participant or official in contest.**

**Changes or additions indicated by** *italics*, **deletions by** ~~strikeout~~.

*Subdivision 1.*     **Definition.**    *As used in this section, "official"
means one who umpires, referees, judges, officiates or is otherwise
designated to render decisions concerning the conduct or outcome
of any contest included herein.*

*Subd. 2.*     **Acts prohibited.**     *Whoever does any of the fol-
lowing may be sentenced to imprisonment for not more than five
years, or to payment of a fine of not more than $5,000, or both:*

*(1)     Offers, gives, or agrees to give, directly or indirectly,
any benefit, reward or consideration to a participant, manager,
director, or other official, or to one who intends to become such
participant or official, in any sporting event, race or other contest of
any kind whatsoever with intent thereby to influence such participant
not to use his best effort to win or enable his team to win or to
attain a maximum score or margin of victory, or to influence such
official in his decisions with respect to such contest; or*

*(2)     Requests, receives, or agrees to receive, directly or in-
directly, any benefit, reward or consideration upon the understanding
that he will be so influenced as such participant or official.*

*Subd. 3.*     **Duty to report.**     *Whoever is offered or promised
such benefit, reward or consideration upon the understanding that
he will be so influenced as such participant or official and fails
promptly to report the same to his employer, manager, coach, or
director, or to a county attorney may be punished by imprisonment
for not more than one year or to payment of a fine of not more
than $1,000, or both.*

Sec. 609.83.     **Falsely impersonating another.**     *Whoever does
either of the following may be sentenced to imprisonment for not
more than five years or to payment of a fine of not more than $5,000,
or both:*

*(1)     Assumes to enter into a marriage relationship with an-
other by falsely impersonating a third person; or*

*(2)     By falsely impersonating another with intent to defraud
him or a third person, appears, participates, or executes an instru-
ment to be used in a judical proceeding.*

## ARTICLE II

## PROVISIONS RELATED TO THE CRIMINAL CODE

Section 1.     Minnesota Statutes 1961, Section 169.11, is
amended to read:

169.11     **Criminal Negligence.**     ~~Any person who by oper-~~

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

ating or driving a vehicle of any kind in a reckless or grossly negli-
gent manner causes a human being to be killed, under circumstances
not constituting murder in the first, second, or third degree, or
manslaughter in the first or second degree, is guilty of criminal
negligence in the operation of a vehicle resulting in death.

A person convicted of a crime defined herein shall be punished
by imprisonment in a state penal institution for a term not exceeding
five years, or in the workhouse or county jail for not more than one
year, or by a fine of not more than $1,000, or by both a fine and im-
prisonment in a state penal institution or a fine and imprisonment
in the workhouse or county jail.

The commissioner shall revoke the driver's license, and the
secretary of state shall revoke the chauffeur's license, of any person
convicted of the crime of criminal negligence in the operation of a
vehicle resulting in the death of a human being.

Sec. 2.    Minnesota Statutes 1961, Section 243.05, is amended
to read:

243.05    **Commission; powers; limitations.**    The state adult
corrections commission may parole any person sentenced to confine-
ment in the state prison or the state reformatory, provided that no
convict serving a life sentence for murder other than first-degree
*murder committed in violation of clause (1) of section 609.185*
who has not been previously convicted of a felony shall be paroled
until he has served 20 years, less the diminution which he would
have been allowed for good conduct had his sentence been for 20
years; and provided further that no convict serving a life sentence
for murder who has been previously convicted of a felony or though
not previously convicted of a felony is serving a life sentence for
*murder in the* first degree murder *committed in violation of clause
(1) of section 609.185* shall be paroled until he has served 25 years,
less the diminution which would have been allowed for good con-
duct had his sentence been for 25 years; provided further, in all
cases where a convict is serving a sentence for murder, unanimous
consent of the adult corrections commission shall be required for
parole of such convict. Upon being paroled and released, such
convicts shall be and remain in the legal custody and under the
control of the state adult corrections commission, subject at any
time to be returned to the state prison, the state reformatory, or the
state reformatory for women and the parole rescinded by such com-
mission, when the legal custody of such convict shall revert to the
warden or superintendent of the institution. The written order of
the adult corrections commission, certified by the chairman of the
commission, shall be sufficient to any peace officer or state parole

**Changes or additions indicated by** *italics,* **deletions by** strikeout.

SESSION LAWS            [Chap.

and probation agent to retake and place in actual custody any person on parole or probation to the state adult corrections commission, but any probation or parole agent may, without order of warrant, when it appears to him necessary in order to prevent escape or enforce discipline, take and detain a parolee or probationer to the state adult corrections commission and bring such person before the adult corrections commisison for its action. Paroled persons, and those on probation to the state adult corrections commission, may be placed within or without the boundaries of the state at the discretion of the commission, and the limits fixed for such persons may be enlarged or reduced according to their conduct.

In considering applications for parole or final release, the commisison shall not be required to hear oral argument from any attorney or other person not connected with the prison or the reformatory in favor of or against the parole or release of any prisoners, but it may institute inquiries by correspondence, taking testimony or otherwise, as to the previous history, physical or mental condition, and character of such prisoner, and to that end shall have authority to require the attendance of the warden of the state prison or the superintendent of the state reformatory or the state reformatory for women and the production of the records of these institutions, and to compel the attendance of witnesses, and each member of the commission is hereby authorized to administer oaths to witnesses for every such purpose.

Sec. 3.     *Minnesota Statutes 1961, Section 243.18, is amended* to read:

243.18    **Diminution of sentence.**     Every convict sentenced for any term other than life, whether confined in the state prison, the state reformatory, or the state reformatory for women, or on parole therefrom, may diminish the term of his sentence as follows:

(1)    For each month, commencing on the day of his arrival, during which he has not violated any prison rule or discipline, and has labored with diligence and fidelity, five days;

(2)    After one year of such conduct, seven days for each month;

(3)    After two years of such conduct, nine days for each month;

(4)    After three years, ten days for each month for the entire time thereafter.

