EXHIBIT 62

# HISTORY

OF

# BUCKS COUNTY,

## PENNSYLVANIA;

INCLUDING

AN ACCOUNT OF ITS ORIGINAL EXPLORATION; ITS RELATION TO THE SETTLEMENTS
OF NEW JERSEY AND DELAWARE; ITS ERECTION INTO A SEPARATE COUNTY,
ALSO ITS SUBSEQUENT GROWTH AND DEVELOPMENT, WITH SKETCHES OF
ITS HISTORIC AND INTERESTING LOCALITIES, AND BIOGRAPHIES
OF MANY OF ITS REPRESENTATIVE CITIZENS.

EDITED BY J. H. BATTLE.

ILLUSTRATED.

PHILADELPHIA, PA., CHICAGO, ILL.:
A. WARNER & CO., PUBLISHERS.
1887.

F
157
.B8B3

COPYRIGHT, 1887, BY A. WARNER & CO.

PHILADELPHIA:
COLLINS PRINTING HOUSE,
705 Jayne Street.

220                   HISTORY OF BUCKS COUNTY.

of the building. Within, a spacious passageway, open to the ceiling of the
second story and floored with encaustic tiles laid in a somewhat elaborate
pattern, gives access to the four offices below, and to the entrance of the court-
room. On the left are the offices of prothonotary and recorder, and above them,
on the second floor, are two rooms occupied by the commissioners. On the right
are the offices of the clerk of the orphans' court, and the register, and above
them on the second floor are the arbitration room and the Historical Society's
room. The upper offices are reached by an iron stairway and a gallery which
leads to the various rooms. An alcove in the second story over the vestibule
admits to the offices that here flank the tower and to a spiral iron stairway that
permits the visitor to ascend to the clock room. A short passageway connects
the two parts of the building and ushers the visitor into a large amphitheatre,
the farther side of which is cut off by the " bench" and the partition walls that
reserve the rear of the building for retiring rooms for the judge and lawyers,
waiting rooms for witnesses, the law library, several jury rooms, and a hallway
that leads to a rear entrance. The appointments of the court-room and offices
are characterized by good taste and durability, while the stained-glass windows
of the upper corridor, and of the court-room add a touch of elegance that is
striking without being extravagant. Beneath the building is a capacious cellar
with ample room for the storage of fuel and musty archives, beside a steam ap-
paratus that supplies the means of heating the whole building.

The demand for a new jail at this time was scarcely less urgent than the
one for a new court-house. The equipment was behind the necessity of the
times, and it had fallen into a state of " general debility" that demanded con-
stant repairs to delay the day of final dissolution. In 1877 a fire did consider-
able damage, as if to emphasize the contrast with the new court-house in course
of construction, but the usual patching of old garments with new cloth prolonged
its term of service. This state of things began at last to find reflection in the
reports of the grand juries, and a round of changes was rung upon the phrase,
" everything found in as good order as the old fabric will admit of." At the
February session of 1882 the grand jury made a new departure, and declared
themselves " unanimously of the opinion that the present building used for the
purposes of a jail, is entirely unfit for the purposes for which it is used, and

---

Over the entrance to the court-room the following may be seen:—

| Samuel Keller: | | Hutton & Ord, |
| And<sup>w</sup> J. Solomon: | County | Architects. |
| Edmund Goddard: | | James B. Doyle, |
| Commissioners. | Buildings. | Builder. |
| William Closson | | H. D. Livezey and |
| Clerk. | 1877. | Francis Adelman |
| | | Superintendents. |

Lewis Essick, Stone Mason.

# EXHIBIT 63

MARCH 2021

# THE CRAVEN HALL NEWSLETTER

## CRAVEN HALL HISTORICAL SOCIETY, THE JOHN FITCH STEAMBOAT MUSEUM & THE CRAVEN-VANSANT BURYING GROUND



## VOLUME 19, ISSUE 1, MARCH 2021

Erik Fleischer - President
Laura Martin - VP, Treasurer
Bernice Graeter-Reardon - VP, Secretary
Jennifer Burns - VP, Public Relations, Editor
Kent Sloan - Photographer



**In This Issue:**
President's Letter
Internet Project & Website Rebranding
The Craven Hall Historical Society Has Authors
Pandemic Activities at Craven Hall
18th Century Clock/Educational Programs
Tales from the Burying Ground
The Battle of Crooked Billet
Upcoming Events 2021
Memberships & Donations

# PRESIDENT'S LETTER

Welcome to 2021 and goodbye to 2020 – we won't miss you!

While the pandemic has changed our lives significantly during the past year, the Society was able to function reasonably well with the hosting of 2/3rds of our Elementary Program for 4th graders before being shut down. Unfortunately, our steam/model steamboat program with Centennial Middle Schools was cancelled. We were able to conduct many of our monthly House and Museum tours with special protocols – face masks and social distancing.

Looking to the future, our Board authorized the establishment of three Vice-President positions; namely, Vice-President/Treasurer, Laura Martin; Vice-President/Secretary, Bernice Graeter-Reardon, and Vice-President/ Public Relations – Jennifer Burns. The persons selected to these positions were members of a management task force established in 2019 to chart our path forward. One of the prime tasks of the management team was to establish a vision for the future and the initial result was the establishment of a new branding – namely, The CRAVEN HALL HISTORIC SITE to reflect not only Craven Hall, the building, but also the The John Fitch Steamboat Museum and the Craven/Vansant Burying Ground. To highlight our rebranding, the team developed a new logo to reflect the change and our members and supporting businesses will receive a decal (with adhesive backing) and a refrigerator magnet as shown below.

In conclusion, we want to again thank our member supporters and businesses that make it possible for us to keep "History Alive" in our community. Please consider taking out or renewing your membership in our Society. We've raised the membership fee to $15 to be able to offer you an adhesive decal and refrigerator magnet. Donations are also deeply appreciated and your contributions are tax deductible as we are a registered 501-c-3 non-profit corporation.



As we move forward into 2021 and beyond, we hope to be able to reactivate our school programs in 2021 and once again present a program series on history topics with guest presenters, another craft brew session with Moss Mill Brewing of Southampton, PA, and a character presentation of "residents" of the Craven/Vansant Burying Ground. In the meantime, stay safe and well – hopefully we are on the path to a more normal lifestyle.

-Erik Fleischer, President

# CRAVEN HALL & THE JOHN FITCH STEAMBOAT MUSEUM GIFTED INTERNET ACCESS THROUGH HISTORIC PARTNERSHIP

Thanks to Ray Cline of Libertas Consulting of Ivyland, PA and Low Voltage Nation, a consortium of internet providers across the nation, Craven Hall and the John Fitch Steamboat Museum now have access to high-speed internet. The equipment and installation, valued at over $30,000, was almost completely donated by Libertas Consulting and members of Low Voltage Nation, along with financial contributions from local supporters.

Craven Hall also received a grant from Visit Bucks for $1,500 to use for the project. The project came about through a local Chamber of Commerce scholarship meeting held at Craven Hall where Ray Cline, owner of Libertas Consulting, learned about the educational programs on local history conducted annually for local school students since 1996 and saw a need and opportunity to help advance the efforts of Craven Hall and the John Fitch Steamboat Museum. Craven Hall and the John Fitch Steamboat Museum can now offer free internet access to visitors and guest presenters and provide a 30-person meeting hall with internet access for other groups. In addition, this new service will provide the capability to enhance our museum exhibits and other offerings.

Words alone make it difficult to express our deep appreciation for all the vendors who donated equipment and the numerous installers who had to find appropriate places to install the equipment while protecting the historic fabric of an 1845 mansion house. It was a monumental effort completed over a single weekend without a hitch. To all who participated and/or made a contribution, a huge THANK YOU!!



# THE CRAVEN HALL HISTORICAL SOCIETY HAS AUTHORS

Craven Hall Historical Society is proud to announce it has two published authors on its board! Abraham Lincoln historian and author, Fred Antil, and local historian and author, Jennifer Burns (Rogers), have published books on topics they are both very passionate about — Fred, *A Lincoln Treasure Trove*, and Jennifer, *Hidden History of Bucks County*.

For Lincoln enthusiasts and experts alike, *A Lincoln Treasure Trove* is fun, informative, and engaging, and offers some of the most interesting, unknown stories and lesser-known facts about our nation's 16th president. *Hidden History of Bucks County* dives into the rich history beautiful Bucks County has to offer, from stories of our county's founders and famous and influential families, to historic, Revolutionary War-era taverns and inns, cemeteries, and more.

Purchase your copy of *A Lincoln Treasure Trove* or *Hidden History of Bucks County* online at Amazon.com, Barnes and Noble, and local book stores near you.

# CRAVEN HALL LAUNCHES REBRANDED, MOBILE-FRIENDLY WEBSITE

In Fall 2020, we announced the launch of our new mobile-friendly website, built by our VP of Public Relations, Jennifer Burns, and her brother, Brian Rogers, a senior web developer from a local digital advertising agency. We also recently partnered with Blu Echo Design, based out of Langhorne, Bucks County, for a logo redesign and rebranding. We chose to rebrand our organization as The Craven Hall Historic Site to encompass Craven Hall, the John Fitch Steamboat Museum, and our historic burying ground which dates back to the pre-Revolutionary War era.



Our previous website, built before the age of mobile browsing, showcased our years of work dedicated to the preservation of local history through stories, articles, and photographs. Everything was successfully transferred to our new website and additional features were added including a contact form, donation form, and more. Later this year, we are planning on launching our eLibrary, providing access to over one hundred books and documents. We will continue to add to our eLibrary database as we acquire more historic documents and books for our archives. A huge thank you to Brian for his help on this project!

Visit our rebranded website at:
www.craven-hall.org

# JOHN FITCH - STEAMBOAT INVENTOR - HE GETS NO RESPECT!

For those readers who have visited the John Fitch Steamboat Museum here in Warminster, PA, you may have heard one of our docents reference John Fitch as the Rodney Dangerfield of his day. The lack of respect for John Fitch is wide spread – a marker for his birthplace was placed on an adjacent property because the lot owners didn't want it on their property!



We are indebted to Kathy Hernard of Slidell, LA for yet another example of the lack of respect for the steamboat inventor. Ms. Hernard is the granddaughter of renowned Chicago sculptor, Frederick C Hibbard. He is best known for his statues of Mark Twain and Tom Sawyer/Huck Finn in Hannibal, MO, along with a number of Civil War statues. Mr. Hibbard attempted to memorialize John Fitch with a number of model sculptures as seen here but apparently could not gain any sponsors to support his proposed sculptures. Just another example of how little respect John Fitch has received even though his invention paved the way for modern transportation.



# PANDEMIC ACTIVITIES AT CRAVEN HALL

Our maintenance "crew" of Kent Sloan, Otto Blavier, and writer, Erik, have undertaken the opportunity during our current shutdown to do a major "refreshment" of Craven Hall along with some needed yard work.

Kent and Erik "refreshed" the Library and Museum rooms and upstairs hallway in Craven Hall – scraping, plastering and repainting walls and woodwork. In addition, 15 sets of 2nd floor shutters were repaired, repainted, and rehung.

Our "refreshment" activities were supported by additional volunteers, Bernice Graeter-Reardon, Mary Ann Casele, Laura Martin and Jen Burns and her parents, Cindy and Ray Rogers.

Additional cleaning/repainting projects are planned for 2021.


Museum Room


Shutter Repair and Repainting

Otto Blavier cut down our large log pile in preparation for splitting and removed two storm damaged apple trees in preparation for our Christmas Tree sales this fall/winter. Otto can and will do almost anything but draws the line when it comes to painting! We have excused him from painting projects as his other skills are invaluable!

We hope the current shutdown will soon be lifted but in the interim we will continue our efforts to accomplish needed work on the property.


Apple Tree Removal

## 18TH CENTURY CLOCK INSTALLED IN VANSANT PARLOR

Craven Hall has a new addition to our collection thanks to the clock repair and restoration skills of Orland Bergere. The 30-hour clock is of English origin and dates circa 1780. The wood case is walnut and the dial is hand painted. There is no chime or bell but the clock workings originally had an alarm bell. The writer bought the clock at an auction in Virginia because of the handsome walnut case and beautiful dial without realizing the "workings" were in very poor condition. We are most appreciative of Orland Bergere's many volunteer hours of repair and restoration that has brought this fine wall clock back to working order.

 

## EDUCATION PROGRAMS ON LOCAL HISTORY IMPACTED BY PANDEMIC

The year 2020 is one we probably all want to forget as it caused the cancellation of many programs. Fortunately, we were able to complete two thirds of our program for 4th graders on local history. All twelve classes for McDonald Elementary and Davis Elementary were completed before schools closed due to the pandemic. Unfortunately, we didn't get a chance to host any classes from Willow Dale Elementary.

The program on the importance of steam and the model steamboat competition by students of Klinger Middle School and Log College were also cancelled by the pandemic. Since these classes are held in May, we still have hope that we may be able to conduct them in May 2021. We normally schedule our Elementary Programs beginning in December and we hold out hope that this program can restart in December 2021.

We are considering the possibility to video tape some portions of the Elementary Program in that event that student visits to Craven Hall are delayed until December 2022.

# TALES FROM THE 1769 VANSANT/CRAVEN BURYING GROUND

## Part 1 - James (Jacobus) "Cobe" Scout

The historic 1769 Craven/Vansant Burying Ground contains over 60 graves and several of the "residents" have interesting stories to tell. Probably the most interesting "resident" is James (Jacobus) Scout, or "Cobe" Scout as he was known by his friends and associates. His gravestone had the unusual inscription, "he shot an English soldier at 900 yards and killed him," and "he was an intimate friend of Thomas Paine." The original gravestone has long been gone but a 1912 postcard of the graveyard confirms the inscriptions. While not recorded on his gravestone, "Cobe" was also a close friend of John Fitch and he allowed Fitch to use his shop to build his first steamboat models. The story of shooting an English soldier is recorded in WWH Davis's *History of Bucks County*. "Cobe" apparently was "mocked" with a gesture by an English or Hessian solder on the New Jersey side of the Delaware River as "Cobe" and his companions stood on the Pennsylvania shoreline. "Cobe" raised his rifle (he was a rifle-maker), fired a shot and the soldier dropped – thus the story.

"Cobe" was also involved in the Revolutionary War incident known as the Paoli Massacre where colonial troops were set upon at night by British soldiers with disastrous results for the colonials. "Cobe" was making his escape when he heard a horseman bearing down on him and thought he was a "goner." At that moment, a shot rang out and the rider fell from his horse. "Cobe" managed to grab on to the horse and escape. He found two pistols and a pair of horseshoes in the saddlebags on the horse. He sold the pistols but kept the horseshoes. His neighbors in Warminster always thought him a little strange which may explain his friendship with another "strange" fellow – John Fitch.

## Part 2 - Abraham Sutphin

Abraham Sutphin is one of 11 Revolutionary War veterans who "reside" in the Craven-Vansant Burying Ground. Our "Troubles" with Mother England that erupted in the spring of 1775 prompted Abraham in 1777 to join Captain Bingley's unit of the Pennsylvania Militia. That unit was part of Captain Issac Longstreth's brigade and assigned to General Lacey's Corp.



Gravestone of Jacobus Scout

On the night of April 30, 1778, he was assigned sentry duty at the south end of Crooked Billet (Hatborough) and observed an enemy force advancing on the town. He claims to have quickly fired a warning shot to alert Gen. Lacey and his forces and as such he claimed to have saved Gen. Lacey and others from being captured or killed. The battle, known as the Battle of Crooked Billet, was a rout of the militia forces with many militia captured or killed. Abraham was fortunate to escape capture. Abraham's brother-in-law was none other than James (Jacobus) Scout.

*The Craven/Vansant Burying Ground is accessible from the back parking lot of the Fox Run Apartments on Newtown Road.*



Gravestone of Abraham Sutphin

# THE BATTLE OF CROOKED BILLET: MAY 1, 1778

On May 1, 1778, the Battle of Crooked Billet took place near the Crooked Billet Tavern in present-day Hatboro, Montgomery County. A skirmish in the Philadelphia Campaign of the American Revolutionary War, British forces, led by General William Howe and under the command of Major John Graves Simcoe, attacked Brigadier General John Lacey and three Pennsylvania militia regiments. John Lacey, of Buckingham, became a military officer when he was appointed brigadier general in January 1778 at the age of 23. General George Washington, quartered at Valley Forge, fearing the British would raid Bucks County and surrounding areas for food and supplies, sent Lacey two objectives to meet by spring 1778: guard the roads leading to Philadelphia, and protect the Patriots throughout the countryside.

General Lacey's forces continued to shrink despite the promise of one thousand men at all times. Lacey's camp shrunk to just six hundred men, and then to about 400 at the time of battle. In April, Simcoe gained permission to launch a surprise attack on Lacey, and on April 30, a joint force of Hessians and British troops marched from Philadelphia to Second Street Pike, up through Horsham, cornering Lacey at his encampment in Hatboro. Lacey, caught off guard because a Lieutenant ordered to keep watch fell asleep at his post, had to quickly retreat and pull his troops to a nearby wooded area. Abraham Sutphin (our burying ground "resident") claims to have fired a warning shot to alert General Lacey, possibly saving Lacey and others from being captured or killed.

The British wreaked havoc, stealing supplies, burning crops, and committing atrocious crimes against the Americans. According to the Royal Pennsylvania Gazette, between 80-100 Americans were killed, at least 50 more captured, forcing Lacey and his troops to retreat into Warminster.

If you are interested in learning more about the battle, please be sure to visit our Battle of Crooked Billet display during your next visit to Craven Hall.



Painting of the Battle of Crooked Billet. See this at your next visit to Craven Hall.

## We Thank You for Your Continued Support!

To stay up to date on Craven Hall, and to learn more about Colonial America and local history, visit **Facebook.com/CravenHallHistoricalSociety Instagram.com/HistoricCravenHall**, and **Medium.com/@cravenhall**

  



# MEMBERSHIPS & DONATIONS

NAME: _____   STREET: _____

CITY/STATE/ZIP: _____   TELEPHONE: _____

EMAIL ADDRESS: _____

## APPLICATION FOR MEMBERSHIP

**Membership:**
- ☐ Individual or Family: $15 (Includes decal and refrigerator magnet)
- ☐ Donation assistance for additional displays - John Fitch Hall - $_____  *Thank You.*

**Volunteers**:
- ☐ Restoration/Repairs:
- ☐ Fundraising:
- ☐ Historic Research/Library:
- ☐ Centralizing Records:
- ☐ Docent (Tour Guide):
- ☐ Membership/Public Relations:
- ☐ Special Events:
- ☐ Gravestone Restoration:
- ☐ Other: _____

*If you are interested in volunteering, please check a box. We need you. Thank you.*

☐ **Contribution to the John Fitch Museum**   Amount: _____ *Thank you.*

**DVD of Craven Hall**   ☐ Amount by check: $17.50 (to address below)
☐ Amount by pick-up: $15.00 (Please call to arrange: 215-675-4698)

Contributions to aid in the restoration and operation of Craven Hall are always welcome. Please make your check payable to: **Craven Hall Society, Inc. P.O. Box 2042, Warminster, PA 18974.**

The Society is a non-profit corporation registered in Pennsylvania. Your contribution is tax deductible.



**Craven Hall 1900's**
Craven Hall Historical Society
P.O. Box 2042
Street and Newtown Roads
Warminster, PA 18974
(215) 675-4698



EXHIBIT 64

# Patient-reported Outcomes at 6 to 12 Months Among Survivors of Firearm Injury in the United States

*Juan Pablo Herrera-Escobar, MD, MPH,*✉ *Elzerie de Jager, MBBS(Hons),* 
*Justin Conrad McCarty, DO, MPH,* *Stuart Lipsitz, ScD,* *Adil H. Haider, MD, MPH,* 
*Ali Salim, MD,*† *and Deepika Nehra, MD*†

**Objective:** Assess outcomes in survivors of firearm injuries after 6 to 12 months and compared them with a similarly injured trauma population.

**Background:** For every individual in the United States who died of a firearm injury in 2017, three survived, living with the burden of injury. Current firearm research largely focuses on mortality and short-term health outcomes, while neglecting the long-term consequences.

**Methods:** We contacted adult patients with a moderate-to-severe injury from a firearm or motor vehicle crash (MVC) treated at 3 level I trauma centers in Boston between 2015 and 2018. Patients were contacted 6 to 12 months postinjury to measure: presence of daily pain; screening for post-traumatic stress disorder (PTSD); new functional limitations; return to work; and physical and mental health-related quality of life. We matched each firearm injury patient to MVC patients using Coarsened Exact Matching. Adjusted Generalized Linear Models were used to compare matched patients.

**Results:** Of 177 eligible firearm injury survivors, 100 were successfully contacted and 63 completed the study. Among them, 67.7% reported daily pain, 53.2% screened positive for PTSD, 38.7% reported a new functional limitation in an activity of daily living, and 59.1% have not returned to work. Compared with population norms, overall physical and mental health-related quality of life was significantly reduced among firearm injury survivors. Compared with matched MVC survivors (n = 255), firearm injury survivors were significantly more likely to have daily pain [adjusted odds ratio (OR) 2.30, 95% confidence interval (CI) 1.08−4.87], to screen positive for PTSD (adjusted OR 3.06, 95% CI 1.42−6.58), and had significantly worse physical and mental health-related quality of life.

**Conclusions:** This study highlights the need for targeted long-term follow-up care, physical rehabilitation, mental health screening, and interventions for survivors of firearm violence.

**Keywords:** firearm injury, functional outcomes, long-term outcomes, mental health, post-traumatic stress disorder, quality of life

*(Ann Surg 2021;274:e1247−e1251)*

Rates of firearm-related deaths in the United States exceed those of all other 25 high-income nations combined.[1] Firearm-related injuries represent 4% of all patients treated at US trauma centers, and firearm-related deaths account for 17% of deaths due to injury.[2,3] However, the burden of firearm-related injuries is not limited to those who die. For every individual in the United States who died of a firearm injury in 2017, three survived. These individuals are left living with the burden of their injury.[4] Current firearm research

From the *Center for Surgery and Public Health, Brigham and Women's Hospital, Boston, MA; and †Division of Trauma, Burn and Surgical Critical Care, Brigham and Women's Hospital, Boston, MA.
✉jherrera@hsph.harvard.edu.

Funding: The present original work was funded by the Center for Surgery and Public Health own resources.
Disclosure: The authors have no conflicts of interest to disclose.

Copyright © 2020 Wolters Kluwer Health, Inc. All rights reserved.

ISSN: 0003-4932/20/27406-e1247
DOI: 10.1097/SLA.0000000000003797

largely focuses on mortality and short-term health outcomes,[5,6] while neglecting the long-term consequences.[7]

Survivors of injury as a whole commonly suffer from reduced quality of life, poor functional outcomes, psychological disturbances, chronic pain, and social disintegration long after their injury.[8−12] Two attempts to collect long-term outcomes data for injured patients in the United States, the National Study on Cost and Outcomes of Trauma (NSCOT), and the Functional Outcomes and Recovery after Trauma Emergencies (FORTE) project found that 40% to 45% of injured individuals had not returned to work 1 year after injury.[8,9] Additionally, these patients have a high prevalence of chronic pain, functional limitations, and mental health disturbances such as post-traumatic stress disorder (PTSD) and depression.[8]

Survivors of firearm-related violence have been shown to have significant long-term declines in physical and mental health.[13] More than 80% of screened firearm-injury survivors at 8 months postinjury report moderate or severe symptoms of post-traumatic stress.[14] One in 6 will be readmitted to a hospital,[14] and 1 in 11 will be readmitted with acute stress disorder/PTSD within 6 months of their injury.[15] The average yearly costs of these hospitalizations exceed $2.8 billion.[14] In addition to increased healthcare utilization, victims have increased rates of disability, work loss, and deterioration in quality of life.[16] The societal cost of which is estimated to be approximately $229 billion.[14]

It is imperative that we better understand the recovery trajectories of survivors of firearm-related injury to shift the discussion towards strategies to improve long-term outcomes. How survivors of firearm-related violence compare with similarly injured survivors of nonfirearm-related trauma is not known. Herein, we compare the long-term outcomes for survivors of firearm-related violence with similarly injured survivors of a motor vehicle crash (MVC). We compare groups with regards to presence of daily pain, screening for PTSD, new functional limitations, return to work, and physical and mental health-related quality of life after 6 to 12 months postinjury. Our hypothesis is that firearm-injured patients have worse long-term outcomes compared with MVC survivors.

## METHODS

### Setting

This study was conducted using data from the FORTE project registry. The FORTE project is a prospective multicenter effort between 3 Boston level I trauma centers to collect postdischarge patient-reported outcome measures (PROMs) for traumatically injured patients. This initiative started in December, 2015 at Brigham and Women's Hospital (BWH), and in June, 2016 at Massachusetts General Hospital (MGH) and Boston Medical Center (BMC). Further details of the development and design of the FORTE project have been published elsewhere.[17]

### Participants and Study Design

We included adult (18–64 years) English or Spanish-speaking trauma patients with a moderate to severe injury [injury severity

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

score (ISS) ≥9] from a firearm or MVC treated at the participating institutions between 2015 and 2018. Eligible patients were sent opt-out letters 6 to 12 months after discharge, explaining the purpose of the study and informing them that they would be contacted by telephone to collect information about their recovery. In addition, they were provided a pamphlet with details about the study and its significance, and also steps to opt out of the study or to provide updated contact information. Patients who sustained a firearm injury as a result of self-harm and those who were incarcerated or deceased at the time of follow-up were excluded.

Patients were contacted via telephone, and interviews were completed by a trained researcher or completed by the patient via e-mail or paper format after obtaining verbal consent. The interview consisted of an initial screening followed by a series of survey questions to assess functional and PROMs, and also other relevant aspects of the patient recovery experience. For the present study, the outcomes were: presence of daily pain; screening for PTSD; new functional limitations; return to work; and physical and mental health-related quality of life.

## Study Variables

### Patient Demographics and Clinical Information

Patient demographic and clinical information from the index hospitalization were obtained from institutional trauma registries. Clinical variables extracted from the trauma registry included age, sex, race, prior psychiatric illness, mechanism of injury, ISS, intensive care unit (ICU) length of stay, hospital length of stay (LOS), in-hospital complications, prior substance abuse disorder, surgical procedures, and discharge disposition. Education level was asked in the follow-up interviews.

### Exposure

Patients were divided into firearm and MVC survivors based on the mechanism of injury reported in the institutional trauma registries. In cases where this information was missing, the data were extracted manually from the patients' medical records.

### Outcome Measures

*Daily Pain.* Daily pain was defined as a positive answer ("strongly agree" or "agree" on the 5-point Likert scale) to the Trauma Quality-of-Life instrument (T-QoL)[18] item "I have pain on a daily basis".

*Screening for PTSD.* Positive screening for PTSD was defined as having at least 4/7 positive responses in the Breslau questionnaire.[19] The Breslau questionnaire was derived from the modified National Institute of Mental Health Diagnostic Interview Schedule and the World Health Organization Composite International Diagnostic Interview, version 2.1.

*Functional Limitations.* Functional limitation was defined as the new need for assistance with any of the 8 daily activities from the functional engagement domain of the T-QoL. The activities included are: drive, walk upstairs, walk on flat surfaces, dress, shower, eat, go to the bathroom, and cook.

*Return to Work.* Two questionnaire items were used to assess return to work. Patients were asked whether they were working or not the month before the injury and at the time of the interview. Only individuals working before injury were included in the return to work analyses.

*Physical and Mental Health-related Quality of Life.* Health-related quality of life was assessed using the physical (PCS) and mental (MCS) component summary scores of the Short-Form-12 (SF-12) Health Survey version-2. PCS and MCS are represented as t-scores with a population mean of 50 and a standard deviation (SD) of 10, in which 0 represents the lowest level of health and 100 the highest.

## Data Analysis

Descriptive statistics were used to describe patient demographics, clinical characteristics, and study outcomes. Participants' and nonparticipants' demographic and clinical characteristics were compared using parametric tests ($t$ tests) or nonparametric tests (Wilcoxon rank-sum test) for continuous variables, and chi-square tests or Fisher exact tests for categorical variables, as appropriate. Mean SF-12 PCS and MCS were described and compared with the US population mean score of 50.

Outcome analyses were conducted in 2 stages. First, we matched each firearm injury patient to between 1 and 4 MVC patients using Coarsened Exact Matching (CEM).[20] The groups were matched on age, sex, race, education level, and psychiatric illness diagnosis; the number of MVC matches per firearm patient was based on the number of similar matches that the CEM algorithm found. The CEM approach to matching has been shown to have optimal statistical properties in finding matches. Further, it has shown to be superior to other matching methods in its ability to reduce imbalance, model dependence, estimation error, bias, and other criteria.[20] Second, we used Generalized Linear Models (CEM-weighted) adjusted for ISS, substance abuse disorder, and discharge disposition to compare matched patients on 6 to 12-month outcomes.

Interviews with missing data on the predictor or covariates were searched in the patients' medical records. In cases where the information could not be found (<3%), interviews were excluded, consistent with a complete case analysis approach. Statistical significance was set at $P < 0.05$ (2-sided). Stata version 14.0 was used for analysis. Partners Healthcare Institutional Review Board approval was obtained.

## RESULTS

Among 177 eligible firearm injury survivors, 63 participated in the study and 1 patient was unmatched (Fig. 1). Mean age of firearm survivors (n = 62) was 28.9 years (SD 9.6), 85.5% were male, 69.4% black, and all patients had some form of healthcare insurance at the time of injury. There were no significant differences in demographic or injury-related characteristics between firearm participants and eligible nonparticipants (Table 1). Of firearm injury survivors, 67.7% reported daily pain, 53.2% screened positive for PTSD, 38.7% reported a new functional limitation in an activity of daily living, and 59.1% of patients previously working (n = 44) have not returned to work. Compared with population norms, overall physical and mental health-related quality of life was significantly reduced among firearm injury survivors: SF-12 PCS—41.0 (SD 12.5, $P < 0.001$); and SF-12 MCS—41.1 (SD 15.1, $P < 0.001$). Seventy-six per cent of survivors of firearm-related injury had at least 1 of these aforementioned negative outcomes.

Sixty two firearm injury survivors were matched to 255 out of a pool of 1072 eligible MVC survivors (Table 2). Compared with matched MVC survivors (CEM-weighted), firearm injury survivors were more likely to report daily pain [adjusted odds ratio (OR) 2.30, 95% confidence intyerval (CI) 1.08, 4.87)], to screen positive for PTSD [adjusted OR 3.06, 95% CI 1.42, 6.58), and had worse SF-12 PCS [adjusted mean difference −4.33, 95% CI −8.36, −0.31) and MCS [adjusted mean difference −7.89, 95% CI −12.84, −2.93)] (Table 3). No significant differences were found in regards to new functional limitations or return to work.

© 2020 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.



**FIGURE 1.** Flowchart diagram.

## DISCUSSION

Using data from a large multicenter long-term trauma outcomes registry, we found that physical and mental health outcomes for survivors of firearm violence were significantly worse than a comparable population of MVC survivors. Specifically, firearm injury survivors had a higher prevalence of chronic pain, were more likely to screen positive for PTSD, and had worse physical and mental health-related quality of life.

With an increasing focus on the long-term outcomes of injured patients, it is apparent that as a whole, these individuals often struggle with regards to functional recovery, social reintegration, and mental health.[8–12] Previous studies have reported a high prevalence of PTSD in the general trauma population (18%–20%),[8–9] after MVCs

(6%–45%),[21] for those with a traumatic brain injury (27%),[22] and for survivors of a burn (2%–40%).[23] Similarly, rates of chronic pain oscillate between 33% and 50% in the general trauma population, traumatic brain injury, and burn groups.[24–26] Although these rates reported in more than 60 studies are, in themselves, very high, they are all well below the rates we found for survivors of firearm injuries.

There is a dearth of literature on the long-term impact of surviving a firearm-related injury. The few studies that do exist have often focused on very specific injury types, have combined firearm survivors with other injury mechanisms to analyze larger groups, or have focused on the economic impact of firearm-related injury.[6,15,27–29] In 2002, Greenspan and Kellermann[13] studied the health status and psychologic distress of gunshot-related injury

**TABLE 1.** Firearm Survivors' Demographic and Clinical Characteristics by Participation Status

| | Nonparticipants (n = 115) | Participants (n = 62) | P |
|---|---|---|---|
| Age, mean (SD), yrs | 27.5 (9.2) | 28.9 (9.6) | 0.37 |
| Male sex, n (%) | 107 (93) | 53 (85.5) | 0.10 |
| Black or African-American race, n (%)* | 82 (71.3) | 43 (69.4) | 0.79 |
| High school or lower education, n (%) | Not available | 48 (77.4) | — |
| Previous psychiatric illness, n (%) | 13 (11.5) | 3 (4.8) | 0.15 |
| Injury severity score, mean (SD) | 15.8 (10.0) | 18.4 (9.8) | 0.10 |
| Intensive care unit length of stay, median (IQR), d | 2 (0–6) | 3 (0–6.5) | 0.17 |
| Hospital length of stay, median (IQR), d | 6 (4–14) | 8 (5–17) | 0.10 |
| Any in-hospital complication, n (%) | 22 (19.1) | 18 (29) | 0.13 |
| Substance abuse disorder, n (%) | 47 (40.9) | 31 (50) | 0.24 |
| Any surgical procedure, n (%) | 63 (54.8) | 37 (59.7) | 0.53 |
| Discharge disposition, n (%) | | | 0.08 |
|   Home | 85 (73.9) | 46 (74.2) | |
|   Inpatient rehabilitation facility | 14 (12.2) | 13 (21) | |
|   Other | 16 (13.9) | 3 (4.8) | |
| Time to follow-up, mean (SD), d | Not applicable | 322.9 (87.6) | — |

*Patient race was classified upon self-report or identified by a family member.

© 2020 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

**TABLE 2.** Patient Demographic and Clinical Characteristics

| | Unweighted Unmatched Sample | | | Weighted Matched Sample | | |
|---|---|---|---|---|---|---|
| | Firearm Survivors (n = 63) | MVC Survivors (n = 511) | *P* | Firearm Survivors (n = 62) | MVC Survivors (n = 255) | *P* |
| Matched variables | | | | | | |
| Age, mean (SD), yrs | 28.8 (9.5) | 46 (19.1) | <0.001 | 28.9 (9.6) | 29.7 (10.4) | 0.58 |
| Male sex, n (%) | 54 (85.7) | 321 (62.8) | <0.001 | 53 (85.5) | 85.5% | 1 |
| Black or African-American race, n (%) | 43 (71.7) | 84 (18.1) | <0.001 | 43 (69.4) | 69.4% | 1 |
| High school or lower education, n (%) | 48 (76.2) | 261 (51.5) | <0.001 | 48 (77.4) | 77.4% | 1 |
| Previous psychiatric illness, n (%) | 4 (6.3) | 81 (16.3) | 0.038 | 3 (4.8) | 4.8% | 1 |
| Other variables | | | | | | |
| Injury severity score, mean (SD) | 18.6 (9.8) | 17.1 (9) | 0.23 | 18.4 (9.8) | 17.8 (9.8) | 0.67 |
| Intensive care unit length of stay, median (IQR), d | 3 (0–6.5) | 2 (0–4) | 0.03 | 3 (0–6.5) | 0 (0–3) | 0.002 |
| Hospital length of stay, median (IQR), d | 8 (5–17) | 5 (3–10) | <0.001 | 8 (5–17) | 5 (2–10) | <0.001 |
| Any in-hospital complication, n (%) | 19 (30) | 123 (24.1) | 0.29 | 18 (29) | 23.5% | 0.37 |
| Substance abuse disorder, n (%) | 31 (49.2) | 59 (11.6) | <0.001 | 31 (50) | 29.5% | 0.002 |
| Any surgical procedure, n (%) | 38 (60.3) | 246 (48.1) | 0.07 | 37 (59.7) | 47.1% | 0.08 |
| Discharge disposition, n (%) | | | 0.003 | | | 0.136 |
| Home | 47 (74.6) | 255 (49.9) | | 46 (74.2) | 62% | |
| Inpatient rehabilitation facility | 13 (20.6) | 207 (40.5) | | 13 (21) | 34.3% | |
| Other | 3 (4.8) | 46 (9) | | 3 (4.8) | 3.8% | |
| Time to follow-up, mean (SD), d | 324.1 (87.3) | 299 (94.7) | 0.051 | 322.9 (87.6) | 326.8 (85.6) | 0.75 |

victims 8 months after hospital discharge and found that mean SF-36 scores at follow-up were significantly lower than preinjury scores and that symptoms of PTSD were common. More recently, Joseph et al[15] reported a high readmission rate for survivors of firearm-related injury and that survivors of a semiautomatic rifle or shotgun-related injury had higher odds of developing acute stress disorder or PTSD upon readmission compared with survivors of a handgun-related injury. Our results resonate with previous reports on the significant burden experienced by survivors of firearm-related injury. However, we importantly demonstrate that survivors of firearm-related injury fare even worse than similarly injured survivors of MVC, in end points that matter to the patient. Of note, 59.1% of firearm survivors who were working before the injury have not returned to work 6 to 12 months after injury. Although this rate was not statistically significantly higher than the 1 for MVC survivors (38.1%), it is hard to tell whether this finding is a true reflection of a lack of difference between the groups or may be the product of a lack of statistical power due to the small sample utilized for this specific analysis. Regardless, it is worth noting that close to two-thirds of firearm survivors have not yet reintegrated back into society in this meaningful way.

