# EXHIBIT 73

# LAWS

OF THE

# STATE OF INDIANA,

PASSED AT

## THE FORTIETH REGULAR SESSION

OF THE

## GENERAL ASSEMBLY,

BEGUN ON THE SIXTH DAY OF JANUARY, A. D. 1859.

---

BY AUTHORITY.

---

INDIANAPOLIS:
JOHN C. WALKER, STATE PRINTER,
1859.

## CHAPTER LXXVIII.

AN ACT to prevent carrying concealed or dangerous weapons, and to provide punishment therefor.

### [APPROVED FEBRUARY 23, 1859.]

SECTION 1. *Be it enacted by the General Assembly of the State of Indiana,* That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

Carrying concealed weapons prohibited.

---

## CHAPTER LXXIX.

AN ACT to prevent the throwing or depositing any carrion or dead animal into any running stream or lake of water in this State, and to prevent the depositing or burying any carrion or dead animal on the banks of the same, and prescribing the penalty for the violation thereof.

### [APPROVED MARCH 3, 1859.]

SECTION 1. *Be it enacted by the General Assembly of the State of Indiana,* That any person who shall throw or deposit any dead animal or carrion in any running stream of water, or any lake within this State, or bury or deposit any dead animal or carrion on the banks of any running stream or lake of water within this State, so that the water may become vitiated thereby, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not less than five dollars nor more than twenty dollars.

Throwing carrion in running streams prohibited.

9

# EXHIBIT 74

Case 3:18-cv-10507-PGS-JBD   Document 106-7   Filed 12/15/23   Page 5 of 148 PageID: 9701

# ORDINANCES

OF THE

# CITY OF NASHVILLE,

TO WHICH ARE PREFIXED THE

## State Laws Chartering and Relating to the City.

WITH AN APPENDIX.

COMPILED BY

## WILLIAM K. McALISTER, Jr.,

CITY ATTORNEY.

NASHVILLE, TENN.:
MARSHALL & BRUCE, STATIONERS.
1881.

840                    ORDINANCES.

## CHAPTER 108.

### CARRYING PISTOLS, BOWIE-KNIVES, ETC.

SECTION

1. Penalty imposed for carrying pistols, bowie-knives, etc.
2. Duty of the police to arrest all persons carrying such weapons.
3. Penalty imposed on police officer for failing to arrest persons carrying deadly weapons.

SECTION

4. Police Commissioners instructed to increase number of patrolmen to thirty-four.
5. Provisions against carrying deadly weapons do not extend to police officers.

SECTION 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; *Provided, however*, That no ordinary pocket-knife and common walking-canes shall be construed to be deadly weapons.

SEC. 2. That it shall be the duty of every police officer who sees any person or persons with, or knows of any person carrying, such deadly weapons, to immediately arrest every such person, that they may be dealt with according to the provisions of this act.

SEC. 3. That every police officer who may refuse or neglect to immediately arrest every such person seen with or known to be carrying such deadly weapons, shall be deemed guilty of dereliction of duty, and, upon conviction thereof, shall be dismissed from service, and any two respectable citizens shall be deemed competent to prefer charges to the proper authorities against such police officer for such dereliction of duty.

SEC. 4. To the end that the provisions of this act may be more fully carried out, the Police Commissioners be, and are hereby, instructed to increase the number of patrolmen to thirty-four, to be uniformed, paid and controlled in accordance with the present police law.

SEC. 5. It is expressly understood that the provisions of this act relating to carrying such deadly weapons as are mentioned in the preceding sections, do not extend to police or other officers, or persons that are entitled by law to carry

such deadly weapons, nor does it extend to the act of handling or moving such deadly weapons in any ordinary business way.

SEC. 6. That all laws and parts of laws in conflict with this act are hereby repealed, and this act to take effect from and after its passage, the public welfare requiring it.

Approved December 26, 1873.

---

## CHAPTER 109.

### SABBATH.

SECTION
1. No water-craft to unload on Sunday.
2. No vehicle to be laden on Sunday.
3. No grocery or other place of ordinary business to be kept open on the Sabbath; tavern-

SECTION
keepers and apothecaries excepted.
4. Vendors of ice, ice-cream, soda water, cigars and tobacco excepted.
5. No games allowed on Sunday.

SECTION 1. That if any owner or owners of any steamboat, keel-boat, barge or other water-craft, should load or unload, or cause to be laden or unladen, any such steamboat, keel-boat, barge or other water-craft, on the Sabbath day, within the limits of the corporation of Nashville, unless by the written permission of the Mayor, every person so offending shall forfeit and pay, on conviction thereof, not less than twenty-five nor more than fifty dollars for every such offense.

SEC. 2. That if any person or persons shall load, or cause to be laden, any wagon, cart or dray on the Sabbath day, with any article or package of merchandise, cotton, tobacco or any produce of the country, or unload, or cause to be unladen, any such wagon, cart or dray, or shall receive into his, her or their house, store or warehouse, any such article or package of merchandise, cotton, tobacco, or produce of the country, every person so offending shall forfeit and pay the sum of one dollar for each and every offense.

SEC. 3. That no person or persons shall be allowed to keep his, her or their grocery, dram-shop, confectionery or other place of ordinary business open on the Sabbath day, nor to sell any spirituous liquors on said day, or to deal out the same

EXHIBIT 75

# DIGEST OF THE ORDINANCES

— OF THE —

# CITY OF NASHVILLE,

— TO WHICH ARE PREFIXED THE —

STATE LAWS INCORPORATING, AND RELATING
TO, THE CITY, WITH AN APPENDIX CON-
TAINING VARIOUS GRANTS
AND FRANCHISES.

COMPILED BY

CLAUDE WALLER, City Attorney,
and
FRANK SLEMONS, Assistant City Attorney

NASHVILLE, TENN.:
MARSHALL & BRUCE CO., STATIONERS AND PRINTERS.
1893.

representing money or property, or shall, at any such table or device, or at any game of chance, bet, win, or lose money or property, either in specie or by means of any thing representing the same, or shall suffer any such table or device, at which any game of chance is played, to be set up or used in any tenement in his possession or under his control, shall be deemed guilty of a misdemeanor.

735 (737). No person or persons shall erect or establish any gaming-table, wheel of the description commonly called or known by the name of the "wheel of fortune, equality, black and red," or of any other name or denomination whatever, within the limits of the corporation, under the penalty of fifty dollars for every twenty-four hours or less period such gaming-table or wheel be kept up.

736 (738). If any tavern-keeper or other householder within the limits of this corporation shall suffer or permit any of the before-mentioned gaming-tables or wheels to be erected, established, or kept in his, her, or their house, he, she, or they, so offending, shall forfeit and pay the sum of fifty dollars for every twenty-four hours, or any less period, which he, she, or they shall suffer or permit such gaming-table or wheel to be erected, established, or kept up; *Provided*, That nothing herein contained shall be so construed as to extend to backgammon boards.

737 (739). If any person or persons shall, at any time, in any tavern, ordinary or licensed house of entertainment, or grocery, within the corporation, or in any house attached thereto, or upon the lot or premises whereon such licensed house is or may be situated or erected, win or lose money, or any thing of value, at cards or any other game of hazard and address, every such person shall, on conviction thereof, forfeit and pay not less than five nor more than fifty dollars; and if any tavern-keeper, ordinary-keeper, or grocery-keeper shall suffer or permit any person or persons to lose money or any thing of value at any time in his, her, or their house, or on his, her, or their premises, at any game or games whatsoever, knowing the same, shall forfeit and pay for every such offense not less than five nor more than fifty dollars.

### III. THE CARRYING OF DEADLY WEAPONS.

SECTION.
738. Carrying pistols, etc.; penalty.
739. Duty of police in regard thereto.
740. Police may carry pistols.

SECTION.
741. Unlawful weapons to be seized and forfeited.

738 (742). Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly

weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every such subsequent offense, shall be fined fifty dollars; *Provided, however,* That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons.

**739** (743). It shall be the duty of every police officer who sees any person or persons with, or knows of any person carrying such deadly weapons, to immediately arrest every such person, that they may be dealt with according to the provisions of this section.

**740** (744). It is expressly understood that the provisions of the above sections, relating to carrying such deadly weapons, do not extend to police or other officers, or persons that are entitled by law to carry such deadly weapons; nor does it extend to the act of handling or moving such deadly weapons in any ordinary business way.

**741** (704). All pistols, knives, and other weapons, the carrying of which upon the person is unlawful, which may be found upon the persons of individuals arrested by the metropolitan police, shall be seized by the captain of the metropolitan police, and shall be retained by him and forfeited to the Mayor and City Council, and shall, in no case, be returned to the individual from whom the same was taken, or to any one claiming the same.

### IV. LAWS IN REGARD TO BAWDY HOUSES AND SPORTING WOMEN.

| SECTION. | SECTION. |
| --- | --- |
| 742. Houses of ill fame prohibited; evidence of, what is. | sidewalks in front of their houses. |
| 743. Riding and walking with prostitutes prohibited. | 745. Proprietors not to allow minors in their houses. |
| 744. Prostitutes not to stand on the | 746. Penalty. |

**742** (727). Any person or persons who shall keep within the limits of this corporation a house of ill fame, or who shall willfully permit any house owned by him, her, or them to be kept in a disorderly manner, viz.: a house to which men resort for the purpose of criminal intercourse with lewd women, such person or persons shall be subject to a fine of fifty dollars for such offense, and a like sum for every day such house may be so continued or kept; and it is hereby declared to be a sufficient evidence of such person or persons

EXHIBIT 76



345.2
P9.

/ 0 . 6 . / 2

# THE

# REVISED ORDINANCES

OF

# PROVO CITY,

CONTAINING

## ALL THE ORDINANCES IN FORCE

ON THE FIRST DAY OF FEBRUARY, A. D. 1877, AND THE RULES AND
ORDER OF BUSINESS OF PROVO CITY COUNCIL.

TO WHICH IS PREFIXED

## THE ORGANIC ACT OF UTAH,

AND

THE CITY CHARTER, WITH AMENDMENTS THERETO.

———————

Revised, Consolidated and Published

## BY AUTHORITY.

———————

PRINTED AT THE DESERET NEWS STEAM PRINTING ESTABLISHMENT,
SALT LAKE CITY, UTAH,
1877.

106                 REVISED ORDINANCES

### CHAPTER 6.—Offenses against the Peace of the City.

Riots.

SEC. 179. When three or more persons shall be riotously, unlawfully or tumultuously assembled, the Mayor or any Justice of the Peace, who shall have a knowledge or be informed thereof, is hereby authorized

Proclama-
tions.

to make proclamation among the persons so assembled, or as near to them as he can safely approach, charging and commanding them immediately to disperse and peacefully depart to their habitations or lawful pursuits; and if, upon proclamation having been made, such persons shall not obey, the Mayor or Justice of the Peace may command the Marshal and any number of policemen, and all persons there being, and the full power of the city, and order that the offenders be brought before him to be dealt with according to law.

Refusal to
give
prompt
assistance.

SEC. 180. Every person who shall refuse to give prompt assistance, after proclamation and a call for his services have been made to secure an offender, as mentioned in the preceding section, is guilty of an offense.

Disturbing
the quiet
of street,
etc.

SEC. 181. Every person who shall wilfully disturb the quiet of any street, alley, public or private building, neighborhood, private family or person or any lawful assembly or religious meeting, by giving false alarms of fire, by loud or unusual noises, ringing of bells, blowing of horns, or other instruments, or by indecent or obscene language, conversation or conduct, or by threatening or quarreling, or by any other device or means whatever, is guilty of an offense, and liable to a fine in any sum less than one hundred dollars.

SEC. 182. Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot,

false knuckles, bowieknife, dagger, or any other dan- *Carrying deadly weapons prohibited* gerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; *Provided*, that nothing in this section, shall *Proviso.* be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.

---

### CHAPTER 7.—Offenses against the Elective Franchise.

SEC. 183. Every person who shall vote more than *Fraudulent voting, changing ballots, etc.* once at the same election, or knowingly offer to deposit two or more ballots in the ballot box, or who shall change any ballot, after the same has been deposited in the ballot box; or who, after the election, adds or attempts to add, any ballot to those legally polled, is guilty of an offense, and liable to a fine in any sum less than one hundred dollars, or imprisonment not exceeding one hundred days, or both.

SEC. 184. Every person who shall offer any bribe, *Bribing or intimidating electors.* threat, or intimidation to any elector, for the purpose of influencing his vote, or the vote of any elector, is guilty of an offense, and liable to a fine in any sum less than one hundred dollars, or imprisonment not exceeding one hundred days, or both.

---

### CHAPTER 8.—Offenses against Good Morals.

SEC. 185. Every person who shall fish, hunt, or in- *Sunday, fishing, amusements and business prohibited on.* dulge in any secular out-door amusements, or conspicuous or noisy secular labor, on the day of the week

Digitized by Google

EXHIBIT 77

# SESSION LAWS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

———————

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

16                       LAWS OF ARIZONA.

SEC. 3.   This Act shall take effect from and after its pass-age.

Approved March 18, 1889.

---

No. 12.                    AN  ACT

Concerning the Transaction of Judicial Business on Legal Holi-
days.

*Be it enacted by the Legislative Assembly of the Territory of
Arizona:*

SECTION 1.   No Court of Justice shall be open, nor shall
any Judicial business be transacted on any Legal Holiday, ex-
cept for the following purposes:

1.   To give, upon their request, instructions to a Jury
when deliberating on their verdict.

2.   To receive a verdict or discharge a Jury.

3.   For the exercise of the powers of a magistrate in a
criminal action, or in a proceeding of a criminal nature; pro-
vided, that the Supreme Court shall always be open for the
transaction of business; and provided further, that injunctions,
attachments, claim and delivery and writs of prohibition may
be issued and served on any day.

SEC. 2.   All Acts and parts of Acts in conflict with this
Act are hereby repealed.

SEC. 3.   This Act shall be in force and effect from and after
its passage.

Approved March 18, 1889.

---

No. 13.                    AN ACT

Defining and Punishing Certain Offenses Against the Public
Peace.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   If any person within any settlement, town,
village or city within this Territory shall carry on or about his
person, saddle, or in his saddlebags, any pistol, dirk, dagger,
slung shot, sword cane, spear, brass knuckles, bowie knife, or
any other kind of knife manufactured or sold for purposes of
offense or defense, he shall be punished by a fine of not less
than twenty-five nor more than one hundred dollars; and in
addition thereto, shall forfeit to the County in which he is con-
victed, the weapon or weapons so carried.

SEC. 2.   The preceding article shall not apply to a per-
son in actual service as a militiaman, nor as a peace officer

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3.   If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4.   The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5.   Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6.   Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7.   It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties

shall notify the keepers of hotels, boarding houses and drink-
ing saloons in their respective Counties of their duties under
this law, and if after such notification any keeper of a hotel,
boarding house or drinking saloon, shall fail to keep notices
posted as required by this Act, he shall, on conviction thereof
before a Justice of the Peace, be fined in the sum of five dol-
lars to go to the County Treasury.

SEC. 8.   All Acts or parts of Acts in conflict with this Act
are hereby repealed.

SEC. 9.   This Act shall take effect upon the first day of
Apr l, 1889.

Approved March 18, 1889.

---

No. 14.               AN ACT

To Amend Paragraph 492, Revised Statutes.

*Be it Enacted by the Legislative Assembly of the Terrritory
of Arizona:*

SECTION 1.   That Paragraph 492, Chapter 5, Title 13, of
the R vised Statutes. be amended so as to read as follows: "If
he fail to attend in person or by deputy any term of the Dis-
trict Court. the Court may designate some other person to
perform the duties of District Attorney during his absence from
Court, who shall receive a reasonable compensation to be certi-
fied by the Court, and paid out of the County Treasury, which
the Court shall by order direct to be deducted from the salary
of the District Attorney, if the absence of such Attorney is
not excused by such Court."

SEC. 2.   That all Acts and parts of Acts in conflict with
this Act be, and the same are, hereby repealed.

SEC. 3.   That this Act shall take effect and be in force
from and after its passage.

Approved March 19, 1889.

---

No. 15.               AN ACT

To Provide for the Payment of Boards of Supervisors of the
Counties within the Territory of Arizona.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   Each member of the Board of Supervisors
within this Territory shall be allowed as compensation for their
services Five Dollars per day for each day's actual attendance
at the sitting of said Board, at which sitting any County busi-
ness is transacted; and twenty cents per mile actually traveled

EXHIBIT 78

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.





DATE DOWNLOADED: Fri Dec 8 11:45:15 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1890 412 .

ALWD 7th ed.
, , 1890 412 .

Chicago 17th ed.
"," Oklahoma - 1st Regular Session : 412-522


AGLC 4th ed.
'' Oklahoma - 1st Regular Session 412

OSCOLA 4th ed.
'' 1890 412             Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

CRIMES AND PUNISHMENT.

495

(2430) § **6.** Every person who, with intent to extort any money or other property from another, sends to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat. *Chap. 25. Sending threatening letter.*

(2431) § **7.** Every person who unsuccessfully attempts by means of any verbal threat such as is specified in the second section of this article, to extort money or other property from another is guilty of a misdemeanor. *Attempting to export money.*

ARTICLE 47.—CONCEALED WEAPONS.

SECTION.
1. Prohibited weapons enumerated.
2. Same.
3. Minors.
4. Public officials, when privileged.
5. Arms, when lawful to carry.

SECTION.
6. Degree of punishment.
7. Public buildings and gatherings.
8. Intent of persons carrying weapons.
9. Pointing weapon at another.
10. Violation of certain sections.

(2432) § **1.** It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. *Prohibited weapons enumerated.*

(2433) § **2.** It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. *Same.*

(2434) § **3.** It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article. *Minors.*

(2435) § **4.** Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person. *Public officials, when privileged.*

(2436) § **5.** Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise. *Arms, when lawful to carry.*

(2437) § **6.** Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent con- *Degree of punishment.*

**Chap. 25.**

viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

**Public buildings and gatherings.**

(2438) § **7.**   It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

**Intent of persons carrying weapons.**

(2439) § **8.**   It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

**Pointing weapons at another.**

(2440) § **9.**   It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

**Violation of section seven.**

(2441) § **10.**   Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

ARTICLE 48.—FALSE PERSONATION AND CHEATS.

SECTION.
1.   False impersonation, punishment for.
2.   False impersonation and receiving money.
3.   Personating officers and others.
4.   Unlawful wearing of grand army badge.
5.   Fines, how paid.
6.   Obtaining property under false pretenses.

SECTION.
7.   False representation of charitable purposes.
8.   Falsely representing banking corporations.
9.   Using false check.
10.   Holding mock auction.

**Punishment for false impersonation.**

(2442) § **1.**   Every person who falsely personates another, and in such assumed character, either:

First.   Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second.   Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third.   Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth.   Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

EXHIBIT 79

# LAWS

## OF THE

# STATE OF MARYLAND.

## MADE AND PASSED

At a Session of the General Assembly, begun and held at the
City of Annapolis, on the Third day of January, 1872,
and ended on the First day of april, 1872.

# 1872.



Published by      Authority.

## BALTIMORE:

## PUBLISHED BY JOHN MURPHY & CO.

*Publishers of the Maryland Code and Supplements, Maryland Reports, &c.*

### 182 BALTIMORE STREET.

S. S. MILLS, AND L. F. COLTON, State Printers.

## 1872.

Screw Dock Company," be and the same is hereby revived, and shall continue in full force and effect until the year eighteen hundred and ninety, and until the end of the next session of the General Assembly that shall happen thereafter, to every intent and purpose as if the corporate existence thereof had not been interrupted, or the Act aforesaid had not expired.

Re-organization.

SEC. 2. *And be it enacted*, That the person or persons holding stock in said corporation, shall, within three months after the passage of this Act, meet for the purpose of re-organizing the same at the office last occupied by said corporation, for the transaction of business, and at such meeting, of which the holder or holders of all said stock shall be duly notified, transfers of stock may be made by the holder or holders thereof, on the books of the company, and officers of the company may be elected, and such other business transacted as may be necessary for the interest of said corporation.

In force.

SEC. 3. *And be it enacted*, That this Act shall take effect from the date of its approval by the Governor.

Approved February 26, 1872.

————————•●•————————

## CHAPTER 42.

AN ACT to add an additional section to article two of the Code of Public Local Laws, entitled "Anne Arundel county," sub-title "Annapolis," to prevent the carrying of concealed weapons in said city.

Additional section.

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That the following section be added to article two, of the Code of Public Local Laws, entitled "Anne Arundel county," sub-title "Annapolis:"

WM. PINKNEY WHYTE, Esquire, Governor.    57

Sec. 246. It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected as other fines and penalties are now collected; *provided*, the provisions of the section shall not apply to any officer of the law, either of the State or city, where any pistol or other weapon is a part of the prescribed outfit of said officer, *and provided further*, that either party, feeling aggrieved at the decision of said Justice of the Peace, shall have the right to appeal to the Circuit Court of Anne Arundel county. *(margin: Concealed weapons. Proviso.)*

Sec. 2. *And be it enacted*, That this Act shall take effect from the date of its passage. *(margin: In force.)*

Approved February 26, 1872.

———•———

## CHARTER 43.

AN ACT to amend an Act, entitled "An Act to incorporate the President and Directors of the Maryland Fire Insurance Company of Baltimore," passed at January session, eighteen hundred and fifty-eight, by decreasing the capital stock and par value of the shares thereof, and by altering the mode of voting by the stockholders.

Section 1. *Be it enacted by the General Assembly of Maryland*, That the par value of the shares of the capital stock of the President and Directors of the Maryland Fire Insurance Company of Baltimore, be and the same is hereby reduced to five dollars per share, and the said Company may at any time hereafter increase its capital stock to the amount of two *(margin: Par value reduced. Capital stock decreased.)*

EXHIBIT 80

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

SECOND AMENDMENT

## The legal history of bans on firearms and Bowie knives before 1900

DAVID KOPEL | 11.20.2022 12:55 PM

Bowie knives are back in constitutional law news these days, after a very long absence. The U.S. Supreme Court's *Bruen* decision instructs lower courts to look to U.S. legal history to see what sorts of restrictions on Second Amendment rights are consistent with the mainstream American legal tradition. According to the Court, the legal history of the Founding Era is the most important, the late nineteenth century much less so, and the twentieth century too late to create a tradition that contradicts the text of the Second Amendment.

Post-*Bruen*, some gun control advocates have been looking to Bowie knife laws as analogical justifications for bans on common modern rifles and magazines. In a separate post, *Bowie knife statutes 1837-1899*, I provide a state-by-state survey of all state Bowie knife laws through 1899. This post examines constitutional case law on Bowie knives, the history of such knives, and the history of pre-1900 bans on types of firearms.

Advertisement

AD

As described below, valid pre-1900 precedents on firearms prohibitions are non-existent. *Bruen* suggests that "dramatic technological changes may require a more nuanced approach" in drawing historical analogies to justify modern arms controls. Accordingly, there has been renewed interest in Bowie knives, which are said to be a new technology that appeared in the early 19th century. In the Fourth Circuit, Maryland Attorney General Frosh is defending a Maryland ban on many common rifles. In his recently-filed supplemental brief in *Bianchi v. Frosh*, Bowie knife laws are an important part of his argument, including with a citation to my article *Knives and the Second Amendment*, 47 U. Michigan J. of Law Reform 175 (2013) (with Clayton Cramer and Joseph Olson).

At a previous stage in the case, I coauthored an amicus brief in support of the plaintiffs' cert. petition, *Bianchi v. Frosh.* No. 21-902. The brief was on behalf of Professors of Second Amendment Law (including VC's Randy Barnett), Cato Institute, John Locke Foundation, Center to Keep and Bear Arms (Mountain States Legal Foundation), and Independence Institute.

The week after *Bruen*, the Supreme Court granted cert., vacated the decision below (the Fourth Circuit upholding the ban), and remanded for consideration in light of *Bruen*.

This post proceeds as follows:

- Part I summarizes *Bruen*'s rules for reasoning from historical analogies.
- Part II summarizes the pre-1900 American history of firearms bans. Four states enacted some sort of prohibitory law on particular types of firearms.
- Part III explains Bowie knives, and the infamous 1837 murder on the floor of the Arkansas legislature that may have spurred legislative action in several states.
- Part IV examines the three major state supreme court cases involving Bowie knives:
  - In Georgia, *Nunn v. State* (1844) held that a statute banning Bowie knives and handguns violated the Second Amendment.
  - In Tennessee, *Aymette v. State* (1840) upheld a ban on concealed carry of Bowie knives as not violating the state constitution. The court stated that the right to keep arms was individual, but the right to bear arms was only for military service, such as the militia. Mistakenly, the court said that a Bowie knife would be of no use to a militia. To the contrary, many militias used Bowie knives, before and after 1840.
  - *Cockrum v. State* (1859) applied the Texas Constitution and the Second Amendment and stated, "The right to carry a bowie-knife for lawful defense is secured, and must be admitted." However, enhanced sentencing for use of a Bowie knife in murder was constitutional.

The other post, *Bowie knife statutes 1837-1899*, excerpts and analyzes state 19th-century Bowie knife statutes. With very rare exceptions, states that chose to regulate Bowie knives treated them the same as other, older, types of fighting knives, namely dirks and/or daggers. As described in this post, "Bowie knives" were briefly considered to be a new type of arm, but they were not. Bowie knife laws turned into general laws about large knives, and so in statutes, "Bowie knife" was joined by other well-known fighting knives.

The knife category of Bowie knives plus dirks and/or daggers was frequently regulated at the same level as handguns. That is, prohibitions were rarities. The mainstream approach for handguns and knives was non-prohibitory for peaceable adults, such as laws forbidding concealed carry (while allowing open carry), prohibiting sales to minors, or specially punishing misuse.

Whatever 19th century handgun laws teach about permissible limits on the right to arms, the Bowie knife laws go no further. Because Bowie knives are so often *in pari materia* with 19th-century handgun regulations that they add little if anything to the very thin base of historical precedents for prohibitions on common arms.

The legal history of Bowie knives reinforces the U.S. Supreme Court's history-based holdings about permissible handgun regulation. Bowie knives were not some extraordinary category for which regulation was more severe than was typical for handgun control.

**I. Rules from *Bruen***

Further analysis of the material in this Part is in my article *Restoring the right to bear arms: New York State Rifle and Pistol Association v. Bruen*, 2021-22 Cato Supreme Court Review (Trevor Burrus ed., 2022).

*Bruen* affirmed that text, history, and tradition is the correct methodology in Second Amendment cases, not interest balancing:

> … *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

142 S. Ct. 2111, 2126-27 (2022). Courts may not engage in interest balancing, nor may they defer to legislative interest balancing:

> The Second Amendment "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

*Id.* at 2131 (quoting *Heller*).

Thus, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

Judges do not bear the burden of becoming legal history researchers. As with anything else that the government must prove, the government must present persuasive legal history to the court. "Courts are thus entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.5.

Sometimes, the government and its allies will win because there are many historic laws that are twins of modern ones—such as prohibiting reckless discharge of a firearm in populated areas. Additionally, the government can prove its case by "analogical reasoning." This means "a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133.

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* "[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* (quoting <u>Drummond v. Robinson</u>, 9 F.4th 217, 226 (3d Cir. 2021)).

If a historical arms control law is both "established" and "representative," the next step is to determine whether the modern gun control and the alleged historical analogue are "relevantly similar." *Bruen* does not purport to "exhaustively" define how judges may consider similarity. Instead, *Bruen* suggests that *Heller* and *McDonald* point to "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."

"How" means: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense."

"Why" means: "whether that burden is comparably justified." The second metric prevents historic, burdensome laws that were enacted for one purpose from being used as a pretext to impose burdens for other purposes. *Id.* at 2132-33.

How to deal with technological or societal changes? Per Justice Thomas:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

*Id.* at 2132 (quoting <u>McCulloch v. Maryland</u>). Some social problems have been around for a long time. Whether previous generations addressed a problem with restrictions on Second Amendment rights is an important question:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131.

