# EXHIBIT 116

# NSSF® REPORT 2021 EDITION
# FIREARMS RETAILER

## SURVEY REPORT

Conducted for the
National Shooting Sports Foundation®
by: Southwick Associates




NSSF
The Firearm Industry
Trade Association

©2021 National Shooting Sports Foundation, Inc. All Rights Reserved. No part of this publica-
tion may be republished, reproduced or redistributed in any form or by any means, electronic or
mechanical, except in the case of brief quotations in articles. NSSF members in good standing
may share this publication with their employees, including making it available for internal viewing
or download via their company intranet sites, provided 1.) the publication is offered in its entirety,
including this paragraph, and 2.) is accompanied by the following notice: "This publication is
made available to employees for job reference purposes only, not for redistribution outside the
company." A reward is provided to persons who provide conclusive evidence of illegal
republication, reproduction, redistribution or other violation of NSSF's rights in this publication.

**TABLE OF CONTENTS**

Overview ........................................................................................................................... 1

Products Sold .................................................................................................................. 1

Sales Trends .................................................................................................................... 11

Sales Margins and Net Profit ...................................................................................... 15

Inventory ......................................................................................................................... 16

Selected Operating Measures ...................................................................................... 18

Markets and Customers ............................................................................................... 19

Website and Online Marketing ................................................................................. 21

Social Media and Current Issues ............................................................................... 24

Shooting Ranges and Other Offerings ...................................................................... 26

Background Checks and Operating Systems............................................................. 27

## OVERVIEW

This report is the result of an in-depth analysis of the U.S. firearms retail industry sponsored by the National Shooting Sports Foundation.  The information for the report was collected through an online survey of retailers that was conducted from February through March 2020.  The survey respondents included 313 retail establishments located in 50 states. They range in size from single proprietors to large outdoor specialty retailers.

This report shows results for 2018 and 2020. Due to significant changes in survey design during 2020, several questions only show results for the most recent year. Results for 2019 are not available since the retailer survey was not conducted that year.

## PRODUCTS SOLD

From which business activity does your business earn a majority of its annual revenues?



Total number of responses in 2020: n = 423

*Of those that selected "Retail" as earning the majority of annual revenues:*

Please check the category that best describes your retail business:



| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Local / Independent Shop | 82.9% | 76.9% | 246 |
| Online Retailer | 5.9% | 5.3% | 17 |
| Gun Show / Outdoor Expo | 2.7% | 2.8% | 9 |
| Outdoor Specialty Store | 1.4% | 2.8% | 9 |
| General Sporting Goods | 0.9% | 1.3% | 4 |
| Pawn | 0.5% | 4.1% | 13 |
| Mass Merchant | 0.5% | 0.0% | 0 |
| Cataloguer | 0.0% | 0.0% | 0 |
| Other | 5.4% | 6.9% | 22 |
| **Total** | **100%** | **100%** | **320** |

2

*Of those that selected "Wholesale", "Manufacturing" or "Other" as earning the majority of annual revenues:*

Do you earn any revenues from retail sales (sales directly to customers)?



|  | 2020 | Responses (2020) |
|---|---|---|
| Yes | 60.2% | 62 |
| No | 39.8% | 41 |
| Total | 100% | 103 |

3

Which categories of NEW products do you currently sell retail?



| | 2020 | Responses (2020) |
|---|---|---|
| Handguns | 86.9% | 272 |
| Shotguns | 83.4% | 261 |
| AR-style / modern sporting rifles | 82.1% | 257 |
| Traditional rifles | 79.9% | 250 |
| Muzzleloaders | 23.6% | 74 |
| None of these | 9.6% | 30 |

Total number of responses for 2020: n = 313

4

Please check the top three calibers sold for NEW modern sporting rifles:



| | 2020 | Responses (2020) |
|---|---|---|
| 223/556 cal | 87% | 221 |
| 22 LR | 43% | 109 |
| 300 Blackout | 41% | 103 |
| 9 mm | 39% | 98 |
| 308 Winchester | 30% | 75 |
| 5.56 mm | 26% | 66 |
| 6.5 Creedmoor | 10% | 25 |
| 45 ACP | 2% | 5 |
| Other | 2% | 5 |
| 350 Legend | 1% | 3 |
| 40 cal | 1% | 3 |
| 450 Bushmaster | 1% | 2 |
| 6.5 PRC | 1% | 2 |
| Not sure | 1% | 2 |
| 280 Ackley Improved | 0% | 1 |
| 458 Socom | 0% | 1 |
| 6 mm | 0% | 0 |

Total number of responses in 2020: n = 253

5

Which categories of USED products do you currently sell retail?



Number of responses selling at least one of these firearm types USED in 2020: n = 310

| | 2020 | Responses (2020) |
|---|---|---|
| Handguns | 75.5% | 234 |
| Shotguns | 67.4% | 209 |
| Traditional rifles | 66.8% | 207 |
| AR-style / modern sporting rifles | 63.2% | 196 |
| None of these | 22.3% | 69 |
| Muzzleloaders | 20.0% | 62 |

6

Of your annual AR-style/modern sporting rifle sales in 2020, please report the percentages you think were sold primarily for hunting purposes, target-shooting purposes and personal-protection purposes.



| AR-style/modern sporting rifles | 2018 | 2020 |
|---|---|---|
| Hunting purposes | 29.6% | 20.5% |
| Personal-protection purposes | 36.1% | 41.4% |
| Target/informal shooting | 34.3% | 38.2% |

Total number of responses in 2020: n = 244

7

Approximately what percentage of the firearms you sold in 2020 were:



| Firearms sold | 2018 | 2020 |
|---|---|---|
| New | 82.0% | 79.4% |
| Used | 18.0% | 20.6% |

Total number of responses in 2020: n = 250

Approximately what percentage of the firearms you sold in 2020 were:



|  | 2018 | 2020 |
|---|---|---|
| Semi-auto pistol | 43.5% | 44.2% |
| AR/ modern sporting rifle | 17.7% | 20.3% |
| Traditional rifle | 12.7% | 11.3% |
| Shotgun | 13.7% | 12.4% |
| Revolver | 8.8% | 7.2% |
| Muzzleloader | 2.0% | 1.6% |
| Other | 1.5% | 1.5% |

Total number of responses in 2020: n = 241

Which of these product categories do you currently sell?



| | 2020 | Responses (2020) |
|---|---|---|
| Ammunition | 91.9% | 239 |
| Optics | 87.3% | 227 |
| Firearm accessories such as grips, slings, bipods, etc. | 86.9% | 226 |
| Gun-cleaning equipment and supplies | 85.8% | 223 |
| Safety equipment | 82.7% | 215 |
| Gunsmithing | 56.9% | 148 |
| Hunting- or shooting-related gifts and home items | 45.0% | 117 |
| Apparel | 42.3% | 110 |
| Reloading equipment and supplies | 40.8% | 106 |
| Hunting accessories | 31.2% | 81 |
| Products not related to hunting/shooting | 26.2% | 68 |
| Archery and bowhunting equipment | 15.8% | 41 |

Total number of responses in 2020: n = 260

10

**SALES TRENDS**

What percent of your gross annual sales were from the following categories?



■ New firearms                                    ■ Ammunition
■ Hard goods                                      ■ Used firearms
■ Products not related to hunting and shooting    ■ Soft goods
■ Archery and bowhunting

|  | 2018 | 2020 |
|---|---|---|
| New firearms | 51.5% | 43.4% |
| Ammunition | 13.2% | 20.5% |
| Hard goods | 11.2% | 10.8% |
| Used firearms | 11.9% | 11.4% |
| Products not related to hunting and shooting | 4.3% | 6.7% |
| Soft goods | 4.1% | 2.9% |
| Archery and bowhunting | 2.5% | 1.4% |

Total number of responses in 2020: n = 288

11

Total sales compared to the previous year:



| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Up | 40.5% | 85.6% | 172 |
| Flat | 25.2% | 7.0% | 14 |
| Down | 34.4% | 7.5% | 15 |

What was the average change of total sales compared to the previous year?

| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Avg. Increase | 22.9% | 80.8% | 170 |
| Avg. Decrease | 18.2% | 42.5% | 15 |

12

Please compare your sales this year to your sales last year in the following categories listed below.  For each category please say whether sales were UP or DOWN.



*Total responses (year over year sales) in 2020: Optics (163); Ammunition (179); Muzzleloaders (122); Handguns (180); Shotguns (181); AR-Style rifles (180); Traditional rifles (180).*

In 2020, what were your total sales of shooting and hunting-related items only, including firearms, ammo, accessories, apparel, etc.?

| Year | Average Total Sales |
|---|---|
| 2018 | $1,252,011 |
| 2020 | $2,666,719 |
| # of 2020 Responses | 170 |

Of all your FIREARM sales last year, please estimate the percentage of sales dollars attributable to each type of firearm:



Total responses in 2020: n = 194

**SALES MARGINS and NET PROFIT**

What is your average margin on the sale of NEW firearms?

|  | 2018 | 2020 |
|---|---|---|
| **NEW Firearms** | 15.8% | 18.6% |
| Handguns | 16.3% | 20.2% |
| Rifles | 16.8% | 20.1% |
| Shotguns | 16.4% | 20.0% |
| Muzzleloaders | 5.7% | 12.6% |

Total responses in 2020: n = 155

|  | 2018 | 2020 |
|---|---|---|
| Centerfire | 24.1% | 34.0% |
| Rimfire | 21.4% | 30.7% |

Total responses in 2020: n = 156

Did your net profit increase, decrease or stay the same compared to the previous year?



Total number of responses in 2020: n = 159

Estimated changes in net profit (for those who reported an increase or decrease).

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Average Increase | 15.2% | 70.2% | 118 |
| Average Decrease | 38.9% | 37.1% | 12 |

15

<u>**INVENTORY**</u>

How did your spending on inventory change in 2020 versus 2019 for:

**Firearms**



**Ammunition**



16

| Product | Change in Spending on Inventory | 2020 |
|---|---|---|
| Firearms | Increased | 74.1% |
| | Decreased | 10.8% |
| | Stayed the Same | 10.8% |
| | Unknown | 4.4% |
| Ammunition | Increased | 71.3% |
| | Decreased | 15.9% |
| | Stayed the Same | 8.9% |
| | Unknown | 3.8% |

Total number of respondents for FIREARMS (2020):  n = 94
Total number of respondents for AMMUNITION (2020): n = 94

For 2020, what was the percentage change in your spending on inventory for each of the following items?

| | | 2020 | Responses (2020) |
|---|---|---|---|
| Firearms | Average Increase | 93.3% | 74 |
| | Average Decrease | 44.5% | 7 |
| Ammunition | Average Increase | 121.3% | 73 |
| | Average Decrease | 50.4% | 8 |

17

**SELECTED OPERATING MEASURES**

*NOTE: The following tables are based on a subset of respondents who provided complete information for sales, inventory, square footage, and cost of goods sold. Results are broken out into two categories: retailers with $1 million or more in total annual sales of shooting and hunting-related items only, and those with less than $1 million in sales.*

What was the average value (replacement value, not retail value) of the total inventory you had on hand in 2020 for shooting- and hunting-related merchandise only, including firearms, ammo, accessories, apparel, etc.)? DO NOT include inventory for other activities such as fishing, hardware, camping, etc.

| | 2020 | Responses (2020) |
|---|---|---|
| Retailers less than $1 million | $112,673.78 | 67 |
| Retailers $1 million or more | $3,352,872.20 | 46 |

*Does not include inventory for other activities such as fishing, hardware, camping, etc.

To the best of your ability, please estimate the number of inventory turns you achieved in 2020:

| | 2020 | Responses (2020) |
|---|---|---|
| Retailers less than $1 million | 7.34 | 23 |
| Retailers $1 million or more | 7.56 | 33 |

*78 retailers were not able to answer this question.

What was the <u>total square footage</u> of retail space dedicated to shooting- and hunting-related items only, as of December 31?

| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Retailers less than $1 million | 1,116 | 2,087 | 71 |
| Retailers $1 million or more | 4,788 | 9,299 | 47 |

Please tell us how many full-time employees your store had in 2018 for hunting and shooting related merchandise including firearms, ammunition, etc.

| | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Retailers less than $1 million | | | |
| Full Time Employees | 2.4 | 1.8 | 77 |
| Part Time Employees | 2.0 | 1.2 | 47 |
| | | | |
| Retailers $1 million or more | | | |
| Full Time Employees | 5.6 | 10.1 | 77 |
| Part Time Employees | 4.6 | 9.9 | 48 |

## MARKETS and CUSTOMERS

What percentage of your shooting- and hunting-related sales revenue do you attribute to female customers?

|  | 2018 | 2020 |
|---|---|---|
| % of sales revenue | 20.3% | 28.0% |

Total number of responses in 2020: n = 143

What type of firearm did female buyers purchase most often? (ranked from 1 (most likely) to 6 (least likely)

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Semi-automatic handgun | 1.2 | 1.2 | 126 |
| Revolver | 2.4 | 2.4 | 110 |
| AR platform (MSR) rifle | 3.5 | 3.2 | 105 |
| Shotgun | 3.8 | 3.4 | 104 |
| Traditional rifle | 3.9 | 4.3 | 89 |
| Muzzleloader | 5.8 | 6.0 | 60 |

*These results show how firearms retailers rank the observed preferences of female firearm buyers for given types of firearm on a scale of 1 (very likely) to 6 (not likely at all). For instance, the average respondent suggested that female hunters/shooters who purchased firearms from their business in 2020 most likely purchased a semi-automatic handgun (average rank of 1.2 out of 6) and was least likely to purchase a muzzleloader (average rank of 6 out of 6).*

In your opinion, what percent of your customers were first-time gun buyers?

|  | 2018 | 2020 |
|---|---|---|
| % of all customers who were first time gun buyers | 24.0% | 34.0% |

Total number of responses in 2020: n = 162

What type of firearm did first-time buyers purchase most often?

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Semi-automatic handgun | 1.3 | 1.2 | 142 |
| AR platform (MSR) rifle | 2.9 | 2.5 | 128 |
| Revolver | 3.1 | 3.2 | 125 |
| Shotgun | 3.6 | 3.3 | 112 |
| Traditional rifle | 3.9 | 4.5 | 130 |
| Muzzleloader | 5.9 | 6.0 | 75 |

*These results show how firearms retailers rank the observed preferences of first-time firearm buyers for given types of firearm on a scale of 1 (very likely) to 6 (not likely at all). For instance, the average respondent suggested that first time gun buyer who purchased firearms from their business in 2020 was more likely to purchase a revolver (average rank of 3.2 out of 6), than a traditional rifle (average rank of 4.5 out of 6).*

19

To the best of your knowledge, what was your total customer demographic in 2020?

|  | 2018 | 2020 |
|---|---|---|
| Male | 78.5% | 73.8% |
| Female | 21.5% | 26.2% |
|  |  |  |
| White | 74.4% | 68.9% |
| Black | 9.3% | 12.9% |
| Hispanic | 12.1% | 10.6% |
| Asian | 4.1% | 3.9% |
|  |  |  |
| White Male | 59.5% | 51.6% |
| White Female | 15.0% | 17.4% |
| Black Male | 7.0% | 9.0% |
| Black Female | 2.4% | 3.9% |
| Hispanic Male | 9.0% | 7.9% |
| Hispanic Female | 3.1% | 2.7% |
| Asian Male | 3.1% | 2.6% |
| Asian Female | 1.0% | 1.2% |
| Other | NA | 3.7% |

Total number of responses in 2020: n = 140

Do you have a system you use to collect demographic information (age, gender, race/ethnicity) on your customers?

|  | 2018 | 2020 |
|---|---|---|
| Yes | 3.8% | 8.6% |
| No | 96.2% | 91.4% |

Total number of responses in 2020: n = 139

20

**WEBSITE and ONLINE MARKETING**

Does your business currently have a website?



| | 2020 |
|---|---|
| Yes | 82.5% |
| No | 17.5% |

Total number of responses in 2020: n = 143

21

Do you sell any hunting and shooting-related products via the Internet?



|       | 2018  | 2020  |
|-------|-------|-------|
| Yes   | 41.3% | 58.0% |
| No    | 58.8% | 42.0% |

Total number of responses in 2020: n = 143

This year, did your online sales increase or decrease?

|                | 2018  | 2020  |
|----------------|-------|-------|
| Increase       | 30.3% | 69.9% |
| Stay the same  | 51.5% | 18.1% |
| Decrease       | 18.2% | 12.0% |

Total number of responses in 2020: n = 83

Please estimate as best as possible the percentage of annual shooting and hunting-related sales revenues that were generated online:

|                                      | 2018  | 2020  |
|--------------------------------------|-------|-------|
| % sales revenue generated online     | 26.0% | 28.1% |

Total number of responses in 2020: n = 78

If you are not currently selling hunting and shooting products online, do your future business plans include selling online?



Total number of responses in 2020: n = 59

**<u>SOCIAL MEDIA AND CURRENT ISSUES</u>**

In 2020, were you denied the ability to advertise on any platforms?



|        | 2020  |
|--------|-------|
| Yes    | 48.3% |
| No     | 41.3% |
| I don't know | 10.5% |

Total number of responses in 2020: n = 139

24

**Which social media platforms does your store use to communicate with customers?**



| Social Media Platform | 2020 |
|---|---|
| Facebook | 87.5% |
| Instagram | 59.2% |
| Twitter | 28.3% |
| YouTube | 26.7% |
| LinkedIn | 20.8% |
| Yelp | 13.3% |
| Other | 10.0% |
| MeWe | 7.5% |
| Parlor | 3.3% |
| Snapchat | 2.5% |
| Pinterest | 1.7% |
| Reddit | 1.7% |
| TikTok | 0.8% |
| Rumble | 0.8% |

Total number of responses in 2020: n = 120

25

**SHOOTING RANGES AND OTHER OFFERINGS**

Do you have an active shooting range on-site?



Total number of responses in 2020: n = 260

Do you offer any of the following general firearm instruction classes at your store? (select all that apply)

| Class | 2018 | 2020 |
|---|---|---|
| Basic Pistol | 36.6% | 54.6% |
| Concealed Carry | 39.8% | 50.6% |
| Basic Rifle | 23.6% | 33.9% |
| Advanced Pistol Shooting | 19.3% | 33.5% |
| Women Only | 20.5% | 33.1% |
| Self-Defense | 24.2% | 31.5% |
| Basic Shotgun | 21.1% | 25.9% |
| Youth Classes | 16.1% | 25.9% |
| Tactical | 14.3% | 23.9% |
| Advanced Rifle Shooting | 13.7% | 20.3% |
| Hunter Education | 11.8% | 14.7% |
| Gunsmithing | 9.9% | 14.3% |
| Advanced Shotgun Shooting | 8.7% | 14.3% |
| Close Quarters Combat | 3.7% | 13.6% |
| Other | 3.7% | 7.6% |
| Reloading | 5.0% | 5.6% |
| We do not offer any firearm-related classes | 49.1% | 33.5% |

Total number of responses in 2020: n = 251

**BACKGROUND CHECKS AND OPERATING SYSTEMS**

What percent of firearms sales (if any) in your store(s) use the approved alternate permits (such as concealed carry license) when completing a firearm sale? In other words, out of 100 firearms sold, what percent do not utilize the NICS system?

|  | 2018 | 2020 | Responses (2020) |
|---|---|---|---|
| Average response | 38.4% | 40.0% | 117 |

*Question shown only to respondents located in the following states: Alaska, Arizona, Arkansas, Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Montana, Nebraska, Nevada, North Carolina, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah, Washington, West Virginia and Wyoming.*

You are in a state that requires background checks on Private Party Transfers. Approximately what percent of total NICS background checks conducted by your store are for such Private Party Transfers?

|  | 2020 | Responses (2020) |
|---|---|---|
| Average response | 11.2% | 65 |

*Question shown only to respondents located in the following states: California, Colorado Connecticut, Delaware, Illinois, Iowa, Maryland, Massachusetts, Michigan, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, Washington and Washington D.C.*

To the best of your recollection, on average how many firearms are sold per completed Form 4473?

|  | 2018 | 2020 | # 2020 Responses |
|---|---|---|---|
| Average number of firearms sold per completed form 4473 | 1.1 | 1.3 | 91 |

*For example, in 2020 there were about 10 Form 4473s completed for every 13 firearms sold.*



11 Mile Hill Road
Newtown, CT 06470-2359
T: 203.426.1320
F: 203.426.1087
nssf.org

©2021 National Shooting Sports Foundation, Inc. All Rights Reserved

Item# 30383-21    3/21

# EXHIBIT 117

REPORT **Second Amendment**

# If You Can't Beat 'Em, Lie About 'Em: How Gun Control Advocates Twist Heritage's Defensive Gun Use Database in the "Large-Capacity" Magazine Debate

**May 17, 2023**  37 min read



Amy Swearer

**Senior Legal Fellow, Meese Center**

Case 3:18-cv-10507-PGS-JBD   Document 196-10   Filed 12/15/23   Page 35 of 228 PageID: 10591

—— *SUMMARY*

*Any assertion that The Heritage Foundation's scholarship on defensive gun use implicitly supports magazine capacity limitations for civilians should be categorically rejected. On the contrary, it shows that bans on the civilian possession of standard-capacity magazines threaten to have devastating effects on law-abiding gun owners who find themselves outnumbered, outgunned, or otherwise at a disadvantage against criminal actors. It is neither constitutional nor prudent for the government to tie one hand behind the backs of peaceable gun owners, especially when it exempts itself from that same prohibition in a tacit acknowledgement that standard-capacity magazines can be incredibly useful and necessary tools when facing criminal threats in a civilian context.*

**KEY TAKEAWAYS**

1   Magazines with a capacity of more than 10 rounds are a centuries-old technology, while attempts to limit civilian magazine capacity are a very modern phenomenon.

2   Standard-capacity magazines are incredibly useful for law-abiding civilians who find themselves at a disadvantage against armed criminals.

3   Advocates of magazine capacity limits overstate their potential public safety benefits and underestimate the myriad ways criminals can circumvent such limits.

myriad ways criminals can circumvent such limits.



In recent decades, gun control advocates have been fixated increasingly on passing laws that would prohibit the civilian possession of so-called large-capacity magazines. While the definition is entirely arbitrary and varies even across the handful of states in which they are regulated, "large-capacity" magazines are most often defined as magazines capable of holding more than 10 rounds of ammunition.[1]

Gun control advocates routinely decry these devices as being used largely for criminal purposes, cynically questioning why law-abiding citizens would ever be in a situation requiring them to fire more than 10 rounds without reloading. In reality, magazines with a capacity of more than 10 rounds are the factory standard for many of the most popular guns on the civilian market and have been for more than a century. Countless Americans own them for precisely the same reasons that police departments commonly issue them to peace officers: While the circumstances in which they are strictly "necessary" for self-defense may not be everyday occurrences, their presence in those situations is important. Moreover, advocates of magazine capacity limits routinely overstate the potential public safety benefits of such laws and underestimate the myriad ways in which criminals can (and already do) circumvent them.

The willingness of gun control advocates to stretch the truth about magazine capacity recently reached new heights. On November 30, 2022, a conglomerate of gun control groups filed a brief of amici curiae before a federal district court in Hanson v. District of Columbia, a case in which the plaintiffs are challenging the District of Columbia's "large-capacity" magazine ban for civilians.[2] In this brief (hereinafter the Brady Brief), the gun control groups argued in part that the District's limitation on magazine capacity for civilians is constitutionally sound because civilians simply do not need more

than 10 rounds to defend themselves. To support this argument, the brief referenced two articles on defensive gun use published by The Daily Signal, the multi-media arm of The Heritage Foundation, as part of a monthly series dating back to 2019. Based on these two articles alone the brief argued that:

> Even advocates of the permissive use of firearms have acknowledged that the ability to fire more than ten rounds of ammunition without reloading is not necessary for defensive purposes. For example, recent compilations by The Heritage Foundation's The Daily Signal of national reports on defensive gun use cases reflect that none involved the use of anywhere close to ten rounds of ammunition.[3]

At best, the Brady Brief's characterization of these monthly articles on defensive gun use is recklessly lazy and wrongly attributes to the authors (and The Heritage Foundation more broadly) a policy position that neither holds. At worst, it constitutes an intentional effort to deceive a federal court with blatantly misleading claims about The Heritage Foundation's research and scholarship on defensive gun uses and Second Amendment policy. Far from "acknowledging" that magazine capacity laws have no harmful impact on civilian self-defense, Heritage's scholarship unambiguously supports the position that peaceable Americans have a constitutional right to possess magazines with a capacity of 11 or more rounds and that the possession of such magazines during a defensive gun use, as demonstrated below, can sometimes be the difference between life and death or serious bodily injury.

## Magazine Capacity, the Constitution, and Public Policy

Irrespective of whatever information can be gleaned from Heritage's Defensive Gun Use Database[4] on the importance or prevalence of standard-capacity magazines during civilian defensive gun uses, laws prohibiting their sale to (or possession by) law-abiding citizens suffer from a host of constitutional and public policy concerns. These concerns are nothing new and have been raised for many years by Second Amendment advocates both affiliated and unaffiliated with The Heritage Foundation.[5]

From a purely constitutional perspective, the prevalence of defensive gun uses involving more than 10 rounds being fired is irrelevant to the question of whether the Second Amendment protects a right to possess magazines with a capacity of 11 or more rounds. The Supreme Court of the United States has not so far reviewed a challenge to laws limiting magazine capacity for civilians. This includes the 1994 Federal Assault Weapons Ban, which before it sunset without renewal in 2004 prohibited the sale of magazines holding 10 or more rounds to civilians.[6] However, given the Court's subsequent holdings in foundational Second Amendment cases like District of Columbia v. Heller[7] and New York Rifle & Pistol Association v. Bruen,[8] it is difficult to see how any court could uphold magazine capacity limits while remaining faithful to the existing jurisprudential framework.

In Heller, the Supreme Court affirmed that the Second Amendment protects an individual right to keep and bear arms centered on self-defense and struck down a District of Columbia law banning the civilian possession of operable handguns inside the home.[9] In so doing, it reasoned that the Second Amendment's protections are not limited only to those arms in existence at the time of ratification but "extend[], prima facie, to all instruments that constitute bearable arms."[10] While "dangerous and unusual" arms may fall outside of the Amendment's scope, it certainly covers small arms (in this case, handguns) that are "typically possessed by law-abiding citizens for lawful purposes" like self-defense.[11] The Court re-emphasized this "common lawful purpose" concept two years later in McDonald v. City of Chicago, in which it also determined that the Fourteenth Amendment's Due Process Clause extended the Second Amendment's protections against state infringement as well.[12] Most recently, under Bruen, the Court explained that, to be constitutional, any challenge restriction on the right to keep and bear arms must be consistent with the nation's historical tradition of firearms regulation.[13]

However accurate they may be, the assertions by gun control advocates that law-abiding citizens rarely need to fire more than 10 rounds without reloading during a defensive gun use are premised on addressing the wrong question.

The relevant question under Heller is not whether an arm is strictly or commonly necessary for purposes of self-defense, but whether it is commonly possessed by law-abiding citizens for lawful purposes. There can be little doubt that magazines are "arms" or at least so critical to the functioning of arms that they receive the same constitutional protections as the "arms" that require them. Guns require ammunition to function as intended, and many of the most commonly possessed firearms rely on magazines to feed ammunition into the chamber. Those magazines are therefore unquestionably necessary components for one to be able to exercise his or her right to keep and bear arms.

It is also unquestionably true that law-abiding Americans commonly own magazines capable of holding more than 10 rounds as well as firearms capable of accepting those magazines. Data collected by the 2021 National Firearms Survey, which is the most comprehensive survey of American gun owners ever conducted, suggest that nearly half of American gun owners have owned a magazine with a capacity of 11 or more rounds.[14] Most of these approximately 39 million gun owners with standard-capacity magazines possess several of them, suggesting that more than 500 million such magazines may currently be in civilian circulation.[15] The most common reasons that gun owners cite for possessing magazines that hold more than 10 rounds are recreational target shooting (64.3 percent); home defense (62.4 percent); hunting (47 percent); defense outside the home (41.7 percent); and competitive shooting sports (27.2 percent).[16] All are traditionally considered to be lawful activities.

While the Second Amendment's protections are not limited to the technology that existed in 1792, multi-shot firearms were well-known to the Founding generation.[17] The trend in firearm manufacturing toward increased ammunition capacity was already well underway by the time the Second Amendment was ratified.[18] Rifles with magazines capable of holding more than 10 rounds of ammunition first achieved mass-market success in the late 1860s, and handguns with such magazines first became popular in the 1930s.[19] By the 1960s and 1970s, advancements in magazine technology had

made magazines capable of holding more than 10 rounds the factory
standard for many of the most popular firearms on the civilian market, and
millions of such firearms were sold.[20]

As one might guess from the long-standing popularity of larger-capacity
magazines among civilians, attempts to limit magazine capacity for civilian
gun owners are a modern phenomenon. Far from being rooted in some
historical tradition of regulation, the first three laws even remotely resembling
modern bans on large-capacity magazines did not arise until the 1930s—and
two of the three were repealed within decades.[21] Even today, limits on
magazine capacity exist in only a minority of states, most of which did not
impose those limitations until the 21st century.[22]

Constitutional concerns aside, laws that restrict magazine capacity for
civilians are just poor public policy. First, even if compliance is widespread
and coupled with proactive enforcement, the potential benefits to public
safety are limited at best. Suicides, not homicides, account for the bulk of
annual gun deaths, and in such circumstances, magazine capacity is almost
entirely irrelevant.[23] Most gun crimes are not targeted shootings with an
underlying intent to kill, but rather robberies and aggravated assaults in
which the perpetrator brandishes—but does not fire—the gun.[24] Even with
respect to the minority of gun crimes in which perpetrators fire their
weapons, it is not at all clear that magazine capacity limits offer meaningful
benefits. Only a small percentage of homicides involve two or more victims,
which are the types of crimes most likely to require an offender to fire more
than 10 rounds to accomplish his or her criminal purpose.[25] Moreover, the
official analysis of the 1994 federal law prohibiting the sale of magazines with
a capacity of more than 10 rounds concluded that there was "no evidence of
reductions in multiple-victim gun homicides or multiple-gunshot wound
victimizations" as a result of the prohibition.[26] This is hardly surprising, given
that the "banned...magazines were used in only a minority of gun crimes
before the law."[27]

Importantly, there is no reason whatsoever to assume either that compliance
with magazine capacity laws would be widespread or that the laws would be

effectively and vigorously enforced. In fact, it appears that Americans are widely and openly noncompliant with laws prohibiting the possession of standard-capacity magazines in states that have already imposed them.[28] If the mass of peaceable Americans are notoriously unwilling even to register "grandfathered" guns and magazines under less confiscatory frameworks, what reason is there to believe that the more criminally bent sectors of society would simply turn in their banned magazines and never again buy, steal, or 3D-print new ones?[29]

It is little wonder, then, that proponents of magazine capacity limitations have increasingly turned away from arguments that these laws will lower crime rates generally and instead focus on their alleged impact on the least common type of gun violence: mass public shootings.[30] One of the most popular arguments raised in favor of limiting magazine capacity for civilians is that standard-capacity magazines may enable mass public shooters to inflict higher numbers of casualties by decreasing the number of times they need to reload. Again, even assuming widespread compliance and effective enforcement, limiting magazine capacity is unlikely to lower casualty rates in mass public shootings to any meaningful degree.

First, mass public shooters can (and routinely do) work around these limitations by bringing several firearms and extra loaded magazines, easily replacing expended magazines within seconds.[31] Moreover, analysis of data from mass public shootings shows that most perpetrators do not actually use magazines capable of holding more than 10 rounds and that, in any event, mass public shooters typically do not fire at a rate that is fast enough for casualty counts to be attributed to magazine capacity.[32] This conclusion is supported by the findings of various panels analyzing the effect of magazine capacity for individual mass shootings as well as by the reality that high casualty counts have occurred during shootings where only "limited-capacity" magazines were used.[33]

Finally, the reality is that mass public shooters throughout American history have been more than capable of killing large numbers of people even with far more "rustic" and "limited-capacity" guns than today's modern rifles with

"large-capacity" magazines. For example:

- In 1915, an aggrieved man armed with a double-barrel shotgun walked into a law office in downtown Brunswick, Georgia, and fatally shot a judge.[34] He then continued shooting random people in the crowded business district, ultimately killing seven and wounding 30 in just 10 minutes, having apparently considered how to reload his firearm most efficiently and effectively for maximum carnage.[35] He would in fact kill more people than a different aggrieved man who, more than a century later, walked into a downtown Louisville, Kentucky, bank with an "assault weapon" and "high-capacity" magazines and began indiscriminately shooting his colleagues.[36]
- In 1949, a man with nothing more than a single 9mm pistol with an eight-round magazine killed 13 and wounded three more in just 12 minutes during a mass public shooting in Camden, New Jersey.[37] His actions stopped not because of his "limited" magazine capacity, but because he simply ran out of bullets and surrendered.[38] He would nonetheless kill and injure more people than would a gunman with "high-capacity magazines" at a Buffalo, New York, supermarket more than eight decades later.[39]

These are far from the only examples of historical mass public shootings with high casualty counts that tend to disprove an assertion that such atrocities are a modern phenomenon or meaningfully facilitated by a gunman's use of modern, standard-capacity magazines.[40]

It is clear that laws limiting magazine capacity for civilians are both constitutionally problematic and unlikely to have a significant impact on public safety even if perfectly enforced. It is not just that these laws have little practical effect on criminal actions—they would at the same time undermine the practical ability of peaceable citizens to defend themselves in those scenarios where the need for armed self-defense is most acute, such as when they are outnumbered, outgunned, or otherwise placed at a tactical disadvantage.

These scenarios of tactical disadvantage are almost certainly more common for peaceable citizens than for criminals, who have the upper hand in planning

and executing their crimes. Unlike law-abiding citizens, who must reactively defend themselves whenever and under whatever circumstances they are victimized, criminals can (and often do) wait for (or even create) the most advantageous circumstances. For example, a significant percentage of homicides, robberies, and other violent crimes involve multiple offenders.[41] Multiple-offender homicides in particular are becoming increasingly common: In 2008, roughly one of every five homicides involved multiple offenders.[42]

Gun control advocates arguably concede this point on the potential importance of being able to fire more than 10 rounds without reloading when they support magazine capacity laws that universally exempt law enforcement officers, often including in their off-duty capacities and with their personal firearms.[43] Law enforcement officers in the United States are peace officers acting in a civilian context and generally speaking respond to the same criminal threats first faced by the peaceable citizens who called them for assistance in the first place. The circumstances under which they may use deadly force largely parallel the laws of self-defense for civilians. While off duty, their powers of arrest and investigation in many cases are based solely on the rights of citizens' arrest possessed by all other members of society. And while most civilian defensive gun uses do not involve any rounds being fired, much less more than 10 rounds being fired, the same is true of police-involved shootings.[44] To whatever extent, then, that standard-capacity magazines are useful for law enforcement officers, they are equally useful for civilians who face those same threats.

## What Heritage Defensive Gun Use Database Actually Shows About Magazine Capacity in Defensive Shootings

What, then, do the Heritage Defensive Gun Use Database and corresponding monthly Daily Signal series actually show about the importance of standard-capacity magazines for civilian defensive gun use? While such cases likely do not constitute a majority of defensive gun uses, either by civilians or by law enforcement officers, in those cases where more than 10 rounds are needed, the ability to fire those rounds without the need to reload can be the difference between life and death or serious bodily injury. Those cases often

involve a defensive gun user who is outnumbered by multiple armed
assailants or who is engaged in a sustained gun battle with an assailant who
is heavily armed.

Incidents of civilian defensive gun use are inherently difficult to analyze, and it
would be impossible to determine the exact number that occur every year,
much less to gauge the exact number that involve the firing of more than 10
defensive rounds. It is clear, however, that civilian defensive gun uses are
common occurrences. Studies consistently conclude that in any given year,
Americans use their guns defensively between 500,000 and several million
times, with the best available evidence indicating that the real average is
probably somewhere between 1 million and 2 million times a year.[45] Most of
these defensive gun uses do not involve a gun being fired, will not receive the
slightest bit of media attention, and may not even be reported to police.[46] In
general, media reports on a defensive gun use rarely include specific
information on the number of rounds fired by either the offender or the
defensive gun user. Sometimes, contextual information—like the number of
gunshot wounds sustained by an offender—can provide insight into a
potential minimum number of defensive rounds fired, but not an upper limit.

The Heritage Defensive Gun Use Database was not designed to track specific
case features like the number of rounds fired defensively and does not
purport to maintain an exhaustive record of cases in which more than 10
defensive rounds were fired. Moreover, the monthly article series published
by The Daily Signal does not provide an exhaustive list of defensive gun use
cases compiled in the database in any given month. As the articles
themselves clearly explain, the series covers at most only a fraction of the
media-verified cases compiled in any given month and is intended to be more
of a highlight reel than a comprehensive resource. Cases for these monthly
articles are chosen to a large extent based on aesthetic factors like ensuring
that featured cases are somewhat evenly spaced throughout a given month
and maintain a reasonable amount of both geographic and contextual
diversity.

It is in no way reasonable to conclude, as the Brady Brief does, that if one of

the monthly Daily Signal articles does not include an example in which a defensive gun user fired more than 10 rounds, then no such cases occurred. Ironically, the September 2022 article cited by the Brady Brief illustrates this point perfectly.[47] Missing from that article (which covers cases from August 2022) is an August 19, 2022, defensive gun use in Williamsport, Pennsylvania, by a concealed carry permit holder who fired "approximately 18 rounds" at an armed robber.[48] This defensive gun use was not highlighted in the monthly roundup, but it was included in The Heritage Foundation's interactive database and featured on the database's official Twitter account.[49]

Even a cursory review of the more than 3,000 media-verified defensive gun uses compiled in the database shows that the Williamsport case is far from the only instance involving a defensive gun user who clearly fired more than 10 rounds that was not featured in the monthly highlight article. For example, the March 2022 article did not cover a February 22, 2022, defensive gun use that occurred in Richmond, Kentucky, in which a man fired at least 19 rounds during a shootout with an intruder who had just killed his daughter.[50] Nor did the March 2021 article feature a February 5, 2021, case in Summerville, South Carolina, in which an armed resident fired 13 rounds at multiple armed assailants who shot at him from his apartment complex's parking lot.[51]

The authors of the Brady Brief also apparently assume that if a media report (or a summary of the media report featured in the monthly Daily Signal highlight article) does not explicitly state that a defensive gun user fired more than 10 rounds, then it could not have occurred. True, it is sometimes evident from the broader context that fewer than 10 rounds were fired or at least that such an event was unlikely. Other times, however, this assumption is entirely unwarranted. This includes two cases featured in the articles cited by the Brady Brief and far too easily dismissed as involving "nowhere close" to the firing of 10 rounds in self-defense.

- In the August 16, 2022, case in Lexington, South Carolina, that was featured in the cited September 2022 Daily Signal article, both the assailant and the defensive gun user sustained multiple gunshot wounds during an exchange of gunfire inside the defensive gun user's home.[52] As far as can currently

be discerned, law enforcement officers did not release details to the public concerning the number of rounds fired during the shootout. The broader context of this defensive gun use, however, is one in which it is certainly plausible that the defensive gun user fired more than 10 rounds. Much like the defensive gun user in the Richmond, Kentucky, case mentioned above, the defensive gun user here was involved in what appears to have been an intense gun battle with a heavily armed opponent in which both parties would have had ample opportunity for defensive cover.

- Similarly, a June 16 incident in Hopkinsville, Kentucky, that was featured in the July 2022 article cited by the Brady Brief includes language and circumstances making it entirely plausible for the defensive gun user to have fired more than 10 rounds. That elderly homeowner was involved in a shootout with three armed intruders who fired at him first, and the most detailed articles available say merely that the homeowner "returned shots."[53] Unless the authors of the gun control brief have information to which the original journalists were not privy, there is no reasonable basis for concluding that the homeowner could not have fired or in fact did not fire more than 10 rounds in self-defense in a gunfight with multiple assailants.

This type of scenario, like any other scenario in which it is almost certain that the defensive gun user fired more than 10 rounds, is so commonly featured in the monthly articles that the authors of the Brady Brief must have gone out of their way to ignore any articles that did not fit the misleading narrative they wished to convey. For example:

- The May 2022 highlight article featured a Florida gun owner who used three different firearms to defend himself during an April shootout.[54] While his first firearm appears to have jammed, it is reasonable to assume that he moved to his third firearm because he expended all of the ammunition in his second firearm—an AR-15 rifle that commonly utilizes 30-round magazines. The odds are therefore very high that this defensive gun user cumulatively fired more than 10 rounds from those three firearms.
- During a September 2022 defensive gun use from Chicago featured in the

October 2022 highlight article, a concealed carry permit holder in Chicago shot back at gunmen who opened fire on a birthday celebration.[55] Although reports do not say for certain how many rounds were fired by either the gunmen or the defensive gun user, so many were fired in total that one witness described initially thinking that the gunshots were fireworks.[56]

As with cases explicitly involving more than 10 rounds fired in self-defense, the monthly articles have also omitted plenty of cases from the database in which it was statistically probable that the defensive gun users fired more than 10 rounds. For example:

- In February 2022, a civilian gun owner in Maple Falls, Washington, fired an entire magazine's worth of ammunition at a gunman while providing covering fire for two wounded sheriff's deputies who were pinned down, allowing them to move to safety and likely saving their lives.[57] While the few readily available media reports on this shootout do not appear to include any information on the defensive gun user's magazine capacity, both the prevalence of semi-automatic handguns that use magazines capable of holding more than 10 rounds and the lawful nature of their possession in Washington State make it entirely unreasonable to conclude that the defensive gun user could not have fired or did not in fact fire more than 10 rounds.
- A July 2022 Philadelphia, Pennsylvania, case involved at least 40 rounds fired between the victim and his three assailants, only one of whom was clearly portrayed in media reports as being armed.[58] It is statistically reasonable, if not highly probable, for the victim to have fired more than 10 of those rounds under the circumstances.

Finally, the monthly articles sometimes include summaries of defensive gun uses that unintentionally omit relevant information on the number of rounds fired in self-defense. This happened, for example, in the very first article of the series, which was published in January 2019. The summary for a January 20 incident simply noted that a homeowner killed three of four intruders but, likely for purposes of brevity, left out the detail that he fired dozens of rounds

during that gun battle.[59] Similarly, the December 2021 article featured a
November 20, 2021, shooting in Philadelphia in which an Uber driver shot and
wounded two of three armed robbers, but did not note that video of the
shootout indicates that he probably fired more than 10 rounds.[60]

As the primary purpose of this monthly article series never has been to
compile and showcase every single time a defensive gun user fires more than
10 rounds, it is likely that other articles in this series also contain case
summaries inadvertently glossing over such information.

Along those same lines, neither the Daily Signal article series nor the
Defensive Gun Use Database provides insight into the number of times
defensive gun uses prove unsuccessful—or are rendered significantly less
successful—precisely because a gun owner is killed or sustains serious injury
because he or she was limited to fewer than 10 rounds. Such cases would be
as difficult to research using available media reports as are cases involving
more than 10 rounds fired defensively, but they do clearly occur and would be
equally relevant to the policy conversation.

As just one example, during a May 2022 incident in Haines City, Florida, a
defensive gun user was fatally shot while reloading his firearm during a
gunfight with his assailant.[61] The victim's firearm was a revolver, a type of
gun that almost always has a capacity of less than 10 rounds.[62] And, of
course, there are cases that predate the current scope of the Defensive Gun
Use Database, which currently includes only cases that occurred on or after
January 1, 2019.[63]

## Conclusion

Any assertion that The Heritage Foundation's scholarship on defensive gun
use implicitly supports magazine capacity limitations for civilians should be
categorically rejected. On the contrary, it shows that bans on the civilian
possession of standard-capacity magazines threaten to have devastating
effects on law-abiding gun owners who find themselves outnumbered,
outgunned, or otherwise at a disadvantage against criminal actors. It is

neither constitutional nor prudent for the government to tie one hand behind the backs of peaceable gun owners, especially when it exempts itself from that same prohibition in a tacit acknowledgement that standard-capacity magazines can be incredibly useful and necessary tools when facing criminal threats in a civilian context.

Amy E. Swearer is a Senior Legal Fellow in the Edwin Meese III Center for Legal and Judicial Studies at The Heritage Foundation.

APPENDIX TABLE 1

## Non-Exhaustive Review of Defensive Gun Uses Likely Involving More than 10 Defensive Rounds (Page 1 of 4)

| Date | Location | Context |
| --- | --- | --- |
| March 18, 2023 | Ambler, PA | A gunman with an illegally possessed and illegally modified weapon opened fire on a group of people who gathered at a cemetery to celebrate the birthday of a deceased friend. A concealed carry permit holder fired back in self-defense, fatally shooting the gunman. In all, 30 rounds were exchanged between the gunman and the permit holder, although the exact breakdown of who shot how many rounds was not disclosed.[a] |
| February 23, 2023 | Bakersfield, CA | A concealed carry permit holder engaged in a shootout with multiple armed robbers whom he stumbled upon in his driveway when returning home from dinner with friends. He emptied at least one magazine, reloaded, and "continued firing until the [suspects'] car sped away."[b] Even accounting for California's ban on standard-capacity magazines, the fact that the defensive gun user reloaded a presumably compliant magazine and continued firing makes it statistically likely that he fired more than 10 rounds. |
| January 20, 2023 | Chicago, IL | A concealed carry permit holder fired 18 rounds during a shootout with an armed robber at a train station. Despite the rush hour crowd of bystanders, no one except the robber was hit by the permit holder's gunfire.[c] |
| November 25, 2022 | Chickasha, OK | Based on the number of shell casings found inside the home, an armed resident appears to have fired at least 12 rounds at an intruder.[d] |
| August 19, 2022 | Williamsport, PA | A concealed carry permit holder fired "approximately 18 rounds" in self-defense during an armed robbery.[e] |
| July 11, 2022 | Jonesboro, GA | A homeowner investigating suspected prowlers outside of his home engaged in a brief gunfight with armed assailants. It is difficult to tell from the video exactly how many rounds the homeowner fired based on sound alone, but he fired one warning shot, then fired rapidly an unknown number of times as he backed away before clearly firing four additional rounds. Based on the video evidence of recoil during the rapid burst, it is likely that the homeowner fired a total of more than 10 rounds.[f] |
| April 27, 2022 | Philadelphia, PA | An off-duty security guard exchanged fire with three would-be robbers, only one of whom was clearly identified as armed. More than 40 shell casings were found at the scene.[g] |
| April 8, 2022 | Melbourne, FL | A gun owner used three different firearms—including two AR-15 rifles, which presumptively had standard-capacity magazines—to defend himself during a shootout with an assailant. While the defensive gun user's handgun jammed, it is likely that he switched to his third firearm because his second firearm ran out of ammunition and that he fired more than 10 rounds in his own defense.[h] |
| February 22, 2022 | Richmond, KY | A man fired at least 19 rounds from two different handguns (and specifically 11 rounds from the first handgun) during a gunfight with a heavily armed intruder who had just killed his daughter.[i] |
| February 10, 2022 | Maple Falls, WA | An armed civilian fired an entire magazine of ammunition at a gunman while laying down covering fire for two wounded sheriff's deputies, enabling them to get to safety and likely saving their lives.[j] Given the prevalence of handguns with standard-capacity magazines and their lawful status in Washington State, it is likely that the civilian fired more than 10 rounds. |

APPENDIX TABLE 1

## Non-Exhaustive Review of Defensive Gun Uses Likely Involving More than 10 Defensive Rounds (Page 2 of 4)

| Date | Location | Context |
|------|----------|---------|
| November 20, 2021 | Philadelphia, PA | An armed Uber driver defended himself against three armed carjackers, shooting two of the suspects "several times" each. A surveillance camera captured the incident, and while it is difficult to determine from the audio exactly how many shots the defensive gun user fired (the audio does not appear to match up with the muzzle flashes), a reasonable listener could discern more than 10 rounds, which is consistent with the number of gunshot wounds suffered by the suspects.[k] |
| November 21, 2021 | Des Moines, IA | An armed homeowner exchanged gunfire with two intruders, and audio from nearby security cameras indicates that at least 15 rounds were fired. Given that the two suspects were injured and fled while the homeowner was unharmed, it is reasonable to conclude that most of those rounds may have been fired by the homeowner.[m] |
| June 22, 2021 | Decatur, GA | When a gunman fatally shot a man in a targeted attack, some of the victim's friends engaged the gunman in a shootout, killing him in what police deemed lawful self-defense. According to reports, more than 50 rounds were fired from four guns, making it likely that at least one defensive gun user fired more than 10 rounds.[n] |
| May 1, 2021 | St. Paul, MN | Two concealed carry permit holders defended themselves against three armed assailants in a gunfight from which police recovered "dozens of shell casings," indicating a high likelihood that at least one of the defensive gun users fired more than 10 rounds.[p] |
| February 20, 2021 | Metairie, LA | Nearly 100 rounds were exchanged between an active shooter and seven gun store employees before the gunman was fatally shot. Investigators said the gunman fired 32 rounds, meaning that defensive gun users cumulatively fired more than 60 rounds. The timeline is not entirely clear, but the best available information seems to indicate that the largest portion of those rounds was fired by only three or four employees.[q] |
| February 5, 2021 | Summerville, SC | An armed resident of an apartment complex fired 13 rounds at multiple armed suspects who shot at him from the parking lot.[r] |
| January 18, 2021 | Hesperia, CA | A homeowner engaged an armed would-be intruder in a sustained gunfight for 45 seconds. While it is unclear exactly how many rounds were fired, the video evidence and sheer length of the engagement indicate a high probability that more than 10 defensive rounds were fired.[s] Importantly, the possession of standard-capacity magazines was still perfectly lawful on this date as long as they qualified under a then-existing grandfathering provision. |
| April 29, 2020 | Yoder, CO | A hemp farmer engaged in a gun battle with four armed assailants who likely mistook the farmer's lawful business for an illegal (and often cash-heavy) marijuana operation. Hundreds of shell casings reportedly were found around the home, and while it is unclear exactly how many of these rounds were fired by the hemp farmer in self-defense, the single media report on the incident states that at the very least, he "emptied an entire magazine" from his handgun.[t] |
| April 22, 2020 | Las Vegas, NV | A concealed carry permit holder fired 11 rounds at an assailant who, seemingly at random, opened fire on the permit holder and another person as they sat eating fast food in a shopping center parking lot.[u] |

APPENDIX TABLE 1

## Non-Exhaustive Review of Defensive Gun Uses Likely Involving More than 10 Defensive Rounds (Page 3 of 4)

| Date | Location | Context |
|---|---|---|
| November 25, 2019 | Miami, FL | A concealed carry permit holder living in a van with his girlfriend and son fired "at least 14 rounds" at a man who threatened the family with an AK-47 rifle.[v] |
| May 14, 2019 | Tallahassee, FL | An armed homeowner engaged in a shootout with four armed intruders who broke into his home after having earlier stolen his keys. The homeowner fired at least 25 rounds from an AR-15 rifle in self-defense.[w] |
| January 20, 2019 | Houston, TX | A homeowner armed with a "fully loaded AK-47" almost certainly fired more than 10 rounds in self-defense when he fatally shot three of four intruders who broke into his home. Dozens of rounds were exchanged, and only two of the intruders were clearly armed.[x] At least one media report explicitly states that the homeowner fired "dozens" of those rounds himself.[y] |

SOURCES AND FOOTNOTES:

a   Fox 29 Philadelphia, "DA Says Deadly Shooting at Montgomery County Cemetery Was Self-Defense: 'No Criminal Charges Warranted,'" April 7, 2023, https://www.fox29.com/news/montgomery-county-deadly-shooting-cemetery-ruled-self-defense (accessed May 10, 2023).

b   While California prohibits standard-capacity magazines and the defensive gun user was technically able to fire more than 10 rounds in his defense, the mere fact of having to reload while under fire from multiple assailants drastically increased the danger he faced—danger that would have been mitigated had he not needed to reload in the first place. Source: Robert Price, "Home Invasion Victim Recalls Night of Alleged Robbery," KGET News, updated March 12, 2023, https://web.archive.org/web/20230314094617/https://www.kget.com/news/local/news/home-invasion-victim-recalls-night-of-alleged-robbery/ (accessed May 10, 2023).

c   CWB Chicago, "Arrested 32 Times Since 2014, Man Allegedly Engaged in a 'Firefight' with a Concealed Carry Holder on a CTA Train," January 22, 2023, https://cwbchicago.com/2023/01/arrested-32-times-since-2014-man-allegedly-engaged-in-a-firefight-with-a-concealed-carry-holder-on-a-cta-train.html (accessed May 10, 2023).

d   Kaylee Douglas and Natalie Clydesdale, "Chickasha Police: Homeowner Shoots, Kills Man Attempting to Enter House," KFOR, updated November 15, 2022, https://kfor.com/news/local/police-investigate-homicide-at-chickasha-home/ (accessed May 10, 2023).

e   John Beauge, "Pa. Man Shoots Teen Multiple Times After Having Gun Drawn on Him: Police," Penn Live, August 21, 2022, 10:05 p.m., https://www.pennlive.com/crime/2022/08/pa-man-shoots-teen-multiple-times-after-having-gun-drawn-on-him-police.html (accessed May 12, 2023.

f   Eric Perry, "Video Surveillance Captures Homeowner, Burglar Suspects in Shootout in Clayton County," Fox 5 Atlanta, updated July 12, 2022, https://www.fox5atlanta.com/news/video-surveillance-captures-homeowner-burglar-suspects-in-shootout-in-clayton-county (accessed May 10, 2023).

g   6 ABC Action News, "Cobbs Creek Shootout Leaves Security Guard, Teen Injured; At Least 40 Shots Fired," April 28, 2022, https://6abc.com/philadelphia-shooting-cobbs-creek-58th-street-baltimore-avenue-shootout-shopping-center/11799170/ (accessed May 12, 2023).

h   Thomas Mates, "Man Arrested After Shootout in Melbourne Neighborhood," WKMG News 6 Orlando, April 20, 2022, 10:37 a.m., http://thf-legal.s3.amazonaws.com/DGU/April%202022/04.08.22_Melbourne_FL.pdf (accessed May 12, 2023).

i   Krista Johnson and Hayes Gardner, "Jordan Morgan's Death: Suspect Shannon Gilday Arrested in Madison County," Courier Journal, updated February 28, 2022, 1:23 p.m. ET, https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/ (accessed May 12, 2023).

j   AJ Janavel, "'I Drop an Entire Magazine': Neighbor Shares Story About Saving Whatcom Co. Deputies," Fox 13 Seattle, February 15, 2022, https://www.q13fox.com/news/i-drop-an-entire-magazine-fox-13-news-talks-to-man-who-helped-save-whatcom-co-deputies (accessed May 12, 2023).

k   Fox 29 Philadelphia, "Uber Driver Shoots 2 During Attempted Robbery in Mayfair, Police Say," updated November 20, 2021, https://www.fox29.com/news/police-attempted-armed-robbery-victim-shoots-suspects-leaving-2-critical-in-mayfair (accessed May 10, 2023), and Active Self Protection, "Uber Driver Absolutely Delivers in Defensive Gun Use," YouTube, December 7, 2021, https://www.youtube.com/watch?v=UspezjeLN_k (accessed May 10, 2023).

m   KIRO 7, "Homeowner, Des Moines Police Fire at Armed Robbery Suspects," November 22, 2021, https://www.kiro7.com/news/local/homeowner-des-moines-police-fire-armed-robbery-suspects/HROO4ZCU3JE4HBD2INX46EG6W1/ (accessed May 10, 2023).

n   Marc Teichner, "DeKalb County Gas Station Gunfire Leaves 2 Dead, 2 Injured," Fox 5 Atlanta, June 23, 2021, https://www.fox5atlanta.com/news/gas-station-gunfire-leaves-2-dead-2-injured (accessed May 10, 2023).

p   Kristi Belcamino, "Seven Injured by Gunfire During a Night of Shootouts Across St. Paul," Twin Cities Pioneer Press, May 3, 2021, https://www.twincities.com/2021/05/02/seven-shot-and-injured-in-st-paul-in-night-of-shoot-outs/ (accessed May 10, 2023).

APPENDIX TABLE 1

## Non-Exhaustive Review of Defensive Gun Uses Likely Involving More than 10 Defensive Rounds (Page 4 of 4)

q   Neil Vigdor and Christine Hauser, "Gunman Who Killed 2 at Louisiana Gun Store Fired 32 Rounds, Sheriff Says," *The New York Times*, February 22, 2021, https://www.nytimes.com/2021/02/22/us/new-orleans-shooting-joshua-williams.html (accessed May 10, 2023), and Victoria Cristina, "Watch: Surveillance Video Shows Before, During Shootout at Metairie Gun Store," WGNO, updated February 23, 2021, https://wgno.com/news/local/watch-live-sheriff-lopinto-provides-update-on-metairie-gun-store-shooting/ (accessed May 10, 2023).

r   Ray Rivera, "Police Continuing Investigation into Gun Battle at Summerville Apartment Complex," Live News 5 WCSC, February 8, 2021, 10:13 p.m., https://www.live5news.com/2021/02/09/police-continuing-investigation-into-gun-battle-summerville-apartment-complex/ (accessed May 12, 2023).

s   Jose Quintero, "Hesperia Shootout Suspect Pleads Not Guilty to 5 Felonies," *Victorville Daily Press*, January 22, 2021, https://www.vvdailypress.com/story/news/2021/01/22/hesperia-shootout-suspect-pleads-not-guilty-5-felonies/6663407002/ (accessed May 10, 2023).

t   Liz Henderson, "El Paso County Hemp Grower Reports Gunbattle with Invaders Who Might Have Mistaken Plants for Marijuana," *The Gazette*, updated July 1, 2020, https://gazette.com/news/el-paso-county-hemp-grower-reports-gunbattle-with-invaders-who-might-have-mistaken-plants-for/article_f2f4083e-8bff-11ea-8f8d-83c959f9e23d.html (accessed May 10, 2023).

u   Glenn Puit, "DA: Fatal Shooting in Parking Lot Was 'Clear Case of Self-Defense,'" *Las Vegas Review-Journal*, May 4, 2020, https://www.reviewjournal.com/crime/homicides/da-fatal-shooting-in-parking-lot-was-clear-case-of-self-defense-2020768/ (accessed May 10, 2023).

v   WPLG Local 10, "Man Explains How He Shot, Killed Gunman in Miami," YouTube, November 25, 2019, https://www.youtube.com/watch?v=wvI-00hGtrA (accessed May 10, 2023).

w   ABC 27 WTXL, "Police: Tallahassee Homeowner Shot 2 Out of 4 Home Invasion Suspects, All 4 Charged," updated May 24, 2019, https://www.wtxl.com/news/local-news/tpd-investigating-home-invasion-robbery (accessed May 10, 2023).

x   Emily Reaux and Matt Dougherty, "3 Suspects Dead, Another Injured After Homeowner Opens Fire During East Houston Break-In," KHOU 11, January 19, 2019, https://www.khou.com/article/news/crime/3-suspects-dead-another-injured-after-homeowner-opens-fire-during-east-houston-break-in/285-29b21dcb-0f08-43bb-8d1e-6bd7d8b559e2 (accessed May 10, 2023).

y   Travis Fedschun, "Texas Homeowner Shoots, Kills 3 Men and Injures 2 During Home Invasion, Officials Say," Fox News, January 21, 2019, https://www.foxnews.com/us/Texas-homeowner-shoots-kills-3-men-and-injures-2-during-home-invasion-officials-say (accessed May 12, 2023).

LM331 ☎ heritage.org

## Show References                                               +

## *Authors*



### Amy Swearer
Senior Legal Fellow, Meese Center

# EXHIBIT 118

# Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation

**Mark W. Smith**[1]

**and**

**Dan M. Peterson**[2]

---

[1] Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law at the University of Oxford and a Presidential Scholar and Senior Fellow in Law and Public Policy at the King's College, New York City. Mr. Smith is the author of numerous academic and popular articles on the Second Amendment and is admitted to the United States Supreme Court.  Contact: msmith@tkc.edu

[2] Dan M. Peterson is an attorney whose practice focuses on the Second Amendment and firearms law. A graduate of the Harvard Law School, he is admitted to the United States Supreme Court and eight federal Circuit Courts of Appeals. Mr. Peterson has authored approximately sixty articles in journals and the popular press and is a Washington Fellow of the Claremont Institute.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................... 1

    A.    Corpus Linguistics 1.0: The *Heller* Court Rejects Anti-Gun Rights Arguments By Linguists Based On Word Counts. ................................................. 2

    B.    Corpus Linguistics 2.0: The Not So "New And Improved" Corpus Linguistics.... 5

    C.    The Corpora: Been There, Done That................................................ 10

    D.    Overview Of The Issues With Legal Corpus Linguistics ..................................... 15

II.    DEFICIENCIES WITHIN THE CORPUS MAY SERIOUSLY DISTORT THE RESULTS PRODUCED. ................................................. 19

    A.    The "Invisible Common Man"............................................................. 20

    B.    The Existing Corpora Are Incomplete And Do Not Include Many Key Texts. ... 22

    C.    Corpora Will Often Be Biased In Favor Of Newsworthy Facts And Against Important Traditions ......................................... 25

    D.    The Results Reported In Corpus Linguistics Briefs May Be Biased Due To Historical And Temporal Circumstances ...................... 26

    E.    The Choice Of A Particular Corpus May Affect Results ...................................... 30

III.    CORPUS LINGUISTICS SUFFERS FROM SERIOUS METHODOLOGICAL PROBLEMS AT ITS CORE ........................................................................... 31

    A.    The Frequency Hypothesis Is Unsound ................................................ 32

    B.    Because The Categorization Of Corpus Linguistics Results Are Subjective, The Supposed Scientific Conclusions Will Often Not Be Reproducible.............................................................. 46

    C.    Corpus Linguistics: Science Or Scientism?............................................ 56

IV.    PRACTICAL PROBLEMS IN CONSTITUTIONAL AND OTHER CASES ............... 59

    A.    Presentation Of Corpus Linguistics Arguments For The First Time On Appeal Will Often Leave Litigants With No Chance To Respond ................................... 59

    B.    Judges And Lawyers Do Not Have The Expertise Or Training To Conduct Corpus Linguistics Research, And Expert Testimony Is Required If The Results Of Such Research Are To Be Considered. ................ 62

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

C.  Performing Corpus Linguistics Analysis Is Unreliable, Time Consuming, And Expensive ................................................................................... 65

V.  THE LINGUISTS' BRIEFS FOCUS ON EMPTY WORD COUNTS WHILE IGNORING THE SUPREME COURT'S TEXT AND HISTORY TEST ...................... 67

A.  Far From Helping Originalism, Corpus Linguistics Detracts From The Proper Focus On Text and History ....................................... 67

B.  History Of Arms Regulation In The Colonies And Early Republic .................... 74

C.  In The Colonial And Founding Periods There Was A Continuous History Of Owning, Using, And Carrying Arms By Individuals ........................ 78

D.  Corpus Linguistics Ignores The Ideas Prevailing When The U.S. Was Founded  86

VI.  CORPUS LINGUISTICS HAS NOT BEEN BROADLY EMBRACED BY THE COURTS ................................................ 95

VII.  IN CORPUS WE TRUST? NOT LIKELY ...................................................... 99

VIII.  CONCLUSION ............................................................................ 104

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

## I.      INTRODUCTION[1]

In *District of Columbia v. Heller*,[2] the Supreme Court soundly rejected the argument raised by professors of linguistics in an *amicus* brief that word frequency counts could limit the Second Amendment's phrase "bear arms" to a solely military meaning as opposed to also including an individual right to carry arms for private purposes. A decade later, that argument has been resurrected in the form of "corpus linguistics," which involves computerized searches of large databases of texts called "corpora" to arrive at word frequency counts. Because "bear arms" appears most frequently in a military context in these searches, certain proponents of this method claim that the Second Amendment does not protect an individual right to carry arms but rather applies only to militia or military uses, and that *Heller* should be overruled.

This article seeks to examine those and related claims. In the end, these proponents have simply doubled down on the already rejected claim that the Second Amendment's meaning can be determined by word counts. While they have expanded the number of words counted, they have not cured any of the fatal flaws of the argument since Justice Scalia's opinion in *Heller* refuted it, and confirmed that the Second Amendment protects an individual right to keep and bear arms separate from militia service.

Because corpus linguistics relies on computerized searches of large bodies of texts in an attempt to determine the meaning of a disputed word or phrase, it has been touted as a way of

---

[1] The information presented here has been prepared for general information and scholarly research purposes only. It does not constitute legal or other advice, is not to be acted on as such, may not be current, and is subject to change without notice. The information presented here is provided "as is" without representation or warranty of any kind including as to suitability, reliability, completeness, applicability, merchantability, fitness, noninfringement, result, or any other matter. Any representation or warranty that might be otherwise implied is expressly disclaimed. Any user of any information herein assumes any and all risks associated with such use and shall hold harmless Professor Mark W. Smith and Dan M. Peterson and their respective affiliates in all respects. Your use of this information does not create an attorney-client relationship or any other relationship between you and Professor Smith or Mr. Peterson.

[2] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

1

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

discovering the "original public meaning" of constitutional terminology by searching historical corpora that contain texts from around the time of the Founding. Thus, it has sometimes attracted attention from scholars and judges who favor "originalism" in constitutional interpretation.

But the use of corpus linguistics in legal analysis is neither "scientific" nor "objective" as its proponents claim. As we demonstrate below, corpus linguistics fails as a "scientific" tool at every step of the process. Even if corpus linguistics were scientific and objective, it also suffers from practical and procedural flaws. Claims that corpus linguistics is an objective scientific analysis are further undercut by the potential for manipulation of corpora.

But most importantly, the methodology itself is a flawed approach to making judgments about constitutional meaning. History and tradition shed far more light on how the Founders viewed the right to carry arms than word counts possibly can. The ideas of the Founders about the source and nature of natural rights are also essential in determining whether they conceived the right to bear arms as narrowly limited to militia service.

The Second Amendment protects the most fundamental right that we have: the right to protect ourselves against deadly attacks. It is also a bulwark against tyranny, against leaving the people disarmed in the face of those intent on oppression. It is too important to be tinkered with by a mode of interpretation that fails to engage seriously the history, traditions, purposes, and ideas that underlie it.

### A. Corpus Linguistics 1.0: The *Heller* Court Rejects Anti-Gun Rights Arguments By Linguists Based On Word Counts

The Supreme Court's 2007 grant of *certiorari* in *District of Columbia v. Heller* "set off a media frenzy typically reserved for cases involving such culture-war touchstones as abortion,

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

affirmative action, and prayer in schools."[3] Since its 1939 decision in *United States v. Miller*,[4] the Court had not meaningfully addressed the Second Amendment, and never in its history had it robustly considered the nature and scope of the rights protected by it. In *Heller,* the Court faced for the first time a choice between two competing theories of what the Second Amendment protects: either an amorphous, unenforceable "collective" right to have and use arms solely for militia purposes, or an individual right, enforceable in court like other provisions of the Bill of Rights, to keep and carry firearms for self-defense and other lawful purposes. In *Heller,* the Supreme Court confirmed what most Americans have known throughout our history: that the Second Amendment recognizes and protects an individual right to arms for lawful purposes such as self-defense.[5]

 *Heller* generated a record 68 *amicus curiae* briefs,[6] including one filed by three professors of English and linguistics (the "*Heller* Linguists' Brief").[7] The *Heller* Linguists' Brief bears mentioning because it employed a methodology that purported to divine the meaning of "bear arms" in the Second Amendment by counting the number of times that phrase occurred in a military context.[8] In their brief, the professors and linguists stated that they had reviewed 115 different texts either written or published between 1776 and 1791 that used the term "bear arms,"

---

[3] Ilya Shapiro, *Friends of the Second Amendment: A Walk through the Amicus Briefs in D.C. v. Heller*, 20 J. ON FIREARMS & PUB. POL'Y 15 (2008).

[4] 307 U.S. 174 (1939).

[5] *Heller*, 554 U.S. at 582, 595, 630 (the Second Amendment protects "an individual right to keep and bear arms," the "core lawful purpose" is self-defense, and that individual right is "unconnected with militia service").

[6] Shapiro, *Friends of the Second Amendment* at 15.

[7] Br. for Professors of Linguistics and English Dennis E. Baron, Richard W. Bailey, and Jeffrey P. Kaplan in Support of Petitioners, *District of Columbia v. Heller*, No. 07-290, filed January 11, 2008 ("Heller Linguists' Br.").

[8] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

and concluded that 110 employed those words in a military context.[9] From this nose-counting, they argued that the meaning of "bear arms" in the Second Amendment concerned only bearing arms for militia or military purposes and did not protect a private, individual right to bear arms. The *Heller* Linguists' Brief thus lined up entirely with the views of numerous anti-firearms rights groups, who contend that the Second Amendment—unlike the rest of the Bill of Rights—protects only an alleged collective right.

The *Heller* court singled out this argument advanced by the linguists—a forerunner of corpus linguistics— and expressly and unequivocally rejected their approach.[10] As Justice Scalia wrote for the majority:

> Justice STEVENS … points to a study by *amici* supposedly showing that the phrase "bear arms" was most frequently used in the military context. See *post*, at 2828–2829, n. 9; Linguists' Brief 24. [But] the fact that the phrase was commonly used in a particular context does not show that it is limited to that context, and, in any event, we have given many sources where the phrase was used in nonmilitary contexts. Moreover, the study's collection appears to include (who knows how many times) the idiomatic phrase "bear arms against," which is irrelevant.

The Court's opinion continued:

> The *amici* also dismiss examples such as "'bear arms .. . for the purpose of killing game'" because those uses are "expressly qualified." Linguists' Brief 24. (Justice STEVENS uses the same excuse for dismissing the state constitutional provisions analogous to the Second Amendment that identify private-use purposes for which the individual right can be asserted. See *post*, at 2828.) That analysis is faulty. A purposive qualifying phrase that contradicts the word or phrase it modifies is unknown this side of the looking glass (except, apparently, in some courses on linguistics). If "bear arms" means, as we think, simply the carrying of arms, a modifier can limit the purpose of the carriage ("for the purpose of self-defense" or "to make war against the King"). But if "bear arms" means, as the petitioners and the dissent think, the carrying of arms only for military purposes, one simply cannot add "for the purpose of killing game." The right "to carry arms in the militia for the purpose of killing game" is worthy of the Mad Hatter. Thus, these

---

[9] *Heller* Linguists' Br. at 24.

[10] *Heller*, 554 U.S. at 584–89.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

purposive qualifying phrases positively establish that "to bear arms" is not limited to military use [footnote omitted].[11]

That the Supreme Court considered and then squarely rejected the arguments made in the *Heller* Linguists' Brief is not only telling but is actually dispositive of today's debate about what role, if any, corpus linguistics should play in the interpretation of the Second Amendment.

### B.  Corpus Linguistics 2.0: The Not So "New And Improved" Corpus Linguistics

In 2019, over a decade after the Supreme Court decided *Heller* and rejected the arguments made in the *Heller* Linguists' Brief, linguists were back at it in another Second Amendment case, *New York State Rifle & Pistol Association v. City of New York*.[12] Two *amicus* briefs were filed in that case by proponents of corpus linguistics.[13] We will never know the Supreme Court's response, if any, to these two briefs in the *NYSRPA* case because the Court vacated the decision by the Second Circuit on mootness grounds without reaching the merits.[14] But the *amicus* briefs filed in *NYSRPA* advocating the supposedly new science of legal corpus linguistics appear to be part of a recent effort to convince the courts to adopt this method of interpretation—particularly in Second Amendment cases.

So, what is corpus linguistics?

---

[11] *Heller*, 554 U.S. at 589.

[12] 140 S.Ct. 1525 (2020) (hereafter, "*NYSRPA*").

[13] Br. for Corpus Linguistics Professors and Experts as *Amici Curiae* Supporting Respondents, *New York State Rifle & Pistol Association v. City of New York*, No. 18-280, filed Aug. 12, 2019 ("NYSRPA Linguists' Br."); Br. of Neal Goldfarb as *Amicus Curiae* in Support of Respondents, *New York State Rifle & Pistol Association v. City of New York*, No. 18-280, filed Aug. 12, 2019 ("Goldfarb Br."). Goldfarb also sought to participate in oral argument, but the Court denied his motion. Motion of Neal Goldfarb for Leave to Participate in Oral Argument and for Divided Argument DENIED, *New York State Rifle & Pistol Association v. City of New York*, No. 18-280 (Oct. 15, 2019).

[14] *NYSRPA*, 140 S.Ct. at 1527.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

To start, we must define "linguistics." Simply, "linguistics" is the study of language.[15] Corpus linguistics as an academic field has been around for decades. It focuses on examining a large collection of digitized texts or other records of language use, called a "corpus," through computerized searches and analyses, as a way to determine the rules that govern various languages, to compare the structures of different languages, and to better understand patterns of language use.[16] Corpus linguistics seeks to apply the tools of "big data" to a database of text-searchable documents to reach purportedly objective answers about language meaning and use.

"Legal corpus linguistics" is a narrower application of corpus linguistics.[17] Legal corpus linguistics has received attention in recent years, largely in law reviews,[18] as a supposedly new, scientific tool for determining the meaning of words or phrases in constitutions, statutes, or other legal documents.[19] Legal corpus linguistics generally involves electronic searches of corpora for

---

[15] *See What is Linguistics*, BYU COLLEGE OF HUMANITIES, LINGUISTICS, https://linguistics.byu.edu/what-is-linguistics/.

[16] *See* GENA R. BENNETT, USING CORPORA IN THE LANGUAGE LEARNING CLASSROOM: CORPUS LINGUISTICS FOR TEACHERS 2 (Michigan ELT 2010).

[17] For the sake of brevity, "corpus linguistics" is used in this article to mean "legal corpus linguistics," which is the only subject under discussion here.

[18] Though corpus linguistics has generated significant scholarly discussion, its effect on case law to date has been quite limited, as discussed below.

[19] *See, e.g.,* Stephen C. Mouritsen, *Hard Cases and Hard Data: Assessing Corpus Linguistics as an Empirical Path to Plain Meaning*, 13 COLUM. SCI. & TECH. L. REV. 156 (2011); James C. Phillips, Daniel M. Ortner, & Thomas R. Lee, *Corpus Linguistics & Original Public Meaning: A New Tool To Make Originalism More Empirical*, 126 YALE L.J. FORUM (May 18, 2016); Lee J. Strang, *How Big Data Can Increase Originalism's Methodological Rigor: Using Corpus Linguistics to Reveal Original Language Conventions*, 50 U. CAL. DAVIS L. REV. 1181, 1184 (2017); Neal Goldfarb, *A Lawyer's Introduction to Meaning in the Framework of Corpus Linguistics*, 2017 BYU L. REV. 1359 (2018); Stefan Th. Gries and Brian G. Slocum, *Ordinary Meaning and Corpus Linguistics*, 2017 BYU L. REV. 1417 (2018); Hanjo Hamann and Friedemann Vogel, *Evidence-Based Jurisprudence Meets Legal Linguistics—Unlikely Blends Made in Germany*, 2017 BYU L. REV. 1473 (2018); Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 STAN. L. REV. 443 (2018); Jennifer L. Mascott, *The Dictionary as a Specialized Corpus*, 2017 BYU L. REV. 1557 (2018); Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788 (2018); Jake Linford, *Datamining the Meaning(s) of Progress*, 2017 BYU L. REV. 1531 (2018); James C. Phillips and Jesse Egbert, *Advancing Law and Corpus Linguistics: Importing Principles and Practices from Survey and Content Analysis Methodologies to Improve Corpus Design and Analysis*, 2017 BYU L. REV. 1589 (2018); Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 522 (2019); Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. PA. L. REV. 261 (2019); s*ee also* James C. Phillips and Josh

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

words or combinations of words, and categorization of the results by usage or by context, all in an attempt to determine the meaning of a word or phrase that is legally relevant in a particular case. Proponents of legal corpus linguistics state that it is "a *scientific* discipline" and that its primary goal "is to use methodological [sic] valid techniques in order to *discover objective reality*." (emphasis added)[20] They further claim that "[b]ecause so much of legal scholarship revolves around linguistic questions, corpus methods can be leveraged to provide *scientifically valid methods for learning objective reality* to answer those questions." (emphasis added)[21] Apparently, by christening the approach with a new, technical, and scientific-sounding name— "corpus linguistics"—the proponents of the method believe they have conferred scientific, objective validity on a method already rejected by the Supreme Court for its deficiencies.

For corpus linguistics or legal corpus linguistics to function, or even to exist, there must first be a corpus to search. The *NYSRPA* corpus linguistics briefs relied on searches of two corpora for appearances of single words or combinations of words.[22] In a manner similar to the

---

Blackman, *The Mysterious Meaning of the Second Amendment*, THE ATLANTIC (Feb. 28, 2020), https://www.theatlantic.com/ideas/archive/2020/02/big-data-second-amendment/607186/.

Most of these law review articles have been authored by proponents of corpus linguistics. There have been some recent articles, however, that are critical of corpus linguistics. *See, e.g.*, Carissa Byrne Hessick, *Corpus Linguistics and the Criminal Law*, 2017 BYU L. REV. 1503 (2018); John S. Ehrett, *Against Corpus Linguistics*, 108 GEO. L.J. Online 50 (2019); Donald L. Drakeman, *Is Corpus Linguistics Better than Flipping a Coin?*, 109 GEO. L.J. Online 81 (2020) (hereafter "Drakeman"); Kevin P. Tobia, *Testing Ordinary Meaning*, 134 HARV. L. REV. 726, 770 (2020).

[20] BYU Law, Law & Corpus Linguistics — Background (updated Oct. 8, 2019), https://lcl.byu.edu/projects/law-corpus-linguistics-background/.

[21] *Id.*

[22] The *Heller* Linguists' Brief relied chiefly on results reported in an article written by one of the named *amici* joining that brief. Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 509 (Spring 2019) (hereafter Baron, *Corpus Evidence*). That article was based on searches of two corpora made available by the J. Reuben Clark Law School at Brigham Young University ("BYU"). The first, the Corpus of Founding Era American English ("COFEA") contains about 120,000 texts. The second, Corpus of Early Modern English ("COEME"), has about 40,000 texts. The Goldfarb Brief, filed by attorney Neal Goldfarb on behalf of himself, relied on searches performed by him in the same two corpora. Although this article discusses in Part VII below the possibility or potential of manipulation of corpora to affect results, especially when the results of a search may influence the outcome of an intensely partisan or a hotly contested policy question, we do not assert that these corpora have been manipulated by Goldfarb, Baron, or anyone else.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

*Heller* Linguists' Brief, these two briefs categorized references to "arms," "bear," "bear arms," and related terms as appearing either in a military context or in a non-military context. For example, the Goldfarb Brief found that a search for the verb "bear" and the noun "arms" within four words of each other in those two corpora resulted in 531 hits (known as "concordance lines"); Goldfarb categorized 503 of these instances (almost 95%) as conveying a military meaning.[23] Of the remaining 28 lines, he classified two lines as consistent with *Heller*'s interpretation, but excluded them from being counted as being consistent because they were "metaphorical."[24] He considered fifteen lines to be "ambiguous" as to whether they were military or comported with *Heller*'s "ordinary meaning" test.[25] But he admitted that he categorized 11 lines (2%) as "unambiguously" using the term "bear arms" to mean "carry weapons" *outside* the military context, one of the meanings *Heller* found to be included in the Second Amendment's use of the phrase.[26] Similarly, the *NYSRPA* Linguists' Brief stated that "[o]ut of nearly 1,000 examined uses of 'bear arms' in 'seventeenth- and eighteenth-century English and American texts,' 'roughly 900 separate occurrences of bear arms before and during the Founding era'" had a military or collective context, and "only a handful of results from those corpora 'were either ambiguous or carried no military connotation.'"[27]

　　Even though legal corpus linguistics had not formally emerged as a new field of study or advocacy in 2008, the opinion in *Heller* thoroughly evaluated the *Heller* Linguists' Brief and just as thoroughly rejected it, including the linguists' argument that counting the number of uses of

---

[23] Goldfarb Br. at 21.

[24] Neal Goldfarb, COFEA & COEME: "bear arms" & "carry arms" (rev. July 31, 2019), available at http://bit.ly/Corpus2dAm (spreadsheet downloaded from folder 4) ("Goldfarb 'bear arms' spreadsheet").

[25] *Id.*

[26] *Id.*

[27] *NYSRPA* Linguists' Br. at 18–19.

8

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

"bear arms" in military as opposed to non-military contexts would be useful in determining the meaning of the Second Amendment.[28] The only meaningful difference between the *Heller* Linguists' Brief (filed in 2008) and the two briefs in *NYSRPA* (filed in 2019) is that the two *NYSRPA* briefs depended on locating the relevant words or terms by searching large, computerized corpora rather than by individually examining a smaller group of texts. But the analysis performed in the two *NYSRPA* briefs appears to be functionally identical to that performed some ten years earlier and emphatically rejected by the Supreme Court in *Heller*: categorizing the context in which the search results were found as either military or non-military, counting the results to determine which is the numerically dominant context, and concluding that the numerically dominant context determines what those words mean when used in the Second Amendment.

The Goldfarb Brief went so far as to contend that its findings mandated the reversal of *Heller*. The brief stated that it was filed "to bring [Goldfarb's] analysis to the Court's attention, and to urge that the Court decline to decide the Second Amendment issue in this case," and that "the issue should not be decided unless *Heller* is revisited first."[29] "[G]iven that *Heller* has been called in question," the brief warned, "it would be a mistake for the Court to continue applying *Heller*."[30] Goldfarb opined that his results were so important that "the need to reexamine *Heller* cannot be avoided," and "it would not be appropriate for the Court to decide any Second Amendment issues while *Heller*'s continuing validity is under a cloud of uncertainty."[31] The Goldfarb Brief contended that the corpus linguistics results presented there were so new and

---

[28] *Heller*, 554 U.S. at 584–89 (2008).

[29] Goldfarb Br. at 2.

[30] *Id*. at 5.

[31] *Id*. at 26.

9

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

compelling that, going forward, "it would probably be necessary to reexamine all prior scholarship that treated *bear arms* meaning 'carry weapons whether or not in the military' or 'carry weapons in the military.' (Which is just another way of saying 'most if not all prior scholarship.')."[32]

These are audacious claims, to say the least. But does the application of corpus linguistics to the Second Amendment really require re-examination of all prior scholarship on the subject, including *Heller* itself? It does not. Corpus linguistics is a flawed methodology, and its use is particularly unpersuasive in seeking to override a known history in which the right to carry arms privately and peacefully was unfettered during the Founding period and in the early American Republic. That pre-existing right was recognized and protected by the Second Amendment and various state constitutional guarantees. There was a long, unbroken history of widespread carrying of arms, and the right to carry arms for purposes of self-defense was considered a fundamental, natural right that could not be abrogated by any law of civil society. When compared to this longstanding, robust and well-documented history, counting up words sheds little or no light on the original public meaning of the Second Amendment.

### C.  The Corpora: Been There, Done That

As a threshold matter, advocates of corpus linguistics often claim that it is new. But is it really? In the Second Amendment context, at least, the materials relevant to determining the meaning of that amendment (*i.e.*, the contents of corpora) have been available for many decades, and often for centuries. The "big data" tools to count words or phrases may be relatively new, but that does not fundamentally change the analysis because it has been known since that amendment's adoption that the "right of the people to keep and bear arms" embraced both militia

---

[32] *Id*. at 28.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

or military meanings *and* non-military meanings. And the relevant texts in the corpora obviously have not changed in over 200 years.

The COFEA corpus, for example, used by both the Linguists' Brief and the Goldfarb brief in *NYSRPA*, is composed of the following collection of texts:

- Elliot's *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*
- Farrand's *Records of the Federal Convention of 1787*
- Founders Online (the papers of six Founders)
- a selection of HeinOnline documents from the relevant period
- United States Statutes at Large for the first five Congresses, and
- Evans Early American Imprints[33]

These sources have been widely available for many years and have long been used by scholars debating questions of constitutional interpretation.[34] Elliot's Debates was first published in 1836, and Farrand's Records was first published in 1911. The papers of the Founders have long been available in various editions. The Hein Online selection and the Statutes at Large merely reproduce basic legal documents from the Founding period.[35] In addition, works such as the

---

[33] At the time of this writing, the BYU webpage describing the COFEA project states that COFEA is composed of these six corpora. *See* https://lcl.byu.edu/projects/cofea. However, when one clicks on the "Corpus Info" tab for COFEA on the initial search interface page, the "corpus definition" also includes the Caselaw Access Project in addition to these six sources. *See* https://lawcorpus.byu.edu/cofea/concordances.

[34] The only possible exception is material taken from Evans Early American Imprints, which purports to contain the text of virtually every book, broadside, and pamphlet published in the colonies and early Republic from 1639 to 1800. *See* https://www.readex.com/products/early-american-imprints-series-i-evans-1639-1800. The full digitized version by Readex contains about 38,000 texts. *Id*. The portion of the Evans material contained in COFEA was obtained from the Michigan Text Creation Partnership. https://lcl.byu.edu/projects/cofea. *See* Evans Early American Imprints (Evans) TCP, https://textcreationpartnership.org/tcp-texts/evans-tcp-evans-early-american-imprints/. The portion included in COFEA consists of 2,646 texts and makes up nearly half of the number of words in that corpus. https://lcl.byu.edu/projects/cofea/. Evans Early American Imprints was begun in 1955, but was originally published in micro opaque form, requiring a specialized optical reader. All of the Evans documents have now been digitized by Readex, but that collection is expensive to purchase commercially.

[35] The HeinOnline collection is said to consist of "mostly session laws, executive department reports, and legal treatises.", https://lcl.byu.edu/projects/cofea/.

11

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

massive Documentary History of the Ratification of the Constitution,[36] and extensive online resources, have made primary source documents available to any researcher.

COEME also appears to contain little if anything that is new. According to Brigham Young University ("BYU"), COEME "cover[s] texts from 1475 – 1800 that were included in the Evans Bibliography, the Early English Books Online (EEBO), Eighteenth Century Collections Online (ECCO) corrected by the Text Creation Partnership (TCP) Evans Bibliography (University of Michigan)."[37] Of these, it appears that much of the relevant part of the Evans Bibliography is already in COFEA.[38] According to the University of Michigan, the Early English Books Online (EEBO) corpus traces:

> the history of English thought from the first book printed in English in 1475 through to 1700. The books in these collections include works of literature, philosophy, politics, religion, geography, history, politics [sic], mathematics, music, the practical arts, natural science, and all other areas of human endeavor. [39]

As a small sampling, EEBO contains works by "Erasmus, Shakespeare, King James I, Marlowe, Galileo, Caxton, Chaucer, Malory, Boyle, Newton, Locke, More, Milton, Spenser, Bacon, Donne, Hobbes, Purcell, Behn, and Defoe."[40] But of these, the writers whose works are likely to contain words or phrases relevant to legal interpretation or political philosophy (such as

---

[36] http://digital.library.wisc.edu/1711.dl/History.Constitution.

[37] *See* https://lawcorpus.byu.edu/.

[38] At the time of this writing, COFEA is said to contain 2,646 documents from the Evans Bibliography whereas COEME is said to contain 4,977 from that collection. https://lawcorpus.byu.edu/cofea/concordances;showCorpusDescription=true/search/; https://lawcorpus.byu.edu/byucoeme;showCorpusDescription=true/concordances/search. COEME extends back much further in history than the 1760-1799 period most often examined in the Second Amendment Supreme Court linguists' briefs.

[39] University of Michigan, Text Creation Partnership, https://textcreationpartnership.org/tcp-texts/eebo-tcp-early-english-books-online/

[40] *Id*.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Locke, More, Milton, Bacon, Defoe, and Hobbes) have long been available and been used to inform our understanding of the original meaning of Founding-era legal texts.

The Eighteenth Century Collections Online (ECCO), the final source of texts contained in COEME, is said by its commercial publisher to contain "every significant English-language and foreign-language title printed in the United Kingdom during the eighteenth century as well as thousands of important works from the Americas."[41] It is advertised as having 135,000 titles in Part I, and nearly 50,000 additional titles in Part II.[42] Apparently, COEME includes at most 2,473 of these titles, made available to BYU through the Michigan Text Creation Partnership.[43] Which of these 2,473 titles are included in COEME, how they were chosen, and how representative they might be of the universe of printed titles contained in the commercial version of ECCO, is unknown to us. Certainly, books printed in the United Kingdom and the Americas during the eighteenth century relevant to the Constitution and Bill of Rights have been examined by scholars for decades, indeed centuries. So, there is nothing new from that standpoint. As previously noted, the Evans Early American Imprints are already represented in COFEA and COEME, so there is also a substantial likelihood that for American titles in particular there will be some overlap between ECCO and the Evans documents.

Thus, most of the contents of these corpora have long been available to and researched by researchers and scholars. Only the convenience of the computerized search feature seems new.

---

[41] Gale.com, *Access newly discovered works and new holdings of eighteenth-century British publications*, https://www.gale.com/c/eighteenth-century-collections-online-part-ii.

[42] Gale.com, Eighteenth Century Collections Online, https://www.gale.com/primary-sources/eighteenth-century-collections-online

[43] University of Michigan, Text Creation Partnership, https://textcreationpartnership.org/tcp-texts/ecco-tcp-eighteenth-century-collections-online/.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

So how much marginal value is provided by this computerized search feature in the Second Amendment context? Very little. Modern scholarship on the Second Amendment, beginning around 1980, has been extremely thorough in combing through the relevant historical materials bearing on the Second Amendment's purpose, meaning, and interpretation. As long ago as 1997, Justice Thomas noted that, "[m]arshaling an impressive array of historical evidence, a growing body of scholarly commentary indicates that the 'right to keep and bear arms' is, as the Amendment's text suggests, a personal right."[44]

*Heller* was exceptional in its detailed collection of evidence regarding the meaning of the text and the history of the right to keep and bear arms—indeed, the majority's analysis of text and history extends for some 63 pages.[45] Most seminal Supreme Court cases interpreting the other provisions of the Bill of Rights have examined the historical, legal, and intellectual roots of those Amendments in far less detail than the sources for the Second Amendment have been scrutinized.[46]

---

[44] *Printz v. United States*, 521 U.S. 898, 939 n.2 (1997) (Thomas, J., concurring). Notable book length investigations include STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? (2021); STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGIN OF THE RIGHT TO BEAR ARMS (2008); JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994); STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS: FREEDMEN, THE FOURTEENTH AMENDMENT, AND "THE CONSTITUTIONAL RIGHT TO BEAR ARMS," 1866-1876 (2d ed. 2010); NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY, AND MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2d ed. 2017) (law school casebook). Law review articles are countless. *See, e.g.*, Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms"*, 49 LAW & CONTEMP. PROBS. 151 (1986); Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637 (1989).

[45] *Heller*, 554 U.S. at 574–636.

[46] *See, e.g. Everson v. Bd. of Ed.*, 330 U.S. 1, 8–16 (1947) (Court takes some nine pages to discuss the history and meaning of the Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 303–10 (1940) (approximately eight pages for the court's analysis of the First Amendment's free exercise clause, virtually none of which is historical); *Weeks v. United States*, 232 U.S. 383, 389–398 (1914) (application of Fourth Amendment exclusionary rule to search by federal officers; about ten pages for analysis, most of which concerns prior case law, with only a small amount of historical review); *Miranda v. Arizona*, 384 U.S. 436 (Jun. 13, 1966, reh. denied Oct. 10, 1966) (Fifth Amendment right to counsel and to remain silent; some very brief historical discussion at 459, 489); *New York Times Co. v. Sullivan*, 376 U.S. 254, 268–83 (1964) (applying First Amendment to state libel law with virtually no discussion of text or history); *Katz v. United States*, 389 U.S. 347, 351 (1967); *id.* at 360–62 (Harlan, J., concurring)

14

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Simply put, the collections of texts touted by the proponents of legal corpus linguistics appear to contain virtually nothing new. It appears that corpus linguistics' principal "contribution" in the Second Amendment context is to provide an excuse for courts to ignore entirely the legal history of the right to arms, the unbroken tradition in this country since its inception of having and using arms, and the *ideas* of the Founders and their intellectual forebears and instead rely only on rudimentary word counts. As discussed below, more data does not necessarily mean more valuable information or insight, or a scientifically rigorous analysis.

### D.  Overview Of the Issues with Legal Corpus Linguistics

Because the difficulties in applying corpus linguistics to resolve lawsuits are numerous, and of several different kinds, we provide a brief overview of those shortcomings before digging more deeply into specific issues. These deficiencies fall into four categories: 1) problems with compiling the corpus itself; 2) flaws with the methodological tools that are central to the corpus linguistics method; 3) practical obstacles to fair and effective use of corpus linguistics in constitutional litigation; and 4) the fundamental difficulty that observing and quantifying bare patterns of language use cannot supersede a genuine understanding of a  provision's text and history.

We begin with the potential problems with the corpus itself. Especially in corpora that are historical in nature, a corpus may not be representative of how the ordinary individual of that time period would have understood or used a particular word or phrase. The writing of elites may predominate, for example, and the common person may be nearly invisible in writings during the Founding period. Also, there is a potential bias in favor of newsworthiness: some events tend to

---

(articulating "reasonable expectation of privacy" test for Fourth Amendment based on precedent and policy considerations, with no discussion of textual or historical arguments); *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (adopting "imminent lawless action" test for free speech, based entirely on precedent, with no discussion of the First Amendment's text or history).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

be recorded (and find their way into a corpus) because they are unusual or important. Meanings concerning such events may be recorded disproportionately while equally common meanings or every day common uses may be recorded only rarely.[47] Similarly, some meanings or contexts may be the subject of much discussion during a particular period due to special historical and temporal circumstances, drowning out other meanings that are not being publicly discussed with as much frequency. To illustrate, the word "pandemic" as used in 2020 and 2021 would likely refer overwhelmingly to COVID-19, unlike the word's use in earlier years. And, obviously, the choice of corpora may affect results.

Next, we consider the difficulties with legal corpus linguistics' core methodological tools. One such problem affecting corpus linguistics in all cases, whether in ordinary litigation or constitutional litigation, is the process of categorization. When a search of a corpus reveals hundreds or thousands of hits, how does the researcher determine how each result is to be categorized when there are two or more competing meanings? Are there formal criteria to make that determination—as the methodology's claim to scientific objectivity would seem to require— or is the decision simply subjective? And how does one cull results that contain the words or phrases in question, but are irrelevant to the particular usage or meaning being examined? If these determinations are merely subjective, results among researchers will vary, and those results cannot accurately be called scientific.

A separate problem is called the frequency hypothesis, which essentially posits that the contextual meaning with the greatest number of hits is the meaning that must be adopted. But this hypothesis is contrary to what we know about language. Just because a corpus search returns

---

[47] For example, Americans today do not generally e-mail, text, or post about driving their motor vehicles even though a large percentage of Americans own and drive motor vehicles every day. Similarly, news outlets do not generally report on Sunday family drives but, rather, they report on car accidents, police chases, and other out of the ordinary events.

16

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

a greater number of hits that are categorized as having one meaning rather than another does not necessarily mean that the word or phrase *always* bears that meaning or that it has that meaning in the particular statute, document, or constitutional provision in question. Any attorney who has drafted a legal document recognizes that how a word is used in one document may be very different than how it is used in another legal document. This is a lesson that every first-year law student learns. Thus, the very fact that at least *some* instances in the corpora—even if a minority—bear an alternative meaning demonstrates that the majority meaning is *not* necessarily the meaning in any given instance or context. So, how does one make the leap from overall frequency to a particularized determination—especially using objective criteria readily replicable by other independent researchers? That is the unanswered question that is fatal to the linguists' claims that corpus linguistics is a superior—or even useful—method of constitutional interpretation.

Additionally—and crucially—there is a fundamental difficulty in squaring an approach that relies primarily or exclusively on "nose counting" with the traditional judicial tools used to determine original public meaning. Justice Barrett, before she was appointed to the Supreme Court, was thus correct when she observed that constitutional interpretation is not "a kind of mechanical exercise where you can look in … a corpus linguistics database to generate every answer."[48] What happens if corpus linguistics produces results at odds with accepted understandings and traditions going back to colonial times? For instance, the alleged distinction between the right of the people to bear arms (a) for militia purposes and (b) for private purposes such as self-defense or hunting, was utterly foreign to the intellectual universe of the Founders.

---

[48] The Federalist Society, *Showcase Panel II: Why, or Why Not, Be an Originalist?*, 69 CATH. U. L. REV. 683, 711 (Fall 2020).

17

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

In fact, claiming that the Second Amendment protects only a "militia" right, and not a private right, is a late twentieth and early twenty-first century contrivance.[49]

When one reviews the history of arms regulation in the colonies and in the early Republic, the idea that the Second Amendment was meant to protect a solely military right, and that there was no right to carry arms privately, is jarringly at odds with the laws existing then. Founding era laws imposed virtually no restrictions on the ownership or carrying of arms except when arms were misused. Complementarily, there were longstanding, deep traditions of private use of arms for lawful purposes, including for private self-defense.

Perhaps most importantly, the Founders were steeped in, and adopted themselves, the principles of Enlightenment thinkers who based their concepts of rights on natural law and reason. It would have been unthinkable to them that fundamental rights were to be determined by word counts. They viewed such rights as being inherent, God-given, natural rights, with the right to protect one's life being the "primary canon in the law of nature," which they believed and stated could not be taken away by any law of civil society.[50]

There are also major practical problems with using corpus linguistics in litigation. If it is introduced into the case by *amici* or judges rather than the parties—as has generally been the case in Second Amendment and most other cases so far—it presents major risks that parties may

---

[49] After enactment of the federal Gun Control Act of 1968, some federal courts upheld the provision banning firearm possession by felons on the basis that no individuals have Second Amendment protection. *United States v. Johnson*, 497 F.2d 548, 550 (4th Cir. 1974), was typical—it disposed of a Second Amendment challenge with a single sentence: "The courts have consistently held that the Second Amendment only confers a collective right of keeping and bearing arms which must bear a 'reasonable relationship to the preservation or efficiency of a well regulated militia.'" Yet the only court case cited was *United States v. Miller*, 307 U.S. 174 (1939), which made no reference to a "collective" right. Instead, the Supreme Court would later state, *Miller* "positively suggests, that the Second Amendment confers an individual right to keep and bear arms (though only arms that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia')." *District of Columbia v. Heller*, 554 U.S. 570, 622 (2008).

[50] John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 Masterpieces of Eloquence 2573 (Mayo W. Hazeltine, et al. eds., 1905).

18

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

be denied any effective ability to respond. When the theory is injected *sua sponte* by appellate judges, it risks not only depriving parties of the chance to respond, but such use also may be an improper encroachment on the adversarial system, a major tenet of which is that the parties should have the ability to shape their own case. Moreover, it is highly questionable whether judges or attorneys have the expertise to conduct and interpret corpus linguistics research. They are certainly not trained in such research. If corpus linguistics is indeed scientific and a method for discovering objective truths, then it should be subject to the same constraints as other fields that claim empirical validity, using expert testimony in conformance with the rules of evidence, and with the courts acting as gatekeepers under *Daubert* principles.[51] Of course, that would only add to the already high cost of American litigation.

A final consideration is the potential for bias in the corpora. While such manipulation may be of less concern in obscure or routine legal cases, it may be of substantial importance in cases involving political controversies, constitutional interpretations, or other socially charged issues. And the incentives to manipulate corpora will increase if partisans know that such manipulation could influence future court decisions.

## II.   DEFICIENCIES WITHIN THE CORPUS MAY SERIOUSLY DISTORT THE RESULTS PRODUCED

The difficulties with corpus linguistics begin at its very core—with the corpus itself. For multiple independent reasons, the construction of a corpus of texts is subject to inevitable and subjective biases and shortcomings that call into question the scientific validity of any search results arising therefrom.

---

[51] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) (under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

### A.  The "Invisible Common Man"

Corpus linguistic advocates sometimes present it as the ally of originalism in constitutional adjudication.[52] And certainly, it is part of the task of originalism, as noted by some of these advocates, to try to determine "the meaning the words and phrases of the Constitution would have had, in context, to ordinary readers, speakers, and writers of the English language, reading a document of this type, at the time adopted."[53] These advocates claim corpus linguistics aids this enterprise because corpora such as COFEA "have documents authored both by 'Founders' and by more 'ordinary,' 'average' folk."[54]

But does corpus linguistics really allow us to hear the voice of these ordinary, average folk; that is, the common man? There are strong reasons to believe it does not. Particular corpora may not be representative of speech or popular meaning at a particular time. During many phases of history, writing by educated elites will predominate. Four of the six collections that make up COFEA consist entirely of legal documents, records concerning Congress, or records of national or state conventions.[55] You will not hear the voice of the common man there, only the voices of legal and political practitioners and societal elites.

Of the remaining two collections within COFEA, one—the papers of the Founders Online—comprises documents penned by six of the most prominent men in the colonies and

---

[52] Thomas R. Lee & James C. Philips, *Data-Driven Originalism*, 167 U. PA. L. REV. 261 (2019).

[53] James C. Phillips, Daniel M. Ortner, & Thomas R. Lee, *Corpus Linguistics & Original Public Meaning: A New Tool To Make Originalism More Empirical*, 126 YALE L.J. FORUM (May 18, 2016) (citing Vasan Kesavan & Michael Stokes Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 GEO. L.J. 1113, 1118 (2003)).

[54] *Id*.

[55] These four are the HeinOnline documents, the Statutes at Large, Farrand's Records, and Elliot's Debates. The addition of the Harvard case law access materials tips COFEA even more toward a legal database containing the language of elites.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

early Republic.[56] The final component of COFEA—the Evans Early American Imprints—contains "advertisements, allegories, almanacs, autobiographies, ballads, bibles, captivity narratives, cookbooks, diaries, elegies, eulogies, hymns, imaginary voyages, narratives, novels, operas, plays, poems, primers, sermons, songs, speeches, textbooks, tracts, travel literature and many others."[57] While there is more diversity in these than in the legislative and legal materials, the average farmer in western Massachusetts in the 1700s likely did not write novels, poems, or operas, or have his diary published. Even if he did, he would not likely have written about common, ordinary everyday events such as carrying a firearm (just like we do not email or text routinely about ordinary activities such as brushing one's teeth, drinking coffee, or driving to work).

The reality is that none of these corpora genuinely captures the ordinary language spoken at the Founding by people who never recorded their daily actions, such as ordinary workers and tradesmen, frontiersmen and settlers, slaves, illiterate people, and Native Americans. As law professor Anya Bernstein has recognized, "[i]f we use COFEA to determine what a constitutional provision meant to people at the time of the Founding, we posit that the tiny minority this corpus represents—political superstars, lawmakers and government agents, a few legal scholars—is the speech community that gets to determine what the Constitution meant at the time."[58] Thus, the claim that corpus linguistics allows us to hear the voice of the common

---

[56] The six men are the first four Presidents (Washington, Adams, Jefferson, and Madison), together with Benjamin Franklin and Alexander Hamilton. It appears that some portion of the papers of John Jay may have been added to COFEA as well.

[57] Readex, Early American Imprints, Series I: Evans, 1639-1800, https://www.readex.com/content/early-american-imprints-series-i-evans-1639-1800.

[58] Anya Bernstein, *More than Words*, DUKE CENTER FOR FIREARMS LAW BLOG (July 7, 2021), https://firearmslaw.duke.edu/2021/07/more-than-words/.

21

Electronic copy available at: https://ssrn.com/abstract=3887060

man discussing ordinary activities using ordinary language, all to help us determine the original meaning of constitutional language, is largely illusory.

### B.  The Existing Corpora Are Incomplete and Do Not Include Many Key Texts

Advocates of legal corpus linguistics often pretend that the method is based on searches of idealized corpora, which comprehensively contain every relevant text across all relevant time periods and speech communities, allowing the researcher to "examine the use of [a] word … through time" and "across language genres, registers, and speech communities to determine whether the word has taken on some specialized meaning."[59] The existing corpora fall far short of this ideal. Indeed, the corpora most commonly used in the Second Amendment context—COFEA and COEME—do not include many of the historical texts that lawyers and historians, over the last several decades of debate over the right to keep and bear arms, have agreed are *the critical source-texts* for understanding the Second Amendment's original meaning. Whatever the utility of corpus linguistics in other fields, the fact that the best-available corpora do not include these key texts makes the method particularly unreliable in the context of the Second Amendment.

In some cases, these omissions result from the chronological limits on the corpora's scope. COFEA, for example, includes only texts from between 1760 and 1799, and while COEME reaches much further back in time—to 1475—it also ends in 1800. While the 40 years between 1760 and the end of the eighteenth century may be the most relevant, for originalists, as a matter of abstract theory, they are not the *only* relevant years—and in the Second Amendment context, many key texts were written in the early years of the nineteenth century when the

---

[59] Thomas R. Lee & Stephen C. Mouritsen, *The Corpus and the Critics*, 88 U. CHI. L. REV. 275, 349 (2021).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Founders were still active in the public scene.[60] For example, scholars have long relied on prominent Founder James Wilson's Lectures on Law as setting forth a widely influential exposition of the Second Amendment.[61] But because this work was published in 1804, it is not included in either COFEA or COEME. Similarly, the fact that Thomas Jefferson regularly traveled with pistols has been viewed by many as relevant to the Second Amendment's scope; but we only know that fact from an 1816 source that, because of its date, is excluded from these corpora.[62]

More fundamentally, however, COFEA and COEME are both missing many key texts that fall *within* their chronological coverage, simply because of the incomplete and fragmentary nature of these corpora. As described above, COFEA is principally composed of the records of the drafting and ratification conventions, the papers of a few Founders, some legal texts, and a collection of early-American books and pamphlets. As of July 13, 2021, both COEME and COFEA *do not* include several critical examples of "bear arms"—either because they fall outside of the databases these corpora draw from or because these underlying databases are themselves simply incomplete—including the following:

- Virginia's colonial requirement that "All persons whatsoever upon the Sabaoth daye shall frequente divine service both forenoon and afternoon, and all suche as **beare armes** shall bring their pieces swordes, poulder and shotte."[63]

- Maryland's similar colonial statue providing "Noe man able to **bear arms** to goe to church or Chappell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott." [64]

---

[60] *See Heller*, 554 U.S. at 605 (looking to "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification").

[61] *See* HALBROOK, *supra* note 100, at 191–92; Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373, 392 (2016).

[62] HALBROOK, *supra* note 100, at 198–99.

[63] LYON G. TYLER, NARRATIVES OF EARLY VIRGINIA, 1606–1625 273 (1907).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

- Roger Sherman's statement, on the floor of the First Congress, that it was "the privilege of every citizen, and one of his most essential rights, to **bear arms**, and to resist every attack upon his liberty or property, by whomsoever made."[65]

- Tench Coxe's statement on the proposed Bill of Rights that, "As civil rulers, not having their duty to the people, duly before them, may attempt to tyrannize, and as the military forces which shall be occasionally raised to defend our country, might pervert their power to the injury of their fellow-citizens, the people are confirmed by the next article in their right to keep and **bear their private arms**."[66]

- James Wilson's statement that, "the great natural law of self-preservation … is expressly recognized in the constitution of Pennsylvania. 'The right of the citizens to **bear arms** in the defence of themselves shall not be questioned.' This is one of our many renewals of the Saxon regulations. 'They were bound,' says Mr. Selden, 'to keep arms for the preservation of the kingdom, and of their own persons.' "[67]

- Texts relating to Britain's late eighteenth-century efforts to disarm Irish Catholics, including a 1795 arms confiscation law that provided authorization for magistrates to seize firearms possessed by any person "not qualified by law to **bear or carry arms**."[68]

- A statement in parliamentary debate by the Duke of Richmond denouncing orders to disarm citizens that he "considered as a violation of the constitutional right of Protestant subjects to keep and **bear arms** for their own defense."[69]

- In response, Earl Bathurst discussed "the right of **bearing arms** for personal defense."[70]

The fact that the two leading Founding-Era corpora do not include these references casts serious doubt on the reliability and usefulness of legal corpus linguistics in this context, and this in turn calls into serious question the value of the work of those corpus-linguistics practitioners

---

[64] Act of June 23, 1542, *in* WILLIAM H. BROWNE, ARCHIVES OF MARYLAND 103 (1885).

[65] STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 195 (2021) (quoting 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, 92–93).

[66] Stephen P. Halbrook & David B. Kopel, *Tench Coxe and the Right to Keep and Bear Arms, 1787–1823,* 7 WM. & MARY BILL OF RTS. J., 347, 367 (Feb. 1999).

[67] 3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON, L.L.D. 84 (Bird Wilson, ed. 1804).

[68] 35 Geo. 3, ch. 36, § 37 (1795).

[69] 49 THE LONDON MAGAZINE OR GENTLEMAN'S MONTHLY INTELLIGENCER 467 (1780).

[70] *Id.* at 468.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

who have made claims about the Second Amendment's meaning based on these incomplete corpora.[71]

### C. Corpora Will Often Be Biased In Favor Of Newsworthy Facts And Against Important Traditions

An additional problem with corpus linguistics is the selection bias of the databases included within the corpus. Let us imagine a typical database of newspapers. Newspapers report the *news*, which are generally recent, significant occurrences. An event reported as "news" is necessarily noteworthy in some way—a disaster, say, or an important or unusual event, such as an election or unexpected weather. The proverbial "Cat Stuck Up a Tree" is news. The ten million cats that return home safely every night will never be news and thus will never be recorded. Event news would be "23 Shot Over the Weekend in Chicago." The headline you won't see is: "300 Million Americans Slept Safely in Their Beds Last Night in Another Wave of Gun Non-Violence." This overwhelmingly larger event will never be recorded as news or in any news database.

This bias in favor of the newsworthy—over the ordinary or routine—has the potential to distort the understanding of the right to keep and bear arms reflected in the corpora used by corpus linguistics.[72] Instances of ordinary private citizens bearing arms for individual self-protection are not newsworthy and may rarely be recorded. What newspaper is likely to publish a story on each of the thousands of frontiersmen who left the family cabin every morning with musket in hand and used it to shoot game, or carried it with them to protect themselves against a

---

[71] Because Neal Goldfarb's analysis of the right to bear arms is drawn from COFEA and COEME, for example, the datasets he relied upon do not include any of these key passages. *See* Goldfarb Br. at 15.

[72] Plaintiffs-Appellants' Suppl. Br. at 13–14, 16, *Jones v. Becerra*, No. 20-56174 (9th Cir.), filed April 23, 2021. The *Jones* case is discussed further, *infra*.

25

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

criminal, Indian, or animal attack that never materialized?[73] Bearing or carrying of arms will not tend to be written about in that context.[74] But if the militia is called out, or a bloody battle occurs, or constitutional amendments are proposed, discussed, or adopted, or there is a need to debate and organize the relationship between the federal government and the state governments concerning militias, those things are newsworthy and more likely to be recorded and included in the corpora.

Courts have begun to recognize these fundamental difficulties, too. In a recent Sixth Circuit case, there were dueling concurrences about the propriety of using corpus linguistics to determine the meanings of certain terms used in the federal ERISA statute.[75] One of the concurrences, written by the author of the Court's opinion, expressed serious doubts about the utility and practicality of employing corpus linguistics for precisely the reasons identified above:

> [U]sing a corpus linguistics database will likely result in dozens, if not hundreds or thousands, of examples of a term's usage. How should courts make sense of all this information? First, we could count the number of times a term is used in the database (assuming appropriately selected parameters) and then decide that the most frequently used meaning is the ordinary meaning. But that approach would risk privileging the most *newsworthy* connotations of a term over its ordinary meaning.[76]

### D.  The Results Reported In Corpus Linguistics Briefs May Be Biased Due To Historical And Temporal Circumstances

More generally, a corpus may be biased simply because it draws sources from a particular era in time when certain subjects were under public discussion to a greater degree than

---

[73] During the oral argument in *Heller v. D.C.*, then-Justice Kennedy specifically noted the important of firearms for protecting early Americans and their families "against hostile Indian tribes and outlaws, wolves and bears, and grizzlies." Tr. of Oral Arg., *District of Columbia v. Heller*, No. 07-290 at 8 (Mar. 18, 2008), http://online.wsj.com/public/resources/documents/scotus-guns-20080318.pdf.

[74] *See* Plaintiffs-Appellants' Suppl. Br., *Jones*, *supra*, at 14–15.

[75] *Wilson v. Safelite Group, Inc.*, 930 F.3d 429 (6th Cir. 2019)

[76] *Id.* at 445–46 (Stranch, J. concurring) (emphasis added).

26

Electronic copy available at: https://ssrn.com/abstract=3887060

others.[77] That seems to be the case with the results in the *NYSRPA* linguists' briefs. During the years examined by the linguists (1760–1799), the colonists engaged in at least two major wars— the French and Indian War and the War of Independence—and then the citizens of the new Republic drafted, debated, adopted, and amended numerous state constitutions (some of which had right-to-arms provisions) and the federal Constitution. Thereafter, the citizenry held ratifying conventions on the Constitution. A number of states and commentators issued demands for a Bill of Rights, and those proposed amendments were discussed and ultimately ratified by the states. All of this prompted intense public discussion of such topics as standing armies and militias composed of the body of the people, as opposed to "select militias." And even after the conclusion of this constitutional ratification process, the First Congress debated and passed the first ten amendments to the Constitution, and the Second Congress also debated and passed what became the Militia Acts of 1792. Accordingly, many of the results of this discussion would also be recorded in documents associated with the ultimate laws, accounts of legislative debates, and other public records.[78]

By contrast, the individual right to keep and bear arms for private self-defense, unlike discussions about war or militia service, was not being widely debated during this period; it already existed in practice and was simply accepted and assumed.[79] Because there was no proposal to alter, shrink, or abolish the individual, private right to arms, there was no need to discuss publicly or debate that aspect of the right. Thus, a disproportionate count of uses of the

---

[77] *See* Plaintiffs-Appellants' Suppl. Br., *Jones*, *supra*, at 14–15.

[78] For example, in Goldfarb's spreadsheets many results concerning the bearing of arms had to do with what the laws were or should be with respect to, *e.g.*, Quakers who were "scrupulous of bearing arms," which people were capable of bearing arms, which ones should be excused from bearing arms, which ones were liable to bear arms, and similar subjects—all matters that would be discussed and publicly debated given the events and history of the Founding period.

[79] *See* discussion in Part V regarding the history and tradition of private ownership and carrying of arms, along with the natural rights conceptions of individual self-defense.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

word "arms" or the phrase "bear arms" in military contexts would not be surprising; indeed that outcome would be expected. But that nose-counting, which reflects only the *topics* that were being discussed then, does not nullify the unitary right to arms, and the private right aspect of it, recognized and protected by the Second Amendment.

Accordingly, if a corpus containing sources from this period contains a high number of references to bearing arms in a military context, that may simply be because *that's what people were talking about then*—not because this was the only accepted or widespread meaning of the phrase "bear arms" in the English language in that era. Rather than proving that "bear arms" always means carrying arms militarily, such a result would show only that the phrase appears more often in writings about armies and militias *in a time* when those things were frequently being discussed. That would hardly be surprising, given the historical context of the period in question.

Indeed, our own research of the COFEA, the corpus most used in the Second Amendment context, provides clear evidence of this kind of implicit bias. We searched COFEA for all texts containing the word "arms" (including all of the various forms of the word, such as "arm" or "armed") and then analyzed a random subset of 150 concordance lines, by coding each line based on whether the passage concerned the use of arms in the military or in militia service, or rather in some non-military context such as self-defense or hunting.[80] The results were overwhelming: fully 92 percent of passages using "arms" in the relevant sense involved armies, militias, or some other plainly military-related context. Only 2 percent of the relevant passages

---

[80] We obtained the random sample by using an online tool to generate a list of 150 random numbers between 1 and the total number of returns (36,272). We excluded duplicates and irrelevant usages of "arms" (such as those referring to limbs rather than firearms). The data underlying the results is attached to the end of this article.

28

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

concerned individual self-defense. We conducted searches for various synonyms of "arms" and obtained similar results:

- for the word "firearms," 59 percent of the relevant passages concerned the military, compared to 8 percent involving self-defense and 15 percent involving hunting;

- for the word "guns," 90 percent arose in the military context, 3 percent involved hunting, and no passages referred to individual self-defense;

- for the word "muskets," 91 percent involved military-related use, 1 percent involved self-defense, and another 1 percent involved hunting.[81]

These searches confirm what the basic historical facts discussed above suggest: because of the social context of late eighteenth-century America, the texts in the corpus discussing firearms overwhelmingly concern the topic that dominated the national conversation during this period: military matters. It is thus wholly unsurprising that a search for the phrase "bear arms" would return results that disproportionately use the phrase to describe carrying firearms for military purposes; this merely reflects the fact that *the vast majority of texts discussing firearms in this particular time and place were focused on the military*.

Combined with the faulty assumptions of the frequency hypothesis, discussed below, such bias has the potential to seriously distort the results of any corpus linguistics analysis. Take a word with various shades of meaning, such as "airplane." "Airplane" can refer to military aircraft, civilian jumbo-jets, and single-engine Cessnas. But as a recently-filed appellate brief has observed "[o]ne would expect that an analysis of the uses of this word in a corpus drawn from the writings of a nation enduring a period of total war would show that the word was predominantly used to refer to military aircraft—fighters, bombers and the like—rather than

---

[81] Each of these searches were conducted according to the same methodology described in the previous footnote, except for the search of "firearms," which only returned 29 concordance lines, all of which were analyzed. The data underlying each of these results is attached to the end of this article.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

civilian jumbo-jets or single-engine pleasure craft."[82] By corpus linguistics' lights, that would necessarily lead to the conclusion that the word "airplane" must mean only military aircraft, and that the handful of references to crop dusters and civilian airliners must be disregarded in determining what "airplane" means. But that is absurd; obviously, the various meanings possessed by a word like "airplane" do not simply evaporate during those periods when one particular usage of the word is employed more frequently than others because of the historical context.

### E.  The Choice Of A Particular Corpus May Affect Results

The *NYSRPA* Linguists' Brief acknowledged that searches for the contextual meaning of a word or phrase in different corpora may yield different results. For example, the brief noted that a search in Google Books in publications from 1760 to 1795 found that "bear arms" was used "in a collective rather than an individual sense" 67.4 percent of the time.[83] This is a much lower percentage than was found for collective/military uses in both *NYSRPA* briefs, which searched COFEA and COEME instead of Google Books. Given the various ways in which any given corpus may be skewed, that is not a surprise. But the result is that someone using the corpus linguistics method may well be able to predetermine the result through the choice of *which corpora to search*—destroying the method's claim to scientific objectivity.

Relatedly, searches in a given corpus may not be reproducible over time because the contents of the corpus, or the design of the search engines used, may change. For example, Baron reports that his search of COEME yielded 1,578 hits for the phrase "bear arms," but because

---

[82] *See* Plaintiffs-Appellants' Suppl. Br., *Jones, supra* at 15.

[83] NYSRPA Linguists' Br. at 21, citing Alison L. LaCroix, *Historical Semantics and the Meaning of the Second Amendment*, THE PANORAMA (August 3, 2018), http://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment/.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

COEME only allows the first 1,000 results to be viewed, he could not examine the other 578.[84] At the time of this writing, however, the BYU search engine interface for both COEME and COFEA allows only 500, not 1,000, results to be viewed.[85] It is unclear when this change was made. Moreover, an attempt to replicate Baron's search of COEME during the writing of this article returned 1,452 total hits for "bear arms," compared to Baron's 1,578. It is unclear if this resulted from a change in the search engine, in the corpus, or both, or for some other unknown reason. But what is clear is that Baron's search, executed just a couple of years ago, seems to be no longer replicable. Without safeguards against changing the contents of the corpora or modifying the manner in which the search engine works, one may question whether it is a suitable tool for the serious work of deciding constitutional cases.

### III.   CORPUS LINGUISTICS SUFFERS FROM SERIOUS METHODOLOGICAL PROBLEMS AT ITS CORE

As noted, the central premise of corpus linguistics is that if the word or phrase at issue is used with a particular apparent meaning in the majority of instances in the relevant context within a corpus, then this majority meaning must be the sense in which the word or phrase is used in the document, statute, or constitutional provision at issue. This assumption is known as the frequency hypothesis. Thus, the linguists' briefs filed in the *Heller* and *NYSRPA* cases count the number of search results in which "bear arms" (or combinations of "bear" and "arms" near each other) appear in a military context, compare that to the number of results that were non-military in nature, and then declare the former meaning the winner. But the frequency hypothesis that undergirds the entire endeavor is deeply flawed and fundamentally irreconcilable with the

---

[84] Baron, *Corpus Evidence* at 511, n.5.

[85] While a maximum of 500 results can be viewed in the online search interface, up to 100,000 can be exported. *See, e.g.*, Corpus of Founding American English, https://lawcorpus.byu.edu/cofea/concordances (select "Additional Options" and "Max Hits" for search interface, and "Export" and "Max # of Results to Export" for export).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

way human language works. And even if the hypothesis were plausible, corpus linguistics' claim to scientific objectivity would still be empty, due to the inherently subjective nature of the categorization and counting processes.

### A.  The Frequency Hypothesis Is Unsound

Even if a particular word or phrase—such as "bear arms"—is most often used to convey one meaning, it can also include one or more *other* meanings. Nor does it follow that the meaning of a word in a legal provision at issue is necessarily the same as the "majority" meaning and must exclude other meanings. When there are two meanings, it is a fallacy to conclude that a court must choose between those two meanings and accept only one of them as the only valid meaning. And, in fact, there is nothing at all incompatible between the Second Amendment's protection of bearing arms for militia purposes *and* for private purposes—the Founders confirmed that the pre-existing natural right to keep and bear arms "shall not be infringed." Justice Scalia, writing for the *Heller* Court, also found enough of the latter usages to indicate that "bear arms" included a private, non-militia right.[86]

A good example of including both meanings is the Supreme Court's *Muscarello* decision in 1998.[87] In that case, the issue was whether the statutory term "carries a firearm" was limited to carrying a firearm on one's person or also included carrying a firearm in a vehicle. The Court said it had:

> surveyed modern press usage, albeit crudely, by searching computerized newspaper databases—both the New York Times data base in Lexis/Nexis, and the "US News" data base in Westlaw. We looked for sentences in which the words "carry," "vehicle," and "weapon" (or variations thereof) all appear. We found thousands of such sentences, and random sampling suggests that many,

---

[86] *Heller*, 554 U.S. at 588 (noting that " 'bear arms' was frequently used in nonmilitary contexts," and citing Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?* 6 GEO. J.L. & PUB. POL'Y 511 (2008)).

[87] *Muscarello v. United States*, 524 U.S. 125 (1998).

32

Electronic copy available at: https://ssrn.com/abstract=3887060

perhaps more than one-third, are sentences used to convey the meaning at issue here, *i.e.,* the carrying of guns in a car.[88]

Even though the Court found that only about a third of the usages involved cars, it used that finding to support its conclusion that "carries a gun" could include carriage in a vehicle.[89] In a similar way, "bear arms" includes bearing or carrying them privately, not just in the militia.

It is simplistic to use corpus linguistics as a primary method of determining what the Second Amendment means when we already have a rich history of what the Founding generation understood about the right to keep and bear arms; when we know of the complete legal freedom to carry and bear arms that existed in the early Republic; when we are aware of the widespread traditions of bearing arms for private purposes; and when it is evident that the Founders conceived of their rights as natural rights, not a grant from government. This will all be explored in more detail below. So, to call for overruling *Heller* based on word counts alone is an extraordinarily cramped, mechanistic, and almost willfully blind method for interpreting our fundamental constitutional right to keep and bear arms.

To determine constitutional meaning, counting noses is not enough. Quality may be more important than quantity. But before turning to our history and the ideas of the Founders, a purely linguistic point is in order. We may wish to consider to whom some of the particular noses are attached.

Did the Founders themselves believe that the phrase "bear arms" included, as a matter of linguistic meaning, bearing arms by individuals for private purposes, such as hunting and self-defense? Let's ask them.

---

[88] *Id*. at 129.

[89] *Id*.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Thomas Jefferson (principal author of the Declaration of Independence) and James Madison (principal draftsman of the Bill of Rights) were both familiar with using the term "bear arms" in a non-military context, and together they employed that usage to include the individual use of a gun:

> Just four short years before he penned the first draft of the Bill of Rights, James Madison himself presented to the Virginia General Assembly, in October of 1785, a Bill for the Preservation of Deer drafted by Thomas Jefferson. The bill prohibited the hunting of deer under certain circumstances and ends with the following restriction:
>
> [A]nd, if, within twelve months after the date of the recognizance he shall bear a gun out of his inclosed ground, unless whilst performing military duty, it shall be deemed a breach of the recognizance, and be good cause to bind him a new, and every such bearing of a gun shall be a breach of the new recognizance and cause to bind him again.[90]

Here, "bearing a gun" included doing so for the private purpose of hunting and was expressly distinguished from doing so "whilst performing military duty.…"[91]

Tench Coxe, who was a friend of Madison, published an article in a New York newspaper analyzing the proposed Bill of Rights just two days after the text was made public in 1789. In what has been called "[p]robably the most comprehensive section-by-section exposition on the Bill of Rights to be published during its ratification period,"[92] Coxe's "Remarks" included the following statement:

---

[90] Cramer & Olson at 517 (quoting from Thomas Jefferson, A Bill for the Preservation of Deer (Oct. 31, 1785), in 2 The Papers of Thomas Jefferson 443, 444 (Julian P. Boyd, ed. 1950)).

[91] This example also undermines the claim made in an amicus brief by certain Corpus Linguistics Professors that "no corpus evidence from the founding indicated that 'bear' had an individualized connotation in the context of firearms generally," given the lack of instances of phrases such as "bear a rifle" or "bear a pistol." Br. of Corpus Linguistics Professors & Experts as Amici Curiae Supporting Appellees at 19–20, *Young v. Hawaii*, No. 12-17808 (9th Cir. June 4, 2020). "Bear a gun" in this bill is an example of "bear" having an individualized connotation in the context of firearms generally, the bill was associated with two of the most prominent founders, and it is included in the COFEA corpus.

[92] Stephen P. Halbrook & David B. Kopel, *Tench Coxe and the Right to Keep and Bear Arms, 1787–1823,* 7 WM. & MARY BILL OF RTS. J., 347, 367 (Feb. 1999).

34

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

> As civil rulers, not having their duty to the people, duly before them, may attempt to tyrannize, and as the military forces which shall be occasionally raised to defend our country, might pervert their power to the injury of their fellow-citizens, the people are confirmed by the next article in their right to keep and bear their private arms.[93]

Coxe here, too, was referring to a private right, not a militia right. Indeed, he envisioned the need for "the people" to oppose with "private arms" any attempts by government to tyrannize, including such attempts by government military forces. As noted by Halbrook and Kopel, "Coxe sent a copy of his essay to Madison along with a letter of the same date. Madison wrote back acknowledging 'Your favor of the 18th instant. The printed remarks inclosed in it are already I find in the Gazettes here [New York].' Madison approvingly added that ratification of the amendments 'will however be greatly favored by explanatory strictures of a healing tendency, and is therefore already indebted to the co-operation of your pen.'"[94]

Other Founders besides Madison and Jefferson used the phrase "bear arms" to mean carry arms in a private, individual, non-military capacity. Founder James Wilson was a delegate to the Second Continental Congress, signed both the Declaration of Independence and the U.S. Constitution, helped craft the latter document as a member of the 1787 Constitutional Convention, led the fight for ratification in Pennsylvania, engineered the drafting of the 1790 Pennsylvania Constitution, and thereafter was a law professor at the University of Pennsylvania and a Justice of the United States Supreme Court.[95] In his law lectures at the University, discussing the subject of homicide, he stated that homicide is authorized "when it is necessary

---

[93] *Id*.

[94] *Id*.

[95] JOHN R. VILE, THE CONSTITUTIONAL CONVENTION OF 1787: A COMPREHENSIVE ENYCYCLOPEDIA OF AMERICA'S FOUNDING, 839-840 (Clark, 2d ed. 2016); see also James Wilson, Encylopedia Britannica, https://www.britannica.com/biography/James-Wilson-United-States-statesman.

Electronic copy available at: https://ssrn.com/abstract=3887060

for the defence of one's person or house."[96] Basing that principle upon the natural law of self-preservation,[97] Wilson noted that this natural law principle "is expressly recognized in the constitution of Pennsylvania. 'The *right of the citizens to bear arms in the defence of themselves shall not be questioned*.' This is one of our many renewals of the Saxon regulations. 'They were bound,' says Mr. Selden, 'to keep arms for the preservation of the kingdom, and of their own persons.'"[98]

John Adams used the term "bear arms" concerning individuals and outside the military context. Following a regionwide famine, Bologna, Italy, was experiencing extensive intra-party strife, murders, and accusations in the late 1200s. So, the people elected a number of new officials who adopted measures that Adams believed were harsh and "inconsistent with liberty." As Adams described it, "In order to purge the city of its many popular disorders, they were obliged to forbid a great number of persons, under grievous penalties, to enter the palace; nor

---

[96] 3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON L.L.D. 84 (Bird Wilson ed. 1804).

[97] *See* discussion in Part V.D, below.

[98] 3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON, L.L.D. 84 (Bird Wilson ed. 1804) (emphasis added). Wilson cited to Article IX, Section 21 of the Pennsylvania Constitution, which read in full: "To bear arms. Sect. XXI. That the right of the citizens to bear arms, in defence of themselves and the state, shall not be questioned." PA Constitution, Duquesne School of Law, "Constitution of the Commonwealth of Pennsylvania – 1790," https://www.paconstitution.org/texts-of-the-constitution/1790-2/. The language in the Pennsylvania Constitution protecting the right of citizens to bear arms in defense of themselves *and* the state cuts strongly against interpreting bear arms as referring only to bearing arms in a militia or military setting. Goldfarb has argued that "it seems to me that it's inappropriate to assume that the use of bear arms without any modification would have been understood in the same way as the use of the phrase as modified in" state provisions such as this. Neal Goldfarb, *Regarding the Strength of the Corpus Evidence (and Noting Issues that the Evidence Doesn't Resolve)*, DUKE CENTER FOR FIREARMS LAW BLOG (July 13, 2021), https://firearmslaw.duke.edu/2021/07/regarding-the-strength-of-the-corpus-evidence-and-noting-issues-that-the-evidence-doesnt-resolve/. But it is eminently appropriate to assume that the unmodified phrase "bear arms" in the Second Amendment must *encompass* the meanings it had as modified in state constitutions. As *Heller* explained, "A purposive qualifying phrase that contradicts the word or phrase that contradicts the word or phrase it modifies is unknown this side of the looking glass (except, apparently, in some courses of linguistics)." 554 U.S. at 589; *see also id.* ([I]f 'bear arms' means … the carrying of arms only for military purposes, one simply cannot add 'for the purpose of killing game.' The right to 'carry arms in the militia for the purpose of killing game' is worthy of the Mad Hatter.").

36

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

was it permitted them to go about the city, nor to bear arms." Adams used the phrase with respect to "persons," not with respect to bearing arms as part of a military body.[99]

Founder Roger Sherman of Connecticut signed the Articles of Confederation, Declaration of Independence, and Constitution, and served as a representative and senator in the early sessions of Congress. During a congressional debate in 1790, Sherman stated that he:

> conceived it to be the *privilege of every citizen, and one of his most essential rights, to bear arms*, and to resist every attack upon *his liberty or property*, by whomsoever made. The particular states, *like private citizens*, have a right to be armed, and to defend, by force of arms, their rights, when invaded.[100]

Sherman used "bear arms" in reference to the right of an individual citizen to repel attacks on his own liberty or property. The right of states to be armed and to defend against attacks is analogous to the right of citizens to bear arms privately.

So, for Founders Madison, Jefferson, Wilson, Adams, and Sherman, the phrase "bear arms" expressly included carrying arms in a private and non-military context. Besides preparing the working draft of the Bill of Rights, Madison shepherded it through the First Congress. Sherman was appointed to a select committee to consider amendments, and even produced his own handwritten draft of proposed amendments.[101]

This understanding of "bear arms" by the Founders was not unique to America but was entirely consistent with usage in the British Isles in the eighteenth century. In early eighteenth century Ireland, Catholics were required to obtain a license in order to carry arms. Some were alleged to be carrying weapons under revoked or falsified licenses. Accordingly, a proclamation

---

[99] 2 JOHN ADAMS, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA 422 (London: 1787).

[100] STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 195 (2021) (quoting 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, 92–93).

[101] The Roger Sherman House, https://rogershermanhouse.com/2020/07/22/the-only-handwritten-draft-of-the-bill-of-rights-by-roger-sherman/.

37

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

was issued by the authorities "to Re-call all Licenses whatsoever to *bear arms* formerly Granted to any Papist in this Kingdom."[102] They could get new licenses, however, and such "Papists having the same, may *bear and keep such Arms* as shall be therein Inserted."[103] The proclamation employed the phrase "carry arms" several times and it was used interchangeably with "bear arms."[104] Obviously, the use of "bear arms" referred to individuals, not collectivities, and there is no hint that the licensed individuals would bear those arms for military purposes.

In 1793, an Act was passed by the Irish Parliament lifting various restrictions on Catholics, but not the prohibition on possession of arms. There was a carefully defined exception for wealthy Catholics who took an oath of allegiance to the king. But ordinary individuals remained prohibited, and an Act of 1795 concerning the city of Dublin "authorized magistrates to search places 'for concealed arms' and to seize firearms possessed by any person 'not qualified by law *to bear* or carry arms.'"[105] The qualification to bear arms applied straightforwardly to individuals, not in relation to military bodies or service.

Following the Gordon Riots in London in 1780,

the Duke of Richmond, Charles Lennox, regretted the failure of the magistrates, who were in charge of law enforcement, to suppress the riots and the use of the military in their place. He denounced the letters from Lord Jeffrey Amherst, commander-in-chief of the British army, ordering his forces "to disarm the citizens, who had taken up arms, and formed themselves into associations, for the defense of themselves and their properties. The letters he considered as a violation

---

[102] "Irish Catholics Licensed to Keep Arms (1704)," 4 *Archivium Hibernicum* 59, 64 (1915).

[103] *Id.* at 65 (emphasis added).

[104] *Id.*

[105] STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 85–86 (2021) (quoting from An Act for more effectually preserving the Peace within the City of Dublin, 35 Geo. 3, c. 36, § 37, Acts of the Parliament of Ireland (1795)).

Electronic copy available at: https://ssrn.com/abstract=3887060

of the constitutional right of Protestant subjects *to keep and bear arms* for their own defense."[106]

The British constitutional right of Protestant subjects to keep and bear arms for their own defense is a purely individual right; the statute in question makes no mention of a militia.[107]

Earl Bathurst, President of the Privy Council, disagreed and "stated the difference between *the right of bearing arms for personal defense*, and that of bodies of the subjects arraying themselves, without a commission from the king; the latter he declared to be unlawful."[108] Earl Bathurst and the Duke of Richmond may have differed as to the right to assemble for armed defense, but they agreed linguistically and constitutionally that there was a right to bear arms for personal defense, independent of any militia connection.

In 1780, the Recorder of London (a judge and legal advisor to the City) issued an opinion on group defense that occurred during the Gordon Riots. That opinion, as quoted in a later publication, stated:

> The right of his majesty's Protestant subjects, to have arms for their own defense, and to use them for lawful purposes, is most clear and undeniable. It seems, indeed, to be considered, by the ancient laws of this kingdom, not only as a *right,* but as a *duty*; for all the subjects of the realm, *who are able to bear arms*, are bound to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace. And that this right, which every Protestant most unquestionably possesses, *individually,* may, and in many cases *must,* be exercised collectively, is likewise a point which I conceive to be most clearly established by the authority of judicial decisions and ancient acts of parliament, as well as by reason and common sense.[109]

---

[106] 49 *The London Magazine or Gentleman's Monthly Intelligencer* 467 (1780) (quoted in STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 89 (2021) (emphasis added)

[107] English Bill of Rights, 1 W. & M., 2d sess., c. 2 (1689).

[108] 49 *The London Magazine or Gentleman's Monthly Intelligencer* at 468.

[109] William Blizard, *Desultory Reflections on Police: With an Essay on the Means of Preventing Crime and Amending Criminals* 59–60 (1785) (emphasis regarding "able to bear arms" added).

39

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Again, we see that "bear arms" can and did mean the right to carry weapons for personal self-defense and for performance of civic duties, apart from any organized military body. Linguistically, the private carrying of weapons was included in the phrase "bear arms" and its variations and, as these quotations reveal, the English constitutional right to arms was considered to be an individual, private right, not a collective, military one.

Critically, of these nine contemporaneous usages of "bear arms" in an individual, not collective, sense, the corpus searches by Goldfarb of COFEA and COEME picked up only *one* of these quotes (the Adams quote, perhaps the least important of them all). Goldfarb classified it as "ambiguous."[110] These results are thus illustrative of several of the issues with corpus linguistics discussed above. The Wilson lecture, for example, is in neither COFEA nor COEME because the lectures were published just outside of the date range of the databases. The Jefferson and Madison bill is in COFEA, but because it uses the phrase bearing of a *gun* rather than bearing of *arms*, it apparently did not turn up in Goldfarb's searches. The remaining sources—the statements by Founders Wilson, Sherman, and Tench Coxe expressly expounding on the constitutional meaning of "bear arms" and the four quotes from Great Britain also discussing the right to bear arms—are simply absent from COFEA and COEME.  In a recent brief, corpus linguistics professors argue that the *Heller* Court was wrong "based on the paucity of the extant historical record" and that, since *Heller*, corpus linguistics researchers "have discovered a voluminous body of evidence reinforcing the collective, militaristic meaning of 'bear arms.'"[111] Perhaps it would be more accurate to say that corpus linguistics has "discovered" a body of evidence of dubious utility, and that it has missed key, contemporaneous expositions by

---

[110] Goldfarb 'bear arms' spreadsheet, tab 2, line 519.

[111] Br. of Corpus Linguistics Professors and Experts as Amici Curiae Supporting Appellees at 14, *Young v. Hawaii*, No. 12-17808 (9th Cir. June 4, 2020).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

knowledgeable individuals of the meaning of the right to bear arms, proving that it was understood to be an individual right.

Goldfarb has argued "that by the end of the 1600s, *carry* had replaced *bear* as the verb generally used to convey the meaning 'carry.'"[112] That would be news to Samuel Johnson, the most eminent lexicographer of the eighteenth century. In 1755, Johnson provided thirty-seven definitions under the word "bear" as a verb. Of those, the first six defined "bear" to mean "carry" in various contexts. But even if Goldfarb's contention were true, it would not help answer what the word bear, *when used*, meant in the eighteenth century. As Goldfarb himself admits and as Johnson and the examples cited above confirm, bear could be used to mean carry then. Indeed, in other contemporary dictionaries, carry is a main definition of the verb bear.[113]

Words can obviously embrace two or more meanings. This phenomenon is so commonplace as to hardly be remarkable. One need only browse through a page in the dictionary to see that virtually any commonly used word has more than one meaning. Consider the words book, fan, hoop, and punt. All have multiple valid meanings. "Book" as a noun can mean the written and bound publication, or as a slang verb can mean to move urgently ("book it") or to charge a criminal ("book 'em, Danno"), or to make a reservation at a hotel ("book a reservation"). "Fan" can refer to the device for blowing air or an enthusiast of some person or activity. "Hoop" can denote a circular band to hold together the staves of a barrel or cask or can refer to a basketball hoop (or the plural "hoops" can refer to basketball generally). "Punt" can refer to a shallow-draft boat propelled by a long pole, or the act of kicking an American football

---

[112] Br. of Neal Goldfarb as Amicus Curiae in Support of Respondents at 12, *New York State Rifle & Pistol Ass'n, Inc. v. Corlett*, No. 20-843 (Feb. 12, 2021).

[113] *See* N. BAILEY, AN UNIVERSAL ETYMOLOGICAL DICTIONARY (22d ed. 1770); 2 J. ASH, THE NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1795); T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1796).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

after dropping it. These multivocal words ordinarily cause no trouble because speakers or readers conversant with a language can discern from *context* which particular meaning is being used in a given instance. Readers familiar with the English language, for example, know from context that in Shakespeare's famous line "I wasted time, and now doth time waste me",[114] the words "waste" (and "wasted") are being used to express two distinct and different meanings, a feature of language that Shakespeare is known for exploiting to great literary effect.

Not only do most words have more than one accepted meaning but, importantly, the applicability of any given meaning to a particular use of the word cannot be determined simply by counting words. In any random sample of modern American-English discourse—much less a sample that may be biased in the ways discussed in the previous section—the word "hoops" is more likely to mean basketball than circular bands for holding barrel staves together. "Punt" is more likely to mean the act of kicking a football than a shallow-draft boat. That is because modern discourse is much more likely to be about basketball and football than barrel components or boats floating near Oxford. So too, the evidence cited by proponents of legal corpus linguists demonstrates at most that the phrase "bear arms" is *sometimes*, or even perhaps *most often*, used in a military context—not that it is limited to that context.

A recent concurring opinion by Justice Alito makes a similar point. In debating the use of the series-qualifier canon—the presumption that a modifier at the end of a "parallel construction that involves all nouns or verbs in a series ... normally applies to the entire series"— Justice Alito noted that the validity of that canon as a genuine description of linguistic usage "is an empirical question," and suggested that "a corpus linguistics analysis" might show whether "the percentage of sentences" using series qualifiers in the way described by the canon is "high enough to justify

---

[114] WILLIAM SHAKESPEARE, THE LIFE AND DEATH OF KING RICHARD THE SECOND, act 5, sc. 5, 2. 49.

42

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

the canon."[115] But when it comes to determining whether a particular sentence's meaning accords with the canon, Justice Alito explained, judges must ask how "a reasonable reader, fully competent in the language, would have understood the text at the time it was issued," not simply apply "inflexible rules."[116] When *Matthew* 26:75 says that St. Peter "went forth and wept bitterly," Justice Alito observed, "[n]o one familiar with the English language would fail to understand" that "bitterly" qualifies "wept" but "does not suggest that he went forth bitterly," "even though its meaning is contrary to the one suggested by the series-qualifier canon."[117] Accordingly, "no matter how" a corpus linguistic analysis of patterns of usage "broke down," Justice Alito concludes, "that is not what matters," since a court's job is to determine "the sense of the matter" not engage in "a technical exercise ... [of] mechanically applying a set of arcane rules."[118]

The frequency hypothesis suffers from other problems as well. For example, there is the difficulty of determining what frequency of meaning—if any—suffices for one to conclude that that meaning must apply to the particular example in question. "Is it sufficient if 99% of instances go one way but the alternative meaning is nonetheless used in the remaining one percent? 85 percent? 50.1 percent? A plurality when there are several different available meanings?"[119] After all, as just shown, if the search results contain even a few of the less frequent usages, that usage may well be included in the one the Framers or ratifiers intended—

---

[115] *Facebook, Inc. v. Duguid*, 141 S.Ct.1163, 1169, 1174–75 (2021).

[116] *Id.* at 1175.

[117] *Id.* at 1174.

[118] *Id*. at 1175.

[119] *See* Plaintiffs-Appellants' Suppl. Br., *Jones, supra*, at 12–13.

Electronic copy available at: https://ssrn.com/abstract=3887060

and indeed, as with the Second Amendment, there may be other, non-corpus evidence to indicate that was their likely intent or understanding.[120]

Even where a usage does not occur *at all* in a particular corpus, other evidence may conclusively demonstrate that it is the correct one in context. For example, "in some corpora, there are no examples of airplanes being referred to as 'vehicles.'"[121] Yet survey evidence shows, unsurprisingly, that ordinary language users consider an airplane to be a "vehicle" by large margins.[122] Similarly, "[t]he blue pitta is a bird found in Asia but not North America. It is no less a bird, and we are no less comfortable calling it a bird just because is does not appear in corpora of American English."[123]

Responding to these examples, in an amicus brief proffered to, but rejected by the Ninth Circuit, Goldfarb has argued "that it is doubtful that questions such as whether a blue pitta is a bird or an airplane is a vehicle present issues of word meaning at all," because "it makes little sense to say that *bird* has a different meaning for each avian species, or that *vehicle* has separate meanings for cars, trucks, airplanes, and whatever else it might be applied to."[124] But the same, of course, could be said for "bear arms" once it has been determined—as Goldfarb concedes— that at the Founding the phrase could be used to describe both carrying arms in a military or

---

[120] The frequency hypothesis may also not correspond to how the public would understand a word or phrase in the Constitution: "[h]ow often a term appears in newspapers, magazines, or other publications is a separate inquiry from how members of the public would understand that term when used in a statute" or the Constitution." Defendants-Appellees' Supplemental Brief at 18 (quoting Carissa Byrne Hessick, *Corpus Linguistics and the Criminal Law*, 2017 B.Y.U. L. REV. 1503, 1509 (2017).

[121] Kevin P. Tobia, *The Corpus and the Courts*, U. CHI. L. REV. ONLINE (Mar. 21, 2021), https://bit.ly/3sgE1WB.

[122] Kevin P. Tobia, *supra* note 19, at 770.

[123] Lawrence M. Solan & Tammy Gales, *Corpus Linguistics as a Tool in Legal Interpretation*, 2017 BYU L. REV. 1311, 1315.

[124] Reply Br. of Neal Goldfarb as Amicus Curiae in Support of Neither Party, Responding to the Parties' Suppl. Brs. and Taking No Position as to Affirmance or Reversal, at 4 n.11, *Jones v. Becerra*, No. 20-56174 (9th Cir.), filed May 3, 2021; *see* Order, *Jones v. Becerra*, No. 20-56174 (9th Cir. May 4, 2021). The 9th Circuit also denied Goldfarb's motion to participate in oral argument. *See* Order, *Jones v. Becerra*, No. 20-56174 (9th Cir. Apr. 27, 2021).

44

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

militia setting and for personal use.[125] Thus, by Goldfarb's own logic, it makes little sense to say that "bear arms" has a different meaning depending on the purposes for which arms are borne. And if that is the case, then Goldfarb's entire critique of *Heller* falls apart, and tools other than corpus linguistics—such as history and tradition—are needed to determine the scope of the Second Amendment right.[126]

University of Notre Dame Professor Donald Drakeman has strongly urged that interpretation of the results to determine "objective public meaning" requires "a *sound theory* for supporting only one of two or more competing meanings if more than one usage has been identified in the dataset."[127] He contends that "[w]e currently lack a theoretical justification for the rule that constitutional meaning must be equated with the most frequent usage…. Constitutional corpus linguistics theorists employing the frequency thesis need to construct a persuasive argument for why constitutional meaning cannot be found in bona fide, well-attested usages simply because another usage occurs more frequently in documents having nothing to do with the Constitution."[128]

Rather than defending the frequency hypothesis, two leading advocates of legal corpus linguistics have recently *disavowed* any "approach that merely seeks to determine the most

---

[125] Goldfarb Brief at 21; *see also* Neal Goldfarb, *Regarding the Strength of the Corpus Evidence (and Noting Issues that the Evidence Doesn't Resolve)*, DUKE CENTER FOR FIREARMS LAW BLOG (July 13, 2021), https://firearmslaw.duke.edu/2021/07/regarding-the-strength-of-the-corpus-evidence-and-noting-issues-that-the-evidence-doesnt-resolve/ (acknowledging that "*bear* was sometimes used to denote the kind of carrying that the Court had in mind").

[126] For similar reasons, Professor Baron attacks a straw man when he says that "[t]oday's Supreme Court majority may cling to the myth that *bear arms* has nothing to do with soldiering." Dennis Baron, *Corpus Linguistics, Public Meaning, and the Second Amendment*, DUKE CENTER FOR FIREARMS LAW BLOG (July 12, 2021), https://firearmslaw.duke.edu/2021/07/corpus-linguistics-public-meaning-and-the-second-amendment/. That certainly was not the *Heller* majority's view, as the Court expressly acknowledged that bear arms had "various meanings (*one of which is military*)." *Heller*, 554 U.S. at 589 n.11 (emphasis added).

[127] Drakeman at 85 (emphasis added).

[128] Drakeman at 97–98.

45

WORK IN PROGRESS

common sense of a word and then labels that sense the ordinary meaning."[129] In the same article, the authors expressly concede that the fact that a "use … is not reflected in a corpus (or is even only uncommonly reflected)" does *not* mean that it "cannot fall within the ordinary meaning of a studied term."[130]

Goldfarb, for his part, has defended the frequency hypothesis by arguing that if courts are looking for a term's ordinary meaning, that ordinary meaning will be reflected by "what happens most of the time."[131] But as we have explained, there are a multitude of factors independent of meaning that could affect the frequency with which a particular term shows up in a particular corpus. Thus, even on the wooden view posited by Goldfarb, simply counting hits for what "happens most of the time" in a corpus would not establish a word's ordinary meaning.

The frequency hypothesis—that if one meaning of a word or phrase is numerically dominant, then it must have that meaning in the document under examination—is a most shaky hypothesis and lacks the force to overturn centuries-old understandings of fundamental constitutional principles.

### B. Because The Categorization Of Corpus Linguistics Results Are Subjective, The Supposed Scientific Conclusions Will Often Not Be Reproducible

In addition to the fundamental difficulties with the "frequency hypothesis," the methods used in legal corpus linguistics *to determine* which usage of a word or phrase is the more frequent one are themselves beset by problems that vitiate their claim to scientific objectivity.

---

[129] Lee & Mouritsen, *supra* note 59, at 342.

[130] *Id.* at 334.

[131] Proposed Reply Br. of Neal Goldfarb as Amicus Curiae in Support of Neither Party, Responding to the Parties' Suppl. Brs. and Taking No Position as to Affirmance or Reversal, at 3, *Jones v. Becerra*, No. 20-56174 (9th Cir.), filed May 3, 2021.

46

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Consider the difficulties inherent in arriving at the relevant universe of instances of a word or phrase in question. Depending on the particular search, frequently there will be results that are simply irrelevant to the question to be determined in the legal dispute at hand. For example, more broadly worded searches including the words "bear" and "arms" may return results involving heraldry, where "arms" is used in connection with coats of arms. Results could even be a product of zoology or hunting, including literally the arms of a bear. But determining which results are relevant will often be subjective and discretionary. How are these to be culled out in a way that is replicable? As noted by the concurrence in the Sixth Circuit's decision in *Wilson*, irrelevant results might:

> require the court to perform this culling process itself.... But by what metric would we make that choice? ... Such choices would require highly subjective, case-by-case determinations about the import and relevance of a given source. Textualists have long advised us to forgo that interpretive method. *See, e.g., Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment) ("The legislative history of [this] Act contains a variety of diverse personages, a selected few of whom—its 'friends'—the Court has introduced to us in support of its result. But there are many other faces in the crowd, most of which, I think, are set against today's result."). Legislative history tells us, at a minimum, how some of the statute's authors understood a term; corpus linguistics does not offer even that insight. (citation omitted)[132]

In addition, how does one determine alleged duplicates? If a single *Associated Press* story appears in a thousand newspapers or websites, is that a single occurrence or a thousand?[133] Depending on the issue, one might make a case for either approach.

Probably the central difficulty is in determining the criteria that are used to *categorize* the results once they have all been collected. If it is merely the judgment of the researcher, results will be subjective and will not be able to be duplicated, even if a second researcher entered the

---

[132] *Wilson v. Safelite Group, Inc.,* 930 F.3d. 429, 446 (6th Cir. 2019) (Stranch, J., concurring).

[133] The AP actually has about 1,300 members and affiliates. 2017 Consolidated Financial Statements, the Associated Press and Subsidiaries at 6, https://www.ap.org/about/annual-report/2017/ap-financials-2017.pdf.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

exact same search terms.[134] Even with voluminous amounts of so-called empirical and objective data available, corpus linguistics necessarily requires the intervention of subjective human judgments to categorize it. Neither the *NYSRPA* Linguist's Brief nor the Goldfarb Brief revealed any criteria other than Baron's and Goldfarb's subjective intuition regarding how the search results were classified as military or non-military.

As noted above, the *NYSRPA* Linguists' Brief quotes from a recent study that searched Google Books for "bear arms," and found that "bear arms" was used 67.4 percent of the time in a collective rather than an individual sense.[135] According to that brief, this result included using that phrase "in a collective sense with a plural subject (*e.g.,* 'Slaves were not permitted to bear arms'), as well as using the phrase in a collective sense with a singular subject (*e.g.*, 'when a slave was made free, a spear was put into his hand, and he was thenceforward permitted to *bear arms*, and subjected to military services").[136]

This illustrates the problem of categorization. Here the researcher chose to categorize "Slaves were not permitted to bear arms" as having a "collective" meaning. Why? What is there about this last sentence that carries a collective meaning? It can just as easily be read to mean that individual slaves were not permitted to carry firearms. The plural subject does not make the right or action a collective one. The sentence "the fourteen defendants appearing before Judge Jones last Friday pled guilty" does not mean they did so collectively.

---

[134] Indeed, it may be the case that the same researcher might not be able to replicate his own results years later as he may categorize results differently in 2025 than he did in 2021.

[135] Linguists' Br. at 21, citing Alison L. LaCroix, *Historical Semantics and the Meaning of the Second Amendment*, THE PANORAMA (August 3, 2018), http://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment/.

[136] *Id*. at 21–22.

48

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

The *NYSRPA* Linguists' Brief provides further examples of this difficulty. The brief states that of the seven "non-military" hits, all but one "are at best ambiguous, as they appear in contexts suggesting a military or quasi-military sense of bearing arms."[137] Here are three of these hits:[138]

> "'That no person shall use or *bear any Arms* within London, and the Suburbs, or in any place between the said City and Pallace of Westminster, nor in no other part of the Pallace by Land or by Water, except such of the Kings people, as he shall appoint to keep the Kings peace.' [1657]."[139]

What makes this passage "military or quasi-military" in nature? The subject here is singular ("person"), and this paragraph straightforwardly describes a ban on using or bearing arms in specified localities. There is no hint of collective or military action.

> "'[The 1689 Bill of Rights] asserted the freedom of election to parliament, the freedom of speech in parliament, and the right of the subject to *bear arms*, and to petition his sovereign.'[1771]."[140]

This quote refers to the *right of the subject* (singular) to bear arms, along with several other civil liberties. There is nothing collective about it, and again, there is no mention of military action, actual or proposed.

> "'That every Person who will go for Ireland on these Conditions, shall out of his first share of Money, buy for himself and every Relation and Servant that he carries with him (who are able to *bear Arms*,) a good Musket, or Case of Pistols for the defence of his Family.'[1690]."[141]

---

[137] *NYSRPA* Linguists' Br. at 19–20 (quoting Baron, *Corpus Evidence* at 512).

[138] *NYSRPA* Linguists' Br. at 20 (quoting Baron, *Corpus Evidence* at 512).

[139] Robert Cotton, An Exact Abridgement Of The Records In The Tower Of London: From the Reign of King Edward the Second, Unto King Richard the Third. 51 (1657), https://qu od.lib.umich.edu/e/eebo/A34712.0001.001/.

[140] IV OLIVER GOLDSMITH, HISTORY OF ENGLAND: FROM THE EARLIEST TIMES TO THE DEATH OF GEORGE II 51 (1771), https://archive.org/details/historyofengland001gold/page/n5

[141] RICHARD BUCKLEY, THE PROPOSAL FOR SENDING BACK THE NOBILITY AND GENTRY OF IRELAND 6 (1690), https://quod.lib.umich.edu/e/eebo/A30010.0001.001/1:3?rgn=div1;view =fulltext.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Here, the subject of the sentence is singular, and the express purpose is for "defence of his Family." Defending one's family is generally not considered military in nature, and the persons to be armed are only the individual and his immediate household.

An amicus brief filed by Corpus Linguistics Professors in *Young v. Hawaii* in the Ninth Circuit further illustrates the difficulty. The Professors reproduce five "representative examples" of the term "keep arms" "refer[ring] to weapons for use in the military or militia." [142] But two of the sources plainly also contemplate the term "keep arms" referring to use for personal defense:

- Freemen were bound to follow their Lords to the Wars, and many were Volunties, yet it seems all were bound upon call under peril of Fine and were bound to *keep Arms* for the preservation of the Kingdom, their Lords, ***and their own persons***."[143]

- Protestants were bound to *keep Arms* and Defend ***themselves*** and their Country from the power of the Popish Natives which were then Armed against them."[144]

So out of those five "representative" quotes that are classified as military or militia, at least two refer to possession of arms for individual defense. Classifying these sources as solely militia or military is questionable at best.

Even results that speak of bearing arms for war or warlike purposes do not necessarily connote a military meaning. "Phrases like 'bear a gun' or 'bear arms' are not military-only just because they are sometimes used near words like 'war.' In the usage of the time, 'war' included personal self-defense."[145] John Locke, for example, when discussing what "makes it lawful ... to kill a thief" in self-defense, reasoned that "it is lawful for me to treat him as someone who has

---

[142] Br. of Corpus Linguistics Professors & Experts as Amici Curiae Supporting Appellees at 21–22, *Young v. Hawaii*, No. 12-17808 (9th Cir. June 4, 2020) (brackets deleted, second emphasis added).

[143] *Id*. (brackets deleted, second emphasis added).

[144] *Id*. (brackets deleted, second emphasis added).

[145] Br. of Amici Curiae Professors of Second Amendment Law, et al. at 10, *Young v. Hawaii*, No. 12-17808 (9th Cir. June 4, 2020).

50

Electronic copy available at: https://ssrn.com/abstract=3887060

put himself into a state of war with me."[146] As explained below, Locke's views were very influential in revolutionary America.

The problem of categorization is further demonstrated by comparing the results of the searches on which the Goldfarb Brief and the *NYSRPA* Linguists' Brief were based. Goldfarb described his search as looking for:

> all  instances of the noun *arms* occurring within four words  of any form of the verb *bear* (*bear*, *bears*, *bearing*, etc.).  After duplicating the results and filtering out lines that  did not involve either of the senses that are relevant here, there remained, between COFEA and COEME,  531 concordance lines.[147]

Goldfarb limited his search in both corpora to 1760 through 1799, the period covered by COFEA. He has posted spreadsheets of his results online.[148] According to Goldfarb, 28 of the 531 concordance lines were either ambiguous or consistent with *Heller*'s conclusion that "bear arms" can mean to carry arms outside of any military context.[149]

In the article on which the *NYSRPA* Linguists' Brief was mostly based, by contrast, Baron reports that the phrase "bear arms" occurs about 310 times in COFEA.[150] COEME, Baron states, "contains 1,578 instances of the phrase." Baron's COEME search apparently covered all of the seventeenth and eighteenth centuries, unlike Goldfarb's. But, Baron notes, "Since COEME only returns a maximum of 1,000 hits for a collocation search, I was not able to examine 578 of the 1,578 citations with bear arms."[151] Thus, in the COFEA and COEME corpora he was "able to examine about 1,300 of these instances in context. Correcting for estimated duplicates, roughly

---

[146] JOHN LOCKE, SECOND TREATISE OF GOVERNMENT § 18 (1690).

[147] Goldfarb Br. at 21.

[148] https://lawnlinguistics.com/2019/07/16/corpora-and-the-second-amendment-the-right-of-the-people-to-bear-arms/

[149] *Id.* (downloadable spreadsheet entitled "bear arms.")

[150] Baron, *Corpus Evidence* at 510.

[151] *Id*. at 511.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

900 separate occurrences of bear arms before and during the Founding era refer to war, soldiering, or other forms of armed action by a group rather than an individual. Seven were either ambiguous or carried no military connotation." [152]

In sum: Baron examined roughly 900 occurrences, including all of the corpora and time periods searched by Goldfarb, and found seven usages that were clearly or arguably non-military. Goldfarb examined 531 usages and found 28 that were clearly or arguably non-military. In other words, Goldfarb found those usages four times as frequently as Baron did, when examining search results consisting of about half the number that Baron reviewed—a difference of roughly eight to one. The results suggest that Baron was far less likely to subjectively categorize occurrences as clearly or arguably non-military than Goldfarb was in his subjective categorizations.

The categorizations made by the Goldfarb Brief and the *NYSRPA* Linguists' Brief thus demonstrate the inherent problems with using corpus linguistics to determine the meaning of constitutional language. Since subjective judgment is used to cull allegedly irrelevant results and to categorize supposedly relevant results, it would be virtually impossible for the linguists' findings to be replicated—let alone effectively challenged—by anyone who might disagree with the categorizations they made. [153]

---

[152] *Id.* at 510–11.

[153] Subjective categorization, particularly by a single individual, also raises the distinct possibility of confirmation bias, creating the "tendency to test one's beliefs or conjectures by seeking evidence that might confirm or verify them and to ignore evidence that might disconfirm or refute them." In other words, the "bias…helps to maintain prejudices and stereotypes." If one's thesis—or mere belief—is that the Second Amendment protects only a collective right, the chance that one would categorize a given usage as a collective one probably increases. A similar confirmation bias could exist for one who believes that the right is individual. *See generally* Colman, Andrew M. "confirmation bias." In A DICTIONARY OF PSYCHOLOGY, Oxford University Press, 2008.

52

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

The Second Amendment declares that "the right of the people to keep and bear Arms, shall not be infringed."[154] Even the Goldfarb Brief admits that the right of the people to *keep* arms refers to a private right.[155] So, the Goldfarb Brief then shifts gears and argues, to a point,[156] that the "right of the people" to "bear arms" really means "the right to serve in the militia."[157] This reasoning is critically flawed.[158]

As an initial matter, every place in the Bill of Rights where the term "right of the people" is used, it plainly means the entire people, not a portion such as the organized militia, and this has long been understood.[159] The use of "right of the people" in the Second Amendment should

---

[154] U.S. CONST. amend. II.

[155] Goldfarb Br. at 17 ("The corpus data for *keep* is consistent with how the word was interpreted in *Heller*.").

[156] The Goldfarb Brief itself doesn't really contain much argument on this point, referring instead to a blog post that Goldfarb himself has made on this subject. Goldfarb Br. at 23–24, referencing bit.ly/RightBearArmsLnL.

[157] *Id*. at 23 ("[T]he right to bear arms was probably regarded as a *right* to serve in the militia."). Goldfarb has since indicated that he's "not fully satisfied with [this] conclusion. That's not necessarily to say I think it's wrong, but I suspect that at a minimum it's an oversimplification." Neal Goldfarb, *Regarding the Strength of the Corpus Evidence (and Noting Issues that the Evidence Doesn't Resolve)*, DUKE CENTER FOR FIREARMS LAW BLOG (July 13, 2021), https://firearmslaw.duke.edu/2021/07/regarding-the-strength-of-the-corpus-evidence-and-noting-issues-that-the-evidence-doesnt-resolve/.

[158] At this point, Goldfarb is no longer engaged in corpus linguistics but is merely advancing ordinary legal arguments.

[159] In *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), the Court observed that " '[T]he people' seems to have been a term of art employed in select parts of the Constitution." The Court determined that "the people" as used in the Bill of Rights means the "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. Just as in the First and Fourth Amendments, the "right of the people" in the Second Amendment extends to all members of that national community, not just those who are able-bodied, male, and between certain specified ages so as to be included in the organized militia. The "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances," U.S. CONST. amend. I, and "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. CONST. amend. IV, are individual rights that extend to all members of the national community, individuals may bring suits to enforce them, and depriving an individual of these rights violates the Constitution. The same is true for "the right of the people" guaranteed by the Second Amendment. While Goldfarb has done a corpus linguistics analysis that purports to find that "*the right of the people* was most often used to denote rights that were collective in that their exercise required the concerted action of multiple people," Br. of Neal Goldfarb as Amicus Curiae in Support of Neither Party at 11, *Jones v. Becerra*, No. 20-56174 (9th Cir. Apr. 23, 2021), surely the most relevant "corpus" for these purposes is the Bill of Rights itself, and "right of the people" in that document has long been understood to denote individual rights. *See* William Baude, *Heller Survives the Corpus*, DUKE CENTER FOR FIREARMS LAW BLOG (July 9, 2021), https://firearmslaw.duke.edu/2021/07/heller-survives-the-corpus/. ("While there are examples in the corpus of a 'right of the people' being used collectively, *Heller*'s chief reason for rejecting such a reading was constitutional context: other provisions of the Constitution (viz, the First and Fourth Amendments) use the 'right of the people' to

---

53

Electronic copy available at: https://ssrn.com/abstract=3887060

therefore be interpreted the same way under the interpretive canon known as the "presumption of consistent use"; that is, that a word or phrase should be interpreted to mean the same thing throughout a legal document. The blog post relied on in the Goldfarb brief tries to get around the presumption of consistent use, but it does not succeed. The post avers:

> But if one's starting point is that the right to bear arms was understood as a right to serve in the militia, interpreting the use of *the people* in the Second Amendment consistently with its use elsewhere in the Constitution would generate dissonance between the different components of the Second Amendment itself. In this situation, something's got to give, and I think that what has to give is the presumption of consistent use.[160]

This argument fails for at least four reasons. First, for the purported "dissonance" to occur at all, one must first accept that "the right to bear arms was understood as a right to serve in the militia"—the very proposition that is at issue. Goldfarb's argument is thus manifestly circular and proves nothing.

Second, why say "right of the *people* to keep and bear arms" if "right to serve in militia" was the intended meaning? If the drafters meant a right to serve in the militia (unlikely, since militia service was more of a duty than a right), they surely would have said so.

Third, adopting the "militia" interpretation offered by the Goldfarb Brief leads to insuperable difficulties. What does "militia" mean? Does it mean the whole body of the people?[161] In that case, the "militia" restriction changes nothing.[162] Does it mean the militia as

---

[160] https://lawnlinguistics.com/2019/07/16/corpora-and-the-second-amendment-the-right-of-the-people-to-bear-arms/

[161] At the Virginia ratifying convention, George Mason asked, "Who are the militia? They consist now of the whole people, except a few public officers." 3 JONATHAN ELLIOT (ed.), DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, 425–26 (1827), https://memory.loc.gov/cgi-bin/query/r?ammem/hlaw:@field(DOCID+@lit(ed00316)).

refer to an individual right, so it is likely that the Second Amendment did so as well. This is a good example of the limits to legal corpus linguistics analysis. The use of a phrase in other contexts cannot do much to rebut a claim made from the context of a particular document.").

54

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

defined in various state statutes? If so, it would mean that women, for example, did not constitute members of "the people," and were and are excluded from the right to keep and bear arms. Also excluded would be white males outside the age limits set by statute. Is it plausible to assume that the framers and ratifiers intended men to lose their right to bear arms the moment they passed the age of 45 (or some other statutory limit)?[163] There is no evidence of such a belief or practice. Alternatively, does "the militia" mean statutory members of the militia when called into active service, during such service? It would certainly be odd, if that is what was meant, to use the term "the people" instead.

Finally, the definition of "militia" varied from time to time, and from state to state in the colonial and Founding period. Did the right of the people to keep and bear arms *then change* every time the definition changed? The Second Amendment would be an odd constitutional right indeed if it were subject entirely to the legislature's control.

What is more, "[i]t is hard to imagine this 'one-half of an idiom' reading surviving if *keep arms* were confirmed to be purely literal,"[164] a result that Goldfarb concedes is consistent with the corpus data. Indeed, *Heller* already derided Goldfarb's maneuver for the absurdity it is:

---

[162] As shown in Part V.D below, the Founders believed that the most important rights were founded in natural law. The Second Amendment did not *grant* a right to keep and bear arms. It merely confirmed that natural right, and it was a right possessed by individuals.

[163] The present federal militia statute provides:

"(a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

(b) The classes of the militia are—

(1) the organized militia, which consists of the National Guard and the Naval Militia; and

(2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia."

10 U.S.C. § 246.

[164] Jones, 34 BYU J. P.L. at 172.

55

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

"The word 'Arms' would have two different meanings at once: 'weapons' (as the object of 'keep') and (as the object of 'bear') one-half of an idiom. It would be rather like saying 'He filled and kicked the bucket' to mean 'He filled the bucket and died.' Grotesque."[165] While Goldfarb acknowledges that his "interpretation requires that *arms* be understood as being simultaneously literal (as part of *keep arms*) and figurative (as part of *bear arms*)," he claims that "there is reason to believe that that was in fact how *keep and bear arms* was understood at the time of the Second Amendment's framing and ratification."[166] Presumably that "reason" is Goldfarb's own corpus linguistics analysis. But rather than confirm his analysis, this counterintuitive result indicates that it has gone awry. Goldfarb presents no evidence that individuals at the Founding (or ever) were in the habit of having a *single usage of a single word* convey two different meanings. As just explained, there is a presumption that the same word repeated in a legal text has the same meaning throughout; surely there should be an even stronger presumption that a single word in a legal text is not both literal and half of an idiom.

### C.  Corpus Linguistics: Science Or Scientism?

Given the problems with the corpora and with the core methodology of corpus linguistics, it is reasonable to doubt that corpus linguistics is a scientific process that produces objective results. Corpus linguistics has been promoted as a means to determine the original public meaning of language in the Constitution. Its advocates often tout it as a powerful new methodology to implement the originalist school of constitutional interpretation that came to the

---

[165] *District of Columbia v. Heller*, 554 U.S. 570, 587 (2008).

[166] Br. of Neal Goldfarb as Amicus Curiae in Support of Respondents at 13, *New York State Rifle & Pistol Ass'n, Inc. v. Corlett*, No. 20-843 (Feb. 12, 2021).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

fore during the 1980s; a school of interpretation that has been embraced by Supreme Court justices including Justices Scalia, Thomas, Roberts, Alito, Gorsuch, Kavanaugh, and Barrett.[167]

Proponents argue that because corpus linguistics relies on computerized analyses of large and supposedly principled collections of texts to discover actual patterns of language use, it can provide "insight into, among other things, the meaning of words and phrases."[168] It is said to be a "scientific discipline."[169] Its advocates insist that the methodology is useful because it is supposedly "objective" and "empirical," and performs "tasks that cannot be performed by human linguistic intuition alone."[170] Because much legal scholarship revolves around linguistic questions, they claim that "corpus methods can be leveraged to provide *scientifically valid* methods for learning objective reality."[171]

But is corpus linguistics actually science, or is it mere "scientism"?[172] Corpus linguistics certainly provides numbers (data), as science does, but if the numbers (data) are generated by flawed reasoning and subjective judgments, the results are plainly not scientific.

As Professor Tobia has observed, the "use of corpus linguistics admits of interpretive choice and flexibility. Judges and advocates have flexibility in terms of which selection from the legal text to analyze, which corpus or corpora to search, which search(es) to conduct, and what

---

[167] The Supreme Court recently stated that *Heller*'s aim was to determine "the public understanding in 1791 of the right codified by the Second Amendment . . . ." *Gamble v. United States*, 139 S. Ct. 1960, 1975 (2019).

[168] BYU, Law & Corpus Linguistics — Background, https://lcl.byu.edu/projects/law-corpus-linguistics-background.

[169] *Id.*

[170] NYSRPA Linguists' Br. 14 (citing Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788, 831–32 (2018)).

[171] BYU Law, Law & Corpus Linguistics — Background (updated Oct. 8, 2019), https://lcl.byu.edu/projects/law-corpus-linguistics-background/ (emphasis added).

[172] Scientism is the theory, reaching back to nineteenth century Positivism, that science can solve all human problems, and that if something cannot be proven empirically by science, then it is not valid as knowledge. *See* Thomas Burnett, *What is Scientism?*, American Association for the Advancement of Science, https://www.aaas.org/programs/dialogue-science-ethics-and-religion/what-scientism

57

Electronic copy available at: https://ssrn.com/abstract=3887060

conclusions to draw from the results returned from the corpus."[173] Given this substantial

flexibility, Tobia "question[s]" the "claim that introduction of objective empirical methods will

easily constrain legal interpretation."[174]

Professor Drakeman, after examining the use of corpus linguistics (or allied methods) in

constitutional interpretation, proposed an alternative method: *flipping a coin*.

> In practice, corpus linguistics searches for the Constitution's original meaning have often sought to select one of two possible meanings…. The goal has been to determine the answer objectively and empirically through a Big Data analysis of language use in the Founding era. For the sake of argument, and to highlight the key role of assumptions in applying this methodology to constitutional interpretation, I will propose an alternate approach to resolving lawsuits that has the advantage of being equally or more objective, while also being faster, cheaper, and a great deal less complicated: flipping a coin, for which the odds of an accurate answer to these kinds of binary questions is 50%.[175]

Drakeman contends that the purported accuracy of corpus linguistics results depends on

four assumptions: 1) that the database is fairly and comprehensively constructed to reflect usage

in the Founding era; 2) that the search criteria will capture all relevant hits and exclude irrelevant

ones; 3) that the interpreter has accurately defined, correctly categorized, and precisely counted

every hit regarding a particular meaning; and 4) that the interpreter has correctly reached a

conclusion from analyzing the results, based on the number of hits or otherwise, regarding the

objective public meaning as the word or phrase is used in the Constitution.[176] If the chance of

---

[173] Kevin Tobia, *Dueling Dictionaries and Clashing Corpora*, DUKE CENTER FOR FIREARMS LAW (July 6, 2021), https://firearmslaw.duke.edu/2021/07/dueling-dictionaries-and-clashing-corpora/.

[174] *Id*. Tobia's point is illustrated by the writings of corpus linguistics practitioners on the Second Amendment. *See, e.g.*, Br. of Neal Goldfarb as Amicus Curiae in Support of Appellees at 8–9, *Young v. Hawaii*, No. 12-17808 (9th Cir. June 4, 2020) (disagreeing with *Heller*'s reading of certain uses of "bear arms" as "denoting the non-military carrying of weapons"); Br. of Neal Goldfarb as Amicus Curiae in Support of Respondents at 17, *New York State Rifle & Pistol Ass'n, Inc. v. Corlett*, No. 20-843 (Feb. 12, 2021) (disagreeing with search strategy used by other corpus linguistics analyses); Josh Jones, *The 'Weaponization' of Corpus Linguistics: Testing Heller's Linguistic Claims*, 34 BYU J. P.L. 135 (2019). ("disagree[ing] with Goldfarb's coding in several respects").

[175] Drakeman at 83.

[176] Drakeman at 98.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

accurately completing each step is even as high as 85%, he concludes, then the overall likelihood of reaching a correct result (85% x 85% x 85% x 85%) is 52%—very close to the likelihood of a coin toss.[177]

### IV.    PRACTICAL PROBLEMS IN CONSTITUTIONAL AND OTHER CASES

In addition to these fundamental theoretical and methodological difficulties with corpus linguistics, using corpus linguistics in real world litigation suffers from serious procedural and evidentiary problems.

#### A.  Presentation Of Corpus Linguistics Arguments For The First Time On Appeal Will Often Leave Litigants With No Chance To Respond

It is rare, at least for now, for litigants to present original corpus linguistics research at the trial court level. To date, corpus linguistics arguments seem to be presented through two main channels: in *amicus* briefs on appeal or by appellate judges conducting their own research.

Let us begin with the *amicus* brief route. In the case of *amicus* briefs submitted in support of respondents in the Supreme Court or in support of appellees in the federal Courts of Appeals, those briefs will generally be submitted after the opening brief for petitioners or appellants has already been filed. Thus, any *amici* supporting the petitioners or appellants will have no chance to respond to arguments based on corpus linguistics data. The only opportunity the petitioners or appellants themselves will have to respond will be in their reply brief—where space is tightly limited and at a point in the litigation where it will not be feasible in most instances for the parties to conduct their own substantial corpus linguistics research, or to try to duplicate (or

---

[177] *Id.*

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

discredit) the research results of opposing *amici*. The result is that only one side will be able to present meaningfully-briefed corpus linguistics arguments.[178]

The situation is equally unfair when a court itself presents corpus linguistics results conducted *sua sponte* in the very opinion that decides the case. There is then *no* chance for the parties to replicate, scrutinize, or respond to the data or methodology. The harm to the adversary system by injecting corpus linguistics based on a judge's research was well described in the majority opinion in a criminal case in Utah.[179] The opinion noted that one of the judges, Associate Chief Justice Thomas Lee, argued in a concurrence:

> that we should decide this case against Mr. Rasabout on the basis of the corpus linguistics research he has conducted *sua sponte*. But because his rationale is so different in kind from any argument made by the parties, Mr. Rasabout has never had a reasonable opportunity to present a different perspective. This violates the very notion of our adversary system, which "assures fairness by exempting a party from the inequity of [losing] on appeal on a ground that [he] had no opportunity to address." "[W]e should not dilute [the protections of our adversary system] by stretching their standards to justify our consideration of [an argument] we find interesting or important." Moreover, deciding this case on the basis of an argument not subjected to adversarial briefing is a recipe for making bad law.[180]

A musical copyright infringement case against singer Katy Perry and others illustrates the fundamental unfairness (and violation of the rules of evidence and *Daubert* principles) posed by

---

[178] It isnot unusual for *amici* in constitutional cases to cite publicly available facts, sources, studies, and the like in support of "legislative facts." The difference with corpus linguistics is that the corpus linguistics briefs may cite *data* based on their own independent research, with no requirement to disclose the raw results and the procedures by which those results were refined.

[179] *State v. Rasabout*, 356 P.3d 1258 (Utah 2015). The Supreme Court of Utah has since changed course and has used corpus linguistics in some cases.

[180] *Id.* at 1264–65 (citations and footnotes omitted). *See also United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1578 (May 7, 2020), in which the Supreme Court reprimanded the Ninth Circuit for departing "so drastically from the principle of party presentation as to constitute an abuse of discretion," and vacated and remanded the case "for an adjudication of the appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel."

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

allowing alleged scientific evidence into a case by the back door. In *Gray v. Hudson*,[181] plaintiffs claimed that an eight-note musical *ostinato* in "Dark Horse" by Ms. Perry infringed the copyright of "Joyful Noise" by the group Flame. Both sides named expert witnesses, and their reports were subjected to *Daubert* challenges.[182] Both experts testified at trial, the jury returned a large damages verdict in favor of plaintiffs, and the trial court entered judgment. The trial court then granted a Rule 50(b) motion by defendants for judgment as a matter of law, overturning the jury verdict. Among other things, the trial court gave weight to an *amicus* brief by a group of musicologists filed after the trial was over and judgment had been entered. In big data fashion, the musicologists' brief stated that they had run the key pitch sequences through two large databases of music and found that the "search of music databases housed by the Center for Computer Assisted Research in the Humanities at Stanford University, and the Repertoire International des Sources Musicales, indicates that there are at least 6 other compositions in the same key containing the same pitch sequence, and more than 2,000 in all keys."[183]

Plaintiffs had no opportunity to refute this outside the record, hearsay evidence; to examine the scientific validity of it under *Daubert*; to cross-examine the individuals promulgating it; to inquire into the procedures used or the composition of the databases; or to otherwise examine its reliability. How the case will be decided on appeal is not yet known, but it

---

[181] *Gray v. Hudson*, No. 2:15-CV-05642-CAS (C.D. Cal. Mar. 16, 2020), *appeal pending* No. 20-55401 (9th Cir. 2020).

[182] The U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579 (1993), governs the admissibility of purportedly scientific evidence into the record, tasking the judge with the role of ensuring that the evidence is grounded in scientifically valid principles and methodology.

[183] *See Gray v. Perry*, 2020 WL 1275221, at *10 (C.D. Cal. 2020).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

exemplifies the dangers of bypassing accepted safeguards regarding alleged scientific evidence, such as happens when corpus linguistics searches are injected into a case on appeal.[184]

### B. Judges And Lawyers Do Not Have The Expertise Or Training To Conduct Corpus Linguistics Research, And Expert Testimony Is Required If The Results Of Such Research Are To Be Considered

Corpus linguistics advocates claim, as noted above, that corpus linguistics is scientific, objective, and empirical. If so, some judges have argued that judges as a class do not have the scientific training or expertise to conduct such research. This was succinctly stated in the majority opinion in *Rasabout*:

> [I]t would be entirely inappropriate for this court to conduct the independent scientific research that serves as the basis for Justice Lee's approach.... Linguistics is a scientific field of study that uses empirical research to draw findings.... The knowledge and expertise required to conduct scientific research are "usually not within the common knowledge" of judges, so "testimony from relevant experts is generally required in order to ensure that [judges] have adequate knowledge upon which to base their decisions."[185]

The use of corpus linguistics would also turn judges and parties (or *amici*) into amateur lexicographers, rather than relying on those who compile dictionaries professionally to use their expertise in a neutral manner, unconnected with litigation advocacy. As stated by Judge Jane Branstetter Stranch in her concurrence in *Wilson*:

> I would not substitute the ad hoc selection process of individual judges for the "experienced judgment" of these trained scholars. Doing so would convert judges into armchair lexicographers, attempting the same work that dictionary authors have been performing for centuries. But unlike those experts, judges would shoulder this task without the specialized training necessary to make a reliable

---

[184] In the *Jones* case, *supra*, the State of California itself agreed that "courts should be cautious in their use of corpus linguistics, especially where—as here—this emerging tool is raised for the first time in an interlocutory appeal." Defendants-Appellees' Suppl. Br. at 16, *Jones v. Becerra* (9th Cir.), filed Apr. 23, 2021. Interestingly, while making this argument, California was arguing *against* an expansive view of the Second Amendment and gun rights generally.

[185] *Rasabout*, 356 P.3d at 1265 (footnotes omitted).

62

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

and neutral judgment call. Encouraging litigants to take on that same role would make the problem worse, not better.[186]

Although corpus linguistics as a field is not, perhaps, in the same class of difficulty as quantum mechanics, it does have its own terminology and concepts, which will not be familiar to the parties, lawyers, and judges. One is not likely, in the courthouse cafeteria, to hear judges or attorneys tossing about terminology such as "concordance lines" or "collocate searches," much less chatting about how frequency can help determine "the degree of cognitive entrenchment of particular words/grammatical patterns."[187] And courthouse cafeterias are probably the better for it.

To illustrate, consider this language from the Goldfarb Brief, explaining a search for the word "bear" within four words before or after "arms":

> In earlier versions of this spreadsheet, the category in section 1m which is now described as "copredicational or arguably copredicational," was instead described as "zeugmatic or zeugmoid." The change from "zeugmatic" to "copredicational or arguably copredicational" was made because I realized that I was using "zeugma" to cover all cases of what I now refer to as copredication, including cases that would not be characterized as zeugma as that term is conventionally used and understood in linguistics. (For further explanation of zeugma and copredication, see the post "'keep and bear arms' (Part 2)."[188]

It appears that words like "zeugma," "zeugmatic," and "copredicational" have not yet found their way into Black's Law Dictionary. This is not to say that corpus linguistics is inherently esoteric or difficult for those few brave souls with the fortitude and interest (and time) to figure out its serious-sounding vocabulary, but merely to observe that its language and concepts will not be instantly familiar to judges, law clerks, lawyers, or juries.

---

[186] *Wilson*, 930 F.3d at 447.

[187] *NYSRPA* Linguists' Br. at 15.

[188] Neal Goldfarb, Corpora and the Second Amendment "bear arms" (part 3), LawNLinguistics (July 10, 2019), http://bit.ly/BearArmsLnL3.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

It is true that sometimes judges or juries need to make decisions regarding scientific, medical, technical, or other issues outside their knowledge, expertise, and experience. That is why, in such cases, parties will employ competing expert witnesses to elucidate the facts and relevant scientific principles involved. Since legal corpus linguistics advocates, as noted above, contend that it is scientific and empirical, then the logical conclusion is that it should be handled in accordance with the pertinent rules of evidence and *Daubert* principles for expert scientific testimony, on both the federal and state levels.[189] Indeed, in some cases involving linguistic analysis, expert reports were submitted.

In a federal District Court decision, the Court held after a *Daubert* hearing that proposed linguistics testimony on "authorial attribution" by a proffered expert must be excluded in part, and the remaining testimony could be presented to the jury, but could not be offered as an expert opinion on the ultimate issue.[190] In a habeas corpus case, the Court found that failure to provide funds for an expert on "linguistic discourse analysis"[191] was harmless error, because petitioner did not demonstrate that such analysis was "generally scientifically reliable and thus admissible in New York."[192] A federal trial court had no trouble under *Daubert* striking the expert report by an expert in "social linguistics" because of the "absence of a reliable theory" underpinning the report.[193]

---

[189] Particularly relevant are Fed. R. Evid. 702, 703, and 705, and their state law analogues. *See also Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579 (1993).

[190] *U.S. v. Zajac*, 748 F.Supp.2d 1340, 1353–54 (D. Utah 2010); *see also U.S. v. Van Wyk*, 83 F.Supp.2d 515, 523 (D. N.J. 2000) (excluding most testimony by qualified expert to identify defendant as author of threatening letters, in part because of the "lack of scientific reliability of forensic stylistics").

[191] Sometimes called "language discourse analysis."

[192] *Tyson v. Keane*, 991 F.Supp. 314, 328–29 (S.D.N.Y. 1998) (citing three other federal court cases in which linguistic discourse analysis expert testimony was excluded).

[193] *Flagstar Bank, FSB v. Freestar Bank, NA*, 687 F. Supp.2d 811, 820 (C.D. Ill. 2009).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

A recent federal District Court decision implied that a *Daubert* motion would have been appropriate in testing the admissibility of findings by a linguistics expert employing mathematical methods.[194] It rejected those findings, which attempted to attribute authorship of anonymous letters to one or more of the defendants in a defamation case by the use of a "computational linguistics" methodology. Expressly noting that the "court does not have a Daubert motion before it," the Court "reache[d] no conclusion about the reliability" of the linguistics expert's analytical method, but for a limited purpose accepted her opinion as admissible.[195] Nevertheless the Court found that the expert's attribution of the letters to one or more defendants "falls short of the clear and convincing standard because of the limitations [the expert] describes in her methodology."[196]

In short, courts should not use an untested, non-expert, outside the record, corpus linguistics analysis to revolutionize the accepted understanding of the Second Amendment or other constitutional provisions.[197]

### C.  Performing Corpus Linguistics Analysis Is Unreliable, Time Consuming, And Expensive

As anyone involved in lawsuits can attest, litigation is expensive.[198] Widespread use of corpus linguistics in litigation would only add to those high costs. As opposed to using

---

[194] *Neborsky v. Town of Victory*, slip. op., No. 5:17-cv-142 (D. Vt. May 1, 2020); *aff'd* 845 F. App'x 77 (1st Cir. Apr. 26, 2021).

[195] *Id.* at 45.

[196] *Id*. at 47.

[197] As the State of California recently noted in an appellate brief in a Second Amendment case, "any corpus linguistics analysis likely should be performed (if at all) by experts or lawyers trained in the tool, in the context of discovery in the trial court, and with sufficient time to carefully craft relevant searches, analyze data, and apply the resulting information to the question presented." The brief further notes that the use of corpus linguistics should be "approached with caution" and that "any corpus linguistics analysis should be conducted in the first instance in the context of discovery in the trial court." Defendants-Appellees' Suppl. Br., *Jones*, *supra*, at 2, 24–25.

[198] *U.S. Litigation Costs Ranked as No.1 in the World*, CLASSACTION.ORG (May 28, 2013), https://www.classaction.org/blog/us-litigation-costs-ranked-as-no1-in-the-world. International Comparisons of

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

traditional means of interpretation, corpus linguistics research can "only be reliably conducted by dueling linguistics experts. Imposing such a significant financial burden on so many of the litigants coming through the doors of our courts would be tantamount to locking those doors for all but the most affluent."[199]

Corpus linguistics analysis is time-consuming (and expensive) even to verify results presented by another party. When searching the corpora at the BYU site, each result contains only a small snippet of text in which the search words appear, expandable to a larger snippet through a key-word-in-context or "KWIC" function. Goldfarb has posted spreadsheets that contain his results, but for each result they include only the snippet, the "concordance line number," the corpus name, and then the "source ID number," such as "HeinR91," "K107868.000," and "eebo.N07965."[200] His spreadsheet results do not contain the work's author, the title, date, or even country of publication (COEME contains English language results from countries other than the United States).[201] Those are available through the KWIC function in COFEA and COEME themselves, but that requires anyone trying to access that basic information to try to replicate the search, and then examine each hit line by line to verify the results. That would be time consuming and, as noted above, may be impossible due to changes in the corpora or search engine.

---

Litigation Costs, U.S. CHAMBER INSTITUTE FOR LEGAL REFORM 4 (June 2013), https://instituteforlegalreform.com/wp-content/uploads/media/ILR_NERA_Study_International_Liability_Costs-update.pdf.

[199] *Rasabout*, 356 P.3d at 1265.

[200] https://lawnlinguistics.com/2019/07/16/corpora-and-the-second-amendment-the-right-of-the-people-to-bear-arms/ (click link to download corpus data).

[201] *Id.*

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

### V.   THE LINGUISTS' BRIEFS FOCUS ON EMPTY WORD COUNTS WHILE IGNORING THE SUPREME COURT'S TEXT AND HISTORY TEST

#### A.  Far From Helping Originalism, Corpus Linguistics Detracts From The Proper Focus On Text and History

In *Heller*, the Supreme Court employed a textual and historical analysis to determine the meaning of the Second Amendment while flatly rejecting any "balancing test" such as strict or intermediate scrutiny. Shortly thereafter, while still sitting on the D.C. Circuit, Judge—now Justice—Kavanaugh's dissent in *Heller v. District of Columbia* inquired:

> Are gun bans and regulations to be analyzed based on the Second Amendment's text, history, and tradition (as well as by appropriate analogues thereto…)? Or may judges re-calibrate the scope of the Second Amendment right based on judicial assessment of whether the law advances a sufficiently compelling or important government interest to override the individual right?[202]

Then-Judge Kavanaugh concluded that "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition .. .."[203] He continued:

> in order for the Court to prospectively approve the constitutionality of several kinds of gun laws—such as machine gun bans, concealed-carry laws, and felon-in-possession laws—the Court obviously had to employ *some* test. Yet the Court made no mention of strict or intermediate scrutiny when approving such laws. Rather, the test the Court relied on—as it indicated by using terms such as "historical tradition" and "longstanding" and "historical justifications"—was one of text, history, and tradition.[204]

---

[202] *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting).

[203] History and tradition are overlapping concepts. In determining the meaning of a constitutional provision, historical events and traditions of the American people leading up to and surrounding the adoption of the provision are most relevant. Post-ratification history and tradition may also be relevant, but in the event of a conflict the original understanding controls. *See Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("It is not uncommon for courts to look to post-ratification history and tradition to inform the interpretation of a constitutional provision . . . . That said, post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.").

[204] *Id.* at 1273. (citing *Heller*, 554 U.S. at 626–27, 635.)

67

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Although the Courts of Appeals have, in general and contrary to *Heller*, applied balancing tests, many federal appellate judges have continued to advocate for applying *Heller*'s textual and historical test as opposed to a "levels of scrutiny" approach.[205] And while the Seventh and D.C. Circuits have generally applied a "levels of scrutiny" approach in Second Amendment cases, they also have struck down onerous carry restrictions categorically, without engaging in any interest balancing.[206] The Illinois Supreme Court followed the Seventh Circuit's lead in finding that State's ban on public carry categorically unconstitutional.[207] And the Illinois Supreme Court and the Massachusetts Supreme Judicial Court (that State's high court) have likewise struck down stun gun bans categorically.[208] Therefore, while a number of appellate courts have generally eschewed *Heller*'s guidance, the insubordination has not been uniformly consistent.

Under a text and history approach, understanding the meaning of the Second Amendment begins with its text, including the common meaning of its words and phrases in context. The text may also be compared with other provisions of the Bill of Rights and the Constitution where similar wording appears. One must also examine the history of the Amendment and the rights it codifies, in the period leading up to its passage by Congress and in the state ratifying

---

[205] *Mai v. United States*, 974 F.3d 1082, 1087 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc, joined by VanDyke, J.); *Mance v. Sessions*, 896 F.3d 390, 394) (5th Cir. 2018) (Elrod, J. dissenting from denial of rehearing en banc, joined by Jones, Smith, Willett, Ho, Duncan, & Engelhardt, JJ.); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014) (panel op.), *rev'd en banc* 824 F.3d 919 (9th Cir. 2016), *cert. denied* 137 S.Ct. 1995 (Jun. 26, 2017); *Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018), *rev'd en banc* 992 F.3d 765 (9th Cir. 2021). At least four justices of the U.S. Supreme Court believe it is important to clarify how *Heller* and *McDonald* should apply, and that lower courts are misinterpreting those cases. As Justice Kavanaugh stated in his concurrence in the *NYSRPA* case: "I also agree with JUSTICE ALITO's general analysis of *Heller* and *McDonald*. Post, at 25 . . . . And I share JUSTICE ALITO's concern that some federal and state courts may not be properly applying *Heller* and *McDonald*. The Court should address that issue soon, perhaps in one of the several Second Amendment cases with petitions for certiorari now pending before the Court." *NYSRPA*, 140 S.Ct. at 1527.

[206] *See Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012).

[207] *See People v. Aguilar*, 2013 IL 112116 ¶ 21.

[208] *See People v. Webb*, 2019 IL 122951 ¶ 21; *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018).

68

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

conventions. Relevant material also includes the history of the right to arms under English law, post-adoption commentaries, and judicial decisions on this subject during the early Republic. The purpose and history of the Fourteenth Amendment may also be helpful in understanding the Second Amendment's history and tradition. The Supreme Court extensively considered these types of sources in *Heller* and *McDonald* when analyzing the Second Amendment. In light of these decisions, Professor Baron's accusation that "[c]onservative jurists claim to focus on the text and nothing but the text as they seek to discover the original public meaning of the Second Amendment" is plainly inaccurate.[209]

In contrast to this rich and textured inquiry, legal corpus linguistics analysis in the Second Amendment context has instead focused in excruciating detail on word counts and word combinations, usually—if not always—to the exclusion of history and tradition. As stated by Judge Stranch in *Wilson v. Safelite*, after noting some of the practical concerns with corpus linguistics:

> Underlying these practical usage issues is my concern with the implicit suggestion that corpus linguistics is a simple, objective tool capable of providing answers to the puzzle of statutory interpretation. The use of corpus linguistics brings us no closer to an objective method of statutory interpretation. Instead, it encourages judges to stray even further from our historic and common-sense considerations—including the "text, structure, history, and purpose" of a statute, *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (citation omitted)—that ought to guide our analysis.[210]

Goldfarb has defended against the charge that corpus linguistics ignores context by arguing that "as actually used in legal interpretation corpus linguistics ... has always taken account of the context in which the relevant word or phrase appears in the statute, constitution, or

---

[209] Dennis Baron, *Corpus Linguistics, Public Meaning, and the Second Amendment*, DUKE CENTER FOR FIREARMS LAW BLOG (July 12, 2021), https://firearmslaw.duke.edu/2021/07/corpus-linguistics-public-meaning-and-the-second-amendment/.

[210] *Wilson*, 930 F.3d at 448.

Electronic copy available at: https://ssrn.com/abstract=3887060

other provision at issue."[211] "Thus," Goldfarb continued, "what matters is not the most common use of the word or phrase overall, but the most common use when the word or phrase appears in a context similar to its context in the legal provision."[212] But this purported defense misses the point. The relevant "context" that corpus linguistics ignores is the broader history and tradition of the right to carry arms in the period around the Founding, as well as the intellectual underpinning of the Founders' political philosophy. This missing context is not supplied by eliminating irrelevant or off-topic results before counting hits in a corpus linguistics analysis.

Changing tack, Goldfarb argues that criticizing corpus linguistics for "ignoring the history and context of legal texts ... is like criticizing bicycles because they can't mow lawns" and, if accepted, would also mean that "dictionaries shouldn't be used in legal interpretation." [213] In other words, "[c]orpus linguistics, like most tools, has a function it was designed to perform, and like most tools it's not good at performing other functions. But that's no reason to throw the tool away."[214] Goldfarb goes on to highlight an "approach to combining corpus linguistics with history" proposed by Law Professor Lawrence Solum which "brings corpus linguistics together with two additional methodologies: (1) immersing oneself in 'the linguistic and conceptual world of the authors and readers of the constitutional provision being studied,' and (2) studying the 'Constitutional Record,' which includes 'precursor provisions,' drafting history, the ratification debates, early historical practice, and early judicial decisions."[215]

---

[211] Reply Br. of Neal Goldfarb as Amicus Curiae in Support of Neither Party, Responding to the Parties' Supplemental Brs. and Taking No Position as to Affirmance or Reversal, at 2, *Jones v. Becerra*, No. 20-56174 (9th Cir.), filed May 3, 2021.

[212] *Id*. at 2–3.

[213] *Id*. at 5 (brackets deleted).

[214] *Id*.

[215] *Id*. at 6 (citing Lawrence Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 BYU L. REV. 1621 (2017)).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

But this narrow conception of the role of corpus linguistics seems hard to square with Goldfarb's insistent pronouncements that his corpus linguistics analyses call for a fundamental rethinking of the Supreme Court's Second Amendment jurisprudence. Goldfarb appears to be engaging in the motte-and-bailey fallacy (which takes its name from the medieval European motte-and-bailey castle) by making a radical claim (that his corpus analysis undermines *Heller*), but when challenged retreating to a more modest claim (that corpus linguistics can play a limited role in constitutional interpretation) to insist that his argument has not been refuted.

What is more, Goldfarb's more modest conception of the role of corpus linguistics does not undermine, but actually vindicates *Heller*. As explained above, the Court in *Heller* had before it the submission of linguists who argued that the phrase "bear arms" was most often used in a military context. The Court evaluated this claim alongside historical evidence of the type Professor Solum says should be considered, and then determined that the best interpretation of the Second Amendment is that it protects an individual right to have and carry firearms that is not limited to the military context. While Goldfarb's analysis adds to the quantity of texts evaluated by the linguists, it is not qualitatively different and does nothing to undermine the broader historical inquiry performed by the Court.

The relative weakness of corpus linguistics compared to an approach attuned to the history and tradition surrounding a particular legal text is illustrated by a "parable" that University of Chicago Law Professor Will Baude "found very helpful":

> On one occasion an expert in the law stood up to test the Linguist. "Linguist," he asked, "what must I do to correctly interpret this Law?"
>
> "What is written in the Law?" he replied. "How do you read it?"
>
> The Judge answered, "the Law says, 'no person shall bear arms at or near any bank.' This proscribes carrying arms at or near rivers or lakes."

71

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

"You have answered incorrectly," the Linguist replied, "this means that no person shall perform any military service at or near financial institutions."

But the Judge wanted the Linguist to justify himself, so he asked, "And how did you come to that conclusion?"

In reply, the Linguist said: "I conducted a corpus linguistics analysis of the words 'bear arms' and 'bank.' In the first case, I found that 'bear arms' had an idiomatic sense to do with military service that was used more frequently than the literal sense you favored."

The Linguist continued: "In the second case, I found that the sense to do with financial institutions was used more frequently than the sense to do with bodies of water. Go and hold likewise!"

The Judge replied, "I cannot. My law clerk discovered one piece of historical evidence about this Law in particular that refutes your very general background evidence."

The Judge continued: "The Law's author said in a newspaper article defending the Law, 'the recent public shooting at the river demands action!" And with this one piece of evidence, the Judge moved the mountain of evidence supplied by the corpus data into the dustbin.[216]

Justice Barrett, before she became a member of the Supreme Court, gave a similar response when asked by Judge Thomas Hardiman during a panel discussion in which she participated, "What do our panelists think ... about addressing [a] stay off the grass hypothetical by having recourse to corpus linguistics to figure out whether grandpa was talking about marijuana or the lawn"?[217] Then-Judge Barrett responded, "So I imagine that if you plug in 'stay off the grass' into a corpus linguistics database, you may well generate answers that are both 'stay off the green stuff on the lawn' as well as 'stay off of pot.' We know which one it is

---

[216] Will Baude, *The Parable of the Soldier at the Bank*, THE VOLOKH CONSPIRACY (JULY 7, 2021), https://reason.com/volokh/2021/07/07/the-parable-of-the-soldier-at-the-bank/#comments. Overall, Baude has indicated that in his view based on the corpus linguistics arguments advanced to date, "most of *Heller*'s premises have not yet been dislodged, and the results are less dramatic than *Heller*'s critics hoped." William Baude, *Heller Survives the Corpus*, DUKE CENTER FOR FIREARMS LAW BLOG (July 9, 2021), https://firearmslaw.duke.edu/2021/07/heller-survives-the-corpus/.

[217] The Federalist Society, *Showcase Panel II: Why, or Why Not, Be an Originalist?*, 69 CATH. U. L. REV. 683, 711 (Fall 2020).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

because of the grandfather being a drug addict in the 1970s."[218] Thus, Barrett concluded, "It was the context of the situation that answered the question. *So I don't think that interpretation, whether we're talking about statutes or the Constitution, is a kind of mechanical exercise where you can look in dictionaries or even a corpus linguistics database to generate every answer*."[219]

\* \* \* \*

While we cannot summarize here all of the scholarship and arguments demonstrating that the Second Amendment is an individual right firmly fixed in our nation's history and traditions, we can examine several important strands that show the risk of ignoring history and tradition while focusing on word counts. The evidence is much more compelling than the single newspaper article in the parable of the soldier at the bank or grandpa's drug use history in the hypothetical addressed by Justice Barrett. First, the historical absence of any legal prohibitions on carrying arms peaceably during the colonial period and early Republic demonstrates that the early inhabitants of this country believed that the right to bear arms for private use should not be restricted. Second, early Americans exercised that right on a daily basis—that is, there was a tradition of keeping and bearing arms for private use. Third, the Founders, in accordance with Enlightenment philosophy, believed that it was part of the plan of God or Nature, discernible by reason, to be able to exercise the natural right of self-defense through the use of arms. We address these three key points in this Section, and we believe that the contrast with the approach taken by the Second Amendment corpus linguistics advocates will be apparent.

---

[218] *Id*.

[219] *Id*. (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

**B.  History Of Arms Regulation In The Colonies And Early Republic**

The history of arms regulation in the colonies and early republic is simple and sheds far more light on the meaning and purpose of the Second Amendment than any word counts. Most colonies and states had organized militias, in which able-bodied male citizens were required to participate, generally furnishing their own rifles or muskets, powder, and lead.[220] Apart from militia use, private arms could be carried and used by individuals at will as long as the use was peaceable.[221]

Foes of the individual right to keep and bear arms argue that provisions similar to medieval England's Statute of Northampton applied in this country after American independence, either by positive enactment in a handful of states or by the carryover of the common law from Great Britain.[222] But the Statute itself, as interpreted in England, and the very few American analogues, made carrying of arms illegal only when done "to the terror of the people" or similar language.[223] There were often exceptions for slaves and free blacks, changing

---

[220] *See* NICHOLAS JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY, AND MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 225–34, 287–97 (2d. ed. 2018).

[221] There were also a few, generally local, safety regulations, governing such things as storage of gunpowder, shooting in crowded areas or in a manner that would endanger the public, and hunting regulations.

[222] It bears mentioning that in a recent dissent from the Court's denial of certiorari in a right to carry case, Justice Thomas thoroughly debunked the notion that the Statute of Northampton precluded a finding of the individual right to carry arms in public. *See Rogers v. Grewal*, 140 S. Ct. 1865, 1869–73 (Thomas, J., dissenting). Stephen Halbrook's 2021 book also refutes any notion that the Statute of Northampton, and any U.S. analogues, diminish the individual rights model of the Second Amendment. STEPHEN HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? Part I (2021).

[223] For example, Virginia's Act Forbidding and Punishing Affrays (1786) recited that no man shall "go nor ride armed . . . *in terror of the country*. . . ." *A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force*, ch. 21, at 30 (1803) (emphasis added). The 1795 Massachusetts enactment punished "such as shall ride or go armed *offensively, to the fear or terror of the good citizens of this Commonwealth*. . . ." 2 *Perpetual Laws of the Commonwealth of Massachusetts* 259 (1801) (emphasis added); *see also* Act of Nov. 14, 1801, *in* 1 LAWS OF THE STATE OF TENNESSEE: INCLUDING THOSE OF NORTH CAROLINA NOW IN FORCE IN THIS STATE: FROM THE YEAR 1715 TO THE YEAR 1820, INCLUSIVE 710 (Edward Scott, ed. 1821); An Act describing the power of Justices of the Peace in Civil and Criminal Cases §1, *in* LAWS OF THE STATE OF MAINE 285 (1822).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

over time and place. But otherwise the right to carry in the colonies and early Republic was universal.

The very limited colonial enactments and statutes of the early Republic concerning arms in general consisted of such things as prohibiting firearms trade with Indians,[224] forbidding discharge of firearms in certain inappropriate places,[225] specifying the circumstances in which former colonists disloyal to the Revolution (that is, the wartime enemy forces) could be disarmed,[226] and regulating hunting.[227] Throughout the colonial period to the ratification of the Bill of Rights, there was no law against a white citizen carrying arms so long as those arms were carried peaceably.[228]

The same is largely true after ratification of the Bill of Rights. The Supreme Court has sometimes looked at post-ratification history and tradition to help determine the meaning of

---

[224] *See, e.g.,* Ordinance of March 31, 1939*, in* LAWS & ORDINANCES OF NEW NETHERLAND, 1638–1674 18 (E.B. O'Callaghan ed., 1868).

[225] Act of April 9, 1760, §7, *in* A DIGEST OF THE ORDINANCES OF THE CORPORATION OF THE CITY OF PHILADELPHIA; AND OF THE ACTS OF ASSEMBLY RELATING THERETO 87 (Clement S. Miller ed., 1828).

[226] An Ordinance Respecting The Arms of Non-Associators, §1, *in* 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 11 (William S. Ray ed., 1903) (directing militia officers to collect all arms in his district in the hands of non-associators; *i.e.*, Loyalists).

[227] Act of March 2nd, 1642 Act XI, *in* 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 148 (1823) (requiring leave of landowner before hunting on his land).

[228] There was a single outlier in early colonial New Jersey. New Jersey then consisted of two separate Provinces. In the Province of East New Jersey, a law was enacted in 1686 forbidding the concealed carrying of "any pocket pistol, skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons," with certain other prohibitions and exceptions. *See* Laws of 1686, Ch. 9, in AARON LEAMING & JACOB SPICER, GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF THE PROVINCE OF NEW JERSEY, THE ACTS PASSED DURING THE PROPRIETARY GOVERNMENTS, AND OTHER MATERIAL TRANSACTIONS BEFORE THE SURRENDER THEREOF TO QUEEN ANNE 290-91 (*ca.* 1752) (2d.ed. 1881). Beginning with Massachusetts in 1836, several states in the middle nineteenth century enacted laws requiring individuals who were reasonably accused of posing a specific threat to public safety to post a surety or bond before continuing to carry their arms. But by their plain text, these laws only limited those reasonably thought to pose a threat to public safety; they in no way generally banned the peaceable carrying of arms. Title II, ch. 134, § 16 Revised Statutes of the Commonwealth of Massachusetts 750 (Theron Metcalf & Horace Mann eds., 1836). For a more complete discussion of these laws and New Jersey's colonial restriction, *see* STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 128–29. 222–33 (2021).

Electronic copy available at: https://ssrn.com/abstract=3887060

constitutional provisions.[229] That makes sense, because people then had a continuing understanding of what the Constitution meant, passed down from the Founding. The history of regulating the carrying of arms during the entire period through the Mexican War (1846–48) consisted only of prohibitions in a small minority of states against carrying *concealed* weapons (not the open carry of weapons), often of only a few specified kinds. Court challenges to these laws under the Second Amendment or, more frequently, under state constitutional guarantees of the right to arms, universally assumed that a private right to arms existed under those guarantees and was enforceable in court.[230]

These cases concerning bans on carrying concealed weapons involved the right to private carry by individuals, and thus negate any collective "militia right" theory. If the right were only a right to serve in the militia, the courts would not have even entertained these cases and would have dismissed them on grounds that the individuals had no right to carry weapons outside of militia use. The *Nunn* court expressly stated its understanding that the right to bear arms privately was protected, not just a militia right: "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree."[231]

The Supreme Court's decision in *Dred Scott* observed that if blacks were held to be citizens within the meaning of the Constitution's Privileges and Immunities clause:

---

[229] *Dames & Moore v. Regan*, 453 U.S. 654, 679 n. 8 (1981) (Article II powers); *Marsh v. Chambers*, 463 U.S. 783, 786–92 (1983) (legislative prayers and the Establishment Clause).

[230] *See, e.g., Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822); *Simpson v. State*, 13 Tenn. (5 Yerg.) 356 (1833); *Aymette v. State*, 21 Tenn. (2 Humph.) 154 (1840); *State v. Reid*, 1 Ala. 612 (1840); *State v. Buzzard*, 4 Ark. 18 (1842) (three separate opinions; conviction upheld because concealed weapon was not suitable for militia purposes); *Nunn v. State*, 1 Ga. (1 Kelly) 243 (1846); *State v. Chandler*, 5 La. Ann. 489 (1850).

[231] *Nunn,* 1 Ga. at 251.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation .. . and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, and *to keep and carry arms wherever they went*. (emphasis added).[232]

Despite ruling incorrectly on the merits, the infamous *Dred Scott* opinion demonstrated the understanding that black people *as citizens* would have had the same liberties as white people under the Constitution; namely, "to keep and carry arms wherever they went," privately, and unconnected to any military or militia duties.

The judicial distinction between a collective militia right and a private right to arms was invented in the twentieth century, not in the Founding period.[233] That distinction was first advanced in the federal Circuit Courts of Appeals, at the earliest, in 1942.[234] It was then adopted by most federal circuits in the latter quarter of the twentieth century.[235] But the idea that the Second Amendment protects only a collective—and not an individual—right to bear arms was

---

[232] *Scott v. Sandford*, 60 U.S. 393, 417 (1857).

[233] There are some mid-to-late nineteenth-century state court cases, beginning with *State v. Buzzard*, 4 Ark. 18 (1842), that upheld restrictions on carrying certain weapons such as brass knuckles, fighting knives, and small pocket pistols, on grounds that these weapons had no relationship to military service. These cases involved interpretation of state constitutional provisions, which varied in their wording, not the Second Amendment. No state case adopted an interpretation that the state constitution did not protect an individual right, but only a collective militia right, until *City of Salina v. Blaksley*, 83 P. 619 (Kan. 1905). That example was not followed by other state cases in the early twentieth century, which continued to hold that the right was an individual one. *See generally* David T. Hardy, *The Rise and Demise of the Collective Right Interpretation of the Second Amendment*, 59 CLEV. ST. L. REV. 315 (2011), https://engagedscholarship.csuohio.edu/clevstlrev/vol59/iss3/4.

[234] *Cases v. United States*, 131 F.2d 916, 921–23 (1st Cir.1942).

[235] *See, e.g., Silveira v. Lockyer*, 312 F.3d 1052, 1063–66 (9th Cir. 2002); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir.1999); *United States v. Wright*, 117 F.3d 1265, 1273–74 (11th Cir. 1997); *United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996); *Love v. Pepersack*, 47 F.3d 120, 124 (4th Cir. 1995); *United States v. Hale*, 978 F.2d 1016, 1018–20 (8th Cir. 1992) (Second Amendment limited "to the preservation or efficiency of a militia); *United States v. Oakes*, 564 F.2d 384, 387 (10th Cir. 1977) (similar); *United States v. Warin*, 530 F.2d 103, 105–07 (6th Cir. 1976); *but see United States v. Emerson*, 270 F.3d 203, 221, 223, 227–60 (5th Cir. 2001) and *Parker v. District of Columbia*, 478 F.3d 370, 373 (D.C. Cir. 2007) (both cases holding that the Second Amendment guarantees an individual right to keep and bear arms, and is not a collective right).

77

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

not adopted in any federal case during the Founding period, during all of the nineteenth century, and for most of the twentieth century.

### C. In The Colonial And Founding Periods There Was A Continuous History Of Owning, Using, And Carrying Arms By Individuals

To confirm that there was a history of carrying firearms we need look no further than the seven Presidents from the founding of the Republic until 1837, who all privately kept, carried, and enjoyed firearms, as did Patrick Henry[236] and John Marshall, the prominent early Chief Justice of the U.S. Supreme Court.

Patrick Henry stirred the Virginia Ratification Convention by declaring, "The great object is, that every man be armed .. .. Every one who is able may have a gun."[237] As a lawyer before the Revolution, Henry lived "just north of Hanover town, but close enough for him to walk to court, his musket slung over his shoulder to pick off small game for [his wife] Sarah's table."[238]

George Washington owned perhaps fifty firearms, and some of his pistols, saddle holsters, and fowlers (shotguns) may be seen today at Mt. Vernon and West Point.[239] According to a nineteenth-century source, after the Revolutionary War ended Washington and his servant rode on horseback from Alexandria to Mount Vernon. "*As was then the custom*, the General had holsters, with pistols in them, to his saddle." (emphasis added). A ruffian and reputed murderer forbade him from passing and threatened to shoot him. As related by that source, Washington

---

[236] Patrick Henry, who delivered the famous "Give me liberty or give me death!" speech, was an early governor of Virginia and a leader in the Virginia ratifying convention considering the adoption of the federal Constitution. He was prominent among the anti-Federalists, who supported the inclusion of a Bill of Rights as a condition to ratifying the Constitution.

[237] III JONATHAN ELLIOT (ed.), DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 386 (1827), https://oll.libertyfund.org/title/elliot-the-debates-in-the-several-state-conventions-vol-3.

[238] HARLOW GILES UNGER, LION OF LIBERTY 30 (2010).

[239] STEPHEN HALBROOK, THE FOUNDERS' SECOND AMENDMENT 316–17 (2008), citing Ashley Halsey, Jr., *George Washington's Favorite Guns*, AMERICAN RIFLEMAN 23 (February 1968).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

handed his pistol to the servant, saying "If this person shoots me, do you shoot him," and rode on without incident.[240]

John Adams spent his youth playing games and sports, and, "above all, in shooting, to which diversion I was addicted to a degree of ardor which I know not that I ever felt for any other business, study, or amusement."[241] A biographer states:

> John's zest for shooting prompted him to take his gun to school, secreting it in the entry so that the moment school let out he might dash off to the fields after crows and squirrels.[242]

Thomas Jefferson was an avid hunter, shooter, and gun collector. His memorandum books kept between 1768 and 1823 contain numerous references to the acquisition of pistols, guns, muskets, rifles, fusils, gun locks and other gun parts, the repair of firearms, and the acquisition of ammunition. Included were a pair of "Turkish pistols .. . so well made that I never missed a squirrel at 30 yds. with them."[243]

Jefferson carried one or both of these Turkish pistols when traveling as President. In an 1803 letter, Jefferson wrote to an innkeeper at Orange Courthouse, located between Monticello and Washington, D.C.: "I left at your house .. . a pistol in a locked case, which no doubt was found .. . after my departure. I have written to desire Mr. Randolph or Mr. Eppes to call on you for it, as they come on to Congress, to either of whom therefore be so good as to deliver it."[244]

---

[240] BENJAMIN TAYLOE, OUR NEIGHBORS ON LAFAYETTE SQUARE 47 (1872).

[241] ANNE BURLEIGH, JOHN ADAMS 8–9 (1969) (quoting 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257 (1961)).

[242] *Id.* at 9 (citing 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 258–59 n.6).

[243] *See* references in HALBROOK, FOUNDERS' SECOND AMENDMENT at 318 n.40 (2008).

[244] Jefferson's letter to Randolph also survives. "From Thomas Jefferson to Paul Verdier, 9 October 1803," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-41-02-0366. [Original source: *The Papers of Thomas Jefferson*, vol. 41, *11 July–15 November 1803*, Barbara B. Oberg ed. Princeton: Princeton University Press, 2014, p. 486.]; "From Thomas Jefferson to Thomas Mann Randolph, 9 October 1803," *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-41-02-0365. [Original

79

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

James Madison, in a 1775 missive, extolled the marksmanship "skill of the Virginians" (including himself) with the rifle:

> The strength of this Colony will lie chiefly in the rifle-men of the Upland Counties, of whom we shall have great numbers .. .. The most inexpert hands rec[k]on it an indifferent shot to miss the bigness of a man's face at the distance of 100 Yards. I am far from being among the best & should not often miss it on a fair trial at that distance.[245]

As a young boy, James Monroe was taught by his father how to hunt, and as he grew he became rather successful at bringing home game for dinner.[246] In 1769, at age eleven, James was enrolled at Campbell Academy, several miles from his home in Westmoreland County, Virginia. Each day, "[w]ell before dawn, James left for school, carrying his books under one arm with his powder horn under the other and his musket slung across his back."[247] Future Chief Justice John Marshall was a boarder at the school, and "[o]n occasion John accompanied James back to the Monroe farm, frequently stopping to hunt along the way."[248]

John Quincy Adams also owned a gun and liked to hunt. As a young man he made this entry in his diary: "Rain'd in the fore part of the day but cleared up in the afternoon: I went with my gun down upon the marshes; but had no sport."[249] On another occasion he noted: "Just before

---

source: *The Papers of Thomas Jefferson*, vol. 41, *11 July–15 November 1803*, Barbara B. Oberg ed. Princeton: Princeton University Press, 2014, pp. 485–486.].

[245] CLAYTON CRAMER, ARMED AMERICA 151 (2006) (quoting I James Madison, William T. Hutchinson & William M.E. Rachal, eds., THE PAPERS OF JAMES MADISON 153 (1962)).

[246] TIM MCGRATH, JAMES MONROE: A LIFE 8 (2020).

[247] *Id.* at 9 (2020).

[248] *Id.*

[249] "29th.," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/03-02-02-0002-0008-0030. [Original source: *The Adams Papers*, Diary of John Quincy Adams, vol. 2, *March 1786–December 1788*, Robert Taylor J & Marc Friedlaender, eds. Cambridge, MA: Harvard University Press, 1981, p. 281.]

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

dark I went out with the gun, for half an hour, but saw no game."[250] As an older man while stationed abroad he wrote to his younger brother, Thomas Boylston Adams, asking that he instruct John Quincy's boys on firearms:

> One of things which I wish to have them taught, and which no man can teach them better than you, is the use and management of firearms .. .. As you are a sportman I beg you occasionally from this time to take George out with you in your shooting excursions, teach him gradually the use of the musket, its construction, and the necessity of prudence in handling it; let him also learn the use of pistols, and exercise him at firing at a mark.[251]

In 1788, one year after the Constitution had been signed, and three years before the Bill of Rights and Second Amendment became effective, future President Andrew Jackson wrote about one of his trips saying "I had my saddlehorse—a fine young stallion—and a stout pack-mare carrying my personal effects."[252] For arms, Jackson carried a pair of pistols in saddle holsters, a pistol worn on his belt, and a new rifle.[253] That's four firearms, in case you weren't counting!

As a judge, when the sheriff and posse could not capture a wrongdoer who faced them down, Jackson asked the sheriff to summon him in the arrest, adjourned court for ten minutes, and at pistol point captured the culprit.[254] In his will, Jackson made special bequests of some of his prized possessions, including three swords that had been presented to him, and "pistols given

---

[250] *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/03-01-02-0007-0012. [Original source: *The Adams Papers,* Diary of John Quincy Adams, vol. 1, *November 1779–March 1786,* Robert J. Taylor Marc Friedlaender, eds. Cambridge, MA: Harvard University Press, 1981, pp. 334–350.]

[251] "From John Quincy Adams to Thomas Boylston Adams, 8 September 1810," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/99-03-02-1850. [Original source: This is an Early Access document from The Adams Papers. It is not an authoritative final version.]

[252] H. W. BRANDS, ANDREW JACKSON: HIS LIFE AND TIMES at 54–55.

[253] *Id.*

[254] ROBERT V. REMINI, THE LIFE OF ANDREW JACKSON at 43–44.

81

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

him by General Lafayette," which he bequeathed to Lafayette's son.[255] These instances of the early Presidents and Founders possessing and using firearms for private, non-militia purposes are not exhaustive, but are representative.[256]

Though traditional practices are often not recorded, we have this from the eminent legal and constitutional scholar, teacher, and judge St. George Tucker in 1803: "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side."[257]

As early as 1747, Benjamin Franklin observed that "most People hav[e] a Firelock of some kind or other already in their Hands."[258]

Further contemporaneous testimony that people were already well-armed for private purposes is provided by Representative James "Left Eye" Jackson of Georgia, who commented during the 1790 debates over what became the Militia Acts of 1792:

> Against a motion to delete the requirement in the bill that every man "provide himself" with arms and insert that every man "shall be provided" with arms, Jackson explained that "most of the citizens of America possessed and used guns. *In Georgia and in the back country they were useful to procure food, and were to be met with in every House.* He had no doubt but the people would supply themselves fully, without the interference of the Legislature...."[259]

Not only were guns widely possessed and used, but that possession and use was both an individual right and useful for militia duty. Jackson agreed "that every citizen was not

---

[255] *Id.*at 348.

[256] For some additional examples, *see* STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 198–201 (2021).

[257] 5 St. George Tucker, *Blackstone's Commentaries* Appendix 19 (1803).

[258] "Form of Association, 24 November 1747," Founders Online, National Archives, https://founders.archives.gov/documents/Franklin/01-03-02-0092. [Original source: The Papers of Benjamin Franklin, vol. 3, January 1, 1745, through June 30, 1750, Leonard W. Labaree, ed. New Haven: Yale University Press, 1961, pp. 205–212.]

[259] STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 194 (2021) (citations omitted; emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

only entitled to carry arms, but also in duty bound to perfect himself in the use of them, and thus become capable of defending his country."[260]

Studies of firearms ownership and use, both in colonial times and the early republic, show that guns were commonplace and frequently used. A review of at least eight separate studies of probate inventories of estates during the colonial era and early republic found that "Guns are found in 50-73% of the male estates in each of the eight databases and in 6-38% of the female estates in each of the first four databases."[261] The authors concluded that "Gun ownership is particularly high compared to other common items."[262] A national sample of inventories for the year 1774 showed that "guns are listed in 54% of estates, compared to only 30% of estates listing any cash, 14% listing swords or edged weapons, 25% listing Bibles, 62% listing any book, and 79% listing any clothes."[263]

Professor Clayton E. Cramer has written two books demonstrating the prevalence and widespread use of firearms in colonial times, the early republic, and the nineteenth century.[264] He also cites numerous studies of inventories of estates, showing the widespread ownership of firearms. Cramer quotes from a wide range of original sources demonstrating that firearms not only were commonly possessed for militia purposes, but they also were widely available and used so often for other purposes that generally their use was not remarked on. At the very inception of Plymouth Colony in 1620, a party of twenty men went ashore at Cape Cod and each

---

[260] *Id.* at 195.

[261] James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1778 (2002).

[262] *Id.*

[263] *Id.* These findings may be given particular credence given the lead author's aversion to firearms. *See* James Lindgren, *Fall from Grace: Arming America and the Bellesiles Scandal*, 111 YALE L.J. 2195, 2196 (2002). (hereafter "Lindgren, *Fall from Grace*").

[264] CLAYTON E. CRAMER, ARMED AMERICA: THE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE (2006); CLAYTON E. CRAMER, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE (2018).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

one carried a firearm.[265] Plymouth and Massachusetts Bay colonies celebrated important occasions, such as the coming and goings of dignitaries, by firing guns.[266] So entrenched was the gun culture that in 1635 Massachusetts Bay prohibited brass farthings (a low value coin) as currency, and substituted readily available musket bullets "to pass for farthings"—testifying to their availability and utility.[267]

Cramer also describes archaeological evidence in Virginia of widespread possession of guns. Reports of excavations in 1995 through 1997 found that the dig had recovered "parts of at least eight different matchlocks, one snaphaunce pistol, and one other snaphaunce, six musket rests, two bullet moulds, a musket scourer, 2,807 pieces of lead shot, 223 bullets (defined as lead shot over 10mm diameter, but excluding artillery projectiles), at least 30 bandoliers, nine gunflints, and a bullet bag."[268] Even Indians were well-armed with firearms from early colonial times.[269]

Second Amendment scholar Stephen Halbrook noted in a recent book that in 1807 Aaron Burr was tried for treason, of which he was acquitted, based on an alleged conspiracy to create a separate country in what was then called the Southwest. "In response to claims that he met with a

---

[265] CRAMER, ARMED AMERICA 57 (citing [William Bradford], "A Relation, or Journal, of the Beginning and Proceedings of the English Plantation settled at Plymouth," in Edward Arber, ed., THE STORY OF THE PILGRIM FATHERS, 1606-1623 A.D. AS TOLD BY THEMSELVES, THEIR FRIENDS, AND THEIR ENEMIES 432 (1897). Cramer notes that "Forty-one adult men signed the Mayflower Compact, and twenty were ashore with guns, with at least two guns remaining on the ship. We therefore know that there were guns for *at least* half of the men at Plymouth." CRAMER, ARMED AMERICA 57 (emphasis in original).

[266] CRAMER, ARMED AMERICA 59. Cramer cites several examples.

[267] *Id.* (quoting JOHN WINTHROP, (James Kendall Hosmer, ed.), WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND" 1630-1649 1:70, 229, 2:194, 1:148 (1908).

[268] CRAMER, ARMED AMERICA 61.

[269] The colonists—British, French, Dutch, and to a lesser degree other nationalities—carried on an extensive trade in firearms, ammunition, and gunsmithing services with the tribes, beginning as early as the 1620s and expanding enormously as time went on. The story of the arming of the Indian tribes in pre-revolutionary times is told in detail in David J. Silverman, THUNDERSTICKS: FIREARMS AND THE VIOLENT TRANSFORMATION OF NATIVE AMERICA 21–154 (2016).

84

Electronic copy available at: https://ssrn.com/abstract=3887060

### WORK IN PROGRESS

number of armed men in the course of the conspiracy," Halbrook relates, "his defense attorney made an argument that illustrated the widespread use of firearms in the United States:

> Rifles, shot guns and fowling pieces are used commonly by the people of this country in hunting and for domestic purposes; they are generally in the habit of pursuing game. In the upper country every man has a gun; a majority of the people have guns everywhere, for peaceful purposes. Rifles and shot guns are no more evidence of military weapons than pistols or dirks used for personal defence, or common fowling pieces kept for the amusement of taking game. It is lawful for every man in this country to keep such weapons."[270]

One celebrated (and later notorious) book, *Arming America,* by Michael Bellesiles, wrongly claimed that guns were rare in early America; *i.e.*, that there was no longstanding tradition of firearms use for private purposes. Bellesiles claimed in his book that "[T]he vast majority of those living in British North American colonies had no use for firearms, which were costly, difficult to locate and maintain, and expensive to use."[271] As summarized by James Lindgren, in an article describing Bellesiles' claims:

> According to Bellesiles, in seventeenth-, eighteenth-, and early nineteenth-century America there were very few guns. Privately owned guns were mostly in poor working condition. By law, guns were not kept in the home but rather stored in central armories, and guns were too expensive for widespread private ownership. He even claims that men generally were unfamiliar with guns and that they did not want guns—preferring axes and knives instead, in part because guns were so inaccurate that they were of little use. He argues that few settlers hunted, and implies that axes made very good weapons in hunting. According to *Arming America*, in battle "the ax [was often considered] the equal of a gun." (footnotes to Bellesiles omitted throughout).[272]

But in order to reach those false conclusions, Bellesiles had to invent or misrepresent sources on a breathtaking scale, causing an investigation, which led to Bellesiles being fired from

---

[270] STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 212 (2021) (quoting DAVID ROBERTSON, REPORTS OF THE TRIALS OF COLONEL AARON BURR, (LATE VICE PRESIDENT OF THE UNITED STATES,) FOR TREASON, AND FOR A MISDEMEANOR 582 (Philadelphia: Hopkins & Earle, 1808).

[271] MICHAEL A. BELLESILES, ARMING AMERICA: THE ORIGINS OF A NATIONAL GUN CULTURE 110 (2000).

[272] Lindgren, *Fall from Grace* at 2196.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

his faculty position at Emory University and stripped of the Bancroft Prize, which he had been awarded for his book.[273]

The Founding generation and the many generations that followed knew how integral firearms were to American life. Firearms were commonplace; they were everywhere. As described above, children carried them to and from school. After noting that John Locke's influential Second Treatise of Government invariably involved an appeal to arms in order "to alter or abolish tyrannous government," Professor Akhil Amar observed that "[t]o Americans in 1789, this was not merely speculative theory. It was the lived experience of the age."[274] The everyday exercise of their right to arms for private purposes was an equally deeply lived experience for the colonists and Founding generation.

The NYSRPA Linguists' Brief contends that "Newly available corpus linguistics evidence cautions against expanding the Second Amendment to entitle civilians to carry loaded guns in public places whenever they so choose."[275] But counting of word occurrences simply cannot overcome the robust historical record demonstrating that Americans during the Founding were legally free to own and carry arms of all kinds privately, did so routinely, and had done so since the colonies were founded. To imagine that the Founders, ratifiers, and later generations meant the Second Amendment to leave that private right unprotected is simply untenable.

### D.  Corpus Linguistics Ignores The Ideas Prevailing When The U.S. Was Founded

As noted, the distinction between an alleged collective right and an individual right did not emerge until the twentieth century, and it was not meaningfully adopted by federal appellate

---

[273] The story is told, and Bellesiles exposed, in Lindgren, *Fall from Grace, passim*, and in CLAYTON E. CRAMER, ARMED AMERICA x-xvii (2006).

[274] AKHIL REED AMAR, THE BILL OF RIGHTS 47 (1998)

[275] *NYSRPA* Linguists' Brief 17.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

courts until the end of the twentieth century. Even then, the collective right construct was not judicially viewed as a "right to serve in the militia," as the Goldfarb Brief urges, but as a right possessed by the states.[276] To the Founding generation, any contention that they as individuals did not have the right to keep and carry arms would have been inconceivable. That is especially true given the way they thought about rights.

The members of the Founding generation were products of the eighteenth-century Enlightenment and rationalist intellectual universe. They were heavily influenced by Locke's Second Treatise of Government, which argued that natural law and natural rights were discoverable by reason. Thus, the Bill of Rights did not create or bestow rights; it merely recognized rights that already existed.[277] As described by the late Harvard Professor Bernard Bailyn, an eminent intellectual historian of the American founding:

> It is not simply that the great virtuosi of the American Enlightenment—Franklin, Adams, Jefferson—cited the classic Enlightenment texts and fought for the legal recognition of natural rights and for the elimination of institutions and practices associated with the *ancien régime*. They did so; but they were not alone. The ideas and writings of the leading secular thinkers of the European Enlightenment—reformers and social critics like Voltaire, Rousseau, and Beccaria as well as conservative analysts like Montesquieu—were quoted

---

[276] The reasoning behind the right belonging to the states was: "[T]he Second Amendment guarantees a collective rather than an individual right." *United States v. Warin*, 530 F.2d 103, 106 (6th Cir.), *cert. denied*, 426 U.S. 948 (1976). "Because the Second Amendment guarantees the right of the states to maintain armed militia, the states alone stand in the position to show legal injury when this right is infringed." *Hickman v. Block*, 81 F.3d 98, 102 (9th Cir. 1996). So even the collective right theory does not support Goldfarb's position that the Second Amendment protects a right to serve in the militia.

[277] *See United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (the right to keep and bear arms "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence."). The Linguists' Brief takes the opposite position: "Hence, corpus linguistics can shed considerable light on whether the phrase 'keep and bear arms' was most commonly understood at the Founding to *confer* an individual right...." *NYSRPA* Linguists' Brief at 15 (emphasis added). Although at present we are less inclined to speak of God-given natural law, the tradition has existed well past the Founding period. Martin Luther King, Jr. declared in his Letter from the Birmingham Jail:

> A just law is a man-made code that squares with the moral law, or the law of God. An unjust law is a code that is out of harmony with the moral law. To put it in the terms of St. Thomas Aquinas, an unjust law is a human law that is not rooted in eternal and natural law.

Dr. Martin Luther King, Jr., *Letter from Birmingham Jail* (April 16, 1963), available at https://letterfromjail.com/.

87

Electronic copy available at: https://ssrn.com/abstract=3887060

everywhere in the colonies, by everyone who claimed a broad awareness. In pamphlet after pamphlet the American writers cited Locke on natural rights and on the social and governmental contract, Montesquieu and later Delolme on the character of British liberty and on the institutional requirements for its attainment, Voltaire on the evils of clerical oppression, Beccaria on the reform of criminal law, Grotius, Pufendorf, Burlamaqui, and Vattel on the laws of nature and of nations, and on the principles of civil government. The pervasiveness of such citations is at times astonishing....[278]

Though there were other influences on their thinking, such as the writings of Greek and Roman antiquity, the English common law, New England Puritan covenant theology, and the English opposition radicals of the early eighteenth century, virtually no scholar doubts that Enlightenment writers wielded profound influence on the way the Founders thought about fundamental rights.

The Founders' interest in and adoption of the ideas of the great Italian Enlightenment author Cesare Beccaria illustrate the point.[279] Beccaria was an ardent foe of disarming private citizens, writing that laws forbidding the carrying of arms:

> [D]isarm those only who are neither inclined nor determined to commit crimes. Can it be supposed that those who have the courage to violate the most sacred laws of humanity and the most important in the civil code will respect the lesser and more arbitrary laws, which are easier and less risky to break, and which, if enforced, would take away the personal freedom – so dear to man and to the enlightened lawgiver – and subject the innocent man to all the annoyances which the guilty deserve? These laws make the victims of attack worse off and improve the position of the assailant. They do not reduce the murder rate but increase it, because an unarmed man can be attacked with more confidence than an armed man.[280]

---

[278] BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 27 (2d ed. 1992).

[279] *See* Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms,* 2020 PEPPERDINE L. REV. 71 (2020).

[280] CESARE BECCARIA, ON CRIMES AND PUNISHMENTS AND OTHER WRITINGS 78 (Aaron Thomas, ed., Aaron Thomas & Jeremy Parzen, trans., 2008).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Thomas Jefferson took the time to transcribe this quotation from Beccaria (and more) in the original Italian in his commonplace book.[281] John Adams wrote out a passage from Beccaria in his diary in 1770, quoted from Beccaria in his defense of the British soldiers following the Boston Massacre, and later acquired his own copy of *On Crimes and Punishments*.[282] In 1792, after the Revolutionary War fighting had ceased, James Madison was entrusted with the task of compiling a list of books which Congress ought to acquire for members' use. In January 1793, Madison submitted his report, which included the *Opere diverse di Cesare Beccaria* in three parts, which shows the esteem in which Beccaria was held by the Founders.[283]

In 1775, Alexander Hamilton exemplified the natural rights position when he proclaimed that:

> The sacred rights of mankind are not to be rummaged for, among old parchments, or musty records. They are written, as with a sun beam, in the whole *volume* of human nature, by the hand of the divinity itself; and can never be erased or obscured by mortal power. (emphasis in original)[284]

Philip Livingston, a New York Delegate to the Continental Congress and signer of the Declaration of Independence, in a 1774 pamphlet asked another pamphleteer, "Do you mean, my Reverend Sir, that any right .. . if it be not confirmed by some statute law is not a legal right .. .

---

[281] *See* Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders, supra,* at 75–76.

[282] "[June 1770]," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/01-01-02-0014-0003. [Original source: The Adams Papers, Diary and Autobiography of John Adams, vol. 1, 1755–1770, L. H. Butterfield, ed. Cambridge, MA: Harvard University Press, 1961, pp. 350–355.].

[283] "Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031. [Original source: The Papers of James Madison, vol. 6, 1 January 1783–30 April 1783, William T. Hutchinson & William M. E. Rachal eds. Chicago: The University of Chicago Press, 1969, pp. 62–115.].

[284] Alexander Hamilton, *The Farmer Refuted*, &c., [23 February] 1775, *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-01-02-0057. [Original source: *The Papers of Alexander Hamilton*, vol. 1, *1768–1778*, Harold C. Syrett, ed. New York: Columbia University Press, 1961, pp. 81–165.]

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

?" Livingstone emphatically rejected that position, avowing that legal rights are "those rights which we are entitled to by the eternal laws of right reason."[285]

Jefferson was thoroughly imbued with the natural law and natural rights outlook. In his draft instructions to the Virginia delegation attending the First Continental Congress, Jefferson stated that an address by them to King George III regarding grievances should be presented with a "freedom of language and sentiment which becomes a free people, claiming their rights as derived from the laws of nature, and not as the gift of their chief magistrate [that is, the British king]".[286] Two years later, his draft of the Declaration of Independence would be finalized at the Second Continental Congress to read:

> We hold these truths to be self-evident, that all men are created equal, that *they are endowed by their Creator with certain unalienable Rights*, that among these are *Life*, Liberty and the pursuit of Happiness. —That to *secure* these rights, Governments are instituted among Men .. .." (emphasis added).[287]

The most important of those natural rights was the right to defend one's life and the lives of others. The Founders were very familiar with William Blackstone's Commentaries on the Laws of England, a seminal and authoritative four-volume treatise first published in 1765. Blackstone's "works constituted the preeminent authority on English law for the Founding generation."[288] Under the heading "The Rights of Persons," Blackstone identified "three principal or primary articles: the right of personal security, the right of personal liberty, and the

---

[285] Philip Livingstone, *The Other Side of the Question, or A Defence of the Liberties of North-America* 9 (1774), https://www.canadiana.ca/view/oocihm.55972/14?r=0&s=1 (spelling and punctuation modernized).

[286] Thomas Jefferson, Draft of Instructions to the Virginia Delegates in the Continental Congress (MS Text of *A Summary View*, &c.), (July 1774])" *Founders Online,* National Archives, https://founders.archives.gov/ documents/Jefferson/01-01-02-0090. [Original source: *The Papers of Thomas Jefferson*, vol. 1, *1760–1776*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 121–137.]

[287] THE DECLARATION OF INDEPENDENCE, para. 2 (U.S. 1776).

[288] *Alden v. Maine*, 527 U.S. 706, 715 (1999).

Electronic copy available at: https://ssrn.com/abstract=3887060

right of private property."[289] The right of personal security includes "a person's legal and uninterrupted enjoyment of his life," and Blackstone declared that "Life is the immediate gift of God, a right inherent by nature in every individual .. .."[290]

The constitution of England, according to Blackstone, "established certain other auxiliary subordinate rights of the subject, which serve principally as outworks or barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."[291] He stated that:

> The fifth and last auxiliary right of the subject .. . is that of *having arms for their defence*, suitable to their condition and degree, and such as are allowed by law. Which is also declared by the same statute 1 W. & M. st. 2. c. 2, and is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression.[292]

Two things are important to note about the passages from Blackstone just quoted. First, Blackstone was working within the eighteenth-century Enlightenment conception of rights as being natural rights. The right to life is an "immediate gift from God, a right inherent in every individual." The right to arms is "declared" by the statute, not created by it, and is an allowance of "the natural right of resistance and self-preservation." Second, all of the rights discussed in these passages are individual rights. They are "the rights of persons," and the right to arms exists to foster "self-preservation." So Blackstone expressly founded the individual right to arms on

---

[289] 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *129 (1765–1769), https://oll-resources.s3.us-east-2.amazonaws.com/oll3/store/titles/2140/Blackstone_1387-01_EBk_v6.0.pdf (spelling and punctuation modernized).

[290] *Id.*

[291] *Id.* at *141.

[292] *Id*. at *143–44 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

natural rights.[293] There is no hint that this right has anything "collective" about it, or that the right to arms exists for military purposes. In fact, it comes into play when the "sanctions of laws and society" fail to protect the individual.

The Constitution as promulgated in 1787 did not originally have a Bill of Rights. In the ratifying conventions in some states, the ratifiers urged the First Congress to adopt amendments that would codify certain rights that the people believed they already possessed, either as natural rights, or as historical rights and liberties they had enjoyed as Englishmen. In the Virginia ratifying convention, twenty declarations of rights were proposed. The very first article expressly declared:

> That there are certain *natural rights*, of which men, when they form a social compact, cannot deprive or divest their posterity; among which are the *enjoyment of life and liberty*, with the means of acquiring, possessing, and *protecting property*, and pursuing and obtaining happiness and *safety*. (emphasis added)[294]

Virginia's proposals contained a more extended version of what ultimately became the Second Amendment:

> That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state. That standing armies in time of peace are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the community will admit; and that in all cases the military should be under strict subordination to, and governed by the civil power.[295]

This proposed amendment confirms that "the people *have* a right to keep and bear arms," just as the Second Amendment states that "*the right* of the people" shall not be infringed. In

---

[293] Thomas Paine, author of *Common Sense,* the most influential pamphlet in American Revolutionary times, was also a natural rights thinker. *See, e.g.,* THOMAS PAINE, THE RIGHTS OF MAN 49–53 (2d. ed. 1791).

[294] 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF VIRGINIA, Appendix, 161–62 (1803) (hereafter, "Tucker's Blackstone").

[295] *Id.* at 164.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

other words, the Founders conceived of the right as a natural right that already existed, independently of whether it was mentioned in the Constitution.

The right to arms was intimately bound up with the inherent, natural right to self-defense, which was often considered the quintessential, supreme natural right. Blackstone wrote that because "the future process of law is by no means an adequate remedy for injuries accompanied with force" the law permits an individual "immediately to oppose one violence with another. *Self-defence, therefore, as it is justly called the primary law of nature*, so it is not, neither can it be in fact, taken away by the law of society." (emphasis added).[296]

The Founders held the same view of the natural right to self-defense. John Adams acted as the attorney *defending* eight British troops in the trial following the Boston Massacre in 1770. The residents of Boston whom the troops attacked were armed with clubs. But rather than saying that this alone gave the troops the right to attack the citizens, Adams acknowledged that, "*here every private person is authorized to arm himself*; and on the strength of this authority I do not deny *the inhabitants had a right to arm themselves at that time for their defence.*" (emphasis added)[297] Adams instead based his plea of justifiable homicide in self-defense on Blackstone and the law of nature. He stated that the basis is found in "self-love":

> which is not only our indisputable right but our clearest duty. By the laws of nature, this is interwoven in the heart of every individual. God Almighty, whose law we cannot alter, has implanted it there .. .. It is the first and strongest principle in our nature. Justice Blackstone calls it "The primary canon in the law of nature."[298]

---

[296] 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *47 (1765–1769), https://oll-resources.s3.us-east-2.amazonaws.com/oll3/store/titles/2142/Blackstone_1387-02_EBk_v6.0.pdf (spelling and punctuation modernized).

[297] John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 Masterpieces of Eloquence 2573 (Mayo W. Hazeltine, et al. eds., 1905) (emphasis added).

[298] *Id.*

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

In the separate trial of Captain Preston, the commanding officer of those eight troops, Adams argued that the right of self-defense is a natural right that cannot be taken away by civil society. In his Notes of Authorities for His Argument for the Defense in October 1770, in "Captn. Prestons Case," Adams included the point "Self Defence, the primary Canon of the Law of Nature," almost certainly again referring to Blackstone. He also included in his notes a point referring to "Foster 273." This is an important English legal treatise from the mid-1700s that was popularly known as "Foster's Crown Cases."[299] On p. 273, the following passage appears:

> In the Case of Justifiable Self-Defense the injured Party may repel Force with Force in Defence of his Person, Habitation, or Property, against one who manifestly intendeth and endeavoureth with Violence or Surprize to commit a known Felony upon either .. .. and if in a Conflict between them He happeneth to Kill, such Killing is Justifiable. *The Right of Self-Defence in these Cases is founded in the Law of Nature, and is not nor can be superseded by any Law of Society.*" (emphasis added)[300]

St. George Tucker, the eminent Founding era scholar and judge mentioned above, published his own edition of Blackstone, with notes and commentary tailoring it for an American audience. In discussing "The restraints imposed on the legislative powers of the federal government," he quoted the Second Amendment, characterized it as "the true palladium of liberty," and immediately noted that "The right of self defence is the first law of nature .. .."[301]

The right to armed self-defense was viewed by the Founders as a right that could not be taken away by any law of civil society. That natural right was the right they expressly confirmed in the Second Amendment.

---

[299] SIR MICHAEL FOSTER, A REPORT OF SOME PROCEEDINGS ON THE COMMISSION FOR THE TRIAL OF THE REBELS IN THE YEAR 1746, IN THE COUNTY OF SURRY: AND OF OTHER CROWN CASES: TO WHICH ARE ADDED DISCOURSES UPON A FEW BRANCHES OF THE CROWN LAW (1762).

[300] "Adams' Notes of Authorities for His Argument for the Defense: October 1770," Founders Online, National Archives, https://founders.archives.gov/documents/Adams/05-03-02-0001-0003-0007. [Original source: The Adams Papers, Legal Papers of John Adams, vol. 3, Cases 63 and 64: The Boston Massacre Trials, L. Kinvin Wroth & Hiller B. Zobel eds. Cambridge, MA: Harvard University Press, 1965, pp. 81–86.].

[301] Tucker's Blackstone at 290, 300.

94

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

So, how do the linguists square the Founders' conception of rights as natural rights, as the rights of individuals to self-defense, as the right to have and use arms to engage in defense of self, others, or property, all in a non-military, civil context, with their late twentieth century formulation that it is a merely collective, military right, or a "right to serve in the militia"? How do they reconcile their "counting of hits" methodology with the deep philosophical principles that the Founders actually embraced, articulated, and lived? Answer: they don't.

Relying on word counts is an inadequate substitute for history, tradition, and engaging with the known beliefs and principles of the men who wrote and ratified our Founding documents, including the Second Amendment.

## VI.   CORPUS LINGUISTICS HAS NOT BEEN BROADLY EMBRACED BY THE COURTS

So far, perhaps as a result of the deficiencies described above, corpus linguistics has made relatively few inroads (outside of Utah) into actual judicial decision-making. The Utah connection likely arises because Justice Thomas Lee of the Utah Supreme Court is a thought leader in the corpus linguistics space, and several corpora are maintained at BYU.

Most of the cases employing or mentioning corpus linguistics are state court cases. When this article was prepared, there were twenty-one published state court appellate cases mentioning, using, or rejecting corpus linguistics.[302] Of these, eleven were Utah state court cases, three were

---

[302] *Athens v. McClain*, 168 N.E.3d 411 (Ohio 2020); *Brady v. Park*, 445 P.3d 395 (Utah 2019); *Craig v. Provo City*, 389 P.3d 423 (Utah 2016); *Exotic Motors v. Zurich Am. Ins. Co.*, 597 S.W.3d 767 (Mo. Ct. App. 2020); *Fire Ins. Exch. v. Oltmanns*, 416 P.3d 1148 (Utah 2018); *In re Adoption of Baby E.Z.*, 266 P.3d 702 (Utah 2011); *Muddy Boys, Inc. v. Dep't of Com., Division of Occupational and Prof. Licensing*, 440 P.3d 741 (Utah Ct. App. 2019); *Murray v. BEJ Minerals, LLC*, 464 P.3d 80 (Mont. 2020); *Napolitano v. St. Joseph Cath. Church*, 308 So.3d 274 (Fl. Dist. Ct. App. 5th 2020); *Neese v. Utah Bd. of Pardons and Parole*, 416 P.3d 663 (Utah 2017); *O'Hearon v. Hansen*, 409 P.3d 85 (Utah Ct. App. 2017); *People v. Harris*, 885 N.W.2d 832 (Mich. 2016); *Richards v. Cox*, 450 P.3d 1074 (Utah 2019); *Salt Lake City Corporation v. Haik*, 466 P.3d 178 (Utah 2020); *State in Interest of J.M.S.*, 280 P.3d 410 (Utah 2011); *State v. Burke*, 462 P.3d 599 (Idaho 2020); *State v. Gomez-Alas*, 477 P.3d 911 (Idaho 2020); *State v. Lantis*, 447 P.3d 875 (Idaho 2019); *State v. Misch*, 2021 WL 650366 (Vt. 2021); *State v. Rasabout*, 356 P.3d 1258 (Utah 2015); *State v. Thonesavanh*, 904 N.W.2d 432 (Minn. 2017). The only case involving the right

95

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Idaho cases, and there was one each from the Florida, Minnesota, Michigan, Missouri, Montana, Ohio, and Vermont state courts.

The federal courts have had far fewer cases in which corpus linguistics was used or even mentioned.[303] The U.S. Supreme Court has already rejected the word count methodology in *Heller*, and has not relied on corpus linguistics arguments in any of its opinions as of this writing.[304] Goldfarb has claimed that "[i]n recent years, individual members of [the Supreme] Court have relied on corpus analyses, or directly on corpus data," in their opinions.[305] But it would be a stretch to say that any of the three opinions he cites amount to an endorsement of corpus linguistics.[306] Justice Alito cited a corpus linguistics analysis in a footnote in his dissenting opinion in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).[307] But this passing reference in a footnote in a statutory interpretation case to a study that "support[ed]" the conclusion Justice Alito had already reached through standard legal analysis hardly amounts to an endorsement of corpus linguistics to determine the meaning of constitutional terms. *Id.*

---

to keep and bear arms in which corpus linguistics was discussed is *State v. Misch.* Ultimately the Vermont Supreme Court declined to adopt a militia-only, collective right view, affirming instead that under the Vermont Constitution the right is an individual one. For a well-reasoned criticism of *Misch*, *see* Stephen P. Halbrook, New Gun Rights Decision: State of Vermont v. Misch, THE FEDSOC BLOG (Apr. 13, 2021), https://fedsoc.org/commentary/fedsoc-blog/new-gun-rights-decision-state-of-vermont-v-misch.

[303] *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91 (3d Cir. 2019); *Lawrence v. First Fin. Inv. Fund V, LLC*, 444 F.Supp.3d 1313 (D. Utah 2020); *Nycal Offshore Dev. Corp. v. United States*, 148 Fed.Cl. 1 (Fed. Cl. 2020); *United States v. Scott*, 990 F.3d 94 (2d Cir. 2021); *United States v. Ward*, 972 F.3d 364 (4th Cir. 2020) (corpus linguistics merely mentioned in a concurrence); *United States v. Woodson*, 960 F.3d 852 (6th Cir. 2020); *Wilson v. Safelite Group, Inc.*, 930 F.3d 429 (6th Cir. 2019); *Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019).

[304] As noted, *supra*, Justice Alito mentioned corpus linguistics in a concurrence as possibly providing guidance on the "series-qualifier canon," but did not suggest it should be used to determine the meaning of constitutional language.

[305] Br. of Neal Goldfarb as Amicus Curiae in Support of Respondents at 8, *New York State Rifle & Pistol Ass'n, Inc. v. Corlett*, No. 20-843 (Feb. 12, 2021).

[306] Other corpus linguistics advocates have also cited some of these opinions. *See* Br. of Corpus Linguistics Professors & Experts as Amici Curiae Supporting Appellees at 11, *Young v. Hawaii*, No. 12-17808 (9th Cir. June 4, 2020).

[307] *Bostock*, 140 S. Ct. at 1769, n.22 (Alito, J., dissenting).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Indeed, Justice Alito's footnote does not even contain the term "corpus linguistics." Justice Thomas similarly has cited a study using corpus linguistics techniques alongside a more conventional analysis of historical texts without mentioning expressly or commenting upon the utility of corpus linguistics.[308] In another case, Justice Thomas supported his claim that the phrase "expectation(s) of privacy" does not appear in "collections of early American English texts" by citing the Corpus of Historical American English, Google Books, and COFEA,[309] but Justice Thomas was simply making the point that Justice Harlan had invented the reasonable expectation of privacy test for the Fourth Amendment in the 1960s. He did not purport to be conducting a corpus linguistics analysis to determine the meaning of words in the Constitution. Instead, he determined the "ordinary meaning" of "search" by consulting Founding-era dictionaries.[310]

The Third Circuit used a combination of dictionary definitions, case law, and corpus linguistics results from a search of the Corpus of Historical American English (all three of which agreed), to determine the meaning of the word "previously" in an ERISA amendment.[311]

As discussed above, the Sixth Circuit in the *Wilson* case declined to employ corpus linguistics.[312] In *United States v. Woodson,*[313] after citing three dictionary definitions of the disputed word, the Sixth Circuit mentioned that a corpus linguistics search, apparently by the Court itself, of a contemporary database produced results consistent with the dictionary

---

[308] *See Lucia v. S.E.C.*, 138 S. Ct. 2044, 2056–57 (2018) (Thomas, J., concurring).

[309] *Carpenter v. United States*, 138 S.Ct. 2206, 2238 & n.4 (2018) (Thomas, J., dissenting).

[310] *See id.* at 2238.

[311] *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d at 95.

[312] *Wilson v. Safelite Group, Inc.*, 930 F.3d 429 (6th Cir. 2019).

[313] 960 F.3d 852, 855 (6th Cir. 2020). The corpus searched was the Corpus of Contemporary American English, commonly known as COCA.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

definitions. In *Wright v. Spaulding*, the Sixth Circuit invited the parties to submit supplemental briefs using COFEA, and two *amicus* corpus linguistics briefs were submitted as well.[314] Ultimately, the Court agreed with the parties "that corpus linguistics turned out not to be the most helpful tool in the toolkit."[315] Outside the Third and Sixth Circuits, corpus linguistics is barely mentioned in the federal appellate courts.[316]

The articles and amicus briefs encouraging the use of corpus linguistics in the Second Amendment context may have begun to attract judicial attention, however. A panel of the Ninth Circuit hearing a Second Amendment challenge to California's restrictions on the ability of 18-to 20-year-olds to acquire firearms recently requested supplemental briefing on whether "the tool of corpus linguistics help[s] inform the determination of the original public meaning" of three phrases in the Second Amendment: "'A well regulated Militia'; 'the right of the people'; and 'shall not be infringed.'"[317] Both parties to the appeal expressed strong reservations about the utility of the corpus linguistics methodology,[318] and it remains to be seen whether the Ninth Circuit relies on the tool in deciding the case.

As of this writing, there have been two cases involving corpus linguistics in the lower federal courts. In *Lawrence v. First Financial Investment Fund V, LLC*,[319] the Utah federal

---

[314] *Wright v. Spaulding*, 939 F.3d at 700, n.1.

[315] *Id*. at 700, n.1.

[316] *United States v. Ward,* 972 F.3d 364, 380 (4th Cir. 2020) (concurrence discusses problems with dictionary definitions and, though not applying corpus linguistics, cites Associate Chief Justice Thomas Lee's concurrence in *Rasabout* as using a corpus linguistics approach); *Jones v. Governor of Florida*, 975 F.3d 1016, 1104, at *65 (11th Cir. Sept. 11, 2020) (dissent cites a law review article with "corpus linguistics" in its title).

[317] Order at 1, *Jones v. Becerra* (9th Cir.), Docket No. 50, filed Mar. 26, 2021.

[318] *Compare* Plaintiffs-Appellants' Suppl. Br., *Jones*, *supra*, at 8–20, *with* Defendants-Appellees' Supplemental Brief, *Jones*, *supra*, at 16–27 (noting that "corpus linguistics sources . . . may not reliably track ordinary people's judgments about meaning" and that interpreters "have to be careful not to conflate 'ordinary meaning' with 'most common meaning'" (quotation marks omitted)).

[319] 444 F.Supp.3d 1313 (D. Utah 2020).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

district court searched a modern corpus, apparently *sua sponte*, to determine what the words "collection office" meant in a Utah statute enacted in 1953. It found no usage of that term during the 1950s and a single irrelevant one in 1985. The court therefore concluded that "the dictionary definitions of those terms provide the best information concerning their meaning."[320] In a recent case in the U.S. Court of Federal Claims,[321] the court resolved the issue of what the word "process" meant in 1868 by looking to passage-era dictionary definitions. In a lengthy footnote, it was revealed that the court also performed its own corpus linguistics analysis, apparently without it having been raised by the parties.[322] The court concluded that "a corpus linguistic analysis of the term 'process' leads the court to the same result as the passage-era dictionary definitions."[323]

## VII.    IN CORPUS WE TRUST? NOT LIKELY

The use of dictionaries from around the time of the Founding, such as Samuel Johnson's famous *A Dictionary of the English Language* (first published in 1755), or Noah Webster's *An American Dictionary of the English Language* (first published in 1828, not long after the Founding), has much to recommend it. Not only were these men titans of scholarship, but their dictionaries were intended to be objective. They had no ax to grind concerning twenty-first century legal disputes. Furthermore, dictionaries in use at the Founding, and therefore their definitions, would have been familiar to those who drafted the Constitution and the Bill of Rights, and to those Americans reading them.

---

[320] *Id.* at 1322, n.60.

[321] *Nycal Offshore Dev. Corp. v. United States*, 148 Fed.Cl. 1 (2020).

[322] *Id*. at 13, n.6.

[323] *Id.*

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

But if corpus linguistics gains ground, there is a real risk that contemporary corpus research could suffer from bias. The Goldfarb Brief contends that "scholars (both legal and linguistic) are less motivated to advance a policy agenda" than "gun-right advocates."[324] This is highly doubtful at best. The example of historian Michael Bellesiles, discussed above, shows that political biases can lead even "scholars" to produce manipulated, even fraudulent, results, and prestigious historians to accept those results uncritically.[325]

One of the risks of using historical corpora, which are perhaps less likely to have built-in political biases, is that such a practice may pave the way to using modern corpora that are more likely to be politically biased. A few courts have used searches of recent corpora to determine meaning.[326] That bias can occur either intentionally by groups that have an agenda, as a product of the way modern communications operate, or both.

What is more, unlike primary sources themselves, which are static documents, an electronic corpus is a dynamic collection of documents that can be added to or subtracted from on an ongoing basis. The problem compounds for the creation and publication of documents in the present-day that will be the basis for the corpora of the future. If courts start relying on corpus data as a regular part of constitutional and statutory interpretation, partisans will have strong incentives to try to optimize – or manipulate – the corpus data in their favor. A similar

---

[324] Goldfarb Br. at 15–16

[325] See also Clayton E. Cramer, What Clayton Cramer Saw and (Nearly) Everyone Else Missed, History News Network, THE GEORGE WASHINGTON UNIVERSITY, https://historynewsnetwork.org/article/1185 (quoting highly favorable reactions by historians and others to Bellesiles' book because it fit their political predilections).

[326] See, e.g., Woodson, 960 F.3d at 855 (6th Cir. 2020) (utilizing Corpus of Contemporary American English ("COCA"); Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund, 932 F.3d 91 (3d Cir. 2019) (using Corpus of Historical American English ("COHA") from the 1970s and 1980s to determine meaning of word "previously" in ERISA amendment); Lawrence v. First Fin. Inv. Fund V, LLC, 444 F.Supp.3d 1313 (D. Utah 2020) (using COHA)); Richards v. Cox, 450 P.3d 1074 (Utah 2019) (searching COCA and COHA for the meaning of "employment" around the year 1986).

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

argument has been used to caution against too-ready use of legislative history in legal interpretation:

> Both legislative history and constitutional history are strategic: players make statements with an eye on how other people will respond to them. In this century, legislative history has become strategic in another way: players make statements with an eye on how judges will construe their statutes. Legislative history, therefore, has become less revealing of original deals. Moreover, the Court has an obligation to create rules of interpretation that discourage this second-order strategic behavior in future Congresses. A rule of total exclusion is the only kind of rule that might do the trick.[327]

There already is evidence that online data sources may not be free of bias. A recent study by researchers at the Northwestern School of Communication, for example, analyzed a large sample of the sources represented in the Google Top Stories box—those little pictures that show up at the top of a Google search and that, when clicked, take users to an online news source, web page, or the like. They found that "[t]he top 20.0% of news sources (136 of 678) account for 86.0% of all impressions [that is, views]; and 52.1% of impressions go to the top 20 news sources…The top three, CNN, The New York Times, and The Washington Post, account for 23.0% of impressions observed."[328] CNN was first on the list, accounting for 10.9% of all impressions. Fox News was fourth on the list, accounting for only 3.0% of the impressions served up by Google, despite the fact that when cable viewers consciously select their own news sources, Fox has consistently greater viewership than CNN.[329]

---

[327] William N. Eskridge, *Should the Supreme Court Read the Federalist but not Statutory Legislative History?*, 66 GEO. WASH. L. R. 1301, 1302–03 (1998).

[328] Daniel Trielli & Nicholas Diakopoulos, *Search as News Curator: The Role of Google in Shaping Attention to News Information* (in 2019 CHI Conference on Human Factors in Computing Systems Proceedings (CHI 2019), May 4–9, 2019, Glagsow, Scotland, UK, https://doi.org/10.1145/3290607.3300683).

[329] *See generally* Lindsey Ellefson, *Fox News Tops CBS to Become Highest Rated Network in Primetime This Summer*, THE WRAP (Aug. 5, 2020), https://www.thewrap.com/fox-news-primetime-ratings/  Bill Keveney, "Cable news race: Fox holds onto top spot in ratings after post-election dip," (June 30, 2021), https://news.yahoo.com/cable-news-race-fox-holds-144339894 html ("For the first half of 2021, Fox ranked first across the day (averaging 1.3 million viewers) and in primetime (2.3 million). MSNBC finished second in both

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

The danger is not so much in using corpus linguistics to determine what "previously" (*Caesars Entertainment*) or "employment" (*Richards*) means; the problem is that using corpus linguistics in controversial cases where politics, culture, or fundamental rights are involved may lead to biased results due to biased corpora.

Indeed, if the media, including traditional newspapers, online media, and social media, heavily emphasize stories about mass shootings or police shootings, while ignoring millions of instances in which individuals use firearms in self-defense,[330] corpora based on those sources will be biased.

To illustrate further how popular culture references can be revised after the fact, let's go to the movies. Firearms seem to be a particular target of those who would edit the corpus of American films. Consider the *Star Wars* movies, which have been revised several times over the years.

> In 1978, *Star Wars* won seven Academy Awards. But if you want to watch that original version, the first of George Lucas's soon to be seven-part saga, you'll find it difficult. In fact, it's actually impossible to buy an official copy of *Star Wars* as it was first released. Lucas doesn't want you to see that version.[331]

---

categories (1.1 million and 1.9 million, respectively), and CNN ranked third (1 million and 1.4 million in primetime), according to Nielsen figures for the year to date through June 27").

[330] There is sizable literature on defensive gun use in the United States. Estimates range from 256,500 annual defensive gun uses to 2.5 million. Most studies estimate that the number is over 1 million per year. *See, e.g.,* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* 86 J. CRIM. L. & CRIMINOL. 150 (1995); PHILIP COOK & JENS LUDWIG, GUNS IN AMERICA: RESULTS OF A COMPREHENSIVE NATIONAL SURVEY OF FIREARMS OWNERSHIP AND USE 73 (1996), https://www.Policefoundation.org/wp-content/uploads/2015/06/Cook-et-al.-1996-Guns-in-America.pdf; Brian Doherty, *A Second Look at a Controversial Study About Defensive Gun Use,* REASON (Sep. 4, 2018), https://reason.com/2018/09/04/what-the-cdcs-mid-90s-surveys-on-defensi/; Tom W. Smith, *A Call for a Truce in the DGU War,* 87 J. CRIM. L. & CRIMINOL. 1462 (1997). Yet very few of these defensive uses are reported in the national news. When coverage occurs at all, it is generally limited to local outlets.

[331] Rose Eveleth, *The Star Wars George Lucas Doesn't Want You to See,* THE ATLANTIC (Aug. 27, 2014), https://www.theatlantic.com/technology/archive/2014/08/the-star-wars-george-lucas-doesnt-want-you-to-see/379184/.

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

Note these multiple changes: "In the original versions of the films…it's clear that Han Solo pulled out his gun and shot the bounty hunter Greedo. In the 1997 version, Greedo shoots first. In the 2004 version, they shoot at the same time."[332]

Looney Tunes has announced that in a reboot of the cartoon series that will be streamed on television, guns will be eliminated, including Elmer Fudd's shotgun.[333] While the series will still feature "the cartoon's characteristic violence – using sticks of dynamite, booby traps and the iconic anvils and bank safes dropped onto characters," the executive producer stated that "We're not doing guns."[334] Steven Spielberg, after a screening in Los Angeles, "expressed regret over alterations made to *E.T.* a few years ago, where guns were digitally replaced with walkie-talkies," and promised to restore the original version.[335]

Corpora cannot represent a true and accurate snapshot of language used in a particular time and place when the documents comprising the corpora are subsequently revised or rewritten to fit a political or social agenda.

While there is less risk, perhaps, for ideological manipulation of the original sources contained in corpora from centuries ago, there is a very large risk of such manipulation of contemporary corpora. Such risks should be kept in mind, and guarded against, before courts give any great credence to corpus linguistics analyses relying on such corpora.

---

[332] *Id.*

[333] Marina Pitofsky, *Elmer Fudd Will Not Have a Gun in 'Looney Tunes' Reboot*, THE HILL (Jun. 6, 2020), https://thehill.com/blogs/in-the-know/in-the-know/501503-elmer-fudd-banned-from-having-a-gun-in-looney-tunes-reboot.

[334] *Id.*

[335] Russ Fischber, *Steven Spielberg Regrets Altering 'E.T.;' Will Release 'E.T.' and 'Raiders' on Blu-ray in Original Forms*, Film: Blogging the Reel World (Sep. 14, 2011), https://www.slashfilm.com/steven-spielberg-regrets-altering-et-raiders-hit-bluray-original-forms/.

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

## VIII.   CONCLUSION

Does the Second Amendment confirm a pre-existing, individual right to bear arms for any lawful purpose, or does it, as some linguists claim, include only an alleged "right to serve in the militia" and exclude an individual, private right to arms? After reviewing corpus linguistics search results for "bear arms," and after considering the contemporary evidence of text, history, and tradition regarding the right to bear arms, which is more conclusive: the militia-only thesis, or the confirmation of a robust right to arms for both militia purposes and private purposes?

The answer is not difficult. As *Heller* noted, "bear arms" could mean, and did mean then, a right to bear arms individually and privately, as well as for military purposes. That suffices to answer the question. It could mean both and did mean both, and thus the right includes a private, individual right for lawful purposes such as self-defense.

Simply because a word search returns a greater number of hits for a military meaning does not exclude the individual right meaning—here the shortcomings of the frequency hypothesis are on full display. As described above, originalism is neither advanced nor improved when searching corpora that primarily reflect political and legal usage by elites. Corpora are likely to be biased in favor of newsworthy events and may, in a given time period, simply reflect meanings pertaining to matters that were under public discussion at the time, rather than ordinary usages relating to matters that were not often discussed.

The choice of a particular corpus may materially affect results, as shown by the different results produced by searches of Google as opposed to COFEA and COEME. The subjective nature of first eliminating irrelevant results, and then categorizing any remaining results felt to be relevant belies any claim that corpus linguistics is scientific—because those decisions are unlikely to be reproduced from researcher to researcher. Biases, even unconscious, of the

104

Electronic copy available at: https://ssrn.com/abstract=3887060

WORK IN PROGRESS

researcher will likely affect results. And, indeed, as selective censorship in this country mounts, contemporary corpora—and perhaps, in time, historical corpora—are also becoming biased.

There are major procedural and practical problems with determining meaning, especially in constitutional cases, by using corpus linguistics. Introducing corpus linguistics by *amici* on appeal will often leave one side with no opportunity to respond, and if introduced by a court *sua sponte* on appeal, its use undermines the adversarial system. Lawyers and judges are not trained in the subject and should not become amateur lexicographers. If corpus linguistics is to be used, such evidence should be subject to the rules of evidence regarding expert testimony and *Daubert* gate-keeping functions in order to test its scientific validity.

Even the State of California—not exactly a Second Amendment-friendly state—has recognized that corpus linguistics has serious limitations, especially at the appellate level. The California Attorney General has argued that corpus linguistics is not "always 'the most helpful tool in the toolkit'" when it comes to divining the meaning of words. In a recent submission to the Ninth Circuit Court of Appeals, the California Attorney General cautioned that (a) corpus linguistics should be performed, if at all, by trained experts during discovery and not introduced on appeal; (b) the meaning of a word in a corpus may not equate to how the public would understand the term when used in the Constitution; (c) the corpora for a specific time period could be skewed by major news events of the period; (d) the selection of relevant databases and appropriate search parameters within a designated corpus are critical in the search for a term's meanings; (e) search results may not take into account variations in speech by geography, speech communities, or time periods; (f) findings will be influenced by the decisions of researchers to exclude search results which they believe to be irrelevant to the question presented; (g) an expert would likely be needed to determine what constitutes statistically significant sample sizes; and

105

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

(h) with respect to research on the Second Amendment, it is important to review the entire Amendment in context as opposed to searching for isolated words or phrases.[336]

But more importantly in the right to bear arms context, the approach applied in the linguists' briefs is massively contradicted by the text and history pertinent to the Second Amendment. Then, as now, the word "bear" meant to "carry." With only one colonial exception that we have found, there were no general prohibitions on carrying arms privately and peaceably during the colonial period, the time of the Founding, and the early Republic. And firearms were owned, carried, and used routinely, in large numbers, by nearly everyone, including children. The first seven presidents (among many others) carried firearms for private purposes. The Founding generation assumed a right to bear arms freely. Had there been a movement to restrict that right, the outcry would have been massive. But there was no outcry, because the right the Second Amendment protects was not construed then to be exclusively a "right to serve in the militia," as the linguists contend.

Such a construction goes entirely against the grain of how the Founders thought. They were thoroughly schooled in Enlightenment thinking, from Locke to Blackstone to Beccaria. The Founders believed that the right to self-defense was the *primary natural right* of all human beings, and that right, by its very nature, could never be taken away by any law of civil society. That right was viewed as a gift from God and deducible from nature by the application of reason. It included a right to use arms for self-defense and the defense of others. It was anathema to the Founders that they ever could or should be stripped of that right by any government, and so they confirmed that pre-existing right in the Second Amendment. The distinction between a militia

---

[336] Defendants-Appellees' Suppl. Br., *Jones*, *supra*, at 16, 18–20, 23, 27 (citations omitted).

106

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

right and a private right is a latter-day invention by persons intent on doing what the Founders opposed.

Lord Kelvin, the British mathematical physicist and engineer who helped shape modern physics, famously remarked: "When you cannot express it in numbers, your knowledge is of a meagre and unsatisfactory kind." That is no doubt true when applied to the field of physics and other hard sciences. Yet Jacob Viner, the eminent mid-century economist and teacher of Milton Friedman, reportedly countered: "Yes, and when you *can* express it in numbers your knowledge is of a meager and unsatisfactory kind."[337] Both men were right. In the hard sciences, numbers are crucial. But when one attempts to reduce constitutional interpretation, rooted in ideas, traditions, and history, to a mathematical exercise, the results will be unsatisfactory.

We close with a quotation from Associate Chief Justice Thomas Lee of the Utah Supreme Court, perhaps the leading judicial advocate of corpus linguistics. Justice Lee himself has claimed only a modest role for corpus linguistics:

> Corpus analysis is something of a last resort. It comes into play only if we find that the legislature is not using words in some specialized sense, and only if we cannot reject one of the parties' definitions based on the structure or context of the statute .. .. Corpus analysis comes in, in other words, as something of a tie-breaker where we find no better way of resolving the matter.[338]

We don't need a tie-breaker for Second Amendment interpretation. The Founders were clear that the people had a right to be armed for lawful purposes. They had just fought a war that was sparked principally by the attempted confiscation of their arms in Boston by the British General Gage. There has been an unbroken tradition in this country of carrying arms for private purposes from the time settlers first stepped ashore to the present day. And, until recently, no one

---

[337] Quoted in ROBERT HIGGS, CRISIS AND LEVIATHAN: CRITICAL EPISODES IN THE GROWTH OF AMERICAN GOVERNMENT 20 (1987).

[338] *Rasabout*, 356 P.3d at 1286–87 (Lee, A.C.J., concurring in part and concurring in the judgment).

Electronic copy available at: https://ssrn.com/abstract=3887060

**WORK IN PROGRESS**

questioned that the Second Amendment confirmed that right. It would be foolish for a court to

hold otherwise based on word counts.

Electronic copy available at: https://ssrn.com/abstract=3887060

Firearm, Firearms

Electronic copy available at: https://ssrn.com/abstract=3887060

## Legend

| | |
|---|---|
| 1 | Used in a Military Context |
| 2 | Used in a Context Relating to Individual Self-Protection |
| 3 | Used in a Context Relating to Hunting |
| 4 | Used in Another Context |
| 5 | Ambiguous/Unable to Determine the Context |
| 6 | Irrelevant or Duplicate Use |

Electronic copy available at: https://ssrn.com/abstract=3887060

| Number | Source | Year | Context Left | Key | Context Right | Code |
|---|---|---|---|---|---|---|
| 1 | HeinR169 | 1776 | ...be defined and march to few 7; Abd that each Mn furh himself as a good 9. A N 4 , A Cpl for the otter Security of the inhabitants , by obliging the Mass White Persons to carry | Firearm | and is world fitted to metanat , or instead of a Bayonel , a Hatchel or Towathawe , a Cutlcuch box , Knapsack and Bithkel to Places of Publick Woorey W  referees it is necessary , for the liquidy and defence | 1 |
| 2 | HeinR122 | 1787 | had a mortal aversion to companion would have sought any body when his life was in no danger, but he | Firearms | and all instruments of death , in order to appease him , I assured him, no part of this extraordinary expence should | 2 |
| 3 | evans N21100 | 1794 | Persons to carry | Firearms | They hated, not daring to venture any farther attack. The two prisoners were made fast to the thwarts of the | 1 |
| 4 | evans N22725 | 1796 | and the people preserving the garrisons of the boat, the party pulled off instantly, 4, 11, and 963, making in all 908 officers and men. [At foot of text] "About three fourths have | firearms | of some sort." | 2 |
| 5 | finds jefferson 01-15-02-0549 | 1776 | frequently infected with persons, who make use of row-boats, that carry from twenty | firearms | These marauders appear chiefly in the spring when the river overflows its banks, and therefore their escape, should they meet | 1 |
| 6 | evans N26739 | 1797 | ball at the least, and use the utmost diligence in training and accustoming his horse to stand the discharge of | firearms | and in making himself acquainted with the military exercise for Cavalry. That in order to make a satori be of more | 5 |
| 7 | finds jefferson 01-01-02-0098 | 1775 | had visited Blent's workshop in 1765, wrote of this purchase to Henry Knox. "This method of forming the | firearms | appears to me so advantageous, when repairs become necessary, that I have thought it my duty ... to purchase and | 1 |
| 8 | finds jefferson 02-01-02-2023 | 1759 | prisoners may be redeemed. We have use of row-boats, that carry from twenty. The General orders every one of them to provide himself with a half pike or spear | firearm | bows and arrows, broad swords and javelins  we have shields also which cover a man from head to foot | 1 |
| 9 | evans N18208 | 1731 | as soon as possible. ...of course by the firing. Selling up a loud yell  they ran up to the brothers and | firearms | either  has a Mr. Kritts started back, but Peter received a brace of balls in his bosom. He recoiled a few steps back | 1 |
| 10 | finds washington 03-12-02-0405 | 1777 | discharged the 24  cases of gun locks 6  cases of gun barrels 65  cases of old bayonets  Locks and furniture of 3100 | firearms | of various kinds taken from the peasantry of Bordeaux when they were deprived of the shot, or charge and purchased | 1 |
| 11 | evans N24073 | 1797 | or the overseer of overseers who shall or may have the charge of such slave or | firearms | or other offensive weapons, so taken or seized, shall be duly summoned to show cause why the same should not | 1 |
| 12 | finds jefferson 01-22-02-0020 | 1787 | know the exact use of guns is recommended in our country, to furnish our young men the use of | firearms | and thereby to preserve them for war and battle. But why should we inspire our youth, by such exercises, or | 1 |
| 13 | HeinR122 | 1787 | to Major Samuel Apes, for the "Use of the Town of Danveri, two Pounds two Shillings in tulp for the | Firearm | mentioned in Petition. Cxuil. R6O0 100qqery the Selemn of Hoste e 7  passed April 12, 1777. Rxfend. That there | 3 |
| 14 | evans N25038 | 1798 | allow him to set up in the different colonies all kinds of manufacturers, in wool, flax, hemp, iron, steel | firearms | are made: guns for hunters, and iron cannon are cast. As yet no gunpowder is made, but it can be | 1 |
| 15 | HeinR170 | 1776 | liberty of observing to him, though you that if he wishen to secure a right to his discovery, relative to | firearms | accomplying his petition with | 1 |
| 16 | HeinR170 | 1776 | mounting of the officers load, and is proceeding on house of the soldier's market. This method of forming the | firearms | appears to me so advantageous, when repairs become necessary, that I have thought it my duty not only to mention | 4 |
| 17 | finds franklin 01-13-02-0124 | 1766 | within a week after you receive this Letter along the most direct Road to Williamsburg, carrying with them such good | firearms | and Accoutrements as they have or can procure. As the number called for is absolutely requisite you will be pleased | 3 |
| 18 | finds jefferson 01-15-02-0410 | 1789 | it will be made to appear to the com  inittee for letting with public debt-takers  by sufficient vouchers , that such | firearms | and all ornaments were delivered to the keeper of said flores , that said committee be, not hereby are directed, to | 4 |
| 19 | finds jefferson 01-05-02-0229 | 1781 | person preferably shall be made,  or if upon any other examination be shall be satisfied that the said | firearms | or other offensive weapons, that have been seized according to the directions , and agreeable to the true intent and | 1 |
| 20 | finds jefferson 01-05-02-0229 | 1781 | persons offering such firearms. ...tumult, than those which are set on foot by our princes and great people in Germany, as neither dogs nor | firearms | can be used here. But what is most to be admired in all this affair is, the great coolness of and accoutrements he left which taken a prisoner and that the same be charged to the | 1 |
| 21 | HeinR122 | 1776 | be allowed and paid out of the public treasury of the Commonwealth , the further sum of which trips out of this letter give acknowledgement , the of War of Boston the President | firearm | accounts of the United In due time, they have very much contributed to the glorious Journey of Saratoga, it is with | 1 |
| 22 | HeinR122 | 1787 | receiving his invoice of 7000 Table  "s As  or the better Security of the inhabitants  b"  can ing the Male White | firearms | the Same Zeale to Places of Publick Worjoo  r is  An Ar to prohilz  so a certain Time , the Exportation of India & Corn | 5 |
| 23 | evans N10973 | 1787 | Table  "s As  or the better Security of the inhabitants  b"  can ing the Male White Persons to carry | firearms | in good order, for the purpose of shooting game." These and other masitencias of the enemy being daily perpetrated on | 4 |
| 24 | HeinR172 | 1776 | Iully sons, and always kept his house was the | firearm | Then we were at a boat, one of our party said he wanted some retaliation, that one returned back and | 1 |
| 25 | finds washington 05-04-02-0335 | 1787 | his persuasion, though of the same religious persuasion, yet had a number of | Firearms | in good order, for the purpose of shooting game." These and other masitencias of the enemy being | 1 |
| 26 | HeinR122 | 1787 | to reliable upon Mitchel, as he was unable to do a himself. All we took from the | firearms | of India & Corn | 1 |
| 27 | evans N17876 | 1791 | house was the or the overseer of overseers who shall or may have the charge of such slave or | Firearms | Then we were at a boat, one of our party said he wanted some retaliation, that one returned back and | 3 |
| 28 | evans N14465 | 1784 | saves from which been copper from such | firearms | or other offensive weapon so taken or seized ,  that be duly summoned to  Thew cause why the | 2 |
| 29 | HeinR122 | 1787 | THE OPPRESSOR, THE SMALL AND THE GREAT IS THERE, AND THE | firearms | same fhould not be which run along the surface of our globe, are all equal in their original, whether we consider | 2 |
| 30 | evans N25881 | 1799 | SERVANT IS FREE FROM HIS MASTER. THE mone and | firearms | them is themselves | 6 |

Electronic copy available at: https://ssrn.com/abstract=3887060



| Row Labels | Count of Code |
|---|---|
| 1 - Used in a Military Context | 16 |
| 2 - Used in a Context Relating to Individual Self-Protection | 2 |
| 3 - Used in a Context Relating to Hunting | 4 |
| 4 - Used in Another Context | 2 |
| 5 - Ambiguous/Unable to Determine the Context | 3 |
| 6 - Duplicate or Irrelevant | 2 |
| **Grand Total** | **29** |



Electronic copy available at: https://ssrn.com/abstract=3887060

Arm, Arms, Armed, Arming

Electronic copy available at: https://ssrn.com/abstract=3887060

## Legend

| | |
|---|---|
| 1 | Used in a Military Context |
| 2 | Used in a Context Relating to Individual Self-Protection |
| 3 | Used in a Context Relating to Hunting |
| 4 | Used in Another Context |
| 5 | Ambiguous/Unable to Determine the Context |
| 6 | Irrelevant or Duplicate Use |

Electronic copy available at: https://ssrn.com/abstract=3887060

**Number | Source | Year | Context Left | Key | Context Right | Code**

| Source | Year | Context Left (fragment) | Key | Context Right (fragment) | Code |
|---|---|---|---|---|---|---|
| 508 Indvs.washington 99-01-02-00069 | 1796 | such person, but am informed that Sullngton near Dusendorf in Germany is a place where there are noted manufacturers of that place in order to discover the number of | arms | | |
| 1792 evans N16250 | 1773 | Wos not this the case in the reign of Charles the first, when the proud and parliament took up | arms | In maintain his rights and laws of the people, and when it required setting the head of the King or impossible to ... | 4 |
| 2157 Fedrs.washington 03-06-02-0653 | 1777 | a seceeding difficult to join the Soldiers. I have said to be a second Sassen I have not yet effected immobilising the Troops remain a at their ornateness of Loyalty and Attachment to the Blarness Majesty, have offered their | arms | prayed to be embodied as Royal Militia, accepted Commission in his Service, or endeavoured to subvert our Constitution, and have it ... | |
| 2493 evans N14606 | 1780 | Congratulations on the Success of his shown he felt and mount'd them as his own J SPKs thirsts foxock. ha followers Rd. Whie fook add | arms | supine of his head. They crohn him with a slanderous tongue 'and the legal justice maintains the wrong) at his they | |
| 2991 evans N24916 | 1797 | us to use himself year? Shalt a vie prospect's sovereign not Doubts at will our adject tithe 'To books and fluted of Regulations that have been renowned by each Corps, Regimental Quarter Masters will make returns of all | arms | & Cr wantd'a raise the glory share, By them pla out. By them succeed. Spare thee I'm wretched victims, space | |
| 3274 fedrs.washington 03-25-02-0581 | 1778 | the place, afraid expected to see Swords start from below some unecring risk, and he might his hand upon the | arms | accoutrements and ammunition in your possession. The supple Comprisers will also order similar returns with which he always unveiled. As they advanced, his utility vaunted, its savage features gradually softened, and, towards evening, they | 2 |
| 1355 evans N22567 | 1795 | it is their sen and duty to trust in them. As it is obstany for soldiers to trust in their | arms | or in their observing and courage in battle from, or in one another, so it is obstany for the people of either from the other, before the arrival of the sale provisional articles in America... it is agreed that | 1 |
| 3678 evans N27247 | 1796 | a bigger bigger hyacids wield. But FREEDOM in our sword and shield. And all their acts are streaming to | arms | to arms; or Sobre. The avenging sword unsheath. March on; march on; at least's resolv'd On victory or death from the other... before the arrival of the sale provisional articles in America... it is agreed | |
| 3889 evans N24608 | 1747 | that any place of Sertuity belonging to Great Britain or to the United States; should have been compromed by the | arms | or ammunition...at such times and places as they shall fit applicated by their respective commanders | |
| 4600 HeurEff241 | 1774 | least Bc caretoers in it, under the penalty of a sum not exceeding four shillings to wait of any such conductors to perceed to do the Meadows of floor captives. With respect to the Invalides, their general use | arms | in their annual officits. The Canoneers, in the retail time, were kept to their labour, and six hundred officers were appointed | |
| 3329 evans N18706 | 1762 | mountains, and subject to the same State governments, would be such, as wild, in my opinion, justify even recourse to | arms | to free themselves from, and to shake off, so uperiorous a yoke. [96] This representation was made in converation and | |
| 6363 fedrs.lafdt a5.aiden177.txt | 1781 | brave Works, who led the other Year — Swen, steep, great Sloil, and take thy mastle Pied. Since by thy | arms | (v). Absyrn Stats, are Eseo' White Pits careful to invite thy Name, Among the most | |
| 8169 HeurEff94 | 1764 | In this opinion he could not agree. It was persuaded, and he thought indisteno to show, that the right of parties to support those stipulations by | arming | Invoinair steps for defence in the hent ... may be regulated and restrained, as to become in no | |
| 6961 Indvs.hamilton 01-03-02-0251 | 1783 | beyond the native, to any enagements which shall upon the contrersing | arms | did not afford to produce the authority by which they ... set seals on which was too heavy to near They attempted to take it from him by force; but he threatened them with instant death, and | |
| 3225 HeurEff122 | 1798 | table walls, and in many distances, under the same roof with themselves. The Conspirers were divided into small bodies well under a board, which he drew out and advanced with a board them, charging them with teachery in | arms | to war. They attempted to take it from him by force; but he threatened them with instant death, and never | |
| 9338 evans N18858 | 1942 | concealing their link con theme to use up a that is compelled Days with 1 exciting the Chickateaws is will on the Cotens 2, furnishing them with | arms | gave it 1387', 1413', 1415', 1522 a bait to advance the silence of ... repsived 1698 chained 1069 in defence of our country, we through our civis business would be to oppose strength to strength, in the | 5 |
| 9295 HeurEff99 | 1790 | that are so many distances, under the same roof with themselves... concealing their ... to use up a that is compelled from on board, while himself searching about farther; bound three gars had in a crew-fuvse just at hand. | arming | the other litise than that went with him. By this time same of the soldiers were got ashore and ansality to prevent. As they approached ... | |
| 9975 evans N11146 | 1771 | afterwach he | armed | of better person of whom the via July may be required refusing to receive such prisoner or prisoners | |
| 1659 evans NND515 | 1774 | at the dissolution of the captain and above that sum as a court martial shall inflict 37. Any mariner of board (how give way so) disagree patterns Say, fellow-citizens, what citicula brought have and instant assistance in | armedly | as proft. —Shop-integration bashes Josh each eye— Revenge grisels him wen teeth— Death grins an hideous smile — and | |
| 13745 Indvs.washington 03-25-52-0080 | 1779 | with success, but we must suffer much is that strain tire, and unless we continue to achieve powerful | arms | ammunition, and clothing and other warlike stores, and supples of com, or a cold in Europe equivalent ... we must undeceive in the name of the soldiers against the Government Governor Tryon induced at the head of some Troops, drawn from the | |
| 13457 fedrs.jefferson 01-14-02-0285 | 1787 | some of the internal Regulations of that Province, and a small number of People in the back parts rose in interval of the Confrocision being consc cremed in late security, the truth been chiefly sopported by the | Arms | of others, A it his is readily allowed. We concur and should acknowledge a ourshelfers conclusion, it paid our vessels at present, when they were met for the propose of taking effectual measures for the | |
| 11234 HeurBT1 | 1794 | supples and | arms | as proft, it for the | |
| 13139 evans N21549 | 1798 | colors would continue to unsial those sebs. And if this were the case, why might they not to go into TO THE EDITOR OF THE NEW JERSEY GAZETTE, January 17th [MR. COLLINS, WHEN it necessity, the complexion which always with | arms | defence of our country, we through our civis business would be to oppose strength to strength, in the | |
| 13929 evans N18777 | 1782 | provisions and | arms | 3. aiming at the occupation of a post at the 4. giving merdes and masks of preference to several bodies | |
| 2115 Indvs.jefferson 01-28-02-0368 | 1790 | with the drum came from the main giant in Maxzay's barrack, for case the soldiers there is drawn up under no custom would be the duce, that on his time should be given to either unless stipulated by Treaty, in | arms | and heard the officers, and hovel it men | |
| 12292 evans N2P6010 | 1770 | no custom would be the duce that no law or should be given to either unless stipulated by Treaty, in | arms | and heard the officers, and hovel it men | |
| 12862 Fedrs.jefferson 01-26-02-0629-0005 | 1793 | And pointed where the spade was pound. Late went to its their pole in ground. And usg'd with equal meaning any thing more than to be drected, her conetation was clansious against encioners and stabiisen and was for taking | arms | there I would wish it might be put off till we have a centerely of operating, I have heard that at 5t. Domingo...having taken and sent into Baltimore her English vessel for Recoeveptor the same had been arrested by | |
| 1037 Indvs.jefferson 01-26-02-0629-0001 | 1788 | Rude super been among the most languins as to the happy issue of the late convention, I feared the strong | arm | of military power, I feared that the people who had been wise enough to surrender would not have fortness sufficient | |
| 1648 Indvs.jefferson 01-27-02-0183 | 1779 | impose a duty upon the Milita that should be disagreeable or disgusting to them. Should there be a in Virginia Oct. 2. 1792 Sir I received yesterday your favor of Sep. 18. stating that the vessel the Industry, | arming | | |
| 1698 HeurEff172 | 1780 | which will free Asia. 14 ahine gianblett teni respectively and 1 with 1 t inf loors) tem for thing with th | armed | 1 5t . and they freely sec directed so sets will them so t to arlicated of the mon | |
| 4468 HeurEff159 | 1777 | ready for us. in public t.ions. a ds number of held pieces and sides and a proper quantity of | ammunition | and 2 entra entry a ... No later / 41 engage in any war without the consent of the United | |

Case 3:18-cv-10507-PGS-JBD  Document 196-10  Filed 12/15/23  Page 172 of 228 PageID: 10728

Electronic copy available at: https://ssrn.com/abstract=3887060

Electronic copy available at: https://ssrn.com/abstract=3887060

Electronic copy available at: https://ssrn.com/abstract=3887060

Electronic copy available at: https://ssrn.com/abstract=3887060



| Row Labels | Count of Code |
|---|---|
| 1 - Used in a Military Context | 97 |
| 2 - Used in a Context Relating to Individual Self-Protection | 1 |
| 4 - Used in Another Context | 4 |
| 5 - Ambiguous/Unable to Determine the Context | 3 |
| 6 - Duplicate or Irrelevant | 45 |
| **Grand Total** | **150** |



Electronic copy available at: https://ssrn.com/abstract=3887060

Musket, Muskets

Electronic copy available at: https://ssrn.com/abstract=3887060

## Legend

| | |
|---|---|
| 1 | Used in a Military Context |
| 2 | Used in a Context Relating to Individual Self-Protection |
| 3 | Used in a Context Relating to Hunting |
| 4 | Used in Another Context |
| 5 | Ambiguous/Unable to Determine the Context |
| 6 | Irrelevant or Duplicate Use |

Electronic copy available at: https://ssrn.com/abstract=3887060

| | Number | Source | Year | Context Left | Key | Context Right | Code |
|---|---|---|---|---|---|---|---|
| 1 | 5 | frdrs jefferson 01-04-02-0459 | 1781 | At this place we lost 5 brass field pieces 4 pounders which had been sunk in the river: about 300 | muskets | some goods of the public store, some Quartermaster's stores, of which 120 sides of leather was the principal article | 1 |
| 2 | 2 | evans N16570 | 1788 | MR. Ezra Curtis, aged twenty years, on the 18th of September, 1785, received a wound by the bursting of a | musket | the breech-pin of which, entering his right eye, drove the eye, with the whole of its bony orbit before it | 4 |
| 3 | 8 | frdrs washington.03-03-02-0429 | 1776 | Ground against the Enemy under the above want of Powder—and, we have disbanded one Army & recruited another, within | Musket | Shot of two and Twenty Regimts, the Flower of the British Army when our strength have been little if any | 1 |
| 4 | 10 | HeinR105 | 1784 | a good Rifleman, the Apparatus necessary for the fame , and a Tomahawk , if I hall be accepted in Lieu of the | Musket | and the Bayonet and other Articles belonging thereto 12 And Be it Enacted , That each Person enrolled as aforesaid , Ammunition | 1 |
| 5 | 24 | frdrs washington.06-02-02-0474 | 1798 | arms I know not, nor of what sort, or length, they are intended to be. My opinion is, that both | Musket | & Bayonet ought to be full as long as those with whom we expect to contend, to give confidence to the | 1 |
| 6 | | | | | | | |
| 7 | 29 | frdrs washington.05-12-02-0121 | 1793 | that a proportional reduction be made of those intended as Rifle companies, four of whom are to be armed with | Muskets | of war ... I have the honor to be with the greatest respect Your most obedt servant H. Knoxsecy | 1 |
| 8 | 33 | frdrs washington.99-01-02-04665 | 1781 | One hat a bayonet put to his breast, and upon the man's being Knocked down for his insolence a | musket | was fired, which being their alarm signal & most of them paraded in arms. In short their whole behaviour was Such | 1 |
| 9 | 35 | evans N20525 | 1794 | unfinish'd furrow held; And flocks unguided roam'd the field: 50 Forth from his shop the tradesman flew, His | musket | seizing, to pursue; From every house, the hurried swains, Tumultuous, throng'd the bustling plains; At race, the crossing | 1 |
| 10 | 40 | frdrs franklin.01-34-02-0315 | 1781 | the training of the Marquis of Fayette, with dispatch, have tacitly consented to the embarkation of the said Cases of | musket | Barrels, under our promise of your furnishing us the Ministers passport to cover them from censure, and by which, only | 1 |
| 11 | 42 | frdrs jefferson.01-05-02-0786 | 1781 | and pistols and took possession of the Court house at the door of which they placed a sentinel with his | Musket | Colo. Corbin went and salk'd to them moderately endeavouring to diswade them from such an unlawful act, but they | 1 |
| 12 | 50 | frdrs adams.99-02-02-2785 | 1798 | I am [pushing] the fabrication of arms, at Springfield, erecting another manufactory, and entering into Contracts, for some thousands of | muskets | ... but until I can make sure of a number, equal to the probable wants of such an army, as may | + |
| 13 | 56 | frdrs jefferson.01-03-02-0502 | 1780 | them, but such is the state of their resources that they have not yet been able to move a single | musket | from this state to theirs. All the waggons we can collect have been furnished to the Marqs de Kalb, and | 1 |
| 14 | 66 | HeinR105 | 1784 | 11. And Be it Enacted , That every Person enrolled as aforesaid , Armsandactrual constantly keep himself furnished with a good | Musket | well fitted coutterments to be prour'd with a Bayonet , a Worm , a Cartridge - Box , twenty - three Rounds of exbry each Cartridges | 1 |
| 15 | 74 | evans N24100 | 1797 | such a market in France, would require four Judges and a dozen soldiers Here, the law has no need of | muskets | , education and morals have done every thing. Two clerks of the police walk in the market. If they suspect a | 4 |
| 16 | 78 | evans N18559 | 1792 | all the king's powder. Yesterday numbers more assembled, and last night brought off many cannon, &c. and about sixty | muskets | This day the town is full of armed men, who refuse to disperse, but appear determined to compleat | 1 |
| 17 | 86 | HeinR239 | 1774 | The conditions on the part of the public to be these . each non commissionesofficer and soldier tobe furnished with a | musket | bayonet and cartouch box, and every two years with a suit of uniform, consisting of a coat jacket , and breeches | 1 |
| 18 | 92 | frdrs adams.99-02-02-1567 | 1794 | past there have been cast at least one hundred pieces of brass ordnance a month and manufacturd of one thousand | muskets | per diem. Meanwhile every male capable of bearing arms was drill'd, and as fast as possible, equip'd. In | 1 |
| 19 | 102 | evans N19454 | 1793 | under Col. Arnold was equally unsuccessful. The Colonel received a wound in one of his legs from a | musket | ball, and was carried to the general hospital. His men maintained their ground till ten o'clock, when, all hopes of | 1 |
| 20 | 110 | evans N14520 | 1784 | along side of each other (which was not done until an hour after the the engagement began) Capt. Landais out of | musket | shot raked the Bon-homme Richard, &c. which implies it was about an hour after the beginning of the engagement, that | + |

Electronic copy available at: https://ssrn.com/abstract=3887060

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| 21 | 117 evans N10511 | 1774 | far off by this time they had got the buoy into their canoe, and we were obliged to fire a | musket | at them with (○); this hit one of them, and they immediately threw the (○); over | 1 |
| 22 | 119 evans N19780 | 1793 | Dutch fleets, commanded by Admiral Russel, defeated the French sleet off La Hogue. 1693 Bayonets at the end of loaded | muskets | first used by the French. The duchy of Hanover made the ninth electorate. Bank of England established by King William | 1 |
| 23 | 135 fndrs jefferson 01-12-02-0019 | 1787 | me shall meet with no delay. I should be glad to hear from you at what prices you think the | muskets | ...and sabres could be sold each, because I would write to America to know whether they could chuse they should | 1 |
| 24 | 184 evans N18813 | 1792 | puts him hors du combat till it is extracted. 6th. Bows and arrows are more easily provided every where than | musstets | and ammunition. Polydore Virgil, speaking of one of our battles against the French in Edward the Third's reign, mentions | 1 |
| 25 | 189 evans N17326 | 1790 | or wild Buffalo's hide, thick enough to send off the blow of a scymitar, but not an arrow or | musket | ball. The Genrocs go equally armed, but none but Rajahpoots, whose business it is to sight, and Bramins of distinction | 4 |
| 26 | 191 evans N19064 | 1792 | as instruction in all the subtleties of war. Since they became acquainted with the Europeans, their warlike apparatus is a | musket | ...hatchet, and a long knife. Their boys still accustom themselves to bows and arrows, and are so dextrous in | 1 |
| 27 | 192 evans N11960 | 1776 | and great experience in such cases, must be universally acknowledged "The first intention, in regard of accidents caused the next day there was an uncommon appearance of the militia | musket | or pistol ball is, if possible, to extract the ball, or any other extraneous body that may be lodged in. | 4 |
| 28 | 195 evans N08347 | 1767 | of the town of Boston, many persons taking their | muskets | who never carried one upon any other occasion, and the governor was conducted to his house with as great parade | 3 |
| 29 | 198 0322 fndrs washington 03-07-02- | 1776 | the Cloathing as nothing will contribute more to facilitate the recruiting Service than warm & comfortable Cloathing to those who engage | Muskets | are not wanted at this place, nor should they, or any other valuable Stores (in my judgment) be kept in | 1 |
| 30 | 225 fndrs jefferson 01-17-02-0240 | 1790 | have so long waited for are at length sent by M St. Trys. There is besides one for a soldiers | musket | ...which the workman sends you as a model. The price of the six others is eight livres each. The express | 1 |
| 31 | 227 evans N18096 | 1788 | were, At each pop Hundreds drop, While the the same time, a Turk hit me just in the nape of the neck with the | musltets | entre the artillery. Kid'd and wounted I.e confounded, What a charming thing's a battle! But the pleasant joke of | 1 |
| 32 | 231 evans N26461 | 1799 | but one | musket | ...that I fell down flat on my face, on the body of my slain enemy. My companions, all but one | 1 |
| 33 | 234 evans N20452 | 1794 | from May 22, 1794, to May 22, 1795, free —after the 22d May, 1795, 15 per cent. ad val. | Muskets | and fire locks, without bayonets, 15 Mksterd in four. 15 Muskins and musktets, printed, stained or coloured. 12 ¾ — | 1 |
| 34 | 237 evans N19454 | 1793 | one being ant arrived from (illustration) Battle of Bunkers Hill the southward, nor had they any other guns than common | musltets | ...and even those were not furnished with bayonets. However, they were almost all marksmen, being accustomed to sporting of one | 1 |
| 35 | 241 HeinR168 | 1776 | Soldier in the Pay of the Prov Records of this state... duty at Nova Scotia he received three | musket | balls co ss. Archivers...from the Enemy, by which he is rendered a Cripple, and never had .xxx..717..to | 1 |
| 36 | 244 HeinR187 | 1790 | a pouch with a box therein to contain not less than twenty - four cartridges, suited to the bore of his | musket | of firelock, each cartridge to contain a proper quantity of powder and ball, or with a good rifle, knapsack, shot | 1 |
| 37 | 246 evans N22983 | 1796 | put into an open fighter; and, after receiving several blows on the skull with the but of a | musket | ...thrown into the water. These were called republican marriages. VOL. I PAGE 72. On the 25th of October, Carrier, the | 1 |
| 38 | 247 0003-0002-0002 fndrs adams 06-13-02-0162- | 1782 | them, fire balls, gunpowder, match, cannon balls, pikes, (5) swords and broadswords, lances, spears, halberds, (6) mortars, pe-tards, grenades, saltpeter, | muskets | musket ball, helmets, head pieces, breast-plates, coats of mail, and the like kinds of arms proper for arming soldiers, musket-rests | 3 |
| 39 | 256 evans N10923 | 1775 | flying! Then the granted of certain laws and middle people of England are, by the tyranny of certain laws almost as ignorant in the use of a | musket | just they are of the ancient Catepulta. The Americans are likewise, to a man, skilful in the management of the | 3 |
| 40 | 270 evans N32815 | 1776 | American cause is injured by you. He expects you will all take up arms, and flock to his standard with | musltets | on your shoulders. Your opinions are of no use to him, unless you support him personally, for 'tis soldiers | 1 |
| 41 | 274 10954 fndrs washington 99-01-02- | 1783 | first Massachusetts brigade, signed by Major Barber, for a number of arms, accoutrements, three thousand flints and forty thousand | Musket | cartridges. I have ordered all the articles to be issued, except, two thousand flints and the 40,000 musket cartridges, which | 1 |

Electronic copy available at: https://ssrn.com/abstract=3887060

Case 3:18-cv-10507-PGS-JBD   Document 196-10   Filed 12/15/23   Page 181 of 228 PageID: 10737

| # | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 42 | 299 fndrs jefferson 01=05-02-0092 | | 1781 | to Arm all the Citizens of the State. I take the Liberty of proposing the following plan. That 8.000 good | Muskets | with Bayonets, as many Cartridge boxes, 8 Field pieces and the necessary amunition be immediately provided. That the counties in | 1 |
| 43 | 307 elliots v3 section6 txt | | 1788 | receive their punishment of what service would animate us to you, when, most probably, you will not have a single pay of the King. Bed—killing the siege. 309—deserters, 44 | musket | in the state? for, as arms are to be provided by Congress, they may or may not furnish with bayonets, 915 muskets without bayonets, and 1,156 damaged muskets were | 1 |
| 44 | 308 evans N25514 | | 1798 | 75 brass cannon, 169 iron do. 5,743 | muskets | among the trophies of victory. This was the principal | 1 |
| 45 | 332 fndrs washington 99-01-02-01680 | | 1780 | pleased therefore to direct the above quantity to be sent forward as speedily as our circumstances will admit.—The is no christian. just as you found out that your red coat and your | Muskets | which will be returned are for the most part in perfect order, except wanting Bayonets and the Cartouch Boxes are did not prevent you from being a coward. Your misery in the military life, like that of | 1 |
| 46 | 347 evans N26548 | | 1799 | cockade. your shoulder knot, and your committee are of opinion. that the State of New York has a just | musket | the . bayonets and accoutrements : but as they presume that arms and accoutrements | 1 |
| 47 | 361 HeinR243 | | 1774 | claim on the United States for these | muskets | have been furnished by other states to arm the | 1 |
| 48 | 369 fndrs adams 99-02-02-3763 | | 1799 | the day previous to the evening of its being evacuated, when the cannonade & musketry were beyond description. I received a | musket | ball through my left wrist. the pain of which was almost inappuntable, but binding it up. I continued at my | 1 |
| 49 | 405 evans N16310 | | 1788 | flying! Then the groans of soldiers dying. Just like sparrows, as if were. At each pop, Hundreds drop. While the | muskets | prittle prattle. Killed and wounded. I,ve confounded. What a charming thing's a battle! But the pleasant joke of all | 1 |
| 50 | 410 0517 | | 1779 | Side & on the Island that the whole may be readily distinguished and known. Any soldier who presumes to fire his | musket | without leave from the commanding officer of his regiment (who is not to give it but in cases of necessity | 1 |
| 51 | 415 HeinR271 | | 1774 | int the United States . You will scroll the Court of France for on immediate Supply of twenty or thirty thousand | Muskets | and Bayonets . and a large Supply of Ammunition and brass Field Pieces. to be t The sentences enclosed in brackets | 1 |
| 52 | 432 evans N27257 | | 1799 | And her flag is roaring, Always finds her sons disposd to. To chub the foe that's daring. Charge the | musket | fair . For that's the brave to share. Is he noblest body. Guard your coast, protect the | 1 |
| 53 | 439 HeinR191 | | 1790 | saying that there are no arms in the country . and that the district which he represents does not contain ten | muskets | If they had not muskets he knew they had arms of another kind ( rifles ) which were very valuable . and which | 1 |
| 54 | 440 fndrs franklin 01=38-02-0348 | | 1782 | had sometime after his first 'arrival in France, purchased in that kingdom, for the use of his countrymen. 50.000 | muskets | &c. that he gave three livres for each of them, being old condemned arms. that he had them cleared and | 1 |
| 55 | 444 fndrs adams 05-02-02-0001- 0003-0008 | | 1770 | Assaults . The Publication of Evidence, an [accidental] misfortune to Prisoner. Some Evidence for Prisoner. Jos. Edwards. Says a | Musket | ordered to prime and load. John Frost. Said Fire fie. It might be said by 3 Sorts of people. Semje | 1 |
| 56 | 454 HeinR280 | | 1774 | small'? How comes it that the number of muskets is less than that of the prisoners . and that all the | muskets | . &c I-favour is given for the brave to be as greatly inferior to are until for service ? How comes the number of bayonets to be so greatly inferior to that of the muskets | 1 |
| 57 | 458 0011 | | 1776 | advance with their field pieces kept up a fire with them for a considerable time but did not advance within | musket | shot aitho they were covered with a large party Capt. Rowley misses one of his men did not discover | 1 |
| 58 | 472 0047 | | 1796 | of trouble upon this point. and I hope you will be pleased with them. The French Standard as well for the | musket | as bayonet is strictly adhered to. I can no otherwise account for the delay of the superintendant in not sending | 1 |
| 59 | 478 evans N26346 | | 1796 | Their soldiers are variously armed, one part of the cavalry have a gun, pistol, and scymeter. and another | muskets | and lances. The infantry carry guns, bows, or slings, shortpikes, (S) or broad swords. The naval force of | 1 |
| 60 | 480 fndrs jefferson 01=15-02-0046 | | 1769 | the great inconvenience we receive of the old peasant | muskets | which occupy a great part of our own warehouse, we do not doubt but that you feel all the hardships | 1 |

Electronic copy available at: https://ssrn.com/abstract=3887060

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 61 | 491 0004-0009 | fndrs adams 05-03-02-0000- | 1770 | magnanimous to rush upon the points of fixed bayonets, and title, vapour, and provoke at the very mouths of loaded | muskets | It may be brutal rage, or wanton rashness, but not surely any true magnanimity."¹ | 1 |
| 62 | 502 05395 | fndrs washington 99-01-02 | 1781 | and are rendered more so by the late removal of one of the strongest companies. I find the number of | musket | cartridges in the magazines, by continued diminution, are very insufficient in case of siege, and need a very considerable augmentation | 1 |
| 63 | 503 0374 | fndrs washington 03-11-02: | 1777 | hope we shall not in the End fall short of them. Capt. Treat mentions that there is no quantity of | Musket | Cartridges in the Garrison, you should therefore immediately procure loose powder from the Ships, if you have none in the | 1 |
| 64 | 506 HeinR120 | | 1776 | non - commissioned officer and private, who now polfelfes ; or who thall polsess , before the expiration of the said year , a | musket | or firelock , thall be obliged to appear on duty with such musket or firelock, whether his attachment be under or | 1 |
| 65 | 516 evans N20201 | | 1793 | he received a shot in his belly from a courageous woman, the only person in the house who had her two | muskets | and two pistols charged, and was prepared for all [our, but they thought fit to retreat, carrying off the dead. Beat | 2 |
| 66 | 521 evans N13065 | | 1779 | you a new English dance. To our grenadier's march, that shall frighten all France. IV Let's take up our | muskets | and pour on our cartridges And, Monsieurs, you'll find us as good as our words Beat drums, trumpets sound | 1 |
| 67 | 532 HeinR187 | | 1790 | came from. he much feared could not be executed . Each militia man is to come into the field with a | musket | or firelock , a bayonet, cartouch - box , and other equipments. These , he verily believed , could not but hasl . If the citizens | 1 |
| 68 | 537 evans N18228 | | 1791 | captain and myself, with five more, set off in the boat towards New Providence. We had no more than two | musket | load of gun-powder with us if any thing should happen, and our stock of provisions consisted of three gallons of | 1 |
| 69 | 543 HeinR2269 | | 1774 | Eraston . Resolved , That the Secret Committee be directed to deliver the / R . Livingston , Mr . [ Thomas ] Lynch , Jun . and Mr . [ Carter ] | muskets | lately imported , to Colonel Skee, for the use of his batalion. this letter is in the Papers of the Continental | 1 |
| 70 | 547 evans N14620 | | 1784 | we went along at same time, our tops fired at her, and upon her quarter-deck, she returned only a few | musket | shots at us (one of which went through a man's hat brim, who was upon the forecastle, without hurting | 1 |
| 71 | 548 evans N11390 | | 1775 | the uneasy engines of your service? They are Englishmen; who must feel for the privileges of Englishmen; and their carrying | muskets | and bayonets about them, surely does not exclude them the pale of civil community. Do you think that these men | 2 |
| 72 | 554 0084 | fndrs washington 03-11-02: | 1777 | and at a certain period relieve their companions. it is to be wished that every Man could bring a good | Musket | and Bayonet into the field, but in times like the present we must make the best shift we can, and | 1 |
| 73 | 559 0270 | fndrs washington 03-01-02: | 1775 | only 194. Barls of Powder in all (including the late supply from Philadelphia) wch is not sufficient to give 25 | Musket | Cartridges to each man, and scarcely to serve the Artillery in any brisk Action one single day) | 1 |
| 74 | 565 evans N14620 | | 1784 | bore away and went on the weather-quarter of the enemies as they were, having the largest of them at two | musket | 's shot distance by the lee-bow, and the other at the same distance by her beam's end, which hailed | 1 |
| 75 | 567 0297 | fndrs washington 03-10-02: | 1777 | Musket Ball Containing Nine Thousand Four Hundred & thirty weight, Suitable for French Arms Muskets & Militia. With thirty Four Reams of | Musket | Cartridge Paper. Colo. Hughes Let me Know that best Received Counter Orders from your Excellency that the powder must not | 1 |
| 76 | 574 HeinR120 | | 1776 | have received . any public arms , and whose assessment thall not amount to Five Hundred Dollars , but who shall polfefs a | musket | or firelock , ( hall be obliged to appear on duty with such musket or firelock , or be considered and returned as | 1 |
| 77 | 575 fndrs hamilton 01-21-02-0236 | | 1798 | 's have been without much character and without any intellect. There is no indication that they have read a single | musket | from france, and in general they are without arms except Pikes. There is but one remedy for Ireland, and it | 1 |
| 78 | 586 HeinR224 | | 1774 | motion of Mr . M[erwether] [ Smith , seconded by Mr . [ Samuel ] Adams . Ordered . That the Board of War cause the rampart | muskets | in their possession to be repaired . and forward , with all possible despatch . to the executives of the State of Virginia | 1 |
| 79 | 588 evans N35515 | | 1792 | attempts to board us, but they fired their cannon, and galled us with their small arms. I had gotten a | musket | on board, and discharged it as I thought, for it flashed in the pan, and the noise of the other | 1 |

Electronic copy available at: https://ssrn.com/abstract=3887060

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 80 | 589 fndrs.franklin.01-22-02-0113 | 1775 | | the World. I intend therefore to propose to our Assembly to give that Encouragement here, by engaging to take 2000) | Muskets | per Annum for Ten Years, at a good Price, which I doubt not will in that time establish the Manufacture | 1 |
| 81 | 592 fndrs.jefferson.01-12-02-0020 | 1787 | | are broken, eaten up with rust, and worth nothing. 15,000 pieces of walnut for gunstocks, very good. 30. cases of | muskets | from Holland, about 27. in each case. say about 700 muskets with their bayonets good of their form but not | 1 |
| 82 | 600 evans.N23759 | 1796 | | shall be comprised all arms and implements serving for the purposes of war, by land or sea, such as cannon, | muskets | mortars, petards, bombs, grenadoes, carcasses, saucisses, carriages for cannon, musket rests, bandoliers, gunpowder, match, salt-petre, ball, pikes, swords, head pieces | 1 |
| 83 | 602 fndrs.franklin.01-26-02-0308 | 1778 | | Mr. Mercile. they are the worst I ever saw and should be sold for scrap. From the same source come | muskets | and parts for them. Of the clothes, arms, etc., remaining in the magazine, I can ship at the moment only | 1 |
| 84 | 614 fndrs.jefferson.01-06-02-0022 | 1781 | | this Place under a Guard of 7 men. Mr. Anderson is now in such a way as to repair 100 | muskets | week and from the additional number of hands which he'll be able to sett to work next week I | 1 |
| 85 | 615 washington.03-13-02- | 1778 | | all Lebanon and the other places. Materials should be ordered to came and each Regiment employed in making and storing | Musket | Cartridges. At all events, I think this would be proper, as a store of them cannot be hurtful to | 1 |
| 86 | 616 washington.03-11-02- | 1777 | | I am sorry to Repeat to Your Excellency, the Distress I have Suffered for Want of a proper supply of | Musket | Cartridges from Springfield, or the Materials to make them. The inclosed from the Commissary of Ordnance Stores at Albany, will | 1 |
| 87 | 625 Henri0275 | 1774 | | day. Resolved. That Liom Balton be authorized and appointed to superintend and direct, the making or altering of one hundred | muskets | on the construction exhibited by him, and called "the new improved gun.", which will discharge eight rounds with one loading | 1 |
| 88 | 627 evans.N18028 | 1791 | | all day till between three and four o'clock in the evening, when we came up with, and passed within a | musket | shot of one seventy-four gun ship, and the Indiaman also, who now hoisted her colours, but immediately hauled them down | 1 |
| 89 | 643 Q497 | 1777 | | the Enemy threw up a Battery in the rear of the Fort close to the Banks of the Meadow within | Musket | shot of us & had already got one piece of Artillery in it. We attacked it with the Floating Batteries[,] Block | 1 |
| 90 | 656 05605 | 1781 | | the service by breaking up said deposit, and delivering the stores (among which are most of the arms, accoutrements, and | musket | carriages for the ensuing campaign) to the D. C. Master. Fishkill, from its relative situation to West Point and the Army | 1 |
| 91 | 676 evans.N14820 | 1784 | | be no mistake made, and there could be none made, as we could see their colours. "We went twice within | musket | shot of the Serapis astern, and once on her bow. That there was no opportunity nor time lost in going | 1 |
| 92 | 677 0013 | 1776 | | It is not in the pages of History perhaps, to furnish a case like ours, to maintain a post within | Musket | Shot of the Enemy for Six months together, without—and at the same time to disband one Army and | 1 |
| 93 | 687 0533 | 1780 | | competent to every contingent demand. Unless we experience some unlucky stroke of fortune, they certainly will. As to the large | Muskets | without Bayonets—they would without doubt answer much better in a Garrison than in the Field, however as there | 1 |
| 94 | 692 evans.N09706 | 1772 | | the Englishman's gun missing fire, he bid the Indian fire away, and he did so to purpose. sent one | musket | ball through his heart, and another not above two inches from it, he fell upon his face in the mud | 1 |
| 95 | 708 evans.N07877 | 1784 | | Quakers point with the other Citizens some in getting the Cannon to the Barracks, some few I suppose, carried | Muskets | and were as active as any others in helping to keep the Indians from being murder'd—Alass, is | 1 |
| 96 | 709 evans.N12772 | 1778 | | 17. 1777. WILLIAM ELLIOT. Adjutant. A STATE of the Arms and Accoutrements in Colonel MARSHALL's Regiment. Good Bad Wanting | Muskets | 258.68.18 Bayonets, 150.0.188 Cartridge-boxes, 287.0.77 Prickers and Brushes, 49.0 265 Horns, 60.0 | 1 |
| 97 | 721 Henri6222 | 1774 | | That the officers of each company be chosen by the respective companies. That each soldier be furnished with a good | musket | that will carry an ounce ball, with a bayonet, steel ramrod, worm, priming wire and brush fitted thereto, a cutting | 1 |

| | A | B | | C | D | E | F | G |
|---|---|---|---|---|---|---|---|---|
| 98 | 722 | HeinR191 | | 1790 | be it further enacted, That all brass cannon, muskets, and firelocks, with bayonets suited to the same, pistols, swords, cutlasses | musket | balls, lead, and gunpowder, which shall be imported into the United States from any foreign country, within the term of | 1 |
| 99 | 731 | evans N26083 | | 1797 | Mediterranean and brought fresh into port warranted free from sickness, and wounds! Also, a considerable number! a little damaged! by | musket | short and cannon balls! and careless handling, with long knives and broad swords! and for want of wholesome air! on | 4 |
| 100 | 732 | fndrs jefferson 01-16-02-0138-0002 | | 1790 | with rivets, nails, old iron, broken bottles &c. &c. and the soldiers fir'd much the same stuff from their | Muskets | which is prov'd by the cartridges found in their boxes many of which I have seen. The firing continued seven | 1 |
| 101 | 737 | evans N13570 | | 1782 | Carbine had the track of a musket visible at the extremity of his neck, and the bullets, with which that | musket | was charged, slanted along the left jaw, carrying off some of the finest teeth in the world, and which, perhaps | 1 |
| 102 | 739 | fndrs washington 99-01-02- | | 1780 | on this subject, who will direct the detail of the affair. Enclosed is a return of all the lead and | musket | cartridges I know of, and the places where they are deposited, by which you will be able to see at | 1 |
| 103 | 740 | fndrs jefferson 01-05-02-0029 | | 1781 | Boston in 1776 being only sixteen years old, in June 1777 he was wounded in New Jersey 'by a | Musket | Ball which shattered his thigh Bone.' He languisheth for two years and, contrary to all expectations, recovered his health | 1 |
| 104 | 749 | evans N09071 | | 1770 | time I stood near the door of the royal exchange tavern, but apprehending danger as the soldiers stood with their | muskets | and bayonets in a charg'd or presented position, mov'd from thence down said royal exchange lane, and stood | 1 |
| 105 | 770 | evans N25533 | | 1795 | shall be comprized all arms and implements serving for the purposes of war, by land or sea, such as cannon | muskets | , mortars, petards, bombs, grenades, carcasses, saucisses, carriages for cannons, musket rests, bandoliers, gun powder, match, saltpetre, ball, pikes | 1 |
| 106 | 773 | HeinR274 | | 1774 | Resolved , That ye Board of War be directed to send to ye Commissary of Stores at New York , 10 Tons | Musket | and Rifle powder , 20 Tons Buck shot , a Quantity of Tin , as many brass Field pieces , | 1 |
| 107 | 781 | fndrs washington 05-14-02- | | 1793 | suffer—led by humanity I attempted in passing the ship to speak the centinel level'd & cock'd his | musket | & had I not refd would doubtlessly have executed the orders given. There are about ten American vessels in this | 1 |
| 108 | 784 | fndrs jefferson 01-05-02-0304 | | 1781 | Gent. Muhlenburg's Camp 400th musket powder 2100th Lead To Captn. Irish for the Continental Laboratory 3500lb | musket | powder and 3900lb Lead. amounting to 10,900lb powder and 6,000lb of Lead. These Things being put into | 1 |
| 109 | 785 | evans N10511 | | 1774 | people in one of the canoes took the opportunity of our being at dinner to tow away our buoy: a | musket | was fired over them without effect, we then endeavoured to reach them with some small shot, but they were too | 1 |
| 110 | 786 | evans N10511 | | 1774 | using threatening gestures, that we were in some pain for our small boat, which was still employed in sounding: a | musket | was therefore fired over them, but finding it did them no harm, they seemed rather to be provoked than intimidated | 1 |
| 111 | 802 | evans N22518 | | 1795 | Providence, in consequence of Mr. Morris's order, as chairman of the secret committee of Congress, two hundred and thirty-four | muskets | in part of the two hundred and forty-four directed to be sent. The inclosed copy of a letter from Mr. | 1 |
| 112 | 815 | evans N20039 | | 1794 | raised her head towards the ship, and growled her resentment at the murderers, which they returned with a volley of | musket | balls. She fell between her cubs, and died licking their wounds. 9. What child can read this interesting story, and | 3 |
| 113 | 817 | evans N20724 | | 1794 | putting him upon the full speed, and stopping him instantaneously, rising up on the saddle and firing a | musket | when the horse is on the full gallop, &c. in the performance of all which exercises he seemed | 4 |
| 114 | 821 | fndrs washington 03-07-02- | | 1776 | may have the earliest intelligence if any Troops should be filing off to the Westward. We are greatly distressed for | Musket | Ball and Cartridge paper, that lately come up being all for Cannon Cartridges—please to order up what can | 1 |
| 115 | 865 | fndrs washington 03-07-02- 0035 | | 1776 | I am more fully convinced that we can prevent any ships from stoping the communication. I have forwarded Eighty thousand | Musket | Cartridges more, under the care of a Subbalterns Guard commanded by Lt Pemperton of Col. Rollings Regiment. This moment heard | 1 |
| 116 | 868 | HeinR188 | | 1790 | 4.c . That it shall not be lawful to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses | musket | balls, lead, bombs, grenades, gunpowder sulphur, or saltpetre: but the exportation of the aforesaid articles are hereby prohibited for | 1 |
| 117 | 898 | evans N14155 | | 1783 | and give as their best wishes,—and none will condemn it, but those that are interested, whose objections our | Muskets | will readily answer: Frank. I approve of your zeal, my friend, but not of your proposal.—The whole cause | 5 |

Electronic copy available at: https://ssrn.com/abstract=3887060

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 118 | 903 | evans N17823 | 1790 | chests and fireworks made ready; and our landmen quartered among the seamen; and 25 of them appointed for | musket | fleets, and every man written down for their quarter. The wind continued N. with fair weather- and other | 1 |
| 119 | 904 0206 | frds washington 05-05-02- | 1790 | companies are to act as artillery, or infantry, as the service may require, as each of them are armed with | muskets | , besides two brass field-pieces, with the proper quantity of ammunition. I beg I leave to submit to your judgement, the following | 1 |
| 120 | 912 | evans N11419 | 1775 | part of the outermost reef, which is in general almost dry; and in a few spots entirely dry, run within | musket | shot to the southward of this dry reef, and then steer east, as you go in, and you will have | 4 |
| 121 | 915 09018 | frds washington 99-01-02: | 1781 | the state of Ammunition, with reference to the proposed operations, it is found impossible to furnish more than fifteen Thousand | Musket | Cartridges for the Use of the State of New Jersey, especially at a time, when, we are obliged to solicit | 1 |
| 122 | 930 | HeinR100 | 1796 | with a Sword or Hanger; and Elfpontoon; and that from and after five Years from the passing this Ar; all | Muskets | for arming the Militia; as herein required, shall be of bores sufficient for Balls of the eighteenth part a of | 1 |
| 123 | 935 05311 | frds washington 99-01-02: | 1781 | for their progress---You will now take the light Artillery--and smallest Mortars with their Stores and the | Musket | Cartridges with you. But let these follow under a proper escort rather than impede the March of the detachment which | 1 |
| 124 | 945 | evans N26769 | 1799 | sacerdotal habit and assume the sword of vengeance---the peaceful plowman to forsake his agricultural pursuit and shoulder his | musket | ---to leave the possessions in which he delighted, and the friends nearest his heart, to secure and defend those | 5 |
| 125 | 954 0029 | frds washington 03-15-02: | 1778 | to keep a Look out, in the mean time Executed Seeds the Deserter, the horse Returned. Reported they were within the Soldiers remained in their position , without offering any | Musket | shot of the fort, Exchanged a few Shot, and Come off: an hour by Sun, we had information that 100 | 1 |
| 126 | 959 | HeinR240 | 1774 | violence, individuals only occasionally uttering offensive words and wantonly pointed their | Muskets | to the Windows of the Hall of Congress. No danger from premeditated violence was apprehended . But it was observed that | 1 |
| 127 | 968 | evans N14620 | 1784 | else she would have been boarded in her main chains, 'Capt. Landais thinking it was the Pallas, when at a | musket | shot of him, hailed her in French, and told them to take care, they were coming on board of him, and | 1 |
| 128 | 969 | frds franklin 01-31-02-0058 | 1779 | upon the B:h: Richard, they were right to relieve it. Art 21. The Alliance fired but three Vollies, while within | Musket | Shot of the Serapis. Art 22. The morning after the Engagement Capt. Landais Said on board the Serapis, as he | 1 |
| 129 | 977 | evans N09071 | 1770 | street opposite the Custom-house, the centinel on their approach placd himself on the custom-house steps, and charg'd his | musket | and presented the same against the body of the people who offer'd him no insult or violence, in a | 1 |
| 130 | 992 | evans N22529 | 1795 | shall be completed all arms and implements serving for the purposes of war, by land or sea, such as cannon, | muskets | , mortars, petards, bombs, grenadoes, carcasses, saucisses, carriages for cannon, muskets rests bandoleers, gunpowder, match, salt-petre, ball, pikes, swords, head pieces | 1 |
| 131 | 999 | evans N22533 | 1795 | war, by land or sea, such as cannon, muskets, mortars, petards, bombs, grenadoes, carcasses, saucisses, carriages for cannons, saltpetre , muskets, musket ball, bucklers, helmets , | musket | rests, bandoliers, gun powder, match, saltpetre, ball, pikes, swords, head pieces cuirasses, halberts, lances , javelines, horse-furniture, holsters, belts, and generally | 1 |
| 132 | 1012 | HeinR232 | 1774 | breastplates , coats of mail and the like kinds of arms proper for arming soldiers . | musket | rests, belts, horses with their furniture, and all other warlike instruments whatever. These merchandises which follow shall not be reckoned | 1 |
| 133 | 1015 0421 | frds washington 03-14-02- | 1778 | to use all the means in my power to increase the number to 200 I am apprehensive the number of | Musket | Cartridges will fall greatly short of the Quantity expected, owing to a disappointment of Men Coll Sweers informed me the | 1 |
| 134 | 1018 | HeinR3120 | 1776 | before the expiration of the said year ; a musket or firelock , that be obliged to appear on duty with such | musket | or firelock , whether his alinment be under or above Five , Hundred Dollars , under the penalty for neglect , of being considered | 1 |
| 135 | 1024 | evans N11269 | 1775 | rescue, but the Faction continuing the assault with redoubled violence, and some of the Soldiers being knocked down, and their | muskets | nearly wrestled from them, fired, and killed and wounded some of the Rioters. The consequence of this insurrection was, that | 1 |
| 136 | 1025 | evans N23535 | 1795 | the body-guards drew his sword, which provoked a national guard of Versailles to give him a blow with his | musket | were equally offended at the | 1 |
| 137 | 1032 | HeinR104 | 1761 | the Authority aforesaid, That every Person so inlisted as aforesaid within this Colony , shall always be provided with one good | Musket | or Fusee , well fixed ; a Cartouch Box or Powder- Horn , one Pound of Powder , | 1 |

Electronic copy available at: https://ssrn.com/abstract=3887060

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| 1039 | HeinR260 | 1774 | May, 1787 at Westport 50 or 60 Tons of unserviceable iron Ordnance 20 Tons of old carriage iron. 2000 damaged | muskets | 700 pistols. 2 Tons of saltpetre 1000 lb of rope a large number of saddles and horse harness a quantity | 1 |
| 1052 | HeinR325 | 1776 | purposes of war, by and or sea, such as cannon, muskets, mortars, petards, bombs, grenades, carcasses, saucisses, | musket | - rests, bandoleers, gun - powder, match, saltpetre, ball, pikes, swords, head - pieces, cuirasses, halberts, lances, javelins, horse - furniture, holsters, belts, and | 1 |
| 1054 | HeinR188 | 1790 | carriages for cannon. likewise a member of a Republican society. The moment that I heard of the Western insurrection. I took up my | musket | as a volunteer, and marched three hundred miles to suppress the insurrection" Mr G could give the address. but he was | 1 |
| 1068 | evans N17823 | 1790 | Susan his wife one of the Earl of Lincoln's sisters arrived here. He brought more order-oc, | muskets | and powder bought for the public for monies given to that end, for godly people in England began now to | 4 |
| 1073 | HeinR100 | 1790 | and Knapsack, a Pouch with a Box therein to contain twenty counters. four Cartridges. fulled to the bore of his | Musket. | or Firelock. each Cartridge to contain a proper quantity of Powder, and Ball, or with a good Rifle, Knapsack, Shot | 2 |
| 1076 | HeinR188 | 1796 | coast from the Algerines, and therefore we have no occasion for ships of war. But if we lay down our | muskets | , are we in no danger from the Indians ? A member has just now stated, that an English ship of war | 1 |
| 1085 | HeinR228 | 1774 | will permit a farther supply of one thousand stand of Arms. five hundred pounds of Gunpowder. one thousand pounds of | musket | ball , three thousand gun flints , one thousand Cartridge boxes , and ten thousand musket cartridges. Resolved , That the secretary at war | 1 |
| 1096 | HeinR224 | 1774 | to Congress an estimate furnished us by the D_ Q_ M of Pennsylvania , for the sum necessary to transport 200,000 | musket | cartridges to the Southern army. From the situation of that army this supply is most pressingly wanted , and we beg | 1 |
| 1102 | fndrs washington 03.08.02-0066 | 1777 | the Orders they shall Receive. Case Shott with Flannel Cartridges for 3, 6 & 12 pounders to be the first Object | Musket. | Cartgs. are likewise to be made in great Numbers. You are to contract for & procure likewise the Articles a List | 1 |
| 1104 | fndrs adams 99-02-02-0426 | 1799 | a good merchant's books. so that no confusion may arise, in our reciprocal arrangements. I have bespoke your two | muskets | at Mr. Schuckler's. They will be ready in about a fortnight and Mr. Welch will take care to send | 5 |
| 1106 | evans N11269 | 1775 | them out of Town without any danger. These guiltless Sons had knocked down some of the soldiers. were wresting their | muskets | from them. and were pushing into the Custom House at the time they were fired at. and one of these | 1 |
| 1118 | evans N16879 | 1789 | I could perceive. as they lay scattered about. that the party was very numerous, and many of them armed with | muskets | Having happily succeeded in my undertaking. I returned without delay to the Naudowessies. and desired they would instantly | 1 |
| 1120 | HeinR150 | 1792 | a pouch . with a box therein to contain not less than twenty . four cartridges fitted to the bore of his | musket | or firelock . each cartridge containing a pro_ . per quantity of powder and ball . two square flints . a blanket and knapsack. | 1 |
| 1137 | evans N17823 | 1790 | every town should be furnished with powder out of the common store, paying for it in country commodities, likewise for | muskets | , and for military watches and alarms &c. Presently upon this there arose an alarm in the night upon this occasion | 1 |

Electronic copy available at: https://ssrn.com/abstract=3887060



| Row Labels | Count of Code |
|---|---|
| 1 - Used in a Military Context | 137 |
| 2 - Used in a Context Relating to Individual Self-Protection | 1 |
| 3 - Used in a Context Relating to Hunting | 1 |
| 4 - Used in Another Context | 8 |
| 5 - Ambiguous/Unable to Determine the Context | 3 |
| **Grand Total** | **150** |



Electronic copy available at: https://ssrn.com/abstract=3887060

Gun, Guns

Electronic copy available at: https://ssrn.com/abstract=3887060

## Legend

| | |
|---|---|
| 1 | Used in a Military Context |
| 2 | Used in a Context Relating to Individual Self-Protection |
| 3 | Used in a Context Relating to Hunting |
| 4 | Used in Another Context |
| 5 | Ambiguous/Unable to Determine the Context |
| 6 | Irrelevant or Duplicate Use |

Electronic copy available at: https://ssrn.com/abstract=3887060

| # | Number | Source | Year | Context Left | Key | Context Right | Code |
|---|--------|--------|------|--------------|-----|---------------|------|
| 1 | 167 | HenR169 | 1792 | …may , it be apprehended to be lodged and kept in such Fortress , Saving… | Gun | Powder &c any incommensurate incident not freeme being built be indexed tobe lodged in any… | |
| 2 | 186 | evans N35615 | 1776 | …also , all such stop publicks 'Provincial Stocks of … we gained sight of them : but their ninth was soon changed when we got | Gun | upon our… | |
| 3 | 261 | hotrs washington 99-01-02-0543-44 | 1780 | …the Mars , an American Vessel of 20 …what relates to setting of | Guns | …would depart a little time after her charged with dispatches for us—although there is something extraordinary in all | |
| 4 | 427 | HenR104 | 1781 | That this A & or any Part cont , & c. not to be extend to thereof , except | Guns | ( I hall not be somwent … constrand to extend to , or any Way able & the Counties of n , or Six , Ele ll barges | |
| 5 | 551 | HenR102 | 1776 | 262 To prevent Watering w ats a corner I saw people with sticks striking on their guns all the right wing | Gun | in the fight . 269 Woods , burning , lee B l. Woodpeckers , fee C 7 X Y Z A Table T [ r ] A | |
| 6 | | hotrs adams 05-02-02-0001-0004-0013 | 1770 | apprehended danger and that the so were these heroes indiscriminately to take the said ships belonging to | guns | might go off accidentally . I went to get to the upper end towards the | |
| 7 | 583 | hotrs adams N24799 | 1770 | Officers on board the Eliza of 22 Guns , fell down to the Hook sunday | guns | together with an able master and 36 … in this ridiculous undertaking 100 volunteers embarked . & Millions commission was procured | |
| 8 | 396 | evans N24799 | 1797 | four galleys , three gunbats , four ships of sixty | gun | both which ships wit ba the first tier wind for the River St Lawrence [ The embargo is taken off | |
| 9 | 612 | hotrs washington 03-17-02-0027 | 1778 | last , with the Balticar of 20 procured at any rate ] they have not been complained , excepting two | such Guns | such Boats , each mounting a Thirty two Pounder in the Bow , are in good forwardness at Poughkeepson | |
| 10 | 681 | hotrs washington 03-13-02-0443 | 1778 | …large Scows , which are really fresh'n—four West Indias . It is now to be practicable , these died but Two Ships of 64 Guns , the | Gun | Others are Order'd … been Sent and | |
| 11 | 690 | hotrs washington 99-01-02-0598) | 1781 | fired? A I do not know certain , seven or eight I believe . I did not count them. Before the last | gun | was fired. Montgomery made a push at me with his bayonet. I had a stick a my hand , as I and a frigate of thirty-six . besides a number of the quick sailing little vessels called Scampavoies | |
| 12 | 875 | evans N09159 | 1770 | and without even appearing to be fatigued . Their sea force consists of | Guns | … | |
| 13 | 1070 | evans N18610 | 1792 | estimate it will appear that to compleat the 74 | gun | ships buildung under his agency he requires an immediate supply of money . That his funds are totally exhausted and by | |
| 14 | 1137 | HenR212 | 1774 | and Men . Resolved that two more Vessels be fitted out with all … expedition , the one to carry not exceeding twenty | Guns | and the other not exceeding thirty six Guns , with a proportionable number of Swivells and Men , to be employed in | |
| 15 | 1375 | hotrs adams 01-03-02-0016-0037 | 1775 | ever Sept Since , that he takd the sergen with Grace Sheds , & some of them might have been Scattered , or such [ touched | Curns | or either from that made them fly At 23 . Capt Lamdas ras said several times Since the Action | |
| 16 | 1180 | hotrs franklin 01-31-02-0098 | 1779 | men that of Cannons , which [ hall or may be wanted for digging or intrenching . or powered mounting the great | Guns | and manning them ufeul . and further , that a ffaft and my be awful . by Warrant as abscribel , to impress able | |
| 17 | 1375 | HenR101 | 1769 | is wiling to undertake it , this morning about seven oClock , the enemies fleet were all in Motion , they fired several | Guns | which I looked upon to be signarals , they said about for the span of two hours , and I Come to all | |
| 18 | 1502 | index washington 03-16-02-0332 | 1777 | state ten Ships of forty will reduce it to [ ten ] second] one ships of War , ten third rate , fifteen fourth | grans | ten of thirty-six , and eight of twenty . If America says the . had only a twentieth part of the naval force sailed all the same time for Georgia having under he convoy a Store ship and two or three other | |
| 19 | 1776 | HenR199 | 1776 | Sir James Wallace in the Experiment of 50 | Guns | Vessels put in them . The remainder of old works , going out of the town , have been strengthened . and | |
| 20 | 1600 | hotrs washington 03-22-02-0421 | 1778 | so still . Two works of earth have been raised at some distance from the town , wide off the road , and | guns | guns passed there | |
| 21 | 1602 | HenR192 | 1774 | my left , and one in my breast that all my breast I struck off with a stick and the | gun | went off instantly . Then I draw back , and finding one dead as I though , on my left and one on loaded , and your flow matches burning . A ll ure … unmered Jacobin of Entercountry order . is an | |
| 22 | 1608 | evans N06070 | 1770 | as our forty ma ' riners trade with the savages of the Indian ocean - with your men at their profit , your | gun | enemy to all governments . under and towards passing by Georges uo to liston must be in in he isle Scituation . Row Galleys are | |
| 23 | 1624 | HenR246 | 1775 | Vessels passing thro the Gut must come within Musket Shot of a Fort on … all Ve sters of [ 32 ] Order , out of " the Powder , Mill at | Guns | absolutely necessary to … - Powde r ' he is length's Shelings per pound for the firms , Relylve permitting uban Bernard Olwe | |
| 24 | 1806 | hotrs adams 04-01-02-0256 | 1776 | Peebchs , as Alvertisers of [ y ] Order , out of " the Powder , Mill at Adover . four hundred Pounds of | Gen | total passed Ocxober 9 , 1776 . On the … bring pined by another of his ships of war , and by the little frigate called the That look several | |
| 25 | 1821 | HenR169 | 1776 | him , with the mattus and calieneles , Amon , whose vessel carried sixty sworts , and pistrls , accompanied with matstt dogs . tomn whose violence , being one right | guns | contrasted . though killed by William Robertson : but we were night | |
| 26 | 1867 | evans N16982 | 1788 | the melancholy terror of Invocry , which is almost one continued narrative til murders and calamities . Amon whose vessel carried sixty | guns | apprehensive of immediate danger . I left my … | |
| 27 | 1868 | HenR160 | 1790 | and day hunted by men armed with to wit . Resolved . That a Naval force . to consist of four ships of forty - four . and two ships of twenty | guns | each . be provided for the protection of the commerce of the United States against the Algerine cruisers . " It was resolved | |
| 28 | 1961 | HenR188 | 1790 | on board of a pilot boat and send them to Norfolk , that the same boat returned at night , and the | guns | were again taken on board of the ship , that a revenue cutter was dispatched to detain her , but she had | |
| 29 | 2046 | hotrs washington 05-16-02-0228-0012 | 1794 | fixtance to which the | gen | will carry 41 or pointing a pech - fork at hip , flanding within the reach of it , or by holding up | |
| 30 | 2140 | HenR997 | 1794 | Stotfners . —we have to state the following in 1792 , he was a lieutenant | gen | This ship being paid off in 1783 he was reduced to the half-pay , on which he supported himself until 1789 | |
| 31 | 2175 | evans N21569 | 1795 | on board the Albion , of 64 guns , not shoulded and wanted right across the street to the Box , & great | Guns | were at least 5 , 6 or 7 Guns Shutbell Haxes . I spentt the Evening near the Dock . The Master of | |
| 32 | 2232 | hotrs adams 05-03-02-0201-0004-0010 | 1795 | guns , not shoulded and wanted right across the street to the Box , & great provisions of war , as soldiers , arms , engines , | Guns | ships or other necessaries for the use of war , nor to suffer the same to be furnished by ther | |
| 33 | 2270 | evans N21598 | 1795 | the parties agree " not to furnish the enemies of each other with any provisions of war , as soldiers , arms , engines , | guns | subjects | |

Electronic copy available at: https://ssrn.com/abstract=3887060

| # | A | B | C | D | F | G |
|---|---|---|---|---|---|---|
| 34 | | 2385 evans N14960 | 1785 | main deck, the rest are quarterdeck and forecastle guns. A vessel of the same dimensions, and without quarterdeck and forecastle... | guns | which are of little or no use on the plain I shall mention, will carry 28 twentyfour pounders. If that any yet this contemptible power gives rise to all the costs of Portugal and Spain, and may be | 1 |
| 35 | | 3504 evans N20724 | | then regularly fortified, except Mozootvoo, and that hardly produces half a... occupying the space of working the | guns | isolate of the want of working them | 1 |
| 36 | | 2939 evans N07706 | 1764 | on good Christians in slavery ... Send 'em good Beef, and Pork, and Bread. | Guns | Powder, Flints, and store of Lead. To Shoot your Negotiaus through the Head. Devoutly then, make Affirmation, You're Friends. | 2 |
| 37 | | 1539 fnoss washington 03-02-02-0433 | 1775 | the Wharf to morrow morning—This afternoon I have been procuring a number of Horses to carry the Baggage Waggons & | Gun | Carriages to Cambridge, & intend to begin upon that Business to morrow Morning. Your Excelly may be assur'd I shall lose no time | 1 |
| 38 | | 2574 HenR172 | 1778 | kept without shot sooner ploughd V. Barrel of good ... captain cried 'England and Ireland my boys!' When he mentioned old | Gun | Powder, containing one Hundred V barrels ... three hundred fiftis cor. Weight of Leaden Balls ( of different sizes ) and three hundred | 1 |
| 39 | | 2715 evans N24235 | 1797 | Ireland my heart made a noise. Our sweet little ... the public News papers son that purpose. That an Inventory of the Stores | guns | and other Warlike Accoutrements, be polished up in some public place a sufficient time before the Sale for the inspection | 1 |
| 40 | | 2798 HenR168 | 1776 | and Apparatus belonging to her, except the ... have b Co_a in the Continental army are making applicdti i to the Grammar | Guns | and accoutrements. which warehoesm im Mem before they left cartp i as leyfiog. and incereass | 3 |
| 41 | | 2854 HenR172 | 1776 | Count or payment it over ... proceed to the West Indies, or whereever ordered. I should suppose, that | gun | Ships, and some of smaller size. which will be by that time prepared, might be employed to great advantage in | 1 |
| 42 | | 2859 fnoss adams 99-02-02-3040 | 1798 | the three Frigates, and six or seven 20 ... but so lightly built that one good broadside of a frigate suffices for them. | Gun | Carriages so Cambridge, & intend to begin upon that Business to morrow. Your excelcy of the same calibre, all these things being furnished them by the Danes, Swedes, and Dutch | 1 |
| 43 | | 3882 fnoss jefferson 01-12-02-0861 | 1798 | arrived from Salem they have recievd advice that the L'Evêlée Capt De | guns | Powder consisting one Hundred V barrels ... three Hundred fiftis cor. Weight of Leaden Balls ( | 1 |
| 44 | | 2990 fnoss franklin 01-34-02-0446 | 1781 | Thaly felt in with the Romulus of 44 ... would needs try his new | Guns | with a Convoy consisting of 20 Transports bound from New York to the Assistance of Arnold. The accounts differ in | 1 |
| 45 | | 2924 evans N16592 | | shapes, I was shot in my Christmas holidays by a young jack-snapes, who ... few feet, I having a stick in my hand made a stroke at the robber who | gun | upon me• "But I shall pass ·(·)· Hende and several other stages of life, to remind | 1 |
| 46 | | 2941 evans N06071 | 1770 | to 150,000 cannon fired upon the earth. And if this explosion is made by | gun | out of this hand I then made a stroke at the officer my right foot slipt, that brought me on | 1 |
| 47 | | 2946 evans N13549 | 1781 | an elastick fluid, as volent as ... if so that it might be known. It was General noor who told me of it. On | gun | powder. then the matter of this globe must be as strong and firm as the iron of cannon, and the firing, I went into my float with my people, and went to the south-west point of Mount Independence | 1 |
| 48 | | 2949 evans N12272 | 1778 | Saturday evening, at ... after and put up then | gun | and with his Arm. They then fired and were priming and loading again I am pretty positive the Capt lost | 1 |
| 49 | | 2986 fnoss adams 05-03-02-0001-0003-0004 | 1770 | than a larger broad load. He came before em about 4 or 5 minutes | Guns | em | 1 |
| 50 | | 9040 HenR190 | 1790 | other of that number of ... to Just mention it in your Excy. Should the Enemy Attempt to Land Here | guns | but not so much · It was true they were not at first contemplated to be so large · but strong reasons to fire, But Shall Send the Earliest intelligence. Possable I am with Great Respect your Excys Most | 1 |
| 51 | | 9040 HenR190 | 1779 | this post, we have No Alarm ... enn to us, and upon this immediately came an officer with a party of six | Guns | Obedient Humble Servt | 1 |
| 52 | | 3068 fnoss washington 03-20-02-0004 | | or seven men with ... hoes on each fide · though only four were actually open · at 3d time of | guns | breastright and changer'd the way, and by their behaviour i did not know but they would fire I said then mounted. Soon after · a Frenchman applied to a Ship - car penter to repair the water | 1 |
| 53 | | 3146 evans N09070 | 1770 | her annual, to accommodate the four ... 204, 207, 210, 6 to prevent the killing of | Guns | which was in a ... Night• V Proportional Naval or Warlike Stores, 200, 2627 to prevent Violating w · ith a Gun in the | 1 |
| 54 | | 3240 HenR301 | 1781 | the transport brought up by the two Barons [Barons], 200 mattrasses | Gun | Powder· Flinte has promised to pack up your books and to carry them to Tuckahoe. He this day | 1 |
| 55 | | 3270 HenR102 | 1776 | 100 tents, 3 tents, rum, and 2 barrels of ... at sea in five or six Weeks, the other two, in three months. Of the 12, not | Gun | told me ... five have been procured by purchase—the Hennac of Boston—the Ganges & the Delaware, of | 1 |
| 56 | | 9311 fnoss jefferson 01-01-02-0169 | 1776 | to exceed 24 ... it is fast by near the water side, by the shelter of which they lay safe | Guns | Philadelphia, and the | 1 |
| 57 | | 3320 fnoss adams 99-02-02-2709 | 1798 | from the enemy's ... navy. A single year's contribution would build, equip, man, and send to | gune | and so well played their few guns, that they may have half the Indians, and put them all to a sea, a force which should carry 300 | 1 |
| 58 | | 3491 evans N11149 | 1775 | with the bower anchors. As none of the islanders had yet made their | gune | The rest of the confederacy, exerting themselves in the same proportion, would equip in the same | 1 |
| 59 | | 3483 evans N06081 | 1796 | apprehending the firing of a second ... d on. Q But this Prisoner under this gun is of the Director to be pointed at | gun | time 1500 guns more ... Captain Conn thought it advesable to go ashore in search of them, that we might lose no time in opening | 1 |
| 60 | | 3601 evans N23500 | 1797 | the Republics before the ... opening of the batteries of that parallel, we not only continued a consistent | gun | was fired from that ship, or other? A· Before the gun was fired · Q· Whom did the Prisoner ask the | 1 |
| 61 | | 3604 evans N24775 | | fire with our mortars, and every ... that a strange gentlemanl desired to speak with him, and was waiting in | gun | that could be brought to bear upon it, but, a little petore-day-break, on the morning of the 19th, I in the summer-house, and strictly ordered Harry by no means to touch it, but he was no sooner | 1 |
| 62 | | 3657 evans N14342 | 1783 | saw their marine deprived at once of fifteen hundred sailors and sixty | gun | gone, than they burst forth | 1 |
| 63 | | 3688 evans N30351 | 1795 | square-rigged vessels, exclusive of a ship of forty-four ... find Mr. John Toms and Oxter immediately, on the Stocks, at Boudryne, | gune | and sea frigates, besides the total loss of the commercial productions of Virginia. The two lines of the combined arm's | 3 |
| 64 | | 3711 evans N14342 | 1783 | for me, a Large Cutter to Mount (2) ... five days; and then having equiped with our | Guns | Such 6 and 9 pounders which is Contracted for to be Completeated in four Months, and I hope that, with our journey very tedious. We arrived at | 1 |
| 65 | | 3792 fnoss franklin 01-36-02-0086 | 1779 | they went out Narossea 28 Guns 3Stoos of War Avenger 14 Guns Fury | Guns | and accoutrements, we received towards Pittsburgh. The western was ascending not, which made Savage 16 Guns Mentor 16 Guns Racoon 14 Guns & a Floating Battery She Carryes 22 Guns 18 | 1 |
| 66 | | 3851 fnoss washington 99-01-02-0933 | 1782 | 16 Guns Hornet 14 Guns Otter 14 | Guns | pounders 16 Guns 12 | 1 |

Electronic copy available at: https://ssrn.com/abstract=3887060

| # | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 67 | 3867 | evans N69070 | | any such thing, then went up stairs into the lower west chamber, next to | guns | fired in lang-street, which killed three persons which I saw lay on the street, supposing | |
| 68 | 3890 | Hart R656 | 1770 | J. Perkins, Adm. Morton bearing the handsof in the rear of the carriage | guns | the snow | |
| 69 | 3925 | evans N36347 | 1767 | guns, from New-England, by order from Mr. Warren, and on the 22d the | guns | Frooster from New Windsor Belonging to this Continent made at Mr Workers mill out of which I Paid | |
| 70 | 3970 | hicks washington 03-05-02-0236 | 1776 | my Brothers Letter will Inform you in Regard to them. I Received a few Days Ago about two 1 un of | Gun | the success | |
| 71 | 4095 | hicks washington 99-01-02-0934 | 1762 | known what day Sandy Hook 12th Inst. Vessel 26 Guns at Sea, is not | Guns | Spency Hook | |
| 72 | 4179 | Hart R170 | 1776 | at first Day of Ann Domini. One Thousand Seven hundred and | Let - | Guns | |
| 73 | 4222 | evans N09616 | 1771 | drawn upon the Entrance, but the Air should immediately be purified by | Guns | unfortunately affected us before | |
| 74 | 4392 | evans N08347 | 1757 | arrived before Louisburgh the Chester, a 50 | gun | Canterbury and Sunderland, two | |
| 75 | 4465 | evans N14342 | 1783 | then arm, and their alertness in working the | puns | each, with such other Assistance as may be in their power, and becoming good Allies 3d That as a | |
| 76 | 4481 | hicks franklin 01-20-02-0223 | 1777 | which are the Spanish Guns left at Gibraltar, in the last Siege, the other | guns | chose | |
| 77 | 4526 | hicks adams 99-01-02-0754 | 1766 | of either five or Six iron | guns | and 20 Brass and 53 more no mounted—on a rock to the Northward of the Town is | |
| 78 | 4538 | evans N21976 | 1795 | captain Raynor, and the Caesar of 74 | gune | both of which had entirely escaped the effects of the tempest. Between these two a desperate and | |
| 79 | 4552 | hicks jefferson 01-23-02-0061 | 1792 | assailants, turned around one of two | guns | close | |
| 80 | 4585 | evans N26399 | 1799 | Marches, retreats, attacks, and routs. Proclaim'd by | gune | this and find several shots at the city without doing any damage. A detachment of the Regiment | |
| 81 | 4585 | evans N01494 | 1794 | the nogra loss is probably you, the most interesting & important | gun | du Cap; accompanied | |
| 82 | 4762 | hicks washington 03-14-02-0615 | 1778 | intelligence just received. The La Sensible in Frigate of 36 | Guns | and armies, and strode, The air with various clargorn till | |
| 83 | 4782 | hicks washington 03-17-02-0491 | 1778 | there are four which appear to be about 50 | Gun | duty to | |
| 84 | 4797 | hicks jefferson 01-30-02-0001 | 1789 | efforts, until sometime in the month of November, in the year 1736, when | guns | brave boys, Only try and you'll prove, that a soldier cannot love, Then away for bold soldiers | |
| 85 | 4826 | evans N10065 | 1779 | Since your rush is as sure as a | gun | beggmne | |
| 86 | 4826 | evans N10718 | 1770 | to brim with in the length of their | gun | before the firing. Number were coming down by the Town house. Call'd em cowardly Rascalls | |
| 87 | 5066 | hicks hamilton 01-13-02-0002 | 1782 | astmitted licenses with the most unequivocal proof that flies [ hp the | puns | mounnd and preparetib...Us within the territory of the United States. | |
| 88 | 5073 | Hart R302 | 1781 | Chicon of Marseilles, did encreate her force of | guns | as before we sjart | |
| 89 | 5164 | evans N22669 | 1796 | and received with these and what might | guns | Sovereign Lord the King seised | |
| 90 | 5169 | Hart R171 | 1776 | o'clock, to re-build a | gun | public treasury | |
| 91 | 5231 | evans N21976 | 1795 | parts of the American coast. Between the departure of D'Estaing and the | gun | from the Hawk troops; the Reasonable and | |
| 92 | 5275 | evans N25680 | 1797 | One Morlock used the others hired guns three times over him, at the last | guns | with a double charge. the Reasonable and Centurion of 64 and the Cornwall of 74 guns, all arrived | |
| 93 | 5344 | hicks washington 03-06-02-0242 | 1776 | of them; 40 odd | Guns | are gone up the East River I am Yr Most Obedt Servt Go. Washington | |
| 94 | 5360 | evans N23514 | 1759 | occasioned the firing of the alarm | guns | road, on which Maj Woodbridge | |
| 95 | 5418 | evans N27768 | 1796 | saw two shots of the soldiers Q. What was the occasion of your rushing | guns | to bear upon our fortification. If she means to attack it, it is probable she will warp in the next | |
| 96 | 5484 | evans N09159 | 1770 | in upon them after the first | gun | was fired? A. All my and was to know who they were Q. Did you wonder what was the occasion | |
| 97 | 5512 | evans N07166 | 1762 | enemy fired this morning with three | gun | covered way before the | |
| 98 | 5561 | etkos c3 section16 jst | 1788 | ship will cost you ninety-eight thousand pounds, including | puns | pounds in... | |
| 99 | 5564 | evans N26812 | 1788 | another just behind; these two had | guns | wet, when | |

Electronic copy available at: https://ssrn.com/abstract=3887060

Case 3:18-cv-10507-PGS-JBD   Document 196-10   Filed 12/15/23   Page 193 of 228 PageID: 10749

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 99 | | 5592 evans N1581-3 | 1792 | should be some of the Connecticut men or some others, ready to run down upon the wharfs with some few was met with and the two which were convoyed them viz. the | guns | | 1 |
| 100 | | 5601 hofs franklin 01-38-02-0427 | 1779 | I rode about an o'clock I was told that the Drums had been some time beating and kept a slovenly tour | Guns | are brought into were fired, that Weymouth Bell had been ringing, and Mr. Webb was then ringing. I immediately sent of an express | 4 |
| 101 | | 5705 hofs adams 04-01-02-0136 | 1775 | Returned from Newport I find that Admiral Gridon in a Ninety gun Ship has | Guns | Ship has also Arrived with him. Those Ships were Separated from the Fleet in a Storm—The Fleet | 4 |
| 102 | | 5721 hofs washington 03-17-02-0071 | 1778 | Arrived at Newport a Slovenly tour | gun | which one of thirty-six consisting of one vessel of forty-four | 1 |
| 103 | | 5761 Henri R188 | 1780 | By advices still more recent. The fleet | guns | one of thirty-six, one of twenty-eight, three others and a brig   Mr.  F  observed   that gentlemen had objected | 2 |
| 104 | | 5776 evans N997-59 | 1770 | those few stand at? A   Right over the way Q   Was you looking at the person who fired the last | gun | | 1 |
| 105 | | 5803 Henri R170 | 1770 | to employ farm suitable person or persons,  to build for the Invoic of this   men, provided with a certain train of artillery   The fleet consisted of fifteen | guns | ?-A. Yes, I saw him aim as I did that was running down the middle of the street, and kept on Old deck taking a special care to procure the most approved plan from some kind signal right,  24 | 4 |
| 106 | | 5807 evans N14479 | 1784 | State  one fifty four  one Twenty six | guns | | 4 |
| 107 | | 5809 hofs adams 05-02-02-0001-0001-0003-0006 | 1770 | strike upon the Gun and the corner man next me sane said fire and immediately fired  This was the first | Gun | Aason as he had fired he said Damn you lire, I am so sure that I thought it was | 3 |
| 108 | | 5813 hofs adams 05-01-02-0001-0004-0007 | 1770 | found his account in the charge of one gun two persons killed on the spot? He did not recollect that he fired before, I was placed so that I must have seen it   His | Gun | but suppose, that by one of the guns   Attacks tell, he stooped to see if the Mobtab was dead, then | 4 |
| 109 | | 5822 hofs adams 05-01-02-0001-0034-0004 | 1770 | of the army, which all Cart bridge  A c  in the year 1775, for which they reviewed a like quantity of | gun | powder  Therefore Resolved,   That   ?-A. Yes, I saw him aim as I did and the Fergle were round him 7 or 8 foot off | 4 |
| 110 | | 5874 Henri R171 | 1776 | their Cannon  The Grand Harbour   She meets with a Vessel of superior Force   She mounts 14 Carriage | Guns | 6 & 4 pounders, for we have thought of mounting two 9 Pounders upon her main Beam, if we find | 2 |
| 111 | | 5928 hofs washington 03-04-02-0017 | 1776 | I took his barrel, a pair of new muskkons, his flintlock; powder horn, bullet bag, together with the | gun | said marched off, directing my course toward the few o'clock mark, about half an hour before | 4 |
| 112 | | 5996 evans N2R812 | 1798 | The accounts brought by her seemed to alarm the folks very much  It was reported that the custom house or | gun | had been taken and the English fleet chased into Portsmouth by the combined Fleet, which | 3 |
| 113 | | 6105 hofs washington 03-23-02-0120 | 1779 | open a Battery of two Fort Miffin. I have been at Fort Miffin to stay, The Enemy are prepared to | Guns | I take them to be Eighteens or Twenty fours, this Night or tomorrow Morning, In Conjunction with their two Howitzers | 4 |
| 114 | | 6113 hofs washington 03-12-02-0178 | 1777 | of the two Fleets under the Count De Barras and Count de Grasse and Frigates, two vessels and one brig | Guns | and the Rainbow of forty four have been captured from the Enemy—I hope it is true  We have | 3 |
| 115 | | 6163 hofs washington 99-01-02-0695-06 | 1781 | that the Ruby of sixty four and Reduced  That two other armed vessels be fitted out with all expedition, the one to carry not exceeding 20 | Guns | and the offer not exceeding 16 Guns  with a proportionate number of swivels and men, to be employed in such | 2 |
| 116 | | 6181 Henri R251 | 1774 | from hence, so that she will have in all 38 guns, &c.  the other is a French frigate of 34 | guns | who is the admiral They take at Fort Royal and along the coast all the small vessels, shallops, boats, &c. | 2 |
| 117 | | 6225 evans N07502 | 1764 | not be worth while to send them at all If they are yet in a State to be serviceable as | guns | Barrels and would be reduced by the Rust to old Iron by being sent loose and open, the Sum of | 3 |
| 118 | | 6267 hofs adams 05-03-02-0086 | 1780 | sixteen  as the first frig? A  I saw none  Q  Were any blows given after the first and before the second | gun | fired? A  No  Q  Did you, or did you not, after the first gun was fired see a blow aimed | 4 |
| 119 | | 6273 hofs adams 05-03-02-0001-0004-0013 | 1770 | A Speech recommending a further provision against 23 oft reported 42 Slave M.  the plain of  for a thirty | gun | ship, 86 O wre and Thompson, the petition of 101 silos - D Sentow  Officers, a bill of a certain description of | 4 |
| 120 | | 6326 Henri R188 | 1780 | good Andrew the Black re-examined  The time from my seeing life | gun | | 3 |
| 121 | | 6421 hofs adams 05-03-02-0001-0003-0006 | 1770 | Guard placed at the Custom House viz the 2d afternoon. Mr. Shaw, and the Ladies went down and drank tea at Doctor | Guns | did not exceed 5 or 6 minutes  John Coffin, Theodore Bliss a few days after the affair told me he | 4 |
| 122 | | 6445 hofs franklin 01-25-02-0028 | 1770 | obtain leave to proceed to France and procure in Cambridge, from the I Aug  1797, to 160  1703  0 Xo 0 to Josiah | Guns | and necessaries, I return to the Ship again at Portsmouth, on my return I found a probability of getting | 4 |
| 123 | | 6653 hofs adams 03-31-02-0007-0012-0026 | 1795 | Saltonstall's  We went out on a to his majesty's command in his letter to the government under which this province then was  There are few | gun | party but not real, any great success  Spent part of the evening at Mr. White's  and past at Mr. Down   of  requiring | 4 |
| 124 | | 6700 Henri R173 | 1776 | vessel shall return the salute   continued in the Ghats of England and Ireland, of which Vessels the | gun | more lying at the upper part of Portsmouth, purchased by private persons, for their security and defence against the Indians | 4 |
| 125 | | 6707 evans N1655R | 1792 | as many guns as a vessel of the same size of any other nation, which | gun | for gun  17  The subjects and citizens of either party may frequent the coasts and countries of the other and | 4 |
| 126 | | 6737 hofs jefferson 01-08-02-0277 | 1785 | I fear is but too true That the Rawley in Tabern She was first engaged with | gun | Ship have in Sight, Came up & after giving her a few Broadsides She was abridged to Sirre—prizes any | 4 |
| 127 | | 6709 hofs franklin 01-08-02-0277 | 1778 | [blank] is one, commanded by [blank] mounting [blank] possibly be inferred from the evidence,  is an augmentation of the force | guns | Come asually mounted, and then the oldiinent should have been founded on the 4th  instead of the 3d | 4 |
| 128 | | 6712 hofs franklin 01-36-02-0089 | 1782 | A Frigate & a ferry | guns | Ship  after an obstinate Engagement, and carried her into the Texall  But I cannot learn the | 2 |
| 129 | | 6783 hofs washington 03-17-02-0306 | 1778 | of the vessel  as she arrived here with some another brilliant Action, by taking a Forty four | guns | particulars with much | 4 |
| 130 | | 6854 Henri R901 | 1781 | neither men nor powder armed when the siege was finished  THE | Gun | unexpectedly, had arrived at Boston from England and were immediately sent to join the | 4 |
| 132 | | 6875 hofs adams 01-04-02-02-002-0010 | 1779 | Princess Mary of 60 and the Hector of 40 | guns | commodore, pursuant to his general orders | 4 |
| 131 | | 6932 evans N2R347 | 1767 | | | | |

Electronic copy available at: https://ssrn.com/abstract=3887060

Case 3:18-cv-10507-PGS-JBD   Document 196-10   Filed 12/15/23   Page 194 of 228 PageID: 10750

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| 133 | fhotrs franklin 01-13-02-0159 | 1766 | Traitier shall sell or otherwise supply the Indians with Rum or other spirituous Liquors, Swan Shot or rifled Barrell'd | Guns | '136. I apprehend that if the Indians cannot get Rum or fair Traders, it will be a great | 6 |
| 134 | fhotrs washington 99-01-02-07154 | 1781 | of last night says there was at dark all the Evening 24 Sail of the Line, one Ship of 50, off—Winds at West discovers five Ships and one Man of War double | Guns | Two of 40 Six large Frigates and four Small Ships of War fell down from New York and with them Standing to the Eastward &c. so far corroberates the Report of the Five Saylors of this Morning that I | 1 |
| 135 | fhotrs washington 99-01-02-09334 | 1782 | decKer he Supposed forty or fifty. | Guns | em | 1 |
| 136 | HeinF10K | | the sides the said galleys ( hall be rigged as the commissioner of the | guns | and other materials; shall be provided while the said galleys are on the flocks . to the end that no | 1 |
| 137 | 7252 HeinF10K | 1785 | navy shall direct, and be rigging, fails, arms would be at once easy to us, and highly agreeable to our good | guns | with two balls each, and having taken a convenient position so as to fire together, we perceived | 1 |
| 138 | 7258 evans N24371 | 1797 | natured fellow-travellers. We accordingly loaded our | guns | from | 3 |
| 139 | 7351 evans N35515 | 1792 | not to fire a gun till I gave them orders, but as soon as ever they had fired the great | guns | to discharge our small arms upon them ; could not prevail upon Don Ferdinand to keep below, through I saw | 1 |
| 140 | 7372 evans N36070 | 1770 | the head of life-alley, I saw about eight soldiers standing round the sentry box by the Custom-House with their | guns | levelled breast high and a considerable number of people stand in Kingstreet, when I had been there about three minutes | 1 |
| 141 | 7450 fhotrs adams 05-03-02-0001-0004-0016 | 1770 | sticks strike the party, and struck the cheers, and surrounded the party, and struck the Opinion that I wou'd be for the common good to destroy the whole of the works and take the | guns | with their sticks several blows. This is a witness for the crown, and his testimony is of great weight for | 4 |
| 142 | 7538 fhotrs washington 03-12-02-0188 | 1777 | 1. further excepted : This en % later : of Non-commission'd Offering-G-ut, car, fled a commistarry-ditcharge of fire his | Guns | to the Jersey Shore, where they'll serve to guard the River, and in case we could get possession of on a Training or Muster Day, ... without the signal ( Order of Lenox of his Superr ' Officer, | 1 |
| 143 | 7547 HeinR169 | 1776 | to volatie the rights of their constituents. The speech being ended, the | Gun | under such Pe : [or] | 1 |
| 144 | 7585 evans N17875 | 1791 | drum beat to arms, as many as had the enemy being windoward, and having her head towards the north, fired | guns | were ordered to load them with balls, centries were placed all the doors, and the whole Legislature were held prisoners | 1 |
| 145 | 7605 evans N14620 | 1784 | six or seven of her larboard lower battery Southern. Their rode is very danger, the harbour safe and strongly | guns | at the Alliance, but the shots went between her masts; seeing the position of these two ships, I judged, that | 1 |
| 146 | 7614 fhotrs jefferson 01-12-02-0581 | 1788 | defended. They have 9 vessels from 20 to 36, as the most urgent affairs are over I think they] ment it ; Congress has | guns | and 4 or 5 smaller. They are sharp built, and swift, but so lightly built that one good broadside of | 1 |
| 147 | 7782 fhotrs washington 03-03-02-0077 | 1776 | Ordered you 15 ton of take or destroy some Marchant Vessels laying there, but by the disclosures Genl Smallwood made with the Militia, & Some Ship | Gun | Powder from New York & we have Salt Petre enough here, to make 80 Ton more so that I hope we they were obliged to desist from their Enterprize. Clin'n'elson was during this time endeavouring to | 1 |
| 148 | 7984 fhotrs washington 99-01-02-04472 | 1781 | guns, or changing or altering the calibre or size of the | guns | Collect the Militia on past, in any manner whatever, the making of new gun carriages , or the cutting of new port holes in any | 2 |
| 149 | 8002 HeinR191 | 1790 | Boston, I had been taught to expect that from the Herald, of 20 Guns, and the Boston Cutter, of 14 | Guns | would have been perplexed to Join Capt. Barry, at Cape Cod, or Nantasket road, about the 20th instant. Barry arrived | 1 |
| 150 | 8096 fhotrs adams 99-02-02-2763 | 1798 | proper lieg. This fit of illness proved a violent ague, which made me so weak I could hardly carry my | gun | and when the fit was on me, I was almost petrified with thirst. One night as I was ruminating on | 3 |
| 151 | 3763 fhotrs hamilton 01-16-02-0107-0001 | 1794 | tonnage duties on the ships of such nations. These resolutions were, according to Theodore Sedgwick of Massachusetts, the great | gun | of the present session," and they dominated debate in the "House of Representatives during January and the first days | 2 |

Electronic copy available at: https://ssrn.com/abstract=3887060



| Row Labels | Count of Code |
|---|---|
| 1 - Used in a Military Context | 134 |
| 3 - Used in a Context Relating to Hunting | 5 |
| 4 - Used in Another Context | 10 |
| 6 - Duplicate or Irrelevant | 1 |
| **Grand Total** | **150** |



Electronic copy available at: https://ssrn.com/abstract=3887060

EXHIBIT 119



*Don Troiani's*
# SOLDIERS
*of the*
# AMERICAN
# REVOLUTION

**ART BY DON TROIANI**
**TEXT BY JAMES L. KOCHAN**

**Additional contributions by Don Troiani, Erik Goldstein, and Bob McDonald**

Copyrighted material

Copyright © 2007 by Stackpole Books
Images © 2007 by Don Troiani

Published by
STACKPOLE BOOKS
5067 Ritter Road
Mechanicsburg, PA 17055
www.stackpolebooks.com

All rights reserved, including the right to reproduce this book or portions thereof in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the publisher. All inquiries should be addressed to Stackpole Books, 5067 Ritter Road, Mechanicsburg, PA 17055

The images in this book may not be removed and sold, framed or unframed for any commercial purpose. All images are copyright © Don Troiani, all rights reserved. Any form of alteration, reproduction, or mutilation is a violation of Federal Copyright Law. No images may be reproduced in any form or by any other means (including electronic) without the written permission of Don Troiani.

Printed in China

10 9 8 7 6 5 4 3 2 1

FIRST EDITION

For free information about the artwork and limited edition prints of Don Troiani, contact:

Historical Art Prints
P.O. Box 660
Southbury, CT 06488
203-262-6560
www.historicalartprints.com

For information on licensing images in this book, visit www.historicalimagebank.com

**Library of Congress Cataloging-in-Publication Data**

Troiani, Don.
  Don Troiani's soldiers of the American Revolution / text by Don Troiani and James L. Kochan ; art by Don Troiani. — 1st ed.
      p. cm.
  Includes bibliographical references.
  ISBN-13: 978-0-8117-3323-6
  ISBN-10: 0-8117-3323-8
  1. United States—History—Revolution, 1775–1783—American forces—Pictorial works. 2. United States—History—Revolution, 1775–1783—British forces—Pictorial works. 3. United States—History—Revolution, 1775–1783—Equipment and supplies—Pictorial works. 4. United States. Continental Army—Uniforms—Pictorial works. 5. Great Britain. Army—Uniforms—History—18th century—Pictorial works. 6. Soldiers—United States—History—18th century—Pictorial works. 7. Soldiers—Great Britain—History—18th century—Pictorial works. I. Kochan, James, 1958– II. Title.

  E251.T76 2006
  973.3—dc22

                                    2006008123

Copyrighted material



## Neckstock Clasp

The 29th Regiment of Foot composed part of the garrison of Fort Ticonderoga in the summer and fall of 1777. This "male" half of copper-alloy neckstock clasp is inscribed to that regiment and was lost by an unfortunate soldier—the cost to replace it was almost certainly deducted from his meager pay.



## British Eighteen-Hole Cartridge Box, Belt, and Frog, 1759–84

The design of this simple set of accoutrements had its origins in the early eighteenth century and continued in usage by the British Army for nearly a hundred years virtually unchanged in form. The cartridge box was a simple, curved block of black-painted poplar or beech wood drilled to hold eighteen rounds of musket or carbine cartridges. A royal cipher was embossed on the black leather flap, which was nailed to the back of the wooden block, and two leather belt keepers were similarly attached to the front. The cartridge box was worn on a narrow belt of blackened harness leather that closed with a simple square iron buckle. A sliding frog, made of two pieces of harness leather, crudely sewn together and reinforced with tinned iron rivets, held the bayonet of the soldier's firearm.



New recruits to British regiments were issued a "stand of arms" before joining their regiments. The box with frog and belt was part of this stand, in addition to the musket with its sling, bayonet, and scabbard. This specimen of the cartridge box is stamped with the GRIII cypher in false gold leaf, denoting its production during the reign of King George III (1760–1820). Nearly identical cartridge boxes survive in other collections with the cipher of King George II (1727–60). Simple and cheap to produce, tens of thousands of these sets were made under contract for the Board of Ordnance until replaced by the twenty-four-round tin "magazine" that was adopted in 1784.





## Cartridge Box Badge

A detachment of forty-five officers and men of the 26th Regiment of Foot under Capt. William Delaplace composed the feeble garrison of Fort Ticonderoga when it was captured by Ethan Allen and Benedict Arnold on May 10, 1775. This brass cartridge box badge with "26" in open-work belonged to one of the enlisted men and was found in the ruins of the fort.

FORT TICONDEROGA

TROIANI COLLECTION

FORT TICONDEROGA

Copyrighted material

# EXHIBIT 120

Military > Weapons

# Forgotten Weapons: The Mitrailleuse

**An early Franco-Belgian machine gun developed before military commanders truly understood how to use automatic weapons.**

BY IAN MCCOLLUM   PUBLISHED: DEC 9, 2015



Media Platforms Design Team

The mitrailleuse was one of the early types of mechanical machine gun, along with the Gatling, Gardner, Nordenfelt, and others. "Mitrailleuse" is actually a general name for a volley gun–one with many barrels in a cluster, which are fired sequentially. The two most common types were the Montigny (a Belgian design fired by a lever) and the Reffye (a French design fired by crank).

The Reffye was a top-secret weapon used by the French in the Franco-Prussian War, which was expected to be a huge game-changer. However, there was little experience worldwide in how best to use a weapon like this, and the French commanders chose to use them like artillery, firing at long range where they were inaccurate and underpowered. In this role, they were utterly outclassed by the Prussian Krupp

artillery, leading to a general European disdain for the effectiveness of machine guns that would last until the First World War.

Reffye mitrailleuse in use, firing blanks:

**MORE FROM POPULAR MECHANICS**





Watch on

Excellent CAD animation of a Reffye:



Advertisement - Continue Reading Below

The Montigny was typically a 37-barreled affair, using a removable cartridge plate for loading which allowed it to maintain a very high rate of fire (as long as loaded plates were available to the gunners). The breech was a large block containing 37 separate firing pins, which the cartridge plate attached to the front of. A large lever at the rear of the gun connected to a knee-joint type cam that would push the breechblock forward, chambering the 37 cartridges and locking the breechblock in place. A second lever on the side of the gun would then be pulled up vertically, firing the barrels in succession.



**Belgian Montigny mitrailleuse**

Media Platforms Design Team

The firing mechanism was quite simple. When the breechblock was pulled rearward, all of the firing pins would be cocked against their own individual springs, and a plate would slide up between the firing pin and its port in the front of the breechblock. The firing lever simply pulled that blocking plate downward, allowing the firing pins to snap forward against their cartridges in sequence. The rate of fire

would be determined by the speed with which the firing lever was pulled, and could be as slow as single shots if the gunner was careful.

Once the cartridges had all been fired, the rear lever would be used to unlock the breech and pull it backwards. The cartridge plate (now full of empty cases) would be pulled out the top of the gun, and a fresh loaded one put in its place. This sequence would be repeated as desired until the gun overheated or ammunition ran out.



**Loading plate for a Montigny mitrailleuse**

Media Platforms Design Team

Advertisement - Continue Reading Below

The Mitrailleuse as a general type of firearm saw only one major combat usage, and that was the Franco-Prussian War of 1870-1871. The French had adopted the Reffye Mitrailleuse and considered it a game-changer. Unfortunately for the French, the tactical understanding of how to use a weapon like the Mitrailleuse was still totally lacking. The guns were treated like artillery, and used to fire at ranges of 1500 meters  or more against German infantry. The sights on the Mitrailleuse were simple post and notch affairs like rifles of the day, and the extreme range required excellent range estimation (which the gunners were not trained for). To compound the problem, the combination of long range and small projectiles made it nearly impossible to observe point of impact when firing, and it was nearly impossible to actually hit targets as a result.

The problems with French use of the Mitrailleuse were compounded by the secrecy surrounding the guns. The Army was so focused on preventing the Germans from

discovering the guns that virtually no training was given to troops on their use–few had even seen them prior to battle. The secrecy had not been particularly effective, though, and the Prussians knew about the guns. Concerned about their potential effectiveness, they were made a high-priority target for the very effective Prussian field guns, which could easily destroy them from well beyond the range of return fire.

As a result of their utter failure to provide the French Army with an advantage, a general feeling of the inferiority of all such rapid-fire rifle-caliber weapons would permeate military culture for several decades. Ultimately, it was only the use of Maxim guns in WWI that would change the minds of generals and ordnance departments worldwide (although a forward-looking few did learn from conflicts like the Russo-Japanese War).

# EXHIBIT 121

# THE

# GATLING GUN

By

Paul Wahl and Donald R. Toppel

ARCO PUBLISHING COMPANY, Inc.

New York

623.44
WAH

LIBRARY
Southern Union State Junior College
Wadley, Alabama 36276

091217

004675

Second Printing, 1971

Published by ARCO PUBLISHING COMPANY, Inc.
219 Park Avenue South, New York, N.Y. 10003

Copyright © Paul Wahl and Donald R. Toppel, 1965

All Rights Reserved

No part of this book may be reproduced, by any means,
without permission in writing from the publisher, except
by a reviewer who wishes to quote brief excerpts in connection
with a review in a magazine or newspaper.

Library of Congress Catalog Card Number 64-16612

Arco Catalog Number 1196

Printed in the United States of America



½ Scale

PRACTICE WITH 1 INCH GATLING GUN AT HARTFORD, U.S.A. NOV'T 2, 1869
Target 10 ft. × 10 ft. - Bulls Eye 10 in. Diameter

Distance 500 yards - Over 90 all in whole lot.

what earlier date, arrangements were made with Ed. A. Paget & Co., Vienna, to manufacture the gun at their plant. L. W. Broadwell, Gatling's European sales agent, was a partner in the Paget operation.

Provisions for production outside the United States evidently were deemed desirable by the Gatling Gun Company, and their association with both Armstrong and the Nobel brothers in Russia proved satisfactory, unlike that with Paget, which eventually was terminated.

In 1871, W. H. Talbott, president of the Gatling Gun Company, visited Austria and found the Paget firm on the verge of dissolution as the result of mismanagement and disunity in the partnership. It was also found that the guns produced by Paget were not up to the high standards of those manufactured by Colt, Armstrong, and Nobel. For a time, Gatling management considered purchasing the Paget works, as proposed by Paget to Talbott, but as it turned out they did not buy this Vienna plant for reasons unknown.

## GATLING FAMILY MOVES TO CONNECTICUT

In 1870, returning from his second tour of Europe, Richard Jordan Gatling moved his family from Indianapolis, Indiana, their home for many years, to Hartford, Connecticut, where the Gatling Gun was manufactured at Colt's Armory. The Gatling home, in Hartford, was on Charter Oak Place, not far from the spot where the Charter Oak once grew.

Hartford was home to the Gatlings for 27 years, until 1897, when Mr. and Mrs. Gatling moved to New York City to live with their daughter, Ida, and her husband, Hugh O. Pentecost, an attorney. During his more than 25 years as a resident of Hartford, Gatling took an active interest in local affairs, and was a charter member of the Hartford Club. The Gatling family attended the South Baptist Church; their son-in-law, Hugh Pentecost, prior to giving up the cloth for the bar, served as pastor of this church.

Judging from correspondence of the early 1870's, the headquarters of the Gatling Gun Company remained in Indianapolis until 1874, although the guns had been made in Hartford since 1866. By act of the General Assembly of the State of Connecticut, in 1874, the Gatling Gun Company was incorporated under the laws of that state. Mentioned in the resolution as incorporators: Richard J. Gatling, James Goodwin, Henry Keney, and Edgar T. Welles.

EXHIBIT 122

# A
# REVOLUTION
# IN
# ARMS

## A
## History of the
## First Repeating Rifles

Joseph G. Bilby

# A REVOLUTION IN ARMS

## A HISTORY OF THE FIRST REPEATING RIFLES

Joseph G. Bilby



WESTHOLME
Yardley

Copyright © 2006 Joseph G. Bilby
Original photographs by John Hubbard © 2006 Westholme Publishing

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced in any form or by any electronic or mechanical means, including information storage and retrieval systems, without permission in writing from the publisher, except by a reviewer who may quote brief passages in a review.

Westholme Publishing, LLC
904 Edgewood Road
Yardley, Pennsylvania 19067
Visit our Web site at www.westholmepublishing.com

ISBN: 978-1-59416-580-1
Also available in paperback.

Produced in the United States of America.

*machina* to save his imperial bacon, ordered a formal trial of the gun. The emperor was ⸱ n⁻ preoccupied trying to stave off his many enemies, who were closing in for the kill fror аı. over Europe, however, and failed to follow up on his order. It was not until the summer of 1814, with Bonaparte simmering in his first exile on Elba, that the Société d'Encouragment pour l'Industrie conducted a thorough test of Pauly's invention. Pauly was apparently a pragmatist, and also demonstrated his invention for Russian officers in Paris with the allied army of occupation, who reportedly purchased a number of guns from him.[3]

Although representatives of two major powers thus evaluated the Pauly system, neither country adopted it. Unfortunately, details on the actual test results of Pauly's breechloader are lost to history, so we can only speculate as to the cause of its apparent failure to impress enough for military adoption. One drawback might well have been suspicions of its durability in the field, and another the cost and manufacturing difficulty, not only of the guns themselves but also of their unique ammunition. Pauly cartridge bases were reloadable and reusable, but individually machined. It is quite possible that since the capacity of manufacturers to mass produce identical objects with the same dimensions was still in the future, the bases would fit well only into a specific gun, a limitation that would cause a supply nightmare.

Whatever the cause for its rejection, the Pauly breechloader design enjoyed a limited but steady popularity among French sportsmen, with improvements patented in 1816 and 1818 and apparent production by a number of small custom gunsmiths. Pauly himself went on to patent a high-powered air gun in Britain, and several pistols made on this design still survive.[4]

Muzzle-loading guns, smoothbore and then rifled, remained the mainstay of the infantry forces of the major powers for more than fifty years after Pauly patented his breech-loading system. Although military muzzleloaders were sturdy and, to use a modern term, idiot proof in the hands of the average recruit, the paper cartridges that they and all early breechloaders, including the Pauly, used remained comparatively fragile items.

As late as the American Civil War, when more durable semi-fixed and fixed metallic ammunition was making a widespread appearance, the rifle musket cartridge used by most infantrymen was still made from paper. Assessments of the paper cartridge's durability in the field were not optimistic. A correspondent of the *Army & Navy Journal* wrote that "any soldier can tell you that after a long march many of his cartridges are useless, the powder having sifted out, and that in tearing cartridges more or less powder is wasted, even at target practice, much more in the heat of the battle." Powder spillage during the loading process affecting ballistic consistency was one reason the Springfield .58 caliber musket powder charge was raised from sixty to sixty-five grains by the middle of the Civil War.[5]

In the first half of the nineteenth century, most American inventors of military breech-loading guns applied themselves to developing a firearm and ammunition that addressed the military requirements of durability, rapid reloading, and sealing the breech from gas escape. The ammunition used in these designs was invariably fired by external ignition, initially, as in the case of the Hall, flint and steel, and subsequently, with designs like the Sharps, Smith, and Maynard, by percussion cap.

Europeans went a step further, attempting to develop a firearms system that achieved the

alongside its barrel. Sam managed to sell the Texas navy 180 of these carbines and arrang   United States government trial between his carbine and the single-shot breech-loading       . Although accuracy results from both guns were virtually identical, the Colt, as might be expected, won the rate of fire competition hands down.[48]

Through skillful promotion and exploitation of the trial results, Sam Colt was able to sell his new carbines to both the Army and Navy for use against the persistent Seminoles. A field evaluation filed in 1842 by Lieutenant John McLaughlin, an early enthusiast for repeating arms, proved favorable in some aspects. McLaughlin attested to the fact that Colt's guns, despite fears to the contrary, were rugged and stood up to the rigors of campaigning by his Marines. They were "constantly employed in the field & in canoes from the 9th Oct. until the 22 Decr. 1841" and stood the test better than ordinary muskets.[49]

Unfortunately, however, serious problems beyond durability also arose, to include occasional multiple chamber ignition and cylinder explosions. These safety issues, coupled with a failure of parts interchangeability, halted government procurement of Colt carbines and hastened the end of the Patent Firearms Company, which went bankrupt in 1841. Although remaining guns, including revolving long arms, continued to be sold though the early 1840s, Sam Colt was personally out of the gun business until 1847. The advent of the Mexican war, however, reawakened memories of the effectiveness of Colt guns in Texas service. United States Army Captain Samuel Walker, a former Texas Ranger, collaborated with Sam Colt in the design of a massive new .44 caliber handgun, known today among collectors today as the "Walker Colt," and large government orders ensued.

The new contracts put Colt back in the gun business for good. Although production was largely confined to handguns for several years, drawings and sample copies of new revolving rifle designs exist from the 1846-1847 period and there was apparently a limited production revival of a modified version of the 1839 carbine made for the state of Rhode Island.[50]

With his Paterson works long gone, Colt went to the well-established industrial firm of Eli Whitney to produce the Walker design. Profits from this venture were used to establish the Colt Patent Fire Arms Company in Hartford, Connecticut. The 1849 discovery of gold in California ensured Colt's success, as the civilian handgun market expanded dramatically. The Model 1849 "Baby Dragoon" .31 caliber pocket revolver quickly became an arm of choice for men headed for the gold fields.[51]

The major problems of multiple chamber ignition and exploding cylinders apparent in Florida were easily addressed. The defective cylinders appear to have been the result of manufacturing errors, while the multiple ignitions were caused by poorly fitting percussion caps that exposed a chamber to ignition by flame generated when another chamber was fired. Although remedied in later years, these Florida defects would dog the Colt for generations, earning later revolving rifle designs, including his, an undeserved reputation well into the twentieth century.[52]

The Colt Company did not offer a standard long gun again until its "New Model" of 1855. This sidehammer design, resulting from development work by Sam Colt and his factory manager Elisha K. Root, was applied to pocket pistols, rifles, and shotguns. The New Model rifle entered production in 1857 in .36 and .44 calibers, and the army purchased over 400 for

# EXHIBIT 123

ASPEN CASEBOOK SERIES

*JOHNSON*
*KOPEL*
*MOCSARY*
*O'SHEA*

# FIREARMS LAW AND THE SECOND AMENDMENT
## Regulation, Rights, and Policy

*Second*
*Edition*


Wolters Kluwer

ASPEN CASEBOOK SERIES

# Firearms Law and the Second Amendment Regulation, Rights, and Policy

**Second Edition**

**Nicholas J. Johnson**
Professor of Law
Fordham University School of Law

**David B. Kopel**
Adjunct Professor of Law
University of Denver Sturm College of Law

**George A. Mocsary**
Assistant Professor of Law
Southern Illinois University School of Law

**Michael P. O'Shea**
Professor of Law
Oklahoma City University School of Law



Copyright © 2018 CCH Incorporated. All Rights Reserved.

Published by Wolters Kluwer in New York.

Wolters Kluwer Legal & Regulatory U.S. serves customers worldwide with CCH, Aspen Publishers, and Kluwer Law International products. (www.WKLegaledu.com)

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or utilized by any information storage or retrieval system, without written permission from the publisher. For information about permissions or to request permissions online, visit us at www.WKLegaledu.com, or a written request may be faxed to our permissions department at 212-771-0803.

To contact Customer Service, e-mail customer.service@wolterskluwer.com, call 1-800-234-1660, fax 1-800-901-9075, or mail correspondence to:

Wolters Kluwer
Attn: Order Department
PO Box 990
Frederick, MD 21705

Printed in the United States of America.

1 2 3 4 5 6 7 8 9 0

ISBN 978-1-4548-7644-1

**Library of Congress Cataloging-in-Publication Data**

Names: Johnson, Nicholas J., author. | Kopel, David B., author. | Mocsary, George A., author.
Title: Firearms law and the Second Amendment : regulation, rights, and policy / Nicholas J. Johnson, Professor of Law, Fordham University School of Law; David B. Kopel, Adjunct Professor of Law, University of Denver Sturm College of Law; George A. Mocsary, Assistant Professor of Law, Southern Illinois University School of Law; Michael P. O'Shea, Professor of Law, Oklahoma City University School of Law.
Description: Second edition. | New York : Wolters Kluwer Legal & Regulatory U.S./Aspen Publishers, [2018] | Series: Aspen casebook series | Includes bibliographical references and index.
Identifiers: LCCN 2017032684 | ISBN 9781454876441
Subjects: LCSH: Firearms — Law and legislation — United States — History. | United States. Constitution. 2nd Amendment. | Gun control — United States — History. | LCGFT: Casebooks
Classification: LCC KF3941 .J64 2018 | DDC 344.7305/33 — dc23
LC record available at https://lccn.loc.gov/2017032684

were used to gun down at least twenty percent of officers killed in the line of duty.

The record reveals that defendants have tailored the legislation at issue to address these particularly hazardous weapons. The dangers posed by some of the military-style features prohibited by the statutes — such as grenade launchers and silencers — are manifest and incontrovertible. As for the other enumerated military-style features — such as the flash suppressor, protruding grip, and barrel shrouds — New York and Connecticut have determined, as did the U.S. Congress, that the "net effect of these military combat features is a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns." Indeed, plaintiffs explicitly contend that these features improve a firearm's "accuracy," "comfort," and "utility." This circumlocution is, as Chief Judge Skretny observed, a milder way of saying that these features make the weapons more deadly.

The legislation is also specifically targeted to prevent mass shootings like that in Newtown, in which the shooter used a semiautomatic assault weapon. Plaintiffs complain that mass shootings are "particularly rare events" and thus, even if successful, the legislation will have a "minimal impact" on most violent crime. That may be so. But gun-control legislation "need not strike at all evils at the same time" to be constitutional.

Defendants also have adduced evidence that the regulations will achieve their intended end of reducing circulation of assault weapons among criminals. Plaintiffs counter — without record evidence — that the statutes will primarily disarm law-abiding citizens and will thus impair the very public-safety objectives they were designed to achieve. Given the dearth of evidence that law-abiding citizens typically use these weapons for self-defense, . . . plaintiffs' concerns are speculative at best, and certainly not strong enough to overcome the "substantial deference" we owe to "predictive judgments of the legislature" on matters of public safety. The mere possibility that some subset of people intent on breaking the law will indeed ignore these statutes does not make them unconstitutional.

Ultimately, "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." We must merely ensure that the challenged laws are substantially — even if not perfectly — related to the articulated governmental interest. The prohibition of semiautomatic assault weapons passes this test.

ii.   Prohibition on Large–Capacity Magazines

The same logic applies *a fortiori* to the restrictions on large-capacity magazines. The record evidence suggests that large-capacity magazines may "present even greater dangers to crime and violence than assault weapons alone, in part because they are more prevalent and can be and are used . . . in both assault weapons and non-assault weapons." Large-capacity magazines are disproportionately used in mass shootings, like the one in Newtown, in which the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes. Like assault weapons, large-capacity magazines result in "more shots fired,

# EXHIBIT 124

# FIREARMS OF THE AMERICAN WEST 1866–1894

LOUIS A. GARAVAGLIA

CHARLES G. WORMAN



University of New Mexico Press • Albuquerque

THIS BOOK IS THE PROPERTY OF
SEQUOYAH REGIONAL LIBRARY



Library of Congress Cataloging in Publication Data
(Revised for vol. 2)

Garavaglia, Louis A., 1940–
  Firearms of the American West.

  Includes bibliographies and indexes.
  Contents: [1] 1803–1865 — [2] 1866–1894.
    1. Firearms, American—History.  I. Worman, Charles G.,
1931–      II. Title.
TS533.2.G36  1984  vol. 1      683.4'00973      83-12528
ISBN 0-8263-0720-5 (set)
ISBN 0-8263-0792-2 (v. 2)

© 1985 by the University of New Mexico Press
All rights reserved.
International Standard Book Number 0-8263-0792-2.
Library of Congress Catalog Card Number 83-12528.
First edition

Designed by Whitehead & Whitehead

## Winchester Repeating Rifles!

**Firing Two Shots a Second, as a Repeater, and Twenty Shots a Minute as a Single Breech-Loader.**

These powerful, accurate, and wonderfully effective weapons, carrying eighteen charges, which can be fired in nine seconds, are now ready for the market, and are sold by all responsible Gun Dealers throughout the country. For information send for circulars and pamphlets to WINCHESTER REPEATING ARMS CO., New Haven, Conn.

Leavenworth (Kansas) Times and Conservative, October 1868.

## Dupont's Gunpowder, Safety Fuse,
### —AND—
### WINCHESTER REPEATING ARMS.

DUPONT'S Superior Mining Powder (milipore), F FFF.

DUPONT'S Blasting Powder, in air-tight corrugated Iron Kegs, C-F-FF-FFF.

DUPONT'S Unbrand Bread, Diamond Grain, Nos. 1, 2, 3 and 4, in 1 lb. and ¼ lb. canisters.

DUPONT'S Unrivalled Double, Eagle Duck and Eagle Rifle, Nos. 1, 2, in half kegs, qr. kegs, 1 lb. cans, and in 1 lb. and ¼ lb. canisters.

DUPONT'S Standard Rifle, 1, 2, 3, FFF-FFF, in kegs, half kegs, qr. kegs, 1 lb., ½ lb. and ¼ lb. canisters.

DUPONT'S Superior Rifle, 1, 2, 3, FFF-FFF, in kegs, half kegs, qr. kegs, and in 1 lb., ½ lb. and ¼ lb. canisters.

DUPONT'S Cannon, Musket, Mealed and Fuse Powder.

EAGLE SAFETY FUSE (manufactured near Santa Cruz, Cal. by the U. S. A. P. Co.) Constantly on hand full supplies of this celebrated brand's water-proof and Submarine, Triple Taped, Double Taped, Single Taped and Hemp Fuse, etc. This brand is acknowledged the best in use, and the articles equal to any in the world. The above celebrated Fuse we warranted equal to any made in the world.

**WINCHESTER REPEATING ARMS** (Henry's Improved and Patent new model).

[Several lines of product description, partly illegible, listing:]
Repeating Sporting Rifles, .44 cal.
Repeating Sporting Rifles, .38 cal.
Repeating Carbines, .44 cal.
Etc.

JOHN SKINKER, Sole Agents, [address illegible]

San Francisco Mining and Scientific Press, March 1872.

or fancy metalwork such as plating and engraving. With the magazine fully loaded and a round in the chamber, the rifle would hold a maximum of eighteen cartridges, similarly loaded, the carbine would hold fourteen. Because the Winchester and the Henry were sometimes stocked side by side in the country, the Henry might be mistakenly called an "eighteen shooter," or the Winchester a "sixteen shooter," by a casual observer.[41]

Although manufacture of the arm began in 1866, there were evidently no domestic sales until 1867. Company officials recalled that, except for one or two sample arms, the first two carbines sold in this country went to Major H. G. Litchfield, adjutant for the Department of the Platte, in late August of 1867. However, a small quantity may have left the factory before that: in the spring of 1867 a cavalry detachment in Wyoming surprised a band of Indians about to attack a wagon train on the Platte River; Finn Burnett and two soldiers chased one Indian into a hollow, where he put up a stiff fight before going down. Burnett "took from him the first Winchester rifle I had ever seen."[42]

Apparently neither Winchester nor its dealers made much of an effort to promote the new arm until 1868. They were advertising in Galveston and Brownsville papers in February of that year, and in March the Cheyenne Leader and the Frontier Index, proclaimed themselves "Sole Agents For the Whole West For the Celebrated Winchester's Patent Repeating Rifle And Carbine." A. D. McAusland of Omaha also advertised the Winchester in 1868, and in October of that year the Winchester firm itself placed ads in the Omaha Republican and the Leavenworth Times & Conservative, complete with illustrations of the arm.[43] One of the new and famous carbines that went West was the special-order arm acquired by Gen. Grenville Dodge, chief engineer for the Union Pacific railroad. This gun (se-

128