# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al. | ) ) Civil Action No. 3:18-cv-10507-PGS-LHG |
| *Plaintiffs,* | ) |
| v. | ) |
| MATTHEW PLATKIN, et al. | ) |
| *Defendants.* | ) |
| ——————————————— | ) |
| MARK CHEESEMAN, et al. | ) |
| *Plaintiffs,* | ) |
| v. | ) |
| MATTHEW PLATKIN, et al. | ) Civil Action No. 3:22-cv-4360-PGS-LHG |
| *Defendants.* | ) |
| ——————————————— | ) |
| BLAKE ELLMAN, et al. | ) |
| *Plaintiffs,* | ) |
| v. | ) Civil Action No. 1:22-cv-4397-PGS-LHG |
| MATTHEW PLATKIN, et al. | ) |
| *Defendants.* | ) |

***ANJRPC* AND *ELLMAN* PLAINTIFFS' BRIEF REPLYING AS TO THEIR SUMMARY JUDGMENT MOTION AND IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com
*Attorneys for ANJRPC and Ellman Plaintiffs*

i

# **Table of Contents**

**INTRODUCTION** ................................................................................. 1

**1.  The Banned Magazines are, in Fact, Arms.** .................................... 3

**2.  The Banned Magazines and Firearms are in "Common Use" and
     Therefore Cannot be Banned.** ..................................................... 6

**3.  The Banned Magazines and Firearms are Suitable for Self-Defense.** ....... 13

**4.  The Challenged Bans are not Consistent with the Historical Tradition
     of Firearms Regulation.** ............................................................ 16

   **A.  New Jersey Cannot Save its Sweeping Bans by Pointing to Some
        Dramatic Technological Change or Novel Societal Problem.** ........... 16

   **B.  There Is No Historical Tradition in this Country of Banning
        Arms that Millions of Law-Abiding Citizens Own for Lawful
        Purposes.** ...................................................................... 20

**5.  The Magazine Ban is an Unconstitutional Taking** ...................... 28

**CONCLUSION** ............................................................................... 33

## <u>Table of Authorities</u>

**Page(s)**

## <u>Cases</u>

*Andrews v. State*, 50 Tenn. 165 (1871)........................................................................... 20

*Andrus v. Allard*, 444 U.S. 51 (1979) ............................................................................ 40

*Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) .......................... 25

*Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) .................................... 12

*Bevis v. City of Naperville*, 2023 WL 2077392 (7th Cir. 2023) ................................... 26

*Bevis v. City of Naperville*, 85 F. 4th 1175 (7th Cir. 2023)......................................... 12

Caetano v. Massachusetts, 577 U.S. 411 (2016) ...................................................... 7, 11

*Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d 824 (9th Cir. 2004).............. 42

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.
    837 (1984) ................................................................................................................. 6

*Day v. State*, 37 Tenn. 496 (1858) ............................................................................... 31

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................... passim

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)............................................... 19, 20

*Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 WL 6180472 (S.D. Cal.
    Sept. 22, 2023) .......................................................................................................... 7

*Duncan*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017)....................................................... 41

*Herrera v. Raoul,* 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ................................ 26

*Horne v. Department of Agric.*, 135 S. Ct. 2419 (2015). ................................... passim

*In re Continental Airlines*, 134 F.3d 536 (3d Cir. 1998)............................................ 35

*International Paper Co. v. United States*, 282 U.S. 399 (1931)................................. 38

*Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264  (1920)................................................. 40

*James Everard's Breweries v. Day*, 265 U.S. 545 (1924)......................................... 40

*Kelo v. City of New London*, 545 U.S. 469  (2005) .................................................... 38

*Koons v. Platkin*, 2023 WL 3478604 (D.N.J. May 16, 2023) ................................... 25

*Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 606 (2013) .................................... 40

*Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005) .............................................. 36, 37

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ............. 38, 39

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003  (1992) ........................... 36

*Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021) ........................................... 32

*Miller v. Bonta*, No. 19-cv-01537,
    2023 WL 6929336  (S.D. Cal. Oct. 19, 2023) ................................................. passim

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .............. passim

*Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) ....................................... 23

*Nunn v. State*, 1 Ga. 243 (1846) ................................................................................ 31

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327
    (9th Cir. 1977) ................................................................................................... 39

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ................................................. 38

*Rupp v. Becerra*, 2018 WL 2138452 (C.D. Cal. May 9, 2018) .................................. 41

*Staples v. United States*, 511 U.S. 600 (1994) ................................................ 1, 13, 32

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S.
    302  (2002) ..................................................................................................... 36, 41

*United States v. Welch*, 217 U.S. 333 (1910) ........................................................... 37

## Statutes

1797 Del. Laws 104 ................................................................................................... 29

1798 Ky. Acts 106 ..................................................................................................... 30

1837 Ala. Acts 7 ........................................................................................................ 30

1853 Comp. L. Cal. §127 ........................................................................................... 30

1859 Ind. Acts 129 .................................................................................................... 30

1927 Mich. Pub. Acts 887 ........................................................................ 33

1927 R.I. Acts & Resolves 256................................................................... 33

1933 Cal. Stat., ch. 450 ............................................................................ 33

1933 Minn. Laws ch. 190 ......................................................................... 33

1933 Ohio Laws 189 ................................................................................. 33

1959 Mich. Pub. Acts 249 ........................................................................ 33

1959 R.I. Acts & Resolves 260................................................................... 33

1963 Minn. Sess. L. ch. 753 ..................................................................... 33

1965 Cal. Stat. ch. 33 ............................................................................... 33

1972 Ohio Laws 1866 ............................................................................... 34

1975 R.I Pub. Laws 738............................................................................ 33

1975 Va. Acts, ch. 14 ............................................................................... 34

Act A2761 § 5(a) ...................................................................................... 38

Act A2761 § 5(c) ...................................................................................... 37

Pub. L. No. 103-322, 108 Stat. 1796 (1994)............................................. 34

## **Other Authorities**

Christopher S. Koper et al., An Updated Assessment of the Federal Assault
    Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to
    the Nat'l Inst. of Justice 96 (2004), https://bit.ly/3wUdGRE .................. 26

David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022),
    bit.ly/3RNRpQD ..................................................................................... 24

