## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.<br><br>*Plaintiffs*,<br><br>v.<br>MATTHEW PLATKIN, et al.<br><br>*Defendants*.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) )<br><br>Civil Action No. 3:18-cv-10507-PGS-LHG |
| MARK CHEESEMAN, et al.<br><br>*Plaintiffs*,<br><br>v.<br>MATTHEW PLATKIN, et al.<br><br>*Defendants*.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) )<br><br>Civil Action No. 3:22-cv-4360-PGS-LHG |
| BLAKE ELLMAN, et al.<br><br>*Plaintiffs*,<br><br>v.<br>MATTHEW PLATKIN, et al.<br><br>*Defendants*. | ) ) ) ) ) ) ) ) ) )<br><br>Civil Action No. 1:22-cv-4397-PGS-LHG |

**COMBINED BRIEF OF *ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.* ("*ANJRPC*") AND *ELLMAN* PLAINTIFFS IN OPPOSITION TO STATE DEFENDANTS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF EMANUEL KAPELSOHN AND CLAYTON CRAMER AND IN REPLY IN FURTHER SUPORT OF THEIR DAUBERT MOTION**

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for ANJRPC and Ellman
Plaintiffs*

## Table of Contents

Page(s)

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 2

1.  EMANUEL KAPELSOHN IS MORE THAN QUALIFIED TO OFFER HIS
    OPINIONS ................................................................................................ 2

2.  EMANUEL KAPELSOHN'S ERRATA SHEET AND BALLISTIC TESTING
    VIDEO SHOULD BE ACCEPTED BY THE COURT. ................................... 6

3.  CLAYTON CRAMER IS MORE THAN QUALIFIED TO OFFER HIS
    OPINIONS ................................................................................................ 7

4.  THE STATE'S HISTORICAL EXPERTS, CORNELL, SPITZER, AND
    ROTH SHOULD BE EXCLUDED ...............................................................17

5.  THE STATE'S INTEREST BALANCING EXPERTS KLAREVAS, ALLEN,
    HARGARTEN, YURGEALITIS AND WEBSTER SHOULD BE EXCLUDED .............18

6.  THE STATE'S EXPERT BARON SHOULD BE EXCLUDED
    FOR LACK OF FOUNDATION ................................................................ 20

CONCLUSION................................................................................................. 23

## <u>Table of Authorities</u>

**Page(s)**

## <u>Cases</u>

*Am. Tech. Res. v. United States*, 893 F.2d 651 (3d Cir. 1990) ..................................... 2

*Daubert v. Merrell Dow Pharms. Co.*, 509 U.S. 579 (1993) ....................................... 1

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................................. 19

*EBC, Inc. v. Clark Bldg. Sys., Inc.,* 618 F.3d 253 (3d Cir. 2010).............................. 6, 7

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ................................................... 2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ............... 18, 19

*Schneider v. Fried,* 320 F.3d 396 (3d Cir. 2003).......................................................... 2

*Staples v. U.S.*, 511 U.S. 600 (1994) .......................................................................... 19

*Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998) ........................................................... 2

# **INTRODUCTION**

The State moves to exclude the expert testimony of Emanuel Kapelsohn, a firearms expert with a 45 year history of consulting, teaching, writing, and lecturing – a firearms expert who has recently been *retained by the State of New Jersey as a firearms expert* in a case in Superior Court of New Jersey.

The State also moves to exclude the expert testimony of Clayton Cramer, an historian who has been cited twice by the United States Supreme Court (*District of Columbia v. Heller* and *McDonald v. Chicago*), as well as 14 times by federal courts of appeals, 12 times by federal district courts, and 5 times by state supreme courts.

The State does this by ignoring the rules set forth in *Daubert v. Merrell Dow Pharms. Co.*, 509 U.S. 579 (1993), by misrepresenting the basis for the expert opinions, and by pretending that the rules applicable scientific processes are the rules that apply here. They are not.

