# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ASSOCIATION OF NEW JERSEY
RIFLE & PISTOL CLUBS, INC., et
al.

        *Plaintiffs*,

    v.

MATTHEW PLATKIN, et al.

        *Defendants*.

_____

MARK CHEESEMAN, et al.

        *Plaintiffs*,

    v.

MATTHEW PLATKIN, et al.

        *Defendants*.

_____

BLAKE ELLMAN, et al.

        *Plaintiffs*,

    v.

MATTHEW PLATKIN, et al.

        *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:18-cv-10507-PGS-LHG

Civil Action No. 3:22-cv-4360-PGS-LHG

Civil Action No. 1:22-cv-4397-PGS-LHG

***ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.*** **(*"ANJRPC"*) AND *ELLMAN* PLAINTIFFS' <u>AMENDED</u> RESPONSE TO STATE DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com
*Attorneys for ANJRPC and Ellman Plaintiffs*

Pursuant to Federal Rules of Civil Procedure 56 and D.N.J. Local Rule 56.1, ANJRPC and Ellman Plaintiffs submit the following **Amended** Response to State Defendants Statement of Material Facts Not in Dispute. ANJRPC and Ellman Plaintiffs also adopt the answers of the Cheeseman plaintiffs that are not inconsistent.

## ANJRPC AND ELLMAN PLAINTIFFS RESPONSES

1.  New Jersey enacted its assault firearms prohibition in 1990. P.L. 1990, Ch. 32.

**RESPONSE:**   **Undisputed.**

2.  That law was enacted after a mass shooting in Stockton, California when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others at an elementary school. Decl. of Daniel Vannella Ex. 4, Rpt. of Professor Robert Spitzer ¶ 1.[1]

**RESPONSE:**   **Undisputed.**

---

[1] For ease of reference, the following lists frequently cited expert reports and their corresponding exhibits within the Vannella Declaration:

Ex. 3: Rpt. of Professor Saul Cornell
Ex. 4: Rpt. of Professor Robert Spitzer
Ex. 5: Rpt. of Professor Randolph Roth
Ex. 6: Rpt. of Professor Denis Baron
Ex. 7: Rpt. of Lucy Allen
Ex. 8: Rpt. of Dr. Stephen Hargarten
Ex. 9: Rpt. of Professor Louis Klarevas
Ex. 10: Rpt. of Professor Daniel Webster
Ex. 11: Rpt. of James Yurgealitis
Ex. 12: Rpt. of Professor Brian DeLay

3.   New Jersey Governor Jim Florio's bill signing statement for Public Law 1990 discussed the capacity of the prohibited firearms to cause mass destruction and pose a threat to police, citizens, and children. Vannella Decl. Ex. 42.

**RESPONSE**:   **Undisputed**.

4. In 2018, New Jersey enacted P.L. 2018, Chapter 39, which revised the definition of an unlawful "large capacity ammunition magazine" from 15 to 10 rounds of capacity.

**RESPONSE**:   **Undisputed**.

5.   N.J. Stat. Ann. § 2C:39-1(w) regulates only a specific subset of handguns, rifles, and shotguns. Vannella Decl. Ex. 11, Rpt. of James Yurgeleatis ¶¶ 8-26.

**RESPONSE**:   **Undisputed**.

6.   N.J. Stat. Ann. § 2C:39-1(y) does not limit how many magazines an individual may possess.

**RESPONSE**:       **Undisputed**.

7.   Fourteen states plus the District of Columbia restrict large-capacity magazines, representing more than 115 million people, or approximately 34.5% of the U.S. population.  Spitzer Rpt. ¶¶ 2, 56.

**RESPONSE**:   **Disputed. The definition of large capacity magazine" is not unform in each state. Colorado has a 15 round limit, Colo. Rev. Stat. § 18-12-301 (2); Delaware has a 17 round limit, Del. Code tit. 11, § 1469(a); Illinois and Vermont are 10 for long guns and 15 for handguns. 720 ILCS 5/24-1.10; Vt. Stat. tit. 13, § 4021(e).**

8.   Ten states plus the District of Columbia have enacted assault weapons and large-capacity magazine bans, as have various localities around the country, representing approximately 109 million people, or 32.7% of the U.S. population. Spitzer Rpt. ¶ 2.

**RESPONSE:  Disputed. "Assault weapon" is also a made up word that has different meanings in different states.**

9.   Semi-automatic rifles and pistols which are designed to function with detachable magazines will still function as intended regardless of the capacity of the magazine a user inserts into the firearm.  Numerous manufacturers sell semi-

automatic pistols packaged with detachable magazines ranging in size from 7 rounds to 15 rounds.  Yurgealitis Rpt. ¶¶ 131–134.

**RESPONSE:  Disputed. The Yurgealitis Report does not say which pistols are packaged with magazines from 7 to 15 rounds and therefore the statement cannot be generalized.**

10. "Any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity" of less than 10 rounds.  Yurgealitis Rpt. ¶ 145.  Thus an AR-15 style rifle "will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity."  Yurgealitis Rpt. ¶ 145.

**RESPONSE**: **Disputed. If a rifle is typically sold with a magazine greater than 10 rounds it cannot be said that it "will function as designed" with a 10 round magazine even if it will function.**

11. Each of the features listed in N.J. Stat. Ann. 2C:39-1(w)(2) and the 1996 Attorney General Guidelines, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a combat scenario:

  i. A pistol grip or thumbhole stock (for rifles and shotguns);
  ii. Forward handgrip (rifles, shotguns, and pistols);
  iii. Folding/telescoping stocks (rifles and shotguns);
  iv. Flash suppressors;
  v. Grenade launchers;
  vi. Barrel shroud;
  vii. Threaded barrel;
  viii. Buffer tube, arm brace, or the like;
  ix. "Bump stocks"

Yurgealitis Rpt. ¶¶ 117–130.

**RESPONSE**: **"Combat" is undefined and in the context of the report can include civilian self-defense. Undisputed to the extent "combat" includes self-defense. Disputed to the extent Defendant contends it does not. See also Kapelsohn Dec and Rebuttal Report.**

**History Of Firearms Technology**

3

12. Single-shot, muzzle-loading firearms were the ubiquitous guns from the time of America's initial settlement by Europeans until the latter part of the 19th Century. Spitzer Rpt. ¶¶ 30, 40; Vannella Decl. Ex. 12, Rpt. of Professor Brian DeLay ¶ 34; Rpt. of Professor Saul Cornell at 24. These were slow-loading guns that had to be loaded with gunpowder and ball before every shot, and could not be kept loaded without corroding the iron barrels. DeLay Rpt. ¶ 37; Cornell Rpt. at 24. Moreover, the black powder used in these weapons was both corrosive and attracted moisture like a sponge. Cornell Rpt. at 18. These weapons were thus limited as practical tools for self-defense. Cornell Rpt. at 18.

**RESPONSE: Undisputed only that they were ubiquitous but not exclusive. See also Hlebinksy Dec.**

13. Repeat fire was difficult to achieve with colonial-era muzzle loading firearms, and they were known to be inaccurate at range. DeLay Rpt. ¶¶ 37, 61.

**RESPONSE**: **Undisputed**.

14. Muzzle loading firearms could not be loaded while lying prone, such that soldiers became an easier target during combat when they rose to reload. DeLay Rpt. ¶ 61.

**RESPONSE: Undisputed**.

15. The average 18th Century soldier fired two or three shots a minute from a smoothbore musket. DeLay Rpt. ¶ 16.

**RESPONSE: Undisputed**.

16. Multi-shot firearms were not common, ordinary, or found in general circulation during the Colonial and Founding eras. Spitzer Rpt. ¶ 30. Repeating firearms did not pose a threat to public safety in 1791. DeLay Rpt. ¶ 49.

**RESPONSE: Undisputed**.

17. Repeating arms were experimental, flawed curiosities at the times of the Founding and ratification of the Fourteenth Amendment, and were rare in the United States during those eras. DeLay Rpt. ¶¶ 5, 8, 13, 51. No repeating firearm achieved military or commercial significance before the 19th Century. DeLay Rpt. ¶¶ 8, 14.

**RESPONSE: Disputed**. Hlebinsky Dec. para. 30-46.

18. 18th Century repeaters were unreliable and prone to misfiring.  DeLay Rpt. ¶ 14.

**RESPONSE: Disputed**. Hlebinsky Dec. para. 30-46.

19. Early repeaters that used the superposed firing method were slow to load and could explode in the user's hands if the sequencing between rounds was off. They also produced clouds of white smoke from the gunpowder when fired. DeLay Rpt. ¶ 15.

**RESPONSE: Disputed**. Hlebinsky Dec. para. 30-46.

20. The Puckle gun, an 18th Century repeater, was a military weapon, was not a self-loading or hand-held firearm, and was not manufactured for commercial sale. Spitzer Rpt. ¶¶ 31-32; DeLay Rpt. ¶ 16.

**RESPONSE: Disputed**. Hlebinsky Dec. para. 30-46.

21. The 18th Century Belton repeater was neither proven feasible nor produced for distribution.  It used the superposed firing method. Spitzer Rpt. ¶¶ 33-34; DeLay Rpt. ¶ 24.

**RESPONSE**: **Disputed**. Hlebinsky Dec. para. 30-46.

22. Only a few hundred of the 19th Century Jennings multi-shot rifle were manufactured. This gun used the superposed firing method.  Spitzer Rpt. ¶ 35; DeLay Rpt. ¶ 53.

**RESPONSE: Disputed**. Hlebinsky Dec. para. 30-46.

23. The 18th Century Girandoni air rifle required 1500 strokes to restore power after its reservoirs were empty, making it impractical for civilian use.  These air guns were complex and expensive to make and repair, and therefore were rare in 18th and early 19th Century America.  Spitzer Rpt. ¶ 36; DeLay Rpt. ¶¶ 28-29, 32; Cornell Rpt. at 28. Indeed, the Austrian military, one of the few armed forces to purchase this weapon, quickly abandoned it. Cornell Rpt. at 28.

**RESPONSE: Disputed**. Hlebinsky Dec. para. 30-46. And it came with multiple reservoirs.

24. The repeating pistols produced by the Volcanic Repeating Arms Company in the 19th Century were few, flawed, and experimental.  Spitzer Rpt. ¶ 37.

**RESPONSE** **Disputed**. Hlebinsky Dec. para. 30-46.

25. The guns advertised by Samuel Miller and James Pim in the early 1700s were not offered for sale, used for self-defense, or employed in combat.  DeLay Rpt. ¶ 20.

**RESPONSE: Undisputed**.

26. The gun advertised by John Cookson in the early 1700s was for a single weapon. There is no evidence that Cookson continued to make or sell that firearm. DeLay Rpt. ¶ 21.

**RESPONSE: Undisputed.**

27. The Continental Congress cancelled its order for 100 of Joseph Belton's gun in the 1770s.  There is no evidence that Belton ever produced that gun in quantity.  DeLay Rpt. ¶ 23-24; Spitzer Rpt. ¶ 33-34.

**RESPONSE: Undisputed.**

28. The U.S. Navy purchased several hundred Chambers repeaters, which utilized the superposed load technology, but there is no evidence that the guns were put to use or produced for commercial sale. DeLay Rpt. ¶ 52.

**RESPONSE: Undisputed.**

29. The market for firearms in early America shared very few features with the contemporary world of firearms commerce. Cornell Rpt. at 22.

**RESPONSE: Disputed. Vague. See generally Hlebinsky Dec discussing incremental history of firearms development**

30. In the early 1800s, the government took an active role in encouraging the manufacture of arms, and it had a vested interest in what types of weapons would be produced. The American firearms industry, then in its infancy, was thus largely dependent on government contracts and subsidies. Cornell Rpt. at 20.

**RESPONSE: Disputed as to dependency. See Hlebinsky Dec re history of firearms development.**

31. Early American firearms production in the era of the Second Amendment was dominated by artisan production, while local gun smiths—not big box stores

like Walmart—sold most firearms. Most households, apart from the wealthiest ones, could not afford to own multiple weapons. Cornell Rpt. at 22.

**RESPONSE: Undisputed.**

32. The vast majority of the repeating pistols that entered the market in the 1830s (i.e., pepperbox pistols and revolvers) held seven or fewer rounds.  Only three 19th Century revolvers had greater than ten-round capacity, and only a few hundred of those were produced.  DeLay Rpt. ¶ 58.

**RESPONSE: Undisputed.**

33. Mid-19th Century repeating pistols had to be manually reloaded when empty.  It could take at least one minute to complete the reloading process.  DeLay Rpt. ¶ 59.  This limited the damage a single shooter could inflict on a group of people.  DeLay Rpt. ¶ 69.

**RESPONSE: Undisputed.**

34. The Colt revolver was designed as a six-shot weapon and did not circulate widely in society until after the Civil War.  Spitzer Rpt. ¶ 41.

**RESPONSE: Undisputed.**

35. The Henry and Winchester repeating firearms were the only reliable firearms that could fire more than ten rounds in the years surrounding the ratification of the Fourteenth Amendment.  DeLay Rpt. ¶ 64.  Most of those weapons produced between 1861 and 1871 were purchased by the military or exported abroad.  DeLay Rpt. ¶ 65; Spitzer Rpt. ¶ 42.  Overall, large-capacity firearms constituted less than 0.02% of all firearms in the United States as late as 1872.  Vannella Decl. Ex. 12, Correction to Rebuttal Report of Professor Brian DeLay ¶¶ 1-2.

**RESPONSE: Disputed. See Hlebinsky Dec, para. 30-46.**

36. The Winchester firearms in the last third of the 19th Century were fixed magazine, lever-action rifles that required the shooter to manipulate a lever in a forward-and-back motion before each shot in order to eject a spent casing and chamber a new round.  When the magazine was empty, it had to be manually reloaded round by round. Spitzer Rpt. ¶ 42; DeLay Rpt. ¶¶ 69, 75.

