## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al. <br><br> *Plaintiffs,* <br><br> v. <br> MATTHEW PLATKIN, et al. <br><br> *Defendants.* | ) HON PETER G. SHERIDAN <br> ) <br> ) Civil Action No. 3:18-cv-10507-PGS-LHG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| MARK CHEESEMAN, et al. <br><br> *Plaintiffs,* <br><br> v. <br> MATTHEW PLATKIN, et al. <br><br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 3:22-cv-4360-PGS-LHG <br> ) <br> ) <br> ) <br> ) |
| BLAKE ELLMAN, et al. <br><br> *Plaintiffs,* <br><br> v. <br> MATTHEW PLATKIN, et al. <br><br> *Defendants.* | ) HON. PETER G. SHERIDAN <br> ) <br> ) Civil Action No. 1:22-cv-4397-PGS-LHG <br> ) <br> ) <br> ) <br> ) |

## DECLARATION OF CLAYTON CRAMER

I, CLAYTON CRAMER, hereby depose and state:

1.      I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2.      I have attached hereto a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report).   The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty.   I hereby adopt and incorporate my expert report in this declaration as if set forth in full detail.

I declare under penalty of perjury on this 15th day of December 2023, that the foregoing is true and correct.

CLAYTON CRAMER

Dated: December 15, 2023

1

# REBUTTAL EXPERT REPORT OF CLAYTON CRAMER

## JULY 17, 2023

## I.      Qualifications

My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller* (2008), *McDonald v. Chicago* (2010), *Jones v. Bonta* (9th Cir. 2022), *Young v. State* (9th Cir. 2021), *State v. Sieyes* (Wash. 2010), *Senna v. Florimont* (N.H. 2008), *Mosby v. Devine* (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

In several cases, my work has been cited in defense of laws limiting firearms ownership: *State v. Roundtree* (Wisc. 2021), *State v. Christen* (Wisc. 2021), *King v. Sessions* (E.D.Penn. 2018).

I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert reports and declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

My CV is attached hereto as Exhibit A.

## II.     Saul Cornell

This Rebuttal to Prof. Cornell reveals multiple errors that demonstrate a limited knowledge of the colonial period and legal history.

### A.      Carrying Over English Common Law

At p. 3, Cornell asserts "Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law

1

that had been in effect in the English colonies for generations." His footnote lists "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804)."

"9 STATUTES AT LARGE OF PENNSYLVANIA 29-30" carried over English law but with the important provision:

> all and every person and persons whosoever are hereby enjoined and required to yield obedience to the said laws as the case may require *until the said laws or acts of general assembly respectively, shall be repealed or altered* or until they expire by their own limitation and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted.[1] [emphasis added]

Certainly, the Pennsylvania Constitution of 1790, with its guarantee of a right to keep and bear arms,[2] qualifies as alteration of English common law concerning arms.

"FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792)." The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[3] North Carolina's 1776 Constitution guarantees "That the people have a right to bear arms, in defense of the State"[4] Again, this guarantee concerning the right to bear arms overrode English

---

[1] 9 STATUTES AT LARGE OF PENNSYLVANIA 30 (1903).
[2] Penn. Const., Art. IX, § 21 (1790).
[3] Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA iii (1792).
[4] North Carolina Const. Art. XVII (1776).

common law.  Furthermore pp. 60-61 in Martin's collection is the Statute of Northampton disqualified for relevance by *Bruen*.[5]

When the North Carolina Supreme Court heard State v. Newsom (1844), one of the claims made by the black defendant was that the 17th article the Bill of Rights of North Carolina protected his right to carry a shotgun.  The North Carolina Supreme Court in deciding in this case, did not question whether the right to keep and bear arms was individual in nature.  Instead, they ruled that the defendant's color was the deciding principle, taking precedence over the text.  Referring to the authors of the North Carolina Constitution: "They must have felt the absolute necessity of the existence of a power somewhere, to adopt such rules and regulations, as the safety of the community might, from time to time, require."[6]

*Commonwealth v. Leach*, 1 Mass. 59 (1804)": The decision did nothing to make English common law applicable in Massachusetts:

> Hooker, for the prosecution, conceded that justices of the peace were officers created by statute, and that their jurisdiction and powers were wholly dependent upon the statutes; 2 Hawk. P. C. c. 8, 13 , &c. But he contended that their jurisdiction here was not limited to those offences which are expressly, and by name in our own statutes, made cognizable by them; on the contrary, that it extended to all cases in which justices of the peace in *England* had jurisdiction by any of the statutes of that country which were passed previous to the emigration of our ancestors; which were to be considered as a part of our common law; that this was strongly implied in the act for establishing Courts of General Sessions of the Peace, passed July 3, 1782, (stat. 1782, c. 14 ,) by the first section of which" they are empowered to hear and determine all matters relative to the conservation of the peace, and the punishment of such offences as are cognizable* by them at common law, or by the acts and laws of the legislature, and to give judgment, &c.

> In this act, the term *common law* cannot mean the common law of *England*, because justices of the peace there are not common law officers; it must,

---

[5] *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111, 2139, 2140 (2022).
[6] *State v. Newsom*, 27 N.C. (5 Ired.) 250, 255 (1844).

> therefore, mean our common law; and on this subject, our common law must be precisely what the *statute* law of *England* was at the time of the emigration of our ancestors from that country. The statutes which were previous to that time enacted in England, and which define or describe the authorities, powers, and jurisdiction of justices of the peace, give to them, expressly, cognizance of divers offences which were offences at common law; among which are trespasses.[7] [emphasis in original]

Clearly, only *some* parts of English law were common with Massachusetts law. Where Massachusetts law had differed, English law was no longer valid.

A later digest of Massachusetts decisions includes "*Commonwealth v. Leach*, 1 Mass. 59 (1804)" in its list of "English Statutes Adopted Here."[8]  Only individual s*tatutes*, not necessarily all of common law applied in Massachusetts, or there would be no need to have a detailed list.

Cornell has attributed this carryover of English law as it was in 1776 to "[e]ach of the new states" from sources in three states, none of which fits his claim.  Cornell does not understand his sources.

The U.S. Supreme Court has also emphasized how little significance English common law has compared to a constitution: "Legislation is the exercise of sovereign authority. High and important powers are necessarily vested in the Legislative body; whose acts, under some forms of government, are irresistible and subject to no control. In England, from whence most of our legal principles and legislative notions are derived, the authority of the Parliament is transcendent and has no bounds."[9]

---

[7] *Commonwealth v. Leach*, 1 Mass. 59 (1804).
[8] 2 Massachusetts Digest: Being a Digest of the Decisions of the Supreme Judicial Court Of Massachusetts, From The Year 1804 to the Year 1857. 661 (1863).
[9] *Vanhorne's Lessee v. Dorrance*, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).

## B.      Conserving the Peace

Prof. Cornell on p. 3 quotes Blackstone's COMMENTARIES about how the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."  True enough, but Blackstone's quote is from a discussion of:

> [S]ubordinate magistrates, whom I am to consider justices of the peace…  Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[10]

While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective description, and irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defense…"[11]  Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

> The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[12]

If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

---

[10] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).
[11] *Id.*, at 143.
[12] *Id.*, at 121.

At p. 6:

> The most basic right of all at the time of Founding was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power. The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.  Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." The term police encompassed more than law enforcement, it also included the right of the people to legislate for the common good.

The Pennsylvania Constitution included a guarantee of a right to keep and bear arms,[13] a guarantee "[N]o part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives"[14] and a guarantee of "a right to freedom of speech, and of writing, and publishing their sentiments."[15]  These seem to be pretty large exceptions to Cornell's imagined right "to legislate for the common good."  Perhaps Cornell's understanding of state police power is wrong or at least more limited than he imagines?

Pennsylvania Supreme Court decisions portray the state's police power somewhat more narrowly than Cornell: "Its exercise may be limited by the frame or constitution of a particular government, but its natural limitations, in the absence of a written constitution, are found in the situation and necessities of the state, and these must be judged of in the first instance by the government itself."[16]

What the people, and ideally the legislature as well, consider "laws to promote public health and safety" has been restrained by both state constitution bills of rights and the U.S. Bill of Rights from the very beginning.  Rep. James Madison, author of the Bill of Rights, is also

---

[13] Penn. Const. Art. 11 (1776).
[14] Penn. Const. Art. 8 (1776).
[15] Penn. Const. Art. 12 (1776).
[16] *Commonwealth v. Vrooman*, 164 Pa. 306, 316 (Penn. 1894).

remembered for his MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN arguing that Virginia should disestablish the Anglican Church:

> Either then, we must say that the will of the Legislature is the only measure of their authority, and that, in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: either we must say that they may control the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary powers of the State; nay, that they may despoil us of our right of suffrage, and erect themselves into an independent and hereditary assembly: or, we must say, that they have no authority to enact into law the bill under consideration.[17]

If Cornell really believes in this police power "to promote the common good," I look forward to his stalwart defense of state laws mandating racially segregated public schools and public accommodations, censorship of dirty books, prohibitions on sodomy, one man/one woman marriage laws, and bans on transgender sports. It is hard to consider a person a legal scholar or historian who does not understand that the American experiment in democracy has always been restrained by a recognition that majorities can and do make mistakes. This is the reason that every state constitution today, many of the Revolutionary state constitutions, and the U.S. Constitution has a Bill of Rights.

At pp. 8-9, Cornell quotes the Second Amendment and asserts, "Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state." The first clause of the Second Amendment references not well-regulated arms but a "well-regulated militia."

*Heller* pointed out that, "The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but

---

[17] James Madison, A MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN; WRITTEN IN 1784-5, AT THE REQUEST OF THE RELIGIOUS SOCIETY OF BAPTISTS IN VIRGINIA 41 (1828).

rather announces a purpose."[18]  Either Cornell is misreading the Second Amendment's text or he is unfamiliar with the *Heller* decision.  In either case, he has demonstrated his lack of expertise in this subject.

Cornell at pp. 7-8 cites the Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term.  If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject.[19]

At p. 8, quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property."  The relevance of this quote to this case seems confused.  The plaintiffs are not arguing for no government or a "destitution of all law," but a disagreement about *this* law.  Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

At p. 11, Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."  What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power.  The recent consequences of panic after 9/11 should be a reminder that even well-intentioned polity's can blow it.

Cornell continues: "In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping

---

[18] *D.C. v. Heller*, 554 U.S. 570, 577 (2008).
[19] Richard Burn and John Burn, A New Law Dictionary 79 (1792).

track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order." Mustering the militia required no such recordkeeping. Colonial and state militia laws did not keep track of who was armed. They imposed a duty to be armed and to show up with those arms on muster day or face fines for failure.[20] I am unaware of any safe storage laws of this period, and Cornell cites only a secondary source for a rather important claim. I have a pretty complete collection of colonial and Revolutionary militia laws[21] and there are no such provisions that I can find.

At pp. 12-13: "The plain text of the Second Amendment not only protects the right to keep and bear arms, it acknowledges that this right is designed to encourage the security of a free state. Actions that undermine this security are clearly not protected by the Amendment." It is unclear to what Cornell refers. Mass murder (the posited purpose the assault weapons ban) certainly endangers individuals; in no way does it endanger "the security of a free state."

It is certainly true that a group of men who violently overthrew their lawful government had a strong sympathy for the right of put-upon citizens to rise up in rebellion. The New Hampshire Constitution of 1784: "The doctrine of non-resistance against arbitrary power, and oppression, is absurd, slavish, and destructive of the good and happiness of mankind."[22]

James Madison, author of the Second Amendment, articulated a revolutionary model of arms ownership in *Federalist* 46. At the time, Madison was arguing that the widely demanded Bill of Rights as a limit on the new government's powers were unnecessary: "The only refuge left

---

[20] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall bare Arms that are above the age of sixteen years except they do tender a sufficient excuse [to] the Corte & the Cort allow the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649  25-26 (1857) ("It is ordered that every one that bares arms shall be completely furnished with arms (viz), a musket, a sword, bandoleers, a rest, a pound of powder, 20 bullets fitted to their musket, or 4 pound of pistol shot or swan shot at least, and be ready to show them in the market place upon Monday the 16th of this Month before Captain Turner and Lieutenant Seely under the penalty 20 s fine for every default or absen[ce].")
[21] Clayton E. Cramer, *Militia Statutes*, https://claytoncramer.com/primary/primary.html#MilitiaLaws, last accessed July 15, 2023/
[22] New Hampshire Const. Part I, .Art. 10 (1784).

for those who prophesy the downfall of the State governments is the visionary supposition that the federal government may previously accumulate a military force for the projects of ambition." His response to why this was not a serious danger?

> Extravagant as the supposition is, let it however be made. Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government; still it would not be going too far to say, that the State governments, with the people on their side, would be able to repel the danger. *The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million of citizens with arms in their hands, officered by men chosen from among themselves, fighting for their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops.* Those who are best acquainted with the last successful resistance of this country against the British arms, will be most inclined to deny the possibility of it. *Besides the advantage of being armed, which the Americans possess over the people of almost every other nation,* the existence of subordinate governments, to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of. *Notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as the public resources will bear, the governments are afraid to trust the people with arms.* And it is not certain, that with this aid alone they would not be able to shake off their yokes. But were the people to possess the additional advantages of local governments chosen by themselves, who could collect the national will and direct the national force, and of officers appointed out of the militia, by these governments, and attached both to them and to the militia, it may be affirmed with the greatest assurance, that the throne of every tyranny in Europe would be speedily overturned in spite of the legions which surround it.[23] [emphasis added]

Responding to Shays' Rebellion in 1786, Jefferson argued that it was not such a bad thing:

> et where does this anarchy exist? Where did it ever exist, except in the single instance of Massachusetts? And can history produce an instance of a rebellion so honorably conducted? I say nothing of its motives. They were founded in ignorance, not wickedness. God forbid we should ever be 20 years without such a rebellion. The people cannot be all, and always, well informed. The part which

---

[23] James Madison, *Federalist* 46.

is wrong will be discontented in proportion to the importance of the facts they misconceive. If they remain quiet under such misconceptions it is a lethargy, the forerunner of death to the public liberty. We have had 13. states independent 11 years. There has been one rebellion. That comes to one rebellion in a century and a half for each state. What country before ever existed a century and half without a rebellion? *And what country can preserve its liberties if their rulers are not warned from time to time that their people preserve the spirit of resistance? Let them take arms. The remedy is to set them right as to facts, pardon and pacify them. What signify a few lives lost in a century or two?* The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants. It is its natural manure.[24] [emphasis added]

To summarize, if that national government created a standing army, it would be grossly outnumbered by the armed population who with the assistance of state governments directing it would rapidly overthrow such a project of ambition.

If Cornell is arguing that assault weapons might be a danger to the security of the government, James Madison and Thomas Jefferson would certainly agree and likely applaud. This is doubtless unpleasant news to those in charge of our current governments, but it was clearly part of the Founders' mindset.

At p. 10: "The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties."

In 1777, Pennsylvania responded to concerns that Loyalists might be a fifth column by passing a law that provided that those of militia age refusing to swear an oath of loyalty to the Revolutionary governments were prohibited from "holding any office or place of trust in this state, serving on juries, suing for any debts, electing or being elected, buying, selling or transferring any lands, tenements or

---

[24] Thomas Jefferson to William Smith, Nov. 13, 1787, Library of Congress, https://www.loc.gov/exhibits/jefferson/105.html, last accessed July 17, 2023.

hereditaments, and shall be disarmed by the lieutenant or sub-lieutenant of the city or counties respectively."

Massachusetts' similar Test Act:

> That every male person above sixteen years of age, resident in any town or place in this colony, who shall neglect or refuse to subscribe a printed or written declaration, of the form and tenor hereinafter prescribed, upon being required thereto by the committee of correspondence, inspection and safety, shall be disarmed, and have taken from him, in manner hereafter directed, all such arms, ammunition and warlike implements, as, by the strictest search, can be found in his possession or belonging to him…[25]

Like its cousins in other states, refusing the oath disqualified one for any public office, work as a minister, voting, or teaching.[26]  Cornell could easily use these wartime emergency acts as justification today for restrictions on transferring property, voting, teaching, or preaching the gospel.

Abuses of civil liberties were widespread during the chaos of the Revolution.  Thomas Jefferson drafted a bill of attainder passed by the Virginia Legislature in 1778.[27]  In Cornell's model, the U.S. Constitution's prohibition on Bills of Attainder[28] can be safely ignored.

## C.    Arms vs. Accoutrements[29]

### 1. Cartridge-Boxes Are Not Magazines

At pp. 13-15, Cornell seeks to distinguish magazines from arms, by observing that cartridge-boxes were considered accoutrements, not arms.  This I do not dispute.  A rifleman of 1791 could easily dispense with a cartridge-box and carry cartridges in his pocket.  He might simply carry black powder in a powder horn and bullets in his pocket.  A 1791 cartridge-box is

---

[25] 5 Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay 479 (1886), ch. 21.
[26] Ibid. 481.
[27] William M. Burwell, Address Delivered Before the Society of Alumni of the University of Virginia 446-47 (1847).
[28] U.S. Const., Art. I, § 9, cl. 3.
[29] This section applies equally to the report and contentions of Dennis Baron.

functionally identical to a modern cartridge box.  It is a place where you store ammunition until you are ready to use it.  No amount of clever use of search terms in large bodies of text will change this.

### 2. Magazines Are Part of the Firearm

Magazines in a semiautomatic firearm (or even a lever action or bolt-action firearm) regardless of capacity or if they are detachable are a fundamental part of the weapon.  Without a magazine, you must reload for every shot.  This is a slow and inconvenient process.  For target shooting, this might be an acceptable choice.  For self-defense or hunting, this is impractical.  If the court doubts this, ask your bailiff if he would want to maintain order in the courtroom with a single-shot pistol.

All semiautomatic firearms come with a magazine, either detachable or as part of the gun for fixed-magazine firearms (usually shotguns and some rifles).  I have never seen a semiautomatic firearm sold without a magazine; it is part of the gun.  And, in fact, the very New Jersey magazine law being challenged in this lawsuit defines "Large capacity ammunition magazine" in terms of its function to feed ammunition "continuously and directly therefrom into a semi-automatic firearm." N.J.S. 2C:39-1(y). The banned magazines are feeding devices and are part of the firearms. They are nothing like cartridge boxes.

If the question is whether a Large Capacity Magazine or a detachable magazine is necessary, again, ask a bailiff or any police officer.  While the risks they face are more common than an ordinary citizen, they are not fundamentally different in quality.  Someone who breaks into your home or assaults you on the street may require more than one shot to cause them to cease being a threat to your life.  Under the stress of a life-threatening incident, not every shot will hit

your attacker; not every shot that hits your attacker will be sufficiently well-placed to stop the attack.  If there are multiple attackers, a ten round magazine may not be sufficient.

Even with an LCM ban, the effectiveness of LCM bans for reducing mass murder is not well-established.  In the aftermath of the 2018 Parkland shooting:

> Several state legislators who visited the school with crime-scene investigators said they learned from police that Cruz's rifle was not top-of-the-line, perhaps explaining the malfunction.
>
> The "weapon and bullets were not high quality and were breaking apart," one of the legislators, state Sen. Lauren Book, D-Plantation, told the Herald.
>
> Cruz went in with only 10-round magazines because larger clips would not fit in his duffel bag, Book said.[30]

Nearly any shooter can with a few minutes practice do magazine swaps in less than a second.  Limiting magazines to a 10-round capacity would be of very limited value for reducing mass murder.  The only circumstances in which a 10-round limit might matter would be if a courageous bystander took advantage of the second or less required for a magazine swap.  While such interventions have happened, the circumstances are a bit more complex than portrayed by advocates of LCM bans: "[murderer's name redacted] fired all 31 bullets in the magazine and was reloading when a woman in the crowd, already wounded, attempted to grab the gun from him. He finally changed the magazine and tried to fire, but the gun jammed. Meanwhile, two men from the crowd grabbed him and subdued him, officials said."[31]

Similarly, the Clackamas Mall shooting in December, 2012, ended with fewer dead than was likely the murderer's intentions because: "[The sheriff] said the death toll would have been

---

[30] Nicholas Nehamas and David Smiley, *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report Says,* MIAMI HERALD, Feb. 27, 2018.
[31] Sam Quinones and Michael Muskal, *Jared Loughner to be charged in Arizona shootings targeting Gabrielle Giffords,* Los Angeles Times, Jan. 9, 2011.

higher had the shooter's assault rifle not jammed and law enforcement not responded within minutes of the first shot."[32]

I would add from personal experience that many larger magazines, if loaded to full stated capacity, often jam on the first few rounds until the magazine spring has had a chance to "set" in the fully compressed state after a few months fully loaded.  Experienced shooters know this. Noteworthy is that the Clackamas Mall shooter stole the AR-15 "the day before from someone he knew,"[33] and likely did not know this.  Giffords' shooter was using a 31-round magazine,[34] which is larger than the factory magazine, and others in the crowd may have survived because the next magazine he loaded jammed the gun. They at least suggest LCMs are exaggerated in their dangerousness.

### 3. Pistols in Colonial America

At p. 19: "Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates."

Bayonets are not a firearms technology, nor are they regularly included with a firearm for sale.  I have certainly never seen one included with a gun, nor does this case involve bayonet regulation.  (I cannot recall reading of any mass murders involving bayonets in recent years.)

Cornell's assumption of who owned pistols and why reflects, I think, Cornell's single source, a book about dueling by people in national politics.  47. How common were pistols before

---

[32] John Bacon, *Oregon mall shooter, victims identified, USA Today*, Dec. 11, 2012.
[33] *Id*.
[34] Sam Quinones and Michael Muskal, *Jared Loughner to be charged in Arizona shootings targeting Gabrielle Giffords,* Los Angeles Times, Jan. 9, 2011.

the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was a civilian market for them in at least some cities; and that pistol ownership was unremarkable. An analysis of all Plymouth Colony probate inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[35]

On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Calvarymen were obligated to provide themselves with "a case of pistols, and a carabine."  Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols." [36] (How many pistols were in one case?  At least one.)

