## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | CIVIL NO. 18-10507-PGS-JBD |
| Plaintiffs, | |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |
| MARK CHEESEMAN, TIMOTHY CONNOLLY, and FIREARMS POLICY COALITION, INC., | CIVIL NO. 22-04360-PGS-JBD |
| Plaintiffs, | |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey State Police, CHRISTINE A. HOFFMAN, in her official capacity as Acting Gloucester County Prosecutor, and BRADLEY D. BILLHIMER, in his | |

1

official capacity as Ocean County Prosecutor,

Defendants.

BLAKE ELLMAN, THOMAS R. ROGERS, and ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

Plaintiffs,

v.

MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, LT. RYAN MCNAMEE, in his official capacity as Officer in Charge of the Chester Police Department, and KENNETH J. BROWN, JR., in his official capacity as Chief of the Wall Township Police Department,

Defendants.

CIVIL NO. 22-04397-PGS-JBD

**MEMORANDUM**

Before the Court are consolidated cases in which there are two Motions for Summary Judgment and a Cross-Motion for Summary Judgment.  The Plaintiffs challenge New Jersey's Assault Firearms Law,[1] claiming that aspects of this regulatory scheme are unconstitutional under the Second and Fourteenth Amendments.  (*See* ECF Nos. 174; 175).  More specifically, Plaintiffs challenge the

---

[1] N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5(f) (West 2024); N.J. Stat. Ann § 2C:39-9(g) (West 2024); N.J. Stat. Ann. 2C:58-5 (West 2024).

constitutionality of the Assault Firearms Laws' prohibition on the possession of so-called "assault firearms" and a provision within the Assault Firearms Law that regulates the possession of large capacity ammunition magazines to magazines capable of holding no more than ten rounds (hereinafter, the "LCM Amendment").[2] State Defendants cross-move for summary judgment, arguing that the Assault Firearms Law and the LCM Amendment are constitutional.   (ECF No. 183-1). Along with these Motions for Summary Judgment are *Daubert* motions to exclude expert testimony.   (ECF Nos. 176; 182). The Court heard oral arguments on the Motions for Summary Judgment on April 11, 2024.   (ECF No. 217).

It is hard to accept the Supreme Court's pronouncements that certain firearms policy choices are "off the table" when frequently, radical individuals possess and use these same firearms for evil purposes.[3]   Even so, the Court's decision today is dictated by one of the most elementary legal principles within our legal system: *stare decisis.* That is, where the Supreme Court has set

---

[2] N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j) (West 2024); N.J. Stat. Ann. § 2C:39-20(a) (West 2024).

[3] Justice Scalia explained in *Heller*:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns . . . .   But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.

*District of Columbia v. Heller,* 554 U.S. 570, 636 (2008).

forth the law of our Nation, as a lower court, I am bound to follow it. This principle—combined with the reckless inaction of our governmental leaders to address the mass shooting tragedy afflicting our Nation—necessitates the Court's decision. For these reasons and those below, the AR-15 Provision of Assault Firearms Law is unconstitutional. The LCM Amendment is constitutional. Both *Daubert* motions are also denied.

**I.**

Prior to discussing this decision's logic, the Court addresses the limited scope of this decision. With respect to Plaintiffs' Motions for Summary Judgment as to the Assault Firearms Law generally, Plaintiffs sometimes broadly frame their argument—effectively seeking a wholesale declaration that the Assault Firearms Law is unconstitutional. (*See* ECF No. 174-1 at 29–30; ECF No. 175-7 at 28–34). At other times, Plaintiffs are narrower in their request, focusing their arguments on the AR-15. (ECF No. 174-1 at 36–37; ECF No. 175-7 at 29; ECF No. 174-7 at ¶¶ 18–19, 23–24; ECF No. 175-8 at ¶ 25).

For example, Plaintiffs Mark Cheeseman and Timothy Connolly state that they intend and desire to exercise their rights to keep and bear firearms classified as "assault firearms" under the Assault Firearms Law, "including but not limited to" an AR-15 style rifle. (ECF No. 174-7 at ¶¶ 18–19, 23–24). In another example, within

Plaintiffs Blake Ellman's and Thomas Rogers' Statement of Undisputed Material

Facts, they write:

> The challenged version of the New Jersey 'assault firearms' law has
> <u>nothing</u> to do with the military M16 select-fire rifle, only with the AR-
> 15, the civilian semiautomatic version that fires one single shot for each
> separate pull of the trigger, just as all other semiautomatic firearms do
> The select-fire ("fully automatic") M16 version of the rifle is heavily
> regulated under federal law and other New Jersey statutes, and is not
> involved in this case.

(ECF No. 175-8 at ¶ 25) (emphasis in the original).   State Defendants' briefing also

appears to focus largely on the AR-15 as a typical "assault weapon" under the

Assault Firearms Law.   (*See* ECF No. 183-1 at 15, 33–34, 43–48).   Thus, the

information presented to the Court focuses largely on one specific type of firearm:

the AR-15.   And given the variety of firearms regulated in the Assault Firearms Law

and the nuances that each individual firearm presents, the Court's analysis of the

Assault Firearms Law is limited to the firearm with which the Court has been

provided the most information: the AR-15.   The question before the Court therefore

concerns N.J. Stat. Ann. § 2C:39-1(w)(1)'s inclusion of the Colt AR-15[4] in its

enumerated  list of "assault firearms" (hereinafter, the "AR-15 Provision").[5]   More

---

[4] Although the Court refers to the firearm as the "AR-15," the precise firearm defined
as regulated within the AR-15 Provision is the "Colt AR-15."
[5] The full text of N.J. Stat. Ann. § 2C:39-1(w)(1)'s AR-15 Provision includes two
firearms in its full text: the Colt AR-15 and the CAR-15 series. Even where the
disputed provision lists two weapons, the Court's analysis of the AR-15 Provision
focuses only upon the AR-15. This is because the Court has not been provided with

precisely, the question is whether the possession of the AR-15 for use within the home for self-defense is unconstitutional under the Second and Fourteenth Amendments.[6]

For the reasons enumerated below, the AR-15 Provision is unconstitutional. Accordingly, the breadth of this decision is limited by the fact that the remainder of the Assault Firearms Law stands since it has not been challenged.

## II.

New Jersey amended its existing firearms regulatory scheme and enacted the Assault Firearms Law[7] in 1990.  This law criminalized the possession of many types

---

sufficient information regarding the CAR-15 series to deduce what this weapon is or how it relates to the AR-15.

[6] On this question, Counsel for the *Ellman* and *Association of New Jersey Rifle & Pistol Clubs, Inc.* Plaintiffs anecdotally set forth this argument at oral argument by stating the following:

> [I]f someone's breaking into my home, I'm reaching for my AR-15. I'm going to defend my home with my AR-15, no question in my mind. So, you know, counsel, my friend on the other side says, well, you don't need—you're not defending 500 yards, you're not defending, that's not the point.  And, again, . . . . [t]he AR-15 platform and all of the firearms like it are excellent at every range.  You don't need to be at 500 yards to take and pull out your rifle and defend yourself.  At twenty yards, at ten yards I'd rather have my AR-15 . . . . [R]ifles are always better at defending yourself than handguns.  Handguns are weak.

(Apr. 11, 2024 Tr. 81:24–82:11).

[7] P.L. 1990, Ch. 32 (West); *see* N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5(f) (West 2024); N.J. Stat. Ann § 2C:39-9(g) (West 2024); N.J. Stat. Ann. 2C:58-5 (West 2024).

and models of firearms; it criminalized rifle possession as a crime of the second degree requiring a term of imprisonment unless the assault firearm was licensed. *See* P.L. 1990, Ch. 32 (West); *see* N.J. Stat. Ann. §§ 2C:39-5(f), 2C:39-5(h), 2C:39-5(i) (West 2024).

Within the Assault Firearms Law, the term "assault firearm" is defined broadly and encompasses numerous categories. The law enumerates more than sixty weapons that constitute assault firearms, including but not limited to:

- any shotgun with a revolving cylinder such as the "Street Sweeper" or "Striker 12";
- Beretta AR-70 and BM59 semi-automatic firearms;
- Bushmaster Assault Rifle;
- Colt AR-15 and CAR-15 series;
- Galil type
- Heckler and Koch HK91, HK93, HK94, MP5, and PSG-1;
- the Ruger K-Mini-14/5F and Mini-14/5RF;
- the Springfield Armory BM59 and SAR-48 type;
- the USAS 12 semi-automatic type shotgun; and
- Uzi type semi-automatic firearms.

P.L. 1990, Ch. 32 (West); *see* N.J. Stat. Ann. § 2C:39-1(w)(1) (West 2024). Relevant to the analysis here is the provision within the Assault Firearms Law regulating the "Colt AR-15" (hereinafter, the "AR-15 Provision").[8]

---

[8] For the reasons enumerated above, the Court limits its analysis of the constitutionality of N.J. Stat. Ann. § 2C:39-1(w)(1) to the information that has been briefed. *See* discussion at *supra* note 5.

The Assault Firearms Law also has a catchall phrase broadening its impact. The Assault Firearms Law applies to "[a]ny firearm manufactured under any designation which is *substantially identical* to any of the firearms listed above," P.L. 1990, Ch. 32 (West); *see* N.J. Stat. Ann. § 2C:39-1(w)(2) (West 2024) (emphasis added). In addition, certain types of semi-automatic rifles were prohibited, such as: a "semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock," N.J. Stat. Ann §2C:39-1(w)(3) (West 2024); any "part or combination of parts … [that] convert a firearm into an assault firearm … from which an assault firearm may be readily assembled," N.J. Stat. Ann § 2C:39-1(w)(5) (West 2024); and a "firearm with a bump stock attached." N.J. Stat. Ann §2C:39-1(w)(6) (West 2024).[9]  The original law from 1990 had a prohibition on large capacity ammunition magazines such that no semi-automatic rifle with a fixed magazine capacity could exceed 15 rounds. *See* P.L. 1990, Ch. 32 (West); N.J. Sess. Law Serv. Ch. 39. (West).

In 2018, New Jersey enacted P.L. 2018, Chapter 39, which revised the definition of an unlawful "large capacity ammunition magazine" from a capacity of

---

[9] Note that this provision was not a part of the original 1990 law as drafted and was added in a 2017 amendment made effective January, 16, 2018. N.J. Sess. Law Serv. Ch. 323. (West).

fifteen rounds to ten rounds (hereinafter, the "LCM Amendment").  N.J. Stat. Ann.

§§ 2C:39-1(y), 2C:39-3(j); N.J. Stat. Ann. § 2C:39-20(a).

### III.

A motion for summary judgment should be granted only if "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is

'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"A factual dispute is 'material' if it 'might affect the outcome of the suit under the

governing law.'"  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020)

(quoting *Anderson*, 477 U.S. at 248).