The commissioner of corrections, in view of the aggravated nature and frequency of offenses, may take away any or all of

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

the good time previously gained, and, in consideration of mitigating circumstances or ignorance on the part of the convict, may afterwards restore him, in whole or in part, to the standing he possessed before such good time was taken away. ~~When a convict shall pass the entire period of his imprisonment without an unexcused violation of the rules or discipline, upon his discharge he shall be restored to his rights and privileges forfeited by conviction, and receive from the governor a certificate, under the seal of the state, as evidence of such restoration.~~

Sec. 4.       Minnesota Statutes 1961, Section 340.461, Subdivision 5, is amended to read:

Subd. 5.       **Forging of intoxicating liquor labels.**       Any person who, with intent to defraud, shall forge any such certification label, shall be guilty of forgery ~~in the third degree~~ and punished accordingly.

Sec. 5.       Minnesota       Statutes       1961,       Section       359.08,       is amended to read:

359.08       **Misconduct.**       Any notary who shall exercise the duties of his office after the expiration of his term, or when otherwise disqualified, ~~or who shall append his official signature to acknowledgments or other documents when the parties executing the same have not appeared before him,~~ shall be guilty of a misdemeanor.

Sec. 6.       Minnesota Statutes 1961, Section 566.01, is amended to read:

566.01       **Forcible entry and unlawful detainer.**       *(1)*       No person shall make entry into lands or tenements except in cases where his entry is allowed by law, and in such cases he shall not enter by force, but only in a peaceable manner. ~~If any person does to the contrary, he shall be punished by fine.~~

*(2)       When any person has made unlawful or forcible entry into lands or tenements, and detains the same, he may be sentenced to imprisonment for not more than 90 days or to payment of a fine of not more than $100.*

*(3)       If he has been removed therefrom in proceedings under Minnesota Statutes, Chapter 566, or by other legal proceedings, and thereafter, contrary thereto, re-enters, he may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $1,000, or both.*

Sec. 7.       Minnesota Statutes 1961, Section 610.08, is amended to read:

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

## 1242                    SESSION LAWS                  [Chap,

610.08    **Presumption of responsibility.**  ~~Save as herein-
after specified,~~ *Except as otherwise provided by law, in every crimi-
nal proceeding,* ~~every~~ *a* person is presumed to be responsible for
his acts; and the burden of rebutting such presumption is upon
him. ~~Children under the age of seven years, idiots, imbeciles, luna-
ties, or insane persons are incapable of committing crime. Children
of seven, and under 12, years of age are presumed incapable of com-
mitting crime; but this presumption may be removed by proof that
they have sufficient capacity to understand the act or neglect, and
to know that it was wrong. When, in legal proceedings, it becomes
necessary to determine the age of a child, he may be produced for
inspection, to enable the court or jury to determine the age thereby;
and the court may also direct his examination by one or more
physicians, whose opinion shall be competent evidence upon the
question of his age.~~

Sec. 8.    Minnesota Statutes 1961, Section 610.35, is amended
to read:

610.35    **Sentences of convicts.**  ~~When a convict is sentenced
to the state prison for more than one year, unless the exact period
be fixed by law; the court shall so limit the term that it will expire
between the months of March and November.~~ When a sentence
may be imprisonment in a county jail, the offender may be sentenced
to and imprisoned in a workhouse, if there be one in the county .
where he is tried or where the offense was committed, and if there
be no workhouse in the county where the offender is tried or where
the offense was committed, then the offender may be sentenced to
and imprisoned in a workhouse in any county in this state; pro-
vided, that the county board of the county where the offender is
tried shall have some agreement for the receipt, maintenance, and
confinement of the prisoners with the latter county. The place of
imprisonment shall be specified in the sentence. Convicts may be
removed from one place of confinement to another when so provided
by statute.

Sec. 9.    Minnesota    Statutes    1961,    Section    614.054,    is
amended to read:

614.054    **Certain associations permitted to operate bingo
game.**    The game "bingo" as defined herein shall not be con-
strued as a lottery or as gambling within the meaning of Minnesota
Statutes ~~1941,~~ Sections ~~614.01 to 614.09~~ *609.75 to 609.76,* pro-
vided that such game is conducted by a religious, charitable, fra-
ternal, or other association, not organized for pecuniary profit, and
duly existing under the laws of the state of Minnesota, and that the
proceeds therefrom are not to inure to the profit of any individual;

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

3:18-cv-10507-PGS-JBD  Document 196-3  Filed 12/15/23  Page 142 of 167 P
8940

and provided further that such association before conducting such game shall give 30 days written notice of the time and place thereof to the governing body of the governmental subdivision or county or state fair in which it intends to conduct such game, and such governing body does not pass a resolution objecting thereto.

Sec. 10.    Minnesota Statutes 1961, Section 614.15, is amended to read:

614.15    **Evidence of accomplice.**    Any person may be convicted for violation of sections ~~614.06 to 614.14~~ *609.75 to 609.76* on his own confession out of court, or upon the testimony of an accomplice.

Sec. 11.    Minnesota Statutes 1961, Section 615.13, is amended to read:

615.13    **Conductor; authority to arrest.**    Every conductor of a railway train, with or without warrant, may arrest any person committing any act *upon such train* specified in ~~section 615.12~~ *sections 609.605 and 609.72,* and take him before a magistrate or to the next railway station, and deliver him to the proper officer, or to the station agent, who shall take such person before the proper magistrate or deliver him to such officer. Every such conductor and station agent shall in such case possess all the powers of a sheriff with a warrant.

Sec. 12.    Minnesota Statutes 1961, Section 618.21, Subdivision 2, is amended to read:

Subd. 2.    Any person convicted of selling, prescribing, administering, dispensing or furnishing any narcotic drug to a minor under the age of 18 years, ~~or upon a second or subsequent conviction for the violation of any other provision of this chapter, or if the person convicted has previously been convicted of any violation of the laws of the United States or of this or any other state, territory or district relating to narcotics drugs or marijuana,~~ shall be punished by a fine of not exceeding $20,000 and by imprisonment in a state penal institution for not less than ten or more than 40 years.