The contributing factors to the differential rates in physical and mental health outcomes after discharge among MVC and firearm survivors are likely multifactorial. A greater perceived threat to life and the context in which most violence-related firearm injuries occur may be key factors. In addition, firearm survivors often come from more vulnerable socioeconomic neighborhoods which can make access to postdischarge care and resources a challenge. Poor social support networks may also contribute to poor recovery trajectories.[12,30]

This study has implications both on the patient and public health level. Although firearm injuries are a significant public health problem in the United States, what happens to the vast majority of patients who survive their injuries is largely unknown. To improve long-term outcomes in this patient population, robust data sources are needed to better understand the risk factors and drivers of their poor outcomes. In addition, a more comprehensive view of trauma systems is needed that

**TABLE 3.** Comparison of Outcomes Between Firearm and Motor Vehicle Crash Survivors at 6 to 12 Months Postinjury

| | Firearm Survivors (n = 62) | Motor Vehicle Crash Survivors (n = 255) | Adjusted Odds Ratio [95% Confidence Interval]* | *P* |
|---|---|---|---|---|
| Daily pain, n (%)† | 42 (67.7%) | 145 (56.9%) | 3.10 (1.26, 7.60) | **0.01** |
| Positive screening for PTSD, n (%)‡ | 33 (53.2%) | 59 (23.1%) | 2.50 (1.07, 5.81) | **0.03** |
| New functional limitations, n (%)§ | 24 (38.7%) | 65 (25.5%) | 2.26 (0.95, 5.42) | 0.07 |
| Have not returned to work¶ | 26 (59.1%) | 80 (38.1%) | 1.67 (0.68, 4.10) | 0.26 |
| | Mean (SD) | Mean (SD) | Adjusted Difference in Mean Scores [95% Confidence Interval]* | *P* |
| SF-12 MCS‖ | 41.1 (SD 15.1) | 49.1 (SD 11.9) | −6.77 (−12.45, −1.10) | **0.02** |
| SF-12 PCS‖ | 41 (SD 12.5) | 44.4 (SD 11.6) | −5.09 (−9.27, −0.92) | **0.02** |

Boldface indicates statistical significance [*P* < 0.05 (2-sided)].
*Reference group: motor vehicle crash survivors.
†Defined as a positive answer to the Trauma Quality-of-Life instrument (T-QoL) item "I have pain on a daily basis".
‡Defined as having at least 4/7 positive responses in the Breslau spectrum.
§Defined as the new need for assistance with any of the eight daily activities from the functional engagement domain of the T-QoL.
¶Analyses were conducted on the subset of patients who were working before the injury: firearm survivors (n = 44) and MVC survivors (n = 210).
‖Physical (PCS) and mental (MCS) component summary scores. Population mean score of 50 with a standard deviation of 10, where 0 represents the lowest level of health and 100 the highest.

© 2020 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

encompasses the continuum of care from the point of injury through rehabilitation. Current trauma systems often fall short in ensuring that injured patients continue a successful recovery and rehabilitation after discharge, which ends up primarily affecting vulnerable populations such as survivors of firearm-related trauma.

This study is not without limitations and must be interpreted in the context of the study design. First, as with any other prospective cohort study, there is a possibility of selection bias due to the loss to follow-up. Although the magnitude of this risk is unknown, we did not identify any significant differences between participants and nonparticipants, at least, in measurable baseline demographic and clinical characteristics. Second, the lack of data on the presence of prior injuries, and baseline mental and physical health poses unique limitations that come with studying long-term outcomes after injury. We attempt to address this by inquiring with patients about baseline functional status, by adjusting for the presence of a diagnosed psychiatric illness before the injury, and by using population norms to put our results into context. However, we recognize the possibility of recall bias, the presence of undiagnosed mental health illness in the population, and that our population baseline health status may differ from the average US population. Third, the Breslau screening scale for PTSD has limitations, such as the nonuse of clinical assessments for its validation[20]; and ISS may underestimate the severity of injury in penetrating trauma. Lastly, this study was conducted in multiple institutions, but all of them are within 1 geographical region, and as such, the results may not be generalizable to other populations.

## CONCLUSIONS

Survivors of firearm-related injury far worse long-term compared with similarly injured survivors of a MVC. There is a pressing need for targeted long-term follow-up care, physical rehabilitation, mental health screening, and interventions for survivors of firearm violence. This study informs the dialog for the firearm injury public health crisis in the United States in an area that has been previously neglected.[5] Firearm injuries are about more than the lives lost and the initial medical care; we must also recognize the long-term burden born by survivors.

## ACKNOWLEDGMENTS

*The authors would like to thank George Velmahos, MD, PhD (Division of Trauma, Emergency Surgery, and Surgical Critical Care, Massachusetts General Hospital, Boston, Massachusetts), Haytham MA Kaafarani, MD, MPH (Division of Trauma, Emergency Surgery, and Surgical Critical Care, Massachusetts General Hospital, Boston, Massachusetts) and Sabrina Sanchez, MD, MPH (Division of Trauma, Acute Care Surgery & Surgical Critical Care, Boston University School of Medicine, Boston, Massachusetts) for their generous collaboration with and support of this work. None of the persons mentioned above received compensation for their contributions to this work.*

## REFERENCES

1. Krug EG, Mercy JA, Dahlberg LL, et al. The world report on violence and health. *Lancet*. 2002;360:1083–1088.

2. Kuhls DA, Campbell BT, Burke PA, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury. *J Trauma Acute Care Surg*. 2017;82:877–886.

3. Xu J, Murphy SL, Kochanek KD, Bastian B, Arias E. National Vital Statistics Reports Volume 67, Number 5 July 26, 2018, Deaths: Final Data for 2016. Vol. 67, National Vital Statistics Reports; 2018.

4. Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2017 on CDC WONDER Online Database, released December, 2018. Data are from the Multiple Cause of Death Files, 1999-2017, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Available at: http://wonder.cdc.gov/ucd-icd10.html. Accessed March 12, 2019.

5. The Global Burden of Disease 2016 Injury Collaborators. Global Mortality From Firearms, 1990-2016. JAMA 2018;320:792–814.

6. Alarcon LH, Germain A, Clontz AS, et al. Predictors of acute posttraumatic stress disorder symptoms following civilian trauma: highest incidence and severity of symptoms after assault. *J Trauma Acute Care Surg*. 2012;72:629–635 [discussion 635–637].

7. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS) [online]; 2005. Available at: https://webapp.cdc.gov/sasweb/ncipc/nfirates.html. Accessed April 25, 2019.

8. Zatzick D, Jurkovich GJ, Rivara FP, et al. A National US Study of posttraumatic stress disorder, depression, and work and functional outcomes after hospitalization for traumatic injury. *Ann Surg*. 2008;248:429–437.

9. Haider AH, Herrera-Escobar JP, Al Rafai SS, et al. Factors associated with long-term outcomes after injury: results of the Functional Outcomes and Recovery after Trauma Emergencies (FORTE) multi-center cohort study. *Ann Surg*. 2018.

10. Gabbe BJ, Simpson PM, Harrison JE, et al. Return to work and functional outcomes after major trauma: who recovers, when, and how well? *Ann Surg*. 2016;263:623–632.

11. Gabbe BJ, Simpson PM, Cameron PA, et al. Long-term health status and trajectories of seriously injured patients: a population-based longitudinal study. *PLoS Med*. 2017;14:e1002322.

12. Herrera-Escobar JP, Rivero R, Apoj M, et al. Long-term social dysfunction after trauma: what is the prevalence, risk factors, and associated outcomes? *Surgery*. 2019;166:392–397.

13. Greenspan AI, Kellermann AL. Physical and psychological outcomes 8 months after serious gunshot injury. *J Trauma*. 2002;53:709–716.

14. Spitzer SA, Staudenmayer KL, Tennakoon L, et al. Costs and financial burden of initial hospitalizations for firearm injuries in the United States, 2006-2014. *Am J Public Health*. 2017;107:770–774.

15. Joseph B, Hanna K, Callcut RA, et al. The hidden burden of mental health outcomes following firearm-related injures. *Ann Surg*. 2019;270:593–601.

16. Fowler KA, Dahlberg LL, Haileyesus T, et al. Firearm injuries in the United States. *Prev Med*. 2015;79:5–14.

17. Rios-Diaz AJ, Herrera-Escobar JP, Lilley EJ, et al. Routine inclusion of long-term functional and patient-reported outcomes into trauma registries: the FORTE project. *J Trauma Acute Care Surg*. 2017;83:97–104.

18. Wanner JP, deRoon-Cassini T, Kodadek L, et al. Development of a trauma-specific quality-of-life measurement. *J Trauma Acute Care Surg*. 2015;79:275–281.

19. Breslau N, Peterson EL, Kessler RC, et al. Short screening scale for DSM-IV posttraumatic stress disorder. *Am J Psychiatry*. 1999;156:908–911.

20. Iacus SM, King G, Porro G. Causal inference without balance checking: coarsened exact matching. *Political Analysis*. 2012;20:1–24.

21. Heron-Delaney M, Kenardy J, Charlton E, et al. A systematic review of predictors of posttraumatic stress disorder (PTSD) for adult road traffic crash survivors. *Injury*. 2013;44:1413–1422.

22. Haarbauer-Krupa J, Taylor CA, Yue JK, et al. Screening for post-traumatic stress disorder in a civilian emergency department population with traumatic brain injury. *J Neurotrauma*. 2017;34:50–58.

23. Giannoni-Pastor A, Eiroa-Orosa FJ, Fidel Kinori SG, et al. Prevalence and predictors of posttraumatic stress symptomatology among burn survivors: a systematic review and meta-analysis. *J Burn Care Res*. 2016;37:e79–e89.

24. Velmahos CS, Herrera-Escobar JP, Al Rafai SS, et al. It still hurts! Persistent pain and use of pain medication one year after injury. *Am J Surg*. 2019;218:864–868.

25. Sullivan-Singh SJ, Sawyer K, Ehde DM, et al. Comorbidity of pain and depression among persons with traumatic brain injury. *Arch Phys Med Rehabil*. 2014;95:1100–1105.

26. Mayou R, Bryant B. Outcome in consecutive emergency department attenders following a road traffic accident. *Br J Psychiatry*. 2001;179:528–534.

27. Payne JE, Berne TV, Kaufman RL, et al. Outcome of treatment of 686 gunshot wounds of the trunk at Los Angeles County-USC Medical Center: implications for the community. *J Trauma*. 1993;34:276–281.

28. Benzel EC, Day WT, Kesterson L, et al. Civilian craniocerebral gunshot wounds. *Neurosurgery*. 1991;29:67–72.

29. Holbrook TL, Anderson JP, Sieber WJ, et al. Outcome after major trauma: discharge and 6-month follow-up results in the Trauma Recovery Project. *J Trauma*. 1998;45:315–324.

30. Herrera-Escobar JP, Seshadri AJ, Rivero R, et al. Lower education and income predict worse long-term outcomes after injury. *J Trauma Acute Care Surg*. 2019;87:104–110.

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

EXHIBIT 65

An official website of the United States government. Here's how you know

Home • Crime in the U.S. • 2019 • Crime in the U.S. 2019 • Tables • Expanded Homicide Data Table 8



**Home** | Offenses Known to Law Enforcement | Violent Crime | Property Crime | Clearances | Persons Arrested | Police Employee Data

Expanded Homicide Data Table 8

**Murder Victims**
by Weapon, 2015–2019

Download Excel

| Weapons | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Total** | **13,847** | **15,355** | **15,206** | **14,446** | **13,927** |
| Total firearms: | 9,143 | 10,398 | 11,014 | 10,445 | 10,258 |
| Handguns | 6,194 | 6,778 | 7,052 | 6,683 | 6,368 |
| Rifles | 215 | 300 | 389 | 305 | 364 |
| Shotguns | 248 | 247 | 263 | 237 | 200 |
| Other guns | 152 | 172 | 178 | 164 | 45 |
| Firearms, type not stated | 2,334 | 2,901 | 3,132 | 3,056 | 3,281 |
| Knives or cutting instruments | 1,533 | 1,562 | 1,608 | 1,542 | 1,476 |
| Blunt objects (clubs, hammers, etc.) | 438 | 466 | 474 | 455 | 397 |
| Personal weapons (hands, fists, feet, etc.)[1] | 651 | 668 | 715 | 712 | 600 |
| Poison | 8 | 12 | 15 | 6 | 16 |
| Explosives | 1 | 1 | 0 | 4 | 3 |
| Fire | 63 | 78 | 93 | 76 | 81 |
| Narcotics | 70 | 119 | 112 | 102 | 93 |
| Drowning | 12 | 9 | 8 | 9 | 7 |
| Strangulation | 96 | 97 | 90 | 75 | 64 |
| Asphyxiation | 105 | 93 | 112 | 92 | 92 |
| Other weapons or weapons not stated | 1,727 | 1,852 | 965 | 928 | 840 |

- [1] Pushed is included in personal weapons.
- NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

**Most Wanted**

Ten Most Wanted
Fugitives
Terrorism
Kidnappings / Missing Persons
Seeking Information
Bank Robbers
ECAP
ViCAP

**About**

Mission & Priorities
Leadership & Structure
Partnerships
Community Outreach
FAQs

**News**

Stories
Videos
Press Release
Speeches
Testimony
Podcasts and Radio
Photos
Español
Apps

**Resources**

Law Enforcement
Businesses
Victim Assistance
Reports & Publications

**What We Investigate**

Terrorism
Counterintelligence
Cyber Crime
Public Corruption
Civil Rights
Organized Crime
White-Collar Crime
Violent Crime
WMD

**Contact Us**

Field Offices
FBI Headquarters
Overseas Offices

**Services**

CJIS
CIRG
Laboratory Services
Training Academy
Operational Technology
Information Management

**FBI Jobs**

Submit a Tip
Crime Statistics
History
FOIPA
Scams & Safety
FBI Kids
FBI Tour

**Additional Resources**

Accessibility
eRulemaking
Freedom of Information / Privacy Act
Legal Notices
Legal Policies & Disclaimers
Privacy Policy
USA.gov
White House
No FEAR Act
Equal Opportunity





**FBI.gov Contact Center**
Email updates

EXHIBIT 66

# Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms

r  reason.com/2018/10/31/neither-capacity-nor-power-distinguishes

October 31, 2018



These two weapons fire the same ammunition at the same rate with the same muzzle velocity and have the same capacity. But the first is listed by name as a banned gun in Sen. Feinstein's latest bill, while the second is specifically exempted.

Joanna Andreasson / Reason

In an editorial published the day after the shooting that killed 11 people at a Pittsburgh synagogue on Saturday, *The New York Times* erroneously claimed that so-called assault weapons like the Colt AR-15 rifle used in that attack are distinguished by their "high capacity." In a news story posted yesterday, *Times* reporter Richard A. Oppel Jr. suggests that AR-15-style rifles are especially "powerful," which also is not true.

Unlike, say, Barack Obama or Hillary Clinton, Oppel acknowledges that an AR-15, like any other semi-automatic, "fires one bullet at a time." Still, he says, "it is a powerful weapon: light, easy to hold and to fire, with limited recoil, its bullets shooting out of the muzzle more than twice as fast as most handgun rounds." The only part of that description that is related to "power" is the part about muzzle velocity, and here Oppel pulls the time-honored trick of comparing the rifles Dianne Feinstein hates with handguns instead of other rifles. Bullets fired from rifles generally move faster than bullets fired from pistols, mainly because a longer barrel gives them more room to accelerate. But that tells us nothing about the difference between the rifles Feinstein wants to ban—which are distinguished by features such as folding stocks, pistol grips, and barrel shrouds—and the ones she is willing to leave on the market.

If the comparison is limited to long guns, the .223-caliber round typically fired by AR-15-style rifles does have a relatively high muzzle velocity. But other cartridges, fired by guns that are not considered "assault weapons," equal or surpass it. Furthermore, muzzle velocity is not the only factor in a bullet's lethality; size also matters, and so-called assault weapons fire smaller rounds than many hunting rifles.

Oppel adds that "the standard AR-15 magazine holds 30 bullets and can be swapped out quickly, allowing a shooter to fire more than a hundred rounds in minutes." The ability to accept "high-capacity" magazines does not distinguish "assault weapons" from other guns, and Oppel's point about how quickly magazines can be switched undermines the argument that a 10-round limit would make mass shootings less deadly. In any case, any semi-automatic gun can fire "more than a hundred rounds in minutes," which would require, at most, pulling the trigger about once per second.

The *Times* has been helping to perpetuate the myth that there is something uniquely deadly about "assault weapons" for decades. But it also has intermittently published articles pointing out that the distinctions drawn by politicians like Feinstein make little sense, or at least acknowledging that perspective. Critical readers, even if they had no other source of information about "assault weapons," should be able to figure out that there is something fishy about the case for banning these guns. It's too bad there are not more of those on the paper's editorial board or reporting staff.

EXHIBIT 67

REVIEW

# Gunshot Wound Review

**Martin L Fackler, MD**

Dr Fackler is president of the
International Wound Ballistics
Association.

Received for publication
July 25, 1994. Revisions received
October 10, 1994, and
February 8 and July 27, 1995.
Accepted for publication
April 26, 1996.

Copyright © by the American College
of Emergency Physicians.

There is no serious argument about the wounding potential of
various kinds of penetrating projectiles. The laws of physics in
concert with modern bullet testing have clarified and quantified
the mechanisms by which bullets disrupt tissue. Despite this
scientific background, much misinformation persists in the
wound-ballistics literature. This article reviews the interaction of
penetrating projectiles with human tissue. Understanding of
wound ballistics allows the emergency physician to become a
more informed reader of its literature, as well as a more reliable
provider of care to the wounded patient.

[Fackler ML: Gunshot wound review. *Ann Emerg Med* August
1996;28:194-203.]

## INTRODUCTION

From the Revolutionary War to the settling of our western
frontier, small-arms use has been inextricably entwined
with American history. Widespread use of firearms has
induced scientists and physicians to define the basic princi-
ples of wound ballistics. Over the past century, the mecha-
nisms by which penetrating projectiles injure living tissue
have been extensively studied and explained. Yet mistaken
ideas about bullet effects are still held today. The most com-
mon misconception about gunshot wound treatment is that
the penetration of any "high-velocity" bullet causes enig-
matic "shock waves" and cavitation that will doom tissues
even far from the bullet path. The purpose of this review is
to scientifically discuss wound ballistics, refute misconcep-
tions, and present the pathophysiology to support a rational
strategy for the treatment of gunshot wounds.

## CONTROVERSIES REGARDING WOUNDING POTENTIAL

In 1967, a group reported the wounds caused by M-16 rifle
bullets in Vietnam as "massively destructive"[1] and possess-
ing "devastating wounding power . . . tremendous wound-

**GUNSHOT WOUNDS**
*Fackler*

ing and killing power".[2] Because the 3,100 foot/second (945 m/second) muzzle velocity of the M-16 bullet was higher than that of previous military bullets, "high velocity" became synonymous with "devastating wounding power."

These subjective descriptions attracted the attention of Swedish researchers.[3] In 1974, a Swedish wound-ballistics researcher claimed that the tissues surrounding wounds caused by "high-velocity" projectiles were "subjected to the formation of the temporary cavity [which was] 30 times the diameter of the projectile" and that these tissues "will not survive."[4] Implicit in this claim was that in the treatment of any wound caused by a "high-velocity" projectile the surgeon must excise a cylinder of tissue at least 30 times the diameter of that projectile: To treat a wound caused by a 30-caliber bullet (such at that fired by the AK-47 "assault rifle"), a surgeon would have to carve out a cylinder of tissue at least 9 inches in diameter. This procedure equates to performing amputation for practically any wound of the arm or leg.

Others have also claimed that assault weapon bullets cause massive injuries, including traumatic amputation.[5] In addition, many fallacies regarding bullet effects were presented in the 1975 edition of *The NATO Handbook: Emergency War Surgery,* including a description of the temporary cavity for "high-velocity missiles" as "30 to 40 times the size of the missile."[6] Although the Swedish findings were subsequently disproved[3] and a new objective and scientific chapter on missile-caused wounds was written for the 1988 edition of *The NATO Handbook*[7], widespread misinformation persists.

Delegates to the Tri-Service War Surgery conferences of 1970 and 1971[8] reported no unusual problems associated with "high-velocity" bullet wounds in Vietnam. There were no reports of rifle bullet wounds causing traumatic amputation of an extremity. No one recommended removal of an amount of tissue even remotely approaching a 9-inch-diam-

eter cylinder from the wound caused by an AK-47 or any other rifle.

Other reports on rifle bullet wounds from Vietnam also gave a very different impression: "Uncomplicated perforating soft-tissue wounds were the most common bullet wounds of the extremities. They showed small entry and exit wounds and a clean soft-tissue track with little or no devitalization of tissue. Such wounds usually healed if left alone."[9]

## WOUNDING MECHANISMS

The objective measurement of a wound's dimensions, along with a clear and precise description of the tissue disruption (augmented by good-quality photographs including a measuring scale) is the only valid method of verifying the disruption caused by a given bullet. This method permits meaningful comparison of the disruptive effects caused by various bullets.[10]

Basic physics verifies that a projectile's potential to disrupt tissue is determined by both its mass and its velocity. Wounding potential is also determined to a great extent by a bullet's physical characteristics. Projectile construction and shape determine a bullet's tendency to deform, fragment, or change its orientation (by becoming unstable and "yawing," or turning sideways, relative to the line of flight). Such behavior in tissue greatly affects tissue disruption. For example, an expanding soft-point or hollow-point bullet causes more tissue disruption than a similar but nonexpanding one, as demonstrated by comparison of Figures 1 and 2.

Many current textbooks of surgery, however, claim that a bullet's velocity determines the severity of the wound it causes.[11-17] For wounds caused by presumed high-velocity missiles, these texts recommend extensive excision of tissue from around the projectile path, whereas if the wound was presumed to have been caused by a low-velocity projectile, little or no excision of tissue is recom-

**Figure 1.**
*Wound profile produced by the American 7.62 NATO full metal jacket bullet. This bullet does not deform in tissue and begins to yaw after an average penetration of about 16 cm. Note that the large temporary cavity forms as a result of the blunt shape of the bullet traveling sideways.*



mended. The history of small-arms development, the physics of penetrating projectiles, findings of laboratory testing, and measurements of wounds prove the fallacy of this concept.

About 1880, the velocity of small-arms projectiles was doubled from about 1,300 feet/second (396 m/second) to more than 2,400 feet/second (731 m/second). This was the largest velocity increase in the history of small-arms development, made possible by the inventions of the jacketed bullet (in which the soft lead core was covered with a jacket of harder metal) and smokeless gunpowder. If current textbooks are correct in their assertion that a projectile's velocity alone determines its wounding capacity, such a large increase in velocity would have caused a large increase in wound severity. In fact, just the opposite effect occurred. A striking decrease in wounding effect was reported from all battlefields on which the new bullets were used.[18-21] The reason is made clear when the wound profiles of the bullets involved are studied. These profiles were made by shooting into ordnance gelatin calibrated against living pig muscle[22] and validated by measurements taken during human autopsies.[23]

Figure 3 shows the wound profile of a typical example of the last generation of bullets made from solid lead. The velocity of such a bullet was about that of present day 22-caliber rimfire bullets, with diameters ranging from 41 to 45 caliber (10.4 to 11.4 mm). These bullets weighed from 300 to 500 grains (19.4 to 32.4 g). When these large, soft lead bullets struck flesh, they flattened, assuming a mushroom shape: This enlarged the diameter to 60 to 80 caliber (13.4 to 20.3 mm). In addition to making a larger hole, the blunted shape of the flattened bullet caused temporary cavities as large as those caused by modern M-16 rifle bullets (compare Figures 3 and 4).

Figure 5 shows the behavior of the 6.5-mm Mannlicher-Carcano bullet, typical of the first jacketed bullets. Its diameter and mass were only about half those of previous lead bullets. The jacketed bullets' much higher velocity required a decrease in bullet mass; otherwise recoil would have been excessive. The most striking characteristic of these long, round-nosed, small-caliber bullets was the tendency to travel point-forward in soft tissue until about 24 inches (61 cm) was penetrated. The jacketed bullets did not flatten or deform in human soft tissue but made small, punctate holes, disrupting little tissue (unless one struck bone, in which case it might become deformed or yaw).

The fear that these new bullets would prove insufficient to incapacitate enemy soldiers was realized by the British, in India, in 1895. They modified the bullets (at

**Figure 2.**

*Wound profile produced by the 7.62 NATO cartridge loaded with a soft-point hunting bullet. This cartridge is more commonly known as the .308 Winchester in civilian circles. This bullet expands to more than double its original diameter and loses about one third of its weight in fragments, within an inch or so of striking tissue. These fragments cause multiple perforations of the tissue surrounding the bullet path, penetrating up to 9 cm radially. The large temporary cavity then displaces this tissue, which has been weakened by multiple perforations by fragments. The synergy between fragmentation and cavitation results in detachment of pieces of muscle and increases the permanent-cavity dimensions.*



**Figure 3.**

*Wound profile produced by the Vetterli bullet. This bullet is typical of those used by military forces in the last half of the 19th century (the Vetterli was used by the Swiss and Italian armies from about 1870 to 1890). It flattens on striking tissue, expanding its diameter and giving it a blunt shape that allows it to produce a substantial temporary cavity despite its "low" velocity. The 44 Magnum hollow-point rifle bullet is one modern bullet that produces a wound profile similar to that of the Vetterli.*



the Dum-Dum arsenal) by grinding off some of the hard jacket at the bullet's tip. This modification caused the bullets to expand on striking flesh and to produce increased disruption. The Hague Peace Conference of 1899, however, prohibited the Dum-Dum modification for use in military conflicts.[24]

Later military rifle bullets, with pointed noses, traveled shorter distances in the body point-forward than did the earlier round-nosed ones (compare Figures 1, 4 and 6 with Figure 5). The farther a nondeforming bullet travels

### Figure 4.

*Three variations in the wound profile produced by the M-16A1 full metal jacket bullet. All the military bullet wound profiles (Figures 2–4) shown are of the average profile; in about 7 of 10 cases the distance before yaw will be within ±25% of that shown. This figure shows the variations in distance of penetration before yaw and the concomitant variations in wounding pattern seen with the M-16A1 military rifle bullet. The middle profile is the average one, seen in about 70% of cases; the top and bottom profiles each occur in about 15% of cases. In other, occasional cases, yaw occurs earlier or later than in those shown. Some observers in Vietnam believed the M16 was "terribly destructive," whereas others considered it less disruptive than needed. Most observers had seen few if any gunshot wounds before, and their knowledge of the circumstances surrounding the shootings was incomplete at best. Add to this the inherent variation illustrated in this figure, and it is easy to see why there was confusion.*



point-forward in tissue, the less tissue it disrupts.[25] Figure 7 shows the distance various military rifle bullets travel in tissue before they yaw.

The Russian AK-47/Chinese SKS military bullet (7.62 × 39 mm) is considerably more stable in tissue than other modern military rifle bullets. The path of an AK-47 bullet through the body is generally not long enough for yaw; most cause no greater tissue disruption than common handgun bullets.[9,10]

The myth that "shock waves" generated by a bullet cause tissue damage was laid to rest in 1947 when Harvey et al examined the differences between the two types of pressure waves produced by penetrating projectiles.[26] The first, commonly known as the "shock wave" but more properly called the sonic pressure wave, is simply the sound of the projectile striking the surface of the tissue or tissue simulant. This sound wave travels ahead of the bullet: The speed of sound in tissue is approximately 4,750 feet/second (1,450 m/second), considerably faster than the speed at which bullets penetrate tissue. In the studies by Harvey et al, these sonic waves, produced in water when a $^3/_{16}$-inch (4.7- mm) steel sphere struck at 3,000 feet/second (914 m/second), produced pressures up to 60 atm but their duration was but a few microseconds. These sonic waves did not move the water perceptibly.

A second pressure wave follows the penetrating projectile. Termed "temporary cavity," it results when the penetrating projectile strikes tissue, which then accelerates radially away (like a splash) from where the projectile struck, obeying Newton's laws of motion.[27] The temporary cavity pressure produced by Harvey et al was about 4 atm; it pulsated a few times and lasted 4 or 5 milliseconds per pulsation.[26,28] In these experiments the temporary cavity did move tissue, and it could be a significant wounding mechanism, depending on its size and the characteristics of the tissue it dislodged.[26,28-31] Inelastic tissues such as liver are far more susceptible to disruption by the temporary cavity than are more flexible body tissues such as muscle, bowel wall, and lung.[29,30-31]

The observation by Harvey et al that the sonic pressure wave does not move tissue perceptibly but that the temporary cavity does is consistent with predictions from basic physics. Compare the impulse (the capacity to change the momentum of, or move, a body) available in each of these waves by multiplying its pressure by the duration: the sonic wave might reach 60 atm but only lasts a few microseconds (60 × 3=180); the temporary cavity might only reach 4 atm but lasts several pulsations of 4 or 5 milliseconds each, a total of about

12,000 microseconds (4 × 12,000=48,000). Therefore temporary cavity pressure waves produce between 200 and 300 times more capacity to move tissue than the sonic wave.

Harvey et al[26] explained the difficulties posed by the coexistence of the two kinds of pressure waves by separating the sonic wave from the temporary cavitation. They used two methods. First, they shot into a steel plate placed against the water surface in a water tank; the sonic wave passed through the plate and into the water, but the projectile was stopped, essentially eliminating temporary cavity– caused motion in the water. They also suspended frog hearts in water, shot spheres near them, and recorded the sequence with high-speed imaging equipment. Because the sonic wave precedes the projectile and the temporary cavity follows it, Harvey et al were able to observe that the disruption of tissue accompanied the pressure changes caused by the temporary cavity, not those of the sonic wave.

Between 1987 and 1990, five papers by Swedish researchers were published[32-36] that purported to show evidence that Harvey et al were wrong and that sonic pressure ("shock") waves generated by .24-inch (6-mm) steel spheres shot at 3,937 to 4,922 feet/second (1,200 to 1,500 m/second) into the legs of 20-kg pigs caused damage to various distant parts of the pigs' nervous systems. These investigators ascribed their results to the sonic wave, but failed to consider the far more likely

possibility that tissue movement from transmitted temporary cavitation was the causative factor. High-speed cinematographic films of small pigs shot with various bullets show that the entire body of the animal can be moved by the pulsating temporary cavity caused by the projectiles used in the aforementioned studies.[32-36]

Two studies by French and American investigators provided the opportunity to search for nervous system dysfunction and other "distant effects" resulting from sonic waves or transmitted cavitation.[31,37] No indication of nervous system dysfunction was seen, and no evidence of injury "distant" from the bullet path was found at autopsy in either study.

In March 1994 American researchers claimed to have identified shock waves as a mechanism of tissue damage in 326 cases (2% of the 16,316 gunshot wound cases they reported).[38] This appears to be the first report in which any investigator has claimed to have detected damage in human beings caused by the shock waves produced by bullets. These investigators apparently did not confuse shock waves with temporary cavitation; they listed cavitation as another mechanism of tissue damage. Unfortunately, this group failed to describe their criteria for determining that tissue had been injured by shock waves.

A modern researcher wishing to study the sonic pressure wave could avoid the confounding effects of cavitation by using a lithotriptor. The lithotriptor generates sonic pressure waves without using a projectile, therefore

**Figure 5.**
*Wound profile produced by the 6.5 Mannlicher-Carcano full metal jacket bullet. Note that this bullet does not deform in tissue and that it penetrates an average 61 cm before beginning to yaw, accounting for its deep penetration. This is the bullet used to assassinate President John F Kennedy. Had the wound profile illustrating the penetration potential of this bullet been available at the time of the investigation into the murder it would have allayed doubts about the capacity of a single 6.5-mm bullet to have passed through the base of the president's neck, then continued through the chest of Texas Governor John Connally and then through Connally's wrist (including the distal radius) before penetrating his thigh.*



yielding no temporary cavity. Despite the fact that the sonic waves generated by the lithotriptor have three times the amplitude of those produced by small-arms projectiles, and as many as 2,000 waves might be used during a single treatment session for the treatment of renal calculi, these sonic waves do not significantly harm the surrounding tissues.[39,40]

In contrast, the damage caused in the human body by a bullet's temporary cavity can vary greatly, depending on the size of the cavity and its anatomic location. The forces of the temporary cavity follow the path of least resistance, separating tissue planes and tearing tissues where they are fixed and cannot be displaced. For instance, the cavity caused by most expanding handgun bullets is about 9 cm in diameter (Figure 8). To determine tissue movement surrounding the permanent bullet path, first subtract the 2-cm permanent bullet path. Then divide the remaining 7 cm diameter by 2 to obtain the radius, 3.5 cm (the distance in question). In a shot through the abdomen, the temporary cavity forces move a loop of small bowel only about 3.5 cm (1.4 inches). This 9-cm-diameter cavity is also likely to be absorbed in muscle or lung tissue without any damage. In the liver, however, it could cause serious damage because of the tissue's inelasticity. In the cranial cavity a 9-cm temporary cavity will most likely cause instant death as a result of the inability of brain tissue (restrained by the cranial vault) to move aside.

When—as a result of increased projectile size, increased velocity, or both—the temporary cavity is large enough to damage muscle tissue, the damage is patchy and not necessarily correlated with its distance from the permanent wound path. Microscopic sections were made and studied in conjunction with the study reported in reference 31 (14-cm diameter cavities in the thighs of 90-kg pigs). These sections showed patchy tears of muscle tissue and torn small blood vessels in the muscle. The muscle damage and blood vessel damage often were not found in the same area (Fackler MJ, Breteau JPL, Unpublished data, 1988). When one recognizes that the temporary cavity simply pushes tissue aside momentarily, it becomes clear that the location and arrangement of the small blood vessels in the tissue displaced largely determine which ones will be most susceptible to being torn. The microscopic finding of patchy bleeding from torn small vessels is what one would expect knowing the mechanism causing the damage and the variation in the anatomy of the blood supply to the skeletal musculature.

Fractures from cavitation are rare in the human being: I have seen but two (both from short-range shotgun blasts) and have not seen a verified report of any in the literature. When a bone is broken by cavitation, the fracture is a simple one. A gunshot fracture with multiple bone fragments separated by several centimeters and usually mixed with fragments of the projectile is a clear sign that the bone was struck by the bullet and not damaged by temporary cavitation.

To date, no study has scientifically or objectively demonstrated any change in the human gunshot victim that cannot be explained by the well-recognized wounding mechanisms of tissue crush resulting from a direct hit by the penetrating projectile or tissue displacement from temporary cavitation.

**Figure 6.**
*Wound profile produced by the Russian AK-47/Chinese SKS military bullet (7.62×39 mm) full metal jacket bullet. This is the most widely used "assault rifle" bullet in the world. It does not deform in tissue and travels about 26 cm before beginning to yaw. This explains the clinical finding that most wounds caused by this bullet resemble those made by much lower velocity handgun bullets.*



## COMMUNICATION PROBLEMS IN WOUND BALLISTICS

Failure to adhere to the basic precepts of scientific method is the common denominator of misconceptions in wound ballistics.[41] Good science is impossible without precise and clear communication, but the authors of most papers appearing in the wound-ballistics literature continue to use terms that are the antithesis of precision and clarity. These include the following.

**High velocity** The British draw their line between low and high velocity at 1,100 feet/second (335 m/second), which is the speed of sound in air. Various American researchers draw the line at 2,000, 2,500, or 3,000 feet/second (610, 762, and 914 m/second, respectively). In contemporary papers the terms "high velocity" and "low velocity" are often used without definition.[32,33] Velocity should be expressed in numbers, or a numerical velocity range (eg, 900 to 1,200 feet/second).

**High energy** Users of this popular but ambiguous term never give it a numeric definition.[32-36] Some wound-ballistics researchers fire 6-mm steel spheres into 20-kg pigs at about 3,200 feet/second (975 m/second) and call it a "high-energy" trauma model.[42] Yet their "high-energy" sphere has only about 340 foot-pounds (461 joules) of kinetic energy. Many handgun bullets possess that much energy, but they are considered by most to be "low-energy" projectiles.[41] The use of the imprecise "high" and "low" makes no more sense in the description of energy than it does in the description of velocity. Researchers who feel compelled to write about energy should at least describe it numerically.

**Kinetic energy** Tissue disruption is often discussed in terms of "local dissipation of kinetic energy."[43] A valid explanation of how the penetrating projectile disrupts tissue would be more appropriate. Was the wounding mechanism predominantly one of crushing, as would be caused by an 18-mm (71 caliber) sphere traveling in the 500- to 800-foot/second (152- to 244-m/second) range; or was it predominantly tissue tearing from being displaced and stretched beyond its elastic limits by temporary cavitation, as might be caused by a 6-mm (24 caliber) sphere traveling in the 3,000- to 3,300-foot/second (914- to 1,006-m/second) range? The amount of kinetic energy possessed by each of these projectiles might be the same, yet the pattern and type of damage they would produce are distinctly dissimilar.

"Kinetic energy" may sound erudite; however, it reveals nothing about the magnitude, type, and location of tissue disruption or the forces that cause tissue disruption—the essence of wound ballistics—and diverts attention from these critical elements. The force interactions between penetrating projectile and tissue remain hidden behind the abstract "kinetic energy" discussions.