Legal tradition is based on many places over many years. A few harsh laws in a few places do not negate the mainstream. For example, in *Bruen* the following were, cumulatively, insufficient to negate the general American tradition of a right to carry arms:

- A statute in the short-lived colony of East Jersey (half of present New Jersey) against frontiersmen ("planters") carrying handguns. The statute was in effect for "[a]t most eight years."
- An 1871 Texas ban against carrying handguns under most circumstances.
- In the latter nineteenth century, five western territories with statutes against handgun carrying in cities, or more broadly.

- Four colonial or Early Republic statutes that supposedly prohibited arms carrying. They actually did not, but the Court assumed *arguendo* that the description of the statutes in the amicus briefs of the anti-gun lobbies was accurate.

In general, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154.

Broad state restrictions on peaceable carry did become more common in the 20th century, most famously with the 1911 New York "Sullivan Act" at issue in *Bruen*. But, "[a]s with . . . late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 n.28.

According to *Bruen*, states may require licenses for bearing arms in public. Issuance must be based on narrow and objective criteria. The licensing systems may not have "lengthy wait times . . . or exorbitant fees." *Id*. at 2138 n.9.

## II. Firearms bans in the U.S. before 1900

Attorneys General who must defend recent state bans on various types of common firearms have a challenging task. There were very few bans of particular types of firearms during the nineteenth century, and all of them are plainly unconstitutional under modern doctrine.

### A. Georgia ban on handguns, Bowie knives, and other arms

The only firearms ban statute before the Civil War was enacted by Georgia. It outlawed possession, sale, open carry, and concealed carry of the vast majority of handguns. The statute also banned Bowie knives and certain other arms. In *Nunn v. State*, the Georgia Supreme Court held the statute entirely unconstitutional because of the Second Amendment, except as to concealed carry. *Nunn* is the historic case that is most extolled by the U.S. Supreme Court's *Heller* opinion. The case is discussed further in Part IV.

### B. Tennessee ban on many handguns

After the end of Reconstruction, the white supremacist legislature of Tennessee in 1879 banned the sale "of belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols"—that is, large handguns of the sort carried by military officers, artillerymen, etc. These big and well-made guns were already possessed in quantity by former Confederate soldiers. The army & navy handguns were more expensive than smaller pistols. The ban was upheld because it would help reduce the concealed carrying of handguns. <u>State v. Burgoyne</u>, 75 Tenn. (7 Lea) 173 (1881).

### C. Arkansas ban on many handguns, and Bowie knives

Arkansas followed suit with a similar law in 1881. That law also forbade the sale of Bowie knives, dirks (another type of knife), sword-canes (a sword concealed in a walking stick), or metal knuckles. In a prosecution for the sale of a pocket pistol, the Arkansas Supreme Court rejected a constitutional defense. The statute was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare." <u>Dabbs v. State</u>, 39 Ark. 353, 357 (1885).

The right to arms provision of the Tennessee Constitution, as adopted in 1870 and still in effect, states, "the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime." The 1868 Arkansas Constitution right to arms, also still in effect, states, "The citizens of this State shall have the right to keep and bear arms for their common defence."

In both states, the "common defense" language was interpreted by the courts as protecting an individual right of everyone, but only for militia-type arms. Such arms included the general types of handguns used in the U.S. military. When Congress was drafting the future Second Amendment, there was a proposal in the Senate to add similar "common defence" language. The Senate rejected the proposal. Senate Journal, 1st Cong., 1st Sess. <u>77</u> (Sept. 9, 1789).

Whatever the merits of the state courts' interpretations of the state constitutions, the Tennessee and Arkansas statutes are unconstitutional under the Second Amendment. The U.S. Supreme Court in *Heller* repudiated the notion that the Second Amendment is only for military-type arms. Dick Heller's 9-shot .22 caliber revolver was certainly not a military-type handgun.

### D. Florida licensing law for repeating rifles and handguns

The closest historic analogue to present bans on semiautomatic rifles is an 1893 Florida statute that required owners of Winchesters and other repeating rifles to apply for a license from the board of county commissioners. In 1901 the law was extended to also include handguns. As amended, "Whoever shall carry around with, or have in his manual possession, in any county in this State, any pistol, Winchester rifle, or other repeating rifle, without having a license from the county commissioners of the respective counties of this State," should be fined up to $100 or imprisoned up to 30 days.

The county commissioners could issue a two-year license only if the applicant posted a bond of $100. The commissioners were required to record "the maker of the firearm so licensed to be carried, and the caliber and number of the same." *Revised General Laws of Florida*, § 7202-03 (1927); 1893 Fla. Laws ch. 4147; 1901 Fla. Laws ch. 4928.

The bond of $100 was exorbitant. It was equivalent to over $3,400 today. (Fed. Reserve Bank of Minneapolis, <u>Consumer Price Index 1800-</u>. 2022 = 884.6. 1893 = 27. 1901 = 25. Avg. = 26.)

A 1909 case involved Giocomo Russo's petition for a writ of mandamus against county commissioners who had refused his application for a handgun carry license. Based on his name, Russo may have been an Italian immigrant. At the time, Italians were sometimes considered to be in a separate racial category. When Russo applied, the county commissioners said that they only issued licenses to applicants whom they knew personally, and they did not think the applicant needed to carry a handgun. Russo argued that the licensing statute was unconstitutional.

The Florida Supreme Court denied Russo's petition for a writ of mandamus. According to the Court, there were two possibilities: 1. If the statute is constitutional, then mandamus to the county commissioners would be incorrect, because they acted within their legal discretion. 2. If the statute is unconstitutional, then mandamus would be improper, because a writ of mandamus cannot order an official to carry out an unconstitutional statute. Either way, Russo was not entitled to a writ of mandamus. Pursuant to the doctrine of constitutional avoidance, the Court declined to opine on the statute's constitutionality. *State v. Parker*, 57 Fla. 170, 49 So. 124 (1909).

Decades later, a case arose as to whether a handgun in an automobile glove-box fit within the statutory language, "on his person or in his manual possession." By 5-2, the Florida Supreme Court held that it did not; no license was necessary to carry a handgun or repeating rifle in an automobile. *Watson v. Stone*, 148 Fla. 516, 4 So. 2d 700 (1941). A four Justice majority granted the defendant's petition for habeas corpus because of the rule of lenity: in case of ambiguity criminal statutes should be construed narrowly.

Justice Rivers H. Buford concurred in with the 4-Justice majority opinion. His opinion went straight to the core problem with the statute.

Born in 1878, Buford had worked from ages 10 to 21 in Florida logging and lumber camps. In 1899, at the suggestion of a federal judge who owned a logging camp, Buford began the study of law. He was admitted to the Florida bar the next year. In 1901, he was elected to the Florida House of Representatives. Later, he was appointed county prosecuting attorney, elected state's attorney for the 9th district, and elected state attorney general. He was appointed to the Florida Supreme Court in 1925. 3 *History of Florida: Past and Present* <u>156</u> (1923); Florida Supreme Court, <u>Justice Rivers Henderson Buford</u>. As of 1923, "His principal diversion is hunting." *History of Florida* at 156.

The Florida Constitution of 1885 had provided: "The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."

Concurring, Justice Buford wrote that the statute should be held to violate the Florida Constitution and the Second Amendment:

> I concur in the judgment discharging the relator because I think that Section 5100, R.G.S., § 7202, C.G.L., is unconstitutional because it offends against the Second Amendment to the Constitution of the United States and Section 20 of the Declaration of Rights of the Constitution of Florida.
>
> Proceedings in habeas corpus will lie for the discharge of one who is held in custody under a charge based on an unconstitutional statute. [citations omitted]
>
> The statute, supra, does not attempt to prescribe the manner in which arms may be borne but definitely infringes on the right of the citizen to bear arms as guaranteed to him under Section 20 of the Declaration of Rights of the Florida Constitution.

He explained the history of the exorbitant licensing laws of 1893 and 1901:

> I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of this State have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.

*Watson*, 4 So.2d at 703.

Justice Buford had described some of the changed societal conditions underlying the 1893 and 1901 enactments. There may have been additional factors involved. Repeating rifles had been around for decades and had been widely available and affordable for many consumers since the 1860s. By the 1880s, manufacturing improvements had made such rifles affordable to many black people. They were using such rifles to drive off lynch mobs, such as in famous 1892 incidents in Paducah, Kentucky, and Jacksonville Florida. In Jacksonville,

> [W]hen a white man, having been killed by a negro, and threats of lynching the prisoner from the Duval County Jail being made, a large concourse, or mob of negroes, assembled around the jail and defied and denied the sheriff of the county ingress to the building. This mob, refusing to disburse upon the reading of the riot act by the sheriff, he called for assistance from the militia to aid him in enforcing the laws.

Report of the Adjutant-General for the Biennial Period Ending December 31, 1892, at 18, in [Florida] *Journal of the Senate* (1893); Nicholas J. Johnson, *Negroes and Gun: The Black Tradition of Arms* 110-12 (2014).

In sum, the 19th century history of firearms bans is not helpful for modern litigants seeking to justify prohibitions on semiautomatic rifles. The only pre-1900 statutory precedent for such a law is Florida in 1893, and it is a dubious precedent. Before that, there were three prior sales prohibitions that covered many or most handguns. One of these was held to violate the Second Amendment, and the other two are plainly unconstitutional under *Heller*.

Accordingly, renewed attention attention is being given to precedents involving Bowie knives, which we will examine next.

**III. Bowie knives and Arkansas toothpicks**

**A. What is a Bowie knife?**

Cites for some of the material in Part III.A & B are available in my Michigan *Knives and the Second Amendment* article. This part is supplemented by information from emails with Mark Zalesky, publisher of *Knife Magazine*.

Starting in 1837, several southern states enacted laws about Bowie knives. Some of these statutes also applied to the "Arkansas toothpick." Later, many other states adopted Bowie knife laws.

The term "Bowie knife" originated after frontiersman Col. Jim Bowie used one at a famous "Sandbar Fight" on the lower Mississippi River near Natchez, Mississippi,on September 19, 1827.

The knife had been made by Rezin Bowie, Jim's brother. According to Rezin, the knife was intended for bear hunting. He stated, "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved." Nothing about the knife was novel.

The initial and subsequent media coverage of the Sandbar Fight was often highly inaccurate. As "Bowie knife" entered the American vocabulary and then the British, manufacturers began labeling all sorts of large knives as "Bowie knives." Some of these were straight (like Rezin's) and other had curved blades. Rezin's knife was single-edged, but some "Bowie knives" were double-edged. Rezin's knife did not have a clip point, but some so-called "Bowie knives" did. Likewise, some had crossguards (to protect the user's hand), and others did not. "Bowie knife" more a sloppy marketing term than a description of a particular type of knife—just as some people today say "Coke" to mean many kinds of carbonated beverages. (The difference is that true "Coke" products, manufactured by the Coca-Cola Company, do exist; there never was a true Bowie

knife.) Manufacturers slapped the "Bowie knife" label on a wide variety of large knives that were highly suitable for hunting and self-defense. In words of knife historian Norm Flayderman, "there is no one specific knife that can be exactingly described as a Bowie knife." Norm Flayderman, *The Bowie Knife: Unsheathing an American Legend* 490 (2004).

The knife photo in this post is an 1850s knife manufactured in England and marketed as a "Bowie knife." It's a good match for what 20th century movies and television called as a "Bowie knife." There are many modern imitations, none of which are like the knife at the Sandbar Fight; nor are they the type that Rezin and Jim Bowie later ordered from custom cutlers. Visit today's websites of knife sellers, search for "Bowie knife," and you will find a quite a disparate variety.

From the beginning, laws about "Bowie knives" have been plagued by vagueness. For example, a Tennessee statute against concealed carry applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick . . . ." 22 Tenn. Gen. Assemb. Acts 200, ch. 137.

When Stephen Hayes was prosecuted for concealed carry, the witnesses disagreed about whether his knife was a Bowie knife. Some said that it was too small and slim to be a Bowie knife, and would properly be called a "Mexican pirate-knife." The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in shape or size resembling a bowie-knife." Note the disjunctive "form, shape *or* size." On appeal, the Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife" alone. A strict application of the letter of the law could result in injustices: "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick" and would thus be illegal. The Tennessee Supreme Court held that the statute must be construed "within the spirit and meaning of the law" and relied on the judge and jury to make this decision as a matter of fact. *Haynes v. State*, 24 Tenn. (5 Hum.) 120 (1844).

**B. What is an Arkansas toothpick?**

As for "Arkansas Toothpick," Flayderman say that it was mainly another marketing term for "Bowie knife." Flayderman at 265-74. However, he notes that some Mississippi tax receipts, and some other writings, expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."

Mark Zalesky, publisher of *Knife Magazine*, explained in Nov. 10 and 19 emails to me: "The idea of the 'Arkansas toothpick' being a large dagger seems to stem from Raymond Thorp's 1948 book *Bowie Knife* (Thorp actually did some good research, but much of the book is complete nonsense); *The Iron Mistress* novel and movie in 1951/52; and the subsequent interest in Bowie, Crockett, the Alamo etc. during the 1950s and early 1960s. You are dealing with a definition that has changed over the years." But as of 1840, "Most evidence supports the idea that 'Arkansas toothpick' was originally a 'frontier brag' of sorts, a casual nickname for any variety of bowie knife but particularly types that were popular in Arkansas."

Here is a drawing of what late 20th century Americans, based on contemporary movies and television, thought to be an Arkansas toothpick. It is sharpened on both edges (unlike the sandbar fight knife), with a triangular blade up to eighteen inches long.

The late 20th century idea of an Arkansas toothpick. By Rhonda Thorne Cramer. ( Rhonda L. Thorne Cramer)

**C. The crime in the Arkansas legislature**

The sandbar fight had taken place in 1827. Jim Bowie died on March 6, 1836, as one of the defenders of the Alamo. In 1840, he would become the namesake of Bowie County, the northeasternmost county in Texas. According to Zalesky, "we first see the term 'Bowie knife' beginning to come into use in 1835 and by mid-1836 it was everywhere. It is clear that such knives existed before the term for them became popular."

Perhaps the first legislation about Bowie knives, from Mississippi and Alabama in mid-1837, was about a continuing problem of criminal misuse. Legislative attention to the topic was surely intensified by an infamous crime in late 1837, which may have helped lead to the enactment of several laws in succeeding weeks. My frequent coauthor, historian Clayton Cramer, explains:

> Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J. J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.
>
> Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."Judge William F. Pope, *Early Days in Arkansas* 225 (Dunbar H. Pope ed., 1895); "The Murder in Arkansas," 54 *Niles' National Register* 258 (June 23, 1838). "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted." Raymond W. Thorp, *Bowie Knife* 4 (1991). While Wilson was expelled from the House, he was acquitted at trial, causing "the most intense indignation through the entire State." Pope, at 225-26; Thorp at 1-5; "General Assembly," *Arkansas State Gazette*, Dec. 12, 1837, at 2 (expulsion two days later); "The trial of John Wilson . . . .," (Milledgeville, Ga.) *Southern Recorder*, March 6, 1838; "The Murder in Arkansas," *Niles' National Register*, *supra*..

**IV. Cases on Bowie knives**

In the nineteenth century, there were three major state supreme court constitutional cases on Bowie knives. The results of all three are consistent:

- Georgia: Prohibiting the sale of Bowie knives violates the Second Amendment. Prohibiting concealed carry does not.
- Tennessee: Prohibiting concealed carry of Bowie knives does not violate the state constitution.
- Texas: The state constitution and the Second Amendment guarantee the right to own and carry Bowie knives, but extra punishment for a crime committed with a Bowie knife is constitutional.

**A. *Nunn v. State***

Between 1800 and the beginning of the Civil War in 1861, there was one law enacted against particular types of firearms. The Georgia Supreme Court held it unconstitutional as a violation of the Second Amendment. <u>Nunn v. State</u>, 1 Ga. 243 (1846). The U.S. Supreme Court's 2008 *Heller* case extols *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 612 (2008).

Shortly after the infamous crime in the Arkansas legislature, an 1837 Georgia statute declared:

> that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.

*Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837*, pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

*Glossary*:

"Dirk": Originally, a Scottish fighting knife with one cutting edge. Harold L. Peterson, *Daggers & Fighting Knives of the Western World* 60 (1968). According to Zalesky, "Dirks in America were small stabbing weapons, usually small daggers but sometimes single edged." Many 19th century laws forbade concealed carry of "dirks" and/or "daggers."

"Sword-cane": a sword concealed in a walking stick.

"Horse pistols": the only type of handgun not banned in Georgia. These were large handguns, usually sold in a pair, along with a double holster that was meant to be draped over a saddle. They were too large for practical carry by a person who was walking.

Although section 1 of the act was prohibitory, Section 4 contained an exception allowing open carry of some of the aforesaid arms, not including handguns: "*Provided, also,* that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view…" The same section also allowed vendors to sell inventory they already owned, through the next year.

At the time, there was no right to arms in the Georgia Constitution. In 1846, the Georgia Supreme Court held the statute unconstitutional for *all* the enumerated arms, not just for handguns. The Court explained that the Second Amendment protected an inherent right, and nothing in the Georgia Constitution had ever authorized the state government to violate the right. For all the weapons, including handguns, the ban on concealed carry was upheld. The ban on handgun open carry was unconstitutional.

*Nunn* was among the many antebellum state court decisions holding that a right enumerated in the U.S. Bill of Rights was protected against state infringement. *See* Jason Mazzone, *The Bill of Rights in Early State Courts*, 92 Minn. L. Rev. 1 (2007); Akhil Reed Amar, *The Bill of Rights* 145-56 (1998) (discussing "the Barron contrarians").

**B. *Aymette v. State***

In 1837, Tennessee prohibited concealed carry of Bowie knives and Arkansas toothpicks. 22 Tenn. Gen. Assemb. Acts 200, ch. 137 (1838). An 1838 bill to add pistols to the concealed carry ban was rejected. Tennessee Legislature, *Daily Republican Banner* (Nashville), Jan. 13, 1838, at 2. The Tennessee Supreme Court upheld the concealed carry ban in a famous 1840 case. *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840).

The Tennessee Constitution's right to arms at the time was "the free white men of this State have a right to keep and to bear arms for their common defence." The racial exclusion to the original 1796 Constitution had been added in 1834. As noted above, the U.S. Senate had rejected inserting a "common defence" clause into the proposed Second Amendment.

According to the Tennessee Court, the right to *keep* arms was an individual right. But the right to *bear* arms was only for service in a militia. The right to bear arms "does not mean for *private defence,* but being armed, they may as a body, rise up to defend their just rights, and compel their rulers to respect the laws." The legislature could forbid arms that are "not usual in civilized warfare, or would not contribute to the common defence." *Aymette* at 157-59. According to the Court, Bowie knives "are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution." *Id.* at 158.

The *Aymette* court was very wrong on the facts. In 1836, the people of Texas had used Bowie knives to "rise up to defend their just rights," in their War of Independence from Mexico. The Texans won the war at the Battle of San Jacinto on April 21, 1836, when they stormed the Mexican breastworks, and used their Bowie knives to rout and put to flight the army of Mexican dictator Santa Ana. Kopel et al., *Knives*, at 189-90.

During the Civil War, Tennessee, Mississippi, and Alabama had to enact legislation to ameliorate the Bowie knife shortage that their laws had caused. The Tennessee legislature suspended the Bowie knife law for the duration. *See* Kopel, *Bowie knife statutes 1837-1899*. The militia of neighboring Mississippi often carried Bowie knives. Benson J. Lossing, 1 *Pictorial History of the Civil War in the United States of America* 479 n.2, 541 n.2 (1866) So did other soldiers, from every part of the nation. Flayderman at 125–68.

According to the U.S. Supreme Court in *Heller*, *Aymette* "erroneously, and contrary to virtually all other authorities," read the right to keep and bear arms as limited to the overthrow of a tyrannical government. *Heller*, 554 U.S. at 613. *Heller* held that the Second Amendment right to arms is not limited to the types of arms used by militia.

**C. *Cockrum v. State***

After winning independence in 1836, the Republic of Texas joined the United States in 1845. A Texas state statute provided that a person convicted of manslaughter with a Bowie knife or dagger would be considered guilty of murder. For murder convictions in general, Texas law gave the jury discretion to impose a sentence of solitary confinement for life. In *Cockrum*, the judge had erroneously taken away the jury's discretion, and instructed them to impose solitary for life. Accordingly, a new trial was necessary. *Cockrum v. State*, 24 Tex. 394 (1859).

The *Cockrum* court rejected the defense attorney's argument that enhanced punishment for a crime with a Bowie knife violated the Texas Constitution right to arms and the Second Amendment. "The right to carry a bowie-knife for lawful defense is secured, and must be admitted," wrote the court. *Id.* at 402. But the right to own and carry a Bowie knife for lawful self-defense did not preclude enhanced punishment for using the weapon in a crime. *Id.* at 403.

The court explained why Bowie knife crime was appropriate for enhanced sentencing:

> It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death.

*Id.* at 402–03 (emphasis added).

The Texas legislature had not infringed an iota on the right to possess and carry Bowie knives; but as be described in the companion article, *Bowie knife statutes 1837-1899*, a few other Southern legislatures enacted taxes discouraging Bowie knife possession by the poor.  In the antebellum era, not everyone could afford a firearm, but almost anyone could afford a large knife. As defense counsel in *Cockrum* had pointed out:

> A bowie-knife or dagger, as defined in the code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.

24 Tex. at 395-96. The Texas Supreme Court did not disagree with defense counsel's argument here. The court simply thought that extra punishment for violent criminals did not infringe the rights of peaceable poor people, or of anyone else.

In sum, two of the three antebellum right to arms cases involving Bowie knives stated that keeping and bearing such arms is a constitutional right. The *Aymette* decision was to the contrary, but it was based on the double error that the right to arms is for militia-type arms only, and that a Bowie knife is not such an arm.

As *Cockrum* illustrates, Bowie knife laws were not really about Bowie knives per se. Such laws amounted to generic laws about large knives, including very old-fashioned types such as butcher knives.

The discussion of Bowie knife statutes continues in *Bowie knife statutes 1837-1899*. In short, Bowie knives were quickly assimilated to lawmaking about old-fashioned knives, such as dirks and daggers. Often, these knives were regulated the same as handguns. Sales bans were rare, with Tennessee joined only by Arkansas, in 1881. The norm in other states was limits on concealed carry and sales to minors, and penalties for misuse.



To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** (Required)

e.g. jane@example.com      Submit

***NEXT:***  Bowie knife statutes 1837-1899

**DAVID KOPEL** is research director at the Independence Institute.

SECOND AMENDMENT    GUN CONTROL    CONCEALED CARRY    RIGHT TO CARRY

MEDIA CONTACT & REPRINT REQUESTS

💬 Show Comments (60)

---

*RECOMMENDED*

Fast reloading of guns in the 19th century

Washington Is Now the 10th State With an 'Assault Weapon' Ban

Why bans on so-called 'assault weapons' are unlikely to reduce mass shooting deaths

'Assault Weapon' Banners Assert False Distinctions Because the Real Ones Are Silly

**AR rifle ammunition is less powerful than most other rifle ammunition**

About

Browse Topics

Events

Staff

Jobs

Donate

Advertise

Subscribe

Contact

Media

Shop

Amazon

© 2023 Reason Foundation | Accessibility | Privacy Policy | Terms Of Use

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

# EXHIBIT 81

# ACTS

OF THE

## GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN

## MILLEDGEVILLE,

AT AN

### ANNUAL SESSION

### NOVEMBER AND DECEMBER,

## 1860.

PUBLISHED BY AUTHORITY.

MILLEDGEVILLE :
BOUGHTON, NISBET & BARNES, STATE PRINTERS.
1861.

*Buying or receiving stolen goods of slaves or free negroes, Penitentiary offence from 1 to 4 years.* That from and after the passage of this act, if any free white person or persons, shall buy or receive any money, goods, chattels, or other effects, from any negro or free person of color, that has or have been stolen, or feloniously taken, knowing the same to have been so stolen or feloniously taken, such person or persons, so offending, shall be taken and deemed to be an accessory, or accessories, after the fact; and being convicted thereof, shall be punished by imprisonment and labor in the Penitentiary, for any time not less than one year, nor longer than four years.

Sec. II. Repeals conflicting laws.

Assented to 19th December, 1860.

### (No. 63.)

*An Act to amend the Twelfth Section of the Thirteenth Division of the Penal Code.*

*Twelfth Sec. of the Thirteenth Div. of Penal Code, amended.* Section I. *The General Assembly of the State of Georgia do enact,* That the Twelfth Section of the Thirteenth Division of the Penal Code, be, and the same is hereby amended, by striking out the following words, "whereby the health of such slave or slaves, may be injured or impaired." *

Assented to December 19th 1860.

* The 12th section of the 13th division of the Penal Code provides that "any owner or employer of a slave, who shall cruelly treat such slave or slaves, *by unnecessary or excessive whipping; by withholding proper food or sustenance; by requiring greater labor from such slave or slaves than he, she or they, are able to perform; or by not affording proper clothing,* whereby the health of such slaves may be injured and impaired, or cause or permit the same to be done; every such owner or employer, shall be guilty of a misdemeanor, &c."

In order to convict under the above section, as it heretofore stood, it was necessary to prove, in addition to the fact of cruel treatment. &c., also that *thereby the health of such slave or slaves was injured or impaired*; but hereafter, under the above amendment, in order to convict, it will be only necessary to prove the fact of cruel treatment, &c. See T. R. R. Cobb's New Digest, p. 827.

### (No. 64.)

*An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned.*

*Selling or furnishing weapons to slaves or free negroes, prohibited. Penalty.* Section I. *The General Assembly of the State of Georgia do enact,* That from and after the passage of this Act, any person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defence, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months, at the discretion of the Court; *Provided,* That this Act shall not be so construed as to prevent *Proviso as to owners and overseers, in certain cases.* owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer.

*Slaves employed on Rail Roads.—Bail for slaves in certain cases.*

SEC. II. *And be it further enacted,* That it shall be the duty of the several Judges of the Superior Courts of this State, to give special-ly in charge to the Grand Juries of the several Courts, the provisions of this act.

*Judges to give this Act in charge.*

SEC. 3. Repeals conflicting laws.

Assented to 19th December, 1860.

---

# TITLE XX.

---

## ROADS.

*Moneys received in lieu of work on Roads by negroes employed by Rail Road Contractors, to be expended on such Roads.*

### (No. 65.)

*An Act to repeal, [amend?] "an Act to exempt negroes employed by Contractors in the construction of Rail Roads, from liability to work on Roads, on certain conditions."\**

SECTION I. *Be it enacted, &c.,* That said recited Act, be so amended as to require the several Overseers of Roads, into whose hands any moneys may come by virtue of the provisions of said recited Act, to expend said moneys in hiring hands to work on the Roads, of which they are respectively overseers.

*Moneys received in lieu of work on Roads by negroes employed by R. R. contractors, to be expended on such Roads.*

SEC. II. Repeals conflicting laws.

Assented to 19th December, 1860.

\*See Acts of 1859, p. 65.

---

# TITLE XXI.

---

## SLAVES AND FREE PERSONS OF COLOR.

SECTION 1. Slaves committed to jail for crime may be admitted to bail—proviso.

SECTION 2. Slaves or free persons of color may be admitted to bail, in certain cases.

### (No. 66.)

*An Act to authorize the owner, or owners, of Slaves charged with offences against the Laws, to give bail for such slave, or slaves.*

1. SECTION. I. *The General Assembly of the State of Georgia do enact,* That when any slave, or slaves, charged with the commission of any offence against the laws of this State, may be committed to Jail, it shall and may be lawful for the owner, or owners, of said

*Slaves committed to jail for crime, in certain cases, may be admitted to bail.*

EXHIBIT 82

WORKING DRAFT – Subject to change

# "Not all History is Created Equal":

# In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868

Mark W. Smith

***

Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology, Oxford University; Presidential Scholar and Senior Fellow in Law and Public Policy, The King's College; Distinguished Scholar and Senior Fellow of Law and Public Policy, Ave Maria School of Law. He also hosts the Four Boxes Diner YouTube Channel, which addresses Second Amendment scholarship, history, and issues. He is the author of multiple books including *First They Came for the Gun Owners: The Campaign to Disarm You and Take Your Freedoms* (Bombardier Books 2019) and *#Duped: How the Anti-gun Lobby Exploits the Parkland School Shooting—and How Gun Owners Can Fight Back* (Post Hill Press 2018).