E. Gregory Wallace, *"Assault Weapons" Myths*, 43 S. Ill. L.J. 193 (2018) ............. 19

*Mark W. Smith, What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller in Arms-ban Cases—Again (June 18, 2023), bit.ly/42OrITT, at 7-8.* ............................................................................ 18

NSSF, Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation (July 20, 2022), bit.ly/45Sj7lT ................................................. 12

NSSF, Modern Sporting Rifle Comprehensive Consumer Report 12 (July 14, 2022), bit.ly/3oXjavU ............................................................................ 12

Proceedings of the Virginia Assembly, 1619, in Narratives of Early Virginia, 1606-25, at 273 (Lyon Gardiner Tyler ed., 1907) ...................................... 22

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 105-06 (2008) ................................................................... 18

Wash. Post Staff, Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners (Mar. 26, 2023), https://wapo.st/3KrUouy .................................... 12

William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned 3-7 (May 13, 2022), https://bit.ly/3HaqmKv .............. 12

## INTRODUCTION

Perhaps the most important holding of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022) is the stark reminder that the Second Amendment does not allow interest balancing by the State. Simply put, the State does not get to decide whether the people exercising right to keep and bear arms is, on balance, worth it as a matter of policy:

> The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

*Id*. (internal citation omitted.)

The Supreme Court made this clear in *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008):

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.

The State does not get to say that allowing the people to possess certain arms is, in its view, too dangerous. *Staples v. U.S.,* 511 U.S. 600, 611 (1994) ("[D]espite their potential for harm, guns generally can be owned in perfect innocence."). The Second Amendment has already resolved the question in favor of law abiding people.  The people get to choose which arms they wish to use for lawful purposes, and "[i]t is this balance—

1

struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131. In *Heller*, key to the Supreme Court's holding that the District of Columbia could not ban handguns was the fact that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family . . . ." *Heller,* 554 U.S. at 628.

Thus, the choice of what arms to use for lawful purposes, such as self-defense, belongs to the people, not the State. It is not up to the State to tell the people what arms they may or should use or to say what is and is not suitable for such lawful purposes.

And yet, the State's entire position is based on prohibited interest balancing. The State's position can be boiled down to "we think magazines holding more than 10 rounds and semi-automatic firearms with certain features are used too frequently by criminals and therefore law abiding people cannot possess them." And yet this *exact* argument failed in *Heller*.

Even worse, that argument would never be sufficient to nullify any other provision in the Bill of Rights. Imagine New Jersey arguing that it may deprive a mass shooting suspect of the right to counsel or the right to trial by jury simply because the crime he is accused of is especially heinous.

And yet New Jersey tries to get away with precisely this fallacy, claiming that law abiding folks may be deprived of their right to choose standard magazines holding more

than 10 rounds and semi-automatic firearms with disfavored features to defend themselves because they are sometimes also used by criminals to commit heinous crimes.

Fundamentally, New Jersey is trying to utterly rewrite *Heller* and *Bruen* and convince this Court that the Supreme Court did not hold that the Second Amendment protects a broad and robust right. Indeed, under the State's fictional version of *Heller* and *Bruen*, the State can do almost anything it wants regarding the right to keep and bear arms. This is not what *Heller* and *Bruen* stand for, and the record in these cases shows that New Jersey's ban on standard capacity magazine in excess of 10 rounds and semi-automatic firearm with disfavored features are unconstitutional.

**1.    The Banned Magazines are, in Fact, Arms.**

In arguing that magazines are not "arms" entitled to protection under the Second Amendment, the State asserts two argument bordering on the frivolous. *Heller*, 554 U.S. at 582.

First, the State enlists the aide of a linguist with no understanding of firearms who plays word games without addressing actual meaning. Dennis Baron claims that he searched 18th and 19th century newspapers for the term "cartridge box" and "cartouche box" and found that "cartridge box" was considered mere "accoutrement" rather than "arms." He then claims that "cartridge box" is somehow a precursor to "magazine."

3

Baron's own words show how absurd this is.  At paragraph 30 of his report he says this:

> The "cartridge box" or "cartouch box"—the precursor to today's "magazine"—is typically mentioned in lists of accoutrements, often in connection with other items worn with a soldier's uniform. The "cartridge box" almost never appears to be included among a soldier's weapons. The OED defines "cartridge box" as "a box for storing or carrying cartridges; the case in which a soldier carries his supply of cartridges"

In other words, a cartridge box was simply a box of cartridges inside of which a soldier carried around his ammunition. By Baron's own words it was clearly nothing more than a container for carrying around ammunition—nothing like a modern magazine which is an ammunition feeding device—a part of the firearm that feeds ammunition into the chamber of the firearm. *See* Rebuttal Report of Emanuel Kapelsohn, Kapelsohn Reply Dec Ex. A at 3-7; Rebuttal report of Clayton Cramer, Cramer Reply Dec Ex. A. at 12-13; N.J.S. 2C:39-1(y). Baron plainly has no understanding of actual firearms or how they work.

The State attempts to end run around this obvious error by referencing a single newspaper article from 1869 describing an obscure French device called a "Mitrailleuse," which Baron merely assumes, based on nothing, "would seem to be analogous to what we call a machine gun today." The article describes the device as follows: "It contains thirty-seven common infantry cartridges, arranged like cigars in a bundle. As soon as it is attached to the breech of the cannon, the Mitrailleuse is loaded. A man sitting on the carriage fires it by turning a crank. . . . The crank is turned once more and the cartridge

4

box is removed from the cannon; a man to the right takes it, removes it from the 'cigar box'; the men to the left put a new one in."

This use of the term "cartridge box" does not in any way resemble any of the other uses of that term identified by Baron – all the rest of which merely describe a container for ammunition to be carried around. Unlike everyone other use of the term "cartridge box" identified by Baron, this one is uniquely involved in the firing process.

Although the description of the Mitrailleuse makes it sounds more like a revolver than a magazine (*see* Hlebinsky Declaration at 21 (definitions)), even if this unique use of the term "cartridge box" could describe something like a modern magazine, this usage plainly does not resemble the other uses that Baron claims fall into the category "accoutrement."  This use is something unique and cannot seriously be used to argue that a magazine is an "accoutrement" and not an arm.