Further, the State insists on usurping the exlusive province of the Court by offering expert testimony on what the law was historically. A witness can no more tell the Court what the law was than he can tell the Court what the law is.

The State also continues to egregiously defy the United States Supreme Court by continuing to offer inflammatory and prejudicial interest balancing testimony. Such testimony simply not allowed.

Finally, the State tries to offer linguistic testimony from a witness who (admittedly) knows nothing about firearms and therefore cannot connect any of his linguistic research to the subject matter of the case. Such testimony lacks a proper foundation and is improper.

The State's motion should be denied and Plainitffs' motion should be granted.

## **ARGUMENT**

### 1.    Emanuel Kapelsohn is More Than Qualified to Offer His Opinions

The State admits that *Daubert* is about more than scientific evidence. The State explains as follows:

> A witness is qualified to provide expert testimony only if the witness has "specialized expertise" with "a broad range of knowledge, skills, and training" in the testimony's subject matter. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); supra at 8-9. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (*quoting Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990)). Experts who lack formal education or training in a particular area must rely upon practical experience to demonstrate that they possess "the minimum qualifications necessary to testify as an expert." *Elcock v. Kmart Corp.*, 233 F.3d 734, 743 (3d Cir. 2000).

State.Br.12.

The State then goes on to ignore all of this in objecting to Kapelsohn's credentials. Kapelsohn's 65 page *curriculum vitae* sets forth a massive amount of both training and experience as a firearms consultant, expert, teacher, and author spanning a 45 year career. Calling him simply "a commercial attorney and firearms instructor" as the State does (State.Br.2) is disingenuous.

2

So, too, is the State's focus on the term "methodology." Methodology is a scientific concept. But Kapelsohn is not a scientist offering scientific testimony. Kapelsohn offers his opinions based on his 45 years of experience working with, lecturing about, writing about, and studying[1] firearms technology and usage.

By way of example, when Kapelsohn testifies about the nature, operation, use, and characteristics of an AR-15 rifle, he does so because he has, for decades, been handling them, using them, teaching about them, studying them, and writing about them. That he lacks a Ph.D. in AR-15 (whatever that might be) is irrelevant.

This underscores the meaninglessness of the State's obsession with methodology. There is no methodology to discuss when a witness is describing 45 year worth of personal observations and experience with a firearm.

The State also sets up a strawman by falsely suggesting that Kapelsohn is offering opinions on linguistics, biomechanics and medicine, history, and statistics.  He is not. For example, in critiquing the State's linguistics witness Baron, Kapelsohn is not, himself, offering an opinion on linguistics. He is simply explaining that Baron does not know what a modern magazine is and that makes Baron's approach and, ultimately, his conclusions wrong.  Baron's opinion can only be as good as it relates to the subject matter of the

---

[1] The State seems to insist, without any basis, that the study of a topic can only be valid if done so in the pursuit of a formal University degree, thereby pretending that Kapelsohn's years of training classes taken from the FBI, ATF, police agencies, and firearms industry manufacturers count for nothing. There is nothing in *Daubert* or any case law supporting that view.

lawsuit. Kapelsohn simply points out why Baron's lack of understanding of firearms renders his opinion meaningless. That is not Kapelsohn giving an opinion on linguistics. That is Kapelsohn giving an opinion on firearms.

The same is true as to Kapelsohn's critique of the state's witness Hargarten. The State claims that Kapelsohn is offering a medical opinion in identifying a critical error in Hargarten's anlysis. He is not.

Hargarten offers a comparison of wound damage across various projectiles, trying to argue (unsuccessfully) that there is something novel about the size of the wound channel from a 5.56 caliber bullet. In attempting to show this novelty he tries to compare the wound from a 5.56 caliber bullet to a musket ball (presumably to argue that the wounding from a modern 5.56 caliber bullet would even be surprising to the Founding generation). Kapelsohn's point is that, in his analysis, Hargarten understates the size of the musket ball by a factor of 9—an enormous error which utterly undermines Hargarten point. *See* Kapelsohn Rebuttal Report at 7-9. This is firearms testimony not medical testimony.