**RESPONSE: Undisputed.**

37. Both automatic and semi-automatic weapons use energy released by the first round fired to load the next round into the firing chamber. Both are capable of firing numerous rounds without reloading, potentially with the use of detachable ammunition magazines or similar feeding devices. Spitzer Rpt. ¶¶ 21, 23; DeLay Rpt. ¶ 75. Automatic arms continue to fire as long as the trigger is depressed, while semiautomatic arms require the shooter to squeeze the trigger for each round fired. DeLay Rpt. ¶ 76.

**RESPONSE: Undisputed.**

38. Detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century. These drastically accelerated the process to load and reload a firearm by making it possible to load an entire magazine at once, rather than bullet-by-bullet. DeLay Rpt. ¶ 79.

**RESPONSE: Disputed. See Hlebinsky Dec, para. 30-46.**

39. Semi- and fully automatic firearm technology was developed in the 1880s and did not become reliable or widely available until the beginning of the 20th Century. The primary market was the military. Spitzer Rpt. ¶ 38; DeLay Rpt. ¶¶ 6; 76. When this dramatic technological change provoked unprecedented social concern, it led to a wave of regulatory legislation across the country. DeLay Rpt. ¶ 6.

**RESPONSE: Disputed. Plaintffs.Br.16-28. And there were not any bans like NJ has imposed.**

40. The firearms and firearm feeding devices regulated in the early 20th Century, unlike those from previous centuries, were capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices. Spitzer Rpt. ¶ 29.

**RESPONSE: Disputed. See Hlebinsky Dec, para. 30-46.**

41. Early precursors to modern semi-automatic and automatic firearms were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus due to their large size and weight, such as the Gatling gun. Because their use and suitability were limited to military settings, there was no need to regulate these weapons among the civilian population. Spitzer Rpt. ¶ 5.

**RESPONSE: Disputed as overbroad. All early handguns and rifles were precursors to small arms used in combat in the modern era. See generally Hlebinky Dec.**

42. Fully automatic machine guns, capable of firing all of their rounds from a single barrel and with a single trigger pull, were developed during World War I. These weapons, such as the Thompson submachine gun ("Tommy gun") and Browning Automatic Rifle ("BAR"), were developed as military weapons but were made available to civilians after the war.  It was not until the early 1920s that these hand-held, fully automatic weapons operated reliably, were available to civilians, and began to circulate in society.  Spitzer Rpt. ¶¶ 5, 6, 8; DeLay Rpt. ¶ 81.\

**RESPONSE: Undisputed.**

43. After 1930, commercial sales of the Tommy gun were discontinued except to the military and law enforcement due to concerns about criminal use of the firearm.  Spitzer Rpt. ¶ 7.

**RESPONSE: Undisputed**

**History and Development of Assault Rifles and LCMs**

44. Rapid-fire semiautomatic weapons that accept magazines capable of holding more than 10 rounds, such as the AR-15, are derived from technologies developed for military use. Roth Rpt. ¶¶ 58-59.  Many of the assault weapons available for purchase by the public are near identical copies of military firearms, save for the lack of select fire capability.  Yurgealitis Rpt. ¶ 112. The only difference between the Colt-produced military and civilian versions of the AR-15 / M-16 was removal of select fire capability and relocation of assembly/ disassembly pins in the lower receiver as stated previously. Yurgealitis Rpt. ¶ 72.

**RESPONSE:  Disputed. See Hlebinsky Dec, para. 30-46. Objection as to inflammatory characterizations.**

45. The first "assault rifle" or "assault weapon," which arose during World War II, was the German StG 44. The features of the German StG 44 were intended, in part, to increase the effectiveness of the individual soldier by enabling more rapid fire, increasing the amount of ammunition an individual combatant could carry, and allowing more rapid re-loading. Yurgealitis Rpt. ¶¶ 40-44. These features were also utilized in the German MP40, and by the United States's M3 "Greasegun" in in World War II.  Yurgealitis Rpt. ¶¶ 64-65. Many of these features were also utilized in the design and manufacture of mid-20th Century submachine guns. Yurgealitis Rpt. ¶ 64.

**RESPONSE**: Disputed to the extent the use of the term "Assault rifle" or "assault weapon" is intended to match the NJ statute. Nothing the record supports this.

46. In 1947, after the end of World War II, the USSR developed what one firearm expert and historian termed "the quintessential assault rifle – the Kalashnikov designed AK-47." The AK-47 adopted several features from the German StG 44. Yurgealitis Rpt. ¶¶ 50-51.

**RESPONSE**: Disputed to the extent the use of the term "Assault rifle" or "assault weapon" is intended to match the NJ statute. Nothing the record supports this.

47. Other countries followed suit and developed military rifles that incorporated these same features to some extent. Yurgealitis Rpt. ¶ 52. In the United States, for instance, Eugene Stoner developed a number of lightweight assault rifle designs that resulted in the AR-10 (.308 caliber) with features that are now commonplace in the standard assault rifle design: light weight, separate pistol grip and shoulder stock, foregrip/barrel shroud, detachable magazine, and numerous lash hider/muzzle brake variations. Yurgealitis Rpt. ¶ 55.

**RESPONSE**: Disputed to the extent the use of the term "Assault rifle" or "assault weapon" is intended to match the NJ statute. Nothing the record supports this.

48. In 1961, the United States Department of Defense purchased a quantity of AR-15 rifles, which followed the original AR-10.  The Department tested those AR-15 rifles in Vietnam and issued a report summarizing their field evaluation. Comments in that report describe "catastrophic injuries" to combatants shot by AR-15 rifles, including "severing of limbs and decapitation." Yurgealitis Rpt. ¶ 56. By the mid 1960's, the U.S. Army adopted the AR-15 as standard issue and renamed the M-16. Yurgealitis Rpt. ¶¶ 56-57.

**RESPONSE**: Disputed. Noting in the record supports any claim that this "AR-15" is the same as the AR-15 pattern rifle in use today by civilians.  The former was capable of automatic fire. The latter is not.  See Kapelsohn Dec. para. 30-31.

49. In the 1950's and 1960's, assault rifles proliferated and civilian version of these weapons were developed. These civilian versions, including the Colt AR-15, retained the performance capacities of the military weapons off which they were based, including the effective range, muzzle velocity, and semiautomatic range of fire. Their "basic configuration, appearance, construction and operation" remained "unchanged." Yurgealitis Rpt. ¶¶ 71-73.

**RESPONSE: Disputed. See Kapelsohn Dec. para. 30-31.**

50. These civilian versions also retained the capability to accommodate large-capacity magazines of more than ten rounds. Yurgealitis Rpt. ¶ 73.

**RESPONSE: Undisputed except as to inflammatory term "large capacity magazine." Kapelsohn Dec. para 32**

51. Over time, these weapons have remained largely consistent. For instance, there are multiple internal parts that are completely interchangeable between military weapons that Colt manufactured in the 1960's and an AR-15 today. Yurgealitis Rpt. ¶ 74. The same goes for internal AK operating parts and assemblies. Yurgealitis Rpt. ¶ 81.

**RESPONSE: Undisputed.**

52. The term "assault weapon" entered common use in the firearms community as early as 1986, as the below "Gun Digest Book of Assault Weapons," published that year, demonstrates:



Yurgealitis Rpt. ¶ 85.

**RESPONSE**: Disputed. Assault weapon bans are symbolic measures designed to get politicians into the media to promote the image that they are doing something. Prior to 1989, the term "assault weapon" did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of "assault rifles" so as to allow an attack on as many additional firearms as possible on the basis of undefined "evil" appearance.[23] In drafting the AWCA, then, California legislators tried to give technical meaning to a formless concept where none had existed before. An early, non-politicized definition developed by the Federal Bureau of Alcohol, Tobacco, and Firearms (BATF) emphasizes the nature of the problem. After defining a true "assault weapon" as a machine gun capable of fully-automatic fire,[24] the BATF proposed the following definition:

> **Assault Weapon Derived Semi-Auto** - a firearm cosmetically similar to an Assault Weapon, but incorporating entirely different receiver and internal components, designed in cooperation with BATF, not to be convertible to full-auto, rendering the firearm capable of semi-auto fire only, it is functionally identical to commercial semi-auto hunting rifles, target rifles and shotguns and may incorporate a detachable box magazine[,] bayonet lug and pistol grip/folding type stock ….[25]

> **The key elements of this definition are looks or style ("cosmetically similar"), the absence of a rational difference from "good" guns ("functionally identical"), and the availability of non-functional accessories ("detachable box magazine" etc.)."[26] Since determinations of similar appearances or style vary from person to person, the political nature of the concept and its ambiguity were exposed early.[27]**
>
> **Bruce H. Kobayashi & Joseph E. Olson,** *In Re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons",* **8 Stan. L. & Pol'y Rev. 41, 43 (1997).**

53. The terms "assault weapon" and "assault rifle" originated in the firearms industry marketing in the 1980s. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public. Spitzer Rpt. ¶¶ 50-51.

**RESPONSE: Disputed.** *Id.*

54. The firearms industry has also promoted the similarities between semi-automatic versions of their full/select battle rifles for marketing purposes, as well as conversion capabilities with features like grenade launchers, as the below advertisement demonstrates:





Yurgealitis Rpt. ¶ 88.

**RESPONSE: Disputed. The citation does not support the claim.**

55. In 1990, following the passage of Federal and numerous State local Assault Weapon Bans, the firearm industry began to use the moniker "Modern Sporting Rifle" to describe semi-automatic variants of the fully automatic/select fire M-16. Yurgealitis Rpt. ¶ 90.

**RESPONSE: Disputed. There was no Federal Assault weapon ban in 1990.**

**In 2009, the term "modern sporting rifle" was coined by the <u>National Shooting Sports Foundation</u> for its survey that year as a marketing term used by the firearms industry to describe <u>modular</u> semi-automatic rifles including AR-15s.[23][4][24][12]**

**https://en.wikipedia.org/wiki/AR-15%E2%80%93style_rifle#cite_note-NSSF-MSR-12**

14

56. The lineage and refinement of large capacity detachable magazines and belt feeding mechanisms can be traced directly to a military heritage. Development and refinement of large capacity feeding devices for machine guns gained increased importance with the advent of World War I. Yurgealitis Rpt. ¶ 91.

**RESPONSE: Disputed. LCM means whatever number the state says it does. And magazine capacity has been increasing steadily since firearms came into existence.  The detachable magazine was patented as early as  1859. See pages 72-73.**
**https://books.google.com/books?id=c1wWAAAAYAAJ&pg=PA72#v=onepage&q&f=false**

See also Hlebinky Dec para. 30-46

57. The ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat, which is a feature of design intended for military use.  Yurgealitis Rpt. ¶ 110.

**RESPONSE: Disputed. The citation does not exclude usefulness in self-defense. See also Kapelsohn Dec. para. 35.; Kapelsohn Rebuttal Report at 9-16.**

58. After World War I, a number of advancements in arms technology and design facilitated practical semi-automatic rifles for standard issue. In World War II, U.S. Forces where issued a rifle with eight-round internal magazine (the Springfield Armory M-1 "Garand" rifle). The United States also deployed a .30 caliber M-1 with a fifteen-round detachable box magazine that was issued to support personnel behind the front lines. Yurgealitis Rpt. ¶ 95.

**Response: Undisputed**.

59. When the AR-15 (later the M-16) was issued to U.S. Forces in the 1960's, it was issued with twenty-round detachable magazines. Yurgealitis Rpt. ¶ 96.

**RESPONSE: Undisputed.**

60. When the first semi-automatic variant became available for sale to the public in 1964, it only came with two five-round magazines. Yurgealitis Rpt. ¶ 97. This remained the case as late as 1987. Yurgealitis Rpt. ¶ 99.

15

**RESPONSE:   Disputed. The citation does not support the claim.  See also Kapelsohn Dec.**

61. Even as development of semi-automatic pistols continued after World War II, magazine capacities generally remained under ten rounds. Yurgealitis Rpt. ¶ 100.

**RESPONSE: Disputed as the claim has no time frame.**

62. By the late 1980's, numerous domestic and foreign manufacturers began developing and offering numerous semi-automatic models with magazine capacities equaling or exceeding fifteen rounds. Yurgealitis Rpt. ¶ 101-102.

**RESPONSE: Undisputed.**

63. In 1994 Congress adopted the Federal Assault Weapons Ban, which limited the maximum capacity of a detachable magazine to ten rounds. Numerous firearm and aftermarket magazine manufacturers, in turn, initiated production of "post ban" magazines to confirm to the new legislation. Magazines with a capacity of over ten rounds were termed "Large Capacity Magazines." Yurgealitis Rpt. ¶ 103.

**RESPONSE: Disputed as to terminology.  Citation is misleading and does not support the claim.**

64. "Post ban" magazines were modified versions of existing large-capacity magazines to keep their dimensions identical and ensure that ten-round magazines functioned identically to "large capacity magazines." Yurgealitis Rpt. ¶ 103.

**RESPONSE: Undisputed except same objection as to terminology.**

65. Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation that also contained magazine-capacity limitations. In turn, many semi-automatic handgun manufacturers and rifles continued to offer "state compliant" versions to customers in affected states. Yurgealitis Rpt. ¶ 105.

**RESPONSE: Undisputed except as to term "numerous" which is inflammatory and unsupported.**

66. Many aftermarket manufacturers, including Mec-Gar and ProMag, offer ten-round magazines specifically for use in handguns that come with large-capacity magazines. Yurgealitis Rpt. ¶ 109.

**RESPONSE:** *Id.*

## Assault Weapons and LCMs' Lethality

67. Assault firearms are not designed for traditional hunting purposes.  Rather, the .223 caliber / 5.56 mm bullets fired from AR type rifles and pistols cause considerable tissue damage to their targets and are therefore counterintuitive choices for hunting.  Yurgealitis Rpt. ¶ 153.