While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige.   Only a few pre-Revolutionary War American-made pistols have survived.[37]  Surviving pistols made for William Smith of Farmington, Connecticut by Medad Hills in 1771, were equipped with American-made barrels, and apparently English locks.[38]

---

[35] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.
[36] Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840).
[37] Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792 312 (1980); Frank Klay, THE SAMUEL E. DYKE COLLECTION OF KENTUCKY PISTOLS 4-15 (1972); Felicia Johnson Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 34 (1948).
[38] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).

Advertising and news reports show that merchants offered pistols for sale in Colonial America. Such ads appear in the *Boston Gazette* as early as 1720. Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[39]

A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749. A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as they said, got the six Pair at some other Place."[40]  In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[41] as did Henry Deabarear, who sold "pistols for holsters and the pocket…."  Philadelphia merchants advertised pistols for sale repeatedly from 1744 onward.[42]  A 1745 ad in the PENNSYLVANIA GAZETTE, offered "ship muskets, *pistols*, cut lashes and poleaxes, gunpowder, lead, shot and bullets, English and French gun flints."[43] [emphasis added]

Pistols appear in journals and newspaper articles throughout the colonial period—and while the crimes committed with them are sometimes shocking, the *presence* of pistols is never remarkable.  Governor John Winthrop made several references to pistols in New England in the nineteen years that his journal covers.  One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire) that led the factions to arm themselves and march, at least one member

---

[39] BOSTON GAZETTE issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742, May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

[40] PENNSYLVANIA GAZETTE, August 31, 1749.

[41] September 4, 1772 and September 14, 1773, WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).

[42] *Pennsylvania Gazette*, November 1, 1744; September 26, 1745; October 3, 1745; October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748; September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759; February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764; August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.

[43] *Just imported by Hamilton, Wallace and Company, in the Ship*, PENNSYLVANIA GAZETTE, Sep. 26, 1745, Oct. 3, 1745.

identified as armed with a pistol.  There were murders with pistols at Stamford, Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at Cape Sable in 1646.[44]  Pistols appear in other places in Winthrop's Journal.[45]  Winthrop never expressed any surprise over the presence of pistols.

An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[46] [emphasis in original]

Many eighteenth century accounts also mention pistols.  Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[47]   In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopped on the Road, and his Money demanded, by two Men with Pistols…."[48]  There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse of and accidental deaths from pistols; they are never described as surprising.[49]  Pistols appear among the South Carolina

---

[44] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153, 180, 275 (1908).
[45] *Id.*, at 95, 151,
[46] *NEW YORK, October 28. Monday Evening last a very melancholy*, PENNSYLVANIA GAZETTE, OCT. 31, 1745.
[47] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).
[48] *By the last Post from New York…*, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[49] *Monday Evening last a very melancholy…*,  PENNSYLVANIA GAZETTE, Oct. 31, 1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr. 20, 1749.

Regulators and the criminals to whom they administered frontier justice.[50]   Nor was there any surprise when pistols appear in the hands of the law-abiding, such as a description of Rev. Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols on Account of the Indians…."[51]

Pistols appear in news reports: This came from New York in 1775, describing events before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which was refused him; and whilst struggling to enter the door, he received a blow upon his head, which leveled him with the ground: Having recovered a little, he arose and discharged a *pistol* among the opposers, and commanded the Court party to fire also; when, as Mr. Langdon supposes, about five of them fired. Mr. French, one of the opposers, was killed by a ball's being lodged in his head, and two more of the same party were also wounded. The sheriff and the Court party then entered the courthouse. The populace without discharged a gun and two *pistols*.[52] [emphasis added]

Many news accounts report pistols being used by people far removed from "wealthy, powerful, and influential."[53]

A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not proofed (as English law required) thus creating a risk to his reputation.[54]   A 1766 ad in the SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass barrel pistols."[55]

---

[50] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).
[51] *Last Monday Capt. Tyng in the Massachusetts…*, PENNSYLVANIA GAZETTE, Aug. 15, 1745.
[52] *MR. Mark Langdon, from Westminster, in the…,* VIRGINIA GAZETTE, Apr. 22, 1775.
[53] BY THE LAST POST FROM NEW YORK…, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[54] *To the Publick,*  SOUTH CAROLINA GAZETTE, DEC. 26, 1743.
[55] *GUERIN & WILLIAMSON,Have just imported in the London*, SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL, Jun. 24, 1766, Jul. 1, 1766, Jul. 8, 1766

Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities.  This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off any handgun, pistol, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province...."[56]



PAUL REVERE'S VERY COMPACT POCKET PISTOL [57]

My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[58]  Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers, still it is pretty apparent that Cornell's

---

[56] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, Dec. 28, 1774.
[57] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[58] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

claim about the scarcity of pistols outside of those being used by the elite for dueling is utterly wrong and shows a limited knowledge of the period for which he has "expert" opinions.

### 4. Black Powder

At p. 18:

> Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge…. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

This is a perfectly logical statement, but the documents left by colonial Americans show that they did not follow it very consistently.  As mentioned above, people unloaded firearms in public places with tragic results.  Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to follow this very logical action:

> At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[59]

And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[60]

---

[59] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.
[60] *Id.* 2:55.

And with reference to Cornell's claim at p. 18: "The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge":

> It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[61] [emphasis added]

And:

> One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[62]

These four incidents of firearms kept loaded when not in active use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in books that I have not read?  Perhaps if Cornell was well-read in colonial documents, he would know enough to know about colonial practices to be an expert.   The relevance of this claim to the proposed law is unclear.  Did Cornell just copy and paste this section from a declaration where this was relevant?

Finally, there is one more piece of evidence that Americans kept firearms loaded when not ready for use.  In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

---

[61] *Id.*, 2:317.
[62] *Id.*, 2:72.

The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town…

You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

Cornell knows about this ordinance; he first brought it to my attention by email some years back.

## D.     Firearms Regulation in Antebellum America

At p. 32, Cornell makes a misleading reference to *Brown v. Maryland*, (1827): The regulation of firearms and ammunition was singled out as the quintessential example of state police power." The decision involved not gunpowder or even police power, but a state requirement

> [T]hat all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spirituous liquors, &c. and other persons selling the same by wholesale, bale or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license, as by the original act is directed, for which they shall pay fifty dollars…[63]

---

[63] *Brown v. Maryland*, 25 US 419, 436 (1827).

The *Brown* decision was based on the Dormant Commerce Clause.  The reference to gunpowder was in response to a hypothetical by Maryland: "He may sell by retail, at auction, or as an itinerant pedlar. He may introduce articles, as gunpowder, which endanger a city, into the midst of its population; he may introduce articles which endanger the public health, and the power of self-preservation is denied."  Chief Justice Marshall's decision quoted by Cornell was: "The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States."[64]  It was "a branch of the police power," not "the quintessential example."  The hazard of storing gunpowder in a crowded city is clear; it may explode without human agency and represents an enormous risk to persons perhaps far removed from the gunpowder.  If Cornell wants to liken the risk of assault weapon or LCM ownership to gunpowder storage, he needs a much clearer explanation of that parallel.

At 35, Cornell also quotes from the *License Cases* (1847) to justify what seems to be a nearly unlimited police power of the state:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.

This understanding of the nearly unlimited authority of the state by invoking the magic incantation "new and vicious indulgences" makes the entire Bill of Rights null and void.  If a state decided that sodomy and divorce were "new and vicious indulgences," the state would enjoy unlimited power to prohibit these actions.

---

[64] *Id*. at 443.

Cornell at p. 35 quotes selectively from *State v. Reid* (Ala. 1840) to claim that "'The terms in which this provision is phrased,' the court noted, 'leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."

The following paragraph of *Reid* admits

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, *under the presence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.*[65] [emphasis added]

I do not see how Cornell missed this utter rejection of his claim, two sentences later.

At p. 35 n. 121: "Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 95, at 91."  Cornell might have benefitted from reading the primary sources, as historians try to do, instead of relying on a clearly flawed secondary source.  Of course, this would require Cornell becoming familiar with the subject than he has along with *Bliss*, many other decisions decided the "scope of state power to regulate arms," often explicitly recognizing a right to open carry based on their state constitutions, and in some cases the Second Amendment, not the rarely mentioned "police power."[66]

---

[65] *State v. Reid*, 1 Ala. 612, 616, 617, 35 Am. Dec. 44 (1840).

[66] Just a *few* examples: *Bliss v. Commonwealth*, 2 Littell 90, 13 Am. Dec. 251 (Ky. 1822) (struck down a ban on carrying concealed weapons based on state constitution);. *Simpson v. State*, 5 Yerg. 356 (Tenn. 1833) (struck down a conviction for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make," because "the freemen of this state have a right to keep and to bear arms for their common defense."  Tenn. Const.  Article 11, sec. 26); *Aymette v. State,* 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840) (upheld a ban on concealed carry of a Bowie knife because the Tennessee Constitution only protected weapons of war: "The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution."); *State v. Reid,* 1 Ala. 612 (1840) (" A statute which, under

### E.    Post-1868 Evidence

Cornell insists at pp. 38-39: "As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good."  Had Cornell read *McDonald v. Chicago* (2010) he would know that it was precisely the racial discrimination of the Black Codes that caused the 14th Amendment to limit state authority in this area.[67]  This was the basis by which *McDonald* incorporated the Second Amendment against the states.[68]

### F.    Summary

Cornell misrepresents the broadness of the carryover of English law to the American colonies.  He lists three states that apparently must stand in for all thirteen former colonies and even these two of these three are clear that later statutes (presumably including post-Revolutionary state constitutions) take precedence.  In Massachusetts, only a few aspects of English law carried over to the new state.

He misrepresents Blackstone about the importance of conserving the peace; argues for a unlimited democracy that the Bill of Rights exists to prevent; He misrepresents how the militia laws and the Test Acts worked.

---

the presence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional."); *Owen v. State*, 31 Ala. 387 (1858) (upheld a ban on concealed carry, but "That section was not designed to destroy the right, guaranteed by the constitution to every citizen, "to bear arms in defense of himself and the State"; nor to require them to be so borne, as to render them useless for the purpose of defense."); 3 Iredell 418, 423 (N.C. 1843) (Upholding a conviction of a bully running around armed and threatening people: "For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.")
[67] *McDonald v. City of Chicago*, 561 U.S. 742, 779 (2010)
[68] *Id*. at 790.

He misrepresents *State v. Reid* (Ala. 1840); misuses Dormant Commerce Clause cases to argue for an unlimited power of the states to regulate everything with no power of the Bill of Rights to counter such abuses of majority power.

Cornell attempts to use post-1868 laws contrary to *Bruen's* clear instructions.

## III.   Louis Klarevas

This Rebuttal to Louis Klarevas demonstrates that his claims about mass murder rate change are very questionable.

### A.   Intentional Criminal Acts

At ¶11: "It is my professional opinion, based upon my extensive review and analysis of the data, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide." This is one of those claims that on its face is so obviously wrong that he must be leaving something out of his claim. There have been 543 mass murders since 2006 (of which some do not involve firearms) with 2,829 dead.[69] (I picked 2006 because there was an available dataset.) Yet the FBI reports there were 13,477 homicide incidents in 2021, 17,815 murders in 2020, 14,548 in 2019, with the lowest number since 2011 being 12,312 in 2014.[70] There were 170,206 total murders 2011 through 2021. Somehow mass murders from all years 2006 through 2021 are 1.7% of the *total* murders in the years 2011 through 2021, and mass murders are the biggest threat of "individual acts of intentional criminal violence"?

---

[69] *Mass killing database: Revealing trends, details and anguish of every US event since 2006, USA Today,* Mar. 29, 2023. *See Number of mass killing victims killed per year.* In 2022, there were 24 non-gun mass murder victims; in 2021, 18; in 2020, 18.
[70] FBI, *Expanded Homicide Offense Counts in the United States,* https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/shr, last accessed April 1, 2023. FBI, Crime Data Explorer for 2021 Homicide, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/crime-trend, last accessed July 15, 2023.

## B.   Errors of History

At ¶11: "mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, largely related to the use of assault weapons and LCMs": Mass murders with double-digit fatalities without LCMs are surprisingly common in American history[71] and not a recent phenomenon.  Here the "expert" shows the questionable nature of his database.

The mass murderer at the University of Texas in 1966 murdered fourteen people.[72]  He was a skilled marksman using a very traditional hunting rifle: a Remington 700.  He also had two more rifles, a shotgun, and three pistols with him.[73]  The Navy Yard mass murderer used a pump-action Remington 870 shotgun to murder 12.[74]

## C.   Those Other Mass Murders Do Not Count

At ¶11, "high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs…"  By similar incidents, I presume he means firearms mass murders *only*.

Of course, mass murder does not require a firearm of any sort.  Non-firearm double-digit mass murders are by no means particularly modern aspects of American history.  On Christmas Eve, 1913, a man shouted, "Fire! Fire!  Everybody rush!" in the Italian Hall where striking miners and their families were having a Christmas party.  (There was no fire.)  As the crowd attempted to

---

[71] 150 dead in the 1873 Colfax, La., Massacre, 140 dead in the Mountain Meadows, Utah Massacre, 74 dead in the Calumet, Mich. Trampling incident; at least 100 killed in the 1921 Tulsa riot; 95 murdered in an arson of a school in 1958 Chicago,

[72] Charles Bowden, *The Men Who Stopped a Mass Murderer,* Esquire, Aug. 26, 2021, https://www.esquire.com/news-politics/a36890935/charles-whitman-mass-shooting-university-of-texas/, last accessed February 6, 2023.

[73] Craig Hlavaty, *Rifle Reported To Be Used In Charles Whitman Killing Spree Up For Sale*, *Houston Chronicle*, Sep. 24, 2014, https://www.chron.com/news/houston-texas/texas/article/Rifle-reported-to-be-used-in-Charles-Whitman-5777479.php,          last accessed February 6, 2023.

[74] Greg Botelho and Joe Sterling, FBI: *Navy Yard shooter 'delusional,' said 'low frequency attacks' drove him to kill*, CNN, Sep. 26. 2013.

exit the hall through an inadequate exit, seventy-four people (mostly children) were trampled to death.[75]  One account ascribed the false claim to "a drunken" man,[76] but considering the murder of strikebreakers in Calumet a few weeks before in the middle of a fierce labor dispute,[77] this seems unlikely as the cause.[78]  11. June 24, 1973: The murderer took revenge for being expelled from the UpStairs Lounge, a gay bar.  He walked down the street and bought a bottle of cigarette lighter fluid, killing 33 people.[79]

The five largest mass murders in U.S. history have been with airplanes,[80] explosives,[81] and flammable liquids.[82]  Klarevas cannot discount these other mass murders as terrorist acts as he includes terrorist firearms mass murders at Fort Hood, TX and San Bernardino, CA in his Table 6 of mass shootings.

This unwillingness to include non-firearms mass murders is questionable.  Other experts on mass murder have responded to my list of early American mass murders by discounting the mass murders of children:

> The husband who attacked his family with an axe in Clarksburg, Virginia, in 1805 killed only one adult, his wife.  His other eight victims were his children. And the husband who attacked his family with a knife in Hallowell, Maine, in 1806 killed only one adult, his wife. His other 7 victims were his children. Cramer's evidence does not show that edged and blunt weapons are effective tools for committing mass murder. It shows instead that infants and children are not capable of defending themselves against attacks by adults.  That conclusion is consistent with the extensive literature in contemporary criminology that

---

[75] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

[76] *Day of Joy is One of Sorrow*, [Valley City, N.D.] *Weekly Times-Record*, Jan. 1, 1914, 6.

[77] *Strike Breakers Taken to Mines at Point of Pistols*, *Omaha Daily Bee*, Jan. 11, 1914, 1 (based on U.S. Dept. of Labor report).

[78] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

[79] Elisabeth Dias with Jim Down, *The Horror Upstairs*, TIME, Jul. 1, 2013.

[80] David B. Caruso, *Official 9/11 death toll grows by 1 nearly a decade later*, HOUSTON CHRONICLE, Jun. 17, 2011. (2,753 dead at World Trade Center); *Accused 9/11 plotter Khalid Sheikh Mohammed faces New York trial*, CNN, November 13, 2009. (146 at Pentagon).

[81] Elizabeth Chuck, *Twenty Years Later: The People in the Oklahoma City Bombing*, NBC NEWS, Apr. 18, 2015.

[82] Richard W.Bukowski, P.E. and Robert C. Spetzler, *Analysis Of The Happyland Social Club Fire With Hazard I*, 4(4) JOURNAL OF FIRE PROTECTION ENGINEERING, 117-131,(1992), (87 dead); *Dupont Plaza Hotel Fire Puerto Rico 1986*, NIST ENGINEERING LABORATORY, https://www.nist.gov/el/dupont-plaza-hotel-fire-puerto-rico-1986, last accessed November 17, 2017. (98 dead).

shows that young children are killed in the overwhelming majority of cases with weapons other than firearms, because adults can kill children so easily with physical force or everyday household objects.[83]

I guess we can ignore mass murders of children in justifying LCM bans.

### 1.   Effectiveness of Assault Weapon Bans

At ¶11: "states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs": He points to his own work for this claim.  I point to the National Institute of Justice report, commissioned by Congress as part of the 1994 federal assault weapons ban:

> A central argument for special regulation of assault weapons and large capacity magazines is that they facilitate the rapid firing of high numbers of shots, which allows offenders to inflict more wounds on more persons in a short period of time, thereby increasing the expected number of injuries and deaths per criminal use. The study examined trends in the following consequences of gun use: gun murders, victims per gun homicide incident, wounds per gunshot victim, and, to a lesser extent, gun murders of police.

> There were several reasons to expect, at best, a modest ban effect on criminal gun injuries and deaths. First, studies before the ban generally found that between less than 1 and 8 percent of gun crimes involved assault weapons, depending on the specific definition and data source used. Although limited evidence suggests that semiautomatics equipped with large capacity magazines are used in 20 to 25 percent of these gun crimes, it is not clear how often large capacity magazines actually turn a gun attack into a gun murder.  Second, offenders could replace the banned guns with legal substitutes or other unbanned semiautomatic weapons to commit their crimes. …

> However, other analyses using a variety of national and local data sources found no clear ban effects on certain types of murders that were thought to be more closely associated with the rapid-fire features of assault weapons and other semiautomatics equipped with large capacity magazines. The ban did not produce declines in the average number of victims per incident of gun murder or gun murder victims with multiple wounds.[84]

A follow-up study near the end of the ban produced interesting results concerning LCMs:

---

[83] Randolph Roth, Supplemental Sur-Rebuttal Expert Report And Declaration Of Randolph Roth, Rupp v. Bonta (C.D.Cal. 2017).
[84] Jeffrey A. Roth and Christopher S. Koper, *Impacts of the 1994 Assault Weapons Ban: 1994-96*, NCJ 173405, (Washington: National Institute of Justice, 1999), 1, 7, 8.

Specific data on shots fired in gun attacks are quite fragmentary and often inferred indirectly, but they suggest that relatively few attacks involve more than 10 shots fired.  Based on national data compiled by the FBI, for example, there were only about 19 gun murder incidents a year involving four or more victims from 1976 through 1995…. The few available studies on shots fired show that assailants fire less than four shots on average (see sources in Table 9-1 and Goehl, 1993), a number well within the 10-round magazine limit imposed by the AW-LCM ban, but these studies have not usually presented the full distribution of shots fired for all cases, so it is usually unclear how many cases, if any, involved more than 10 shots.[85]

As to the data from one city in particular, Jersey City, the authors were careful to observe:

*Caution is warranted in generalizing from these results because they are based on a very small number of incidents (6) from one sample in one city.* Further, it is not known if the offenders in these cases had LCMs (gun model and magazine information was very limited); they may have emptied small magazines, reloaded, and continued firing. But subject to these caveats, the findings suggest that the ability to deliver more than 10 shots without reloading may be instrumental in a small but non-trivial percentage of gunshot victimizations. On the other hand, *the Jersey City study also implies that eliminating AWs and LCMs might only reduce gunshot victimizations by up to 5%. And even this estimate is probably overly optimistic because the LCM ban cannot be expected to prevent all incidents with more than 10 shots.* Consequently, any effects from the ban (should it be extended) are likely to be smaller and perhaps quite difficult to detect with standard statistical methods (see Koper and Roth, 2001a), especially in the near future, if recent patterns of LCM use continue.[86] [emphasis added]

Curiously, when attempting to evaluate effects of lethal and injurious gun violence, the authors pointed to the decline in murder rates during the ban period, but:

Attributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that *crimes with LCMs appear to have been steady or rising since the ban*. For this reason, we do not undertake a rigorous investigation of the ban's effects on gun violence…. But a more casual assessment shows that *gun crimes since the ban have been no less likely to cause death or injury than those before the ban,* contrary to what we might expect if crimes with AWs and LCMs had both declined. For instance, the percentage of

---

Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* 90 (Jul. 2004).
[86] *Id*. at 91.

violent gun crimes resulting in death has been very stable since 1990 according to national statistics on crimes reported to police.[87] [emphasis added]

If a nationwide ban on manufacture and sale of LCMs seems to have no noticeable effect, what would the actions of one state do?

### 2. Cherry-Picking Data

For several years, I have been gathering American mass murders from the 17th century forward. I am currently working my way through the 1960s; I have 792 mass murder incidents with 5,325 dead from all weapon types. I have a very incomplete collection past 1960, but complete enough to see that Klarevas cherry-picks his data.

Klarevas' Table 1 (page 6) lists "The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11." This seems to be an arbitrarily picked date: it excludes the Happyland Social Club arson mass murder of 87 (1990); the Oklahoma City explosives mass murder of 168 (1995); the Dupont Plaza Hotel arson mass murder of 98 (1986); and the elephant in the room, the largest mass murder in U.S. history: on 9/11 (2001). All of these far exceed the fatality count of the most deadly event in his Table 1. His Exhibit C, "High-Fatality Mass Shootings in the United States, 1991-2022," by setting 1991 as his starting date again excludes several mass shootings that would otherwise make the list and would alter his Figure 2 (page 7), "Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022." Firearm mass murders that he leaves out because they are before 1991 raise serious questions about his claim "the problem of high-fatality mass shooting violence is on the rise," is less persuasive, at least to anyone with a knowledge of America's long history of mass murder before 1991.