"The Court must view the facts and evidence presented on the motion in the

light most favorable to the nonmoving party."  *Razak*, 951 F.3d at 144; *see also*

*Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (stating that "[o]n cross-motions

for summary judgment, the court construes facts and draws inferences in favor of

the party against whom the motion under consideration is made" (internal quotation

marks and citation omitted)).  Moreover, summary judgment "is inappropriate when

the evidence is susceptible of different interpretations or inferences by the trier of

fact."  *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).  Thus, a "judge's function is

not . . . to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. As such, "the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 860 (3d Cir. 1990).

In this case, there are many disputes of fact. Genuine disputes of material fact are where "the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]'" and "[a] factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"[10] When Plaintiffs and State Defendants were questioned about this issue at oral argument, Plaintiffs and State Defendants detailed their different positions on how to resolve a motion for summary judgment where there are so many issues of fact. (*See* Apr. 11, 2024 Tr. 10:24–14:20). The *Ellman* and *Association of New Jersey Rifle & Pistol Clubs, Inc.* Plaintiffs suggested that, because the Motions for Summary Judgment handle issues of law, no further record was needed and that the Court could decide the case on the constitutionality of the challenged laws alone. (Apr. 11, 2024 Tr. 11:5–13). Similarly, the *Cheeseman* Plaintiffs stated that because the facts upon which the *Cheeseman* Plaintiffs were focusing utilized the "common use test and what that demonstrates," such an analysis brings the Court to a conclusion that does not rely

---

[10] *Razak*, 951 F.3d at 144 (quoting *Anderson*, 477 U.S. at 248).

upon disputed facts.  (Apr. 11, 2024 Tr. 13:17–14:10).  State Defendants, on the other hand, believe that the Court could rely on the undisputed facts within the record and decide the issue.  (Apr. 11, 2024 Tr. 14:13–20).[11]  Since the disputed facts before the Court are largely legislative in nature and not adjudicative, the Court may decide the Motions for Summary Judgment.

These disputed facts are legislative rather than adjudicative facts.  According to the Advisory Committee Note to Federal Rule of Evidence 201, the distinction between adjudicative facts and legislative facts is that "adjudicative facts are simply the facts of the particular case" whereas legislative facts "are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." Fed. R. Evid. 201(a), Advisory Committee Note to 1972 Proposed Rule [of Evidence] 201.  The disputed facts in the case before the Court bear largely upon the historical framework against which we are operating, the interpretation of the historical record, or the reading of disparate laws across the United States.  As "there

---

[11] The State Defendants effectively stated that should the Court disagree with their assessment of the facts, summary judgment was inappropriate.  State Defendants explained their position by stating:  "[W]e do think that if you disagree with what I just said, Your Honor can't grant the plaintiff summary judgment because we have genuine issues of material fact on their facts."  (Apr. 11, 2024 Tr. 14:21–24).  Notably, prior to oral argument, both Plaintiffs and State Defendants had agreed during conferences with the Court that they did not wish to proceed to trial and that these issues could be decided at the summary judgment stage.

are no evidentiary issues in these . . . cases" and "[t]he constitutionality of the challenged statutory provisions do[] not present factual questions for determination in a trial[,]" the Court makes its factual findings below. *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (noting that "[o]nly adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the [challenged gun law].")

Relying upon this same reasoning, both *Daubert* motions are denied. The facts before the Court are legislative rather than adjudicative in nature. They are complex, detailed, and often broad sweeping; frequently, they reach conclusions about general traditions at work within our Nation. Given the fact that these are legislative facts—and where the record is complex and broad—it is within the Court's discretion and an exercise of its gate-keeping function to decide the issues presented to it based upon all information presented. *See Jones v. Bonta*, 34 F.4th 704, 726 n.24 (9th Cir.), *vacated upon reh'g*, 47 F.4th 1124 (9th Cir. 2022) (in a pre-*Bruen* decision, noting that the Ninth Circuit Court of Appeals could consider facts that had not been submitted at the District Court level because they were legislative facts rather than adjudicative facts); *see also G.M. Enterprises, Inc. v. Town of St. Joseph, Wis.*, 350 F.3d 631, 640 (7th Cir. 2003) (at the summary judgment stage in the First Amendment context, noting that "[a] requirement of *Daubert*-quality evidence would impose an unreasonable burden on the legislative process . . . .").

12

Accordingly, the Court considers all the expert reports presented to it. The Court relies upon the information it believes to be most credible in making this decision. The *Daubert* motions are denied.

**IV.**

The Association of New Jersey Rifle and Pistol Clubs, Inc. (hereinafter "ANJRPC") and the Firearms Policy Coalition, Inc. (collectively, the "Groups" or the "Group") are Plaintiffs in these consolidated cases. Although no party has objected to the Groups' standing to sue, no relief is granted or denied as to either Group aside from the relief enumerated below as to their named Plaintiffs.

### A. Plaintiffs: *Ass'n of New Jersey Rifle and Pistol Clubs, Inc., et al. v. Platkin et al.* (No. 18-cv-10507) and *Ellman v. Platkin et al.* (No. 22-cv-4397)

Plaintiffs and members of ANJRPC Blake Ellman and Thomas Rogers wish to acquire—and state that but-for the Assault Firearms Law would acquire—one or more of the banned semi-automatic firearms for purposes of self-defense in the home or other lawful purposes. (ECF No. 175-8 at ¶ 22). Plaintiffs and members of ANJRPC Blake Ellman and Marc Weinberg wish to acquire—and state that but-for the LCM Amendment would acquire—a magazine that qualifies as a "large capacity ammunition magazine" for purposes of self-defense in the home or other lawful purposes. (ECF No. 175-8 at ¶ 20). No facts or evidence have been presented to suggest that all semi-automatic firearms are substantially identical to the AR-15.

### a. Blake Ellman

Blake Ellman (hereinafter, "Ellman") is a Plaintiff in this litigation. (ECF No. 175-8 at ¶ 1). Ellman is a law-abiding citizen of the United States and resident of the State of New Jersey. (ECF No. 175-8 at ¶ 3). Ellman is a firearms instructor, range safety officer, armorer, and competitive shooter. (ECF No. 175-8 at ¶ 2). Ellman is not a retired law enforcement officer and does not fall within any of the other exceptions enumerated in the LCM Amendment. (ECF No. 175-8 at ¶ 3).

Prior to the effective date of LCM Amendment, Ellman lawfully owned and kept in the State of New Jersey ammunition magazines that were capable of holding more than ten but fewer than sixteen rounds of ammunition. Ellman owned these magazines for lawful purposes, including self-defense in the home. Ellman states that but-for the LCM Amendment, he would have continued to own and keep these magazines in his home in the State of New Jersey. Instead, Ellman states that he was forced, in some instances, to transfer noncompliant magazines and purchase new replacement magazines at considerable cost. Ellman also states that, in other instances, he was forced to spend money to permanently modify other magazines thereby significantly impairing the value of those magazines. Ellman further states that since the LCM Amendment went into effect, he has purchased several new pistols for which he was required to pay money to permanently modify the magazines down to ten rounds prior to receiving them in the State of New Jersey. (ECF No. 175-8 at ¶ 4). If it were lawful, Ellman claims that he would also acquire

14

new magazines capable of holding more than ten rounds of ammunition. Because of the LCM Amendment and the associated criminal penalties, Ellman states that he refrains from doing so. (ECF No. 175-8 at ¶ 5).

In addition, Ellman wishes to own semi-automatic firearms for lawful purposes, including self-defense in the home. Ellman states that he would choose a semi-automatic rifle as an option for home defense. This is because, as an experienced firearm owner and instructor, Ellman believes that a semi-automatic rifle is ideally suited to his home defense needs. Ellman states that but-for Assault Firearms Law, he would acquire and keep one or more semi-automatic firearms in his New Jersey home. However, Ellman states that because of the Assault Firearms Law and the associated criminal penalties, he refrains from doing so. (ECF No. 175-8 at ¶ 7). Ellman states that he would otherwise apply for a license to possess semi-automatic firearms. (ECF No. 175-8 at ¶ 8).

### b. Marc Weinberg

Marc Weinberg (hereinafter, "Weinberg") is a Plaintiff in this litigation. (ECF No. 175-8). He is a citizen of the United States and resident of New Jersey. Weinberg is not a retired law enforcement officer, and Weinberg does not fall within any of the other exceptions enumerated in the LCM Amendment. (ECF No. 175-8 at ¶ 10).

Weinberg lawfully owned and kept in New Jersey ammunition magazines that qualified as "large capacity ammunition magazines" under the LCM Amendment because they were capable of holding more than ten but fewer than sixteen rounds of ammunition.  Weinberg owned these magazines for lawful purposes, including self-defense in the home.  Weinberg states that but-for the LCM Amendment, he would have continued to own and keep these magazines in his New Jersey home. Instead, Weinberg states that he was forced to sell these magazines at a substantial loss.  Further, since the LCM Amendment went into effect, Weinberg states that he purchased two new pistols for which he was required to pay money to permanently modify the magazines down to ten rounds prior to receiving them in New Jersey. (ECF No. 175-8 at ¶ 11).   If permitted to do so, Weinberg states that he would acquire new magazines capable of holding more than ten rounds of ammunition. Weinberg states that because of the LCM Amendment and the associated criminal penalties, he refrains from acquiring such firearms.  (ECF No. 175-8 at ¶ 12).

### c.  Thomas Rogers

Thomas Rogers (hereinafter, "Rogers") is a Plaintiff in this litigation.  (ECF No. 175-8).  He is a citizen of the United States and resident of New Jersey.  Rogers does not fall within any of the exceptions enumerated in the Assault Firearms Law. (ECF No. 175-8 at ¶ 14).  Rogers is a long-time firearms owner, having owned and used firearms for more than forty years. (ECF No. 175-8 at ¶ 15).  Rogers wishes

to own semi-automatic firearms for lawful purposes, including self-defense in the home.  In particular, he would choose a semi-automatic shotgun as an option for home defense because, as an experienced firearm owner, Rogers believes that a semi-automatic shotgun is ideally suited to his home defense needs.  Rogers pleads that but-for the Assault Firearms Law, he would acquire and keep one or more semi-automatic firearms in his New Jersey home.  Rogers states that because of Assault Firearms Law and the associated criminal penalties, he refrains from acquiring such firearms. (ECF No. 175-8 at ¶ 16).

### B. Plaintiffs: *Cheeseman, et al., v. Platkin, et al.* (No. 22-cv-4360)

Plaintiffs—and members of the Firearms Policy Coalition, Inc.—Mark Cheeseman and Timothy Connolly seek to exercise their right to keep and bear semi-automatic arms for lawful purposes in New Jersey but are prohibited from doing so under the Assault Firearms Law.  (ECF No. 174-7 at ¶ 27).   No facts or evidence has been presented to suggest that all semi-automatic firearms are substantially identical to the AR-15.