Sec. 13.    Minnesota Statutes 1961, Section 619.36, is amended to read:

619.36    **Indictment; where triable.**    Every indictment for kidnapping may be found and tried either in the county where the offense was committed, or in any county through or in which the person kidnapped or confined was taken or kept while under confinement or restraint. ~~Upon a trial for violation of sections 619.34~~

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

1244                     SESSION LAWS                      [Chap.

~~and 619.35, the consent thereto of the person kidnapped or con-
fined shall not be a defense, unless it appears satisfactorily to the
jury that such person was above the age of 16 years, and that his
consent was not extorted by threats or duress.~~

Sec. 14.    Minnesota  Statutes  1961,  Section  621.37,  is
amended to read:

621.37    **Penalties.**    Any  person  who  violates  any  of  the
provisions of sections 621.36 to 621.39 shall~~, for the first violation,
be guilty of a misdemeanor; and, for a second and each subsequent
violation during the same calendar year, shall be guilty of a gross
misdemeanor~~. Every written consent for any purpose specified in
sections 621.36 to 621.39 and every certified copy of such consent
shall be deemed to be a written instrument within the meaning of
the laws relating to forgery, and any person who shall forge any
such written consent or certified copy thereof shall be guilty of
forgery ~~in the second degree,~~ and shall be punished accordingly.
Any person who shall lend or transfer or offer to lend or transfer
any such written consent or certified copy thereof to another person
who is not entitled to use the same, and any person not entitled to
use any such written consent or certified copy thereof who shall
use any such written consent or certified copy thereof, or who shall
borrow, receive, or solicit from another any such written consent
or certified copy thereof, shall be guilty of a gross misdemeanor,
and punished accordingly.

Sec. 15.    **Proof of concealment of property by obligor of
secured property.**    **[609.621]**    *Subdivision  1.    When  in  any
prosecution under section 609.62, it appears that there is a default
in the payment of the debts secured and it further appears that the
obligor has failed or refused to reveal the location of the security,
this shall be considered sufficient evidence to sustain a finding that
the obligor has removed, concealed, or disposed of the property.*

*Subd. 2.    In any prosecution under section 609.62, it is a
sufficient allegation and description of the security and the property
secured to state generally that such property was duly mortgaged
or sold under a conditional sales contract, or as the case may be,
giving the date thereof and the names of the obligor and obligee.*

Sec. 16.    Minnesota  Statutes  1961,  Section  617.05,  is
amended to read:

617.05    **Abduction; evidence; penalty.**    Every  person  who

(1)    Shall take a female under the age of 18 years, for the
purpose of prostitution or sexual intercourse~~, or, without the consent~~

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

~~of her father, mother, guardian, or other person having legal charge
of her person, for the purpose of marriage;~~

(2)    Shall inveigle or entice an unmarried female under the
age of 25 years, of previous chaste character, into a house of ill-
fame or assignation, or elsewhere for the purpose of prostitution
or sexual intercourse;

(3)    Shall take or detain a woman unlawfully against her
will, with intent to compel her by force, menace, or duress, ~~to
marry him or any other person, or~~ to be defiled; or,

(4)    Being parent, guardian, or other person having legal
charge of the person of a female under the age of 18 years, shall
consent to her taking or detention by any person for the purpose
of prostitution or sexual intercourse

Shall be guilty of abduction and punished by imprisonment in
the state prison for not more than five years, or by a fine of not
more than $1,000, or by both. No conviction shall be had for abduc-
tion ~~or compulsory marriage~~ upon the unsupported testimony of the
female abducted or compelled.

Sec. 17.    *Minnesota Statutes 1961, Sections 168.47; 168.48;
168.49; 241.24; 243.01; 243.11; 243.60; 243.70; 243.76; 243.77;
340.69; 360.075, Subdivision 3; 361.06; 437.03; 561.05; 561.06;
610.01; 610.02; 610.03; 610.04; 610.05; 610.06; 610.07; 610.09;
610.11; 610.12; 610.13; 610.14; 610.15; 610.16; 610.17; 610.18;
610.19; 610.20; 610.21; 610.22; 610.23; 610.24; 610.25; 610.26;
610.27; 610.28; 610.29; 610.30; 610:31; 610.32; 610.33; 610:34;
610.36; 610.37; 610.38; 610.39; 610.41; 610.42; 610.43; 610.44;
610.45; 610.46; 610.47; 610.50; 610.51; 611.09; 611.10; 612.01;
612.02; 612.03; 612.04; 612.05; 612.06; 612.07; 612.08; 612.09;
612.10; 612.11; 612.12; 613.01; 613.02; 613.03; 613.04; 613.05;
613.06; 613.07; 613.08; 613.09; 613.10; 613.11; 613.12; 613.16;
613.17; 613.18; 613.19; 613.20; 613.21; 613.251, 613.26; 613.27;
613.29; 613.30; 613.31; 613.32; 613.33; 613.34; 613.35; 613.36;
613.37; 613.38; 613.39; 613.40; 613.41; 613.42; 613.43; 613.45;
613.46; 613.47; 613.48; 613.49; 613.50; 613.51; 613.56; 613.57;
613.58; 613.61; 613.62; 613.63; 613.64; 613.65; 613.66; 613.68;
613.70; 613.71; 613.72; 613.73; 613.74; 613.75; 613.76; 613.79;
614.01; 614.02; 614.03; 614.04; 614.05; 614.06; 614.07; 614.08;
614.11; 614.13; 614.14; 614.16; 614.17; 614.18, Subdivision 1;
614.22; 614.24; 614.32; 614.33; 614.34; 614.36; 614.37; 614.38;
614.39; 614.40; 614.51; 614.52; 614.53; 614.54; 614.55; 614.56;
614.57; 614.575; 614.60; 614.62; 614.63; 614.64; 614.65; 614.67;
614.71; 614.72; 614.73; 614.74; 614.75; 615.01; 615.02; 615.03;
615.04; 615.05; 615.06; 615.07; 615.08; 615.09; 615.10; 615.11;*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout~~.

SESSION LAWS [Chap.