**Debridement** The term "débridement" has been used by the French for several centuries: It means "to relieve tension and establish drainage by incision."[44] During World War I, the word was adopted into English, but its meaning was confused in the transition. American writers use it sometimes as a synonym for "excision" and sometimes as a catch-all term implying that "something was done"

---

**Figure 7.**
*Average distances traveled point-forward in soft tissue before yawing by some common military rifle bullets.*

6.5-mm Mannlicher-Carcano: 61 cm
Russian AK-47/Chinese SKS (7.62 × 39 mm): 26 cm
7.62 NATO (American version): 16 cm
M-16A1 (M-193 bullet): 12 cm
M-16A2 (M-855 bullet): 10 cm
AK-74: 8 cm.

These distances are averages: about 70% of bullets yaw within 25% of this average distance, whereas about 15% yaw at a shallower penetration depth and the other 15% at a greater depth of penetration.

---

**Figure 8.**
*Wound profile produced by the 38 Special 158-grain lead hollow-point bullet. This bullet was the standard load used by the Federal Bureau of Investigation for many of the years that a revolver was used as the duty weapon. This bullet expands on striking tissue, and its diameter increases by about 50%. It produces a larger permanent cavity than nonexpanding handgun bullets and a larger temporary cavity. Still, the temporary cavity it produces is not large enough to add significantly to the bullet's disruption except in tissues, such as liver, that lack elasticity.*



38 Spec FBI Load
158 gr lead HP
vel—860 ft/sec (4 in brl)

Permanent Cavity

Temporary Cavity

15 mm

0 cm        5        10        15        20        25        32

---

GUNSHOT WOUNDS
*Fackler*

to a gunshot wound. Saying "the wound was debrided" communicates nothing about the specifics of what was done, yet the details of how a wound was treated are crucial to meaningful communication about wound care. "Debride" and "debridement" should be avoided in scientific discourse in favor of more precise terms such as "incision" and "excision."[31]

## PATHOPHYSIOLOGY OF GUNSHOT WOUND TREATMENT

There is little disagreement in the wound-ballistics literature about how to treat penetrating projectile wounds of the chest and abdomen or those that disrupt major blood vessels or bones. Ironically, most of the dispute and misunderstanding concerns treatment of the least lethal injuries: uncomplicated extremity wounds. Central to this dispute is how to manage the soft-tissue disruption.

Knowledge of the pathophysiology of penetrating projectile wounds is needed to choose the best treatment methods. Tissue disruption provokes increased local inflow of blood and migration of white cells and fluid through the walls of small blood vessels to combat the bacteria and to clean up devitalized tissue.[45,46] Local swelling, which in some cases can be counterproductive and even pose a threat to life and limb (eg, a compartment syndrome) may result. Increase in compartment pressure can be prevented by wide opening of the wound path and excision of all devitalized tissue. It can also be prevented with the much simpler and less costly (in terms of surgical resources and patient complications) procedure fasciotomy, which is the closest thing in English to the original French meaning of "debridement." Tissue swelling might not pose a problem where (1) tissue disruption is minimal, or (2) even in the face of considerable tissue disruption if cavitation caused by the bullet splits open the skin, muscle, and fascia, thereby providing excellent decompression and drainage.[31]

If the tissue damage along the bullet path is so minimal that the body defense mechanisms can absorb it, as is the case with wounds from most handgun bullets (and military rifle bullets in the portion of their path before they have yawed), most of these wounds heal without intervention.

The trauma caused by penetrating projectiles stimulates new capillaries to grow into the disrupted area.[45,46] This increasing blood supply takes a few days to provide increased resistance to bacteria and is the reason behind the most basic tenet of surgical care of gunshot wounds:

leaving the wound open after the initial surgery and closing it after 4 to 7 days. Wartime experience has shown that immediate closure of these wounds results in a high infection rate, whereas leaving them open until the local blood supply has been augmented by ingrowth of new capillaries results in far better healing.[31] All gunshot wounds are contaminated with bacteria. On occasion one still hears the myth that bullets reach such a high temperature in the gun barrel that they are sterilized by being fired. This was proved false by LaGarde in 1892[47], whose findings were more recently verified by Thoresby and Darlow.[48]

The bacteria brought in by the bullet multiply in proportion to the amount of tissue that has been devitalized or severely damaged. When too much devitalized tissue is present for the body to absorb, the bacterial load is too great, or both, the body tries to wall off the bacteria-laden devitalized tissue by laying down a fibrin barrier.[45,46] If the wound is open, this walled-off necrotic mass is simply expelled after about 10 days.[31] If access to the outside is not available for the necrotic mass to be expelled, it will become an abscess. The treatment for an abscess is simple incision and dependent drainage. If incision and drainage is not performed, sufficient pressure may build up in the abscess for it to spread by breaking through its fibrin walls; erosion into blood vessels and invasive bacteremia may result. The body's defensive fibrin barriers can also be dissolved by the enzyme fibrinolysin, formed by the group A β-hemolytic streptococcus bacteria. This bacteria's capacity to spread by enzymatic action is why throughout history it has been the significant killer of the battlefield wounded.[49,50] Since World War II, however, β-hemolytic streptococcus has nearly disappeared from battlefields because antibiotics have been used to treat virtually all wounded by projectiles. Fortunately, the streptococcus has remained very sensitive to penicillin spectrum antibiotics. An adequate blood level of a penicillin spectrum antibiotic will prevent life-threatening invasive bacteremia caused by a group A β-hemolytic streptococcus, and penicillin remains effective against the clostridial species of bacteria that cause gas gangrene.[51-53]

Ideally, all dead and injured tissue surrounding the bullet path should be excised within a few hours of injury. This excision would decrease the work of the body's defenses and allow the ingrowth of new capillaries to progress unimpeded so that after 4 to 7 days the wound may be closed and uncomplicated healing expected. It is seldom possible, however, for even the most experienced surgeon to be able to identify with certainty the line of demarcation between tissue that will survive and that which will not.

GUNSHOT WOUNDS
*Fackler*

The "four Cs" (color, consistency, contractility, and circulation) have been taught to help surgeons differentiate viable from nonviable muscle. Those who support this method[54, 55], however, fail to advise whether abnormality in only one of these Cs indicates nonviability or whether two, three, or all four criteria must be fulfilled. During the Korean conflict, an attempt was made to measure the accuracy with which surgeons could evaluate muscle viability on the basis of the 4 Cs.[54] Biopsy specimens taken by surgeons were graded for muscle disruption by a pathologist. A "statistically significant" correlation was found for all but color. Their data, however, were not convincing: Although contractility deficits were found in all 22 of the severely disrupted muscle biopsy specimens, they were also found in 16 of the 18 judged to have been minimally disrupted. "Consistency" had the best correlation: It was judged normal in only 1 of the 22 severely disrupted specimens but was also judged normal in only 8 of the 18 minimally disrupted ones. The samples were taken an average of 6 hours after injury. Applicability to patients seen early after injury is questionable. Blood flow to tissues surrounding bullet paths can change markedly in the first few hours after wounding.[31] Delineation of where the body will draw the line on nonviable tissue can be compounded by severe hemodynamic shock and massive injury, which can compromise body defenses.

A reasonable way of dealing with this dilemma is to remove tissue that has been partially detached or severely disrupted and then examine the open wound after 2 days, by which time it will be obvious if more tissue must be excised. This method should be suitable for most civilian trauma centers.

In the military setting, however, the goal of getting the wound to heal rapidly has led many to handle the dilemma with a more radical excision of tissue. In an attempt to remove all potentially nonviable tissue, military surgeons often use an en bloc dissection of all dead, injured, and questionable tissue along with a margin of normal tissue—a procedure akin to excision of a malignancy. The danger of carrying this approach to extremes is easy to recognize.[4] Proponents of the "when in doubt, cut it out" school often preach that their method is necessary to avoid death resulting from invasive bacteremia or gas gangrene. This untrue; antibiotics and the far simpler surgical incision to relieve pressure and establish dependent drainage will do that.[31,56]

The great majority of civilian gunshot wounds are caused by handgun bullets. These bullets usually cause punctate extremity wounds that disrupt so little tissue that the body's defenses handle it well without the need for surgery. Military surplus weapons and ammunition are commonly available[57], and information given to the treating physician by those wounded and and their confreres about weapon and bullet type and the circumstances surrounding a shooting are notoriously inaccurate. Therefore perforating extremity wounds from military rifle bullets have undoubtedly been interpreted as handgun wounds in many cases and treated as such, with good results. The damage caused by the military rifle bullet before it yaws (Figures 1, 4-6) cannot be differentiated from that caused by a handgun bullet even by the most expert.[25,41,58,59]

It is possible for a bullet wound to be punctate at its entrance and exit, and yet have caused serious muscle disruption deep in the central part of the extremity. There should be no problem, however, in separating these wounds (which might well need to be opened wide) from those with minimal disruption. Any significant buried tissue disruption in the human extremity should be easily diagnosed by physical examination and roentgenographic studies.

Modern wound ballistics is a paradox. Its fundamentals are strongly supported by the laws of physics, well illustrated, and clarified by current bullet-testing techniques and verified by centuries of observations made on battlefields. Yet its literature remains a minefield of misconceptions. Objective data explaining the basis of wound ballistics aid the physician in understanding injury potential. Wounds result when penetrating projectiles crush tissue, displace it, or both. Projectile mass, velocity, shape, and construction, as well as the characteristics and anatomic constraints of the tissue penetrated, determine the amount, type, and location of tissue disruption. No matter how expert one might be in understanding wound ballistics, understanding the medical consequences of bullet wounds is often challenging. Unknown and unexpected variables, such as contact wounds (where powder gases can add greatly to the tissue disruption) and a bullet passing through an intermediate target before impact, can change the morphology of a wound from a given weapon. The basic rule for every health care provider to remember in caring for gunshot victims is to evaluate objectively the location, extent, and type of tissue disruption and base treatment on these findings. Dr Douglas Lindsey puts it best in his advice: "Treat the wound and not the weapon."[7]

REFERENCES

1. Rich NM, Johnson EV, Dimond FC Jr: Wounding power of missiles used in the Republic of Vietnam. *JAMA* 1967;199:157-161, 168.

2. Dimond FC Jr, Rich NM: M-16 rifle wounds in Vietnam. *J Trauma* 1967;7:619-625.

3. Parks WH: Political-legal factors in small arms research and development. *Wound Ballistics Rev* 1992;1:16-17.

4. Rybeck B: Missile wounding and hemodynamic effects of energy absorption. *Acta Chir Scand* 1974;450(suppl):5-32.

GUNSHOT WOUNDS
*Fackler*

5. Trunkey D: Affidavit in opposition to plaintiffs' motion for preliminary injunction. Sworn on 4 September 1990. No. 9008-04628, Oregon State Shooting Assn., et al., Plaintiffs, v. Multnomah County, et al., Defendants. Circuit Court of Oregon, Multnomah County.

6. Whelan TJ Jr: Missile-caused wounds, in *Emergency War Surgery: NATO Handbook*, US revision 1. Washington DC; US Government Printing Office, 1975:9-17.

7. Bowen TE: Missile-caused wounds, in *Emergency War Surgery: NATO Handbook*, US revision 2. Washington DC: US Government Printing Office, 1988:13-34.

8. War surgery, in *Proceedings of the Commander in Chief Pacific Fifth Conference on War Surgery*. Tokyo, 1971:33.

9. King KF: Orthopaedic aspects of war wounds in South Vietnam. *J Bone Joint Surg* 1969;51B:112-117.

10. Fackler ML, Malinowski JA, Hoxie SW, et al: Wounding effects of the AK-47 rifle used by Patrick Purdy in the Stockton, California, schoolyard shooting of January 17, 1989. *Am J Forens Med Pathol* 1990;11:185-189.

11. Davis JH, Drucker WR, Foster RS, et al: *Clinical Surgery*. St Louis: Mosby, 1987.

12. Dufour D, Kroman Jensen S, Owen-Smith M, et al: *Surgery for Victims of War*. Geneva: International Committee of the Red Cross, 1988.

13. Owen-Smith MS: *High Velocity Missile Wounds*. London: Edward Arnold Limited, 1981:21-32.

14. Ochsner MG, Jaffin JH: Complications of wounding agents, in Mattox KL (ed): *Complications of Trauma*. New York: Churchill Livingstone, 1993:267.

15. Swan KG, Swan RC: *Gunshot Wounds: Pathophysiology and Management*, ed 2. Chicago: Year Book, 1989:9.

16. Sheehy SB, Jimmerson CL: *Manual of Clinical Trauma*, ed 2. St Louis: Mosby, 1994:25.

17. Sedwitz MM, Shackford SR: Vascular trauma, in Cuschieri A, Giles GR, Moossa AR (eds): *Essential Surgical Practice*, ed 2. London: Wright, 1988:305.

18. MacCormack W: Some points of interest in connexion with the surgery of war. *Lancet* 1895;2:290-292.

19. Longmore T: *Gunshot Injuries*, ed 2. London: Longmans & Green, 1895:157.

20. Stevenson WF: *Wounds in War*. London: Longmans, Green & Company, 1897:107.

21. Keith A, Rigby HM: Modern military bullets: A study of their destructive effects. *Lancet* 1899;2:1499-1507.

22. Fackler ML, Malinowski JA. The wound profile: A visual method for quantifying gunshot wound components. *J Trauma* 1985;25:522-529.

23. Fackler ML: The wound profile and the human body: Damage pattern correlation. *Wound Ballistics Rev* 1994;1:12-19.

24. Greenwood C: The political factors, in Warner K (ed): *Gun Digest*, ed 34. Chicago: Follett, 1980:161-168.

25. Fackler ML: Wounding patterns of military rifle bullets. *Int Def Rev* 1989;22:59-64.

26. Harvey EN, Korr IM, Oster G, et al: Secondary damage in wounding due to pressure changes accompanying the passage of high velocity missiles. *Surgery* 1947;21:218-239.

27. Newton IS: *The Motion of Bodies*, Cajori revision of the Motte 1729 translation. Berkeley: University of California Press, 1934:13.

28. Harvey EN, McMillen JH, Butler EG, et al: Mechanism of wounding, in Coates JB Jr, Beyer JC (eds): *Wound Ballistics*. Washington DC: US Government Printing Office, 1962.

29. Fackler ML, Surinchak JS, Malinowski JA, et al: Wounding potential of the Russian AK-74 assault rifle. *J Trauma* 1984;24:263-266.

30. Mendelson JA, Glover JL: Sphere and shell fragment wounds of soft tissues: Experimental study. *J Trauma* 1967;7:889-914.

31. Fackler ML, Breteau JPL, Courbil LJ, et al: Open wound drainage versus wound excision in treating the modern assault rifle wound. *Surgery* 1989;105:576-584.

32. Suneson A, Hansson HA, Seeman T: Peripheral high-energy missile hits cause pressure changes and damage to the nervous system: Experimental studies on pigs. *J Trauma* 1987;27:782-789.

33. Suneson A, Hansson HA, Seeman T: Central and peripheral nervous damage following high-energy missile wounds in the thigh. *J Trauma* 1988;28(suppl 1):S197-S203.

34. Suneson A, Hansson HA, Lycke E, et al: Pressure wave injuries to rat dorsal root ganglion cells in culture caused by high-energy missiles. *J Trauma* 1989;29:10-18.

35. Suneson A, Hansson HA, Seeman T: Pressure wave injuries to the nervous system caused by high-energy missile extremity impact. I. Local and distant effects on the peripheral nervous system: A light and electron microscopic study on pigs. *J Trauma* 1990;30:281-294.

36. Suneson A, Hansson HA, Kjellstrom BT, et al: Pressure waves caused by high-energy missiles impair respiration of cultured dorsal root ganglion cells. *J Trauma* 1990;30:484-488.

37. Fackler ML, Breteau JPL, Sendowski ICP, et al: Perforating wounds of the abdomen by the modern assault rifle. Chungking, China: Proceedings of the Sixth International Wound Ballistics Symposium. *J Trauma (China)* 1990;6(suppl):192-199.

38. Ordog GJ, Balasubramanian S, Wasserberger J, et al: Extremity gunshot wounds. I. Identification and treatment of patients at high risk of vascular injury. *J Trauma* 1994;36:358-368.

39. Kahnoski RJ, Lingemen JE, Coury TA, et al: Combined percutaneous and extracorporeal shock wave lithotripsy for staghorn calculi: An alternative to anatrophic nephrolithotomy. *J Urol* 1986;135:679-681.

40. Kuwahara M, Kambe K, Kurosu S, et al: Extracorporeal stone disintegration using chemical shock waves. *J Urol* 1986;135:814-817.

41. Fackler ML: Wound ballistics: A review of common misconceptions. *JAMA* 1988;259:2730-2736.

42. Almskog B, Risberg B, Teger-Nilsson AC, et al: Early local and systemic fibrinolytic response to high energy missile trauma. *Acta Chir Scand* 1982;suppl 508:327-336.

43. Saunders CE, Ho MT: *Current Emergency Diagnosis and Treatment*, ed 4. Norwalk, Connecticut: Appleton-Lange, 1992:280.

44. LeDran H: Traité ou reflexions tirées de la pratique sur les playes d'armes a feu. Paris: Osmont, 1737:54.

45. Nealon TF Jr, Grossi CE: Principles of operative surgery: General considerations, in Nora PF (ed): *Operative Surgery*, ed 2. New York; Lea & Febiger, 1973:5-6.

46. Kumar V, Cotran RS, Robbins SL: *Basic Pathology*, ed 5. Philadelphia: Saunders, 1992:47-59.

47. LaGarde LA. *Gunshot Injuries*, ed 2. New York: William Wood & Company, 1916:132.

48. Thoresby FP, Darlow HM: The mechanisms of primary infection of bullet wounds. *Br J Surg* 1967;54:359-361.

49. Reyer C: Antiseptische und offene Wundbehandlung. *Arch Klin Chir* 1876;19:712-727.

50. Franz C: *Lehrbuch der Kriegschirurgie*, ed 3. Berlin: Springer, 1942:63.

51. Altemeier WA, Furste WL, Culbertson WR: Chemotherapy in gas gangrene. *Arch Surg* 1947;55:668-680.

52. Owen-Smith MS, Matheson JM: Successful prophylaxis of gas gangrene of the high-velocity missile wound in sheep. *Br J Surg* 1968;55:36-39.

53. Porritt AE: *Penicillin Therapy and Control in 21 Army Group*. British Army of the Rhine, May 1945.

54. Scully RE, Artz CP, Sako Y: The criteria for determining the viability of muscle in war wounds, in Howard JM (ed): *Battle Casualties in Korea: Studies of the Surgical Research Team. Vol III. The Battle Wound: Clinical Experiences*. Washington DC: Walter Reed Army Medical Center, 1955:181-187.

55. Zajtchuk R (ed): *Textbook of Military Medicine, Part I: Warfare, Weaponry, and the Casualty*, vol 5, *Conventional Warfare: Ballistic, Blast and Burn Injuries*. Washington DC: US Government Printing Office, 1990.

56. Fackler ML, Lindsey D: Wounds and injuries of the soft tissues, in Bowen TE: *Emergency War Surgery: NATO Handbook*. Washington DC: US Government Printing Office, 1988.

57. *Shotgun News*: Issue 10, vol 50, April 1996.

58. Fackler ML: Ballistic injury. *Ann Emerg Med* 1986;15:1451-1455.

59. Fackler ML: Physics of penetrating trauma, in McSwain NE Jr, Kerstein MD (eds): *Evaluation and Management of Trauma*. Norwalk, Connecticut: Appleton-Century-Crofts, 1987.

Reprint no. 47/1/74504
Address for reprints:
Martin L Fackler, MD
Rural Route 4, Box 264
Hawthorne, Florida 32640
352-481-5661

# EXHIBIT 68

# Firearms Chimera: The Counter Productive Campaign to Ban the AR-15 Rifle

## Dennis P. Chapman[*]

Introduction.......................................................................................... 191
I.      The Function of the Right to Keep and Bear Arms in American Society ................................................................ 194
II.     The Moving Goal Posts of the Gun Control Movement 199
III.    Firearms Evolution and the Emergence of a Uniquely Military Firearms Capability............................................. 201
IV.     Misconstruing the AR-15 as a Military Weapon ............ 204
V.      Violent Crime and Combat are not Equivalent Phenomena ................................................................................................. 208
VI.     Is the AR-15 Uniquely Suited to Killing Large Number of People? .................................................................................. 208
VII.    "High Capacity" Magazines: Superfluous for Criminals, Essential for Self Defense. ................................................. 213
VIII.   AR-15 Rifles are Commonly Used for Lawful Purposes 216
IX.     A Final Obstacle: The Potential for Abuse .................... 221
Conclusion .......................................................................................... 223

## Introduction

     I have always been a collector. During my childhood, I collected comic books, butterflies, coins, and stamps, with a few tentative forays into other areas as well. These interests faded over the course of military service and the other endeavors of adulthood, but my collecting impulse was merely dormant, not extinct, and has long since revived. Among its chief

---

     * Attorney, Virginia; Colonel (Retired), U.S. Army; BS, United States Military Academy; JD, Thomas M. Cooley Law School. Colonel Chapman served with the 10th Mountain Division during Operation *Restore Hope*, Somalia, and as head of a U.S. military advisory team with 3rd Brigade, 4th Division, Iraqi Army during Operation *Iraqi Freedom*.

Electronic copy available at: https://ssrn.com/abstract=3466567

objects now are old, arcane, or noteworthy books. Having settled into the practice of law after military retirement, a few obscure old law books have naturally found their way onto my shelves.

One such book is *The Revised Statutes of Michigan*, 1838. Among the enactments of the state's early legislative sessions was one providing that "[p]ersons going about armed with dirk, &c., [sic] may be required to find sureties of the peace,"[1] and that "[i]f any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing."[2] Another of my old volumes, the 1849 *Code of Virginia*, contains a similar provision.[3] These could be considered early versions of today's *red flag laws*—statutes enacted to facilitate the pre-emptive abridgment of a particular person's right to keep and bear arms upon the complaint of another private citizen. Like those today, these old laws required, expressly or implicitly, a reasonable basis to fear that the person sought to be restrained might do harm, and that said person be allowed to contest the restraint upon their right to own or bear arms.[4] Somewhat more restrictive was the 1852 *Code of Alabama*, which provided:

> Any one who carries concealed about his person a pistol, or any other description of fire arms, not being threatened with, or having good reason to apprehend an attack, or travelling, or setting out on a journey, must, on conviction, be fined not less than fifty nor more than three hundred dollars.[5]

Yet, even Alabama's more restrictive code permitted unrestricted open carry and allowed concealed carry when travelling or when reasonably in fear of attack.[6] Thus, there can be no doubt that at the time they enacted these laws, the citizens of these states took it as given that the right to keep and bear arms was a private right individually vested in every peaceable citizen and that the view taken by some of their grandchildren (that the right

---

1. THE REVISED STATUTES OF THE STATE OF MICHIGAN 707 (E. B. Harrington & E. J. Roberts eds., Detroit, John S. Bagg, Printer to the State, 1838).
2. *Id.* at 657–58.
3. THE CODE OF VIRGINIA 756 (Richmond, William F. Ritchie, Public Printer, 1849).
4. *Id.*; THE REVISED STATUTES OF THE STATE OF MICHIGAN, *supra* note 1.
5. THE CODE OF ALABAMA § 3274 (John J. Ormond et al eds., Montgomery, Brittain and De Wolf, State Printers, 1852).
6. *Id.* § 3274–75.

Electronic copy available at: https://ssrn.com/abstract=3466567

to keep and bear arms is a collective right only, vested in such militia as the legislature might deign to organize, with private ownership of arms for other purposes allowed at sufferance only) would have been heresy. This is confirmed by the states' constitutional provisions in force when they enacted the laws mentioned above. The Constitution of Alabama provided that "[e]very citizen has the right to bear arms in defence [sic] of himself and the State."[7] Michigan's Constitution contained a similar provision.[8] The Virginia Bill of Rights, adopted June 12th, 1776, and incorporated by reference into the Virginia Constitution in force at the time of the above-cited enactments, provided "[t]hat a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence [sic] of a free state."[9] As Michigan Chief Justice Thomas Cooley explained:

> [I]f the right [to keep and bear arms] were limited to those enrolled [in the militia], the purpose of this guaranty might be defeated altogether by the action or neglect to act of the government it was meant to hold in check. The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose. But this enables the government to have a well-regulated militia; for to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.[10]

Yet these hardy and independent citizens, jealous of their liberties, saw no inconsistency between an individual right to keep and bear arms and the imposition of a limited abridgment of that right in specific cases where a person posed a credible threat of a breach of the peace.[11]

The revival of such laws is one proposal put forward to cope with the outrageous mass public shootings that beset us today. On its face, there would seem to be merit to the idea: it emerges in the aftermath of many such shootings where family, friends, or the authorities had good cause for

---

7.   ALA. CONST. of 1819, art. I, § 23.
8.   MICH. CONST. of 1835, art. I, § 13.
9.   VA. CONST., art. I, §13; VA. CONST. of 1830, art. I.
10.  THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (Boston, Little, Brown, and Co. 1880).
11.  *See* THE REVISED STATUTES OF THE STATE OF MICHIGAN, *supra* note 1, at 657–58; *see also* COOLEY, *supra* note 10, at 271.

Electronic copy available at: https://ssrn.com/abstract=3466567

concern about the shooter beforehand, but failed to act.[12] A carefully drafted statute, with an appropriate standard of proof, and fair, reasonable, and prompt due process protections for the person purported to be a threat, might have prevented some attacks. However, many American gun owners vigorously resist such proposals, attracting the criticism that they oppose any firearms restrictions at all, including gun control advocates' own supposedly "common sense gun safety" proposals.

Gun control advocates take this opposition as proof of pro-Second Amendment advocates being in the thrall of the "gun lobby." This misses the mark, however, for as David Hardy has shown, gun owners have ample reason to be skeptical of gun control advocates' proposals.[13] This is unfortunate, for the natural impulse of gun rights advocates ought to be to support such laws: As a group, gun owners tend to be conservative, to value law and order, to favor tough-on-crime policies, to be strong supporters of law enforcement, and at least one researcher has found that they also tend to be relatively non-violent.[14] This paper examines one source of this inconsistency: the argument over whether to ban the AR-15 rifle and similar firearms and the impact of that proposal on the overall gun violence debate.

## I. THE FUNCTION OF THE RIGHT TO KEEP AND BEAR ARMS IN AMERICAN SOCIETY

The American tradition of arms and the private right to keep and bear arms, which is one of its political manifestations, is complex and multifaceted. It encompasses a wide range of functions. These include practical personal applications, such as subsistence, sport, and self-defense; collective applications such as defense of the community and resistance to tyranny; and potent political, cultural, historical, and mythological functions. In the American political tradition, private ownership of arms finds its highest and most fundamental function in serving as a badge of sovereignty. According to Max Weber, the "state is a human community that (successfully) claims the monopoly of the legitimate use of physical force within a given territory."[15] In many political systems, the embodiment

---

12. *Cf.* Will Garbe et al., *Dayton Shooting: Oregon District gunman left decade of red flags*, Dayton Daily News (Aug. 9, 2019) [https://perma.cc/9FZZ-WRPD] (stating family and friends of a mass shooter had previous red flag's regarding shooter's behavior and mental state).

13. David A. Hardy, *Gun Owners, Gun Legislation, and Compromise*, 31 T.M. COOLEY L. REV. 33, 35 (2014).

14. *See* John R. Lott & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. LEGAL STUD. 1, 2–3 (1997).

15. Max Weber, Lecture: Politics as a Vocation, 1 (1918) (transcript available at   http://anthropos-lab.net/wp/wp-content/uploads/2011/12/Weber-Politics-as-a-Vocation.pdf [https://perma.cc/5VAF-9Z5T]) (emphasis omitted).

Electronic copy available at: https://ssrn.com/abstract=3466567

of the state and the locus of sovereignty is a political party, a monarch or autocrat, or a political institution, such as parliament or the army.[16] However, under the American political creed as expressed in its founding documents, the state is the mere agent of the People, governing at their sufferance, with the People themselves remaining the locus of sovereignty.[17] As the collective sovereign, they retain for themselves a private right to maintain the means of physical force, separate and apart from that entrusted to the state, as manifested in the Constitutional right to keep and bear arms.[18]

      This is evident in the attitudes toward the bearing of arms by slaves during the antebellum period and by the Freedmen following the Civil War.[19] Among the most regrettable relics of the Antebellum period is Chief Justice Roger B. Taney's infamous opinion in *Dred Scott v. Sandford*, arguably the most odious holding ever emitted by the courts of any Common Law country. One of *Dred Scott's* principal holdings was that neither Congress nor the states had the power to naturalize African slaves or their descendants.[20] Among the litany of Taney's objections to such naturalization was that conferring citizenship upon slaves or their descendants would give them the right, among other things, "to keep and

---

16. *See id.* at 1–2 (charismatic or personal rule), and 8 (parliamentary supremacy). For an example of the Army as the locus of sovereignty, consider the Revolutionary Army of Mexico from 1910 to 1940; *see* Edwin Lieuwen, *Mexican Militarism: The Political Rise and Fall of the Revolutionary Army* (The University of New Mexico Press, 1968), page xii.

17. The U.S. Declaration of Independence provides, "That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, — That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect [sic] their Safety and Happiness." The U.S. Constitution provides, in the Preamble, that "**We the People** of the United States, in Order to form a more perfect Union, establish justice, insure domestic Tranquility, provide for the common defence [sic], promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, **do ordain and establish this Constitution for the United States of America**" (emphasis added). *See also* ALA. CONST. of 1819, *supra* note 7, at art. I, §2, "All political power is inherent in the people, and all free governments are founded on their authority"; MICH. CONST. of 1835, *supra* note 8, at art. 1, §1, "[a]ll political power is inherent in the people;" THE CODE OF VIRGINIA, *supra* note 3, at 32, "all power is vested in, and consequently derived from, the people; that Magistrates are their trustees and servants, and at all times amenable to them."

18. *See* U.S. CONST. amend. II.

19. Scott v. Sandford, 60 U.S. 393, 417 (1857), *superseded by constitutional amendment,* U.S. CONST. amend. XIV; David B. Kopel, THE SECOND AMENDMENT IN THE NINETEENTH CENTURY, 1998 BYU L. REV. 1359, 1452–54 (1998).

20. *Scott*, 60 U.S. at 420.

Electronic copy available at: https://ssrn.com/abstract=3466567

carry arms wherever they went."[21] By contrast, after the Civil War, the Republican-controlled Congress adopted the opposite policy during Reconstruction.[22] Congress enacted measures, such as the Freedmen's Bureau Act of 1866, which provided that "the right to … have full and equal benefit of all laws and proceedings concerning personal liberty, [and] personal security … including the Constitutional right be bear arms, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color or previous condition of slavery."[23] Furthermore, "[t]he framers intended and opponents recognized the Fourteenth Amendment to guarantee the right to keep and bear arms **as a right and attribute of citizenship** that no State government could infringe."[24] They also intended that the Fourteenth Amendment would extend these rights to the Freedmen. As Stephen Halbrook argued:

> The arms that the Fourteenth Amendment's framers believed to be constitutionally protected included the latest firearms of all kinds, from military muskets (which were fitted with bayonets) and repeating rifles to shotguns, pistols, and revolvers. The right of the people to keep arms meant the right of an individual to possess arms in the home and elsewhere; the right to bear arms meant to carry arms on one's person. The right to have arms implied the right to use them for protection of one's life, family, and home against criminals and terrorist groups of all kinds, whether attacking Klansmen or lawless law enforcement. Far from being restricted to official militia activity, the right to keep and bear arms could be exercised by persons against the state's official militia when it plundered and killed the innocent.[25]

While the importance of each has waxed and waned over time according to the conditions prevailing in the country at any given moment, each facet of the private right to keep and bear arms has shaped American

---

21. *Id.* at 417.

22. *See Congress Profiles: 39th Congress (1865–1867)*, HISTORY, ART & ARCHIVES: UNITED STATES HOUSE OF REPRESENTATIVES, https://history.house.gov/Congressional-Overview/Profiles/39th/ [https://perma.cc/L6HR-57YW]; STEPHEN P. HALBROOK, FREEDMAN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876, at 40–41 (1998).

23. HALBROOK, *supra* note 22, at 40–41 (emphasis omitted).

24. *Id.* at 42 (emphasis added).

25. *Id.* at 43.

Electronic copy available at: https://ssrn.com/abstract=3466567

culture and history in its turn and continues to do so to a greater or lesser degree today.[26]

The use of ranging weapons for subsistence hunting dates back tens or even hundreds of thousands of years.[27] Nonetheless, it seems unlikely

---

26. These functions do not merely fade in importance over time; they sometimes wax more important. See, for example, Walter G. Libber, *Every Citizen A Rifleman*, NATIONAL SERVICE WITH THE INTERNATIONAL MILITARY DIGEST, Apr. 1919, at 207-09 (deploring the fact that while "[t]he American is traditionally a rifleman," with the growth of our population, "centered in the towns," "our skill and confidence in the use of firearms gradually decreased," even to the point that it became "a deplorable fact that shortly before signing the armistice [ending WWI] during the operations of the Argonne American soldiers were sent into the front lines who had never fired a rifle," and that "it is a well-known fact that our urban population is cut off from any opportunity of learning the use of the rifle…"); compare this to the situation one hundred years later, where firearms use has dramatically rebounded to the point that "[m]ore people participate in target shooting than play tennis, soccer or baseball," with shooting sports generating over $16 billion in retail sales annually (National Sports Shooting Foundation, *Target Shooting in America, A Force for Conservation*, 2019), and National Public Radio reporting that, notwithstanding high profile incidents of gun violence, shooting ranges in the United States are booming, with the National Sports Shooting Foundation listing "hundreds and hundreds of shooting ranges in the United States, including more than 1,800 that have special programs for women and young people. Linton Weeks, *Are Shooting Ranges The New Bowling Alleys?* NPR, https://www.npr.org/2013/01/31/170391799/are-shooting-ranges-the-new-bowling-alleys, retrieved Sept. 5th, 2020. Consider also the changing face of competition shooting in the United States, which was driven largely by state militia organizations in the 19th Century (see generally James B. Tefethen and James E. Serven, *Americans and Their Guns,* Stackpole Books, 1967), as compared with the contemporary sports shooting scene, in which competition shooting has expanded considerably to include large numbers of civilian shooters of both sexes (see *Frontsight*, the magazine of the USPSA, cited elsewhere in this work), also discussed at Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles*, cited elsewhere in this paper. Furthermore, even when the role of a particular shooting application does fade in prominence, it rarely if ever fades to the point of irrelevance. Consider, for example, hunting: In *Sport Hunting and Conservation, 1880 – 1920*, ENVIRONMENTAL REVIEW: ER Vol. 12, No. 1 (Spring, 1988), at 51-60, Thomas R. Dunlap discusses the transition from "pot hunting to sport hunting" (page 53), and the subsequent decline in hunting popularity in recent generations; but notwithstanding said change, hunting remains a major component of American culture. Consider that there were nearly 11.5 million hunters in the United States as of 2016, a number exceeding the populations of 43 states, and that these hunters spent $27.1 billion pursuing their sport that year (National Sports Shooting Foundation, *Hunting in America: An Economic Force for Conservation*, 2018). For discussion of how the AR-15 has displaced earlier firearms platforms in pursuit of these activities, see Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles*; the ATF's Ronald Turk; and AR15Hunter.com, all cited elsewhere in this paper.

Electronic copy available at: https://ssrn.com/abstract=3466567

that many Western Europeans were still dependent upon subsistence hunting by the time firearms technology emerged and took hold with sedentism, herding, and agriculture having emerged in the Fertile Crescent 12,000 years ago and spread across Europe from 8,800 to 5,500 years ago, millennia before the invention of firearms.[28]

However, the very different conditions prevalent in North America made the earliest English colonists here heavily dependent upon firearms for their survival, with the Native American tribes becoming dependent upon the same technology themselves in due course.[29] Thus, the Jäger rifles, made by German gunsmiths as the accoutrement of European sportsmen, became the Pennsylvania or Kentucky long rifle—a tool of practical necessity for daily life—when those gunsmiths migrated to the New World.[30] Economic and technical developments have since rendered subsistence hunting obsolete.[31] As hunting author, Norman Strung, once noted: "Since man first learned to use weapons, he has hunted to obtain food. [But] [e]xcept in the remotest corners of the world, hunting is no longer necessary for survival."[32]

Privately-owned firearms were decisively important to the collective defense of the community in North America in a way never contemplated in Europe.[33] In North America, "defense of country and laws [would] be secured through the Militia—civilians primarily, soldiers on occasion" who "when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."[34] However, the growth of the Army National Guard has largely displaced the individual, armed citizen in the role of collective defense of the local community.[35]

---

27. Corey A. O'Driscoll & Jessica C. Thompson, *The Origins and Early Elaboration of Projectile Technology*, EVOLUTIONARY ANTHROPOLOGY, Jan./Feb. 2018 at 30, 31, 35, 41.

28. *See* Solange Rigaud, *Ornaments Reveal Resistance of North European Cultures to the Spread of Farming*, Plos One (Apr. 8th, 2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0121166 (last visited Sept. 5th, 2020).

29. DAVID HARSANYI, FIRST FREEDOM: A RIDE THROUGH AMERICA'S ENDURING HISTORY WITH THE GUN 24–25, 49 (1st Threshold ed. Hardcover Oct. 2018).