Electronic copy available at: https://ssrn.com/abstract=4248297

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

I.   1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL
     UNDERSTANDING OF THE SECOND AMENDMENT. .............................................. 7

     A.  The meaning and scope of each provision in the Bill of Rights is the same whether
         applied against the states or against the federal government. ....................................... 7

     B.  The meaning of a constitutional provision is fixed when it is adopted. ....................... 9

     C.  The public understanding of the Bill of Rights by ratifiers in the Founding period
         controls the meaning of its provisions. ....................................................................... 10

     D.  All three of the Supreme Court's substantive interpretations of the Second
         Amendment assess its meaning and scope by looking at the Founding period. ......... 15

     E.  Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the
         Founding Period, not 1868. ......................................................................................... 17

     F.  If later understandings contradict the original understanding of the text, the original
         understanding controls. ............................................................................................... 27

     G.  The Court of Appeals' decisions cited to support 1868 as the determinative year have
         been abrogated or rely on an obvious misreading of McDonald. ............................... 31

II.  1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE
     BILL OF RIGHTS. ........................................................................................................ 33

     A.  It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they
         were incorporating against the states all of the provisions of the first eight
         amendments. ................................................................................................................ 33

     B.  The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill
         of Rights through the Privileges or Immunities Clause. .............................................. 40

     C.  The individual right to bear arms in the Second Amendment was understood the same
         way in 1868 as in 1791. .............................................................................................. 41

III. THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES
     NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION
     JURISPRUDENCE. ........................................................................................................ 45

     A.  Professor Lash's approach is theoretically unsound and unlikely to be adopted. ...... 46

ii

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

B. Professor Amar's approach contains similar flaws and his theories have been rejected by Heller..................................................................................................... 51

CONCLUSION..................................................................................................................... 57

iii

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

## INTRODUCTION

In June of 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*,[1] its most significant case interpreting the scope of the Second Amendment since the landmark decision in *District of Columbia v. Heller* in 2008.[2]  *Bruen* was a major victory for the constitutional right to keep and bear arms.  One consequence of the decision has been to send the gun control movement scrambling for new ways to undercut the right to bear arms in a post-*Bruen* world.  Opponents of the Second Amendment have seized upon a short passage by Justice Thomas, author of the *Bruen* opinion, to argue in the lower courts that an originalist interpretation requires courts to look at the meaning of the Second Amendment (and thus, logically, all provisions of the Bill of Rights) when the Fourteenth Amendment was ratified in 1868, not in 1791 when the Bill of Rights was ratified.  This approach, if accepted, would revolutionize not only Second Amendment law, but also the Court's entire Bill of Rights jurisprudence.  It is nonsensical, contrary to the Supreme Court's precedents, and contradicts the express text of *Bruen*.

Before looking at what the *Bruen* opinion said (or did not say) on that subject, *Bruen* itself needs to be placed in context.  *Heller* held that the Second Amendment confirms an individual right to keep and bear arms for lawful purposes such as self-defense.  It also rejected the use of a means-ends balancing test, such as levels of scrutiny, and instead relied on a "text, history, and tradition" test.

In the fourteen years between *Heller* and *Bruen*, most of the lower federal courts largely disregarded *Heller*'s historical methodology and instead applied a two-part interest balancing

---

[1] 142 S.Ct. 2111 (2022).

[2] 554 U.S. 570 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

test.  The first part of the test looked at whether a particular ban or restriction fell within the scope of the Second Amendment.  If it did, the second part of the test was invoked, and the lower courts usually applied an "intermediate scrutiny" balancing test to render the Second Amendment's protections ineffectual.  That remained true even after the Court held in *McDonald v. City of Chicago*[3] that the Second Amendment is a fundamental individual right that is incorporated against states and localities by the Fourteenth Amendment's Due Process Clause.

*Bruen* changed all of that.  The Court expressly rejected balancing tests.  In the words of the Court, the second step was "one step too many."[4]  *Heller* and *McDonald*, the Court stated, "do not support applying means-end scrutiny in the Second Amendment context."[5]  Rather, Second Amendment cases must be firmly rooted in the text and history of that Amendment.  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," the Court held.  To overcome that presumption, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[6]  That means that the government has the burden of showing that there were reasonably close historical analogues to the present-day restriction that is challenged.[7]

But at what point in history should courts look to determine if there were laws or restrictions analogous to those being challenged?  Immediately after *Bruen* was decided,

---

[3] 561 U.S. 742 (2010).

[4] *Bruen*, 142 S.Ct. at 2127.

[5] *Id.*

[6] *Id.* at 2127, 2130.

[7] *Bruen* established several important principles for the Second Amendment.  In addition to striking down the two-part test for the Second Amendment, it established that the Second Amendment protects the carrying of weapons outside the home.  It held that carry permit or license systems are unconstitutional if they vest discretion in state or local officials instead of being based on objective criteria. It also outlined the proper methodology for applying the Second Amendment based upon reasoning by historical analogy.

Electronic copy available at: https://ssrn.com/abstract=4248297

government defendants (and their anti-gun amici) in Second Amendment cases began to argue that in litigation against states and localities, as opposed to litigation against the federal government, the relevant time period is not 1791, when the Second Amendment was ratified, but 1868, when the Fourteenth Amendment was ratified.[8]

Here is the passage in *Bruen* on which they base this argument.  After reviewing the historical methodology to be employed by courts in future Second Amendment cases, the Court made a final observation that:

> Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel. Tiernan v. Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [citations omitted] And we have *generally assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791*. See, *e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).
>
> We also *acknowledge* that there is an *ongoing scholarly debate* on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they

---

[8] See, *e.g.*, Br. of Def. John Harrington in Support of his Motion for Summary Judgment 24, *Worth v. Harrington*, No. 0:21-CV-01348,  Doc. 49 (D. Minn. Aug. 4, 2022) ("Especially relevant … are laws that were in effect around the time the Fourteenth Amendment, which made the Second Amendment applicable to the States, was ratified); Electronic Amicus Letter Br. of Everytown for Gun Safety 2, *Lara v. Commissioner Pennsylvania State Police*, No. 21-1832, Doc. 61 (3d Cir. Aug. 2, 2022) ("the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states."); [Proposed] Amicus Br. of Everytown for Gun Safety in Support of Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction 7, *Antonyuk v. Bruen*, No. 1:22-cv-00734, Doc. 33 (N.D.N.Y. Aug. 18, 2022) ("Thus, when the people chose to extend the Bill of Rights to the states in 1868, their understanding of the scope of each right should control the originalist analysis today.").  The specific arguments made in these and similar cases are discussed in Part G, below.

3

Electronic copy available at: https://ssrn.com/abstract=4248297

readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings").[9]

That portion of the opinion concluded that: "We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."[10]

That has led gun control advocates to treat the issue of whether 1791 or 1868 is the relevant time period as an open question and to argue for 1868.  Undoubtedly that is because there were more laws concerning firearms on the books in 1868 than there were in 1791, and thus more opportunities to find historical "analogues" to restrict individual rights.  Also, the Reconstruction period is unusual in American history because the North was occupying the South with military force, and the South was trying to disarm the newly freed blacks.  Such actions during that period are therefore not representative of either the Founding period or of the American historical tradition.

But 1791 vs. 1868 is not an open question.  That the Founding period is the correct time to determine the original public meaning of an individual right is not a mere "assumption," as Justice Thomas stated in his respectful nod to the "ongoing scholarly debate."  It is an integral and controlling part of the Court's Bill of Rights jurisprudence.  As shown in this article, when history must be consulted to determine meaning, it has been the universal practice of the Court to look at the Founding period and relevant antecedents to determine original public understanding. No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights.  If periods after 1791 are consulted at all, it

---

[9] *Bruen*, 142 S.Ct. at 2137-38 (emphasis added). The SSRN article by Professor Lash has now been published as Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (Summer 2022).

[10] *Id*. at 2138.

Electronic copy available at: https://ssrn.com/abstract=4248297

is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791.

The Supreme Court has held that the meaning of the Constitution, including the Bill of Rights, is fixed at the time it was adopted, not later.  A provision of the Bill of Rights has only one meaning, whether applied against the federal government or the states.  And the time period for determining that single meaning, when history must be examined, is 1791.  That is true of the three cases cited in the passage quoted above from *Bruen;* it is true of all of the Supreme Court's Second Amendment cases beginning with *Heller*, including *Bruen* itself; and it is true of Supreme Court cases examining other rights provisions of the Bill of Rights.  The Court has also clearly stated that if a later interpretation differs from the original meaning at the time of ratification of the Bill of Rights, the later interpretation must yield.

As shown in detail below, the cases cited by post-*Bruen* defendants or amici in Second Amendment litigation were either abrogated by *Bruen* itself, resulted from a misreading (later corrected) of the *McDonald* decision by a single Circuit Court of Appeals, or were those which cited to that mistaken decision.

Even if one examines the period of ratification of the Fourteenth Amendment, there is no evidence that the ratifiers thought the existing rights in the Bill of Rights somehow changed in meaning.  Rather, the Fourteenth Amendment's purpose was to include African Americans within the protections granted to citizens and to protect their rights against encroachments by the states.  In fact, it did not take long for the Supreme Court to decide that "privileges or immunities" of citizens of the United States were a very limited set of rights indeed.

This article concludes with a description of the scholarly positions of Professors Lash and Amar regarding use of the year 1868 to determine the meanings of the Bill of Rights.  Professor

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Lash's position would require a complete overturning of Supreme Court's Bill of Rights jurisprudence.  Professor Amar's position is different, and his concerns, especially regarding the Second Amendment, may have been resolved by *Heller*, which was decided ten years after his cited book was published.

6

Electronic copy available at: https://ssrn.com/abstract=4248297

I.     **1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL UNDERSTANDING OF THE SECOND AMENDMENT.**

   A.   *The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or against the federal government.*

The key to understanding why *only* 1791 is the proper year for determining the original public meaning of the Second Amendment, or of any other right of individuals enumerated in the Bill of Rights, is found in *Bruen* itself: "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government."[11]   The Court does not apply two different versions of the Second Amendment, or two versions of other incorporated provisions of the first eight amendments in the Bill of Rights.  Specifically, it does not apply one meaning when invoked against potential federal infringement and a different meaning when invoked against a potential state or locality infringement.

This has been a fundamental principle of Bill of Rights jurisprudence for more than five decades.[12]  That an incorporated right has only a single meaning was made crystal clear in *McDonald*, which quoted *Malloy v. Hogan* as establishing that the Court has:

> abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court."[13]

Instead, as *McDonald* noted, the *Malloy* Court "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment

---

[11] *Bruen*, 142 S.Ct. at 2137 (emphasis added).

[12] The concept that the federal government and state governments are restrained equally by the First Amendment, and by the incorporated First Amendment, appears to go back even further. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states *as incompetent as Congress* to enact such laws." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (emphasis added).

[13] *McDonald*, 561 U.S. at 765 (quoting *Malloy v. Hogan*, 378 U.S. 1, 5–6 (1964)).

7

Electronic copy available at: https://ssrn.com/abstract=4248297

according to the same standards that protect those personal rights against federal encroachment.'"[14]  The meaning of a provision of the Bill of Rights is *identical* whether applied against the states or the federal government.  Similarly, the Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."[15]

*McDonald* discussed one anomalous case, *Apodaca v. Oregon*,[16] which when *McDonald* was decided allowed state criminal defendants to be convicted of a serious crime by a 10-2 vote rather than only by a unanimous jury as the Sixth Amendment requires in federal trials.  That case has since been overruled in *Ramos v. Louisiana*, with the Court noting that it has "long explained … that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government."[17]  As a case decided just one year earlier stated, "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."[18]  That means, however it is interpreted, the Second Amendment must apply *equally* against the states and the federal government.

---

[14] *McDonald*, 561 U.S. at 765-66 (quoting *Malloy*, 378 U.S. at 10, and further citing *Mapp v. Ohio*, 367 U.S. 643, 655–656 (1961); *Ker v. California*, 374 U.S. 23, 33–34 (1963); *Aguilar v. Texas*, 378 U.S. 108, 110 (1964); *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Duncan v. Louisiana*, 391 U.S. 145, 149, 157–158 (1968); *Benton v. Maryland*, 395 U.S. 784, 794–795 (1969); and *Wallace v. Jaffree*, 472 U.S. 38, 48–49 (1985)).

[15] *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

[16] 406 U.S. 404 (1972).

[17] *Ramos v. Louisiana,* 140 S.Ct. 1390, 1397 (2020).

[18] *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (incorporating the Excessive Fines Clause).

Electronic copy available at: https://ssrn.com/abstract=4248297

*B.   The meaning of a constitutional provision is fixed when it is adopted.*

*Bruen* explained that the Constitution's "meaning is fixed according to the understandings of those who ratified it…."[19]  Since the Bill of Rights is part of the Constitution and was ratified just three years after the unamended Constitution went into effect, its meaning was fixed as of that time.  Noting that the "Constitution can, and must, apply to *circumstances* beyond those *the Founders* specifically anticipated,"[20] *Bruen* quoted from *United States v. Jones*,[21] which concluded that installation of a tracking device on a vehicle was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*") (emphasis added).[22] Circumstances may change, but the central meaning is fixed.

The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.  As Justice Thomas noted in his concurrence in *McIntyre v. Ohio Elections Comm'n*:[23]

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now.*" *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] *the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions ...* in the several states." *Rhode Island v. Massachusetts,* 37 U.S. (12 Pet.) 657, 721 (1838).

---

[19] *Bruen,* 142 S.Ct. at 2132.

[20] *Id.*

[21] 565 U.S. 400, 404–405 (2012).

[22] *Id.* (emphasis added).

[23] 514 U.S. 334, 359 (1995) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

Thus, as long ago as 1838, the concept of a "historically fixed meaning" was an accepted proposition. It remained an accepted proposition in 1905 when *South Carolina v. United States* was decided and has remained so to the present day.

C. *The public understanding of the Bill of Rights by ratifiers in the Founding period controls the meaning of its provisions.*

As the above passages demonstrate, the relevant time period for ascertaining the *single* meaning of a provision of the Bill of Rights, as applied to the states and to the federal government, is the ratification of those amendments at the time of the Founding, not the time of incorporation of the right into the Fourteenth Amendment. *Bruen* recognized that the "Second Amendment's *historically fixed meaning*" must date, like the Amendment itself, to 1791, when the Court reaffirmed *Heller*'s finding that the right applies to new circumstances, specifically that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence *in the 18th century.*'"[24]

In the passage from *Bruen* quoted above regarding the "assumption" that 1791 is the relevant time period, the Court cited three cases, all of which looked to the time of ratification of specific amendments in 1791 to determine their original public meaning: *Crawford v. Washington*, 541 U.S. 36 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) (First Amendment). Those cases all involve applications against the states of incorporated provisions of the Bill of Rights. The *Bruen* opinion stated that the Court had "assumed" in those cases that the Founding was the relevant time period. But, as those cases show, the Founding period is

---

[24] *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

expressly stated to be the period to be examined to determine the meaning of the provisions in question.[25]

Crawford is a Confrontation Clause case. Finding that the text alone did not resolve the specific meaning and purposes of that Clause, the Court observed that "[w]e must therefore turn to the historical background of the Clause to understand its meaning."[26] The Court then examined pertinent English legal history, colonial laws and practices, the common law as understood at the time of the Founding, comparable provisions in eighteenth century state constitutions, and some early nineteenth century cases and commentary to determine its meaning. Throughout its historical review, the Court repeatedly used expressions such as:

- "…the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify..."

- "The founding generation's immediate source of the concept, however, was the common law..."

- referring to certain evils "…that English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind."

- "…ex parte examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them."

---

[25] See also Heller, 554 U.S. at 576-77 (stating that the normal meaning of the words in the Second Amendment excludes meanings "that would not have been known to ordinary citizens in the founding generation." (emphasis added).

[26] Crawford, 541 U.S. at 43.

Electronic copy available at: https://ssrn.com/abstract=4248297

- [the Sixth Amendment] "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established *at the time of the founding...*"

- "…the *common law in 1791* conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."

- "We do not infer from these that *the Framers* thought exceptions would apply even to prior testimony."

- "Our cases have thus remained faithful to *the Framers' understanding:*"

- "…we do not think *the Framers* meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence..." [27]

There is no indication whatsoever in *Crawford* that when the Sixth Amendment is applied through the Fourteenth Amendment to a state, the public understanding of the Sixth amendment at the time of ratification of the Fourteenth Amendment determines its meaning or changes the 1791 meaning.  And the Supreme Court's reliance on Founding-era history in *Crawford* was not a mere "assumption"; it was inseparable from its holding.

The second case cited is *Virginia v. Moore,*[28] a Fourth Amendment case, where the protection of that Amendment was asserted against a state's actions.  The issue was whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law.[29]  The Court looked to the Founding era for guidance:

---

[27] *Id.* at 36, 43, 50, 51, 54, 56, 59, 61 (emphasis added).

[28] 553 U.S. 164 (2008).

[29] *Id.* at 166 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

In determining whether a search or seizure is unreasonable, we begin with history. We look to the *statutes and common law of the founding era* to determine the norms that the Fourth Amendment was meant to preserve.[30]

The Court stated that it was "aware of no historical indication that *those who ratified the Fourth Amendment* understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted."[31]  Instead, the "immediate object of the Fourth Amendment was to prohibit the general warrants and writs of assistance that *English judges had employed against the colonists.*"[32]  Emphasizing the focus on the Founding period, the Court continued, "[n]o early case or commentary, to our knowledge, suggested the Amendment was intended to incorporate subsequently enacted statutes," and "[n]one of the early Fourth Amendment cases that scholars have identified sought to base a constitutional claim on a violation of a state or federal statute concerning arrest."[33]

According to the Court, this is "not a case in which the claimant can point to 'a clear *answer [that] existed in 1791* and has been generally adhered to by the traditions of our society ever since.'" [34]  As with *Crawford*, there was no indication in *Virginia v. Moore* that the understanding of the ratifiers of the Fourteenth Amendment was relevant or should even be considered.

In the third case, *Nevada Comm'n on Ethics v. Carrigan*,[35] the issue was whether a provision of the state's Ethics in Government Law requiring legislators to recuse themselves from voting on certain measures violated the First Amendment.  The Court held that it did not

---

[30] *Id.* at 168 (emphasis added).

[31] *Id.* (emphasis added).

[32] *Id.* at 166-69 (citations omitted) (emphasis added).

[33] *Id.* at 169.

[34] *Id.* at 170-71 (quoting *Atwater v. Lago Vista*, 532 U.S. 318, 345 (2001) (cleaned up) (emphasis added).

[35] 564 U.S. 117 (2011).

13

Electronic copy available at: https://ssrn.com/abstract=4248297

because voting by legislators does not implicate a personal right of free speech, but is an exercise of legislative power on behalf of the citizenry.  One of the arguments in support of that conclusion was that such recusal laws had existed at the time of the Founding and were not considered to be restraints on speech.

As with *Crawford* and *Moore*, the Court never even considered whether the scope of the First Amendment meaning should be determined by the understanding of the ratifiers of the Fourteenth Amendment.  Instead, it looked to the Founding period to determine whether a law requiring recusal violated the right to freedom of speech or expression.  The Court noted that "Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws *existed in 1791* and have been in place ever since."[36]  The Court found that recusal rules like the one at issue in the case have existed since the founding of the Republic:

> "*[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning,*'" *Printz v. United States*, 521 U.S. 898, 905 (1997) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723–724 (1986)). *That evidence is dispositive here. Within 15 years of the founding*, both the House of Representatives and the Senate adopted recusal rules. The House rule—to which no one is recorded as having objected, on constitutional or other grounds, see D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 10 (1997)—was adopted within a week of that chamber's first achieving a quorum.[37]

The Court observed that "The first Senate rules did not include a recusal requirement, but Thomas Jefferson adopted one when he was President of the Senate" in 1801.[38]  It also looked to recusal requirements for federal judges as early as 1792.[39]

---

[36] *Id*. at 122 (emphasis added).

[37] *Id.* (emphasis added).

[38] *Id.* at 123.

[39] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4248297

When the Supreme Court looks at history to determine the intent of ratifiers, it always looks to the Founding era as the period of sole or primary relevance.  In addition to the three cases cited by *Bruen*, decisions under the Second Amendment, and all of the other amendments that have been incorporated, look to the Founding period.[40]

> D.  *All three of the Supreme Court's substantive interpretations of the Second Amendment assess its meaning and scope by looking at the Founding period.*

There have been three Supreme Court cases—*Heller*, *Caetano*, and *Bruen*—that have applied the substantive meaning of the Second Amendment.  *McDonald* surveyed the importance of the right to keep and bear arms over our nation's history to determine if it should be incorporated through the Fourteenth Amendment.  But *McDonald* did not attempt to expound on its exact substantive meaning because Chicago's handgun ban was clearly unconstitutional under *Heller* if the Second Amendment was incorporated.  *Heller*, *Caetano*, and *Bruen* all used the Founding period to determine the scope and meaning of the Second Amendment.

*Heller* first analyzed the meaning of the text of the Second Amendment by examining sources that either preceded 1791 or were close enough in time thereafter to validly ascertain what the language meant to the Founding generation.[41]

While it is unnecessary to review every citation by *Heller* as evidence of meaning in the Founding era, a few examples will illustrate the point.  The Court stated that in interpreting the Second Amendment's text, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'  Normal meaning may of course include an idiomatic

---

[40] The Seventh Amendment has not been incorporated generally against the states because it is a provision governing trials in federal courts.

[41] *Heller*, 554 U.S. 577-592.

Electronic copy available at: https://ssrn.com/abstract=4248297

meaning, but it excludes secret or technical meanings that would not have been known to *ordinary citizens in the founding generation*."[42]

To ascertain the meaning of "militia," the Court stated: "As we will describe below, the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range."[43]  *Heller* looked at the *colonial* militia, not the militia as it existed in 1868 or some later period.

For the meaning of "arms," *Heller* looked exclusively at mid- to late eighteenth-century dictionaries and sources, such as Samuel Johnson's famed dictionary.[44]  It concluded that "The term was applied, *then as now*, to weapons that were not specifically designed for military use…."[45]  "Then" refers to the Founding period.  The Court concluded that "Although one *founding-era* thesaurus limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war,' even that source stated that all firearms constituted 'arms.'"[46]

Regarding the meaning of "keep," the Court again cited Johnson's Dictionary, with a confirmatory reference to the early Webster definition.  The opinion noted that "The phrase 'keep arms' was not prevalent in the written documents *of the founding period* that we have found," but cited three examples, all of which preceded 1791.[47]  The Court construed "bear" in the same way, stating, "from our review of *founding-era sources*, we conclude that this natural meaning [which the Court had adopted] was also the meaning that 'bear arms' had in the 18th

---

[42] *Id.* at 576-77 (citations omitted) (emphasis added).

[43] *Id.* at 580.

[44] The opinion did contain a "see also" reference to Noah Webster's 1828 dictionary, but it was merely cited as "similar."  It also cited *State v. Duke*, 42 Tex. 455, 458 (1874), but noted only that that case cited state court decisions construing "arms."

[45] *Heller*, 554 U.S. at 581 (emphasis added).

[46] *Id.* (emphasis added).

[47] *Id.* at 583 (emphasis added).

16

Electronic copy available at: https://ssrn.com/abstract=4248297

century."[48] In the end, the Court concluded that it was "adopt[ing] . . . the original understanding of the Second Amendment" as its definitive interpretation.[49] That can only mean the understanding that prevailed at its ratification.

*Caetano* applied the Second Amendment against the Commonwealth of Massachusetts.[50] Although this *per curiam* opinion did not itself engage in historical analysis, it expressly relied on *Heller*'s language and reasoning, which were rooted in the Founding period.  There was no suggestion by the Court that 1868 was the proper date, or that the understanding of the ratifiers of the Fourteenth Amendment was even pertinent, much less controlling.

*Bruen* again confirmed that the time of ratification of the Bill of Rights is the pertinent period.  Addressing New York's historical arguments from medieval times to the end of the nineteenth century, the Court observed that "not all history is created equal" and then reaffirmed *Heller*'s statement that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[51]  The Second Amendment was adopted in 1791, so that should be conclusive.

E.  *Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868.*

As described in *Bruen*, the meaning of a constitutional provision is fixed when adopted. That includes the provisions of the Bill of Rights, which have the same meaning when incorporated against the states as when they apply directly to the federal government.  In numerous cases involving all of the amendments in the Bill of Rights that have been incorporated, the relevant time period has been held to be the Founding period.  None has looked

---

[48] *Id.* at 584 (emphasis added).

[49] *Id.* at 625.

[50] *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

[51] *Bruen*, 142 S.Ct. at 2136.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

primarily to the post-Civil War period to determine the scope of a provision within the Bill of Rights.  To the extent late 19th century interpretations have been discussed in these cases, it was never because the understandings of the ratifiers of the Fourteenth Amendment were found to prevail over those of the Founders in 1791.  Instead, discussions of late 19th century history are treated as confirmation of the 1791 understanding.  While the list here cannot be exhaustive, some examples will illustrate.

*First Amendment:*

The *Nevada Commission on Ethics* case was one of the three cases cited by Justice Thomas as showing that the Court had "assumed" that 1791 is the proper period for determining the scope and meaning of a provision of the Bill of Rights.[52]  As described above, it was alleged in that case that Nevada had infringed on respondent's right of freedom of speech.  The Court looked to the Founding period, and an unbroken tradition since then, to determine that the conduct in question was not speech protected by the First Amendment.

In *Near v. Minnesota*,[53] applying the principles of the First Amendment regarding freedom of the press against a state, the Court heavily emphasized the historical understanding of freedom of the press in 1791 when striking down a state law that imposed prior restraint on a publication deemed a "public nuisance."  The Court stated that "The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as *historically conceived and guaranteed.*"[54]  It alluded to the struggle in England over prior restraints before the Founding era, quoted from Blackstone's *Commentaries* on the nature of the right, cited an early Massachusetts case regarding the meaning of the right, relied on

---

[52] *Id.* at 2137-38.

[53] 283 U.S. 697 (1931).

[54] *Near*, 283 U.S. at 713.

18

Electronic copy available at: https://ssrn.com/abstract=4248297

Madison's Report on the Virginia Resolutions to show differences between the right in England and in America, and included an extensive excerpt from that Report.[55]  This was, of course, a case relying on incorporation against a state, but there was no mention of 1868 as purportedly being the relevant time period for ascertaining the meaning of freedom of the press.

The famous case of *Reynolds v. United States*[56] presented the question of whether a federal statute governing the Territory of Utah could prohibit bigamy without violating the Free Exercise Clause.  Although the case was purely federal, the Supreme Court turned to history at the time of the Founding and before, to determine the meaning of religion and the scope of the right.  The Court noted that:

> The word 'religion' is not defined in the Constitution. We must go elsewhere, therefore, to ascertain its meaning, and nowhere more appropriately, we think, than to *the history of the times in the midst of which the provision was adopted*. The precise point of the inquiry is, what is the religious freedom which has been guaranteed.[57]

The Court then reviewed some colonial history in which religious freedom was circumscribed, and considered in detail a dispute concerning a bill in Virginia in 1784, regarding which James Madison:

> prepared a 'Memorial and Remonstrance,' which was widely circulated and signed, and in which he demonstrated 'that religion, or the duty we owe the Creator,' was not within the cognizance of civil government. [citation omitted]. At the next session the proposed bill was not only defeated, but another, 'for establishing religious freedom,' drafted by Mr. Jefferson, was passed.[58]

The Court considered Jefferson's bill and his views about religious freedom and reviewed the treatment of that subject in the Constitutional Convention and during the period of

---

[55] *Id*. at 713-17.

[56] 98 U.S. 145 (1878).

[57] *Reynolds*, 98 U.S. at 163.

[58] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

ratification of the Bill of Rights.[59]  There was no hint that the public understanding of the First Amendment in 1868 was important, let alone that passage of the Fourteenth Amendment somehow retroactively changed the meaning of the Free Exercise Clause.