Baron's claim is also thoroughly debunked by Plaintiffs' firearms expert Emanuel Kapelsohn. *See* Kapelsohn Rebuttal Report at 3-7. *See also* Rebuttal Report of Clayton Cramer at 12-15 (debunking the same specious argument made by Saul Cornell).

Second, the State tries to argue that the prior finding of both this Court and the Third Circuit that magazines *are* arms are not binding because they were vacated by the Supreme Court on remand. But appeals are taken from judgments not opinions. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). The remand order from the Supreme Court merely provided: "Petition GRANTED. Judgment

5

VACATED and case REMANDED for further consideration in light of *N.Y. State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S. Ct. 2111 (2022)"; *see also Miller v. Bonta*, No. 19-cv-01537, 2023 WL 6929336, at *7 (S.D. Cal. Oct. 19, 2023) (reaffirming all previously made findings of facts and conclusions of law on a remand for further consideration in light of *Bruen*.). The only aspect of the judgment inconsistent with *Bruen* was the use of the old two step procedure and the use of intermediate scrutiny. Nothing about the Court's GVR disturbed any factual findings or rulings regarding the meaning of the term "arms."

The State further argues that this Court's prior reasoning is flawed because while a magazine may be necessary for the firearm to function, a large capacity magazine is not. But this misses the point. The issue is whether magazines are arms, not magazines of a particular capacity. Whether something is an arm arises from its nature. *See also Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 WL 6180472, at *8 (S.D. Cal. Sept. 22, 2023). Magazines are arms. Therefore, the banned magazines fall within the scope of the Second Amendment.

## 2.   The Banned Magazines and Firearms are in "Common Use" and Therefore Cannot be Banned.

Unfortunately, the term "common use" is misleading because the lynchpin of the "common use test" is not actual use but possession. The reason for this is twofold.

First, the actual test is whether the arms that have been banned are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 ; Caetano

v. Massachusetts, 577 U.S. 411, 416 (2016) (Alito, J., concurring). *Heller* actually speaks of possession rather than use.

Second, in *Heller*, key to the Supreme Court's holding that the District of Columbia could not ban handguns was the fact that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family . . . ." *Id*. at 628. Thus it is the *choice* of the people that matters, not how they actually end up using them if at all.

Third, the State's reliance on the phrase from *Bruen* "commonly used firearms for self-defense," 142 S. Ct. at 2138, is severely taken out of context. The full sentence is:

> But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense.

*Id*. When viewed in context, the phrase "for self-defense" plainly relates to the antecedent "public carry" not "commonly used." Thus, the Court is speaking of carrying firearms for the purpose of self-defense, not that the Second Amendment only applies to firearms commonly used for self-defense.

Further, Defendants' argument defies constitutional text, Supreme Court precedent, and common sense. The Second Amendment protects the right "to keep and bear Arms," not just to fire them when the need for self-defense arises. U.S. Const. amend. II. That is precisely why the Supreme Court has held that "bear[ing] arms" includes not just firing them at would-be attackers, but "carry[ing]" them equipped with ammunition "for the purpose ... of being armed and ready for offensive or defensive

action." *Bruen*, 142 S. Ct. at 2134 (ellipsis in original; emphasis added) (quoting *Heller*, 554 U.S. at 584).  Under a straightforward reading of both the text of the Constitution and the Supreme Court's opinion in *Bruen*, an individual "uses" her firearm for the Second Amendment's *ne plus ultra* purpose every time she keeps or carries it "at the ready for self-defense." *Id*.[1]

Defendants' contrary account makes nonsense of *Bruen* in more ways, too.  *Bruen* juxtaposed the phrase "weapons that are those 'in common use at time'" with the phrase "those that 'are highly unusual in society at large.'" *Id*. at 2143 (quoting *Heller*, 554 U.S. at 627).  That juxtaposition makes sense only if the "uses" that matter include keeping and bearing, as the latter phrase is nonsensical vis-à-vis a frequency-of-firing inquiry.  And lest there be any lingering doubt, *Bruen* concluded that people have a right to carry handguns outside the home for self-defense without ever even asking how frequently they fire them in actual self-defense situations.  It was enough for the Court in *Bruen*, just as it was for the Court in *Heller*, that "handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 142 S. Ct. at 2143.

---

[1] This argument also fails a common-sense analysis of the term use. As another court recently pointed out, a person who wears a seatbelt every time they get behind the wheel of a car is using the seatbelt for safety even though they may never get in an accident and actually need the seatbelt to protect them. *Miller*, 2023 WL 6929336, at *36. Likewise, a skydiver who has a reserve parachute but never deploys it is still using it for safety. *Id*. And a Pennsylvania man who kept a firearm in his nightstand for 30 years before he actually had to defend himself from an intruder with that firearm was nevertheless using the firearm for home defense the entire time. *Id*.

How frequently law-abiding citizens keep versus carry firearms, or fire them at ranges versus at attackers, is therefore legally irrelevant, as an individual lawfully "uses" her firearm every time she does any of those things.

Moreover, to the extent the common-use test makes it particularly difficult to belatedly ban firearms already in wide circulation, there is every reason to think the *Bruen* majority would view that as a feature, not a bug.  And while Defendants seem to think that the test the Supreme Court established in *Bruen* is "circular," there is no denying that *Bruen* held that arms may not be banned consistent with our Nation's historical tradition if they are "in common use today" for lawful purposes.  142 S. Ct. at 2143.  Indeed, the Court even went out of its way to make clear that arms that are common today are protected by the Second Amendment even if they were not common at the founding.  *Id.*

The circularity critiques are also overstated.  While *Bruen*  focused on the need for a firearm to be "unusual," the historical test asks whether a firearm "is both dangerous and unusual."  *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment); *Miller*, 2023 WL 6929336, at *4.  .  Accordingly, states cannot freeze firearms technology in time by banning new models before they can enter the market and become common, as they would still need to show that a new model is "dangerous" in some way that meaningfully differentiates it from arms that are in common use.  Far from being "circular," the common-use test appropriately trusts the American people's judgment in selecting the firearms they think are appropriate for lawful use.