The same is true with respect to Kapelsohn's critique of Yurgealitis's flawed claims regarding the wounding capacity of the 5.56 caliber bullet. Kapelsohn's critiques are based on his firearms knowledge, not any claim to have expertise in medicine. *See* Kapelsohn Rebuttal Report at 9-10.

The State also mischaracterizes Kapelsohn's testimony. For example, the State claims that Kapelsohn relied on 7 newspaper articles for the proposition that AR-15s are useful self-defense. State.Br.20. This is false. Kapelsohn's opinion as to the use of the AR-15 platform is based on his decades of personal experience and knowledge. The newspapers articles were simply examples. *See* Kapelsohn Declaration para. 6-27.

The State also mischaracterizes some of the materials produced by Kapelsohn requested at his deposition. The State criticizes "two "shooting glass video' depict[ing] Mr. Kapelsohn shooting at two pieces of glass reinforced with safety film" and "handwritten notes and a spreadsheet without explanation." State.Br.24n.8.

But those items have nothing to do with Kapelson's opinions or this case. They were produced because counsel asked at his deposition to produce any material he had regarding past ballistic testing. Kapelsohn Reply Dec. para. 3. Those items have no relationship to his opinions in this case, yet the State critiques them as if they do, attempting (but failing) to undermine Kapelsohn through a strawman.

These examples demonstrate how the State is desperately trying to exclude the testimony of an eminently qualified firearms expert by repeatedly mischaracterizing the record.

The State's motion should be denied.

**2.** **Emanuel Kapelsohn's Errata Sheet and Ballistic Testing Video Should be Accepted by The Court.**

Defendants are correct that this issue is controlled by *EBC, Inc. v. Clark Bldg. Sys.*, Inc., 618 F.3d 253 (3d Cir. 2010). In *EBC*, the Third Circuit adopted a flexible approach to Fed. R. Civ. P. 30(e). In the Third Circuit, the decision whether to permit even a contradictory errata sheet (and the errata objected to here are not necessarily contradictory) is a "fact-specific" determination not susceptible to a "one-size-fits-all rule"  While courts are not categorically required to consider contradictory errata, they are also not required "to strike contradictory errata if sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted." *Id*. at 270 (emphasis added).

All of the objected to material is directly responsive to questions posed by counsel at a deposition.  None is merely gratuitous addition.

By way of example, one of the items Defendants object to is a video demonstration of wall penetration by various rounds of ammunition prepared by Mr. Kapelsohn after his deposition was taken. Both Plaintiffs' expert Kapelsohn and Defendants' expert Yurgelitis opine on the wall penetration potential of various types ammunition in the context of self-defense.  Naturally, they do not agree. In his Rebuttal expert report Kapelsohn testified that he has performed ammunition wall penetration demonstrations (not testing) many times in classes he has taught over the years. *See* Kapelsohn Rebuttal

Report at 13-14. At his deposition, counsel asked him if he has any video of those. Kapelsohn said that because they were live demonstrations in class he does not. Therefore, he went out and did one to produce to the Defendants.

Everything objected to was directly put in issue by Defendants at the depositions and is are therefore proper under *EBC*. Defendants' motion should be denied.

**3.      Clayton Cramer is More Than Qualified to Offer His Opinions**

As with Kapelsohn, the State mischaracterizes Cramer's credentials and the nature of the opinion he is giving. As his curriculum vitae shows, Cramer has an MA in History and his work has been cited in two United States Supreme Court decisions (notably *District of Columbia v. Heller* and *McDonald v. Chicago*), several state supreme court decisions, and many federal appellate and district court decisions.  The attempt to cast him as nothing more than a hobbyist is absurd.