**RESPONSE:   Disputed. They come in all different types of calibers, which is why the statute does not determine what an assault firearm is by caliber. And the .223 round is very popular for varmint hunting, according to Field and Stream Magazine:**

**"Though it will never reign as the best all-around varmint cartridge, it will very likely always be the most popular. Professional guide Mark Mackenzie considers the .223 Remington the best varmint cartridge you can buy." https://www.fieldandstream.com/10-best-varmint-cartridges-in-world/**

**See also Kapelsohn Rebuttal Report at 9-10.**

68. Assault firearms banned under New Jersey law were designed for military use, effective at battlefield ranges of up to 500 yards, and the design purpose of the .223 caliber bullet used in the AR-16 / M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet. Yurgealitis Rpt. ¶ 137.

**RESPONSE:  Disputed. See Kapelsohn Dec at 31.**

69.The AR-15 has approximately the same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute. Delay Rpt. ¶ 58.

**RESPONSE: Disputed. It is irrational to single out semiautomatic rifles for prohibition based on rate of fire, given that semiautomatic handguns are plainly constitutionally protected.*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)**

70. More than 45,000 individuals die each year from gun-related injuries in the United States. Rpt. Of Dr. Stephen Hargarten ¶ 11.  Those who survive suffer from serious complications, lifelong disabilities, and psychological trauma. Hartarten Rpt. ¶¶ 11, 36.

RESPONSE:  **Disputed:**

**In 2021, 54% of all gun-related deaths in the U.S. were suicides (26,328), while 43% were murders (20,958), according to the CDC. The remaining gun deaths that year were accidental (549), involved law enforcement (537) or had undetermined circumstances (458).**

**https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/**

**Rifles only account for about 2% of homicide deaths from 2010-2014 according to the FBI's uniform Crime Report. One is multiple times more likely to die by knives, a beating without a weapon, or other blunt objects. https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/expanded-homicide-data/expanded_homicide_data_table_8_murder_victims_by_weapon_2010-2014.xls**

71. The AR-15 was designed to chamber and fire a 5.56 x 45 mm cartridge. Yurgealitis Rpt. ¶ 55. This cartridge has a muzzle velocity of approximately 3200 feet per second, which is almost three times greater than the muzzle velocity of a 9mm pistol. Yurgealitis Rpt. ¶ 58. This velocity is sufficient to penetrate the soft body armor (Level II or Level IIIA) that most officers are issued. Yurgealitis Rpt. ¶ 6.

**RESPONSE:  Disputed. Dr. Martin Fackler, military trauma surgeon, former director of the Army's Wound Ballistics Laboratory, and the most widely-recognized modern expert on the subject, observed that "[p]robably no scientific field contains more misinformation than wound ballistics."**

A firearm bullet is propelled by the expanding gas from a gunpowder explosion. Other things being equal, a bullet fired from a longer barrel will have higher velocity than a bullet fired from a shorter barrel. For example, a bullet that travels through a 16 inch rifle barrel will spend about four times longer being propelled by the expanding gas than will a bullet that travels through a 4 inch handgun barrel.

Bullets from AR rifles, like bullets from most other modern rifles, typically have about <u>three times</u> the muzzle velocity of common handgun bullets. Muzzle velocity is measured at the moment the barrel exits the bullet; as the bullet travels downrange, velocity declines due to air friction.

<u>More velocity</u> does not necessarily mean <u>greater wound severity</u>—a ping-pong ball and a bullet fired at the same muzzle velocity will produce very different effects on the target (*terminal results*).

https://reason.com/volokh/2023/02/27/how-powerful-are-ar-rifles

72.  Once a 5.56mm bullet connects with tissue, it will "yaw"—rotate on its axis—creating temporary and permanent large wound cavities. Handgun bullets, by contrast, because they are heavier and travel at a lower velocity, do not typically "yaw" and do not create as large a wound cavity. Yurgealitis Rpt. ¶58. In part because of the significant damage that 5.56mm bullets create upon impact with living tissue, they are generally not favored as a hunting cartridge. Yurgealitis Rpt. ¶62.

**<u>RESPONSE</u>: Disputed**. This depends on the ammunition. The Military uses 5.56 Full Metal Jacket rounds. This is because you have to clean the barrel more with unjacketed bullets, and soldiers do not have time to do that on the battlefield. There are many types of ammunition on the market that are designed not to do that.

And the statement is categorically untrue. Dr. Fackler found that about 85% of military 5.56mm FMJ bullets travel point-forward at least <u>five inches</u> before beginning to yaw. The straighter the bullet hits the target, the <u>longer</u> it will take to yaw after it strikes. Thus, a nondeforming full metal jacket rifle bullet can pass <u>completely</u> <u>through</u> a human target without yawing or fragmenting, leaving a small wound channel and relatively mild injury unless it strikes a vital organ, bone, or other critical structure.

https://reason.com/volokh/2023/02/27/how-powerful-are-ar-rifles/.

See also Figure 4 showing the difference between jacketed and unjacketed bullets upon impact. http://www.gwicu.com/Assets/Articles/Ballistics.pdf.

This is wrong. They are a favored hunting cartridge for varmint. It is not a favored cartridge for deer because it is not powerful enough:

How many policemen know that the .223 is a varmint rifle? -designed for shooting woodchucks and prairie dogs. It was never intended for shooting human being-sized targets. It is wisely prohibited for shooting deer (basically a human-being-sized target) in most states. Yet shotguns, using buckshot or slugs, are used to shoot thousands of deer annually. A pretty good grasp of a given police or military projectile's disruptive capacity can be gained by simply looking at the size of the animals which are routinely hunted with the civilian version of the projectile.

Journal of the International Wound Ballistic Association at 6, Vol 5 Issue 2 (Fall 2001).

http://thinlineweapons.com/IWBA/2001-Vol5No2.pdf.

Some states ban the use of .223 caliber rifles when hunting deer and other animals larger than varmints because their rounds lack sufficient power. The ethos of hunting is to take an animal with a single fatal shot. In the views of some state game commissions, the usual AR calibers of .223 and 5.56mm are too weak; at least a .270 is required for hunting deer, antelope, or anything larger.

https://reason.com/volokh/2023/02/27/how-powerful-are-ar-rifles/

73. A bullet damages a body by transferring kinetic energy to the target. Increases in the mass, velocity, and surface area of a bullet each increase the energy delivered to a target. Hargarten Rpt. ¶ 12.

**RESPONSE: Undisputed.**

74. A study by Hargarten 2022 showed that assault weapons can release more kinetic energy per minute than other kinds of firearms. Hargarten Rpt. ¶ 13. For instance, assault weapons release approximately three times more energy than a Thompson Machine Gun bullet, between four to nineteen times more energy than handguns, depending on the caliber, and ten times more energy than a musket. And

the energy release can increase if the bullet fragments upon impact. Hargarten Rpt. ¶ 25; *see also id*. Ex. B.

**RESPONSE: Disputed.  The citation has nothing to do with the NJ definition of assault firearm.**

75. In the Hargarten 2022 study, the size of the temporary cavity that assault-weapon bullets cause was significantly larger than what the Thompson Machine gun, handguns, and muskets cause. Hargarten Rpt. ¶¶ 13, 26; *see also id*. Ex. B.  The AR-15 style bullet, with its kinetic energy release and its greater permanent and temporary cavities is more destructive than those fired by the Thompson Machine gun rifle and handguns.  Hargarten Rpt. ¶ 28.

**RESPONSE:  Disputed. There is no AR-15 style bullet. And a lot of this depends on the cartridge and barrel length**.

76. Assault weapons can cause extreme damage to the tissue and organs of shooting victims, leading to high fatality and complication rates in victims. Hargarten Rpt. ¶¶ 13, 32.

**RESPONSE: Disputed. This is all dependent on the type of bullet, and is no different than any other firearm.**

77.Assault weapons are also more likely to cause significant damage to bones, the skeletal structure, and critical solid organs like the liver and spleen. Damage to these organs, in turn, increases the risk of catastrophic bleeding. Hargarten Rpt. ¶ 32.

**RESPONSE: Disputed. This also depends on the cartridge and is no different than any other firearm.**

78. Assault weapons cause added damage when there are multiple bullet wounds. In this case, a victim's wounds are more complex, carry a higher likelihood of injury requiring surgical intervention, and increase the likelihood of death at the scene or upon arrival at an emergency department. Hargarten Rpt. ¶ 34.

**RESPONSE: Disputed.**

**There have been numerous reports that the military's 5.56 FMJ round has insufficient terminal effectiveness in combat. Combat veteran and military small arms expert Jim Schatz <u>explains</u>, "The disturbing failure of the 5.56x45mm caliber to consistently offer adequate incapacitation has been known for nearly 20 years." He <u>describes</u> one Special Forces (SF) mission in**

Afghanistan when an insurgent was shot seven or eight times in the torso with the 5.56 round, got back up, climbed over a wall, and reengaged other SF soldiers, killing a SF medic. The insurgent then was shot another six-to-eight times from about 20-30 yards before finally being killed by a SF soldier with a handgun.

Similarly, <u>Rob Maylor</u>, a former Australian SAS sniper, has "on several occasions witnessed bad guys being hit multiple times by 5.56mm . . . at varying ranges and then continue[] to fight." He explains that while the 5.56 round is designed to yaw and fragment, "[t]his isn't happening all the time and as a result projectiles are passing through the body with minimal damage."

Mark Bowden's bestselling book <u>*Black Hawk Down*</u> gives vivid accounts of less-than-lethal performance of the Army's green-tip 5.56mm bullet (M855) in the Battle of Mogadishu in 1993. He describes one Delta operator's rounds as passing right through his targets. When the Sammies were close enough he could see when he hit them. . . . [I]t was like sticking somebody with an ice pick. The bullet made a small, clean hole, and unless hit happened to hit the heart or spine, it wasn't enough to stop a man in his tracks. [The operator] felt like he had to hit a guy five or six times just to get his attention.

These instances are consistent with Dr. Fackler's own findings. He <u>recounts</u> that [i]n 1980, I treated a soldier shot accidentally with an M16 M193 bullet from a distance of about ten feet. The bullet entered his left thigh and traveled obliquely upward. It exited after passing through about 11 inches of muscle. The man walked into my clinic with no limp whatsoever: the entrance and exit holes were about 4mm across, and punctate. X-ray films showed intact bones, no bullet fragments, and no evidence of significant tissue disruption caused by the bullet's temporary cavity. The bullet path passed well lateral to the femoral vessels. He was back on duty in a few days. Devastating? Hardly.

Dr. Fackler further <u>notes</u> that "[i]n my experience and research, at least as many M16 users in Vietnam concluded that [the 5.56mm] produced unacceptably minimal, rather than 'massive,' wounds."

Like any firearm, the AR rifle in typical calibers such as .223/5.56mm, can cause serious or lethal wounds, and so can other rifles, shotguns, and handguns. <u>Wound profiles</u> from the Army's Wound Ballistics Laboratory illustrate the permanent and temporary cavities, penetration depth,

deformation, and fragmentation of both the deforming (soft-point) .223 caliber bullet, the non-deforming 5.56mm FMJ bullet, and other larger caliber bullets typically used in hunting rifles (e.g., .30-30, .308). A comparison of those profiles shows that the wounding effects of the larger caliber bullets are at least as extensive as the .223/5.56, and typically more so.

https://reason.com/volokh/2023/02/27/how-powerful-are-ar-rifles/

79.  Large capacity magazines increase this destructive potential by increasing the number of rounds someone can fire without having to reload, thereby increasing the number of bullets that can be fired during a given time period.  Hargarten Rpt. ¶ 30.

**RESPONSE: Disputed. Criminals can carry more magazines. See also Kapelsohn Dec and Rebuttal report.**

80. Assault weapons are even more likely to cause serious injury or death for children due to children's smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves. Hargarten Rpt. ¶ 36.

**RESPONSE: Disputed. This is no different than any other firearm**

Thirty-three years ago, Dr. Fackler described how media accounts embellished the injuries suffered by five children murdered in the 1989 elementary school shooting in Stockton, California, one of the first modern mass shootings; the crime created the national "assault weapon" controversy. Dr. Fackler did ballistics testing on the ammunition used in the criminal's semiautomatic AKM-56S rifle, whose rounds are larger than the .223/5.56mm rounds that are most often used in ARs. Dr. Fackler also reviewed the autopsies of the children killed. He explained:

Much of the media coverage generated by the Stockton shooting has contained misstatements and exaggerations. The myth of "shock waves" resounding from these "high velocity" bullets "pulverizing bones and exploding organs" (even if they were not hit by the bullet) "like a bomb" going off in the body was repeated by the media, in certain cases even after they were furnished solid evidence that disproved these absurdities. None of the autopsies showed damage beyond the projectile path. One "expert" was quoted as stating that the death rate from "assault weapons . . . approaches 50[%]." Another, reporting on the effects of "high speed" bullets, stated that "most of those hit in an extremity will end up with amputations. If you're hit in the trunk, it becomes a lethal injury. . ." In the Stockton schoolyard, the

**death rate was 14% and none of the [wounded] victims died later or required extremity amputation.**

**https://reason.com/volokh/2023/02/27/how-powerful-are-ar-rifles/**

81. In the Sandy Hook Elementary School shooting, not one child wounded by an assault-weapon bullet ultimately survived. Hargarten Rpt. ¶ 36.

**RESPONSE: Undisputed.**

**History of Firearms Regulations**

82. Weapons regulations in the United States have historically followed the same series of steps: First, a new gun or gun technology is invented. Second, it may then be patented. Third, it is often developed with a focus on military applications and needs, not directly for civilian acquisition or use. Fourth, some military-designed weapons may spread to, or be adapted to, civilian markets and use. Finally, if such weapons circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, the government may implement gun policy/law changes.  Spitzer Rpt. ¶¶ 27, 47.

**RESPONSE: Disputed. See Hlebinsky Dec. para 20-27 and generally.**

83. The general progression of firearms regulation follow a general patter. New gun regulations are not enacted at the time that firearm technologies are invented or conceived.  Rather, they are enacted when those technologies circulate sufficiently in society to present a public safety concern.  Spitzer Rpt. ¶ 27.