---

[87] *Id*. at 92.

The Texas Tower mass murder of 1966; 17 people died.[88]  The murderer was a skilled marksman using a very traditional hunting rifle: a Remington 700.  He also had two more rifles, a shotgun, and three pistols with him.[89]

Jul. 18, 1990: A convicted felon who was perhaps upset about repossession of his car six months earlier, went into a General Motors Acceptance Corp. offices and murdered nine.[90]

Sep. 15, 1989: An employee of Standard Gravure printing plant had a grudge against his employer, in his opinion, because of his mental illness.  (He had voluntarily sought mental health treatment in the past.)  He murdered seven people and wounded many others.  He left in his home a copy of *Time* open to an article about the Stockton mass murderer.[91]

Feb. 16, 1988: A murderer upset that his stalking had been spurned shot his way into her place of employment, in Santa Clara, Cal. killing seven and wounding four with a shotgun.[92]

Apr. 23, 1987: A retired librarian described by neighbors as having "a bad temper and a sick wife… and maybe a little crazy" murdered six and wounded 14.  He used a shotgun, pistol, and rifle.  He had a history of shooting at neighborhood kids who walked across his lawn.[93]  A bystander distracted the murderer by returning fire, "which allowed people to escape" from a grocery store where the shooting was taking place.[94]

[88] Gary M. Lavergne, *University of Texas Tower Shooting (1966)*, Texas State Historical Association,
[89] Craig Hlavaty, *Rifle Reported To Be Used In Charles Whitman Killing Spree Up For Sale*, *Houston Chronicle*, Sep. 24, 2014,https://www.chron.com/news/houston-texas/texas/article/Rifle-reported-to-be-used-in-Charles-Whitman-5777479.php, last accessed February 6, 2023.
[90] Ronald Smothers, "Florida Gunman Kills 8 And Wounds 6 in Office," *New York Times*, Jun. 19, 1990; "10th Death in Office Shooting," *New York Times*, Jun. 28, 1990.
[91] Ronald Smothers, "Disturbed Past of Killer of 7 is Unraveled," *New York Times*, Sep. 16, 1989, https://www.nytimes.com/1989/09/16/us/disturbed-past-of-killer-of-7-is-unraveled.html, last accessed November 24, 2018.
[92] Dan Morain and Mark A. Stein, "Unwanted Suitor's Fixation on Woman Led to Carnage," *Los Angeles Times*, Feb. 18, 1988.
[93] Barry Bearak, "6 Dead and 14 Hurt in Rampage: Florida Shooting Suspect 'Meanest Man on Block'," *LOS ANGELES TIMES*, Apr. 25, 1987, http://articles.latimes.com/1987-04-25/news/mn-990_1_palm-bay-police, last accessed November 24, 2018.,"
[94] John A. Torres, "Palm Bay Killer Far From Execution 20 Years Later." [Lakeland, Fla.] *Ledger*, Apr. 30, 2007, https://www.theledger.com/news/20070430/palm-bay-killer-far-from-execution-20-years-later, last accessed November 24, 2018.

There a number of other high-fatality firearm mass murders before 1991: 14 murdered in a post office in 1986[95]; 20 murdered in a McDonald's in 1984[96]; nine murdered in Manley Hot Springs, Alaska in 1984[97]; eight murdered in Miami in 1982[98]; nine murdered in Midland Co., Mich. In 1982[99]; seven murdered at Cal State University, Fullerton in 1976[100]; 11 murdered in Hamilton, Ohio in 1975[101].

The number of high-fatality firearm mass murders *before* 1991 make his rising linear trend-line in Figure 2 very likely to change.  In addition, Klarevas' Figure 1 makes no allowance for U.S. population growth from 1991 to 2022.  The 1991 population was 251,000,000;[102] in 2022, it was 332,403,650.[103]  The U.S. had 32% more people in 2022 than in 1991.  You can expect the number of incidents and dead to rise in proportion to the population.  This is why criminologists express crime rates per 100,000 population.  Failure to account for population growth and his misleading choice of start date utterly discredits Klarevas' Figures 1 and 2.

Klarevas' focus on mass *shootings* ignores the largest mass murders in American history, which did not use guns.  The previously mentioned arson and explosives mass murders are in that category.  Ignoring these alternative methods of "intentional criminal violence" in is just dishonest if you are concerned about reducing mass murder.

---

[95] "Massacre at a Post Office," *New York Times*, Aug. 24. 1986.,"
[96] "Coast Man Kills 20 in Rampage at a Restaurant." *New York Times,* Jul. 19, 1984; "Police Defended in Macdonald's Case," *New York Times,* Aug. 3, 1984.,"
[97] "Memories of Springtime Murders Chill Small Alaskan Town," *New York Times*, Nov. 11, 1984.
[98] George Volsky, "Gunman in Miami Kills 8 in Rampage," *New York Times,* Aug. 21, 1982.
[99] "Michigan Man is Guilty of Killing 7 in Family," *New York Times,* Oct. 9, 1982; Gus Burns, "Police say infamous Farwell killer, Robert Lee Haggart, strangled and raped Midland woman in 1977," *Saginaw News,* Jul. 24, 2009.
[100] Maria Bovsun, "Mass Murderer Who Killed 7 At Cal State Fullerton Begs to be Freed From Psychiatric Hospital," New York Daily News, Jun. 11, 2016.
[101] Flowers and Flowers, Murders in the United States, 76.
[102] U.S. Census, *National Intercensal Tables: 1990-2000*, 1991.
[103] U.S. Census, *U.S. Population Estimated at 332,403,650 on Jan. 1, 2022*.

At ¶13: "In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres." He further claims in Figure 4 (page 9) that 85% of high-fatality mass shooting events in the last 16 years involved LCMs. And in Figure 5 (page 10) that 53% of high-fatality mass shooting deaths in the last 16 years involved assault weapons. These are pretty amazing (and wrong) claims.

The USA Today database published in 2018 found that only ¾ of mass murders used guns.[104] Of that ¾, some murders were a combination of weapons: shooting, stabbing, blunt force.[105]

- 49.6% were semiautomatic handguns (some of which *could* have used LCMs);

- 22.4% were revolvers, so no LCMs possible, and not "assault weapons";

- 0.9% were described as "automatic (assault) pistols" (automatic weapons are not subject to the New Jersey law);

- 8.6% were semiautomatic rifles (only some of which qualify as "assault weapons"; there are a lot of inexpensive .22 rimfire semiautomatic rifles in America);

- 9.5% were single-shot rifles (so no LCMs and not "assault weapons");

- 0.4% were "automatic rifle" (not subject to the New Jersey law).

- 8.6% were shotguns. While there *are* magazine-fed shotguns that could be fitted with LCMs, the only shotguns identified by type that I have ever seen in news

---

Behind the Bloodshed: The Untold Story of America's Mass Killings, USA Today, Apr. 16, 2015, https://www.gannett-cdn.com/GDContent/mass-killings/index.html#title, last accessed April 2, 2023.
*Id.*, https://www.gannett-cdn.com/GDContent/mass-killings/index.html#explore, *see* Dec. 15. 2014 Souderton, Pa.

reports of mass murders are a pump-action Remington 870 shotgun to murder 12 at the Navy Yard in 2013.[106]

Even ignoring the non-firearms mass murders, the firearms used 2006-2015 that could not have been "assault weapons" include the 22.4% of revolvers, 9.5% of single-shot rifles, and 8.6% of shotguns.  At least 40.5% of 2006-2018 firearms mass murders could *not* have used an LCM.

The last 16 years before 2022 is the period 2006-2022.  Even including use of LCMs in automatic weapons would require that to get to Klarevas' 85% of high-fatality mass shooting events using LCMs would require that in the period 2017-2022 the previous 40.5% of non-LCM mass shooting victims fell to 15% of the total.

Klarevas' Exhibit C lists the 2018 Parkland shooting as using an LCM.  There seems to be some question about that:

> Several state legislators who visited the school with crime-scene investigators said they learned from police that Cruz's rifle was not top-of-the-line, perhaps explaining the malfunction.
>
> The "weapon and bullets were not high quality and were breaking apart," one of the legislators, state Sen. Lauren Book, D-Plantation, told the Herald.
>
> Cruz went in with only 10-round magazines because larger clips would not fit in his duffel bag, Book said.[107]

I confess that I was not even aware that there were 10-round AR-15 magazines available, until this question was first raised.

---

Greg Botelho and Joe Sterling, FBI: Navy Yard shooter 'delusional,' said 'low frequency attacks' drove him to kill, CNN, Sep. 26. 2013 https://www.cnn.com/2013/09/25/us/washington-navy-yard-investigation/index.html, last accessed February 3, 2023.
[107] Nicholas Nehamas and David Smiley, *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report Says,* MIAMI HERALD, Feb. 27, 2018.

### D.    Summary

The current effort to restrict semiautomatic rifles of an often military appearance and what prohibitionists call Large Capacity Magazines (LCMs) started in 1989 after a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment, ended his suffering by committing mass murder and with an AK-47 pattern rifle.  He received a Social Security disability check which enabled him to buy guns and ammunition while remaining homeless.  As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference.  However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[108]

Drawing chalk marks around bodies, postmortems and providing counselling for the survivors is cheaper?  It was still many lives wasted by California's confused and irrational mental health policy that subsequently spread across the country in the 1970s.

A contributing factor to mass murders is media coverage:

> Three shootings with multiple victims shook California over the last few days. The shootings Monday at two farms in Half Moon Bay, Calif., closely followed over the weekend at a dance hall in Monterey Park, Calif.
>
> That's no surprise, say scientists who study mass shootings. Research shows that these incidents usually occur in clusters and tend to be contagious. Intensive media coverage seems to drive the contagion, the researchers say.
>
> Back in 2014 and 2015, researchers at Arizona State University analyzed data on cases of mass violence. They included *USA Today*'s data on mass killings (defined as four or more people killed using any means, including guns) from 2006 to 2013, data on school shootings between 1998 and 2013, and mass shootings (defined as incidents in which three people were shot, not necessarily

---

[108] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings*, October, 1989, 19, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

killed) between 2005 and 2013 collected by the <u>Brady Campaign to Prevent Gun Violence</u>.

The lead researcher, <u>Sherry Towers,</u> a faculty research associate at Arizona State University, had spent most of her career modeling the spread of infectious diseases — like Ebola, influenza and sexually transmitted diseases. She wanted to know whether cases of mass violence spread contagiously, like in a disease outbreak.

So, she plugged each data set into a mathematical model.

"What we found was that for the mass killings — so these are high-profile mass killings where there's at least four people killed — there was significant evidence of contagion," says Towers. "We also found significant evidence of contagion in the school shootings."

In other words, school shootings and other shootings with four or more deaths spread like a contagion — each shooting tends to spark more shootings….

Towers and her colleagues also found that what set apart shootings that were contagious was the amount of media coverage they received. "In the incidences where there were four or more people killed, and even school shootings, those tended to get national and even international media attention," says Towers.[109]

Nonetheless, no one would seriously suggest controls on "assault media" because they can provoke copycat mass murders.

Untreated mental illness started this current campaign and many of the subsequent mass murders have had at their root mental illness which was unseen, ignored, or where the laws or policies made involuntary commitment impossible.[110]

The Secret Service published a report in 2018 analyzing mass murders with three or more dead and concluded.

Nearly two-thirds of the attackers (n = 18, 64%) experienced mental health symptoms prior to their attacks. The most common symptoms observed were related to psychosis (e.g., paranoia, hallucinations, or delusions) and suicidal thoughts…. Further, some

---

[109] Rhitu Chatterjee, *Mass Shootings Can Be Contagious, Research Shows*, NPR, Jan. 24, 2023.
[110] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 CONN. L.R. 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) for how we got here.

attackers (n = 7, 25%) had been hospitalized for treatment or prescribed psychiatric medications prior to their attacks.[111]

This should be no surprise: if you are hallucinating that you are surrounded by flesh-eating zombie Congressmen (as with the shooter at the U.S. Capitol in 1999[112]), then mass murder makes perfect sense; indeed failing to do so would be a sign of insanity.

A 2000 *New York Times* examination of mass murderers concluded:

> The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help, and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

> Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population.

> However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [113]

In this respect, mentally ill mass murderers are not terribly different from their more mundane individual murder counterparts: the mentally ill are overrepresented among murderers. It should not be surprising that severe mental illness and murder is strongly correlated, as are severe mental illness and other violent crimes across multiple nations and multiple decades. The severely mentally ill commit about 10% of all violent felonies.[114]   A 1999 study of U.S. prisoners found

---

[111] United States Secret Service, Mass Attacks in Public Spaces – 2017, Mar. 2018, available at https://mentalillnesspolicy.org/wp-content/uploads/secret_service_64_attacks_MI.pdf.

[112] Bill Miller, *Capitol Shooter's Mind-Set Detailed*, Washington Post, Apr. 23, 1999, available at https://www.washingtonpost.com/wp-srv/national/longterm/shooting/stories/weston042399.htm

[113] Laurie Goodstein and William Glaberson, "The Well-Marked Roads to Homicidal Rage," *New York Times*, April 10, 2000.

[114] Arthur Zitrin, Anne S. Hardesty, Eugene I. Burdock & Ann K. Drossman, Crime and Violence Among Mental Patients, 133 Am. J. Psychiatry 142-9 (1976) (deinstitutionalized New York City mental patients had disproportionate arrest rates for rape, burglary, and aggravated assault); Larry Sosowsky, Crime and Violence Among Mental Patients Reconsidered in View of the New Legal Relationship Between the State and the Mentally Ill, 135 *Am. J. Psychiatry* 33-42 (1978) (San Mateo County, California, mental patients showed grossly disproportionate arrest rates for murder, rape, robbery, aggravated assault, and burglary; 55

that 16.2 percent of state prison inmates, 7.4 percent of federal prison inmates, and 16.3 percent of

jail inmates, were mentally ill.[115]  A study of Indiana murder convicts found that 18 percent were

severely mentally ill, suffering from "schizophrenia or other psychotic disorder, major depression,

mania, or bipolar disorder."[116]  The Indiana murder convicts diagnosed with schizophrenia were

3.7 percent of the murder convicts,[117] compared to 1.1 percent of the U.S. adult population.[118]

Untreated mental illness started this current campaign and many of the subsequent mass

murders have had at their root mental illness which was unseen, ignored, or where state laws or

policies made involuntary commitment impossible.[119]

---

times more likely to be arrested for murder than the general population in 1973; 82.5 times more likely to be arrested  to be arrested for murder in 1972; nine times more likely to be arrested for rape, robbery, aggravated assault, and burglary than the general population); Larry Sosowsky, Explaining the Increased Arrest Rate Among Mental Patients: A Cautionary Note, 137 *Am. J. Psychiatry* 1602-5 (1980)  (even mental patients with no pre-hospitalization arrests were five times as likely to be arrested as the general population for violent crimes); H. Richard Lamb & Linda E. Weinberger, Persons with Severe Mental Illness in Jails and Prisons: A Review, 49 Psychiatric Services 483-92 (1998); Jeanne Y. Choe, Linda A. Teplin & Karen M. Abram, Perpetration of Violence, Violent Victimization, and Severe Mental Illness: Balancing Public Health Concerns, 59 *Psychiatric Services* 153-164 (Feb. 2008) (Studies in Denmark and Sweden found that psychotics are disproportionately violent offenders); Eric B. Elbogen & Sally C. Johnson, The Intricate Link Between Violence and Mental Disorder: Results From the National Epidemiologic Survey on Alcohol and Related Conditions, 66 *Archives of General Psychiatry* 152-161 (2009) ("violence and violent victimization are more common among persons with severe mental illness than in the general population.")

[115] Paula M. Ditton, Bureau of Justice Statistics, Mental Health and Treatment of Inmates and Probationers (Washington: U.S. Department of Justice, 1999), NCJ 174463, available at https://bjs.ojp.gov/library/publications/mental-health-and-treatment-inmates-and-probationers

[116] Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder, 36 *J. Am. Acad. Psychiatry & Law* 74, 76 (2008).

[117] Id. at 80.

[118] National Institute of Mental Health, *Schizophrenia* (August 21, 2013), http://www.nimh.nih.gov/statistics/1schiz.shtml.

[119] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 *Conn. L.R.* 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill* (2012) for how we got here.

Fix the root problem or mass murderers will use the weapons they have historically used in the United States: arson,[120] vehicles,[121] explosives,[122] hammers,[123] axes,[124] poison,[125] aircraft,[126] and train derailments.[127]   Or they might use the weapons mass murderers use in other nations: arson;[128] vehicles;[129] explosives,[130] sharp objects,[131] hammers;[132] poison gas,[133] and of course, in spite of much stricter firearms laws, guns.[134]

---

[120] 3 Teamsters Charged in San Juan Hotel Fire," *Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018 (97 dead); Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911,* NEW YORK TIMES, Mar. 26, 1990 (87 dead); Phil Luciano, *9-year-old arraigned on murder charges in deadly Goodfield arson fire,* PEORIA JOURNAL STAR, Oct. 21, 2019 (5 dead).

[121]  Lauren del Valle, Ray Sanchez and Eric Levenson, *Terror suspect accused of killing 8 people on NYC bike path still believes in ISIS, defense attorney says,* CNN, January 9, 2023.

[122] FBI, *Oklahoma City Bombing*, https://www.fbi.gov/history/famous-cases/oklahoma-city-bombing, last accessed January 31, 2023 (168 dead); *Fate Saves Scores in Blast When Maniac's Plot Kills 43,* [Washington, D.C.] EVENING STAR, May 19, 1927, 1; *Los Angeles, on Election Eve, in Ferment Over Confession of the McNamaras,* [Chicago, Ill.] THE DAY BOOK, Dec. 2, 1911, 1 (21 dead); *Seven Detectives and Three Miners Dead,* SEATTLE STAR, Jul. 26, 1912, 1 (10 dead).

[123] *A Family Slain,* KANSAS CITY JOURNAL, Mar. 4, 1899, 1 (5 dead).

[124] *Five Battered With An Axe,* [Keokuk, Ia.] DAILY GATE CITY, Oct. 17, 1911, 1 (5 dead); *Mystery of 30 Axe-Murders is Believed Near Its Solution,* ALBUQUERQUE MORNING JOURNAL, Mar. 22, 1915, 1 (police believed one man murdered 29 people in five families over three years).

[125] *A Modern Borgia,* NASHVILLE UNION AND AMERICAN, Oct. 27, 1868, 1 (the maid murdered a family of seven).

[126] FBI, CRIME IN THE UNITED STATES: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf (3047 dead); Id., (184 dead); Id., (40 dead); Judith Cummings, *Kin of Suspect Defiant and Contrite,* NEW YORK TIMES, Dec. 11, 1987 (44 dead).

[127] *Crack Flyer Jumps Track,* [De Kalb, Illinois] DAILY CHRONICLE, Mar. 17, 1941, 1 (5 dead).

[128] *A Decade On, Childers Remembers Hostel Fire Tragedy*, BRISBANE [Australia] TIMES, Jun. 23, 2010 (15 dead); Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears,* [U.K.] DAILY MAIL, Sep. 8, 2014. (11 dead); Makiko Inoue, Motoko Rich and Hikari Hida, 24 Dead in Suspected Arson at Office Building in Japan, N.Y. TIMES, Dec. 16, 2021.

[129] *Toronto is the most recent of many deliberate attacks involving vehicles,* USA TODAY, Apr. 23, 2018 (10 dead in Toronto attack, 14 dead in Barcelona, Spain, 8 on London Bridge, 12 in Berlin, Germany); *Nice attack: Trial for Bastille Day massacre which killed 86 begins,* BBC, Sep. 5, 2022 (86 dead); *Australian who rammed and killed six pedestrians jailed for life,* REUTERS, Feb. 21, 2019 (6 dead); Alex Johnson, *A Short History of Vehicles Being Used as Deadly Weapons,* NBC News, Jul. 15, 2016 (8 dead).

[130] Andrew Higgins and Kimiko De Freytas-Tamura, *In Brussels Bombing Plot, a Trail of Dots Not Connected,* NEW YORK TIMES, March 26, 2016 (33 dead); Sylvia Hui, *Bomber's brother gets 55 years for Manchester concert attack,* Associated Press, Aug. 20, 2020 (22 dead)

[131] Jason Van Rassel, *Police officer's son charged in city's worst mass murder,* CALGARY [Alberta] HERALD, Apr. 17, 2014 (5 dead); Jonathan Pearlman, *Eight Children Murdered In Mass Stabbing In Australia,* [U.K.] TELEGRAPH, Dec. 19, 2014 (8 dead); Robert Foyle Hunwick, *Why Does China Have So Many School Stabbings?, New Republic,* Nov. 2, 2018 (summarizing 14 knife mass murders in two incidents); David Mercer, *Canada mass stabbing: Trudeau urges public to 'be careful' over two men suspected of killing 10 people,* SKY NEWS, Sep. 5, 2022 (10 dead).

[132] Jamelle Wells, *Robert Xie Trial: Lin Family 'Murdered With Hammer Bought From $2 Shop,* ABC [Australia], May 12, 2014 (5 dead)

[133] *Japan marks 25 years since deadly Aum sarin attack on Tokyo subway,* Japan Times, Mar. 20, 2020 (14 dead).

[134] *Gunman's Rampage in France Leaves 14 Dead, Los Angeles Times,* Jul. 13, 1989; *Teen-Age Gunman Kills Himself and 12 Others in France, New York Times,* Sep. 25, 1995; Nick Caistor, *Profile of a Teenage Killer, BBC News,* Apr. 28, 2002; *18 Dead in German School Shooting, BBC News,* Apr. 26, 2002; *Brazil School Shooting: Twelfth Child Dies, SkyNews,* Apr. 8, 2011; James Graff, *Politics Under the Gun, Time,* Mar. 31, 2002 (8 dead; 18 wounded in France); *Safety Council To Investigate Gun Laws, DutchNews.nl,* Apr. 12, 2011, http://www.dutchnews.nl/news/archives/2011/04/safety_council_to_investigate.php, last accessed May 21, 2011; *Schutter was al eerder suicidaal, NOS Nieuws.* Apr. 10, 2011, http://nos.nl/artikel/232127-schutter-was-al-eerder-suicidaal.html, last accessed May 21, 2011.