### a.  Mark Cheeseman and Timothy Connolly

Plaintiffs Mark Cheeseman (hereinafter, "Cheeseman") and Timothy Connolly (hereinafter, "Connolly") are plaintiffs in this litigation.  (ECF No. 174-7 at ¶¶ 16–17).  Plaintiffs Cheeseman and Connolly state that they intend and desire to exercise their rights to keep and bear firearms classified as "assault firearms"

17

under the Assault Firearms Law, including but not limited to an AR-15 style rifle, for lawful purposes including: home defense, target shooting, and proficiency training. (ECF No. 174-7 at ¶¶ 18–19). But-for the Assault Firearms Law, Plaintiffs Cheeseman and Connolly state that they would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns. (ECF No. 174-7 at ¶¶ 20–21). The Assault Firearms Law nonetheless renders it illegal for either of them to do so. (ECF No. 174-7 at ¶ 22).

Considering the State's enforcement of the Assault Firearms Law, Plaintiffs Cheeseman and Connolly state that they refrain from acquiring, possessing, and using for self-defense and other lawful purposes any AR-15 rifle, any other firearm prohibited under the Assault Firearms Law, or any "substantially identical" firearm as defined under the Guidelines,[12] based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Assault Firearms Law. (ECF No. 174-7 at ¶ 23)

### C. Historical and Statutory Background

The Parties have provided the Court with a comprehensive historical analysis. It can be distilled as follows:

1. In 1791, about twelve years after the end of the American Revolutionary War, the Bill of Rights was adopted as part of the Constitution of the United States

---

[12] *See infra* ¶ 23–24.

to protect and guarantee the freedom of citizens.  One of those rights is the right to "keep and bear Arms."  The Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. Amend. II.

2. In the 1830s, some State legislatures enacted laws regulating arms despite that Second Amendment guarantee.  One of these laws concerned Bowie knives.  Bowie knives were a type of knife that proliferated throughout the United States during the 1800s.  Bowie knives were distinctive for their long blades; these blades were longer than ordinary knives.  (ECF No. 176-1 at 401; *id.* at 503–04).  Bowie knives also had crossguards to protect the hands of a combatant, and they had clip points to make it easier to cut or stab opponents.  (ECF No. 176-1 at 401; *id.* at 503–04).  While the Bowie knife could be used in self-defense against a violent aggressor, such knives ended up being widely used in fights and criminal activities at that time.  (*Id.* at 505–09 (citing three cases, two from Tennessee and one from Texas: *Aymette v. State*, 1840 WL 1554, 21 Tenn. 152 (Tenn. 1840); *Haynes v. Tennessee*, 1844 WL 1894, 24 Tenn. 120 (Tenn. 1844); *Cockrum v. State*, 1859 WL 6446, 24 Tex. 394 (Tex. 1859); ECF No. 183-1 at 74–75).  Between 1837

and 1868, twenty-four States or Territories[13] enacted regulations that placed restrictions on the possession of Bowie knives.  (ECF No. 176-1 at 582–85; *id.* at 624–718).  Once Bowie knives' potential misuse became apparent, restrictions were enacted in all other states or territories—with the exception of New Hampshire—within the next few decades and up until the Twentieth Century.  (*Id.* at 510).  This did include laws that restricted the type of knife embodied by the Bowie knife without mentioning a Bowie knife by name. (*Id.*).

3.  In terms of magazines for firearms, it was not until the mid-1800s that patents for magazines began appearing in the historical record.  In 1847, Walter Hunt patented a tubular magazine.  (ECF No. 175-6 at 21).  In 1855, Rollin White patented a box magazine.  (*Id.*).  Finally, in 1864, Robert Wilson patented a detachable magazine.  (*Id.*; *see* ECF No. 176-1 at 896–97).  Large capacity detachable magazines and the belt feeding mechanism "can be traced directly to a military heritage . . . and it was[ not] until the advent of WWI that development and refinement of large capacity feeding devices for machineguns gained increased importance."  (ECF No. 176-1 at 896).

---

[13] These states were Alabama; Arizona; California; Colorado; District of Columbia; Florida; Georgia; Hawaii; Idaho; Indiana; Kansas; Kentucky; Maine; Massachusetts; Mississippi; Montana; New Mexico; New York; North Carolina; Ohio; Tennessee; Texas; Virginia; and Washington.  (ECF No. 176-1 at 582–85).

Admittedly, the "line between military and civilian arms was certainly blurred at the founding of the country.   While the military . . . sometimes utilized superior civilian arms, civilians could also possess guns that were traditionally associated with the military . . . ." (ECF No.175-6 at 18).

4. In the 1860s, rifles capable of holding more than ten rounds became available, but the magazine was fixed.[14]   (ECF No. 175-6 at 21; ECF No. 184-3 at 8, 43–44, 46).   These rifles were mostly sold to the military, and civilians possessed a small percentage of those rifles at the time of the ratification of the Fourteenth Amendment in 1868.  (ECF No. 184-3 at 48).

5. Indeed, despite the issuance of a patent for detachable magazines in 1864, firearms with detachable magazines were not widely available until the end of the Nineteenth Century.  (ECF No. 175-6 at 21; ECF No. 176-1 at 475–76; ECF No. 197 at 23).  According to State Defendants' expert Brian Delay, "detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century."  (ECF No. 184-3 at 54).

6. By the 1920s, firearms with detachable magazines capable of holding more than ten rounds became commercially available.  (ECF No. 184-3 at 9).  During this same time, many states began regulating magazine capacities for

---

[14] A fixed magazine is a magazine that is not detachable from the firearm.

semi-automatic firearms. (ECF No. 176-1 at 419 (citing Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 L. & CONTEMP. PROBS. 237, 238 (2020)); ECF No. 176-1 at 475–77).

7. Nine States and the District of Columbia between the years of 1917 and 1934 regulated magazine capacity or set firing limits for semi-automatic and fully automatic weapons. (ECF No. 176-1 at 476, 478). These were: the District of Columbia; Massachusetts; Michigan; Minnesota; New Jersey; North Carolina; Ohio, Rhode Island; South Dakota; and Virginia. (*Id.* at 476, 478). Some of these statutes regulated these rounds for a particular purpose only, such as hunting. (*Id.* at 478). Eleven more states regulated only fully automatic weapons between 1923 and 1933, "where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices." (*Id.* at 476). These States were Illinois; Louisiana; Minnesota; New Jersey; North Dakota; Oregon; Pennsylvania; South Carolina; Texas; and Vermont. Between 1927 and 1933, California, Hawaii, Missouri, and Washington State banned all firearms capable of receiving rounds through feeding devices. (*Id.* at 476, 478).

8. In 1934, Congress passed the National Firearms Acts which "[h]eavily regulated machine guns, short-barrel rifles[,] shotguns, and silencers." (ECF

No. 176-1 at 331).  In 1938, Congress passed the Federal Firearms Act which established "a federal licensing system to regulate manufacturers, importers, and dealers to firearms."  (ECF No. 176-1 at 332).  These laws were passed in response to several gangland shootings involving machine guns in the immediately-preceding years and to reduce the number of shots that a shooter could release in rapid succession in an incident. (ECF No. 176-1 at 418–20, 473; ECF No. 183-2 at 19).

9.  In terms of the AR-15, it was not developed until the mid-Twentieth Century. In 1956, Eugene Stoner developed the AR-10—the precursor to the AR-15. (ECF No. 175-6 at 21; *see also* ECF No. 184-3 at 98).  In 1959, Armalite— an American small arms engineering firm—sold the rights to Colt's Manufacturing to produce the AR-15.  (ECF No. 175-6 at 21; *see also* ECF No. 184-3 at 98).  By 1964, Colt's Manufacturing delivered AR-15s to the commercial market. (ECF No. 175-6 at 21).

10. The AR-15 is a style of semi-automatic rifle.  This means that a user can fire only one round for each pull of the trigger, and the rifle either self-reloads or chambers the next round after one round is fired.  (*E.g.*, ECF No. 175-8 at 6–7).

11. A semi-automatic weapon differs in important ways from a manually-operated repeating firearm; a manually-operated repeating firearm requires

that a user "manually operate the mechanism to bring a fresh cartridge into position for firing." (ECF No. 184-3 at 98).   The semi-automatic weapon also differs from a fully automatic firearm, like a machine gun, because a fully automatic firearm—when the trigger is depressed—will fire a continuous, rapid series of shots until the trigger is released or the ammunition supply is exhausted.  (*Id.*).  To shoot a semi-automatic weapon like the AR-15, one must depress the trigger each time that one wishes to shoot.  (ECF No. 174-1 at 31).  Rounds are inserted into the AR-15 through a detachable magazine.

12. An AR-15 style rifle can have the following design:



(ECF No. 184-3 at 106, 228 (emphasizing the straight-line design of the AR-15/M-16 model).

13. The AR-15 is produced by several different manufacturers.  (*See* ECF No. 175-8 at 14–15).  These include, but are not limited to: Colt; FN, Ruger; Remington; Bushmaster; Rock River Arms; Wilson Combat; Barrett; DPMS

Panther Arms; H&K; Lewis Machine; Olympic Arms; Palmetto State Armory; and Mossberg. (*Id.*).

14. In 2018, an estimated five to ten million AR-15s were in civilian hands in the United States. (*Id.*). As of 2022, it was estimated that there were around 24 million AR-15s and similar sports weapons in circulation; this number was exceeded only by the number of registered handgun owners within the United States. (ECF No. 174-1 at 37; ECF No. 175-5 at 14–15; *see also* Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue,* 60 HASTINGS L.J. 1285, 1296 (2009) (noting that in 2009, a year after *Heller*, that the AR-15 was the best-selling rifle type within the United States).

15. According to Plaintiffs' Expert Emanuel Kapelsohn (hereinafter, "Kapelsohn"), the AR-15 has many uses, including self-defense, target shooting, hunting, and pest control by ranchers and farmers. (ECF No. 184-3 at 101). According to Kapelsohn, the build of the weapon also makes it particularly well-suited to self-defense. According to Kapelsohn, because of the AR-15's "light weight, very mild recoil, and good ergonomics," it is a weapon which is "well suited to younger shooters, female shooters, and other shooters of smaller stature . . . ." (*Id.*).

16. Further, it is "an easy rifle for larger, stronger individuals to use." (*Id.*). Overall, according to Kapelsohn, all these design features—including the effectiveness of the AR-15's cartridge for self-defense use and its better continuity of fire when used with available magazines—make the AR-15 a good choice for self-defense. (*Id.*).

17. Evidence has also been presented that AR-15s are used for self-defense. Plaintiffs have shown that the AR-15 has been used recently in several, relatively high-profile self-defense events in Florida, Illinois, Texas, Pennsylvania, and Oklahoma.   (ECF No. 175-5 at 105–12, 120–26). Plaintiffs in this matter have also pled that, but-for the Assault Firearms Law's AR-15 Provision, they would own an AR-15 for the purpose of self-defense within the home.  (ECF No. 174-7 at ¶¶ 18–19; *see also* ECF No. 175-8 at ¶¶ 7, 16 (where Plaintiffs Ellman and Rogers argue that they would possess a semi-automatic weapon without naming the AR-15 specifically).