615.12; 615.14; 615.15; 615.16; 615.17; 616.01; 616.02; 616.03; 616.04; 616.05; 616.15; 616.16; 616.163; 616.18; 616.19; 616.21; 616.24; 616.25; 616.26; 616.28; 616.30; 616.41; 616.415; 616. 42; 616.43; 616.44; 616.45; 616.46; 617.04; 617.05; 617.11; 617.12; 617.13; 617.15; 617.31; 617.55; 617.56; 617.57; 617.58; 617.59; 617.60; 617.61; 617.62; 617.63; 617.64; 617.65; 617.66; 617.67; 617.68; 617.72; 617.73; 617.74; 617.75; 619.01; 619.02; 619.03; 619.04; 619.05; 619.07; 619.08; 619.09; 619.10; 619.13; 619.15; 619.16; 619.17; 619.18; 619.19; 619.20; 619.21; 619.22; 619.23; 619.24; 619.25; 619.26; 619.27; 619.28; 619.29; 619.30; 619.31; 619.32; 619.33; 619.34; 619.35; 619.37; 619.38; 619.39; 619.40; 619.41; 619.42; 619.43; 619.44; 619.45; 619.46; 619.47; 619.48; 619.49; 619.50; 619.51; 619.52; 619.53; 619.54; 619.55; 619.57; 619.58; 619.59; 619.60; 619.61; 619.62; 619.63; 620.01; 620.02; 620.05; 620.06; 620.07; 620.08; 620.09; 620.10; 620.11; 620.12; 620.13; 620.14; 620.15; 620.16; 620.17; 620.18; 620.19; 620.20; 620.21; 620.22; 620.23; 620.24; 620.25; 620.26; 620.27; 620.273; 620.34; 620.41; 620.44; 620.45; 620.46; 620.47; 620.48; 620.49; 620.50; 620.501; 620.502; 620.51; 620.59; 620.60; 620.61; 620.62; 620.63; 620.64; 620.65; 620.66; 620.68; 620.69; 620.70; 620.71; 620.72; 620.74; 620.76; 621.01; 621.021; 621.025; 621.031; 621.035; 621.041; 621.05; 621.06; 621.065; 621.066; 621.07; 621.08; 621.09; 621.10; 621.11; 621.12; 621.13; 621.14; 621.15; 621.17; 621.18; 621.19; 621.20; 621.21; 621.22; 621.23; 621.24; 621.25; 621.26; 621.27; 621.28; 621.29; 621.30; 621.31; 621.32; 621.33; 621.34; 621.341; 621.342; 621.35; 621.40; 621.41; 621.42; 621.43; 621.44; 621.45; 621.46; 621.48; 621.49; 621.51; 621.52; 621.53; 621.54; 621.55; 621.56; 621.57; 622.01; 622.02; 622.03; 622.04; 622.05; 622.06; 622.07; 622.08; 622.09; 622.10; 622.11; 622.12; 622.13; 622.14; 622.15; 622.16; 622.17; 622.18; 622.19; 622.21; 622.22; 622.28; 623.20; 623.21; 623.22; 623.23; 623;25; 623.26; 631.42; 631.47; 631.49; 634.05; 636.02; 641.19; and 643.18, are hereby repealed.

## ARTICLE III

Section 1.  **Effective date.**  *This act is in effect on and after September 1, 1963.*

Approved May 17, 1963.

---

### CHAPTER 754—H. F. No. 480

*An act relating to state civil service; salary ranges, accommodations for examinations; amending Minnesota Statutes 1961, Sections 43.12, Subdivision 2; 43.121, Subdivision 3; and 43.29.*

**Changes or additions indicated by** *italics,* **deletions by** ~~strikeout.~~

EXHIBIT 40

# ACTS

### OF THE

# GENERAL ASSEMBLY

### OF THE

# COMMONWEALTH OF VIRGINIA

## SESSION 1975

which commenced at the State Capitol, Richmond,
on Wednesday, January 8, 1975 and ended
on Saturday, February 22, 1975

## VOLUME I

### CHAPTERS 1-495

Commonwealth of Virginia
Department of Purchases and Supply
Richmond
1975

loaded firearms in moving vehicles, nor to persons acting at the time in defense of persons or property.

### Article 5.
### Uniform Machine Gun Act.

§ 18.2-288. *Definitions.*—When used in this article:

(1) "Machine gun" applies to any weapon which shoots or is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.

(2) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault with intent to maim, disable, disfigure or kill, robbery, burglary, housebreaking, breaking and entering and larceny.

(3) "Person" applies to and includes firm, partnership, association or corporation.

§ 18.2-289. *Use of machine gun for crime of violence.*—Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a class 2 felony.

§ 18.2-290. *Use of machine gun for aggressive purpose.*—Unlawful possession or use of a machine gun for an offensive or aggressive purpose is hereby declared to be a class 4 felony.

§ 18.2-291. *What constitutes aggressive purpose.*—Possession or use of a machine gun shall be presumed to be for an offensive or aggressive purpose:

(1) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found;

(2) When the machine gun is in the possession of, or used by, a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions;

(3) When the machine gun has not been registered as required in § 18.2-295; or

(4) When empty or loaded shells which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

§ 18.2-292. *Presence prima facie evidence of use.*—The presence of a machine gun in any room, boat or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 18.2-293. *What article does not apply to.*—The provisions of this article shall not be applicable to:

(1) The manufacture for, and sale of, machine guns to the armed forces or law-enforcement officers of the United States or of any state or of any political subdivision thereof, or the transportation required for that purpose; and

(2) Machine guns and automatic arms issued to the National Guard of Virginia by the United States or such arms used by the United States Army or Navy or in the hands of troops of the National Guards of other states or territories of the United States passing through Virginia, or such arms as may be provided for the officers of the State Police or officers of penal institutions.

§ 18.2-293.1. *What article does not prohibit.*—Nothing contained in this article shall prohibit or interfere with:

(1) The possession of a machine gun for scientific purposes, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; and

(2) The possession of a machine gun for a purpose manifestly not aggressive or offensive.

Provided, however, that possession of such machine guns shall be subject to the provisions of § 18.2-295.

§ 18.2-294. *Manufacturer's and dealer's register; inspection of stock.*—Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it

was received. Upon demand every manufacturer or dealer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable as a class 3 misdemeanor.