30. *Cf. id.* at 26–30 (discussing the evolution of the Kentucky rifle).

31. *See* NORMAN STRUNG, DEER HUNTING: TACTICS AND GUNS FOR HUNTING ALL NORTH AMERICAN DEER 7 (J.B. Lippincott Co. 1973).

32. *Id.*

33. *See* HARSANYI, *supra* note 29, at 20.

34. United States v. Miller, 307 U.S. 174, 179 (1939).

35. *See generally* Christopher R. Brown, *Been There, Doing That in a Title 32 Status: The National Guard Now Authorized to Perform Its 400-Year Old Domestic Mission in Title 32 Status*, ARMY LAW., May 2008, at 23, 23, 26, 35 (discussing how the National Guard's role has changed).

Electronic copy available at: https://ssrn.com/abstract=3466567

Although the foregoing applications of privately owned arms are no longer a practical necessity for daily survival, they are still valuable and important. As Strung has observed: "[A] heritage stretching for eons can't be denied by a paltry few centuries of 'civilization.'"[36] Additionally, the nearly miraculous growth and development of the United States since achieving independence does not rule out the revival of the day to day importance of these shooting applications in the event of future emergency.[37] Nonetheless, the applications of privately-owned firearms that are of greatest practical importance to Americans today are sporting purposes and, most importantly, personal self-defense against violent attack.[38]

## II.  THE MOVING GOAL POSTS OF THE GUN CONTROL MOVEMENT

The stated aim of red flag laws is to get guns out of the hands of the imminently violent, while leaving them in the hands of peaceable citizens. Notwithstanding this, many gun owners vigorously oppose red flag laws. Sadly, this opposition is neither unreasonable nor, regrettably, unjustified. For gun control advocates have given American gun owners ample reason to view all of their proposals, no matter how benign they may seem, as a mere Trojan horse, offered to gain a foothold from which to enact ever more draconian gun control measures.[39] From the perspective of reducing gun violence, today's American-gun-control lobby agenda is counterproductive in the extreme, being almost perfectly calibrated to generate the implacable opposition of American gun owners to any proposals that might be put forward–a constituency at least some of whose support will be essential to pass any reform.[40]

---

36.  STRUNG, *supra* note 31, at 7.

37.  Having served in the relief effort in Homestead, Florida following devastation of Hurricane Andrew, and having observed the dystopian societal collapse of Somalia triggered by that country's suicidal civil war in the early 1990s via my service there during Operation Restore Hope in 1992 and 1993, I can attest from personal observation to the fragility of our civilized existence. For a visual depiction of the devastation caused by Hurricane Andrew, see THE BIG ONE: HURRICANE ANDREW (Andrews & McNeel, 1992). For a discussion of the savage brutality of the Somali civil war and the dystopian nightmare that followed it, see LIDWIEN KAPTEIJNS, CLAN CLEANSING: THE RUINOUS LEGACY OF 1991 (University of Pennsylvania Press, 2013); for accounts of the U.S. military involvement in Somalia, see Martin Stanton, *Somalia on $5.00 a Day: A Soldier's Story* (Presidio, 2001); and LAWRENCE E. CASPER, FALCON BRIGADE: COMBAT AND COMMAND IN SOMALIA AND HAITI (Lynne Rienner, 2001).

38.  GARY A. KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA 41–42 (Aldine De Gruyer 1991).

39.  Hardy, *supra* note 13, at 37–39, 42, 46.

40.  *Id.* at 39, 42, 45–46.

Electronic copy available at: https://ssrn.com/abstract=3466567

No single gun policy proposal has done more to discredit gun control advocates in the eyes of American gun owners than the obsession with banning the most popular rifle in the United States, the AR-15.[41] In their quest to ban the AR-15, gun control advocates have discredited themselves by candidly admitting that their true aim is not so much the elimination of that particular rifle, but the opening up of an aperture through which further, more extreme restrictions might be pursued.[42] As early as 1989, the Violence Policy Center noted that "assault weapons are quickly becoming the leading topic of America's gun control debate and will most likely remain the leading gun control issue for the near future. Such a shift will not only damage America's gun lobby, ***but strengthen the handgun restriction lobby***."[43] The *Washington Post* admitted in 1994 that "[t]he [crime] bill also includes a ban on assault weapons . . . but no one should have any illusions about what was accomplished. Assault weapons play a part in only a small percentage of crime. The provision is mainly symbolic*; its virtue will be if it turns out to be, as hoped, a stepping stone to broader gun control.*"[44] As criminologist Gary Kleck has noted,

---

41. Examples of this single minded focus on AR-15s and similar rifles in recent years abound: Popular horror writer Stephen King, an outspoken advocate for gun control, calls for the banning of "the sale of assault weapons such as the Bushmaster and the AR-15," while assuring us that he has no designs on our other guns: "Guys, gals, now hear this: no one wants to take away your hunting rifles. No one wants to take away your shotguns. No one wants to take away your revolvers, and no one wants to take away your automatic pistols, as long as said pistols hold no more than 10 rounds" (also note how he seems not recognize that the "Bushmaster" is not a separate category of firearm, but merely one brand under which the AR-15 platform is sold)  *See* Stephen King*, Stephen King: Why the US Must Introduce Limited Gun Controls*, THE GUARDIAN (Feb. 1, 2013, 8:27 AM), https://www.theguardian.com/books/2013/feb/01/stephen-king-pulled-book-gun-controls [https://perma.cc/E5ZP-9QUG]; When asked about  gun owners who feel that "a Biden Administration means they're going to come for my guns," former Vice President, Joe Biden, replied, "Bingo, you're right if you have an assault weapon." *David Harsanyi, Of Course Joe Biden Wants to Take Your Guns Away*, THE CORNER -- NAT'L REV. Online, Mar. 10th, 2020, https://www.national review.com/corner/joe-biden-second-amendment-of-course-he-wants-to-take-your-guns-away/  retrieved September 5th, 2020); and presidential candidate Beto O'Rourke declared that "hell, yes, we are going to take your AR-15, your AK-47" (Todd J. Gillman, *Beto 'Hell yes' O'Rourke's endorsement has Joe Biden fending off allegation that he's a gun-grabber*, The Dallas Morning News,March 10th, 2020, https://www.dallasnews.com/news/politics/2020/03/10/beto-hell-yes-orourkes-endorsement-has-joe-biden-fending-off-allegation-that-hes-a-gun-grabber/ (last visited Sept. 5th, 2020).

42. Editorial, *Hyping the Crime Bill*, WASH. POST., Sept. 15, 1994, at A16.

43. *Assault Weapons and Accessories in Americ*a, THE VIOLENCE POL'Y CTR. (1988), https://www.vpc.org/studies/awaconc.htm [https://perma.cc/8Q9A-FHWQ] (emphasis added).

44. *Hyping the Crime Bill*, *supra* note 42.

> Leaders of procontrol [sic] advocacy groups such as Handgun Control and the Coalition to Stop Gun Violence (previously the National Coalition to Ban Handguns) used to assure audiences that they were interested only in regulating handguns, so hunters and sport shooters who used rifles and shotguns had nothing to fear from them…. Yet, once "assault rifles" became a highly publicized issue, leaders of these groups immediately pushed for strict controls on semi-automatic rifles … This kind of policy shift undercuts their credibility regarding their ultimate intentions, and feeds the worst paranoia of anticontrol extremists. In Don Kates' words, this sort of "extremism poisons the well," making it all the harder to get people to seriously consider more reasonable alternatives. [45]

As Kleck further notes,

> [i]t would be unfair to generalize from such cases to all supporters of moderate controls [as] [u]ndoubtedly, many of those who insist they are not interested in further controls are sincere[;] [u]nfortunately, it is impossible for gun owners to know for sure which gun control supporters are sincere, how numerous they are, whether they will continue in the future to adhere to their commitment to limited controls, and whether they will dominate the gun control movement in the future. There are uncomfortable historical parallels between the gun control movement and the Temperance movement. The latter movement was originally directed toward regulating alcohol and encouraging, as its name suggested, moderation in drinking and reduction in alcoholism. Yet it eventually evolved into the national Prohibition movement, which completely banned the production and sale of alcohol and thereby criminalized millions of Americans (citation omitted). [46]

## III.  Firearms Evolution and the Emergence of a Uniquely Military Firearms Capability

In pursuit of banning the AR-15 "as a stepping stone to broader gun control," gun control advocates have bet heavily on their view that "[t]he weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons—anything

---

45.  Kleck, *supra* note 38, at 10.
46.  *Id.* at 10–11.

Electronic copy available at: https://ssrn.com/abstract=3466567

that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons."[47] However, they have not sat by and complacently waited for the AR-15's martial appearance to carry the day for them. They have embarked upon a vigorous, unflagging disinformation campaign to frighten the public into demanding that the AR-15 be banned. One rhetorical device frequently deployed is to characterize the AR-15 as a "weapon of war." Notwithstanding the AR-15's outward appearance, this characterization is groundless, resting in part upon the common misconception that "[m]ost firearms, no matter what their current uses, derive directly or indirectly from firearms originally designed for the military."[48] However, not only have developments in civilian and military firearms technology been interrelated throughout history, but important technological advancements have often been accepted in civilian firearms long before being accepted for military applications.[49] This tendency toward military skepticism of new developments in firearms technology, even manifested itself to a small degree with respect to Armalite's ground breaking design that would become the AR-15 and later the M16, is evident from the Army's 1966 marksmanship field manual, which sniffed that "the much-argued-for superiority of lightweight alloys, plastics, and glass compounds must be balanced against the yet-to-be-confirmed field observations of their wearing qualities and stress resistance."[50]

One noteworthy example of the lag in military acceptance of firearms technology developed for civilian use is the rifled barrel; gunsmiths in Germany were proficient in this technology as early as 1530,[51] and the first patent for such was issued as early as 1635.[52] Yet rifles were not widely accepted for military use for centuries after that. While rifles were successfully employed during the French and Indian War and the American Revolutionary War in North America,[53] the British were still relying on the smoothbore Brown Bess as their standard infantry arm at

---

47. *Assault Weapons and Accessories in America*, *supra* note 43.

48. KLECK, *supra* note 38, at 70.

49. *See generally* Dennis Chapman, Features and Lawful Common Uses of Semi-Automatic Rifles 88-91 (July 16, 2019) (unpublished ms.) (on file with SSRN), https://ssrn.com/abstract=3436512 [https://perma.cc/VS5V-RSWK].

50. DEP'T OF THE ARMY, FIELD MANUAL 23-71, RIFLE MARKSMANSHIP, 225 (December 1966).

51. *See* HARSANYI, *supra* note 29, at 29.

52. C.H.B PRIDHAM, SUPERIORITY OF FIRE: A SHORT HISTORY OF RIFLES AND MACHINE-GUNS 8 (Hutchinson's Sci. and Tech. Publications 1945).

53. *Id.* at 8–10.

Electronic copy available at: https://ssrn.com/abstract=3466567

Waterloo.[54] Only in the Crimean War in 1854 was the rifle first "generally used" as a standard infantry arm by Great Britain.[55]

The introduction of semi-automatic firearms in the civilian market substantially preceded their military adoption. A "gas-operated semi-automatic pistol" emerged as early as 1863.[56] "[T]he earlier [semi-]automatic rifles of the beginning of the modern type" were introduced by the mid-1890s,[57] decades before the U.S. adopted the M1 Garand, the first semi-automatic rifle adopted as a standard infantry arm.[58] Even the AR-15 itself, as David R. Hughes reports, owes its existence to civilian visionaries with civilian shooting applications in mind.[59] Though Eugene Stoner is famously credited with its invention, the AR-15 ultimately owes its space-age construction of aluminum, fiberglass, and polymers to avid hunter and firearms enthusiast Richard Boutelle, President of Fairchild Aircraft. Boutelle, among others, tasked Fairchild's Armalite Division with creating a line of high-end, lightweight sporting rifles made from the materials used in aircraft construction.[60] Only after the unexpected success of Armalite's AR-5 survival rifle did Armalite defer commercial work in favor of the military market.[61] Notwithstanding its distinctive appearance and unique aluminum, fiberglass, and plastic construction, the AR-15's most groundbreaking feature was, arguably, its ammunition–the intermediate .223 Remington and 5.56mm NATO rounds. Yet, even this feature was derived from a civilian antecedent.[62] It was based on the .222 Remington varmint cartridge developed in 1950 by Remington's Mike Walker.[63]

Only in the 20th century did automatic and selective fire technology–the first shoulder-fired weapons technology (with trivial exceptions) conceived solely for military applications–become firmly established. Selective fire technology gives the modern infantryman a capability not present in any civilian firearm: the option of firing either semi-automatically, that is, one round per pull of the trigger (a capability

---

54. *Id.* at 11.

55. JOHN A. ENGLISH & BRUCE I. GUDMUNDSSON, ON INFANTRY 12 (Praeger Publishers rev. ed. 1994); PRIDHAM, *supra* note 52, at 12.

56. Wilson, R.K., *Textbook of Automatic Pistols*, Small Arms Tech. Pub. Company, Plantersville, South Carolina, 1943; reprinted by Palladium Press for the Firearms Classics Library, 1999, p. 53.

57. MELVIN M. JOHNSON JR. & CHARLES T. HAVEN, AUTOMATIC ARMS: THEIR HISTORY, DEVELOPMENT AND USE 51 (William and Morrow Co. 1941).

58. *Id.* at 65–66.

59. DAVID R. HUGHES, THE HISTORY AND DEVELOPMENT OF THE M16 RIFLE AND ITS CARTRIDGE 254–55 (1990).

60. *Id.*

61. *Id.*

62. *Id.* at 23.

63. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

readily available in civilian firearms for well over a hundred years), or in automatic mode, firing multiple rounds with a single pull of the trigger.

Implicit in the characterization of the AR-15 as a "weapon of war" is the assumption that it bears certain features useful in combat, and that those features are also useful in crime.[64]  This, however, is faulty reasoning: "the logical problem with this position is that whatever technical attributes guns have that make them suitable for committing crimes necessarily make them useful in a variety of lawful applications."[65] Yet, the error is even greater than that. While capabilities that make a firearm useful in crime may also be useful in other shooting applications, the reverse is not true. This paper will demonstrate how applications useful in legitimate shooting activities are often, even usually, *irrelevant* in criminal applications.

## IV.  MISCONSTRUING THE AR-15 AS A MILITARY WEAPON

In *Kolbe v. Hogan*, the U.S. 4th Circuit Court of Appeals observed that "soldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations."[66] The court's assertion that semi-automatic fire may be more "accurate and lethal" than automatic fire is very dubious, especially as it regards lethality.[67] The court

---

64.  Christopher S. Koper, William D. Johnson, Jordan L. Nichols, Ambrozine Ayers & Natalie Mullins, *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources*, 95 J. OF URB. HEALTH 313, 313–14 (2018); Jeffrey A. Roth & Christopher S. Koper, *Impacts of the 1994 Assault Weapons Ban: 1994-96*, NAT'L INST. OF JUST. RES. IN BRIEF, Mar. 1999, at 2.

65.  KLECK, *supra* note 38, at 14.

66.  Kolbe v. Hogan, 849 F.3d 114, 125 (4th Cir. 2017).

67.  The Court's assertion that semi-automatic fire is more accurate and lethal than automatic fire cannot bear scrutiny, as demonstrated by the effect of fully automatic machine guns in battle. See, e.g., PRIDHAM, *supra* note 52, at 47., describing an attack by a company of 200 Japanese troops upon a Russian position defended by two Maxim machineguns during the Russo-Japanese War, in which "the Japanese firing line was literally swept away;" see also John Ellis, writing of the Battle of the Somme, that "As before, British tactics were based upon the infantry charge, and the German upon the deployment of large numbers of machine guns. The forward positions were almost entirely entrusted to the battle-hardened machine gunners, whilst the bulk of the ordinary infantry was held further back to counter-attack or mop up the few enemy who managed to get beyond the front line;" Ellis then quotes Lloyd George as observing that "[o]ur men advanced against the most terrible machine gun fire ever directed against troops … and fell by the thousands in every attack." JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN 141 (Johns Hopkins Univ. Press paperback ed. 1986).The fully automatic machinegun retains pride of place in the  infantry even today, thus refuting the Court's conclusion that automatic fire  is interchangeable with or even inferior to that of semi-automatic weapons:  "The machinegun is one of the most

Electronic copy available at: https://ssrn.com/abstract=3466567

does correctly note that semi-automatic fire is the most appropriate mode of fire for individual soldiers and police in many law enforcement and military scenarios. From this, the court leaps to the conclusion that, because semi-automatic firing capability has military value, it is therefore unprotected by the Second Amendment. The court misapprehends the situation; however, semi-automatic fire is useful in law enforcement and military situations because it is useful in *all* legitimate shooting applications. This is especially true about the AR-15, as well-stated by John Stokes in the left-leaning *Vox*:

> In the pre-AR-15 era, if you wanted a gun for shooting little groundhogs, a gun for shooting giant feral hogs, and a gun for home defense, you'd buy three different guns in three different calibers and configurations. With the AR platform, a person with absolutely no gunsmithing expertise can buy one gun and a bunch of accessories, and optimize that gun for the application at hand … So cops and civilians buy AR-15s because that one gun can be adapted to an infinite variety of sporting, hunting, and use-of-force scenarios by an amateur with a few simple tools … **Anyone who tells you that the AR-15 is bad for hunting and home defense has absolutely no idea what they're talking about because by definition an AR is a gun that can be exquisitely adapted for those niches and many others** … The AR-15's incredible flexibility, accuracy, and ease-of-use combine with its status as the most thoroughly tested and debugged firearm in military history to make it massively popular with shooters of all stripes, **from hunters to home defense buyers to competitors** to police.[68]

The same cannot be said about automatic fire; it exists for the purely military purpose of achieving fire superiority over an enemy force. Automatic and selective fire is ***the only significant uniquely military firearms feature***. Stokes observes that "[t]here is no conceivable

---

potent weapons in a rifle company's armory. It can support the rifleman with a heavy volume of close and continuous fire in both the attack and the defense" (Major Harlie R. Treat, *Machinegunners*, Infantry, Nov-Dec 1983, page 38); "The two M60 machine guns in the light infantry platoon provide a significant portion of the unit's firepower" (FM 7-70, *Light Infantry Platoon/Squad*, Headquarters, Dep't of the Army, September 1986, page 7-1 ); "The machine gun … is the platoon leader's means to decisively influence a combat situation" (I*d. at* 7-35); "Whatever technique is in the defense, machine guns are the heart of it" (*Id.* at 7-41).

68.  John Stokes, *Why millions of Americans – including me – own the AR-15*, VOX.COM, (June 20, 2016, 11:00 AM) https://www.vox.com/2016/6/20/11975850/ar-15-owner-orlando [https://perma.cc/T2G6-PHKF] (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3466567

circumstance in which a police officer — not even a SWAT team member — would need to mow down hordes of people."[69] However, this cannot be said about infantry combat. Combat is a truly distinctive shooting application, wherein combatants employ fire and movement to gain advantage over another force.[70] A key assumption in planning for infantry combat is that the opposing force will have the ability to *offer meaningful resistance*.[71] Overcoming such resistance is the purpose of automatic fire and selective fire capability. On the offense, automatic fire enables an attacker to direct such a high volume of fire at that enemy that he is *suppressed*—that is to say, the intensity of the attacker's fire materially degrades the defender's ability to return effective fire or to maneuver to counter the attack.[72] Individual riflemen in combat often engage the enemy in semi-automatic mode. However, that changes when they find themselves acting in a support by fire (SBF) role, suppressing an enemy position so that a maneuvering element can destroy it; as Conrad and Tinsley explain,

> The SBF element's focus is to gain fire superiority and cover the maneuver of the assaulting force as it gains a foothold onto an objective. Establishing the SBF is as critical to the deliberate attack as conducting the assault. Without the SBF, the assaulting element has to contend with an enemy that is presented with only one problem. When the assault element is covered by the SBF element, the enemy is now presented with a dilemma.[73]

In the military context, a "dilemma" is:

> a situation in which the enemy is presented with two or more equally bad alternatives . . . When presented with a dilemma, an enemy has two reactions. The first reaction is not knowing what to do as he attempts to decide between equally bad options. This effect is commonly termed "fixed."[74]

---

69.  *Id.*

70.  SFC Carter H. Conrad & SFC Johnny Tinsley, *The Art of Support by Fire*, 103 INFANTRY 2, Apr. - June 2014, at 28.

71.  Dennis P. Chapman, *Tactical Errors in the Dismounted Fight*, 113 ARMOR 20, 22 (July-Aug. 2004).

72.  *Id.* at 20–22; Dennis P. Chapman, *An Element of Strength: Reinvigorating Small-Unit Training*, 113 Armor 35, 36–37 (May-June 2004).

73.  Conrad & Tinsley, *supra* note 70, at 28.

74.  DEP'T OF THE ARMY, FIELD MANUAL 3-21.8 (FM 7-8), THE INFANTRY RIFLE PLATOON AND SQUAD 1-22 (28 Mar. 2007).

Electronic copy available at: https://ssrn.com/abstract=3466567

The sources quoted above are all from the 21st Century, but this concept is not a new one. As early as 1945, the staff of the Allied 15th Army Group, under Lieutenant General Mark Clark in Italy, described what happens when a military unit allows itself to be caught on the horns of such a dilemma:

> Troops that . . . permitted themselves to be pinned down were inevitably subjected to deadly mortar and artillery concentrations which very often caused excessive casualties . . . Our troops had a strong inclination, when fired upon, to dig in without returning the fire, inasmuch as they could see no suitable targets at which to fire. When they did return fire into the hostile area, the German fire either materially decreased or stopped. Some units quickly learned that the proper procedure to take, when fired upon, was to return fire promptly, deploy a force sufficient to overcome the resistance, and keep on going.[75]

Conversely, the defender uses automatic fire to attempt to break the attacker's momentum by confronting him with a curtain of interlocking fires so intense that he cannot continue his attack without excessive losses.[76] As the Canadian officer, historian, and military theorist, John A. English, explained:

> A commander has a moral responsibility to keep his men alive and [] no commander is ever justified in launching his troops to a direct attack on an enemy firmly in position. To do so under modern conditions would be to trigger, from even a dozen enemy armed with assault rifles, an intense fire of roughly 6,000 rounds a minute during the last few hundred yards.[77]

In infantry combat, "mow[ing] down lots of people" is wholly in order and calls for a uniquely military capability: automatic or selective fire.

---

75. G-3 SECTION HEADQUARTERS 15 ARMY GROUP. ITALY, A MILITARY ENCYCLOPEDIA BASED ON OPERATIONS IN THE ITALIAN CAMPAIGNS 169 (1943-1945).

76. Chapman, *supra* note 72, at 37.

77. ENGLISH & GUDMUNDSSON, *supra* note 55, at 222.

Electronic copy available at: https://ssrn.com/abstract=3466567

## V.  VIOLENT CRIME AND COMBAT ARE NOT EQUIVALENT PHENOMENA

In contrast to infantry combat, crime is an entirely different phenomenon wherein the assailant assumes that his victim *cannot* offer meaningful resistance. A criminal seeks out weak, isolated, vulnerable victims who pose little likelihood of resisting the attack.[78] Where the intended victim is able to place the attacker in an "initiative/armament deficit," thereby demonstrating that he *can* resist effectively, it is likely that the attacker will forgo that target, knowing that "there is probably someone a couple of blocks away who is unprepared and will make a far easier victim."[79]  Not only does this paradigm make automatic fire capability superfluous to a criminal, even a mass shooter, but it also renders all the firearms features that gun control advocates find so disturbing irrelevant in the criminal context. As Craig Douglas has noted, a criminal approaches his presumptively helpless target with two profound advantages. The first is "unequal initiative," in that he chooses the time, place, and manner of his attack so as to place his victim at maximum disadvantage. The second is "unproportional armament," bringing to bear some sort of weapon—often, but not always, a firearm—to multiply his strength vis-à-vis the victim and to compel compliance.[80] *Under these circumstances, the specific features or qualities of any particular firearm become irrelevant*. In the criminal attack scenario, any marginal improvement in the effectiveness of one firearm versus another is simply subsumed within the overwhelming imbalance of power in the attacker's favor created by his possession of nearly any type of firearm at all.

The converse, however, *does not follow*. Having been taken at a disadvantage, the victim requires more than mere parity with his attacker to survive. Instead, he or she requires superiority in some capacity to break the assailant's momentum and regain the initiative. The most efficacious means to accomplish this is a firearm superior in quality and effectiveness to the attacker's weapon.

## VI.  IS THE AR-15 UNIQUELY SUITED TO KILLING LARGE NUMBER OF PEOPLE?

Gun control advocates argue that the AR-15 is particularly well-suited to produce a high volume of fire and kill lots of people, making them ideal for mass shootings.[81] They typically ascribe this supposed excessive

---

78.  CRAIG DOUGLAS, THE CRIMINAL ASSAULT PARADIGM, IN STRAIGHT TALK ON ARMED DEFENSE 92, 94 (Massad Ayoob ed., 2017).

79.  *Id.* at 96.

80.  *Id.* at 92–104.

81.  *See,* e.g., Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018 4:20PM ET), https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-

Electronic copy available at: https://ssrn.com/abstract=3466567

lethality to pistol grips, hand-guards that encircle the barrel ("barrel shrouds"),[82] and so-called "high capacity" magazines,[83] all of which gun control advocates allege enable a shooter to "spray an area and kill large amounts of people," by stabilizing the weapon and protecting the shooter's hand from the heat generated by rapid firing.[84]

This claim does not withstand scrutiny. A comprehensive review of U.S. Army marksmanship doctrine from 1923 through 2012 demonstrates that neither pistol grips nor "barrel shroud" hand-guards are associated with spraying fire, from the hip, or otherwise.[85] "Barrel shroud" handguards are old technology. One of the earliest rifles equipped with them was the Short Magazine Lee-Enfield (S.M.L.E.), introduced around the turn of the 20th Century.[86] These rifles served British forces through both World Wars. The S.M.L.E. was equipped with such a hand-guard to protect the soldier's hand from the heat generated by rapid firing.[87] But this rather debunks the gun control advocates' claims than confirm them. The "rapid firing" of the S.M.L.E was only 15 rounds per minute, or one round every four seconds. This is a far cry from the fantastical rates of fire mistakenly attributed to the AR-15 by gun control advocates, as noted below.[88, 89] Furthermore, a 1975 Rock Island Arsenal study on the M16 rifle found that the barrel can reach temperatures high enough to cause injury at rather low rates of fire, even at some points along the barrel, after the first round fired.[90] Thus, contrary to

---

ar-15-became-mass-shooters-weapon-of-choice-107819/ [https://perma.cc/A36F-WLXQ].

82. The term "barrel shroud" does not appear in any U.S. Army firearms literature, nor the literature of the shooting sports community, so far as I am aware. It appears to be a phrase coined by legislators, regulators, or gun control activists, rather than by those who actually design and use firearms.

83. COUNCIL OF THE DIST. OF COLOMBIA COMM. ON PUBLIC SAFETY AND THE JUDICIARY, REP. ON B. 17-843, "FIREARMS REGISTRATION AMENDMENT ACT OF 2008" at 7 (2008).

84. *Id.*; Johnathan Lowy, et al., *Panel 2: Are Semiautomatic Rifles, aka "Assault Weapons," Protected by the Second Amendment?*, THE FEDERALIST SOC'Y, THE SECOND AMENDMENT IN THE NEW SUPREME COURT (Jan. 15, 2019), https://fedsoc.org/conferences/the-2nd-amendment-in-the-new-supreme-court?#agenda-item-panel-2-are-semiautomatic-rifles-aka-assault-weapons-protected-by-the-second-amendment.

85. *See* Chapman, *supra* note 49, at 34–68, for a more detailed account of the U.S. Army marksmanship doctrine as it relates to pistol grips and "barrel shrouds."

86. PRIDHAM, *supra* note 52, at 16–17.

87. *Id.* at 17.

88. *Id.* at 56–57, 67.

89. As a bolt action rifle, the S.M.L.E. can hardly be said to be capable of "spraying" fire anyway.

90. RONALD E. ELBE, EXTERNAL BARREL TEMPERATURE OF THE M16A1 RIFLE 15–21 (1975); J.C. Lawrence & J.P. Bull, *Thermal Conditions Which Cause*

Electronic copy available at: https://ssrn.com/abstract=3466567

the claims of gun control advocates, "barrel shrouds" are an appropriate safety feature in any legitimate shooting application, not just combat or mass shootings.

While United States Army doctrine has provided for quick-kill, hip-firing techniques for all the shoulder-fired arms adopted since World War I, there is no correlation between the existence of such techniques and the presence of pistol grips or "barrel shroud" hand-guards on the weapons.[91] For example, one of the United States Army's earliest shoulder fired automatic weapons was the selective fire M1918 Browning Automatic Rifle (BAR). It had neither a "barrel shroud" nor a pistol grip, but its training manual provided for "assault fire" from the hip.[92] The doctrine for the semi-automatic M1 Garand and M1 Carbine, as well as for the selective fire M14, all contained hip-firing techniques. Yet while all these rifles had "barrel shrouds," none of them had pistol grips in their standard configuration.[93] While the doctrine for both the Thompson and M3 submachine guns provided for hip firing and both had pistol grips, neither had a "barrel shroud."[94] Furthermore, even to the extent that military doctrine provided for hip firing techniques, these were niche techniques that received very little attention or training. In fact, the doctrine sometimes denigrated them. One doctrinal manual for the Thompson submachinegun allowed for firing "from the hip while marching," but dismissed it as a "relatively ineffective" technique that "should rarely be used."[95] The doctrine for the M3 "Grease Gun" allowed for hip firing, but cautioned that "the soldier must have a great deal of practice before he can do accurate shooting" in this manner.[96]

---

*Skin Burns*, 5 ENGINEERING IN MED. 61, 61 (1976); A. R. Moritz & F. C. Henriques, *Studies of Thermal Injury*, 1974 AM. J. OF PATHOLOGY 695, 711.

91.  War Dep't Training Regulation (TR) 150-30, Marksmanship, Automatic Rifle, at 23 (November 21, 1923).

92.  *Id.* at 23.

93.  DEP'T OF ARMY FIELD MANUAL 23-5, U.S. RIFLE CALIBER .30, M1, at 4 (May 1965); DEP'T OF ARMY FIELD MANUAL 23-5, U.S. RIFLE CALIBER .30, M1, at 106–110 (Sept. 1958); WAR DEP'T BASIC FIELD MANUAL, U.S. CARBINE, CALIBER .30, M1, at 2 (May 20, 1942); DEP'T OF ARMY FIELD MANUAL 23-7/DEP'T OF THE AIR FORCE MANUAL 50-4, CARBINE CALIBER .30 M1, M1A1, M2, AND M3, at 1–6 (Jan. 1952); DEP'T OF ARMY FIELD MANUAL 23-8, U.S. RIFLE 7.62-MM M14, at 11, 25 (Dec. 1959); DEP'T OF ARMY FIELD MANUAL 23-8, US M14 AND M14A1 RIFLES, at 5 and 133 (15 Apr. 1974).

94.  WAR DEP'T FIELD MANUAL 34-35, THOMPSON SUBMACHINE GUN, CALIBER .45, M19281A, WITH CHANGES 1, 2, 3, & 4, at 2 (31 December 1941); FM 23-41, SUBMACHINE GUNS CALIBER .45 M3 AND M3A1, at 5, 55 (July 1957) [hereinafter FM23-41].

95.  WAR DEP'T FIELD MANUAL 23-40, THOMPSON SUBMACHINE GUN, CALIBER .45, M19281A, WITH CHANGES 1, 2, 3, & 4, at 35 (31 Dec. 1941).

96.  FM 23-41, *supra* note 94, at 54.

Electronic copy available at: https://ssrn.com/abstract=3466567

Were the AR-15's distinctive pistol grip and hand-guards intended to facilitate "spraying fire" from the hip, one would expect U.S. military doctrine to have further emphasized such firing techniques with the introduction of the semi-automatic AR-15's selective-fire military analogue, the M16. Yet the opposite happened: while Army marksmanship doctrine retained them, it diluted the already limited importance of hip-firing techniques by incorporating quick fire techniques from the shoulder not long after the M16's introduction.[97] By 2012, the Army had effectively admitted to the obsolescence of hip-firing firing techniques by acknowledging the primacy of firing from the shoulder, noting that "[m]odern short-range combat (SRC) techniques emphasize carrying the rifle with the butt high, so the rifle sights can be brought into display as quickly as firing a hasty unaimed shot. In extremely dangerous moments, special reaction teams (SRTs) commonly advance with **weapons shouldered**."[98] The Marine Corps marksmanship manual does not include any reference to hip firing at all.[99]

The principal voices popularizing this myth of spraying fire from the hip are governmental authorities seeking to justify firearms restrictions,[100] gun control advocates, and the creators of pop culture fiction. Examples of the latter include 1967's *The St. Valentine's Day Massacre*, wherein Al Capone's "Tommy Gun" wielding henchmen mow down his

---

97. 50359 Army Training Text 23-71-1, Principles of Quick Kill 13 (12 May 1967); James W. Dees, George J. Magner & Michael R. McCluskey, Human Resources Research Organization Technical Report 71-4, at 15, An Experimental Review of Basic Combat Rifle Marksmanship: MARKSMAN, Phase I, at 15 (1971); Dep't of Army Field Manual 23-8, M14 and M14A1 Rifles, and Rifle Marksmanship, at 152 (15 April 1974); FM 23-9, M16A1 Rifle and Rifle Marksmanship, at 151-53  (June 1974); Dep't of Army Field Manual 23-9, M16A1 and M16A2 Rifle Marksmanship, at 4-12 (3 July 1989).

98. Dep't of Army Field Manual 3-22.9(FM 23-9), Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine, at 7-17 (April 2003) (C3 April 2005); Dep't of Army Field Manual 3-22.9, Rifle Marksmanship M16-/M4-Series Weapon, at 7-20 (August 2008) [hereinafter FM 3-22.9] (emphasis added).

99. US Marine Corps, MCRP 3-01A, Rifle Marksmanship (11 Oct. 2012).

100. Council of the D.C., Comm. on Pub. Safety and the Judiciary, Rep. on Bill 17-843, *Firearms Registration Amendment Act of 2008*, 7 (2008). "As stated in the above paragraph, assault weapons are military-style weapons made for offensive military use. They are designed with military features to allow rapid and accurate spray firing. They are not designed for sport, but to kill people quickly and efficiently. Assault weapons also have features such as pistol grips and the ability to accept a detachable magazine. **Pistol grips help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position**." *Id.* (emphasis added).

enemies,[101] and 1983's *Scarface*, where Al Pachino's Tony Montana cuts down his enemies with an M16 in the film's climactic scene.[102]

   This is not the only false claim about the capabilities of the AR-15 in circulation. After the Pulse Nightclub shooting, Congressman Alan Grayson claimed that the AR-15 could fire 700 rounds per minute.[103] Similarly, the 4th Circuit in *Kolby v. Hogan* absurdly claimed that there is little difference between automatic and semi-automatic fire.[104] Theoretically, the rate at which a semi-automatic weapon can fire is limited by the speed of its recoil cycle, but the rate at which a shooter can induce his weapon to expend ammunition is of little importance in itself.[105] As Johnson and Haven noted in 1941, what really matters is how fast one can fire *and still hit targets*.[106] As they observed, "[i]t is customary to consider rapid fire in terms of how many shots are fired in one minute. **This is unreal and very misleading**. The true criterion and measure of efficiency are expressed in terms of how many shots are necessary to fire the necessary number of effective shots."[107]

   Referring again to the semi-automatic AR-15's selective-fire military analogue, the M16, the maximum *effective* semi-automatic rate of fire is 45 rounds per minute and the sustained rate of fire of 12–15 rounds per minute.[108] Even if a shooter were able to replicate the fantastical rates of fire attributed to the semi-automatic AR-15 by Representative Grayson and others, his fire would be ineffective. Semi-automatic rifles have greater effective rates of fire than bolt action rifles, but they are still limited.[109] After conducting a study comparing the effective rates of fire for bolt action and semi-automatic rifles, Johnson and Haven found that firing a semi-automatic rifle at 10 rounds per 1.5 seconds produced *unaimed fire*.[110] This derives from the fundamental principles of marksmanship.[111] These principles include steady position, sight picture, breath control, and trigger squeeze.[112] A shooter attempting to replicate fully automatic fire with a

---

   101. THE ST. VALENTINE'S DAY MASSACRE (Twentieth Century Fox 1967).

   102. SCARFACE (Universal Pictures 1983).

   103. Douglas Ernst, *Alan Grayson claims AR-15s can fire '700 rounds in a minute' after Orlando attack*, THE WASHINGTON TIMES (Monday, June 13, 2016), https://www.washingtontimes.com/news/2016/jun/13/alan-grayson-claims-ar-15-rifles-can-fire-700-roun/ [https://perma.cc/Z7G2-NMH9].

   104. Kolbe v. Hogan, 849 F.3d 114, 125 (4th Cir. 2017).

   105. JOHNSON & HAVEN, *supra* note 57, at 189.

   106. *Id.*

   107. *Id.* (emphasis added).