In *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,[60] a case involving a dispute between a religious school and a teacher who was a "minister" at the school, the EEOC brought suit against the school, alleging that the minister had been unlawfully terminated because she had threatened litigation under the Americans with Disabilities Act.[61] The Court reviewed English, colonial, and Founding era evidence as to the extent to which American governments could be involved in personnel decisions in religious institutions.[62]  It noted that "It was against this background that the First Amendment was *adopted*."[63]  Among other things, "the *founding generation* sought to foreclose the possibility of a national church…."[64] "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."[65]

In a recent free exercise case, *Fulton v. City of Philadelphia*,[66] the Court's majority opinion found it unnecessary to perform a historical analysis to determine the meaning of the First Amendment's text because the case could be decided under existing precedents.  However,

---

[59] *Id.*

[60] 565 U.S. 171 (2012).

[61] *Id.* at 179-80.

[62] *Id.* at 182-83.

[63] *Id.* at 183

[64] *Id.*

[65] *Id.* at 184.

[66] 141 S.Ct. 1868 (2021).

20

Electronic copy available at: https://ssrn.com/abstract=4248297

Justice Alito, joined by Justices Thomas and Gorsuch, concurred in the judgment, and wrote a lengthy analysis of the text and historical meaning of the Free Exercise Clause, which focused nearly entirely on the meaning in 1791.[67]  After quoting key words from the First Amendment, the concurrence noted that those "words had essentially the same meaning *in 1791* as they do today."[68] Justice Alito wrote that, following *Heller*'s lead, "we must ask whether the Free Exercise Clause protects a right that was known *at the time of adoption to have defined dimensions*."[69]  He noted that "critical state ratifying conventions approved the Constitution on the understanding that it would be amended to provide express protection for certain fundamental rights, and the right to religious liberty was unquestionably one of those rights."[70] Because of deeper constitutional scholarship in recent years, "we are now in a good position to examine how the free-exercise right was understood *when the First Amendment was adopted.*"[71]

*Lynch v. Donnelly*, a case involving whether a municipality could include a creche as part of its Christmas display, said that interpretation of the Establishment Clause should comport with "what history reveals was the contemporaneous understanding of its guarantees."[72]  It looked to the actions of the First Congress in 1789 in determining the meaning of that clause:  "In the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid chaplains for the House and

---

[67] *Fulton*, 141 S.Ct. at 1894-912.

[68] *Id*. at 1896.

[69] *Id*. at 1899.

[70] *Id*. at 1901.

[71] *Id.* at 1899.

[72] *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Senate."[73]  The time of the ratification of the Fourteenth Amendment played no such role in interpreting the right.

*Fourth Amendment:*

As described above, another of the three cases cited by Justice Thomas in support of the Court's looking to the time of the Founding was *Virginia v. Moore*, a Fourth Amendment case. As noted, that case relied on the "statutes and common law of the founding era," and sought to determine the understanding of "those who ratified the Fourth Amendment."[74]  Other cases applying the Fourth Amendment against the states have similarly looked to the Founding period, not the time of ratification of the Fourteenth Amendment.

In *Wyoming v. Houghton*, the Court said that to determine whether government action violates Fourth Amendment rights, "we inquire first whether the action was regarded as an unlawful search or seizure under the common law *when the Amendment was framed.*"[75] Similarly, in *Wilson v. Arkansas*,  the Court stated that in evaluating the scope of Fourth Amendment rights, "we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law *at the time of the framing*."[76]  *Houghton* and *Wilson*, like *Moore*, both applied the Fourth Amendment to states, but not a word was mentioned regarding 1868 being the proper time for assessing the scope or meaning of the right.

---

[73] *Id.* at 674.

[74] *Virginia v. Moore*, 553 U.S. at 168.

[75] 526 U.S. 295, 299 (1999) (emphasis added).

[76] 514 U.S. 927, 931 (1995) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

*Fifth Amendment:*

In *Benton v. Maryland*,[77] the case that incorporated the Fifth Amendment's Double Jeopardy Clause against the states, the Court performed a brief review of the history of that concept's inclusion in American law, especially noting the Founding period.  The right to be free of multiple prosecutions:

> became established in the *common law of England long before this Nation's independence*. [citations omitted].  As with many other elements of the common law, it was carried into the jurisprudence of this Country through the medium of Blackstone, who codified the doctrine in his Commentaries…. Today, every State incorporates some form of the prohibition in its constitution or common law…. [The underlying principle against double jeopardy] has *from the very beginning been part of our constitutional tradition*.[78]

Similarly, in *Gamble v. United States*,[79]  the Court recently examined the meaning of the "dual-sovereignty" doctrine in Fifth Amendment double jeopardy jurisprudence.  The text of the Fifth Amendment protects individuals from being twice put in jeopardy "for the same offence." Accordingly, the Court looked at the meaning of the word "offence" in the Founding period and found that it "was commonly understood *in 1791* to mean 'transgression,' that is, 'the Violation or Breaking of a Law.'"[80]  The Court continued, "As *originally understood*, then, an 'offence' is defined by a law, and each law is defined by a sovereign. So where there are two sovereigns, there are two laws, and two 'offences.'"[81]  Although *Gamble* was a federal case, the Court

---

[77] 395 U.S. 784 (1969).

[78] *Id.* at 795-96 (emphasis added).

[79] 139 S.Ct. 1960 (2019) (citations omitted, emphasis added).

[80] *Id.* at 1965 (emphasis added).

[81] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

recognized that through incorporation the very same principles applied to the state court proceedings under which Gamble had already been convicted.[82]

*Sixth Amendment:*

*Crawford v. Washington*,[83] described above, was a Sixth Amendment Confrontation Clause case and one of the three cases noted by Justice Thomas in *Bruen* to have "assumed" that the Founding period is the relevant time for determining the scope of provisions of the Bill of Rights.  It repeatedly relied on evidence regarding the Framers, 1791, and the Founding period.

In *Ramos v. Louisiana*,[84] the Court considered whether the incorporated Sixth Amendment right to a jury trial in state criminal cases requires a unanimous verdict.  The Court looked at precedents arising from before the Founding period, and practices around the time the Sixth Amendment was ratified:

> The requirement of juror unanimity emerged in 14th century England and was soon accepted as a vital right protected by the common law. As Blackstone explained, no person could be found guilty of a serious crime unless "the truth of every accusation ... should ... be confirmed by the unanimous suffrage of twelve of his equals and neighbors…."[85]

> This same rule applied in the *young American States.* Six State Constitutions explicitly required unanimity. Another four preserved the right to a jury trial in more general terms. But the variations did not matter much; consistent with the common law, state courts appeared to regard unanimity as an essential feature of the jury trial.[86]

The Court further recognized that it was the original time of ratification that was pertinent for determining the meaning of trial by jury, explaining that:

---

[82] *Gamble*, 139 S.Ct. at 1963, 1979.

[83] *Crawford v. Washington*, 541 U.S. 36 (2004).

[84] 140 S.Ct. 1390 (2020).

[85] *Id*. at 1395.

[86] *Id*. at 1396 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

It was against this backdrop that James Madison drafted and *the States ratified the Sixth Amendment in 1791*. By that time, unanimous verdicts had been required for about 400 years. If the term "trial by an impartial jury" carried any meaning at all, it surely included a requirement as long and widely accepted as unanimity.[87]

In other Sixth Amendment cases, the Court has also looked to the Founding period to determine the scope, meaning, or importance of various provisions of that Amendment.  *See*, *e.g.*, *Powell v. Alabama,*[88] (right to counsel; examining scope of right at English law in Founding period, Blackstone's rejection of English limitations on the right, and inclusion of right to counsel in early American constitutions); *Klopfer v. North Carolina*[89] (right to speedy trial; reviewing early English law, Magna Carta, Coke's *Institutes* and the American familiarity with them at the time of the Founding, Virginia's 1776 Declaration of Rights, and early state constitutions); *In re Oliver,*[90] (right to public trial; relying on "our English common law heritage" and state constitutions in most of the original states); *Duncan v. Louisiana,*[91] (right to jury trial in all state criminal cases in which such right would exist in federal court; reviewing early English history and English Bill of Rights, Blackstone, Stamp Act Congress, First Continental Congress, Declaration of Independence, and constitutions of original states); *Washington v. Texas,*[92] (Compulsory Process Clause; stating that the Framers included this clause to overcome certain limits on who could testify at common law).

---

[87] *Id*. (emphasis added).

[88] 287 U.S. 45, 60-67 (1932).

[89] 386 U.S. 213, 223-25 (1967).

[90] 333 U.S. 257, 266–268 (1948).

[91] 391 U.S. 145, 151-54 (1968).

[92] 388 U.S. 14, 20, 23 (1967).

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

*Eighth Amendment:*

In *Timbs v. Indiana*, to determine whether the Excessive Fines Clause was incorporated against the states, the Court examined early English legal history from the time of Magna Carta, Blackstone, the abuses by the Stuart kings, the English Bill of Rights, and colonial and state constitutions.[93]  It noted that the statements in the English Bill of Rights that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted," were adopted almost verbatim first by the Virginia Declaration of Rights and then in the Eighth Amendment itself.[94]  The Court did discuss the period around ratification of the Fourteenth Amendment, but only to note that then 35 of the 37 states had prohibitions against excessive fines, but that abuses of fines to control black people nevertheless continued.[95]  As in *McDonald*, the inclusion of post-bellum nineteenth century developments in the Court's historical review was aimed only at determining that the right is "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition."[96]  There was no suggestion that 1868 was the primary period to determine the meaning of the clause, or that its meaning was somehow changed by the process of incorporation.  Indeed, given the deep roots into English and American history not only of the principle but the very language prohibiting excessive fines, that would have been an untenable exercise.

The author has not found, and litigants in post-*Bruen* litigation have so far not pointed to, a *single* Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or

---

[93] 139 S.Ct. 682, 687-88 (2019).

[94] *Timbs,* 139 S. Ct. at 688.

[95] *Id*. at 688-99.

[96] *Id.* at 687 (quoting *McDonald*).

Electronic copy available at: https://ssrn.com/abstract=4248297

meaning of a provision of the Bill of Rights. [97]  The Second Amendment is not a "second class right"[98] and there is no reason for it to be treated differently from the other provisions of the Bill of Rights in this respect.  In addition, adoption of 1868 as the proper focus for determining the meaning of the Second Amendment would mean that the Supreme Court was utterly wrong in looking to the Founding period in *Heller*, *Caetano*, and *Bruen*.

> F. *If later understandings contradict the original understanding of the text, the original understanding controls.*

*Heller*, *McDonald*, and *Bruen* all considered some amount of 19th century history. *McDonald* did so not to discern the meaning or scope of the right to keep and bear arms, but rather to determine whether it has historically been considered "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."[99]  *Caetano* relied on the Founding-era research and principles announced in *Heller*.  But both *Heller* and *Bruen* engaged in extensive historical analysis and provided some clear guideposts regarding the proper uses of post-Civil War history.

The post Founding-era history examined by *Heller* and *Bruen* was used by the Court only to confirm rather than to contradict the Founding era understanding. Regarding *Heller*, the *Bruen* Court observed that:

> we made clear in *Gamble*[100] that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." In other words, this 19th-century

---

[97] Litigants have cited lower court decisions that they claim have done this, and I discuss the errors in those claims in Part IG.

[98] *McDonald*, 561 U.S. at 780, 781-87.

[99] *McDonald*, 561 U.S. at 767.

[100] *Gamble v. United States,* 139 S.Ct. 1960 (2019).

Electronic copy available at: https://ssrn.com/abstract=4248297

evidence was "treated as mere confirmation of what the Court thought had already been established."[101]

*Bruen* itself found that the text of the Second Amendment plainly covers the right to carry arms in public.[102]  It also carefully noted that "to the extent later history contradicts what the text says, the text controls."[103]  It adopted the view of then-Judge Kavanaugh in a D.C. Circuit Second Amendment case that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."[104]  And, obviously, the insistence by some scholars and advocates that 1868 should control, is only of importance if they believe they can show that the 1868 understanding was *different* from the 1791 understanding.  But if the 1868 understanding is different from that of 1791, it must be rejected because it is inconsistent with the text and the original meaning that "is fixed according to the understandings of those who ratified it."[105]

But even if the arguments that 1868 trumps 1791 did not conflict with *Heller*, *Caetano*, and *Bruen*, and the Court's entire incorporation jurisprudence—which they plainly do—the Court would give them little weight in any event, due to the sheer remoteness in time of any post-Civil War statements, understandings, or legal developments.  The Court warned against giving "post-enactment history more weight than it can rightly bear," and reaffirmed *Heller*'s observation that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much

---

[101] *Bruen*, 142 S.Ct. at 2137 (quoting *Gamble*, 139 S.Ct. at 1975-76).

[102] *Id.* at 2134.

[103] *Id*. at 2137.

[104] *Id*. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

[105] 142 S. Ct. at 2132.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

insight into its original meaning as earlier sources."[106]  In fact, faced with twentieth-century

evidence that *did* contradict the Founding-era evidence, the *Bruen* Court rejected that evidence,

stating that the Court will not:

> address any of the 20th-century historical evidence brought to bear by
> respondents or their *amici*. As with their late-19th-century evidence, the 20th-
> century evidence presented by respondents and their *amici* does not provide
> insight into the meaning of the Second Amendment when it contradicts earlier
> evidence.[107]

Justice Barrett, concurring in *Bruen*, also cautioned that "today's decision should not be

understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th

century to establish the original meaning of the Bill of Rights."[108]  That is quite right—*Bruen*'s

analysis forecloses that type of reasoning.

An example of the errors that can occur when courts engage in such "freewheeling

reliance" on mid-to late 19th century analogues is contained in a recent temporary restraining

order enjoining enforcement of some of New York State's new restrictions on carry enacted after

the *Bruen* decision.[109]  In that case, the District Court let stand a ban on carrying concealed

firearms in places of worship, with some exceptions for keeping the peace, despite the fact that

*Bruen* did not include places of worship in its list of "sensitive places."[110]  The District Court

relied on only six "analogues," which were state statutes enacted between 1870 and 1890.[111] But

these alleged analogues come far too late, as indicated by *Bruen* itself and by Justice Barrett's

concurrence in *Bruen*.  To illustrate, in 1740, South Carolina required that "every white male

---

[106] *Id.* at 2136–37 (quoting *Heller*, 554 U.S. at 614).

[107] *Id.* at 2154 n.28.

[108] *Id.* at 2163 (Barrett, J., concurring).

[109] *Antonyuk v. Hochul*, No. 1:22-CV-0986, Doc. 27 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*").

[110] *Bruen*, 142 S.Ct. at 2133.

[111] *Antonyuk II* at 33 n.25.

29

Electronic copy available at: https://ssrn.com/abstract=4248297

inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who…is…liable to bear arms in the militia of this Province," who shall "go and resort to any church or any other public place of divine worship," must "carry with him a gun or a pair of horse-pistols…with at least six charges of gunpowder and ball."[112]  In 1770, Georgia required that "every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia…and resorting…to any church…shall carry with him a gun, or a pair of pistols." Each man was required to "take the said gun or pistols with him to the pew or seat," and these arms were to "be fit for immediate use and service."[113]

As discussed, all Supreme Court cases on the Bill of Rights have looked to the Founding Period for determining meaning, not to the late 19th century.  If there is no analogue in the Founding period, one cannot jump—as the New York court did—to the late 19th century to look for analogues in the first place.  Justice Barrett in her concurrence pointedly quoted from *Espinoza v. Montana Dept. of Revenue,* 140 S.Ct. 2246, 2258-2259 (2020), which stated that a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" informing our understanding of the First Amendment.[114]  If such a practice cannot establish a pertinent American tradition for the First Amendment, it cannot do so for the Second Amendment, either.

---

[112] 7 David J. McCord, Statutes at Large of South Carolina 417-19 (Columbia, S.C.: A.S. Johnston, 1840) (enacted 1740, re-enacted 1743).

[113] Horatio Marbury and William A. Crawford, Digest of the Laws of the State of Georgia, 241-42 (1802) (law of Feb. 27, 1770, § 1).

[114] *Bruen*, 142 S.Ct. at 2163.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

> G. *The Court of Appeals' decisions cited to support 1868 as the determinative year have been abrogated or rely on an obvious misreading of McDonald.*

The briefs supporting the pro-gun control litigants in the *Worth*, *Lara*, and *Antonyuk* cases, *supra* n.8, rely on Court of Appeals cases that supposedly establish that the time of ratification of the Fourteenth Amendment is the key time period for determining the scope and meaning of the Second Amendment.  Even a cursory review of those cases belies that contention.

The amicus brief by Everytown for Gun Safety in *Lara* offers a more robust argument than the defendant's brief in *Worth*.  It contends that for the historical inquiry:

> the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. Several circuits reached this conclusion in applying the first step of the pre-*Bruen* framework.[115]

For this proposition, it provides the following footnote:

> *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is [to] a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *criticized on other grounds by Bruen,* 142 S. Ct. at 2124, 2126-27; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp*., 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)); *Binderup v. Att'y Gen.*, 836 F.3d 336, 362 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and in the judgments) (quoting *Ezell*).[116]

Taking these in order, *Gould* was not "criticized on other grounds" by *Bruen*.  *Gould* was entirely abrogated by *Bruen*.  It is a legal nullity.  The *Ezell* quote is accurate.  The problem there is that *McDonald* did not state that if the claim involves a state or local law where the "scope"

---

[115] Amicus Letter Br. of Everytown for Gun Safety, *Lara v. Comm'r Pa. State Police*, No. 21-1832, Doc. 61, at 2 (3d Cir. Aug. 2, 2022).

[116] *Id.* at 2–3.

31

Electronic copy available at: https://ssrn.com/abstract=4248297

question asks how the right was understood when the Fourteenth Amendment was proposed and ratified.  The Seventh Circuit in Ezell simply got it wrong.  For this proposition, it cites "*McDonald*, 130 S.Ct. at 3038–47."[117]  But there is no such holding in those pages of *McDonald*. They are simply part of the Court's historical survey of why the right is "fundamental," and do not specify 1868 as the time period to determine the extent of the right.  *Bruen* certainly did not read *McDonald* that way and instead focused on 1791 in an approach that it asserted was consistent with all its other Second Amendment precedents, *McDonald* included.  And the Seventh Circuit changed course shortly after *Ezell* was decided, observing that "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*."[118]

*Greeno* simply quoted the mistaken language in *Ezell*, apparently without investigating its accuracy.[119]  It was also a somewhat cursory "plain error" review in a criminal case because the defendant had not raised the Second Amendment issue at trial.[120]  The *Drummond* case did not hold that 1868 is the proper date.  It merely stated, without any elaboration or citation of authority, that "[f]or the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted."[121]  It then cited authorities from 1825, 1885, and 1895 as part of its analysis, but did not attempt to determine what the ratifiers of the Fourteenth Amendment may have understood the right's scope to be in 1868.[122]  The citation to

---

[117] *Ezell*, 651 F.3d at 702.

[118] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

[119] 679 F.3d at 518.

[120] *Id*. at 516.

[121] 9 F.4th at 227.

[122] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

*Binderup* is to a concurrence, not the Court's opinion, and it, too, merely recites the mistaken language of *Ezell*.[123]

In short, litigants arguing for 1868 as the proper date for historical inquiry in incorporation cases would have the lower courts overlook the unbroken line of Supreme Court cases that the right must be the same against both the federal government and the states; that the right is fixed when the relevant Bill of Rights provision is adopted; and that the Founding period is the relevant period for determining the meaning of the Constitution generally and for particular provisions of the Bill of Rights.  In opposition to these firm and consistent holdings by the Supreme Court, they offer one abrogated opinion by one Court of Appeals, a single Court of Appeals opinion that clearly made a mistake that was later corrected, and a series of cases that relied on that mistake apparently without further investigation.

## II.   1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE BILL OF RIGHTS.

A.   *It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they were incorporating against the states all of the provisions of the first eight amendments.*

If those who advocate for 1868 as the proper year for determining the meaning of the Second Amendment were to prevail, an important consequence must be faced.  There is no reason for the Second Amendment to be different from any other provision of the Bill of Rights in this respect.  It is not a "second class right" as *McDonald* pointedly observed.[124]  So, if those advocates were to be successful, consistent application of the doctrine of incorporation must look to 1868 for the public meaning of all of the provisions of the Bill of Rights, not just the Second

---

[123] 836 F.3d at 362.

[124] 561 U.S. at 780, 781–87.

33

Electronic copy available at: https://ssrn.com/abstract=4248297

Amendment.  Furthermore, those meanings must displace the original understandings of 1791.

As shown above, both of these propositions are flatly contradicted by well-settled Supreme Court

lines of precedent.

But there is a further problem.  If the understanding of the ratifiers of the Fourteenth

Amendment of each provision of the Bill of Rights must take precedence, then we must be

certain that those ratifiers understood that they were incorporating all of the provisions of the Bill

of Rights against the states, and that those rights had a particular, different meaning to them at

the time.  This is not only contrary to logic and precedent, but as a practical matter impossible, or

nearly so.

The Fourteenth Amendment does not state that it is applying the first eight amendments

against the states.  It does not even mention the Bill of Rights. Furthermore, the Due Process

Clause was not the principal or stated means by which the Fourteenth Amendment sought to give

protection to black freedmen to exercise the right to keep and bear arms.  The operative language

considered critical at the time was the Citizenship Clause in the first sentence of Section 1 of the

Fourteenth Amendment, coupled with the Privileges or Immunities Clause in the second

sentence.  Together, they read:

> All persons born or naturalized in the United States, and subject to the jurisdiction
> thereof, are citizens of the United States and of the State wherein they reside. No
> State shall make or enforce any law which shall abridge the privileges or
> immunities of citizens of the United States....[125]

The first sentence was arguably necessary to overcome the holding of the infamous *Dred*

*Scott* case, which held that African Americans were not citizens of the United States and

---

[125] U.S. Const. amend. XIV, § 1.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

therefore could not bring suit in federal courts, among other things.[126]  The second sentence was to protect the privileges or immunities of citizens against state infringement.

But what did "privileges or immunities of citizens of the United States" mean? Throughout the Congressional debates on the Fourteenth Amendment, the Civil Rights Act of 1866, and other Congressional enactments for which the Fourteenth Amendment was intended to provide constitutional authority, contradictory and vague accounts were given by members of Congress and others of the Amendment's meaning and effect.

Let us recall the state of the law regarding the Bill of Rights then.  In *Barron v. Baltimore*, the Supreme Court held that the Fifth Amendment's Takings Clause provided a limit only on the federal government and not on actions by state or local governments.[127]  It was widely, though not universally, assumed thereafter that none of the provisions of the first eight amendments in the Bill of Rights applied against the states.  In fact, that had been the prevailing view even before *Barron*.  At the time of ratification of the Fourteenth Amendment, was it clear that that Amendment was meant to reverse *Barron* and apply all of the protections in the Bill of Rights against the states? If that was not clear at the time, the ratifiers of the Fourteenth Amendment would have had no occasion to reconsider their understandings of the Bill of Rights, including the Second Amendment.

The first difficulty in looking at the likely understanding of the ratifiers of 1868 is that "privileges and immunities" already had a widely accepted meaning.  Article IV, Sec. 2, the Comity Clause of the Constitution, provides that "[t]he Citizens of each State shall be entitled to

---

[126] *Dred Scott v. Sandford*, 60 U.S. 393 (1857).  Also, had African Americans been considered citizens, *Dred Scott* presented a parade of horribles that would have ensued, including that it would give them the right "to keep and carry arms wherever they went." *Id.* at 417. As Justice Thomas observed for the Court in *Bruen*, "even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America." *Bruen*, 142 S.Ct. at 2151.

[127] *Barron ex rel. Tiernan v. City of Baltimore*, 32 U.S. 243, 250–51 (1833).

Electronic copy available at: https://ssrn.com/abstract=4248297

all Privileges and Immunities of Citizens in the several States."[128]   The opinion of Supreme

Court Associate Justice Bushrod Washington, sitting as a member of a circuit court, was widely

quoted to interpret the meaning of "privileges and immunities."  In *Corfield v. Coryell* he wrote:

> The inquiry is, what are the privileges and immunities of citizens in the several
> states? We feel no hesitation in confining these expressions to those privileges
> and immunities which are, in their nature, fundamental; which belong, of right, to
> the citizens of all free governments; and which have, at all times, been enjoyed by
> the citizens of the several states which compose this Union, from the time of their
> becoming free, independent, and sovereign. What these fundamental principles
> are, it would perhaps be more tedious than difficult to enumerate. They may,
> however, be all comprehended under the following general heads: Protection by
> the government; the enjoyment of life and liberty, with the right to acquire and
> possess property of every kind, and to pursue and obtain happiness and safety;
> subject nevertheless to such restraints as the government may justly prescribe for
> the general good of the whole. The right of a citizen of one state to pass through,
> or to reside in any other state, for purposes of trade, agriculture, professional
> pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to
> institute and maintain actions of any kind in the courts of the state; to take, hold
> and dispose of property, either real or personal; and an exemption from higher
> taxes or impositions than are paid by the other citizens of the state; may be
> mentioned as some of the particular privileges and immunities of citizens, which
> are clearly embraced by the general description of privileges deemed to be
> fundamental: to which may be added, the elective franchise, as regulated and
> established by the laws or constitution of the state in which it is to be exercised.
> These, and many others which might be mentioned, are, strictly speaking,
> privileges and immunities....[129]

Notably absent from this list is any direct reference to the provisions making up the Bill

of Rights.  Of course, the Bill of Rights was not written or ratified until after the adoption of the

Constitution.  But Justice Washington wrote this passage in 1823. If "privileges and immunities"

encompassed all of the provisions in the first eight amendments, it seems at least somewhat

---

[128] U.S. CONST. art. IV, § 2.

[129] 6 F. Cas. 546, 551–52 (E.D. Pa. 1823).

Electronic copy available at: https://ssrn.com/abstract=4248297

strange that he did not describe any of the specific rights named in the Bill of Rights or state analogues to those rights.[130]

In debating the Civil Rights Bill of 1866, 42 U.S.C. § 1981, Senator Lyman Trumbull of Illinois (co-author of the Thirteenth Amendment and Chairman of the Senate Judiciary Committee) quoted the portion of the *Corfield* decision set forth above. [131]  The Fourteenth Amendment, of course, was thought by some to be necessary to provide constitutional authority for the Civil Rights Act.  Trumbull described the first section of the bill, which declared all persons of African descent to be citizens of the United States, and noted that there "shall be no discrimination in civil rights or immunities" among the inhabitants of any state "on account of race, color, or previous condition of slavery," as "the basis for the whole bill."[132]  The other provisions contained only "necessary machinery" for enforcement.  After reading aloud the passage from *Corfield*, Trumbull stated that it enumerates "the very rights belonging to a citizen of the United States which are set forth in the first section of this bill."[133]  It was anything but clear from Trumbull's speech that "privileges or immunities" or "civil rights or immunities" was meant to include wholesale the first eight amendments in the Bill of Rights.

When the Fourteenth Amendment itself was presented to the Senate on behalf of a Joint House and Senate Committee, Senator Jacob Howard took a contrasting position.  He again quoted the passage from *Corfield* as constituting "privileges and immunities," but then said that "to these should be added the personal rights guaranteed and secured by the first eight

---

[130] The Comity Clause of Art. IV, Sec. 2, was meant to preclude states from denying to citizens of other states the rights, processes, and privileges afforded its own citizens within its boundaries. That would mean only those privileges or rights held by citizens as part of state law and would not include provisions such as those in the federal Bill of Rights that were designed to prevent federal overreach.

[131] CONG. GLOBE, 39th Cong., 1st Sess. 474–75 (1866).

[132] *Id.*

[133] *Id.*

37

Electronic copy available at: https://ssrn.com/abstract=4248297

amendments of the Constitution; such as the freedom of speech and of the press; the right of the people to peaceably assemble and petition the government for a redress of grievances; … the right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house without the consent of the owner," and so forth down through the remaining amendments.[134]  He continued:  "The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees."[135]

Howard's opinion that "privileges or immunities" embraced the first eight amendments was by no means universal.[136]  Sen. Thomas Hendricks of Indiana stated that he had not "heard any Senator accurately define, what are the rights and immunities of citizenship" or that "any statesman has very accurately defined them."  He described the terms as "not very certain" and "vague."[137]  Senator Reverdy Johnson of Maryland favored the citizenship and due process clauses, but stated that "I think it quite objectionable to provide that 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' simply because I do not understand what will be the effect of that."[138]  Rep. Benjamin Boyer of Pennsylvania found Section 1 "objectionable also in its phraseology, being open to ambiguity and admitting of conflicting constructions."[139]

---

[134] *Id*. at 2765.