As a last-ditch effort, Defendants point to machine guns, and argue that the Supreme Court could not really have meant what it clearly said because, if it did, "machine guns would be entitled to Second Amendment protection, since there are roughly '176,000 legal civilian-owned machine guns in the United States.'" St. Br.37-38. But that elides just how unusual machine guns are in American society. The defining feature of a machinegun is that it fires a continuous stream of bullets when the trigger is depressed. That feature is highly useful for suppressive fire in a war zone, but highly disadvantageous for personal self-defense, because it makes it much more difficult "to accurately shoot and hit [one's] intended target in case of confrontation," and "the 'meaningful exercise' of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended target." *Barnett v. Raoul*, 2023 WL 3160285, at *9 (S.D. Ill. Apr. 28, 2023), *vacated sub nom. Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023). That is in large part why Americans never chose machineguns *en masse* even before they were banned. *See* Expert Report of Robert J. Spitzer ¶6, (machineguns were a commercial "failure from the start" among law-abiding citizens). That is a far cry from semiautomatics capable of firing more than ten (or 17) rounds without reloading, which millions of law-abiding citizens in this country have kept and borne for self-defense and other lawful purposes for more than a century.

Defendants' emphasis on machine guns also elides what the Supreme Court itself has said about them—and, in particular, the difference between a fully automatic M16

rifle and a semiautomatic AR-15 rifle.  The core question in *Staples*, was whether an AR-15 is similar enough to an M16 to put people on notice that they should ensure that it has not been modified in some way that renders its possession illegal.  In answering that question "no," the Court accepted the proposition that "certain categories of guns"—including "machineguns"—are so dangerous and unusual that people should know that even their mere possession may be illegal.  *Staples*, 511 U.S. at 611.  But the Court refused to extend that logic to "conventional semi-automatic" firearms such as AR-15 rifles, "precisely because guns falling outside those categories"—i.e., arms that are not dangerous and unusual—"traditionally have been widely accepted as lawful possessions."  *Id*. at 612, 615.  The Court's holding thus necessarily turned on the conclusions both that AR-15s are not even in the same "category" as M16s and that AR-15s have traditionally been legal, whereas M16s have not.

Further, and contrary to Defendants' *ipse dixit*, *Heller* redoubled that holding.  First of all, and further confirming that Defendants' understanding of the threshold textual inquiry is bunk, *Heller* explicitly described "M-16 rifles and the like" as "arms."  554 U.S. at 627.  And while *Heller* went on to acknowledge the presumptive validity of longstanding prohibitions on "M-16 rifles and the like," that dictum is fully consistent with *Bruen's* subsequently holding that "arms" can be banned consistent with the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id*.

Finally, Defendants point to testimony from another scholar criticizing Professor English's 2021 National Firearms Survey as methodologically problematic.  State.Br.39. But that scholar overlooked that the first few pages of the survey disclose that it used an "extraordinarily large," "nationally representative sample" of firearms owners and explain the process used to develop the sample and English's findings.  *See* William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned 3-7 (May 13, 2022), https://bit.ly/3HaqmKv.  In all events, the English survey's findings are entirely consistent with ATF data, industry reports, and the Washington Post's recent findings—which likely explains why Defendants offer no contrary statistics or account of U.S. firearms (or magazine) ownership.  *See, e.g.,* Wash. Post Staff, Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners (Mar. 26, 2023), https://wapo.st/3KrUouy (19% of sampled gun owners own an AR-style rifle); NSSF, Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation (July 20, 2022), bit.ly/45Sj7lT (government and industry data showing that Americans own 24 million AR-platform rifles); NSSF, Modern Sporting Rifle Comprehensive Consumer Report 12 (July 14, 2022), bit.ly/3oXjavU (average American who owns an AR-platform rifle owns 3 or 4 of them).

**3.     The Banned Magazines and Firearms are Suitable for Self-Defense.**

The State invents another argument that is entirely irrelevant under *Heller* and *Bruen*. The State tries to suggest that the banned arms are not "suitable" for self-defense. This is both factually incorrect and also irrelevant.

First, *Heller* makes clear that, "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms."  554 U.S. at 582. Further, the protected arms are those "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625. While lawful *purposes* (stated in the plural) include self-, they are plainly not *limited* to self-defense. Thus, the Second Amendment protects arms that are possessed for purposes that may have nothing to do with self-defense, such as training, target shooting, and hunting.

Moreover, because *Heller* places the decision in the hands of the people, what the State thinks of "suitability" for self-defense is entirely irrelevant. What matters is what the people think and what the people choose.

Second, the banned magazines and firearms plainly *are* suitable for self-defense, which is why so many people choose them. The Declaration of Emanuel Kapelsohn lays out in great detail just why magazines with a capacity in excess of rounds and semi-

automatic firearms with the enumerated disfavored features are chosen for self-defense. Kapelsohn Dec Para. 35-73.[2]

Further Kapelsohn thoroughly refutes the claim of the State's expert Yurgealitis. *See* Kapelsohn Rebuttal Report at 9-16. Among other things, Yurgealitis asserts that a revolver would be his choice as a self-defense arm in the home because of the risk of over penetration of bullets through residential walls.

The problem with Yurgealitis's opinion is two-fold. First, Yurgealitis ignores the fact that handgun bullets, including those recommended by Yurgealitis, *also* over penetrate walls. *Id*. at 12-14.[3] Notably, Yugealitis presents no comparative data. He asserts that 5.56 caliber bullets penetrate walls but present no data on how penetrative other round, including handgun rounds are. As such his opinion in this regard is useless.

Moreover, the State claims that the banned magazines and firearms "bear a military heritage." St. Br. at 30. But this is a non-sequitur. First, the expert Declaration of firearm

---

[2] The State erroneously claims that Kapelsohn's conclusions are based on 7 newspaper articles.  That is incorrect. Kapelsohn's report makes clear that his opinions are based on his 45 years of experience as a firearms expert, consultant, trainer, and author. The newspaper articles are merely illustrative examples.