Cramer has been relied upon and cited in the following cases:

**U.S. Supreme Court**

*McDonald v. Chicago*, 130 S. Ct. 3020, 3039 n. 21, 3041 n.25, 3043, 3132 (2010)

*District of Columbia v. Heller*, 128 S. Ct. 2783, 2795 (2008)

**Federal Appellate Courts**

*Vincent v. Garland*, 80 F.4th 1197, 1204 n.2 (10th Cir. 2023)

*Jones v. Bonta*, 34 F.4th 704, 718 n.15 (9th Cir. 2022)

*U.S. v. Chester*, 628 F.3d 673, 691 (4th Cir. 2010)

*Hirschfeld v. BATF*, 5 F. 4th 407, 426 n.15, 420 n.27, 429 n.29, 437. n.49 (4th Cir. 2021)

*Young v. Hawaii,* 896 F.3d 1044, 1059 (9th Cir. 2018)

*Duncan v. Becerra*, 970 F.3d 1133, 1149 n.7 (9th Cir. 2020)

*Mance v. Sessions*, 896 F.3d 699, 714 n.16 (5th Cir. 2018)

*NRA v. BATFE*, 714 F.3d 334, 340 n.6, 343 n.22, 4343 n.25 (5th Cir. 2013).

*Ezell v. City of Chicago*, 651 F.3d 684, 702 n.11 (7th Cir. 2011).

*U.S. v. Chester*, 628 F.3d 673, 681 (4th Cir. 2010)

*U.S. v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010)

*U.S. v. Skoien*, 587 F.3d 803, 810 (7th Cir. 2009)

## Federal District Courts

*Duncan v. Bonta*, 2023 WL 6180472 *29 n. 185, *31 n.208, (S.D. Cal. 2023)

*United States v. Jackson*, 2023 WL 6881818 *6 (N.D. Miss. 2023)

*Hanson v. D.C.,* 2023 WL 3019777 *14 (D.D.C. 2023)

*U.S. v. Posey*, 665 F.Supp.3d 762, 770 (D. Ind. 2023)

*U.S. v. Schnur*, (S.D. Miss. 2023)

*U.S. v. Gray*, (D. Colo. 2022)

*Koons v. Platkin*, 2023 WL 3478604, *103, *107 (2023) (D.N.J. 2023)

*U.S. v. Perez-Garcia*, 628 F.Supp.3d 1046, 1054 (S.D. Cal. 2022)

*U.S. v. Daniels*, 610 F.Supp.3d 892, 896 n.5 (S.D. Miss. 2022)

*King v. Sessions*, 2018 WL 3008527 *4 (N.D. Miss. 2023)

*Powell v. Tompkins*, 26 F.Supp.2d 367, 486 (D. Mass. 2013)

*Moody v. Arc of Howard County, Inc.*, 5 n.4, 94 Empl. Prac. Dec. P 44,221

**State Supreme Courts**

*State v. Roundtree*, 952 NW 2d 765, 786 (Wisc. 2021)

*State v. Christen*, 96 Wis.2d 705, 766 (2021)

*State v. Sieyes*, 225 P.3d 995, 1001 (Wash. 2010)

*Senna v. Florimont*, 958 A.2d 427, 433 n.4 (N.J. 2008)

*Mosby v. Devine*, 851 A.2d 1031, 1055, 1056, 1059, 1061, 1065, 1068, 1072 (R.I. 2004)

*Pagel v. Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002)

As with Kapelsohn, the State mischaracterizes the nature of Cramer's testimony. At p. 34: the State argues "To begin, Mr. Cramer openly admits that he has no education, training, or credentials in statistics or data analysis. Cramer Dep. Tr. at T136:22-137:11."

But Cramer's criticism of Klarevas was that he constructed his data from a range of dates that excluded incidents that changed the slope of his graph's trendline. This makes his claim of increasing number of high-fatality mass murders misleading because he left out many high-fatality mass shootings before 1991. Adding those missing incidents flattens out the trend line on his graph. This requires no training in statistics; this only requires including the missing data.