**RESPONSE: Disputed. Or the Second Amendment forbids the governments from banning commonly owned firearms.**

84. There were few restrictions on firearms from the colonial period to the start of the Revolution because homicide rates were low. When homicides did occur, guns were seldom used, largely due to the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy.  Spitzer Rpt. ¶ 78.; Roth Rpt. ¶¶ 16-17.

**RESPONSE: Disputed. This is pure speculation**.

24

85. In the 1800's, states and cities enacted regulations on every aspect of the manufacture, sale, and storage of gunpowder due to the substance's dangerous potential to detonate if exposed to fire or heat. Cornell Rpt. at 30. Indeed, early American governments recognized the danger posed by gunpowder and multiple states passed laws delegating authority to local governments to regulate the sale of gunpowder for public safety. Cornell Rpt. at 31.

**RESPONSE:  Disputed. These were fire safety regulations.**

86. Specific crime-related concerns that involved dangerous weapons led to legislative enactments in the late 1700s and early 1800s.  Between 1780 and 1809, at least four states enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed, at least three states enacted laws to punish the discharge of firearms near populated areas, and at least four states criminalized public arms carrying.  Spitzer Rpt. ¶ 59.

**RESPONSE:  Disputed. These show that they didn't ban guns, then punished people who abused their gun rights.**

87. As early as 1771, New Jersey and other states banned or heavily regulated trap guns, which were often used to defend the user's property but posed a public safety problem because they sometimes killed or hurt innocent people.  At least 18 states enacted anti-trap gun laws between the 1700s and early 1900s.  Spitzer Rpt. ¶¶ 79-82 & Exs. B, F.

**RESPONSE:  Disputed. What the State does not admit or seem to recognize is that "trap guns" are not guns at all. They are a method by which a gun, any gun, can be set up to fire indiscriminately through the use of springs, strings, or other atypical triggering mechanism without needing an operator. Nonetheless, absent from our history is a tradition of trap gun restrictions in the important years between the 1791 and 1868. The 1771 New Jersey trap gun law, upon which the State relies, predates the Declaration of Independence, New Jersey statehood,[218] and the Second Amendment. Ninety-five years passed before a second restriction on trap gun was enacted and that one applied only to the Utah Territory (1865). [80]. Within the states, the first regulation on setting a trap gun, was enacted in Minnesota in 1873. [109]. Two states followed later in 1875 (Michigan) and 1884 (Vermont). In other words, trap guns were not prohibited by law in the District of Columbia or 36 of the 37 states (then existing), until 1873. California did not enact its own trap gun law until 1957.[219] Court decisions between 1791 and 1868 recognized that it**

**was entirely lawful to use trap guns (or spring guns, as they were sometimes called) to defend one's property.[220] If this is what a national tradition of trap gun regulation looks like, it is a strange look, indeed**.

**\*34 Claiming trap guns were "dangerous weapons commonly used for criminal behavior and not for self-defense,"[221] the State has a problem with the facts. There is little historical evidence that trap guns were used for criminal behavior. Rather, guns were set as traps by common people to protect their property from thieves and sometimes for self-defense against burglars. Perhaps just as often trap guns were used to hunt game. Historian and expert witness for the State, Robert Spitzer opines about trap guns: (1) "[t]hose who set gun traps typically did so to defend their places of business, properties, or possessions;" and (2) "opinion was more divided ... with some arguing that thieves or criminals hurt or killed by the devices had it coming."[222] So, when the State claims trap guns were used by criminals and not for self-defense, it gets the facts backwards. The how and why of the two types of regulations are not relevantly similar, thus trap gun laws are not useful analogues for prohibiting modern magazines.**

**Duncan v. Bonta, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*33–34 (S.D. Cal. Sept. 22, 2023)**

88. In the 18th and 19th Centuries, every state in the nation had laws restricting dangerous weapons such as clubs, knives, slungshots, bludgeons, sandbags, and pistols, which were widely used for criminal purposes.  Spitzer Rpt. ¶¶ 70-74, 76-77 & Ex. C.

**RESPONSE:  Disputed. As detailed in a pair of previous posts, the mainstream historical tradition for controversial arms such Bowie knives and slungshots was to forbid concealed carry, to restrict sales to minors (especially without parental consent), or to impose extra punishment for misuse. But not to prohibit possession or sales for adults. *See* the previous Volokh Conspiracy posts supra , The legal history of bans on firearms and Bowie knives before 1900 and Bowie knife statutes 1837-1899**

89.In the 1800s, the government started to regulate the firearms industry to prevent sub-standard weapons from being sold, as well as from military weapons being diverted from the militia. Cornell Rpt. at 20.

**RESPONSE:  Disputed. This was done to ensure that the firearm would perform. In Cornell's own words:**

**The law detailed the manner in which these inspections were to be conducted, which included testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance.**

90. Starting in the 1830's, most, if not all, states in the country enacted laws that barred or restricted the carrying or possession of Bowie knives, which were intended for combat and became associated with criminal use and dueling.  Spitzer Rpt. ¶¶ 61, 67; *see also id.* Ex. H.

**RESPONSE: Disputed. *Heller* did not mention knife laws at all in evaluating the District of Columbia's handgun ban. And the Supreme Court's plurality did not mention bowie knives in evaluating Chicago's handgun ban, except as an example of Reconstruction-era efforts to disarm African-Americans.[214] This is not to say that bowie knives are not "arms" imbued with Second Amendment protection.[215] Historical knife laws would be relevant in evaluating a modern prohibition on knives. It is simply to say that historical *firearm* regulations are obviously more likely to be relevant analogues for modern *firearm* restrictions.**

**Even if knife regulations were relevant, they would not help the State much.[216] There were laws restricting bowie knives in some states in the 1800's, but not the vast majority of states. There is also little evidence of actual prosecutions for simply possessing a bowie knife, much less a judicial opinion on constitutionality. One court observed that a Tennessee bowie knife law was generally disregarded.[217]**

***33 The argument that a cluster of laws prohibiting the carrying of dangerous knives could justify a gun ban, lost its wind in *McDonald*. If the regulation of knives was not a sufficient analogue for restricting handguns in Chicago, neither are regulations of dirks, daggers, sword canes, and bowie knives useful analogues for prohibiting modern magazines.**

**<u>Duncan v. Bonta</u>, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *32–33 (S.D. Cal. Sept. 22, 2023).**

91. Forty-three states enacted anti-slungshot laws in the 19th Century. Overall, 71 anti-slungshot laws were enacted in the 19th Century and 12 were enacted in the 20th Century. Spitzer Rpt. ¶¶ 74, 76; *see also id.* Ex. C.

**RESPONSE:   Disputed.**

**David K**opel:

As detailed in a pair of previous posts, the mainstream historical tradition for controversial arms such Bowie knives and slungshots was to forbid concealed carry, to restrict sales to minors (especially without parental consent), or to impose extra punishment for misuse. But not to prohibit possession or sales for adults. *See* the previous Volokh Conspiracy posts supra, **The legal history of bans on firearms and Bowie knives before 1900** and **Bowie knife statutes 1837-1899**.


92.  In the late 1800s and early 1900s several states effectively barred possession of certain weapons outright.  Spitzer Rpt. ¶ 45.  For example, an 1837 Georgia law made it a crime to sell, offer to sell, keep, or have Bowie knives. Spitzer Rpt. ¶ 67 & Ex. E; Roth Rpt. ¶ 31. And as early as 1850, Massachusetts banned the manufacture and sale of slung shots. Spitzer Rpt. Ex. E.

**RESPONSE** Disputed. **Georgia (1837)** As described in the companion post supra, ***The legal history of bans on firearms and Bowie knives before 1900***, the legislature in 1837 declared:

that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.
*Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837*, pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

The Georgia Supreme Court held all of the law to violate the Second Amendment, except a section outlawing concealed carry. ***Nunn v. State***, 1 Ga. 243 (1846).

https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

93. States also targeted easily concealed pistols during America's gun violence crisis in the Jacksonian era for regulation, reflecting concerns that these firearms were dangerous or capable of provoking terror. Cornell Rpt. at 35.

**RESPONSE: Disputed. There were no bans at the time. That citation is to Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).**

**That same article has a table noting that there were no bans from 1791-1868. See Table 1 at 60.**

94. In the post-Civil War period, the rise in the circulation of multi-shot handguns in society, such as the Colt revolver, contributed to escalating interpersonal violence and was accompanied by the rapid spread of concealed carry restrictions.  By the end of the 19th Century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying. Spitzer Rpt. ¶ 45; DeLay Rpt. ¶ 70.

**RESPONSE: Disputed. Other courts have found Professor Spitzer's analysis—including this very sentence—to be unhelpful:**

**When a historian overgeneralizes about past laws, it is not helpful.[164] For example, the State's expert, professor Spitzer, opines that, "[c]urrent restrictions on assault weapons and detachable ammunition magazines are historically grounded. They are part of a pattern in America's history of legislative restrictions on particular weapons stretching back centuries."[165] Unfortunately, when one digs a little deeper, it turns out that his first example comes from twentieth-century machinegun laws. *Bruen* puts very little weight on machinegun laws so far removed from the nation's beginnings.**

**Professor Spitzer also says that, "[b]y the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying."[166] Once again, late-in-time laws at the end of the nineteenth century provide less guidance on how the Second Amendment was understood at the time it was adopted in 1791. During the more important years from 1791 to 1868, only 25% of the states had enacted concealed carrying restrictions on pistols.**

**Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at *28 (S.D. Cal. Oct. 19, 2023)**

95. During Reconstruction, Republican-dominated legislatures in the South enacted a range of racially-neutral gun regulations in response to violence directed against African Americans including by white supremacist groups. Cornell Rpt. at 39-40.

**RESPONSE:   Disputed. Laws neutral on their face were enforced against black and other minorities but not against whites. *Watson v. Stone*, 4 So.2d 700, 703 (Fla. 1941); Clayton Cramer, The Racist Roots of Gun Control, 4 Kan. J.L. & Pub. Pol'y 17 (1994-1995).**

96. The slow-load lever-action firearms of the 19th Century did not attract regulatory attention at that time and would not be banned under the challenged New Jersey laws today.  DeLay Rpt. ¶¶ 73-74.

**RESPONSE:    Undisputed**

97. Before the early 1920s, automatic weapons were unregulated because they did not exist or were not circulating widely in society. Spitzer Rpt. ¶ 8.

**RESPONSE:  Disputed. The claim is speculation.**

98. Criminals and terrorists began adopting machine guns and submachine guns starting in the 1920s. Roth Rpt. ¶¶ 53-54.

**RESPONSE: Undisputed**.

99. In the early 20th Century, legislatures responded to the risks that fully automatic and semiautomatic firearms posed to public safety by restricting their sale, possession, and manufacture. Roth Rpt. ¶ 56. Once they circulated appreciably in society and became associated with criminal activity, states began to restrict their sale, manufacturing, and possession.  DeLay Rpt. ¶ 82; Spitzer Rpt. ¶ 6, 11-15, 45; Cornell Rpt. at 35-36.  Some jurisdictions also prohibited large-capacity semi-automatic weapons. Spitzer Rpt. Ex. D.

**RESPONSE: Disputed. Handguns are much more associated with criminal activity than "assault weapons" are.**
**https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF**

100.     Beginning in the 20th Century, ten states plus the District of Columbia regulated semi-automatic and fully automatic weapons; eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices; and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner.  Spitzer Rpt. ¶ 24.  In total, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity between 1917 and 1934.  Spitzer Rpt. ¶¶ 24-25. *See also* DeLay Rpt. ¶ 84 (describing 20th Century restrictions on semi-automatic firearms and magazine capacity).

**RESPONSE:   Disputed. None of these laws resemble the challenged New Jersey laws.**

101.     Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots automatically or semi-automatically more than twelve shots without reloading."  The National Rifle Association endorsed the law and encouraged it to be used as a guide for other states.  Spitzer Rpt. ¶ 16.

**RESPONSE:**   .

102.     In 1934, Congress enacted the National Firearms Act, which strictly regulated fully automatic weapons.  Spitzer Rpt. ¶ 17.  During the same time period, at least seven states plus the District of Columbia enacted laws restricting semi-automatic weapons.  Spitzer Rpt. ¶ 21.

**RESPONSE: Disputed. Plaintiffs.Reply.Br.28-35. None of these laws resemble the challenged New Jersey laws.**

103.     Congress passed the National Firearms Acts of 1934 and 1938 in response to the use of machine guns and submachine guns in notorious killings. Roth Rpt. ¶¶ 53-56.

**RESPONSE: Undisputed.**

104.     In passing the National Firearms Acts of 1934 and 1938, Congress placed restrictions on the ownership of machine guns and submachine guns based

on their ability to fire rapidly from magazines capable of holding more than 10 rounds. Roth Rpt. ¶¶ 55-56.

**RESPONSE: Disputed. Mischaracterizes the statute.**

105.    None of the federal laws regulating machine guns, automatic weapons, silencers, certain ammunition and large-caliber weapons, or destructive devices such as grenades and artillery have ever applied to the U.S. military. DeLay Rpt. ¶ 94. *See also* Spitzer Rpt. ¶ 17.

**RESPONSE: Undisputed.**

106.    Removable magazines were not subject to regulation before the early 20th Century because those that did exist were rare and had not played any appreciable role in creating civil disorder.  Spitzer Rpt. ¶ 23.

**RESPONSE:   Disputed. Speculation. See also Hlebinsky Dec.**

**History of Firearms-Related Homicides**

107.    Levels of interpersonal gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. Cornell Rpt. at 17-18.

**RESPONSE:**

108.    In the colonial era leading up to the Revolutionary War, homicides among colonists were rare. Roth Rpt. ¶¶ 17-18.