## IV.     Randolph Roth

This section analyzes Prof. Roth's Expert Report concerning the "history of homicides and mass murders in the United States. I take particular exception to his interpretation of the influence of firearms technology on murder and mass murder in particular.

### A.     Homicide and Firearms in the Colonial Era (1688-1763)

#### 1.     Regional and Cultural Variation

Starting at ¶20 Roth provides a plausible set of explanations for changing murder rates by region and over time.  He misses several explanations that might significantly contribute to murder rates, single or mass murder and regardless of weapon type: imported cultural traditions; religious beliefs, and population density.

The early British settlements in America established patterns of family life and acceptable individual behavior, and these cultural patterns persisted into the nineteenth century, often influencing regional levels of violence.  As David Hackett Fischer has exhaustively documented, four distinctive British folkways dominated eighteenth- and early nineteenth-century American society, and still influence it today: Puritan New England; Cavalier Virginia; Quaker Pennsylvania; and back country Scots-Irish.  Nor is this a recent discovery: the British novelist Frederick Maryatt visiting America in 1837, identified this country as still constituting distinct cultures: "[T]he puritan of the east, the Dutch descent of the middle states, the cavalier of the south . . . nearly as marked and distinct now, as at the first occupation of the country; softened down indeed, but still distinct.  Not only are the populations of the various states distinct, but even those of the cities. . . ."[135]

---

[135]. Frederick Marryat, *Diary in America*, ed. Jules Zanger 36 (1839)

Puritan New England was disproportionately settled by entire families, many of them representatives of "the sturdy middle class of England."[136]  With its emphasis on family life, self-discipline, and the consequences of sin, Puritan New England set a pattern that replicated itself as Yankees migrated west across the continent.[137]  This cultural pattern of self-discipline and social order appears to have played a part in keeping serious violent crimes rare in Boston and New York City until the 1830s, when large numbers of Irish immigrants arrived, ending the cultural homogeneity of these cities.[138]

The Quakers, while attaching less importance to marriage than the Puritans,[139] shared the Puritan desire for social order and peace. Frances Wright, describing 1820 Philadelphia, observed the Quaker influence in "the orderly behaviour of the citizens.  You not only see no riots in the streets, but no brawls. . . ."[140]  While the Quaker ideal of social order was different from that of the Puritans, the Quaker system of punishments was even more severe (except for capital punishment, which the Quakers opposed).[141]  Even after the Quakers had ceased to control the Delaware Valley, their culture persisted.  Not surprisingly, migrants heading west from the Delaware Valley carried these values about peace and social order with them.[142]

Cavalier Virginia, because of the commercial motivations that underlaid the colony and because of high female death rates (caused by an unhealthy combination of temperature,

---

[136] David Hackett Fischer, ALBION'S SEED: FOUR BRITISH FOLKWAYS IN AMERICA 26-31 (1989); Virginia Dejohn Anderson, *Migrants and Motives: Religion and the Settlement of New England, 1630-1640*, 58 NEW ENGLAND QUARTERLY 339-383 (1985), in Stanley N. Katz, John M. Murrin, and Douglas Greenberg, eds., COLONIAL AMERICA: ESSAYS IN POLITICS AND SOCIAL DEVELOPMENT  102-106 (4th ed. 1993).
[137] David T. Courtwright, *Violent Land: Single Men and Social Disorder from the Frontier to the Inner City* 48-49 (1996).
[138] James F. Richardson, *Urban Police in the United States* 19 (1974); Roger Lane, *Policing the City: Boston 1822-1885 26-38* ( 1967); Frances Wright, *Views of Society and Manners in America*, ed. Paul R. Baker 16-18 (1963).
[139] Fischer, ALBION'S SEED, 487-488.
[140] Frances Wright, VIEWS OF SOCIETY, 236.
[141] Fischer, ALBION'S SEED, 494-499, 584-589.
[142] . Fischer, *Albion's Seed* 594-595.

mosquitoes, and swamps), was dominated by single young men.  The culture that developed there was disordered and violent in a way that the Puritan and Quaker cultures were not.  A consequence of this single male culture was the South's emphasis on honor—and the use of violence to avenge insults to honor.[143]

Nor is this a later interpolation.  As early as the 1830s, at least one traveler through the Old Southwest observed that the surplus of single young men caused an increase in violence and dueling.[144]   While of a somewhat later era (1850s Nevada and postbellum California), Roger McGrath statistically demonstrated that violent crime rates in the wildest frontier mining camps of the Sierra Nevada were low in every category except for murder, where single males fought to the death because of "honor, pride, and courage."  In many respects, McGrath's description of this culture sounds very southern—or perhaps the problems of single young men transcend culture.[145]

Perhaps the most important of these cultural factors arrived between 1717 and 1775, when a vast swarm of British immigrants arrived for whom violence was not a consequence of too many

---

[143]. Courtwright, *Violent Land*, 27-30; Edward L. Ayers, *Vengeance and Justice: Crime and Punishment in the 19th-Century American South* 20-21 (1984).  Bertram Wyatt-Brown, SOUTHERN HONOR: ETHICS AND BEHAVIOR IN THE OLD SOUTH 166-174 (1982) , provides examples of how southern culture glorified fighting and dueling, even at the expense of young men's lives.

Wyatt-Brown, SOUTHERN HONOR 20, argues that dueling had been common in the North before the Revolution but declined in response to Beecher's attacks on dueling.  But a minority viewpoint, articulated in Bruce Baird, "The Social Origins of Dueling in Virginia," in Michael Bellesîles, ed., LETHAL IMAGINATION: VIOLENCE AND BRUTALITY IN AMERICAN HISTORY (1999), 87-112, argues that colonial Virginia was not a particularly violent culture until shortly before the Revolution, when back country Scots-Irishmen become an increasingly important influence on the tidewater Cavaliers.

[144]. Joseph Holt Ingraham, 2 *The South-West: By a Yankee* 45-9 (1835).

[145]. Roger D. McGrath, *Gunfighters, Highwaymen, and Vigilantes: Violence on the Frontier* 247-255 (1984).

single young men but was a fundamental part of their way of life.  Often called Scots-Irish,[146] these settlers came from the English and Scottish border counties, sometimes after a stay in Ulster.[147]

Like the Puritans, these immigrants were likely to arrive as family units.  Sometimes, entire communities emigrated together.[148]  Unlike Virginia cavalier culture, gender ratio should not have made these immigrants peculiarly violent.  Instead, they brought a culture of violence with them. Two differing theories have been offered to explain this level of violence: In some ways, they are complementary not competing theories.

One theory holds that the absence of effective government created a culture in which private violence, both defensive and offensive, was the only practical way to survive.  From the eleventh century to the close of the eighteenth century, the borderlands between Scotland and England were the scene for continual warfare and private criminal behavior.  Ambrose Bierce's cynical definition of a pacifist as a "dead Quaker" suggests at least one reason why defensive and offensive violence became a part of the culture: In an area where rape, torture, and murder were common and no effective legal system existed, those reluctant to use deadly force would be at a serious disadvantage.  The inhabitants developed a callous disregard for law and the lives of others; survivors pass on their culture much more effectively than the dead.  These values became a part of the Scots-Irish culture.[149]

---

[146]. Fischer, *Albion's Seed*, 618-621, does an effective job of demonstrating the misleading nature of the term "Scots-Irish."  Alas, the term is so thoroughly ingrained in the American lexicon that it seems beyond hope to call them "borderlanders."

[147]. James G. Leyburn, *The Scotch-Irish: A Social History* 157 (1962), says that 250,000 immigrated just from Ulster during this period.

[148]. Fischer, *Albion's Seed*, 608-610.  One example of this Scots-Irish family group migration is the 1730 arrival of the McConnell, Young, and Setlington families from northern Ireland.  Ethel McConnell Bartindale, *History of the McConnell Family* 6-7 (1923).  The McConnells were my *very* peaceful and civilized ancestors.

[149]. Fischer, *Albion's Seed*, 621-632; Ayers, *Vengeance and Justice*, 21-23.  Leyburn, *The Scotch-Irish*, 3-13, describes the causes for this culture of violence in greater detail than Fischer, though arguing that the level of violence significantly decreased by 1610, even though the cultural values associated with it persisted.

Another theory argues that the Scots-Irish culture of violence was a product of an economy based on herding on marginal agricultural lands.  Where poor soils or a lack of rain make lands marginal for farming, herding takes its place, as it did in both Scotland and many of the mountainous and arid parts of the American South.  Herding and its cause, poor agricultural lands, carry with it three closely related problems that lead to a culture of honor and violence: portability of goods, poverty caused by poor soils, and an absence of effective government because of a limited tax base.

Because a herder's livelihood is dependent on a readily transportable form of property, he is much more likely to suffer theft than a farmer.  Crops cannot be cajoled into walking away, unlike sheep or cattle.  Crops are often less valuable per weight, and therefore the incentive to steal crops is less.  Consider how widespread the problem of cattle rustling was in the American West, while there is no equivalent specialized term for the theft of wheat "on the hoof."  A herder must then be able and willing to defend his livestock from theft—and in remote settings where he may have little or no assistance from government.

Rustlers will attack whom they perceive as the weakest herdsman to steal his livestock.  Members of a herding culture must therefore be sensitive to insult, "to preserve the individual's reputation for being willing and able to carry out violence if needed."[150]  Hence, the culture of honor exists—one in which how others perceive your willingness to defend what is yours matters very much.  This would suggest that in exchange for reduced property crimes, such a society experiences increased crimes of violence as herdsmen demonstrate this willingness to fight.  Not surprisingly, with such a tradeoff, property crimes appear to have been rare in the South relative

---

[150]. Richard E. Nisbett and Dov Cohen, *Culture of Honor: The Psychology of Violence in the South* 89 (1996).

to crimes of violence.[151]   Perhaps the southerner's willingness to use force to protect property explains why property crimes were rare and crimes of violence were common.

At the same time, the poverty of a region dependent on herding makes it more likely that thieves will risk injury or death to steal livestock because the alternative may be hunger or even starvation.   Agricultural societies usually have sufficient surpluses (assuming equivalent distribution of wealth) that stealing is not necessary to avoid hunger.  Not only must the herder have the ability to defend his herd from theft, but his need to protect his livestock is likely higher as well because of the poverty of a herding society.

Finally, herding societies, because of their limited tax base, often have limited criminal justice systems.  The herder must therefore deal with problems of theft himself if he wishes to protect his livelihood.[152]   Whether the herding economic base caused the culture of honor in Scotland or not, herding dominated the economy in the antebellum southern uplands, with farming a sideline—as had been the case for centuries in the borderlands whence came the Scots-Irish.[153]

## 2.      Homicide in Colonial America

Prof. Roth in ¶17 argues that "Violence among colonists was not a pressing problem on the eve of the Revolution."  I would completely agree that this was true, but I disagree strongly with his reasons for why.

> First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.

---

[151] Grady McWhiney, Cracker Culture: Celtic Ways in the Old South 166-7 (1988).
[152] Nisbett and Cohen, *Culture of Honor*, 5-11, 88-90.
[153] McWhiney, CRACKER CULTURE, 51-56, 64-78. Malcolm J. Rohrbough, THE TRANS-APPALACHIAN FRONTIER: PEOPLE, SOCIETIES, AND INSTITUTIONS 1775-1850 288 (1978), also notes the emphasis on herding, not farming, in the Old Southwest.

Roth's source is Roth's book American Homicide 63. This is not evidence; it is "trust me, I know what I am doing." Review of that chapter in Roth's book has a lot of very plausible arm-waving but not evidence that would persuade someone who did not already share Roth's assumptions or trust in…Randolph Roth. Roth provides no evidence to show that political stability increased, that patriotism increased or trust in government increased.

We need to examine Roth's definitions. These homicide rates are not *murder* rates, which makes comparison to current murder rates invalid. First of all, Roth repeatedly indicates that he is looking at homicides by "unrelated adults."[154] About 6% of murder victims in 2019 were under 18.[155] It seems likely that murder of minors (which at that time would have included all under 21 years) would have been similarly common. "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[156]

Damaging comparability the other direction, Roth tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[157] About 6% of recent civilian homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable. Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon

---

[154] Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).
[155] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).
[156] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).
[157] Randolph Roth, AMERICAN HOMICIDE xii (2009).

any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[158]

Roth at ¶17: "By the late 1750s and early 1760s, the rates at which *adult* colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England."  These are rates not terribly different from current U.S. murder rates.  Roth's numbers however understate murder rates.  This gives a warmer and cozier picture of colonial America than it was.

> New England especially was doing *something* right, but what?  Roth at p. 10 has a second explanation, but one that explains too much:
> Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.  They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.

One blackpowder muzzle loading firearm of the time could fire large numbers of bullets without reloading: the blunderbuss.  Often portrayed in cartoon representations of Pilgrim hunting:

---

[158] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).



159

The blunderbuss was a shotgun with a belled muzzle intended to distribute shot at close range where it would be devastating.  Soldiers often used them to repel boarders at sea or while boarding ships at sea.  They were also "the preferred weapon of coach guards… and defense of close spaces such as buildings and in dealing with unruly crowds."[160]  They were loaded with up to 20 pellets of buckshot.  #0 buckshot is .33 caliber.[161]  At close range, they would be firing 20 lead balls the diameter of a modern 9mm bullet.  While likely less lethal beyond 20 yards (hunting distance for fowl), the state of medical knowledge would likely have made them as fatal as being attacked with a modern pistol.

Were blunderbusses commonly owned?  They appear for sale in ads,[162] in murder cases,[163] and inventories of confiscated weapons.  When General Gage ordered the citizens of Boston turn

---

[159] *Blunderbuss, the "Thunder Box" of the Battlefield*, American Revolution Institute of the Society of the Cincinnati, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/, last accessed February 5, 2023.
[160] Spencer C. Tucker, INSTRUMENTS OF WAR: WEAPONS OF TECHNOLOGY THAT HAVE CHANGED HISTORY 72-73 (2015).
[161] Chris Baker, *Buckshot*, https://www.luckygunner.com/lounge/stuff-you-should-know-about-buckshot-part-1/, last accessed February 5, 2023.
[162] *Boston Gazette*, May 30, 1720.
[163] In 1630, ten years after his arrival at Plymouth, John Billington, who had been in continual trouble at Plymouth, was convicted of murdering John Newcomen with a blunderbuss, after some quarrel now lost to history. George F. Willison, SAINTS AND STRANGERS 308 (1981)/

in their firearms after the unpleasantness at Lexington, the more gullible citizens turned in thousands of weapons including 38 blunderbusses.[164]

The single shot nature of a muzzle loader certainly would have deterred their use for mass murder.  There are many other plausible explanations for the rarity of homicides in that time.  There were no cities.  Even today, population density in America is strongly correlated with murder: Metropolitan Statistical Areas have 5.1/100,000 murders, compared to 4.5 for cities outside metropolitan areas and 3.9 for Nonmetroplitan counties.[165]  And few nonmetropolitan counties in America today could even begin to compare to any New England county for population.  Murder rates in New England today remain among the lowest in the nation (Maine: 1.5/100,000; New Hampshire: 2.2; Vermont: 1.8; compared to the U.S.: 5.0),[166] even with until recently some of the most relaxed gun laws in America (Giffords Law Center to Prevent Gun Violence Annual Gun Law Scorecard: Maine: F; New Hampshire F; Vermont C-).[167]  Many other states are awash in modern guns, relaxed gun laws, and murder rates that are only slightly worse than colonial New England.  My home state, Idaho, which does not even require a license to carry, and has no machine gun regulation, is 2.0/100,000; South Dakota (1.9); Wyoming (2.2).[168]  All three states get an F from Giffords. [169]  Considering that Roth's homicide rates undercount murders by excluding children and murders by relatives, none of these states with *very* relaxed gun laws and widespread availability of modern firearms seem to be doing much worse today than colonial New England.  Perhaps Roth needs to consider other explanations?

---

[164] Richard Frothingham, HISTORY OF THE SIEGE OF BOSTON, AND OF THE BATTLES OF LEXINGTON, CONCORD, AND BUNKER HILL 94-95 (6th ed., 1903).

[165] FBI, CRIME IN THE UNITED STATES 2019 Table 2.

[166] FBI, CRIME IN THE UNITED STATES 2019 Table 4.

[167] Giffords Law Center to Prevent Gun Violence, *Annual Gun Law Scorecard*, https://giffords.org/lawcenter/resources/scorecard/, last accessed July 16, 2023.

[168] FBI, Crime in the United States: 2019, Table 4.

[169] Giffords Law Center to Prevent Gun Violence, *Annual Gun Law Scorecard*, https://giffords.org/lawcenter/resources/scorecard/, last accessed July 16, 2023.

### 3. Black Powder

At ¶19, Roth suggests an explanation for why a society where guns were widespread did

not have a substantial gun murder problem:

> And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire. The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage. That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.

This would be a persuasive and logical argument except for what the people who lived then

tell us.  Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries

caused by colonists failing to follow this very logical action:

> And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[170]

> Children were not safe from these rarely loaded firearms:

> It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[171] [emphasis added]

> And:

> One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without

---

[170] Id. 2:55.
[171] Id., 2:317.

doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[172]

These four incidents of firearms kept loaded when not in actual use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in books that I have not read?

Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use.  In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town…

You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

Roth at ¶ 21 asserts: "Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training."  His source is himself.  Almost every

---

[172] Id., 2:72.

colony required colonists to carry arms to church for security against either Indian attack or slave rebellion, or while travelling out of the colony.[173]   It is certainly possible that except when ordered to do so, colonists were not generally armed.  Roth needs more than his say-so.  That so many

---

[173] 1770 Georgia: "An act for the better security of the inhabitants by obliging the male white persons to carry fire arms to places of public worship."  19(part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA (1910), :137-140. this law required all white male inhabitants to carry either a long gun or a pair of pistols to church Id. at 138; "That the church warden or church wardens of each respective parish, and the deacons, elders or select men... to examine all such male persons" to make sure that they were armed." Id. at 138, 139.

1642 Maryland: ""Noe man able to bear arms to goe to church or Chappell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott."  3 ARCHIVES OF MARYLAND 103  (1885);

1630/1 Massachusetts: "Further, it is ordered, that noe pson shall travel single betwixte theis plantation & Plymouthe, nor without some armes, though 2 or 3 togeathr." 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 85 (1853); 1636/7 Because of the danger of Indian attack, and because much of the population was neglecting to carry guns, every person above eighteen years of age (except magistrates and elders of the churches) were ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12d. for every default".  And no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12d. for every default." Id. at 190.

1646 New Haven Colony When militiamen were called by the beating of the drum "to the publique worship of God" they were to show up "with their armes compleat, their guns ready charged, with their match for their matchlocks and flints ready fitted in their firelocks".  RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 `32 (1857);

1641 Plymouth Colony "It is enacted That every Towneship within this Government do carry a competent number of pieeces fixd and compleate with powder shott and swords every Lord's day to the meetings--one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."  THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 70 (1836); 1658: ordered 1/4 of the militia "carry theire armes" to church every Sunday, defined as "some serviceable peece and sword and three charges of powder and bullets" or be fined "2 shillings and six pence...." Id. at 115; 1681: Also, the statute of 1658 requiring 1/4 of the militia to bring their guns to church every Sunday was updated to require "six charges of powder same shott" from "beginning of Aprill to the end of October yearly...." Id. at 192, 193;

1639 Rhode Island "It is ordered, that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."  There was a fine of five shillings for failing to be armed in either circumstance." 1  RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (1856); 1643 reiterated an earlier order "for every man to have so much powder, and so many bullets, and so the forwarning is to stand still in force; and also that every man do come armed unto the meeting upon every sixth day" 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 79, 80 (1856);

1743 South Carolina required: "That within three months from the time of passing this Act , every white male inhabitant of this Province , (except travellers and such persons as shall be above sixty years of age, ) who, by the laws of this Province is or shall be liable to bear arms in the militia of this Province, either in times of alarm or at common musters, who shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province , and shall not carry with him a gun or a pair of horse pistols , in good order and fit for service, with at least six charges of gun- powder and ball , and shall not carry the same into the church or other place of divine worship as aforesaid , every such person shall forfeit and pay the sum of twenty shillings" 7 THE STATUTES AT LARGE OF SOUTH CAROLINA: EDITED UNDER AUTHORITY OF THE LEGISLATURE 417 (1840);

1619 Virginia "All persons whatsoever upon the Sabaoth daye shall frequente divine service and sermons both forenoon and afternoon, and all suche as beare armes shall bring their pieces swordes, poulder and shotte. And every one that shall transgresse this lawe shall forfaicte three shillinges a time to the use of the churche." NARRATIVES OF EARLY VIRGINIA 1606-1625 273 (1907).

colonists were regularly carrying loaded firearms without murdering each other suggests technology was not the reason for colonial New England's peace.

### C.        Homicide in the Early Republic/Population Density

Most baffling is Roth's apparent indifference to the role of population density.  At ¶24: "By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year."  New York City had 123,706 people at the 1820 census; Philadelphia 63,802.  These were the two largest cities in America.[174]  The anonymity of large cities makes it far easier for a murderer to escape justice; this is such a large oversight as to make me scratch my head in wonder that he could compare areas of such radically different densities with no apparent awareness that population density might explain these murder rate differences.

At ¶24, Roth claims: "And the proportion of domestic and nondomestic homicides committed with firearms was similarly low—between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia."  We now that they did not go around armed because they were not murdering each other?  This is circular reasoning.  Perhaps there were few reasons to kill each other.  In many states today, most of the adult population is allowed to carry concealed firearms without a license and many are regularly armed and we still have low murder rates.

---

[174] U.S. Census, *1820 Fast Facts,* https://www.census.gov/history/www/through_the_decades/fast_facts/1820_fast_facts.html, last accessed February 6, 2023.