18. Prior to 1990, New Jersey had regulated the use, possession, and manufacture of firearms within its jurisdiction.  Around that time, in Stockton, California, a gunman armed with an AK-47 and handgun killed five children and wounded thirty-three others at an elementary school. (ECF No. 183-2 at 3).

19. This incident prompted legislative action.  In 1990, New Jersey modified its existing statutory framework to enact the assault firearms prohibition at P.L.

1990.  (ECF No. 183-2 at 3).  The signing statement for Public Law 1990 signed by then-Governor Jim Florio discussed the capacity of the prohibited firearms to cause mass destruction and pose a threat to police, citizens, and children.  (ECF No. 183-2 at 3). This law was retitled and has become known now as the "Assault Firearms Law."

20. Effective May 1, 1990, the Assault Firearms Law prohibited an enumerated list of "assault firearms."  The Assault Firearms Law lists sixty-six semi-automatic rifles and shotguns.  P.L. 1990, Ch. 32 (West); *see also* N.J. Stat. Ann § 2C:39-1(w)(1).

21. Within that law, the term "assault firearm" is defined broadly and encompasses numerous categories.  The law enumerates more than sixty weapons that constitute assault firearms including but not limited to:

- any shotgun with a revolving cylinder such as the "Street Sweeper" or "Striker 12";
- Beretta AR-70 and BM59 semi-automatic firearms;
- Bushmaster Assault Rifle;
- Colt AR-15 and CAR-15 series;
- Galil type
- Heckler and Koch HK91, HK93, HK94, MP5, and PSG-1;
- the Ruger K-Mini-14/5F and Mini-14/5RF;
- the Springfield Armory BM59 and SAR-48 type;
- the USAS 12 semi-automatic type shotgun; and
- Uzi type semi-automatic firearms.

P.L. 1990, Ch. 32 (West); *see* N.J. Stat. Ann. § 2C:39-1(w)(1) (West 2024).

22. In addition to this enumerated list, the Assault Firearms Law includes a catchall provision which broadens its impact. The Assault Firearms Law states that it applies to "[a]ny firearm manufactured under any designation which is *substantially identical* to any of the firearms listed above[.]" P.L. 1990, Ch. 32 (West); *see* N.J. Stat. Ann. § 2C:39-1(w)(2) (West 2024) (emphasis added).

23. This "substantially identical" language caused some confusion. To clarify, Attorney General Peter Verniero explained "substantially identical" in an August 1996 letter entitled: "Guidelines Regarding Substantially Identical provisions in The State's Assault Firearms Law" (hereinafter, the "Guidelines"). The Guidelines defined and subdivided "substantially identical" firearms into three categories of semi-automatic weapons.

24. As stated by the Guidelines:

A semi-automatic firearm should be considered to be "substantially identical," that is, identical in all material respects, to a named assault weapon if it meets the below listed criteria:
   A. semi-automatic rifle that has the ability to accept a detachable magazine and has at least 2 of the following:

   1. a folding or telescoping stock;
   2. a pistol grip that protrudes conspicuously beneath the action of the weapon;
   3. a bayonet mount;
   4. a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
   5. a grenade launcher;

B. a semi-automatic pistol that has an ability to accept a detachable magazine and has at least 2 of the following:

1. an ammunition magazine that attaches to the pistol outside of the pistol grip;
2. a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;
3. a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;
4. manufactured weight of 50 ounces or more when the pistol is unloaded; and
5. a semi-automatic version of an automatic firearm; and,

C. a semi-automatic shotgun that has at least 2 of the following:

1. a folding or telescoping stock;
2. a pistol grip that protrudes conspicuously beneath the action of the weapon;
3. a fixed magazine capacity in excess of 5 rounds; and
4. an ability to accept a detachable magazine.

*Assault Firearms Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws, issued August 19, 1996*, N.J. DIV. OF CRIMINAL JUSTICE, https://perma.cc/M7GZ-CWX3 (last visited June 21, 2024).

25. The Assault Firearms Law also contained a provision that criminalized the possession of what it calls a "large capacity ammunition magazine." Originally, this was defined to include "a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed

continuously and directly therefrom into a semiautomatic firearm." *See* P.L. 1990, Ch. 32 (West); N.J. Sess. Law Serv. Ch. 39. (West).

26. In 1994, Congress passed a statute regulating magazine capacity. The Public Safety and Recreational Firearms Use Protection Act (hereinafter, the "Act") prohibited the manufacture of magazines capable of holding more than ten rounds of ammunition. *See* Pub.L.No. 103–322, tit. XI, subtit. A, § 110103, 108 Stat. 1796, 1998–2000 (1994). The Act contained a sunset provision in 2004. Congress did not renew this law.

27. On June 7, 2018—and effective June 13, 2018—the Assault Firearms Law was modified with an amendment (hereinafter, the "LCM Amendment") which amended the threshold at which a magazine qualifies as large capacity. P.L. 2018, c. 39 § 1; *see also* N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), N.J. Stat. Ann. § 2C:39-20(a).

28. This threshold was now ten rounds of ammunition. The logic behind the LCM Amendment was to reduce the number of fatalities in a mass shooting. The idea was that, since changing a magazine takes time to accomplish, lessening the number of rounds that a magazine could hold would allow more interim periods at which victims could move to safety. Note that the LCM Amendment does not impose any limitations on the number of compliant

magazines that a person can purchase or own; it restricts only the capacity of the magazine to ten rounds.[15]

29. These changes also provided exceptions for certain firearms purchased before the LCM Amendment's effective date—specifically, for (1) firearms with a "a fixed magazine capacity holding up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds;" or for firearms (2) "which only accept[] a detachable magazine with a capacity of up to 15 rounds which [are] incapable of being modified to accommodate 10 or less rounds[]." N.J. Stat. Ann. §§ 2C:39-20(a)1, 2C:39-20(a)2 (West 2024).

30. A mass shooting is generally considered a shooting event where "four or more people were killed in a public place in one incident, excluding incidents [where another] . . . criminal activity such as a robbery" was occurring. (ECF No. 176-1 at 23). While the number of the mass shootings that have occurred within the past forty years is not precisely quantified, some sources have counted the number of mass shootings between 1982 and 2022 as having ranged from anywhere from 112 to 317. (ECF No. 176-1 at 23–26).

31. This alarming frequency aside, in an analysis of these mass shooting events, experts presented evidence that large capacity magazines and "assault

---

[15]  Other LCM Amendment restrictions are not pertinent to the question before the Court today.

weapons" were often used in mass shootings; that injuries and fatalities were higher in mass shooting incidents involving "assault weapons and/or large-capacity magazines" and that it was "common for offenders to fire more than 10 rounds when using an assault weapon or large-capacity magazine in mass shootings." (*E.g.*, ECF No. 176-1 at 7; ECF No. 176-1 at 27–28; *see also* 176-1 at 270).

32. Overall, the deadliest acts of intentional criminal violence within the United States since September 11, 2001 have been mass shootings. (ECF No. 176-1 at 268). Just within the last seven years, these mass shootings include the following events. There was the mass shooting in Uvalde, Texas on May 24, 2022 where twenty-one people were murdered. (*Id.*). There was also the mass shooting in El Paso, Texas on August 3, 2019 where twenty-three people were murdered. There was the mass shooting in Sutherland Springs, Texas on November 5, 2017 where twenty-five people were killed. There was also the mass murder of sixty people in Las Vegas, Nevada on October 1, 2017. (*Id.*).

33. Evidence has been presented to the Court to suggest that in recent years, these incidents are increasing both in frequency and in lethality. (*E.g.*, ECF No. 176-1 at 269; ECF No. 176-1 at 30–31).

### D. Supreme Court Jurisprudence[16]

Within the past several years, the Second Amendment and corresponding analysis undertaken by the courts has been in flux. The Court summarizes the decisions that have shaped today's standard below.

### a. *District of Columbia v. Heller*

In 2008, the Supreme Court formulated a new standard for a Second Amendment analysis in *District of Columbia v. Heller*, 554 U.S. 570 (2008). When the case underlying the *Heller* decision was initially filed, the District of Columbia imposed a general prohibition on the possession of handguns upon its residents. *Id.* at 574. The plaintiff in *Heller* was a special police officer who was authorized to carry a handgun while on duty, yet he was unable to legally keep a handgun in his home located within the District of Columbia. *Id.* at 575.

In holding that the Second Amendment protects an individual's right to possess firearms and that the complete prohibition on the possession of handguns within the District of Columbia violated the Second Amendment, the Court held that

---

[16] The United States Supreme Court recently held that the Bureau of Alcohol, Tobacco, Firearms and Explosives "exceeded its statutory authority by issuing a Rule that classifies bump stocks as machine guns." *Garland v. Cargill*, 602 U.S. 406, 415 (2024). The *Cargill* opinion makes no mention of the Second Amendment, *Heller*, or *Bruen*. And although the Dissent does mention *McDonald* (specifically, Justice Thomas' concurrence), it does so in the context of discerning legislative purpose and contemporaneous understandings. *Id.* at 437 (Sotomayor, J., dissenting). Accordingly, the Court does not include *Cargill* in its analysis.

"a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," *i.e.*, "self-defense in the home," must "fail constitutional muster." *Id.* at 628–29. In addition, the Court held that "[i]t [was] no answer" to suggest that a regulation prohibiting an entire class of arms is permissible "so long as the possession of other firearms . . . is allowed." The Court stated that the "complete prohibition of [handguns] is invalid." *Id.* at 629. The Court concluded that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table[,]" including "the absolute prohibition" of commonly-owned arms "held and used for self-defense in the home." *Id.* at 636.

Acknowledging public safety concerns, the *Heller* Court tempered its holding with the caveat that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court provided a "list [of presumptively lawful regulatory measures that] d[id] not purport to be exhaustive," such as "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27 n.26. The Court "also recognize[d] another important limitation on the right to keep and carry arms," that being "prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (internal citations omitted).

### b. *McDonald v. City of Chicago*

The Supreme Court again addressed the issue of the Second Amendment in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (plurality opinion). There, in finding that the Fourteenth Amendment incorporated the Second Amendment right to keep and bear arms recognized in *Heller*, the Supreme Court elucidated the standard set forth in *Heller*. *Id.* at 791.

In addressing the question of whether the Second Amendment right to keep and bear arms is incorporated into the concept of due process, *McDonald* noted that *Heller* pointed to the answer, stating that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and . . . that individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* at 767 (emphasis in the original).

Overall, *McDonald* wrote that the right to keep and bear arms was among the "fundamental rights necessary to our system of ordered liberty." *Id.* at 778. In noting this, *McDonald* reiterated the central holding in *Heller*: "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *Id.* at 780.

However, *McDonald* noted the limitations of *Heller*'s holding, stating that "while striking down a law that prohibited the possession of handguns in the home, [*Heller*] recognized that the right to keep and bear arms [was not] 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626).   *McDonald* noted that the *Heller* holding "did not cast doubt" on certain "longstanding regulatory measures" on firearm possession or use such as those laid out by the court in *Heller*.  *Id.* at 786 (quoting *Heller*, 554 U.S. at 626–27).