§ 18.2-295. Registration of machine guns.—Every machine gun in this State shall be registered with the Department of State Police within twenty-four hours after its acquisition. Thereafter it shall be registered annually. Blanks for registration shall be prepared by the Superintendent of State Police, and furnished upon application. To comply with this section the application as filed shall be notarized and shall show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The Superintendent of State Police shall immediately upon registration required in this section furnish the registrant with a certificate of registration, which shall be kept by the registrant and produced by him upon demand by any peace officer. Failure to keep or produce such certificate for inspection shall be a class 3 misdemeanor, and any peace officer, may without warrant, seize the machine gun and apply for its confiscation as provided in § 18.2-296. No registered machine gun shall be transferred without the registrant notifying in writing the Superintendent of State Police the name and address of the transferee. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

§ 18.2-296. Search warrants for machine guns.—Warrant to search any house or place and seize any machine gun possessed in violation of this article may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the attorney for the Commonwealth, a police officer or conservator of the peace, may order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof.

§ 18.2-297. How article construed.—This article shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

§ 18.2-298. Short title of article.—This article may be cited as the "Uniform Machine Gun Act."

### Article 6.
#### "Sawed-Off" Shotgun Act.

§ 18.2-299. Definitions.—When used in this article:

(1) "Sawed-off" shotgun applies to any weapon, loaded or unloaded, originally designed as a shoulder weapon, utilizing a self-contained cartridge from which a number of ball shot pellets or projectiles may be fired simultaneously from a smooth or rifled bore by a single function of the firing device and which has a barrel length of less than eighteen inches for smooth bore weapons and sixteen inches for rifled weapons. Weapons of less than .225 caliber shall not be included.

(2) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault with intent to maim, disable, disfigure or kill, robbery, burglary, housebreaking, breaking and entering and larceny.

(3) "Person" applies to and includes firm, partnership, association or corporation.

§ 18.2-300. Possession or use of "sawed-off" shotgun for crime of violence.—Possession or use of a "sawed-off" shotgun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a class 2 felony.

§ 18.2-301. Possession or use of "sawed-off" shotgun for offensive or aggressive purpose.—Unlawful possession or use of a "sawed-off" shotgun for an offensive or aggressive purpose is hereby declared to be a class 4 felony.

§ 18.2-302. What constitutes offensive or aggressive purpose.—Possession or use of a "sawed-off" shotgun shall be presumed to be for an offensive or aggressive purpose:

(1) When the "sawed-off" shotgun is found in the possession of an individual at the scene of a riot or civil disturbance, unless such possession is on premises owned or rented by the individual for residential, recreational or business purposes and obviously for defense of his person, family or property during such riot or civil disturbance;

# EXHIBIT 41

# On This Day:  August 1, 1863

🌐 **archive.nytimes.com**/www.nytimes.com/learning/general/onthisday/harp/0801.html





On **August 1, 1863** , *Harper's Weekly* featured a cartoon about the Draft Riot in New York City.

*Click on the image to open a larger version of the cartoon or <u>read the caption and explanation</u>.*
*Image and text provided by <u>HarpWeek.</u>*

HarpWeek's Cartoon of the Day

## How to Escape the Draft

Artist: unknown

O n July 13, 1863, anti-draft violence erupted in New York City, resulting in four days of bloodshed, arson, looting, and mayhem.  The New York City Draft Riot, with an official death toll of 119 (which many at the time thought too low), remains the bloodiest outbreak of civil disorder in American history.  In this cartoon, a gang of Irish-American rioters prepares to assault an elderly black man who shields a black child in his arm. By the hot summer of 1863, New York City was a smoldering cauldron of racial, class, religious, and political resentments.  The incident sparking the rampage in mid-July was the implementation of a military conscription law passed by Congress on March 3, 1863.  Members of the Peace wing of the Democratic Party (nicknamed "Copperheads") were incensed by the draft law, which they denounced as a violation of civil liberties, an unfair burden on workingmen (rich draftees could hire substitutes for $300), and a threat to white supremacy.

The latter sentiment arose from President Abraham Lincoln's Emancipation Proclamation of January 1, 1863.  Many Northern whites concluded that the combined policies of emancipation and conscription meant that they would be forced to risk their

lives in a war to free black slaves.  In addition, Democratic politicians and newspapers convinced their constituents, including many Irish immigrants, that emancipation would allow the freedmen to move North to take their jobs and marry their daughters.

For months, Democratic associations in New York City had been distributing pamphlets and organizing public rallies that denounced the war, emancipation, blacks, Lincoln, and Republicans in terms of class and race warfare.  Governor Horatio Seymour promised to challenge the draft law in court, arguing that the quotas for Democratic strongholds, including most of New York City, were unfairly higher than for Republican districts.  Other anti-draft voices called for armed resistance, and at a mass meeting on July 4, Seymour warned, "the bloody and treasonable and revolutionary doctrine of public necessity can be proclaimed by a mob as well as by a government."

By then, New York City was virtually undefended, as thousands of Union troops had left in late June in order to defend Pennsylvania against the recent invasion of Confederate commander Robert E. Lee, which culminated in the Battle of Gettysburg (July 1-3).  Since those troops had not returned to New York, the city had only 550 men in eight forts, and no naval ships in the harbor.  Meanwhile, Governor Seymour's legal ploy to stop the law's implementation was unsuccessful, and the draft's lottery began in New York City on Saturday, July 11.

At 6 a.m. on Monday, July 13, hundreds of the city's white workingmen marched in protest against the draft, carrying placards and banging metal pans.  The crowd grew as the procession wended its way to the provost marshal's office on Third Avenue, where the lottery commenced at 10:30.  A company of volunteer firemen, angry over losing their traditional exemption from conscription, demolished and burned the draft office.  The expanding mob forced an army squadron of 32 soldiers to retreat, and beat Police Superintendent John Kennedy to a bloody mess.

Demonstrators downed telegraph poles, uprooted train tracks, and fashioned clubs from fence rails.  The anti-draft zealots then went on an arson spree, targeting homes of draft supporters, well-known Republicans, and the wealthy on Fifth Avenue, looting as they went.  Irish Catholic rioters targeted Protestant charities, such as the Magdalene Asylum and Five Points Mission.  By the late afternoon, protesters had entered the city's arsenal, which they burned (killing ten of their own) when the police arrived.

The rioters also began attacking blacks, shouting racial slurs, and torching homes of poor African Americans on the west side of 30th Street.  In one of the most infamous incidents, a mob burned the Colored Orphan Asylum on west 44th Street, although its 237 children escaped to safety.   The policy of racial extermination escalated during the night:  a black man was lynched and set afire; while waterfront tenements, taverns, and other others buildings populated by black laborers were systematically burned.  Racially mixed couples were especially at risk from the rioters' wrath.