   108. DEP'T OF ARMY FIELD MANUAL 3-22.9(FM 23-9), RIFLE MARKSMANSHIP M16A1, M16A2/3, M16A4, AND M4 CARBINE, at 2-1 (Apr. 2003) [hereinafter FM 3-22.9(FM23-9)].

   109. JOHNSON & HAVEN, *supra* note 57, at 189–90.

   110. *Id.* at 190.

   111. FM 3-22.9, *supra* note 98, at 4–16.

   112. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

semi-automatic rifle would, through the rapidity of his actions, fail to apply these principles correctly. Specifically, he or she would fail to properly apply the trigger squeeze fundamental, which requires careful, even depression of the trigger:[113]

> The most important single factor in marksmanship is trigger squeeze. Everything about your position and aim may be perfect, but, unless you squeeze the trigger correctly, your shot will not go where you have aimed … if you jerk the trigger, you lose control … jerking the trigger will disturb the sites. Even a slight movement will spoil an otherwise good shot.[114]

A shooter attempting to replicate automatic fire with a semi-automatic rifle would jerk the trigger, moving the rifle slightly off target, thereby spoiling his aim. A selective fire rifle, such as the M16 in automatic mode, continuously fires rounds as long as the trigger remains depressed.[115] This eliminates the jerking effect of rapid, repeated trigger pulls and minimizes errors in applying the other marksmanship techniques while firing on automatic.

## VII. "HIGH CAPACITY" MAGAZINES: SUPERFLUOUS FOR CRIMINALS, ESSENTIAL FOR SELF DEFENSE.

One feature that might seem at first blush to materially enhance the lethality of a semi-automatic firearm are so-called "high capacity" magazines. This is based on the assumption that a shooter equipped with such magazines can fire more rounds without reloading, and thereby inflict more casualties.[116] However, upon scrutiny this hypothesis fails. Former Indiana Sheriff Ken Campbell, in a 2013 video demonstration, compared the amount of time that it took both experienced and inexperienced shooters to expend the same amount of rounds using different combinations of magazines of varying capacities.[117] He also performed a demonstration

---

113. *Id.* at 4–23; DEP'T OF ARMY FIELD MANUAL 23-5, U.S. RIFLE CALIBER .30, M1, at 110 (Sept. 1958).

114. DEP'T OF ARMY FIELD MANUAL 23-7/DEP'T OF AIR FORCE MANUAL 50-4, CARBINE CALIBER .30 M1, M1A1, M2, AND M3, at 157 (Jan. 1952).

115. FM 3-22.9(FM23-9), *supra* note 108, at 4–8.

116. Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17(I) JUST. RESEARCH AND POL'Y 28, 44 (2016).

117. Billy Hallowell, *Sheriff Debunks Gun Magazine 'Fallacies' in This Viral Vid (Plus:His Response to Biden's Shotgun Advice)*, The Blaze, (Mar. 1, 2013), https://www.theblaze.com/news/2013/03/01/sheriff-debunks-fallacies-surrounding-

Electronic copy available at: https://ssrn.com/abstract=3466567

where he simulated a bystander attempting to disarm a shooter during the interval when the shooter changes magazines.[118] Sheriff Campbell demonstrated that shooters of any skill level can change magazines so fast as to have no material impact upon the shooter's net rate of fire. Additionally, the demonstration showed that a shooter can change magazines fast enough to defeat any attempt to rush and disarm him.[119] Commenting on firearms restrictions limiting magazine capacity to 10 rounds, self-defense and firearms expert Massad Ayoob observed that

> Criminals bent on causing harm, on the other hand, even assuming they were impeded from obtaining magazines holding over ten rounds due to the ordinance, could simply arm themselves with multiple weapons, and often do. Criminals have time to assess and plan shootings, whereas victims do not. Whitman, the Texas Tower mass murderer, literally brought a large box of rifles, handguns, a shotgun and ammunition to his sniper perch. Harris and Klebold had four firearms between them at Columbine. Holmes in Aurora brought rifle, shotgun, and pistol into the theater … The likelihood of the mass murderer arriving on scene with multiple firearms also largely negates the theory that with fewer rounds in the gun, the killer could be more easily disarmed and subdued by unarmed citizens when he first ran empty, before he could reload.[120]

Given the alacrity with which attackers can change magazines, restrictions on magazine capacity are not an effective way of curbing the lethality of their attacks. However, while magazine capacity limits do little to constrain the damage done by criminal assailants, they do materially

---

gun-magazines-in-this-viral-vid-plus-his-response-to-bidens-shotgun-advice [https://perma.cc/6BNM-H4QZ].

118. *Id.*

119. Regrettably, Sheriff Campbell resigned his post in 2014 after it was revealed that he had been involved in an affair with a known prostitute. While this regrettable lapse certainly reflects upon Sheriff Campbell's personal and professional values and judgment, it says nothing about the efficacy of the demonstrations described here. *See* Diana Penner & Vic Ryckaert, *Boone County sheriff resigns amid prostitution investigation*, INDYSTAR. (9:22 p.m. ET Jun. 19, 2014), https://www.indystar.com/story/news/crime/2014/06/19/boone-county-sheriff-resigns-amid-prostitution-probe/11015867/ (last updated 1:20 p.m. ET Jun. 20, 2014) [https://perma.cc/K55D-V7UY].

120. Declaration of Massad Ayoob in Support of Motion for Preliminary Injunction ¶¶ 19–22, at 7–8, S.F. Veteran Police Officers Ass'n v. City and Cty. of S.F., No. 13-CV-13-5351 (N.D. Cal. 2014).

Electronic copy available at: https://ssrn.com/abstract=3466567

impair the ability of peaceable citizens to defend themselves.[121] Ayoob explains:

> The homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally do not permit gathering multiple firearms or magazines. Ideally, one hand would be occupied with the handgun itself, and the other, with a telephone to call the police. And, assuming they even had time for a magazine change, most people do not sleep wearing clothing that would allow them to stow spare magazines, etc. on their person. They would have only what was in the gun … The virtuous citizen, . . . cannot practically be expected to have accessible that many guns or that much ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.[122, 123]

---

121. *Id.* ¶¶ 17–23, at 6–8.

122. *Id.* ¶¶ 19-22.

123. Gun control advocates sometimes assert that 10 rounds ought to be enough to repel an attacker (for example, see Stephen King, *supra* note 41: "[i]f you can't kill a burglar with 10 shots, you need to go back to the shooting range.") However, this is not a valid assumption. As shown by Marshall and Sanow, *post*, it often requires multiple rounds to stop an attacker. This is especially true where there are multiple assailants, and in such cases 10 rounds may not be nearly sufficient. *See* Stefani Okolie, *post*, reporting on a home invasion where "dozens of shots were fired" by home owner to repel five home invaders. *See also* the case of Susan Gonzalez and her husband, reported by Masaad Ayoob, who were confronted by two home invaders. Mrs. Gonzalez was armed with a Ruger 9mm pistol " designed to hold fifteen cartridges in the magazine and one more in the firing chamber," but which due to legal restrictions was loaded with a 10 round magazine.  By the time she had expended 10 rounds, she had gravely injured one attacker but the other was unhit; he disarmed her and stole the couple's vehicle in which both suspects fled, leaving Mrs. Gonzalez and her husband lucky to be alive. Declaration of Massad Ayoob in Support of Motion for Preliminary Injunction, San Francisco Veteran Police OfficersAss'n , et al., v. The City and County of San Francisco, et al., U.S. District Court for the Northern District of California, San Francisco Division, Case No. 13-CV-13-5351, Document 17, filed December 27th, 2013, paragraphs 5 – 9.

Electronic copy available at: https://ssrn.com/abstract=3466567

Gary Kleck confirmed Sheriff Campbell's results.[124] In a 2016 study, Kleck reviewed 24 mass shootings in which the shooter's effective rate of fire could be ascertained.[125] In the mass shooting events he analyzed, the average rate of fire was slower than the time needed to change magazines.[126] Therefore, the changing of magazines did not reduce the attackers' net effective rate of fire at all.[127]

Criminal assaults and military combat are not equivalent phenomena. Nonetheless, the law abiding citizen that hopes to cope successfully with a criminal attack can learn something from the American infantrymen who successfully coped with their own enemies in Italy, as noted by the staff of the 15th Army Group in the Italian Theater during the Second World War: "It was shown repeatedly that units which pressed their attack vigorously suffered far fewer casualties and were more uniformly successful than those which hesitated or stopped when fired upon."[128]

It is here that a semi-automatic firearm equipped with a so-called "high capacity" magazine becomes essential to a peaceable citizen defending himself. These tools enable a law-abiding citizen to respond vigorously to his attacker with equal or greater force than the attacker has brought to bear. This gives the citizen the chance to wrest the initiative back away from the criminal assailant.

## VIII.  AR-15 RIFLES ARE COMMONLY USED FOR LAWFUL PURPOSES

So-called "assault" weapons and "high capacity" magazines are not necessary to execute mass shootings.[129] Christopher Koper's findings indicate that so-called "assault weapons" are used in as few as 18% and as many as 57% of mass shooting incidents.[130] Therefore, many of these attacks are carried out with other firearms.[131] For example, shotguns were

---

124. Kleck, *supra* note 116.

125. *Id.*

126. *Id.*

127. Kleck, *supra* note 116, at 44.

128. G-3 SECTION HEADQUARTERS 15 ARMY GRP., IT., *supra* note 75.

129. *See* Matthew Larosiere, *Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions*, LEGAL POL'Y BULL., No. 3, July 17, 2018, at 8, 10 (arguing that, because mass shooters plan ahead, they can execute their murderous motivations using any weapon of choice).

130. Christopher S. Koper, et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, J. URB. HEALTH 313, 317–18, tbl.2 (2018).

131. Statista Research Dep't, *Weapon Types Used in Mass Shootings in the United States Between 1982 and February 2020*, STATISTA (May 4, 2020),

Electronic copy available at: https://ssrn.com/abstract=3466567

used in the Washington Navy Yard and Annapolis Gazette attacks.[132] Additionally, firearms are not the only weapons by which a spree killing can be executed. In Eighteenth and Nineteenth Century Malay culture, men would suddenly embark upon mass killing sprees, armed only with edged weapons.[133] This was known as the *amok* phenomenon.[134]

Not only are American gun owners confronted with a flood of false and deceptive information about the AR-15 from the gun control lobby, but they are also subject to a veritable gaslighting campaign.[135] Gun control advocates such as Senator Diane Feinstein claim that the AR-15 is not commonly used for lawful purposes.[136] The AR-15 is only the *latest* target of this kind of advocacy. As Kleck has observed:

> many gun law proponents have narrowed their political efforts, targeting specific types of guns, which they argue are "good for only one thing – to kill." These proponents differentiate "good" (or at least not-so-bad) types of guns, like the old family deer rifle, from "bad" types of guns. At various times, the especially dangerous, "bad" subcategory has been (1) handguns, (2) the cheap, small handguns known as "Saturday Night Specials," (3) so-called "assault rifles," (4) machine guns, and (5) plastic guns. Proponents argue that these weapons are only useful for committing crimes, and sometimes even imply that they are never used

https://www.statista.com/statistics/476409/mass-shootings-in-the-us-by-weapon-types-used/ [https://perma.cc/A454-HZQ5].

132. JOHN M. RICHARDSON, DEP'T OF THE NAVY, REPORT OF THE INVESTIGATION INTO THE FATAL SHOOTING INCIDENT AT THE WASHINGTON NAVY YARD ON SEPTEMBER 16, 2013 AND ASSOCIATED SECURITY, PERSONNEL, AND CONTRACTING POLICIES AND PRACTICES 2, 40 (Nov. 8, 2013); Chase Cook, *Man Charged in Capital Gazette Shooting Asks for Time to Consider Insanity Plea*, CAPITAL GAZETTE (Aug. 15, 2018), https://www.capitalgazette.com/news/crime/ac-cn-ramos-plea-0816-story.html [https://perma.cc/XZY5-P5H9].

133. JOHN C. SPORE, RUNNING AMOK: AN HISTORICAL INQUIRY (Ohio Univ. Ctr. for Int'l Studies, 1988).

134. *Id.*

135. *See* Emily Miller, *Here Are the 5 Worst "Fake News" Reports on Guns in 2017*, THE DAILY SIGNAL (Dec. 28, 2017), https://www.dailysignal.com/2017/12/28/5-worst-fake-news-reports-guns-2017/ [https://perma.cc/QV2V-NZ25]; David Stitz, *"Gaslighting" and Gun Control*, THE INTELLIGENCER (Apr. 26, 2013, 12:15 A.M.), https://www.theintell.com/88082ef6-f221-50cc-8f60-d2f9a51d2841.html [https://perma.cc/K7SM-JW9H].

136. Stephanie Mencimer, *Kavanaugh Defends Opinion That Assault Weapons Are "Common" and Can't Be Banned*, MOTHER JONES (Sept. 5, 2018), https://www.motherjones.com/politics/2018/09/kavanaugh-defends-opinion-that-assault-weapons-are-common-and-cant-be-banned/ [https://perma.cc/RHZ2-37YT] (this page contains a tweet and video clip).

Electronic copy available at: https://ssrn.com/abstract=3466567

for any legitimate purposes. Because the guns have no legitimate purposes, it is argued, there can be no objection to outlawing them.[137]

These claims are demonstrably false, as Ronald Turk, Associate Deputy Director (Chief Operating Officer) of the ATF, admitted in 2017:

> Since the sunset of the Assault Weapons ban in 2004, the use of AR-15s, AK-style, and similar rifles now commonly referred to as "modern sporting rifles" has increased exponentially in sport shooting. These firearm types are now standard for hunting activities. ATF could re-examine its almost 20-year-old study to bring it up to date with the sport shooting landscape of today, which is vastly different than what it was years ago. Action shooting sports and organizations such as 3 Gun and the United States Practical Shooting Association (USPSA) have also drastically expanded in recent years. Restriction on imports serves questionable public safety interests, as these rifles are already generally legally available for manufacture and ownership in the United States.[138]

The AR-15 is the most popular rifle for competition shooting and is thoroughly integrated into competition shooting,[139] including Civilian Marksmanship Program and National Rifle Association Service Rifle and High Power competitions;[140] United States Practical Shooting Association

---

137. KLECK, *supra* note 38, at 14.

138. RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (ATF), OPTIONS TO REDUCE OR MODIFY FIREARMS REGULATION, 5 (Jan. 20, 2017).

139. It is not merely integrated into formal shooting competitions, but into the very fabric of recreational shooting. As my own observations show, the vast majority of rifles appearing at ranges for target shooting are AR-15s.

140. *See* NRA HIGH POWER RIFLE RULES, 7–8 (Nat'l Rifle Ass'n of Am., 2020); CMP HIGHPOWER RIFLE COMPETITION RULES, 33–36 (Civilian Marksmanship Program, 23d ed. 2019); Frank Melloni, *Intro to Service Rifle,* NRA SHOOTING SPORTS USA (June 5, 2019), https://www.ssusa.org/articles/2019/6/5/ intro-to-service-rifle [https://perma.cc/29FJ-LWQ2]; SUSSA Staff, *supra* note 135; Serena Juchnowski, *Why Shoot High Power Service Rifle?* NRA SHOOTING SPORTS USA (Nov. 19, 2018), https://www.ssusa.org/articles/2018/11/19/why-shoot-high-power-service-rifle/ [https://perma.cc/4Z5M-LSJ3]; Dennis Santiago, *What You Need to Know About High Power Rifle Competition*, NRA SHOOTING SPORTS USA (Sept. 18, 2018), https://www.ssusa.org/articles/2018/9/18/what-you-need-to-know-about-high-power-rifle-competition/ [https://perma.cc/SJ3B-6KN5].; *See* SUSSA Staff, *10 Essential Items You Need to Get Started in High Power Rifle*, NRA SHOOTING SPORTS USA (Sept. 20, 2017), https://www.ssusa.org/

Electronic copy available at: https://ssrn.com/abstract=3466567

competitions;[141] and Three Gun competitions.[142]  At the Three Gun competition, competitors shoot with pistol, shotgun, and rifle in the same course.[143]

An unarmed person can be incapacitated or killed with relative ease with nearly any improvised weapon that comes to hand; because humans are relatively fragile compared to game animals, this tells us virtually nothing about hunting, one of the archetypal American firearms activities. Criticizing the methods used by Colonel Louis A. LaGarde in his classic 1914 study, *Gunshot Injuries* ,[144] Evan P. Marshall and Edwin J. Sanow observed in 1992 that "steers are much harder to kill than humans, so applying the results of shooting animals to how particular handgun loads would work against humans was a hopeless task."[145] Because wild animals are physically much more agile and robust than human beings, choice of firearm is much more important when hunting wild game than when committing violent crime against people.[146] As Montana hunting and fishing guide Norman Strung explained in 1973:

---

articles/2017/9/20/10-essential-items-you-need-to-get-started-in-high-power-rifle [https://perma.cc/2RN6-SDEA] (photo caption).

141. *See* Jake Martens, *The JP Enterprises PCC [Pistol Caliber Carbine] Midwest Championship*, 35 USPSA: THE OFFICIAL J. OF THE U.S. PRACTICAL SHOOTING ASS'N. STARTING PAGE NO., 40-42 (2019).

142. *See* Jeff Johnston and Phil Bourjaily, *The Beginner's Guide to 3-Gun Competition*, FIELD & STREAM (Sept. 30, 2019), https://www.fieldandstream.com/ beginners-guide-3-gun-competition/ [https://perma.cc/4AMT-6LMS].

143. *See, e.g.*, John B. Holbrook, II, John Wick 3-Gun, USPCA Magazine, July/Aug. 2019, at 56; Aaron Bright, Review: A Couple of Carbines from Palmetto State Armory, USPCA Magazine, July/Aug. 2019, at 42; Troy McManus, Cochin in Steel Challenge, USPCA Magazine, July/Aug. 2019, at 9; Manny Bragg and Carole Bryant, The Glock 2018 Area 6 Championship, Frontsight, July/Aug. 2018, at 11; Jessica Nietzel, Multigun Nationals: What a Blast, Frontsight, July/Aug. 2018, at 16, 18, 20, 22; Kristine Hayes, The Science of Competition: Is Knowing How to Fail the Secret to Winning? Frontsight, July/Aug. 2017, at 18; Cora Maglaya, 2017 USPSA Armscor Rock Island Multigun National Championship, Frontsight, July/Aug. 2017, at 22. *See also* Frontsight, July/Aug. 1989; Frontsight, Mar./Apr. 1990; Frontsight, September/October 1991; Frontsight, July/Aug. 2001; Frontsight, July/Aug. 2002; Frontsight, Mar./Apr. 2010; Frontsight, Nov./Dec. 2010; Frontsight, Sept./Oct. 2014; Frontsight, July/Aug. 2015; Frontsight, July/Aug. 2016; Frontsight, May/June 2017; Frontsight, July/Aug. 2017; Frontsight, July/Aug. 2018 (covers).

144. LOUIS A. LA GARDE, GUNSHOT INJURIES: HOW THEY ARE INFLICTED, THEIR COMPLICATIONS AND TREATMENT. 43 (William Wood & Co., 2d ed. 1916). Le Garde used animals and cadavers to evaluate the lethality of various handgun calibers and loads.

145. EVAN P. MARSHALL & EDWIN J. SANOW, HANDGUN STOPPING POWER: THE DEFINITIVE STUDY 13 (Paladin Press, 1992).

146. *See* Will Drabold, *Here Are 7 Animals Hunters Kill Using an AR-15*, TIME (July 6, 2016, 12:13 P.M.), https://time.com/4390506/gun-control-ar-15-

> [t]hat kind of country you are hunting in should be the
> determining factor in your choice of a rifle rather than the
> species you are hunting or the size of your quarry. This is
> true of the caliber, the type of sight to use, and the action of
> the weapon.[147]

On the other hand, nearly any firearm will suffice in the hands of a criminal
to kill as many people as he wants.[148] Contrary to the perceptions of some,
semi-automatic rifles have long been recognized as superior hunting
instruments in appropriate settings. Strung notes,

> Actions include bolt, lever, pump, and [semi]automatic.
> Because of the sudden snap-shot nature of hunting deer in
> brushy country, the bolt action is the least desirable for this
> situation. . . . I also find this problem with the lever actions
> … Personally, I favor the [semi]auto in the woodlands … I
> find being able to squeeze off four fast shots … a real
> advantage.[149]

As AR-15 has become more popular generally, it has also become
increasingly popular as a hunting platform.[150] In fact, Colt marketed the
AR-15 as a "superb hunting partner" when it introduced the rifle to the
civilian market in 1964.[151] *Time* recently profiled several hunters who use
the AR-15 in various calibers to hunt everything from jackrabbits to elk,[152]
and *AR15Hunter.com* describes the use of the AR-15 as a hunting
implement.[153] The AR-15 and other semi-automatic carbines are also
increasingly the firearm of choice for many as a home defense weapon.[154]

---

semiautomatic-rifles/ [https://perma.cc/UJF8-28ZZ] (recognizing various gun
choices to be used for hunting different wild animals and noting the agility of
coyotes and the robust nature of boars).

147. STRUNG, *supra* note 31, at 168–69.

148. *See* Larosiere, *supra* note 129 (arguing that a murderer may use any
firearm to kill).

149. *Id.* at 174.

150. *See* Drabold, *supra* note 146.

151. *American Rifleman*, Apr. 1964.

152. Drabold, *supra* note 146.

153. *About AR15 Hunter*, AR15 HUNTER (July 22, 2014, 8:26 P.M.),
http://ar15hunter.com/about-us/ [https://perma.cc/PMJ9-3GLZ].

154. Larosiere, *supra* note 129, at 12; Jim Wilson, *AR-15 Rifles for Home
Defense? Yes!* NRA FAMILY (June 13, 2019), https://www.nrafamily.org
/articles/2019/6/13/ar-15-rifles-for-home-defense-yes/ [https://perma.cc/Z499-DRU
8].

Electronic copy available at: https://ssrn.com/abstract=3466567

For example, a resident used his semi-automatic AK-47 to repel five armed home invaders in a Houston incident in January 2019.[155]

Gun control advocates have mounted an effective disinformation campaign against the AR-15 by inaccurately stigmatizing it as a tool of warfare and crime, while ignoring the true basis of its popularity.[156] The true basis is that it is an extremely well-designed rifle readily mastered by shooters of all shapes, sizes, and skill levels, and is easily adapted to all manner of legitimate shooting applications.[157] The gun control lobby has very effectively built public and political support for their position but at a steep cost.[158] In relying upon such false claims and misleading tactics, they have badly provoked many responsible American gun owners, aborting any reasoned discussion of the problem of gun violence in the process.

## IX. A Final Obstacle: The Potential for Abuse

It is not merely the divisive tactics of the gun control movement that put gun owners on their guard about red flag laws. There are also real concerns about the potential for error and abuse in the implementation of such laws.[159] As Dave Workman of the Second Amendment Foundation has said, "It's a great idea on paper . . . . The problem is execution."[160] A dramatic example of just how red flag laws can go wrong in the "execution" is the case of Gary Willis. He was killed by Maryland police in Anne Arundel County after the police arrived at his home, shortly after 5:00 in the morning on November 5, 2018, to execute an *ex parte* "extreme risk protective order" (ERPO).[161] This order was issued at the request of his sister following a dispute over the care of their mother.[162] While it can be

---

155. Stefania Okolie, *5 Shot and 3 Killed After Homeowner Opens Fire on Suspects in East Houston*, ABC Eyewitness News (Jan. 20, 2019), https://abc13.com/5-shot-and-3-dead-after-home-invasion-in-east-houston/5097015/ [https://perma.cc/FZ43-63AP].

156. *See* Kleck, *supra* note 38, at 73; David B. Kopel, *Trust the People: The Case Against Gun Control*, 3 J. on Firearms and Pub. Pol'y, 77, 77–78 (1990); Larosiere, *supra* note 129, at 5.

157. *See* Jon Schuppe, *America's Rifle: Why So Many People Love the AR-15*, NBC News (Feb. 15, 2018, 7:08 A.M.), https://www.nbcnews.com/news/us-news/america-s-rifle-why-so-many-people-love-ar-15-n831171 [https://perma.cc/2CMG-2BBA].

158. *See* David B. Kopel, *The Costs and Consequences of Gun Control*, Pol'y Analysis No. 784 (Dec. 1, 2015), https://www.cato.org/publications/policy-analysis/costs-consequences-gun-control [https://perma.cc/2WS8-QQPF].

159. *See generally* Jacob Sullum, *States Are Depriving Innocent People of Their Second Amendment Rights*, Reason, Nov. 1991, at 47–51 (providing a concise overview of these concerns).

160. *Id.* at 51.

161. *Id.* at 47.

162. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

fairly said that Mr. Willis contributed to this tragic outcome by his ill-judged obstinate behavior in response to the police attempt to enforce the order, there would also seem to be some doubt as to whether an ERPO was appropriate in the first place. According to family, Mr. Willis "wasn't dangerous, just strongly opinionated."[163] His niece said that Mr. Willis "like[d] to speak his mind" but that he "wouldn't hurt anybody."[164] She added that the incident had left her "just dumbfounded now" and that the police "didn't need to do what they did."[165] However, for the Anne Arundel County Police Chief Timothy Altomare, the ambiguity of the situation served more to justify than to cast doubt on the validity of the EPRO. Altomare stated that "[i]f you look at this morning's outcome, it's tough for us to say 'Well, what did we prevent?' … [b]ecause we don't know what we prevented or could've prevented. What would've happened if we didn't go there at 5 a.m.?"[166] In response, *Reason's* Jacob Sullum tartly observed that "[w]ell, for one thing, Gary Willis probably would still be alive."[167]

Also impeding real dialogue is a concern over other types of potential government abuse of which gun owners are aware. One such is eminent domain abuse. This was dramatically brought to the public's consciousness by the Supreme Court's notorious holding in *Kelo v. City of New London*,[168] dramatized in the film *Little Pink House*.[169] Another is civil asset forfeiture abuse, recently addressed by the U.S. Supreme Court in *Timbs v. Indiana*.[170]  Here, the Court held for the first time that the Eighth Amendment's Excessive Fines clause is incorporated against the States via the Fourteenth Amendment.[171] In this case, Tyson Timbs was convicted of selling about $260 worth of heroine.[172] In addition to the sentence of one year of home detention and five years' probation imposed by the trial court, the State also seized his $40,000 SUV.[173] Philadelphia[174] and Chicago[175]

---

163. *Id.*

164. *Id.*

165. *Id.*

166. Phil Davis, *Anne Arundel Police Chief: Shooting Was Evidence That Month-Old "Red Flag" Law Is Needed*, TCA REG'L NEWS, Nov. 6, 2018.

167. Sullum, *supra* note 159, at 47.

168. Kelo v. City of New London, 545 U.S. 469 (2005) (holding that an interpretation of "public use" may be broadened to "public purpose" within the meaning of the Takings Clause).

169. LITTLE PINK HOUSE (Korchula Productions 2017).

170. Timbs v. Indiana, 586 S. Ct. 682, 684–87 (2019).

171. *Id.* at 685–87.

172. Kellie Hwang, *An Indiana Man Was Caught With $260 of Heroin. The State Took His $42,000 Land Rover*, INDYSTAR (Nov. 30, 2018, 11:44 A.M.), https://www.indystar.com/story/news/2018/11/30/civil-forfeiture-timbs-v-indiana-scotus-supreme-court/2148377002/ [https://perma.cc/Q56S-9YFS].

173. *Timbs*, 586 S. Ct. at 686.

174. *See* DICK M. CARPENTER II, ET AL., INST. FOR JUST., POLICING FOR PROFIT: THE ABUSE OF CIVIL ASSET FORFEITURE 19 (2d ed. Nov. 2015).

Electronic copy available at: https://ssrn.com/abstract=3466567

have implemented even more kafkaesque forfeiture regimes. Given some municipalities' callous disregard of their citizens' property rights, it is hardly inconceivable that states and municipalities, hostile to gun ownership, might abuse the power vested in them under red flag laws to harass law abiding gun owners and relieve them of their firearms, if only temporarily.[176]

## CONCLUSION

In warfare, "[t]reachery or [p]erfidy"—acts such as "feign[ing] surrender" or falsely "broadcast[ing] to the enemy that an armistice has been agreed upon"—are "forbidden because [they] destroy[] the basis for a restoration of the peace short of the complete annihilation of one belligerent by another."[177] The pro and anti-gun movements are not literally at war, of course. Nonetheless, the gun control movement's rhetoric— mischaracterizing the nature and capabilities of the AR-15; constantly shifting targets as to which guns are "bad" and merit proscription and which may be tolerated in private hands; and repeated, brazen insistence, against all evidence to the contrary, that the AR-15 neither has legitimate use nor is commonly used for any purposes but combat and mass murder—has gravely impeded constructive discourse on the question. The rhetorical excesses of gun control advocates have "destroy[ed] the basis for"[178] real, effective discussions about how to curb gun violence by convincing gun owners that the gun control lobby's true objectives are the total annihilation of America's firearms tradition and the *de facto*, if not *de jure*, repeal of the Second Amendment, and that any proposals that may be enacted will be just one more click on the implacable ratchet toward their goal of obliterating gun rights altogether.

Even worse is the impact that these false arguments have on members of the gun control movement itself. In focusing on certain weapons like the AR-15 as particularly "bad" compared to other firearms,

---

175. *See* Inst. for Justice, Chicago Impound: The Windy City Tows the Cars of Innocent People and Holds Them for Ransom, https://ij.org/utility/case-print/?case-name=123791 [https://perma.cc/KUP8-HB6C]; John Pearley Huffman, *An Inside Look at Chicago's Seedy Car-Impound Netherworld*, CAR AND DRIVER (Aug. 25, 2019), https://www.caranddriver.com/features/a28776512/impounded-cars-chicago/?mkt_tok=eyJpIjoiTm1ZMU1EazRNV1ZpT1RjMiIsInQiOiJCUHNzVkdGT2JBaGFCQlFlamNDc3JpMTNPWFBteForMUVVdzJoMVBScjZtWnZ6c1RadUxySHA1RFdHaG4xR1wvSWtmaVwvMUJmc0xsWHdlZFBcL1FiYXRlYTNwUFJmQzdnUjFNUkJMTXkwMDM3ekIzZU1peStnNm5YWW5IYTVRc0liaSJ9 [https://perma.cc/6JL6-FW7A].

176. *See generally* CARPENTER II, ET AL., *supra* note 174, at 2–3 (providing an overview of the problem of civil asset forfeiture abuse).

177. DEP'T OF THE ARMY, THE LAW OF LAND WARFARE 22 (July 1956).

178. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

the gun control movement has inculcated in its supporters the unrealistic belief that if only these particularly "wicked" firearms were eliminated, the problem of gun violence would be greatly reduced. This, in turn, has the effect of relieving states, municipalities, and the Federal Government of the expensive, tedious, and time-consuming work that might really prevent some of these tragedies. As Kevin Williamson noted,

> What's missing is ordinary, unglamorous, labor-intensive law-enforcement and public-health work … We complain about 'straw buyers' but rarely prosecute them; some federal prosecutors refuse as a matter of publicly stated policy to take a straw-buyer case unless it is part of a larger (sexier) organized-crime investigation. … On and on it goes: Ordinary crime and ordinary criminals, ordinary bureaucratic failure, and the occasional act of armed histrionics to keep the headlines churning.[179]

One of my favorite books as a  youth was written by Soviet defector Vladimir Bogdanovich Rezu, writing pseudonymously as Victor Suvorov.[180] This book, *Inside the Soviet Army*, contains a very important leadership lesson that any soldier must learn: "[a]fter some time you will come to understand the most important rules of all, one which you have never been taught – respect your soldiers."[181] However, the real point is what he adds a few lines later: that respecting your soldiers "means more than just showing them respect."[182] A commander respects his soldiers by "[s]how[ing] that [he] care[s] about them by meeting their needs whenever possible [and by] [c]onsider[ing] them as men–with problems, hopes, and feelings–just like [himself]."[183] What relevance do these observations have for the debate over firearms in America? Only this: in the aftermath of *District of Columbia v. Heller*,[184] gun control activists have been forced to

---

179. Kevin D. Williamson, *How to Spot a Serious Gun-Crime Proposal*, NAT'L REV. (Sept. 3, 2019, 2:43 P.M.), https://www.nationalreview.com/2019/09/how-to-spot-a-serious-gun-crime-proposal/ [https://perma.cc/2AMG-4VNX].

180. Luke Harding, *"Will They Forgive Me? No": Ex-Soviet Spy Viktor Suvorov Speaks Out*, THE GUARDIAN (Dec. 29, 2018), https://www.theguardian.com/world/2018/dec/29/ex-soviet-spy-viktor-suvorov [https://perma.cc/6RYA-ABB4].

181. VIKTOR SUVOROV, INSIDE THE SOVIET ARMY 257 (Macmillan Publ'g Co., Inc., 1982).

182. *Id.* at 257–58.

183. DANDRIDGE M. MALONE, SMALL UNIT LEADERSHIP: A COMMONSENSE APPROACH 33 (Presidio Press, 1983).

184. District of Columbia v. Heller, 554 U.S. 570, 602, 635 (2008) (holding that the Second Amendment protects an individual's right to keep and bear arms).

Electronic copy available at: https://ssrn.com/abstract=3466567

pay grudging homage to the individual right to keep and bear arms.[185] However, American gun owners remember the contrary assertions of these same activists: that the Second Amendment did not codify such an *individual* right, but only a collective guarantee intended to "protect members of a state militia from being disarmed by the federal government,"[186] and that "the majority of Americans **mistakenly believe** that the Second Amendment of the Constitution guarantees the individual right to keep and bear arms."[187] Just as respecting Suvorov's soldiers meant more than merely treating them with respect, "respecting" the right to keep and bear arms means more than making an empty obeisance to it. Really respecting the right means taking the time to understand the true nature of firearms, developing proposals that are effective in reducing gun violence, and doing so in a way that really respects the rights of peaceable law-abiding gun owners. These have been notably absent on the pro-control side of the debate.[188]

Some gun control activists will never be satisfied until every last privately-owned firearm in the United States has been confiscated. By the same token, some gun rights advocates will never accept any firearms regulations whatsoever. Few people, however, fall into either of these extreme camps. Many gun owners are willing to consider measures that might actually contribute to a reduction in gun violence, as opposed to misguided and pointless proposals such as banning so-called "assault" weapons and "high-capacity" magazines. Unfortunately, given the acrimony to which the debate over guns has descended, and given the extent to which it has become encumbered by misinformation and error, substantial assurances are needed to bring American gun owners to the table; bland assertions of respect for the Second Amendment will not suffice.

Serious progress on the problem of gun violence, including mass shootings, depends upon acceptance by all parties of certain fundamental principles: (1) the right to keep and bear arms is an individual right, as set forth in *Heller* and *McDonald v. City of Chicago*;[189] (2) the Second Amendment protects the rights of peaceable citizens to acquire, possess, and use the firearms of their choice, including semi-automatic firearms such as the AR-15 and the magazines designed for them by their manufacturers; and (3) that real and effective due process protections must be respected

---

185. *See* The Cato Institute, *The Right to Keep and Bear Arms: 10 Years After Heller*, Cato Pol'y Rep., Sept./Oct. 2018, at 16.

186. Pete Shields, Guns Don't Die – People Do 55 (Arbor House Publ'g Co., 1981).

187. *Assault Weapons and Accessories in America*, *supra* note 43 (emphasis added).

188. *See* Kopel, *supra* note 158 ("Responsible firearms policies . . . do not attempt to infringe the constitutional rights of good persons.").

189. McDonald v. City of Chicago, 561 U.S. 742, 749–50, 791 (2010).

Electronic copy available at: https://ssrn.com/abstract=3466567

before these rights may be abridged. Affirmation of these basic points by the United States Supreme Court would clear away much of the detritus clogging the debate about guns and violence and might facilitate the implementation of real, practical solutions in a way that has heretofore evaded us.

Electronic copy available at: https://ssrn.com/abstract=3466567

EXHIBIT 69

# AMERICAN HOMICIDE

## RANDOLPH ROTH



**RANDOLPH ROTH**

# American Homicide

**THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS**
Cambridge, Massachusetts
London, England

Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

First Belknap Press of Harvard University Press paperback edition, 2012

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
    American homicide / Randolph Roth.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 978-0-674-03520-1 (cloth : alk. paper)
    ISBN 978-0-674-06411-9 (pbk.)
    1. Homicide—United States—History.   I. Title.

HV6524.R68 2009
364.1520973—dc22        2009016830

from property disputes, quarrels, ethnic and religious hatreds, and sexual assaults except the rate at which they occurred. In most cases, the murderers believed their fellow colonists were out to steal their property or had it in for them because of their class, nationality, or faith. The sense that other colonists were adversaries—that society was a war of all against all—put people on their guard and made them reluctant to show weakness under any circumstances. The sense that fellow colonists were adversaries had an even more dangerous impact on men who were deeply alienated or disturbed, like William Schooler and John Stoddard. It gave them license to prey on their neighbors: to take sex, money, or whatever else they wanted from those weaker than they were. Only when colonists came to see one another in a different light—as allies rather than antagonists—would these homicide rates decline.