[135] *Id*. at 2766.

[136] Indeed, that was news to Justice Felix Frankfurter in 1947.  In his concurring opinion in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 467–68 (1947), Justice Frankfurter wrote: "Not until recently was it suggested that the Due Process Clause of the Fourteenth Amendment was merely a compendious reference to the Bill of Rights whereby the States were now restricted in devising and enforcing their penal code precisely as is the Federal Government by the first eight amendments."

[137] CONG. GLOBE, 39th Cong., 1st Sess. 3039 (1866).

[138] *Id*. at 3041.

[139] *Id*. at 2467.

38

Electronic copy available at: https://ssrn.com/abstract=4248297

If the very members of Congress that were debating the Fourteenth Amendment disagreed as to its meaning, or found it "vague" and open to "conflicting constructions," then determining how the ratifiers in the states in 1868 understood the meanings of each of the provisions of the first eight amendments in 1868, particularly when it was unclear that those eight amendments were being incorporated wholesale against the states, is a very fraught endeavor (as well as an unjustified one).

There is also a practical difficulty in determining what the state ratifiers in 1868 may have understood.  There were thirty-seven states in 1868.  Few records exist on the ratification of the Fourteenth Amendment.  What little exists is found in messages of governors who submitted the Fourteenth Amendment to their state legislatures, legislative debates (which were recorded in only Pennsylvania and Indiana), and committee reports (Massachusetts, Texas, and Wisconsin).  One controversy was whether the Constitution already protected basic rights versus whether the Fourteenth Amendment was necessary.  Voting rights were discussed, which had generally been held to be a political right conferred by a constitution or statute, rather than a natural civil right.[140]

Finally, whatever the meaning of "privileges or immunities," it is clear that the Fourteenth Amendment, and legislation that preceded and followed it, were meant to curb abuses of the rights of African Americans.  It is also clear that the drafters and ratifiers of the Fourteenth Amendment wanted to enforce those rights *against the states*.  They were not inventing new rights or changing what those rights meant.  The proponents of the Fourteenth Amendment simply wanted the same civil rights that white people already had to be extended to African

---

[140] See STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS 67–70 (Updated ed. 2010).

Electronic copy available at: https://ssrn.com/abstract=4248297

Americans and to prevent states from denying or infringing those rights or applying the laws in a discriminatory fashion.

None of this is intended to cast doubt on the doctrine of incorporation, the Court's incorporation through the Due Process clause, or incorporation of the Second Amendment, all of which have been decided.  It is only to point out that anyone seeking to determine the specific understanding by ratifiers of the Fourteenth Amendment in 1868 of each provision of Bill of Rights is likely to be chasing a chimera.  Using a time period so long after the Founding should not be done for the Second Amendment or for any other specific rights in the first eight amendments.

> B.  *The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill of Rights through the Privileges or Immunities Clause.*

Although there was disagreement in Congress about what "privileges or immunities" meant, the biggest disagreement was with the Supreme Court.  In fact, the Supreme Court rejected the proposition that the Amendment incorporated the Bill of Rights at the first opportunity it had to do so.  In the *Slaughter-House Cases*, the Court held that the "privileges or immunities" language in the Fourteenth Amendment included only rights that depended on federal citizenship, including:

> to come to the seat of government to assert any claim he may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions. He has the right of free access to its seaports, through which all operations of foreign commerce are conducted, to the subtreasuries, land offices, and courts of justice in the several States.[141]

The Court further stated that:

> Another privilege of a citizen of the United States is to demand the care and protection of the Federal government over his life, liberty, and property when on

---

[141] *Slaughter-House Cases*, 83 U.S. 36, 79 (1872).

Electronic copy available at: https://ssrn.com/abstract=4248297

the high seas or within the jurisdiction of a foreign government. Of this there can be no doubt, nor that the right depends upon his character as a citizen of the United States. The right to peaceably assemble and petition for redress of grievances, the privilege of the writ of habeas corpus, are rights of the citizen guaranteed by the Federal Constitution. The right to use the navigable waters of the United States, however they may penetrate the territory of the several States, all rights secured to our citizens by treaties with foreign nations, are dependent upon citizenship of the United States, and not citizenship of a State. One of these privileges is conferred by the very article under consideration. It is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State.[142]

Although the First Amendment right to peaceably assemble and petition for redress of grievances is included, no other rights under the Bill of Rights are mentioned, and the Court did not suggest that all of the rights in the first eight amendments are protected from violation by the states.

Even though there was widespread agreement in Congress that the Fourteenth Amendment and contemporaneous legislation was meant to prevent the disarming of African Americans, there is little evidence that the ratifiers of that amendment had in mind specific meanings for all of the first eight amendments, much less that those meanings differed from the original meanings of 1791.  There wasn't even agreement on which rights in the Bill of Rights would be incorporated.  Thus, any attempt to shift the relevant period for determining the meaning of the Bill of Rights from 1791 to 1868 will be fraught with difficulty, as well as having no basis in logic or in the Supreme Court's incorporation jurisprudence.

   *C.   The individual* right *to bear arms in the Second Amendment was understood the same way in 1868 as in 1791.*

The debate about whether 1791 or 1868 is the critical year ultimately only has significance if there were important differences in the understandings of the ratifiers between those two time periods.  But in the discourse that led to the Fourteenth Amendment, the right to

---

[142] *Id.* at 79–80.

Electronic copy available at: https://ssrn.com/abstract=4248297

keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding.  The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states.

Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866.  Rep. Thomas Eliot, sponsor of the former, explained that the bill would invalidate laws like that of Opelousas, Louisiana, providing that no freedman "shall be allowed to carry fire-arms" without permission of his employer and as approved by the board of police.[143]  He noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms…."[144]  Accordingly, the Freedmen's Bureau bill guaranteed the right "to have full and equal benefit of all laws and proceedings for the security of person and estate, including the constitutional right to bear arms."[145]

Senator Garret Davis said that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[146]  Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[147]  The Amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[148]

---

[143] CONG. GLOBE, 39th Cong., 1st Sess. 517 (1866).

[144] Id. at 657.

[145] Id. at 654.

[146] Id. at 371.

[147] Id. at 1182.

[148] Id. at 3210.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

A common theme in the media was that freedmen had the right to bear arms because they were part of "the people."  The *American Citizen*, a Pennsylvania newspaper, quoted the Second Amendment and wrote: "Now what is here meant by 'the people' – Webster defines it as 'the body of persons who compose a community, town, city or nation….'"  So defined, "not a black person in the South, or anywhere else in the country, can be excluded under it from the right to bear arms," and "if the negro be not included in the militia, they are peculiarly the 'people' of the nation, and under the words of the Constitution are entitled to bear arms."[149]

Far from changing the meaning of the right to keep and bear arms, the Civil Rights Act and the Freedmen's Bureau Act, precursors of the Fourteenth Amendment, used phraseology taken from Blackstone with which the Founders were familiar.  Representative James Wilson, Chairman of the Judiciary Committee, explained the background to the Civil Rights Bill's phraseology "civil rights and immunities" and "full and equal benefit of all laws and proceedings for the security of person and property …."[150]  He equated those rights and immunities with those enumerated by Blackstone, on which the Founders also relied:

Blackstone classifies them under three articles, as follows:

1.     The right of personal security; which, he says, "Consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation."

2.     The right of personal liberty; and this, he says, "Consists in the power of locomotion, of changing situation, or moving one's person to whatever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law."

3.     The right of personal property; which he defines to be, "The free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the law of the land."[151]

---

[149] *The Right to Bear Arms*, AMERICAN CITIZEN (Butler, Pa.), Nov. 7, 1866, at 4.

[150] CONG. GLOBE, 39th Cong., 1st Sess. 1117 (1866).

[151] *Id*. at 1118.

43

Electronic copy available at: https://ssrn.com/abstract=4248297

Representative Wilson had the Second Amendment partly in mind when he stated that every right enumerated in the federal Constitution is "embodied in one of the rights I have mentioned, or results as an incident necessary to complete defense and enjoyment of the specific right."[152]  Indeed, the Freedmen's Bureau Act explicitly declared that:

> the right…to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery.[153]

The same Blackstonian concepts basic to the Founders, including the right to bear and use arms, were thus inherited and applied by the drafters of the Fourteenth Amendment.  There was no change in the meaning of the right itself; instead, there was a change to who could exercise the right and who was prevented from restricting its exercise.

That the nature of the right was viewed as unchanging in 1868 is well illustrated by the Supreme Court's nearly contemporaneous decision in *United States v. Cruikshank*.[154]  There the Court explained that private infringement of the right to assemble was not a subject for federal enforcement:

> The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. In fact, it is, and always has been, one of the attributes of citizenship under a free government…. It was not, therefore, a right granted to the people by the Constitution. The government of the United States when established found it in existence, with the obligation on the part of the States to afford it protection. As no direct power over it was granted to Congress, it remains … subject to State jurisdiction.[155]

---

[152] *Id*. at 1118–19.

[153] Freedmen's Bureau Act of 1866, §14, 14 Stat. 173, 176–77 (1866) (emphasis added).

[154] 92 U.S. 542 (1875).

[155] *Id*. at 551.

44

Electronic copy available at: https://ssrn.com/abstract=4248297

The Court found the counts of the indictment alleging private infringement of the right to bear arms under the Second Amendment to be "equally defective," explaining:

> The right there specified is that of 'bearing arms for a lawful purpose.' This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the Amendments that has no other effect than to restrict the powers of the national government….[156]

Like the right to assemble, the right to bear arms was a pre-existing and unchanged right not "granted" by the Constitution but guaranteed against infringement.

Thus, the Supreme Court in 1875 viewed the right to keep and bear arms as having the same contours as at the Founding period, which saw the right in the same terms.  Just as the authors or ratifiers of the Second Amendment sought to guarantee a pre-existing right, the ratifiers of the Fourteenth Amendment sought only to *extend* that protection, not change the right itself.

## III.   THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION JURISPRUDENCE.

As previously noted, the *Bruen* opinion stated that the Court has "assumed" that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.  The opinion went on to acknowledge that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."[157]  The only two sources cited for the existence of this debate were Kurt Lash,

---

[156] *Id*. at 553.

[157] *Bruen*, 142 S. Ct. at 2138.

45

Electronic copy available at: https://ssrn.com/abstract=4248297

*Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439 (2022) and A. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

As described below, Professor Lash frankly seeks to use 1868 as the definitive period for determining the meaning and scope of all incorporated provisions of the Bill of Rights.  His proposal is not just a radical departure from the Supreme Court's incorporation jurisprudence that has been so carefully fought over and eventually worked out over a period of many decades. Instead, it candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights.

Professor Amar's approach is more nuanced.  In the work cited, he proposes to rely more heavily on what he believes to be the changed 1868 meaning of the Second Amendment in particular.  But any necessity for that is undermined by the decision in *Heller* (2008), a decade after Professor Amar's book was published (1998).

A.   *Professor Lash's approach is theoretically unsound and unlikely to be adopted.*

Professor Lash believes that if a provision of the Bill of Rights meant something different to the ratifiers of the Fourteenth Amendment than it did to the ratifiers of the Bill of Rights, the 1868 meaning must control.  At the outset of his article, he describes the conundrums that positing a different meaning in 1868 would create.  "Do incorporated rights have the same meaning and scope as their counterparts in the 1791 amendments, or does the original Free Speech Clause have a different meaning and scope than the 'incorporated' Free Speech Clause?"[158]  He contends that if the meanings are different, originalists "seem forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable

---

[158] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1440 (2022).

Electronic copy available at: https://ssrn.com/abstract=4248297

against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings."[159]  This is simply not the case.  If it turns out that a later meaning has ostensibly departed from the original meaning, one must reject the later meaning, as Supreme Court principles discussed above instruct, and apply the original meaning to the states.

Noting, as set forth in Part IA, above, that the Supreme Court has definitively and repeatedly held that the rights against the federal government and the states must be the same, Lash inquires:  If the meanings must be the same, "are the original 1791 meanings carried *forward* into the 1868 amendment, or are the understandings of the people of 1868 carried *backward* into the original Bill of Rights and applied against the federal government by way of 'reverse incorporation'?"[160]  But as just explained, this is a problem exclusively of Lash's own making, which is divorced from the actual intentions of the ratifiers of the Fourteenth Amendment. They did not intend to alter the content of the Second Amendment—they just wanted to extend its protections to all citizens against encroachments by state governments.

Lash's answer to his own question is that rights as understood in 1868 must be "reverse incorporated" into the Bill of Rights.  He states that there is only "one Freedom of Speech Clause—the one the people spoke into existence in 1791 but then *respoke* in 1868."[161]  The drafters' views are secondary at best, according to Lash, because "the legally operative understanding must be that of the ratifiers.  Only the latter counts as the voice of the people."[162] He argues that "[w]hen the people adopted the Fourteenth Amendment, they readopted the

---

[159] *Id.* at 1441.

[160] *Id.* at 1440 (emphasis in original).

[161] *Id.* at 1441.

[162] *Id.* at 1443.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."[163]

There are many issues with this approach.  Until now, "reverse incorporation" has never involved using 1868 meanings of incorporated Bill of Rights provisions to revise or replace the original meanings of the Bill of Rights at the time of the Founding.  In *Brown v. Bd. of Educ. of Topeka, Kan.*,[164] the Court declared school segregation unconstitutional based on the Fourteenth Amendment's Equal Protection Clause.  But a companion case, *Bolling v. Sharpe*,[165] concerned school segregation in the District of Columbia, a federal enclave.  The original Bill of Rights lacked an equal protection clause.  So, the Warren Court read the Fourteenth Amendment's Equal Protection Clause back into the Due Process Clause of the Fifth Amendment.  It was, plainly, a limited, *ad hoc* device for sidestepping a constitutional impediment to reaching the desired result.[166]  So, "reverse incorporation" doesn't have much of a pedigree and it has not been applied in other contexts.

There are at least five major problems with Professor Lash's approach.

First, his analysis is completely contrary to Supreme Court precedents.  As noted in Part IB, above, constitutional meanings are fixed when they are ratified, and that includes the Bill of Rights, which was ratified in 1791.  Further, when it has been necessary to consult history to determine the meaning of incorporated provisions of the Bill of Rights, every Supreme Court case has considered the Founding era to be the determinative period even though later evidence

---

[163] *Id.* at 1441.

[164] 347 U.S. 483 (1954).

[165] 347 U.S. 497 (1954).

[166] Note that the Equal Protection Clause of the Fourteenth Amendment was an express protection spelled out in Section 1.  The Court did not use the ostensible meaning of an incorporated provision of the Bill of Rights to change the original meaning of that provision.  Reverse incorporation has not extended past inserting "equal protection" into the Fifth Amendment's Due Process Clause.  See *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995).

48

Electronic copy available at: https://ssrn.com/abstract=4248297

is sometimes examined for confirmation.  And if later practice or understanding conflicts with the original understanding, the original understanding must prevail.

Second, there is no compelling, principled basis for concluding that the 1868 meaning, if different, ought to prevail.  Is it just because 1868 is later in time than 1791?  That does not preclude using the original meaning of the Bill of Rights, and simply applying those meanings to additional persons and entities: that is, in favor of African Americans, and against the states.  And in fact, that is what the debates in 1868, to the extent they mentioned the first eight amendments, seemed to contemplate.  See Part IIC, above.

Third, it is untrue that the ratifiers "spoke into existence" Bill of Rights provisions in 1791, but then "respoke" them in 1868.  Although "spoke into existence" and "respoke" are intriguing metaphors, that is not what happened.  Most of the provisions of the first eight amendments were either considered natural rights or rights inherited by Englishmen at common law and then carried forward, possibly somewhat modified, into the new Republic.  The Bill of Rights was largely a confirmation of existing rights, not an original grant of rights.  And the drafters of the Fourteenth Amendment did not "respeak" them; they extended their protections to people who had previously been denied them and guaranteed them against governments that had previously not been limited by them.

In fact, "speaking" is a particularly inapt metaphor for Lash to choose, when there is *no* textual evidence in the Fourteenth Amendment that it was revising the Bill of Rights.  As the Court explained in *Heller*, constitutional provisions must be given their "normal and ordinary" meaning, which "may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."[167]

---

[167] 554 U.S. at 576–77.

49

Electronic copy available at: https://ssrn.com/abstract=4248297

Lash is essentially arguing for a secret, unspoken meaning, hidden in the Fourteenth Amendment.

Fourth, Lash's "reverse incorporation" relies on the Privileges or Immunities Clause of the Fourteenth Amendment to incorporate the provisions of the Bill of Rights against the states. The *Slaughterhouse Cases*[168] relegated the Privileges or Immunities Clause to a relative backwater, and *Cruikshank*[169] declined to use that Clause to incorporate First and Second Amendment rights.  Although there is respectable opinion that regards the Privileges or Immunities Clause as a better vehicle for incorporation than the Fourteenth Amendment Due Process Clause, the Court has refused the invitation to recast its incorporation jurisprudence under the rubric of the Privileges or Immunities Clause.  When counsel proposed during oral argument in *McDonald* that the Privileges or Immunities Clause was the proper vehicle for incorporation, Chief Justice Roberts warned that, "Of course, this argument is contrary to the Slaughter-House Cases, which have been the law for 140 years … it's a heavy burden for you to carry to suggest that we ought to overrule that decision."[170]

Finally, Lash himself suggests the reason his proposal is unlikely to find acceptance.  He writes that the "1868 respeaking of the Bill of Rights…transforms 'reverse incorporation' from a proposition about equal protection and a single clause of the Fifth Amendment into a proposition about the entire content of the Bill of Rights."[171]  One suspects that the Supreme Court will not want to have the entirety of its Bill of Rights jurisprudence "transformed" retroactively based

---

[168] 83 U.S. at 79.

[169] 92 U.S. at 554–57.

[170] Transcript of Oral Argument at 4, *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ( No. 08-1521).

[171] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1441–42 (2022).

Electronic copy available at: https://ssrn.com/abstract=4248297

upon an unnecessary, unjustified, and unprecedented reliance on 1868 as the focus for determining meaning and scope of the Bill of Rights.

> B. *Professor Amar's approach contains similar flaws and his theories have been rejected by Heller.*

Turning to Professor Amar's book,[172] his emphasis on 1868[173] is more subtle and less drastic than the wholesale reverse incorporation proposed by Lash. Amar proposes a theory of "refined incorporation" that would allegedly reconcile the different approaches to incorporation proposed by Justices Hugo Black, William Brennan, and Felix Frankfurter.[174] He commends Justice Black's view "that *all* of the privileges and immunities of citizens recognized in the Bill of Rights" are incorporated through the Fourteenth Amendment.[175] But he does not recognize all of the provisions of the Bill of Rights as "privileges or immunities of citizens," stating that some are more akin to rights of states, and others are "alloyed provisions," part citizen right and part state right, that may have to undergo "refinement and filtration" before their citizen-right elements can be "absorbed" by the Fourteenth Amendment.[176] He also contends that other provisions of the Bill of Rights may become "less majoritarian and populist, and more libertarian, as they are repackaged in the Fourteenth Amendment as liberal civil rights—'privileges or immunities' of individuals—rather than republican political 'right[s] of the people' as in the original Bill."[177] He disagrees with the formulation by Justice Brennan that the key

---

[172] A. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

[173] Professor Amar typically refers to 1866, the year the Fourteenth Amendment was drafted and proposed by Congress to the states for ratification.

[174] Amar at xiv.

[175] Amar at xiv (emphasis in original).

[176] *Id.*

[177] *Id.* at xiv-xv.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

question for incorporation is whether the right is "fundamental."[178]  He also disagrees with Justice Frankfurter's "insistence" that incorporation turned on "abstract conceptions of 'fundamental fairness' and 'ordered liberty' as the sole litmus tests for incorporation."[179]  Thus, his "refined incorporation" differs in critical respects from the Court's current test, as stated in *McDonald*: whether the right "is fundamental to our scheme of ordered liberty, or as we have said in a related context, whether this right is 'deeply rooted in this Nation's history and tradition.'"[180]

Amar observes that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment," that provisions in the Bill of Rights may be "transformed when they come into contact with the Fourteenth Amendment," and that in some cases, "the gravitational pull of the Fourteenth Amendment has altered the trajectory of the original Bill."[181]  This is contrary to *Bruen*'s asseverations that the Constitution's "meaning is fixed according to the understandings of those who ratified it."[182]

Moreover, Amar's book was written ten years before *Heller* was decided, and his specific analysis of the Second Amendment rests on foundations that were rejected by *Heller*.  In his book, Amar spends eighteen pages summarizing his view on "the military amendments" (Second and Third Amendments) as he thinks they were seen at the time of the Founding.  He writes that:

> As with our First Amendment, the text of the Second is broad enough to protect rights of private individuals and discrete minorities; but, as with the First, the Second's core concerns are populism and federalism. At heart, the amendment reflects a deep anxiety about a potentially abusive federal military….[183]

---

[178] *Id*. at xiv.

[179] *Id.*

[180] 561 U.S. at 767 (citations omitted) (emphasis omitted).

[181] Amar at xv.

[182] 142 S. Ct. at 2132.

[183] Amar at 46.

52

Electronic copy available at: https://ssrn.com/abstract=4248297

He goes on to discuss standing armies and the Founders' distrust of them.  He states unequivocally that "[t]he ultimate right to keep and bear arms belongs to 'the people,' not the states," and that "'the people' at the core of the Second Amendment are the same people at the heart of the Preamble and the First Amendment."[184]  Thus, he recognizes the individual right to arms, but claims that at the time of the Founding protection of such rights was not the main purpose.  Indeed, "to see the un-Reconstructed amendment as primarily concerned with an individual right to hunt or to protect one's home is like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge or to have sex."[185]  The contrast between *Heller*'s conclusion that protecting one's home was a central component of the right, and Amar's view, is stark.

Like Lash, he believes that the meaning of the right to keep and bear arms had been transformed by the time of the Fourteenth Amendment.  Originally, the right was "intimately connected with federalism concerns about a federally controlled standing army that might seek to overawe state-organized militias."[186]  He observes that, "By contrast, in 1866, John Bingham, Jacob Howard, Thaddeus Stevens and company were hardly in the mood to rail against a federal standing army; these men, after all, wanted to use precisely such an army to reconstruct recalcitrant southern states."[187]  Furthermore, "the people" in Amar's view corresponded roughly with the militia, and "political rights" such as voting rights, service on juries, and eligibility for public office, were (like service in the militia) largely limited to white males.  But the Privileges

---

[184] Amar at 51.

[185] Amar at 49.

[186] Amar at 216.

[187] *Id*.

53

Electronic copy available at: https://ssrn.com/abstract=4248297

or Immunities Clause "spoke of all citizens, pointedly including women and children…."[188]

Thus, the rights protected by the Privileges or Immunities Clause focused on "civil rights," not "political rights."  Even though the right to keep and bear arms was a paradigmatic "privilege" of "citizens of the United States," the "right in 1789 and the right in 1866 meant different things," according to Amar.[189]

He concludes:

Indeed, as the Second Amendment illustrates, the very same words "the right…to keep and bear arms" take on a different coloration and nuance when they are relabeled "privileges or immunities of citizens" rather than "the right of the people," and when they are severed from their association with a well-regulated militia.  To recast the textual point as a historical one, the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789.  Mechanical incorporation [Amar's term for due process incorporation as advocated by Justice Black] obscured all this and, indeed, made it easy to forget *that when we "apply" the Bill of Rights against the states today, we must first and foremost reflect on the meaning and the spirit of the amendment of 1866, not the Bill of 1789.*[190]

Thus, in a more subtle and less extreme way, Amar agrees with Lash that the time of the Fourteenth Amendment is more important than the Founding period for determining the meaning of incorporated provisions of the Bill of Rights.

It is unclear, at best, whether Amar's distinction between 1868's relabeling the right as a privilege or immunity of citizens, and 1791's the "right of the people" in connection with the militia, has any continuing relevance in Second Amendment interpretation.  At the time of Amar's book, the Second Amendment had not been incorporated, and was generally held by lower courts to relate only to militia service.  The Court's opinion in *Heller* carefully recognized the role of the citizen militia in the colonies and early Republic, but it accurately determined that

---

[188] *Id.*

[189] Amar at 257.

[190] Amar at 223 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

the right was an individual right for self-defense as well, the position for which Amar seems to be contending.  Thus, *Heller* may have largely dispelled Amar's concerns about the nature of the right.  Critically, however, these findings in *Heller* did not depend in any way on the understandings of the ratifiers in 1868, but looked to that general time period only as confirmation of the nature of the right as both militia-related and individual, just as it considered some antebellum interpretations as confirmation.

Amar's analysis may be rejected on grounds similar to (though not identical with) those on which Lash's may be rejected:  he relies on the Privileges or Immunities Clause for incorporation; that reliance leads him to differ from the Supreme Court as to what, exactly, is incorporated; and the test for incorporation is different from the Supreme Court's test.  He does not directly address whether the provisions of the Bill of Rights differ in substance when applied against the federal government or against the states, though he seemingly believes that they may be different, stating that it is "[h]arder to understand" Brennan's "insistence that once a provision of the Federal Bill was deemed incorporated, it applied identically in state and federal proceedings."[191] But that question has long ago been resolved by the Court.

So both Lash and Amar would shift the focus to 1868 rather than 1791, though Amar doesn't expressly state, as Lash does, that the 1868 understanding must displace the 1791 understanding.  Gun control proponents will undoubtedly latch on to these positions, as the briefs cited above do, to argue that more extensive restrictions on firearms in 1868 (and no doubt thereafter) as opposed to the Founding are the proper historical analogues when evaluating the constitutionality of present-day gun laws.  But the reasoning behind the approaches of both of these scholars flies in the face of many decades of settled Supreme Court precedent.  The Court

---

[191] Amar at 222.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

is unlikely to reverse itself on its fundamental incorporation doctrine principles and case law, and the lower courts are bound by those decisions.  The alleged "scholarly dispute" about the proper time for determining the meaning of an incorporated provision of the Bill of Rights really consists of one scholarly dissent and one partial scholarly dissent from Supreme Court jurisprudence that has definitively resolved this issue.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

**CONCLUSION**

The Supreme Court has held that provisions of the Bill of Rights have only a single meaning, whether applied against the federal government or against the states.  That meaning is fixed at the time of adoption; that is, in 1791.  What a provision of the Constitution meant then, it means now, even though circumstances might change.

The three cases cited by the *Bruen* opinion for the "assumption" that 1791 is the critical period all relied on Founding era history extensively and as an integral part of their analyses.  All Supreme Court cases that have engaged in historical review of the Second Amendment to determine its meaning have looked to 1791 as the primary period.  Any examination of later periods has been done only to confirm the conclusion already reached regarding the original meaning at the Founding.  As the review in this article of Supreme Court cases construing other provisions of the Bill of Rights shows, the Founding period is the exclusive period for determining meaning.  The Supreme Court has never looked to 1868 as the primary period for determining the meaning of provisions of the Bill of Rights, and its decisions generally do not even mention that period.  Neither litigants nor the scholars mentioned in the Court's reference to the "ongoing scholarly debate" have pointed to a single Supreme Court case which determined the meaning of a provision of the Bill of Rights based primarily on the time of ratification of the Fourteenth Amendment, and to the exclusion of the 1791 understanding.

The lower court cases cited by litigants in current litigation were either abrogated by *Bruen* or relied on a mistake (later corrected) in the Seventh Circuit's *Ezell* decision.

Reliance on the ostensible public understanding of the Fourteenth Amendment when it was ratified—even if such an approach did not contradict existing Supreme Court precedent regarding the determinative period—is fraught with difficulty.  It is unclear that the ratifiers of the Fourteenth Amendment thought that they were incorporating all of the first eight

57

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

amendments against the states.  The Fourteenth Amendment doesn't mention the Bill of Rights, and there were conflicting interpretations at the time regarding what that amendment meant and did.  Most notably, the Supreme Court in the *Slaughterhouse Cases* and the *Cruikshank* case immediately disagreed with what some of the proponents of the Fourteenth Amendment believed to be its effect.  In any event, there is little or no evidence that the ratifiers of the Fourteenth Amendment believed that the Second Amendment meant anything different than it had meant since the Founding.