[3] Notably, Kapelsohn explained that he has demonstrated this phenomenon many times as part of classroom instruction. In fact, because counsel for the State asked Mr. Kapelsohn if he had any video of his demonstrations (which he did not as, they were classroom demonstrations), Kapelsohn created a new video specifically in response to counsel's question. The video actually shows that the 5.56 bullets shot out of an AR-15 rifle penetrated *least* of all the test bullets. *See* Reply Kapelsohn Dec, Para. 4;  "Sheetrock Penetration Testing.mp4" at https://app.box.com/s/z2kbhjbelg23d8wrslciancosylex463.

historian Ashley Hlebinsky demonstrates quite plainly that historically (particularly at the time of the Founding). *See* Hlebinsky Dec at para 20-27.

Second, the State admits, but ignores, that the banned arms lack the very key feature that accounts for the actual military nature of modern military arms – that is, fully automatic or select-fire functioning. State.Br.29. *See also* Kapelsohn Dec at para. 29-31; *Miller*, 2023 WL 6929336, at *11 ("The AR-15 … is not used by any military as a standard issue piece.").

Third, the State simply fails to show why the superior capabilities of the banned magazines and firearms makes them unsuitable for self-defense. Logically, an arm that fires faster, with greater accuracy, and which inflicts more damage on the target will offer a superior deterrent to criminals than one which is *less* effective at doing all of those things. The very feature that is *absent* from the banned arms, fully automatic fire, is the only thing that arguably has a purely military application (suppressive fire). Indeed, courts have held that repeaters, which allowed individuals to fire faster, were protected by the Second Amendment for over 150 years: "that the rifle of all descriptions, the shot gun, the musket, and repeater, are such arms; and that under the Constitution the right to keep such arms, cannot be infringed or forbidden by the Legislature."

Finally, the attributes that the State and its expert complain of (e.g. wounding capability and speed of fire) have nothing to do with the features banned by the subject statutes. The so-called "assault firearm" statute bans arms based on features such as a

threaded barrel, a flash suppressor, a folding or telescoping stock, a forward grip. Neither the State nor any of its experts even attempts to explain what any of these features has to do with their disfavor of what they refer to as "assault weapons." That makes all of their arguments entirely irrelevant. And, Kapelsohn explains quite clearly why these features are, in fact, useful to ordinary individuals. *See* Kapelsohn Dec para 48-73.

Thus, although they need not be in order to enjoy Second Amendment protection, the banned arms are suitable for self-defense.

**4.     The Challenged Bans are not Consistent with the Historical Tradition of Firearms Regulation.**

    **A.     New Jersey Cannot Save its Sweeping Bans by Pointing to Some Dramatic Technological Change or Novel Societal Problem**.

The absence of any well-established tradition supporting the state's ban is not owing to any "dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. Semiautomatic firearms with the features New Jersey singles out are not modern innovations, and neither are ammunition feeding devices that hold more than 10 rounds. The first arm that could fire several rounds without reloading was invented in the 1500s, and several such arms pre-dated the Revolution. *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020). As for "cartridge-fed" "repeating" firearms—arguably the most direct forebears of the firearms New Jersey now bans—they came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66." *Id.* at 1148. These multi-shot

firearms were not novelties; they were ubiquitous among civilians by the end of the Civil War. *Andrews v. State*, 50 Tenn. 165, 179 (1871) (emphasis added); *see also Miller*, 2023 WL 6929336, at *20 (noting that the Winchester Model 1866, a repeater, was "capable of firing 15 rounds in half as many seconds.").

Semiautomatic firearms capable of firing several rounds without reloading—i.e., exactly what New Jersey outlaws—were not far behind. The modern semiautomatic action was invented in the 1880s; modern box magazines came onto the scene in the 1890s; and manufacturers first sold semiautomatic firearms with detachable magazine no later than 1896. *Duncan*, 970 F.3d at 1148. None of this is disputed. As one of Defendants' own historians explains in detail, "gunmakers had at their disposal" "[b]y the early 1890s" "a trio of potent new design features that would become characteristic of most modern … semi-automatic firearms"—namely, "self-loading mechanisms, smokeless powder ammunition, and detachable magazines." Delay Decl. ¶80 (emphases added). That explains why "[t]he most copied and influential of all modern handguns," which "is still in production today," was invented in 1911. *Id.*

To be sure, modern firearms and magazines like the ones New Jersey has banned can fire more rounds more accurately and more quickly than their founding-era predecessors (although they are not meaningfully better on those scores than a Colt Model 1911). But that does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second

17

Amendment was ratified. *Heller*, 554 U.S. at 624-25. After all, it would be particularly perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists. Indeed, far from treating technological advancements aimed at improving accuracy, capacity, and functionality as nefarious developments that made firearms "too dangerous," history shows that those are precisely the kinds of things people have consistently looked for when determining how best to protect self, others, and home. Advancements welcomed by law-abiding citizens are simply not the sort of "dramatic technological changes" with which *Bruen* was concerned—as evidenced by the Court's emphatic focus on whether arms are "in common use today," *Bruen*, 142 S. Ct. at 2143 (emphasis added). *See Mark W. Smith, What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller in Arms-ban Cases—Again (June 18, 2023), bit.ly/42OrITT*, at 7-8.

Expert historian Ashley Hlebinsky lays out the 600 year history of firearms development and demonstrates that, rather than being any dramatic technological change, the challenged technology represents incremental innovation in the endless pursuit to shoot faster, further, more accurately, and with greater effect, with the most significant changes in firearm technology taking place in the first 300 years. *See* Hlebinsky Dec at para. 28-60.

To the extent New Jersey seeks to justify its ban as owing to some "unprecedented societal concern[]," *Bruen*, 142 S. Ct. at 2132, that argument fails too. Even accepting the

dubious proposition that there is some causal link between the recent rise in mass shootings and arms that have been lawfully possessed by civilians for the better part of a century, the unfortunate reality is that mass murder has been a fact of life in the United States for a very long time. *See* Rebuttal Expert Report of Clayton Cramer at 42-110; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 105-06 (2008); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023). Nevertheless, before the 1990s, no state banned semiautomatic firearms just because they had pistol grips, collapsible stocks, or barrel shrouds, and there were almost no efforts to restrict the firing capacity of semiautomatic arms, period. That is not because such firearms were adopted only by militaries: "No military in the world uses a service rifle that is semiautomatic only." E. Gregory Wallace, *"Assault Weapons" Myths*, 43 S. Ill. L.J. 193 (2018) at 205.