9

Klarevas's Figure 1 misleads because it shows rising deaths per year in high-fatality mass shootings with no adjustment for the 32% increase in U.S. population during the years 1991-2022.  Adjusted for population change (a per capita murder rate) would make his trendline a bit less worrisome.  Including high-fatality mass shootings back to 1900 again reduces the claimed dramatic increase supposedly caused by LCMs becoming available in the last several decades.  There were plenty of high-fatality mass shootings in the early twentieth century.  Again, this requires no training in statistics; this only requires using a more complete data set.

At p. 34 the State argues: "While Mr. Cramer publishes in law reviews and popular press, he has not published a peer-reviewed article on any topic in the last twenty years, and has never published a peer-reviewed article on statistics."

And yet nothing in *Daubert* requires publication in peer reviewed articles. Certainly the United States Supreme Court and the many other court cited above did not think so.

The state argues at p. 35: "Rather, Mr. Cramer proffered his rebuttal opinions before he even read the expert reports he was purportedly responding to, did not review them thoroughly after receiving them, and refused to review the sources cited in those reports. These deficiencies are exacerbated by a results-driven bias. Unsurprisingly, his report betrays a resulting lack of reliability."

10

That mischaracterizes his testimony. He did read the reports in detail. However, because he has read nearly identical reports by the same experts making the same sometimes claims in half a dozen or more cases around the country, he was able to formulate his opinion *before* reading all of the reports in full (which he did), because he (correctly) knew what they were going to say.

The State argues at p. 36: "Rather, he admitted that he did not closely examine the States' experts reports at all. For example, Mr. Cramer admitted at his deposition that he failed to perform a "credibly detailed valuation" of Professor Klarevas's report, which contains numerous and detailed statistical analyses of data."

But the State ignored the testimony at T137:22-25 and T138:1-3:

Q.     How long did you spend reviewing Professor Klarevas' report?

A.     Looks like five hours.  I would not say that it was a credibly [sic] detailed valuation.  [The actual testimony was certainly "incredibly detailed evaluation" not "credibly"]  I found enough serious problems with it that I thought, well, that's enough to demonstrate the invalidity of his claims.

In other words, he found certain flaws and testified about those flaws.

His later evaluation was because the date range Klarevas used was problematic. Why start at 1991?  Klarevas ignored the high-fatality mass shootings of the 1980s. This is a discrete error Cramer identified.

11

This false strawman appears at p. 36: "And Mr. Cramer could not specifically recall whether he actually read Professor Baron's report in this case, asserting that he 'know[s] he read it in other cases.'"

Yet, Baron's flawed claim is also asserted by Cornell. Cramer explicitly refuted Cornell's claim regarding "cartridge boxes." The same analysis applies to Baron even though Cramer did not explicitly address Baron in detail. This is not a *Daubert* issue at all.

The State argues at p. 36: "At other times, Mr. Cramer openly admitted to prejudging Professor Cornell's report, stating he already arrived at opinions of Professor Cornell's report before he actually reviewed it. Id. at T105:23-106:22."

This is because Cornell produces the same flawed declarations repeatedly in cases all over the country. He produces the same erroneous material in case after case, as Cramer explained at T106:199-22.

The State argues at p. 36-37: "Moreover, Mr. Cramer did not even review the New Jersey laws being challenged in these matters before rendering his report and sitting for a deposition in this matter…. He also professed a lack of knowledge the basic terms of the laws being challenged in the present case."

But that is irrelevant. Cramer is not giving an opinion on the validity of the laws, but about the history of weapons regulation.

12

The State argues at p. 37: "He refused to review "secondary sources" (e.g., articles and books) relied upon by the State's experts, claiming that such materials can be flawed, and at one point in his report lectured Professor Cornell for not relying solely on 'primary sources, as historians try to do.'… Mr. Cramer acknowledged he did not review any of the secondary sources cited in Professor Cornell's report, and does not remember if he reviewed the secondary sources cited in Professor Roth's report…"

But *Bruen* established the standard for testing the constitutionality of a law by reference to actual historical regulation. If the goal is to demonstrate that such a law existed, there needs to be a primary source for such a law. Many of Cornell's secondary sources are his own work.  Because *Bruen* requires historical evidence of the Founding Era, Cornell should have been able to cite primary sources.