**RESPONSE: Disputed. They still happened and the founders didn't confiscate firearms.**

**The Founding generation's solution for mass killings was not to deprive ordinary citizens of weapons needed for defense, but for armed citizens to have an active role in preventing, or minimizing the harm caused by, mass killings. Second Amendment scholar Stephen Halbrook explains that in 1775, "In a widely published message to the committees of safety,**

**Richard Caswell, William Hooper, and Joseph Hewes, North Carolina's members of the Continental Congress, stated 'It is the Right of every English Subject to be prepared with Weapons for his Defense.'"47 Halbrook continues: "Incidentally, the same issue of the North-Carolina Gazette which published the above also reported an incident in which 'a Demoniac being left**

in a Room, in which were 18 loaded Muskets,' shot three men and wounded another with a sword, 'upon which the People present, without further Ceremony, shot him dead.'" 48 He concludes: "For the Founders, the right of the subject to be armed for defense of self and the community was necessary to suppress such tragedies-- they never imagined a world in which they would be disarmed for the supposed benefit of preventing access to weapons by madmen." 49

**Court**

**Mark W. Smith, <u>Nysrpa v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms-and A Strong Rebuke to "Inferior Courts"</u>, 2022 Harv. J.L. & Pub. Pol'y Per Curiam 24, 9 (2022).**

109.    In the colonial era, the proportion of homicides committed with firearms was no greater than 15 percent. Roth Rpt. ¶¶ 18, 20.

**<u>RESPONSE</u>:    Disputed. Dueling was very common in the founding era Roth Rpt. ¶ 26**

110.    The vast majority of muzzle-loading firearms available in the colonial era, such as muskets and fowling pieces, needed to be reloaded manually after every shot. Roth Rpt. ¶ 19.

**<u>RESPONSE</u>: Undisputed.**

111.    Reloading one of the muzzle-loading firearms available in the colonial era took at least half a minute to complete. Roth Rpt. ¶ 19.

**<u>RESPONSE</u>:  Undisputed.**

112.    The muzzle-loading firearms of the colonial era, such as muskets and fowling pieces, were liable to misfire. Roth Rpt. ¶ 19.

**<u>RESPONSE</u>:  Undisputed.**

113.     In the colonial era, most owners of muzzle-loaded firearms stored their guns empty and loaded them anew before every use. Roth Rpt. ¶ 19; Cornell Rpt. at 18. Due to the preference for storing these weapons unloaded, they posed fewer dangers to children from accidental discharges. Cornell Rpt. at 18.

**RESPONSE:  Disputed. Speculation and non sequitur. This is also partially because the powder attracted moisture and rusted.**

114.     The rates of homicides of European Americans in the colonies by unrelated adults rose during the Revolutionary War period. Roth Rpt. ¶¶ 23-24.

**RESPONSE:**

115.     Following the end of the Revolutionary War, homicide rates fell across New England, the Mid-Atlantic states, and the settled Midwest. Roth Rpt. ¶¶ 23-24

**RESPONSE:**

116.     Following the end of the Revolutionary War, the proportion of homicides committed with firearms was between 0 and 10 percent. Roth Rpt. ¶ 24.

**RESPONSE:**

117.     In the colonial era, firearm use was generally limited to hunting, controlling vermin, or serving in the militia. Roth Rpt. ¶¶ 18, 26.

**RESPONSE:  Disputed. See generally, *Heller.***

118.     In the Founding era, there was little interest among public officials in northern states in restricting the use of firearms, with the exception of placing restrictions on dueling. Roth Rpt. ¶ 26.

**RESPONSE:**

119.     In the slave states during the Founding era, the proportion of homicides committed with firearms increased to between one-third and two-fifths. Roth Rpt. ¶ 27.

**RESPONSE:  This is because dueling was more common in the South. And it was banned in DC, but not Maryland, which was a slave state until 1864. All the federal politicians went over to Maryland to duel because they outlawed it in DC:**

**"Anti-dueling ordinances also failed to stop the flow of blood. Duelists ignored or evaded such laws. In fact, the most popular dueling ground in America was at Bladensburg, Maryland, near the nation's capital. Dueling was banned in Washington, but not in Maryland, which was a short carriage ride away. Irate legislators could simply shuttle out to Bladensburg and fire at will."**

**https://www.pbs.org/wgbh/americanexperience/features/duel-history-dueling-america/**

120.     Pistols that started to become commercially available in the early 1800s could be kept loaded and carried for longer amounts of time without risk of corrosion than the firearms that were prevalent in the colonial era. Roth Rpt. ¶ 29.

**RESPONSE:**

121.     Pistols and revolvers contributed to a sharp increase in the proportion of homicides committed with firearms at the end of the 19th Century. Roth Rpt. ¶¶ 30-40.

**RESPONSE: They didn't ban the firearms, they regulated how they were used.**

122.     States that imposed restrictions on carrying certain concealed weapons in the 19th Century were responding to concealable weapons contributing to rising crime rates. Roth Rpt. ¶¶ 30-33.

**RESPONSE:   They didn't ban the firearms, they regulated how they were used.**

123.     States that imposed restrictions on carrying certain concealed weapons in the 19th Century were responding to technological advances that enabled firearms to fire multiple rounds in succession without reloading. Roth Rpt. ¶ 33.

**RESPONSE:  They didn't ban the firearms; they regulated how they were used.**

124.     In the mid-1800s, homicide rates rose across the United States. Roth Rpt. ¶¶ 34, 35.

**RESPONSE:**

125.     Economic transformation was accompanied by profound social changes that gave rise to America's first gun violence crisis. As cheaper, more dependable, and easily concealable handguns proliferated, Americans, particularly southerners, began sporting them regularly. Cornell Rpt. at 24.

**RESPONSE:**   .

126.     From the Mexican War through Reconstruction, the proportion of homicides committed with firearms increased. Roth Rpt. ¶ 35.

**RESPONSE:**

127.     Once pistols and revolvers became commercially available in the mid-19th Century, they began to displace the single-shot guns prevalent in the early 1800s. Roth Rpt. ¶¶ 33-40.

**RESPONSE:**

128.     The pistols and revolvers that became commercially available in the mid-19th Century could be fired multiple times before having to reload. Roth Rpt. ¶¶ 37-38.

**RESPONSE:**

129.     Once single-shot guns began to be displaced by breech-loading firearms in the mid-19th Century, the proportion of homicides committed with firearms increased even in periods when overall homicide rates temporarily fell. Roth Rpt. ¶ 40.

**RESPONSE:**

130.     By the 1920s, the proportion of homicides committed with firearms reached a median of 56% in New England and over 70% in the South and West. Roth Rpt. ¶ 40.

**RESPONSE:**

131.       In the Reconstruction era, state legislators understood that placing restrictions on the carrying and/or possession of certain weapons was within states' constitutional authority. Roth Rpt. ¶¶ 40-46.

**RESPONSE: Disputed. Speculation and legal conclusion.**

132.       In response to Reconstruction-era violence directed against African Americans, Republican-dominated legislatures in the Reconstruction South passed a range of racially neutral gun regulations to protect individuals from gun violence. Cornell Rpt. at 39-40

**RESPONSE: Disputed. Laws neutral on their face were enforced against black and other minorities but not against whites. *Watson v. Stone*, 4 So.2d 700, 703 (Fla. 1941); Clayton Cramer, The Racist Roots of Gun Control, 4 Kan. J.L. & Pub. Pol'y 17 (1994-1995).**

133.       Incidents in which a single person killed four or more persons using firearms were rare, if not non-existent, in the colonial, Founding or Reconstruction eras. Roth Rpt. ¶¶ 47-48; Vannella Decl. Ex. 9, Rpt. of Professor Louis Klarevas ¶ 19.

**RESPONSE:  Disputed. They are still rare today. It's confusing the way ABC reported this:**

**There have been more than 632 mass shootings in 2023 so far, which is defined by the Gun Violence Archive as an incident in which four or more victims are shot or killed. These mass shootings have led to 597 deaths and 2,380 injuries.**

https://abcnews.go.com/US/116-people-died-gun-violence-day-us-year/story?id=97382759#:~:text=There%20have%20been%20more%20than,597%20deaths%20and%202%2C380%20injuries.

**597 divided by 331 million (the total population in the country) means that 00018% of the population has been killed in a "mass shooting" from January to five days ago.**

**Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at *33 (S.D. Cal. Oct. 19, 2023)**

134.     Firearms were used in approximately two fifths of homicides between unrelated white people before the Civil War era, and in approximately four fifths of all homicides in 2021.  DeLay Rpt. ¶ 37.

**RESPONSE:  Objection. Rifles and handguns are lumped in one.**

135.     In the 1980's, the introduction of semi-automatic handguns into the criminal market led to a dramatic increase in criminal firepower.  This resulted in more gun crimes and homicides with no corresponding increase in non-gun homicides.  Spitzer Rpt. ¶ 83.

**RESPONSE:  Disputed. Semi-automatic handguns existed for decades before the 1980's.**

**The spike in crime then was related to the crack cocaine epidemic and the fact that the boomers were the largest generation and there were a lot of them in an age range that is likely to commit the most crime:**

**Between 1984 (roughly the date at which crack first appeared) and 1991, homicide rates of young black males nearly doubled. The growth in homicide was much smaller for other groups: 30, 40 and 7 percent increases for older black males, young white males and older white males, respectively. (Between 1973 and 1984, homicide trends across these groups were generally similar.) If homicide rates of black males had mirrored that of the rest of the population between 1984 and 1991, overall homicide rates would have been 16 percent lower in 1991, which I take as a best guess of the impact of crack over this time period. Following the same logic used earlier, the implied impact of crack on violent crime is half as large and the impact on property crime negligible.**

[https://pricetheory.uchicago.edu/levitt/Papers/LevittUnderstandingWhyCrime2004.pdf](https://pricetheory.uchicago.edu/levitt/Papers/LevittUnderstandingWhyCrime2004.pdf)

## Mass Shootings – General

136.     From the colonial era through the end of the 19th Century, mass killings were predominantly committed by a group of people. Roth Rpt. ¶¶ 47-50.

**RESPONSE:   Disputed. Cramer Report at 42-109.**

137.     There is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949. For 70% of its 247-year existence as a nation, the United States did not experience a single mass shooting resulting in double-digit fatalities.  Klarevas Rpt. ¶ 19.

**RESPONSE:   Disputed. Dr. Klerevas's conclusions have been criticized by other courts for disregarding other instances of mass violence:**

**He also reports that his search of newspaper archives found no mass shootings of ten or more deaths until 1949.[206] In looking, he excluded from the search incidents of large-scale, intergroup gun violence such as mob violence and rioting. Certainly, such events have occurred in the nation's history, such as the Philadelphia nativist riots in the spring and summer of 1844.[207]**

**Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

**Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41.**

**There are several with 8 or 9 before that.  http://behindthetower.org/a-brief-history-of-mass-shootings**

138.     After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966.  The third such mass shooting then occurred nine years later, in 1975.  And the fourth such incident occurred seven years after, in 1982.  Klarevas Rpt. ¶ 20.



**RESPONSE:** *Id*. **Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41.**
**Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal.**
**Oct. 19, 2023)**

139.     The distribution of double-digit-fatality mass shootings changes in the early 1980's, when five such events took place in a span of just five years.  Klarevas Rpt. ¶ 21.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at**
**27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33**
**(S.D. Cal. Oct. 19, 2023)**

140.     This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the

1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). Klarevas Rpt. ¶ 21.

**RESPONSE: Disputed. The citations do not compare the firearms to the New Jersey statute. Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6629336, at \*33 (S.D. Cal. Oct. 19, 2023)**

141.    In the 20-year period between 1987-2007, only two double-digit-fatality mass shootings occurred. Klarevas Rpt. ¶ 21.

**RESPONSE: Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6629336, at \*33 (S.D. Cal. Oct. 19, 2023)**

142.    Between 1987 and 2007, three federal measures were in effect: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.  Klarevas Rpt. ¶ 21.

**RESPONSE: Disputed. Those laws do not cover the entire period.**

143.    A broader dataset of shooting incidents from the Gun Violence Archive shows that shooting events with four or more injuries or fatalities has been increasing from 2014 to 2021. Vannella Decl. Ex. 7, Rpt. of Lucy Allen ¶ 41.



**RESPONSE**: Disputed. Kapelsohn Rebuttal Report at 10-12. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *13-14 (S.D. Cal. Sept. 22, 2023)

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

144.    The 7 deadliest acts of intentional criminal violence in the U.S. since September 11, 2011 have all been mass shootings. Klarevas Rpt. ¶ 12. Perpetrators in all 7 employed LCMs, and 6 of the 7 used assault weapons. Klarevas Rpt. ¶ 15.

Table 2.  The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11

| Deaths | Date | Location | Involved Assault Weapons | Involved LCMs ( > 10 Rounds ) |
|---|---|---|---|---|
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

**RESPONSE: Disputed. This omits that the September 11th attackers committed their attacks with box cutters and swiss army knives, which makes the deadliest attack done through knives.**

**Nat'l Comm'n on Terrorist Attacks Upon the U.S.,** *The 9/11 Commission Report* **530 and n.145 ("Atta had a stopover in Zurich, where he bought two Swiss Army knives .... He may have intended to use the knives during the attacks.");** *id.* **at 476 and n.57 ("Knives with blades under 4 inches, such as Swiss Army Knives, scout knives, pocket utility knives, etc., may have been allowed to enter the sterile area."), https://www.9-11commission.gov/report/911Report.pdf [https://perma.cc/W235-EBKV]**

**Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

145.     Assault firearms with large-capacity magazines inflicted significant damage in recent mass shootings at the Pulse Nightclub in 2016 (49 fatalities, 50+ wounded), Las Vegas in 2017 (60 fatalities, 400+ wounded), the Uvalde, Texas school shooting in 2022 (21 fatalities, 17 wounded), and the July 4th Highland Park shooting in 2022 (7 fatalities, 48 wounded). Yurgealitis Rpt. ¶ 5. Assault firearms are capable of inflicting significant carnage upon civilians in a short period of time, especially in conjunction with large capacity magazines.  Yurgealitis Rpt. ¶ 5.

**RESPONSE:  Disputed. So are other firearms.**

146.     All but four mass shootings that have occurred in the United States since 1965 involved a single shooter. Roth Rpt. ¶ 67.

**RESPONSE:**

147.     The four mass shootings in the United States since 1965 that involved more than one shooter were each committed by two assailants. Roth Rpt. ¶ 67.