At ¶26, more circular reasoning: "Because gun use was generally limited to hunting, controlling vermin, or serving in the militia, there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels."  Or people generally behaved themselves, so there was no need to regulate the practice.  That legislatures passed surety bond laws suggests that not everyone behaved themselves, so there was *some* regulation.

At ¶27:

Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states, where violence among citizens increased after the Revolution to extremely high levels. Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year. Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.

Since Roth cites me as a source for part of this, I find it curious that he did not consider the evidence I found that this murder problem was an outgrowth of the backcountry honor culture, which was also the origin of the dueling problem that by Roth's admission in the previous sentence was the target of Northern legislation.  It was also the target of much Southern legislation and involved not just "Poor and middle-class whites" but people held back from legislative, judicial, and militia positions by "dueling oaths" requiring them to swear that they had not participated in a duel after a particular, often frequently changing date.[175]

"The justices of the Louisiana Supreme Court echoed these sentiments—'unmanly' men carried concealed weapons to gain 'secret advantages' over their adversaries."  He cites his book

---

[175] Example: LAWS OF THE STATE OF INDIANA, PASSED AND PUBLISHED AT THE SECOND SESSION OF THE GENERAL ASSEMBLY 362-365 (1818).

instead of a Louisiana Supreme Court decision.  And his book cites my book.  Why not look up the decision itself?[176]  This is not terribly persuasive evidence of scholarship.

At ¶31, Roth describes Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons."  He then buries in a footnote that the law did not survive the Georgia Supreme Court.  This seems like rather a big deal.  While *Nunn v. State* upheld the concealed carry ban part of the law, the decision also ruled that: "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such, merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree…"  This is a rather important point.

Roth recounts likely causes of changes in murder rates but makes no attempt to quantify relationships between these changes and murder rate changes.  Many of his likely causes are not prone to quantification.  Nonetheless, some are.  If slavery drove high murder rates in the South, an obvious test would be to attempt to draw a correlation between slaves per 100,000 population by state, or even more ideally, by county.  A perhaps more subtle measure might be what percentage of slave holders were "planters," those holding 20 or more slaves.  It is hard to take seriously claims about relationships of various factors to murder rates when not even this basic statistical analysis has been demonstrated.

### D.    From the Mexican War through the Early Twentieth Century

Roth opens ¶33 with a statement that is utterly false.  "By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession."  No state banned concealed firearms, or even placed restrictions on possession.  Concealed carry was heavily regulated.  In the footnote he observes: "

---

[176] State v. Chandler, 5 La. An. 489, 490, 491 (1850).

These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

What makes this claim in the footnote misleading is that the Vermont Supreme Court overturned a Rutland ordinance that banned concealed carry, while upholding the state law which required that the carrier did so "with the intent or avowed purpose of injuring a fellow man." Without that criminal intent, the Court ruled, the Vermont Constitution's right to keep and bear arms provision took precedence over a city ordinance.[177]

Another misleading part of this claim is that some states passed concealed carry bans and then repealed them.  California banned the carrying of concealed weapons in 1864.[178]  It then repealed the law in 1870.[179]  Newspapers that hailed the new law also hailed its repeal.  The reason has some relevance to Roth's claims.  One editorial argued that the law:

> bothers the good and assists the bad. It disarms the orderly citizen and places no obstruction in the way of the robber. Homicides were very common some years ago in California, and their frequency was partly due to the general custom among the miners of carrying revolvers and large knives. They were mostly single men, who would occasionally drink freely, and under the influence of strong liquor they did not hesitate to take life in case of a quarrel. But of late years, families have increased, dissipation has decreased, and drunken affrays are more rare. At the same time, robbery on the highway, and especially in this city, is more frequent.[180]

Roth at ¶34 then observes that with respect to homicide:

But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South

---

[177] State v. Rosenthal, 75 Vt. 295, 55 A. 610 (1903)
[178] 1 GENERAL LAWS OF THE STATE OF CALIFORNIA, FROM 1850 TO 1864, INCLUSIVE 1585 (1870).
[179] California sess. Laws ch. 63 (1869-70).
[180] *The Carrying of Concealed Weapons*, DAILY ALTA CALIFORNIA, Mar. 13, 1869, 2.

and the Southwest, where rates had already risen in the early national period, but in the North.

Most curious people would ask which was the direction of causality between widespread passage of bans on concealed weapon carrying and a rising homicide rate. Both directions are plausible, if that editorial from the Daily Alta California is to be believed. It is apparent that Prof. Roth did not consider that possibility.

At ¶36: "Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun. But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession." Yes, there was evolution of firearms technology during the early Republic, but Colt's important advances receive too much attention from Roth. From the late 18th century, gun makers made repeating handguns called pepper-boxes.

The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[181] The development of the percussion cap certainly made them more practical. While a percussion cap could certainly be detonated by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.

Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL

---

[181] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[182]   Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[183]

While pepper-box pistols had a poor reputation for being more hazard to the shooter than the target, perhaps based on the necessarily dangerous flintlock method of firing, you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[184]

At ¶37: "Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway."  Perhaps Roth should consider whether the homicide crisis was because of revolvers or was the homicide crisis the cause of revolver popularity.  By his own admission in ¶35: "Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons."  The current issue with "assault weapons" and LCMs may be more a symptom of larger problems.  If you do not address those root causes, you may only change the method of murder.

At ¶38: "Smith and Wesson had created a near-perfect murder weapon. It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time."  They had also created a near-perfect weapon of self-defense.  That also describes the sidearm carried by every police officer and millions of law-abiding Americans.  Roth has just admitted his biases.

---

[182] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.
[183] *English Transitional Pepperbox Revolver*, FORGOTTEN WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.
[184] *Antique Pepperbox Pistol 1850's Washington Arms Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

At ¶40: Easily concealed, [revolvers] became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards."  Also, for estranged spouses or romantic partners, sheriffs, constables, or police officers, targets of self-styled toughs, and intended victims of mass murderers.  "CHICAGO, Apr. 5. Two men were killed and three wounded today when a former employee of the W. A. Foundry & Machine Company walked into the offices of the concern and began firing with two pistols.  He was then shot and killed by the plant superintendent, who opened fire in return."[185]

At ¶40, Roth tells us: "As modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction."  Again, Roth's insistence on including lawful defensive killings in "homicides" tells us nothing about whether this changing homicide rate was good or bad.  If toughs, estranged lovers, or criminals using clubs or fists were the dead and the shooters were their intended victims, it could just as well explain "the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time."  Roth's data is interesting from an epidemiological standpoint but perhaps not useful for understanding murder.

¶40: "Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history."  Since Roth has repeatedly shown us data on unrelated homicides for colonial America, he should show us some actual data on this change,

---

[185] "Former Employe[sic] Kills 2; Wounds 3," Bisbee [Ariz.] Daily Review, Apr. 6, 1922, 1.

rather than just opening the sentence with "Ominously."  Certainly, there was no shortage of mass murders in families in this period using non-firearms.  "Here are just a *few* examples: axes,[186] hammers,[187] knives,[188] poison,[189] drowning,[190] and strangling.[191]  I have hundreds more depressing examples.

Starting at ¶41, Roth reaches to laws passed after 1868, the cutoff line as far as *Bruen* is concerned.

Prof. Roth argues in ¶22 that the Founding Generation believed public safety threats "could be checked only by statutes that placed limits on basic rights."  I do not dispute this claim, but if Revolutionary standards are a basis for current laws, what will Prof. Roth's response be to a 1792

---

[186] *Trial of Abel Clements*, [Richmond, Va.] *Virginia Argus,* Jul. 19, 1806, 2 (man murdered wife and eight children).

[187] *Murdered Her Children*, [Jonesboro, Tenn.] HERALD AND TRIBUNE, Jun. 11, 1874, 1 (Woman bashes her husband in the back of the head with a cooper's adze (a specialized type of hammer), an injury expected to be eventually fatal. While seeking medical and police assistance, the woman beat to death her three children with an iron); *A Family Slain*, KANSAS CITY JOURNAL, Mar. 4, 1899, 1 (The missing father apparently beat to death his wife and their four children with a hammer.); *Insane Farmer Kills His Family,* Butler [Mo.] Weekly Times, Mar. 19, 1903, 7 (A farmer murdered his wife and six children with a sledgehammer then used it on himself); *Four Men Killed*, SAVANNAH MORNING NEWS, Aug. 18, 1903, 1 (Physician "[c]razed by drink" attacked his wife; when she returned he had beaten their three children to death with a claw hammer.)

[188] *Three murdered and a Suicide*, MUSCATINE [IOWA] WEEKLY JOURNAL, Jan. 11, 1861, 1 (Murderer, "after a social interview with some of his neighbors, which ended with singing and prayer" murdered his wife, a son, and a daughter with a knife.); *Shocking Murder in York County, Pennsylvania*, [Richmond, Va.] DAILY DISPATCH, Jun. 22, 1866, 1 (Robber murdered farmer George Squibb, his wife, and granddaughter with a knife.); *A Wife and Three Children Murdered by the Husband-Father*, CAIRO [ILL.] EVENING BULLETIN, Dec. 3, 1869, 1 (Man murders his wife and three children, cutting their throats.)

[189] *A Modern Borgia*, NASHVILLE UNION AND AMERICAN, Oct. 27, 1868, 1 (Servant girl poisons family of seven with Paris green, an arsenic rat poison.); *Families Poisoned*, [Austin, Minn,] MOWER COUNTY TRANSCRIPT, May 2, 1872, 1 (A boarder poisoned three of Mrs. Tibner's children because Mrs. Tibner would not lend him $1; he later confessed to his crime, and the murder of his wife and their child.); *A Shoemaker Named Geistlach…*, [Winsboro, S.C.] NEWS AND HERALD, Jun. 18, 1878, 1 (Mrs. Geistlach and her two children found dead from chloroform poisoning.  Because she was illiterate, investigators considered her suicide note a forgery.  Her husband, an out of work shoemaker, had disappeared, leading to suspicion that he was the actual killer.); *An Inhuman Step-Mother*, [Washington, D.C.] EVENING STAR, Jun. 15, 1869, 1; [Franklin, La.] PLANTERS' BANNER, Sep. 1, 1869, 1 (Stepmother drowns three children from husband's previous marriage out of jealousy.  The river was only two feet deep, so she held them under "until life was extinct.")

[190] *Caucasian Cruelty*, ST. PAUL DAILY GLOBE, Dec. 16, 1888, 1 (Man murders his wife and two children, drowning them with iron weights.); *Drowned Her Six Children*, ADAMS COUNTY NEWS [Ritzville, Wash.] Feb. 27, 1901, 4 (A woman threw her six children down a 30 foot deep well, "then jumped into the well, and, the belief is, held their heads under water until all were drowned.")

[191] *State Specials*, DALLAS DAILY HERALD, Apr. 16, 1881, 1 (Mrs. John Simmons, her four year-old son and her mother-in-law" were murdered.  Mrs. Simmons had been "outraged" before the cutting of her throat; the mother-in-law strangled and the son murdered by dashing "the brains of his little son out upon the rocks.")

"An act for the punishment of lewdness, adultery and polygamy?"[192]  Would New York State's

capital punishment of buggery[193] and Massachusetts' "An Act Against Sodomy[194] have a similar

claim?  Would the Pennsylvania Constitution 1776 provision:

> And each member, before he takes his seat, shall make and subscribe the following
> declaration, viz:
>
> I do believe in one God, the creator and governor of the universe, the rewarder of
> the good and the punisher of the wicked. And I do acknowledge the Scriptures of
> the Old and New Testament to be given by Divine inspiration.[195]

If you intend to murder several people in a short period of time, an ax or a knife remains a

sufficient weapon.  They are cheap and silent.  They draw no attention to your actions or provide

warning to other potential victims.

### E.    Irrelevant Laws

Roth at ¶26-27 discusses the development of concealed weapon regulation, much of it

directed at knives, and sometimes leaving firearms completely unregulated, such as Tennessee's

1838 law.[196]  If Roth's point is that the early Republic found acceptable the regulation of concealed

carry of deadly weapons, its relevance to possession or sale of LCMs and "assault weapons" (most

of which would be concealable only by ten-foot-tall criminals), as is the objective of the New

Jersey law, seems unclear.

---

[192] *Laws of the State of New-Hampshire* 257-8 (1792).; Laurel Thatcher Ulrich, *A Midwife's Tale: The Life of Martha Ballard, Based on her Diary, 1785-1812*, (New York, Random House, 1990), 291-307; Horrid Murder! At an early hour on Wednesday morning last, the inhabitants of this town were alarmed with the dreadful information…, (Augusta, Me., 1806), 1 (murdered his wife and seven of his eight children with an axe or knife); "Miscellaneous Clippings," Wyandot [Ohio] Pioneer, Feb. 27, 1863, 2 (Woman murdered three stepchildren with an ax); "The Philadelphia Horror," Chicago Tribune, Apr. 3, 1869, 2; "Horrible Murder," [Irasburgh, Vt.] Orleans Independent Standard, Apr. 13, 1869, 3; "The Late Terrible Tragedy in Philadelphia," [Washington, D.C.] Evening Star, Apr. 1, 1869, 1 (A man with ax murdered his wife and two children)

[193] 1 *Laws of the State of New-York 336 (*1792).

[194] *Perpetual Laws of the Commonwealth of Massachusetts* 187 (1789).

[195] Pennsylvania Const. § 10 (1776).

[196] *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8* ch. 137 at 200-201 (1838),

Even conceding antebellum constitutionality of regulation of concealed carry, the Tennessee Supreme Court decision upholding the 1838 concealed knife law has something to say about "weapons of war":

> To make this view of the case still more clear, we may remark, that the phrase, "*bear arms*," is used in the Kentucky constitution as well as in our own, and implies, as has already been suggested, their military use. The *28th section of our bill of rights* provides, "that no citizen of this State shall be compelled to *bear arms*, provided he will pay in equivalent, to be ascertained by law." Here we know that the phrase has a military sense, and no other; and we must infer that it is used in the same sense in the *26th section*, which secures to the citizen the *right to bear arms*. A man in the pursuit of deer, elk and buffaloes, might carry his rifle every day, for forty years, and, yet, it would never be said of him, that he had *borne arms*, much less could it be said, that a private citizen *bears arms*, because he has a dirk or pistol concealed under his clothes, or a spear in a cane. So that, with deference, we think the argument of the court in the case referred to, even upon the question it has debated, is defective and inconclusive.[197]

If only military arms are protected, then these weapons that we are told are "weapons of war," must be protected arms. This must be what that James Madison, author of the Second Amendment, meant when in Federalist 46 he wrote about the potential danger of a tyrannical national government:

> Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government; still it would not be going too far to say, that the State governments, with the people on their side, would be able to repel the danger. The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million of citizens with arms in their hands,…

Roth speaks approvingly of *Nunn v. State* (Ga. 1846) and its acceptance of concealed carry regulation but misses its important protection for arms possession and carry:

> The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used

---

[197] *Aymette v. State*, 21 Tenn. (2 Hump.) 154, 161 (1840)/

by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all of this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.   Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this right, originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, reestablished by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own Magna Charta! And Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans, plead eloquently for this interpretation![198]

Also Roth refers to "prohibitions against carrying certain concealable weapons…"  It was only if the weapons were *concealed*, not concealable.  A pistol or Bowie knife might well be concealable, but if openly carried, it was still lawful.  Tennessee prohibited sale of fighting knives and concealed carry, but open carry remained lawful with an added penalty if the bearer injured another party with no apparent requirement that the knife be concealed.[199]

¶27 Roth asserts that in the 1830s several states "passed laws …  that restricted the use or ownership of certain types of weapons."  I can find no laws restricting ownership, only prohibitions on concealed carry with sentence enhancements for criminal use while carrying openly (Texas,[200] Tennessee[201]).  Many of these statutes prohibited or taxed prohibitively the sale or transfer of such weapons (Alabama,[202] Georgia,[203] Tennessee.[204]) without prohibiting ownership.

At ¶28 n. 55, Roth informs us that "These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against

---

[198] *Nunn v. State*, 1 Ga. 243, 250, 251 (1846).
[199] 1838 Tenn. Ch. 137 § 4.
[200] See *Cockrum v. State*, 24 Tex. 394, 402 (1859).
[201] 1838 Tenn. Ch. 137 § 4.
[202] 1837 Ala. Ch. 11, § 2.
[203] *Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837* (Milledgeville: P. L. Robinson, 1838), 90-91 § 1.
[204] 1838 Tenn. Ch. 137 § 1.

Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892)."

An Andrew Rosenthal was convicted in Rutland City Court of violating city ordinance No. 10, "prohibiting a person from carrying within the city any brass knuckles, pistol, slung shot, or weapon of similar character, or any weapon concealed on his person, without permission of the mayor or chief of police," though in what way, and with what arms, is not told by the headnotes or the decision.  The Vermont Supreme Court struck down the ordinance based on the Vermont Constitution "art. 16, [which] declares that the people have a right to bear arms for the defense of themselves and the state," and that the ordinance in question "so far as it relates to the carrying of a pistol under any circumstances without such consent, is repugnant to the Constitution, and to that extent void."

Vermont Statutes §4922 prohibited the carrying of arms, "with the intent or avowed purpose of injuring a fellow man":

> Under the general laws, therefore, a person not a member of a school may carry a dangerous or deadly weapon, openly or concealed, unless he does it with the intent or avowed purpose of injuring another; and a person who is a member of a school, but not in attendance upon it, is at liberty, in a similar way, to carry such weapons.[205]

The Court pointed out that the Rutland ordinance banned any carrying of a weapon concealed, whether a criminal intent was present or not, and was therefore contrary to the "Constitution and the general laws of the state."  The Court emphasized that while other parts of the Rutland ordinance might be also invalid, these were "questions not now before the court."[206]

---

[205] *State* v. *Rosenthal*, 75 Vt. 295, 55 Atl. 610, 611 (1903).
[206] *Id.*

Roth at ¶28, informs us that "the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse." This is a strong assertion, in desperate need of evidence. The only sources listed are Roth and a paper co-authored by Roth about Old West Homicide rates, which paper makes no reference to revolvers, Colt, pistol, or handgun.[207]  Referencing your own claims is unpersuasive.

Because Colt production for the commercial market started in 1848,[208] with the apparent swarm of murder rate data in Roth's possession, one might expect a table showing the steady rise in murder rates starting in 1848. Where is it? This increase in production was not subtle and should be considered cumulative in its effects; firearms are quite durable. This page from the Colt factory shows an order by *one* distributor for 200 7-shot revolvers per week:

---

[207] Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195.

[208] David A. Hounshell, *From the American System to Mass Production 1800-1932: The Development of Manufacturing Technology in the United States* 47 (1984).



43

62.673.                    Hartford Conn Dec. 31. 1874.

Messrs Schuyler Hartley & Graham
       1760  New York.
            Gentlemen
                    Your favor of the 29 th inst
came to hand this a.m. and in reply would say.
that the stock of new Pocket that we have on hand
and in the works cannot exceed 2000 Pistols of these
about 1500 are finished. The remainder are in the
works, of those on hand there are about an equal
quantity of 4½, 5½ and 6½ inch. In altering
them over into Breech Loaders we would make them
all 4½ inch if desired. We will let the "Allies" have
them as they are (P&B) at 4⁰⁰ Ea net or we will
alter them into Breech Loaders at 5⁰⁰ Ea net.
It would require about 60 days to alter 12 to 1500.
We are prepared to act on the 38 & 41/cals when we
hear or receive any encouragement from the Allies
and as stated to Mr Moore when in Hartford.
With the compliments of the season. We remain.
                        Yours truly
                (Signed)  Hugh Harrison Treas.

209

At ¶34, Roth claims:

By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico. Homicide rates whipsawed, however, in the South. They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.

With all these advanced technology firearms on the market and cumulatively in private hands, it seems odd that murder rates fell in most of the country while rising in the South. Perhaps it was not the firearms, but the social upheaval of the end of Reconstruction and the rise of Jim Crow that caused increasing murder rates there? Having grabbed onto his preference for blaming revolvers, he suddenly loses interest in the larger social changes that were heavily concentrated in the one region where murder rates were rising. Worse for Roth's argument, in ¶35-36, he recounts how Texas, Tennessee, and Arkansas adopted increasingly strict gun carrying laws over the period in which he tells us murder rates were rising in the South. Somehow more revolvers caused more murders in the gun control leading South but the opposite in the rest of America.

After describing how California repealed its ban on concealed carrying of weapons, he asserts that "public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves." Roth cites an article on which I was co-author but somehow missed the quote from one of the newspapers that applauded the repeal:

Homicides were very common some years ago in California, and their frequency was partly due to the general custom among the miners of carrying revolvers and large knives. They were mostly single men, who would occasionally drink freely, and under the influence of strong liquor they did not hesitate to take life in case of a quarrel. *But of late years, families have increased, dissipation has decreased, and*

69

*drunken affrays are more rare*. At the same time, robbery on the highway, and especially in this city, is more frequent.[210] [emphasis added]

California had become less violent because of demographic changes and only seemed to need armed citizens to discourage robbery.

More evidence that Roth is not reading carefully is ¶45 n. 95:

Note that the title of the Cramer and Olson essay is misleading. It does not refer to the origins of the laws discussed here or to the ways in which they were enforced. It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

Yet his source for the "laws discussed here" is the paper that "does not refer to the origins of the laws discussed here…"  Somehow he missed "C.California's First Concealed Weapon Law," and "A.California's Second Concealed Weapon Law & Pancho Villa," and "B.California's Third Concealed Weapon Law."