### c. *New York State Rifle & Pistol Association, Inc. v. Bruen*

Between 2008 and 2022, the Courts of Appeal had developed a means-end scrutiny approach to the Second Amendment analysis.  This Second Amendment means-end scrutiny approach was rejected by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*.  597 U.S. 1, 24 (2022).  In rejecting this approach, *Bruen* reiterated the holdings of *Heller* and *McDonald*: that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Bruen*, 597 U.S. at 8.

*Bruen* examined a challenge to a New York law that, *inter alia*, limited the issuance of an "unrestricted license to 'have and carry' a concealed 'pistol or revolver][,]'" and to secure such a license, an applicant must demonstrate a "'proper cause' exist[ed] to issue it." 597 U.S. at 11–15.  The two named plaintiffs in *Bruen* were law-abiding adult citizens of Rensselaer County, New York; each had applied for an unrestricted license to carry a handgun in public.  *Id.* at 15–16.  These applicants did not claim any unique danger to personal safety and only wanted to carry a handgun for self-defense.  *Id.*  Both of their applications were denied.  *Id.*

36

The Court held that the proper-cause requirement violated the Constitution, in that it "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

In deciding this, the Court set forth a new standard for applying the Second Amendment.  It is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).  The Court stated that this standard "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26.  Justice Thomas further explained:  "In some cases that inquiry will be fairly straightforward.  For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26–27.  The Court noted that *Heller* exemplified such a case, where handgun possession was totally banned within the home. *Id.* at 27.

The *Bruen* Court reiterated that *Heller* had made clear that "the right secured by the Second Amendment is not unlimited," and that certain restrictions may still

37

be imposed on arms. *Id.* at 21. Further, the Court noted that current regulations may implicate either "unprecedented societal concerns" or "dramatic technological changes" different from those that existed when the Second Amendment was ratified in 1791 or when the Fourteenth Amendment was ratified in 1868. *Id.* at 27. In those circumstances, "a more nuanced approach" to determine if historical regulations are "relevantly similar" to the currently challenged regulations must be utilized based on two measurements: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.

### d. *United States v. Rahimi*

The Supreme Court addressed its previous holdings within the context of an individual that posed a credible threat to the physical safety of another in *Rahimi*. *United States v. Rahimi*, 144 S.Ct. 1889 (2024). There, the Supreme Court examined whether a federal statute that prohibits individuals who are the subject of a domestic violence restraining order that includes a finding that that individual represents a credible threat to the physical safety of another from possessing a firearm violated the Second Amendment. *Id.* at 1894. The Court held that the statute did not violate the Second Amendment, finding that where an individual had been found by a court to pose a credible threat to the physical safety of another, that individual may be temporarily disarmed consistent with the Second Amendment. *Id.* at 1896.

In holding this, the Court reiterated the appropriate analysis as laid out in *Bruen*. *Id.* at 1897. The Court also noted that its precedents "were not meant to suggest a law trapped in amber. As we explained in *Heller,* for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding." *Id.* (citations omitted).

### e. Procedural History

It is against this backdrop of Supreme Court jurisprudence that the procedural history of this case is set forth. The issues before the Court today are not new as they relate to the LCM Amendment. The LCM Amendment's constitutionality was litigated before me in 2018 at the preliminary injunction stage. (ECF No. 74). The preliminary injunction was denied. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 17-cv-10507, 2018 WL 4688345, at *1 (D.N.J. Sept. 28, 2018), *aff'd sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) (hereinafter, "*ANJRPC I*").

In denying the preliminary injunction, I relied on the four-part test set forth by the Third Circuit. *See ANJRPC I*, 2018 WL 4688345, at *8 (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017)). Under the first step of the preliminary injunction analysis—whether the moving party has a reasonable probability of success on the merits—I found, *inter alia*, that, (1) under the pre-*Bruen* means-end scrutiny standard, the LCM Amendment did not infringe on the

39

Second Amendment constitutional rights of citizens, and (2) the LCM Amendment did not present an unconstitutional taking under the Fifth Amendment. *Id.* at \*8–\*16. My decision was affirmed on appeal, where the Third Circuit found on the merits that the LCM Amendment, *inter alia,* (1) did not violate the Second Amendment under the pre-*Bruen* standard and (2) did not constitute a taking under the Fifth Amendment. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 124 (3d Cir. 2018), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022) (hereinafter, "*ANJRPC II*"). In deciding this issue, the Third Circuit analyzed the LCM Amendment under the first step of *Heller* and then, after finding that the Second Amendment applied to LCM Amendment, found the LCM Amendment survived intermediate scrutiny. *ANJRPC II*, 910 F.3d at 116. The Third Circuit also analyzed *ANJRPC II* plaintiffs' takings claims under the Fifth Amendment, and it affirmed my decision that the LCM Amendment was neither an actual nor a regulatory taking. *ANJRPC II*, 910 F.3d at 124.

Around a year later in July 2019, several motions for summary judgment came before me as well as a cross-motion for summary judgment on the constitutionality of the LCM Amendment. (*See* ECF No. 101). In granting summary judgment for State Defendants, I explained the following:

> The Court recognizes that a different standard applies here—at the summary judgment stage—than applied on the petition for preliminary

> injunction. However, the Third Circuit has issued a precedential
> decision that resolves all legal issues in this case and there remains no
> genuine disputes of material fact. More specifically, the Third Circuit
> explicitly held that the New Jersey law "does not" violate "the Second
> Amendment, the Fifth Amendment's Takings Clause, and the
> Fourteenth Amendment's Equal Protection Clause." Therefore,
> because it is binding Third Circuit precedent that the New Jersey law
> is constitutional, the Court shall grant Defendants' motions for summary
> judgment          and          deny          Plaintiffs'          cross-motion.

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 18-cv-10507, 2019 WL 3430101, at *3 (D.N.J. July 29, 2019), *aff'd sub nom. Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey,* 974 F.3d 237 (3d Cir. 2020), *cert. granted, judgment vacated sub nom., Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck,* 142 S. Ct. 2894 (2022). The Third Circuit affirmed my decision again, not reaching the question of the constitutionality of the LCM Amendment since it read that the previous panel's decision in *ANJRPC II* as binding.[17] *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 240 (3d Cir. 2020), *cert. granted, judgment vacated sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck,* 142 S. Ct. 2894 (2022) (hereinafter, "*ANJRPC III*").

---

[17] Specifically, the Third Circuit explained:

> The plaintiffs have now appealed again, arguing that the District Court
> erred in treating the prior panel's opinion as binding and arguing again
> that the Act is unconstitutional. Because they are wrong on the first point,
> we do not reach the second. We will affirm.

*ANJRPC III*, 974 F.3d at 240.

In 2022, the Supreme Court repudiated means-end scrutiny analysis in the Second Amendment context in *Bruen*. On June 30, 2022, the Supreme Court granted the writ of certiorari for the plaintiffs in *ANJRPC III*. The Supreme Court vacated the judgment in *ANJRPC III* and remanded the case back to the Third Circuit "for further consideration in light of *New York State Rifle & Pistol Assn., Inc. v. Bruen.*" *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022). The Third Circuit, in turn, remanded to the case back to me "for [a] decision in the first instance under the standard announced in *Bruen* . . . ." (Third Circuit Docket No. 19-3142, ECF No. 147-1).

While the lead case was ongoing throughout this time period, the member cases before the Court today were initiated after the *Bruen* decision. The complaint in *Cheeseman et al. v. Platkin et al.* was filed on June 30, 2022. (No. 22-cv-04360 at ECF No. 1). Similarly, the complaint in the other member case, *Ellman et al. v. Platkin et al.*, was filed on July 1, 2022 (No. 22-cv-04397 at ECF No. 1).

These cases were consolidated for discovery in an order entered on February 6, 2023. (ECF No. 148). Discovery concluded on August 31, 2023. In an order dated September 11, 2023, I ordered the extended consolidation of these cases through the resolution of the *Daubert* and Summary Judgment Motions. (ECF No. 168). Accordingly, before the Court today are issues from all three of these cases.

**V.**

42

Before the Court today are two separate issues: whether the AR-15 Provision within the Assault Firearms Law is unconstitutional and whether the LCM Amendment is unconstitutional. The Court first lays out the *Bruen* standard before addressing each constitutional challenge below.

## A. *Bruen* Standard

As previously mentioned, the Supreme Court in *Bruen* repudiated a means-end test, and it provided the lower courts with a new standard. The Third Circuit recently outlined this test in *Lara*. *See Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 129 (3d Cir. 2024).

The Third Circuit explained the first step of *Bruen* as where the "court determines whether 'the Second Amendment's plain text covers an individual's conduct.' . . . That 'textual analysis' focuse[s] on the 'normal and ordinary' meaning of the Second Amendment's language . . . . If the text applies to the conduct at issue, 'the Constitution presumptively protects that conduct.'" *Lara*, 91 F.4th at 129 (internal marks and citations omitted). There are several limitations to this right, however. These are that the arm must be in "common use" and it must not be "dangerous and unusual." *See Heller*, 554 U.S. at 627–28. What constitutes common use is not clear under relevant Supreme Court precedent at the present time.

Assuming an arm falls within the plain text of the Second Amendment, the Court proceeds to the second step of the analysis. Here, "a court determines whether

the regulation in question 'is consistent with the Nation's historical tradition of firearm regulation.' . . . If it is, the presumption made at the first step of *Bruen* is overcome, and the regulation in question can stand." *Id.* (internal marks and citations omitted).   The Third Circuit explained that in this second step, "the government bears the burden of identifying a 'founding-era' historical analogue to the modern firearm regulation." *Id.* (citations omitted).   The Third Circuit further explained that in this analysis we "are to look to the founding because '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" (citations omitted). With respect to relevant precedent, the Third Circuit explained that "[t]he question is 'whether historical precedent from before, during, and even after the founding evinces a comparable tradition of regulation[,]'" and that courts should "discount '[h]istorical evidence that long predates' 1791 and 'guard against giving postenactment history more weight than it can rightly bear.'" *Id.* This analysis requires a court to consider the "'how and why the regulations [being compared] burden a law-abiding citizen's right to armed self-defense.'" *Id.* (citations omitted).

### B. AR-15 Provision of the Assault Firearms Law

Plaintiffs challenge the Assault Firearms Law[18] as unconstitutional. For the reasons stated previously, this analysis focuses on the AR-15 Provision of the Assault Firearms Law. Under *Heller*, while the Supreme Court stated that the Second Amendment right is not unlimited, the Supreme Court forbade a complete prohibition on a class of gun ownership. *See* 554 U.S. at 628–29, 636 (holding the absolute prohibition of an "entire class of 'arms'" that is widely utilized for the lawful purpose of self-defense is impermissible). Guided by this decision, and for the reasons below, the AR-15 Provision of the Assault Firearms Law which prohibits the use of the Colt AR-15 for the use of self-defense within the home does not pass constitutional muster when applying the *Bruen* standard.