At Newspaper Row, across from City Hall, Henry Raymond, owner and editor of *The New York Times*, averted the rioters with Gatling guns, one of which he manned.  The mob, instead, attacked the headquarters of abolitionist Horace Greeley's *New York Tribune* until forced to flee by the Brooklyn Police.

On Tuesday, July 14, the rioters again focused on destroying and looting property of the wealthy, including stores such as Brooks Brothers. The protesters assaulted police and soldiers, who represented federal authority, and erected barricades along First and

3/5

Third Avenues.  The mob continued venting its ferocious fury on blacks, beating them and burning their homes and businesses.  At least 11 black men were brutally murdered during the riot.  Yet, some of the anti-draft protestors, especially the German Americans, broke ranks with rioters and even assisted the police.

Democratic politicians essentially reacted with a policy of appeasement.  Governor Seymour sent representatives to negotiate with the rioters, while addressing a group of protestors as "My friends," and pledging to work for repeal of the draft.  Republicans, on the other hand, called for swift and forceful action.  "Crush the Mob!"  ran *The New York Times* headline, as Mayor George Opdyke telegraphed Secretary of War Edwin Stanton for federal troops.  Since Robert E. Lee, the invading Confederate commander, had crossed back into Virginia following his defeat at Gettysburg, Stanton was able to dispatch five regiments to New York City.

The federal troops arrived on Wednesday, July 15, as the demonstrators continued attacking blacks, the wealthy, Protestant missions, and Republicans (who were identified with the previous three groups).  Fierce fighting between soldiers and their allies and the rioters lasted until Thursday evening, July 16.  By Friday, 6000 soldiers were dispersed throughout the city, and the situation began returning to normal.  Similar anti-draft riots occurred in other Northern cities during the summer of 1863, but none as massive and destructive as the one in New York City.

Following the riot, President Lincoln appointed General John Dix, a War Democrat, to ensure that the military draft was implemented and that the city remained at peace.  The prosecuting district attorney, Abraham Oakey Hall, and the presiding judge, John Hoffman, both Tammany Hall Democrats, earned praise from all sides for conducting rigorous yet fair trials.  67 of the indicted rioters were convicted, although few received long sentences.

Meanwhile, Lincoln reduced New York's draft quota by more than half.  The city's Board of Supervisor's, William Tweed's Tammany Hall, and other organizations began hiring military substitutes for the city's workingmen who could not otherwise afford them.  The draft riot caused many blacks to flee the metropolis, resulting in a 20% decline in New York City's African-American population during the Civil War.

Robert C. Kennedy

---

Back to the top of this page.
Back to today's page.
Go to another day.

---



Cartoon and explanation provided by HarpWeek.

Copyright 2001 The New York Times Company and HarpWeek

# EXHIBIT 42

# A Look Back at the Thompson Submachine Gun

**americanrifleman.org**/content/a-look-back-at-the-thompson-submachine-gun



National Firearms Museum

Much of human history is tied to the firearms man has invented to wage war and defend himself from others. For me, one of the most fascinating periods is the waning years of the 19th century and the first half of the 20th. It is during this period that the Industrial Revolution came into full bloom, yet carried with it the notions of craftsmanship and beauty from a time when such things as assembly lines and interchangeable parts were in their infancy.



The Thompson submachine gun is a perfect example. If you ever have the opportunity to examine one, you'll see the straight lines and perfect bevels and radii of components made by hand, one at a time, combined with the latest technology of the age to produce a tool that could lay down fierce fire in the close quarters of hand-dug trenches. Even better, if you are blessed with the opportunity to send a magazine or two downrange, you will marvel at the common strengths of men of the day to haul around and be able to control a 13-lb. firearm that threatens to leave your hands at any instant.

To truly appreciate all that is the Thompson, let's step back and take a look at what and who brought it about. Then it will be easier to accept why it remained in service for a half century. It takes something special to last that long when so many seek to improve or supersede a design.



John Taliaferro Thompson was born on Dec. 31, 1860, in Newport, Ky., to a military family. His youth was much like that of a military brat, living from post to post, yet by the age of 16 he had decided to make the military his career, just as his father had. Thompson chose artillery and engineering as his chosen specialties, and by 1890 he was assigned to the U.S. Army's Ordnance Department, where he specialized in small arms and spent the remainder of his service.

During the Spanish-American War, Thompson—after being promoted to lieutenant colonel —served as Chief Ordnance Officer for the commander of the Cuban campaign, General William R. Shafter. It was here that Thompson had his first taste of automatic weapons, and he quickly realized the effectiveness of these guns.

Thompson retired from the army in November 1914, just as World War I was ginning up in Europe. He took a position with Remington Arms of Ilion, N.Y., as Chief Engineer, ensuring that plenty of Pattern 14 Enfield rifles reached British forces as well as Mosin-Nagant rifles made their way to Russian troops from the Eddystone Arsenal in Chester, PA.

Trench warfare became an accepted and primary tactic during World War I. The trench tended to nullify the accuracy, range and effectiveness of bolt-action rifles with high-intensity cartridges—provided the soldier kept his head down. Rushing a trench was largely ineffective because the relatively slow operating bolt actions were too slow to be of much good. Within a couple of years Thompson started experimenting with automatic weapons—so-called trench brooms—that would be more effective in clearing trenches.



Early on, Thompson imagined a semi-automatic rifle to serve as a trench broom. For cartridges with major power—the .30-06 Springfield, for example—automatic or semi-automatic arms need a locked breech and a gas system for reliable and controllable operation. Thompson realized that a gas-operated arm would likely be too cumbersome and heavy as a trench broom, where the physical conditions were tight, ranges tended to be very short, and the power of a major-caliber rifle was not needed, but handiness and quick handling were. In short, what was needed was an arm capable of withering fire, chambered in a cartridge that was effective at short range in a package easily manipulated by a single man.