One of the most telling signs of the wariness and hostility with which men approached one another was the rate at which they killed each other with guns. Colonists were well armed, but, unlike their counterparts in most of Europe, most chose guns over swords or daggers. Probably 60 percent of all households had at least one working gun. Guns were essential tools in the colonies. Men used them to hunt, to control vermin, and to defend themselves against Indians or people of other nationalities. Few men owned handguns; they needed the range and firepower that muskets afforded and the flexibility to fire shot or slugs, depending on the target. Muskets had their limits as murder weapons. They were inaccurate with slugs, impossible to conceal, and difficult to load. But if the would-be murderer had time to prepare his attack or had already loaded his gun for some other purpose, muskets were usually deadly, in no small part because there was no good medical care for the wounds they inflicted. They were the preferred weapons for killing not only Indians but also political rivals, trespassers, and old enemies. Through 1675, 38 percent of homicides among unrelated colonists in New England and New Netherlands were committed with guns; the figure was probably 40 percent in Maryland. Guns were not responsible for violence, which was rife among Europeans everywhere, but their availability may have made that violence more deadly in colonial America.[61]

The homicide problem among colonists was also exacerbated by indentured servitude, which disrupted the social hierarchy more than

l the
's cut
wills

cidal
· sta-
nists,
·nth-
. the
t be-
reli-
·cial
set-
ents
ntier

# "All Hanging Together"

*The Decline of Homicide in the Colonial Period*

In the final quarter of the seventeenth century the murder rate in the colonies suddenly dropped. The exact timing of the fall in the homicide rate in these years is uncertain because so many court records from the late seventeenth century have been lost, but it appears that between 1675 and 1693 the rate for European adults fell abruptly twice: once after Bacon's Rebellion (1675) and King Philip's War (1675–76) and again in the late 1680s and early 1690s, at the time of the Glorious Revolution in England. The rate remained low by historical and modern standards for nearly eighty years, until the revolutionary crisis of the 1760s and 1770s.

The patterns were very different for African Americans and Native Americans. African Americans were killed by unrelated adults at high rates in the late seventeenth and early eighteenth centuries, when racial slavery replaced indentured servitude as the primary source of bound labor in British North America. Native Americans in New England were killed by unrelated adults at high rates throughout the colonial period, especially between 1720 and 1760.

## European American Homicide

The decline in homicide rates among European Americans was dramatic. In Maryland the rate at which unrelated European adults killed

61

3:18-cv-10507-PGS-JBD  Document 196-6  Filed 12/15/23  Page 81 of 133 PageID:

colonists per year on the eve of the French and Indian War and 6 per 100,000 during the war.[68]

Homicide rates followed a more complex pattern in Pennsylvania, but they, too, ended up low on the eve of the French and Indian War, and they fell to an even lower level during the war (Figure 2.2). The colony, which was settled by Quakers, Moravians, and other pietists in the 1680s and 1690s, initially had a very low homicide rate—around 2 per 100,000 adults per year. That rate was largely due to the stability of the Quaker-dominated government, the pietists' solidarity and commitment to nonviolence, and the absence of a staple crop, which almost eliminated the need for slaves or indentured servants. Most of the inhabitants were also willing to live in peace with Native Americans and to abide by the terms of treaties.[69]

However, the homicide rate surged in Pennsylvania from the late 1710s to the early 1730s, to probably 9 or more per 100,000 adults per year—the rate that had prevailed in New England before King Philip's War. The primary cause was a sudden influx of settlers from northern Ireland, Germany, and elsewhere. The arrival of thousands of non-English and non-Quaker immigrants made Quakers and pietists a minority, and the moral and religious solidarity that had prevailed in the colony was destroyed. Quakers and pietists found this new diversity distressing and felt they had been "invaded." They debated whether newcomers should be granted political rights. Relations between established residents and "foreigners" were tense, as they were among newcomers of different nationalities, and many poor immigrants were profoundly alienated from everyone. Germans killed Irishmen, Scotsmen killed Welshmen, indentured servants killed masters or fellow servants, and criminal gangs committed robbery murders. Quakers and other pietists did not themselves become homicidal, but beyond the bounds of their communities Pennsylvania became more so, repeating the pattern that took hold in New England in the mid-seventeenth century, when the society outside the Puritan community became more homicidal.[70]

Matters were made worse in Pennsylvania by an economic recession caused by an act of Parliament that prescribed a uniform rate of exchange for foreign coins to prevent tampering. Pennsylvania obeyed the new law, thanks to the influence of the Penn family and of Philadelphia's Quaker merchants, who were currying favor with the royal

had governed with a
...ed to a brutal struggle
...e in 1789 until 1802,
...establishing a dicta-
...ably ranged from 30
...uthern, and western
...eak and citizens were
... The homicide prob-
... Paris, where the post-
... But the actual homi-
... to have been 40 per
...ent and newspaper ac-

...perience a dramatic
... England and in Swe-
...are available, homi-
...1830s. According to
...pear to have doubled
...se to 20 per 100,000
...elne crushed an upris-
...gues to the lower house
...political equality for
...30 per 100,000 adults
...authoritarian govern-
...Canada, where politi-
...of 1837, but they in-
...in government, and

...United States did not
...ounties studied inten-
...the Revolution di-
...her words, homicide
...between Tories and re-
...armies—was most in-
...City and Philadelphia,
...southwestern Vir-
...reached seventeenth-
...order broke down,

and neighbor turned against neighbor. For most white Americans, the Revolution was profoundly disruptive and divisive, but in those areas it was a genuine civil war. The criminal justice system disbanded or became the partisan tool of whoever was in power locally. Vigilante and revenge killings ensued, some motivated by politics, some not. As in revolutionary France, the proliferation of politically charged homicides was matched by an increase in garden-variety homicides as individuals adopted the same hostile and predatory attitudes toward their neighbors that political partisans showed toward their opponents. The extremely high homicide rates persisted until the end of the War of 1812, when they finally returned to the levels that prevailed in the rest of the nation.

Homicide rates doubled even in places where the struggle for power between Tories and rebels was intermittent or short-lived and the criminal justice system remained effective, like New England and the Chesapeake. In colonies that experienced political violence during the imperial crisis of the 1760s and early 1770s, like Pennsylvania, Massachusetts, and North Carolina, the increase in homicide began before the Revolution as the withering of British patriotism and the erosion of loyalty to the governments imposed upon the colonies by the crown undermined the fellow feeling that had kept homicide in check since the late seventeenth century. And in most communities within those colonies, the revolutionary movement was too divisive for solidarity to be reestablished while the outcome of the Revolution remained in doubt. But in places like the Shenandoah Valley of Virginia, where the Revolution won broad support and caused little disruption, the homicide rate among unrelated white adults continued to fall in the late eighteenth century. Homicide rates also continued to fall for African Americans in the South and in New England. Blacks were less likely to be murdered by whites and by one another, in large part because of the vitality of the antislavery movement, which freed many slaves and increased humanitarian regard for blacks. The movement also forged greater solidarity among blacks and gave them hope for a better future.

Wherever government broke down, political, robbery, and revenge homicides proliferated. The political upheaval undermined existing loyalties and institutions and made people from all walks of life more impatient with legal and economic restraints and more sensitive to

personal slights. Ordinary men were suddenly more likely to kill to defend their reputations, property, or rights. Public men—politicians, military officers, attorneys, and newspaper editors—were particularly vulnerable to the Revolution's disruptive effects. In a republic that had yet to develop strong parties or political institutions, they were at the mercy of public opinion, and a surprising number of them died trying to defend their honor in duels.

The American Revolution might have had an even worse effect on the homicide rate if it had created a long-lasting economic crisis or a deep-seated disruption of the social hierarchy. Life was difficult for the poor in America's largest cities—Boston, New York, and Philadelphia—and the urban poor were especially restive and violent in the late eighteenth century.[3] But in small towns and in the countryside, most people were still able to form households and to buy their own shops or farms, thanks to the British victory in the French and Indian War, which had opened vast tracts of land to settlement. African Americans everywhere looked forward to new opportunities because of the decline of slavery. In the slaveholding South, revolutionary ideas would challenge the social hierarchy and lead to a permanent increase in homicides there, but almost everywhere else the Revolution's impact on homicide was confined to the years between 1764 and 1790, when government broke down and fellow feeling declined.

The increase in all kinds of homicides among unrelated adults began the moment conflict between colonists and the government turned violent. Homicide rates rose in Pennsylvania, North Carolina, and South Carolina after revolts broke out in the backcountry in the 1760s over Indian policy, land policy, and the failure to grant newly settled counties adequate representation in colonial assemblies (Figure 2.2). The turning point in New England was 1770, the year of the Boston Massacre (Figure 1.2). In the Chesapeake politics remained nonhomicidal until 1775, when fighting broke out between loyalist and patriot forces (Figure 1.3). Many of the homicides that occurred were political or war-related. In southern New England and the Chesapeake, where the homicide rate for whites doubled, such homicides were probably responsible for a third of the increase in the 1770s and early 1780s. On the Vermont frontier and in the southern and western backcountry, political homicides were responsible for more than half the increase.[4]

Case 3:18-cv-10507-PGS-JBD   Document 196-6   Filed 12/15/23   Page 84 of 133 PageID: 9647

ers Barnett and Nicholas Davenport worked as farm laborers for a wealthy couple. One day they clubbed the couple to death, killed their three young grandchildren, looted their house, and set it on fire. Such cold-blooded murders, which had all but disappeared from New England after King Philip's War and from the Chesapeake after Bacon's Rebellion, reappeared once the revolutionary crisis began. Gun violence, where it can be measured, was also more common. In New England the proportion of political and nonpolitical homicides committed with guns rose from 13 percent before the Revolution to 52 percent.[20] The increase suggests that more of these homicides were premeditated.

Retaliatory and vigilante murders also increased, at least among whites. Occasionally these murders occurred among criminals. In 1779 Younger Hardwick apparently killed fellow gang member Erasmus Whitworth in Amelia County, Virginia, because Whitworth had stolen part of Hardwick's share of the loot. But most perpetrators and victims were law-abiding citizens. In Albemarle County, Virginia, a local man stepped into a tavern and imprudently told a table of "gamesters" that he had just collected a debt. When he left, one of the gamblers sneaked out after him. Several men took note and followed the gambler. They found their neighbor dead, his throat cut and his money gone. They tracked the gambler to a canebrake where he was washing blood from his hands and hanged him on the spot.[21]

Pennsylvania suffered a rash of deadly brawls and robberies from the mid-1760s into the early 1790s, most of which occurred among strangers. Travelers were waylaid, sailors stabbed, and merchants terrorized by a floating population of former soldiers, runaway servants, gang members, and war refugees, who had no qualms about cutting throats to steal whatever they could. But even for law-abiding citizens, the violent ways learned during the Revolution died hard. John Lacey was a fervent patriot from Bucks County who had once ordered his men to shoot on sight any farmer caught trading with the enemy in Philadelphia. After the war he got into a business dispute with a man named Joel Cooke, who he thought was trying to defraud him. Lacey shot Cooke dead behind a Quaker meetinghouse.[22]

Revenge homicides, robbery homicides, political homicides, and vigilante homicides had always been common on contested frontiers, where no government or coalition of governments could gain the up-

country, where it took decades to create strong, stable govern-
ments and where men created their own justice by killing people who
wronged them. From the Georgia Piedmont to the Ohio River Valley,
homicide rates were extremely high from the mid-1760s through the
War of 1812. Rates of 25 to 30 per 100,000 per year were common for
white adults in areas where county governments had been established
(Figures 4.1 and 4.2). In the backcountry, where settlers and Indians
(and the Spanish and British) were still fighting for control, rates
probably reached 200 or more per 100,000. Those numbers had not
been seen since the early seventeenth century.

Like previous frontiers that were politically unstable and lacked
strong institutions that could uphold law and order, the revolutionary
backcountry was plagued by vigilantism, revenge murders, political
murders, systematic violence by criminal gangs, and campaigns against
peaceable Native Americans who did not move on after they were de-
feated militarily. During the Revolution more backcountry whites took
the law into their own hands and killed to advance their interests or
defend their rights, lives, and property. This pattern would reappear
later in Florida, the Southwest Territory, the lower Mississippi Valley,
Texas, and California.



**Figure 4.1** Homicide rate in plantation counties in Georgia, 1790–1900 (per
100,000 adults per year). Franklin, Jasper, and Wilkes Counties.

3:18-cv-10507-PGS-JBD Document 196-6 Filed 12/15/23 Page 86 of 133 PageID:

assassinations and duels among public men reappeared. This constant political turmoil, with ideologues of all stripes warring over what form the government should take, was accompanied by an elevated homicide rate among unrelated adults. By World War I, France's homicide rate was double the rates in more politically stable and unified nations such as England, Wales, Sweden, and Norway.[3]

It was at this time that homicide rates in the United States truly diverged from rates elsewhere in the Western world. In the late 1840s and 1850s they exploded across the nation, not only in the plantation South and the Southwest, where higher rates already prevailed, but also in the mountain South and the North, which had previously had extremely low rates. The least homicidal places in the Western world suddenly became the most homicidal. By the end of the Civil War, homicide rates among unrelated adults were substantially higher in the North than in Canada or western Europe, and higher still by one or two orders of magnitude in the South and Southwest. All kinds of homicide increased: robbery murders, rape murders, and killings over insults, bar tabs, card games, property disputes, and small debts. Ethnically and racially motivated murders increased, as did murders in the workplace and along the nation's roads, railroads, and waterways. Everywhere and under all sorts of circumstances, Americans, especially men, were more willing to kill friends, acquaintances, and strangers.

Immigration, economic hardship, and the conquest of areas populated by Hispanic and Native peoples contributed to the rise in homicide in the late 1840s and 1850s. Irish, French Canadian, German, and Chinese immigrants were well represented both as victims and as perpetrators wherever substantial numbers of them worked as unskilled laborers; and Hispanic and Native peoples in the trans-Mississippi West saw their homicide rates rise because of dispossession, demoralization, and victimization by white settlers. Yet homicide rates also surged among native-born Protestants, and in most areas of the country their rates rose as quickly as those of immigrants or ethnic minorities.[4] Many native-born workers, particularly African Americans, saw their standard of living decline in cities around the nation as masses of immigrants flooded into the country from Ireland, Germany, and French Canada. But native-born murder rates continued to climb even in ru-

Confederates. They killed blacks, white Republicans, and one another at an alarming rate. They were responsible for the great disparity between the rates at which blacks and whites committed murder in Republican-governed states. In rural Louisiana, for example, sixteen times as many blacks were killed in interracial confrontations as whites, and whites killed one another at twice the rate blacks did (34 per 100,000 adults per year versus 18 per 100,000). Homicide rates were lower in plantation counties in Georgia and South Carolina, but the disparities between the rates at which whites and blacks committed homicide were similar. The contrast with Virginia, where former Confederates held onto power, was stark. Wherever reactionary whites remained in power, they killed at the same rates they had before the war. Where they lost power, they killed with abandon.[107]

Roughly three-fifths of the nonfamily, nonintimate homicides committed by whites in Louisiana and Georgia during Reconstruction grew out of political or economic disputes. Many of these killings were mass murders of Republicans or black laborers. In Georgia a dozen freedmen died when white militants attacked a Republican rally in Camilla and a polling station in Savannah, and perhaps a dozen more were killed in gang attacks on black farm workers in Henry and Columbia counties. In Louisiana hundreds died in the Colfax Massacre of 1873, the Coushatta affair of 1874, the Caledonia and Natchitoches riots of 1878, and the Bossier and Caddo riots of 1868. The latter two occurred when white militants in the Red River Valley retaliated against local blacks who had tried to arrest a white trader for shooting at a black man.[108]

Some of the violence was spontaneous, but much of it was organized by terror groups like the Ku Klux Klan that were determined to end Republican rule and return white-supremacist Democrats to power. These organizations, led by former Confederate officers and manned primarily by veterans of the Confederate army, were desperately opposed to emancipation, equal rights, and "Negro rule." They wanted to hold on to their cheap, exploitable workforce, but on a deeper level they were terrified of what might happen if black men became full participants in society. Southerners would become "a race of mulattoes . . . another Mexico; we shall be ruled out from the family of white nations. . . . It is a matter of life and death with the Southern people to keep their blood pure." One Georgia Republican observed sharply

Chinese, whose rate fell after World War I.[3] There are lower homicide rates among non-Hispanic whites in the North, the Southwest, and southern cities, higher homicide rates among whites in the rural South, and a divergence in intraracial homicide rates between non-Hispanic whites and the minorities that are most subject to discrimination (overt or institutional) in each region of the country.

## White Homicide in the North, 1877–1917

In the last two decades of the nineteenth century, homicide rates declined across the North (Figures 4.2 and 5.1–5.3), continuing a trend that had begun in most jurisdictions at the end of the Civil War. The rates bottomed out in the late 1880s or 1890s before inching up again in the late 1890s and early 1900s. On the eve of World War I, when a majority of states first met federal standards for death registration, the homicide rate (including family and intimate homicides) for adults of all races ranged from 1 to 4 per 100,000 in New England, 2 to 5 in prairie states, and 3 to 8 in the industrial states. With the exception of a few states with very low rates—Wisconsin, New Hampshire, Vermont, and Maine—the North was more homicidal than Canada or western Europe, but less so than it had been in the mid-nineteenth century.[4]

Homicide rates declined in the North in the late nineteenth century because of a drop in murders among unrelated whites. Labor violence increased, especially on railroads and docks, and around coal mines, steel mills, and logging camps, but it did not claim enough lives to have an appreciable effect on the white homicide rate. Most labor violence was instrumental, aimed at changing the behavior of employers, strikers, scabs, the militia, or the police, so the death toll was surprisingly low. Every other kind of homicide among unrelated whites decreased. Property disputes, tavern brawls, sexual assaults, robberies, and spontaneous quarrels claimed fewer lives than they did in the mid-nineteenth century.[5]

The decline in homicides probably escaped the notice of most northerners. They still read articles in the newspapers each week about murders in saloons and on city streets, and their neighbors could still turn on each other with shocking suddenness in arguments over felled trees, trampled crops, laundry bills, or fishing spots. George Poe, a carriage driver in Chillicothe, Ohio, got fed up with a drunken passenger,

EXHIBIT 70

# CONTRACT

### BETWEEN

## HIS MOST CHRISTIAN MAJESTY.

#### AND THE

## UNITED STATES OF AMERICA,

##### ENTERED INTO BY THE

### COUNT DE VERGENNES, AND MR. FRANKLIN,

The 16th of July, 1782, and ratified by Congress the 22d of January 1783.

---—●●●—---

**Motives for making a particular statement of the amount of pecuniary supplies furnished by France, and the mode of re-payment by the United States.**

THE king having been pleased to attend to the requests made to him in the name, and on behalf of the united provinces of North America, for assistance in the war and invasion under which they had for several years groaned ; and his majesty, after entering into a treaty of amity and commerce with the said confederated provinces, on the 6th of February, 1778, having had the goodness to support them, not only with his forces by land and sea, but also with advances of money, as abundant as they were effectual, in the critical situation to which their affairs were reduced : it has been judged proper and necessary to state exactly the amount of those advances, the conditions on which the king made them, the periods at which the congress of the United States have engaged to repay them to his majesty's royal treasury, and in fine, to state this matter in such a way as for the future to prevent all difficulties capable of interrupting the good harmony which his majesty is resolved to maintain and preserve between him and the said United States. For executing so laudable a purpose and with a view to strengthen the bands of amity and commerce which subsist between his majesty and the said United States ; we, Charles Gravier de Vergennes, &c. counsellor of the king in all his councils, commander of his orders, minister and secretary of state, and of his commands and finances, vested with full powers of his majesty to us given for this purpose : and we, Benjamin Franklin, minister plenipotentiary of the United States of North America, in like manner vested with full powers of the congress of the said states for the present purpose ; after duly communicating our respective powers, have agreed to the following articles :

### ARTICLE I.

**Amount of different loans.**

It is agreed and certified, that the sums advanced by his majesty to the congress of the United States, under the title of a loan, in the years 1778, 1779, 1780, 1781, and the present, 1782, amount to the sum of eighteen million of livers, money of France, according to the following twenty-one receipts of the

Generated on 2023-12-08 16:06 GMT  /  https://hdl.handle.net/2027/nyp.33433008589750
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by **Google**

Original from
NEW YORK PUBLIC LIBRARY

EXHIBIT 71

### *FAUX HISTOIRE* OF THE RIGHT TO BEAR ARMS:

### *YOUNG v. HAWAII* (9ᵗʰ Cir. 2021)

Stephen P. Halbrook[*]

### *CONTENTS*

Introduction
I.  THE TEXT OF THE SECOND AMENDMENT OVERRIDES SELECTIVE "HISTORY"
II.  HISTORICALLY, HAWAIIAN CARRY LAWS WERE ADVERSE TO THE RIGHT
III.  PEACEABLE CARRY WAS LAWFUL IN THE ENGLISH TRADITION
    A. The Royal Decrees Were Directed at Tumultuous Gatherings, Not Peaceable Carry
    B. The Statute of Northampton and Related Laws Applied to Affrays and Violent Crime
    C. *Rex v. Knight*, the Decisive Precedent, Held that Going Armed was Lawful Unless Done in a Manner to Terrorize the Subjects
    D. English Treatises Limited the Offense to Carrying Dangerous and Unusual Weapons
    E. The English Bill of Rights Confirmed the Ancient Right to Have Arms
IV.  AMERICA WAS FOUNDED ON A ROBUST RIGHT TO BEAR ARMS
    A. Colonial Laws Often Mandated the Carrying of Arms
    B. Post-Ratification Laws Only Banned Going Armed Offensively, to the Terror of the Citizens
    C. Nineteenth-Century Surety Laws Only Applied with a Showing of Reasonable Cause to Fear Injury or a Breach of the Peace
    D. Courts Upheld Concealed Carry Bans Only Because Open Carry was Lawful
    E. Slaves and Persons of Color Were Denied the Right to Bear Arms Because They Were Not Considered Citizens
    F. None of the Early Treatises Countenanced a Carry Ban
    G. The Fourteenth Amendment Sought to Do Away with Black Code Requirements that African-Americans Obtain a License to Bear Arms Subject to an Official's Discretion
    H. Twentieth-Century Aberrations Teach Nothing about the Original Understanding
Conclusion

---

[*]J.D., Georgetown University Law Center; Ph.D., Philosophy, Florida State University. Books include *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*; *The Founders'Second Amendment*; *Securing Civil Rights: Freedmen, the Fourteenth Amendment, & the Right to Bear Arms*; *Firearms Law Deskbook*; and *That Every Man be Armed*.  Argued *Printz v. United States*, 521 U.S. 898 (1997), and other Supreme Court cases, and represented a majority of members of Congress as amici curiae in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Attorney at Law, Fairfax, Va.; Senior Fellow, Independent Institute.  See www.stephenhalbrook.com.  Copyright © Stephen P. Halbrook 2021. All rights reserved.

Electronic copy available at: https://ssrn.com/abstract=3885910

Introduction

The Ninth Circuit's en banc decision in *Young v. State of Hawaii* (2021) holding that no "right of *the people* to . . . *bear* arms" exists under the Second Amendment could perhaps win a contest for the most *faux histoire* of any judicial decision on a Bill of Rights guarantee.[1]  The Ninth Circuit previously held that no right exists to carry a concealed weapon.[2]  It now extends its ruling to the only other way to bear arms – open carry.  Without any linguistic analysis of the text of the Second Amendment, the majority essentially holds that the right to bear arms is outside "the historical scope" of the right to bear arms.[3]

To obtain a license to carry a firearm, Hawaii requires a person to show "the urgency or the need" to do so, a requirement not specified for *any* constitutional right.  Per the court's description, the applicant George Young only "relied upon his general desire to carry a firearm for self-defense," thus failing to show "the urgency or need."[4]  Thus, from the very beginning of the opinion, the court signaled that it did not consider "the right of the people to . . . bear arms" to be a right at all that one may exercise based on the desire to do so, but is a privilege that the government may grant or withhold based on its subjective assessment of whether the applicant has an "urgency or need" to exercise this fundamental constitutional right that is a non-constitutional right.  Imagine subjecting the right of free speech to whether the Ninth Circuit says an arm of government considers it urgent or needed for a citizen to speak.

The majority decision by Judge Jay Bybee has been subjected to withering criticism not only in the dissenting opinion by Judge Diarmuid O'Scannlain, joined by three other judges[5] – not unexpectedly – but also by Second Amendment scholars.  Professor Nelson Lund focuses on the general "fake originalism" of the decision,[6] which the court apparently saw as necessary to clothe the Amendment with its supposed original understanding.  Professors David Kopel and George Mocsary delve into the opinion's "errors of omission," based on the slicing out of critical

---

[1]*Young v. State of Hawaii*, 992 F.3d 765 (9th Cir. 2021) (*en banc*), petition for cert. filed, No. 12-17808 (U.S. May 25, 2021).

[2]*Id*. at 773, citing *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (*en banc*).

[3]*Id*. at 773.

[4]*Id*.

[5]*Id.* at 828 (O'Scannlain, J., dissenting).

[6]See Nelson Lund, "Fake Originalism and the Right to Bear Arms," *Law & Liberty*, April 12, 2021.  https://lawliberty.org/fake-originalism-and-the-right-to-bear-arms/

2

Electronic copy available at: https://ssrn.com/abstract=3885910

words to distort historical quotations.[7]  Without replicating these very valid criticisms, this Article demonstrates that the *Young* decision is even worse.

## I.  THE TEXT OF THE SECOND AMENDMENT OVERRIDES SELECTIVE "HISTORY"

First a word on the text, which is AWOL from the majority opinion.  The Second Amendment provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."  What could be unclear about "the right" of "the people" to "bear arms"?  Everything, saith the court.  In fact, the court does not even purport to discuss those words.  Instead, the firearm restrictions in English and American history supposedly "reflect longstanding prohibitions," and "the conduct they regulate is therefore outside the historical scope of the Second Amendment."[8]  Pay no attention to the words behind the curtain.

This nullifies not only the literal words of the Amendment, but also the Supreme Court's analysis of those words in *District of Columbia v. Heller*, which decided: "At the time of the founding, as now, to 'bear' meant to 'carry.'"[9] The Court added that the right to "bear arms" refers to a right to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person."[10]  The Court found the "inherent right of self-defense" to be "most acute" in the home, indicating that it is also acute outside the home.[11] It noted that the decision did not "cast doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ."[12]  That comment obviously casts doubt on laws forbidding the carrying of firearms in *non-sensitive* places.

The *Young* court mentions, but sees nothing particularly significant or binding about, *Heller*'s above discussion.[13]  While the Amendment's text does not limit the right to the home,

---

[7]David B. Kopel & George A. Mocsary, "Errors of Omission: Words Missing from the Ninth Circuit's *Young v. State of Hawaii*," 2021 *U. Ill. L. Rev. Online* 172 (May 13, 2021).

[8]*Id*. at 773.

[9]*District of Columbia v. Heller,* 554 U.S. 570, 584 (2008) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

[10]*Id*.

[11]*Id*. at 628.

[12]*Id*. at 626.

[13]*Young*, 992 F.3d 782-83.

Electronic copy available at: https://ssrn.com/abstract=3885910

and *Heller* said that Americans valued the right "more important for self-defense and hunting" than for militia purposes,[14] *Young* thought that exercise of the right "outside the home is less clear," and that *Heller* only "implied" that "some right to bear arms may exist outside the home."[15]  Perhaps it is unclear that hunting and militia activities always take place outside the home, and that self-defense is frequently exercised outside the home.

As has been stated about passages from *Heller*: "This is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings."[16]

Judge O'Scannlain said it best in his dissent – "the majority reduces the right to 'bear Arms' to a mere inkblot."[17]  Instead of beginning with the constitutional text – as *Heller* did with its linguistic analysis of each word and phrase[18] – *Young* claimed that it would base its determination of whether "the challenged law affects conduct that is protected by the Second Amendment" on the "historical understanding of the scope of the right."[19]  While *Heller* indeed used that phrase about the historical understanding, it began with the language of the Amendment.  *Young* simply skipped that stage and jumped right into the history.  But it would be a combination of the wrong history and a distorted history.

*Young* begins its analysis of the historical scope of the Second Amendment by noting its prior decision in *Peruta* that "the Second Amendment does not protect the right of a member of the general public to carry concealed firearms in public."[20] No need exists to review *Peruta* here because it was based on the same *faux histoire* that *Young* uses to square the circle and conclude that no member of the general public has a right openly to carry firearms either.

The court goes on to say: "Our sister circuits have, in large part, avoided extensive historical analysis."[21]  It is certainly true that the circuits that have upheld carry bans have avoided the actual history.  But *Young* declares its ambition to write the definitive history: "We

---

[14]*Heller,* 554 U.S. at 599.

[15]*Young*, 992 F.3d at 783.

[16]*United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*).

[17]*Young*, 992 F.3d at 830 (O'Scannlain, J., dissenting).

[18]*Heller,* 554 U.S. at 576.

[19]*Young*, 992 F.3d at 783 (quoting *Heller,* 554 U.S. at 626).

[20]*Peruta v. County of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc).

[21]*Young*, 992 F.3d at 784.

4

Electronic copy available at: https://ssrn.com/abstract=3885910

do not think we can avoid the historical record."[22]  It then announces its determination that "restrictions on carrying arms openly have long been a part of our legal tradition,"[23] from which it concludes that "the people" have no "right to . . . bear arms" at all.

## II.  HISTORICALLY, HAWAIIAN CARRY LAWS WERE ADVERSE TO THE RIGHT

Rather than limiting its analysis to the "historical scope" of the Second Amendment, *Young* deemed it relevant to trace in detail Hawaiian laws beginning when Hawaii was a monarchy, before its annexation by the United States.  The court quotes the Act of May 25, 1852, § 1, as imposing punishment on "[a]ny person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon."[24] But the sentence did not end there – it continued "unless good cause be shown for having such dangerous weapons . . . ."[25]

For all we know, a person's credible claim that he or she was carrying for self-defense, in the absence of evidence that the person was carrying for a nefarious purpose, would have been considered good cause.  Or would that have depended on the person's race or national origins?  At any rate, at that time, no state in the United States had any such ban, and no state delegated power to a legislature to "authorize" select persons the privilege of carrying arms.

Section 2 of the Act (of which the court quotes just a few words) provided in full: "The following persons are hereby declared to be authorized to bear arms, viz: – All persons holding official, military or naval rank either under this government or that of any nation at peace with this Kingdom, when worn for legitimate purposes."[26]  The contrast could not be more stark – the Second Amendment recognizes "the right of the people to . . . bear arms," while the law declared that only persons in government were "authorized to bear arms."

On the date of the above enactment, the 1840 Constitution of the Hawaiian Kingdom was in force.  It did not declare any right to bear arms.[27]  Hawaii's Constitution of 1852, enacted on June 14, 1852 – just a month after passage of the Act – included a Declaration of Rights, but it

---

[22]*Id.*

[23]*Id.* at 786.

[24]*Id.* at 774, citing 1852 Haw. Sess. Laws 19.

[25]§ 1, 1852 Haw. Sess. Laws 19.

[26]*Id.*, § 2.

[27]See text at http://hooilina.org/collect/journal/index/assoc/HASH0166.dir/5.pdf.

5

Electronic copy available at: https://ssrn.com/abstract=3885910

said nothing even remotely about the right to bear arms.[28]  With provisions like the following, the 1852 Constitution was alien to American values: "The King is sovereign of all the chiefs and of all of the people; the kingdom is his."[29]  That recalls the infamous dictum of Louis XIV: "*L'état, c'est moi*."

According to *Young*, "Hawai'i's regulation of dangerous weapons remained in effect after Hawai'i consented to annexation as a U.S. territory in 1898."[30]  But the court neglected a significant liberalization of Hawaiian law that took place after the monarchy was overthrown and the Republic of Hawaii was proclaimed in 1894.  Under the new Constitution, all statutes in force at the time continued to be in force,[31] which meant that the 1852 law remained on the books.  However, a law was passed in 1896 providing for a license to carry a pistol or other firearm based on the payment of a fee, without any other qualification.[32]  As the following explains, a person with that license was not subject to the 1852 law.

In *Republic of Hawaii v. Clark* (1897) – which *Young* ignores – the Hawaiian Supreme Court quoted what was then Chapter 54, § 1, of the Penal Code, that "any person not authorized by law, who shall carry or be found armed with" a pistol or other dangerous weapon was subject to punishment "unless good cause be shown for having such dangerous weapon."[33]

But that was not the only pertinent law on the books.  Chapter 64, Laws of 1896, provided for an "annual fee for a license to possess, carry or use a pistol, rifle, carbine, shotgun or other fire-arm" of one dollar and stated that "no fire-arm shall be possessed, carried or used in the Republic without a license . . . ."[34]  The only qualification for the license was the payment of the fee.  The defendant in *Clark* was charged under Chapter 54, but had a license under Chapter 64 to carry a Smith & Wesson revolver.  The court reversed his conviction based on the following:

> Upon comparison of Chap. 64, Laws of 1896, with Chap. 54 of the Penal Code, we are of opinion that this Act does not repeal Chap. 54 of the Penal Code;

---

[28]See text at http://hooilina.org/collect/journal/index/assoc/HASH01ce.dir/5.pdf.

[29]Haw. Const., Art. 36 (1852).

[30]*Young*, 992 F.3d at 774.

[31]Haw. Const., Art. 92, § 1 (1894).

[32]Ch. 64, §§ 59 & 60, *Laws of the Republic of Hawaii Passed by the Legislature at its Session, 1896*, at 224 (1896).

[33]*Republic of Hawaii v. Clark*, 10 Haw. 585, 585-86 (1897).

[34]*Id*. at 587, quoting §§ 59 & 60, Chapter 64, Laws of 1896.

6

Electronic copy available at: https://ssrn.com/abstract=3885910

but, as its terms are explicit in giving a license to possess, carry and use fire-arms, a person who has complied with its terms and obtained a license thereunder can plead the same in justification under a criminal charge made against him for carrying deadly weapons under Chap. 54 of the Penal Code, and claim that he was authorized by the license law to carry the weapon, and the same would be a good defense and no conviction could be had.[35]

So *Young* left out a significant chapter in the history of Hawaiian law on the carrying of firearms.  While no state in the United States had such a law, Hawaii allowed anyone to carry a pistol merely by paying a license fee.

As of 1913, *Young* tells us that Hawaiian law allowed a person to carry a pistol if he or she had "good cause" (which did not require a license) or was "authorized by law."[36]  For all we know, "good cause" may have included a credible claim that the person was carrying a pistol for self-defense.  Or the authorities may have tied "good cause" to one's race or national origins.  And although not mentioned by *Young*, the law continued to provide that "[t]he following persons are hereby declared to be authorized to bear arms, viz.: all persons holding official, military, or naval rank . . . ."[37]  Again, the conflict with the right of "the people" to bear arms in the Second Amendment was obvious.

Under a 1927 law, *Young* continues, a person needed a license to carry a "pistol or revolver concealed upon his person or to carry one elsewhere than in his home or office," which would be granted on showing a "good reason to fear an injury to his person or property, or . . . other proper reason for carrying a pistol or revolver."[38] The court states that this only applied to concealed carry, but in 1961, a law was enacted that to carry openly, one must demonstrate "the urgency of the need" and must be "engaged in the protection of life and property."[39]

Nothing in *Young* reflects how the above provisions were interpreted.  Under the "good" or "proper" reason requirements, was a statement on the application form that the person wished to carry for self-defense sufficient to be issued a license?[40]  Given that not a single Hawaiian case

---

[35]*Id.* at 587.

[36]*Young*, 992 F.3d at 774, citing 1913 Haw. Sess. Laws 25, act 22, § 1.

[37]§ 3090, Revised Laws of Hawaii 1123 (1905).

[38]*Young*, 992 F.3d at 774, citing 1927 Haw. Sess. Laws 209, 209–211.

[39]*Id.* at 775, citing 1961 Haw. Sess. Laws 215.

[40]See *Schubert v. DeBard*, 398 N.E. 2d 1339, 1341 (Ind. App. 1980) (holding that self-defense was "a proper reason" for a license to carry a handgun and that discretion by the issuing

7

Electronic copy available at: https://ssrn.com/abstract=3885910

with those terms appears in the Westlaw databank, does the lack of litigation on the subject indicate that licenses were freely available?  It is noteworthy that virtually no Hawaiian decisions with the search terms "firearm" in the same sentence as "without a license" appear until the 1990s and 2000s.

Today, one must show "an exceptional case" and a "reason to fear injury to [his or her] person or property" for a license to carry concealed.[41] A license for open carry requires that "the urgency or the need has been sufficiently indicated" and that the applicant "is engaged in the protection of life and property."[42]  As the record reflects, no one gets licenses to carry concealed.  As applied in Hawaii County, open carry licenses are available only to "private detectives and security guards."[43]

### III.  PEACEABLE CARRY WAS LAWFUL IN THE ENGLISH TRADITION

A. The Royal Decrees Were Directed at Tumultuous Gatherings, Not Peaceable Carry

As *Heller* stated, the Second Amendment codified a pre-existing right that we "inherited from our English ancestors."[44] But *Young* is intent on presenting every conceivable monarchial intrusion on the right rather than exploring the actual right as it evolved in spite of these violations.  It is biased in favor of the power of the kings and against the liberties of the often-oppressed subjects.  Its method would be analogous to detailing every royal law or decree that repressed the freedom of the press in order to show that the First Amendment freedom of the press is nugatory.

How fitting that *Young* begins with the royal decrees, the arbitrary diktats of often blood-thirsty monarchs who engaged in raw power struggles with their opponents and who treated their subjects as fodder to exploit and repress.  The Founders would be aghast that the Bill of Rights would be interpreted according to the tyrannical decrees of medieval English kings.