The "ongoing scholarly debate" about whether 1868 is the proper year amounts to little. Professor Lash's approach, in addition to being theoretically unsupported, would upset the entire Supreme Court jurisprudence on the Bill of Rights.  Professor Amar's approach has likely been rendered unnecessary by *Heller.*

In short, it can be said with confidence that the Supreme Court will not adopt 1868 as the primary or determinative period for construing the meaning of the Second Amendment or any other provisions of the Bill of Rights.  For that reason, it is inadvisable, to say the least, for the lower courts to look to 1868 --rather than 1791-- when searching for historical analogues to justify modern-day gun control laws.

Electronic copy available at: https://ssrn.com/abstract=4248297

EXHIBIT 83

# Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions

scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions

June 27, 2022

SYMPOSIUM

 By Saul Cornell

on Jun 27, 2022 at 5:05 pm



*This article is part of a <u>symposium</u> on the court's <u>decision</u> in New York State Rifle & Pistol Association v. Bruen.*

*Saul Cornell is the Paul and Diane Guenther chair in American history at Fordham University and adjunct professor of law at Fordham Law School.*

The majority opinion in *New York State Rifle & Pistol Association v. Bruen* invokes the authority of history but presents a version of the past that is little more than an ideological fantasy, much of it invented by gun-rights advocates and their libertarian allies in the legal academy with the express purpose of bolstering litigation such as *Bruen*. Rather than applying a history, text, and tradition approach, it would be more accurate to characterize Justice Clarence Thomas' decision as an illustration of the current Supreme Court's new interpretive model: "Fiction, Fantasy, and Mythology." Indeed, the distortion of the historical record, misreading of evidence, and dismissal of facts that don't fit the gun-rights narrative favored by Thomas are genuinely breathtaking in scope. Thomas has taken law-office history to a new low, even for the Supreme Court, a body whose special brand of "law chambers history" has prompted multiple critiques and been a source of amusement for generations of scholars and court watchers.

It is particularly noteworthy that Justice Stephen Breyer called out his colleagues for engaging in the most rank form of law-office history in his dissent. Although it has become common, almost routine, for scholars to catalog the embarrassing quality of the current Supreme Court's uses of history, it is unusual to see a sitting justice level this charge against others on the court in a published opinion. It is hard to dispute Breyer's negative

characterization of his colleagues' tendentious, error-filled, and highly selective culling of evidence to vindicate their gun-rights agenda. <u>Bruen does mark a new low for the court.</u> Indeed, it seems appropriate that Thomas saw fit to quote <u>Dred Scott</u>, the court's worst decision in history, approvingly. Thomas not only treats the case as good legal authority but suggests the author of the most reviled opinion in American law captured the meaning of the Second Amendment better than any other judicial pronouncement in American history.

To describe the Thomas version of the past as a caricature understates the case. In the Bizzaro constitutional universe inhabited by Thomas, Shakespeare's England was filled with pistol-packin' peasants, a notion that most English historians would find bonkers. The characterization of early American firearms regulation is equally flawed, and Thomas rests his dismissal of antebellum enforcement of gun laws on an as yet unpublished and <u>error-filled</u> <u>account by one of his former clerks</u> — even as he dismisses the many counter-examples provided by New York as a slender reed upon which to rest their case.

 Perhaps the most egregious distortion of the historical record occurs in the majority's false claims about regulation during Reconstruction. Evidence of robust regulation of guns in public featured prominently in the briefs filed in the case, but the majority either dismisses contrary evidence as unrepresentative or simply ignores evidence it finds inconvenient. Here is what Thomas says about Texas, a state whose robust gun laws, he reluctantly concedes, undeniably support New York's approach to public safety. "We acknowledge," Thomas wrote, "that the Texas cases support New York's proper-cause requirement, which one can analogize to Texas' 'reasonable grounds' standard. But the Texas statute, and the rationales set forth in <u>English</u> and <u>Duke</u>, are outliers."

The originalist methodology applied by Thomas has one set of rules that apply to interpreting legal texts that support gun rights, and another more demanding set of standards that apply to those that undermine them. <u>The Thomas version of originalism</u> might be summarized as follows: No amount of evidence is enough to support gun control, but no iota of evidence is too little to legitimate gun-rights claims. If one of the goals of originalism was to limit judicial discretion (a value few originalists continue to espouse now that they have a supermajority on the court), then the Thomas rule does the opposite. It provides a license to cherry-pick evidence with reckless abandon if the materials support the ideological agenda of the Federalist Society.

Texas, it is worth stressing, was hardly alone in embracing a robust view of state police-power authority over regulation of arms in public. Georgia's 1868 arms-bearing provision declared that: "The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne." The reconstructed southern states and newly admitted western states all drafted new arms-bearing provisions in their state constitutions, casting aside the Founding-era focus on militias, substituting new language more individualistic in focus. Justice Samuel Alito recognized this fact in <u>McDonald v. City of Chicago</u> but stopped reading

the text of these provisions in mid-sentence because all these provisions went on to affirm the sweeping police-power authority of the states to regulate arms in public. In _District of Columbia v. Heller_, Justice Antonin Scalia read the Second Amendment backward, and in _McDonald_, Alito stopped reading the text mid-sentence. If anyone had any doubts that the new originalism was the Federalist Society's latest intellectual scam, then these two approaches to reading constitutional texts ought to dispel any lingering doubts. In the hands of this court, originalism is a constitutional "Etch A Sketch," in which judges can erase texts at will and read them backward if necessary.

Twelve million Americans during the Reconstruction period were living under state constitutional arms-bearing provisions that reflected this new regulatory paradigm, a model that forged an indissoluble link between the right to regulate and the right to bear arms. For Thomas, twelve million is too little to be consequential. The court's right-wing originalist supermajority, including Thomas, Alito, and their ideological co-conspirators, are making up the rules of evidence and historical interpretation on the fly, constantly shifting the burden of proof, to suit their agenda.

Even more galling, assuming that historical accuracy is still a value for the court's originalist ideologues, is the absence of any attention to local gun regulation, which increased dramatically during Reconstruction. Contrary to the patently false claims made by Thomas, states and localities acted on the language in the new state arms-bearing provisions, including enacting permit schemes based on a specified need for self-defense, precisely the type of regulatory regime at issue in _Bruen_. Thomas treats New York's law as if it emerged out of nowhere in the early 20th century, but the truth is that a host of localities had enacted similar laws starting in the 1870s, which means that New York's law was firmly rooted in Reconstruction-era conceptions of the scope of permissible regulation under the Second Amendment.

Many of these laws, excavated from obscure sources, were presented to the court in a remarkable appendix to a brief submitted by Air Force historian Patrick Charles. This evidence contradicts Thomas' facile claims that Texas-style gun control was an anomaly. Nor does Thomas acknowledge the evidence presented in the historians and law professors' brief submitted in _Bruen_. It discussed the spread of permit schemes in California and other parts of the nation after the Civil War. By the last decade of the 19th century, more than half the population of the state living in its cities and towns were living under these types of restrictions. Again, in the surreal originalist universe inhabited by Thomas and his colleagues, if 50% of a state lived under New York-style restrictions, this also fails to reach a sufficient threshold to provide historical evidence supporting gun regulation.

Nor were these restrictive public-carry regimes an exclusively western development. In 1873, Jersey City prohibited carrying dangerous weapons without a permit, which the city's municipal court could grant to people "from the nature of their profession, business or occupation, or from peculiar circumstances." Jersey City was hardly one of the "cattle towns"

of the Old West, another body of evidence that Thomas simply discounts because it is inconsistent with his ideological agenda. The map below graphically underscores how wrong Thomas got the history in *Bruen*. It shows that millions of Americans were living under restrictive public-carry laws similar in scope to the New York law at issue in *Bruen* for decades before the Sullivan Act.

Distorting the past to further his ideological agenda has become a trademark feature of Thomas. What is more disheartening is that the court's newest originalists, Justices Neil Gorsuch and Amy Coney Barrett, signed on to this historical charade. Despite protestations that they are not ideological warriors and political hacks, Gorsuch and Barrett missed an opportunity to prove that originalism can be applied in a rigorous and neutral manner. Apparently, that claim continues to a be a promise as yet unfilled.



Graphic courtesy of Hastings Constitutional Law Quarterly, Saul Cornell, "History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?" (June, 2022).

Posted in Symposium on the court's ruling in New York State Rifle & Pistol Association v. Bruen, Merits Cases

Cases: New York State Rifle & Pistol Association Inc. v. Bruen

**Recommended Citation:** Saul Cornell, *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/

# EXHIBIT 84



Texas A&M Law Review

Volume 4 | Issue 1

2016

# The Law and Politics of Firearms Regulation in Reconstruction Texas

Mark Anthony Frassetto
mark.a.frassetto@gmail.com

Follow this and additional works at: https://scholarship.law.tamu.edu/lawreview

Part of the Constitutional Law Commons, Fourteenth Amendment Commons, Law and Politics Commons, and the Second Amendment Commons

## Recommended Citation

Mark Anthony Frassetto, The Law and Politics of Firearms Regulation in Reconstruction Texas, 4 Tex. A&M L. Rev. 95 (2016).

This Article is brought to you for free and open access by Texas A&M Law Scholarship. It has been accepted for inclusion in Texas A&M Law Review by an authorized editor of Texas A&M Law Scholarship. For more information, please contact aretteen@law.tamu.edu.

# THE LAW AND POLITICS OF FIREARMS REGULATION IN RECONSTRUCTION TEXAS

*by Mark Anthony Frassetto\**

TABLE OF CONTENTS

I. INTRODUCTION......................................... 95
II. TEXAS'S RECONSTRUCTION-ERA RESTRICTIONS ON
   PUBLIC CARRY IN HISTORICAL CONTEXT............... 97
   A. *The Uniquely High Levels of Violence in Texas*..... 97
   B. *The Radical Republican Administration of Edmund
      Davis* ........................................... 101
      1. Edmund Davis's Rise to Governor ............. 101
      2. The Davis Administration: 1870–1872 ......... 102
      3. The Davis Administration: 1873–1874 ......... 108
III. LEGAL CHALLENGES AND INTERPRETATION OF THE
   1871 PROHIBITION ON PUBLIC CARRY ................. 110
   A. *The Texas State Constitution and Arms Bearing* .... 111
   B. *The Texas Supreme Court, 1867–1874*.............. 112
   C. *The Semicolon Court Cases* ........................ 113
   D. *The 'Redeemer' Court Cases* ....................... 118
IV. CONCLUSION ........................................ 121

## I. INTRODUCTION

The current state of scholarship on Second Amendment history paints post-Civil War firearms regulations as racist efforts by Southern states to prevent blacks from defending themselves against racial violence.[1] This reading distorts the historical record by ignoring the actors responsible for numerous gun laws across the former

\* Counsel, Everytown for Gun Safety, B.A. Marquette University, J.D. Georgetown University Law Center. I would like to thank Professor Darrell Miller, Professor Joseph Blocher, Professor Saul Cornell, Eric Ruben, Adam Skaggs, and Patrick Charles for their guidance in drafting this Article. I would like to especially thank Professor Robert Dykstra for his incredibly generous assistance with Part II, especially his assistance in calculating homicide rates, and his efforts to find homicide records for 1869. Opinions expressed in this Article are solely those of the Author and do not necessarily reflect the views of Everytown for Gun Safety.

1. *See, e.g.*, Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629 (1989) (discussing directly on the subject of this Article, but portraying the events described in a very anti-Republican manner); Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity—The Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307 (1995). Also, see Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17 (1995), which is especially inaccurate historically on this topic.

DOI: https://doi.org/10.37419/LR.V4.I1.3

Confederacy. This Article is, in part, an effort to respond to such accounts by presenting the first detailed analysis of the post-war legislative response to widespread firearm violence in Texas, as well as the judicial interpretations of that legislation.[2] More fundamentally, this Article provides an in-depth account of the political views of the Republican Unionists, who followed their ratification of the Fourteenth Amendment with strict regulation on publicly carrying firearms to protect freedmen from racial violence.

Given the Supreme Court's instruction in *District of Columbia v. Heller* that the historical understanding should inform how the right to keep and bear arms is understood today,[3] the views of those who wrote the Fourteenth Amendment (through which the Second Amendment applies to the states) are plainly relevant.[4] As this Article's account of Texas history makes clear, the Republican Unionists who ratified the Fourteenth Amendment held a narrow view of the right to carry firearms in public, and believed public carry could be broadly regulated. By contrast, it was the Southern Democrats—who had fought relentlessly against the Fourteenth Amendment after losing the Civil War—who advocated an expansive view of the right to carry guns in public, a view which gun rights proponents continue to espouse today.

Part II of this Article explains that Texas, like most Southern states, suffered widespread violence against freedmen and their Republican supporters during the Reconstruction period.[5] But unlike in many

---

2. Several major provisions of the laws discussed in this Article were repealed by the Texas state legislature during the 2015 legislative session. *See* Tex. H.B. 910, 84th Leg., R.S. (2015) (repealing S.B. 11, 84th Leg., R.S. (2015)). Everytown for Gun Safety opposed these changes.

3. *See* District of Columbia v. Heller, 554 U.S. 570, 626–28 (2008).

4. *See* McDonald v. City of Chicago, 561 U.S. 742, 771–80 (2010); Akhil Reed Amar, *The Second Amendment as a Case Study in Constitutional Interpretation*, 2001 UTAH L. REV. 889, 889–90 (2001); Clayton E. Cramer et al., *This Right is Not Allowed By Governments That Are Afraid of the People: The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823 (2010).

5. In this Article, the terms "Republican" or "Radical Republican" will be used to identify Unionists who generally supported black civil rights, the policies of Reconstruction, and the administration of Edmund J. Davis. "Democrat" will be used to refer to secessionists who opposed Reconstruction, black civil rights, and the administration of Edmund J. Davis. The political divisions in Reconstruction Texas were not nearly this clear cut, but a more detailed taxonomy would go beyond the level of detail necessary for this Article. Reconstruction refers to the period of Federal and Republican control in Texas from 1865–1874 and nationally from 1863–1877. Reconstruction is generally divided into two periods. The first, Presidential Reconstruction, during which the rebel states were treated indulgently by the federal government and the Southern pre-war political order generally remained in place, took place from 1865 to early 1867. The second period, known as Congressional Reconstruction, began when the Radical Republican majorities elected in 1866 took office. The Radical Republican Congress passed the Reconstruction Acts, which placed the rebel states under military control and excluded former Confederates from politics. During Congressional Reconstruction, control was eventually passed from federal military gover-

states, Republican Unionists in Texas confronted racist reactionaries' violence with strong legislative and executive action. On the heels of the Fourteenth Amendment—which Republicans drafted and ratified—Republicans in Texas enacted a law prohibiting the carrying of firearms under most circumstances.

Part III of this Article recounts the diverging outcomes of two legal challenges to Texas's broad restrictions on public carry, in which the Texas Supreme Court evaluated both federal and state constitutional attacks on the law. The first challenge, in 1872, was considered by a high court made up of Republicans and Unionists, who decisively upheld the law under both the Second Amendment and its analogue in the Texas Constitution. By 1874, when the Court heard the second challenge, its membership had completely changed. That Court—made up entirely of Democrats, four-fifths of whom were former Confederate officers—took a much broader view of the right to bear arms. However, even this Democrat-controlled Court concluded that the law did not infringe upon the right to bear arms.

The Republican Unionists may have lost political and judicial control in Texas, but their legacy lives on through the Fourteenth Amendment. As such, their philosophy on the role of government, the Constitution, and self-defense—including their narrow view of the right to carry arms in public—is a crucial part of the history of the Second Amendment. Justice Scalia's instructions in *Heller* to look to history in interpreting the Second Amendment means an accurate portrayal of historical gun regulations is of crucial importance. This Article is intended as an initial step in that direction.

## II. TEXAS'S RECONSTRUCTION-ERA RESTRICTIONS ON PUBLIC CARRY IN HISTORICAL CONTEXT

### A. *The Uniquely High Levels of Violence in Texas*

Texas was a uniquely violent place, both before and after the Civil War. While violence in every Confederate state far exceeded violence in the North, Texas's levels of violence stood out even among the Confederate states.[6] At the time of annexation in 1845, the homicide rate in lawless South Texas was a staggering 100 per 100,000 and a likely 50 per 100,000 in the slaveholding portion of East Texas.[7] As a reference

---

nors to Republican-controlled state governments, most of which included blacks. Reconstruction ended at different times in each state when control returned to conservative white Democrats known as "redeemers." *See generally* ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863–1877 (1988).

6. *See, e.g.,* HORACE V. REDFIELD, HOMICIDE, NORTH AND SOUTH: BEING A COMPARATIVE VIEW OF CRIME AGAINST THE PERSON IN SEVERAL PARTS OF THE UNITED STATES 11, 68 (Ohio State Univ. Press 2000) (1880).

7. RANDOLPH ROTH, AMERICAN HOMICIDE 234 (2009). Roth attributes this extremely high murder rate to the weak governance provided by Mexico and instability and conflict caused by the transition from Mexico, to the Republic of Texas, to the

point, the 2013 U.S. murder rate was 4.5 per 100,000.[8] Visitors to Texas before the Civil War often commented on the high levels of violence and how well-armed many Texans were. Frederick Law Olmstead, the famed landscape architect, wrote after touring Texas in the 1850s:

> The street affrays are numerous and characteristic. I have seen, for a year or more, a San Antonio weekly [newspaper], and hardly a number fails to have its fight or its murder. More often than otherwise, the parties meet upon the plaza by chance, and each, on catching sight of his enemy, draws a revolver, and fires away. . . . [I]t is, not seldom, the passers-by who suffer. Sometimes it is a young man at a quiet dinner in a restaurant, who receives a ball in the head; sometimes an old negro woman, returning from market, who gets winged.[9]

Violence continued in Texas during the War, especially against Unionists. In 1862, forty-two suspected Union sympathizers were lynched in Gainesville, while in 1863, German-American Unionists were massacred while attempting to flee to Mexico.[10]

A report commissioned by the 1868–69 Constitutional Convention (the "Convention Report") found that violence further increased in the period after the Civil War ended in 1865. Homicides had increased from a reported total of 98 in 1865 to 347 in 1867.[11] While the investigators admitted these numbers "came far short of representing the actual number," as they included full reports from only thirty of Texas's 127 counties, they showed the trend of increasing violence in Texas, much of it political.[12] Even with the Convention Report's under-inclusive numbers, the murder rate in Texas during the period from 1860 to 1868 was forty-five times that in New York.[13] Texas led

---

United States. This was especially true in South Texas where it is estimated at least 200 people were murdered by bandits between 1836 and 1845.

8. *Uniform Crime Reports: Murder*, FED. BUREAU OF INVESTIGATION, http://1.usa.gov/1YNrV3N [https://perma.cc/8WFL-AYU2] (last visited July 12, 2016).

9. FREDERICK LAW OLMSTED, A JOURNEY THROUGH TEXAS: OR, A SADDLE-TRIP ON THE SOUTHWESTERN FRONTIER 158 (Univ. of Tex. Press 1978) (1857); *see also* BARRY A. CROUCH & DONALY E. BRICE, THE GOVERNOR'S HOUNDS: THE TEXAS STATE POLICE, 1870–1873 10 (2011) (describing a Texan's conversation with northern journalist Albert D. Richardson in which the Texan told Richardson, "if you want to obtain distinction in this country, kill somebody.").

10. *Great Hanging at Gainesville*, TEX. ST. HIST. ASS'N, http://bit.ly/1W53ai6 [https://perma.cc/M2UZ-GPTC] (last visited July 12, 2016); CARL H. MONEYHON, EDMUND J. DAVIS OF TEXAS: CIVIL WAR GENERAL, REPUBLICAN LEADER, RECONSTRUCTION GOVERNOR 48 (2010).

11. Ann Patton Baenziger, *The Texas State Police During Reconstruction: A Reexamination*, 72 SW. HIST. Q. 470, 471 (1969).

12. CROUCH & BRICE, *supra* note 9, at 20.

13. *Id.*; *see also* TEX. CONSTITUTIONAL CONVENTION (1868–1869), JOURNAL OF THE RECONSTRUCTION CONVENTION: WHICH MET AT AUSTIN, TEXAS 501 (Tracy, Siemering & Co. 1870) (New York state, despite having a population five times the size of Texas, only suffered a total of forty-seven murders in 1867—300 less than the number of murders in Texas during the same year).

the nation in murders throughout the post-War period. In 1870, Texas had at least 323 murders, a staggering 195 more than the next-most-deadly state.[14] The Convention Report authors wrote they doubted "such a record of blood can be exhibited in any Christian or civilized State in the world in a time of peace."[15]

MINIMUM HOMICIDE RATES IN RECONSTRUCTION TEXAS[16]

| Year | 1865 | 1866 | 1867 | 1868 | 1869 | 1870 |
|---|---|---|---|---|---|---|
| Total Population | 711,397 | 732,833 | 754,270 | 775,706 | 797,143 | 818,579 |
| White Population | 492,796 | 507,176 | 521,557 | 535,938 | 550,319 | 564,700 |
| Black Population | 218,193 | 225,249 | 232,306 | 239,362 | 246,416 | 253,700 |
| Reported Murders | 98 | 170 | 347 | 319 | N/A | 323 |
| White Victims | 47 | 75 | 173 | 182 | N/A | N/A |
| Black Victims | 51 | 95 | 174 | 137 | N/A | N/A |
| Overall Murder Rate (per 100,000) | 13.776 | 23.198 | 46.005 | 41.124 (70.498) | 49.6[17] | 39.45[18] |
| White Rate (per 100,000) | 9.537 | 14.788 | 33.17 | 33.216 (58.213) | N/A | N/A |
| Black Rate (per 100,000) | 23.374 | 42.176 | 74.901 | 57.235 (98.118) | N/A | N/A |

Texas was especially resistant to emancipation and Reconstruction, resulting in staggering levels of violence against blacks and Unionists. Presidential Reconstruction-era governor James Throckmorton even proposed a system of gradual emancipation be implemented, in clear

14. Baenziger, *supra* note 11, at 473.

15. CROUCH & BRICE, *supra* note 9, at 20.

16. These rates are calculated using Reconstruction Journal Records for the homicide numbers and 1860 and 1870 census information for the population numbers. The Convention Report records are clearly and admittedly under-inclusive, so these numbers provide only a minimum homicide rate during the period. The actual homicide rate may have been significantly higher—possibly double or triple the calculated rate. Populations are calculated by dividing the difference between the 1860 and 1870 census evenly and allocating across the ten years. Homicide Rates for 1868 were calculated using both the raw numbers, which included up to the end of July, and numbers adjusted for the remaining five months.

17. This rate is calculated using Freedmen's Bureau Records for 46 counties during the first quarter of 1869, adjusting for the population of those counties. It is impossible to determine whether these counties are representative of the state as a whole, and intuitively more anarchic counties seem less likely to accurately report their records. It is also impossible to determine whether the murder rate was subdued by relatively cold weather in the early part of the year. This data also does not account for the more tumultuous period surrounding the election at the end of 1869. The Author would like to again thank Robert Dykstra for locating these records and calculating the 1869 homicide rate.

18. This number was calculated based on statistics released by the Federal Census Bureau, and published in the Daily State Journal (Austin) in August 31, 1871. *See* Baenziger, *supra* note 11, at 473 n.13. *See also* ROTH, *supra* note 7, at 569 n.123 (estimating a homicide rate of 268 per 100,000 in South and West Texas).

*TEXAS A&M LAW REVIEW*

violation of both the Emancipation Proclamation and Thirteenth Amendment.[19] Provisional military governor Andrew J. Hamilton in a letter to President Johnson described reports of "shooting and hanging of Negroes by the half dozens at a time, for the crime of leaving their former Masters."[20] General W.E. Strong described freedmen being treated "unmercifully, and shot down like wild beasts, without any provocation . . . ."[21] And fifth military district Commander Major General Joseph J. Reynolds reported "murder of negroes is so common as to render it impossible to keep an accurate account of them."[22] The Convention Report showed that between 1865 and 1867, for every white person murdered by a black person, thirty-seven black people were murdered by whites.[23] Many of the 460 murders of whites during that time period were also attacks on white Republicans by Democrats.[24]

Given the frequency of attacks on blacks and Republicans, the investigation and prosecution of these crimes left much to be desired. Abner Doubleday, a Civil War General stationed in Texas after the War, reported that not a single white man had been convicted of murder in Texas since it achieved independence from Mexico.[25] This was obviously an exaggeration, but the reality was only slightly less extreme. Of the approximately 1,000 homicides reported in Texas between 1865 and 1869, there were only 279 indictments, five convictions, and one execution (a freedman).[26] That meant only one of every 200 murderers was actually punished for his crime. The Convention Report stated bluntly why these numbers were so low: "It is our solemn conviction that the courts, especially juries, as a rule, will not convict ex-rebels for offenses committed against Union men and freedmen . . . ."[27] Even when a conviction was secured, justice was often still out of reach. In one case, a white man who had attacked and nearly beat to death a freedman was arrested by a Freedman's Bureau agent, turned over to civil authorities, and convicted; the punishment was a fine of one cent.[28] In 1870, a reported 702 murderers and 413 attempted murderers were on the loose in Texas.[29] Crime, especially directed toward blacks and Unionists, was out of control.

---

19. MONEYHON, *supra* note 10, at 77.
20. CROUCH & BRICE, *supra* note 9, at 11–12.
21. *Id.* at 12.
22. *Id.* at 21.
23. TEX. CONSTITUTIONAL CONVENTION (1868–1869), *supra* note 13, at 194.
24. *Id.* at 195.
25. CROUCH & BRICE, *supra* note 9, at 15.
26. Baenziger, *supra* note 11, at 473. These numbers were not broken down by race, so it is possible Doubleday's statement about murder prosecutions was accurate during the post-War period.
27. TEX. CONSTITUTIONAL CONVENTION (1868–1869), *supra* note 13, at 199.
28. *Id.*
29. Baenziger, *supra* note 11, at 473.

### B.   *The Radical Republican Administration of Edmund Davis*

In 1869, Radical Republican Edmund Davis was elected Governor of Texas. Davis's administration would be defined by its effort to restore order in Texas in the face of Democratic opposition. As part of this effort, Davis would establish an integrated statewide police force, a state-funded public education system, and, most notably for this Article, a statewide ban on carrying firearms in public. Ultimately, in the face of widespread opposition, most of the efforts of Davis and his Radical Republican party were doomed. However, Davis's statewide ban on public carry remained in place for more than a century. The actions of his administration, especially regarding public carry of firearms, provide insights into the Radical Republicans' philosophy on guns, self-defense, and the role of government.

#### 1.   Edmund Davis's Rise to Governor

Prior to the Civil War, Davis served as a judge in South Texas and was a close political ally of Texas Revolution hero and Unionist, Sam Houston.[30] Davis opposed secession, and attempted to run for a position as a delegate to the secession convention in order to oppose leaving the Union.[31] After secession, Davis refused to swear a loyalty oath to the Confederacy and was removed from his judgeship.[32] Davis fled Texas and served as an officer in the Union army, rising to the rank of Brigadier General by the end of the War.[33]

After the War, Davis was elected as a delegate to the 1866 Texas Constitutional Convention as a Unionist who supported the proposals of military governor Andrew J. Hamilton.[34] During Presidential Reconstruction, Davis and the Unionists were in the distinct minority in the convention, which refused to ratify the Thirteenth and Fourteenth Amendments and essentially restored control to the secessionists who controlled the state during the War. At the convention, Davis was limited to procedural maneuvers to stall particularly egregious provisions and to introducing doomed provisions in protest. Notably, Davis proposed universal male suffrage for blacks, a position well out front of his party at the time.[35] In 1868, as a result of the Republican controlled Congress seizing control of Reconstruction policy, a new Con-

---

30. Carl H. Moneyhon, *Edmund Jackson Davis*, Tex. St. Hist. Ass'n, http://bit.ly/1XT3kLm [https://perma.cc/E4JK-8TV8] (last visited July 24, 2016).