Moreover, the Hlebinsky Dec shows that the Founding generation was well aware of ever advancing firearm technology in an effort to always shoot faster, further, straighter, and with greater effect. Hlebinsky Dec para. 38-42. That future advancements in firearms technology could make them more effective both for good purposes and bad would not be surprising to them and therefore, it could not be reasonably said that we face an unprecedented societal concern.

There has never been any historical tradition of banning arms that law-abiding citizens typically keep and use for lawful purposes based on the damage they could inflict

in the hands of someone bent on misusing them. To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm. *See Bruen*, 142 S. Ct. at 2132; *Heller*, 554 U.S. at 627. Because the challenged bans fly in the face of that historical tradition, they violate the Second Amendment.

> ### B.     There Is No Historical Tradition in this Country of Banning Arms that Millions of Law-Abiding Citizens Own for Lawful Purposes.

The fact that the banned arms are in common use ends the historical inquiry, and the bans must fail. But to the extent any addition historical analysis is required, New Jersey has not come close to meeting its burden of demonstrating any historical tradition of prohibiting the arms it has banned. To the contrary, the historical record reveals a long tradition of welcoming technological advancements aimed at enhancing law-abiding citizens' ability to accurately fire repeatedly.

For a historical law to serve as a "proper analogue" to a modern regulation, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-33. Indeed, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id*. at 2133 (emphasis omitted). Moreover, even a relevantly similar historical analogue must be "well-established and representative." *Id*. A court may not uphold a restriction just because a state manages to

locate a few similar laws in the past, as doing so would "risk[] endorsing outliers that our ancestors would never have accepted." *Id*.; *see*, *e.g., Antonyuk v. Hochul*, 2022 WL 16744700, at *45 (N.D.N.Y. Nov. 7, 2022) (purported analogues governing less than 6% of U.S. neither sufficiently representative nor sufficiently well-established); *Koons v. Platkin*, 2023 WL 3478604, at *62-68 (D.N.J. May 16, 2023) (purported analogues spanning only five states over 250 years insufficient to show historical tradition).

Applying those principles, Defendants' proposed analogues fall far short. At the outset, Defendants rely heavily on what they try to portray as a historical tradition of restricting "dangerous" arms without regard to whether they are "unusual." The *Bevis* and *Herrera* courts likewise posited that "history and tradition demonstrate that particularly 'dangerous' weapons are unprotected," without ever even analyzing commonality. *Bevis v. City of Naperville*, 2023 WL 2077392 (7th Cir. 2023) at *9, *10-16; *Herrera v. Raoul,* 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) at *7. But as Defendants acknowledge, St. Br. at 55, the Supreme Court has recognized only a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2128 (emphasis added) (*quoting Heller*, 554 U.S. at 627). As Justice Alito has explained, "this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). That alone poses a considerable challenge for Defendants' effort to eliminate half the test.

That effort fails. Several examples—a 1686 East New Jersey law restricting concealed carry of various knives or "other unusual or unlawful weapons," and laws restricting the carrying of weapons like clubs—not only involve what by their own admission were unusual weapons, but flunk the "relevantly similar" test for a simple reason: Laws that restrict only the carrying of certain types of arms (and only concealed carrying at that) are not remotely similar in how they regulate to a law like the challenged bans herein that bans possession. *Miller*, 2023 WL 6929336, at *27 ("The history and tradition of concealed carry prohibitions are not nuanced analogues for California's 'assault weapon' ban.").[4]  After all, the question is "how … the regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133, and a law that restricts only one type of carrying but leaves the right to keep arms in the home untouched obviously imposes far lesser burdens than a law that bans both carrying and keeping.

As for the rest of Defendants' early historical narrative, the Supreme Court has already determined the import of the fact "that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'": "[E]ven if these colonial laws prohibited the carrying of [certain arms] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public

---

[4] These restrictions are not relevantly similar on their face because they do not apply to firearms. *Miller*, 2023 WL 6929336, at *12 (noting that the *Bruen* court only considered firearm restrictions when determining if there was a right to carry a firearm outside the home).

carry of weapons that are unquestionably in common use today." *Id.* at 2143. That conclusion applies *a fortiori* when it comes to efforts to prohibit both keeping and bearing arms. At any rate, whatever laws may have existed about "unusual or unlawful weapons," no colony or state in the early Republic prohibited people from carrying firearms, either openly or concealed. To the contrary, some state and local laws affirmatively encouraged or even required such carrying. *See, e.g.*, Proceedings of the Virginia Assembly, 1619, in Narratives of Early Virginia, 1606-25, at 273 (Lyon Gardiner Tyler ed., 1907). Early regulations either prohibited concealed carry while allowing open carry and possession or merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. And as *Bruen* explained in painstaking detail, those laws were never understood to cover commonly owned arms. *Id.* at 2142-56.

Regulations on so-called "trap guns" and clubs are even less apposite. "[W]hat the State does not admit or seem to recognize is that 'trap guns' are not guns at all. They are a method by which a gun, any gun, can be set up to fire indiscriminately through the use of springs, strings, or other atypical triggering mechanisms without an operator." *Miller*, 2023 WL 6929336, at *21. Laws against setting traps do not impose any "burden [on] a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133; they criminalize the rigging of a device to expel a projectile without a human pulling the trigger. Thus, they are not bans of any particular gun: "Trap gun laws restricted only the particular manner of using any gun." *Miller*, 2023 WL 6929336, at *21. And there was

no historical tradition of restricting trap guns. *Id*. at \*21–22 In fact, many courts from 1791 to 1868 held that trap guns were legal to use. *Id*. at \*22 n.131 (collecting authorities).

As for clubs, Defendants suggest that they were "regulated" or "restrict[ed]." But neither they nor their historians say what sort of "restrictions" were placed on clubs— information that is crucial to determining whether modern and historical laws "impose a comparable burden" on Second Amendment rights. *Bruen*, 142 S. Ct. at 2132.