The State argues p. 37: "Despite this, Mr. Cramer acknowledged that he himself relies on secondary sources, but only when he is convinced the source is sufficient."

Checking the cited transcript pages shows a slightly different story.

Q.   And are the secondary sources that you cite in your own report free from flaw?

A.   That is an interesting question.  If I was aware that they had flaws, I would not have cited them.  In some cases I have actually looked up the primary sources that are cited by the secondary sources and verified that they have accurately represented them.

T100:17-24.

The State argues at p. 38 that Cramer is an untrustworthy source because he has strong opinions in opposition to laws like New Jersey's.  Yet, nowhere does the State explain how such view would impact Cramer opinions. In what way would such views impact Cramer's testimony? The State does not say, and neither the United State Supreme Court nor any of the other numerous courts that have relied on Cramer appear to have found that a concern.

The State also does not explain how Cramer's reference to Duke Law School's Repository of Historical Firearms Laws as the "Duke trash repository" impacts that validity of his testimony. Though others may choose to use more diplomatic language to describe an often inaccurate collection of laws (upon which many state experts appear to rely instead of looking up the actual statutes), that has nothing to do with Cramer actual opinion in the case.

The State argues at p.39: "For example, he accuses Professor Cornell of attributing the carryover of English law in 1776 to only three sources—sources that he believed Professor Cornell fails to understand. Cramer Rebuttal Rpt. 4. But Mr. Cramer offered that criticism without reviewing any of the other scholarly literature Professor Cornell also cited to in evidentiary support of that particular opinion."

Cornell lists three primary sources for his claim and none support his claim. Where identification of actual historical laws matter, if Cornell failed to find even one primary

14

source to back his claim it would not be appropriate to seek support in secondary sources. Cramer is correct.

The State argues at p. 39: "And while Professor Cornell cited to colonial historian Kevin Sweeney's article, "Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America," in support of his opinion that over 90 percent of the weapons owned by Americans were long guns, and not pistols, at the time that the Second Amendment passed, Mr. Cramer admits that he did not bother to read that article."

Yet whatever Sweeney may write, it is proper to give more weight to actual archaeological evidence.  Cramer's Rebuttal Report reads as follows at 16:

> An analysis of all Plymouth Colony probate inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.

This is far superior evidence to Sweeney as a secondary source. Again Cramer is correct.

The State criticizes the manner in which Cramer used newspaper reports to catalog mass murders at pp. 39-40. It is hard to imagine how using two large collections of historical American newspapers, one of which has more than ten million pages, is flawed.

The State argues at p. 40: "Even within this limited universe of newspaper articles that resulted in 'hits,' Mr. Cramer's filtering of those hits to identify only those reporting incidents of 'mass murder,' is itself arbitrary and subjective. In selecting qualifying incidents, he considers the moral or legal culpability of the victims or perpetrators as he

15

gleaned from the articles, and excludes some otherwise qualifying incidents from his review. For example, he chooses to exclude what he considers to be 'justifiable' or 'excusable' killings when identifying instances of mass murder, such as when he—lacking even a background in law or criminal justice—believed that the perpetrator acted in self-defense."

Cramer excluded incidents done by police and under military orders which did not result in criminal charges because such homicides are not considered murders.  He relied on newspaper accounts as to whether deaths were accidental or intentional, and if intentional, defensive in nature.  This requires no background in law.

The State complains at p. 40: "Nor does he classify incidents as 'mass murder' if he perceives the incident to be gang-related, because, in his view, 'determining if they were defensive in nature or not requires confidence in the integrity of the participants,' and gang members 'often have reason to lie.'"

It is not at all clear why that is a flaw. How would one tell after the fact who were the aggressors and who were the victims in a gang related event?