**RESPONSE:**

148.     The availability of semiautomatic weapons and magazines that hold more than 10 rounds has made it possible for one or two individuals to kill or wound a large number of people in a short amount of time. Roth Rpt. ¶¶ 50, 67-68.

**RESPONSE:   Disputed. The citation does not support the assertion. The same is true of most firearms.**

149.     The availability of semiautomatic weapons and magazines that hold more than 10 rounds has made it possible for a single shooter to commit mass murder without rallying collaborators around a common cause. Roth Rpt. ¶¶ 47, 68.

**RESPONSE:  Disputed. The citation does not support the assertion. The same is true of most firearms. See also Cramer Report. at 42-109.**

150.     In the 2011 mass shooting in which U.S. House Representative Gabby Giffords was wounded, the shooter fired 31 rounds with a Glock 19 semiautomatic handgun before he was disarmed by bystanders while changing magazines; each of the 31 rounds fired struck an individual. Roth Rpt. ¶ 69.

**RESPONSE:**

151.     Lucy Allen performed a 2023 study of public mass shootings was conducted using data from four sources: Mother Jones, the Citizens Crime Commission of New York City, the Washington Post, and the Violence Project (the latter two of which began publishing data in 2018-2019). Each source defines mass shooting as one where four or more people were killed in a public place in one incident, excluding incidents related to other crimes such as robberies and domestic violence). The combined data spanned 1982 to October 2022, which yielded 179 mass shooting events. Allen Rpt. ¶¶ 25-29.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, **No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, **No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

152.     The Allen 2023 study shows the number of mass shooting events has been increasing, from 1982 to 2022. Allen Rpt. ¶ 39.



**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, **No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, **No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

153.     The Allen 2023 study shows the number of mass shooting events with large-capacity magazines has been increasing, from 1982 to 2022. Allen Rpt. ¶ 40.



**RESPONSE:** Disputed. Kapelsohn Rebuttal Report at 10-12. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *13-14 (S.D. Cal. Sept. 22, 2023)

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

154. From 1991 to 2022, both the number of high-fatality mass shooting incidents and number of mass shooting fatalities have grown significantly. Klarevas Rpt. ¶ 12.



Figure 1. Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022



Figure 2. Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022

**RESPONSE:** **Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

## Use of Assault Weapons and LCMs in Mass Shootings

155.     There is evidence that the design features of assault weapons and LCMs make them especially appealing to criminals and to those who commit mass shootings.  Data on 15 mass shootings from 1984 to 1993 compiled by Gary Kleck (1997) revealed six (40%) involved assault weapons or other firearms equipped with LCMs.  Vannella Decl. Ex. 10, Rpt. of Professor Daniel Webster ¶ 9.

**RESPONSE**: **Disputed. See the above crime statistics about how rifles are very rarely used in crimes**.

156.     The rate at which assault weapons are used to commit gun massacres far outpaces the rate at which they are owned in the United States. Klarevas Rpt. ¶ 14.

**RESPONSE**:  **Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41.**

**The citation does not support the assertion.**

**Millions of Americans collectively own more than 24 million of these rifles. William English, PhD, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned 2 (May 13, 2022), https://bit.ly/3HaqmKv; NSSF, Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation (July 20, 2022), https://bit.ly/3zKDFh4. That exceeds the number of Ford F-150s, America's most popular automobile, in the country. See Brett Foote, There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB. And "the numbers have been steadily increasing." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020, 1022 (S.D. Cal. 2021), vacated and remanded, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "In 2018 alone[,] … 1,954,000 modern rifles were manufactured or imported into the United States." Id. at 1022. Again, that figure far exceeded the number of Ford F-series trucks sold in the same year. See Fourth-Quarter 2020 Sales at 2, Ford (Dec. 2020), https://ford.to/3H87Y5T (787,442 F-series trucks were sold in the U.S. in 2020). To state the obvious, a product lawfully owned and lawfully used by millions of Americans—and 20% of all gun owners, see Wash. Post Staff, Sept. 30-Oct. 11, 2022, Washington Post- Ipsos poll of AR-15 owners, https://wapo.st/3KrUouy (Mar. 26, 2023)—is not "highly unusual in society at large."**

**Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

157.     **Percentage of mass shootings perpetrated with AWs or LCMs.** Within the Allen 2023 dataset discussed above, there were 153 mass shooting events for which it was known if an assault weapon was used.  Of those 153 mass shootings, an assault weapon was used in 36 of them (24%). In the same dataset,

there were 115 mass shooting events for which magazine capacity was known. Out of those 115 events, there were 73 where the perpetrator used large-capacity magazines (63%). Allen Rpt. ¶¶ 30-31.

**RESPONSE: Disputed. Kapelsohn Rebuttal Report at 10-12. _Duncan v. Bonta_, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

**_Miller v. Bonta_, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

158.    Of the 179 mass shooting incidents examined in the Allen 2023 Study, whether the guns used were obtained legally was known in 112 of them.  In those 112 mass shootings, shooters in 89 (79%) of them obtained their guns legally. Even if one assumed the guns were illegally obtained in the 67 incidents for which legal purchase status of the gun used was not known, 50% of the mass shootings were still done with guns obtained legally (89 out of 179).  Allen Rpt. ¶ 38.

**RESPONSE:   Disputed. Kapelsohn Rebuttal Report at 10-12. _Duncan v. Bonta_, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

**_Miller v. Bonta_, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

159.    In the Allen 2023 Study, 80% of the guns used in mass shooting events for which it was known whether the guns were legally obtained (202 out of 252 guns) were obtained legally.  Allen Rpt. ¶ 38.

**RESPONSE:   Disputed. Kapelsohn Rebuttal Report at 10-12. _Duncan v. Bonta_, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

**_Miller v. Bonta_, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

160.     **Average number of shots by perpetrator (AWs).** Of the 36 events involving assault weapons in the Allen 2023 study data, there are 24 in which the number of shots fired is known. Shooters fired more than 10 rounds in each of the 24 incidents. The average number of shots fired was 149. By contrast, the average number of shots fired in mass shootings without an assault weapon was 38.  Allen Rpt. ¶ 36.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.**

***Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

 ***Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

161.     **Average number of shots by perpetrator (LCMs).** Of the 73 incidents known to have involved a large-capacity magazine in the Allen 2023 study data, there are 49 in which the number of shots fired is known. Shooters fired more than 10 rounds in 46 of the 49 incidents. The average number of shots fired was 99. In contrast, the average number of shots fired in mass shootings without large-capacity magazines was 16. Allen Rpt. ¶ 37.

**RESPONSE: Disputed. Kapelsohn Rebuttal Report at 10-12. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

***Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

162.     **Comparative casualties.** Within the Allen 2023 dataset, the average number of fatalities was 12 per mass shooting with an assault weapon versus 6 for those without an assault weapon. The average number of fatalities was 10 per mass shooting with large-capacity magazines versus 6 for those without large-capacity magazines. The average number of fatalities was 13 per mass shooting with both assault weapons and large-capacity magazines versus 6 for those with neither. Allen Rpt. ¶¶ 32-34.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta***, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta***, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

163.      Within the Allen 2023 dataset, the average number of injuries or fatalities was 36 per mass shooting with an assault weapon versus 10 for those without an assault weapon. The average number of injuries or fatalities was 25 per mass shooting with large-capacity magazines versus 9 for those without large-capacity magazines. The average number of injuries or fatalities was 40 per mass shooting with both assault weapons and large-capacity magazines versus 8 for those with neither. Allen Rpt. ¶¶ 32-34.

**Numbers of Fatalities and Injuries in Public Mass Shootings**
**1982 - October 2022**

| Weapon Used | # of Incidents | Average # of | | |
|---|---|---|---|---|
| | | Fatalities | Injuries | Total |
| Assault Weapon | 36 | 12 | 24 | 36 |
| No Assault Weapon | 117 | 6 | 4 | 10 |
| Unknown | 26 | 5 | 3 | 9 |
| Large-Cap. Mag. | 73 | 10 | 16 | 25 |
| No Large-Cap. Mag. | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |
| Assault Weapon & Large-Cap. Mag. | 31 | 13 | 27 | 40 |
| Large-Cap. Mag. Only[1] | 36 | 8 | 7 | 15 |
| No Assault Weapon or Large-Cap. Mag.[2] | 41 | 6 | 3 | 8 |
| Unknown[3] | 71 | 5 | 3 | 8 |

Notes and Sources:

Casualty figures exclude the shooter. Assault Weapon and large-capacity magazine classification and casualties updated based on review of stories from Factiva/Google searches.

[1] Shootings involving large-capacity magazine and no Assault Weapon.

[2] Shootings involving neither a large-capacity magazine nor Assault Weapon.

[3] Shootings where it is either unknown whether a large-capacity magazine was involved or unknown whether an Assault Weapon was involved.

**RESPONSE:   Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta***, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

51

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

164.     A study by Christopher Koper in 2014 showed that between 1982 and 2012, mass shootings (defined as shootings with four or more victim fatalities) committed with assault weapons caused more fatalities per incident than mass shootings committed with other firearms (a mean of 10.4 fatalities with assault weapons vs. 7.4 fatalities with other firearms) and caused non-fatal gunshot wounds to more people (a mean of 13.5 people with non-fatal gunshot wounds in mass shootings with assault weapons vs. 6.4 without).  Webster Rpt. ¶¶ 9, 11.

**RESPONSE:**

165.     A study by Luke Dillon in 2013 showed that mass shootings (defined as shootings with four or more victim fatalities) committed with firearms with LCMs had 60% more fatalities on average than those committed with firearms without LCMs (a mean of 10.19 fatalities vs. 6.35) and had more than 3 times as many victims with non-fatal gunshot wounds (a mean of 12.39 people with non-fatal gunshot wounds in mass shootings with LCMs vs. 3.55 without LCMs). Webster Rpt. ¶ 11.

**RESPONSE:**

166.     The Allen 2023 study results are consistent with those of other studies that have analyzed mass shootings, each of which show that the average number of casualties (whether defined as injuries and fatalities or fatalities alone) were higher in mass shooting events where the perpetrator used large-capacity magazines. Allen Rpt. ¶ 35; Roth Rpt. ¶¶ 64-66.

**Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings**

| Source | Criteria | | Time Period | # of Incidents | Avg. # of Fatalities + Injuries / Fatalities | |
|---|---|---|---|---|---|---|
| | # Victims | Other Criteria | | | With LCM | Without LCM |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2003)[1] | at least 4 killed[3] | Includes shootings "in a public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-October 2022 | 179 | 25 / 10 | 9 / 6 |
| Allen (2020)[2] | | | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[4] | more than 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[5] | at least 6 killed[3] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[6] | at least 4 killed[3] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

Notes and Sources:
[1] Exhibit B of this report.
[2] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.*, dated January 23, 2020.
[3] Excluding shooter.
[4] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).
[5] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).
[6] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

**RESPONSE: Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)

167.     **High Fatality Mass Shootings – AWs.** Focusing on high-fatality mass shootings in particular (defined as events resulting in 6 or more victims being shot to death), an analysis of such events by Prof. Klarevas (based on a dataset that Prof. Klarevas maintains and continuously updates, which is reproduced at Exhibit C to his report) between 1991 and 2022, where the weapon used was known, showed that the percentage of such shootings where the perpetrator employed an assault weapon has increased over time. The overall rate of use of assault weapons in such high fatality mass shootings is 34%, but rose to 53% over the past 4 years. Klarevas Rpt. ¶ 13.

53



**Figure 3. Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**

Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**RESPONSE: Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at *33 (S.D. Cal. Oct. 19, 2023)**

168.    **High Fatality Mass Shootings – LCMs.** Of the high fatality mass shootings between 1991 and 2022 where magazine capacity used was known, the percentage of such shootings where the perpetrator employed a large-capacity magazine (with greater than 10 rounds of capacity) has increased. The overall rate of use of LCMs in such high fatality mass shootings is 77%, but rose to 100% over the past 4 years. Klarevas Rpt. ¶ 13.



Figure 4. Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022

Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

**RESPONSE:   Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

169.     **High Fatality Mass Shootings – Lethality.** There is a positive association between the lethality of mass shootings and the use of assault weapons and LCMs. The average death toll for high-fatality mass shootings involving assault weapons was 13.7 fatalities per shooting. By contrast, the average death toll for high-fatality mass shootings without assault weapons was 8.2 fatalities per shooting. The average death toll for high-fatality mass shootings involving LCMs was 11.5 fatalities per shooting. By contrast, the average death toll for high-fatality mass shootings without LCMs was 7.3 fatalities per shooting. Klarevas Rpt. ¶15, 16.

**Table 3.  The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

**Table 4.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

170.     Use of LCMs with assault weapons in high-fatality mass shootings resulted in a 92% increase in the average death toll compared to high-fatality mass shootings involving neither instrument. Klarevas Rpt. ¶ 17.

| Table 5. The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

171.     A 2020 study in *Criminology & Public Policy* by Webster et al found that for the period of 1984 to 2017, state bans on LCMs were associated with a 48 percent lower incidence of fatal mass shootings within those states, when compared to years in those states in which there was no LCM ban and with 70% fewer deaths from fatal mass shootings per capita.  Webster Rpt. ¶ 14.

**RESPONSE:**

172.     A 2020 study in *Law and Human Behavior* by Siegel et al found that LCM bans were also associated with significantly lower rates of fatal mass shootings.  Webster Rpt. ¶ 14.

**RESPONSE:**

173.     A 2019 study by Klarevas et al. in the *American Journal of Public Health* found that between 1990 and 2017, the incidence of fatal mass shootings (those with 6 or more victim deaths) in states without LCM bans was more than

double the rate than in states with LCM bans.  The annual number of deaths in non-LCM ban states was also 3 times higher.  Webster Rpt. ¶ 14.

**RESPONSE:**    **Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

174.    A 2015 study by Gius et al in *Applied Economics Letters* found statistically significant negative associations between assault weapon bans and fatalities from public mass shootings.  Webster Rpt. ¶ 16.