### F.     Roth's Irrelevant Technical Errors

At ¶58, Roth goes into a technical discussion of the M-16 and compares it to the ArmaLite [*sic*] AR-15 as "the civilian version of the M-16."  While many parts are common between the two weapons, and a few intentionally incompatible, the most relevant aspects are the cartridge and speed of fire.  While 3,300 feet per second suggests an enormously powerful bullet, it is less powerful than many common hunting rifles.  The muzzle energy of the metal case 55 grain cartridge is 1,282 foot-pounds.  The widely used for hunting .308 Winchester is 2,648 foot-pounds.  Both are quite lethal, but the .308 Winchester is more destructive at 200 yards than the .223 Remington at the muzzle.[211]  If the speed or power of the AR-15's cartridge is relevant, it is a

---

[210] *The Carrying of Concealed Weapons*, DAILY ALTA (SAN FRANCISCO) CALIFORNIA 2 Mar. 13, 1869.
[211] Sportsman's Guide, *Rifle Ballistics Charts*, https://www.sportsmansguide.com/ballisticscharts/rifle, last accessed February 6, 2023.

reminder that a hunting rifle expertly fired is quite deadly.  The mass murderer at the University of Texas in 1966 murdered fourteen people.[212]  He was a skilled marksman using a very traditional hunting rifle: a Remington 700.  He also had two more rifles, a shotgun, and three pistols with him.[213]

A shortage of LCMs can always be solved by carrying more guns.  Two examples: The mass murderer at ESL in Sunnyvale in 1988 arrived at the scene carrying "three handguns, including 9mm Browning semiautomatic pistol and a .380-cal. semiautomatic pistol, a .30-06 high-powered rifle and a 12-gauge shotgun -- the weapon used in all the killings."[214]  The .30-06 is a standard hunting rifle caliber; I doubt that it used detachable magazines.

In 1913, a former teacher showed up at a Bremen, Germany, Catholic school "armed with six loaded revolvers."  He killed one teacher, two children, "three children were gravely injured and three other children were slightly wounded."  The article described him as "demented."[215] Depending on whether they were they were 5-shot, 6-shot, or 9-shot revolvers (all still common today) he could have fired 30, 36, or 54 shots without reloading.

At ¶62:

> Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms. The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.

---

[212] Charles Bowden, *The Men Who Stopped a Mass Murderer,* Esquire, Aug. 26, 2021, https://www.esquire.com/news-politics/a36890935/charles-whitman-mass-shooting-university-of-texas/, last accessed February 6, 2023.

[213] Craig Hlavaty, *Rifle Reported To Be Used In Charles Whitman Killing Spree Up For Sale, Houston Chronicle,* Sep. 24, 2014,     https://www.chron.com/news/houston-texas/texas/article/Rifle-reported-to-be-used-in-Charles-Whitman-5777479.php, last accessed February 6, 2023.

[214] Jay Mathews, *Sudden Death In Sunnyvale*, *Washington Post*, Feb. 18, 1988.

[215] *Maniac Shot Many People*, BARRE [Vt.] DAILY TIMES, Jun. 20, 1913, 1.

There are differences in other parts: hammers, bolt carrier, and lower receiver.  If Roth is trying to suggest that there is some easy conversion between the two weapons, see 26 USC § 5845(b ).[216]  Any parts collection capable of that conversion is *already* a machine gun.

The rubber band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  There is nothing specific to the AR-15 or any other "assault weapon" about this; it works on any semiautomatic firearm.  New Jersey by refusing to ban all semiautomatic firearms demonstrates that this is a cosmetic law that can be easily defeated.  "The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger."  The cited source makes no such claim.  Firearm manufactures engage in a continual battle between lighter triggers to improve accuracy and safety requirements to avoid unintentional firing.  The idea that firearms manufacturers are intentionally reducing trigger pull to facilitate the rubber band solution is in need of evidence.  Curiously, BATF has already made possession of a shoelace and a semiautomatic weapon (even if not an "assault weapon" into a felony.[217]

¶67: "What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two."  My research has involved mass *murders*, not just mass *shootings*.  (I consider mass murder a bad thing, not just when committed with firearms.)  This includes a number of mass murders since 1965 with very high death counts.

**New Orleans, La. (1973)**

---

[216] *Full   Auto   vs   Semi   Auto   AR15   Bolt   Carrier   Group   Comparison*, https://www.youtube.com/watch?v=MO3LWqaw_Wg&t=53s, last accessed February 6, 2023.
[217] See Bureau of Alcohol, Tobacco, and Firearms letter, Sep. 30, 2004, https://claytoncramer.com/ATF-shoestring-machine-gun-2004.jpg, last accessed February 6, 2023.

06/24/1973: The murderer took revenge for being expelled from the UpStairs Lounge, a gay bar.  He walked down the street and bought a bottle of cigarette lighter fluid, killing 33 people.[218]

**Los Angeles, Cal. (1987)**

12/7/1987: The airline fired passenger agent for theft; he used his employee ID to smuggle a gun on board, murdered his former supervisor, then killed the flight crew.  He crashed the airliner crashes; killing 45.  He blamed his lack of promotion on racism.[219]

**San Juan, P.R. (1986)**

12/31/1986: Three Teamsters attempted to negotiate a better labor contract with their employer by setting a fire that murdered 97 people.[220]

**New York, N.Y. (1990)**

3/25/1990: Angry at his girlfriend, the murderer used $1 of gasoline and a match to set fire to her place of employment, murdering 87 people, leaving three survivors.[221]

**Oklahoma City, Okla. (1995)**

4/19/1995: The murderer set off a bomb in front of the federal building killing 168 people and injuring hundreds more.  This was retaliation for the 1993 deaths of dozens at the Branch Davidian compound that the murderer blamed on criminal behavior by the federal government.[222]

**New York, N.Y. (2001)**

---

[218] Elisabeth Dias with Jim Down, *The Horror Upstairs, Time,* Jul. 1, 2013.

[219] Judith Cummings, *Kin of Suspect Defiant and Contrite, New York Times*, Dec. 11, 1987.

[220] *3 Teamsters Charged in San Juan Hotel Fire, Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

[221] Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911, New York Times,* Mar. 26, 1990.

[222] Flowers and Flowers, *Murders in the United States,* 56-7.

9/11/2001: Terrorists fly two commercial airliners into the World Trade Center killing 3047 people, wounding far more and plunging the U.S. into war.[223]

**Arlington Co., Va. (2001)**

9/11/2001: Same terrorist group flies an airliner into the Pentagon killing 184 people and wounding far more. [224]

**Somerset Co., PA (2001)**

9/11/2001: Same terrorist group fights for control of an airliner against determined and courageous crew and passengers, crashing the plane into the ground before reaching their D.C. target.  Forty people murdered.[225]

Roth's claim that recent mass *shootings* never involve more than two is *mostly* correct. One recent group mass *shooting* took place on Oct. 31, 2019, in Orinda, Cal. A conflict between gangs led to a shooting in which the murderers shot to death five people and "several others were injured.[226]  Mass *murders,* however, often involve larger groups such as those aforementioned.

### G.    Mass Murder: My Current Research Project

#### 1.    Defining Mass Murder

Since 2019, I have been researching the history of mass murder in the United States.  The definition of mass murder does not have a universal definition.  The FBI's definition of mass murder is four or more dead (including the killer) in one event, in one location.[227]  Other agencies,

---

[223] FBI, Crime in the United States: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf
[224] FBI, Crime in the United States: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf
[225] FBI, Crime in the United States: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf
[226] Annie Sciacca, *'It Was A Bloodbath': Orinda Halloween Shooting Investigation Reveals Gang Connections*, San Jose Mercury-News, Nov. 17, 2019.
[227] FBI, Serial Murder: Multidisciplinary Perspectives for Investigators 8 (2008), distinguishing mass murder from serial murderers. "Generally, mass murder was described as a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murders."

such as the U.S. Secret Service use the term "mass attacks" in which "three or more people are harmed."[228]

For my research, I have adapted the Secret Service's definition. For purposes of this research, I slightly extended the FBI definition to include at least two murder victims committed in multiple locations within 24 hours and use the Secret Service's "three or more people harmed." The suicide or lawful killing of the mass murderer or murderers is not included in the total dead.

A more widely used definition of mass murder is four or more killed, making comparison with FBI and Secret Service data a bit more difficult.  Throughout this report, I will provide information using both definitions.

I have excluded multiday mass murders committed in riots, such as the New York City Draft Riots of 1863, and many of the race riots of the 20th century because they were not in one location.  Determining when these murders took place precludes easy classification. I also have excluded crimes such as the Colorado cannibalism murders in 1874, because it is unclear over what period the victims were murdered.

There are deaths that might qualify as mass murder, but which have circumstances that might also qualify as lawful self-defense and are thus not included.[229]  There are mass murders that appear to be gang-related; I have excluded many of those because determining if they were defensive in nature or not requires confidence in the integrity of the participants, who often have reason to lie.

Obviously, mass murder does not include acts of war.  Mass murders committed by governments as official policy are outside the legal definition of murder.  Other horrifying mass

---

[228] U.S. Secret Service, Mass Attacks in Public Spaces – 2019, 6 (August, 2020).
[229] *Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act*, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1.

killings outside our definition include those performed by non-state actors with the acquiescence, assistance, or encouragement of local, regional, or national governments.  Some mass murders were not official acts but were assisted by governmental disarming of the victims.  Example: the East St. Louis race riot of 1916, where police and state militia disarmed blacks in advance of a non-governmental mass murder.

**East St. Louis, Ill. (1916)**

7/7/1916: "Cowardly Police and Militia Search Negroe's [*sic*] Homes, Disarm Them, and Then Turn Them Over to the Blood-Thirsty Demons Clamoring For Their Lives.  Without Arms or Protection 38 are Killed, More Than 200 Wounded and 325 Negro Homes are Burned and Looted." [230]  "'I killed seventeen last night,'" he said, grinning as he shifted an ax he was carrying from one hand to the other.  "And I am going to get a few more if I get a chance."[231]

Category: public.

Suicide: No

Cause: Racism

Weapon: at least 17 by ax.[232]

Also excluded are governmentally supported acts of mass murder committed outside the rules of land warfare. The bombing of the Soo Locks on the Great Lakes shortly after U.S. entry into World War I, which would otherwise meet the criteria of mass murder, smells suspiciously like German sabotage and I therefore excluded it.[233] This also excludes one of the earliest American mass murders: ten murdered by Lenape Indians at a school in 1764 Greencastle,

---

[230] "Fiends Incarnate!" *Kansas City Sun*, Jul. 7, 1917, 1.

[231] "Listen, Men!" *Kansas City Sun*, Jul. 7, 1917, 1.

[232] "Fiends Incarnate!" *Kansas City Sun*, Jul. 7, 1917, 1.

[233] *Attempt Made To Wreck Soo Locks,* EAST OREGONIAN, May 16, 1917, 1.

Pennsylvania,[234] as well as the many thousands (at least) killed in various Indian wars (such as the hundreds killed during the Dakota War of 1862).

I have excluded *most* mass murders of Indians by Indians because most were outside the civil society of America, and the records of such crimes are thus necessarily incomplete. The Criminal Justice Research Center's data on Colonial and Revolutionary New England murders contains examples of Indian mass murders for which we have data and I have included these.[235] I have included incidents here where a mass murder (by white or Indian and regardless of the victim's race) was clearly *not* a part of warfare, such as those motivated by robbery or kidnapping with the goal of ransom.

There are mass murders where the victim count includes people killed because a felony was taking place. Because of the felony-murder rule, I have included people killed lawfully during a felony as mass murder victims, such as happened in the Johnson County War.[236] I have excluded incidents in which all the dead were felons.[237]

There are incidents which might be best categorized as mutual combat, where armed groups attacked each other with great loss of life but determining who were the victims and who were the murderers is not easy from surviving news coverage, such as the struggle between Democratic and Republican campaign workers in Clayhole Voting Precinct in 1922. The ensuing gunfight killed at least five people and wounded ten to thirteen others.[238]

---

[234] Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017).
[235] Criminal Justice Research Center, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797,* https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england.
[236] *A War in Wyoming,* [Maysville, Ky.] *Evening Bulletin,* Apr. 13, 1892, 1.
[237] *Nevada Mining Boss Besieged in His Office, Kalispell Bee,* Jan. 09, 1903, 1
[238] Some Facts About Clayhole, [Lancaster, Ky.] *Central Record,* Jul. 20, 1922, 1.

I have excluded a small number of cases where trial found the killer not guilty of what were clearly mass murders.  Example: Miss Verna Ware opened fire in the Gatesville courthouse in 1909, killing the man she accused of seducing her, two others not involved in the case and wounding a fourth.[239]

### 2. Finding Mass Murders

How do you find historical mass murders?  The phrase "mass murder" is quite rare in historical documents.  Using the *ngram* tool in books.google.com for books published 1600-2000 shows essentially zero matches until 1952,[240] and many of the rare pre-1952 matches are actually abbreviations of Massachusetts such as "Mass. Murder" or "Mass., murder."[241]  The abbreviation "Mass." causes similar problems when searching the Library of Congress' collection of 1789-1963 newspapers for the words "mass" and "murder" within five words of each other.[242]  An additional problem is the use of the phrase to describe governmentally sanctioned and indeed government-operated warfare.[243]

Searching the Library of Congress' *Chronicling America* collection of newspapers for the words "murders", "murdered", "killed", "slain", "dead" in association with numbers found a sea

---

[239] *Woman to Face Murder Charge*, Waxahachie [Tex.] *Daily Light*, Feb. 8, 1909, 1; *Four People Wounded, Palestine* [Tex.] *Daily Herald*, Feb. 4, 1909, 2; *Jury Verdict Not Guilty*, Liberty *[Tex.] Vindicator*, Feb. 11, 1910, 1.

[240] https://books.google.com/ngrams/graph?content=%27mass+murder%27&year_start=1600&year_end=2000&corpus =17&smoothing=3&share=&direct_url=t1%3B%2C%27%20mass%20murder%20%27%3B%2Cc0, last accessed June 12, 2018.

[241] Examples: Michigan State Prison, *Biennial Report of the Board of Control and Officers of the State House of Correction and Branch Prison of State Prison in Upper Peninsula...* 22, 41, 65 (1916),; R.W. Bligh, comp., *New York Herald Almanac: Financial, Commercial and Political Register 1874 87* (1874).

[242] https://chroniclingamerica.loc.gov/search/pages/results/?state=&dateFilterType=yearRange&date1=1789&date2=19 63&language=&ortext=&andtext=&phrasetext=&proxtext=mass+murder&proxdistance=5&rows=20&searchType= advanced; Examples: *'Joe is a Good Boy,' Declares Ettor's Parents*, [Chicago, Ill.] *The Day Book*, Oct. 25, 1912; 14; *Queries Pour in on J. Frank Hickey*, [Chicago, Ill.] *The Day Book*, Dec. 4, 1912, 28; *Written Authority to Walk in Your Own Town,* [Chicago, Ill.] *The Day Book,* Feb. 5, 1912.

[243] Jos. Veltman, *Do Workers Want War?* [letter to the editor] [Chicago, Ill.] *The Day Book*, Jan. 17, 1916, 23.

of matches, most of which needed to be read before discarding.  In many cases, similar or identical news stories appeared in multiple newspapers.  If the same facts appeared repeatedly, and there were hundreds of references to an event, I did not read every newspaper account of that event.

There are several frustrating limitations of the *Chronicling America* collection:

1. Copyright restrictions make post-1922 newspaper collections incomplete.
2. Many of these mass murders, in addition to appearing in many different newspapers, sometimes appear in only one or two newspapers, far removed from the crime, both geographically and temporally.  One example is a mass murder of three in Tamworth, N.H. in 1857 which appeared only in an 1858 summary of the previous year's events, which was published in Pennsylvania.[244]  This made it difficult to gather additional data on the crime.
3. Nineteenth century accounts often used the word "murders" rather far afield from its legal meaning, or in reference to general social problems such as alcohol.  This produced so many thousands of matches that I have often settled for detailed examination of the first 100 front page news stories.  Newspapers in the nineteenth century also published many foreign news accounts and fiction.  Limiting searches to the front pages thus reduced false positives which would have to be laboriously examined for location and fiction status. (If it didn't make the front page, it seems unlikely it could be either a specific crime, or something as shocking as a mass murder.)

Defining a mass murder by the number of dead can understate mass murders, if either police or civilian intervention interrupts the murderer.  (There are some examples in my list of mass murders cut short, although not short enough, by such actions.)  In addition, some of the events gathered here list crimes in which the immediate coverage includes persons wounded so seriously that the coverage describes them as "probably fatally."[245]  When considering the nature of medical and surgical care available until my lifetime, it seems a good guess that those described as "probably fatally" wounded can be properly included among the dead.

One limitation of my research project is that, as my father used to tell me, "Newspapers are the first draft of history."  They may miss mass murders because of location, loss of newspapers

---

[244] *Principal Events of General and Local Interest During the Year 1857*, Lewiston [Penn.] Gazette, Jan. 21, 1858, 1.
[245] *Maniacal Unknown in Attempt to Exterminate Whole Family*, Bisbee [Ariz.] Daily Review, Apr. 6, 1922, 1.

from the historical record, and sometimes intentional editorial refusal to cover barbarous behavior (which has been demonstrated to promote copycat mass murders, even to the choice of manufacturer of the weapon used).[246]

There is a well-established pattern of copycat crimes inspired by news coverage. One example: An 1887 murder (although with only two victims and thus not in the database) was unmistakably a copycat of a recently reported mass murder. A mechanic read an article about a mass murder committed in part with Rough on Rats, a poison,[247] to his wife:

> His wife listened to the account of the… murder and then bade her husband read it. He went over it a third time and then she took the paper to the neighbors and had it read twice more. Thursday she sent her mother for yeast, and took a heavy dose of Rough on Rats and forced a dose of the poison down the throat of her babe…. The woman died in great agony and her babe expired soon after.[248]

Along with *Chronicling America*, I have made extensive use of the commercial site *Newspapers.com* and a few secondary sources.

Another valuable source was the list of "Homicide among Adults in Colonial and Revolutionary New England, 1630-1797," compiled by Randolph Roth and Cornelia Hughes Dayton.[249] While this is a list of *all* murders, not just mass murders, it provided an additional source of incidents.

### 3.    Group Activity

Roth's claim at ¶15 is that before modern firearms technology, mass murder "because of the limitations of existing technologies, were carried out by large groups of individuals acting in

---

[246] Clayton E. Cramer, *Ethical Problems of Mass Murder Coverage in the Mass Media*, 9:1 *Journal of Mass Media Ethics* 26-42 (Winter, 1993-94).
[247] "A Maniac Mother," *St. Paul Daily Globe*, Apr. 24, 1886, 1.
[248] "Rough on Rats," *Austin Weekly Statesman*, Feb. 3, 1887, 7.
[249] Randolph Roth and Cornelia Hughes Dayton, comp., *Homicide among Adults in Colonial and Revolutionary New England, 1630-1797*, Oct. 2009, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england, last accessed June 12, 2018.

concert, rather than by individuals or small groups."  The supposed distinction between modern individual mass murder and group mass murder of earlier centuries does not stand careful examination.  Mass murder is *still* sometimes a group activity.  Such happened at Littleton, Colo. on Apr. 20, 1999[250] and the terrorist attacks of September 11, 2001.  Other recent group mass murders include one on Oct. 31, 2019, in Orinda, Cal. A conflict between gangs led to a shooting in which the murderers shot to death five people and "several others were injured."[251]  On Dec. 31, 1986, in San Juan, P.R. three Teamsters attempted to negotiate a better labor contract with their employer by setting a fire that murdered 97 people.[252]

Before 1961, when "assault weapons" and LCMs were rare, there were 216 non-firearms incidents with four or more dead and a single murderer for a total of 1,353 dead or 6.26/incident.  With firearms only, there were 172 incidents with 825 dead or 4.80/incident.

As this report later shows, individual mass murder is neither particularly modern not dependent on technological advances.

### 4.    Data Limitations

It would be very useful to be able to extract data identifying which were group mass murders and which were individual.  When I started this project, this seemed an unnecessary detail and so I did not gather it.  I have since gone back and coded mass murder incidents based on whether they were committed by an individual or a group.  In some cases, it is impossible to

---

[250] R. Barri Flowers and H. Loraine Flowers, *Murders in the United States: Crimes, Killers and Victims of the Twentieth Century 59* (2001).
[251] Annie Sciacca, *"It was a bloodbath": Orinda Halloween shooting investigation reveals gang connections*, *San Jose Mercury-News,* Nov. 17, 2019.
[252] *3 Teamsters Charged in San Juan Hotel Fire*, *Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

determine this.  Often news accounts, confessions, or suicide notes clearly identify that this was the act of an individual.  In some cases, there is ambiguity, such as train derailments.

When gathering this data, I only recorded if a particular weapon was used rather than counting deaths by weapon.  In older news accounts, there is no breakdown of deaths by weapon.  In many cases, the state of forensic medicine would make it impossible to determine if the ax to the head or the subsequent knife to the throat was the fatal injury.  It would make little difference which caused a victim's death: the murderer's punishment would be the same.