To the first step of the *Bruen* analysis, whether the Second Amendment's plain text covers Plaintiffs' proposed course of conduct—the possession and use of AR-15s within the home for self-defense—the answer is yes. Following the guidance set forth in *Heller* and reiterated in *Bruen*, the plain text of the Second Amendment covers the individual conduct at issue here. As the Supreme Court discussed in *Bruen*, the Second Amendment confers the right to an individual to bear arms "'upon

---

[18] The law as enacted by the New Jersey Legislature is entitled the "Assault Firearms Law." The pejorative nature of this title was raised in the briefing. (ECF No. 174-1 at 30–35; ECF No. 175-7 at 9). Without deciding this issue, the Court notes that the charged language in the phrase "assault firearms" frustrates the Court's role in evaluating the constitutionality of a challenged law under *Bruen* and appears to criminalize the user of an "assault firearm" from the outset.

the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Bruen*, 597 U.S. at 32 (citations omitted). The right to bear arms within the home was central to the understanding of "keep and bear" arms. *See Heller*, 554 U.S. at 628–35. Although *Heller* and *Bruen* treated handguns and not semi-automatic weapons, the applicability of the Second Amendment's text to the question before the Court appears to already have been answered by those same decisions. *Heller*, 554 U.S. at 605–26; *Bruen*, 597 U.S. at 32–33.

In combatting this conclusion, State Defendants appeal to one of the limitations of the Second Amendment right. Specifically, State Defendants argue that AR-15s are not in common use today for self-defense and are therefore not covered by the Second Amendment. (ECF No. 183-1 at 36–55). This argument draws upon language in *Heller* which explained that the right to keep and carry arms was limited to "the sorts of weapons protected were those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (citations omitted).

What the Supreme Court meant by "common use" is not exactly clear. Indeed, the litigants in this case have differing views as to what the Supreme Court meant. As is relevant here, the State Defendants appear to ask the Court to use a common use standard that grafts (1) common use with (2) a lawful purpose along with (3) evidence of the total number of self-defense incidents involving the relevant firearm

46

in question.  This analysis would also consider (4) the characteristics of the firearm itself and its usefulness for self-defense.  (*See* ECF No. 183-1 at 42–55; Apr. 11, 2024 Tr. 49:02–50:17).  Plaintiffs, on the other hand, would have the Court read the common use requirement as a requirement that hinges on possession—that is to say, that "common use" is satisfied by showing that the number of weapons in circulation is high.  (*E.g.*, Apr. 11, 2024 Tr. 22:02–26:03; *id.* at 29:20–31:17; ECF No. 174-1 at 35–40).

To the Court, the answer appears to be somewhere in the middle.[19] Understanding our Nation's historical tradition as one where the right to keep and bear arms was integrally linked with the Founding era fear of disarmament faced by the American colonists in the face of governmental oppression, the right to keep and bear arms seems to be inherently connected with an understanding of the lawful purposes of keeping those same arms.  *Heller*, 554 U.S. at 579–605; *see also Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland*

---

[19] Earlier this month, Judge Roth addressed the common use test in her concurrence in *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, No. 23-1633, 2024 WL 3406290 (3d Cir. July 15, 2024) (Roth, J., concurring). Judge Roth stated that she believed the common use test should hinge upon whether a weapon was in "common use today for self-defense," and she pointed to several metrics, including "a weapon's objective suitability for self-defense and whether [a weapon] is commonly used in self-defense." *Id.* at *13 (Roth, J., concurring). Overall, Judge Roth stated that "a weapon is in common use for self-defense if evidence shows it is (1) well adapted for self-defense and (2) widely possessed and employed for self-defense." *Id.*

*Sec.*, 664 F. Supp. 3d 584, 593–94 (D. Del. 2023), *aff'd*, No. 23-cv-1633, 2024 WL 3406290 (3d Cir. July 15, 2024) (noting the disagreement within the jurisprudence with respect to the definition of "common use," and that the *Delaware State Sportsmen's Association* court's sense was that the "'in common use' inquiry turns on whether a regulated weapon is "'in common use' for self-defense."); *Vermont Federation of Sportsmen's Clubs, et al., v. Birmingham, et al.*, No. 2:23-cv-710, 2024 WL 3466482, at *8 (D. Vt. July 18, 2024) (noting that "'common ownership' is different from 'common use for self-defense'"). This requirement, however, does not appear to have a threshold number that Plaintiffs must meet to show that a weapon is in common use for self-defense.

Thus, when undertaking this common use for lawful purposes inquiry, the Court finds that Plaintiffs have satisfied their burden with respect to the AR-15. Plaintiffs have shown that the weapon is "overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628. AR-15 firearms are produced by a multitude of manufacturers and are commonly owned throughout the United States—it is estimated that as of 2022, AR-15s and similar sporting rifles[20] had around 24 million owners; this ownership number was exceeded only by the number of registered handgun owners within our Nation. As of 2022, it was

---

[20]Although the litigants discuss "sporting rifles," the precise scope of what sporting rifles entailed was not defined in the briefing.

estimated that there were around 24 million AR-15s and similar sports weapons in circulation; this number was exceeded only by the number of registered handgun owners within the United States.  (ECF No. 174-1 at 37; ECF No. 175-5 at 14–15 (estimating that as of 2018, there are between five million and ten million AR-15 rifles in civilian hands within the United States); *see also* Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue,* 60 HASTINGS L.J. 1285, 1296 (2009) (noting that in 2009, a year after *Heller,* that the AR-15 was the best-selling rifle type within the United States).

Further, Plaintiffs have shown that AR-15s are well-adapted for self-defense. Evidence has been presented to the Court that the build of the AR-15 makes it well-suited to self-defense because it is "light weight, [has] very mild recoil, and [has] good ergonomics[;]" it is a weapon which is "well suited to younger shooters, female shooters, and other shooters of smaller stature . . . ."  (ECF No. 184-3 at 101). Further, the AR-15's design features—including the effectiveness of its cartridge for self-defense use and its better continuity of fire when used with available magazines—make the AR-15 a good choice for self-defense.  (*Id.*).  Plaintiffs have also shown that the AR-15 is used—or would be used should it be permitted to be used in New Jersey—for self-defense.  (*See* ECF No. 175-8 at ¶ 7; ECF No. 175-8 at ¶ 16; ECF No. 174-7 at ¶¶ 18–19; ECF No. 175-8 at ¶ 22).   Plaintiffs have shown that the AR-15 has been used recently in several, relatively high-profile self-defense

events in Florida, Illinois, Texas, Pennsylvania, and Oklahoma. (ECF No. 175-5 at 105–12, 120–26).

In this inquiry, the State Defendants would also have the Court draw a distinction between handguns and the AR-15 based upon the fact that handguns are more popularly used for self-defense than AR-15s. State Defendants argue that "handguns are far and away the most commonly used firearm for self-defense, accounting for 41% of all reported cases of defensive gun use, and 90% of cases in which the firearm type was known." (ECF No. 183-1 at 40). To the Court, it appears that the State Defendants are asking the Court to engage in the weighing of empirical data to draw a line and say what is "commonly used" based upon their argument that the AR-15 is not the quintessential self-defense weapon within the home; such line drawing exercises teeter on the edge of asking the Court to make the difficult "empirical judgments regarding firearm regulation" that the courts were undertaking prior to *Bruen*. It is not this Court's place to do so.[21] Plaintiffs need not show that

---

[21] As the *Bruen* Court explained:

> If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.

AR-15s are the most popular weapon for defensive gun use in circulation in order to show they are commonly used for a lawful purpose; they need only show that it is commonly used for a lawful purpose.  Where the clear language of *Heller* states that the Second Amendment's right to self-defense is "most acute" within the home, the dictates of the Supreme Court on this matter are clear: the banning of this firearm for self-defense within the home where it is a firearm that has been shown to be commonly used for a lawful purpose is unpermitted. [22]

The Court proceeds to the second step in the *Bruen* analysis, which is "whether the regulation in question 'is consistent with the Nation's historical tradition of firearm regulation.' . . . If it is, the presumption made at the first step of

---

*Bruen*, 597 U.S. at 26.

[22] The question of whether AR-15s are most useful in military service and therefore may be banned without infringing the Second Amendment right was not fully addressed in the briefing. *Heller*, 554 U.S. at 627.  State Defendants argued in their brief that the AR-15 is a near identical copy of a military style weapon, the M-16, and was developed by the U.S. Military during the Vietnam War for use against the Viet Cong. (ECF No. 183-1 at 43; *see also* Apr. 11, 2024 Tr. at 70:01–71:22).  State Defendants argue further that the AR-15 caused "catastrophic injuries" (*Id.*).  Plaintiffs do not address this point directly, instead pointing out that AR-15s are commonly used for self-defense and are possessed by many law-abiding individuals. (ECF No. 193 at 30–41).  At oral argument, Plaintiffs argued that the common use test overcomes the dangerous and unusual category under *Heller*. (Apr. 11, 2024 Tr. 30:4–10).  The evidence before the Court on this category under *Heller* is insufficient to show that it is a weapon most-suited to military use.  The Court was provided with evidence only that the AR-15 was developed from what was originally a military-style weapon during the Vietnam War.  This evidence alone is insufficient to show that a weapon is "most useful in military service" as described in *Heller*.

*Bruen* is overcome, and the regulation in question can stand." *Lara*, 91 F.4th at 129

(internal marks and citations omitted). The AR-15 Provision cannot stand since it is

inconsistent with our Nation's historical tradition of firearm regulation.   Most

importantly—and without even undertaking the analytical dive into the historical

analogues provided to the Court—this decision is supported by the plain text of

*Heller*.  As the Supreme Court stated in *Heller* with respect to the handgun ban in

that case:

> [T]he inherent right of self-defense has been central to the Second
> Amendment right. The handgun ban amounts to a prohibition of an
> entire class of "arms" that is overwhelmingly chosen by American
> society for that lawful purpose. The prohibition extends, moreover, to
> the home, where the need for defense of self, family, and property is
> most acute. Under any of the standards of scrutiny that we have applied
> to enumerated constitutional rights, banning from the home "the most
> preferred firearm in the nation to 'keep' and use for protection of one's
> home  and  family,"  .   .   .     would  fail  constitutional  muster.

*Heller*, 554 at 630 (internal citations omitted).  Like in *Heller*, the Assault Firearms

Law's AR-15 Provision acts effectively as the total prohibition on a commonly used

firearm for self-defense—AR-15s—within the home; the text of New Jersey's

Assault Firearms Law prohibiting a list of sixty-six weapons, including the  Colt

AR-15 defined in the AR-15 Provision.  N.J. Stat. Ann § 2C:39-1(w) (West 2024).

The AR-15 Provision is impermissible under the plain text of *Heller*.

Undertaking the historical analogue analysis leads to the same conclusion.