Thompson was struck with an idea one of his contemporaries, naval officer John Bell Blish, came up with. Blish observed that when a naval gun utilizing an interrupted-thread breech was fired with a full load, the breech remained pretty much completely closed. However, when fired with lighter loads, the breech tended to unscrew a bit. He concluded that dissimilar metals meeting on an incline from one another, and under heavy pressure, would adhere to each other, while lower pressures did not expose this phenomenon. Blish patented his observed principal (U.S. Patent 1,131,319) in 1915.

3/8



After acquiring venture capital from self-made millionaire and financier Thomas F. Ryan of New York, Thompson founded the Auto Ordnance Company in 1916. His first attempt was an "Auto Rifle" utilizing Blish's principle as a delayed-blowback operation. After a number of trials, however, it was determined that the .30-06 cartridge was too powerful for the Blish concept of operation. Still later, in 1929, the idea was resubmitted in the form of .276 Pederson chambered rifle, but again it was dismissed because of the necessity of pre-lubricated ammunition in order for the rifle to function, and the danger to bystanders during ejection. But long before Pederson's attempt, Thompson took another tack and applied the Blish patent to a fully automatic carbine that fired from an open bolt, chambered in .45 ACP.

Thompson's design crew—Theodore H. Eickhoff, Oscar V. Payne, and George E. Goll—quickly began working on a project called "Annihilator I," and by 1918 had a testable prototype available. Unfortunately for Auto Ordnance at the time, World War I was over, and the military market for what was called the Thompson Submachine Gun dried up rather quickly. An aside: Some think that the Thompson was the first submachine gun, but that is not true. Theodor P. Bergman—a German industrialist—is credited with the first submachine gun, the 9 mm MP 18, introduced in 1918, which saw limited use in the Great War. The Thompson, however, is the first to use the term "submachine gun" in its name.



© National Firearms Museum

Auto Ordnance began producing and selling its Thompson Submachine Gun in 1921, often referred to as the Model 1919. At the time, virtually anyone with the cash could buy one across the counter. The price, however, was a bit steep at $200, including one 20-round stick magazine—the equivalent of nearly $3,000 today. There are some early advertising posters of a cowboy protecting his herd with a Thompson. Sales trickled in, not enough to turn everyone associated with Auto Ordnance rich, but enough to keep the lights on. The Marine Corps purchased a few, as did the U.S. Postal Inspection Service. A handful of police departments added a Thompson or two to their stores, and a limited number of copies were sold internationally. The Model 1928 reduced the firing rate from an uncontrollable 1,500 rpm to an easier to handle and more effective rate of 830 rpm. These slower rate-of-fire Thompsons ditched the Bish-type dissimilar metal, delayed-blowback operation in favor of a straight blowback.

The company began offering a Cutts Compensator—the forerunner of today's muzzle brake—in 1926. A couple of years later Federal Laboratories assumed the distributing of the Thompson. By that time the basic Model 21 was offered at $175, the Model 21C (with the Cutts Compensator) was $200 and a 50-round drum magazine would lighten the wallet a staggering five bucks.

One little problem developed, however, that would prove nearly fatal to the Thompson. On Jan. 17, 1920 the Volstead Act became the law of the land, and the country officially went dry—no booze. Prohibition—as it became known—had the unintended consequence of

giving birth to widespread criminal production and distribution of alcoholic beverages. Since the activity itself was illegal, vicious and uncontrollable criminal gangs sprouted all over the country like weeds after a spring rain. The guns of choice for most of these gangs was the Thompson Submachine Gun, along with the Browning and Colt Automatic Rifles. Compounding this overabundance of criminals was The Depression in October 1929. A country where there was no work and nothing to drink became unruly, and many of the criminals from Al Capone to Bonnie and Clyde were adored by much of the public—that is until these criminals began killing innocent citizens during their nefarious deeds.

It was during this time period when the Thompson garnered some of its most infamous nicknames—Chicago Typewriter, Chicago Piano, Drum Gun, Chicago Organ Grinder and The Chopper, to name a few. If the city of Chicago seems overly prevalent it was because of it being central to the bootleg liquor trade and the gangs that ran those operations. On Feb. 14, 1929, five members of the North Side Gang and two other affiliates were mowed down gangland style in a warehouse at Dickens and Clark in Lincoln Park, Chicago. Gangsters believed to be from Al Capone's gang—though this was never officially proven, likely due to the prolific corruption in Chicago's Police Department and City Government— posing as police officers, were the executioners. Two Thompsons, along with a pair of shotguns were used to carry out what became known as the St. Valentine's Day Massacre.

Prohibition was repealed on Dec. 5, 1933, but the carryover of gangland murders and the hue and cry from the public, along with an attempted assassination of Franklin D. Roosevelt, continued to pressure the government to act. Since the government was having only limited and sporadic success in dealing with gangland criminals, it turned to the only thing that was incapable of fighting back—the guns and otherwise law abiding citizens.



The government first attempted to outlaw the possession of all machine guns by the citizenry, but those in opposition were successful in preventing the draconian measures. However, members of the 73rd Congress led by Robert L. Doughton (D–NC), were successful in arguing that such firearms could be subjected to a tax. Leaving conventional handguns aside, the Congress passed the National Firearms Act of 1934, and President Roosevelt signed it into law on June 26, 1934. To possess such a firearm required the payment of a one-time $200 tax, proof of which was a stamp on the application. The law largely had its desired effect; private ownership of guns like the Thompson Submachine Gun was effectively eliminated by making it too costly to abide by the law.

Law enforcement and foreign sales kept Auto Ordnance afloat for a few years until 1938, when the U.S. military adopted two versions of the Thompson Submachine Gun, the M1 and M1A1. Changes from the 1928 include barrels without cooling fins, a simpler rear sight, moving the charging handle from the top of the receiver to the side and the elimination of the drum magazine. More than 1.5 million of the robust Thompsons were made, and they served throughout World War II, Korea and the Vietnam wars. The Thompson enjoyed—and still does—a reputation for reliability. The .45 ACP cartridge gave up a bit of stopping power and accuracy past 150 meters, but for short-range

engagements the gun really lived up to its original nickname, Annihilator. After World War II, the Thompson saw service in no less than a dozen other conflicts, even as recently as the Iraq war.