The court cites several royal decrees in the years 1299-1327 to the effect that "King Edward I and his successor, King Edward II, issued a series of orders to local sheriffs that

---

authority "would supplant a right with a mere administrative privilege").

[41] *Young*, 992 F.3d at 775, citing HRS § 134-9(a).

[42] *Id*.

[43] *Id*. at 776.

[44] *Young*, 992 F.3d at 786, quoting *Heller*, 554 U.S. at 599.

8

Electronic copy available at: https://ssrn.com/abstract=3885910

prohibited 'going armed' without the king's permission."[45]  But the court is unsure about whether these decrees were, in fact, merely temporary: "Although the king regularly granted the sheriffs authority to disarm the people while in public, it is unclear from these royal orders whether that authority was absolute or if it was tied to times of potential upheaval and possible affray."[46]

*Young* neglects that the context of the term "going armed" in these decrees concerned disruptive, potentially violent behavior, not the mere carrying of defensive weapons by peaceable subjects.  For instance, the court partially quotes a decree of Edward I instructing the sheriff of York to prohibit "any knight, esquire or any other person from . . . going armed without the king's special licen[s]e."[47] But the full text without deletions shows that the order instructed the sheriff more specifically to prohibit:

> any knight, esquire or any other person from tourneying, tilting (*burdeare*), making jousts, seeking adventures or otherwise going armed without the king's special licence, and to cause to be arrested the horses and armour of any persons found thus going with arms after the proclamation, as the king wills that no tournaments, tiltings or jousts shall be made by any persons of his realm without his special licence.[48]

The meaning of the above terms puts the term "going armed" in a completely different light than *Young* suggests.  The  *Dictionarium Anglo-Britannicum* provides this definition: "Turnament, (F.), Justing, or Tilting, a Warlike Exercise of armed Knights, or Gentlemen fighting with one another on Horse-Back, with Lances or Spears; a Sport much us'd in former Times, but now quite laid aside."[49]  Peaceably carrying a dagger or bow and arrow for self-defense would not be "going armed" in the above context.

In any event, these royal decrees are wholly irrelevant.  Edward I Longshanks was one of the most ruthless kings who is best known today for his cruelty toward the Scots (he ordered the indescribably gruesome execution of William Wallace of "Braveheart" fame).  His son Edward II fought against reforms by the barons and was eventually forced to abdicate, after which he was murdered.  The Founders would have held in contempt the idea that they must get "the king's license" to do anything, whether carry arms or speak freely.  Instead, they fired the shot heard

---

[45]*Id*. at 786.

[46]*Id*. at 787.

[47]*Id*. at 786, quoting 4 *Calendar Of The Close Rolls, Edward I, 1296–1302*, at 588 (July 16, 1302, Westminster) (H.C. Maxwell-Lyte ed., 1906).

[48]4 *Calendar* at 588.

[49]John Kersey, *Dictionarium Anglo-Britannicum or a General English Dictionary* (1708).

9

Electronic copy available at: https://ssrn.com/abstract=3885910

'round the world to prevent the king's troops from confiscating their unlicensed firearms.

### B. The Statute of Northampton and Related Laws Applied to Affrays and Violent Crime

"Any doubt as to the scope of government's authority to disarm the people in public was dispelled with Parliament's 1328 enactment of the Statute of Northampton," *Young* confidently announces, "which effectively codified the firearms restrictions that preceded it."[50]  "Firearms" restrictions?  The matchlock was the first functional gun, and it appeared around 1440 in Nuremberg and in other parts of Europe in the next thirty years.[51]  That aside, the Statute provided that no person shall "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere . . . ."[52]

Did this archaic language ban going armed per se, or did it do so only in affray of the peace?  English courts would read it in the latter manner, as discussed below.  But *Young* immediately takes a great leap forward and, citing a law review article, asserts: "To the majority of fourteenth-century Englishmen, the Statute of Northampton was generally understood to be 'a complete prohibition on carrying weapons in public, at least in populated areas.'"[53] How would anyone know what "the majority" of Englishmen then understood about the Statute, if they were even aware of it?  The article's author makes no such bold claim about the public, and instead simply asserts that to have been the understanding of the Statute.  His proof?  Two other law review articles, one of which agreed and the other of which disagreed, stating that "the statute only prohibited going armed in defensive armor . . . ."[54]

---

[50]*Id.*

[51]Robert Held, *The Age of Firearms* 26 (1957).

[52]2 Edw. 3, 258, ch. 3 (1328).

[53]*Young*, 992 F.3d at 788, citing Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," 43 S. Ill. U. L.J. 61, 67 (2018).

[54]Frassetto ,"To the Terror of the People," at 67.  He cites, *id*. n.27, Patrick Charles, "The Faces of the Second Amendment Outside of the Home: History Versus Ahistorical Standards of Review," 60 CLEV. ST. L. REV. 1, 11 (2012); Clayton E. Cramer, "The Statute of Northampton (1328) and Prohibitions on the Carrying of Arms (Sept. 19, 2015) (unpublished manuscript) (available at SSRN: https://ssrn.com/abstract=2662910) (arguing the statute only prohibited going armed in defensive armor).

Electronic copy available at: https://ssrn.com/abstract=3885910

*Young* next asserts, "The statute applied to anyone carrying arms, without specifying whether the arms were carried openly or secretly.  In 1350, Parliament specifically banned the carrying of concealed arms."[55]  For that, the court purports to quote 25 Edw. 3, 320, st. 5, c. 2, § 13 (1350), as follows: "[I]f percase any Man of this Realm ride armed [covertly] or secretly with Men of Arms against any other . . . it shall be judged . . . Felony or Trespass, according to the Laws of the Land." (alteration in original)."[56]

Astonishingly, the court deleted the essence of the crime, shown here in italics: "[I]f percase any Man of this Realm ride armed [covertly] or secretly with Men of Arms against any other, *to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance* . . . it shall be judged . . . Felony or Trespass, according to the Laws of the Land of old Times used . . . ."  The offense thus consisted of gangs riding with concealed arms to murder, rob, or kidnap.  It did not prohibit a peaceable person from carrying concealed arms.  The court overzealously manipulated the statute in an effort to prove what it cannot prove.  Had an attorney, an officer of the court, made such a misrepresentation, sanctions would be in order.

The Statute was expanded in 1396, *Young* continues, to encompass the bearing of a Sallet, Skull of Iron, or "other Armour."[57]  The Sallet and Skull of Iron were medieval combat helmets.[58]  Presumably, other armor would have been similar armor designed for the battlefield.  As discussed below, these were the kinds of warlike instruments that would create terror among the public, which is what the Statute aimed to discourage.  There is no evidence that it was aimed at burghers and peasants peaceably carrying arms to protect themselves from robbers and murderers.

*Young* next describes the enforcement of the Statute, but the orders given by Edward III again indicate that repression of roving bands of knights or criminals was the object.  The court quotes a November 1328 order to sheriffs "to cause the statute made in the late parliament at Northampton prohibiting men coming armed before justices or other ministers of the king, or going armed, etc., to be observed,"[59] but ignored the related order to investigate "the malefactors who have made assemblies of men-at-arms or have ridden or gone armed in his bailiwick,

---

[55] *Young*, 992 F.3d at 788.

[56] *Id.* at 788-89.

[57] *Id.* at 789, citing 20 Ric. 2, 92–93, ch. 1 (1396).

[58] "Medieval Helmets," https://www.pinterest.com/pin/210472982560782548/; "Medieval Helmet," https://medievalbritain.com/type/medieval-life/weapons/medieval-helmet/.

[59] *Young*, 992 F.3d at 789.

11

Electronic copy available at: https://ssrn.com/abstract=3885910

contrary to the statute and the king's proclamation . . . ."[60]  Sheriffs were ordered to imprison "all those whom he shall find going armed, with their horses and armor."[61] That doesn't exactly sound like serfs carrying protective staffs or bows.

The court gives a snippet of a 1334 order "which reinforced the statute's exceptions for those on the king's errand,"[62] but leaves out the critical part informing that "the king has learned that several malefactors and disturbers of the peace, not respecting these statutes, making assemblies and illicit gatherings both by day and night in York, its suburbs and neighbourhood, go about armed and lie in wait for those coming and going to and from that city, and staying there, both the king's ministers and other lieges, and beat, wound and rob them . . . ."[63]  The law was aimed at these aggressors, not their victims.

*Young* claims that "restrictions on carrying also permeated public life,"[64] but its only proof is the example that on Friday before the Feast of St. Thomas, "All guests in hostelries were to be warned against going armed in the City."[65]  But this indicated that many guests may have arrived at the hostelries armed and were told to leave their arms there.  The Feast of St. Thomas was a major event[66] that was likely attended by the king and his ministers, so that this was likely just a temporary restriction.

The court ends its discussion of the enforcement of the Statute by noting Richard II's 1377 order to continue enforcing the Statute.[67]  But it left out the persons to which the Statute was aimed – those who "have gone and go armed and bearing arms wander hither and thither,

---

[60]1 *Calendar Of The Close Rolls, Edward III, 1327-1330*, at 420 (Nov. 10 and 11, 1328) (H.C. Maxwell-Lyte ed., 1896).

[61]2 *Calendar Of The Close Rolls, Edward III, 1330-1333*, at 131 (April 3, 1330, Woodstock) (H.C. Maxwell-Lyte ed., 1898).

[62]*Young*, 992 F.3d at 789.

[63]Letter to Mayor and Bailiffs of York (Jan. 30, 1334), in 3 H. Maxwell-Lyte ed., *Calendar of the Close Rolls, Edward III, 1333-1337*, at 294 (London: Her Majesty's Stationery Office, 1898).

[64]*Young*, 992 F.3d at 789.

[65]1 *Calendar of Plea & Memoranda Rolls of the City of London, 1323-1364*, at 156 (Dec. 19, 1343) (A.H. Thomas ed., 1898).

[66]"St. Thomas's Day," https://encyclopedia2.thefreedictionary.com/St.+Thomas%27s+Day.

[67]*Young*, 992 F.3d at 790.

12

Electronic copy available at: https://ssrn.com/abstract=3885910

laying snares for men coming to or from the town and those dwelling therein, beating, wounding and evil treating them, robbing some of their property and goods, . . . in breach of the peace and to the terror of the people in those parts."[68]  It was not aimed at the potential victims of these crimes who might carry arms for protection.

So *Young* ends its discussion of enforcement of the Statute in 1377.  What's the significance of all of that detail?  The court appears to be lining up one item after another so that it has far more citations than the dissent.  What possible relevance are these orders of medieval monarchs to the Second Amendment and the Founders?  None at all.

C. *Rex v. Knight*, the Decisive Precedent, Held that Going Armed was Lawful Unless Done in a Manner to Terrorize the Subjects

*Young* discusses two cases that bear on the Statute, the first of which is almost irrelevant and the second of which is dispositive of how the Statute was interpreted.  This discussion is a low point in the opinion, coming as it does from highly educated judges who routinely apply complex precedents to adjudicate cases.

The first is *Chune v. Piott* (1615), a case decided by the King's Bench which involved a plaintiff who sued a sheriff for an unlawful arrest arising out of the plaintiff's attempt to help a prisoner escape.  The Statute of Northampton was not involved.  Justice Croke, one of four judges who opined in the case, mentioned as an analogy that "the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, *in terrorem populi Regis*; he ought to take him, and arrest him, notwithstanding he doth not break the peace in his presence."[69]  Thus, the carrying of the weapon must be *in terrorem populi Regis* (to the terror of the King's subjects), and the arrest could be made even if the suspect did not break the peace in the sheriff's presence.

*Young* correctly states: "The phrase *in terrorem populi Regis*— "to the terror of the king's people'—might suggest one of two things: First, that there must be some proof of the carrier's *intent* to terrorize the people or, second, that there must be some proof of the *effect* (whether intended or not) on the people."[70]  But it then jumps to the conclusion that neither was an element of the offense because the sheriff could arrest the person just for carrying "notwithstanding he doth not break the peace."[71]  Not so.  *Chune* explicitly stated that if the sheriff "sees any one to

---

[68]1 *Calendar Of The Close Rolls, Richard II, 1377-1381*, at 34 (Dec. 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914).

[69]Chune v. Piott, 80 Eng. Rep. 1161, 1162 (K.B. 1615).

[70]*Young*, 992 F.3d at 790.

[71]*Id*.

13

Electronic copy available at: https://ssrn.com/abstract=3885910

carry weapons in the high-way, *in terrorem populi Regis*," he could arrest him even if the person didn't separately "break the peace in his presence."  The sheriff could not make an arrest if he only "sees any one to carry weapons in the high-way" peaceably and thus *not* "*in terrorem populi Regis*."

Hopefully the Ninth Circuit would not so sloppily misconstrue modern criminal laws in such a manner.  If it did, massive numbers of criminal defendants could be convicted without any strict adherence to the actual elements of the offenses.

Next comes the court's misconstruction of the two reported cases concerning Sir John Knight, which constitute *the* definitive interpretation by the King's Bench of the Statute of Northampton. One version of the decision reported an information against Knight based on the Statute, which it characterized as having prohibited "going or riding armed in affray of peace . . . ."  It was alleged that Knight "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects, *contra formam statuti*."[72]  The case was tried before a jury and "the defendant was acquitted." The Chief Justice said that the meaning of the Statute "was to punish people who go armed to terrify the King's subjects. It is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects . . . ."[73]

So the offense was going armed "in affray of peace," *i.e.*, in a manner "to terrify the King's subjects." But *Young* is unwilling to concede the obvious, ignoring those clear words and citing that part of the decision to conclude that "the meaning of the Statute of Northampton was to punish those who go armed."  It adds that, based on the comment about the King being unable to protect his subjects – which in no way changes the elements of the crime – "perhaps that Knight was acquitted because he had not intended criticism of the king's authority or ability to keep the peace."  The "authority" for that claim is the ever-ready law review article spin that invents the claim that "Knight defended himself on the grounds of his 'active loyalty' to the crown rather than by denying that he had created a public terror."[74]  Nothing in the King's Bench opinion even remotely insinuates that.

The other version of the Knight opinion recited counsel for defendant's argument: "This statute was made to prevent the people's being oppressed by great men; but this is a private matter, and not within the statute."  (Recall the turbulent times of Edward III with bodies of knights fighting it out.)  The Chief Justice held: "But tho' this statute be almost gone in desuetudinem [disuse], yet where the crime shall appear to be malo animo [with evil intent], it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for

---

[72]*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686).

[73]*Id.*

[74]*Young*, 992 F.3d at 790, quoting Frassetto, 43 S. Ill. U. L.J. at 70.

14

Electronic copy available at: https://ssrn.com/abstract=3885910

their security) . . . ."[75]  While ignoring this parenthetical, *Young* concedes that Knight's acquittal was due to his lack of "mal-intent to terrify the people."[76]

    *Young* cites a third source on the Knight case, a diary kept by Narcissus Luttrell, which noted the charge that he was "goeing with a blunderbus in the streets, to the terrifyeing his majesties subjects," and that the jury acquitted him, "not thinking he did it with any ill design . . . ."[77]  This just confirms again that he was charged with going armed to the terror of the subjects, and the jury acquitted him because he did not do so with evil intent.

    There are other original sources that the court does not cite, and they all speak with one voice.  It turns out that Knight was going armed for protection after being attacked.[78]  And yet *Young* implies that we just don't know what occurred – "[w]e cannot resolve this dispute in the original sources, much less in the academic literature" – and that the court bound him to his good behavior, "making Knight's 'acquittal' more of a conditional pardon."[79]  This final attempt to muddy the water just doesn't work.  "If the jury therefore find the prisoner not guilty, he is then for ever quit and discharged of the accusation," according to Blackstone.[80]  Courts still had a power to bind a person to keep the peace.[81]

    *Young* doesn't bother to mention any subsequent English cases, including those that were right on point.  The King's Bench held in 1914 that the Statute of Northampton made it an offense "to ride or go armed without lawful occasion *in terrorem populi*," adding:

> The words "in affray of the peace" in the statute, being read forward into the "going armed," render the former words part of the description of the statutable offence.  The indictment, therefore, omits two essential elements of the offence – (1) That the going armed was without lawful occasion; and (2) that the act was *in*

---

[75]*Rex v. Knight*, Comb. 38, 90 Eng. Rep. 330 (K.B. 1686).

[76]*Young*, 992 F.3d at 790, quoting 1 Narcissus Luttrell, *A Brief Historical Relation of State Affairs, September 1678 to April 1714*, at 380, 389 (Oxford Univ. Press 1857).

[77]*Young*, 992 F.3d at 790-91.

[78]3 Roger Morrice, *The Entring Book of Roger Morrice 1677-1691*, at 307-08 (Woodbridge, England: Boydell Press, 2007).

[79]*Id.* at 791.

[80]4 Blackstone, *Commentaries* *335.

[81]*Id.* at *249.

Electronic copy available at: https://ssrn.com/abstract=3885910

*terrorem populi*.[82]

An example of such violation, as another court held, was "firing a revolver in a public place, with the result that the public were frightened or terrorized."[83]  By contrast, the last decision ever to mention the Statute stated, "mere possession of a weapon, without threatening circumstances . . ., is not enough to constitute a threat of unlawful violence. So, for example, the mere carrying of a concealed weapon could not itself be such a threat."[84]

D.  English Treatises Limited the Offense to Carrying Dangerous and Unusual Weapons

*Young* begins its analysis of English treatises by reference to a guide to legal restrictions in London published in 1419 providing that only the privileged classes could carry arms.[85]  Imagine what our Founders would have thought of such monarchial tyranny.  In 1775, at Lexington and Concord, they essentially took arms against British orders not to go armed other than in the service of the King.

Next, *Young* acknowledges what William Hawkins – one of the greatest influences in the minds of the Founders – wrote on the subject.  It was an affray where "a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people," "no wearing of arms is within the meaning of this statute [of Northampton], unless it be accompanied with such circumstances as are apt to terrify the people," and thus that "persons of quality" did not violate the statute by wearing "common weapons . . . for their ornament or defence."[86]  That should end the discussion.

But *Young* falls off the wagon again.  A law review article to the rescue – ignoring Hawkins' general statements, the court asserted that only "certain classes of people could carry arms" in that "public carry was not threatening when it was done by the wealthy . . . ."[87]  The court goes on to misconstrue Hawkins to say that "proactive self-defense was not a good enough

---

[82]*Rex v. Smith*, 2 Ir. R. 190, 204 (K.B. 1914).

[83]*Rex v. Meade*, 19 L. Times Repts. 540, 541 (1903).

[84]*I v. Director Of Public Prosecutions*, 2 Cr. App. R. 14, 226 (Lords 2001).

[85]*Young*, 992 F.3d at 792, quoting John Carpenter, *Liber Albus: The White Book of the City of London* 335 (Henry Thomas Riley ed., 1862).

[86]*Id*., quoting 1 William Hawkins, *A Treatise of the Pleas of the Crown* 488-89 (John Curwood ed., 1824).

[87]*Id*., citing  Frassetto, 43 S. Ill. U. L.J. at 67–69.

16

Electronic copy available at: https://ssrn.com/abstract=3885910

reason to go armed openly."[88]  But Hawkins stated: "[A] man cannot excuse the wearing [of] such armour in public, by alleging that such a one threatened him, and [that] he wears it for the safety of his person from his assault."[89] By "such armour," Hawkins meant unusual, warlike armor that would alarm the subjects; by contrast, on the same page, he wrote that "persons armed with privy coats of mail" for self-defense do not violate the Statute "because they do nothing in terrorem populi."[90]  Exactly – privy coats of mail could not be seen because they were worn under one's garments, and thus could not terrorize anyone.

*Young*'s next witness is Joseph Keble, but he is quoted just for saying "if a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed."[91] The court is confused about whether that refers to "unusual weapons" – the same sentiment expressed by Hawkins above – or "to common weapons worn when one would not expect it."[92]  Before this decision, who ever suggested the latter?

According to Blackstone, "[t]he offence of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the Statute of Northampton."[93] Ignoring the reference to dangerous or unusual weapons, *Young* changes this to mean that "the mere act of going armed in and of itself terrified the people."[94]  Lord Coke said that one could not "goe armed, by night or by day, &c. before the Kings Justices in any place whatsoever."[95]  But *Young* feels compelled to delete the context of being "before the Kings Justices" so that it reads "goe nor ride armed by night nor by day . . . in any place what[s]oever."[96]

---

[88]*Id*.

[89]*Id*., quoting 1 Hawkins, *A Treatise of the Pleas of the Crown* at 489.

[90]1 Hawkins at 489.

[91]*Young*, 992 F.3d at 792-93, quoting Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of their Duty* 147 (1689).

[92]*Id*. at 793.

[93]4 William Blackstone, *Commentaries* *148–49 (1769).

[94]*Young*, 992 F.3d at 793.

[95]Edward Coke, *The Third Part of the Institutes of the Laws of England* 160 (E. and R. Brooke ed., 1797).

[96]*Young*, 992 F.3d at 793.

17

Electronic copy available at: https://ssrn.com/abstract=3885910

### E. The English Bill of Rights Confirmed the Ancient Right to Have Arms

"The English Bill of Rights created, for the first time, a right for certain people to possess arms, but it was a conditional right. " *Young* informs us.[97]  Actually, it "created" nothing, and instead declared thirteen "true, ancient and indubitable rights," including the following: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Condition, and as are allowed by Law."[98]  The Second Amendment specified no such conditions on the right of all of "the people" to bear arms.  In his notes introducing the bill of rights in Congress, James Madison observed the fallacy "as to English Decl[aratio]n. of Rights" that it limited "arms to protest[an]ts."[99]  And St. George Tucker contrasted the English Declaration with the Second Amendment's wording that "the right of the people to keep and bear arms shall not be infringed," adding, "this without any qualification as to their condition or degree, as is the case in the British government."[100]

*Young* ignored relevant opinions by the English courts on questions of English law.  An English court gave the following jury instruction in an 1820 case: "But are arms suitable to the condition of people in the ordinary class of life, and are they allowed by law?  A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is traveling or going for the ordinary purposes of business."[101]

Blackstone characterized the right as "a public allowance under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."[102]  *Young* reduces this to a snippet about "due restrictions" only and attributes to Blackstone the averment that there was a "prohibition on publicly carrying weapons,"[103] which is not to be found in the general term "have Arms for their

---

[97]*Id.* at 793.

[98]An Act Declaring the Rights and Liberties of the Subject, 1 W. & M., Sess. 2, c.2, (1689).

[99]Madison, Notes for Speech in Congress, June 8, 1789, 12 *The Papers of James Madison*, Charles F. Hobson *et al*. eds., 193-94 (Charlottesville: University Press of Virginia, 1979).

[100]1 Blackstone, *Commentaries* *143-44 n.40 (St. George Tucker ed. 1803).

[101]*Rex v. Dewhurst*, 1 State Trials, New Series 529, 601-02 (1820).

[102]1 Blackstone, *Commentaries* *139.

[103]*Young*, 992 F.3d at 793.

18

Electronic copy available at: https://ssrn.com/abstract=3885910

Defence"[104] and which ignores Blackstone's reference to "dangerous or unusual weapons."[105]

Finally, our Bill of Rights is not bound by the English Declaration.  Just before discussing the right to arms, Blackstone addressed "the right of petitioning the king, or either house of parliament, for the redress of grievances."  He added that no petition "for any alteration in church or state, shall be signed by above twenty persons, . . . nor shall any petition be presented by more than ten persons at a time.  But, *under these regulations*, it is declared by the statute 1 W. & M. st. 2. c. 2, that the subject hath a right to petition . . . ."[106]  St. George Tucker noted about this passage: "The right of petitioning is not subject to any limitation or restriction in the United States."[107]  Would the Ninth Circuit limit our First Amendment right to petition to the more limited right to petition under the English Declaration?

### IV. AMERICA WAS FOUNDED ON A ROBUST RIGHT TO BEAR ARMS

#### A. Colonial Laws Often Mandated the Carrying of Arms

"The colonists shared the English concern that the mere presence of firearms in the public square presented a danger to the community," *Young* asserts.[108]  But the court presents no evidence that "the colonists" had any such concern.  All it could dig up was a 1686 law of East New Jersey, which did not apply in West New Jersey, providing that no person may "privately . . . wear any pocket pistol" or certain other weapons – open carry was fine – and that "no planter shall ride or go armed" with certain weapons except when traveling.[109]  Planters must have been deemed second-class subjects.

That law may not have survived the Glorious Revolution which led to the Declaration of Rights, as a 1694 East New Jersey law made it unlawful for a slave "to carry any gun or pistol" into the woods or plantations unless with the owner or a white man, which implied that the latter

---

[104]An Act Declaring the Rights and Liberties of the Subject, 1 W. & M., Sess. 2, c.2, (1689).

[105]4 William Blackstone, *Commentaries* *148–49 (1769).

[106]1 Blackstone, *Commentaries* *143 (St. George Tucker ed. 1803) (emphasis added). Blackstone cited 13 Car. II. st. 1. c. 5, for the limits on petitioning.

[107]*Id.* n.39 (Tucker ed.).

[108]*Young*, 992 F.3d at 794.

[109]*Id.*, quoting An Act against Swords, &c., 1686 N.J. Laws 289, 289-90, ch. IX.

19

Electronic copy available at: https://ssrn.com/abstract=3885910

persons could carry such arms.[110]

*Young*'s only other evidence was a Massachusetts Bay law of 1692 and a New Hampshire law of 1699 that prohibited going armed "offensively,"[111] not going armed peaceably.  So much for "the colonists" being concerned about "the mere presence of firearms" in public.

*Young* then pivots to "colonial laws that not only permitted public carry, but mandated it," such as when going to church, to public gatherings, and traveling.  These many laws together with the virtually non-existent restrictions leads the court to assert that "the colonies assumed that they had the power to *regulate* – whether through *mandates* or *prohibitions* – the public carrying of arms."[112]  But nothing in the power to require implies a power to ban.  The fact that going armed was so often required only shows how commonplace it was for everyone to carry arms.

Finally, the court mentions Virginia's 1786 statute providing that "no man, great nor small, . . . [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country."[113]  But that required proof as an element of the offense not just that one went armed, but also that he did so "in terror of the Country."  The law was drafted by a Committee of Revisors, of which Thomas Jefferson played the leading role.[114]  Had it been read to ban the mere carrying of firearms, Jefferson would have been one of its biggest violators, as he regularly went armed and defended the right to do so.[115]

The court skips over the history of the British attempts to disarm the Americans as a leading cause of the American Revolution, the proposal of the Constitution without a bill of rights that led to an outcry for recognition of the right to bear arms, and the discussion in the public sphere leading to the ratification of the Second Amendment.  It's like nothing relevant was

---

[110]An Act concerning Slaves, &c., § 1, East New Jersey Laws, October 1694, ch.II, L&S 340-342.

[111]*Young*, 992 F.3d at 794-95, quoting An Act for the Punishing of Criminal Offenders, 1692 Mass. Laws No. 6, at 11–12, and 1699 N.H. Laws. 1.

[112]*Young*, 992 F.3d at 795.

[113]*Id*., quoting 1786 Va. Laws 33, ch. 21.

[114]2 Jefferson, *The Papers of Thomas Jefferson*, Julian P. Boyd ed., 519-20 (Princeton: Princeton University Press, 1951).

[115]See Stephen P. Halbrook, *The Founders' Second Amendment* 131, 260, 316-18 (Lanham, Md.: Rowman & Littlefield, 2008).

20

Electronic copy available at: https://ssrn.com/abstract=3885910

said in the period 1768 to 1791 relevant to the right to bear arms.[116]  Better to focus on medieval monarchial decrees and East New Jersey's aberration to prove that no right to bear arms was recognized.  Especially don't look at the text behind the curtain.

### B. Post-Ratification Laws Only Banned Going Armed Offensively, to the Terror of the Citizens

*Young* is eager to detail what it considers to be post-ratification laws in the states, but skipped over the state declarations of rights and lack of any restrictions during the ratification and early post-ratification period.  For instance, Pennsylvania's Declaration of Rights of 1776 provided: "That the people have a right to bear arms for the defense of themselves, and the state . . . ."[117]  It was strengthened in 1790 to say that the right "shall not be questioned."[118]  Like every other state, Pennsylvania had no law that restricted the peaceable carrying of arms.[119]  *Young* has no comment on this vast void and instead searches for what did not exist.

The court's first example is the alleged North Carolina law of 1792 that repeated the Statute of Northampton.  The court should have thought something was fishy when it noted that the law "did not even remove the references to the king . . . ."[120]  The fact is that the citation – 1792 N.C. Laws 60, ch. 3 – is bogus.  The actual source was a 1792 book by a lawyer who thought he was compiling the English statutes in force in North Carolina.[121]  Later compilers wrote that this work "was utterly unworthy" as "omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force . . . ."[122]

The court's only other example is the Massachusetts law of 1795 that authorized the arrest of "such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[123]  Once again, this only prohibited going armed in an offensive manner

---

[116]See Halbrook, *The Founders' Second Amendment*, *passim*.

[117]Pennsylvania Declaration of Rights, Art. XIII (1776).

[118]Pennsylvania Declaration of Rights, Art. XXI (1790).

[119]See Stephen P. Halbrook, *A Right to Bear Arms: State and Federal Bills of Rights and Constitutional Guarantees* (1989) (analyzing the laws of the original states).

[120]*Young*, 992 F.3d at 797.

[121]François-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60-61 (1792).

[122]"Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii (1855).

[123]*Young*, 992 F.3d at 797, quoting 1795 Mass. Acts 436, ch. 2.

21

Electronic copy available at: https://ssrn.com/abstract=3885910

that would induce fear or terror, all being elements of the offense.

### C. Nineteenth-Century Surety Laws Only Applied with a Showing of Reasonable Cause to Fear Injury or a Breach of the Peace

*Young* finds early nineteenth-century statutes on the manner of going armed, but not on going armed per se.   Tennessee prohibited "go[ing] armed to the terror of the people, or privately carry[ing]" certain weapons; Louisiana banned having "any concealed weapon"; and Maine punished those who "ride or go armed offensively, to the fear or terror of the good citizens of this State."[124]

Tennessee later passed an outlier law against "carrying . . . belt or pocket pistols, either in public or in private,"[125] but it would have been considered unconstitutional under that state's high court ruling in *Simpson v. State* (1833), which held that "the people may carry arms" under the state guarantee, adding: "By this clause of the constitution, an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature . . . ."[126]   *Young* fails to mention this decision.

Massachusetts adopted a law in 1836 that, as *Young* states, "became a template for other states."   The credibility of the court's thesis stands or falls in how it represents this law.   The law stated:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault [sic] or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.[127]

This law simply did not apply to the peaceable carrying of arms.   One could go armed at will unless a complaint was made by a "person having reasonable cause to fear an injury, or breach of the peace," and a magistrate would have to find that such "reasonable cause" – not mere suspicion or speculation – existed.   Even if reasonable cause to fear injury or a breach of the peace was found, the person going armed would be justified if he had "reasonable cause to

---

[124]*Id*. at 798-99.

[125]*Id*. at 799.

[126]*Simpson v. State*, 13 Tenn. Reports (5 Yerg.) 356, 360 (1833).

[127]1836 Mass. Acts 750, ch. 134, § 16.

Electronic copy available at: https://ssrn.com/abstract=3885910

fear" assault, injury, or violence to his person, family, or property.  If not, he would be required to find sureties to keep the peace, after which he could continue going armed as long as he kept the peace.

The Ninth Circuit routinely interprets complex statutes today, but seems baffled by this simple law.  Ignoring that there must first be a "complaint of any person having reasonable cause to fear an injury, or breach of the peace," the court averred that public carry was limited to "persons who could demonstrate their need to carry for the protection of themselves, their families, or their property.  In effect, the Massachusetts law provided that such weapons could not be carried in public unless the person so armed could show 'reasonable cause.'"[128] How could this sophisticated court ignore that anyone could go armed without getting to the issue of whether the person was "without reasonable cause to fear an assault [sic] or other injury," unless reasonable cause was first found that a specific person feared injury or breach of the peace from the person carrying arms?

Later in the opinion, *Young* returns to the Massachusetts law, but cannot get the procedure right.  It states: "If a person was found with one of the enumerated weapons, . . . then 'any person having reasonable cause to fear an injury, or breach of the peace' could file a complaint."[129]  That's upside down.  One could be found with a weapon anytime without consequence.  It was only when a person with reasonable cause to fear an injury filed a complaint that the process would begin.  The court further read the statute to say "that it gave permission to people to carry concealable arms if they had 'reasonable cause,' which the statute defined as fear of assault" or other injury.[130]  Not so.  The statute did not purport to "give permission" to carry – it had nothing to do with peaceable carry and only applied if the person threatened another and was not carrying for self-defense.

"A number of states followed Massachusetts and adopted some version" of the above, *Young* correctly states, citing several of them.[131]  That only further refutes the court's central thesis, as all of these laws require offensive behavior and complaints before carrying would be questioned.

Young next partially quotes part of an 1862 Pennsylvania law as follows: "*If any person, not being an officer on duty in the military or naval service of the state or of the United States,*

---

[128]*Young*, 992 F.3d at 799.

[129]*Id.* at 819.

[130]*Id.*

[131]*Id.* at 799-800.

23

Electronic copy available at: https://ssrn.com/abstract=3885910

shall go armed with dirk, dagger, sword or pistol . . . ."[132] However, the deleted part includes the routine requirement of a "complaint of any person having reasonable cause to fear a breach of the peace therefrom," and the defense of "reasonable cause to fear an assault or other injury or violence to his family, person or property . . . ."[133]

Finally, *Young* recites a handful of postbellum statutes primarily in the "Wild West" states and territories that actually prohibited carrying certain weapons, whether openly or concealed, or which applied that rule to towns.[134] This time period is getting far afield from the Founding, and some of these laws were open to constitutional challenge.[135] But it is definitely not the case, as the court boldly asserts, that "the states broadly agreed that small, concealable weapons, including firearms, could be banned from the public square."[136] The court made no attempt to examine the law of each state nationwide – many of which had no regulation at all – and it read the laws of key states like Massachusetts completely wrong.

D.  Courts Upheld Concealed Carry Bans Only Because Open Carry was Lawful

As the court recognizes, most of the early precedents are "largely from Southern states,"[137] but it doesn't ask itself why – the answer being that there were largely no restrictions on peaceable carry in the Northern states. That confirmed that the right to bear arms was unquestioned, other than restrictions on carrying concealed, mostly in the Southern states. That of course refutes *Young*'s narrative that peaceable carry was largely banned.

Kentucky's Constitution provided: "That the right of the citizens to bear arms in defense of themselves and the State shall not be questioned."[138] Kentucky passed the first ban on concealed carry in 1813, and its high court in *Bliss v. Commonwealth* (1822) declared it unconstitutional, given that the right to bears arms "existed at the adoption of the constitution . . .

---

[132]*Id*. at 800, citing 1862 Pa. Laws 250, § 6 (emphasis added).

[133]The law originally passed as the Act of March 31, 1860, P.L. 427, § 6, 19 P.S. § 23. See *Commonwealth v. Rice*, 8 Pa. D. & C. 295, 297-98 (Quarter Sess. 1926) (noting the requirement of a "complaint of *any* person having reasonable cause to fear a breach of the peace").

[134]*Young*, 992 F.3d at 800-01.

[135]E.g., *In re Brickey*, 70 P. 609 (Idaho 1902) (declaring carry ban unconstitutional).

[136]*Young*, 992 F.3d at 801.

[137]*Id*. at 802.

[138]Ky. Const., Art. XII, § 23 (1792).

24

Electronic copy available at: https://ssrn.com/abstract=3885910

[and] consisted in nothing else but in the liberty of the citizens to bear arms."[139] The guarantee was then revised to provide that "the general assembly may pass laws to prevent persons from carrying concealed arms."[140] This obviously solidified the right to open carry.  *Young* gloats that "courts in Georgia, Alabama, and Louisiana deviated from *Bliss* by holding that restrictions on concealed weapons were permissible."[141]  But this shows only that the few states even to ban concealed carry saw open carry as a right that could not be infringed.

The Georgia high court held that a carry ban, to the extent it "contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void."[142]  It relied on the Second Amendment, as Georgia had no bill of rights guarantee.  Alabama's high court held that "the Legislature cannot inhibit the citizen from bearing arms openly . . . ."[143]  And the Louisiana high court reasoned that the right to carry arms openly "is the right guaranteed by the Constitution of the United States . . . ."[144]  *Young* discusses these cases in support of its thesis that total carry bans are constitutional, yet they only show that the courts in the small minority of states that banned concealed carry upheld the right to carry openly.[145]

*Young* finally finds the statute and the decision it was looking for, but both were outliers dated *eighty years* after ratification of the Second Amendment.  But it hid its eyes to an earlier decision by the same court under a stronger state constitutional guarantee.  In 1859, the Texas high court wrote in *Cockrum v. State*: "The right of a citizen to bear arms, in lawful defense of himself or the State, is absolute. . . . A law cannot be passed to infringe upon or impair it, because it is above the law, and independent of the law-making power."[146]  That case didn't make *Young*'s cut.

Instead, *Young* devotes a lengthy paragraph to *English v. State* (1871), in which the Texas high court upheld a ban on carrying pistols and certain other weapons (excluding long guns)

---

[139]*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822).