31. *Id.*

32. Moneyhon, *supra* note 10, at 40–41. Sam Houston was also removed as governor for refusing to swear loyalty to the Confederacy, an action akin to removing George Washington from office. Thomas H. Kreneck *Samuel Houston*, Tex. St. Hist. Ass'n, http://bit.ly/1UnCfMQ [https://perma.cc/R2JB-66LW] (last visited July 24, 2016).

33. Moneyhon, *supra* note 10, at 59–72.

34. *Id.* at 79–80.

35. *Id.* at 82–83. Davis may have meant suffrage for blacks meeting educational or literacy thresholds.

stitutional Convention was called and Davis was selected as a compromise candidate between conservatives and Radical Republicans for convention president.[36] During the conference, Davis assumed leadership of the Radical Republicans. His able management of an extremely contentious conference propelled him to statewide prominence.[37]

In 1869 the federal government sought to return control of Texas to an elected state government. An election—in which former Confederate soldiers were generally prohibited from voting for the new government—was held to fill the state government created by the 1868 Constitutional Convention.[38] Davis was elected Governor of Texas by less than 800 votes in an election marred by violence against blacks seeking access to the polls.[39] This violence and intimidation was especially severe in Falls County, where white plantation owners marched their black employees to the polls, handed them a ballot of Davis's opponent, and watched as it was dropped into the ballot box. Blacks attempting to vote for Davis had their lives threatened and ballots ripped from their hands.[40] In Milam and Navarro counties, voting was discontinued after federal and local officials were attacked and mobs of whites stormed the polls in order to prevent blacks from voting.[41] After the election, racial violence continued in both counties, with blacks pistol-whipped in front of the courthouse in Navarro County in retribution for Davis's election.[42]

## 2.  The Davis Administration: 1870–1872

In the midst of this chaos and widespread resistance, Davis began his term as governor. In his inaugural message, Davis called the legislature's attention to the "consideration of measures to establish law and order throughout the State, and the punishment or repression of crime."[43] Davis proposed several policies to reduce crime in Texas, including reorganizing the state militia, which had been disbanded under military rule; establishing a state police force; creating an impartial court system; and establishing free, state-funded, public schools (which Davis identified as a long-term crime prevention measure).[44]

---

36. *Id.* at 114–15. At the time, the primary dispute between the two factions was over the *ab initio* issue, which was whether the legislative and judicial acts of the secessionist governments should have continued validity.

37. *Id.* at 122. The convention collapsed without finalizing a state constitution.

38. *See generally* Dale Baum, *Chicanery and Intimidation in the 1869 Texas Gubernatorial Race*, 97 Sw. Hist. Q. 36 (1993).

39. *Id.* at 36.

40. *Id.* at 49.

41. *Id.* at 38–39 (stating that the discontinued voting in Milam and Navarro counties almost certainly did not swing the election results).

42. *Id.* at 40.

43. H.J. of Tex., 12th Leg., 1st C.S. 14 (1870) (inaugural address of Governor Edmund J. Davis).

44. *Id.* at 18–21.

The state legislature adopted all of these policies in one form or another.[45] As a first step, Davis created a racially integrated state police force to "follow up and arrest offenders" where the "authorities are too weak to enforce respect [for the law] or indisposed to do so."[46] The creation of the force drew sharp opposition from both Democrats and conservative Republicans, who claimed that creating the state police was an inappropriate transfer of power from local governments to the Governor. State Senator and former slave Matthew Gaines cut to the true heart of the opposition, stating it was not the result of fear over executive power, but rather opposition to the "idea of gentleman of my color being armed and riding around after desperadoes."[47]

The resistance, however, was insufficient to stop the establishment of Davis's force, which was granted powers not given to local law enforcement, including the authority to cross county lines and act independently of local law officers.[48] The chief of the state police was also granted power to command all local law enforcement when necessary to suppress crime and arrest offenders.[49] The force, which split approximately sixty percent white and forty percent black, was diverse to a level surpassing many modern police departments, including among its officers whites, freedmen, Tejanos, and Asians, as well as both former Union and Confederate soldiers.[50] This racial diversity was enough for Texas Democrats to dub the state police (when being polite) a "Negro Militia."[51]

During Davis's inaugural address, he also called for the prohibition on carrying handguns in public. Davis stated:

> I would, in this respect of prevention of crimes, call your attention
> to the provisions of section thirteen of the Bill of Rights, on the

---

45. Act approved June 24, 1870, 12th Leg., C.S., ch. 10, 1870 Tex. Gen. Laws 11, 11, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 185, 185 (1898); Act approved July 1, 1870, 12th Leg., C.S., ch. 13, 1870 Tex. Gen. Laws 19, 19, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 193, 193 (1898); Act approved July 2, 12th Leg., C.S., ch. 14, 1870 Tex. Gen. Laws 21, 21, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 195, 195 (1898); Act approved Aug. 13, 1870, 12th Leg., C.S., ch. 68, 1870 Tex. Gen. Laws 113, 113, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 287, 287 (1898). The school system adopted by the Davis administration provided equal funding for all students in the state, in contrast with the system in effect in Texas 100 years later and controversially upheld by the Supreme Court in *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973).

46. Baenziger, *supra* note 11, at 473.

47. *Id.* at 474.

48. Act approved July 1, 1870, 12th Leg., C.S., ch. 13, § 8, 1870 Tex. Gen. Laws 19, 20, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 193, 194 (1898).

49. Act approved July 1, 1870, 12th Leg., C.S., ch. 13, § 5, 1870 Tex. Gen. Laws 19, 19, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 193, 193 (1898).

50. *See* CROUCH & BRICE, *supra* note 9, app.; Baenziger, *supra* note 11, at 475. Crouch and Brice dispute the forty percent cited by Baenziger, and originally used as a criticism of the state police force, but do not dispute that the state police were integrated to a degree unprecedented at the time.

51. Baenziger, *supra* note 11, at 475.

subject of bearing arms. The Legislature is there given a control over the privilege of the citizen, in this respect, which was not in the old constitution. There is no doubt that to the universal habit of carrying arms is largely to be attributed the frequency of homicides in this State. I recommend that this privilege be placed under such restrictions as may seem to your wisdom best calculated to prevent the abuse of it. Other than in a few of the frontier counties there is no good reason why deadly weapons should be permitted to be carried on the person.[52]

That summer, the state legislature partially fulfilled Governor Davis's request by passing a law forbidding the carrying of any "bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind," at a variety of locations:

any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election . . . or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly.[53]

The fine for violating the new law was a whopping $50 to $500 (the modern equivalent of $1,000 to $10,000).[54]

While the prohibition on carrying firearms at public gatherings provided an important tool for the state police to maintain order, it proved insufficient to prevent and deter crime.[55] In a letter to the 1871 session of the state legislature, Governor Davis stated the law was "a very partial remedy" and went on to say "instances of personal violence occur almost daily" and "are within the experience of everybody."[56] Davis stated that a total prohibition on carrying arms rather than the limited prohibition enacted in the previous session would be "a great preventative of violence and bloodshed" and "essential to the complete suppression of lawlessness."[57] Confusion about the proper enforcement of the 1870 Law also contributed to one of the more serious crises faced by the Davis administration.

---

52. H.J. of Tex., 12th Leg., 1st C.S. 19 (1870). Handguns accounted for around two-thirds of the murders in Texas during the period, which is an aberrationally high percentage for the time. *See* ROTH, *supra* note 7, at 356.

53. Act approved Aug. 12, 1870, 12th Leg., C.S., ch. 46, 1870 Tex. Gen. Laws 63, 63, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 237, 237 (Gammel Book Co. 1898); CROUCH & BRICE, *supra* note 9, at 26.

54. Calculated using inflation calculator at http://www.westegg.com/inflation/, which is based on consumer price index statistics going back to 1800 (last visited July 12, 2016).

55. CROUCH & BRICE, *supra* note 9, at 61 (discussing the arrest of Joseph Elliott for wearing arms in a public assembly during efforts to stop the notorious West Gang).

56. H.J. of Tex., 12th Leg., R.S. 57 (1871).

57. *Id.*

During the summer of 1870, Madison County was wracked by violence against freedmen. Tensions reached their peak on July 21, 1870, when a band of disguised men staged a jailbreak on the Madison County jail, releasing two murderers. In response, State Police Private John H. Patrick, a Republican with ambitions for higher office, assembled a group of black militia and began confiscating guns from any person carrying them, under color of the 1870 Act.[58] Patrick's confiscation order, along with the fact that blacks were enforcing laws against whites, led to widespread public outrage. A local deputy sheriff formed a posse with the ostensible purpose of arresting Patrick, but an actual intent to foment violence against politically active blacks and Republicans, based on the claim that blacks had joined Patrick's militia unit with the intention of murdering whites.[59] The posse sought Patrick at his home, but he was in Austin where a disciplinary hearing had been convened to look into his actions. The group instead killed two militia leaders.[60] In response to this incident and other chaos in the county—including militia members being killed, shot, and attacked, and freedmen being whipped by whites—Governor Davis ordered forty state police and three-hundred state guards into Madison County to restore order. Many of his opponents viewed these actions as tyrannical, and the event damaged the reputation of the state police and the Davis administration statewide.

In response to concerns about the effectiveness of the 1870 Act, and likely partially as a result of the confusion in Madison County, the Texas Legislature drafted a bill in 1871 that prohibited the carrying of any "pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife . . . [without] reasonable grounds for fearing an unlawful attack on his person . . . ."[61] The bill punished first offenses with confiscation of the weapon and a fine between $25 and $100 (approximately $500–$2,000 with inflation)[62] and up to sixty days in prison for a second offense.[63] The law's exception allowing publicly carrying a firearm when in fear of unlawful attack was further narrowed by requiring the defendant to show that the

---

58. CROUCH & BRICE, *supra* note 9, at 39–40 (Patrick would be fired in December 1870). Confusion does not seem to have been limited to Patrick. In one instance a district court judge, F.P. Wood, ordered anyone who carried a gun in town, not just those at public assemblies, to be arrested. *Id.* at 62.

59. *Id.* at 40.

60. *Id.*

61. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927 (1898).

62. Calculated using inflation calculator at http://www.westegg.com/inflation/, which is based on consumer price index statistics going back to 1800 (last visited July 12, 2016).

63. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927 (1898).

danger was "immediate and pressing," and "of such a nature as to
alarm a person of ordinary courage," that "the weapon was borne
openly and not concealed beneath the clothing," and that the claimed
danger did not have "origin in a difficulty first commenced by the ac-
cused."[64] This clarified that the exception did not apply when a person
had carried a firearm due to a generalized fear of crime, but rather
only when a specific threat existed. The penalties for the 1870 Act
were also amended to provide for confiscation of the weapon and im-
prisonment for up to 90 days for subsequent offenses.[65] The law
granted the governor the power to exempt counties from the carry
prohibition if they were dubbed a frontier county "liable to incursions
of hostile Indians."[66] The law also included exceptions for people car-
rying weapons on their own property or in their place of business,
members of the militia in active service, law enforcement officers, and
the transportation of arms in the baggage of travelers.[67]

The bill titled "An Act to Regulate the Keeping and Bearing of
Deadly Weapons," was introduced by Republican Representative
Frederick Grothaus on January 24, 1871.[68] The bill passed out of the
Judiciary Committee 5–3, receiving primarily Republican support.[69]
On March 9, 1871, the House passed the bill by a margin of 60–12,
with all twelve black representatives voting in favor of the bill.[70] On
March 29, 1871, the Senate passed the bill by a 20–4 margin with sup-
port of both of the State's black Senators.[71] In both chambers opposi-
tion to the law consisted primarily of Democrats, and conservative

---

64. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 2, 1871 Tex. Gen. Laws
25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927
(1898).

65. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws
25, 25–26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927,
927–28 (1898).

66. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 4, 1871 Tex. Gen. Laws
25, 26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 928
(1898).

67. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws
25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927
(1898).

68. H.J. of Tex., 12th Leg., R.S. 95 (1871); Britney Jeffery, *Frederick Edward
Grothaus*, TEX. ST. HIST. ASS'N, http://bit.ly/1Llq64O [https://perma.cc/HY5L-X6JD]
(last visited July 24, 2016).

69. H.J. of Tex., 12th Leg., R.S. 443–44 (1871) (Judiciary Committee Report dated
February 28, 1871).

70. The black representatives who supported the measure were Richard Allen,
D.W. Burley, Silas Cotton, Goldstein Dupree, Jeremiah J. Hamilton, Mitchell
Kendall, David Medlock, John Mitchell, Henry Moore, Sheppard Mullens, Benjamin
Franklin Williams, and Richard Williams. *See* H.J. of Tex., 12th Leg., R.S. 523–32
(1871).

71. G.T. Ruby and freedman Matthew Gaines were the two black senators who
supported the Amendment. *See* S.J. of Tex., 12th Leg., R.S. 538 (1871).

Republicans, who had served in the Confederate Army.[72] Governor Davis signed the bill on April 12, 1871.[73]

The new prohibition on public carry was widely enforced across the State, especially by the state police.[74] Line police officers consistently sent their superiors reports of arresting those carrying weapons.[75] Local law enforcement also participated in arresting those carrying weapons illegally.[76] In fact, Governor Davis declared martial law in Limestone County, in part because of the aftermath of a shootout between police and a man they were trying to arrest for carrying a pistol.[77] Davis specifically mentioned the citizens' failure to obey the law against carrying pistols and other weapons as a reason for the declaration.[78]

While state and local law enforcement worked to carry out the ban, many citizens resisted. Some tried to circumvent the law by posing as state or local law enforcement that were exempted from the public carry restrictions. It was difficult to know who was lying, but in at least one case an imposter who was discovered carrying a revolver was ar-

---

72. Members of the House voting nay: Abbot (Democrat, Confederate Officer); English (Unknown Party, Confederate Officer); M.A. Gaston (Democrat); Hawkins (Conservative); F. Kyle (Democrat, Confederate Officer); J.W. Lane (Democrat); Jas. A. Miller (Democrat); W.C. Pierson (Radical/Democrat) (There is some dispute as to the political affiliation of W.C. Pierson he is listed as a Radical Republican in the Texas State Almanac from 1870, but his obituary states he was one of the few Democrats who served in the Texas House of Representatives during Reconstruction); Robb (Democrat, Confederate Officer); E. Ross (Democrat); Self (Unknown); G.H. Slaughter (Radical Republican). Members of the Senate voting nay: Bowers (Conservative, Confederate Officer); Cole (Democrat); Dillard (Democrat, Confederate Officer); Picket (Conservative). *See* H.J. of Tex., 12th Leg., R.S. 523–32 (1871); S.J. of Tex., 12th Leg., R.S. 538 (1871); Texas Almanac (1870) (for party affiliation information); *The Handbook of Texas*, Tex. St. Hist. Ass'n, https://tshaonline.org/handbook (for biographical information) (last visited July 12, 2016).

73. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25, 25–26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927–28 (1898).

74. *See generally* State v. Clayton, 43 Tex. 410 (1875); State v. Duke, 42 Tex. 455 (1874); Young v. State, 42 Tex. 462 (1874); Smith v. State, 42 Tex. 464 (1874); Titus v. State, 42 Tex. 578 (1874); Waddell v. State, 37 Tex. 354 (1873); Baird v. State, 38 Tex. 599 (1873); English v. State, 35 Tex. 473 (1872); Jenkins v. State, 36 Tex. 638 (1872); McNell v. State, 14 S.W. 393 (Tex. Ct. App. 1890); Wilson v. State, 10 S.W. 749 (Tex. Ct. App. 1889); Cathey v. State, 5 S.W. 137 (Tex. Ct. App. 1887); Roberson v. State, 228 S.W. 236 (Tex. Crim. App. 1921); George v. State, 234 S.W. 87 (Tex. Crim. App. 1921); Mayfield v. State, 170 S.W. 308 (Tex. Crim. App. 1914); Harris v. State, 126 S.W. 890 (Tex. Crim. App. 1910); Davidson v. State, 45 S.W. 488 (Tex. Crim. App. 1898); Sexton v. State, 45 S.W. 920 (Tex. Crim. App. 1898); *Ex parte* Jones, 41 S.W. 626 (Tex. Crim. App. 1897).

75. Crouch & Brice, *supra* note 9, at 122.

76. *An Acting Officer Murdered*, Daily Herald (Dallas, Tex.), July 15, 1871, at 4; Weekly Democratic Statesman (Austin, Tex.) Sept. 21, 1871, at 4.

77. *A Negro Outrage at Springfield*, Weekly Democratic Statesman (Austin, Tex.), Oct. 5, 1871, at 3.

78. Crouch & Brice, *supra* note 9, at 108.

rested and fined.[79] Similarly, a few state police officers who were terminated for misconduct continued to fraudulently act as officers and on occasion were arrested for illegally carrying firearms.[80] Some efforts to enforce the law turned violent, including the Lampasas Massacre of 1873, the deadliest single incident in the brief existence of the state police. Four state police officers were murdered by members of a local cattle-rustling gang when they attempted to arrest a gang member who was violating the public carry ban.[81] Despite this resistance, law enforcement efforts to enforce the public carry prohibition continued.

### 3.   The Davis Administration: 1873–1874

During the elections of 1872, a coalition of Democrats and conservative Republicans campaigned against Davis's policies and the Democrats retook control of the state legislature by an overwhelming margin. In Davis's 1873 address to the now extremely hostile Democratically-controlled House of Representatives, he stated the prohibition on public carry "had a most happy effect," and to further push for its enforcement, Davis "offered a standing reward for the arrest and conviction of violators of it."[82] The fate of Davis's law enforcement efforts was, however, in large measure, linked to the fate of the state police. In 1873, when the Democrats retook the House of Representatives and Senate, they immediately defunded and then disbanded Davis's police force.

Governor Davis vetoed the legislature's initial bill disbanding the state police, questioning the wisdom of dissolving the force at a time when lawlessness was "still rampant in parts of the state" and praising the bravery and efficacy of the state police. He offered to work with the legislature to prevent any future incidents of abuse of power, but the fate of the police was sealed on April 22, 1873, when the House of Representatives passed the repeal over Davis's veto in a 58–7 vote.[83] Between 1870 and 1872 the state police had made more than 6,000 arrests, effectively suppressed the Ku Klux Klan, and provided freedmen real protection against racial violence.[84] Democrats cheered the disbandment of the police as a great victory over Radical Republican oppression. In Georgetown and Waco, jubilant crowds stormed the jails and set free many of the prisoners arrested by the state police.[85] The abolishment of the state police threw sole responsibility for law

---

79. *Id.* at 120.

80. *Id.* at 124. In contrast to the strict enforcement of the prohibition on public carry, the state police opposed efforts by local Democratic law enforcement to disarm freedmen of their militia and special police weapons. *Id.* at 141.

81. *Id.* at 150–56.

82. H.J. of Tex., 13th Leg., R.S. 33–34 (1873).

83. Baenziger, *supra* note 11, at 488.

84. FONER, *supra* note 5, at 440.

85. Baenziger, *supra* note 11, at 488.

enforcement back into the hands of the local sheriffs and deputies who had failed so miserably to check crime prior to the police's creation. An Adjutant General's report at the end of the year reported "the 'arms law' [concerning personal weapons] except in the more populous counties, is being entirely disregarded . . . ."[86]

In December 1873, Davis lost his reelection bid for governor in an overwhelming defeat as former Confederate supporters were again allowed to vote and Texas saw a massive influx of immigrants from other southern states.[87] But shortly afterwards, the Texas Supreme Court invalidated the election because it had been conducted under an election statute passed by the Democratically-controlled state legislature in violation of the Texas Constitution of 1869.[88] In what was often derisively called "the semicolon case," the Court was tasked with interpreting Article 3, Section 6 of the Texas Constitution of 1869, which read "All elections for State, District and County officers shall be held at the county seats of the several counties, until otherwise provided by law; and the polls shall be opened for four days, from 8 o'clock A. M. until 4 o'clock P. M. of each day."[89] The Court held that the provision allowed the legislature to change the location of elections but not the times.[90] Because the election law had limited elections to a single day rather than the four days required by the 1869 Constitution, the Court tossed out the results of the entire election.[91]

Davis was faced with the unenviable choice of either ignoring a decision of the state Supreme Court (every member of which he had appointed) or refusing to recognize a governor and state legislature elected by a 2–1 margin. Davis knew that retaining the governorship was not feasible, but he also knew that the legal legitimacy of a state government elected through an election that had been invalidated by

---

86. *Id.* at 489.

87. FONER, *supra* note 5, at 549.

88. *See generally Ex parte* Rodriguez, 39 Tex. 705 (1873). Davis had signed the election law. *Id.* at 706.

89. Lance A. Cooper, *"A Slobbering Lame Thing"? The Semicolon Case Reconsidered,* 101 SW. HIST. Q. 320, 323 (1998).

90. The *Rodriguez* decision, and the Davis administration generally, have been vilified in Texas history since Democrats regained full control in 1874. *See generally* T.R. FEHRENBACH, LONE STAR: A HISTORY OF TEXAS AND THE TEXANS (1968). One textbook used in a state-mandated government course at Texas colleges described the "injustice, oppression, and extravagance" of the Davis administration and the twelfth legislature as "undoubtedly, the worst in the history of the state." WILBOURN E. BENTON, TEXAS POLITICS: CONSTRAINTS AND OPPORTUNITIES (5th ed. 1984). However, the Court's reading of the state constitution seems reasonable, although bold in the context the decision was made. Cooper, *supra* note 89, at 339.

91. *See Ex parte* Rodriguez, 39 Tex. at 773–74. Similarly, another dispute existed surrounding the term of the governor because of inconsistent provisions in the State constitution as to the length of the Governor's term and the inauguration of a new governor. *See generally* Carl H. Moneyhon, *Edmund J. Davis in the Coke-Davis Election Dispute of 1874: A Reassessment of Character,* 100 SW. HIST. Q. 130 (1996).

*TEXAS A&M LAW REVIEW*

the state Supreme Court would be dubious.[92] Davis sought a statement of recognition from President Grant for the new legislature before it sat, but President Grant only gave a vague statement that it would be "prudent" and "right" to "yield to the will of the people."[93] Shortly afterwards, the newly elected legislature assembled and sought the recognition of Davis, who refused to grant it without some sort of recognition from the President or Congress. The legislature responded by inaugurating Richard Coke as governor. Davis refused to leave office without federal recognition for the new government, and believed his term ran an additional three months. He posted militia to guard the executive offices from a Democratic takeover.[94] The Democrats responded by placing their own militia to guard the legislative chamber. To avoid conflict, Davis agreed to send his militia forces away. Shortly afterwards, Davis agreed to vacate the governor's mansion under protest.[95] Davis leaving office marked the end of the Reconstruction period in Texas.

### III. Legal Challenges and Interpretation of the 1871 Prohibition on Public Carry

In the three years following enactment of the 1871 prohibition on public carry, two major legal challenges reached the Texas Supreme Court. The first was heard by a Court made up entirely of Davis appointees sympathetic to Reconstruction—the same Court that later invalidated the election of the Democratic legislature.[96] This "Semicolon Court" was held in such disrepute among Democratic "redeemers" that its opinions were only considered quasi-precedential among judges and attorneys in post-Reconstruction Texas.[97] The second challenge came in 1874, after the Democratic legislature, furious at the Court's ruling against the validity of its election, removed the entire bench from office and appointed a new Democratic slate of judges.[98]

---

92. *Id.* at 133–34.
93. *Id.* at 143.
94. *Id.* at 146.
95. *Id.* at 149.
96. There was one change in the Court membership between the *English* decision and the *Semicolon* case. *See* Hans W. Baade, *Chapters in the History of the Supreme Court of Texas: Reconstruction and "Redemption" (1866–1882)*, 40 St. Mary's L.J. 17, 78, 116 (2008).
97. *Id.* at 92. I use "Semicolon Court" here as shorthand for the Court appointed by Governor Davis. The designation has traditionally been used derisively, especially by Southern scholars critical of Reconstruction. Use of the designation here is for clarity only and is in no way intended to be critical of the Court. Similarly the use of the term "redeemers" is used only to be consistent with historical discussion of the period and in no way to imply the reassertion of conservative white control was a positive development.
98. *Semicolon Court*, Tex. St. Hist. Ass'n, http://bit.ly/1KQlYzG [https://perma .cc/5ADF-TNJS] (last visited July 24, 2016).

These two cases created a kind of natural experiment that isolated the cotemporaneous legal views on firearms rights of Republican Unionists and Democratic redeemers. Ultimately, both Courts ruled that the general prohibition on carrying firearms in public was constitutional, but they relied on radically different reasoning in doing so. The distinctions in their legal reasoning embody the difference in the jurisprudential approach to the right to bear arms of the Southern Democrats whose rebellion resulted in the passage of the Fourteenth Amendment and the Republican Unionists who supported and passed the Amendment.

### A.   *The Texas State Constitution and Arms Bearing*

The Texas Constitution has contained a Second Amendment analogue since the first Constitution of the Republic of Texas which read: "Every citizen shall have the right to bear arms in defense of himself and the Republic. The military shall at all times and in all cases be subordinate to the civil power."[99] In 1845, in the first Texas State Constitution, the two provisions of the 1836 Constitution were separated and the Second Amendment analogue was tweaked to read: "Every Citizen shall have the right to keep and bear arms, in the lawful defence of himself and the State."[100] This language remained consistent in both the 1861 Confederate State Constitution and the 1866 Presidential Reconstruction Constitution.[101]

After the takeover of Congress by Radical Republicans and the passage of the First Reconstruction Act, a new Texas Constitutional Convention was called in 1868. One of the major concerns facing the delegates was the growing lawlessness in Texas, especially that targeting freed slaves and Republicans.[102] In his opening message to the convention, then Governor Elisha Pease stated, "crime was never more prevalent in Texas [than now]."[103] Many delegates also likely had in mind the attempted lynching of sitting Supreme Court Justice Colbert Caldwell and the organization of the Ku Klux Klan in Texas, which had recently killed several blacks in a march through a freedmen's community.[104] In this lawless period, the delegates narrowed the scope of the firearms right to say: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."[105] This constitution was ratified in 1869, and its provision on the right to

---

99. REPUB. TEX. CONST. of 1836, Declaration of Rights, § 14.
100. TEX. CONST. of 1845, art. I, § 13.
101. TEX. CONST. of 1861, art. I, § 13; TEX. CONST. of 1866, art. I, § 13.
102. MONEYHON, *supra* note 10, at 48.
103. *Id.* at 116.
104. *Id.* at 117.
105. TEX. CONST. of 1869, art. I, § 13.

keep and bear arms was in force when both legal challenges to the public carry law were heard.[106]

## B.  *The Texas Supreme Court, 1867–1874*

During the Reconstruction period, the Texas Supreme Court underwent unprecedented upheaval. As a result of changes in federal policy and state politics between 1866 and 1874, Texas went through four different Supreme Courts.[107] During Presidential Reconstruction, in the immediate aftermath of the Civil War, Texas Democrats adopted a Constitution meant to change as little as possible without bringing federal retribution. Under the terms of that constitution, a slate of five Democratic Justices were elected, four of whom had served as officers in the Confederate army.[108] With the advent of Congressional Reconstruction, the federally appointed military governor of Texas appointed a new Court more sympathetic to the Union.[109] This Court sat until the ratification of the Republican-drafted Constitution of 1869 and the inauguration of Edmund J. Davis as governor in 1870.

In 1870, Davis filled the now three-member state Supreme Court, forming the so-called Semicolon Court. The Court's first three justices were Lemuel Evans, Wesley Ogden, and Moses B. Walker, all of whom had unionist sentiments and close ties to the North.[110] Evans was a Tennessee-born conservative Republican who was forced to flee Texas during the Civil War after opposing secession, ending up in Washington D.C.[111] Ogden was born in New York and practiced law in Ohio and New York before moving to Texas in 1849. Ogden was also forced to flee Texas after opposing secession, but returned after the War, serving in several judicial positions prior to being appointed to the Court.[112] Walker was the only member of the Court who could fairly be called a carpetbagger.[113] Prior to the War, Walker was a Yale-educated Ohio attorney and failed politician who rose to the rank of brevet brigadier general during the War. Walker remained in the mili-

---

106. *Constitution of 1869*, Tex. St. Hist. Ass'n, http://bit.ly/1IVwcsy [https://perma .cc/Z8AQ-NAMP] (last visited July 24, 2016).