The reason for that omission is not hard to discern. Several of these laws targeted groups who were not, at the time, understood to have any constitutional rights—namely, enslaved people and other racial minorities. *See, e.g.,* 1797 Del. Laws 104 (quoted at Spitzer Rpt. Ex. E at 17) ("[I]f any Negro or Mulatto slave shall presume to carry any guns … clubs, or other arms and weapons whatsoever, without his master's special license … he shall be whipped with twenty-one lashes, upon his bare back."); 1798 Ky. Acts 106 (quoted at Spitzer Decl. Ex. E at 34-35) (similar). Laws that governed only those who were not at the time considered to be part of "the people" protected by the Second Amendment cannot tell courts anything about the rights of those who are. *See Bruen*, 142 S. Ct. at 2149–51. At any rate, even laws prohibiting disfavored groups from carrying clubs and other analogous weapons did not restrict the right to possess them.

Defendants also invoke "regulation of Bowie knives" in the 1800s, but they misstate what those laws did. Plaintiffs are not aware of any antebellum statute that completely banned the sale or possession of Bowie knives. Nearly all nineteenth-century

Bowie-knife laws were limited to restricting concealed carry—which, again, cannot serve as a proper analogue to a ban on acquisition and possession. And most of the restrictions Defendants cite merely escalated punishments for crimes committed with Bowie knives, see 1837 Ala. Acts 7; 1853 Comp. L. Cal. §127, or targeted concealed carry or open carry with intent to do harm, see 1859 Ind. Acts 129, while leaving intact citizens' right to possess and openly carry—i.e., keep and bear—such weapons. In all events, even the most sweeping Bowie knife laws were short-lived: By 1900, "no state prohibited possession of Bowie knives." David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), bit.ly/3RNRpQD. And the most onerous laws were contemporaneously deemed unconstitutional unless they were construed more narrowly. *E.g., Nunn v. State*, 1 Ga. 243 (1846); *see Bruen*, 142 S. Ct. at 2147 (singling out *Nunn* as "particularly instructive" regarding the Second Amendment's meaning). Moreover, there are not enough bowie knife laws to establish a historical tradition. *Miller*, 2023 WL 6929336, at *25. Nor is there any evidence that they were regularly enforced. *Day v. State*, 37 Tenn. 496, 499 (1858) ("It is a matter of surprise that these sections of this act, so severe in their penalties, are so generally disregarded in our cities and towns.").

There is, put simply, no evidence in the historical record that states in the eighteenth and nineteenth centuries broadly (or even narrowly) prohibited the general public from acquiring arms commonly kept and borne for lawful purposes just because they were considered too "dangerous," let alone of imposing such prohibitions on firearms with the

kinds of features New Jersey singles out. Nor do things change when one fast-forwards a century or even two. Before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1024 (S.D. Cal. 2021). The earliest laws treating such features as sufficient to convert an otherwise-lawful firearm into a so-called unlawful "assault weapon" date back to only 1989, and the earliest restriction on magazine capacity dates back only to 1990, which is far too late to serve as an indicator of a "historical tradition." *See Bruen*, 142 S. Ct at 2126.

Defendants are thus forced to resort to trying to analogize semiautomatic firearms to fully automatic firearms. But the Supreme Court has recognized the important difference between the two. *See Staples*, 511 U.S. at 603, 612.

The State's citations do not function like the challenged ban. One applied to semiautomatics only to the extent they were "altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers," 1933 Minn. Laws ch. 190, §1(b); and two more merely required a special license, without prohibiting either sale or possession, *see* 1933 Cal. Stat., ch. 450; 1933 Ohio Laws 189. Even the remaining three—all extreme outliers—did not categorically prohibit the sale or possession of semiautomatics. *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I. Acts & Resolves 256, 256-57; 1933 Minn. Laws ch. 190. And all of those laws, including the few that banned acquisition of certain semiautomatics, were either repealed entirely or

replaced with laws regulating only fully automatic weapons within a few decades. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263, amended by 1975 R.I Pub. Laws 738, 738-39, 742; 1963 Minn. Sess. L. ch. 753, at 1229; 1965 Cal. Stat., ch. 33, at 913; 1972 Ohio Laws 1866, 1963; 1975 Va. Acts, ch. 14, at 67.

There is thus no historical evidence that states broadly prohibited the general public from acquiring semiautomatic firearms, regardless of what features or firing capacity they had. *Miller*, 2023 WL 6929336, at *7. Indeed, such laws remain rare even today; the firearms New Jersey has banned are legal in (at least) 40 states.

As for the federal government, it did not restrict semiautomatic arms in any way until 1994, see Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)), and Congress allowed that law to expire after just ten years after a Department of Justice study showed that it had produced "no discernable reduction" in violence committed with firearms. Christopher S. Koper et al., An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice 96 (2004), https://bit.ly/3wUdGRE.

The lack of a historical tradition supporting New Jersey's magazine ban is even more palpable. No state prohibited acquiring ammunition feeding devices of any capacity until the Bush Administration. Thus, even if this Court were to look beyond the indisputable commonality of the arms New Jersey bans, the result would remain unchanged, as there simply is no well-established tradition of banning semiautomatic

firearms, the self-defense-enhancing features these bans single out, or the feeding devices that enable ubiquitous firearms to work as intended.

**5.  The Magazine Ban is an Unconstitutional Taking**.

The State argues that this issue is controlled by law of the case notwithstanding *Bruen*, citing *In re Continental Airlines*, 134 F.3d 536 (3d Cir. 1998). But *Continental Airlines* is not about law of the case and has no application here.

New Jersey's magazine ban takes Plaintiffs' property because it dispossesses them of their lawfully acquired magazines. To begin, because they are personal property, the magazines covered by the ban are "property" within the meaning of the Takings Clause. *Horne v. Department of Agric.*, 135 S. Ct. 2419, 2425–26 (2015).

Property can be "taken" within the meaning of the Fifth Amendment in one of two ways: A "physical taking" occurs when the government appropriates or otherwise physically dispossesses the owner of property. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005). A "regulatory taking" occurs when the government regulates the use of that property in a manner that "is tantamount to a direct appropriation or ouster." *Id.*; *see also Horne*, 135 S. Ct. at 2427; *In re Trustees of Conneaut Lake Park*, 855 F.3d at 525.