At p. 41 the State attempts the same strawman argument as with Kapelsohn: "He does not explain what generally accepted standards support any of these filtering methods that he chose, or how he can consistently apply those methods to actual examples—because no such standards exist."

The objection is nonsensical since no such standard sexist.

16

The State argues at p. 42: "This late-in-time submission does not aim to correct any inaccuracies in the initial report, nor does it provide data or analysis previously unavailable at the time of his original report. On the contrary, as Mr. Cramer openly admits, he decided to 're-run' and add data—data which was available to him at the time he issued his original report—after perceived weaknesses in his analysis were exposed at deposition."

This does not impugn Cramer's initial critique of Klarevas that his data were incomplete. Even if the Court determines that Cramer's *supplemental* report is untimely that does not undermine Cramer's initial critique or resurrect Klarevas's flawed analysis.

The State's objections to Cramer's testimony are unfounded. But even at worst, they would only go to weight and not to admissibility. Thus, the motion to exclude Cramer's testimony should be denied.

**4.     The State's Historical Experts, Cornell, Spitzer, and Roth Should be Excluded**

In an effort to save the improper testimony of its historical experts, the State sets up a strawman, falsely claiming that Plaintiffs' motion objects to these experts testifying about the "governing law."  That is not Plaintiffs' argument. As is clear from Plaintiffs' moving brief, it is not just the "governing law" that is the exclusive province of the Court, but any statement of what the law is *or was*.

Thus, not only may an expert not testify about what the law currently is, an expert may also not testify about what the law was in, say, 1791. The exclusive expertise of the

judge to say what the law is does not change merely because the judge is required to say what the law was 230 years earlier, and the State's experts are doing just that.

And while it is true that a few courts have accepted the proffer of witnesses on historical laws those courts are wrong. It is notable that there is not a single Second Amendment decision from the United States Supreme Court that relied on or even allowed experts to testify about relevant historical laws. All such laws were presented by briefs of the parties and amici.

Accordingly, because they are improperly invading the exclusive province of the Court to determine what the law is or at any time was, the testimony of Cornell, Spitzer, and Roth should be excluded.

## 5.      The State's Interest Balancing Experts Klarevas, Allen, Hargarten, Yurgealitis and Webster Should be Excluded

It could not be more obvious why the State wishes to call Klarevas, Allen, Hargarten, Yurgealitis, and Webster to testify. Regardless of how the State tries to spin and re-characterize their testimony in creative ways, their sole purpose is to improperly litter the record with prejudicial and inflammatory allegations of blood and death. That is all they are doing. The State is simply utterly frustrated that the Supreme Court has, twice, made it clear that interest balancing is not allowed.

Perhaps the most important holding of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022) is the stark reminder that the Second Amendment does not allow interest balancing by the State. Simply put, the State does not get to decide

whether the people exercising right to keep and bear arms is, on balance, worth it as a

matter of policy:

> The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

*Id*. (internal citation omitted.)

The Supreme Court made this clear in *District of Columbia v. Heller*, 554 U.S. 570,

634 (2008):

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.

The State does not get to say that allowing the people to possess certain arms is, in

its view, too dangerous. *Staples v. U.S.,* 511 U.S. 600, 611 (1994) ("[D]espite their

potential for harm, guns generally can be owned in perfect innocence."). The Second

Amendment has already resolved the question in favor of law abiding people.  The people

get to choose which arms they wish to use for lawful purposes, and "[i]t is this balance—

struck by the traditions of the American people—that demands our unqualified

deference." *Bruen*, 142 S. Ct. at 2131.

Yet, New Jersey refuses to accept that clear command from the Supreme Court. To

be sure, in an abundance of caution, Plaintiffs have offered witnesses to refute certain

aspects of that improper testimony. But the bottom line is that New Jersey is barred from trying to convince the Court that they may ban arms because in their view they are bad.

The choice of what arms to possess and carry is entirely up to the people. That is the balance that was already struck in 1791 with the ratification of the Second Amendment.