**RESPONSE:**

175.    A 2022 study by Cook et al. in *JAMA* found that, during the federal assault weapons ban from 1994 to 2004, fatalities from shootings with banned weapons decreased during the second half of the ban and then surged after the ban expired. Webster Rpt. ¶ 17. A 2004 study by Koper et al. for the National Institute of Justice found a one-third reduction in the share of crime guns recovered and traced by law enforcement that were assault weapons.  Webster Rpt. ¶ 15.

**RESPONSE:  Disputed. The Koper Study found "no discernable reduction" in violence committed with firearms. Christopher S. Koper et al., An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice 96 (2004), https://bit.ly/3wUdGRE.**

176.    From 2015 to 2019, five of the top ten deadliest mass shootings in U.S. history occurred and each was committed with an assault weapon.  Webster Rpt. ¶ 17.

**RESPONSE:**

177.    A 2021 study in *JMIR Public Health Surveillance* by Post et al. showed that during the years the federal assault weapons ban was in place, statistical models estimated that the federal ban on assault weapons and LCMs resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries during the decade the ban was in place.  Those statistical models estimated that if the federal ban had continued after 2004, there would have been 30 fewer public mass shootings, 339 fewer people murdered in

those shootings, and 1,139 fewer people injured in those shootings.  Webster Rpt. ¶ 18.

**RESPONSE:**

178.     The number of fatalities from mass public shootings committed with non-assault weapons has remained relatively flat. Webster Rpt. ¶ 17.



**RESPONSE:**

## Use of Assault Weapons/ LCMs and Crime

179.     The features of assault style firearms, including LCMs, are attractive to users who are most likely to use firearms in crime.  Webster Rpt. ¶ 13.

**RESPONSE:  Disputed. When it comes to the federal assault weapon ban,**

The congressionally-mandated study of the federal "assault weapon ban" of 1994-2004 found that the ban had no impact on crime, in part because "the banned guns were never used in more than a modest fraction of gun murders."

Roth, Koper, et al., Impact Evaluation of the Public Safety and recreational Firearms Use Protection Act of 1994, Urban Institute, March 13, 1997. https://www.urban.org/research/publication/impact-evaluation-public-safety-and-recreational-firearms-use-protection-act-1994.

Subsequent research conducted by the RAND Corporation found no conclusive evidence that banning "assault weapons" or "large" capacity magazines has an effect on mass shootings or violent crime.

Rand Corporation, The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States, 2018, p. 66. https://www.rand.org/content/dam/rand/pubs/research_reports/RR2000/RR2088/RAND_RR2088.pdf

"Murder rates were 19.3% higher when the Federal [assault weapon] ban was in effect."

Mark Gius, An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates, Applied Economic Letters, Vol. 21, No. 4.

http://www.tandfonline.com/doi/full/10.1080/13504851.2013.854294

Total violent crime and murder has fallen to near historic lows, while ownership of so called LCMs and assault weapons has risen to all-time highs.

The FBI Crime Data tool breaks down what types of weapons are used in homicides:

Murder Victims by Weapon
Sort By: Category

Handguns

7,937

Firearms, type not stated

5,706

Knives or cutting instruments

| | |
|---|---|
| Other weapons or weapons not stated | 1,630 |
| Personal weapons (hands/fists/feet/etc.) | 1,327 |
| Rifles | 665 |
| Other guns | 542 |
| Blunt objects (clubs/hammers/etc.) | 422 |
| Narcotics | 367 |
| Shotgun | 187 |
| Asphyxiation | 186 |
| Fire | 98 |
| Strangulation | 94 |
| Poison | 20 |
| Drowning | 15 |
| Explosives | 3 |
| | 1 |

https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/shr

**See also Kapelsohn Dec para. 36-73.**

180.      After rapid-fire semiautomatic handguns and rifles with large capacity magazines arrived on the domestic market in the 1970s and 1980s, they were picked up by criminals, terrorists, and lone gunmen.  These firearms inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff.  Roth Rpt. ¶ 60.

**RESPONSE:  Disputed. They are also picked up by law abiding citizens because there are not as many criminals, terrorists, and gunmen as there are "LCMs" and "Assault weapons."  See also Kapelson Dec at para. 36-73.**

181.     Uniformed police officers are generally outfitted with soft body armor of a "Level II" or "Level IIIA" protection rating for the National Institute of Justice. Those ratings of body armor are suitable protection against most handgun bullets (which reach a muzzle velocity of 1200FPS (+ or -), but not against rifle caliber AR & AK type assault rifles (which reach a muzzle velocity of 3200FPS (+ or -). Yurgealitis Rpt. ¶ 156

**RESPONSE: Disputed. The specified body armor will not stop any rifle bullet (other than .22). https://www.ojp.gov/pdffiles1/nij/nlectc/250144.pdf**

182.     The firearms prohibited by N.J. Stat. Ann. § 39-1(w) pose a threat to overall public safety and increase the likelihood that first responders charged with stopping a threat, or attending to wounded citizens, may be injured or killed in performance of their duty. Yurgealitis Rpt. ¶ 156.

**RESPONSE: Disputed. The specified body armor will not stop any rifle bullet (other than .22). https://www.ojp.gov/pdffiles1/nij/nlectc/250144.pdf**

**See also Kapelsohn Rebuttal Report at 9-16.**

183.      A study by Christopher Koper et al. in 2017 showed that across ten different cities in the United States, firearms with LCMs accounted for between 15 and 36% of firearms recovered by law enforcement between 2001 and 2014. Webster Rpt. ¶ 12.

**RESPONSE:**

184.     Firearms with LCMs accounted for 40.6% of the firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings with 4 or more fatalities for the period of 2009 to 2015. Webster Rpt. ¶ 12 (citing Koper)

**RESPONSE:**

185.     Assault weapons accounted for between 2.6 and 8.5% of firearms recovered by law-enforcement officers in the same ten cities between 2001 and 2014. Webster Rpt. ¶ 12. (citing Koper).

**RESPONSE:**

Assault weapons also accounted for 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally between 2009 and 2015. Webster Rpt. ¶ 12. (citing Koper).

**RESPONSE**: Disputed. The United States Department of Justice reports that in the year 2021, in the entire country 447 people were killed with rifles (of all types). From this one can say that, based on a national population of 320 million people in the United States, rifles of any kind (including AR-15s) were used in homicides only 0.0000014% of the time. Put differently, if 447 rifles were used to commit 447 homicides and every rifle-related homicide involved an AR-15, it would mean that of the approximately 24,400,000 AR-15s in the national stock, less than .00001832% were used in homicides. It begs the question: what were the other AR-15 type rifles used for? The only logical answer is that 24,399,553 (or 99.999985%) of AR-15s were used for lawful purposes.

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *3 (S.D. Cal. Oct. 19, 2023)

186.     Assuming that assault weapons account for 3 percent of the population of firearms in civilian hands, the data discussed above indicates assault firearms and firearms with LCMs are specifically used in crime, in lethal violence against law enforcement officers, and in fatal mass shootings at percentages five to ten times higher than they would be expected to if those weapons' features played no role in whether they were used in crimes.  Webster Rpt. ¶ 13.

**RESPONSE**:  Disputed. The 3% assumption has no basis. Millions of Americans collectively own more than 24 million of these rifles. William English, PhD, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned 2 (May 13, 2022), https://bit.ly/3HaqmKv; NSSF, Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation (July 20, 2022), https://bit.ly/3zKDFh4. That exceeds the number of Ford F-150s, America's most popular automobile, in the country. See Brett Foote, There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB. And "the numbers have been steadily increasing." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020, 1022 (S.D. Cal. 2021), vacated and remanded, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "In 2018 alone[,] … 1,954,000 modern rifles were manufactured or imported into the United States." Id. at 1022. Again, that figure far exceeded the number of Ford F-series trucks sold in the same year. See Fourth-Quarter 2020 Sales at 2, Ford (Dec. 2020), https://ford.to/3H87Y5T (787,442 F-series trucks were sold in the U.S. in 2020). To state the obvious, a product lawfully owned and lawfully used by millions of Americans—and 20% of all gun owners, see Wash. Post Staff,

**Sept. 30-Oct. 11, 2022, Washington Post- Ipsos poll of AR-15 owners, https://wapo.st/3KrUouy (Mar. 26, 2023)—is not "highly unusual in society at large."**

187.     A study by Wintemute et al. (1998) in *Annals of Emergency Medicine*, using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses. Webster Rpt. ¶ 13.

**RESPONSE:**

**Self-Defense Data**

188.     Home defense and self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire.  Yurgealitis Rpt. ¶ 137.

**RESPONSE: Disputed. William English estimates that "guns are used defensively by firearms owners in approximately 1.67 million incidents per year."**

**"Recall that a majority of defensive incidents involved multiple assailants (51.2%). Presumably, it would be advantageous to have a firearm with a larger capacity magazine if one needed to engage more than one assailant, which these responses suggest is indeed common. Although in most defensive gun uses the gun was not fired (81.9%), we can further analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired."**

**https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494#**

189.     Based on incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017, it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Allen Rpt. ¶¶ 9-11.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.** _Duncan v._
_Bonta_**, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal.
Sept. 22, 2023)**

_Miller v. Bonta_**, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D.
Cal. Oct. 19, 2023)**

190.     **Average number of shots fired for self-defense – NRA Data.** Out of
736 incidents in the NRA Armed Citizen database between January 2011 and May
2017, the average number of shots fired by a person using firearms in self-defense
was 2.2. Allen Rpt. ¶ 10.[2]

**RESPONSE: Disputed. However it is that they were chosen, some 736
incidents in the Armed Citizen Database were said to be analyzed and the
number of shots tabulated, but details are completely absent. Allen does not
list the 736 stories. Nor does she reveal how she assigned the number of shots
fired in self-defense when the news accounts use phrases like "the intruder
was shot" but no number of shots was reported, or "there was an exchange of
gunfire," or "multiple rounds were fired." She includes in her 2.2 average of
defensive shots fired, incidents where no shots were fired. 102 One would
expect the impact of Allen's choice to include a zero for a no-shot event to be
significant because (even using her number) 32.1% of the events in the home
in California were no-shot events. 103 She also reported no incidents in
California where more than 10 shots were fired in self-defense among the
stories she reviewed. It seems obvious that in a state where magazines holding
more than 10 rounds have been illegal to buy or sell for twenty years, law-
abiding citizens are using the smaller magazines that the law requires for self-
defense. Absent from the expert opinion is a statistic reporting the average
number of shots fired by criminals. Also absent is the number of intruders or
whether the homeowner was able to escape unharmed**.

**Duncan v. Bonta, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14
(S.D. Cal. Sept. 22, 2023 ; Kapelsohn Rebuttal Report at 10-12.**

---

[2] Paragraph 11 is mislabeled as Paragraph 9. _See_ Allen Rpt. at 6.

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

191.     Indeed, in the vast majority of incidents—587 (or 79.8%)—the defender fired 1 to 5 bullets; and in 134 (or 18.2%), the defender fired no shots at all. Allen Rpt. ¶¶ 9-10.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

192.     Within that same dataset, only 2 incidents (0.3% of all incidents) were reported where the defender fired more than 10 bullets. In 18.2% of incidents, the defender fired zero shots. In 80% of incidents, the defender fired 1 to 5 shots. In 2% of incidents, the defender fired 6 to 10 shots. Allen Rpt. ¶ 10.

**Breakdown of Incidents in NRA Armed Citizen Database by Number of Shots Fired**
**January 2011 - May 2017**

| # of Shots Fired | # of Incidents | % of Incidents |
|---|---|---|
| 0 | 134 | 18.2% |
| 1-5 | 587 | 79.8% |
| 6-10 | 13 | 1.8% |
| More than 10 | 2 | 0.3% |

*Average Number of Shots Fired: 2.2*

Notes and Sources:
Data from NRA Armed Citizen database covering 736 incidents from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

193.     These 2 incidents were reported in the database after Allen's initial findings were published (at which time there were zero incidents involving more than 10 shots fired). Underlying reporting of those two incidents did not indicate the defenders needed to fire more than 10 shots to defend themselves. Allen Rpt. ¶ 5, n.2.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, **No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, **No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

194.     The NRA database is not limited to cases of self-defense in the home, and the number of shots fired was found to be similar in incidents both inside and outside the home. Allen Rpt. ¶¶ 9, 11 n.16.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, **No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, **No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

195.     A separate study of the NRA database for an earlier time period, 1997 to 2001, found similar results.  Specifically, that study also found that, on average, 2.2-shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. Allen Rpt. ¶ 9, n.14; Yurgealitis Rpt. ¶ 147.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, **No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, **No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

196.     An additional study of news reports using the Factiva archive of aggregated news content from nearly 33,000 sources using keyword search criteria resulted in 35,000 stories from January 2011 to May 2017 in the United States. The search criteria matched approximately 90% of the NRA Armed Citizen database reports, and the remaining 10% showed the typical number of shots fired was no different. Allen Rpt. ¶12.

**RESPONSE**:  **Disputed. Kapelsohn Rebuttal Report at 10-12.** _**Duncan v. Bonta**_**, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

_**Miller v. Bonta**_**, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**


197.     **Average number of shots fired for self-defense - Factiva.** Separately, a random number generator was used to sample the 35,000 news stories aggregated on Factiva between January 2011 to May 2017 that matched relevant search terms, yielding 4,800 news stories on incidents of self-defense of a firearm in the home. A random selection of 200 such stories were analyzed. In that analysis the average number of shots fired per *story* was 2.61. Allen Rpt. ¶¶ 12-15.