A few examples of mass murders when firearms technology was not used:

Clarksburg, Va.: Nov. 10, 1805: Man murdered his wife and eight children.  While found guilty, there was substantial evidence of mental illness. Weapon: ax.[253]

Hallowell, Me.: Jul. 9, 1806, The father murdered his wife and seven of his eight children with an axe or knife before killing himself with a knife.  The cause was unclear, but the murderer mentioned poverty in a suicide note.  Weapon: ax.[254]

Uniontown, Wash. Feb. 25, 1901: A woman threw her six children down a 30 foot deep well, "then jumped into the well, and, the belief is, held their heads under water until all were drowned."[255]  "She is violently insane.  The woman's husband died a year ago, and she has been supported by the county and charity of neighbors."[256]  Reporter interview supports evidence of insanity: "[S]he gave him incoherent reasons for slaying her little ones…. [s]he had read of the Chinese war and the terrible atrocities committed in the Orient, and had warning that the Chinese

---

[253] *Trial of Abel Clements*, [Edinburgh, Scotland] *Caledonian Mercury,* Aug. 25, 1806, 4.
[254] Laurel Thatcher Ulrich, *A Midwife's Tale: The Life of Martha Ballard, Based on her Diary, 1785-1812* 291-307 (1990),; *Horrid Murder! At An Early Hour On Wednesday Morning Last, The Inhabitants Of This Town Were Alarmed With The Dreadful Information… 1* (1806).
[255] *Drowned Her Six Children*, *Adams County News* [Ritzville, Wash.] Feb. 27, 1901, 4.
[256] *Washington Standard* [Olympia, Wash.], Mar. 1, 1901, 3.

were coming today to burn her house and slay her children…   Mr. Rustemeyer… was well acquainted with the family… He said… Mrs. Wurzer was never considered just right in her mind, and thinks she should have been restrained of her liberty long ago." Weapon: drowning.[257]

Roth has elsewhere argued that children should not be included as victims of mass murder:

> But Cramer's claim that axes, clubs, and knives can kill or wound are effective tools for committing mass murder is misleading…. The husband who attacked his family with an axe in Clarksburg, Virginia, in 1805 killed only one adult, his wife. *His other eight victims were his children.* And the husband who attacked his family with a knife in Hallowell, Maine, in 1806 killed only one adult, his wife. *His other 7 victims were his children. Cramer's evidence does not show that edged and blunt weapons are effective tools for committing mass murder.* It shows instead that infants and children are not capable of defending themselves against attacks by adults.   That conclusion is consistent with the extensive literature in contemporary criminology that shows that young children are killed in the overwhelming majority of cases with weapons other than firearms, because adults can kill children so easily with physical force or everyday household objects.[258] [emphasis added]

**Belvidere, N.J. (1843)**

Two (perhaps three) men murdered John Castner, his wife, one of their children, "and an old bachelor brother-in-law."  The purpose was believed to be either robbery or inheritance of the land by one of the murderers. Weapon: blunt object[259]

Before 1960, there were 807 non-firearm mass murders: 3,812 dead: an average of 4.72 dead per incident; 866 exclusively firearms mass murders, 3,740 dead: an average of 4.31 dead per incident.  (For four or more dead: 393 non-firearm incidents, 2,590 dead, an average of 5.59 dead per incident.  Firearms incidents: 313 with 2,110 dead; 5.74 average.)  Firearms mass murders were not rare, even with "primitive" technology:

---

[257] *Killed Her Children*, *Cottonwood* [Ida.] *Report*, Mar. 1, 1901, 1.

[258] Supplemental Sur-Rebuttal Expert Report And Declaration Of Randolph Roth, Rupp v. Bonta, (C.D.Cal. 2023), 6-7.

[259] *The Warren Tragedy*, AMERICAN REPUBLICAN AND BALTIMORE DAILY CLIPPER, Jan. 23, 1845. 1.

**Swan River, Minn. Terr. (1860)**

Early 1860 or late 1859: A very complex incident.  One Chippewa warrior ("A") murdered another Chippewa ("B").  A few days later, B's squaw ("C") saw A, and shot him.  A's brother ("D") shot C.  C's brother ("E") shot D.

Category: public

Suicide: no

Cause: revenge

Weapon: firearm[260]

**Coldwater, Mich. (1865)**

Jan. 30, 1865: Young man becomes engaged to a woman in Lorain Co., Ohio.  This is a problem, because his wife in Coldwater, Mich., is about to give birth, so he returns home, where his wife lives with the young man's parents.  In the midst of giving birth, the young man murdered his wife.  When the young man's father and mother showed up, he shot them to death.  (Other accounts identify the town as Woodstock, and that the murder of his wife and unborn child followed the murder of his parents.)  His behavior after arrest, as newspaper coverage described, "suggests the charitable conjecture that the man is insane."  He confessed the crime and signed autographs for the crowd around the jail that described himself as "murderer of his wife, father and mother."  He invited his friends in Lorain County to visit him in jail "where they would find him 'playing checkers with his nose, on the jail windows.'"

Category: family

Suicide: no

Cause: mental illness

---

[260] *Indian revenge*, *Muscatine* [Iowa] *Weekly Journal*, Jan. 27, 1860, 1.

Weapon: firearm[261]

**Sleepy Hollow, N.Y. (1870)**

Jan. 1. 1870: Farmer murdered his wife, and two of his neighbors, father and son, who appear to have visited the murderer's wife in his absence.  The murderer had a reputation for being too fond of rum.

Category: public

Suicide: no

Cause: jealousy?

Weapon: firearm[262]

**Glenville, Minn. (1889)**

Feb. 15, 1889: Murderer, relative of the victims, shot to death, "Mary Chemeieck, aged six, and her sister Rose, aged eleven…"  Apparently, his niece, Rose, had spurned his advances.  He then murdered their mother with a shotgun and committed suicide.

Suicide: yes

Cause: unknown

Weapon: pistol, shotgun[263]

A mass murder that is *not* part of my database shows how "primitive" firearms technology is not a barrier to school mass murder.  A former teacher showed up at a Bremen, Germany, Catholic school "armed with six loaded revolvers."  He killed one teacher, two children, "three children were gravely injured and three other children were slightly wounded."  The article

---

[261] *A Triple Murder*, [Plymouth, Ind.] *Marshall County Republican*, Feb. 16, 1865, 1.
[262] *A Triple Murder at Sleepy Hollow*, *Wilmington* [N.C.] *Journal*, Jan. 14, 1870, 1.
[263] *He was a Rejected Lover*, *St. Paul Globe*, Feb. 17, 1889, 1.

described him as "demented."[264]  Depending on whether they were they were 5-shot, 6-shot, or 9-shot revolvers (all still common today) he could have fired 30, 36, or 54 shots without reloading.

Firearms became more common weapons by the 1920s.  Axes and hatchets as mass murder weapons declined as wood stoves became less common.  While I have not categorized the poison mass murders as precisely as I might do if I were starting from scratch, "illuminating gas" and "Rough on Rats" (both were commonly used to wipe out spouses and children) declined as automobile exhaust poisoning rose.

This should be no surprise; mass murderers use what is available.  A May 20, 1931, Mattoon, Ill. incident catches this improvisational nature well.  A former employee of her late husband attempted to burn to death the woman and her two daughters with whom he had recently moved to Illinois.  They escaped the burning house.  He then shot to death the mother, attempted to strangle the daughters, then shot them and beat them to death with an automobile starter crank.  Weapons: firearm, strangle, blunt.[265]  Similarly, May 30, 1840: The husband, murdered his mother-in-law and her five children.  Cause: robbery.  Weapon: strangulation; stone; axe, rifle; knife.  He confessed after the first hanging failed.[266]

Even today's gun mass murderers are not as narrowly focused as the popular imagination sees them.  May 24, 2014, Isla Vista, Cal.: College student, upset about his sex life (or rather its absence) stabbed to death his three roommates, shot three women at a sorority (two of whom died), shot another student, injured two bicyclists by ramming them with his car, and shot and wounded four pedestrians.[267]

---

[264] *Maniac Shot Many People*, *Barre* [Vt.] *Daily Times*, Jun. 20, 1913, 1.
[265] *Woman Shot. Tots Choked, Brownsville Herald,* May 20, 1931, 1.
[266] *Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children* 6-7, 9-10 (1841).
[267] Shelby Lin Erdman and Greg Botelho, *Timeline: A killer's rampage through a California college town*, *CNN*, May 27, 2014, https://www.cnn.com/2014/05/24/us/california-rampage-timeline/, last accessed November 27, 2018.

For the following table, some of these weapon types require explanation.

UNKNOWN means the weapon type was not identified in the article.

AIRCRAFT is for murders committed with an airplane (not all of which took place on Sep. 11, 2001).  (Bombing of planes is in the EXPLOSIVE weapon type.)

TRAIN involves intentional derailment of trains to cause loss of life.  The motivation for most of these crimes is uncertain.  One was insurance fraud; authorities alleged "that the men entered into the plot to get rid of their wives and at the same time to collect damages from the railroad company."  One of the murderers collected $500 from the railroad for injuries to his wife.[268]  Another, on Dec. 27, 1934: Police charged three men with the intentional derailment of a train, in the hopes that one of the train crew would lose his job, so that one of the three would get that job.  The crash killed three employees and injured 16 passengers.[269]

Incident count by weapon type for mass murders before 1960 where only one weapon type was used:

| method | count_incident | total_dead |
|---|---|---|
| arson | 72 | 466 |
| ax | 93 | 419 |
| blunt | 91 | 363 |
| drown | 24 | 82 |
| explosive | 34 | 278 |
| firearm_unknown | 408 | 2063 |
| hang | 40 | 149 |
| hatchet | 19 | 63 |
| knife | 49 | 178 |
| machine_gun | 7 | 37 |
| other | 13 | 122 |
| othersharp | 28 | 106 |

---

[268] *Plot to Kill Their Wives*, [Maysville, Ky.] *Evening Bulletin,* Mar. 26, 1896, 1.
[269] *Trio Held In Wreck Accused Of Murder*, [Washington, D.C.] *Evening Star,* Mar. 10, 1935, 1.

| method | count_incident | total_dead |
|--------|---------------:|-----------:|
| personal | 2 | 9 |
| pistol | 201 | 693 |
| poison | 67 | 260 |
| rifle | 119 | 451 |
| shotgun | 84 | 307 |
| strangle | 16 | 54 |
| train | 15 | 76 |

### H.      Killing People Without Modern Firearms Technology

How do you kill lots of people without modern firearms technology?  Before 1960, there are four incidents with more than 50 dead.  Colfax, Louisiana (1873) where the KKK murdered 150 black civil rights activists using firearms; Mountain Meadows, Utah (1857) where Mormons with firearms of type unknown murdered 140 settlers moving west; Tulsa, Okla. (1921), at least 89 murdered by a mob, with a variety of weapons, Calumet, Mich. (1913) where one person provoked a panic that killed 74 people, mostly trampled to death.

By comparison, my database, while incomplete after 1960, has six mass murders with more than 50 dead after 1960: San Juan, P.R. (1986), 97, dead by arson committed by three men; New York City (1990), 87 dead by arson by one person; Oklahoma City (1995), 168, dead by explosive committed by two (only one was given a capital sentence); New York City (2001), 3047, dead by aircraft, and Arlington, Va. (2001), 184, dead by aircraft with 19 murderers from both events; Las Vegas (2017), 58, dead by one rifleman.

### 1.      Explosives

One popular method was explosives.

**Sells, Ark. (1900)**

Oct. 15, 1900: "[F]ather, mother, and four young children blown to atoms" by dynamite explosion.  "It is believed that a dispute over a homestead claim prompted the outrage."

Category: family non-resident

Suicide: no

Cause: greed

Weapon: explosives[270]

**Cripple Creek, Colo. (1904)**

Jun. 5, 1904: Someone set off a bomb under a train station platform where non-union men were waiting for a train during a strike.  Twelve died "and a score or more injured..." Subsequently, "Forty shots were fired in a crowd in the street.  Two men were killed and at least six persons wounded."  One of the dead "by blow from revolver."  Then the National Guard troops showed up and attempted to restore order.

Category: public

Suicide: no

Cause: labor

Weapon: explosives, firearm, blunt [271]

**Mullins, W.Va. (1909)**

5/16/1909: Organized crime group The Black Hand used dynamite to blow up an Italian boarding house.  One of the victims broke faith with the Black Hand.  The explosion killed four and injured three.

Category: residential

---

[270] *Whole Family Murdered*, [St. Genevieve, Mo.] *Fair Play*, Oct. 20. 1900, 1.
[271] *Terrorism and Death Dominate Colorado*, *Saint Paul Globe*, Jun. 7, 1904, 1.

Suicide: no

Cause: gang

Weapon: explosives[272]

### Mudlow, W.Va. (1912)

7/26/1912: Striking miners dynamited a machine gun operated by agents of the Baldwin detective agency, killing three miners and seven detectives.

Category: public

Suicide: no

Cause: labor

Weapon: explosives[273]

### Superior, Penn. (1914)

11/15/1914: Someone blew up the Kanaza general store, which was also the Kanaza residence, with two separate dynamite bombs, killing Kanaza's three children and two other men. Five others suffered injuries.  Mr. Kanaza believed the motive was revenge for a lawsuit.

Category: family

Suicide: no

Cause: revenge

Weapon: explosives[274]

### San Francisco, Cal. (1916)

Feb. 22, 1916: Someone set off a dynamite bomb during the "Preparedness Day Parade," in preparation for World War I.  While the identity of the murderers is uncertain (California Governor Culbert Olson many years later pardoned those originally convicted as evidence of

---

[272] *Black Hand Kills Four By Dynamite*, *Bluefield* [W.Va.] *Evening Leader*, May 17, 1909, 1.
[273] *Seven Detectives and Three Miners Dead*, *Seattle Star,* Jul. 26, 1912, 1.
[274] *Dynamite Kills Five In Spite Act*, *New-York Tribune*, Nov. 16, 1914, 1.

perjury at the trial accumulated), circumstances suggests that it was the work of anarchists, hostile to U.S. involvement in the war.

Category: public

Suicide: no

Cause: terrorism

Weapon: dynamite[275]

**New York, N.Y. (1920)**
09/16/1920: Anarchists set off a bomb in Wall Street, killing 31 and injuring 125 others.

Category: public

Suicide: No

Cause: terrorism

Weapon: TNT[276]

**Germantown, Md. (1920)**
11/18/1920: Two neighbors had a longstanding feud.  On Election Day, one shot the other in the neck.  The farmer shot in the neck took revenge with 50 pounds of dynamite, killing his neighbor, the housekeeper and her two children.

Category: family non-resident

Suicide: no

Cause: revenge

Weapon: explosives[277]

---

[275] *Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb, Bemidji* [Minn.] *Daily Pioneer*, Jan. 3, 1917, 1; *Preparedness Day Bombing*, https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_investigations.
[276] *Bomb Batters Wall Street; 31 Slain, 125 Hurt, The Sun and the New York Herald*, Sep. 17, 1920, 1.
[277] *Bomb Wrecks Farmers Home Killing Three,* [Salem, Ore.] *Capital Journal,* Nov. 19, 1920, 1.

**Pittsburgh, Penn. (1925)**

May 6. 1925: Two bombs destroyed three buildings, killing eight people immediately, and fatally injuring two others.  One of the buildings housed a grocer who had been the victim of extortion threats by a Black Hand society.

Category: residential

Suicide: no

Cause: extortion

Weapon: explosive[278]

**Bath, Michigan (1927)**

May 18, 1927: Treasurer of the local school board was angered by his property tax increase to pay for a new school building that he had opposed.  He placed a dynamite bomb in the basement of the school, by which method he murdered 37 children and six adults as well as seriously injuring 44 others.  Only a wiring mistake prevented other charges from taking down the rest of the building which endangered 150 more students.  The murderer had already beaten his wife to death at their home before blowing up their house.  He blew himself up in his car in front of the school 30 minutes after the school explosion.

Category: public

Suicide: yes

Cause: revenge

Weapon: explosive, blunt object[279]

---

[278] *Eight Are Killed In Blasted Homes*, [Washington, D.C.] *Evening Star,* May 06, 1925, 1.
[279] *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] *Evening Star,* May 19, 1927, 1.

**New York, N.Y. (1927)**

Oct. 8, 1927: Someone set off a dynamite bomb demolishing a four-story apartment building, killing five and injuring eleven.  Why did police assume a dynamite bomb?  "Finding of 20-Pound Unexploded Bomb Leads Police to Suspect Infernal Machine."

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[280]

**Newton, Mass. (1928)**

01/31/1928: Someone used dynamite to destroy a building containing "extensive liquor making apparatus in the basement."  Six people died.

Category: private

Suicide: no

Cause: gang?

Weapon: explosive[281]

**Seat Pleasant, Md. (1930)**

01/01/1930: A belated and misdelivered Christmas gift was dynamite and exploded as the family unwrapped it.  The explosion killed an expectant mother and two siblings, her mother, and injured two other siblings.  The family was new to the community with no known enemies.

Category: family non-resident

Suicide: no

Cause: unknown

---

[280] *Four Killed In Bomb Explosion In Tenement District Of New York*, [Douglas, Ariz.] *Douglas Daily Dispatch*, Oct. 09, 1927, 1; *Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement*, *New York Times*, Oct. 9, 1927, 1.
[281] *Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story*, *Brownsville Herald*, Jan. 31, 1928, 1.

Weapon: explosives[282]

**Chesterton, Ind. (1933)**

10/10/1933: A bomb explosion in the cargo compartment aboard a United Airlines flight ripped the plane apart, killing seven people.  Motive remained uncertain.

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[283]

**Denver, Colo. (1955)**

11/1/1955: The 23-year-old son of passenger Daisie E. King eventually confessed that he placed a 25-stick dynamite bomb in her luggage, blowing up her airliner, killing 44 people.  The murderer had taken out life insurance policies on his mother and was expecting to receive a "substantial inheritance" upon her death.

Category: public

Suicide: no

Cause: greed

Weapon: explosives[284]

Since 1960, this technology, despite attempts to regulate explosives, remain a big dead per incident killer.  Using fertilizer, a murderer on Apr. 20, 1995, set off a truck bomb in front of the Oklahoma City Federal Building killing 168 people and injuring hundreds more.

---

[282] *Gift Package Bomb Kills Woman; 5 Hurt,* [Washington, D.C.] *Evening Star,* Jan. 01, 1930, 1; *Bomb Survivors Tell Of Explosion,* [Washington, D.C.] *Evening Star,* Jan. 12, 1930, 1.

[283] *Ill-Fated Plane Wrecked By Bomb US Prober Says, Indianapolis Times,* Oct. 14, 1933, 1.

[284] Flowers And Flowers, *Murders In The United States*, op cit. 30-1; FBI, *Jack Gilbert Graham*, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham, last accessed October 5, 2022.

Category: public

Suicide: no

Cause: terrorism

Weapon: explosives[285]

### 2.   Arson

Arson is also a common and very low technology method to cause lots of suffering.

**New York, N.Y. (1903)**
11/1/1903: Police and coroner believed that a tenement building fire that killed 26 people

was "of incendiary origin."

Category: residential

Suicide: no

Cause: unknown

Weapon: arson[286]

**Boston, Mass. (1913)**
Dec. 3, 1913: A lodging house refused a man a room "for want of 15 cents."  He lit the

structure on fire, killing 27 lodgers in a dangerously renovated structure.

Category: residential

Suicide: no

Cause: revenge

Weapon: arson[287]

---

[285] Flowers and Flowers, *Murders in the United States*, 56-7.
[286] *Tenement House Fire*, [Maysville, Ky.] *Evening Bulletin*, Nov. 2, 1903, 4.
[287] *Burns Lodging House When Refused Room; 27 Homeless Men Died*, [New York, N.Y.] *Evening World*, Dec. 3, 1913, 1.

**San Francisco, Cal. (1944)**

03/27/1944: Over a period of four hours, five San Francisco skid row hotels "burst into flames" following a previous weekend of 11 fires in Oakland hotels. The New Amsterdam Hotel fire killed 22 and injured 27. "Authorities noted an odor of kerosene or gasoline." One tenant, 33, showed injuries from the fire and was held in the "hospital psychopathic ward."

Category: public

Suicide: no

Cause: mental illness

Weapon: arson[288]

**Tulsa, Okla. (1921)**

05/01/1921: The police arrested a young black man for what later appears to have been an accidental touching of a white female elevator operator. Rumors spread that police charged him with sexual assault. A lynch mob arrived at the county jail. The sheriff and deputies prevented seizure of the young man. A group of armed black men offered to help the sheriff defend the jail. This display of arms by black men inflamed white public sentiment leading to the destruction of Greenwood, the black section of Tulsa. More than one thousand homes were burned and *at least* 89 dead. Newspapers and public officials removed news accounts and official records about the riot from files. The Tulsa Race Riot Commission in 2001 "concluded that between 100 and 300 people were killed and more than 8,000 people made homeless over those 18 hours in 1921," with many bodies buried in unmarked mass graves.

Category: public

Suicide: no

---

[288] *22 Killed In Hotel Fire In San Francisco*, [Santa Cruz, Cal.] *Santa Cruz Sentinel*, Mar. 29, 1944, 1.

Cause: racism

Weapon: firearms, arson, unknown?[289]

**Chicago, Ill. (1958)**

Dec. 1, 1958: Our Lady of the Angels school burned, killing 95.[290]  Several years later, a 13-year-old confessed while on a lie detector that he had started the fire: "because he hated school, rebelled at the authority of teachers, liked to hear the sound of fire sirens and to watch fire engines race along the street."[291]

After 1960, there have been several arson mass murders with equal or larger death counts, and this remains a common method of mass murder in other nations. In Australia, an arsonist burned the Childers, Queensland's Palace Backpackers Hostel in 2000, killing 15.[292]  The 2011 Quakers Hill Nursing Home fire killed eleven, set by a nurse after police questioned him about drug abuse.[293]  Japan had several arson mass murders in late 2021, killing 24, 17, and 33 in separate incidents.[294]  These required no advanced firearms technology or even firearms.  The previously mentioned San Juan, P.R. arson mass murder killed 97. [295]  The March 25, 1990, Happyland Social Club fire killed 87 people, leaving three survivors.  Angry at his girlfriend, the murderer used $1 of gasoline and a match to set fire to her place of employment.[296]

---

[289] *Tulsa Race Riots*, https://www.history.com/topics/roaring-twenties/tulsa-race-massacre, last accessed July 5, 2021.

[290] Our Lady of the Angels School fire, https://en.wikipedia.org/wiki/Our_Lady_of_the_Angels_School_fire

[291] *Boy Admits Fire Fatal To 95*, *Miami News*, January 16, 1962, 1.

[292] *A Decade On, Childers Remembers Hostel Fire Tragedy*, *Brisbane* [Australia] *Times*, Jun. 23, 2010.

[293] Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears*, [U.K.] *Daily Mail*, Sep. 8, 2014.

[294] Makiko Inoue, Motoko Rich and Hikari Hida, *24 Dead in Suspected Arson at Office Building in Japan*, *N.Y. Times*, Dec. 16, 2021, https://www.nytimes.com/2021/12/16/world/asia/japan-fire-osaka.html, last accessed November 21, 2022.

[295] *3 Teamsters Charged in San Juan Hotel Fire*, *Chicago Tribune*, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

[296] Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, *New York Times*, Mar. 26, 1990.