State Defendants put forth evidence that similar weapons have historically been

regulated, including but not limited to trap guns, gunpowder, Bowie knives, slingshots, and clubs. (ECF No. 183-1 at 69–76). However, these comparisons are unavailing given a single fact: New Jersey's AR-15 Provision constitutes a complete ban on a class of firearms that is commonly-used for self-defense. Just because there are some firearms available under New Jersey's statutory scheme[23] does not change this conclusion since *Heller* was clear on this point:

> It is no answer to say . . . that it is permissible to ban the possession of [a weapon] so long as the possession of other firearms . . . is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.

*Heller*, 554 U.S. at 629. Thus, in this Court's understanding of Supreme Court precedent, a categorical ban on a class of weapons commonly used for self-defense is unlawful.

This conclusion is made clearest when looking to the closest historical analogue to an AR-15: a Bowie knife. The Bowie knife was a type of knife that was commonly-used throughout the United States during the 1800s; the Bowie knife was distinctive for its long blade. (ECF No. 176-1 at 401; *id.* at 503–04). Bowie knives

---

[23] This point goes more specifically to a point argued by *amici*, who argue against the view that the Assault Firearms Law was a categorical ban by stating that the Assault Firearms Law "does not ban possession of all 'rifles' or 'semi-automatic rifles.' The statute regulates an enumerated, tailored list of semi-automatic rifles and semi-automatic pistols and an enumerated, narrowly tailored list of firearm features that pose a specific threat to society." (ECF No. 186-1 at 26).

had longer blades than ordinary knives, had crossguards to protect the hands of a combatant, and had clip points to make it easier to cut or stab opponents. (ECF No. 176-1 at 401; *id.* at 503–04). The State Defendants analogize AR-15s to the Bowie knife given that semi-automatic pistols with detachable magazines only began to retail in the late 1800s. (ECF No. 183-1 at 74–75; ECF No. 183-1 at 88). The State Defendants put forth proof of regulations in various States such as Tennessee and Arkansas which prohibited the carrying and sale of Bowie knives to argue here that New Jersey's regulation of AR-15s is warranted. (*See* ECF No. 183-1 at 75). While "Bowie knives and many other knives were often regulated like handguns[,]" one main fact undermines State Defendants' argument here. D.B. Kopel, & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900,* 50 J. OF LEGIS. 224, 293 (2024). Few States prohibited the complete sale of Bowie knives. Indeed, the mainstream approach to Bowie knife regulation was to "ban concealed carry, to forbid sales to minors, or to impose extra punishment for criminal misuse[,] not to wholesale ban their possession." *Id.* Thus, when looking at the "hows" of the regulation, it does not stand against the Supreme Court's dictates set forth in *Bruen* and *Heller*; a few States' approach to banning Bowie knife regulation does not render its regulation consistent with the Nation's historical tradition, and it does not suggest to the Court that Bowie knives were widely regarded as not used for lawful purposes

or that AR-15s are viewed in that same way.  Nor do the "whys" put forth stand since the AR-15 has been shown to be a firearm in common-use for self-defense.

The State Defendants and *amici* argue that in undertaking this second step of the test set forth by *Bruen*, the Court should consider the nuanced circumstances discussed by Justice Thomas in *Bruen*; specifically, Justice Thomas noted that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 597 U.S. at 27.   The Court explained that these reasons would require a look to the "hows" and "whys" of a regulation. *Id.* at 29.  In this vein, State Defendants and *amici* argue that the past 200 years' worth of unprecedented societal changes such as increased urbanization and advances in firearms technology have greatly increased the lethality of mass shootings and thus, necessitate this nuanced analysis. (ECF No. 186-1 at 15–24). This argument, however, brings the Court back to its conclusion: the similarity of the Assault Firearms Law's AR-15 Provision to the issues treated in *Heller*.   State Defendants' argument fails because, like in *Heller*, the Assault Firearms Law *categorically bans* a type of weapon that is commonly used for self-defense.

Based upon the Supreme Court's clear direction on this point, the AR-15 Provision of the Assault Firearms Law is unconstitutional for the Colt AR-15 for use for self-defense in the home.

## C. LCM Amendment

Plaintiffs argue both that the LCM Amendment is unconstitutional because it (1) violates the Second and Fourteenth Amendments and (2) constitutes a prohibited taking under the Fifth Amendment. The LCM Amendment passes constitutional muster because although the Second Amendment right is implicated, this regulation is in line with the historical regulations within the tradition of our Nation. Put more precisely, the reduction of capacity is a limitation on firearms ownership. It is not a categorical ban preventing law-abiding citizens from exercising their Second Amendment rights for a weapon that is in common use for self-defense. It is well established that "a right secured by the Second Amendment is not unlimited . . . ." *Bruen*, 597. U.S. at 21. New Jersey's LCM Amendment is an appropriate limitation on the Second Amendment rights for the reasons below.

### 1. The Constitutionality of the LCM Amendment under the Second and Fourteenth Amendments

Applying the *Bruen* test, one looks first at whether large capacity ammunition magazines are entitled to Second Amendment protections under the plain text of the Second Amendment. The Court need not look far to answer this question. The Supreme Court has held that "[t]he possession of arms also implie[s] the possession

of ammunition." *United States v. Miller*, 307 U.S. 174, 180 (1939). This reading has been confirmed by the Third Circuit, which has held that large capacity ammunition magazines are an arm within the meaning of the Second Amendment. Specifically, the Third Circuit has stated that "since magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment" *ANJRPC II*, 910 F.3d at 116. While the Third Circuit's decision on this point was made prior to the Supreme Court's decision in *Bruen*, the Court does not read *Bruen* to disrupt the Third Circuit's reading of plain text of the Second Amendment. *See Bruen*, 597 U.S. at 19 ("Step one of the [overturned] framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."). In this Court's understanding of *Bruen*, the question of whether the plain text of the Second Amendment covers the statutory language of the LCM Amendment under *Heller's* first step was unaltered by *Bruen*. Accordingly, the Third Circuit's finding that magazines are arms within the meaning of the Second Amendment stands.[24]

---

[24] *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,* 664 F. Supp. 3d 584, 596 (D. Del. 2023), *aff'd,* No. 23-1633, 2024 WL 3406290 (3d Cir. July 15, 2024) (in denying Plaintiffs' motion for a preliminary injunction, finding that large capacity magazines were an arm within the meaning of the Second Amendment and relying upon *ANJRPC II*) *but see Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, No. 23-cv-1633, 2024 WL 3406290, at *15 (3d Cir. July 15, 2024) (Roth, J., concurring) (arguing that the

In a similar argument to that leveled against the Assault Firearms Law's AR-15 Provision, State Defendants argue that large capacity magazines are not in common use today for self-defense and are therefore unprotected under the Second Amendment. (ECF No. 183-1 at 36). The State Defendants argue that the evidence before the Court shows that civilians acting in self-defense rarely use more than ten shots and rarely use more than one magazine. (*Id.* at 37). Therefore, State Defendants argue, that magazines holding more than ten rounds are rarely used for self-defense. The Third Circuit has addressed this question in *ANJRPC II*, "although less definitively." *Delaware Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 596 (D. Del. 2023), *aff'd*, No. 23-cv-1633, 2024 WL 3406290 (3d Cir. July 15, 2024) (citing *ANJRPC II*, 910 F.3d at 116). As Judge Andrews described:

> Applying the now-defunct two-step approach under intermediate scrutiny, the Third Circuit "assume[d] without deciding that LCMs are typically possessed by law-abiding citizens for lawful purposes." *ANJRPC II*, 910 F.3d at 116. It did, however, observe that "millions of magazines are owned, often come factory standard with semiautomatic weapons," and "are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense." *Id.*

*Id.* at 596. This Court agrees with Judge Andrew's review of *ANJRPC II*. And what is more, the Court believes that—by definition—large capacity magazines are commonly owned given that the LCM Amendment permits some level of large

---

record developed in the same case "shows that *none* of the assault weapons and [large capacity magazines] are 'Arms' protected by the Second Amendment.").

capacity magazine ownership in the State of New Jersey and has done so for more than thirty years.[25]

The Court moves next to its analysis of the State of New Jersey's justification for its regulation by examining its reasons for regulating large capacity ammunition magazines and their consistency with our Nation's historical tradition of firearm regulation. Prior to undertaking this step in the *Bruen* analysis, the Court addresses a distinction between the analysis of the Assault Firearms Law with respect to AR-15s and the LCM Amendment. In the Court's reading of the Assault Firearms Law as it relates to the AR-15 Provision, the unprecedented societal changes discussed by Justice Thomas were not implicated given the facial similarities between the case before the Court and *Heller* and *Bruen*.

The LCM Amendment presents different issues, and the nuanced analysis is implicated. The State Defendants argue that the unprecedented rapidity and damage of mass shootings support a nuanced reading of the historical analogues under

---

[25] In a similar way to briefing surrounding the "dangerous and unusual" origin of the AR-15, the dangerous and unusual origin of large capacity magazines was not extensively briefed. Instead, State Defendants relied upon the military origins of large capacity ammunition magazines to demonstrate that large capacity magazines are most useful in military service and therefore may be banned without infringing the Second Amendment right. (ECF No. 183-1 at 45–46). *See also* discussion at *supra* note 22. Notwithstanding this gap, as will be explained below, the unusual nature of large capacity ammunition magazines was elucidated through other elements of the briefing and is addressed in the nuanced analysis under the second step of *Bruen.*

*Bruen.* (ECF No. 183-1 at 58, 61–63). Plaintiffs, on the other hand, argue that firearms capable of firing more than ten rounds are not a modern innovation, that these arms predate the American Revolution by about one hundred years, and that there were no laws restricting ammunition capacity at the time of the Founding. (ECF No. 175-7 at 37). Plaintiffs do concede that "modern firearms and magazines like the ones New Jersey has banned are more accurate and capable of quickly firing more rounds than their founding-era predecessors." (ECF No. 175-7 at 40). The State Defendants' argument is valid because the accuracy and lethality of the weapons in facilitated by these large capacity ammunition magazines is an unprecedented change and was not addressed in the Supreme Court's decisions in *Heller* or *Bruen.*

As the briefing has revealed, the question of magazine capacity is directly related to the mass shooting issue since a magazine's capacity bears strongly upon the lethality and accuracy of modern firearms; where mass shootings have become a societal scourge, the very practical issue of ways to prevent—or alternately, to limit—their lethality is before the Court. Even where there may have been mass events of murder in the Founding Era or Reconstruction Era, these instances pale in comparison to the accurate brutality exacted today by mass shooters. For these reasons, the nuanced historical analysis discussed within *Bruen*—which called for

nuanced "analogical reasoning" to determine whether historical analogues are "relevantly similar" in unprecedented circumstances—is appropriate. *Id.* at 28.