With its sleek lines and powerful staccato sound signature, the Thompson Submachine Gun has starred in dozens of motion pictures worldwide for the better part of a century. Most recently it added a starring role in the made-for-television movie "The Highwaymen," starring Kevin Costner as <u>Frank Hamer</u>, and Woody Harrelson as Manny Gault, as the two aging Texas Rangers who took down Bonnie and Clyde.

There is only a limited supply of Thompsons left, and fewer yet that can be fired. Most are too valuable to be shot since the possession of any full-auto firearms manufactured after 1986 is now prohibited by citizens. But if you are fortunate enough to find an owner who will let you shoot his, make sure you take him up on it. To actually shoot this iconic firearm is quite a thrill.

**Additional Reading:**
**Frank Hamer: Legendary Lawman**
**The G.I. Thompson in World War II**
**The Tommy Gun In Country: The Thompson SMG in Vietnam**
**Thompson Submachine Gun**

# EXHIBIT 43

**NSSF® FAST FACTS**

# BACKGROUND INFORMATION ON SO-CALLED "ASSAULT WEAPONS"

The term "Assault Weapon", coined in the 1980's in an effort to ban semiautomatic rifles, has arguably become one of the most successful antigun public relations tools in modern history. The term "assault weapon" is now broadly used by antigun activists to describe any and all semiautomatic firearms as taboo and undesirable for private civilian ownership, despite being legally owned and used by millions of Americans. Antigun politicians and misinformed media have perpetuated this erroneous moniker for decades to drive public opinion of semiautomatic firearms into the gutter. As a result, many think that a semiautomatic firearm is a so-called "assault weapon" based on its cosmetic features or assume that the firearm is in fact a fully automatic machine gun.

What has incorrectly been termed an "assault weapon" is a semi-automatic firearm that fires just one bullet with each pull of the trigger (versus a fully automatic firearm — machine gun — which continues to shoot until the trigger is released). Specifically, legislation has incorrectly defined an "assault weapon" as a semi-automatic firearm that can accept a detachable magazine and has one or more of the following cosmetic features (it is these cosmetic features that



*"The public's confusion over fully-automatic machine guns versus semi-automatic assault weapons — anything that looks like a machine gun is presumed to be a machine gun — can only increase the chance of public support for restrictions on these weapons."*

distinguish the firearm from other "non-assault weapons."):

- A folding or telescoping stock
- A pistol grip
- A bayonet mount
- A flash suppressor, or threads to attach one
- A grenade launcher

None of these features figure into the criminal misuse of firearms, regardless of their appearance.

## SEPARATING FACT FROM FICTION

There is a tremendous amount of misinformation surrounding the issue of so-called "assault weapons." Below are several of the more misleading allegations related to these firearms followed by corresponding statements of fact:

**Claim: A commercially-sold "assault weapon" is a machine gun and has no place in civilian hands.**

**Fact:** A so-called "assault weapon" is NOT a machine gun or automatic firearm. Automatic firearms were

severely restricted from civilian ownership under the 1934 National Firearms Act. A so-called "assault weapon" is functionally no different than any other "legal" firearm. These guns fire in the same manner as any other semi-automatic firearm (one shot per trigger pull — no spray firing), they shoot the same ammunition as other guns of the same caliber and are no more powerful. What differentiates a so-called "assault weapon" from other guns is cosmetic; for example, the type of stock on the gun, which makes the conventionally operating firearm look more like a military firearm.

The gun-ban lobby understands that the confusion over what is and what is not an "assault weapon" only benefits them. Consider this statement from Josh Sugarmann of the Violence Policy Center:

"The public's confusion over fully-automatic machine guns versus

*continued* ➡️





**NSSF**
The Firearm Industry
Trade Association

semi-automatic assault weapons — anything that looks like a machine gun is presumed to be a machine gun — can only increase the chance of public support for restrictions on these weapons."

**Claim: Semi-automatic "assault weapons" are high-powered guns that are meant for war.**

**Fact:** So-called "assault weapons" are more often than not less powerful than other hunting rifles. The term "assault weapon" was conjured up by anti-gun legislators to scare voters into thinking these firearms are something out of a horror movie. These guns are used for many activities. In fact, the Colt AR-15 and Springfield M1A, both labeled "assault weapons," are the rifles most often used for marksmanship competitions in the United States. And their cartridges are standard hunting calibers, useful for game up to and including deer.

**Claim: The 1994 "assault weapons ban" helped to reduce violent crime.**

**Fact:** A recent comprehensive study by the Centers for Disease Control — hardly a pro-gun entity — looked at the full panoply of gun control measures — including the "assault weapons ban" — and concluded that none could be proven to reduce crime. Homicide statistics demonstrate that the miniscule use of so-called "assault weapons" in crime (less than 1 percent) continued to decrease after the ten-year ban expired in 2004 and their manufacturing and sales resumed.

Another study, commissioned by Congress, found "the banned weapons and magazines were never used in more than a modest fraction of all gun murders."

The report also noted that so-called "assault weapons" were "rarely used in gun crimes even before the ban."

## CONCLUSION

Legislation to ban so-called "assault weapons" typically targets rifles that are in common use and rarely used in crime. According to the 2019 FBI Uniform Crime Report, from 2015 – 2019: Knives, Blunt Objects, and Personal Weapons (fists and feet) exceeded rifles of all kinds for cause of death every year.[i]

Semiautomatic pistols, the firearm of choice for conceal carry licensees, have recently garnered attention from antigun lawmakers, as evidenced by their inclusion under the "assault weapon" umbrella in legislation. This practice is becoming more commonplace as the efforts to conceal true intentions of banning all privately owned firearms are diminished. Banning all semiautomatic firearms is now the goal of the antigun lobby who know that the common criminal will not be affected by such bans and legislation. Labeling every semiautomatic firearm as an "assault weapon" plays on the emotional response of the public who may not be educated on how firearms work and their everyday use by law abiding citizens seeking to defend themselves and their families. Legislation to curb crime should be the priority, not laws that will only disarm and endanger those who follow the rules. Semiautomatic firearms are the most common type of firearm in the United States and are used for a wide variety of legitimate purposes, including hunting, small game control, target shooting, competition, and personal defense.

***They should not be banned.***

---

[i] https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls



**NSSF**®
**The Firearm Industry Trade Association**

© 2021 National Shooting Sports Foundation, Inc. All Rights Reserved