[140]Ky. Const., art. XIII, § 25 (1850).

[141]*Young*, 992 F.3d at 803.

[142]*Nunn v. State*, 1 Ga. 243, 251 (1846).

[143]*State v. Reid*, 1 Ala. 612, 619 (1840).

[144]*State v. Chandler*, 5 La. Ann 489, 490 (1850).

[145]*Young*, 992 F.3d at 803-05.

[146]*Cockrum v. State*, 24 Tex. 394, 401-02 (1859).

25

Electronic copy available at: https://ssrn.com/abstract=3885910

unless one had reasonable grounds to fear an unlawful attack or was traveling.[147]  At that point, the Texas guarantee was watered down to recognize the right to bear arms only "under such regulations as the legislature may prescribe."[148]  Any restriction would be upheld under such a standard.  As for the Second Amendment, *Young* notes the holding in *English* that the Amendment's scope was limited to arms that were "useful and proper to an armed militia."[149]  Query whether *Young* would agree with *English*'s recognition of "the right to 'keep' such 'arms' as are used for purposes of war," which included not just the musket and pistol, but also "the field piece, siege gun, and mortar."[150]

     *Young* next discusses the Tennessee case of *Andrews v. State* (1871), but it conflicts with the thesis that a state may ban the bearing of arms.  Tennessee banned the carrying of a "belt or pocket pistol or revolver" except when on a journey.  The state's high court held this law to violate the right of the citizens "to bear arms for their common defense" as applied to a "pistol known as the repeater," which "is a soldier's weapon – skill in the use of which will add to the efficiency of the soldier."[151]  *Young* acknowledges the holding that "the carrying of [a repeater] could not be constitutionally prohibited."[152]

     In a later decision, the Tennessee court "upheld an indictment for carrying an army pistol that was not displayed in hand."[153]  Like Tennessee, Arkansas protected the right to bear arms "for the common defense," and its high court upheld a prohibition on the carrying of "such pistol as is used in the army or navy of the United States, in any manner, except uncovered, and in the hand."[154]  *Young* cites these cases to show that legislatures may regulate "the permissible manner

---

[147]*Young*, 992 F.3d at 805, citing *English v. State*, 14 Am. Rep. 374, 35 Tex. 473 (1871).

[148]Tex. Const., Art. I, § 13 (1868).  It has been said that *English* was decided by "a court established by a State constitution (that of 1869) which was the product of military occupation and the disfranchisement of most of the State's inhabitants . . . ."  *Masters v. State*, 653 S.W.2d 944, 947 (Tex. App. 1983) (Powers, J., concurring).  Selective enforcement of the law may have been the rule.

[149]*Id.*, quoting *English*, 35 Tex. at 474.

[150]*English* at 476-77.

[151]*Andrews v. State*, 50 Tenn. 165, 177, 186-87 (1871).

[152]*Young*, 992 F.3d at 806.

[153]*Id.* at 807, citing *State v. Wilburn*, 66 Tenn. 57 (1872).

[154]*Id.*, quoting *Haile v. State*, 38 Ark. 564, 565 (1882).

Electronic copy available at: https://ssrn.com/abstract=3885910

of carrying a weapon in public."[155]  But that cuts against the power to ban absolutely.  Would the Ninth Circuit hold that Hawaii, if it enacted such a law, could not ban the carrying of military handguns in the hand?

But the definitive Arkansas case was *Wilson v. State* (1878), and *Young* simply disregards it.  That state's high court overturned a conviction for carrying a revolver, reasoning thus: "But to prohibit the citizen from wearing or carrying a war arm . . . is an unwarranted restriction upon his constitutional right to keep and bear arms. . . . If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."[156]

*Young* ventures into the early twentieth century,[157] but that's too far removed from 1791.  Of the cases discussed, it correctly states that "the state courts generally agree that the legislature can prohibit the carrying of concealed weapons."[158]  It should be borne in mind that most Northern states had minimal restrictions on carry, which is why "the state courts" *Young* refers to are almost exclusively Southern.  This limited number of courts, *Young* continues, upheld restrictions on open carry in certain places, open carry of certain weapons, and open carry without a license.[159]  Yet other than the *English* decision from Texas, none of the precedents upheld a complete ban on the carrying of handguns.  The general rule was that while the manner of carrying could be regulated, a complete ban in public of all types of handguns would be unconstitutional.

E.  Slaves and Persons of Color Were Denied the Right to Bear
Arms Because They Were Not Considered Citizens

While purporting to analyze nineteenth century laws and judicial decisions, *Young* entirely disregards restrictions on African Americans, both slaves and free persons of color.  Because they were not considered as part of "the people" to whom the right to bear arms applied, the Southern states generally prohibited them from carrying arms at all or gave officials discretion to issue or not to issue carry licenses to them.  Sound familiar?

A Virginia law provided that "[n]o free negro or mulatto, shall be suffered to keep or carry any fire-lock of any kind, any military weapon, or any powder or lead, without first

---

[155]*Id.*

[156]*Wilson v. State*, 33 Ark. 557, 559-60, 34 Am. Rep. 52 (1878).

[157]*Young*, 992 F.3d at 807-08.

[158]*Id.* at 808.

[159]*Id.*

27

Electronic copy available at: https://ssrn.com/abstract=3885910

obtaining a license from the court" where he resided, "which license may, at any time, be withdrawn by an order of such court."[160]  As a Virginia court held, among the "numerous restrictions imposed on this class of people [free blacks] in our Statute Book, many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States," were "the restriction . . . upon their right to bear arms."[161]

In Georgia, it was unlawful "for any slave, unless in the presence of some white person, to carry and make use of fire arms," unless the slave had a license from his master to hunt.[162]  It was also unlawful "for any free person of colour in this state, to own, use, or carry fire arms of any description whatever . . . ."[163]  Georgia's high court held: "Free persons of color have never been recognized here as citizens; they are not entitled to bear arms . . . ."[164]

Delaware forbade "free negroes and free mulattoes to have, own, keep, or possess any gun [or] pistol," except that such persons could apply to a justice of the peace for a permit to possess a gun or fowling piece, which could be granted if "the circumstances of his case justify his keeping and using a gun . . . ."[165]  The police power was said to justify restrictions such as "the prohibition of free negroes to own or have in possession fire arms or warlike instruments."[166]

North Carolina made it unlawful "if any free negro, mulatto, or free person of color, shall wear or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger or bowie-knife, unless he or she shall have obtained a licence" from the court.[167]  This was upheld as constitutional partly on the ground that "the free people of color cannot be considered as citizens . . . ."[168]  The court added: "It does not deprive the free man of color of the right to carry arms about his person, but subjects it to the control of the County Court, giving them the power to say, in the exercise of a sound discretion, who, of this class of

---

[160]Va. 1819, c. 111, § 8.

[161]*Aldridge v. Commonwealth*, 2 Va. 447, 449 (Gen. Ct. 1824).

[162]Digest of the Laws of the State of Georgia 424 (1802).

[163]§ 7, 1833 Ga. Laws 226, 228.

[164]*Cooper v. Savannah*, 4 Ga. 72 (1848).

[165]Ch. 176, § 1, 8 Laws of the State of Delaware 208 (1841).

[166]*State v. Allmond*,  7 Del. 612, 641 (Gen. Sess. 1856).

[167]*State v. Newsom*, 27 N.C. 250, 250 (1844) (quoting Act of 1840, ch. 30).

[168]*Id*. at 254.

28

Electronic copy available at: https://ssrn.com/abstract=3885910

persons, shall have a right to the licence, or whether any shall.'"[169]  This is reminiscent of today's judicial jargon that the right of the people to bear arms is not infringed by laws granting officials discretion to deny them that very right.

*Dred Scott v. Sanford* (1857) notoriously held that African Americans were not citizens and had no rights that must be respected.[170]  Chief Justice Taney wrote that, if African Americans were considered citizens, "it would give them the full liberty of speech . . .; to hold public meetings upon political affairs, and to keep and carry arms wherever they went."[171]

*Young* was unable to find a single nineteenth-century statute or judicial decision that subjected a person's right to bear arms to the discretion of a governmental official.  Yet it needed such precedents to support its thesis that this is permissible.  Had the court considered the plight of slaves and free persons of color, it would have found the precedents it sought – except that would demonstrate that its purported rule befitted only persons who were not considered citizens or among "the people."

### F. None of the Early Treatises Countenanced a Carry Ban

*Young* seeks support from a number of standard treatises.[172]  They flatly contradict the thesis that carrying arms may be generally banned or may be left to the discretion of an official.

The court begins with St. George Tucker, who stated that "[t]he right of self defence is the first law of nature"; *Young* adds, with no basis, that Tucker "is principally concerned with the regulation of military arms, such as muskets, rifles, or shotguns, which were prohibited for a time in England 'under the specious pretext of preserving the game.'"[173] Here's what Tucker actually said:

> The right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible. Wherever . . .  the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink

---

[169]*Id.* at 253.

[170]*Scott v. Sanford*, 60 U.S. (19 How.) 393 (1857).

[171]*Id*. at 417.

[172]*Young*, 992 F.3d at 808-11.

[173]*Id*. at 809, quoting 1 St. George Tucker, *Blackstone's Commentaries*, at app'x 300.

29

Electronic copy available at: https://ssrn.com/abstract=3885910

of destruction.[174]

*Young* just invented the claim that Tucker "is principally concerned with the regulation of military arms," although that was a concern too, but the reference to self-defense indicates concern with handguns, and the reference to preserving the game indicates concern with hunting arms.  All of these uses were included in Tucker's statement: "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side."[175]

*Young* further quotes Joseph Story "on the logic that bearing arms acted as 'a strong moral check against the usurpation and arbitrary power of rulers.'"[176] Yet *Young*'s thesis is that those very rulers may ban the bearing of arms.

"Most nineteenth-century American authors assumed that the state had the right to regulate arms in the public square," *Young* boldly asserts, actually meaning "to ban" rather than "to regulate."  But its quotation from William Rawle precludes that claim: "[E]ven the carrying of arms abroad by a single individual, *attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them*, would be sufficient cause to require him to give surety of the peace."[177]  It quotes Francis Wharton, but leaves out the part about the crime being "where a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people . . . .*"[178]

*Young* further defeats itself by quoting Thomas Cooley, who said that "the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose."[179] *Young* argues that the people need permission and that it can be arbitrarily denied.  It quotes passages from New York writer Benjamin Vaughan Abbott opining against careless gun handling and carrying for defense in settled areas,

---

[174]*Id.*, app'x 300.

[175]*Id.*, app'x 19

[176]*Young*, 992 F.3d at 809, quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* 746 (1833).

[177] William Rawle, *A View of the Constitution of the United States of America* at 126 (1829) (emphasis added).

[178]Francis Wharton, *A Treatise on the Criminal Law of the United States* 527–28 (Philadelphia: James Kay, 1846) (emphasis added).

[179]Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880).

30

Electronic copy available at: https://ssrn.com/abstract=3885910

but ignores what Abbott said about the actual state of the law: "Carry a pistol if you please, but you shall carry it openly.  Hang it in a belt, or hold it in your hand, or keep it in sight so that people can see you go armed . . . ."[180]  New York itself did not pass a definitive ban on carrying a concealed firearm in cities without a license until 1910.[181]

Lastly, *Young* quotes John Ordronaux, who wrote that "the carrying of concealed weapons may be absolutely prohibited without the infringement of any constitutional right, while a statute forbidding the bearing of arms openly would be such an infringement."[182]  *Young* concedes that to be the rule set forth in some of the above cases from Georgia, Louisiana, and Tennessee, but incorrectly states that the conviction in *Andrews* was upheld for openly carrying.[183]  To the contrary, the indictment in *Andrews* was quashed because it only charged that he carried a pistol without specifying the type;[184] recall the holding that the state could not ban the carrying of a repeater of the type a soldier would carry.

*Young* concludes regarding the above treatises: "None of these commentaries, with the possible exception of Ordronaux, seriously questions the power of the government to regulate the open carrying of arms in public."[185]  To the contrary, *not a single one* of these commentators opined that the open carrying of arms in public could be banned.

G. The Fourteenth Amendment Sought to Do Away with Black Code Requirements that African-Americans Obtain a License to Bear Arms Subject to an Official's Discretion

*Young* seems persistently AWOL when it comes to dramatic parts of our constitutional history that definitively repudiate the claim that government officials may have discretion to decide who, if anyone, may be licensed to carry a firearm.  The black codes gave such discretion to officials as applied to the freedmen, Congress passed legislation to protect the right of African Americans to bear arms, and the Fourteenth Amendment was adopted in part to constitutionalize the right of all of the people at large to bear arms.

---

[180]Benjamin Vaughan Abbott, *Judge and Jury* 337 (New York: Harper and Brothers, 1880).

[181]N.Y. Penal Law § 1897 (1910), in *People v. Warden of City Prison*, 154 A.D. 413, 139 N.Y.S. 277, 280 (1913).

[182]John Ordronaux, *Constitutional Legislation in the United States* 242-43 (1891).

[183]*Young*, 992 F.3d at 811.

[184]*Andrews*, 50 Tenn. at 192.

[185]*Young*, 992 F.3d at 811.

31

Electronic copy available at: https://ssrn.com/abstract=3885910

That issue came to the fore when slavery was abolished.  As Frederick Douglass explained in 1865, "the black man has never had the right either to keep or bear arms."[186] The Southern states meant to keep it that way by enacting the black codes.  The first state law noted by the Supreme Court in *McDonald v. Chicago* as typical of what the Fourteenth Amendment would invalidate required a license to have a firearm that an official had discretion to limit or deny.  In 1865, Mississippi provided that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind . . . ."[187]

Second Amendment deprivations were debated in bills leading to enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866.  Rep. Thomas Eliot, sponsor of the former, explained that the bill would invalidate laws like that of Opelousas, Louisiana, providing that no freedman "shall be allowed to carry fire-arms" without permission of his employer and as approved by the board of police.[188]  He noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms . . . ."[189]

Senator Garret Davis said that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[190]  Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[191]  Yet violations persisted, such as in Alexandria, Virginia, which continued "to enforce the old law against them [freedmen] in respect to whipping and carrying fire-arms . . . ."[192]

Representative William Lawrence of Ohio discussed the need to protect freedmen, quoting General D. E. Sickles' General Order No. 1 of January 1, 1866, for the Department of South Carolina, which negated the state's prohibition on possession of firearms by blacks and, at the same time, recognized the right of all peaceable persons to carry arms:

---

[186]"In What New Skin Will the Old Snake Come Forth?" Address delivered in New York City, May 10, 1865, 4 *The Frederick Douglass Papers* 84 (1991).

[187]Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, quoted in *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010).

[188]Cong. Globe, 39th Cong., 1st Sess. 517 (1866).

[189]*Id*. at 657.

[190]*Id.* at 371.

[191]*Id.* at 1182.

[192]Report of the Joint Committee on Reconstruction, H.R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, at 21 (1866).

32

Electronic copy available at: https://ssrn.com/abstract=3885910

The constitutional rights of all loyal and well disposed inhabitants to bear arms, will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons; nor to authorize any person to enter with arms on the premises of another without his consent.[193]

Introducing the Fourteenth Amendment in the Senate, Jacob Howard referred to "the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as . . . the right to keep and bear arms . . . ."[194]  The Amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[195]

James Lewis, a freedman in Mississippi, was arrested for carrying a musket without the required license.  Chief Justice Handy of Mississippi's highest court upheld the conviction, declaring the federal Civil Rights Act unconstitutional and holding that the state arms guarantee protected only citizens.[196]  In a separate case, Judge R. Bullock acquitted Wash Lowe and other freedmen for carrying firearms without a license, holding the requirement violative of the right to bear arms for self-defense, which was "a natural and personal right – the right of self-preservation."[197]  General Ulysses S. Grant noted these decisions in a report stating: "The statute prohibiting the colored people from bearing arms, without a special license, is unjust, oppressive, and unconstitutional."[198]

The Freedmen's Bureau Act was passed by the same two-thirds-plus members of Congress who voted for the Fourteenth Amendment.[199]  The Act declared that:

the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition

---

[193]Cong. Globe, 39th Cong., 1st Sess., 908-09 (1866).  See *McDonald*, 561 U.S. at 773 & n.21 (citing this order and commenting that "Union Army commanders took steps to secure the right of all citizens to keep and bear arms").

[194]Cong. Globe, 39th Cong., 1st Sess. 2765 (1866).

[195]*Id.* at 3210.

[196]"Mississippi . . .  The Civil Rights Bill Declared Unconstitutional by a State Court," *New York Times*, Oct. 26, 1866, at 2; see *McDonald*, 561 U.S. at 775 n.24.

[197]*Id.*

[198]Cong. Globe, 39th Cong., 2d Sess., 33 (1866).

[199]Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* 41-43 (1998).

33

Electronic copy available at: https://ssrn.com/abstract=3885910

of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color or previous condition of slavery.[200]

The Civil Rights Act of 1871, which remains law today, provides for a civil action against a person who, under color of state law, subjects a citizen to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[201]  The right to bear arms was one of the rights intended to be protected by the enactment.[202]

After passage of the Act, a Congressional investigation found widespread disarming of African Americans and a continuation of the old black codes whereby "a free person of color was only a little lower than a slave. . . . [and hence] forbidden to carry or have arms."[203]  President Grant reported that Ku Klux Klan groups continued "to deprive colored citizens of the right to bear arms and of the right to a free ballot . . . ."[204]  The Klan targeted the black person, Senator Daniel Pratt noted, who would "tell his fellow blacks of their legal rights, as for instance their right to carry arms and defend their persons and homes."[205]

*Young*'s silence about the above part of our constitutional history is deafening.  Free citizens had a right to carry arms; slaves did not.  Under slavery, free persons of color were prohibited from carrying arms without a license that was subject to the discretion of the authorities.  Under the black codes, the same restriction was applied to all freedmen.  The Civil Rights Act and Freedmen's Bureau Act of 1866 sought to negate these state infringements, and it took the Fourteenth Amendment to constitutionalize the right to bear arms for all persons.

H. Twentieth-Century Aberrations Teach Nothing about the Original Understanding

*Young* states: "We are not inclined to review twentieth-century developments in detail, in part because they may be less reliable as evidence of the original meaning of the American right to keep and bear arms."[206]  In fact, they illustrate how some laws completely deviated from the

---

[200] §14, 14 Stat. 173, 176-77 (1866).

[201] 17 Stat. 13 (1871).  Section 1 survives as 42 U.S.C. § 1983.

[202] *McDonald*, 561 U.S. at 776, citing Halbrook, *Freedmen* 120-131.

[203] 1 *Report of the Joint Select Committee to Inquire into the Condition of Affairs in the Late Insurrectionary States* 261-62 (Feb. 19, 1872).

[204] Ex. Doc. No. 268, 42nd Cong., 2d Sess., 2 (1872).

[205] Cong. Globe, 42nd Cong., 2d Sess., 3589 (1872).

[206] *Id*.

34

Electronic copy available at: https://ssrn.com/abstract=3885910

original meaning.  The very first example is Massachusetts, which did not ban carrying a loaded pistol or revolver without authorization until 1906.[207]  Between its first settlement in 1628 and 1906, citizens could peaceably carry firearms freely.

In 1909, Alabama banned the carrying of a pistol off of one's premises. Through laws passed in 1911 and 1913, New York banned the carrying of handguns without a license. Those are *Young*'s only examples of outright bans on carrying firearms without a license.  California, Pennsylvania, and the other states *Young* cites only banned the carrying of unlicensed concealed handguns.[208]  Open carry remained the almost-universal rule nationwide.  The three outlier states *Young* cites, which did not even ban unlicensed carry until the twentieth century, teach nothing about the original meaning of the right to bear arms.

Conclusion

Young concludes its historical survey:

> Our review of more than 700 years of English and American legal history reveals a strong theme: government has the power to regulate arms in the public square. . . . [T]he overwhelming evidence from the states' constitutions and statutes, the cases, and the commentaries confirms that we have never assumed that individuals have an unfettered right to carry weapons in public spaces. Indeed, we can find no general right to carry arms into the public square for self-defense.[209]

The court has utterly failed to make any such historical case.  It begins with the false premise that the Second Amendment incorporates every medieval royal decree, it obscures the English rule that going armed was not an offense unless done so in a manner to terrify the subjects, and it reads the English Declaration of Rights in the narrowest fashion without recognizing that American freedoms are broader.  The period from the pre-Revolutionary period through the ratification of the Second Amendment is not even mentioned.  It fails to appreciate that peaceable carry was the rule in the nineteenth century as expressed in state statutes and court decisions, with restrictions on concealed carry being the primary exception.

The *Young* majority ignores the only antebellum laws that provided for discretionary licenses to carry – those applicable primarily to free persons of color.  And it ignores the impetus for the Fourteenth Amendment being to invalidate laws banning firearm carry to freedmen without, again, a discretionary license.

---

[207]1906 Mass. Acts 150, ch. 172, § 2.

[208]*Young*, 992 F.3d at 812-13.

[209]*Id*. at 813.

35

Electronic copy available at: https://ssrn.com/abstract=3885910

These historical failings are predictable, for most of all *Young* ignores the Second Amendment's text – "the *right* of *the people* to keep and *bear arms*, shall not be infringed."  The court's premise is that no such right exists, that only the few have this privilege, that bearing arms is reserved for an elite, and that banning a right is not infringement.  The "history" it presents supposedly shows that "carrying arms in public was not treated as a fundamental right,"[210] despite the right of the people to bear arms being in the text of the Constitution.

---

[210] *Id*. at 820.

Electronic copy available at: https://ssrn.com/abstract=3885910

EXHIBIT 72

Case 3:18-cv-10507-PGS-JBD Document 196-6 Filed 12/15/23 Page 129 of 133 PageID: 9693

# At a GENERAL ASSEMBLY held at

Burlington from the Twentieth Day of November to the Twenty-firft Day of December 1771, in the Twelfth Year of the Reign of King George the Third, the following Laws were paffed.

## SESSION THE FOURTH.

### CHAP. DXXXIX.

*An* ACT *to continue and amend an* Act, *entitled, An* Act *for better fettling and regulating the* Militia *of this Colony of* New-Jerfey ; *for the repelling Invafions, and fuppreffing Infurrections and Rebellions.** 

Paffed Dec. 21, 1771.

WHEREAS the Act paffed in the Nineteenth Year of the Reign of our late Sovereign Lord King *George* the Second, entitled, *An* Act *for better fettling and regulating the Militia of this Colony of* New-Jerfey ; *for the repelling Invafions, and fuppreffing Infurrections and Rebellions,* will expire at the End of this Seffion of Affembly ; *Preamble.*

Sect. 1. BE IT ENACTED *by the Governor, Council and General Affembly, and it is hereby Enacted by the Authority of the fame,* That the faid Act, entitled, *An* Act *for better fettling and regulating the Militia of this Colony of* New-Jerfey ; *for the repelling Invafions, and fuppreffing Infurrections and Rebellions,** fhall be, and hereby is continued, and every Article and Claufe therein contained fhall be and remain in full Force, from the Publication hereof, to the firft Day of *May* which will be in the Year of our Lord One Thoufand Seven Hundred and Seventy-feven, and from thence to the End of the next Seffion of the General Affembly of this Colony, and no longer. *Limitation.*

2. AND WHEREAS it has been a Cuftom of late, in fome of the Counties of this Colony, to choofe the Militia Officers Conftables ; for preventing the fame for the Future, BE IT ENACTED *by the Authority aforefaid,* That, during the Continuance of this Act, it fhall not be lawful for any Court of General Quarter-Seffions of the Peace, or for any of the Inhabitants of this Colony, at their annual Town-meetings, to appoint or choofe any commiffioned Officer, while in Commiffion, to be a Conftable ; any Law, Ufage or Cuftom to the contrary notwithftanding. *Commiffioned Officers not to be chofen Conftables.*

### CHAP. DXL.

*An* ACT *for the Prefervation of* Deer *and other Game, and to prevent trefpaffing with Guns.*

Paffed Dec. 21, 1771.

WHEREAS the Laws heretofore paffed in this Colony for the Prefervation of Deer and other Game, and to prevent trefpaffing *Preamble.*

* Chap. CC.

ing with Guns, Traps and Dogs, have, by Experience, been found in-
fufficient to anfwer the falutary Purpofes thereby intended ; Therefore,

**No Perfon to carry a Gun on Lands not his own, except, &c.**

    Sect. 1. BE IT ENACTED *by the Governor, Council and General Af-
fembly of this Colony of* New-Jerfey, *and it is hereby Enacted by the Au-
thority of the fame,* That if any Perfon or Perfons fhall prefume, at
any Time after the Publication hereof, to carry any Gun on any
Lands not his own, and for which the Owner pays Taxes, or is in his
lawful Poffeffion, unlefs he hath Licenfe or Permiffion in Writing from
the Owner or Owners or legal Poffeffor, every fuch Perfon fo offending,
and convicted thereof, either upon the View of any Juftice of the Peace
within this Colony, or by the Oath or Affirmation of one or more Wit-
neffes, before any Juftice of the Peace of either of the Counties, Cities or
Towns-corporate of this Colony, in which the Offender or Offenders
may be taken or refide, he, fhe or they, fhall, for every fuch Offence, for-
feit and pay to the Owner of the Soil, or his Tenant in Poffeffion, the
**Penalty.** Sum of *Forty Shillings*, with Cofts of Suit ; which Forfeiture fhall
and may be fued for and recovered by the Owner of the Soil, or Te-
nant in Poffeffion, before any Juftice of the Peace in this Colony, for
the Ufe of fuch Owner or Tenant in Poffeffion.

**No Perfon to drive Deer or other Game, except, &c.**

    2. AND BE IT ENACTED *by the Authority aforefaid,* That if any
Perfon fhall prefume, at any Time after the Publication of this Act,
to hunt or watch for Deer with a Gun, or fet in any Dog or Dogs to
drive Deer, or any other Game, on any Lands not his own, and for
which the Owner or Poffeffor pays Taxes, or is in his lawful Poffeffion,
unlefs he hath Licenfe or Permiffion in Writing from fuch Owner or
Owners or legal Poffeffor ; every fuch Perfon fo offending, and being
convicted thereof in Manner aforefaid, fhall, for every fuch Offence,
forfeit and pay to the Owner of the Soil, or Tenant in Poffeffion, the
**Penalty.** Sum of *Forty Shillings*, with Cofts of Suit ; provided, that nothing
herein contained fhall be conftrued to extend to prevent any Perfon
carrying a Gun upon the King's Highway in this Colony.

**Penalty on Non-Refi-dents.**

    3. AND BE IT FURTHER ENACTED *by the Authority aforefaid,* That
if the Perfon or Perfons offending againft this Act be Non-Refidents
of this Colony, he or they fhall forfeit and pay for every fuch Offence
*Five Pounds*, and fhall forfeit his or their Gun or Guns to any Perfon
or Perfons who fhall inform and profecute the fame to Effect, before
any Juftice of the Peace in any County of this Colony, wherein the
Offender or Offenders may be taken or apprehended.

**Penalty for killing, &c. Deer out of Seafon.**

    4. AND BE IT ENACTED *by the Authority aforefaid,* That if any
Perfon or Perfons fhall kill, deftroy, hunt or take any Doe, Buck,
Fawn, or any Sort of Deer whatfoever, at any other Time or Seafon,
except only between the firft Day of *September* and the firft Day of
*January* yearly and every Year, he, fhe or they fo offending, fhall for-
feit and pay the Sum of *Forty Shillings* for each and every Offence ;
to be fued for, recovered and applied as hereafter is directed.

**What fhall be Evidence of fuch Kill-ing, &c.**

    5. AND, for the better and more effectual convicting of Offenders
againft this Act, BE IT ENACTED *by the Authority aforefaid,* That any
and every Perfon or Perfons in whofe Cuftody fhall be found, or who
fhall

Case 3:18-cv-10507-PGS-JBD   Document 196-6   Filed 12/15/23   Page 131 of 133 PageID: 9694

fhall expofe to Sale, any green Deerfkins, or frefh Venifon killed at
any Time after the firft Day of *January*, and before the firft Day of
*September* aforefaid, and fhall be thereof convicted by the Oath or
Affirmation of one or more credible Witneffes, fhall be deemed guilty
of offending againft this Act, and be fubjected to the Penalties of kill-
ing Deer out of Seafon.

6. AND WHEREAS great Numbers of idle and diforderly Per-
fons make a Practice of hunting on the wafte and unimproved Lands
in this Colony, whereby their Families are neglected, and the Publick
is prejudiced by the Lofs of their Labour, BE IT THEREFORE EN- Who may
ACTED *by the Authority aforefaid*, That, from and after the firft Day hunt on un-
of *January* next, no Perfon or Perfons whatfoever (except fuch Perfons Lands.
as are by the Laws of this Colony qualified to vote for Reprefentatives
in General Affembly, in Right of their Freeholds, and their Sons being
of the Age of eighteen Years or upwards, and living with their Parent
or Parents, or being Freeholders) fhall, on any Pretence whatever, hunt
on the wafte and unimproved Lands in this Colony ; and if any Per-
fon or Perfons, not qualified as aforefaid, fhall prefume to hunt as
aforefaid, he or they fo offending fhall forfeit and pay, for every fuch
Offence, the Sum of *Twenty Shillings ;* to be recovered by Action of Penalty on
Debt, with Cofts, by any Perfon who fhall fue for the fame ; to be ap- Offenders.
plied one Half to the Profecutor, and the other Half to the Ufe of the
Poor of the Townfhip or Precinct where the Fact was committed.

7. AND BE IT ENACTED *by the Authority aforefaid*, That if any Per- Penalty on
fon or Perfons within this Colony fhall fet any Trap or other Device fetting Traps,
whatfoever, larger than what is ufually and commonly fet for Foxes &c.
and Mufkrats, fuch Perfon, fetting fuch Trap or other Device, fhall
pay the Sum of *Five Pounds*, and forfeit the Trap or other Device,
fhall fuffer three Months Imprifonment, and fhall alfo be liable to make
good all Damages any Perfon fhall fuftain by fetting fuch Trap or other
Device, and the Owner of fuch Trap or other Device, or Perfon to
whom it was lent, fhall be efteemed the Setter thereof, unlefs it fhall
be proved, on Oath or Affirmation, what other Perfon fet the fame, or
that fuch Trap or other Device was loft by faid Owner or Perfon to
whom it was lent, and abfolutely out of his Power ; and if the Setter Penalty on a
of the Trap or other Device be a Slave, and it be his own voluntary Act, Slave fetting
he fhall (unlefs the Mafter or Miftrefs fhall pay the Fine) in Lieu of fuch &c.
Fine, be publickly whipped with thirty Lafhes, and committed till
the Cofts are paid ; and that the faid Trap or other Device fhall be broken
and deftroyed in the View and Prefence of the Juftice of the Peace
before whom they are brought : And if any Perfon or Perfons fhall have Penalty on
Poffeffion of, or there fhall be found in his or their Houfe, any Trap keeping fuch
or Traps, Device or Devices whatfoever, for taking of Deer, fuch Per- Trap, &c.
fon or Perfons fhall be fubjected to the fame Penalty as if he or they
were convicted of fetting fuch Trap or Traps, or other Device.

8. AND, for encouraging the Deftruction of fuch Traps and De- Reward for
vices, BE IT ENACTED *by the Authority aforefaid*, That if any Perfon feizing a
fhall feize any Trap or other Device for the taking Deer, and fhall car- Trap, &c.
ry fuch Trap or other Device to any Magiftrate of the County
where fuch Trap or Device was feized, fuch Perfon fhall be entitled to

Digitized from Best Copy Available

an Order from the said Magistrate to the Collector of such County, to pay him the Sum of *Ten Shillings*, out of any Money in his Hands raised for the Use of the County ; which Sums shall be allowed to such Collector on the Settlement of his Accounts.

**Penalty on a Smith making or mending such Trap, &c.**

9. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That every Smith or other Artificer, who shall hereafter make or mend any such Trap or other Device aforesaid, he shall forfeit and pay the Sum of *Forty Shillings ;* and the Person carrying such Trap or other Device to the Artificer aforesaid, shall forfeit and pay the Sum of *Twenty Shillings.* And every Person who shall bring into this Colony any

**Penalty on bringing such Trap, &c. into the Colony.**

such Trap or Device as aforesaid shall forfeit and pay the Sum of *Forty Shillings.* And if the Person who shall carry the same to the Smith or Artificer shall be so poor as that he shall not be able to pay the Forfeiture aforesaid, he shall be committed to the common Gaol, until he shall prove who is Owner of such Trap or Device, or who delivered the same to him ; and in such Case the Forfeiture aforesaid shall be levied on the Goods, or in Failure of Goods, on the Body of the Owner of such Trap or Device, or the Person who delivered the same to the Pauper, and the Trap or Device shall be forfeited and destroyed.

**Penalty for setting loaded Guns.**

10. AND WHEREAS a most dangerous Method of setting Guns has too much prevailed in this Province, BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of *Six Pounds ;* and on Non-payment thereof shall be committed to the common Gaol of the County for six Months.

**Application of Penalties.**

11. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That the Fines and Forfeitures in this Act expressed, and not particularly appropriated, shall be paid, one Half to the Prosecutor, and the other Half to and for the Use of the Poor of the Town, Precinct or District, where the Offence is committed ; and that the Execution of this Act,

**Jurisdiction given to one Magistrate.**

and every Part thereof, shall be within the Cognizance and Jurisdiction of any one Magistrate or Justice of the Peace, without any Reference to the Act for Trial of small Causes in this Colony.

**This Act not to affect Parks.**

12. AND BE IT ENACTED, That nothing in this Law shall be construed to extend to restrain the Owners of Parks, or of tame Deer, from killing, hunting or driving their own Deer.

**Penalty on Magistrate neglecting his Duty.**

13. AND BE IT ALSO ENACTED *by the Authority aforesaid*, That if any Justice of the Peace or other Magistrate, within this Province, shall have Information of any Persons offending against this Act, in killing Deer out of Season, setting and making Traps, Non-Residents killing Deer, and Persons setting of Guns, and shall not prosecute the same to Effect within two Months after such Information, he shall forfeit and pay the Sum or Sums to which the Offender against this Act would have been liable.

14. AND

Digitized from Best Copy Available

14. AND BE IT ENACTED *by the Authority aforefaid*, That the Juf- | *This Act to be publifhed and executed.*
tices at every Quarter-Seffions of the Peace fhall caufe this Act to be
publickly read ; and give in Charge to the Grand-Jury to particularly
inquire and prefent all Perfons for killing Deer out of Seafon, fetting
or making Traps, and all Non-Refidents killing, deftroying, hunting
and taking any Sort of Deer, and all Perfons fetting of Guns ; and,
upon Conviction for either of the faid Offences, the faid Juftices fhall
fet and impofe the Fines and Penalties herein before-mentioned, with
Cofts of Suit.

15. AND BE IT ENACTED *by the Authority aforefaid*, That if any | *Appeal given to next Sef- fions.*
Perfon or Perfons whatfoever, whether the Accufed or Accufer, Plaintiff
or Defendant, fhall think themfelves aggrieved by any of the Judg-
ments given by the faid Juftices or other Magiftrates, for any Suit
commenced by Virtue of this Act ; then it fhall and may be lawful
for fuch Perfon or Perfons to appeal, on giving fufficient Security for
the Forfeitures and Cofts, to the next Court of General Quarter-Seffions,
held for fuch County where fuch Judgment fhall be given ; which Court
is hereby empowered to hear and determine all and every fuch Appeal
or Appeals.

16. AND BE IT ENACTED *by the Authority aforefaid*, That if any | *Penalty for watching in the Night near a Road.*
Perfon or Perfons, within this Colony, fhall, after the Publication of this
Act, watch with a Gun, on any uninclofed Land within two Hun-
dred Yards of any Road or Path, in the Night Time, whether the faid
Road is laid out by Law or not, or fhall ftand or ftation him or them-
felves upon or within two Hundred Yards of any Road as aforefaid,
for fhooting at Deer driven by Dogs, he or they fo offending, fhall, on
Conviction, forfeit and pay the Sum of *Five Pounds* for every fuch Of-
fence ; to be recovered by Action of Debt, or Prefentment of the
Grand-Jury as aforefaid, and pay all Damages.

17. PROVIDED ALWAYS, That the fixth Section of this Act fhall | *Not to affect Indians, nor Effex, Bergen, Morris or Suffex.*
not be conftrued to affect any Native *Indian ;* and that nothing in this
Act fhall be conftrued to prevent the Inhabitants of *Effex, Bergen, Mor-
ris* and *Suffex*, from making, having in their Houfes, or fetting Traps
of five Pounds Weight or more for Bears, Wolves, Foxes, or any other
wild Beafts, Deer only excepted.

18. AND BE IT FURTHER ENACTED *by the Authority aforefaid*, That | *Repeal of Former Laws.*
all former Laws made in this Colony for the Prefervation of Deer and
other Game, and to prevent trefpaffing with Guns, and regulating the
Size of Traps, fhall be, and they are hereby repealed.

### C  H  A  P.      DXLI.

*An* ACT *declaring the River* Delaware *a common* Highway,
*and for improving the* Navigation *in the faid River.*

Paffed Dec. 21, 1771.

WHEREAS the improving the Navigation in Rivers is of great | *Preamble.*
Importance to Trade and Commerce ; AND WHEREAS the River
*Delaware*

Digitized from Best Copy Available