107. Baade, *supra* note 96, at 18.

108. *Id.* at 36–37.

109. *Id.* at 50.

110. In 1873, Justice Evans was replaced with pre-War unionist John David McAdoo. Upon secession, McAdoo chose Texas over the Union and served in the Confederate military—ultimately rising to the rank of Brigadier General. *See John David McAdoo*, Tex. St. Hist. Ass'n, http://bit.ly/1OiKF3D [https://perma.cc/924J-SP2N] (last visited July 24, 2016).

111. Baade, *supra* note 96, at 79–80.

112. *Id.* at 81.

113. Carpetbagger is a derogatory term for a person who moved from the North to the South during reconstruction to take advantage of political opportunities, here the term is intended to be merely descriptive. Foner, *supra* note 5, at 295 n.28.

tary after the War and was assigned to Texas, where he was appointed to the military Supreme Court.[114]

The 1873 election that unseated Davis also included a referendum on a state constitutional amendment to disband the State Supreme Court and replace it with a new Court made up of five Justices.[115] The newly elected Governor Coke appointed three justices who had previously served on the Confederate Texas Supreme Court and one justice who had served on the Court when Democrats controlled it during Presidential Reconstruction. Two of the Justices had been representatives at the Texas Secession convention. Thomas J. Devine, one of the associate justices appointed by Governor Coke, had the distinction of being one of only three people tried for treason after the Civil War.[116] The Fortieth edition of the Texas Reports pointedly acknowledged the transition to the "Redeemer" Court saying: "[w]ith this volume we pass to another era in the judicial history of Texas. Those who have before construed the laws of this [s]tate, and who have assisted in the effort to preserve constitutional freedom for its citizens, again constitute its court of last resort."[117]

## C.  *The Semicolon Court Cases*

The Semicolon Court's major case concerning firearms, *English v. State*, arose out of three prosecutions under the 1871 Texas public carry law. English had been convicted for carrying an unloaded "out of repair" pistol while intoxicated, and a second appellant was convicted of carrying a butcher knife at a religious assembly.[118] The appellants challenged both the 1871 general prohibition on carrying firearms in public as well as the specific restriction on carrying in enumerated public places first enacted in 1870. He and his co-defendants brought challenges, under both the federal Second Amendment and Article 1, Section 13 of the Texas Constitution of 1869.[119]

---

114. *Moses B. Walker*, Tex. St. Hist. Ass'n, http://bit.ly/1NcaN2f [https://perma.cc/D4P3-B2KT] (last visited July 24, 2016).

115. Although the Semicolon Court invalidated the election, the Democrats convened the legislature anyway, passing the Amendment by the required two-thirds vote in each chamber. Baade, *supra* note 96, at 121.

116. *Id.* at 123.

117. *Id.* at 124 (citing Alex W. Terrell & Alex S. Walker, *Preface* to 40 Tex., at v, v (1882)).

118. English v. State, 35 Tex. 473, 473–74, 480 (1872). No evidence of the circumstances of third prosecution is available, but the Supreme Court reversed the judgment in that appellant's case, which presumably means that that court's ruling was in conflict with the *English* decision. A request to the Texas State Archives—which houses Texas Supreme Court records for this period—for records related to the *English* and *Duke* cases resulted in an archivist informing the Author that the Court records for both cases had been lost at some time prior to 1944 when cases were indexed.

119. *Id.* at 474, 478.

*TEXAS A&M LAW REVIEW*        [Vol. 4

Justice Walker wrote the opinion for a unanimous Court. The opinion first looked to whether the federal Second Amendment prevented Texas from prohibiting the carrying of firearms. Interestingly, the Court found that unlike other rights enumerated in the Bill of Rights, the Second Amendment, standing alone, applied equally to both state and local governments.[120] This interpretation relied exclusively on the work of New York legal commenter Joel Prentiss Bishop, with the opinion quoting two entire paragraphs from Bishop's treatise on Criminal Law.[121] Relying on Bishop, Walker adopted a militia-based view of the Second Amendment, finding that the only weapons protected were those used during service in the militia because "such only are properly known by the name of 'arms,' and such only are adapted to promote 'the security of a free State.'"[122]

Justice Walker's opinion further stated that under the Second Amendment "'bear' arms refers merely to the military way of using them, not to their use in bravado and affray."[123] Walker—who was quite familiar with firearms, having served as a Colonel for the Ohio volunteers during the Civil War, and having been shot three times during the battle of Chickamauga—decisively found that the law did not violate the Second Amendment, stating:

> No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the Constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the Legislature to punish and prohibit.[124]

The Court then went on to uphold the law under the Second Amendment, saying: "The act referred to makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover the wants of society."[125]

Next, the Court turned to consider the case under Article 1, Section 13 of the Texas State Constitution of 1869. The Court decided that the

---

120. *Id.* at 475 (citing JOEL PRENTISS BISHOP, *Carrying Weapons,* COMMENTARIES ON THE LAW OF STATUTORY CRIMES 493 (1873)).

121. *See generally* BISHOP, *supra* note 120. Notably, Bishop believed the Second Amendment applied to the states by its own terms rather than through either the due-process or privileges and immunities clauses of the Fourteenth Amendment.

122. *English*, 35 Tex. at 475; BISHOP, *supra* note 120, at 497.

123. *English*, 35 Tex. at 473, 475.

124. *Id.* at 476.

125. *Id.* at 477. Walker also made an interesting distinction between the right protected by the Second Amendment, and a pre-existing right to self-defense, stating: "There is no abridgement of the personal rights, such as may be regarded as inherent and inalienable to man, nor do we think his political rights are in the least infringed by any part of this law." *Id.*

term "arms" as used in the Texas State Constitution had the same meaning as in the Second Amendment and was limited to militia weapons.[126] It went on to state that the provision of section 13—making the right subordinate to the regulations prescribed by the state legislature—clearly allowed for the prohibition on publicly carrying firearms except in limited circumstances. Walker's opinion then clarified that even in the absence of the provision allowing regulation, the prohibition on public carry would be valid.[127]

Justice Walker next discussed how Texas's law was consistent with the laws enacted in other states. He observed that:

> This law is not peculiar to our own State, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the States of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration.[128]

While Walker did not cite the specific statutes he mentioned, he most likely referred to a series of laws primarily enacted in the North, which generally prohibited carrying a firearm or other dangerous weapon without reasonable cause to fear an attack on oneself or one's family. The laws of Maine, Massachusetts, Michigan, Minnesota, Oregon, Pennsylvania, Virginia, West Virginia, and Wisconsin all included such statutes.[129]

Justice Walker's opinion then shifted from legal analysis to a discussion of the relationship between individuals, their community, and government, stating in reference to the 1871 Act that:

> It will doubtless work a great improvement in the moral and social condition of men, when every man shall come fully to understand that, in the great social compact under and by which States and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the State for redress. We must not go back to the state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive.
>
>      . . .

---

126. *Id.* at 478.

127. *Id.* at 478–79 ("But we do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the State or Federal Constitution.").

128. *Id.* at 479.

129. *See generally* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121, 130–32 (2015). *See also* 1841 Me. Laws 709, ch. 169, § 16; 1836 Mass. Acts 750, § 16; 1846 Mich. Pub. Acts 690, ch. 162, § 16; 1851 Minn. Laws 526, ch. 112, § 18; 1853 Or. Laws 218, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6; 1847 Va. Acts 127, ch. 14, § 15; 1870 W. Va. Acts 702, ch. 153, § 8; 1838 Wis. Sess. Laws 381, § 16.

116                          *TEXAS A&M LAW REVIEW*                          [Vol. 4

> The powers of government are intended to operate upon the civil conduct of the citizen; and whenever his conduct becomes such as to offend against public morals or public decency, it comes within the range of legislative authority.[130]

On this point, the Court quoted John Stuart Mill's *On Liberty*:

> "It is one of the undisputed functions of the government, to take precautions against crime before it has been committed, as well as to detect and punish it afterwards. The right inherent in society, to ward off crimes against itself by antecedent precautions, suggests the obvious limitations to the maxim, 'that purely self-regarding misconduct cannot properly be meddled with in the way of prevention or punishment.'"[131]

Walker's opinion rejected the challenge to the portion of the law that prohibited carrying weapons at public assemblies even more vehemently. Justice Walker wrote for the Court that: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[132] The Court upheld the public assembly provision just as it had the general public carry prohibition.

The Semicolon Court had a few other opportunities to interpret the 1871 Act. In *Jenkins v. State*, the Court, again in a decision by Justice Walker, upheld the sufficiency of an indictment for carrying firearms. The Court found that the government was not required to plead that the defendant did not fall into the exceptions in the act; rather it was the defense's burden to prove the defendant fell within one of the laws exceptions.[133]

In *Waddell v. State*, the Court contrasted the right to keep arms for self-defense in the home, which it had recognized as protected in *English*, with carrying arms in public, which could be strictly regulated. In *Waddell*, it reversed a defendant's conviction for carrying a firearm when the defendant purchased two pistols, proceeded to several other stores in town seeking ammunition to fit his gun, and then travelled to his home fifteen miles out of town. The Court found the conduct within the statute's exception for keeping or bearing arms on one's own premises or on a journey, stating:

---

130. *English*, 35 Tex. at 477–78.

131. *Id.* at 478 (The reporter has the Court citing to pages 56 and 57 of John Stuart Mill's *On Liberty*, but the actual quotes appear between pages 172 and 175).

132. *Id.* at 478.

133. Jenkins v. State, 36 Tex. 638 (1872) (The headnotes for *Jenkins* describe the offense as "carrying concealed weapons" while the actual statute prohibits carrying weapons generally).

he had a perfect right to purchase the arms, and for the purpose of obtaining ammunition to suit them, he had a right to take them with him, to any place where such ammunition was sold; and then he had a perfect right to take them to his home for any lawful purpose he may have intended to serve with them, such as guarding his house against thieves and robbers, defending himself and family against murderers or assassins.[134]

The Court then reaffirmed the validity of the law stating, "[W]e find nothing in the act which, rightly construed, takes away any right or abridges any reasonable and lawful privilege of the citizen."[135] The Court then advised prosecutors and lower courts against bringing similar cases, saying,

if wrong constructions are placed upon this act, and absurd and vexatious prosecutions for acts not within the denunciation of the law are tolerated and entertained by the courts, the law itself must become unpopular, even odious, to a free people, and the Legislature will be driven by public indignation and protest to repeal the law.[136]

In contrast to *Waddell*, in *Baird v. State*, the Court upheld the conviction of a defendant who carried a handgun while hog hunting.[137] The defendant claimed his carrying was legal under the "place of business" exception because he hunted hogs in the forest every winter, which he claimed made it his regular business. The Court was unwilling to grant the exception such a broad interpretation, noting that if "place of business" included anywhere a person could conduct business, "every man could very plausibly set up the right to keep and bear arms on every occasion, for he could always claim to be at his own business . . . ."[138] The Court limited place of business to a particular location dedicated exclusively to a person's business. The Court also rejected a challenge that the prosecution had failed to show that the person was not on his own property at the time of the crime, saying whether a person owned the property where he was arrested for carrying is within the defendant's own knowledge and power of proof.[139] However, the Court again cautioned against overly zealous application of the law, saying:

---

134. Waddell v. State, 37 Tex. 354, 356 (1873). This is similar to language in the 1871 Tennessee case. *See also Andrews v. State*, 50 Tenn. 165, 178–79 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose, a man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.").

135. *Waddell*, 37 Tex. at 355.

136. *Id.*

137. Baird v. State, 38 Tex. 599 (1873).

138. *Id.* at 601.

139. *Id.* at 602.

*TEXAS A&M LAW REVIEW* [Vol. 4]

The constitutionality of that act being admitted, its beneficial effects upon society have been quite fully demonstrated and placed almost beyond question. But while it is generally conceded that the execution of that law, in the spirit, and for the purposes intended by the law-making power, would greatly conduce to the peace and quiet of the citizens of the State, yet it must also be admitted that any attempt to prostitute that law from the purposes for which it was enacted into an instrument of oppression to annoy and harass any peaceful and law-abiding citizen, would greatly tend to bring that law into disfavor, and create and stimulate a demand for its repeal. It is therefore but just and reasonable that this law, as well as all others, should be executed in the spirit intended, for the good of the citizens generally, and not as a snare to entrap the unwary who intend no wrong, and believe they are exercising only their legitimate or inalienable rights.[140]

Possibly in response to these concerns, after laying down the rule that Baird's conduct violated the law, the Court reversed the conviction on a technical issue.[141]

### D.   *The 'Redeemer' Court Cases*

When the Redeemer Democrats took over the governorship, they reconstituted the Supreme Court and appointed Democratic judges to replace the Semicolon Court.[142] While the Democrats repealed most of the Davis administration's legislative accomplishments, they left in place the prohibition on public carry, although enforcement was sporadic.[143] The newly constituted Court heard several challenges to the 1871 Firearms Act during its first year and issued a series of three opinions interpreting the Act. Notably, while all three decisions reversed the defendant's conviction for carrying firearms, even the "Redeemer" Court concluded that the public carry prohibition was constitutional.

The first and most important case was *State v. Duke*, an appeal by the state after the district court had found an indictment under the 1871 law deficient on constitutional grounds.[144] The "Redeemer" Court upheld the law as the Semicolon Court had, although with very

---

140. *Id.* at 600–01. The Court seems to have wanted to avoid creating an excuse for the now Democratically controlled state legislature to repeal the public carry law.

141. *Id.* at 603.

142. Baade, *supra* note 96, at 121.

143. *See, e.g.*, The Weekly Democratic Statesman (Austin, Tex.) Mar. 26, 1874 at 3; *Row on Sunday*, The Waco Daily Examiner (Waco, Tex.) June 9, 1874 at 3; The Dallas Daily Herald (Dallas, Tex.) Nov. 13, 1874 at 4; *Judge Burford's Court*, The Dallas Daily Herald (Dallas, Tex.) at 4; Mayor's Court, The Dallas Daily Herald (Dallas, Tex.) June 17, 1875 at 4; *Bold Resistance – The Difficulties of Enforcing Laws*, The Dallas Weekly Herald, July 17, 1875 at 3; The Dallas prosecutions occurred under a Dallas City Ordinance with identical language to Texas's statewide law, *see Ordinances of the City of Dallas*, Dallas Herald (Dallas, Tex.) June 15, 1872 at 1.

144. State v. Duke, 42 Tex. 455 (1874).

different reasoning.[145] The first difference arose out of the applicability of the Second Amendment. The "Redeemer" Court found the Second Amendment did not apply to the states, citing *Barron v. Baltimore* and the *Slaughter-House Cases*.[146] While this decision was fully supported by law, and anticipated the next year's decision of the United States Supreme Court in *United States v. Cruikshank*, 92 U.S. 542 (1875), it is also consistent with the Democratic desire to minimize the role of the federal government and the reach of federal constitutional law within the state.

The Court then considered the statute under Article 1, Section 13 of the Texas Constitution of 1869. The Court disagreed with the Semicolon Court's militia-based reading of Section 13, noting that the Texas right excluded the Second Amendment's recitation of the well-regulated militia language, and instead stated:

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for defense of the State. If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection.[147]

The Court then stated:

> Regarding, then, some kinds of pistols as within the meaning of the word, we are of the opinion that the Act in question is nothing more than a legitimate and highly proper regulation of their use. . . . It undertakes to regulate the place where, and the circumstances under which, a pistol may be carried; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business.[148]

However, the Court then went on to uphold the lower court's dismissal of the indictment on the grounds that the state failed to plead that the exceptions in the Act did not apply to the defendant's con-

---

145. *Id.* at 457.

146. *Id.* at 457–58 (citing *Barron v. Baltimore*, 32 U.S. 243 (1833) and *Slaughter-House Cases*, 83 U.S. 36 (1873)). The *Slaughter-House Cases* were decided after the *English* decision, but *English* did not rely on the Fourteenth Amendment for the applicability of the Second Amendment to the States.

147. *Id.* at 458–59. Notably, by making this distinction *Duke* does seem to interpret the Second Amendment as a militia based rather than individual right.

148. *Id.* at 459 (reversing the conviction because the prosecution had failed to assert that the defendant did not fall into the statutory exceptions).

duct. In doing so, the Court overturned the Semicolon Court's *Jenkins* decision which had come to the opposite conclusion.[149]

The Semicolon and "Redeemer" Courts also disagreed about the scope of citizens' self-defense rights. The Semicolon Court was adamant that citizens in a society relinquish the power to settle scores, and instead rely on the state to keep the peace. The "Redeemer" Court spoke of no such limitations. Rather, the Court essentially permitted citizens to decide the appropriate level of self-defense by upholding a right to keep "commonly kept" arms "appropriate for 'open and manly use in self-defense.'"[150] The Court went so far as to name several "commonly kept" arms protected by the state constitution, including pistols and double-barreled shotguns.[151]

In a pair of cases decided the same day as *Duke*, the "Redeemer" Court interpreted the exceptions to the public-carry ban, overturning convictions in both cases. In *Young v. State*, the Court reversed a conviction for carrying a pistol because the trial court judge had refused to let in evidence regarding threats made against the defendant.[152] The defendant claimed he only carried a pistol because he had previously been attacked, and his attacker after being restrained had yelled, "If I didn't kill you this time, damn you, I will do it yet."[153] The trial judge, in an extremely narrow reading of the exception, found as a matter of law that this statement was inadequate because the attacker was not physically present at the time defendant was arrested with the gun.[154] The Court disagreed, finding that the issue was a mixed matter of both fact and law that should have gone to a jury. The Court noted: "[i]t is easy to imagine circumstances under which the danger might be most imminent, though the person from whom it was threatened was not immediately present."[155]

---

149. *Id.* at 461. *See generally* Jenkins v. State, 26 Tex. 638 (1872); *see also* State v. Clayton, 43 Tex. 410 (1875) (finding the indictment valid, which read defendant "unlawfully carr[ied] on and about his person a certain pistol, he then and there having no reasonable grounds for fearing an unlawful attack on his person, nor was he then and there either a militiaman in actual service, or a peace officer, or a policeman, nor was he then and there on his own premises or at his own place of business." This was sufficient to plead the exceptions).

150. *Duke*, 42 Tex. at 458. For a discussion of the culture of honor and violence prevalent in the South, *see* BERTRAM WYATT-BROWN, SOUTHERN HONOR: ETHICS & BEHAVIOR IN THE OLD SOUTH (Oxford Univ. Press 1983).

151. *Duke*, 42 Tex. at 458–59.

152. Young v. State, 42 Tex. 462 (1874).

153. *Id.* at 463.

154. *Id.* at 463–64.

155. *Id.* at 464; *see also* Bailey v. Commonwealth, 74 Ky. 688, 692–93 (1876) (interpreting similar language to allow carry when a specific threat exists even if that threat is not actually present); Chateaux v. State, 52 Ala. 388, 390 (1875) (continuing to carry a pistol concealed after passing through a dangerous area does not meet the exception for good reason to apprehend an attack).

In the second decision interpreting the law's exceptions, the Court reversed a conviction for carrying a pistol on two grounds.[156] First, the indictment did not state that the defendant lacked reasonable grounds to fear an unlawful attack.[157] Second, the defendant was traveling sixteen miles to a nearby town, a journey he expected to last two or three days.[158] The Court found this was sufficient to bring the defendant within the exception for travelers.[159] While these decisions seem reasonable, they do appear to be part of a pattern of finding technical flaws in indictments and prosecutions in order to avoid subjecting defendants to punishment under the 1871 Act.

However, the "Redeemer" Court did not overturn every firearms conviction that came before it.[160] In *Titus v. State*, the Court upheld a conviction for carrying a pistol while hunting. The Court made clear that the statute did not include an exception for hunting and that the use of pistols in hunting is neither "necessary or proper."[161] While the Semicolon Court's *Baird* decision was clearly on point, the Court did not cite it as precedent, but rather only stated that *Baird* "is a case similar to the present."[162]

## IV.  CONCLUSION

As the foregoing makes clear, at the time of the ratification of the Fourteenth Amendment, restrictions on publicly carrying firearms were not viewed by Texas Republicans as violative of any right. Rather, in 1870 and 1871, faced with a horrifying rate of violence, Texas's Republican state legislature did not feel constrained in taking action to protect the people of Texas. This resulted in a general prohibition on carrying firearms that was aggressively enforced by a newly created state police force. This restriction was consistent with the Republican view that individuals surrendered their personal right to avenge grievances by entrusting government to maintain societal order.

Contrary to the historical accounts presented by many scholars, these laws were obviously not enacted based on racial animus. Then, as now, gun violence weighed most heavily on the black commu-

---

156. Smith v. State, 42 Tex. 464 (1874).

157. *Id.* at 465.

158. *Id.*

159. *Id.* at 466.

160. At the time, every criminal defendant was entitled to an appeal as of right to the State Supreme Court. This proved burdensome to the Supreme Court, which resulted in the creation of the Texas Court of Criminal Appeals. Baade, *supra* note 96, at 126.

161. Titus v. State, 42 Tex. 578, 579 (1874).

162. *Id.* at 579. The Semicolon Court cases were held in such ill repute in "redeemed" Texas that attorneys practicing in Texas avoided citing them as precedent.

*TEXAS A&M LAW REVIEW* [Vol. 4

nity.[163] But, unlike the present day inaction of Congress and many state legislatures, in the face of aberrational homicide rates, the government of Texas under Governor Edmund Davis took action. This action was taken with the full support of the black community who it was intended to protect.[164] The law was also enforced in a racially neutral manner during the Davis administration.[165] The Texas state police was a fully integrated police force closely aligned with the Republican governor and fully committed to protecting freedmen from violence perpetrated by whites.

When interpreting the rights protected by the Fourteenth Amendment, scholars should look to the legal views of those who supported the enactment and ratification of the Fourteenth Amendment rather than those who fought to abscond from the constitutional system, and in the case of Texas Democrats, specifically rejected ratification of the Fourteenth Amendment.[166] The Republican-appointed Supreme Court did not struggle to uphold the prohibition on carrying firearms. Justice Walker, a former Union general, found the law consistent with the laws of the rest of the nation and self-evidently valid and beneficial. In contrast, the law was viewed with suspicion when it came before the "redeemed" Supreme Court, which expressed sympathy for a right to "manly self-defense." These differing views are representative of the differing Republican and Democratic views about gun rights, self-defense, and the role of government. The Republican view was enshrined in the Fourteenth Amendment after the North's victory in the Civil War. This view should be the guide in interpreting the scope of the Second Amendment now.

---

163. *See generally* Nate Silver, *Black Americans Are Killed at 12 Times the Rate of People in Other Developed Countries*, Five Thirty Eight (June 18, 2015, 5:33 PM), http://53eig.ht/1RdE3VR [https://perma.cc/Q4XS-KA3C].

164. *See supra* notes 71–72.

165. This Article does not speak to the enforcement of the laws in the post-Reconstruction period. While press accounts from the post-Reconstruction period seem to indicate that the law continued to be enforced against both the white and black population, it is virtually certain that blacks would have been treated unfairly.

166. Texas Democrats also rejected ratification of the Thirteenth Amendment. *Constitutional Convention of 1866*, Tex. St. Hist. Ass'n, http://bit.ly/1ZYBA6d [https://perma.cc/T5AQ-95M3] (last visited July 24, 2016).

EXHIBIT 85

# STATUTES OF CALIFORNIA
## 1927

———

### CONSTITUTION OF 1879
#### AS AMENDED

### RESOLUTIONS
#### ADOPTED AT
### EXTRA SESSION OF FORTY-SIXTH LEGISLATURE
## 1926

### MEASURES SUBMITTED TO VOTE OF ELECTORS
#### 1926

### GENERAL LAWS, AMENDMENTS TO CODES
### RESOLUTIONS
### CONSTITUTIONAL AMENDMENTS
#### PASSED AT THE
### REGULAR SESSION OF FORTY-SEVENTH LEGISLATURE
## 1927



**CALIFORNIA STATE PRINTING OFFICE**
**SACRAMENTO, 1927**

938                    STATUTES OF CALIFORNIA.              [Ch. 552

ness connected with this office; said traveling expenses not to
exceed one hundred dollars per year per supervisor.

**Jurors.**   15. For attending as a grand juror, or a trial juror in
criminal and civil cases in the superior court, for each day's
attendance, three dollars; for each mile actually traveled one
way as such grand juror, or trial juror, in the superior court,
under summons or order of the court, twenty-five cents. The
county clerk shall certify to the auditor the number of days'
attendance, and the number of miles traveled by each juror
and the auditor shall then draw his warrant therefor and the
treasurer shall pay the same.

**Effect of act.**   SEC. 2.   The provisions of this act, so far as they are
substantially the same as existing statutes governing counties
of this class, must be construed as continuations thereof and
not as new enactments; and nothing in this act contained shall
be deemed to shorten or extend the term of office or employ-
ment of any person holding office or employment under the
provisions of such statutes.

---

## CHAPTER 552.

*An act to prohibit the possession of machine rifles, machine
guns and submachine guns capable of automatically and
continuously discharging loaded ammunition of any caliber
in which the ammunition is fed to such guns from or by
means of clips, disks, drums, belts or other separable
mechanical device, and providing a penalty for violation
thereof.*

[Approved by the Governor May 16, 1927. In effect July 29, 1927.]

*The people of the State of California do enact as follows:*

**Possession of machine guns.**   SECTION 1. On and after the date upon which this act
takes effect every person, firm or corporation, who within
the State of California possesses any firearm of the kind com-
monly known as a machine gun shall be guilty of a public
offense and upon conviction thereof shall be punished by
imprisonment in the state prison not to exceed three years
or by a fine not to exceed five thousand dollars or by both
such fine and imprisonment.

*Provided, however,* that nothing in this act shall prohibit
police departments and members thereof, sheriffs, and city
marshals or the military or naval forces of this state or of
the United States from possessing such firearms for official
use in the discharge of their duties.

**"Machine gun" defined.**   SEC. 2. The term machine gun as used in this act shall
be construed to apply to and include all firearms known as
machine rifles, machine guns or submachine guns capable of
discharging automatically and continuously loaded ammuni-
tion of any caliber in which the ammunition is fed to such gun
from or by means of clips, disks, drums, belts or other separa-
ble mechanical device.

# EXHIBIT 86

# LAWS OF MISSOURI

PASSED AT THE SESSION OF THE

## *Fifty-fifth General Assembly*

WHICH CONVENED AT THE CITY OF
JEFFERSON, WEDNESDAY, JANUARY 2, 1929
AND ADJOURNED WEDNESDAY, MAY 29, 1929

*Also Proposition No. 3, (For the issuance of
seventy-five million dollars [$75,000,000] of
additional road bonds), Approved by Vote of
the People at the General Election, Nov. 6, 1928*



MDCCCXX

(*By Authority*)

COMPILED BY

CHARLES U. BECKER

SECRETARY OF STATE

*In compliance with Section 7068, Revised
Statutes of Missouri, 1919*

[H. B. 498.]

## CRIMES AND PUNISHMENT: Prohibiting the Sale Delivery, Transportation, Possession or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law.

AN ACT to prohibit the sale, delivery, transportation, possession or control of machine rifles, machine guns and sub-machine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical devices and providing a penalty for violation thereof.

SECTION
1. Unlawful to sell, deliver, transport or have in possession any machine gun.

SECTION
2. The term "machine gun" defined.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

**Section 1.   Unlawful to sell, deliver, transport or have in possession any machine gun.**—It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

**Sec. 2.   The term "machine gun" defined.**—The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

Approved June 1, 1929.

---

[S. B. 438.]

## CRIMINAL PROCEDURE: Relating to Parole, Except for Certain Offenses.

AN ACT to repeal section 4157, article 18, chapter 25, of the Revised Statutes of Missouri, 1919, relating to parole, except for certain offenses; and, to enact a new section in lieu thereof to be known as section 4157, relating to the same subject.

SECTION
1. Repealing section 4157, article 18, chapter 25, Revised Statutes of Missouri, 1919, and enacting new section.

SECTION
4157. Parole may be given, except for certain offenses.