Physical takings can assume a variety of forms, from a "direct appropriation" to "the functional equivalent of a practical ouster of the owner's possession." *Lingle*, 544 U.S. at 537 (quotation marks and alteration omitted) (quoting *Lucas v. South Carolina*

28

*Coastal Council*, 505 U.S. 1003, 1014 (1992)). But the *sine qua non* of a physical taking is dispossession. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002) (physical takings, unlike regulatory takings, "dispossess the owner"). For even where a property right is "only destroyed and ended, a destruction for public purposes may as well be a taking as would be an appropriation for the same end." *United States v. Welch*, 217 U.S. 333, 339 (1910).

New Jersey's ban on the possession of lawfully-acquired property effects a physical taking of that property. Apart from a narrow exemption for a theoretical class of firearms that cannot be altered to accept fewer than eleven rounds, the law criminalizes the continued possession (after 180 days) of standard-capacity magazines that individuals lawfully acquired before the law's effective date. And while New Jersey's statute may provide owners a menu of options as to *how* they can be dispossessed of their arms, none allows what is necessarily to avoid a taking—namely, the ability to continue to possess one's lawfully-acquired property. For starters the option of surrendering these arms to the government, Act A2761 § 5(c), is a "direct government appropriation . . . of private property" which is "a paradigmatic taking requiring just compensation." *Lingle*, 544 U.S. at 537; *see also Horne*, 135 S. Ct. at 2428.

To avoid this appropriation, owners of banned arms may transfer their firearm or magazine to "any person or firm lawfully entitled to own or possess that firearm or magazine." Act A2761 § 5(a). But transferring property *to someone else* effects "a practical ouster of the owner's possession," which also constitutes a *per se* taking. That

is so regardless of whether the transfer is to someone other than the government. The Supreme Court has repeatedly recognized that a *per se* taking occurs when the government mandates a transfer of property from one private party to another. *See, e.g.*, *Kelo v. City of New London*, 545 U.S. 469, 475 (2005); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982); *International Paper Co. v. United States*, 282 U.S. 399, 408 (1931); *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004–05 (1984) ("[T]he deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking.").

Nor does it make any difference that owners of banned rifles and standard capacity magazines are given the options of rendering them inoperable or permanently altering them to accept rounds or less. Act A2761 § 5(b). The law is clear that the government cannot escape its obligations under the Fifth Amendment by affording owners such alternatives.

In *Horne*, for example, the raisin growers could have "plant[ed] different crops," or "[sold] their raisin-variety grapes as table grapes or for use in juice or wine." 135 S. Ct. at 2430. Likewise, in *Loretto*, the owner could have converted her building into something other than an apartment complex. *See* 458 U.S. at 439 n.17.

The Supreme Court rejected arguments that these options changed the nature of the takings in those cases, admonishing that "property rights 'cannot be so easily manipulated.'" *Horne*, 135 S. Ct. at 2430 (quoting *Loretto*, 458 U.S. at 439 n.17); *see also Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327,1329

30

(9th Cir. 1977) (finding a taking even where the owner was given an opportunity to keep its property by rehabilitating that property at its own expense and to the government's satisfaction). If nothing else, the use of the threat of uncompensated confiscation to force property owners to alter their property is a classic unconstitutional condition. *See Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 606–07 (2013).

All of that readily distinguishes the Magazine Ban from restrictions on the *use* of personal property that have been upheld against takings challenges. For example, in *Andrus v. Allard*, 444 U.S. 51 (1979), the Supreme Court held that a ban on the sale of previously lawful eagle products was not a taking. But in doing so, it emphasized that it was "crucial that [the owners] retain[ed] the rights to possess and transport their property." *Id*. at 66. Likewise, in the Prohibition-era cases, the Supreme Court rejected takings challenges to restrictive liquor laws because the statutes restricted only the ability to sell lawfully acquired alcohol, not to continue to possess it. *See James Everard's Breweries v. Day*, 265 U.S. 545, 560 (1924) (upholding statute "prohibiting traffic in intoxicating malt liquors for medicinal purposes"); *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 278–79 (1920) (upholding statute barring sales of liquor "for beverage purposes"). Here, by contrast, New Jersey leaves no option by which citizens may continue to possess their lawfully acquired property in the form that they acquired it. That is a taking.

As another federal court recently held when confronted with a similar ban in California, "whatever expectations people may have regarding property regulations, they

'do not expect their property, real or personal, to be actually occupied or taken away.' " *Duncan*, 265 F. Supp. 3d 1106, 1138 (S.D. Cal. 2017) (quoting *Horne*, 135 S. Ct. at 2427); *but see Rupp v. Becerra*, 2018 WL 2138452, at *4 (C.D. Cal. May 9, 2018) (dismissing a similar takings challenge). Thus, "whatever might be the State's authority to ban the sale or use of magazines over 10 rounds, the Takings Clause prevents it from compelling the physical *dispossession* of such lawfully-acquired private property without just compensation." *Duncan*, 265 F. Supp. at 1138.

Although it takes private property, Act A2761 fails to fulfill New Jersey's "categorical duty to compensate" the owners of the banned arms. *Tahoe-Sierra*, 535 U.S. at 322. It makes no provision at all for government compensation. True, a property owner who chooses to transfer his arms to a third party may be able to obtain *some* compensation for those arms, but that is not what the Fifth Amendment requires. Instead, the Constitution requires "just compensation," which is "to be measured by the market value of the property at the time of the taking." *Horne*, 135 S. Ct. at 2432 (quotation marks omitted). Nothing in New Jersey's ban even suggests, let alone ensures, that the compensation a magazine owner receives for the potential sale of her property to a third party will reflect its fair market value. In fact, by compelling transfer by a fixed date and prohibiting possession by nearly everyone in the state, the law practically ensures that the owner will receive less than fair market value. Precisely to avoid such a result, the Takings Clause prevents "government attempts to lay the general public's burden of just compensation on third parties." *Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d

32

824, 831 (9th Cir. 2004) (O'Scannlain, J., concurring).

New Jersey's magazine ban takes Plaintiffs' standard-capacity magazines without securing just compensation. Plaintiffs are therefore entitled to summary judgment as to their claim that it violates the Takings Clause.

## **CONCLUSION**

In view of the foregoing, the Court should grant summary judgment declaring the challenged bans unconstitutional and permanently enjoining their enforcement.

Dated: December 15, 2023

Respectfully submitted,

s/ Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com