Further, to the extent that the State claims that the testimony of some of these interest balancing experts is relevant to whether the banned arms are in common use for self-defense, Plaintiffs' summary judgment briefs makes it clear that is not the correct standard. Therefore such testimony is also impermissible.

Because Klarevas, Allen, Hargarten, Yurgealitis, and Webster have obviously been called to improperly prejudice the Court with prohibited interest balancing, their testimony should be excluded.

## 6.    The State's Expert Baron Should be Excluded for Lack of Foundation

The State tries mightily to save their proposed expert Dennis Baron, but the effort fails. The simple truth is that Baron cannot offer admissible testimony because, as a linguist with no knowledge or understanding of firearms (which the State admits), he has no ability to connect his linguistic investigation of the term "cartridge box" with what a magazine actually is. It matters not at all how much scouring of old newspapers Baron does when he cannot connect those results to the subject matter of the lawsuit because he does not understand it.

Baron claims that he searched 18th and 19th century newspapers for the term "cartridge box" and "cartouche box" and found that "cartridge box" was considered mere "accoutrement" rather than "arms." He then claims that "cartridge box" is somehow a precursor to "magazine."

Baron's own words show how absurd this is.  At paragraph 30 of his report he says this:

> The "cartridge box" or "cartouch box"—the precursor to today's "magazine"—is typically mentioned in lists of accoutrements, often in connection with other items worn with a soldier's uniform. The "cartridge box" almost never appears to be included among a soldier's weapons. The OED defines "cartridge box" as "a box for storing or carrying cartridges; the case in which a soldier carries his supply of cartridges"

In other words, a cartridge box was simply a box of cartridges inside of which a soldier carried around his ammunition. By Baron's own words it was clearly nothing more than a container for carrying around ammunition—nothing like a modern magazine which is an ammunition feeding device—a part of the firearm that feeds ammunition into the chamber of the firearm. *See* Rebuttal Report of Emanuel Kapelsohn, Kapelsohn Reply Dec Ex. A at 3-7; Rebuttal report of Clayton Cramer, Cramer Reply Dec Ex. A. at 12-13; N.J.S. 2C:39-1(y). Baron plainly has no understanding of actual firearms or how they work.

The State attempts to end run around this obvious error by referencing a single newspaper article from 1869 describing an obscure French device called a "Mitrailleuse," which Baron merely assumes, based on nothing, "would seem to be analogous to what

21

we call a machine gun today." The article describes the device as follows: "It contains thirty-seven common infantry cartridges, arranged like cigars in a bundle. As soon as it is attached to the breech of the cannon, the Mitrailleuse is loaded. A man sitting on the carriage fires it by turning a crank. . . . The crank is turned once more and the cartridge box is removed from the cannon; a man to the right takes it, removes it from the 'cigar box'; the men to the left put a new one in."

This use of the term "cartridge box" does not in any way resemble any of the other uses of that term identified by Baron – all the rest of which merely describe a container for ammunition to be carried around. Unlike everyone other use of the term "cartridge box" identified by Baron, this one is uniquely involved in the firing process.

Although the description of the Mitrailleuse makes it sounds more like a revolver than a magazine (*see* Hlebinsky Declaration at 21 (definitions)), even if this unique use of the term "cartridge box" could describe something like a modern magazine, this usage plainly does not resemble the other uses that Baron claims fall into the category "accoutrement."  This use is something unique and cannot seriously be used to argue that a magazine is an "accoutrement" and not an arm.

Baron is hoisted by his own petard. Because he has no understanding of magazines or any aspect of firearms and therefore cannot connect his work to the subject matter of the case, his testimony lacks a proper foundation and should be excluded.

## **<u>CONCLUSION</u>**

In view of the foregoing, the Court should deny Defendants' motion to exclude Plaintiffs' expert testimony and grant Plaintiffs' motion to exclude Defendants' expert testimony.

Dated: December 15, 2023

Respectfully submitted,

<u>s/ Daniel L. Schmutter</u>
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com