**RESPONSE**:  **Disputed. For a second study, Allen says she conducted a word search of a news aggregator called Factiva. Factiva is a commercial database behind a paywall to which the Court and the public have no access. Even if one did have access to the Factiva database, one could not repeat her study. Allen's methodology for the Factiva study is incomprehensible. For the Factiva database of 70 million news stories, her word search returned 35,000 stories. 105 From there she somehow selected 200 stories of defensive gun use in the home and set out to analyze the events. 106 As with the Armed Citizen study, Allen does not provide a list of the 200 stories she analyzed. Compare that to the long, detailed list of 179 mass shooting stories she includes in the second part of her declaration. For the Factiva study, there is no way to check her analysis or her math. And once again she includes in the averages those events where no shots were fired, bringing the overall average down. 107**

**Had a table of the stories she and her team analyzed been supplied, it would certainly reveal important information. For example, this Court randomly selected two pages from Allen's mass shooting table: pages 10 and 14. From looking at these two pages (assuming that the sources for the reports**

were accurate and unbiased) the Court is able to make statistical observations, including the observation that the number of shots fired were unknown 69.04% of the time. Without a similar table for the NRA or Factiva studies, this Court cannot ascertain the number of shots fired in each incident, the number of times a homeowner possessed a LCM, the number of times the number of shots fired were unknown, whether the homeowner was unharmed, or the number of intruders.

23 Allen's 2.2 shot average is suspect for larger reasons. The whole statistical exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police investigatory reports. A database of news articles lacks the usual indicia of accuracy and reliability of admissible evidence. According to fifteen national polls conducted by non-law enforcement agencies, there may be from 760,000 defensive handgun uses to 3,600,000 defensive uses each year.108 Compared to the comprehensive details given for her study on mass shooting events, the NRA and Factiva studies are curiously lacking in depth and breadth and causes the Court to deeply discount her opinion.

Duncan v. Bonta, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *14 (S.D. Cal. Sept. 22, 2023; Kapelsohn Rebuttal Report at 10-12.

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

198.     There was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering the incident (i.e., the more shots fired, the more news stories covered the incident). A statistical calculation was performed to adjust for this effect, yielding the average number of shots fired per incident as 2.34. In 11.6% of incidents, the defender fired no shots; in 97.3% of incidents, the defender fired 5 or fewer shots. In no incidents was the defender reported to have fired more than 10 bullets. Allen Rpt. ¶¶ 15-17.

**Number of Shots Fired in Self-Defense in the Home
Based on Random Selection of Articles from Factiva
January 2011 - May 2017**

| | Incidents in the Home |
|---|---|
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with <=5 Shots Fired | 195 |
| Percent of Incidents with <=5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

Notes and Sources:
Based on news stories describing defensive gun use in a random selection of Factiva stories 2011 to May 2017 using search string (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property") with region set to United States and excluding duplicate stories classified as "similar."
Calculated using weights reflecting the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 10-12. _Duncan v. Bonta_, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

**_Miller v. Bonta_, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

199.     Out of almost 1,000 incidents of self-defense analyzed (736 from the NRA Armed Citizen database and 200 randomly sampled from Factiva), only 2 involved reports of more than 10 shots fired in a self-defense scenario in the home (0.2%). Because the analysis excludes incidents without news reportage, and because the fewer shots fired, the less news coverage there is, the 0.2% figure likely overestimates the overall percentage of self-defense incidents in which more than 10 rounds were used. Allen Rpt. ¶18.

**RESPONSE:   Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, **No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*13-14 (S.D. Cal. Sept. 22, 2023)**

*Miller v. Bonta*, **No. 19CV01537BENJLB, 2023 WL 6929336, at \*33–34 (S.D. Cal. Oct. 19, 2023)**

200.      **Percentage of rifle use for self-defense.** The Heritage Foundation maintains a "Defensive Gun Uses In the U.S." database (DGU), with data beginning in January 1, 2019. An analysis of the 2,714 incidents in the database spanning January 1, 2019 through October 6, 2022 showed 51 incidents where a rifle was used. This represents 2% of all incidents in the database and 4% of all incidents in the database with a known gun type. After conducting the same analysis again, but excluding incidents in states that had restrictions on assault weapons, the results were 48 incidents, representing 2% and 4% of the total number of incidents, 2,499. Allen Rpt. ¶¶ 19-24.

**RESPONSE: Disputed. Another judge devoted over a page to the flaws with Lucy Allen's conclusion here:**

**Another expert witness for the State, economist Lucy Allen, has supplemented her earlier testimony.[209] Today, she opines on the frequency of rifles reported in defensive gun uses. The State asserts that Allen's statistics prove "assault weapons" are not being commonly fired for self-defense.[210] To support this notion, Allen looks at a very small database of defensive gun uses collected from news broadcasts or publications, where 54% of the time the gun type is** *unknown.* **From this, she implies that using a rifle to defend oneself is incredibly rare. Her charts misleadingly suggest that rifles are used in just 2–4% of defensive gun uses and actually occurred only 51 times across three and one-half years.[211] Other evidence suggests that guns are needed and used defensively thousands of times each year, and that rifles are used far more frequently than Allen's statistics suggest.**

**How does Allen arrive at her opinion? She looks at a database maintained by the Heritage Foundation. The database explicitly states that it is not intended to be comprehensive. It attempts to highlight some successful defensive gun uses that are reported by news organs.[212] Allen counts 2,714 total defensive gun uses in the database between January 2019 and October 2022.[213] Her results cannot be tested because she does not identify the specific incidents or**

71

how she scored the gun-type variables attributed to each incident. Consequently, there is no way to check her analysis or her math. Her study cannot be reproduced. Unfortunately, this means her opinion lacks classic indicia of reliability. "Reliability and validity are two aspects of accuracy in measurement. In statistics, reliability refers to reproducibility of results."[214]

*34 Validity is another concern. Of the 2,714 total incidents studied, less than half (1,241) of the events indicated a known firearm. Trying to perform a study about the frequency of a particular type of gun used in self-defense, where more than 50% of the time the gun type is unknown, is of questionable validity. Doing just that, she opines that a rifle was used only 4% of the time when gun type is known.[215]  Next, she factors in the 1,471 "unknowns" and lowers her result to 2%.

But this calculation, incredibly, requires one to assume that none of the unknown incidents involved a rifle. She factors in a zero for rifles every time there is an unknown firearm type. What if one instead assumed that all of the unknown incidents involved a rifle—then it could be said that rifles had been used over 50% of the time. Of course, neither the 0% nor the 100% assumption is useful.

Along the way, Allen fails to mention that the Heritage Foundation webpage she linked to notes that guns are probably used in self-defense between 500,000 and 3,000,000 times a year. Nor does Allen mention any of the incidents where AR-15s were used that are linked on the Heritage Foundation defensive gun use visualization web page. For example, Allen skips over mentioning the disabled 61-year-old, though attacked and shot in his home, saved by his AR-15.[216] Nor does Allen cite the Georgia man with an AR-15 who shot at three attackers after they approached his home at 4 a.m. with their faces covered and firing shots.[217] Allen also could have found the report of the pregnant wife and mother who used an AR-15 to defend against multiple armed attackers.[218]  These are just three incidents from three months of reports that appear on the Heritage Foundation webpage that should have been counted in Allen's chart. Allen's study is suspect for larger reasons. The whole statistical exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police investigatory reports. There are no police reports or eyewitness declarations collected for Allen's study. A limited collection of news articles lacks the usual indicia of accuracy and reliability of admissible evidence.

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

201.    **Percentage of handgun use for self-defense.** Within the same dataset, there were 1,113 incidents where a handgun was used. This represents 41% of all incidents in the database and 90% of all reported incidents with a known gun type. Allen Rpt. ¶ 23.

| | The Heritage Foundation Defensive Gun Uses Database | | |
|---|---|---|---|
| **Firearm Type** | **Incidents**[1] | **% of Total** | **% of Known** |
| (1) | (2) | (3) | (4) |
| | | | |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| **Total known:** | **1,241** | | |
| **Total:** | **2,714** | | |

Source:
"Defensive Gun Uses in the U.S.," *The Heritage Foundation*.
Data as of October 7, 2022.
[1] Note that three incidents are coded as having more than one firearm type and thus the sum by firearm type is larger than the total number of incidents.

**RESPONSE:**   **Disputed. Kapelsohn Rebuttal Report at 10-12.** *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *13-14 (S.D. Cal. Sept. 22, 2023)

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *33–34 (S.D. Cal. Oct. 19, 2023)

202.    **Assault Weapons Self-Defense Use in Active Shootings.** An analysis of FBI data of active shootings between January 1, 2000 and December

31, 2022 in the United States revealed 456 active shooter incidents, of which 18 incidents involved defensive gun use by civilians, excluding law enforcement or armed security. For this dataset, active shooter incident refers to attacks by perpetrators "in a populated area." In 17 of the 18 incidents, the firearm used by an armed private citizen was identifiable. 14 involved handguns, 1 involved a shotgun, 1 involved a bolt-action rifle, and 1 involved an assault rifle. Thus, only 5.9% (1 of 17) cases where a firearm was used for self-defense in an active-shooter scenario involved the use of an assault weapon. Overall, only 1 out of 456 active-shooter scenarios in the last 23 years (0.2%) involved an armed civilian intervening with an assault weapon. Klarevas ¶¶ 25-26.

**RESPONSE:  Disputed. Kapelsohn Rebuttal Report at 12; Cramer Report at 27-41. Miller v. Bonta, No. 19CV01537BENJLB, 2023 WL 6929336, at \*33 (S.D. Cal. Oct. 19, 2023)**

## Historical Linguistics

203.    An appropriate way to glean the original public meaning of constitutional text is to consider historical dictionaries and databases comprising real-world examples of how Americans used words between Founding and Reconstruction. Vannella Decl. Ex. 6, Rpt. of Professor Dennis Baron ¶¶ 2, 9–20.

**RESPONSE:  Objection. The statement is not a fact.**

204.    Between Founding and Reconstruction, the word "arms" referred to weapons. Baron Rpt. ¶¶ 20, 29, 31(q), 32, 74.

**RESPONSE:  Disputed. District of Columbia v. Heller, 554 U.S. 570, 581 (2008); the Third Circuit has already recognized that "[b]ecause ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey, 910 F.3d 106, 116 (3d Cir. 2018) ("ANJRPC I") "); Duncan, 2023 WL 6180472, at \*8. And rightly so, as it is not the firearm alone, but with ammunition fed by the magazine, that "facilitate[s] armed self-defense." See Bruen, 142 S. Ct. at 2132. Feeding devices are not just holders of ammunition; they are an integral part of the mechanism that makes semiautomatic firearms work: When a user pulls the trigger, the round in the chamber fires, and the**

74

**semiautomatic action combines with the magazine to feed a new round into the firing chamber. Without a device to feed ammunition to the firing chamber, modern semiautomatic firearms are little more than overengineered clubs. Citizens thus carry firearms equipped with magazines for the same reason they carry firearms loaded with ammunition: "[W]ithout bullets, the right to bear arms would be meaningless." Jackson v. City & Cnty. of S.F., 746 F.3d 953, 967 (9th Cir. 2014). That magazines and other ammunition feeding devices are integral to the functionality of the firearms citizens carry suffices to make them "presumptively protect[ed]" by the Constitution. Bruen, 142 S. Ct. at 2126.**

205.     During that same period, the word "arms" was used separately from the word "accoutrements," which referred to accessories such as belts, scabbards, and cartridge boxes. Baron Rpt. ¶¶ 2(a), 23–28, 31(f), 31(*l*), 32, 37, 39, 42–44, 47–48, 51, 55.

**RESPONSE:  Undisputed.**

206.     "Cartridge boxes," "cartridge cases," and "cartouch cases" were phrases used during this period to describe ammunition containers. Baron Rpt. ¶¶ 3, 30, 31(i), 71.

**RESPONSE:   Undisputed**.

207.     The word "magazine" is currently used to describe ammunition containers, but it began to be so used only during the latter half of the 19th Century. Baron Rpt. ¶¶ 3, 21–22, 30, 31(n), 58, 67–68. For instance, the Oxford English Dictionary notes the earliest use of magazine meaning "a bullet storage container" as 1868. Baron Rpt. ¶ 3, 22, 58, 64. From that point, the word "magazine" gradually replaced the phrase "cartridge box" and the like.  Baron Rpt. ¶ 68.

 **RESPONSE:  Disputed. By statute it means an ammunition feeding device.  And it also does by definition:**

**A compartment in some types of firearms, often a small detachable box, in which cartridges are held to be fed into the firing chamber.**

**https://www.ahdictionary.com/word/search.html?q=magazine**

**the equivalent would be a ramrod on a musket. See also Kapelsohn Rebuttal Report at 3-7; Cramer Report at 12-13.**

208.     Modern magazines often feed ammunition into firearms. Baron Rpt. ¶¶ 30, 31(n), 58.

**RESPONSE:  Undisputed.**

209.     Historically, cartridge boxes also fed ammunition into firearms. For example, to operate the "Mitrailleuse," a French field weapon analogous to today's machine guns, a person "fire[d] it by turning a crank" and then "removed" "the cartridge box … from the canon" and "put a new one in." Baron Rpt. ¶ 31(n).

**RESPONSE: Disputed. This didn't exist until the 1870s in France. See also Plaintiffs.Reply.Br.3-5.**

https://www.merriam-webster.com/dictionary/mitrailleuse

210.     Ammunition containers—whether cartridge boxes or magazines— were not historically understood to be "arms." Baron Rpt. ¶¶ 2(b), 3, 22–23, 29–32, 44, 58, 64, 68, 71, 74.

**RESPONSE:  Disputed.**

**Modern magazines, submits the State, are more like founding-era cartridge boxes or "ancillary equipment associated with soldiering" that were not strictly necessary to fire a gun. Today, however, as pointed out above, some semiautomatic firearms will not function at all without a magazine, while others can fire no more than one round. As such, a magazine is an essential component without which a semiautomatic firearm is useless for self-defense. Therefore, a magazine falls within the meaning of "arms."79**

**Duncan v. Bonta, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*9 (S.D. Cal. Sept. 22, 2023).**

Dated:  December 16, 2023             Respectfully submitted,

                                                          s/ Daniel L. Schmutter
                                                          Daniel L. Schmutter
                                                          Hartman & Winnicki, P.C.
                                                          74 Passaic Street
                                                          Ridgewood, New Jersey 07450
                                                          (201) 967-8040
                                                          (201) 967-0590 (fax)
                                                          dschmutter@hartmanwinnicki.com