**New Orleans, La. (1973)**

Jun. 24, 1973: The murderer took revenge for being expelled from the UpStairs Lounge, a gay bar.  He walked down the street and bought a bottle of cigarette lighter fluid, killing 33 people.[297]

**Chicago, Ill. (1976)**

01/30/1976: An employee of Wincrest Nursing Home with a mental illness problem (pyromania) started a fire in a clothing wardrobe, which killed 22 residents.  The employee was charged with arson.[298]

### 3.    Brutal Misuse of Tools

Mass murders do not even require purpose-built tools.

**Villisca, IA. (1912)**

Sep. 9, 1912: It appears that a business competitor and member of the Iowa State Senate murdered Joseph Moore, his wife Sarah, their four children and two visiting children "with an ax." An "itinerant minister" was charged.  The Iowa Attorney-General "sought to commit" the minister "to an insane asylum, a step that would bar the prosecution of any other person suspected of the crime."

Relatives of the victims claimed that the Attorney-General blamed the wrong person; in response, the Iowa legislature passed a law prohibiting public discussion of the crime.  This led to an "injunction against J.N. Wilkerson, a detective, whose four years' investigation of the murders cast suspicion on a prominent state senator."  The public meeting by Villisca residents took place in Omaha, Neb., instead.

---

[297] Elisabeth Dias with Jim Down, *The Horror Upstairs, Time,* Jul. 1, 2013.
[298] National Fire Protection Association, *Preliminary Report NFPA Fire Analysis Department Wincrest Nursing Home*, 1, 4, https://oac.cdlib.org/view?docId=hb9v19p0sd&doc.view=frames&chunk.id=div00008&toc.id=0, last accessed November 27, 2022; *Woman Indicted in Chicago Blaze*, *New York Times*, Feb. 4, 1976.

Category: greed

Suicide: no.

Cause: greed

Weapon: ax[299]

### 4.   Panic

While a less common mass murder weapon, panic can lead to trampling murders.

**Calumet, Mich. (1913)**

Dec. 24, 1913: A man shouted, "Fire! Fire!  Everybody rush!" in the Italian Hall where striking miners and their families were meeting for a Christmas party.  (There was no fire.)  As the crowd attempted to exit the hall through an inadequate exit, seventy-four people (mostly children) were trampled to death.[300]   One account ascribed the false claim to "a drunken" man,[301] but considering the murder of strikebreakers in Calumet a few weeks before in the middle of a fierce labor dispute,[302] this seems unlikely as the cause.

Category: public

Suicide: no

Cause: labor

Weapon: mouth[303]

### I.   Causes

The focus of the State on the *method* of mass murder might be better spent on solving the problem by solving underlying causes.

---

[299] *Villisca Ax Murders to Be Discussed in Mass Meeting*, Omaha Daily Bee, Jul. 6, 1917, 1.

[300] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, *Omaha Daily Bee*, Feb. 12, 1914, 1.

[301] *Day of Joy is One of Sorrow*, [Valley City, N.D.] *Weekly Times-Record*, January 1, 1914, 6.

[302] *Strike Breakers Taken to Mines at Point of Pistols*, Omaha Daily Bee, Jan. 11, 1914, 1 (based on U.S. Dept. of Labor report).

[303] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, *Omaha Daily Bee,* Feb. 12, 1914, 1.

The following table shows the proximate cause of all mass murders in my database before 1960.  (After 1960, the data is not yet complete.)   The following bullet points describe the abbreviations that are used in the table:

- **Rob** is a mass murder performed as part of a robbery or to eliminate witnesses to the robbery.
- **MI** (Severe mental illness, primarily psychoses and other illnesses that cut off the sufferer from reality) includes all crimes where either contemporary accounts describe the murderer as insane, or where the nature of the crime makes other explanations implausible (this is necessarily a judgment call, on which my experience with mentally ill relatives and friends informs my opinion).

  The legal definition of mental illness is much narrower than the medical definition. Through most of U.S. history, the McNaughton Rule (sometimes spelled M'Naughten) defined legal insanity as: "at the time of committing the act, the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know what he was doing was wrong."[304]  A person who did not know he was doing wrong, was insane.

  Persons who are mentally ill sometimes know that they are doing wrong and try to escape arrest and conviction (perhaps because the "aliens," or the CIA or KGB "agents" that they have just murdered are still after them).  Such persons are legally sane, while in any conventional sense, they are as "mad as hatters."
- **MI?** are persons whose sanity seems questionable but for which contemporary accounts are less than persuasive.
- **PPD** (Postpartum Depression): Tragically, many mentally ill or possibly mentally ill incidents (not included in the MI or MI? category) are mass murders by mothers with recently born babies.  In cases where the murders are by recent mothers and where news accounts provide no other explanation I have categorized these as **postpartum depression**.   Some news accounts identified the mother as 'temporarily insane" with no previous history of mental illness.  In a few cases the news accounts report on previous mental illness hospitalizations associated with previous births.
- Many cases I have listed as "**PPD?**" because this is a plausible explanation when no other seems more likely.
- **Resist** is a criminal resisting arrest.
- **Unknown** describes a very large number of crimes where either the motivation is unclear or the newspaper coverage is silent; this also includes some mass murders where the inability to identify the murderer makes cause impossible to determine.

---

[304] *The insanity defense and Diminished Capacity*, https://www.law.cornell.edu/background/insane/insanity.html

- **Religion** is mass murders committed as part of religious persecution. (And yes, in America!)
- **Racism** is its frequent cousin. In some cases, these include revenge or retribution against Indians for crimes not, or at least not clearly committed by the victims.
- **Politics** are murders committed to advance a political cause.
- **Terror** are mass murders committed to cause mass fear for purposes of political change outside elections. Example: 9/11.
- **Revenge** are mass murders committed to take revenge for real or perceived injuries by the murderer, his family, or acquaintances.
- **Ind** are crimes between Indians and settlers that are not official acts of war, but that might have been seen that way by the murderers. I have classified all attacks against peaceful travelers, settlers, and Indians in this cause. (In some cases, the killers openly admitted that the victims were "peaceful," but were supplying guns to less friendly tribes.) [305]
- **Financial** is a strange subclass of family murders committed, usually by a parent concerned their family is about to become impoverished, who then "protect" them from that suffering by mass murder. In some cases, this seems to be a form of mental illness: at least one example involved a mass murderer who was in no danger of impoverishment.
- **Labor** are crimes committed during labor disputes, sometimes against strikebreakers, sometimes against labor unionists.
- **Quarrel** are incidents that start out as some relatively minor dispute before escalating into disproportionate response.
- **Cult** refers to mass murders committed by oddball religious cults; I was surprised how widespread these were in the early 20th century (the Church of the Sacrifice slaughtered entire families, often with the family's own ax).
- **Rape** are mass murders committed to eliminate witnesses to a rape.
- **Greed** are mass murders carried out to obtain wealth other than by robbery, often by inheritance from the deceased.
- **Divorce** is an alternative form of **Revenge**; divorce has been or is in the process and someone is seeking retribution. This includes separated spouses attempting reconciliation.
- **Adultery**: a variant of **Revenge**.
- **Jealousy**: should be obvious.
- **Intoxication** are crimes attributed to alcohol or drug-induced stupidity. The strong overlap between **mental illness** and **substance abuse** (one often causing the other) makes some of these hard to distinguish, especially 150 years after the crime.

---

[305] *From California and Oregon*, [Washington, D.C.] *Evening Star*, Mar. 21, 1860, 2.

- **Bullying** is a recent category, and one that I suspect reflects some deeper mental illness; I was bullied as a child, had access to low-grade explosives (nerds have peculiar hobbies), and never even *thought* of mass murder (or even low-intensity revenge).

- **Stalker**: someone did not get their attentions rewarded as they saw fit.

- **Witnesses**: Eliminating witnesses to some crime other than rape or robbery.

| Lookup to ca... | incidents | dead |
|---|---|---|
| ADULTERY | 3 | 11 |
| CULT | 9 | 41 |
| CULT? | 2 | 9 |
| DIVORCE | 75 | 271 |
| FINANCIAL | 55 | 221 |
| GANG | 32 | 119 |
| GREED | 38 | 254 |
| IND | 24 | 191 |
| INTOX | 54 | 203 |
| JEALOUSY | 35 | 121 |
| LABOR | 46 | 465 |
| LYNCH | 92 | 350 |
| MI | 182 | 756 |
| MI? | 102 | 457 |
| OTHER | 27 | 120 |
| POLITICS | 21 | 143 |
| QUAR | 175 | 624 |
| RACISM | 18 | 270 |
| RAPE | 19 | 66 |
| RELIGION | 3 | 175 |
| RESIST | 35 | 154 |
| REVENGE | 95 | 428 |
| REVENGE? | 1 | 3 |
| ROB | 152 | 643 |
| SLAVERY | 1 | 4 |
| STALKER | 1 | 3 |
| TERROR | 14 | 284 |
| UNKNOWN | 435 | 1754 |
| WITNESSES | 4 | 28 |
| EXTORTION | 6 | 43 |
| PRISON BREAK | 17 | 79 |
| PPD | 17 | 71 |
| PPD? | 61 | 205 |

- Plotting the causes without UNKNOWN shows the high frequency causes:



incidents by cause  before 1960

-

Incidents by cause before 1960 where dead are four or more:

| incidents by cause before 1960 dead >= 4 | | |
|---|---|---|
| Lookup to cause | incidents | dead |
| ADULTERY | 1 | 5 |
| CULT | 9 | 41 |
| CULT? | 1 | 6 |
| DIVORCE | 21 | 104 |
| FINANCIAL | 22 | 120 |
| GANG | 11 | 57 |
| GREED | 21 | 206 |
| IND | 21 | 182 |
| INTOX | 23 | 109 |
| JEALOUSY | 14 | 62 |

| incidents by cause before 1960 dead >= 4 | | |
|---|---|---|
| Lookup to cause | incidents | dead |
| LABOR | 30 | 417 |
| LYNCH | 33 | 173 |
| MI | 85 | 459 |
| MI? | 38 | 178 |
| OTHER | 10 | 69 |
| POLITICS | 14 | 122 |
| QUAR | 56 | 272 |
| RACISM | 13 | 254 |
| RAPE | 6 | 26 |
| RELIGION | 2 | 172 |
| RESIST | 17 | 103 |
| REVENGE | 37 | 263 |
| ROB | 70 | 373 |
| SLAVERY | 1 | 4 |
| TERROR | 11 | 275 |
| UNKNOWN | 182 | 1007 |
| WITNESSES | 3 | 25 |
| EXTORTION | 4 | 37 |
| PRISON BREAK | 9 | 55 |
| PPD | 10 | 50 |
| PPD? | 16 | 70 |

Before 1960 at least four dead, excluding UNKNOWN:



It should surprise no one that mental illness and likely mental illness are a high frequency category.  While most mentally ill people are primarily a hazard to themselves, severely mentally ill people are overrepresented in murder and other violent crimes.[306]  Deinstitutionalization of the mentally ill starting with New York in 1964 and California in 1969 played significant roles in increased homelessness and violent crime rates.[307]

Professor Bernard E. Harcourt points out that the rise in murder rates in the 1960s, and their decline in the 1990s correlated with the change in the percentage of the population that was institutionalized: those who were confined to either a mental hospital or prison.  According to Harcourt, sociologists examining the expansion of imprisonment in the 1990s, the so-called "incarceration revolution," missed the even more important component of institutionalization:

---

[306] See Clayton E. Cramer, *Mental Illness and the Second Amendment*. 46 CONNECTICUT LAW REVIEW 1301-6 (May 2014):(collecting studies).

[307] See Clayton E. Cramer, *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill* (2012) and Jean Isaac Rael and Virginia C. Armat, *Madness In The Streets: How Psychiatry And The Law Abandoned The Mentally Ill* (1990) for how beautiful abstract theories and fanaticism created the tragic urban landscape of modern America.

mental hospitals and then prisons, as mentally ill persons became guests of the state for serious crimes.  When adding mental hospital inmates to prisoners, Harcourt found an astonishingly strong negative correlation between the institutionalization rate, and the murder rate: -0.78.  Harcourt found that even when adjusting for changes in unemployment and the changing fraction of the population that was at their peak violent crime ages, the negative correlation remained strong, and did a better job of predicting both the 1960s rise and the 1990s decline in murder rates than other models.[308]

Steven P. Segal of the University of California, Berkeley studied state-to-state variations in murder rates and mental health care, controlling for socioeconomic, demographic, and geographic data. He concluded that "[l]ess access to psychiatric inpatient-beds and more poorly rated mental health systems were associated with increases in the homicide rates of 1.08 and 0.26 per 100,000, respectively." (Since the national average homicide rate was 7.4 per 100,000 people for 2020,[309] more access to beds is clearly quite important in reducing homicide rates; "poorly rated mental health systems" matter, but not as dramatically.)

Segal observed an even greater difference from the variation in involuntary civil commitment (ICC) laws. "Broader ICC-criteria were associated with 1.42 less homicides per 100,000" or bit more than one-fourth of the national homicide rate. In short, states where involuntary commitment of the mentally ill was relatively easy had significantly fewer murders than states where it was very hard.[310]

---

[308] Bernard E. Harcourt, *From the Asylum to the Prison: Rethinking the Incarceration Revolution*, 84 TEXAS LAW REVIEW 1766-75 (2006).

[309] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 3, 2022 12:51:23 PM

[310] Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, Social Psychiatry and Psychiatric Epidemiology, November 10, 2011, https://web.archive.org/web/20170323153646/http://kendras-law.org/national-studies/commitmenthomiciderates.pdf, last accessed August 19, 2022.

A 2000 *New York Times* examination of mass murderers concluded:

> The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help, and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

> Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population.

> However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [311]

A few representative cases from the period before 1960:

**New Haven, Conn. (1930)**
Jun. 21, 1930: The father had been involuntarily committed to a mental hospital.  He escaped, threw his four children and wife from a 400-foot cliff, then jumped.

Category: family

Suicide: yes

Cause: mental illness

Weapon: other[312]

**New York, N.Y. (1953)**
Apr. 01, 1953: A college professor, 52, under psychiatric care, strangled his wife and their two children, then stabbed himself to death.

Category: family

---

[311] Laurie Goodstein and William Glaberson, *The Well-Marked Roads to Homicidal Rage*, *New York Times*, Apr. 10, 2000.
[312] *Maniac Veteran Kills His Family*, *New Britain Herald,* Jun. 23, 1930, 9.

Suicide: yes

Cause: mental illness

Weapon: strangled[313]

**Eleva, Wisc. (1909)**

Feb. 2. 1909: The father stabbed to death his four children, then "stabbed himself and then jumped from the barn loft with a rope around his neck.  At the same time he hurled a fire brand into the stable, firing the barn."

Category: family

Suicide: Yes.

Cause: ¨[Father] was recently released from an insane asylum."

Weapon: knife[314]

### J.      Summary

Mass murder, by groups, or by individuals is not new.  It has often involved non-firearms and continues to do so today.  The focus on firearms ignores the underlying causes, often severe mental illness not recognized or treated.

As noted above, untreated mental illness started this current campaign and many of the subsequent mass murders have had at their root mental illness which was unseen, ignored, or where the laws or policies made involuntary commitment impossible.[315]  Fix the root problem or mass

---

[313] *Triple Murder, Suicide Apparent,* [Parsons, Kansas] *Parsons Sun,* Apr. 04, 1953, 7.
[314] *Murders Whole Family and Then Kills Self,* [Pendleton, Ore.] *East Oregonian*, Feb. 22, 1909, 8.
[315] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 CONN. L.R. 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) for how we got here.

murderers will use the weapons they have historically used in the United States: arson,[316] vehicles,[317] explosives,[318] hammers,[319] axes,[320] poison,[321] aircraft,[322] and train derailments.[323]  Or they might use the weapons mass murderers use in other nations: arson;[324] vehicles;[325] explosives,[326] sharp objects,[327] hammers;[328] poison gas,[329] and of course, in spite of much stricter firearms laws, guns.[330]

---

[316] 3 Teamsters Charged in San Juan Hotel Fire," *Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018 (97 dead); Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, NEW YORK TIMES, Mar. 26, 1990 (87 dead); Phil Luciano, *9-year-old arraigned on murder charges in deadly Goodfield arson fire*, PEORIA JOURNAL STAR, Oct. 21, 2019.

[317] Lauren del Valle, Ray Sanchez and Eric Levenson, *Terror suspect accused of killing 8 people on NYC bike path still believes in ISIS, defense attorney says*, CNN, January 9, 2023.

[318] FBI, *Oklahoma City Bombing*, https://www.fbi.gov/history/famous-cases/oklahoma-city-bombing, last accessed January 31, 2023 (168 dead); *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] EVENING STAR, May 19, 1927, 1; *Los Angeles, on Election Eve, in Ferment Over Confession of the McNamaras*, [Chicago, Ill.] THE DAY BOOK, Dec. 2, 1911, 1 (21 dead); *Seven Detectives and Three Miners Dead*, SEATTLE STAR, Jul. 26, 1912, 1 (10 dead).

[319] *A Family Slain*, KANSAS CITY JOURNAL, Mar. 4, 1899, 1 (5 dead).

[320] *Five Battered With An Axe*, [Keokuk, Ia.] DAILY GATE CITY, Oct. 17, 1911, 1 (5 dead); *Mystery of 30 Axe-Murders is Believed Near Its Solution*, ALBUQUERQUE MORNING JOURNAL, Mar. 22, 1915, 1 (police believed one man murdered 29 people in five families over three years).

[321] *A Modern Borgia*, NASHVILLE UNION AND AMERICAN, Oct. 27, 1868, 1 (the maid murdered a family of seven).

[322] FBI, CRIME IN THE UNITED STATES: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf (3047 dead); Id., (184 dead); Id., (40 dead); Judith Cummings, *Kin of Suspect Defiant and Contrite*, New York Times, Dec. 11, 1987 (44 dead).

[323] *Crack Flyer Jumps Track*, [De Kalb, Illinois] DAILY CHRONICLE, Mar. 17, 1941, 1 (5 dead).

[324] *A Decade On, Childers Remembers Hostel Fire Tragedy*, BRISBANE [Australia] TIMES, Jun. 23, 2010 (15 dead); Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears*, [U.K.] DAILY MAIL, Sep. 8, 2014. (11 dead).

[325] *Toronto is the most recent of many deliberate attacks involving vehicles*, USA TODAY, Apr. 23, 2018 (10 dead in Toronto attack, 14 dead in Barcelona, Spain, 8 on London Bridge, 12 in Berlin, Germany) (10 dead); *Nice attack: Trial for Bastille Day massacre which killed 86 begins*, BBC, Sep. 5, 2022 (86 dead); *Australian who rammed and killed six pedestrians jailed for life*, REUTERS, *Feb. 21, 2019* (6 dead); Alex Johnson, *A Short History of Vehicles Being Used as Deadly Weapons*, NBC News, Jul. 15, 2016 (8 dead).

[326] Andrew Higgins and Kimiko De Freytas-Tamura, *In Brussels Bombing Plot, a Trail of Dots Not Connected*, NEW YORK TIMES, March 26, 2016 (33 dead); Sylvia Hui, *Bomber's brother gets 55 years for Manchester concert attack*, Associated Press, Aug. 20, 2020 (22 dead).

[327] Jason Van Rassel, *Police officer's son charged in city's worst mass murder*, CALGARY [Alberta] HERALD, Apr. 17, 2014 (5 dead); Jonathan Pearlman, *Eight Children Murdered In Mass Stabbing In Australia*, [U.K.] TELEGRAPH, Dec. 19, 2014 (8 dead); Robert Foyle Hunwick, *Why Does China Have So Many School Stabbings?, New Republic*, Nov. 2, 2018 (summarizing 14 knife mass murders in two incidents); David Mercer, *Canada mass stabbing: Trudeau urges public to 'be careful' over two men suspected of killing 10 people*, SKY NEWS, Sep. 5, 2022 (10 dead).

[328] Jamelle Wells, *Robert Xie Trial: Lin Family 'Murdered With Hammer Bought From $2 Shop*, ABC [Australia], May 12, 2014 (5 dead)

[329] *Japan marks 25 years since deadly Aum sarin attack on Tokyo subway,* Japan Times, Mar. 20, 2020 (14 dead).

[330] *Gunman's Rampage in France Leaves 14 Dead, Los Angeles Times*, Jul. 13, 1989; *Teen-Age Gunman Kills Himself and 12 Others in France, New York Times*, Sep. 25, 1995; Nick Caistor, *Profile of a Teenage Killer, BBC News*, Apr. 28, 2002; *18 Dead in German School Shooting, BBC News*, Apr. 26, 2002; *Brazil School Shooting: Twelfth Child Dies, SkyNews*, Apr. 8, 2011; James Graff, *Politics Under the Gun, Time,* Mar. 31, 2002 (8 dead; 18 wounded in France); *Safety Council To Investigate Gun Laws, DutchNews.nl*, Apr. 12, 2011, http://www.dutchnews.nl/news/archives/2011/04/safety_council_to_investigate.php, last accessed May 21, 2011; *Schutter was al eerder suicidaal, NOS Nieuws*. Apr. 10, 2011, http://nos.nl/artikel/232127-schutter-was-al-eerder-suicidaal.html, last accessed May 21, 2011.

As long as we as a society focus on *methods* rather than *causes*, we are engaged in unneeded polarization while still not solving the problem.

_____

Clayton E. Cramer

As long as we as a society focus on *methods* rather than *causes*, we are engaged in unneeded polarization while still not solving the problem.

Clayton E. Cramer

# EXHIBIT A

## Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  |  |
|--|--|
|  | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
|--|--|
|  | First Place, Undergraduate Division |

**TEACHING EXPERIENCE:**

Fall, 2020 - present     ***Adjunct Faculty*:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**.


Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**.

ical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**.

e University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**.

d Professor Peter Mellini in his course "Twentieth Century World." I graded quizzes, exams, and answered weekly written questions from students.  I also prepared and lectured about the rise of totalitarianism in the period between the world wars.

**BOOKS:**

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

**SELECTED PUBLICATIONS:**

"Assaulty Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:issue 1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002.  "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

## WORKS CITED IN COURT DECISIONS:

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

*"*Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester*, 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008).  In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010)*.*

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance.  I also have an unusually

detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.