Turning now to the nuanced analysis, evidence submitted to the Court shows that detachable magazines did not exist in the Founding period; it was not until the mid-1800s that patents for magazines falling within the definition of the LCM Amendment began appearing in the historical record.[26] (ECF No. 175-6 at 21; *see also* ECF No. 176-1 at 896–97). Large capacity detachable magazines and the belt feeding mechanism in firearms "can be traced directly to a military heritage . . . and it was[ not] until the advent of WWI that development and refinement of large capacity feeding devices for machineguns gained increased importance." (ECF No. 176-1 at 896). Admittedly, the "line between military and civilian arms was certainly blurred at the founding of the country. While the military . . . sometimes utilized superior civilian arms, civilians could also possess guns that were traditionally associated with the military . . . ." (ECF No. 175-6 at 18).

In the 1860s, rifles capable of holding more than ten rounds became available, but the magazine was fixed.[27] (ECF No. 175-6 at 21; ECF No. 184-3 at 8, 43–44, 46). These rifles were mostly sold to the military, and civilians possessed a small

---

[26] In 1847, Walter Hunt patented a tubular magazine. (ECF No. 175-6 at 21) In 1855, Rollin White patented a box magazine. (*Id.*). Finally, in 1864, Robert Wilson patented a detachable magazine. (*Id.*; *see* ECF No. 176-1 at 896–97).

[27] A fixed magazine is a magazine that is not detachable from the firearm.

percentage of those rifles at the time of the ratification of the Fourteenth Amendment in 1868. (ECF No. 184-3 at 48).

Despite the issuance of a patent for detachable magazines in 1864, firearms with detachable magazines were not widely available until the end of the Nineteenth Century. (ECF No. 175-6 at 21; ECF No. 176-1 at 475–76; ECF No. 197 at 23). According to State Defendants' expert Brian Delay, "detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century." (ECF No. 184-3 at 54). Further, firearms with detachable magazines capable of holding more than ten rounds became commercially available in the 1920s. (ECF No. 184-3 at 9). As magazines capable of holding more than ten rounds did not exist in 1791 and were not widely available in 1868, to locate a statute or regulation from that time predicting their existence is unlikely.

In sum, the relevant large capacity magazines simply did not exist during Founding or Reconstruction Eras. As a result, the next step is to "engag[e] in an analogical inquiry" by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.

The apt historical analogues here are other firearms (specifically, pistols) and the Bowie knife. With respect to pistols, the relevant restrictions provided by the State Defendants are largely contemporary. For example, State Defendants' Expert

Richard Roth (hereinafter, "Roth") cites Twentieth Century regulations surrounding firearms more broadly linked to a surge in violence in the United States that occurred between the Mexican-American War and Reconstruction. (ECF No. 176-1 at 403–10). Where earlier limitations were provided, these examples are limited. State Defendants' Expert Robert J. Spitzer (hereinafter, "Spitzer") details pistol restrictions in the Eighteenth Century, and the limitations he lists are: penalties for crimes committed by armed perpetrators in Connecticut, Ohio, New Jersey, and Maryland; restrictions in New York, Ohio and Maryland to punish discharge of firearms near populated areas; and laws in Virginia, Massachusetts, North Carolina, and Tennessee which criminalized public arms carrying. (ECF No. 176-1 at 45–46). In addition, Spitzer details the regulation of semi-automatic weapons in the early to mid-nineteenth century. (ECF No. 176-1 at 463–75). As the Supreme Court noted in *Bruen*, while postenactment history has weight in this analysis, the use of post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, [and does] not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 36 (quoting *Heller*, at 554 U.S. at 614).

With respect to restrictions on the concealed carrying of pistols, the evidence appears to vary based upon the region. According to Spitzer, forty-nine States and the District of Columbia enacted laws that prohibited the "concealed carrying of

certain enumerated weapons or types of weapons."  (ECF No. 176-1 at 577–80).
Stronger restrictions might have been enacted in different geographic areas where
homicide rates were higher.  For example, in Texas "where the homicide rate soared
to at least 76 per 100,000 adults per year from June 1865 to June 1868, the legislature
passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed
carry of a wide range of weapons, including firearms . . ."  (ECF No. 176-1 at 408).
By the early Twentieth Century, laws appeared to restrict "general weapons
carrying, whether concealed or open[.]"  (ECF No. 176-1 at 577–80).  Notably
missing from the historical record provided to the Court are categorical and
complete bans on firearms.

The most analogous comparison to the regulation at issue here is the Bowie
knife, which—like many other knives—"were [historically] often regulated like
handguns[.]" D. B. Kopel, & Joseph G.S. Greenlee, *The History of Bans on Types
of Arms Before 1900,* 50 J. OF LEGIS. 224, 293 (2024).  Bowie knives were prolific
in the United States in the 1830s and were widely used in fights and criminal
activities. (ECF No. 176-1 at 505–09 (citing three cases, two from Tennessee and
one from Texas: *Aymette v. State*, 1840 WL 1554, 21 Tenn. 152 (Tenn. 1840);
*Haynes v. Tennessee*, 1844 WL 1894, 24 Tenn. 120 (Tenn. 1844); *Cockrum v. State*,
1859 WL 6446, 24 Tex. 394 (Tex. 1859); ECF No. 183-1 at 74–75).  At least twenty-
four States or Territories enacted restrictions on the possession of such knives

between 1837 and 1868. (ECF No. 176-1 at 582–85; *id.* at 624–718). Once Bowie knives' potential misuse became apparent, restrictions were enacted in all other states or territories—with the exception of New Hampshire—within the next few decades and up until the Twentieth Century. (*Id.* at 510). The State Defendants present proof of the regulation in various states such as Tennessee and Arkansas which prohibited the carrying and sale of Bowie knives. (*See* ECF No. 183-1 at 75). Few states prohibited the complete sale of Bowie knives. Indeed, the mainstream approach to Bowie knife regulation was to "ban concealed carry, to forbid sales to minors, or to impose extra punishment for criminal misuse[,] not to wholesale ban their possession." D. B. Kopel, & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900,* 50 J. OF LEGIS. 224, 293 (2024). Thus, while a few outlier States implemented near-total restrictions on Bowie knives, these restrictions overall formed the basis for a tradition of prohibiting a subset of arms that could be useful and had become common for self-defense yet nevertheless posed a threat to public safety.

Analyzing the historical analogues requires the Court to consider "both 'how' and 'why' the regulations . . . burden a law-abiding citizen's right to armed self-defense.'" *Lara,* 91 F.4th at 129 (quoting *Bruen,* 597 U.S. at 29). With respect to the "how," the LCM Amendment places a burden on self-defense that is comparable to the burden imposed by the historical analogues. Evidence has been

presented that there is a tradition in our Nation of weapons regulation for weapons such as pistols or Bowie knives. These laws prohibited the use of these weapons in certain ways. For instance, throughout the Eighteenth Century, numerous states issued penalties, laws, or restrictions for the use or discharge of firearms in certain manners, including discharge in a public area or public arms carrying. (ECF No. 176-1 at 45–46). Or take the regulations within the Nineteenth Century addressing the Bowie knife; while several States banned the carrying or use of Bowie knives in certain ways in the early 1800s, by the mid-1800s, at least twenty-four States or Territories enacted some level of restriction on Bowie knives. (ECF No. 176-1 at 582–85; *id.* at 624–718). Once Bowie knives' potential misuse became apparent, restrictions were enacted in all other states or territories—with the exception of New Hampshire—within the next few decades and up until the Twentieth Century. (*Id.* at 510). Like these restrictions, the LCM Amendment is precisely that—a restriction responding to safety concerns present in our time.

As to the "whys" for the LCM Amendment, there is significant data that large capacity magazines increase the lethality of mass shooting events.[28] The prevalence of large capacity magazines being holding more than ten rounds being used in high-fatality mass shootings is extremely high; indeed, all mass shootings between 2019 through 2022 involved their use. (*See* ECF No. 176-1 at 268–71, 278; *see* ECF No.

---

[28] *See* discussion at *supra* ¶¶ 30–33.

183-2 at 33).  This observation reflects growing trends.  First, that mass shootings are becoming more deadly.  Second, that large capacity ammunition magazines have been used in most of these mass shooting events in recent years.  This relationship is impossible to ignore.  The stated purpose of the State of New Jersey—to effectively slow down a mass shooter—is well-served by the LCM Amendment. The LCM Amendment might accomplish this end by providing a solution to this very real problem; the lethality exerted upon the victims of a shooter armed with a magazine that can continue to shoot in a line of uninterrupted fire for a longer time period is lessened where that line of uninterrupted fire is reduced.  A limitation on magazine capacity stops the rate at which victims can be injured.  A limitation on magazine capacity allows for time during which a shooter may be intercepted, interrupted, or hopefully, stopped.  Such a problem—while new to us—is analogous to other safety issues presented by commonly used weapons for lawful purposes confronted by our Nation in the past.  In the past, legislators took action to prevent these societal problems with limitations as the State of New Jersey has done here. This burden on the people of New Jersey's right to self-defense is comparable to that imposed by these historical laws.   As such, these historical analogues provide the basis for the following conclusion: that the State may regulate the permissible capacity of the large capacity magazines.

For these reasons, the LCM Amendment is constitutional.

## 2. The Constitutionality of the LCM Amendment under the Fifth and Fourteenth Amendments

Plaintiffs Ellman and Weinberg also bring claims asserting violations of the Takings Clause of the Fifth Amendment. Plaintiffs Ellman and Weinberg argue that they have suffered damages because of the LCM Amendment. Specifically, Plaintiffs Ellman and Weinberg argue that their large capacity ammunition magazines have been taken from them without just compensation. State Defendants oppose this motion, arguing for summary judgment in their favor because this issue was already decided by the Third Circuit on the merits in 2018. (ECF No. 183-1 at 90; *ANJRPC II*, 910 F.3d at 124; *see also ANJRPC III*, 974 F.3d at 240). State Defendants are correct, and Plaintiffs' Motion for Summary Judgment is denied.

This exact issue was already addressed and decided by the Third Circuit. *ANJRPC II*, 910 F.3d at 124 (finding that the LCM Amendment was neither an actual nor a regulatory taking). In the Court's reading of *Bruen*, *Bruen* altered the means-end scrutiny analysis to the Second Amendment analysis. And while the Supreme Court vacated the judgment and remanded the matter for reconsideration in light of *Bruen*, the Court does not read anything in the text of *Bruen* to disrupt the Third Circuit's decision as it relates to the Fifth Amendment analysis. In the same way that that the Court is bound to follow decisions of the Supreme Court, the Court is bound by decisions of the Third Circuit.

The LCM Amendment is not an unconstitutional taking.

**VI.**

The AR-15 Provision of the Assault Firearms Law is unconstitutional under *Bruen* and *Heller* as to the Colt AR-15 for use of self-defense within the home.  In contrast, the LCM Amendment is constitutional under these same decisions.  The Third Circuit's decision on whether the LCM Amendment constitutes an unconstitutional taking—and its finding that the LCM Amendment does not— remains valid since *Bruen* did not disrupt this holding.

An Order and Judgment follow.


7/30/24
—————————
Date

Peter M Sheridan
—————————
PETER G. SHERIDAN, U.S.D.J.